**No.**

# In the Supreme Court of the United States

---

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
ET AL., PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

---

*ON PETITION FOR A WRIT OF CERTIORARI*
*BEFORE JUDGMENT TO THE UNITED STATES*
*COURT OF APPEALS FOR THE NINTH CIRCUIT*

---

**PETITION FOR A WRIT OF CERTIORARI**
**BEFORE JUDGMENT**

---

NOEL J. FRANCISCO
*Solicitor General*
*Counsel of Record*
JOSEPH H. HUNT
*Assistant Attorney*
*General*
JEFFREY B. WALL
*Deputy Solicitor General*
HASHIM M. MOOPPAN
*Deputy Assistant Attorney*
*General*
JONATHAN Y. ELLIS
*Assistant to the Solicitor*
*General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
*Attorneys*

*Department of Justice*
*Washington, D.C. 20530-0001*
*SupremeCtBriefs@usdoj.gov*
*(202) 514-2217*

**AR3309**

**QUESTIONS PRESENTED**

This dispute concerns the policy of immigration enforcement discretion known as Deferred Action for Childhood Arrivals (DACA). In 2016, this Court affirmed, by an equally divided Court, a decision of the Fifth Circuit holding that two related Department of Homeland Security (DHS) discretionary enforcement policies, including an expansion of the DACA policy, were likely unlawful and should be enjoined. See *United States* v. *Texas*, 136 S. Ct. 2271 (per curiam). In September 2017, DHS determined that the original DACA policy was unlawful and would likely be struck down by the courts on the same grounds as the related policies. DHS thus instituted an orderly wind-down of the DACA policy. The questions presented are as follows:

1. Whether DHS's decision to wind down the DACA policy is judicially reviewable.

2. Whether DHS's decision to wind down the DACA policy is lawful.

(I)

**AR3310**

## PARTIES TO THE PROCEEDING

Petitioners are the Donald J. Trump, President of the United States; Jefferson B. Sessions III, Attorney General of the United States; Kirstjen M. Nielsen, Secretary of Homeland Security; U.S. Department of Homeland Security; and the United States.

Respondents are the Regents of the University of California; Janet Napolitano, President of the University of California; the State of California; the State of Maine; the State of Maryland; the State of Minnesota; the City of San Jose; Dulce Garcia; Miriam Gonzalez Avila; Saul Jimenez Suarez; Viridiana Chabolla Mendoza; Norma Ramirez; Jirayut Latthivongskorn; the County of Santa Clara; and Service Employees International Union Local 521.

(II)

# TABLE OF CONTENTS

Page

Opinions below ........................................................................ 1
Jurisdiction ............................................................................. 2
Statutory provisions involved ................................................. 2
Statement ............................................................................... 2
Reasons for granting the petition .......................................... 14
   I.    The questions presented warrant this Court's
       immediate review ....................................................... 15
   II.   The decisions below are wrong ................................... 17
       A.  DACA's rescission is unreviewable under
          the APA ............................................................... 17
       B.  DACA's rescission is lawful ................................. 23
          1.  The rescission is reasonable in light of
              DHS's serious doubts about the legality of
              the DACA policy ......................................... 23
          2.  The rescission is reasonable in light of
              DHS's additional and independent policy
              concerns ...................................................... 27
          3.  The rescission is reasonable in light of
              DHS's correct determination that DACA
              is unlawful .................................................. 28
          4.  The rescission does not violate equal
              protection or due process ............................. 30
   III.  The Court should grant certiorari before
        judgment in all three cases ......................................... 32
Conclusion .............................................................................. 34
Appendix A — District court order denying FRCP
                    12(b)(1) dismissal and granting
                    provisional relief (Jan. 9, 2018) .................. 1a
Appendix B — District court order granting in part
                    defendants' motion to dismiss under
                    FRCP 12(b)(6) (Jan. 12, 2018) ................. 71a
Appendix C — Notice of appeal (Jan. 16, 2018) ................. 91a
Appendix D — Court of appeals order (Jan. 25, 2018) ....... 96a

(III)

AR3312

IV

Table of Contents—Continued:                              Page

Appendix E  —  Memorandum on Exercising
                   Prosecutorial Discretion with Respect
                   to Individuals Who Came to the United
                   States as Children (June 15, 2012) .......... 97a
Appendix F  —  Memorandum on Exercising
                   Prosecutorial Discretion with Respect
                   to Individuals Who Came to the United
                   States as Children and with Respect to
                   Certain Individuals Who Are the
                   Parents of U.S. Citizens or Permanent
                   Residents (Nov. 20, 2014) ...................... 102a
Appendix G  —  Memorandum on Rescission of Deferred
                   Action for Childhood Arrivals
                   (Sept. 5, 2017) ........................................... 111a
Appendix H  —  Memorandum from Secretary Kirstjen
                   M. Nielsen (June 22, 2018) .................... 120a
Appendix I  —  Statutory provisions ................................. 127a

## TABLE OF AUTHORITIES

Cases:

*Arizona* v. *United States*, 567 U.S. 387 (2012) ........... 2, 3, 19

*Bowman Transp., Inc.* v. *Arkansas-Best Freight
Sys., Inc.*, 419 U.S. 281 (1974) ........................................... 24

*Casa de Maryland* v. *Department of Homeland Sec.*,
284 F. Supp. 3d 758 (D. Md. 2018) ...................................... 8

*Dames & Moore* v. *Regan*, 453 U.S. 654 (1981) ................. 17

*FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502
(2009) ................................................................................... 23

*Harlow* v. *Fitzgerald*, 457 U.S. 800 (1982) ........................ 28

*Heckler* v. *Chaney*, 470 U.S. 821 (1985) ...................... *passim*

*I.C.C.* v. *Brotherhood of Locomotive Eng'rs*,
482 U.S. 270 (1987)...................................................... 18, 21

*Jennings* v. *Rodriguez*, 138 S. Ct. 830 (2018) ..................... 22

**AR3313**

V

Cases—Continued:                                                  Page

*Lincoln* v. *Vigil*, 508 U.S. 182 (1993) ................................... 18

*Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto.*
   *Ins. Co.*, 463 U.S. 29 (1983) ..................................... 23, 26, 29

*Reno* v. *American-Arab Anti-Discrimination*
   *Comm.*, 525 U.S. 471 (1999) .........................3, 19, 22, 30, 31

*Texas* v. *United States*:

    86 F. Supp. 3d 591 (S.D. Tex.), aff'd,
      809 F.3d 134 (5th Cir. 2015), aff'd,
      136 S. Ct. 2271 (2016) ................................................ 5

    809 F.3d 134 (5th Cir. 2015), aff'd,
      136 S. Ct. 2271 (2016) ............................5, 6, 24, 25, 29

*Texas* v. *United States*, No. 18-cv-68,
   2018 WL 4178970 (S.D. Tex. Aug. 31, 2018).............. 16, 25

*Thunder Basin Coal Co.* v. *Reich*, 510 U.S. 200
   (1994)....................................................................... 22

*Trump* v. *Hawaii*, 138 S. Ct. 2392 (2018)........................... 31

*United States* v. *Armstrong*, 517 U.S. 456
   (1996)................................................................ 19, 28, 30

*United States* v. *Nixon*, 418 U.S. 683 (1974)...................... 17

*United States* v. *Texas*, 136 S. Ct. 2271 (2016) ............. 6, 16

*Wayte* v. *United States*, 470 U.S. 598 (1985) ..................... 20

*Youngstown Sheet & Tube Co.* v. *Sawyer*,
   343 U.S. 579 (1952)............................................... 17

Constitution, statutes, regulation, and rules:

U.S. Const.:
    Art. III.................................................................... 31
    Amend. V (Due Process Clause)................................... 30

Administrative Procedure Act,
   5 U.S.C. 551 *et seq.*............................................... 5
    5 U.S.C. 701(a)(2)................................... 9, 17, 18, 19, 127a
    5 U.S.C. 706(2)(A).................................... 23, 128a

AR3314

VI

Statutes, regulation, and rules—Continued:     Page

  Federal Food, Drug, and Cosmetic Act,
    21 U.S.C. 301 *et seq.* ................................................................... 20
  Immigration and Nationality Act,
    8 U.S.C. 1101 *et seq.* .................................................................... 2
      8 U.S.C. 1103(a)(1) ................................................................ 2
      8 U.S.C. 1158(b)(1)(A) ........................................................... 3
      8 U.S.C. 1182(a) (2012 & Supp. V 2017) ............................ 2
      8 U.S.C. 1227(a) (2012 & Supp. V 2017) ............................ 2
      8 U.S.C. 1229b ........................................................................ 3
      8 U.S.C. 1252 ............................................................9, 17, 21, 129a
      8 U.S.C. 1252(b)(9) ......................................................... 22, 138a
      8 U.S.C. 1252(g) ............................................................. 21, 143a
  Railway Labor Act, 45 U.S.C. 151 *et seq.* ............................ 21
  Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* ............. 8, 12
  6 U.S.C. 202(5) (2012 & Supp. V 2017) ................ 3, 19, 28, 29
  28 U.S.C. 1254(1) ......................................................................... 15
  28 U.S.C. 1292(b) ................................................................... 11, 12
  28 U.S.C. 2101(e) ......................................................................... 16
  8 C.F.R. 274a.12(c)(14) ................................................................ 3
  Fed. R. Civ. P.:
    Rule 12(b)(1) ......................................................... 9, 10, 12
    Rule 12(b)(6) ............................................................. 9, 12
  Sup. Ct. R. 11 ................................................................................ 16
Miscellaneous:

  S. 1291, 107th Cong., 1st Sess. (2001) ................................... 4
  S. 1545, 108th Cong., 1st Sess. (2003) ................................... 4
  S. 2075, 109th Cong., 1st Sess. (2005) ................................... 4
  S. 2205, 110th Cong., 1st Sess. (2007) ................................... 4
  S. 3827, 111th Cong., 2d Sess. (2010) .................................... 4

**AR3315**

VII

Miscellaneous—Continued:                          Page

Stephen M. Shapiro et al., *Supreme Court Practice*
  (10th ed. 2013) ................................................... 17

The White House, *Remarks by the President on
  Immigration* (June 15, 2012), https://go.usa.gov/
  xnZFY ................................................................ 26

U.S. Citizenship & Immigration Servs.,
  U.S. Dep't of Homeland Sec.:

  *Deferred Action for Childhood Arrivals:
    Frequently Asked Questions* (Mar. 8, 2018),
    https://go.usa.gov/xngCd ...................................... 4, 5

  *Frequently Asked Questions: Recession of
    DACA* (Sept. 5, 2017), https://go.usa.gov/
    xPVmE ...................................................... 7

  *Guidance on Rejected DACA Requests*
    (Feb. 14, 2018), https://go.usa.gov/xPVmG .......... 7, 31

AR3316

# In the Supreme Court of the United States

———————

No.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
ET AL., PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

———————

*ON PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT TO THE UNITED STATES
COURT OF APPEALS FOR THE NINTH CIRCUIT*

———————

**PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT**

———————

The Solicitor General, on behalf of the United States Department of Homeland Security and other federal parties, respectfully petitions for a writ of certiorari before judgment to the United States Court of Appeals for the Ninth Circuit.

**OPINIONS BELOW**

The order of the district court granting respondents' motion for a preliminary injunction and denying the government's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) (App. 1a-70a) is reported at 279 F. Supp. 3d 1011. The order of the district court granting in part and denying in part the government's motion to dismiss under Rule 12(b)(6) (App. 71a-90a) is reported at 298 F. Supp. 3d 1304.

(1)

AR3317

## JURISDICTION

On January 9, 2018, the district court denied the government's Rule 12(b)(1) motion, entered a preliminary injunction, and certified its Rule 12(b)(1) decision for interlocutory appeal.  On January 12, 2018, the district court granted in part and denied in part the government's Rule 12(b)(6) motion and certified its decision for interlocutory appeal.  The government filed a notice of appeal of both the January 9 and January 12 orders on January 16, 2018 (App. 91a-95a).  The Ninth Circuit granted permission to appeal both the January 9 and January 12 orders on January 25, 2018.  App. 96a.  The court of appeals' jurisdiction over the appeal of the preliminary injunction rests on 28 U.S.C. 1292(a)(1).  The court of appeals' jurisdiction over the appeal of the certified rulings rests on 28 U.S.C. 1292(b).  The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1) and 28 U.S.C. 2101(e).

## STATUTORY PROVISIONS INVOLVED

Pertinent statutory provisions are set forth in the appendix to this petition.  App. 127a-143a.

## STATEMENT

1. a. The Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, charges the Secretary of Homeland Security "with the administration and enforcement" of the immigration laws.  8 U.S.C. 1103(a)(1).  Individual aliens are subject to removal if, *inter alia*, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona* v. *United States*, 567 U.S. 387, 396 (2012); see 8 U.S.C. 1182(a) (2012 & Supp. V 2017); see also 8 U.S.C. 1227(a) (2012 & Supp. V 2017).  As a

AR3318

3

practical matter, however, the federal government cannot remove every removable alien, and a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.

For any alien subject to removal, Department of Homeland Security (DHS) officials must first "decide whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396. After removal proceedings begin, government officials may decide to grant discretionary relief, such as asylum or cancellation of removal. See 8 U.S.C. 1158(b)(1)(A), 1229b. And, "[a]t each stage" of the process, "the Executive has discretion to abandon the endeavor." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (*AADC*). In making these decisions, like other agencies exercising enforcement discretion, DHS must engage in "a complicated balancing of a number of factors which are peculiarly within its expertise." *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985). Recognizing the need for such balancing, Congress has provided that the "Secretary [of Homeland Security] shall be responsible for * * * [e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. 202(5) (2012 & Supp. V 2017).

b. In 2012, DHS announced the policy known as Deferred Action for Childhood Arrivals (DACA). See App. 97a-101a. Deferred action is a practice in which the Secretary exercises discretion to notify an alien of her decision to forbear from seeking his removal for a designated period. *AADC*, 525 U.S. at 484. Under DHS regulations, aliens granted deferred action may apply for and receive work authorization for the duration of the deferred-action grant if they establish economic necessity. 8 C.F.R. 274a.12(c)(14). A grant of deferred

**AR3319**

4

action does not confer lawful immigration status or provide any defense to removal. DHS retains discretion to revoke deferred action unilaterally, and the alien remains removable at any time.

DACA made deferred action available to "certain young people who were brought to this country as children." App. 97a. The INA does not provide any exemptions or special relief from removal for such individuals. And, dating back to at least 2001, bipartisan efforts to provide such relief legislatively had failed.[1] Under the DACA policy, following successful completion of a background check and other review, an alien would receive deferred action for a period of two years, subject to renewal. App. 99a-100a. The policy made clear that it "confer[red] no substantive right, immigration status or pathway to citizenship," because "[o]nly the Congress, acting through its legislative authority, can confer these rights." App. 101a.

DHS explained that information provided in the DACA request process would be protected from disclosure for the purpose of immigration enforcement proceedings unless certain criteria related to national security or public safety were satisfied, or the individual met the requirements for a Notice to Appear. USCIS, DHS, *Deferred Action for Childhood Arrivals: Frequently Asked Questions* (Mar. 8, 2018), https://go.usa.gov/xngCd. DHS also stated, however, that this information-sharing policy "may be modified, superseded, or rescinded at any time without notice," and that it "may not be relied

---

[1] See, *e.g.*, S. 1291, 107th Cong., 1st Sess. (2001); S. 1545, 108th Cong., 1st Sess. (2003); S. 2075, 109th Cong., 1st Sess. (2005); S. 2205, 110th Cong., 1st Sess. (2007); S. 3827, 111th Cong., 2d Sess. (2010).

5

upon to create any right or benefit, substantive or pro-
cedural, enforceable at law by any party in any admin-
istrative, civil, or criminal matter." *Id.* at 6.

Later, in 2014, DHS created a new policy of enforce-
ment discretion referred to as Deferred Action for Par-
ents of Americans and Lawful Permanent Residents
(DAPA). App. 102a-110a. Through a process expressly
designed to be "similar to DACA," DAPA made de-
ferred action available for certain individuals who had a
child who was a U.S. citizen or lawful permanent resi-
dent. App. 107a. At the same time, DHS also expanded
DACA by extending the deferred-action period from
two to three years and by loosening the age and resi-
dency criteria. App. 106a-107a.

c. Soon thereafter, Texas and 25 other States
brought suit in the Southern District of Texas to enjoin
DAPA and the expansion of DACA. The district court
issued a nationwide preliminary injunction, finding a
likelihood of success on the claim that the DAPA and
expanded DACA memorandum was a "'substantive'
rule that should have undergone the notice-and-
comment rule making procedure" required by the Ad-
ministrative Procedure Act (APA), 5 U.S.C. 551 *et seq.*
*Texas* v. *United States*, 86 F. Supp. 3d 591, 671 (S.D.
Tex. 2015); see *id.* at 607, 647, 664-678.

The Fifth Circuit affirmed the injunction, holding
that the DAPA and expanded DACA policies likely vio-
lated both the APA and the INA. *Texas* v. *United
States*, 809 F.3d 134, 146, 170-186 (2015). The court of
appeals concluded that plaintiffs had "established a sub-
stantial likelihood of success on the merits of their pro-
cedural claim" that DAPA and expanded DACA were
invalidly instituted without notice and comment. *Id.* at

6

178. The court also concluded, "as an alternate and additional ground," that the policies were substantively contrary to law. *Ibid.* The court observed that the INA contains an "intricate system of immigration classifications and employment eligibility," and "does not grant the Secretary discretion to grant deferred action and lawful presence on a class-wide basis to 4.3 million otherwise removable aliens." *Id.* at 184, 186 n.202. It also noted that Congress had repeatedly declined to enact legislation "closely resembl[ing] DACA and DAPA." *Id.* at 185.

After briefing and argument, this Court affirmed the Fifth Circuit's judgment by an equally divided Court, *United States* v. *Texas*, 136 S. Ct. 2271, 2272 (2016) (per curiam), leaving the nationwide injunction in place.

d. In June 2017, Texas and other plaintiff States in the *Texas* case announced their intention to amend their complaint to challenge the original DACA policy. D. Ct. Doc. 64-1, at 238-240 (Oct. 6, 2017).[2] They asserted that "[f]or the[] same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was unlawful, the original June 15, 2012 DACA memorandum is also unlawful." *Id.* at 239.

On September 5, 2017, rather than confront litigation challenging DACA on essentially the same grounds that had succeeded in *Texas* before the same court for the DAPA and expanded DACA policies, DHS decided to wind down DACA in an orderly fashion. App. 111a-119a. In the rescission memorandum, then-Acting Secretary of Homeland Security Elaine Duke explained that, "[t]aking into consideration the Supreme Court's

---

[2] Citations to the district court docket are to *Regents of the University of California* v. *DHS*, No. 17-cv-5211.

7

and the Fifth Circuit's rulings in the ongoing litigation," as well as the Attorney General's view that the DACA policy was unlawful and that the "potentially imminent" challenge to DACA would "likely * * * yield similar results" as the *Texas* litigation, "it is clear that the June 15, 2012 DACA program should be terminated."  App. 116a-117a.  The Acting Secretary accordingly announced that, "[i]n the exercise of [her] authority in establishing national immigration policies and priorities," the original DACA memorandum was "rescind[ed]." App. 117a.

The rescission memorandum stated, however, that the government "[w]ill not terminate the grants of previously issued deferred action * * * solely based on the directives in this memorandum" for the remaining two-year periods.  App. 118a.  The memorandum also explained that DHS would "provide a limited window in which it w[ould] adjudicate certain requests for DACA." App. 117a.  Specifically, DHS would "adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests * * * from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017."  App. 117a-118a.

DHS has also made clear that the "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017" DACA rescission.  USCIS, DHS, *Guidance on Rejected DACA Requests* (Feb. 14, 2018), https://go.usa.gov/ xPVmG (DHS Information-Sharing Guidance); see

USCIS, DHS, *Frequently Asked Questions: Rescission of DACA* (Sept. 5, 2017), https://go.usa.gov/xPVmE.

e. Shortly after DHS's decision to rescind DACA, respondents brought these five related suits in the Northern District of California challenging the rescission of DACA. Collectively, they allege that the termination of DACA is unlawful because it is arbitrary and capricious under the APA; violates the APA's requirement for notice-and-comment rulemaking as well as the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.*; denies respondents equal protection and due process; and permits the government to use information obtained through DACA in a manner inconsistent with principles of due process and equitable estoppel. See App. 21a-22a. Similar challenges were filed in the Eastern District of New York and in the District of Columbia. See, *e.g.*, *Batalla Vidal* v. *Nielsen*, No. 16-cv-4756 (E.D.N.Y. filed Sept. 19, 2017); *NAACP* v. *Trump*, No. 17-cv-1907 (D.D.C. filed Sept. 18, 2017). A summary of the proceedings in the Northern District of California (*Regents*) follows in this petition. A summary of the proceedings in the other district courts can be found in the government's petitions in those cases, filed simultaneously with this one.[3]

2. In *Regents*, the government filed the administrative record in October 2017. Litigation ensued in which respondents obtained orders from the district court directing a vast expansion of the administrative record, in addition to immediate discovery. See, *e.g.*, D. Ct. Doc. 79 (Oct. 17, 2017). The government sought review of

---

[3] The government largely prevailed in a similar challenge to the rescission filed in the District of Maryland. See *Casa de Maryland* v. *Department of Homeland Sec.*, 284 F. Supp. 3d 758 (2018). An appeal of that decision is pending before the Fourth Circuit.

9

those orders in a mandamus petition in the court of appeals, which a divided panel of the Ninth Circuit denied. 875 F.3d 1200 (2017). After granting a stay of the district court's orders, 138 S. Ct. 371 (2017), this Court granted the government's petition for a writ of certiorari, vacated the Ninth Circuit's judgment, and remanded for further proceedings. 138 S. Ct. 443 (2017) (per curiam). On remand, the district court stayed its orders requiring expansion of the administrative record and authorizing discovery "pending further order." D. Ct. Doc. 225, at 1 (Dec. 21, 2017).

While the litigation over the record proceeded, the government filed a motion to dismiss all five suits under Federal Rule of Civil Procedure 12(b)(1) and (6). D. Ct. Doc. 114 (Nov. 1, 2017). At the threshold, the government argued that respondents' claims are not reviewable because DHS's decision to rescind DACA is committed to agency discretion by law, see 5 U.S.C. 701(a)(2); and because judicial review of the denial of deferred action, if available at all, is barred under the INA prior to the issuance of a final removal order, see 8 U.S.C. 1252. The government also argued that respondents' arbitrary-and-capricious claims fail because DHS rationally explained the decision to wind down the discretionary DACA policy given the Acting Secretary's conclusion that the policy is unlawful and the imminent risk of its being invalidated in the *Texas* case. Finally, the government argued that respondents' other claims are without merit because the rescission of DACA is exempt from notice-and-comment requirements; does not violate principles of equal protection or due process; and does not change or affect the policies governing the use of aliens' personal information.

**AR3325**

10

Respondents opposed the government's motion to dismiss and filed a motion for a preliminary injunction, seeking to prevent the government from rescinding the DACA policy.  D. Ct. Doc. 111 (Nov. 1, 2017); D. Ct. Doc. 205 (Nov. 22, 2017).

3.  On January 9, 2018, the district court denied the motion to dismiss to the extent it was based on Rule 12(b)(1), and entered a preliminary injunction requiring the government to "maintain the DACA program on a nationwide basis."  App. 66a; see App. 1a-70a.

The district court first ruled that the rescission of DACA was not committed to agency discretion by law. The court acknowledged that an agency's decisions "not to prosecute or initiate enforcement actions are generally not reviewable as they are 'committed to an agency's absolute discretion.'"  App. 27a (quoting *Chaney*, 470 U.S. at 831).  But it concluded that the rescission of DACA was different because it involved a "broad enforcement polic[y]," rather than an "'individual enforcement decision'"; it rescinded a policy of enforcement discretion, instead of announcing a new one; and the "main" rationale for rescinding the prior policy was its "supposed illegality," which the court concluded it was authorized to assess.  App. 28a-30a (citation omitted). The court also concluded that the INA did not preclude review because "plaintiffs do not challenge any particular removal but, rather, challenge the abrupt end to a nationwide deferred-action and work-authorization program."  App. 30a-31a.

The district court then ruled that respondents were entitled to a preliminary injunction, concluding that they had demonstrated a likelihood of success on their claims that the rescission of DACA was arbitrary and capricious.  App. 41a-62a.  The court acknowledged that

**AR3326**

11

"a new administration is entitled to replace old policies with new policies so long as they comply with the law," App. 2a, and the court did not dispute that DACA was a discretionary non-enforcement policy that was neither mandated nor specifically authorized by statute.   It nonetheless concluded that respondents were likely to succeed because "the agency's decision to rescind DACA was based on a flawed legal premise" and because the government's "supposed 'litigation risk' rationale" was an invalid "post hoc rationalization" and, "in any event, arbitrary and capricious." App. 42a.

Finding that respondents had satisfied the remaining equitable requirements for an injunction, App. 62a-66a, the district court ordered the government, "pending final judgment" or other order, "to maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017." App. 66a.  The court specifically directed that the government must "allow[] DACA enrollees to renew their enrollments." *Ibid.*[4]

The district court *sua sponte* certified its order for interlocutory appeal under 28 U.S.C. 1292(b), to the ex-

---

[4]  The district court identified certain "exceptions" to its injunction—namely, "(1) that new applications from applicants who have never before received deferred action need not be processed; (2) that the advance parole feature need not be continued for the time being for anyone; and (3) that defendants may take administrative steps to make sure fair discretion is exercised on an individualized basis for each renewal application." App. 66a-67a.  The court also specified that "[n]othing in [its] order" would prohibit DHS from "remov[ing] any individual, including any DACA enrollee, who it determines poses a risk to national security or public safety, or otherwise deserves, in its judgment, to be removed." App. 67a.

tent it denied the "questions interposed by the government in its motion to dismiss under [Rule] 12(b)(1)." App. 70a.

4. On January 12, 2018, the district court issued a further order granting in part and denying in part the government's motion to dismiss to the extent it was based on Rule 12(b)(6). App. 71a-90a. The court declined to dismiss respondents' arbitrary-and-capricious claims "[f]or the same reasons" stated in its January 9 order. App. 72a. It declined to dismiss the equal-protection claim, concluding that respondents' allegations "raise a plausible inference that racial animus towards Mexicans and Latinos was a motivating factor in the decision to end DACA." App. 87a; see App. 83a-87a. And it declined to dismiss the claim that DHS violated substantive due process by allegedly "chang[ing] its policy" on the use of personal information "provided by DACA recipients," reasoning that such a change would "'shock[] the conscience.'" App. 79a-81a (citation omitted). The court dismissed respondents' remaining claims, including with respect to notice-and-comment, the Regulatory Flexibility Act, procedural due process, equitable estoppel, and equal protection based on a fundamental right to a job. App. 72a-79a, 81a-83a, 87a. The court again *sua sponte* certified its order for interlocutory appeal pursuant to 28 U.S.C. 1292(b). App. 89a.

5. Days later, the government filed notices of appeal of the district court's orders, App. 91a-95a, petitioned the Ninth Circuit for interlocutory appeal of the district court's decisions resolving the government's motion to dismiss under Rule 12(b)(1) and (6), and filed a petition for a writ of certiorari before judgment in this Court.

13

The court of appeals granted the government's petition for interlocutory appeal and consolidated the appeals. App. 96a; see 18-15133 C.A. Doc. 3 (January 26, 2018). On February 26, 2018, this Court denied the government's certiorari petition "without prejudice," stating that it "assumed that the Court of Appeals will proceed expeditiously to decide this case." 138 S. Ct. 1182. But while briefing in the Ninth Circuit was completed on April 17 and oral argument was held on May 15, the court of appeals has not yet issued a decision as of the printing of this petition.[5]

6. In June 2018, current Secretary of Homeland Security Kirstjen Nielsen issued a memorandum in response to the district court in *NAACP* v. *Trump*, *supra*, providing further explanation of DHS's decision to rescind DACA. App. 120a-126a. Secretary Nielsen concluded that "the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons." App. 122a. First, the Secretary agreed that "the DACA policy was contrary to law" and explained that "[a]ny arguable distinctions between the DAPA and DACA policies" were not "sufficiently material" to convince her otherwise. *Ibid.*; see App. 122a-123a. Second, the Secretary reasoned that, in any event, "[l]ike Acting Secretary Duke, [she] lack[s] sufficient confidence in the DACA policy's legality to continue this non-enforcement policy, whether the courts would ultimately uphold it or not." App. 123a.

_____

[5] On October 17, 2018, the government informed the court of appeals that, "in order to ensure review by the Supreme Court during its current Term," it intended to file a petition for a writ of certiorari before judgment if the court of appeals did not issue its judgment by October 31. 18-15068 C.A. Doc. 198.

14

She noted that "[t]here are sound reasons for a law en-
forcement agency to avoid discretionary policies that
are legally questionable." App. 122a-123a. Third, the
Secretary offered several "reasons of enforcement pol-
icy to rescind the DACA policy," regardless of whether
the policy is "illegal or legally questionable." App. 123a.
The Secretary also explained that, although she "do[es]
not come to these conclusions lightly," "neither any in-
dividual's reliance on the expected continuation of the
DACA policy nor the sympathetic circumstances of
DACA recipients as a class" outweigh the reasons to
end the policy. App. 125a. The government promptly
informed the court of appeals of Secretary Nielsen's
memorandum. 18-15068 C.A. Doc. 184 (June 22, 2018).

### REASONS FOR GRANTING THE PETITION

These cases concern the Executive Branch's author-
ity to revoke a discretionary policy of non-enforcement
that is sanctioning an ongoing violation of federal immi-
gration law by nearly 700,000 aliens. The DACA policy
is materially indistinguishable from the related policies
that the Fifth Circuit held were contrary to federal im-
migration law in a decision that four Justices of this
Court voted to affirm. No one contends that the policy
is required by federal law. And, in fact, consistent with
the view of the Department of Justice, DHS has decided
that the policy is unlawful and should be adopted only
by legislative action, not unilateral executive action.
Yet as a result of nationwide preliminary injunctions is-
sued by the District Courts in the Northern District of
California and the Eastern District of New York, DHS
has been required to keep the policy in place, now more
than a year since the agency's decision.

In denying the government's previous petition for a
writ of certiorari before judgment "without prejudice,"

**AR3330**

15

this Court "assumed that the Court of Appeals will proceed expeditiously to decide this case."  138 S. Ct. 1182 (2018).  That has not happened.  Although the court of appeals heard oral argument on May 15, 2018, it has yet to issue its decision.  And while no one, respondents included, contends that the legality of DACA's rescission will be finally resolved without this Court's review, absent prompt intervention from this Court, there is little chance the Court would resolve this dispute for at least *another year*.

Accordingly, the government today is filing petitions for writs of certiorari before judgment to the Second, Ninth, and D.C. Circuits, each of which has before it a decision concluding that the rescission of DACA either is or likely is unlawful.  As explained below, those decisions are wrong and they warrant this Court's immediate review.  The government presents each of these petitions to ensure that the Court has an adequate vehicle in which to resolve the questions presented in a timely and definitive manner.  The government respectfully submits that the Court should grant each petition for a writ of certiorari before judgment, consolidate these cases for decision, and consider this important dispute this Term.

## I. THE QUESTIONS PRESENTED WARRANT THIS COURT'S IMMEDIATE REVIEW

Congress has vested this Court with jurisdiction to review "[c]ases in the courts of appeals * * * [b]y writ of certiorari * * * *before or* after rendition of judgment or decree."  28 U.S.C. 1254(1) (emphasis added).  "An application * * * for a writ of certiorari to review a case before judgment has been rendered in the court of appeals may be made at any time before judgment."

16

28 U.S.C. 2101(e). This Court will grant certiorari before judgment "only upon a showing that the case is of such imperative public importance as to justify deviation from normal appellate practice and to require immediate determination in this Court." Sup. Ct. R. 11. These cases satisfy that standard.

An immediate grant of certiorari is necessary to obtain an appropriately prompt resolution of this important dispute. Even if a losing party were immediately to seek certiorari from a decision of one of the courts of appeals, this Court would not be able to review that decision in the ordinary course until next Term at the earliest. In the interim, the government would be required to retain a discretionary non-enforcement policy that DHS and the Attorney General have correctly concluded is unlawful and that sanctions the ongoing violation of federal law by more than half a million people. And the very existence of this litigation (and resulting uncertainty) would continue to impede efforts to enact legislation addressing the legitimate policy concerns underlying the DACA policy.

Such a delay is untenable and unnecessary. This Court is already familiar with the relevant issues in light of its consideration on plenary review of *United States* v. *Texas*, 136 S. Ct. 2271 (2016) (per curiam). And as the same district court that heard the *Texas* case has recently held (and as explained below), the reasoning of the Fifth Circuit's decision in *Texas* holding DAPA and the DACA expansion unlawful equally applies to DACA itself. See *Texas* v. *United States*, No. 18-cv-68, 2018 WL 4178970, at *38 (S.D. Tex. Aug. 31, 2018). Only this Court can resolve the conflict in the lower courts and provide much-needed clarity to the government and DACA recipients alike.

More than eight months ago, this Court recognized the need for an "expeditious[]" resolution of this dispute in its order denying without prejudice the government's earlier petition. 138 S. Ct. 1182. The Court has granted certiorari before judgment to promptly resolve other important and time-sensitive disputes. See, *e.g.*, *Dames & Moore* v. *Regan*, 453 U.S. 654, 668 (1981); *United States* v. *Nixon*, 418 U.S. 683, 686-687 (1974); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 584 (1952); cf. Stephen M. Shapiro et al., *Supreme Court Practice* § 4.20, at 287-288 (10th ed. 2013) (collecting cases where "[t]he public interest in a speedy determination" warranted certiorari before judgment). It should follow the same course here.

## II. THE DECISIONS BELOW ARE WRONG

Review is also warranted because the decisions below are incorrect. DHS's decision to rescind DACA—a policy of enforcement discretion—is a classic determination that is "committed to agency discretion by law," 5 U.S.C. 701(a)(2), and therefore unreviewable under the APA. Even if DHS's prospective denial of deferred action were reviewable, that could only be at the behest of an individual alien after a final order of removal was entered against the alien. See 8 U.S.C. 1252. In any event, the decision to rescind the DACA policy is not arbitrary and capricious, does not violate equal-protection or due-process principles, and is not otherwise unlawful.

### A. DACA's Rescission Is Unreviewable Under The APA

1. a. The APA precludes review of agency actions that are "committed to agency discretion by law." 5 U.S.C. 701(a)(2). "Over the years," this Court has interpreted that provision to apply to various types of

18

agency decisions that "traditionally" have been regarded as unsuitable for judicial review. *Lincoln* v. *Vigil*, 508 U.S. 182, 191 (1993). Section 701(a)(2) precludes review of an agency's decision not to institute enforcement actions, *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985); an agency's refusal to reconsider a prior decision based on an alleged "material error," *I.C.C.* v. *Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987) (*BLE*); and an agency's allocation of funds from a lumpsum appropriation, *Lincoln*, 508 U.S. at 192. Such exercises of discretion, the Court has explained, often require "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Chaney*, 470 U.S. at 831.

With respect to an agency's enforcement discretion in particular, an agency may "not only assess whether a violation has occurred," but "whether agency resources are best spent on this violation or another"; whether enforcement in a particular scenario "best fits the agency's overall policies"; and whether the agency "has enough resources to undertake the action at all." *Chaney*, 470 U.S. at 831. In addition, the Court has noted that when an agency declines to enforce, it "generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." *Id.* at 832. In this way and others, agency enforcement discretion "shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Ibid.*

b. DHS's decision to discontinue the DACA policy falls comfortably within the types of agency decisions

19

that traditionally have been understood as "committed to agency discretion." 5 U.S.C. 701(a)(2). Like the decision to *adopt* a policy of selective non-enforcement, the decision whether to *retain* such a policy can "involve[] a complicated balancing" of factors that are "peculiarly within [the] expertise" of the agency, including determining how the agency's resources are best spent and how the policy fits with the agency's overall policies. *Chaney*, 470 U.S. at 831. Likewise, a decision to abandon an existing non-enforcement policy will not, in itself, bring to bear the agency's coercive power over any individual. Indeed, an agency's decision to reverse a prior policy of civil non-enforcement is akin to changes in policy as to criminal prosecutorial discretion, which regularly occur within the U.S. Department of Justice both within and between presidential administrations, and which have never been considered amenable to judicial review. See *United States* v. *Armstrong*, 517 U.S. 456, 464 (1996).

This presumption of nonreviewability applies with particular force when it comes to immigration. As this Court has recognized, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system." *Arizona* v. *United States*, 567 U.S. 387, 396 (2012); see 6 U.S.C. 202(5) (2012 & Supp. V 2017). And, unlike in the ordinary criminal context, a decision not to enforce tolerates not merely past misconduct but a "continuing violation of United States law." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999). Thus, in the absence of a statutory directive "otherwise circumscribing" the agency's discretion, *Chaney*, 470 U.S. at 833, the Secretary's decisions establishing DHS's enforcement priorities for the Nation's immigration laws are beyond a

20

court's authority to review. There is no such directive here.

c. The district courts' reasons for finding DHS's decision reviewable are unavailing.

First, it makes no difference that the rescission of the DACA policy addressed a "broad enforcement polic[y]," App. 28a, instead of an individual enforcement decision. See *Batalla Vidal* App. 29a-30a. Agency decisions about how its "resources are best spent" or how certain enforcement activity "best fits the agency's overall policies," *Chaney*, 470 U.S. at 831, are just as susceptible to implementation through broad guidance as through case-by-case enforcement decisions. See, *e.g.*, *Wayte* v. *United States*, 470 U.S. 598, 601-603 (1985). And *Chaney* itself concerned the programmatic determination whether to enforce the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 301 *et seq.*, with respect to drugs used to administer the death penalty. See 470 U.S. at 824-825.

Nor does it matter that DHS has *eliminated* a policy of non-enforcement, rather than *adopted* one. App. 29a-30a; *Batalla Vidal* App. 30a. A decision whether to retain a non-enforcement policy implicates all of the same considerations about agency priorities and resources that inform the decision to adopt such a policy in the first instance. And because the rescission does not, by itself, initiate removal proceedings, "like the FDA's non-enforcement decision in *Chaney*, there are no agency proceedings here to provide a 'focus for judicial review,' and DACA's rescission does not itself involve the exercise of coercive power over any person." *NAACP* App. 33a (citation omitted).

Finally, DHS's decision is not reviewable simply because it rests on the agency's view of the legality of the

DACA policy, among other independent reasons. App. 30a; *Batalla Vidal* App. 30a; *NAACP* App. 42a-43a. An otherwise unreviewable agency action does not "become[] reviewable" because "the agency gives a 'reviewable' reason." *BLE*, 482 U.S. at 283. In *BLE*, the ICC's decision not to reconsider a prior decision was therefore unreviewable, even though the agency based that denial on an interpretation of its legal obligations under the Railway Labor Act, 45 U.S.C. 151 *et seq.* 482 U.S. at 276, 283. And in *Chaney*, the Food and Drug Administration's decision not to enforce the misbranding prohibition did not become reviewable even though it was based, in part, on the agency's understanding of its authority to initiate such proceedings. 470 U.S. at 824. The same is true here.

2. At a minimum, Congress has foreclosed district courts from adjudicating collateral attacks on DHS's discretionary enforcement decisions and policies in the manner pursued by respondents.

Under 8 U.S.C. 1252, judicial review of DHS enforcement decisions is generally available, if at all, only through the review procedures of removal orders set forth in that section. In particular, Section 1252(g) states that "[e]xcept as provided in this section * * * no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this subchapter." Section 1252(g) is "designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside

22

the streamlined process that Congress has designed."
*AADC*, 525 U.S. at 485. That design is also reflected in
8 U.S.C. 1252(b)(9), which channels into the review of
final removal orders "all questions of law and fact * * *
arising from any action taken * * * to remove an alien
from the United States." See *AADC*, 525 U.S. at 483
(describing Section 1252(b)(9) is an "unmistakable 'zip-
per' clause"); see also *Jennings* v. *Rodriguez*, 138 S. Ct.
830, 839-841 (2018) (plurality opinion); *id.* at 853-857
(Thomas, J., concurring in part and concurring in the
judgment).

Even in instances where the statutory text less
clearly precludes review, this Court has held that, when
it is fairly discernible that Congress intends a particular
review scheme to be exclusive, a plaintiff is not permit-
ted to circumvent that exclusive scheme by filing a
preemptive district-court action, but must instead pre-
sent his or her claims or defenses in the manner and to
the extent permitted by that review scheme. See *Thun-
der Basin Coal Co.* v. *Reich*, 510 U.S. 200, 207-209
(1994). The rescission of the DACA policy is precisely
the sort of "'no deferred action' decision[]," *AADC*,
525 U.S. at 485, and "part of the process by which
[the alien's] removability will be determined," *Jen-
nings*, 138 S. Ct. at 841 (plurality opinion), that Con-
gress intended to channel through the INA's careful re-
view scheme. Respondents cannot escape that scheme
simply by filing suit before the agency has initiated an
enforcement proceeding against the individual respond-
ents. Respondents' claims, "if they are reviewable at
all," must be litigated in removal proceedings, not through
"separate rounds of judicial intervention" in federal dis-
trict court. *AADC*, 525 U.S. at 485.

AR3338

23

**B. DACA's Rescission Is Lawful**

Even if DHS's decision to rescind DACA is reviewable under the APA, it is plainly valid.  Under the APA, the decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. 706(2)(A).  That standard of review requires only that the "agency 'examine the relevant data and articulate a satisfactory explanation for its action.'"  *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation omitted).  "[A] court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  DHS's decision to begin an orderly wind-down of an indisputably discretionary policy of non-enforcement based on serious doubts about the legality of the policy, as well as the legal and practical implications of maintaining such a policy without statutory authority, easily passes that test.  The district courts' contrary conclusions are unpersuasive.

### 1. *The rescission is reasonable in light of DHS's serious doubts about the legality of the DACA policy*

DHS reasonably rested its decision on the legal and practical implications of maintaining a policy of non-enforcement (original DACA) that is materially indistinguishable from policies (DAPA and expanded DACA) that were struck down by the Fifth Circuit in a decision affirmed by this Court.  Particularly in the face of the threat by Texas and other States to challenge DACA, that rationale alone provides a permissible reason for initiating an orderly wind-down of the policy.

a. As an initial matter, the district courts in *Regents* and *Batalla Vidal* erred in concluding that "[t]he Attorney General's letter and the Acting Secretary's memorandum can only be reasonably read as stating DACA

**AR3339**

24

was illegal and that, given that DACA must, therefore, be ended." App. 56a (emphasis omitted); see *Batalla Vidal* App. 110a. As the court in *NAACP* correctly recognized, DACA's rescission is based on concerns that go beyond the ultimate legality of DACA. Such concerns are evident from the original rescission memorandum. *NAACP* App. 56a; see *Bowman Transp., Inc.* v. *Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (courts should uphold agency action based on any ground that "may reasonably be discerned" from the decision). And any doubt on that score is eliminated by Secretary Nielsen's subsequent statement that "regardless of whether the DACA policy is ultimately illegal, it was appropriately rescinded by DHS because there are, at a minimum, serious doubts about its legality." App. 123a.

b. That rationale is eminently reasonable. In *Texas* v. *United States*, the Fifth Circuit concluded that DAPA and expanded DACA were unlawful on both procedural and substantive grounds. 809 F.3d 134, 178 (2015), aff'd, 136 S. Ct. 2271 (2016); see *id.* at 147 n.11 (including the "DACA expansions" within the opinion's references to "DAPA"). The entirety of the Fifth Circuit's reasoning applies equally to the original DACA policy. With respect to procedure, the Fifth Circuit concluded that the memorandum creating DAPA and expanding DACA was not exempt from notice-and-comment as a statement of policy based entirely on how the *original DACA policy* had been implemented. See *id.* at 171-178.

As a matter of substance, the Fifth Circuit held that DAPA and expanded DACA were contrary to the INA because (1) "[i]n specific and detailed provisions," the INA already "confers eligibility for 'discretionary re-

25

lief,'" including "narrow classes of aliens eligible for deferred action," *Texas*, 809 F.3d at 179 (citation omitted); (2) the INA's otherwise "broad grants of authority" could not reasonably be construed to assign to the Secretary the authority to create additional categories of aliens of "vast 'economic and political significance,'" *id.* at 183 (citation omitted); (3) DAPA and expanded DACA were inconsistent with historical deferred-action policies because they were not undertaken on a "'country-specific basis * * * in response to war, civil unrest, or natural disasters,'" nor served as a "bridge[] from one legal status to another," *id.* at 184 (citation omitted); and (4) "Congress ha[d] repeatedly declined to enact the Development, Relief, and Education for Alien Minors Act ('DREAM Act'), features of which closely resemble DACA and DAPA." *Id.* at 185 (footnote omitted). Every one of those factors also applies to the original DACA policy. Indeed, the Southern District of Texas recently determined, "guided by [that] Fifth Circuit precedent," that the INA could not "'reasonably be construed'" to authorize the maintenance of that policy. *Texas*, 2018 WL 4178970, at *38 (citation omitted); see *id.* at *45-*47 (finding no material differences between DAPA and DACA).[6]

In light of these similarities, DHS could permissibly rescind the DACA policy based on the agency's doubts about the legality of the policy and its likely fate in the courts. As Secretary Nielsen explained, "[a] central aspect of the exercise of a discretionary enforcement pol-

---

[6] The Southern District of Texas nevertheless declined to issue a preliminary injunction enjoining the DACA policy in light of, among other things, Texas's delay in seeking injunctive relief. See *Texas*, 2018 WL 4178970, at *57-*62.

26

icy is a judgment concerning whether DHS has sufficient confidence in the legality of such policy." App. 123a. The "sound reasons" to insist upon such confidence "include the risk that [legally questionable] policies may undermine public confidence in and reliance on the agency and the rule of law, and the threat of burdensome litigation that distracts from the agency's work." *Ibid.* The arbitrary-and-capricious standard does not allow a court "to substitute its judgment" for such a "rational" explanation by a law-enforcement agency. *State Farm*, 463 U.S. at 42-43.

    c. Contrary to the district courts' conclusions, DHS did not fail to sufficiently consider the reliance interests of DACA recipients. See App. 58a; *Batalla Vidal* App. 113a-114a; *NAACP* App. 106a-108a. When President Obama announced DACA in 2012, he explained that it was a "temporary stopgap measure," not a "permanent fix." The White House, *Remarks by the President on Immigration* (June 15, 2012), https://go.usa.gov/xnZFY. And, by its own terms, DACA made deferred action available for only two-year periods, which could "be terminated at any time at the agency's discretion." App. 104a. By choosing a gradual and orderly administrative wind-down of the policy rather than risk an immediate disruptive court-imposed one, DHS ensured that existing DACA grants would be permitted to expire according to their stated two-year terms and even permitted a limited window for additional renewals. In any event, as Secretary Nielsen explained, although the agency was "keenly aware that DACA recipients have availed themselves of the policy in continuing their presence in this country and pursuing their lives," it reasonably found that any asserted reliance interests did not "outweigh the questionable legality of the DACA policy" or

**AR3342**

27

the other factors the agency considered. App. 125a. As she observed, "[t]hat is especially so because issues of reliance would best be considered by Congress, which can assess and weigh a range of options." *Ibid.* The APA provides no basis to second-guess that judgment.

### 2. *The rescission is reasonable in light of DHS's additional and independent policy concerns*

DHS's decision to rescind DACA is independently supported by several additional enforcement-policy concerns. Secretary Nielsen explained that "regardless of whether * * * the DACA policy [is] illegal or legally questionable, there are sound reasons of enforcement policy to rescind the DACA policy." App. 123a. Those reasons include the agency's determination that (1) "DHS should enforce the policies reflected in the laws adopted by Congress and should not adopt public policies of non-enforcement of those laws for broad classes and categories of aliens under the guise of prosecutorial discretion"; (2) "DHS should only exercise its prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-case basis"; and (3) "it is critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws against all classes and categories of aliens," especially given that "tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years." App. 123a-124a. Respondents may disagree with these assessments, but they cannot be dismissed as irrational.

The *NAACP* court criticized these reasons as nothing more than the Secretary's "attempt to disguise * * * objection[s] to DACA's legality as * * * policy justification[s] for its rescission," *NAACP* App. 100a, and too

**AR3343**

28

"cursory" to serve as an independent basis for DHS's decision, *id.* at 102a-103a. That description, however, runs directly counter to the Secretary's explanation that her policy concerns provided a "separate and independently sufficient" reason for her conclusion that the DACA policy "properly was—and should be—rescinded." App. 122a. The presumption of regularity (and principles of inter-Branch comity) require courts to presume that executive officials—and certainly Cabinet officials—are acting in good faith "in the absence of clear evidence to the contrary." *Armstrong*, 517 U.S. at 464 (citation omitted); cf. *Harlow* v. *Fitzgerald*, 457 U.S. 800, 807 (1982). Neither the fact that the Secretary's policy concerns may also inform her view on DACA's legality, nor the succinctness of her explanation, provides remotely sufficient evidence to overcome that presumption.[7]

### 3. *The rescission is reasonable in light of DHS's correct determination that DACA is unlawful*

Finally, DHS's decision is also independently supported by its conclusion, informed by the Attorney General's advice, that indefinitely continuing the DACA policy would itself have been unlawful. As detailed above, the Fifth Circuit had already concluded that the DAPA and expanded DACA policies were invalid in a decision

---

[7]  The *NAACP* court also reasoned that the Secretary's "messaging" rationale (the third enforcement-policy reason) was an impermissible "*post hoc* rationalization." See *NAACP* App. 94a-95a. But the court itself acknowledged that the purpose of that proposition of administrative law is "simply to prevent courts from considering 'rationales offered by anyone other than the proper decisionmakers.'" *Id.* at 92a (citation omitted). There is no dispute that Secretary Nielsen is a "proper decisionmaker[]" for matters of immigration enforcement policies and priorities. *Ibid.*; see 6 U.S.C. 202(5) (2012 & Supp. V 2017).

29

that four Justices of this Court voted to affirm.  See pp. 24-25, *supra*.  And the Attorney General expressed his agreement with the conclusion reached by the Fifth Circuit in a decision that applies equally to the original DACA policy.  See App. 116a.  DHS's conclusion is correct:  DACA is unlawful.  Regardless, it cannot be that DHS's decision to rescind DACA on the basis of the Fifth Circuit's decision, this Court's equally divided affirmance, and the Attorney General's opinion was the type of "clear error of judgment," *State Farm*, 463 U.S. at 43 (citation omitted), that would make it arbitrary and capricious under the APA.

In *Regents* and *Batalla Vidal*, the district courts concluded that DHS could not rely on an assessment of DACA's legality unless it is correct as a matter of law.  See App. 42a; *Batalla Vidal* App. 91a-92a.  Relying on the Secretary's broad discretion in "[e]stablishing national immigration enforcement policies and priorities," 6 U.S.C. 202(5) (2012 & Supp. V 2017), and DHS's "long and recognized practice" of granting deferred action on a programmatic basis, those courts concluded that DACA is lawful.  App. 45a; see App. 42a-48a; *Batalla Vidal* App. 102a-104a.  But the Fifth Circuit rejected those precise considerations when offered in support of the DAPA and expanded DACA policies.  See *Texas*, 809 F.3d at 183.

In *NAACP*, the district court declined to pass on the legality of DACA, but concluded that DHS did not adequately explain its own view.  *NAACP* App. 49a-52a.  But, as explained above, the Fifth Circuit's *Texas* decision provides a robust analysis of the legality of DAPA and expanded DACA in a manner that applies with full force to the original DACA policy.  See pp. 24-25, *supra*.  The Duke and Nielsen memoranda make clear that

30

DHS agrees with the Fifth Circuit's conclusion that the DAPA and expanded DACA policies were unlawful under the INA and sees no meaningful distinctions. See App. 122a ("Any arguable distinctions between the DAPA and DACA policies are not sufficiently material to convince me that the DACA policy is lawful."); App. 117a. The law requires nothing more.

### 4. *The rescission does not violate equal protection or due process*

The district courts also erred in failing to dismiss respondents' claims that DHS's actions violate equal-protection or due-process principles.

a. In *Regents* and *Batalla Vidal*, the district courts declined to dismiss respondents' claim that the rescission violates equal-protection principles incorporated in the Due Process Clause of the Fifth Amendment. See App. 83a-87a; *Batalla Vidal* App. 147a-157a.[8]  But that claim is foreclosed by this Court's decision in *AADC*, which imposed a general bar on discriminatory-motive claims in the immigration-enforcement context. Such claims, the Court explained, "invade a special province of the Executive—its prosecutorial discretion." 525 U.S. at 489; see *Armstrong*, 517 U.S. at 463-465. And in the immigration context, this concern is "greatly magnified" because such claims "permit and prolong a continuing violation of United States law," and also potentially implicate foreign-policy concerns. *AADC*, 525 U.S. at 490. Although the district courts relied heavily on then-candidate Trump's "campaign rhetoric" unconnected to DACA or DACA recipients, App. 85a; *Batalla Vidal*

---

[8]  The *NAACP* court declined to reach the equal-protection challenge to the rescission in light of its statutory holding. See *NAACP* App. 67a.

**AR3346**

31

App. 152a-153a, neither court suggested that such statements trigger *AADC*'s sole potential exception, reserved for "a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome." 525 U.S. at 491. Indeed, even apart from *AADC*, the President's statements are wholly insufficient to suggest that Secretaries Duke and Nielsen were motivated by racial animus in deciding to rescind a policy sanctioning the ongoing violation of federal immigration law by 700,000 aliens, especially given the serious questions about its legality.

    b. The *Regents* court also found that the respondents adequately stated a claim under substantive due process based on DHS's alleged change in its information-sharing policy for personal information gathered from DACA requestors. App. 79a-81a. But there has been no such change and respondents have failed to plausibly allege otherwise. See DHS Information-Sharing Guidance; see also *Batalla Vidal* App. 159a-160a (dismissing a similar claim on that basis); *NAACP* App. 71a-72a (same). Nor would any change to the scope of exceptions to the information-sharing policy violate substantive due process, especially given DHS's express reservation of rights to do so. See pp. 4-5, s*upra*.[9]

---

    [9] The district courts also erred in enjoining the rescission of DACA on a nationwide basis. For the reasons given by Justice Thomas in his concurrence in *Trump* v. *Hawaii*, 138 S. Ct. 2392, 2424-2429 (2018), such relief exceeded the Article III power of the court to remedy the concrete and particular injuries of the parties before it; is inconsistent with longstanding equitable principles; and undermines the sound administration of the federal court system.

AR3347

32

## III. THE COURT SHOULD GRANT CERTIORARI BEFORE JUDGMENT IN ALL THREE CASES

To ensure an adequate vehicle for the timely and definitive resolution of this dispute, the Court should grant the government's petitions in *Regents*, *Batalla Vidal*, and *NAACP*, and consolidate the cases for further review.

A. This petition in *Regents* presents both of the questions presented and all of the relevant claims, including that the rescission of DACA is arbitrary and capricious; denies respondents equal protection and due process; and violates the APA's requirement for notice-and-comment rulemaking. Although the district court's preliminary injunction rests only on respondents' arbitrary-and-capricious claim, the district court addressed the remaining claims in its orders denying the government's motion to dismiss all of respondents' claims on reviewability and merits grounds. By virtue of the Ninth Circuit's acceptance of the interlocutory appeals of those orders and consolidation, a grant of certiorari before judgment would bring before the Court the entire case. Accordingly, this petition should be granted.

B. As fully explained in the *NAACP* petition, the related cases before the D.C. Circuit also raise both questions presented. Respondents in those cases likewise claim that the rescission is arbitrary and capricious; denies respondents equal protection and due process; and violates the APA's procedures concerning notice-and-comment rulemaking. In *NAACP*, however, respondents do not present some of the more tangential claims against the rescission, including, for example, that the rescission violates principles of equitable estoppel. The district court, moreover, did not pass on any constitutional

33

challenges to the rescission. Nevertheless, the Court should also grant certiorari in *NAACP* because that court invited Secretary Nielsen's supplemental memorandum, and it is the only district court to have passed on the effect of that memorandum on the questions presented.

C. Finally, as fully explained in the *Batalla Vidal* petition, the consolidated cases before the Second Circuit at issue in *Batalla Vidal* in many ways replicate the consolidated cases before the Ninth Circuit at issue here. The respondents in each set of cases present essentially the same challenges to the rescission of DACA, and the district courts entered identical nationwide preliminary injunctions based exclusively on respondents' arbitrary-and-capricious claims. Because an order vacating the injunction issued in *Regents* would have no practical consequence unless the injunction in *Batalla Vidal* was similarly vacated, the Court should at least hold the *Batalla Vidal* petition pending resolution of the other petitions. But to ensure that no developments in the lower courts between the filing of this petition and the Court's resolution of the case undermine the Court's ability to provide a definitive resolution of this overall dispute, the government respectfully submits that the Court should also issue a writ of certiorari to the Second Circuit.

\* \* \* \* \*

In 2012, DHS adopted a temporary, stop-gap policy of enforcement discretion, allowing some 700,000 aliens to remain in the United States even though existing laws provided them no ability to do so. After a change in administrations, DHS announced that it was ending that policy based on serious doubts about its legality and the practical implications of maintaining it. Secretary Nielsen has since made clear that DHS's decision also rests on policy considerations wholly apart from any legality concerns. It

34

is plainly within DHS's authority to set the Nation's immigration enforcement priorities and to end the discretionary DACA policy. By order of two district courts, however, DHS has been required to maintain that policy on a nationwide basis for over a year, even while efforts by the President and others to provide a sound legal basis for the policy through the legislative process have failed. More than eight months ago, this Court recognized that this dispute called for an expeditious resolution. That is even more evident today. The Court should grant review in these cases and ensure that it can provide a timely and definitive resolution of the dispute this Term.

## CONCLUSION

The petition for a writ of certiorari before judgment should be granted.

Respectfully submitted.

NOEL J. FRANCISCO
*Solicitor General*
JOSEPH H. HUNT
*Assistant Attorney*
*General*
JEFFREY B. WALL
*Deputy Solicitor General*
HASHIM M. MOOPPAN
*Deputy Assistant Attorney*
*General*
JONATHAN Y. ELLIS
*Assistant to the Solicitor*
*General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
*Attorneys*

NOVEMBER 2018

**AR3350**

No.

# In the Supreme Court of the United States

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE D.C. CIRCUIT*

**PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT**

NOEL J. FRANCISCO
*Solicitor General*
*Counsel of Record*
JOSEPH H. HUNT
*Assistant Attorney*
*General*
JEFFREY B. WALL
*Deputy Solicitor General*
HASHIM M. MOOPPAN
*Deputy Assistant Attorney*
*General*
JONATHAN Y. ELLIS
*Assistant to the Solicitor*
*General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
*Attorneys*

*Department of Justice*
*Washington, D.C. 20530-0001*
*SupremeCtBriefs@usdoj.gov*
*(202) 514-2217*

AR3351

## QUESTIONS PRESENTED

This dispute concerns the policy of immigration enforcement discretion known as Deferred Action for Childhood Arrivals (DACA). In 2016, this Court affirmed, by an equally divided Court, a decision of the Fifth Circuit holding that two related Department of Homeland Security (DHS) discretionary enforcement policies, including an expansion of the DACA policy, were likely unlawful and should be enjoined. See *United States* v. *Texas*, 136 S. Ct. 2271 (per curiam). In September 2017, DHS determined that the original DACA policy was unlawful and would likely be struck down by the courts on the same grounds as the related policies. DHS thus instituted an orderly wind-down of the DACA policy. The questions presented are as follows:

1. Whether DHS's decision to wind down the DACA policy is judicially reviewable.

2. Whether DHS's decision to wind down the DACA policy is lawful.

(I)

**AR3352**

## PARTIES TO THE PROCEEDING

Petitioners are Donald J. Trump, President of the United States; Jefferson B. Sessions III, Attorney General of the United States; Kirstjen M. Nielsen, Secretary of Homeland Security; U.S. Citizenship and Immigration Services; U.S. Immigration and Customs Enforcement; the U.S. Department of Homeland Security; and the United States.

Respondents are the Trustees of Princeton University; Microsoft Corporation; Maria De La Cruz Perales Sanchez; National Association for the Advancement of Colored People; American Federation of Teachers, AFL-CIO; and the United Food and Commercial Workers International Union, AFL-CIO, CLC.

(II)

## TABLE OF CONTENTS

Page

Opinions below ............................................................. 1
Jurisdiction .................................................................... 1
Statutory provisions involved ...................................... 2
Statement ...................................................................... 2
Reasons for granting the petition ............................. 13
    A. The questions presented warrant the Court's
       immediate review ............................................. 14
    B. These cases squarely present the reviewability and
       the lawfulness of DACA's rescission ............................. 15
    C. The Court should grant each of the government's
       petitions and consolidate the cases for consideration
       this Term ........................................................... 16
Conclusion .................................................................... 17
Appendix A — District court memorandum opinion
               (Apr. 24, 2018)............................................. 1a
Appendix B — District court order (Apr. 24, 2018) ............ 75a
Appendix C — District court order (Apr. 24, 2018) ............ 77a
Appendix D — District court memorandum opinion
               (Aug. 3, 2018) ............................................. 80a
Appendix E — District court order (Aug. 3, 2018) ........... 110a
Appendix F — Notice of appeal (Aug. 6, 2018)................. 112a
Appendix G — Notice of appeal (Aug. 6, 2018)................. 114a

## TABLE OF AUTHORITIES

Cases:

    *Arizona* v. *United States*, 567 U.S. 387 (2012) .................... 2
    *Casa de Maryland* v. *Department of Homeland Sec.*,
      284 F. Supp. 3d 758 (D. Md. 2018) ..................................... 8
    *Department of Homeland Sec.* v. *Regents of the*
      *Univ. of Cal.*, 138 S. Ct. 1182 (2018)................................. 14
    *Heckler* v. *Chaney*, 470 U.S. 821 (1985)................................ 3
    *Reno* v. *American-Arab Anti-Discrimination*
      *Comm.*, 525 U.S. 471 (1999) .................................................. 3

(III)

AR3354

IV

Cases—Continued:                                                   Page

    *Texas* v. *United States:*

        86 F. Supp. 3d 591 (S.D. Tex.), aff'd, 809 F.3d 134
            (5th Cir. 2015), aff'd, 136 S. Ct. 2271 (2016) ............. 5

        809 F.3d 134 (5th Cir. 2015), aff'd, 136 S. Ct. 2271
            (2016) ................................................................................ 5

    *United States* v. *Texas*, 136 S. Ct. 2271 (2016) .................... 6

Statutes, regulation, and rules:

    Administrative Procedure Act, 5 U.S.C. 551 *et seq.*............. 5

        5 U.S.C. 701(a)(2)....................................................... 8, 9

    Immigration and Nationality Act, 8 U.S.C. 1101

        *et seq.* ........................................................................... 2

        8 U.S.C. 1103(a)(1)........................................................ 2

        8 U.S.C. 1158(b)(1)(A) ................................................. 2

        8 U.S.C. 1182(a) (2012 & Supp. V 2017) ........................ 2

        8 U.S.C. 1227(a) (2012 & Supp. V 2017) ........................ 2

        8 U.S.C. 1229b................................................................ 2

        8 U.S.C. 1252 ................................................................. 8

    Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* .................. 7

    6 U.S.C. 202(5) (2012 & Supp. V 2017) ................................ 3

    8 C.F.R. 274a.12(c)(14) ........................................................ 3

    Fed. R. Civ. P.:

        Rule 12(b)(1) .................................................................. 8

        Rule 12(b)(6) .................................................................. 8

Miscellaneous:

    S. 1291, 107th Cong., 1st Sess. (2001) .................................. 4

    S. 1545, 108th Cong., 1st Sess. (2003) .................................. 4

    S. 2075, 109th Cong., 1st Sess. (2005) .................................. 4

    S. 2205, 110th Cong., 1st Sess. (2007) .................................. 4

    S. 3827, 111th Cong., 2d Sess. (2010) ................................... 4

AR3355

V

Miscellaneous—Continued:                                    Page

U.S. Citizenship & Immigration Servs.,
  U.S. Dep't of Homeland Sec.:
    *Deferred Action for Childhood Arrivals:
      Frequently Asked Questions* (Mar. 8, 2018),
      https://go.usa.gov/xngCd ........................................... 4
    *Frequently Asked Questions:  Rescission of
      DACA* (Sept. 5, 2017), https://go.usa.gov/
      xPVmE ...................................................................... 7
    *Guidance on Rejected DACA Requests*
      (Feb. 14, 2018), https://go.usa.gov/xPVmG .............. 7

**AR3356**

# In the Supreme Court of the United States

———————

No.

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., PETITIONERS

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL.

———————

*ON PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT TO THE UNITED STATES
COURT OF APPEALS FOR THE D.C. CIRCUIT*

———————

**PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT**

———————

The Solicitor General, on behalf of the President of the United States, Donald J. Trump, and other federal parties, respectfully petitions for a writ of certiorari before judgment to the United States Court of Appeals for the District of Columbia Circuit.

**OPINIONS BELOW**

The order of the district court granting respondents summary judgment (App. 1a-74a) is reported at 298 F. Supp. 3d 209. The order of the district court declining to reconsider its prior order (App. 80a-109a) is reported at 315 F. Supp. 3d 457.

**JURISDICTION**

On April 24, 2018, the district court granted respondents summary judgment (App. 1a-74a). The district court declined to reconsider its prior order and entered

(1)

**AR3357**

2

final judgment on August 3, 2018 (App. 80a-109a). The government filed its notice of appeal on August 6, 2018 (App. 112a-115a). The court of appeals' jurisdiction over the appeal of the district court's final judgment rests on 28 U.S.C. 1291. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1) and 28 U.S.C. 2101(e).

**STATUTORY PROVISIONS INVOLVED**

Pertinent statutory provisions are set forth in the appendix to the petition for a writ of certiorari before judgment in *United States Department of Homeland Security* v. *Regents of the University of California*, also filed today. *Regents* App. 127a-143a.

**STATEMENT**

1. a. The Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, charges the Secretary of Homeland Security "with the administration and enforcement" of the immigration laws. 8 U.S.C. 1103(a)(1). Individual aliens are subject to removal if, *inter alia*, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona* v. *United States*, 567 U.S. 387, 396 (2012); see 8 U.S.C. 1182(a) (2012 & Supp. V 2017); see also 8 U.S.C. 1227(a) (2012 & Supp. V 2017). As a practical matter, however, the federal government cannot remove every removable alien, and a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.

For any alien subject to removal, Department of Homeland Security (DHS) officials must first "decide whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396. After removal proceedings begin, government officials may decide to grant discretionary relief, such as asylum or cancellation of removal. See 8 U.S.C. 1158(b)(1)(A), 1229b. And, "[a]t each stage" of

**AR3358**

3

the process, "the Executive has discretion to abandon the endeavor." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (*AADC*). In making these decisions, like other agencies exercising enforcement discretion, DHS must engage in "a complicated balancing of a number of factors which are peculiarly within its expertise." *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985). Recognizing the need for such balancing, Congress has provided that the "Secretary [of Homeland Security] shall be responsible for * * * [e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. 202(5) (2012 & Supp. V 2017).

b. In 2012, DHS announced the policy known as Deferred Action for Childhood Arrivals (DACA). See *Regents* App. 97a-101a. Deferred action is a practice in which the Secretary exercises discretion to notify an alien of her decision to forbear from seeking his removal for a designated period. *AADC*, 525 U.S. at 484. Under DHS regulations, aliens granted deferred action may apply for and receive work authorization for the duration of the deferred-action grant if they establish economic necessity. 8 C.F.R. 274a.12(c)(14). A grant of deferred action does not confer lawful immigration status or provide any defense to removal. DHS retains discretion to revoke deferred action unilaterally, and the alien remains removable at any time.

DACA made deferred action available to "certain young people who were brought to this country as children." *Regents* App. 97a. The INA does not provide any exemptions or special relief from removal for such individuals. And, dating back to at least 2001, bipartisan efforts to provide such relief legislatively had

**AR3359**

4

failed.[1]  Under the DACA policy, following successful completion of a background check and other review, an alien would receive deferred action for a period of two years, subject to renewal.  *Id.* at 99a-100a.  The policy made clear that it "confer[red] no substantive right, immigration status or pathway to citizenship," because "[o]nly the Congress, acting through its legislative authority, can confer these rights." *Id.* at 101a.

DHS explained that information provided in the DACA request process would be protected from disclosure for the purpose of immigration enforcement proceedings unless certain criteria related to national security or public safety were satisfied, or the individual met the requirements for a Notice to Appear.  USCIS, DHS, *Deferred Action for Childhood Arrivals: Frequently Asked Questions* (Mar. 8, 2018), https://go.usa.gov/ xngCd.  DHS also stated, however, that this information-sharing policy "may be modified, superseded, or rescinded at any time without notice," and that it "may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 6.

Later, in 2014, DHS created a new policy of enforcement discretion referred to as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).  See *Regents* App. 102a-110a.  Through a process expressly designed to be "similar to DACA," DAPA made deferred action available for certain individuals who had a child who was a U.S. citizen or lawful permanent resident.  *Id.* at 107a.  At the same time,

---

[1] See, *e.g.*, S. 1291, 107th Cong., 1st Sess. (2001); S. 1545, 108th Cong., 1st Sess. (2003); S. 2075, 109th Cong., 1st Sess. (2005); S. 2205, 110th Cong., 1st Sess. (2007); S. 3827, 111th Cong., 2d Sess. (2010).

5

DHS also expanded DACA by extending the deferred-action period from two to three years and by loosening the age and residency criteria. *Id.* at 106a-107a.

c. Soon thereafter, Texas and 25 other States brought suit in the Southern District of Texas to enjoin DAPA and the expansion of DACA. The district court issued a nationwide preliminary injunction, finding a likelihood of success on the claim that the DAPA and expanded DACA memorandum was a "'substantive' rule that should have undergone the notice-and-comment rule making procedure" required by the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq. Texas* v. *United States*, 86 F. Supp. 3d 591, 671 (S.D. Tex. 2015); see *id.* at 607, 647, 664-678.

The Fifth Circuit affirmed the injunction, holding that the DAPA and expanded DACA policies likely violated both the APA and the INA. *Texas* v. *United States*, 809 F.3d 134, 146, 170-186 (2015). The court of appeals concluded that plaintiffs had "established a substantial likelihood of success on the merits of their procedural claim" that DAPA and expanded DACA were invalidly instituted without notice and comment. *Id.* at 178. The court also concluded, "as an alternate and additional ground," that the policies were substantively contrary to law. *Ibid.* The court observed that the INA contains an "intricate system of immigration classifications and employment eligibility," and "does not grant the Secretary discretion to grant deferred action and lawful presence on a class-wide basis to 4.3 million otherwise removable aliens." *Id.* at 184, 186 n.202. It also noted that Congress had repeatedly declined to enact legislation "closely resembl[ing] DACA and DAPA." *Id.* at 185.

AR3361

6

After briefing and argument, this Court affirmed the Fifth Circuit's judgment by an equally divided Court, *United States* v. *Texas*, 136 S. Ct. 2271, 2272 (2016) (per curiam), leaving the nationwide injunction in place.

d.  In June 2017, Texas and other plaintiff States in the *Texas* case announced their intention to amend their complaint to challenge the original DACA policy.  D. Ct. Doc. 60, at 238-240 (Feb. 16, 2018).[2]  They asserted that "[f]or the[] same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was unlawful, the original June 15, 2012 DACA memorandum is also unlawful." *Id.* at 239.

On September 5, 2017, rather than confront litigation challenging DACA on essentially the same grounds that had succeeded in *Texas* before the same court for the DAPA and expanded DACA policies, DHS decided to wind down DACA in an orderly fashion.  *Regents* App. 111a-119a.  In the rescission memorandum, then-Acting Secretary of Homeland Security Elaine Duke explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation," as well as the Attorney General's view that the DACA policy was unlawful and that the "potentially imminent" challenge to DACA would "likely * * * yield similar results" as the *Texas* litigation, "it is clear that the June 15, 2012 DACA program should be terminated." *Id.* at 116a-117a.  The Acting Secretary accordingly announced that, "[i]n the exercise of [her] authority in establishing national immigration policies and priorities," the original DACA memorandum was "rescind[ed]." *Id.* at 117a.

---

[2]  Citations to the district court docket are to *Trustees of Princeton University* v. *United States*, No. 17-cv-2325.

AR3362

7

The rescission memorandum stated, however, that the government "[w]ill not terminate the grants of previously issued deferred action * * * solely based on the directives in this memorandum" for the remaining two-year periods. *Regents* App. 118a. The memorandum also explained that DHS would "provide a limited window in which it w[ould] adjudicate certain requests for DACA." *Id.* at 117a. Specifically, DHS would "adjudicate —on an individual, case by case basis—properly filed pending DACA renewal requests * * * from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017." *Id.* at 117a-118a.

DHS has also made clear that the "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017" DACA rescission. USCIS, DHS, *Guidance on Rejected DACA Requests* (Feb. 14, 2018), https://go.usa.gov/ xPVmG; see USCIS, DHS, *Frequently Asked Questions: Rescission of DACA* (Sept. 5, 2017), https://go.usa.gov/ xPVmE.

e. Shortly after DHS's decision to rescind DACA, respondents brought these two related suits in the District of Columbia challenging the rescission of DACA. Collectively, they allege that the termination of DACA is unlawful because it is arbitrary and capricious under the APA; violates the APA's requirement for notice-and-comment rulemaking as well as the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.*; denies respondents equal protection and due process; and permits the government to use information obtained through DACA in

8

a manner that is inconsistent with due-process princi-ples.  See App. 17a-18a.  Similar challenges were filed in the Eastern District of New York and in the North-ern District of California.  See *Batalla Vidal* v. *Nielsen*, No. 16-cv-4756 (E.D.N.Y. filed Sept. 19, 2017); *Regents of the Univ. of Cal.* v. *DHS*, No. 17-cv-5211 (N.D. Cal. filed Sept. 8, 2017).  A summary of the proceedings in the District of Columbia (*NAACP*) follows in this peti-tion.  A summary of the proceedings in the other district courts can be found in the government's petitions in those cases, filed simultaneously with this one.[3]

2.  In *NAACP*, the government filed motions to dis-miss both suits under Federal Rule of Civil Procedure 12(b)(1) and (6).  D. Ct. Doc. 15 (Nov. 8, 2017).  At the threshold, the government argued that respondents' claims are not reviewable because DHS's decision to re-scind DACA is committed to agency discretion by law, see 5 U.S.C. 701(a)(2); and because judicial review of the denial of deferred action, if available at all, is barred un-der the INA prior to the issuance of a final removal or-der, see 8 U.S.C. 1252.  The government also argued that respondents' arbitrary-and-capricious claims fail because DHS rationally explained the decision to wind down the discretionary DACA policy given the Acting Secretary's conclusion that the policy is unlawful and the imminent risk of its being invalidated in the *Texas* case.  Finally, the government argued that respondents' other claims are without merit because the rescission of DACA is exempt from notice-and-comment require-ments; does not violate principles of equal protection or

---

[3]  The government largely prevailed in a similar challenge to the rescission filed in the District of Maryland.  See *Casa de Maryland* v. *DHS*, 284 F. Supp. 3d 758 (2018).  An appeal of that decision is pending before the Fourth Circuit.

AR3364

9

due process; and does not change or affect the policies governing the use of aliens' personal information.

Respondents opposed the government's motions to dismiss and filed a motion for summary judgment or, in the alternative, a preliminary injunction preventing the government from rescinding the DACA policy and from modifying its information-sharing policy.  D. Ct. Docs. 23, 28 (Dec. 15, 2017).

3.  On April 24, 2018, the district court entered an order granting respondents summary judgment and vacating the agency's rescission of DACA.  App. 1a-74a.

The district court first rejected the government's justiciability arguments.  The court concluded that the INA did not preclude review of respondents' claims before a final order of removal on the ground that "there is no allegation here that removal proceedings have yet been initiated against any DACA beneficiary, so there are no pending removal proceedings with which [respondents'] challenge might interfere."  App. 21a.  And the court determined that the rescission of DACA was not "committed to agency discretion by law," 5 U.S.C 701(a)(2), on the ground that Section 701(a)(2) does not apply to an agency's rescission of "a general enforcement policy predicated on [a] legal determination that the program was invalid."  App. 43a.  The court also reasoned that litigation risk "is insufficiently independent from the agency's evaluation of DACA's legality to trigger *Chaney*'s presumption of unreviewability."  *Ibid.*

On the merits, the district court concluded that the rescission was arbitrary and capricious under the APA because the rescission memorandum's "legal reasoning was insufficient to satisfy the Department's obligation to explain its departure from its prior stated view that DACA was lawful."  App. 51a.  The court acknowledged

AR3365

10

that the memorandum cited the Fifth Circuit's decision in *Texas*. *Ibid*. But the court interpreted that decision as holding only that "DAPA likely conflicted with the INA's 'intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status.'" *Ibid*. (citation omitted). The court reasoned that, "unlike DAPA, 'DACA has "no analogue in the INA,"'" and thus the Fifth Circuit's analysis was "inapposite." *Ibid*. (citations omitted). The court also concluded that DHS had failed to adequately consider reliance interests of DACA recipients who had structured their affairs "on the assumption that they would be able to renew their DACA benefits." App. 54a. Finally, the court determined that DHS's litigation-risk concern was arbitrary and capricious because, if a court were to find DACA unlawful under the *Texas* decision, it would have had "'broad discretion' to 'fashion[] equitable relief,'" such as allowing DHS an "opportunity to wind the program down." App. 58a (citation omitted; brackets in original).

The district court rejected respondents' claim that the rescission should have undergone notice-and-comment rulemaking, explaining that the rescission was "exempt from notice and comment as a general statement of agency policy." App. 48a. And the court dismissed the respondents' claim against DHS's alleged change in its information-sharing policy. App. 71a-72a. The court reasoned that, in light of DHS's recent public statements that the policy was unchanged, respondents had not "plausibly allege[d] that DACA beneficiaries' information has been or will be used inconsistently with DHS's stated information-sharing policy." App. 72a.

11

Finally, the court deferred ruling on respondents' equal-protection and due-process challenges to the rescission of DACA. App. 66a-67a. And the court stayed its order for 90 days to permit the Secretary of Homeland Security to "reissue a memorandum rescinding DACA, this time providing a fuller explanation." App. 66a.

4. On June 22, 2018, current Secretary of Homeland Security Kirstjen Nielsen issued a memorandum in response to the district court's invitation. *Regents* App. 120a-126a. In her memorandum, Secretary Nielsen concluded that "the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons." App. 122a. First, the Secretary agreed that "the DACA policy was contrary to law" and explained that "[a]ny arguable distinctions between the DAPA and DACA policies" were not "sufficiently material" to convince her otherwise. *Ibid.*; see App. 122a-123a. Second, the Secretary reasoned that, in any event, "[l]ike Acting Secretary Duke, [she] lack[s] sufficient confidence in the DACA policy's legality to continue this non-enforcement policy, whether the courts would ultimately uphold it or not." App. 123a. She noted that "[t]here are sound reasons for a law enforcement agency to avoid discretionary policies that are legally questionable." App. 122a-123a. Third, the Secretary offered several "reasons of enforcement policy to rescind the DACA policy," regardless of whether the policy is "illegal or legally questionable." App. 123a. The Secretary also explained that, although she "do[es] not come to these conclusions lightly," "neither any individual's reliance on the expected continuation of the DACA policy nor the sympathetic circumstances of DACA recipients as a class" outweigh the reasons to end the policy. App. 125a.

**AR3367**

12

5. On August 3, 2018, the district court denied the government's motion to reconsider its prior order in light of Secretary Nielsen's memorandum. App. 80a-109a. The court largely accepted that the Nielsen memorandum provided a relevant "'further explanation'" for DHS's decision, rather than (as respondents' urged) an impermissible "*post hoc* rationalization." App. 91a (citation omitted).[4] But it concluded that the memorandum did not provide a basis to revisit its reviewability or merits determinations. App. 95a-108a.

On reviewability, the district court observed that the Nielsen memorandum, like the rescission memorandum, was based in part on the view that "the DACA policy was contrary to law." App. 97a (citation omitted). And the court reasoned that "'an otherwise reviewable' legal interpretation 'does not become presumptively unreviewable simply because the agency characterizes it as an exercise of enforcement discretion.'" App. 95a-96a (citation omitted). It rejected the independent non-legal policy reasons offered by Secretary Nielsen as simply an "attempt to disguise an objection to DACA's legality as a policy justification for its rescission." App. 100a.

On the merits, the district court reaffirmed its conclusion that the rescission of DACA is arbitrary and capricious because it did not find DHS's explanation to include a sufficient "legal assessment that th[e] [c]ourt

---

[4] The district court refused to consider one of the several enforcement-policy reasons offered by the Secretary on the ground that it was a *post hoc* rationalization—namely, the importance for DHS to "project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws against all classes and categories of aliens," *Regents* App. 124a. See App. 94a.

could subject to judicial review." App. 105a. As for Secretary Nielsen's other rationales, the court expressed skepticism that the Secretary actually considered them to be "'independently sufficient'" given the court's conclusion that "three of those grounds—the substantial-doubts, legislative-inaction, and individualized-discretion rationales—simply recapitulate the Secretary's inadequately explained legal assessment." App. 106a (citation omitted). In any event, the court reasoned that the Secretary's memorandum "fails to engage meaningfully with the reliance interests and other countervailing factors that weigh against ending the program." *Ibid.* In the court's view, Secretary Nielsen "demonstrates no true cognizance of the serious reliance interests at issue here" and therefore the court refused to "accept as sufficient" her determination that "any reliance interests are outweighed" by the Secretary's other concerns about the DACA policy. App. 107a.

The government filed notices of appeal from the district court's final judgment on August 6, 2018. App. 112a-115a. On August 17, the district court stayed its order vacating the rescission of DACA insofar as the order granted relief beyond that already granted by the district courts in *Regents* and *Batalla Vidal*. D. Ct. Doc. 31.

## REASONS FOR GRANTING THE PETITION

These cases concern the Executive Branch's authority to revoke a discretionary policy of non-enforcement that is sanctioning an ongoing violation of federal immigration law by nearly 700,000 aliens. The DACA policy is materially indistinguishable from the related policies that the Fifth Circuit held were contrary to federal immigration law in a decision that four Justices of this Court voted to affirm. No one contends that the policy is required by federal law. And, in fact, consistent with

14

the view of the Department of Justice, DHS has decided that the policy is unlawful and should be adopted only by legislative action, not unilateral executive action. Yet as a result of nationwide preliminary injunctions issued by the District Courts in the Northern District of California and the Eastern District of New York, DHS has been required to keep the policy in place, now more than a year since the agency's decision.

The government today is filing petitions for writs of certiorari before judgment to the Second, Ninth, and D.C. Circuits, each of which has before it a decision concluding that the rescission of DACA either is or likely is unlawful. As explained in the *Regents* petition, those decisions are wrong and they warrant this Court's immediate review. The government presents each of these petitions to ensure that the Court has an adequate vehicle in which to resolve the questions presented in a timely and definitive manner. The government respectfully submits that the Court should grant each petition for a writ of certiorari before judgment, consolidate these cases for decision, and consider this important dispute this Term.

### A. The Questions Presented Warrant The Court's Immediate Review

The government's petition in *Regents* explains in detail why a grant of certiorari is necessary in order to obtain an appropriately prompt resolution of this important dispute. *Regents* Pet. 15-17. More than eight months ago, this Court recognized the need for an "expeditious[]" resolution of this dispute in its order dismissing without prejudice the government's petition for a writ of certiorari before judgment in *Department of Homeland Sec.* v. *Regents of the University of California*, 138 S. Ct. 1182 (2018). Absent certiorari before

**AR3370**

15

judgment, even if a losing party were immediately to seek certiorari from a decision of one of the courts of appeals, this Court would not be able to review that decision in the ordinary course until next Term at the earliest. In the interim, the government would be required to retain a discretionary non-enforcement policy that DHS and the Attorney General have correctly concluded is unlawful and that sanctions the ongoing violation of federal law by more than half a million people. And the very existence of this litigation (and resulting uncertainty) would continue to impede efforts to enact legislation addressing the legitimate policy concerns underlying the DACA policy.

**B. These Cases Squarely Present The Reviewability And The Lawfulness Of DACA's Rescission**

The cases pending before the D.C. Circuit squarely present both of the questions presented. The respondents raise all of the principal challenges to the lawfulness of the rescission of DACA, including that it is arbitrary and capricious, that it should have gone through notice-and-comment rulemaking, and that it violates equal-protection and due-process principles. The government moved to dismiss all of respondents' claims on justiciability and merits grounds. Respondents opposed dismissal for all of their claims and moved for summary judgment on the arbitrary-and-capricious and notice-and-comment claims. And the district court's final judgment rests on essentially the same arbitrary-and-capricious claim on which the district courts in *Regents* and *Batalla Vidal* rest their nationwide preliminary injunctions.

These cases, moreover, present at least one advantage over the cases at issue in *Regents* and *Batalla Vidal*. Secretary Nielsen issued her memorandum,

16

which provides further explanation for DHS's decision to rescind DACA, in response to an order from the district court in these cases. And she did so after the decisions in *Regents* and *Batalla Vidal* were on appeal. As a result, the district court here is the only court to have addressed the effect of that memorandum on the questions presented (including by considering and rejecting respondents' arguments that Secretary Nielsen's explanation should be disregarded in its entirety as *post hoc* rationalization).

A grant of certiorari before judgment to the D.C. Circuit would therefore ensure that the district court's analysis of Secretary Nielsen's memorandum is before this Court, and it would allow the Court to resolve, at a minimum, the government's justiciability arguments and the arbitrary-and-capricious claim after a final judgment.

### C. The Court Should Grant Each Of The Government's Petitions And Consolidate The Cases For Consideration This Term

To ensure an adequate vehicle for the timely and definitive resolution of this dispute, in addition to granting the government's petition in these cases, the Court should also grant the petitions for a writ of certiorari before judgment in *Regents* and *Batalla Vidal*, and consolidate the cases for further review. Although respondents here present the principal challenges against the rescission of DACA, they do not present some of the more tangential claims against the rescission, including, for example, that the rescission violates principles of equitable estoppel, and their equal-protection challenge is premised on DHS' alleged discrimination on the basis of DACA recipients' unlawful immigration status, not their race. The district court in these cases, moreover, did not pass on any constitutional challenges to the rescission.

**AR3372**

17

The government thus respectfully submits that the Court should grant all three petitions and consolidate the cases for this Court's review. In so doing, the Court would ensure that no intervening developments in the lower courts—for example, a reversal by the Second or Ninth Circuits of one of the preliminary injunctions— would impede or complicate the Court's ability to reach all of the claims against the rescission of DACA on which respondents have prevailed in the lower courts and thus provide a definitive resolution of this dispute this Term.

## CONCLUSION

The petition for a writ of certiorari before judgment should be granted.

Respectfully submitted.

NOEL J. FRANCISCO
*Solicitor General*
JOSEPH H. HUNT
*Assistant Attorney
General*
JEFFREY B. WALL
*Deputy Solicitor General*
HASHIM M. MOOPPAN
*Deputy Assistant Attorney
General*
JONATHAN Y. ELLIS
*Assistant to the Solicitor
General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
*Attorneys*

NOVEMBER 2018

**AR3373**

**No.**

# In the Supreme Court of the United States

---

KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

---

*ON PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT*

---

**PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT**

---

NOEL J. FRANCISCO
  *Solicitor General*
    *Counsel of Record*
JOSEPH H. HUNT
  *Assistant Attorney*
  *General*
JEFFREY B. WALL
  *Deputy Solicitor General*
HASHIM M. MOOPPAN
  *Deputy Assistant Attorney*
  *General*
JONATHAN Y. ELLIS
  *Assistant to the Solicitor*
  *General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
  *Attorneys*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

AR3374

## QUESTIONS PRESENTED

This dispute concerns the policy of immigration enforcement discretion known as Deferred Action for Childhood Arrivals (DACA). In 2016, this Court affirmed, by an equally divided Court, a decision of the Fifth Circuit holding that two related Department of Homeland Security (DHS) discretionary enforcement policies, including an expansion of the DACA policy, were likely unlawful and should be enjoined. See *United States* v. *Texas*, 136 S. Ct. 2271 (per curiam). In September 2017, DHS determined that the original DACA policy was unlawful and would likely be struck down by the courts on the same grounds as the related policies. DHS thus instituted an orderly wind-down of the DACA policy. The questions presented are as follows:

1. Whether DHS's decision to wind down the DACA policy is judicially reviewable.

2. Whether DHS's decision to wind down the DACA policy is lawful.

(I)

AR3375

## PARTIES TO THE PROCEEDING

Petitioners are Kirstjen M. Nielsen, Secretary of Homeland Security; the U.S. Department of Homeland Security; Jefferson B. Sessions III, Attorney General of the United States; Donald J. Trump, President of the United States; U.S. Citizenship and Immigration Services; U.S. Immigration and Customs Enforcement; and the United States.

Respondents are Martin Jonathan Batalla Vidal, Antonio Alarcon, Eliana Fernandez, Carlos Vargas, Mariano Mondragon, and Carolina Fung Feng, on behalf of themselves and all other similarly situated individuals; Make the Road New York, on behalf of itself, its members, its clients, and all similarly situated individuals; the State of New York; the State of Massachusetts; the State of Washington; the State of Connecticut; the State of Delaware; the District of Columbia; the State of Hawaii; the State of Illinois; the State of Iowa; the State of New Mexico; the State of North Carolina; the State of Oregon; the State of Pennsylvania; the State of Rhode Island;  the State of Vermont; the State of Virginia; and the State of Colorado.

(II)

**AR3376**

**TABLE OF CONTENTS**

Page

Opinions below .............................................................. 1
Jurisdiction ................................................................... 2
Statutory provisions involved ...................................... 2
Statement ..................................................................... 3
Reasons for granting the petition ............................... 13
    A.  The questions presented warrant the Court's
        immediate review ............................................ 14
    B.  These cases squarely present the reviewability and
        the lawfulness of DACA's rescission ............................. 15
    C.  The Court should grant each of the government's
        petitions and consolidate the cases for consideration
        this Term ........................................................ 16
Conclusion .................................................................. 18
Appendix A — District court memorandum and order
             (Nov. 9, 2017) ............................... 1a
Appendix B — Notice of appeal (Jan. 8, 2018) ................... 59a
Appendix C — District court amended memorandum &
             order & preliminary injunction
             (Feb. 13, 2018)........................... 62a
Appendix D — Notice of appeal (Feb. 20, 2018)............... 130a
Appendix E — District court memorandum and order
             (Mar. 29, 2018)........................... 133a
Appendix F — Notice of appeal (May 21, 2018) ............... 172a
Appendix G — Court of appeals order accepting
             interlocutory appeals (July 5, 2018)........ 175a

**TABLE OF AUTHORITIES**

Cases:

    *Arizona* v. *United States*, 567 U.S. 387 (2012) .................... 3
    *Casa de Maryland* v. *Department of Homeland Sec.*,
        284 F. Supp. 3d 758 (D. Md. 2018) ...................................... 9
    *Department of Homeland Sec.* v. *Regents of the*
        *Univ. of Cal.*, 138 S. Ct. 1182 (2018)................................. 15

(III)

AR3377

IV

Cases—Continued:                                                        Page

   *Heckler* v. *Chaney*, 470 U.S. 821 (1985)............................ 3, 10

   *Reno* v. *American-Arab Anti-Discrimination*
     *Comm.*, 525 U.S. 471 (1999) .............................................. 3, 4

   *Texas* v. *United States*:

     86 F. Supp. 3d 591 (S.D. Tex.), aff'd, 809 F.3d 134
       (5th Cir. 2015), aff'd, 136 S. Ct. 2271 (2016).............. 6

     809 F.3d 134 (5th Cir. 2015), aff'd, 136 S. Ct. 2271
       (2016)....................................................................................... 6

   *United States* v. *Texas*, 136 S. Ct. 2271 (2016) .................... 6

   *United States, In re*, 138 S. Ct. 443 (2017)............................ 9

Statutes, regulation, and rules:

   Administrative Procedure Act, 5 U.S.C. 551 *et seq.*............. 5

     5 U.S.C. 701(a)(2)................................................................... 10

   Immigration and Nationality Act, 8 U.S.C. 1101
     *et seq.*...................................................................................... 3

     8 U.S.C. 1103(a)(1)................................................................ 3

     8 U.S.C. 1158(b)(1)(A)........................................................ 3

     8 U.S.C. 1182(a) (2012 & Supp. V 2017) .......................... 3

     8 U.S.C. 1227(a) (2012 & Supp. V 2017) .......................... 3

     8 U.S.C. 1229b....................................................................... 3

     8 U.S.C. 1252......................................................................... 10

   Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* ................. 8

   6 U.S.C. 202(5) (2012 & Supp. V 2017) ................................ 3

   8 C.F.R. 274a.12(c)(14) .......................................................... 4

   Fed. R. Civ. P.:

     Rule 12(b)(1) ............................................................. 10, 16

     Rule 12(b)(6) ................................................ 10, 11, 12, 16

Miscellaneous:

   S. 1291, 107th Cong., 1st Sess. (2001) ................................... 4

   S. 1545, 108th Cong., 1st Sess. (2003) ................................... 4

**AR3378**

V

Miscellaneous—Continued:                                    Page

    S. 2075, 109th Cong., 1st Sess. (2005) .................................. 4

    S. 2205, 110th Cong., 1st Sess. (2007) .................................. 4

    S. 3827, 111th Cong., 2d Sess. (2010) ................................... 4

    U.S. Citizenship & Immigration Servs.,
      U.S. Dep't of Homeland Sec.:

      *Deferred Action for Childhood Arrivals:*
        *Frequently Asked Questions* (Mar. 8, 2018),
        https://go.usa.gov/xngCd ........................................... 5

      *Frequently Asked Questions: Rescission of*
        *DACA* (Sept. 5, 2017), https://go.usa.gov/
        xPVmE ..................................................................... 8

      *Guidance on Rejected DACA Requests*
        (Feb. 14, 2018), https://go.usa.gov/xPVmG .............. 8

**AR3379**

# In the Supreme Court of the United States

———————

No.

KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND
SECURITY, ET AL., PETITIONERS

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

———————

*ON PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT TO THE UNITED STATES
COURT OF APPEALS FOR THE SECOND CIRCUIT*

———————

## PETITION FOR A WRIT OF CERTIORARI
### BEFORE JUDGMENT

———————

The Solicitor General, on behalf of the Secretary of Homeland Security and other federal parties, respectfully petitions for a writ of certiorari before judgment to the United States Court of Appeals for the Second Circuit.

### OPINIONS BELOW

The order of the district court granting in part and denying in part the government's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) (App. 1a-58a) is reported at 295 F. Supp. 3d 127. The order of the district court granting respondents' motion for a preliminary injunction (App. 62a-129a) is reported at 279 F. Supp. 3d 401. The order of the district court granting in part and denying in part the government's motion to dismiss under Rule 12(b)(6) (App. 133a-171a) is reported at 291 F. Supp. 3d 260.

(1)

AR3380

2

## JURISDICTION

On November 9, 2017, the district court granted in part and denied in part the government's Rule 12(b)(1) motion (App. 1a-58a), and certified its decision for interlocutory appeal on January 8, 2018. The government filed a notice of appeal of that decision the same day (App. 59a-61a), and the court appeals granted permission to appeal that decision on July 5, 2018 (App. 175a-176a). The district court entered a preliminary injunction on February 13, 2018 (App. 62a-129a). The government filed a notice of appeal of the preliminary injunction on February 20, 2018 (App. 130a-132a). The district court granted in part and denied in part the government's Rule 12(b)(6) motion on March 29, 2018 (App. 133a-171a), and certified its decision for interlocutory appeal on April 30, 2018. The government filed a notice of appeal of that decision on May 21, 2018 (App. 172a-174a), and the court of appeals granted permission to appeal that decision on July 5, 2018 (App. 175a-176a). The court of appeals' jurisdiction over the appeal of the preliminary injunction rests on 28 U.S.C. 1292(a)(1). The court of appeals' jurisdiction over the appeals of the certified rulings rests on 28 U.S.C. 1292(b). The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1) and 28 U.S.C. 2101(e).

## STATUTORY PROVISIONS INVOLVED

Pertinent statutory provisions are set forth in the appendix to the petition for a writ of certiorari before judgment in *United States Department of Homeland Security* v. *Regents of the University of California*, also filed today. *Regents* App. 127a-143a.

3

**STATEMENT**

1. a. The Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, charges the Secretary of Homeland Security "with the administration and enforcement" of the immigration laws. 8 U.S.C. 1103(a)(1). Individual aliens are subject to removal if, *inter alia*, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona* v. *United States*, 567 U.S. 387, 396 (2012); see 8 U.S.C. 1182(a) (2012 & Supp. V 2017); see also 8 U.S.C. 1227(a) (2012 & Supp. V 2017). As a practical matter, however, the federal government cannot remove every removable alien, and a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.

For any alien subject to removal, Department of Homeland Security (DHS) officials must first "decide whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396. After removal proceedings begin, government officials may decide to grant discretionary relief, such as asylum or cancellation of removal. See 8 U.S.C. 1158(b)(1)(A), 1229b. And, "[a]t each stage" of the process, "the Executive has discretion to abandon the endeavor." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (*AADC*). In making these decisions, like other agencies exercising enforcement discretion, DHS must engage in "a complicated balancing of a number of factors which are peculiarly within its expertise." *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985). Recognizing the need for such balancing, Congress has provided that the "Secretary [of Homeland Security] shall be responsible for * * * [e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. 202(5) (2012 & Supp. V 2017).

**AR3382**

4

b. In 2012, DHS announced the policy known as Deferred Action for Childhood Arrivals (DACA). See *Regents* App. 97a-101a. Deferred action is a practice in which the Secretary exercises discretion to notify an alien of her decision to forbear from seeking his removal for a designated period. *AADC*, 525 U.S. at 484. Under DHS regulations, aliens granted deferred action may apply for and receive work authorization for the duration of the deferred-action grant if they establish economic necessity. 8 C.F.R. 274a.12(c)(14). A grant of deferred action does not confer lawful immigration status or provide any defense to removal. DHS retains discretion to revoke deferred action unilaterally, and the alien remains removable at any time.

DACA made deferred action available to "certain young people who were brought to this country as children." *Regents* App. 97a. The INA does not provide any exemptions or special relief from removal for such individuals. And, dating back to at least 2001, bipartisan efforts to provide such relief legislatively had failed.[1] Under the DACA policy, following successful completion of a background check and other review, an alien would receive deferred action for a period of two years, subject to renewal. *Id.* at 99a-100a. The policy made clear that it "confer[red] no substantive right, immigration status or pathway to citizenship," because "[o]nly the Congress, acting through its legislative authority, can confer these rights." *Id.* at 101a.

---

[1] See, *e.g.*, S. 1291, 107th Cong., 1st Sess. (2001); S. 1545, 108th Cong., 1st Sess. (2003); S. 2075, 109th Cong., 1st Sess. (2005); S. 2205, 110th Cong., 1st Sess. (2007); S. 3827, 111th Cong., 2d Sess. (2010).

5

DHS explained that information provided in the DACA request process would be protected from disclosure for the purpose of immigration enforcement proceedings unless certain criteria related to national security or public safety were satisfied, or the individual met the requirements for a Notice to Appear. USCIS, DHS, *Deferred Action for Childhood Arrivals: Frequently Asked Questions* (Mar. 8, 2018), https://go.usa.gov/ xngCd.  DHS also stated, however, that this information-sharing policy "may be modified, superseded, or rescinded at any time without notice," and that it "may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 6.

Later, in 2014, DHS created a new policy of enforcement discretion referred to as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). See *Regents* App. 102a-110a.  Through a process expressly designed to be "similar to DACA," DAPA made deferred action available for certain individuals who had a child who was a U.S. citizen or lawful permanent resident. *Id.* at 107a.  At the same time, DHS also expanded DACA by extending the deferred-action period from two to three years and by loosening the age and residency criteria. *Id.* at 106a-107a.

c.  Soon thereafter, Texas and 25 other States brought suit in the Southern District of Texas to enjoin DAPA and the expansion of DACA.  The district court issued a nationwide preliminary injunction, finding a likelihood of success on the claim that the DAPA and expanded DACA memorandum was a "'substantive' rule that should have undergone the notice-and-comment rule making procedure" required by the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq.*

AR3384

6

*Texas* v. *United States*, 86 F. Supp. 3d 591, 671 (S.D. Tex. 2015); see *id.* at 607, 647, 664-678.

The Fifth Circuit affirmed the injunction, holding that the DAPA and expanded DACA policies likely violated both the APA and the INA. *Texas* v. *United States*, 809 F.3d 134, 146, 170-186 (2015). The court of appeals concluded that plaintiffs had "established a substantial likelihood of success on the merits of their procedural claim" that DAPA and expanded DACA were invalidly instituted without notice and comment. *Id.* at 178. The court also concluded, "as an alternate and additional ground," that the policies were substantively contrary to law. *Ibid.* The court observed that the INA contains an "intricate system of immigration classifications and employment eligibility," and "does not grant the Secretary discretion to grant deferred action and lawful presence on a class-wide basis to 4.3 million otherwise removable aliens." *Id.* at 184, 186 n.202. It also noted that Congress had repeatedly declined to enact legislation "closely resembl[ing] DACA and DAPA." *Id.* at 185.

After briefing and argument, this Court affirmed the Fifth Circuit's judgment by an equally divided Court, *United States* v. *Texas*, 136 S. Ct. 2271, 2272 (2016) (per curiam), leaving the nationwide injunction in place.

d. In June 2017, Texas and other plaintiff States in the *Texas* case announced their intention to amend their complaint to challenge the original DACA policy. D. Ct. Doc. 77, at 238-240 (Oct. 6, 2017).[2] They asserted that "[f]or the[] same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was

---

[2] Citations to the district court docket are to *Batalla Vidal* v. *Nielsen*, No. 16-cv-4756.

7

unlawful, the original June 15, 2012 DACA memorandum is also unlawful." *Id.* at 239.

On September 5, 2017, rather than confront litigation challenging DACA on essentially the same grounds that had succeeded in *Texas* before the same court for the DAPA and expanded DACA policies, DHS decided to wind down DACA in an orderly fashion. *Regents* App. 111a-119a. In the rescission memorandum, then-Acting Secretary of Homeland Security Elaine Duke explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation," as well as the Attorney General's view that the DACA policy was unlawful and that the "potentially imminent" challenge to DACA would "likely  * * *  yield similar results" as the *Texas* litigation, "it is clear that the June 15, 2012 DACA program should be terminated." *Id.* at 116a-117a. The Acting Secretary accordingly announced that, "[i]n the exercise of [her] authority in establishing national immigration policies and priorities," the original DACA memorandum was "rescind[ed]." *Id.* at 117a.

The rescission memorandum stated, however, that the government "[w]ill not terminate the grants of previously issued deferred action  * * *  solely based on the directives in this memorandum" for the remaining two-year periods. *Regents* App. 118a. The memorandum also explained that DHS would "provide a limited window in which it w[ould] adjudicate certain requests for DACA." *Id.* at 117a. Specifically, DHS would "adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests  * * *  from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between

**AR3386**

8

the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017." *Id.* at 117a-118a.

DHS has also made clear that the "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017" DACA rescission. USCIS, DHS, *Guidance on Rejected DACA Requests* (Feb. 14, 2018), https://go.usa.gov/xPVmG; *see* USCIS, DHS, *Frequently Asked Questions: Rescission of DACA* (Sept. 5, 2017), https://go.usa.gov/xPVmE.

e. Respondents—including individual DACA recipients, 16 States, and the District of Columbia—brought these two related suits in the Eastern District of New York challenging the rescission of DACA. Collectively, they allege that the termination of DACA is unlawful because it is arbitrary and capricious under the APA; violates the APA's requirement for notice-and-comment rulemaking as well as the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.*; denies respondents equal protection and due process; and permits the government to use information obtained through DACA in a manner inconsistent with principles of due process and equitable estoppel. See App. 12a-17a. Similar challenges were filed in the Northern District of California and in the District of Columbia. See, *e.g.*, *Regents of the Univ. of Cal.* v. *Department of Homeland Sec.*, No. 17-cv-5211 (N.D. Cal. filed Sept. 8, 2017); *NAACP* v. *Trump*, No. 17-cv-1907 (D.D.C. filed Sept. 18, 2017). A summary of the proceedings in the Eastern District of New York (*Batalla Vidal*) follows in this petition. A summary of the proceedings in the other district courts can be found in the

9

government's petitions in those cases, filed simultaneously with this one.[3]

2. In *Batalla Vidal*, the government filed the administrative record in October 2017, and the district court set December 15 as the deadline for the government's motion to dismiss. As in the parallel Northern District of California litigation, before the government filed its dispositive motion, the district court permitted respondents to engage in broad discovery and directed a vast expansion of the administrative record. D. Ct. Doc. 90, at 10-11 (Oct. 19, 2017). And, as in *Regents*, the government sought review of the district court's orders in a petition for a writ of mandamus in the court of appeals.

While the government's mandamus petition was pending before the Second Circuit, this Court ordered the district court in *Regents* to resolve the government's threshold arguments and to consider whether interlocutory appeal was appropriate, before considering whether any record expansion was necessary. See *In re United States*, 138 S. Ct. 443, 445 (2017) (per curiam). One week later, the Second Circuit denied the government's petition for writ of mandamus in these cases. 17-3345 C.A. Doc. 171 (Dec. 27, 2017). At the same time, however, the court of appeals recognized—as had this Court—that the burdensome obligations imposed by the district court's orders could be obviated if the district court were "to certify its ruling [on the government's threshold defenses] for interlocutory appeal," and noted that "it may be prudent for the District Court

---

[3] The government largely prevailed in a similar challenge to the rescission filed in the District of Maryland. See *Casa de Maryland* v. *Department of Homeland Sec.*, 284 F. Supp. 3d 758 (2018). An appeal of that decision is pending before the Fourth Circuit.

AR3388

to stay discovery pending the resolution of such proceedings." *Id.* at 4.  Following the court of appeals' decision, on December 30, 2017, the district court stayed its orders requiring expansion of the administrative record and authorizing discovery.  Those orders remain stayed.

3. While the litigation over the record proceeded, the government filed its motion to dismiss these suits under Federal Rule of Civil Procedure 12(b)(1) and (6).  D. Ct. Doc. 95 (Oct. 27, 2017).  On November 9, the district court denied in part and granted in part the government's motion to dismiss under Rule 12(b)(1).  App. 1a-58a.

The district court first rejected the government's argument that the rescission of DACA was unreviewable under the APA because it was "committed to agency discretion by law," 5 U.S.C. 701(a)(2).  App. 24a-34a.  It distinguished *Chaney, supra*, on the grounds that (1) these cases concern the rescission of a policy of non-enforcement, rather than the refusal to take a specific enforcement action, and (2) in the court's view the rescission was not based on a "complicated balancing" of factors "within [the agency's] expertise," but on DHS's determination that the DACA policy was unlawful.  App. 29a (quoting *Chaney*, 470 U.S. at 831) (brackets in original).  The court also held that the INA, 8 U.S.C. 1252, did not require respondents' claims to be channeled through that statute's review scheme because the rescission of DACA itself "did not trigger any specific enforcement proceedings."  App. 35a.

The district court dismissed on standing grounds the respondents' claim that DHS failed to provide sufficient notice of the rescission, as well as the States' claims based on DHS's alleged change in its information-sharing

11

policy. App. 134a-171a. But it found that respondents adequately alleged standing to raise their remaining claims (including the individual respondents' claims based on DHS's alleged change in its information-sharing policy). App. 39a-56a. And it deferred consideration of the government's motion to dismiss under Rule 12(b)(6). App. 57a-58a.

The district court subsequently granted the government's request to certify the court's decision for interlocutory appeal. The government filed a notice of appeal of that decision, App. 59a-61a, and petitioned the Second Circuit for permission to appeal.

4. On February 13, 2018, the district court granted respondents' motion for a preliminary injunction requiring DHS to "maintain the DACA program on the same terms and conditions that existed" before the rescission. App. 126a; see App. 62a-129a.

The district court held that respondents were likely to succeed on their claim that DHS's decision to rescind DACA was arbitrary and capricious, concluding that the decision rests on an "erroneous legal conclusion that the DACA program is unlawful and unconstitutional," and on the "factually erroneous premise" that the courts in the *Texas* litigation had recognized "'constitutional defects . . . as to DAPA.'" App. 91a, 105a (capitalization and citation omitted). It also noted that the decision "appears to be internally inconsistent" because the Attorney General concluded that the policy was unconstitutional, but DHS ordered a wind-down of the policy rather than an immediate termination. App. 107a.

The district court rejected the government's argument that the decision is based on the practical implications of retaining the policy, given its doubtful legality.

AR3390

The court concluded that the Attorney General's statement that "it is likely that potentially imminent litigation" would lead the *Texas* court to hold DACA unlawful did not reflect "a reasoned assessment of 'litigation risk'" and that the record did not otherwise reflect such an assessment. App. 110a-111a. The court also reasoned that, even if the record did indicate that litigation risk had been taken into account, the rationale was not sufficiently explained, and failed to take "account of reliance interests [the DACA] program has engendered." App. 113a.

After concluding that the balance of harms tipped in respondents' favor, the district court issued a preliminary injunction requiring the government to maintain the DACA policy nationwide, subject to some limitations. App. 126a. Specifically, like the preliminary injunction issued in the *Regents* litigation, the court indicated that DHS was not required to consider new requests for DACA or requests for "advanced parole" from existing DACA recipients, and could adjudicate DACA renewal requests "on a case-by-case, individualized basis." *Ibid.* The government filed a notice of appeal from the district court's preliminary injunction order on February 20, 2018. App. 130a-132a.

5. On March 29, 2018, the district court issued an order granting in part and denying in part the rest of the government's motion to dismiss under Rule 12(b)(6). App. 133a-171a.

The district court denied the motion to dismiss with respect to respondents' claim that the rescission was arbitrary and capricious "[f]or the reasons stated in" its preliminary-injunction decision. App. 137a. It also declined to dismiss respondents' equal-protection claim, concluding that campaign statements by then-candidate

13

Trump "raise a plausible inference" that DHS's decision to rescind DACA was motived by discriminatory animus.  App. 152a-153a.  The court dismissed respondents' claims based on DHS's alleged change in its information-sharing policy because, in light of DHS's public announcements, respondents had not "plausibly alleged that DHS actually changed its information-sharing policy."  App. 160a.  And it dismissed respondents' remaining claims against the rescission of DACA, including with respect to notice-and-comment, the Regulatory Flexibility Act, and procedural due process.  App. 146a, 170a.[4]

The district court again granted the government's motion to certify its decision for interlocutory appeal. The government filed a notice of appeal of that decision, App. 130a-132a, and again petitioned the Second Circuit for permission to appeal.

6.  On July 5, 2018, the Second Circuit granted the government's petitions for interlocutory appeal of the district court's November 2017 and March 2018 orders, App. 175a-176a, and on July 25 the court of appeals consolidated the pending appeals. Oral argument is tentatively scheduled for January 2019.

**REASONS FOR GRANTING THE PETITION**

These cases concern the Executive Branch's authority to revoke a discretionary policy of non-enforcement that is sanctioning an ongoing violation of federal immigration law by nearly 700,000 aliens.  The DACA policy is materially indistinguishable from the related policies

---

[4]  The district court also declined to dismiss respondents' due-process claim based on DHS's alleged failure to process certain renewal requests that arrived late to DHS or contained clerical errors.  App. 170a.  The government does not challenge that ruling here.

**AR3392**

14

that the Fifth Circuit held were contrary to federal immigration law in a decision that four Justices of this Court voted to affirm. No one contends that the policy is required by federal law. And, in fact, consistent with the view of the Department of Justice, DHS has decided that the policy is unlawful and should be adopted only by legislative action, not unilateral executive action. Yet as a result of nationwide preliminary injunctions issued by the District Courts in the Northern District of California and the Eastern District of New York, DHS has been required to keep the policy in place, now more than a year since the agency's decision.

The government today is filing petitions for writs of certiorari before judgment to the Second, Ninth, and D.C. Circuits, each of which has before it a decision concluding that the rescission of DACA either is or likely is unlawful. As explained in the *Regents* petition, those decisions are wrong and they warrant this Court's immediate review. The government presents each of these petitions to ensure that the Court has an adequate vehicle in which to resolve the questions presented in a timely and definitive manner. The government respectfully submits that the Court should grant each petition for a writ of certiorari before judgment, consolidate these cases for decision, and consider this important dispute this Term.

### A. The Questions Presented Warrant The Court's Immediate Review

The government's petition in *Regents* explains in detail why a grant of certiorari is necessary in order to obtain an appropriately prompt resolution of this important dispute. *Regents* Pet. 15-17. More than eight months ago, this Court recognized the need for an "ex-

AR3393

15

peditious[]" resolution of this dispute in its order dismissing without prejudice the government's petition for a writ of certiorari before judgment in *Department of Homeland Security* v. *Regents of the University of California*, 138 S. Ct. 1182 (2018). Absent certiorari before judgment, even if a losing party were immediately to seek certiorari from a decision of one of the courts of appeals, this Court would not be able to review that decision in the ordinary course until next Term at the earliest. In the interim, the government would be required to retain a discretionary non-enforcement policy that DHS and the Attorney General have correctly concluded is unlawful and that sanctions the ongoing violation of federal law by more than half a million people. And the very existence of this litigation (and resulting uncertainty) would continue to impede efforts to enact legislation addressing the legitimate policy concerns underlying the DACA policy.

### B. These Cases Squarely Present The Reviewability And The Lawfulness Of DACA's Rescission

The cases pending before the Second Circuit squarely present both of the questions presented. The respondents raise all of the principal challenges to the lawfulness of the rescission of DACA, including that it is arbitrary and capricious, that it should have gone through notice-and-comment rulemaking, and that it violates equal-protection and due-process principles. The government moved to dismiss all of respondents' claims on justiciability and merits grounds. And although the district court relied solely on respondents' arbitrary-and-capricious claim in entering a preliminary injunction, the court addressed the government's justiciability arguments in its November 9 order denying the govern-

**AR3394**

16

ment's motion to dismiss under Rule 12(b)(1), and addressed all of the government's merits arguments in its March 29 order denying the government's motion to dismiss under Rule 12(b)(6).  The appeals of all three orders, moreover, have been consolidated before the Second Circuit.  A grant of certiorari before judgment would therefore bring before this Court all of the relevant questions.

### C. The Court Should Grant Each Of The Government's Petitions And Consolidate The Cases For Consideration This Term

To ensure an adequate vehicle for the timely and definitive resolution of this dispute, the Court should grant the government's petition in this case, as well as the petitions in *Regents* and *NAACP*, and consolidate the cases for further review.

As noted in the *Regents* petition, the cases that are the subject of this petition in many ways replicate the cases in the parallel litigation that are the subject of the *Regents* petition.  The respondents in each set of cases present essentially the same challenges to the rescission of DACA.  The district courts entered identical nationwide preliminary injunctions based exclusively on respondents' arbitrary-and-capricious claims, but then passed on the remaining claims in orders denying the government's motions to dismiss all of respondents' claims.  In both sets of cases, the relevant orders from the district courts have all been certified and accepted for interlocutory appeal and have been consolidated before the respective courts of appeals.

Because the *Regents* cases have already been before the Court twice before and because, in light of this Court's previous order, the Ninth Circuit is likely to is-

**AR3395**

17

sue a decision before the Court even considers the government's certiorari petitions, the Court may prefer to grant certiorari in *Regents* over these cases. The Court should, at a minimum, hold this petition pending resolution of the *Regents* petition and any further proceedings before this Court. An order vacating the injunction issued in *Regents* would have no practical consequence unless the injunction in these cases was similarly vacated.

The government respectfully submits, however, that the Court should grant all three petitions and consolidate the cases for this Court's review. In so doing, the Court would ensure that no intervening developments in the lower courts—for example, a reversal of the preliminary injunction by the Ninth Circuit—would impede or complicate the Court's ability to reach all of the claims against the rescission of DACA on which respondents have prevailed in the lower courts and thus provide a definitive resolution of this dispute this Term.

**AR3396**

18

**CONCLUSION**

The petition for a writ of certiorari before judgment should be granted.

Respectfully submitted.

NOEL J. FRANCISCO
*Solicitor General*
JOSEPH H. HUNT
*Assistant Attorney General*
JEFFREY B. WALL
*Deputy Solicitor General*
HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*
JONATHAN Y. ELLIS
*Assistant to the Solicitor General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
*Attorneys*

NOVEMBER 2018

AR3397

No. 18-587

# In the Supreme Court of the United States

———————

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
ET AL., PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

———————

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

———————

**SUPPLEMENTAL BRIEF FOR THE PETITIONERS**

———————

NOEL J. FRANCISCO
  *Solicitor General
    Counsel of Record
  Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

AR3398

**TABLE OF CONTENTS**

Page

Appendix — Court of appeals opinion (Nov. 8, 2018) ........... 1a

**TABLE OF AUTHORITIES**

Cases:

*General Elec. Co.* v. *Gilbert*, 429 U.S. 125 (1976) ................ 9
*Gratz* v. *Bollinger*, 537 U.S. 1044 (2002) ............................ 11
*Grutter* v. *Bollinger*, 539 U.S. 306 (2003) .......................... 11
*Heckler* v. *Chaney*, 470 U.S. 821 (1987)................................ 2
*I.C.C.* v. *Brotherhood of Locomotive Eng'rs*,
    482 U.S. 270 (1987)................................................. 6
*Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut.
    Auto. Ins. Co.*, 463 U.S. 29 (1983)..................................... 10
*Reno* v. *American-Arab Anti-Discrimination
    Comm.*, 525 U.S. 471 (1999) ................................................. 3
*Texas* v. *United States*, 809 F.3d 134
    (5th Cir. 2015), aff'd, 136 S. Ct. 2271 (2016) ................ 3, 4
*Trump* v. *Hawaii*, 138 S. Ct. 2392 (2018)............................ 6
*United States* v. *Booker*, 543 U.S. 220 (2005) .................... 11
*United States* v. *Fanfan*, 542 U.S. 956 (2004).................... 11
*United States* v. *Windsor*:
    568 U.S. 1066 (2012) .......................................... 8
    570 U.S. 744 (2013) ........................................ 8, 9
*Village of Arlington Heights* v. *Metropolitan Hous.
    Dev. Corp.*, 429 U.S. 252 (1977) .......................................... 6

Statutes and rules:

Administrative Procedure Act, 5 U.S.C. 551
    *et seq.* ..................................................................... 2

(I)

AR3399

II

Statutes and rules—Continued:                                   Page

    Immigration and Nationality Act, 8 U.S.C. 1101
    *et seq.* ................................................................ 3

        8 U.S.C. 1252(b)(9) ........................................ 3

        8 U.S.C. 1252(g) ............................................ 3

    6 U.S.C. 202(5) (2012 & Supp. V 2017) ................ 10

    28 U.S.C. 1254(1) ............................................. 8

    Fed. R. Civ. P.:

        Rule 12(b)(1) ................................................ 1

        Rule 12(b)(6) ................................................ 2

    Sup. Ct. R.

        Rule 10 ......................................................... 7

        Rules 10-16 ................................................... 8

        Rule 10(c) ..................................................... 8

        Rule 11 ......................................................... 7

        Rule 15.8 ...................................................... 1

Miscellaneous:

    Stephen M. Shapiro et al., *Supreme Court Practice*
    (10th ed. 2013) ............................................. 9, 11

AR3400

# In the Supreme Court of the United States

––––––––––

No. 18-587

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
ET AL., PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

––––––––––

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE NINTH CIRCUIT*

––––––––––

**SUPPLEMENTAL BRIEF FOR THE PETITIONERS**

––––––––––

This supplemental brief, filed pursuant to Rule 15.8 of this Court, brings to the Court's attention the opinion of the court of appeals in these related cases, which was issued after the filing of the government's petition for a writ of certiorari before judgment, and addresses its impact on the pending petition.

1. On January 9, 2018, the district court entered a preliminary injunction requiring the Department of Homeland Security (DHS) to maintain its policy of immigration enforcement discretion known as Deferred Action for Childhood Arrivals (DACA) for the pendency of these cases challenging the agency's decision to rescind the policy. Pet. App. 1a-70a. In the same order, the court granted in part and denied in part the government's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) and certified the ruling for interlocutory appeal. Pet. App. 69a-70a. On January 12, the

(1)

AR3401

2

court granted in part and denied in part the government's Rule 12(b)(6) motion and again certified its decision for interlocutory appeal. *Id.* at 71a-90a. The government filed a timely notice of appeal, *id.* at 91a-95a, and, on January 25, the Ninth Circuit granted permission to appeal both orders, *id.* at 96a. More than eight months later, on November 5, the government filed a petition for a writ of certiorari before judgment in these cases to ensure that this Court could consider this important dispute this Term.

2. Three days later, the court of appeals affirmed the preliminary injunction and the orders resolving the government's motion to dismiss. App., *infra,* (App.) 1a-97a.

a. The court of appeals first determined that DHS's decision to rescind DACA is reviewable under the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq.* App. 23a-45a. The court acknowledged that an agency's decision not to enforce "is a decision generally committed to an agency's absolute discretion." App. 25a (quoting *Heckler* v. *Chaney,* 470 U.S. 821, 831 (1985)). But the court reasoned that "an agency's nonenforcement decision is outside the scope of the *Chaney* presumption" if it is "based solely on a belief that the agency lacked the lawful authority to do otherwise." App. 29a. And the court determined that DACA's rescission, as reflected in the initial rescission memorandum, rested exclusively on "a belief that DACA was unlawful," not on concerns about maintaining the policy in the face of the then-ongoing litigation or any other exercise of the agency's discretion. App. 35a; see App. 35a-42a. The court observed that the Acting Secretary did not use the words "litigation risk" or "discretion" in the memorandum and that the noted considerations—*i.e.,* rulings in the ongoing litigation and the Attorney General's advice—were "more readily

**AR3402**

understood as supporting a legal conclusion (DACA is illegal) than a pragmatic one (DACA might be enjoined)." App. 35a-36a, 40a.

b. The court of appeals also concluded that the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, did not require that any challenge to the rescission be raised only at the behest of an individual alien after a final order of removal. App. 42a-45a. The court recognized that 8 U.S.C. 1252(g) was designed to "give some measure of protection to 'no deferred action' decisions" by channeling any review of such decisions into the INA's review scheme. App. 43a (quoting *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 (1999) (*AADC*)). But it reasoned that the protection reached only "*individual* 'no deferred action' decisions," not a "programmatic shift like the DACA rescission." *Ibid.* And it concluded that 8 U.S.C. 1252(b)(9) only applies to claims seeking review of a final order of removal. App. 45a n.19.

c. Turning to the merits, the court of appeals affirmed the district court's nationwide preliminary injunction, reasoning that respondents were likely to succeed on their arbitrary-and-capricious claim because DHS's decision was based on an erroneous legal conclusion that DACA was unlawful. App. 45a-60a.

The court of appeals acknowledged that the Fifth Circuit had held unlawful the related policies known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) and expanded DACA. App. 49a, 55a (citing *Texas* v. *United States*, 809 F.3d 134 (5th Cir. 2015), aff'd, 136 S. Ct. 2271 (2016)). In the Ninth Circuit's view, however, the Fifth Circuit had "concluded that DAPA conflicted with the INA largely for a reason that is inapplicable to DACA"—specifically,

4

that the INA provides "'an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status.'" App. 51a-52a (citation omitted).  It reasoned that "there is no analogous provision in the INA defining how immigration status may be derived by undocumented persons who arrived in the United States as children."  App. 52a.

Moreover, the court of appeals reasoned that, contrary to the Fifth Circuit's analysis, a deferred-action policy of DACA's significance was not inconsistent with Congress's enumeration of only "narrow classes of aliens eligible for deferred action," *Texas*, 809 F.3d at 179.  See App. 53a-54a.  The Ninth Circuit stated that, because the statutory grants of deferred-action eligibility "were added to the statute books piecemeal over time," no inference could be drawn about the permissibility of designating vastly larger classes of aliens.  App. 53a.  And it concluded that, in any event, DACA was not a policy of "economic and political" significance, because as of September 2017, DACA had only 689,000 participants, while approximately 4.3 million aliens may have been eligible for DAPA.  App. 54a (citation omitted).

The court of appeals thus concluded that "DACA was a permissible exercise of executive discretion."  App. 56a-57a.  Because, in the Ninth Circuit's view, DACA's rescission was based entirely on DHS's contrary belief, the court determined that respondents "are likely to succeed in demonstrating that the rescission must be set aside."  App. 57a.  In a footnote, the court refused to consider the "impact, if any, on this case" of the June 22 memorandum from current Secretary of Homeland Security Kirstjen Nielsen "'provid[ing] additional explanation of the basis for the DACA rescission,'" suggesting that the memorandum was an impermissible "'post-hoc

5

rationalization[]'" for DHS's decision that is not part of the record of this case and "leav[ing] it to the district court in the first instance to determine [its] admissibility." App. 57a-58a n.24 (citation omitted).

d. The court of appeals also affirmed the resolution of the government's motion to dismiss respondents' claims on the merits. App. 61a-78a. The court held that respondents' notice-and-comment claim was correctly dismissed because DACA's rescission was a "[g]eneral statement[] of policy * * * advis[ing] the public prospectively of the manner in which the agency proposes to exercise a discretionary power," which is exempt from notice-and-comment procedures. App. 61a (citations and internal quotation marks omitted); see App. 61a-65a. And it further held that respondents' due-process claim based on an asserted protected interest in indefinite DACA renewals was correctly dismissed because DHS had consistently stated that it retained discretion to terminate any grant of deferred action or the policy itself. App. 65a-68a.

The court of appeals concluded, however, that the district court had correctly refused to dismiss respondents' arbitrary-and-capricious claim, information-sharing policy claim, and equal-protection claim. App. 61a, 68a-77a. The court of appeals reasoned that respondents' arbitrary-and-capricious claim should not be dismissed "[f]or the reasons stated above in discussing [respondents'] likelihood of success" on that claim. App. 61a. As to the information-sharing policy claim, the court found that respondents plausibly alleged both a protected interest in DHS's indefinite retention of its information-sharing policy and a change in that policy notwithstanding DHS's public assurances to the contrary. App. 68a-

**AR3405**

6

73a. The court concluded that such a change would "shock[] the conscience." App. 73a (citations omitted).

Finally, the court of appeals concluded that respondents plausibly alleged an equal-protection claim under the standard described in *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-267 (1977). App. 73a-77a. The court reasoned that respondents' equal-protection claim does not "implicate the concerns motivating th[is] Court in *AADC*," like "inhibiting prosecutorial discretion, allowing continuing violations of immigration law, and impacting foreign relations." App. 75a-76a. And it distinguished *Trump* v. *Hawaii*, 138 S. Ct. 2392 (2018), on the grounds that respondents had provided more "evidence of discriminatory motivation, including the rescission order's disparate impact on Latinos and persons of Mexican heritage, as well as the order's unusual history." App. 76a-77a.

e. Judge Owens concurred in the judgment. App. 79a-87a. Judge Owens agreed with the majority's affirmance of the motion-to-dismiss rulings, but he disagreed that the court "may review the rescission of DACA for compliance with the APA." App. 79a. He explained that this Court's decision in *I.C.C.* v. *Brotherhood of Locomotive Engineers*, 482 U.S. 270 (1987) (*BLE*), "makes clear that when determining the scope of permissible judicial review, courts consider only the *type* of agency action at issue, not the agency's *reasons* for acting." App. 83a; see *BLE*, 482 U.S. at 283. He observed that DHS's decision to "rescind a non-enforcement policy in the immigration context is the type of administrative action" that this Court has recognized is "'committed to agency discretion by law.'" App. 79a-80a (citation omitted). And he rejected the majority's conclusion

**AR3406**

that the court could still review DHS's decision if it were based solely on DHS's understanding of the INA, reasoning that "*BLE* plainly prohibits [the court] from doing so." App. 82a.

Nevertheless, Judge Owens explained that he would affirm the preliminary injunction and remand for the district court to consider whether respondents' equal-protection claim provides an alternative ground for enjoining the rescission. App, *infra*, 84a-85a. He acknowledged that respondents "did not seek a preliminary injunction on their Equal Protection claim," but he reasoned that the court of appeals could "affirm an injunction issued on legally erroneous grounds where remand for consideration of alternative grounds is warranted." App. 84a. And he concluded that such consideration was warranted here. App. 86a.

3.  The court of appeals' decision significantly strengthens the argument for granting certiorari in these cases. The court of appeals affirmed the district court's orders in every respect, and thus the cases continue to present both questions in the government's petition. The Ninth Circuit's analysis also largely echoes the reasoning of the district court, and it is therefore incorrect for largely the same reasons. See Pet. 17-31. Importantly, however, as a result of the court of appeals' decision, the Court no longer needs to grant certiorari before judgment. The Court can now consider the present petition as one for certiorari after judgment and, if it grants the petition, review the judgment of the court of appeals. Accordingly, the petition need only satisfy the criteria for certiorari under Rule 10, rather than the heightened standard imposed by Rule 11. And there is little question that the court of appeals "has decided an important question

8

of federal law that has not been, but should be, settled by this Court." Sup. Ct. R. 10(c).

Although the government's petition in these cases was filed as one for certiorari before judgment, the issuance of the court of appeals' intervening decision does not deprive the Court of the authority to grant it. If granted, the writ of certiorari would still be directed to the court of appeals, and this Court could still exercise jurisdiction pursuant to 28 U.S.C. 1254(1) ("Cases in the courts of appeals may be reviewed by the Supreme Court by * * * writ of certiorari granted upon the petition of any party * * * before or after rendition of judgment or decree."). This Court's Rules do not establish any additional requirements, other than inclusion of the court of appeals' opinion (attached as an appendix to this brief), for a petition for a writ of certiorari after judgment. See Sup. Ct. R. 10-16.

Granting this petition would be consistent with the course of proceedings in *United States* v. *Windsor*, 570 U.S. 744 (2013), the most analogous example of which the government is aware. In *Windsor*, the government petitioned for a writ of certiorari before judgment. Before the Court considered that petition, however, the court of appeals rendered its opinion. The government then filed a supplemental brief, to which it attached a copy of the court of appeals' opinion, requesting that its petition be considered as a petition for a writ of certiorari after judgment. U.S. Supp. Br. at 7 & App., *Windsor*, *supra* (No. 12-307).

The Court granted certiorari in *Windsor*, 568 U.S. 1066 (2012), over the opposition of another party to the proceedings, see Supp. Br. for Resp. Bipartisan Legal Advisory Grp. of the U.S. House of Representatives at 10-12, *Windsor*, *supra* (No. 12-307), and reviewed the

9

court of appeals' decision, 570 U.S. at 751-752. Although there was significant disagreement in that case about the government's ability to petition for review of a decision with which it agreed, see *id.* at 781-782 (Scalia, J., dissenting), no Justice questioned the Court's decision to grant a petition for a writ of certiorari filed before the court of appeals' decision. The Court granted certiorari in similar circumstances in *General Electric Co.* v. *Gilbert*, 429 U.S. 125 (1976). See Stephen M. Shapiro et al., *Supreme Court Practice* § 2.5, at 87 n.36 (10th ed. 2013) (discussing procedures in *Windsor* and *General Electric*). The Court should likewise grant certiorari and review the court of appeals' decision here.

4. a. At the same time, the court of appeals' decision also strengthens the case for granting certiorari before judgment in *Trump* v. *National Ass'n for the Advancement of Colored People*, No. 18-588 (filed Nov. 5, 2018) (*NAACP*).

As noted, the Ninth Circuit concluded that DACA's rescission was based solely on the unlawfulness of the policy, and it refused to consider the explanation contained in Secretary Nielsen's June 22 memorandum, describing the memorandum as post hoc rationalization. App. 35a, 57a n.24. Each of those steps was error. The initial rescission memorandum indicates that DHS's decision was also based on the legal and practical implications of maintaining the DACA policy in light of DHS's concerns about its legality and the then-ongoing litigation challenging DAPA and expanded DACA. See Pet. 23-24; see also Pet. App. 117a (explaining that DACA "should be terminated," not that it must). And the June 22 memorandum contained a "further explanation" of why DHS's decision to rescind DACA "was, and remains, sound," Pet. App. 121a, by the official vested

**AR3409**

with the responsibility for "[e]stablishing national immigration enforcement policies and priorities," 6 U.S.C. 202(5) (2012 & Supp. V 2017). It is not irrelevant post hoc rationalization. See *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (explaining that "courts may not accept appellate counsel's *post hoc* rationalizations for agency action," but must consider only "the basis articulated by the agency itself").

More important for present purposes, however, the court of appeals' errors confirm that the Court should grant the government's petition in *NAACP*. The government previously suggested that, by granting that petition, the Court would eliminate any argument that Secretary Nielsen's memorandum is not squarely before this Court and would bring directly before the Court the *NAACP* court's consideration of the impact of that memorandum on the resolution of this dispute. See *NAACP* Pet. 15-17. The Ninth Circuit's refusal to undertake that analysis strengthens the argument for following the government's suggested approach.

b. As for *Nielsen* v. *Batalla Vidal*, No. 18-589 (filed Nov. 5, 2018), the government's petitions explained that the cases at issue there replicate, in many respects, the cases at issue here, and the district courts have thus far resolved the overlapping challenges to the rescission in a substantially similar manner. See Pet. 33; *Batalla Vidal* Pet. 16-17. The government previously suggested that the Court grant certiorari in both sets of cases to ensure that, if the Ninth Circuit had ruled for the government on any of the claims the government had lost in *Batalla Vidal*, the Court would still be able to address any such claims in *Batalla Vidal*. *Ibid.* The Ninth Circuit's blanket affirmance of the district court's orders removes that possible complication and therefore

11

eliminates that reason for granting the government's petition in *Batalla Vidal*.

The Court may still wish to grant the *Batalla Vidal* petition to permit the parties in those cases to participate in the Court's consideration of the overlapping issues. At a minimum, however, the Court should hold the *Batalla Vidal* petition pending resolution of the government's petitions in these cases and in *NAACP* to ensure that an order vacating the nationwide injunction in these cases would have immediate effect on the identical injunction issued in the *Batalla Vidal* cases.

c. Granting certiorari before judgment in one or both of the companion cases to ensure that the Court receives a comprehensive presentation of the relevant issues would be consistent with the Court's past practice in similar circumstances. See, *e.g.*, *United States* v. *Fanfan*, 542 U.S. 956 (2004) (No. 04-105) (granting certiorari before judgment in companion case to *United States* v. *Booker*, 543 U.S. 220 (2005) (No. 04-104)); *Gratz* v. *Bollinger*, 537 U.S. 1044 (2002) (No. 02-516) (granting certiorari before judgment in companion case to *Grutter* v. *Bollinger*, 539 U.S. 306 (2003) (No. 02-241)); see also Shapiro § 2.4, at 86 (explaining that the Court has granted certiorari before judgment "not only in cases of great public emergency but also in situations where similar or identical issues of importance were already pending before the Court and where it was considered desirable to review simultaneously the questions posed in the case still pending in the court of appeals"). The Court should follow the same path here.

\* \* \* \* \*

12

For the foregoing reasons and those stated in the petition for a writ of certiorari, the petitions in these cases and in *Trump* v. *National Ass'n for the Advancement of Colored People*, No. 18-588 (filed Nov. 5, 2018), should be granted and the cases consolidated for this Court's review.  The petition in *Nielsen* v. *Batalla Vidal*, No. 18-589 (filed Nov. 5, 2018), should either also be granted and consolidated or, at a minimum, be held pending resolution of the other petitions and any further proceedings in this Court.

Respectfully submitted.

<div align="right">

NOEL J. FRANCISCO
*Solicitor General*
</div>

NOVEMBER 2018

**AR3412**

# APPENDIX

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———

No. 18-15068
D.C. No. 3:17-cv-05211-WHA

REGENTS OF THE UNIVERSITY OF CALIFORNIA;
JANET NAPOLITANO, IN HER OFFICIAL CAPACITY AS
PRESIDENT OF THE UNIVERSITY OF CALIFORNIA,
PLAINTIFFS-APPELLEES

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY;
KIRSTJEN NIELSEN, IN HER OFFICIAL CAPACITY AS
ACTING SECRETARY OF THE DEPARTMENT OF
HOMELAND SECURITY, DEFENDANTS-APPELLANTS

———

No. 18-15069
D.C. No. 3:17-cv-05235-WHA

STATE OF CALIFORNIA; STATE OF MAINE; STATE OF
MINNESOTA; STATE OF MARYLAND,
PLAINTIFFS-APPELLEES

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY;
KIRSTJEN NIELSEN, IN HER OFFICIAL CAPACITY AS
ACTING SECRETARY OF THE DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES OF AMERICA,
DEFENDANTS-APPELLANTS

———

(1a)

2a

————

No. 18-15070
D.C. No. 3:17-cv-05329-WHA

City of San Jose, plaintiff-appellee

*v.*

Donald J. Trump, President of the United States,
in his official capacity; Kirstjen Nielsen,
in her official capacity as Acting Secretary
of the Department of Homeland Security;
United States of America, defendants-appellants

————

No. 18-15071
D.C. No. 3:17-cv-05380-WHA

Dulce Garcia; Miriam Gonzalez Avila; Saul
Jimenez Suarez; Viridiana Chabolla Mendoza;
Jirayut Latthivongskorn; Norma Ramirez,
plaintiffs-appellees

*v.*

United States of America; Donald J. Trump,
in his official capacity as President of the
United States; U.S. Department of Homeland
Security; Kirstjen Nielsen, in her official
capacity as Acting Secretary of the Department
of Homeland Security, defendants-appellants

————

3a

——————

No. 18-15072
D.C. No. 3:17-cv-05813-WHA

COUNTY OF SANTA CLARA; SERVICE EMPLOYEES
INTERNATIONAL UNION LOCAL 521,
PLAINTIFFS-APPELLEES

*v.*

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES; JEFFERSON B.
SESSIONS III, ATTORNEY GENERAL; KIRSTJEN NIELSEN,
IN HER OFFICIAL CAPACITY AS ACTING SECRETARY OF
THE DEPARTMENT OF HOMELAND SECURITY;
U.S. DEPARTMENT OF HOMELAND SECURITY,
DEFENDANTS-APPELLANTS

——————

No. 18-15128
D.C. Nos. 3:17-cv-05211-WHA, 3:17-cv-05235-WHA,
3:17-cv-05329-WHA, 3:17-cv-05380-WHA,
3:17-cv-05813-WHA

REGENTS OF THE UNIVERSITY OF CALIFORNIA;
JANET NAPOLITANO, IN HER OFFICIAL CAPACITY AS
PRESIDENT OF THE UNIVERSITY OF CALIFORNIA;
STATE OF CALIFORNIA; STATE OF MAINE;
STATE OF MINNESOTA; STATE OF MARYLAND;
CITY OF SAN JOSE; DULCE GARCIA; MIRIAM GONZALEZ
AVILA; SAUL JIMENEZ SUAREZ; VIRIDIANA CHABOLLA
MENDOZA; JIRAYUT LATTHIVONGSKORN;
NORMA RAMIREZ; COUNTY OF SANTA CLARA; SERVICE
EMPLOYEES INTERNATIONAL UNION LOCAL 521,
PLAINTIFFS-APPELLEES

*v.*

UNITED STATES OF AMERICA; DONALD J. TRUMP,
IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED
STATES; U.S. DEPARTMENT OF HOMELAND SECURITY;

**AR3415**

4a

KIRSTJEN NIELSEN, IN HER OFFICIAL CAPACITY AS
ACTING SECRETARY OF THE DEPARTMENT OF
HOMELAND SECURITY, DEFENDANTS-APPELLANTS

————

No. 18-15133
D.C. Nos. 3:17-cv-05211-WHA, 3:17-cv-05235-WHA,
3:17-cv-05329-WHA, 3:17-cv-05380-WHA,
3:17-cv-05813-WHA

REGENTS OF THE UNIVERSITY OF CALIFORNIA; JANET
NAPOLITANO, IN HER OFFICIAL CAPACITY AS
PRESIDENT OF THE UNIVERSITY OF CALIFORNIA;
STATE OF CALIFORNIA; STATE OF MAINE;
STATE OF MINNESOTA; STATE OF MARYLAND;
CITY OF SAN JOSE; DULCE GARCIA; MIRIAM GONZALEZ
AVILA; SAUL JIMENEZ SUAREZ; VIRIDIANA CHABOLLA
MENDOZA; JIRAYUT LATTHIVONGSKORN;
NORMA RAMIREZ, PLAINTIFFS-APPELLANTS

*v.*

UNITED STATES OF AMERICA; DONALD J. TRUMP,
IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED
STATES; U.S. DEPARTMENT OF HOMELAND SECURITY;
KIRSTJEN NIELSEN, IN HER OFFICIAL CAPACITY AS
ACTING SECRETARY OF THE DEPARTMENT OF
HOMELAND SECURITY, DEFENDANTS-APPELLEES

————

No. 18-15134
D.C. Nos. 3:17-cv-05211-WHA, 3:17-cv-05235-WHA,
3:17-cv-05329-WHA, 3:17-cv-05380-WHA,
3:17-cv-05813-WHA

DULCE GARCIA; MIRIAM GONZALEZ AVILA;
SAUL JIMENEZ SUAREZ; VIRIDIANA CHABOLLA
MENDOZA; NORMA RAMIREZ; JIRAYUT
LATTHIVONGSKORN; COUNTY OF SANTA CLARA;
SERVICE EMPLOYEES INTERNATIONAL UNION
LOCAL 521, PLAINTIFFS-APPELLANTS

**AR3416**

5a

*v.*

UNITED STATES OF AMERICA; DONALD J. TRUMP,
IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE
UNITED STATES; U.S. DEPARTMENT OF HOMELAND
SECURITY; KIRSTJEN NIELSEN, IN HER OFFICIAL CAPACITY
AS ACTING SECRETARY OF THE DEPARTMENT OF
HOMELAND SECURITY, DEFENDANTS-APPELLEES

———————

Filed:   Nov. 8, 2018

———————

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

———————

**OPINION**

———————

Before:   KIM MCLANE WARDLAW, JACQUELINE H.
NGUYEN, and JOHN B. OWENS, Circuit Judges.

Opinion by Judge WARDLAW; Concurrence by Judge
OWENS

WARDLAW, Circuit Judge:

It is no hyperbole to say that Dulce Garcia embodies
the American dream.   Born into poverty, Garcia and
her parents shared a San Diego house with other fami-
lies to save money on rent; she was even homeless for a
time as a child.   But she studied hard and excelled
academically in high school.   When her family could
not afford to send her to the top university where she
had been accepted, Garcia enrolled in a local community
college and ultimately put herself through a four-year
university, where she again excelled while working full-

**AR3417**

6a

time as a legal assistant. She then was awarded a scholarship that, together with her mother's life savings, enabled her to fulfill her longstanding dream of attending and graduating from law school. Today, Garcia maintains a thriving legal practice in San Diego, where she represents members of underserved communities in civil, criminal, and immigration proceedings.

On the surface, Dulce Garcia appears no different from any other productive—indeed, inspiring—young American. But one thing sets her apart. Garcia's parents brought her to this country in violation of United States immigration laws when she was four years old. Though the United States of America is the only home she has ever known, Dulce Garcia is an undocumented immigrant.

Recognizing the cruelty and wastefulness of deporting productive young people to countries with which they have no ties, the Secretary of Homeland Security announced a policy in 2012 that would provide some relief to individuals like Garcia, while allowing our communities to continue to benefit from their contributions. Known as Deferred Action for Childhood Arrivals, or DACA, the program allows those noncitizens who unwittingly entered the United States as children, who have clean criminal records, and who meet various educational or military service requirements to apply for two-year renewable periods of deferred action—a revocable decision by the government not to deport an otherwise removable person from the country. DACA also allows recipients to apply for authorization to work in this country legally, paying taxes and operating in the aboveground economy. Garcia, along with hundreds

**AR3418**

7a

of thousands of other young people, trusting the government to honor its promises, leapt at the opportunity.

But after a change in presidential administrations, in 2017 the government moved to end the DACA program. Why?  According to the Acting Secretary of Homeland Security, upon the legal advice of the Attorney General, DACA was illegal from its inception, and therefore could no longer continue in effect.  And after Dulce Garcia—along with other DACA recipients and affected states, municipalities, and organizations—challenged this conclusion in the federal courts, the government adopted the position that its fundamentally legal determination that DACA is unlawful is unreviewable by the judicial branch.

With due respect for the Executive Branch, we disagree.  The government may not simultaneously both assert that its actions are legally compelled, based on its interpretation of the law, and avoid review of that assertion by the judicial branch, whose "province and duty" it is "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).  The government's decision to rescind DACA is subject to judicial review.  And, upon review, we conclude that plaintiffs are likely to succeed on their claim that the rescission of DACA—at least as justified on this record—is arbitrary, capricious, or otherwise not in accordance with law.  We therefore affirm the district court's grant of preliminary injunctive relief.[1]

_____

[1] We also affirm in part the district court's partial grant and partial denial of the government's motion to dismiss for failure to state a claim.

8a

## I.

### A. *History of Deferred Action*

The central benefit available under the DACA program is deferred action. Because much of this dispute revolves around the legitimacy of that practice, we begin by reviewing the Executive Branch's historical use of deferred action.

The basic concept is a simple one: deferred action is a decision by Executive Branch officials not to pursue deportation proceedings against an individual or class of individuals otherwise eligible for removal from this country. *See* 6 Charles Gordon et al., Immigration Law & Procedure § 72.03[2][h] (2018) ("To ameliorate a harsh and unjust outcome, the immigration agency may decline to institute proceedings, may terminate proceedings, or may decline to execute a final order of deportation. This commendable exercise in administrative discretion . . . is now designated as deferred action."); *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1119 n.3 (9th Cir. 2001) ("Deferred action refers to an exercise of administrative discretion by the [immigration agency] under which [it] takes no action to proceed against an apparently deportable alien based on a prescribed set of factors generally related to humanitarian grounds." (internal quotation marks omitted)); Hiroshi Motomura, Immigration Outside the Law 29 (2014) (noting that "deferred action is usually granted only for limited periods of time and does not provide a path to lawful permanent resident status or citizenship").

Unlike most other forms of relief from deportation, deferred action is not expressly grounded in statute. It arises instead from the Executive's inherent authority

**AR3420**

9a

to allocate resources and prioritize cases. *Cf.* 6 U.S.C. § 202(5) (charging the Secretary of Homeland Security with "[e]stablishing national immigration enforcement policies and priorities"). As such, recipients of deferred action "enjoy no formal immigration status." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 964 (9th Cir. 2017) (*Brewer II*). But despite its non-statutory origins, Congress has historically recognized the existence of deferred action in amendments to the Immigration and Nationality Act (INA), as well as other statutory enactments. *See* 8 U.S.C. § 1227(d)(2) ("The denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for . . . deferred action[.]"); REAL ID Act of 2005, Pub. L. No. 109-13, § 202(c)(2), 119 Stat. 231, 313 (2005) (listing proof of "approved deferred action status" as sufficient "evidence of lawful status" for the issuance of a driver's license). The Supreme Court has also recognized deferred action by name, describing the Executive's "regular practice (which ha[s] come to be known as 'deferred action') of exercising discretion for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999) (*AADC*). Thus, "it is well settled that the Secretary [of Homeland Security] can exercise deferred action." *Brewer II*, 855 F.3d at 967.

Official records of administrative discretion in immigration enforcement date at least back to the turn of the twentieth century, not long after the enactment of the nation's first general immigration statute in 1882. *See* Act of Aug. 3, 1882, ch. 376, 22 Stat. 214. A 1909 Department of Justice circular regarding statutorily authorized denaturalization instructed that "as a general rule, good cause is not shown for the institution of

**AR3421**

10a

proceedings . . . unless some substantial results are to be achieved thereby in the way of betterment of the citizenship of the country." U.S. Dep't of Justice, Circular Letter No. 107 (Sept. 20, 1909) (quoted in Memorandum from Sam Bernsen, Gen. Counsel, INS, *Legal Opinion Regarding Service Exercise of Prosecutorial Discretion* at 4 (Jul. 15, 1976) (Bernsen Memorandum)).

The government's exercise of deferred action in particular first came to light in the 1970s, as a result of Freedom of Information Act litigation over the government's efforts to deport John Lennon and Yoko Ono, apparently based on Lennon's "British conviction for marijuana possession."   Motomura, *supra*, at 28; *see generally* Shoba Sivaprasad Wadhia, Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases 2-27 (2015).   Then known as "nonpriority status," the practice had been observed in secret within the former Immigration and Naturalization Service (INS) since at least the 1950s, but INS officials had publicly denied its existence.   *See* Leon Wildes, *The Nonpriority Program of the Immigration and Naturalization Service Goes Public:  The Litigative Use of the Freedom of Information Act*, 14 San Diego L. Rev. 42, 52-53 (1976); Wadhia, *supra*, at 16.   After the Lennon case revealed the practice, the INS issued its first public guidance on the use of deferred action, stating that "[i]n every case where the district director determines that adverse action would be unconscionable because of the existence of appealing humanitarian factors, he shall recommend consideration for nonpriority."   Immigration and Naturalization Service, Operations Instructions § 103.1(a)(1)(ii) (1975) (quoted in Wadhia, *supra*, at 17).   Although the 1975 guidance was rescinded in 1997, DHS officials continue to apply

11a

the same humanitarian factors in deciding whether to grant an individual deferred action.   6 Gordon et al., *supra*, § 72.03[2][h] & nn.133-34; *see also AADC*, 525 U.S. at 484 n.8.

In addition to case-by-case adjudications, the Executive Branch has frequently applied deferred action and related forms of discretionary relief programmatically, to entire classes of otherwise removable noncitizens.   Indeed, the Congressional Research Service has compiled a list of twenty-one such "administrative directives on blanket or categorical deferrals of deportation" issued between 1976 and 2011. Andorra Bruno et al., Cong. Research Serv., Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children 20-23 (July 13, 2012); *see also id.* at 9 ("The executive branch has provided blanket or categorical deferrals of deportation numerous times over the years.").

To take one early example, in 1956 President Eisenhower extended immigration parole to over thirty thousand Hungarian refugees who were otherwise unable to immigrate to the United States because of restrictive quotas then in existence.   *See* White House Statement on the Termination of the Emergency Program for Hungarian Refugees (Dec. 28, 1957).   The power to parole—that is, to allow a noncitizen physically to enter the country, while treating that person as "at the border" for purposes of immigration law—is established by statute, but the version of the INA in existence when President Eisenhower acted did not explicitly authorize programmatic exercises of the

12a

parole power.[2]   Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 212(d)(5), 66 Stat. 163, 188. *See generally* 6 Gordon et al., *supra*, § 62.01.   Subsequent presidents made use of similar categorical parole initiatives.   Wadhia, *supra*, at 30.

Another salient example is the Family Fairness program, established by the Reagan Administration and expanded under President George H.W. Bush.   The Immigration Reform and Control Act of 1986 (IRCA) had provided a pathway to legal status for hundreds of thousands of undocumented noncitizens, but did not make any provision for their close relatives unless those individuals separately qualified under the Act's criteria.   *See generally* 3 Gordon et al., *supra*, § 38.06. President Reagan's INS Commissioner interpreted IRCA not to authorize immigration benefits for anyone outside the statutory criteria, but nevertheless exercised executive discretion to defer the deportation of the minor children of noncitizens legalized under the statute.   Alan C. Nelson, Comm'r, INS, *Legalization & Family Fairness:   An Analysis* (Oct. 21, 1987). And in 1990, the INS instituted "significant liberalizations" of the policy by granting one-year periods of extended voluntary departure to children and spouses of individuals legalized under IRCA who could establish admissibility, continuous residency, and a clean

---

[2]   Indeed, there is evidence that "Congress originally intended that parole would be used on a case-by-case basis on behalf of individual aliens."   Cong. Research Serv., Review of U.S. Refugee Resettlement Programs & Policies 8 (1980); *see also* S. Rep. No. 89-748, at 17 (1965).   The statute was amended in 1980 to expressly prohibit categorical grants of parole. Refugee Act of 1980, Pub. L. No. 96-212, § 203(f), 94 Stat. 102, 108; *see* 8 U.S.C. § 1182(d)(5).

AR3424

13a

criminal record.  *INS Reverses Family Fairness Policy*, 67 No. 6 Interpreter Releases 153 (Feb. 5, 1990); *see also* 3 Gordon et al., *supra*, § 38.06.   Contemporary estimates by INS officials of the number of people potentially eligible ranged as high as 1.5 million.[3]   *See Immigration Act of 1989 (Part 2):  Hearings Before the Subcomm. on Immigration, Refugees & Int'l Law of the H. Comm. on the Judiciary*, 101st Cong. 49, 56 (1990) (testimony of Gene McNary, Comm'r, INS). Extended voluntary departure, the mechanism through which these individuals were allowed to remain in the United States is, like deferred action, a creature of executive discretion not specifically authorized by statute.   *See Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1510 (D.C. Cir. 1988) (en banc) (opinion of Mikva, J.).

Since then, the immigration agency has instituted categorical deferred action programs for self-petitioners under the Violence Against Women Act; applicants for T and U visas (which are issued to victims of human trafficking and of certain crimes, respectively); foreign students unable to fulfill their visa requirements after Hurricane Katrina; and widowed spouses of United States citizens who had been married less than two years. None of these deferred action programs was expressly authorized by statute at the time they were initiated.

---

[3]  There is some controversy surrounding this number.  *See generally Unconstitutionality of Obama's Executive Actions on Immigration:  Hearing Before the House Comm. on the Judiciary*, 114th Cong. 84-85 (2015) (written testimony of Professor Stephen H. Legomsky).  But even the lowest reported contemporary estimate was that 100,000 people would actually benefit from the program, indicating a major policy initiative.  *See INS Reverses Family Fairness Policy, supra.*

14a

*B.   The DACA Program*

DACA was announced in a June 15, 2012, memorandum from Secretary of Homeland Security Janet Napolitano,[4] entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children."   Secretary Napolitano explained that the nation's immigration laws "are not designed  . . .  to remove productive young people to countries where they may not have lived or even speak the language," especially where "many of these young people have already contributed to our country in significant ways," and, because they were brought here as children, "lacked the intent to violate the law."   She therefore determined that "[p]rosecutorial discretion, which is used in so many other areas, is especially justified here."

The Napolitano memorandum thus laid out the basic criteria of the DACA program, under which a noncitizen will be considered for a grant of deferred action if he or she:

- came to the United States under the age of sixteen;

- has continuously resided in the United States for at least five years preceding [June 15, 2012] and is present in the United States on [June 15, 2012];

- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

---

[4]  Napolitano is a party to this appeal in her current capacity as President of the University of California.

15a

- has not been convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses, nor otherwise poses a threat to national security or public safety; and

- is not above the age of thirty [on June 15, 2012].[5]

DACA applicants must submit extensive personal information to DHS, along with fees totaling nearly $500.   Applicants also submit to biometric screening in which they are photographed and fingerprinted, enabling extensive biographical and biometric background checks.   If those checks come back clean, each application is then evaluated for approval by DHS personnel on a case-by-case basis.

If approved into the DACA program, an applicant is granted a renewable two-year term of deferred action —again, "a form of prosecutorial discretion whereby the Department of Homeland Security declines to pursue the removal of a person unlawfully present in the United States."   *Brewer II*, 855 F.3d at 967.   In addition to the deferral of removal itself, pre-existing DHS regulations allow all deferred-action recipients to apply for employment authorization, enabling them to work legally and pay taxes.   8 U.S.C. § 1324a(h)(3) (empowering the Executive Branch to authorize the employment of noncitizens); 8 C.F.R. § 274a.12(c)(14) (providing that "[a]n alien who has been granted deferred action" is eligible for work authorization upon a showing of "economic necessity for employment").   Indeed, "DACA recipients are *required* to apply for employment authorization, in keeping with the Executive's intention that DACA recipients remain 'productive' mem-

---

[5] This criterion became known as the "age cap."

16a

bers of society." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014) (*Brewer I*) (emphasis in original).   Finally, DHS does not consider deferred-action recipients, including those benefitting from DACA, to accrue "unlawful presence" for purposes of the INA's reentry bars.[6]   8 U.S.C. § 1182(a)(9)(B)(ii); *see Brewer I*, 757 F.3d at 1059.

In an attempt to build on the success of the DACA program, in 2014 Secretary of Homeland Security Jeh Johnson issued a separate memorandum that both an-

---

[6]  8 U.S.C. §§ 1182(a)(9)(B)(i)(I)-(II) establish a three-year and ten-year bar on admission after specified periods of "unlawful presence."   Additionally, 8 U.S.C. § 1182(a)(9)(C) provides a permanent bar on admission for immigrants who have accrued an aggregate of more than one year of "unlawful presence" and who later attempt to cross the border clandestinely.   As the district court noted below, DHS "excludes recipients of deferred action from being 'unlawfully present' because their deferred action is considered a period of stay authorized by the government."   *Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1039 (N.D. Cal. 2018).   As DHS noted in its DACA Frequently Asked Questions (FAQs), "[f]or purposes of future inadmissibility based upon unlawful presence, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect."   Importantly, however, "deferred action does not confer lawful status upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence."

The FAQs are attached as an exhibit to the *Regents* complaint, and are cited pervasively throughout the *Garcia* complaint.   *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (explaining that for purposes of a motion to dismiss, "[c]ertain written instruments attached to pleadings may be considered part of the pleading.   Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." (internal citation omitted)).

17a

nounced the related Deferred Action for Parents of Americans and Lawful Permanent Residents program (DAPA), which allowed deferred action for certain non-citizen parents of American citizens and lawful permanent residents, and expanded DACA by (1) removing the age cap, (2) extending the term of deferred-action and related work-authorization grants from two to three years, and (3) moving up the cutoff date by which an applicant must have been in the United States to January 1, 2010. Twenty-six states challenged this extension in federal court, arguing that DAPA is unconstitutional. All of the policies outlined in the Johnson memorandum were enjoined nationwide in a district court order upheld by the Fifth Circuit and affirmed by an equally divided Supreme Court. *See United States v. Texas*, 136 S. Ct. 2271 (2016); *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015); *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015); *see also Neil v. Biggers*, 409 U.S. 188, 192 (1972) (affirmance by an equally divided court has no precedential value). The original DACA program remained in effect.

In 2017, a new presidential administration took office, bringing with it a change in immigration policy. On February 20, 2017, then-Secretary of Homeland Security John Kelly issued a memorandum that set out the administration's new enforcement priorities, stating that "the Department no longer will exempt classes or categories of removable aliens from potential enforcement." However, the memorandum explicitly left DACA and DAPA in place. In a second memorandum issued June 15, 2017, after "consider[ing] a number of factors, including the preliminary injunction in the [*Texas*] matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration

18a

enforcement priorities," Secretary Kelly rescinded DAPA as an "exercise of [his] discretion."

Then, on June 28, 2017, Texas Attorney General Ken Paxton wrote to United States Attorney General Jefferson B. Sessions III threatening that if the federal government did not rescind DACA by September 5, 2017, Paxton would amend the complaint in the *Texas* litigation to challenge DACA as well as DAPA.

On September 4, 2017, the day before Paxton's deadline, Attorney General Sessions sent his own letter to Acting Secretary of Homeland Security Elaine Duke. The Attorney General's letter "advise[d] that the Department of Homeland Security . . . should rescind" the DACA memorandum based on his legal opinion that the Department lacked statutory authority to have created DACA in the first place. He wrote:

> DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress'[s] repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch.

The Attorney General further opined that "[b]ecause the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA."

The very next day, following the Attorney General's directive, Acting Secretary Duke issued a memorandum rescinding DACA. The memorandum begins with

**AR3430**

19a

a "Background" section that covers DACA, DAPA, the *Texas* litigation, Secretary Kelly's previous memoranda, Texas Attorney General Paxton's threat, and the Attorney General's letter.   Then, in the section titled "Rescission of the June 15, 2012 DACA Memorandum," the Duke memorandum states:

> Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated.   In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

The Duke memorandum further states that although DHS would stop accepting initial DACA requests effective immediately, the agency would provide a one-month window in which renewal applications could be filed for current DACA beneficiaries whose benefits were set to expire before March 5, 2018.   It also states that DHS would not terminate existing grants of deferred action under DACA "solely based on the directives in this memorandum."   Thus, beginning on March 5, 2018, each DACA recipient's grant of deferred action would be allowed to expire at the end of its two-year term. As of September 4, 2017—the day before the rescission—approximately 689,800 individuals were enrolled in DACA.

AR3431

20a

*C.  Procedural History*

The rescission of DACA instantly sparked litigation across the country, including the cases on appeal here. Suits were filed in the Northern District of California by the Regents of the University of California, a group of states led by California, the City of San Jose, the County of Santa Clara and Service Employees International Union Local 521, and a group of individual DACA recipients led by Dulce Garcia.  The complaints included claims that the rescission was arbitrary and capricious under the Administrative Procedure Act (APA); that it was a substantive rule requiring notice-and-comment rulemaking under the APA; that it violated the due process and equal protection rights protected by the U.S. Constitution; and that DHS was equitably estopped from using the information provided on DACA applications for enforcement purposes. The cases were consolidated before Judge William Alsup in the District Court for the Northern District of California and proceeded to litigation.

On October 17, 2017, the district court ordered the government to complete the administrative record, holding that the record proffered by the government was incomplete in several respects. Seeking to avoid providing additional documents, the government filed a petition for mandamus.  In arguing its mandamus petition, the government took the position that the legality of the rescission should stand or fall based solely on the reasons and the record already provided by the government.  We denied the mandamus petition, stating that "the notion that the head of a United States agency would decide to terminate a program giving legal protections to roughly 800,000 people

**AR3432**

21a

based solely on 256 pages of publicly available documents is not credible, as the district court concluded." *In re United States*, 875 F.3d 1200, 1206 (9th Cir. 2017) (footnotes omitted).

The government next petitioned the Supreme Court for the same mandamus relief; the Court did not reach the merits of the administrative record dispute, but instead instructed the district court to rule on the government's threshold arguments challenging reviewability of its rescission decision before requiring the government to provide additional documents. *In re United States*, 138 S. Ct. 443, 445 (2017). Thus, the administrative record in this case still consists of a scant 256 publicly available pages, roughly three-quarters of which are taken up by the three published judicial opinions from the *Texas* litigation.

Returning to the district court, the government moved to dismiss the consolidated cases on jurisdictional grounds and for failure to state a claim, while the plaintiffs moved for a preliminary injunction. The district court granted the request for a nationwide preliminary injunction, holding that most of the plaintiffs had standing;[7] that neither the APA nor the INA barred judicial review; and that plaintiffs were likely to succeed on their claim that the decision to rescind DACA was arbitrary and capricious. The district court therefore entered a preliminary injunction requiring DHS to adjudicate renewal applications for existing DACA recipients.

---

[7] Two states were dismissed from the case with leave to amend. That decision is not challenged on appeal.

22a

In a separate order, the court partially granted and partially denied the government's motion to dismiss. The court dismissed plaintiffs' notice-and-comment and Regulatory Flexibility Act claims; a due process claim premised on an entitlement to deferred action; and the equitable estoppel claim. The court denied the motion as to plaintiffs' equal protection claim and a due process claim premised on an alleged change in DHS's information-sharing policy.

The district court certified the issues addressed in both its orders for interlocutory review under 28 U.S.C. § 1292(b). We granted the government's petition for permission to appeal the orders. Plaintiffs cross-appealed, asserting that the district court erroneously dismissed their notice-and-comment and due process claims.

## II.

"We review the district court's decision to grant or deny a preliminary injunction for abuse of discretion." *Hernandez v. Sessions*, 872 F.3d 976, 987 (9th Cir. 2017) (quoting *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam)). Within this inquiry, "[w]e review the district court's legal conclusions *de novo*, the factual findings underlying its decision for clear error." *Id.* (quoting *K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 969 (9th Cir. 2015)). A district court's decision on a motion to dismiss for lack of subject matter jurisdiction or for failure to state a claim is also reviewed de novo. *See, e.g.*, *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 963 (9th Cir. 2017).

AR3434

23a

### III.

The threshold question in this case is in many ways also the most pivotal: is Acting Secretary Duke's decision to rescind the DACA program reviewable by the courts at all?   The government contends that both the APA and the INA bar judicial review; we address each statute in turn.

*A.   Reviewability under the APA*

The APA provides for broad judicial review of agency action:   "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Thus, as a general matter, the Supreme Court has consistently articulated "a 'strong presumption' favoring judicial review of administrative action."   *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)); *see also, e.g.*, *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993) ("[W]e have read the APA as embodying a 'basic presumption of judicial review.'") (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)).

However, the APA also forecloses judicial review under its procedures to the extent that "agency action is committed to agency discretion by law."   5 U.S.C. § 701(a)(2).[8]   "This is a very narrow exception" that

---

[8]   This bar does not affect a plaintiff's ability to bring freestanding constitutional claims.   *See Webster v. Doe*, 486 U.S. 592, 601-05 (1988); *Padula v. Webster*, 822 F.2d 97, 101 (D.C. Cir. 1987) ("[E]ven where agency action is 'committed to agency discretion by law,' review is still available to determine if the Constitution has been violated." (quoting *Doe v. Casey*, 796 F.2d 1508, 1517-18 n.33 (1986),

24a

comes into play only "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (internal quotation marks omitted), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *see also Heckler v. Chaney*, 470 U.S. 821, 830 (1985) ("[R]eview is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.").

In *Heckler v. Chaney*, the Supreme Court analyzed this exception in considering "the extent to which a decision of an administrative agency to exercise its 'discretion' not to undertake certain enforcement actions is subject to judicial review under the [APA]." 470 U.S. at 823. In *Chaney*, the Commissioner of the Food and Drug Administration (FDA) declined to take investigatory and enforcement action against state prison officials' use of drugs, which had been FDA-approved for medical use, in human executions. *Id.* at 823-24. A group of prisoners on death row had petitioned the FDA, arguing that using the drugs to execute humans was unlawful because they were only approved for medical use, and not for executions. *Id.* Responding to the petition, the Commissioner questioned whether the FDA had jurisdiction to prohibit the use of drugs in executions, but went on to conclude that even if the agency did have jurisdiction, it would "decline to exercise it under [the agency's] inherent discretion to" do so. *Id.* at 824. The inmates then sued the FDA, at-

---

*aff'd in part, rev'd in part on other grounds*, Webster v. Doe, 486 U.S. 592 (1988))).

25a

tempting to invoke the APA's framework for judicial review.   *Id.* at 825.

The Supreme Court held that the FDA Commissioner's discretionary decision not to enforce the Food, Drug, and Cosmetic Act against state prison officials was unreviewable under the APA.   *Chaney*, 470 U.S. at 837-38.   The Court identified a pre-APA "tradition" under which "an agency's decision not to prosecute or enforce  .  .  .  is a decision generally committed to an agency's absolute discretion," and concluded that "the Congress enacting the APA did not intend to alter that tradition."   *Id.* at 831-32.   As the Court summed up its holding, "[t]he general exception to reviewability provided by § 701(a)(2) for action 'committed to agency discretion' remains a narrow one, but within that exception are included agency refusals to institute investigative or enforcement proceedings, unless Congress has indicated otherwise."   *Id.* at 838 (citation omitted). That is, the normal presumption in favor of judicial review is reversed when the agency action in question is a refusal to enforce the substantive law.

Importantly for present purposes, the Court explicitly left open the question whether "a refusal by the agency to institute proceedings based solely on the belief that it lacks jurisdiction" might be reviewable notwithstanding this general rule.   *Chaney*, 470 U.S. at 833 n.4 ("[W]e express no opinion on whether such decisions would be unreviewable under § 701(a)(2) . . . .").[9]   This

---

[9]  *Chaney*'s footnote 4 reads in its entirety:

We do not have in this case a refusal by the agency to institute proceedings based solely on the belief that it lacks jurisdiction. *Nor* do we have a situation where it could justifiably be found

26a

reservation makes perfect sense. It is one thing to read the APA's exception for "agency action [] committed to agency discretion by law" as including the Executive's discretionary decisions to decline enforcement, given a pre-existing legal tradition that had treated those decisions as unreviewable. It would be quite another to say that an agency's *non*-discretionary belief that it lacked the *power* to enforce the law was similarly "committed to agency discretion." 5 U.S.C. § 701(a)(2); *see Chaney*, 470 U.S. at 833 n.4 ("[W]e note that in those situations [involving a belief that the agency lacked discretion,] the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion.'").

Several years after *Chaney*, our court directly addressed the question that the Supreme Court had left open. In *Montana Air Chapter No. 29 v. Federal Labor Relations Authority*, a union representing civilian Air National Guard employees filed an unfair labor practice charge against the National Guard Bureau, but the Federal Labor Relations Authority (FLRA) refused to issue a complaint. 898 F.2d 753, 755 (9th Cir. 1990). The opinion letters issued by FLRA's general counsel indicated that he had "determined, according

---

that the agency has "consciously and expressly adopted a general policy" that is so extreme as to amount to an abdication of its statutory responsibilities. *See, e.g.*, *Adams v. Richardson*, 156 U.S. App. D.C. 267, 480 F.2d 1159 (1973) (en banc). Although we express no opinion on whether such decisions would be unreviewable under § 701(a)(2), we note that in those situations the statute conferring authority on the agency might indicate that such decisions were not "committed to agency discretion."

*Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (emphasis added).

27a

to his interpretation of the statutes and regulations, that he lacked jurisdiction to issue an unfair labor practice complaint" under the circumstances.  *Id.* at 757.

Acknowledging *Chaney*'s rule that "[a]n agency's decision not to take enforcement action . . . is presumed to be immune from judicial review," we noted that the Supreme Court had nevertheless "suggested that discretionary nonenforcement decisions may be reviewable when" the refusal to enforce is based on a supposed lack of jurisdiction.  *Id.* at 756 (citing *Chaney*, 470 U.S. at 833 n.4).  We took the next logical step, holding that *Chaney*'s presumption of nonreviewability "may be overcome if the refusal is based solely on the erroneous belief that the agency lacks jurisdiction."  *Id.* at 754.  Because "the General Counsel's decision not to issue an unfair labor practice complaint was based on his belief that he lacked jurisdiction to issue such a complaint," we proceeded to "examine the General Counsel's statutory and regulatory interpretations to determine if his belief that he lacked jurisdiction was correct."  *Id.* at 757.[10]

The final piece of the APA reviewability puzzle is the Supreme Court's decision in *City of Arlington v. FCC*, 569 U.S. 290 (2013).  There, the Court was faced with the question whether an agency's determination of

_____

[10] We reject the government's reading of *Montana Air*, under which the *Chaney* presumption would be overcome only if the agency action is based on a belief in a lack of jurisdiction, *and* the refusal to enforce is so extreme as to become an abdication of the agency's statutory responsibilities.  Both *Chaney* and *Montana Air* make clear that these are two independent exceptions to the narrow rule of nonreviewability, not two elements of a single test.  *Chaney*, 470 U.S. at 833 n.4; *Montana Air*, 898 F.2d at 756.

28a

its own jurisdiction is entitled to the same deference as any other agency interpretation under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Writing for the Court, Justice Scalia explained in no uncertain terms that in the context of administrative agencies, "the distinction between 'jurisdictional' and 'nonjurisdictional' interpretations is a mirage." *City of Arlington*, 569 U.S. at 297. With respect to courts, the jurisdictional/nonjurisdictional divide is a real and consequential one, because "[a] court's power to decide a case is independent of whether its decision is correct . . . . Put differently, a jurisdictionally proper but substantively incorrect judicial decision is not ultra vires." *Id.* But the same is not true with respect to agencies: "Both their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires." *Id.* Thus, the Court concluded, "[t]he reality, laid bare, is that there is *no difference*, insofar as the validity of agency action is concerned, between an agency's exceeding the scope of its authority (its 'jurisdiction') and its exceeding authorized application of authority that it unquestionably has." *Id.* at 299 (emphasis in original).[11]

---

[11] The opinion is replete with equally emphatic—and equally quotable—formulations of the same point. *See, e.g.*, *City of Arlington*, 569 U.S. at 301 ("In sum, judges should not waste their time in the mental acrobatics needed to decide whether an agency's interpretation of a statutory provision is 'jurisdictional' or 'nonjurisdictional.' Once those labels are sheared away, it becomes clear that the question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or not.").

AR3440

29a

To summarize, *Chaney* holds that an agency's refusal to enforce the substantive law is presumptively unreviewable because that discretionary nonenforcement function is "committed to agency discretion" within the meaning of the APA.   *Montana Air* builds upon the question left open by *Chaney*'s footnote four, explaining that a nonenforcement decision is reviewable notwithstanding *Chaney* if the decision was based solely on the agency's belief that it lacked jurisdiction to act.   And *City of Arlington* teaches that there is no difference between an agency that lacks jurisdiction to take a certain action, and one that is barred by the substantive law from doing same; the question "is always, simply, whether the agency has stayed within the bounds of its statutory authority."   *City of Arlington*, 569 U.S. at 297 (emphasis omitted).   The rule that emerges is this:   an agency's nonenforcement decision is outside the scope of the *Chaney* presumption—and is therefore presumptively reviewable—if it is based solely on a belief that the agency lacked the lawful authority to do otherwise.   That is, where the agency's decision is based not on an exercise of discretion, but instead on a belief that any alternative choice was foreclosed by law, the APA's "committed to agency discretion" bar to reviewability, 5 U.S.C. § 701(a)(2), does not apply.

This rule is fully consistent with the Supreme Court's decision in *ICC v. Brotherhood of Locomotive Engineers* (*BLE*), which rejected the notion that "if the agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable."   482 U.S. 270, 283 (1987).   We have no quarrel with that statement in the abstract, but as applied it simply begs the question:   is the agency action in question "otherwise unreviewable"?

30a

The *BLE* case concerned the reviewability of the Interstate Commerce Commission's denial of a motion to reopen proceedings on grounds of material error. *Id.* at 280. The Supreme Court held that category of agency action presumptively unreviewable because it "perceive[d] . . . a similar tradition of nonreviewability" to the one it had found in *Chaney* for nonenforcement decisions. *Id.* at 282. In reaching its holding, the Court rejected an argument that there was nevertheless "law to apply"—and that therefore the action was not committed to agency discretion—as the agency's order had discussed the legal merits at length. *Id.* at 280-81. What mattered was that the agency's "formal action" was one for which a tradition of nonreviewability was discernable, regardless of how the agency explained its action.[12] *Id.*

*BLE* thus stands for the proposition that if a particular type of agency action is presumptively unreviewable, the fact that the agency explains itself in terms that are judicially cognizable does not change the categorical rule. Fair enough. But the categorical rule

_____

[12] The Court gave as an example a prosecutor's refusal to institute criminal proceedings based on her "belief . . . that the law will not sustain a conviction." *BLE*, 482 U.S. at 283. Such a belief is not equivalent to a conclusion that the government lacked the power to institute a prosecution in the first place. For one colorful example, in *Bond v. United States*, prosecutors made the "surprising" decision to charge "an amateur attempt by a jilted wife to injure her husband's lover" under the federal statute implementing the international Convention on Chemical Weapons. 134 S. Ct. 2077, 2083-84 (2014). While the Court ultimately interpreted the statute not to encompass the charged conduct, *id.* at 2093-94, no one suggested that the government's aggressive decision to institute the prosecution was itself ultra vires.

31a

announced in *Chaney* does not encompass nonenforcement decisions based solely on the agency's belief that it lacked power to take a particular course; instead, the Court explicitly declined to extend its rule to that situation. *Chaney*, 470 U.S. at 833 n.4. And in *Montana Air*, we held that such decisions *are* reviewable. 898 F.2d at 754. *BLE*'s statement about "otherwise unreviewable" agency decisions, 482 U.S. at 283, therefore has no application to the category of agency action at issue here.

We believe the analysis laid out above follows necessarily from existing doctrine. And, just as importantly, this approach also promotes values fundamental to the administrative process.

First, the *Montana Air* rule does not impermissibly encroach on executive discretion; to the contrary, it empowers the Executive. If an agency head is mistaken in her assessment that the law precludes one course of action, allowing the courts to disabuse her of that incorrect view of the law does not constrain discretion, but rather opens new vistas within which discretion can operate. That is, if an administrator chooses option *A* for the sole reason that she believes option *B* to be beyond her legal authority, a decision from the courts putting option *B* back on the table allows a reasoned, discretionary policy choice between the two courses of action. And if the agency's view of the law is instead confirmed by the courts, no injury to discretion results because the status quo is preserved.

Moreover, allowing judicial review under these circumstances serves the critical function of promoting accountability within the Executive Branch—not accountability to the courts, but democratic accountabil-

**AR3443**

32a

ity to the people.   Accountability in this sense is fundamental to the legitimacy of the administrative system:   although they are "unelected  . . .  bureaucrats," *City of Arlington*, 569 U.S. at 305, the heads of cabinet-level departments like DHS "are subject to the exercise of political oversight and share the President's accountability to the people."   *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 886 (1991).   Indeed, the Constitution's "Appointments Clause was designed to ensure public accountability for  . . .  the making of a bad appointment . . . ."   *Edmond v. United States*, 520 U.S. 651, 660 (1997); *see also* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2251-52 (2001) ("[A]ccountability" is one of the two "principal values that all models of administration must attempt to further."); 1 Richard J. Pierce, Jr., Administrative Law Treatise 114 (5th ed. 2010) ("Agencies are politically accountable because the President is accountable for the actions of agencies.").

This democratic responsiveness is especially critical for agencies exercising prosecutorial functions because, as Justice Scalia explained in his oft-cited dissent in *Morrison v. Olson*, "[u]nder our system of government, the primary check against prosecutorial abuse is a political one."   487 U.S. 654, 728 (1988) (Scalia, J., dissenting).   This check works because "when crimes are not investigated and prosecuted fairly, nonselectively, with a reasonable sense of proportion, the President pays the cost in political damage to his administration." *Id.* at 728-29.   In other words, when prosecutorial functions are exercised in a manner that is within the law but is nevertheless repugnant to the sensibilities of the people, "the unfairness will come home to roost in the Oval Office."   *Id.* at 729.

33a

But public accountability for agency action can only be achieved if the electorate knows how to apportion the praise for good measures and the blame for bad ones. Without knowing the true source of an objectionable agency action, "the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 498 (2010) (quoting The Federalist No. 70, at 476 (Alexander Hamilton) (Jacob E. Cooke ed. 1961)). In then-Professor Kagan's words, "the degree to which the public can understand the sources and levers of bureaucratic action" is "a fundamental precondition of accountability in administration." Kagan, *supra*, at 2332.

The *Montana Air* rule promotes accountability by ensuring that the public knows where to place blame for an unpopular measure. When an agency justifies an action solely with an assertion that the law prohibits any other course, it shifts responsibility for the outcome from the Executive Branch to Congress (for making the law in question) or the courts (for construing it). If the Executive is correct in its interpretation of the law, then the public is correct to blame the other two branches for any resulting problems. But if the Executive is wrong, then it avoids democratic accountability for a choice that was the agency's to make all along. Allowing the judiciary—the branch ultimately responsible for interpreting the law, *see Marbury*, 5 U.S. (1 Cranch) at 177—to review such decisions prevents this anti-democratic and untoward outcome. As Judge Bates of the District Court for the District of Columbia aptly put the point in confronting the very issue we face here, "an official cannot claim that the

34a

law ties her hands while at the same time denying the courts' power to unbind her. She may escape political accountability or judicial review, but not both." *NAACP v. Trump*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018).

We therefore must determine whether the Acting Secretary's decision to end DACA was based solely on a belief that the program was unlawful, such that the *Chaney* presumption does not apply.[13]

---

[13] Because we take this doctrinal course, we need not decide whether the rescission of DACA would be reviewable absent the exception reflected in *Montana Air* and *Chaney*'s footnote four. But we do note several points. First, a literal reading of *Chaney*'s language would not even encompass the decision to rescind DACA, since *Chaney* by its own terms applies only to "agency decisions *not to undertake* enforcement action." 470 U.S. at 832 (emphasis added). Nowhere does the opinion suggest the broader proposition that any decision simply related to enforcement should be presumed unreviewable. Our court's dicta in *Morales de Soto v. Lynch*, 824 F.3d 822, 827 n.4 (9th Cir. 2016), which addressed a completely separate issue of jurisdiction under the INA, is not to the contrary. Thus, to the extent that the *Montana Air* exception might not seem a perfect fit for the rescission of DACA—which was not exactly a decision not to enforce—the *Chaney* presumption itself shares the same defect. There is no daylight between the *Chaney* rule and the *Montana Air* exception in terms of the type of agency action to which they apply. So if the rescission of DACA were outside the *Montana Air* exception by virtue of not being strictly a nonenforcement decision, it would also fall outside the *Chaney* presumption of unreviewability in the first place.

Second, the D.C. Circuit has developed a line of cases explaining that while *Chaney* bars judicial review of a "single-shot nonenforcement decision," on the other hand, "an agency's adoption of a general enforcement policy is subject to review." *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) (quoting *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671,

AR3446

35a

We take Attorney General Sessions literally at his word when he wrote to Acting Secretary Duke that "DACA was effectuated . . . without proper statutory authority," and that DACA "was an unconstitutional exercise of authority by the Executive Branch." These are the reasons he gave for advising Acting Secretary Duke to rescind DACA.  We therefore agree with the district court that the basis for the rescission was a belief that DACA was unlawful, and that the discretionary "litigation risk" rationale pressed by the government now is a mere post-hoc rationalization put forward for purposes of this litigation.[14]  Acting Secretary Duke's September 5, 2017, rescission memorandum contains exactly one sentence of analysis:

> Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney

674-75 (D.C. Cir. 1994)); *see also Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996); *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 496-97 (D.C. Cir. 1988).

Thus, every one of the four courts that has considered the question has held that the rescission of DACA is reviewable under the APA, although each has employed slightly different reasoning for that conclusion.  *See NAACP v. Trump*, 298 F. Supp. 3d 209, 226-34 (D.D.C. 2018); *Casa de Md. v. DHS*, 284 F. Supp. 3d 758, 769-70 (D. Md. 2018); *Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1029-31 (N.D. Cal. 2018) (decision below); *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 147-52 (E.D.N.Y. 2017).

[14] After hundreds of pages of briefing and over an hour of oral argument, it remains less than clear how "litigation risk" differs from a substantive belief that DACA is illegal. We take the term to refer to a concern that DACA would be abruptly enjoined, regardless of whether the program was illegal or not. Of course, such a concern is not independent of an on-the-merits assessment of DACA's legality.

36a

General, it is clear that the June 15, 2012 DACA program should be terminated.

In the next sentence, the Acting Secretary went on to announce the rescission itself:

> In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

The easy rejoinder to the government's insistence that the Acting Secretary rescinded DACA due to "litigation risks" is that the Acting Secretary did not mention "litigation risks" as a "consideration." And both "consideration[s]" actually enumerated by the Acting Secretary are most naturally read as supporting a rationale based on DACA's illegality. The "ongoing litigation" referenced is of course *Texas v. United States*, in which the Fifth Circuit upheld a preliminary injunction against the related DAPA policy, and the Supreme Court affirmed by an equally divided vote.[15] *See Texas*, 136 S. Ct. 2271 (2016); *Texas*, 809 F.3d 134 (5th Cir. 2015). The "rulings" in that case are propositions of law—taken alone, they are more readily understood as supporting a legal conclusion (DACA is illegal) than a pragmatic one (DACA might be enjoined). The pragmatic interpretation requires extra analytical steps (someone might sue to enjoin DACA, and they might win) that are entirely absent from the list of factors that the Acting Secretary stated she was

---

[15] This conclusion is only bolstered by the fact that the government's production of the "administrative record" in this case includes the entirety of the three published judicial opinions in the *Texas* litigation.

AR3448

37a

"taking into consideration" in making her decision. Acting Secretary Duke easily could have included "the prospect of litigation challenging DACA" in her list of considerations; had she done so, then perhaps the reference to the *Texas* litigation could be read as supporting a practical worry about an injunction.[16]   Absent that, however, the mention of the courts' "rulings" is best read as referencing the courts' legal conclusions.

Attorney General Sessions's September 4, 2017, letter likewise focuses on the supposed illegality of DACA, rather than any alleged "litigation risk." Its substantive paragraph states

> DACA was effectuated  . . .  *without proper statutory authority* and with no established end-date, after Congress'[s] repeated rejection of proposed legislation that would have accomplished a similar result.   Such an open-ended circumvention of immigration laws was *an unconstitutional exercise of authority* by the Executive Branch.

(emphases added).

These sentences unmistakably reflect the Attorney General's belief that DACA was illegal and therefore beyond the power of DHS to institute or maintain. The letter goes on to opine that "[b]ecause the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA [in the *Texas* li-

---

[16] The Acting Secretary did reference Texas Attorney General Ken Paxton's threat to amend the *Texas* suit to include DACA, but she did so in the "Background" section of her memorandum.   If anything, the inclusion of the threat in the background portion renders its omission from the list of factors the Acting Secretary was actually "[t]aking into consideration" all the more stark.

38a

tigation], it is likely that potentially imminent litigation would yield similar results with respect to DACA." But in the context of the full paragraph, the reference to "similar results" is best read not as an independent reason for rescinding DACA, but as a natural consequence of DACA's supposed illegality—which is the topic of the paragraph as a whole.  In the words of Judge Garaufis of the District Court for the Eastern District of New York, that reference "is too thin a reed to bear the weight of Defendants' 'litigation risk' argument."  *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 429 (E.D.N.Y. 2018).

In any event, the Attorney General's letter is relevant only to the extent it illuminates whether Acting Secretary Duke—the official who actually rescinded the DACA program—did so as an exercise of her discretion or because she understood her hand to be forced by the law.  In this connection, it is helpful to compare the operative language used by Acting Secretary Duke to rescind DACA with that used by her predecessor, Secretary John Kelly, to rescind DAPA just months before.  In his June 15, 2017, memorandum, Secretary Kelly wrote:

> After consulting with the Attorney General, and *in the exercise of my discretion* in establishing national immigration enforcement policies and priorities, I hereby rescind the November 20, 2014 memorandum [that established DAPA].

(emphasis added).  Placed alongside Acting Secretary Duke's language, the parallels—and the differences—are stark.  Acting Secretary Duke's memorandum reads:

39a

> *In the exercise of my authority* in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum [that established DACA].

(emphasis added).

The obvious similarities between the two passages strongly suggest that Acting Secretary Duke modeled her language after that of Secretary Kelly's memo. And indeed, we *know* that the Acting Secretary considered the Kelly memorandum in reaching her decision, because the government has told us so. *See* Petition for Writ of Mandamus, *In re United States*, No. 17-72917 (9th Cir. Oct. 20, 2017) (stating that the government's proffered administrative record in this case, which includes the Kelly memorandum, "consist[s] of the non-privileged materials considered by the Acting Secretary in reaching her decision to rescind the DACA policy"); *id.* at 18 (taking the position that only materials personally reviewed by the Acting Secretary herself, not by subordinates, are "considered" by the Secretary).

Given that Acting Secretary Duke hewed so closely to Secretary Kelly's language in general, it is appropriate to draw meaning from the one major difference between the two sentences: Secretary Kelly exercised his "*discretion*" in ending DAPA; Acting Secretary Duke merely exercised her "*authority*." *Cf., e.g.*, *Jama v. ICE*, 543 U.S. 335, 357 (2005) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."). The point is that with the example set by the Kelly memorandum

40a

in front of her, Acting Secretary Duke clearly would have known how to express that the rescission was a discretionary act—if that were indeed the case.[17]   Furthermore, the near-verbatim language of the two rescission memoranda suggests that the Acting Secretary adopted the majority of Kelly's wording, but actively rejected describing the DACA rescission as an act of discretion. This difference in language cuts strongly against any suggestion that the rescission was discretionary.

The government counters that the memorandum "focused from beginning to end principally on litigation concerns, not the legality of DACA *per se*."   But as the State plaintiffs point out, the memorandum's references to these supposed "litigation concerns" were limited to a simple summary of the *Texas* litigation's procedural history; appeared only in the "Background" section of the memorandum; and were not referenced in the Acting Secretary's statement of what she was "[t]aking into consideration."   *See also* note 16, *supra*.

The government also asserts that because the Acting Secretary wrote that DACA "should" rather than *must* be ended, she did not view herself as bound to act.   But even on its face, "should" is fully capable of expressing obligation or necessity.   *See, e.g.*, *Should*, New Oxford American Dictionary (3d ed. 2010) ("used to indicate obligation, duty, or correctness"); *cf. Should*, Garner's Dictionary of Legal Usage (3d ed. 2011) ("should   .  .  .   is sometimes used to create

---

[17] Secretary Kelly's references to the factors he considered, which included obviously discretionary considerations such as "our new immigration enforcement priorities," provided a further model for how to describe a discretionary decision, which Acting Secretary Duke also chose not to follow.

AR3452

41a

mandatory standards"). The Acting Secretary's use of "should" instead of "must" cannot overcome the absence of any discussion of potential litigation or the "risks" attendant to it from the rescission memorandum's statement of reasons, and the discrepancy between the rescission of DAPA as an act of "discretion" and the rescission of DACA as an act of "authority."

Finally, the government takes a quote from the Supreme Court to the effect that courts should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974), and contorts it into an argument that the district court's "narrow reading of the Acting Secretary's rationale is *hardly the only one* that 'may reasonably be discerned' from the Acting Secretary's memorandum." But *Bowman* is about finding a reviewable rationale in an agency's action versus finding *no* articulation of that rationale. *Bowman* does not say—and it certainly does not logically follow—that a court must ignore the most natural reading of an agency's statement of reasons just because it may also be "reasonably susceptible" to a (less compelling) reading that the government would prefer. The government is in effect asking the court to defer to agency counsel's post-hoc rationalization, as long as there is some reading of the rescission memorandum—never mind how strained—that would support it. *Bowman* does not require this incongruous result.

We agree with the district court that the Acting Secretary based the rescission of DACA solely on a belief that DACA was beyond the authority of DHS. Under *Montana Air* and *Chaney*'s footnote four, this

42a

conclusion brings the rescission within the realm of agency actions reviewable under the APA.   Unless the INA itself deprives the courts of jurisdiction over this case, we must proceed to evaluate the merits of plaintiffs' arbitrary-and-capricious claim.

B.   *Jurisdiction under the INA*

The government contends that the INA stripped the district court of its jurisdiction in a provision that states:

> Except as provided in this section [which sets out avenues of review not applicable here]   . . .   no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g).

The Supreme Court has explicitly held that this section "applies only to three discrete actions that the [Secretary] may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'"   *AADC*, 525 U.S. at 482 (emphasis in original).   As the Court put it, "[i]t is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings.   Not because Congress is too unpoetic to use synecdoche, but because that literary device is incompatible with the need for precision in legislative drafting."   *Id.*

The government attempts to expand Section 1252(g) to encompass this case in two ways.   First, it points out that the *AADC* Court read that provision as Con-

43a

gress's effort to shield executive decisions not to grant deferred action from review outside the procedures prescribed by the INA.   The Court quoted a treatise describing the practice of deferred action and the litigation that would result when the government declined to grant deferred action:   "Efforts to challenge the refusal to exercise such discretion on behalf of specific aliens sometimes have been favorably considered by the courts . . . ."   *Id.* at 484-85 (quoting 6 Charles Gordon et al., Immigration Law and Procedure § 72.03[2][h] (1998)).   Having reviewed these developments, the Court concluded:   "Section 1252(g) seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations. . . ." *Id.* at 485.

The government argues that *AADC*'s reasoning— and therefore Section 1252(g)—applies to the rescission of DACA, which is itself in some sense a "no deferred action" decision.   It seems quite clear, however, that *AADC* reads Section 1252(g) as responding to litigation over *individual* "no deferred action" decisions, rather than a programmatic shift like the DACA rescission.   For example, the treatise passage *AADC* quotes to set the scene for Congress's action refers explicitly to "[e]fforts to challenge the refusal to exercise [deferred action] *on behalf of specific aliens*. . . ." *Id.* (emphasis added).   And in any case, the holding of *AADC* was explicit:   "The provision applies only to [the] three discrete actions" mentioned in the statute. *Id.* at 482.

The government's fallback argument is thus to cast the rescission of DACA as an initial "action" in the agency's "commence[ment] [of] proceedings."   8 U.S.C.

44a

§ 1252(g).   But *AADC* specifically rejected a broad reading of the three discrete actions listed in Section 1252(g).   "[D]ecisions to open an investigation, [or] to surveil the suspected violator" are *not* included in Section 1252(g)'s jurisdictional bar, *AADC*, 525 U.S. at 482, even though these actions are also "part of the deportation process," *id.*, and could similarly be construed as incremental steps toward an eventual "commence[ment] [of] proceedings," 8 U.S.C. § 1252(g).

Indeed, in a case closely on point, our court rejected the application of Section 1252(g) and allowed to proceed a challenge to INS guidance narrowly interpreting the terms of a "one-time legalization program" for undocumented immigrants.   *See Catholic Soc. Servs., Inc. v. INS*, 232 F.3d 1139, 1141 (9th Cir. 2000).   We noted that "[a]s interpreted by the Supreme Court in [*AADC*], [Section 1252(g)] applies only to the three specific discretionary actions mentioned in its text, not to all claims relating in any way to deportation proceedings," and held that the challenge was not barred. *Id.* at 1150.   The panel did not appear concerned by the fact that it was possible to conceptualize that policy choice by INS as an ingredient in a subsequent decision to commence proceedings against particular individuals.

The government cites no cases applying the Section 1252(g) bar to a programmatic policy decision about deferred action; the two cases it does cite were challenges to individual "no deferred action" decisions—that is, they fall exactly within Section 1252(g) as interpreted by the Court in *AADC*.   *See Vasquez v. Aviles*, 639 F. App'x 898 (3d Cir. 2016); *Botezatu v. INS*, 195 F.3d 311 (7th Cir. 1999).   Especially in light of the "'strong presumption in favor of judicial review of administrative action' gov-

AR3456

45a

erning the construction of jurisdiction-stripping provisions of IIRIRA,"[18] *ANA Int'l, Inc. v. Way*, 393 F.3d 886, 891 (9th Cir. 2004) (quoting *INS v. St. Cyr*, 533 U.S. 289, 298 (2001)), we hold that Section 1252(g) does not deprive courts of jurisdiction to review the DACA rescission order.[19]

## IV.

Having concluded that neither the APA nor the INA precludes judicial review, we turn to the merits of the preliminary injunction. The district court held that plaintiffs satisfied the familiar four-factor preliminary injunction standard[20] with respect to their claim under the APA that the rescission of DACA was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). The

---

[18] Section 1252(g) is one such provision. *See AADC*, 525 U.S. at 475 (describing § 1252(g)'s passage as part of IIRIRA).

[19] In its response and reply brief, the government appears to argue that another provision of the INA, 8 U.S.C. § 1252(b)(9), also stripped the district court of jurisdiction. Although ordinarily an argument not raised in the opening brief would be waived, this argument is jurisdictional so we must consider it. *See, e.g.*, *Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1171 n.3 (9th Cir. 2010) ("[C]hallenges to subject matter jurisdiction cannot be waived[.]"). But Section 1252(b)(9) does not bar jurisdiction here, because it "appl[ies] only to those claims seeking judicial review of orders of removal." *Singh v. Gonzales*, 499 F.3d 969, 978 (9th Cir. 2007) (citing *St. Cyr*, 533 U.S. at 313).

[20] "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

AR3457

46a

government takes issue with the district court's conclusion on only one of the preliminary injunction factors: the likelihood of success on the merits.

In an arbitrary-and-capricious challenge, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 50 (1983); *see also, e.g.*, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (*Chenery II*) ("[A] reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency." (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943) (*Chenery I*)).

Similarly, it is black letter law that where an agency purports to act solely on the basis that a certain result is legally required, and that legal premise turns out to be incorrect, the action must be set aside, regardless of whether the action *could* have been justified as an exercise of discretion.   That principle goes back at least as far as the Supreme Court's seminal decision in *Chenery I*, in which the Court stated:

> If [agency] action rests upon an administrative determination—an exercise of judgment in an area which Congress has entrusted to the agency—of course it must not be set aside because the reviewing court might have made a different determination were it empowered to do so.   But if the action is based upon a determination of law as to which the reviewing authority of the courts does come into play, *an order may not stand if the agency has misconceived the law.*

*Chenery I*, 318 U.S. at 94 (emphasis added).

47a

This holding of *Chenery I* remains good law. *See, e.g., United States v. Ross*, 848 F.3d 1129, 1134 (D.C. Cir. 2017) ("Where a statute grants an agency discretion but the agency erroneously believes it is bound to a specific decision, we can't uphold the result as an exercise of the discretion that the agency disavows."); *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007) (setting aside agency action that was justified on a "legally erroneous" basis, and remanding for further consideration under other justifications).   As the D.C. Circuit flatly put it, "An agency action, however permissible as an exercise of discretion, cannot be sustained where it is based not on the agency's own judgment but on an erroneous view of the law."   *Sea-Land Serv., Inc. v. DOT*, 137 F.3d 640, 646 (D.C. Cir. 1998) (internal quotation marks omitted) (quoting *Prill v. NLRB*, 755 F.2d 941, 947 (D.C. Cir. 1985)).

Thus, if the DACA rescission was based solely on an erroneous legal premise, it must be set aside under 5 U.S.C. § 706(2)(A).   We have already concluded, in our discussion of reviewability, that the rescission was indeed premised on the belief that the DACA program was unlawful.   We next must decide whether that legal conclusion was correct.[21]

Attorney General Sessions's September 4, 2017, letter expresses several possible bases for the agency's ultimate conclusion that DACA was unlawful.   First,

---

[21]  The government does not argue that its conclusion is entitled to *Chevron* deference, likely because "[d]eference to an agency's interpretation of a statute is not appropriate when the agency wrongly 'believes that interpretation is compelled by Congress.'"   *Gila River Indian Cmty. v. United States*, 729 F.3d 1139, 1149 (9th Cir. 2013) (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004)).

AR3459

48a

the Attorney General states that "DACA was effectuated by the previous administration through executive action  . . .  after Congress'[s] repeated rejection of proposed legislation that would have accomplished a similar result."   But our court has already explained that "Congress's failure to pass the [DREAM] Act does not signal the illegitimacy of the DACA program," partly because "the DREAM Act and the DACA program are not interchangeable policies because they provide different forms of relief":  the DREAM Act would have provided a path to lawful permanent resident status, while DACA simply defers removal. *Brewer II*, 855 F.3d at 976 n.10; *see* Motomura, *supra*, at 175 ("DACA is not the DREAM Act; as an interim executive measure, it is limited in duration and provides no durable immigration status.") (footnote omitted); *see also, e.g.*, DREAM Act of 2011, S. 952, 112th Cong. (2011).   Moreover, there is nothing inherently problematic about an agency addressing a problem for which Congress has been unable to pass a legislative fix, so long as the particular action taken is properly within the agency's power.   This argument therefore provides no independent reason to think that DACA is unlawful.

The Attorney General's primary bases for concluding that DACA was illegal were that the program was "effectuated  . . .  without proper statutory authority" and that it amounted to "an unconstitutional exercise of authority."   More specifically, the Attorney General asserted that "the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA" in the *Texas* litigation.

The claim of "constitutional defects" is a puzzling one because as all the parties recognize, no court has

49a

ever held that DAPA is unconstitutional.   The Fifth
Circuit and district court in *Texas* explicitly declined to
address the constitutional issue.   *See Texas*, 809 F.3d
at 154 ("We decide this appeal   . . .   without resolv-
ing the constitutional claim."); *Texas*, 86 F. Supp. 3d at
677 ("[T]he Court is specifically not addressing Plain-
tiffs' likelihood of success on   . . .   their constitu-
tional claims . . . .").   Indeed, the government makes
no attempt in this appeal to defend the Attorney Gen-
eral's assertion that the DACA program is unconstitu-
tional.   We therefore do not address it further.

With respect to DACA's alleged "legal   . . .   de-
fects," the district court explained in great detail the
long history of deferred action in immigration enforce-
ment, including in the form of broad programs; the fact
that the Supreme Court and Congress have both ac-
knowledged deferred action as a feature of the immi-
gration system; and the specific statutory responsibil-
ity of the Secretary of Homeland Security for "[e]s-
tablishing national immigration enforcement policies
and priorities," 6 U.S.C. § 202(5).   The government
does not contest any of these propositions, which them-
selves go a long way toward establishing DACA's le-
gality.   Instead, the government argues that the Fifth
Circuit's reasons for striking down the related DAPA
policy would also apply to DACA.

The Fifth Circuit concluded that DAPA was unlaw-
ful on two grounds:   first, that DAPA was in fact a
legislative rule and therefore should have been prom-
ulgated through notice-and-comment rulemaking; and
second, that DAPA was substantively inconsistent with
the INA.   *See Texas*, 809 F.3d at 171-78, 178-86.

50a

With respect to the first holding, notice-and-comment procedures are not required where the agency pronouncement in question is a "general statement[] of policy." 5 U.S.C. § 553(b)(3)(A). "The critical factor to determine whether a directive announcing a new policy constitutes a rule or a general statement of policy is the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987) (alterations in original) (internal quotation marks omitted).

On its face, DACA obviously allows (and indeed requires) DHS officials to exercise discretion in making deferred action decisions as to individual cases: Secretary Napolitano's memorandum announcing DACA specifically states that "requests for relief pursuant to this memorandum are to be decided on a case by case basis." The Fifth Circuit in *Texas* held that DAPA was a substantive rule notwithstanding similar discretionary language, based primarily on statistics regarding the approval rates of DACA applications. The court read those statistics as revealing that DACA was discretionary in name only—that is, that DHS personnel had no discretion to deny deferred action if the DACA criteria were met. *Texas*, 809 F.3d at 172-73.

But as the dissenting judge in *Texas* pointed out, DACA's (then) 5% denial rate—which did not include applications rejected for administrative deficiencies—is consistent with a discretionary program given that applicants self-select: "It should be expected that only those highly likely to receive deferred action will apply; otherwise, applicants would risk revealing their immigra-

**AR3462**

51a

tion status and other identifying information to authorities, thereby risking removal (and the loss of a sizeable fee)." *Texas*, 809 F.3d at 210 (King, J., dissenting).

Moreover, the denial rate has risen as the DACA program has matured. DHS statistics included in the record reveal that in fiscal year 2016, for example, the agency approved 52,882 initial DACA applications and denied 11,445; that is, 17.8% of the applications acted upon were denied.[22] As Judge King concluded, "Neither of these numbers suggests an agency on autopilot." *Texas*, 809 F.3d at 210 n.44 (King, J., dissenting); *see also Arpaio v. Obama*, 27 F. Supp. 3d 185, 209 n.13 (D.D.C. 2014) (noting that these same statistics "reflect that . . . case-by-case review is in operation").[23] In light of these differences, we do not agree that DACA is a legislative rule that would require notice-and-comment rulemaking.

As to the substantive holding in *Texas*, the Fifth Circuit concluded that DAPA conflicted with the INA largely for a reason that is inapplicable to DACA.

---

[22] U.S. Citizenship & Immigration Services, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017 (March 31, 2017). The number of initial applications is the relevant metric because renewal applications are by definition limited to the pool of those already approved for DACA at least once. Therefore, one would expect an even lower denial rate for renewals.

[23] Judge King's dissent also makes the critical observation that, according to the declarations filed in that case, the reason DHS could not point to specific instances in which DACA applicants met the program criteria but were denied as a matter of discretion was that DHS did not have the ability to track and sort the reasons for DACA denials. *Texas*, 809 F.3d at 211 (King, J., dissenting).

AR3463

52a

Specifically, the Fifth Circuit reasoned that the INA provides "an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status" but that "DAPA would allow illegal aliens to receive the benefits of lawful presence solely on account of their children's immigration status without complying with any of the requirements . . . that Congress has deliberately imposed." *Texas*, 809 F.3d at 179-80. As the district court in this case noted, there is no analogous provision in the INA defining how immigration status may be derived by undocumented persons who arrived in the United States as children. One of the major problems the Fifth Circuit identified with DAPA is therefore not present here.

In resisting this conclusion, the government flips the Fifth Circuit's reasoning on its head, arguing that "[i]nsofar as the creation of pathways to lawful presence was relevant, the fact that Congress had legislated only for certain individuals similarly situated to DAPA beneficiaries—and not DACA recipients—would make DACA *more* inconsistent with the INA than DAPA." To the extent the government meant to draw on the *Texas* court's analysis, it gets it exactly backwards: the whole thrust of the Fifth Circuit's reasoning on this point was that DHS was without authority because "Congress has 'directly addressed the precise question at issue.'" *Texas*, 809 F.3d at 186 (quoting *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 52 (2011)). There is no argument that Congress has similarly occupied the field with respect to DACA; as the Attorney General himself noted, Congress has repeatedly rejected Dreamer legislation.

AR3464

53a

The second major element of the Fifth Circuit's analysis on the substantive issues was that the INA itself "prescribes . . . which classes of aliens can achieve deferred action and eligibility for work authorization." *Texas*, 809 F.3d at 186. The court drew the implication that the statute must therefore preclude the Executive Branch from granting these benefits to other classes. *Id.* (pairing this notion with the pathway-to-lawful-presence argument as the keys to its conclusion).

But "[t]he force of any negative implication . . . depends on context." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013). Indeed, "[w]e do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003). Here, the express grants of deferred action cited by the Fifth Circuit were not passed together as part of the original INA; rather, they were added to the statute books piecemeal over time by Congress. *See* Violence Against Women Act of 2000, Pub. L. No. 106-386, div. B, sec. 1503, § 1154(a)(1)(D)(i), 114 Stat. 1491 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)) (specifying deferred action for certain VAWA self-petitioners); USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361 (same, for family members of lawful permanent residents killed by terrorism); National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)-(d), 117 Stat. 1392, 1694-95 (same, for relatives of noncitizens killed in combat and posthumously granted citizenship).

Given this context, we find it improbable that Congress "considered the . . . possibility" of all other

54a

potential uses for deferred action "and meant to say
no" to any other application of that tool by the immi-
gration agency.  *Barnhart*, 537 U.S. at 168.  We think
the much more reasonable conclusion is that in passing
its seriatim pieces of legislation, instructing that this
and that "narrow class[]" of noncitizens should be eli-
gible for deferred action, *Texas*, 809 F.3d at 179, Con-
gress meant to say nothing at all about the underlying
power of the Executive Branch to grant the same remedy
to others.  We do not read an "and no one else" clause
into each of Congress's individual express grants of
deferred action.

Another element in the Fifth Circuit's analysis was
that "DAPA would make 4.3 million otherwise remova-
ble aliens eligible for lawful presence, employment au-
thorization, and associated benefits, and 'we must be
guided to a degree by common sense as to the manner
in which Congress is likely to delegate a policy decision
of such economic and political magnitude to an admin-
istrative agency.'"  *Id.* at 181 (quoting *FDA v. Brown
& Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).
DACA, on the other hand, had 689,800 enrollees as of
September 2017.  The government asserts that this
difference in size is "legally immaterial," but that re-
sponse is unconvincing.  If the point is that the "eco-
nomic and political magnitude" of allowing 4.3 million
people to remain in the country and obtain work au-
thorization is such that Congress would have spoken to
it directly, then surely it makes a difference that one
policy has less than one-sixth the "magnitude" of the
other.  *Id.*  As the district court laconically put it,
"there is a difference between 4.3 million and 689,800."

55a

Finally, the government finds "an insurmountable obstacle to plaintiffs' position" in that "the district court's injunction affirmed by the Fifth Circuit covered both DAPA and *expanded DACA*." It is true that the *Texas* court also enjoined the expansions of DACA that were announced in the same memorandum as the DAPA program. *See Texas*, 809 F.3d at 147 n.11 ("The district court enjoined implementation of the following three DACA expansions, and they are included in the term 'DAPA' in this opinion . . . ."). But no analysis was devoted to those provisions by either the Fifth Circuit or the *Texas* district court, and one of the keys to the Fifth Circuit's reasoning—that Congress had supposedly occupied the field with respect to obtaining immigration benefits through one's children—does *not* apply to either the original DACA program or its expansions. Under these circumstances, we do not find the *Texas* courts' treatment of the DACA expansions to be strong persuasive authority, much less an "insurmountable obstacle." *Cf.* Bryan A. Garner et al., The Law of Judicial Precedent 170 (2016) ("An authority derives its persuasive power from its ability to convince others to go along with it.").

In sum, the reality is (and always has been) that the executive agencies charged with immigration enforcement do not have the resources required to deport every single person present in this country without authorization. *Compare* Bernsen Memorandum, *supra*, at 1 (stating, in 1976, that "[t]here simply are not enough resources to enforce all of the rules and regulations presently on the books"), *with* Memorandum from John Morton, Assistant Secretary, DHS, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens*, at 1 (June 30,

56a

2010) (estimating that ICE has enough resources to deport only 4% of the undocumented population in any given year, and concluding that "ICE must prioritize the use of its . . . removal resources to ensure the removals the agency does conduct promote the agency's highest enforcement priorities") *and* Motomura, *supra*, at 26 ("The letter of the law creates a large removable population, but whether an individual is actually targeted for removal has long depended on government discretion and bad luck." (footnote omitted)). Recognizing this state of affairs, Congress has explicitly charged the Secretary of Homeland Security with "[e]stablishing national immigration enforcement policies and priorities."   6 U.S.C. § 202(5).

It is therefore no surprise that deferred action has been a feature of our immigration system—albeit one of executive invention—for decades; has been employed categorically on numerous occasions; and has been recognized as a practical reality by both Congress and the courts.   *See, e.g.*, *Brewer II*, 855 F.3d at 967 ("[I]t is well settled that the Secretary [of Homeland Security] can exercise deferred action" as part of her statutory authority "to administer and enforce all laws relating to immigration and naturalization.").   In a world where the government can remove only a small percentage of the undocumented noncitizens present in this country in any year, deferred action programs like DACA enable DHS to devote much-needed resources to enforcement priorities such as threats to national security, rather than blameless and economically productive young people with clean criminal records.

We therefore conclude that DACA was a permissible exercise of executive discretion, notwithstanding

57a

the Fifth Circuit's conclusion that the related DAPA program exceeded DHS's statutory authority. DACA is being implemented in a manner that reflects discretionary, case-by-case review, and at least one of the Fifth Circuit's key rationales in striking down DAPA is inapplicable with respect to DACA. With respect for our sister circuit, we find the analysis that seemingly compelled the result in *Texas* entirely inapposite. And because the Acting Secretary was therefore incorrect in her belief that DACA was illegal and had to be rescinded, plaintiffs are likely to succeed in demonstrating that the rescission must be set aside. *Chenery I*, 318 U.S. at 94; *Safe Air for Everyone*, 488 F.3d at 1101-02.

To be clear: we do not hold that DACA *could not* be rescinded as an exercise of Executive Branch discretion. We hold only that here, where the Executive *did not* make a discretionary choice to end DACA—but rather acted based on an erroneous view of what the law required—the rescission was arbitrary and capricious under settled law. The government is, as always, free to reexamine its policy choices, so long as doing so does not violate an injunction or any freestanding statutory or constitutional protection.[24]

_____

[24] The government has submitted a letter pursuant to Federal Rule of Appellate Procedure 28(j), informing us that the current Secretary of Homeland Security, Kirstjen Nielsen, issued a new memorandum regarding the DACA rescission on June 22, 2018. In the memorandum, Secretary Nielsen "provide[d] additional explanation of the basis for the DACA rescission," in response to an order filed in a parallel lawsuit. The government's letter does not argue that the Nielsen memorandum represents fresh agency action that could possibly moot this appeal. We therefore leave it to the district court in the first instance to determine the admissibility of Secretary Nielsen's letter given that it cannot possibly be a part

58a

## V.

Having concluded that the district court was correct in its APA merits holding, we now turn to the question of the appropriate remedy.   The district court preliminarily enjoined the rescission of DACA with respect to existing beneficiaries on a nationwide basis.   The government asserts that this was error, and that a proper injunction would be narrower.

The general rule regarding the scope of preliminary injunctive relief is that it "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court." *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (internal citation omitted).   But "[t]here is no general requirement that an injunction affect only the parties in the suit." *Bresgal v. Brock*, 843 F.2d 1163, 1169 (9th Cir. 1987); *see also id.* at 1170-71 ("[A]n injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—*if such breadth is necessary to give prevailing parties the relief to which they are entitled*.") (emphasis in original).

It is also important to note that the claim underlying the injunction here is an arbitrary-and-capricious challenge under the APA.   In this context, "[w]hen a reviewing court determines that agency regulations are unlaw-

---

of the administrative record in this case, and its impact, if any, on this case.   And to the extent the Nielsen memorandum is offered as an additional justification of the original DACA rescission, we do not consider it in our review of Acting Secretary Duke's decision because it is well-settled that "we will not allow the agency to supply post-hoc rationalizations for its actions . . . ." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603 (9th Cir. 2014).

AR3470

59a

ful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (internal citation omitted).   As Justice Blackmun explained while "writing in dissent but apparently expressing the view of all nine Justices on this question," *id.*:

> The Administrative Procedure Act permits suit to be brought by any person "adversely affected or aggrieved by agency action."   In some cases the "agency action" will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief that affects the rights of parties not before the court.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting) (citation omitted).

A final principle is also relevant:   the need for uniformity in immigration policy.   *See Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018) ("Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights."). As the Fifth Circuit stated when it affirmed the nationwide injunction against DAPA, "the Constitution requires an *uniform* Rule of Naturalization; Congress has instructed that the immigration laws of the United States should be enforced vigorously and *uniformly*; and the Supreme Court has described immigration policy as a comprehensive and *unified* system."   *Texas*,

60a

809 F.3d at 187-88 (emphases in original) (citations and internal quotation marks omitted).   Allowing uneven application of nationwide immigration policy flies in the face of these requirements.

In its briefing, the government fails to explain how the district court could have crafted a narrower injunction that would provide complete relief to the plaintiffs, including the entity plaintiffs.   *Cf. Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017) ("[T]he Government has not proposed a workable alternative form of the TRO  . . .  that would protect the proprietary interests of the States at issue here while nevertheless applying only within the States' borders.").   Nor does it provide compelling reasons to deviate from the normal rule in APA cases, or to disregard the need for uniformity in national immigration policy.   The one argument it does offer on this latter point—that "[d]eferred action is itself a departure from vigorous and uniform enforcement of the immigration laws," and that "enjoining the rescission of DACA on a nationwide basis . . .  increases rather than lessens that departure" —is a red herring.   DACA *is* national immigration policy, and an injunction that applies that policy to some individuals while rescinding it as to others is inimical to the principle of uniformity.

We therefore conclude that the district court did not abuse its discretion in issuing a nationwide injunction. Such relief is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress.

**AR3472**

61a

## VI.

We turn next to the district court's treatment of the government's motion to dismiss for failure to state a claim.   The government moved to dismiss all of plaintiffs' claims; the district court dismissed some claims and denied the government's motion as to others.   We take each claim in turn.[25]

### A.   APA:   Arbitrary-and-Capricious

For the reasons stated above in discussing plaintiffs' likelihood of success on the merits, the district court was correct to deny the government's motion to dismiss plaintiffs' claim that the DACA rescission was arbitrary and capricious under the APA.   *See* 5 U.S.C. § 706(2)(A).

### B.   APA:   Notice-and-Comment

Plaintiffs also assert that the rescission of DACA is in fact a substantive rule under the APA, and that it therefore could not be validly accomplished without notice-and-comment procedures.

As touched on above with respect to DACA itself, an agency pronouncement is excluded from the APA's requirement of notice-and-comment procedures if it constitutes a "general statement[] of policy."   5 U.S.C. § 553(b)(3)(A).   General statements of policy are those that "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."   *Mada-Luna*, 813 F.2d at 1012-13 (quoting Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947)).   "To qualify as a general statement of policy   .  .  .   a directive must not estab-

---

[25]  Plaintiffs do not challenge the district court's dismissal of their equitable estoppel claim.

**AR3473**

62a

lish a binding norm and must leave agency officials free to consider the individual facts in the various cases that arise and to exercise discretion." *Id.* at 1015 (internal quotation marks omitted); *see also id.* at 1013 ("The critical factor to determine whether a directive announcing a new policy constitutes a rule or a general statement of policy is the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." (alterations in original) (internal quotation marks omitted)).

The district court held that because DACA itself was a general statement of policy that did not require notice and comment, it could also be rescinded without those procedures. This proposition finds support in *Mada-Luna*, in which "we conclude[d] that [a deferred-action Operating Instruction] constituted a general statement of policy, and thus could be validly repealed and superseded without notice-and-comment proceedings." *Id.* at 1017. Plaintiffs contest this conclusion, arguing that the DACA *rescission* was a binding rule, even though DACA's *adoption* was a general statement of policy. They provide two bases for this assertion.

First, plaintiffs argue that the rescission is binding because it requires DHS officials to reject new DACA applications and (after a certain date) renewal applications. It is true that Acting Secretary Duke's rescission memorandum makes rejections of DACA applications mandatory. But the relevant question under the rescission memorandum is not whether DHS officials retained discretion to accept applications for a program that no longer existed; instead, the question is whether DHS officials retained discretion *to grant deferred*

63a

*action* and collateral benefits outside of the (now-cancelled) DACA program.

For its part, the government asserts that the rescission memorandum made clear that, despite the rescission, "future deferred action requests will be 'adjudicat[ed] . . . on an individual, case-by-case basis.'" Mildly put, this assertion mischaracterizes the memorandum. The quoted language refers to the treatment of only (a) initial applications pending on the date of the rescission, and (b) renewal applications filed within the one-month wind-down period. It does *not* refer to how future requests for deferred action outside the DACA program would be handled. Still, the rescission memorandum also did not forbid the agency from granting such requests, and it acknowledged the background principle of deferred action as "an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis." And the memorandum closed by stating that "no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS"—presumably including granting deferred action on a case-by-case basis to some people who would have been eligible for DACA.

If allowed to go into effect, the rescission of DACA would undoubtedly result in the loss of deferred action for the vast majority of the 689,800 people who rely on the program. But the rescission memorandum does not mandate that result because it leaves in place the background principle that deferred action is available on a case-by-case basis.[26] Plaintiffs' primary argu-

---

[26] The Regents argue that "the agency's discretion to grant deferred action on the basis of the DACA criteria has been eliminated."

AR3475

64a

ment against this conclusion is a citation to *United States ex rel. Parco v. Morris*, 426 F. Supp. 976 (E.D. Pa. 1977), which is said to be "the only other decision to address an Executive Branch decision to terminate a deferred-action program without undergoing notice-and-comment rulemaking."   But as the district court noted, the key factor in that case was the contention that under the policy at issue, "'discretion' was exercised favorably in all cases of a certain kind and then, after repeal of the regulation, unfavorably in each such case." *Parco*, 426 F. Supp. at 984.   DACA, by contrast, explicitly contemplated case-by-case discretion, and its rescission appears to have left in place background principles of prosecutorial discretion.

Plaintiffs also argue that the DACA rescission is not a general policy statement because it is binding as a legal interpretation that a DACA-like program would be illegal.   But again, this argument answers the wrong question.   The Acting Secretary's legal conclusion that a DACA-like program is unlawful does not constrain the discretion of line-level DHS employees to grant deferred action on a case-by-case basis, and those employees lack authority to institute such an agency-wide program in the first place.   And plaintiffs do not point to any reason why *this* Acting Secretary's legal conclusion about DACA would bind subsequent Secretaries if they were to disagree with its reasoning—just as Act-

---

This is not quite right either. DHS's authority to grant deferred action *under the DACA program* has been eliminated, but the DACA criteria themselves are some of those that have traditionally guided immigration enforcement discretion.  *See* Wadhia, *supra*, at 57 ("DHS used traditional humanitarian factors to outline the parameters for the DACA program, such as tender age and long-time residence in the United States.").

65a

ing Secretary Duke reversed course from previous Secretaries who concluded DACA was legal.  This is not a "new 'binding rule of substantive law,'" *Mada-Luna*, 813 F.2d at 1014, affecting the rights of the people and entities regulated by the agency; it is an interpretation of the agency's own power, and plaintiffs do not explain why it should be read as binding future DHS Secretaries.  The district court correctly dismissed plaintiffs' notice-and-comment claims.

*C.  Due Process:  Deferred Action*

The *Garcia* plaintiffs—individual DACA recipients—have brought a substantive due process claim alleging that the rescission deprived them of protected interests in their DACA designation, including the renewal of their benefits.  The district court dismissed this claim, holding that there is no protected entitlement in either the initial grant of deferred action under DACA or the renewal of benefits for existing DACA enrollees.  On appeal, the *Garcia* plaintiffs challenge this ruling only as it applies to the renewal of DACA benefits, not as to the initial grant.

"A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution."  *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994).   It is possible to have a property interest in a government benefit, but "a person clearly must have more than an abstract need or desire for [the benefit].   He must have more than a unilateral expectation of it.   He must, instead, have a legitimate claim of entitlement to it."  *Bd. Of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).   Although "a benefit is not a protected entitlement if gov-

**AR3477**

66a

ernment officials may grant or deny it in their discretion," *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005), a legitimate claim of entitlement may exist where there are "rules or mutually explicit understandings that support [a plaintiff's] claim of entitlement to the benefit . . . ." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972); *see also, e.g.*, *Gerhart v. Lake Cty.*, 637 F.3d 1013, 1020 (9th Cir. 2011). The dispute here focuses on whether such "mutually explicit understandings" existed between the government and DACA recipients with respect to the renewal of DACA benefits.

The *Garcia* plaintiffs assert that they and the government "'mutually' understood that DACA recipients would be able to renew their benefits and protection on an ongoing basis so long as they fulfilled the program's criteria." But this argument is undercut by the DACA FAQs published by DHS, which explicitly state that "USCIS retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the [renewal] guidelines are met." The FAQs also state that any individual's "deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion," and Secretary Napolitano's DACA memorandum claims that it "confers no substantive right, immigration status or pathway to citizenship." Whether or not these provisions are legally operative, they do not indicate that the government shared plaintiffs' expectation of presumptive renewal.

Attempting to overcome this facially discretionary language, plaintiffs emphasize several factors. First, they say, the very nature of the DACA project was such that presumptive renewal was required to encourage people to participate; a two-year term with no

67a

presumption of renewal would not have been attractive enough to outweigh the risks to the applicants.   Moreover, Secretary Napolitano's DACA memorandum itself states that grants of deferred action under DACA will be "subject to renewal," and the actual criteria for renewal were "nondiscretionary" in nature.[27]   Finally, the plaintiffs point to a more than 99% approval rate for adjudicated DACA renewal applications.   This, they assert, is powerful evidence of a mutual understanding of presumptive renewal.

All these points might have revealed a question of fact as to whether a mutually explicit understanding of presumptive renewal existed—thereby avoiding dismissal on the pleadings—if plaintiffs were bringing a claim that, for example, their individual DACA renewals were denied for no good reason.   But it is hard to see how an expectation of renewal within the confines of the existing DACA policy could have created a mutually explicit understanding that the DACA program *itself* would not be terminated wholesale.   That is, a 99% renewal rate under DACA provides no evidence that the government shared an understanding that the DACA program would continue existing indefinitely to provide such renewals.   None of plaintiffs' cited authorities appear to address this kind of claim.

---

[27] DHS's DACA FAQs state that "[y]ou may be considered for renewal of DACA if you met the guidelines for consideration of Initial DACA (see above) AND you:   [1] Did not depart the United States on or after Aug. 15, 2012, without advance parole; [2] Have continuously resided in the United States since you submitted your most recent request for DACA that was approved up to the present time; and [3] Have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and do not otherwise pose a threat to national security or public safety."

68a

While we may agree with much of what plaintiffs say about the cruelty of ending a program upon which so many have come to rely, we do not believe they have plausibly alleged a "mutually explicit understanding" that DACA—created by executive action in a politically polarized policy area and explicitly couched in discretionary language—would exist indefinitely, including through a change in presidential administrations. *See Gerhart*, 637 F.3d at 1020 ("A person's belief of entitlement to a government benefit, no matter how sincerely or reasonably held, does not create a property right if that belief is not mutually held by the government.").   On that basis, we affirm the district court's dismissal.

*D.  Due Process:  Information-Sharing*

Several of the complaints allege a different due process theory:  DACA recipients had a protected interest based on the government's representations that the personal information they submitted with their applications would not be used for enforcement purposes, and the government violated this interest by changing its policy to allow such use.   The district court held that the plaintiffs had plausibly alleged facts that state a claim under this theory.

As with their other due process claim, the question whether DACA recipients enjoy a protected due process right protecting them from having the government use their information against them for enforcement purposes turns on the existence of a "mutually explicit understanding[]" on that point between the government and DACA recipients.   *Perry*, 408 U.S. at 601; *see also Gerhart*, 637 F.3d at 1020.   The DACA FAQs published by DHS state the following information-use policy:

69a

Information provided in this request *is protected from disclosure* to ICE and CBP for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). Individuals whose cases are deferred pursuant to DACA will not be referred to ICE. The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing policy covers family members and guardians, in addition to the requestor. This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

(emphasis added). The statement that applicant information "is protected from disclosure" to the enforcement arms of DHS is a strong commitment, and plaintiffs plausibly allege that DACA recipients reasonably relied on it.

The government of course points to the express caveat that the information-sharing policy "may be modified, superseded or rescinded at any time." But as the district court held, this qualifier is ambiguous as to whether it allows the government to change its policy only prospectively, or also with respect to information

70a

already received—and this ambiguity presents a fact question not amenable to resolution on the pleadings. Plaintiffs' interpretation that a policy change would only apply prospectively is a plausible one, given that the policy is written in terms of what will happen to "[i]nformation provided in *this request*," rather than DACA-derived information generally.   (emphasis added).   It is at least reasonable to think that a change in the policy would apply only to those applications submitted after that change takes effect.   And while the government also relies on the language stating that the policy does not create enforceable rights, such a disclaimer by an agency about what its statements do and do not constitute as a legal matter are not dispositive.   *See, e.g.*, *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022-23 (D.C. Cir. 2000) (declining to give legal effect to agency statement that its guidance did "not represent final Agency action, and cannot be relied upon to create any rights . . . .").   Plaintiffs have plausibly alleged a mutually explicit understanding that DACA applicants' information would be protected from disclosure.

The government argues in the alternative that plaintiffs have failed to plausibly allege that DHS actually changed its policy.   Plaintiffs' allegations rest on a set of FAQs about the DACA rescission that DHS published the same day it issued the rescission memorandum, September 5, 2017.   In those rescission FAQs, the previous language stating that personal information "is protected from disclosure" has been replaced with the following:

> Information provided to USCIS in DACA requests *will not be proactively provided* to ICE and CBP for the purpose of immigration enforcement proceedings, unless the requestor meets the criteria for the

71a

> issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA).

(emphasis added).

The government's first response—that the differing language in the two FAQs does not actually reflect a difference in policy—is hard to swallow.  It does not take much parsing of the text to see the significant difference between "protect[ing]" something from "disclosure" on the one hand, and merely declining to "proactively provide[]" it on the other.  This is especially so when the entities in question (and to which USCIS presumably *would* now provide information *re*actively) are fellow components of the same umbrella agency.

Changing gears, the government also points to yet a third set of FAQs, published months after the rescission and not part of the record in this case, which state:

> Information provided to USCIS for the DACA process will not make you an immigration priority for that reason alone.  That information *will only be proactively provided* to ICE or CBP if the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www. uscis.gov/NTA).  *This information-sharing policy has not changed in any way since it was first announced*, including as a result of the Sept. 5, 2017 memo starting a wind-down of the DACA policy.

USCIS, Guidance on Rejected DACA Requests:  Frequently Asked Questions (Nov. 30, 2017) (emphases added).  The government notes that a district court relied on FAQs containing this language in parallel litiga-

72a

tion to dismiss a nearly identical information-use due process claim.  *See Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 279-81 (E.D.N.Y. 2018).

But this case is critically different because in *Batalla Vidal* the plaintiffs had attached the new version of the FAQs to their complaint.  As the court there explained, "Plaintiffs  . . .  have effectively pleaded themselves out of court by relying on a document that contradicts their otherwise-unsupported allegation of a change to DHS's information-use policy."  *Id.* at 280.  By contrast, here the most recent FAQs were not attached to or referenced in any of the complaints—indeed, they postdate the filing of the complaints.  Therefore, the normal rule applies:  materials outside the complaint cannot be considered on a motion to dismiss.  *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Even if it could be considered, this newest FAQ would not conclusively resolve the question of fact surrounding DHS's current information-sharing policy because it still contains the language that suggests a change from the pre-rescission policy.  *See* USCIS, Guidance, *supra* ("[I]nformation will only be *proactively provided* to ICE or CBP if the requestor meets the criteria for the issuance of a Notice To Appear[.]") (emphasis added).[28]  Plaintiffs have plausibly alleged that DHS has changed its policy.

---

[28]  Astonishingly, this sentence—which appears to represent a change from the prior policy of affirmatively protecting information from disclosure—is *immediately adjacent* to DHS's assurance that nothing has changed.  *Cf.* George Orwell, Nineteen Eighty-Four (1949), at 175 ("Oceania was at war with Eastasia:   Oceania had always been at war with Eastasia.").

73a

Finally, in order to state a substantive due process claim, plaintiffs must allege conduct that "shock[s] the conscience and offend[s] the community's sense of fair play and decency." *Sylvia Landfield Tr. v. City of L.A.*, 729 F.3d 1189, 1195 (9th Cir. 2013) (quoting *March v. Cty. of San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012)). The government makes a passing argument that this standard is not satisfied because the information-sharing policy has always contained some exceptions, but as the *Garcia* plaintiffs put it, "[a]pplicants accepted those limited, acknowledged risks when they applied for DACA. They did not accept the risk that the government would abandon the other assurances that were 'crucial' to 'inducing them to apply for DACA.'" (alterations incorporated). We agree. *Cf. Raley v. Ohio*, 360 U.S. 423, 437-39 (1959) (holding that "convicting a citizen for exercising a privilege which the State had clearly told him was available to him" was "the most indefensible sort of entrapment by the State" and violated due process); *Cox v. Louisiana*, 379 U.S. 559, 568-71 (1965) (due process violation where defendant was convicted for leading a demonstration in a location where the police chief had given him permission to do so). Plaintiffs have stated a due process claim based on the alleged change in DHS's information-sharing policy.

*E. Equal Protection*

The district court also held that plaintiffs stated a viable equal protection claim by plausibly alleging that the DACA rescission disproportionately affected Latinos and individuals of Mexican descent and was motivated by discriminatory animus. *See Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (holding a facially neutral action unconstitutional where "its enactment or the

74a

manner in which it was enforced were motivated by a discriminatory purpose," and reviewing the *Arlington Heights* factors for assessing discriminatory purpose) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977)).

Because the district court denied the government's motion to dismiss plaintiffs' equal protection claim at the pleading stage, we take all of the complaints' allegations as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and construe them in the light most favorable to the plaintiffs, *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). We agree with the district court that plaintiffs plausibly alleged an equal protection claim.

Most significantly, plaintiffs allege that the rescission of DACA disproportionately impacts Latinos and individuals of Mexican heritage, who account for 93% of DACA recipients. *See Arlington Heights*, 429 U.S. at 266. The complaints also allege a history of animus toward persons of Hispanic descent[29] evidenced by both pre-presidential and post-presidential[30] state-

---

[29] The government argues that the statements by the President cited in the complaints do not provide sufficient evidence to plausibly allege discriminatory intent. The government first submits that nationality, as opposed to ethnicity, is not an invidious classification, and that many of the cited comments go only to Mexican nationality. "Often, however, the two are identical as a factual matter: one was born in the nation whose primary stock is one's own ethnic group." *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring). And plaintiffs allege discriminatory intent not only toward "Mexican nationals," but also toward "individuals of Mexican heritage, and Latinos."

[30] The district court took judicial notice of one such statement by the President: "[o]n December 29, 2017, President Trump tweeted: 'The Democrats have been told, and fully understand, that there

AR3486

75a

ments by President Trump, who is alleged to have decided to end DACA, even though the directive to the Acting Secretary was issued from Attorney General Sessions.   Finally, the district court properly considered "the unusual history behind the rescission," all of which appeared in the record submitted by the government.   *See Arlington Heights*, 429 U.S. at 267. As the district court noted, "DACA received reaffirmation by the agency as recently as three months before the rescission, only to be hurriedly cast aside on what seems to have been a contrived excuse (its purported illegality).   This strange about-face, done at lightning speed, suggests that the normal care and consideration within the agency was bypassed."

The government contends that the equal protection claim is foreclosed by *AADC*, in which the Supreme Court stated that "as a general matter   . . .   an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation."   525 U.S. at 488.   But in the context of this case, the challenge to the rescission of DACA is not raised "as a defense against [] deportation," and is not a claim of "selective enforcement."   *Id.*   Rather, it is a freestanding claim that the Executive Branch, motivated by animus, ended a program that overwhelmingly benefits a certain ethnic group.   Thus, the equal protection claim does not implicate the concerns motivating

_____

can be no DACA without the desperately needed WALL at the Southern Border and an END to the horrible Chain Migration & ridiculous Lottery System of Immigration etc.   We must protect our Country at all cost!'"   There were many similar statements made by the President after he took the oath of office leading up to the DACA rescission on September 5, 2017.

76a

the Court in *AADC* and underscored by the government: inhibiting prosecutorial discretion, allowing continuing violations of immigration law, and impacting foreign relations. The two cases cited by the government do not support its position, as both of them involved an individual noncitizen making an equal protection argument in an attempt to avoid his own deportation. *See Kandamar v. Gonzales*, 464 F.3d 65, 72-74 (1st Cir. 2006); *Hadayat v. Gonzales*, 458 F.3d 659, 665 (7th Cir. 2006). Plaintiffs' challenge to the rescission of DACA—which is itself discretionary—is not such a case.

The government also contends that even if not totally barred by *AADC*, plaintiffs' claims must be subject to the heightened pleading standard applied to selective-prosecution claims in the criminal context. *See United States v. Armstrong*, 517 U.S. 456, 463-65 (1996). But this argument meets the same objection: as the district court held, plaintiffs' challenge is not a selective-prosecution claim. We are therefore not persuaded by the government's arguments.

The Supreme Court's recent decision in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), does not foreclose this claim. There, statements by the President allegedly revealing religious animus against Muslims were "[a]t the heart of plaintiffs' case . . . ." *Hawaii*, 138 S. Ct. at 2417. The Court assumed without deciding that it was proper to rely on the President's statements, but nevertheless upheld the challenged executive order under rational basis review. *Id.* at 2420, 2423. Here, by contrast, plaintiffs provide substantially greater evidence of discriminatory motivation, including the rescission order's disparate impact on Latinos and per-

77a

sons of Mexican heritage, as well as the order's unusual history.   Moreover, our case differs from *Hawaii* in several potentially important respects, including the physical location of the plaintiffs within the geographic United States, *see Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 781 (9th Cir. 2014) (en banc), the lack of a national security justification for the challenged government action, and the nature of the constitutional claim raised.

Therefore, we conclude that plaintiffs have stated a plausible equal protection claim.

**VII.**

The rescission of DACA—based as it was solely on a misconceived view of the law—is reviewable, and plaintiffs are likely to succeed on their claim that it must be set aside under the APA.   We therefore affirm the district court's entry of a preliminary injunction.[31]   The district court also properly dismissed plaintiffs' APA notice-and-comment claim, and their claim that the DACA rescission violates their substantive due process rights.   The district court also properly denied the government's motion to dismiss plaintiffs' APA arbitrary-and-capricious claim, their claim that the new information-sharing policy violates their due process rights, and their claim that the DACA rescission violates their right to equal protection.

*   *   *

---

[31] We do not disagree with the reasoning of Judge Owens's concurring opinion that the likelihood of success on plaintiffs' equal protection claim is a second, alternative ground for affirming the entry of the injunction.

78a

The Executive wields awesome power in the enforcement of our nation's immigration laws.   Our decision today does not curb that power, but rather enables its exercise in a manner that is free from legal misconceptions and is democratically accountable to the public.   Whether Dulce Garcia and the hundreds of thousands of other young dreamers like her may continue to live productively in the only country they have ever known is, ultimately, a choice for the political branches of our constitutional government.   With the power to make that choice, however, must come accountability for the consequences.

**AFFIRMED.**

79a

OWENS, Circuit Judge, concurring in the judgment:

As I believe that Plaintiffs' Equal Protection claim has some "likelihood of success on the merits," I concur in the judgment affirming the preliminary injunction. The extraordinary practical impact of allowing DACA's rescission to take effect before a final adjudication of its legality far outweighs the minimal practical impact of keeping the program in place a bit longer.    For that reason, it is better now to risk incorrectly preserving the status quo than to risk incorrectly disrupting it.[1] However, I disagree with the portion of the majority's opinion that we may review the rescission of DACA for compliance with the APA.[2]

Under 5 U.S.C. § 701(a)(2), "agency action [that] is committed to agency discretion by law" is not subject to judicial review for compliance with the APA.    Since

---

[1]  The government appears to share this view.    In its petition for certiorari before judgment, the government asserted that "a primary purpose of the Acting Secretary's orderly wind-down of the DACA policy was to avoid the disruptive effects on all parties of abrupt shifts in the enforcement of the Nation's immigration laws. Inviting more changes before final resolution of this litigation would not further that interest."

[2]  As for the government's appeal from the motions to dismiss, I dissent, for reasons stated here, from the majority's holding to affirm the district court's denial of the motion to dismiss Plaintiffs' APA arbitrary-and-capricious claim (Part VI-A).    However, I concur in the majority's holding to affirm the district court's dismissal of Plaintiffs' APA notice-and-comment claim (Part VI-B).    I also concur in the judgment to affirm the district court's ruling on Plaintiffs' Due Process claims (Part VI-C; Part VI-D).    And, as explained here as well, I agree with the majority's decision to affirm the district court's denial of the motion to dismiss the Equal Protection claim (Part VI-E) and hold that the Equal Protection claim offers an alternative ground to affirm the preliminary injunction.

80a

*Heckler v. Chaney*, courts read § 701(a)(2) to preclude judicial review of certain types of administrative action that are "traditionally . . . 'committed to agency discretion.'" 470 U.S. 821, 832 (1985) (holding unreviewable the decision not to institute enforcement proceedings); *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (same for the allocation of funds from a lump-sum appropriation); *Webster v. Doe*, 486 U.S. 592, 599-600 (1988) (same for decisions of the Director of the Central Intelligence Agency to terminate an employee due to national security interests); *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 281-82 (1987) (*BLE*) (same for an agency's refusal to grant reconsideration of an action due to material error).

An agency decision to rescind a non-enforcement policy in the immigration context is this type of administrative action. From *Heckler*, we know that agency actions that "involve[] a complicated balancing of a number of factors," like allocating agency resources and prioritizing agency policies, "are peculiarly within [the agency's] expertise," and are therefore "general-[ly] unsuitab[le] for judicial review." 470 U.S. at 831. And in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) (*AADC*), the Supreme Court made clear that Executive Branch decisions that implicate enforcement priorities in the context of immigration are among those that judges are least equipped to review. *Id.* at 489-90. In *AADC*, the Court explained that the concerns necessitating the Executive's "broad discretion" in criminal prosecutions are "greatly magnified in the deportation context." *Id.* (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).

AR3492

81a

In deciding to rescind an immigration policy of non-enforcement, DHS thus acts with broad discretion that courts cannot review absent clear congressional authorization.   Here, rather than authorize judicial review, the broad, discretion-granting language of the enabling statute reinforces that DHS's enforcement decision is not subject to APA review.   *See* 6 U.S.C. § 202(5) ("The Secretary shall be responsible for . . . [e]stablishing national immigration enforcement policies and priorities."); *see also Webster*, 486 U.S. at 599-600.

Perhaps recognizing that immigration enforcement decisions exhibit the characteristics of unreviewable agency actions, the majority decides that we should nonetheless review the rescission of DACA because these features are not actually at work here:   Acting Secretary Duke explained that DACA was rescinded based on DHS's belief that the program was unlawful. The majority points to *Heckler*'s footnote 4, where the Court left open the question whether courts may review agency action if "a refusal by the agency to institute proceedings [is] based solely on the belief that it lacks jurisdiction."   *Heckler*, 470 U.S. at 833 n.4 ("[W]e express no opinion on whether such decisions would be unreviewable under § 701(a)(2) . . . ."). The majority concludes that the Supreme Court has not yet answered this question, and that our court, in *Montana Air Chapter No. 29 v. FLRA*, 898 F.2d 753, 756-57 (9th Cir. 1990), has answered it in the affirmative:   that otherwise unreviewable agency action is reviewable when the agency justifies its action by reference to its understanding of its jurisdiction.   I respectfully disagree.

In *Montana Air*, we confronted the question left open in *Heckler*'s footnote 4.   Specifically, we held that a

82a

decision by the Federal Labor Relations Authority's General Counsel not to issue an unfair labor practice complaint was reviewable only because his decision was "based solely on his belief that he lacks jurisdiction to issue such a complaint." *Id.* at 756. But what we held reviewable were the General Counsel's "statutory and regulatory interpretations to determine if his belief that he lacked jurisdiction was correct." *Id.* at 757. Applying *Chevron*, we found "impermissible" the General Counsel's interpretations of the statute under which he acted. *Id.* at 758.

Here, by contrast, Plaintiffs do not ask that we apply *Chevron* to review whether Acting Secretary Duke impermissibly interpreted 6 U.S.C. § 202(5) in concluding that the statute authorized the rescission of DACA.[3] Instead, Plaintiffs ask that we review for arbitrariness and capriciousness the *procedures* the agency used to rescind DACA. But nothing in *Montana Air* suggests that *Heckler*'s footnote 4 authorizes arbitrary-and-capricious, rather than *Chevron*, review of agency action simply because the agency acted based on its understanding of its enabling statute. And, despite Plaintiffs' arguments to the contrary, *BLE* plainly prohibits us from doing so.

In *BLE*, the Supreme Court held that an agency's refusal to reconsider a prior adjudicative decision was unreviewable even where the agency based its refusal on its interpretation of its enabling statute. 482 U.S.

---

[3] This is not surprising: § 202(5) makes the Secretary "responsible for . . . [e]stablishing national immigration enforcement policies and priorities." If we accept that this broad, discretion-granting statute authorized DACA's implementation, it surely also sanctions DACA's termination.

AR3494

83a

at 278-84.   In so holding, the Court explained that the agency's refusal to reconsider was unreviewable because it was the *type* of action that "has traditionally been 'committed to agency discretion,'" *id.* at 282 (quoting *Heckler*, 470 U.S. at 832); thus any inquiry into its *reasons* for acting was inappropriate, *id.* at 280-81. "It is irrelevant that the [agency's] order refusing reconsideration discussed the merits of the unions' claim at length," the Court explained, as "[i]t would hardly be sensible to say that the [agency] can genuinely deny reconsideration only when it gives the matter no thought." *Id.*   *BLE* thus makes clear that when determining the scope of permissible judicial review, courts consider only the *type* of agency action at issue, not the agency's *reasons* for acting.

Finally, Plaintiffs argue that even if *BLE* precludes review of *some* types of agency action regardless of the agency's reason for acting, that rule only applies to single-shot enforcement decisions, not to general statements of policy.   *See NAACP v. Trump*, 298 F. Supp. 3d 209, 227-36 (D.D.C. 2018) (discussing *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994), and permitting APA review on this ground).   In other words, Plaintiffs would have us hold that general statements of policy—but not single-shot enforcement decisions—are subject to APA review when the agency's sole reason for acting is its understanding of its jurisdiction.   While the majority acknowledges Plaintiffs' argument without reaching its merits, I believe that such a distinction collapses *Heckler* on its head:   In deciding whether agency action is reviewable, the first question we ask is what type of agency action is before us—whether it is agency action that courts typically review or agency action "traditionally   . . .   'com-

84a

mitted to agency discretion.'"   *Heckler*, 470 U.S. at 832.   This initial inquiry includes consideration of whether the action is a single-shot non-enforcement decision or a general statement of policy.   It would beg the question to conclude that unreviewable agency action is in fact reviewable because it is the type of action that courts typically review.

I would therefore hold that § 701(a)(2) precludes us from subjecting DACA's rescission to arbitrary-and-capricious review.

At the same time, as the government concedes, DACA's rescission may be reviewed for compliance with the Constitution.   I would hold that Plaintiffs have plausibly alleged that the rescission of DACA was motivated by unconstitutional racial animus in violation of the Equal Protection component of the Fifth Amendment, and that the district court correctly denied the government's motion to dismiss this claim.

Notably, Plaintiffs did not seek a preliminary injunction on their Equal Protection claim, instead relying solely on their APA argument.   Nonetheless, this court may affirm a preliminary injunction on any basis supported by the record.   *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1021 (9th Cir. 2013).   And because a preliminary injunction preserves the court's power to render a meaningful decision on the merits, we can affirm an injunction issued on legally erroneous grounds where remand for consideration of alternative grounds is warranted.   *See Gerling Global Reinsurance Corp. of Am. v. Low*, 240 F.3d 739, 754 (9th Cir. 2001) ("It is possible that [the challenged law] violates the Due Process Clause, but the district court did not reach that issue, and it is not fully developed in the record or in

**AR3496**

85a

the briefs presented to this court.  We leave the preliminary injunction in place in order to give the district court an opportunity to consider whether Plaintiffs are likely to succeed on the merits.");  *see also United States v. Hovsepian*, 359 F.3d 1144, 1157 (9th Cir. 2004) (en banc) (holding that the district court erred in entering an injunction but leaving "the injunction in place . . . pending the conclusion of all proceedings in this case, in aid of the court's jurisdiction").  Accordingly, I would affirm the preliminary injunction and remand for consideration whether Plaintiffs have demonstrated a likelihood of success on the merits of their Equal Protection claim.

As the majority details, the record assembled at this early stage is promising.  Plaintiffs highlight (1) the disproportionate impact DACA's rescission has on "individuals of Mexican heritage, and Latinos, who together account for 93 percent of approved DACA applications"; (2) a litany of statements by the President and high-ranking members of his Administration that plausibly indicate animus toward undocumented immigrants from Central America;[4] and (3) substantial procedural irregularities in the challenged agency action.

Such evidence—plus whatever additional evidence Plaintiffs muster on remand—may well raise a presumption that unconstitutional animus was a substantial factor in the rescission of DACA.  *See Vill. of Arlington*

---

[4] Like the majority, I do not interpret *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), to preclude review of the President's statements when applying the *Arlington Heights* standard.  At the merits stage, the district court can still decide whether, or to what degree, the President's statements betray a discriminatory animus behind DACA's rescission.

**AR3497**

86a

*Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977); *see also Hawaii*, 138 S. Ct. at 2420 (holding that courts "may consider plaintiffs' extrinsic evidence" as permitted by the applicable level of scrutiny). If the government fails to rebut that presumption, Plaintiffs will have demonstrated a likelihood of success on the merits. *See Arlington Heights*, 429 U.S. at 270 & n.21 (noting that proof that an action was motivated by a discriminatory purpose shifts to the government the burden of establishing that the same decision would have resulted without the impermissible purpose); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (affirming the injunction where the government failed to meet its burden at preliminary injunction stage, because "the burdens at the preliminary injunction stage track the burdens at trial"). As such, I believe that Plaintiffs have plausibly alleged an Equal Protection violation and that the district court should decide whether it is an alternative ground to grant the preliminary injunction.

Moreover, the balance of equities here weighs heavily in favor of affirming the preliminary injunction. A merits decision from the district court concluding that the Executive rescinded DACA because of unconstitutional racial animus would be little more than an advisory opinion if by that time thousands of young people had lost their status due to the lack of an injunction preserving it. Preliminary injunctive relief exists precisely for circumstances like these: "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Thus, on these facts, the district court was correct to issue a preliminary injunction. *See*

87a

*Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004) (affirming injunction where "the potential harms from reversing the injunction outweigh those of leaving it in place by mistake"); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (granting preliminary relief because "otherwise a favorable final judgment might well be useless"); *Brown v. Chote*, 411 U.S. 452, 457 (1973); *cf. Winter v. NRDC, Inc.*, 555 U.S. 7, 26 (2008) (reversing injunction without addressing likelihood of success on the merits where "the balance of equities and consideration of the overall public interest in this case tip strongly in favor of [defendants]").

Accordingly, while I would remand for the district court to evaluate the Plaintiffs' likelihood of success on the merits of their Equal Protection claim as an alternative basis for preliminary relief in the first instance, I join the majority in affirming the preliminary injunction to preserve the status quo while Plaintiffs attempt to prove up that claim.

AR3499

88a



## Notice to Appear Policy Memorandum

On June 28, we issued a new Notice to Appear (NTA) policy memorandum (PM) (PDF, 140 KB), providing guidance on when USCIS may issue Form I-862, Notice to Appear.

An NTA is a document that instructs an individual to appear before an immigration judge.   This is the first step in starting removal proceedings against them.

Starting Oct. 1, USCIS may issue NTAs on denied status-impacting applications, including but not limited to, Form I-485, Application to Register Permanent Residence or Adjust Status, and Form I-539, Application to Extend/Change Nonimmigrant Status.

USCIS will send denial letters for status-impacting applications that ensures benefit seekers are provided adequate notice when an application for a benefit is denied.   If applicants are no longer in a period of authorized stay, and do not depart the United States, USCIS may issue an NTA.   USCIS will provide details on how applicants can review information regarding their period of authorized stay, check travel compliance, or validate departure from the United States.

89a

The June 2018 NTA Policy Memo will not be implemented with respect to employment-based petitions and humanitarian applications and petitions at this time. Existing guidance for these case types will remain in effect.

We'll continue to prioritize cases of individuals with criminal records, fraud, or national security concerns and will continue the current processes of using our discretion in issuing NTAs on these case types.

USCIS held a public teleconference on Thursday, Sept. 27, and provided an overview of the PM and responded to pre-submitted questions.   The questions and answers, and the overview from the teleconference, are available on the USCIS Teleconference Notice to Appear (NTA) Update Policy Guidance script (PDF, 3.52 MB) posted to the Electronic Reading Room.

**Background**

The updated policy affects the following categories of cases where the individual is removable:

- Cases where fraud or misrepresentation is substantiated, and/or cases where there is evidence the applicant abused any program related to receiving public benefits.   We will issue an NTA in these cases, even if we deny the case for reasons other than fraud.

- Criminal cases where an applicant is charged with (or convicted of) a criminal offense, or committed acts that are chargeable as a criminal offense, even if the criminal conduct was not the basis for the denial or the ground of removability.   We will, where circumstances warrant, re-

90a

fer cases to ICE without issuing an NTA or ad-judicating an immigration benefits.

- Cases where we denied a Form N-400, Application for Naturalization, on good moral character grounds because of a criminal offense.

- Cases where an applicant will be unlawfully present in the United States when we deny the petition or application.

The PM did not change USCIS policy for the following categories:

- Cases involving national security concerns;

- Cases where issuing an NTA is required by statute or regulation;

- Temporary Protected Status (TPS) cases, except where, after applying TPS regulatory provisions, a TPS denial or withdrawal results in an individual having no other lawful immigration status; and

- Cases involving deferred action for childhood arrivals (DACA) recipients and requestors when (1) processing an initial or renewal DACA request or DACA-related benefit request or (2) processing a DACA recipient for possible termination of DACA.   Read the PM (PDF, 77 KB) that applies to cases involving DACA recipients and requestors.

**AR3502**

91a

**United States Court of Appeals for the Ninth Circuit**

**Office of the Clerk**
95 Seventh Street
San Francisco, CA 94103

**Information Regarding Judgment and
Post-Judgment Proceedings**

**Judgment**

- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36. Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**

- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise. To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing (Fed. R. App. P. 40; 9th Cir. R. 40-1)**

**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

(1)  **A.  Purpose (Panel Rehearing):**

- A party should seek panel rehearing only if one or more of the following grounds exist:

92a

- ► A material point of fact or law was overlooked in the decision;

- ► A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or

- ► An apparent conflict with another decision of the Court was not addressed in the opinion.

- Do not file a petition for panel rehearing merely to reargue the case.

**B.  Purpose (Rehearing En Banc)**

- A party should seek en banc rehearing only if one or more of the following grounds exist:

- ► Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or

- ► The proceeding involves a question of exceptional importance; or

- ► The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)   Deadlines for Filing:**

- A petition for rehearing may be filed within 14 days after entry of judgment.  Fed. R. App. P. 40(a)(1).

93a

- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment.   Fed. R. App. P. 40(a)(1).

- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.

- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).

- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication.   9th Cir. R. 40-2.

(3)   **Statement of Counsel**

- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist.   The points to be raised must be stated clearly.

(4)   **Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**

- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.

- The petition must be accompanied by a copy of the panel's decision being challenged.

94a

- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.

- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts. gov under *Forms*.

- You may file a petition electronically via the appellate ECF system.   No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper.   No additional paper copies are required unless the Court orders otherwise.

**Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)**

- The Bill of Costs must be filed within 14 days after entry of judgment.

- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms*.

**Attorneys Fees**

- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.

**AR3506**

95a

- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

**Petition for a Writ of Certiorari**

- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

**Counsel Listing in Published Opinions**

- Please check counsel listing on the attached decision.

- If there are any errors in a published <u>opinion</u>, please send a letter **in writing within 10 days** to:

  ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);

  ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

**AR3507**

96a

**Form 10.    Bill of Costs………………….....***(Rev. 12-1-09)*

**United States Court of Appeals for the Ninth Circuit**

**BILL OF COSTS**

This form is available as a fillable version at:

*http://cdn.ca9.uscourts.gov/datastore/uploads/ forms/Form%2010%20-%20Bill%20of%20Costs.pdf.*

***Note:***    If you wish to file a bill of costs, it MUST be submitted on this form and filed, with the clerk, with proof of service, within 14 days of the date of entry of judgment, and in accordance with 9th Circuit Rule 39-1.   A late bill of costs must be accompanied by a motion showing good cause.   Please refer to FRAP 39, 28 U.S.C. § 1920, and 9th Circuit Rule 39-1 when preparing your bill of costs.

|  | v. |  | 9th Cir. No. |  |
|---|---|---|---|---|

The Clerk is requested to tax the following costs against:

| Cost Taxable under FRAP 39, 28 U.S.C. § 1920, 9th Cir. R. 39-1 | REQUESTED *(Each Column Must Be Completed)* | | | | ALLOWED *(To Be Completed by the Clerk)* | | | |
|---|---|---|---|---|---|---|---|---|
|  | No. of Docs. | Pages per Doc. | Cost per Page* | TOTAL COST | No. of Docs. | Pages per Doc. | Cost per Page* | TOTAL COST |
| **Excerpt of Record** |  |  | $ | $ |  |  | $ | $ |
| **Opening Brief** |  |  | $ | $ |  |  | $ | $ |
| **Answering Brief** |  |  | $ | $ |  |  | $ | $ |
| **Reply Brief** |  |  | $ | $ |  |  | $ | $ |
| **Other\*\*** |  |  | $ | $ |  |  | $ | $ |
|  |  |  | **TOTAL:** | $ |  |  | **TOTAL:** | $ |

**AR3508**

97a

\* *Costs per page*:   May not exceed .10 or actual cost, whichever is less.   9th Circuit Rule 39-1.

\*\* *Other*:   Any other requests must be accompanied by a statement explaining why the item(s) should be taxed pursuant to 9th Circuit Rule 39-1. Additional items without such supporting statements will not be considered.

Attorneys' fees **cannot** be requested on this form.

I. [_____] , swear under penalty of perjury that the services for which costs are taxed were actually and necessarily performed, and that the requested costs were actually expended as listed.

Signature [_____]
("s/" plus attorney's name if submitted electronically)

Date [_____]

Name of Counsel: [_____]

Attorney for: [_____]

_____

*(To Be Completed by the Clerk)*

Date [_____]   Costs are taxed in the amount of $ [_____]

Clerk of Court

By: [_____] , Deputy Clerk

**AR3509**

No. 18-587

# In the Supreme Court of the United States

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, *ET AL.*,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, *ET AL.*,

*Respondents.*

*On Petition for a Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit*

**BRIEF OF *AMICUS CURIAE* EAGLE FORUM
EDUCATION & LEGAL DEFENSE FUND IN
SUPPORT OF PETITIONERS**

ANDREW L. SCHLAFLY
939 Old Chester Rd.
Far Hills, NJ 07931
(908) 719-8608
aschlafly@aol.com

*Counsel for Amicus Curiae*

**AR3510**

i

## QUESTIONS PRESENTED

This dispute concerns the policy of immigration enforcement discretion known as Deferred Action for Childhood Arrivals ("DACA"). In 2016, this Court affirmed, by an equally divided Court, a decision of the Fifth Circuit holding that two related Department of Homeland Security ("DHS") discretionary enforcement policies, including an expansion of the DACA policy, were likely unlawful and should be enjoined. *See United States v. Texas*, 136 S. Ct. 2271 (2016) (*per curiam*). In September 2017, DHS determined that the original DACA policy was unlawful and would likely be struck down by the courts on the same grounds as the related policies. DHS thus instituted an orderly wind-down of the DACA policy.

The questions presented are as follows:

1. Whether DHS's decision to wind down the DACA policy is judicially reviewable.

2. Whether DHS's decision to wind down the DACA policy is lawful.

**AR3511**

iii

# TABLE OF CONTENTS

**Pages**

Questions Presented ..............................................i

Table of Contents ............................................. iii

Table of Authorities ...........................................iv

Interests of *Amicus Curiae* ..................................1

Summary of Argument .........................................2

Argument .............................................................4

    I. The Petition Should Be Granted to Address an Issue of Immense National Importance: Nationwide Injunctions by District Courts Against the President on Immigration Policy ...............4

    II. While Some "Dreamers" Deserve Praise, It Is for Congress Alone to Grant them Citizenship, and the Petition Should Be Granted to Clarify This. ..........7

Conclusion ...........................................................9

**AR3512**

iv

## TABLE OF AUTHORITIES

**Pages**

### Cases

*Alexander v. Sandoval*, 532 U.S. 275 (2001)........6

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .........7

*City & Cty. of S.F. v. Trump*,
   897 F.3d 1225 (9th Cir. 2018)...........................7

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013).........................................4-5

*L.A. Haven Hospice, Inc. v. Sebelius*,
   638 F.3d 644 (9th Cir. 2011) ...........................7

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994)...........................................6

*Regents of the Univ. of Cal. v. United States*
   *Dep't of Homeland Sec.*, 2018 U.S. App.
   LEXIS 31688 (9th Cir. Nov. 8, 2018)...............8

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ........3, 6

*United States v. Glaser*,
   14 F.3d 1213 (7th Cir. 1994) ...........................4

*United States v. Mendoza*,
   464 U.S. 154 (1984).........................................4

*United States v. Texas*,
   136 S.Ct. 2271 (2016)........................................i

*United States v. Truong Dinh Hung*,
   629 F.2d 908 (4th Cir. 1980) ...........................8

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)...........................................4

### Constitution, Statutes and Rules

U.S. CONST. art. I, §8, cl. 4....................................7

**AR3513**

v

U.S. Const. art. II, §3..........................................7

8 U.S.C. §§1101-1537.........................................7

8 U.S.C. §1252(g) ...............................................5

Fed. R. Civ. P. 23...............................................5

S. Ct. R. 37.2(a) ...................................................1

**Other**

Angela Nagle, "The Left Case Against
   Open Borders," *American Affairs* Vol. II,
   No. 4, 17-30 (Winter 2018)
   https://americanaffairsjournal.org/2018/11/
   the-left-case-against-open-borders/.................8

AR3514

No. 18-587

# IN THE
## Supreme Court of the United States

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *ET AL.*,

*Petitioners*,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, *ET AL.*,

*Respondents*.

*On Petition for Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit*

## INTERESTS OF *AMICUS CURIAE*[1]

*Amicus curiae* Eagle Forum Education & Legal Defense Fund ("EFELDF") is a nonprofit corporation founded in 1981. For more than thirty-five years, EFELDF has defended American sovereignty and promoted adherence to federalism and the separation of powers under the U.S. Constitution. EFELDF has consistently opposed unlawful behavior, including illegal entry into and residence in the United States.

---

[1] No counsel for a party authored this brief in whole or in part. No person or entity other than *Amicus*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief. *Amicus* files this brief after providing the requisite ten-day prior written notice to all parties, and obtaining written consent from all the parties to file this brief. *See* S. Ct. R. 37.2(a).

2

Phyllis Schlafly, the founder of EFELDF, was an outspoken defender of national sovereignty against open borders.

For all these reasons, EFELDF has direct and vital interests in the issues before this Court.

## SUMMARY OF ARGUMENT

This case presents yet another nationwide injunction issued by a federal court in California, as affirmed by the Ninth Circuit, which interferes with the clear authority by the Congress and the President to govern immigration. It is difficult to imagine a constitutional power for which judicial restraint is more important, and where nationwide injunctions by district courts are so unjustified. In light of the immense significance of this issue, and amid an epidemic of litigation over it, the Petition should be granted.

As Justice Thomas wisely wrote in concurrence to a reversal last Term of another Ninth Circuit-related immigration decision:

> Injunctions that prohibit the Executive Branch from applying a law or policy against anyone — often called "universal" or "nationwide" injunctions — have become increasingly common. District courts, including the one here, have begun imposing universal injunctions without considering their authority to grant such sweeping relief. These injunctions are beginning to take a toll on the federal court system — preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch.

**AR3516**

3

*Trump v. Hawaii*, 138 S. Ct. 2392, 2424-25 (2018) (Thomas, J., concurring).

These words of Justice Thomas have not yet been heeded, because here we are again having to deal with yet another overreaching nationwide injunction that undermines Congress and disrupts presidential authority.  But it is even worse than that.  Not only is the breadth of the injunction below unjustified, but the district court even lacked jurisdiction under Immigration and Naturalization Act and there was not any standing because mere agency action cannot create a federal right.  The Ninth Circuit decision based its decision on anecdotal virtues of the "Dreamers" – the recipients of DACA benefits – but it is for Congress alone to decide whether to grant them American citizenship.  Congress has chosen not to do so, and instead the judicial branch has conferred rights where none exists.  This presents an urgent issue of national importance, which the Supreme Court should not defer or avoid.

The decision below committed errors on matters of enormous significance to our entire Nation, and thus the Petition for Writ of *Certiorari* should be granted.

**AR3517**

4

## ARGUMENT

I.   **THE PETITION SHOULD BE GRANTED TO ADDRESS AN ISSUE OF IMMENSE NATIONAL IMPORTANCE:   NATIONWIDE INJUNCTIONS BY DISTRICT COURTS AGAINST THE PRESIDENT ON IMMIGRATION POLICY.**

Justice Thomas's alarm bells against nationwide injunctions have not yet been heeded.  They need to be. Nationwide injunctions, like the one below, create havoc in all three branches of government, including the judiciary itself.   The President has publicly expressed his frustration at these injunctions, which all-too-often emanate from within the same few circuits.  Congress is paralyzed by these injunctions from taking up legislation to address   perceived problem.   Courts in other jurisdictions are being improperly bound by injunctions from other courts that lack legitimate authority over them.   *See, e.g.*, *United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994) (courts should be bound only by their appellate courts).

Nationwide injunctions "substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue," as this Court has observed. *United States v. Mendoza*, 464 U.S. 154, 160 (1984).   Moreover, injunctions which extend beyond the parties before the court are inconsistent with due process and not within any exceptions to it, such as class action litigation. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) ("The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.") (inner quotations omitted). *See also Comcast Corp. v. Behrend*, 569 U.S.

**AR3518**

5

27, 33 (2013) ("To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23.") (inner quotations omitted). No such exception exists for sweeping injunctions by district courts that alter immigration rights across the entire country.

The nationwide injunction below is in particular need for review by this Court because the district court also lacks jurisdiction under the preclusion-of-review provision of the Immigration and Naturalization Act. "[N]o court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act." 8 U.S.C. § 1252(g).

Moreover, there was no standing to support the injunction below either, because mere agency action cannot create a federal right. In vintage writing by Justice Scalia for the Court:

> Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not. Thus, when a statute has provided a general authorization for private enforcement of regulations, it may perhaps be correct that the intent displayed in each regulation can determine whether or not it is privately enforceable. But it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself.

AR3519

6

*Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) (citation omitted).

Even when this Court has upheld in part an injunction sought by abortion clinics, it has emphasized that such remedy "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (Rehnquist, C.J.). Yet nearly 25 years later, sweeping nationwide injunctions issued by district courts, like the one at issue here, go far beyond the parties in the case and what is necessary to grant them relief. Rather, immigration policy is plainly and impermissibly being made by the federal judiciary rather than by Congress. Nothing in the Constitution remotely supports such overreach.

As decried by Judge Fernandez in dissenting from yet another immigration-related injunction upheld by the Ninth Circuit, in words that ring equally true on this Petition:

> While it goes without saying that I would vacate the injunction in its entirety, even if it were otherwise proper, the district court erred when it granted a nationwide injunction. It could have granted relief to the Counties without so doing. In fact, the whole concept of issuing nationwide injunctions is somewhat dubious. *See Trump*, U.S. at , 138 S. Ct. at 2425-29 (Thomas, J., concurring); *cf. id.* at , 138 S. Ct. at 2423 (majority opinion) (declining to decide "propriety of the nationwide scope of the injunction"). They should at the very least be used with a great deal of caution. In general, a court should not stretch to impose its will further than is necessary to grant

**AR3520**

7

relief to those before it. *See L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011); *see also Califano v. Yamasaki*, 442 U.S. 682, 701-03, 99 S. Ct. 2545, 2558, 61 L. Ed. 2d 176 (1979).

*City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1250 n.16 (9th Cir. 2018) (Fernandez, J., dissenting).

Strong supervision by this Court of the lower courts is needed, and soon. The Petition should be granted for this Court to rein in the epidemic of national injunctions against the President, particularly in this field of immigration. When it comes to national sovereignty, courts should not play the "sorcerer himself," and the Petition should be granted to correct that error below.

## II. WHILE SOME "DREAMERS" DESERVE PRAISE, IT IS FOR CONGRESS ALONE TO GRANT THEM CITIZENSHIP, AND PETITION SHOULD BE GRANTED TO CLARIFY THIS.

It is hardly controversial to observe that Congress alone has the power to establish immigration law, U.S. CONST. art. I, §8, cl. 4. Accordingly, Congress enacted the Immigration and Naturalization Act, 8 U.S.C. §§1101-1537 ("INA"), and it is not for the courts to change it. The essential role of the President is to ensure that immigration laws are faithfully executed. U.S. CONST. art. II, §3. In addition, the Executive Branch possesses rulemaking authority over immigration, as in other fields of law.

All this leaves the judiciary with precious little legitimate authority over immigration policy. But that is how it should be, and the Petition should be granted to rein in the lower courts as they run far afield on this issue. Immigration is fundamentally an issue of

8

national sovereignty and foreign policy, to which courts should defer to the President rather than interfere with him. "[T]he executive branch not only has superior expertise in the area of foreign intelligence, it is also constitutionally designated as the pre-eminent authority in foreign affairs." *United States v. Truong Dinh Hung*, 629 F.2d 908, 914 (4th Cir. 1980) (deferring to the president on the issue of wiretapping, without a warrant, foreigners while in the United States).

Sympathetic anecdotes can be powerful, and decision below makes the most of them. "She ... was awarded a scholarship that, together with her mother's life savings, enabled her to fulfill her longstanding dream of attending and graduating from law school. Today, Garcia maintains a thriving legal practice in San Diego, where she represents members of underserved communities ...." *Regents of the Univ. of Cal. v. United States Dep't of Homeland Sec.*, 2018 U.S. App. LEXIS 31688, at *18 (9th Cir. Nov. 8, 2018). No one doubts that the hard work deserves praise.

But few DACA recipients graduate from law school, and some DACA recipients base their claim to beneficiary status in having criminal records that do not quite rise to the level of felonies. Suppl. Pet. App. 15a. Moreover, the high achievers would do much to improve their own families' country of origin, and perhaps serve even greater needs there, if they were not given citizenship here. *See* Angela Nagle, "The Left Case Against Open Borders," *American Affairs* Vol. II, No. 4, 17-30 (Winter 2018).[2]  Regardless, this

---

[2]   https://americanaffairsjournal.org/2018/11/the-left-case-against-open-borders/ (viewed Dec. 4, 2018).

9

is a decision for Congress to make, and citation to a few success stories cannot justify a far broader grant of entitlement than Congress has given.  The President is correct in faithfully executing the immigration laws that Congress has enacted, and it was reversible error for the courts below to rule otherwise.

### CONCLUSION

For the foregoing reasons, the Petition for Writ of *Certiorari* should be granted.

Respectfully submitted,

ANDREW L. SCHLAFLY
939 Old Chester Rd.
Far Hills, NJ 07931
(908) 719-8608
aschlafly@aol.com

*Counsel for Amicus Curiae*
  *Eagle Forum Education*
  *& Legal Defense Fund*

Dated: December 4, 2018

AR3523

No. 18-587

# In the Supreme Court of the United States

―――――――

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, *ET AL.*,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, *ET AL.*,

*Respondents.*

―――――――

*On Petition for a Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit*

―――――――

**BRIEF *AMICUS CURIAE* OF IMMIGRATION
LAW REFORM INSTITUTE IN SUPPORT OF
PETITIONERS**

―――――――

CHRISTOPHER J. HAJEC
IMMIGRATION REFORM
LAW INSTITUTE
25 Massachusetts Av NW
Suite 335
Washington, DC 20001
(202) 232-5590
chajec@irli.org

LAWRENCE J. JOSEPH
*Counsel of Record*
1250 Connecticut Av NW
Suite 700-1A
Washington, DC 20036
(202) 202-355-9452
lj@larryjoseph.com

AR3524

## QUESTIONS PRESENTED

This dispute concerns the policy of immigration enforcement discretion known as Deferred Action for Childhood Arrivals ("DACA"). In 2016, this Court affirmed, by an equally divided Court, a decision of the U.S. Court of Appeals for the Fifth Circuit holding that two related Department of Homeland Security (DHS) discretionary enforcement policies, including an expansion of the DACA policy, were likely unlawful and should be enjoined. *See United States v. Texas*, 136 S.Ct. 2271 (per curiam). In September 2017, DHS determined that the original DACA policy was unlawful and would likely be struck down by the courts on the same grounds as the related policies. DHS thus instituted an orderly wind-down of the DACA policy. The questions presented are as follows:

1. Whether DHS's decision to wind down the DACA policy is judicially reviewable.

2. Whether DHS's decision to wind down the DACA policy is lawful.

i

**AR3525**

# **TABLE OF CONTENTS**

Questions Presented ................................................. i

Table of Contents ..................................................... ii

Table of Authorities.................................................. iv

Interest of *Amicus Curiae* ......................................... 1

Statement of the Case ................................................ 2

Summary of Argument.............................................. 2

Argument................................................................ 4

I.   This Court should vacate the injunction because plaintiffs' claims are not justiciable. ..... 4

    A.   All plaintiffs lack standing because DACA could not and did not create any rights........ 5

    B.   Rescission would not redress plaintiffs' injuries because DACA's invalidity would require reinstating the pre-DACA status quo *ante litem*. ................................. 8

    C.   The amendment or rescission of mere enforcement policies — as distinct from rules or regulations — is unreviewable generally, and especially so in the immigration context at issue here. .............. 9

II.  Rescission was lawful because DACA was unlawful. .......................................... 11

    A.   As a legislative rule adopted without an APA rulemaking, DACA is void *ab initio*... 11

    B.   If DACA did not bind agency discretion, rescission would be a lawful exercise of the same discretion used to issue DACA.... 13

    C.   Assuming *arguendo* that *MVMA* review is available, DACA's rescission meets that narrow test........................................... 14

AR3526

    D.  DACA violated the INA. ............................. 16

III. Plaintiffs' Fifth Amendment claims should
    be dismissed. ...................................................... 23

    A.  The "information-sharing" due-process
        claims fail to state a claim. ......................... 23

    B.  The equal-protection claims fail to state
        a claim. ......................................................... 24

Conclusion ............................................................. 25

AR3527

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ............................................... 6

*Am. Mining Congress v. Mine Safety & Health
  Admin.,* 995 F.2d 1106 (D.C. Cir. 1993) ............. 12

*Amrep Corp. v. FTC,*
  768 F.2d 1171 (10th Cir. 1985) .......................... 14

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
  570 U.S. 1 (2013) ................................................. 22

*Arizona v. United States,*
  567 U.S. 387 (2012) ............................................ 19

*Avoyelles Sportsmen's League, Inc. v. Marsh,*
  715 F.2d 897 (5th Cir. 1983) ......................... 12-13

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................ 11

*Board of Governors of the Federal Reserve System
  v. MCorp Financial,* 502 U.S. 32 (1991) ............. 10

*Bolling v. Sharpe,*
  347 U.S. 497 (1954) ............................................ 23

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ................................................ 23

*Chrysler Corp. v. Brown,*
  441 U.S. 281 (1979) ........................................ 6, 12

*City of Los Angeles v. Adams,*
  556 F.2d 40 (D.C. Cir. 1977) .............................. 17

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ................................................ 4

*F.C.C. v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ............................................ 15

AR3528

*FCC v. ITT World Commc'ns, Inc.*,
466 U.S. 463 (1984) ............................................ 10

*Fed'l Crop. Ins. Corp. v. Merrill*,
332 U.S. 380 (1947) ........................................ 7, 24

*Friends of the Earth, Inc. v. Laidlaw Envtl.
Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ............. 7-8

*General Elec. Co. v. EPA*,
290 F.3d 377 (D.C. Cir. 2002) ........................... 12

*Guevara v. Holder*,
649 F.3d 1086 (9th Cir. 2011) ........................... 20

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) ............................................ 8

*Hyder v. Keisler*,
506 F.3d 388 (5th Cir. 2007) ............................ 14

*In re GWI PCS 1, Inc.*,
230 F.3d 788 (5th Cir. 2000) ............................... 8

*Land v. Dollar*,
330 U.S. 731 (1947) ............................................ 5

*Leedom v. Kyne*,
358 U.S. 184 (1958) .......................................... 10

*Louisiana Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ............................................ 6

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................ 5

*Lutwak v. United States*,
344 U.S. 604 (1953) .......................................... 18

*Mada-Luna v. Fitzpatrick*,
813 F.2d 1006 (9th Cir. 1987) ........................... 14

*Manhattan Gen. Equip. Co. v. Commissioner*,
297 U.S. 129 (1936) .......................................... 16

v

AR3529

*Massachusetts v. EPA*,
    549 U.S 497 (2007) ............................................... 17

*McLouth Steel Products Corp. v. Thomas*,
    838 F.2d 1317 (D.C. Cir. 1988) ........................... 13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*
    *Auto. Ins. Co.*, 463 U.S. 29 (1983) .............. 3, 14-15

*Nat. Res. Def. Council, Inc. v. U.S. Envtl. Prot.*
    *Agency*, 725 F.2d 761 (D.C. Cir. 1984) .............. 8-9

*North Am. Coal Corp. v. Director, Office of*
    *Workers' Compensation Programs, U.S. Dept.*
    *of Labor*, 854 F.2d 386 (10th Cir. 1988) ............. 13

*Office of Personnel Mgmt. v. Richmond*,
    496 U.S. 414 (1990) ........................................ 7, 24

*Organized Vill. of Kake v. United States Dep't of*
    *Agric.*, 795 F.3d 956 (9th Cir. 2015) .................... 8

*Pacific Gas & Elec. Co. v. F.P.C.*,
    506 F.2d 33 (D.C. Cir. 1974) ......................... 13-14

*Paulsen v. Daniels*,
    413 F.3d 999 (9th Cir. 2005) ................................ 9

*Perez v. Mortg. Bankers Ass'n*,
    135 S.Ct. 1199 (2015) ........................................ 15

*Pers. Adm'r v. Feeney*,
    442 U.S. 256 (1979) ....................................... 24-25

*Plyler v. Doe*,
    457 U.S. 202 (1982) ........................................... 25

*Schuette v. Coalition to Defend Affirmative Action*,
    572 U.S. 291 (2014) ........................................ 5, 15

*Sea-Land Serv., Inc. v. Alaska R.R.*,
    659 F.2d 243 (D.C. Cir. 1982) ......................... 9-10

*Shell Offshore Inc. v. Babbitt*,
    238 F.3d 622 (5th Cir. 2001) .............................. 12

vi

AR3530

*State of Ohio Dep't of Human Serv. v. U.S. Dept. of Health & Human Serv., Health Care Financing Admin.,* 862 F.2d 1228 (6th Cir. 1988)................................................................. 13

*Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83 (1998)................................................. 4

*Succar v. Ashcroft,* 394 F.3d 8 (1st Cir. 2005) ................................... 17

*Sure-Tan, Inc. v. Nat'l Labor Relations Bd.,* 467 U.S. 883 (1984)............................................. 21

*Texaco, Inc. v. F.P.C.,* 412 F.2d 740 (3d Cir. 1969) ................................ 14

*Texas Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.,* 201 F.3d 551 (5th Cir. 2001) ............... 12

*Texas v. United States,* 86 F.Supp.3d 591 (S.D. Tex. 2015), *aff'd* 809 F.3d 134 (5th Cir.), *aff'd by an equally divided Court,* 136 S.Ct. 2271 (2016) ...................................................... 2, 19

*Texas v. United States,* 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court,* 136 S.Ct. 2271 (2016)............................................ 2, 9, 12, 20

*Touche Ross & Co. v. Redington,* 442 U.S. 560 (1979)........................................... 5-6

*United States v. Mistretta,* 488 U.S. 361 (1989)............................................. 21

*United States v. Picciotto,* 875 F.2d 345 (D.C. Cir. 1989) ........................... 13

*Warth v. Seldin,* 422 U.S. 490 (1975)............................................... 5

vii

AR3531

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) .............................................. 24

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) .............................................. 21

*Winter v. Natural Resources Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................ 11

*Woodall v. Commissioner,*
    964 F.2d 361 (5th Cir. 1992) .............................. 18

**Statutes**

U.S. CONST. art. I, §8, cl. 4 ........................................ 2

U.S. CONST. art. III ............................................... 2, 5

U.S. CONST. amend. V, cl. 4 ................................. 23-24

U.S. CONST. amend. XIV, §1, cl. 4 ......................... 23

Administrative Procedure Act,
    5 U.S.C. §§551-706 ............................. 2-4, 6, 9-15

5 U.S.C. §551(5) .................................................... 12

5 U.S.C. §553(b) .................................................... 12

5 U.S.C. §553(b)(A) ............................................... 12

5 U.S.C. §553(b)(B) ............................................... 12

5 U.S.C. §701(a)(1) ............................................... 10

5 U.S.C. §701(a)(2) ............................................... 10

5 U.S.C. §702 ......................................................... 9

5 U.S.C. §703 ....................................................... 10

5 U.S.C. §704 ....................................................... 11

5 U.S.C. §706(2)(B) ............................................... 16

5 U.S.C. §706(2)(C) ................................................ `6

6 U.S.C. §202(5) ................................................... 22

Immigration and Naturalization Act,
    8 U.S.C. §§1101-1537 ....... 3-4, 10, 16, 18-20, 22-23

viii

AR3532

8 U.S.C. §1103(a)(3) .............................................. 22

8 U.S.C. §1225(a)(1) .............................................. 16

8 U.S.C. §1225(a)(3) .............................................. 16

8 U.S.C. §1225(b)(2)(A) ..................................... 16-17

8 U.S.C. §1229a ................................................ 16-17

8 U.S.C. §1252(g)............................................ 2-3, 10

8 U.S.C. §1324a(h)(3) ......................................... 20-21

8 U.S.C. §1182(n)................................................... 21

8 U.S.C. §1184(g) .................................................. 21

8 U.S.C. §1188 ..................................................... 21

**Rules, Regulations and Orders**

S.Ct. Rule 37.6 ...................................................... 1

8 C.F.R. §274a.12(a)(1)-(16) ................................... 13

8 C.F.R. §274a.12(c)(14) .......................................... 13

Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) .............................. 18, 19

Memorandum from Jeh Charles Johnson, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who are Parents of U.S. Citizens or Permanent Residents* (Nov. 20, 2014) ............................................................ 17-18

**Legislative History**

H.R. REP. NO. 104-725 (1996) ................................... 18

AR3533

**Other Authorities**

Michael X. Marinelli, *INS Enforcement of the
Immigration Reform and Control Act of 1986:
Employer Sanctions During the Citation
Period*, 37 CATH. U. L.R. 829 (1988) ................... 19

x

**AR3534**

No. 18-587

# In the Supreme Court of the United States

——————

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, *ET AL.*,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, *ET AL.*,

*Respondents.*

——————

### *On Petition for a Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit*

——————

## INTEREST OF *AMICUS CURIAE*

The Immigration Reform Law Institute[1] ("IRLI") is a nonprofit 501(c)(3) public interest law firm dedicated both to litigating immigration-related cases in the interests of United States citizens and to assisting courts in understanding federal immigration law. IRLI has litigated or filed *amicus curiae* briefs in a wide variety of immigration-related cases. For more than twenty years the Board of Immigration Appeals has solicited supplementary briefing, drafted by IRLI

---

[1]   *Amicus* files this brief with all parties' written consent, with more than 10 days' written notice. Pursuant to Rule 37.6, counsel for *amicus* authored this brief in whole, no party's counsel authored this brief in whole or in part, and no person or entity — other than *amicus* and its counsel — contributed monetarily to preparing or submitting the brief.

1

AR3535

staff, from the Federation for American Immigration Reform, of which IRLI is a supporting organization.

## STATEMENT OF THE CASE

Several states, state universities, and individuals sued federal immigration officials to challenge the rescission of the Deferred Action for Childhood Arrivals ("DACA") policy implemented by the prior administration, after that administration proved unable to convince Congress to enact legislation to address illegal aliens who arrived here as minors. In addition to providing deferred-action status with respect to deportation, the DACA program also provided work authorization.

After a review, the new administration rescinded DACA, with a future effective date to allow Congress — which has plenary power to regulate immigration, U.S. CONST. art. I, §8, cl. 4 — six months to act. A major part of the rationale was that the successful state plaintiffs in *Texas v. United States*, 86 F.Supp.3d 591 (S.D. Tex. 2015), *aff'd* 809 F.3d 134 (5th Cir.), *aff'd by an equally divided Court*, 136 S.Ct. 2271 (2016) ("*Texas*"), announced plans to challenge DACA on the same grounds on that they used to invalidate the expanded DACA and Deferred Action for Parents of Americans ("DAPA") programs in *Texas*.

## SUMMARY OF ARGUMENT

The district lacked jurisdiction for a preliminary injunction not only under Article III but also under the waiver of sovereign immunity in the Administrative Procedure Act, 5 U.S.C. §§551-706 ("APA"), and the preclusion-of-review provision, 8

2

U.S.C. §1252(g), in the Immigration and Naturalization Act, 8 U.S.C. §§1101-1537 ("INA"). As for standing, DACA cannot serve as the basis for a judicially cognizable right because mere agency action cannot create a federal right, and the fact that the prior administration misled beneficiaries into applying for DACA does not support estoppel against the government (Section I.A). In addition, because plaintiffs cannot prevail against DACA's rescission without simultaneously showing that DACA was void *ab initio* when promulgated, plaintiffs' reward for invalidating rescission would be to invalidate DACA, which would not redress anything (Section I.B). Furthermore, neither APA review nor its waiver of sovereign immunity is available under three distinct barriers to APA review: DHS's actions are committed to agency discretion, fall under the INA's special statutory review, and are non-final (Section I.C).

On the merits, the 2012 DACA policy is void *ab initio* because it was issued in violation of APA notice-and-comment requirements by virtue of its creating rights and cabining discretion in a sufficiently binding manner to exceed its mere enforcement-discretion justification (Section II.A). Alternatively, if viewed as a mere statement of policy, DACA did not create any rights or even constitute final agency action because such policies are not final, but become final only on a case-by-case basis when applied (Section II.B). In any event, DACA's unlawfulness under *Texas* and a pause to allow congressional action provided ample justification under *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*MVMA*"), for rescission (Section II.C). Finally,

3

DACA is substantively inconsistent with INA requirements to commence removal proceedings for illegal aliens (Section II.D).

The lower courts also erred in denying dismissal of two Fifth Amendment claims. First, the "information-sharing" claims under substantive due process fail to meet the test for establishing a substantive due-process right, and any reliance on the informal DACA policies was unreasonable (Section III.A). Second, the equal-protection claims based on race or ethnicity are impermissible disparate-impact claims because the issue here is illegal aliens' immigration status, not race or ethnicity (Section III.B).

## <u>ARGUMENT</u>

### I.   THIS COURT SHOULD VACATE THE INJUNCTION BECAUSE PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE.

A federal court must have jurisdiction to issue a preliminary injunction, *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983), and this Court has the duty to examine jurisdiction, even if the parties concede the issue. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 105 (1998). If jurisdiction is lacking, this Court should remand with an order to dismiss.

Either DACA created no rights or — *if it did* — DACA required an upfront APA rulemaking and is thus void *ab initio* for lacking that rulemaking. Even in the latter case, plaintiffs lack a judicially cognizable right to enforce in this litigation, since the unlawfulness of DACA on the merits deprives them of

4

**AR3538**

standing.[2] The preliminary injunction violates both the separation of powers and principles of democratic self-government, *Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. 291, 311-12 (2014), and must be vacated.

### A.    All plaintiffs lack standing because DACA could not and did not create any rights.

Article III poses a tripartite test for standing: judicially cognizable injury to the plaintiff, causation by the challenged conduct, and redressable by a court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992). For several reasons, plaintiffs here lack a bare threshold injury that is judicially cognizable. But even if they had cognizable rights under DACA, the cost to redeem those rights would be DACA's invalidation because the process of challenging DACA's *rescission* calls into question DACA's *promulgation*. Since DACA was procedurally and substantively unlawful when adopted, a reviewing court's injunction must reinstate the pre-DACA status quo *ante litem*, leaving plaintiffs in the same place as rescission.

Agency officers like petitioners — as well as their predecessors from the prior Administration — cannot create rights. Of course, "Congress may create a statutory right ... the alleged deprivation of which can confer standing," *Warth v. Seldin,* 422 U.S. 490, 514 (1975), but mere agencies cannot create rights. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 577

---

[2]    When standing and the merits "intertwine," federal courts must resolve the jurisdictional and merits issues together. *Land v. Dollar,* 330 U.S. 731, 735 (1947).

5

AR3539

n.18 (1979). As Justice Scalia colorfully explained, "Agencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). If the prior administration had wanted to create rights, it needed either to work with Congress to enact new legislation or, at least, to act using the APA rulemaking authority that Congress has delegated for agencies to create regulatory rights in furtherance of rights that Congress already created by statute. Since neither of these two acceptable routes was taken in DACA, it did not create any rights that plaintiffs can enforce in court.[3]

Relatedly, to the extent that plaintiffs and the lower courts complain about unfairness, they are complaining to the wrong branch of government:

> SIPC and the Trustee contend that the result we reach sanctions injustice. But even if that were the case, the argument is made in the wrong forum, for we are not at liberty to legislate.

*Touche Ross*, 442 U.S. at 579. Neither this Court nor the district court has the power to alter plaintiffs' immigration status by enjoining Executive Branch officers. Instead, as the prior administration and

---

[3]   Failure to follow APA requirements renders the resulting agency action both void *ab initio* and unconstitutional. *Chrysler Corp. v. Brown,* 441 U.S. 281, 303 (1979); *Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 374 (1986) ("an agency literally has no power to act … unless and until Congress confers power upon it"); *see* Section II.A, *infra*. The missing procedure provides at least some of the unconstitutionality that puzzled the Ninth Circuit. *See* Suppl. Pet. App. 48a-49a.

6

AR3540

current administration both have recognized, the only lawful solution here is action by Congress.

Even the district court admits that DACA represents an "expectation of (though not a right to) continued deferred action," Pet. App. 29a, and that is not enough. Nor does the district court's repeated invocation of five years of reliance by 689,800 DACA beneficiaries, *see*, *e.g.*, *id.* 28a, affect the analysis. Most obviously, something that is "not a right" is also not a judicially cognizable right. Moreover, reliance is no basis to estop the federal government. *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 419-20 (1990) ("equitable estoppel will not lie against the Government"). What plaintiffs call an "expectation" was simply misplaced reliance on the administration that issued DACA:

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.

*Fed'l Crop. Ins. Corp. v. Merrill,* 332 U.S. 380, 384 (1947). Insofar as DACA beneficiaries were misled, it was the prior administration that misled them. But under *Merrill* and its progeny, having been misled does not provide any rights to redress.

Finally, third parties such as the institutional and state plaintiffs "lack[] a judicially cognizable interest in the prosecution *or nonprosecution* of another," which "applies no less to prosecution for civil [matters] … than to prosecution for criminal [matters]." *Friends*

7

AR3541

*of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 204 (2000) (emphasis added, internal quotations omitted). Similarly, it is a "fundamental restriction on [judicial] authority" that "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties," *Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013) (interior quotation marks omitted). Thus, the third-party institutional and state plaintiffs lack standing.

**B.** **Rescission would not redress plaintiffs' injuries because DACA's invalidity would require reinstating the pre-DACA status quo *ante litem*.**

Plaintiffs also have a redressability problem: the very act of voiding DACA's rescission would show that DACA was void *ab initio* the day it was promulgated. If DACA cannot be rescinded at will as discretionary, it could not have been adopted in the first place as an exercise of discretion, without a rulemaking.

Procedurally, an action that succeeds in voiding a rescission or amendment reinstates the prior rule, *Nat. Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency*, 725 F.2d 761, 772 (D.C. Cir. 1984) ("*NRDC v. EPA*"); *Organized Vill. of Kake v. United States Dep't of Agric.*, 795 F.3d 956, 970 (9th Cir. 2015); *cf. In re GWI PCS 1, Inc.*, 230 F.3d 788, 796 n.14 (5th Cir. 2000) ("[r]escission unwinds the transaction and restores the status quo ante"). But that does nothing to protect the underlying rule from procedural or substantive challenges. Indeed, judicially revoking an agency's rescission sometimes "casts a cloud over the very

8

**AR3542**

regulations it implicitly reinstates" because the rationale for vacating the agency's revocation also affects the underlying rule, *NRDC v. EPA*, 725 F.2d at 772; *Paulsen v. Daniels,* 413 F.3d 999, 1008 (9th Cir. 2005) (refusing to reinstate a previous rule under that standard because it was itself invalid).

Such a cloud would be cast by any judgment that revokes the federal defendants' rescission of DACA. Specifically, plaintiffs' prevailing here and in similar cases would make clear that DACA was procedurally invalid on the day that the federal defendants' predecessors promulgated DACA. *See* Section II.A, *infra*. If DACA either created judicially cognizable rights that support a federal court's enjoining DACA's repeal or so bound the federal defendants that they could not repeal DACA at will, then DACA required notice-and-comment rulemaking. *Texas*, 809 F.3d at 171. Because no rulemaking occurred, DACA would become procedurally invalid *ab initio* the instant a court held its rescission impermissible.

C.      **The amendment or rescission of mere enforcement policies — as distinct from rules or regulations — is unreviewable generally, and especially so in the immigration context at issue here.**

In the 1976 APA amendments to 5 U.S.C. §702, Congress "*eliminat[ed]* the sovereign immunity defense in *all equitable actions* for specific relief against a Federal agency or officer acting in an official capacity." *Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C. Cir. 1982) (*quoting* S. Rep. No. 996, 94th Cong., 2d Sess. 8 (1976); H.R. Rep. No. 1656,

9

AR3543

94th Cong., 2d Sess. 9 (1976), 1976 U.S. Code Cong. & Admin. News 6121, 6129) (R.B. Ginsburg, J.). But that waiver has several restrictions that preclude review.

First, as the Government explains, Pet. at 17-21, APA exempts actions committed to agency discretion from APA review. 5 U.S.C. §701(a)(2). In addition to the arguments that the Government makes, *amicus* IRLI respectfully submits that this issue includes a "Catch-22" element. If DACA so cabined agency discretion as to lie beyond discretionary rescission, DACA required a rulemaking in the first place and thus is void *ab initio*. *See* Section II.A, *infra*.

Second, APA excludes APA review for "statutes [that] preclude judicial review" and ones with "special statutory review." 5 U.S.C. §§701(a)(1), 703. When a statute provides special statutory review, APA review is not available. *FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 469 (1984). As the Government explains, 8 U.S.C. §1252(g)'s focus on removal proceedings is not an invitation for aliens to file pre-enforcement APA actions preemptively, before removal proceedings commence. Pet. at 22. Only when preclusion-of-review statutes provide no opportunity whatsoever for review has the Court used equity to provide review. *Leedom v. Kyne,* 358 U.S. 184, 188-90 (1958). But that extraordinary relief is not available where — as here — Congress precludes pre-enforcement review, but allows review in enforcement proceedings. *Board of Governors of the Federal Reserve System v. MCorp Financial,* 502 U.S. 32, 43-44 (1991). *Amicus* IRLI respectfully submits that INA review is exactly the type of statutory review that precludes APA review.

10

**AR3544**

Third, and finally, APA review applies only to agency action made reviewable by statute and *final agency action* for which no adequate remedy is available. 5 U.S.C. §704. To the extent that an enforcement policy like DACA does not bind agency actors, the enforcement policy is not final agency action. *See* Section II.B, *infra*; *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Instead, the final agency action lies in the agency action to apply the policy in a specific case. *See* Section II.B, *infra*. Thus, on the one hand, assuming *arguendo* that DACA's issuance did not impermissibly bind agency discretion without APA rulemaking, neither DACA's issuance nor its rescission is final agency action, *id.*, and both are outside APA review. 5 U.S.C. §704. On the other hand, if DACA's issuance *did* bind agency discretion so that its rescission now would qualify as final agency action, then DACA is void *ab initio* for failure to follow required APA rulemaking procedures in the first place. *See* Section II.A, *infra*.

## II.   RESCISSION WAS LAWFUL BECAUSE DACA WAS UNLAWFUL.

Plaintiffs must show a likelihood of prevailing on the merits to establish entitlement to a preliminary injunction. *Winter v. Natural Resources Def. Council, Inc.,* 555 U.S. 7, 20 (2008). Because plaintiffs cannot make that showing for DACA's rescission, this Court should grant review in this important case.

### A.   As a legislative rule adopted without an APA rulemaking, DACA is void *ab initio*.

As the Fifth Circuit held and an equally divided panel of this Court affirmed, a procedurally identical

11

**AR3545**

form of DACA-like relief violated APA's notice-and-comment rulemaking procedures. *Texas*, 809 F.3d at 165-78, *aff'd by an equally divided Court*, 136 S.Ct. 2271 (2016). So too with DACA, which is void *ab initio* on the merits.

Specifically, DACA's issuance violated APA's rule-making requirements as a legislative rule issued without complying with APA's notice-and-comment requirements, 5 U.S.C. §553(b), without eligibility for any exceptions to the requirement. *Id.* §553(b)(A)-(B). The exemption for policy statements and interpretive rules:

- Does not apply when agency action narrows the discretion otherwise available to agency staff, *Texas Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.,* 201 F.3d 551, 556 (5th Cir. 2001); *General Elec. Co. v. EPA,* 290 F.3d 377, 380 (D.C. Cir. 2002);
- Cannot be used to promulgate the regulatory basis on which to confer benefits, *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 908 (5th Cir. 1983); *Chrysler,* 441 U.S. at 302; and
- Cannot be used to promulgate new rules that effectively amend existing rules. *Am. Mining Congress v. Mine Safety & Health Admin.,* 995 F.2d 1106, 1112 (D.C. Cir. 1993); 5 U.S.C. §551(5) (defining "rule making" as the "agency process for formulating, *amending,* or repealing a rule") (emphasis added); *Shell Offshore Inc. v. Babbitt,* 238 F.3d 622, 629 (5th Cir. 2001).

DACA cannot meet these tests.

Under APA, DACA plainly required notice-and-comment rulemaking. For example, employment

12

**AR3546**

authorization is a benefit that is "granted" to beneficiary aliens, 8 C.F.R. §274a.12(c)(14), under sixteen specific circumstances, 8 C.F.R. §274a.12(a)(1)-(16), none of which apply to the across-the-board DACA program. *Cf. United States v. Picciotto,* 875 F.2d 345, 346-49 (D.C. Cir. 1989) (agency cannot add new, specific, across-the-board conditions under general, case-by-case authority to consider changes). Under the foregoing APA criteria, DACA qualifies as a legislative rule, which agencies cannot issue by memoranda or interpretation.

Procedurally infirm rules are a nullity, *Avoyelles Sportsmen's League,* 715 F.2d 897, 909-10; *McLouth Steel Products Corp. v. Thomas,* 838 F.2d 1317, 1322-23 (D.C. Cir. 1988); *State of Ohio Dep't of Human Serv. v. U.S. Dept. of Health & Human Serv., Health Care Financing Admin.,* 862 F.2d 1228, 1237 (6th Cir. 1988); *North Am. Coal Corp. v. Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor,* 854 F.2d 386, 388 (10th Cir. 1988), even if they would have been *substantively* valid if promulgated via notice-and-comment rulemaking. Thus, DACA is a nullity.

**B.    If DACA did not bind agency discretion, rescission would be a lawful exercise of the same discretion used to issue DACA.**

Alternatively, assuming *arguendo* that DACA did not impermissibly bind agency discretion or confer benefits without a rulemaking, an "agency cannot escape its responsibility to present evidence and reasoning supporting its substantive rules by announcing binding precedent in the form of a general

13

statement of policy." *Pacific Gas & Elec. Co. v. F.P.C.,* 506 F.2d 33, 38-39 (D.C. Cir. 1974). Accordingly, such statements are not entitled to deference when an agency relies on them to resolve a *future* substantive question because, logically, the future action (not the initial statement) is the final agency action. *Id.*; *accord Texaco, Inc. v. F.P.C.,* 412 F.2d 740, 744 (3d Cir. 1969); *Amrep Corp. v. FTC,* 768 F.2d 1171, 1178 (10th Cir. 1985); *Mada-Luna v. Fitzpatrick,* 813 F.2d 1006, 1013-14 (9th Cir. 1987). Thus, as an alternative to considering the APA notice-and-comment issue, this Court could simply find that DACA was a mere "general statement of policy" that the petitioners could change at any time without APA compliance.

### C.   Assuming *arguendo* that *MVMA* review is available, DACA's rescission meets that narrow test.

The lower courts found that DHS failed adequately to explain DACA's rescission. Pet. App. at 58a; *see also MVMA,* 463 U.S. at 43. Similarly, the Ninth Circuit held DACA lawful, but did so by relying on the *Texas* dissent and Ninth Circuit authority, Suppl. Pet. App. 48a-56a, neither of which is controlling in the Fifth Circuit. *Hyder v. Keisler*, 506 F.3d 388, 393 (5th Cir. 2007) (Ninth Circuit precedent "is not binding precedent in this circuit"). The credible litigation risk that prompted DACA's rescission was the *threatened Texas litigation* under Fifth Circuit precedent, not an action in the Ninth Circuit under Ninth Circuit precedent.

The lower courts are wrong for several reasons, not only because DACA is illegal, as the *Texas* litigation demonstrated, but also because — even if

14

DACA were lawful — it would have been supportable under *MVMA* for petitioners to prefer that Congress address the issue in the first instance. *See*, *e.g.*, *Schuette*, 572 U.S. at 311-12 (legislated solutions are preferable to imposed solutions in matters of public policy). Quite simply, the lower courts overstate the degree of judicial second-guessing that the *MVMA* line of cases requires in this context.

Federal courts lack authority to set procedural hurdles for agencies, beyond the APA requirements that Congress imposed. *Perez v. Mortg. Bankers Ass'n*, 135 S.Ct. 1199, 1207 (2015). Accordingly, *MVMA* "neither held nor implied that every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance," and the APA "makes no distinction … between initial agency action and subsequent agency action undoing or revising that action." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009). All that *MVMA* required was "a reasoned analysis for the change beyond that which may be required when an agency *does not act* in the first instance." *Id.* at 514 (internal quotations omitted, emphasis in *Fox*). Insofar as no one — yet — has argued that petitioners and their predecessors were *compelled* to issue DACA, the *MVMA* threshold for an analysis over and above inaction is low indeed.

As indicated, DACA's unlawfulness under *Texas* and petitioners' desire for Congress — not federal bureaucrats — to set immigration policy easily meet the need for reasoned analysis, *see* Section II.A, *supra*; *Schuette*, 572 U.S. at 311-12, even assuming *arguendo* that *MVMA* applies when an agency withdraws a

15

purportedly non-binding enforcement policy, while leaving in place all of the underlying authority to issue the same type of relief in an appropriate removal proceeding.

### D.  DACA violated the INA.

DACA also violates the INA on both substantive and procedural grounds, and either sort of violation renders DACA a nullity. *See* 5 U.S.C. §706(2)(B)-(C); *Manhattan Gen. Equip. Co. v. Commissioner*, 297 U.S. 129, 134 (1936) (holding that a "regulation [that] … operates to create a rule out of harmony with the statute, is a mere nullity" because an agency's "power … to prescribe rules and regulations … is not the power to make law" but rather "the power to adopt regulations to carry into effect the will of Congress as expressed by the statute"). DACA suffers from several INA infirmities that render it void.

Procedurally, through DACA, DHS purports to channel aliens into deferred action under prosecutorial discretion, without initiating the statutorily mandated removal proceeding. Specifically, under 8 U.S.C. §1225(a)(1), "an alien present in the United States who has not been admitted … shall be deemed for purposes of this chapter an applicant for admission." That designation triggers 8 U.S.C. §1225(a)(3), which requires that all applicants for admission "shall be inspected by immigration officers," which triggers 8 U.S.C. §1225(b)(2)(A)'s mandate that "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall* be detained for a [removal] proceeding under section 1229a of this

16

title." 8 U.S.C. §1225(b)(2)(A) (emphasis added). "Congress did not place the decision as to which applicants for admission are placed in removal proceedings into the discretion of the Attorney General, but created mandatory criteria." *Succar v. Ashcroft*, 394 F.3d 8, 10 (1st Cir. 2005). "[W]hile the President has broad authority in foreign affairs, that authority does not extend to the refusal to execute domestic laws." *Massachusetts v. EPA*, 549 U.S 497, 534 (2007). In essence, DACA jumps illegal aliens to a favorable result of the removal process, without any of the statutorily required process that must precede that outcome.

Even if some form of deferred action lawfully could apply to some DACA beneficiaries, DACA would remain an invalid form of deferred action. While an agency faced with limited resources necessarily has discretion to implement congressional mandates as best it can, the power to set priorities for action does not authorize ignoring all statutory mandates: "the agency administering the statute is required to effectuate the original statutory scheme *as much as possible*, within the limits of the added constraint." *City of Los Angeles v. Adams*, 556 F.2d 40, 50 (D.C. Cir. 1977) (emphasis added). DACA, however, did not "effectuate the original statutory scheme as much as possible" within the limits set by the lack of funds.

Indeed, DACA was not created because of lack of resources. DACA beneficiaries were already rarely removed. Memorandum from Jeh Charles Johnson, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who*

17

**AR3551**

*are Parents of U.S. Citizens or Permanent Residents* 3 (Nov. 20, 2014) (explaining that DACA applies to individuals who "are extremely unlikely to be deported given [the] Department's limited enforcement resources"). [4] Rather, the program reflects a policy judgment that these aliens should be free to live and work in the United States without fear of deportation. Far from "effectuat[ing] the original statutory scheme as much as possible," this policy judgment is at odds with the INA and congressional intent.

Not only has Congress rejected a legislative version of DACA repeatedly, it has found that "immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and illegal aliens do not have the right to remain in the United States undetected and unapprehended." H.R. Rep. No. 104-725, at 383 (1996) (Conference Report). Congress has also passed laws designed to reduce the incentives for illegal entry, and to incentivize self-deportation where enforcement is lacking. *Texas*, 86

---

[4] This statement is scarcely consistent with Secretary Napolitano's bald assertion that "additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities." Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 1 (June 15, 2012). Admissions against interest are admissible evidence, but self-serving statements are not. *Compare Lutwak v. United States*, 344 U.S. 604, 617-18 (1953) ("admissions … are admissible … under a standard exception to the hearsay rule applicable to the statements of a party") *with Woodall v. Commissioner*, 964 F.2d 361, 364-65 (5th Cir. 1992).

18

F.Supp.3d at 634-35 (arguing that DAPA would disincentivize illegal aliens from self-deporting); Michael X. Marinelli, *INS Enforcement of the Immigration Reform and Control Act of 1986: Employer Sanctions During the Citation Period*, 37 CATH. U. L.R. 829, 833-34 (1988) ("Marinelli") ("Congress postulated that unauthorized aliens currently in the United States would be encouraged to depart") (*citing* H.R. REP. NO. 99-682, at 46 (1986)). Thus, DACA is not meant to implement the INA but rather to amend or soften the INA's treatment of DACA beneficiaries.

Furthermore, DACA is not limited to deferred action; DACA also grants work authorization to its beneficiaries. Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 3 (June 15, 2012). The INA cannot be credibly read to delegate to DHS the unrestricted power to grant work authorization to removable aliens, even "low-priority" ones. Congress, in making it illegal for illegal aliens to work, wished to discourage illegal entry and to encourage removable aliens to remove themselves, even if enforcement by removal is underfunded and slow to reach low-priority cases. *See Arizona v. United States*, 567 U.S. 387, 404 (2012) ("Congress enacted IRCA as a comprehensive framework for combating the employment of illegal aliens") (citations and interior quotation marks omitted); *Texas*, 86 F.Supp.3d at 634-35 (arguing that DAPA would disincentivize illegal aliens from self-deporting); Marinelli, at 833-34. DACA thus exceeds the authority that the INA delegates to DHS.

19

**AR3553**

Although the Ninth Circuit viewed 8 U.S.C. §1324a(h)(3) as authorizing DACA, Suppl. Pet. App. 15a, that subsection provides no substantive authority. Indeed, the subsection is merely a definition, which provides as follows:

> Definition of unauthorized alien. As used in this section, the term "unauthorized alien" means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this Act or by the Attorney General.

8 U.S.C. §1324a(h)(3). As the Fifth Circuit held, this provision is an "exceedingly unlikely" grant of power from Congress to authorize work, because that provision addresses *unlawful* employment of aliens. *Texas*, 809 F.3d at 182-83. Indeed, as the Ninth Circuit has held, "[8 U.S.C. §1324a] merely allows an employer to legally hire an alien (whether admitted or not) while his application [for adjustment of status] is pending." *Guevara v. Holder*, 649 F.3d 1086, 1095 (9th Cir. 2011). As explained below, this provision does not delegate any authority, and it would violate the constitutional nondelegation doctrine if it did.

First, this pre-1996 definition may imply that the Attorney General has — or at one time had — authority to authorize the employment of certain aliens, but the definition does not *itself* delegate any authority. It would be entirely consistent with this pre-1996 definition for a later-enacted INA amendment to have repealed the Attorney General's employment-authorizing powers, without impacting

20

**AR3554**

the status of any aliens affected before Congress began to crack down on the employment of illegal aliens.

Furthermore, assuming *arguendo* that §1324a(h)(3) permitted DHS to give work authorization to DACA beneficiaries, that could only be because §1324a(h)(3) allowed DHS to authorize work for *any class* of alien that DHS choses: the provision contains no limiting language. It is simply unreasonable to suppose that Congress, without any clear statement that it was doing so, granted DHS the unrestricted power to overthrow Congress's own grants of work protection to American workers. *See*, *e.g.*, 8 U.S.C. §§1182(n), 1184(g), 1188 (protecting American workers from competition from aliens); *Sure-Tan, Inc. v. Nat'l Labor Relations Bd.*, 467 U.S. 883, 893 (1984) ("[a] primary purpose in restricting immigration is to preserve jobs for American workers"). If Congress intended to grant the Executive Branch such vast discretion, it would have done so clearly, not through "vague terms or ancillary provisions — it does not, one might say, hide elephants in mouse holes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Finally, if this definition itself delegated *carte blanche* authority to authorize employment, it would violate the nondelegation doctrine, which requires "an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *United States v. Mistretta,* 488 U.S. 361, 372 (1989). The doctrine of constitutional avoidance suggests that this Court should avoid the constitutional nondelegation issue by reading the

21

**AR3555**

statutory definition not to delegate any authority. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17-18 (2013). Either way, DACA is unlawful.[5]

Although the Ninth Circuit viewed 6 U.S.C. §202(5) as authorizing DACA, Suppl. Pet. App. 49a, that section fails to provide the broad authority that DACA would require. Under §202(5), "[t]he Secretary … shall be responsible for … [e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. §202(5). That grant of authority cannot authorize DACA. Section §202(5)'s authorization to set "priorities" does not authorize DACA, which goes far beyond setting enforcement priorities (*e.g.*, by providing work authorization). Indeed, as the DACA-promulgating record itself *admits*, DACA beneficiaries were already extremely low priorities for removal. *See* note 4, *supra*, and accompanying text. Thus, §202(5) could only authorize DACA based on an open-ended authorization to DHS to establish enforcement "policies." But if this language were as open-ended as that, it would allow DHS to establish a policy, for example, of removing only removable aliens who were violent felons, or only those who had been in the country less than two months, or only those who lacked a high-school education — and it would be

---

[5]   The Ninth Circuit correctly ignored 8 U.S.C. §1103(a)(3), which the prior administration also relied on as authorizing DACA. That section merely authorized necessary rulemakings, without authorizing DHS to violate other INA provisions. Only if DHS's authority to "deem[]" that an action is so "necessary" were unlimited and unreviewable could this provision grant authority for DACA, but that would create a nondelegation problem and thus should be rejected under the doctrine of constitutional avoidance.

22

patently unreasonable to suppose that Congress intended DHS to have authority to set policies so at odds with the INA.

## III. PLAINTIFFS' FIFTH AMENDMENT CLAIMS SHOULD BE DISMISSED.

The Ninth Circuit not only affirmed the district court's preliminary injunction, but also affirmed the denial of the Government's motion to dismiss two types of claims under the Fifth Amendment's Due Process Clause: substantive due-process claims for information sharing contrary to DACA beneficiaries' understanding of how their DACA applications would be used, and equal-protection claims[6] for race- or ethnicity-based discrimination. This Court should reverse the denial of the Government's motion to dismiss these claims.

### A. The "information-sharing" due-process claims fail to state a claim.

The Ninth Circuit affirmed the denial of the motion to dismiss plaintiffs' information-sharing claims on a theory of substantive due-process based on Ninth Circuit precedent under a shock-the-conscience and community-standards test. Suppl. Pet. App. 73a. While basing a claim against the *federal* government on community standards in California would raise federalism issues, this Court need not reach that issue. Creating rights based on substantive due-process requires a more rigorous and more

---

[6] Although the Fourteenth Amendment's Equal Protection Clause does not apply to the Federal Government, this Court has found an equivalent equal-protection component in the Fifth Amendment's Due Process Clause. *Buckley v. Valeo,* 424 U.S. 1, 93 (1976); *Bolling v. Sharpe,* 347 U.S. 497, 499 (1954).

23

AR3557

national approach under *Washington v. Glucksberg,* 521 U.S. 702, 720-21 (1997). Plaintiffs' information-sharing claims cannot meet that test and should be dismissed.

Given "[t]he tendency of a principle to expand itself to the limit of its logic," *id.* at 733 n.23 (interior quotation marks omitted), *Glucksberg* held that courts must tread cautiously when expounding substantive due-process rights outside the "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Id.* at 720-21. "[E]xtending constitutional protection to an asserted right or liberty interest" thus requires "the utmost care ... lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the [federal judiciary]." *Id.* at 720. A fundamental right must be both "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Id.* at 720-21. Plaintiffs cannot meet either test, *Richmond,* 496 U.S. at 419-20 (quoted *supra*); *Merrill,* 332 U.S. at 384 (quoted *supra*), so DACA-based "information-sharing" claims fail to state a claim on which relief can be granted.

### B.   The equal-protection claims fail to state a claim.

The Ninth Circuit credited plaintiffs' allegations that 93% of DACA beneficiaries are Mexicans or Latinos and inferred discriminatory intent from statements of the President, both as candidate and as President. Suppl. Pet. App. 74a-75a. Equal protection applies to action taken "at least in part *because of,* not merely *in spite of,* its adverse effects" on a protected class. *Pers. Adm'r v. Feeney,* 442 U.S. 256, 279 (1979)

24

AR3558

(emphasis added); *Plyler v. Doe,* 457 U.S. 202, 223 (1982) ("[u]ndocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy'"). Actions or statements targeted against illegal aliens permissibly "discriminate" based on illegality, not on race or ethnicity.

Assuming *arguendo* that the Ninth Circuit's data were accurate, those data would also be irrelevant. In *Feeney,* the passed-over female civil servant alleged that Massachusetts' veteran-preference law for civil-service promotions and hiring constituted sex-based discrimination. Although women then represented less than two percent of veterans, *Feeney,* 442 U.S. at 270 n.21, Massachusetts did not discriminate *because of sex* when it acted because of another, permissible criterion (veteran status). *Id.* at 272. With women then constituting two percent of all veterans, men were *fifty times* more likely (50:1) to benefit from the state law challenged in *Feeney.* The 93% alleged here is even lower. Similarly, the President's tweets about illegal aliens, Suppl. Pet. App. 74a-75a n.30, concern illegality, not race or ethnicity. This Court should reverse the denial of dismissal of these disparate-impact claims.

## **CONCLUSION**

The Court should grant the petition for a writ of *certiorari.*

AR3559

December 5, 2018          Respectfully submitted,

CHRISTOPHER J. HAJEC          LAWRENCE J. JOSEPH
IMMIGRATION REFORM LAW             *Counsel of Record*
INSTITUTE                  1250 Connecticut Av NW
25 Massachusetts Av NW     Suite 700-1A
Suite 335                  Washington, DC 20036
Washington, DC 20001       (202) 202-355-9452
(202) 232-5590             lj@larryjoseph.com
chajec@irli.org

26

AR3560

**Nos. 18-587, 18-588, & 18-589**

# In the Supreme Court of the United States

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, ET AL., PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL., PETITIONERS

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI BEFORE
JUDGMENT TO THE UNITED STATES COURT OF APPEALS
FOR THE D.C. CIRCUIT*

KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND
SECURITY, ET AL., PETITIONERS

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI BEFORE
JUDGMENT TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

**BRIEF FOR THE STATES OF TEXAS, ALABAMA,
ARIZONA, ARKANSAS, FLORIDA, LOUISIANA,
NEBRASKA, SOUTH CAROLINA, AND WEST
VIRGINIA, AND GOVERNOR PHIL BRYANT OF
THE STATE OF MISSISSIPPI, AS AMICI CURIAE
IN SUPPORT OF PETITIONERS**

*Counsel Listed on Inside Cover*

**AR3561**

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant
  Attorney General

KYLE D. HAWKINS
Solicitor General
   *Counsel of Record*

ARI CUENIN
JOHN C. SULLIVAN
Assistant Solicitors General

OFFICE OF THE
  ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
kyle.hawkins@oag.texas.gov
(512) 936-1700

**AR3562**

**QUESTIONS PRESENTED**

1.  Whether the decision of the Department of Homeland Security (DHS) to wind down the DACA policy is judicially reviewable.

2.  Whether the DHS's decision to wind down the DACA policy is lawful.

(I)

II

**AR3564**

III

## TABLE OF CONTENTS

Page

Questions Presented ............................................................ I

Table of Authorities .......................................................... IV

Interest of Amici Curiae .................................................... 1

Summary of Argument ....................................................... 3

Argument ........................................................................... 5

I.   Review Is Needed to Correct a Fundamental Misunderstanding of APA Review ............................ 5

    A.   A new administration's decision to reverse its predecessor's discretionary policies does not merit special scrutiny .................................... 5

    B.   DACA's wind-down satisfies APA review ........... 8

II.  DACA's Obvious Unlawfulness Is Further Reason to Grant Review ........................................... 17

    A.   DACA contravenes federal law. ........................ 17

    B.   DACA is procedurally unlawful because it was promulgated contrary to the APA's requirements. ...................................................... 18

III. Granting Certiorari to Allow Resolution of All Three DACA-Rescission Challenges This Term Is Warranted .................................................................. 23

Conclusion ........................................................................ 24

**AR3565**

IV

**TABLE OF AUTHORITIES**

Page(s)

Cases:

*Ariz. Christian Sch. Tuition Org. v. Winn,*
563 U.S. 125 (2011) ...................................................... 7

*Brewer v. Arizona Dream Act Coalition,*
No. 16-1180 (U.S. May 1, 2017) .................................. 11

*Chrysler Corp. v. Brown,*
441 U.S. 281 (1979) .................................................... 18

*FERC v. Elec. Power Supply Ass'n,*
136 S. Ct. 760 (2016) .................................................... 8

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ............................................. 6, 7, 8

*Heckler v. Chaney,*
470 U.S. 821 (1985) ...................................................... 8

*McLouth Steel Prods. Corp. v. Thomas,*
838 F.2d 1317 (D.C. Cir. 1988) ................................. 18

*Morton v. Ruiz,*
415 U.S. 199 (1974) .......................................... 18, 19, 22

*Motor Vehicles Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,*
103 S. Ct. 2856 (1983) .................................................. 7

*Nat'l Ass'n of Home Builders v. EPA,*
682 F.3d 1032 (D.C. Cir. 2012) ................................... 6

*Nielsen v. Batalla Vidal,*
No. 18-589 (U.S. filed Nov. 5, 2018) ............................ 5

AR3566

V

*Perez v. Mortgage Bankers Ass'n,*
   135 S. Ct. 1199 (2015) .................................................. 6, 7

*Prof'ls & Patients for Customized Care*
   *v. Shalala,*
   56 F.3d 592 (5th Cir. 1995) ......................................... 18

*Regents of the Univ. of Cal. v. U.S. Dep't*
   *of Homeland Sec.,*
   908 F.3d 476 (9th Cir. 2018) ...................................... 3, 5

*Texas v. United States,*
   328 F. Supp. 3d 662 (S.D. Tex. 2018)
   (*Texas II*) ........................................................... *passim*

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015), *aff'd by an*
   *equally divided court,* 136 S. Ct. 2271
   (2016) (per curiam) (*Texas I*) ............................ *passim*

*Trump v. Nat'l Ass'n for the*
   *Advancement of Colored People,*
   No. 18-588 (U.S. filed Nov. 5, 2018)............................ 5

*U.S. Dep't of Homeland Sec. v. Regents*
   *of Univ. of Cal.,*
   No. 18-587 (U.S. filed Nov. 5, 2018)............................ 3

Constitutional Provisions, Statutes, and Rules:

   U.S. Const. art. II, § 3 .................................................... 7

   5 U.S.C.
      § 551(4) ................................................................. 18
      § 701(a)(2) ............................................................. 8

   8 U.S.C.
      § 1611(b)(2)-(3) ................................................ 20, 22
      § 1621(d) ........................................................... 20, 22

**AR3567**

VI

Sup. Ct. R. 37 .......................................................... 1

Miscellaneous:

3d Am. Complaint, *Batalla Vidal v. Nielsen*, No. 1:16-cv-4756 (E.D.N.Y. Dec. 11, 2017), ECF No. 113 ....................... 21

*AG Paxton Leads 10-State Coalition Urging Trump Administration to Phase Out Unlawful Obama-Era DACA Program*, https://www.texasattorneygeneral.gov/news/releases/ag-paxton-leads-10-state-coalition-urging-trump-administration-to-phase-out (June 29, 2017) ................................................ 9

Br. for the State Respondents, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 1213267 .......... 11, 17, 18

Br. for the States of Texas et al., *Brewer v. Ariz. Dream Act Coalition*, No. 16-1180, 2017 WL 1629324 (U.S. May 1, 2017) ...................................... 11, 12

Complaint, *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-5211 (N.D. Cal. Sept. 8, 2017), ECF No. 1 .................................................. 19

Complaint, *California v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05235-WHA (N.D. Cal. Sept. 11, 2017), ECF No. 1 .................................................. 21

**AR3568**

VII

Complaint, *Garcia v. United States*, No. 3:17-cv-5380 (N.D. Cal. Sept. 18, 2017), ECF No. 1 ........................................................ 21

Complaint, *NAACP v. Trump*, No. 1:17-cv-1907 (D.D.C. Sept. 18, 2017), ECF No. 1 ........................................................ 21

Complaint, *New York v. Trump*, No. 1:17-cv-5228 (E.D.N.Y. Sept. 6, 2017), ECF. No. 1 ........................................ 21, 22

Complaint, *Trs. of Princeton Univ. v. United States*, No. 1:17-cv-2325 (D.D.C. Nov. 3, 2017), ECF No. 1 ............................... 21

H.R. Rep. No. 99-682(I), at 46, 51-52 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5650, 5655-56 ................................. 12

Josh Blackman, *The Constitutionality of DAPA Part I: Congressional Acquiescence to Deferred Action*, 103 Geo. L.J. Online 96 (2015) ........................... 17

Notice of Filing Administrative Record, *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211 (N.D. Cal. Oct. 6, 2017) ........................................................ 2

Oral Arg., *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015) (No. 15-40238), http://www.ca5.uscourts.gov /OralArgRecordings/15/15-40238_4-17-2015.mp3 ......................................... 11

**AR3569**

VIII

Pls.' Stip. Of Voluntary Dismissal,
    *Texas v. United States*,
    No. 1:14-cv-00254 (S.D. Tex. Sept. 12,
    2017)..................................................................................2

**AR3570**

### INTEREST OF AMICI CURIAE

Amici curiae are the States of Texas, Alabama, Arizona, Arkansas, Florida, Louisiana, Nebraska, South Carolina, and West Virginia, and Phil Bryant, Governor of Mississippi.[1]

In these lawsuits, Plaintiffs asks courts to force the federal Executive Branch to retain a "deferred action" program (DACA) that the administration believes violates the Constitution. The administration is correct: DACA affirmatively confers "lawful presence" status and work-authorization eligibility on over half a million aliens. DACA is thus materially identical to two programs (Expanded DACA and DAPA) that were invalidated by the Fifth Circuit in a ruling affirmed by an equally divided vote of this Court. *See Texas v. United States*, 809 F.3d 134, 172, 184-86 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam) (*Texas I*). DACA is procedurally and substantively unlawful for much of the same reasons this Court affirmed in that case.

Texas led the group of States successfully challenging Expanded DACA and DAPA. Texas then led the group of States notifying the federal government that they would challenge DACA on the same grounds if

---

[1] No counsel for any party authored this brief, in whole or in part. No person or entity other than amici contributed monetarily to its preparation or submission. The parties received timely notice of filing, and consents have been provided to amici. *See* Sup. Ct. R. 37.

(1)

2

DACA was not wound down. A.R. 238-40.[2] It was because of the Executive's September 2017 DACA-winddown memorandum that Texas and other States agreed to dismiss their pending lawsuit. Pls.' Stip. of Voluntary Dismissal at 1, *Texas v. United States*, No. 1:14-cv-00254 (S.D. Tex. Sept. 12, 2017), ECF No. 473. And because DACA's rescission was enjoined, the Amici States ultimately filed suit seeking a declaration that DACA was unlawful. *Texas v. United States*, 328 F. Supp. 3d 662 (S.D. Tex. 2018) (*Texas II*).

The petition thus directly implicates the States' efforts to bring about an orderly end to DACA.

---

[2] A.R. cites the Administrative Record, filed as Notice of Filing Administrative Record, *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211 (N.D. Cal. Oct. 6, 2017), ECF No. 64-1.

3

## SUMMARY OF ARGUMENT

I.A. When a new presidential administration decides to change—or even reverse—the discretionary policies of the previous one, its decision is not subject to any special scrutiny beyond that set out in the Administrative Procedure Act (APA). The APA forbids the administration from acting in an arbitrary and capricious manner. That remains true both for the implementation of new policies and the rescission of old policies. The decision to terminate the previous administration's policy must meet that standard—and no other.

B. The plaintiffs in these three cases join a litany of litigants around the nation who seek to upend that principle. They argue that rescinding DACA was not lawful—and the Ninth Circuit has agreed. *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 510 (9th Cir. 2018). But that argument seeks to impose on the administration a burden the APA does not. The Executive does not act arbitrarily or capriciously by rescinding a prior administration's policy that is not required by law and that the Executive concludes is substantively unlawful.

That is especially so here. The Executive decided to wind down DACA after a new administration reexamined its lawfulness and concluded that DACA would likely be held unlawful. Pet. App. 114a-18a.[3] Nothing in the Immigration and Nationality Act (INA) or any oth-

---

[3] Pet. App. cites the Appendix to the Petition for a Writ of Certiorari Before Judgment in *U.S. Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, No. 18-587 (S. Ct. filed Nov. 5, 2018).

4

er federal law *requires* DACA, so its cancellation contravenes no law. Moreover, in response to a lawsuit brought by Texas and a coalition of States, one district court already has concluded that DACA is likely unlawful as both a substantive and procedural matter. Under these circumstances, the Executive's decision satisfies APA review.

This case thus presents an opportunity for the Court to clarify that the cancellation of DACA, like many other discretionary policy decisions, does not merit some special scrutiny beyond that set out in the APA. Applying the correct scrutiny, the plaintiffs' challenge fails.

II.A. The Executive's decision to wind down DACA is especially justified because DACA is substantively and procedurally unlawful. DACA is unlawful for the same reasons that Expanded DACA and DAPA were held unlawful in the previous *Texas I* litigation. *See* 809 F.3d at 172, 184-86. It is substantively flawed because it goes further than mere "prosecutorial discretion" not to deport individuals. DACA confers legal status on individuals, contravening congressional authority to make such determinations.

B. DACA is also procedurally unlawful. The pleadings in the DACA-rescission litigation confirm that it altered substantive rights, yet was issued without APA notice and comment. The Executive cannot be ordered to maintain such an unlawful program. Thus, even on plaintiffs' view of notice-and-comment requirements, injunctions forcing the Executive Branch to continue with DACA cannot be justified.

III. The Court should grant certiorari and reverse all orders enjoining the Executive from winding down

**AR3574**

5

DACA. Although the Ninth Circuit ruled in *Regents of the University of California* after petitioners filed their petition for a writ of certiorari before judgment, 908 F.3d 476, amici agree that granting certiorari in that case is appropriate, Supp. Pet. Br. 9-10. The Ninth Circuit's ruling strengthens the case for granting certiorari before judgment in *Trump v. National Ass'n for the Advancement of Colored People*, No. 18-588 (filed Nov. 5, 2018), and *Nielsen v. Batalla Vidal*, No. 18-589 (filed Nov. 5, 2018), and consolidating the cases for consideration this Term. Only this Court can provide definitive resolution to the dispute over DACA's rescission.

Immediate review is especially warranted here because of the ongoing irreparable harm that DACA inflicts on the States. "[B]ecause DACA increases the total number of aliens in the States by disincentivizing those already present from leaving, the States must provide more . . . social services, which cost more." *Texas II*, 328 F. Supp. 3d at 700. And DACA "allow[s] its recipients to compete with legally present residents" for jobs. *Id.*

## ARGUMENT

### I. Review Is Needed to Correct a Fundamental Misunderstanding of APA review.

#### A. A new administration's decision to reverse its predecessor's discretionary policies does not merit special scrutiny.

The arguments against DACA's rescission reflect plaintiffs' fundamental misunderstanding of APA review. Under their view, a court may rely on policy differences and supposed reliance interests to second-guess an agency determination that seeks to change a

**AR3575**

6

policy from a prior administration. And all this even though the agency acts in the same manner to amend the policy as the agency did to enact it in the first instance.

That is not the law. New presidential administrations bring changes in policy and agency priorities. So long as an agency acts within its realm of authority, its decision to alter a policy determination—or even reverse course—is not subject to an enhanced standard of review. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009); *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1036-37 (D.C. Cir. 2012) (describing the argument that agency reversal is subject to more searching review as "largely foreclosed" by *Fox Television Stations*). This flows from the APA's narrow scope of review that limits the judicial inquiry. *Fox Television Stations, Inc.*, 556 U.S. at 514. Critically, courts must not impose substantive judgments on the contested issue and review those policy shifts only for fidelity to APA procedures—even when reliance interests are at issue. *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1207 (2015).

As this Court admonished in *Mortgage Bankers*, courts have no authority to impose procedural requirements beyond those stated in the APA. *Id.* Procedural fairness does not prevent an agency from "unilaterally and unexpectedly" adopting a different interpretation of a regulation the agency is charged with implementing. *Id.* at 1209. Although agencies cannot simply ignore when the new policy "rests upon factual findings that contradict those which underlay its prior policy," they need only provide a reasoned explanation and justify

7

the change. *Id.* The APA sets the maximum procedural obligations for which agencies must adhere. *Id.* at 1207.

Fundamentally, an agency's policy change need satisfy only the standard it would be held to in the first instance under the APA. *Fox Television Stations*, 556 U.S. at 515. "This means that the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* There is "no basis . . . for a requirement that all agency change be subjected to more searching review." *Id.* at 514. The Court made clear that *Motor Vehicles Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 103 S. Ct. 2856 (1983), "neither held nor implied that every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance." *Id.*

Applying the APA in a contrary manner would intrude on the President's Article II obligation to ensure "that the Laws be faithfully executed." U.S. Const. art. II, § 3; *see Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011) ("The legislative and executive departments of the Federal Government, no less than the judicial department, have a duty to defend the Constitution."). When the Executive determines that a prior unilateral executive action is unconstitutional and discontinues it, judicial review cannot involve a freeranging inquiry beyond the specific standard written into the APA.

This is not to say an agency should act beyond the scope of its statutorily defined authority or that such actions can never be reviewed. If agency policy was "not in accordance with the law" in the first place, it is owed

8

no deference. Courts, however, are not permitted to apply heightened standards of review to pass on agency policy decisions. In reviewing agency action, a court is prohibited from substituting its policy judgments for those of the agency, whose change in policy must be sustained when it passes muster under the same standard it would have been held to in the first instance. *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016); *Fox Television Stations*, 556 U.S. at 513-14.

## B. DACA's wind-down satisfies APA review.

As explained above, DACA's wind-down may be enjoined only if Plaintiffs can overcome APA review.[4] The order winding down DACA satisfies that standard easily, for the reasons the petition describes. The Executive has correctly concluded that DACA is unlawful. No law mandates the policy choices DACA embodies. That was why several States, led by Texas, threatened to sue (and then did sue) to enjoin its continuation. The courts below were thus wrong to block DACA's rescission.

1. The administration prudently decided to wind down DACA in part because of the multi-State legal challenge to DACA's lawfulness. On June 29, 2017, the

---

[4] The Executive's decisions to create and, later, to wind down DACA are reviewable agency actions under the APA. The APA contains a limited exception barring judicial review when an agency decision is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception is "very narrow." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Unreviewability under *Heckler* applies only to "an agency's refusal to take . . . action," such as "an agency's decision not to take enforcement action." *Id.* at 831, 832. In contrast, "when an agency *does* act," the "action itself provides a focus for judicial review" and "can be reviewed to determine whether the agency exceeded its statutory powers." *Id.* at 832.

AR3578

9

Texas Attorney General, nine other State Attorneys General, and one Governor sent a letter to the federal Executive Branch proposing a DACA wind-down to end the *Texas I* litigation challenging the Executive's ability to unilaterally confer lawful presence and work authorization. A.R. 238-40. The coalition promised to voluntarily dismiss the lawsuit challenging unlawful deferred-action programs if the Executive Branch agreed, by September 5, 2017, to rescind DACA and not renew or issue any new DACA permits in the future. A.R. 240.[5]

The letter explained why DACA was unlawful, given that "[c]ourts blocked DAPA and Expanded DACA from going into effect, holding that the Executive Branch does not have the unilateral power to confer lawful presence and work authorization on unlawfully present aliens simply because the Executive chooses not to remove them." A.R. 238. Rather, "[i]n specific and detailed provisions, the [Immigration and Nationality Act] expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present." A.R. 238 (quoting *Texas I*, 809 F.3d at 179). "Entirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA." A.R. 238 (quoting *Texas I*, 809 F.3d at 179). Likewise, "[t]he INA also

---

[5] On the same day that the Texas Attorney General sent the letter, he also issued a press release publicly announcing the letter. *AG Paxton Leads 10-State Coalition Urging Trump Administration to Phase Out Unlawful Obama-Era DACA Program*, https://www.texasattorneygeneral.gov/news/releases/ag-paxton-leads-10-state-coalition-urging-trump-administration-to-phase-out (June 29, 2017).

**AR3579**

10

specifies classes of aliens eligible and ineligible for work authorization," but makes "no mention of the class of persons whom DAPA would make eligible for work authorization." A.R. 238-39 (quoting *Texas I*, 809 F.3d at 180-81). DAPA was "foreclosed by Congress's careful plan." A.R. 238-39 (quoting *Texas I*, 809 F.3d at 186). Thus,

> For these same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was unlawful, the original June 15, 2012 DACA memorandum is also unlawful. The original 2012 DACA program covers over one million otherwise unlawfully present aliens. *Id.* at 147. And just like DAPA, DACA unilaterally confers eligibility for work authorization, *id.*, and lawful presence without any statutory authorization from Congress.

A.R. 238-39.

This letter thus threatened litigation over DACA and provided legal arguments, based on precedent, explaining why DACA was unlawful. Even if this letter were the *only* cited reason for the challenged Executive action, it would provide a non-arbitrary, non-capricious, and valid basis for ending DACA.

2. Texas has explained for years how DACA is unlawful. The June 2017 letter's explanation of DACA's illegality was based on Texas's victory, leading a 27-State coalition, in challenging the materially identical Expanded DACA and DAPA programs. *See, e.g., Texas I*, 809 F.3d at 174 n.139 ("DACA is an apt comparator to DAPA."). In that litigation, counsel of record told the

**AR3580**

11

Fifth Circuit that DACA was required to go through APA notice-and-comment procedure. Oral Arg. at 1:16:01-10, *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015) (No. 15-40238), http://www.ca5.uscourts.gov /OralArgRecordings/15/15-40238_4-17-2015.mp3. DACA was instituted without that procedure.

Texas also filed a brief for a 14-State coalition urging the Court to grant certiorari in *Brewer v. Arizona Dream Act Coalition*, No. 16-1180 (U.S. May 1, 2017). *See* Br. for the States of Texas et al., *Brewer v. Ariz. Dream Act Coalition*, No. 16-1180, 2017 WL 1629324 (U.S. May 1, 2017) ("Texas *Brewer* Br."). Those amici States explained that DACA was unlawful—based on the same substantive and procedural arguments successfully made by the 27-State coalition in *Texas I* regarding Expanded DACA and DAPA. *See* Br. for the State Respondents at 44-70, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 1213267 ("Texas DAPA Br.").

The *Brewer* amici explained that DACA is unlawful because "[d]eferred action under DACA is much more than just a decision not to pursue removal of the alien." Texas *Brewer* Br. at 3. The Executive deems deferred action under DACA to confer "lawful presence." *Id.* Conferring that legal status is more than mere inaction. As the States highlighted, Congress used "lawful presence" status (or "unlawful presence") as the predicate for numerous results, such as removability, *id.* at 9; a 3-year or 10-year reentry bar, *id.* at 10-11; eligibility for "advance parole," *id.* at 11; and eligibility for numerous federal benefits, *id.* at 12-13. Those consequences turn on the "lawful presence" status conferred unilaterally

**AR3581**

12

by the Executive under DACA and DAPA. And that conferral contravenes federal law. *See id.*

Similarly, the States explained that DACA violated statutes governing which aliens are authorized to work in this country:

> [W]hen Congress wanted to provide work-authorization eligibility to four narrow classes of deferred-action recipients, it did so by statute. Otherwise, the 1986 IRCA "prohibit[s] the employment of aliens who are unauthorized to work in the United States because they either *entered the country illegally*, or are in an immigration status which does not permit employment." H.R. Rep. No. 99-682(I), at 46, 51-52 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5650, 5655-56 (emphasis added).

*Id.* at 15-16 (footnote omitted). And the States surveyed various historical practices, explaining how they could not support DACA's unilateral conferral of lawful presence and work authorization. *Id.* at 18-20.

At a minimum, this substantial background merited legitimate doubts that DACA was lawful. The Executive properly deemed it "likely that potentially imminent litigation would yield similar results with respect to DACA" as with respect to Expanded DACA and DAPA, which were already enjoined. Pet. App. 116a.

3. Ultimately, after their warnings went unheeded, Texas and several other States filed suit on May 1, 2018, seeking a declaration that DACA was unlawful and a preliminary injunction. *See Texas II*, 328 F. Supp. 3d 707.

13

Following extensive discovery and an extended hearing on the State's motion for injunctive relief, the district court found that DACA was unlawful for substantially the same reasons as described above. "DACA prevents the removal of its recipients—whom Congress has deemed removable." *Id.* at 714. The court, "guided by Fifth Circuit precedent," held that "none of the claimed statutory provisions [in the INA] give the DHS the authority to implement DACA." *Id.* at 715. "Ultimately, 'the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present,' and Congress has not granted the Executive Branch free rein to grant lawful presence to such a large class of persons outside the ambit of the statutory scheme." *Id.* at 716.

Regarding work authorization, the court also found that the INA "describes specific groups of aliens for whom Congress intended work authorization to be available," but "make[s] no mention of the group of aliens described by DACA." *Id.* at 716-17 (citation omitted). "Congress has in other places specified groups of aliens to be *ineligible* for work authorization," yet DACA "contradicts Congress's intent, as it enables those aliens to apply for work authorizations." *Id.* at 717 (citation omitted). Thus, "[p]ermitting the [Executive] to allow 1.5 million aliens to receive work authorization contradicts the clear congressional purpose of preserving employment opportunities for those persons legally residing in the United States." *Id.* at 718.

The court also noted the path to citizenship that DACA facilitates. DACA, through advance parole, "enable[s] certain individuals to change their inadmissible status (due to unlawful entry) into an admitted/paroled

**AR3583**

14

category and in some cases provide a clearer pathway to citizenship." *Id.* at 720. DACA thus "directly undermines the intent and deterrent effect intended by Congress, and contradicts the express wording of the DACA program's instituting memorandum." *Id.*

Moreover, the court rejected various grounds on which DACA's supporters have attempted to justify it. DACA, like DAPA, "is far from any program conducted in the past." *Id.* at 721. "DACA is 'manifestly contrary' to the statutory scheme promulgated by Congress," and "usurps the power of Congress to dictate a national scheme of immigration laws, and it is therefore contrary to the INA and unreasonable." *Id.* at 722-23. "As were DAPA and Expanded DACA, DACA is 'foreclosed by Congress's careful plan.' The fact that DAPA was three times the size of DACA is of no *legal* significance." *Id.* at 724 (citation omitted). Ultimately, DACA

> contradicts statutory law and violates the APA because the INA directly addresses the issues of lawful presence and work authorization for aliens in this country but does not include those designated by DACA. Furthermore, the award of lawful presence and an entire array of federal, state, and local rights and benefits to aliens Congress has deemed inadmissible flies in the face of the INA's goals of deciding who comes to and stays in the United States, who works in the United States, and who qualifies for government-funded benefits.

*Id.* at 735.

The court also explained that DACA was procedurally invalid under the APA. It rejected the premise that

15

DACA was a procedural rule based on the same reasoning in *Texas I. Id.* at 728. "An agency rule that modifies substantive rights and interests can only be nominally procedural, and the exemption for such rules of agency procedure cannot apply." *Id.* (quoting *Texas I,* 809 F.3d at 176). DACA failed that test because

> [o]ver 800,000 individuals have already received the benefit of lawful presence. Most have received work authorization, and over half a million more individuals are or will be eligible to apply. . . . No matter which party's briefs and exhibits one reviews, each stresses the impact of the DACA program. . . . Although the DACA program has conferred lawful presence on a smaller number of people than DAPA would have, it has nonetheless impacted the Plaintiff States and affected individuals in an equally important manner.

*Id.* at 728.

Just as with DAPA and Expanded DACA in *Texas I*, DACA was not a procedural rule because DACA "established 'the substantive standards by which the [agency] evaluate[d] applications which [sought] a benefit that the agency [purportedly] ha[d] the power to provide.'" *Id.* at 728-79 (quoting *Texas I,* 809 F.3d at 177). The "five criteria by which DACA applicants are evaluated are clearly substantive standards and are no different than the DAPA criteria at issue in *Texas I*." *Id.* at 729.

Nor could DACA be defended as a general policy statement exempt from notice and comment. "[W]hile labels are not unimportant, the true test is how the pro-

16

gram is actually administered and whether it affects rights and obligations." *Id.* Just as in *Texas I*, "[a] general statement of policy 'genuinely leaves the agency and its decision-makers free to exercise discretion,'" and "does not impose any rights and obligations," which cannot be said of DACA. *Id.* at 730 (quoting *Texas I*, 809 F.3d at 171).

The court found it "clear" that "the DACA program confers rights and imposes obligations." *Id.* at 731. DACA recipients receive "lawful presence, the right to apply for work authorization, Social Security, Medicare, access to advance parole, and an array of other federal and state benefits." *Id.* "DACA also impacts the obligations of the individual States" by forcing them "to spend money on various social services." *Id.* And DACA "obligates the Government to forebear from implementing immigration enforcement proceedings." *Id.* "These are certainly the kinds of rights and obligations that give a program 'binding effect' such that the notice-and-comment procedures are required." *Id.*

Nor could APA notice and comment be avoided by purported discretion in conferring DACA benefits. There was "overwhelming evidence concerning the rights conferred and the obligations imposed." *Id.* at 735. As with *Texas I*, "'this case is about the [DHS] Secretary's decision to change the immigration classification of millions of illegal aliens on a class-wide basis.'" *Id.* at 735 (quoting *Texas I*, 809 F.3d at 170). As Executive action, DACA "must at least undergo the formalities of notice and comment." *Id.* at 736.

\*   \*   \*

17

In short, the Southern District of Texas, has confirmed that DACA is unlawful. That is further reason to conclude that the administration did not violate the APA by ending a discretionary—and unconstitutional—program.

## II. DACA's Obvious Unlawfulness Is Further Reason to Grant Review.

### A. DACA contravenes federal law.

DACA is substantively unlawful for the reasons that the Fifth Circuit held Expanded DACA and DAPA unlawful. *See supra* Part I. Purported differences between DAPA and DACA cannot justify the latter.

First, the fact that DACA applies to a smaller number of aliens than DAPA does not make DACA lawful. DAPA and DACA's unlawfulness turns on those programs unilaterally conferring lawful presence and access to work authorization—not on their comparative size. *Texas*, 809 F.3d at 178-86. Moreover, even were it relevant, DACA and DAPA both far exceed the size of any prior deferred-action program. *See* Texas DAPA Br. 53-59.

Nor can DACA be defended on the basis that Congress has provided a (demanding) path to lawful presence for some aliens covered by DAPA, while not providing any path at all for the aliens covered by DACA. That argument only undermines the position of DACA's supporters. It means that DACA has even fewer arguments to support it than did DAPA. *See* Josh Blackman, *The Constitutionality of DAPA Part I: Congressional Acquiescence to Deferred Action*, 103 Geo. L.J. Online 96, 116 (2015). Whereas past instances of deferred action had been defended on the ground that

**AR3587**

18

they were stop-gap measures to ultimate lawful status theoretically obtainable under existing law, *see Texas*, 809 F.3d at 184-85 & n.197, DACA flouts Congress's scheme for conferring lawful presence and cannot possibly be defended on that basis.

## B. DACA is procedurally unlawful because it was promulgated contrary to the APA's requirements.

Plaintiffs' own pleadings in the various challenges to DACA's rescission confirm that DACA is procedurally unlawful (even assuming *arguendo* executive power to create it) because DACA was a substantive rule subject to APA notice-and-comment procedure.

DACA is indisputably a "rule" for APA purposes. 5 U.S.C. § 551(4). Accordingly, DACA had to be issued through notice-and-comment procedure if it was a substantive rule rather than a mere "general statement[] of policy." *Texas*, 809 F.3d at 171 (alteration in original). The key distinction between policy statements and substantive rules is that policy statements cannot be "binding." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979); *see* Texas DAPA Br. at 61-62.

A rule is binding if it creates or modifies "rights and obligations." *E.g.*, *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995), *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988). In *Morton v. Ruiz*, 415 U.S. 199 (1974), this Court held that a vastly more modest rule concerning benefits eligibility "affect[ed] individual rights and obligations" and therefore had to be treated as a substantive rule. *Id.* at 232. The same is true of DACA, under plaintiffs' own pleadings.

AR3588

19

1. This case involves orders entered in multiple actions and, therefore, multiple plaintiffs. The University of California plaintiffs, for example, contend that the DACA-wind-down memorandum "constitutes a substantive rule subject to APA's notice-and-comment requirements." Complaint at 14 ¶ 61, *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211 (N.D. Cal. Sept. 8, 2017), ECF No. 1.

But that could be true only if the creation of DACA was itself a substantive rule—one "affecting individual rights and obligations." *Ruiz*, 415 U.S. at 232. If DACA were not a substantive rule that changed the rights of recipients, then winding down this program also could not be a substantive rule changing rights. Plaintiffs, however, allege that DACA is just such a substantive rule. First, plaintiffs admit that DACA purports to unilaterally confer lawful presence:

> Individuals with DACA status were "not considered to be unlawfully present during the period in which deferred action [was] in effect." USCIS FAQs.

Complaint at 8 ¶ 31, *Regents of Univ. of Cal.*, No. 3:17-cv-05211, ECF No. 1. And plaintiffs admit that aliens with DACA status would not have been able—but for DACA—to lawfully "obtain jobs and access to certain Social Security and Medicare benefits." *Id.* at 2. The necessary implication of those pleadings is that DACA was unlawful all along, as it issued without notice and comment.

There is no requirement that the government must use notice-and-comment procedure to rescind a policy whose issuance needed but did not receive that proce-

20

dure. If the APA somehow required the federal Executive Branch to continue enforcing an unlawful policy while notice-and-comment procedure was used for the first time to rescind the policy, then the APA would be unconstitutional as applied to that unlawful policy.

2. The State of California plaintiffs likewise essentially plead that DACA's attributes meet the test for a substantive rule requiring APA notice-and-comment procedure. For instance, these plaintiffs plead that "DACA Provides Numerous Benefits":

> 82. DACA grantees are provided with numerous *benefits*. Most importantly, they are granted the *right* not to be arrested or detained based solely on their immigration status during the designated period of their deferred action.

> 83. DACA grantees are granted eligibility to receive *employment authorization*.

> 84. DACA also opened the door to *allow travel* for DACA grantees. For example, DACA grantees were allowed to briefly depart the U.S. and legally return . . . .

> 85. Unlike other undocumented immigrants, DACA grantees are not disqualified on the basis of their immigration status from receiving certain public benefits. These include *federal Social Security, retirement, and disability benefits*. *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d). . . .

> 86. DACA grantees are able to secure equal access to other *benefits* and opportunities . . . .

Complaint at 17-18, *California v. U.S. Dep't of Home-*

21

*land Sec.*, No. 3:17-cv-05235-WHA (N.D. Cal. Sept. 11, 2017), ECF No. 1 (emphases added; citations omitted). The *Garcia* plaintiffs here admit the same thing. Complaint at 9 ¶ 27, *Garcia v. United States*, No. 3:17-cv-5380 (N.D. Cal. Sept. 18, 2017), ECF No. 1 ("DACA *confers* numerous important *benefits* on those who apply for and are granted DACA status.") (emphases added).[6]

3. In addition to the five challenges pending in the Northern District of California, several other lawsuits, pending in the Second and D.C. Circuits challenge the DACA-wind-down memorandum. Complaint, *Trs. of Princeton Univ. v. United States*, No. 1:17-cv-2325 (D.D.C. Nov. 3, 2017), ECF No. 1; Complaint, *NAACP v. Trump*, No. 1:17-cv-1907 (D.D.C. Sept. 18, 2017), ECF No. 1; 3d Am. Complaint, *Batalla Vidal v. Nielsen*, No. 1:16-cv-4756 (E.D.N.Y. Dec. 11, 2017), ECF No. 113; Complaint, *New York v. Trump*, No. 1:17-cv-5228 (E.D.N.Y. Sept. 6, 2017), ECF. No. 1. Plaintiffs in those cases similarly have pleaded, in substance, that DACA was unlawful from the outset because it confers substantive rights yet was issued without notice-and-comment procedure.

Plaintiffs in *New York*, for example, plead that DACA affirmatively confers benefits:

---

[6] Furthermore, the *California* plaintiffs state that the APA does not allow policies to remain in effect when they are "predicated on an incorrect legal premise." Complaint at 22 ¶ 106, *California*, No. 3:17-cv-5235, ECF No. 1. Since DACA rests on an incorrect legal premise in that it issued without notice-and-comment procedure, plaintiffs cannot obtain the relief they seek of DACA's continued operation.

22

> [¶] 218. DACA *confers* numerous *benefits* on DACA grantees. Notably, DACA grantees are *granted the right* not to be arrested or detained based solely on their immigration status . . . .

> [¶] 220. DACA grantees are eligible to receive certain *public benefits*. These include *Social Security, retirement, and disability benefits*, and, in certain states, benefits such as driver's licenses or unemployment insurance. *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d).

Complaint at 41, *New York*, No. 1:17-cv-5228, ECF No. 1 (emphases added; citations omitted).

Accordingly, these plaintiffs essentially admit that DACA needed to go through APA notice-and-comment procedure because it was a substantive rule:

> [¶] 289. In implementing the DHS Memorandum, federal agencies have changed the *substantive criteria* by which individual DACA grantees *work, live, attend school, obtain credit, and travel* in the United States. Federal agencies did not follow the procedures required by the APA before taking action impacting these *substantive rights*.

*Id.* at 54 (emphases added).

If DACA's rescission "affect[ed] individual rights and obligations," *Ruiz*, 415 U.S. at 232, then DACA's creation did so, too, and was always unlawful.

**AR3592**

23

## III. Granting Certiorari to Allow Resolution of All Three DACA-Rescission Challenges This Term Is Warranted.

Without this Court's prompt intervention, the orders enjoining the Executive from winding down DACA could last more than another year—frustrating the purpose of the Executive's decision to promptly terminate disputes about DACA's legality. Indeed, because the litigation challenging the DACA wind-down memorandum has persisted, Texas was forced to sue to challenge the June 15, 2012 memorandum creating DACA and its continued implementation.

The district court in *Texas II* found that Texas continues to suffer ongoing and irreparable harm from DACA. The States "bear the costs of providing [healthcare, education, and law-enforcement] social services required by federal law, and the DACA program increases the volume of individuals to whom they must provide these services." 328 F. Supp. 3d at 700. Even the expert for parties defending DACA in *Texas II* opined that Texas alone "incurs more than $250,000,000 in total direct costs from DACA recipients per year." *Id.* at 700-01. And DACA "increases the total number of individuals using Texas's social services." *Id.* at 701. Additionally, DACA harms the States' interests in protecting the economic well-being of their citizens through increased competition "with legally present individuals for available jobs, which can result in DACA recipients being hired for jobs for which legally present individuals have applied and otherwise would have been hired." *Id.* at 693.

**AR3593**

24

Granting certiorari to allow for prompt resolution of all the disputed aspects of DACA's rescission would reduce the present burdens to the courts from the existing litigation. Moreover, the *Texas II* litigation could result in a ruling abruptly ending DACA, rather than winding it down as directed by the Executive in the memorandum challenged here.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted.

KEN PAXTON
Attorney General of
    Texas

JEFFREY C. MATEER
First Assistant
    Attorney General

STEVE MARSHALL
Attorney General of
    Alabama

MARK BRNOVICH
Attorney General of
    Arizona

LESLIE RUTLEDGE
Attorney General of
    Arkansas

KYLE D. HAWKINS
Solicitor General
    *Counsel of Record*

ARI CUENIN
JOHN C. SULLIVAN
Assistant Solicitors General

OFFICE OF THE
    ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
kyle.hawkins@oag.texas.gov
(512) 936-1700

**AR3594**

25

PAMELA JO BONDI
Attorney General of
   Florida

JEFF LANDRY
Attorney General of
   Louisiana

PHIL BRYANT
Governor of
   Mississippi

DOUG PETERSON
Attorney General of
   Nebraska

ALAN WILSON
Attorney General of
   South Carolina

PATRICK MORRISEY
Attorney General of
   West Virginia


DECEMBER 2018

AR3595

**Nos. 18-587 and 18-589**

IN THE

# Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, *ET AL.*, *Petitioners*,
v.
REGENTS OF THE UNIVERSITY OF CALIFORNIA, *ET AL.*

KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND SECURITY, *ET AL.*, *Petitioners*,
v.
MARTIN JONATHAN BATALLA VIDAL, *ET AL.*

On Petitions for Writs of Certiorari to the U.S. Courts of Appeals for the Ninth and Second Circuits

Brief *Amicus Curiae* of Citizens United, Citizens United Foundation, English First Foundation, Public Advocate of the U.S., The Senior Citizens League, 60 Plus Foundation, Gun Owners of America, Gun Owners Foundation, Conservative Legal Defense and Education Fund, Patriotic Veterans, Policy Analysis Center, and Restoring Liberty Action Committee in Support of Petitioners

JOSEPH W. MILLER
  RESTORING LIBERTY
  ACTION COMMITTEE
  Fairbanks, AK  99708
*Attorney for Amicus Curiae*
  *RLAC*

WILLIAM J. OLSON*
HERBERT W. TITUS
JEREMIAH L. MORGAN
ROBERT J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Ave. W., Ste. 4
  Vienna, VA  22180
  (703) 356-5070
  wjo@mindspring.com

December 6, 2018

Attorneys for *Amici Curiae*
*Counsel of Record*

**AR3596**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . .  iii

INTEREST OF THE *AMICI CURIAE* . . . . . . . . . . . . . . .  1

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . .  4

ARGUMENT

I.   THE ACTION RESCINDING DACA IS
     JUDICIALLY UNREVIEWABLE. . . . . . . . . . . . . . .  6

     A.   The Attorney General's Oath to Support
          the Constitution Is Equal to and
          Independent of the Judiciary . . . . . . . . . . .  7

     B.   The Judicial Power "to Say what the
          Law Is" Is Neither Exclusive Nor Final. .  10

     C.   The Executive's Exercise of Power Is
          Politically Accountable to the People,
          Not the Courts. . . . . . . . . . . . . . . . . . . . . .  12

II.  THE SECRETARY'S DECISION TO RESCIND
     DACA WAS NOT ARBITRARY AND CAPRICIOUS
     BECAUSE THE ORIGINAL DECISION TO
     IMPLEMENT THE DACA POLICY WAS
     UNLAWFUL . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

III. THE NATIONWIDE INJUNCTIONS EXCEEDED
     THE DISTRICT COURTS' AUTHORITY  . . . . . . . . .  18

AR3597

ii

IV. The New York District Court
   Erroneously Concluded that Ending
   DACA Would Harm the Social Security
   Trust Funds. . . . . . . . . . . . . . . . . . . . . . . .   23

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

AR3598

iii

## TABLE OF AUTHORITIES

Page

U.S. CONSTITUTION
Article II, Section 4 . . . . . . . . . . . . . . . . . . . . . . . .   12
Article III, Section 2 . . . . . . . . . . . . . . . . . . . . . . .   8, 9
Article VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5, 8

STATUTES
5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
8 U.S.C. § 1611(b)(2)-(3) . . . . . . . . . . . . . . . . . . . . .   25

CASES
Janus v. AFSCME, Council 31, 138 S. Ct.
    2448 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
Marbury v. Madison, 5 U.S. 137 (1803) . . . . . . . .   11
Texas v. United States, 809 F.3d 134 (5th Cir.
    2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
Texas v. United States, 328 F.Supp.3d 662
    (S.D.TX. 2018) . . . . . . . . . . . . . . . . . . . . . .   17, 25
Texas v. United States, 86 F. Supp. 3d 591
    (S.D.TX. 2015) . . . . . . . . . . . . . . . . . . . . . .   21, 22
Trump v. Hawaii, 138 S.Ct. 2392 (2018) . . . . . . .   20
Trump v. IRAP and Trump v. Hawaii, 582
    U.S. ____ 138 S. Ct. 34 (2017) . . . . . . . . . . . .   19
Washington v. Trump, 847 F.3d 1151 (9th Cir.
    2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

MISCELLANEOUS
A. Bickel, The Least Dangerous Branch
    (Yale Press: 1965) . . . . . . . . . . . . . . . . . . . . . .   10
Blackstone's Commentaries on the Laws of
    England (U. Chi. Press, Facsimile ed.:
    1765) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11, 12

AR3599

iv

50 Core American Documents (C. Burkett,
    ed.: Ashbrook Press: 2016) . . . . . . . . . . . . . .   11

Congressional Research Service, "Social Security
    Benefits for Noncitizens" (Nov. 17, 2016) . . . .   25

G. Gunther, Constitutional Law (12th ed.,
    Found. Press: 1991) . . . . . . . . . . . . . . . . . . . . .   9

Attorney General Jeff Sessions Remarks on
    Judicial Encroachment (Oct. 15, 2018) . . . . . .   18

J. Richwine, "Ninth Circuit Ruling on DACA
    Contains Several False or Misleading
    Statements," Center for Immigration
    Studies (November 27, 2018) . . . . . . . . . . . . .   3

Social Security Administration, 2018 Annual
    Report of the Trustees (June 5, 2018). . . .   25, 26

Social Security Administration, Office of the
    Chief Actuary, Actuarial Note No. 2017.9
    (July 2017), "Replacement Rates for
    Hypothetical Retired Workers" . . . . . . . . . . .   24

L. Tribe, American Constitutional Law
    (2d ed., Found. Press 1988) . . . . . . . . . . .   12, 13

**AR3600**

## INTEREST OF THE *AMICI CURIAE*[1]

Citizens United, Public Advocate of the United States, The Senior Citizens League, Gun Owners of America, Inc., and Patriotic Veterans are nonprofit social welfare organizations, exempt from federal income tax under Internal Revenue Code ("IRC") section 501(c)(4). Citizens United Foundation, English First Foundation, 60 Plus Foundation, Gun Owners Foundation, Conservative Legal Defense and Education Fund, and Policy Analysis Center are nonprofit educational and legal organizations, exempt from federal income tax under IRC section 501(c)(3). Restoring Liberty Action Committee is an educational organization. These organizations were established, *inter alia*, for purposes related to participation in the public policy process, including conducting research, and informing and educating the public on the proper construction of state and federal constitutions, as well as statutes related to the rights of citizens, and questions related to human and civil rights secured by law.

Some of these *amici* filed *amicus* briefs in two of these cases earlier this year:

- U.S. Department of Homeland Security v. Regents of the University of California, Brief

---

[1] It is hereby certified that counsel for the parties have consented to the filing of this brief; that counsel of record for all parties received notice of the intention to file this brief at least 10 days prior to the filing of it; that no counsel for a party authored this brief in whole or in part; and that no person other than these *amici curiae*, their members, or their counsel made a monetary contribution to its preparation or submission.

2

*Amicus Curiae* of Citizens United, *et al.*, U.S. Supreme Court (Feb. 2, 2018); and

- Vidal v. Nielsen, Brief *Amicus Curiae* of Citizens United, *et al.*, U.S. Court of Appeals for the Second Circuit (Mar. 14, 2018).

## STATEMENT

Even though the case below was initiated by the Regents of the University of California against Donald J. Trump, Ninth Circuit Judge Wardlaw would have the reader of her opinion believe that the sole plaintiff is Dulce Garcia. At the outset of her lengthy opinion, Judge Wardlaw devotes three detailed paragraphs to Garcia's life, rising from a past of poverty and homelessness to a thriving "legal practice in San Diego," all of which is now being put in jeopardy by "a change in presidential administrations." Bd. of Regents, Univ. of California v. Trump, 2018 U.S. App. LEXIS 31688 at *18-*19 (9th Cir. 2018). It's as if Garcia's life story typifies the 689,800 noncitizens enrolled in Deferred Action for Childhood Arrivals ("DACA") (*id.* at *34), each of whom is supposedly in imminent danger of deportation from this country, even though "the United States of America is the only home she has ever known," having been brought here illegally at four years of age. *Id.* at *18. Judge Wardlaw's broadside allegation seems better suited to having been made in opposition to Trump's immigration policies on the campaign trail, rather than a recitation of facts in support of a judicial

**AR3602**

3

opinion.[2]

Her broad brush enables her to sweep into one group an entire class of DACA eligibles to speak with one voice that they, like Garcia, "trust[ed] the government to honor its promises," and were entitled to "two-year renewable periods of deferred action," even though DACA was a "revocable decision by the government not to deport an otherwise removable person from the country." <u>Regents</u> at *19.  And yet Judge Wardlaw contends that the Government would deny Garcia her day in court to contest the Trump administration's decision to end DACA because of the Government's "legal determination that DACA is unlawful is unreviewable by the judicial branch." *Id.* at *20.

However, as the Government points out in its Petition, its action rescinding the DACA program does not entail the "'exercise [of] its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect.'" Petition for Certiorari ("Pet.") at 18.  Furthermore, a person like Garcia is not likely to be deported given her present professional stature.  And there is nothing in the record to indicate the likelihood of any adverse action, even after the repeal of DACA

---

[2]   *See* J. Richwine, "<u>Ninth Circuit Ruling on DACA Contains Several False or Misleading Statements</u>," Center for Immigration Studies (Nov. 27, 2018) ("In her ruling that the Trump Administration must continue [DACA], Ninth Circuit Judge Kim McLane Wardlaw makes several false or misleading statements intended to portray DACA recipients positively.")

AR3603

4

"'for humanitarian reasons or simply for [the INS's] own convenience.'" <u>Regents</u> at *22.  Rescission of the DACA program, therefore, does not mean that the INS would no longer recognize what Judge Wardlaw terms "the cruelty and wastefulness of deporting productive young people to countries with which they have no ties," or ignore "those noncitizens ... who have clean criminal records, and who meet various educational or military service requirements." *Id.* at *18-*19.  Thus, as Judge Wardlaw concedes, deferred action may be extended to individuals like Garcia under "the Executive's inherent authority to allocate resources and prioritize cases." *Id.* at *21-*22.

## SUMMARY OF ARGUMENT

If, as the Ninth Circuit appears to believe, the continuation of DACA was an action within the judicially unreviewable discretion of the executive department of the Obama administration, then it would be only common sense that the action of the executive department of the Trump Administration rescinding DACA is similarly unreviewable.  But the Ninth Circuit ruled otherwise, asserting that President Trump's Attorney General transformed what would have been an exercise of discretion into a judicially reviewable act solely by his belief that DACA should be rescinded because it was initially an unconstitutional exercise of executive authority.  The Ninth Circuit decision is erroneous.

First, it is based upon the flawed assumption that the executive oath of office to support the Constitution is subject to review by the judiciary whereas the oaths

5

of office prescribed by Article VI of the Constitution apply separate and equally to officers of each of its three branches. Second, it is based upon the flawed assumption that judicial review of the constitutionality of the exercise of executive power is exclusive and final, measured only by court precedents, not by the constitutional text. And, third it is based on the flawed assumption that the federal judiciary is more accountable to the People, than the agencies of the executive department.

The case before the court involves the lawfulness of the action by the Trump Administration to wind down and terminate the Obama Administration's DACA policy. This was an issue on which President Trump campaigned, and which he was elected by the People to implement. The actions by the courts below assume the legality of DACA, rather than decide it. They have been seen by many as thwarting the expressed will of the People, not because DACA repeal violates a provision of the U.S. Constitution or a federal law, but because it violates the will of the Judges. If the American People do not believe they can change policy by changing Presidents, our nation will move into a dangerous time, that would resemble what France is now experiencing with the "Yellow Vest" riots.

The issuance of nationwide, universal injunctions by courts proclaiming what the laws are for all rather than settling disputes between parties before it, is a new and troublesome development with serious repercussions for the rule of law. The ability of litigants to file challenges to Executive Branch action

**AR3605**

6

in carefully selected jurisdictions to get rulings from judges thought to be predisposed to the plaintiffs' cause impairs the proper functioning of a constitutional republic. The Court should order briefing on the legality of universal injunctions in its order granting certiorari.

The adverse effects on the nation from the DACA policy, including the financial drain from giving lawful status to hundreds of thousands of persons in the country illegally has been misrepresented in the courts below, demonstrating why judges with no responsibility for the public fisc should exercise great care in issuing orders imposing burdens on the People without responsibility or accountability to the electorate.

## ARGUMENT

## I. THE ACTION RESCINDING DACA IS JUDICIALLY UNREVIEWABLE.

There can be little doubt that, had the DHS decided to continue DACA, its action would be judicially unreviewable as an exercise of executive discretionary power. As the Government points out in its petition, "[l]ike the decision to *adopt* a policy of selective non-enforcement, the decision whether to *retain* such a policy can 'involve[] a complicated balancing' of factors that are 'peculiarly within [the] expertise' of ... the agency's overall policies." Pet. in 18-587 at 19. As the Government elaborated:

a decision to abandon an existing non-

7

> enforcement policy will not, in itself, bring to bear the agency's coercive power over any individual. Indeed, an agency's decision to reverse a prior policy of civil non-enforcement is akin to changes in policy as to criminal prosecutorial discretion, which regularly occur within the U.S. Department of Justice both within and between presidential administrations, and which have never been considered amenable to judicial review. [*Id.*]

The Ninth Circuit panel opinion, however, appears to reject this claim of unreviewable discretion **if** the Government's reason given in support of its decision not to retain DACA is that it was obliged by the Constitution to do so. Indeed, Circuit Judge Wardlaw goes to great lengths to establish that, on this record, the sole reason for the decision to jettison DACA was not a "pragmatic" assessment of "'litigation risk[s],'" but the firm "belief that DACA was illegal. <u>Regents</u> at *53-*57. In other words, Judge Wardlaw reached the conclusion that, because the DACA rescission was based on the Attorney General's opinion that DACA was unconstitutional, it was a reviewable "act of discretion." *Id.* at *57.

## A. The Attorney General's Oath to Support the Constitution Is Equal to and Independent of the Judiciary.

As an officer of the Executive Department of the United States, the Attorney General is bound by oath to support "this Constitution" of the United States. Pursuant to that oath of office, the Attorney General

**AR3607**

8

determined that DACA "was an unconstitutional exercise of authority by the Executive Branch." Regents at *32-*33.  By his express reliance on the Constitution, Judge Wardlaw believed, the Attorney General's action transformed what theretofore had been an exercise of executive discretion, unreviewable by the judicial branch, into a reviewable constitutional determination.  Missing from the judge's analysis is the fact that not only the judiciary is bound by oath to support "this Constitution" of the United States.  The Attorney General, as an officer of the executive branch, must support the Constitution as he understands it.  As such, the Attorney General is not akin to a junior member of the judicial branch, subject to oversight review by a higher judicial officer.  Rather, Article VI of the Constitution treats officers in the executive and judicial branches of the federal government as equals, each independently bound by oath to support the Constitution in the exercise of his respective powers.

Thus, the Attorney General is certainly not obliged by law or by his oath of office to submit his legal opinion for court review before he takes action on a constitutional matter before him.  Indeed, had the Attorney General submitted his opinion for review by an Article III judge, he would have been rebuffed for having requested the courts for an "advisory opinion," outside the jurisdiction of any federal court over cases and controversies.  As all of the justices of the United States Supreme Court wrote to President Washington in 1793:

[T]he three departments of the government

9

> [being] in certain respects checks upon each other, and our being judges of a court in the last resort, are considerations which afford strong arguments against the propriety of our extrajudicially deciding questions alluded to, especially as the power given by the Constitution, of calling on the heads of departments for opinions, seems to have been *purposely* as well as expressly united to the *executive*.... [Quoted in G. Gunther, <u>Constitutional Law</u> at 1393-94 (12th ed., Found. Press: 1991).]

Judge Wardlaw's vision of the role of the judiciary appears to be at odds with the one envisioned by Chief Justice Jay.

> If an agency head is mistaken in her assessment that the law precludes one course of action, allowing the courts to disabuse her of that incorrect view of the law does not constrain discretion, but rather opens new vistas within which discretion can operate. [<u>Regents</u> at *47.]

Elaborating, Judge Wardlaw hypothesized, "if an administrator chooses option A for the sole reason that she believes option B to be beyond her legal authority, a decision from the courts putting option B back on the table allows a reasoned, discretionary policy choice between the two courses of action." *Id.* at *47-*48. In other words, why wait for an individual case or controversy to arise under Article III, Section 2, when the courts could step in and decide the legal questions

10

before anyone is injured by an erroneous legal decision by an administrative officer?   Professor Alexander Bickel cautioned against such activist intervention:

> One of the chief faculties of the judiciary ... is that the judgment of courts can come later, after the hopes and prophecies expressed in legislation have been tested in the actual workings of our society; the judgment of courts may be had in concrete cases that exemplify the actual consequences of ... executive actions. [A. Bickel, The Least Dangerous Branch at 115-16 (Yale Press: 1965).]

## B.  The Judicial Power "to Say What the Law Is" Is Neither Exclusive Nor Final.

Judge Wardlaw's vision of an upfront, activist judiciary, intimately involved in the exercise of executive discretion, not only violates the separation of powers, but elevates the judiciary to new heights.  Not only does she affirm the judiciary's "province and duty ... to say what the law is," she assumes that its province and duty is both exclusive and final.  It is neither.

President Andrew Jackson, in his famous 1832 message to the Senate explaining his veto of the bill rechartering the Bank of the United States, put the judiciary and its power of judicial review into its proper place in a government of separated powers:

> The Congress, the Executive, and the Court must each for itself be guided by its own

11

opinion of the Constitution. Each public officer who takes an oath to support the Constitution swears that he will support it as he understands it, and not as it is understood by others.... The opinion of the judges has no more authority over Congress than the opinion of Congress has over the judges, and on that point the President is independent of both. The authority of the Supreme Court must not, therefore, be permitted to control the Congress or the Executive when acting in their legislative capacities, but to have only such influence as the force of their reasoning may deserve. [Veto Message of the Bill on the Bank of the United States, reprinted in 50 Core American Documents at 166-67 (C. Burkett, ed.: Ashbrook Press: 2016).]

In contrast, Judge Wardlaw believes that the judicial branch has the "ultimate responsibility" — or the final say — as to what the law is. *Id.* at *51. This is a serious misunderstanding of Marbury v. Madison which recognized that: "the very essence of judicial duty" is to decide the case "conformably" to the law or to the Constitution which ever one applies. *Id.,* 5 U.S. 137, 177-78 (1803). However, in Judge Wardlaw's eyes, the judicial branch is apparently above the law, measuring the correctness of a judicial opinion of the law by its own precedents, not by any objective standard.[3] In Blackstone's day, "the laws of nature and of nature's God" provided a universal standard by

---

[3] *See, e.g.,* Janus v. AFSCME, Council 31, 138 S. Ct. 2448 at 2497-98 (2018) (Kagan, J., dissenting).

AR3611

12

which law in a civil society could be measured.  *See* I Blackstone's Commentaries on the Laws of England 38-43, 69-71 (U. Chi. Press, Facsimile ed.: 1765). Thus, Blackstone observed:

> "the law," and the opinion of the judge are not always convertible terms, or one and the same thing; since it sometimes happens that the judge may mistake the law.  [*Id.* at 71.]

## C. The Executive's Exercise of Power Is Politically Accountable to the People, Not the Courts.

Startlingly, Judge Wardlaw claims that, by expanding the power of the judicial branch, the federal government would "promote accountability within the Executive Branch — not accountability to the courts, but democratic accountability to the people." Regents at *48.  On its face, this claim is incredible.  Of the three branches of the federal government, the judicial branch is the **least** accountable to the people.  Both houses of Congress are directly elected by the people at fixed times and for limited terms of office.  The President, although not directly elected by the people, must stand for election every four years, and may not stand for reelection after serving two of those four-year terms.  In contrast, judges are appointed by the President with the advice and consent of the Senate, "hold[ing] their offices during good behavior."

Except for the remote threat of impeachment under Article II, Section 4, a federal judgeship has become a life-time appointment. As Harvard Professor

13

Lawrence Tribe has observed: "once appointed, they cease to be accountable even to the elected officials who nominated and confirmed them but rather are secured in their independence by life tenure and guaranteed salary." L. Tribe, <u>American Constitutional Law</u> at 62 (2d ed., Found. Press 1988).

That is not all.  As Professor Tribe also points out:

Perhaps even more significantly, judicial review is itself said to be antidemocratic since its result is the invalidation of government action, legislative or executive — action that, however indirectly, did have the sanction of the electorate.  It is obvious, the critics argue, that if judicial review cuts against the grain of representative democracy, judges should invoke their power to strike down legislative and executive power only sparingly.  [*Id.*]

The decision to force the retention of DACA on the nation is nothing less than an unconscionable attempt to nullify the results of a presidential election.

## II.  THE SECRETARY'S DECISION TO RESCIND DACA WAS NOT ARBITRARY AND CAPRICIOUS BECAUSE THE ORIGINAL DECISION TO IMPLEMENT THE DACA POLICY WAS UNLAWFUL.

This case comes to this Court in a somewhat unusual procedural posture — a petition to review three lower court injunctions blocking the Trump Administration's decision to wind down the DACA

**AR3613**

14

program. As such, the issue of the legality of the original DACA program, and as amended, is not front and center. However, should this Court determine that the rescission of DACA is judicially reviewable (which these *amici* believe it is not, *see* Section I, *supra*), then these *amici* would urge that the lawfulness of the original DACA order be identified as one of the questions to be briefed when the writ is issued, for several reasons.

In issuing his injunction District Judge Garaufis directly and repeatedly addressed the issue of the legality of DACA to support his view that its rescission was illegal. Vidal v. Nielsen, 279 F. Supp. 3d 401, 420-27 (E.D.NY. 2018). That fact alone makes it almost impossible to review the legality of the rescission without deciding the legality of DACA.

Moreover, in evaluating the likelihood of success on the merits, Judge Garaufis assumed that the Duke Memorandum was based exclusively on the September 4, 2017, one-page letter of the Attorney General to Acting Secretary Duke. *See* Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA) (Sept. 5, 2017) App. 111a, *et seq.* The judge flatly disagreed with every sentence of the Attorney General's Memorandum. In one section of his argument, he claims that "The Attorney General Erred in Concluding that DACA was unconstitutional"(Vidal at 422), then, "The Attorney General Erred in Concluding that DACA Has the 'Same Legal and Constitutional Defects that the Courts Recognized as to DAPA" (*id.* at 423), and finally that the Duke Memorandum "Relies on a Factually Erroneous

**AR3614**

15

Premise that Courts Have Determined that DACA is Unconstitutional" (*id*. at 427). Each of these foundations for his injunction are refutable and should be reviewed by this Court.

In fact, the DACA wind-down Memorandum issued by Acting Secretary Duke referenced the Attorney General's letter, but was by no means limited to it. The Duke Memorandum asserted several bases for its issuance:

- that the original DACA memorandum of June 15, 2012, was based on a "purported" act of prosecutorial discretion, which could only be applied on "an individualized case-by-case basis." *Id*. at 112a.

- that the DACA memorandum "confer[ed] certain benefits to illegal aliens that Congress had not otherwise acted to provide by law." *Id*.

- that the Feb. 16, 2015 order of the U.S. District Court for the Southern District of Texas enjoining DAPA concluded that the states "were likely to succeed on their claim that the DAPA program did not comply with relevant authorities." *Id*. at 113a.

- that the U.S. Court of Appeals for the Fifth Circuit agreed that the "DAPA policy conflicted with the discretion authorized by Congress" as the Immigration and Nationality Act "flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby

AR3615

16

make them newly eligible for a host of federal
and state benefits, including work
authorization." Moreover "'DAPA is foreclosed
by Congress' careful plan; the program is
"manifestly contrary to the statute" and
therefore was properly enjoined.'" *Id.*

Then, turning to the Attorney General's input, she
added:

- that she had consulted with the Attorney
  General as to risk of litigation pending in Texas.
  *Id.* at 116a.

- that the Attorney General sent a letter to the
  Department … articulating his legal
  determination that DACA "was effectuated by
  the previous administration through executive
  action, without proper statutory authority and
  no established end-date after Congress'
  repeated rejection of proposed legislation." *Id.*

- that the Attorney General stated that "Such an
  open-ended circumvention of immigration laws
  was an unconstitutional exercise of authority by
  the Executive Branch." *Id.*

Only after making all of those findings, does the
Duke Memorandum make one passing reference to the
Attorney General's statement that DACA "has the
same legal and constitutional defects that the courts
recognized as to DAPA." However, Judge Garaufis
seized on that sentence to justify his injunction,
stating "[t]his premise is flatly incorrect" as the Texas

**AR3616**

17

courts' findings were based on the Administrative
Procedure Act, not the Constitution.  <u>Vidal</u> at 427.
Rather than finding a smoking gun, that statement is,
at best, ambiguous as it could be read to reflect (i) the
Attorney General's misunderstanding of the holding of
the court, or (ii) the Attorney General drawing a
logical conclusion from findings and statements made
by the courts, even though those courts did not
ultimately decide the constitutional issues at that
time.  However, given all the other bases given for the
decision, the Acting Secretary's Memorandum
certainly cannot simply be dismissed as having relied
solely on the Attorney General's statement about
constitutionality.

Lastly, Judge Garaufis seemed to find that the
Sessions letter was "factually erroneous" because it
concluded "that the Southern District of Texas and
Fifth Circuit would enjoin the continued operation of
the DACA program...."  *Id*. at *61.  However, in this
case, it was Judge Garaufis who appears to have made
the "erroneous" statement, not the Attorney General.
In February 2018, District Judge Hanen issued a
detailed explanation as to why DAPA and DACA were
legally indistinguishable.  *See* <u>Texas</u> v. <u>United States</u>,
328 F.Supp.3d 662, 723-25 (S.D.TX. 2018).

Thus, whether the prior administration's DACA
policy is lawful should be an important question on
which this Court grants review.  It would be entirely
anomalous to say that one administrative action
undoing another administrative action because it was
unlawful is arbitrary and capricious without
examining whether that initial administrative action

**AR3617**

18

is lawful. Not to review the original DACA policy would only result in further delay and a waste of judicial resources, prolonging the controversy and effectively negating the vote of the American people in electing a new President to implement new policies different from a prior administration. Every year that DACA remains in place is another year of compelled adherence to the prior administration's illegal DACA policy.

## III. THE NATIONWIDE INJUNCTIONS EXCEEDED THE DISTRICT COURTS' AUTHORITY.

Former Attorney General Sessions recounted:

> In the first 175 years of this Republic, not a single judge issued one of these orders.
> But, they have been growing in frequency and, since President Trump took office less than two years ago, 27 district courts have issued such an order. [Attorney General Jeff Sessions Remarks on Judicial Encroachment (Oct. 15, 2018)[4].]

The cases below fall into that category. On January 9, 2018, Judge William Alsup of the Northern District of California issued a preliminary injunction "to maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the

---

[4]    https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-heritage-foundation-judicial-encroachment.

19

rescission on September 5, 2017," with certain narrow
exemptions.  The district judge asserted "a nationwide
injunction is appropriate" because:

> Our country has a strong interest in the
> uniform application of immigration law and
> policy.  Plaintiffs have established injury that
> reaches beyond the geographical bounds of the
> Northern District of California.  The problem
> affects every state and territory of the United
> States.  [Regents of the Univ. of Cal. v. United
> States Dept. of Homeland Sec., 279 F.Supp.3d
> 1011, 1048-49 (2018).]

Judge Alsup cited two cases in support of his view,
both of which have been substantially weakened by the
passage of time.

First, Judge Alsup relied on the Ninth Circuit's
opinion in Washington v. Trump, 847 F.3d 1151, 1167
(9th Cir. 2017), enjoining President Trump's Executive
Orders and Proclamations to deny entry to aliens from
certain countries, based on the need for uniformity in
immigration law and policy.[5]  That reliance may not be
well-founded, as revealed by the well-considered view
of a member of this Court.  Although it denied a stay,
this Court, in a _per curiam_ order, narrowed the
injunctions, leaving them in place, over the dissent of
Justices Thomas, Alito, and Gorsuch.  _See_ Trump v.
IRAP and Trump v. Hawaii, 582 U.S. ____ 138 S. Ct.
34 (2017).  Although neither the _per curiam_ opinion

---

[5]  Regents, 279 F.Supp.3d at 1049.

**AR3619**

20

nor the dissent discussed the nationwide nature of the injunctions under review, the Ninth Circuit opinion on which Judge Alsup relied was overturned by this Court on June 26, 2018. *See* <u>Trump</u> v. <u>Hawaii</u>, 138 S.Ct. 2392 (2018). Because this Court "reverse[d] the grant of the preliminary injunction as an abuse of discretion," it made "it unnecessary to consider the propriety of the nationwide scope of the injunction issued by the District Court." *Id.* at 2423.

However, Justice Thomas substantively questioned the validity of nationwide injunctions. Discussing how such injunctions prevent "legal questions from percolating through the federal courts, encourag[e] forum shopping, and mak[e] every case a national emergency for the courts and for the Executive Branch," Justice Thomas stated his fundamental concern:

> I am skeptical that district courts have the authority to enter universal injunctions. These injunctions did not emerge until a century and a half after the founding. And they appear to be inconsistent with longstanding limits on equitable relief and the power of Article III courts. If their popularity continues, this Court must address their legality. [*Id.* at 2425 (Thomas, J., concurring).]

Second, Judge Alsup asserted "the Fifth Circuit reached the same conclusion" in affirming "the

**AR3620**

21

appropriate scope of an injunction over DAPA[6] ... holding that uniform application of the immigration laws justified a nationwide injunction.  So too here." Regents, 279 F.Supp.3d at 1049.  *See* Texas v. United States, 809 F.3d 134 (5th Cir. 2015) *aff'd by an evenly divided court* United States v. Texas, 136 S.Ct. 2271 (2016).  However, Judge Alsup failed to note that the injunction under review in the Fifth Circuit had been issued by Judge Hanen with respect to the adoption of the DAPA program for violation of APA's procedural requirements.

In his February 16, 2015 decision, Judge Hanen found that the Obama Administration has "clearly legislated a substantive rule without complying with the procedural requirements under the Administration [sic] Procedure Act" requiring "notice and comment." Texas v. United States, 86 F. Supp. 3d 591, 676-77 (S.D.TX. 2015).  The APA grants district courts the authority to "hold unlawful and set aside agency action, findings, and conclusions" in such circumstances. 5 U.S.C. § 706.  Since the DAPA policy was not implemented in accordance with "notice and comment" requirements, Judge Hanen concluded that it was invalid.  He summarized his ruling as follows:

> this temporary injunction enjoins the implementation of the DAPA program that awards legal presence and additional benefits to the four million or more individuals potentially covered by the DAPA

---

[6]  "Deferred Action for Parents of Americans and Lawful Permanent Residents."

22

Memorandum and to the three expansions/additions to the DACA program also contained in the same DAPA Memorandum. [Texas, 86 F.Supp.3d at 677.]

There is no language characterizing Judge Hanen's opinion as "nationwide" or "universal." He only relied on the terms of the APA holding that the Department of Homeland Security could not continue to implement a policy that had been adopted in violation of APA's procedural requirements.

By contrast, the Ninth Circuit had made clear that the injunction was **not** based on a violation of APA's notice-and-comment requirement. *See* Regents at *101. Rather, the Ninth Circuit asserted "that the claim underlying the injunction here is an arbitrary-and-capricious challenge under the APA" which should lead to the rule being "'vacated — not that their application to the individual petitioners is proscribed.'" *Id.* at *78-79. However, the "arbitrary and capricious" finding of the district court was grounded exclusively on the claim that it "was based solely on an erroneous legal premise..." that DACA itself was adopted illegally, and was rescinded for that reason. *Id.* at *65, *71-77, *82. This was not a procedural APA violation. Judge Alsup's opinion falsely assumes that only judges can assess and act on their view about the legality of any policy, and the Justice Department's view that DACA was illegal was a usurpation of that judicial role. In essence, Judge Alsup admits that, if the DACA rescission had been based on a change in policy, he would have had no ground to enjoin it. And, the Ninth Circuit disregarded subsequent information

**AR3622**

23

from Secretary Nielsen as to the additional policy reasons for the policy change. *Id*. at *78 n.24. *See also* Petitioners' Supplemental Brief (Nov. 19, 2018) at 4-5. Even concurring Judge Owens could not go along with the Ninth Circuit's assertion that it could review the DACA rescission for compliance with the substantive rules of the APA. Regents at *103. That rationale was a thin reed on which to base a finding of the DACA rescission being considered "arbitrary and capricious," and without such a finding there could be no "set aside" order and no national injunction.

The widely criticized practice of district courts issuing nationwide injunctions is an important issue which has not been resolved by this Court, but should be.

## IV. THE NEW YORK DISTRICT COURT ERRONEOUSLY CONCLUDED THAT ENDING DACA WOULD HARM THE SOCIAL SECURITY TRUST FUNDS.

The injunction order issued by the U.S. District Court for the Eastern District of New York acknowledged that it is within the government's authority to end DACA: "New Administrations may ... alter or abandon their predecessors' policies...." Vidal at 408-09. But the court then left the realm of law to address matters of policy. The court stated that policies may change when administrations change, "even if these policy shifts may impose staggering personal, social, and economic costs." *Id.*

To that end, the court asserted "the costs of the

**AR3623**

24

DACA rescission over the next decade at ... $24.6 billion in lost Social Security and Medicare tax contributions." *Id*. at 409 n.4. For the estimate of $24.6 billion in lost Social Security and Medicare tax contributions, the court cited the amicus brief of 114 companies. That brief, in turn, cites to and relies exclusively on a policy brief of the Immigrant Legal Resource Center ("ILRC") on the "economic cost of ending DACA." The ILRC policy brief arrives at its estimate of tax receipts based on the number of employed DACA recipients, average annual wages, and payroll taxes over the next 10 years. It limited its projection to 10 years, but DACA recipients would not have been eligible to retire in that timeframe due to the DACA age requirements. This estimate is misleading because its methodology focuses only on income and ignores the expenses on Social Security that DACA recipients will impose on the Social Security Trust Fund in the future. Moreover, lower income workers, such as most of those benefitted by DACA, will receive disproportionately greater benefits relative to taxes paid than will higher income workers, causing a significant net drain on trust funds.[7] The

---

[7] An illegal alien born in 1995, granted lawful status under DACA, who fell into the "low earnings" tier (career average earnings equal to $22,215) would receive annual Social Security benefits of $12,276 in wage-indexed 2017 dollars. On the other hand, a U.S. citizen born the same year in the "high earnings" tier (career average earnings equal to $78,985) would **pay 3.5 times the taxes** paid by the low income worker, but would receive annual Social Security benefits of $26,802 — **only 2.2 times the benefits paid** to the low income worker. *See* Office of the Chief Actuary, Social Security Administration, Actuarial Note No. 2017.9 (July 2017), "Replacement Rates for Hypothetical Retired

**AR3624**

25

court's decision also ignores the drain from the DACA recipients who may qualify for disability benefits before retirement.[8]

The court's assertion about the high cost of rescinding DACA is in error. Actually, it is DACA itself — not the rescission of DACA — that should by logic have an adverse effect on the federal budget. Looking at just one federal program, persons granted "lawful status" under DACA are no longer barred from receiving Social Security Disability Insurance and Retirement benefits.[9]  8 U.S.C. § 1611(b)(2)-(3).[10]

---

Workers," Table C.

[8]  *See* Congressional Research Service, "Social Security Benefits for Noncitizens" (Nov. 17, 2016) at 9.

[9]  The U.S. District Court for the Southern District of Texas recently confirmed that:

> unlawfully present aliens would normally be barred from receiving Social Security retirement benefits, Social Security disability benefits, and health insurance under Part A of the Medicare program because these are federal public benefits. DACA, however, by making its recipients lawfully present, removes an otherwise insurmountable roadblock to their receipt of Social Security, Medicare, and other benefits.  [Texas, 328 F.Supp.3d at 675.]

[10]  The Social Security Board of Trustees 2018 Annual Report anticipates the rescission of DACA will have a negligible impact on the long-term health of the Social Security system — certainly not the significant losses assumed by the New York District Court.  *See* 2018 Annual Report of the Trustees (June 5, 2018) at 37, https://www.ssa.gov/OACT/TR/2018/ tr2018.pdf.

AR3625

26

Even without the addition of DACA beneficiaries to the disability rolls, the trust funds from which those benefits are generally paid face a seriously troubled financial future. *See id.* at 2-3. Decisions that would grow the future liabilities of the United States should be left to the branch with the power of the purse. Congress has developed a nuanced system of entitlement programs and immigration controls, including the payment of benefits only to certain persons. DACA upends that system, usurping the power of the purse from Congress and imposing new and untold liabilities on the United States, putting older Americans at increased financial risk, in ways that Congress to date has refused to sanction.

## CONCLUSION

For the foregoing reasons, the Petitions for Writs of Certiorari should be granted, and the parties directed to brief the two additional issues identified herein.

Respectfully submitted,

JOSEPH W. MILLER
   RESTORING LIBERTY
   ACTION COMMITTEE
   Fairbanks, AK 99708
*Attorney for Amicus Curiae*
   *RLAC*

WILLIAM J. OLSON*
HERBERT W. TITUS
JEREMIAH L. MORGAN
ROBERT J. OLSON
   WILLIAM J. OLSON, P.C.
   370 Maple Ave. W., Ste. 4
   Vienna, VA 22180
   (703) 356-5070
   wjo@mindspring.com

December 6, 2018

Attorneys for *Amici Curiae*
*Counsel of Record

**AR3626**

No. 18-587

# In the Supreme Court of the United States

---

DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Petitioners*,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, *et al.*,

*Respondents.*

---

ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

## BRIEF IN OPPOSITION FOR THE STATES OF CALIFORNIA, MAINE, MARYLAND, AND MINNESOTA

---

XAVIER BECERRA
  *Attorney General of California*
EDWARD C. DUMONT
  *Solicitor General*
MICHAEL L. NEWMAN
  *Senior Assistant Attorney General*

MICHAEL J. MONGAN*
  *Deputy Solicitor General*
SAMUEL P. SIEGEL
  *Associate Deputy Solicitor General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue
San Francisco, CA 94102
(415) 510-3920
Michael.Mongan@doj.ca.gov
*Counsel of Record*

(*Additional counsel on signature page*)

December 17, 2018

AR3627

i

## QUESTION PRESENTED

Whether the district court erred by (i) holding that respondents' claims are subject to judicial review, (ii) entering a preliminary injunction partially suspending petitioners' termination of the Deferred Action for Childhood Arrivals program, and (iii) denying in part petitioners' motion to dismiss.

AR3628

ii

# TABLE OF CONTENTS

**Page**

Introduction ................................................................. 1

Statement ................................................................... 2

Argument ................................................................. 13

I.  There is no need for "prompt intervention" by this Court ......................................... 13

II. Petitioners' merits arguments provide no reason for review .......................................... 17

    A.  Reviewability ................................................ 17

    B.  The preliminary injunction ........................ 23

    C.  The motion to dismiss .............................. 31

Conclusion ............................................................... 33

AR3629

iii

# TABLE OF AUTHORITIES

**Page**

CASES

*Batalla Vidal v. Nielsen*
   279 F. Supp. 3d 401 (E.D.N.Y. 2018)........... *passim*

*Casa de Md. v. Dep't of Homeland Sec.*
   284 F. Supp. 3d 758 (D. Md. 2018) ......... 12, 17, 32

*City of Arlington v. FCC*
   569 U.S. 290 (2013) ............................................ 20

*East Bay Sanctuary Covenant v. Trump*
   ___ F.3d. ____, 2018 WL 6428204
   (9th Cir. Dec. 7, 2018) ........................................ 16

*Encino Motorcars LLC v. Navarro*
   136 S. Ct. 2117 (2016) ........................................ 25

*FCC v. Fox Television Stations, Inc.*
   556 U.S. 502 (2009) ............................................ 23

*Franklin v. Massachusetts*
   505 U.S. 788 (1992) ............................................ 25

*Heckler v. Chaney*
   470 U.S. 821 (1985) ..................................... *passim*

*ICC v. Bhd. of Locomotive Eng'rs*
   482 U.S. 270 (1987) ............................................ 21

*In re United States*
   138 S. Ct. 443 (2017) (per curiam)........................ 5

**AR3630**

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Lincoln v. Vigil*
 508 U.S. 182 (1993) ............................................. 19

*Montana Air Chapter No. 29 v. FLRA*
 898 F.2d 753 (9th Cir. 1990) ............................... 20

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v.*
 *State Farm Mut. Auto. Ins. Co.*
 463 U.S. 29 (1983) ............................................... 23

*NAACP v. Trump*
 298 F. Supp. 3d 209 (2018) ......................... *passim*

*Negusie v. Holder*
 555 U.S. 511 (2009) ............................................. 20

*Neil v. Biggers*
 409 U.S. 188 (1972) ............................................. 26

*Newman v. Apfel*
 223 F.3d 937 (9th Cir. 2000) ............................... 22

*Reno v. Am.-Arab Anti-Discrimination Comm.*
 525 U.S. 471 (1999) ...................................... *passim*

*SEC v. Chenery Corp.*
 318 U.S. 80 (1943) .......................................... 9, 23

*Texas v. United States*
 328 F. Supp. 3d 662 (2018) ........................... 13, 29

*Texas v. United States*
 809 F.3d 134 (5th Cir. 2015) ....................... *passim*

**AR3631**

## TABLE OF AUTHORITIES
### (continued)

Page

*Trump v. Int'l Refugee Assistance Project*
    137 S. Ct. 2080 (2017) ....................... 16, 23, 26, 30

*United States v. Texas*
    136 S. Ct. 2271 (2016) (per curiam)....................... 3

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*
    No. 17-71, slip op. (Nov. 27, 2018) .......... 18, 19, 23

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ........................................... 23, 30

**STATUTES**

5 U.S.C.
    § 701(a)(2) .................................................. *passim*
    § 702(a)(1) ......................................................... 10
    § 706(2)(A) .................................................... 4, 23

6 U.S.C.
    § 202(5) ....................................................... 14, 25

8 U.S.C.
    § 1227(d)(2) ...................................................... 2
    § 1252(b)(9) ..................................................... 18
    § 1252(g) ............................................ 5, 9, 17, 18

**REGULATIONS**

8 C.F.R.
    § 214.14(d)(3) .................................................... 2
    § 274a.12(c)(14) ................................................. 2

AR3632

## INTRODUCTION

This case involves hundreds of thousands of young people who were brought to this country as children. Many of them have never known any other home. All of them currently receive provisional protection from removal from the United States, authorization to work legally, and other benefits through the Deferred Action for Childhood Arrivals (DACA) program. In September 2017, petitioners announced that they were terminating that program on the ground that it would be unlawful to maintain it. Respondents challenged that decision, and the district court entered a preliminary injunction partially preserving the status quo pending resolution of the litigation. The court of appeals has now affirmed the entry of that preliminary injunction. Similar litigation is pending in other circuits.

Petitioners argue that their decision to terminate DACA is not subject to judicial review at all, and in any event that they correctly concluded that the program is unlawful. As to the threshold reviewability issues, every court that has considered petitioners' arguments has rejected them. As to the merits, three district courts, and now the court of appeals in this case, have held that petitioners' decision to terminate DACA cannot be sustained on the theory of illegality that they have proffered. Petitioners identify no good reason for this Court to reach out to review those conclusions at this time—in an interlocutory posture, with no present circuit conflict, and before other courts of appeals have had the chance to consider the similar cases already pending before them.

2

## STATEMENT

1. Deferred action is a "regular practice" under federal immigration law, involving a decision that "no action will thereafter be taken to proceed against an apparently deportable alien." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999) (*AADC*). It has been recognized by Congress and by this Court. *See, e.g.*, 8 U.S.C. § 1227(d)(2); *AADC*, 525 U.S. at 484. Recipients of deferred action may apply for work authorization and receive other benefits. *See, e.g.*, 8 C.F.R. § 274a.12(c)(14) (work authorization); *id.* § 214.14(d)(3) (no accrual of "unlawful presence" for purposes of re-entry bars).

Established in 2012, the DACA program applies to "certain young people who were brought to this country as children and know only this country as home." Pet. App. 97a-98a; *see id.* at 98a (listing criteria). It recognizes that immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language." *Id.* at 99a. DACA provides a channel and framework for individualized deferred action decisions for eligible individuals, who may receive provisional protection from removal for renewable two-year periods, obtain permission for foreign travel ("advance parole"), and enjoy other benefits associated with deferred action. *Id.* at 11a-12a. In September 2017 there were nearly 700,000 active DACA beneficiaries, with an average age of just under 24 years old. *Id.* at 13a. More than 90 percent of DACA recipients are employed, and 45 percent are in school. *Id.*

In 2014, the Office of Legal Counsel at the U.S. Department of Justice memorialized its advice that a general program such as DACA was legally sound so long as immigration officials "retained discretion to

**AR3634**

3

evaluate [its] application on an individualized basis." D.Ct. Dkt. 64-1 at 21 n.8.[1]  Until recently, Executive Branch lawyers likewise argued consistently that DACA was "a valid exercise of the Secretary's broad authority and discretion to set policies for enforcing the immigration laws, which includes according deferred action and work authorization to certain aliens who, in light of real-world resource constraints and weighty humanitarian concerns, warrant deferral rather than removal."  *E.g.*, U.S. Br. 1, *Ariz. Dream Act Coal. v. Brewer*, 9th Cir. No. 15-15307, Dkt. 62 (filed Aug. 28, 2015).

In *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), the Fifth Circuit affirmed a preliminary injunction that forestalled the implementation of a different program, Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), along with some intended expansions of the DACA program.  This Court affirmed that decision by an equally divided vote.  *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).  But the preliminary injunction at issue in *Texas* did not affect the original DACA program.

After the change in federal administrations in January 2017, the new administration initially preserved the DACA program and continued to solicit and accept new and renewal applications for DACA status.  *See* Pet. App. 16a.  The President indicated that the "policy of [his] administration [was] to allow the dreamers [*i.e.*, DACA recipients] to stay."  D.Ct. Dkt. 121-1 at 285.  In June 2017, Attorneys General from Texas and other States threatened to amend their complaint in

---

[1] Citations to "D.Ct. Dkt." are to the docket in N.D. Cal. Case No. 17-cv-5211.

**AR3635**

the still-pending DAPA litigation to include a chal-
lenge to the DACA program. Supp. App. 18a. On Sep-
tember 4, 2017, then-Attorney General Jefferson
Sessions sent a one-page letter advising then-Acting
Secretary of Homeland Security Elaine Duke that her
Department should terminate DACA because it "was
an unconstitutional exercise of authority by the Exec-
utive Branch." D.Ct. Dkt. 64-1 at 251. The letter
stated summarily that DACA "has the same legal and
constitutional defects that . . . courts recognized as to"
DAPA, and asserted that "it is likely that potentially
imminent litigation would yield similar results with
respect to DACA." *Id.*

The next day, the Acting Secretary issued a mem-
orandum formally rescinding the program. Pet. App.
111a-119a. Her stated reason was that "[t]aking into
consideration the Supreme Court's and the Fifth Cir-
cuit's rulings in the ongoing [DAPA] litigation, and the
September 4, 2017 letter from the Attorney General,
it is clear that the June 15, 2012 DACA program
should be terminated." *Id.* at 117a. She instructed
her Department to stop accepting new DACA applica-
tions immediately, and to stop accepting all renewal
applications on October 5, 2017. *See id.* at 117a-118a.

2. The complaints in the five cases addressed to-
gether in the decision below allege, among other
things, that petitioners' termination of DACA was
arbitrary, capricious, or otherwise not in accordance
with law and thus invalid under the Administrative
Procedure Act, 5 U.S.C. § 706(2)(A). On January 9,
2018, the district court largely denied petitioners'

**AR3636**

motion to dismiss on threshold grounds and granted a limited preliminary injunction.  Pet. App. 1a-70a.[2]

The court first considered petitioners' threshold reviewability defenses.  Pet. App. 26a-33a.  It rejected the argument that the decision to terminate DACA was "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2), *id.* at 26a-30a, and held that 8 U.S.C. § 1252(g) did not strip it of jurisdiction to hear the case, *id.* at 30a-33a.  It certified both rulings for interlocutory appeal.  *Id.* at 70a.[3]

Turning to the motion for a preliminary injunction, the district court held that respondents were likely to succeed on their APA claim that petitioners' September 2017 decision to rescind DACA must be set aside.  Pet. App. 41a-62a.  It found no support for petitioners' assertion that maintaining the program was beyond the authority of the Department of Homeland Security or the Executive Branch.  *Id.* at 47a.  In response to petitioners' reliance on decisions in the *Texas* litigation over the DAPA program (*id.* at 50a), the district court noted significant differences between the two programs (*id.* at 51a-54a) and concluded that the "DAPA litigation was not a death knell for DACA" (*id.* at 54a).

---

[2] As the Court is aware from prior proceedings, the parties have vigorously disputed both the adequacy of the putative administrative record proffered by petitioners and certain discovery issues.  *See In re United States*, 138 S. Ct. 443 (2017) (per curiam).  Currently, the district court has stayed discovery and postponed petitioners' obligation to complete the administrative record pending appellate review of petitioners' threshold defenses.

[3] The district court likewise rejected most of petitioners' arguments regarding Article III and prudential standing.  Pet. App. 33a-41a.  Petitioners do not renew those arguments here.

6

The court rejected petitioners' alternative argu-ment that the decision to end DACA was "a reasonable judgment call involving management of litigation risk and agency resources," Pet. App. 55a, as a post hoc jus-tification proffered by counsel, *id.* at 56a-57a. In any event, the court concluded that any such reasoning was unlikely to withstand APA review. *See id.* at 57a-62a. Among other things, the rescission memorandum and the administrative record revealed no considera-tion of "the *differences* between DAPA and DACA that might have led to a different result" (*id.* at 57a); no consideration of possible defenses to a suit challenging DACA (*id.* at 57a-58a); and no comparative assess-ment of the human and other costs of terminating or maintaining DACA (*id.* at 60a).

The court held that the remaining factors of the preliminary injunction test also favored provisional relief. Pet. App. 62a-66a. Respondents were "likely to suffer serious irreparable harm absent an injunction," with individual respondents losing their work author-ization and suffering other hardships and the States losing "valuable students and employees in whom they have invested." *Id.* at 62a. For similar reasons, a pre-liminary injunction would serve the public interest. *Id.* at 65a. The court reasoned that the threatened harms to respondents and the public substantially outweighed the only hardship asserted by petitioners, which was "interference with the agency's judgment" on whether to keep DACA in place while the issues were litigated to final judgment. *Id.*

Accordingly, the district court entered a prelimi-nary injunction partially preserving the status quo for individuals who had already received deferred action. As to those existing recipients, the court required petitioners "to maintain the DACA program on a

**AR3638**

nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017, including allowing DACA enrollees to renew their enrollments." Pet. App. 66a. It made clear, however, that pending the completion of litigation and entry of final judgment petitioners were not required to process new applications from individuals who had never before received deferred action; that the "advance parole" feature of DACA "need not be continued for the time being for anyone"; and that petitioners could "take administrative steps to make sure fair discretion is exercised on an individualized basis for each renewal application." *Id.* at 66a. It also emphasized that the Department of Homeland Security may "proceed[] to remove any individual, including any DACA enrollee, who it determines poses a risk to national security or public safety, or otherwise deserves, in its judgment, to be removed." *Id.*

In a separate order, the district court ruled on petitioners' motion to dismiss various claims under Rule 12(b)(6). Pet. App. 71a-90a. The court dismissed claims that the rescission of DACA should have been accomplished through notice-and-comment rulemaking and related claims under the Regulatory Flexibility Act (*id.* at 72a-75a); due process claims regarding the rescission of DACA (*id.* at 75a-79a); claims based on equitable estoppel (*id.* at 81a-83a); and certain equal protection claims (*id.* at 87a). It denied the motion to dismiss with respect to the claims that the rescission was arbitrary, capricious, or otherwise unlawful (*id.* at 72a); due process claims based on changes in DHS's policies regarding the sharing of information provided by DACA recipients (*id.* at 79a-81a); and equal protection claims alleging discriminatory animus (*id.* at 83a-87a). The court again certified

**AR3639**

8

several of its rulings for interlocutory appeal.  *See id.* at 89a.

Petitioners did not seek a stay of any of these orders.  They did file a petition for certiorari before judgment in this Court at the same time that they filed their regular appeals.  This Court denied that petition on February 26, 2018.  *See* 138 S. Ct. 1182 (No. 17-1003).

3.  The court of appeals affirmed.  Supp. App. 1a-78a.  It first addressed whether petitioners' decision to terminate DACA was unreviewable as a matter "committed to agency discretion by law."   5 U.S.C. § 701(a)(2).  *See* Supp. App. 23a-42a.  The court carefully considered this Court's decision in *Heckler v. Chaney*, 470 U.S. 821 (1985), which applied Section 701(a)(2) to create a presumption of unreviewability for "'agency refusals to institute investigative or enforcement proceedings.'"   *Id.* at 25a (quoting *Chaney*, 470 U.S. at 838).  Although the court noted that "a literal reading of *Chaney*'s language" relating to decisions not to undertake specific enforcement proceedings "would not even encompass the decision to rescind DACA," for purposes of this case it assumed that *Chaney* could be read more broadly.  *Id.* at 34a-35a n.13.  It concluded, however, that "an agency's nonenforcement decision is outside the scope of the *Chaney* presumption—and is therefore presumptively reviewable—if it is based solely on a belief that the agency lacked the lawful authority to do otherwise." *Id.* at 29a; *see id.* at 23a-34a.  The court further agreed with the district court that, in light of the record in this case, "the Acting Secretary based the rescission of DACA solely on a belief that DACA was beyond the authority of DHS."  *Id.* at 41a.  That proffered basis for

**AR3640**

the decision "brings [it] within the realm of agency actions reviewable under the APA." *Id.* at 42a.

The court also rejected petitioners' second threshold argument, that 8 U.S.C. § 1252(g) stripped the district court of jurisdiction to hear this case. Supp. App. 42a-45a. It relied on this Court's holding in *AADC* that Section 1252(g) "applies only to three discrete actions that the Secretary may take: her decision or action to *commence* proceedings, *adjudicate* cases, or *execute* removal orders." *Id.* at 42a (internal quotation marks and alteration omitted). Petitioners' rescission of DACA does not fit into any of these categories of discrete actions. *Id.* at 43a-44a. Moreover, nothing in *AADC* suggests that Section 1252(g) would apply to a "programmatic shift" in a deferred-action policy, such as the DACA rescission. *Id.* at 43a.

Turning to the preliminary injunction, the court of appeals noted that petitioners "take[] issue with the district court's conclusion on only one of the preliminary injunction factors: the likelihood of success on the merits." Supp. App. 46a. Because an agency action "based solely on an erroneous legal premise . . . must be set aside," *id.* at 47a (discussing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943) (*Chenery I*)), the court examined petitioners' stated conclusion that DACA is unlawful. In view of the Executive Branch's broad authority over immigration enforcement policy and priorities and the longstanding practice of using deferred action on a programmatic basis, the court concluded "that DACA was a permissible exercise of executive discretion." *Id.* at 56a; *see id.* at 47a-57a.

The court acknowledged petitioners' heavy reliance on the Fifth Circuit's preliminary assessment of the legality of DAPA in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015). *See* Supp. App. 49a. Exploring

AR3641

the reasoning in that case, however, the court concluded that "the analysis that seemingly compelled the result in *Texas*" was "inapposite" here. *Id.* at 57a. The court emphasized that it was "not hold[ing] that DACA *could not* be rescinded as an exercise of Executive Branch discretion." *Id.* But petitioners' decision to rescind it "based on an erroneous view of what the law required" was "arbitrary and capricious under settled law." *Id.*

The court also held that the district court did not abuse its discretion by entering a nationwide injunction in the circumstances of this case. Supp. App. 60a. In particular, nationwide "relief is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress." *Id.*

Finally, the court of appeals affirmed the district court's ruling on petitioners' motion to dismiss. Supp. App. 61a-77a. As relevant here, the court agreed that respondents had plausibly stated a due process claim with respect to petitioners' changes to their policies governing the use of the sensitive information provided by DACA recipients, *id.* at 68a-73a, and an equal protection claim alleging that the rescission of DACA "disproportionately affected Latinos and individuals of Mexican descent and was motivated by discriminatory animus," *id.* at 73a.

Judge Owens concurred in the judgment. Supp. App. 79a-87a. He would have held that petitioners' decision to terminate DACA was the sort of discretionary non-enforcement decision that is insulated from normal APA review under 5 U.S.C. § 702(a)(1) and *Chaney.* *Id.* at 79a-84a. But he agreed that the preliminary injunction should be affirmed, at least pending further proceedings in the district court, because

the equal protection claim based on discriminatory animus had "some 'likelihood of success on the merits,'" *id.* at 79a, and "the balance of equities here weighs heavily in favor of" provisional relief, *id.* at 86a.

4.  As this litigation has proceeded, courts in other jurisdictions have also considered the legality of petitioners' decision to terminate DACA or the legality of the underlying program.

a.  In the Eastern District of New York, the district court entered a preliminary injunction that is co-extensive with the one affirmed below. *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (2018). The court reasoned that the asserted basis for the decision to terminate DACA was inadequately explained and rested on a premise that was legally and factually flawed. *See* 18-589 Pet. App. 62a, 67a-69a, 90a-119a (*Batalla Vidal* App.). Petitioners did not seek a stay of that order, which is currently on appeal before the Second Circuit, with oral argument scheduled for January 2019. Petitioners seek certiorari before judgment in that case in No. 18-589.

b.  In the District of Columbia, the district court entered a final judgment vacating the decision to terminate DACA. *NAACP v. Trump*, 298 F. Supp. 3d 209 (2018); *see* 18-588 Pet. App. 1a-74a (*NAACP* App.). It reasoned that the termination decision "was predicated primarily on [a] legal judgment that the program was unlawful." *NAACP* App. 73a. But that legal judgment could not support the agency's action because it was "virtually unexplained." *Id.* The district court temporarily stayed its final judgment to afford the agency an opportunity to "reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority." *Id.* at 66a.

Two months later, petitioners submitted a new memorandum from the current Secretary of Homeland Security, Kirstjen Nielsen. Pet. App. 120a-126a. The Nielsen memorandum "decline[s] to disturb the Duke memorandum's rescission of the DACA policy," but offers Secretary Nielsen's "understanding of the Duke memorandum and why the decision to rescind the DACA policy was, and remains, sound." *Id.* at 121a; *see* Pet. 13. After reviewing the Nielsen memorandum, the D.C. district court held that the memorandum "fails to elaborate meaningfully on the agency's primary rationale for its decision." *NAACP* App. 81a. As to "several additional 'policy' grounds for DACA's rescission," the court concluded that most "simply repackage legal arguments previously made," while one was "articulated nowhere in DHS's prior explanation for its decision, and therefore cannot support that decision now." *Id.* at 81a-82a; *see id.* at 95a-103a.

The D.C. district court accordingly adhered to its original final judgment. *NAACP* App. 108a-109a. But it partially stayed its order vacating the rescission of DACA pending appeal, to the extent that the order would provide relief beyond that granted by the preliminary injunctions in place in this case and in *Batalla Vidal*. *See NAACP* Pet. 13. Petitioners' appeal is pending in the D.C. Circuit and briefing is scheduled to be completed in January 2019. Petitioners seek certiorari before judgment in that case in No. 18-588.

c. In the District of Maryland, the district court held that a similar challenge to the termination of DACA was reviewable (rejecting petitioners' threshold arguments to the contrary), but dismissed the claims in substantial part on the merits. *Casa de Md. v. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758 (2018). The

plaintiffs' appeal of that decision was argued before the Fourth Circuit on December 11.  Petitioners have not sought certiorari before judgment in that case.

d.  In the Southern District of Texas, Texas and other States have challenged the legality of the DACA program.  The district court denied the plaintiff States' motion for a preliminary injunction.  *Texas v. United States*, 328 F. Supp. 3d 662, 743 (2018).  It reasoned that the plaintiff States were likely to succeed on the merits, but that they could not establish a right to preliminary equitable relief under the circumstances of the case.  *Id*. at 712-742.  The plaintiff States did not appeal the denial of preliminary relief.  The district court recently set a November 2019 deadline for dispositive motions and scheduled a two-week trial for May 2020.

## ARGUMENT

Petitioners filed their second petition for certiorari before judgment in this case on November 5.  They have since proposed that the Court treat that petition as one seeking review of the decision entered by the court of appeals on November 8.  *See* Supp. Br. 9.  The State respondents have no objection to that proposal.  There is, however, no reason for review at this time.

## I.  THERE IS NO NEED FOR "PROMPT INTERVENTION" BY THIS COURT

The preliminary injunction in this case partially preserves the status quo for a carefully defined group of young people who were brought to this country as children, are law-abiding and productive residents, and in many cases know no other home.  *See generally* Supp. App. 14a-15a.  The case is in an interlocutory posture; there is no present conflict on the questions petitioners seek to present; and three other courts of

appeals are already poised to consider the same questions, including in one case on an appeal from a final judgment. In any ordinary case these circumstances would counsel strongly in favor of denying certiorari at this time.

Petitioners argue that this case instead demands "prompt intervention" (Pet. 15), but they cannot explain why that is so. They do not need this Court to enable them to take any urgent action to protect the public. By its terms, the preliminary injunction here allows them to initiate removal proceedings against any individual DACA recipient in the unlikely event that they perceive a need to do so. Pet. App. 66a. And they have never identified any other pressing action that they are barred from taking while this litigation proceeds. For that matter, the President has expressed disbelief that "anybody [would] really want to throw out good, educated and accomplished young people who have jobs, some serving in the military[.]" *Id.* at 64a-65a.

Although petitioners show no need to take any particular blocked action, they allege a sort of dignitary injury in being temporarily forced to continue in part a program that they characterize as "sanctioning an ongoing violation of federal immigration law by nearly 700,000 aliens." Pet. 14; *see id.* at 33. They suggest that they need immediate review by this Court to protect their ability to exercise discretion in "[e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5); *see, e.g.*, Pet. I, 3, 18-20. But these are curious arguments in the context of this case.

For all their rhetorical emphasis on Executive Branch discretion, *see, e.g.*, Pet. I, 14, 16-17, 19, 23, 33-

**AR3646**

34, petitioners did not explain their decision to terminate DACA by saying that they had concluded, as a matter of policy discretion, that the program is a bad idea.[4]  Their memorandum rescinding DACA instead declared that petitioners could not continue the program because it was *unlawful*.  Much of the decision below hinges on that point, both as to reviewability and on the merits.  The court of appeals emphasized, for example, that it "d[id] not hold that DACA *could not* be rescinded as an exercise of Executive Branch discretion."  Supp. App. 57a.  It held only that the rescission could not be sustained on the illegality theory that petitioners proffered to support it.  *Id.*  Despite some hedging for purposes of litigation, the same assertion of illegality remains the core of petitioners' position in this Court.  *See, e.g.*, Pet. I, 14, 16, 24-26, 28-30.

Thus, petitioners do not actually seek a ruling from this Court to protect their ability to exercise discretion.  What they seek is judicial endorsement of their argument that they *lack* discretion to continue the DACA program.  It is not clear how that argument serves any long-term interest of the Executive Branch.  What is clear is that there is no real need for "prompt intervention" (Pet. 15) by this Court to address it.

---

[4]  On the contrary, even their present petition comes close to endorsing the policy underlying the program.  *See* Pet. 16 (professing concern that this litigation will "impede efforts to enact legislation addressing the legitimate policy concerns underlying the DACA policy"); *id.* at 34 (complaining that petitioners have been required to maintain DACA during this litigation, "even while efforts by the President and others to provide a sound legal basis for the policy through the legislative process have failed").

Indeed, petitioners' own actions help make that point. They have never tried to make a case for emergency relief from the preliminary injunctions in this or related cases, as they have in some other litigation. *See, e.g.*, *East Bay Sanctuary Covenant v. Trump*, \_\_\_ F.3d. \_\_\_\_, 2018 WL 6428204 (9th Cir. Dec. 7, 2018) (denying motion for stay). Nor have they withdrawn their termination of DACA based on the program's purported illegality and then sought to take the same action on different grounds. *Compare Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2083 (2017) (*IRAP*). Indeed, when one district court expressly invited petitioners to revisit the matter and at least "better explain [their] view that DACA is unlawful," *NAACP* App. 74a, after 60 days they merely "decline[d] to disturb" their original decision, Pet. App. 121a, while offering "almost no meaningful elaboration," *NAACP* App. 104a.

Under these circumstances, there is no reason for this Court to grant immediate review to address the questions that petitioners seek to present. The status quo under the decision below continues to provide limited but important protection to individual young people as they pursue their lives in this country. The only result of a "timely and definitive" ruling by this Court (Pet. 34) would be either vindication or rejection of petitioners' legal positions on reviewability and on their putative lack of discretion to continue DACA. The State respondents are, of course, prepared to continue litigating those questions if the Court wishes to address them now. But in the absence of any real urgency or any present conflict, the better course would be to allow further consideration of the issues by the lower courts.

AR3648

## II. PETITIONERS' MERITS ARGUMENTS PROVIDE NO REASON FOR REVIEW

Nothing in petitioners' lengthy discussion of the merits (*see* Pet. 17-32) establishes any reason for review in this case at this time.

### A. Reviewability

Petitioners first argue (Pet. 17-22) that their decision to terminate DACA is not subject to judicial review in this case at all, citing the channeling rule for individual removal challenges under 8 U.S.C. § 1252(g) and the "committed to agency discretion by law" provision of 5 U.S.C. § 701(a)(2). Five federal courts, including the court of appeals below, have now rejected these arguments in this precise context. Supp. App. 23a-45a (decision below); Pet. App. 26a-33a (district court below); *Batalla Vidal* App. 24a-39a (E.D.N.Y.); *NAACP* App. 19a-21a, 25a-43a (D.D.C.); *Casa de Md. v. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 769-770 (D. Md. 2018); *cf. Texas v. United States*, 809 F.3d 134, 163-170 (5th Cir. 2015). In the absence of any conflicting decision, there is no reason for review.

1. Section 1252(g) can be addressed briefly. It deals with judicial review of orders of removal, and applies to "any cause or claim" brought "by or on behalf of any alien arising from the decision or action" by federal authorities "to commence proceedings, adjudicate cases, or execute removal orders against any alien[.]" 8 U.S.C. § 1252(g). To begin with, Section 1252(g) cannot apply to claims advanced by the States (or other entity respondents) in this case. Those claims are brought on behalf of the entity plaintiffs themselves, not "by or on behalf of any alien." 8 U.S.C. § 1252(g); *see Texas*, 809 F.3d at 164; *Batalla Vidal* App. 38a-39a.

**AR3649**

In any event, Section 1252(g) by its terms "applies only to three discrete actions:  a '"decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'"  *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482 (1999) (*AADC*) (emphasis omitted).  Petitioners' decision to terminate DACA is not any of those actions.  *See* Supp. App. 42a-45a.  And contrary to petitioners' suggestion (Pet. 21-22), *AADC*'s observation that Section 1252(g) is "designed to give some measure of protection to 'no deferred action' decisions," 525 U.S. at 485, addresses "litigation over *individual* 'no deferred action' decisions," Supp. App. 43a—that is, decisions that were part of the determination "to commence proceedings" against a particular individual.  That observation has no application to "a programmatic shift like the DACA rescission."  *Id.*  No court of appeals—indeed, no court—has held otherwise.[5]

2.  Section 701(a)(2) prohibits judicial review of agency actions that are "committed to agency discretion by law."  This Court has "read the exception in § 701(a)(2) quite narrowly," to give effect to the normal "strong presumption favoring judicial review."  *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, No. 17-71, slip op. 11, 12 (Nov. 27, 2018).  In *Heckler v. Chaney*, 470 U.S. 821, 823, 832 (1985), this Court held that the "decision of an administrative agency to exercise its 'discretion' not to undertake certain enforcement actions" was traditionally committed to agency discretion, and should be treated as "presumptively

---

[5] Petitioners also invoke Section 1252(b)(9).  Pet. 22.  But that provision applies only to claims "arising from an[] action taken or proceeding brought to remove an alien."  8 U.S.C. § 1252(b)(9).  This case does not involve any such action or proceeding.  *See* Supp. App. 45a n.19.

19

unreviewable" under Section 701(a)(2). Petitioners argue that their decision to terminate the DACA program "falls comfortably" under *Chaney*. Pet. 18; *see id.* at 17-21. But that is not correct, for at least two reasons.

a. First, the decision at issue here is not the type of decision addressed by *Chaney*. As the district courts in this case and *Batalla Vidal* have recognized, the action challenged here is a wholesale termination of a general program designed to channel and guide individual deferred action decisions with respect to a broad class of potential recipients. *Chaney*'s presumption against review does not apply to that kind of decision. Pet. App. 26a-30a; *Batalla Vidal* App. 28a-31a. Nor does the termination decision fall into any other category of actions that courts have "traditionally regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993); *see Weyerhaeuser*, slip op. 12; Pet. 17-18. Accordingly, the decision is subject to the normal strong presumption in favor of review.

b. In any event, *Chaney* "explicitly left open the question whether 'a refusal by the agency to institute proceedings based solely on the belief that it lacks jurisdiction' might be reviewable." Supp. App. 25a (quoting *Chaney*, 470 U.S. at 833 n.4). Here, the court of appeals assumed (without deciding) that petitioners' termination of DACA fell within the general "nonenforcement" rule of *Chaney*. *Id.* at 34a n.13. It then explained why the action was still reviewable, because it was based "solely on a belief that DACA was beyond the authority of DHS." *Id.* at 41a; *see id.* at 34a-42a. That analysis is consistent with this Court's cases and with fundamental principles of administrative law.

As the court of appeals explained, many years ago it considered the question reserved in *Chaney* and held

**AR3651**

"that *Chaney*'s presumption of nonreviewability 'may be overcome if the refusal is based solely on the erroneous belief that the agency lacks jurisdiction.'" Supp. App. 27a (quoting *Montana Air Chapter No. 29 v. FLRA*, 898 F.2d 753, 754 (9th Cir. 1990)). More recently, this Court has made clear that an agency's reasoning about "the scope of [its] statutory authority" is the same as a conclusion about "its jurisdiction." *City of Arlington v. FCC*, 569 U.S. 290, 296-297 (2013); *see id.* at 299; Supp. App. 27a-29a; *NAACP* App. 37a. Accordingly, when an "agency's decision is based not on an exercise of discretion, but instead on a belief that any alternative choice was foreclosed by law," Section 701(a)(2) "does not apply." Supp. App. 29a.

That rule makes sense. Section 701(a)(2) excludes from ordinary judicial review only decisions that are "committed to agency discretion by law." When an agency makes a decision on the professed basis that it lacks lawful authority to do otherwise, by definition it is not exercising any discretion that has been committed to it by law. On the contrary, it is asserting that the law has left it with *no* discretion. Such a pure proposition of law is subject to "judicially manageable standards" of review. *Chaney*, 470 U.S. at 830. And judicial review of the agency's conclusion about its lack of authority does not encroach on any administrative prerogative or discretion. If the agency's legal position is correct, its decision will stand. If not, judicial correction of that legal error will empower the agency to make whatever policy judgments Congress intended to commit to its discretion, "free of [any] mistaken legal premise" regarding the scope of its authority. *Negusie v. Holder*, 555 U.S. 511, 516 (2009); *see* Supp. App. 31a.

**AR3652**

Petitioners contend (Pet. 20-21) that such a decision is nonetheless immune from review because of *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 283 (1987) (*BLE*), which rejected the general proposition that any time an "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." *See also* Supp. App. 82a-84a (Owens, J., concurring in the judgment). But *BLE* did not involve a non-enforcement decision subject to *Chaney*, and there is no indication that the Court in *BLE* intended to resolve—or even comment on—the question reserved in *Chaney* concerning decisions based on legal conclusions about agency authority. The passage cited by petitioners observes that when an agency makes a discretionary and traditionally unreviewable decision in a particular case (there, a discretionary refusal to re-open a prior proceeding to consider a renewed merits argument), the decision does not become reviewable simply because the agency chooses to explain how it has exercised its discretion. *See BLE*, 482 U.S. at 283. Nothing about that observation suggests that normal review should be precluded where an agency decision purports to rest on the *non*-discretionary ground that a given action lies beyond the agency's statutory authority. *See also* Supp. App. 29a-31a; *NAACP* App. 38a.

Indeed, judicial review in these circumstances serves the critical function, central to administrative law, of ensuring clear public accountability for government actions. Supp. App. 31a-34a, 78a. When "an agency justifies an action solely with an assertion that the law prohibits any other course, it shifts responsibility for the outcome from the Executive Branch to Congress . . . or the courts." *Id.* at 33a. If the agency is wrong—and if its decision is treated as unreviewable—"then it avoids democratic accountability for a

**AR3653**

choice that was the agency's to make all along." *Id.* That result is antithetical to our system of judicial review of agency action. *See id.* at 32a-34a; *Newman v. Apfel*, 223 F.3d 937, 943 (9th Cir. 2000) (O'Scannlain, J.) ("political accountability" is "the very premise of administrative discretion in all its forms"). As the district court in the *NAACP* case put it, "an official cannot claim that the law ties her hands while at the same time denying the courts' power to unbind her. She may escape political accountability or judicial review, but not both." *NAACP* App. 73a; *see* Supp. App. 33a-34a.

Here, petitioners purported to base the decision to terminate DACA on a legal conclusion that maintaining the program is unlawful. *See* Pet. App. 116a-117a; D.Ct. Dkt. 64-1 at 251; Pet. 14, 28. Although in litigation they sometimes seek to characterize the decision as resting at least in part on more discretionary factors (such as "litigation risk"), *see, e.g.*, Supp. App. 36a; Pet. 33-34, most courts that have reviewed the record have agreed with the court below that this amounts to no more than "post-hoc rationalization," Supp. App. 35a; *see* Pet. App. 55a-57a; *Batalla Vidal* App. 109a-112a. In any event, any "litigation risk" rationale would be "too closely bound up with [petitioners'] evaluation of DACA's legality to trigger *Chaney*'s presumption of unreviewability." *NAACP* App. 41a, 42a; *cf.* Supp. App. 35a n.14. And it remains clear that what petitioners really want the courts—and especially this Court—to endorse is the proposition that they were required to dismantle DACA because it was unlawful from the start. As the lower courts have so far consistently held, that proposition is subject to standard judicial review.

## B. The Preliminary Injunction

Petitioners do not explain why they believe the district court abused its discretion in applying the factors governing issuance of a preliminary injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). They rest entirely on the contention that the lower courts' preliminary assessment of the merits is incorrect. Pet. 17-34. But that merits analysis is sound—and the equitable considerations here overwhelmingly favored the entry and affirmance of provisional relief. *See IRAP*, 137 S. Ct. at 2087.

1. The Administrative Procedure Act requires an agency to "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see* 5 U.S.C. § 706(2)(A). That explanation must be "based on consideration of the relevant factors," and may not "fail[] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 42, 43; *see also Weyerhaeuser*, slip op. 14. Where an agency departs from its prior position, it must supply a "reasoned analysis for the change"—including by "display[ing] awareness that it is changing position," "show[ing] that there are good reasons for the new policy," and explaining why it chose to disregard any "serious reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514, 515 (2009). Where an agency bases its decision on a conclusion of law, the decision "may not stand if the agency has misconceived the law." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (*Chenery I*); Supp. App. 46a-47a.

a. Petitioners' proffered explanation for terminating DACA does not satisfy these requirements. Petitioners decided to end the program on the asserted

ground that it "is unlawful." Pet. 14; *see* Pet. App. 116a-117a. But neither the one-sentence rationale for rescinding DACA offered by the Acting Secretary, *see* Pet. App. 117a, nor the one-page letter from the Attorney General underlying it, *see* D.Ct. Dkt. 64-1 at 251, offers any adequate explanation for that abrupt change in the government's position.

The Attorney General's letter asserted that DACA is "an unconstitutional exercise of authority by the Executive Branch," with "the same . . . constitutional defects that the courts recognized as to DAPA." D.Ct. Dkt. 64-1 at 251. That assertion "is a puzzling one," both because "[t]he Fifth Circuit and district court in *Texas* explicitly declined to address the constitutional issue" in the DAPA litigation, Supp. App. 48a-49a; *see Batalla Vidal* App. 105a-106a; *NAACP* App. 52a-54a, and because the Attorney General ignored a lengthy opinion from his Department's Office of Legal Counsel explaining why programs such as DACA are consistent with constitutional requirements, *see NAACP* App. 52a-53a. The letter also asserted that "DACA was effectuated . . . without proper statutory authority." D.Ct. Dkt. 64-1 at 251. But it did not identify "any statutory provision with which DACA was in conflict," or address any of the material differences between DACA and DAPA that render "the Fifth Circuit's statutory analysis . . . inapposite" in this context. *NAACP* App. 51a; *see also* Supp. App. 51a-55a; *infra* 27.

As the district court in *NAACP* concluded, the "scant legal reasoning" in the rescission memorandum "was insufficient to satisfy the Department's obligation to explain its departure from its prior stated view that DACA was lawful." *NAACP* App. 51a. It left the courts and the public without the ability to "'discern[]'

the 'path' that the agency followed." *Id.* at 53a. That failure "was particularly egregious here in light of the reliance interests involved"—which the rescission memorandum did not acknowledge—on the part of "hundreds of thousands of beneficiaries" who have "structured their education, employment, and other life activities" around the program. *Id.* at 54a; *see* Pet. App. 58a-62a; *Batalla Vidal* App. 113a-117a. Petitioners' refusal to address those legitimate reliance interests rendered their "barebones" explanation "doubly insufficient." *NAACP* App. 55a; *cf. Encino Motorcars LLC v. Navarro*, 136 S. Ct. 2117, 2125-2126 (2016).

These deficiencies are not mere technical flaws. The APA was adopted to ensure that "federal agencies are accountable to the public." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). The reasoned-explanation requirement helps voters to assess whether they agree with the reasons for government action and to exercise their franchise accordingly. When the Executive Branch instead obscures its reasons for taking an important action, or fails to explain an abrupt change in position, it undermines the principles of transparency and political accountability that the APA is designed to protect. *Cf.* Supp. App. 31a-34a.

b. Apart from petitioners' failure to explain their change in position and their decision to terminate DACA, the decision is invalid because it was based on the flawed premise that DACA is unlawful. Congress has charged DHS with "[e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). At the same time, Congress has made choices that leave "the executive agencies charged with immigration enforcement" with inadequate resources to remove everyone "present in this country without authorization." Supp. App. 55a. In light of its

broad statutory authority and that budgetary reality, DHS has routinely employed deferred action and similar forms of discretionary immigration relief—sometimes on an individual basis, and sometimes through programs that channel the agency's discretion with respect to a "class of individuals otherwise eligible for removal." *Id.* at 8a; *see id.* at 8a-14a (reviewing history). Although deferred action "is not expressly grounded in statute," Congress has repeatedly "recognized the existence of deferred action" in INA amendments. *Id.* at 8a-9a. This Court, too, has recognized deferred action as a "regular practice," involving "exercising discretion for humanitarian reasons or simply for" the agency's "own convenience." *AADC*, 525 U.S. at 483-484; *see* Supp. App. 9a. These considerations establish that DACA is "a permissible exercise of executive discretion." Supp. App. 56a; *see also* D.Ct. Dkt. 64-1 at 21 n.8 (OLC opinion). And petitioners "do[] not contest any" of them. Supp. App. 49a.

Instead, petitioners' arguments about DACA's legality focus entirely on the Fifth Circuit's *Texas* decision, which affirmed a preliminary injunction addressing the DAPA program. Pet. 24-25, 28-29; *see* Supp. App. 49a; Pet. App. 113a-115a. But an interlocutory decision by a single court of appeals does not resolve the legality of a federal program—let alone that of a different program not directly before that court. *See, e.g.*, *IRAP*, 137 S. Ct. at 2087 (preliminary injunction is "often dependent as much on the equities of a given case as the substance of the legal issues it presents," and purpose is "not to conclusively determine the rights of the parties"). Nor does the affirmance of such a decision by an equally divided Court. *See Neil v. Biggers*, 409 U.S. 188, 192 (1972).

Moreover, petitioners overreach in contending that the "entirety of the Fifth Circuit's reasoning applies equally to" DACA. Pet. 24. As to procedural validity, for example, the Fifth Circuit concluded that DAPA likely required a notice-and-comment process because it would not be implemented on a truly discretionary basis. *Texas*, 809 F.3d at 171-178. The Fifth Circuit relied on statistics and a declaration from a union representative, both from 2014, suggesting that DACA applications were rarely denied. *Id.* at 172. More recent data show a materially higher denial rate for DACA applications. Supp. App. 51a. And the union representative recently testified that he has no "firsthand" knowledge about the process of reviewing DACA applications and "never" reviewed such an application himself. New Jersey Br. 23, *Texas v. United States*, S.D. Tex. No. 18-cv-68, Dkt. 215 (filed July 21, 2018). None of that recent information was available to the Fifth Circuit when it issued its decision in 2015.

As to substantive validity, the Fifth Circuit reasoned that the Executive Branch lacked authority to operate DAPA "because 'Congress has "directly addressed the precise question at issue."'" Supp. App. 52a (quoting *Texas*, 809 F.3d at 186). But Congress has not acted in any similar manner with respect to the population subject to DACA. *See id.* The Fifth Circuit also focused on the "economic and political magnitude" of DAPA, through which 4.3 million immigrants would have potentially been eligible for deferred action. *Texas*, 809 F.3d at 181. The DACA population, while significant, is much smaller. *See* Supp. App. 54a (689,800 enrollees as of September 2017).

Thus, even if one were to accept the Fifth Circuit's preliminary assessment of the legality of DAPA, it

would not establish that DACA is unlawful.  In any event, for present purposes it is sufficient to observe that the Ninth Circuit applied established principles in holding that DACA is a permissible exercise of executive discretion, and there is no conflict among the courts of appeals on that question.  If some future decision creates such a conflict, this Court will be able to evaluate at that time whether the issue warrants further review.

c. In this litigation, petitioners have also sought to defend their decision to terminate DACA as one based on an assessment of "litigation risk."  *See, e.g.*, Pet. 9.  Even if such a rationale could reasonably be discerned from the rescission memorandum, *but see* Supp. App. 35a, it would be inadequate to support the decision.  While the memorandum notes that Texas had threatened to amend its DAPA lawsuit to add a challenge to DACA, *see* Pet. App. 116a, there is no indication that the agency conducted a reasoned assessment of that threat.  Any such assessment would have considered the availability of possible defenses, both procedural and on the merits.  It also would have balanced any perceived risk against the costs to be inflicted on individual DACA recipients, the States, the federal government, and the overall economy by abruptly abandoning a policy that has allowed nearly three-quarters of a million people to obtain work authorization and other benefits.  Nothing in the memorandum or the proffered administrative record suggests that petitioners took any account of those countervailing considerations.  *See, e.g.*, Pet. App. 57a-62a.

Petitioners' counsel have attempted to supply in litigation some of the reasoning that the rescission memorandum lacks.  They have told the courts that the DAPA rulings created "the inevitable prospect of

an immediate, nationwide injunction against DACA," D.Ct. Dkt. 204 at 1, compelling the Acting Secretary to terminate DACA to avoid a "disruptive, court-imposed," and "imminent judicial invalidation," C.A. Dkt. 31 at 35-36.  But the district court in the DAPA litigation entered a preliminary injunction before that program was ever implemented, preserving the status quo pending further litigation.  In contrast, the threatened suit challenging DACA was to be filed half a decade *after* the program went into effect, when hundreds of thousands of young people had already structured their lives around the program.  The equities in those two situations are profoundly different.  Indeed, after the threatened litigation eventually materialized in May 2018, the same district court *refused* to enter "preliminary" relief, noting the plaintiffs' "nearly six-year" delay in bringing their claims.  *Texas v. United States*, 328 F. Supp. 3d 662, 739 (S.D. Tex. 2018).[6]

d.  Petitioners now repeatedly invoke the memorandum issued in June 2018 by Secretary Nielsen—which "decline[d] to disturb" the September 2017 termination decision (Pet. App. 121a)—in support of their merits positions.  *See* Pet. 13-14, 24-31, 33; Supp. Br. 9-10.  But Nielsen's memorandum cannot be a basis for concluding that the district court in this case abused its discretion by entering a preliminary injunction in January 2018.  In fact, petitioners still have not submitted that memorandum to the district court in this case.  Although petitioners did submit it to the court of appeals, that court correctly recognized that

---

[6] The court did conclude that the plaintiff States "are likely to succeed on the merits" of their challenge to DACA.  328 F. Supp. 3d at 736; *see* Pet. 25.  But it did not reach any final conclusion to that effect, and instead set a deadline for dispositive motions for late 2019 and scheduled a trial on the merits to begin in 2020.

"to the extent the Nielsen memorandum is offered as an additional justification of the original DACA rescission," it is "well-settled that '[courts] will not allow the agency to supply post-hoc rationalizations for its actions . . . .'" Supp. App. 57a-58a n.24. Beyond that observation, the court of appeals properly left "it to the district court in the first instance to determine the admissibility of Secretary Nielsen's [memorandum] . . . and its impact, if any, on this case." *Id.* In light of those circumstances, petitioners' heavy reliance on the Nielsen memorandum only underscores why this would not be a suitable case for the Court to provide a "definitive resolution" (Pet. 34) of their arguments on the merits.

2. Tellingly, petitioners do not address any of the equitable factors of the four-factor preliminary injunction test. *See* Pet. 17-34; *see generally Winter*, 555 U.S. at 20; *IRAP*, 137 S. Ct. at 2087. As the district court found, those factors weigh heavily in favor of provisional relief. Pet. App 62a-66a. The preliminary injunction partially preserves the status quo that existed before September 2017, only for those who had already applied for and received deferred action under DACA. *Id.* at 66a. It preserves petitioners' ability to exercise discretion on an individualized basis for each person who applies for renewal, and to proceed to remove anyone, at any time, on any lawful ground. *Id.* Without the injunction, hundreds of thousands of young Americans would lose their work authorization and deferred action status. That would profoundly damage the individual respondents, the States and the other entity respondents, our educational institutions, our businesses, and the entire Nation. *Id.* at 62a-65a.

**AR3662**

In contrast, the only allegation of injury that petitioners have ever mustered in this case is that the injunction requires them to "sanction[] an ongoing violation of federal immigration law by nearly 700,000 aliens." Pet. 14. But it is hard to credit that as an allegation of serious harm under the circumstances here. Petitioners themselves decided to leave DACA in place for the first seven months of this Administration, long after the decisions in the DAPA litigation. The President previously proclaimed that the policy of his Administration was "to allow the dreamers to stay." D.Ct. Dkt. 121-1 at 285. Petitioners never even tried to argue for a stay of the preliminary injunction in this case (or in *Batalla Vidal*). And even their present petition recognizes "the legitimate policy concerns underlying . . . DACA." Pet. 16. If there is any abstract injury to petitioners from continuing to preserve the status quo while the courts reach a final resolution of this dispute, it is overwhelmed by the concrete injury that DACA recipients would suffer in the absence of that provisional relief.

## C. The Motion to Dismiss

Finally, there is no reason for immediate review of the denial of petitioners' motion to dismiss the due process and equal protection claims advanced by certain respondents. Pet. 30-31. The only due process claim remaining in this case is a narrow challenge to changes in the policy governing the use of DACA recipients' sensitive information. Petitioners argue that they have not changed their policies, or that if they have then they were entitled to do so. Pet. 31. But the courts below concluded that respondents have plausibly alleged to the contrary. Supp. App. 70a; Pet.

App 79a-81a.[7]  The district court did not grant any provisional relief based on this claim, and there is no reason for this Court to review the matter before the claim has been further developed and resolved by the lower courts.

As to equal protection, petitioners assert that the claim raised by some respondents here "is foreclosed by this Court's decision in *AADC*, which imposed a general bar on discriminatory-motive claims in the immigration-enforcement context." Pet. 30.  Petitioners read that decision too broadly.  As the court below concluded, the claim raised here "does not implicate the concerns motivating the Court in *AADC*," such as "inhibiting prosecutorial discretion, allowing continuing violations of immigration law, and impacting foreign relations."  Supp. App. 75a-76a; *see* 525 U.S. at 489-490.  In any event, petitioners will have the ordinary opportunity to demonstrate in the lower courts why the facts surrounding their termination of DACA do not give rise to an equal protection violation.  They offer no persuasive reason why this Court should consider that question now.

---

[7] The district court in Maryland, although otherwise agreeing with petitioners' merits arguments, "enjoin[ed] the Government from using information provided by Dreamers through the DACA program for enforcement purposes."  *Casa de Md.*, 284 F. Supp. 3d at 779, *appeal pending*, 4th Cir. No. 18-1521 (argued Dec. 11, 2018).

## CONCLUSION

The petition for a writ of certiorari should be denied.

Respectfully submitted,

XAVIER BECERRA
  *Attorney General of California*
EDWARD C. DUMONT
  *Solicitor General*
MICHAEL L. NEWMAN
  *Senior Assistant Attorney General*
MICHAEL J. MONGAN
  *Deputy Solicitor General*
SAMUEL P. SIEGEL
  *Associate Deputy Solicitor General*

JANET T. MILLS
  *Attorney General of Maine*
SUSAN P. HERMAN
  *Deputy Attorney General*

BRIAN E. FROSH
  *Attorney General of Maryland*
STEVEN M. SULLIVAN
  *Solicitor General*
LEAH J. TULIN
  *Assistant Attorney General*

LORI SWANSON
  *Attorney General of Minnesota*
JACOB CAMPION
  *Assistant Attorney General*

December 17, 2018

**AR3665**

No. 18-587

## IN THE
# Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
*Petitioners*,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,
*Respondents.*

ON PETITION FOR A WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## BRIEF OF THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, JANET NAPOLITANO, AND THE CITY OF SAN JOSÉ IN OPPOSITION

Jeffrey M. Davidson
David Watnick
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
(415) 591-6000

Charles F. Robinson
Margaret Wu
Sonya Sanchez
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, CA 94607
(510) 987-9800

Robert A. Long
 *Counsel of Record*
Mark H. Lynch
Alexander A. Berengaut
Megan A. Crowley
Ivano M. Ventresca
James O. Strawbridge
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Avenue, NW
Washington, DC 20001
(202) 662-6000

Mónica Ramírez Almadani
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
(424) 332-4800

*Counsel for The Regents of the University of California and Janet Napolitano*

(*Additional Counsel Listed On Signature Page*)

AR3666

## QUESTIONS PRESENTED

1. Whether 8 U.S.C. § 1252(g), which prohibits judicial review of decisions to "commence proceedings, adjudicate cases, or execute removal orders" in individual immigration cases, bars judicial review of a programmatic decision by the Acting Secretary of the Department of Homeland Security to rescind the Deferred Action for Childhood Arrivals (DACA) program.

2. Whether the Acting Secretary's decision to terminate the DACA program based on an assessment of its legality is a decision "committed to agency discretion by law" and therefore immune from judicial review under the Administrative Procedure Act.

3. Whether the district court abused its discretion by issuing a tailored preliminary injunction enjoining aspects of the rescission of DACA pending adjudication on the merits, considering (a) the likelihood that the rescission will be set aside as arbitrary and capricious under the Administrative Procedure Act; (b) the irreparable harm to DACA recipients and Respondents should the program be rescinded; and (c) the absence of countervailing equities given Petitioners' stated support for DACA.

**AR3667**

ii

## TABLE OF CONTENTS

QUESTIONS PRESENTED ........................................ i

TABLE OF CONTENTS ............................................ ii

TABLE OF AUTHORITIES ..................................... iv

INTRODUCTION .................................................... 1

STATEMENT ........................................................... 2

REASONS FOR DENYING THE PETITION ......... 14

I.    Immediate Review Is Not Warranted ........... 14

    A.    The Petition Presents No Legal Issue Warranting This Court's Immediate Review. ............................ 15

    B.    Petitioners Have Not Shown That Immediate Review Is Warranted. ...... 17

II.   The Decision Of The Court Of Appeals Is Correct. ...................................... 24

    A.    The Government Does Not Dispute That Three Of The Four Preliminary Injunction Factors Overwhelmingly Favor Respondents. ....................................... 24

    B.    The Rescission Of DACA Is Subject To Judicial Review ................. 24

AR3668

iii

C.    Respondents Are Likely To Prevail On The Merits Of Their APA Claims. ......................................... 31

CONCLUSION ....................................................... 37

AR3669

iv

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004) ........................................18, 21

*Batalla Vidal v. Duke*,
    295 F. Supp. 3d 127 (E.D.N.Y. 2017) ............16, 28

*Batalla Vidal v. Nielsen*,
    279 F. Supp. 3d 401 (E.D.N.Y.
    2018).. ...................................................................10

*Batalla Vidal v. Nielsen*,
    291 F. Supp. 3d 260 (E.D.N.Y. 2018) .................10

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) .............................................26

*Bowen v. Michigan Acad. of Family
    Physicians*,
    476 U.S. 667 (1986) ........................................26, 27

*Burlington Truck Lines, Inc. v. United
    States*,
    371 U.S. 156 (1962) .............................................35

*Casa de Md. v. DHS*,
    284 F. Supp. 3d 758 (D. Md. 2018) ..........11, 16, 28

*Citizens for Responsibility and Ethics in
    Washington v. FEC*,
    892 F.3d 434 (D.C. Cir. 2018) ........................17, 27

AR3670

v

*Citizens to Preserve Overton Park, Inc.*
  *v. Volpe,*
    401 U.S. 402 (1971) ....................................... 16, 27

*Edison Elec. Inst. v. EPA,*
    996 F.2d 326 (D.C. Cir. 1993) ....................... 17, 27

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) ........................................... 35

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ....................................... 34, 35

*Hamilton-Brown Shoe Co. v. Wolf Bros.*
  *& Co.,*
    240 U.S. 251 (1916) ............................................. 17

*Heckler v. Chaney,*
    470 U.S. 821 (1985) .................................... *passim*

*ICC v. Brotherhood of Locomotive*
  *Engineers,*
    482 U.S. 270 (1987) ............................................. 30

*In re Nielsen,*
    No. 17-3345 (2d Cir. Dec. 27, 2017) ............. 7, 8, 18

*In re United States,*
    875 F.3d 1200 (9th Cir.), *judgment*
    *vacated*, 138 S. Ct. 443 (2017) ........................ 7, 18

*INS v. St. Cyr,*
    533 U.S. 289 (2001) ............................................. 26

*Int'l Union, United Mine Workers of Am.*
  *v. U.S. Dep't of Labor,*
    358 F.3d 40 (D.C. Cir. 2004) ............................... 34

AR3671

vi

*Jennings v. Rodriguez,*
    138 S. Ct. 830 (2018) ............................................. 25

*Mach Mining, LLC v. EEOC,*
    135 S. Ct. 1645 (2015) .......................................... 26

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ................................. 27, 29, 31

*Montana Air Chapter No. 29 v. FLRA,*
    898 F.2d 753 (9th Cir. 1990) ................... 12, 17, 27

*Motor Vehicle Mfrs. Ass'n of the U.S.,*
    *Inc. v. State Farm Mut. Auto. Ins.*
    *Co.,*
    463 U.S. 29 (1983) ................................................ 33

*NAACP v. Trump,*
    298 F. Supp. 3d 209 (D.D.C. 2018) .......... 10, 16, 28

*NAACP v. Trump,*
    315 F. Supp. 3d 457 (D.D.C. 2018) ..................... 11

*NAACP v. Trump,*
    321 F. Supp. 3d 143 (D.D.C. 2018) ..................... 21

*Negusie v. Holder,*
    555 U.S. 511 (2009) ....................................... 26, 31

*Organized Vill. of Kake v. U.S. Dep't of*
    *Agric.,*
    795 F.3d 956 (9th Cir. 2015) (en
    banc) .................................................................. 34

*Reno v. Am.-Arab Anti-Discrimination*
    *Comm.,*
    525 U.S. 471 (1999) ..................................... *passim*

**AR3672**

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943).................................................31

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947).............................................33

*Texas v. United States*,
  328 F. Supp. 3d 662 (S.D. Tex. 2018)......11, 16, 33

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015)...........................6, 32

*Webster v. Doe*,
  486 U.S. 592 (1988)........................................16, 18

*Weyerhaeuser Co. v. U.S. Fish &*
  *Wildlife Serv.*,
  139 S. Ct. 361 (2018)....................................27, 30

**Statutes**

5 U.S.C. § 701(a)(2) ...........................................*passim*

5 U.S.C. § 702 ......................................................26

5 U.S.C. § 706(2)............................................26, 31, 32

6 U.S.C. § 202(5)..................................................2, 31

8 U.S.C. § 1103(a)(1) ................................................7

8 U.S.C. § 1151 note ................................................3

8 U.S.C. § 1154(a)(1)(D)(i)(II)...............................3, 31

8 U.S.C. § 1182(a)(9)(B)-(C) .......................................4

**AR3673**

viii

8 U.S.C. § 1227(d)(2) ............................................3, 31

8 U.S.C. § 1252(g) ............................................ *passim*

**Other Authorities**

8 C.F.R. § 212.5(f) ...........................................4

8 C.F.R. § 274a.12(c)(14) .....................................4

Sup. Ct. R. 10..............................................15, 16, 19

**AR3674**

## INTRODUCTION

Petitioners ask this Court to review the Ninth Circuit's interlocutory order affirming a preliminary injunction directed to the government's decision to rescind the Deferred Action for Childhood Arrivals (DACA) program, and to grant certiorari before judgment in two additional cases. While the importance of the DACA program may warrant this Court's review at an appropriate time, now is not the time.

First, the government has not shown that it is suffering significant harm that warrants immediate review by this Court. The district court's preliminary injunction operates to preserve a status quo that has existed for six years. The government has made an individualized determination that each of the hundreds of thousands of immigrants who currently benefit from DACA does not present a risk of harm to national security or the public, a determination the government remains free to revisit at any time based on new information. If the government were truly concerned about immediate harm caused by the preliminary injunction, the appropriate course would have been to seek a stay, something the government chose not to do.

Second, this case in its current posture is a poor vehicle to resolve the future of the DACA program. The court of appeals' interlocutory decision affirms the grant of a preliminary injunction, and the government has not contested that three of the four preliminary injunction factors—irreparable harm, balance of equities, and public interest—overwhelmingly favor the issuance of an injunction. This case also includes constitutional claims that must be resolved to decide

**AR3675**

this dispute. Review by this Court at this interlocutory juncture would risk being superseded by new facts and evidence, particularly in view of lower court determinations, not addressed by the Ninth Circuit's interlocutory order, that the government has produced an incomplete administrative record.

Third, there is no circuit split. The government seeks review of the only appellate decision to date. Three additional courts of appeals will likely rule on the lawfulness of the DACA rescission in 2019.

Fourth, the government has failed to present a question of law that warrants this Court's review in the absence of a circuit split. Instead, it argues that the Ninth Circuit misapplied established legal standards to the facts of this case.

For these reasons, the Court should deny the petitions for certiorari.

## STATEMENT

1. a. Since 1956, every presidential administration has exercised its authority to set "national immigration enforcement policies and priorities" by adopting deferred action programs that protect certain categories of otherwise removable immigrants from deportation. 6 U.S.C. § 202(5); SER265-66 (summarizing 17 pre-DACA deferred action programs).[1] These programs recognize that the government lacks sufficient

---

[1] "ER" and "SER" refer to the Ninth Circuit Excerpts and Supplemental Excerpts of Record. 18-15068 Ct. App. Dkts. 32-1–32-3; 45–45-5. "Dkt." refers to docket entries in the district court,

3

resources to "enforce all of the [immigration] rules and regulations presently on the books," and that "[i]n some situations, application of the literal letter of the law would simply be unconscionable and would serve no useful purpose." SER1215. The legality of such programs was commonly accepted, none was challenged in court, and Congress recognized deferred action in several amendments to the Immigration and Nationality Act (INA). See, *e.g.*, 8 U.S.C. § 1227(d)(2) (U visa and T visa applicants are eligible for "deferred action"); *id.* § 1154(a)(1)(D)(i)(II) (petitioners under the Violence Against Women Act are eligible for "deferred action and work authorization"); *id.* § 1151 note (certain immediate family members of certain United States citizens "shall be eligible for deferred action").

In 2012, the Department of Homeland Security (DHS) established the DACA program. Pet. App. 97a-101a. Under DACA, "certain young people who were brought to this country as children and know only this country as home" are eligible to apply for discretionary relief from removal if they (1) came to the United States under the age of sixteen; (2) have continuously resided in the United States since June 15, 2007, and were present in the United States on June 15, 2012, and on the date they requested DACA; (3) are in school, have graduated from high school, have obtained a GED, or have been honorably discharged from the United States military or Coast Guard; (4) do not have a significant criminal record and are not a threat to national security or public safety; (5) were

---

*Regents of the University of California v. DHS*, No. 17-cv-5211 (N.D. Cal.). "AR" refers to the administrative record filed by the government in the district court. Dkt. 64-1.

4

under the age of 31 as of June 15, 2012; and (6) do not have lawful immigration status. *Id*. at 97a-98a. Eligible applicants, who are evaluated on a case-by-case basis, are required to provide the government with sensitive personal information, including their home address and fingerprints, submit to a rigorous DHS background check, and pay a substantial application fee. SER1308, SER1325-26, SER1328.

Since 2012, nearly 800,000 young people have received deferred action under DACA, which confers life-changing benefits, including freedom from deportation, to each recipient that complies with the conditions of the program. ER78. Once DACA is granted, recipients may, pursuant to preexisting regulations, obtain employment authorization and social security numbers. See 8 C.F.R. § 274a.12(c)(14); Dkt. 111 at 16. In addition to permitting recipients to work legally—a benefit that has resulted in a 91% employment rate among recipients and permitted DACA recipients to support their families, Dkt. 111 at 23—these documents unlock access to other important benefits, including driver's licenses, medical insurance, and tuition benefits. See *id*. at 17. Moreover, DACA recipients do not accrue "unlawful presence" for purposes of the INA's re-entry bars, see 8 U.S.C. § 1182(a)(9)(B)-(C), and receive favorable consideration for advance parole, allowing them to lawfully travel abroad and return to the United States, see 8 C.F.R. § 212.5(f).

b. Prior to September 2017, when the government announced its decision to rescind DACA, no court had deemed DACA unlawful and the government consistently had defended the legality of the program. In a

**AR3678**

5

2014 opinion that has not been withdrawn, the Office of Legal Counsel memorialized the advice it provided prior to the promulgation of DACA "that such a program would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis." AR21 n.8. The government argued in the courts that DACA was "a valid exercise of the Secretary's broad authority and discretion to set policies for enforcing the immigration laws." Br. of United States as Amicus Curiae in Support of Appellees at *1, *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017) (No. 15-15307), 2015 WL 5120846.

In February 2017, then-Secretary of Homeland Security Kelly issued a memorandum reordering DHS's enforcement priorities but maintaining DACA unchanged. AR230. Secretary Kelly characterized "DACA status" as a "commitment * * * by the government towards the DACA person." SER1334. In June 2017, Administration officials, including then-Attorney General Sessions, began communicating with several state attorneys general who had challenged a different deferred action program, which never went into effect, known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). SER1442-43. Those discussions culminated in a June 29, 2017 letter, from ten states to Attorney General Sessions, demanding that the government "phase out the DACA program" by September 5, 2017, or else they would seek to amend their DAPA lawsuit to also challenge DACA. AR239.

On September 4, 2017, Attorney General Sessions sent a half-page letter to then-DHS Acting Secretary

**AR3679**

6

Duke, advising that DHS "should rescind" DACA because it was "effectuated * * * without proper statutory authority" and "was an unconstitutional exercise of authority by the Executive Branch." AR251. The letter stated, in conclusory fashion, that DACA "has the same legal and constitutional defects" as the DAPA program, which had been preliminarily enjoined in a decision affirmed by the Fifth Circuit in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016). But because the *Texas* plaintiffs had challenged only DAPA, the Fifth Circuit did not address the legality of the original DACA program.[2] *Ibid.* It is unclear what "constitutional defects" the Attorney General was referring to, since neither *Texas* nor any other case has ever found any deferred action program unconstitutional.

The next day, Acting Secretary Duke issued a short memorandum formally rescinding DACA. The rescission memorandum instructed DHS immediately to stop accepting new DACA applications; immediately to stop accepting advance parole applications; to accept renewal applications only from individuals whose deferred action would expire before March 5, 2018, and only through October 5, 2017; and thereby to cause DACA grants to expire on a rolling basis beginning March 5, 2018. Pet. App. 117a-118a. The memorandum contained a single sentence of analysis: "Taking into consideration the Supreme Court's and

---

[2] The DAPA program included certain expansions of DACA, which were not specifically addressed in *Texas*. Pet. Supp. App. 55a.

the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017, letter from the Attorney General, it is clear that the June 15, 2012, DACA program should be terminated." *Id.* at 117a.[3]

2. The University of California, four states, and other Respondents brought actions in the Northern District of California alleging that the Acting Secretary's decision to rescind DACA was unlawful on several grounds, including that the rescission was arbitrary and capricious under the Administrative Procedure Act (APA). Pet. App. 19a-22a. Respondents also challenged the constitutionality of the rescission on due process and equal protection grounds. *Id.* at 22a.

The parties agreed that the government would move swiftly to produce the administrative record. Dkt. 52-1 at 17-18. On October 6, 2017, the government produced a record consisting of 14 publicly-available documents totaling 256 pages, 187 of which consist of court decisions. See Dkt. 64-1. The Ninth and Second Circuits have held that this record is likely incomplete. For example, it excludes communications between the government and the state attorneys general whose litigation threat purportedly required the rescission of DACA. See, *e.g.*, Dkt. 79; *In re United States*, 875 F.3d 1200, 1205 (9th Cir.), *judgment vacated*, 138 S. Ct. 443 (2017) (ordering record issues to be deferred while district court resolved the government's threshold justiciability arguments); *In*

---

[3] See 8 U.S.C. § 1103(a)(1) (providing that, with respect to the INA, the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling" on DHS).

8

*re Nielsen*, No. 17-3345, slip op. at 2-3 (2d Cir. Dec. 27, 2017).

Petitioners moved to dismiss all five complaints under Rule 12(b)(1) and (6). Pet. App. 26a, 72a. Respondents opposed the motion to dismiss and moved for a preliminary injunction on their APA claims. *See* Dkt. 111 at 10; Dkt. 205.

On January 9, 2018, the district court granted in part and denied in part the government's Rule 12(b)(1) motion and granted in part Respondents' motion for a preliminary injunction. Pet. App. 66a-69a. The court held that Respondents had demonstrated a likelihood of success on their claim that the rescission was arbitrary and capricious, *id.* at 54a, 63a, and satisfied the remaining factors for preliminary injunctive relief, including irreparable harm. *Id.* at 62a-66a. The court relied on Respondents' undisputed evidence of irreparable harm, including their showing that rescission will:

- threaten almost two hundred thousand U.S.-citizen children with the deportation of their parents, see SER1155;

- cause an average of 1,400 DACA recipients to lose their jobs each business day, SER1459;

- and force tens of thousands of DACA recipient undergraduate and graduate students to discontinue their studies for lack of support, including approximately 1,700 at the University of California alone, SER365-69, SER1152-53.

**AR3682**

9

The court's injunction required the government to "allow[] DACA enrollees to renew their enrollments" under the terms applicable prior to the rescission. Pet. App. 66a. For "each renewal application," the district court permitted the government to "take administrative steps to make sure fair discretion is exercised on an individualized basis." *Ibid*. The court's order did not prohibit DHS "from proceeding to remove any individual, including any DACA enrollee, who it determines poses a risk to national security or public safety, or otherwise deserves, in its judgment, to be removed." *Ibid*. The court did not require DHS to process DACA applications from individuals who had not previously received deferred action or to permit advance parole. *Ibid*.

The district court also granted in part and denied in part the government's Rule 12(b)(6) motion, sustaining Respondents' substantive APA and equal protection claims. *Id.* at 71a-90a.

3. The government appealed the court's orders, and the Ninth Circuit ordered expedited briefing. 18-15068 Ct. App. Dkt. 21.

4. On January 18, 2018, the government filed a petition for a writ of certiorari before judgment, seeking review of the district court's orders. On February 26, 2018, the Court denied the petition. 138 S. Ct. 1182. After agreeing to expedite the case, the Ninth Circuit heard oral argument on May 15, 2018.

5. Meanwhile, similar challenges to the rescission of DACA proceeded in other courts. On February 13, 2018, the District Court for the Eastern District of New York preliminarily enjoined the rescission of

**AR3683**

10

DACA in an order that tracks the terms of the *Regents* injunction. *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 437-38 (E.D.N.Y. 2018); see also *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 268 (E.D.N.Y. 2018). The parties appealed to the Second Circuit, where briefing is complete and oral argument is scheduled for January 25, 2019. See *Batalla Vidal v. Nielsen*, No. 18-485, Dkt. 588 (2d Cir. Dec. 12, 2018).

6. In April 2018, the District Court for the District of Columbia granted partial summary judgment against the government and vacated the rescission of DACA, holding that it violated the APA's substantive requirements. *NAACP v. Trump*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018). The court stayed its order for 90 days to give DHS the opportunity to "issue[] a new decision rescinding DACA." *NAACP v. Trump*, No. 17-cv-01907, Dkt. 22 (D.D.C. Apr. 24, 2018).

In response, DHS Secretary Nielsen issued on June 22, 2018, a memorandum "declin[ing] to disturb the Duke memorandum's rescission of the DACA policy." Pet. App. 121a. The memorandum purported to "reflect[] [Secretary Nielsen's] understanding of the Duke memorandum" and to offer "further explanation" of the rescission of DACA. *Ibid*. Secretary Nielsen stated, among other things, that: she was bound by the Attorney General's conclusion that DACA was unlawful; there were "serious doubts" about DACA's legality in any event; and "considering the fact that tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years, * * * it is critically important for DHS to project a message that leaves no doubt regarding the clear,

**AR3684**

11

consistent, and transparent enforcement of the immi-
gration laws." *Id.* at 122a-124a. The memorandum did
not purport to be a new decision and did not include
an administrative record. In notifying the Ninth Cir-
cuit of the memo, the government claimed that it pro-
vided additional reasons for the rescission but did not
argue that it was a new agency action distinct from
the initial rescission memo. 18-15068 Ct. App. Dkt.
184.

On August 3, 2018, the *NAACP* court concluded
the Nielsen memo did not alter the court's earlier con-
clusions. *NAACP v. Trump*, 315 F. Supp. 3d 457, 464-
73 (D.D.C. 2018). The government then appealed to
the D.C. Circuit. Briefing will be completed by Janu-
ary 22, 2019. See *NAACP v. Trump*, No. 18-5243, Doc.
1756433 (D.C. Cir. Oct. 22, 2018).[4]

7. While the *Regents* appeals were pending, the
government on October 17, 2018, submitted a letter to
the Ninth Circuit stating that it "intend[ed] to again

---

[4] On March 5, 2018, the United States District Court for the Dis-
trict of Maryland concluded the plaintiffs' claims in that case
were justiciable, but held that the claims failed on the merits.
*Casa de Md. v. DHS*, 284 F. Supp. 3d 758, 770-79 (D. Md. 2018),
*appeal docketed*, No. 18-1521 (4th Cir. May 8, 2018). The Fourth
Circuit held oral argument in that case on December 11, 2018.

Separately, certain states that had earlier challenged DAPA
moved for a preliminary injunction enjoining DACA before the
*Texas* district court. Despite finding that the plaintiffs were
likely to succeed on the merits, the *Texas* court held that the
plaintiffs' long delay bringing suit precluded them from estab-
lishing irreparable harm. *Texas v. United States*, 328 F. Supp. 3d
662, 736-42 (S.D. Tex. 2018). Likewise, the court held that the
public interest and the hardships an injunction would cause to
DACA recipients weighed in favor of preserving the status quo.
*Id.* at 740-42.

12

petition the Supreme Court for a writ of certiorari before judgment * * * in the event that [the Ninth Circuit] d[id] not issue its judgment by Wednesday, October 31." 18-15068 Ct. App. Dkt. 198 at 1. On November 5, 2018, the government filed a second petition for certiorari before judgment, and simultaneously sought certiorari before judgment in the *NAACP* and *Batalla Vidal* cases.

8. On November 8, 2018, the Ninth Circuit issued an opinion affirming the *Regents* preliminary injunction and the related orders granting in part and denying in part the government's motion to dismiss. Pet. Supp. App. 1a-87a.

The court first considered whether the rescission is exempt from judicial review as a decision "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). The court held the rescission is subject to review under the APA because it was based solely on a non-discretionary legal determination, namely, "a belief that DACA was beyond the authority of DHS." Applying Supreme Court and Ninth Circuit precedent, the court held that administrative decisions premised "on a belief that any alternative choice was foreclosed by law" are not "committed to agency discretion." Pet. Supp. App. 29a-42a (citing *Heckler v. Chaney*, 470 U.S. 821, 853 n.4 (1985); *Montana Air Chapter No. 29 v. FLRA*, 898 F.2d 753, 754 (9th Cir. 1990)). Next, the court concluded that 8 U.S.C. § 1252(g) presents no obstacle to review because the rescission was not one of three discrete actions—"to commence proceedings, adjudicate cases, or execute removal orders"—carved out from review by that section of the INA. *Id.* at 42a-45a (citing *Reno v. Am.-*

**AR3686**

13

*Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 940 (1999) (*AADC*)).

The court then held that Respondents are likely to succeed on the merits of their APA claims, because DACA is "a permissible exercise of executive discretion" that does not run afoul of the INA, and "where an agency purports to act solely on the basis that a certain result is legally required, and that legal premise turns out to be incorrect, the action must be set aside." *Id.* at 46a, 56a-57a. The Court made "clear" that it was "not hold[ing] that DACA *could not* be rescinded as an exercise of Executive Branch discretion," but only that the legal grounds identified by the agency were erroneous. *Id.* at 57a. Because the government did not contest the district court's holdings that the risk of irreparable harm to plaintiffs, the balance of hardships, and the public interest all favored a preliminary injunction, the court did not review those holdings. *Id.* at 45a-46a.

The court of appeals concluded that the district court acted within its discretion by enjoining DHS from implementing certain aspects of the rescission, as such relief "is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress." *Id.* at 58a-60a.

The court of appeals also affirmed the other district court rulings under review, including its denial of the government's motion to dismiss plaintiffs' equal protection claims, holding that "the likelihood of success on plaintiffs' equal protection claim is a second,

AR3687

14

alternative ground for affirming the entry of the injunction." *Id.* at 61a-77a & n.31.

Judge Owens concurred in the judgment, concluding that the preliminary injunction should be affirmed on equal protection grounds. *Id.* at 84a-87a; see *id.* at 85a ("the record assembled at this early stage is promising"). Judge Owens disagreed with the majority's holding that the rescission was reviewable as to the APA claims, in part because he understood there to be a difference between challenges to the "procedures the agency used" and challenges under *Chevron*. See *id.* at 82a.

9. On November 19, 2018, Petitioners filed a supplemental brief making additional arguments based on the Ninth Circuit's opinion.

**REASONS FOR DENYING THE PETITION**

**I.  Immediate Review Is Not Warranted.**

The government's petition for certiorari is its latest effort to truncate the ordinary process for judicial review of agency action. The government has not shown that it will suffer significant harm if the petition is denied. Nor can the government plausibly assert such harm, given that it has never sought a stay in any court.

The government's decision to end the DACA program is a matter of life-changing importance to hundreds of thousands of individuals who participate in the program. Consequently, this case may warrant review by this Court at an appropriate time. However, the government's latest request for immediate review

**AR3688**

15

is unwarranted. The Ninth Circuit's decision is pre-
liminary and interlocutory, and does not address all
the issues in the case. It would thus be extremely dif-
ficult, and likely impossible, for this Court to fully re-
solve the litigation at this stage of the proceedings. In
addition, the Court would benefit from allowing the
issues to be considered by the D.C., Second, and
Fourth Circuits, each of which has heard, or will
shortly hear, argument in a pending appeal. Because
the government has not demonstrated a "compelling
reason[ ]" for immediate review, see Sup. Ct. R. 10, the
petition should be denied.

**A. The Petition Presents No Legal Issue War-
ranting This Court's Immediate Review.**

The questions presented by the petition—consid-
ered purely as legal issues and without regard to the
importance of DACA itself—do not warrant this
Court's review. There is no conflict in the circuits on
the questions presented by the petition, and the gov-
ernment does not allege one. And the questions do not
merit this Court's review in the absence of a circuit
split.

1. The government contends that its decision to
end DACA is insulated from judicial review by two
statutory provisions, 8 U.S.C. § 1252(g) and 5 U.S.C.
§ 701(a)(2). Neither provision presents a legal issue
worthy of this Court's review.

This Court has already interpreted 8 U.S.C.
§ 1252(g) and held that it bars review of only "three
discrete actions"—decisions to "commence proceed-
ings, adjudicate cases, or execute removal orders."
*AADC*, 525 U.S. at 482. This Court rarely reconsiders

**AR3689**

16

its decisions interpreting statutory provisions, and the government does not ask the Court to reconsider *AADC*. Every court to consider the issue has concluded that section 1252(g) does not preclude judicial review here because the rescission of DACA is not one of the "three discrete actions" covered by that section. Pet. App. 31a-33a; Pet. Supp. App. 42a-45a; *NAACP*, 298 F. Supp. 3d at 223-24; *Casa de Md.*, 284 F. Supp. 3d at 769-70; *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 152-54 (E.D.N.Y. 2017). The lower courts' unanimous application of section 1252(g) to a specific situation does not warrant further review. See Sup. Ct. R. 10 (review is "rarely granted" to consider an argument that the lower court misapplied "a properly stated rule of law").

This Court has also interpreted the "committed to agency discretion by law" language of 5 U.S.C. § 701(a)(2) in multiple cases. See *Webster v. Doe*, 486 U.S. 592, 599-601 (1988); *Chaney*, 470 U.S. at 830; *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410-14 (1971). Once again, the government does not contend that the Court's decisions interpreting this statutory provision are flawed or in need of reconsideration. And once again, every court to consider the issue has reached the same conclusion. See, *e.g.*, Pet. App. 26a-30a; Pet. Supp. App. 23a-42a; *NAACP*, 298 F. Supp. 3d at 226-34; *Casa de Md.*, 284 F. Supp. 3d at 769-70; *Batalla Vidal*, 295 F. Supp. 3d at 147-52; cf. *Texas*, 328 F. Supp. 3d at 706-09. As noted above, an argument that the lower courts have misapplied a legal standard is "rarely" an occasion for Supreme Court review. Sup. Ct. R. 10.

17

2. There is also widespread agreement in the lower courts that an agency's determination that it is legally foreclosed from taking a specified action—like the government's determination that it lacked the authority to continue DACA—is subject to judicial review. See, *e.g.*, *Citizens for Responsibility and Ethics in Washington v. FEC*, 892 F.3d 434, 441 n.11 (D.C. Cir. 2018); *Montana Air*, 898 F.2d at 755; *Edison Elec. Inst. v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993); see also *Chaney*, 470 U.S. at 833 n.4 (distinguishing agency actions based on unreviewable discretion from an agency action "based solely on the belief that it lacks jurisdiction").

In sum, the questions presented by the petition, considered as legal issues apart from the importance of the DACA program itself, do not warrant this Court's review.

## B. Petitioners Have Not Shown That Immediate Review Is Warranted.

Although the importance of DACA to the hundreds of thousands of individuals who participate in the program may warrant this Court's eventual review of the government's rescission of the program, immediate review is not warranted.

1. The Ninth Circuit's decision affirming the district court's entry of a preliminary injunction is interlocutory, which ordinarily weighs against immediate review by this Court. See *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 258 (1916). Moreover, the decision to grant or deny a preliminary injunction is reviewed only for an abuse of discretion, which

18

could complicate this Court's review of the legal questions presented. See *Ashcroft v. ACLU*, 542 U.S. 656, 664-65 (2004). In addition, the Court would benefit from allowing the issues to be considered by the D.C., Second, and Fourth Circuits, each of which has heard, or will shortly hear, oral argument.

2. Immediate review by this Court also is unlikely to end the litigation. *First*, there is no dispute that Respondents' constitutional claims are subject to judicial review. *See Webster*, 486 U.S. at 601-05. The court of appeals held that the equal protection claims could proceed beyond the pleadings stage and form an alternative basis for the injunction. Pet. Supp. App. 77a n.31. Thus, even if the Court were to grant the petition and hold that the APA claims are not subject to judicial review, the constitutional claims would remain to be decided.

*Second*, multiple courts have held that the administrative record is likely incomplete. See, *e.g.*, *In re United States*, 875 F.3d at 1205-07; *In re Nielsen*, No. 17-3345, slip op. at 2-3. A ruling based on the current administrative record could be overtaken by additional material added to the record at a later stage of the case. For example, a ruling accepting the government's purported "litigation risk" rationale for rescinding DACA could become untenable if further factual development revealed that the rescission was actually a pretextual effort to gain leverage in negotiations with Congress or was based on racial animus. See Pet. App. 64a ("These theories deserve the benefit of the full administrative record.").

**AR3692**

19

*Third*, neither the district court nor the court of appeals substantively considered Secretary Nielsen's post-hoc memorandum. That memorandum was issued months after the district court issued the preliminary injunction, in response to a different court's order, and after this case was fully briefed and argued to the court of appeals. To the extent Secretary Nielsen's post-hoc memorandum merits consideration, this case is a poor vehicle for considering it. To get around this problem, the government asks the Court to grant certiorari before judgment in *NAACP*. But certiorari before judgment is a truly extraordinary step, and the government has not shown that it is warranted, particularly given that the memorandum consists of post-hoc rationalizations. *See* pp. 35-36 *infra*.

3. The government devotes more than three-quarters of its statement of reasons why the petition should be granted to an argument that the decisions below are incorrect. *See* Pet. 17-31. But as already noted, this Court "rarely" grants review—let alone accelerated, interlocutory review—merely to correct a legal error. Sup. Ct. R. 10. Moreover, the court of appeals' rulings are correct. See pp. 23-36 *infra*.

The government's petition devotes a scant two pages to the argument that immediate review is warranted at this interlocutory stage and prior to decisions by several other courts of appeals where DACA cases are pending. See Pet. 15-17. It asserts that review is "necessary to obtain an appropriately prompt resolution of this important dispute," *id.* at 16, but fails to demonstrate that this is so. Indeed, the government does not advance any of the reasons most likely to justify immediate review by this Court.

20

*First*, the government does not contend that continuing the DACA program creates a national security risk or a risk to the public. That is because DACA is limited to individuals who were brought to the United States as children, have lived here continually for a significant period of time, and have not committed any serious criminal offenses. Pet. App. 97a-98a. For each individual DACA recipient, the government has made a decision, based on a detailed background check, not to pursue removal. Because DACA status must be renewed every two years, this very Administration has made that individualized decision for almost every DACA recipient. In addition, the government is entirely free to take action against any DACA recipient it believes endangers national security or the public. *Id.* at 66a.

*Second*, the government does not assert that it wants to immediately begin deporting DACA recipients. To the contrary, the Administration has stated that it does not think DACA recipients should be deported. See Pet. App. 64a-65a ("In September, President Trump stated his support for DACA, tweeting: 'Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really! . . . .'"). The government is therefore in the unusual position of seeking this Court's review of a court of appeals' decision authorizing the government to maintain a program that it favors as a policy matter.

*Third*, the government does not challenge the lower courts' findings that DACA recipients will suffer severe and irreparable harm. Nor does it challenge the courts' findings that the balance of hardships and

**AR3694**

21

the public interest tip sharply in favor of DACA recipients and against the government. Pet. App. 64a-66a. These lopsided and unchallenged preliminary injunction factors weigh against a discretionary decision to grant accelerated interlocutory review. See *Ashcroft*, 542 U.S. at 664-65.

*Finally*, Petitioners' failure to seek a stay provides an additional reason to deny their request for interlocutory review by this Court. Petitioners have not sought a stay of the present injunction from the district court, the Ninth Circuit, or this Court, nor of the similar injunctions and judgments from the New York and D.C. district courts.[5] Indeed, when Petitioners previously sought certiorari before judgment, they committed *not* to seek a stay in order to "avoid the disruptive effects on all parties of abrupt shifts in the enforcement of the Nation's immigration laws." Pet. 12-13, *DHS v. Regents of Univ. of Cal.*, No. 17-1003 (U.S. 2018); see also Dkt. 243 at 4.

It is unsurprising that Petitioners have not sought a stay, which would have required demonstrating irreparable harm in the absence of a stay, and showing that the balance of hardships favors a stay. See Pet. App. 62a-66a. They cannot satisfy those standards, not least because the preliminary injunction main-

---

[5] Petitioners initially moved for a stay of the *NAACP* order, or, in the alternative, a stay to the extent the order went beyond the *Regents* preliminary injunction. *NAACP v. Trump*, 321 F. Supp. 3d 143, 145-46 (D.D.C. 2018). The district court agreed to "stay its order as to new DACA applications and applications for advance parole, but not as to renewal applications." *Ibid.* Petitioners have not sought a stay before the D.C. Circuit.

22

tains a status quo that has existed for six years—including the period following this administration's affirmative decision to continue the DACA program in February 2017. AR230. Consequently, Petitioners cannot articulate any concrete harm, let alone irreparable harm, from allowing these cases to proceed in an orderly fashion.

4. The government asserts that it should not be "required to retain a discretionary non-enforcement policy that * * * is unlawful and that sanctions the ongoing violation of federal law by more than half a million people." Pet. 16. Given the government's professed support for the objectives of the DACA program, it is unclear how this is a cognizable harm. Ordinarily, a court of appeals' decision affirming the government's authority to implement a discretionary deferred action program would be regarded as beneficial to the government.

Indeed, the lower court rulings effectively expand, rather than contract, the scope of executive power. Those courts ruled that DACA is lawful, thereby relieving the government of a perceived legal constraint. This case therefore presents an unusual situation in which the government is seeking accelerated review of a lower court ruling that enlarges the scope of the agency's authority.

In any event, the preliminary injunction does not "require" the government to retain the DACA program in all circumstances. If the government believes it has non-arbitrary grounds for rescinding DACA, it could issue a new decision concerning the future of the

23

DACA program at any time and submit that new agency action for review to the district courts.

Moreover, neither the preliminary injunction nor the DACA program itself "sanctions" violations of federal law. DACA is a non-enforcement program. It expressly states that it does not grant legal status to DACA recipients. Pet. App. 101a. An agency's decision not to enforce the law is not the same as "sanctioning" a violation of the law.

Finally, the government suggests that this Court's intervention will facilitate action by Congress. The government offers no support for this speculative assertion. A decision by this Court to grant review could have the effect of freezing possible congressional action rather than facilitating it. And to the extent the Administration is seeking immediate review by this Court in order to strengthen its hand in negotiations with Congress, the Court should be cautious about injecting itself into discussions between the political branches. At a minimum, this is not a persuasive reason to grant immediate review.

For all of these reasons, the government has not shown that immediate review is warranted. Accordingly, the Court should deny the petitions for immediate review without prejudice to the right of any party to seek this Court's review at a later stage of the litigation.

**AR3697**

24

## II. The Decision Of The Court Of Appeals Is Correct.

The court of appeals' decision is also correct.

### A. The Government Does Not Dispute That Three Of The Four Preliminary Injunction Factors Overwhelmingly Favor Respondents.

Petitioners do not challenge the district court's determinations that three of the four preliminary injunction factors—risk of irreparable harm, balance of hardships, and the public interest—overwhelmingly favor a preliminary injunction. Without a preliminary injunction, hundreds of thousands of DACA recipients will face devastating, life-changing harm, including loss of employment and educational opportunities, and possible exile from the country in which they have lived since they were children. At the same time, a preliminary injunction inflicts no substantial harm on Petitioners, who have expressed support for DACA, who have never sought to stay the injunction, and who may remove any individual who "poses a risk to national security or public safety, or otherwise deserves, in [their] judgment, to be removed." Pet. App. 66a.

### B. The Rescission Of DACA Is Subject To Judicial Review.

The government argues that courts are powerless to review its decision to rescind the DACA program. It claims that judicial review is precluded by the INA in 8 U.S.C. § 1252(g) and by the APA in 5 U.S.C. § 701(a)(2). Neither provision applies, as the Ninth

**AR3698**

25

Circuit and all four other courts to examine this question have found.

1. The Ninth Circuit correctly concluded that section 1252(g) does not preclude review. Pet. Supp. App. 42a-45a. This Court has interpreted this provision as "appl[ying] only to three discrete actions that the [Secretary] may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *AADC*, 525 U.S. at 482 (quoting section 1252(g)); see also *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (plurality opinion) (same). Because Respondents' claims do not challenge any of these enumerated actions, section 1252(g) does not apply.

Petitioners seek to resurrect the broader reading of section 1252(g) that this Court rejected in *AADC*. They assert that the rescission is unreviewable because it is "part of the process by which [the alien's] removability will be determined." Pet. 22 (quoting *Jennings*, 138 S. Ct. at 841). Even if the rescission were a "part of the process" for determining removability—a dubious assertion, since rescinding DACA does not trigger or even suggest the removal of any particular immigrant—section 1252(g) would not bar review. This Court in *AADC* rejected a similar argument, observing that actions such as opening an investigation—surely a "part of the process" for determining removability—would not come within section 1252(g)'s bar. *AADC*, 525 U.S. at 482; see also *Jennings*, 138 S. Ct. at 841 ("We did not interpret this language [in section 1252(g)] to sweep in any claim that can technically be said to 'arise from' the three listed actions of the [Secretary].").

**AR3699**

26

2. a. The Ninth Circuit also correctly held that the APA permits judicial review here. The APA "manifests a congressional intention that it cover a broad spectrum of administrative actions." *Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988) (citation omitted). Congress "ordinarily intends that there be judicial review" of agency action because "'[t]he statutes of Congress are not merely advisory when they relate to administrative agencies.'" *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 671 (1986) (quoting H.R. Rep. No. 79-1980, at 41 (1946)). The APA thus provides that "[a] person suffering legal wrong because of agency action * * * is entitled to judicial review thereof." 5 U.S.C. § 702; see *id.* § 704.

Consistent with Congress's intent, this Court applies a "strong presumption favoring judicial review of administrative action," which the government "bears a heavy burden" to overcome. *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015) (internal quotation marks omitted). This strong presumption applies equally in the immigration context. See *INS v. St. Cyr*, 533 U.S. 289, 298-99 (2001).

The presumption of judicial review applies when an agency believes its action is compelled by statute. *See* 5 U.S.C. § 706(2) (courts shall "set aside agency action" that is "not in accordance with law"). This Court has recognized that it is the role of the Judiciary to evaluate an agency's claims that Congress has required it to act, or refrain from acting. See *Negusie v. Holder*, 555 U.S. 511, 516 (2009) (remanding because the Board of Immigration Appeals denied relief based on an incorrect reading of Supreme Court precedent);

**AR3700**

27

*Massachusetts v. EPA*, 549 U.S. 497, 528 (2007) (reviewing the EPA's conclusion that it lacked statutory authority to regulate greenhouse gas emissions from new motor vehicles).

Recognizing that courts are the ultimate arbiters of the scope of agency authority, the courts of appeals have long held that agency action is reviewable where it is based on an agency's interpretation of a statute. See, *e.g.*, *Montana Air*, 898 F.2d at 757 ("Nothing in the Administrative Procedure Act * * * precludes review of a proper plaintiff's timely challenge of an agency's announcement of its interpretation of a statute."); *Edison Elec.*, 996 F.2d at 333 (holding agency's "Enforcement Policy Statement" reviewable because its "interpretation has to do with the substantive requirements of the law"); *Citizens for Responsibility & Ethics*, 892 F.3d at 441 n.11 ("[I]f the Commission declines to bring an enforcement action on the basis of its interpretation of [the relevant statute], the Commission's decision is subject to judicial review to determine whether it is 'contrary to law.'").

Because judicial review of agency action is the rule, "nonreviewability" is "an exception which must be demonstrated." *Bowen*, 476 U.S. at 672 n.3. One such "very narrow" exception that applies only in "rare instances," *Overton Park*, 401 U.S. at 410, is for actions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2); see also *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) ("to honor the presumption of review, we have read the exception in §701(a)(2) quite narrowly"). To escape judicial review, an agency action must be one for which a court "would have no meaningful standard against

28

which to judge the agency's exercise of discretion," *i.e.*, where there is "no law to apply." *Chaney*, 470 U.S. at 830. So long as there is "law to apply," the default rule of judicial review remains in force.

b. The government's position here is contrary to well-established precedent and the foundational principles of judicial review under the APA. The Acting Secretary of DHS rescinded DACA based on the Attorney General's conclusion that DACA was created "without proper statutory authority" and "was an unconstitutional exercise of authority by the Executive Branch." AR251. The government nonetheless asserts that its action was "committed to agency discretion" and is thus unreviewable.

Thus far, the courts have unanimously rejected the government's argument that this "narrow" exception to judicial review bars review of the rescission. See, *e.g.*, Pet. Supp. App. 23a-42a; *NAACP*, 298 F. Supp. 3d at 226-34; *Casa de Md.*, 284 F. Supp. 3d at 769-70; *Batalla Vidal*, 295 F. Supp. 3d at 147-52. The Ninth Circuit explained that the reviewability of the rescission "follows necessarily from existing doctrine" in this Court and the courts of appeals. Pet. Supp. App. 31a. There is plainly "law to apply," *Chaney*, 470 U.S. at 830, because the rescission rested upon the legal conclusion that DACA was unlawful. See Pet. Supp. App. 35a-42a.[6]

---

[6] The Ninth Circuit properly rejected the government's inapposite comparison of the rescission of the DACA program to a prosecutor's individualized decision not to institute criminal proceed-

29

c. The government's reliance on this Court's decision in *Chaney* is misplaced because, in that case, the agency had not "refus[ed] * * * to institute proceedings based solely on the belief that it lack[ed] jurisdiction." 470 U.S. at 833 n.4. Here, the Acting Secretary's decision to rescind DACA fits comfortably within *Chaney*'s footnote 4, as the rescission was based on the conclusion that DHS lacked power to continue DACA. See Pet. Supp. App. 24a-31a.

*Chaney* also focused on an agency's refusal to take an individual "requested enforcement action," 470 U.S. at 831, not the creation or rescission of a program. See Pet. Supp. App. 34a-35a n.13 ("Nowhere does [*Chaney*] suggest the broader proposition that any decision simply related to enforcement should be presumed unreviewable."); see also *ibid.* (collecting cases holding that general enforcement policies are subject to review).

In *Chaney*, the Court explained that an individualized decision not to enforce "often involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including the proper allocation of agency resources. 470 U.S. at 831. The decision here, by contrast, did not reflect a "balancing of a number of factors." It was a legal conclusion—something peculiarly within courts' expertise. Cf. *Massachusetts*, 549 U.S. at 527 (holding denials of petitions for rulemaking reviewable in part because,

---

ings. See Pet. Supp. App. 30a n.12 ("Such a belief is not equivalent to a conclusion that the government lacked the power to institute a prosecution in the first place.").

"[i]n contrast to nonenforcement decisions," such denials are "more apt to involve legal as opposed to factual analysis" (internal quotation marks omitted)). The rescission of DACA "involves the sort of routine dispute that federal courts regularly review," *Weyerhaeuser,* 139 S. Ct. at 370, namely, an agency's belief that its actions are compelled by statute.

This Court's decision in *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270 (1987) (*BLE*), is not to the contrary. *BLE* involved an agency action—denial of a petition to reconsider based on material error—that, like the individual nonenforcement decision at issue in *Chaney*, was "traditionally" unreviewable. The Court noted that an "otherwise unreviewable action" does not "become[] reviewable" merely because "the agency gives a 'reviewable' reason." *Id.* at 283. But the decision to rescind DACA was reviewable, so *BLE* is inapposite. See Pet. Supp. App. 29a-31a.

d. Petitioners seek to blame the rescission of DACA on the courts, asserting that they were legally constrained by judicial decisions from continuing DACA. In the next breath, however, they invoke agency discretion to avoid judicial review altogether. But the purpose of the APA is to ensure agency accountability. When agencies exercise policy discretion, they may receive deference or, in "rare" cases where there is no standard to apply, their actions may escape judicial review. When, however, they assert that their actions are compelled by law, courts can, and should, evaluate those claims. The Ninth Circuit's decision thus furthers "values fundamental to the administrative process," serving "the critical function of promoting * * * democratic accountability to the people" by

31

preventing the Executive Branch from shifting responsibility to the courts for its actions. Pet. Supp. App. 31a-33a.

## C. Respondents Are Likely To Prevail On The Merits Of Their APA Claims.

1. a. The court of appeals correctly determined that the rescission is likely arbitrary, capricious, and contrary to law, because Petitioners' stated reason for terminating DACA—its purported illegality—is incorrect. 5 U.S.C. § 706(2)(A) (courts "shall" set aside agency action that is "not in accordance with law"); *Massachusetts*, 549 U.S. at 532-34 (setting aside EPA decision premised on misinterpretation of its legal authority); *Negusie*, 555 U.S. at 516 (remanding for agency to "confront the same question free of [its] mistaken legal premise"); *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("an order may not stand if the agency has misconceived the law").

DACA, like other deferred action programs dating back more than 60 years, is a lawful exercise of DHS's broad statutory authority to "[e]stablish[] national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). Both this Court, see *AADC*, 525 U.S. at 483-85, and multiple provisions of the INA, see, *e.g.*, 8 U.S.C. §§ 1227(d)(2), 1154(a)(1)(D)(i)(II), have recognized that deferred action is an ordinary feature of our immigration system. See also Br. of United States at *42-64, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 836758. The government itself has likewise concluded that DACA falls within its au-

**AR3705**

32

thority to employ deferred action to effectuate its enforcement priorities. See Pet. App. 99a (DACA memorandum); AR21 n.8 (Office of Legal Counsel advice).

The Fifth Circuit's DAPA decisions do not decide the legality of DACA.[7] One of the primary defects the *Texas* court identified in DAPA was that it encroached upon an "intricate [statutory] process for illegal aliens to derive a lawful immigration classification from their children's immigration status." *Texas*, 809 F.3d at 179. But there is no statutory apparatus conferring lawful immigration status on the pool of individuals eligible for DACA, and nothing in the INA *forbids* DACA. The *Texas* court's concern about the scope of DAPA—which would have reached 4.3 million people, 809 F.3d at 181—is not similarly implicated by DACA, which has reached nearly 800,000, Pet. App. 14a.

Accordingly, Petitioners' decision to terminate DACA rested on a legal error. That decision was "not in accordance with law," and must be set aside. 5 U.S.C. § 706(2)(A).

b. Although the rescission memorandum offered only DACA's purported illegality as its basis for the rescission, *see* Pet. App. 116a-117a, Petitioners have argued in the course of this case that DACA was terminated because of perceived "litigation risk" from its continuation. This rationale "is not independent of an on-the-merits assessment of DACA's legality," Pet.

---

[7] Although *Texas* enjoined "expanded DACA," it devoted no analysis to that program. Furthermore, because the "expanded DACA" provisions never went into effect, they are not part of this case.

**AR3706**

33

Supp. App. 35a n.14, and therefore does not alter the analysis.

Moreover, this purported justification is not in the administrative record, rendering it a post-hoc rationalization that cannot justify the agency's action in rescinding DACA. *Id.* at 35a; see *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

c. Even taking the "litigation risk" rationale at face value, the rescission would likely fail arbitrary-and-capricious review. The rescission memorandum does not contain any reasoned assessment of the "litigation risk" from the *Texas* case. For example, it does not explain how Texas and other states could obtain an immediate injunction terminating DACA, despite their waiting nearly six years to sue. See *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983) (agency action is unlawful if it "entirely failed to consider an important aspect of the problem"). Indeed, the *Texas* court *denied* an injunction of DACA based on plaintiffs' delay. 328 F. Supp. 3d at 736-42. The memorandum also contains no evaluation of alternative policies short of rescission that would mitigate litigation risk, such as addressing any purported defects that DACA might share with DAPA. See *State Farm*, 463 U.S. at 48 ("At the very least this alternative way of achieving the objectives of the Act should have been addressed and adequate reasons given for its abandonment.").

Apart from these shortcomings of "litigation risk" as a justification for agency action, it could be invoked in virtually any circumstance, and this would allow an

**AR3707**

34

agency to evade meaningful APA review merely by labeling an otherwise reviewable legal conclusion as a "litigation risk" assessment. See *Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004) (litigation risk was not valid grounds upon which to act); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 970 (9th Cir. 2015) (en banc) (rejecting litigation risk rationale).

d. The rescission is likely to fail arbitrary-and-capricious review for the separate reason that it reversed a "prior policy [that] has engendered serious reliance interests," without giving "a reasoned explanation * * * for disregarding facts and circumstances * * * engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). For over six years, DACA recipients have embarked on careers, enrolled in degree programs, started businesses, purchased homes, and even married and had children, all in reliance on DACA's fundamental promise: that they could remain in the United States if they followed the rules. See, *e.g.*, SER1470-72, Topics 1, 2, 4, 5. Employers and educational institutions will likewise lose their extensive investments in DACA recipients if those recipients become ineligible to work or are deported. See, *e.g.*, SER832-33.

The rescission memorandum did not acknowledge, let alone weigh, these profound reliance interests and the devastating consequences of the rescission on the hundreds of thousands of DACA recipients and the countless other stakeholders who have come to rely on the program. Pet. App. 111a-119a. The administrative record contains no assessment of those

**AR3708**

35

interests. Those failures render the rescission arbitrary and capricious. See *Fox*, 556 U.S. at 515-16.

The government asserts that DACA did not create cognizable reliance interests because it was subject to revocation. Virtually every agency decision is subject to revocation, so long as it is done in accordance with law. But those decisions create reliance interests all the same. See *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016) (Department of Labor was free to reinterpret the Fair Labor Standards Act, but only if it appropriately accounted for reliance interests arising from its prior interpretation). The government was required to consider those interests here.

e. Secretary Nielsen's memorandum, published more than nine months after the rescission and never submitted to the district court in this case, consists of post-hoc rationalizations that cannot overcome the inadequacies of the rescission memorandum. See *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) (agency action may be "upheld, if at all, on the same basis articulated in the order by the agency itself"). In particular, the memorandum's references to enforcement policy and reliance interests advance justifications that appear neither in the rescission memorandum nor in the administrative record, and thus cannot justify the decision. See *ibid.* Importantly, the Nielsen memorandum does not purport to be an independent agency action entitled to review on its own merits; instead, it purports only to offer "explanation" of the earlier-issued rescission memorandum, which it "decline[d] to disturb." Pet. App. 121a. The Ninth Circuit therefore correctly concluded the memorandum was a post-hoc rationalization.

36

To the extent the memorandum merits consideration, given that it was submitted to the Ninth Circuit after oral argument and was not substantively briefed, its impact, if any, should be left to the district court in the first instance. Pet. Supp. App. 57a-58a n.24.

2. Upon finding the rescission of DACA was likely arbitrary and capricious, the court of appeals properly affirmed the preliminary injunction. That remedy is needed to provide relief to the parties, is consistent with the ordinary remedy of vacatur in APA cases, and ensures a uniform immigration policy nationwide.

37

## CONCLUSION

The petition for a writ of certiorari should be denied.

Respectfully submitted,

Jeffrey M. Davidson
David Watnick
COVINGTON &
BURLING LLP
One Front Street
San Francisco, CA
94111
(415) 591-6000

Charles F. Robinson
Margaret Wu
Sonya Sanchez
University of
California
Office of the General
Counsel
1111 Franklin Street,
8th Floor
Oakland, CA 94607
(510) 987-9800

Robert A. Long
  *Counsel of Record*
Mark H. Lynch
Alexander A. Berengaut
Megan A. Crowley
Ivano M. Ventresca
James O. Strawbridge[8]
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Avenue, NW
Washington, DC 20001
(202) 662-6000

Mónica Ramírez Almadani
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
(424) 332-4800

*Counsel for The Regents of the University of California and Janet Napolitano*

*(Counsel listing continues on next page)*

---

[8] Member of the Bar of Maryland, District of Columbia Bar membership pending; supervised by principals of the Firm.

AR3711

38

Justin T. Berger
Brian Danitz
Tamarah Prevost
COTCHETT, PITRE
&MCCARTHY, LLP
840 Malcolm Road, Suite
200
Burlingame, CA 94010
(650) 697-6000

*Counsel for Plaintiff City
of San José*

AR3712

No. 18-587

IN THE

## Supreme Court of the United States

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, ET AL.,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,

*Respondents.*

On Petition For A Writ Of Certiorari
To The United States Court of Appeals
For The Ninth Circuit

**Brief in Opposition for Respondents Dulce Garcia,
Miriam Gonzalez Avila, Saul Jimenez Suarez,
Viridiana Chabolla Mendoza, Norma Ramirez,
Jirayut Latthivongskorn, the County of Santa Clara,
and Service Employees International Union Local 521**

STUART F. DELERY
MATTHEW S. ROZEN
HALEY S. MORRISSON
ANDREW J. WILHELM
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

MARK D. ROSENBAUM
JUDY LONDON
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
(213) 385-2977

THEODORE J. BOUTROUS, JR.
  *COUNSEL OF RECORD*
ETHAN D. DETTMER
KIRSTEN GALLER
JONATHAN N. SOLEIMANI
KELSEY J. HELLAND
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000
tboutrous@gibsondunn.com

*Counsel for Respondents Dulce Garcia, Miriam Gonzalez Avila,
Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez,
and Jirayut Latthivongskorn*

*(Additional Counsel Listed on Inside Cover)*

**AR3713**

LUIS CORTES ROMERO
BARRERA LEGAL GROUP, PLLC
19309 68th Avenue South,
Suite R102
Kent, WA 98032
(253) 872-4730

ERWIN CHEMERINSKY
UNIVERSITY OF CALIFORNIA,
BERKELEY SCHOOL OF LAW*
215 Boalt Hall
Berkeley, CA 94720
(510) 642-6483

LAURENCE H. TRIBE
HARVARD LAW SCHOOL*
1575 Massachusetts Avenue
Cambridge, MA 02138
(617) 495-1767

LEAH M. LITMAN
UNIVERSITY OF CALIFORNIA,
IRVINE SCHOOL OF LAW*
401 E. Peltason Drive
Irvine, CA 92697
(949) 824-7722

*Additional Counsel for Respondents Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, and Jirayut Latthivongskorn*

*Affiliation for identification purposes only*

STACEY M. LEYTON
ERIC P. BROWN
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151

*Counsel for Respondents County of Santa Clara and Service Employees International Union Local 521*

JAMES R. WILLIAMS
GRETA S. HANSEN
LAURA S. TRICE
MARCELO QUIÑONES
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street
East Wing, Ninth Floor
San Jose, CA 95110
(408) 299-5900

*Counsel for Respondent County of Santa Clara*

**AR3714**

## QUESTIONS PRESENTED

The Deferred Action for Childhood Arrivals (DACA) program enables nearly 700,000 undocumented individuals who were brought to the United States as children to live and work here without fear of deportation, so long as they play by the rules. In September 2017, the Acting Secretary of Homeland Security, on the advice of the Attorney General, abruptly decided to terminate the program.

Respondents brought suit to challenge that decision. The district court granted respondents' motion for a preliminary injunction and also denied the government's motion to dismiss for lack of jurisdiction. The court of appeals affirmed.

The questions presented are:

1.   Whether either the Administrative Procedure Act (APA), 5 U.S.C. § 701(a)(2), or a particular provision of the Immigration and Nationality Act (INA), 8 U.S.C. § 1252(g), precludes judicial review of the Acting Secretary's decision to terminate the DACA program.

2.   Whether the district court abused its discretion in entering a preliminary injunction, based on its conclusion that respondents are likely to succeed on the merits of their claim that the decision to end DACA was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA, 5 U.S.C. § 706(2)(A), and its balancing of the equities.

AR3715

ii

# TABLE OF CONTENTS

**Page**

OPINIONS BELOW.....................................................2

JURISDICTION .........................................................3

STATEMENT ...........................................................3

REASONS FOR DENYING THE PETITION..........12

    A.  Only One Court Of Appeals Has Considered The Questions Presented..........12

    B.  The Decision Below Is Preliminary And Interlocutory And Would Not Present The Full Dispute.........................................17

    C.  There Is No Urgent Need For This Court's Review ...........................................20

    D.  The Government's Merits Arguments Do Not Justify Review.................................25

        1.  The Court Of Appeals Properly Affirmed The District Court's Reviewability Determination................26

        2.  The Court Of Appeals Correctly Affirmed The Preliminary Injunction ...............................................28

CONCLUSION ........................................................35

**AR3716**

iii

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Arizona v. Evans*,
514 U.S. 1 (1995)..................................................15

*Ashcroft v. ACLU*,
542 U.S. 656 (2004)..............................................17

*Batalla Vidal v. Duke*,
295 F. Supp. 3d 127 (E.D.N.Y. 2017) ..................13

*Batalla Vidal v. Nielsen*,
279 F. Supp. 3d 401 (E.D.N.Y. 2018)
...........................................................10, 14, 19, 23

*Beame v. Friends of the Earth*,
434 U.S. 1310 (1977)............................................22

*Braxton v. United States*,
500 U.S. 344 (1991)..............................................25

*Brown v. Chote*,
411 U.S. 452 (1973)..............................................19

*Byrd v. United States*,
138 S. Ct. 1518 (2018).........................................19

*Califano v. Sanders*,
430 U.S. 99 (1977)................................................26

*Casa de Md. v. DHS*,
284 F. Supp. 3d 758 (D. Md. 2018)...........4, 13, 14

AR3717

iv

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971)..............................................26

*DHS v. Regents of Univ. of Cal.*
  138 S. Ct. 1182 (2018)......................................9, 20

*Elonis v. United States,*
  135 S. Ct. 2001 (2015)..........................................18

*Encino Motorcars LLC v. Navarro,*
  136 S. Ct. 2117 (2016)....................................29, 32

*Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal,*
  546 U.S. 418 (2006)..............................................21

*Heckler v. Chaney,*
  470 U.S. 821 (1985)..............................................26

*INS v. St. Cyr,*
  533 U.S. 289 (2001)..............................................26

*Martin v. Blessing,*
  134 S. Ct. 402 (2013)............................................25

*Mont. Air Chapter No. 29 v. Fed. Labor Relations Auth.,*
  898 F.2d 753 (9th Cir. 1990)................................11

*NAACP v. Trump,*
  298 F. Supp. 3d 209 (D.D.C. 2018)
  ...................……………………9, 13, 14, 20, 27, 31, 32

*NAACP v. Trump,*
  315 F. Supp. 3d 457 (D.D.C. 2018)....10, 14, 19, 33

AR3718

v

*NAACP v. Trump*,
   321 F. Supp. 3d 143 (D.D.C. 2018) ............... 10, 23

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
   138 S. Ct. 617 (2018) ............................................ 21

*Nat'l Treasury Emps. Union v. Horner*,
   854 F.2d 490 (D.C. Cir. 1988) ............................. 27

*Reno v. Am.-Arab Anti-Discrimination
   Comm.*,
   525 U.S. 471 (1999) .................................... 3, 27, 28

*Ruckelshaus v. Monsanto Co.*,
   463 U.S. 1315 (1983) ........................................... 22

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ............................................. 31

*Spears v. United States*,
   555 U.S. 261 (2009) ............................................. 14

*Texas v. United States*,
   328 F. Supp. 3d 662 (S.D. Tex. 2018)
     ..................................................... 13, 14, 24, 31, 32

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) .......... 5, 15, 16, 28, 30

*Texas v. United States*,
   136 S. Ct. 2271 (2016) ...................................... 5, 15

*In re United States*,
   138 S. Ct. 443 (2017) ............................................. 6

*Va. Military Inst. v. United States*,
   508 U.S. 946 (1993) ............................................. 17

AR3719

vi

*Volpe v. D.C. Fed'n of Civic Ass'ns,*
    405 U.S. 1030 (1972)............................................25

*Wong v. United States,*
    373 F.3d 952 (9th Cir. 2004)................................28

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
    566 U.S. 189 (2012)...........................................18

**Statutes**

5 U.S.C. § 701(a)(2) ............................................25, 26

5 U.S.C. § 706(2)(A)..............................................6, 29

6 U.S.C. § 202(5)...................................................3, 16

8 U.S.C. § 1182(h)....................................................16

8 U.S.C. § 1182(i).....................................................16

8 U.S.C. § 1227(d)(2) ................................................3

8 U.S.C. § 1229b ......................................................16

8 U.S.C. § 1229c .....................................................16

8 U.S.C. § 1252 ...................................7, 16, 26, 27, 28

8 U.S.C. § 1255 ......................................................16

28 U.S.C. § 1254(1)...................................................3

28 U.S.C. § 1292(b)..................................................9

**Rules**

Sup. Ct. R. 10(a) .....................................................12

**AR3720**

vii

Sup. Ct. R. 11.............................................................20

### Other Authorities

Donald J. Trump (@realDonaldTrump),
    Twitter (Jan. 22, 2018, 8:30 p.m.),
    https://tinyurl.com/yajslj5l....................................24

*Exclusive: Trump Threatens*
    *Government Shutdown Over Border*
    *Wall Funding*, Politico (Nov. 28,
    2018), https://tinyurl.com/ya6bsgpr ....................25

Interview by John Dickerson with
    Kirstjen Nielsen, Sec'y, Dep't of
    Homeland Sec., "CBS This Morning"
    (Jan. 16, 2018), https://tinyurl.com/
    y8ekmzar.............................................................22

*Oversight of the United States*
    *Department of Homeland Security:*
    *Hearing before the S. Comm. on the*
    *Judiciary*, 115th Cong. (2018)............................22

*Pelosi Statement on Immigration*
    *Priorities* (Dec. 1, 2018),
    https://tinyurl.com/y8ya2hz3..............................24

*READ: President Trump's Full*
    *Exchange With Reporters*, CNN.com
    (Jan. 24, 2018)...............................................22, 24

*Remarks by President Trump in Press*
    *Conference After Midterm Elections*
    (Nov. 7, 2018),
    https://tinyurl.com/y8ab6pjc...............................24

AR3721

1

## BRIEF IN OPPOSITION

———————————

This case is about whether nearly 700,000 young adults who came to the United States as children and have lived their entire lives here will be subject to removal because the government decided to rescind the Deferred Action for Childhood Arrivals (DACA) program. Since 2012, DACA has allowed these individuals, known as "Dreamers," to obtain an education, work, and contribute to our Nation. The program has been an unqualified success, and DACA recipients have relied on the federal government's repeated promises of protection from removal.

In September 2017, the government reversed course and announced the termination of DACA. The Dreamers' fate has captured the attention of the administration, Congress, and millions of Americans who worry about the devastating impact that terminating DACA will have on families, schools, communities, and our economy.

Respondents—including individual DACA recipients whose stories "embod[y] the American Dream," App. to U.S. Supp. Br. (Supp. App.) 5a—brought this lawsuit to challenge the government's decision to end DACA. The district court entered a preliminary injunction to freeze the DACA program in place, protecting the livelihood and well-being of the nearly 700,000 current DACA recipients, while the courts determine whether the rescission was lawful. The court of appeals affirmed those rulings.

This Court should deny review. The decision below is preliminary and interlocutory. Only one court of appeals has addressed the issue. That court was not presented with, and did not decide, all aspects of the

**AR3722**

2

questions presented.   Indeed, the government con-
cedes there is no way to bring the full dispute before
this Court without ignoring the appellate process and
leapfrogging the court of appeals in two *additional*
cases addressing similar, though not identical, chal-
lenges to the decision to end DACA.

This Court should reject this attempt to upset the
normal appellate process.  If the Court waited until
next Term, there would likely be multiple appellate
decisions addressing all the issues that the govern-
ment asks this Court to review.   Those decisions
would substantially assist this Court.

And there is no urgency here.  The government
cannot credibly claim it is being harmed by the pre-
liminary injunction when it never sought a stay.
DACA recipients contribute to society and have been
carefully vetted.  Their presence in this country while
the courts determine their rights harms no one.  Noth-
ing about the merits warrants immediate review.
This Court should not upset time-honored appellate
procedures, especially when the President said that
he supports allowing the Dreamers to remain in the
country, and signaled willingness to work with Con-
gress to achieve that widely-shared goal.  The petition
should be denied.

## OPINIONS BELOW

 The district court's order granting respondents'
motion for a preliminary injunction and denying the
government's motion to dismiss for lack of jurisdiction
(Pet. App. 1a-70a) is reported at 279 F. Supp. 3d 1011.
The district court's order granting in part and denying
in part the government's motion to dismiss for failure
to state a claim (Pet. App. 71a-90a) is reported at 298
F. Supp. 3d 1304.

**AR3723**

3

The decision of the court of appeals affirming the district court's orders (Supp. App. 1a-87a) is reported at 908 F.3d 476.

## JURISDICTION

The petition for a writ of certiorari before judgment was filed on November 5, 2018. The court of appeals entered judgment on November 8, 2018. The government filed a supplemental brief on November 19, 2018, asking the Court to convert the petition into a petition for a writ of certiorari. This Court's jurisdiction is invoked under 28 U.S.C. § 1254(1).

## STATEMENT

1. Deferred action is "a regular practice" in which the government elects not to seek removal of individuals "for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 & n.8 (1999) (*AADC*). Congress has recognized this established practice in the Immigration and Nationality Act (INA). *See* 8 U.S.C. § 1227(d)(2); *see also* 6 U.S.C. § 202(5).

Over many decades, presidential administrations of both parties have used deferred action to permit certain categories of individuals to remain in the United States. Pet. App. 5a-8a. Deferred action programs have become "a well-accepted feature of the [E]xecutive's enforcement of our immigration laws." *Id.* at 8a.

In 2012, Secretary of Homeland Security Janet Napolitano established DACA. Pet. App. 9a. The program permits young people who were brought to the United States as children to lawfully live and work in this country. *Id.* Qualifying individuals may obtain work authorization and a social security number, and

4

travel overseas and lawfully return to the United States. *Id.* at 12a.

DACA has allowed nearly 800,000 people to come out of the shadows and build productive and fulfilling lives in the United States. Compl. ¶ 128.[1] Dreamers have relied on DACA's promise to advance their education, serve in the U.S. military, start businesses, have families, and make many other life-changing decisions. *Id.* ¶¶ 37, 41, 48-98. Like so many other Dreamers, the individual respondents here—Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Norma Ramirez, and Jirayut Latthivongskorn—achieved remarkable success through hard work, fierce determination, and incredible resilience. *Id.* ¶¶ 4, 6-9.[2] Because of DACA, they have been able to pursue careers as lawyers, medical professionals, and teachers, advancing their commitment to serve their communities. *Id.* ¶¶ 53-55, 62-98. Without DACA, they will face possible deportation and risk losing their families, community connections, and livelihoods. *Id.* ¶¶ 48-49, 63, 76, 83, 91, 128.

DACA enjoys widespread support from the public and from members of both political parties. "An overwhelming percentage of Americans"—up to 87 percent—"support protections for 'Dreamers.'" *Casa de Md. v. DHS*, 284 F. Supp. 3d 758, 767, 779 (D. Md. 2018). Hundreds of America's most important business leaders signed a letter stating that the program is "vital to the future of our companies and our economy." Compl. ¶ 132. And political leaders including

---

[1] "Compl." refers to the complaint filed in *Garcia v. United States*, No. 3:17-cv-5380 (N.D. Cal. Sept. 18, 2017).

[2] After the Complaint was filed in September 2017, Viridiana Chabolla Mendoza was granted Lawful Permanent Resident status.

5

Speaker of the House Paul Ryan and Senator Lindsay Graham have urged the government not to "pull the rug out" from Dreamers who relied on the program. *Id.* ¶¶ 41-47.

2.   The current administration originally supported DACA and the Dreamers.  In March 2017, Secretary of Homeland Security John Kelly stated that DACA embodies a "commitment ... by the government towards ... Dreamer[s]."  Compl. ¶ 46 (first alteration in original).  In April 2017, the President said that the "dreamers should rest easy" because the "policy of [his] administration [is] to allow the dreamers to stay."  *Id.* ¶ 47 (alterations in original).

But on September 4, 2017, the administration reversed course.  Attorney General Jefferson B. Sessions III sent a one-page letter to Acting Secretary of Homeland Security Elaine Duke, stating that "DACA was effectuated by the previous administration through executive action, without proper statutory authority" and "was an unconstitutional exercise of authority by the Executive Branch."  Pet. App. 116a (internal quotation marks omitted).  The following day, he announced the decision to end DACA.  As a reason, he cited the Fifth Circuit's decision (affirmed by an equally divided Court) approving an injunction against a different deferred action program—Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).  Dkt. 64-1 at 251 (citing remarks referring to *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd*, 136 S. Ct. 2271, 2272 (2016) (per curiam) (*Texas I*)).[3]

---

[3]   "Dkt." refers to the electronic docket for *Regents of the University of California v. DHS*, No. 3:17-cv-05211 (N.D. Cal.).

6

Acting Secretary Duke issued a memorandum formally rescinding DACA.  Pet. App. 17a.  The memorandum instructed the agency to stop approving new DACA applications and to allow individuals' DACA status to expire beginning March 5, 2018.  *Id.* at 117a-18a.  Her reasoning was brief:  Citing the "Supreme Court's and the Fifth Circuit's rulings [in *Texas I*], and the September 4, 2017 letter from the Attorney General," she concluded that the "program should be terminated."  *Id.* at 117a.  The memorandum did not analyze "litigation risk" and did not weigh DACA's widespread benefits against the many harms that would result if DACA were rescinded.  Acting Secretary Duke also said—contrary to the President's and prior Secretaries' statements—that "DACA was fundamentally a lie."  Dkt. 121-2 at 1869.

3.  Respondents filed five related lawsuits challenging the decision to rescind DACA.  Respondents contend, *inter alia*, that DACA's rescission (1) is unlawful under the APA because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); (2) violates the APA's notice-and-comment rulemaking requirement; (3) denies DACA recipients equal protection of the laws; and (4) deprives DACA recipients of constitutionally protected property and liberty interests in violation of due process.  Pet. App. 19a-22a.  Because DACA was to expire in March 2018, respondents requested a preliminary injunction.  Dkt. 111.

After an initial dispute about the administrative record (*see In re United States*, 138 S. Ct. 443 (2017) (per curiam)), the district court rejected the government's arguments that no court can review the decision to end DACA.  Pet. App. 1a-70a; *id*. at 26a-33a.  The court held that the Secretary's decision is not

7

"committed to agency discretion by law" under the APA, 5 U.S.C. § 701(a)(2), because it is a "major policy decision" based on the agency's "interpretation of the INA"—a "quintessential[ly]" reviewable legal question for which "there *is* law to apply." Pet. App. 28a-30a. The court also held that 8 U.S.C. § 1252(g) does not bar judicial review, Pet. App. 30a-33a, because that provision applies only to the "three discrete decisions" named in the statute—decisions to "commence proceedings, adjudicate cases, or execute removal orders against any alien," 8 U.S.C. § 1252(g)—and the decision to end DACA is none of those. Rather, it is an "across-the-board cancellation of a nationwide program" done "prior to the commencement of any removal proceedings." Pet. App. 31a-32a.

The district court granted preliminary injunctive relief. Pet. App. 41a-69a. It found respondents likely to succeed on their APA claim that DACA's rescission is arbitrary and capricious because neither of the government's asserted reasons for ending DACA withstood scrutiny. First, the court rejected the government's argument that "the agency lacked authority to implement DACA." *Id.* at 42a. Citing guidance from the Office of Legal Counsel—guidance on which the government itself has relied and has never repudiated—the court explained that DACA is a permissible exercise of the Executive's broad immigration enforcement authority. *Id.* at 42a-43a. The court noted that "the government [had] ma[de] no effort" in this litigation "to challenge any of the … reasons why DACA was and remains within the authority of the agency," *id.* at 48a; it simply cited the Fifth Circuit's decision in the DAPA case, which is distinguishable on multiple grounds, *id.* at 51a-52a.

AR3728

8

Second, the district court rejected the government's post hoc rationalization that litigation risk was a sufficient reason to end DACA. Pet. App. 55a-62a. The court explained that this was not the reason relied upon by the decision-makers: The Attorney General's stated reason for ending DACA was his belief that it is illegal, and the Acting Secretary's memorandum relied on that determination, without separately "consider[ing] whether defending the program in court would (or would not) be worth the litigation risk." *Id.* at 56a. The agency never assessed litigation risk or weighed it against countervailing benefits, such as "DACA's programmatic objectives" and "the reliance interests of DACA recipients." *Id.* at 58a. The agency's about-face, without a reasoned explanation was a paradigmatic example of arbitrary and capricious agency action. *Id.* at 60a-61a.

The district court concluded that the equities strongly favor a preliminary injunction. Pet. App. 62a-66a. The government "d[id] not dispute" that respondents—especially the individual DACA recipients—will face irreparable injury absent temporary injunctive relief. *Id.* at 62a-63a. And the court concluded that the "public interest will be served by DACA's continuation," because the rescission would "result in hundreds of thousands of individuals losing their work authorizations and deferred action status," tearing apart families and removing productive workers from the national economy. *Id.* at 65a.

The preliminary injunction directs the government "to maintain the DACA program," except that the government need not accept new applications and foreign travel requests. Pet. App. 66a-67a. The government may exercise its discretion "on an individualized basis for each renewal application" and may "remove any

**AR3729**

9

individual, including any DACA enrollee, who it de-
termines poses a risk to national security or public
safety, or otherwise deserves, in its judgment, to be
removed." *Id.* at 66a.

The district court granted the government's mo-
tion to dismiss respondents' notice-and-comment and
rescission-based substantive due process claims, but
denied the motion with respect to respondents' sub-
stantive APA, equal protection, and information-shar-
ing-based substantive due process claims. Pet. App.
71a-90a.

4.   The government appealed the preliminary in-
junction order. Pet. App. 91a-95a. With permission
from the district court and court of appeals, the gov-
ernment and respondents each filed interlocutory ap-
peals of the motion to dismiss order. *See* C.A. No. 18-
15128, Dkt. 1; C.A. No. 18-15133, Dkt. 6; C.A. No. 18-
15134, Dkt. 1; *see also* 28 U.S.C. § 1292(b). The gov-
ernment did not seek—and never has sought—a stay
of the preliminary injunction.

Not content with the normal appellate process, the
government filed a petition for a writ of certiorari be-
fore judgment, which this Court denied. *DHS v. Re-
gents of Univ. of Cal.*, 138 S. Ct. 1182 (2018).

5.   In the meantime, another district court in the
District of Columbia entered an order vacating the
Acting Secretary's memorandum rescinding DACA
and giving the government 90 days to provide a "fuller
explanation for the determination that the program
lacks statutory and constitutional authority." *NAACP
v. Trump*, 298 F. Supp. 3d 209, 245 (D.D.C. 2018).
The court stayed its order pending the government's
response. *Id.*

10

In response, Secretary of Homeland Security Kirstjen Nielsen issued a memorandum on June 22, 2018, in which she "decline[d] to disturb" the Acting Secretary's rescission decision because, in her view, that decision "was, and remains, sound." Pet. App. 121a. Her memorandum purported to offer "further explanation" for the rescission decision. *Id.*

The district court in *NAACP* reaffirmed its decision to vacate the rescission, concluding that Secretary Nielsen's additional memorandum did not "meaningful[ly] elaborat[e]" on the initial memorandum. *NAACP v. Trump*, 315 F. Supp. 3d 457, 471-73 (D.D.C. 2018). Consistent with the preliminary injunction here, the *NAACP* court allowed its order to go into effect to the extent it required the government to continue processing renewal applications but stayed its order with respect to new applications. *See NAACP v. Trump*, 321 F. Supp. 3d 143, 150 (D.D.C. 2018).

6. Without waiting for the court of appeals, the government filed a second petition for a writ of certiorari before judgment in this case, Pet. 15, and similar petitions in *NAACP* and a third similar case, *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 421-33 (E.D.N.Y. 2018). *See* U.S. Cert. Pets., Nos. 18-588, 18-589.

The court of appeals affirmed in all key respects. U.S. Supp. Br. 2-7. Like every court that has considered the question, the court of appeals concluded that the rescission is judicially reviewable. Supp. App. 23a-45a. The court explained that the APA permits review of "an agency's nonenforcement decision" that is "based solely on a belief that the agency lacked the lawful authority to do otherwise": If the "agency head is mistaken in her assessment that the law precludes

11

one course of action," the courts can correct that legal error. *Id.* at 27a-31a (citing *Mont. Air Chapter No. 29 v. Fed. Labor Relations Auth.*, 898 F.2d 753 (9th Cir. 1990)). The court concluded that the INA permits review of "programmatic" decisions regarding deferred action "like the DACA rescission." *Id.* at 43a.

On the merits, the court of appeals agreed with the district court that the rescission was likely arbitrary and capricious because it was based on the government's erroneous belief that the program was unlawful. Supp. App. 35a-42a, 45a-57a. The court of appeals determined that Secretary Nielsen's new memorandum was not properly before it, so any argument about it would have to be presented to the district court in the first instance. *Id.* at 57a n.24. The court cautioned, however, that the memorandum did not represent "fresh agency action" and that the government could not rely on "post-hoc rationalizations" for the decision to end DACA. *Id.* Noting that the government had not challenged the district court's weighing of the equities, the court affirmed the preliminary injunction. *Id.* at 45a-46a, 58a-60a. The court also held that "plaintiffs' equal protection claim is a second, alternative ground for affirming the entry of the injunction." *Id.* at 77a n.31.

The court also affirmed dismissal of respondents' notice-and-comment and rescission-based substantive due process claims and denial of the government's motion to dismiss respondents' remaining claims. Supp. App. 61a-77a.

Judge Owens concurred in the judgment. Supp. App. 79a-87a. In his view, the rescission is an "immigration enforcement decision[]" that is categorically "unreviewable" under the APA even if it rests on an incorrect view of the law. *Id.* at 81a. Judge Owens

12

nonetheless would have affirmed the preliminary injunction based on respondents' equal protection claim. *Id.* at 84a.

7.   After the court of appeals issued its decision, the government filed a supplemental brief in this Court seeking to convert its petition for certiorari before judgment into a petition for certiorari.  U.S. Supp. Br. 9.

## REASONS FOR DENYING THE PETITION

The government asks this Court to intervene to decide a significant issue that the lower courts have not yet fully addressed.  In this case, neither the district court nor the court of appeals has conclusively adjudicated respondents' claims.  And although five pending cases present the legal questions here, only one court of appeals has actually addressed some, but not all, of the issues the government wants this Court to address.  Three other courts of appeals are considering the issue.  There is no reason for this Court to ignore normal processes and grant review now.  There is no harm to the government—it has never sought a stay of these rulings—as the decision below simply freezes DACA in place and allows the government to continue exercising its usual enforcement discretion.  And there is a real prospect of a policy solution by the political branches that would make this Court's intervention unnecessary.  The petition should be denied.

## A. Only One Court Of Appeals Has Considered The Questions Presented

1.   The Court ordinarily waits until the circuits have divided to decide an important legal question. Sup. Ct. R. 10(a).  There is nothing even close to a circuit split here.

**AR3733**

13

Five relevant cases are pending: *Regents of Univ. of Cal. v. DHS*, No. 3:17-cv-05211 (N.D. Cal.); *NAACP v. Trump*, No. 1:17-cv-1907 (D.D.C.); *Casa de Md. v. DHS*, 8:17-cv-2942 (D. Md.); *Batalla Vidal v. Nielsen*, 1:16-cv-4756 (E.D.N.Y.); *Texas v. United States*, 1:18-cv-68 (S.D. Tex.).   Only one—this one—has been decided by a court of appeals.   Appeals are pending in three others, and the courts are proceeding expeditiously to decide them.[4]   In the remaining case, which challenges the creation of DACA (not its rescission), the district court declined to issue a preliminary injunction to stop the DACA program, *Texas v. United States*, 328 F. Supp. 3d 662, 740-42 (S.D. Tex. 2018) ("*Texas II*"); the States did not appeal that decision but instead are trying to obtain a final judgment, Joint Discovery/Case Management Plan at 6, *Texas II*, Dkt. 335.

Thus, it is likely that there will be additional appellate decisions within months.   This Court could obtain the benefit of those courts' decisions soon, and have all of the government's issues properly presented.   There is no countervailing harm to the government should the Court do so.   *See* pp. 21-23, *infra*.

All courts that have considered the issue have found the decision to rescind DACA judicially reviewable.   *See NAACP v. Trump*, 298 F. Supp. 3d 209, 234-35 (D.D.C. 2018); *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 148-50 (E.D.N.Y. 2017); *Casa De Md. v. DHS*, 284 F. Supp. 3d 758, 770 (D. Md. 2018).   The district court in Texas also concluded that the decision to start

---

[4]   *See Batalla Vidal*, No. 18-485 (2d Cir.), Dkt. 588 (oral argument scheduled for Jan. 25, 2019); *Casa De Md.*, No. 18-1522 (4th Cir.), Dkt. 55 (oral argument held Dec. 11, 2018); *NAACP*, No. 18-5245 (D.C. Cir.), Dkt. 1756433 (briefing to be completed by Jan. 22, 2019).

14

the DACA program is judicially reviewable. *Texas II*, 328 F. Supp. 3d at 706-09. There is no disagreement among *any* courts about the first question presented in this case.

On the merits, the district court decisions are more varied, but most favor respondents' position. The *NAACP* court held on summary judgment that the rescission violated the APA for largely the same reasons stated by the court of appeals here. 298 F. Supp. 3d at 237-43. The *Batalla Vidal* court preliminarily enjoined the rescission for largely the same reasons. *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 421-33 (E.D.N.Y. 2018). The *Casa de Maryland* court disagreed, holding that "[r]egardless of whether DACA is, in fact, lawful or unlawful," the government reasonably believed the program was unlawful and could terminate the program on that basis. 284 F. Supp. 3d at 768-79. The district court in Texas held that DACA likely was unlawful because it violated the INA and was adopted without notice-and-comment rulemaking. *Texas II*, 328 F. Supp. 3d at 712-36.

Of these decisions, only *NAACP* addressed Secretary Nielsen's memorandum offering "additional justification" for the decision to rescind DACA, which was not before the court of appeals here, Supp. App. 57a n.24. The *NAACP* court held that the memorandum failed to "meaningful[ly] elaborat[e]" on the decision to rescind DACA. 315 F. Supp. 3d at 471-72.

In the "absence of a pronounced conflict among the circuits," the Court "should not rush to answer a novel question" that "could benefit from further attention in the court of appeals." *Spears v. United States*, 555 U.S. 261, 270 (2009) (Roberts, C.J., dissenting). Awaiting "diverse opinions" from the federal appellate

15

courts "may yield a better informed and more endur-
ing final pronouncement" that avoids unforeseen con-
sequences for administrative law, immigration law,
and Executive authority beyond the immediate dis-
pute. *Arizona v. Evans*, 514 U.S. 1, 23 n.1 (1995)
(Ginsburg, J., dissenting). The questions presented
here should be vetted by the courts of appeals, and
they will be soon. If the Court denies certiorari now,
it should have ample opportunity to revisit the ques-
tion next Term with the benefit of decisions from the
Second, Fourth, and D.C. Circuits. There is no reason
to act now.

2.    The government contends (Pet. 16) that the
courts of appeals have disagreed over whether DACA
is lawful. The government made this same argument
in its prior petition for certiorari before judgment.
U.S. Pet., No. 17-1003, at 15-32. It was wrong then,
Individual Pls.' Br. in Opp., at 15-16, and is wrong
now.

As before, the government wrongly assumes that
the Fifth Circuit's analysis of the *adoption* of *DAPA*
applies equally to the *rescission* of *DACA*, despite
acknowledged differences between the programs and
the posture of the litigation. DAPA was a never-im-
plemented deferred action program that would have
affected up to 4.3 million individuals. Pet. App. 54a;
Supp. App. 54a. The Fifth Circuit itself recognized
that "DACA and DAPA are not identical" and that
"any extrapolation from DACA [to DAPA] must be
done carefully." *Texas v. United States*, 809 F.3d 134,
173-74 (5th Cir. 2015), *aff'd*, 136 S. Ct. 2271, 2272
(2016). The lower courts here each correctly gave sev-
eral reasons why the questions before them were not
the same as those before the Fifth Circuit. Pet. App.
50a-54a; Supp. App. 52a-55a; *see* note 5, *infra*. Given

16

these distinctions, the Court should not assume a circuit split before the Fifth Circuit has had a chance to weigh in about the implications of its earlier decision.

Even if there were disagreement about DACA's lawfulness, this case would be a poor vehicle for considering it: The government conspicuously failed to make a full argument below that DACA is unlawful. The government's justification for the rescission was that DACA's continued implementation posed a risk of litigation—*not* the legality of DACA *per* se." C.A. No. 18-15068, Dkt. 31, at 36-38; *see also* Dkt. 204 at 10-11, 14-21. The government told the district court that it "need not agree with [the Acting Secretary's] determination [that DACA was unlawful] to uphold her decision." Dkt. 204 at 17. It told the court of appeals that the Acting Secretary could rely on her "assessment of DACA's legality" even if it was not "correct as a matter of law." C.A. No. 18-15068, Dkt. 31, at 38-39. The government cited the Fifth Circuit's prior DAPA decision as evidence of litigation risk, but conspicuously avoided defending that decision's reasoning or offering any fully-developed argument that DACA is unlawful. *Id.* at 17.[5] The government

---

[5] For example, although the petition claims that "specific and detailed provisions" of the INA preclude deferred action for DACA recipients, Pet. 24, the government's briefs on appeal cited only statutes that support deferred action and similar relief, C.A. No. 18-15068, Dkt. 31, at 2-5, 13, 17, 25-7, 34-38, and *id.*, Dkt. 134, at 1, 15, 17, 24, 33 (citing, collectively, 6 U.S.C. § 202(5), 8 U.S.C. §§ 1182(h)-(i), 1229b-1229c, 1252, 1255). Further, although the Attorney General stated that he found "constitutional defects" in DACA, Pet. App. 17a, the government's briefs below did not identify any relevant constitutional provisions. And the government declined to endorse the Fifth Circuit's holding (809 F.3d at 178) that DAPA was procedurally defective; instead, the government told the district court that "INS deferred-action directives" are "policy statements exempt from notice and comment." Dkt. 204 at 26-27.

AR3737

17

"ma[de] no effort in its briefs to challenge any of the … reasons why DACA was and remains within the authority of the agency." Pet. App. 48a. Having made that strategic decision below, the government should not be allowed to change course now, especially when it is asking this Court to decide the issues in the first instance.

**B. The Decision Below Is Preliminary And Interlocutory And Would Not Present The Full Dispute**

1.   Review is unwarranted now because the decision under review is preliminary and interlocutory. The district court entered a preliminary injunction to freeze the DACA program in place while the courts address whether the government's decision to rescind it was lawful.  This Court reviews that determination for "abuse of discretion" and "uphold[s] the injunction" if "the underlying … question is close." *Ashcroft v. ACLU*, 542 U.S. 656, 664-65 (2004).  The district court's rulings about reviewability and likelihood of success on the APA claim both are interlocutory.  The Court normally does not review interlocutory orders, and for good reason; further development of the issues often crystallizes the arguments in preparation for this Court's review.  *See Va. Military Inst. v. United States*, 508 U.S. 946 (1993) (Scalia, J., concurring in denial of certiorari).

Importantly, the preliminary injunction at issue here is based on only one of respondents' claims for relief—the substantive APA claim.  The courts below did not decide the ultimate merits of that claim, but only found that respondents "have shown a likelihood of success."  Pet. App. 41a; *accord* Supp. App. 46a. And the court of appeals' decision expressly contemplates further proceedings.  It directs the district court

**AR3738**

18

to determine "in the first instance" the relevance, if any, of Secretary Nielsen's memorandum offering "additional justification" for the decision to rescind DACA.  Supp. App. 57a n.24.

As the government recently told the Court, this Court's "general practice is 'not to decide in the first instance issues not decided below'" in the course of the litigation.  U.S. Mem. in Opp. to Mot. to Substitute, at 10, *Michaels v. Whitaker*, No. 18-496 (alteration omitted) (quoting *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012)).  That is especially true where, as here, this Court would be the "first appellate tribunal" to decide the issue.  *Elonis v. United States*, 135 S. Ct. 2001, 2013 (2015).  Granting certiorari now would require the Court to address Secretary Nielsen's memorandum without the benefit of views from any federal appellate court, and would send an unfortunate message to the lower courts about the value of their work.

2.    Further, respondents have another, independent ground that potentially supports the preliminary injunction—the equal protection claim.  Supp. App. 77a n.31, 87a.  But *no* court has yet assess the likelihood that respondents will succeed on that claim.  All the court of appeals did is affirm the denial of the government's motion to dismiss that claim.  *Id.* at 73a-74a, 77a.  The panel majority also agreed with Judge Owens that "plaintiffs' equal protection claim is a second, alternative ground for affirming the entry of the injunction," *id.* at 77a n.31, but in doing so, neither the panel majority nor Judge Owens actually determined whether respondents are likely to succeed on that claim.  Instead, Judge Owens explained that the district court should decide on a full record—including

**AR3739**

19

"whatever additional evidence Plaintiffs muster on remand"—whether Respondents can "demonstrat[e] a likelihood of success on the merits" by "rais[ing] a presumption that unconstitutional animus" against Latinos was a "substantial factor in the rescission of DACA." *Id.* at 84a (Owens, J., concurring). That requires discovery and completion of the administrative record, which were stayed pending appeal. Dkt. 266, at 12. There is not yet a full record on this claim that would permit meaningful review by this Court.

Because the district court has not yet expressed its definitive view of respondents' claims after full development of the record and briefing, granting certiorari at this early stage would embroil this Court in piecemeal review without the ability to conclusively resolve the "ultimate merits" of respondents' claims. *Brown v. Chote*, 411 U.S. 452, 457 (1973).

3. The government attempts to get Secretary Nielsen's memorandum before this Court by asserting without explanation that it was "error" for the Ninth Circuit not to consider it. U.S. Supp. Br. 9. But it is well settled that appellate courts need not decide in the first instance issues not decided below. *E.g.*, *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018).

The government ultimately recognizes (Pet. 32) that there is no way "[t]o ensure an adequate vehicle for the timely and definitive resolution of this dispute" without simultaneously seeking certiorari before judgment from district court decisions in two other cases: *NAACP*, in which the court vacated the memorandum rescinding DACA, 315 F. Supp. 3d at 471-73; and *Batalla Vidal*, which involves a preliminary injunction with the same terms as the preliminary injunction here, 279 F. Supp. 3d at 421-33. In particu-

20

lar, the government seeks certiorari in *NAACP* because that court has "passed on the effect of [Secretary Nielsen's] memorandum on the questions presented," Pet. at 33, while the district court and court of appeals here did not.  But granting certiorari in those cases would not solve the problem of piecemeal, interlocutory review: *Batalla Vidal* is likewise preliminary and interlocutory, and *NAACP* "defer[red] ruling" on the constitutional claims in that case, 298 F. Supp. 3d at 246.  None of these cases presents a full record on any equal protection claim.

More significantly, certiorari before judgment is an extraordinary measure reserved only for cases of such "imperative public importance" that the Court's "immediate" review is necessary.  Sup. Ct. R. 11.  The Court has already denied that extraordinary remedy once, 138 S. Ct. 1182, and nothing has changed that would make it any more appropriate now than it was in February.  Regardless of whether the Court grants certiorari here, therefore, this Court should deny certiorari before judgment in *NAACP* and *Batalla Vidal*.  And rather than engage in piecemeal review, it should also deny certiorari here.

## C. There Is No Urgent Need For This Court's Review

The government rushed this case to this Court by filing a second petition for certiorari before the court of appeals even issued its decision, all in the hopes of "ensur[ing] review by [the Court] during its current Term."  Pet. 13 n.5.  The decision has now issued, but there is still no circuit split on the issues presented, no court of appeals decision presenting the full dispute, and no harm to the government.  There is accordingly no urgency justifying this Court's immediate review.

**AR3741**

21

1.   The government's main complaint is that the preliminary injunction requires it to "sanction[] an ongoing violation of federal immigration law" by each DACA recipient.  Pet. 14.  But the injunction does not compel the government to "sanction" the unlawful presence of anyone.  It expressly preserves the government's authority to exercise "fair discretion … on an individualized basis for each renewal application," and "to remove any individual, including any DACA enrollee, who it determines poses a risk to national security or public safety, or otherwise deserves, in its judgment, to be removed."  Pet. App. 66a.

And the government is routinely required to "sanction" what it perceives to be ongoing violations of federal law pending appellate review.  *E.g.*, *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 627 (2018) (noting "nationwide stay" of enforcement of Waters of the United States Rule).  It is often enjoined from enforcing federal laws against conduct that it believes to be unlawful.  *E.g.*, *Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423 (2006) (affirming injunction against enforcement of Controlled Substances Act).  The government's belief in the correctness of its own position does not defeat the policy of delaying review until these issues have been considered by the other courts of appeals.

2.   More fundamentally, the government's conduct is not consistent with its current expressions of harm.

The injunction merely freezes the situation that has been in place for more than five years, including under the current administration, and with the current President's support.  *See* Compl. ¶ 47 (President confirming that his "policy" is "to allow the dreamers to stay").  The current administration purposefully

22

continued DACA for more than eight months before
rescinding it.  Pet. App. 115a-16a.  The government
has never sought a stay of the preliminary injunction
in this case.  That fact alone demonstrates that the
preliminary injunction causes no harm.[6]

Further, the Secretary of Homeland Security
stated publicly—and repeated to Congress under
oath—that removal of DACA recipients would "not [be
a] priority of enforcement for ICE" "should the pro-
gram end."  Interview by John Dickerson with
Kirstjen Nielsen, Sec'y, Dep't of Homeland Sec., "CBS
This Morning" (Jan. 16, 2018), https://tinyurl.com/
y8ekmzar; *see Oversight of the United States Depart-
ment of Homeland Security:  Hearing before the S.
Comm. on the Judiciary*, 115th Cong. (2018) (state-
ment of Kristjen Nielsen).  After the government's
prior petition was filed, the President said he "cer-
tainly [has the] right" to keep DACA in place after
March 2018 (contrary to the petition's argument that
DACA is unlawful), and that he very well "might" do
so.  *See READ: President Trump's Full Exchange With
Reporters*, CNN.com (Jan. 24, 2018), https://ti-
nyurl.com/ydcafdtr (*CNN Statement*).  These state-
ments "blunt [the government's] claim of urgency,"
*Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317-18
(1983) (Blackmun, J., in chambers), and "vitiate[]
much of the force" of its claimed harm, *Beame v.
Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (Mar-
shall, J., in chambers).

---

[6]   Indeed, it was not until August of this year—when the court
in *NAACP* went beyond maintaining the status quo for current
DACA recipients and vacated the decision rescinding DACA in
full—that the government asked any court to stay any part of
any order regarding DACA.

23

The government cannot credibly claim harm when the current administration willingly permitted the Dreamers to stay for over a year; and stated that it will continue to do so, either by treating recipients as a low enforcement priority or by extending DACA; and has forgone opportunities to avoid any purported harm through a stay.

3.   The truth is that the government has no demonstrable basis for demanding "immediate determination" by this Court because the continuation of DACA harms no one.  DACA recipients are vetted to ensure they pose no "threat to national security or public safety"; have not been convicted of a felony, or multiple or significant misdemeanors; and fulfill educational and work-related criteria.  Pet. App. 9a. Their continued presence does not injure the United States, and does not warrant short-circuiting appellate review.

Any conceivable hardship on the government is muted, moreover, because the orders in this case, *Batalla Vidal*, and *NAACP*, currently are in effect only with respect to existing DACA recipients.  *See* Pet. App. 66a-67a; *Batalla Vidal*, 279 F. Supp. 3d at 437; *NAACP v. Trump*, 321 F. Supp. 3d 143, 150 (D.D.C. 2018).  These are individuals the government has already vetted and permitted to remain in this country, and who have already relied on the government's promises to start families, pursue employment and education, and invest in their communities.  Every court to consider these reliance interests has concluded they strongly outweigh any interest in hastening DACA's end.  *See* Pet. App. 62a-66a; *Batalla Vidal*, 279 F. Supp. 3d at 434; *NAACP*, 321 F. Supp. 3d. at 147-49.  Even the district court in the Texas

24

case, which stated the view that DACA was likely unlawful, left the program in place pending its ultimate resolution of the merits because of the significant reliance interests of DACA recipients and the "great risk" to them and their families should the case be wrongly decided on "only a preliminary injunction record."  328 F. Supp. 3d at 742.

4.    At the same time the Solicitor General claims an urgent need for resolution by this Court, the President and the leadership of the new Congress have both expressed their desire to pursue a political solution that will permit the Dreamers to remain in the United States. *See, e.g.*, *Remarks by President Trump in Press Conference After Midterm Elections* (Nov. 7, 2018), https://tinyurl.com/y8ab6pjc ("THE PRESIDENT:  I think we could really do something having to do with DACA."); *Pelosi Statement on Immigration Priorities* (Dec. 1, 2018), https://tinyurl.com/y8ya2hz3 ("Our House Democratic Majority will once again pass the Dream Act.").

Here, the government's petition would potentially preempt the political process (in addition to preempting the work of the other three courts of appeals).  And it would do so in contravention of the President's statements that his policy is to protect the Dreamers, that he favors a political resolution of their status, and that he has the "right" to keep DACA in place and (absent a political solution) may well do so.  *See* Compl. ¶ 47; *CNN Statement*; Donald J. Trump (@realDonaldTrump), Twitter (Jan. 22, 2018, 8:30 p.m.), https://tinyurl.com/yajslj5l ("I want a big win for everyone, including Republicans, Democrats and DACA ... Should be able to get there.  See you at the negotiating table!").  While the government contends that

this litigation is "imped[ing] efforts to enact legislation" addressing DACA, Pet. 16, and the President has threatened to delay negotiations unless this Court grants review and holds that DACA is unlawful, Jake Sherman & Anna Palmer, *Exclusive: Trump Threatens Government Shutdown Over Border Wall Funding*, Politico (Nov. 28, 2018), https://tinyurl.com/ya6bsgpr, the President's statements of support for DACA and for a legislative fix speak louder than these apparent attempts to influence this Court's ruling. This is an "unusual" case in which "the ultimate authority over the agency, the Chief Executive, publicly favors the very program the agency has ended." Pet. App. 65a. This Court therefore should give the political process a chance to work. *See, e.g.*, *Braxton v. United States*, 500 U.S. 344, 347-48 (1991); *Volpe v. D.C. Fed'n of Civic Ass'ns*, 405 U.S. 1030, 1030 (1972) (Burger, C.J., concurring in denial of certiorari) (noting "legislative action" could effectively preclude review of questions presented to the Court before it would be able to decide the case).

## D. The Government's Merits Arguments Do Not Justify Review

The government also argues that certiorari is warranted because "[t]he decisions below are wrong." Pet. 17. But this Court does not sit as a "court of error correction." *Martin v. Blessing*, 134 S. Ct. 402, 405 (2013) (Alito, J., respecting the denial of certiorari). The government's merits arguments fail to demonstrate a compelling need for this Court's involvement at this stage.

26

### 1. The Court Of Appeals Properly Affirmed The District Court's Reviewability Determination

The government first argues that the APA, 5 U.S.C § 701(a)(2), and a particular provision of the INA, 8 U.S.C. § 1252(g), preclude judicial review of the Acting Secretary's decision to end the DACA program. Not so.

1.   Section 701(a)(2) precludes APA review of agency action that is "committed to agency discretion by law." The government contends that a "presumption of nonreviewability applies with particular force when it comes to immigration." Pet. 19. That is flatly wrong: This Court has consistently applied a "strong presumption in favor of judicial review of administrative action" in the immigration context. *INS v. St. Cyr*, 533 U.S. 289, 298 (2001).

Rather, Section 701(a)(2) "is a very narrow exception" that is applicable only where "there is *no* law to apply," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (emphasis added), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977), meaning that "a court would have no … judicially manageable standards … for judging how and when an agency should exercise its discretion," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). This is not one of those rare instances where there is no law to apply. As the district court explained, "the new administration didn't terminate DACA on policy grounds"; it "terminated DACA over a point of law." Pet. App. 18a. "[D]etermining illegality is a quintessential role of the courts." *Id.* at 30a.

27

The government's assertion that review is impossible because immigration enforcement decisions require "'a complicated balancing' of factors," Pet. 19, rings hollow given that the government ended DACA "based *solely* on a belief that [it] lacked the lawful authority to do otherwise." Supp. App. 29a (emphasis added). Judicial review of that decision in no way "encroach[es] on executive discretion"; respondents seek only to put "back on the table" the authority the government disclaimed so the government can continue to exercise that authority or face "democratic accountability to the people" for declining to do so. *Id.* at 31a-32a. Executive officials cannot "claim that the law ties [their] hands while at the same time denying the courts' power to unbind [them]. [They] may escape political accountability or judicial review, but not both." *NAACP*, 298 F. Supp. 3d at 249.

Ending a five-year old program that confers significant benefits on its recipients—including work authorization, non-accrual of unlawful presence, travel, and the right to obtain a driver's license—is a "major policy decision" that is "quite different from day-to-day agency nonenforcement decisions" that courts have sometimes found unreviewable. *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 496 (D.C. Cir. 1988). There is no tradition of withholding review in these circumstances, and thus the "appropriate starting point" remains the "APA presumption of reviewability." *Id.* at 496-97.

2. Section 1252(g) of Title 8 likewise does not bar review. By its text, that provision applies to three specific types of decisions or actions: those taken "to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C. § 1252(g). This Court has interpreted those provisions narrowly, explaining that

28

judicial review is precluded only for those "three discrete actions." *AADC*, 525 U.S. at 482. This case involves none of them. This is not a challenge to the government's decision to start the removal process against a particular person, or to adjudicate an individual's immigration case, or to actually remove an individual. Rather, it is a challenge to the decision to end the DACA program.

The government seizes on *AADC*'s statement that Section 1252(g) seems "designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations." Pet. 21. But the context makes clear that the statement referred only to decisions involving a specific individual whose removal proceedings had already commenced. The government has cited no case where Section 1252(g) has barred a policy challenge by a group of plaintiffs against whom the government has not even begun removal proceedings. And the courts of appeals have consistently cabined Section 1252(g) to the three circumstances enumerated and rejected its application to programmatic challenges. *See, e.g.*, *Wong v. United States*, 373 F.3d 952, 965 (9th Cir. 2004); *Texas I*, 809 F.3d at 164. There is no imminent need for this Court to review the issue.

### 2. The Court Of Appeals Correctly Affirmed The Preliminary Injunction

The district court entered a preliminary injunction after making an initial assessment of the merits, assessing irreparable injury, and weighing the equities. The court of appeals, reviewing for abuse of discretion, Supp. App. 22a, affirmed the district court's analysis in its entirety. Nothing about the court of appeals' decision necessitates review.

**AR3749**

29

1.  The court of appeals upheld the preliminary injunction because it agreed with the district court's conclusion that respondents are likely to prevail on their claim that the rescission is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Supp. App. 45a (quoting 5 U.S.C. § 706(2)(A)).  Here, the government provided three justifications for DACA's rescission, all of which fail APA review.

a.  The principal argument in the memorandum rescinding DACA is that the Acting Secretary ended DACA because continuing it would have been unlawful.  Pet. 28.  That view is contrary to the government's long-standing position that deferred action programs are permissible, and so the agency was required to "provide a reasoned explanation for the change." *Encino Motorcars LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).  But the only legal analysis the Attorney General and Acting Secretary provided for their decision was a citation to the Fifth Circuit's decision about the DAPA program.  Dkt. 64-1 at AR251; Pet. App. 115a. Before the district court and the court of appeals, the government shifted its argument to litigation risk— an argument that, according to the government, did not depend on a showing that DACA is unlawful.  *See* Dkt. 204 at 17; *see also* Pet. 23-27.  And the government declined to defend the Fifth Circuit's ruling.  *See* note 4, *supra*.

Even though the government had not argued that DACA is unlawful, the district court addressed and correctly rejected that argument.  *See* Pet. App. 42a-54a.  The court of appeals arrived at the same conclusion: "DACA was a permissible exercise of executive discretion, notwithstanding the Fifth Circuit's conclusion that the related DAPA program exceeded DHS's

AR3750

30

statutory authority." Supp. App. 56a-57a. The court of appeals reviewed the numerous authorities that have long justified deferred action programs. *Id.* at 8a-13a. The district court (Pet. App. 50a-54a) and the court of appeals each explained why the Fifth Circuit's decision about DAPA is "entirely inapposite" to DACA. Supp. App. 57a.[7] As the district court stated, the government "ma[de] no effort" "to challenge any of the … reasons why DACA was and remains within the authority of the agency." Pet. App. 48a. Under the circumstances, the court of appeals had ample basis to conclude that respondents "are likely to succeed in demonstrating that the rescission must be set aside." Supp. App. 57a.

b. The government's principal argument before the courts below, repeated in its petition, Pet. 23-27, is that DACA's rescission was justified by litigation risk. But that rationale appears "[n]owhere in the ad-

---

[7]  In brief: First, the Fifth Circuit's procedural holding rested on the district court's factual finding that "DAPA would not genuinely leave the agency and its employees free to exercise discretion." *Texas I*, 809 F.3d at 172-78. Here, by contrast, the district court found ample evidence of "discretionary denials of DACA applications," Pet. App. 49a; *see also* Supp. App. 50a-51a. Second, the Fifth Circuit's substantive holding—that DAPA exceeded the government's statutory authority—rested in part on its determination that granting deferred action to alien parents of U.S. citizens conflicted with INA provisions that gave them an alternate pathway to lawful presence. Supp. App. 51a-54a. DACA, in contrast, fills a gap in the statute by indicating how the government exercises its prosecutorial discretion with respect to a class of non-citizens whose fate was never directly decided by Congress. *Id.* Third, DAPA was challenged before it took effect, whereas DACA has been in place for more than five years, meaning that any legal challenge to DACA would have to overcome the significant reliance interests that have developed over those years, and the doctrine of laches. Pet. App. 57a.

AR3751

31

ministrative record." Pet. App. 56a.  The reason "actually given" by the Attorney General and the Acting Secretary was "DACA's purported illegality"; neither the Attorney General nor the agency ever "consider[ed] whether defending the program in court would (or would not) be worth the litigation risk." *Id.* The discussion of litigation in the Acting Secretary's memorandum was "limited to a simple summary of the *Texas [I]* litigation's procedural history" that "appeared only in the 'Background' section of the memorandum" and "w[as] not referenced in the Acting Secretary's statement of what she was '[t]aking into consideration.'" Supp. App. 40a (last alteration in original).  The Attorney General "likewise focuse[d] on the supposed illegality of DACA." *Id.* at 37a.  The court of appeals thus rightly took "Attorney General Sessions literally at his word" that "the basis for the rescission was a belief that DACA was unlawful." *Id.* at 35a.

Though the government now purports to find a litigation-risk rationale in the memorandum rescinding DACA, it offers no evidence.  It merely cites the *NAACP* decision, which found a litigation-risk rationale in the Acting Secretary's statement that DACA should be "w[ound] … down in 'an efficient and orderly manner.'" 298 F. Supp. 3d at 241 (quoting Pet. App. 116a).  But that statement was made *in light of* the decision to rescind DACA and was never offered as a reason for rescinding it.  Pet. App. 115a; *see SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (APA review is limited to the "grounds invoked by the agency").

In any event, both the court of appeals and the district court correctly determined that the government's post hoc "litigation risk" justification is itself arbitrary and capricious.  The government failed to consider the

**AR3752**

32

"differences between DAPA and DACA that might have led to a different result" in any litigation than in *Texas I*. Pet. App. 57a; *see* note 5, *supra*. Those interests have already had an impact in *Texas II*, spurring the district court there to deny a preliminary injunction despite its doubts about the lawfulness of DACA. 328 F. Supp. 3d at 740-42. Even if that lawsuit should ultimately prevail, the court's careful consideration of the reliance interests of DACA recipients and their families and its recognition of the need for care in "unscrambl[ing] the egg," *id.*, dispels any fear of the sort of "imminent" judicial termination of DACA that the government now claims it was seeking to avoid by winding down the program, Pet. 9; *see also NAACP*, 298 F. Supp. 3d at 241-42.

Unlike the district court in Texas, the government did not weigh any perceived litigation risks against countervailing interests that could have warranted defending DACA. Pet. App. 58a-60a. Those interests include the "serious reliance interests" by DACA recipients, which are precisely the kinds of interests that an agency "must … take[] into account" before changing position. *Encino Motorcars*, 136 S. Ct. at 2126. The paucity of the government's explanation for its change in position meant the district court had ample basis for believing that respondents' claims had sufficient merit to justify preliminary injunctive relief.

c. The government's final attempt to rationalize the rescission (Pet. 24, 27-28) is to invoke Secretary Nielsen's *subsequent* memorandum, which purported to offer "further explanation" for the initial decision to rescind DACA in response to the remand order in *NAACP*. Pet. App. 121a. But that memorandum "cannot possibly be a part of the administrative record in

33

this case." Supp. App. 57a n.24.  It was not authored until *after* the decision under review, and the court of appeals declined to consider it, instead directing the district court to do so "in the first instance."  *Id.*

The memorandum also lacks any legal relevance to this case.  It not a "fresh agency action" (a Rescission 2.0) that can stand or fall on the Secretary's new justifications.  Supp. App. 57a n.24.  It "provides almost no meaningful elaboration on the Duke Memo's assertion that DACA is unlawful," and "fails to engage meaningfully with the reliance interests and other countervailing factors that weigh against ending the program."  *NAACP*, 315 F. Supp. 3d at 471-72.  And to the extent the Secretary purported to offer "additional and independent policy concerns" not identified in the original memorandum rescinding DACA, Pet. 27, the court of appeals rightly declined to consider those "'post-hoc rationalization[s].'"  Supp. App. 57a n.24.

2.   The preliminary injunction in this case also rested on the district court's assessment of irreparable injury and weighing of the equities.  The court rightly concluded that respondents—especially the individual DACA recipients—would be irreparably harmed if DACA were permitted to expire during the pendency of this litigation.  Pet. App. 62a-64a.  The court also found that the public interest favors temporary relief to freeze the DACA program.  *Id.* at 64a-66a.  As the President explained, "[no]body really want[s] to throw out good, educated and accomplished young people who have jobs, some serving in the military."  *Id.* at 65a.

The government never disputed these factors below and fails to do so here.  Combined with the lower courts' preliminary assessment of the merits, the equities sufficiently justify the preliminary injunction.

34

The government has shown no error, let alone error worthy of upsetting a political process that may soon provide a long-term solution for the Dreamers.

AR3755

35

## CONCLUSION

The petition for a writ of certiorari should be denied. Should the Court grant the petition, it should deny certiorari in Nos. 18-588 and 18-589.

Respectfully submitted.

STUART F. DELERY
MATTHEW S. ROZEN
HALEY S. MORRISSON
ANDREW J. WILHELM
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
(202) 955-8500

MARK D. ROSENBAUM
JUDY LONDON
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
(213) 385-2977

LUIS CORTES ROMERO
BARRERA LEGAL GROUP, PLLC
19309 68th Avenue South,
Suite R102
Kent, WA 98032
(253) 872-4730

ERWIN CHEMERINSKY
UNIVERSITY OF CALIFORNIA,
BERKELEY SCHOOL OF LAW*
215 Boalt Hall
Berkeley, CA 94720
(510) 642-6483

THEODORE J. BOUTROUS, JR.
ETHAN D. DETTMER
KIRSTEN GALLER
JONATHAN N. SOLEIMANI
KELSEY J. HELLAND
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000
TBOUTROUS@GIBSONDUNN.COM

LAURENCE H. TRIBE
HARVARD LAW SCHOOL*
1575 Massachusetts Avenue
Cambridge, MA 02138
(617) 495-1767

LEAH M. LITMAN
UNIVERSITY OF CALIFORNIA,
IRVINE SCHOOL OF LAW*
401 E. Peltason Drive
Irvine, CA 92697
(949) 824-7722

*Counsel for Respondents Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, and Jirayut Latthivongskorn*

*Affiliation for identification purposes only*

**AR3756**

36

STACEY M. LEYTON
ERIC P. BROWN
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151

*Counsel for Respondents County
of Santa Clara and Service Em-
ployees International Union Local
521*

JAMES R. WILLIAMS
GRETA S. HANSEN
LAURA S. TRICE
MARCELO QUIÑONES
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street
East Wing, Ninth Floor
San Jose, CA 95110
(408) 299-5900

*Counsel for Respondent County of
Santa Clara*

December 17, 2018

**AR3757**

No. 18-589

# In the Supreme Court of the United States

——————

KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

MARTÍN JONATHAN BATALLA VIDAL, ET AL.,

*Respondents.*

——————

ON PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

——————

**BRIEF IN OPPOSITION FOR RESPONDENTS MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, CAROLINA FUNG FENG, AND MAKE THE ROAD NEW YORK**

——————

Michael J. Wishnie
   *Counsel of Record*
Muneer I. Ahmad
Marisol Orihuela
JEROME N. FRANK LEGAL
SERVICES ORGANIZATION
P.O. Box 209090
New Haven, CT 06520
(203) 432-4800
michael.wishnie@yale.edu

Trudy S. Rebert
NATIONAL IMMIGRATION
LAW CENTER
P.O. Box 721361
Jackson Heights, NY
11372
(646) 867-8793

*Additional Counsel Listed on Inside Cover*

AR3758

Karen C. Tumlin
Cooperating Attorney
JEROME N. FRANK LEGAL
SERVICES ORGANIZATION
P.O. Box 27280
Los Angeles, CA 90027
(323) 316-0944

Mayra B. Joachin
Joshua A. Rosenthal
NATIONAL IMMIGRATION
LAW CENTER
3450 Wilshire Blvd.
#108-62
Los Angeles, CA 90010
(213) 639-3900


Amy S. Taylor
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
(718) 418-7690

Scott Foletta
MAKE THE ROAD NEW YORK
92-10 Roosevelt Avenue
Jackson Heights, NY 11372
(929) 244-3456

**AR3759**

i

## QUESTION PRESENTED

The Solicitor General concedes that the Ninth Circuit's decision in a companion case "eliminates" what appears to have been the government's principal reason for filing this petition. Nevertheless, the government has not withdrawn this petition and instead asks this Court to take the extraordinary step of granting certiorari before judgment to answer several routine questions:

1.  Whether the Administrative Procedure Act or Immigration and Nationality Act preclude judicial review of the rescission of Deferred Action for Childhood Arrivals (DACA).

2.  Whether the district court abused its discretion in issuing a preliminary injunction on the ground that the rescission of DACA was arbitrary and capricious.

3.  Whether Respondents pled equal protection claims sufficiently.

**AR3760**

ii

# TABLE OF CONTENTS

**PAGE**

Question Presented.....................................................i

Introduction .............................................................. 1

Statement................................................................. 2

Reasons for Denying the Petition............................. 7

I.   THE COURT SHOULD DENY THE GOVERNMENT'S
     REQUEST FOR CERTIORARI BEFORE JUDGMENT .. 8

     A.   This Case Fails the Demanding Test
          for Certiorari Before Judgment................. 8

     B.   Past Cases of Certiorari Before
          Judgment Featured True Emergencies .. 10

II.  CERTIORARI IS NOT PROPER IN ANY OF THE
     DACA TERMINATION CASES............................... 12

III. THE DECISIONS BELOW ARE CORRECT .............. 14

     A.   The DACA Termination Is Subject to
          Judicial Review ....................................... 14

     B.   The DACA Termination Was
          Arbitrary and Capricious ....................... 16

     C.   Respondents Adequately Pled that
          Racial Bias Was a Motivating Factor
          in the DACA Termination ....................... 17

Conclusion.............................................................. 18

AR3761

iii

## TABLE OF AUTHORITIES

### Cases

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) ...............................2

*Baldwin v. Sebelius*,
  562 U.S. 1037 (2010) ..........................................10

*California v. Carney*,
  471 U.S. 386 (1985) ...........................................13

*Casa de Maryland v. U.S. Dep't of Homeland Sec.*,
  284 F. Supp. 3d 758 (D. Md. 2018), *appeal ar-
  gued*, (4th Cir. Dec. 11, 2018)............................13

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) .....................................13, 14

*Coleman v. Paccar, Inc.*,
  424 U.S. 1301 (1976) ...........................................8

*Crane v. Johnson*,
  783 F.3d 244 (5th Cir. 2015) ...............................2

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ...........................................11

*Dep't of Homeland Sec. v. Regents of the Univ. of
  Cal.*,
  138 S. Ct. 1182 (2018) .........................................2

*Ex parte Quirin*,
  317 U.S. 1 (1942) ...............................................11

**AR3762**

iv

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ...........................................17

*Gratz v. Bollinger*,
  539 U.S. 244 (2003) ...........................................12

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ...........................................15

*Mistretta v. United States*,
  488 U.S. 361 (1989) ...........................................11

*Mount Soledad Memorial Ass'n v. Trunk*,
  134 S. Ct. 2658 (2014) .........................................1

*NAACP v. Trump*,
  298 F. Supp. 3d 209 (D.D.C. 2018) .......11, 13, 16

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
  795 F.3d 956 (9th Cir. 2015) (en banc) .............17

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
  908 F.3d 476 (9th Cir. Nov. 8, 2018)...........12, 16

*Reno v. American-Arab Anti-Discrimination Committee,*
  525 U.S. 471 (1999) ...............................15, 16, 18

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) .............................................17

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) ...........................................17

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016).....4, 15, 16

**AR3763**

v

*United States v. Clinton*,
    524 U.S. 912 (1998) ............................................9

*United States v. Nixon*,
    418 U.S. 683 (1974) ....................................11, 13

*Vill. of Arlington Heights v. Metro. Hous. Dev.
    Corp.*,
    429 U.S. 252 (1977) ..........................................17

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 937 (1952) ....................................10, 11

**Statutes and Rules**

5 U.S.C. § 706(2)(a) ................................................16

8 U.S.C. § 1154(a)(1)(D)(i)(II) ................................16

8 U.S.C. § 1227(d)(2) ..............................................16

8 U.S.C. § 1252(b)(9) .........................................15, 16

8 U.S.C. § 1252(g) ...................................................15

Sup. Ct. R. 10 .........................................................12

Sup. Ct. R. 11 ................................................ passim

**Other Authorities**

Br. for United States as Amicus Curiae supporting
    appellees, *Ariz. Dream Act Coal. v. Brewer*, 855
    F.3d 957 (9th Cir. 2017) (No. 15-15307), 2015
    WL 5120846. .......................................................3

Defs.' Resp. to Mot. for Prelim. Inj., *State of Texas
    v. Nielsen*, No. 18-00068 (S.D. Tex. June 8,
    2018), ECF No. 71 ............................................14

**AR3764**

vi

Joint Discovery/Case Management Plan, *State of Texas v. United States*, No. 18-00068, (S.D. Tex. Oct. 31, 2018)......................................................13

The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, O.L.C. 2014 WL 10788677 (Nov. 19, 2014)......................................................3

**AR3765**

1

## INTRODUCTION

The government seeks an extraordinary and un-warranted intervention from this Court to save it from routine judicial process and decisions it does not like. This Court grants certiorari before judgment "only upon a showing that the case is of such imperative public importance as to justify deviation from normal appellate practice and to require immediate determi-nation in this Court," Sup. Ct. R. 11, and historically has done so only in national emergencies. This case does not meet that "very demanding standard." *Mount Soledad Memorial Ass'n v. Trunk*, 134 S. Ct. 2658, 2658 (2014) (Alito, J., statement respecting the denial of certiorari before judgment). Moreover, in a supple-mental filing in a companion case correcting a mate-rial misrepresentation to this Court, the government has essentially abandoned this petition altogether.

The preliminary injunction entered by the district court—a stay of which the government never sought below—does no more than preserve the status quo and creates no circumstances that justify the extraordi-nary procedural departure of certiorari before judg-ment. In contrast, for this Court to disrupt the status quo without ordinary appellate review, as the govern-ment urges, would upend the lives of hundreds of thousands of young people and their families, schools, workplaces, and communities.

Nor does this case rise to the level of warranting certiorari at all: The government does not present any momentous legal question, but rather seeks review merely of the application of settled law to the unique facts of this case. Additionally, this Court should not

2

adjudicate the merits of this case while disputes regarding completion of the administrative record and discovery remain pending.

In reality, this petition is a transparent gambit to sidestep "normal appellate practice," Sup. Ct. R. 11, simply because the government lost below. This Court has rejected similar attempts by the government, *see Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 138 S. Ct. 1182, 1182 (2018), and there is no valid reason to reward the government's hyperbolic and inaccurate claims of emergency here—claims the Solicitor General now admits were overstated. The Court should deny the petition and allow the case to proceed before the Second Circuit, which has scheduled argument for January 25, 2019.

## STATEMENT

On September 5, 2017, then-Attorney General Sessions abruptly announced the termination of DACA, a decision affecting nearly 800,000 individuals, on the basis of conclusory and erroneous legal assertions. Prior to the termination, the government had repeatedly and successfully defended DACA's legality for over five years, and no court held it unlawful. *See, e.g., Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) (rejecting a challenge to the legality of DACA); *Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015) (same). In a memorandum that has never been withdrawn, the Department of Justice Office of Legal Counsel (OLC) concluded that DACA was lawful as long as officials "retained discretion to evaluate each application on an individualized basis." The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, O.L.C. 2014

**AR3767**

3

WL 10788677, at *18 n.8 (Nov. 19, 2014); *see also* Br. for United States as Amicus Curiae supporting appellees at *1, *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017) (No. 15-15307), 2015 WL 5120846. After entering office, the Trump Administration twice declined to terminate DACA, exempting it from other broad changes in immigration policy announced in February and June 2017.

DACA allowed hundreds of thousands of young people to pursue their education, support their families, and build a life in the only country they had ever known as home. For instance, after receiving deferred action, Respondent Fung Feng began a career teaching; Respondent Vargas finished his undergraduate degree and enrolled in law school; and Respondent Batalla Vidal became a physical therapist aide and enrolled in further education.

On September 5, 2017, the government shifted course radically. Its decision to terminate DACA relied on conclusory legal assertions presented in a one-page letter from then-Attorney General Sessions to then-Acting Secretary of Homeland Security Elaine Duke ("Sessions Letter") (Dkt. 77-1, AR00000251).[1] The Sessions Letter asserted for the first time that DACA was "an unconstitutional exercise of authority by the Executive Branch," in part "[b]ecause [it] has the same legal and constitutional defects that the courts recognized as to DAPA [Deferred Action for Parents of Americans and Lawful Permanent Residents]," even though DACA and DAPA are distinct and no court had recognized a constitutional defect in

---

[1] All record citations refer to the docket in *Batalla Vidal v. Nielsen*, No. 16-CV-4756 (E.D.N.Y. filed Aug. 25, 2016), except as otherwise noted.

4

the latter. *Id*. Acting Secretary Duke then issued a brief memorandum terminating DACA, citing to the Sessions Letter and Fifth Circuit litigation about DAPA ("Duke Memorandum") (Dkt. 77-1, AR00000252–56); *see generally Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016).

However, rather than immediately terminating DACA, which the agency had proclaimed unlawful, the Department of Homeland Security (DHS) began a six-month "wind down" of DACA. During this time, DHS processed renewal applications received by October 5, 2017 for those whose deferred action expired before March 5, 2018. *See* Duke Memorandum at AR000000255. The government did not address its prior legal analysis (or why its analysis had changed), the legal authority under which DHS processed renewals during the wind-down period, or DACA recipients' reliance interests.

Respondents, including the organization Make the Road New York, initiated their challenge to the DACA termination in the Eastern District of New York on September 5, 2017. After amending their pleadings and joining additional Respondents, they alleged that the termination was arbitrary and capricious under the Administrative Procedure Act (APA), impermissibly motivated by discriminatory animus in violation of the equal protection guarantee of the Fifth Amendment, and a violation of procedural due process as to certain DACA recipients. Dkt. 113, ¶¶ 188–205.[2]

---

[2] Respondents also challenged the DACA termination as a violation of the APA's notice and comment requirement and the Regulatory Flexibility Act, claims that the district court dis-

5

The government filed an administrative record consisting of a mere 256 pages, three-quarters of which were the decisions in *Texas v. United States*. *See Regents* Pet. App. 23a. The district court recognized that this record was "manifestly incomplete" and ordered its completion. Dkt. 89 at 3.

Rather than comply with this order, the government sought immediate review in the Second Circuit, filing an emergency petition under the All Writs Act to stay discovery, contest completion of the administrative record, and challenge the court's jurisdiction. Second Corr. Writ of Mandamus, *In re Nielsen*, No. 17-3345 (2d Cir. Oct. 19, 2017), ECF No. 3. A Second Circuit panel unanimously denied the petition. Opinion and Order at 5, *In re Nielsen,* No. 17-3345 (2d Cir. Dec. 27, 2017), ECF No. 171.

The government filed a motion to dismiss under Rule 12(b)(1) and (b)(6), Dkt. 95, which the district court denied in part and granted in part. Pet. App. 1a–58a. Concluding that the government had failed to rebut the "strong presumption favoring judicial review of administrative action," the district court held that the decision to terminate DACA was reviewable. Pet. App. 25a. The district court also noted its jurisdiction to review constitutional claims. Pet. App. 31a–32a. The government moved to certify an interlocutory appeal of the district court's order. Pet. App. 59a–61a.

---

missed, Pet. App. 145a–46a (E.D.N.Y. 2018), and which Respondents have not appealed. Further, Respondents moved for certification of a nation-wide class. The district court denied that motion as moot, in light of its entry of a nation-wide preliminary injunction. Pet. App. 71a. Respondents did not seek interlocutory review of the denial of class certification.

6

The district court issued a preliminary injunction on February 13, 2018, ordering the government to "maintain the DACA program on the same terms . . . that existed prior to the promulgation of the DACA Rescission Memo," except with respect to consideration of new applications and requests for advance parole. Pet. App. 126a. The district court found that Respondents were likely to succeed on their claim that the DACA termination was arbitrary and capricious because it stemmed from an "erroneous [legal] conclusion"; relied in part on a "plainly incorrect factual premise"; had internally contradictory logic; and did not take into account the reliance interests of hundreds of thousands of recipients. Pet. App. 67a–68a, 113a–14a. The government appealed the preliminary order, Pet. App. 130a–32a, but did not seek a stay of the injunction.

Finally, the district court issued an order granting in part and denying in part the government's motion to dismiss under Rule 12(b)(6). Pet. App. 133a–171a. Concluding that Respondents had alleged "sufficient facts to raise a plausible inference that the DACA rescission was substantially motivated by unlawful discriminatory purpose," Dkt. 260, at 12–13,[3] the district court declined to dismiss Respondents' equal protection claim. The government, for the third time, sought to appeal an order of the district court. Pet. App. 172a–174a.

The Second Circuit granted the government leave to appeal the district court's orders denying its mo-

---

[3] The government's appendix misquotes the district court's decision. The quotation provided here is accurate. *Compare* Pet. App. 147a.

**AR3771**

7

tions to dismiss, Pet. App. 175a–176a, and consolidated the three pending appeals. Oral argument is scheduled for January 25, 2019.

The government filed three petitions for certiorari before judgment on November 5, 2018. Despite the supposed urgency of certiorari before judgment, the government waited more than a week after the Ninth Circuit affirmed entry of a preliminary injunction in *Regents* to supplement its petition. When it finally did so, the government misrepresented Respondents' claims. Supp. Br. at 12–13 (Nov. 19, 2018, No. 18-587).[4] When the government eventually corrected the supplemental brief, it admitted that the Ninth Circuit's ruling "eliminates [one] reason for granting the government's petition," and instead urged that the Court "hold the *Batalla Vidal* petition pending the government's petitions in these cases." Petitioner's Corr. Supp. Br. at 11 (Nov. 28, 2018, No. 18-587).

## REASONS FOR DENYING THE PETITION

Rather than presenting questions "of imperative public importance," despite the unique factual circumstances, this petition concerns well-settled administrative law and pleading questions that the courts below have correctly decided. Sup. Ct. R. 11. As such, there is no need for "immediate determination in this Court," and no part of this case justifies "deviation from standard appellate practice." *Id.* Moreover, this case differs dramatically from the limited instances of

---

[4] The government erroneously stated that Respondents had cross-appealed the district court's dismissal of their notice-and-comment claim, and argued that this was an important reason to grant certiorari before judgment in the present case.

8

national emergency where the Court has taken the ex-
traordinary step of granting certiorari before judg-
ment.

This petition not only fails to merit certiorari be-
fore judgment, but it also fails to satisfy the Court's
traditional certiorari criteria. The case does not pre-
sent an unresolved legal question dividing the courts
of appeals. And disputes around the administrative
record and discovery remain pending. The Court
should deny the request for certiorari in any form.

## I.   The Court Should Deny the Government's Re-
quest for Certiorari Before Judgment

A grant of certiorari before judgment is properly
"an extremely rare occurrence," *Coleman v. Paccar,
Inc.*, 424 U.S. 1301, 1304 n.* (1976) (Rehnquist, J., in
chambers), typically reserved for national emergen-
cies. This petition meets none of the conditions for
such a grant and should be denied.

## A. This Case Fails the Demanding Test for Certio-
rari Before Judgment

First, although DACA is of critical practical im-
portance , the particular questions presented in the
petition are not of "imperative public importance."
Sup. Ct. R. 11. The only questions of law presented are
whether Petitioners' termination of DACA is reviewa-
ble and arbitrary and capricious, and whether Re-
spondents have met their pleading requirements.
These questions all concern application of settled law

**AR3773**

9

to the facts of this case.[5] There are no novel legal ques-
tions that warrant extraordinary review.

Second, this case does not require "immediate de-
termination in this Court." Sup. Ct. R. 11. The case
does not present a public emergency and can be re-
solved expeditiously without resorting to the extraor-
dinary measure of certiorari before judgment.

That DACA recipients may "continu[e] their pres-
ence in this country and pursu[e] their lives" under
the current injunctions, which preserve the status
quo, hardly presents a crisis. Nielsen Memorandum,
*Regents.* Pet. App. 125a. This is evident from the gov-
ernment's own conduct in this litigation and the
prompt schedule for appellate review. Certiorari be-
fore judgment should not be granted where it is clear
"that the Court of Appeals will proceed expeditiously
to decide [the] case." *United States v. Clinton*, 524 U.S.
912, 912 (1998). Here, the government has never
sought a stay of the preliminary injunction, even
when petitioning numerous times for appellate court
review. Moreover, briefing before the Second Circuit
is complete and the Court has set argument for Janu-
ary 25, 2019. Case Calendaring for Argument, No. 18-
485 (2d Cir. Nov. 19, 2018), ECF No. 567. The govern-
ment has not availed itself of remedies available at
the appellate court and can identify no concrete harm
caused by orderly adjudication, yet still argues that

---

[5] Even Amici challenging DACA itself, in a lawsuit pending
before the Southern District of Texas, agree that the Executive's
decision to wind down DACA is reviewable under the APA. *See*
Br. for State of Texas, et al., No. 18-589, at 8 n.4 (citing *Heckler
v. Chaney*, 470 U.S. 821, 830 (1985)).

**AR3774**

10

the presence of DACA recipients is so urgently con-
cerning as to require a drastic deviation from appel-
late practice.

Third, the questions presented in the govern-
ment's petition would benefit from further review by
the courts of appeals.[6] Agencies are routinely subject
to court orders and injunctions with which they disa-
gree, including on actions that affect large numbers of
people. This Court has not granted certiorari before
judgment in past cases simply due to the presence of
controversy, instead allowing for development of the
circuit court law and relevant records. *See, e.g.*,
*Baldwin v. Sebelius*, 562 U.S. 1037, 1037 (2010) (deny-
ing certiorari before judgment on a challenge to the
Affordable Care Act).

Appellate practice is especially important to clar-
ify and distill issues for this Court's review, without
which this Court is deprived of "all of the wisdom that
our judicial process makes available." *Youngstown
Sheet & Tube Co. v. Sawyer*, 343 U.S. 937, 938 (1952)
(Burton J., dissenting from grant of certiorari before
judgment); *id.* ("The need for soundness in the result
outweighs the need for speed in reaching it. The Na-
tion is entitled to the substantial value inherent in [a
decision] . . . by the Court of Appeals.").

## B. Past Cases of Certiorari Before Judgment Fea-
tured True Emergencies

The government's petition falls dramatically short
of prior instances in which this Court has taken the

---

[6] The Fourth Circuit also held argument in a fourth case
challenging the termination of DACA on December 11, 2018.
*Casa de Maryland v. Dep't of Homeland Sec.*, No. 18-01522 (4th
Cir. 2018), ECF No. 56.

**AR3775**

11

extraordinary step of granting certiorari before judgment. Those cases presented a national wartime emergency, implicated the privacy of presidential communications, or required immediate resolution to prevent chaos at the lower courts. *See, e.g.*, *Mistretta v. United States*, 488 U.S. 361, 371 & n.6 (1989) (finding an urgent need to clarify divisions in the district courts regarding sentencing guidelines); *Dames & Moore v. Regan*, 453 U.S. 654, 660 (1981) (authorizing action during a hostage crisis); *United States v. Nixon*, 418 U.S. 683, 686–87 & nn.1–2 (1974) (addressing a subpoena for recordings of presidential conversations); *Youngstown*, 343 U.S. at 584–85 (addressing seizure of national steel industry); *Ex parte Quirin*, 317 U.S. 1, 1 (1942) (considering a challenge to jurisdiction of military tribunals during World War II). Here, the government claims merely that it should not have to "retain a discretionary non-enforcement policy" for a longer period. Pet. 16.

Lacking true urgency, the government's petition is but its latest attempt to avoid regular order in judicial review of its actions.[7] If the government were committed to achieving the correct legal result in this case, it would proceed with orderly appellate review.[8]

---

[7] Similarly, if the government truly viewed the present situation as urgent, it could promulgate a new, procedurally correct and adequately-reasoned memorandum to rescind DACA, as Judge Bates invited. *NAACP v. Trump*, 298 F. Supp. 3d 209, 216 (D.D.C. 2018), *adhered to on denial of reconsideration*, 315 F. Supp. 3d 457 (D.D.C. 2018). It also had multiple opportunities to a seek a stay of the preliminary injunction pending appeal, but repeatedly chose not to do so.

[8] The Court should also reject the government's weak plea to hold this petition in abeyance. Denying the petition outright

12

## II. Certiorari Is Not Proper in Any of the DACA Termination Cases

The DACA cases do not meet the Court's criteria for granting certiorari, nor do they adequately present the questions on which the government seeks review. "Review on a writ of certiorari is not a matter of right, but of judicial discretion . . . granted only for compelling reasons." Sup. Ct. R. 10.

The petitions do not offer any compelling reasons for this Court to grant certiorari. First, no conflict exists between courts of appeals. Every court in the cases being considered for certiorari has concluded that the rescission of DACA was both reviewable and arbitrary and capricious.[9] The courts' judgment on these cases so far is clear.

———————————

will permit the Second Circuit to proceed to decision on the government's three pending appeals. Moreover, as noted above, the government's material error in its first supplemental brief substantially undermines its argument for certiorari in this case. Respondents here have *not* cross-appealed the district court's dismissal of their notice-and-comment claim, as the government concedes. *Compare* Petitioner's Supp. Br. at 12–13 *with* Petitioner's Corr. Supp. Br. at 10–11. Nor does past practice support granting certiorari to *Batalla Vidal* as a "companion" case even if this Court grants certiorari in *Regents. See, e.g.*, *Gratz v. Bollinger*, 539 U.S. 244, 259–60 (2003) (certiorari before judgment granted as a companion case where both cases challenged policies by the same University and had been heard by the Sixth Circuit on the same day).

[9] *See* Pet. App. 24a; *id*. at 67a; *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec*., 908 F.3d 476, 503, 510 (9th Cir. Nov. 8, 2018); *NAACP v. Trump*, 298 F. Supp. 3d 209, 235, 243 (D.D.C. April 24, 2018), *adhered to on denial of reconsideration*, 315 F. Supp. 3d 457 (D.D.C. 2018). *But see Casa de Maryland v.*

13

Second, the administrative and factual records have not been finalized. Review under the APA requires courts to make their decision based on "the full administrative record" before the executive branch official "at the time [she] made [her] decision." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). However, the government "ha[s] yet to produce a plausible administrative record in these cases, without which the court cannot render a merits decision." Pet. App. 123a; *cf.* Opinion and Order at 5, *In re Nielsen* (2d Cir. Dec 27, 2017).[10]

Third, even if this Court grants certiorari on all three cases, it could not "reach all of the claims" and "provide a definitive resolution," as the government suggests, without ruling on constitutional claims in the first instance, which is disfavored, let alone dismissed claims not yet appealed.[11] Pet. 17. The district court has not ruled on Respondents' equal protection claim, merely finding that Respondents adequately stated that claim. Pet. App. 147a–157a; *Nixon*, 418 U.S. at 690 ("The finality requirement of 28 U.S.C. §

───────────────

*U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 770, 773 (D. Md. 2018), *appeal argued*, (4th Cir. Dec. 11, 2018).

[10] Completion of the administrative record and discovery on the constitutional claims in this case are stayed. *See* Dkt. 233; *cf.* Joint Discovery/Case Management Plan, *State of Texas v. United States*, No. 18-00068, (S.D. Tex. Oct. 31, 2018) (discovery underway in separate challenge to lawfulness of DACA).

[11] *See California v. Carney*, 471 U.S. 386, 399–401 (1985) (Stevens, J., dissenting) (citing B. Cardozo, The Nature of the Judicial Process 179 (1921)) ("To identify rules that will endure, we must rely on the . . . lower federal courts to debate and evaluate the different approaches to difficult and unresolved questions of constitutional law.").

**AR3778**

14

1291 embodies a strong congressional policy against piecemeal reviews, and against obstructing or impeding an ongoing judicial proceeding by interlocutory appeals."). Additionally, the Ninth Circuit ruling in *Regents* did not reach key issues in the case, underscoring the need for further proceedings prior to certiorari. *See supra* Part I.A.

## III. The Decisions Below Are Correct

This Court should not grant certiorari because the decisions below are correct. The termination is both reviewable and arbitrary and capricious, and Respondents have stated an equal protection claim.

## A. The DACA Termination Is Subject to Judicial Review

The DACA termination does not fall into the "very narrow" exception to APA review, nor the discrete categories of immigration enforcement action for which the INA bars judicial review; as such, it is reviewable. *Overton Park*, 401 U.S. at 410.

The very narrow exception to the APA's presumption of judicial review, where "agency action is committed to agency discretion by law," applies only "in those rare instances where [. . .] there is no law to apply." *Id.* at 410; *see also Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The district court correctly determined that the government's decision to abruptly terminate DACA did not fall under this narrow exception.[12]

------

[12] Notably, when confronted with Texas's lawsuit to enjoin DACA itself, the government did not contest the district court's jurisdiction. *See* Defs.' Resp. to Mot. for Prelim. Inj., *State of*

15

As the government's petition confirms, DHS terminated DACA exclusively on the basis of a legal determination. Pet. App. 26a–27a, 30a–31a. Thus, there is "law to apply": the same law that the agency relied on in making the legal determination that DACA was unlawful. Pet. App. 26a–28a. This legal analysis does not "involve the complicated balancing" of policy and resource factors, nor is it within the "peculiar[] . . . expertise" of DHS. *Chaney*, 470 U.S. at 831.

Section 1252(g) of Title 8 also does not bar judicial review of the decision to terminate DACA. *See* Pet. 21–22. This Court has already rejected the government's broad reading that § 1252(g) "covers the universe of deportation claims—that it is a sort of 'zipper' clause," *Reno v. American-Arab Anti-Discrimination Committee (AADC)*, 525 U.S. 471, 482 (1999). Instead, this Court held that the § 1252(g) jurisdiction-stripping provisions apply only to three discrete actions involving the Secretary of DHS's decision "to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C. § 1252(g); *AADC*, 525 U.S. at 502; *see also Texas v. United States*, 809 F.3d 134, 164 (5th Cir. 2015) (rejecting government's arguments that § 1252(g) precludes review of DAPA). None of those discrete actions is at issue here, as both the district court, Pet. App. 35a, and Petitioners themselves recognize. *Regents* Pet. 20 ("[T]he rescission does not, by itself, initiate removal proceedings.").

Petitioners' admission similarly defeats their argument, not raised before the district court, that 8 U.S.C. § 1252(b)(9) channels review of Respondents' claims exclusively into proceedings challenging a final

---

*Texas v. Nielsen*, No. 18-00068 (S.D. Tex. June 8, 2018), ECF No. 71.

order of removal. *Regents* Pet. 22. The DACA termina-
tion is not an "action taken [. . .] to remove an alien
from the United States," nor do Respondents chal-
lenge a final order, *see AADC*, 525 U.S. at 483, and §
1252(b)(9) is inapposite.

## B. The DACA Termination Was Arbitrary and Ca-
pricious

The DACA termination fails to meet the APA's
standards for reasoned decision-making. *See* 5 U.S.C.
§ 706(2)(a). The agency provided only "scant legal rea-
soning" to justify its erroneous conclusion that DACA
was unlawful, and it failed to consider the reliance in-
terests engendered by the policy. *NAACP v. Trump*,
298 F. Supp. 3d 209, 238 (D.D.C. 2018).

The agency's conclusion that DACA is unlawful is
legally erroneous. DACA is consistent with the
agency's authority under the INA to grant deferred ac-
tion. *See, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II) (stating
that certain non-citizens are eligible for deferred ac-
tion); *id.* § 1227(d)(2); *AADC*, 525 U.S. at 483–85 (de-
scribing deferred action as a "commendable exercise
in administrative discretion, developed without ex-
press statutory authorization"). Furthermore, alt-
hough the agency purported to rely on the Fifth Cir-
cuit's analysis in *Texas v. United States*, 809 F.3d 134
(5th Cir. 2015), that court's reasons for invalidating
DAPA do not apply to DACA. For instance, the *Texas*
court relied on assertions, since disproven, that DACA
adjudications lacked discretion. *See Regents of Univ.
of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476,
507 (9th Cir. Nov. 8, 2018); *see also* Pet. App. 100a–
04a (noting other relevant differences between DAPA
and DACA). The DACA rescission rests on erroneous

17

legal reasoning and is arbitrary and capricious. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

Nine months after terminating DACA, the agency attempted to rationalize its decision in the Nielsen Memorandum, *Regents* Pet. App. 120a, referencing alleged litigation risk and enforcement policy concerns. However, such *post-hoc* justifications carry no weight. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Even if the agency had properly articulated that DACA was subject to litigation risk, its justification remains irrational. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 970 (9th Cir. 2015) (en banc). Finally, neither the agency's contemporary nor *post-hoc* explanations adequately consider DACA recipients' reliance interests, ignoring this Court's admonition that "serious reliance interests . . . must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

## C. Respondents Adequately Pled that Racial Bias Was a Motivating Factor in the DACA Termination

As the district court correctly concluded, Plaintiffs have properly stated a claim that the DACA termination violated the Constitution's equal protection guarantee. The agency terminated a program whose recipients are mostly of Mexican or Latino heritage, in a highly irregular manner, under the direction of a President who routinely denigrates immigrants of color. Under this Court's precedents, a court may thus infer that the decision was motivated by discriminatory animus. *See, e.g., Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). The government's argument that Respondents' equal protec-

18

tion claim is foreclosed by *AADC*, 525 U.S. 471, is inapposite. *AADC* was a selective prosecution case brought by individuals. Plaintiffs instead challenge the wholesale termination of deferred action under DACA, which allowed nearly 800,000 young people to obtain temporary protection from removal.

## CONCLUSION

Because the petition does not present an emergency warranting this Court's immediate intervention, this Court should deny the government's request to take the extraordinary step of granting certiorari before judgment.

Respectfully submitted,

**AR3783**

19

Michael J. Wishnie
  *Counsel of Record*
Muneer I. Ahmad
Marisol Orihuela
JEROME N. FRANK LEGAL
SERVICES ORGANIZATION
P.O. Box 209090
New Haven, CT 06520
(203) 436-4780
michael.wishnie@yale.edu

Karen C. Tumlin
Cooperating Attorney
JEROME N. FRANK LEGAL
SERVICES ORGANIZATION
P.O. Box 27280
Los Angeles, CA 90027
(323) 316-0944

Amy S. Taylor
MAKE THE ROAD NEW
YORK
301 Grove Street
Brooklyn, NY 11237
(718) 418-7690

Trudy S. Rebert
NATIONAL IMMIGRATION
LAW CENTER
P.O. Box 721361
Jackson Heights, NY 11372
(646) 867-8793

Mayra B. Joachin
Joshua A. Rosenthal
NATIONAL IMMIGRATION
LAW CENTER
3450 Wilshire Blvd. 108-62
Los Angeles, CA 90010
(213) 639-3900

Scott Foletta
MAKE THE ROAD NEW
YORK
92-10 Roosevelt Avenue
Jackson Heights,
NY 11372
(929) 244-3456

    Dated: December 17, 2018

**AR3784**

No. 18-588

IN THE
Supreme Court of the United States

————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL.,

*Petitioners*,

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL.,

*Respondents*.

————

**On Petition for a Writ of Certiorari Before
Judgment to the United States Court of Appeals
for the District of Columbia Circuit**

————

**BRIEF IN OPPOSITION**

————

JOSEPH M. SELLERS
JULIE S. SELESNICK
COHEN MILSTEIN SELLERS
 & TOLL PLLC
1100 New York Ave., N.W.
Fifth Floor
Washington, DC 20005
(202) 408-4600

*Counsel for Respondents
NAACP; American
Federation of Teachers, AFL-
CIO; and United Food and
Commercial Workers
International Union, AFL-
CIO, CLC*

THOMAS J. PERRELLI
LINDSAY C. HARRISON
 *Counsel of Record*
SAM HIRSCH
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com

*Counsel for Respondents The
Trustees of Princeton
University, Microsoft
Corporation, and Maria De
La Cruz Perales Sanchez*

*(Additional Counsel Listed on Inside Cover)*

**AR3785**

RAMONA E. ROMERO
WESLEY MARKHAM
PRINCETON UNIVERSITY
New South Building
Fourth Floor
Princeton, NJ, 08544
(609) 258-2500

*Counsel for Respondent The Trustees of Princeton University*

CYNTHIA L. RANDALL
MICROSOFT CORPORATION
One Microsoft Way
Redmond, WA 98052
(425) 538-3176

*Counsel for Respondent Microsoft Corporation*

BRADFORD M. BERRY
NAACP
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-5797

*Counsel for Respondent NAACP*

ISHAN BHABHA
ALEX S. TREPP
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Respondents The Trustees of Princeton University, Microsoft Corporation, and Maria De La Cruz Perales Sanchez*

DAVID J. STROM
AMERICAN FEDERATION OF
  TEACHERS, AFL-CIO
555 New Jersey Ave. N.W.
Washington D.C.
(202) 393-7472

*Counsel for Respondent American Federation of Teachers, AFL-CIO*

PETER J. FORD
UNITED FOOD &
  COMMERCIAL WORKERS
  INTERNATIONAL UNION,
  AFL-CIO, CLC
1775 K Street. N.W.
Washington D.C. 20006
(202) 223-3111

*Counsel for Respondent United Food & Commercial Workers International Union, AFL-CIO, CLC*

**AR3786**

i

## QUESTIONS PRESENTED

The questions presented are as follows:

1. Whether the Department of Homeland Security's rescission of the Deferred Action for Childhood Arrivals (DACA) program is immune from judicial review.

2. Whether the rescission of the DACA program is lawful under the Administrative Procedure Act.

**AR3787**

ii

## PARTIES TO THE PROCEEDING

Respondents are The Trustees of Princeton University; Microsoft Corporation; Maria De La Cruz Perales Sanchez; the National Association for the Advancement of Colored People; American Federation of Teachers, AFL-CIO; and United Food and Commercial Workers International Union, AFL-CIO, CLC.

Petitioners are Donald J. Trump, President of the United States; Matthew Whitaker, Acting Attorney General of the United States; Kirstjen M. Nielsen, Secretary of Homeland Security; U.S. Citizenship and Immigration Services; U.S. Immigration and Customs Enforcement; the U.S. Department of Homeland Security; and the United States.

AR3788

iii

## TABLE OF CONTENTS

QUESTIONS PRESENTED ............................................ i

PARTIES TO THE PROCEEDING ............................. ii

TABLE OF AUTHORITIES ......................................... iv

INTRODUCTION ................................................ 1

STATEMENT OF THE CASE ...................................... 2

I.     DACA ............................................................. 2

II.    Proceedings Below ................................... 8

REASONS FOR DENYING THE WRIT ................. 10

I.     Review of the *Regents* Case Is
       Premature.............................................. 10

II.    The Petition for Certiorari Before
       Judgment in this Case Should Be Denied......... 13

III.   The District Court's Decision Is Correct.......... 18

       A.    The Rescission of DACA Is
             Subject to Judicial Review..................... 18

       B.    The District Court Correctly Held
             that the Rescission of DACA Was
             Arbitrary and Capricious. ..................... 27

CONCLUSION ................................................ 35

**AR3789**

iv

## TABLE OF AUTHORITIES

CASES

*Aaron v. Cooper*, 357 U.S. 566 (1958) ......................18

*Alpharma, Inc. v. Leavitt*, 460 F.3d 1 (D.C. Cir. 2006).................................30

*American Construction Co. v. Jacksonville, Tampa & Key West Railway Co.*, 148 U.S. 372 (1893) ................................12

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ....................12

*Beame v. Friends of the Earth*, 434 U.S. 1310 (1977) ....................................15

*Brown v. Chote*, 411 U.S. 452 (1973) .........................12

*Camp v. Pitts*, 411 U.S. 138 (1973) ............................31

*Casa De Maryland v. United States Department of Homeland Security*, 284 F. Supp. 3d 758 (D. Md. 2018), *appeal docketed*, No. 18-1522 (8th Cir. May 8, 2018)......................................19

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977) .............19

*Coleman v. Paccar Inc.*, 424 U.S. 1301 (1976) ...........................................2, 13-14

*Consumer Energy Council of America v. FERC*, 673 F.2d 425 (D.C. Cir. 1982), *aff'd sub nom. Process Gas Consumers Group v. Consumer Energy Council of America*, 463 U.S. 1216 (1983)................................32

**AR3790**

v

*Crowley Caribbean Transport, Inc. v. Pena,* 37 F.3d 671 (D.C. Cir. 1994) ................................. 21

*Dames & Moore v. Regan,* 453 U.S. 654 (1981) ........ 13

*Encino Motorcars, LLC v. Navarro,* 136 S. Ct. 2117 (2016) .................................................. 27, 28, 33

*Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418 (2006)............... 16

*Heckler v. Chaney,* 470 U.S. 821 (1985) ............................................. 19, 20, 21, 22, 24

*ICC v. Brotherhood of Locomotive Engineers,* 482 U.S. 270 (1987).................................................. 23

*International Union, UAW v. Brock,* 783 F.2d 237 (D.C. Cir. 1986)................................................. 25

*Judulang v. Holder,* 565 U.S. 42 (2011) ..................... 25

*Lincoln v. Vigil,* 508 U.S. 182 (1993)........................... 21

*Mach Mining, LLC v. EEOC,* 135 S. Ct. 1645 (2015) .................................................................. 8, 19

*Massachusetts v. EPA,* 549 U.S. 497 (2007) ....... 21, 22

*Mistretta v. United States,* 488 U.S. 361 (1989)........ 13

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29 (1983) .................................................. 25, 29, 31, 33

*National Ass'n of Manufacturers v. Department of Defense,* 138 S. Ct. 617 (2018) ................................................................15-16

AR3791

vi

*Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633 (1990)....................................31

*Ex parte Quirin*, 317 U.S. 1 (1942)..............................13

*Reno v. American–Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999).....................26, 27

*Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315 (1983) ........................................................15

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ...............34

*Spears v. United States*, 555 U.S. 261 (2009) ...........11

*Texas v. United States*, 328 F. Supp. 3d 662 (S.D. Tex. 2018)..............................................14

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) ..............................................6

*United States v. Nixon*, 418 U.S. 683 (1974)............13

*United States v. Texas*, 136 S. Ct. 2271 (2016)...........6

*United States v. Texas*, 137 S. Ct. 285 (2016)..............6

*Virginia Military Institute v. United States*, 508 U.S. 946 (1993)..................................12

*Volpe v. District of Columbia Federation of Civic Ass'ns*, 405 U.S. 1030 (1972) .....................18

*Weyerhaeuser Co. v. United States Fish & Wildlife Service*, 139 S. Ct. 361 (2018)...............19

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).......................................13

AR3792

vii

STATUTES

5 U.S.C. § 701(a)(2) ...................................................18-19

6 U.S.C. § 202(5).............................................................33

8 U.S.C. § 1103(a)(1) .....................................................34

8 U.S.C. § 1252(g)..........................................................26

8 U.S.C. § 1324a(h)(2) ...................................................34

8 U.S.C. § 1611(b)(2) .......................................................4

8 U.S.C. § 1611(b)(3) .......................................................4

8 U.S.C. § 1621(d)............................................................4

28 U.S.C. § 2101(e)...........................................................2

LEGISLATIVE MATERIALS

*Hearing on Kirstjen M. Nielsen to be Homeland Security Secretary Before the S. Comm. on Homeland Sec. and Gov't Affairs*, 115th Cong. (2017) ..................................16

*Hearing on Oversight of the United States Department of Homeland Security Before the S. Comm. on the Judiciary*, 115th Cong. (2018)..........................................................17

OTHER AUTHORITIES

8 C.F.R. § 274a.12(c)(14) .................................................4

8 C.F.R. § 212.5(f) ............................................................4

42 C.F.R. § 417.422(h) .....................................................4

42 C.F.R. § 422.50(a)(7)...................................................4

AR3793

viii

Scott Clement & David Nakamura, *Survey Finds Strong Support for 'Dreamers'*, Wash. Post (Sept. 25, 2017), https://tinyurl.com/ybqvqajx ..................4

*NPR Poll: 2 in 3 Support Legal Status for DREAMers; Majority Oppose Building a Wall*, NPR: All Things Considered (Feb. 6, 2018), https://tinyurl.com/yblhrs2d ...................4

*READ: President Trump's Full Exchange With Reporters*, CNN.com (Jan. 24, 2018), https://tinyurl.com/ydcafdtr ................................15

Sup. Ct. R. 11........................................................ 13, 14

AR3794

1

## INTRODUCTION

The government seeks certiorari before judgment in this case based primarily on the pendency of its petition in a different case that is itself a poor candidate for review.[1] That case, *United States Department of Homeland Security v. Regents of the University of California*, No. 18-587, arrives to the Court on an interlocutory posture without a circuit split. And the government makes no credible case for interlocutory review. The DACA program has been in place since 2012. The program was essentially unchallenged through the past administration, and the current administration voluntarily maintained the program for more than eight months before rescinding it. Even upon rescission, the administration allowed many recipients to renew their status once more, effectively continuing the program into 2020. The government has not sought to stay the preliminary injunctions issued by various courts while the parties litigate the *Regents* respondents' claims. Those injunctions are limited to allowing existing DACA recipients to renew their status; they do not compel the government to consider new DACA applications, and they do not allow DACA recipients to leave the country and return using

---

[1] Although Respondents brought two separate cases, they were litigated in the district court as one, and are treated in the Petition as one. Respondents submit a single Brief in Opposition and will refer to their related cases in the singular. Respondents will likewise refer to the three related *Regents* cases in the singular, and to the two related *Batalla Vidal* cases in the singular. *See Kirstjen M. Nielsen v. Martin Jonathan Batalla Vidal*, No. 18-589.

AR3795

2

advance parole. In short, the government's actions in this case demonstrate a *lack* of urgency in rescinding DACA that belies its current assertion that this Court should review the *Regents* decision immediately. These and other arguments are set forth in the briefs in opposition submitted by the respondents in the *Regents* case, and Respondents adopt them in full.

Stripped of the false sense of urgency created by the government's invocation of the *Regents* decision, there is nothing left of the government's petition for certiorari before judgment here, and it should be denied. This case is presently being briefed before the D.C. Circuit and will likely be argued in early 2019. Under this Court's rules, certiorari before judgment is warranted only where the petitioner establishes that "the case is of such imperative public importance as to justify deviation from normal appellate practice and to require immediate determination in this Court." Sup. Ct. R. 11. It is thus the "extremely rare" case that is appropriate for such review. *Coleman v. Paccar Inc.*, 424 U.S. 1301, 1304 n.* (1976) (Rehnquist, J., in chambers); *see* 28 U.S.C. § 2101(e). This case does not meet that standard. And even if it did, the Court should deny review because the district court correctly held that DACA's rescission was reviewable and unlawful.

## STATEMENT OF THE CASE

### I.   DACA

Prior to 2012, millions of young people raised in this country were compelled by circumstances beyond their control to live in the shadows. Brought here as children, they attended American schools, contributed to

AR3796

3

American communities, and strived to achieve American dreams. But because they were not lawfully present, their lives did not resemble those of their American classmates: They often could not secure government-issued identification and, accordingly, could not travel by plane to visit family or attend college far from home; they could not secure work authorization; they generally could not open bank accounts, obtain credit cards, or engage in commercial activity requiring access to credit; they could not access public benefits and, in many cases, health insurance; they could not enlist in the Armed Forces; and they lived in constant fear of law enforcement, with whom any interaction might mean deportation to a country that was foreign to them.

Despite these hardships, many of these young people triumphed. They worked hard and excelled in school, developed talents and professional skills, and contributed to their families and communities. Known as "Dreamers," they achieved these accomplishments notwithstanding their status under the immigration laws. From the perspective of immigration authorities, they were—and still are—a low priority for enforcement. AR 1; *infra* pp. 16-17.[2] From the perspective of most Americans, regardless of political affiliation, they were—and still are—individuals with the values and work ethic America cherishes, and they

---

[2] "AR" refers to the administrative record filed by the government in these proceedings. Dkt. 8-3; *see also Regents of the University of California, et al. v. DHS, et al.*, Case No. 3:17-cv-05211 (N.D. Cal.), ECF No. 64-1. All references to "Dkt." are to documents filed in the district court in No. 17-cv-2325.

**AR3797**

4

deserve to live their lives in the only country many have known.[3]

In 2012, the Department of Homeland Security (DHS) sought to address the plight of the Dreamers. Consistent with its longstanding authority to establish deferred-action programs. Pet. App. 3a-4a; AR 15-23. DHS thus established the Deferred Action for Childhood Arrivals program (DACA). Pet. App. 5a.

By statute and regulation separate and distinct from the DACA program, all persons subject to deferred action—whether under DACA or any other program—may access certain benefits in recognition of their continued presence in the United States. They may seek work authorization. 8 C.F.R. § 274a.12(c)(14). They may request advance parole to travel abroad and re-enter the United States. *Id.* § 212.5(f). And they are eligible for driver's licenses, health insurance, and certain public programs. 8 U.S.C. § 1611(b)(2)-(3) (Social Security and Medicare); *id.* § 1621(d) (state benefits); 42 C.F.R. §§ 417.422(h), 422.50(a)(7) (health insurance).

Before the DACA program was instituted, the Office of Legal Counsel (OLC) advised DHS that DACA was lawful so long as "immigration officials retained discretion to evaluate each application on an individualized basis." Pet. App. 53a n.22 (quotation

---

[3] *NPR Poll: 2 in 3 Support Legal Status for DREAMers; Majority Oppose Building a Wall*, NPR: All Things Considered (Feb. 6, 2018), https://tinyurl.com/yblhrs2d; Scott Clement & David Nakamura, *Survey Finds Strong Support for 'Dreamers'*, Wash. Post (Sept. 25, 2017**)**, https://tinyurl.com/ybqvqajx.

AR3798

5

marks omitted). OLC later memorialized its analysis in a 33-page memorandum that primarily addressed a 2014 proposed program known as "Deferred Action for Parents of Americans and Lawful Permanent Residents" (DAPA). Pet. App. 52a-53a. In its memorandum addressing DAPA, the OLC noted, "[t]he concerns animating DACA were . . . consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion." Pet. App. 53a n.22 (quotation marks omitted; ellipsis in original).

DACA went into force in 2012, and by all accounts, DACA has been successful in enabling hundreds of thousands of young people to pursue higher education and work legally, without the fear of deportation. Pet. App. 54a. Today, DACA recipients make substantial contributions to the U.S. economy, in addition to serving their communities and in this nation's military.

Separately, DHS sought to implement DAPA. DAPA would have extended eligibility for deferred action to approximately 4 million parents of U.S. citizens or lawful permanent residents who were themselves unlawfully present in the United States. AR 33. DAPA also purported to expand the DACA program in certain minor respects. AR 39-40 (changing from two to three-year extension terms, adjusting date-of-entry requirement, and removing age cap). DAPA never went into effect, however, because a coalition of states led by Texas secured a preliminary injunction based on the agency's failure to follow the

6

APA's notice-and-comment rulemaking requirements.[4] Pet. App. 6a. The Fifth Circuit affirmed, holding that the states had demonstrated a likelihood of success on the merits not only of their procedural APA claim, but also of their substantive APA claim, because DAPA appeared to conflict with the INA's "intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status." *Texas v. United States*, 809 F.3d 134, 146, 179 (5th Cir. 2015). This Court granted a petition for a writ of certiorari but divided evenly, thereby affirming the preliminary injunction. *See United States v. Texas*, 136 S. Ct. 2271 (2016). The government sought rehearing, noting that the country lacked a "definitive ruling" on DAPA's legality. Dkt. 28-16 at 2504. That petition was denied. *United States v. Texas*, 137 S. Ct. 285 (2016).

Even after President Trump took office, DHS opted to maintain DACA. In February 2017, then-Secretary of Homeland Security Kelly repealed a broad array of immigration directives but specifically exempted DACA. AR 230. As he later explained, he viewed "DACA status" as a "commitment ... by the government towards the DACA person." Dkt. 28-15 at 1922. In June 2017, Secretary Kelly rescinded DAPA, but again left DACA in place. AR 235-37. Likewise, in public comments the President said "dreamers should rest easy," characterizing the "policy of [his] administration . . . to allow the dreamers to stay." Dkt. 28-15 at 1939-40.

---

[4] The states expressly declined to challenge DACA, which had already been in place for two years.

**AR3800**

7

In June 2017, approximately the time Secretary Kelly made his second decision to leave DACA in place, Attorney General Sessions and other members of the Justice Department communicated with attorneys general from several of the states that had challenged DAPA in the *Texas* case. Dkt. 28-15 at 1951-52. Those conversations culminated in a letter from the state attorneys general to Attorney General Sessions on June 29, 2017. AR 238-40. Although the states had not challenged DACA in the five years since it had been implemented, the letter asserted that DACA was unlawful and asked Defendants to "phase out the DACA program"; if Defendants did not do so, the states said, they would amend their years-old complaint against DAPA to challenge DACA for the first time. AR 239.

On September 4, 2017, Attorney General Sessions announced, in a one-page letter, that DACA was "unconstitutional" and lacked "statutory authority." AR 251. The letter provided no legal analysis, but simply referenced the *Texas* DAPA litigation and the "potentially imminent litigation" over DACA. AR 251. The next day, Acting Secretary of Homeland Security Duke issued a memorandum rescinding DACA (the "Duke Memorandum"). AR 252-56. After describing the course of the *Texas* litigation and reciting the Attorney General's conclusion that DACA was unlawful, Acting Secretary Duke simply announced that it was "clear" that DACA should be terminated. AR 255.

The Duke Memorandum instructed DHS to stop accepting new initial DACA applications and approving new applications for advance parole; to accept renewal

**AR3801**

8

applications from individuals whose current deferred action would expire by March 5, 2018; and to accept such renewals until October 5, 2017. AR 255.

## II.   Proceedings Below

Respondents sued in the United States District Court for the District of Columbia to challenge the decision to rescind DACA. In April 2018, Judge John D. Bates granted Respondents' motion for summary judgment, holding the agency's decision unlawful and setting it aside. Judge Bates concluded that the rescission of DACA was reviewable and that the reasons given to support it were inadequate under the Administrative Procedure Act (APA). Pet. App. 72a-74a. In particular, Judge Bates held that the government could not overcome the "strong presumption favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015) (internal quotation marks omitted). And he held that DACA's rescission was arbitrary and capricious because the government "failed adequately to explain its conclusion that the program was unlawful." Pet. App. 2a. Judge Bates stayed the order of vacatur for ninety days to allow DHS to attempt to remedy the Duke Memorandum's inadequacies. Pet. App. 66a.

In June 2018, Secretary Kirstjen M. Nielsen issued a new memorandum "concur[ring] with and declin[ing] to disturb" the Duke Memorandum. Pet. App. 81a, 86a. The government then moved Judge Bates to revise the April 2018 order and uphold the Duke Memorandum. Pet. App. 81a.

**AR3802**

9

In August 2018, Judge Bates issued an opinion denying the government's motion to revise. The opinion was narrow: "The Court did not hold in its prior opinion, and it does not hold today, that DHS lacks the statutory or constitutional authority to rescind the DACA program. Rather, the Court simply holds that if DHS wishes to rescind the program—or to take any other action, for that matter—it must give a rational explanation for its decision." Pet. App. 108a-109a (citing 5 U.S.C. § 706(2)). Judge Bates found, once again, that DHS had failed to satisfy the bare minimum of rational decisionmaking required by the APA. Pet. App. 108a-109a.

The government filed a notice of appeal to the United States Court of Appeals for the D.C. Circuit. Pet. App. 112a, 114a. The government then moved Judge Bates for a stay of the vacatur pending appeal. Judge Bates granted the government's motion in part, aligning the vacatur order with relief granted by other courts and maintaining a stable status quo:  DHS did not have to begin accepting initial DACA applications or applications for advance parole, but the government had to continue processing DACA renewals. Dkt. 86 at 2. The government has not sought a stay before the D.C. Circuit.

The government's opening brief was filed in the D.C. Circuit on November 26, 2018. Briefing will be complete in the D.C. Circuit on January 22, 2019.

On November 5, 2018, the government filed a petition for a writ for certiorari before judgment in this case and two others: *Regents* No. 18-587 as well as *Nielsen v. Batalla Vidal*, No. 18-589. On November 8,

**AR3803**

10

2018, the Ninth Circuit issued its opinion in the *Regents* case. Two judges affirmed the district court in full, holding that the rescission was reviewable and likely unlawful. *Regents* Supp. Pet. App. 5a-78a. One judge believed that the rescission was not reviewable under the APA, but that the *Regents* respondents were likely to prevail on their equal protection claim. *Regents* Supp. Pet. App. 79a-87a.

On November 19, 2018, the government filed a supplemental brief in this Court in the *Regents* case, seeking to convert its petition for certiorari before judgment into a petition for certiorari and arguing that the Ninth Circuit opinion strengthened the case for certiorari in all three cases. The government filed a second supplemental brief on November 27, 2018, correcting its prior supplemental brief and maintaining the same position that certiorari before judgment should be granted in this case.

## REASONS FOR DENYING THE WRIT

Petitioners seek the extraordinary action of this Court granting certiorari before any court of appeals has reviewed a final judgment on the questions presented—and before this case has been fully briefed before the D.C. Circuit. Petitioners come nowhere near satisfying this Court's standards for a grant of certiorari before judgment, and thus the petition should be denied.

### I.    Review of the *Regents* Case Is Premature.

As the respondents in the *Regents* case explain, notwithstanding the issuance of the Ninth Circuit's decision, the petition in that case does not meet the

11

standard for this Court's review. That case does not involve a circuit split. Nor does the petition present an important question of federal law that should be resolved now.

The first question presented asks only whether the district court misapplied the long-settled legal standard governing when agency action is exempt from judicial review. Applying that standard, all courts that have considered the matter have concluded that the agency's rescission of DACA is reviewable.

The second question presented addresses the legality of DHS's rescission of DACA. While that question may ultimately merit this Court's review, granting certiorari at this stage would short-circuit the development of these issues in the lower courts. "[T]his is exactly the sort of issue that could benefit from further attention in the courts of appeals." *Spears v. United States*, 555 U.S. 261, 270 (2009) (Roberts, C.J., dissenting). The D.C. Circuit, in particular, has valuable expertise on questions of administrative law. It, along with the Second and Fourth Circuits, will soon pass on both issues presented by the petition, and the courts of appeals will likely issue their decisions on these cases in 2019. Granting the petitions before those courts have ruled would unnecessarily deprive the Court of their analysis.

Additionally, the Ninth Circuit addressed the questions presented in an interlocutory posture, holding that the *Regents* respondents "are likely to succeed in demonstrating that the rescission must be set aside." *Regents* Supp. Pet. App. 57a; *see also Regents* Supp. Pet. App. 77a & n.31. This Court reviews

12

that determination solely for "abuse of discretion" and "uphold[s] the injunction" if "the underlying … question is close." *Ashcroft v. ACLU*, 542 U.S. 656, 664-65 (2004) (internal quotation marks omitted). For this very reason, ordinarily this Court awaits final judgment before granting a petition for review.[5] *See, e.g., Va. Military Institute v. United States*, 508 U.S. 946 (1993) (Scalia, J., concurring in denial of certiorari); *Am. Constr. Co. v. Jacksonville, Tampa & Key W. Ry. Co.*, 148 U.S. 372, 384 (1893).

Moreover, the *Regents* respondents present a distinct equal protection claim that the Ninth Circuit found credible, but which had not been fully developed. That claim was not the basis for the district court's entry of a preliminary injunction. *Regents* Supp. Pet. App. 84a. Thus, it is not squarely presented for this Court's review. *See Brown v. Chote*, 411 U.S. 452, 457 (1973). As all three Ninth Circuit judges recognized, however, if presented to the district court, that claim may result in the entry of an identical preliminary injunction, should the existing injunction be vacated. *See Regents* Supp. Pet. App. 77a n.31, 84a-87a.

For these reasons, and those set forth in greater detail by the *Regents* respondents, review of the

---

[5] While this Court granted *United States v. Texas* on an interlocutory posture, circumstances there were materially different. DAPA had not yet been implemented, thus there were no reliance interests to weigh in the balance of factors. *See* AR 183 ("The interest the government has identified can be effectively vindicated after a trial on the merits. The interest the states have identified cannot be, given the difficulty of restoring the *status quo ante* if DAPA were to be implemented.").

13

questions presented in that case is premature.

## II.   The Petition for Certiorari Before Judgment in this Case Should Be Denied.

Even leaving aside that the district court's decision below was correct on the merits, *see infra* pp. 18-34, the petition for certiorari before judgment should be denied for numerous reasons.

*First*, this case does not meet the standard for review before judgment. Sup. Ct. R. 11. It does not involve exigent circumstances remotely comparable to those at issue in cases where the standard was met, such as the legality of a military commission at a time of war, *Ex parte Quirin*, 317 U.S. 1, 20 (1942); the wartime seizure of a steel mill, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 583-84 (1952); an impending deadline involving the breach of an international treaty, *Dames & Moore v. Regan*, 453 U.S. 654, 660 (1981); or grand jury proceedings involving the sitting President, *United States v. Nixon*, 418 U.S. 683, 686-87 (1974). Nor is there "disarray among the Federal District Courts" that might justify this Court's expedited review. *Mistretta v. United States*, 488 U.S. 361, 371 (1989). Each case in which certiorari before judgment has been granted involved emergent issues of national security or issues that "touch fundamentally upon the manner in which our Republic is to be governed." *Dames & Moore*, 453 U.S. at 659. Even if the questions of administrative law in this case may ultimately be appropriate for the Court's review, there is no comparable emergency here. Simply put, this is not the "extremely rare" case that justifies "deviation from normal appellate practice." *Coleman*,

**AR3807**

14

424 U.S. at 1304 n.* (Rehnquist, J., in chambers); Sup. Ct. R. 11.

*Second*, the government's own actions belie its newly-minted claim of urgency. DACA has been in place since 2012. The current administration continued the program for more than eight months before deciding to discontinue it in response to threats from certain states. *See* Pet. App. 8a-9a. Even then, the administration allowed some DACA recipients to renew their deferred status, in effect extending the program for an additional two and a half years. Because the preliminary injunctions in other cases are limited and the vacatur in this case is partially stayed, no new applicants may receive deferred action under the DACA program. Given this status, the district court in the Southern District of Texas, *the court which invalidated DAPA*, denied the states' motion for a preliminary injunction against DACA. *Texas v. United States*, 328 F. Supp. 3d 662, 741-42 (S.D. Tex. 2018). No exigency exists necessitating immediate review of a policy that has been in place since 2012 and that the government itself opted to extend in part through March 2020.

The administration's statements provide further proof that immediate review is unwarranted. The President has indicated that it is his "policy" to "allow the dreamers to stay," Dkt. 28-15 at 1939-40, and senior officials have issued other statements in support of DACA recipients, *see, e.g.*, Dkt. 28-15 at 1922. Contrary to Petitioners' arguments, the President also has asserted that he "certainly [has] the right" to keep DACA in place and indicated he "might" decide to do

AR3808

15

so. *See READ: President Trump's Full Exchange With Reporters*, CNN.com (Jan. 24, 2018), https://tinyurl.com/ydcafdtr (CNN Statement).

*Third*, the government's litigation conduct confirms that immediate review is unnecessary. The government has never sought to stay the preliminary injunctions issued in the Northern District of California or the Eastern District of New York. Nor did the government seek a stay of Judge Bates' decision to allow portions of the vacatur to take effect consistent with those preliminary injunctions. A stay request would require Petitioners to demonstrate irreparable harm, and to show that the balance of hardships favors a stay, something Petitioners have never attempted to articulate—and could not do, even if they tried. Petitioners' litigation choices "blunt [the government's] claim of urgency," *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317-18 (1983) (Blackmun, J., in chambers), and "vitiate[] much of the force" of its claimed harm, *Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (Marshall, J., in chambers).

*Fourth*, the government faces no concrete harm from allowing this case to be decided first by the D.C. Circuit. The government suggests that review is necessary because it is being required to retain a policy it believes is unlawful. Pet. 14-15. But the government need not grant any new DACA applications. And the asserted harm with respect to existing DACA recipients does not warrant premature review: courts regularly maintain the status quo while the government litigates the extent of its authority or legality of its conduct. *E.g., Nat'l Ass'n of Mfrs. v. Dep't*

16

*of Defense*, 138 S. Ct. 617, 627 (2018) (noting the "nationwide stay of the [Waters of the United States] Rule pending further proceedings"); *Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423 (2006) (affirming injunction against enforcement of Controlled Substances Act). Indeed, an alteration of the status quo pending final judgment is the exception, not the norm. The purported harm of maintaining in place a program that has existed since 2012, in the face of an attempt at rescission deemed unlawful by Judge Bates, does not justify circumventing the normal process for appellate review.

The alleged harm of permitting current DACA recipients to maintain their status while this litigation is pending is further discredited by Secretary Nielsen's testimony before Congress that DACA recipients would not be an enforcement priority following DACA's rescission.[6] *See Hearing on Kirstjen M. Nielsen to be Homeland Security Secretary Before the S. Comm. on Homeland Sec. and Gov't Affairs*, 115th Cong. (2017) (exchange with Senator Harris); *accord*

---

[6] Even if DACA recipients are not likely to be immediately removed, without DACA they will lose their authorization to work. As described in detail in Respondents' submissions to the district court, the consequences for DACA recipients will be disastrous, effectively cutting short promising careers and educational programs and terminating DACA recipients' ability to support themselves and their families. *See* Dkts. 28-8, 28-17; *Regents* Pet. App. 62a-66a (recognizing catastrophic consequences of rescission and concluding that consequences for DACA recipients and other affected parties outweigh government's asserted interest in initiating wind-down); *Batalla Vidal* Pet. App. 123a-126a (same).

AR3810

17

*Hearing on Oversight of the United States Department of Homeland Security Before the S. Comm. on the Judiciary*, 115th Cong. (2018) (exchange with Senator Harris). Moreover, the district court's order does not compel the government to "sanction" the unlawful presence of anyone. Under DACA's plain terms, each renewal application is evaluated "on a case by case basis," AR 2, and DHS can initiate removal proceedings against DACA recipients determined to present a risk to national security or public safety. AR 1-3; *see also Regents* Pet. App. 45a. As Judge Bates noted, this litigation "does not itself delay the removal of any specific alien." Pet. App. 38a.

*Fifth*, for similar reasons, the continuation of DACA causes no harm to the public. DACA recipients were subjected to rigorous background checks and heavy scrutiny to ensure they did not pose a "threat to national security or public safety," had not "been convicted of certain criminal offenses," and fulfilled educational and work-related criteria. Pet. App. 4a. Under the terms of the DACA program itself, the government can terminate deferred action if, for example, a DACA recipient is convicted of a disqualifying crime. Sensibly, the government does not even contend that the public might somehow be harmed by the continued lawful presence of DACA recipients during this litigation.

*Sixth*, the government is incorrect that the pendency of this litigation may stymie legislative resolutions to these issues. Pet. at 15. As the government concedes, the challenge of achieving legislative compromise long predates this litigation.

18

Pet. at 4, 15. And with a new Congress set to convene, there is a renewed possibility of a legislative solution. Congressional action could render the matter moot. This possibility counsels against premature consideration by this Court. *See, e.g., Volpe v. D.C. Fed'n of Civic Ass'ns*, 405 U.S. 1030, 1030 (1972) (Burger, C.J., concurring in denial of certiorari).

*Finally*, denying certiorari will not preclude consideration of the questions presented. The government's demand that the Court abandon the ordinary, time-tested appellate process is simply a means to rush the case to the Court this Term—all in a context where the government has never identified any concrete harms caused by addressing this case in the normal course. It is virtually certain that the D.C. Circuit will issue a decision in plenty of time for a petition to be considered next Term. *See Aaron v. Cooper*, 357 U.S. 566, 566-67 (1958) (per curiam) (denying petition for certiorari before judgment). If the Court believes the questions merit review at that time, it will have the benefit of additional circuit opinions. It will also have the option of deciding these issues through a vehicle that is not interlocutory.

### III.   The District Court's Decision Is Correct.

The Court should also deny certiorari because Judge Bates' decision is correct on the merits.

### A. The Rescission of DACA Is Subject to Judicial Review.

As every court to consider the first question presented has agreed, DACA's rescission is neither "committed to agency discretion by law," 5 U.S.C.

19

§ 701(a)(2), nor an action "to commence proceedings, adjudicate cases, or executive removal orders," 8 U.S.C. § 1252(g). *See* Pet. App. 25a-43a; *Regents* Pet. App. 26a-30a; *Batalla Vidal* Pet. App. at 25a-31a; *see also Casa De Maryland v. U.S. Homeland Sec.*, 284 F. Supp. 3d 758, 770 (D. Md. 2018), *appeal docketed*, No. 18-1522 (4th Cir. May 8, 2018).

1. There is a "strong presumption favoring judicial review of administrative action," that the government "bears a heavy burden" to overcome. *Mach Mining*, 135 S. Ct. at 1651 (internal quotation marks omitted); *see also Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 369-70 (2018) (slip op. at 11). Section 701(a)(2) offers a "very narrow exception" to that strong presumption, triggered only when "in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). That is not the case here.

a. The government's lead argument is that "Section 701(a)(2) precludes review of an agency's decision not to institute enforcement actions" under *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). *Regents* Pet. 18. But the government does not even contend that DACA's rescission is such a decision; rather, it seeks to expand *Chaney* to make unreviewable *all* agency decisions about whether and how to enforce federal statutes—no matter the scope and formality of the agency's decision, no matter whether the decision reflects an erroneous view of the agency's legal authority, and no matter whether the agency action at issue is a *non*-enforcement decision at all. Such an expansion—which

**AR3813**

20

would encourage politically unaccountable agencies to make policy in the guise of unreviewable legal determinations—is unwarranted, unwise, and without basis in law.

In *Chaney*, death-row inmates filed a petition asking the FDA to initiate enforcement proceedings to stop two states from using certain drugs in their executions. *See* 470 U.S. at 823-24. The FDA responded by letter, explaining that the agency's enforcement authority in the area was "generally unclear" and that, in any event, the agency had decided that the particular facts alleged did not meet the agency's criteria for initiating enforcement. *See id.* at 824-25. The inmates sought judicial review, arguing that the FDA *did* have authority to act and that it had misapplied its own enforcement criteria. *Id.* at 825-26.

This Court held that "an agency's decision not to take enforcement action should be presumed immune from judicial review." *Id.* at 832. But the Court's decision was limited in two critical respects. *First*, the Court was careful to note that "[w]e do not have in this case a refusal by the agency to institute proceedings based solely on the belief that it lacks jurisdiction." *Id.* at 833 n.4. In such a case, "the statute conferring authority on the agency" might suffice to indicate that the agency's decision to tie its own hands was not "committed to agency discretion." *Id.* (internal quotation marks omitted). *Second*, the Court addressed only an agency's refusal to undertake a "particular enforcement action" in a given instance. *Id.* at 831. The Court referred throughout its opinion to an individual "refusal to institute proceedings," which it analogized

21

to an individual prosecutor's decision "not to indict" a given offender. *Id.* at 832; *see id.* at 827-38.

i. The government seeks to expand *Chaney*'s narrow presumption of unreviewability from individual non-enforcement decisions to "broad enforcement polic[ies]." *Regents* Pet. 20 (quotation marks omitted). But *Chaney* does not apply to general enforcement policies *at all*. This Court has previously declined to extend *Chaney* to decisions not to institute a rulemaking. *See Massachusetts v. EPA*, 549 U.S. 497, 527 (2007). The Court noted as "key differences" the fact that "agency refusals to initiate rulemaking 'are less frequent, more apt to involve legal as opposed to factual analysis, and subject to special formalities, including a public explanation.'" *Id.* (quoting *Am. Horse Protection Ass'n v. Lyng*, 812 F.2d 1, 4 (D.C. Cir. 1987)). There are similar "ample reasons for distinguishing" between broad enforcement policies and "single-shot" nonenforcement decisions like in *Chaney. See Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676-77 (D.C. Cir. 1994).[7]

To be clear, Respondents do not suggest that all challenges to broad enforcement policies are necessarily amenable to review, but simply that they are, as a class, outside *Chaney*'s narrow reversal of the presumption of reviewability. In some cases, there may

---

[7] For similar reasons, the lump sum appropriation held unreviewable in *Lincoln v. Vigil*, 508 U.S. 182 (1993), is distinguishable from a broad enforcement policy. Like a single-shot enforcement decision, the decision not to fund a program for handicapped Indian children in the Southwest is not as amenable to judicial review as a broad enforcement policy. *Id.* at 192-93.

be no "law to apply." *See infra* pp. 24-26. And in many cases, review of agency policies will be highly deferential. *See Massachusetts*, 549 U.S. at 527 (holding that review of a refusal to initiate rulemaking should be deferential). But broad discretion is not the same as unreviewable discretion, and neither *Chaney* nor any of this Court's other cases suggest that a general enforcement policy is presumptively immune from review under the APA.

ii. At a minimum, a general enforcement policy predicated on a misconception of an agency's legal authority is presumptively reviewable. Agency interpretations of law, by definition, are not "committed to agency discretion," as it is ultimately the role of the courts to determine what the law is. DACA's rescission was predicated entirely—or, at a minimum, overwhelmingly—on a legal judgment about the scope of the Secretary's authority. *Supra* p. 7. The district court held that "*Chaney*'s presumption of unreviewability" did not apply "to a legal interpretation phrased as a general enforcement policy," including an interpretation that "concerns the scope of the agency's lawful enforcement authority." Pet. App. 39a. This holding is correct.

An agency action premised on the belief that it is compelled by law does not involve "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Chaney*, 470 U.S. at 831. Indeed, the premise of Petitioners' rescission is that they *lacked* discretion to maintain DACA, so there were no factors to balance. And for that reason, no legitimate interest is served by insulating the agency's

23

legal judgment from review. Barring review of an agency policy based on the value of "enforcement discretion" is nonsensical when the very legal error at issue is the agency's too-narrow definition of its own enforcement discretion. As the district court put it, "an official cannot claim that the law ties her hands while at the same time denying the courts' power to unbind her." Pet. App. 73a.

This rule also draws powerful support from the core purposes of the APA. If an agency's narrow assessment of its legal authority were immune from review, an agency could avoid political accountability for a major policy choice by insisting that the law forced its hand—just as the government has repeatedly claimed here—while also evading any review of the legal judgment  As the district court underscored, approving that result would thwart the APA's commitment to ensuring that agencies are subject to meaningful checks—"in the court of public opinion" or, if not, in a court of law. Pet. App. 72a-73a. *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270 (1987), is not to the contrary. There, the denial of a petition to reconsider certain labor conditions was exactly the sort of single-shot decision not to act that was held unreviewable in *Chaney. Id.* at 282. And the agency did not contend it was without authority to act—it simply did not believe the petition had merit. The Court's statement that an agency action is not reviewable simply where "the agency gives a 'reviewable' reason for otherwise unreviewable action," *id.* at 283, is beside the point where, as here, the agency action is reviewable.

iii. *Chaney* is also inapposite because the rescission

**AR3817**

24

of DACA is not "an agency's *refusal* to take requested enforcement action." 470 U.S. at 831 (emphasis added). Rather, the agency has *affirmatively terminated* a significant program that provided a form of protection against removal to hundreds of thousands of people and offered them the opportunity to work, go to school, obtain driver's licenses, and seek other benefits. *Supra* p. 4. Indeed, *Chaney* expressly distinguished *non*-enforcement decisions from affirmative government actions:

> [W]hen an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect. Similarly, when an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner.

470 U.S. at 832 (emphasis in original).

Termination of a substantial program providing access to important benefits undoubtedly addresses an "area that courts often are called upon to protect." Because *Chaney* does not apply to affirmative actions of that sort, DACA's rescission is subject to the ordinary presumption of reviewability, and the government bears the burden to show that there is "no law to apply."

b. There are judicially manageable standards to apply in resolving Respondents' claims, and the government makes little effort to contend otherwise.

**AR3818**

25

*First*, the basis for the agency's decision was a determination that DHS lacks the statutory authority to continue DACA. That is a purely legal judgment, and, of course, legal standards exist to resolve legal questions. *See Int'l Union, UAW v. Brock*, 783 F.2d 237, 246 (D.C. Cir. 1986) (noting that it is "almost ludicrous to suggest that there is 'no *law* to apply' in reviewing whether an agency has reasonably interpreted a *law*").

*Second*, in many cases, this Court has invalidated agency action because it failed to "cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48-49 (1983). In *Judulang v. Holder*, 565 U.S. 42 (2011), for example, the Court unanimously rejected the government's policy for determining eligibility for discretionary immigration relief as arbitrary and capricious, explaining that the agency's chosen approach was not "tied, even … loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Id.* at 55. Because the agency did not "exercise its discretion in a reasoned manner," its policy could not "pass muster under ordinary principles of administrative law." *Id.* at 53, 64. The Court had no difficulty making that judgment, even without a statutory definition of the "appropriate operation of the immigration system," because the agency's rationale failed on its own terms. *Id.* at 55. The district court undertook the equivalent inquiry in this case, ruling not based on the wisdom of the particular immigration policy at issue, but on the irrationality of the agency's

**AR3819**

26

decisionmaking and the lack of explanation. Pet. App. 48a-60a.

2. The government also argues that 8 U.S.C. § 1252(g) strips the courts of jurisdiction to hear this case. Section 1252(g) states that "[e]xcept as provided in this section [i.e., through the removal process] … no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under [the INA]." That provision does not apply here.

As the district court explained, the government's argument "contradicts not only the plain language of § 1252(g) but also the Court's interpretation of that language in *Reno v. American–Arab Anti-Discrimination Committee ("AAADC")*, where the Court specifically rejected the argument that 'the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings.'" Pet. App. 20a (quoting *AAADC*, 525 U.S. 471, 482 (1999)). As this Court explained, § 1252(g) applies "only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Id*. (quoting 525 U.S. at 482). By contrast, it does not apply to other "part[s] of the deportation process," such as "decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse

**AR3820**

27

reconsideration of that order." *Id.* (quoting 525 U.S. at 482). Here, as the district court explained, "there are no pending removal proceedings with which plaintiffs' challenge might interfere." Pet. App. 21a.[8] Accordingly, § 1252(g) does not bar review of Respondents' claims.

## B. The District Court Correctly Held that the Rescission of DACA Was Arbitrary and Capricious.

1. The district court held that DHS failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Pet. App. 48a. (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016)); *see also* Pet. App. 59a-60a. That narrow holding, which does not rest on DACA's legality, is well grounded in this Court's APA decisions.

*First*, the district court found the agency's "scant legal reasoning" contrary to this Court's clear articulation in *Encino Motorcars* of what the APA requires. Pet. App. 49a-51a. The agency's assertion that DACA violated the INA was "based only on an incongruous reference to the Fifth Circuit's decision on DAPA," Pet. App. 52a, while its "analysis of DACA's

---

8 In addition, § 1252(g) could not bar the claims brought by Respondents Microsoft and Princeton, neither of whom is an alien or suing solely "on behalf of" an alien. Rather, each has alleged that the rescission of DACA will hamper its *own* operations—in Princeton's case as a university, in Microsoft's case as a corporation. *See* Dkt. 1, ¶¶ 61, 62; *see also Batalla Vidal* Pet. App. 38a-39a.

28

constitutionality was so barebones that the Court cannot 'discern[]' the 'path' that the agency followed," Pet. App. 53a-54a (quoting *Encino Motorcars*, 136 S. Ct. at 2125). Those failures were "particularly egregious here in light of the reliance interests involved." Pet. App. 54a (citing *Encino Motorcars*, 136 S. Ct. at 2126); *see also id.* ("DACA had been in place for five years and had engendered the reliance of hundreds of thousands of beneficiaries, many of whom had structured their education, employment, and other life activities on the assumption that they would be able to renew their DACA benefits."). The district court noted that this Court "has set aside changes in agency policy for failure to consider reliance interests that pale in comparison to the ones at stake here." Pet. App. 54a-55a (citing, e.g., *Encino Motorcars*, 136 S. Ct. at 2126).[9]

*Second*, the district court correctly found inadequate the government's explanation for its "litigation risk" basis to rescind DACA. Pet. App. 55a-59a. In the district court, the government argued that if DACA were challenged in litigation brought by Texas, "the district court there would enter a 'nationwide injunction' that 'would have prompted an immediate—and chaotic—end to the policy.'" Pet. App. 55a (quoting Defs.' Reply at 15). The district court appropriately

---

[9] The government suggests that it did consider these interests in that it allowed DACA recipients to maintain their status until it expired. *Regents* Pet. 26-27. But the Duke Memo belies that argument: It does not so much as mention the interests of DACA recipients, instead linking the choice to "wind [DACA] down in an efficient and orderly fashion" to the "administrative complexities" *for the agency* in ending the program. AR 254.

29

held this rationale "so implausible that it fails even under the deferential arbitrary and capricious standard." Pet. App. 60a. In light of the discretion available to a district court in Texas, "it strains credulity" that such a court "would have enjoined DACA immediately and completely without allowing DHS any opportunity to wind the program down."[10] Pet. App. 58a. Because the agency failed even to acknowledge the range of options available to a district court, much less analyze and weigh them against the benefits of maintaining the DACA program, the court found this rationale arbitrary and capricious. Pet. App. 58a-59a.[11]

2. Relying on the Nielsen Memo, the government seeks to morph its rationale for rescinding DACA into an argument that it did so based on "serious doubts" about DACA's legality. To the extent that rationale

---

[10] As expected, the Southern District of Texas denied Texas's motion for a preliminary injunction. *Texas*, 328 F. Supp. 3d at 741-42.

[11] For the exact reasons given by the district court, *amici*'s argument that "threatened litigation" alone provided a "valid basis for ending DACA,"—even absent any analysis of the likely outcome of the litigation or of the costs of rescinding DACA—is baseless. Texas, Amicus Br. at 10. Moreover, Respondents identified additional failures of explanation, but the district court did not reach them in light of its central ruling that the rationales provided for rescission were themselves inadequate. Nevertheless, DACA's rescission could equally be invalidated for failing to consider alternatives, such as enhancements to the individualized review of DACA applications, or failing to explain the reasoning underlying the agency's idiosyncratic and haphazard "wind-down" process. *See State Farm*, 463 U.S. at 50-51.

30

differs in substance from the rationale in the Duke Memo, it may not be used to justify, retroactively, Acting Secretary Duke's rescission of DACA. And, in any event, it too fails arbitrary and capricious review.

a. The Duke Memo articulates only one independent rationale for DACA's rescission: the claim that DACA is illegal. Both Attorney General Sessions' letter and the Duke Memo are framed in purely legal terms. AR 251-256. Indeed, after declaring DACA "unconstitutional" and lacking in "proper statutory authority," Attorney General Sessions invoked the "duty to defend the Constitution and faithfully execute the laws passed by Congress" and touted the "restoration of the rule of law" that DACA's rescission would purportedly bring about. AR 251. In this context, the Attorney General's passing assertion that a court would "likely" agree with him about DACA, AR 251, cannot plausibly be viewed as a freestanding basis for rescission. And the Duke Memo that followed the next day added nothing of substance to the Attorney General's analysis, and certainly nothing resembling a policy assessment.

The new justifications for the rescission of DACA contained in the Nielsen Memo cannot retroactively bolster the prior decision. *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (citing *Overton Park*, 401 U.S. at 420).[12] As the district court put it, there is a

---

[12] As the district court observed: "[H]ad Secretary Nielsen opted to issue a new decision rescinding DACA, the explanations offered in her memorandum would be contemporaneous and, consequently, not *post hoc*. She did not do this, however." Pet. App. 94a n.7. Moreover, if Secretary Nielsen had taken a separate

31

critical distinction between "an 'amplified articulation' of the agency's prior reasoning (which must be considered)," and "'a new reason for why the agency *could* have' taken the action (which must be disregarded)." Pet. App. 92a (citations omitted).

*Camp v. Pitts*, 411 U.S. 138 (1973), is instructive. There, an agency declined to approve a bank charter, and the court of appeals held that the agency's explanation for that decision was deficient. This Court held that under *Overton Park*, the court could obtain "such additional explanation of the reasons for the agency decision as may prove necessary." 411 U.S. at 143. But the Court stressed a "caveat": "Unlike *Overton Park*, in the present case there was contemporaneous explanation of the agency decision" to deny the bank charter; and while that explanation "may have been curt," it "surely indicated the determinative reason for the final action taken." *Id.* Accordingly, the Court said, the validity of the agency's action "must … stand or fall on the propriety of that finding." *Id.* If the pivotal finding could not be sustained even with the benefit of further explanation from the relevant personnel, the agency would need to make a fresh decision on remand. *Id.* (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)); *see also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990) (reaffirming that *Overton Park* authorizes "a remand to the agency for a fuller explanation of the

---

administrative action, Respondents would be entitled to review the administrative record to assess whether Secretary Nielsen weighed all of the relevant interests, "look[ing] at the costs as well as the benefits." *State Farm*, 463 U.S. at 52, 54.

32

agency's reasoning *at the time of the agency action*" (emphasis added)); Pet. App. 82a.

Thus, while the Nielsen Memo's legal analysis may be considered, its other arguments—and certainly its "policy" arguments, to the extent they exist—may not be used to uphold the rescission.

b. Even if a court could consider the Nielsen Memo's "serious doubts about DACA's legality," that justification is arbitrary and capricious.

*First*, the Nielsen Memo no more explains its "doubts" about DACA's legality than did the Duke Memo explain its conclusion. Pet. App. 106a. Secretary Nielsen asserts that DACA "was contrary to law" without specifying *which* law,[13] saying only that the Fifth Circuit's DAPA decision turned on the "incompatibility of such a major non-enforcement policy with the INA's comprehensive scheme." *Regents* Pet. App. 122a. But she does not articulate when a non-enforcement policy becomes sufficiently "major" that it is incompatible with the INA. For example, Secretary Nielsen does not say which of the myriad past deferred action programs would pass muster under this novel,

---

[13] To the extent the government contends that DACA was improper because it would have required notice and comment, that itself would not be sufficient to uphold the rescission because the government would have needed notice and comment to undo the program. *See Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 446 (D.C. Cir. 1982) ("[T]he APA expressly contemplates that notice and an opportunity to comment will be provided prior to agency decisions to repeal a rule."), *aff'd sub nom. Process Gas Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983).

33

barely-articulated standard. Dkt. 28-16 at 2158-60. And even though her analysis appears to turn on whether a non-enforcement policy is sufficiently "major," Secretary Nielsen does not address the significant differences between DACA and DAPA as to scope and size: both that DAPA, unlike DACA, was an "open-ended" policy "with no established end-date," AR 251, and that there were almost four persons eligible for DAPA for each person eligible for DACA. Even combining the efforts of the Duke and Nielsen Memos, it remains true that "[w]hatever potential reasons [Defendants] might have given, [they] in fact gave almost no reasons at all." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016).

The Nielsen Memo's discussion of reliance interests also remains inadequate. Secretary Nielsen notes her awareness "that DACA recipients have availed themselves of the policy" and states that the "asserted reliance interests" do not "outweigh the questionable legality of the DACA policy and [the] other reasons for ending the policy discussed above." *Regents* Pet. App. 125a. But acknowledging that DACA has existed is not the same thing as weighing the real effects of its rescission. Thus, like the Duke Memo, the Nielsen Memo "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

*Second*, even if Secretary Nielsen had provided an adequate explanation, it would be incorrect. DACA is a lawful exercise of DHS's broad statutory authority to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and to carry out the "administration and enforcement of [the INA] and all

**AR3827**

34

other laws relating to the immigration and naturalization of aliens," 8 U.S.C. § 1103(a)(1), including by providing for work authorization, 8 U.S.C. § 1324a(h)(2). As the United States itself has previously argued, the government has long used deferred action to effectuate its enforcement priorities. *See* Dkt. 28-16 at 2152-74.[14] Because the government is incorrect about DACA's legality, rescission based on that rationale is arbitrary and capricious. *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[A]n order may not stand if the agency has misconceived the law.").

Accordingly, Secretary Duke's rescission of DACA remains arbitrary and capricious and cannot be saved by the Nielsen Memo. Because the district court's narrow and well-reasoned decision is correct, the petition should be denied.

---

[14] In arguing that DACA is illegal, *amici* entirely ignore not only the well-established history of deferred action programs, but also the 2014 OLC Memorandum explicitly determining that DACA was a lawful exercise of executive discretion. *See* Texas, Amicus Br. 12. But failing to acknowledge evidence contrary to its position does not render that evidence invalid.

**AR3828**

35

## CONCLUSION

The petition for a writ of certiorari before judgment should be denied.

Respectfully submitted,

JOSEPH M. SELLERS
JULIE S. SELESNICK
COHEN MILSTEIN SELLERS
  & TOLL PLLC
1100 New York Ave., N.W.
Fifth Floor
Washington, DC 20005
(202) 408-4600

*Counsel for Respondents
NAACP; American
Federation of Teachers,
AFL-CIO; United Food and
Commercial International
Union, AFL-CIO*

THOMAS J. PERRELLI
LINDSAY C. HARRISON
  *Counsel of Record*
SAM HIRSCH
ISHAN BHABHA
ALEX S. TREPP
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com

*Counsel for Respondents The
Trustees of Princeton
University, Microsoft
Corporation, and Maria De
La Cruz Perales Sanchez*

**AR3829**

36

RAMONA E. ROMERO
WESLEY MARKHAM
Princeton University
New South Building
Fourth Floor
Princeton, NJ, 08544
(609) 258-2500

*Counsel for Respondent The
Trustees of Princeton
University*

DAVID J. STROM
AMERICAN FEDERATION OF
  TEACHERS, AFL-CIO
555 New Jersey Ave. N.W.
Washington D.C.
(202) 393-7472

*Counsel for Respondent
American Federation of
Teachers, AFL-CIO*

CYNTHIA L. RANDALL
MICROSOFT CORPORATION
One Microsoft Way
Redmond, WA 98052
(425) 538-3176

*Counsel for Respondent
Microsoft Corporation*

BRADFORD M. BERRY
NAACP
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-5797

*Counsel for Respondent
NAACP*

PETER J. FORD
UNITED FOOD &
  COMMERCIAL WORKERS
  INTERNATIONAL UNION,
  AFL-CIO, CLC
1775 K Street. N.W.
Washington D.C. 20006
(202) 223-3111

*Counsel for Respondent
United Food & Commercial
Workers International Union,
AFL-CIO, CLC*

**AR3830**

No. 18-589

IN THE

# Supreme Court of the United States

KIRSTJEN M. NIELSEN,
Secretary of Homeland Security, et al.,

*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, et al.,

*Respondents.*

ON PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT TO THE UNITED STATES
COURT OF APPEALS FOR THE SECOND CIRCUIT

BRIEF IN OPPOSITION FOR THE STATES OF NEW YORK,
MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT,
DELAWARE, HAWAIʻI, ILLINOIS, IOWA, NEW MEXICO, NORTH
CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND,
VERMONT, AND VIRGINIA, AND THE DISTRICT OF COLUMBIA

BARBARA D. UNDERWOOD*
 *Attorney General*
 *State of New York*
ANISHA S. DASGUPTA
 *Deputy Solicitor General*
ANDREW W. AMEND
 *Senior Assistant*
 *Solicitor General*
DAVID S. FRANKEL
 *Assistant Solicitor General*
 28 Liberty Street
 New York, NY 10005
 (212) 416-8020
 barbara.underwood@ag.ny.gov
 *Counsel of Record*

(*Additional counsel listed on signature page.*)

AR3831

*i*

## COUNTERSTATEMENT OF QUESTION PRESENTED

Whether the extraordinary relief of certiorari before judgment is warranted to consider the reviewability and lawfulness of petitioners' September 2017 decision to end Deferred Action for Childhood Arrivals.

**AR3832**

*ii*

## TABLE OF CONTENTS

**Page**

INTRODUCTION.........................................................1

STATEMENT ............................................................2

REASONS FOR DENYING THE PETITION..........14

    A.   This Litigation Presents No Emergency Warranting the Extraordinary Remedy of Certiorari Before Judgment. ..........................14

    B.   The Courts of Appeals Are Not Divided on Any Issues Presented in This Litigation, Nor Do Other Factors Warrant Denying This Court the Benefit of Additional Percolation of Those Issues. ..........................21

    C.   In Light of the Procedural Posture of This Litigation, Petitioners' *Batalla Vidal* Appeals Present an Especially Poor Vehicle for Certiorari Before Judgment. ..........................25

CONCLUSION .......................................................31

AR3833

*iii*

## TABLE OF AUTHORITIES

**Cases**                                                **Page(s)**

*Aaron v. Cooper*, 357 U.S. 566 (1958) ...................... 18

*Arizona Dream Act Coal. v. Brewer*, 818 F.3d
   901 (9th Cir. 2016) ................................................ 5

*Arizona Dream Act Coal. v. Brewer*, 855 F.3d
   957 (9th Cir. 2017) ............................................... 4

*Arizona v. Evans*, 514 U.S. 1 (1995) ........................ 23

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ......... 5

*Citizens to Preserve Overton Park, Inc. v.
   Volpe*, 401 U.S. 402 (1971) ............................. 21,27

*Coleman v. Paccar Inc.*, 424 U.S. 1301 (1976).......... 14

*Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015)......... 5

*Dames & Moore v. Regan*, 453 U.S. 654 (1981) .... 15,23

*Decker v. Northwest Envt'l Def. Ctr.*, 568 U.S.
   597 (2013) ........................................................... 30

*DHS v. Regents of Univ. of Cal.*, 138 S. Ct.
   1182 (2018) .................................................... 15,18

*District Hosp. Partners, L.P. v. Sebelius*, 794 F.
   Supp. 2d 162 (D.D.C. 2011)................................. 28

*Ex parte Quirin*, 317 U.S. 1 (1942) .......................... 14

*FTC v. Phoebe Putney Health Sys., Inc.*, 568
   U.S. 216 (2013) ................................................... 30

*Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*,
   240 U.S. 251 (1916) ............................................ 26

*Heckler v. Chaney*, 470 U.S. 821 (1985)................... 21

*In re United States*, 138 S. Ct. 443 (2017) ............... 18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State
   Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983)...... 22

*iv*

| Cases | Page(s) |
|---|---|
| *Mount Soledad Mem'l Ass'n v. Trunk*, 134 S. Ct. 2658 (2014) | 14 |
| *NAACP v. Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018) | 25 |
| *NAACP v. Trump*, 321 F. Supp. 3d 143 (D.D.C. 2018) | 20 |
| *Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018) | 19,20 |
| *Regents of Univ. of Cal. v. DHS*, 908 F.3d 476 (9th Cir. 2018) | 13 |
| *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) | 3 |
| *SEC v. Chenery Corp.*, 318 U.S. 80 (1943) | 22 |
| *Texas v. United States*, 328 F. Supp. 3d 662 (S.D. Tex. 2018) | 20,29 |
| *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) | 6,29 |
| *Texas v. United States*, 86 F. Supp. 3d 591 (2015) | 6,29 |
| *United States v. Clinton*, 524 U.S. 912 (1998) | 18 |
| *United States v. Hollywood Motor Car Co.*, 458 U.S. 263 (1982) | 26 |
| *United States v. Mistretta*, 488 U.S. 361 (1989) | 23 |
| *United States v. Nixon*, 418 U.S. 683 (1974) | 15,26 |
| *United States v. Stanley*, 483 U.S. 669 (1987) | 27 |
| *United States v. Texas*, 136 S. Ct. 2271 (2016) | 6,29 |
| *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) | 28 |
| *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788 (D.C. Cir. 1984) | 28 |

**AR3835**

*v*

| Cases | Page(s) |
|---|---|

*Webster v. Doe*, 486 U.S. 592 (1988).........................27

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ................................. 14,15

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 937 (1952) ....................................26

## Laws

Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat. 5 ......................4

DHS Appropriations Act, 2010, Pub. L. No. 111-83, 123 Stat. 2142 (2009) ................4

DHS Appropriations Act, 2015, Pub. L. No. 114-4, 129 Stat. 39 ................................4

Immigration Reform and Control Act of 1986, Pub. L. 99-603, 100 Stat. 3359....................3

5 U.S.C.
  § 705................................................21
  § 706................................................27

8 U.S.C.
  § 1154................................................3
  § 1324a..............................................5

## Regulations & Rules

8 C.F.R.
  § 1.3................................................22
  § 212.5..............................................5
  § 214.14.............................................3
  § 274a.12..........................................3,22

28 C.F.R. § 1100.35(b)(2) .............................3

Sup. Ct. R. 11.....................................14,16

**AR3836**

*vi*

**Miscellaneous Authorities**                **Page(s)**

H.R. Rep. No. 111-157 (2009).......................................4

**AR3837**

## INTRODUCTION

Congress and this Court have long recognized the Executive Branch's discretion to forbear enforcement against persons whom federal immigration law makes removable from the United States—a practice commonly referred to as "deferred action." Respondents are a group of sixteen States[1] and the District of Columbia that have challenged petitioners' decision to terminate Deferred Action for Childhood Arrivals (DACA), which provides a framework for the Department of Homeland Security (DHS) to receive and process requests for deferred action from law-abiding individuals who were brought to the United States as children.[2] In the proceedings below, the U.S. District Court for the Eastern District of New York entered a preliminary injunction partially enjoining DACA's termination in light of the irreparable harms that the termination threatened to respondents and the public, and the likelihood respondents would succeed on the merits of their Administrative Procedure Act (APA) claim that the termination was arbitrary and capricious. (Pet. App. 62a-129a.) Separately, the district court issued orders denying petitioners' motions to dismiss respondents' APA and equal-protection claims for lack of jurisdiction (Pet. App. 1a-58a) and failure to state a claim (Pet. App. 133a-171a).

---

[1] Those States are New York, Massachusetts, Washington, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Iowa, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, and Virginia.

[2] A group of individuals and organizations—the other respondents to this petition—brought a separate, similar challenge in the same district court.

**AR3838**

2

The U.S. Court of Appeals for the Second Circuit has consolidated petitioners' interlocutory appeals from the district court's orders and will hear argument on those on January 25, 2019. (Case Calendaring, No. 18-485 (2d Cir. Nov. 19, 2018), ECF No. 567.) Petitioners seek to bypass the court of appeals, however, and have petitioned this Court for the extraordinary remedy of certiorari before judgment.

This Court should deny the petition because no external deadline or other urgent circumstance requires the Court to conclusively resolve this litigation on an emergency basis. Petitioners have failed to show that permitting the Second Circuit to consider their appeals in the first instance will cause any injury whatsoever to them or to the public. In addition, there is no conflict among the courts of appeals on the issues presented here. Only one circuit court has addressed those issues, but three additional circuits are now expeditiously hearing appeals, putting the benefits of appellate percolation not far off. Finally, even if there were a need for this Court to review those issues at the present time, this litigation would be a poor vehicle for that undertaking because it comes to the Court in an interlocutory posture as well as before judgment by an intermediate appellate court.

## STATEMENT

1. Like other forms of deferred action, DACA reflects the reality that there are many more undocumented immigrants in the United States than federal immigration authorities have the means to remove. To focus enforcement resources, DHS and its predecessors have a long-standing practice of "giv[ing] some cases lower priority" by "grant[ing] deferred action,"

**AR3839**

3

8 C.F.R. § 274a.12(c)(14). A grant of deferred action memorializes the Executive's decision not to proceed against a potentially removable person for a specified period of time. *Reno v. American-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 484 (1999). Under federal regulations, the grant also makes that person eligible to apply for work authorization and to receive other benefits. 8 C.F.R. § 274a.12(c)(14) (work authorization); *id.* § 214.14(d)(3) (no accrual of "unlawful presence" for purposes of re-entry bars); 28 C.F.R. § 1100.35(b)(2) (similar). (*See* CA2 J.A. 217 (memorandum of the U.S. Department of Justice, Office of Legal Counsel ("OLC Mem.").)

Deferred action has been "a regular practice" of the Executive Branch for decades, "for humanitarian reasons or simply for its own convenience." *AADC*, 525 U.S. at 483-84. This Court has approved of the practice, *id.* at 483-84, and Congress has enacted legislation relying on the existence of both deferred action and the federal regulation that makes deferred action grantees eligible for work authorization, *see* 8 U.S.C. § 1154 (deferred action); Immigration Reform and Control Act of 1986, Pub. L. 99-603, 100 Stat. 3359 (work authorization). (*See also* Pet. App. 75a.)

On various occasions since the 1970s, DHS and its predecessors have found it expedient to make deferred action "available to certain classes of aliens" (CA2 J.A. 230 (OLC Mem.)). For example, the 1977 Silva Letter-holders program stemming from executive action by the Kennedy administration provided a framework for 250,000 "nationals of certain countries" to obtain stays of removal; and the Family Fairness Program—adopted by the Reagan administration and extended under the first Bush administration—"deferred the deportation of 1.5 million family members of

AR3840

4

noncitizens who were legalized through the Immigration Reform and Control Act." *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 968 n.2 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1279 (2018).

a. In June 2012, DHS announced DACA: a framework for processing requests for deferred action from persons who were brought to the United States as children and met several other threshold eligibility criteria. (CA2 J.A. 213-215.) DHS explained that DACA would help DHS "ensure that [its] enforcement resources" would be expended on the serious criminals that Congress directed DHS to prioritize for deportation,[3] rather than on "low priority cases." (CA2 J.A. 213.)

To be eligible for DACA, a person must have come to the United States under the age of sixteen, continuously resided here between 2007 and 2012, not yet attained the age of thirty, and satisfied specific educational or military service requirements. (CA2 J.A. 213.) The person must not have been convicted of a felony, a significant misdemeanor, or multiple misdemeanors, and must not otherwise pose a threat to national security or public safety. (CA2 J.A. 213-215.) As the DACA memorandum explained, "prosecutorial discretion" was "especially justified" with respect to such people, many of whom "have already contributed to our country in significant ways." (CA2 J.A. 214.) The memorandum emphasized, however, that no individual could receive deferred action through DACA

---

[3] *See*, *e.g.*, DHS Appropriations Act, 2015, Pub. L. No. 114-4, 129 Stat. 39, 43; Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, div. F., tit. II, 128 Stat. 5, 251; DHS Appropriations Act, 2010, Pub. L. No. 111-83, 123 Stat. 2142, 2149 (2009); H.R. Rep. No. 111-157, at 8 (2009).

5

without first passing a background check, and that all requests for relief under DACA "are to be decided on a case by case basis." (CA2 J.A. 214.)

Individuals granted deferred action under DACA received protection from removal for renewable two-year periods, and the ability to apply for work authorization and for permission to travel outside the country ("advance parole"). (CA2 J.A. 214-215.) *See* 8 C.F.R. § 212.5.

From June 2012 until September 2017, more than 800,000 individuals relied on DACA to obtain deferred action and employment authorization, including more than 100,000 residents of the respondent States. (Pet. App. 62a-63a; CA2 J.A. 2332-2336.) DACA enabled grantees to pursue higher education, secure employment, and create and run businesses. (CA2 J.A. 2129-2213.) It also enabled States to employ grantees with special skills, tax the grantees' income and purchases, and collect tuition from grantees who enrolled at public colleges and universities based on assurances that they would be able to work upon graduation.[4] (CA2 J.A. 2239-2258, 2266-2298, 3753-3757, 3774-3794, 3956-3965.)

Prior to September 2017, several courts heard challenges to DACA, but none of the challenges succeeded.[5] In those cases, the federal government defended the legality of DACA, including through

---

[4] *See also* 8 U.S.C. § 1324a(a), (e) (imposing penalties on employers of persons who lack authorization to work).

[5] *See Arizona Dream Act Coal. v. Brewer*, 818 F.3d 901, 906 (9th Cir. 2016), *amended on denial of reh'g en banc*, 855 F.3d 957 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1279 (2018); *Arpaio v. Obama*, 797 F.3d 11, 15 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 900 (2016); *Crane v. Johnson*, 783 F.3d 244, 247 (5th Cir. 2015).

6

amicus curiae participation. *See, e.g.*, United States Br. as Amicus Curiae, *Arizona Dream Act Coal.*, No. 15-15307 (9th Cir. Aug. 28, 2015), ECF No. 62. The Office of Legal Counsel likewise explained in a lengthy public opinion that DACA was legally sound so long as immigration officials "retained discretion to evaluate each application on an individualized basis." (CA2 J.A. 233; *see also* CA2 J.A. 833 (petitioners' admission "that at least one DACA applicant who met the guidelines of the 2012 DACA memorandum was nonetheless denied DACA").)

b. In 2015, Texas and several other States challenged DHS's creation of a different deferred action framework for certain parents of citizens and permanent residents (Deferred Action for Parents of Americans and Lawful Permanent Residents, also known as DAPA), as well as particular changes that DHS made to DACA in 2014. The U.S. District Court for the Southern District of Texas entered a nationwide injunction against the implementation of DAPA and the 2014 changes to DACA, concluding that the plaintiffs were likely to succeed on their claim that DHS had failed to comply with the procedural requirements of the APA. *Texas v. United States*, 86 F. Supp. 3d 591, 677 (2015). A divided panel of the Fifth Circuit affirmed on both procedural and substantive APA grounds. *Texas v. United States*, 809 F.3d 134, 146-49 (5th Cir. 2015). This Court affirmed by an equally divided court. *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

The federal government continued DACA despite the preliminary injunction against DAPA, accepting more than 400,000 new and renewal DACA applications into the new Administration. (CA2 J.A. 1756.) In

7

February 2017, DHS rescinded certain other immigration policies, but expressly left DAPA and DACA intact. (Pet. App. 80a.) In mid-June of 2017, DHS rescinded DAPA, which had never gone into effect due to the injunction, but again explicitly did not disturb DACA. (Pet. App. 80a-81a.) In late June 2017, the *Texas* plaintiffs informed U.S. Attorney General Jeff Sessions that they would amend the complaint in their still-pending DAPA challenge to include a challenge to DACA, unless the federal government agreed by September 5 to rescind the DACA memorandum. (CA2 J.A. 451.) The letter did not ask for existing DACA grants to be cancelled, or for the federal government to change its enforcement priorities with respect to DACA-eligible persons. (CA2 J.A. 451.)

c. On September 4, 2017, Attorney General Sessions sent a one-page letter to Acting DHS Secretary Elaine Duke advising that DHS "should rescind" DACA. (CA2 J.A. 463.) The letter stated that DACA lacked "statutory authority" and was "unconstitutional," and that DACA had been implemented "after Congress' repeated rejection of proposed legislation that would have accomplished a similar result." (CA2 J.A. 463.) The letter then opined that DACA "has the same legal and constitutional defects that the courts recognized as to DAPA," and would likely meet the same fate in the "potentially imminent litigation" threatened by the *Texas* plaintiffs. (CA2 J.A. 463.) Finally, the letter stated that "[i]n light of the costs and burdens that will be imposed on DHS" if DACA were enjoined, "DHS should consider an orderly and efficient wind-down process." (CA2 J.A. 463.) The letter did not describe the basis for any of those conclusions beyond a general citation to the *Texas* opinions, which did not consider DAPA's constitutionality and

**AR3844**

8

recognized several significant distinctions between DAPA and DACA.

On September 5, Attorney General Sessions announced the termination of DACA at a press conference. (CA2 J.A. 3488-3489.) That same day, Acting Secretary Duke issued a memorandum formally terminating the program. (CA2 J.A. 464-468.) The memorandum quoted from Attorney General Sessions's September 4 letter and then stated that "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings" and the letter, "it is clear" that DACA should be terminated. (CA2 J.A. 467.) Like Attorney General Sessions's letter, the memorandum did not address or acknowledge the reasons that DHS and the U.S. Department of Justice had previously given to the public for concluding that DACA was lawful, the benefits of the program, or the myriad costs and harms that terminating the program would inflict on grantees and the public. The only potential costs that the memorandum mentioned were the unspecified "administrative complexities" referenced by Attorney General Sessions's letter. (CA2 J.A. 466.) The termination memorandum announced that DHS would reject all new DACA applications "filed after the date of this memorandum," and would accept renewal applications only until October 5, and only from individuals whose current deferred action status would expire on or before March 5, 2018. (CA2 J.A. 467.) The memorandum further stated that DHS would no longer approve any "applications for advance parole under standards associated with the DACA program." (CA2 J.A. 467.)

2. The respondent States filed this suit on September 7, 2017, alleging (among other things) that the termination of DACA was driven by discriminatory

9

animus in violation of equal protection and the APA; failed to comply with the procedural requirements of the APA and Regulatory Flexibility Act; and was otherwise arbitrary and capricious. (CA2 J.A. 198, 200-202.) The district court ruled that (i) petitioners' attempt to rescind DACA was reviewable under the APA and Immigration and Naturalization Act (Pet. App. 24a-39a); (ii) respondents' equal protection and substantive APA claims were adequately pleaded (Pet. App. 137a-138a, 147a-157a); and (iii) respondents were entitled to a preliminary injunction on their substantive APA claim (Pet. App. 90a-129a). After delays created by petitioners' litigation conduct, petitioners' interlocutory appeals from these orders were consolidated for presentation to the Second Circuit, which is scheduled to hear argument on the appeals on January 25, 2019.

a. In October 2017, petitioners proffered an extremely limited administrative record to the district court consisting of "materials that [they] unilaterally decide[d] to present to the court, rather than the record upon which the agency made its decision." (Order at 2, No. 17-3345 (2d Cir. Dec. 27, 2017), ECF No. 171.) Respondents objected, and the district court sustained their objection. (Mem. & Order, No. 17-cv-5228 (E.D.N.Y. Oct. 19, 2017), ECF No. 66.) Petitioners then petitioned the Second Circuit for a writ of mandamus, seeking (i) vacatur of the district court's orders to complete the record and produce a privilege log identifying any record materials petitioners were withholding as privileged, and (ii) a stay of petitioners' document-production obligations pending the resolution of threshold justiciability arguments that petitioners had not yet presented to the district court in the form of a motion to dismiss. (Pet. for a Writ of

10

Mandamus, No. 17-3345 (2d Cir. Oct. 23, 2017), ECF No. 33.) The Second Circuit held the mandamus petition in abeyance and stayed petitioners' document-production obligations until the district court resolved those "issues of jurisdiction and justiciability." (Order, No. 17-3345 (2d Cir. Oct. 24, 2017), ECF No. 41.)

b. Within two weeks after petitioners moved to dismiss this suit, the district court entered an order largely denying the portion of petitioners' motion that sought dismissal for lack of jurisdiction.[6] (Pet. App. 58a.) Petitioners did not promptly request certification of that ruling for interlocutory appeal under 28 U.S.C. § 1292(b), which would have enabled the ruling to be considered on an expedited basis along with their mandamus petition. Petitioners instead waited seven weeks to request certification, by which time the Second Circuit had denied their mandamus petition (Pet. App. 85a-86a; *see* Notice of Mot., No. 17-cv-5228 (E.D.N.Y. Dec. 28, 2017), ECF No. 184.) Despite its "grave misgivings" about the delay that would be created by § 1292(b) certification at that stage of the proceedings, the district court granted petitioners' request and postponed the preliminary injunction proceedings scheduled for the following week. (Mem. & Order at 8, No. 17-cv-5228 (E.D.N.Y. Jan. 8, 2018), ECF No. 198.) Petitioners applied to the Second Circuit for permission to proceed with their

---

[6] The district court dismissed for lack of standing the States' claims that petitioners violated due process by failing to sufficiently notify grantees of DACA's end and the limited renewal window, and by apparently ceasing to protect sensitive personal information that DACA grantees had been induced to provide. (Pet. App. 50a-56a.)

11

interlocutory appeal,[7] but subsequently asked the Second Circuit to hold their appeal until the district court resolved the still-pending portion of their motion to dismiss for failure to state a claim, and respondents' motion for a preliminary injunction. (Pet. App. 87a.) The Second Circuit accordingly directed that petitioners' application for leave to file an interlocutory appeal be "held in abeyance pending the district court's adjudication of the parties' pending motions." (Order at 2, No. 18-122 (2d Cir. Jan. 31, 2018), ECF No. 46.)

c. Within two weeks of the order holding the Second Circuit proceedings in abeyance, the district court held a hearing and entered a preliminary injunction. The district court concluded that respondents were likely to succeed on their claim that petitioners' decision to terminate DACA was arbitrary and capricious, and that the other preliminary injunction factors weighed strongly in respondents' favor. (Pet. App. 119a, 126a.) The court directed petitioners to allow DACA renewals "on the same terms and conditions that existed prior to the promulgation of the DACA Rescission Memo." (Pet. App. 126a.) The court declined to order petitioners to grant new applications from "individuals who have never before obtained DACA benefits" or to "continue granting 'advanced parole' to DACA beneficiaries." (Pet. App. 126a.) Petitioners noticed an appeal of the district court's preliminary injunction order (Pet. App. 130a-131a), and the Second Circuit granted petitioners' motion to expedite that appeal (Order, No. 18-485 (2d Cir. Mar. 8, 2018), ECF No. 61).

---

[7] (Pet. for Permission to Appeal, No. 18-122 (2d Cir. Jan. 16, 2018), ECF No. 1.)

12

d. One month later, in March 2018, the district court entered an order largely denying petitioners' motion to dismiss for failure to state a claim. (Pet. App. 133a-171a.) The court held that the state respondents had adequately pleaded their equal protection and substantive APA claims, but dismissed the States' APA notice-and-comment claims and Regulatory Flexibility Act claims. (Pet. App. 137a.) At petitioners' request, the district court certified the order for interlocutory appeal.[8] (Order, No. 17-cv-5228 (E.D.N.Y. Apr. 30, 2018), ECF No. 220.)

e. In July 2018, the Second Circuit granted petitioners' applications for interlocutory appeal of the district court's November 2017 and March 2018 orders, directed that those appeals be consolidated with petitioners' pending appeal from the district court's February 2018 preliminary injunction order, and granted petitioners' request for expedited supplemental briefing.[9] (Order, No. 18-1313 (2d Cir. July 5,

---

[8] Petitioners also sought a stay of their deadline to answer the complaint. (Mot. for Stay of Answer Deadlines Pending Appeal, No. 17-cv-5228 (E.D.N.Y. Apr. 10, 2018), ECF No. 216.) The district court largely denied that motion two days later, requiring petitioners to file their answer within forty-five days and explaining that it was "reasonable to require [petitioners] to take the steps necessary to avoid exacerbating the needless delays they have already caused." (Order, No. 17-cv-5228 (E.D.N.Y. Apr. 12, 2018).)

[9] Contrary to petitioners' assertions, the litigation pending before the Second Circuit does not present the question of whether petitioners' termination of DACA "should have gone through notice-and-comment rulemaking." *See* Pet. 15. Neither the state plaintiffs nor the individual plaintiffs in this litigation have appealed or cross-appealed the dismissal of their notice-and-comment claims, as petitioners have acknowledged in a

AR3849

13

2018), ECF No. 44; Order, No. 18-122 (2d Cir. July 5, 2018), ECF No. 75; Mot. Order, No. 18-485 (2d Cir. July 25, 2018), ECF No. 499.) The parties completed supplemental briefing on October 30, 2018, and the Second Circuit has calendared the consolidated appeals for argument on January 25, 2019. (Suppl. Reply Br., No. 18-485 (2d Cir. Oct. 30, 2018), ECF No. 561; Case Calendaring Entry, No. 18-485 (2d Cir. Nov. 19, 2018), ECF No. 567.)

   f.  On November 5, 2018, petitioners filed petitions for certiorari before judgment in this case and in parallel DACA challenges being heard by the U.S. Courts of Appeals for the Ninth and District of Columbia Circuits: *Department of Homeland Security v. Regents of the University of California*, No. 18-587 (Nov. 5, 2018); *Trump v. NAACP*, No. 18-588 (Nov. 5, 2018). Three days later, the Ninth Circuit issued an opinion affirming the decisions of the U.S. District Court for the Northern District of California which petitioners had appealed. *Regents of Univ. of Cal. v. DHS*, 908 F.3d 476, 487, 520 (9th Cir. 2018). The *Regents* and *Trump* petitions are being briefed on the same schedule as the present petition.

---

corrected supplemental brief supporting their parallel petition in *Department of Homeland Security v. Regents of the University of California*, No. 15-587, which was filed November 28, 2018.

14

## REASONS FOR DENYING THE PETITION

### A. This Litigation Presents No Emergency Warranting the Extraordinary Remedy of Certiorari Before Judgment.

This Court will grant certiorari before judgment "only upon a showing that the case is of such imperative public importance as to justify deviation from normal appellate practice and to require immediate determination in this Court." Sup. Ct. R. 11. This is a "very demanding standard," *Mount Soledad Mem'l Ass'n v. Trunk*, 134 S. Ct. 2658, 2658-59 (2014) (Alito, J., statement respecting denial of certiorari before judgment), and a grant of certiorari before judgment is "an extremely rare occurrence," *Coleman v. Paccar Inc.*, 424 U.S. 1301, 1304 n.* (1976) (Rehnquist, J., in chambers).

The rare occasions on which this Court has granted certiorari before judgment demonstrate the exceptional urgency required to warrant that relief. For instance, the exigencies of war demanded immediate resolution of the challenges to executive action in *Ex parte Quirin*, 317 U.S. 1 (1942), and *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). The former case addressed a presidential order creating a military tribunal to try German saboteurs who had come to America after America entered World War II. *Ex parte Quirin*, 317 U.S. at 6, 21-23. The latter case dealt with a presidential order seizing most of the Nation's steel plants to avert a strike during the Korean War. *Youngstown Sheet & Tube*, 343 U.S. at 582. This Court decided both cases within weeks of the challenged presidential orders. *See Ex parte Quirin*, 317 U.S. at 22 (presidential order issued July 2, 1942; case decided by this Court on July 31, 1942);

**AR3851**

15

*Youngstown Sheet & Tube*, 343 U.S. at 582-83 (presidential order issued April 8, 1952; case decided by this Court on June 2, 1952).

Extraordinary circumstances likewise created exceptional urgency in *United States v. Nixon*, which concerned a motion to quash a subpoena that sought recordings of confidential communications concerning the Watergate scandal from the President, for use in a pending criminal prosecution. *See* 418 U.S. 683, 686-90 (1974). Similarly, in *Dames & Moore v. Regan*, this Court was presented with a challenge to executive orders implementing an international agreement to end the Iran hostage crisis, against the backdrop of a looming deadline by which "Iran could consider the United States to be in breach of" the agreement. *See* 453 U.S. 654, 660 (1981). In *Nixon* and *Dames & Moore*, this Court again acted with dispatch to resolve those exceptionally pressing matters. *See Nixon*, 418 U.S. at 687-88 (subpoena issued April 18, 1974; case decided by this Court on July 24, 1974); *Dames & Moore*, 453 U.S. at 666-67 (suit filed April 28, 1981; case decided by this Court on July 2, 1981).

The present litigation is not comparable. It presents no urgent issue of national defense or international relations; its pendency inhibits no crucial government action; and no external deadline, pending proceeding, or other circumstance requires its immediate and conclusive resolution. Indeed, less than a year ago, this Court *denied* a petition for certiorari before judgment in parallel litigation raising substantially the same issues as petitioners' appeals here. *See DHS v. Regents of Univ. of Cal.*, 138 S. Ct. 1182 (2018). This Court's denial of certiorari before judgment in *Regents* stands in stark contrast to its expedited consideration of the issues in *Ex parte Quirin*, *Youngstown Sheet &*

AR3852

16

*Tube*, *Nixon*, and *Dames & Moore*, and underscores that the questions raised here present no emergency.

1. In a supplemental brief supporting their current parallel petition in *Regents*, petitioners observed that the Ninth Circuit's decision in *Regents* eliminates one of the main reasons they sought certiorari before judgment in this Second Circuit litigation. *See* Pets.' Suppl. Br. at 10-11, *Regents*, No. 18-587 (Nov. 28, 2018) ("*Regents* Suppl. Br."). Petitioners explained that they had sought certiorari before judgment here to enable this Court to review any issue that might be decided in their favor by the Ninth Circuit, but resolved against them by the Eastern District of New York: a concern that was obviated by the Ninth Circuit's rejection of all of petitioners' arguments on appeal. *Id.* Petitioners suggest that this Court "may still wish" to grant certiorari to allow the parties to "participate in the Court's consideration of the overlapping issues" raised here and in *Regents. Id.* at 11. But such a suggestion is quite different from a showing that a dispute is "of such imperative public importance as to . . . *require* immediate determination in this Court," Sup. Ct. R. 11 (emphasis added).

Petitioners seem to recognize as much when they analogize their appeals to prior cases where certiorari before judgment was granted despite the absence of any "'great public emergency'" because "similar or identical issues of importance were already pending before the Court" and the Court elected "'to review simultaneously the questions posed in the case still pending in the court of appeals.'" *Regents* Suppl. Br. at 11 (quoting Stephen M. Shapiro et al., *Supreme Court Practice* § 2.4, at 86 (10th ed. 2013)). That characterization undermines any suggestion that petitioners' appeals here present an emergency—and in any

**AR3853**

17

event, certiorari before judgment would not be appropriate in the *Batalla Vidal* appeals even if this Court were to grant certiorari in *Regents* or *Trump*, for reasons we explain later (see *infra* at 26-30).

Petitioners' conduct in the proceedings below is likewise inconsistent with any claim of an emergency. Although petitioners purport to need immediate relief from the preliminary injunction entered by the district court (Pet. 14-15), they have not sought a stay of the injunction from any court during the more than nine months that the injunction has been in place. In addition, the litigation strategy they pursued below delayed rather than advanced their appeals in the Second Circuit. Petitioners waited seven weeks to ask the district court to certify for interlocutory appeal its order denying their motion to dismiss on jurisdictional grounds; had they acted earlier, the interlocutory appeal could have been presented and resolved in conjunction with petitioners' then-pending mandamus petition. Moreover, when the district court granted their request for certification, petitioners asked the Second Circuit to hold the interlocutory appeal in abeyance pending the preliminary injunction proceedings in the district court, which the district court had previously postponed in response to petitioners' declared intention to take an interlocutory appeal. See *supra* at 10-11. (*See* Order, No. 17-cv-5228 (E.D.N.Y. Jan. 12, 2018).)

2. Petitioners also cannot show any injury from allowing the Second Circuit to consider their appeals in the first instance. The Second Circuit has been willing to act expeditiously throughout this proceeding, granting every request for expedited consideration that petitioners have made. See *supra* at 11-12. And that court is scheduled to hear oral argument on

18

petitioners' fully briefed appeals on January 25, 2019. The circuit's awareness of the need to "proceed expeditiously to decide this case," *United States v. Clinton*, 524 U.S. 912, 912 (1998)—when coupled with petitioners' failure to show any need for an immediate, conclusive resolution—refutes any claim of prejudice and provides a further factor in favor of denying certiorari before judgment. *See Aaron v. Cooper*, 357 U.S. 566, 567 (1958); *see also Regents*, 138 S. Ct. at 1182.

Indeed, the courts below have consistently granted petitioners' requests to stay completion of the administrative record and discovery, suspending petitioners' evidentiary obligations nearly continuously since October 20, 2017.[10] See *supra* at 9-10. (Mot. Order, No. 17-3345 (2d Cir. Oct. 20, 2017), ECF No. 23.) The current stay will remain in place pending the Second Circuit's decision in petitioners' appeals, and petitioners may seek an additional stay from the lower courts or this Court if they can demonstrate that one is needed. The Second Circuit's consideration of these appeals therefore will not burden petitioners with discovery obligations of the type that they complained about in their earlier, unsuccessful petition for certiorari before judgment in *Regents*. *See* Pet. 13, *Regents*, No. 17-1003 (U.S. Jan. 18, 2018).

3. Petitioners' suggestion that their appeals require immediate resolution by this Court is also belied by the absence of any harm to the public from permitting these appeals to go forward in the Second Circuit. Although petitioners complain that the preliminary

---

[10] Accordingly, petitioners have yet to produce any of the missing administrative record documents. (Pet. App. 123a.) *See In re United States*, 138 S. Ct. 443, 445 (2017).

AR3855

19

injunction will remain in place while the Second Circuit considers their appeals, that injunction did no more than maintain the status quo by preventing the termination of DACA, a form of deferred action that DHS has granted since 2012 to law-abiding individuals who have lived in the United States since at least 2007. Petitioners do not and cannot explain how DACA's existence *now* poses a problem too urgent to allow the Second Circuit to consider their appeals. Indeed, for the first seven months of the current Administration, petitioners deliberately left DACA in place, publicly and expressly reaffirming their commitment to DACA grantees until their abrupt about-face in September 2017. (CA2 J.A. 141-142.)

As multiple courts have concluded based on fact-intensive records, DACA's continuation during the pendency of these appeals serves rather than harms the public interest. By protecting grantees who have come out of the shadows and are undertaking higher education and skilled employment, the continuation of DACA safeguards the interests of hundreds of thousands of grantees, their families and employers, the institutions with which they are associated, and the communities and States in which they reside.

Two district courts have thus concluded that the balance of equities and the public interest favor *maintaining* DACA, not terminating it, while challenges to petitioners' September 2017 rescission efforts are litigated. (Pet. App. 123a-126a.) *Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1047-48 (N.D. Cal.), *aff'd*, 908 F.3d 476 (9th Cir. 2018). As both courts found, ending DACA would injure not only grantees, but also many States and the District of Columbia in their capacities as employers, providers

**AR3856**

20

of health services, and proprietors of public universi-
ties; terminating DACA would also cost these entities
many millions of dollars in tax revenue. (Pet. App.
122a-123a, 128a (sixteen States and District of
Columbia).) *Regents*, 279 F. Supp. 3d at 1033-34, 1046-
47 (four States). Based on similar considerations, a
third district court required petitioners to continue
processing DACA renewal requests pending petitioners'
appeal of an order vacating the September 2017
rescission decision as arbitrary and capricious. *NAACP
v. Trump*, 321 F. Supp. 3d 143, 148-49 (D.D.C. 2018)
(partly declining to stay vacatur order pending appeal).
And a fourth district court, although concluding that
DACA was likely unlawful, declined to enjoin DACA's
operation because doing so would "not make sense nor
serve the best interests of the country" given that
"DACA recipients and others nationwide have relied
upon it for the last six years." *Texas v. United States*,
328 F. Supp. 3d 662, 742 (S.D. Tex. 2018).

In sum, petitioners cannot show any urgent need
for a definitive resolution of these appeals, or any
injury to themselves or to the public from allowing
these appeals to proceed in the Second Circuit.
Petitioners thus fall well short of meeting the
demanding standard for the extraordinary relief of
certiorari before judgment.

**AR3857**

21

**B.  The Courts of Appeals Are Not Divided on Any Issues Presented in This Litigation, Nor Do Other Factors Warrant Denying This Court the Benefit of Additional Percolation of Those Issues.**

Only the Ninth Circuit has ruled on the reviewability and legality of the termination of DACA, and thus there is no split in the federal courts of appeals that requires this Court's swift intervention to resolve. Nor is there any significant level of disagreement on these issues among the district courts, or any other compelling need to bypass the review of these issues that is currently underway in the Second Circuit, the Fourth Circuit, and the D.C. Circuit.[11]

1. Every court to reach the issue (the Ninth Circuit and four district courts) has held that respondents' APA claims are judicially reviewable. *See* 5 U.S.C. § 705(a)(2). Each has explained why, under this Court's precedents, petitioners' termination of DACA for purported illegality falls outside the "very narrow" class of agency actions that present no "meaningful standard against which to judge the agency's exercise of discretion." *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); *Heckler v. Chaney*, 470 U.S. 821, 839 (1985). And all of those courts—except for the district court in Maryland, whose decision is now under review by the Fourth Circuit—have agreed that the manner in which petitioners terminated DACA was inconsistent with

---

[11] Petitioners have not sought this Court's intervention in the Fourth Circuit litigation, *Casa De Maryland v. DHS*, No. 18-1521 (4th Cir.), where the district court ruled largely in petitioners' favor.

**AR3858**

22

petitioners' legal obligations. Each of these courts reasoned that petitioners' bare-bones, internally inconsistent, and legally flawed explanations for their decision failed to satisfy their APA obligation to adequately present a reasoned basis for their action.[12] *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42-43 (1983).

Moreover, the outlier district court decision upholding the merits of petitioners' actions has not resulted in widespread institutional confusion or subjected any party to conflicting obligations. This case

---

[12] In defending the rationality of petitioners' legal analysis, petitioners' amici misplace their reliance on statements about the incidental benefits of DACA that respondents made in the district court. *See* Amicus Br. for States of Texas et al. 22-23. The notice-and-comment violation found by the *Texas* courts hinged on the premise—now proven to be incorrect (see *infra* at 29)—that "DACA decisions were not truly discretionary." (CA2 J.A. 465.) Amici now pose an alternative theory that DACA was required to go through notice and comment regardless of whether DHS exercised discretion because DACA purportedly amounted to a substantive rule that conferred benefits and affected individual rights and obligations. Texas Amicus Br. at 18-22. This alternative theory, however, is not germane to the legality of petitioners' conduct under the APA. Petitioners' actions must be judged on the grounds they asserted at the time of decision, not post hoc rationales asserted by third parties. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943). In any event, amici misconstrue respondents' statements. Terminating DACA affected individuals' rights and obligations because it deprived DHS officers of discretion to grant DACA requests and renewals, thereby stripping existing grantees of deferred action's attendant benefits without an individualized assessment. In contrast, the creation of DACA established only a framework for accepting deferred action requests. The ancillary benefits of deferred action are not attributable to the DACA memorandum, but to longstanding regulations that apply to deferred-action recipients generally. *See, e.g.*, 8 C.F.R. §§ 1.3(a)(4)(vi), 274a.12(c)(14).

AR3859

23

is thus unlike *United States v. Mistretta*, where the Court granted certiorari before judgment because lower courts were in "disarray" on the legality of federal criminal sentencing guidelines, and the lack of a uniform approach by the courts had chaotic implications for the functioning of the federal criminal justice system. 488 U.S. 361, 371 & n.6 (1989); *see also Dames & Moore*, 453 U.S. at 660 (noting the "conflicting conclusions" of lower courts on the legality of Executive actions that were imminently necessary to avoid breaching an international agreement).

2. At present, three circuits are considering challenges to petitioners' termination of DACA: the Second Circuit, the Fourth Circuit, and the D.C. Circuit. Allowing these courts to first deliberate on the questions of administrative law presented by the termination of DACA would likely "yield a better informed and more enduring final pronouncement" on those issues if this Court does ultimately undertake review at some point. *See Arizona v. Evans*, 514 U.S. 1, 23 n.1 (1995). And if all of these courts reach the same conclusion as the Ninth Circuit regarding DACA's reviewability and legality, this Court may decide that its own intervention is unnecessary. The Court will not need to wait long to obtain the benefits of appellate percolation: the Fourth Circuit heard argument on December 11, 2018; the Second Circuit has scheduled oral argument in this action for January 25, 2019; and the D.C. Circuit has set a briefing schedule that concludes on January 22, 2019. *Batalla Vidal*, No. 18-485 (2d Cir.), ECF No. 567; *Casa De Maryland v. DHS*, No. 18-1521 (4th Cir.), ECF No. 44; *NAACP v. Trump*, No. 18-5243 (D.C. Cir.), Clerk's Order (Oct. 22, 2018).

Although petitioners would now disregard the benefits of additional appellate review, their brief to

24

the Second Circuit decried the "detrimental effect" of "foreclosing adjudication by a number of courts and judges." (Defs.-Appellants' Opening Br. at 47, No. 18-485 (2d Cir.), ECF No. 59 (quotation marks omitted).) Similarly, in other recent litigation, the Justice Department has vigorously proclaimed the importance of allowing important issues to percolate through the circuit courts. In defending the legality of conditions imposed on certain law-enforcement grants, the Department urged that the scope of relief should not foreclose parallel review because "the Supreme Court 'benefits from permitting several courts of appeals' to consider 'important questions of law.'" (Suppl. Br. for Appellant 23, *City of Chicago v. Sessions*, No. 17-2991 (7th Cir. July 20, 2018), ECF No. 142 (alteration marks omitted) (quoting *United States v. Mendoza*, 464 U.S. 154, 164 (1984))). The Justice Department further asserted that "percolation is more valuable, not less, for pure legal questions"—like some of the issues here—because "appellate courts exercising de novo review of a pure legal question can gain insights by comparing differing analyses of a common question, whereas appellate comparison of decisions arising in fact-heavy contexts is less useful precisely because of the varying factual record in each case." *Id.*

3. Petitioners' central argument here against appellate percolation is baseless. Petitioners and their amici claim that, absent immediate review and corrective action by this Court, petitioners would be required to retain DACA through an additional term of this Court, even though they now regard DACA as unlawful and objectionable. (Pet. 15; Amicus Br. for Citizens United et al. 18.) That argument hinges on a false premise. The lower courts that have found petitioners' September 2017 termination of DACA to be reviewable

**AR3861**

25

and illegal have not bound petitioners' discretion to end DACA in a lawful manner, but instead have recognized that petitioners could end DACA by issuing a new agency decision on a new agency record. (*E.g.*, Pet. App. 66a.) One court expressly invited petitioners to do just that. *See NAACP v. Trump*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018).[13] Petitioners declined that invitation, electing instead to stand on the existing, flawed rationales of illegality set forth in the Sessions letter and the Duke memorandum.

Petitioners' request for certiorari before judgment thus flows from their desire to avoid accountability for their policy choices, rather than from any need to enable the exercise of discretion. Such circumstances present no cause for intervention by this Court, and certainly no cause for intervention in a manner that would redound to this Court's detriment by short-circuiting the traditional appellate processes that should inform the Court's review.

## C. In Light of the Procedural Posture of This Litigation, Petitioners' *Batalla Vidal* Appeals Present an Especially Poor Vehicle for Certiorari Before Judgment.

Whether or not the termination of DACA raises issues that may ultimately warrant this Court's review, this litigation is an especially poor vehicle to address those issues.

---

[13] (*See also* Order at 2, *NAACP*, No. 17-cv-2325 (D.D.C. Apr. 24, 2018), ECF No. 69 (directing parties to inform the court "whether DHS has issued a new decision rescinding DACA and whether the parties contemplate the need for further proceedings in this case").)

**AR3862**

26

1. First, there is no intermediate appellate decision. Further review by the Second Circuit would offer the Court "the substantial value inherent in an intermediate consideration of the issue by the Court of Appeals," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 937, 938 (1952) (Burton, J., dissenting from grant of certiorari before judgment). By contrast, granting certiorari here would prematurely cut off that beneficial avenue of additional consideration.

Second, the district court has not issued a final judgment. Petitioners instead seek review of three interlocutory orders in which the district court declined to dismiss respondents' equal protection and substantive APA claims, and entered a preliminary injunction on the latter claim. Accordingly, this litigation may yet require additional proceedings in the district court. Granting certiorari now would therefore depart from the "strong congressional policy against piecemeal reviews, and against obstructing or impeding an ongoing judicial proceeding by interlocutory appeals," *Nixon*, 418 U.S. at 690; *see United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 265 (1982) (noting the longstanding principles "inimical to piecemeal appellate review of trial court decisions which do not terminate the litigation"); *see also Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 258 (1916) (writ of certiorari will not issue before final judgment except in "extraordinary cases").

2. Petitioners and their amici are simply incorrect to argue that granting this petition would ensure a "definitive resolution" of the entire action. (Pet. 16; Texas Amicus Br. 5.) For example, litigation of respondents' equal-protection claims remains at an early stage: the district court did not grant any relief based on equal-protection grounds, determining only that

27

the two complaints have adequately stated a claim.
And under this Court's settled precedents, there are
no threshold challenges that would bar judicial review
of respondents' equal-protection claims. *See, e.g.*,
*Webster v. Doe*, 486 U.S. 592, 603 (1988) (decisions
committed to agency discretion by law are still subject
to judicial review for constitutional violations).

Immediate interlocutory review also would not
guarantee a definitive resolution of respondents' APA
claims. Petitioners argue that this Court could finally
dispose of those claims (1) by ruling that the termina-
tion of DACA is not subject to APA review, or (2) by
determining that the termination survives APA
review on the merits. *See Regents* Pet. at 23-30. But
petitioners are wrong in asserting that, if this Court
were to find the challenged action reviewable, the
Court could then rule in petitioners' favor on the
ultimate merits of the APA claims. Under the APA,
judicial "review is to be based on the full adminis-
trative record that was before" the agency decision-
maker "at the time he made his decision." *Overton
Park*, 401 U.S. at 420; *see* 5 U.S.C. § 706 (APA
review proceeds on basis of the "whole record"). And in this
action, the Second Circuit already has held—in a
decision on which petitioners have not now sought this
Court's review[14]—that "there is a strong suggestion
that the record before the [district] Court was not

---

[14] The three interlocutory orders of the district court that
petitioners have appealed, and on which they have sought
certiorari before judgment, do not encompass the district court's
rulings on any record or discovery issues. Those separate record
and discovery issues are thus outside of this Court's potential
review upon a grant of certiorari before judgment. *See United
States v. Stanley*, 483 U.S. 669, 676-77 (1987) (interlocutory
appeals are "confined to the particular order[s] appealed from").

28

complete," and that "some limited discovery" is still necessary to ensure the district court has the whole record when it finally adjudicates the merits of respondents' APA claims. (Order, No. 17-3345 (2d Cir. Dec. 27, 2017), ECF No. 171 (quotation marks omitted)). Accordingly, any evaluation of the merits of respondents' APA claims would, at this juncture, be limited to reviewing whether the district court abused its discretion in granting preliminary relief on a partial record.[15]

Recent proceedings in the U.S. District Court for the Southern District of Texas illustrate the difficulties inherent in interlocutory review, and caution against a premature grant of certiorari. In 2015, that court preliminarily enjoined related types of deferred action (DAPA and DHS's 2014 changes to DACA) based on a preliminary record suggesting that DHS

---

[15] Although certain challenges to administrative action—such as claims that a rule is facially inconsistent with a statute—may be resolved before production of the full record on a motion under Federal Rule of Civil Procedure 12(b)(6), courts have uniformly held that claims that challenge an agency's reasons or its rule-making process cannot be dismissed before the agency presents the complete administrative record against which such claims are evaluated. *See, e.g.*, *District Hosp. Partners, L.P. v. Sebelius*, 794 F. Supp. 2d 162, 171-73 (D.D.C. 2011) (elaborating on this distinction and collecting cases). Indeed, to permit dismissal upon review of "less than the full administrative record might allow a party to withhold evidence unfavorable to its case, and so the APA requires review of 'the whole record.'" *See Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) (quoting § 706). Here, for example, agency materials not yet produced, but that were before the Attorney General and Acting Secretary at the time of the termination decision, may well "fairly detract[]" from petitioners' stated justifications and thus provide further support for respondents' APA claims. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951).

AR3865

29

was not exercising discretion in evaluating DACA applications. *Texas*, 86 F. Supp. 3d at 677. That preliminary injunction was affirmed by the Fifth Circuit, 809 F.3d 134 (5th Cir. 2015), and by a per curiam opinion of this Court, which was equally divided, 136 S. Ct. 2271 (2016). In ending DACA, Attorney General Sessions and Acting Secretary Duke relied on the *Texas* district court's finding: both decision-makers cited to the *Texas* opinion, and the Acting Secretary expressly relied on the *Texas* courts' conclusion that "DACA decisions were not truly discretionary." (CA2 J.A. 465.)

But evidence recently adduced in a separate challenge to the legality of DACA (see *supra* at 20) conclusively refutes the *Texas* district court's view that DHS was not exercising discretion when evaluating DACA applications. Based on a fuller record that incorporates a number of materials not presented in 2015, the *Texas* district court has reversed course, rejecting a claim brought by Texas and other States that "those processing DACA applications are not free to exercise discretion." *Texas*, 328 F. Supp. 3d at 734. That court has now concluded, based on a more complete record, that the evidence supporting Texas's claim is "not convincing, either in its quantity or quality." *Id.*

3. In light of the posture of this case, a grant of the instant petition is not warranted regardless of how this Court addresses the pending petitions in *Regents* and *NAACP*. Petitioners argue most forcefully for review in *Regents*; indeed, they fully present the merits of their claims in that petition only. But if this Court were to grant review in *Regents*—despite the current lack of a circuit split and at a time when three appeals courts are actively deliberating on the same

**AR3866**

30

issues—there would be little reason to simultaneously grant this petition. *Regents* is adequately postured to present for review the same categories of claims and issues raised here. Petitioners fail to explain why granting review before judgment in this separate case—and prematurely foreclosing Second Circuit review—would also be necessary to protect their interests.[16]

This Court should also reject petitioners' alternative request (Pet. 17) to hold their petition in abeyance. Petitioners would suffer no harm from having to refile a petition once the Second Circuit completes its expeditious consideration of this appeal. And this Court would benefit from a petition that addresses the Second Circuit's reasoning. Thus, the better course is to await the Second Circuit's ruling, and to allow any aggrieved party to seek review as necessary by filing a new petition (or cross-petition) tailored to the issues and circumstances at that time. In any event, if this Court does choose to hold the petition, it should expressly direct the Second Circuit to continue with its expeditious consideration of the appeal, because such deliberations can only better inform this Court's ultimate review.

---

[16] If this Court grants certiorari nonetheless, it should not accept the request of petitioners' amici to review additional questions beyond those presented by petitioners. Citizens United Amicus Br. 14, 23, 26. Petitioners' amici have identified no basis for this Court to deviate from its general practice of disregarding claims that have been raised solely by an amicus and have not been pursued in the petition for certiorari. *See, e.g.*, *Decker v. Northwest Envt'l Def. Ctr.*, 568 U.S. 597, 614 (2013) (Roberts, C.J., concurring); *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 226 n.4 (2013).

31

## CONCLUSION

The petition for certiorari before judgment should be denied.

Respectfully submitted,

BARBARA D. UNDERWOOD*
   *Attorney General*
   *State of New York*
ANISHA S. DASGUPTA
   *Deputy Solicitor General*
ANDREW W. AMEND
   *Senior Assistant*
   *Solicitor General*
DAVID S. FRANKEL
   *Assistant Solicitor General*
barbara.underwood@ag.ny.gov

December 2018                    * *Counsel of Record*

(*Counsel listing continues on next page.*)

32

GEORGE JEPSEN
  *Attorney General*
  *State of Connecticut*
55 Elm St.
P.O. Box 120
Hartford, CT 06106

MATTHEW P. DENN
  *Attorney General*
  *State of Delaware*
820 N. French St.
Wilmington, DE 19801

DOUGLAS S. CHIN
  *Attorney General*
  *State of Hawai'i*
425 Queen St.
Honolulu, HI 96813

LISA MADIGAN
  *Attorney General*
  *State of Illinois*
100 W. Randolph St.
Chicago, IL 60601

THOMAS J. MILLER
  *Attorney General*
  *State of Iowa*
1305 E. Walnut St.
Des Moines, IA 50319

MAURA HEALEY
  *Attorney General*
  *Commonwealth of*
    *Massachusetts*
One Ashburton Place
Boston, MA 02108

HECTOR H. BALDERAS
  *Attorney General*
  *State of New Mexico*
408 Galisteo St.
Santa Fe, NM 87501

JOSH STEIN
  *Attorney General*
  *State of North Carolina*
114 W. Edenton St.
Raleigh, NC 27603

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court St. N.E.
Salem, OR 97301

JOSH SHAPIRO
  *Attorney General*
  *Commonwealth of*
    *Pennsylvania*
Strawberry Square, 16th Fl.
Harrisburg, PA 17120

PETER F. KILMARTIN
  *Attorney General*
  *State of Rhode Island*
150 South Main St.
Providence, RI 02903

THOMAS J. DONOVAN
  *Attorney General*
  *State of Vermont*
109 State St.
Montpelier, VT 05609

**AR3869**

33

MARK R. HERRING
  *Attorney General*
  *Commonwealth of Virginia*
202 North Ninth St.
Richmond, VA 23219

JOHN W. HICKENLOOPER
  *Governor*
  *State of Colorado*
JACKI COOPER MELMED
  *Legal Counsel*
  *to the Governor*
136 State Capitol Bldg.
Denver, CO 80203

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
800 Fifth Ave., Ste. 2000
Seattle, WA 98104

KARL A. RACINE
  *Attorney General*
  *District of Columbia*
Suite 650 North
441 4th St., NW
Washington, DC 20001

AR3870

No. 18-588

# In the Supreme Court of the United States

———

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.

———

*ON PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE D.C. CIRCUIT*

———

**REPLY BRIEF FOR THE PETITIONERS**

———

NOEL J. FRANCISCO
*Solicitor General*
*Counsel of Record*
*Department of Justice*
*Washington, D.C. 20530-0001*
*SupremeCtBriefs@usdoj.gov*
*(202) 514-2217*

AR3871

**TABLE OF AUTHORITIES**

Cases:                                                          Page

*Alpharma, Inc.* v. *Leavitt*, 460 F.3d 1
(D.C. Cir. 2006) ................................................. 4, 6

*Camp* v. *Pitts*, 411 U.S. 138 (1973)................... 5

*DHS* v. *Regents of the Univ. of Cal.*, 138 S. Ct. 1182
(2018)................................................................ 2

*Florida Power & Light Co.* v. *Lorion*, 470 U.S. 729
(1985)................................................................ 5

*Gratz* v. *Bollinger*, 537 U.S. 1044 (2002) ............... 3

*Grutter* v. *Bollinger*, 539 U.S. 306 (2003)............... 3

*Pension Benefit Guaranty Corp.* v. *LTV Corp.*,
496 U.S. 633 (1990)........................................ 5

*United States* v. *Booker*, 543 U.S. 220 (2005) ...... 3

*United States* v. *Fanfan*, 542 U.S. 956 (2004)...... 3

Statute and rules:

6 U.S.C. 202(5) (2012 & Supp. V 2017) ................. 1
Sup. Ct. R.:
    Rule 10 .................................................... 3
    Rule 11 .................................................... 3

Miscellaneous:

Stephen M. Shapiro et al., *Supreme Court Practice*
(10th ed. 2013) ........................................... 3

(I)

**AR3872**

# In the Supreme Court of the United States

————

No. 18-588

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.

————

*ON PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE D.C. CIRCUIT*

————

**REPLY BRIEF FOR THE PETITIONERS**

————

1.  In September 2017, the Department of Homeland Security (DHS) determined, in accordance with the views of the Attorney General, that the non-enforcement policy known as Deferred Action for Childhood Arrivals (DACA) was likely unlawful and should be wound down in an orderly fashion. Such a quintessential exercise of the Secretary of Homeland Security's authority to establish "national immigration enforcement policies and priorities," 6 U.S.C. 202(5) (2012 & Supp. V 2017), is not judicially reviewable and was eminently reasonable in any event. See Pet. 17-31, *United States DHS* v. *Regents of the Univ. of Cal.*, No. 18-587 (Nov. 5, 2018); Reply Br. 6-11, *Regents, supra* (No. 18-587). Yet DHS has been compelled by two nationwide preliminary injunctions to retain the unlawful policy and thereby sanction the continuing violation of federal immigration law by nearly 700,000 aliens.

(1)

**AR3873**

2

Last February, this Court declined to review the first of those injunctions before the court of appeals could pass on its validity.  See *DHS* v. *Regents of the Univ. of Cal.*, 138 S. Ct. 1182 (2018) (No. 17-1003).  The Court made clear its expectation, however, that the court of appeals "w[ould] proceed expeditiously to decide th[e] case," at which time the government could renew its request.  *Id.* at 1182.  More than ten months later, the court of appeals' judgment is here and the Court is presented the opportunity it anticipated in February.  For the reasons stated in the government's reply brief filed today in *Regents*, *supra* (No. 18-587), the Court should now grant the government's *Regents* petition, and resolve this important dispute this Term.

2. In addition to granting certiorari in *Regents*, the Court should also grant certiorari before judgment in this case.  Such an order would be consistent with this Court's past practices in similar circumstances.  And it would ensure that the Court both receives a comprehensive presentation of the relevant issues and has an adequate vehicle for the timely and definitive resolution of this dispute.  See Pet. 16-17; Supp. Br. 11, *Regents*, *supra* (No. 18-587).  Respondents' arguments to the contrary are unpersuasive.

a. Respondents argue at length (Br. in Opp. 13) that this case "does not involve exigent circumstances" that would justify granting certiorari before judgment.  But that is not the right standard.  When the government filed its petitions in these cases, no court of appeals had addressed the questions presented.  The government therefore explained that this dispute met the Court's heightened standard for certiorari before judgment because the issues here are of such "imperative public importance as to  * * *  require immediate determination

in this Court." Sup. Ct. R. 11; see Pet. 14-15; *Regents*
Pet. 15-17.  By virtue of the Ninth Circuit's intervening
judgment, however, the certiorari decision in these
cases is no longer governed by that standard—and thus
the bulk of respondent's opposition is moot.

Most obviously, the certiorari decision in the *Regents*
cases is now governed by the Court's ordinary standard
under Rule 10.  As explained more fully in the briefing
in those cases, further review is plainly warranted un-
der the Rule 10 standard.  See *Regents* Reply Br. 1-11.
The Ninth Circuit's judgment, however, also affects the
standard for determining whether certiorari before
judgment is appropriate here.  As the government ex-
plained in its supplemental briefing, this Court has
granted certiorari before judgment "not only in cases of
great public emergency but also in situations where
similar or identical issues of importance were already
pending before the Court and where it was considered
desirable to review simultaneously the questions posed
in the case still pending in the court of appeals."
Stephen M. Shapiro et al., *Supreme Court Practice*
§ 2.4, at 86 (10th ed. 2013); see *Regents* Supp. Br. 11
(citing *United States* v. *Fanfan*, 542 U.S. 956 (2004)
(No. 04-105) (granting certiorari before judgment in
companion case to *United States* v. *Booker*, 543 U.S. 220
(2005) (No. 04-104)); *Gratz* v. *Bollinger*, 537 U.S. 1044
(2002) (No. 02-516) (granting certiorari before judgment
in companion case to *Grutter* v. *Bollinger*, 539 U.S. 306
(2003) (No. 02-241))).

Respondents ignore these precedents, but similar
considerations strongly counsel in favor of granting the
government's petition here.  Specifically, in granting
certiorari in this case alongside the *Regents* petition,
the Court would eliminate any argument that Secretary

4

Nielsen's June 22 memorandum is not part of the record before this Court and would bring directly before the Court the district court's consideration of the impact of that memorandum on the resolution of this dispute. See Pet. 15-17. The Ninth Circuit's refusal to undertake that analysis and the *Regents* respondents' refusal to address the contents of the Nielsen memorandum in their briefs in opposition only underscores the wisdom of that approach.

b. Contrary to respondents' assertion (Br. in Opp. 30-33), moreover, the entire Nielsen memorandum is relevant to the Court's consideration of the questions presented. Respondents insist that the Court ignore the bulk of that memorandum because they claim it was not a "separate administrative action." *Id.* at 30 n.12; cf. *Regents* Indiv. Br. in Opp. 33 (arguing that the Nielsen memorandum is irrelevant because it was not a "'fresh agency action' (a Rescission 2.0)") (citation omitted). Respondents would apparently require DHS to reset this protracted litigation by issuing a "new" independent agency decision on DACA before the current Secretary could offer any further explanation of the rescission. But where, as here, a court determines that an agency's initial explanation is insufficient and requests further explanation, "it is incumbent upon the court to consider that explanation when it arrives." *Alpharma, Inc.* v. *Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006). That is particularly appropriate here, given that every court to have addressed the question has agreed that the rescission did not require notice-and-comment rulemaking and therefore the Nielsen memorandum itself satisfies the procedural requirements for a new agency action in any event.

To be sure, unlike the respondents in *Regents*, respondents here now concede (Br. in Opp. 32) that the

5

Court can and should consider certain aspects of the Nielsen memorandum.  They nevertheless contend that only "amplifi[cations]" of previously offered rationales may be considered after remand, not "new reason[s] for why the agency *could* have taken the action"—which they argue means that only Secretary Nielsen's "legal analysis may be considered."  *Id.* at 31-32 (citation and internal quotation marks omitted).  On a remand for insufficient explanation, however, an agency is free to engage in and offer to the reviewing court "*additional* investigation or explanation" for its action.  *Florida Power & Light Co.* v. *Lorion*, 470 U.S. 729, 744 (1985) (emphasis added).

*Camp* v. *Pitts*, 411 U.S. 138 (1973) (per curiam), is not to the contrary.  In the passage on which respondents rely, the Court discussed the appropriate scope of "affidavits or testimony" that could be offered directly to the reviewing court to allow it to properly assess agency action.  *Id.* at 143.  The Court placed no limitations on the explanation an agency might offer if the court found that the reasons offered at the time of the decision were insufficient and the decision was remanded to the agency for further consideration.  *Ibid.* And the Court's ambiguous dicta in *Pension Benefit Guaranty Corp.* v. *LTV Corp.*, 496 U.S. 633 (1990), about the scope of any remand is similarly inapposite. See *id.* at 654 (noting that, where an agency's initial explanation is insufficient, "the preferred course" "'except in rare circumstances, is to remand to the agency for additional investigation or explanation'") (quoting *Florida Power & Light Co.*, 470 U.S. at 744).

The rule against post hoc rationalizations generally "forbids judges to uphold agency action on the basis of rationales offered by anyone other than the proper

6

decisionmakers." *Alpharma*, 460 F.3d at 6. It "applies to rationalizations offered for the first time in litigation affidavits and arguments of counsel." *Ibid.* An official memorandum offered by the Secretary of Homeland Security explaining why DHS's decision to rescind DACA "was, and remains, sound," *Regents* Pet. App. 121a, is neither. For that reason, the Court should grant the government's petition in this case alongside the *Regents* petition to eliminate any argument that it may not consider the implications of Secretary Nielsen's memorandum on the resolution of this dispute.

\* \* \* \* \*

For the foregoing reasons and those stated in the petition, the petition for a writ of certiorari before judgment should be granted and the case consolidated with *United States DHS* v. *Regents of the University of California*, No. 18-587 (filed Nov. 5, 2018), for the Court's consideration this Term.

Respectfully submitted.

NOEL J. FRANCISCO
*Solicitor General*

JANUARY 2019

AR3878

No. 18-587

# In the Supreme Court of the United States

———————

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
ET AL., PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

———————

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE NINTH CIRCUIT*

———————

**REPLY BRIEF FOR THE PETITIONERS**

———————

NOEL J. FRANCISCO
*Solicitor General*
  *Counsel of Record*
*Department of Justice*
*Washington, D.C. 20530-0001*
*SupremeCtBriefs@usdoj.gov*
*(202) 514-2217*

AR3879

## TABLE OF AUTHORITIES

Cases:                                                              Page

*Alpharma, Inc.* v. *Leavitt*, 460 F.3d 1 (D.C. Cir.
  2006) ................................................................ 8, 9

*Burwell* v. *Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751
  (2014) ................................................................... 4

*Heckler* v. *Chaney*, 470 U.S. 821 (1985) ............................ 6, 7

*I.C.C.* v. *Brotherhood of Locomotive Eng'rs*,
  482 U.S. 270 (1987) ................................................ 6

*Munaf* v. *Geren*, 553 U.S. 674 (2008) .................................... 4

*Nielsen* v. *Preap*, 138 S. Ct. 1279 (2018) .............................. 4

*Reno* v. *American-Arab Anti-Discrimination
  Comm.*, 525 U.S. 471 (1999) ................................... 3

*Sessions* v. *Dimaya*, 138 S. Ct. 1204 (2018) ......................... 2

*Texas* v. *United States*, 809 F.3d 134 (2015), aff'd by
  an equally divided Court, 136 S. Ct. 2271 (2016) ..... 3, 9, 10

*Texas* v. *United States*, 328 F. Supp. 3d 662
  (S.D. Tex. 2018) ................................................... 3, 9

*Trump* v. *Hawaii*, 138 S. Ct. 2392 (2018) ......................... 2, 4

*United States* v. *Sanchez-Gomez*, 138 S. Ct. 1532
  (2018) ................................................................... 2

*United States* v. *Texas*, 136 S. Ct. 2271 (2016) .................... 2

Statute and rules:

Administrative Procedure Act, 5 U.S.C. 701 *et seq.*:
  5 U.S.C. 701(a)(2) ................................................ 6
Sup. Ct.:
  Rule 10 ............................................................... 2
  Rule 10(c) ............................................................ 2
  Rule 11 ............................................................... 2

(I)

**AR3880**

II

Miscellaneous:                                         Page

Stephen M. Shapiro et al., *Supreme Court Practice*
(10th ed. 2013) ..................................................................... 11

**AR3881**

# In the Supreme Court of the United States

----------

No. 18-587

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
ET AL., PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

----------

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

----------

**REPLY BRIEF FOR THE PETITIONERS**

----------

When this Court declined to grant certiorari before judgment to review the district court's injunction requiring the Department of Homeland Security (DHS) to maintain the non-enforcement policy known as Deferred Action for Childhood Arrivals (DACA), the Court made clear that it expected the court of appeals to "proceed expeditiously to decide this case," at which time the government could renew its request. 2/26/18 Order (No. 17-1003). More than ten months later, the court of appeals' judgment is here and the Court is presented the opportunity it anticipated in February. The Court should now grant certiorari and resolve this important dispute this Term.

1. When the government filed this petition in November, the court of appeals had still not issued its judgment. The petition therefore explained (at 15-17) why this case met the Court's heightened standard for

(1)

**AR3882**

2

certiorari before judgment. See Sup. Ct. R. 11. Respondents rely heavily on that same standard in opposition. See, *e.g.*, Indiv. Br. in Opp. 12 ("There is no reason * * * to ignore normal processes and grant review"); Regents Br. in Opp. 14 (arguing against "truncat[ing] the ordinary process"). By virtue of the intervening judgment, however, the certiorari decision is now governed by the Court's ordinary standard under Rule 10. And whether further review is warranted under *that* standard is not a close question. Respondents' arguments to the contrary lack merit.

a. Respondents contend (Indiv. Br. in Opp. 12-17) that review is unwarranted in the absence of a circuit conflict. But certiorari is appropriate when "a United States court of appeals has decided an important question of federal law that has not been, but should be, settled by this Court." Sup. Ct. R. 10(c). And the Court frequently reviews decisions, like the one below, that interfere with the implementation of federal policies and enforcement of federal law, particularly immigration law, without any conflict. See, *e.g.*, *Trump* v. *Hawaii*, 138 S. Ct. 2392 (2018); *United States* v. *Sanchez-Gomez*, 138 S. Ct. 1532 (2018); *Sessions* v. *Dimaya*, 138 S. Ct. 1204 (2018). Indeed, this Court granted certiorari absent a circuit conflict in *United States* v. *Texas*, 136 S. Ct. 2271 (2016), after the Fifth Circuit affirmed a nationwide preliminary injunction preventing implementation of the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) and expanded DACA policies.

The court of appeals' decision here presents at least as strong a case for this Court's review. The district court's nationwide injunction commands the government to preserve a policy that affirmatively sanctions the ongoing violation of federal law by 700,00 aliens who

**AR3883**

3

have no lawful immigration status and no right to the policy's continuation.  Cf. *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999) (*AADC*).  Absent this Court's intervention, the government will be required to maintain the policy nationwide for years after DHS and the Attorney General determined that it should end.

Moreover, there *is* a circuit conflict.  In *Texas* v. *United States*, the Fifth Circuit held that the DAPA and expanded DACA policies were "manifestly contrary" to the Immigration and Nationality Act (INA).  809 F.3d 134, 186 (2015) (*Texas I*), aff'd by an equally divided Court, 136 S. Ct. 2271 (2016).  As the district court that enjoined those policies has recognized, the Fifth Circuit's reasoning applies equally to DACA.  See *Texas* v. *United States*, 328 F. Supp. 3d 662, 723 (S.D. Tex. 2018) (*Texas II*).  Indeed, although the Ninth Circuit attempted to distinguish *Texas I* in some respects, it ultimately disagreed with critical portions of the Fifth Circuit's reasoning.  Compare *Texas I*, 809 F.3d at 179, 186 (concluding that in identifying several "narrow classes" of aliens eligible for deferred action, Congress "foreclosed" the creation of broad new categories), with Supp. Br. App. 54a ("We think the much more reasonable conclusion is that in * * * instructing that this and that 'narrow class[]' of noncitizens should be eligible for deferred action, Congress meant to say nothing at all about the underlying power of the Executive Branch to grant the same remedy to others.") (citation omitted; brackets in original).  And the Ninth Circuit did not even try to square its determination that DACA is lawful with the Fifth Circuit's determination that expanded DACA was not.  See *id.* at 55a (finding "the *Texas* court's

4

treatment of the DACA expansion" not "to be strong persuasive authority").

b. Respondents argue (Indiv. Br. in Opp. 17-19) that the interlocutory posture of this case is reason to deny review. But the Court reviews interlocutory decisions presenting important legal issues. See, *e.g.*, *Trump* v. *Hawaii*, *supra*; *Nielsen* v. *Preap*, 138 S. Ct. 1279 (2018); *Burwell* v. *Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). Again, the Court granted certiorari in *Texas* to review the preliminary injunction against the DAPA and expanded DACA policies. Just as in *Texas*, even if the question were only whether to maintain the nationwide "status quo" while litigation proceeds, Regents Br. in Opp. 22, in a case of this magnitude the answer should come from this Court.

In any event, respondents are plainly wrong to assert (Regents Br. in Opp. 15) that it would be difficult for the Court to "fully resolve the litigation at this stage." This Court always has the authority, in reviewing a preliminary injunction, to "address the merits" of the litigation when appropriate. *Munaf* v. *Geren*, 553 U.S. 674, 691 (2008). Moreover, the district court also certified for interlocutory appeal its order resolving the government's motion to dismiss, in which the government sought to dismiss the entire case. And the court of appeals affirmed that order alongside the preliminary injunction. Supp. Br. App. 61a-77a. If this Court grants certiorari and agrees with the government on the merits, termination of this litigation would thus not only be "[]possible," Regents Br. in Opp. 15, but inevitable.

Respondents also err in contending (Regents Br. in Opp. 18) that the earlier dispute about the scope of the record counsels against further review. Respondents themselves recognize (*ibid.*) that the Court does not

need to resolve any record issues to review the preliminary injunction itself. The Court would also, of course, not need to resolve the scope of the record for APA review if it determines the rescission is not reviewable under the APA at all. If the Court determines that the merits of respondents' claim are reviewable under the APA, it may need to determine the scope of the record. But that subsidiary question itself is one on which the lower courts are in need of this Court's guidance. See, *e.g.*, 138 S. Ct. 443.

c. Contrary to respondents' assertions (Indiv. Br. in Opp. 21), the government's conduct has been consistent with the need for prompt resolution of this dispute. It has so advocated from the very start of this litigation, and it has made considerable effort in all of these cases to make it possible—filing briefs in advance of court-ordered deadlines, seeking expedition, and seeking certifications for interlocutory appeal of dispositive rulings. Respondents nevertheless fault (State Br. in Opp. 16) the government for not requesting stays of the injunctions here and in the related cases. But seeking such relief is not a prerequisite to seeking certiorari. And the government has taken other steps to ensure that the injunctions are not unnecessarily prolonged, including filing a petition for a writ of certiorari before judgment within days of the entry of the first injunction and filing this petition in time for the Court to hear this dispute in the ordinary course before the end of this Term.

d. Finally, a decision from this Court would not "preempt the political process." Indiv. Br. in Opp. 24. A decision concerning DHS's authority to rescind DACA would say nothing about Congress's unquestioned power to alter the immigration status of DACA recipients. And if anything, it is the preliminary injunction obtained by

respondents and the legal uncertainty surrounding the rescission that is impeding legislative efforts.

2. Review of the court of appeals' judgment is further warranted because the decision is wrong.

a. Establishing enforcement policies is a type of agency action that "traditionally" has been regarded as unsuitable for judicial review, *Heckler* v. *Chaney*, 470 U.S. 821, 832 (1985), and is therefore "committed to agency discretion by law," 5 U.S.C. 701(a)(2). Pet. 17-21. Respondents argue (State Br. in Opp. 19-22) that rule does not apply because DHS supposedly based its rescission decision solely on a legal conclusion— namely, that DACA is unlawful. But even if *Chaney* "left open" whether resting on a legal ground can render a traditionally unreviewable decision reviewable, *id.* at 19 (citation omitted), this Court's subsequent decision in *I.C.C.* v. *Brotherhood of Locomotive Engineers*, 482 U.S. 270, 283 (1987) (*BLE*), removes any doubt. See Supp. Br. App. 82a (Owens, J., concurring in the judgment). As the *BLE* Court explained, agency actions falling within a "tradition of nonreviewability" do not "become[] reviewable" any time they rest on the agency's view of the underlying legal regime. 482 U.S. at 282-283. Indeed, "a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction," yet it is "entirely clear" that such decisions are unreviewable. *Id.* at 283.

In any event, DACA's rescission is also based on concerns about the implications of maintaining a non-enforcement policy of questionable legality and other policy concerns. See Pet. 23-28. In other words, it reflects the sort of "complicated balancing of a number of

7

factors which are peculiarly within [the agency's] expertise" that makes enforcement discretion traditionally unreviewable. *Chaney*, 470 U.S. at 831.  Particularly in light of Secretary Nielsen's official memorandum clearly stating that these concerns justify rescinding DACA "whether the courts would ultimately uphold [the policy] or not," Pet. App. 123a, judicial review of such a decision is not required to "ensur[e] clear public accountability for government actions."  State Br. in Opp. 21.

Respondents also briefly repeat (State Br. in Opp. 19) the district court's theory that programmatic determinations of enforcement priorities are "different from day-to-day agency nonenforcement decisions." Pet. App. 28a (citation omitted).  The court of appeals declined to endorse that theory for good reason:  it is flatly contrary to *Chaney*, which itself concerned the programmatic determination whether to enforce the Federal Food, Drug, and Cosmetics Act with respect to drugs used to administer the death penalty.  See 470 U.S. at 824-825.

b.  Even if the decision were reviewable, it was eminently reasonable for DHS to rescind DACA based on three independent rationales.

*First*, the rescission is supported by DHS's serious doubts about the legality of the policy. Pet. 23-27.  Contrary to respondents' assertions (Regents Br. in Opp. 32), that rationale is readily discernible from the Duke memorandum—which explained that, in light of the *Texas* decisions and the Attorney General's letter, the DACA policy "*should* be terminated," not that it *must*. Pet. App. 117a (emphasis added).  Acting Secretary Duke rescinded the policy "[i]n the exercise of [her] authority in establishing national immigration policies and priorities," not as compelled by law.  *Ibid.*  And in any

8

event, the Nielsen memorandum removes any doubt whether the rescission rests on concerns about maintaining an enforcement policy of questionable legality, independent of its ultimate legality.  See *id.* at 123a.

Respondents contend (Indiv. Br. in Opp. 31-32) that the government did not adequately consider either potential non-merits defenses to a lawsuit by the *Texas* plaintiffs or DACA recipients' reliance interests.  But there are "sound reasons for a law enforcement agency to avoid discretionary policies that are legally questionable," wholly apart from whether those policies will ultimately be invalidated by courts, including "the risk that such policies may undermine public confidence in and reliance on the agency and the rule of law."  Pet. App. 123a.  Respondents also provide no basis for second-guessing DHS's conclusion that these concerns "outweigh" any reliance interests that DACA recipients may assert in the maintenance of such a policy.  *Id.* at 125a.

*Second*, the rescission is justified by independent policy concerns that Secretary Nielsen explained would support rescission "[e]ven if a policy such as DACA could be implemented lawfully."  Pet. App. 124a; see Pet. 27-28.  Respondents insist that the Court ignore these concerns because the Nielsen memorandum was not a "'fresh agency action' (a Rescission 2.0)."  Indiv. Br. in Opp. 33 (citation omitted).  Respondents would apparently require DHS to reset this protracted litigation by issuing a "new" independent agency decision on DACA before the current Secretary could offer any further explanation of the rescission.  But where, as in *NAACP*, a court determines that an agency's initial explanation is insufficient and requests further explanation, "it is incumbent upon the court to consider that explanation when it arrives."  *Alpharma, Inc.* v. *Leavitt*,

460 F.3d 1, 6 (D.C. Cir. 2006). That is particularly appropriate here, given that every court to have addressed the question has agreed that the rescission did not require notice-and-comment rulemaking and therefore the Nielsen memorandum itself satisfies the procedural requirements for a new agency action.

*Third*, the rescission is supported by DHS's correct determination that the DACA policy is unlawful. Pet. 28-30. Although respondents criticize (State Br. in Opp. 23-25) DHS for failing to sufficiently explain its legal reasoning, it was utterly reasonable for DHS to rely on the Fifth Circuit's detailed analysis of the closely related DAPA and expanded DACA policies. See Pet. App. 122a ("Any arguable distinctions between the DAPA and DACA policies are not sufficiently material to convince me that the DACA policy is lawful.").

Respondents remarkably contend that the *Texas I* decision is "inapposite." Indiv. Br. in Opp. 30 (citation omitted). They observe (Regents Br. in Opp. 32) that the Fifth Circuit cited INA provisions that create a mechanism for aliens to derive lawful immigration status from the status of their U.S. citizen children. Because no parallel pathway to lawful status allegedly exists for DACA recipients, respondents contend that no direct conflict with the INA exists here. *Ibid.*; see Supp. Br. App. 52a. But the pathway to lawful status in *Texas I* is available to only *some* of the aliens who would have qualified for DAPA, see 809 F.3d at 179-180 (not for parents of lawful permanent residents), and to *none* of the aliens who would have qualified for expanded DACA, see *Texas II*, 328 F. Supp. 3d at 724. A direct conflict with those particular provisions therefore could not have been necessary to the Fifth Circuit's judgment. They are simply part of the "INA's specific and intricate

provisions" that preclude DHS from creating vast new deferred-action policies. *Texas I*, 809 F.3d at 186.

Respondents also observe (Regents Br. in Opp. 32) that DAPA would have been available to approximately 4.3 million aliens, while DACA has been granted to "only" around three quarters of a million aliens. But that difference cannot be ascribed "legal significance." *Texas II*, 328 F. Supp. 3d at 724 (emphasis omitted). At the outset, the right comparator is not the number of aliens *granted* DACA, but the number qualified to *request* it: approximately 1.5 million. See *id.* at 676. In either case, a non-enforcement policy affecting 700,000 or 1.5 million aliens is plainly a policy of "vast 'economic and political significance'" to which the Fifth Circuit's analysis applies. *Texas I*, 809 F.3d at 183 (citation omitted).

c. Finally, the court of appeals erred in affirming the denial of the government's motion to dismiss the other ancillary claims. Pet. 30-31. No respondent defends the court's due-process ruling. Cf. State Br. in Opp. 31-32 (urging only that the Court decline to review it). As for equal protection, respondents make the puzzling contention that this Court's decision in *AADC* does not apply because this case purportedly does not implicate *AADC*'s concerns about "inhibiting prosecutorial discretion, allowing continuing violations of immigration law, and impacting foreign relations." *Id.* at 32 (citation omitted). But respondents assert an equal-protection claim in an effort to prevent DHS from rescinding a discretionary *non-enforcement policy* sanctioning the *ongoing violation* of federal immigration law by 700,000 aliens based, at least in part, on their assertion that the primary beneficiaries of that policy are nationals of certain *foreign countries*. That claim, of course, directly implicates the *AADC* Court's concerns.

11

In any event, respondents have not adequately pleaded an equal-protection claim even if *AADC* does not apply. See Pet. 31.

3.  The Court should also grant the government's petition in *Trump* v. *NAACP*, No. 18-588 (filed Nov. 5, 2018).  Granting certiorari before judgment in *NAACP* would eliminate any argument that the Nielsen memorandum is not squarely before the Court—a course that seems particularly prudent given respondents' failure to offer any response to the content of that memorandum here.  The Court may also wish to grant the petition in *Nielsen* v. *Batalla Vidal*, No. 18-589 (filed Nov. 5, 2018), despite the overlapping claims, to ensure the fullest presentation of the issues.  Supp. Br. 11.

Respondents in those cases also oppose certiorari by arguing that the government has not demonstrated "exigent circumstances" justifying certiorari under Rule 11.  *NAACP* Br. in Opp. 13.  But the Court grants certiorari before judgment "not only in cases of great public emergency but also in situations where similar or identical issues of importance [are] already pending before the Court and where it [i]s considered desirable to review simultaneously the questions posed in the case still pending in the court of appeals."  Stephen M. Shapiro et al., *Supreme Court Practice* § 2.4, at 86 (10th ed. 2013); see Supp. Br. 11.  That rationale applies here.

12

\* \* \* \* \*

For the foregoing reasons and those stated in the petition for a writ of certiorari and supplemental brief, the petition should be granted.  The petition in *Trump* v. *NAACP*, No. 18-588 (filed Nov. 5, 2018), should also be granted and the case consolidated with this one.  The petition in *Nielsen* v. *Batalla Vidal*, No. 18-589 (filed Nov. 5, 2018), should either be granted and consolidated or, at a minimum, be held pending resolution of the other petitions and any further proceedings in this Court.

Respectfully submitted.

NOEL J. FRANCISCO
*Solicitor General*

JANUARY 2019

**AR3893**

No. 18-589

# In the Supreme Court of the United States

---

KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

---

*ON PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT*

---

**REPLY BRIEF FOR THE PETITIONERS**

---

NOEL J. FRANCISCO
*Solicitor General*
*Counsel of Record*
*Department of Justice*
*Washington, D.C. 20530-0001*
*SupremeCtBriefs@usdoj.gov*
*(202) 514-2217*

**AR3894**

## TABLE OF AUTHORITIES

Cases:                                                                              Page

*DHS* v. *Regents of the Univ. of Cal.*, 138 S. Ct. 1182
  (2018) ................................................................................. 2

*Gratz* v. *Bollinger*, 537 U.S. 1044 (2002) ................................. 3

*Grutter* v. *Bollinger*, 539 U.S. 306 (2003) ............................... 3

*United States* v. *Booker*, 543 U.S. 220 (2005) ..................... 3

*United States* v. *Fanfan*, 542 U.S. 956 (2004)..................... 3

*United States, In re*, 138 S. Ct. 443 (2017)........................... 5

*Yamaha Motor Corp., U.S.A.* v. *Calhoun*,
  516 U.S. 199 (1996)................................................................. 5

Statutes and rules:

6 U.S.C. 202(5) (2012 & Supp. V 2017) ................................. 1

28 U.S.C. 1292(b) .................................................................. 5

Sup. Ct. R.:
  Rule 10................................................................................ 3
  Rule 11................................................................................ 3

Miscellaneous:

Stephen M. Shapiro et al., *Supreme Court Practice*
  (10th ed. 2013) ................................................................... 3

16 Charles Alan Wright et al, *Federal Practice and
Procedure* (3d ed. 2012 & Supp. 2018)................................. 5

(I)

# In the Supreme Court of the United States

————

No. 18-589

KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

————

*ON PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT*

————

**REPLY BRIEF FOR THE PETITIONERS**

————

1. In September 2017, the Department of Homeland Security (DHS) determined, in accordance with the views of the Attorney General, that the non-enforcement policy known as Deferred Action for Childhood Arrivals (DACA) was likely unlawful and should be wound down in an orderly fashion. Such a quintessential exercise of the Secretary of Homeland Security's authority to establish "national immigration enforcement policies and priorities," 6 U.S.C. 202(5) (2012 & Supp. V 2017), is not judicially reviewable and was eminently reasonable in any event. See Pet. 17-31, *United States DHS* v. *Regents of the Univ. of Cal.*, No. 18-587 (Nov. 5, 2018); Reply Br. 6-11, *Regents, supra* (No. 18-587). Yet DHS has been compelled by two nationwide preliminary injunctions to retain the unlawful policy and thereby sanction the continuing violation of federal immigration law by nearly 700,000 aliens.

(1)

**AR3896**

2

Last February, this Court declined to review the first of those injunctions before the court of appeals could pass on its validity. See *DHS* v. *Regents of the Univ. of Cal.*, 138 S. Ct. 1182 (2018) (No. 17-1003). The Court made clear its expectation, however, that the court of appeals "w[ould] proceed expeditiously to decide th[e] case," at which time the government could renew its request. *Id.* at 1182. More than ten months later, the court of appeals' judgment is here and the Court is presented the opportunity it anticipated in February. For the reasons stated in the government's reply brief filed today in *Regents*, *supra* (No. 18-587), the Court should now grant the government's *Regents* petition, and resolve this important dispute this Term.

2. In addition to granting certiorari in *Regents*, the Court may also wish to consider granting certiorari in these related cases. Such an order would be consistent with this Court's past practices in similar circumstances, and it would ensure that the Court receives a comprehensive presentation of the relevant issues for the timely and definitive resolution of this dispute. See Pet. 16-17; Supp. Br. 11, *Regents*, *supra* (No. 18-587). Respondents' arguments to the contrary are unpersuasive.

Respondents argue at length that this case "presents no emergency" that would justify granting a writ of certiorari before judgment. State Br. in Opp. 14 (capitalization omitted); see *id.* at 14-20. But that is not the right standard. When the government filed its petitions in these cases, no court of appeals had addressed the questions presented. The government therefore explained that this dispute met the Court's heightened standard for certiorari before judgment because the issues here are of such "imperative public importance as to * * * require immediate determination in this

**AR3897**

3

Court." Sup. Ct. R. 11; see Pet. 14-15; *Regents* Pet. 15-17. By virtue of the Ninth Circuit's intervening judgment, however, the certiorari decision in these cases is no longer governed by that standard—and thus the bulk of respondent's opposition is moot.

Most obviously, the certiorari decision in the *Regents* cases is now governed by the Court's ordinary standard under Rule 10. As explained more fully in the briefing in those cases, further review is plainly warranted under the Rule 10 standard. See *Regents* Reply Br. 1-11. The Ninth Circuit's judgment, however, also affects the standard for determining whether certiorari before judgment is appropriate here. As the government explained in its supplemental briefing, this Court has granted certiorari before judgment "not only in cases of great public emergency but also in situations where similar or identical issues of importance were already pending before the Court and where it was considered desirable to review simultaneously the questions posed in the case still pending in the court of appeals." Stephen M. Shapiro et al., *Supreme Court Practice* § 2.4, at 86 (10th ed. 2013); see *Regents* Supp. Br. 11 (citing *United States* v. *Fanfan*, 542 U.S. 956 (2004) (No. 04-105) (granting certiorari before judgment in companion case to *United States* v. *Booker*, 543 U.S. 220 (2005) (No. 04-104)); *Gratz* v. *Bollinger*, 537 U.S. 1044 (2002) (No. 02-516) (granting certiorari before judgment in companion case to *Grutter* v. *Bollinger*, 539 U.S. 306 (2003) (No. 02-241))). The Court should consider granting the government's petition in these related cases for similar reasons. Specifically, reviewing these cases in addition to the *Regents* cases would ensure that the Court receives the fullest presentation of the overlapping issues and would immediately bring before it any

**AR3898**

4

intervening decision by the Second Circuit addressing the questions presented. See Pet. 15-17.

Contrary to respondents' contention (State Br. in Opp. 25), the cases before the Second Circuit do not present an "especially poor vehicle to address" the questions presented. Like the district court in *Regents*, the district court here addressed the merits of all respondents' claims in resolving the government's motion to dismiss and certified its order for interlocutory appeal. Pet. App. 133a-171a. And like the Ninth Circuit in *Regents*, after accepting the interlocutory appeal, the Second Circuit consolidated the appeals of the preliminary injunction and the motion-to-dismiss orders. See Pet. 13. Granting certiorari before judgment would therefore bring the entire case before this Court.

Respondents err in asserting (State Br. in Opp. 27) that the earlier dispute about the scope of the record would inhibit this Court's review. As in *Regents*, respondents themselves recognize (*ibid.*) that the Court does not need to resolve any record issues to review the preliminary injunction itself. They likewise accept (*ibid.*) that the Court would not need to resolve the scope of the record for APA review if it determines the rescission is not reviewable under the APA at all. If the Court determines that the merits of respondents' claim are reviewable under the APA, it may need to determine the scope of the record. But in those circumstances, the record issues would not be "outside of this Court's potential review." *Id.* at 27 n.14. To the extent that resolving the government's motion to dismiss these cases depends on resolving the record issues, then the district court's certification for interlocutory appeal of its motion-to-dismiss order also places those issues before the court of appeals—and therefore before this

**AR3899**

5

Court.  Under 28 U.S.C. 1292(b), the "scope of review includes all issues material to the order in question." *Yamaha Motor Corp., U.S.A.* v. *Calhoun*, 516 U.S. 199, 205 (1996) (brackets and citation omitted); see 16 Charles Alan Wright et al., *Federal Practice and Procedure* § 3929 (3d ed. 2012 & Supp. 2018) ("The court [of appeals] may * * * consider any question reasonably bound up with [a] certified order, whether it is antecedent to, broader or narrower than, or different from the question specified by the district court.").  And the record issues are themselves ones on which the lower courts are in need of this Court's guidance.  See, *e.g.*, *In re United States*, 138 S. Ct. 443 (2017) (per curiam); *Department of Commerce* v. *United States Dist. Court for the S. Dist. of N.Y.*, cert. granted, No. 18-557 (oral argument scheduled for Feb. 19, 2018).

3.  At a minimum, the Court should hold this petition pending resolution of the *Regents* petition and any further proceedings before this Court.  Because the district court here issued a nationwide injunction identical to the one in *Regents*, an order vacating the injunction in *Regents* would have no immediate practical effect unless the injunction issued here is also vacated.  Holding this petition (or granting it) is the most efficient way to accomplish that result.  Pet. 16-17.

Respondents contend (State Br. in Opp. 30) that a hold is unwarranted because the Court "would benefit from a [subsequent] petition that addresses the Second Circuit's reasoning * * * tailored to the issues and circumstances at that time."  But respondents concede (*ibid.*) that "*Regents* is adequately postured to present for review the same categories of claims and issues raised here."  If the Court grants the *Regents* petition and the Second Circuit addresses those issues before this Court

6

issues its decision, any relevant analysis can be addressed in the briefing for *Regents*. And if the Court decides *Regents* before the Second Circuit issues its decision, that will control the Second Circuit's analysis.[*]

\* \* \* \* \*

For the foregoing reasons and those stated in the petition, the petition for a writ of certiorari before judgment should either be granted and consolidated with *United States DHS* v. *Regents of the University of California*, No. 18-587 (filed Nov. 5, 2018), or, at a minimum, be held pending resolution of the government's other petitions and any further proceedings in this Court.

Respectfully submitted.

NOEL J. FRANCISCO
*Solicitor General*

JANUARY 2019

---

[*] The Second Circuit is also considering the district court's refusal to dismiss a due-process claim based on DHS's alleged failure to process certain renewal requests made after the rescission, which arrived late to DHS or contained clerical errors. See Pet. App. 170a. But the government is not challenging that ruling here, and the ruling provides no basis for the district court's nationwide preliminary injunction preventing DACA's rescission. See Pet. 13 n.4.

Nos. 18-587, 18-588, and 18-589

# In the Supreme Court of the United States

———

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

———

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

———

**BRIEF FOR THE PETITIONERS**

———

NOEL J. FRANCISCO
  *Solicitor General
   Counsel of Record*
JOSEPH H. HUNT
  *Assistant Attorney
   General*
JEFFREY B. WALL
  *Deputy Solicitor General*
HASHIM M. MOOPPAN
  *Deputy Assistant Attorney
   General*
JONATHAN Y. ELLIS
  *Assistant to the Solicitor
   General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
  *Attorneys*

  *Department of Justice
   Washington, D.C. 20530-0001
   SupremeCtBriefs@usdoj.gov
   (202) 514-2217*

Additional Captions Listed on Inside Cover

**AR3902**

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., PETITIONERS

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, ET AL.

———————

*ON WRIT OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT*

———————

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, ET AL., PETITIONERS

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

———————

*ON WRIT OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

———————

**AR3903**

## QUESTIONS PRESENTED

This dispute concerns the policy of immigration enforcement discretion known as Deferred Action for Childhood Arrivals (DACA). In 2016, this Court affirmed, by an equally divided vote, a decision of the Fifth Circuit holding that two related Department of Homeland Security (DHS) discretionary enforcement policies, including an expansion of the DACA policy, were likely unlawful and should be enjoined. See *United States* v. *Texas*, 136 S. Ct. 2271 (per curiam). In September 2017, DHS determined that the original DACA policy was unlawful and would likely be struck down by the courts on the same grounds as the related policies. DHS thus instituted an orderly wind-down of the DACA policy. The questions presented are as follows:

1. Whether DHS's decision to wind down the DACA policy is judicially reviewable.

2. Whether DHS's decision to wind down the DACA policy is lawful.

(I)

**AR3904**

## TABLE OF CONTENTS

Page

Opinions below .................................................................. 2
Jurisdiction ....................................................................... 2
Constitutional and statutory provisions involved .................... 3
Statement:
    A.   Legal framework ...................................... 3
    B.   Factual background ................................. 5
    C.   Procedural history .................................. 8
        1.   District courts enjoin or vacate the
             rescission on a nationwide basis ................... 9
        2.   Secretary Nielsen further explains the
             rescission ....................................... 10
        3.   The D.C. district court declines to
             reconsider its decision in light of the
             Nielsen Memorandum ................................. 12
        4.   The Ninth Circuit affirms the nationwide
             preliminary injunction ................................. 13
Summary of argument .................................................... 14
Argument ........................................................................ 16
    I.   DACA's rescission is not judicially reviewable
       under the APA ........................................... 17
       A.   DHS's decision to rescind a policy of
           enforcement discretion is committed to
           agency discretion by law ........................... 17
       B.   The lower courts' rationales for reviewing
           DHS's decision lack merit .......................... 21
    II.   DACA's rescission is lawful ......................... 32
       A.   The rescission is reasonable in light of DHS's
           serious doubts about DACA's lawfulness ........... 33
       B.   The rescission is reasonable in light of DHS's
           additional policy concerns ......................... 37
           1.   The Secretary reasonably concluded that
              DHS should not decline on this scale to
              enforce the law adopted by Congress ......... 38

(III)

IV

Table of Contents—Continued:                                    Page

      2.    The Secretary reasonably concluded that DHS should exercise its prosecutorial discretion not to enforce on a case-by-case basis ........................................................ 39

      3.    The Secretary reasonably concluded that DHS should discourage illegal immigration by projecting a message of consistent enforcement.............................. 40

      4.    The Secretary adequately considered any reliance interests .................................... 42

  C.    The rescission is reasonable in light of DHS's conclusion that DACA is unlawful ...................... 43

      1.    DHS correctly concluded that DACA is unlawful ...................................................... 43

      2.    DHS's legal conclusion provides ample basis for upholding the decision................... 50

  D.    The rescission does not violate equal protection........................................................ 52

Conclusion ...................................................................... 57

Appendix — Constitutional and statutory provisions .......... 1a

**TABLE OF AUTHORITIES**

Cases:

    *Arizona* v. *United States*, 567 U.S. 387 (2012) ......... 4, 20, 45

    *Bowman Transp., Inc.* v. *Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ........................................... 27

    *Casa de Maryland* v. *DHS*, 924 F.3d 684 (4th Cir. 2019), petition for cert. pending, No. 18-1469 (filed May 24, 2019) ........................... 19, 22, 24

    *Department of Commerce* v. *New York*, 139 S. Ct. 2551 (2019) ............................................ 32, 37, 43

**AR3906**

V

Cases—Continued:                                              Page

*Encino Motorcars, LLC* v. *Navarro*, 136 S. Ct. 2117
(2016) ...............................................................................51

*FDA* v. *Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)..................................... 44, 45, 48

*Heckler* v. *Chaney*, 470 U.S. 821 (1985)..................... *passim*

*ICC* v. *Brotherhood of Locomotive Eng'rs*,
482 U.S. 270 (1987)................................... 17, 23, 24

*INS* v. *St. Cyr*, 533 U.S. 289 (2001) .................................... 21

*International Union* v. *Brock*, 783 F.2d 237
(D.C. Cir. 1986) ..............................................................26

*Jennings* v. *Rodriguez*, 138 S. Ct. 830 (2018) .................... 21

*Lincoln* v. *Vigil*, 508 U.S. 182 (1993) ................................... 17

*Martin* v. *OSHRC*, 499 U.S. 144 (1991)...............................29

*Morgan Stanley Capital Grp. Inc.* v. *Public Util.
Dist. No. 1*, 554 U.S. 527 (2008) ........................................51

*Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto.
Ins. Co.*, 463 U.S. 29 (1983) .................................. 29, 35, 50

*Reno* v. *American-Arab Anti-Discrimination
Comm.*, 525 U.S. 471 (1999) ...................................... *passim*

*SEC* v. *Chenery Corp.*, 318 U.S. 80 (1943)...........................50

*Texas* v. *United States*:
86 F. Supp. 3d 591 (S.D. Tex.), aff'd, 809 F.3d 134
(5th Cir. 2015), aff'd, 136 S. Ct. 2271 (2016).............. 6
809 F.3d 134 (5th Cir. 2015), aff'd, 136 S. Ct. 2271
(2016)..............................................6, 33, 34, 35, 36, 48
136 S. Ct. 2271 (2016) ...................................................... 7

*Texas* v. *United States*, 328 F. Supp. 3d 662
(S.D. Tex. 2018)....................................................................34

*Trump* v. *Hawaii*, 138 S. Ct. 2392 (2018)...........................32

*United States* v. *Armstrong*, 517 U.S. 456 (1996) ........ 19, 30

*United States* v. *Texas*, 136 S. Ct. 2271 (2016) ....................7

AR3907

VI

Cases—Continued:                                                  Page

   *Utility Air Regulatory Grp.* v. *EPA*, 573 U.S. 302
     (2014) ................................................................. 45

   *Village of Arlington Heights* v. *Metropolitan Hous.*
     *Dev. Corp.*, 429 U.S. 252 (1977) ......................... 53

   *Wayte* v. *United States*, 470 U.S. 598 (1985) ..................... 22

   *Webster* v. *Doe*, 486 U.S. 592 (1988) ................................... 53

Constitution, statutes, and regulation:

   U.S. Const. Amend. V .................................................... 52, 1a

   Administrative Procedure Act, 5 U.S.C. 701 *et seq.* ............. 6

     5 U.S.C. 701(a)(1) .................................................... 20, 1a

     5 U.S.C. 701(a)(2) ................................ 14, 17, 19, 21, 31, 1a

     5 U.S.C. 706(2)(A) .................................................. 17, 32, 3a

   Federal Food, Drug, and Cosmetic Act,
     21 U.S.C. 301 *et seq.* .................................................... 17

   Immigration and Nationality Act,
     8 U.S.C. 1101 *et seq.* ...................................................... 3

     8 U.S.C. 1103(a)(1) ...................................................... 3, 5a

     8 U.S.C. 1103(a)(2) ...................................................... 3, 5a

     8 U.S.C. 1103(a)(3) ............................................. 3, 43, 46, 5a

     8 U.S.C. 1158(b) ........................................................... 44

     8 U.S.C. 1158(b)(1)(A) .................................................... 4

     8 U.S.C. 1182(a) (2012 & Supp. V 2017) ......................... 4

     8 U.S.C. 1182(d)(5) ......................................................... 44

     8 U.S.C. 1227(a) .............................................................. 4

     8 U.S.C. 1229b ............................................................ 4, 44

     8 U.S.C. 1229b(a) ........................................................... 44

     8 U.S.C. 1229b(b)(1)(D) .................................................. 44

     8 U.S.C. 1229c ............................................................... 44

     8 U.S.C. 1252(b) (1976) .................................................. 49

     8 U.S.C. 1252(b) (1988 & Supp. II 1990) ....................... 49

AR3908

VII

Statutes and regulation—Continued:                Page

8 U.S.C. 1252(b)(9) ........................................... 20, 21, 17a
8 U.S.C. 1252(g) ................................................ 20, 21, 22a
8 U.S.C. 1254a................................................................ 44
8 U.S.C. 1254a(b)(1) ...................................................... 44
Immigration Reform and Control Act of 1986,
    Pub. L. No. 99-603, 100 Stat. 3359 ................................... 48
6 U.S.C. 202(5)
    (2012 & Supp. V 2017) ......................4, 29, 37, 43, 45, 46, 4a
49 U.S.C. 30301 note............................................................ 43
8 C.F.R. 274a.12(c)(14) .................................................. 5, 44

Miscellaneous:

Dean DeChairo, *Immigration Framework
    Coming Next Week, Senators Say*, RollCall.com
    (Jan. 4, 2018), http://www.rollcall.com/news/
    immigration-framework-coming-next-week-
    senators-say-2 .................................................................. 32
43 Fed. Reg. 29,526 (July 10, 1978)...................................... 49
84 Fed. Reg. 33,829 (July 16, 2019)...................................... 40
David Hancock, *Few Immigrants Use Family Aid
    Program*, Miami Herald, 1990 WLNR 2016525
    (Oct. 1, 1990)........................................................................ 49
Memorandum from Stuart Anderson, Exec. Assoc.
    Comm'r, INS, to Johnny N. Williams, Exec. Assoc.
    Comm'r, INS, *Deferred Action for Aliens with
    Bona Fide Applications for T Nonimmigrant
    Status* (May 8, 2002) ........................................................ 47
Memorandum from Gene McNary, Comm'r, INS,
    to Reg'l Comm'rs, et. al., INS, *Family Fairness:
    Guidelines for Voluntary Departure under 8 CFR
    242.5 for the Ineligible Spouses and Children of
    Legalized Aliens* (Feb. 2, 1990)........................................ 48

**AR3909**

VIII

Miscellaneous—Continued:                                    Page

Memorandum from Donald Neufeld, Acting Assoc.
Dir., Office of Domestic Operations, USCIS,
to Field Leadership, USCIS, *Guidance Regarding
Surviving Spouses of Deceased U.S. Citizens and
their Children* (Sept. 4, 2009) ........................................... 47

Memorandum from Paul W. Virtue, Acting Exec.
Assoc. Comm'r, INS., to Reg'l Dirs. et al., INS,
*Supplemental Guidance on Battered Alien Self-
Petitioning Process and Related Issues*
(May 6, 1997) ........................................................................ 47

Pia Orrenius & Madeline Zavodny, *What Are the
Consequences of an Amnesty for Undocumented
Immigrants?*, 9 Geo. Pub. Pol'y Rev. 21 (2004) .............. 41

Jeffrey S. Passel & Mark Hugo Lopez,
Pew Research Center, *Up to 1.7 Million
Unauthorized Immigrant Youth May Benefit
from New Deportation Rules* (Aug. 14, 2012),
https://assets.pewresearch.org/wp-content/
uploads/sites/7/2012/12/unauthorized_
immigrant_youth_update.pdf .......................................... 36

Press Release, *USCIS Announces Interim Relief
for Foreign Students Adversely Impacted by
Hurricane Katrina* (Nov. 25, 2005) ................................. 47

*Recent Developments*, 64 No. 41 Interpreter
Releases 1190 (Oct. 26, 1987) ..................................... 48, 49

*Recent Developments*, 67 No. 6 Interpreter
Releases 153 (Feb. 5, 1990) ............................................... 49

*Recent Developments*, 67 No. 8 Interpreter
Releases 201 (Feb. 26, 1990) ............................................ 49

S. 1291, 107th Cong., 1st Sess. (2001) ................................... 5

S. 2075, 109th Cong., 1st Sess. (2005) ................................... 5

S. 3827, 111th Cong., 2d Sess. (2010) .................................... 5

S. 744, 113th Cong., 1st Sess. (2013) ..................................... 5

AR3910

IX

Miscellaneous—Continued:                                          Page

S. 1615, 115th Cong., 1st Sess. (2017) ................................. 5

The White House:

*Remarks by President Trump in Press*
*Conference* (Feb. 16, 2017),
https://go.usa.gov/xVYjF .......................................... 55

*Remarks by the President on Immigration*
(June 15, 2012), https://go.usa.gov/xnZFY........ 38, 42

USCIS, *Number of Form I-821D, Consideration of*
*Deferred Action for Childhood Arrivals, by Fiscal*
*Year, Quarter, Intake and Case Status, Fiscal*
*Year 2012-2019* (Apr. 30, 2019),
https://go.usa.gov/xVCpC ................................................. 39

AR3911

# In the Supreme Court of the United States

No. 18-587

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

*ON WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

No. 18-588

DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL., PETITIONERS

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, ET AL.

*ON WRIT OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT*

No. 18-589

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, ET AL., PETITIONERS

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

*ON WRIT OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

**BRIEF FOR THE PETITIONERS**

(1)

**AR3912**

2

## OPINIONS BELOW

In *Department of Homeland Security* v. *Regents of the University of California*, No. 18-587 (*Regents*), the opinion of the court of appeals (*Regents* Supp. Br. App. 1a-87a) is reported at 908 F.3d 476, and the orders of the district court granting respondents' motion for a preliminary injunction and granting in part and denying in part the government's motion to dismiss (*Regents* Pet. App. 1a-70a, 71a-90a) are reported at 279 F. Supp. 3d 1011 and 298 F. Supp. 3d 1304.  In *Trump* v. *NAACP*, No. 18-588 (*NAACP*), the order of the district court granting respondents summary judgment (*NAACP* Pet. App. 1a-74a) is reported at 298 F. Supp. 3d 209, and the order of the district court declining to reconsider its prior order (*NAACP* Pet. App. 80a-109a) is reported at 315 F. Supp. 3d 457.  In *McAleenan* v. *Batalla Vidal*, No. 18-589 (*Batalla Vidal*), the order of the district court granting respondents' motion for a preliminary injunction (*Batalla Vidal* Pet. App. 62a-129a) is reported at 279 F. Supp. 3d 401, and the orders of the district court granting in part and denying in part the government's motion to dismiss (*Batalla Vidal* Pet. App. 1a-58a, 133a-171a) are reported at 295 F. Supp. 3d 127 and 291 F. Supp. 3d 260.

## JURISDICTION

In *Regents*, the judgment of the court of appeals was entered on November 8, 2018.  In *NAACP*, the judgment of the district court was entered on August 3, 2018 (*NAACP* Pet. App. 110a-111a); the notices of appeal were filed on August 6, 2018 (*id.* at 112a-115a); and the appeal was docketed in the court of appeals on August 10, 2018.  The court of appeals' jurisdiction rests on 28 U.S.C. 1291.  In *Batalla Vidal*, the district court certified its orders granting in part and denying in part the government's motion to dismiss on January 8, 2018, and

**AR3913**

3

April 30, 2018; the notices of appeal were filed, respectively, on January 8, 2018 (*Batalla Vidal* Pet. App. 59a-61a), and May 21, 2018 (*id.* at 172a-174a); and the appeals of those orders were docketed on July 5, 2018. The district court entered its preliminary injunction on February 13, 2018 (*id.* at 62a-129a); the notice of appeal was filed on February 20, 2018 (*id.* at 130a-132a); and the appeal was docketed on the same day. The court of appeals' jurisdiction over the appeals of the certified orders in *Batalla Vidal* rests on 28 U.S.C. 1292(b). The court of appeals' jurisdiction over the appeal of the preliminary injunction rests on 28 U.S.C. 1292(a)(1). The petitions for writs of certiorari in all three cases were filed on November 5, 2018, and were granted on June 28, 2019. The jurisdiction of this Court rests on 28 U.S.C. 1254(1) and 2101(e).

### CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Relevant constitutional and statutory provisions are reproduced in an appendix to this brief. App., *infra*, 1a-22a.

### STATEMENT

#### A.  Legal Framework

The Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, charges the Secretary of Homeland Security "with the administration and enforcement" of the immigration laws. 8 U.S.C. 1103(a)(1). The Secretary is vested with the authority to "establish such regulations; * * * issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under the Act, and is given "control, direction, and supervision" of all Department of Homeland Security (DHS) employees. 8 U.S.C. 1103(a)(2) and (3).

**AR3914**

4

Individual aliens are subject to removal if, *inter alia*, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona* v. *United States*, 567 U.S. 387, 396 (2012); see 8 U.S.C. 1182(a) (2012 & Supp. V 2017), 8 U.S.C. 1227(a). As a practical matter, however, the Executive Branch lacks the resources to remove every removable alien, and a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. For any alien subject to removal, DHS officials must first "decide whether it makes sense to pursue removal at all." *Ibid.* After removal proceedings begin, government officials may decide to grant discretionary relief, such as asylum or cancellation of removal. See 8 U.S.C. 1158(b)(1)(A), 1229b. And, "[a]t each stage" of the process, "the Executive has discretion to abandon the endeavor." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (*AADC*).

In making these decisions, like other agencies exercising enforcement discretion, DHS must engage in "a complicated balancing of a number of factors which are peculiarly within its expertise." *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985). Recognizing the need for such balancing, Congress has provided that the "Secretary [of Homeland Security] shall be responsible for * * * [e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. 202(5).[1]

Deferred action is a practice in which the Secretary exercises enforcement discretion to notify an alien of the agency's decision to forbear from seeking the alien's removal for a designated period. *AADC*, 525 U.S. at

---

[1] All references to Section 202(5) are to 6 U.S.C. 202(5) (2012 & Supp. V 2017).

5

484.  Under DHS regulations, aliens granted deferred action may receive certain benefits, including work authorization for the same period if they establish economic necessity, 8 C.F.R. 274a.12(c)(14).  A grant of deferred action does not confer lawful immigration status or provide any defense to removal.  DHS retains discretion to revoke deferred action unilaterally, and the alien remains removable at any time.  *Regents* Pet. App. 101a.

**B.  Factual Background**

1.  a.  In 2012, DHS announced the nonenforcement policy known as Deferred Action for Childhood Arrivals (DACA).  *Regents* Pet. App. 97a-101a.  DACA provided deferred action to "certain young people who were brought to this country as children."  *Id.* at 97a.  The INA does not provide any exemptions or special relief from removal for such individuals.  And dating back to at least 2001, bipartisan efforts to provide such relief legislatively had failed (and have continued to fail).[2]  Under the DACA policy, following successful completion of a background check and other review, an alien would receive deferred action for a period of two years, subject to renewal.  *Id.* at 99a-100a.  The policy specified, however, that it "confer[red] no substantive right, immigration status or pathway to citizenship," because "[o]nly the Congress, acting through its legislative authority, can confer these rights."  *Id.* at 101a.

In 2014, DHS announced an expansion of the DACA policy and a new, related policy of nonenforcement known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).  *Regents* Pet.

---

[2]  See, *e.g.*, S. 1291, 107th Cong., 1st Sess. (2001); S. 2075, 109th Cong., 1st Sess. (2005); S. 3827, 111th Cong., 2d Sess. (2010); S. 744, 113th Cong., 1st Sess. (2013); S. 1615, 115th Cong., 1st Sess. (2017).

App. 102a-110a.  The expansion of DACA would have loosened the age and residency criteria and extended the deferred-action period to three years.  *Id.* at 106a-107a. DAPA would have provided deferred action to certain parents whose children were U.S. citizens or lawful permanent residents through a process designed to be "similar to DACA."  *Id.* at 107a.

b. Texas and 25 other States promptly brought suit in the Southern District of Texas to enjoin DAPA and the expansion of DACA.  The district court issued a nationwide preliminary injunction, finding a likelihood of success on the claim that the DAPA and expanded DACA memorandum violated the notice-and-comment requirement of the Administrative Procedure Act (APA), 5 U.S.C. 701 *et seq. Texas* v. *United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

The Fifth Circuit affirmed the preliminary injunction, holding that DAPA and expanded DACA likely violated both the APA and INA.  *Texas* v. *United States*, 809 F.3d 134, 146, 170-186 (2015).  The court agreed that the DAPA and expanded DACA memorandum likely required notice-and-comment rulemaking.  *Id.* at 178.  It also concluded that the policies were likely substantively contrary to the INA.  *Ibid.*  The court reasoned that the INA contains an "intricate system of immigration classifications and employment eligibility," and "does not grant the Secretary discretion to grant deferred action and lawful presence on a class-wide basis to 4.3 million otherwise removable aliens."  *Id.* at 184, 186 n.202.

7

This Court affirmed the Fifth Circuit's judgment by an equally divided vote. *United States* v. *Texas*, 136 S. Ct. 2271, 2272 (2016) (per curiam).[3]

c. Following this Court's decision, two relevant events occurred concerning the original DACA policy. First, Texas and other States in the *Texas* case announced their intention to amend their complaint to challenge DACA. J.A. 872-876. They asserted that "[f]or the[] same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was unlawful, the original June 15, 2012 DACA memorandum is also unlawful." J.A. 873. Second, in a letter to then-Acting Secretary of Homeland Security Elaine C. Duke, then-Attorney General Jefferson B. Sessions III concluded that, like the DAPA policy, the DACA policy was effectuated "without proper statutory authority," and thus "it [wa]s likely that [the] potentially imminent litigation would yield similar results" to the *Texas* litigation. J.A. 877-878.

2. On September 5, 2017, DHS decided to wind down DACA in an orderly fashion. *Regents* Pet. App. 111a-119a (Duke Memorandum). Acting Secretary Duke explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation," as well as the Attorney General's view that the DACA policy was unlawful and that the "potentially imminent" challenge to DACA would "likely * * * yield similar results" as the *Texas* litigation, "it is clear that the June 15, 2012 DACA program should be termi-

---

[3] After consulting with the Attorney General, then-Secretary of Homeland Security John Kelly rescinded the memorandum announcing DAPA and expanded DACA. J.A. 868-871.

AR3918

8

nated." *Id.* at 116a-117a. The Acting Secretary accordingly announced that, "[i]n the exercise of [her] authority in establishing national immigration policies and priorities," the original DACA policy was "rescind[ed]." *Id.* at 117a.

The Duke Memorandum stated, however, that the government would "not terminate the grants of previously issued deferred action * * * solely based on the directives in this memorandum." *Regents* Pet. App. 118a. It also explained that DHS would "provide a limited window" in which it would "adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests * * * from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017." *Id.* at 117a-118a.

### C. Procedural History

These challenges to DACA's rescission were filed in the Northern District of California, the District of Columbia, and the Eastern District of New York. See J.A. 376-796.[4] Collectively, respondents allege that the rescission of DACA is arbitrary and capricious under the APA; violates the APA's requirement for notice-and-

---

[4] The government's petition for a writ of certiorari to review the Fourth Circuit's judgment in another challenge to the rescission is pending before this Court. See *DHS* v. *Casa de Maryland*, No. 18-1469 (filed May 24, 2019). After the Court granted review in these cases, the government asked the Court to hold the petition in *Casa de Maryland* pending the Court's decision here.

comment rulemaking; and denies equal protection and
due process to DACA recipients.[5]

### 1. District courts enjoin or vacate the rescission on a nationwide basis

In all three of the cases before the Court, district
courts either enjoined or vacated DHS's decision on a
nationwide basis.

a. In *Regents* and *Batalla Vidal*, the district courts
granted in part and denied in part the government's mo-
tions to dismiss, and entered identical preliminary in-
junctions. *Regents* Pet. App. 1a-90a; *Batalla Vidal* Pet.
App. 1a-58a, 62a-129a, 133a-171a. Those courts deter-
mined that, although agency enforcement decisions
"are generally not reviewable," the rescission of DACA
was different because it terminated a general policy of
nonenforcement, and the "main" rationale was the "sup-
posed illegality" of the prior policy. *Regents* Pet. App.
27a-28a, 30a (citation omitted); see *Batalla Vidal* Pet.
App. 29a-30a. They further concluded that the rescis-
sion was likely arbitrary and capricious, primarily be-
cause, in their view, DACA was lawful. *Regents* Pet.
App. 42a; *Batalla Vidal* Pet. App. 91a. Each court or-
dered the government to maintain DACA "on the same
terms and conditions as were in effect before the rescis-
sion," with certain exceptions, principally that "new ap-
plications from applicants who have never before re-
ceived deferred action need not be processed." *Regents*
Pet. App. 66a-67a. The courts also both declined to dis-
miss the equal protection claim, finding that respond-

---

[5] The notice-and-comment claim and due process challenge to the
rescission have been uniformly rejected by the lower courts and are
not at issue before this Court.

10

ents' allegations "raise[d] a plausible inference that racial animus towards Mexicans and Latinos was a motivating factor in the decision to end DACA." *Id.* at 87a; see *id.* at 83a-87a; *Batalla Vidal* Pet. App. 152a-153.

b. In *NAACP*, the district court granted summary judgment to respondents and vacated the rescission of DACA in its entirety. *NAACP* Pet. App. 1a-74a. Like the other district courts, the D.C. district court determined that the rescission was reviewable because it was "a general enforcement policy predicated on [a] legal determination that the program was invalid." *Id.* at 43a. Unlike the other courts, the D.C. district court did not address whether DHS's legal conclusion was correct— *i.e.*, whether DACA was lawful. *Id.* at 50a. Instead, the court concluded that the Duke Memorandum's "legal reasoning was insufficient" to satisfy arbitrary-and-capricious review. *Id.* at 51a. In light of that ruling, the court deferred addressing respondents' equal protection claim. *Id.* at 66a-67a. And it stayed its order for 90 days to permit DHS to "reissue a memorandum rescinding DACA, this time providing a fuller explanation." *Id.* at 66a.

### 2. *Secretary Nielsen further explains the rescission*

On June 22, 2018, then-Secretary of Homeland Security Kirstjen M. Nielsen issued a memorandum responding to the D.C. district court's invitation to provide further explanation of DHS's decision to rescind DACA. *Regents* Pet. App. 120a-126a (Nielsen Memorandum). Secretary Nielsen explained that "the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons." *Id.* at 122a.

11

First, the Secretary agreed that "the DACA policy was contrary to law." *Regents* Pet. App. 122a. The Secretary endorsed the Fifth Circuit's conclusion that "'the INA d[id] not grant [her] discretion to grant deferred action and lawful presence on a class-wide basis'" at the scale of the DAPA policy, and she explained that "[a]ny arguable distinctions between the DAPA and DACA policies" were "not sufficiently material" to alter that conclusion. *Ibid.* (citation omitted); see *id.* at 122a-123a.

Second, the Secretary reasoned that, "[l]ike Acting Secretary Duke, [she] lack[ed] sufficient confidence in the DACA policy's legality to continue this non-enforcement policy, whether the courts would ultimately uphold it or not." *Regents* Pet. App. 123a. She noted "sound reasons for a law enforcement agency to avoid discretionary policies that are legally questionable," including the risk of "undermin[ing] public confidence" in the agency and "the threat of burdensome litigation that distracts from the agency's work." *Ibid.*

Third, the Secretary offered several "reasons of enforcement policy to rescind the DACA policy," regardless of whether the policy is "illegal or legally questionable." *Regents* Pet. App. 123a. She reasoned that, in her view, "public policies of non-enforcement * * * for broad classes and categories of aliens" should be "enacted legislatively," not "under the guise of prosecutorial discretion." *Id.* at 123a-124a. She reasoned that DHS should exercise its prosecutorial discretion only "on a truly individualized, case-by-case basis." *Id.* at 124a. And she reasoned that, given the unacceptably high numbers of illegal border crossings, it was "critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and

12

transparent enforcement of the immigration laws against all classes and categories of aliens." *Ibid.*

Finally, the Secretary explained that, although she "d[id] not come to these conclusions lightly," "neither any individual's reliance on the expected continuation of the DACA policy nor the sympathetic circumstances of DACA recipients as a class" outweigh the reasons to end the policy. *Regents* Pet. App. 125a. And she noted that the rescission of the policy would not "preclude the exercise[] of deferred action in individual cases if circumstances warrant." *Ibid.*

### 3. The D.C. district court declines to reconsider its decision in light of the Nielsen Memorandum

Following Secretary Nielsen's memorandum, the D.C. district court denied the government's motion to reconsider its prior order. *NAACP* Pet. App. 80a-109a. The court refused to reconsider whether DHS's decision was reviewable, reasoning that the Nielsen Memorandum, like the Duke Memorandum, was based "first and foremost" on the view that "'the DACA policy was contrary to law.'" *Id.* at 97a (citation omitted). And the court concluded that the independent, non-legal policy reasons offered by Secretary Nielsen were simply "attempt[s] to disguise an objection to DACA's legality as a policy justification for its rescission." *Id.* at 100a. On the merits, the court reaffirmed its conclusion that DHS had not provided a sufficient "legal assessment." *Id.* at 105a. The court further asserted that the Secretary's memorandum "fail[ed] to engage meaningfully with the reliance interests and other countervailing factors that weigh against ending the program." *Ibid.* The court therefore reaffirmed its conclusion that the rescission "must be set aside" in its entirety, *id.* at 109a; see *id.* at

**AR3923**

13

109a n.13, though it ultimately stayed its order with respect to aspects of the rescission exempted from the injunctions issued in California and New York, 17-cv-1907 D. Ct. Doc. 31 (Aug. 17, 2018).  See p. 19, *supra*.

#### 4.  *The Ninth Circuit affirms the nationwide preliminary injunction*

Several months later, the Ninth Circuit in *Regents* affirmed the preliminary injunction and the orders resolving the government's motion to dismiss.  *Regents* Supp. Br. App. 1a-87a.

a.  The panel majority acknowledged that an agency's nonenforcement decision is "generally committed to an agency's absolute discretion."  *Regents* Supp. Br. App. 25a (citation omitted).  But it reasoned that such a decision is nevertheless reviewable if it is "based solely on a belief that the agency lacked the lawful authority to do otherwise."  *Id.* at 29a.  The panel majority determined that DACA's rescission, as reflected in the initial Duke Memorandum, rested exclusively on "a belief that DACA was unlawful," not on concerns about maintaining the policy in the face of the then-ongoing litigation or any other exercise of the agency's discretion.  *Id.* at 35a; see *id.* at 35a-42a. And it refused to consider the Nielsen Memorandum, suggesting that it was an impermissible "post-hoc rationalization[]" and was not part of the record.  *Id.* at 57a-58a n.24 (citation omitted).  On the merits, the panel majority agreed that respondents were likely to succeed on their APA claim because DHS's decision was based entirely on an erroneous legal conclusion that DACA was unlawful.  *Id.* at 45a-60a.

The panel also affirmed the denial of the government's motion to dismiss respondents' equal protection

14

claim, concluding that respondents had plausibly alleged that the rescission was racially motivated. *Regents* Supp. Br. App. 73a-77a.

b. Judge Owens concurred. *Regents* Supp. Br. App. 79a-87a. He disagreed that the rescission was reviewable "for compliance with the APA." *Id.* at 79a. He explained that "when determining the scope of permissible judicial review, courts consider only the *type* of agency action at issue, not the agency's *reasons* for acting," and that DHS's decision to "rescind a non-enforcement policy in the immigration context is th[e] type of administrative action" that this Court has recognized is "'committed to agency discretion by law.'" *Id.* at 79a-80a, 83a (citation omitted). Nevertheless, Judge Owens explained that he would affirm the preliminary injunction and remand for the district court to consider whether respondents' equal protection claim provided an alternative ground for enjoining the rescission. *Id.* at 84a-85a.

### SUMMARY OF ARGUMENT

I. The orders and judgments under review hold that DACA's rescission either is or likely is arbitrary and capricious under the APA. But the rescission is not reviewable under that standard. Section 701(a)(2) exempts agency action from arbitrary-and-capricious review to the extent the action is "committed to agency discretion by  law." A decision to rescind a policy of nonenforcement is a quintessential action committed to an agency's absolute discretion, absent a statutory directive limiting that discretion. And no one contends that the INA itself limits DHS's authority to resume enforcing the law as written.

The lower courts held that Section 701(a)(2) does not apply to DACA's rescission principally on the ground that DHS based its decision solely on a determination

**AR3925**

15

that DACA was unlawful. Even if the rescission were based solely on DHS's legal judgment, however, this Court has squarely held that an otherwise unreviewable agency action does not become reviewable due to the reasons that an agency provides. In any event, the rescission did not rest solely on a legal rationale. The Duke and Nielsen Memoranda make clear that DHS's decision also rests on policy grounds. The lower courts' reasons for disregarding those policy rationales are unpersuasive. Thus, even under the lower courts' theory, arbitrary-and-capricious review is unavailable.

II. Even assuming the rescission were reviewable, DHS provided multiple, independently sufficient grounds for withdrawing DACA. First, as a practical matter, DHS was reasonably concerned about maintaining a nonenforcement policy that is similar to, if not materially indistinguishable from, two related policies that the Fifth Circuit had held unlawful, in a decision affirmed by an equally divided vote of this Court. Second, as a matter of policy, DHS wanted to terminate a legally questionable nonenforcement policy and leave the creation of policies as significant as DACA to Congress. Third, as a matter of law, DHS correctly, and at a minimum reasonably, concluded that DACA is unlawful. None of those three grounds is remotely arbitrary or capricious, let alone all three. Finally, respondents' equal protection claim fails as a matter of law and provides no basis for affirming the orders and judgments below.

16

**ARGUMENT**

These cases concern the Executive Branch's authority to revoke a discretionary policy of nonenforcement that is sanctioning an ongoing violation of federal immigration law by nearly 700,000 aliens. At best, DACA is legally questionable; at worst, it is illegal. Either way, DACA is similar to, if not materially indistinguishable from, the policies—including an expansion of DACA itself—that the Fifth Circuit previously held were contrary to federal immigration law in a decision that this Court affirmed by an equally divided vote. In the face of those decisions, DHS reasonably determined—based on both legal concerns and enforcement priorities—that it no longer wished to retain DACA. Yet two nationwide preliminary injunctions have forced DHS to maintain this entirely discretionary policy for nearly two years.

Contrary to the decisions below, the APA does not require DHS to retain a discretionary policy that the INA at most barely permits and likely forbids. Decisions about how the government will exercise enforcement discretion within the bounds of the law are uniquely entrusted to the Executive Branch. The APA's judicial-review provision thus does not apply. But even if DHS's decision were reviewable, DHS's legal and policy justifications for discontinuing DACA were not remotely arbitrary or capricious. DACA was created as a temporary, stopgap measure in 2012, after legislative efforts to provide permanent immigration relief for a similar class of aliens repeatedly failed. DHS has offered a number of reasons why it now wishes to withdraw that policy and instead enforce the INA as written, and the lower courts' criticisms of those rationales do not withstand scrutiny.

17

## I. DACA'S RESCISSION IS NOT JUDICIALLY REVIEWABLE UNDER THE APA

The courts below each found that the rescission of DACA either is or likely is arbitrary and capricious under the APA, 5 U.S.C. 706(2)(A).  But Section 706(2)(A) does not apply to agency actions to the extent those actions are "committed to agency discretion by law." 5 U.S.C. 701(a)(2).  And DACA's rescission is a quintessential exercise of enforcement discretion to which arbitrary-and-capricious review does not apply.

### A. DHS's Decision To Rescind A Policy Of Enforcement Discretion Is Committed To Agency Discretion By Law

"Over the years," this Court has interpreted Section 701(a)(2) to apply to various types of agency decisions that "traditionally" have been regarded as unsuitable for judicial review.  *Lincoln* v. *Vigil*, 508 U.S. 182, 191 (1993).  That provision precludes review, for example, of an agency's decision not to institute enforcement actions, *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985); an agency's refusal to reconsider a prior decision based on an alleged "material error," *ICC* v. *Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987) (*BLE*); and an agency's allocation of funds from a lump-sum appropriation, *Lincoln*, 508 U.S. at 192.  The same is especially true of an agency decision to rescind a discretionary policy of nonenforcement against a category of individuals who are violating the law on an ongoing basis.

1. *Chaney* is most instructive.  The Court there considered a challenge to the decision of the Food and Drug Administration (FDA) not to enforce the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. 301 *et seq.*, against the "unapproved use of approved drugs" for capital punishment.  *Chaney*, 470 U.S. at 824.  The FDA had reasoned that it lacked jurisdiction to bring such

18

enforcement actions and that, even if it had jurisdiction, the agency would exercise its "inherent" enforcement discretion to decline to do so. *Ibid.* The Court refused to subject the agency's decision to arbitrary-and-capricious review. *Id.* at 831.

The Court observed that "an agency's decision not to prosecute or enforce, whether through civil or criminal process," is "generally committed to an agency's absolute discretion" and "unsuitab[le] for judicial review." *Chaney*, 470 U.S. at 831. It explained that a decision not to enforce "often involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether agency resources are best spent on this violation or another" and whether enforcement in a particular scenario "best fits the agency's overall policies." *Ibid.* The Court noted, in addition, that when an agency declines to enforce, it "generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." *Id.* at 832. And it recognized that agency enforcement discretion "shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Ibid.* Accordingly, the Court concluded that, absent a statute "circumscribing an agency's power to discriminate among issues or cases it will pursue," the agency's "exercise of enforcement power" is "committed to agency discretion by law." *Id.* at 833, 835.

DHS's decision to discontinue the DACA policy is exactly the type of agency decision that traditionally has been understood as unsuitable for judicial review and

19

therefore "committed to agency discretion" under Section 701(a)(2). Like the decision to *adopt* a policy of non-enforcement, the decision whether to *retain* such a policy "often involves a complicated balancing" of factors that are "peculiarly within [the] expertise" of the agency, including determining how the agency's resources are best spent in light of its overall priorities. *Chaney*, 470 U.S. at 831. Likewise, a decision to abandon an existing nonenforcement policy will not, by itself, bring to bear the agency's coercive power over any individual; that will occur only if any resulting enforcement proceeding leads to a final adverse order. And, like a decision to adopt a nonenforcement policy, an agency's decision to reverse a prior policy of nonenforcement is akin to changes in policy as to criminal prosecutorial discretion. *Casa de Maryland* v. *DHS*, 924 F.3d 684, 709 (4th Cir. 2019) (Richardson, J., dissenting in relevant part), petition for cert. pending, No. 18-1469 (filed May 24, 2019). Such discretion is regularly exercised within the Department of Justice, both within and between presidential administrations, and separation-of-powers considerations underscore why it has never been considered amenable to APA review. See *United States* v. *Armstrong*, 517 U.S. 456, 464 (1996).

Accordingly, absent a statutory directive "otherwise circumscribing" DHS's traditional discretion, there is no "law to apply" to judge the Secretary's exercise of her broad enforcement discretion. *Chaney*, 470 U.S. at 833-834. No one has suggested that the INA expressly or implicitly circumscribes the Secretary's decision to rescind DACA's broad policy of nonenforcement. See *Regents* Supp. Br. App. 57a ("To be clear: we do not hold that DACA *could not* be rescinded as an exercise

**AR3930**

of Executive Branch discretion."). Section 701(a)(1) therefore squarely applies.

2. These principles of nonreviewability apply with particular force in the context of enforcement of the immigration laws. As the Court has observed, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system." *Arizona* v. *United States*, 567 U.S. 387, 396 (2012). And in that context, the concerns inherent in any challenge to prosecutorial discretion "are greatly magnified." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999). "Whereas in criminal proceedings the consequence of delay is merely to postpone the criminal's receipt of his just deserts," a delay in the enforcement of immigration laws "permit[s] and prolong[s] a continuing violation of United States law." *Ibid.*

Congress's particular concern for these principles is underscored by the INA. Section 1252(g) of the INA channels "any cause or claim by or on behalf of any alien arising from the decision or action * * * to commence proceedings, adjudicate cases, or execute removal orders against any alien" into petitions for review of final removal orders. 8 U.S.C. 1252(g). And Section 1252(b)(9) likewise provides that "*all* questions of law and fact * * * arising from *any* action taken or proceeding brought to remove an alien from the United States under this subchapter" is subject only to "judicial review of a final order under this section." 8 U.S.C. 1252(b)(9) (emphasis added). The Court has previously recognized that these provisions were "designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention

21

outside the streamlined process that Congress has designed." *AADC*, 525 U.S. at 485; see *INS* v. *St. Cyr*, 533 U.S. 289, 313 & n.37 (2001).

The rescission of the DACA policy is the sort of "'no deferred action' decision[]," *AADC*, 525 U.S. at 485, that Congress intended to channel through the INA's careful review scheme. It is properly considered an initial "action" in DHS's "commence[ment] [of] proceedings" within the meaning of Section 1252(g), and an "action taken" to "remove an alien from the United States" within the broader meaning of Section 1252(b)(9), see *Jennings* v. *Rodriguez*, 138 S. Ct. 830, 854 (2018) (Thomas, J., concurring in part and concurring in the judgment). But even if those provisions do not directly preclude review here, see *Regents* Supp. Br. App. 43a-45a & n.19, the INA's cabined review scheme confirms the importance Congress placed on shielding DHS's discretionary decisions from review, and reinforces why immigration enforcement policy decisions are unreviewable under the APA as "committed to agency discretion by law." 5 U.S.C. 701(a)(2).

### B. The Lower Courts' Rationales For Reviewing DHS's Decision Lack Merit

The courts below concluded that DHS's decision to rescind the DACA policy was reviewable on three different grounds. Each is wrong.

1. The courts below reasoned in part that the DACA rescission is reviewable because it is a particular *type* of enforcement decision—namely, a broad and categorical decision to rescind a nonenforcement policy, rather than a single-shot decision not to enforce against an individual. But *Chaney* itself concerned the programmatic determination whether to enforce the FDCA with respect to drugs used to administer the death penalty,

22

not the particular circumstances of any individual case. See 470 U.S. at 824-825.  The FDA explained that state lethal-injection laws, as a class, did not present the sort of "serious danger to the public health" that would warrant enforcement of the FDCA, and therefore, even if the agency had "jurisdiction in the area," it would decline to exercise that jurisdiction against such a state law.  *Ibid.*  As even the D.C. district court here recognized, "the FDA's refusal to act in [*Chaney*] was more than just a one-off nonenforcement decision."  *NAACP* Pet. App. 35a.

*Chaney*'s reasoning also fully supports a finding of nonreviewability here.  Agency decisions about how its "resources are best spent" or how certain enforcement activity "best fits the agency's overall policies," 470 U.S. at 831, are, if anything, more susceptible to implementation through broad guidance than through case-by-case enforcement decisions.  See, *e.g.*, *Wayte* v. *United States*, 470 U.S. 598, 601-603 (1985).  Indeed, "supervisory control over that discretion is necessary to avoid arbitrariness and ensure consistency."  *Casa de Maryland*, 924 F.3d at 713 (Richardson, J., dissenting in relevant part).  A rule that shielded enforcement decisions from review "only when inferior officers exercise single-shot enforcement decisions" would be counterproductive.  *Ibid.*  It would also "brush[] aside the separation of powers" concerns that underlie the Court's decisions in this area.  *Ibid.*; see *AADC*, 525 U.S. at 489 (explaining that review of enforcement discretion "invade[s] a special province of the Executive").

It is likewise immaterial that DHS has *eliminated* a policy of nonenforcement, rather than *adopted* one.  See, *e.g.*, *Regents* Supp. Br. App. 34a n.13.  A decision whether to retain a nonenforcement policy implicates

**AR3933**

23

all of the same considerations about agency priorities and resources that inform the decision to adopt such a policy in the first instance. And as the D.C. district court also acknowledged, because the rescission does not, by itself, initiate removal proceedings, "like the FDA's nonenforcement decision in *Chaney*, there are no agency proceedings here to provide a 'focus for judicial review,' and DACA's rescission does not itself involve the exercise of coercive power over any person." *NAACP* Pet. App. 33a (citation omitted). Like a criminal defendant, an alien subjected to removal proceedings may challenge the substantive validity of an adverse final order, but he may not raise a procedural claim that the government was arbitrary and capricious for commencing enforcement.

2. The courts below also reasoned that DHS's *rationale* rendered its enforcement decision reviewable because DHS purportedly rested solely on a legal judgment about DACA's lawfulness. That reasoning is both legally and factually wrong. Because the rescission of DACA is the type of decision that *Chaney* held is unreviewable, it makes no difference what reasons DHS gave. And in any event, DHS's decision did not rest solely on a legal judgment.

a. As an initial matter, even if the rescission were based solely on DHS's conclusion that DACA is unlawful, the decision would not be reviewable under the APA. In *BLE*, this Court squarely held that agency actions falling within a "tradition of nonreviewability" do not "become[] reviewable" just because the agency "gives a 'reviewable' reason" concerning its legal authority. 482 U.S. at 282-283. As the Court further explained, "a common reason for failure to prosecute an alleged crim-

AR3934

24

inal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction," yet it is "entirely clear" that such decisions are unreviewable. *Id.* at 283. The reconsideration decision at issue in *BLE* was therefore unreviewable, even though the agency based that decision on its legal interpretation of a federal statute. *Id.* at 276, 283. As Judge Owens recognized, the same would "plainly" be true of DHS's decision to rescind DACA, even if it were based solely on the agency's interpretation of the INA. *Regents* Supp. Br. App. 82a; see *Casa de Maryland*, 924 F.3d at 714-715 (Richardson, J., dissenting in relevant part) ("[T]he scope of permissible judicial review must be determined by the type of agency action * * * not the agency's reasons for acting.").

In concluding otherwise, the Ninth Circuit relied on footnote four in *Chaney*, in which this Court "express[ed] no opinion" on whether a nonenforcement decision might be reviewable if it were "based solely on the belief that [the agency] lacks jurisdiction" or were "so extreme as to amount to an abdication of [the agency's] statutory responsibilities." 470 U.S. at 833 n.4; see *Regents* Supp. Br. App. 25a-26a. But whatever doubt *Chaney* left, the Court's subsequent decision in *BLE* resolved it. In any event, as the rest of the footnote and accompanying text make clear, *Chaney* was referring only to circumstances in which "the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion.'" 470 U.S. at 833 n.4; see *id.* at 832-833. That was why, in the *Texas* litigation, courts could review the claim that the INA barred DHS from adopting DAPA and expanded DACA. But that theory cannot apply here, where no one argues that the INA somehow bars DHS

25

from rescinding DACA and resuming enforcement of the law.

The Ninth Circuit recognized that *BLE* "stands for the proposition that if a particular type of agency action is presumptively unreviewable, the fact that the agency explains itself in terms that are judicially cognizable does not change the categorical rule." *Regents* Supp. Br. App. 30a. And it correctly assumed that a decision to rescind a policy of enforcement discretion, like DACA, is the type of decision that is presumptively unreviewable under *Chaney*. See *id.* at 34a n.13. It nevertheless reasoned that a "nonenforcement decision[] based solely on the agency's belief that it lacked power to take a particular course" is reviewable. *Id.* at 31a. But the only difference between an unreviewable "nonenforcement decision[]," *ibid.*, and a "nonenforcement decision[] *based solely on the agency's belief that it lacked power to take a particular course*," *ibid.* (emphasis added), is the agency's *reason* for its decision. That is precisely what *BLE* teaches cannot convert an unreviewable decision into a reviewable one.

Some of the courts below were concerned that, if an enforcement decision that rests on a legal interpretation is unreviewable, an agency could shield any interpretation from review by embedding it in such a policy. See, *e.g.*, *NAACP* Pet. App. 31a. As a threshold matter, that concern is not presented here. DHS did not rest the rescission on any interpretation of particular substantive provisions of the INA that plaintiffs could otherwise challenge under the APA. But in any event, the concern is fundamentally misguided. Assuming that an agency's interpretation is otherwise reviewable (*i.e.*, if the plaintiff can satisfy the APA's various requirements

26

for review), it does not matter that the agency has announced the interpretation together with a nonenforcement policy. "Nothing in the [APA] or in the holding or policy of [*Chaney*], precludes review" of an interpretation as a categorical matter because it is announced with an enforcement decision. *International Union* v. *Brock*, 783 F.2d 237, 245 (D.C. Cir. 1986). A court may or may not be able to review the interpretation and declare it invalid on a prospective basis, *id.* at 247-248; but what it may never do is review the nonenforcement decision itself, *id.* at 246-247. The former would be subject to whatever review is otherwise available under the APA; and the latter remains committed to agency discretion. Combining the two in the same document does not change the reviewability of either.

b. In any event, DACA's rescission was *not* based solely on DHS's legal conclusion that the policy is unlawful. Acting Secretary Duke decided that she did not want to retain and litigate a policy whose legality was, at a minimum, highly questionable in light of the *Texas* litigation. And Secretary Nielsen was clear that those considerations, as well as additional policy concerns with DACA, were the bases for DHS's decision. Accordingly, even under the lower courts' erroneous understanding of *Chaney* and *BLE*, DHS's rescission of DACA is not reviewable under the APA.

i. A fair reading of the Duke Memorandum demonstrates that DHS's decision never rested exclusively on a legal conclusion that DACA was unlawful. The Acting Secretary recounted in significant detail the litigation surrounding the DAPA and expanded DACA policies. *Regents* Pet. App. 111a-114a. She noted that the agency's previous decision to discontinue DAPA and expanded DACA was made after "considering the [government's]

**AR3937**

27

likelihood of success on the merits of th[at] ongoing litigation." *Id.* at 115a-116a. She described the subsequent letter from Texas and other States to the Attorney General notifying him of those States' intention to amend the existing lawsuit to challenge the original DACA policy. *Id.* at 116a. And she focused on litigation risk when she highlighted the Attorney General's statement that "it is likely that potentially imminent litigation would yield similar results with respect to DACA." *Ibid.* The Acting Secretary concluded that, in light of the foregoing, and "[i]n the exercise of [her] authority in establishing national immigration policies and priorities," the DACA policy "should" be terminated and wound down in "an efficient and orderly fashion." *Id.* at 116a-117a. As even the D.C. district court recognized, "[t]ogether, these statements were sufficient to express the Department's concern that a nationwide injunction in the Texas litigation would abruptly shut down the DACA program." *NAACP* Pet. App. 56a.

The Ninth Circuit nevertheless reasoned that the Acting Secretary's statement is "most naturally read as supporting a rationale based on DACA's illegality." *Regents* Supp. Br. App. 36a. It asserted that "litigation risks" were never expressly mentioned as something that Acting Secretary Duke took into "consideration." *Ibid.* And after scrutinizing her word choice and sentence structure as compared to that of her predecessor in rescinding the DAPA policy, the court concluded that the "difference in language" cut against any "suggestion that the rescission was discretionary." *Id.* at 40a. But the memorandum is not a statutory provision properly parsed with legislative precision. The relevant question is whether the Acting Secretary's rationale "may reasonably be discerned." *Bowman Transp., Inc.*

**AR3938**

28

v. *Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). The Acting Secretary's extensive discussion of the prior litigation and her statement that she "should"—not must—rescind DACA confirm that the risk she perceived was that the government was not "likel[y]" to "succe[ed]" on the merits of the "imminent litigation." *Regents* Pet. App. 115a-117a.

ii. Regardless, Secretary Nielsen's memorandum removes any doubt that DHS's decision rests on more than DACA's unlawfulness per se. That memorandum makes crystal clear that, "regardless of whether the DACA policy is ultimately illegal," DHS's decision to rescind is also based on the agency's "serious doubts about its legality" and other "reasons of enforcement policy." *Regents* Pet. App. 123a; see *id.* at 122a ("[T]he DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons."). Although the Ninth Circuit and the D.C. district court both refused to credit Secretary Nielsen's non-legal rationales, neither court's reasoning withstands scrutiny.

As a threshold matter, the Ninth Circuit refused to consider the Nielsen Memorandum at all on the ground that it postdated the district-court proceedings. *Regents* Supp. Br. App. 58a n.24. By virtue of this Court's grant of certiorari before judgment in *NAACP*, in which the district court invited the additional memorandum and addressed it at length, the Nielsen Memorandum is undoubtedly before this Court. See *NAACP* Pet. App. 66a. The Court cannot and should not decide these cases without assessing the whole of the agency's actions, and its assessment of the Nielsen Memorandum in *NAACP* will necessarily control whether the *Regents* injunction must be vacated.

**AR3939**

29

The Ninth Circuit also wrongly suggested that the Nielsen Memorandum is an impermissible "post-hoc rationalization[]." *Regents* Supp. Br. App. 58a n.24 (citation omitted).  To be sure, in reviewing an agency decision under the APA, "courts may not accept *appellate counsel's* post hoc rationalizations for agency action." *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (emphasis altered).  An agency's actions "must be upheld, if at all, on the basis articulated by the agency itself." *Ibid.*  But that rule has no application here.  The Nielsen Memorandum was issued directly by the Secretary of Homeland Security—the official vested by Congress with the authority to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. 202(5)—to explain *her* reasons for concluding that DHS's decision to rescind DACA "was, and remains, sound." *Regents* Pet. App. 121a.  Just as much as the memoranda establishing DACA and then rescinding it, the Nielsen Memorandum "*is* agency action, not a *post hoc* rationalization of it." *Martin* v. *OSHRC*, 499 U.S. 144, 157 (1991).

Indeed, the D.C. district court itself recognized that almost all of Secretary Nielsen's policy grounds were not "post hoc rationalization[s]." *NAACP* Pet. App. 95a.  Remarkably, however, that court disregarded Secretary Nielsen's policy reasons for rescinding DACA as an "attempt to disguise an objection to DACA's legality as a policy justification for its rescission." *Ibid.*; see *id.* at 98a-99a.  But Secretary Nielsen could not have been clearer that the policy reasons she offered for rescinding DACA were independent from her legal concerns.  See *Regents* Pet. App. 123a ("[R]egardless of whether these concerns about the DACA policy render it illegal

30

or legally questionable, there are sound reasons of enforcement policy to rescind the DACA policy."); *id.* at 122a (providing "several separate and independently sufficient reasons"). There is no basis to question those statements, particularly in light of the presumption of regularity that courts owe to the coordinate Branches. See *Armstrong*, 517 U.S. at 464.

The D.C. district court observed that two of Secretary Nielsen's policy concerns—that DHS (1) "should not adopt public policies of non-enforcement of those laws for broad classes and categories of aliens," *Regents* Pet. App. 123a; and (2) "should only exercise its prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-case basis," *id.* at 124a—also had informed the legal analysis of the DACA policy by Attorney General Sessions, Acting Secretary Duke, and the Fifth Circuit. *NAACP* Pet. App. 98a-100a. But far from evidence of pretext, such overlap is entirely expected: those same factors are relevant to whether only Congress can adopt such an enforcement policy as a legal matter *and* to whether, at a minimum, only Congress should adopt the policy as a discretionary matter. In *Chaney* itself, the FDA similarly relied on federalism concerns to conclude both that it lacked jurisdiction to enforce the FDCA against state lethal-injection laws *and* that, even if it possessed such authority, it would not enforce the FDCA against those laws. See Pet. App. at 81a-86a, *Chaney*, *supra* (No. 83-1878). The overlapping considerations did not undermine the nonreviewability of the FDA's decision. The same is true here.

In any event, the D.C. district court's reasoning does not apply by its own terms to Secretary Nielsen's addi-

**AR3941**

31

tional concern that, in light of "tens of thousands of minor aliens [who] have illegally crossed or been smuggled across our border in recent years," it was important for DHS to "project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws against all classes and categories of aliens" that will discourage such dangerous and illegal journeys. *Regents* Pet. App. 124a. The court itself recognized that rationale was not reflected in the Duke Memorandum or the Attorney General's letter. *NAACP* Pet. App. 94a. For that reason, the court deemed that one rationale an impermissible post hoc explanation. *Id.* at 94a-95a. But that conclusion was wrong for the same reasons the Ninth Circuit's post hoc rationalization holding was incorrect: it is the agency's own explanation for its decision. See p. 29, *supra*. And thus Secretary Nielsen's messaging rationale alone is sufficient to show that the agency did not rely solely on a legal rationale, and that the agency's decision is unreviewable on any theory.

3. Finally, contrary to the lower courts' suggestion, *Regents* Supp. Br. App. 31a-32a; *NAACP* Pet. App. 73a, principles of political accountability do not justify reviewing DHS's decision to rescind DACA. As a threshold matter, the Nielsen Memorandum clearly states that DHS's concerns justify rescinding DACA "whether the courts would ultimately uphold [the policy] or not." *Regents* Pet. App. 123a. Given that plain statement, the lower courts' concerns about political accountability ring hollow. In any event, free-floating concerns about accountability have no grounding in either the text of Section 701(a)(2) or the precedent construing it. The teaching of *Chaney* and *BLE* is that some discretionary

AR3942

decisions by the Executive Branch are beyond the authority of courts to review—even when justified by reasons that courts might review in other contexts. The Executive Branch is to be held accountable for those discretionary decisions through democratic channels. For instance, Congress may respond to, and accept or override, the Executive's reasons for adopting or rescinding a nonenforcement policy. Here, in fact, Congress and the President were in the midst of attempting to negotiate a legislative solution, when DHS's rescission was enjoined, and the negotiations collapsed. See Dean DeChairo, *Immigration Framework Coming Next Week, Senators Say*, RollCall.com (Jan. 4, 2018), http://www.rollcall.com/news/immigration-framework-coming-next-week-senators-say-2. If anything, judicial review of DHS's decision undermined that political process.

## II. DACA'S RESCISSION IS LAWFUL

Even assuming the rescission is reviewable, it is plainly valid. Cf. *Trump* v. *Hawaii*, 138 S. Ct. 2392, 2409 (2018). Under the APA, the decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A). The scope of review under that standard is "narrow." *Department of Commerce* v. *New York*, 139 S. Ct. 2551, 2569 (2019) (citation omitted). It requires only that the agency "'examined the relevant data' and articulated 'a satisfactory explanation'" for its decision, "'including a rational connection between the facts found and the choice made.'" *Ibid.* (citation omitted). A court "may not substitute [its] judgment for that of the [agency]." *Ibid.* DHS's decision here easily passes that test on multiple legal and policy grounds. Ultimately, whether or not DHS was required to rescind DACA, it certainly was not required to maintain

33

it.  The courts below erred in second-guessing DHS's entirely rational judgment to stop facilitating ongoing violations of federal law on a massive scale.

### A. The Rescission Is Reasonable In Light Of DHS's Serious Doubts About DACA's Lawfulness

DHS's decision to wind down the DACA policy was more than justified by DHS's serious doubts about the lawfulness of the policy and the litigation risks in maintaining it.  Regardless of whether one agrees or disagrees with the Fifth Circuit's decision enjoining both DAPA and expanded DACA—and this Court's affirmance of that decision by an equally divided vote—those decisions provided ample reason to doubt whether the similar, if not materially indistinguishable, DACA policy could survive a legal challenge.  DHS reasonably concluded that maintaining a legally questionable policy of nonenforcement could "undermine public confidence in and reliance on the agency and the rule of law," and risk "burdensome litigation" that could distract from the agency's work.  *Regents* Pet. App. 123a.  Particularly once Texas and other States announced their intention to challenge DACA, it was more than reasonable for DHS to determine that it was better to wind down DACA in an orderly fashion rather than incur the time, expense, and legal and practical risks of continuing to defend it.  *Id.* at 117a-118a.

1. In *Texas* v. *United States*, the Fifth Circuit affirmed a nationwide preliminary injunction against DAPA and expanded DACA.  809 F.3d 134, 186 (2015), aff'd, 136 S. Ct. 2271 (2016) (per curiam).  The court concluded that both DAPA and expanded DACA were "manifestly contrary," *id.* at 186, to the INA for four reasons:  (1) "[i]n specific and detailed provisions," the

34

INA already "confers eligibility for 'discretionary relief,'" including "narrow classes of aliens eligible for deferred action," *id.* at 179 (citation omitted); (2) the INA's otherwise "broad grants of authority" could not reasonably be construed to assign to the Secretary the authority to create additional categories of aliens of "vast 'economic and political significance,'" *id.* at 183 (citation omitted); (3) DAPA and expanded DACA were inconsistent with historical "discretionary deferral[]" policies because they were not undertaken on a "'country-specific basis * * * in response to war, civil unrest, or natural disasters,'" nor served as a "bridge[] from one legal status to another," *id.* at 184 (citation omitted); and (4) "Congress ha[d] repeatedly declined to enact the Development, Relief, and Education for Alien Minors Act ('DREAM Act'), features of which closely resemble DACA and DAPA," *id.* at 185 (footnote omitted).

The entirety of that reasoning applies equally to DACA. The original DACA policy, like its subsequent expansion and the related DAPA policy, grants deferred action to a vast category of aliens, not in response to any country-specific emergency and despite repeated inaction by Congress. Indeed, the Southern District of Texas recently determined, "guided by [that] Fifth Circuit precedent," that the INA could not "'reasonably be construed'" to authorize the maintenance of DACA. *Texas* v. *United States*, 328 F. Supp. 3d 662, 715 (2018) (citation omitted).[6] At a minimum, given these similarities and "potentially imminent litigation," Acting Secretary Duke acted reasonably in instituting an orderly

---

[6] The district court nevertheless declined to issue a preliminary injunction enjoining the DACA policy in light of, among other things, Texas's delay in seeking injunctive relief. See *Texas*, 328 F. Supp. 3d at 736-742.

35

wind-down of the policy, rather than risking a court-ordered shutdown, the terms and timing of which would be beyond the agency's control. *Regents* Pet. App. 116a-117a. And Secretary Nielsen reasonably concluded that she too "lack[ed] sufficient confidence in the DACA policy's legality" to maintain it, "whether the courts would ultimately uphold it or not." *Id.* at 123a. The arbitrary-and-capricious standard does not allow a court "to substitute its judgment" for DHS's on that question. *State Farm*, 463 U.S. at 42-43.

2. The courts below distinguished DAPA from DACA on two grounds, both of which lack merit. Certainly, neither is so compelling that it was unreasonable for DHS to conclude that the costs of retaining DACA outweighed the benefits.

a. First, the courts below focused on the Fifth Circuit's observation in *Texas* that "Congress has enacted an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status," and DAPA would have applied to some similarly situated aliens "without complying with any of the requirements," 809 F.3d at 179-180. *E.g.*, *Regents* Supp. Br. App. 52a. They reasoned that because "there is no analogous provision in the INA defining how immigration status may be derived by undocumented persons who arrived in the United States as children," "[o]ne of the major problems the Fifth Circuit identified with DAPA is * * * not present" in DACA. *Ibid.*

That pathway to legal status, however, was not critical to the Fifth Circuit's analysis. That process was only one of a host of "specific and detailed provisions" that the Fifth Circuit relied on to decide that DAPA and expanded DACA were inconsistent with the INA's overall scheme. *Texas*, 809 F.3d at 179; see *id.* at 179-181.

**AR3946**

36

Moreover, as the Fifth Circuit pointed out, the INA's process applied only to parents of U.S. citizens. See *id.* at 180. DAPA, on the other hand, would have provided relief to parents of U.S. citizens *and* lawful permanent residents—and the Fifth Circuit concluded the policy was invalid in whole, not just in part. *Regents* Pet. App. 108a.

b. Second, the courts noted that DAPA would have made up to "4.3 million otherwise removable aliens" eligible for deferred action and associated benefits, while DACA had been granted to 689,800 enrollees as of September 2017. *Regents* Supp. Br. App. 54a; see *Batalla Vidal* App. 103a. As an initial matter, although the number of aliens who were ultimately granted DACA is approximately 700,000, approximately 1.7 million originally met the eligibility criteria. See Jeffrey S. Passel & Mark Hugo Lopez, Pew Research Center, *Up to 1.7 Million Unauthorized Immigrant Youth May Benefit from New Deportation Rules* 3 (Aug. 14, 2012). But whether 1.7 million or nearly 700,000 aliens, there can be no debate that DACA, like DAPA and expanded DACA, is a policy of "vast 'economic and political significance'" to which the Fifth Circuit's reasoning applies. *Texas*, 809 F.3d at 183 (citations omitted). The type of deferred-action policies that the Fifth Circuit suggested might be permissible typically "affect[ed] only *a few thousand* aliens for months or, at most, a few years." *Id.* at 185 n.197 (emphasis added).

c. In any event, even if DACA were distinguishable from DAPA, there still would be no question that maintaining the DACA policy presented serious legal concerns. After all, the Fifth Circuit and this Court affirmed an injunction not only against DAPA, but also against the expansion of DACA—which merely would

**AR3947**

37

have extended the length of DACA grants from two to three years and tweaked the age and residency criteria. Although the courts below did not find the Fifth Circuit's decision "persuasive authority" on the validity of expanded DACA, *Regents* Supp. Br. App. 55a, it is obvious that there was, at the very least, serious doubt concerning DACA's lawfulness and a real risk that the policy would meet the same fate. The Secretary therefore faced a choice: expend time and resources defending DACA, with the risk that a court would order it shut down either immediately or pursuant to a court-drafted plan beyond DHS's control, or rescind DACA in an orderly fashion. Regardless of whether one agrees with the policy choice, the Secretary's decision to opt for the latter was an eminently reasonable one.

**B. The Rescission Is Reasonable In Light Of DHS's Additional Policy Concerns**

DHS's decision to rescind DACA is independently supported by several additional enforcement-policy concerns. Secretary Nielsen explained that "regardless of whether * * * the DACA policy [is] illegal or legally questionable, there are sound reasons of enforcement policy to rescind the DACA policy." *Regents* Pet. App. 123a. The INA vests the Secretary with the authority to set the Nation's immigration-enforcement priorities. See 6 U.S.C. 202(5). There is no appropriate basis for courts to second-guess the Secretary's policy judgments, which fall well "within the range of reasonable options." *Department of Commerce*, 139 S. Ct. at 2571.

AR3948

38

1.  *The Secretary reasonably concluded that DHS should not decline on this scale to enforce the law adopted by Congress*

The Secretary concluded that, as a matter of policy, broad-based and controversial deferred-action policies like DACA and DAPA should proceed only with congressional approval and the political legitimacy and stability that such approval entails.  She thus determined that, even if she could have continued DACA unilaterally, she did not want to.  *Regents* Pet. App. 123a-124a. That determination was entirely sensible.

In fact, many of her policy concerns echo those expressed by President Obama upon the announcement of the DACA policy itself.  The President agreed with the Secretary's assessment that unilateral executive action could not provide a permanent solution for DACA recipients:  "This is not a path to citizenship.  It's not a permanent fix.  This is a temporary stopgap measure."  The White House, *Remarks by the President on Immigration* (June 15, 2012), https://go.usa.gov/xnZFY (*Obama Remarks*).  The policy itself acknowledges that it does not confer any lawful "immigration status," because "[o]nly the Congress, acting through its legislative authority, can confer those rights."  *Regents* Pet. App. 101a.  And precisely because the DACA solution was only "temporary," President Obama agreed that "Congress need[ed] to act."  *Obama Remarks*.  The Secretary reasonably determined that, in the absence of such congressional action, DHS should not maintain this temporary stopgap measure six years later.

The D.C. district court gave only one reason for rejecting the Secretary's desire to await action by Congress:  "an agency's view as to which branch of government ought to address a particular policy issue" is not

**AR3949**

39

"an assessment appropriately" made by an agency. *NAACP* Pet. App. 99a (citation omitted). That is a startling and unsupported assertion. Far from illegitimate, such executive restraint is laudable. It is both a common and salutary feature of our constitutional structure that the political branches may seek to achieve large-scale policy solutions through consensus rather than unilateral action. That is particularly so for controversial policies, where the give and take of the legislative process can help forge stable political compromises that unilateral action cannot. Nothing in our system of separated powers prohibits executive officials from seeking legislative approval for particularly significant executive actions. And the Secretary's decision to do so here was plainly reasonable.

### 2. *The Secretary reasonably concluded that DHS should exercise its prosecutorial discretion not to enforce on a case-by-case basis*

The Secretary's determination that "DHS should only exercise its prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-case basis" was also reasonable. *Regents* Pet. App. 124a. Whatever its merits, DACA plainly creates an implicit presumption that requestors who meet its eligibility criteria will be granted deferred action.[7] Otherwise, it would serve no purpose. A truly individualized approach to deferred action, in contrast, begins with the

---

[7] The numbers bear that out. The approval rate for initial requests for DACA is 91% since its adoption in 2012—and that takes into account even requests that were denied merely because the alien did not satisfy the eligibility criteria. See USCIS, *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake and Case Status, Fiscal Year 2012–2019* (Apr. 30, 2019), https://go.usa.gov/xVCpC.

**AR3950**

40

presumption that those here illegally should be re-moved, and seeks to identify, on a case-by-case basis, individuals who should be excused from that presumption. The Secretary's preference for the latter merely continued the policy adopted by her predecessor, Secretary Kelly. See J.A. 857-867 (prohibiting DHS officials from exercising prosecutorial discretion "in a manner that exempts or excludes a specified class or category of aliens from enforcement of the immigration laws" except pursuant to DAPA, expanded DACA, and DACA); J.A. 868-871 (rescinding DAPA and expanded DACA).

The D.C. district court called this rationale "[s]pecious," reasoning that, "if Secretary Nielsen believes that DACA is not being implemented as written, she can simply direct her employees to implement it properly." *NAACP* Pet. App. 100a. But the Secretary's point was not about "her own employees' misapplication of [the DACA policy]," *ibid.*; it was about the thumb on the scales that is created by any categorical deferred-action policy with stated eligibility criteria. The Secretary wanted to remove that presumption, and return to the truly individualized review of deferred-action requests that was available pre-DACA. One can agree or disagree with that judgment, but it is not remotely specious.

### 3. *The Secretary reasonably concluded that DHS should discourage illegal immigration by projecting a message of consistent enforcement*

As Secretary Nielsen recognized, "tens of thousands of minor aliens" in recent years have made the dangerous trek—with or without their families—to and across our southern border without legitimate claims to lawfully enter the country. *Regents* Pet. App. 124a; see generally 84 Fed. Reg. 33,829, 33,838 (July 16, 2019)

41

(discussing "demographic shift in the alien population crossing the southern border from Mexican single adult males to predominantly Central American famil[ies]"). To address that problem, the Secretary determined that DHS should send a strong message that children who are sent or taken on this perilous and illegal journey will not be accorded preferential treatment. She thus additionally concluded that "it is critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws against all classes and categories of aliens," and that rescission of the DACA policy will help project that message. *Regents* Pet. App. 124a. That too is an eminently reasonable judgment.

The D.C. district court questioned whether the DACA policy could be blamed for the patterns of illegal immigration about which the Secretary expressed concern, noting that DACA was available only to individuals who have lived in the United States since 2007 and thus aliens who illegally entered the country more recently would not be eligible. *NAACP* Pet. App. 102a. But that misses the point entirely. Amnesty-like policies typically do not encourage further illegal conduct by expressly blessing it prospectively, but rather by "creat[ing] an expectation of future amnesties" and "[h]opes of gaining legal status conditional on living or working in the U.S. for a certain period of time." Pia Orrenius & Madeline Zavodny, *What Are the Consequences of an Amnesty for Undocumented Immigrants?*, 9 Geo. Pub. Pol'y Rev. 21, 31 (2004). The Secretary reasonably concluded that creating that expectation was undermining the Nation's immigration system and that conveying a powerful message of consistent enforcement would address that concern.

42

### 4. *The Secretary adequately considered any reliance interests*

Finally, the Secretary sufficiently considered the reliance interests of DACA recipients as weighed against these reasonable policy concerns. As President Obama forthrightly explained, DACA was a "temporary stop-gap measure," not a "permanent fix." *Obama Remarks*. By its own terms, the policy "confer[ed] no substantive right" or lawful "immigration status." *Regents* Pet. App. 101a. It instead expressed the government's intention not to enforce the federal immigration law against the recipient for a two-year period, which itself could be terminated at any time at the agency's discretion. *Ibid.*

Nevertheless, Secretary Nielsen explained that the agency was "keenly aware that DACA recipients have availed themselves of the policy in continuing their presence in this country and pursuing their lives." *Regents* Pet. App. 125a. The Duke Memorandum balanced those interests by permitting existing DACA grants to expire according to their stated two-year terms and by allowing a limited window for additional renewals. *Id.* at 117a-118a. And contrary to the D.C. district court's dismissive suggestion that Secretary Nielsen "ignore[d]" the "serious reliance interests," *NAACP* Pet. App. 107a (citations omitted), she explained that her decision to stand by the rescission was not one she came to "lightly," *Regents* Pet. App. 125a. In the end, however, she concluded that neither the asserted reliance interests of any individual DACA recipient nor "the sympathetic circumstances" of all such recipients could "overcome[] the legal and institutional concerns with sanctioning the continued presence of hundreds of thousands of aliens who are illegally present in violation of the laws passed by Congress." *Ibid.* The APA provides

43

no basis to second-guess that "value-laden" judgment. *Department of Commerce*, 139 S. Ct. at 2571.

### C. The Rescission Is Reasonable In Light Of DHS's Conclusion That DACA Is Unlawful

Finally, DHS's conclusion that the DACA policy was not just legally questionable but indeed unlawful itself requires that the rescission be upheld. That conclusion was correct. But even if the Court disagrees, DHS's reasonable determination of the scope of its own authority provides ample justification for its decision.

#### 1. DHS correctly concluded that DACA is unlawful

a. Deferred action under the INA originally "developed without express statutory authorization." *AADC*, 525 U.S. at 484 (citation omitted). The government has since grounded its authority in the Secretary's general powers to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. 202(5), and to "establish such regulations; * * * issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter," 8 U.S.C 1103(a)(3). And Congress and this Court have recognized the practice's use in certain contexts. See, *e.g.*, *AADC*, 525 U.S. at 484 (noting that "[a] case may be selected for deferred action" for "humanitarian reasons") (citation omitted); 49 U.S.C. 30301 note (authorizing States to issue driver's licenses to aliens with "approved deferred action status"). But neither the INA's general grants of authority in 6 U.S.C. 202(5) and 8 U.S.C. 1103(a)(3), nor the other scattered references to deferred action throughout the U.S. Code, can be fairly interpreted as authorizing DHS to maintain a categorical deferred-action policy affirmatively sanctioning the ongoing violation of federal law by up to

44

1.7 million aliens to whom Congress has repeatedly declined to extend immigration relief.

In the INA, Congress has provided a comprehensive, detailed scheme for affording certain aliens relief or reprieve from removal. See, *e.g.*, 8 U.S.C. 1158(b) (asylum), 1182(d)(5) (parole), 1229b (cancellation of removal), 1229c (voluntary departure), 1254a (temporary protected status). Those provisions set forth, often in significant detail, when and to whom such relief is available. Section 1229b(a), for example, provides the Attorney General discretion to cancel removal for non-lawful-permanent resident aliens only if the alien (i) has been physically present in the United States for ten years; (ii) has been a person of good moral character; (iii) has not been convicted of an aggravated felony; and (iv) removal would result in exceptional and extremely unusual hardship to the alien's U.S. citizen relative. 8 U.S.C. 1229b(b)(1)(D). Other provisions are similarly detailed. See, *e.g.*, 8 U.S.C. 1254a(b)(1) (defining criteria for temporary protected status).

Of course, DHS retains authority to address "interstitial matters" of immigration enforcement, *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) (citation omitted), but the DACA policy is hardly interstitial. It presumptively makes a class of more than a million illegal aliens, to whom the INA provides no recognition or special solicitude, eligible for reprieve from removal that the INA does not afford. And that forbearance, pursuant to longstanding regulations, in turn makes DACA recipients eligible to obtain affirmative assistance—*e.g.*, work authorization—to aid them in their continuing unlawful presence. See 8 C.F.R. 274a.12(c)(14). That is not a gap-filling measure in any meaningful sense. It is instead "an agency decision[] of

45

vast 'economic and political significance'" without any warrant from Congress. *Utility Air Regulatory Grp.* v. *EPA*, 573 U.S. 302, 324 (2014) (citation omitted). And "[w]hen an agency claims to discover in a long-extant statute an unheralded power" over important national affairs, this Court "typically greet[s] its announcement with a measure of skepticism." *Ibid.*

To be sure, the Court has recognized DHS's "broad discretion" in the enforcement of the federal immigration laws, *Arizona*, 567 U.S. at 396, including its ability to grant deferred action, *AADC*, 525 U.S. at 484. And, as a practical matter, DHS does not have the ability to vigorously enforce the immigration laws against every alien unlawfully present in the United States. Cf. *Regents* Supp. Br. App. 55a-56a. DHS therefore must establish enforcement priorities, and strategically deploy its resources to enforce the law. See 6 U.S.C. 202(5). But informing roughly 1.7 million aliens that they may continue violating federal law without fear of enforcement—while establishing a procedure to make them eligible for additional benefits—goes well beyond strategically directing the agency's resources to the highest priority violators. It instead deploys those resources on a massive scale in a manner that will undermine the deterrent effect of federal law by facilitating its continuing violation.

Regardless of the sympathetic circumstances of the aliens involved or the merits of deferred action as a general matter, "we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *Brown & Williamson*, 529 U.S. at 133. And the Secretary's general

46

powers to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. 202(5), and to "perform such other acts as he deems necessary for carrying out his authority under the [INA]," 8 U.S.C 1103(a)(3), simply do not provide the clarity that is required to authorize a nonenforcement policy of the nature and scope of DACA.

b. In reaching a contrary conclusion, the lower courts did not dispute the magnitude of the policy or identify any specific delegation on which DHS could rely. Rather, the lower courts principally rested on the vast disparity between the estimated number of aliens unlawfully within the United States and the resources available to DHS to enforce the immigration laws. *E.g.*, *Batalla Vidal* Pet. App. 95a. But at most, that justifies a decision not to deploy limited resources to remove low-priority targets. As explained above, however, it does not justify deploying those limited resources in a manner that *facilitates* ongoing violation of federal law by a massive number of aliens. There is an obvious difference between not pursuing lower-priority offenses (especially completed ones) and affirmatively assisting lower-priority offenders to persist in ongoing illegal activity.

The lower courts also identified several prior class-based deferred-action policies that they deemed analogous to DACA. *E.g.*, *Regents* Supp. Br. App. 13a, 56a. Although the courts did not spell out the theory, a previous memorandum from the Office of Legal Counsel (OLC), when addressing DAPA, observed that "Congress has long been aware of the practice of granting deferred action, including in its categorical variety, and of its salient features; and it has never acted to disap-

47

prove or limit the practice." J.A. 828. That memorandum further observed that, on several occasions, Congress has "either assumed that deferred action would be available in certain circumstances, or expressly directed that [it] be extended to certain categories of aliens." J.A. 828-829.

The OLC memorandum, however, does not undermine the Secretary's conclusion that DACA is unlawful. Even if legislation that "assume[s]" the existence of a DHS policy should be understood as ratifying that policy, J.A. 828, the prior deferred-action policies on which OLC relied are all easily distinguished.[8] To begin, they all used deferred action to provide certain aliens temporary relief while the aliens sought or awaited permanent status afforded by Congress—*e.g.*, while the alien's bona fide visa application awaited approval or until a visa actually issued following approval. They were also afforded to categories of aliens for whom Congress had

---

[8] See Memorandum from Paul W. Virtue, Acting Exec. Assoc. Comm'r, INS., to Reg'l Dirs. et al., INS, *Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* (May 6, 1997) (domestic violence victims whose visa applications had been approved, but were not immediately available); Memorandum from Stuart Anderson, Exec. Assoc. Comm'r, INS, to Johnny N. Williams, Exec. Assoc. Comm'r, INS, *Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status* (May 8, 2002) (possible victims of human trafficking with *bona fide* pending visa applications); Press Release, USCIS, *USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina* (Nov. 25, 2005) (aliens on nonimmigrant student visas temporarily displaced from their full course of study by Hurricane Katrina); Memorandum from Donald Neufeld, Acting Assoc. Dir., Office of Domestic Operations, USCIS, to Field Leadership, USCIS, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children* (Sept. 4, 2009) (widows and widowers of U.S. citizens previously eligible for visas, pending a statutory fix).

AR3958

48

expressed a special solicitude in the INA—*e.g.*, victims of domestic violence or human trafficking. And, importantly, they were far more limited in scope, "affecting only a few thousand aliens for months or, at most, a few years." *Texas*, 809 F.3d at 185 n.197. For these reasons, all of those policies might fairly be described as "interstitial" in nature. *Brown & Williamson*, 529 U.S. at 159 (citation omitted). They are categorically different from DACA.

As for the various other DHS discretionary-relief policies cited by the lower courts—on which OLC did not focus—they are also inapposite. See *Regents* Supp. Br. App. 11a-13a. Consider, for example, the "Family Fairness" policy, which the Ninth Circuit deemed a "salient" precedent. *Id.* at 12a. Under that policy, the Immigration and Nationality Service (INS) exercised its discretion, in certain circumstances, to grant so-called "extended voluntary departure" to the spouses and children of aliens who had been granted a pathway to legal status by the Immigration Reform and Control Act of 1986 (IRCA), Pub. L. No. 99-603, 100 Stat. 3359.[9] OLC has explained that extended voluntary departure was "derived from the voluntary departure statute," which, at the time, "permitted the Attorney General to make a finding of removability if an alien agreed to voluntarily depart the United States, without imposing a time limit for the alien's departure." J.A. 817 n.5 (citing 8 U.S.C.

---

[9] See *Recent Developments*, 64 No. 41 Interpreter Releases 1190, App. I at 1203-1204 (Oct. 26, 1987); Memorandum from Gene McNary, Comm'r, INS, to Reg'l Comm'rs, et. al., INS, *Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990).

49

1252(b) (1988 & Supp. II 1990)).  When created, Family Fairness and similar policies thus had a plausible basis in the INA.[10]  Congress has since set a time limit of 120 days for voluntary departure, and DHS has not granted an alien extended voluntary departure in more than 30 years.  *Ibid.*

Moreover, like the prior deferred-action policies, Family Fairness provided limited relief to aliens while they awaited permanent relief expressly provided by the INA.  See *Recent Developments*, 64 No. 41 Interpreter Releases 1190, App. I at 1202 (Oct. 26, 1987) (explaining that once an alien was approved for permanent resident status under IRCA, "the legalized alien will be eligible to bring in immediate relatives" under the INA).  Its scale also ultimately did not match that of DACA.  While some contemporaneous estimates stated that as many as 1.5 million aliens were eligible for relief under Family Fairness, *Regents* Supp. Br. App. 13a & n.3, other estimates by the INS suggested as few as 100,000 aliens would be affected.  *Recent Developments*, 67 No. 6 Interpreter Releases 153, 153 (Feb. 5, 1990); see *Recent Developments*, 67 No. 8 Interpreter Releases 201, 206 (Feb. 26, 1990).  In the end, fewer than 50,000 applications were reportedly received.  David Hancock, *Few Immigrants Use Family Aid Program*,

---

[10] In *Texas*, the United States argued that extended voluntary departure was distinct from statutory voluntary departure.  See U.S. Br. 48-49, *Texas*, *supra* (No. 15-674); U.S. Reply Br. 23 & n.3, *Texas*, *supra* (No. 15-674).  Whether or not that was correct, the INS at least purported to be implementing the voluntary-departure statute in granting extended voluntary departure.  See 43 Fed. Reg. 29,526, 29,528 (July 10, 1978) (describing extended voluntary departure as an exercise of the "authority contained in [8 U.S.C. 1252(b) (1976)] to allow aliens to depart voluntarily").  The same cannot be said here.

50

Miami Herald, 1990 WLNR 2016525 (Oct. 1, 1990).  In sum, neither Family Fairness nor other historical policies provide a basis for sustaining the very different DACA policy.

### 2. *DHS's legal conclusion provides ample basis for upholding the decision*

In any event, even if the Court disagrees with DHS's legal conclusion, DHS's decision to rescind DACA based on its own view of its legal authority—informed by the Fifth Circuit's decision, this Court's equally divided affirmance, and the Attorney General's opinion—was not the type of "clear error of judgment" that would make it arbitrary and capricious under the APA.  *State Farm*, 463 U.S. at 43 (citation omitted).

a. The Ninth Circuit and New York district court held that DHS could not rely on an assessment of DACA's legality unless the courts agreed that it was correct as a matter of law.  *Regents* Supp. Br. App. 46a; *Batalla Vidal* Pet. App. 91a.  Both courts relied on this Court's statement that "if [agency] action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law."  *SEC* v. *Chenery Corp.*, 318 U.S. 80, 94 (1943).  In *Chenery*, however, the agency was adjudicating the rights of various third parties in a company's reorganization plan.  *Id.* at 82-85.  Here, DHS was interpreting the scope of its own authority to maintain a discretionary policy of nonenforcement that no one claims was required by law.

That difference matters because, as a coordinate Branch, the Executive has an independent duty to determine whether it lacks authority to act.  And in the unique context of its decision whether or not to enforce the law, the Executive is entitled to act on its view of the

**AR3961**

51

bounds of its enforcement discretion even if the courts might disagree. For example, the Attorney General may direct United States Attorneys not to bring prosecutions that, in his view, would be unconstitutional—even if the courts might hold those prosecutions valid. There is nothing arbitrary and capricious about making such an enforcement decision based on the Executive's own view of what the law permits. So too here, DHS was entitled to stand on its view that DACA is an invalid exercise of prosecutorial discretion even if the courts would uphold it.

b. The D.C. district court declined to uphold the rescission on the basis of DHS's legal conclusion because, in its view, DHS did not adequately explain its change in position. *NAACP* Pet. App. 49a-55a; see *Encino Motorcars, LLC* v. *Navarro*, 136 S. Ct. 2117, 2125 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."). Of course, if DACA is unlawful, even an inadequate explanation could not provide a basis to overturn the agency's decision to rescind the unlawful policy. See *Morgan Stanley Capital Grp., Inc.* v. *Public Util. Dist. No. 1*, 554 U.S. 527, 544-545 (2008). But assuming a reasoned explanation were needed, the agency met that requirement here. DHS "display[ed] awareness that it [was] changing position," "show[ed] that there are good reasons for the new policy," and took into account any "serious reliance interests." *Encino Motorcars*, 136 S. Ct. at 2126 (citation omitted).

In both the Duke and Nielsen Memoranda, DHS plainly displayed an awareness that it was changing its policy and its legal view by issuing a memorandum rescinding DACA based, in part, on the legal concerns. *Regents* Pet. App. 117a, 122a. Both memoranda also

52

provided good reasons for that new position by discussing at length the intervening history of the DAPA litigation, including the Fifth Circuit's and this Court's decisions, and the Attorney General's view that DACA suffered from the same legal defects. *Id.* at 112a-117a, 122a-123a.  And to the extent the asserted reliance interests are cognizable, the Nielsen Memorandum elaborated on the reasons why they were insufficient to maintain the prior policy.  See pp. 42-43, *supra*.

The D.C. district court nevertheless reasoned that DHS did not "satisfy [its] obligation to explain its departure from its prior stated view that DACA was lawful."  *NAACP* Pet. App. 51a.  The court appeared to be referring to the prior OLC opinion.  See *Id.* at 53a-54a nn.22-23.  As noted, that opinion principally addressed the lawfulness of DAPA and another related deferred-action policy that DHS was considering.  In a footnote, the opinion reported that, before the announcement of the DACA policy, OLC had "orally advised" DHS of its "preliminary view" that the policy "would be permissible."  J.A. 827 n.8.  But of course, OLC's opinion had since been flatly rejected by the Fifth Circuit in an opinion that was affirmed by an equally divided vote in this Court.  And DHS made clear that it agrees with the robust analysis in the Fifth Circuit's intervening decision and that it sees no meaningful distinctions between the lawfulness of those policies and the lawfulness of the original DACA policy.  *Regents* Pet. App. 117a, 122a. The APA demands nothing more.

### D.  The Rescission Does Not Violate Equal Protection

Lastly, DACA's rescission does not violate the equal protection principles of the Fifth Amendment.  Respondents contend that DHS's exercise of enforcement discretion was motivated by discriminatory animus.

53

Although review of that constitutional claim is not foreclosed by Section 701(a)(2), see *Webster* v. *Doe*, 486 U.S. 592, 603-604 (1988); *Chaney*, 470 U.S. at 838, the claim fails on the merits for multiple reasons.

1. At the outset, a discriminatory-enforcement claim is not cognizable in the immigration context.  As the Court explained in *AADC*, "a selective prosecution claim is a *rara avis.*" 525 U.S. at 489.  Even in the ordinary criminal context, discriminatory-motive challenges to enforcement discretion "invade a special province of the Executive" and "'threaten[] to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry.'"  *Id.* at 489-490 (citation omitted).  In the immigration context, these concerns are "greatly magnified," because a selective-prosecution claim not only delays "just deserts," but "permit[s] and prolong[s] a continuing violation" of law.  *Id.* at 490.  Courts are also "ill equipped" to consider the authenticity or the adequacy of the foreign-policy considerations that motivate such decisions.  *Id.* at 491.  For those reasons, although the Court has "not rule[d] out the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome," as a general matter, "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation." *Id.* at 488, 491.

The Ninth Circuit and New York district court refused to dismiss the equal protection claim under *AADC*, reasoning that respondents had plausibly stated a claim under the general equal protection standard articulated in *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).  *Regents* Supp. Br. App. 73a-77a; *Batalla Vidal* Pet. App. 147a-

AR3964

54

157a.  The courts reasoned that, rather than asserting a selective enforcement claim "as a defense against * * * deportation," *AADC*, 525 U.S. at 488, respondents raise a "freestanding claim that the Executive Branch, motivated by animus, ended a program that overwhelmingly benefits a certain ethnic group."  *Regents* Supp. Br. App. 75a.  But the "program" the government ended was a policy of immigration enforcement that "benefit[ed]" the group by formally forbearing from removing them.  Contrary to the Ninth Circuit's puzzling assertion, a challenge to DHS's decision to rescind that policy as motivated by a discriminatory purpose directly implicates the *AADC* Court's concerns about "inhibiting prosecutorial discretion, allowing continuing violations of immigration law, and impacting foreign relations."  *Id.* at 76a.  Because DHS's facially neutral rescission of a nonenforcement policy is not the rare case where an exception to *AADC* may be warranted, respondents' claim fails.

2.  In any event, even under the *Arlington Heights* factors, respondents do not state a claim.  The courts below relied on three categories of allegations:  (1) the disparate impact of the rescission, noting that "93% of DACA recipients" are "Latinos and individuals of Mexican heritage"; (2) various "pre-presidential and post-presidential statements" made by President Trump almost entirely unrelated to the DACA policy or the decision to rescind; and (3) the "unusual history" behind the rescission.  *Regents* Supp. Br. App. 74a-75a (footnote omitted); see *Batalla Vidal* Pet. App. 152a-153a.  None of those factors, either alone or together, supports respondents' equal protection claim.

First, given the United States' natural immigration patterns, the disparate impact of the rescission of DACA

55

is neither surprising nor illuminating of the agency's motives. Indeed, if it were enough to state a claim that a broad-scale immigration decision disparately impacted individuals of any particular ethnicity, virtually any such decision could be challenged on that ground.

Second, the cited statements are equally irrelevant. Here, the relevant decisionmakers were Secretaries Duke and Nielsen, and there is no evidence that either harbored any discriminatory animus towards anyone. As the New York district court recognized, respondents "have not identified statements by Acting Secretary Duke or the Attorney General that would give rise to an inference of discriminatory motive," *Batalla Vidal* Pet. App. 156a, and the same goes for Secretary Nielsen. In any event, only one of the President's statements relied on by the lower courts even addresses DACA recipients and it reveals nothing more than the obvious fact that DACA has been an important part of legislative negotiations on immigration reform. See *Regents* Supp. Br. App. 74a-75a n.30 ("The Democrats have been told, and fully understand, that there can be no DACA without the desperately needed WALL at the Southern Border.") (citation omitted). And in fact, the President has repeatedly praised DACA recipients and urged Congress to "legalize" their protection. *Batalla Vidal* Pet. App. 156a; see J.A. 679 ("Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military?") (citation omitted); The White House, *Remarks by President Trump in Press Conference* (Feb. 16, 2017), https://go.usa.gov/xVYjF ("But the DACA situation is a very, very—it's a very difficult thing for me. Because, you know, I love these kids.").

56

Finally, there is nothing remotely "unusual" about the history of the rescission. On February 20, 2017, then-Secretary of Homeland John Kelly announced a general policy against exercising immigration enforcement discretion "in a manner that exempts or excludes a specified class or category of aliens." J.A. 863. At the time, Secretary Kelly carved out DACA, expanded DACA, and DAPA from that policy. J.A. 858. In June 2017, Secretary Kelly announced that, "[a]fter consulting with the Attorney General" and in light of the ongoing *Texas* litigation, he was rescinding the DAPA and expanded DACA policies, while DACA "remain[ed] in effect." J.A. 870-871. And in September 2017, Acting Secretary Duke rescinded DACA as well. *Regents* Pet. App. 111a. Far from a "strange about-face," *Regents* Supp. Br. App. 75a, the rescission of DACA was the logical consequence of a general policy approach adopted at the beginning of this Administration and, after careful deliberation, gradually extended to the most controversial of such policies.

The Ninth Circuit approvingly quoted the district court's description of the Duke Memorandum as "hurriedly cast[ing] aside" a policy that had recently been "reaffirm[ed]" on the basis of "what seems to have been a contrived excuse (its purported illegality)." *Regents* Pet. App. 86a; see *Regents* Supp. Br. App. 75a. But the court's description omits key facts: two weeks after Secretary Kelly rescinded the DAPA and expanded DACA policies, the *Texas* plaintiffs indicated their intent to challenge the original DACA policy, and the Attorney General informed the Acting Secretary that he had concluded that the policy was unlawful based in significant part on the *Texas* litigation invalidating the DAPA and expanded DACA policies. Both of those

**AR3967**

57

facts provide ample explanation for the policy change and its timing.

In short, whether considered separately or collectively under either *AADC* or *Arlington Heights*, respondents' allegations are wholly insufficient to show that Secretaries Duke and Nielsen were motivated by racial animus in deciding to rescind a policy sanctioning the ongoing violation of federal immigration law by 700,000 aliens, especially given the serious questions about its legality.  Respondents' equal protection claim fails as a matter of law, and cannot provide a basis for affirming the orders and judgments below.

### CONCLUSION

The judgments of the Ninth Circuit and the District Court for the District of Columbia, as well as the orders of the Eastern District of New York, should be reversed.

Respectfully submitted.

NOEL J. FRANCISCO
   *Solicitor General*
JOSEPH H. HUNT
   *Assistant Attorney*
   *General*
JEFFREY B. WALL
   *Deputy Solicitor General*
HASHIM M. MOOPPAN
   *Deputy Assistant Attorney*
   *General*
JONATHAN Y. ELLIS
   *Assistant to the Solicitor*
   *General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
   *Attorneys*

AUGUST 2019

## APPENDIX

1.   U.S. Const. Amend. V provides:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

2.   5 U.S.C. 701 provides:

**Application; definitions**

(a)   This chapter applies, according to the provisions thereof, except to the extent that—

(1)   statutes preclude judicial review; or

(2)   agency action is committed to agency discretion by law.

(b)   For the purpose of this chapter—

(1)   "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

(A)   the Congress;

(B)   the courts of the United States;

(1a)

2a

  (C) the governments of the territories or possessions of the United States;

  (D) the government of the District of Columbia;

  (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

  (F) courts martial and military commissions;

  (G) military authority exercised in the field in time of war or in occupied territory; or

  (H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix; and

  (2) "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.


3. 5 U.S.C. 706 provides:

**Scope of review**

 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

  (1) compel agency action unlawfully withheld or unreasonably delayed; and

**AR3970**

3a

(2)   hold unlawful and set aside agency action, findings, and conclusions found to be—

(A)   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)   contrary to constitutional right, power, privilege, or immunity;

(C)   in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)   without observance of procedure required by law;

(E)   unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)   unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.


4.   6 U.S.C. 202 (2012 & Supp. V 2017) provides:

**Border, maritime, and transportation responsibilities**

The Secretary shall be responsible for the following:

(1)   Preventing the entry of terrorists and the instruments of terrorism into the United States.

4a

(2)   Securing the borders, territorial waters, ports, terminals, waterways, and air, land, and sea transportation systems of the United States, including managing and coordinating those functions transferred to the Department at ports of entry.

(3)   Carrying out the immigration enforcement functions vested by statute in, or performed by, the Commissioner of Immigration and Naturalization (or any officer, employee, or component of the Immigration and Naturalization Service) immediately before the date on which the transfer of functions specified under section 251 of this title takes effect.

(4)   Establishing and administering rules, in accordance with section 236 of this title, governing the granting of visas or other forms of permission, including parole, to enter the United States to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States.

(5)   Establishing national immigration enforcement policies and priorities.

(6)   Except as provided in part C of this subchapter, administering the customs laws of the United States.

(7)   Conducting the inspection and related administrative functions of the Department of Agriculture transferred to the Secretary of Homeland Security under section 231 of this title.

(8)   In carrying out the foregoing responsibilities, ensuring the speedy, orderly, and efficient flow of lawful traffic and commerce.

5a

5.   8 U.S.C. 1103 provides in pertinent part:

**Powers and duties of the Secretary, the Under Secretary, and the Attorney General**

**(a)   Secretary of Homeland Security**

(1)   The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers:   *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

(2)   He shall have control, direction, and supervision of all employees and of all the files and records of the Service.

(3)   He shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter.

(4)   He may require or authorize any employee of the Service or the Department of Justice to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon any other employee of the Service.

(5)   He shall have the power and duty to control and guard the boundaries and borders of the United States

6a

against the illegal entry of aliens and shall, in his discretion, appoint for that purpose such number of employees of the Service as to him shall appear necessary and proper.

(6)   He is authorized to confer or impose upon any employee of the United States, with the consent of the head of the Department or other independent establishment under whose jurisdiction the employee is serving, any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service.

(7)   He may, with the concurrence of the Secretary of State, establish offices of the Service in foreign countries; and, after consultation with the Secretary of State, he may, whenever in his judgment such action may be necessary to accomplish the purposes of this chapter, detail employees of the Service for duty in foreign countries.

(8)   After consultation with the Secretary of State, the Attorney General may authorize officers of a foreign country to be stationed at preclearance facilities in the United States for the purpose of ensuring that persons traveling from or through the United States to that foreign country comply with that country's immigration and related laws.

(9)   Those officers may exercise such authority and perform such duties as United States immigration officers are authorized to exercise and perform in that foreign country under reciprocal agreement, and they shall enjoy such reasonable privileges and immunities necessary for the performance of their duties as the government of their country extends to United States immigration officers.

7a

(10)  In the event the Attorney General determines that an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate Federal response, the Attorney General may authorize any State or local law enforcement officer, with the consent of the head of the department, agency, or establishment under whose jurisdiction the individual is serving, to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service.

(11)  The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized—

(A)  to make payments from funds appropriated for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law under an agreement with a State or political subdivision of a State; and

(B)  to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service.

\*    \*    \*    \*    \*

8a

**(g)   Attorney General**

**(1)   In general**

The Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

**(2)   Powers**

The Attorney General shall establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section.

AR3976

9a

6.   8 U.S.C. 1252 provides:

**Judicial review of orders of removal**

**(a)   Applicable provisions**

  **(1)   General orders of removal**

   Judicial review of a final order of removal (other than an order of removal without a hearing pursuant to section 1225(b)(1) of this title) is governed only by chapter 158 of title 28, except as provided in subsection (b) of this section and except that the court may not order the taking of additional evidence under section 2347(c) of such title.

  **(2)   Matters not subject to judicial review**

   **(A)   Review relating to section 1225(b)(1)**

    Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review—

     (i)   except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title,

     (ii)   except as provided in subsection (e) of this section, a decision by the Attorney General to invoke the provisions of such section,

     (iii)   the application of such section to individual aliens, including the determination made under section 1225(b)(1)(B) of this title, or

AR3977

10a

(iv)  except as provided in subsection (e) of this section, procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title.

**(B)   Denials of discretionary relief**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—

(i)   any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or

(ii)   any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

**(C)   Orders against criminal aliens**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), no court shall have jurisdiction to review any final order of removal against an alien who is removable by rea-

AR3978

11a

son of having committed a criminal offense covered in section 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D) of this title, or any offense covered by section 1227(a)(2)(A)(ii) of this title for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 1227(a)(2)(A)(i) of this title.

**(D)   Judicial review of certain legal claims**

Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

**(3)   Treatment of certain decisions**

No alien shall have a right to appeal from a decision of an immigration judge which is based solely on a certification described in section 1229a(c)(1)(B) of this title.

**(4)   Claims under the United Nations Convention**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment, except as provided in subsection (e).

12a

**(5)  Exclusive means of review**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in subsection (e).   For purposes of this chapter, in every provision that limits or eliminates judicial review or jurisdiction to review, the terms "judicial review" and "jurisdiction to review" include habeas corpus review pursuant to section 2241 of title 28, or any other habeas corpus provision, sections 1361 and 1651 of such title, and review pursuant to any other provision of law (statutory or nonstatutory).

**(b)  Requirements for review of orders of removal**

With respect to review of an order of removal under subsection (a)(1), the following requirements apply:

**(1)  Deadline**

The petition for review must be filed not later than 30 days after the date of the final order of removal.

**(2)  Venue and forms**

The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings.   The record and briefs do not have to be printed.   The court of appeals shall review the proceeding on a typewritten record and on typewritten briefs.

13a

**(3)   Service**

**(A)   In general**

The respondent is the Attorney General.   The petition shall be served on the Attorney General and on the officer or employee of the Service in charge of the Service district in which the final order of removal under section 1229a of this title was entered.

**(B)   Stay of order**

Service of the petition on the officer or employee does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise.

**(C)   Alien's brief**

The alien shall serve and file a brief in connection with a petition for judicial review not later than 40 days after the date on which the administrative record is available, and may serve and file a reply brief not later than 14 days after service of the brief of the Attorney General, and the court may not extend these deadlines except upon motion for good cause shown.   If an alien fails to file a brief within the time provided in this paragraph, the court shall dismiss the appeal unless a manifest injustice would result.

**(4)   Scope and standard for review**

Except as provided in paragraph (5)(B)—

(A)   the court of appeals shall decide the petition only on the administrative record on which the order of removal is based,

14a

(B)    the administrative findings of fact are con-clusive unless any reasonable adjudicator would be compelled to conclude to the contrary,

(C)    a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law, and

(D)    the Attorney General's discretionary judg-ment whether to grant relief under section 1158(a) of this title shall be conclusive unless manifestly contrary to the law and an abuse of discretion.

No court shall reverse a determination made by a trier of fact with respect to the availability of corrobo-rating evidence, as described in section 1158(b)(1)(B), 1229a(c)(4)(B), or 1231(b)(3)(C) of this title, unless the court finds, pursuant to subsection (b)(4)(B) of this section, that a reasonable trier of fact is com-pelled to conclude that such corroborating evidence is unavailable.

**(5)    Treatment of nationality claims**

**(A)    Court determination if no issue of fact**

If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality claim.

**(B)    Transfer if issue of fact**

If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the peti-tioner's nationality is presented, the court shall

AR3982

15a

transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of title 28.

**(C)   Limitation on determination**

The petitioner may have such nationality claim decided only as provided in this paragraph.

**(6)   Consolidation with review of motions to reopen or reconsider**

When a petitioner seeks review of an order under this section, any review sought of a motion to reopen or reconsider the order shall be consolidated with the review of the order.

**(7)   Challenge to validity of orders in certain criminal proceedings**

**(A)   In general**

If the validity of an order of removal has not been judicially decided, a defendant in a criminal proceeding charged with violating section 1253(a) of this title may challenge the validity of the order in the criminal proceeding only by filing a separate motion before trial.   The district court, without a jury, shall decide the motion before trial.

**(B)   Claims of United States nationality**

If the defendant claims in the motion to be a national of the United States and the district court finds that—

16a

(i)   no genuine issue of material fact about the defendant's nationality is presented, the court shall decide the motion only on the administrative record on which the removal order is based and the administrative findings of fact are conclusive if supported by reasonable, substantial, and probative evidence on the record considered as a whole; or

(ii)   a genuine issue of material fact about the defendant's nationality is presented, the court shall hold a new hearing on the nationality claim and decide that claim as if an action had been brought under section 2201 of title 28.

The defendant may have such nationality claim decided only as provided in this subparagraph.

**(C)   Consequence of invalidation**

If the district court rules that the removal order is invalid, the court shall dismiss the indictment for violation of section 1253(a) of this title.   The United States Government may appeal the dismissal to the court of appeals for the appropriate circuit within 30 days after the date of the dismissal.

**(D)   Limitation on filing petitions for review**

The defendant in a criminal proceeding under section 1253(a) of this title may not file a petition for review under subsection (a) during the criminal proceeding.

**(8)   Construction**

This subsection—

AR3984

17a

(A)   does not prevent the Attorney General, after a final order of removal has been issued, from detaining the alien under section 1231(a) of this title;

(B)   does not relieve the alien from complying with section 1231(a)(4) of this title and section 1253(g)[1] of this title; and

(C)   does not require the Attorney General to defer removal of the alien.

**(9)   Consolidation of questions for judicial review**

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.   Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

**(c)   Requirements for petition**

A petition for review or for habeas corpus of an order of removal—

(1)   shall attach a copy of such order, and

(2)   shall state whether a court has upheld the validity of the order, and, if so, shall state the name

---

[1]  See References in Text note below.

18a

of the court, the date of the court's ruling, and the kind of proceeding.

**(d)   Review of final orders**

A court may review a final order of removal only if—

(1)    the alien has exhausted all administrative remedies available to the alien as of right, and

(2)    another court has not decided the validity of the order, unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding or that the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of the order.

**(e)   Judicial review of orders under section 1225(b)(1)**

**(1)   Limitations on relief**

Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may—

(A)    enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection, or

(B)    certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized under a subsequent paragraph of this subsection.

AR3986

19a

**(2)   Habeas corpus proceedings**

Judicial review of any determination made under section 1225(b)(1) of this title is available in habeas corpus proceedings, but shall be limited to determinations of—

(A)   whether the petitioner is an alien,

(B)   whether the petitioner was ordered removed under such section, and

(C)   whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title, such status not having been terminated, and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 1225(b)(1)(C) of this title.

**(3)   Challenges on validity of the system**

**(A)   In general**

Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of—

(i)   whether such section, or any regulation issued to implement such section, is constitutional; or

(ii)   whether such a regulation, or a written policy directive, written policy guideline, or

20a

written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

**(B) Deadlines for bringing actions**

Any action instituted under this paragraph must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure described in clause (i) or (ii) of subparagraph (A) is first implemented.

**(C) Notice of appeal**

A notice of appeal of an order issued by the District Court under this paragraph may be filed not later than 30 days after the date of issuance of such order.

**(D) Expeditious consideration of cases**

It shall be the duty of the District Court, the Court of Appeals, and the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any case considered under this paragraph.

**(4) Decision**

In any case where the court determines that the petitioner—

(A) is an alien who was not ordered removed under section 1225(b)(1) of this title, or

(B) has demonstrated by a preponderance of the evidence that the alien is an alien lawfully ad-

AR3988

21a

mitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title, the court may order no remedy or relief other than to require that the petitioner be provided a hearing in accordance with section 1229a of this title.   Any alien who is provided a hearing under section 1229a of this title pursuant to this paragraph may thereafter obtain judicial review of any resulting final order of removal pursuant to subsection (a)(1).

**(5)   Scope of inquiry**

In determining whether an alien has been ordered removed under section 1225(b)(1) of this title, the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner.   There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

**(f)   Limit on injunctive relief**

**(1)   In general**

Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

22a

**(2)   Particular cases**

Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law.

**(g)   Exclusive jurisdiction**

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

AR3990

Nos. 18-587, 18-588, 18-589

# In the Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, *et al., Petitioners*,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, *et al., Respondents*.

*ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, *et al., Petitioners*,

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al., Respondents*.

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT*

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, *et al., Petitioners*,

v.

MARTÍN JONATHAN BATALLA VIDAL, *et al., Respondents*.

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT*

## BRIEF OF RESPONDENTS THE STATES OF CALIFORNIA, MAINE, MARYLAND, AND MINNESOTA

XAVIER BECERRA
 *Attorney General of California*
MICHAEL J. MONGAN*
 *Solicitor General*
MICHAEL L. NEWMAN
 *Senior Assistant Attorney General*
SAMUEL P. SIEGEL
JOSHUA PATASHNIK
 *Deputy Solicitors General*
SHUBHRA SHIVPURI
JAMES F. ZAHRADKA II
 *Deputy Attorneys General*
455 Golden Gate Ave.
San Francisco, CA 94102
(415) 510-3920
Michael.Mongan@doj.ca.gov

September 27, 2019          *Counsel of Record*

(*Additional counsel listed on inside cover*)

AR3991

AARON M. FREY
  *Attorney General of Maine*
SUSAN P. HERMAN
  *Deputy Attorney General*
6 State House Station
Augusta, ME  04333

BRIAN E. FROSH
  *Attorney General*
  *of Maryland*
STEVEN M. SULLIVAN
  *Solicitor General*
LEAH J. TULIN
  *Assistant Attorney General*
200 Saint Paul Place
20th Floor
Baltimore, MD  21202

KEITH ELLISON
  *Attorney General*
  *of Minnesota*
LIZ KRAMER
  *Solicitor General*
JACOB CAMPION
  *Assistant Attorney General*
445 Minnesota Street
Suite 1100
St. Paul, MN  55101

**AR3992**

i

## QUESTIONS PRESENTED

Whether the district courts in these consolidated cases properly held (i) that petitioners' September 2017 decision to terminate the Deferred Action for Childhood Arrivals policy is subject to judicial review under the Administrative Procedure Act, (ii) that the decision violated or likely violated the Act, and (iii) that petitioners' motions to dismiss certain other claims that remain pending in the California and New York proceedings should be denied.

**AR3993**

# TABLE OF CONTENTS

**Page**

Introduction .................................................... 1

Statement ...................................................... 2

    A.  Legal and factual background ...................... 2

    B.  Procedural background ................................ 7

Summary of argument ........................................ 11

Argument ...................................................... 13

I.  The decision to terminate DACA is subject to judicial review ............................................ 13

    A.  The termination decision is not "committed to agency discretion by law" ............. 13

    B.  New rationales advanced by petitioners after the termination decision do not make it unreviewable ........................... 21

    C.  Section 1252 does not bar review ................ 23

II.  The termination decision is invalid under the APA ...................................................... 23

    A.  The agency's stated premise that DACA is unlawful is incorrect ..................... 25

        1.  Deferred action is lawful ....................... 25

        2.  Class-based deferred action policies are a permissible policy tool .......... 27

        3.  DACA is a permissible class-based deferred action policy ............................ 31

        4.  The agency's assertion that DACA is illegal rests on a mistaken legal premise ................................................. 34

AR3994

## TABLE OF CONTENTS
## (continued)

                                                                    Page

B.  The agency's explanation for its deci-
    sion does not satisfy the APA's require-
    ments for reasoned decisionmaking ............ 41

C.  Alternative rationales advanced by pe-
    titioners during this litigation cannot
    save the termination decision ..................... 45

    1.  "Litigation risk" .................................... 45

    1.  Former Secretary Nielsen's policy
        rationales ............................................. 47

III. The judgments of the courts below should
     be affirmed ............................................... 52

Conclusion ................................................................. 55

**AR3995**

# TABLE OF AUTHORITIES

**Page**

CASES

*Arizona v. United States*
    567 U.S. 387 (2012) .............................. 3, 31, 32, 34

*Arpaio v. Obama*
    797 F.3d 11 (D.C. Cir. 2015) ................................. 4

*Burlington Truck Lines, Inc. v. United States*
    371 U.S. 156 (1962) .............................................. 45

*Camp v. Pitts*
    411 U.S. 138 (1973) (per curiam)................. *passim*

*Casa de Md. v. DHS*
    924 F.3d 684 (4th Cir. 2019) .................... 20, 41, 45

*Checkosky v. SEC*
    23 F.3d 452 (D.C. Cir. 1994) (per curiam)........... 48

*Cheng Fan Kwok v. INS*
    392 U.S. 206 (1968) .............................................. 15

*Citizens to Preserve Overton Park, Inc. v. Volpe*
    401 U.S. 402 (1971) .................................. 14, 48, 51

*City of Arlington v. FCC*
    569 U.S. 290 (2013) .............................................. 19

*Cooter & Gell v. Hartmarx Corp.*
    496 U.S. 384 (1990) .............................................. 41

v

## TABLE OF AUTHORITIES
### (continued)

Page

*Crane v. Johnson*
   783 F.3d 244 (5th Cir. 2015) .................................. 4

*Crawford v. Silette*
   608 F.3d 275 (5th Cir. 2010) ............................... 47

*Dep't of Commerce v. New York*
   139 S. Ct. 2551 (2019) ................................. *passim*

*Encino Motorcars, LLC v. Navarro*
   136 S. Ct. 2117 (2016) .......................................... 41

*Envtl. Def. Fund, Inc. v. Costle*
   657 F.2d 275 (D.C. Cir. 1981) ............................. 49

*FCC v. Fox Television Stations, Inc.*
   556 U.S. 502 (2009) ....................................... 41, 43

*FDA v. Brown & Williamson Tobacco Corp.*
   529 U.S. 120 (2000) ............................................. 39

*Fla. Power & Light Co. v. Lorion*
   470 U.S. 729 (1985) ............................................. 48

*Foti v. INS*
   375 U.S. 217 (1963) ............................................. 15

*Franklin v. Massachusetts*
   505 U.S. 788 (1992) ....................................... 14, 19

*Heckler v. Chaney*
   470 U.S. 821 (1985) ..................................... *passim*

AR3997

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Hotel & Rest. Emps. Union v. Smith*
   846 F.2d 1499 (D.C. Cir. 1988) (en banc) ........ 3, 27

*ICC v. Bhd. of Locomotive Eng'rs*
   482 U.S. 270 (1987) ................................. 15, 20, 21

*In re United States*
   138 S. Ct. 443 (2017) (per curiam).................. 7, 53

*In re United States*
   875 F.3d 1200 (9th Cir. 2017) ............................. 54

*Kisor v. Wilkie*
   139 S. Ct. 2400 (2019) ................................... 18, 19

*Lincoln v. Vigil*
   508 U.S. 182 (1995) ....................................... 14, 15

*Local 814, Int'l Bhd. of Teamsters,*
   *Chauffeurs, Warehousemen v. NLRB*
   546 F.2d 989 (D.C. Cir. 1976) ............................. 49

*Mont. Air Chapter No. 29, Ass'n of*
   *Civilian Technicians, Inc. v. FLRA*
   898 F.2d 753 (1990)............................................. 20

*Motor Vehicle Mfrs. Ass'n of the U.S.,*
   *Inc. v. State Farm Mut. Auto. Ins. Co.*
   463 U.S. 29 (1983) ......................................... 25, 41

*NAACP v. Trump*
   321 F. Supp. 3d 143 (D.D.C. 2018) ...................... 11

**AR3998**

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Newman v. Apfel*
   223 F.3d 937 (9th Cir. 2000) ............................... 44

*NLRB v. Bell Aerospace Co.*
   416 U.S. 267 (1974) .............................................. 39

*Noel v. Chapman*
   508 F.2d 1023 (2d Cir. 1975)............................... 15

*OSG Bulk Ships, Inc. v. United States*
   132 F.3d 808 (D.C. Cir 1998) .............................. 17

*Red Lion Broad. Co. v. FCC*
   395 U.S. 367 (1969) .............................................. 36

*Reno v. Am.-Arab Anti-Discrimination Comm.*
   525 U.S. 471 (1999) ........................ 3, 23, 25, 28, 35

*Republic of Argentina v. NML Capital, Ltd.*
   573 U.S. 134 (2014) .............................................. 53

*SAS Inst., Inc. v. Iancu*
   138 S. Ct. 1348 (2018) ......................................... 23

*Sea-Land Serv., Inc. v. Dep't of Transp.*
   137 F.3d 640 (D.C. Cir. 1998) ............................. 41

*SEC v. Chenery Corp.*
   318 U.S. 80 (1943) (*Chenery I*) ............... 24, 25, 41

*SEC v. Chenery Corp.*
   332 U.S. 194 (1947) (*Chenery II*)............. 34, 46, 48

**AR3999**

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Texas v. United States*
   328 F. Supp. 3d 662 (S.D. Tex. 2018) ........... 33, 47

*Texas v. United States*
   809 F.3d 134 (5th Cir. 2015) ....................... *passim*

*Texas v. United States*
   86 F. Supp. 3d 591 (S.D. Tex. 2015) .................... 5

*Trump v. Int'l Refugee Assistance Project*
   137 S. Ct. 2080 (2017) ................................... 42, 49

*United States v. Texas*
   136 S. Ct. 2271 (2016) (per curiam)................. 5, 6

*United Steel v. Mine Safety & Health Admin.*
   925 F.3d 1279 (D.C. Cir. 2019) ........................... 48

*Weyerhaeuser Co. v. U.S. Fish &*
*Wildlife Serv.*
   139 S. Ct. 361 (2018) .......................................... 14

*Wong Wing Hang v. INS*
   360 F.2d 715 (2d Cir. 1966)................................. 15

**STATUTES**

5 U.S.C.
   § 701(a)(1) ....................................................... 23
   § 701(a)(2) ................................................. *passim*
   § 702................................................................ 14
   § 706................................................................ 18
   § 706(2)(A) ................................................ *passim*

**AR4000**

**TABLE OF AUTHORITIES**
(continued)

Page

6 U.S.C.

§ 202(5) ............................................................ 3, 40

8 U.S.C.

§ 1101(a)(27)(J) ................................................... 32
§ 1103 .................................................................. 26
§ 1103(a)(1) .............................................. 3, 17, 40
§ 1103(a)(3) ...................................................... 3, 40
§ 1154(a)(1)(D)(i)(II) ...................................... 29, 36
§ 1154(a)(1)(D)(i)(IV) ..................................... 29, 36
§ 1158(a)(2)(E) ...................................................... 32
§ 1182(a)(9)(B)(ii) ................................................. 26
§ 1182(a)(9)(B)(iii)(I) ........................................... 32
§ 1182(d)(5)(A) ....................................................... 3
§ 1227(d)(2) ...................................................... 26, 29
§ 1229b(b)(1) ......................................................... 32
§ 1252 ...................................................................... 9
§ 1252(b)(9) ........................................................... 23
§ 1252(g) ............................................................... 23
§ 1254a .................................................................... 3
§ 1324a(h)(3) .................................................. 26, 39
§ 1439 .................................................................... 32
§ 1611(b)(2)-(4) .................................................... 27

49 U.S.C.

§ 30301 note .................................................. 26, 29

Consolidated Appropriations Act, 2016,
   Pub. L. No. 114-113, 129 Stat. 2242 .................... 32

AR4001

x

# TABLE OF AUTHORITIES
## (continued)

**Page**

Dep't of Homeland Sec. Appropriations
   Act, 2010, Pub. Law 111-83, 123
   Stat. 2142.................................................... 30

Dep't of State Authorization Act, Pub. L.
   No. 98-164, 97 Stat. 1017 (1983) ........................ 29

Immigration Act of 1990, Pub. L. No.
   101-649, 104 Stat. 4978 ................................. 29, 31

REGULATIONS

8 C.F.R.
   § 1.3(a)(4)(vi).................................................... 4, 27
   § 214.14(d)(3) .................................................... 4, 26
   § 274a.12(c)(14) ......................................... 4, 26, 38

28 C.F.R.
   § 1100.35(b)(2) .................................................... 4, 26

OTHER AUTHORITIES

129 Cong. Rec. 25,324 (1983) .................................... 29

46 Fed. Reg. 25,080 (May 5, 1981) ............................ 26

55 Fed. Reg. 6058 (Feb. 21, 1990) ............................ 28

84 No. 36 Interpreter Releases 2125
   (Sept. 17, 2007)..................................................... 30

96 No. 14 Interpreter Releases 14
   (April 1, 2019)........................................................ 30

**AR4002**

## TABLE OF AUTHORITIES
### (continued)

**Page**

Bruno, et al., Cong. Research Serv.,
*Analysis of June 15, 2012 DHS
Memorandum* (July 13, 2012),
https://tinyurl.com/y5muva2y.............................27

DREAM Act of 2010, H.R. 5281, 111th
Cong. (2010)...........................................................36

Friendly, *Chenery Revisited*, 1969 Duke
L.J. 199, 209 (1969)..............................................48

H.R. 29, 114th Cong. (2015) ......................................36

H.R. Rep. No. 100-627 (1988).............................28, 30

*Immigration Act of 1989: Hearing Before
the Subcomm. on Immigration,
Refugees, and Int'l Law of the House
Comm. on the Judiciary*, 101st
Cong., 2d Sess. pt. 2 (1990)..................................28

Memorandum from Donald Neufeld,
Acting Assoc. Dir., Office of Domestic
Operations, USCIS to Field
Leadership, *Guidance Regarding
Surviving Spouses of Deceased U.S.
Citizens and their Children* (June 15,
2009....................................................................30

Memorandum from Gene McNary,
Commissioner, INS to Reg'l
Comm'rs, *Re: Family Fairness* (Feb.
2, 1990) ...............................................................28

**AR4003**

**TABLE OF AUTHORITIES**
**(continued)**

Page

USCIS, *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake Biometrics and Case Status, Fiscal Year 2012-2017* (June 30, 2017), https://tinyurl.com/ y868mj7y ............................................................. 43

USCIS, *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake and Case Status, Fiscal Year 2012-2019* (Apr. 30 2019), https://tinyurl.com/y59zwrtd ............. 32, 33

## INTRODUCTION

The Deferred Action for Childhood Arrivals policy enables certain young people to apply for deferred action, a form of discretionary immigration relief, on an individual basis. Those eligible for consideration under DACA arrived in the United States as children and many of them have never known any other home. All are either enrolled in school, have completed it, or have served honorably in our armed forces. DACA recipients contribute to their States and the Nation as employees, parents, and productive members of our communities. Deferred action affords them a measure of stability and reassurance as they go about their lives and careers here. As a policy, DACA has enjoyed widespread support. As a legal matter, it is grounded in the Executive Branch's broad authority to set priorities and exercise discretion in enforcing the immigration laws, and is consistent with similar class-based discretionary relief policies adopted over the last six decades.

In September 2017, however, petitioners decided to terminate the DACA policy. The decision memorandum, signed by then-Acting Secretary of Homeland Security Duke, offered only one rationale: that DACA was unlawful. It cited a one-page letter from then-Attorney General Sessions asserting that the policy was unconstitutional and beyond the agency's statutory authority.

The respondents in the proceedings now before this Court filed suits challenging the termination decision in district courts in California, New York, and the District of Columbia. All three courts held that the decision was subject to review under the Administrative Procedure Act, in light of the legal rationale proffered for the action. The California and New York district

**AR4005**

courts granted preliminary injunctions on the ground that the agency's stated legal premise was incorrect, and the Ninth Circuit has since affirmed the grant of preliminary relief in the California proceeding. The D.C. district court vacated the agency's decision on the ground that the legal premise was, at a minimum, inadequately explained. Those rulings are correct, and the termination decision may be vacated on either ground identified by the courts below.

Petitioners complain that the lower courts "have forced DHS to maintain this entirely discretionary policy for nearly two years." U.S. Br. 16. In fact, no court has held that "DACA *could not* be rescinded as an exercise of Executive Branch discretion." *Regents* Supp. App. 57a; *see NAACP* Pet. App. 108a-109a; *Batalla Vidal* Pet. App. 67a. On the contrary, the courts below have recognized and highlighted the Executive's wide discretion in setting policies regarding immigration enforcement. So far, however, petitioners have chosen to stand by their original decision, which is based not on policy grounds but on the assertion that DACA is unlawful. That decision must stand or fall on the contemporaneous rationale that the agency chose to offer as the public basis for its action. *See, e.g.*, *Camp v. Pitts*, 411 U.S. 138, 142-143 (1973) (per curiam). It cannot be sustained on that basis.

## STATEMENT

### A. Legal and Factual Background

1. Congress has granted the Executive Branch broad authority with respect to immigration enforcement. It has charged the Secretary of Homeland Security "with the administration and enforcement of" the Immigration and Nationality Act "and all other laws relating to . . . immigration and naturalization,"

8 U.S.C. § 1103(a)(1); directed him to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority," *id.* § 1103(a)(3); and made him responsible for "[e]stablishing national immigration enforcement policies and priorities," 6 U.S.C. § 202(5).

That responsibility carries with it an obligation to exercise "broad discretion" in enforcing the immigration laws. *Arizona v. United States*, 567 U.S. 387, 396 (2012). Such discretion is a "principal feature of the removal system." *Id.* It is inherent in the fact that the federal government cannot realistically remove every undocumented immigrant, *see Regents* Supp. App. 55a-56a—even if doing so were desirable as a policy matter. And it "embraces immediate human concerns" and the "equities of an individual case," such as whether an immigrant has "long ties to the community, or a record of distinguished military service." *Arizona*, 567 U.S. at 396.

The authority to exercise discretion takes several forms. Some are specifically authorized by statute. *See, e.g.*, 8 U.S.C. § 1182(d)(5)(A) (parole); *id.* § 1254a (temporary protected status). Others have been recognized as inherent in the Executive's authority in this area. *See* J.A. 817 n.5 (deferred enforced departure); *Hotel & Rest. Emps. Union v. Smith*, 846 F.2d 1499, 1519 (D.C. Cir. 1988) (en banc) (opinion of Silberman, J.) (extended voluntary departure).

This case involves deferred action, a "regular practice" in which the Executive decides that "no action will thereafter be taken to proceed against an apparently deportable alien." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999) (quoting 6 Gordon et al., *Immigration Law and Procedure*

**AR4007**

§ 72.03[2][h] (1998)). Under longstanding federal regulations, the validity of which is not disputed here, recipients of deferred action may seek work authorization and receive certain other limited benefits. *See* 8 C.F.R. §§ 1.3(a)(4)(vi), 214.14(d)(3), 274a.12(c)(14); 28 C.F.R. § 1100.35(b)(2). Like other forms of discretionary immigration relief, deferred action may be exercised on a purely ad hoc basis, or through policies that provide a framework to guide individualized decisions for applicants in a particular class. For nearly 60 years, the Executive Branch has operated dozens of class-based discretionary relief policies, including several that involved deferred action. *See* J.A. 821-826.

2. Established in 2012, DACA creates a framework guiding deferred action decisions regarding "certain young people who were brought to this country as children," many of whom "know only this country as home." *Regents* Pet. App. 97a-98a. Individuals who obtain deferred action under DACA receive a provisional grant of forbearance from removal for a two-year period, subject to renewal. *Id.* at 98a-101a. They do not gain any lawful immigration status, and immigration officials retain the ability to commence removal proceedings against them at any time. J.A. 819.

Before the Secretary announced DACA, the Office of Legal Counsel at the Department of Justice advised that a policy such as DACA would be legally sound so long as immigration officials "retained discretion to evaluate [its] application on an individualized basis." J.A. 827 n.8. After the Secretary implemented DACA, the federal government successfully defended the policy against various legal challenges. *See Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015); *Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015).

**AR4008**

By September 2017 there were nearly 700,000 active DACA recipients, with an average age of just under 24 years old. *Regents* Pet. App. 13a. More than 400,000 of those individuals lived in the respondent States. J.A. 998. Over 90 percent of DACA recipients are employed, and 45 percent are in school. *Regents* Pet. App. 13a. They have bought homes, embarked on careers, and started families. *See* J.A. 879-980. They are employees at our state and local agencies, and students and staff at our public colleges and universities. *See, e.g.,* J.A. 513, 515, 557, 756-765. They add value to the States and our local communities in many ways—including by contributing to our economies, paying billions of dollars in taxes, and parenting their children. *See, e.g.*, J.A. 510-525, 733-753.

3. In 2014, then-Secretary of Homeland Security Johnson announced the creation of a new program, Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). DAPA would have applied to adults who, among other things, had been in the United States since 2010, were the parents of citizens or lawful permanent residents, and were not enforcement priorities. *Regents* Pet. App. 107a-110a. It also would have expanded the scope of DACA in several respects. *Id.* at 106a-107a.

Before DAPA could be implemented, Texas and other States challenged its legality, and a district court granted a nationwide preliminary injunction temporarily barring its implementation. *See Texas v. United States*, 86 F. Supp. 3d 591, 677-678 (S.D. Tex. 2015). A divided panel of the Fifth Circuit affirmed that interlocutory order, *see Texas v. United States*, 809 F.3d 134, 146 (5th Cir. 2015), and this Court affirmed the Fifth Circuit's judgment by an equally divided vote, *see United States v. Texas*, 136 S. Ct.

2271 (2016) (per curiam).  Before that litigation proceeded to final judgment, the current administration took office and rescinded the DAPA policy.  DAPA and the intended expansion of DACA thus never went into effect.  But the preliminary injunction entered and affirmed in *Texas* did not affect the original DACA policy.

4.  The new administration initially retained DACA and continued to solicit and process applications for deferred action under the policy.  *See Regents* Pet. App. 16a.  Indeed, the President and other senior officials expressed their commitment to the policy.  *See, e.g.*, J.A. 435, 720.  In the summer of 2017, however, officials at the Department of Justice began to discuss DACA with the plaintiffs in the *Texas* litigation (which remained pending despite the rescission of DAPA).  *Regents* D.Ct. Dkt. 124 at 79-82.  On June 29, those plaintiffs publicly informed then-Attorney General Sessions that if the administration did not "phase out the DACA program" by September 5, they would amend their complaint to challenge DACA.  J.A. 874.

On September 4, the Attorney General sent a one-page letter advising then-Acting Secretary of Homeland Security Duke that her Department "should rescind" DACA because it was "unconstitutional" and "effectuated . . . without proper statutory authority."  J.A. 877.  He further asserted that DACA "has the same legal and constitutional defects that the courts recognized as to DAPA."  J.A. 878.  The Attorney General announced the termination of DACA at a press conference the next day.  J.A. 999-1004.

Also on September 5, Acting Secretary Duke issued a memorandum formally rescinding DACA.  *Regents* Pet. App. 111a-119a.  Her memorandum contained one sentence explaining the reason for the decision:

"Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing [DAPA] litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." *Id.* at 117a. She instructed her Department to stop accepting new DACA applications immediately and to stop accepting all renewal applications after one month. *See id.* at 117a-118a.

## B. Procedural Background

These consolidated proceedings arise out of multiple suits challenging the decision to terminate DACA, which respondents filed in district courts in California, New York, and the District of Columbia.

1. The States of California, Maine, Maryland, and Minnesota, as well as the other respondents in No. 18-587, filed complaints in the Northern District of California. They alleged, among other things, that the termination decision was arbitrary, capricious, or otherwise not in accordance with law and thus invalid under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *See* J.A. 376-579

a. Petitioners proffered an administrative record consisting of 14 documents and "256 publicly available pages, roughly three-quarters of which are taken up by the three published judicial opinions from the *Texas* litigation." *Regents* Supp. App. 21a. The parties disputed the adequacy of that putative administrative record, including in proceedings before this Court. *See In re United States*, 138 S. Ct. 443 (2017) (per curiam). Consistent with this Court's instructions, *see id.* at 445, the district court postponed petitioners' obligation to complete the record and stayed discovery pending review of certain threshold defenses.

**AR4011**

8

Thereafter, the district court rejected petitioners' arguments on reviewability, *Regents* Pet. App. 26a-41a, and granted a limited preliminary injunction, *id.* at 41a-70a. The court held that respondents were likely to succeed on their APA claim because, among other things, the agency's decision was based on the incorrect premise that DACA was unlawful. *Id.* at 41a-62a. The court also concluded that the equities favored provisional relief. *Id.* at 62a-66a. The preliminary injunction partially preserved the status quo for individuals who had already received deferred action under DACA. *Id.* at 66a. It allowed the agency to continue exercising individualized discretion in reviewing renewal applications and to "proceed[] to remove any individual, including any DACA enrollee, who it determines poses a risk to national security or public safety, or otherwise deserves, in its judgment, to be removed." *Id.* In a separate order, the court dismissed some additional claims, while allowing certain due process and equal protection claims to proceed. *Id.* at 71a-90a.

b. The court of appeals affirmed. *Regents* Supp. App. 1a-78a. It first addressed whether petitioners' decision to terminate DACA was unreviewable as a matter "committed to agency discretion by law" within the meaning of 5 U.S.C. § 701(a)(2). The court assumed without deciding that the decision fell within the scope of *Heckler v. Chaney*, 470 U.S. 821 (1985), which applied Section 701(a)(2) to create a presumption of non-reviewability for "agency refusals to institute investigative or enforcement proceedings." *Id.* at 838; *see Regents* Supp. App. 34a-35a n.13. The court concluded, however, that "an agency's nonenforcement decision is outside the scope of the *Chaney* presumption—and is therefore presumptively reviewable—if it is based solely on a belief that the agency lacked the lawful authority to do otherwise." *Regents* Supp.

**AR4012**

App. 29a; *see id.* at 23a-34a.  Here, the termination decision was reviewable because it was based "solely on a belief that DACA was beyond the authority of DHS." *Id.* at 41a.  The court also rejected petitioners' argument that 8 U.S.C. § 1252 stripped the district court of jurisdiction to hear this case.  *Id.* at 42a-45a.

On the merits, the court of appeals noted that the only preliminary injunction factor in dispute was respondents' likelihood of success on the merits of their APA claim.  *Regents* Supp. App. 45a-46a.  Because an agency action "based solely on an erroneous legal premise . . . must be set aside," *id.* at 47a, the court examined petitioners' stated ground that DACA was unlawful.  In view of the Executive Branch's broad authority over immigration enforcement policy and priorities and its longstanding practice of using class-based discretionary relief policies, the court concluded "that DACA was a permissible exercise of executive discretion." *Id.* at 56a; *see id.* at 47a-57a.  It emphasized that it was "not hold[ing] that DACA *could not* be rescinded as an exercise of Executive Branch discretion." *Id.*  But petitioners' decision to rescind the program "based on an erroneous view of what the law required" was subject to vacatur. *Id.*  The court next held that the district court's decision to make its preliminary injunction effective nationwide was not an abuse of discretion under the circumstances of this case.  *See id.* at 58a-60a.  It also affirmed the district court's ruling on petitioners' motion to dismiss. *Id.* at 61a-77a.

Judge Owens concurred in the judgment. *Regents* Supp. App. 79a-87a.  Although he would have held that petitioners' decision to terminate DACA was insulated from APA review under Section 701(a)(2) and *Chaney*, *id.* at 79a-84a, he would have affirmed

**AR4013**

the preliminary injunction on the alternative basis of the equal protection claim advanced by certain respondents, *id.* at 79a, 86a.

2. In No. 18-589, the Eastern District of New York entered a preliminary injunction co-extensive with the one affirmed in the California proceeding. *Batalla Vidal* Pet. App. 62a-129a. The court reasoned that the asserted basis for the termination decision was inadequately explained and rested on a premise that was legally and factually flawed. *See id.* at 67a-69a, 90a-119a.

3. In No. 18-588, the district court for the District of Columbia entered a final judgment vacating the termination decision. *See NAACP* Pet. App. 1a-74a. It reasoned that the decision "was predicated primarily on [a] legal judgment that the program was unlawful." *Id.* at 73a. But that legal judgment could not support the agency's action because it was "virtually unexplained." *Id.* The court temporarily stayed its judgment to afford the agency an opportunity to "provid[e] a fuller explanation for the determination that the program lacks statutory and constitutional authority." *Id.* at 66a.

Two months later, petitioners submitted a supplemental memorandum from then-Secretary of Homeland Security Nielsen. *Regents* Pet. App. 120a-126a. She "decline[d] to disturb" her predecessor's decision and offered her own "understanding of the Duke memorandum." *Id.* at 121a. The district court held that this supplemental memorandum "fail[ed] to elaborate meaningfully on the agency's primary rationale for its decision." *NAACP* Pet. App. 81a. Secretary Nielsen merely "repackage[d] legal arguments previously made" and offered new rationales that could not sup-

port the original decision because they were not iden-tified in Duke's memorandum. *Id.* at 81a-82a; *see id.* at 95a-103a. The court accordingly adhered to its orig-inal final judgment, *id.* at 108a-109a, but it partially stayed its order pending appeal, to the extent that full vacatur would provide relief beyond the preliminary injunctions that had been entered in the other cases, *see NAACP v. Trump*, 321 F. Supp. 3d 143, 146 (D.D.C. 2018).

4. This Court granted certiorari in the California case, granted certiorari before judgment in the New York and D.C. cases, and consolidated the proceedings for purposes of briefing and argument.

## SUMMARY OF ARGUMENT

The critical feature of this case is that petitioners decided to terminate DACA on the stated ground that the policy was unlawful. That drives the analysis of both the reviewability and merits questions.

As to reviewability, petitioners contend that the courts are powerless to review this decision because it is a type of agency action that has traditionally been treated as presumptively immune from review. The termination decision does not, in fact, fall within such a tradition. But even if it did, it would still be subject to review because the sole rationale that the agency offered for the decision was that it lacked authority to maintain DACA. The Administrative Procedure Act's narrow exception precluding review of actions that are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), cannot apply when the publicly stated basis for the action is that the law left the agency with no discretionary choice to make.

**AR4015**

As to the merits, agency action that is based on an invalid legal premise must be vacated. Here, petitioners' assertion that they lack authority to maintain DACA is incorrect. The Executive Branch has broad authority to set policies and priorities and to exercise discretion in enforcing the immigration laws. That includes the authority to grant deferred action and other forms of discretionary relief, as well as the authority to adopt a policy framework that guides individual relief decisions for a class of potential applicants with common characteristics. DACA is part of a long tradition of class-based discretionary relief policies that stretches back six decades. It applies to a carefully defined class of young people who are particularly likely to present compelling cases for discretionary relief; it facilitates the agency's efficient and even-handed consideration of their applications for deferred action, while preserving its discretion to deny relief where appropriate; and, for those who receive deferred action, it provides a measure of stability and reassurance as they go about their lives and careers. The INA does not require petitioners to continue the DACA policy, but it also does not prohibit them from doing so. And the agency's contrary assertion was not only incorrect, it was almost entirely unexplained, which provides an additional ground for vacatur.

Before this Court, petitioners primarily defend the termination decision based on "policy grounds" (U.S. Br. 32) that they advanced in a supplemental memorandum long after the decision was made. Those rationales are not properly considered here (and, in any event, would be insufficient to support the decision). Administrative action must "stand or fall" on the basis of the original rationale offered by the agency at the time of the decision, judged in light of the complete administrative record. *Camp v. Pitts*, 411 U.S.

13

138, 143 (1973) (per curiam).  Courts sometimes afford an agency the opportunity to provide further explanation for its original rationale, as the D.C. district court did here.  But agencies may not use that opportunity to introduce new rationales for an old decision.  A contrary rule would blur the lines of accountability and create confusion about the actual basis for agency action.  That result is not acceptable—especially when an agency has made a decision as consequential as this one.

## ARGUMENT

### I.   THE DECISION TO TERMINATE DACA IS SUBJECT TO JUDICIAL REVIEW

Petitioners first argue (U.S. Br. 17-32) that the courts may not review their decision to terminate DACA.  Every court to consider petitioners' reviewability arguments has properly rejected them.

#### A.  The Termination Decision Is Not "Committed to Agency Discretion by Law"

Petitioners principally contend that the termination decision is one "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  The threshold inquiry under Section 701(a)(2) is whether the challenged action is of a type that courts have traditionally treated as non-reviewable.  There is no such tradition with respect to an agency's termination of a policy framework such as DACA.  And even if there were, the termination decision in this case would still be subject to review.  As a matter of text and precedent, Section 701(a)(2) applies only to actions that actually involve "[an] agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  But the decision to terminate DACA was grounded solely on an assertion that the policy was unlawful—that is, that the agency

**AR4017**

had no discretionary choice to make. *See Regents* Pet. App. 117a. Petitioners cannot resist judicial review on the premise that the law committed that action to their discretion.

1. The Administrative Procedure Act embodies a strong presumption in favor of judicial review. *Lincoln v. Vigil*, 508 U.S. 182, 190 (1995); *see* 5 U.S.C. § 702. That presumption recognizes that "'legal lapses and violations occur.'" *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). When they do, courts play a critical role in providing appropriate remedies and ensuring that "federal agencies are accountable to the public." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).

"[T]o honor the presumption of review," and to "give effect to" the substantive requirements of the APA, this Court has "read the exception in § 701(a)(2) quite narrowly." *Weyerhaeuser*, 139 S. Ct. at 370; *see also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019). It has "generally limited the exception to 'certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion,'" and for which there is "no meaningful standard against which to judge the agency's" discretionary action. *Dep't of Commerce*, 139 S. Ct. at 2568 (citations omitted). Agency actions falling outside such a tradition are reviewable, apart from "those rare instances" where there is simply "'no law to apply.'" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); *see also Chaney*, 470 U.S. at 830 ("no judicially manageable standards").

On the few occasions when this Court has recognized a category of traditionally unreviewable actions, it has relied on a clear history to that effect. In

*Chaney*, for example, the Court cited judicial precedent dating back to the nineteenth century, which established a general tradition of declining to review an agency's decision not to institute a particular enforcement proceeding. *See* 470 U.S. at 831. Elsewhere, the Court pointed to "a similar tradition of nonreviewability," including decades of case law, in holding unreviewable an agency's refusal to reconsider a decision in response to allegations of material error. *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987) (*BLE*); *see id.* at 280; *cf. Vigil*, 508 U.S. at 192-193 (discussing "tradition[]" of regarding an agency's "allocation of funds from a lump-sum appropriation" as unreviewable).

Petitioners can point to nothing similar here. To the contrary, any identifiable tradition favors review. Since the emergence of class-based discretionary relief policies nearly 60 years ago, courts have repeatedly entertained legal challenges to their adoption or termination. That history includes a Second Circuit decision four decades ago, *see Noel v. Chapman*, 508 F.2d 1023, 1029 (2d Cir. 1975); the Fifth Circuit's decision in the DAPA case, *see Texas v. United States*, 809 F.3d 134, 169 (5th Cir. 2015); and the unbroken chain of decisions reviewing the agency action at issue here, *see, e.g.*, *Regents* Supp. App. 41a-42a.[1]

Petitioners attempt to shoehorn the DACA termination decision into the tradition of non-review recognized in *Chaney*. *See, e.g.*, U.S. Br. 23. *Chaney* involved condemned prisoners in Texas and Oklahoma

---

[1] There is also a tradition of courts reviewing agency denials of discretionary relief in individual cases. *See, e.g.*, *Cheng Fan Kwok v. INS*, 392 U.S. 206, 217 (1968); *Foti v. INS*, 375 U.S. 217, 228 n.15 (1963); *Wong Wing Hang v. INS*, 360 F.2d 715, 718 (2d Cir. 1966) (Friendly, J.).

who contended that the use of certain drugs in lethal injection protocols violated the Food, Drug, and Cosmetic Act. 470 U.S. at 823. They "petitioned the FDA . . . to take various investigatory and enforcement actions to prevent these perceived violations," and the agency "refus[ed] to take the requested actions." *Id.* at 823-824. The agency "conclud[ed] that FDA jurisdiction in the area was generally unclear but in any event should not be exercised to interfere with this particular aspect of state criminal justice systems." *Id.* at 824. The prisoners then filed an APA suit "asking that the FDA be required to take the same enforcement actions requested" in their petition. *Id.* at 825. This Court concluded "that an agency's decisions not to take enforcement action should be presumed immune from judicial review under 701(a)(2)" in light of the established "tradition" of committing such decisions to agency discretion. *Id.* at 832. It held that the presumption had not been rebutted in that case. *See id.* at 832-837.

The type of agency action at issue here is fundamentally different from "an agency's refusal to institute proceedings." *Chaney*, 470 U.S. at 832; *see, e.g.*, *Regents* Pet. App. 26a-30a; *Batalla Vidal* Pet. App. 28a-31a. Most critically, whether the FDA action in *Chaney* is described as "programmatic" or "single-shot," U.S. Br. 21, it reflected a definitive decision not to enforce the Food, Drug, and Cosmetic Act with respect to particular conduct by drug manufacturers and prison administrators, *see* 470 U.S. at 824-826. By contrast, a decision to adopt or rescind a class-based deferred action policy does not represent a "[r]efusal[] to take enforcement steps" against anyone. *Id.* at 831. By adopting such a policy, the agency establishes a framework that guides and facilitates future deferred action decisions with respect to a class

of potential recipients; by terminating it, the agency takes away that framework.  Neither decision is the type of non-enforcement action addressed by *Chaney*. *See, e.g.*, *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) ("an agency's adoption of a general enforcement policy" falls outside of *Chaney*); *Regents* Supp. App. 34a n.13 (*Chaney* does not support the proposition "that any decision simply related to enforcement should be presumed unreviewable").[2]

Because the agency's decision to terminate DACA does not fall within any tradition of non-review, it is reviewable unless, as petitioners contend, "there is no 'law to apply'" here.  U.S. Br. 19.  But the only ground Acting Secretary Duke cited in her one-sentence public explanation was a legal one.  *See Regents* Pet. App. 117a.  Petitioners acknowledge that the Attorney General's pronouncement about DACA's illegality was binding on Duke, *id.* at 123a (citing 8 U.S.C. § 1103(a)(1)); they assert that Duke herself "concluded that DACA is unlawful," U.S. Br. 43; and they offer extensive legal argument about why "[t]hat conclusion was correct," *id.*; *see id.* at 43-50.  Having publicly based and defended their decision on that legal ground, petitioners cannot credibly argue that a court has no law to apply in reviewing it.

2. Even if the termination decision could fit within the tradition of non-review recognized in *Chaney* (as

---

[2] Petitioners focus (U.S. Br. 18-19) on *Chaney*'s discussion of various concerns related to judicial review of non-enforcement decisions that the Court "list[ed] . . . to facilitate understanding" of courts' "traditional[]" reluctance to review such decisions.  470 U.S. at 832.  As the courts below explained, most of those concerns do not apply to the separate type of action at issue here. *See, e.g.*, *Regents* Pet. App. 28a-30a.

the Ninth Circuit assumed without deciding, *Regents* Supp. App. 34a n.13), it would remain subject to review under the circumstances here. In *Chaney*, this Court "emphasize[d]" that the presumption against judicial review of non-enforcement decisions "may be rebutted" in appropriate circumstances. 470 U.S. at 832-833. One possible circumstance, expressly reserved in footnote four, was a decision in which the agency declined to act "based solely on the belief that it lacks jurisdiction." *Id.* at 833 n.4.[3] Such an exception is consistent with the text of the APA and the principles underlying *Chaney*, and it squarely applies to the decision challenged here.

By its terms, Section 701(a)(2) requires an action that involves "the agency's exercise of discretion." *Chaney*, 470 U.S. at 830. If an agency's decision instead rests solely on a publicly stated conclusion that it lacks any legal authority to take a particular action, it cannot resist judicial review on the ground that its decision was "committed to agency discretion by law." To the contrary, such an action presents the kind of "relevant question[] of law" that Congress intended the courts to decide. 5 U.S.C. § 706; *cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2432 (2019) (Gorsuch, J., concurring in the judgment) (the "unqualified command" of Section 706 "requires the court to determine legal questions . . . by its own lights, not by those of

---

[3] The Court noted that, in such a situation, "the statute conferring authority on the agency might indicate" that the decision is non-discretionary. 470 U.S. at 833 n.4. But the Court did not suggest—much less "make clear" (U.S. Br. 24)—that the exception it reserved would be limited to that circumstance.

political appointees or bureaucrats who may even be self-interested litigants in the case at hand").

*Chaney*'s analysis confirms that the exception it suggested in footnote four is a sensible one. A "refusal by the agency to institute proceedings based solely on the belief that it lacks jurisdiction," 470 U.S. at 833, n.4, does not involve any "complicated balancing" of policy factors that "are peculiarly within [agency] expertise" and that courts are not "equipped . . . to deal with." *Id.* at 831. And it *does* provide "a focus for judicial review." *Id.* at 832. The same is true when an agency refuses to act based solely on the belief that it lacks authority to do so: an "agency's interpretation of . . . the scope of [its] statutory authority" is no different from an interpretation of "its jurisdiction." *City of Arlington v. FCC*, 569 U.S. 290, 296-297 (2013).

Far from encroaching on any executive prerogative, *see* U.S. Br. 18, 22, judicial review of an agency's asserted lack of authority protects the agency's ability to exercise lawful discretion. If an agency is laboring under a mistaken view that it lacks discretion to act in a particular way, judicial review will free the agency to make "a reasoned, discretionary policy choice." *Regents* Supp. App. 31a. At the same time, review advances the APA's core purpose of ensuring that "federal agencies are accountable to the public." *Franklin*, 505 U.S. at 796. When "an agency justifies an action solely with an assertion that the law prohibits any other course, it shifts responsibility for the outcome from the Executive Branch to Congress . . . or the courts." *Regents* Supp. App. 33a. Absent judicial review, an agency professing a lack of legal authority to act will "avoid[] democratic accountability for a choice that was the agency's to make all along." *Id.*

**AR4023**

All of these considerations support adopting the exception reserved in footnote four, as the Ninth Circuit did many years ago. *See Mont. Air Chapter No. 29, Ass'n of Civilian Technicians, Inc. v. FLRA*, 898 F.2d 753, 756 (1990). And that exception squarely applies to the agency decision at issue here. As noted, the sole justification the agency offered for the decision to terminate DACA was a conclusion that continuing the policy would violate the law. *See Regents* Pet. App. 117a; J.A. 877-878.[4]

Petitioners contend that this Court's decision in *BLE* rejected the exception suggested in *Chaney*. U.S. Br. 23-24. That is incorrect. *BLE* considered an action that was both discretionary and traditionally unreviewable: a refusal to re-open a prior proceeding for the purpose of considering a renewed merits argument. *See* 482 U.S. at 280. In a departure from the standard agency practice of denying requests to reopen "without [a] statement of reasons," *id.* at 283 (emphasis omitted), the agency in *BLE* chose to explain its discretionary denial in an order that "respond[ed] in some detail to all of the major contentions" on the merits, *id.* at 276. This Court held that the action was unreviewable, notwithstanding the agency's discussion of the underlying merits. *See id.* at 280. In the process, the Court rejected the notion "that if the agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." *Id.* at 283. But *BLE* did not present an opportunity to address whether courts could review an

---

[4] *See also Regents* Supp. App. 47a (rescission of DACA was "premised on the belief that the DACA program was unlawful"); *Regents* Pet. App. 56a (same); *Batalla Vidal* Pet. App. 67a-68a (same); *Casa de Md. v. DHS*, 924 F.3d 684, 699-700 (4th Cir. 2019), *cert. pending*, No. 18-1469 (same).

agency non-enforcement decision that is predicated
solely on the ground that the agency lacks authority to
act. The case did not involve any non-enforcement
decision and the agency did not deny the request to re-
open based on any purported lack of authority. *See id.*
at 280-282. There is no indication that this Court in-
tended its observation about "'reviewable' reason[s]"
even to comment on the question reserved in *Chaney*,
let alone to "resolve[]" it. U.S. Br. 24.

## B. New Rationales Advanced by Petitioners After the Termination Decision Do Not Make It Unreviewable

In litigation, petitioners have argued that the ter-
mination decision is unreviewable because it was
based on an alternative and discretionary "litigation
risk" rationale. U.S. Br. 27. Most of the courts to con-
sider this argument have held—correctly—that no
such rationale can be found in the decision memoran-
dum. *See Regents* Supp. App. 36a-41a; *Regents* Pet.
App. 55a-57a; *Batalla Vidal* Pet. App. 68a. While the
"Background" portion of the memorandum mentioned
the threatened lawsuit from Texas (among other his-
torical developments), *Regents* Pet. App. 116a, the
memorandum did not identify that threat as a basis
for the decision or suggest that the agency made any
real assessment of the threat, *id.* at 117a.

But even if the Court could plausibly discern a liti-
gation risk rationale from the decision memorandum,
that would not alter the reviewability analysis. *See
NAACP* Pet. App. 39a-42a. If an agency based a deci-
sion on a reasoned assessment of litigation risk, such
as by weighing the benefits of an action or policy
against the costs of potential litigation, that might "be
'discretionary' in a meaningful sense." *Id.* at 40a.
Here, however, any litigation risk rationale is (at

most) barely discernible.  And it is entirely derivative of the agency's express conclusion that it lacked authority to continue DACA.  A secondary consideration of that sort cannot create a "discretionary" action for purposes of Section 701(a)(2).  *See id.* at 41a-42a ("litigation-risk justification was too closely bound up with [the] evaluation of DACA's legality to trigger *Chaney*'s presumption of unreviewability").

Petitioners also argue that the supplemental memorandum submitted by former Secretary Nielsen in the D.C. litigation renders the termination decision unreviewable.  U.S. Br. 28-31.  As discussed in greater detail below, *infra* pp. 47-49, core principles of administrative law require judicial review to focus on the rationale publicly stated by the agency decisionmaker at the time the challenged decision was made.  In rare circumstances, federal courts invite an agency to further explain its stated rationale (as the D.C. district court did here).  But that further explanation may be considered by the courts only because it was invited by a judicial tribunal with authority to review the agency's action, and only as a further explication of the agency's original rationale.  There is no logical reason—and no basis in precedent—for concluding that a supplemental memorandum intended to facilitate judicial review of an originally reviewable action could render that action unreviewable.  If petitioners were to "issue a new decision rescinding DACA," *NAACP* Pet. App. 94a n.7, the reviewability inquiry could properly focus on whatever new rationales the agency might advance at that time.  For now, the inquiry must focus on the September 2017 termination decision, which was publicly premised solely on a conclusion about the limits of the agency's authority.

23

### C. Section 1252 Does Not Bar Review

The APA also recognizes that a statute may "preclude judicial review" of agency action. 5 U.S.C. § 701(a)(1). Here, the lower courts correctly rejected petitioners' argument that 8 U.S.C. § 1252(g) "foreclosed district courts from adjudicating" the present dispute. *Regents* Pet. 21; *see* U.S. Br. 21. Section 1252(g) limits federal court jurisdiction with respect to only "three discrete actions" by the Secretary of Homeland Security: "her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (*AADC*). The decision to terminate the DACA policy is not any of those actions. Petitioners also argue that review is foreclosed by 8 U.S.C. § 1252(b)(9). U.S. Br. 21. But that provision applies only to claims "arising from any action taken or proceeding brought to remove an alien," and this case does not involve any such action or proceeding. *See Regents* Supp. App. 45a n.19. The channeling provisions Congress adopted in Section 1252 do not apply here by their terms, and petitioners' suggestion that they implicitly foreclose review (*see* U.S. Br. 21) is untenable. *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018) ("[T]his Court's precedents require 'clear and convincing indications' that Congress meant to foreclose review.").

### II. THE TERMINATION DECISION IS INVALID UNDER THE APA

On the merits, petitioners now principally defend the decision to terminate DACA on the strength of "a number of reasons" first advanced after the decision was made. U.S. Br. 16; *see id.* at 32-43. But having originally based the decision on the stated ground that DACA was unlawful—and having so far declined to

**AR4027**

replace it with any new decision based on a different ground—petitioners must defend their action on the legal rationale they originally offered. *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (*Chenery I*).

The termination decision cannot be sustained on that rationale. Before this Court, petitioners do not question the Executive Branch's "'broad discretion' in the enforcement of the federal immigration laws," U.S. Br. 45; or its authority to designate particular classes of undocumented immigrants as "low-priority targets," *id.* at 46; or its authority to grant deferred action in individual cases, *see id.* at 39-40, 43, 45; or its authority, "pursuant to longstanding regulations," to grant work authorization to those who receive deferred action, *id.* at 44. They do not seriously contest the legality of prior class-based deferred action policies that were "more limited in scope" than DACA. *Id.* at 48. And they suggest no apparent desire to actually remove DACA recipients from the country. *See, e.g.*, *id.* at 55. But they nonetheless argue that DACA's "nature and scope" make it illegal. *Id.* at 46.

That argument is not tenable. When the Executive Branch identifies a class of immigrants who, while undocumented, are very likely to be low priorities for removal and strong candidates for discretionary relief, nothing prevents it from adopting a policy framework under which individuals within that class may seek deferred action. Such a policy does not prevent the Executive from denying deferred action—or even initiating removal proceedings—in any appropriate case. In many other cases, immigration officials will appropriately decide to grant deferred action to deserving individuals. That relief, and the limited benefits that flow from it under existing regulations, are consistent

with longstanding law and practice—as well as fairness and common sense. To be sure, the INA does not require the Executive Branch to adopt or continue a policy such as DACA. But, just as surely, nothing in the law forbids it.

## A. The Agency's Stated Premise That DACA Is Unlawful Is Incorrect

An agency's "action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). When the agency's stated rationale rests on a "determination of law," the action "may not stand if the agency has misconceived the law"—even if the action might have been justified on some other ground. *Chenery I*, 318 U.S. at 94. Under that settled principle, the decision to terminate DACA cannot stand because the legal conclusion on which the agency publicly based it is incorrect. *See Regents* Supp. App. 46a-57a. To illuminate the agency's legal error, we first address the practice of deferred action generally and the long history of class-based discretionary relief policies, and then turn to the legality of the policy at issue here.

### 1. Deferred action is lawful

It is common ground that the practice of granting deferred action in individual cases is lawful. *See* U.S. Br. 39-40, 43. Although deferred action "developed without express statutory authorization," this Court has described it as a "regular practice" that the Executive may employ "for humanitarian reasons or simply for its own convenience." *AADC*, 525 U.S. at 484. And since the emergence of the practice, Congress has adopted statutes that expressly contemplate pre-existing executive authority to grant deferred action. *See,*

*e.g.*, 8 U.S.C. § 1227(d)(2); 49 U.S.C. § 30301 note. All agree that deferred action is available only as a matter of executive discretion, and that individual grants of deferred action do not provide a defense to removal and are "revocable at any time in the agency's discretion." J.A. 854.

By regulation, the Attorney General (and now the Secretary) have exercised statutory authority to confer certain limited benefits on individuals who receive deferred action. Petitioners do not question these "longstanding regulations." U.S. Br. 44. In particular, deferred action recipients may apply to be considered for work authorization if they "establish[] an economic necessity for employment." 8 C.F.R. § 274a.12(c)(14). That regulation was adopted by the INS in 1981 to codify its existing practice. *See* 46 Fed. Reg. 25,080-25,081 (May 5, 1981) (citing 8 U.S.C. § 1103). Congress confirmed the Attorney General's authority to adopt this regulation in the Immigration Reform and Control Act of 1986, which made it unlawful for an employer to hire an "unauthorized alien," defined as one who is not either a lawful permanent resident or "authorized to be so employed by [the INA] *or by the Attorney General.*" 8 U.S.C. § 1324a(h)(3) (emphasis added). Other federal regulations conferring limited benefits on deferred action recipients are likewise grounded in particular grants of statutory authority.[5]

---

[5] Certain regulations provide that the period of time during which an individual enjoys deferred action does not count as a period of "unlawful presence" for purposes of various re-entry bars. 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); *see* 8 U.S.C. § 1182(a)(9)(B)(ii) (an "alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the

## 2. Class-based deferred action policies are a permissible policy tool

As an alternative to granting discretionary immigration relief on an ad hoc basis, the Secretary may adopt policies that guide and channel deferred action decisions for a class of potentially eligible individuals who share certain circumstances or characteristics. Class-based policies are a salutary method for the Secretary to promote both efficiency and fairness, by identifying categories of individuals who are likely to be low priorities for removal and establishing a framework that facilitates even-handed consideration of their applications for relief.

a. The federal government has operated "more than two dozen" such policies over the past six decades involving various forms of discretionary relief. *See* J.A. 821-822.[6] From 1960 through 1990, for example, the INS adopted various class-based policies for granting "extended voluntary departure," an "extrastatutory" form of immigration relief. *Hotel & Rest. Emps. Union v. Smith*, 846 F.2d 1499, 1519 (D.C. Cir. 1988) (en banc) (opinion of Silberman, J.).[7] Those policies

---

Attorney General"). Another regulation defines individuals "currently in deferred action status" to be "'lawfully present'" within the meaning of the statute governing eligibility for certain work-related benefit programs. 8 C.F.R. § 1.3(a)(4)(vi); *see* 8 U.S.C. § 1611(b)(2)-(4) (individuals "lawfully present in the United States as determined by the Attorney General" may participate).

[6] *See generally* Bruno, et al., CRS, *Analysis of June 15, 2012 DHS Memorandum*, at 20-23 (July 13, 2012), https://tinyurl.com/y5muva2y.

[7] Petitioners previously agreed with Judge Silberman that extended voluntary departure was extrastatutory, but now suggest

applied to immigrants from particular countries. H.R. Rep. No. 100-627 at 6 (1988) (EVD Report). They ultimately allowed hundreds of thousands of "otherwise deportable aliens to remain temporarily in the United States" for humanitarian reasons. *Id.*

Other discretionary relief policies defined the eligible class more broadly. A prominent example is the "Family Fairness" policy, established in 1987 and expanded in 1990, which made extended voluntary departure available to qualifying spouses and children of immigrants who had been granted legal status under the Immigration Reform and Control Act.[8] At the time it was expanded, the Commissioner of the INS testified that up to 1.5 million individuals could be eligible for relief.[9]

For over two decades, the Executive has also employed class-based policies to guide the exercise of deferred action in individual cases. *See generally* J.A. 822-826. Class-based deferred action policies have addressed, for example, certain victims of spousal abuse, *id.* at 822-823; victims of human trafficking and certain other crimes who were applying for "T" or "U" visas, *id.* at 823-825; certain foreign students affected

---

that it may have "'derived from the voluntary departure statute.'" U.S. Br. 48; *see id.* at 48-49 & n.10. Either way, like deferred action, it "developed without express statutory authorization." *AADC*, 525 U.S. at 484.

[8] *See* Memorandum from Gene McNary, Commissioner, INS to Reg'l Comm'rs, *Re: Family Fairness* (Feb. 2, 1990) (Family Fairness Memo).

[9] *Immigration Act of 1989: Hearing Before the Subcomm. on Immigration, Refugees, and Int'l Law of the House Comm. on the Judiciary*, 101st Cong., 2d Sess. Pt. 2, at 49, 56 (1990) (testimony); *see also* 55 Fed. Reg. 6058 (Feb. 21, 1990) ("approximately one million").

by Hurricane Katrina, *id.* at 825; and certain widows and widowers of U.S. citizens, *id.* at 825-826. Like DACA, these policies required immigration officials to make individualized assessments of whether deferred action was appropriate, and did "not 'provide any assurance that all such requests [would] be granted.'" *Id.* at 825; *see id.* at 822-826.

Congress has long been aware of these and other class-based discretionary relief policies, and has encouraged their use. In 1983, for example, a "sense of the Congress" resolution encouraged the creation of a class-based relief policy that would have applied to El Salvadoran immigrants. *See* Dep't of State Authorization Act, Pub. L. No. 98-164, § 1012, 97 Stat. 1017, 1062 (1983). In 1990, Congress adopted a statute addressing individuals covered by the Family Fairness policy; it delayed the effective date by one year and emphasized that the delay "shall not be construed as reflecting a Congressional belief that the existing family fairness program should be modified in any way before such date." Immigration Act of 1990 (IMMACT), Pub. L. No. 101-649, tit. III, § 301(g), 104 Stat. 4978, 5030. Since the emergence of class-based deferred action policies in the 1990s, Congress has never disapproved of the practice; instead, it has adopted multiple statutes that pre-suppose executive authority to grant deferred action. *See, e.g.*, 8 U.S.C. § 1227(d)(2); *id.* § 1154(a)(1)(D)(i)(II), (IV); 49 U.S.C. § 30301 note.

b. Petitioners seek to distinguish prior class-based policies from the DACA policy at issue here (U.S. Br. 46-50), but those distinctions do not survive scrutiny. For example, not all of the prior policies may "fairly be described as 'interstitial' in nature," *id.* at 48, providing only "temporary relief while the aliens sought or

awaited permanent status afforded by Congress," *id.* at 47. Several class-based policies were adopted at a time when the eligible population had no existing mechanism for obtaining legal status (outside of generally available channels such as asylum). The deferred action policy for certain widows and widowers of U.S. citizens, for example, was established when "no [other] avenue of immigration relief exist[ed]."[10] It is true that Congress eventually created a pathway for those individuals to obtain lawful status. *See* Dep't of Homeland Sec. Appropriations Act, 2010, Pub. Law 111-83, § 568(c), 123. Stat. 2142, 2186-2187. But that simply highlights that the policy was "interstitial" only in hindsight—as petitioners themselves seem to hope will soon be true of DACA. *See* U.S. Br. 32 (discussing petitioners' pursuit of "a legislative solution").

Nor were all prior policies more time-limited than DACA. *See* U.S. Br. 48. For example, the federal government granted certain Czechoslovakians extended voluntary departure in one-year increments from 1968 through 1977. *See* EVD Report at 6; *see also id.* (listing other policies with similar durations). And three successive presidential administrations have granted deferred enforced departure to certain Liberians since 2007. *See, e.g.*, 84 No. 36 Interpreter Releases 2125 (Sept. 17, 2007); 96 No. 14 Interpreter Releases 14 (April 1, 2019).

Finally, while many prior policies defined the eligible population quite narrowly, *see* U.S. Br. 49, others were much broader. As the Executive told Congress, for example, fully 40 percent of the undocumented

---

[10] Memorandum from Donald Neufeld, Acting Assoc. Dir., Office of Domestic Operations, USCIS to Field Leadership, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children* (June 15, 2009).

population at the time were eligible for relief under the expanded Family Fairness policy. *See* J.A. 851-852; *supra* p. 28. Substantially fewer people ultimately applied because Congress authorized statutory relief shortly thereafter. *See* IMMACT, tit. III, § 301(g). At the time the policy was expanded, however, its scale not only "match[ed] that of DACA," U.S. Br. 49, but far exceeded it.

### 3. DACA is a permissible class-based deferred action policy

DACA tracks the established practice of using class-based frameworks to identify and process the cases of individuals who are likely to be compelling candidates for relief or forbearance. It applies only to young people who came or were brought to this country as children; have continuously resided here since 2007; are current students, have completed high school, or are honorably discharged veterans; have not been convicted of any serious crimes; and do not otherwise threaten national security or public safety. *See Regents* Pet. App. 98a. Eligible individuals who pass a background check and pay a fee may apply for deferred action on an individual basis. *Id.* at 11a, 99a. Successful applicants receive a grant of deferred action for a two-year period. *Id.* at 100a. That grant is revocable and provides no defense to removal, *see* J.A. 819, but it does afford recipients a measure of stability and the opportunity to seek authorization to work legally in the country they know as home.

Like past class-based policies, DACA is grounded in important part in "immediate human concerns." *Arizona v. United States*, 567 U.S. 387, 396 (2012). Those who meet the minimum criteria have, by definition, "long ties to the community." *Id.* Many of them also have "a record of distinguished military service,"

"children born in the United States," or other qualities that make them particularly suitable for discretionary relief. *Id.* They are not among the populations that Congress has prioritized for removal. And many of the DACA criteria are consonant with considerations that Congress itself has relied on in setting immigration policy.[11] Indeed, nearly everyone seems to agree with the agency's initial assessment that individuals who satisfy the DACA criteria are likely to present "low priority cases" for removal. *Regents* Pet. App. 98a; *see id.* at 64a-65a (statement by President Trump: "Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!"); *id.* at 125a (Secretary Nielsen's recognition of "the sympathetic circumstances of DACA recipients as a class").

Also like other class-based deferred action policies, DACA requires individual applications to be evaluated on a case-by-case basis as a matter of "[p]rosecutorial discretion." *Regents* Pet. App. 99a; *see* J.A. 827 & n.8. Immigration officials are free to consider all the information available to them and to deny (or revoke) deferred action based on any relevant factor. Since the policy's inception, USCIS has denied more than 81,000 initial applications for deferred action.[12] Petitioners

---

[11] Congress has, for example, adopted laws prioritizing the removal of criminals rather than law-abiding individuals, *see* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. F, tit. II, 129 Stat. 2242, 2497; *see also* J.A. 813, and provisions reflecting a special concern for undocumented immigrants who come to this country as children, *see* 8 U.S.C. §§ 1101(a)(27)(J), 1158(a)(2)(E), 1182(a)(9)(B)(iii)(I), have been physically present in the United States for lengthy periods, *see id.* § 1229b(b)(1), or have served honorably in the armed forces, *see id.* § 1439.

[12] USCIS, *Number of Form I-821D, Consideration of Deferred*

do not publish data on the basis for those denials, but they have acknowledged in this litigation that some number of the denials involved applicants "who met the threshold criteria for consideration [under] DACA," J.A. 1010, and therefore must have been rejected based on consideration of other factors in their individual cases.[13]

No doubt, a large percentage of those who meet the stated criteria and submit applications do receive grants of deferred action. *See* U.S. Br. 39 n.7 (91% approval rate since 2012); *Regents* Supp. App. 51a (17.8% of applications acted on in 2016 denied). That is what one would expect of a policy that is calibrated to identify, as potential candidates for discretionary relief, "productive young people" who "have already contributed to our country in significant ways." *Regents* Pet. App. 99a; *see also Texas*, 809 F.3d at 174 ("DACA applicants are less likely to have backgrounds that would warrant a discretionary denial."). In addition, the nature of the DACA policy encourages self-selection among the population of people who satisfy the threshold criteria, many of whom have never applied

---

*Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake and Case Status, Fiscal Year 2012-2019* (Apr. 30 2019), https://tinyurl.com/y59zwrtd.

[13] The lower courts in the DAPA litigation expressed doubts as to whether "DACA allowed for discretion," based on their review of information in the preliminary injunction record. *E.g.*, *Texas*, 809 F.3d at 175-176. In light of the more robust factual record developed in recent litigation, however, the same district court concluded that the evidence proffered by plaintiffs to show that "individual decision-makers are not exercising . . . discretion" was "not convincing, either in its quantity or quality." *Texas v. United States*, 328 F. Supp. 3d 662, 734 (S.D. Tex. 2018); *see generally* DACA Recipients & New Jersey Amicus Br. 9-24.

for relief. *See Texas*, 809 F.3d at 210 (King, J., dissent-ing). Applicants must pay a substantial fee (currently $495), submit to a federal background check, and pro-vide sensitive personal information and biometric data to federal authorities. *See Regents* Pet. App. 9a-11a; J.A. 713. It is no wonder that the substantial majority of individuals who are willing to take those steps present compelling cases for deferred action.

### 4. The agency's assertion that DACA is il-legal rests on a mistaken legal premise

The question of DACA's legality is at issue in this case because petitioners based their decision to termi-nate the policy on the stated premise that it was unlawful. As discussed above, judicial review of the agency's legal conclusion must focus on the specific "grounds invoked by the agency" in its decision mem-orandum. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (*Chenery II*). Here, the asserted grounds are that DACA was "unconstitutional" and beyond the agency's "proper statutory authority." *Regents* Pet. App. 116a.

a. The constitutional objection can be addressed briefly. To this day, petitioners have not identified any constitutional flaw in the DACA policy—including in their merits brief in this case. As noted, a "principal feature of the removal system is the broad discretion exercised by" executive officials, who "must decide whether it makes sense to pursue removal at all" in a particular case. *Arizona*, 567 U.S. at 396. A policy that guides the exercise of that discretion in certain cases, subject to all the procedures and requirements imposed by Congress, does not violate the Constitu-tion.

b.  The only considerations invoked by Acting Secretary Duke and Attorney General Sessions for the assertion that DACA is beyond the agency's statutory authority were the rulings in the DAPA case.  *See Regents* Pet. App. 117a; J.A. 877; U.S. Br. 33-36.  But the reasons offered by the Fifth Circuit majority for affirming the preliminary injunction in that case are either inapplicable to DACA, incorrect, or both.

The Fifth Circuit relied on language in the DAPA memorandum deeming DAPA recipients to be "'*lawfully present* in the United States.'"  *Texas*, 809 F.3d at 148; *see Regents* Pet. App. 104a.  The DACA memorandum contains no similar language.  *See Regents* Pet. App. 97a-101a.  Although established regulations direct that, for certain limited purposes, periods of deferred action do not constitute "unlawful presence," *see supra* n.5, that is true of *any* grant of deferred action—whether under DACA, under a "previous-deferred action program[]," *Texas*, 809 F.3d at 184, or on an "ad hoc" basis, *id.* at 186 n.202.  And neither those regulations nor the grant of deferred action itself interferes with the Secretary's ability to initiate removal proceedings with respect to any deferred action recipient.

The Fifth Circuit also focused on INA provisions "allowing defined classes of aliens to be lawfully present" and making certain specific "classes of aliens eligible for deferred action."  *Texas*, 809 F.3d at 179.  Those provisions do not foreclose the ability of the Executive to grant deferred action, which does not confer any lawful immigration status and has always been understood as an exercise of the Secretary's general authority that "developed without express statutory authorization."  *AADC*, 525 U.S. at 484.  Congress has indicated its understanding and approval of the

**AR4039**

deferred-action mechanism when it has adopted provisions instructing the Secretary to consider granting that relief to specific classes of individuals. *See, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV). But nothing about those provisions suggests that they were intended to prohibit the Executive from granting deferred action to other individuals in other situations.

Another consideration the Fifth Circuit invoked was the fact that Congress has "repeatedly declined to enact" specific statutory relief for the DACA population. *Texas*, 809 F.3d at 185; *see* U.S. Br. 34, 44. Of course, "unsuccessful attempts at legislation are not the best of guides to legislative intent." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 n.11 (1969). They are particularly unilluminating here: The legislative proposal cited by the Fifth Circuit would have created a path to lawful immigration status, not a statutory deferred action policy. *See* DREAM Act of 2010, H.R. 5281, 111th Cong. (2010). And Congress has also declined to enact bills that would have curtailed class-based deferred action policies or otherwise limited the practice of deferred action. *See, e.g.*, J.A. 828 n.9; H.R. 29, 114th Cong. (2015).

In addition, the Fifth Circuit was troubled by the size and breadth of the DAPA policy. *See, e.g.*, *Texas*, 809 F.3d at 181 ("4.3 million otherwise removable aliens eligible"). Whatever force that concern might have had in the context of the DAPA case, it does not undermine the legality of a policy such as DACA— which applies to a far smaller category of immigrants that is carefully defined to include only those who are particularly likely to be deserving of discretionary relief.

Finally, the Fifth Circuit relied on an alternative holding that DAPA likely required a notice-and-comment rulemaking process. *See Texas*, 809 F.3d at 170-178. But petitioners do not suggest that they agree with that holding; nor have they made any similar argument here regarding DACA.[14]

c. Before this Court, petitioners unveil a theory of why they lack authority to continue DACA that is somewhat more elaborate than the cursory assertions they have advanced to date. They now argue that "the nature and scope of DACA" make it unlawful. U.S. Br. 46. That argument is unpersuasive.

Petitioners do not question their authority to designate classes of undocumented immigrants as "low-priority targets," U.S. Br. 45, and they seem to agree that the immigrants eligible for DACA are among the lowest priority in the Nation. *See Regents* Pet. App. 64a-65a. To be sure, for purposes of this litigation, petitioners have taken to characterizing DACA recipients as complicit in "ongoing violations of federal law on a massive scale." *E.g.*, U.S. Br. 33. But the fact remains that most of them "were brought to this country as children," *Regents* Pet. App. 97a, lacked any "intent to violate the law," *id.* at 98a, "know only this country as home," *id.*, and have become "productive" members of our society, *id.* at 99a. And petitioners appear to embrace the idea that these individuals could properly seek and obtain deferred action on an "individualized" and "case-by-case basis." *Id.* at 124a; U.S. Br. 39-40.

---

[14] In any event, that holding rested in substantial part on a factual premise that even the district court in the DAPA proceedings has since disavowed. *See supra* n.13.

Petitioners object to DACA's use of "stated eligibility criteria," which they view as creating an "implicit presumption" that those who satisfy the criteria will obtain relief. U.S. Br. 39-40. But every policy that seeks to "strategically deploy [agency] resources" (*id.* at 45) by identifying people who are likely to be low priorities for removal must state criteria of one form or another. Defined criteria are particularly important for policies guiding the exercise of discretionary relief, because they help "to avoid arbitrary enforcement decisions by individual officers" and to facilitate a degree of consistency across the agency. J.A. 837. At the same time, DACA clearly directs that immigration officials retain discretion to deny deferred action in appropriate cases based on any relevant factors. *See Regents* Pet. App. 99a-101a. Experience has demonstrated that many applications are in fact denied, *supra* pp. 32-33, and petitioners have not identified anything in the DACA policy supporting their assertion that it "inhibit[s] assessments of whether deferred action is appropriate in a particular case," *Regents* Pet. App. 124a. Petitioners may prefer a purely ad hoc approach to deferred action as a matter of policy, *see id.*, but nothing in the INA prohibits the Secretary from adopting a more robust and transparent framework to guide deferred action decisions for especially deserving populations.

Petitioners also focus on the fact that those who receive deferred action under DACA are eligible to seek work authorization. U.S. Br. 44-46. This is not any "unheralded" executive authority. *Id.* at 45. As noted, the possibility of work authorization flows from a separate and "longstanding" regulation, *id.* at 44, which petitioners do not challenge. 8 C.F.R. § 274a.12(c)(14). As a result of that regulation, each of the class-based deferred action policies described

above enabled those who received relief to pursue work authorization. So did many other class-based discretionary relief policies, including the Family Fairness policy that applied to up to 40 percent of the undocumented population. *See* Family Fairness Memo; J.A. 822. All the while, Congress has never modified its statute recognizing the Attorney General's (and now the Secretary's) ability to "authoriz[e]" those who receive discretionary relief "to be so employed." 8 U.S.C. § 1324a(h)(3); *see NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275 (1974) ("[C]ongressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.").[15]

Moreover, it is consistent with "common sense" (U.S. Br. 45) that Congress has allowed the Secretary to use his authority in this way. When the Executive has made a considered decision to temporarily forbear from removing particular individuals from the United States, it is sensible to allow them the opportunity to support themselves and their families through lawful employment during that period of forbearance. The only practical alternative would be for deferred action recipients to work illegally—exposing themselves to exploitation and affecting the labor market. No plausible interpretation of the INA demands that result.

Petitioners' final objection to DACA relates to the policy's size and "scope." U.S. Br. 46-50; *see id.* at 46-49. No doubt, the scope of such a policy is relevant to its legality. It could present substantial legal concerns

---

[15] This case is thus quite unlike *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), where the agency's longstanding position was that it *lacked* authority to regulate tobacco products and Congress "ratif[ied]" that position "and precluded the FDA from regulating." *Id.* at 158, 161; *see* U.S. Br. 45.

if a class-based deferred action policy encompassed people whom Congress designated as priorities for removal, *see* J.A. 807, or was so large that it would likely "impede removals that would otherwise occur in its absence," *id.* at 851. Here, however, DACA uses carefully selected criteria to define a population of young people that all seem to agree are among the very lowest priorities for immigration enforcement. Petitioners' complaint about the total number of people who satisfy those criteria merely states an aspect of the problem facing the agency; it is not an argument one way or the other about the legality of any particular policy response to that problem.

We can all regret that so many deserving young people are caught in a legal limbo that is not of their own making. No one is happy that the political branches of our federal government have not agreed to a sensible solution. While we await such a solution, the Secretary remains responsible for establishing "national immigration enforcement policies and priorities" to deal with the situation as it presently stands. 6 U.S.C. § 202(5); *see* 8 U.S.C. § 1103(a)(1), (3). Petitioners have not established that the law forbids them from maintaining, as part of that effort, a policy framework that guides discretionary deferred action decisions about this carefully defined and highly deserving group of immigrants.

d. Petitioners finally argue that even if the legal conclusion on which the termination decision rests is "[in]correct," the decision may stand if that conclusion was nonetheless "reasonable." U.S. Br. 43; *see id.* at 50-51. That argument is foreclosed by *Chenery*, which applies with full force here. Regardless of whether an agency action might be justified on some other basis, if it "is based upon a determination of law," then it

"may not stand if the agency has misconceived the law." *Chenery I*, 318 U.S. at 94; *see, e.g.*, *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 646 (D.C. Cir. 1998); *cf. Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 402 (1990) ("'[I]f a district court's findings rest on an erroneous view of the law, they may be set aside on that basis.'"). The question here is not whether an agency's statutory interpretation or other legal analysis could be viewed as "reasonable," but whether the agency acted on a mistaken view of the limits of its lawful discretion.

## B. The Agency's Explanation for Its Decision Does Not Satisfy the APA's Requirements for Reasoned Decisionmaking

As the D.C. district court explained, the termination decision must be vacated for the additional reason that the agency "fail[ed] to give an adequate explanation" for its action. *NAACP* Pet. App. 54a; *see id.* at 49a-55a; *see also Casa de Md.*, 924 F.3d at 703-705.

One of the "basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Agency explanations must be "based on consideration of the relevant factors," and may not "fail[] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 42, 43. When an agency departs from its prior position, it must (among other things) supply a "reasoned explanation for the change," *Encino Motorcars*, 136 S. Ct. at 2125, and "display awareness that it *is* changing positions," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

To explain the illegality rationale here, the decision memorandum invokes just two considerations: the rulings in the DAPA litigation and the Attorney

General's letter. *Regents* Pet. App. 117a. That letter also invokes the rulings in the DAPA litigation. J.A. 877. Neither document explains why those rulings were fatal to the separate DACA policy. Neither says anything about why the Fifth Circuit's interlocutory decision would control the analysis of DACA's legality, or acknowledges any of the differences between the two policies. *See supra* pp. 35-36. Neither addresses the fact that this Court's order affirming the Fifth Circuit was not accompanied by any explanation, is not precedential, and affirmed only a grant of preliminary equitable relief. Under those circumstances, the Court's order could not have resolved the validity of DAPA—let alone of DACA.[16] And while both documents assert that DACA "was effectuated . . . without proper statutory authority," *Regents* Pet. App. 116a; J.A. 877, neither one discusses the Secretary's broad statutory authority to establish immigration enforcement policies and priorities or the long history of class-based deferred action policies.

Indeed, the letter and the decision memorandum raise more questions about petitioners' rationale than they answer. The letter asserts that "the DACA policy has the same . . . constitutional defects that the courts recognized as to DAPA," J.A. 878, when in fact no court ever recognized any "constitutional defect[]" in DAPA, *see Regents* Supp. App. 48a-49a. The decision memorandum asserts that the agency was unable to identify specific discretionary denials of deferred action involving applicants who "appeared to satisfy

---

[16] *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (a preliminary injunction is "often dependent as much on the equities of a given case as the substance of the legal issues it presents," and its purpose is "not to conclusively determine the rights of the parties").

the" DACA eligibility criteria, *Regents* Pet. App. 112a-113a n.1, an assertion that petitioners have since admitted is incorrect, *see* J.A. 1010.

The agency also failed to demonstrate any "awareness that it [was] changing position[s]." *Fox Television*, 556 U.S. at 515. Petitioners created DACA after receiving advice from the Office of Legal Counsel that it would be lawful, J.A. 827 n.8; they successfully defended the policy in court, *supra* p. 4; and they continued the policy long after this Court's summary affirmance in the DAPA case—soliciting, accepting, and processing hundreds of thousands of applications for deferred action under DACA during the last seven months of the Obama Administration and the first seven months of the Trump Administration.[17] The decision memorandum does not acknowledge any of that history. *See Fox Television*, 556 U.S. at 515.

After finding the explanation in the decision memorandum inadequate, the D.C. district court stayed its vacatur order to allow the agency an opportunity to "provid[e] a fuller explanation for the determination that [DACA] lacks statutory and constitutional authority." *NAACP* Pet. App. 66a; *see infra* pp. 49-50. But when Secretary Nielsen responded in a supplemental memorandum, she barely expanded on the explanation offered by her predecessor. Once again, the agency's explanation of why "the DACA policy was contrary to law" relied exclusively on the Attorney General's letter and the Fifth Circuit's decision. *Regents* Pet. App. 122a; *see id.* at 122a-123a. The supplemental memorandum at least acknowledged the

---

[17] *See* USCIS, *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake Biometrics and Case Status, Fiscal Year 2012-2017* (June 30, 2017), https://tinyurl.com/y868mj7y.

existence of "arguable distinctions between the DAPA and DACA policies," *id.* at 122a, but it did not discuss those distinctions or explain why the agency believed the Fifth Circuit's decision was fatal to DACA.  *See NAACP* Pet. App. 105a ("[T]he Nielsen Memo offers nothing even remotely approaching a considered legal assessment.").

Petitioners' argument that the "APA demands nothing more" than the unelaborated assertions of illegality that the agency offered here (U.S. Br. 52) misunderstands both the nature and purpose of the requirement for a reasoned explanation.  *See Dep't of Commerce*, 139 S. Ct. at 2575.  That requirement "is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."  *Id.* at 2575-2576.  A reasoned explanation facilitates effective judicial review and ensures "political accountability," which is "the very premise of administrative discretion in all its forms."  *Newman v. Apfel*, 223 F.3d 937, 943 (9th Cir. 2000) (O'Scannlain, J.); *see Regents* Supp. App. 31a-34a.

While an agency need not prepare "the equivalent of a bench memo" to explain its changed legal position, *Regents* C.A. Dkt. 31 at 31, that does not excuse it from offering enough of an explanation to allow a jurist or a concerned citizen to understand the true basis for the agency's conclusion that one of its own policies was unlawful.  Here, even a discerning reader is left uncertain about, for example, whether the Executive Branch believes that DACA violates the Constitution (and, if so, why), and on what basis it believes the policy exceeds the Executive's broad statutory authority to decide how to enforce the immigration laws.  Especially when making a decision that directly affects the

lives of hundreds of thousands of people, an agency owes the public and the courts a more substantial and reasoned explanation.

## C. Alternative Rationales Advanced by Petitioners During this Litigation Cannot Save the Termination Decision

The bulk of petitioners' merits arguments before this Court address rationales that the Acting Secretary did not express in her September 2017 decision memorandum. *See* U.S. Br. 32-43. Those additional rationales were either advanced by counsel during the course of this litigation or presented in Secretary Nielsen's June 2018 supplemental memorandum, which "decline[d] to disturb" the challenged decision. *Regents* Pet. App. 121a. They are not properly considered here. Petitioners chose to justify this important decision on the ground that DACA is unlawful. Unless and until they choose to supersede that original action with some new one, their decision must "stand or fall" on that ground. *Camp*, 411 U.S. at 143.

### 1. "Litigation Risk"

A court conducting review under the APA "may not accept appellate counsel's *post hoc* rationalizations for agency action." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Petitioners have argued in these proceedings that the termination decision may be justified on an alternative "litigation risk" rationale. U.S. Br. 27. The great majority of the courts to consider the issue have correctly held that this rationale is *post hoc*. *See Regents* Supp. App. 35a; *Regents* Pet. App. 55a-57a; *Batalla Vidal* Pet. App. 109a-112a; *Casa de Md.*, 924 F.3d at 700 & n.12. As discussed above, *supra* p. 21, the decision memorandum never even mentioned litigation risk as an alternative ground for the decision.

**AR4049**

Petitioners argue that such a rationale can be inferred. *See* U.S. Br. 26-28. A corollary of the principle that courts must review agency action on the contemporaneous basis identified by the decisionmaker, however, is that the "basis must be set forth with such clarity as to be understandable." *Chenery II*, 332 U.S. at 196. A reviewing court may not "chisel that which must be precise from what the agency has left vague and indecisive." *Id.* at 197. Neither the "discussion of the prior litigation" over DAPA in the decision memorandum's "Background" section, U.S. Br. 28, nor the Acting Secretary's "statement that she 'should'—not must—rescind DACA," *id.*, is sufficient to suggest to a discerning reader that the decision was based on an assessment of litigation risk.

And even if a separate litigation risk rationale could reasonably be discerned from the decision memorandum, *see NAACP* Pet. App. 56a, it could not support the decision, *see id.* at 56a-59a. While the memorandum briefly describes the DAPA litigation and notes that Texas had threatened to challenge DACA, there is no indication that the agency conducted any reasoned assessment of that threat. Any such assessment would have had to consider the availability of possible defenses, both procedural and on the merits. It would have evaluated policy adjustments the agency might make to forestall any legal attack. And it would have balanced any perceived risk of a possible adverse court decision against the costs—to DACA recipients, the States, the federal government, and the overall economy—that were certain to be inflicted by abruptly ending the policy. Nothing in the decision memorandum or the proffered administrative record

suggests that the agency gave any thought to those considerations.[18]

Nor can the decision to rescind DACA be justified by concerns about an immediate "court-ordered shutdown" on terms "beyond the agency's control" (U.S. Br. 35)—even if those concerns had been expressed in the decision memorandum. District courts have "broad discretion" to "fashion[] equitable relief." *E.g.*, *Crawford v. Silette*, 608 F.3d 275, 278 (5th Cir. 2010). The equities surrounding a challenge to a policy that has been in place for years, and one on which hundreds of thousands of young people have structured their lives, would weigh heavily against any abrupt court-ordered shutdown. Indeed, after the threatened litigation eventually materialized in May 2018, the district court in Texas, while inclined to agree with the plaintiffs on the merits, refused to enter any provisional order shutting down the policy. *Texas v. United States*, 328 F. Supp. 3d 662, 740 (S.D. Tex. 2018).

### 2. Former Secretary Nielsen's Policy Rationales

Most of petitioners' merits arguments focus on rationales unveiled in Secretary Nielsen's supplemental memorandum, which was submitted to the district court in the D.C. proceeding. *See* U.S Br. 35, 37-43. Those new rationales are not properly considered here.

Judicial review of agency action is ordinarily limited to the contemporaneous rationale of the formal

---

[18] When the D.C. district court invited the agency to further explain any concern about litigation risk, Secretary Nielsen invoked the "burdens[]" of litigation and her "serious doubts" about DACA's legality (based principally on the "determination and ruling" in the Attorney General's summary letter), but again offered no reasoned assessment of the threat. *Regents* Pet. App. 123a.

agency decisionmaker and the complete administrative record before the agency at the time of the decision. *See Dep't of Commerce*, 139 S. Ct. at 2573; *Camp*, 411 U.S. at 143. If the decision cannot be sustained on that basis, the proper course is normally to vacate the decision and remand to the agency for further consideration. *See Camp*, 411 U.S. at 143; *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see generally* 5 U.S.C. § 706(2)(A). Vacatur allows the agency to "deal with the problem afresh," *Chenery II*, 332 U.S. at 201, and it serves an important "'think-it-over' function," Friendly, *Chenery Revisited*, 1969 Duke L.J. 199, 209 (1969). Courts allow the agency to take a fresh look at the problem—even if there is "scant doubt" about what it will do in the new proceeding, *id.*—out of respect for the proper division of authority between the judicial and executive branches. And remand benefits the public by requiring the agency to state formally and forthrightly the grounds for any further action.

In rare circumstances, some courts defer vacatur and instead invite the agency to provide further explanation for a rationale that would not otherwise satisfy the APA's requirements for reasoned decisionmaking. At its most formal this practice is known as "remand without vacatur," and it is not without controversy.[19] But it has been recognized by the D.C. Circuit, *see, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019), and finds some support in this Court's jurisprudence, *see Camp*, 411 U.S. at 143; *Overton Park*, 401 U.S. at 420. It affords the agency

---

[19] *See, e.g.*, *Checkosky v. SEC*, 23 F.3d 452, 490-493 (D.C. Cir. 1994) (opinion of Randolph, J.) (remand without vacatur is "flatly prohibit[ed]" by section 706(2)(A)'s command that reviewing courts "'shall . . . hold unlawful and set aside' the agency action").

an opportunity to submit "an amplified articulation" of the rationale it originally advanced. *Local 814, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976). What it does not afford is an opportunity to defend an old decision on new rationales. Whether the "additional explanation" is obtained through a formal remand, *id.*, or through a less formal procedure, it "should be merely explanatory of the original record and should contain no new rationalizations." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981) (addressing agency affidavits).

This Court's decision in *Camp* underscores that limitation. The Court acknowledged the possibility of seeking "additional explanation" of the agency's "curt" stated rationale, which rested on a "finding that a new bank was an uneconomic venture." 411 U.S. at 143. But it added that "[i]f *that finding* is not sustainable on the administrative record [originally] made, then the Comptroller's decision must be vacated." *Id.* (emphasis added).

Here, the D.C. district court stayed its judgment vacating the termination decision for 90 days to give petitioners "an opportunity to better explain" their stated rationale "that DACA is unlawful." *NAACP* Pet. App. 74a; *see id.* at 66a. Petitioners could have responded to the court's invitation by providing a reasoned explanation for that original rationale. Or they could have advanced new rationales for terminating DACA—by "issu[ing] a new decision" presenting any such rationales, which then would have been the basis for any future judicial review. *Id.* at 94a n.7; *cf. Int'l Refugee Assistance Project*, 137 S. Ct. at 2083. But petitioners did neither.

Instead, Secretary Nielsen submitted a short supplemental memorandum that purported to give "further explanation" for her predecessor's rationale, *Regents* Pet. App. 121a, but in fact "provide[d] almost no meaningful elaboration on the Duke Memo's assertion that DACA is unlawful," *NAACP* Pet. App. 104a. At the same time, she emphasized that she was not making any new decision: she "decline[d] to disturb the Duke memorandum's rescission of the DACA policy," and wrote only to explain her "understanding of the Duke memorandum and why [Duke's] decision to rescind the DACA policy was, and remains, sound." *Regents* Pet. App. 121a. As a direct consequence of the agency's choice to stand by its original decision, that decision must "stand or fall" based on the rationale identified in Duke's original decision memorandum and the agency's explanation of that rationale. *Camp*, 411 U.S. at 143. Secretary Nielsen's new policy rationales cannot be advanced to sustain the earlier decision.

In any event, those new rationales would not satisfy the requirements of the APA. Most of the "reasons of enforcement policy" identified by Secretary Nielsen (*Regents* Pet. App. 123a) are in fact premised on the validity of the legal ground offered by her predecessor. Nielsen describes her "serious doubts about [DACA's] legality," *id.*; asserts that grants of deferred action under the DACA policy are not "truly individualized" or "case-by-case," *id.* at 124a; and contends that a policy such as DACA "should be enacted legislatively," *id.* Those rationales "simply recapitulate" the agency's unsupported and incorrect conclusion that DACA is unlawful. *NAACP* Pet. App. 106a. At the very least, they depend heavily on the premise that DACA is unlawful, and there is reason to doubt that Secretary Nielsen would have advanced them if she knew that premise was incorrect.

**AR4054**

Secretary Nielsen's final rationale is that the agency terminated DACA to "project a message" of "clear" and "consistent" enforcement of the immigration laws in response to an influx of "minor aliens" who "have illegally crossed or been smuggled across our border in recent years." *Regents* Pet. App. 124a. Petitioners acknowledge that this argument "was not reflected in the Duke Memorandum." U.S. Br. 31. This type of policy rationale could be reviewed under the arbitrary and capricious standard, in light of the "full administrative record," if offered as a contemporaneous ground for agency action. *Overton Park*, 401 U.S. at 420; *see Dep't of Commerce*, 139 S. Ct. at 2573; *Camp*, 411 U.S. at 143. Here, however, the problem is not just that the agency decisionmaker did not advance this policy rationale, but also that there is no support for Nielsen's policy views in the proffered record of materials underlying Duke's decision. Petitioners acknowledge as much by citing only materials from outside that record to bolster this rationale. *See* U.S. Br. 40-41.

That deficiency highlights why it is not appropriate to review agency action based on new, after-the-fact rationales. This Court limits review to the originally stated rationale not for the sake of formalism, but so that courts and the public can evaluate the justifications for agency action offered by the accountable agency decisionmaker in light of the information before the agency at the time of the decision. A rule allowing agencies to introduce a new rationale long after the decision was made would blur the lines of accountability, by creating confusion about who made the decision and why they did so; it would reduce the agency's incentives for offering a sustainable rationale in the first instance; and it would deprive the courts and the public of the record materials necessary to

evaluate whether the new rationale is a genuine one that resulted from reasoned decisionmaking. *Cf. Dep't of Commerce*, 139 S. Ct. at 2575-2576.

The D.C. district court recognized that nothing prevented former Secretary Nielsen from "issu[ing] a new decision rescinding DACA." *NAACP* Pet. App. 94a n.7. Nothing prohibits her successor from doing the same. Indeed, given petitioners' stated concerns that continued judicial review of the Acting Secretary's decision has "undermined [the] political process" by frustrating their "attempt[s] to negotiate a legislative solution," U.S. Br. 32, the most perplexing aspect of this case may be that they have not done so. If the agency issues a new decision, any further judicial review would properly focus on whatever rationales are publicly proffered to support it. Until then, however, petitioners must defend their decision to terminate DACA on the legal rationale they offered to the public and the courts in the decision memorandum signed by Acting Secretary Duke.

## III. THE JUDGMENTS OF THE COURTS BELOW SHOULD BE AFFIRMED

Because the contemporaneous rationale that the agency offered for the termination decision rests on an incorrect and inadequately explained premise, the decision is subject to vacatur. *See* 5 U.S.C. § 706(2)(A). It follows that the final judgment of the D.C. district court should be affirmed. It follows *a fortiori* that the respondents in the California and New York actions are likely to succeed on the merits. And the equitable considerations here tilt overwhelmingly in favor of affirming the provisional relief granted in those proceedings: petitioners have not identified any tangible harm caused by DACA; and they do not dispute the profound harm that their decision would cause to

individuals, families, communities, employers, universities, and States as a result of nearly 700,000 DACA recipients losing their deferred action. *See, e.g.*, *Regents* Pet. App. 62a-63a.

Although the D.C. case arrives at this Court following a final judgment, the California and New York cases remain in an interlocutory posture, following the district courts' partial denials of petitioners' motions to dismiss. In the California case, for example, the lower courts ruled that respondents stated a due process claim regarding changes to the federal policy governing the sensitive personal information provided by DACA recipients. *Regents* Supp. App. 68a-73a; *Regents* Pet. 79a-81a. Petitioners mentioned those rulings in their petition, *see Regents* Pet. 31, but have forfeited any challenge to them by omitting the issue from their merits brief. *See, e.g.*, *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 140 n.2 (2014).[20]

As to the pending APA claims, the respondents in California and New York (unlike those in D.C.) have challenged the adequacy of the 14-document administrative record proffered by petitioners—and every court to consider that question has held that the proffered record is incomplete.[21] If this Court holds that

---

[20] Although the state respondents in the California proceeding did not allege an equal protection claim based on discriminatory animus (*see* U.S. Br. 52-57), the court of appeals correctly denied the motion to dismiss as to that claim (*see Regents* Supp. App. 73a-77a).

[21] *See In re United States*, 875 F.3d 1200, 1205 (9th Cir. 2017), *judgment vacated*, 138 S. Ct. 443 (2017); *In re Nielsen*, No. 17-3345, Dkt. 171 at 2-3 (2d. Cir. Dec. 27, 2017); *Regents* D.Ct. Dkt. 79 at 8; *Batalla Vidal* D.Ct. Dkt. 89 at 3.

the APA claim is reviewable and then affirms the judgment in the D.C. case, that would substantially resolve the remaining proceedings.  But if the claim is reviewable and the D.C. judgment is not affirmed in its entirety, then the California and New York cases should be remanded for completion of the administrative record.

Obtaining the complete record is not a matter of mere academic significance.  Petitioners promoted and continued DACA well into the present federal administration and long after the rulings in the DAPA case; they terminated the policy after private deliberations with the state plaintiffs in the DAPA litigation (which are not reflected in the proffered administrative record); and they chose to offer a legal conclusion as the sole basis for the decision, but have separately advanced numerous policy rationales (which also are not reflected or supported in the proffered record), *see, e.g.*, J.A. 999-1004; *Regents* Pet. App. 123a-125a.  That sequence of events raises legitimate questions about whether the rationale offered by the agency here is a "contrived excuse."  *See Regents* Supp. App. 75a. While agencies normally enjoy a presumption of regularity, U.S. Br. 30, the courts are always entitled to obtain the complete administrative record before finally resolving the legality of agency action—to ensure, among other things, that the rationale offered by the agency is a genuine one.  *Cf. Dep't of Commerce*, 139 S. Ct. at 2575 (court order requiring completion of administrative record led to documents establishing that "the sole stated reason" for the agency decision "seems to have been contrived").

55

## CONCLUSION

The judgments below should be affirmed.

Respectfully submitted,

XAVIER BECERRA
  *Attorney General of California*
MICHAEL J. MONGAN
  *Solicitor General*
MICHAEL L. NEWMAN
  *Senior Assistant Attorney General*
SAMUEL P. SIEGEL
JOSHUA PATASHNIK
  *Deputy Solicitors General*
SHUBHRA SHIVPURI
JAMES F. ZAHRADKA II
  *Deputy Attorneys General*

AARON M. FREY
  *Attorney General of Maine*
SUSAN P. HERMAN
  *Deputy Attorney General*

BRIAN E. FROSH
  *Attorney General of Maryland*
STEVEN M. SULLIVAN
  *Solicitor General*
LEAH J. TULIN
  *Assistant Attorney General*

KEITH ELLISON
  *Attorney General of Minnesota*
LIZ KRAMER
  *Solicitor General*
JACOB CAMPION
  *Assistant Attorney General*

September 27, 2019

**AR4059**

Nos. 18-587, 18-588, 18-589

IN THE

# Supreme Court of the United States

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,

*Respondents.*

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL.,

*Respondents.*

**On Writ Of Certiorari To The United States Court Of Appeals For The Ninth Circuit And Writ Of Certiorari Before Judgment To The United States Court Of Appeals For The Second Circuit**

**Brief for DACA Recipient Respondents, Make the Road New York, County of Santa Clara, and Service Employees International Union Local 521**

THEODORE J. BOUTROUS, JR.
ETHAN D. DETTMER
JONATHAN N. SOLEIMANI
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

MARK D. ROSENBAUM
JUDY LONDON
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
(213) 385-2977

THEODORE B. OLSON
 *COUNSEL OF RECORD*
STUART F. DELERY
MATTHEW S. ROZEN
ANDREW J. WILHELM
SURIA M. BAHADUE
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
TOlson@gibsondunn.com

*Counsel for DACA Recipient Respondents in No. 18-587*
*(Additional Captions and Counsel Listed on Inside Cover)*

**AR4060**

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

*Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.,

*Respondents.*

————————

**On Writ Of Certiorari Before Judgment To The United States Court Of Appeals For The District Of Columbia Circuit**

————————

ERWIN CHEMERINSKY
UNIVERSITY OF CALIFORNIA,
BERKELEY SCHOOL OF LAW*
215 Boalt Hall
Berkeley, CA  94720
(510) 642-6483

LAURENCE H. TRIBE
HARVARD LAW SCHOOL*
1575 Massachusetts Avenue
Cambridge, MA  02138
(617) 495-1767

LUIS CORTES ROMERO
IMMIGRANT ADVOCACY & LITIGATION
CENTER, PLLC
19309 68th Avenue South,
Suite R102
Kent, WA  98032
(253) 872-4730

LEAH M. LITMAN
UNIVERSITY OF MICHIGAN
LAW SCHOOL*
3226 Jeffries Hall
Ann Arbor, MI 48109
(734) 764-0549

*Additional Counsel for DACA Recipient Respondents in No. 18-587*

*\*Affiliation for identification purposes only*

**AR4061**

MICHAEL J. WISHNIE
MUNEER I. AHMAD
MARISOL ORIHUELA
JEROME N. FRANK LEGAL
SERVICES ORGANIZATION
P.O. Box 209090
New Haven, CT 06520
(203) 432-4800

KAREN C. TUMLIN
COOPERATING ATTORNEY
JEROME N. FRANK LEGAL
SERVICES ORGANIZATION
P.O. Box 209090
New Haven, CT 06520
(323) 316-0944

AMY S. TAYLOR
PAIGE AUSTIN
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
(718) 418-7690

TRUDY S. REBERT
NATIONAL IMMIGRATION LAW
CENTER
P.O. Box 721361
Jackson Heights, NY 11372
(646) 867-8793

ARACELI MARTÍNEZ-OLGUÍN
MAYRA B. JOACHIN
NATIONAL IMMIGRATION LAW
CENTER
3450 Wilshire Blvd.
#108-62
Los Angeles, CA 90010
(213) 639-3900

SCOTT FOLETTA
MAKE THE ROAD NEW YORK
92-10 Roosevelt Avenue
Jackson Heights, NY 11372
(929) 244-3456

*Counsel for DACA Recipient Respondents and*
*Make the Road New York in No. 18-589*

STACEY M. LEYTON
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151

*Counsel for Respondents County of*
*Santa Clara and Service Employees*
*International Union Local 521 in*
*No. 18-587*

JAMES R. WILLIAMS
GRETA S. HANSEN
LAURA S. TRICE
MARCELO QUIÑONES
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street
East Wing, Ninth Floor
San Jose, CA 95110
(408) 299-5900

*Counsel for Respondent County of*
*Santa Clara in No. 18-587*

**AR4062**

i

## QUESTIONS PRESENTED

Since 2012, the Deferred Action for Childhood Arrivals ("DACA") policy has enabled nearly 800,000 undocumented individuals who arrived in the United States as children to live and work here without fear of deportation, so long as they qualify and remain eligible for the policy.  In September 2017, the Attorney General issued a one-page, conclusory letter reversing the government's longstanding legal position.  Bound by the Attorney General's advice, the Acting Secretary of Homeland Security abruptly issued a new immigration enforcement policy that terminated DACA.

The questions presented in these consolidated cases are:

1.   Whether either the Administrative Procedure Act ("APA"), 5 U.S.C. § 701(a)(2), or the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252(b)(9), (g), precludes judicial review of the Secretary's decision to terminate the DACA policy.

2.   Whether the Secretary's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA, 5 U.S.C. § 706(2)(A).

**AR4063**

ii

## PARTIES TO THE PROCEEDING

In No. 18-587, Petitioners are Donald J. Trump, President of the United States; William P. Barr, Attorney General of the United States; Kevin K. McAleenan, Acting Secretary of Homeland Security; U.S. Department of Homeland Security; and the United States.

Respondents are the Regents of the University of California; Janet Napolitano, President of the University of California; the State of California; the State of Maine; the State of Maryland; the State of Minnesota; the City of San Jose; Dulce Garcia; Miriam Gonzalez Avila; Saul Jimenez Suarez; Viridiana Chabolla Mendoza; Norma Ramirez; Jirayut Latthivongskorn; the County of Santa Clara; and Service Employees International Union Local 521.[*]

In No. 18-588, Petitioners are Donald J. Trump, President of the United States; William P. Barr, Attorney General of the United States; Kevin K. McAleenan, Acting Secretary of Homeland Security; U.S. Citizenship and Immigration Services; U.S. Immigration and Customs Enforcement; the U.S. Department of Homeland Security; and the United States.

Respondents are the Trustees of Princeton University; Microsoft Corporation; Maria De La Cruz Perales Sanchez; National Association for the Advancement of Colored People; American Federation of Teachers, AFL-CIO; and the United Food and Commercial Workers International Union, AFL-CIO, CLC.

---

[*]  After the Complaint was filed in September 2017, Viridiana Chabolla Mendoza was granted Lawful Permanent Resident status.

**AR4064**

iii

In No. 18-589, Petitioners are Kevin K. McAleenan, Acting Secretary of Homeland Security; the U.S. Department of Homeland Security; William P. Barr, Attorney General of the United States; Donald J. Trump, President of the United States; U.S. Citizenship and Immigration Services; U.S. Immigration and Customs Enforcement; and the United States.

Respondents are Martin Jonathan Batalla Vidal, Antonio Alarcon, Eliana Fernandez, Carlos Vargas, Mariano Mondragon, and Carolina Fung Feng, on behalf of themselves and all other similarly situated individuals; Make the Road New York, on behalf of itself, its members, its clients, and all similarly situated individuals; the State of New York; the State of Massachusetts; the State of Washington; the State of Connecticut; the State of Delaware; the District of Columbia; the State of Hawaii; the State of Illinois; the State of Iowa; the State of New Mexico; the State of North Carolina; the State of Oregon; the State of Pennsylvania; the State of Rhode Island; the State of Vermont; the State of Virginia; and the State of Colorado.

AR4065

iv

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................ 1

STATEMENT ........................................................... 3

SUMMARY OF ARGUMENT ....................................... 14

ARGUMENT ........................................................... 17

    I.   DHS's New Immigration Enforcement Policy Terminating DACA Is Judicially Reviewable .................................................... 17

        A.  The APA Does Not Bar Judicial Review ............................................... 18

            1.  DHS's Action Is Not A Traditionally Unreviewable Nonenforcement Decision ............... 18

            2.  There Are Meaningful Standards For Judicial Review ....... 21

        B.  The INA Does Not Bar Judicial Review ............................................... 28

   II.  DHS Violated The APA By Failing To Engage In Reasoned Decisionmaking ......... 29

        A.  The Government Violated the APA By Failing To Explain Its Policy Change Or Acknowledge Its Prior Stance On DACA's Legality ................... 30

        B.  The Government Violated the APA By Failing To Consider The Costs Of Its Decision Or The Interests Affected ................................................... 33

        C.  The Decision Violates the APA Because Its Central Legal Premise—That DACA Is Unlawful—Is Wrong ............................. 37

**AR4066**

v

D.  The Government's Other Proffered Rationales Do Not Justify DHS's Policy ....................................................48

   1.  Concerns About Litigation Risk Do Not Justify The Decision................................48

   2.  Secretary Nielsen's Memorandum Does Not Justify The Decision....................................53

CONCLUSION .........................................................59

vi

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arizona v. United States,*
    567 U.S. 387 (2012)....................................3, 39, 44

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015)................................31

*Berger v. United States,*
    295 U.S. 78 (1935)................................................43

*Bowman Transp., Inc. v. Ark.-Best*
    *Freight Sys., Inc.,*
    419 U.S. 281 (1974)........................................30, 33

*Burlington Truck Lines, Inc. v.*
    *United States,*
    371 U.S. 156 (1962).............................................48

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014).............................................38

*Capitol Sprinkler Inspection, Inc. v.*
    *Guest Servs., Inc.,*
    630 F.3d 217 (D.C. Cir. 2011)............................25

*Citizens for Responsibility & Ethics in*
    *Washington v. U.S. Dep't of Justice,*
    922 F.3d 480 (D.C. Cir. 2019)............................32

*Citizens to Pres. Overton Park, Inc. v.*
    *Volpe,*
    401 U.S. 402 (1971)........................................24, 53

AR4068

vii

*Cooter & Gell v. Hartmarx Corp.*,
   496 U.S. 384 (1990)...............................................48

*Crane v. Johnson*,
   783 F.3d 244 (5th Cir. 2015)...............................31

*Crowley Caribbean Transp., Inc. v.*
   *Pena*,
   37 F.3d 671 (D.C. Cir. 1994).............................20

*Dalton v. Specter*,
   511 U.S. 462 (1994).............................................32

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981).............................................42

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019)...............................*passim*

*E. Bay Sanctuary Covenant v. Trump*,
   354 F. Supp. 3d 1094
   (N.D. Cal. 2018)...................................................54

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016)...................................30, 34

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009).......................................26, 35

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992).............................................23

*Heckler v. Chaney*,
   470 U.S. 821 (1985)..................................19, 20, 22

AR4069

viii

*ICC v. Brotherhood of Locomotive Engineers*,
    482 U.S. 270 (1987)........................................23, 25

*INS v. St. Cyr*,
    533 U.S. 289 (2001)..............................................17

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018)....................................28, 29

*Judulang v. Holder*,
    565 U.S. 42 (2011)..............................................27

*Kingdomware Techs., Inc. v. United States*,
    136 S. Ct. 1969 (2016).........................................37

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)....................................22, 40

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950)..............................................43

*M.G.U. v. Nielsen*,
    325 F. Supp. 3d 111 (D.D.C. 2018).....................54

*Mach Mining, LLC v. EEOC*,
    135 S. Ct. 1645 (2015)..............................18, 19, 28

*Make the Road N.Y. v. U.S. Dep't Homeland Sec.*,
    No. 1:18-cv-2445, ECF No. 63-1
    (E.D.N.Y. Aug. 14, 2019)...............................11, 50

AR4070

ix

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) ...............................22

*Mass. Trs. of E. Gas & Fuel Assocs. v.*
    *United States,*
    377 U.S. 235 (1964)..................................51, 53, 58

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)...............................................20

*Michigan v. EPA,*
    135 S. Ct. 2699 (2015).................26, 29, 34, 35, 36

*Mingo Logan Coal Co. v. EPA,*
    829 F.3d 710 (D.C. Cir. 2016) .......................34, 57

*Moses H. Cone Mem'l Hosp. v. Mercury*
    *Constr. Corp.,*
    460 U.S. 1 (1983)................................................25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc.*
    *v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983).........................................37, 48

*Ms. L. v. ICE,*
    310 F. Supp. 3d 1133 (S.D. Cal.
    2018) ....................................................................54

*In re Nielsen,*
    No. 17-3345, ECF No. 171
    (2d Cir. Dec. 27, 2017).........................................10

*Red Lion Broad. Co. v. FCC,*
    395 U.S. 367 (1969)..............................................41

**AR4071**

x

*Reno v. Am.-Arab Anti-Discrimination*
    *Comm.,*
    525 U.S. 471 (1999)..................5, 28, 29, 40, 41, 45

*Rucho v. Common Cause,*
    139 S. Ct. 2484 (2019)...........................................45

*Rutledge v. United States,*
    517 U.S. 292 (1996)...............................................33

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943)...........................................29, 48

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947)...............................................48

*Sessions v. Dimaya,*
    138 S. Ct. 1204 ...............................................43, 45

*Shieldalloy Metallurgical Corp. v.*
    *Nuclear Regulatory Comm'n,*
    624 F.3d 489 (D.C. Cir. 2010)..............................37

*SPV-LS, LLC v. Transamerica Life*
    *Ins. Co.,*
    912 F.3d 1106 (8th Cir. 2019).............................25

*Texas v. United States,*
    136 S. Ct. 2271 (2016)............................................8

*Texas v. United States,*
    328 F. Supp. 3d 662 (S.D. Tex. 2018).................52

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015)....8, 21, 32, 44, 51, 52

**AR4072**

xi

*Trump v. Hawaii,*
 138 S. Ct. 2392 (2018)..............................25, 43, 54

*United States v. Armstrong,*
 517 U.S. 456 (1996).............................................42

*United States v. Riverside Bayview Homes, Inc.,*
 474 U.S. 121 (1985).............................................42

*Utility Air Regulatory Grp. v. EPA,*
 573 U.S. 302 (2014).............................................40

*Walter O. Boswell Mem'l Hosp. v. Heckler,*
 749 F.2d 788 (D.C. Cir. 1984)...............................36

*Wayte v. United States,*
 470 U.S. 598 (1985).............................................42

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
 139 S. Ct. 361 (2018)...........................................17

*White Stallion Energy Ctr., LLC v. EPA,*
 748 F.3d 1222 (D.C. Cir. 2014)............................36

*Youngstown Sheet & Tube Co. v. Sawyer,*
 343 U.S. 579 (1952).............................................42

**Statutes**

5 U.S.C. § 701(a)(1) ................................................18

5 U.S.C. § 701(a)(2) ...........................................14, 18

xii

5 U.S.C. § 706(2)(A) ........................... 10, 16, 27, 29, 47

5 U.S.C. § 706(2)(C) ................................................... 27

5 U.S.C. § 1151(b)(2)(A)(i) ........................................ 51

6 U.S.C. § 202(5) ............................................. 4, 28, 39

8 U.S.C. § 1103(a)(1) ................................................. 21

8 U.S.C. § 1103(a)(3) ................................................. 39

8 U.S.C. § 1182(a)(9)(B) ............................................ 38

8 U.S.C. § 1227(d)(2) ................................................. 41

8 U.S.C. § 1252(b)(9) ......................................... 15, 28, 29

8 U.S.C. § 1252(g) ..................................... 15, 28, 29, 41

8 U.S.C. § 1324a(h)(3) ........................................... 5, 41

8 U.S.C. § 1427 ....................................................... 51

8 U.S.C. § 1611(b)(2)-(4) ............................................. 6

Consolidated Appropriations Act, 2008,
    Pub. L. No. 110-161, Div. A, Tit. II,
    121 Stat. 1844, 2051 ........................................... 28

Consolidated Appropriations Act, 2016,
    Pub. L. No. 114-113, Div. F, Tit. II,
    129 Stat. 2242, 2497 ........................................... 28

REAL ID Act of 2005, Pub. L. No. 109-
    13, Div. B., § 201(c)(2)(B)(viii), 119
    Stat. 302 (2005) ............................................ 6, 42

AR4074

xiii

USA PATRIOT Act of 2001, Pub. L. No.
107-56, § 423(b), 115 Stat. 361 ............................41

## Regulations

8 C.F.R. § 1.3(a)(4)(vi) ...........................................6, 38

8 C.F.R. § 109.1(b)(6) (1982) ...........................5, 40, 41

8 C.F.R. § 212.5 ..........................................................6

8 C.F.R. § 274a.12(c)(14) ...............................5, 38, 40

42 C.F.R. § 417.422(h).........................................6, 38

## Other Authorities

American Immigration Council,
*Executive Grants of Temporary
Immigration Relief, 1956-Present*
(Oct. 2014),
https://tinyurl.com/y27k6qx8.......................4, 5, 46

Ana Gonzalez-Barrera, *Record Number
of Deportations in 2012*, Pew
Research Center (Jan. 24, 2014),
https://tinyurl.com/y292hjnh. ..............................47

Andorra Bruno et al., Cong. Research
Serv., Analysis of June 15, 2012
DHS Memorandum, *Exercising
Prosecutorial Discretion with Respect
to Individuals Who Came to the
United States as Children* (July 13,
2012) .....................................................................39

**AR4075**

xiv

*DHS Secretary on Trump's Reported Vulgar Comments, DACA Policy*, CBS News (Jan. 16, 2018), https://tinyurl.com/y8ekmzar ..............................44

H.R. Rep. No. 627, 100th Cong., 2d Sess. 6 (1988)..........................................................4

Jeffrey S. Passel & Mark Hugo Lopez, Pew Research Center, *Up to 1.7 Million Unauthorized Immigrant Youth May Benefit from New Deportation Rules* (Aug. 14, 2012)......................46

Memorandum from Doris Meissner, Commissioner of Immigration and Naturalization Service, on Exercising Prosecutorial Discretion (Nov. 17, 2000), https://tinyurl.com/ y6hw8gsq ..............................................................45

Memorandum from Johnny N. Williams, Exec. Assoc. Comm'r, Office of Field Operations, to Reg'l Dirs. et al., *Unlawful Presence* (June 12, 2002) .....................38

Moore's Federal Practice § 54.25[4] (2019)..................................................................26

Moore's Federal Practice § 59.30[6] (2019)..................................................................26

No Free Rides Act, H.R. 3090, 115th Cong. (June 28, 2017) .........................................44

AR4076

xv

The Separation of Powers Act of 2015,
H.R. 29, 114th Cong. (Jan. 6, 2015) ...................44

Tom K. Wong & Hillary Kosnac, *Does
the Legalization of Undocumented
Immigrants in the US Encourage
Unauthorized Immigration from
Mexico? An Empirical Analysis of the
Moral Hazard of Legalization*
International Migration 159 (2017) ...................56

AR4077

1

## INTRODUCTION

The Constitution and federal immigration laws afford the Executive Branch significant authority to set immigration enforcement priorities. For decades, presidential administrations from both political parties have used that authority to permit certain categories of individuals to remain and work in the United States. The principal check on the Executive's authority in this area is procedural: As with other exercises of the government's coercive power, the Executive must comply with the Administrative Procedure Act ("APA") by giving "reasoned explanation[s] … that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019). An administration may impose new or different priorities, but only if it adheres to APA requirements and clearly states its policy choices so that it can be held publicly accountable for them. The judiciary, in turn, has a limited but essential role: ensuring that the Executive considers and clearly explains the consequences of new approaches, especially for those who will be profoundly affected by a change.

This case concerns an immigration policy change covering undocumented individuals who arrived in the United States as children. Since 2012, the Deferred Action for Childhood Arrivals ("DACA") policy allowed these individuals, known as "Dreamers," to obtain an education, work, and contribute to this nation and its economy without constant fear of deportation. The Secretary of Homeland Security announced DACA in a memorandum that explicitly articulated the factors underlying the policy: the agency's limited "enforcement resources," DACA recipients'

**AR4078**

2

"contribut[ions] to our country," and the need for a "clear and efficient process for exercising prosecutorial discretion" on an "individual basis." *Regents* Pet. App. 98a-100a. The policy has been widely perceived as a success, and many people—including DACA recipients, and their families, employers, and educational institutions—have made significant decisions based on forbearance from removal, just as the government intended them to do.

For many months, the current administration maintained and publicly supported DACA. But in September 2017, the Secretary suddenly announced a new policy that terminated the five-year-old policy, threatening deportation of DACA recipients from the only country many of them have ever known as home. In sharp contrast to the decision adopting DACA, the new memorandum came nowhere near satisfying the APA's requirements for reasoned decisionmaking. The Secretary did not even mention enforcement resources or the significant costs to DACA recipients, their families, communities, workplaces, schools, and the larger economy.

The government has offered different rationales for the decision over time. But the same fatal flaw infects them all: The Secretary's assertion that DACA exceeded her authority. In terminating DACA, the Secretary purported to respond to a binding letter from the Attorney General stating that DACA is unlawful and unconstitutional. The letter's perfunctory legal analysis included an obvious factual error and failed to acknowledge the administration's departure from the Executive Branch's longstanding legal position, as presented to this Court and reflected in advice of the Justice Department's Office of Legal Counsel ("OLC"). In fact, the Secretary's ostensible

3

legal premise driving her decision was erroneous: DACA is lawful.

The administration could have left DACA in place. It did not have to end this humanitarian policy that allows nearly 700,000 people to stay in the only country they have ever really known.  It did not have to eliminate the opportunity for these individuals to earn a living to support themselves and their families. It did not have to disclaim Executive authority that administrations of both parties rightly have exercised for decades.  But rather than own up to its choice, the administration claimed its hands were tied by the courts and the law.  It is a cardinal principle of administrative law that the Executive may not shield discretionary policy decisions from scrutiny behind erroneous claims that the law allows only one result, yet that is what the administration did here.

The APA demands—and the public deserves—a genuine analysis and lucid explanation of the relevant policy considerations before reversing a long-standing policy and subjecting 700,000 individuals to deportation to unfamiliar nations where they may not even speak the language.  Because DHS failed to meet these basic standards, the lower courts correctly set aside the new policy.

## STATEMENT

1.   The Immigration and Nationality Act ("INA") grants immigration officials "broad discretion" to pursue removal from the United States of noncitizens deemed removable by Congress.  *Arizona v. United States*, 567 U.S. 387, 396 (2012).  That discretion is one of immigration law's "principal feature[s]."  *Ibid*. It reflects the reality that "there simply are not enough resources to enforce all of the rules and regulations presently on the books," and that "[i]n

**AR4080**

4

some circumstances"—because Congress "cannot possibly [have] contemplate[d] all of the possible circumstances in which the [INA] may be applied"— "application of the literal letter of the law" would be "unconscionable" and "serve no useful purpose." *Regents* Ct. App. ECF No. 45, at 1215. The INA accordingly directs the Secretary of Homeland Security to "[e]stablis[h] national immigration enforcement policies and priorities." 6 U.S.C. § 202(5).

Every presidential administration over the past 65 years has exercised some form of enforcement discretion—through more than thirty separate policies—to make categories of undocumented noncitizens deemed low priority eligible for forbearance from removal. American Immigration Council, *Executive Grants of Temporary Immigration Relief, 1956-Present* 3-10 (Oct. 2014), https://tinyurl.com/y27k6qx8 ("AIC Report"). The Eisenhower, Kennedy, Johnson, and Nixon Administrations, for example, paroled more than 600,000 Cubans into the United States, and the Ford and Carter Administrations paroled in nearly 360,000 Vietnamese, Cambodians, and Laotians. *Ibid*. Similarly, from 1960 to 1990, each presidential administration used "extended voluntary departure" to forbear removal of groups of "otherwise deportable aliens" based on their nationality "out of concern that … forced repatriation … could endanger their lives or safety." H.R. Rep. No. 627, 100th Cong., 2d Sess. 6 (1988). The Reagan and George H.W. Bush Administrations' Family Fairness Program made extended voluntary departure available to 1.5 million eligible recipients—more than 40 percent of the undocumented population at the time—while their parents or spouses pursued immigration status under

**AR4081**

5

newly enacted legislation. AIC Report, at 2. Subsequent administrations used "deferred enforced departure" to grant similar relief to 80,000 Chinese following the Tiananmen Square protests, 190,000 Salvadorans after their eligibility for temporary protected status expired, and others. *Id.* at 6-7.

One way the Executive exercises its enforcement discretion is through deferred action, "a regular practice" in which the government elects not to seek removal of individuals "for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 & n.8 (1999) ("*AADC*"). The Executive has granted deferred action since the 1970s, *Regents* Ct. App. ECF No. 45, at 1220, and each presidential administration since 1997 has adopted deferred action policies covering categories of noncitizens. J.A. 822-26. Past policies covered battered spouses and human trafficking survivors awaiting visas, students displaced by Hurricane Katrina, and surviving spouses of U.S. citizens who had "no avenue of immigration relief." *Ibid.*

The Executive has long recognized the need for individuals granted discretionary relief from removal to support themselves and their families. Since 1981, federal regulations have expressly authorized recipients of deferred action and other exercises of enforcement discretion to work in the United States. 8 C.F.R. § 109.1(b)(6) (1982); *id.* § 274a.12(c)(14). Congress later codified this authority by permitting employers to hire any noncitizen "authorized to be … employed by [the INA] *or by the Attorney General*" (now Secretary). 8 U.S.C. § 1324a(h)(3) (emphasis added); 8 C.F.R. § 274a.12(c)(14). By statute and regulation,

**AR4082**

6

deferred action recipients may also obtain driver's licenses, REAL ID Act of 2005, Pub. L. No. 109-13, Div. B., § 201(c)(2)(B)(viii), 119 Stat. 302 (2005); participate in Social Security and Medicaid, 8 U.S.C. § 1611(b)(2)-(4); 8 C.F.R. § 1.3(a)(4)(vi); 42 C.F.R. § 417.422(h); and apply for and receive advance parole, allowing them to travel abroad and re-enter the United States, 8 C.F.R. § 212.5.

2.  In 2012, Secretary of Homeland Security Janet Napolitano established the DACA policy. *Regents* Pet. App. 97a-101a. Undocumented individuals who arrived in the United States as children and met rigorous criminal background checks and education or military service requirements could apply for deferred action for renewable two-year periods. *Ibid.* Both initial and renewal applications were decided on a "case by case basis," and DHS provided no "assurance[s] that relief w[ould] be granted in all cases." *Id.* at 99a. Indeed, the government does not dispute the Ninth Circuit's determination that DHS actually exercised discretion in adjudicating DACA applications. *See Regents* Supp. App. 50a-51a. Individuals granted deferred action could apply for work authorization and other benefits pursuant to existing statutes and regulation. *Id.* at 12a. Secretary Napolitano explained that immigration laws were not "designed to remove productive young people to countries where they may not have lived or even speak the language," and DHS's exercise of "prosecutorial discretion" to forbear removal of these individuals was "especially justified" because they had "already contributed to our country in significant ways" and "lack the intent to violate the law." *Regents* Pt. App. 98a-99a. She adopted DACA to "ensure that [the government's] enforcement resources are not expended on these low priority cases." *Ibid.* The government actually encouraged eligible

**AR4083**

7

noncitizens to apply to participate in DACA. *See* Supp. Pet. App. 73a (Ninth Circuit "agreeing" that the government's "assurances were crucial to inducing [DACA recipients] to apply for DACA") (quotation marks omitted); *Regents* Dist. Ct. ECF No. 121-1, at 181, 227; *id.* ECF No. 1 ¶ 33.

DACA has allowed nearly 800,000 people—including nearly 700,000 current recipients—to build productive lives in the United States without persistent fear of deportation. *NAACP* Pet. App. 5a. Based upon DACA, they have organized their lives to advance their education, serve in the U.S. military, start businesses, have families, and make other life-changing decisions. J.A. 435-49, 652-70. Like many other DACA recipients, the individual respondents here—Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Norma Ramirez, Jirayut Latthivongskorn, Martín Jonathan Batalla Vidal, Antonio Alarcon, Eliana Fernandez, Carlos Vargas, Mariano Mondragon, and Carolina Fung Feng—have pursued new paths and dreams previously unavailable to them. Some have embarked on careers as lawyers, medical professionals, and teachers; others now can raise families without fear of separation, pay for children's or parents' health care, drive family members to school and medical appointments, provide a home for their families, or advocate for their communities. *Id.* at 659, 889-910, 927, 946, 960. DACA recipients are embedded throughout the economy; 72% of Fortune 500 companies have hired DACA recipients. *Id.* at 605. If DACA is eliminated, recipients will face the persistent fear of being uprooted from their homes and separated from their families. They, their families, and their communities will suffer extraordinary losses. *Id.* at 435-49, 461.

8

3.   Four years after DACA began, this Court considered a challenge to a different policy—Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA").   Announced in 2014 but never implemented, DAPA would have made deferred action available to up to 4.3 million parents whose children were U.S. citizens or lawful permanent residents. *Regents* Pet. App. 54a, 107a-08a.   Unlike DACA, the memorandum announcing DAPA said that, although "[d]eferred action does not confer any form of legal status in this country, … it simply means that, for a specified period of time, an individual is presumed to be lawfully present in the United States." *Id.* at 104a. DAPA also would have loosened the age and residency requirements for DACA and extended the deferred action period to three years. *Id.* at 106a-07a.

Before DAPA was implemented, several states challenged it under the APA and obtained a preliminary injunction.   A divided Fifth Circuit panel affirmed. *Texas v. United States*, 809 F.3d 134, 171-86 (5th Cir. 2015).   This Court affirmed by an evenly divided vote in a per curiam, nonprecedential decision on June 23, 2016. *Texas v. United States*, 136 S. Ct. 2271 (2016).

4.   The current administration initially supported DACA.   In March 2017, DHS Secretary John Kelly stated that DACA embodies a "commitment" "by the government towards … Dreamer[s]." J.A. 435.   In April 2017, the President personally assured DACA recipients they could "rest easy" because the "policy of [his] administration [is] to allow the dreamers to stay." *Ibid* (alterations in original).   DHS continued to accept, process, and grant DACA applications.

9

Then the administration reversed course.   On September 4, 2017, Attorney General Jefferson Sessions sent a one-page letter to Acting DHS Secretary Elaine Duke, stating that "DACA was effectuated by the previous administration through executive action, without proper statutory authority" and "was an unconstitutional exercise of authority by the Executive Branch." J.A. 877.  Although no court had found DAPA constitutionally defective, the Attorney General cited the *Texas* decision and stated that DACA has "the same legal and constitutional defects that the courts recognized as to DAPA." *Id.* at 877-78.

The following day, Secretary Duke issued a new enforcement policy memorandum that ended DACA. *Regents* Pet. App. 111a-19a.  Her explanation was brief: "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing [DAPA] litigation, and the September 4, 2017 letter from the Attorney General," she concluded that DACA "should be terminated." *Id.* at 117a.  The memorandum contained no analysis of purported litigation risks.  Nor did it weigh defending DACA and its benefits against the hardship that limiting deferred action would impose on the hundreds of thousands of DACA recipients, their families, employers, schools, communities, and the economy.  The memorandum instructed DHS to stop approving new DACA applications—even where immigration officials might have granted the same relief before DACA—and to stop processing certain renewal applications in October 2017, thus allowing individual recipients' deferred action to expire beginning in March 2018.  *Id.* at 117a-18a.

Even after the new policy was announced, the President publicly supported DACA recipients.  *E.g.*,

10

Donald Trump (@realDonaldTrump), Twitter (Sept. 14, 2017, 5:28 AM), https://tinyurl.com/y378dsy9 ("Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!"); Donald Trump (@realDonaldTrump), Twitter (Sept. 14, 2017, 5:35 AM), https://tinyurl.com/y29uh56w ("They have been in our country for many years through no fault of their own - brought in by parents at young age.").

5.   Respondents in these consolidated cases filed lawsuits challenging DHS's action in the Northern District of California, the District of Columbia, and the Eastern District of New York.   J.A. 376-796. Respondents contend, *inter alia*, that the policy is unlawful under the APA because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).   J.A. 463-767.

The government produced a mere 256-page administrative record comprising just 14 public documents: the memoranda adopting and rescinding DACA, OLC's analysis of DAPA, the Attorney General's letter, published opinions from the DAPA litigation, and letters from States and Members of Congress.   *Regents* Dist. Ct. ECF No. 64-1.   "All nonpublic materials, some eighty-four documents, actually reviewed by the Acting Secretary remained withheld as privileged."   *Regents* Pet. App. 23a.   The lower courts in *Regents* and *Batalla Vidal* found that the administrative record was incomplete.   *Regents* Dist. Ct. ECF No. 79, at 8; *Batalla Vidal* Dist. Ct. ECF No. 89, at 3; *see also In re Nielsen*, No. 17-3345, ECF No. 171, at 3 (2d Cir. Dec. 27, 2017) (finding "strong suggestion" that administrative record was

**AR4087**

11

incomplete).  It turns out, for example, that DHS did not include a Summary of Conclusions from a Principals Committee meeting, dated August 24, 2017, reflecting the Committee's "agree[ment] that" DHS will "withdraw the 2012 DACA memorandum … in light of DOJ's legal determination" that DACA is unlawful.  *Make the Road N.Y. v. U.S. Dep't Homeland Sec.*, No. 1:18-cv-2445, ECF No. 63-1, at 209 (E.D.N.Y. Aug. 14, 2019).

In all three cases, the district courts rejected the government's arguments that the APA and the INA prohibit judicial review of its action.  *Regents* Pet. App. 26a-33a; *NAACP* Pet. App. 25a-43a; *Batalla Vidal* Pet. App. 24a-38a.  Each court then either enjoined or vacated the policy.

In *Department of Homeland Security v. Regents of the University of California*, No. 18-587 ("*Regents*"), the district court granted preliminary injunctive relief.  *Regents* Pet. App. 41a-69a.  It found respondents likely to succeed on their APA claim that DHS's policy was "'not in accordance law' because [the decision to adopt it] was based on the flawed legal premise that the agency lacked authority to implement DACA." *Id.* at 42a.  And it held that equity strongly favored preliminary relief because eliminating DACA would "result in hundreds of thousands of individuals losing their work authorizations and deferred action status," tearing apart families and removing productive workers from the economy.  *Id.* at 65a.  The Ninth Circuit affirmed the injunction for largely the same reasons.  *Regents* Supp. App. 1a-78a.[1]

---

[1]  The Ninth Circuit also affirmed the denial of the government's motion to dismiss the DACA Recipient Respondents' Equal Protection claim, but noted that "Plaintiffs did not seek a

12

In *McAleenan v. Batalla Vidal*, No. 18-589 ("*Batalla Vidal*"), the district court granted an identical preliminary injunction. *Batalla Vidal* Pet. App. 90a-129a. It found that respondents were likely to succeed on their APA claim because DHS acted "based on an erroneous legal premise." *Id.* at 91a. The court also concluded that the action was arbitrary and capricious because: (1) it rested on an "obvious factual mistake"—the Attorney General's assertion that the Fifth Circuit in *Texas* had found "'constitutional defects … as to DAPA,'" *id.* at 105a (omission in original); and (2) the Secretary's decision to wind down DACA gradually was "internally inconsistent" with her statement that DACA is unlawful, *id.* at 107a-09a.

In *Trump v. NAACP*, No. 18-588, the district court vacated Secretary Duke's memorandum. *NAACP* Pet. App. 48a-66a. It reasoned that the government had failed sufficiently to explain its legal conclusion that DACA is unlawful, and the decision therefore was arbitrary and capricious regardless of the correctness of that legal conclusion. *Id.* at 49a-55a. The court rejected the government's request to remand to the new DHS Secretary, Kirstjen Nielsen, while leaving DHS's new policy in place. *Id.* at 62a-66a. Instead, it vacated the policy but stayed its order for 90 days to give the

---

preliminary injunction on [that] claim, instead relying solely on their APA argument." *Regents* Supp. App. 84a. The district court in *Batalla-Vidal* likewise found that plaintiffs had stated an Equal Protection claim, *Batalla-Vidal* Pet. App. 157a, but based its preliminary injunction only on the APA, *id.* at 68a. Respondents do not rely on the Equal Protection claims to affirm the issuance of the preliminary injunctions. No court has yet decided the merits of those claims. The APA claims are sufficient to resolve the case, and this Court need not address Equal Protection in this interlocutory posture at the pleading stage.

13

Secretary an opportunity to "reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority." *Id.* at 66a.

6. Secretary Nielsen declined the *NAACP* court's invitation to issue a new agency action. Instead, she issued a memorandum in which she "decline[d] to disturb" Secretary Duke's policy and proffered several reasons why, in her view, that action "was, and remains, sound." *Regents* Pet. App. 121a.

Secretary Nielsen's memorandum stated that she was "bound" by the Attorney General's conclusion that DACA is unlawful, and therefore legally compelled to terminate DACA. *Regents* Pet. App. 122a-23a. Thus, she did not address—any more than the Attorney General or Secretary Duke—the Trump and Obama administrations' prior support for DACA or the Executive's longstanding legal position and exercises of deferred action authority. Instead, Secretary Nielsen purported to recast that conclusion in policy terms—suggesting for example that deferred action "should be enacted legislatively" rather than implemented by the Executive. *Id.* at 123a-24a. The memorandum did not weigh these supposed policy considerations independently against the significant hardships that denying deferred action would cause to multiple stakeholders. Instead, it offered only the perfunctory conclusion that DACA's "questionable legality" and "other reasons" *together* outweighed the unstated "interests" of DACA recipients alone. *Id.* at 125a.

The government has not defended Secretary Nielsen's memorandum as a new agency action. Instead, DHS offered the memorandum as a reason for the district court to reconsider its order vacating

**AR4090**

14

Secretary Duke's initial decision. *See NAACP* Pet. App. 81a. Exercising discretion under Federal Rule of Civil Procedure 54(b)—which permits reconsideration of interlocutory orders any time before final judgment—the court declined to consider any "'new reason[s]'" first offered by Secretary Nielsen. *Id.* at 92a. The court agreed to consider the Nielsen memorandum only as it clarified Secretary Duke's reasoning, *id.* at 91a-92a, but concluded that even with this additional gloss, the reasons Secretary Duke "previously gave" could not salvage her decision "because the Court ha[d] already rejected them." *Id.* at 82a. The Court thus allowed its vacatur of Secretary Duke's policy to stand. *Ibid.*

## SUMMARY OF ARGUMENT

1. Neither the APA's narrow exception for decisions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), nor the INA prevents judicial review of the government's new enforcement policy.

The APA does not preclude review of an agency's action affecting 700,000 DACA recipients' ability to remain in the United States, as well as eligibility for work authorization and other benefits under separate authorities. There is no remotely comparable case withholding judicial review, much less a "tradition" of unreviewability. Here, there are meaningful standards for the Court to apply, particularly because DHS's decision was based on an (incorrect) legal judgment. The government now claims that its decision was based on "litigation risk," but that rationale appears nowhere in Secretary Duke's memorandum, nor can it be meaningfully separated from DHS's incorrect belief that DACA is unlawful.

The government also argues that Secretary Nielsen's subsequent memorandum precludes review.

15

But that memorandum was not offered as a new agency action on a new administrative record. It merely purported to provide additional support for Secretary Duke's memorandum after it was vacated by the *NAACP* court. That court did not abuse its discretion in refusing to reconsider the vacatur based on Secretary Nielsen's memorandum. In any event, *both* memoranda can be reviewed under the APA's general requirement of reasoned decisionmaking.

Nor does the INA, 8 U.S.C. § 1252(b)(9), (g), preclude review. Section 1252(b)(9) applies only to removal orders, detention decisions, and removal decisions. Section 1252(g) applies only to decisions to commence proceedings, adjudicate cases, or executive removal orders. Respondents' claims do not fall into any of these categories.

2. The Executive can change course on enforcement policies, but not in arbitrary and unreasoned ways. DHS's new policy terminating DACA did not meet the APA's requirement for reasoned decisionmaking and public accountability. DHS did not consider, for example, the Executive's long history of deferred action policies and institutional claim of legal authority. Nor did it consider the costs of its decision, including loss of work authorization for 700,000 DACA recipients. The failure to consider costs to DACA recipients, their families and employers, and the larger economy is particularly egregious as hundreds of thousands of people made life-altering decisions based on DACA, as the government intended them to do.

Moreover, the central rationale for DHS's decision—that DACA is unlawful—is wrong. The government has never defended the Attorney General's assertion that DACA is "unconstitutional."

16

Nor has it questioned the Executive's authority to grant deferred action on an individualized basis, 70 years of deferred action policies affecting more than a million noncitizens, or the validity of regulations making deferred action recipients eligible for work authorization. The Executive's inherent authority over immigration, which this administration and others have consistently argued to this Court, and the congressional ratification of deferred action put DACA on solid legal footing. DACA fits comfortably within the tradition of past humanitarian deferred action policies. The government's contrary conclusion is "not in accordance with the law." 5 U.S.C. § 706(2)(A).

The government's remaining rationales also fail.

First, purported concerns over litigation risk cannot justify DHS's action. Secretary Duke claimed she was bound by the Attorney General's erroneous conclusion that DACA was unlawful; thus, any discussion of litigation risk was an afterthought and bound up with the legal error. Regardless, the agency never fully considered litigation risk through, for example, carefully comparing DACA and DAPA or weighing the benefits of defending DACA against risks the government might face if DACA were successfully challenged. Moreover, because nearly all major agency action will spur litigation, this rationale—if credited—would defeat judicial review of nearly any agency action. As Gene Hamilton, the principal drafter of Secretary Duke's memorandum testified, a "litigation risk" rationale "sounds like the craziest policy you could have in a department. You could never do anything if you were always worried about being sued." J.A. 1007.

Second, Secretary Nielsen's memorandum does not justify the agency's action. She, too, claimed to be

17

bound by the Attorney General's legal conclusion and she, too, failed to meaningfully analyze litigation risk. Her other rationales, which she claims are independent, merely recast the legal case against DACA in policy terms. Her memorandum is not supported by any administrative record (none was ever filed).

Secretary Nielsen's purported rationales—"doubts" about legal authority and concern that relief "should be enacted legislatively," be provided "individually," and "project a message" of consistent enforcement—cannot provide the "reasoned explanation" absent from Secretary Duke's memorandum because Secretary Nielsen chose not to take new agency action. Regardless, Secretary Nielsen (like her predecessor) never accounted for the hardships that DHS's reversal would impose on DACA recipients or others. Her superficial cost-benefit analysis weighed the costs of ending DACA against all of her collective reasons for supporting that outcome—including her erroneous views on DACA's legality. Her conclusion cannot stand.

## ARGUMENT

### I. DHS's New Immigration Enforcement Policy Terminating DACA Is Judicially Reviewable

The APA mandates that those who "suffe[r] legal wrong because of agency action" are "entitled to judicial review." 5 U.S.C. § 702. Because agencies are "'especially'" likely to disregard their legal obligations "'when [violations] have no consequence,'" the APA establishes a "'strong presumption favoring judicial review of administrative action,'" *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018), especially in the immigration context, *see INS v. St.*

**AR4094**

18

*Cyr*, 533 U.S. 289, 298 (2001).  The government bears the "heavy burden" to overcome that presumption. *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015).

Agency decisions are reviewable unless: (1) they have been "committed to agency discretion by law," 5 U.S.C. § 701(a)(2); or (2) another "statut[e] preclude[s] judicial review," *id.* § 701(a)(1).  As every court to consider the issue has agreed, *see, e.g.*, U.S. Opening Brief ("Br.") 9-14, neither bar applies here.

## A. The APA Does Not Bar Judicial Review

This Court "narrowly" construes the APA's exception to judicial review for decisions "committed to agency discretion by law." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019).  The exception is "limited … to certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion." *Ibid.* (quotation marks omitted).  And it only precludes review when there is "no meaningful standard" for courts to apply.  *Ibid*.  Neither requirement is met here.

### 1. DHS's Action Is Not A Traditionally Unreviewable Nonenforcement Decision

The government asserts that DHS's new policy terminating DACA is unreviewable because it is like a traditionally unreviewable decision "not to institute enforcement actions."  Br. 17.  But DHS did not decline to institute an enforcement action.  It made a broad policy change affecting all DACA recipients' ability to remain in the country and, pursuant to separate authorities, access work authorization and other attendant benefits.  The government cannot

19

point to any remotely similar policy reversal that has escaped judicial review—let alone a tradition of denying review—because none exists.    The government thus falls far short of its "heavy burden" to avoid review.  *Mach Mining*, 135 S. Ct. at 1651.

The government relies mainly on *Heckler v. Chaney*, 470 U.S. 821 (1985), but *Chaney* involved a completely different situation.    In *Chaney*, eight inmates who had been sentenced to death petitioned the FDA to initiate enforcement proceedings against two States to prevent their use of particular drugs for lethal injections.  In denying the petition, the FDA invoked its "inherent discretion to decline to pursue certain enforcement matters."  *Id*. at 824.  This Court held that the decision was not reviewable in light of the "tradition" of affording "absolute" deference to "an agency's decision not to prosecute or enforce."  *Id.* at 831.    The Court emphasized the "complicated balancing of … factors" involved in selecting enforcement targets and measuring "particular enforcement action[s]" against the "agency's overall policies."  *Ibid.*  Most tellingly, the Court reasoned that nonenforcement decisions generally lack any "focus for judicial review" because they do not involve the exercise of "*coercive* power" over an individual. *Id.* at 832.

Here, by contrast, DHS's action is coercive. Although DACA is rooted in the government's authority to defer removal proceedings against individuals subject to deportation, Congress (by statute) and DHS (by regulation) have added benefits that flow from deferred action, including access to work authorization.  Ending DACA denies 700,000 DACA recipients the ability to work, and thus directly "infringe[s] upon areas that courts are called upon to

20

protect." *Chaney*, 470 U.S. at 832.  The government is therefore wrong that ending DACA "will not, by itself, bring to bear the agency's coercive power over any individual." Br. 19.

Further, the Secretary exercised that power categorically, whereas *Chaney* involved "[i]ndividual, isolated nonenforcement decisions." 470 U.S. at 839 (Brennan, J., concurring).   As Justice Brennan explained, *Chaney* "holds that [the FDA's] *individual* decisions … not to take enforcement action in response to citizen requests are presumptively not reviewable" because Congress did not "inten[d] courts to review such mundane matters." *Id.* at 838-39 (emphasis added).   The FDA did not make an affirmative, public "programmatic determination" to exempt all cases from enforcement, as the government contends. Br. 21-22.  It declined to initiate specific enforcement actions sought in a single petition.

This Court has declined to extend *Chaney* to decisions that are "'less frequent'" and "'more apt to involve legal as opposed to factual analysis.'" *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007). Decisions about general enforcement policy are both. They are "abstracted from the particular combinations of facts" that "drive … individual enforcement decision[s]," and that agencies may be better suited to evaluate. *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994).   They also cover more ground, so agencies typically supply "a clearer (and more easily reviewable) statement of [their] reasons." *Ibid.*  "[C]ursory, ad hoc, or post hoc" decisionmaking may be the norm, by necessity, for "individual decisions to forego enforcement," *ibid*, but agencies must explain major policy initiatives that

**AR4097**

21

tangibly and adversely affect hundreds of thousands of persons.

These considerations permit review of Secretary Duke's decision for the same reason they permit review of the decisions to adopt DACA and DAPA. As the Fifth Circuit explained, a decision that "triggers … eligibility for federal benefits" involves "much more than nonenforcement," and is therefore reviewable. *Texas v. United States*, 809 F.3d 134, 166 (5th Cir. 2015). This was the ground for reviewability offered to this Court. State Resp. Br. at 39, *Texas*, 2016 WL 1213267 (U.S. Mar. 28, 2016). And the very premise of the change in policy is that "potentially imminent litigation" would enjoin DACA. J.A. 878. The government dismisses any distinction between "eliminat[ing]" and "adopt[ing]" DACA as "immaterial," Br. 22 (emphasis omitted), so its assertion that the decision to eliminate DACA is unreviewable contradicts the stated premise of DHS's new policy. DHS's action is reviewable.

## 2. There Are Meaningful Standards For Judicial Review

There are "meaningful standard[s]" for courts to apply in reviewing Secretary Duke's action. *Dep't of Commerce*, 139 S. Ct. at 2568.

a. Secretary Duke ostensibly announced a new policy terminating DACA because Attorney General Sessions determined that DACA was "unconstitutional" and "effectuated … without proper statutory authority." J.A. 877. Secretary Nielsen later recognized that conclusion was binding on DHS. *Regents* Pet. App. 122a-23a (citing 8 U.S.C. § 1103(a)(1)). In her memorandum, Secretary Duke said that she "[took] into consideration" only the

22

Attorney General's letter and the authorities underlying his legal conclusion. *Id.* at 117a.

Assessing this purely legal premise falls squarely within the judiciary's core competency: "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). The APA likewise "requires the court to determine legal questions," *Kisor v. Wilkie*, 139 S. Ct. 2400, 2432 (2019) (Gorsuch, J., concurring in the judgment). The legal question here can be answered by reference to the INA's text and structure, the Executive's broad discretion over immigration and long history of implementing deferred action policies, and this Court's precedent on the appropriateness of deferred action. *See infra* at 37-48.

Secretary Duke's disavowal of legal authority to maintain DACA also further distinguishes this case from *Chaney*. The Secretary did not "exercise [her] 'discretion'" to change DHS's deferred action policy based on a "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Chaney*, 470 U.S. at 823, 831. In fact, she *disclaimed* discretion to maintain DACA in light of the Attorney General's binding legal determination. *Cf. id.* at 833 n.4 (distinguishing "a refusal by an agency to institute proceedings based solely on the belief that it lacks jurisdiction").

Reviewing an agency's determination that it lacks legal authority furthers, rather than threatens, the agency's discretion. It frees the agency to make a policy decision to exercise or decline to exercise its authority. "[A]llowing judicial review under these circumstances ... promot[es] ... democratic accountability" within the Executive Branch by preventing it from "blam[ing] the other two branches ... for a choice that was the agency's to make all

23

along." *Regents* Supp. App. 31a-33a. Reviewing the Executive's new enforcement policy "prevents this anti-democratic and untoward outcome," *id*. at 33a, and ensures that "an official cannot claim that the law ties her hands while at the same time denying the courts' power to unbind her," *NAACP* Pet. App. 73a. These are not "free-floating" accountability concerns, Br. 31; they reflect the APA's central purpose of holding federal agencies "accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).

The government is wrong that under *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270 (1987) ("*BLE*"), it "makes no difference what reasons DHS gave." Br. 23. *BLE* involved an agency's single-shot decision not to reconsider its prior order after the time to obtain judicial review had passed. This Court held that parties could not "exten[d] indefinitely" the time to seek relief by first asking the agency to reconsider its order and then petitioning for review of the decision denying reconsideration, 482 U.S. at 280, and emphasized that there is a "tradition" of denying review in similar circumstances, *id.* at 282. These reasons did not depend on *why* the agency had denied reconsideration, so the Court adopted a blanket rule that such decisions are always unreviewable, even if the agency gives a "'reviewable' reason." *Id.* at 283.

This situation is very different. It may be that under *BLE*, "agency actions *falling within a tradition of nonreviewability*" remain nonreviewable even when they are based on "reviewable reason[s]." Br. 23-24 (quoting *BLE*, 482 U.S. at 282-83) (quotation marks omitted; emphasis added). But Secretary Duke's decision—to deprive DACA recipients of deferred action and, as a result, eligibility for work

**AR4100**

24

authorization by regulation—is the type of decision that courts traditionally review. *See supra* at 21. It is enough, therefore, that there are meaningful standards to apply *in this case*. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (review available if there is "law to apply" "in a given case"), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The Secretary's reliance on a reviewable legal premise satisfies that requirement.

b. The government denies that the decision was "based solely on DHS's legal conclusion." Br. 26. Although Secretary Duke's sole stated reason for her new policy was DACA's supposed illegality, the government has unearthed a new and different argument in this litigation—that it was justified by "litigation risk." Br. 27. This maneuver does not defeat reviewability.

First, the Ninth Circuit correctly deemed that justification a "mere post hoc rationalization" and refused to consider it, including in deciding reviewability. *Regents* Supp. App. 35a. *Post hoc* rationalizations cannot deprive courts of the ability to review the agency's otherwise-reviewable original action. *See infra* at 48-49.

Second, even if Secretary Duke's reasoning were stretched to encompass litigation risk, there are still meaningful standards for courts to apply. The Attorney General's conclusion about the likely outcome of litigation challenging DACA was expressly premised on his own view of the policy's legality. J.A. 878 ("Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.").

25

Nothing else in Secretary Duke's memorandum is tethered to litigation risk. As such, litigation risk here is inseparable from the reviewable legal judgment. *NAACP* Pet. App. 41a-42a. Moreover, assessing a lawsuit's likelihood of success—as the lower courts did here in assessing the need for a preliminary injunction—is standard fare for courts. *E.g.*, *Regents* Supp. App. 77a.

c.   Secretary Nielsen's later memorandum comes too late to bear on reviewability and in any event would not lead to a different result.

i.   The Nielsen memorandum is not a new agency action like the successive travel bans in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), and the government has not defended it as such. The government offers it only as support for the Duke memorandum. Br. 28. Since *NAACP* vacated *that* memorandum before Secretary Nielsen issued hers, the Nielsen memorandum is relevant only if it provides a basis to reconsider the vacatur.

The decision to reconsider an interlocutory order rests in "the discretion of the district judge." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 12 (1983). As *BLE* confirms, decisions denying reconsideration—"by lower courts" and agencies alike—are traditionally reviewable only in limited circumstances. 482 U.S. at 282. Appellate courts review denials of reconsideration for abuse of discretion. *E.g.*, *SPV-LS, LLC v. Transamerica Life Ins. Co*., 912 F.3d 1106, 1111 (8th Cir. 2019); *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc*., 630 F.3d 217, 227 (D.C. Cir. 2011).

The district court in *NAACP* did not abuse its discretion in denying reconsideration. DHS had every opportunity to offer additional reasons for its new

26

policy, both before the policy was vacated and after. The court invited Secretary Nielsen to revive the policy properly—through a new agency action on a new administrative record, *NAACP* Pet. App. 94a—but she declined. The court was not required to revisit its vacatur at all, let alone based on arguments DHS failed to advance before vacatur. *See* Moore's Federal Practice §§ 54.25[4], 59.30[6] (2019). The court thus reasonably declined to consider Secretary Nielsen's "new reason[s]" through the backdoor of a reconsideration motion. *NAACP* Pet. App. 92a.

The government points out that *NAACP* discussed the Nielsen memorandum at length. Br. 28. But the court considered that memorandum only as evidence of *Secretary Duke's* reasons, *NAACP* Pet. App. 91a-92a, and properly read, it sheds no light on that issue. Secretary Nielsen issued her memorandum "to explain *her* reasons," not Secretary Duke's. Br. 29. Since nothing in the record suggests Secretary Duke shared Secretary Nielsen's reasons, the Nielsen memorandum does not affect the district court's reasoning.

ii.  Regardless, the Nielsen memorandum is reviewable in its own right "according to the general requirements of reasoned agency decisionmaking" under the APA. *Dep't of Commerce*, 139 S. Ct. at 2569. Judicial review is available to ensure, at minimum, that DHS: (1) gave a "reasoned explanation … that can be scrutinized by courts and the interested public," *id.* at 2575-76; (2) considered the "facts and circumstances that underlay or were engendered by [its] prior policy" before "chang[ing] … course," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009); and (3) "pa[id] attention to the advantages *and* the disadvantages of [its] decisions," *Michigan v. EPA*,

**AR4103**

27

135 S. Ct. 2699, 2707 (2015). Courts routinely apply these standards.

It makes no difference, therefore, whether the INA itself "circumscribes the Secretary's decision." Br. 19. The authority to set aside agency action that is "arbitrary" and "capricious" or an "abuse of discretion," 5 U.S.C. § 706(2)(A), is independent of the authority to set aside actions "in excess of statutory jurisdiction," *id.* § 706(2)(C).

In *Judulang v. Holder*, for example, this Court held that a Board of Immigration Appeals policy governing eligibility for discretionary relief from deportation was properly reviewed under the APA's "arbitrary and capricious" standard, even though the challenged policy was "not an interpretation of any statutory language" and the statute "d[id] not mention" the question decided by the agency. 565 U.S. 42, 52 n.7 (2011). Even without a "textual anchor" to guide its review, the Court unanimously rejected the policy because it was based on "irrelevant" factors unconnected to whether the noncitizens affected deserved the requested relief. *Id.* at 55, 60. As *Judulang* recognized, removal of noncitizens with "longstanding ties to this country" is "a matter of the utmost importance," and statutory silence cannot justify approaching that matter arbitrarily without judicial oversight. *Id.* at 64. Even when an agency acts within its substantive authority, courts have "a role, and an important one, in ensuring that [it] engaged in reasoned decisionmaking." *Id.* at 53.[2]

---

[2]  Although DHS's substantive authority is "broad," it is not "unbounded." *Dep't of Commerce*, 139 S. Ct. at 2568.  Congress

28

## B. The INA Does Not Bar Judicial Review

The government's truncated arguments based on the INA, 8 U.S.C. § 1252(b)(9), (g), are similarly misplaced. *See* Br. 20-21. The challenged action does not fit within either provision's plain language and thus cannot overcome the presumption of reviewability. *Mach Mining*, 135 S. Ct. at 1651.

Neither provision applies outside of the removal process. Section 1252(b)(9) limits judicial review of claims that challenge "an order of removal," a "decision to detain … or to seek removal," or "part of the process by which … removability will be determined." *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (plurality op.). The three-justice plurality in *Jennings* stated this expressly, and the three dissenting justices would have gone farther, limiting Section 1252(b)(9) to claims that "challenge … an order of removal." *Id*. at 876 (Breyer, J., dissenting). Section 1252(g), meanwhile, "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. AADC*, 525 U.S. 471, 482 (1999). It is not triggered by "all claims arising from deportation proceedings," *ibid.*, and does not "sweep in any claim that can

---

authorized the Secretary to set "national immigration … priorities," 6 U.S.C. § 202(5), but it regularly circumscribes that authority. *See*, *e.g.*, Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Div. F, Tit. II, 129 Stat. 2242, 2497 (directing the Secretary to prioritize the removal of criminal noncitizens by "severity of th[e] crime"); Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, Div. A, Tit. II, 121 Stat. 1844, 2051 (conditioning grant of funds to deport noncitizens who have committed crimes on the Secretary's creation of a "methodology" to "identify and prioritize for removal criminal aliens convicted of violent crimes").

29

technically be said to 'arise from' the three listed actions of the Attorney General," *Jennings*, 138 S. Ct. at 841 (plurality op.).

Respondents here do not challenge any removal order or detention decision. And the Duke memorandum is not a decision to "commence" removal proceedings against any DACA recipient; "adjudicate" any case; or "execute" any removal order. 8 U.S.C. § 1252(g). Accordingly, neither statute applies.

Sections 1252(b)(9) and 1252(g) may "give *some* measure of protection to 'no deferred action' decisions" in the specific context of individual removal proceedings. Br. 20 (quoting *AADC,* 525 U.S. at 485) (emphasis added). But Congress was concerned about "'[e]fforts to challenge the refusal to exercise [deferred action] on behalf of *specific* aliens.'" *AADC*, 525 U.S. at 485 (emphasis added). The government's programmatic decision here is not a matter that must await judicial review in separate, individual actions in immigration courts.

## II. DHS Violated The APA By Failing To Engage In Reasoned Decisionmaking

DHS's new policy that terminated DACA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA, 5 U.S.C. § 706(2)(A), and must be set aside, *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("*Chenery I*") ("[A]n order may not stand if the agency has misconceived the law.").

The fundamental principle of administrative law is that "administrative agencies are required to engage in reasoned decisionmaking." *Michigan*, 135 S. Ct. at 2706 (quotation marks omitted). While agencies remain "free to change their existing policies," the

30

APA demands that they "provide a reasoned explanation for [such] change[s]," *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016), "that can be scrutinized by courts and the interested public," *Dep't of Commerce*, 139 S. Ct. at 2575-76.

Respondents do not ask this Court to "second-gues[s]" DHS's policy "judgment" or question its ability to change policy. Br. 32-33. The decisions below recognized that the Executive *can* rescind DACA "as an exercise of [its] discretion," *Regents* Supp. App. 57a, but the policy cannot be changed without the "minimal level of analysis" necessary for reasoned decisionmaking, judicial oversight, and public accountability, *Encino Motorcars*, 136 S. Ct. at 2125, supported by the administrative record, *Dep't of Commerce*, 139 S. Ct. at 2573. The way in which DHS replaced DACA with a new enforcement policy is antithetical to proper administrative action. DACA is a matter of significant public concern. DACA recipients, their communities, and the public deserve a reasoned explanation for the government's decision supported by a complete administrative record. They did not receive one.

## A. The Government Violated the APA By Failing To Explain Its Policy Change Or Acknowledge Its Prior Stance On DACA's Legality

The letter from Attorney General Sessions and Secretary Duke's memorandum do not allow a reviewer to reasonably "discer[n]" the legal "path" DHS followed in jettisoning its prior positions and concluding that DACA is unlawful. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). The decision violated the APA.

31

For decades, the Executive has exercised its authority to grant deferred action for humanitarian purposes, including on a categorical basis, and to couple that relief from removal with work authorization and other benefits. After DACA was adopted, the Department of Justice vigorously defended it as a "valid exercise of the [Executive's] broad authority and discretion to set policies for enforcing the immigration laws." U.S. Amicus Br. at 1, *Ariz. Dream Act Coalition v. Brewer*, 2015 WL 5120846 (9th Cir. Aug. 2015); *see also Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015); *Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015). Reflecting the Executive's legal judgment and long-term institutional interests, the Solicitor General defended DAPA before this Court and argued that challenges to that deferred action policy "dramatically understate[d] the scope of [DHS's] authority" to establish immigration-enforcement policies and priorities. Pet. Br. at 61, *Texas*, 2016 WL 836758 (U.S. Mar. 1, 2016); *see also* Appellants' Br. at 26, *Barr v. E. Bay Sanctuary Covenant*, 2019 WL 4307408 (9th Cir. Sept. 3, 2019) (government arguing it was permitted to "exercise its discretion" to limit asylum "through categorical rules").

That position was backed by OLC's considered legal analysis. OLC "orally advised" DHS that DACA was lawful, J.A. 827 n.8, and later memorialized its recognition of DHS's authority to grant deferred action on a categorical basis in a lengthy opinion that the Justice Department made public. *Id.* at 797-856. Such OLC "formal written opinions" are a "particularly important form of controlling legal advice," and especially "significant" OLC opinions are "presumpt[ively]" made public, thereby educating the nation "on some of the weightiest matters in our

32

public life." *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 922 F.3d 480, 483-84 (D.C. Cir. 2019) (quotation marks omitted). And for much of 2017—even after this Court's 4-4 affirmance in *Texas*—President Trump, the DHS Secretary, and other members of the current administration publicly supported DACA. J.A. 455.

Notwithstanding this history, Attorney General Sessions and Secretary Duke offered only a threadbare explanation of their central legal premise that DACA is both unconstitutional and unlawful. Neither addressed the Solicitor General's detailed defense of Executive authority and practice on deferred action before this Court or the analysis in OLC's opinion, nor did they explain why the Fifth Circuit's reasons for rejecting DAPA would apply to the materially different policy considerations in DACA. Indeed, in citing the Fifth Circuit's *Texas* decision to conclude that DACA is unconstitutional, the Attorney General's letter mischaracterized the very opinion on which it purported to rely—a crucial and "obvious factual mistake." *Batalla Vidal* Pet. App. 98a. The Fifth Circuit expressly *declined* to resolve constitutional questions regarding DAPA, *Texas*, 809 F.3d at 154, and as the government recently argued to this Court, "'claims that an official exceeded his statutory authority' are *not* constitutional claims." App. for Stay Pending Appeal, *Trump v. Sierra Club*, No. 19A60 (U.S., July 12, 2019) (quoting *Dalton v. Specter*, 511 U.S. 462, 474 (1994)).

The government tries to excuse its unexplained about-face by asserting that it reflected DHS's "agree[ment]" with the Fifth Circuit's "fla[t] reject[ion]" of OLC's lengthy analysis. Br. 52. But neither the Attorney General's letter nor Secretary

**AR4109**

33

Duke's memorandum said that. And regardless, a conclusory, unexplained statement "agreeing" with the ruling of a single, divided court of appeals—in the face of DOJ's analysis and decades-old Executive practice across administrations of both parties—does not constitute "[r]easoned decisionmaking." *Dep't of Commerce*, 139 S. Ct. at 2576. Nor does this Court's 4-4 summary affirmance in *Texas* elevate the legal significance of the Fifth Circuit's ruling or its reasoning. *See* Br. 7, 15, 16, 33, 52. "An unexplained affirmance by an equally divided court" is "not entitled to precedential weight no matter what reasoning may have supported it." *Rutledge v. United States*, 517 U.S. 292, 304 (1996).

While the government need not outline its reasoning "with legislative precision" (Br. 27), the Attorney General's letter and Secretary Duke's memorandum are so sparse that one cannot reasonably "discer[n]" the logical "path" DHS followed in its decisionmaking. *Bowman*, 419 U.S. at 286. It would be one thing for the government to have acknowledged its official prior positions, as articulated by OLC and elsewhere, and explained its newfound disagreement to justify disclaiming Executive authority and abandoning the five-year-old policy with 700,000 participants. But the Attorney General's unexplained "failure to even consider OLC's thorough [public] analysis"—without any principled reasons for doing so—"is [itself] arbitrary and capricious." *NAACP* Pet. App. 54a n.23.

## B. The Government Violated the APA By Failing To Consider The Costs Of Its Decision Or The Interests Affected

"[R]easonable regulation" also "ordinarily requires paying attention to the advantages *and* the

34

disadvantages of agency decisions," *Michigan*, 135 S. Ct. at 2707, and then "explain[ing] whether the benefits outweigh the costs," *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 734 (D.C. Cir. 2016) (Kavanaugh, J., dissenting).  In adopting her new policy, Secretary Duke "failed [her] most basic duty under the [APA] to consider all of the relevant factors, including costs," and thereby "asses[s] whether [her] proposed action would do more good than harm."  *Id.* at 732.  Both "common administrative practice and common sense require[d]" such an assessment, *id.* at 733, and its absence here violated the APA, *Michigan*, 135 S. Ct. at 2707.

These principles apply with special force where, as here, an agency's "longstanding policies … engendered serious reliance interests," *Encino Motorcars*, 136 S. Ct. at 2126.  When individuals and businesses form plans around a policy, reversing course is "more costly" than when an agency "announces a decision on a clean slate." *Mingo*, 829 F.3d at 732 (Kavanaugh, J., dissenting).  Considering the consequences of a change for people and institutions who have ordered their affairs in response to government action, in other words, is part of agencies' basic obligation to consider costs, which exists independent of whether regulated parties can assume that the government will stay its course from administration to administration, *see* Br. 42; *Encino Motorcars*, 136 S. Ct. at 2126 (agency was free to change interpretation at any time but had to acknowledge harms that could result).  Here, the government never considered the "disruption" its policy "would have on the lives of DACA recipients, let alone their families, employers and employees, schools and communities." *Regents* Pet. App. 60a.

35

In establishing DACA, Secretary Napolitano explained that the policy was meant "to ensure that [DHS's] enforcement resources are not expended on … low priority cases but are instead appropriately focused on people who meet [DHS's] enforcement priorities." *Regents* Pet. App. 98a. Generally, those who met the policy's criteria were not enforcement priorities because they "lacked the intent to violate the law," and "many" were "already [being] offer[ed] administrative closure" in any event. *Ibid*. "[P]rosecutorial discretion" was also "especially justified" because those "productive young people" had "already contributed to our country in significant ways." *Id*. at 98a-99a.

In terminating DACA for a different enforcement approach, neither Attorney General Sessions nor Secretary Duke even acknowledged such "facts and circumstances," let alone provided "a reasoned explanation … for disregarding [them]." *Fox*, 556 U.S. at 516. They neither questioned DHS's original reasons for adopting DACA nor suggested that the circumstances supporting the policy had changed.

Indeed, nothing in Secretary Duke's memorandum suggests the government considered any of the hardships that DACA recipients and others would face without deferred action. *Michigan*, 135 S. Ct. at 2708. By 2017, DACA had enabled hundreds of thousands of young people "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books." *Regents* Dist. Ct. ECF No. 121-1, at 252-53. DACA recipients, including the individual respondents here, had subjected themselves to

**AR4112**

36

background checks, paid their fair share of taxes, and ceased living in persistent fear of removal.  They have advanced their education, served in the U.S. military, started businesses, formed families, and taken out business and student loans and mortgages.  *Regents* Dist. Ct. ECF No. 124-2, at 1-3.  They have made significant contributions to their employers and educational institutions, which in turn made decisions and investments based on the ability of DACA recipients to continue to work or study in the United States.  *Id.* at 7-9.  Data from shortly before Secretary Duke's memorandum showed that over 90 percent of DACA recipients were then-employed.  *Regents* Dist. Ct. ECF No. 119-2, at 41, 44.  And research from 2017 estimated that ending DACA would cost the federal government $60 billion in lost revenue and eliminate $215 billion from the economy in lost GDP.  *Regents* Dist. Ct. ECF No. 113-1, at 73.

Rather than weigh these costs against the perceived "advantages … of [its] decisio[n]," *Michigan*, 135 S. Ct. at 2707, the government adopted an impermissibly "cost-blind approach" to terminating the policy, *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1265 (D.C. Cir. 2014) (Kavanaugh, J., dissenting), *majority rev'd sub nom. Michigan*, 135 S. Ct. 2699.  It treats DHS's policy change as if nothing significant will come of it.  This Court is "'not required to exhibit [such] naiveté.'"  *Dep't of Commerce*, 139 S. Ct. at 2575.

Beyond failing to consider costs, DHS failed to consider "reasonably obvious alternatives" to terminating DACA.  *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 803 (D.C. Cir. 1984).  For example, even if the Secretary believed DACA was implemented in a manner that gave insufficient

37

discretion to agency employees, she was required to consider, at minimum, "significant and viable" alternatives that remedy DACA's alleged legal defects while mitigating the foreseeable impact on relevant reliance interests. *Shieldalloy Metallurgical Corp. v. Nuclear Regulatory Comm'n*, 624 F.3d 489, 493 (D.C. Cir. 2010); *accord Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency must consider "important aspect[s]" of its decision).  She did not do so.

## C. The Decision Violates the APA Because Its Central Legal Premise—That DACA Is Unlawful—Is Wrong

Earlier in this litigation, the government did not directly defend the Secretary's premise that DACA is unlawful; it merely argued that the Secretary's legal premise was "reasonable," *Regents* Ct. App. Br. 31, 39-40, and "ma[de] no effort" to argue that DACA is unlawful, *Regents* Pet. App. 48a.  Before this Court, however, the government squarely contends that DACA is unlawful.  *See* Br. 43.  This Court "normally decline[s] to entertain such forfeited arguments." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1978 (2016).

Further, the government does not defend Attorney General Sessions' conclusion that DACA is "unconstitutional."  It limits its argument that DACA is unlawful to one assertion:  The INA cannot be "fairly interpreted as authorizing DHS to maintain a categorical deferred-action policy" comparable to DACA.  Br. 43-44.[3]

---

[3]  The challengers to DAPA took the opposite position in *Texas*, conceding before this Court that the government had ample authority to "forbea[r] from remov[ing]" a large group of noncitizens

38

The government concedes that, by regulation, noncitizens "granted deferred action may receive certain benefits, including work authorization for the same period if they establish economic necessity." Br. 5 (citing 8 C.F.R. § 274a.12(c)(14)). It has never questioned the legality of those regulations—or any of the benefits conferred by DACA. Thus, this Court need not determine the lawfulness of longstanding regulations that treat recipients of deferred action as "lawfully present" for purposes of Social Security or Medicare. *E.g.*, 8 C.F.R. § 1.3(a)(4)(vi); 42 C.F.R. § 417.422(h). Nor is this Court called upon to assess DHS's longstanding guidance that remaining in the United States during a period of deferred action does not count against an individual seeking lawful admission. *See* Memorandum from Johnny N. Williams, Exec. Assoc. Comm'r, Office of Field Operations, to Reg'l Dirs. et al., *Unlawful Presence* 1 (June 12, 2002); 8 U.S.C. § 1182(a)(9)(B). This Court need not go further than the arguments advanced by the parties. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 721 (2014).

The arguments the government *does* make against the legality of DACA fail for several reasons.

*1. The Executive Has Long Granted Deferred Action.* The government's argument that deferred action cannot be granted through a broad policy is inconsistent with the INA and the Executive's longstanding practice, which has been approved by Congress and the courts.

The INA directs the Secretary to "establis[h] national immigration enforcement policies and

---

on a "class bas[is]." Oral Arg. Tr., *United States v. Texas*, No. 15-674, at 50:9-11 (U.S. Apr. 18, 2016).

39

priorities," 6 U.S.C. § 202(5), and authorizes her to perform all acts she "deems necessary" for enforcing the immigration laws, 8 U.S.C. § 1103(a)(3). "[T]he broad discretion exercised by immigration officials" pursuant to these provisions is a "principal feature of the removal system." *Arizona v. United States*, 567 U.S. 387, 396 (2012). As the government recognizes, "DHS does not have the ability to vigorously enforce the immigration laws against every alien unlawfully present in the United States." Br. 45. Congress annually appropriates only enough funding to remove 400,000 of 11.3 million undocumented noncitizens, so prioritizing enforcement of certain deportable noncitizens is a "practical necessity." *Batalla Vidal* Pet. App. 72a. The government concedes that setting those priorities is "more susceptible to implementation through broad guidance than through case-by-case enforcement decisions." Br. 22.

For nearly seventy years, the Executive has interpreted the INA to authorize discretionary relief to forbear removal on a categorical basis of undocumented noncitizens deemed to be low-priority. Between 1976 and 2011, the government issued over twenty "administrative directives on blanket or categorical deferrals of deportation" for humanitarian and other reasons ranging from protecting refugees to keeping families together. Andorra Bruno et al., Cong. Research Serv., Analysis of June 15, 2012 DHS Memorandum, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 15 n.72, 20-23 (July 13, 2012) (capitalization omitted). The Executive has used deferred action to provide relief to battered spouses, human trafficking survivors, foreign students displaced by Hurricane Katrina, and surviving spouses of U.S. citizens. *Id*. at 20. Many of these

40

policies include work authorization, *e.g. id.* at 21; J.A. 822, 825, and since 1981, the Executive has acknowledged its authority to grant deferred action in published regulations that allow noncitizens to receive work authorization in connection with deferred action, *see* 8 C.F.R. § 109.1(b)(6) (1982), *codifying* 46 Fed. Reg. 25,079, 25,080 (May 5, 1981); 8 C.F.R. § 274a.12(c)(14).

Collectively, these policies provided relief to more than a million recipients before DACA was adopted. In addition, the Family Fairness program (1987-1990) made as many as 1.5 million individuals eligible for discretionary relief—more than 40 percent of the undocumented population at the time.  AIC Report at 2.

Thus, in implementing DACA, DHS did not "'discover … an unheralded power'" in a "'long-extant statute,'" as the government contends.  Br. 45 (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).  Instead, the Executive's interpretation of the INA to permit categorical deferred action policies was "early, longstanding, and consistent," and it accordingly "count[s] as powerful evidence of [the INA's] original public meaning." *Kisor*, 139 S. Ct. at 2426 (Gorsuch, J., concurring in the judgment) (emphasis omitted).  The novel decision was not the adoption of DACA, but instead the Executive's current position to cede authority long exercised by administrations of both parties rather than protect institutional prerogatives.

*2.   Congress And This Court Have Ratified Deferred Action.*  This Court has recognized deferred action as "a regular practice" that the government may exercise "for humanitarian reasons or simply for [its] own convenience." *AADC*, 525 U.S. at 483-84 &

**AR4117**

41

n.8.  "Congress," meanwhile, "has not just kept its silence by refusing to overturn the administrative construction" of the INA authorizing deferred action, "but has ratified it with positive legislation." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381-82 (1969).

Even before the INA included any express mention of deferred action, Congress amended the INA to account for it.  In 1987, for example, Congress enacted the current provision underlying DACA's work-authorization component, which provides that a noncitizen may be lawfully hired if she is "authorized to be so employed by … the Attorney General." 8 U.S.C. § 1324a(h)(3).     And in 1996, Congress enacted 8 U.S.C. § 1252(g), which, as this Court recognized, was "clearly designed to give some measure of protection to 'no deferred action' decisions" in individual cases, *AADC*, 525 U.S. at 485.  Congress enacted both provisions without purporting to prohibit the Executive's established practice of granting deferred action (including on a categorical basis), or countermanding the regulation expressly permitting the Attorney General to authorize employment for deferred-action recipients, 8 C.F.R. § 109.1(b)(6) (1982).

Since that time, moreover, Congress has: (1) provided statutory authority to grant deferred action to specific classes of noncitizens, *e.g.*, USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 361  (certain family members of lawful permanent residents killed on September 11, 2001, or of citizens killed in combat); (2) codified procedural protections for deferred action applications, 8 U.S.C. § 1227(d)(2) (denial of administrative stay "shall not preclude the alien from applying for … deferred action"); and (3) authorized States to issue driver's

42

licenses to deferred action recipients, REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, § 201(c)(2)(B)(viii), 119 Stat. 302 (2005).

Nowhere in this "closely related" legislation codifying deferred action and its attendant benefits did Congress evince any "contrary indication" that it sought to limit the "broad discretion" thus conferred. *Dames & Moore v. Regan*, 453 U.S. 654, 678 (1981). This demonstrates that the Executive is "implementing congressional policy rather than embarking on a frolic of its own." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139 (1985).

*3. The Executive Has Inherent Authority To Implement And Maintain DACA.* In any event, the power to grant deferred action does not depend on any delegation from Congress because it is inherent in the Executive's constitutional authority. "When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Here, the Executive's constitutional duty under the Take Care Clause to "take Care that the Laws be faithfully executed" is more than enough to confer power to grant deferred action even "in absence of … a congressional grant … of authority." *Ibid.* "'Broad discretion,'" including "whether or not to prosecute" is a core executive constitutional function. *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)). And, an enduring principle of prosecutorial discretion is not prosecution to the full extent of the

43

law, but rather "that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).

The Executive has "sweeping authority" in the immigration context. *Trump*, 138 S. Ct. at 2413. Accordingly, Congress's "'delegat[ion]'" of enforcement discretion to DHS "merely authorizes the Executive Branch to exercise a power that it already has." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1248-49 (Thomas, J., dissenting). Congress need not speak with precision to "'delegate a policy decision of [great] economic and political magnitude to an administrative agency,'" Br. 45-46, when the constitutional separation of powers already assigns that decision to the Executive in the first instance.

The government's argument to the contrary is at odds with the administration's own theory of Executive authority. The government told this Court in *Trump v. Hawaii* that the Executive's power over immigration "stems not alone from legislative power but is inherent in the executive power." U.S. Br. 45, *Trump v. Hawaii*, No. 17-965 (U.S. Feb. 21, 2018) (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950)). The government offers no principled basis for retreating from that authority here.

This is not to say that the Executive is unchecked. Congress can impose substantive limitations on deferred action—through legislation but not through silence. And under the APA, DHS can adopt deferred action policies only after giving "genuine," "reasoned explanation[s] … that can be scrutinized by courts and the interested public." *Dep't of Commerce*, 139 S. Ct. at 2575-76.

But Congress has not imposed any substantive limit here. Its failure to pass the DREAM Act, *see*

**AR4120**

44

*Texas*, 809 F.3d at 185; *Texas* Pet. Br. 5 & n.2, cannot be read to limit deferred action because that Act was not a deferred-action policy; instead, it would have provided the Dreamers with a pathway to permanent residency. *Regents* Supp. App. 48a. Congress's failure to act left the status quo intact—where the agency can use, and often has used, deferred action. In fact, Congress repeatedly has refused to pass bills that would terminate DACA. *See, e.g.*, The Separation of Powers Act of 2015, H.R. 29, 114th Cong. (Jan. 6, 2015); No Free Rides Act, H.R. 3090, 115th Cong. (June 28, 2017).

*4. DACA Fits Within Traditional Deferred Action Policies.* DACA fits squarely within longstanding Executive practice. The policy is limited to individuals who even by Secretary Nielsen's standards are "not [a] priority of enforcement." *DHS Secretary on Trump's Reported Vulgar Comments, DACA Policy*, CBS News (Jan. 16, 2018), https://tinyurl.com/y8ekmzar. They undergo rigorous background checks, J.A. 924; may not have felony or multiple or serious misdemeanor convictions or "pos[e] a threat to national security or public safety"; and must be "in school," have a high school degree or equivalent, or be a veteran, *Regents* Pet. App. 98a. They are "productive young people" who "have already contributed to our country in significant ways." *Id.* at 99a. And because they arrived in this country "as children," *ibid.*—at the average age of 6.5, *Regents* Dist. Ct. ECF No. 119-2, at 41—they "lacked the intent to violate the law." *Regents* Pet. App. 98a. Indeed, "[a]s a general rule, it is not a crime for a removable alien to remain in the United States." *Arizona*, 567 U.S. at 407. DACA "ensure[s] that [the government's] enforcement resources are not

**AR4121**

45

expended on these low priority cases." *Regents* Pet. App. 98a.

Like past forbearance policies, moreover, DACA serves "humanitarian" purposes. *AADC*, 525 U.S. at 483-84. DACA recipients "know only this country as home." *Regents* Pet. App. 97a-98a. Deportation "to countries where they may not have lived or even speak the language," *id.* at 99a, is a "'drastic measure'" akin to "'banishment or exile,'" *Dimaya*, 138 S. Ct. at 1213. The Executive has long treated a person's "ties to [her] home country (*e.g.*, whether the alien speaks the language or has relatives in the home country)" as a "[r]elevant humanitarian concern" in exercising prosecutorial discretion in immigration cases. Memorandum from Doris Meissner, Commissioner of Immigration and Naturalization Service, on Exercising Prosecutorial Discretion 3 (Nov. 17, 2000), https://tinyurl.com/y6hw8gsq. The concerns animating DACA are "consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion." J.A. 828 n.8.

The government argues that DACA is a policy of "'vast economic and political significance'" and therefore different from prior policies. Br. 44-45. Setting aside the fact that DHS was required to, but did not, weigh this "vast economic and political significance" in adopting its new policy terminating DACA (*supra* at 33-37), the government identifies no authority that the size of a categorical deferred action policy has statutory or constitutional significance. And the government offers no "discernible and manageable standard" for deciding when a deferred action policy goes "too far." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019).

46

Even still, whether this Court considers the number of individuals eligible or the number of recipients, DACA is comparable to past policies. The government inflates the number eligible to 1.7 million by including every child that could eventually age into the policy. Jeffrey S. Passel & Mark Hugo Lopez, Pew Research Center, *Up to 1.7 Million Unauthorized Immigrant Youth May Benefit from New Deportation Rules* 3 (Aug. 14, 2012). The number immediately eligible was 950,000. *Ibid*. Either way, the population is comparable to the 1.5 million that were eligible for Family Fairness by the government's own contemporaneous estimates. The number ultimately "affected" by Family Fairness may have been smaller because fewer applied, Br. 49, but other policies reached hundreds of thousands of recipients, *see supra* at 4.

The government's remaining attempts to distinguish past policies are meritless. Those policies did not exclusively cover individuals awaiting visas or "categories of aliens for whom Congress had expressed special solicitude in the INA." Br. 47-48. The government granted deferred enforced departure to 190,000 Salvadorans after their eligibility for temporary protected status expired. AIC Report, at 7. And it granted deferred action for surviving spouses of U.S. citizens who had "no avenue of immigration relief." J.A. 826. Family Fairness covered individuals whose spouses and parents had a pathway to citizenship and at most could hope to "'bring in immediate relatives'" many years in the future. Br. 49. While some of these policies "purported" to exercise specific grants of statutory authority, Br. 49 n.10 (discussing extended voluntary departure statute), so does DACA, *see supra* at 6, and none of the past statutes support the government's insistence

**AR4123**

47

that only explicit congressional authorization of categorical discretionary relief is sufficient.

5. *DACA Does Not Facilitate Legal Violations.* The government asserts that DACA "facilitates ongoing violation[s]" of the immigration laws. Br. 46 (emphasis omitted). But that is no more true of DACA than of individual grants of deferred action or for the myriad deferred enforcement policies historically approved by all three branches of government over decades. Perhaps more importantly, remaining in the country while removable is not a crime. Nor is obtaining work authorization or other benefits pursuant to regulations backed by statutory authority that the government does not question in this litigation. If anything, encouraging low-priority enforcement targets to self-identify facilitates enforcement against higher-priority targets. Indeed, the year that the Obama Administration implemented DACA, it deported a record number of individuals. *See* Ana Gonzalez-Barrera, *Record Number of Deportations in 2012*, Pew Research Center (Jan. 24, 2014), https://tinyurl.com/y292hjnh.

6. *The APA Does Not Protect "Reasonable" But Wrong Legal Conclusions.* Finally, the government argues that its legal position, even if not correct, was nevertheless "reasonable." Br. 43, 50-52. Under the APA, however, a "reasonable" but wrong legal analysis cannot sustain agency action. Agencies, like lower courts, may have "independent duty to determine whether [they] lac[k] authority to act." Br. 50. But those determinations, no less than lower courts' rulings, cannot evade judicial review. Agency decisions are reviewed for "abuse of discretion" and must be set aside if the agency's "conclusions" are "not in accordance with law." 5 U.S.C. § 706(2)(A). Just as

48

a lower court decision based on "an erroneous view of the law" is "necessarily" an abuse of discretion, *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990), an agency "order may not stand if the agency has misconceived the law," *Chenery I*, 318 U.S. at 94. Beyond conflicting with the APA, the government's proffered standard of a "reasonable" legal analysis is so ambiguous and subjective as to nearly always be a fallback argument for sustaining agency action. That is not, and cannot be, the law.

## D. The Government's Other Proffered Rationales Do Not Justify DHS's Policy

Unable to defend Secretary Duke's stated rationale for her policy, the government primarily defends it on grounds she did not articulate. But these cannot survive scrutiny.

### 1. Concerns About Litigation Risk Do Not Justify The Decision

The government now claims Secretary Duke ended DACA because she had "serious doubts about the lawfulness of the policy and the litigation risks in maintaining it." Br. 33.

a.   It is well-settled that courts "may not accept appellate counsel's *post hoc* rationalizations for agency action." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Instead, APA review is limited to the "grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("*Chenery II*"). "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50.

The government's litigation-risk rationale is a "classic post hoc rationalization" because it appears

**AR4125**

49

"[n]owhere in the administrative record." *Regents* Pet. App. 56a. Neither Attorney General Sessions nor Secretary Duke ever "consider[ed] whether defending the program in court would (or would not) be worth the litigation risk." *Ibid*. Although Secretary Duke mentioned possible litigation challenging DACA, she never identified "risks" posed by this litigation that the government would avoid by adopting a new policy.

The government now suggests the decision was motivated by a concern that a "court-ordered" end to the policy would be more "'abrupt'" than an administrative "wind-down." Br. 27, 34-35. But Secretary Duke's memorandum "offers absolutely no indication that [the government] considered these impacts," and no one reading the memorandum would "have guessed that [the government] made [its] decision for this reason." *Batalla Vidal* Pet. App. 111a-13a. The memorandum's statement that DACA should be terminated in "'an efficient and orderly fashion,'" Br. 27 (quoting *Regents* Pet. App. 116a-17a), did not evince a *reason* for terminating DACA; it was a statement of *how* the Secretary planned to end the policy given the administrative "complexities" of doing so.

A recent Freedom of Information Act production by the government confirms that DACA was terminated based on a legal judgment and not any other reason. *See supra* at 11. A Principals Committee meeting at the White House determined that DACA "is unlawful and will be ended" and specified a process to be followed. "The DOJ will send a memorandum to DHS outlining the legal reasons that the DACA program is unlawful," and then "DHS will draft a memorandum to withdraw the 2012 DACA memorandum, and any related memoranda or

50

guidance, in light of DOJ's legal determination." *Make the Road*, No. 1:18-cv-2445, ECF No. 63-1, at 209. At that point, "DHS will then propose a plan to wind down the DACA program." *Ibid.* This document establishes that the government did not include vital information in the incomplete administrative records in these cases, and that "litigation risk" and other subsequent "rationales" are litigation-driven, *post hoc* justifications and not legitimate bases for the decision.

b.  The prospect of litigation hovers over virtually all major policy decisions by an agency. If that alone justified abandoning a rule, the APA's requirement of reasoned explanation would be a dead letter. As Gene Hamilton, the principal drafter of Secretary Duke's memorandum, testified, a "litigation risk" rationale "sounds like the craziest policy you could have in a department." J.A. 1007. Nor would anyone have thought that a decision to terminate DACA—a longstanding policy currently affecting 700,000 people—would avoid significant litigation. And indeed, it did not.

Any assessment of litigation risk also cannot be extricated from the government's flawed conclusion that DACA is unlawful. The Attorney General predicted that litigation challenging DACA would likely succeed "[b]ecause" of DACA's "legal and constitutional defects." J.A. 878. His factual and legal errors inevitably infected his conclusion. More fundamentally, Secretary Duke and Secretary Nielsen were "bound" by the Attorney General's conclusion that DACA is unlawful, *Regents* Pet. App. 122a-23a, so the discussion of potential litigation at best was offered to bolster a foregone conclusion. In these circumstances, it is impossible to excise the

**AR4127**

51

Secretary's "mistake[s]" in concluding that DACA was unlawful and say they "clearly had no bearing on the … substance" of whatever litigation risk analysis she may have performed. *Mass. Trs. of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 248 (1964).

c.   Although the Attorney General and the Secretary placed great weight on the Fifth Circuit's decision in *Texas*, neither considered the "differences between DAPA and DACA that might have led to a different result." *Regents* Pet. App. 57a. The Fifth Circuit recognized that "DAPA and DACA are not identical" and that "any extrapolation from DACA [to DAPA] must be done carefully." *Texas*, 809 F.3d at 173-74. The policies differ in significant ways.

*First*, DAPA, unlike DACA, would have classified recipients as "lawfully present in the United States," as the memorandum adopting DAPA expressly stated. *Regents* Pet. App. 104a. This language formed the centerpiece of the *Texas* plaintiffs' arguments challenging DAPA before this Court. Texas Pet. Br., *United States v. Texas*, No. 15-674, at 1, 7-8 (U.S. Dec. 2015). By contrast, "the DACA memo itself said nothing about lawful presence." *Id*. at 6.

*Second*, DAPA covered parents of citizens and lawful permanent residents, who already had a statutory path to lawful immigration status. *Texas*, 809 F.3d 179-80.[4] The Fifth Circuit found this fact decisive in concluding that DAPA could not be justified as filling a "'gap'" in the INA. *Id.* at 186. Secretary Nielsen thus mischaracterized the Fifth

---

[4]   The government is wrong that parents of lawful permanent residents have no path to lawful status. Br. 36. Lawful permanent residents can become citizens, 8 U.S.C. § 1427, and then sponsor their parents for lawful permanent residence, *id.* § 1151(b)(2)(A)(i).

52

Circuit's opinion when she claimed the decision "did not turn on whether [DAPA recipients] had a pathway to lawful status." *Regents* Pet. App. 122a. Unlike DAPA, DACA "has no … analogue in the INA"—DACA recipients have no statutory path to lawful status. *Id*. at 54a.

*Third*, DAPA was challenged before it took effect, whereas DACA took effect over seven years ago. Any judicial decision to terminate DACA necessarily would have to account for the policy's impact on hundreds of thousands of people. *Regents* Pet. App. 57a. Indeed, consideration of those costs had an impact in *Texas v. United States*, where a district court recently denied a preliminary injunction against DACA despite its doubts about DACA's lawfulness. 328 F. Supp. 3d 662, 740-42 (S.D. Tex. 2018). The court recognized the difficulty of "unscrambl[ing] the egg" after DACA recipients and their families relied on the program. *Ibid.* The recognition dispels any fear of the sort of imminent judicial termination of DACA that the government now claims it was seeking to avoid by winding down the policy.

*Fourth*, DAPA would have covered more than one-third of those unlawfully present in the United States. *Texas*, 809 F.3d at 148. The Fifth Circuit concluded that DAPA's size undermined its legality. *Id.* at 181-82. DACA is "open to far fewer individuals than DAPA would have been," *Batalla Vidal* Pet. App. 103a, and is close in size to past deferred action policies.

There is no evidence in the administrative record that the Secretary ever considered these distinctions. Failing to do so was arbitrary and capricious.

53

### 2. Secretary Nielsen's Memorandum Does Not Justify The Decision

a.   Secretary Nielsen's central reason for supporting Secretary Duke's policy remains the Attorney General's erroneous conclusion that DACA is unlawful and unconstitutional. *Regents* Pet. App. 122a-23a. She also states that DACA should be ended because: (1) maintaining it despite "doubts" about its lawfulness may "undermine public confidence in and reliance on the agency and the rule of law" and result in "burdensome litigation"; (2) relief "should be enacted legislatively"; (3) deferred action should be implemented on an "individualized" basis; and (4) DHS should convey a "message" of "consistent" enforcement. *Id.* at 123a-24a.

The *NAACP* court rightly dismissed these "attempt[s] to disguise … objection[s] to DACA's legality as … policy justification[s]." *NAACP* Pet. App. 100a. "[B]oilerplate assertions[s]" that agencies should avoid legally questionable policies and leave them to Congress cannot "insulate" an agency's assessment of its legal authority from judicial review. *Id.* at 98a.   Especially given the government's concession that the Attorney General's legal conclusion *compelled* Secretary Nielsen to defend DACA's termination, *NAACP* Ct. App. Oral Arg. 33:11-33:26, https://tinyurl.com/y64xnxoc, there is no way extricate her reasoning from the Attorney General's. *See Mass. Trustees*, 377 U.S. at 248.  If Secretary Nielsen did not believe she was free to leave DACA in place, then there was no policy choice for her to make.  At a minimum, her attempt to reframe the decision in policy terms in the midst of litigation challenging that premise must be "viewed critically." *Overton Park*, 401 U.S. at 420.

AR4130

54

b.   Even if considered independently, Secretary Nielsen's additional rationales also fail to supply the "reasoned explanation" missing from the Duke memorandum. *Dep't of Commerce*, 139 S. Ct. at 2575-76.   None of the rationales finds support in the administrative record, to which "a court is ordinarily limited." *Id.* at 2573.   Indeed, the government has never produced an administrative record supporting the Nielsen memorandum, and the judicial opinions on DAPA that largely comprise the record for the Duke memorandum do not support Secretary Nielsen's rationales.   That alone is fatal.   The rationales each fail on their own terms as well.

*First*, "doubts" about legal authority alone are insufficient to justify abandoning a lawful policy. Agencies do not ordinarily give up their policies merely because they are challenged, at least without specific, articulable reasons for doing so.   This administration is no exception:   Secretary Nielsen defended multiple controversial policies against legal challenges—including policies that detain minor children and separate them from their parents, *Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal. 2018), preclude asylum for individuals who enter the United States outside a designated port of entry, *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1101 (N.D. Cal. 2018), and return asylum seekers to Mexico during their immigration proceedings, *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 124 (D.D.C. 2018). Each time, consistent with past practice, *e.g.*, *Trump*, 138 S. Ct. at 2423, the government endured "the litigation risks in maintaining" these policies despite public "doubts" about their lawfulness, Br. 33. Secretary Nielsen offers no neutral principle for treating "doubts" as dispositive here but not elsewhere.   The evident explanation, which she

**AR4131**

55

conceded, is that she was bound by the Attorney General's erroneous legal conclusion.

*Second*, asserting that relief "should be enacted legislatively" does not explain why the Executive should not act absent a legislative solution. As the government concedes, President Obama pursued a legislative solution but still supported DACA as a "stopgap" measure. Br. 38. Secretary Nielsen never explained why she viewed these two solutions as mutually exclusive.

*Third*, Secretary Nielsen's asserted aversion to categorical Executive action is incompatible both with decades-long deferred-action practice, *supra* at 4, and DHS's recent policies. Under the current administration, DHS has unilaterally imposed categorical bans on noncitizens from multiple countries and categorically altered the requirements for obtaining asylum—a far more expansive use of executive power than allowing a class of people to *apply* for an individualized grant of deferred action. *See supra* at 54. Indeed, just last month, the Executive defended its authority to "exercise its discretion" to limit asylum "through categorical rules, not just through case-by-case adjudication." App. for Stay Pending Appeal, at 26, *E. Bay*, No. 19A230 (U.S. Aug. 26, 2019). Selective departure from an agency's asserted principles is fundamentally arbitrary.

*Fourth*, maintaining DACA is fully compatible with Secretary Nielsen's view that deferred action decisions should be made on an "individualized" basis. The DACA policy requires all "requests for relief … to be decided on a case by case basis," affording ample "consideration … to the individual circumstances of each case." *Regents* Pet. App. 98a-99a. Satisfying DACA's criteria was only a prerequisite to being

AR4132

56

"*considered*" for relief, *ibid.* (emphasis added)—it did not create a "presumption" that relief would be granted. Br. 39-40. The high percentage of applications granted reflects that many warranted discretionary relief, and that the most deserving applicants self-selected to apply. If Secretary Nielsen believed that fewer applications should have been granted, "she [could have] simply direct[ed] her employees to implement" the policy accordingly. *NAACP* Pet. App. 100a.

DHS's new policy, in fact, leaves no possibility for the "individualized" relief that Secretary Nielsen promises. Secretary Duke's memorandum directs DHS officers to deny *all* deferred action requests from DACA-eligible individuals, even where DHS might have granted the same relief before DACA's adoption in 2012. *Regents* Pet. App. 117a-18a. In practice, therefore, ending DACA is not a return to individualized discretion—it is a policy of categorical denial of relief.

*Fifth*, ending DACA to "project a message" of consistent enforcement makes little sense, since "DACA is available only to those individuals who have lived in the United States since 2007." *NAACP* Pet. App. 102a. DACA's termination would send no meaningful signal to undocumented individuals who arrived after 2007. The notion that the failure to rescind this program has caused even one person, much less many of them, to enter unlawful with the hope of obtaining amenities and a path to remain is unsupported by the record and contrary to recent empirical research. *See* Tom K. Wong & Hillary Kosnac, *Does the Legalization of Undocumented Immigrants in the US Encourage Unauthorized Immigration from Mexico? An Empirical Analysis of*

57

*the Moral Hazard of Legalization,* 55 International Migration 159 (2017).

c. In any event, Secretary Nielsen's analysis is insufficient because she did not grapple with the toll of Secretary Duke's action on the affected people and institutions. Her memorandum simply asserts that she is "keenly aware" that "DACA recipients" have "availed themselves" of the policy, and that their "interests" do not "outweigh" the agency's other concerns. *Regents* Pet. App. 125a.

This perfunctory analysis falls well short of the "detailed justification"—"consider[ing] *all* of the relevant costs"—that the APA requires. *Mingo,* 829 F.3d at 737 (Kavanaugh, J., dissenting) (emphasis added). Secretary Nielsen never identifies the "interests" of DACA recipients that she supposedly weighed or addresses the hardships they will face without DACA. Instead, she dismisses these concerns because DACA "conferred no substantive rights." *Regents* Pet. App. 125a. Nor does she purport to weigh the substantial burden her decision imposes on the economy as a whole and the many stakeholders— families, communities, workplaces, and schools—that structured their lives and businesses around the policy, just as the government intended them to do.

Ultimately, moreover, Secretary Nielsen's limited cost-benefit analysis depends on the validity of *each* of the reasons discussed in her memorandum. While Secretary Nielsen claimed each "separate" rationale was "independently sufficient" to justify the new policy, *Regents* Pet. App. 122a, her conclusion was that "the questionable legality of the DACA policy and other reasons for ending the policy" *collectively* outweigh DACA recipients' interests in maintaining the policy. *Id.* at 125a. *Any* error in her reasoning—

58

including her threshold legal error that DACA is unlawful—undermines that conclusion.  This Court cannot dismiss Secretary Nielsen's numerous errors as harmless.  *Mass. Trustees*, 377 U.S. at 248.

**AR4135**

59

## CONCLUSION

The beneficiaries of DACA—including individual recipients, communities, schools, and businesses—are as numerous and varied as the contributions DACA recipients make to our nation.  DACA allows 700,000 vetted young people to live, work, and learn in this country without persistent fear of being sent to a place they may not remember or even speak the language. The government may replace DACA with a different policy, thus raising the specter of deportation, only if it satisfies the APA's requirement for reasoned decisionmaking so it can be held publicly accountable. That includes weighing the costs of eliminating this valuable humanitarian policy.  Perhaps knowing that a true cost-benefit analysis could not possibly justify this change, the government argues that its hands were tied as a legal matter.  That is wrong—DACA is lawful, and the government is free to maintain the program.  If it does not wish to do so, the APA requires a reasoned explanation of why it is changing course supported by an administrative record.  Because the government has provided no such explanation, this Court should affirm the decisions below.

60

Respectfully submitted.

THEODORE J. BOUTROUS, JR.
ETHAN D. DETTMER
JONATHAN N. SOLEIMANI
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

THEODORE B. OLSON
   *COUNSEL OF RECORD*
STUART F. DELERY
MATTHEW S. ROZEN
ANDREW J. WILHELM
SURIA M. BAHADUE
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
TOlson@gibsondunn.com

MARK D. ROSENBAUM
JUDY LONDON
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
(213) 385-2977

LUIS CORTES ROMERO
IMMIGRANT ADVOCACY &
LITIGATION CENTER, PLLC
19309 68th Avenue South,
Suite R102
Kent, WA  98032
(253) 872-4730

ERWIN CHEMERINSKY
UNIVERSITY OF CALIFORNIA,
BERKELEY SCHOOL OF LAW*
215 Boalt Hall
Berkeley, CA  94720
(510) 642-6483

LEAH M. LITMAN
UNIVERSITY OF MICHIGAN
LAW SCHOOL*
3226 Jeffries Hall
Ann Arbor, MI 48109
(734) 764-0549

LAURENCE H. TRIBE
HARVARD LAW SCHOOL*
1575 Massachusetts Avenue
Cambridge, MA  02138
(617) 495-1767

*Counsel for DACA Recipient Respondents in No. 18-587*

*\*Affiliation for identification purposes only*

**AR4137**

61

MICHAEL J. WISHNIE
MUNEER I. AHMAD
MARISOL ORIHUELA
JEROME N. FRANK LEGAL
SERVICES ORGANIZATION
P.O. Box 209090
New Haven, CT 06520
(203) 432-4800

KAREN C. TUMLIN
COOPERATING ATTORNEY
JEROME N. FRANK LEGAL
SERVICES ORGANIZATION
P.O. Box 209090
New Haven, CT 06520
(323) 316-0944

AMY S. TAYLOR
PAIGE AUSTIN
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
(718) 418-7690

TRUDY S. REBERT
NATIONAL IMMIGRATION LAW
CENTER
P.O. Box 721361
Jackson Heights, NY 11372
(646) 867-8793

ARACELI MARTÍNEZ-OLGUÍN
MAYRA B. JOACHIN
NATIONAL IMMIGRATION LAW
CENTER
3450 Wilshire Blvd.
#108-62
Los Angeles, CA 90010
(213) 639-3900

SCOTT FOLETTA
MAKE THE ROAD NEW YORK
92-10 Roosevelt Avenue
Jackson Heights, NY 11372
(929) 244-3456

*Counsel for DACA Recipient Respondents and Make the Road New York in No. 18-589*

STACEY M. LEYTON
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151

*Counsel for Respondents County of Santa Clara and Service Employees International Union Local 521 in No. 18-587*

JAMES R. WILLIAMS
GRETA S. HANSEN
LAURA S. TRICE
MARCELO QUIÑONES
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street
East Wing, Ninth Floor
San Jose, CA 95110
(408) 299-5900

*Counsel for Respondent County of Santa Clara in No. 18-587*

September 27, 2019

AR4138

Nos. 18-587, 18-588, and 18-589

═══════════════════

IN THE

# Supreme Court of the United States

───────────────

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
*Petitioners*,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,
*Respondents.*

───────────────

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT
OF APPEALS FOR THE NINTH CIRCUIT

───────────────

**BRIEF FOR RESPONDENTS
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,
JANET NAPOLITANO, AND THE CITY OF SAN JOSÉ**

───────────────

Jeffrey M. Davidson
David Watnick
COVINGTON & BURLING LLP
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000

Charles F. Robinson
Margaret Wu
Sonya Sanchez
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, CA 94607
(510) 987-9800

Robert A. Long
*Counsel of Record*
Lanny A. Breuer
Mark H. Lynch
Alexander A. Berengaut
Megan A. Crowley
Ivano M. Ventresca
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Avenue, NW
Washington, DC 20001
(202) 662-6000

*Counsel for The Regents of the University of California
and Janet Napolitano*

(Additional Captions and Counsel Listed On Inside Cover)

**AR4139**

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

> *Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.

> *Respondents.*

————————

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, ET AL.,

> *Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL.

> *Respondents.*

————————

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

————————

Justin T. Berger
Brian Danitz
Tamarah Prevost
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
(650) 697-6000
*Counsel for City of San José*

**AR4140**

**QUESTIONS PRESENTED**

1. Whether the decision of the Acting Secretary of Homeland Secretary to rescind the Deferred Action for Childhood Arrivals (DACA) policy is subject to judicial review under the Administrative Procedure Act.

2. Whether the decision to rescind the DACA policy was arbitrary and capricious.

i

ii

# TABLE OF CONTENTS

INTRODUCTION......................................................... 1

STATUTORY AND REGULATORY
    PROVISIONS INVOLVED.................................. 2

STATEMENT ............................................................ 2

SUMMARY OF ARGUMENT................................. 14

ARGUMENT ........................................................... 17

I.    The Rescission Of DACA Is Reviewable. ......... 17

    A.    Acting Secretary Duke's Decision Is
        Reviewable................................................. 18

    B.    The Nielsen Memorandum Does Not
        Alter The Reviewability Analysis. ............. 26

II.    The Rescission Of DACA Was Arbitrary
     And Capricious.................................................... 30

    A.    The Rescission Of DACA Was Not
        Adequately Explained. ............................... 31

        1.    The Duke Memorandum Fails To
            Adequately Explain The
            Rescission. ............................................. 32

        2.    The Nielsen Memorandum Does
            Not Cure The Defects In The Duke
            Memorandum. ....................................... 37

**AR4142**

iii

3.   The Agency Failed To Give Adequate Consideration To Reliance Interests. ................ 40

B.  DACA Is Lawful. ........................................ 44

1.   DACA Is A Lawful Exercise Of Authority Conferred By The INA. ........ 44

2.   The Government's Arguments That DACA Is Unlawful Lack Merit. ...................................... 49

3.   "Litigation Risk" Is Not A Valid, Independent Basis For Rescinding DACA. ...................................... 53

C.  This Court Should Not Rule For The Government Without A Complete Administrative Record, Particularly Given The Evidence Of Pretext. ................ 55

1.   The Administrative Record Is Incomplete. ............................ 55

2.   There Is Evidence That DHS's Explanation Is Pretextual. .................. 56

CONCLUSION ........................................... 58

APPENDIX................................................1a

**AR4143**

iv

## TABLE OF AUTHORITIES

### Cases

*Abbott Labs. v. Gardner,*
   387 U. S. 136 (1967) .............................................. 18

*Burlington Truck Lines, Inc. v. United States,*
   371 U.S. 156 (1962) .............................................. 27

*Casa De Maryland v. U.S. Dep't of Homeland Sec.,*
   284 F. Supp. 3d 758 (D. Md. 2018) ...................... 13

*Casa De Maryland v. U.S. Dep't of Homeland Sec.,*
   924 F.3d 684 (4th Cir. 2019) ................................ 13

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) ........................................ 18, 55

*Cutter v. Wilkinson,* 544 U. S. 709 (2005) ............... 18

*Dep't of Commerce v. New York,* 139 S. Ct. 2551 (2019) .................................................. *passim*

*Encino Motorcars, LLC v. Navarro,* 136 S. Ct. 2117 (2016) ................................... 32, 33, 41, 43

*FCC v. Fox Television Stations,* 566 U.S. 502 (2009) ............................................. 41

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) .............................................. 52

*Fed. Election Comm'n v. Akins,*
   524 U.S. 11 (1998) ............................................... 20

**AR4144**

v

*Fed. Power Comm'n v. Texaco Inc.*, 417 U.S. 380 (1974) ............................................................ 40

*Heckler v. Chaney*, 470 U.S. 821 (1985) ..................................... *passim*

*ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270 (1987) ................................. 19, 24, 25

*INS v. St. Cyr*, 533 U.S. 289 (2001) ............................................. 18

*Int'l Union, UAW v. Brock*, 783 F.2d 237 (D.C. Cir. 1986) ....................... 20, 24

*Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d 40 (D.C. Cir. 2004) ............................................................ 53

*Judulang v. Holder*, 565 U.S. 42 (2011) ................................... 27, 31, 39

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ............................................. 19

*Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645 (2015) ...................................... 18

*Marbury v. Madison*, 1 Cranch 137 (1803) ........................................... 18

*Massachusetts v. EPA*, 549 U.S. 497 (2007) .................................. 20, 22, 44

*Michigan v. E.P.A.*, 135 S. Ct. 2699 (2015) ...................................... 27

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................................................... *passim*

**AR4145**

vi

*Neil v. Biggers*, 409 U.S. 188 (1972) ........................35

*Negusie v. Holder*,
    555 U.S. 511 (2009)........................................34, 44

*In re Nielsen*,
    No. 17-3345 (2d Cir. Dec. 27, 2017)..............10, 55

*Organized Vill. of Kake v. U.S. Dep't of*
    *Agric.*, 795 F.3d 956 (9th Cir. 2015) (en
    banc) ...............................................................53

*OSG Bulk Ships, Inc. v. United States*,
    132 F.3d 808 (D.C. Cir. 1998) ..............................23

*Reno v. Am.-Arab Anti-Discrimination*
    *Comm.*,
    525 U.S. 471 (1999)..................................26, 45, 52

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ....................................20, 31, 44

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)........................................31, 37

*Texas v. United States*,
    328 F. Supp. 3d 662 (S.D. Tex. 2018) .................54

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015), *aff'd by an*
    *equally divided Court*, 136 S. Ct. 2271
    (2016) ..............................................8, 23, 33, 34, 47

*In re United States*,
    138 S. Ct. 443 (2017)...........................................10

*In re United States*,
    875 F.3d 1200 (9th Cir.), *judgment*
    *vacated*, 138 S. Ct. 443 (2017) .............................10

**AR4146**

vii

*Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014) ............................................................52

*Webster v. Doe,*
486 U.S. 592 (1988) .............................................19

*Weyerhauser Co. v. U.S. Fish & Wildlife Serv.,*
139 S. Ct. 361 (2018) .....................................17, 20

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076 (2015) .....................................................45

**Statutes**

5 U.S.C. § 701 ...................................................*passim*

5 U.S.C. § 702 ...................................................18

5 U.S.C. § 706 ...................................................*passim*

6 U.S.C. § 202 ...........................................2, 16, 44, 52

8 U.S.C. § 1103 ...............................................16

8 U.S.C. § 1151 ...............................................4, 45

8 U.S.C. § 1154 ...............................................4, 45

8 U.S.C. §§ 1181-88 .........................................2

8 U.S.C. §§ 1226-29c .......................................2

8 U.S.C. § 1227 ...............................................4

8 U.S.C. § 1252 ...............................................25, 26

8 U.S.C. § 1324a .............................................17

49 U.S.C. § 30301 ...........................................45

Immigration Reform and Control Act, Pub. L. No. 99-603, 100 Stat. 3359 (1986).....................3

**AR4147**

viii

Pub. L. No. 101-649, Tit. III, 104 Stat. 5030
  (1990) .................................................................... 49

**Regulatory Authorities**

8 C.F.R. § 1.3(a)(4) ....................................................... 6

8 C.F.R. § 109.1(b)(7) (1982) ...................................... 6

8 C.F.R. § 274a.12(c)(14) .................................. 6, 35, 46

**Other Authorities**

American Immigration Council, *Executive
  Grants of Temporary Immigration Relief,
  1956-Present* (Oct. 2014), *available at*
  https://bit.ly/2hIzgX8 ............................................... 3

Pia Orrenius & Madeline Zavodny, *What
  Are the Consequences of an Amnesty for
  Undocumented Immigrants?*, 9 Geo. Pub.
  Pol'y Rev. 21 (2004) ............................................ 40

**AR4148**

# INTRODUCTION

After the President stated repeatedly that DACA participants had nothing to fear and should rest easy, the Acting Secretary of Homeland Security abruptly announced the rescission of DACA. There is no dispute that this decision has life-changing implications for nearly 700,000 DACA participants and their families. Yet the Acting Secretary provided only a single vague sentence of explanation for the decision that leaves basic questions unanswered.

The government argues that this highly consequential decision is immune from judicial review under the Administrative Procedure Act. But the government has not overcome the strong presumption favoring judicial review of agency action. Nor has it demonstrated that this case fits into one of the few and narrow categories of agency action traditionally viewed as "committed to agency discretion by law." When an agency determines that an action is *required* by law, as the agency did here, it is not exercising discretion. Instead, the agency is concluding that it has no discretion to exercise. It makes no sense to hold that such legal determinations cannot be reviewed by a court.

On the merits, the Acting Secretary's explanation is too vague and cursory to satisfy the APA's arbitrary-and-capricious standard. These deficiencies are not cured by Secretary Nielsen's post hoc effort, in the midst of litigation, to rehabilitate Acting Secretary Duke's explanation.

In addition, the interlocutory posture of *Regents* and *Batalla Vidal*, the evident incompleteness of the administrative record, and evidence that the actual

1

**AR4149**

2

reasons for rescinding DACA are different from the stated reasons, are additional reasons for affirming the preliminary injunctions in those cases.

## STATUTORY AND REGULATORY PROVISIONS INVOLVED

Relevant statutory and regulatory provisions not reproduced in Petitioners' brief are reproduced in an appendix to this brief. App., *infra*, 1a-11a.

## STATEMENT

**1. Deferred Action Policies**. The Immigration and Nationality Act (INA) establishes requirements governing the admissibility of noncitizens into the United States, see, *e.g.*, 8 U.S.C. §§ 1181-88, as well as procedures for the detention and removal of noncitizens, see, *e.g.*, *id.* §§ 1226-29c. Subject to those provisions, Congress has assigned the Secretary of Homeland Security responsibility for "[e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5).

Since 1956, every presidential administration has exercised this authority by adopting policies under which the government forgoes immigration enforcement against certain categories of immigrants. See SER265-66 (summarizing 17 pre-DACA discretionary relief policies).[1] President Eisenhower "paroled" into the United States tens of thousands of otherwise-excludable Hungarian refugees after the Soviet Union crushed the Hungarian Revolution. Dkt. 121-1 at 11,

---

[1] "ER" and "SER" refer to the Ninth Circuit Excerpts and Supplemental Excerpts of Record. "Dkt." refers to docket entries in the district court.

**AR4150**

3

13 (Statements of President Eisenhower). Presidents Eisenhower, Kennedy, Johnson, and Nixon paroled more than 600,000 Cuban immigrants into the United States through a series of discretionary policies. American Immigration Council, *Executive Grants of Temporary Immigration Relief, 1956-Present* (Oct. 2014), *available at* https://bit.ly/2hIzgX8.

In 1987, the Reagan Administration instituted the Family Fairness Program, which provided eligibility for extended voluntary departure to spouses and children of individuals in the process of legalizing their immigration status under the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 (IRCA), even though the Act itself did not cover spouses and children. Dkt. 121-1 at 20-24 (INS Commissioner Alan C. Nelson, *Legalization and Family Fairness — An Analysis* (Oct. 21, 1987)). In 1990, President George H. W. Bush expanded that program. *Id.* at 26-27 (Memorandum from Gene McNary, Comm'r, INS, to Reg'l Comm'rs, INS, *Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990)). The Family Fairness Program ultimately extended relief to approximately 1.5 million people, an estimated 40 percent of the undocumented population at the time. See U.S. Cert. Pet. at 7, *United States v. Texas*, No. 15-674 (2015).

The Clinton Administration established a deferred action policy for individuals petitioning for relief under the Violence Against Women Act of 1994. Dkt. 121-1 at 56-62 (Memorandum from Paul W. Virtue, Acting Exec. Assoc. Comm'r, INS., to Reg'l Dirs. et al., INS, *Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* (May 6, 1997)).

4

The George W. Bush Administration similarly provided deferred action to certain applicants for T and U visas (victims of human trafficking and crimes such as domestic violence, respectively), *id.* at 67-68 (Memorandum from Stuart Anderson, Exec. Assoc. Comm'r, INS, to Johnny N. Williams, Exec. Assoc. Comm'r, INS, *Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status* (May 8, 2002)), which subsequently were ratified by statute, *see* 8 U.S.C. § 1227(d)(2) (U visa and T visa applicants are eligible for "deferred action").

These policies, and others like them, reflect the reality that the government lacks sufficient resources to "enforce all of the [immigration] rules and regulations presently on the books," and that in "some situations, application of the literal letter of the law would simply be unconscionable and would serve no useful purpose." SER1215 (Memorandum from Sam Bernsen, INS General Counsel, to Commissioner, *Legal Opinion Regarding Service Exercise of Prosecutorial Discretion* (July 15, 1976)). For decades, the legality of these policies was widely accepted and none was challenged in court.

Congress has also expressly acknowledged the existence of deferred action policies. *See, e.g.,* 8 U.S.C. § 1227(d)(2); *id.* § 1154(a)(1)(D)(i)(II), (IV) (petitioners under the Violence Against Women Act are eligible for "deferred action and work authorization"); *id.* § 1151 note (certain immediate family members of certain United States citizens "shall be eligible for deferred action").

**2. DACA.** The Department of Homeland Security (DHS) established the DACA policy in 2012. *Regents* Pet. App. 97a-101a. The memorandum establishing

**AR4152**

5

the policy provides that "certain young people who were brought to this country as children and know only this country as home" are eligible to apply for case-by-case discretionary relief from removal if they (1) came to the United States under the age of sixteen; (2) have continuously resided in the United States since June 15, 2007, and were present in the United States both on June 15, 2012, and on the date they requested DACA; (3) are in school, have graduated from high school, have obtained a GED, or have been honorably discharged from the United States military or Coast Guard; (4) do not have a significant criminal record and are not a threat to national security or public safety; (5) were under the age of 31 as of June 15, 2012; and (6) do not have lawful immigration status. *Id.* at 97a-98a. Eligible applicants are required to provide the government with sensitive personal information, including their home address and fingerprints, submit to a rigorous DHS background check, and pay a substantial application fee. SER1308, 1325-26, 1328 (USCIS Form I-821D, *Consideration of Deferred Action for Childhood Arrivals*, and Instructions).

Before DACA was announced, the Office of Legal Counsel (OLC) advised that "such a program would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis." JA 827-28 n.8. This advice was memorialized in a comprehensive 2014 OLC opinion. JA 797-856. In accordance with OLC's advice, the memorandum creating DACA directs that, for applicants meeting the threshold criteria, "requests for relief pursuant to this memorandum are to be decided on a case by case basis," as "part of th[e] exercise of

6

prosecutorial discretion." *Regents* Pet. App. 99a. The memorandum further provides that "DHS cannot provide any assurance that relief will be granted in all cases." *Ibid.* In defending against legal challenges to the DACA policy, the government argued that DACA is "a valid exercise of the Secretary's broad authority and discretion to set policies for enforcing the immigration laws." U.S. Br. *1, *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017), 2015 WL 5120846.

The government does not dispute that DACA has created enormous benefits for participants and the country as a whole. Nearly 700,000 young immigrants currently have deferred action under the policy. Dkt. 290-2 (Demographics Report). Pursuant to longstanding regulations, DACA participants, like the beneficiaries of prior deferred action policies, may obtain employment authorization and a social security number. See 8 C.F.R. § 274a.12(c)(14) (promulgated in 1987); *id.* § 109.1(b)(7) (1982); *id.* § 1.3(a)(4) (promulgated in 1996). These benefits have allowed DACA participants to achieve a 91 percent employment rate, and to increase their wages by 69 percent. SER1145-48 (Wong Decl.). Access to lawful work allows DACA participants to support their families, including their estimated 200,000 U.S.-citizen children, SER1155, and to receive employer-sponsored health insurance. Dkt. 118-1 at 260 (McLeod Decl.). The rescission of DACA would cost the country an estimated $215 billion in lost GDP and $60 billion in lost federal tax revenue over a ten-year period. SER359 (Brannon & Albright Decl.). In addition, DACA participants contribute more than $1.25 billion in state and local tax revenue each year. SER447 (Essig, et al. Decl.).

7

DACA has allowed 94 percent of participants to pursue educational opportunities previously unavailable to them; 72 percent are pursuing a bachelor's or higher degree. SER1152 (Wong Decl.). For example, Mitchell Santos Toledo arrived in the United States from Mexico when he was less than two years old. JA 954 (Santos Toledo Decl.). Despite growing up in difficult circumstances, he excelled in school. *Id.* at 954-56. Upon graduation from high school, he was accepted at the University of California, Berkeley, but could not attend because his family was poor and he was unable to lawfully work in the United States. *Id.* at 957-58. Once DACA was created, Santos Toledo was granted deferred action in 2013. *Id.* at 959. For the first time, he was allowed to lawfully work, and earned enough as a bank teller and paralegal to begin his studies at UC Berkeley, while also helping to support his family. *Id.* at 960-61. Santos Toledo graduated with Highest Distinction in Legal Studies in 2016, and was the commencement speaker for his program. *Id.* at 962-63. He now attends Harvard Law School. *Id.* at 963. If DACA is rescinded, Santos Toledo will be unable to lawfully work in the United States and could be deported at any time to a country he has not lived in since he was less than two years old. *Id.* at 964.

Evelyn Valdez-Ward arrived in the United States when she was six months old. SER1109 (Valdez-Ward Decl.). She did not know that she was undocumented until she applied for college. *Id.* at 1110. When she received her work authorization after obtaining deferred action through DACA, she "got [her] first real job as a cashier at Kroger's," then worked as a tutor

8

and restaurant server—all while paying undergraduate tuition and giving money to her family. She has since become an acclaimed doctoral student in Ecology and Biology at UC Irvine. *Id.* at 1111-13. Her doctoral research, which is supported by a grant from the Ford Foundation, cannot be completed if DACA is terminated. *Id.* at 1113.

**3.   The Government's Decision to Rescind DACA**. Early in his Administration, President Trump affirmed that the "policy of [his] administration [is] to allow the dreamers to stay" and declared that "dreamers should rest easy."[2] In February 2017, then-Secretary of Homeland Security Kelly exempted DACA from a repeal of other immigration directives, JA 857-67, and stated that "DACA status" is a "commitment * * * by the government towards the DACA person," Dkt. 121-1 at 273.

On September 4, 2017, however, then-Attorney General Sessions sent a half-page letter to then-Acting Secretary of Homeland Security Duke, advising that DHS "should rescind" DACA because it was "effectuated * * * without proper statutory authority" and "was an unconstitutional exercise of authority by the Executive Branch." JA 877-78. The letter asserted that DACA "has the same legal and constitutional defects" as a different deferred action policy, Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which had been preliminarily enjoined in a decision affirmed by the Fifth Circuit in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015),

---

[2] SER1346-47 (Tr. of AP Interview with Trump (Apr. 24, 2017), https://www.cbsnews.com/news/transcript-of-ap-interview-with-trump/).

AR4156

9

*aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016). JA 878. The Attorney General's letter does not elaborate on the purported "constitutional defects" in DACA. Neither the Fifth Circuit nor any other court has ever found any deferred action policy unconstitutional.

On September 5, the day after the Attorney General's letter, Acting Secretary Duke issued a memorandum rescinding DACA. *Regents* Pet. App. 111a-12a. The memorandum instructed DHS to cease accepting new DACA applications and advance parole applications and to accept renewal applications only through October 5, 2017, and only from individuals whose deferred action would expire before March 5, 2018. *Id.* at 117a-18a. The memorandum provided a one-sentence justification for ending DACA: "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." *Id.* at 117a.

That same day, the President tweeted: "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this issue!" Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 8:38 PM), https://tinyurl.com/y7f2y6tj. The President later tweeted that "[t]he Democrats have been told, and fully understand, that there can be no DACA without the desperately needed WALL at the Southern Border and an END to the horrible Chain Migration & ridiculous Lottery System of Immigration etc." Donald J. Trump (@realDonaldTrump), Twitter (Dec. 29, 2017, 5:16 AM), https://goo.gl/aZ19im.

**AR4157**

10

**4. The California Litigation**. The University of California and other Respondents brought actions in the Northern District of California contending that the decision to rescind DACA violated the Administrative Procedure Act (APA). *Regents* Pet. App. 19a-22a. Some Respondents also challenged the rescission on due process and equal protection grounds. *Id.* at 22a.

a. The administrative record produced by the government consists of 14 publicly-available documents totaling 256 pages, including 187 pages of judicial opinions. See Dkt. 64-1. The lower courts have determined that this administrative record is incomplete.[3] This Court has directed the lower courts to adjudicate the government's threshold reviewability arguments before proceeding with litigation to complete the administrative record. *In re United States*, 138 S. Ct. 443 (2017).

b. Petitioners moved to dismiss the complaints; Respondents opposed Petitioners' motion and sought a preliminary injunction on their APA claims. See Dkt. 111 at 10; Dkt. 205. The district court granted both motions in part. *Regents* Pet. App. 66a-69a. The court held that Respondents are likely to succeed on their claim that the rescission was arbitrary and capricious. *Id.* at 54a, 62a. In finding that Respondents also satisfied the remaining preliminary injunction factors, the court relied on Respondents' extraordinary showing of irreparable harm, see *id.* at 62a-63a, which establishes, for example, that the rescission would cause

---

[3] See Dkt. 79 (ordering completion of the administrative record); *In re United States*, 875 F.3d 1200, 1205 (9th Cir.) (denying mandamus petition), *judgment vacated*, 138 S. Ct. 443 (2017); *In re Nielsen*, No. 17-3345, slip op. at 2-3 (2d Cir. Dec. 27, 2017).

11

roughly 1,400 DACA participants to lose their jobs each business day, SER1459 (Center for America Progress, *Study: The Impact of Deferred Action for Childhood Arrivals (DACA) Program Repeal on Jobs*), and force tens of thousands of DACA participant undergraduate and graduate students to discontinue their studies for lack of support, SER1152-53 (Wong Decl.). The University of California alone has approximately 1,700 DACA students whose educations and contributions to the University would be imperiled by the rescission. SER365-69 (Brick Decl.).

The court's injunction required the government to "allow[] DACA enrollees to renew their enrollments" under the terms applicable prior to the rescission. *Regents* Pet. App. 66a. For "each renewal application," the district court permitted the government to continue to "take administrative steps to make sure fair discretion is exercised on an individualized basis." *Ibid*. The injunction does not prohibit DHS "from proceeding to remove any individual, including any DACA enrollee, who it determines poses a risk to national security or public safety, or otherwise deserves, in its judgment, to be removed." *Ibid*. Nor does the injunction require DHS to process DACA applications from individuals who had not previously received deferred action, or to restore DACA participants' ability to obtain advance parole to travel abroad and return home to the United States. *Ibid*.

c. The Ninth Circuit affirmed the district court's orders. *Regents* Pet. Supp. App. 1a-87a. The court held that the rescission decision is not "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). The court reasoned that the rescission was based on a non-discretionary legal determination that "DACA

12

was beyond the authority of DHS." *Regents* Pet. Supp. App. 41a. It concluded that administrative decisions premised "on a belief that any alternative choice was foreclosed by law" are not "committed to agency discretion." *Id.* at 29a.

The court next held that Respondents are likely to succeed on the merits of their APA claims, because DACA is "a permissible exercise of executive discretion" that is consistent with the INA, *id.* at 56a-57a, and "where an agency purports to act solely on the basis that a certain result is legally required, and that legal premise turns out to be incorrect, the action must be set aside," *id.* at 46a. The court emphasized that it was "not hold[ing] that DACA *could not* be rescinded as an exercise of Executive Branch discretion," but only that the legal grounds identified by the agency were erroneous. *Id.* at 57a.

On appeal, the government did not dispute the district court's holdings that the likelihood of irreparable harm, the balance of hardships, and the public interest all strongly favor a preliminary injunction. *Id.* at 45a-46a.

The court of appeals also affirmed the denial of the government's motion to dismiss Respondents' equal protection claims, holding that "the likelihood of success on [Respondents'] equal protection claim is a second, alternative ground for affirming the entry of the injunction." *Id.* at 61a-77a & n.31.

Judge Owens concurred in the judgment, concluding that the APA claim was immune from judicial review but that the preliminary injunction should be affirmed on equal protection grounds. *Id.* at 84a-87a.

13

**5.  The New York, Maryland, and District of Columbia Litigation**.  While the *Regents* cases were proceeding, additional challenges to the rescission of DACA proceeded in other courts and reached the same result.

- In February 2018, the District Court for the Eastern District of New York preliminarily enjoined the rescission of DACA in an order that tracks the terms of the *Regents* injunction. *Batalla Vidal* Pet. App. 126a-128a.

- In March 2018, the District Court for the District of Maryland granted summary judgment to the government, concluding that the rescission was reviewable, but not arbitrary and capricious. *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758 (D. Md. 2018). On appeal, the Fourth Circuit reversed, concluding that the rescission was reviewable, arbitrary and capricious, and should be vacated under the APA. *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684 (4th Cir. 2019).

- In April 2018, the District Court for the District of Columbia granted partial summary judgment against the government and vacated the rescission of DACA, concluding that it violated the APA. *NAACP* Pet. App. 72a-74a.

In *NAACP*, the district court stayed its order for 90 days to give DHS the opportunity to "issue[] a new decision rescinding DACA." *NAACP* Pet. App. 76a. Rather than issue a new decision, Secretary of Homeland Security Nielsen issued a memorandum "concur[ring]

**AR4161**

14

with and declin[ing] to disturb" the Duke Memorandum's rescission of the DACA policy. *Regents* Pet. App. 126a. The memorandum states that it "reflects [Secretary Nielsen's] understanding of the Duke memorandum" and purports to offer "further explanation" of the rescission of DACA. *Id.* at 121a.

**5. The Government's Petitions for Certiorari**. In January 2018, the government filed a petition seeking certiorari before judgment to review the preliminary injunction entered by the district court in *Regents*. This Court denied the petition. 138 S. Ct. 1182.

In November 2018, the government filed a second petition for certiorari before judgment in *Regents*, and also sought certiorari before judgment in *NAACP* and *Batalla Vidal*. On June 28, 2019, this Court granted certiorari in *Regents*, and granted certiorari before judgment in *NAACP* and *Batalla Vidal*.[4]

### SUMMARY OF ARGUMENT

1. The decision to rescind DACA is judicially reviewable. The strong presumption favoring judicial review of administrative action, rather than the very narrow exception for actions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), applies here.

*First*, the rescission rests on a determination that DACA is unlawful. In reviewing that legal determination, a court clearly has "law to apply." Moreover, when an agency concludes that an action is prohibited by law, it is not exercising discretion. Instead, it has found that it has no discretion to exercise. To say that an agency's determination that it lacks discretion is

---

[4] The government also filed a petition for certiorari in *Casa de Maryland*, No. 18-1469, which remains pending.

15

committed to the agency's discretion verges on the nonsensical.

*Second*, DACA is a generally-applicable policy that affects hundreds of thousands of people. Decisions to terminate such policies have not traditionally been regarded as among the very few categories of agency decisions that are committed to agency discretion by law.

The Nielsen Memorandum does not alter the reviewability analysis. The "discretionary" reasons it offers for ending DACA are impermissibly post hoc, inextricably linked to the lawfulness of DACA, or both. Moreover, the APA expressly contemplates that agency actions based on discretionary considerations are reviewable for "abuse of discretion." 5 U.S.C. § 706(2)(A).

2.  The rescission was arbitrary and capricious.

a.  Acting Secretary Duke's one-sentence explanation cannot withstand judicial review. The Duke Memorandum does not explain the basis for concluding that a Fifth Circuit decision concerning DAPA compels the conclusion that DACA is unlawful, nor does it address the differences between those policies. The Duke Memorandum leaves unexplained the Attorney General's erroneous assertion that the Fifth Circuit held DAPA to be unconstitutional. It does not address whether the Secretary regarded the Attorney General's letter as "controlling." See 8 U.S.C. § 1103(a)(1). And it never explains why a carefully-reasoned OLC opinion reaching the opposite conclusion is incorrect.

The post hoc Nielsen Memorandum does not cure these defects. That memorandum fails to address,

16

among other things, the OLC opinion and the differences between DAPA and DACA. Moreover, its reasoning is inextricably tied to the lawfulness of DACA and its "messaging" rationale is insupportable.

DHS also failed to demonstrate that it gave adequate consideration to the welfare of the individuals affected by the decision or the reliance of DACA participants on the policy, rendering its decision arbitrary.

The government's reliance on "litigation risk," which is never mentioned in the Duke Memorandum, is not an adequate, independent basis for the rescission. Agencies cannot evade meaningful judicial review of legal conclusions by repackaging them as "litigation risk" assessments. In any event, DHS failed to show that it considered important aspects of litigation risk.

b. The Acting Secretary erred in concluding that DACA is unlawful. Congress granted DHS authority to "[e]stablish[] national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). Beginning with President Eisenhower, every administration has exercised this authority to grant deferred action to groups of otherwise removable immigrants. Congress has expressly recognized that the Executive Branch possesses this authority. It did so knowing that longstanding regulations confer benefits, such as work authorization, on individuals granted deferred action. See 8 U.S.C. § 1324a(h)(3).

The government's assertion that DACA automatically grants deferred action to a vast category of undocumented individuals is incorrect. The DACA Mem-

**AR4164**

orandum expressly provides that immigration officials must evaluate each application on an individualized basis, and the evidence confirms that this is how the policy has been implemented.

c.  At a minimum, this Court should not reach a final decision on the merits in the absence of a complete administrative record. The current record is incomplete on its face, and multiple courts have so found. The arguments against making a final decision on the merits in the absence of a complete record are strengthened by indications that the Executive Branch had other reasons, apart from its view of the lawfulness of DACA, for rescinding the policy.

## ARGUMENT

### I.   The Rescission Of DACA Is Reviewable.

There is a "strong presumption" that administrative actions are subject to judicial review. *Weyerhauser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). That presumption applies to the decision to rescind DACA. Where, as here, an agency concludes that its action is required by law, it is not exercising discretion. Instead, it is concluding that it has no discretion to exercise. Moreover, when an agency asserts that an action is required by judicial decisions, it shifts responsibility for its actions onto the courts. In such cases, it is "the province and duty" of this Court, not the agency, "to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177 (1803); see 5 U.S.C. § 706 ("the reviewing court shall decide all relevant questions of law").

18

### A. Acting Secretary Duke's Decision Is Reviewable.

The starting point for analyzing reviewability is the "strong presumption favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1653 (2015); *INS v. St. Cyr*, 533 U.S. 289, 298-99 (2001) (applying presumption in the immigration context). The APA's expansive judicial review provision provides that any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA's "generous review provisions must be given a hospitable interpretation." *Abbott Labs. v. Gardner*, 387 U. S. 136, 140-41 (1967) (citations omitted).

The government's brief never mentions the strong presumption favoring judicial review, or the "heavy burden" the government must carry to overcome that presumption. *Mach Mining*, 135 S. Ct. at 1651. Instead, it moves directly to an argument that judicial review is precluded by 5 U.S.C. § 701(a)(2), which applies to actions "committed to agency discretion by law." Section 701(a)(2) creates only a "very narrow exception" to the strong presumption of judicial review, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), that applies only in "'rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion,'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019) (quoting *Weyerhaeuser*, 139 S. Ct. at 370).

**AR4166**

So long as there is "law to apply" in reviewing a challenged action, the exception does not apply and judicial review is available. *Id.* at 2568-69.

This Court has limited section 701(a)(2) to a very short list of categories of "administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Dep't of Commerce*, 139 S. Ct. at 2568 (citing *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985); *Webster v. Doe*, 486 U.S. 592, 600-01 (1988); *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993)). The rescission of DACA is not an intelligence agency personnel decision, see *Webster*, 486 U.S. at 600-01, a denial of a reconsideration motion alleging material error, see *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 282 (1987) (*BLE*), or a re-allocation of funds from a lump-sum appropriation, *Lincoln*, 508 U.S. at 192. The government contends, however, that the rescission of DACA falls within the traditionally unreviewable category of a decision not to institute enforcement proceedings. U.S. Br. 23. That argument fails for several reasons.

1. The Court undoubtedly has "law to apply" in evaluating the rescission. Acting Secretary Duke gave a one-sentence explanation for her action: "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." *Regents* Pet. App. 117a. This explanation, such as it is, rests entirely on the law. It invokes a legal determination by the then-Attorney General that DACA was "effectuated * * * without proper statutory authority" and "was an unconstitutional exercise of authority by the Executive Branch." *Id.* at

20

116a. It also relies on judicial opinions concerning another deferred action policy, DAPA. The Acting Secretary offered nothing else as a basis for her decision.

Courts are well equipped to review the legal conclusion that DACA is unlawful. Indeed, it is "almost ludicrous to suggest that there is 'no *law* to apply' in reviewing whether an agency has reasonably interpreted a *law*." *Int'l Union, UAW v. Brock*, 783 F.2d 237, 246 (D.C. Cir. 1986). The APA expressly provides that courts, not agencies, are to "decide all relevant questions of law." 5 U.S.C. § 706. This case thus presents "the sort of routine dispute that federal courts regularly review." *Weyerhauser*, 139 S. Ct. at 370. See, *e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 529-34 (2007) (setting aside EPA decision premised on the agency's misinterpretation of its legal authority); *SEC v. Chenery Corp.* ("*Chenery I*"), 318 U.S. 80, 94 (1943) ("an order may not stand if the agency has misconceived the law").

Moreover, when an agency concludes that an action is required by law, it is not exercising discretion. Instead, it has determined that it *lacks* any discretion. It thus make no sense to say that the agency's action is "committed to agency discretion by law." Cf. *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) ("Agencies often have discretion about whether or not to take a particular action. Yet those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground."). If the government's position were accepted, it would have the bizarre consequence that when an agency mistakenly concludes that it lacks discretion, the courts are powerless to correct the agency's legal error, leaving the

21

agency to exercise less than the powers actually provided by law.

Here, moreover, the agency deflected responsibility for ending DACA to the courts, by declaring that judicial decisions require that DACA be ended. When an agency makes such a declaration, judicial review upholds not only the design of the APA but the structure of the Constitution. As the Ninth Circuit noted, judicial review in these circumstances upholds "values fundamental to the administrative process," serving "the critical function of promoting * * * democratic accountability to the people," by preventing the Executive Branch from shirking accountability for its actions. *Regents* Pet. Supp. App. 31a-32a.

2. The government relies on this Court's decisions in *Chaney* and *BLE*, but those decisions do not resolve the reviewability issue in this case, and in fact cast doubt on the government's expansive interpretation of section 701(a)(2).

a.  In *Chaney*, eight death-row inmates petitioned the FDA to initiate enforcement proceedings to prevent the use of drugs in their executions that they alleged were not "safe and effective." 470 U.S. at 823-24. The FDA denied their request, concluding that its enforcement authority "was generally unclear" and that, assuming it possessed such authority, it was "authorized to decline to exercise it under [its] inherent discretion to decline to pursue certain enforcement matters." *Id.* at 824-25. Reasoning that "an agency's decision not to take enforcement action should be presumed immune from judicial review," the Court held that the FDA's refusal to take enforcement action was unreviewable. *Id.* at 832. That holding was limited in several important respects.

22

*First*, *Chaney* concerned an agency's decision not to institute *specific* requested enforcement proceedings, which the Court found "has traditionally been 'committed to agency discretion.'" *Ibid.* *Chaney* did not concern the creation or rescission of a generally applicable policy like DACA. *Id.* at 823 ("This case presents the question of the extent to which a decision of an administrative agency to exercise its 'discretion' not to undertake *certain enforcement actions* is subject to judicial review * * * ." (emphasis added)); see also *Dep't of Commerce*, 139 S. Ct. at 2568 (describing *Chaney* as involving "a decision not to institute enforcement proceedings"). Both the Court and the FDA viewed the requested agency action as a one-time enforcement decision "involv[ing] a complicated balancing of a number of factors which [were] peculiarly within [the FDA's] expertise." *Chaney*, 470 U.S. at 831. As the Ninth Circuit correctly observed, "[n]owhere does [*Chaney*] suggest the broader proposition that any decision simply related to enforcement should be presumed unreviewable." *Regents* Pet. Supp. App. 34a n.13.

Unlike the one-time enforcement decision at issue in *Chaney*, the rescission was not a decision to initiate, or not initiate, enforcement proceedings in any specific immigration case. Nor did the Acting Secretary's decision involve "a complicated balancing of a number of factors * * * peculiarly within [DHS's] expertise." Instead, the rescission rests on a legal conclusion concerning the scope of DHS's authority. Cf. *Massachusetts*, 549 U.S. at 527 (declining to extend *Chaney* to decisions not to institute a rulemaking and noting that "agency refusals to initiate rulemaking 'are less

**AR4170**

23

frequent, more apt to involve legal as opposed to factual analysis, and subject to special formalities, including a public explanation'" (citation omitted)).

In contrast to the individual enforcement decisions in *Chaney*, there is no established tradition of non-reviewability for programmatic policy decisions. The rescission of DACA directly affects nearly 700,000 participants, and has even more widespread indirect effects. Such decisions repeatedly have been held reviewable. *E.g.*, *Dep't of Commerce*, 139 S. Ct. at 2567-69 (reviewing decision to reinstate citizenship question to standard census form); *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) ("an agency's statement of a general enforcement policy" is reviewable even though a "single-shot nonenforcement decision" may not be (citation and emphases omitted)); cf. also *Texas*, 809 F.3d at 163-69.

Moreover, when a court reviews a single-shot nonenforcement decision, it considers whether the agency *must* enforce a statute against a specific target. If the inmates' claim in *Chaney* had succeeded, the "implausible result" would have been that a court would have *required* FDA "to exercise its enforcement power to ensure that States only use drugs that are 'safe and effective' for human execution." 470 U.S. at 827. In contrast, judicial review of whether an agency has the authority to implement a discretionary non-enforcement policy involves no such intrusion into agency authority. Far from forcing the agency to do anything, a judicial finding that an agency possesses certain authority provides the agency with greater policy flexibility.

*Second*, this Court's decision in *Chaney* recognized a critical distinction between enforcement decisions

24

and *non*-enforcement decisions, noting that "when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights." *Id.* at 832. That reasoning does not extend to the rescission of DACA. By *eliminating* a non-enforcement policy, the government paves the way for the subsequent exercise of coercive power over individuals, including arrest and deportation. See U.S. Br. 45 (arguing that DACA participants should face "fear of enforcement").

*Third*, the Court's opinion in *Chaney* expressly noted that review may be appropriate where, as here, the agency's decision was "based solely on the belief that it lacks jurisdiction" to act. 470 U.S. at 833 n.4. Thus, "*Chaney* itself left open the possibility that review might be available even for a nonenforcement decision if that decision is predicated solely on the agency's interpretation of a statute. The rationale for this exception is clear: the court has law to apply in determining whether the agency erred." *Brock*, 783 F.2d at 245 n.10 (citation omitted).

b. The government contends that *BLE* answers the question left open in *Chaney's* footnote 4, but it reads far too much into that decision. In *BLE*, the Court held that a denial of a petition to reconsider for material error was unreviewable, based on a "tradition of nonreviewability" of such denials. 482 U.S. at 282. The Court's holding was narrow, and limited to the circumstances of the case. Critical to the Court's analysis in *BLE* was the explanation that, so long as the petition for reconsideration is timely, the agency's original order remains subject to judicial review after the agency denies the reconsideration petition. By con-

25

trast, the Court explained, denials of petitions for reconsideration based on "new evidence" or "changed circumstances" *are* reviewable, because barring review of such denials would eliminate "all opportunity for judicial consideration" of new facts or circumstances. *Id.* at 279.

In the course of a detailed discussion, the Court noted that the "vast majority of denials of reconsideration * * * are made *without statement of reasons.*" *Id.* at 283. It was in this context that the Court remarked that its cases did not stand for "the principle that if the agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." *Ibid*. Read in context, this statement applies to the denial of reconsideration motions, where the underlying decision remains subject to judicial review, and means only that a traditionally nonreviewable decision that would be unreviewable if no reason had been given would not become reviewable merely because the agency chose to give a reason. As explained above, the decision to rescind DACA does not fall into a recognized category of traditionally unreviewable agency action.

c. In the courts below, the government advanced a separate argument that review of the decision to rescind DACA is precluded by 8 U.S.C. § 1252(g). The lower courts uniformly rejected this argument, explaining that it is contrary to this Court's holding that section 1252(g) applies only to "three discrete actions" antecedent to a reviewable final removal order, namely actions to "commence proceedings, adjudicate cases, or execute removal orders," and not to the "many other decisions or actions that may be part of

**AR4173**

26

the deportation process." *Reno v. Am.-Arab Anti-Dis-crimination Comm.,* 525 U.S. 471, 482 (1999) (*AADC*) (citation and emphases omitted). Respondents are not seeking review of any of these discrete actions, and therefore section 1252(g) does not preclude review.

In this Court, the government has effectively abandoned its INA-based argument. Instead, it briefly contends that Congress's decision to preclude review of three discrete actions supports the government's argument that immigration enforcement policy decisions are generally unreviewable. U.S. Br. 20. The government's reasoning is backwards: Section 1252(g) demonstrates that Congress knows how to preclude judicial review when it wishes to do so. The fact that section 1252(g) applies only to three discrete actions suggests that judicial review of other actions, such as the rescission of DACA, is not precluded.

## B. The Nielsen Memorandum Does Not Alter The Reviewability Analysis.

Nine months after Acting Secretary Duke issued the decision to rescind DACA, and in response to litigation setbacks, Secretary Nielsen issued a second memorandum that purports to expand on the explanation provided in the Duke Memorandum. The Nielsen Memorandum does not render Acting Secretary Duke's decision unreviewable.

As explained above, the decision to rescind DACA falls outside the few categories of agency action traditionally recognized as unreviewable. Even if the government could rely on the Nielsen Memorandum to show that the decision to rescind DACA was based on discretionary factors as well as legal considerations, that still would not render the decision unreviewable.

27

The APA provides that agency actions are reviewable for "abuse of discretion," 5 U.S.C. § 706(2)(A), and courts routinely review discretionary agency actions to ensure that they are reasonable and reasonably explained. See, *e.g.*, *Dep't of Commerce*, 139 S. Ct. at 2568; *Judulang v. Holder*, 565 U.S. 42, 53 (2011).

Additionally, the Nielsen Memorandum is not a new agency action. Instead, it is a post hoc document created by the agency for the purpose of gaining an advantage in ongoing litigation, and issued because the government did not wish "to reset this protracted litigation by issuing a 'new' independent agency decision on DACA." U.S. Reply Br. 4, *Trump v. NAACP*, No. 18-588 (U.S. Jan. 4, 2019).

It is a long-established principle that judicial review of agency action is limited to the reasons the agency gave when it took the action in question. See, *e.g.*, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) (agency action may be "upheld, if at all, on the same basis articulated *in the order* by the agency itself"); *Michigan v. E.P.A.*, 135 S. Ct. 2699, 2710 (2015) ("[A] court may uphold agency action only on the grounds that the agency invoked *when it took the action*.") (emphases added). The operative order rescinding the DACA policy is the Duke Memorandum. Therefore, the Court should consider only the grounds invoked in that memorandum.

If agencies were free to alter the rationale for their actions in the middle of judicial review, courts could be required to review a continuously moving target. Faced with possible defeat in litigation, agencies could render briefs, oral argument, and even lower court opinions obsolete by issuing post hoc documents unsupported by an administrative record. In this case,

**AR4175**

28

for example, the Nielsen Memorandum was issued after the district court entered a preliminary injunction in *Regents*, and after oral argument in the Ninth Circuit.

Consideration of post hoc agency explanations is particularly inappropriate where, as here, courts have found that the administrative record is incomplete. The agency should not be able to manipulate judicial review by changing the rationale for its decisions while withholding the full administrative record that was before the original decisionmaker.

The Nielsen Memorandum expressly "decline[s] to disturb" the Duke Memorandum, and merely provides "further explanation" that "reflects [Secretary Nielsen's] understanding" of the Duke Memorandum. *Regents* Pet. App. 121a. This "further explanation" consists of three "enforcement" rationales to justify the Duke Memorandum's rescission of DACA: (1) "DHS should enforce the policies reflected in the laws adopted by Congress"; (2) "DHS should only exercise its prosecutorial discretion not to enforce * * * on a truly individualized, case-by-case basis"; and (3) DHS must "project a message that leaves no doubt" that DHS will enforce the immigration laws, given that "tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years." *Id.* at 123a-24a. None of these rationales is articulated in the Duke Memorandum, and two of them are inextricably tied to the lawfulness of DACA. The rationale that "DHS should enforce the policies reflected in the laws adopted by Congress" rests on a legal conclusion that DACA is inconsistent with the laws adopted by Congress. Similarly, the rationale

AR4176

29

that "DHS should only exercise its prosecutorial dis-
cretion not to enforce * * * on a truly individualized,
case-by-case basis" rests on a conclusion that DACA is
not, and cannot be, applied in such a manner. As the
government acknowledges (with considerable under-
statement), those rationales "overlap" with the legal-
ity rationale. U.S. Br. 30.

The Nielsen Memorandum does not identify the
"messaging" rationale as an independent basis for re-
scinding DACA. Instead, it claims to offer three inde-
pendent reasons for the rescission, preceded by para-
graphs beginning with "First," "Second," and "Third."
"Messaging" is one of multiple justifications that to-
gether form the third asserted reason for rescission.
Thus, the Nielsen Memorandum does not assert that
the "messaging" rationale alone was sufficient to re-
scind the policy.

The government's current arguments concerning
the Nielsen Memorandum are also sharply at odds
with its prior statements to this Court that the rescis-
sion was based exclusively on legal concerns. See U.S.
Mandamus Pet. at 21, No. 17-801 ("The Acting Secre-
tary's explanation for her decision rested on her as-
sessment of the risks presented by (and the ultimate
legality of) maintaining a policy (original DACA) that
was materially identical to ones (expanded DACA and
DAPA) struck down by the Fifth Circuit in a decision
affirmed by this Court, and that the plaintiffs who
prevailed in that earlier suit intended to challenge be-
fore the same court on the same grounds."); U.S. Cert.
Pet. at 16, No. 17-1003 ("The Acting Secretary opted
to wind down DACA after reasonably concluding that
the policy was likely to be struck down by courts and
indeed was unlawful."); see also *id.* at 24.

30

For these reasons, the Nielsen Memorandum does not alter the conclusion that the rescission of DACA is subject to judicial review.

## II.  The Rescission Of DACA Was Arbitrary And Capricious.

In *Regents* and *Batalla Vidal*, the district courts granted Respondents' motions for a preliminary injunction.[5] The government has not sought a stay of these injunctions. Nor has it challenged the lower courts' determinations that Respondents meet three of the four preliminary injunction factors. In particular, the undisputed record on irreparable harm is nothing short of overwhelming. Absent an injunction, hundreds of thousands of DACA participants face devastating and life-changing harm, including loss of employment, loss of educational opportunities, and removal from the only country they have known since they were young children. These harms will also have cascading effects on the families of DACA participants, including their nearly 200,000 U.S.-citizen children, as well as their employers, schools, and communities.

The balance of hardships likewise tips decisively in favor of Respondents. The injunctions place no limitation on the government's authority to remove any DACA participant who "poses a risk to national security or public safety, or otherwise deserves, in its judgment, to be removed." *Regents* Pet. App. 66a. Although

---

[5] See *Regents* Pet. App. 62a-66a; *Batalla Vidal* Pet. App. 119a-126a. The Ninth Circuit affirmed the *Regents* injunction, and this Court granted certiorari before the Second Circuit ruled on the *Batalla Vidal* injunction.

**AR4178**

31

the government's counsel complains about "sanctioning an ongoing violation of federal immigration law by nearly 700,000 aliens," U.S. Br. 16, the President has affirmed that the "policy of [his] administration [is] to allow the dreamers to stay." SER1346-47; accord, ER45 ("Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!...").

Having conceded three of four preliminary injunction factors, the government argues that Respondents are unlikely to succeed on the merits because the decision to rescind DACA was not arbitrary and capricious. That argument fails for three principal reasons. *First*, the decision to rescind DACA was inadequately explained. *Second*, the rescission rests on an incorrect determination that DACA is unlawful. *Third*, the incompleteness of the administrative record, and evidence that the stated reasons for ending DACA are not the true reasons, provide additional grounds for this Court to reject the government's arguments.

## A. The Rescission Of DACA Was Not Adequately Explained.

Meaningful judicial review requires that "the grounds upon which the administrative agency acted [be] clearly disclosed and adequately sustained." *Chenery I*, 318 U.S. at 94. The basis for agency action must be "set forth with such clarity as to be understandable." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (*Chenery II*); see also *Judulang*, 565 U.S. at 64. Under the arbitrary and capricious standard, the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*

**AR4179**

32

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). An agency may choose to reverse an existing policy but must first "provide a reasoned explanation for the change, * * * show that there are good reasons for the new policy," and "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016) (citation omitted).

The rescission of DACA fails to meet these requirements.

### 1.   The Duke Memorandum Fails To Adequately Explain The Rescission.

Acting Secretary Duke provided a one-sentence explanation for the rescission of DACA: "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." *Regents* Pet. App. 117a. The rest of the Duke Memorandum consists of "background" discussion and instructions for winding down the policy. It is truly remarkable that a Cabinet-level officer would offer such a cursory explanation for a decision that affects hundreds of thousands of lives and reverses a longstanding and carefully-reasoned government position. The APA requires more.

The Duke Memorandum states that the decision to rescind DACA was based on three sources: the Fifth Circuit's DAPA decision, this Court's order affirming that decision by an equally divided Court, and the Attorney General's letter. The memorandum does not

**AR4180**

33

explain how or why these sources led to the Secretary's decision. Because this superficial explanation fails to explain the Acting Secretary's reasoning, it does not withstand APA review. See *Encino*, 136 S. Ct. at 2125.

a. The Duke Memorandum's bare reference to the Fifth Circuit's DAPA decision does not supply the requisite explanation. The memorandum does not explain whether the Acting Secretary was relying on the Fifth Circuit's procedural ruling (which could have been addressed by providing an opportunity for notice and comment) or its substantive ruling. Nor does it address the significant distinctions between DAPA and DACA. The primary substantive defect identified by the Fifth Circuit was that DAPA encroached upon an "intricate [statutory] process" in the INA for immigrants "to derive a lawful immigration classification from their children's immigration status." *Texas*, 809 F.3d at 179. Under that statutory process, "an applicant must (i) have a U.S. citizen child who is at least twenty-one years old, (ii) leave the United States, (iii) wait ten years, and then (iv) obtain one of the limited number of family-preference visas from a United States consulate." *Id.* at 179-80. The Fifth Circuit held that DAPA would allow undocumented individuals "to receive the benefits of lawful presence solely on account of their children's immigration status without complying with any of the requirements, enumerated above, that Congress has deliberately imposed." *Id.* at 180.

There is no comparable "intricate statutory process" for the individuals eligible for DACA. As a result, there is no basis to conclude, as the Fifth Circuit did

34

with respect to DAPA, that "Congress has 'directly addressed the precise question at issue.'" *Id.* at 186 (citation omitted).[6] The Duke Memorandum's failure to address this distinction raises the possibility that the Acting Secretary acted on a "mistaken assumption" that the Fifth Circuit's reasoning applies directly to DACA. See *Negusie v. Holder*, 555 U.S. 511, 522 (2009).

The Fifth Circuit also concluded that DAPA was a policy of "vast economic and political significance," and that if Congress intended to create such a policy, it would have done so by express legislation. *Texas*, 809 F.3d at 188 (internal quotation marks omitted). DAPA made approximately four million individuals eligible for deferred action—more than one-third of all undocumented individuals in the United States. *Id.* at 181. By contrast, DACA applies to many fewer individuals and is similar in scale to at least one past discretionary relief program adopted during the Reagan Administration. U.S. Br. at *49, *United States v. Texas*, 136 S. Ct. 2271 (2016), 2016 WL 836758 (discussing Family Fairness Program).

Moreover, the memorandum that created DAPA expressly stated that participants would be "lawfully present in the United States." *Regents* Pet. App. 104a. In contrast, the DACA Memorandum does not discuss, or even mention, "lawful presence." Instead, DACA is a policy of deferred action under which the government forbears for renewable two-year periods from enforcement action against individuals considered low

---

[6] The Fifth Circuit enjoined the entire DAPA memorandum, including provisions that moderately expanded DACA, but the court did not say anything about those provisions.

35

priorities for enforcement. To be sure, longstanding and unchallenged regulations separately provide that individuals receiving deferred action are permitted to work to support themselves during the deferral period. See 8 C.F.R. § 274a.12(c)(14) (providing for work authorization). But DACA, by its express terms, does not create a path to immigration status or establish lawful presence. *Regents* Pet. App. 101a ("This memorandum confers no substantive right, immigration status or pathway to citizenship.").

The Duke Memorandum does not acknowledge or discuss these differences.

b. The Duke Memorandum's reference to this Court's order affirming the Fifth Circuit's decision, by an equally divided Court, adds nothing of substance. Such orders have no precedential value. See *Neil v. Biggers*, 409 U.S. 188, 192 (1972). The Duke Memorandum fails to acknowledge this basic point.

c. The Duke Memorandum's reference to the Attorney General's letter makes matters worse by raising additional questions that require an explanation from the Secretary. The Attorney General's half-page letter states that DACA was "effectuated * * * without proper statutory authority," and was "an unconstitutional exercise of authority by the Executive Branch." JA 877. The letter asserts, without explanation, that DACA has the same "constitutional defects that the courts recognized as to DAPA." JA 878. But neither the Fifth Circuit nor any other court has held that DAPA (or DACA) has any "constitutional defects." Neither the Attorney General nor Acting Secretary

**AR4183**

36

Duke acknowledged or discussed OLC's detailed opinion concluding that DAPA was constitutional.[7]

The Attorney General's letter also asserts that DACA was implemented "without proper statutory authority," JA 877, but it neither acknowledges nor addresses the long and unchallenged history of such policies and Congress's statutory recognition of deferred action.

The Duke Memorandum's reference to the Attorney General's letter also raises another problem: the Acting Secretary failed to address 8 U.S.C. § 1103(a)(1), which provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling" on the Secretary of DHS. *Ibid.* By listing multiple sources and placing the Attorney General's letter last on the list, the Duke Memorandum suggests that the Acting Secretary did not regard herself as bound by the Attorney General's letter. But this, along with much else, is unclear. The Acting Secretary should have explained whether she was making an independent determination to rescind DACA, or regarded herself as required to reach that decision under 8 U.S.C. § 1103(a)(1).

In addition to providing an inadequate explanation for the legal sources it cites, the Duke Memorandum fails to address highly relevant legal sources that cut against the decision. The memorandum does not acknowledge that its conclusion is directly contrary to a detailed 2014 OLC opinion and the government's longstanding litigation position. See JA 797-856; U.S.

---

[7] The government has not attempted to defend the Attorney General's unexplained statement that DACA is unconstitutional, and has not challenged the constitutionality of DACA.

37

Br. at *1, *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017), 2015 WL 5120846. It never explains why the 2014 OLC opinion reached the wrong conclusion, or why the considerations the government previously relied on to defend DHS's authority to establish a policy such as DACA are no longer valid.

For all of these reasons, the Duke Memorandum's explanation of the decision to rescind DACA is inadequate. As this Court has explained, it "will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." *Chenery II*, 332 U.S. at 196-97.

## 2. The Nielsen Memorandum Does Not Cure The Defects In The Duke Memorandum.

The Court should decline to consider the Nielsen Memorandum because it is a post hoc rationalization issued without any supporting administrative record. But even if the Court were to consider the Nielsen Memorandum, it fails to adequately explain the rescission.

Secretary Nielsen asserts that "[t]he Fifth Circuit's rejection of DAPA and expanded DACA did not turn on whether the covered aliens had a pathway to lawful status (which not all of them had). Rather, it turned on the incompatibility of such a major non-enforcement policy with the INA's comprehensive scheme." *Regents* Pet. App. 122a. This statement falls well short of an adequate explanation for the rescission. It still fails to address the differences between DACA and DAPA, Congress's acknowledgement of deferred

38

action, the government's prior defenses of DAPA and DACA, the half-century practice of deferred action, and the detailed OLC opinion.

As discussed above, see *supra* at 28-29, the Nielsen Memorandum's additional "policy" rationales for rescinding DACA are largely a repackaging of the rationale that DACA is unlawful. The sole rationale that does not depend on DACA's lawfulness is that DHS must "project a message that leaves no doubt" that DHS will enforce the immigration laws, given that "tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years" and "then have been released into the country owing to loopholes in our laws." *Regents* Pet. App. 124a.

The Nielsen Memorandum does not assert that the "messaging" rationale is sufficient to support the rescission, nor could it. First, the "messaging" rationale states, in effect, that the government should inflict grievous harm on nearly 700,000 young immigrants living in the United States, each of whom was individually determined to be a low priority for enforcement, in order to send a message to potential immigrants living outside the United States. If such a policy could ever be rational, it would have to be supported by some explanation of what "message" the government intended to send, an evaluation of whether the benefits of such a "message" outweigh the obvious and large costs to DACA participants, their families, and communities, and whether the "message" could be delivered through other less harmful means. If agencies could inflict such grievous harm based solely on a "messaging" rationale unsupported by any facts or

**AR4186**

39

analysis, there would be virtually no limit to the harm they could inflict.

Second, the "messaging" rationale is unreasonable on its own terms. DACA has nothing to do with the vaguely described "loopholes in our laws" that have permitted minors to be released rather than detained during the pendency of asylum or other immigration proceedings. DACA applies only to a subset of individuals who were residing in the United States as of June 15, 2007. It has no bearing on minors that have illegally crossed or been smuggled into the United States in "recent years." An agency cannot base its policies on such irrelevant factors. See *Judulang*, 565 U.S. at 55 ("agency action must be based on non-arbitrary, 'relevant factors'" (citation omitted)).

Third, the "messaging" rationale lacks any support in the administrative record. The Nielsen Memorandum cites no record support for the proposition that "thousands of minors" have "illegally crossed or been smuggled" into the United States in "recent years." The government tries to fill this gap with a Federal Register notice from this summer, see U.S. Br. 40-41, but that notice cannot retroactively justify an action taken nearly two years earlier. The government also fails to explain what beneficial effect the "message" will have. Neither the Nielsen Memorandum nor the government's brief asserts that the "message" will deter or decrease illegal immigration, and there is no analysis, data, or fact-finding supporting such an assertion. In the absence of relevant facts, there can be no "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citation omitted).

**AR4187**

40

The government also cites a single 15-year old law review article about legalization under IRCA. U.S. Br. 41 (citation omitted). The authors state, without citation, that a "fundamental problem with an amnesty is that it creates an expectation of future amnesties." Pia Orrenius & Madeline Zavodny, *What Are the Consequences of an Amnesty for Undocumented Immigrants?*, 9 Geo. Pub. Pol'y Rev. 21, 31 (2004). Extending this argument to DACA requires unsupported speculation. DACA does not provide legalization and applies to a fixed population already in the United States as of 2012. There is no reason for potential immigrants outside the United States, if they are even aware of DACA, to expect that there will be future policies similar to DACA, to foresee that they would be the beneficiaries of such policies, and to change their decisions about immigration as a result. Nor is there any explanation how this hypothesized sequence of events would be prevented by rescinding DACA. Neither the Nielsen Memorandum nor the Duke Memorandum addresses any of these issues.

In sum, even if the Nielsen Memorandum were properly considered, the government's explanation for rescinding DACA remains "so ambiguous that it falls short of that standard of clarity that administrative orders must exhibit." *Fed. Power Comm'n v. Texaco Inc.*, 417 U.S. 380, 395-96 (1974).

### 3. The Agency Failed To Give Adequate Consideration To Reliance Interests.

The rescission of DACA is also arbitrary and capricious because the agency failed to demonstrate that it gave adequate consideration to reliance interests.

41

When an agency reverses a policy previously in effect, a "reasoned explanation" must include reasons "for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations*, 566 U.S. 502, 516 (2009). Where "serious reliance interests [are] at stake," the agency must offer more than "conclusory statements." *Encino*, 136 S. Ct. at 2127.

The Duke Memorandum never mentions the reliance interests created by the DACA policy. For more than five years, DACA participants have enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance on the benefits of the DACA policy, principally that they would be free from arrest and deportation and could lawfully work. See, *e.g.*, SER1470-72, Topics 1, 2, 4, 5. Employers and educational institutions likewise will lose their extensive investments in DACA participants if those participants became ineligible to work or are deported. See, *e.g.*, SER832-33.

There are nearly 700,000 DACA participants and they support nearly 200,000 U.S.-citizen children through their lawful work. SER1155 (Wong Decl.). Beginning the day the rescission were permitted to go into effect, and every day thereafter, nearly one thousand DACA participants would lose their DACA grants and their work authorizations as the two-year term of the grants expired. SER1459.

For Mitchell Santos Toledo, who arrived in the United States when he was less than two years old, "DACA has been and continues to be central to [his] ability to financially support [him]self and [his] family." JA 954, 964 (Santos Toledo Decl.). DACA enabled

**AR4189**

42

him to complete his studies at the University of California and enroll at Harvard Law School. *Id.* at 960-63. He is working to support himself and has taken out loans to permit him to complete his studies. *Id.* at 960, 963. If the rescission were permitted to go into effect, he would be unable to lawfully work in the United States. He would lose whatever job he has, along with any employer-sponsored health insurance. *Id.* at 960-61. On any day, at any time, at home or in public, he could be arrested by federal immigration authorities and deported to a country he has not lived in since he was two years old. The rescission of DACA would result in similarly catastrophic consequences to hundreds of thousands of individuals.

The consequences of rescinding DACA would not be limited to DACA participants themselves, but would radiate outward to their families, schools, and employers. For example, many DACA participants are school teachers. SER382-83 (Carrizales Decl.). Their students would lose their classroom teachers when their DACA grants expire. Other DACA participants are studying to become doctors, and many will work in under-served communities. SER761. They could not treat patients if DACA is rescinded. In the aggregate, DACA participants' work in the lawful labor force is estimated to generate $215 billion in economic activity and $60 billion in tax revenue over the next ten years. SER359 (Brannon & Albright Decl.).

The Duke Memorandum never even acknowledges, let alone weighs, these reliance interests and the devastating consequences of the rescission on the hundreds of thousands of DACA participants and the countless other stakeholders who have come to rely on the policy. *Regents* Pet. App. 111a-19a. Nor does the

43

administrative record contain any assessment of those interests. The wholesale disregard for the serious reliance interests of hundreds of thousands of individuals, their families, their employers, and their communities renders the decision to rescind DACA arbitrary and capricious decisionmaking. See *Encino*, 136 S. Ct. at 2127 ("In light of the serious reliance interests at stake, the Department's conclusory statements do not suffice to explain its decision.").

The Nielsen Memorandum's brief reference to reliance interests is both too little and too late. This post hoc document, issued without any supporting record, fails to provide anything more than conclusory statements about the enormous reliance interests implicated by DACA. Secretary Nielsen's passing statement that she is "keenly aware" of DACA participants' reliance interests is insufficient. *Regents* Pet. App. 125a. She completely failed to identify the nature and extent of the reliance interests implicated by the rescission, instead referring in a vague and conclusory fashion to the "sympathetic circumstances of DACA recipients." *Ibid.* The issue is not "sympathetic circumstances," but rather an agency decision that will systematically immiserate 700,000 people and their families, taken without any serious discussion of those consequences or whether they could be mitigated. Indeed, her stated reason for disregarding the serious reliance interests is because "issues of reliance would best be considered by Congress." *Ibid.* That is not an evaluation of reliance interests, but an abdication of the agency's responsibility to conduct an evaluation.

44

### B.    DACA Is Lawful.

To date, no court has issued a final decision on whether DACA is legal. Because this Court is "a court of review, not of first view," *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005), it should not decide that issue at this stage of the litigation. If the Court were nevertheless to reach the issue, it should hold that DACA is lawful.

The issue is not whether the rescission of DACA was "reasonable," U.S. Br. 33, but whether the agency's legal rationale is correct. The APA provides that courts "shall" set aside agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A). This Court has not hesitated to set aside agency action for legal error. *E.g.*, *Negusie*, 555 U.S. at 516 (remanding for agency to "confront the same question free of [its] mistaken legal premise"); *Massachusetts*, 549 U.S. at 532-34 (setting aside agency decision premised on misinterpretation of its legal authority); *Chenery I*, 318 U.S. at 94 ("an order may not stand if the agency has misconceived the law").

### 1.    DACA Is A Lawful Exercise Of Authority Conferred By The INA.

The INA confers authority to "[e]stablish[] national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). Beginning with President Eisenhower, every administration has exercised this authority to "defer action" against otherwise removable immigrants, both in individual cases and with respect to particular categories of immigrants deemed to be low priorities for enforcement. See *supra* at 2-4 (summarizing history of deferred action policies). As this

**AR4192**

45

Court has recognized, the executive has been "engaging in a regular practice (which had come to be known as 'deferred action')" of exercising enforcement discretion "for humanitarian reasons or simply for its own convenience." *AADC*, 525 U.S. at 483-84.

"Congress has long been aware of the practice of granting deferred action, including in its categorical variety, and of its salient features; and it has never acted to disapprove or limit the practice." JA 828 (OLC opinion); see also *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2094 (2015) (relying on "[t]he weight of historical evidence" as indicating that "Congress has accepted" executive's power). Indeed, Congress has expressly recognized deferred action in several statutes. See, *e.g.*, 8 U.S.C. §§ 1227(d)(2), 1151 note, 1154(a)(1)(D)(i)(II), (IV); 49 U.S.C. § 30301 note. In the Real ID Act of 2005, Congress accepted "approved deferred action status" as "[e]vidence of [l]awful [s]tatus" for purposes of determining whether state-issued driver's licenses or identification cards could be used at the federal level. 49 U.S.C. § 30301 note. And Congress expressly recognized the executive's use of deferred action in authorizing DHS to grant administrative stays of final orders of removal to T and U visa applicants. 8 U.S.C. § 1227(d)(2) ("denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for * * * deferred action"). As the government previously argued to this Court, these statutes "highlight Congress's continued acceptance of this flexible and discretionary practice." U.S. Br. at *58, *Texas*, 136 S. Ct. 2271, 2016 WL 836758 (internal quotation marks omitted).

46

Congress enacted these statutes against the back-drop of longstanding regulations that enable those with deferred action to access benefits like work authorizations. See 8 C.F.R. § 274a.12(c)(14) (1987). And Congress itself has expressly allowed employers to hire any undocumented individual "authorized to be * * * employed by th[e INA] *or by* [the Secretary of DHS]." 8 U.S.C. § 1324a(h)(3) (emphasis added).

The government recognizes that DHS has "broad discretion" to implement deferred action so long as it does so through the use of case-by-case determinations. See U.S. Br. 40, 45; see also JA 827 n.8 (OLC opinion) (DACA "would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis."). The DACA Memorandum satisfies this standard. It expressly provides that "requests for relief pursuant to this memorandum are to be decided on a case by case basis." *Regents* Pet. App. 99a; see also *id.* at 99a-100a (discretion should be exercised "on an individual basis"; "DHS cannot provide any assurance that relief will be granted in all cases").

Case-by-case discretion has also been exercised in practice. The OLC opinion observes that "DHS evaluates applicants' eligibility for DACA on a case-by-case basis." JA 827. As the Ninth Circuit noted, "in fiscal year 2016, * * * 17.8% of the applications acted upon were denied." See *Regents* Pet. Supp. App. 51a ("the denial rate has risen as the DACA program has matured"). Although the Fifth Circuit in *Texas* relied on a conclusion that, based on experience in the DACA policy, DAPA would not be applied on a true-case-by-case basis, the evidence now demonstrates that DACA has been administered in precisely that way. See Br.

47

for Amici *Texas v. United States* Defendant-Intervenor DACA Recipients and State of New Jersey at 9-25 ("N.J. Br.") (collecting evidence).[8] For example, the Associate Director for USCIS Service Center Operations has testified that "USCIS has denied DACA even when all the DACA guidelines, including public safety considerations, have been met." Neufeld Decl., *Texas* Dkt. 130-11 ¶ 18 (S.D. Tex. 2015); see also N.J. Br. 11 ("DACA can be denied if [USCIS] determine[s] that the person doesn't merit a favorable exercise of discretion," including due to "the totality of the circumstances." (citation and emphasis omitted)).[9] And, as of 2015, "approximately 200,000 requests for additional evidence had been made upon receipt of DACA applications." *Texas*, 809 F.3d at 175. The government does not dispute any of this evidence, but instead asserts that DACA creates "an implicit presumption" that eligible applications will be granted. U.S. Br. 39. Even if that were true, however, it would not distinguish

---

[8] The Fifth Circuit relied in part on the 2014 declaration of a union representative who subsequently testified that that he has no firsthand knowledge of reviewing DACA applications. N.J. Br. 25-27. The government's brief asserts that the "approval rate for initial requests for DACA is 91% since its adoption in 2012." U.S. Br. 39 n.7. The 91% figure is not in the administrative record and appears to leave out individuals denied at the "lockbox" stage. Moreover, the government does not argue that this approval rate demonstrates that DACA is non-discretionary.

[9] The Duke Memorandum asserts in a footnote that "USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion." *Regents* Pet. App. 112a-13a n.1. That statement is contrary to the testimony of the responsible government personnel, and the government's brief does not rely on it.

48

DACA from the many previous discretionary relief policies implemented by the government.

The DACA policy is congruent with historical and current government practice. For example, the government currently maintains a deferred-action policy for the "spouse, widow(er), parent, son, or daughter" of military members and veterans. See Discretionary Options for Military Members, Enlistees and Their Families, *available at* https://bit.ly/2kLe3ho. In addition, the Family Fairness Program exceeded the size of the current DACA-participant population. See U.S. Br. at *49, *Texas*, 136 S. Ct. 2271, 2016 WL 836758 (estimating that program "targeted as many as 1.5 million people, about 40% of the undocumented population at the time").

The Family Fairness Program was established following the passage of IRCA, in which Congress granted lawful status to millions of undocumented immigrants meeting certain criteria. The statutory legalization did not extend to those immigrants' spouses and children. Nevertheless, the INS, in 1987, decided to "indefinitely defer deportation" for (1) ineligible spouses and children who could show compelling or humanitarian factors; and (2) ineligible unmarried minor children who could show that both parents (or their only parent) had obtained lawful temporary resident status. SER1231-32.

In 1990, the INS adopted an expanded version of the program establishing programmatic criteria that *bound* agency officers, and granted extended voluntary departure *and* work authorization. See Dkt. 121-1 at 26-27 ("Voluntary departure *will be granted* to the spouse and to unmarried children under 18 years of

49

age" meeting certain requirements and "[w]ork authorization will be granted" (emphasis added)). Any ineligible spouse or minor child of an individual legalizing under IRCA would be entitled to relief upon showing that he or she (1) had been residing in the country by the date of IRCA's enactment; (2) was otherwise inadmissible; (3) had not been convicted of a felony or three misdemeanors; and (4) had not assisted in persecution of persons. *Ibid.*

After the expanded program was implemented, Congress ratified it by passing legislation providing relief to the participants in the program. The legislation effectively recognized the validity of INS's mandatory, programmatic policy by delaying the effectiveness of the legislation for one year, but providing that the one-year delay "shall not be construed as reflecting a Congressional belief that the existing family fairness program should be modified in any way before such date." Pub. L. No. 101-649, Tit. III, § 301(g), 104 Stat. 5030. Congress thus conveyed its view that a broad-based *mandatory* relief policy is within the executive's authority.

In accordance with these precedents, the Executive Branch, until September 2017, had concluded that DACA falls within its authority to employ deferred action to effectuate its enforcement priorities. See *Regents* Pet. App. 99a (DACA Memorandum); JA 827 n.8 (OLC opinion).

### 2.  The Government's Arguments That DACA Is Unlawful Lack Merit.

The government seems to agree that DHS has broad authority to implement deferred action, but

50

now contends that it is not authorized to grant the relief provided by the DACA Memorandum. In straining to portray DACA as unlawful, the government misstates what DACA does. The government's brief describes DACA as "grant[ing] deferred action to a vast category of aliens," U.S. Br. 34, and "informing roughly 1.7 million aliens that they may continue violating federal law without fear of enforcement," *id.* at 45. But the DACA Memorandum does no such thing. As explained above, it does not require that deferred action be granted to a "category" of individuals. Even those who have received DACA may have it revoked or non-renewed if circumstances warrant. Dkt. 121-1 at 201 (DACA Toolkit); cf. *Regents* Pet. App. 66a-67a.

In describing the DACA policy, the government disregards the actual language of the DACA Memorandum, which does not dictate a categorical outcome, but rather sets out criteria to guide the exercise of discretion by subordinate agency officials in evaluating particular cases. See *supra* at 46-47. These guidelines implement rather than supplant the Secretary's discretion. As the government acknowledges, some "supervisory control over [agency] discretion is necessary to avoid arbitrariness and ensure consistency." U.S. Br. 22 (citation omitted). The government knows how to *require* subordinate officials to provide relief from removal. It did so in the Family Fairness Program, see *supra* at 48-49, but did not do so in the case of DACA.

Even if DACA could properly be understood as a "categorical" policy, the government acknowledges that it has adopted numerous such "categorical" policies in the past. See U.S. Br. 46-47. The government attempts to distinguish these policies as either "coun-

AR4198

51

try-specific" or "interstitial." *Id.* at 34, 48. But the deferred action policies described above do not fit either description. See *supra* at 48-49. And the government does not explain why a "country-specific" deferred-action policy is more or less lawful than other "categorical" policies.

Likewise, the government's "interstitial" standard fails to meaningfully distinguish DACA from other discretionary relief policies. For instance, the government consigns to a footnote a reference to its *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children*. U.S. Br. 47 n.8. Individuals eligible for deferred action under this policy—certain surviving spouses of deceased U.S. citizens where the surviving spouse and the U.S. citizen were married less than two years at the time of the citizen's death— had "no avenue of immigration relief." Dkt. 121-1 at 85 (Memorandum from Donald Neufeld, Acting Assoc. Dir., Office of Domestic Operations, USCIS, to Field Leadership, USCIS, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children* (Sept. 4, 2009)). Although there was "proposed legislation in the U.S. Congress" to address these spouses and children, USCIS nonetheless allowed them to receive deferred action. *Ibid.* Although Congress eventually passed legislation addressing this issue, JA 826 n.7, there was no way of knowing in advance whether the policy was "interstitial" when it was adopted. Should Congress eventually pass legislation granting immigration status to DACA participants, DACA would similarly be seen as "interstitial" in hindsight.

The government's efforts to distinguish the Family Fairness Program are unpersuasive. According to the government, the difference between that program and

52

DACA is that there was an arguable statutory basis for "extended voluntary departure" in the INA at the time of the Family Fairness Program. But deferred action *also* has a statutory basis, as the government recognizes, see U.S. Br. 43 (citing 6 U.S.C. § 202(5), 8 U.S.C. § 1103(a)(3)).

The government also asserts that DACA rests on the agency's "discover[y]" of an "unheralded power," resulting in a decision of "vast 'economic and political significance' without any warrant from Congress." U.S. Br. 45 (citations omitted). But nothing about DACA is "unheralded." Discretionary relief from removal is well-trodden ground, whether granted through case-by-case discretion with guidelines, see, *e.g.*, *AADC*, 525 U.S. at 484 n.8, or through mandatory programmatic criteria, see *supra* at 48-49.

This case differs from *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014) and *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), in which an agency asserted newly unearthed powers to regulate previously unregulated activities. Here, in contrast, the government does not dispute that DHS could grant deferred action to each of the individuals eligible for DACA. See *Regents* Pet. App. 125a ("the rescission of the DACA policy does not preclude the exercise of deferred action in individual cases if circumstances warrant"). There is likewise agreement that the government lacks the resources to remove every undocumented immigrant in the United States and must accordingly set "policies and priorities." 6 U.S.C. § 202(5). Unlike the truly "unheralded" powers at issue in *Utility Air* and *Brown & Williamson*, the DACA Memorandum adopts common-sense criteria to

**AR4200**

53

prioritize DHS's enforcement through its recognized deferred-action authority.

In sum, DHS erroneously concluded that it lacks authority to maintain the DACA policy. As a result, the rescission of DACA was "not in accordance with law," and must be set aside. 5 U.S.C. § 706(2)(A).

### 3. "Litigation Risk" Is Not A Valid, Independent Basis For Rescinding DACA.

The government argues that "litigation risk," as opposed to a determination that DACA is unlawful, provided a separate rationale for the rescission. That argument fails for several reasons.

*First*, the Duke Memorandum never mentions "risk," and never identifies, much less weighs, any risks or benefits of litigation. Indeed, the drafter of the Duke Memorandum testified that a policy of responding to "litigation risk" would be "the craziest policy you could have in a department." JA 1007.

*Second*, "litigation risk" is not an adequate, independent rationale for agency action. If it were, agencies could avoid meaningful APA review of their legal conclusions simply by relabeling them as "litigation risk" assessments. See *Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004) (litigation risk was not valid ground upon which to act); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 970 (9th Cir. 2015) (en banc) (rejecting litigation risk rationale). Moreover, "litigation risk" is simply a prediction about legality. See *Regents* Pet. Supp. App. 35a n.14. Allowing agencies to circumvent judicial review of that ultimate issue would violate the APA's instruction that "the reviewing court,"

54

rather than the agency, "shall decide all relevant questions of law." 5 U.S.C. § 706.

*Third*, even if "litigation risk" could qualify as a valid reason for agency action in some circumstances, DHS utterly failed to engage in a reasoned assessment of litigation risk. See *State Farm*, 463 U.S. at 43. For example, the government asserts that DHS was concerned about an "immediate[]" judicial end of DACA, U.S. Br. 37, but it never addressed the obvious point that the risk that Texas and other states could obtain a preliminary injunction abruptly ending DACA was greatly reduced by the years-long delay in seeking such an injunction, as well as the powerful equities weighing against such an injunction. Indeed, when the plaintiffs in *Texas* finally sought a preliminary injunction, the district court denied the motion because it came too late and was inequitable. *Texas v. United States*, 328 F. Supp. 3d 662, 736-42 (S.D. Tex. 2018).

The government also failed to address the litigation risks created by *rescinding* DACA. This aspect of litigation risk undermines the government's claim that the rescission was necessary because "'burdensome litigation' * * * could distract from the agency's work." U.S. Br. 33. In any event, Secretary Duke never articulated such a concern, and Secretary Nielsen merely speculated that "*a* law enforcement agency" may want to avoid legally questionable policies for several reasons, including "the *threat* of burdensome litigation." *Regents* Pet. App. 123a (emphasis added).

*Fourth*, the post hoc Nielsen Memorandum states only that Secretary Nielsen "lack[ed] sufficient confidence in the DACA policy's legality to continue this

55

non-enforcement policy, whether the courts would ultimately uphold it or not." *Ibid*. Such a vague and conclusory statement is insufficient. An agency cannot "merely recite the terms 'substantial uncertainty' as a justification for its actions" and comply with the APA. *State Farm*, 463 U.S. at 52.

## C.   This Court Should Not Rule For The Government Without A Complete Administrative Record, Particularly Given The Evidence Of Pretext.

### 1.   The Administrative Record Is Incomplete.

Judicial review of agency action under the APA is on "the whole record," 5 U.S.C. § 706, which requires that the Court have access to "the full administrative record that was before the Secretary at the time he made his decision," *Overton Park*, 401 U.S. at 420.

That requirement has not been satisfied here. Two district courts have determined that the administrative record is incomplete, and two courts of appeals have upheld that determination.[10] Those rulings are entirely reasonable. It is implausible that Acting Secretary Duke rescinded a policy directly affecting 700,000 individuals based on nothing more than a handful of judicial opinions and other public documents. Documents obtained in response to Freedom of

---

[10] Dkts. 79, 266; *In re United States*, 875 F.3d at 1205, *judgment vacated*, 138 S. Ct. 443; *Batalla Vidal* Dkt. 89 at 3; *In Re: Kirstjen M. Nielsen*, No. 17-3345 (2d. Cir. Dec. 27, 2017).

56

Information Act requests, and subject to judicial no-
tice, confirm that the administrative record is incom-
plete.[11]

Without access to the full body of evidence and
analysis that was before Acting Secretary Duke at the
time of her decision, the Court is not in a position to
determine that her decision survives arbitrary and ca-
pricious review. See *State Farm*, 463 U.S. at 43 (arbi-
trary and capricious review considers whether agency
"entirely failed to consider an important aspect of the
problem" or "offered an explanation * * * that runs
counter to the evidence before the agency"). Given the
interlocutory posture of *Regents* and *Batalla Vidal*, a
ruling by this Court that the rescission was not arbi-
trary and capricious would be premature.

## 2. There Is Evidence That DHS's Expla-nation Is Pretextual.

The need for a complete administrative record is
confirmed by disturbing indications that the govern-
ment's stated reasons for rescinding DACA are not the
true reasons for its decision. Judicial review under the
APA requires the agency to disclose the actual basis
for its action. *Dep't of Commerce*, 139 S. Ct. at 2573.
"The reasoned explanation requirement of adminis-
trative law, after all, is meant to ensure that agencies
offer *genuine* justifications for important decisions,
reasons that can be scrutinized by courts and the in-

---

[11] For example, these documents describe a "Principals Commit-
tee Deferred Action for Childhood Arrivals" meeting on August
24, 2017, where it "was agreed that" DACA "is unlawful and will
be ended." *Make the Road N.Y. v. DHS*, No. 18-cv-2445, Dkt. 63-
1 at 209 (E.D.N.Y.).

57

terested public." *Id.* at 2575-76 (emphasis added). Accordingly, agency action must be set aside where the "explanation for agency action * * * is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.* at 2575. Here, the government's explanation does not square with what appear to be its actual priorities and decisionmaking process.

For example, when Attorney General Sessions announced the rescission, he stated that DACA denies Americans jobs and contributes to crime. SER1354-55. These rationales were not included in the Duke Memorandum, and there is no support for them in the administrative record. Indeed, DACA participants are required as a condition of the policy not to have committed any serious crime, *Regents* Pet. App. 98a, and the undisputed evidence shows that the DACA policy makes a positive contribution to the economy, SER359.

There is also evidence that the Administration rescinded DACA to gain leverage in negotiations with Congress over funding for a border wall and other immigration matters. On October 8, 2017, for example, President Trump sent a letter to congressional leaders setting out "Immigration Principles and Policies" that "must be included as part of any legislation addressing the status of [DACA] recipients." JA 982. These "Principles and Policies" included funding for a border wall. See also Donald J. Trump (@realDonaldTrump), Twitter (Dec. 29, 2017, 5:16 AM), https://goo.gl/aZ19im ("The Democrats have been told, and fully understand, that there can be no DACA without the desperately needed WALL at the South-

58

ern Border and an END to the horrible Chain Migration & ridiculous Lottery System of Immigration etc."); Donald J. Trump (@realDonaldTrump), Twitter (Jan. 23, 2018, 8:07 PM), https://goo.gl/Zz46iq ("[I]f there is no Wall, there is no DACA."); Donald J. Trump (@realDonaldTrump), Twitter (Feb. 5, 2018, 6:36 AM), https://goo.gl/BpvHV6 ("Any deal on DACA that does not include STRONG border security and the desperately needed WALL is a total waste of time."). These statements indicate that the Administration rescinded DACA in order to create a legislative bargaining chip. See, *e.g.*, *Make the Road N.Y.* No. 18-cv-2445, Dkt. 63-1.

Finally, the President has indicated that he may "revisit" the rescission. See Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 8:38 PM), https://tinyurl.com/y7f2y6tj. That statement is at odds with Acting Secretary Duke's explanation that the policy must be ended because it is unlawful, since if the policy were unlawful, there would be nothing to "revisit."

The evidence that the government's asserted reasons for rescinding DACA are not its actual reasons provides an additional basis for affirming the injunction.

## CONCLUSION

The judgment of the court of appeals should be affirmed.

**AR4206**

59

Respectfully submitted,

Jeffrey M. Davidson
David Watnick
COVINGTON &
BURLING LLP
415 Mission Street,
Suite 5400
San Francisco, CA
94105
(415) 591-6000

Charles F. Robinson
Margaret Wu
Sonya Sanchez
University of
California
Office of the General
Counsel
1111 Franklin Street,
8th Floor
Oakland, CA 94607
(510) 987-9800

Robert A. Long
*Counsel of Record*
Lanny A. Breuer
Mark H. Lynch
Alexander A. Berengaut
Megan A. Crowley
Ivano M. Ventresca
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Avenue, NW
Washington, DC 20001
(202) 662-6000

*Counsel for The Regents of the University of
California and Janet Napolitano*

Justin T. Berger
Brian Danitz
Tamarah Prevost
COTCHETT, PITRE
&MCCARTHY, LLP
840 Malcolm Road,
Suite 200
Burlingame, CA 94010
(650) 697-6000

*Counsel for City of San
José*

AR4207

# APPENDIX

1.  8 U.S.C. § 1151 note provides:

>  \* \* \*

**EXTENSION OF POSTHUMOUS BENEFITS TO SURVIVING SPOUSES, CHILDREN, AND PARENTS**

Pub. L. 108-136, div. A, title XVII, §1703(a)-(e), Nov. 24, 2003, 117 Stat. 1693, provided that:

>  \* \* \*

(c) SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENT ALIENS.—

>  (1) TREATMENT AS IMMEDIATE RELATIVES.—
>
>>  (A) IN GENERAL.—A spouse or child of an alien described in paragraph (3) who is included in a petition for classification as a family-sponsored immigrant under section 203(a)(2) of the Immigration and Nationality Act (8 U.S.C. 1153(a)(2)) that was filed by such alien, shall be considered (if the spouse or child has not been admitted or approved for lawful permanent residence by such date) a valid petitioner for immediate relative status under section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)). Such spouse or child shall be eligible for deferred action, advance parole, and work authorization.
>>
>>  (B) PETITIONS.—An alien spouse or child described in subparagraph (A) may file a

1a

**AR4208**

2a

petition with the Secretary of Homeland Security for classification of the alien under section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)). For purposes of such Act [8 U.S.C. 1101 et seq.], such a petition shall be considered a petition filed under section 204(a)(1)(A) of such Act (8 U.S.C. 1154(a)(1)(A)).

(2) Self-Petitions.—Any spouse or child of an alien described in paragraph (3) who is not a beneficiary of a petition for classification as a family-sponsored immigrant may file a petition for such classification under section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)) with the Secretary of Homeland Security, but only if the spouse or child files a petition within 2 years after such date. Such spouse or child shall be eligible for deferred action, advance parole, and work authorization.

(3) Alien Described.—An alien is described in this paragraph if the alien—

(A) served honorably in an active duty status in the military, air, or naval forces of the United States;

(B) died as a result of injury or disease incurred in or aggravated by combat; and

(C) was granted posthumous citizenship under section 329A of the Immigration and Nationality Act (8 U.S.C. 1440-1).

3a

(d) PARENTS OF LAWFUL PERMANENT RESIDENT ALIENS.—

   (1) SELF-PETITIONS.—Any parent of an alien described in paragraph (2) may file a petition for classification under section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)), but only if the parent files a petition within 2 years after such date. For purposes of such Act [8 U.S.C. 1101 et seq.], such petition shall be considered a petition filed under section 204(a)(1)(A) of such Act (8 U.S.C. 1154(a)(1)(A)). Such parent shall be eligible for deferred action, advance parole, and work authorization.

   (2) ALIEN DESCRIBED.—An alien is described in this paragraph if the alien-

      (A) served honorably in an active duty status in the military, air, or naval forces of the United States;

      (B) died as a result of injury or disease incurred in or aggravated by combat; and

      (C) was granted posthumous citizenship under section 329A of the Immigration and Nationality Act (8 U.S.C. 1440-1).

      * * *

**AR4210**

4a

2.   8 U.S.C. § 1154 provides:

**Procedure for granting immigrant status**

(a) PETITIONING PROCEDURE

\* \* \*

(D)(i)(I) Any child who attains 21 years of age who has filed a petition under clause (iv) of subsection (a)(1)(A) of this section or subsection (a)(1)(B)(iii) of this section that was filed or approved before the date on which the child attained 21 years of age shall be considered (if the child has not been admitted or approved for lawful permanent residence by the date the child attained 21 years of age) a petitioner for preference status under paragraph (1), (2), or (3) of section 1153(a) of this title, whichever paragraph is applicable, with the same priority date assigned to the self-petition filed under clause (iv) of subsection (a)(1)(A) of this section or subsection (a)(1)(B)(iii) of this section. No new petition shall be required to be filed.

(II) Any individual described in subclause (I) is eligible for deferred action and work authorization.

(III) Any derivative child who attains 21 years of age who is included in a petition described in clause (ii) that was filed or approved before the date on which the child attained 21 years of age shall be

**AR4211**

5a

considered (if the child has not been admitted or approved for lawful permanent residence by the date the child attained 21 years of age) a VAWA self-petitioner with the same priority date as that assigned to the petitioner in any petition described in clause (ii). No new petition shall be required to be filed.

(IV) Any individual described in subclause (III) and any derivative child of a petition described in clause (ii) is eligible for deferred action and work authorization.

\* \* \*

3. 8 U.S.C. § 1227 provides:

**Deportable aliens**

\* \* \*

(d) ADMINISTRATIVE STAY

(1) If the Secretary of Homeland Security determines that an application for nonimmigrant status under subparagraph (T) or (U) of section 1101(a)(15) of this title filed for an alien in the United States sets forth a prima facie case for approval, the Secretary may grant the alien an administrative stay of a final order of removal under section 1231(c)(2) of this title until-

(A) the application for nonimmigrant status under such subparagraph (T) or (U) is approved; or

6a

(B) there is a final administrative denial of the application for such nonimmigrant status after the exhaustion of administrative appeals.

(2) The denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for a stay of removal, deferred action, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws of the United States.

\* \* \*

4. 8 U.S.C. 1324a provides:

**Unlawful employment of aliens**

\* \* \*

(h) MISCELLANEOUS PROVISIONS

\* \* \*

(3) Definition of unauthorized alien

As used in this section, the term "unauthorized alien" means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General.

\* \* \*

AR4213

7a

5.   49 U.S.C. § 30301 note provides:

 * * *

**IMPROVED SECURITY FOR DRIVERS' LICENSES AND PERSONAL IDENTIFICATION CARDS**

 * * *

Pub. L. 109-13, div. B, title II, May 11, 2005, 119 Stat. 311, provided that:

 * * *

**SEC. 202. MINIMUM DOCUMENT REQUIRE-MENTS AND ISSUANCE STANDARDS FOR FEDERAL RECOGNITION.**

(a) MINIMUM STANDARDS FOR FEDERAL USE. —

> (1) IN GENERAL.—Beginning 3 years after the date of the enactment of this division [May 11, 2005], a Federal agency may not accept, for any official purpose, a driver's license or identification card issued by a State to any person unless the State is meeting the requirements of this section.

> (2) STATE CERTIFICATIONS.—The Secretary shall determine whether a State is meeting the requirements of this section based on certifications made by the State to the Secretary. Such certifications shall be made at such times and in such manner as the Secretary, in consultation with the Secretary of Transportation, may prescribe by regulation.

**AR4214**

8a

(b) MINIMUM DOCUMENT REQUIREMENTS.—To meet the requirements of this section, a State shall include, at a minimum, the following information and features on each driver's license and identification card issued to a person by the State:

   (1) The person's full legal name.
   (2) The person's date of birth.
   (3) The person's gender.
   (4) The person's driver's license or identification card number.
   (5) A digital photograph of the person.
   (6) The person's address of principle residence.
   (7) The person's signature.
   (8) Physical security features designed to prevent tampering, counterfeiting, or duplication of the document for fraudulent purposes.
   (9) A common machine-readable technology, with defined minimum data elements.

(c) MINIMUM ISSUANCE STANDARDS. —

   (1) IN GENERAL.—To meet the requirements of this section, a State shall require, at a minimum, presentation and verification of the following information before issuing a driver's license or identification card to a person:

      (A) A photo identity document, except that a non-photo identity document is acceptable if it includes both the person's full legal name and date of birth.

      (B) Documentation showing the person's date of birth.

**AR4215**

9a

(C) Proof of the person's social security account number or verification that the person is not eligible for a social security account number.

(D) Documentation showing the person's name and address of principal residence.

(2) SPECIAL REQUIREMENTS.—

(A) IN GENERAL.—To meet the requirements of this section, a State shall comply with the minimum standards of this paragraph.

(B) EVIDENCE OF LAWFUL STATUS.—A State shall require, before issuing a driver's license or identification card to a person, valid documentary evidence that the person-

(i)   is a citizen or national of the United States;

(ii)  is an alien lawfully admitted for permanent or temporary residence in the United States;

(iii) has conditional permanent resident status in the United States;

(iv)  has an approved application for asylum in the United States or has entered into the United States in refugee status;

(v)   has a valid, unexpired nonimmigrant visa or nonimmigrant visa status for entry into the United States;

10a

    (vi)  has a pending application for asylum in the United States;

   (vii)  has a pending or approved application for temporary protected status in the United States;

 (viii)  has approved deferred action status; or

   (ix)  has a pending application for adjustment of status to that of an alien lawfully admitted for permanent residence in the United States or conditional permanent resident status in the United States.

\* \* \*

6.  8 C.F.R § 274a.12 provides:

**Classes of aliens authorized to accept employment.**

\* \* \*

(c)  *Aliens who must apply for employment authorization.* An alien within a class of aliens described in this section must apply for work authorization. If authorized, such an alien may accept employment subject to any restrictions stated in the regulations or cited on the employment authorization document. USCIS, in its discretion, may establish a specific validity period for an employment authorization document, which may include any period when an administrative appeal or judicial review of an application or petition is pending.

\* \* \*

   (14) An alien who has been granted deferred action, an act of administrative convenience to

**AR4217**

11a

the government which gives some cases lower priority, if the alien establishes an economic necessity for employment;

* * *

AR4218

Nos. 18-587, 18-588, and 18-589

IN THE

Supreme Court of the United States

————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL.,

*Petitioners*,

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL.,

*Respondents.*

————

On Writ of Certiorari Before Judgment to the United States
Court of Appeals for the District of Columbia Circuit

————

**BRIEF FOR THE D.C. RESPONDENTS**

————

BENJAMIN M. EIDELSON
1525 Massachusetts Ave.
Cambridge, MA 02138
(617) 495-4846

*Counsel for Respondents*
*The Trustees of Princeton*
*University, Microsoft*
*Corporation, and Maria De*
*La Cruz Perales Sanchez*

LINDSAY C. HARRISON
  *Counsel of Record*
IAN HEATH GERSHENGORN
THOMAS J. PERRELLI
MATTHEW E. PRICE
ISHAN K. BHABHA
JENNER & BLOCK LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com

*Counsel for Respondents*
*The Trustees of Princeton*
*University, Microsoft*
*Corporation, and Maria De*
*La Cruz Perales Sanchez*

*(Additional Captions and Counsel Listed on Inside Cover)*

**AR4219**

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,
*Respondents.*

————

**On Writ of Certiorari to the United States
Court of Appeals for the Ninth Circuit**

————

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, ET AL.,

*Petitioners*

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL.,

*Respondents.*

————

**On Writ of Certiorari Before Judgment to the United States
Court of Appeals for the Second Circuit**

————

JOSEPH M. SELLERS
JULIE S. SELESNICK
COHEN MILSTEIN SELLERS
  & TOLL PLLC
1100 New York Ave., NW
Fifth Floor
Washington, DC 20005
(202) 408-4600

*Counsel for Respondents
NAACP; American
Federation of Teachers,
AFL-CIO; and United Food
and Commercial Workers
International Union, AFL-
CIO, CLC*

BRADFORD M. BERRY
NAACP
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-5797

*Counsel for Respondent
NAACP*

**AR4220**

RAMONA E. ROMERO
WESLEY MARKHAM
PRINCETON UNIVERSITY
New South Building
Fourth Floor
Princeton, NJ 08544
(609) 258-2500

*Counsel for Respondent The*
*Trustees of Princeton*
*University*

CYNTHIA L. RANDALL
MICROSOFT CORPORATION
One Microsoft Way
Redmond, WA 98052
(425) 538-3176

*Counsel for Respondent*
*Microsoft Corporation*

DAVID J. STROM
AMERICAN FEDERATION
 OF TEACHERS, AFL-CIO
555 New Jersey Ave. N.W.
Washington, DC
(202) 393-7472

*Counsel for Respondent*
*American Federation of*
*Teachers, AFL-CIO*

PETER J. FORD
UNITED FOOD &
 COMMERCIAL WORKERS
 INTERNATIONAL UNION,
 AFL-CIO, CLC
1775 K Street. N.W.
Washington, DC 20006
(202) 223-3111

*Counsel for Respondent*
*United Food & Commercial*
*Workers International*
*Union, AFL-CIO, CLC*

**AR4221**

i

## QUESTIONS PRESENTED

The questions presented are:

1. Whether the rescission of the Deferred Action for Childhood Arrivals (DACA) policy is immune from judicial review.

2. Whether the rescission of the DACA policy violated the Administrative Procedure Act.

AR4222

ii

## TABLE OF CONTENTS

QUESTIONS PRESENTED ............................................ i

TABLE OF AUTHORITIES ......................................... iv

INTRODUCTION ....................................................... 1

STATEMENT OF THE CASE ...................................... 4

    A.    Legal and Factual Background ............... 4

    B.    Proceedings Below ................................... 16

SUMMARY OF ARGUMENT ..................................... 18

ARGUMENT ............................................................. 21

I.    THE DUKE MEMORANDUM IS
    REVIEWABLE .................................................... 21

    A.    The Non-Discretionary Rescission
        of DACA Is Not Committed to
        Agency Discretion by Law ..................... 22

    B.    Additionally, General Enforcement
        Policies Are Not Committed to
        Agency Discretion by Law ..................... 30

II.    THE DUKE MEMORANDUM IS
    ARBITRARY AND CAPRICIOUS ................. 34

AR4223

iii

A.    The Duke Memorandum Offers No Reasoned Explanation for Rescinding the DACA Memorandum. ............................................. 34

B.    The Solicitor General's Arguments Do Not Explain Why DACA Is Unlawful..................................................... 44

III.    THE NIELSEN MEMORANDUM'S "POLICY" RATIONALES DO NOT RENDER THE DUKE MEMORANDUM EITHER UNREVIEWABLE OR LAWFUL............................................................. 49

A.    The Nielsen Memorandum's Non-Legal Rationales Should Be Disregarded................................................. 49

B.    Even if the Nielsen Memorandum's Non-Legal Rationales Are Considered, They Do Not Justify Upholding the Duke Memorandum. ...... 56

CONCLUSION ............................................................. 61

AR4224

iv

## TABLE OF AUTHORITIES

### Cases

*Bowen v. American Hospital Ass'n*, 476 U.S. 610 (1986) .................................................. 51

*Camp v. Pitts*, 411 U.S. 138 (1973) ..................... 50, 51

*Chaney v. Heckler*, 718 F. 2d 1174 (D.C. Cir. 1983), *rev'd*, 470 U.S. 821 (1985)...................... 28-29

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012)................................................. 53

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ......................... 50, 51, 57

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ............................................................... 25, 30

*Cooper v. Harris*, 137 S. Ct. 1455 (2017)............. 29, 45

*Crowley Caribbean Transportation, Inc. v. Pena*, 37 F.3d 671 (D.C. Cir. 1994) ...................... 32

*Department of Commerce v. New York*, 139 S. Ct. 2551 (2019)................................ 34, 35, 50, 52, 56

*Edison Electric Institute v. United States EPA*, 996 F.2d 326 (D.C. Cir. 1993) .................... 32

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ............................................................. 43

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010)........... 26

*Heckler v. Chaney*, 470 U.S. 821 (1985) .......................................... 19, 26, 27, 30, 31, 33

AR4225

v

*ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270 (1987) .................................... 24, 27, 28

*Judulang v. Holder*, 565 U.S. 42 (2011) .................... 57

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ................ 36, 53

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ......................... 24

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ........................................................ 44

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ........... 33

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) .................................................... 24, 39, 41, 42

*Negusie v. Holder*, 555 U.S. 511 (2009) .................... 25

*NLRB v. Wyman-Gordon Co.*, 394 U.S. 759 (1969) ........................................................ 56

*North Carolina v. Covington*, 137 S. Ct. 1624 (2017) ........................................................ 60

*OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808 (D.C. Cir. 1998) ........................................ 32

*Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633 (1990) .................................... 35, 49, 50

*Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015) ........................................................ 60

*Phelps Dodge Corp. v. NLRB*, 313 U.S. 177 (1941) ........................................................ 25

AR4226

vi

*Matter of Quintero*, 18 I. & N. Dec. 348 (B.I.A. 1982) .......................................................... 4

*Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969) ................................................ 47

*Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) ............................ 4

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) ..................................................... 38

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ......... 36, 54

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ....... 35, 39

*Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735 (1996) ......................................... 25

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ............................................. 9, 10, 11

*Time, Inc. v. United States Postal Service*, 667 F.2d 329 (2d Cir. 1981) ......................... 42

*United States v. Texas*, 136 S. Ct. 2271 (2016) ......... 11

*Vermont Yankee Nuclear Power Corp. v. Natural Resource Defense Council, Inc.*, 435 U.S. 519 (1978) ................................... 51

*Weyerhaeuser Co. v. United States Fish & Wildlife Serv*ice, 139 S. Ct. 361 (2018) .... 21, 30, 61

## STATUTES

5 U.S.C. 701(a)(2) ......................................... 24

6 U.S.C. 202(5) ....................................... 29, 58

8 U.S.C. 1103(a)(1) ..................................... 22

AR4227

vii

8 U.S.C. 1103(a)(2) ...................................................... 58

8 U.S.C. 1103(a)(3) ...................................................... 58

8 U.S.C. 1182(a)(9)(B)(ii)............................................. 6

8 U.S.C. 1227(a)(1)(B)................................................. 6

8 U.S.C. 1252(g)......................................................... 34

8 U.S.C. 1324a(h)(3) ................................................... 5

8 U.S.C. 1611(a)......................................................... 6

8 U.S.C. 1611(b)(2).................................................. 5, 37

8 U.S.C. 1641(b).......................................................... 6

## LEGISLATIVE MATERIALS

H.R. Rep. No. 100-627 (1988) ..................................... 6

*Hearing Before S. Judiciary Comm. on Oversight of the U.S. Dep't of Homeland Sec.*, 115th Cong. (Jan. 16, 2018) ............................. 15, 16

*Oversight of the Administration's Decision to End DACA: Hearing Before S. Comm. on the Judiciary*, 115th Cong. (Oct. 3, 2017) .......... 15

*Written Testimony of DHS Secretary Kirstjen Nielsen* (Dec. 20, 2018), https://bit.ly/2lWjQ3X................................................. 18

## OTHER AUTHORITIES

8 C.F.R. 1.3(a)(4) .......................................................... 5

8 C.F.R. 274a.12(c)(14) ............................................... 5

45 C.F.R. 152.2(8)....................................................... 43

viii

Corrected Answer, *Texas v. Nielsen*, 1:18-cv-68 (S.D. Tex. Mar. 6, 2019), Dkt. 370............. 39, 45

*Definition of the Term Lawfully Present in the United States for Purposes of Applying for Title II Benefits Under Section 401(b)(2) of Public Law 104-193*, 61 Fed. Reg. 47,039 (Sept. 6, 1996) ........................................................5-6

Henry J. Friendly, Chenery *Revisited*, 1969 Duke L.J. 199.................................................... 42, 44

3 Kristin E. Hickman & Richard J. Pierce, Jr., *Administrative Law Treatise* §19.7 (6th ed. 2019)...................................................................... 33

Letter from Cindy Mann, to State Health Officials (Aug. 28, 2012), https://bit.ly/2kJZgn5....... 43

Memorandum from Johnny N. Williams, Executive Associate Commissioner, Office of Field Operations, to Regional Directors et al., *Unlawful Presence* (June 12, 2002)................. 6

*Notice of Availability*, 82 Fed. Reg. 43,556 (Sept. 18, 2017) ...................................... 13

Oral Argument Transcript, *United States v. Texas*, No. 15-674 (U.S. Apr. 18, 2016) .............. 11

*Press Briefing by Press Secretary Sarah Sanders* (Sept. 5, 2017), https://bit.ly/2kxBJld ................................................................. 14

*Principals Committee, DACA: Summary of Conclusions*, No. 1:18-cv-02445 (E.D.N.Y. Aug. 14, 2019), Dkt. 63-1 ....................................... 12

**AR4229**

ix

*Remarks by President Trump* (Jan. 9, 2018),
    https://perma.cc/5QHA-97S6 ............................... 15

Respondents Brief, *United States v. Texas*, No.
    15-674 (U.S. Mar. 28, 2016), 2016 WL
    1213267 .................................................................. 11

*Statement from President Donald J. Trump*
    (Sept. 5, 2017), https://bit.ly/2ExWxCQ ....... 14, 15

Twitter, *@realDonaldTrump* (Sept. 6, 2019),
    https://bit.ly/2m6JSRY .......................................... 18

United States Brief, *United States v. Texas*,
    No. 15-674 (U.S. Mar. 1, 2016), 2016 WL
    836758 .................................................................... 59

AR4230

1

## INTRODUCTION

The D.C. Respondents agree with the other Respondents that Deferred Action for Childhood Arrivals (DACA) is lawful. But the focus of this brief is narrower. Regardless of one's view of DACA's legality, Judge Bates was correct to vacate its rescission. The Government's explanation of *why* it thought DACA unlawful was incoherent. And that failure of reasoned decision-making mattered: It led the agency to neglect consideration of remedial approaches short of abandoning DACA outright—approaches that might well have resolved whatever legal concerns the Government had.

The Government frames its brief around the proposition that a new Administration ought to be able to reevaluate the discretionary policy choices of its predecessors. Respondents agree. But Secretary Duke's rescission of DACA was not based on a discretionary policy judgment. Instead, it was grounded in a legal determination by the Attorney General that DACA is unlawful. That approach allowed the Administration to tell the public that it could not permissibly maintain DACA, and that Congress and the courts, rather than the President, thus bore responsibility for the rescission's human consequences.

The Government must now live with the consequences of claiming that its hands were tied. For starters, the Administration's determination that it *lacked* discretion is reviewable. An agency cannot claim that its action was compelled by law and at the same time that the action was "committed to agency discretion by law." As Judge Bates correctly recognized, the

**AR4231**

2

Government can avoid accountability or reviewability, but not both.

Nor can the Government avoid judicial review by relying on the Nielsen Memorandum to recast the rescission as a policy call. The Government was (and is) free to issue a new rescission memorandum on policy grounds. But under this Court's precedents, an agency may not defend an existing action on grounds it invents after the fact. This rule promotes both the accountability of agency decision-making and the orderly process of judicial review.

This case shows the wisdom of that rule. Judge Bates invited the Government to issue a new rescission decision based on an appropriate administrative record assembled for that purpose. The Government instead elected to re-defend the Duke Memorandum, thereby steering the case toward what it perceived as a path to faster review. The result is a jumble of conclusory, *post hoc* policy justifications made for litigation advantage, resting on an old administrative record assembled for an entirely different purpose. The APA demands more.

As for the actual basis of the rescission decision—the determination that DACA is unlawful—Judge Bates correctly concluded that the Administration's reasoning was incoherent. It is impossible to discern what, exactly, the Government found unlawful about DACA. And because the Administration did not analyze its own legal concerns in a reasoned fashion, it was premature for the Administration to conclude that rescission of DACA in its entirety was required or appropriate.

AR4232

3

To be clear, vacatur is not an empty gesture, the first volley in a game of court-agency "ping-pong," or a request for a better "bench memo." The failure of reasoned explanation here goes to the heart of the case. As the Government's brief explains, DACA's core is simply enforcement forbearance: "Deferred action is a practice in which the Secretary exercises enforcement discretion to notify an alien of the agency's decision to forbear from seeking the alien's removal for a designated period." U.S. Br. 4. Other "DHS regulations"—each pre-dating DACA and grounded in its own statutory authority—then allow "aliens granted deferred action [to] receive certain benefits." *Id.* at 5. The Government's threadbare assertion that it lacked legal authority to maintain DACA entirely failed to consider the distinction between pure deferred action—that is, notifying the DACA recipient of the decision to forbear from enforcement—and the collateral consequences of deferred action.

No one contends here that a policy of pure deferred action for childhood-arrivals, standing alone, is unlawful. That policy is of immense significance in its own right. Yet this baby went out with the bathwater. To the extent the Administration believed DACA recipients could not lawfully receive certain additional benefits that DHS has associated with deferred action, it made no effort to identify which ones or to analyze the statutory authority for the relevant regulations, which are independent of DACA. Instead, the Administration simply leaped to the conclusion that DACA needed to be rescinded. No wonder that Judge Bates concluded the

**AR4233**

4

Government had failed the basic requirements of reasoned decision-making. No other conclusion was possible.

This case, in short, is about accountability. Judge Bates made crystal clear that the Government has the power to rescind DACA, but only if it takes responsibility for its actions, offers forthright justifications, and explains them in a reasoned fashion. Because the Government failed to do so, the decision below should be affirmed.

## STATEMENT OF THE CASE

### A. Legal and Factual Background

1.a. "Deferred action" is a term of art for an administrative decision not to "'proceed against an apparently deportable alien.'" *Reno v. Am.-Arab Anti-Discrimination Comm. (AAADC)*, 525 U.S. 471, 483-84 (1999) (citation omitted). It is, in other words, "an informal administrative stay of deportation … bestowed as a matter of prosecutorial grace." *Matter of Quintero*, 18 I. & N. Dec. 348, 349 (B.I.A. 1982). By engaging in this "regular practice" of prioritizing its limited prosecutorial resources, *AAADC*, 525 U.S. at 484, the Government allows those whom it does not intend to remove to live without the constant fear of deportation. But because deferred action is, by definition, just a decision about enforcement, it does not change a person's underlying status as removable.

b. Although deferred action itself is only a non-enforcement decision, DHS has also chosen to treat its deferred-action decisions as relevant to certain other

**AR4234**

5

matters within the agency's purview.  Because these collateral effects of deferring action appear to have loomed large in the Government's assessment of DACA, they provide vital context here.

First, the statute prohibiting employment of any "unauthorized alien" defines that term to exclude persons "authorized to be so employed by [the INA] *or by* the [DHS Secretary]."  8 U.S.C. 1324a(h)(3) (emphasis added).  Since 1987, the Secretary has exercised this authority to permit employers to hire numerous categories of noncitizens—ranging from certain persons with pending asylum applications, to non-immigrant students who face unforeseen economic hardship, to "[a]n alien who has been granted deferred action … if the alien establishes an economic necessity for employment."  8 C.F.R. 274a.12(c)(14).  Both the statute granting the Secretary this authority and the regulation exercising it long postdate the practice of deferred action itself.

Second, the INA bars most noncitizens from participating in Social Security and Medicare, but allows their participation if they are "lawfully present in the United States *as determined by the [Secretary]*."  8 U.S.C. 1611(b)(2) (emphasis added).  Since 1996, the Government has deemed that statute to encompass various categories of noncitizens for whom it "has decided for humanitarian or other public policy reasons not to initiate removal proceedings," including through deferred action—while stressing that this definition of "lawfully present" was "[f]or purposes of 8 U.S.C. 1611(b)(2) only."  8 C.F.R. 1.3(a)(4); *see Definition of the Term Lawfully Present in the United States for Purposes of Applying*

6

*for Title II Benefits Under Section 401(b)(2) of Public Law 104-193*, 61 Fed. Reg. 47,039 (Sept. 6, 1996). Once again, that regulation arose long after, extends beyond, and is distinct from deferred action itself.

Third, since 2002, DHS has treated a deferred-action decision as one of the circumstances that tolls periods of "unlawful presence" for purposes of any future inadmissibility determination. *See* 8 U.S.C. 1182(a)(9)(B)(ii) (specifying when "an alien is deemed to be unlawfully present" for this purpose). In adopting this reading, the Government made clear that the interpretation "does not in any way alter the nature of deferred action" itself. Memorandum from Johnny N. Williams, *Unlawful Presence* 1 (June 12, 2002).

In contrast to these policies, Congress and federal agencies have chosen not to extend other benefits to persons with deferred action and not to treat such persons as "lawfully present" for other purposes. For example, such individuals are not "qualified" for most public benefits programs. *See* 8 U.S.C. 1611(a), 1641(b); *see also infra* at 42. And they are treated as "present in the United States in violation of … law" for purposes of removability. 8 U.S.C. 1227(a)(1)(B).

c. The Government sometimes elects to defer action on an *ad hoc* basis, and other times pursuant to general policies that guide individual officials' discretion. The Government has adopted numerous policies of the latter variety over many decades. *See generally* H.R. Rep. No. 100-627, at 4-6 (1988). For example, a 1990 "Family Fairness" program deferred removal of approximately 1.5 million individuals whose spouses or parents had been

AR4236

7

granted legal status in the United States.  JA 850 n.15.

2.a.  In 2012, then-DHS Secretary Napolitano issued a memorandum (the DACA Memorandum) instituting a deferred-action policy known as "Deferred Action for Childhood Arrivals" (DACA).  DACA is a "nonenforcement policy" that "provide[s] deferred action to 'certain young people who were brought to this country as children.'"  U.S. Br. 5.  Specifically, Secretary Napolitano identified a class of childhood-arrivals for whom a favorable exercise of "prosecutorial discretion" would be "especially justified"—barring any countervailing considerations, which officials were charged with identifying on a "case by case" basis.  *Regents* Pet. App. 98a-101a.  These young people generally did not act with "intent to violate the law," and the agency's priorities did not extend to "remov[ing] productive young people to countries where they may not have lived or even speak the language."  *Id.*  The DACA Memorandum thus established agency-wide guidance for the exercise of "prosecutorial discretion … by deferring action" for renewable two-year periods.  *Id.* 100a.  But it expressly "confer[red] no substantive right [or] immigration status."  *Id.* 101a.

b.  As of September 2017, nearly 700,000 young people had been granted deferred action based on DACA.  U.S. Br. 36.  The life-changing impact of those decisions is undisputed.  First, DACA recipients no longer live in fear of contact with law-enforcement (including as a witness or victim) or others who might instigate their

8

removal.[1]  Second, because DACA recipients know the Government has no intention to remove them imminently, they can plan their lives here accordingly—from starting college with the expectation of graduating, to forging long-term relationships, to investing in their communities.  Third, most have established the "economic necessity" required by the pre-existing work authorization regulation, allowing them to work on-the-books and pursue productive careers.  The positive impacts of DACA have therefore been shared by recipients' families, classmates, and co-workers; by educational institutions like Princeton University; and by employers like Microsoft Corporation.

3.a.  In 2014, then-DHS Secretary Johnson issued another memorandum (the DAPA Memorandum) adopting "new policies for the use of deferred action."  *Regents* Pet. App. 103a.  In the name of "family unity," the DAPA Memorandum recommended 4.3 million adults for consideration for deferred action, on the ground that they were parents of U.S. citizens or lawful permanent residents.  *Id.* 104a.  It tweaked the eligibility criteria for DACA as well.  *Id.*

The DAPA Memorandum had two other notable features that framed the litigation that followed.  First, the memorandum asserted, without citation or qualification,

---

[1] For example, before DACA, Respondent Maria De La Cruz Perales Sanchez "avoided the police, and would not have contacted them unless it was a life or death situation"; was "reluctant to seek out medical treatment"; and could not "travel[] without fear" even in her own community.  JA 880-83.

9

that a decision to defer action under DAPA "means that … an individual is permitted to be lawfully present in the United States." *Id.* Second, the memorandum itself invoked and appeared to exercise the Secretary's statutory "authority to grant [work] authorization." *Id.* 108a (citing 8 U.S.C. 1324a(h)(3)). The DAPA Memorandum thus invited the characterization of DAPA as a unified policy or status under which deferred enforcement was inextricably tied to "lawful presence" and eligibility for work authorization. In contrast, as explained above, past agency guidance regarding deferred action (including the DACA Memorandum) had provided only for deferred action itself—that is, for enforcement forbearance—leaving any further consequences of that deferral to be determined by whatever the regulations addressing other subjects might provide at the time they are applied. *See supra* at 5-6.[2]

b. Before the DAPA Memorandum went into effect, Texas and other States secured a preliminary injunction. The Fifth Circuit affirmed, holding that the States would likely succeed on their notice-and-comment and substantive APA claims. *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

With respect to the substantive APA claim, the Fifth Circuit "conclude[d] … that the INA does not grant the

---

[2] In keeping with this traditional approach, the DACA Memorandum touched on work authorization only in passing—instructing agency officials to "accept applications" from those granted deferred action "to determine whether these individuals qualify for work authorization" under the pre-existing scheme. *Regents* Pet. App. 101a.

10

Secretary discretion to grant deferred action *and lawful presence* on a class-wide basis to 4.3 million otherwise removable aliens." *Id.* at 186 n.202 (emphasis added). In so holding, the court contrasted this Court's "description, in *AAADC*, of deferred action as a nonprosecution decision," with the fact that "[u]nder DAPA, '[d]eferred action . . . means that, for a specified period of time, an individual is permitted to be *lawfully present* in the United States.'" *Id.* at 167-68 (quoting the DAPA Memorandum). As the court explained, "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present," but "absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA." *Id.* at 179; *see id.* at 180.

The Fifth Circuit was careful to note that "[p]art of DAPA involves the Secretary's decision … not to enforce the immigration laws as to a class of what he deems to be low-priority illegal aliens," and the court took no issue with that "part" of DAPA—*i.e.*, with deferred action itself, as described in *AAADC*. *Id.* at 166. But, the court explained, the fact remained that the DAPA Memorandum purported to "make 4.3 million otherwise removable aliens eligible for lawful presence, employment authorization, and associated benefits," and Congress would not have delegated a decision "'of such economic and political magnitude to an administrative agency.'" *Id.* at 181 (citation omitted).[3]

---

[3] The Government did not ask the Fifth Circuit to distinguish or

11

c. This Court granted the Government's petition for certiorari. Like the Fifth Circuit, the Respondent States stressed that they did not object to DAPA insofar as it afforded deferred action in the traditional sense. As they put it, DHS was "free … to issue 'low-priority' identification cards to aliens" as it saw fit. Resp'ts Br. at 39, *United States v. Texas*, No. 15-674 (U.S. Mar. 28, 2016), 2016 WL 1213267. And the States agreed that DHS could lawfully take that kind of action on a class-wide basis and on DAPA's vast scale. *See* Oral Argument Tr. 50-53, *United States v. Texas*, No. 15-674 (U.S. Apr. 18, 2016). But "DAPA's granting of lawful presence," they argued, "pushes the concept of deferred action far beyond what this Court has recognized." Resp'ts Br. at 41-42.

This Court affirmed the Fifth Circuit's preliminary injunction by an equally divided vote. *See United States v. Texas*, 136 S. Ct. 2271 (2016). In June 2017, a new DHS Secretary rescinded the DAPA Memorandum, but left the DACA Memorandum in place.

4.a. Shortly thereafter, the attorneys general of some of the States that had challenged DAPA sent a letter to Attorney General Sessions contending that the DACA Memorandum was legally defective because, "just like DAPA, DACA unilaterally confers eligibility for work authorization and lawful presence without any

---

sever the DAPA Memorandum's guidance for deferring action from any further consequences of that deferral. To the contrary, the Government insisted that "'[d]eferred action under DAPA'" and "'lawful presence'" were "'two sides of the same coin.'" *Texas*, 809 F.3d at 167.

12

statutory authorization from Congress." JA 873 (internal citation omitted). Unless the Administration rescinded the DACA Memorandum by September 5, 2017, the States said, they would challenge DACA as well.

b. On August 24, 2017, the relevant cabinet secretaries and agency heads met at the White House. *See Principals Committee, DACA: Summary of Conclusions* at 209, No. 1:18-cv-02445 (E.D.N.Y. Aug. 14, 2019), Dkt. 63-1. At that meeting, "[i]t was agreed" that "the previous Administration's [DACA] program is unlawful and will be ended." *Id.* Accordingly, "DOJ will send a memorandum to DHS outlining the legal reasons that the DACA program is unlawful." *Id.* Then, DHS would "draft a memorandum" to "withdraw the 2012 DACA memorandum … in light of DOJ's legal determination." *Id.* DHS would also "propose a plan to wind down the DACA program," within specified parameters. *Id.* Meanwhile, the Domestic Policy Council would "develop a unified list of legislative items" relating to immigration reform, setting up a potential bargain "that addresses individuals who had previously been eligible to receive DACA permits." *Id.*

c. The agencies carried out their assigned tasks. On September 4, 2017, Attorney General Sessions sent Acting DHS Secretary Duke a one-page letter stating that the DACA Memorandum was unlawful; noting the courts would "likely" agree; and instructing that DHS should therefore rescind it. JA 877-78.

The next day, Secretary Duke issued a memorandum to her subordinates rescinding the DACA Memorandum

**AR4242**

13

(the "Duke Memorandum"), *Regents* Pet. App. 111a, which was later published in the *Federal Register*, *see Notice of Availability*, 82 Fed. Reg. 43,556 (Sept. 18, 2017). After describing the litigation over DAPA and the letter from the States, Secretary Duke recited the Attorney General's "legal determination" that the program lacked "proper statutory authority" and was "unconstitutional." *Regents* Pet. App. 116a. "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General," she wrote, "it is clear that the June 15, 2012 DACA program should be terminated." *Id.* 117a. She therefore "rescind[ed] the June 15, 2012 memorandum." *Id.* "Nevertheless," she explained, "in light of the administrative complexities associated with ending the program, [the Attorney General] recommended that the Department wind [DACA] down in an efficient and orderly fashion." *Id.* 116a. Accordingly, Secretary Duke established a six-month window for DHS to grant final renewals of deferred action in certain cases. *Id.* 117a-118a.

Neither the Attorney General's letter nor Secretary Duke's memorandum identified what precisely they found unlawful about DACA—the mere decision to defer enforcement action (and notify individuals of the same), or some or all of the benefits that followed under separate DHS regulations and policies. Accordingly, neither official considered whether the DACA Memorandum's rescission—*i.e.*, the rescission of enforcement forbearance—was the necessary or appropriate cure, or

**AR4243**

14

whether some other remedy was available that would have fewer disruptive impacts for the agency, DACA recipients, and the public.

    d.  In their public-facing explanations of the decision to rescind DACA, the President and his subordinates repeatedly insisted that their hands were tied by Congress and the Constitution.

    As the White House Press Secretary stated just after the rescission's announcement: "The President made the best decision in light of the fact that the system was set up by the Obama administration, in clear violation of federal law." *Press Briefing by Press Secretary Sarah Sanders* (Sept. 5, 2017), https://bit.ly/2kxBJld.  When reporters asked whether the President was trying to avoid public responsibility by leaving the main announcement (on live television) to the Attorney General, she reiterated that "*[i]t was a legal decision*, and that would fall to the Attorney General." *Id.* (emphasis added); *see id.* ("[I]t would be the Department of Justice to make a legal recommendation, and that's what they did").  Another reporter asked where "the President stand[s] on the program itself," apart from "objections to the constitutionality of DACA." *Id.*  The Press Secretary answered that "it's something that he would support if Congress puts it before him"; his concern was simply that "this has to be something where the law is put in place." *Id.*

    The President's written statement reiterated the same message.  "I do not favor punishing children … for the actions of their parents," he explained.  *Statement from President Donald J. Trump* (Sept. 5, 2017), https://bit.ly/2ExWxCQ.  But "[t]he legislative branch,

**AR4244**

15

not the executive branch, writes these laws." *Id.* The States' threat of litigation "requir[ed] my Administration to make a decision regarding [DACA's] legality," and the Administration concluded that "the program is unlawful and unconstitutional and cannot be successfully defended in court." *Id.* Far from suggesting that the Administration was terminating DACA in an exercise of policymaking discretion, the President emphatically asserted the opposite.

The Administration returned to this refrain as the "wind down" unfolded. When the President was pressed on the "[e]ighty-six percent of the American people" who favor relief for "DACA-protected kids," he responded that he "doesn't have the right to do this" without "go[ing] through Congress." *Remarks by President Trump* (Jan. 9, 2018), https://perma.cc/5QHA-97S6. The Assistant DHS Secretary similarly advised the Senate Judiciary Committee that "we are not authorized to exercise [authority] against the advice of the Attorney General," and thus "when we were advised [DACA] was unlawful," only the terms of "draw[ing] it down" were discussed. *Oversight of the Administration's Decision to End DACA: Hearing Before S. Comm. on the Judiciary*, 115th Cong. (Oct. 3, 2017) (statement of Michael Dougherty, Assistant Sec'y). Likewise, when Acting Secretary Nielsen (who took office in December 2017) was pressured in another Senate hearing to extend the "wind down" period, she "stress[ed] how strong[ly] [she] feel[s] about finding a permanent solution for this population," but insisted that she had no discretion in the matter. *See Hearing Before S. Judiciary Comm. on*

16

*Oversight of the U.S. Dep't of Homeland Sec.*, 115th Cong. (Jan. 16, 2018).  She stated: "I believe the attorney general has made it clear that he believes such exercise is unconstitutional.  It's for Congress to fix."  *Id.*

**B.  Proceedings Below**

1.  Respondents challenged the Duke Memorandum in the U.S. District Court for the District of Columbia.  The administrative record consisted of just fourteen publicly available documents totaling 256 pages, three-quarters of which were the judicial opinions in the DAPA litigation.

In April 2018, the District Court (Bates, J.) granted summary judgment to Respondents and vacated the Duke Memorandum.  The court first concluded that the rescission was reviewable because it was predicated on a legal judgment that the agency lacked discretion to do otherwise.  *NAACP* Pet. App. 25a-43a.  The court then held that the Government had "failed adequately to explain its conclusion that the program was unlawful"— instead offering only "barebones" and "inapposite" analysis—and had "egregious[ly]" failed to account for the interests of existing DACA recipients.  *Id.* 2a, 51a, 54a, 55a.  The court did not reach the question of DACA's lawfulness.

The court stayed the effect of its vacatur for ninety days to allow DHS to "reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority."  *Id.* 66a.  It "anticipated that DHS would do so by way of a new agency action," in

**AR4246**

17

which DHS would be free to revise its policy or invoke new reasons in support of its decision.  *Id.* 90a.

2. On June 22, 2018, DHS instead filed in the District Court a memorandum, addressed to no one, from Secretary Nielsen (the "Nielsen Memorandum").  *Regents* Pet. App. 120a-126a.  The Nielsen Memorandum acknowledged that Secretary Duke's decision had been "vacated," *id.* 121a, but it did not rescind the DACA Memorandum anew or take any other new action.  Instead, it offered "further explanation" that "reflects [Secretary Nielsen's] understanding of the Duke memorandum and why the decision to rescind the DACA policy was, and remains, sound."  *Id.* 121a.  The Nielsen Memorandum was neither supported by any administrative record nor published in the *Federal Register*.

The Government then moved the District Court to "revise" its earlier order vacating the Duke Memorandum and instead "leave in place DHS's September 5, 2017 decision to rescind the DACA policy."  Motion to Revise at 19, *NAACP v. Trump*, No. 17-cv-2325 (D.D.C. July 11, 2018), Dkt. 74 ("Motion to Revise").  The District Court denied that motion.  Rather than "issu[ing] a new decision rescinding DACA" as the earlier "order had contemplated," the court explained, DHS had chosen "to stand by its September 2017 rescission decision."  *NAACP* Pet. App. 82a, 86a, 90a & n.6.  Accordingly, the court could consider the Nielsen Memorandum only insofar as it further explained the agency's actual reasons for that prior decision.  *Id.* 92a.  And to the extent the Nielsen Memorandum was grounded in the Duke Memorandum at all, it still failed to offer a reasoned

18

explanation of Secretary Duke's decision. *Id.* 105a.

In August 2018, the District Court entered final judgment. *NAACP* Pet. App. 110a-111a. The Government appealed, and the D.C. Circuit heard oral argument. This Court then granted certiorari before judgment.

3. Six months after filing her in-court memorandum, Secretary Nielsen testified regarding DACA's rescission before Congress. She reiterated that the Administration rescinded DACA because it "was an unlawful use of executive authority" and predicted that the courts would ultimately agree. *Written Testimony of DHS Secretary Kirstjen Nielsen* (Dec. 20, 2018), https://bit.ly/2lWjQ3X. She did not say that DACA was rescinded for other "independently sufficient reasons." *Regents* Pet. App. 122a.

In September 2019, after the Government filed its brief in this Court, the President reiterated that his Administration rescinded the DACA Memorandum because it was a "[t]otally illegal document" and that the public should "rest assured" he favors a "bipartisan deal" to protect childhood-arrivals from removal through lawful means. Twitter, *@realDonaldTrump* (Sept. 6, 2019), https://bit.ly/2m6JSRY & https://bit.ly /2lcwkEy.

## SUMMARY OF ARGUMENT

I. For two independent reasons, Secretary Duke's rescission of DACA is not "committed to agency discretion by law." First, the action did not involve any

**AR4248**

19

exercise of discretion.  Rather, the Attorney General determined that DACA could not lawfully be maintained.  In light of that legal determination, Secretary Duke had no discretion to continue the policy.  And when the Government disclaims, rather than exercises, its discretion, nothing in the APA or this Court's cases immunizes its legal judgment from judicial review.  The Government seeks to avoid these problems by recasting the rescission as a discretionary decision about "litigation risk," but the binding nature of the Attorney General's determination, the text of the Duke Memorandum, and the Administration's contemporaneous public statements all belie that description.

Second, and in any event, the Duke Memorandum is reviewable because it is a general enforcement policy.  As the D.C. Circuit has long held, there are sound reasons to treat such general policies—unlike the FDA's decision to deny a particular enforcement request in *Heckler v. Chaney*, 470 U.S. 821 (1985)—as presumptively reviewable.  Such policies are less frequent than individual enforcement decisions, likelier to involve legal as opposed to factual analysis, and more often accompanied by a public explanation that provides a focus for review.  This case is a perfect example.

II.  On the merits, Judge Bates correctly held that the Government failed to offer the reasoned explanation that the APA demands.  It is impossible to discern from the materials before the Court just what the Government regards as illegal about DACA or its collateral effects. And the Government failed to draw any rational

20

connection between its vague legal concerns and the action—rescinding DACA altogether—that it took. Accordingly, the Court should affirm Judge Bates' order vacating the rescission.

Although that judgment will leave the Government free to articulate its legal objection to DACA anew, there is no reason to think the Government necessarily will reach the same result. Insofar as the Government's legal concerns can be discerned, they appear to pertain not to DACA's policy of deferred action (*i.e.*, of enforcement forbearance and notice to the recipient of that forbearance), but instead to the benefits that deferred-action recipients may obtain as a consequence of other regulations. As the Government acknowledges, however, those benefits are distinct from both DACA in particular and deferred action in general. Accordingly, when the Government finally evaluates the issues here in a reasoned fashion, it will likely recognize that any perceived illegality can be cured *without* rescinding the DACA Memorandum and the deferred-action policy it adopted. Because the Government thought itself legally bound to take that step, however, it overlooked all other remedial possibilities.

III. The Court should not consider the Nielsen Memorandum for anything other than its attempt at explicating the Government's legal reasoning. Although the Government could have issued a new rescission decision on policy grounds after Judge Bates vacated the Duke Memorandum, it chose to double-down on defending Secretary Duke's decision instead. As a result of that choice, the Government may not defend its action

**AR4250**

21

on grounds other than those invoked by Secretary Duke. That rule is both well-settled and well-justified. In any event, the Nielsen Memorandum's new "policy" rationales could not justify DACA's rescission even if they were properly before the Court.

## ARGUMENT

## I.  THE DUKE MEMORANDUM IS REVIEWABLE.

This Court has "'long applied a strong presumption favoring judicial review of administrative action.'" *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (citation omitted). Rebutting this presumption ordinarily requires showing that a court "'would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Id.* (citation omitted). But the Government makes no attempt to show that here, and for good reason: The Duke Memorandum rests on legal reasoning that a court could readily review.[4]

Instead, the Government argues that the Duke Memorandum is analogous to the non-enforcement decision held presumptively unreviewable in *Chaney*. U.S. Br. 17-20. This argument fails for two independent reasons. First, an agency action predicated on the agency's own lack of authority—as DACA's rescission was here—is reviewable. Second, unlike *Chaney*, this case concerns a

---

[4] Though the Nielsen Memorandum's "policy" rationales are not properly before the Court, *see infra* Section III.A, if the Court nevertheless considers them, they relate to a general enforcement policy and are therefore reviewable for reasoned decision-making under the APA, *see infra* Sections I.B, III.B.

22

general enforcement policy, and such policies are presumptively reviewable.

### A. The Non-Discretionary Rescission of DACA Is Not Committed to Agency Discretion by Law.

1. Secretary Duke did not rescind DACA in an exercise of enforcement discretion. Rather, as she explained, the Attorney General made a "legal determination" that the policy was unlawful. *Regents* Pet. App. 116a. And as the Government agrees, that "determination … of law" was binding on her. 8 U.S.C. 1103(a)(1); *accord Regents* Pet. App. 122a-123a. The Government cannot seriously contend that Secretary Duke had discretion to maintain a policy that she was bound to treat as illegal.

Nonetheless, the Government argues that because Secretary Duke also "recounted … the [DAPA] litigation," quoted the Attorney General's prediction that courts would "likely" agree with him, and ultimately used the word "should" rather than "must," she made a freestanding, discretionary judgment of "litigation risk." U.S. Br. 26-27. That makes too much of too little.

First, had Secretary Duke perceived such discretion, one would expect to see an assessment of the costs of rescinding the policy weighed against the legal risk of maintaining it. But there is no such assessment in the memorandum or the administrative record. Indeed, when pressed in the D.C. Circuit to point to any language suggesting the agency relied on litigation risk, the Government had no answer. *See* Oral Arg. Recording 2:00-4:07 ("[Judge Griffith:] It's not there … It's the answer, it's an easy, it's not there. … [Government:] Okay.

**AR4252**

23

Let's assume that's true."), https://bit.ly/2kFWEqf.

Second, assessing "litigation risk" would have made little sense. Given the Attorney General's binding determination that the policy was unlawful, the only reason to consider "litigation risk" would be to assess whether the agency could get away with administering an unlawful policy—or perhaps instead, as Judge Bates observed, to lay a predicate for artificially "insulat[ing] [the legal decision] from judicial review." *NAACP* Pet. App. 40a.

Third, the Government's reading fails to distinguish between the decision *whether* to end DACA and the decision *how quickly* to end it. At most, Secretary Duke asserted discretion to devise an "orderly" process for "ending the program"—subject to the Attorney General's "review[] [of] the terms on which" she would do even that. *Regents* Pet. App. 116a. But there is no hint of discretion to preserve the DACA Memorandum (or, relatedly, to resolve any legal concerns by adjusting other features of the regulatory scheme while leaving the DACA Memorandum in place, *see infra* at 39-43).

Fourth, the Solicitor General's interpretation of the Duke Memorandum is inconsistent with the Administration's numerous statements to the public and to Congress, which asserted unambiguously that the Administration eliminated DACA because it was "unlawful and unconstitutional." *See supra* at 13-15.

Finally, while the statement that DACA would "likely" fail in court cannot plausibly be cast as a distinct rationale for the Government's decision, it was in any event a judgment expressly predicated on the Attorney

**AR4253**

24

General's legal determination, and so would not carry independent weight regardless. *See, e.g., Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 54-55 (1983) (invalidating rationale that was "expressly dependent on" another, invalid premise).

In short, the question before this Court is whether the decision the Government actually made and announced—that it was legally required to rescind DACA—is immune from judicial review.

2.   When an agency action simply gives effect to the agency's determination that it lacks discretion to do otherwise, nothing in the APA bars judicial review.  The APA precludes review "to the extent that … agency action is committed to agency discretion by law."  5 U.S.C. 701(a)(2).  But it is nonsensical to say that an agency's *disavowal* of its own discretion is "*committed* to agency discretion."  "To [that] extent," at least, the agency's action is plainly not committed to its unreviewable discretion.  *Cf. Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (holding that an agency's allocation of funds "to meet permissible statutory objectives" is unreviewable because "'[t]o [that] extent,' the decision to allocate funds 'is committed to agency discretion by law'" (brackets in original)).  No text, tradition, or principle weighs against such limited review.  And apart from its mistaken claims that *Chaney* or *ICC v. Bhd. of Locomotive Eng'rs ("BLE")*, 482 U.S. 270 (1987), settled the issue (*see infra* at 25-29), the Government does not even argue otherwise.  *See* U.S. Br. 23-26.

3.  Two principles of this Court's jurisprudence further confirm the propriety of judicial review when an

25

agency opts to disavow its discretion.

a. First, judicial review of agency action disclaiming discretion can only enhance that discretion—and so furthers the ends of Congress and the legitimate ends of the Executive Branch alike. When Congress confers authority on an agency, it "desire[s] the agency … to possess whatever degree of discretion the [statute] allows," *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 741 (1996), not some lesser degree. And when courts demand that an agency "exercise[] the discretion with which Congress has empowered it," they "affirm most emphatically the authority of the [agency]" itself. *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197 (1941).

b. Second, review in such cases is essential to the separation of powers and to clear lines of accountability. This Court has afforded agencies deference when they *exercise* discretion based on their sense of good policy, even when they resolve statutory ambiguities pertaining to the limits of their own authority. *See City of Arlington v. FCC*, 569 U.S. 290, 296 (2013). But the Court has never extended such deference—let alone insulation from all review—to cases in which the Government purports to *lack* discretion in light of what it claims to be inflexible legal commands. *See, e.g., Negusie v. Holder*, 555 U.S. 511, 523 (2009). To that extent, at least, courts "do not leave it to the agency to decide when it is in charge." *City of Arlington*, 569 U.S. at 327 (Roberts, C.J., dissenting).

An agency decision that it is *not* in charge—and that it therefore must take a particular action, however ill-advised or unpopular—poses special concerns. When an

26

agency makes a discretionary decision, its choice is reviewed "in the court of public opinion." *NAACP* Pet. App. 72a-73a. But when the Government claims instead that the law forced its hand, it shifts responsibility to Congress and the courts. Review in such cases is thus essential to ensuring that the Executive Branch "may escape political accountability or judicial review, but not both." *Id.* 73a. Put otherwise, the APA should be interpreted to ensure that a President "can[not] escape responsibility for his choices by pretending that they are not his own." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 497 (2010).

3. Neither *Chaney* nor *BLE* is to the contrary.

a. First, the Government mischaracterizes both the facts and the holding of *Chaney*. In that case, eight death-row inmates filed a petition "requesting that the FDA take various enforcement actions" to prevent Oklahoma and Texas from using certain drugs in their executions. 470 U.S. at 823. The agency "refused their request." *Id.*

Contrary to the Solicitor General's description, the FDA did not "reason[] that it lacked jurisdiction." U.S. Br. 17. Rather, the agency concluded that its "jurisdiction in the area was generally unclear" but "in any event should not be exercised" on policy grounds. *Chaney*, 470 U.S. at 824-25. The Court therefore framed the case as "present[ing] the question of the extent to which *a decision of an administrative agency to exercise its 'discretion'* not to undertake certain enforcement actions is subject to judicial review." *Id.* at 823 (emphasis added). And that is why *Chaney* reserved the question

27

of whether a non-enforcement decision would be review-able if it were "based solely on the belief that [the agency] lacks jurisdiction." *Id.* at 833 n.4.

In fact, *Chaney* hinted at the logical answer to that reserved question: The very existence of "[t]he statute *conferring* authority on the agency" might indicate that a *disavowal* of that same authority was not "'committed to agency discretion.'" *Id.* (emphasis added); *see also id.* at 833 ("Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers."). That answer makes sense, as none of the practical reasons favoring unreviewability in *Chaney* have any application to an agency's judgment that it lacks authority altogether. *See id.* at 831.

b. The Government's remaining argument—indeed, its principal argument—is that "whatever doubt *Chaney* left, the Court's subsequent decision in *BLE* resolved it." U.S. Br. 24. That vastly over-reads *BLE*.

*BLE* concerned an agency's denial of reconsideration. 482 U.S. at 278-79. When such a denial is based solely on a judgment that the prior decision was correct, the Court reasoned, allowing review of the refusal to reconsider would only circumvent time limits. *Id.* at 279-80. The Court made clear, however, that insofar as an agency denies reconsideration based on its assessment of new evidence or changed circumstances, the agency's decision *is* reviewable. *Id.* at 278. In its main analysis, therefore, *BLE* underscores that the reasons underlying a given agency action can determine whether (or to what extent) it is reviewable.

AR4257

28

The Government focuses instead on the Court's response to Justice Stevens' concurrence.  That separate opinion argued that a refusal to reconsider should be reviewable *whenever* it is based on an explicit analysis of the substantive law at issue.  The Court rejected the concurrence's sweeping premise "that if the agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." *Id.* at 283. "To demonstrate the falsity of that proposition," the Court explained, it was "enough" to offer a single counterexample: A prosecutor's "failure to prosecute" would be unreviewable even if based on his belief "that the law will not sustain a conviction." *Id.*  According to the Government, this riposte—which did not mention *Chaney*—resolved the important issue that *Chaney* left open. That is incorrect.

First, a criminal prosecutor's decision not to indict is so thoroughly insulated from judicial review that it is impossible to draw any lesson from *BLE*'s hypothetical broader than the one *BLE* itself drew.  The hypothetical shows that the presence of a reason "that courts are well qualified to consider," 482 U.S. at 283, does not necessarily establish reviewability.  But in the case of the *BLE* hypothetical, such an inference fails so clearly because of the longstanding rule against suits to compel criminal prosecutions.  As then-Judge Scalia—the author of *BLE*—had previously explained, the "discretion of [a] *criminal* prosecutor" who "deci[des] *not* to prosecute" has long been held "not merely ... *generally* unreviewable, but *entirely* so." *Chaney v. Heckler*, 718

29

F.2d 1174, 1195-96 & n.4 (D.C. Cir. 1983) (Scalia, J., dissenting) (some emphasis added; citations omitted), *rev'd*, 470 U.S. 821 (1985).  So, while the example sufficed to prove *BLE*'s point, it equally underscores that *BLE* did not take up the question posed in this case.  In particular, *BLE* did not address whether a court may review an agency's assertion that it would *violate* the law if it acted otherwise, let alone outside the criminal context, let alone when the contemplated review would not compel any enforcement action at all.

As for that question—the relevant one here—a different hypothetical is more illuminating.  Suppose that the agency in *BLE* had denied reconsideration not based on its view of the substantive labor law, but rather in the mistaken belief that its governing statute prohibited reopening proceedings to correct material errors.  Nothing in *BLE* suggests that erroneous abdication would have been accepted as unreviewable based on "the type of decision" (U.S. Br. 25) at issue.  "[G]iven the strangeness of that rule … [one] cannot think that the Court adopted it without any explanation."  *Cooper v. Harris*, 137 S. Ct. 1455, 1481 (2017).  And here, the Government's determination that DACA exceeded Secretary Napolitano's authority to "[e]stablish … enforcement policies and priorities," 6 U.S.C. 202(5), is just such a disavowal of the agency's own authority.[5]

---

[5] There is no dispute about this last point: As the Government said below, its legal rationale interpreted not "the substantive scope of the [INA]" but rather "the scope of [DHS's] own enforcement discretion."  Motion to Revise 9.

30

In effect, this understanding of section 701(a)(2) holds that, when it comes to an agency's claim of *unreviewable* discretion—as opposed to deference—the dissenters in *City of Arlington* had it right. That is, when an agency seeks exemption from all review of its legal judgment, there must at least be a "judicial determination of whether *the particular issue* was committed to agency discretion." *City of Arlington*, 569 U.S. at 306. In light of the APA's "basic presumption of judicial review," *Weyerhaeuser*, 139 S. Ct. at 370 (quotation marks omitted), there is no basis for concluding that Congress gave DHS unreviewable discretion to identify the legal limits of its own non-enforcement discretion. And it bears reiterating that the Government has not even attempted to conjure a reason why Congress would have made such a peculiar choice.

## B.  Additionally, General Enforcement Policies Are Not Committed to Agency Discretion by Law.

DACA's rescission is also reviewable for a second, independent reason:  It is a general enforcement policy, not an individualized enforcement decision. *Chaney* involved only the latter. And there are good reasons why general enforcement policies should not be added to the very short list of agency actions that are presumptively unreviewable.

1. *Chaney* concerned whether the Court could review an agency decision "not to undertake *certain enforcement actions*." 470 U.S. at 823 (emphasis added). In holding the FDA's decision unreviewable, the Court emphasized the various factors relevant to the exercise

31

of enforcement discretion in any particular case: "whether a violation has occurred"; "whether agency resources are best spent on *this* violation or another"; "whether *the particular enforcement action requested* best fits the agency's overall policies"; and whether the agency has the resources "to undertake *the action*." *Id.* at 831 (emphases added). The Court also referred throughout its opinion to a "refusal to institute proceedings" in a particular case, which it analogized to an individual prosecutor's decision "not to indict" a particular offender. *Id.* at 832; *id.* at 827-38.[6]

The Government nevertheless contends that *Chaney* involved a "programmatic determination" because the Government's *reasons* for declining to enforce could be applied to other cases that are relevantly similar. U.S. Br. 21-22. But that is true of any reason. What matters, for present purposes, is that the FDA did not set or announce any general policy governing a class of enforcement cases; it simply denied the petitions before it. In fact, one issue in *Chaney* was whether the FDA's decision was consistent with the agency's *existing* general rules and policy statements—a question that would make no sense if the FDA had revised its general policy in denying the petitions. *See* 470 U.S. at 826, 836.

2. The D.C. Circuit has thus long held that general

---

[6] Justice Brennan's concurrence underscored that the Court's holding was limited to the "[i]ndividual, isolated nonenforcement decisions" that "must be made by hundreds of agencies each day." 470 U.S. at 839 (Brennan, J., concurring).

32

enforcement policies, announced apart from any particular matter, are presumptively reviewable. *See Edison Elec. Inst. v. U.S. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993); *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994); *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998). As Judge Williams explained in *Crowley*, there are good reasons for distinguishing between a "single-shot" non-enforcement decision and a "general enforcement policy … articulated … in some form of universal policy statement." 37 F.3d at 676.

First, "expressions of broad enforcement policies are abstracted from the particular combinations of facts the agency would encounter in individual enforcement proceedings," and thus are "more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision." *Id.* Second, broad policy pronouncements pose the risk that the agency may be "abdicat[ing] … its statutory responsibilities," whereas one-off decisions, by their nature, do not raise the same concern. *Id.* at 677 (quotation marks omitted). Finally, "an agency will generally present a clearer (and more easily reviewable) statement of its reasons for acting when formally articulating a broadly applicable enforcement policy, whereas such statements in the context of individual decisions to forego enforcement tend to be cursory, ad hoc, or post hoc." *Id.*

This Court relied upon essentially the same reasoning in declining to extend *Chaney* to decisions not to

33

institute a rulemaking. *See Massachusetts v. EPA*, 549 U.S. 497, 527 (2007). Compared to the myriad ad hoc nonenforcement decisions that agency officials must make, refusals to initiate a rulemaking are "'less frequent, more apt to involve legal as opposed to factual analysis,'" and more often accompanied by a "'public explanation'" that provides a focus for review. *Id.* (citation omitted). In each of these respects, general enforcement policies are more like decisions to forgo rulemakings than they are like the particular non-enforcement decisions in *Chaney*.

   3.   Finally, this case is unlike *Chaney* in another significant respect. The individual non-enforcement decisions in *Chaney* were decisions *not* to act (and in response to petitions that the affected parties had no obvious procedural right to file). *See id.* Accordingly, after the FDA denied those petitions (which it equally could have ignored), everything stood just as if they had never been filed at all. In substance, then, the agency simply opted to do nothing. Indeed, the leading treatise understands *Chaney* as standing for the proposition "that agency inaction is subject to a presumption of unreviewability." 3 Kristin E. Hickman & Richard J. Pierce, *Administrative Law Treatise* § 19.7, at 1965-66 (6th ed. 2019). Here, by contrast, the Duke Memorandum is an affirmative policy statement that dramatically alters the status quo. The agency's action thus provides the "focus for judicial review," 470 U.S. at 832, that the non-enforcement decisions in *Chaney* did not. For this reason, too, the APA's ordinary presumption—that Congress did not set agencies free to make decisions of great

34

consequence without any judicial backstop—should pre-
vail here.[7]

## II. THE DUKE MEMORANDUM IS ARBITRARY AND CAPRICIOUS.

The D.C. Respondents agree with other Respond-
ents that DACA and all of its consequences are lawful.
But the Court need not reach that question to affirm.
This brief focuses instead on the path forged by Judge
Bates: the Administration's garbled explanation for its
legal determination fails the test of reasoned decision-
making.   Under this Court's longstanding precedent,
that is reason enough to vacate the action and leave the
agency free to try again if it wishes.  And that is no mere
formality here: If and when the Government articulates
what exactly it finds problematic, there will surely be
many solutions far short of the action it said it was com-
pelled to take.

### A.   The Duke Memorandum Offers No Reasoned Explanation for Rescinding the DACA Mem-orandum.

To validly rescind the DACA Memorandum, Secre-
tary Duke was required to "articulate[] 'a satisfactory
explanation' for [her] decision."  *Dep't of Commerce v.
New York*, 139 S. Ct. 2551, 2569 (2019) (quoting *State
Farm*, 463 U.S. at 43).  This requirement has two as-
pects.  First, the agency's explanation "must be set forth

---

[7] Although the Government makes an oblique appeal to 8 U.S.C.
1252(g), that argument fails for the reasons stated by the District
Court, *see NAACP* Pet. App. 19a-21a, and other Respondents.

**AR4264**

35

with such clarity as to be understandable," *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947), so that a court can proceed to "fulfill its duties" under the APA. *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655 (1990). Second, if the agency passes that threshold test, its explanation (together with the administrative record) must show that it "pursue[d] [its] goals reasonably," including by drawing a "'rational connection between the facts found and the choice made.'" *Dep't of Commerce*, 139 S. Ct. at 2569, 2576 (quoting *State Farm*, 463 U.S. at 43). Here, the Government's rescission decision fails at the first step. And to the extent that its reasoning can be understood, it fails at the second step as well.

1. First, the District Court correctly held that the Government "offer[ed] nothing even remotely approaching a considered legal assessment." *NAACP* Pet. App. 105a. Although the rescission decision plainly rested on a judgment that the DACA Memorandum was unlawful, that judgment is so ill-explained that this Court could not review it short of "guess[ing] at the theory underlying the agency's action." *Chenery*, 332 U.S. at 196-97.

a. Even if the Court searches for a coherent explanation of the Government's legal reasoning in the Attorney General's letter, the Duke Memorandum, *and* the relevant portions of the Nielsen Memorandum, it will not find one.[8] Begin with the Attorney General's letter,

---

[8] Although it is unnecessary to resolve the issue here, only the Attorney General's letter should actually be considered in this inquiry. The APA requires that the actual basis of the controlling judgment

**AR4265**

36

which stated his binding determination that the DACA Memorandum lacked "proper statutory authority" and was "unconstitutional." JA 877. That letter observed that the DAPA Memorandum was enjoined on "multiple legal grounds" and asserted, without any explanation, that the DACA Memorandum "has the same legal and constitutional defects that the courts recognized as to DAPA." JA 877-78.

This comparison to the Fifth Circuit's *Texas* decision is inscrutable. First, no court identified any "constitutional defect[] … as to DAPA." JA 878. And second, although one of the Fifth Circuit's two "legal grounds" for enjoining the DAPA Memorandum was a failure to complete notice-and-comment, *see supra* at 9, the Attorney General never mentioned that concern; Secretary Duke mentioned it at most obliquely, *see Regents* Pet. App. 114a; and both Secretary Nielsen and the Solicitor General ignored it. That leaves the comparison to *Texas* resting solely on the Fifth Circuit's holding that DAPA conflicted with the INA. But none of the agency documents offer any intelligible explanation of how the Government actually understands that holding.

According to one view—seemingly voiced at one point by Secretary Nielsen—the Fifth Circuit's holding "turned on the incompatibility of such a major non-enforcement policy with the INA's comprehensive

---

be "clearly disclosed," *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943), and here the controlling legal judgment was the Attorney General's. *Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (to warrant deference, an interpretation must "emanate from those actors … [who] make authoritative policy").

37

scheme." *Regents* Pet. App. 122a.  But the Fifth Circuit and State plaintiffs conceded the legality of a non-enforcement policy on DAPA's scale; they only took issue with the accompanying provision of so-called "lawful presence" and, to a lesser extent, work authorization. *See supra* at 9-11.  Given that disconnect, it is at least unclear whether the Government's position is actually that mere deferrals of enforcement action become unlawful when undertaken on too "major" a scale.  *Cf.* U.S. Br. 45-46 (not appearing to take that position).

Perhaps, then, the Government's legal objection is instead limited (as the Fifth Circuit's and the States' was) to the *affirmative benefits* that other regulations associate with a decision to defer action.  There is evidence for this interpretation, too.  *See Regents* Pet. App. 114a (Duke); *id.* 122a (Nielsen); JA 877-78 (Sessions).  But if these benefits underlie the alleged problem, the Government's position is only more obscure.  For one thing, and as discussed in detail below, the Government has never said why this would require rescinding the *DACA Memorandum* and thereby ending enforcement forbearance, as opposed to modifying the application of other regulations.  *See infra* at 39-43.

But even with respect to those other regulations, the Government has never said *which* benefits it does not believe it may lawfully confer or to whom.  The Government has not said, for example, whether it now believes that the regulation treating various classes of noncitizens as "lawfully present" "[f]or purposes of 8 U.S.C. 1611(b)(2) only" is invalid—or, perhaps, is invalid in

38

some of its myriad applications. Nor has the Government explained whether or to what extent it now believes the DHS work-authorization regulation is unlawful. *See supra* at 5. And, finally, if the problem is the *combination* of certain of these features—*i.e.*, numerical scale, "lawful presence" for certain purposes, and potential eligibility for work authorization—the Government has not said whether the alleged legal problem is triggered by any particular combination, nor has it made any attempt to explain "'[h]ow much [deferred action] is too much,'" *Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019).

b. In substance, then, all the Government has said is that it agrees with enough of the Fifth Circuit's reasoning to conclude that DACA is unlawful. Each of the Government's attempts at articulating *what* it actually agrees with, however, has yielded more questions than answers. There is an obvious reason for that: While the Administration is committed to terminating *DACA* on legal grounds, it does not wish to articulate a legal rule that would curtail the agency's future authority and cast a pall over decades-old regulations. Presumably that is also why the Government has not withdrawn and replaced the on-point, 33-page OLC opinion and replaced it with one tracking and explicating the Fifth Circuit's reasoning in *Texas*: If the Executive Branch is going to argue against its own power, it prefers to address the issue only in the cryptic fashion of the three agency documents here. *Cf. NAACP* Pet. App. 104a (describing the Government's decision to "ignore[] the 2014 OLC Memo

39

laying out a comprehensive framework" as "mystifying").[9]

In any event, the Government's failure to meaningfully explain itself precludes effective judicial review at this time.  As this Court has said: "We must know what a decision means before the duty becomes ours to say whether it is right or wrong."  *Chenery*, 332 U.S. at 197 (citation omitted).  The District Court correctly vacated the rescission decision on this ground alone.

2.  If the Court nonetheless decides to reconstruct the agency's reasoning as best it can and review that reasoning on its merits, the Court should hold that the agency failed to draw a "'rational connection between the facts found and the choice made'" and "entirely failed to consider an important aspect of the problem."  *State Farm*, 463 U.S. at 43.

Although the contours of the Government's position are far from clear, it seems the Government concluded that the DACA Memorandum was unlawful because it

---

[9] The same dynamic is playing out in the pending litigation challenging DACA.  *See Texas v. Nielsen*, 1:18-cv-68 (S.D. Tex. filed May 1, 2018).  In its initial answer, the Government agreed that DACA is unlawful but declined to admit or deny specific allegations.  Only after the district court struck that pleading as deficient did the Government articulate its actual position on the legal theory advanced to challenge DACA.  It then "aver[red] that benefits tied to a DACA grant are the result of pre-existing regulations or other guidance, not the conferral of deferred action itself," and "that DACA is a policy permitting prosecutorial discretion, not a program conferring benefits."  Corrected Answer, ¶¶ 61, 150, 329, *Texas v. Nielsen*, 1:18-cv-68 (S.D. Tex. Mar. 6, 2019), Dkt. 370.

40

not only resulted in a large number of decisions to defer action, but also triggered the further consequences that presently attend *all* decisions to defer action. *See supra* at 36. But even assuming (for the sake of argument) that some conjunction of these policies was indeed unlawful, that in no way explains the judgment that the DACA Memorandum itself was unlawful, or that the policy of allowing childhood-arrivals to apply for enforcement forbearance therefore had to be rescinded.

As the parties agree, the DACA Memorandum established a "nonenforcement policy" that "provide[s] deferred action to 'certain young people who were brought to this country as children.'" U.S. Br. 5 (quoting *Regents* Pet. App. 97a-101a). And as the parties also agree, "deferred action" is "a practice in which the Secretary exercises enforcement discretion to notify an alien of the agency's decision to forbear from seeking the alien's removal for a designated period." *Id.* at 4. "Deferred action" has carried that same meaning—*i.e.*, a deferral of enforcement action—from its inception. *See supra* at 4. But, as noted above, neither the Fifth Circuit nor the States that challenged the DAPA Memorandum have raised any objection to the large-scale provision of deferred action in that sense. *See supra* at 9-11. In other words, the legality of the sole action described within the four corners of the DACA Memorandum is essentially undisputed.

Furthermore, the Government agrees that a decision to defer enforcement action by itself need not inherently result in any affirmative benefits. Instead, any benefits flowing from a decision to defer action are the result of

**AR4270**

41

separate regulations that post-date the practice of deferred action, pre-date DACA, and can be modified wholly independent of both. *See* U.S. Br. 5; *supra* at 5-6, 38 n.9.

Thus, the Attorney General and DHS failed to draw any rational connection between their apparent judgment that DACA recipients could not be treated as "lawfully present" for certain purposes (and/or made eligible for work authorization), on the one hand, and their conclusion that the Government could not lawfully maintain its policy of enforcement forbearance, on the other. At the very least, their failure to consider whether their objection was actually properly aimed at the DACA Memorandum's guidance for the exercise of enforcement forbearance—or instead at certain other policies they acknowledge to be separate—means that they "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

To be sure, there is a natural explanation for the Government's failure to consider that its legal objection was not properly directed at the *DACA Memorandum*: The Fifth Circuit had enjoined the *DAPA Memorandum*. But if that explains the Attorney General's or DHS's oversight, it only underscores the shallowness of their analysis. As explained above, the DAPA case was litigated on the premise that the underlying deferred-action policy and its collateral effects (which allegedly included an unbounded grant of "lawful presence") rose or fell together—a premise seemingly invited by the DAPA Memorandum itself. *See supra* at 8-11. There was no reason for the Government to take the same

42

stance in its internal assessment of DACA. And still worse, the agency documents give no hint that the Government even realized the choice it was making.

3. Far from being a volley in a predictable "'ping-pong game,'" *Time, Inc. v. U.S. Postal Serv.*, 667 F.2d 329, 335 (2d Cir. 1981), the decision to vacate and remand here carries immense real-world importance. The APA requires an ill-considered decision to be reconsidered in part because "proceeding on the right path may require or at least permit the agency to make qualifications and exceptions that the wrong one would not." Henry J. Friendly, Chenery *Revisited*, 1969 Duke L.J. 199, 223. Indeed, in *State Farm* itself, this Court unanimously set aside an agency decision that opted for "rescission" of an existing policy but "gave no consideration whatever to modifying" the policy to redress the agency's own concern. 463 U.S. at 46-50. Here, if and when the Government develops a cogent theory of *what* it believes to be unlawful, it will be faced with numerous remedial paths that it has so far failed to consider (or, perhaps, perceive).

Most notably, if the Government believes that the conjunction of enforcement forbearance and some form of "lawful presence" is unlawful—the principal submission of the State plaintiffs in *Texas*, *see supra* at 11— DHS could modify its policies regarding "lawful presence."[10]  For example, the Government could decide

_____

[10] Alternatively, if the Government ultimately decides that its objection is based on work authorization, it would presumably consider parallel modifications to the relevant 1987 regulation. *See*

43

that, on reflection, deferred-action recipients are not "lawfully present" in the sense relevant to one or another statute. *See supra* at 5-6. Or, if it preferred a more surgical approach, it could carve out those who obtain deferred action pursuant to the DACA Memorandum. In fact, DACA recipients are already defined as not "lawfully present" for purposes of the Affordable Care Act. *See* 45 C.F.R. 152.2(8). Nor does the Government treat them as "lawfully residing in the United States" for purposes of Medicaid. *See* Letter from Cindy Mann to State Health Officials (Aug. 28, 2012), https://bit.ly/2kJZgn5. But because the Government has never settled on a determinate legal theory, it has never even considered whether its concerns could be resolved by adjusting the regulation to reflect its current view of "lawful presence" (whatever that view is) or following these DACA-specific examples.

Of course, Respondents do not favor any of these modifications—but that is beside the point. Hundreds of thousands of childhood-arrivals would benefit incalculably if the Government merely continued the DACA Memorandum's assurances against removal, let alone their eligibility for work authorization. The Government has never explained why even its own concerns preclude preserving DACA to that extent—particularly in light of the substantial disruptive effects of outright rescission for DACA recipients and their families, schools, and employers. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016) ("'[S]erious reliance interests

---

*supra* at 5.

44

… must be taken into account.'").  Accordingly, it is vital for this Court to enforce the APA's requirement of reasoned decision-making and thereby prompt the Government to finally consider whether it is "entirely sure the evil [it sees] calls for any remedy, let alone the drastic one [it] ha[s] chosen."  Friendly, *supra*, at 209.[11]

## B.   The Solicitor General's Arguments Do Not Explain Why DACA Is Unlawful.

The Solicitor General contends that, even if the Government gave an "inadequate explanation" at the agency level, this Court should uphold the rescission decision on the ground that "DACA is unlawful."  U.S. Br. 51; *see id.* at 43-50.  But the Solicitor General's attack on DACA's legality fails for essentially the same reasons that the Government's prior explanations were inadequate.  If anything, the Solicitor General's brief only underscores that the Department of Justice and DHS *still* have not come to any considered position regarding the legality of large-scale deferred-action policies, the legality of the regulations that associate collateral benefits with deferred-action decisions, or the relationship between the two.

---

[11] The same explanatory deficiencies dispose of the Government's remarkable argument (U.S. Br. 50-51) that the Executive Branch's legal views could justify its action even if they are wrong.  Even if that premise were true, *but see Marbury v. Madison*, 5 U.S. (1 Cranch.) 137, 177 (1803), the Government does not dispute that the APA's requirement of reasoned explanation would apply all the same.  Here, the absence of a reasoned explanation precludes a judgment that the Government was "wrong but reasonable" in believing itself bound to rescind the DACA Memorandum.

45

1.  First, the Solicitor General's account of the Fifth Circuit's reasoning in *Texas* "is like Hamlet without the prince." *Cooper*, 137 S. Ct. at 1496 (Alito, J., dissenting in part).  The Solicitor General extracts "four reasons" from the Fifth Circuit's opinion but, through artfully truncated quotations, manages to avoid any mention of "lawful presence"—or, for the most part, work authorization.  *Compare* U.S. Br. 33-36, *with supra* at 9-10 (describing Fifth Circuit's actual reasoning).  This oddity appears to reflect the more basic predicament in which the Government finds itself.  On the one hand, the Attorney General and DHS pinned their objection to DACA to the Fifth Circuit's decision, and the Solicitor General needs to defend their doing so.  But on the other hand, the Government remains committed to its longstanding (and correct) position that the benefits that concerned the Fifth Circuit "are the result of pre-existing regulations or other guidance, not the conferral of deferred action itself." Corrected Answer, ¶ 61, *Texas v. Nielsen*, 1:18-cv-68 (S.D. Tex. Mar. 6, 2019), Dkt. 370; *see* U.S. Br. 4-5.  And if that is so, these benefits could not explain why a deferred-action policy is itself unlawful or must be rescinded.

Rather than engaging with this tension, the Solicitor General papers it over.  By describing the Fifth Circuit's decision in generic terms—as concerned with "deferred action and associated benefits," or "categories of aliens of vast economic and political significance"—he avoids grappling with the actual legal foundations of the "associated benefits" that gave rise to the alleged "vast economic and political significance."  U.S. Br. at 34, 36

AR4275

46

(quotation marks omitted). But as a result of this evasion, he does not articulate any serious reason for inferring from the *Texas* decision—which rested on lawful presence and work authorization—that DACA's policy of enforcement forbearance is unlawful.[12]

2. When the Solicitor General turns to articulating his *own* reasons for finding DACA unlawful, the Government's position becomes murkier still. *See id.* 43-50. What DHS may not do, he says, is "maintain a [1] categorical deferred-action policy [2] affirmatively sanctioning the ongoing violation of federal law by [3] up to 1.7 million aliens to whom [4] Congress has repeatedly declined to extend immigration relief." *Id.* at 43-44.

Initially, two of these conditions are clear make-weights. The Solicitor General never mentions the "categorical" criterion again and does not explain why the DHS Secretary is not permitted to limit the room for subjective whims and personal preferences by setting consistent, agency-wide criteria for the exercise of non-enforcement discretion—while mandating individualized review of all genuinely case-specific factors. In fact, the Solicitor General lauds such general policies. *See id.* 22; *see also infra* at 57. And the fact that Congress has not passed the DREAM Act—also ignored in the balance of the Solicitor General's discussion—proves

---

[12] One reason the Government remains firmly (and correctly) committed to distinguishing deferred action from its collateral effects is that, if the two were collapsed, every decision to grant or deny deferred action would presumably be subject to judicial review—just as Texas claims regarding DACA and its rescission. *See* Brief Amici Curiae of Texas et al. 31.

47

nothing. "[U]nsuccessful attempts at legislation" are un-illuminating. *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 382 n.11 (1969). But even if that rule were otherwise, surely the more illuminating "unsuccessful" congressional action was the failure of legislation *to end DACA*. *See* JA 828 n.9. That speaks more directly to the policy at issue here than does the failure of legislation that would have granted childhood-arrivals full-blown legal status, a status that DACA does not provide.

The core of the Solicitor General's argument, then, is captured by the other two conditions: DHS may not "affirmatively sanction[]" or "facilitate[]" the continuing presence of too large a number of noncitizens who lack lawful immigration status. U.S. Br. 43-44. But, just as with his discussion of *Texas*, the Solicitor General is studiously vague about what this means. He does not contend that deferred action *itself* "affirmatively sanctions" anyone's presence or is for that reason unlawful. To the contrary, he acknowledges that "[a] grant of deferred action does not confer lawful immigration status or provide any defense to removal." *Id.* at 5. And he does not appear to contend that mere enforcement forbearance becomes unlawful when it is conducted on too large a scale or pursuant to an affirmative application process. *See id.* at 44-45. That position, as earlier noted, would go far beyond what even the Fifth Circuit and the State plaintiffs ever claimed, *see supra* at 36—and it would have sweeping ramifications for other non-enforcement policies, well beyond the immigration context, that the Government is predictably unwilling to invite.

If only by process of elimination, then, the Solicitor

48

General's objection seems to be to the collateral conse-
quences that currently attend deferred-action decisions,
at least as applied to large-scale deferred-action policies.
*See* U.S. Br. 44-45 (suggesting that these consequences
make a policy more than "interstitial"). But once again,
the Solicitor General says virtually nothing about where
these benefits come from. He thus fails to explain why
they make the DACA Memorandum unlawful, rather
than (at most) call for thoughtful consideration of the
separate regulations and policies establishing "a proce-
dure to make [deferred-action recipients] eligible for
additional benefits." *Id.* at 45.

3. In any event, this Court should not take up the
delicate merits issues posed by the legality of deferred-
action policies or associated benefits based on briefing
that is cursory at best, and obfuscatory at worst. Those
legal issues implicate a complex statutory and regula-
tory scheme that governs the lives and livelihoods of
millions of people, across numerous categories, in varied
ways. Yet the relevant statutes and regulations make
barely a cameo appearance in the Government's brief.
That is all the more reason simply to hold that the Gov-
ernment failed to offer a reasoned explanation of its
decision to rescind the DACA Memorandum. *See supra*
Section II.A. If the Court goes further, however, it
should hold that the DACA Memorandum itself is law-
ful—and leave questions pertaining to other agency
regulations to be addressed if and when the need arises.

49

### III. THE NIELSEN MEMORANDUM'S "POLICY" RATIONALES DO NOT RENDER THE DUKE MEMORANDUM EITHER UNREVIEWABLE OR LAWFUL.

Despite having rescinded DACA on legal grounds, the Government now invokes a "number of reasons" of enforcement policy offered by Secretary Nielsen. U.S. Br. 16. The Court should not permit this change in tune. After the District Court vacated the Duke Memorandum, the Government chose *not* to take a new agency action rescinding DACA—as the court's order had contemplated—but instead to insist that Judge Bates should un-vacate the Duke Memorandum and uphold that prior agency action after all. That was no accident: As the Nielsen Memorandum acknowledged, this approach allowed the Government to "continue to seek appellate review" of decisions holding Secretary Duke's action unlawful—rather than mooting those cases and facing a second round of litigation that would begin anew. *Regents* Pet. App. 121a. But having chosen to defend the validity of Secretary Duke's action, the Government cannot resort to hypothetical policy rationales invented by Secretary Nielsen nine months later. Finally, even if Secretary Nielsen's new rationales were properly before the Court, they would still fail arbitrary-and-capricious review.

### A. The Nielsen Memorandum's Non-Legal Rationales Should Be Disregarded.

1. To determine whether an agency action was arbitrary or capricious, a court must "evaluate the agency's rationale *at the time of decision*." *LTV*, 496 U.S. at 654

**AR4279**

50

(emphasis added).  Contrary to the Solicitor General's suggestion (U.S. Br. 29), that rule does not merely prohibit new explanations by the agency's lawyers.  Rather, in a series of cases, this Court has directly addressed—and strictly limited—an agency's *own* authority to augment its explanation of a prior action after the fact.

As this Court recently explained, "a court is ordinarily limited to evaluating the agency's contemporaneous explanation" of its action.  *Dep't of Commerce*, 139 S. Ct. at 2573.  That rule does have an exception—but it does not help the Government.  In particular, if "there was such failure to explain administrative action as to frustrate effective judicial review," *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973), a court may "remand to the agency for a fuller explanation of the agency's reasoning *at the time of the agency action*," *LTV*, 496 U.S. at 654 (emphasis added).  Such a remand allows after-the-fact explanation of the agency's *original* reasons, but it does not afford an opportunity to propose *new* reasons.  Whether new material is obtained from the agency via in-court affidavits or via a "remand … for a fuller explanation," it must "shed light on the Secretary's reasoning *at the time [s]he made the decision*."  *Id.* at 654 (emphasis added); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971).

This Court has already explained how these principles apply to a case like this one.  If an agency gives a "contemporaneous explanation" of its action that, however "curt," "indicate[s] the determinative reason for the final action taken," then any subsequent attempt to better *explain* that prior agency action may not venture

**AR4280**

51

beyond the "determinative reason" already given. *Camp*, 411 U.S. at 143; *see id.* (applying this rule to the Comptroller of Currency's "finding that a new bank was an uneconomic venture"). The Court has thus made it "abundantly clear" that "when there is a contemporaneous explanation of the agency decision, the validity of that action must 'stand or fall on the propriety of that finding,'" *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978) (quoting *Camp*, 411 U.S. at 143), not some other finding devised later.

2. This rule is not only well-settled, but well-justified. For starters, the text of the APA requires it. As a matter of plain English, whether a decision was "arbitrary" or "capricious" depends on whether "the actual choice made … was based on a consideration of the relevant factors." *Overton Park*, 401 U.S. at 416. If it was not, then the decision was necessarily an "arbitrary" (or "capricious") one. It makes no difference whether the decisionmaker (or her successor) later comes to think that she happened upon the right bottom-line.

Beyond the text, this Court's longstanding rule against upholding old actions based on new reasons serves three central values of administrative law—each exemplified by this case.

a. First, the rule serves "the principle of agency accountability." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 643 (1986) (plurality opinion). "The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer … reasons that can be scrutinized by courts *and the interested public*."

52

*Dep't of Commerce*, 139 S. Ct. at 2575-76 (emphasis added). That core objective would be frustrated if the agency could act on one basis and present that rationale to the public, only to have the action upheld based on different reasons it articulates in a court filing months or years later.

This case is a perfect example. The Administration went to great lengths to present DACA's rescission as a "legal decision" that was "for Congress to fix." *See supra* at 13-15. If the Administration now wishes to rescind DACA on other grounds—with different political implications—it should be required to take a new agency action that the public will understand to take the place of the last one. Although the Government objects that a new action would come at the cost of "reset[ting] this protracted litigation," *NAACP* Cert. Reply Br. 4, that is, in part, the point. Such a "reset" would make clear to the interested public that the Government has made a distinct decision worthy of equal attention and scrutiny as the first. By contrast, if the *original* action is now upheld, many will understandably conclude that the "legal decision" advertised to the public was vindicated by the courts.

b. Just as importantly, the APA's bar on *post hoc* rationalizations ensures that agency decisions are guided by fair and considered judgment. This Court has recognized that agencies (not just their lawyers) will naturally be drawn to rationalize their prior actions. The fact that a position is "'advanced by an agency seeking to defend past agency action against attack'" is thus a "reason to suspect that [it] 'does not reflect the agency's fair and

53

considered judgment.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (citations omitted); *see Kisor*, 139 S. Ct. at 2417 (same). By requiring that the agency make a new decision if it wishes to rest on a new reason, the traditional rule mitigates the gravitational pull of the existing decision on the agency's thinking.

Once again, this case exemplifies the logic of the rule. As a practical matter, Secretary Nielsen's assessment of the reasons for and against rescinding DACA was surely colored by the fact that she was actively litigating the merits of her agency's existing decision to rescind DACA. That is not to accuse the Executive Branch of "[ir]regularity" (U.S. Br. 30), but simply to recognize that agency officials are not immune to human psychology. When an agency takes a new action, by contrast, it necessarily abandons the hope (and temptation) of vindicating its last one in further litigation. And here again, the Government's candid concession that it did not wish "to reset this protracted litigation by issuing a 'new' independent agency decision," *NAACP* Cert. Reply Brief at 4, proves the point. New reasons given in the midst of "protracted litigation" that the agency is eager to resolve are likely to represent a "'convenient litigating position,'" *Christopher*, 567 U.S. at 155, rather than a considered judgment.

Indeed, the Nielsen Memorandum poses this familiar worry with unusual sharpness. Given Secretary Nielsen's acknowledgment that the Attorney General's legal determination remained binding on her, *see Regents* Pet. App. 122a-123a, her assertion that she also favored

54

DACA's rescission as a matter of policy lacked any real-world consequence.  The only reason even to undertake such a hypothetical exercise of discretion was to seek an advantage in this litigation.  Tellingly, the new policy rationales were not supported by any new administrative record, nor grounded anywhere in the prior administrative record—and yet, in Secretary Nielsen's asserted judgment, each made for a "separate and independently sufficient" reason why the agency had been right all along.  *Id.* 122a.  This Court's ordinary concerns about an agency's *post hoc* rationalizations apply with particular force to this kind of litigation-oriented thought experiment.

c.  Finally, the traditional bar on new reasons for old actions also promotes "the orderly functioning of the process of review."  *Chenery*, 318 U.S. at 94.  "[T]he courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review."  *Id.*  And they cannot exercise their duty in an orderly fashion if the "considerations underlying the action under review," *id.*, are a perpetual moving target.  In fact, an agency anticipating litigation would have perverse incentives: Rather than crafting the best possible defense for its action at the outset, the agency instead would be best served by promulgating a trial-balloon rationale, waiting until it is sued, and then crafting reasons to circumvent the challengers' arguments.  That not only enlists courts in a game of Whac-a-Mole, but also further undermines the values of accountable and considered decision-making.

Just as with those other values, this case illustrates

55

the disorder threatened by the Government's approach. The District Court rendered summary judgment and vacated the Duke Memorandum in April 2018. Whatever new reasons for rescinding DACA the agency later adduced, they could not warrant "revising" a prior judgment that was in no way erroneous. *See* Motion to Revise at 19. Meanwhile, the Government also sought to interject and rely upon the new memorandum in two pending appeals of district court decisions rendered before the memorandum even existed. Orderly review under the APA is better achieved by hewing to this Court's simple and venerable rule: An agency action may not be upheld based on *post hoc* rationalizations.

3. Because the Duke Memorandum may not be upheld based on new reasons, the Government's choice to "stand by its September 2017 rescission decision," *supra* at 17, places it in a self-imposed bind. The Duke Memorandum rested solely on a judgment of legal invalidity. *See supra* at 21-23. Accordingly, insofar as the Nielsen Memorandum advances any other arguments, they are not properly at issue here. At the same time, the Nielsen Memorandum's actual legal explanation remains inadequate. *See supra* at 35-40. And the Duke Memorandum thus remains both reviewable and arbitrary and capricious. That resolves this case.[13]

---

[13] Contrary to the Solicitor General's assertion (U.S. Br. 29-30), the District Court agreed with the critical aspects of this analysis. As the court explained, insofar as Secretary Nielsen had recast the agency's decision as a "policy" choice, she had impermissibly "alter[ed]," rather than "elaborat[ed] on," Secretary Duke's reasoning.

56

To be sure, even when a prior agency action was arbitrary, this Court has occasionally found it unnecessary to remand because the outcome of future proceedings was wholly foreordained. *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (plurality opinion). That is not so here. As explained above, DHS still has not yet reckoned with the range of options for remedying the asserted legal problem that has so far driven its decision-making. *See supra* at 41-42. And any new decision to rescind the DACA Memorandum on policy grounds would implicate delicate "considerations of politics, the legislative process, [and] public relations." *Dep't of Commerce*, 139 S. Ct. at 2573. Indeed, the President continues to assert that he supports relief for DACA recipients—and that his Administration rescinded the existing policy not based on substantive disagreement, but because it is "totally illegal." *Supra* at 18. Thus, it is impossible for the Solicitor General, former-Secretary Nielsen, or anyone else to predict how the President and now-Secretary McAleenan will respond to a decision affirming the judgment below.

## B. Even if the Nielsen Memorandum's Non-Legal Rationales Are Considered, They Do Not Justify Upholding the Duke Memorandum.

1. The District Court correctly held that, even if the Nielsen Memorandum's "policy" arguments were to be

---

*NAACP* Pet. App. 101a; *see id.* at 95a-98a. True, the court treated this conclusion only as establishing reviewability, rather than as rendering the non-legal assertions completely irrelevant. But the court nevertheless proceeded to correctly reject the new arguments on the merits. *See id.* at 98a-103a; *infra* Section III.B.

57

considered, they should not be permitted to preclude judicial review—particularly in light of "the broader context of this litigation." *NAACP* Pet. App. 95a-100a; *supra* n.13; *see also Overton Park*, 401 U.S. at 420 (explaining that, even in the limited circumstances when an agency's augmented explanation may be considered, it "must be viewed critically"). That judgment was, at a minimum, well within the court's discretion in resolving a motion for reconsideration. Moreover, because the rescission of DACA is a change in a general enforcement policy, it is presumptively reviewable regardless of whether it rests on an asserted lack of discretion. *See supra* Section I.B. Like other discretionary judgments, Secretary Nielsen's "policy" rationales can at least be reviewed to determine whether DHS "exercise[d] its discretion in a reasoned manner." *Judulang v. Holder*, 565 U.S. 42, 53 (2011).

2. Each of the new arguments adduced by Secretary Nielsen is arbitrary and capricious.

a. Secretary Nielsen said she had "serious doubts" about the legality of the DACA Memorandum. *Regents* Pet. App. 123a. But the arbitrariness of the Government's legal explanation, *see supra* Section II.A, is fatal regardless of whether it is offered in support of a claim of "doubt" or a bottom-line conclusion. Likewise, the suggestion that the agency rescinded DACA outright for fear of repeating the *Texas* case rests on the same non sequitur discussed above. *See supra* at 38-41, 44-45.

b. Secretary Nielsen's purported "reasons of enforcement policy" fare no better. One asserted reason is that "DHS should enforce the policies reflected in the

**AR4287**

58

laws adopted by Congress." *Regents* Pet. App. 123a. But the law most on point, 6 U.S.C. 202(5), affirmatively *authorizes* DHS to set enforcement policies and priorities—and does so against a backdrop of numerous past deferred-action policies that are not different from DACA in any respect noted by Secretary Nielsen. The closest Secretary Nielsen came to identifying a contrary legislative "policy" was to draw an inference from the non-passage of the DREAM Act, but that inference fails for the reasons given above. *See supra* at 46.

Secretary Nielsen also asserted that DHS "should only exercise its prosecutorial discretion" free of agency-wide criteria that "tilt the scales" in favor of deferring action in certain cases. *Regents* Pet. App. 124a. But, again, Congress made the DHS Secretary "responsible" for "[e]stablishing … enforcement policies and priorities," 6 U.S.C. 202(5)—and for exercising "control, direction, and supervision" over DHS employees, 8 U.S.C. 1103(a)(2) and (3). An unexplained preference for abdicating those responsibilities and leaving employees to act on whim is irrational. For that matter, the Government itself argues that "'supervisory control over [individual] discretion is necessary to avoid arbitrariness.'" U.S. Br. 22 (citation omitted). In any event, Secretary Nielsen did not offer any evidence that the residual case-by-case review prescribed by the DACA Memorandum had actually proved inadequate.[14] Nor

---

[14] In fact, the evidence establishes that discretionary review of DACA applications is far from perfunctory. *See* Brief Amici Curiae of *Texas v. United States* Defendant-Intervenors DACA Recipients and State of New Jersey.

59

did she explain why, if it had, she could not "simply direct her employees to implement it properly." *NAACP* Pet. App. 100a.

Secretary Nielsen also suggested that DHS must "project a message" about DHS's intent to enforce the law, given that "thousands of minor aliens have illegally crossed … our border in recent years." *Regents* Pet. App. 124a. But nothing in the record supports the claim that DACA—which applies "only to those individuals who have lived in the United States since 2007," *NAACP* Pet. App. 102a—has any causal relationship to minors crossing the border. Secretary Nielsen failed even to acknowledge that the Government previously took a contrary position. *See* U.S. Br. at 47, *United States v. Texas*, No. 15-674 (U.S. Mar. 1, 2016), 2016 WL 835758. And, tellingly, rather than cite the administrative record to support the point, the Solicitor General cites a law-review article that the agency apparently never considered. U.S. Br. 41.

3.a.   Finally, an additional defect cuts across the whole of the Nielsen Memorandum. As the District Court explained, Secretary Nielsen "fail[ed] to engage meaningfully with the reliance interests and other countervailing factors that weigh against" rescission. *NAACP* Pet. App. 106a. In fact, she did "not even identify what those interests are," *id.* 107a, even though they plainly bear on the remedial choice facing the Government, *see supra* at 41-43. Instead, contrary to this Court's admonition that *agencies* must carefully consider the effects of rescinding an existing policy, Secretary Nielsen simply opined that any such matters

**AR4289**

60

"would best be considered by Congress." *Regents* Pet. App. 125a. She thus gave no hint that she considered the equitable considerations identified in the DACA Memorandum, the number of people who had obtained deferred action under DACA, the life-changing significance of those deferrals, or the derivative impacts of rescission on families, schools, churches, communities, and employers. The administrative record does not even include any information on these subjects.

If Secretary Nielsen's discussion of costs and reliance suffices here, this Court's instruction that "'[i]t would be arbitrary and capricious to ignore such matters,'" *Perez v. Mortgage Bankers Association*, 135 S. Ct. 1199, 1209 (2015) (citation omitted), will be reduced to a box-checking exercise. When a *court's* remedial order offers only "minimal reasoning" and purports to have evaluated only "unspecified costs," this Court lacks "confidence that [it] adequately grappled with the interests on both sides" and is unable to perform "even deferential review." *North Carolina v. Covington*, 137 S. Ct. 1624, 1626 (2017) (*per curiam*). An agency charged with decisions of the magnitude at issue here should be held to no less a standard.

b. Finally, Secretary Nielsen's cursory discussion of rescission's disruptive effects also severely undermines her claims of severability. Although Secretary Nielsen asserted that each of her three rationales was "independently sufficient" as an affirmative reason to rescind DACA, *Regents* Pet. App. 122a, she did not attempt to weigh each of those reasons independently against the interests on the anti-rescission side of the balance. *See*

**AR4290**

61

*id.* 125a (stating only that reliance interests "do not outweigh the questionable legality of the policy *and* other reasons for ending the policy discussed above" (emphasis added)). Thus, one cannot conclude that Secretary Nielsen meaningfully considered whether each of her grounds would independently justify rescission. The absence of any such analysis is less surprising when one remembers that Secretary Nielsen was engaged in a counterfactual assessment of how she would exercise discretion that she believed that she did not have. *See supra* at 52-53. As this Court has observed, "'legal lapses and violations occur, and especially so when they have no consequence.'" *Weyerhaeuser*, 139 S. Ct. at 370 (citation omitted).

## CONCLUSION

The District Court's judgment should be affirmed.

62

Respectfully submitted,

BENJAMIN M. EIDELSON
1525 Massachusetts Ave.
Cambridge, MA 02138
(617) 495-4846

*Counsel for Respondents*
*The Trustees of Princeton*
*University, Microsoft*
*Corporation, and Maria De*
*La Cruz Perales Sanchez*

CYNTHIA L. RANDALL
MICROSOFT CORPORATION
One Microsoft Way
Redmond, WA 98052
(425) 538-3176

*Counsel for Respondent*
*Microsoft Corporation*

LINDSAY C. HARRISON
    *Counsel of Record*
IAN HEATH GERSHENGORN
THOMAS J. PERRELLI
MATTHEW E. PRICE
ISHAN K. BHABHA
JENNER & BLOCK LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com

*Counsel for Respondents*
*The Trustees of Princeton*
*University, Microsoft*
*Corporation, and Maria De*
*La Cruz Perales Sanchez*

RAMONA E. ROMERO
WESLEY MARKHAM
PRINCETON UNIVERSITY
New South Building
Fourth Floor
Princeton, NJ 08544
(609) 258-2500

*Counsel for Respondent The*
*Trustees of Princeton*
*University*

**AR4292**

63

JOSEPH M. SELLERS
JULIE S. SELESNICK
COHEN MILSTEIN SELLERS
  & TOLL PLLC
1100 NEW YORK AVE., NW
FIFTH FLOOR
WASHINGTON, DC 20005
(202) 408-4600

*Counsel for Respondents
NAACP; American
Federation of Teachers, AFL-
CIO; and United Food and
Commercial Workers
International Union, AFL-
CIO, CLC*

PETER J. FORD
UNITED FOOD &
  COMMERCIAL WORKERS
  INTERNATIONAL UNION,
  AFL-CIO, CLC
1775 K Street. N.W.
Washington, DC 20006
(202) 223-3111

*Counsel for Respondent
United Food & Commercial
Workers International
Union, AFL-CIO, CLC*

BRADFORD M. BERRY
NAACP
4805 MOUNT HOPE DRIVE
BALTIMORE, MD 21215
(410) 580-5797

*Counsel for Respondent
NAACP*

DAVID J. STROM
AMERICAN FEDERATION
  OF TEACHERS, AFL-CIO
555 New Jersey Ave. N.W.
Washington, DC
(202) 393-7472

*Counsel for Respondent
American Federation of
Teachers, AFL-CIO*

**AR4293**

Nos. 18-587, 18-588, 18-589

# In the Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, et al.,
*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al.,
*Respondents.*

DONALD J. TRUMP, President of the United States, et al.,
*Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, et al.,
*Respondents.*

KEVIN K. MCALEENAN,
Acting Secretary of Homeland Security, et al.,
*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, et al.,
*Respondents.*

ON WRITS OF CERTIORARI TO THE UNITED STATES COURTS OF APPEALS
FOR THE NINTH, DISTRICT OF COLUMBIA, AND SECOND CIRCUITS

**BRIEF FOR THE STATES OF NEW YORK, MASSACHUSETTS,
WASHINGTON, COLORADO, CONNECTICUT, DELAWARE,
HAWAI'I, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, AND
VIRGINIA, AND THE DISTRICT OF COLUMBIA,
RESPONDENTS IN NO. 18-589**

LETITIA JAMES
  *Attorney General of New York*
BARBARA D. UNDERWOOD*
  *Solicitor General*
ANISHA S. DASGUPTA
  *Deputy Solicitor General*
ANDREW W. AMEND
  *Assistant Deputy Solicitor General*
DAVID S. FRANKEL
  *Assistant Solicitor General*
28 Liberty Street
New York, New York 10005
(212) 416-8020
barbara.underwood@ag.ny.gov
*(Additional counsel on signature pages)*   *Counsel of Record

**AR4294**

*i*

## COUNTERSTATEMENT OF
## QUESTIONS PRESENTED

1. Whether petitioners' September 2017 decision to terminate Deferred Action for Childhood Arrivals (DACA) is judicially reviewable.

2. Whether petitioners' decision to terminate DACA was lawful.

AR4295

*ii*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................1

STATEMENT .......................................................3

    A.   Factual Background .....................................3

          1.  Deferred Action for Childhood Arrivals (DACA) .....................................3

          2.  Defendants' Termination of DACA .......7

    B.   Procedural Background...........................10

          1.  This suit in the Eastern District of New York ..........................................10

          2.  Parallel proceedings in other federal courts ....................................................11

SUMMARY OF ARGUMENT ..................................13

ARGUMENT............................................................16

I.   The Termination of DACA Is Judicially Reviewable........................................................16

    A.   Petitioners Chose to Base the Termination Solely on a Legal Conclusion About Their Authority....................................................17

          1.  Petitioners expressly rested the termination on a conclusion that DACA was unlawful. .......................................17

          2.  Petitioners cannot retroactively inject new considerations into their termination decision. ..........................20

    B.   The APA Permits Review of an Agency's Conclusion that Its Authorizing Statutes Forbid a Particular Action. ......................22

**AR4296**

*iii*

Page

　　　1.　An agency's determination about the limits of its authority is not a discretionary non-enforcement decision. ................................................ 23

　　　2.　Petitioners misconstrue *Brotherhood of Locomotive Engineers* ....................... 26

　　　3.　8 U.S.C. § 1252(g) does not bar review here. .......................................... 29

II.　Petitioners' Termination of DACA Was Arbitrary and Capricious. ............................... 30

　　A.　Petitioners' Asserted Conclusion That DACA Was Illegal Rested on Substantial Errors of Fact and Law. ........ 31

　　　1.　Petitioners erroneously assumed that DACA prevented agency officials from exercising discretion. ........................... 31

　　　2.　Petitioners purported to rely on the holding of a case that contained no such holding. ................................... 34

　　B.　Petitioners' Evaluation of DACA Omitted Essential Factors. ....................... 35

　　　1.　Petitioners failed to address significant differences between DACA and DAPA. ............................... 36

　　　2.　Petitioners failed to explain their change in position or to consider the significant interests affected. ............. 39

　　C.　Petitioners' Defective Legal Analysis Led to a Flawed Legal Conclusion. ........... 43

AR4297

*iv*

|  |  | **Page** |
|---|---|---|
| D. | This Court Cannot Uphold Petitioners' Justifications for the Termination Without a Full Administrative Record. | 51 |
| III. | The States Have Sufficiently Stated an Equal Protection Claim. | 53 |
|  | CONCLUSION | 57 |

AR4298

*v*

## TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Arizona Dream Act Coal. v. Brewer*, 855 F.3d
    957 (9th Cir. 2017) .................................................. 4

*Arizona v. United States*, 567 U.S. 387 (2012)... 38,44,50

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ......... 6

*AT&T Info. Sys., Inc. v. General Servs. Admin.*,
    810 F.2d 1233 (D.C. Cir. 1987) ............................ 20

*Bowen v. Michigan Acad. of Family Physicians*,
    476 U.S. 667 (1986) .............................................. 22

*Camp v. Pitts*, 411 U.S. 138 (1973) .......................... 20

*Casa de Md. v. U.S. Dep't of Homeland Security*,
    924 F.3d 684 (4th Cir. 2019) ..................... 13,19,20

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) .............................................. 23

*Crowley Caribbean Transp., Inc. v. Pena*, 37
    F.3d 671 (D.C. Cir. 1994) .................................... 29

*Department of Commerce v. New York*, 139 S.
    Ct. 2551 (2019) ............................................ passim

*Department of Transp. v. Association of Am.
    R.R.*, 135 S. Ct. 1225 (2015)................................. 26

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct.
    2117 (2016) ...................................................... 40,41

*FCC v. Fox Television Stations*, 556 U.S. 502
    (2009) ............................................................. 25,40

*Food Mktg. Inst. v. Interstate Commerce
    Comm'n*, 587 F.2d 1285 (D.C. Cir. 1978)............. 22

*Heckler v. Chaney*, 470 U.S. 821 (1985)............ passim

*In re United States*, 138 S. Ct. 443 (2017) ............... 52

*INS v. St. Cyr*, 533 U.S. 289 (2001) .......................... 22

**AR4299**

*vi*

| Cases | Page(s) |
|---|---|

*Interstate Commerce Commission v. Brotherhood of Locomotive Engineers*, 482 U.S. 270 (1987) ............................................. 27,28

*Jama v. Immigration & Customs Enf't*, 543 U.S. 335 (2005) ........................................................ 44

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) .......... 30

*Judulang v. Holder*, 565 U.S. 42 (2011) ................. 28

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950) ................................................... 44

*Kucana v. Holder*, 558 U.S. 233 (2010).................... 22

*Lennon v. INS*, 527 F.2d 187 (1975) ........................ 46

*Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645 (2015) ................................................................. 26

*Martin v. Occupational Safety & Health Review Commission*, 499 U.S. 144 (1991) ....................... 21

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............ 28

*Montana Air Chapter No. 29, Ass'n of Civilian Technicians, Inc. v. Federal Labor Relations Auth.*, 898 F.2d 753 (9th Cir. 1990).................... 29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............... passim

*NAACP v. Trump*, 321 F. Supp. 3d 143 (D.D.C. 2018) ............................................................. 12,13

*Reno v. American-Arab Anti-Discrimination Comm. (AADC)*, 525 U.S. 471 (1999).......... passim

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943).......... 21,35

*Staub v. Proctor Hosp.*, 562 U.S. 411 (2011) ........... 56

*Texas v. United States*, 328 F. Supp. 3d 662 (S.D. Tex. 2018)............................................. 32,33

**AR4300**

*vii*

**Cases**                                    **Page(s)**

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ............................................ passim

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252 (1977) .......... 53,54

*Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788 (D.C. Cir. 1984) .................................... 51

*Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*, 139 S. Ct. 361 (2018) .......... 16,23,24

*Winter v. Natural Resources Def. Council, Inc.*, 555 U.S. 7 (2008) .................................. 30

**Laws**

5 U.S.C. § 701(a)(2) .......................................... passim

6 U.S.C. § 202(5) .................................. 45,50

8 U.S.C.
    § 1103(a)(1) .................................. 17,35,45
    § 1154 ..................................................... 4
    § 1182(a)(9)(B)(iii)(I) ............................ 38
    § 1252 ................................................ 10,30
    § 1324a(h)(3) ................................. 4,47,50
    § 1611(b)(2) ............................................ 47

DHS Appropriations Act, 2010, Pub. L. No. 111-83, 123 Stat. 2142 (2009) ...................................... 5

DHS Appropriations Act, 2015 Pub. L. No. 114-4, 129 Stat. 39 (2015) ............................................ 5

**Regulations**

8 C.F.R. § 1.3(a)(4)(vi) ................................. 47

8 C.F.R. § 274a.12(c)(14) ........................................ 3,46

44 Fed. Reg. 10,369 (Feb. 20, 1979) .......................... 47

46 Fed. Reg. 25,079 (May 5, 1981) ............................ 47

**AR4301**

*viii*

| **Miscellaneous Authorities** | **Page(s)** |
| --- | --- |

David A. Graham, *Trump Says Democrats Want Immigrants to Infest the U.S.*, The Atlantic (Jun. 19, 2018), https://tinyurl.com/yarcu95m....55

H.R. Rep. No. 111-157 (2009).....................................5

Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times (May 16, 2018), https://tinyurl.com/ybl97zr6 ................................55

New Oxford American Dictionary (3d ed. 2010) ......18

Sam Bernsen, INS Gen. Counsel, *Leave to Labor*, 52 No. 35 Interpreter Releases 291 (Sep. 1975) ..........................................................47

*See* U.S. Citizenship & Immigration Servs., Number of Form I-821-D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake and Case Status, Fiscal Year 2012-2017 (Sept. 30, 2017), https://tinyurl.com/y87kbxrq ......................7

U.S. Citizenship & Immigration Servs., Approximate Active DACA Recipients (Aug. 31, 2018), https://tinyurl.com/y2zd8odn ...............6

**AR4302**

## INTRODUCTION

In September 2017, the Acting Secretary of the Department of Homeland Security (DHS) and the Attorney General (who are petitioners here) announced that Deferred Action for Childhood Arrivals (DACA) was unlawful and was being terminated. DACA is a framework for processing requests for deferred action—a form of discretionary forbearance from removal—for certain persons who arrived in the United States as children.

The decision to terminate DACA was a dramatic policy reversal that threatened devastating consequences for hundreds of thousands of people, and serious harm to many thousands of employers and the economies and institutions of every State. Yet petitioners offered just one cursory paragraph to justify their legal conclusion. That paragraph contained a demonstrably incorrect factual assumption and a glaring misstatement of law. Moreover, the proffered administrative record, if taken at face value, reveals that petitioners did not undertake even a basic investigation of whether DACA operated in the way they assumed. At every turn, petitioners failed to meet the basic requirements of rational decisionmaking. And because petitioners asserted that the law gave them no discretion to retain DACA, they cannot now evade judicial review by arguing that the termination was committed to their discretion by law.

2

As governments themselves, the state respondents here ("States")[1] well understand that a new administration needs latitude to change discretionary policies. But the States also understand that there are consequences to how a new administration makes those changes. Although petitioners could have chosen to terminate DACA as a discretionary policy decision, they chose instead to declare that the law compelled the termination. Petitioners' decision to proceed based on a pronouncement about what the law required takes their action out of the realm of unreviewable enforcement discretion and into the realm of judicial review. "[A]n official cannot claim that the law ties her hands while at the same time denying the courts' power to unbind her. She may escape political accountability or judicial review, but not both." (*NAACP* Pet. App. 73a.)

The States filed suit in the Eastern District of New York to hold petitioners accountable for the insufficiently and incorrectly reasoned determination that DACA was unlawful, and to protect the States' residents, institutions, fiscs, and economies from the harm threatened by the federal government's termination decision. Since 2012, well over 150,000 residents of our States have used DACA to obtain deferred action. Those individuals have come out of the shadows and become productive members of their communities in the only country many have known as home. In deciding to terminate DACA, petitioners

---

[1] The state respondent coalition here includes the States of New York, Massachusetts, Washington, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Iowa, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, and Virginia, and the District of Columbia.

3

ignored the many ways in which individuals, families, institutions, and States have relied on the policy; and petitioners ignored the reasoning of a prior Secretary and Attorney General who concluded that DACA was lawful. Petitioners' legal determination is reviewable, it is arbitrary and capricious, and it should be vacated.

## STATEMENT

### A.  Factual Background

#### 1.  Deferred Action for Childhood Arrivals (DACA)

There are many more undocumented immigrants in the United States than federal immigration authorities have the means to remove. To focus enforcement resources, DHS and its predecessors have a longstanding practice of "giv[ing] some cases lower priority" by "grant[ing] deferred action." 8 C.F.R. § 274a.12(c)(14). A grant of deferred action memorializes the Executive's decision not to proceed against a potentially removable person for a specified period of time. *Reno v. American-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 484 (1999). Under federal regulations that have been in place for decades, deferred action recipients may apply for privileges like work authorization. *See* 8 C.F.R. § 274a.12(c)(14) (work authorization). (Joint App'x (J.A.) 797, 799 (memorandum of the U.S. Department of Justice, Office of Legal Counsel (OLC) ("OLC Mem.").)

Deferred action has been "a regular practice" of the Executive Branch for decades, "for humanitarian reasons or simply for its own convenience." *AADC*, 525 U.S. at 483-84. The Supreme Court has approved

**AR4305**

4

the practice, *id.*, and Congress has both recognized the existence of deferred action and confirmed the DHS Secretary's authority to make deferred action recipients eligible for work authorization, *see* 8 U.S.C. § 1154 (deferred action); 8 U.S.C. § 1324a(h)(3) (work authorization).

On various occasions since the 1950s, DHS and its predecessors have found it expedient to make deferred action and similar forms of discretionary relief from removal "available to certain classes of aliens." (J.A. 822 (OLC Mem.).) Past policies of this type include the 1977 Silva Letterholders program, under which 250,000 nationals of certain countries obtained stays of removal. *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 968 n.2 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1279 (2018). Similarly, the Family Fairness Program introduced under the Reagan administration—and expanded under the first Bush administration—"deferred the deportation of 1.5 million family members of noncitizens who were legalized through the Immigration Reform and Control Act." *Id.*

In June 2012, DHS announced that it was creating DACA to provide a channel for processing deferred action requests from persons who arrived in the United States as children and met certain other threshold eligibility criteria. (*Regents* Pet. App. 97a-101a.) DHS explained that DACA was intended to help DHS "ensure that [its] enforcement resources" are expended on the serious criminals that Congress

**AR4306**

5

directed DHS to prioritize for removal,[2] rather than on "low priority cases." (*Regents* Pet. App. 98a.)

To be eligible for DACA, a person must have arrived in the United States under the age of sixteen, continuously resided here between 2007 and 2012, not yet attained the age of thirty, and satisfied certain educational or military service requirements. The person must not have been convicted of a felony, a significant misdemeanor, or multiple misdemeanors, and must not otherwise pose a threat to national security or public safety. (*Regents* Pet. App. 98a.) As DHS explained when announcing the DACA policy, "prosecutorial discretion" is "especially justified" with respect to such people, many of whom "have already contributed to our country in significant ways." (*Regents* Pet. App. 99a.) The memorandum emphasized, however, that no individual could receive deferred action through DACA without first passing a back-ground check, and that all DACA requests "are to be decided on a case by case basis." (*Regents* Pet. App. 99a.) Individuals granted deferred action under DACA receive forbearance from removal for renewable two-year periods revocable at any time. Under pre-existing statutory and regulatory provisions, DACA recipients may apply for work authorization and for permission to travel outside the country ("advance parole"). (*See Regents* Pet. App. 100a-101a.)

From June 2012 until September 2017, about 800,000 individuals relied on DACA to obtain deferred

---

[2] *See, e.g.,* DHS Appropriations Act 2010, Pub. L. No. 111-83, 123 Stat. 2142 (2009); H.R. Rep. No. 111-157, at 8 (2009); *see also* DHS Appropriations Act, 2015, Pub. L. No. 114-4, 129 Stat. 39, 43 (2015).

6

action and employment authorization; in September 2017, there were about 700,000 active recipients, including over 150,000 residents of the States.[3] DACA enabled these recipients to pursue higher education, secure employment, and create and run businesses. (*Batalla Vidal* CA2 J.A. 2129-2213.) It enabled the States to employ DACA recipients with special skills, tax the recipients' income and purchases, and collect tuition from recipients enrolled at public colleges and universities. (*Batalla Vidal* CA2 J.A. 2239-2258, 2266-2298, 3754-3757, 3774-3794, 3956-3965.)

Several legal challenges to DACA were brought before September 2017, and all failed. In each case, the federal government defended the legality of the policy, including through amicus curiae participation. *See, e.g.*, *Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015); Br. for United States as Amicus Curiae, *Arizona Dream Act Coal. v. Brewer*, No. 15-15307 (9th Cir. Aug. 28, 2015), ECF No. 62. OLC likewise explained in a published opinion that DACA was legally sound so long as immigration officials "retained discretion to evaluate each application on an individualized basis." (J.A. 827 n.8.)

In 2015, Texas and several other States brought a suit challenging DHS's decision to create a new deferred action policy (Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA)) and to make certain changes to DACA. *See Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam). The *Texas* district court entered a preliminary

---

[3] (*See NAACP* Pet. App. 5a; J.A. 996, 998.) *See also* U.S. Citizenship & Immigration Servs., Approximate Active DACA Recipients (Aug. 31, 2018).

7

injunction enjoining the implementation of DAPA and the changes to DACA—neither of which had yet gone into effect—based on its conclusion that the plaintiffs were likely to succeed on the procedural claim they brought under the Administrative Procedure Act (APA). A divided panel of the Fifth Circuit affirmed on both procedural and substantive APA grounds. 809 F.3d at 146. Neither court addressed the *Texas* plaintiffs' constitutional claims. This Court summarily affirmed by an equally divided court. 136 S. Ct. 2271.

The federal government maintained DACA after the preliminary injunction against DAPA, and into the new administration, continuing to accept more than 400,000 new and renewal DACA applications.[4] In February 2017, DHS rescinded certain other immigration policies, but expressly left DAPA and DACA intact. (J.A. 857.) In mid-June 2017, DHS rescinded DAPA, which had never gone into effect due to the injunction; DHS again expressly declined to disturb DACA. (J.A. 868.)

## 2.  Defendants' Termination of DACA

In late June 2017, the *Texas* plaintiffs wrote to Attorney General Sessions stating that they would amend the complaint in their still-pending DAPA case to include a challenge to DACA unless the federal government agreed by September 5 to rescind DACA. (J.A. 872-874.) The agency officials tasked with determining the fate of DACA decided in an August

---

[4] *See* U.S. Citizenship & Immigration Servs., Number of Form I-821-D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake and Case Status, Fiscal Year 2012-2017 (Sept. 30, 2017).

8

24, 2017 meeting that DACA "is unlawful and will be ended"; they agreed that "DOJ will send a memorandum to DHS outlining the legal reasons the DACA program is unlawful," after which DHS would end the program. Principals Comm., Summary of Conclusions (filed in *Make the Road N.Y. v. United States DHS*, No. 18-cv-2445 (E.D.N.Y. Aug. 14, 2019), ECF No. 63-1, at 209).

On September 4, Attorney General Sessions sent a four-paragraph letter to the Acting Secretary of DHS, Elaine Duke, advising that DHS "should rescind" DACA because DACA lacked "statutory authority," was "unconstitutional," and had been implemented "after Congress' repeated rejection of proposed legislation that would have accomplished a similar result." (J.A. 877.) The Attorney General's legal analysis consisted of a single paragraph in which he asserted that DACA "has the same legal and constitutional defects that the courts recognized as to DAPA," and would likely meet the same fate in the "potentially imminent litigation" threatened by the *Texas* plaintiffs. (J.A. 878.) The Attorney General advised that "[i]n light of the costs and burdens that will be imposed on DHS" in implementing a rescission, "DHS should consider an orderly and efficient winddown process." (J.A. 878.) The letter did not describe the basis for any of those conclusions beyond a general citation to the *Texas* opinions, which did not consider DAPA's constitutionality and recognized significant distinctions between DAPA and DACA. *See Texas*, 809 F.3d at 172-74.

On September 5, Attorney General Sessions announced the termination of DACA at a press conference, and Acting Secretary Duke issued a memorandum formally terminating DACA. (J.A. 999-

**AR4310**

9

1004; *Regents* Pet. App. 111a-119a.)  The termination memorandum quoted the Attorney General's September 4 letter and then stated that "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings" and the Attorney General's letter, "it is clear" that DACA should be terminated. (*Regents* Pet. App. 117a.) Like the Attorney General's letter, the Acting Secretary's memorandum did not address or acknowledge the reasons that DHS and the U.S. Department of Justice (DOJ) had previously given to the public for concluding that DACA was lawful, the benefits of DACA, or the myriad costs and harms that terminating DACA would inflict on recipients and the public. The only potential costs that the Acting Secretary's memorandum mentioned were the unspecified "administrative complexities" referenced by the Sessions letter. (*Regents* Pet. App. 116a.) Moreover, although Acting Secretary Duke stated that she had been unable to identify any instances of her agency denying a DACA application on discretionary grounds, petitioners now admit that DHS does exercise case-specific discretion in determining whether to grant a DACA request from an applicant who meets the threshold criteria. (*Regents* Pet. App. 112a-113a n.1; J.A. 1010.) (See *infra* at 32-33.)

In the termination memorandum, the Acting Secretary announced that DHS would reject all new DACA applications "filed after the date of this memorandum," and would accept renewal applications only until October 5, and only from individuals whose current deferred action status would expire on or before March 5, 2018. (*Regents* Pet. App. 117a-118a.)

**AR4311**

10

## B. Procedural Background

### 1. This suit in the Eastern District of New York

Sixteen States and the District of Columbia filed this suit in the United States District Court for the Eastern District of New York on September 7, 2017, alleging (among other things) that the termination of DACA was arbitrary and capricious under the APA, and violated equal protection under the Fifth Amendment's Due Process Clause. (*See* J.A. 782, 784.) Petitioners proffered an extremely limited administrative record to the district court, consisting solely of the "materials that [they] unilaterally decide[d] to present to the court, rather than the record upon which the agency made its decision." Order at 2, *In re Nielsen*, No. 17-3345 (2d Cir. Dec. 27, 2017), ECF No. 171. The district court found the record incomplete, but on petitioners' request for a writ of mandamus, the court of appeals stayed petitioners' document-production obligations pending the district court's resolution of "issues of jurisdiction and justiciability." Order, *In re Duke*, No. 17-3345 (2d Cir. Oct. 24, 2017), ECF No. 41.

The district court then rejected petitioners' arguments that judicial review was barred by either the APA, 5 U.S.C. § 701(a)(2), or the Immigration and Nationality Act (INA), 8 U.S.C. § 1252(g). The court determined that the States had standing to challenge the termination of DACA based on their proprietary interests as employers of DACA recipients and as operators of state-run colleges and universities that employed and enrolled DACA recipients. (*Batalla Vidal* Pet. App. 46a-49a.)

**AR4312**

11

In February 2018, the district court entered a preliminary injunction requiring petitioners to continue processing DACA renewal applications based on its determination that petitioners' decision to terminate DACA was likely arbitrary and capricious, and that the other preliminary injunction factors weighed strongly in respondents' favor. (*See Batalla Vidal* Pet. App. 126a.) The district court concluded that the termination would irreparably harm the States as employers and providers of public benefits (*Batalla Vidal* Pet. App. 121a-122a), and that a nationwide injunction was warranted to fully protect the state parties, who employed and admitted persons across the country into their "public hospitals, schools, and universities" (*Batalla Vidal* Pet. App. 128a).

### 2. Parallel proceedings in other federal courts

Concurrently with this suit, three other plaintiff groups have been litigating challenges to the termination of DACA in other federal courts. In *Regents of the University of California v. U.S. Department of Homeland Security*, a coalition including individuals, state and local governments, and the University of California challenged the termination of DACA in the Northern District of California. That district court reached conclusions similar to those of the district court in *Batalla Vidal*: it identified the same administrative record as deficient, rejected petitioners' threshold arguments that would bar review, determined that the termination likely violated the APA, and issued a preliminary injunction that is coextensive with the New York court's preliminary injunction. (*Regents* Pet. App. 25a-26a, 41a-42a, 66a.) On appeal, the Ninth

12

Circuit affirmed that preliminary injunction, holding that petitioners violated the APA in terminating DACA based on "an erroneous view of what the law required." (*Regents* Supp. Pet. App. 57a.)

In *NAACP v. Trump*, a plaintiff coalition including NAACP, Microsoft, and Princeton University challenged the termination of DACA in the District of Columbia. Like the district court here, the D.C. district court determined that defendants' September 2017 termination of DACA was "reviewable and unlawful because it was based chiefly on a 'virtually unexplained' conclusion that DACA was unlawful." *NAACP*, 321 F. Supp. 3d 143, 147 (D.D.C. 2018). (*See NAACP* Pet. App. 73a). Rather than immediately vacate the flawed action, the district court stayed the decision to allow DHS ninety days to "better explain its view that DACA is unlawful," or to "issue[] a new decision rescinding DACA." (*NAACP* Pet. App. 74a, 76a). DHS chose to write an explanatory memorandum rather than to issue a new decision, and in June 2018, Secretary Kirstjen Nielsen (Acting Secretary Duke's successor) submitted to the court a short memorandum that "reflect[ed Nielsen's] understanding of the Duke memorandum." (*Regents* Pet. App. 121a.) Noting that like her predecessor she was statutorily "bound by" the Attorney General's earlier conclusion that DACA was unlawful, Secretary Nielsen declared that she "concur[red] with and decline[d] to disturb" Acting Secretary Duke's decision. (*Regents* Pet. App. 122a, 123a, 126a.) The D.C. district court held that the new memorandum failed to cure the defects in the termination decision, because although Secretary Nielsen's memorandum "purports to offer further explanation for DHS's decision to rescind DACA, it fails to elaborate meaningfully on

**AR4314**

13

the agency's primary rationale for its decision: the judgment that the policy was unlawful and unconstitutional." (*NAACP* Pet. App. 81a.) The district court issued final judgment in plaintiffs' favor on the APA claims, but stayed pending appeal the aspects of its decision mandating broader relief than the injunctions in New York and California. *NAACP*, 321 F. Supp. 3d at 147. The court did not reach the constitutional claims.

Another plaintiff group challenged the termination of DACA in district court in Maryland. After the district court declined to enjoin the termination of DACA, the Fourth Circuit reversed, holding that the termination decision was reviewable and vacating it as unlawful under the APA. *Casa de Md. v. U.S. Dep't of Homeland Security*, 924 F.3d 684, 706 (4th Cir. 2019).

On June 28, 2019, this Court granted certiorari in *Regents*, and granted certiorari before judgment in *Batalla Vidal* and *NAACP*, where the Second and D.C. Circuits had heard oral argument on petitioners' appeals, but had not yet ruled. The Court consolidated these three actions here. The federal government's petition for certiorari in *Casa de Maryland* (No. 18-1469), filed well after the other three petitions, is still pending.

## SUMMARY OF ARGUMENT

I. Petitioners' September 2017 termination of DACA is judicially reviewable. Petitioners announced to the public that they lacked authority to maintain DACA and were therefore compelled to terminate it. They cannot avail themselves of the APA's exception for decisions committed to agency discretion because

**AR4315**

14

they did not purport to be exercising any discretion when they terminated DACA; instead, they declared that they lacked authority to maintain DACA and were therefore compelled to terminate it. Petitioners cannot use Secretary Nielsen's June 2018 memorandum to retroactively insert other considerations into their 2017 decision.

II. The APA requires vacatur of petitioners' September 2017 termination decision. Petitioners' decisional documents fail every test of reasoned decision-making: they contain mistakes of fact and law, and fail to address important and material considerations. For example, although the purported absence of case-by-case discretion was central to petitioners' conclusion that DACA was invalid, petitioners' proffered administrative record suggests that petitioners did not consider a single piece of data, review a single guidance document, or hear from a single employee about whether DHS was actually exercising discretion in processing DACA applications. Indeed, evidence produced in this and other litigation shows that DHS officials in fact exercise such discretion under DACA and that even a rudimentary investigation by petitioners would have revealed that fact.

Separately, petitioners made a glaring legal error when stating that DACA possessed the same *constitutional* defects that the *Texas* courts had attributed to DAPA; no court has ever found DAPA unconstitutional. Petitioners failed to address significant differences between DACA and DAPA, despite the Fifth Circuit's explicit recognition of those differences in *Texas*. Petitioners likewise failed to explain their major course change on the legality of DACA. Nor did they take steps to ascertain the massive costs

15

and harms that the termination would inflict on hundreds of thousands of people, many thousands of employers, and the economies and institutions of every State.

Petitioners' defective analysis also yielded a flawed conclusion. Contrary to petitioners' arguments, DACA is lawful. No one disputes that DHS's broad authority to administer the immigration laws and set enforcement priorities includes the discretion to grant deferred action for humanitarian reasons. And DACA recipients' characteristics weigh strongly in favor of deferred action under well-recognized criteria: all DACA recipients arrived in this country as children, have strong roots in their U.S. communities, and have not engaged in serious criminal conduct. Petitioners' claims that DACA was too large and consequential to be implemented without specific congressional approval overlooks that the availability of work authorization—DACA's most significant economic impact—is supported by a express grant of statutory authority. In sum, Congress has not barred DHS from exercising its broad enforcement discretion to grant deferred action to an exceptionally sympathetic, law-abiding, and productive group of individuals who may yet be given the right to stay.

In all events, this Court cannot uphold DACA's termination because the administrative record proffered by petitioners remains incomplete. Crucial questions about petitioners' decisional process remain unanswered, including what steps petitioners took to investigate how DACA operates and what information those steps revealed.

III. Certain respondents in both New York and California (including the States here) pleaded equal

16

protection claims that were correctly sustained against motions to dismiss, and await further development in the trial courts. The lower courts rightly recognized the sufficiency of respondents' allegations concerning the overwhelming disparate impact of DACA's termination on Latinos from Mexico; irregularities in petitioners' decision-making process; and expressions of animus by the President, who admitted his involvement in the termination.

## ARGUMENT

## I.  The Termination of DACA Is Judicially Reviewable.

Because the APA creates a "strong presumption in favor of judicial review of agency action," this Court has given a narrow reading to 5 U.S.C. § 701(a)(2)'s exception to reviewability for actions committed to agency discretion. *See Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018); *accord Department of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019). The Court has restricted § 701(a)(2)'s exception to circumstances where an action is committed to agency discretion by statute or by a tradition of unreviewability. *Department of Commerce*, 139 S. Ct. at 2568. DHS's announcement that the INA prohibited it from exercising discretion is not within either category.

17

**A. Petitioners Chose to Base the Termination Solely on a Legal Conclusion About Their Authority.**

**1. Petitioners expressly rested the termination on a conclusion that DACA was unlawful.**

According to the September 2017 documents announcing the termination of DACA, petitioners based their action on a legal conclusion that DACA was unlawful. Attorney General Sessions declared in a letter to Acting Secretary Duke that DACA constituted "an open-ended circumvention of immigration laws" that was "unconstitutional" and "without proper statutory authority." (J.A. 877; *see* J.A. 999.) He further opined that DACA was unlikely to survive judicial review because it possessed "the same legal and constitutional defects that the courts recognized as to DAPA." (J.A. 878.) The day after receiving that letter, the Acting Secretary issued a memorandum terminating DACA on the basis of the Attorney General's "legal determination" that DACA was invalid. (*Regents* Pet. App. 111a-112a, 116a.) After describing the *Texas* courts' holdings in striking down DAPA and then quoting the Attorney General's observation that DACA suffered the same legal defects, the Acting Secretary declared that "it is clear that the June 15, 2012 DACA program should be terminated." (*Regents* Pet. App. 116a-117a.)

Petitioners admit that DHS adopted the Attorney General's view that DACA is "not just legally questionable but indeed unlawful." (*E.g.*, Br. 43.) Indeed, the Attorney General's legal determination was "controlling" on DHS as a matter of law. 8 U.S.C.

18

§ 1103(a)(1). Secretary Nielsen's subsequent memorandum thus conceded that Nielsen and Duke were statutorily "bound by" the Attorney General's determination that DACA was unlawful. (*Regents* Pet. App. 123a.) Any subsequent Secretary will be too, unless the Attorney General's determination is administratively or judicially set aside.

In contending that Acting Secretary Duke was nonetheless exercising discretion, petitioners focus on the Acting Secretary's statement that she "should"—rather than "must"—terminate DACA. (*See* Br. 27-28.) But the word "should" is commonly "used to indicate obligation, duty, or correctness." *Should*, New Oxford American Dictionary (3d ed. 2010). The term therefore simply reflects the Acting Secretary's view that DACA's legal deficiencies obligated her to terminate the policy. The decisional documents lack any textual support for petitioners' assertions that the Acting Secretary harbored "serious doubts" about DACA's lawfulness or viewed DACA's legality as "highly questionable," separate and apart from the Attorney General's binding legal conclusion. (Br. 26-28, 33.) Grafting equivocal language onto the Attorney General's unequivocal conclusion does not change the fact that petitioners chose to base the termination on the conclusion that DHS lacked legal authority to promulgate or maintain DACA. (*See NAACP* Pet. App. 41a-42, 98a.)

The decisional documents likewise contain no support for petitioners' claim (Br.26-27) that they based the termination partly on concerns about litigation risk. The Acting Secretary never expressly identified such concerns, including in her discussion of

**AR4320**

19

the *Texas* litigation.[5] Nor can that concern be read into the Attorney General's statement that DACA would likely meet the same fate as DAPA. (*See* Br. 27.) That statement was not offered as "an independent reason for rescinding DACA," but rather as the Attorney General's view of the "natural consequence of DACA's supposed illegality." (*Regents* Supp. Pet. App. 38a.)

"Nowhere in the administrative record did the Attorney General or the agency consider whether defending the program in court would (or would not) be worth the litigation risk." (*Regents* Pet. App. 56a; *see also Batalla Vidal* Pet. App. 110a-111a.) Petitioners' proffered administrative record contains no data or analysis on the costs and benefits of continuing DACA, no information on the potential consequences should a court strike it down, and no documents relevant to any other consideration that would invoke DHS's policy expertise. The record contains only the *Texas* judicial opinions; the documents establishing, maintaining, and rescinding DACA and DAPA; prior legal memoranda on the justifications for DACA and DAPA; and several letters in which politicians stated their support for DACA or opposition to it.[6] The record lacks any indication that

---

[5] The courts have overwhelmingly agreed. *Casa de Md.*, 924 F.3d at 700. (*Regents* Supp. Pet. App. 36a; *Batalla Vidal* Pet. App. 110a.)

[6] A document produced in separate FOIA litigation that was improperly excluded from the administrative record here further confirms that petitioners chose to rest the termination decision exclusively on legal grounds. More than a week before DACA was terminated, an inter-agency "principals" committee agreed that "DOJ will send a memorandum to DHS outlining the legal reasons the DACA program is unlawful," and that DHS would

20

Acting Secretary Duke independently weighed policy considerations that could be severed from the legal determination she adopted. Thus, even if one could discern petitioners' claimed discretionary considerations in the decisional documents, those considerations would be "too closely bound up" with petitioners' legal determination to affect reviewability. (*NAACP*, Pet App. 41a-42a.) *Accord Casa de Md.*, 924 F.3d at 700.

### 2. Petitioners cannot retroactively inject new considerations into their termination decision.

Secretary Nielsen's June 2018 supplemental memorandum does not change the reviewability analysis here. Where an agency record suffers "such failure to explain administrative action as to frustrate effective judicial review," a court may "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary." *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973) (per curiam). But any such explanation is limited to elaboration of "the determinative reason" identified "contemporaneous[ly]" with the agency's original action, as set out in the "administrative record already made and presented to the reviewing court." *Id.*[7]

---

then end the program—consistent with the committee's declaration that DACA "is unlawful and will be ended." Principals Committee, Summary of Conclusions, *supra*.

[7] *Accord Department of Commerce*, 139 S. Ct. at 2575-76 ("a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record"); *AT&T Info. Sys., Inc. v. General Servs. Admin.*, 810 F.2d 1233, 1236 (D.C. Cir. 1987) (per curiam) (supplemental explanations

21

Secretary Nielsen elected to elaborate her "understanding of the Duke memorandum" (*Regents* Pet. App. 121a), rather than accept the D.C. district court's invitation to issue a new decision on a new record (*see NAACP* Pet. App. 94a n.7, 76a, 78a). Therefore, her supplemental memorandum is relevant to this litigation only insofar as it illuminates the conclusion regarding DACA's illegality that petitioners announced in September 2017. Petitioners cannot use Secretary Nielsen's supplemental explanation to retroactively insert other considerations into their 2017 termination decision.

Petitioners' argument to the contrary (*see* Br. 28) would upend nearly eighty years of black-letter administrative law that bars agencies from relying on post hoc rationales. *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80, 89 (1943). Although petitioners suggest that this prohibition applies only to new reasons offered by appellate counsel (*see* Br. 29), courts have long understood the opposite to be true.[8] As the D.C. Circuit explained more than forty years ago, "[p]ost-hoc rationalizations by the agency on remand are no more permissible than are such arguments when raised by appellate counsel during judicial review."

---

"should be merely explanatory of the original record and should contain no new rationalizations" (quotation marks omitted)).

[8] Petitioners misplace their reliance (Br. 29) on the statement in *Martin v. Occupational Safety & Health Review Commission* that the Secretary of Labor's interpretation of a statute in an administrative adjudication "*is* agency action, not a *post hoc* rationalization of it." 499 U.S. 144, 157 (1991). Agency adjudications occur during agency proceedings as an "exercise of the agency's delegated lawmaking powers," *id.*, not "*after* agency proceedings have terminated," *id.* (emphasis in original).

22

*Food Mktg. Inst. v. Interstate Commerce Comm'n*, 587 F.2d 1285, 1290 (D.C. Cir. 1978).

Petitioners' contrary rule would subvert the premise of agency accountability that underlies the APA. "The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offered genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Department of Commerce*, 139 S. Ct. at 2575-76. If an agency's stated rationales were only a first stab at identifying reasons sufficient to withstand (or evade) judicial review, agencies would possess far less incentive to present careful, reasoned, and genuine accounts of their choices. Especially in cases involving politically sensitive subject-matter, agencies might offer only a partial explanation at first, knowing that they could try again if their initial effort was found inadequate.

## B.  The APA Permits Review of an Agency's Conclusion that Its Authorizing Statutes Forbid a Particular Action.

Having chosen to base their termination of DACA on a legal conclusion about DHS's authority, petitioners cannot evade judicial review by hiding behind the APA's exception for actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). To honor "the strong presumption that Congress intends judicial review of administrative action,"[9] *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986),

---

[9] The presumption in favor of judicial review applies with equal force in the immigration context. *See, e.g.*, *Kucana v. Holder*, 558 U.S. 233, 251 (2010); *INS v. St. Cyr*, 533 U.S. 289, 298 (2001).

23

this Court has "read the exception in § 701(a)(2) quite narrowly," *Weyerhaeuser*, 139 S. Ct. at 370. *Accord Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). Section 701(a)(2) precludes judicial review only when there is no "law to apply" and a court therefore lacks any "meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (quotation marks omitted); *accord Department of Commerce*, 139 S. Ct. 2551, 2568-69. "The few cases" where this Court has applied the exception involve purely discretionary "agency decisions that courts have traditionally regarded as unreviewable, such as the allocation of funds from a lump-sum appropriation, or a decision not to reconsider a final action." *Weyerhaeuser*, 139 S. Ct. at 370 (citations omitted). The termination of DACA is not within this narrow class of unreviewable decisions.

### 1. An agency's determination about the limits of its authority is not a discretionary non-enforcement decision.

Acting Secretary Duke did not purport to be exercising any discretion when she terminated DACA. Instead, her termination memorandum and the letter from Attorney General Sessions it incorporated set forth petitioners' unequivocal view that DHS lacked discretion to continue administering DACA. (See *supra* at 17-20.) Congress did not give DHS unreviewable discretion to determine the limits of DHS's authority. Nor does § 701(a)(2) exempt from reviewability as "committed to agency discretion" an action that an agency characterizes as compelled by law and lacking any discretionary component.

AR4325

24

Petitioners' argument to the contrary depends on an overbroad reading of *Heckler v. Chaney*. *Chaney* held that an agency's decision "to exercise its 'discretion' not to undertake certain enforcement actions" is presumptively unreviewable under § 701(a)(2) because such a decision entails a "complicated balancing of a number of factors which are peculiarly within [an agency's] expertise." 470 U.S. at 823, 831. For such decisions, an agency must assess not only "whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to" act at all. *Id.* Thus, judicial review of discretionary non-enforcement decisions would necessarily intrude on deliberations about priorities and resources long entrusted to agency judgment, and a court would lack any "meaningful standard[s] against which to judge the agency's exercise of discretion." *Id.* at 830.

Here, the Acting Secretary did not use her agency's expertise to weigh discretionary considerations of the type identified in *Chaney*, but instead announced that the law precluded her from exercising enforcement discretion. When an agency reaches a definitive conclusion about the scope of its legal authority, there are plainly "judicially manageable standards" of review, *see id.*, because adjudicating whether an administrative agency has properly interpreted its implementing statute is precisely "the sort of routine dispute" regularly adjudicated by federal courts, *see Weyerhaeuser*, 139 S. Ct. at 370. (*See also NAACP* Pet. App. 39a (identifying "the scope of the agency's lawful enforcement authority" as a

**AR4326**

25

"natural subject for judicial review").) And neither the Court in *Chaney* nor petitioners here identify any historical tradition allowing executive agencies to announce an interpretation of law free from oversight by the branch of government tasked with declaring what the law is. *Cf. Chaney*, 470 U.S. at 831, 833 n.4 (identifying centuries-old precedents illuminating unreviewability of discretionary non-enforcement decisions, and distinguishing agency actions based on an asserted lack of authority).

Petitioners concede that *Chaney* does not preclude judicial review in cases where a "statutory directive" is present that "circumscrib[es]" the agency's discretion. (Br. 19.) On that basis, petitioners acknowledge that the creation of DAPA was properly subject to review by the Fifth Circuit and this Court to evaluate whether "the INA barred DHS from adopting DAPA and expanded DACA." (Br. 24.) But this case presents the fundamentally similar issue of whether the INA barred DHS from adopting and retaining DACA: an issue equally amenable to judicial review. *See FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009) (the APA "make[s] no distinction . . . between initial agency action and subsequent agency action undoing or revising that action" (quotation marks omitted)). Nothing in the text of § 701(a)(2) nor in any historic tradition of unreviewability restrains courts from policing the bounds of an agency's statutory discretion, whether the agency is asserting authority it lacks, or disclaiming authority it possesses.

Treating an agency's legal conclusion about its authority as unreviewable would hamper agencies in exercising the very discretion that § 701(a)(2) is designed to protect. As the Ninth Circuit observed, "[i]f an agency head is mistaken in her assessment

**AR4327**

26

that the law precludes one course of action, allowing the courts to disabuse her of that incorrect view of the law does not constrain discretion, but rather opens new vistas within which discretion can operate." (*Regents* Supp. Pet. App. 31a.) Judicial review of agency legal interpretations thus keeps agencies publicly accountable. Agencies should not be able to misinterpret what the law requires and face "no consequence" for such a "legal lapse[]."*Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1653 (2015). The contrary rule urged by petitioners would allow agencies to "pass[] off" unpopular policy preferences as unreviewable interpretations of law, and thus to "wield power without owning up to the consequences." *See Department of Transp. v. Association of Am. R.R.*, 135 S. Ct. 1225, 1234 (2015) (Alito, J., concurring). (*See also Regents* Supp. Pet. App. 31a-34a). "[A]n official cannot claim that the law ties her hands while at the same time denying the courts' power to unbind her. She may escape political accountability or judicial review, but not both." (*NAACP* Pet. App. 73a.)

## 2. Petitioners misconstrue *Brotherhood of Locomotive Engineers.*

Petitioners erroneously suggest that their termination of DACA is immune from review under *Chaney* because the Acting Secretary *could have* ended DACA as an exercise of enforcement discretion. (*E.g.*, Br. 18-19, 22.) But the Court in *Chaney* expressly distinguished between an agency's exercise of "inherent discretion" to decline enforcement, 470 U.S. at 824, and an agency action "based solely on the belief that [the agency] lacks jurisdiction," *id.* at 833 n.4. Contrary to petitioners' arguments (Br. 23-25), the Court did not collapse this distinction when it decided

27

*Interstate Commerce Commission v. Brotherhood of Locomotive Engineers (BLE)*, 482 U.S. 270 (1987).

Petitioners misplace their reliance (Br. 23-25) on *BLE*'s principle that agency action falling within a "tradition of nonreviewability" does not "become[] reviewable" simply because the agency "gives a 'reviewable' reason" for acting. 482 U.S. at 282-83. An agency must be exercising discretion to come within the tradition of nonreviewability recognized in *Chaney*. Here DHS announced that the law gave DHS no discretion to exercise. This case thus stands outside *BLE*'s observation that an agency does not invite judicial review by offering legal views when it invokes its discretionary power to decline enforcement. It is one thing for an agency to mention legal considerations when expressly exercising its discretion,[10] and quite another for an agency to announce a definitive conclusion that the law *forbids* a certain exercise of discretion. There is no tradition of nonreviewability for actions in which an agency disavows enforcement discretion, rather than exercising it—as evidenced by petitioners' failure to identify any case or historical source to the contrary.

Petitioners' sweeping reading of *BLE* is inconsistent with the Court's own reasoning in that case. *BLE* explained that even as to denials of reconsideration, reviewability turns on the nature of the determination by the agency. An agency considering only a claim that rehearing should be

---

[10] The agency in *Chaney*, for instance, expressed doubts about its jurisdiction to take the regulatory action requested while making clear that it would not take that action as a matter of discretion in any event. 470 U.S. at 824-25.

28

granted because of "material error" possesses complete and traditional discretion. 482 U.S. at 280, 282. By contrast, there is no "tradition of nonreviewability" when a reconsideration request rests on new evidence or changed circumstances. *Id.* at 283-84. In those instances, as here, a reviewing court can apply well-worn "ordinary standards" of review to assess whether the agency's determination contains (among other things) any "errors of fact or law" that render it arbitrary and capricious. *See id.*

Common practice belies petitioners' argument that any agency action connected to non-enforcement is unreviewable no matter what type of determination the agency renders. For example, in *Massachusetts v. EPA*, this Court reviewed and rejected EPA's determination that it lacked regulatory enforcement authority in a particular sphere, holding that non-enforcement decisions are challengeable when agencies are subject to procedural rules for denying a rulemaking petition. 549 U.S. 497, 527-28 (2007). And in *Judulang v. Holder*, this Court applied arbitrary-and-capricious review to assess whether the Board of Immigration Appeals had rationally explained its basis for adopting a specific framework for discretionary immigration relief. 565 U.S. 42, 55 (2011).

In the decades since *BLE* was decided, the federal courts of appeals have continued to distinguish between non-enforcement decisions that apply an agency's vested discretion, and decisions that interpret the bounds of the agency's authority. The Ninth Circuit, for example, differentiates non-enforcement decisions made as "an exercise of discretion," which are unreviewable, from non-enforcement decisions "based solely on [the agency's]

**AR4330**

29

belief that [it] lacks jurisdiction" to act, which are reviewable. *Montana Air Chapter No. 29, Ass'n of Civilian Technicians, Inc. v. Federal Labor Relations Auth.*, 898 F.2d 753, 756-57 (9th Cir. 1990) (interpreting scope of *Chaney*). The D.C. Circuit similarly holds that broad statements of enforcement policy are generally reviewable because they are "likely to be direct interpretation of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion." *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676-77 (D.C. Cir. 1994).

Petitioners are mistaken in contending that if review is not precluded here, courts could review a prosecutor's refusal to institute criminal proceedings when the refusal is based on a "'belief . . . that the law will not sustain a conviction.'" (Br. 23-24 (quoting *BLE*, 482 U.S. at 283).) Criminal prosecutors operate within a strong tradition of unreviewable enforcement discretion that has no counterpart for the civil enforcement decisions of administrative agencies. Moreover, unlike a prosecutor's decision to prosecute, the decision to terminate DACA was not a decision to refrain from enforcement. It was simply a decision to end a framework of forbearance.

### 3.   8 U.S.C. § 1252(g) does not bar review here.

The INA provides that, outside of certain exceptions, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders against

**AR4331**

30

any alien." 8 U.S.C. § 1252(g). As this Court has explained, § 1252(g) "applies only to [the] three discrete actions" listed, not the full universe of "claims arising from deportation proceedings." *AADC*, 525 U.S. at 482; *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (provision does not "sweep in" other types of claims that might "technically" relate to "the three listed actions" but are not one of "those three specific actions themselves"). Section 1252(g) thus does not cover the termination of DACA, which was not a decision to "commence proceedings, adjudicate cases, or execute removal orders."

In addition, § 1252(g) strips courts of jurisdiction only to hear claims brought "by or on behalf of any alien." It thus would not apply to the States' claims, brought to vindicate our States' interests as employers, proprietors of public universities, and regulators.

## II. Petitioners' Termination of DACA Was Arbitrary and Capricious.

Petitioners announced that they were terminating DACA because Attorney General Sessions had concluded that DACA possessed all of "the same legal and constitutional defects" the *Texas* courts had found with respect to DAPA. (*Regents* Pet. App. 116a (quotation marks omitted).) Their decision to do that was arbitrary and capricious because the Attorney General's legal opinion contained several facially apparent errors and omissions.[11] The APA requires an agency to "articulate a satisfactory explanation for its

---

[11] The States are therefore likely to succeed on their APA claim, and petitioners do not dispute that the other factors, *see Winter v. Natural Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008), strongly support an injunction.

AR4332

31

action" that demonstrates consideration of "relevant factors"—including any "important aspect of the problem"—without any "clear error of judgment." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983) (quotation marks omitted). Petitioners' approach fails to meet these requirements and falls short of the "reasoned explanation" the APA requires. *See Department of Commerce*, 139 S. Ct. at 2575-76.

## A. Petitioners' Asserted Conclusion That DACA Was Illegal Rested on Substantial Errors of Fact and Law.

### 1. Petitioners erroneously assumed that DACA prevented agency officials from exercising discretion.

In concluding that DACA was unlawful under the *Texas* decisions invalidating DAPA, petitioners made a fundamental factual mistake. Even a rudimentary investigation would have shown that DACA has a feature that takes it squarely outside the *Texas* courts' analysis: in considering DACA requests, DHS officials exercise case-by-case discretion.

On a preliminary record, the Fifth Circuit concluded that DHS's DAPA memorandum "would not genuinely leave the agency and its employees free to exercise discretion." *Texas*, 809 F.3d at 176. From this, the court concluded that DAPA likely violated APA notice-and-comment procedures. The Fifth Circuit identified the lack of case-specific discretion as a reason why DAPA also likely exceeded DHS's authority under the INA, expressly noting that "[w]e do not address whether single, ad hoc grants of

32

deferred action made on a genuinely case-by-case basis are consistent with the INA." *Id.* at 186 n.202.

Attorney General Sessions's conclusion that DACA possessed the same defects as DAPA assumed that federal officials were *not* free to exercise case-by-case discretion when evaluating DACA requests. Acting Secretary Duke endorsed that assumption in declaring that "DACA decisions were not truly discretionary" (*Regents* Pet. App. 114a), and that she had "not been able to identify" a single instance where an application was "denied based solely on discretion" (*Regents* Pet. App. 112a-113a n.1). Secretary Nielsen issued no corrective or explanation for this assumption in her supplemental memorandum.

Evidence in this case and in a separate challenge to DACA brought by Texas and other States last year shows that petitioners' assumption was false, and that petitioners knew or should have known that. (J.A. 1010.) *See Texas v. United States*, 328 F. Supp. 3d 662, 733-34 ("*Texas II*") (S.D. Tex. 2018). DHS admitted below that it has identified discretionary denials, and petitioners no longer stand behind Acting Secretary Duke's contrary assertion. (J.A. 1010.) Other materials confirm the substantial discretion DHS exercised in evaluating DACA requests, including internal DHS documents, statements from agents who actually process DACA applications, and updated figures showing a discretionary denial rate of 20 percent for initial DACA applications (not including administrative rejections) in the full year before DACA was terminated (J.A. 996). In light of this evidence, the federal district court judge who in 2015 found that DACA (and therefore DAPA) did not leave room for discretion rejected a claim last year that "those processing DACA applications are not free to exercise

33

discretion." *Texas II*, 328 F. Supp. 3d at 734. As that judge concluded, the evidence now put forth by Texas and other States to support that claim was "not convincing, either in its quantity or its quality." *Id.*

In reaching this conclusion, the judge in *Texas II* specifically rejected the assertions of Kenneth Palinkas, the president of the union representing agents who process DACA requests. Palinkas' declaration was critical to the *Texas* courts' determination that DAPA would be administered in the same way as DACA, and thus would not be discretionary. *See Texas*, 809 F.3d at 172-73 (noting Palinkas's claim that "DACA applications are simply rubberstamped if the applicants meet the necessary criteria" (quotation marks omitted)). But Palinkas admitted in a 2018 deposition in *Texas II* that he has strong personal feelings against DACA, that he is not involved in processing DACA applications, and that he in fact is "not aware of the extent to which discretion is exercised." (Amicus Br. of DACA Recipients and State of New Jersey 23 (quotation marks omitted).) Accordingly, although the district judge in *Texas* had enjoined DAPA based on Palinkas's assertions, the same judge in *Texas II* declined to accept those assertions as a basis for enjoining DACA, noting that Palinkas had never "processed a DACA application," and that "most of what [he] had to say was either opinion or based upon hearsay." *Texas II*, 328 F. Supp. 3d at 733 n.105.

Petitioners apparently failed to conduct any inquiry into how DACA applications are actually processed. Instead, they uncritically accepted the earlier *Texas* decisions' characterization of DACA as nondiscretionary, which rested on the now-debunked Palinkas assertions. Petitioners thus failed to meet

34

their basic obligation under the APA to "examine the relevant data" before reaching a conclusion. *See State Farm*, 463 U.S. at 43. No government should proceed in such a manner when making a decision that threatens devastating effects on hundreds of thousands of people, and serious harm to many thousands of employers and the economies and institutions of every State. The APA requires the federal government to meet higher standards of reasoned decisionmaking.

The sparse and incomplete record that petitioners have produced to date fails to substantiate petitioners' assumptions and claims. *See State Farm*, 463 U.S. at 52; *see also Department of Commerce*, 139 S. Ct. at 2575 (agency action is invalid where "evidence tells a story that does not match the explanation"). Moreover, petitioners' assertion that DACA decisions were "not truly discretionary" was contradicted by information readily available to petitioners that was unquestionably material to petitioners' legal assessment. Without further production of record documents that might support petitioners' assertions on this score (see *infra* at 51-53 (discussing incomplete record)), the only conclusion a court can draw is that petitioners wrongly assumed that DACA left no room for case-by-case discretion, and that this assumption led petitioners to conclude that DACA possessed serious legal defects it did not in fact have.

### 2. Petitioners purported to rely on the holding of a case that contained no such holding.

In discussing the *Texas* decisions—the only precedents petitioners cited to justify their declaration that the law compelled them to terminate DACA—petitioners asserted without explanation that DACA

**AR4336**

35

"has the same legal *and constitutional* defects that the courts recognized as to DAPA." (*Regents* Pet. App. 116a (emphasis added, quotation marks omitted); *see* J.A. 877.) But no court has ever found either DAPA or DACA to possess "constitutional defects."

Petitioners make no attempt to explain this error. They instead paraphrase Attorney General Sessions's language (Br. 52) to exclude his incorrect statements that "courts recognized" DAPA to have "constitutional defects" (J.A. 877). But his mistake was glaring and material. Acting Secretary Duke's memorandum adopted the entirety of the reasoning in his letter, and specifically quoted his reference to "constitutional defects." (*Regents* Pet. App. 116a.) And under 8 U.S.C. § 1103(a)(1), she and her successors are bound by the Attorney General's determination unless and until that determination is withdrawn or overruled.

Governments owe it to the public to act with more care when conducting legal analyses that will affect so many so greatly. It was arbitrary and capricious for petitioners to rest the termination of DACA—a decision that will impact the lives and livelihoods of many—on a sloppy and facially erroneous reading of what petitioners claimed was their key legal authority. Agency action "may not stand if the agency has misconceived the law." *Chenery*, 318 U.S. at 94.

## B. Petitioners' Evaluation of DACA Omitted Essential Factors.

Even if petitioners had not made the above errors, the termination decision would still be arbitrary and capricious because petitioners did not consider factors that were important and relevant to their analysis. *State Farm*, 463 U.S. at 42-43.

**AR4337**

36

### 1. Petitioners failed to address significant differences between DACA and DAPA.

Petitioners' conclusion that DACA was unlawful rested on the premise that DACA possessed the same infirmities that the Fifth Circuit attributed to DAPA. Yet the Fifth Circuit itself cautioned that "DACA and DAPA are not identical," 809 F.3d at 174, and that "any extrapolation" from one to the other "must be done carefully," *id.* at 173. Despite that admonition, petitioners never addressed key differences between DAPA and DACA.

For example, the Fifth Circuit emphasized that approximately 4.3 million people—nearly 40 percent of the undocumented population—would have been eligible for DAPA and reserved the question whether grants of deferred action to a smaller population "are consistent with the INA." *Texas*, 809 F.3d at 147-48, 186 n.202. DACA eligibility extends to only about 1.4 million persons, about 10 percent of the current undocumented population. Br. for United States at 59, *Texas I*, 136 S. Ct. 2271 (No. 15-674). DACA's size (unlike DAPA's) is thus comparable to historic exercises of discretionary relief like the Family Fairness Program, which the Fifth Circuit did not criticize. Even in absolute terms, fewer individuals are eligible for DACA than the approximately 1.5 million persons who were eligible for the Family Fairness Program, although that program was implemented when the undocumented population was much smaller.[12] (J.A. 821-822, 850 n.15.) Petitioners gave no

---

[12] Petitioners fail in their attempts to distinguish DACA from the Family Fairness Program and other historical policies

37

reasons why a deferred-action framework of DACA's more limited scope is governed by the Fifth Circuit's decision or reasoning about DAPA.

The Fifth Circuit's decision also turned on the ability of those eligible for DAPA to "derive a lawful immigration status from their children's immigration status" under the INA. *Texas*, 809 F.3d at 179. According to the Fifth Circuit, DAPA circumvented "Congress's careful plan" by offering relief—on terms different from what Congress prescribed—to a class of persons already within the ambit of certain "specific and intricate provisions" of the INA. *Id.* at 186; *see also id.* at 179-80. Because the INA contains no comparable provisions concerning the class of persons who would qualify for DACA, that critical aspect of the court's reasoning does not translate. Petitioners argue that the INA's pathway to legal status for DAPA-eligible individuals was "not critical to the Fifth Circuit's analysis" (Br. 35-36), but the Fifth Circuit's discussion shows otherwise. The absence of analogous prescriptions concerning DACA-eligible individuals is thus a "critical difference" that petitioners should have addressed in their decisional documents. *See State Farm*, 463 U.S. at 54.

Petitioners likewise failed to account for the federal government's prior statements to this Court that DACA was grounded in the important principle that "people who came to this country as children are not similarly situated to adults," and have "particularly strong ties to this country" because many "have

---

extending discretionary relief to large numbers of noncitizens (Br. 47-50) for the reasons stated by the other respondents. (*See, e.g.*, Br. for DACA Recipient Resps. 44-47; Br. for States of California et al. 27-28 & n.10.)

38

never known another home." *Texas* U.S. Br. 45-46.
This Court has recognized "long ties to the community"
as an important equitable consideration in enforce-
ment of the immigration laws. *See Arizona v. United
States*, 567 U.S. 387, 396 (2012). And the INA itself
distinguishes between children and adults, excluding
time accrued as a minor from the "unlawful presence"
calculation. *See* 8 U.S.C. § 1182(a)(9)(B)(iii)(I).

Petitioners' remarkable assertion to this Court
that "the sympathetic circumstances of the aliens
involved" are simply immaterial to DACA's validity
(Br. 45) ignores that "humanitarian reasons" and
"sympathetic factors" are well-recognized bases for
extending deferred action, *AADC*, 525 U.S. at 484 &
n.8. As this Court explained in *Arizona*, "[d]iscretion
in the enforcement of immigration law embraces
immediate human concerns." 567 U.S. at 396.
Petitioners cannot now disclaim that element of their
discretion simply because they would rather not
exercise it.

Secretary Nielsen's June 2018 supplemental
memorandum does nothing to change the analysis.
While Secretary Nielsen stated her belief that any
differences between DACA and DAPA are insufficient
"to convince [her] that the DACA policy is lawful"
(*Regents* Pet. App. 122a), she did not explain why she
viewed those differences as immaterial. This was an
especially conspicuous failure because three district
courts, whose reasoning was available to Secretary
Nielsen when she issued the new memorandum, had
found those distinctions material. (*See Batalla Vidal*
Pet. App. 98a-104a; *Regents* Pet. App. 50a-54a; *NAACP*
Pet. App. 51a-52a.) Secretary Nielsen also continued
to rely on Attorney General Sessions's pronouncement
that DACA is illegal because it purportedly shares

**AR4340**

39

with DAPA some general "incompatibility" with the "INA's comprehensive scheme." (*Regents* Pet. App. 122a.) Yet, despite three district courts having explained why that was not so, Secretary Nielsen neither identified the INA provisions with which DACA purportedly conflicts, nor provided any "clue as to how an agency official, a court, or anyone else would go about determining whether a particular nonenforcement policy meets [her] test for 'compatibility' with the overall statutory scheme." (*NAACP* Pet. App. 105a.) In sum, "the Nielsen Memo offers nothing even remotely approaching a considered legal assessment" (*NAACP* Pet. App. 105a), and thus failed to address any of the critical omissions of reasoning in the termination decision that render it arbitrary and capricious.

Petitioners initially offered a cursory legal analysis that failed to identify how the few legal authorities they believed relevant—the *Texas* decisions and the INA—compelled the conclusion that they reached. Inexplicably, after three courts had identified these failures of reasoning, Secretary Nielsen elected to ignore and elide those defects, rather than to confront and correct them by providing the analysis that had been missing. Thus, even after a second chance, petitioners have yet to produce the reasoned explanation required by the APA, and it is not for a court to "supply a reasoned basis for the agency action that the agency itself has not given." *See State Farm*, 463 U.S. at 43.

### 2. Petitioners failed to explain their change in position or to consider the significant interests affected.

Petitioners also violated the APA by changing course on DACA for non-discretionary reasons without

40

fulfilling their obligations to "supply a reasoned analysis for the change," *State Farm*, 463 U.S. at 42; to show "good reasons for the new policy," *Fox Television*, 556 U.S. at 515; or to consider the "serious reliance interests" DACA engendered, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quotation marks omitted).

For the first seven-and-a-half months of the current presidential administration, petitioners gave no indication they considered DACA illegal under the reasoning of the *Texas* decisions. To the contrary, they continued to accept and process requests for DACA relief, and the President explained in April 2017 that his policy was not to deport DACA recipients, whom he advised to "rest easy." (J.A. 435.) Former DHS Secretary John Kelly likewise publicly affirmed in March 2017 that the federal government had made a "commitment" to DACA recipients (J.A. 435), and Secretary Kelly kept DACA in place even as the agency announced other restructurings of its enforcement policies in February and June 2017 (J.A. 857, 868).

Yet on September 5, 2017, petitioners reversed course and declared that DACA was beyond DHS's authority under the INA and the Constitution. Petitioners claim that they evinced an awareness that they were changing their position and provided purportedly "good reasons" for the change by referring to the *Texas* litigation and the Attorney General's view that DACA had the same defects as DAPA. (Br. 51-52.) But the errors and omissions in the Attorney General's analysis show that petitioners' new position was not "the product of reasoned decisionmaking." *See State Farm*, 463 U.S. at 52. Even now, petitioners continue to mischaracterize the *Texas* decisions. In belatedly

41

acknowledging that the federal government previously considered DACA legal, petitioners claim that the OLC memorandum reflecting the government's prior view was "flatly rejected by the Fifth Circuit." (Br. 52.) But neither Acting Secretary Duke nor Secretary Nielsen ever addressed the OLC memorandum, nor did Attorney General Sessions distinguish the memorandum in his legal analysis. And the Fifth Circuit did not in fact reject the OLC memorandum. Rather, it concluded that DAPA's particular characteristics differentiated DAPA from the other types of deferred action and similar discretionary relief described in the memorandum. *Texas*, 809 F.3d at 184 n.197.

Petitioners also acted arbitrarily and capriciously in failing to account for the interests of those who have relied on DACA. *See Encino Motorcars*, 136 S. Ct. at 2126. To be sure, petitioners remained (and remain) free to terminate DACA or to rescind the relief afforded to any particular DACA recipient as a matter of discretion. But even in areas where an agency has broad discretion, an agency must still demonstrate that it understands how affected parties will be impacted by a major course change. For example, the automobile dealerships in *Encino Motorcars* could claim no right to the continued existence of a Department of Labor regulation allowing them to avoid paying overtime to service advisors. *See id.* Yet even though the agency was free to change policy, it improperly ignored the impacts of its change in enforcement policy on the dealerships who had "structured their compensation plans against [the] background understanding" in place. *Id.* The agency there failed to perform the necessary diligence given the "serious reliance interests at stake." *Id.* at 2127.

**AR4343**

42

Interests weightier than an ability to avoid paying overtime wages are at issue here. Yet petitioners nowhere attempted to ascertain the likely costs and harms of their change in course. The APA's requirements of reasoned decisionmaking demand more.

Since 2012, DACA has provided a means for about 800,000 recipients to support themselves and their families, and to contribute to their communities by starting businesses and performing essential jobs; without DACA, recipients will lose that ability. Private and public employers have invested time and resources in hiring and training DACA recipients that the program permitted to work and to be hired; losing those employees will disrupt businesses and harm state and other government agencies. Many recipients have enrolled in multi-year degree programs that they that now may not be able to complete, to the detriment of the enrollees—some of whom already made nonrefundable tuition payments—and of the colleges and universities that admitted them. Petitioners do not dispute that terminating DACA will produce these harms. Nor can they dispute that their proffered administrative record reveals no attempt to assess the scope and magnitude of the costs and harms that would result from a termination of DACA.

Petitioners claim that they nonetheless accounted for the serious reliance interests at stake by ordering a wind-down of DACA over time. (Br. 42.) But they described that choice as necessary to accommodate unspecified "administrative complexities" that the termination would present for DHS. (*Regents* Pet. App. 116a.) Nothing in the record suggests that Acting Secretary Duke or Attorney General Sessions ever considered the massive economic, social, and personal

**AR4344**

43

consequences of terminating DACA for those relying on it.

Petitioners fare no better in their attempt to rely (*see* Br. 42, 51-52) on Acting Secretary Nielsen's assurance that she was "keenly aware that DACA recipients have availed themselves of the policy in continuing their presence in this country and pursuing their lives" (*Regents* Pet. App. 125a). Even if this assurance could be imputed to the decisionmakers who actually terminated DACA—Acting Secretary Duke and Attorney General Sessions—the administrative record proffered by petitioners does not show what information Secretary Nielsen considered to inform herself of the type or magnitude of the interests at stake. Moreover, her cursory discussion refers only to unspecified "reliance interests" of DACA recipients; it makes no attempt to account for the effects of the termination on the States and the other organizations, entities, and persons who employ and depend upon DACA recipients. Petitioners' failure to recognize that these interests even exist is by itself grounds for vacating the termination decision.

## C. Petitioners' Defective Legal Analysis Led to a Flawed Legal Conclusion.

The legal and factual errors in petitioners' legal analysis (see *supra* at 31-35) led them to erroneously conclude that DACA exceeded the enforcement discretion conferred on immigration officials by the INA.[13]

---

[13] Petitioners' conclusion that DACA is unlawful is a conclusion no court has ever reached. And because petitioners' analysis was arbitrary and capricious, this Court need not address petitioners' flawed conclusion. In any event, it would be

44

"A principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. The Constitution and the INA charge these officials with determining whether, when, and how to take enforcement action against removable individuals. Crucial practical and policy considerations make broad latitude essential to that complex task. As this Court has noted, "[t]he equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service." *Id.* (*See also Regents* Pet. App. 98a (enumerating veteran status as eligibility criteria for DACA).) In addition, "[s]ome discretionary decisions involve policy choices that bear on this Nation's international relations," *Arizona*, 567 U.S. at 396, a field where circumstances often change, sometimes rapidly, and this Court has a "customary policy of deference to the President," *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 348 (2005) (citing this policy in declining to impose restrictions on removal process that were not expressly required by Congress).

In insisting that DACA required specific legislative authorization (Br. 43-46), petitioners upend the fundamental premise of immigration law that "flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." *See United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (quotation marks omitted). The relevant inquiry here

---

inappropriate here to uphold petitioners' legal conclusion based on legal reasons not asserted by any agency decisionmaker in this case, especially given petitioners' failure to produce the complete record for review. (See *infra* at 51-53.)

45

is not whether Congress specifically authorized DHS to make discretionary grants of deferred action to individuals meeting DACA's eligibility criteria, but whether Congress's broad grant of enforcement discretion to DHS precludes that authority. The answer to that question is *no*.

Congress has tasked the DHS Secretary with "the administration and enforcement" of the INA and "all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. § 1103(a)(1), and has directed the Secretary to "issue such instructions" and "perform such other acts as he deems necessary for carrying out his authority," *id.* § 1103(a)(3). Congress has also charged the DHS Secretary with responsibility for "[e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). And by appropriating funds sufficient to remove only a small portion of the country's total undocumented population, Congress has made it necessary for DHS to exercise substantial discretion in setting those priorities. (*See Batalla Vidal* Pet. App. 72a (DHS "has the resources to remove fewer than 400,000" of approximately 11.3 million undocumented immigrants).) Petitioners thus acknowledge that the "vast disparity" (Br. 46) between the size of the undocumented population and DHS's limited resources means that the agency cannot indiscriminately pursue removal of all undocumented immigrants; it must instead "establish enforcement priorities, and strategically deploy its resources to enforce the law" (Br. 45).

One well-recognized way in which DHS and its predecessor agencies have long carried out that mission is by affording certain removable individuals discretionary relief such as deferred action, originally known as "nonpriority." *AADC*, 525 U.S. at 484

46

(quotation marks omitted); *see also*, *e.g.*, *Lennon v. INS*, 527 F.2d 187, 189 n.3 (1975). "This commendable exercise in administrative discretion, developed without express statutory authorization," *AADC*, 525 U.S. at 484 (quotation marks omitted), does not confer lawful immigration status or provide a defense to removal. Instead, DHS refrains from removal for a stated period, revocable at any time, "for humanitarian reasons or simply for its own convenience." *Id.; see also* 8 C.F.R. § 274a.12(c)(14) (describing deferred action as "an act of administrative convenience to the government which gives some cases lower priority"). Relevant criteria include a low probability that an individual will ultimately be removed, "the presence of sympathetic factors that could adversely affect future cases or generate bad publicity" for the government, and the absence of any violations of law constituting a high enforcement priority. *AADC,* 525 U.S. at 484 n.8.

Petitioners do not dispute that their broad authority to administer the immigration laws and set enforcement priorities includes the authority to grant deferred action and to notify DACA recipients of that decision. (Br. 4-5). As petitioners rightly note, "Congress and this Court have recognized the practice's use in certain contexts." (Br. 43; *see* Br. 45.) Petitioners also do not dispute the validity of their own regulations permitting deferred-action recipients to receive certain privileges during a period of deferred action, including work authorization in cases of economic necessity. (Br. 5 (citing 8 C.F.R. § 274a.12(c)(14)).) Indeed, those regulations are longstanding, applicable not just to DACA recipients but to all recipients of deferred action, and supported by separate legislative authority. The practice of

47

granting work authorization to economically needy immigrants during periods of discretionary relief from removal dates back to at least the 1970s,[14] was first codified in regulations in 1981,[15] and was confirmed by Congress in 1986.[16] *See* 8 U.S.C. § 1324a(h)(3) (recognizing employers' ability to hire immigrants who are "authorized to be so employed by [the INA] *or by the [DHS Secretary]*" (emphasis added)).

Petitioners nevertheless argue that DACA exceeded the broad discretion to grant deferred action and work authorization that petitioners admittedly possess. But each of their arguments is mistaken. Petitioners suggest that DACA is invalid because it is a "categorical deferred-action policy" (Br. 40, 43), by which they mean it has "stated eligibility criteria" (Br. 40) and "creates an implicit presumption that requestors who meet its eligibility criteria will be

---

[14] *See* Sam Bernsen, INS Gen. Counsel, *Leave to Labor*, 52 No. 35 Interpreter Releases 291, 294 (Sep. 1975).

[15] *See* Employment Authorization, 46 Fed. Reg. 25,079, 25,080 (May 5, 1981).

[16] Likewise, regulations dating back to 1979 have allowed deferred-action recipients to participate in Social Security. 44 Fed. Reg. 10,369, 10,371 (Feb. 20, 1979). And the INA now reflects Congress's plain intent to vest the Secretary of DHS with discretion to grant Social Security benefits to those who have been granted deferred action. 8 U.S.C. § 1611(b)(2) (bar on granting Social Security benefits "shall not apply . . . to an alien who is lawfully present in the United States *as determined by the [Secretary]*" (emphasis added)); *see also* 8 C.F.R. § 1.3(a)(4)(vi) (for "purposes of 8 U.S.C. § 1161(b)(2)," defining "lawfully present" to include specified "classes of aliens permitted to remain in the United States because DHS has decided for humanitarian or other public policy reasons not to initiate removal proceedings or enforce departure," including "[a]liens currently in deferred action status").

48

granted deferred action" (Br. 39). But the memorandum announcing DACA allows DHS agents to exercise case-by-case discretion to deny deferred action to those who meet DACA's threshold criteria (*Regents* Pet. App. 99a), and those agents were indisputably exercising that discretion (see *supra* at 32-33). There is nothing unusual or unlawful about creating an efficient framework for the exercise of individualized enforcement discretion by establishing criteria that identify candidates who are likely to benefit from that discretion. (*See* J.A. 821-826 (OLC Mem.).) Properly understood, DACA does not violate the legal principle petitioners invoke.

One of the core functions of deferred action is to serve DHS's "own convenience." *AADC*, 525 U.S. at 484. Deferred-action frameworks like DACA serve that end in part "by encouraging lower priority individuals to identify themselves to the agency," which can help "the agency to better focus its scarce resources on higher enforcement priorities." (J.A. 837-838 (OLC Mem.).) Implementing deferred action only in an ad hoc way would leave the agency less able to direct resources toward its highest enforcement priorities. As the New York district court observed, there is "no principled reason why the Executive Branch may grant deferred action to particular immigrants but may not create a program by which individual immigrants who meet certain prescribed criteria are eligible to request deferred action." (*Batalla Vidal* Pet. App. 95a.)

Petitioners are simply wrong that DACA "affirmatively sanction[s] the ongoing violation of federal law." (Br. 43). Like all forms of deferred action, DACA neither provides recipients with lawful immigration status nor furnishes a defense to removal, and

**AR4350**

49

a grant of deferred action under DACA can be revoked at any time. DACA relief simply communicates a decision that DHS has elected not to use its limited resources to remove the recipient for a stated time, unless the agency sooner changes its mind. In this respect, DACA is no different from the type of deferred action that petitioners acknowledge to be legitimate. (*See* Br. 46-50.) Nor does the grant of work authorization to DACA recipients transform this policy into a violation of law or distinguish it from other deferred action policies, as petitioners contend. (Br. 44-45). Work authorization is available to *all* recipients of deferred action under independent statutory and regulatory provisions that were put in place years before this Court endorsed deferred action in *AADC*.

Petitioners fare no better in suggesting that DACA is somehow flawed because an estimated 1.7 million individuals were eligible to request deferred action under DACA. (Br. 43-44.) First, that number is a questionable figure that exceeds petitioners' prior estimate. (See *supra* at 36.) Second, that number, even if correct, would represent just a small portion (approximately 15 percent) of the estimated 11.3 million undocumented immigrants in the country (*Batalla Vidal* Pet. App. 72a). And the estimated number of persons who in fact received deferred action pursuant to DACA (800,000) is an even smaller fraction: approximately 7 percent. DACA's eligibility criteria have thus effectively identified a narrow segment of the overall removable population: a group of individuals who were highly unlikely to be removed both because of DHS's limited resources and because of those individuals' particular characteristics. Even now, petitioners do not deny that DACA recipients— all of whom arrived in this country as children, have

**AR4351**

50

strong roots in their U.S. communities, and have not engaged in serious criminal conduct (*Regents* Pet. App. 97a-98a)—are "low-priority targets" for removal (Br. 46). DACA recipients' characteristics weigh strongly in favor of deferred action for "humanitarian reasons" under the criteria recognized by this Court in *AADC*, including a low likelihood of removal, the "presence of sympathetic factors," and the absence of any violation "given high enforcement priority." *See* 525 U.S. at 484 n.8.

Petitioners are further mistaken in contending that DACA was too consequential from an economic and political standpoint to be left to DHS without a more specific grant of statutory authority. (Br. 44-45.) DACA's most significant economic impact—the availability of work authorization—*was* based on a specific statutory grant of authority: 8 U.S.C. § 1324a(h)(3). Moreover, it would be impossible for DHS to carry out its statutory charge to establish "national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), without making decisions with significant economic and political consequences.

At bottom, petitioners' claim that DACA required additional legislation ignores that Congress has already given DHS broad discretion to set enforcement priorities and forgo enforcement based on "humanitarian reasons," *AADC*, 525 U.S. at 484, and "immediate human concerns," *Arizona*, 567 U.S. at 396. "Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime." *Id.* Congress has sensibly and humanely authorized DHS to permit individuals to work legally during the period when the agency has chosen to forbear from removing them. To be sure, Congress has

51

not at this point created a pathway for recipients of deferred action under DACA to obtain lawful immigration status, but that step remains overwhelmingly popular with the public and still may become a reality. In the meantime, nothing in the congressional scheme forecloses DHS from exercising its enforcement discretion to grant deferred action to an exceptionally sympathetic, law-abiding, and productive group of individuals who have not known another home, are unlikely to be removed, and are widely viewed as promising candidates to be given the right to stay.

### D. This Court Cannot Uphold Petitioners' Justifications for the Termination Without a Full Administrative Record.

Even if this Court disagrees that petitioners' actions were arbitrary and capricious on the current record, it must reject petitioners' request to uphold their termination of DACA as "plainly valid." (*See* Br. 32.) Claims that challenge an agency's reasons for acting cannot be resolved against an APA plaintiff on the merits until the agency has presented the complete administrative record undergirding its decision. The contrary course that petitioners urge would permit and incentivize agencies to withhold evidence unfavorable to the agency's position. *See Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984). APA plaintiffs are thus entitled to a complete administrative record, and a court may properly direct completion when the record presented is demonstrably incomplete. *See Department of Commerce*, 139 S. Ct. at 2574.

Here, the dismissal of respondents' APA claims that petitioners request cannot be granted at the

**AR4353**

52

current stage of the proceedings because petitioners have yet to produce a complete administrative record. In December 2017, after the Ninth Circuit affirmed the district court's determination in *Regents* that the administrative record produced by petitioners was facially deficient, this Court directed the district court to address petitioners' "threshold arguments" about jurisdiction and reviewability before considering whether "amendments to the record are necessary and appropriate." *In re United States*, 138 S. Ct. 443, 445 (2017) (per curiam). Shortly afterwards, the Second Circuit denied petitioners' mandamus application, which had sought to preclude completion of the administrative record in *Batalla Vidal*, a case where the district court had already rejected petitioners' jurisdiction and reviewability arguments. Order at 4, *In re Nielsen*, No. 17-3345 (2d Cir. Dec. 27, 2017), ECF No. 171. The Second Circuit noted that specific materials "appear to be missing" from petitioners' proffered record and that the district court in California had already identified 48 non-privileged documents that were before the agency decisionmakers but not within the record presented.[17] *Id.* at 2-3.

Nearly two years later, petitioners still have not completed the administrative record in any of the cases under review.[18] As the New York district court

---

[17] Since that ruling, petitioners have produced in FOIA litigation other documents that should have been part of the administrative record here, including the August 24, 2017 document describing the conclusions of the Principals Committee. *See* Principals Comm., Summary of Conclusions.

[18] In *Batalla Vidal* and *Regents*, petitioners obtained a stay of that obligation pending their various interlocutory appeals.

53

recognized, because the States' APA claims turn on asserted defects in the rationality and reasonableness of petitioners' decisional process, and because the record here remains incomplete, it is not possible to render judgment in petitioners' favor at this moment in the proceedings. (*Batalla Vidal*, Pet. App. 138a.) Nor could this Court reverse the determination that the record is incomplete when petitioners have not challenged those rulings in their opening brief and when those rulings are, in any event, plainly correct.

## III. The States Have Sufficiently Stated an Equal Protection Claim.

The Court should decline to disturb the *Regents* and *Batalla Vidal* rulings denying petitioners' motion to dismiss the equal protection claims in those cases.[19] The respondents in the New York and California cases who raised an equal protection claim adequately alleged that the termination of DACA was motivated by discriminatory animus against Latinos from Mexico, and resulted in a discriminatory effect on that group. *See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977). To sufficiently plead animus, a plaintiff need only raise a plausible inference that "an invidious discriminatory

---

(*See Batalla Vidal* Pet. App. 138a n.4.) *See also* Order, *Regents v. United States Dep't of Homeland Security*, No. 17-05211 (N.D. Cal. Sep. 14, 2018). The respondents in *NAACP* moved for summary judgment on the partial record, which the district court granted. (*NAACP* Pet. App. 18a, 76a.)

[19] The New York and California district courts' injunctions and the D.C. district court's judgment relied only on APA claims, and none of the respondents relies on an equal protection claim as an alternative ground for affirming those dispositions.

AR4355

54

purpose" could have been "a motivating factor" in a governmental decision. *See id.* at 265-66. Respondents satisfied that standard here.

First, respondents alleged that the impact of terminating DACA falls overwhelmingly on Latinos from Mexico. Seventy-eight percent of DACA recipients are Latinos from Mexico. (*Regents* Supp. Pet. App. 74a; J.A. 708.) Of the approximately 1,400 DACA recipients who would lose deferred action each day without the relief granted by the courts below (*Batalla Vidal* Pet. App. 120a), approximately 1,100 are Latinos from Mexico.

Second, respondents alleged that petitioners failed to act with the care and consideration that governments typically give a decision of this magnitude (J.A. 718-721, 727-734), a fact which can support an inference of discriminatory intent, *see Arlington Heights*, 429 U.S. at 267. The current administration reaffirmed its commitment to DACA recipients on several occasions, including as late as June 2017. (J.A. 718-721.) Yet just three months later, petitioners announced that the law compelled them to terminate DACA in decisional documents that contained mistakes of fact and law, and failed to address important considerations. For example, although the purported absence of case-by-case discretion was central to petitioners' conclusion, petitioners' proffered administrative record suggests that petitioners did not consider a single piece of data, review a single guidance document, or hear from a single employee about whether DHS was actually exercising discretion in processing DACA applications.

55

Third, respondents alleged that although President Trump may have made a few positive statements about DACA (*cf.* Br. 55), the President has also made repeated statements demonstrating prejudice against Latinos from Mexico (*see Batalla Vidal* Pet. App. 152a; *see also Regents*, Supp. Pet. App. 74a-77a). Those invidious statements are enough at the pleading stage to state an equal protection claim. For example, during his presidential campaign, then-candidate Trump denigrated Mexican immigrants as rapists and criminals. (J.A. 721-722.) After his inauguration, President Trump characterized Latino immigrants as "animals." (J.A. 676-677.) The President continued these statements even into the period between the September 2017 termination of DACA and Secretary Nielsen's purportedly curative new memorandum, comparing immigrants from Mexico to vermin who "infest our Country."[20] Subsequently, in a speech in May 2018, he declared that such immigrants "aren't people. These are animals."[21]

To be sure, at trial respondents will need to prove that this demonstrated animus was connected to the termination of DACA. But at the pleading stage, respondents' allegations are sufficient to raise a plausible inference that the President's discriminatory animus was a motivating factor in the termination of DACA.

Petitioners argue that the President's statements are immaterial and that the question here is whether

---

[20] *See* David A. Graham, *Trump Says Democrats Want Immigrants to Infest the U.S.*, The Atlantic (Jun. 19, 2018).

[21] *See* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times (May 16, 2018).

AR4357

56

Acting Secretary Duke (or Secretary Nielsen) harbored animus. (Br. 55.) But the President has broad power to direct his subordinates, and declared his direct involvement in the termination decision. (J.A. 729.) A high-level government official cannot launder his animus through subordinate officers. This Court has recognized that animus can be an unlawful "motivating factor" when an otherwise unbiased decisionmaker is spurred by the animus of others in the same organization—even others to whom the decisionmaker does not report. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). And plainly, the inclinations and directives of the President can motivate an agency head who serves at the President's pleasure.

In an attempt to obtain a more favorable standard of review, petitioners miscast respondents' equal protection claims as a selective-enforcement challenge. But the States are not individual plaintiffs claiming discrimination within individual enforcement proceedings. *See, e.g.*, *AADC*, 525 U.S. at 488. (*See also Regents* Supp. Pet. App. 75a-76a.) Instead, they are suing to vindicate their proprietary interests in DACA's effects on state economies and workforces, and interests in public health, public safety, and public education. In addition, the equal protection claims here will not disrupt individualized removal actions. DACA is a class-wide framework allowing individuals to apply for deferred action; it is not a defense to prosecution or removal, and continuing DACA would not bar DHS from exercising discretion to enforce in any given case.

57

## CONCLUSION

The decisions below should be affirmed.

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
BARBARA D. UNDERWOOD*
  *Solicitor General*
ANISHA S. DASGUPTA
  *Deputy Solicitor General*
ANDREW W. AMEND
  *Assistant Deputy*
  *Solicitor General*
DAVID S. FRANKEL
  *Assistant Solicitor General*
barbara.underwood@ag.ny.gov

September 2019        * *Counsel of Record*

(*Counsel listing continues on next page.*)

58

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
55 Elm St.
P.O. Box 120
Hartford, CT 06106

KATHY JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French St.
Wilmington, DE 19801

CLARE E. CONNORS
  *Attorney General*
  *State of Hawai'i*
425 Queen St.
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
100 W. Randolph St.
Chicago, IL 60601

THOMAS J. MILLER
  *Attorney General*
  *State of Iowa*
1305 E. Walnut St.
Des Moines, IA 50319

MAURA HEALEY
  *Attorney General*
  *Commonwealth of*
  *Massachusetts*
One Ashburton Place
Boston, MA 02108

HECTOR H. BALDERAS
  *Attorney General*
  *State of New Mexico*
408 Galisteo St.
Santa Fe, NM 87501

JOSH STEIN
  *Attorney General*
  *State of North Carolina*
114 W. Edenton St.
Raleigh, NC 27603

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court St. N.E.
Salem, OR 97301

JOSH SHAPIRO
  *Attorney General*
  *Commonwealth of*
  *Pennsylvania*
Strawberry Square, 16th Fl.
Harrisburg, PA 17120

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main St.
Providence, RI 02903

THOMAS J. DONOVAN
  *Attorney General*
  *State of Vermont*
109 State St.
Montpelier, VT 05609

**AR4360**

59

MARK R. HERRING
  *Attorney General*
  *Commonwealth of Virginia*
202 North Ninth St.
Richmond, VA 23219

PHIL WEISER
  *Attorney General*
  *State of Colorado*
1300 Broadway, 10th Fl.
Denver, CO 80203

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
800 Fifth Ave., Ste. 2000
Seattle, WA 98104

KARL A. RACINE
  *Attorney General*
  *District of Columbia*
Suite 650 North
441 4th St., NW
Washington, DC 20001

**AR4361**

**Nos. 18-587, 18-588, and 18-589**

# In the Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

**REPLY BRIEF FOR THE PETITIONERS**

NOEL J. FRANCISCO
*Solicitor General
Counsel of Record
Department of Justice
Washington, D.C. 20530-0001
SupremeCtBriefs@usdoj.gov
(202) 514-2217*

Additional Captions Listed on Inside Cover

**AR4362**

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.

———————

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT*

———————

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

———————

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT*

———————

**AR4363**

**TABLE OF CONTENTS**

Page

A. The Nielsen Memorandum should be considered..........2

B. DACA's rescission is not reviewable...............................7

C. DACA's rescission is lawful...........................................13

D. The judgments and orders should be reversed............22

**TABLE OF AUTHORITIES**

Cases:

*Burlington Truck Lines, Inc.* v. *United States*,
  371 U.S. 156 (1962)....................................................3

*Camp* v. *Pitts*, 411 U.S. 138 (1973)...........................................4

*Casa de Maryland* v. *DHS*, 924 F.3d 684
  (4th Cir. 2019), petition for cert. pending,
  No. 18-1469 (filed May 24, 2019) ........................................8

*Citizens to Preserve Overton Park* v. *Volpe*,
  401 U.S. 402 (1971)....................................................4

*Department of Commerce* v. *New York*,
  139 S. Ct. 2551 (2019) ..................................................3, 6, 23

*FCC* v. *Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)...................................................16

*FCC* v. *National Citizens Comm. for Broadcasting*,
  436 U.S. 775 (1978).................................................21

*Heckler* v. *Chaney*, 470 U.S. 821 (1985).................7, 9, 10, 12

*ICC* v. *Brotherhood of Locomotive Eng'rs*,
  482 U.S. 270 (1987)...............................................9, 10

*INS* v. *St. Cyr*, 533 U.S. 289 (2001)......................................12

*Judulang* v. *Holder*, 565 U.S. 42 (2011) .............................12

*Massachusetts* v. *EPA*, 549 U.S. 497 (2007) ..................8, 21

*Michigan* v. *EPA*, 135 S. Ct. 2699 (2015)...........................17

*Morgan Stanley Capital Grp. Inc.* v. *Public Util.*
  *Dist. No. 1*, 554 U.S. 527 (2008)..........................................6

(I)

**AR4364**

II

Cases—Continued:                                            Page

*Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto.*
    *Ins. Co.,* 463 U.S. 29 (1983) ......................................... 17, 20

*NLRB* v. *Wyman-Gordon Co.,* 394 U.S. 759 (1969) ............. 6

*National Treasury Emps. Union* v. *Von Raab,*
    489 U.S. 656 (1989) ................................................................. 5

*PDK Labs., Inc.* v. *DEA,* 362 F.3d 786
    (D.C. Cir. 2004) ...................................................................... 6

*Reno* v. *American-Arab Anti-Discrimination*
    *Comm.,* 525 U.S. 471 (1999) ........................................ 10, 22

*United States* v. *Armstrong,* 517 U.S. 456 (1996) ............. 10

*Utility Air Regulatory Grp.* v. *EPA,* 573 U.S. 302
    (2014) ........................................................................................ 19

Constitution and statutes:

U.S. Const. Art. II ................................................................. 19

Administrative Procedure Act,
    5 U.S.C. 551 *et seq.,* 5 U.S.C. 701 *et seq.:*
        5 U.S.C. 551(4) ............................................................... 4
        5 U.S.C. 551(13) ............................................................. 5
        5 U.S.C. 701(a)(2) ............................................. 9, 10, 12
        5 U.S.C. 706 ..................................................................... 6
        5 U.S.C. 706(2)(A) ....................................................... 12

Department of Homeland Security Appropriations
    Act, 2010, Pub. L. No. 111-83, § 568(c),
    123 Stat. 2186 ..................................................................... 18

Immigration and Nationality Act,
    8 U.S.C. 1101 *et seq.:*
        8 U.S.C. 1103(a)(1) ..................................................... 11
        8 U.S.C. 1182(d)(5)(A) ............................................... 19
        8 U.S.C. 1252(b) (1988 & Supp. II 1990) ...................... 19
        8 U.S.C. 1324a ............................................................. 19
        8 U.S.C. 1324a(h)(3) ................................................... 19

**AR4365**

III

Miscellaneous:                                                   Page

Dep't of Homeland Sec., *Memorandum from Secre-
   tary Kirstjen M. Nielsen on the Rescission of
   DACA* (June 22, 2018), https://go.usa.gov/xp3BE.............5

H.R. Rep. No. 911, 110th Cong., 2d Sess. (2008)...............18

Memorandum from Donald Neufeld, Acting Assoc.
   Dir., Office of Domestic Operations, USCIS, to
   Field Leadership, USCIS, *Guidance Regarding
   Surviving Spouses of Deceased U.S. Citizens and
   their Children* (Sept. 4, 2009) ...........................................18

The White House, *Remarks by the President on
   Immigration* (June 15, 2012),
   https://go.usa.gov/xnZFY ...................................................17

U.S. Citizenship & Immigration Servs., Dep't of
   Homeland Sec., *Adjudicator's Field Manual* ...............19

**AR4366**

# In the Supreme Court of the United States

No. 18-587

DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

*ON WRIT OF CERTIORARI TO THE*
*UNITED STATES COURT OF APPEALS*
*FOR THE NINTH CIRCUIT*

No. 18-588

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.

*ON WRIT OF CERTIORARI BEFORE JUDGMENT*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE DISTRICT OF COLUMBIA CIRCUIT*

No. 18-589

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

*ON WRIT OF CERTIORARI BEFORE JUDGMENT*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SECOND CIRCUIT*

**REPLY BRIEF FOR THE PETITIONERS**

(1)

**AR4367**

2

In 2012, the Department of Homeland Security (DHS) adopted DACA, a temporary policy of enforcement discretion that created a mechanism for up to 1.7 million aliens to receive forbearance from removal and federal benefits, even though existing laws make it illegal for them to remain in the United States. That policy was itself illegal, and at a minimum legally questionable. For those reasons, and a host of policy concerns, DHS has been trying to rescind DACA for more than two years. Although respondents claim to accept DHS's authority to do so, they ask this Court to review the change in policy under such rigorous requirements as to effectively preclude it. In their view, the "true cost-benefit analysis" that the Administrative Procedure Act (APA) purportedly requires "could not possibly justify this change." Ind. Br. 59. Respondents' approach to the APA bears no resemblance to this Court's. DHS's decision to rescind a purely discretionary nonenforcement policy is not reviewable under the APA. And even if it were, the decision of a law-enforcement agency to rescind this legally dubious policy *not* to enforce the law plainly satisfies any narrow review the APA provides.

### A. The Nielsen Memorandum Should Be Considered

Although the Duke Memorandum provides ample basis to reverse the judgments below, the Court can and should also consider Secretary Nielsen's explanation for DACA's rescission, which confirms that it is both unreviewable and lawful. U.S. Br. 28-31. No one argues that the Nielsen Memorandum is not properly before the Court at all. And although respondents argue that the Court should disregard the parts of it that doom their case, they are wrong for three related reasons.

1. As the D.C. district court correctly concluded, most of Secretary Nielsen's explanation is simply an

**AR4368**

3

"amplified articulation" of Acting Secretary Duke's explanation. *NAACP* Pet. App. 92a (citation omitted). No respondent meaningfully argues that the Court cannot consider Secretary Nielsen's explanation of the unlawfulness rationale contained in the Duke Memorandum. And respondents offer (D.C. Br. 22) only one reason for disregarding her further explanation that, even if DACA ultimately might be found lawful, it should be rescinded based on the costs of maintaining such a legally questionable nonenforcement policy—namely, that the Duke Memorandum purportedly did not sufficiently articulate those concerns. That is wrong. See p. 11, *infra*. Regardless, respondents acknowledge that, at a court's invitation, an agency may offer a fuller explanation of a rationale that existed at the time of its decision but was too "curt[ly]" expressed. D.C. Br. 50 (citation omitted). That is precisely what Secretary Nielsen did when she explained that, "[l]ike Acting Secretary Duke," she "lack[ed] sufficient confidence in the DACA policy's legality" to maintain it. *Regents* Pet. App. 123a.

2. More fundamentally, considering even new policy rationales offered by Secretary Nielsen would not violate the rule prohibiting a reviewing court from accepting "*post hoc* rationalizations for agency action." *Burlington Truck Lines, Inc.* v. *United States*, 371 U.S. 156, 168 (1962). That principle prevents thrusting courts "into the domain which Congress has set aside exclusively for the administrative agency," *id.* at 169 (citation omitted), and generally precludes "judicial inquiry into 'executive motivation' [that] represents 'a substantial intrusion' into the workings of another branch," *Department of Commerce* v. *New York*, 139 S. Ct. 2551, 2573 (2019) (citation omitted). It is not implicated when, as

**AR4369**

4

here, the agency itself offers the explanation for agency action through proper agency procedures.

*Camp* v. *Pitts*, 411 U.S. 138 (1973) (per curiam), is not to the contrary. There, the Court discussed the appropriate scope of "affidavits or testimony" that the agency could offer in defense of its action directly to the reviewing court, regardless of the required procedures for taking the action in the first place. *Id.* at 143. The Court, however, placed no limitations on the explanation an agency might offer if a court found the reasons initially offered were insufficient and the agency provided additional ones in accordance with all relevant procedures. *Ibid.*; cf. *Citizens to Preserve Overton Park* v. *Volpe*, 401 U.S. 402, 420-421 (1971) (permitting consideration of the agency's additional "formal findings," even if considered "to some extent" "*post hoc* rationalization"). And, here, neither the Immigration and Nationality Act (INA) nor the APA requires any particular procedures at all for changes in enforcement policies.

Respondents appear to acknowledge that Secretary Nielsen was free to offer entirely new rationales in a "new agency action." D.C. Br. 52. But nothing in the APA required that the new action reinstate DACA and rescind it again, rather than ratify the rescission and state her reasons for doing so. And the latter is precisely what Secretary Nielsen did, explicitly stating that the prior decision "remains" sound, that the DACA policy "should be" rescinded, and that she both "decline[d] to disturb" the rescission and "concur[red] with" it for the reasons she articulated. *Regents* Pet. App. 121a, 123a, 126a. Secretary Nielsen's Memorandum is a "rule" setting forth "an agency statement of general * * * applicability and future effect designed to implement * * * policy." 5 U.S.C. 551(4). It thus *is*

**AR4370**

5

"agency action," 5 U.S.C. 551(13), not solely an explanation of a past action.

There is no need to "reset" the litigation for any new reasons to be considered.  D.C. Br. 53 (citation omitted). Secretary Nielsen expressly based her decision on an already available administrative record—namely, the Duke Memorandum, the administrative record proffered for that decision, Acting Secretary Duke's accompanying statement, and the then-existing judicial opinions reviewing the Duke Memorandum, see *Regents* Pet. App. 121a—and the questions before the Court are purely legal.  In resolving them, the Court can and should consider new agency actions "to the extent they supplement or displace [DHS's] original directive." *National Treasury Emps. Union* v. *Von Raab*, 489 U.S. 656, 661 n.1 (1989).

Respondents offer no sound reason why it should matter for purposes of considering the Nielsen Memorandum that the D.C. district court's vacatur of the Duke Memorandum had not taken effect or that the government continues to defend the Duke Memorandum.  Such a rule would not serve "principle[s] of agency accountability." D.C. Br. 51 (citation omitted). Contrary to respondents' suggestion (*id.* at 52), Secretary Nielsen did not offer her explanation only in court filings.  She publicly issued it in the same manner as the Duke Memorandum (and the original DACA memorandum).  DHS, *Memorandum from Secretary Kirstjen M. Nielsen on the Rescission of DACA* (June 22, 2018), https://go.usa.gov/xp3BE.  There is no "reason to suspect" that it "does not reflect the agency's fair and considered judgment." D.C. Br. 52-53 (citation omitted).

And respondents' assertion (Cal. Br. 51) that considering Secretary Nielsen's reasons for rescinding the

6

DACA policy would "reduce the agency's incentives for offering a sustainable rationale in the first instance" is not realistic. Even if it were costless to redo agency action, it is implausible that an agency would risk delaying the implementation of new policy by intentionally withholding a well-reasoned explanation in the first instance. That is particularly so where, as is often true, doing so would require the agency to undertake time-consuming and costly efforts such as notice-and-comment rulemaking or adjudicative procedures.

3. At a minimum, if the Nielsen Memorandum provides an adequate basis to uphold DACA's rescission, remanding the matter based on an inadequacy in the Duke Memorandum "would be an idle and useless formality." *NLRB* v. *Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (plurality opinion). The APA "does not require" courts to "convert judicial review of agency action into a ping-pong game." *Morgan Stanley Capital Grp. Inc.* v. *Public Util. Dist. No. 1*, 554 U.S. 527, 545 (2008) (citation omitted); see *PDK Labs., Inc.* v. *DEA*, 362 F.3d 786, 800, 808-809 (D.C. Cir. 2004) (Roberts, J., concurring in part and  in the judgment) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") (citation omitted). To the contrary, the APA requires courts to take "due account  *  *  * of the rule of prejudicial error." 5 U.S.C. 706; see *Department of Commerce*, 139 S. Ct. at 2573;

Respondents contend (D.C. Br. 56) that it is "impossible  *  *  * to predict" how DHS would respond if the Court remanded the matter to it. But that is manifestly untrue. DHS already has determined that the rescission of the DACA policy was "proper" and therefore

AR4372

7

that the policy "should" be terminated. *Regents* Pet. App. 122a. That judgment did not depend on whether DACA was lawful. *Ibid.* And DHS continues to defend all of Secretary Nielsen's reasons before this Court. There is no basis for concluding that the agency's position might change if it were required to consider the question a third time.

## B. DACA's Rescission Is Not Reviewable

As reflected in both the Duke and Nielsen Memoranda, DHS's decision to rescind its nonenforcement policy is a quintessential enforcement decision of the sort traditionally "committed to an agency's absolute discretion." *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985). It is therefore unreviewable absent a statute "circumscribing [the] agency's power to discriminate among issues or cases it will pursue." *Id.* at 833; see U.S. Br. 17-32. Respondents do not claim that the INA restricted DHS's authority to rescind DACA. Their arguments that the rescission nevertheless is reviewable—because of the *type* of decision or the *reasons* given—are all flawed.

1. Respondents principally attempt to distinguish DACA's rescission from the type of decision at issue in *Chaney* on the ground (Ind. Br. 18-21) that the rescission concerned a general enforcement policy, rather than an enforcement decision in an individual case. But *Chaney* itself concerned a categorical enforcement policy. Although the Food and Drug Administration (FDA) reached its decision in response to a request by individual inmates, in rejecting that request, FDA categorically stated that "the use of lethal injection by State penal systems is a practice over which FDA has no jurisdiction" and, regardless, it would "decline, as a matter of enforcement discretion, to pursue supplies of

8

drugs under State control that will be used for execu-
tion by lethal injection."  Pet. App. at 82a, 85a, *Chaney*,
*supra* (No. 83-1878).  Indeed, *none* of the relief that the
inmates sought was specific to their cases; they sought
system-wide relief.  See *id.* at 81a-82a; *e.g.*, *id.* at 82a
(requesting that FDA "[a]dopt a policy" for seizing
lethal-injection drugs "from prisons or State depart-
ments of correction").  That forecloses respondents' im-
plausible suggestion (Cal. Br. 16) that *Chaney* would
have been decided differently if FDA had announced its
nonenforcement policy, like DHS did here, as a general
"framework" before applying it to specific individuals.

Respondents cite lower-court decisions that distin-
guish between single-shot enforcement decisions and
general policies on the ground that the latter are more
likely to contain "direct interpretations of the com-
mands of the substantive statute."  D.C. Br. 32 (citation
omitted).  But the Duke and Nielsen Memoranda ad-
dress only the scope of DHS's enforcement discretion,
not the INA's substantive commands.  U.S. Br. 25-26.
To the extent that some lower-court decisions may be
read to authorize review of an enforcement policy itself,
rather than an otherwise-reviewable substantive inter-
pretation contained within it, they "simply cannot be
reconciled with *Chaney*."  *Casa de Maryland* v. *DHS*,
924 F.3d 684, 713 (4th Cir. 2019) (Richardson, J., dis-
senting in relevant part).  As for respondents' reliance
(D.C. Br. 33) on *Massachusetts* v. *EPA*, 549 U.S. 497
(2007), that case concerned an agency's denial of a peti-
tion for rulemaking, which the Court specifically distin-
guished from the type of "nonenforcement decision[]"at
issue in *Chaney* and here.  *Id.* at 527.

Finally, respondents are wrong to suggest (Ind. Br.
19) that DACA's rescission itself is coercive because it

9

denies "DACA recipients the ability to work." The Duke Memorandum explained that the agency would not "revoke Employment Authorization Documents solely based on the" rescission. *Regents* Pet. App. 118a. And the inability to obtain new or renewed work authorization is simply a collateral consequence of the termination of the deferred-action policy—no different than if a prosecutor ends a nonenforcement policy that diverts certain low-level offenders into job-training or drug-rehabilitation programs.

2. Respondents are also wrong to contend (Cal. Br. 17-21) that, even if DACA's rescission fits within the tradition identified in *Chaney*, it is reviewable because it was based solely on the conclusion that DACA was unlawful. U.S. Br. 23-32.

a. Legally, where "the type of agency decision in question 'has traditionally been "committed to agency discretion,"'" it does not "become[] reviewable" whenever the agency "gives a 'reviewable' reason" for the action. *ICC* v. *Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 282-283 (1987) (*BLE*) (quoting *Chaney*, 470 U.S. at 832). Particularly where, as here, the government has no legal obligation to give any public explanation for its otherwise-unreviewable decision, it would be perverse to subject the decision to years of litigation because the government volunteered one. In determining whether an action is committed to agency discretion, "it is the [agency]'s formal action, rather than its discussion, that is dispositive." *Id.* at 281. Section 701(a)(2) precludes review of "agency action," not agency "reasons."

Respondents observe (Cal. Br. 21) that the agency action at issue in *BLE* was not a "non-enforcement decision" and was not "based on any purported lack of au-

10

thority." But the Court refused to review the legal analysis in the agency's reconsideration decision in *BLE* by analogizing to precisely such a nonenforcement decision. It explained that "a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction. * * * [Y]et it is entirely clear that the refusal to prosecute cannot be the subject of judicial review." *BLE*, 482 U.S. at 283.

That was not because of any "longstanding rule against suits to compel criminal prosecutions." D.C. Br. 28. It was based on the longstanding tradition of not subjecting "decision[s] *whether or not* to prosecute" to judicial review, reflecting concerns about invading the "special province" of the Executive and the general unsuitability of that class of decisions for judicial review. *United States* v. *Armstrong*, 517 U.S. 456, 464 (1996) (emphasis added) (quoting *Chaney*, 470 U.S. at 832). The same concerns apply to decisions to enforce federal immigration laws and, indeed, are "greatly magnified" given that the consequence of review is to "prolong a continuing violation" of federal law. *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999) (*AADC*).

Moreover, while it is true that *BLE* identified distinct reasons for the tradition of not reviewing requests to reopen for material error, Regents Br. 25-26, the salient point is that, whatever the particular reason for a tradition of unreviewability, Section 701(a)(2) "was meant to preserve" it. *BLE*, 482 U.S. at 282. And while the *BLE* Court did note that some types of refusal to reopen are reviewable (D.C. Br. 27), that is not due to the reasons the agency chooses to provide, but rather the substantive basis of the petitioner's request.

**AR4376**

11

482 U.S. at 278 (distinguishing "petitions alleging 'new evidence' or 'changed circumstances'").

b.  In any event, as a factual matter, DACA's rescission was not based solely on a legal conclusion.  Acting Secretary Duke emphasized the threat of impending litigation, the Attorney General's conclusion that it was "likely" that such litigation "would yield similar results" to the earlier litigation, and her resulting decision that the DACA policy "should" be wound down.  *Regents* Pet. App. 115a-117a.  The Duke Memorandum alone thus demonstrates that the decision has always been based, in part, on the Secretary's "exercise of [her] authority in establishing national immigration policy," *id.* at 117a, not just the Attorney General's authority to issue "controlling" determinations of relevant "questions of law," 8 U.S.C. 1103(a)(1).

Respondents suggest (D.C. Br. 22-23) that Acting Secretary Duke must not have exercised such discretion because her memorandum does not contain an explicit "assessment of the costs of rescinding the policy weighed against the legal risk of maintaining it."  But such an exercise would serve little purpose where, as here, the relevant costs of maintaining the policy were not only monetary, but the damage to public confidence in DHS and in the rule of law, as well as the potential distraction from the agency's important work.  *Regents* Pet. App. 123a.  And even if that criticism were relevant to whether the litigation-risk rationale was valid on the merits, it fails to show that the decision was not actually based on serious doubts about DACA's legality.

It is likewise irrelevant that the concerns about maintaining a legally questionable policy were paired with a conclusion that the DACA policy is, in fact, un-

12

lawful.  It is not uncommon for courts or agencies to offer independent, alternative rationales for their decisions.  Indeed, FDA in *Chaney* similarly concluded both that the agency "ha[d] no jurisdiction" over the States' "use of lethal injection," and that, even if it did, "as a secondary and separate basis of denial," the agency would not, "as a matter of enforcement discretion," take the requested actions.  Pet. App. at 82a, 85a, *Chaney*, *supra* (No. 83-1878).  That fact provides no basis to call into question the sincerity of either ground.

c. The Nielsen Memorandum, moreover, makes clear that DACA's rescission is not based exclusively on legal rationales and thus is unreviewable.  See *Regents* Pet. App. 123a-124a.  Respondents are wrong that DACA's rescission would still be reviewable to ensure that it was not "'arbitrary' and 'capricious' or an 'abuse of discretion.'"  Ind. Br. 26-27 (quoting 5 U.S.C. 706(2)(A)).  "[B]efore any review at all may be had, a party must first clear the hurdle of § 701(a)," and Section 701(a)(2) bars "abuse of discretion" review for actions traditionally committed to agency discretion. *Chaney*, 470 U.S. at 828, 830.

*Judulang* v. *Holder*, 565 U.S. 42 (2011), does not hold otherwise.  That case did not involve enforcement discretion.  Instead, in an appeal from a final order of removal, the alien challenged the denial of a form of discretionary relief that conferred lawful status.  See *INS* v. *St. Cyr*, 533 U.S. 289, 295 (2001) ("If relief is granted, * * * the alien remains a permanent resident.").  The agency's policy was reviewable because it did not fit within the tradition of unreviewability identified in *Chaney*, not because Section 706(2)(A) applies to all discretionary decisions.  Indeed, the case did not even address Section 701(a)(2).

**AR4378**

13

### C. DACA's Rescission Is Lawful

Even if judicially reviewable under the APA, DHS's decision to rescind a nonenforcement policy that was at best legally uncertain—and, at worst, unlawful—was plainly rational.  U.S. Br. 32-56.

1.  DACA's rescission is justified by DHS's concerns about maintaining the legally questionable nonenforcement policy, particularly in the face of impending litigation.  U.S. Br. 33-37.

One set of respondents suggests that "litigation risk" can never be "an adequate, independent rationale for agency action."  Regents Br. 53-54.  But not even the D.C. district court was willing to go that far.  See *NAACP* Pet. App. 40a.  And other respondents rightly disavow it.  See Cal. Br. 21 (acknowledging that, in some contexts, a litigation-risk rationale "might" render the rescission unreviewable).  Indeed, it is commonplace for an agency to acquiesce in a federal court's determination that a prior action is unlawful, even if it disagrees.  After all, an agency is not required to push its questionable legal authority to its logical extreme.

Recognizing such a possibility does not permit an agency to evade judicial review (assuming such review is even available).  It simply shifts the focus of any review from the agency's legal determination to its evaluation of the costs of maintaining a policy in the face of legal uncertainty.  Abandoning administrative efforts on that basis will not always survive scrutiny because the legal doubts must be rational.  But in the face of the Fifth Circuit's decision affirming a preliminary nationwide injunction against DAPA and expanded DACA, and this Court's equally divided affirmance, DHS was (more than) reasonably concerned about the legality of DACA, the possibility of an immediate court-ordered shutdown,

**AR4379**

14

and the intangible costs to this *law-enforcement agency* of maintaining a legally dubious policy *not to enforce the law*, regardless whether courts might ultimately uphold it. *Regents* Pet. App. 123a; accord *id.* at 117a.

Like the lower courts, respondents fault DHS for failing to address possible distinctions between DAPA and DACA that might have led the Fifth Circuit to reach a different conclusion with respect to DACA. N.Y. Br. 36-39. But respondents do no better in identifying any material distinction. U.S. Br. 35-36. And in nearly 300 pages of briefing, none of the respondents meaningfully grapples with the fact that the Fifth Circuit held that both DAPA *and* expanded DACA were substantively unlawful—a judgment this Court affirmed by an equally divided court. That was not a judicial oversight. Everyone in that case simply agreed that the policies stood or fell together. See, *e.g.*, U.S. Br. at 10-11, 45, *United States* v. *Texas*, No. 15-674.

Some respondents assert that, unlike DACA, DAPA "would have classified recipients as 'lawfully present in the United States.'" Ind. Br. 51 (citation omitted). But as other respondents effectively recognize (Cal. Br. 26 n.5, 35), DACA is no different with respect to "lawful presence" than DAPA: while neither policy *in fact* makes it lawful to remain in the country, deferred action under either policy is *deemed* to satisfy statutory "lawful presence" requirements for purposes of certain federal benefits (*e.g.*, social security) and the INA's reentry bars. Indeed, the highlighted portion of the DAPA memorandum explained the consequences of "deferred action" generally, not DAPA specifically. *Regents* Pet. App. 104a.

Respondents criticize (Ind. Br. 52) DHS for failing to consider whether the *Texas* district court would have

**AR4380**

15

exercised its discretion not to order an immediate shutdown of the DACA policy based on a balancing of the equities. Even if so, that would not address the intangible costs of maintaining a legally questionable nonenforcement policy. And in any event, as long as DHS reasonably determined that the court likely would declare DACA substantively unlawful (as it did), it cannot be irrational for DHS to have concluded that—one way or another—the policy likely would be brought to an end. The question was whether the policy's termination would be pursuant to a court-ordered plan or one set by DHS. The fact that the *Texas* court recently declined on equitable grounds to enjoin the DACA policy at an interlocutory stage of the latest challenge does not undermine that judgment. Cf. Regents Br. 54. Indeed, the court's conclusion that the Fifth Circuit's prior decision controls the unlawfulness of DACA on the merits powerfully vindicates DHS's legal concerns.

2. The rescission is independently justified by Secretary Nielsen's enforcement-policy concerns. U.S. Br. 37-43.

Respondents inaccurately characterize Secretary Nielsen's policy concerns as "recapitulat[ing]" her legal concerns. Cal. Br. 50 (citation omitted). Secretary Nielsen explicitly stated that her policy concerns apply "regardless of whether the[] concerns about the DACA policy render it illegal or legally questionable." *Regents* Pet. App. 123a. There is nothing unusual in maintaining that, even if certain substantive values reflected in the law (*e.g.*, federalism or the separation of powers) do not legally foreclose a particular action, they provide an independent policy rationale for not pursuing that course. FDA did precisely that in its decision in *Chaney*, and no Member of the Court questioned its sincerity. U.S. Br. 30.

16

Respondents contend (Ind. Br. 55) that the Secretary's preference for truly individualized prosecutorial discretion is inconsistent with past categorical deferred-action policies and current categorical asylum rules. But DHS's past deferred-action policies were nothing like DACA. See pp. 17-19, *infra*. And in any event, DHS was free to change its position on the desirability of categorical nonenforcement policies. Indeed, although he had made an exception for DACA, Secretary Kelly had already announced such a change. J.A. 857-867. There is also no inconsistency between Secretary Nielsen's desire to avoid categorical deferred-action policies that tilt the scales *against* enforcing federal immigration law as written, and the agency's use of categorical rules in other contexts to *enforce* those laws.

Respondents complain (Cal. Br. 51) that the Secretary's desire to project a message of consistent immigration enforcement to discourage further illegal immigration is not supported by evidence in the administrative record. But the basis for the Secretary's policy preference is "an exercise in logic rather than clairvoyance." *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 521 (2009). DHS is committed to vigorous enforcement of the federal immigration laws. Toward that end, it seeks to send a strong, consistent message that illegal immigration will not be tolerated. Policies like DACA plainly undermine the clarity of that message by facilitating ongoing illegality on a massive scale through prospective assurance that the immigration laws will not be enforced coupled with affirmative benefits.

In light of those reasonable policy goals, the Secretary adequately acknowledged and balanced the asserted reliance interests in the indefinite continuance of DACA. No one disputes that, from the outset, DACA

**AR4382**

17

was a temporary, discretionary policy; was granted in only two-year increments; and created no lawful status or substantive rights. *Regents* Pet. App. 101a. Indeed, President Obama made clear that the policy represented only a "stopgap measure," not a "permanent fix." The White House, *Remarks by the President on Immigration* (June 15, 2012). Against this backdrop, the DACA policy could not engender any legally cognizable reliance interests in the government's continuing facilitation of DACA recipients' unlawful status. And while respondents assert that law-abiding institutions have "ordered their affairs" in response to DACA (Ind. Br. 34), those interests are concededly "derivative" (D.C. Br. 60) of the aliens' ongoing violations of the immigration laws.

In any event, DHS did not "entirely fail[] to consider" the asserted reliance interests. *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To the contrary, Secretary Nielsen expressly acknowledged them and weighed them against her other concerns. Respondents would demand more, but the INA neither imposes any requirement on DHS to determine whether this policy is "appropriate and necessary" based on a formal study, *Michigan* v. *EPA*, 135 S. Ct. 2699, 2705 (2015) (citation omitted), nor provides any other reason to conclude that the Secretary is required to perform a technical cost-benefit analysis before enforcing the statute as written.

3. DACA's rescission is also independently justified by DHS's conclusion that the DACA policy itself is unlawful. U.S. Br. 43-52.

a. In arguing to the contrary, respondents rely on DHS's historical deferred-action policies and other discretionary-relief policies. But the nature and scope

**AR4383**

18

of the DACA policy make it fundamentally different from the handful of prior class-based deferred-action policies. DACA does not simply delay removal until the alien can obtain (or recover) some lawful status already afforded by Congress; it provides a reprieve from removal to a class of aliens that Congress has repeatedly *declined* to grant permanent relief. And it offers deferred action, triggering additional affirmative benefits, on a much larger scale than any such prior policy. Thus, while DHS's prior deferred-action policies are fairly described as interstitial, DACA is not.

Respondents identify (Cal. Br. 30) one prior deferred-action policy—which applied to certain widows and widowers of U.S. citizens seeking visas—that they wrongly assert was "'interstitial' only in hindsight" because the INA at the time did not provide those aliens any "avenue of immigration relief." Memorandum from Donald Neufeld, Acting Assoc. Dir., Office of Domestic Operations, USCIS, to Field Leadership, USCIS, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children* 1 (Sept. 4, 2009). As DHS explained, although the agency did not interpret the INA to afford the affected aliens relief, several circuits had disagreed and bills were pending in both houses of Congress to ratify that view. *Ibid.* The pending legislation—which was expected to affect fewer than 100 aliens per year, H.R. Rep. No. 911, 110th Cong., 2d Sess. 4 (2008)—was enacted into law less than five months later, and the policy ended. Pub. L. No. 111-83, § 568(c), 123 Stat. 2186. At most, then, DHS effectively acquiesced in lower-court rulings to allow Congress to enact a legislative fix. By contrast, DACA recipients indisputably have no path to lawful status, and the

19

maintenance of DACA is impeding any path to legislative resolution.

The rest of the historical policies on which respondents rely all at least purported to implement either separate, specific statutory authority, see 8 U.S.C. 1252(b) (1988 & Supp. II 1990) (voluntary departure); 8 U.S.C. 1182(d)(5)(A) (parole), the President's Article II authority over foreign affairs, see USCIS, DHS, *Adjudicator's Field Manual* Ch. 38.2 (deferred enforced departure), or both. Any congressional approval or tolerance of such policies, at most, ratified or acquiesced in the asserted scope of that distinct authority. And, in fact, with respect to extended-voluntary-departure policies, like Family Fairness, any arguable statutory basis has since been foreclosed. U.S. Br. 48-49.

The affirmative benefits triggered by DACA are not irrelevant simply because they are afforded under separate, longstanding regulations. Cf. Cal. Br. 38-39. Although the benefit-conferring regulations predate DACA and apply to all deferred action, the DACA policy triggered those benefits in a manner that had never previously been done. Section 1324a may have ratified extending work authorization to aliens who received deferred action on an individualized basis or pursuant to interstitial class-based deferred-action policies. See 8 U.S.C. 1324a(h)(3) (referring to aliens "authorized to be so employed * * * by the Attorney General"). But it cannot reasonably be interpreted to have "br[ought] about [the] enormous and transformative expansion" in the Secretary's authority that would be required to support conferring work authorization in conjunction with a deferred-action policy like DACA. *Utility Air Regulatory Grp.* v. *EPA*, 573 U.S. 302, 324 (2014). And that is so whether deferred action and associated benefits

20

are granted to everyone, or *nearly* everyone, who meets the eligibility criteria.  Cf. N.Y. Br. 31-34.

b. Because the DACA policy is unlawful, DHS had no choice but to rescind it and the APA provides no basis for vacating its termination.  Although respondents urge (Ind. Br. 37) the Court not to reach a conclusion on the policy's lawfulness, the Ninth Circuit's judgment rests on its unequivocal conclusion that "DACA was a permissible exercise of executive discretion."  *Regents* Supp. Br. App. 56a.  To be sure, the Court can hold that rescinding DACA based on the Executive's own view of its enforcement duties was not a "clear error of judgment," U.S. Br. 50 (quoting *State Farm*, 463 U.S. at 43), without addressing DACA's legality.  But if the Court disagrees, DACA's ultimate legality is squarely presented.

Respondents argue (Regents Br. 44) that DHS's legal conclusion must survive *de novo* review.  But they fail to identify any case finding an agency enforcement decision arbitrary and capricious merely because the court disagrees with the agency's reasonable interpretation of the scope of its legal authority to not enforce federal law.  And in the context that respondents identify as most analogous—the denial of a petition for rulemaking—this Court explained that review under the APA must be "'extremely limited'" and "'highly deferential,'" and found the agency's decision not to exercise its authority arbitrary and capricious only after concluding that "[t]he statute [wa]s unambiguous."  *Massachusetts*, 549 U.S. at 527-528, 529 (citation omitted).

Respondents contend (N.Y. Br. 31-42) that DHS offered an inadequate explanation for its legal analysis.  But the APA requires only that "the agency's path may reasonably be discerned."  *State Farm*, 463 U.S. at 43

21

(citation omitted).  Both memoranda reflect DHS's conclusion that the DACA policy exceeded the agency's "statutory authority." *Regents* Pet. App. 116a, 123a. That conclusion does not depend on whether DACA prevented DHS officials from exercising any discretion. See pp. 19-20, *supra*.  And neither Secretary "place[d] any significant weight" on Attorney General Sessions' statement that DACA was unconstitutional, *FCC* v. *National Citizens Comm. for Broadcasting*, 436 U.S. 775, 804 n.23 (1978)—which, in any event, simply underscored his strongly held view that DACA was based on a statutorily unauthorized exercise of Executive power.

DHS was not required to consider whether DACA's illegality could be addressed by separating deferred action—generally or under DACA specifically—from at least some of the benefits it triggers.  D.C. Br. 39-44. Deferred action coupled with the associated benefits are the two legs upon which the DACA policy stands, as many of the briefs in support of respondents confirm. See, *e.g.*, Inst. of Higher Educ. Amicus Br. 5-11.  Indeed, it is largely the eligibility for benefits triggered by deferred action that allows DACA recipients to "come out of the shadows and become productive members of their communities."  N.Y. Br. 2.  It was not arbitrary and capricious for DHS to view deferred action and its collateral benefits as importantly linked.

4.  Finally, DACA's rescission does not violate equal protection principles.  U.S. Br. 52-57.  As an initial matter, all of the respondents in the California litigation and the non-State respondents in the New York litigation have forfeited any defense of the lower courts' refusal to dismiss their equal protection claims.  Although the individual respondents assert (at 12 n.1) that their equal protection claims are not before the Court, the

22

district-court orders refusing to dismiss those claims were certified for interlocutory appeal and consolidated with the preliminary-injunction appeals, *Regents* Supp. Br. App. 22a; *Batalla Vidal* Pet. App. 147a-157a, 175a-176a; and the Ninth Circuit specifically affirmed the California district court's equal protection analysis in the judgment under review, *Regents* Supp. Br. App. 73a-77a.

The substantive defense from the New York State respondents (at 53-56) is also unpersuasive. Respondents do not even attempt to demonstrate that DACA's rescission is "so outrageous" that it overcomes this Court's concerns about recognizing a discriminatory-motive challenge to an exercise of immigration enforcement discretion. *AADC*, 525 U.S. at 491. Instead, they contend that *AADC* is not implicated because vacating the rescission would protect their proprietary interests and not interfere with DHS's exercise of enforcement discretion in any individual case. But vacating the rescission would interfere with DHS's categorical exercise of enforcement discretion *for all its cases*, and respondents' interests are protected only by "prolong[ing] * * * continuing violation[s]" of federal immigration law. *Id.* at 490. The reasoning of *AADC* fully applies. In any event, respondents offer nothing more than the lower courts' opinions to defend their equal protection claims even under the *Arlington Heights* standard. As explained, their allegations fall woefully short of stating a claim even under that standard. U.S. Br. 54-57.

### D. The Judgments And Orders Should Be Reversed

Because DACA's rescission is unreviewable and in any event lawful, the judgments and orders before this

23

Court should be reversed. Respondents' incorrect arguments about the scope of the administrative record should not prevent the Court from doing so. As an initial matter, those arguments are irrelevant to the Court's review of the D.C. district court's final judgment. Respondents in that case did not challenge the completeness of the administrative record, *NAACP* Pet. App. 18a, and do not challenge it here. As for the other cases, respondents themselves recognize that the record dispute is irrelevant if DACA's rescission is unreviewable. Cal. Br. 54. Regardless, given the nature of the rescission, no dispute over the record could show that the rescission was arbitrary and capricious or sustain the district courts' nationwide preliminary injunctions.

There is no basis to think that reasons offered by either Secretary were pretextual. Cf. Regents Br. 56-58. At most, respondents identify unstated policy reasons why the President or the former Attorney General may have wanted to see DACA rescinded. But "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Department of Commerce*, 139 S. Ct. at 2573. *A fortiori*, it may not do so based on such alleged reasons of *other* officials.

24

\* \* \* \* \*

For the foregoing reasons and those stated in our opening brief, the judgments of the Ninth Circuit and the District Court for the District of Columbia, as well as the orders of the Eastern District of New York, should be reversed.

Respectfully submitted.

NOEL J. FRANCISCO
*Solicitor General*

OCTOBER 2019

No. 18-589

### In The
# Supreme Court of the United States

———————◆———————

CHAD WOLF, ACTING SECRETARY
OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

MARTÍN JONATHAN BATALLA VIDAL, ET AL.,

*Respondents.*

———————◆———————

**On Writ Of Certiorari Before Judgment
To The United States Court Of Appeals
For The Second Circuit**

———————◆———————

**MOTION FOR LEAVE TO FILE
SUPPLEMENTAL BRIEF AFTER ORAL
ARGUMENT, AND SUPPLEMENTAL BRIEF**

———————◆———————

TRUDY S. REBERT
NATIONAL IMMIGRATION
  LAW CENTER
P.O. Box 721361
Jackson Heights, NY 11372
(646) 867-8793

ARACELI MARTÍNEZ-OLGUÍN
MAYRA B. JOACHIN
NATIONAL IMMIGRATION
  LAW CENTER
3450 Wilshire Blvd.
#108-62
Los Angeles, CA 90010
(213) 639-3900

AMY S. TAYLOR
PAIGE AUSTIN
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
(718) 418-7690

MICHAEL J. WISHNIE
  *Counsel of Record*
MUNEER I. AHMAD
MARISOL ORIHUELA
JEROME N. FRANK LEGAL
  SERVICES ORGANIZATION
P.O. Box 209090
New Haven, CT 06520
(203) 432-4800
michael.wishnie@yale.edu

KAREN C. TUMLIN
Cooperating Attorney
JEROME N. FRANK LEGAL
  SERVICES ORGANIZATION
P.O. Box 209090
New Haven, CT 06520
(323) 316-0944

*Counsel for* Batalla Vidal
  *Non-State Respondents*

———————◆———————

**AR4391**

1

## MOTION FOR LEAVE TO FILE
## SUPPLEMENTAL BRIEF AFTER ORAL
## ARGUMENT, AND SUPPLEMENTAL BRIEF

Pursuant to Supreme Court Rules 25.6 and 25.7, non-State respondents Martín Batalla Vidal, et al., move for leave to file a supplemental brief presenting new information that was not available at the time of oral argument.

First, this case involves whether the decision to terminate DACA must be vacated because, among other reasons, the Department of Homeland Security did not adequately assess the relevant reliance interests when it terminated the program. *See* Br. of DACA Recipient Respondents at 34 ("Here, the government never considered the 'disruption' its policy 'would have on the lives of DACA recipients, let alone their families, employers and employees, schools and communities.'") (citing *Regents* Pet. App. 60a); *see also* Transcript of Oral Argument at 23-24. The COVID-19 pandemic, and resulting mobilization of resources, provide a vivid illustration of some of the reliance interests engendered by the program that the agency failed to consider – namely, those borne by healthcare and other essential service providers that employ DACA recipients. While the agency could not have predicted the pandemic, at the very least it was required to give adequate consideration to the significant adverse consequences of termination for these and other key societal actors who rely on and benefit from the work of DACA recipients. It failed to do so.

**AR4392**

2

Second, the question of whether DACA recipients would be deported if the program were terminated was raised at oral argument. Tr. at 48-9. The federal government recently clarified its plans regarding the deportation of DACA recipients with final orders of removal.

Respectfully submitted,

TRUDY S. REBERT
NATIONAL IMMIGRATION
  LAW CENTER
P.O. Box 721361
Jackson Heights, NY 11372
(646) 867-8793

ARACELI MARTÍNEZ-OLGUÍN
MAYRA B. JOACHIN
NATIONAL IMMIGRATION
  LAW CENTER
3450 Wilshire Blvd. #108-62
Los Angeles, CA 90010
(213) 639-3900

AMY S. TAYLOR
PAIGE AUSTIN
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
(718) 418-7690

April 2, 2020

MICHAEL J. WISHNIE
  *Counsel of Record*
MUNEER I. AHMAD
MARISOL ORIHUELA
JEROME N. FRANK LEGAL
  SERVICES ORGANIZATION
P.O. Box 209090
New Haven, CT 06520
(203) 432-4800
michael.wishnie@yale.edu

KAREN C. TUMLIN
Cooperating Attorney
JEROME N. FRANK LEGAL
  SERVICES ORGANIZATION
P.O. Box 209090
New Haven, CT 06520
(323) 316-0944

*Counsel for* Batalla Vidal
  *Non-State Respondents*

**AR4393**

i

## TABLE OF CONTENTS

Page

SUPPLEMENTAL BRIEF FOR RESPONDENTS
MARTÍN JONATHAN BATALLA VIDAL ET
AL. ....................................................................   1

## TABLE OF AUTHORITIES

OTHER AUTHORITIES

Matthew Albence, Acting Dir., Immigr. & Cus-
toms Enforcement, Public Safety Media Brief-
ing (Jan. 23, 2020) ......................................................4

*Resources and Authorities Needed to Protect and
Secure the Homeland: Hearing Before the S.
Comm. on Homeland Sec. and Governmental
Affairs*, 116th Cong. (2020) .......................................4

BRIEFS

Brief for 109 Cities, Counties, et al. as Amicus
Curiae Supporting Respondents .............................3

Brief for Ass'n of Am. Medical Colleges as Ami-
cus Curiae Supporting Respondents ...................1, 2

Brief for Nineteen Coll. and Univ. as Amicus Cu-
riae Supporting Respondents ..................................3

Brief for SEIU, AFL-CIO, and AFSCME as Ami-
cus Curiae Supporting Respondents .......................3

Brief for United We Dream as Amicus Curiae
Supporting Respondents...........................................3

**AR4394**

1

## SUPPLEMENTAL BRIEF FOR RESPONDENTS
## MARTÍN JONATHAN BATALLA VIDAL ET AL.

*Batalla Vidal*-Respondents submit this brief to advise the Court of the bearing on this matter of the COVID-19 pandemic and the current national state of emergency. *Batalla Vidal*-Respondents argue that the decision to terminate DACA must be vacated because, among other reasons, the agency did not adequately assess the relevant reliance interests when it terminated the program. The public health crisis now confronting our nation illuminates the depth of those interests as borne by employers, civil society, state and local governments, and communities across the country, and especially by healthcare and other essential services providers. Furthermore, it throws into sharp relief DACA recipients' important contributions to the country and the significant adverse consequences of eliminating their ability to live and work without fear of imminent deportation. These are the very consequences the agency failed to consider.

Healthcare providers on the frontlines of our nation's fight against COVID-19 rely significantly upon DACA recipients to perform essential work. Approximately 27,000 DACA recipients are healthcare workers—including nurses, dentists, pharmacists, physician assistants, home health aides, technicians, and other staff—and nearly 200 are medical students, residents, and physicians. Brief for Ass'n of Am. Medical Colleges as Amicus Curiae Supporting Respondents at 2-3. The pandemic sheds new light on the reliance interests of healthcare providers and the

**AR4395**

2

public health consequences of ignoring those interests, presciently identified by the Association of American Medical Colleges and 32 allied organizations in their amicus brief:

> The country [is not] prepared to fill the loss that would result if DACA recipients were excluded from the health care workforce. The number of physicians in the United States has not kept pace with our growing and aging population and a commensurate increase in patients. . . . These shortages will be felt most keenly in medically underserved areas, such as rural settings and poor neighborhoods – precisely the areas in which DACA recipients are likeliest to work.

> The risk of a pandemic also continues to grow, since infectious diseases can spread around the globe in a matter of days due to increased urbanization and international travel. . . . To ensure health security, the country needs a robust health workforce. Rescinding DACA, however, would deprive the public of domestically educated, well-trained, and otherwise qualified health care professionals. . . .

*Id.* at 4-5; *see also id.* at 16-24.

The record contains additional evidence of DACA recipients' involvement in providing healthcare. For example, plaintiff-respondent Jirayut ("New") Latthivongskorn is a resident physician at the Zuckerberg San Francisco General Hospital and Trauma Center, having graduated from the University of California, San Francisco School of Medicine. J.A. at 916-931.

**AR4396**

3

Other DACA-recipient healthcare providers include
Dr. Dalia Larios, a physician at Brigham and Women's
Hospital and Massachusetts General Hospital, Brief
for Nineteen Coll. and Univ. as Amicus Curiae Sup-
porting Respondents at 17; Dr. T.W., a surgeon, Brief
for SEIU, AFL-CIO, and AFSCME as Amicus Curiae
Supporting Respondents at 7-9; Jesus Contreras, a
Houston-area paramedic, Brief for 109 Cities, Coun-
ties, et al. as Amicus Curiae Supporting Respondents
at 10; Yazmin I., a medical intern in St. Louis, Brief for
United We Dream as Amicus Curiae Supporting Re-
spondents at 15; Luis A., an intensive care nurse in Ar-
kansas, *id.* at 26; Daniel C., a registered nurse in New
Jersey, *id.* at 27; M.R., a homecare worker for the el-
derly in California, SEIU, AFL-CIO, and AFSCME Am.
Br. at 4-5; I.T., a surgical technician in El Paso, *id.* at
15-17; and plaintiff-respondent Martín Jonathan Ba-
talla Vidal, a physical therapist. J.A. at 909. DACA re-
cipients are essential to protecting communities across
the country endangered by COVID-19. Termination of
DACA during this national emergency would be cata-
strophic.[1]

---

[1] The COVID-19 pandemic also highlights DACA recipients'
impact on the economy and the importance of their participation
in public health measures. Millions of family members, including
U.S. citizens, rely upon DACA recipients for their economic and
physical well-being. Furthermore, the forbearance from immigra-
tion enforcement that DACA affords promotes compliance by
DACA recipients with stay-at-home orders and facilitates safe
testing and treatment for COVID-19. These steps are essential to
the public health measures now being taken to slow transmission
of the virus and prevent the nation's healthcare system from be-
ing overwhelmed.

4

Petitioners recently have affirmed the significant risks faced by DACA recipients if termination of the program were upheld. In prior public statements, the President had averred that, upon the rescission of DACA, the administration would not target former DACA recipients for removal. J.A. at 496; *see* Tr. 48-9. Since Oral Argument, however, Petitioners have made clear that they plan to begin deporting DACA recipients if the termination of the program is upheld. On January 23, the Acting ICE Director stated, in reference to DACA recipients with final orders of removal, "If they get ordered removed, and DACA is done away with by the Supreme Court, we can actually effectuate those removal orders." Matthew Albence, Acting Dir., Immigr. & Customs Enforcement, Public Safety Media Briefing (Jan. 23, 2020*). The Acting Secretary of DHS made similar statements while testifying before the Senate on March 4. *Resources and Authorities Needed to Protect and Secure the Homeland: Hearing Before the S. Comm. on Homeland Sec. and Governmental Affairs*, 116th Cong. (2020) (statement of Chad F. Wolf, Sec'y, Dep't of Homeland Sec.) ("So when we get final orders of removal, we're going to effectuate those.").

If the Court deems it appropriate, *Batalla Vidal*-Respondents would welcome the opportunity for supplemental briefing on the scope and relevance of third parties' reliance interests, including to address whether remand to the agency for reconsideration of

AR4398

5

its decision to terminate DACA is appropriate in light of the extraordinary public health emergency.

Respectfully submitted,

TRUDY S. REBERT
NATIONAL IMMIGRATION
   LAW CENTER
P.O. Box 721361
Jackson Heights, NY 11372
(646) 867-8793

ARACELI MARTÍNEZ-OLGUÍN
MAYRA B. JOACHIN
NATIONAL IMMIGRATION
   LAW CENTER
3450 Wilshire Blvd. #108-62
Los Angeles, CA 90010
(213) 639-3900

AMY S. TAYLOR
PAIGE AUSTIN
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
(718) 418-7690

April 2, 2020

MICHAEL J. WISHNIE
   *Counsel of Record*
MUNEER I. AHMAD
MARISOL ORIHUELA
JEROME N. FRANK LEGAL
   SERVICES ORGANIZATION
P.O. Box 209090
New Haven, CT 06520
(203) 432-4800
michael.wishnie@yale.edu

KAREN C. TUMLIN
Cooperating Attorney
JEROME N. FRANK LEGAL
   SERVICES ORGANIZATION
P.O. Box 209090
New Haven, CT 06520
(323) 316-0944

*Counsel for* Batalla Vidal
   *Non-State Respondents*

**AR4399**