No. 18-587

In The

# Supreme Court of the United States

————

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, *et al.*,

*Respondents.*

————

**On Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit**

————

**BRIEF OF PROFESSORS—
DEAN RONALD A. CASS,
CHRISTOPHER C. DEMUTH, SR., AND
JAMES L. HUFFMAN—AS *AMICI CURIAE*
IN SUPPORT OF NEITHER PARTY**

————

RONALD A. CASS
  *Counsel of Record*
CASS & ASSOCIATES, PC
10560 Fox Forest Drive
Great Falls, VA 22066-1743
(703) 438-7590
roncass@cassassociates.net

*Counsel for Amici Curiae*

August 23, 2019

WILSON-EPES PRINTING CO., INC. – (202) 789-0096 – WASHINGTON, D. C. 20002

AR4400

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................ iii

INTEREST OF *AMICI CURIAE* ........................ 1

SUMMARY OF ARGUMENT ............................ 2

ARGUMENT ......................................................... 11

   I.  Judicial Review Should Not Intrude on Discretion Granted to Administrators by Law ........................................................... 11

      A. Courts' Review of Discretionary Agency Action under the APA Is Strictly Limited ................................................. 11

         1. The APA Provides Limited Review of Discretionary Actions for which Review Is Not Excluded ................. 11

         2. Discretionary Actions Based on Policy Considerations Are Subject to Narrow Review for Specific Decision-Making Failures .............. 13

      B. The Scope of Review for Discretionary Agency Actions Is Identical for Initial Decisions on an Issue or Changes in Agency Policy Respecting an Issue ..... 18

  II.  Courts Should Not Inquire into, or Base Decisions on, Administrators' Motives for Actions Challenged under the APA ......... 25

      A. Review of Agency Action under the APA Focuses on Lawfulness Judged by the Reasons Given, Not Motives .... 25

AR4401

ii

TABLE OF CONTENTS—Continued

Page

B. Inquiries into Officials' Motives Intrude on Spheres of Action Committed to Co-Equal Branches of Government and Invite Litigation Based on Political or Personal Predilections................ 28

CONCLUSION ..................................................... 33

**AR4402**

iii

# TABLE OF AUTHORITIES

CASES                                                    Page(s)

*American Trucking Associations v.*
*United States,*
344 U.S. 298 (1953)................................    12

*American Trucking Assns., Inc. v.*
*Atchison, T. & S. F. R. Co.,*
387 U. S. 397 (1967)................................  23-24

*Baltimore Gas & Electric Co. v. Natural*
*Resources Defense Council, Inc.,*
462 U.S. 87 (1983)....................................    17

*Barnhart v. Walton,*
535 U.S. 212 (2002)..................................    18

*Bowman Transp., Inc.* v. *Arkansas-Best*
*Freight System, Inc.,*
419 U. S. 281 (1974)............................ 4, 13, 23

*Camp v. Pitts,*
411 U.S. 138 (1973)................................. 28, 29

*Caperton v. A.T. Massey Coal Co., Inc.,*
556 U.S. 868 (2009)..................................    29

*Chevron U.S.A. Inc. v. Natural Resources*
*Defense Council, Inc.,*
467 U.S. 837 (1984) (*Chevron*)....................   5, 15

*Citizens to Preserve Overton Park v. Volpe,*
401 U.S. 402 (1971)................................. 17, 18

*City of Arlington v. Federal*
*Communications Commission,*
133 S. Ct. 1863 (2013) ..............................    16

*Cuozzo Speed Technologies, LLC v. Lee,*
136 S. Ct. 2131 (2016).......................... 5, 15, 16

**AR4403**

iv

TABLE OF AUTHORITIES—Continued

Page(s)

*Department of Agriculture v. Moreno*,
   413 U.S. 528 (1973).....................................8, 26, 27

*Department of Commerce v. New York*,
   588 U.S. ___ (2019) .................................*passim*

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016)..............................   24

*Federal Communications Commission v.*
   *Fox Television Stations, Inc.*,
   556 U.S. 502 (2009).................................*passim*

*Federal Communications Commission v.*
   *National Citizens Committee*
   *for Broadcasting*,
   436 U.S. 775 (1978)..................................   12

*FERC v. Electric Power Supply Assn.*,
   577 U. S. ___ (2016) .................................  7, 24

*Free Enterprise Fund v. Public Company*
   *Accountability Oversight Board*,
   561 U.S. 477 (2010)..................................20, 21

*Gibson v. Berryhill*,
   411 U.S. 564 (1973)..................................29, 30

*Gregoire v. Biddle*,
   177 F.2d 579 (2d Cir. 1949) ...........7-8, 9, 25, 30

*Gundy v. United States*,
   588 U.S. ____ (2019)..................................   14

*Gutierrez-Brizuela v. Lynch*,
   834 F.3d 1142 (10th Cir. 2016)................   5, 16

*Heckler v. Chaney*,
   470 U.S. 821 (1985).................................*passim*

AR4404

v

TABLE OF AUTHORITIES—Continued

Page(s)

*Loving v. United States*,
    517 U.S. 748 (1996).................................. 14

*Kisor v. Wilkie*,
    588 U.S. ___ (2019) ................................... 16

*MCI Telecommunications Corp. v.
    American Tel. & Tel.*,
    512 U.S. 218 (1994)................................. 17

*Michigan v. Environmental Protection
    Agency*, 135 S. Ct. 2600 (2015) ................. 15

*Morgan v. United States*,
    304 U.S. 1 (1938)............................. 7, 9, 25, 30

*Motor Vehicle Mfrs. Assn. of United States, Inc.
    v. State Farm Mut. Automobile Ins. Co.*,
    463 U. S. 29 (1983)..................................*passim*

*National Broadcasting Co. v. United States*,
    319 U.S. 190 (1943)................................. 17

*National Cable & Telecommunications
    Association v. Brand X Internet Services*,
    545 U.S. 967 (2005)..................................... 3, 11

*Permian Basin Area Rate Cases*,
    390 U. S. 747, 390 U. S. 784 (1968).......... 23

*Romer v. Evans*,
    517 U.S. 620 (1996)............................. 8, 25, 26

*SEC v. Chenery*,
    318 U.S. 80 (1943).................................... 9, 28

*Smiley v. Citibank (South Dakota), N.A.*,
    517 U.S. 735 (1996)............................ 12, 15, 18

AR4405

vi

TABLE OF AUTHORITIES—Continued

Page(s)

*Trump v. Hawaii,*
585 U. S. ___ (2018)...................................*passim*

*Tumey v. Ohio,*
273 U.S. 510 (1927)...................................   29

*United States v. Morgan,*
313 U.S. 409 (1941)................................*passim*

*Ward v. Village of Monroeville,*
409 U.S. 57 (1972)....................................   29

*Wayman v. Southard,*
23 U.S. (10 Wheat.) 1 (1825) ...................   14

*Webster v. Doe,*
486 U.S. 592 (1988)..................................   12

CONSTITUTION

U.S. Const. art. II, §3 ..................................   20

STATUTES

5 U.S.C. §701(a)(2) .....................................   3, 12

5 U.S.C. §706 .......................................4-5, 14, 15

5 U.S.C. §706(2)(A)...................................*passim*

5 U.S.C. §706(2)(B).....................................   5

5 U.S.C. §706(2)(C)...................................   4, 5, 13

5 U.S.C. §706(2)(D)......................................   4, 13

**AR4406**

vii

TABLE OF AUTHORITIES—Continued

OTHER AUTHORITIES                    Page(s)

Larry Alexander & Saikrishna Prakash,
*Delegation Really Running Riot*, 93 Va.
L. Rev. 1035 (2007) ................................... 14

Jack M. Beermann, *End the Failed* Chevron
*Experiment Now: How* Chevron *Has
Failed and Why It Can and Should Be
Overruled*, 42 Conn. L. Rev. 779 (2010) ... 16

Stephen G. Breyer, *Judicial Review of
Questions of Law and Policy*, 38 Admin.
L. Rev. 363 (1986) ................................... 15

Clark Byse, *Judicial Review of Admin-
istrative Interpretation of Statutes: An
Analysis of* Chevron *Step Two*, 2 Admin.
L.J. 255 (1988) ......................................... 14, 18

Ronald A. Cass, Auer *Deference: Doubling
Down on Delegation's Defects*, 87 Fordham
L. Rev. 531 (2018) ................................... 12

Ronald A. Cass, *Delegation Reconsidered: A
Delegation Doctrine for the Modern Admin-
istrative State*, 40 Harv. J.L. & Pub. Pol'y
147 (2016) ................................................. 14

Ronald A. Cass, *Is* Chevron*'s Game Worth
the Candle? Burning Interpretation at
Both Ends*, *in* Liberty's Nemesis: The
Unchecked Expansion of the State (Dean
Reuter & John Yoo eds., 2016) ................ 16

AR4407

viii

TABLE OF AUTHORITIES—Continued

Page(s)

Ronald A. Cass, *Nationwide Injunctions' Governance Problems: Forum-Shopping, Politicizing Courts, and Eroding Constitutional Structure*, 27 Geo. Mason L. Rev. 35 (issue no. 1, 2019) (forthcoming), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3390064 ............. 10, 31

Ronald A. Cass, *Vive La Deference?: Rethinking the Balance Between Administrative and Judicial Discretion*, 83 Geo. Wash. L. Rev. 1294 (2015) ........................ 14, 18

Christopher DeMuth, *OIRA at Thirty*, 63 Admin. L. Rev. 101 (2011) ........................ 17

John F. Duffy, *Administrative Common Law in Judicial Review*, 77 Tex. L. Rev. 113 (1998) .................................................. 14-15

William N. Eskridge, Jr. & Lauren E. Baer, *The Continuum of Deference: Supreme Court Treatment of Agency Statutory Interpretation from* Chevron *to* Hamdan, 96 Geo. L.J. 1083 (2008) ........................... 15

Cynthia R. Farina, *Statutory Interpretation and the Balance of Power in the Administrative State*, 89 Colum. L. Rev. 452 (1989) ........................................................... 15

Merrick Garland, *Deregulation and Judicial Review*, 98 Harv. L. Rev. 507 (1985) ........ 6, 19

AR4408

ix

TABLE OF AUTHORITIES—Continued

Page(s)

Michael Herz, *Deference Running Riot: Separating Interpretation and Lawmaking Under* Chevron, 6 Admin. L.J. Am. U. 187 (1992) ............................................ 16, 18

Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327 (2002) ......... 14

Gary Lawson & Stephen Kam, *Making Law out of Nothing at All: The Origins of the* Chevron *Doctrine*, 65 Admin. L. Rev. 1 (2013)...................................................... 15

Elbert Lin, *States Suing the Federal Government: Protecting Liberty or Playing Politics?*, 52 U. Rich. L. Rev. 633 (2018)..................................................... 10, 31

James Madison, 1 Annals of Congress 499 (1789)...................................................... 21

Thomas O. McGarity, *Some Thoughts on "Deossifying" the Rulemaking Process*, 41 Duke L.J. 1385 (1992)............................... 6, 19

McNollgast, *The Political Origins of the Administrative Procedure Act*, 15 J.L. Econ. & Org. 180 (1999)............................ 19, 21

Thomas W. Merrill & Kristin E. Hickman, Chevron's *Domain*, 89 Geo. L.J. 833 (2001)...................................................... 15

Glen O. Robinson, *The Federal Communications Commission: An Essay on Regulatory Watchdogs*, 64 Va. L. Rev. 169 (1978).. 6, 19, 20

**AR4409**

x

TABLE OF AUTHORITIES—Continued

Page(s)

Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 Duke L.J. 511 (1989)........................   15

George B. Shepherd, *Fierce Compromise: The Administrative Procedure Act Emerges from New Deal Politics*, 90 Nw. U. L. Rev. 1557 (1996).........................................5-6, 19, 21

James Q. Wilson, *The Dead Hand of Regulation*, 25 Pub. Int. 39 (Fall 1971)....  6, 20

IN THE

# Supreme Court of the United States

————

No. 18-587

————

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, *et al.*,
*Respondents.*

————

**On Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit**

————

**BRIEF OF PROFESSORS—
DEAN RONALD A. CASS,
CHRISTOPHER C. DEMUTH, SR., AND
JAMES L. HUFFMAN—AS *AMICI CURIAE*
IN SUPPORT OF NEITHER PARTY**

————

**INTEREST OF *AMICI CURIAE*[1]**

*Amici* are teachers, scholars, and former government officials who each have had extensive engagement with administrative law over a period of more than 40 years. *Amici* have served in a variety of positions in

———————

[1] The parties have consented in writing to the filing of this brief, and their letters of consent have been filed with the Clerk. No party's counsel authored this brief in whole or in part, and no person or entity other than *amici* or their counsel made a monetary contribution intended to fund its preparation or submission.

2

the United States government, including positions in the Executive Office of the President, executive departments, independent agencies, and the judicial branch. *Amici* have been responsible for making decisions in official capacities and for reviewing agency decisions. They also have been deeply involved with organizations devoted to administrative law and have taught classes and written numerous articles and books on matters implicated in the questions presented in this case. This brief reflects *amici*'s long-standing interests in the subject of administrative law and particularly in standards for judicial review of administrative action.

## SUMMARY OF ARGUMENT

The questions presented in this case address (1) whether the particular decision at issue is "committed to agency discretion by law," and (2) and whether the particular decision was lawful.

The critical inquiry in the second question is the manner in which courts decide whether an administrative action is "arbitrary" or "capricious" or "an abuse of discretion." See Administrative Procedure Act (APA), 5 U.S.C. §706(2)(A). That inquiry also implicates two subsidiary questions: the extent to which an administrative action that changes a prior agency action bears a higher burden of justification than an action taken on a matter of first impression for the agency, and the degree to which courts are permitted to inquire into the particular considerations in the mind of an administrator in assessing the lawfulness of an agency action.

*Amici* address only the considerations respecting the second question presented, elaborating considerations relevant to the manner in which courts decide whether an administrative action is "arbitrary, capricious, [or]

**AR4412**

3

an abuse of discretion." APA, 5 U.S.C. §706(2)(A). In doing so, however, we also address the dividing line between the determination necessary to resolving question (1) (whether a matter is committed to agency discretion by law) and the central part of question (2) (whether a decision is arbitrary, capricious, or an abuse of discretion). Although our analysis generally accords with arguments favorable to petitioners, our goal is not to support one party but to clarify analysis of issues respecting the nature of review that are before the Court in the instant case.

*Distinguishing Reviewable from Unreviewable Discretion.* The APA distinguishes two sorts of analysis. One is *whether* a matter is "committed to agency discretion by law" in such a manner as to preclude review. See, e.g., *Heckler v. Chaney*, 470 U.S. 821, 831–35 (1985) (*Chaney*). The other is *how* courts review matters on which agencies enjoy discretion that remains subject to judicial review. See, e.g., *Federal Communications Commission v. Fox Television Stations, Inc.*, 556 U.S. 502, 511–14 (2009) (*Fox Television Stations*); *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967, 981, 989 (2005) (*Brand X*). The APA both excludes agency actions from judicial review "to the extent that . . . agency action is committed to agency discretion by law," APA, 5 U.S.C. §701(a)(2), and provides for review, among other things, for "an abuse of discretion." APA, 5 U.S.C. §706(2)(A). While the APA does not insulate *all* discretionary action from review—a reading that would make providing review for "abuse of discretion" incongruous—the text of the APA plainly commands respect from courts for the exercise of delegated discretion by agencies.

4

*Scope of Review for Ordinary Discretion.* When statutes provide limiting directives, exercises of discretion can be reviewed to assure that the administrator has not acted contrary to those directives. See APA, 5 U.S.C. §706(2)(A), §706(2)(C), §706(2)(D); *Chaney*, 470 U.S. at 831–35. Apart from specific constraints on the scope of delegated discretion, the exercise of discretion is checked only to assure consistency with basic principles for reasoned decision-making. See, e.g., *Fox Television Stations*, 556 U.S. at 513–14; *Bowman Transp., Inc.* v. *Arkansas-Best Freight System, Inc.*, 419 U. S. 281, 286 (1974) (*Bowman Transp.*). As this Court has emphasized, the scope of review is "narrow," an observation frequently coupled with the caution that "a court is not to substitute its judgment [on questions of policy] for that of the agency." *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983) (*State Farm*). Similarly, the Court stated that "a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute." *Id.*, at 42. That narrow review standard is consistent with an appreciation that even reviewable discretionary action is still *discretionary* action—and the fact that a range of discretionary actions is made expressly unreviewable indicates the law's antipathy to intrusive judicial review of administrative discretion.

Concern over judicial intrusion into discretionary policy-based judgments is most evident in the narrowness of the terms used to authorize reviewing courts to set the agency action aside. See APA, 5 U.S.C. §706(2)(A). The terms respecting review of discretionary decisions contrast sharply with those respecting review of interpretations of law. See APA, 5 U.S.C.

5

§706, §706(2)(B), §706(2)(C). Despite confusion on this score, deference to administrative *exercises* of discretion for policy matters—as opposed to *interpretation* of the *scope* of discretion committed to executive officers—is the cornerstone of decisions, such as the *Chevron* decision, interpreting those commands, and informs demands to clarify the meaning of *Chevron* (or to abandon the test associated with it). See, e.g., *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–46, 859, 862–66 (1984) (*Chevron*); *Cuozzo Speed Technologies, LLC v. Lee*, 136 S. Ct. 2131, 2142–44 (2016) (*Cuozzo*); *id*. at 2148 (Thomas, J. concurring); *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149, 1152–58 (10th Cir. 2016) (Gorsuch, J., concurring).

*Scope of review for policy changes*. The APA and the precedents of this Court do not support different degrees of scrutiny—in particular, they do not support heightened scrutiny—for use of discretionary authority to make changes in agency policies. See, e.g., *State Farm*, 463 U.S. at 41. The text of the APA plainly does not require different review standards for agency exercises of discretion that alter the policies guiding prior exercises of agency discretion. As this Court has said: "[t]he statute makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action." *Fox Television Stations*, 556 U.S. at 515; see also *State Farm*, 463 U.S. at 41. Nor would it be reasonable to infer from the APA a general intention to make successive exercises of policy discretion increasingly difficult. Those who wrote and voted for the APA were acutely aware of the complicated nature of administrative decision-making, including the forces that promote—and also those that oppose—changes in policy over time. See, e.g., George B. Shepherd, *Fierce Compromise: The Administrative Procedure Act*

6

*Emerges from New Deal Politics*, 90 Nw. U. L. Rev. 1557, 1560–61, 1583–1623, 1655–68 (1996).

As former government officials, *amici* attest that there are many impediments to making policy changes, from the procedural rigors of some policymaking modes to the resistance of individuals and groups advantaged by or invested in the existing policy. See also Merrick Garland, *Deregulation and Judicial Review*, 98 Harv. L. Rev. 507, 508 (1985); Thomas O. McGarity, *Some Thoughts on "Deossifying" the Rulemaking Process*, 41 Duke L.J. 1385, 1385–88, 1396–98 (1992). It is important to note as well that groups that may resist policy changes frequently include agency staff, a set of government officials who tend to turn over less often than politically-appointed officials with policy-making authority. Their relative longevity in office and frequent association with the adoption of earlier policy initiatives can reduce their enthusiasm about making changes supported by politically-appointed officials who have different views and shorter time horizons on getting policies implemented. See, e.g., Glen O. Robinson, *The Federal Communications Commission: An Essay on Regulatory Watchdogs*, 64 Va. L. Rev. 169, 185–87, 216–19 (1978); James Q. Wilson, *The Dead Hand of Regulation*, 25 Pub. Int. (Fall 1971) at 39, 48.

Given these considerations, courts reviewing agency actions should be particularly careful not to give undue weight to disputes between staff resisting change and policy-making officials supporting change. See, e.g., *Department of Commerce v. New York*, 588 U.S. ___, ___–___ (2019) (slip op. at 17–20) (*Department of Commerce*). The existence of multiple sources of resistance to changing policies that are already built into the decision-making process also supports the conclusion reached by this Court in *State Farm* that rescission of

**AR4416**

7

a rule is subject to the same review standard as adoption of the rule, not a higher or lower standard, *State Farm*, 463 U.S. at 41.

This Court has, however, identified settings in which changes in policy require explanation to satisfy the modest tests set out in APA §706(2)(A). For example, *Fox Television Stations* observed that changes in policy based on fact-findings at odds with earlier findings may call for explanation or at least recognition of that circumstance. *Id.*, 556 U.S. at 514. This instruction should not be read as a directive to ignore the limitations on judicial review written into law and emphasized repeatedly by this Court. See *Department of Commerce*, 588 U. S. (slip op., at 18–20); *FERC v. Electric Power Supply Assn.*, 577 U. S. ___, ___ (2016) (slip op., at 30); *Fox Television Stations*, 556 U.S. at 515–16. *Amici* believe it is critical for this Court to clarify the limitations on review in this context to avoid misunderstanding by lower courts.

*Looking into administrators' motives.* This Court has made clear that, in general, for a court reviewing agency action, it is "not the function of the court to probe the mental processes" of the administrator. *Morgan v. United States*, 304 U.S. 1, 18 (1938) (*Morgan II*). The Court has warned that delving into the motives and thought processes of a decision-maker in a co-equal branch of government—like looking into the motives of a judge rather than what is written in the judge's opinion—would be "destructive" of the responsibility of administrators and would undermine "the integrity of the administrative process." *United States v. Morgan*, 313 U.S. 409, 422 (1941) (*Morgan IV*). Similar cautions have been expressed by other judges over many years. See, e.g., *Gregoire v. Biddle*, 177 F.2d 579,

8

580–81 (2d Cir. 1949) (op. for the court by Learned Hand, C.J.) (*Gregoire*).

Despite concerns over the adverse effects of endeavoring to divine the motives behind official acts, this Court has identified a small number of instances in which these inquiries will be permitted. It recently described these exceptional cases as those in which a challenged policy cannot plausibly rest on any sustainable ground, so that "it is impossible to 'discern a relationship to legitimate state interests,' or that the policy is inexplicable by anything but [legally impermissible] animus.'" *Trump v. Hawaii*, 585 U. S. ___ (2018) (*Trump v. Hawaii*) (slip op. at 33) (quoting *Romer v. Evans*, 517 U.S. 620, 632, 635 (1996) (*Romer*)). Those are cases involving actions that this Court said "lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" *Trump v. Hawaii*, 585 U.S. (slip op. at 33) (quoting *Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973) (*Moreno*)). In essence, the conclusion followed from finding no rational basis for the challenged actions. Last term, in *Department of Commerce*, this Court offered other, strongly-worded cautions against judicial inquiries into reasons for official action beyond those offered in support of a course of action, including considerations tied to changes in political priorities. 588 U. S. (slip op. at 24).

Nevertheless, the *Department of Commerce* majority found that, as part of a "premature" inquiry into the basis for the Secretary of Commerce's decision, evidence was produced demonstrating that the Secretary's proffered explanation was "pretextual," further concluding that this finding excused the premature demand for such evidence. See *id*., (slip op. at 24–28). In contrast to decisions such as *Romer* and *Moreno*, *Department of Commerce* supported setting aside a decision as

9

improperly motivated *after* determining that it was *justified* on the grounds stated by the administrator, see *id.*, (slip op., at 19–20), making reference to the administrator's motive a separate inquiry rather than an extrapolation from the absence of a rational basis for his action. The peculiar ground for decision in *Department of Commerce* creates tension with the Court's decision in *SEC v. Chenery*, 318 U.S. 80, 87 (1943) (*Chenery*), which limited review to the stated rationale for administrative action.

*Problems of inquiry into official motives*. More important, this approach threatens to greatly expand the occasions for inquiry into the motives of administrators, a change that would invite challenges that almost certainly would enmesh courts in the very sort of inquiries that this Court warned against in *Morgan II* and *Morgan IV* and that Judge Hand criticized in *Gregoire*—inquiries that are at odds with the understood division of responsibilities between courts and coordinate branches of government. See, e.g., *Department of Commerce*, 588 U.S. (slip op., at 2, 7–8, 13–15) (Thomas, J., dissenting).

*Amici* strongly support the Court's traditional reluctance to examine the motives of administrative decision-makers exercising legally granted authority. Having been government decision-makers as well as academic critics of government decisions, *amici* underscore the threat to constitutionally separated powers if reviewing judges seek to plumb the motives of officials in co-equal branches of government. The general points on this threat were eloquently stated by Justice Frankfurter in *Morgan IV* and Judge Hand in *Gregoire*, observing the risk inquiries into motive present to ordinary official conduct. See *Morgan IV*, 313 U.S. at 422; *Gregoire*, 177 F.2d at 580–81.

AR4419

10

In addition, changing the traditional, APA-based standard of review to accommodate inquiries into official motives encourages use of judicial review not strictly as a means for keeping official actions within *legal* bounds, but as means for extending *political* disputes into the judicial domain. This undermines the perceived legitimacy of the courts and intrudes on decisions committed to other branches. See, e.g., *Trump v. Hawaii*, 585 U.S. (slip op. at 5–10) (Thomas, J., dissenting); Ronald A. Cass, *Nationwide Injunctions' Governance Problems: Forum-Shopping, Politicizing Courts, and Eroding Constitutional Structure*, 27 Geo. Mason L. Rev. (issue no. 1, 2019) (forthcoming), at 35–40, available at https://papers.ssrn.com/sol3/papers.cf m?abstract_id=3390064 (*Nationwide Injunctions*); see also Elbert Lin, *States Suing the Federal Government: Protecting Liberty or Playing Politics?*, 52 U. Rich. L. Rev. 633 (2018).

The degree to which the approach taken in *Department of Commerce* will produce the adverse consequences identified by *amici* and by Justice Thomas' dissenting opinion depends critically on whether this Court views that decision as setting a pattern for a broad set of cases or as addressing a truly exceptional situation. The opinion in *Department of Commerce* suggests that the decision's acceptance of a judicial inquiry into, and determination based on, official motives is limited to a very small category of disputes. 588 U.S. (slip op. at 24–28). Certainly, the approach taken by the Court in *Trump v. Hawaii*, 585 U. S. (slip op. at 32–37), just a short time prior to *Department of Commerce*, indicates an appreciation of the highly unusual circumstances in which the Court has considered arguments respecting the motives of other federal officers. *Amici* urge the Court to clarify that the decision in *Department of Commerce* responded to an extraordinary set of

11

circumstances and did not change the long-accepted understanding of the APA.

## ARGUMENT

### I. Judicial Review Should Not Intrude on Discretion Granted to Administrators by Law.

#### A. Courts' Review of Discretionary Agency Action under the APA Is Strictly Limited.

At the outset, it is important to emphasize that the second question presented (the lawfulness of the actions being reviewed) necessarily concerns the scope of review of agency actions that embody "ordinary discretion"—discretionary judgments assigned to administrators but not excepted from judicial review. The first question presented in this case (reviewability) turns on identifying the line between ordinary (reviewable) discretionary judgment and discretionary judgment that lies entirely outside the purview of judicial review. *Amici* do not address the question of reviewability.

##### 1. The APA Provides Limited Review of Discretionary Actions for which Review Is Not Excluded.

However, understanding the proper scope of review does require initial attention to the APA's distinction between asking *whether* a matter is "committed to agency discretion by law" in such a manner as to preclude review, see, e.g., *Chaney*, 470 U.S. at 831–35, and asking *how* courts review matters on which agencies enjoy discretion that remains subject to judicial review, see, e.g., *Fox Television Stations*, 556 U.S. at 511–14; *Brand X*, 545 U.S. at 981, 989.

12

The APA excludes agency actions from judicial review "to the extent that . . . agency action is committed to agency discretion by law," APA, 5 U.S.C. §701(a)(2), and provides for review, among other things, for "an abuse of discretion." APA, 5 U.S.C. §706(2)(A). Obviously, the APA cannot be read to insulate *all* discretionary action from review. That would be wholly at odds with the "abuse of discretion" provision. At the same time, the text of the APA plainly commands respect from courts for the exercise of delegated discretion by agencies. See, e.g., *Fox Television Stations*, 556 U.S. at 511–14; *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 740–47 (1996) (*Smiley*); *Webster v. Doe*, 486 U.S. 592, 600–601 (1988) (*Webster*); *Chaney*, 470 U.S. at 831–35; *Federal Communications Commission v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 813–14 (1978) (*Citizens Committee*); *American Trucking Associations v. United States*, 344 U.S. 298, 314–15 (1953) (*Trucking Associations*).

The distinction between discretion at odds with review and "ordinary discretion" that remains subject to limited review looks to the particular legal authority for agency action. See, e.g., *Webster v. Doe*, 486 U.S. 592, 599–601 (1988) (*Webster*); *id.*, at 605–06 (O'Connor, J., concurring in part and dissenting in part); *id.* at 606–10 (Scalia, J., dissenting). See also Ronald A. Cass, Auer *Deference: Doubling Down on Delegation's Defects*, 87 Fordham L. Rev. 531, 537–44 (2018) (explaining the relation between ordinary discretion, unreviewable discretion, and judicial review). Review is precluded so far as an action is subject to discretion that is not limited by statutory directives, as, for example, is generally true for the choices prosecutors and similar officials make in deciding which cases to pursue. See *Chaney*, 470 U.S. at 831–35. If this Court determines that the actions at issue here embody judgments that

**AR4422**

13

are framed and limited by statutory directives but are lawfully committed to administrative decision-making, the scope of review is that appropriate to exercises of ordinary discretion. *Amici*'s primary concern is with the terms of review for such decisions.

### 2. Discretionary Actions Based on Policy Considerations Are Subject to Narrow Review for Specific Decision-Making Failures.

When statutes provide limiting directives, exercises of discretion can be reviewed to assure that the administrator has not acted contrary to those directives. See APA, 5 U.S.C. §706(2)(A), §706(2)(C), §706(2)(D); *Chaney*, 470 U.S. at 831–35. Apart from specific constraints on the scope of delegated discretion, courts check the exercise of discretion to assure consistency with basic principles for reasoned decision-making. See, e.g., *Fox Television Stations*, 556 U.S. at 513–14; *Bowman Transp.*, 419 U. S. at 286. The scope of such review is "narrow," and this Court has admonished other courts "not to substitute [their] judgment [on questions of policy] for that of the agency." *State Farm*, 463 U. S. at, 43. Similarly, the Court stated that "a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute." *Id*., at 42. The narrow review standard reflects understanding that reviewable discretionary action is still *discretionary* action. The law's insulation of other discretionary action from review signals concern over intrusive judicial review of administrative discretion.[2]

---

[2] Limited scope of review for discretionary administrative action does not prejudge whether statutorily authorized discretion

**AR4423**

14

The narrow terms chosen to authorize reviewing courts to set aside discretionary agency action emphasize the limited nature of such review. Taking these terms at their common meanings, bases for overturning an action are limited to its being "arbitrary" (not guided by any rational choice principle), "capricious" (following a choice principle that seems chosen by mere whim—such as what color someone wore to a hearing or what letters begin or end a person's last name), or "an abuse of discretion" (such as conferring an advantage on individuals related to the decision-maker or sharing the same political or religious affiliation as the decision-maker). APA, 5 U.S.C. §706(2)(A). That language stands in sharp contrast to the APA's declaration that "the reviewing court shall *decide* all relevant questions of law, *interpret* constitutional and statutory provisions, and *determine* the meaning or applicability of the terms of an agency action." APA, 5 U.S.C. §706 (emphasis added). See also Clark Byse, *Judicial Review of Administrative Interpretation of Statutes: An Analysis of* Chevron *Step Two*, 2 Admin. L.J. 255, 262–63, 266–67 (1988); Ronald A. Cass, *Vive La Deference?: Rethinking the Balance Between Administrative and Judicial Discretion*, 83 Geo. Wash. L. Rev. 1294, 1311–19 (2015) (*Rethinking*); John F.

---

is consistent with constitutional constraints on delegation of legislative power. See, e.g., *Gundy v. United States*, 588 U.S. ____ (2019) (slip op. at 4–6); id., (slip op. at 1, 3, 5–9) (Gorsuch, J., dissenting); *Loving v. United States*, 517 U.S. 748, 757–58 (1996); *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825); Larry Alexander & Saikrishna Prakash, *Delegation Really Running Riot*, 93 Va. L. Rev. 1035, 1042–43 (2007); Ronald A. Cass, *Delegation Reconsidered: A Delegation Doctrine for the Modern Administrative State*, 40 Harv. J.L. & Pub. Pol'y 147, 151–61, 177 (2016); Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 335–53 (2002).

15

Duffy, *Administrative Common Law in Judicial Review*, 77 Tex. L. Rev. 113, 115, 120 (1998); William N. Eskridge, Jr. & Lauren E. Baer, *The Continuum of Deference: Supreme Court Treatment of Agency Statutory Interpretation from* Chevron *to* Hamdan, 96 Geo. L.J. 1083, 1087–89 (2008); Cynthia R. Farina, *Statutory Interpretation and the Balance of Power in the Administrative State*, 89 Colum. L. Rev. 452, 453–56, 472–75 (1989).

Statutory commands such as APA §706 recognize the difference between the scope of judicial review appropriate for *exercises* of administrative discretion for policy matters and the review appropriate for *interpretation* of the *scope* of discretion committed to executive officers. Even though this has been a source of confusion, the *Chevron* decision, interpreting commands congruent with the APA, and other decisions of this Court have appreciated the distinction between those roles. See *Chevron*, 467 U.S. at 843–46, 859, 862–66; see also *Cuozzo*, 136 S. Ct. at 2142–44; *Michigan v. Environmental Protection Agency*, 135 S. Ct. 2600, 2706–97 (2015); *Smiley*, 517 U.S. at 740–47. Scholarly commentary on both the *Chevron* doctrine and related decisions has recognized the importance of this distinction. See, e.g., Stephen G. Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin. L. Rev. 363, 370 (1986); Gary Lawson & Stephen Kam, *Making Law out of Nothing at All: The Origins of the* Chevron *Doctrine*, 65 Admin. L. Rev. 1, 3–5 (2013); Thomas W. Merrill & Kristin E. Hickman, Chevron*'s Domain*, 89 Geo. L.J. 833, 863–64, 870–72 (2001); Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 Duke L.J. 511, 516 (1989).

This distinction is even more emphatically the basis for calls to make clear that *Chevron* does not require

16

deference to administrative *interpretations* of *law* as distinct from *policy* judgments made in *implementing* the law. See, e.g., *Cuozzo*, 136 S. Ct. at 2148 (Thomas, J. concurring); *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149, 1152–58 (10th Cir. 2016) (Gorsuch, J., concurring); Jack M. Beermann, *End the Failed* Chevron *Experiment Now: How* Chevron *Has Failed and Why It Can and Should Be Overruled*, 42 Conn. L. Rev. 779, 781–87 (2010); Ronald A. Cass, *Is* Chevron*'s Game Worth the Candle? Burning Interpretation at Both Ends*, *in* Liberty's Nemesis: The Unchecked Expansion of the State 57, 57–58 (Dean Reuter & John Yoo eds., 2016); Michael Herz, *Deference Running Riot: Separating Interpretation and Lawmaking Under* Chevron, 6 Admin. L.J. Am. U. 187, 198–200 (1992). The distinction between the scope of review apposite to administrative exercises of policy discretion and to interpretation of legal commands also informed this Court's recently articulated understanding of the *Auer* doctrine's proper scope (or the proper scope of a doctrine that would replace *Auer*). See *Kisor v. Wilkie*, 588 U.S. ___ (2019) (slip op. at 15–18); *id*. (slip op. at 13–18, 20–21) (Gorsuch, J., dissenting); *id*. (slip op. at 1–2) (Kavanaugh, J., dissenting). This Court's rejection of a distinction between judicial deference to administrative determinations respecting an agency's jurisdiction and determinations related to an agency's exercise of authority is not at odds with the recognition that interpretation of law should be distinguished from exercises of policy discretion in its implementation. See *City of Arlington v. Federal Communications Commission,* 133 S. Ct. 1863, 1868–73 (2013).

Many statutes commit some measure of discretion to administrators while setting boundaries around that discretion. The law's directives may tightly constrain the administrative decision or may give

17

considerable leeway. Indeed, a single statute may do both with respect to different exercises of discretion. See, e.g., *MCI Telecommunications Corp. v. American Tel. & Tel.*, 512 U.S. 218, 220, 234 (1994); *National Broadcasting Co. v. United States*, 319 U.S. 190, 216 (1943). The reviewing court's tasks are to interpret the limits set by law—a question on which courts owe agencies no deference—and otherwise to review exercises of discretion *only* for the sorts of unreasonable discretionary action that the APA proscribes: action that is arbitrary, capricious, or an abuse of discretion. See APA, 5 U.S.C. §706(2)(A).

This does not include review to determine if an action is less well-reasoned than a judge would like, or weighs evidence and considerations differently than the judge would have, or is associated with political considerations that the judge would not embrace. See, e.g., *Department of Commerce*, 588 U.S. (slip op. at 16–20); *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103 (1983). Those inquiries would overstep the bounds even of the sort of internal evaluation typically done by executive branch officials reviewing major decisions of other officials—despite recognition that executive branch review, which takes place within the same branch authorized to implement the law, is compatible with a more searching inquiry into the grounds for decision. See, e.g., Christopher DeMuth, *OIRA at Thirty*, 63 Admin. L. Rev. 101, 106 (2011). (One of this brief's *amici* oversaw this process as Administrator of the Office of Information and Regulatory Affairs. See *id.*)

*Amici* urge that, in elaborating the test used to review discretionary agency actions, this Court address the language in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971) (*Overton Park*),

**AR4427**

18

respecting the need for an inquiry that is "searching and careful." In particular, the Court should make clear that this language does not support review that goes beyond assuring that exercises of discretionary authority are not arbitrary or capricious or an abuse of discretion. Despite its association with the notion of taking a "hard look" at exercises of discretion, *Overton Park* also cautioned that the "standard of review is a narrow one." *Overton Park*, 401 U.S. at 416. Unlike review of discretionary policy decisions, judicial decision respecting the consistency of agency action with legal requirements based on statutory interpretation takes a super-hard look at the issue—courts assess statutory meaning *de novo*, even though their assessment also may read the statute as providing scope for discretionary agency choices, often justified by the agency as resting on a reasonable interpretation of statutory language.  See, e.g., Byse, *supra*, at 262–63, 266–67; Cass, *Rethinking, supra*, at 1311–19; Herz, *supra*, at 198–200. Non-deferential judicial determinations of statutory meaning coexist with deference on agency choices implementing statutory terms only so far as courts read the law as granting agencies that discretion. See, e.g., *Barnhart v. Walton*, 535 U.S. 212, 218–22 (2002); *Smiley*, 517 U.S. at 740–47. *Overton Park* should not be read as changing the standard of review for arbitrariness, capriciousness, or abuse of discretion spelled out in APA §706(2)(A).

### B. The Scope of Review for Discretionary Agency Actions Is Identical for Initial Decisions on an Issue or Changes in Agency Policy Respecting an Issue.

The APA does not support different degrees of scrutiny—specifically, not *increased* scrutiny—for use of discretionary authority to make changes in agency

**AR4428**

19

policies, as compared to using that authority to set policies initially. See, e.g., *State Farm*, 463 U.S. at 41. As this Court has said: "[t]he statute makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action." *Fox Television Stations*, 556 U.S. at 515; see also *State Farm*, 463 U.S. at 41. It would not be reasonable to infer from the APA a general intention to make successive exercises of policy discretion increasingly difficult. Reading such a requirement into the APA would both strain the language of the statute and hinder the responsiveness of the executive branch to the public.

Moreover, heightened scrutiny for actions that change policies would reinforce factors that already restrain policy changes. *Amici*, as former government officials, are well aware that there are many impediments to making policy changes, from the procedural rigors of some policymaking modes to the resistance of individuals and groups advantaged by or invested in the existing policy. See, e.g., Garland, *supra*, at 508; McGarity, *supra*, at 1385–88, 1396–98; Robinson, *supra*, at 189–97, 216–19. Those who wrote and voted for the APA were acutely aware of the nature of administrative decision-making, including the forces that promote— and also those that oppose—changes in policy over time. See, e.g., McNollgast, *The Political Origins of the Administrative Procedure Act*, 15 J.L. Econ. & Org. 180, 181, 199–206 (1999); Shepherd, *supra*, at 1560– 61, 1583–1623, 1655–68. Recognition that the administrative process is part of a complicated set of processes shaping policy-making and implementation—processes that plainly do not produce a simple transmission belt from presidential election to policy adoption and application—underscores reasons for concern over doctrines that would erect additional barriers to change. That recognition supports the conclusion reached by

20

this Court in *State Farm* that rescission of a rule is subject to the same review standard as adoption of the rule, not a higher or lower standard, *State Farm*, 463 U.S. at 41.

Agency staff frequently are among those who may resist policy changes. These government officials generally remain at particular agencies longer than politically-appointed officials with policy-making authority. That, along with their frequent association with the adoption of earlier policy initiatives, can reduce enthusiasm about making changes supported by politically-appointed officials who have different views and shorter time horizons on getting policies implemented. See, e.g., Robinson, *supra*, at 185–87, 216–19; Wilson, *supra*, at 48. Staff-level officials' entrenchment in particular agencies, association with existing policies, and ability to impede change strongly counsels against over-weighting disputes between staff resisting change and policy-making officials supporting change. See, e.g., *Department of Commerce*, 588 U. S. (slip op. at 17–20).

In offering that caution, *amici* do not overlook the important insights that long-term official connection with a set of issues or with institutional considerations respecting their resolution may provide.

We do, however, note the potential conflict between *political accountability* provided by election of the Chief Executive—who is charged under Article II of the Constitution with faithfully implementing the law, U.S. Const., Art. II, §3—and legal doctrines that increase opportunities for bureaucratic resistance to initiatives from officers reporting more directly to the President. That concern is reflected in this Court's statement in *Free Enterprise Fund v. Public Company Accountability Oversight Board*, 561 U.S. 477 (2010) (*Free Enterprise Fund*), that "[o]ne can have a

**AR4430**

21

government that functions without being ruled by functionaries, and a government that benefits from expertise without being ruled by experts." *Id*., at 499.

This same concern about preserving Presidential authority and public accountability was central to the Court's decision in *Free Enterprise* that limitations on presidential (and presidentially directed) removal of officers unconstitutionally impair the President's obligation to take care that the laws are faithfully executed. *Id*., at 495–98. Whether one applauds or disagrees with the particular application of that concern in *Free Enterprise Fund*, there should be recognition of the importance of concern over excessive interference with control of executive action by the President and "the chain of dependence" between the elected officer and those under him—"the lowest officers, the middle grade, and the highest," *id*., at 498 (quoting James Madison, 1 Annals of Congress 499 (1789).

This Court's reading of the tests set out in APA §706(2)(A) also should be informed by appreciation that the act struck a balance between making administrators accountable for staying within the limits of the law and preventing undue interference with implementation of tasks assigned to administrators. See generally McNollgast, *supra*; Shepherd, *supra*. The modesty of the tests set out in §706(2)(A) is consistent with limiting intrusion into decision-making that is constitutionally and statutorily assigned to the executive branch.

Applying the same modest tests to all reviewable exercises of discretion—whether the agency action consists of adopting a policy respecting matters not previously addressed by the agency, changing a recently adopted policy, or altering a long-standing policy—also is consistent with preserving public accountability.

AR4431

22

Simply put, restricting impediments to changing past government decisions facilitates responsiveness to the broad interests expressed in presidential elections.

Justice Rehnquist said this explicitly in his dissent (joined by three other justices) in *State Farm*:

> The agency's changed view of the standard seems to be related to the election of a new President of a different political party. . . . A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations. As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration.

*State Farm*, 463 U.S. at 59 (Rehnquist, J., dissenting) (footnote omitted). While the four justices dissenting agreed with the majority that the same tests govern initial adoptions, revisions, and revocations of rules, they stated that the tests should be applied with greater sensitivity to the policy discretion enjoyed by administrators and to the connection between that discretion and public accountability through elections.

The application of the tests contained in APA §706(2)(A), of course, depends on particular facts respecting the exercise of discretion, and, as stated above, the tests for reviewing *exercises* of discretion are separate from the tests for determining the *extent* to which law confers discretion. Judges should be clear that the burden in challenging exercises of discretion is significant— that is what a narrow standard of review necessarily

23

means. See, e.g., *Department of Commerce*, 588 U. S. (slip op. at 19–20); *Fox Television Stations*, 556 U.S. at 514–21; *State Farm*, 463 U.S. at 42–43; *Bowman Transp.,* 419 U. S. at 286.

This Court at times has compressed the different standards of §706(2)(A) into a single requirement of reasonableness in the agency's exercise of discretion, including the associated requirement of a reasonable explanation. But that requirement is not altered because an agency changes course:

> [T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. . . . And, of course, the agency must show that there are good reasons for the new policy. But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates.

*Fox Television Stations*, 556 U.S. at 515. The general application of this same standard of review to both initial and changed policy prescriptions responds to the Court's and the APA's understanding that the exercise of policy discretion is purposely subject to variation over time. See, e.g., *State Farm*, 463 U.S. at 42 ("an agency must be given ample latitude to 'adapt their rules and policies to the demands of changing circumstances.' *Permian Basin Area Rate Cases,* 390 U. S. 747, 390 U. S. 784 (1968)"); *American Trucking Assns., Inc. v. Atchison, T. & S. F. R. Co.,* 387 U. S.

24

397, 416 (1967) ("[r]egulatory agencies do not establish rules of conduct to last forever").

However, this Court has identified particular settings in which changes in policy require explanation to meet the requirements of APA §706(2)(A). For example, *Fox Television Stations* declared:

> [W]hen, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account[,] . . . [i]t would be arbitrary or capricious to ignore such matters. In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.

*Id*., 556 U.S. at 514. While this requirement is an important one, it should not be read as a directive to ignore the limitations on judicial review written into law and emphasized repeatedly by this Court. In other words, the explanation required in such circumstances is one that recognizes the issues to be addressed and provides guidance as to the reasons behind the agency's resolution of them. See also *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126–27 (2016). The reasons must be sufficient to withstand challenge under the various "arbitrary, capricious" headings in APA §706(2)(A), but the agency's explanation need not satisfy judges of the correctness and cogency of the answers an agency gives. See *Department of Commerce*, 588 U. S. (slip op., at 18–20); *FERC v. Electric Power Supply Assn.*, 577 U. S. ___, ___ (2016) (slip op., at 30); *Fox Television Stations*, 556 U.S. at 515–16. *Amici*

AR4434

25

believe it is critical for this Court to clarify the limitations on review in this context.

## II. Courts Should Not Inquire into, or Base Decisions on, Administrators' Motives for Actions Challenged under the APA.

### A. Review of Agency Action under the APA Focuses on Lawfulness Judged by the Reasons Given, Not Motives.

As a rule, for a court reviewing agency action, as this Court has emphatically said, it is "not the function of the court to probe the mental processes" of the administrator. *Morgan II*, 304 U.S. at 18. Justice Frankfurter, writing for the Court in *Morgan IV* explained the reasons to avoid inquiries into the motives and thought processes of a decision-maker in a co-equal branch of government. He compared looking at the motives of an administrator to looking into the motives of a judge rather than what is written in the judge's opinion, concluding that this sort of inquiry would be "destructive" of the responsibility of administrators and would undermine "the integrity of the administrative process." *Morgan IV*, 313 U.S. at 422. Other noted judges have sounded similar warnings, including Judge Learned Hand's thoughtful opinion in *Gregoire*. See 177 F.2d at 580–81.

While repeating these warnings, this Court has stated that inquiries into motive may be permitted in cases in which a challenged policy cannot plausibly rest on any sustainable ground—cases where "it is impossible to 'discern a relationship to legitimate state interests,' or . . . the policy is inexplicable by anything but [legally impermissible] animus.'" *Trump v. Hawaii*, 585 U. S. (slip op. at 33) (quoting *Romer v. Evans*, 517 U.S. at 632, 635). The Court also described the

**AR4435**

26

exceptional cases as involving actions that "lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" *Trump v. Hawaii*, (slip op. at 33) (quoting *Moreno*, 413 U.S. at 534). In other words, the Court concluded that the rationales advanced in support of the actions being reviewed were insufficient to justify those actions under prevailing constitutional standards of review. See *Romer*, 517 U.S. at 631–33 (challenged actions did not pass rational basis review);[3] *Moreno*, 413 U.S. at 534–38. Finding no rational connection between the stated goals of the challenged actions and the classifications embedded in the actions themselves fit the Court's conclusions that other, unconstitutional, grounds motivated the actions. See *Romer*, 517 U.S. at 634–35; *Moreno*, 413 U.S. at 534–35 (relying also on statements in legislative history).

Last term, in *Department of Commerce*, this Court arguably expanded the set of cases in which inquiries into motive are permitted, finding the argument advanced in support of a discretionary policy decision to have been "pretextual" *even though* the majority found that the stated ground for the decision was reasonable and, taken at face value, was within legal bounds. See *Department of Commerce*, 588 U. S. (slip op., at 19–20). The majority opinion stated:

---

[3] While Justice Scalia's dissent denies that the majority engaged in rational basis review, *Romer*, 517 U.S. at 640 (Scalia, J., dissenting), the majority does declare that the Court "will uphold the legislative classification so long as it bears a rational relation to some legitimate end" before stating "Amendment 2 fails . . . even this conventional inquiry." *Id*., at 631–32 (citation omitted). The critique by Justice Scalia concerns more the character of the Court's arguments indicating a lack of rational basis than their absence. See *id*., at 640–53 (Scalia, J., dissenting).

AR4436

27

> The Secretary was required to consider the evidence and give reasons for his chosen course of action. He did so. It is not for us to ask whether his decision was "the best one possible" or even whether it was "better than the alternatives."

*Department of Commerce*, 588 U.S. (slip op., at 20) (citation omitted).

Not only did the Court accept the sufficiency of the Secretary's rationale, it instructed that "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Id*., (slip op. at 24). The Court also underscored that a policy decision may not be set aside simply "because it might have been influenced by political considerations or prompted by an Administration's priorities." *Id*. The Court further stated that, although "a strong showing of bad faith or improper behavior" could justify an inquiry into "the mental processes of administrative decisionmakers," *id*., the court below had erred in ordering such an inquiry in the case at bar because it entered that order when evidence before the lower court did not satisfy that high standard. See *id*., (slip op. at 24–25).

Nevertheless, the Court found that, as part of the inquiry into the basis for the Secretary of Commerce's decision, evidence was produced demonstrating that the Secretary's proffered explanation was "pretextual," further concluding that this justified and excused the "premature" demand for such evidence. See *id*., (slip op. at 24–28). In contrast to decisions such as *Romer* and *Moreno*, *Department of Commerce* supported setting aside a decision as improperly motivated *after* finding it *justified* on the grounds stated by the administrator, making reference to the administrator's motive a

**AR4437**

separate inquiry rather than an extrapolation from the absence of a rational basis for his action.

Because it holds an administrative decision unlawful on grounds of motive after finding it adequately supported in law on the basis of its stated rationale and supporting record, *Department of Commerce* is at odds with the Court's decision in *SEC v. Chenery*, 318 U.S. at 87. *Chenery* stands for the proposition that courts will not look beyond the stated rationale for administrative action. *Chenery* rejected government efforts to shift judicial review from that initial rationale to later explanations that might have proved more in keeping with standards for agency action.

Resistance to considering reasons other than those given initially by the agency equally applies in this setting. Courts should take the agency at its word and test its stated reasons against the APA's standards for review, neither asking what other reasons might have been given nor what hidden motives might be divined. See, e.g., *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973).

### B. Inquiries into Officials' Motives Intrude on Spheres of Action Committed to Co-Equal Branches of Government and Invite Litigation Based on Political or Personal Predilections.

Justice Frankfurter's analogy to probing the actual motivation behind a judicial decision is apt. See *Morgan IV*, 313 U.S. at 422. Disappointed litigants and other critics of judicial decisions may be so certain of the correctness of their position that they greet any contrary decision with suspicion. Every judge is familiar with speculation that something in the judge's background, personal life, religion, or past political associations explains the *real* basis for a decision. Yet

29

appellate courts routinely review lower court decisions for consistency with the law and do not permit counsel directly to question a judge about his or her thought processes leading to a decision or to subpoena law clerks for similar inquiries.

This Court has stated that the role of a court reviewing administrative actions is comparably circumscribed. Courts properly look at the administrative record and base a judgment on that record; they do not hold hearings on the decision-maker's thinking about the action taken or try to divine that from other extrinsic evidence. See, e.g., *Trump v. Hawaii*, 585 U.S. (slip op. at 32–33); *Camp v. Pitts*, 411 U.S. at 142–43; *Morgan IV*, 313 U.S. at 422; *Morgan II*, 304 U.S. at 18. Nor do courts look at a record—not of lower court proceedings or of administrative proceedings—to divine decision-makers' true motives, as opposed to evaluating whether the decision was legally justified on the grounds asserted. Motives are complex, difficult to ascertain, and seldom matters that courts are well-equipped to assess. That is why rules intended to prevent bias in particular contexts, notably individuated adjudications of rights, address specific types of relationships (principally financial) that can be ascertained from facts, making the objectively established relationship—rather than subjective determinations of motive—decisive. See, e.g., *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868 (2009); *Gibson v. Berryhill*, 411 U.S. 564 (1973); *Ward v. Village of Monroeville*, 409 U.S. 57 (1972); *Tumey v. Ohio*, 273 U.S. 510 (1927). Further, even those rules are not applied to broad policy decisions.[4]

---

[4] *Gibson v. Berryhill*, 411 U.S. 564 (1973), concerns a rule-based determination on licensing and turns on the question of the administrators' financial self-interest in adopting the rule. The

30

Because *Department of Commerce* threatens to greatly expand the occasions for inquiry into the motives of administrators, this Court should clearly specify the limits on such inquiries. While *amici* are skeptical of any such inquiries, permitting inquiries into motive even when administrators have articulated cogent, legally sufficient reasons for their actions invites challenges that almost certainly would enmesh courts in the very sort of difficulties this Court warned against in *Morgan II* and *Morgan IV* and that Judge Hand criticized in *Gregoire*—inquiries that are at odds with the understood division of responsibilities between courts and coordinate branches of government. See, e.g., *Department of Commerce*, 588 U.S. (slip op., at 2, 7–8, 13–15) (Thomas, J., dissenting). In Justice Thomas' words: "[T]he Court's decision enables partisans to use the courts to harangue executive officers through depositions, discovery, delay, and distraction." *Id.*, (slip op. at 15) (Thomas, J., dissenting). This "implicate[s] separation-of-powers concerns insofar as it enables judicial interference with the enforcement of the laws." *Id.*

*Amici* strongly endorse the Court's long-standing resistance to examining the motives of administrative decision-makers exercising legally granted authority. *Amici* have been government decision-makers as well as academic critics of government decisions, and have studied taught, and written about government decision-making. Drawing on our experience, *amici* stress the threat to constitutionally separated powers if reviewing

---

rule's effect was to make individuals working for one specific firm ineligible to practice optometry. Those specific individuals challenged the rule excluding them from practice. The action at issue in *Gibson*, thus, is tantamount to the sort of individual determination in other cases.

31

judges seek to plumb the motives of officials in co-equal branches of government. Permitting inquiries into official motives encourages use of judicial review not strictly as a means for keeping official actions within *legal* bounds but as extensions of *political* disputes into the judicial domain. This undermines the perceived legitimacy of the courts and intrudes on decisions committed to other branches. See, e.g., *Trump v. Hawaii*, 585 U.S. (slip op. at 5–10) (Thomas, J., dissenting); Cass, *Nationwide Injunctions*, *supra*, at 35–40; see also Lin, *supra*, at 634–46 (describing coordination among politically-allied state attorneys general and other groups in legal challenges).

Whether and how much the approach taken in *Department of Commerce* produces the harms identified by *amici*, by Justice Thomas' dissenting opinion, and others depends critically on the way this Court views that decision. It can be seen as setting a pattern for a broad set of future cases or as addressing a truly exceptional situation, not likely to be repeated often if at all. Fortunately, the opinion in *Department of Commerce* emphasizes the Court's understanding of the extraordinary circumstances of that case. The decision describes the instances in which inquiry into motive is appropriate as constituting a "narrow exception to the general rule against" such inquiries, 588 U.S. (slip op. at 24); it characterizes the extent of the record available as "rare" for such cases, *id*., (slip op. at 28); and shortly after that, it again states that the case involves "unusual circumstances," *id*. These statements suggest a view of the decision as limited to a very small category of disputes, perhaps even, in the dissenting justices' words, the case may come to be seen as "an aberration—a ticket good for this day and this train only." *Id*., (slip op. at 15) (Thomas, J., dissenting).

32

Certainly, the approach taken by the Court in *Trump v. Hawaii*, 585 U. S. (slip op. at 32–37), just a short time prior to *Department of Commerce*, indicates an appreciation of the highly unusual circumstances in which the Court has considered arguments respecting the motives of other federal officers. In *Trump v. Hawaii*, the Court rejected entreaties to look into motive, instead reviewing the challenged action to see if it was supported by a merely rational basis, see *id.* (slip op. at 33–37), as has been the rule.

The Court should clarify that the decision in *Department of Commerce* responded to an extraordinary set of circumstances and did not constitute either a change to the accepted understanding of the APA or, worse yet, an open invitation to courts to consider challenges based on the assumption that one political party's or one national administration's motives are at odds with judges' views of shared ideals.

Based on our collective experience in government, studying government, and teaching and writing about government, *amici* firmly believe that permitting judicial inquiries into matters of official motive would be far more likely to damage effective government than to promote it. Such a change would be contrary to the text of the APA, contrary to the weight of precedent, and contrary to underlying governance structures.

AR4442

33

## CONCLUSION

The scope of review applied to discretionary actions, when subject to judicial review, should be narrow, should assess specific forms of unlawful decision-making, and should assess the rationale for action, not the motives attributed to those taking the action. The judgment of the court below should be evaluated in accord with these considerations and should be reversed and remanded to the court below if not consistent with these considerations.

Respectfully submitted,

RONALD A. CASS
   *Counsel of Record*
CASS & ASSOCIATES, PC
10560 Fox Forest Drive
Great Falls, VA 22066-1743
(703) 438-7590
roncass@cassassociates.net

*Counsel for Amici Curiae*

August 23, 2019

**AR4443**

Nos. 18-587, 18-588, 18-589

IN THE

# Supreme Court of the United States

DEP'T OF HOMELAND SECURITY, *et al., Petitioners*

v.

REGENTS OF THE UNIV. OF CALIFORNIA, *et al., Respondents*

------

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, *et al., Petitioners*

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al., Respondents*

------

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, *et al., Petitioners*

v.

MARTIN JONATHAN BATALLA VIDAL, *et al., Respondents*

ON WRIT OF CERTIORARI
TO THE UNITED STATES COURTS OF APPEALS
FOR THE NINTH, D.C., AND SECOND CIRCUITS

## BRIEF OF *AMICUS CURIAE* CENTER FOR CONSTITUTIONAL JURISPRUDENCE IN SUPPORT OF PETITIONERS

JOHN C. EASTMAN
 *Counsel of Record*
ANTHONY T. CASO
The Claremont Institute's
    Center for Constitutional
    Jurisprudence
c/o Dale E. Fowler School of Law
Chapman University
One University Drive
Orange, CA 92866
(877) 855-3330
jeastman@chapman.edu

*Counsel for Amicus Curiae
Center for Constitutional Jurisprudence*

AR4444

i

## QUESTIONS PRESENTED

This dispute concerns the policy of immigration enforcement discretion known as Deferred Action for Childhood Arrivals (DACA).  In 2016, this Court affirmed, by an equally divided vote, a decision of the Fifth Circuit holding that two related Department of Homeland Security (DHS) discretionary enforcement policies, including an expansion of the DACA policy, were likely unlawful and should be enjoined. *See United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).  In September 2017, DHS determined that the original DACA policy was unlawful and would likely be struck down by the courts on the same grounds as the related policies.  DHS thus instituted an orderly wind-down of the DACA policy.  The questions presented are as follows:

1. Whether DHS's decision to wind down the DACA policy is judicially reviewable.

2. Whether DHS's decision to wind down the DACA policy is lawful.

This *amicus curiae* brief addresses the second question presented.

AR4445

ii

# TABLE OF CONTENTS

QUESTIONS PRESENTED ..........................................i

TABLE OF AUTHORITIES.........................................iii

INTEREST OF AMICUS CURIAE..............................1

SUMMARY OF ARGUMENT......................................1

ARGUMENT.................................................................2

I.   The DACA Program That President Trump's
     Administration Seeks to Rescind Was Itself
     Legally and Even Constitutionally Infirm. ...........2

     A. The Immigration and Nationality Act
        mandates removal of unauthorized aliens.......2

     B. DACA and DAPA are both categorical, and
        therefore unconstitutional, suspensions of the
        law.........................................................................6

     C. The provision of benefits and a "lawful" status
        are beyond the scope of prosecutorial
        discretion...........................................................13

II.  A Discretionary Decision Not To Enforce The Law
     Cannot Give Rise To A Reliance Interest In
     Continued (And Certainly Not In Perpetual) Non-
     Enforcement. ..........................................................22

CONCLUSION ............................................................24

AR4446

iii

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Richardson*,
480 F.2d 1159 (1973)..................................................7

*Blodgett v. Holden,*
275 U.S. 142 (1927)..................................................20

*Chamber of Commerce of U.S. v. Whiting*,
131 S. Ct. 1968 (2011)..............................................17

*Clinton v. New York*,
524 U.S. 417 (1998)..................................................21

*Crane v. Napolitano*, 3:12-CV-03247-O,
2013 WL 1744422 (N.D. Tex. Apr. 23, 2013) ......5, 6

*Crowley Caribbean Transp., Inc. v. Pena*,
37 F.3d 671 (D.C. Cir. 1994)....................................11

*Fed. Express Corp. v. Holowecki*,
552 U.S. 389 (2008)....................................................5

*Federal Radio Comm. v. Nelson Bros. Bond &
Mortgage Co.*,
289 U.S. 266 (1933)..................................................19

*Fiallo v. Bell,*
430 U.S. 787 (1977)..................................................21

*FTC v. Gratz*,
253 U.S. 421 (1920)..................................................19

*Galvin v. Press*,
347 U.S. 522 (1954)..................................................21

*Heckler v. Chaney*,
470 U.S. 821 (1985) ...................................... 6, 7, 9, 10

*Hoffman Plastic Compounds, Inc. v. N.L.R.B.*,
535 U.S. 137 (2002)..................................................17

**AR4447**

iv

*In re E-R-M & L-R-M,*
  25 I. & N. Dec. 520 (BIA 2011) ................................6

*INS v. Chadha,*
  462 U.S. 919 (1983) ...................................................20

*J.W. Hampton, Jr., & Co. v. United States,*
  276 U.S. 394 (1928) ...................................................19

*Kendall, v. United States ex rel. Stokes,*
  37 U.S. (12 Pet.) 524 (1838).....................................10

*Kleindienst v. Mandel,*
  408 U.S. 753 (1972) ...................................................20

*Lopez v. Davis,*
  531 U.S. 230 (2001) ...............................................5, 6

*Lozano v. City of Hazleton,*
  496 F. Supp. 2d 477 (M.D. Pa. 2007), *aff'd in part,*
  *vacated in part,* 620 F.3d 170 (3d Cir. 2010),
  *judgment vacated sub nom. City of Hazleton, Pa. v.*
  *Lozano,* 131 S. Ct. 2958 (2011), and *aff'd in part,*
  *rev'd in part,* 724 F.3d 297 (3d Cir. 2013).............18

*Mistretta v. U.S.,*
  488 U.S. 361 (1989) ...................................................19

*New York Central Securities Corp. v. United States,*
  287 U.S. 12 (1932) .....................................................19

*Oceanic Steam Navigation Co. v. Stranahan,*
  214 U.S. 320 (1909) ...................................................21

*Perales v. Casillas,*
  903 F.2d 1043 (5th Cir. 1990) .................................12

*Perez v. Mortg. Bankers Ass'n,*
  135 S.Ct. 1199 (2015).................................................1

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
  525 U.S. 471 (1999) ...................................................12

**AR4448**

v

*Sale v. Haitian Centers Council, Inc.*,
  509 U.S. 155 (1993) ..................................................20

*Tagg Bros. & Moorhead v. United States*,
  280 U.S. 420 (1930) ..................................................19

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015)..........................................................................18

*Town of Castle Rock, Colo. v. Gonzales*,
  545 U.S. 748 (2005) ....................................................4

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018)................................................1

*U.S. v. Juarez-Escobar*,
  25 F. Supp. 3d 774 (W.D. Pa. 2014) ......................11

*United States v. Texas*,
  136 S.Ct. 2271 (2016)................................................1

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ..................................................19

## Statutes

5 U.S.C. § 701(a)(2) .......................................................7

8 U.S.C. § 1101(a)(15)(V)............................................16

8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV)............................12

8 U.S.C. § 1158(c)(1)(B) ..............................................16

8 U.S.C. § 1182(a)(6)(C)................................................3

8 U.S.C. § 1182(a)(6)(E)(iii), (d)(11) ..........................13

8 U.S.C. § 1182(a)(7) .....................................................3

8 U.S.C. § 1182(d)(13), (14) ........................................13

**AR4449**

vi

8 U.S.C. § 1225(a)(2) ......................................................3

8 U.S.C. § 1225(a)(3) ......................................................3

8 U.S.C. § 1225(b)(1)(A)(i) .............................................3

8 U.S.C. § 1225(b)(2)(A) .............................................3, 5

8 U.S.C. § 1226(a)(3) ....................................................16

8 U.S.C. § 1229a(a)(1) ....................................................3

8 U.S.C. § 1229a(a)(3) ....................................................4

8 U.S.C. § 1229a(b)(5)(A) ...............................................4

8 U.S.C. § 1229a(c)(1)(A) ...............................................4

8 U.S.C. § 1229a(c)(2) ....................................................4

8 U.S.C. § 1229a(c)(3) ....................................................4

8 U.S.C. § 1229b .........................................................13

8 U.S.C. § 1229c...........................................................12

8 U.S.C. § 1231(a)(7) ....................................................16

8 U.S.C. § 1252(b).........................................................12

8 U.S.C. § 1254a .........................................................12

8 U.S.C. § 1324a(h)(3).....................................15, 17, 20

29 U.S.C. § 626(d)...........................................................5

National Defense Authorization Act for Fiscal Year
    2004, Pub. L. No. 108-136, § 1703(c)-(d), 117 Stat.
    1392, 1694 ................................................................13

USA PATRIOT ACT of 2001, Pub. L. No. 107-56, §
    423(b), 115 Stat. 272, 361 .........................................12

AR4450

vii

## Other Authorities

ABA Standards for Criminal Justice 1–4.5,
commentary (2d ed.1980) .........................................4

Carrol, Lewis, Through the Looking Glass (1871) .....1

Cooper, Bo, General Counsel, INS, *INS Exercise of Prosecutorial Discretion*,  (July 11, 2000)....... 14, 24

Johnson, Jeh Charles, Memorandum for Leon Rodriguez*, et al.*, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents* (Nov. 20, 2014)..9, 13, 15

Napolitano, Janet, Secretary of Homeland Security, Memo to David V. Aguilar, Acting Commissioner, U.S. Customs and Border Protection, et al., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012)................................. 1, 8, 23

Obama, Barack, Remarks by the President at Univision Town Hall (March 28, 2011)..................22

Rotunda, R., and Nowak, J., 1 Treatise on Const. Law § 7.6 (March 2016) .............................................4

S.B. 1291 (2001)...........................................................18

Thompson, Karl R., Office of Le-gal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Un-lawfully Present in the United States and to Defer Re-moval of Others* (Nov. 19, 2014) .................................. 10, 12

Transcript, Hearing on *President Obama's Executive Overreach on Immigration*, House of

**AR4451**

viii

Representatives Judiciary Committee (Dec. 2, 2014).............................................................................9

U.S. Citizenship and Immigration Services, *Frequently Asked Questions* (June 15, 2015) ........15

USCIS Form I-821D (06/25/13) ..................................23

## Rules

Sup. Ct. R. 37.3(a) ...........................................................1

Sup. Ct. R. 37.6...............................................................1

## Constitutional Provisions

U.S. Const. art. I, § 1 ...................................................19

U.S. Const. art. I, § 7 ...................................................21

U.S. Const. art. I, § 9, cl. 7 .........................................21

U.S. Const. art. II, § 3............................................ 2, 10

AR4452

1

## INTEREST OF AMICUS CURIAE[1]

The Center for Constitutional Jurisprudence is the public interest law arm of the Claremont Institute, whose stated mission is to restore the principles of the American founding to their rightful and preeminent authority in our national life, including the fundamental *separation of powers* principles implicated by these cases. The Center has previously appeared before this Court as *amicus curiae* in several cases addressing similar separation of powers issues, including *Trump v. Hawaii*, 138 S. Ct. 2392 (2018); *United States v. Texas*, 136 S.Ct. 2271 (2016); and *Perez v. Mortgage Bankers Ass'n*, 135 S.Ct. 1199, 1213 (2015).

## SUMMARY OF ARGUMENT

Janet Napolitano, the former Secretary of Homeland Security who issued the DACA Memo at issue in these cases, brought suit against her successor in office alleging, primarily, that her prior handiwork could not be undone without going through the Notice and Comment rulemaking procedures that she herself had not followed. Complaint ¶ 15, Joint Appendix Vol. 2:561. These cases thus have a bizarre, through-the-looking-glass aspect to them. *Cf.* Lewis Carrol, Through the Looking Glass (1871). To understand the full scope of the incongruity, a review of the prior ac-

---

[1] Pursuant to this Court's Rule 37.3(a), this amicus brief is filed with the consent of the parties. Pursuant to Rule 37.6, Amicus Curiae affirms that no counsel for any party authored this brief, and no person other than Amicus Curiae, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

2

tions, both of former Secretary Napolitano and her immediate successor, former Secretary Jeh Johnson (who issued the parallel DAPA Memo), is necessary.

That assessment reveals that the prior DACA and DAPA memos were both illegal and even unconstitutional. They both pushed the idea of prosecutorial discretion beyond the point where discretion becomes suspension of the law, in violation of the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3. And even were such a categorial refusal to enforce the law within the bounds of prosecutorial discretion (or, more to the point, not susceptible to judicially-manageable criteria), the additional benefits conveyed on DACA and DAPA recipients by the memos—including a "lawful presence" in the United States and eligibility for work authorization—cannot plausibly be subsumed under a prosecutorial discretion umbrella.

Given the patent infirmities of the DACA and DAPA programs, the notion that the *current* administration could not exercise its own prosecutorial discretion to actually enforce the laws on the books is, well, rather bizarre. The lower court decisions so holding simply must be reversed.

## ARGUMENT

**I.   The DACA Program That President Trump's Administration Seeks to Rescind Was Itself Legally and Even Constitutionally Infirm.**

**A. The Immigration and Nationality Act mandates removal of unauthorized aliens.**

3

Several provisions of the Immigration and Nationality Act mandate specific enforcement actions by immigration officials.  Section 1225(a)(3), for example, specifies that "All aliens (including alien crewmen) who are applicants for admission [defined as any alien who has not been admitted] or otherwise seeking admission or readmission to or transit through the United States *shall be inspected by immigration officers*."  8 U.S.C. § 1225(a)(3) (emphasis added).[2]  Absent a credible claim for asylum, stowaways are not eligible for admission at all, and "*shall be ordered removed* upon inspection by an immigration officer."  § 1225(a)(2) (emphasis added).  And apart from a few exceptions not at issue here, once an immigration officer "determines that an alien … is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer *shall order the alien removed* from the United States without further hearing or review…."  § 1225(b)(1)(A)(i) (emphasis added).  In other cases, "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a [removal] proceeding under section 1229a …." § 1225(b)(2)(A) (emphasis added).

Once an alien has been detained under that statutory mandate, "[a]n immigration judge *shall conduct proceedings* for deciding the inadmissibility or deportability of an alien. § 1229a(a)(1) (emphasis added). An alien who fails to appear "*shall be ordered removed* in absentia" if the Immigration Service establishes that the alien was provided written notice of the hearing

---

[2] All code section references are to Title 8 of the U.S. Code unless otherwise noted.

4

and that the alien is removable. § 1229a(b)(5)(A) (emphasis added). Finally, applying the burdens of proof set out in the statute, "[a]t the conclusion of the proceeding the immigration judge *shall decide* whether an alien is removable from the United States." § 1229a(c)(1)(A) (emphasis added); §§ 1229a(c)(2), (3).

In other words, the statutory scheme uses the mandatory "shall" rather than a discretionary "may" throughout, indicating Congress's intent to treat these duties as ministerial mandates rather than discretionary enforcement options.

To be sure, this Court has recognized that a "well established tradition of police discretion has long co-existed with apparently mandatory arrest statutes." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 760 (2005) (citing 1 ABA Standards for Criminal Justice 1–4.5, commentary, pp. 1–124 to 1–125 (2d ed.1980). But removal proceedings are civil proceedings, not criminal ones, and as at least one prominent legal treatise has noted: "In contrast to criminal prosecution, the government has no free rein to refuse to enforce civil actions." R. Rotunda and J. Nowak, 1 Treatise on Const. Law § 7.6 (March 2016).

Moreover, Congress's statutory scheme here provides the "stronger indication" of a true mandate that this Court found lacking in *Gonzales*. 545 U.S. at 761-62. Beyond the repeated use of the mandatory language, Congress specified that removal proceedings "*shall be the sole and exclusive procedure* for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." § 1229a(a)(3) (emphasis added). The claim that a President has discretion *not*

5

*to commence removal proceedings* against unauthorized aliens and thereby afford to them a "lawful presence" in the United States cannot be squared with Congress's language that a determination of admissibility by an immigration judge in a removal proceeding is the "sole and exclusive" means for determining whether an alien may be admitted.

The U.S. District Court for the Northern District of Texas in *Crane v. Napolitano*, 3:12-CV-03247-O, 2013 WL 1744422 (N.D. Tex. Apr. 23, 2013), reached precisely that conclusion. Although that action by border patrol agents was ultimately dismissed for lack of subject matter jurisdiction because the Merit Systems Protection Board was the exclusive venue for their claims,[3] the District Court's analysis of the relevant statutory language was thorough and persuasive: "Congress's use of the word 'shall' in Section 1255(b)(2)(A) imposes a mandatory obligation on immigration officers to initiate removal proceedings against aliens they encounter who are not 'clearly and beyond a doubt entitled to be admitted.'" *Id*. at *17.

The court found compelling this Court's decisions in *Fed. Express Corp. v. Holowecki*, 552 U.S. 389 (2008), and *Lopez v. Davis*, 531 U.S. 230 (2001). *Holowecki* held that the EEOC's "duty to initiate informal dispute resolution processes upon receipt of a charge is mandatory in the ADEA context" because of statutory language in 29 U.S.C. § 626(d) providing that the EEOC "*shall* promptly seek to eliminate any

---

[3] *Crane*, No. 3:12-cv-03247-O, Order (N.D. Tex., July 31, 2013), available at http://www.crs.gov/analysis/legalsidebar/Documents /Crane_DenialofMotionforReconsideration.pdf.

6

alleged unlawful practice by informal methods of conciliation, conference, and persuasion." 552 U.S. at 399 (emphasis added).  Similarly, *Lopez* noted that Congress's "use of a mandatory 'shall' . . . impose[s] discretionless obligations."  531 U.S. at 241. The court also found this Court's decision in, *e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 835 (1985), and the Board of Immigration Appeals decision in *In re E-R-M & L-R-M*, 25 I. & N. Dec. 520, 520 (BIA 2011), to be distinguishable.  The discretion recognized in the latter— an immigration case—was simply whether to refer an unauthorized alien to regular or expedited removal proceedings, the court noted, not "to refrain from initiating removal proceedings at all." *Crane*, 2013 WL 1744422, at *10. And the court found the statutory language in the Food, Drug, and Cosmetic Act at issue in *Chaney*, which this Court held committed "complete discretion to the Secretary to decide how and when they should be exercised," 470 U.S. at 835, to be in contrast with the Immigration and Nationalization Act, which "is not structured in such a way that DHS and ICE have complete discretion to decide when to initiate removal proceedings." *Crane*, 2013 WL 1744422, at *10.

### B. DACA and DAPA are both categorical, and therefore unconstitutional, suspensions of the law.

Even if Congress's use of the mandatory term "shall" is deemed not to foreclose prosecutorial discretion in individual cases, the DACA and DAPA programs went much further than authorizing case by case discretion.  Instead, they amounted to a categorical and therefore unconstitutional suspension of the law.

AR4458

7

This Court's decision in *Chaney* is instructive. After concluding "that an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)" of the Administrative Procedures Act, this Court "emphasize[d] that the decision is only presumptively unreviewable; the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Chaney*, 470 U.S. at 832-33. This Court then cited, with apparent approval, the D.C. Circuit's en banc decision in *Adams v. Richardson*, 480 F.2d 1159 (1973) (en banc). The Court of Appeals in that case rejected the Government's claim of discretion over how or even whether to enforce Title VI of the Civil Rights Act of 1964. "Title VI not only require[d] the agency to enforce the Act, but also set[] forth specific enforcement procedures," *id.* at 1162, just as the Immigration and Naturalization Act does here. More significantly, the Court of Appeals recognized—in language cited by this Court—that prosecutorial discretion does not apply when an agency "has consciously and expressly adopted a general policy which is in effect an abdication of its statutory duty." *Id.*; *see also Chaney*, 470 U.S. at 833 n.4.

Both DACA and DAPA fall on the "categorical suspension of the law" side of the *Chaney* line. In her June 15, 2012 memo establishing the DACA program, former Homeland Security Secretary Janet Napolitano set out specific, categorical criteria for DACA program eligibility. Memo from Janet Napolitano, Secretary of Homeland Security, to David V. Aguilar, Acting Commissioner, U.S. Customs and Border Protection, et al., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States*

8

*as Children*, p. 1 (June 15, 2012). Although the memo repeatedly asserts that eligibility decisions are to be made "on a case by case basis," it is actually a directive to immigration officials to grant deferred action to anyone meeting the criteria. "With respect to individuals who meet the above criteria" and are not yet in removal proceedings, the memo orders that "ICE and CBP *should* immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States." *Id.* at 2 (emphasis added). And "[w]ith respect to individuals who are in removal proceedings but not yet subject to a final order of removal, and who meet the above criteria," "ICE *should* exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States." *Id.* (emphasis added). USCIS and ICE are directed to "establish a clear and efficient process" for implementing the directive, and that process "*shall* also be available to individuals subject to a final order of removal regardless of their age." *Id.* (emphasis added).

Homeland Security Secretary Jeh Johnson's November 2014 memo establishing the DAPA program did the same thing. Although sprinkled with the phrase, "case-by-case basis," it also established eligibility criteria for the new program and directed immigration officials "to immediately begin identifying persons" who met the eligibility criteria, in order "to prevent the further expenditure of enforcement resources with regard to these individuals." Jeh Charles John-

AR4460

9

son, Memorandum for Leon Rodriguez, *et al.*, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents*, p. 2 (Nov. 20, 2014). The memo even announced that the process for terminating removal of eligible aliens "*shall also be available* to individuals" already "subject to final orders of removal." *Id.* (emphasis added).

The notion that either memo allowed for a true individualized determination rather than providing a categorical suspension of the law is simply not credible. There is nothing in either memo to suggest that immigration officials could do anything other than grant deferred action to those meeting the defined eligibility criteria. Indeed, the overpowering tone of the memos is one of woe to line immigration officers who did not act as the memo told them they "should," a point that was admitted by Department of Homeland Security officials in testimony before the House of Representatives. *See* Transcript, Hearing on *President Obama's Executive Overreach on Immigration*, House of Representatives Judiciary Committee (Dec. 2, 2014) (Representative Goodblatt noting: "DHS has admitted to the Judiciary Committee that, if an alien applies and meets the DACA eligibility criteria, they will receive deferred action. In reality, immigration officials do not have discretion to deny DACA applications if applicants fulfill the criteria.").

Nevertheless, by repeatedly regurgitating the phrase, "on a case by case basis," Secretaries Napolitano and Johnson seemed to have recognized that prosecutorial discretion cannot be exercised categorically without crossing the line drawn in *Chaney* into

AR4461

10

unconstitutional suspension of the law—without, that is, violating the President's constitutional obligation to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3; *Chaney*, 470 U.S. at 833 n.4. But the memos' directives to the immigration services *not to enforce* the immigration laws against anyone meeting the eligibility criteria set out in the memos, "in order to prevent low priority individuals from being removed from the United States," clearly falls on the unconstitutional side of the *Chaney* line. As this Court recognized nearly 180 years ago, "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible." *Kendall, v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838).

The Office of Legal Counsel at the Department of Justice has likewise recognized the need for individualized determinations for exercises of prosecutorial discretion to be constitutional. "[T]he Executive Branch ordinarily cannot … consciously and expressly adopt[] a general policy that is so extreme as to amount to an abdication of its statutory responsibilities," it noted in the memo purporting to validate the DAPA program. Karl R. Thompson, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, p. 7 (Nov. 19, 2014) (quoting *Chaney*, 470 U.S. at 833 n.4, internal quotation marks omitted). "[A] general policy of non-enforcement that forecloses the exercise of case-by-case discretion poses 'special risks' that the agency has exceeded the bounds of its enforcement discretion." *Id.* (quoting *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671,

11

677 (D.C. Cir. 1994)). Yet that is exactly what DACA and DAPA did. As the district court for the Eastern District of Pennsylvania correctly recognized, the executive actions at issue in those programs, establishing threshold eligibility criteria for aliens unlawfully present in the United States to obtain "deferred action," constituted "legislation" rather than prosecutorial discretion, "and effectively change[d] the United States' immigration policy." *U.S. v. Juarez-Escobar*, 25 F. Supp. 3d 774, 786 (W.D. Pa. 2014).

Neither were the executive actions implemented in the DACA and DAPA programs simply an exercise of the kind of prosecutorial discretion that had been exercised by previous administrations. Much was made at the time of the Family Fairness Program implemented by President George H.W. Bush's administration in February 1990. But that program, which dealt with delayed voluntary departure rather than DACA and DAPA's deferred action, was specifically authorized by statute. Section 242(b) of the Immigration and National Act at the time provided, in pertinent part:

> *In the discretion of the Attorney General* and under such regulations as he may prescribe, deportation proceedings, including issuance of a warrant of arrest, and a finding of deportability under this section need not be required in the case of any alien who admits to belonging to a class of aliens who are deportable under section 1251 of this title if such alien voluntarily departs from the United States at his own expense, or is removed at Government expense as hereinafter authorized, unless the Attorney General has reason to believe that such alien is deportable under paragraphs (4) to (7), (11),

AR4463

12

(12), (14) to (17), (18), or (19) of section 1251(a) of this title.

8 U.S.C. § 1252(b), *cited in Perales v. Casillas*, 903 F.2d 1043, 1048 (5th Cir. 1990) (emphasis added).

That specific statutory authority was largely superseded by the Temporary Protected Status program established by the Immigration Act of 1990, which is available to nationals of designated foreign states affected by armed conflicts, environmental disasters, and other extraordinary conditions, 8 U.S.C. § 1254a, and subsequently limited to 120 days by the 1996 Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRI"), *see* 8 U.S.C. § 1229c. In contrast, as even the OLC opinion defending DAPA acknowledged, "deferred action," which is the asserted basis for the DACA and DAPA executive actions, "developed without statutory authorization." OLC Memo, at 13; *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999) (noting that deferred action "developed without express statutory authorization," apparently in the exercise of discretionary response to international humanitarian crises that trigger the President's separate foreign affairs authority of the sort now covered by the Temporary Protected Status Program).

There are now specific statutes that authorize deferred action. *See*, *e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"); USA PATRIOT ACT of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361 (proving that certain immediate family members of Lawful Permanent Residents who were killed on 9/11 should be made "eligible for deferred action."); National Defense Authorization Act for Fiscal Year 2004, Pub. L.

13

No. 108-136, § 1703(c)-(d), 117 Stat. 1392, 1694, and other statutes that delegate to the Attorney General discretion to waive other provisions of the INA in specific circumstances, *e.g.*, 8 U.S.C. § 1182(a)(6)(E)(iii), (d)(11) (authorizing discretionary waiver of smuggler ineligibility for admission rule for smugglers who only assisted their own spouses, parents, or children); 8 U.S.C. § 1182(d)(13), (14) (authorizing, in certain specified circumstances, discretionary waiver of inadmissibility rules for recipients of "T" and "U" visas); *cf.* 8 U.S.C. § 1229b (authorizing the Attorney General to "cancel removal" and "adjust status" for up to four thousand aliens annually who are admitted for lawful permanent residence and who meet certain specific statutory criteria). But none of these statutes authorize the broad use of deferred action for domestic purposes asserted by the June 2012 DACA program or the expanded November 2014 DAPA program. Indeed, the fact that Congress deemed it necessary to include such statutory authorization for these specific domestic uses of deferred action is compelling evidence that the Executive does *not* have unfettered discretion to give out deferred action whenever it chooses, and certainly not to deem such individuals as "lawfully present in the country for a period of time," as Secretary Johnson claimed in his November 20, 2014 memo. Johnson Memo, *supra*, at 2.

## C. The provision of benefits and a "lawful" status are beyond the scope of prosecutorial discretion.

Even if DACA's categorical suspension of deportation requirements could be viewed as a valid exercise of prosecutorial discretion, the granting of affirmative

14

benefits such as work authorization and "lawful presence" cannot be.

"The doctrine of prosecutorial discretion applies to enforcement decisions, not benefit decisions," noted Bo Cooper, General Counsel for the Immigration and Naturalization Service at the end of the Clinton Administration. Bo Cooper, General Counsel, INS, *INS Exercise of Prosecutorial Discretion*, at 4 (July 11, 2000).[4] Although Cooper was of the opinion that the INS had "prosecutorial discretion to place a removable alien in proceedings, or not to do so," he acknowledged that it did "not have prosecutorial discretion to admit an alien into the United States who is inadmissible under the immigration laws, or to provide any immigration benefit to any alien ineligible to receive it." *Id*. at 1. "[T]he grant of an immigration benefit, such as naturalization or adjustment of status, is a benefit decision that is not a subject for prosecutorial discretion." *Id*. at 4.

Yet in implementing DACA, the Immigration services contended that an unauthorized alien "who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period of deferred action is in effect." U.S. Citizenship and Immigration Services, *Frequently Asked Questions*

---

[4] Available at http://niwaplibrary.wcl.american.edu/reference/dditional-materials/immigration/enforcement-detention-and-criminaljustice/government-documents/Bo-Cooper-memo%20pros%20discretion7.11.2000.pdf

AR4466

15

(June 15, 2015).[5] And Secretaries Napolitano and Johnson both directed the immigration services to extend work authorization to individuals they placed in deferred action who were otherwise ineligible to work in the United States. Secretary Napolitano's memo establishing the DACA program cited no provision of law authorizing her to grant work authorization, but Secretary Johnson purported to find such authority in five words of the work authorization definitional statute. "Each person who applies for deferred action pursuant to the criteria above shall also be eligible to apply for work authorization for the period of deferred action, pursuant to my authority to grant such authorization reflected in section 274A(h)(3) of the Immigration and Nationality Act," he wrote. Johnson Memo, at 4-5 (citing 8 U.S.C. § 1324a(h)(3)).

Section 1324a establishes the general rule that employing an unauthorized alien is illegal. Subsection (a)(1) specifically makes it unlawful to hire "an unauthorized alien (as defined in subsection (h)(3) of this section)." Subsection (h)(3) in turn defines "unauthorized alien" as any alien who is not "lawfully admitted for permanent residence" (that is, someone who qualifies under one of the carefully wrought exemptions to inadmissibility contained in Section 1101(a)(15) of the Immigration Code, such as the "T" visa) or an alien "authorized to be so employed by this chapter *or by the Attorney General.*" 8 U.S.C. § 1324a(h)(3) (emphasis added).

---

[5] Available at https://web.archive.org/web/20150626103 508/https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions.

16

That last phrase, "or by the Attorney General" (and by extension the Secretary of Homeland Security), was the statutory hook that Secretary Johnson claimed to have provided him unfettered discretion to grant work authorization to any unauthorized alien he wished. It was, to say the least, a pretty slim reed.

For one thing, such a broad interpretation of that brief statutory reference would render superfluous several other statutory provisions that give specific authority to the Attorney General to confer both lawful status and work authorization and other benefits on certain unauthorized aliens in carefully circumscribed circumstances. Section 1101(a)(15)(V), for example, allows the Attorney General to confer temporary lawful status on the close family members of lawful permanent residents who have petitioned the Attorney General for a nonimmigrant visa while an application for an immigrant visa is pending. Section 1158(c)(1)(B) authorizes the Secretary to grant work authorization to aliens who have been granted asylum). Section 1226(a)(3) allows the Secretary to grant work authorization to otherwise work-eligible aliens pending a removal decision, and Section 1231(a)(7) permits the Secretary to grant work authorization under certain narrow circumstances to aliens who have received final orders of removal. Much more likely, therefore, that the phrase, "or by the Attorney General," simply refers to the specific grants of authority given to the Attorney General in other pro-visions of the Immigration Code.

For another, nothing in the legislative history suggests that Congress intended to give the Attorney General the kind of unfettered discretion that Secretary Johnson claimed. The section of the immigration

17

law that includes the brief phrase on which this entire edifice of authority was erected was added in 1986 as part of the Immigration Reform and Control Act. The legislative record leading to the adoption of that monumental piece of legislation is extensive, but there does not appear to be any discussion whatsoever of the clause, much less any claim that by including that clause, Congress was conferring unfettered discretion on the Attorney General to issue "lawful presence" and work authorization to anyone illegally present in the United States he chose. Indeed, such a position makes a mockery out of the finely wrought (and hotly contested) provisions elsewhere in the Immigration code providing for such lawful status only upon meeting very strict criteria.

The more limited view of Section 1324a(h)(3), namely, that it simply refers to other provisions of federal law conferring such authority on the Attorney General in specific circumstances, was implicitly espoused by a plurality of this Court when, in *Chamber of Commerce of U.S. v. Whiting*, it summarized Section 1324a(h)(3) as defining an "unauthorized alien" to be "an alien not 'lawfully admitted for permanent residence' or *not otherwise authorized by federal law to be employed*." 131 S. Ct. 1968, 1981 (2011) (emphasis added); *see also Hoffman Plastic Compounds, Inc. v. N.L.R.B.*, 535 U.S. 137, 147 (2002) (federal immigration law denies "employment to aliens who (a) are not lawfully present in the United States, or (b) are not lawfully authorized to work in the United States," citing Section 1324a(h)(3)); *Lozano v. City of Hazleton*, 496 F. Supp. 2d 477, 518-19 (M.D. Pa. 2007), *aff'd in part, vacated in part*, 620 F.3d 170 (3d Cir. 2010), *judgment vacated sub nom. City of Hazleton, Pa. v.*

18

*Lozano*, 131 S. Ct. 2958 (2011), and *aff'd in part, rev'd in part*, 724 F.3d 297 (3d Cir. 2013).

Moreover, if the clause did provide the Attorney General (now Homeland Security Secretary) with such unfettered discretion, Congress had been wasting its time trying to put just such an authority into law. For more than a decade illegal immigration advocates had been pushing for Congress to enact the DREAM Act, the acronym for the Development, Relief, and Education for Alien Minors Act first introduced by Senators Dick Durbin and Orin Hatch as Senate Bill 1291 back in 2001. The bill would give lawful permanent residence status and work authorization to anyone who arrived in this country illegally as a minor, had been in the country illegally for at least five years, was in school or had graduated from high school or served in the military, and was not yet 35 years old (although that age requirement could be waived). The bill or some version of it has been reintroduced in each Congress since, but has usually faced such stiff opposition by those who view its principal provisions as an "amnesty" for illegal immigrants that even its high-level bipartisan support has proved insufficient to get the bill adopted. It is hard to imagine the expenditure of so much political capital to provide an authority to the Secretary that he claimed had been in the existing statutes all along. As Judge Smith noted in the Fifth Circuit's decision enjoining DAPA, such an interpretation is "exceedingly unlikely." *Texas v. United States*, 809 F.3d 134, 183 (5th Cir. 2015), *as revised* (Nov. 25, 2015). "Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouse-

19

holes." *Id.*, n. 186 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).

Indeed, even if this Court were to accept that the general phrase, "or by the Attorney General," could be interpreted to support Secretary Johnson's claimed authority to extend work authorization without reliance on other specific grants of authority, such an interpretation would render the clause unconstitutional, a violation of a core aspect of separation of powers.

Article I, Section I of the Constitution requires that "[a]ll legislative Powers" granted by the Constitution must be exercised by Congress and cannot be delegated away. U.S. Const. art. I, § 1. This Court has held that Congress can delegate a large amount of rule-making authority to executive branch agencies, but only if it "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to con-form." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928); *Mistretta v. U.S.*, 488 U.S. 361, 372 (1989).

To be sure, this Court has, over the decades, been rather generous in determining what qualifies as an "intelligible principle." *See, e.g.*, *Tagg Bros. & Moorhead v. United States*, 280 U.S. 420 (1930) ("just and reasonable"); *New York Central Securities Corp. v. United States*, 287 U.S. 12 (1932) ("public interest"); *Federal Radio Comm. v. Nelson Bros. Bond & Mortgage Co.*, 289 U.S. 266, 285 (1933) ("public convenience, interest, or necessity"); and *FTC v. Gratz*, 253 U.S. 421 (1920) ("unfair methods of competition"). But even though the treatment of such amorphous language as an "intelligible" principle might rightly cause one to wonder whether the word "intelligible" is really

AR4471

20

intelligible at all, this Court has always insisted that there at least be *something* in the statute adopted by Congress to constrain the agency's discretion.

If Secretary Johnson's interpretation of Section 1324a(h)(3) were to be accepted, there is absolutely nothing. The phrase, "or by the Attorney General," is not constrained by any requirement that the Attorney General's decision be in the "public interest," or for the "public convenience, interest, or necessity," or be "just and reasonable," or even be in the public interest *as the Attorney General determines it to be*. Rather, it stands entirely on its own, unadorned and unencumbered by any lawmaking judgment by Congress.

Because such an interpretation as that offered by Secretary Johnson would be manifestly unconstitutional, a violation of the non-delegation doctrine even in its current, largely moribund state, it should only be adopted, under the doctrine of constitutional avoidance, if no other reasonable interpretation exists that would render the statute constitutional. *See, e.g.*, *Blodgett v. Holden,* 275 U.S. 142, 148 (1927) (opinion of Holmes, J.). Because the constitutionally valid alternative interpretation set out above is not only reasonable, but much more consistent with the Immigration code in its entirety, Secretary Johnson's interpretation simply cannot stand.

This should be particularly true in the immigration law context, over which Congress's power has repeatedly been described by this Court as "plenary." *See, e.g.*, *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 201 (1993); *INS v. Chadha*, 462 U.S. 919, 940-41 (1983); *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972). Indeed, this Court declared over a century ago that "over no conceivable subject is the legislative

21

power *of Congress* more complete" than immigration. *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909) (emphasis added); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). "[T]hat the formulation of [immigration] policies is entrusted *exclusively to Congress* has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government." *Galvin v. Press*, 347 U.S. 522, 531 (1954) (emphasis added).

There is yet another constitutional problem with the interpretation that had been offered by Secretary Johnson. The granting of "lawful presence" and work authorization by the Executive branch alone made DACA and DAPA recipients eligible for other financial benefits without specific authorization from Congress. That violates Article I, Section 9 of the Constitution, which provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Only Congress, in compliance with the bicameralism and presentment requirements of the Constitution, U.S. Const. art. I, § 7, could authorize such appropriations; a President (much less a Secretary of Homeland Security) cannot do it unilaterally. *See Clinton v. New York*, 524 U.S. 417, 438 (1998).

In sum, by frequent use of the word "shall," the Immigration and Nationality Act itself mandates removal in a number of circumstances, thus overriding whatever prosecutorial discretion might normally exist. Even if otherwise, the DACA and DAPA programs were categorical suspensions of the law rather than the exercise of true case-by-case discretion, and therefore ran afoul of the President's constitutional duty to take care that the laws be faithfully executed. And

AR4473

22

even if the line between permissible discretion and impermissible suspension is deemed to be too difficult a line to be judicially enforceable, the provision of a "lawful presence" status and other benefits such as work authorization is simply beyond the scope of what can be accomplished through the use of prosecutorial discretion. Former President Obama was therefore correct when, on more than a dozen occasions, he announced he had no constitutional authority to "just suspend deportation through executive order." *See, e.g.,* Remarks by the President at Univision Town Hall (March 28, 2011).[6] "There are enough laws on the books by Congress that are very clear in terms of how we have to enforce our immigration system that for me to simply through executive order ignore those congressional mandates would not conform with my appropriate role as President." *Id.*

The notion, accepted by the lower courts, that the current administration cannot rescind a discretionary policy of a prior administration that was itself of such dubious legality simply cannot be countenanced.

## II. A Discretionary Decision Not To Enforce The Law Cannot Give Rise To A Reliance Interest In Continued (And Certainly Not In Perpetual) Non-Enforcement.

A second argument advanced by plaintiffs and accepted by the courts below, namely, that DACA cannot be rescinded because DACA recipients have reliance and Due Process interests in retaining their deferred

---

[6] Available at https://obamawhitehouse.archives.gov/the-press-office/2011/03/28/remarks-president-univision-town-hall.

AR4474

23

action "lawful presence" status, is equally without merit, for several reasons.

First, if the DACA program was a valid exercise of prosecutorial discretion *not to enforce* the law, it is necessarily the case that a successor administration (or even the same administration, should it decide to exercise its discretion in a different direction) could choose once again to exercise that same prosecutorial discretion in favor of *enforcing* the law. Indeed, the exercise of discretion to *enforce* is necessarily more valid than the exercise of discretion *not to enforce*, because the former carries with it no risk of crossing the line into an unconstitutional suspension of the law.

Second, the DACA program on its own terms explicitly disclaimed any reliance interest. The policy, as articulated by Secretary Napolitano, "confer[ed] no substantive right, immigration status or pathway to citizenship." Regents Pet. App. 101a. "Only the Congress, acting through its legislative authority, can confer these rights," she added. *Id.* And applicants for the DACA program were separately notified, on the application form itself, that "Deferred action does not confer lawful status upon an individual." USCIS Form I-821D (06/25/13).[7]

Such caveats are not surprising. Law enforcement officers exercise prosecutorial discretion every day, most often without such express caveats. When a highway patrol officer chooses not to stop someone driving a few miles over the speed limit, that is an ex-

---

[7] Available at https://web.archive.org/web/2014010707 4823/http://www.uscis.gov/sites/default/files/files/form/ i-821d.pdf.

24

ercise of prosecutorial discretion. When the Drug Enforcement Agency decides not to arrest someone for small amounts of marijuana possession, that, too, is an exercise of prosecutorial discretion. But in none of those routine cases does an entitlement to future exercises of prosecutorial discretion arise, should one choose to continue to violate the law. And this is true even if the law enforcement officer does not spell out in writing or explicitly state that his decision not to make an arrest *this time* is not an immunity from arrest *next time*. The notion that there can possibly be a reliance interest in continued, even perpetual, prosecutorial discretion *not to have the law enforced* would turn the "discretion" into an entitlement, a "grant of an immigration benefit, such as naturalization or adjustment of status, … that is not a subject for prosecutorial discretion," as former Clinton administration INS General Counsel Bo Cooper acknowledged more than two decades ago. Bo Cooper, *INS Exercise of Prosecutorial Discretion*, at 4, *supra* at 14.

Finally, had the DACA program actually created an entitlement in which there could be a reliance interest, it would even more clearly have amounted to an unconstitutional suspension of the law. *See supra*, I.B.

The claim of "reliance interest" in a prosecutor's "discretion" is therefore an oxymoron that should be rejected by this Court.

## CONCLUSION

Because the DACA program adopted in 2012 is itself constitutionally infirm, the decision by the current administration to rescind it is well within the bounds of its own executive authority. But even were

AR4476

25

it perfectly valid as a legitimate exercise of prosecutorial discretion, the discretion exercised by one presidential administration cannot possible bind a future presidential administration that chooses to exercise its prosecutorial discretion in a different manner. That would convert a discretionary decision not to prosecute into an entitlement to be exempt from the operation of the law entire, which is a legislative rather than executive function, assigned under our Constitution to the Congress, not to the President. The decisions of the courts below to the contrary should therefore be reversed.

Respectfully submitted,

JOHN C. EASTMAN
   *Counsel of Record*
ANTHONY T. CASO
The Claremont Institute's
   Center for Constitutional
   Jurisprudence
c/o Dale E. Fowler School of
   Law at Chapman Univ.
One University Drive
Orange, CA 92866
(877) 855-3330
jeastman@chapman.edu

*Counsel for Amicus Curiae*
*Center for Constitutional Jurisprudence*

August 2019

**AR4477**

**Nos. 18-587, 18-588, and 18-589**

IN THE

# Supreme Court of the United States

————

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
*PETITIONERS*,

*V.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,
*RESPONDENTS.*

*On Writ of Certiorari to the
United States Court of Appeals for the Ninth Circuit*

————

**BRIEF FOR THE CATO INSTITUTE AND
PROFESSOR JEREMY RABKIN
AS *AMICI CURIAE* SUPPORTING DACA AS A
MATTER OF POLICY BUT PETITIONERS AS A
MATTER OF LAW**

————

Josh Blackman
1303 San Jacinto St.
Houston, TX 77079
(713) 646-1829
jblackman@stcl.edu

Ilya Shapiro
  *Counsel of Record*
CATO INSTITUTE
1000 Mass. Ave. N.W.
Washington, D.C. 20001
(202) 842-0200
ishapiro@cato.org

August 26, 2019

Additional Captions Listed on Inside Cover

**AR4478**

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., PETITIONERS

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL.

_____

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE
UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF
COLUMBIA CIRCUIT*

_____

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, ET AL., PETITIONERS

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

_____

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE
UNITED STATES COURT OF APPEALS FOR THE SECOND
CIRCUIT*

_____

AR4479

iii

## QUESTIONS PRESENTED

This dispute concerns the policy of immigration enforcement discretion known as Deferred Action for Childhood Arrivals (DACA). In 2016, this Court affirmed, by an equally divided vote, a Fifth Circuit ruling that two related Department of Homeland Security (DHS) discretionary enforcement policies, including an expansion of the DACA policy, were likely unlawful and should be enjoined. See *United States* v. *Texas*, 136 S. Ct. 2271 (per curiam). In September 2017, DHS determined that the original DACA policy was unlawful and would likely be struck down by the courts on the same grounds as the related policies. DHS thus instituted an orderly wind-down of the DACA policy. The questions presented are as follows:

1. Whether DHS's decision to wind down the DACA policy is judicially reviewable.

2. Whether DHS's decision to wind down the DACA policy is lawful.

AR4480

iv

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................ vi

INTEREST OF *AMICI CURIAE* ................................. 1

INTRODUCTION AND
  SUMMARY OF ARGUMENT .............................. 2

ARGUMENT ................................................................ 4

I.  DACA, WHICH LACKS "EXPRESS
    STATUTORY AUTHORIZATION,"
    CANNOT BE SUPPORTED BY "IMPLICIT
    CONGRESSIONAL ACQUIESCENCE" .............. 4

    A. CONGRESS DID NOT—AND COULD
       NOT—IMPLICITLY AUTHORIZE DACA
       BY ACQUIESCING TO PAST EXERCISES
       OF DEFERRED ACTION ................................. 5

    B. DACA IS NOT CONSONANT WITH PAST
       EXECUTIVE PRACTICE ................................. 6

II. IF FEDERAL LAW AUTHORIZES DACA,
    IMPORTANT PROVISIONS OF THE INA
    IMPERMISSIBLY DELEGATE LEGISLATIVE
    POWER TO THE EXECUTIVE ......................... 10

    A. COURTS DO NOT DEFER TO EXECUTIVE
       ACTIONS THAT IMPLICATE "MAJOR
       QUESTIONS" OF "DEEP 'ECONOMIC
       AND POLITICAL SIGNIFICANCE'" ............. 11

    B. "THE HYDRAULIC PRESSURE OF OUR
       CONSTITUTIONAL SYSTEM . . . SHIFT[ED]
       THE RESPONSIBILITY" FOR REVIEWING
       LEGISLATIVE DELEGATIONS FROM
       THE NONDELEGATION DOCTRINE TO
       THE MAJOR QUESTIONS DOCTRINE ....... 13

v

C. THE FIFTH CIRCUIT USED THE MAJOR
QUESTIONS DOCTRINE "IN SERVICE OF
THE CONSTITUTIONAL RULE" THAT
CONGRESS CANNOT DELEGATE ITS
LEGISLATIVE POWER .................................. 15

D. THE ATTORNEY GENERAL'S LETTER
MADE A REASONABLE
CONSTITUTIONAL OBJECTION
TO DACA.......................................................... 17

E. THE SOLICITOR GENERAL'S BRIEF
REAFFIRMS THE ATTORNEY
GENERAL'S REASONABLE
CONSTITUTIONAL OBJECTION ................ 21

F. TO ELIMINATE NONDELEGATION
CONCERNS, COURTS SHOULD DEFER
TO REVERSALS OF NOVEL EXECUTIVE
ACTIONS THAT EXPANDED
EXECUTIVE POWER ..................................... 24

CONCLUSION.......................................................... 27

**AR4482**

vi

## TABLE OF AUTHORITIES

**Cases**

*Chevron U.S.A. Inc. v. Natural Res. Def.
Council, Inc.*, 467 U.S. 837 (1984) ......................... 11

*Dames & Moore v. Regan*, 453 U.S. 654 (1981) .......... 6

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ....................................... *passim*

*Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010) ...... 8

*Gundy v. United States*,
139 S. Ct. 2116 (2019) .................................... *passim*

*King v. Burwell*, 135 S. Ct. 2480 (2015) ............ *passim*

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ...................... 25

*McDonald v. Chicago*, 561 U.S. 742 (2010) .............. 15

*McPherson v. Blacker*, 146 U.S. 1 (1892) ................... 6

*Medellin v. Texas*, 552 U.S. 491 (2008) ...................... 6

*NAACP v. Trump*,
298 F. Supp. 3d 209 (D.D.C. 2018) .............. 8, 17, 24

*NLRB v. Noel Canning*, 573 U.S. 513 (2014) .............. 5

*Reno v. Am.-Arab Anti-Discrim. Comm.*,
525 U.S. 471 (1999) .............................................. 2, 4

*Texas v. United States*,
328 F. Supp. 3d 662 (S.D. Tex. 2018) .................... 19

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) ......................... *passim*

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ........... 22, 27

*Util. Air Regulatory Group v. EPA*,
573 U.S. 302 (2014) ....................................... *passim*

**AR4483**

vii

*Vidal v. Nielsen*,
    279 F. Supp. 3d 401 (E.D.N.Y. 2018).............. 24, 26

*Whitman v. American Trucking Ass'ns*,
    531 U.S. 457 (2001) ................................... 12, 14, 17

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................. 5

*Zivotofsky v. Kerry*, 135 S. Ct. 2076 (2015).............. 10

## Statutes and Regulations

8 C.F.R. 274a.12(c)(14) .......................................... 4, 18

6 U.S.C. § 202(5) ..................................................... 4, 5

8 U.S.C § 1103(a) .................................................... 4, 5

8 U.S.C. § 1229c(a)(2)(A) ........................................... 8

8 U.S.C. § 1254(e) ....................................................... 8

8 U.S.C. § 1324a(h)(3)................................................. 4

Dep't of Justice, Immig. & Naturalization Service,
    *Employment Authorization; Classes of Aliens
    Eligible*, 52 Fed. Reg. 46,092 (Dec. 4, 1987)..... 18-19

## Other Authorities

Adam B. Cox & Cristina M. Rodríguez,
    *The President and Immigration Law*,
    119 Yale L.J. 458 (2009) ........................................ 26

Adam B. Cox & Cristina M. Rodríguez,
    *The President and Immigration Law Redux*,
    125 Yale L.J. 104 (2015) ........................................ 26

Brief for the Cato Institute et al. as Amici Curiae
    Supporting Respondents, *United States v. Texas*,
    136 S. Ct. 2271 (2016) (No. 15-674)........... 15, 27, 28

**AR4484**

viii

Brief for the Petitioners, *United States v. Texas*,
  136 S. Ct. 2271 (2016) (No. 15-674) .................... 4, 5

Brief of Senate Majority Leader Mitch McConnell
  and 42 Other Members of the U.S. Senate as
  Amici Curiae as Amici Curiae Supporting
  Respondents, *United States v. Texas*,
  136 S. Ct. 2271 (2016) (No. 15-674) ................. 19-20

Glenn Kessler, *Obama's Claim that George H.W.
  Bush Gave Relief to '40 Percent' of Undocumented
  Immigrants*, Wash. Post (Nov. 24, 2014) ............... 8

Ilya Shapiro, *I'm an Immigrant and a Reform
  Advocate. Obama's Executive Actions Are a
  Disaster for the Cause*,
  Wash. Post, Feb. 24, 2015 .................................... 3-4

Josh Blackman, *Defiance and Surrender*,
  59 S. Tex. L. Rev. 157 (2018) ................................... 6

Josh Blackman, *Gridlock*,
  130 Harv. L. Rev. 241 (2016) ................................ 11

Josh Blackman, *Immigration Inside the Law*,
  55 Washburn L.J. 31 (2016) ................................... 26

Josh Blackman, *Presidential Maladministration*,
  2018 Ill. L. Rev. 397 (2018) .............................. 25-26

Josh Blackman, *The Constitutionality of DAPA
  Part I: Congressional Acquiescence to Deferred
  Action*, 3 Geo. L.J. Online 96 (2015) ................... 7, 9

Josh Blackman, *The Constitutionality of DAPA
  Part II: Faithfully Executing The Law*,
  19 Tex. Rev. L. & Pol. 215 (2015) ......................... 15

Josh Blackman, *Understanding Sessions's
  Justification to Rescind DACA*, Lawfare
  (Jan. 16, 2018) ....................................................... 17

ix

Karl R. Thompson, OLC Memorandum Opinion,
*DHS's Authority to Prioritize Removal of Certain*
*Aliens Unlawfully Present in the United States*
*and to Defer Removal of Others*
(Nov. 19, 2014)................................................. 5, 6, 9

Letter from Attorney General Jeff Sessions to
Acting Secretary Duke (Sept. 5, 2017) ........... 18, 20

Peter Margulies, *The Boundaries of Executive*
*Discretion: Deferred Action, Unlawful Presence,*
*and Immigration Law*,
64 Am. U. L. Rev. 1183 (2015)................................. 8

*Presidential Authority to Decline to Execute*
*Unconstitutional Statutes*,
18 Op. OLC 199 (Nov. 2, 1994).............................. 10

Stephen Breyer, *Judicial Review of Questions of*
*Law and Policy*,
38 Admin. L.Rev. 370 (1986) ............................11-12

**AR4486**

1

## INTEREST OF *AMICI CURIAE*[1]

The Cato Institute is a nonpartisan think tank dedicated to individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies promotes the principles of constitutionalism that are the foundation of liberty. To those ends, Cato conducts conferences and publishes books, studies, and the annual *Cato Supreme Court Review*.

Jeremy A. Rabkin is a law professor at George Mason University's Antonin Scalia Law School. Prof. Rabkin's fields of expertise include administrative law, constitutional history, and statutory interpretation.

The interest of *amici* here lies in preserving the separation of powers that maintains the rule of law at the heart of the Constitution's protections for individual liberty. *Amici* generally support DACA-type policies that would normalize the immigration status of individuals who were brought to this country as children and have no criminal records. But the president cannot unilaterally make fundamental changes to immigration law—in conflict with the laws passed by Congress and in ways that go beyond constitutionally-authorized executive power. Nor does the president acquire more powers when Congress refuses to act, no matter how unjustified the congressional inaction is. The separation of powers prevents the president from expanding his own authority. Those same dynamics ensure that a subsequent president can reverse his predecessor's unlawful executive actions.

---

[1] Rule 37 statement: All parties issued blanket consents to the filing of *amicus* briefs. Nobody but *amici* and their counsel authored any of this brief or funded its preparation and submission.

2

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

Through the Deferred Action for Childhood Arrivals program (DACA), the previous administration took the position that the Immigration and Nationality Act (INA) authorized the secretary of homeland security to confer lawful presence on roughly 1.5 million aliens. The current administration reversed course. The attorney general concluded that this reading of federal law had "constitutional defects." He reached this decision in light of the Fifth Circuit's injunction of the similar Deferred Action for Parents of Americans and Lawful Permanent Residents program (DAPA), which this Court affirmed by an equally divided vote.

Several lower courts blocked the president from winding down DACA, however, holding that the executive branch failed to justify the rescission. These rulings are wrong because DACA goes beyond executive power under the INA. But even if the Court declines to reach that holding, the attorney general offered reasonable constitutional objections such that if DACA somehow complies with the INA, then the INA itself violates the nondelegation doctrine as applied here.

*First*, DACA, which lacks "express statutory authorization," *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 484 (1999), cannot be supported by any "implicit" congressional acquiescence. Two general provisions within the INA cannot bear the weight of this foundational transformation of immigration policy. Moreover, it should not matter if Congress has stood by idly when previous presidents exercised materially different deferred-action policies. The presi-

3

dent cannot acquire new powers simply because Congress acquiesced to similar accretions in the past. In any event, DACA is not consonant with past practice.

These arguments are sufficient to confirm the attorney general's conclusion that DACA is unlawful. But even if the Court disagrees—or declines to reach that issue—the executive branch has still provided adequate grounds to justify the rescission of DACA.

That is, *second*, the attorney general reasonably determined that DACA is inconsistent with the president's duty of faithful execution. Admittedly, the attorney general's letter justifying the rescission is not a model of clarity. But it need not be. This executive-branch communication provides, at a minimum, a reasonable constitutional objection to justify DACA rescission. Specifically, it invokes the "major questions" doctrine, which is used "in service of the constitutional rule" that Congress cannot delegate legislative power to the executive branch. *Gundy v. United States*, 139 S. Ct. 2116, 2142 (2019) (Gorsuch, J., dissenting). In other words, if federal law in fact supported DACA, then important provisions of the INA would run afoul of the nondelegation doctrine. The attorney general, as well as the Fifth Circuit, rejected this reading of the INA. Here, the court should accept the executive's determination of how to avoid a nondelegation problem: by winding down a discretionary policy.

*Amici* support comprehensive immigration reform, of which a DACA-type policy is only one part. But the president can't make the requisite legal changes by himself. Such unlawful executive actions both set back prospects for long-term reform and, more importantly here, weaken the rule of law. *See*, *e.g.*, Ilya Shapiro, *I'm an Immigrant and a Reform Advocate. Obama's*

4

*Executive Actions Are a Disaster for the Cause*, Wash. Post, Feb. 24, 2015, https://wapo.st/30rnq5m. Reversing the courts below would restore the immigration debate to the political process—exactly where it belongs.

## ARGUMENT

### I.  DACA, WHICH LACKS "EXPRESS STATUTORY AUTHORIZATION," CANNOT BE SUPPORTED BY "IMPLICIT" CONGRESSIONAL ACQUIESCENCE TO PREVIOUS USES OF DEFERRED ACTION

This Court has recognized that deferred action is a "regular practice" in the enforcement of immigration law. *Reno*, 525 U.S. at 484 (1999). However, it developed "without express statutory authorization." *Id.* (citations omitted). In 2016, the government argued that three statutes vested the secretary of homeland security with the "broad statutory authority" necessary for DAPA—and by extension, DACA. Brief for the Petitioners at 42, United States v. Texas, 136 S. Ct. 2271 (2016) (No. 15-674) ["Brief for DAPA Petitioners"].

First, the government cited 6 U.S.C. § 202(5), which authorizes the secretary of homeland security to "[e]stablish[] national immigration enforcement policies and priorities." Second, the government invoked 8 U.S.C § 1103(a), which charges the secretary "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens." Third, the government relied on the interaction between 8 U.S.C. § 1324a(h)(3) and 8 C.F.R. 274a.12(c)(14). The former statute excludes from the definition of "unauthorized alien" an alien who is "authorized to be so employed by this chapter or by the Attorney General." The latter regulation states that an

5

alien who has been granted deferred action "must apply for work authorization" if she "establishes an economic necessity for employment." The solicitor general conceded that "Section 1324a(h)(3) did not create the Secretary's authority to authorize work; that authority already existed in Section 1103(a), the vesting clause that gives the Secretary sweeping authority to administer the INA and to exercise discretion in numerous respects." Brief for DAPA Petitioners, at 63.

In short, the case for DACA's statutory legality hangs on only two provisions of the U.S. Code: 6 U.S.C. § 202(5) and 8 U.S.C § 1103(a). Can the authority for DACA be found within the four corners of these statutes? No. Instead, the executive branch defended DACA on a broader understanding of delegation.

## A. CONGRESS DID NOT—AND COULD NOT—IMPLICITLY AUTHORIZE DACA BY ACQUIESCING TO PAST EXERCISES OF DEFERRED ACTION

In 2014, the Office of Legal Counsel (OLC) opined that DAPA and DACA were lawful. Karl R. Thompson, OLC Memorandum Opinion, *DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* at 29 (Nov. 19, 2014) [hereinafter OLC Opinion]. OLC contended that these policies were legal, in part, because Congress "implicitly approved" past "permissible uses of deferred action." *Id.* at 24.

The Court has, at times, endorsed this sort of "adverse possession" approach to the separation of powers. *NLRB v. Noel Canning*, 573 U.S. 513, 526 (2014) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring); *id.*

AR4491

6

at 613 (Scalia, J., concurring). That is, the president can accumulate *new* constitutional powers "by engaging in a consistent and unchallenged practice over a long period of time." *Id.* at 613–14. *But see Medellin v. Texas*, 552 U.S. 491, 532 (2008) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)) ("Past practice does not, by itself, create power.")*; Josh Blackman, *Defiance and Surrender*, 59 S. Tex. L. Rev. 157, 164 (2018) (noting that "courts favor purported defiance over voluntary surrender") (citing *McPherson v. Blacker*, 146 U.S. 1, 35–36 (1892)).

But the Court has never sanctioned the extension of a Frankfurterian gloss to the statutory context. The president cannot accrete new legislation-based powers because Congress has acquiesced to similar accretions in the past. The legality of DACA must stand or fall by virtue of the authority delegated by 6 U.S.C. § 202(5) and 8 U.S.C § 1103(a), *not* based on whether Congress has acquiesced to past invocations of those authorities.

## B. DACA IS NOT CONSONANT WITH PAST EXECUTIVE PRACTICE

Even accepting OLC's framework, DACA is not "consonant with" past executive policy. *See* OLC Opinion at 24. OLC identified only "five occasions since the late 1990s" where the government "made discretionary relief available to certain classes of aliens through the use of deferred action": deferred action for (1) "[b]attered [a]liens [u]nder the Violence Against Women Act"; (2) "T and U Visa [a]pplicants"; (3) "[f]oreign [s]tudents [a]ffected by Hurricane Katrina"; (4) "[w]idows and [w]idowers of U.S. [c]itizens"; and, as relevant here, (5) the 2012 "Deferred Action for Childhood Arrivals" (DACA) policy. *Id.* at 15–20.

7

The scope of Congress's acquiescence for the first four policies was far more constrained than OLC suggested. Each instance of deferred action was sanctioned by Congress, and one of two qualifications existed: (1) the alien already had an existing lawful presence in the U.S., or (2) the alien had the immediate prospect of lawful residence or presence in the U.S. In either case, "deferred action acted as a *temporary bridge* from one status to another, where benefits were construed as arising immediately post-deferred action." Josh Blackman, *The Constitutionality of DAPA Part I: Congressional Acquiescence to Deferred Action*, 3 Geo. L.J. Online 96, 112 (2015) (emphasis in original). *See also Texas v. United States*, 809 F.3d 134, 184 (5th Cir. 2015) ("[M]any of the previous programs were *bridges* from one legal status to another, whereas DAPA awards lawful presence to persons who have never had a legal status and may never receive one.") (emphasis added).

The solicitor general makes this same point now: these past practices "used deferred action to provide certain aliens temporary relief while the aliens sought or awaited permanent status afforded by Congress." Brief for the Petitioners at 47, Dep't of Homeland Security v. Regents of the Univ. of California (2019) (Nos. 18-587, 18-588, and 18-589) [SG Brief]. Unlike previous recipients of deferred action, DACA beneficiaries have no prospect of a formal status adjustment unless they become eligible for some other statutory relief.

Nor does President George H.W. Bush's 1990 "Family Fairness" policy, which OLC also cited, support DACA's legality. First, the Family Fairness policy served as a *bridge* to adjustment of status because it was "interstitial to a statutory legalization scheme."

8

*Texas v. United States*, 809 F.3d at 185; *see also* Peter
Margulies, *The Boundaries of Executive Discretion:*
*Deferred Action, Unlawful Presence, and Immigration*
*Law*, 64 Am. U. L. Rev. 1183, 1217 (2015) ("Family
Fairness was ancillary to Congress's grant of legal sta-
tus to millions of undocumented persons in IRCA.").
Second, the actual size of the program is significantly
smaller than DACA. *See* SG Brief at 49; *see also* Glenn
Kessler, *Obama's Claim that George H.W. Bush Gave*
*Relief to '40 Percent' of Undocumented Immigrants*,
Wash. Post (Nov. 24, 2014), https://perma.cc/J92E-
C6M9. Third, the Family Fairness policy was premised
on a different statutory authority, known as extended
voluntary departure, 8 U.S.C. § 1254(e), which was se-
verely curtailed in 1996. 8 U.S.C. § 1229c(a)(2)(A). The
solicitor general now seems to endorse this argument.
*See* SG Brief at 49 n. 10.[2]  As a result, all exercises of
deferred action prior to 1996 are of limited relevance.

Finally, OLC admitted that DACA stands on a
more tenuous footing than did DAPA. A cryptic foot-
note explained that OLC "orally advised" that DACA
was still "permissible," even though it "was predicated

---

[2] One of the courts below suggested that DACA rescission was
"arbitrary and capricious" because the attorney general "fail[ed]
to even consider OLC's thorough analysis." *NAACP v. Trump*, 298
F. Supp. 3d 209, 240 n.23 (D.D.C. 2018). But one president cannot
"choose to bind his successors by diminishing their powers." *Free*
*Enter. Fund v. PCAOB*, 561 U.S. 477, 497 (2010). Nor can one
administration's OLC bind a subsequent OLC. The attorney gen-
eral's decision to reverse course should be seen as an implicit re-
pudiation of the 2014 OLC opinion. Moreover, declining to explain
internal agency deliberations was in no sense "arbitrary and ca-
pricious." In any case, the solicitor general maintains that the
OLC memo on DAPA "does not undermine the Secretary's conclu-
sion that DACA is unlawful." SG Brief at 47.

9

on humanitarian concerns that appeared less particularized and acute than those underlying certain prior class-wide deferred action programs." OLC Opinion at 18 n.8. In other words, DACA was less "consonant" with past executive practice than was DAPA. Even if this legal framework were correct, OLC once again erred with respect to the facts. "[T]he concerns animating DACA were" *not* "consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion." *See id*. Generally, the "humanitarian concern" behind past deferred action policies concerned family reunification. DAPA, at least, had this attribute: beneficiaries were required to have a close kinship with a citizen or lawful permanent resident child. In contrast, DACA beneficiaries need not have *any* familial relationship with *any* citizen or lawful resident. See Blackman, *The Constitutionality of DAPA Part I, supra* at 116–19. *Amici* agree with OLC that the legal basis for DAPA was stronger than the legal basis for DACA. Neither policy, however, can be squared with federal immigration law.

In sum, DACA lacks "express statutory authorization," and is not supported by "implicit" congressional acquiescence. This conclusion provides adequate grounds to reverse the judgments below. The Administrative Procedure Act (APA) cannot be read to force the executive branch to continue implementing a policy that is contrary to law, regardless of how it chooses to rescind the policy. SG Brief at 51 ("[I]f DACA is unlawful, even an inadequate explanation could not provide a basis to overturn the agency's decision to rescind the unlawful policy."). But even if the Court disagrees on that point, or declines to resolve that question, the executive branch has still provided adequate grounds to justify the rescission of DACA.

10

## II. IF FEDERAL LAW AUTHORIZES DACA, IMPORTANT PROVISIONS OF THE INA IMPERMISSIBLY DELEGATE LEGISLATIVE POWER TO THE EXECUTIVE

The executive doesn't need the judiciary's permission to stop enforcing a law it sees as unconstitutional. *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. Off. Legal Counsel 199 (Nov. 2, 1994). For example, in 2002, President George W. Bush construed an obviously "mandatory" statute as "advisory," so as not to "impermissibly interfere with [his] constitutional authority" concerning diplomatic recognition. *Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2082 (2015). This decision was compelled by his duty to take care that the laws be faithfully executed. Const., art. II, § 3. Ultimately, the Court endorsed this exercise of departmentalism. *See Zivotofsky*, 135 S. Ct. at 2096.

Likewise, the executive branch does not need the judiciary's permission to cease enforcing a regulation it determines to be unconstitutional. Indeed, the APA would be unconstitutional, as applied, whenever its regulatory manacles required the executive to continue enforcing an unconstitutional policy.

Here, the attorney general determined that DACA had "constitutional defects," in light of the Fifth Circuit's decision in *Texas v. U.S*, and the major questions doctrine. The Court should defer to this reasonable interpretation of the president's duty to faithfully execute the law because it avoids nondelegation problems. In other words, courts should allow reversals of novel execution actions that expand presidential power.

11

## A. COURTS DO NOT DEFER TO EXECUTIVE ACTIONS THAT IMPLICATE "MAJOR QUESTIONS" OF "DEEP 'ECONOMIC AND POLITICAL SIGNIFICANCE'"

Under the familiar rule established in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, courts will defer to an agency's interpretation of an ambiguous statute so long as the interpretation is reasonable. 467 U.S. 837, 845 (1984). In four cases from the past quarter-century, however, the Court carved out an important exception to *Chevron*: when a regulation implicates a "major question," the agency is owed no deference. *See* Josh Blackman, *Gridlock*, 130 Harv. L.Rev. 241, 260-265 (discussing doctrinal development).

First, *FDA v. Brown & Williamson Tobacco Corp.*, held that the FDA could not expand its jurisdiction to regulate tobacco as a "drug." 529 U.S. 120, 131–33 (2000). This case introduced the concept of the "major questions" doctrine. The phrase came from a 1986 article authored by then-Judge Stephen Breyer: "'Congress is more likely to have focused upon, and answered, *major questions*,'" he wrote, "'while leaving interstitial matters to answer themselves in the course of the statute's daily administration.'" *Id.* at 159 (emphasis added) (quoting Stephen Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin. L.Rev. 363, 370 (1986)). Regulations that resolve such "major questions" in "extraordinary cases," give courts "reason to hesitate before concluding that Congress has intended such an implicit delegation." *Id.* As a result, the Court was "obliged to defer not to the agency's expansive construction of the statute, but to Congress' consistent judgment to deny the FDA" the authority to

AR4497

12

regulate tobacco as a drug. *Id.* at 160. The Court was "confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." *Id.*

Second, *Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001) elaborated on the *Brown & Williamson* framework. The Court recognized that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Id.* at 468. Justice Scalia explained in a memorable line that Congress "does not, one might say, hide elephants in mouseholes." *Id.* (citations omitted).

Third, in *Util. Air Reg. Group v. EPA* (*UARG*), the Court added a skeptical gloss to *Brown & Williamson*: "When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' we typically greet its announcement with a measure of skepticism." 573 U.S. 302, 324 (2014) (quoting *Brown & Williamson*, 529 U.S. at 159). Congress will "speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Id.* ((quoting *Brown & Williamson*, 529 U.S. at 159).

Fourth, the Court revisited the major questions doctrine in *King v. Burwell*. 135 S. Ct. 2480 (2015). This case considered whether the Affordable Care Act (ACA) permitted the payment of subsidies on exchanges established by the federal government. *Id.* at 2488. The Court declined to defer to the government's reading of the ACA: "In extraordinary cases . . . there may be reason to hesitate before concluding that Congress has intended such an implicit delegation." *Id.* at 2488–89 (quoting *Brown & Williamson*, 529 U.S. at

13

159). Instead, it recognized that the payment of billions of dollars of credits on the federal exchanges was a major question of "*deep* 'economic and political significance' that is central to this statutory scheme." *Id.* at 2489 (quoting *UARG*, 573 U.S. at 324)) (emphasis added, to signal that the modifier "deep" was grafted onto the *Brown & Williamson* test). If Congress had intended for the IRS to have this authority to grant tax credits, "it surely would have done so expressly." *Id.*

A recent opinion from this Court sheds further light on the major questions doctrine and its constitutional foundation, the nondelegation doctrine.

## B. "THE HYDRAULIC PRESSURE OF OUR CONSTITUTIONAL SYSTEM . . . SHIFT[ED] THE RESPONSIBILITY" FOR REVIEWING LEGISLATIVE DELEGATIONS FROM THE NONDELEGATION DOCTRINE TO THE MAJOR QUESTIONS DOCTRINE

*Gundy v. United States* considered the constitutionality of a provision of the Sex Offender Registration and Notification Act (SORNA). 139 S. Ct. 2116 (2019). SORNA § 20913(d) gave the attorney general "the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter . . . and to prescribe rules for the registration of any such sex offender." A plurality of the short-handed Court held that Section 20913(d) did not violate the "nondelegation doctrine[, which] bars Congress from transferring its legislative power to another branch of Government." *Id*. at 2121.

At least three justices disagree. The SORNA provision, Justice Gorsuch wrote, "purports to endow the

14

nation's chief prosecutor with the power to write his own criminal code governing the lives of a half-million citizens." *Id.* at 2131 (Gorsuch, J., dissenting). Through this statute, he observed, Congress "gave the Attorney General free rein to write the rules for virtually the entire existing sex offender population in this country." *Id.* at 2132. Justice Gorsuch acknowledged that the Court "last held that a statute improperly delegated the legislative power to another branch" more than eight decades ago. *Id.* at 2141. Yet "the Court has hardly abandoned the business of policing improper legislative delegations." *Id.* The judiciary has continued to perform that function with a different label, notably "the 'major questions' doctrine." *Id.*

Generally, "an agency can fill in statutory gaps where 'statutory circumstances' indicate that Congress meant to grant it such powers." *Id.* The major questions doctrine is as an exception to that rule. *Chevron* deference does not apply "[w]hen the 'statutory gap' concerns 'a question of deep economic and political significance' that is central to the statutory scheme.'" *Id.* (quoting *Burwell*, 135 S. Ct. at 2488–89). What are examples of such "major questions?" Justice Gorsuch cited each case in the modern nondelegation trilogy: (1) *Brown & Williamson* (regulations "to ban cigarettes"); (2) *UARG* (regulations to "assume control over millions of small greenhouse gas sources"); and (3) *King v. Burwell* (regulations "to rewrite rules for billions of dollars in healthcare tax credits"). *Id.* at 2141–42. In each case, deference was not warranted because Congress "did not hide elephants in mouseholes." *Whitman*, 531 U.S. at 468.

The major questions doctrine is not a mere "canon of statutory construction." *See Gundy*, 139 S. Ct. at

15

2142 (Gorsuch, J., dissenting). Instead, courts "apply the major questions doctrine in service of the constitutional rule that Congress may not divest itself of its legislative power by transferring that power to an executive agency," *id.*[3] "When one legal doctrine becomes unavailable to do its intended work, the hydraulic pressures of our constitutional system sometimes shift the responsibility to different doctrines." *Id.* (citing *McDonald v. Chicago*, 561 U.S. 742, 758 (2010)). In this way, the major questions doctrine is a corollary to the nondelegation doctrine.

## C. THE FIFTH CIRCUIT USED THE MAJOR QUESTIONS DOCTRINE "IN SERVICE OF THE CONSTITUTIONAL RULE" THAT CONGRESS CANNOT DELEGATE ITS LEGISLATIVE POWER

In *Texas v. United States*, the Fifth Circuit purported to decide the legality of DAPA "without resolving the constitutional claim." 809 F.3d. at 154. Specifically, the panel expressly declined to "decide the challenge based on the Take Care Clause." *Id.* at 146 n. 3.[4] The panel observed that "[w]e merely apply the ordinary tools of statutory construction to conclude that

---

[3] Although the *Gundy* plurality rejected Justice Gorsuch's application of the nondelegation doctrine in that case, no justice disputes that the major questions doctrine reflects long-established constitutional concerns.

[4] *Amici* previously explained how DAPA runs afoul of the Take Care Clause. *See* Brief for the Cato Institute et al. as Amici Curiae Supporting Respondents at 20-30, United States v. Texas, 136 S. Ct. 2271 (2016) (No. 15-674) ["Cato DAPA Brief"]. These arguments apply with equal force to DACA. *See also* Josh Blackman, *The Constitutionality of DAPA Part II: Faithfully Executing The Law*, 19 Tex. Rev. L. & Pol. 215 (2015).

16

Congress directly addressed, yet did not authorize, DAPA." *Id.* at 183 n 191. Although the major questions doctrine, again, is not a mere "canon of statutory construction," *Gundy*, 139 S. Ct. at 2142 (Gorsuch, J., dissenting), part VII of *Texas* faithfully considered the modern nondelegation trilogy:

> DAPA would make 4.3 million otherwise removable aliens eligible for lawful presence, employment authorization, and associated benefits, and "we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." DAPA undoubtedly implicates "question[s] of deep 'economic and political significance' that [are] central to this statutory scheme; had Congress wished to assign that decision to an agency, it surely would have done so expressly."

*Texas*, 809 F.3d at 181 (citing *Brown & Williamson*, 529 U.S. 120, *UARG*, 573 U.S. 302, and *King v. Burwell*, 135 S. Ct. 2480).

Next, the Fifth Circuit considered the three statutes that OLC claimed supported DAPA, as well as DACA: "the broad grants of authority" in 6 U.S.C. § 202(5) and 8 U.S.C. § 1103(a)(3) "cannot reasonably be construed as assigning 'decisions of vast 'economic and political significance,' such as DAPA, to an agency." *Id.* at 183 (quoting *UARG*, 573 U.S. at 324). What about 8 U.S.C. § 1324a(h)(3), which purportedly empowers the secretary to provide DACA recipients with work authorization? The court observed that the statute "does not mention lawful presence or deferred action" and "is

AR4502

17

listed as a '[m]iscellaneous' definitional provision expressly limited to § 1324a." *Id*. This section, which "concern[s] the 'Unlawful employment of aliens'" was "an exceedingly unlikely place to find authorization for DAPA." *Id*. (citing *Whitman*, 531 U.S. at 468 ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."). At bottom, the Fifth Circuit's decision is best understood to reflect an application of the major questions doctrine, a corollary to the nondelegation doctrine.

## D. THE ATTORNEY GENERAL'S LETTER MADE A REASONABLE CONSTITUTIONAL OBJECTION TO DACA

In September 2017, the attorney general wrote a one-page letter to the acting secretary of homeland security. A careful parsing of this executive-branch communication, read in conjunction with *Texas* and Justice Gorsuch's *Gundy* dissent, establishes a reasonable constitutional objection to DACA premised on the nondelegation doctrine. Indeed, this reading was apparent even before *Gundy*.[5]

---

[5] *NAACP v. Trump*, 298 F. Supp. 3d 209, 240 n.21 (D.D.C. 2018) ("At least one commentator has identified a second possible constitutional argument in the Sessions Letter: 'The Obama administration's open-ended reading of certain definitional provisions of the Immigration and Nationality Act (INA) would run afoul of the nondelegation doctrine.' *See* Josh Blackman, *Understanding Sessions's Justification to Rescind DACA*, Lawfare (Jan. 16, 2018), https://perma.cc/B28T-2DRJ; *see also Texas*, 809 F.3d at 150 (noting that the plaintiffs there had asserted "constitutional claims under the Take Care Clause" and the "separation of powers doctrine")).

AR4503

18

The letter recognized that under DACA, "certain individuals who are without lawful status in the United States [can] request . . . benefits such as work authorization." Letter from Attorney General Jeff Sessions to Acting Secretary Duke (Sept. 5, 2017). The attorney general explained that the work-authorization grants were "effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result." *Id.* He added that "[s]uch an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." *Id.*

Why was the provision of work benefits "effectuated . . . without proper statutory authority"? Why was it "an unconstitutional exercise of authority by the Executive Branch"? Why was it "an open-ended circumvention of immigration laws"? Admittedly, the attorney general's letter is not a model of constitutional clarity. But it need not be. It provides, at a minimum, a reasonable constitutional objection to justify the rescission of DACA.

First, consider the regulation that authorizes the secretary to grant DACA recipients with work authorization, with which we can presume the attorney general was familiar.[6] 8 C.F.R. 274a.12(c)(14) provides a crystalline illustration of the elephant-in-mousehole framework. In 1987, the Immigration and Naturalization Service denied a petition for rulemaking to restrict the issuance of work authorization to certain aliens. See Dep't of Justice, Immig. & Naturalization,

---

[6] *See infra* n.8.

19

*Employment Authorization; Classes of Aliens Eligible*, 52 Fed. Reg. 46,092 (Dec. 4, 1987). The government justified the denial, in part, because the number of such work authorizations would be "quite small"—so small, that the number was "not worth recording statistically." *Id.* at 46,092-93. Moreover, such authorizations would "normally [be] of very limited duration," and would be very rare. *Id.* at 46,092.

DACA operates in a very different fashion. The policy could provide roughly 1.5 million aliens with work authorization, and those authorizations could be renewed for years to come.[7] This elephantine-sized grant of work authorizations—limited in neither size and "with no established end-date"—cannot conceivably be jammed into a not-statistically-significant mousehole. In every sense, this provision of benefits relies on a reading of federal immigration law that amounts to "an unconstitutional exercise of authority by the Executive Branch"—that is, the exercise of legislative powers. The attorney general's conclusion is consistent with the Court's admonition in *Brown &* Williamson: "Congress could not have intended to delegate a decision of such economic and political significance"—the ability to provide work authorization to 1.5 million aliens—"in so cryptic a fashion."[8]

---

[7] *Texas v. United States*, 328 F. Supp. 3d 662, 676 (S.D. Tex. 2018) ("An estimated population of 1.5 million people—greater than the populations of at least ten states—potentially qualify for these benefits."). As a matter of first principle, people should not need government permission to work. But federal (and state) law often imposes onerous and even irrational requirements on the right to earn an honest living, which the president is powerless to alter.

[8] In 2016, a group of 43 senators explained that "it strains credulity that Congress would grant the Executive such unfettered discretion" to grant so many work authorizations. *See* Brief of Senate

20

Second, the attorney general's analysis echoed another important attribute of modern nondelegation doctrine: the provision of work authorization to 1.5 million aliens was a major question of "deep 'economic and political significance' that is central to this statutory scheme." *King v. Burwell*, 135 S. Ct. at 2489 (quoting *UARG*, 573 U.S. at 324)). Indeed, the attorney general stressed that DACA sidestepped Congress "after Congress' repeated rejection of proposed legislation that would have accomplished a similar result."

Secretary of Homeland Security Kristjen Nielsen echoed this reading of *Texas*. Her June 2018 memorandum noted that the Fifth Circuit's decision "turned on the incompatibility of such a *major* nonenforcement policy with the INA's comprehensive scheme." (emphasis added). That is, DACA resolved a "major question." The status of the Dreamers has divided our polity for more than a decade. This question is of far deeper "economic and political significance" than the payment of healthcare subsidies on the federal exchange.

Third, the letter cited part VII of the Fifth Circuit's panel decision. The attorney general reasoned that "[b]ecause the DACA policy has the same legal and *constitutional defects* that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Letter from Attorney General Sessions, *supra* (emphasis added). Admittedly, the Fifth Circuit purported to

---

Majority Leader Mitch McConnell and 42 Other Members of the U.S. Senate as Amici Curiae Supporting Respondents at 22–23, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674). That brief should provide some insight into the current administration's thinking: it was authored by the current head of OLC and joined by the attorney general who authorized DACA rescission.

21

decide the case "without resolving the constitutional claim." *Texas*, 809 F.3d. at 154. But that framing was inapt. Justice Gorsuch's *Gundy* dissent clarifies that the application of the major question doctrine *was* a constitutional decision. The attorney general's reference to DAPA's "constitutional defects" is most naturally understood as a rejection of the prior administration's unbounded reading of federal law.

## E. THE SOLICITOR GENERAL'S BRIEF REAFFIRMS THE ATTORNEY GENERAL'S REASONABLE CONSTITUTIONAL OBJECTION

To be sure, the solicitor general stopped short of referring to the major questions doctrine, as well as the nondelegation doctrine. He did not expressly reference what the "constitutional defects" in DACA were. With good reason. Generally, the federal government is hesitant to support doctrines that could result in the invalidation of federal law. But it is difficult to read the government's brief—especially after *Gundy*—without seeing its constitutional overtones.

First, the solicitor general touches all the bases of the Court's modern nondelegation doctrine jurisprudence. He observes that "DHS retains authority to address 'interstitial matters' of immigration enforcement." SG Brief at 44 (citing *Brown & Williamson*, 529 U.S. at 159). However, DACA "is hardly interstitial." *Id.* Next, he explains that "longstanding regulations" concerning "work authorization" are inconsistent with DACA, which "is not a gap-filling measure in any meaningful sense." *Id.* Instead, DACA is "an agency decision[] of vast 'economic and political significance'" without any warrant from Congress." *Id.* at 44–45 (quoting *UARG*, 573 U.S. at 324). "When an agency

22

claims to discover in a long-extant statute an unheralded power over important national affairs, this Court typically greets its announcement with a measure of skepticism." *Id.* at 45 (cleaned up).

Second, the solicitor general explains that the prior administration's broad reading of federal immigration laws cannot be reconciled with Congress's "finely reticulated regulatory scheme" over immigration. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2406–07 (2018) (citations omitted). The government argues that "neither the INA's general grants of authority in 6 U.S.C. 202(5) and 8 U.S.C. 1103(a)(3), nor the other scattered references to deferred action throughout the U.S. Code, can be *fairly interpreted* as authorizing DHS to maintain a categorical deferred-action policy affirmatively sanctioning the ongoing violation of federal law by up to 1.7 million aliens to whom Congress has repeatedly declined to extend immigration relief." SG Brief at 43–44 (emphasis added). The brief adds that 6 U.S.C. § 202(5) and 8 U.S.C. § 1103(a)(3) "simply do not provide the *clarity* that is required to authorize a nonenforcement policy of the nature and scope of DACA." SG Brief at 45-46 (emphasis added). Finally, the brief observes that the lower courts did not "identify any *specific delegation* on which DHS could rely" to enact a policy of DACA's magnitude. SG Brief at 46 (emphasis added). The emphasized language—*fairly interpreted*, *clarity*, and *specific delegation*—is about as close as any solicitor general will ever get to conceding that his predecessor espoused a reading of federal law that would violate the nondelegation doctrine.

Third, and most important, the solicitor general frames the attorney general's decision in expressly departmentalist terms: he was not merely interpreting a

23

statute, but was advising on the executive's duty of faithful execution. His brief explains that "as a coordinate Branch, the Executive has an independent duty to determine whether it lacks authority to act." SG Brief at 50. What is an example of such a determination? The quintessential exercise of executive power: "the Attorney General may direct United States Attorneys not to bring prosecutions that, in his view, would be unconstitutional." *Id.* at 51. Does the government need to persuade the courts about the validity of that action? Absolutely not. "[I]n the unique context of its decision whether or not to enforce the law, the Executive is entitled to act on its view of the bounds of its enforcement discretion *even if the courts might disagree.*" *Id.* at 50–51 (emphasis added). The solicitor general explains that "[t]here is nothing arbitrary and capricious about making such an enforcement decision based on the Executive's own view of what the law permits. So too here, DHS was entitled to stand on its view that DACA is an invalid exercise of prosecutorial discretion even if the courts would uphold it." *Id.* It is difficult to read this conclusion, which follows a lengthy discussion of the major questions doctrine, as anything but an endorsement of the constitutional theory underlying the nondelegation doctrine.

Here, the executive branch is on the same page: the previous administration's reading of federal law that supports DACA would render parts of the INA unconstitutional. For that reason, the attorney general recommended, and the secretary decided, to rescind DACA. The Court should hesitate before reaching an alternate holding, in which the attorney general and the secretary of homeland security, as well as the solicitor general, were simply mistaken about the executive's faithful execution. The better understanding is

AR4509

24

that the reference to DACA's "constitutional defects" was framed in terms of the major questions and non-delegation doctrines, as Justice Gorsuch recognized in *Gundy*.[9] But if there is any doubt about this important question, the government should be asked to represent its position about DACA's "*constitutional* defects."

## F. TO ELIMINATE NONDELEGATION CONCERNS, COURTS SHOULD DEFER TO REVERSALS OF NOVEL EXECUTIVE ACTIONS THAT EXPANDED EXECUTIVE POWER

Admittedly, *amici*'s reading of the attorney general's letter is charitable. Indeed, one of the court below took exception to this approach: "Some academic commentators have offered interesting arguments as to why courts should review deferentially Defendants' decision to end the DACA program." *Vidal v. Nielsen*, 279 F. Supp. 3d 401, 421 (E.D.N.Y. 2018) (citing Josh Blackman on *Lawfare Blog* and Zachary Price on *Take Care Blog*). The court observed that the government has not sought such deference, "arguing instead that, if their decision is indeed subject to judicial review, it should be reviewed under the *ordinary* arbitrary-and-capricious standard of APA § 706(2)(A)." 279 F. Supp. at 421, n. 9 (emphasis added). If the government still maintains this position, *amici* respectfully posit that a different standard should be applied.

---

[9] One of the courts below contended that because the government did "not raise" arguments premised on the nondelegation doctrine, it would "not consider them." *NAACP*, 298 F. Supp. 3d at 240 n. 21 (D.D.C. 2018). *Amici* contend that these constitutional defenses were not—and indeed cannot be—waived.

25

The attorney general's letter is not akin to mundane guidance documents in which an agency interprets its own regulations. *See Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). This case isn't about the "regulatory definition of active moiety," whatever that is. *Id.* at 2410 n.1. Rather, the letter explains that continuing to enforce DACA would be unconstitutional. And it concludes: "As Attorney General of the United States, I have a duty to defend the Constitution and to faithfully execute the laws passed by Congress." This invocation of the constitutional standard takes this letter out of the realm of normal administrative law. *See* SG Brief at 50 ("DHS was interpreting the scope of its own authority to maintain a discretionary policy of nonenforcement that no one claims was required by law.").

For example, the Court has recognized that the major questions doctrine takes a regulation out of *Chevron*'s domain. Such a "presidential discovery" of new power should not be entitled to deference. *See* Josh Blackman, *Presidential Maladministration*, 2018 Ill. L. Rev. 397, 423 (2018) ("[W]hen the President's instigation leads to an agency asserting some new power, Article III spider senses should start tingling. This caution should be even more pronounced when the discovery of the new power occurs *after* Congress refused to vest a similar power through bicameralism."). This cramped approach restores the "major question" back to the democratic process.

A similar dynamic should apply for the major questions doctrine, but in reverse: deference should be afforded to the rescission. Stated differently, the "presidential discovery" of a novel power should be viewed with skepticism, while the "presidential reversal" of that action should be viewed with deference. *See id.* at

26

405, 483-84. The "*ordinary* arbitrary-and-capricious standard of APA § 706(2)(A)," *Vidal*, 279 F. Supp. at 421 (emphasis added), is not applicable in this context.

Both approaches lead to the same destination: "while Congress can enlist considerable assistance from the executive branch in filling up details and finding facts," Congress cannot "endow the nation's chief prosecutor with the power to write his own [immigration] code governing the lives of [one-and-a-]half-million" aliens. *See Gundy*, 139 S. Ct at 2131, 2148 (Gorsuch, J., dissenting).

\*     \*     \*

If the previous administration's boundless reading of immigration law was correct, Congress would have unconstitutionally delegated legislative authority to the executive branch. Indeed, leading immigration scholars—whom the government cited—endorse such an expansive conception of statutory delegation. *See* Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458, 511 (2009) (noting that the president now enjoys a "*de facto* delegation of power that serves as the functional equivalent to standard-setting authority."); Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law Redux*, 125 Yale L.J. 104, 155 (2015) (concluding that "the structure of modern immigration law simply leaves us with no discernable congressional enforcement priorities."); Josh Blackman, *Immigration Inside the Law*, 55 Washburn L.J. 31 (2016) (recalling that according to some immigration scholars, "Congress and the INA impose absolutely no constraints on the prosecutorial discretion of the President, so long as the President does not entirely stop deportations").

27

But a *de facto* delegation of statutory authority with no discernable congressional enforcement priorities would "constitute an invalid delegation of legislative power to the executive." *See* Cato DAPA Brief at 24–25. In a conflict between a novel executive action based on a theory that would render vast swaths of immigration law unconstitutional, and a more constrained reading of those laws that allows Congress to resolve "major questions," the latter must prevail.

The Court need not treat this case as a vehicle "to revisit" the nondelegation doctrine, writ large. *Gundy*, 139 S. Ct. at 2131 (Gorsuch, J., dissenting). Instead, it can be resolved on the narrower "hydraulic" principle afforded by the major questions doctrine. Indeed, this modified approach is especially appropriate here because the executive seeks to reverse a discretionary policy endorsed by his predecessor. Here, we have the rare situation where the federal government seeks to contract, rather than expand, its own powers. SG Brief at 39 ("Nothing in our system of separated powers prohibits executive officials from seeking legislative approval for particularly significant executive actions."). Courts enforcing constitutional checks and balances should encourage these kinds of decisions.

## CONCLUSION

Presidents with different priorities come and go. But under our constitutional separation of powers, Congress's "painstaking[ly] detail[ed]" and "finely reticulated regulatory scheme" over immigration must prevail. *See Trump v. Hawaii*, 138 S. Ct. at 2444 (Sotomayor, J., dissenting). Congress, not the president, is empowered to resolve the status of the Dreamers, a major question that has divided our polity for more

**AR4513**

28

than a decade. Three years ago, *amici* explained that rejecting this novel discovery of executive power "would return the ball of change to the court where it belongs: Congress." Cato DAPA Brief at 34. The same principle controls here.

Respectfully submitted,

Josh Blackman
1303 San Jacinto St.
Houston, TX 77079
(713) 646-1829
jblackman@stcl.edu

Ilya Shapiro
  *Counsel of Record*
CATO INSTITUTE
1000 Mass. Ave. N.W.
Washington, D.C. 20001
(202) 842-0200
ishapiro@cato.org

August 26, 2019

Nos. 18-587, 18-588, 18-589

In The

# Supreme Court of the United States

◆

DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, *et al.*,

*Respondents.*

◆

DONALD J. TRUMP, PRESIDENT
OF THE UNITED STATES, *et al.*,

*Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, *et al.*,

*Respondents.*

◆

KEVIN K. McALEENAN, ACTING
SECRETARY OF HOMELAND SECURITY, *et al.*,

*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, *et al.*,

*Respondents.*

◆

**On Writs Of Certiorari To The United States
Courts Of Appeals For The Ninth Circuit, District
Of Columbia Circuit, And Second Circuit**

◆

*AMICUS* **BRIEF OF SAVE JOBS USA AND THE
WASHINGTON ALLIANCE OF TECHNOLOGY
WORKERS IN SUPPORT OF PETITIONERS**

◆

JOHN M. MIANO
*Counsel of Record*
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave., NW, Suite 315
Washington DC 20001
(202) 232-5590
miano@colosseumbuilders.com

COCKLE LEGAL BRIEFS (800) 225-6964
WWW.COCKLELEGALBRIEFS.COM

**AR4515**

i

## TABLE OF CONTENTS

Page

INTEREST OF *AMICI CURIAE* ......................... 1

SUMMARY OF THE ARGUMENT ..................... 3

ARGUMENT ........................................................ 4

  I.  DACA is unlawful because DHS has no authority to permit alien employment through administrative actions not authorized by Congress ................................. 4

    A.  Section 1324a(h)(3) cannot confer on DHS the authority to authorize alien employment because it is a term definition, limited in scope to its own section ...................................................... 5

    B.  Congress did not confer on DHS dual authority to define classes of aliens eligible for employment in the agency's general authority to promulgate regulations ................................................. 8

    C.  Even if Congress had attempted to confer on DHS the power to define classes of aliens eligible for employment, such a delegation of power would be unconstitutional ................... 11

  II.  Whether § 1324a(h)(3) confers on DHS co-equal authority with Congress to authorize any class of aliens it chooses to work will have major implications throughout the immigration system and is not an issue to be lightly considered ....................... 14

CONCLUSION.................................................... 16

**AR4516**

ii

## TABLE OF AUTHORITIES

Page

CASE LAW:

*Arizona Dream Act Coal.* v. *Brewer*, 757 F.3d
1053 (9th Cir. 2014)...................................................6

*Arizona* v. *Inter Tribal Council of Ariz., Inc.*, 133
S. Ct. 2247 (2013) ...................................................13

*Clinton* v. *City of N.Y.*, 524 U.S. 417 (1998)...............12

*Guevara* v. *Holder*, 649 F.3d 1086 (9th Cir. 2011).........6

*J. W. Hampton, Jr., & Co.* v. *United States*, 276
U.S. 394 (1928) .......................................................12

*Indus. Union Dep't, AFL-CIO* v. *Am. Petroleum
Inst.*, 448 U.S. 607 (1980) ........................................16

*Int'l Longshoremen's & Warehousemen's Union*
v. *Meese*, 891 F.2d 1374 (9th Cir. 1989)...................14

*Int'l Union of Bricklayers & Allied Craftsmen* v.
*Meese*, 761 F.2d 798 (D.C. Cir. 1985).......................14

*Loving* v. *United States*, 517 U.S. 748 (1996) .............12

*NAACP* v. *Trump*, 298 F. Supp. 3d 209 (D.D.C.
2018) ..........................................................................5

*Regents of the Univ. of Cal.* v. *U.S. Dep't of Home-
land Sec.*, 279 F. Supp. 3d 1011 (N.D. Cal.
2018) ...............................................................2, 6, 8

*Texas* v. *United States*, 809 F.3d 134 (5th Cir.
2015) ..............................................................5, 6, 8

*United States* v. *Texas*, 136 S. Ct. 2271 (2015).............6

**AR4517**

iii

TABLE OF AUTHORITIES—Continued

Page

*Util. Air Regulatory Grp.* v. *Envtl. Prot. Agency*, 573 U.S. 302 (2014) ...................................................7

*Vidal* v. *Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018) ........................................................................5, 8

*Whitman* v. *Am. Trucking Ass'ns*, 531 U.S. 457 (2001)................................................... 4, 8, 10, 12, 13

CONSTITUTION:

U.S. Const., Art. I, § 7 ..................................................12

STATUTES:

Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 163....................................9, 11

Immigration and Nationality Act of 1965, Pub. L. No. 89-236, 79 Stat. 911........................................11

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3445 ...........................8

Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 ..........................................................11

Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, 117 Stat. 11 ..................................9

8 U.S.C. § 1103 ........................................................9, 13

8 U.S.C. § 1324a(h)(3) ..........................................*passim*

AR4518

iv

TABLE OF AUTHORITIES—Continued

Page

REGULATIONS:

Employment Authorization for Certain H-4 De-
    pendent Spouses, 80 Fed. Reg. 10,284 (Feb. 25,
    2015) ........................................................................10

Improving and Expanding Training Opportuni-
    ties for F-1 Nonimmigrant Students With
    STEM Degrees and Cap-Gap Relief for All El-
    igible F-1 Students, 81 Fed. Reg. 13,040 (Mar.
    11, 2016) .............................................................2, 11

Extending Period of Optional Practical Training
    by 17 Months for F-1 Nonimmigrant Students
    With STEM Degrees and Expanding Cap-Gap
    Relief for All F-1 Students, 73 Fed. Reg. 18,944
    (Apr. 8, 2008) ..........................................................15

Employment Authorization for Certain H-4 De-
    pendent Spouses, 80 Fed. Reg. 10,284 (Feb. 25,
    2015) ....................................................................1, 10

Enhancing Opportunities for H-1B1, CW-1, and
    E-3 Nonimmigrants and EB-1 Immigrants, 81
    Fed. Reg. 2,068 (Jan. 15, 2016) ..............................10

International Entrepreneur Rule, 82 Fed. Reg.
    5,238 (Jan. 17, 2017) ..............................................11

CONGRESSIONAL REPORTS:

S. Rep. No. 82-1072 (1952) ...........................................9

S. Rep. No. 82-1137 (1952) ...........................................9

H.R. Rep. No. 82-1365 ..................................................9

**AR4519**

v

TABLE OF AUTHORITIES—Continued

Page

OTHER AUTHORITIES:

Julia Preston, *Pink Slips at Disney. But First, Training Foreign Replacements*, New York Times, June 3, 2015....................................................15

Neil G. Ruiz and Abby Budiman, *Number of Foreign College Students Staying and Working in the U.S. After Graduation Surges*, Pew Research Center, May 10, 2018....................................11

**AR4520**

1

### INTEREST OF *AMICI CURIAE*[1]

*Amici* submits this brief in support of their own interests as plaintiffs in ongoing federal court cases. The central issue in *Amici*'s cases is whether the U.S. Department of Homeland Security (DHS) shares dual authority with Congress to define classes of aliens eligible for employment.

*Amicus* Save Jobs USA is a group of American computer professionals who worked at Southern California Edison until they were replaced by foreign guestworkers possessing H-1B visas. *Save Jobs USA* v. *United States Dep't of Homeland Security*, No. 16-5287 (D.C. Cir.) is an Administrative Procedure Act (APA) challenge to DHS regulations granting work authorization to the spouses of certain H-1B guestworkers. Employment Authorization for Certain H-4 Dependent Spouses, 80 Fed. Reg. 10,284 (Feb. 25, 2015).

*Amicus* the Washington Alliance of Technology Workers, Local 37083 of the Communication Workers of America, the AFL-CIO (Washtech), is a union that represents American technology workers throughout the United States. *Wash. Alliance of Technology Workers* v. *United States Dep't of Homeland Security*, No. 16-1170 (D.D.C) is an APA challenge to the regulation Improving and Expanding Training Opportunities for

---

[1] The parties have given blanket consent to the filing of *amicus curiae* briefs in this case. No counsel for any party in this case authored this brief in whole or in part. No person or entity aside from *Amici*, their respective members, or their respective counsel made a monetary contribution to the preparation or submission of this brief. *Amici* do not have parent corporations or issue stock.

2

F-1 Nonimmigrant Students With STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students, 81 Fed. Reg. 13,040 (Mar. 11, 2016). This regulation authorizes aliens holding F-1 student visas to work in the United States for over three years after the aliens graduate.

*Amici*'s cases share a key common issue with this case: whether DHS shares dual authority with Congress to define classes of aliens eligible for employment. This is because the Deferred Action for Childhood Arrivals (DACA) program at issue here is yet another example of DHS using its claim of dual authority to permit alien employment administratively. *E.g.*, *Regents of the Univ. of Cal.* v. *United States Dep't of Homeland Sec.*, 908 F.3d 476, 490 (9th Cir. 2018).

The question of whether DHS shares dual authority with Congress was not contested in the courts below in this case because no party had any incentive to raise this key issue regarding the lawfulness of DACA. Because no party raised the issue, courts below that have blocked the DHS from rescinding the DACA program rely on the erroneous conclusion that the program is substantively lawful.

As *Amici*'s cases illustrate, this question of DHS authority over alien employment has broad implications that extend beyond DACA. DACA is just one of several recent DHS actions that have been made pursuant to the agency's claim that it has unlimited authority to grant alien employment. This Court cannot find that the DACA program is substantively lawful

3

without validating DHS's claim that it has such unlimited authority. Should this Court take that path, DHS can continue its use of regulations to wipe out protections for American workers that Congress has enacted as part of the immigration system. Consequently, *Amici*'s interests are aligned with the government's interests in this case in regard to outcome but diverge from the government's interests on the important question of whether DHS has the general authority to issue work authorizations to aliens.

————◆————

## SUMMARY OF THE ARGUMENT

The Deferred Action for Childhood Arrivals (DACA) program is substantively unlawful because the Department of Homeland Security (DHS) has no authority to permit illegal aliens to be employed through regulation. In recent years, DHS has claimed that Congress implicitly established dual authority to extend employment to aliens. Under this claimed system, alien employment can be authorized either by Congress through statute or by DHS through regulation.

Congress has never attempted to create such a system. Because neither Petitioners nor Respondents had any incentive to question whether DHS had the vast power over alien employment that it claims, the issue was uncontested in the courts below. The courts below stated that DHS's authority to issue employment authorization documents to DACA participants

4

comes from the definition of the term unauthorized alien in 8 U.S.C. § 1324a(h)(3), a definition that is limited in scope to its own section and does not authorize DHS to do anything. By concluding that this provision confers on DHS equal authority with Congress to extend employment to aliens, the courts below have found an "elephant[ ] in [a] mousehole[ ]." *Whitman* v. *Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Even under the implausible assumption that Congress intended to confer on DHS the alien employment authority necessary to implement DACA, that would make § 1324a(h)(3) unconstitutional under the non-delegation doctrine because Congress has provided no guidance whatsoever on how DHS is to use that alleged authority. Because a contrary reading of § 1324a(h)(3)—that it provides no such sweeping authority to DHS—is possible, and indeed preferable, the doctrine of constitutional avoidance mandates its adoption.

———————◆———————

## ARGUMENT

### I.  DACA is unlawful because DHS has no authority to permit alien employment through administrative actions not authorized by Congress.

Petitioners assert that the DACA program is unlawful, but they focus solely on the issue of whether such a blanket action truly represents agency discretion. Pet. Br. 43–50. The question of whether DACA is

5

substantively lawful, however, goes beyond whether it is a valid exercise of discretion not to prosecute; DACA also incorporates the "affirmative agency action" of "issu[ing] . . . employment authorization." *Texas* v. *United States*, 809 F.3d 134, 168 (5th Cir. 2015) (observing the operation of the closely-related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) program). Furthermore, "allowing for the issuance of employment authorizations to any class of illegal aliens whom DHS declines to remove [] is beyond the scope of what the [Immigration and Nationality Act] can reasonably be interpreted to authorize. . . ." *Id.* at 169. Despite the glaring unlawfulness of DACA's work authorizations, Petitioners completely neglect to address that issue where a decision by this Court would impact labor protections in the entire immigration system. Pet. Br. 43–50, Pet. 27–30 (No. 18-587), Pet. 14–15 (No. 18-588).

### A. Section 1324a(h)(3) cannot confer on DHS the authority to authorize alien employment because it is a term definition, limited in scope to its own section.

The courts below brushed off the question of where Congress has authorized DHS to grant employment to DACA participants. In *NAACP* v. *Trump*, the district court made no mention at all of the employment issue in its analysis of whether DACA was lawful. 298 F. Supp. 3d 209, 238–40 (D.D.C. 2018). In *Vidal* v. *Nielsen*, the district court simply stated in dicta within a parenthetical that 8 U.S.C. § 1324a(h)(3) conferred

**AR4525**

6

that authority. 279 F. Supp. 3d 401, 412 (E.D.N.Y. 2018). In *Regents of the Univ. of Cal.* v. *U.S. Dep't of Homeland Sec.*, the district court also stated § 1324a was the source of the employment authority. 279 F. Supp. 3d 1011, 1020 (N.D. Cal. 2018) (citing *Arizona Dream Act Coal.* v. *Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014)); *but see Guevara* v. *Holder*, 649 F.3d 1086 (9th Cir. 2011) (holding that there was "nothing in the statute [8 U.S.C. § 1324a] or administrative regulation to provide for more" than "merely allow[ing] an employer to legally hire an alien (whether admitted or not) while his [adjustment of status] application is pending.").

In the earlier litigation over the similar Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) program, the employment question *was* addressed in an adversarial context. *See Texas* v. *United States*, No. 15-40238, Reply Brief (5th Cir. May 18, 2016). In finding the DAPA program unlawful, the U.S. Court of Appeals for the Fifth Circuit rejected the argument that § 1324a conferred the authority to authorize alien employment. *Texas* v. *United States*, 809 F.3d 134, 182–83 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2015). The Fifth Circuit observed that 8 U.S.C. § 1324a(h)(3) is a "'miscellaneous' definitional provision expressly limited to § 1324a, a section concerning the 'Unlawful employment of aliens'" and that it "cannot reasonably be construed as assigning 'decisions of vast economic and political significance.'" *Id.* at 183 (quoting *Util. Air*

AR4526

7

*Regulatory Grp.* v. *Envtl. Prot. Agency*, 573 U.S. 302, 323–24 (2014)).

Claiming 8 U.S.C. § 1324a(h)(3) confers on DHS the authority to define classes of aliens eligible for employment administratively requires taking that provision out of context. Congress created § 1324a in the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 101, 100 Stat. 3445. This Act, for the first time, imposed civil and criminal sanctions on employers who employed aliens that were not authorized to work under the immigration system. *Id.* Section 1324a(h)(3) defined such aliens as:

(3) Definition of unauthorized alien

As used in this section, the term "unauthorized alien" means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General.

That Act also contains seven provisions directing the Attorney General to extend alien employment outside of the scheme of the Immigration and Nationality Act. § 101, 100 Stat. at 3368; § 201 ("Legalization") 100 Stat. at 3397 & 3399 (two), § 301 ("Lawful Residence for Certain Special Agriculture Workers") 100 Stat. at 3418 & 3421 (two), 3428. Had Congress omitted the clause "or by the Attorney General" in § 1324a(h)(3)(B), it would have created the absurd situation in which the

8

Act authorized certain aliens be employed, but at the same time made hiring these aliens unlawful.

Yet, because this issue was uncontested, the courts below allowed an innocuous clause in a term definition, limited in scope to its own section, and necessary for other provisions of the Act to function properly, to be transformed into unlimited authority for DHS to permit alien employment. *See Vidal*, 279 F. Supp. 3d at 412; *Regents of the Univ. of Cal.*, 279 F. Supp. 3d at 1020; *but see Texas* v. *United States*, 809 F.3d 134, 183 (5th Cir. 2015) (holding § 1324a(h)(3) did not confer such authority). Such an interpretation flouts the instructions of this Court: "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman* v. *Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

**B.  Congress did not confer on DHS dual authority to define classes of aliens eligible for employment in the agency's general authority to promulgate regulations.**

Given the obvious problem with the claim that § 1324a(h)(3)—a definition, limited in scope to its own section—conferred on DHS unlimited authority to permit alien employment, DHS had a brand new theory when the employment issue was raised before this Court in *Texas*: "Section 1324a(h)(3) did not create the Secretary's authority to authorize work; that authority already existed in Section 1103(a). . . ." *United States*

9

v. *Texas*, No. 15-674, Br. for the Pet'rs at 63 (U.S. Mar. 1, 2016). Nonetheless, that line of reasoning is just as problematic as asserting such authority comes from a term definition.

Section 1103(a) defines the general powers of the Secretary of Homeland Security. This provision was created in the Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 163 (INA).[2] That act was a "complete revision" of our immigration laws. S. Rep. No. 82-1072, at 2 (1952). Yet there is no provision anywhere in the act that authorizes the secretary to permit alien employment through regulation. INA, *passim*. Furthermore, the legislative history of the act shows there was no implicit intent to confer on the secretary such authority. Both the House and Senate reports on the INA state that it "provides strong safeguards for American labor" and that all aliens (with three exceptions not applicable here) seeking to perform labor are excluded if the Secretary of Labor determines that American workers are available or that the foreign labor would adversely affect American workers. S. Rep. No. 82-1137 at 11; H.R. Rep. No. 82-1365 at 50–51 (identical text). If Congress had intended to confer on an agency the ability to authorize alien employment outside the statutory scheme, surely this would have been listed as one of the exceptions to the labor protections of the act—but it was not. *Id.* In

---

[2] The Consolidated Appropriations Resolution, 2003, transferred to the Secretary of Homeland Security authority originally granted to the attorney general. Pub. L. No. 108-7, Div. L, § 105, 117 Stat. 11, 531.

10

any event, the claim that DHS's general authority gives it authority equal to that of Congress to define classes of aliens eligible for employment runs into the same problem as before: "Congress [ ] does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman* v. *Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

There now exists the absurd situation where DHS claims that alien "employment may be authorized by statute or by the Secretary." Employment Authorization for Certain H-4 Dependent Spouses, 80 Fed. Reg. 10,284, 10,294 (Feb. 25, 2015).[3] Yet there is no provision that explicitly creates that authority and DHS has been inconsistent about where the authority was created.

Worse yet, DACA and DAPA are not the only examples where DHS has authorized large amounts of foreign labor to enter the U.S. job market. In recent years DHS has authorized massive increases in foreign labor through administrative action as it has responded to business interests seeking to undermine the protections for American workers that Congress has enacted in the immigration system. *E.g.*, 80 Fed. Reg. at 10,294; Enhancing Opportunities for H-1B1, CW-1, and E-3 Nonimmigrants and EB-1 Immigrants, 81 Fed. Reg. 2,068 (Jan. 15, 2016); Improving and Expanding Training Opportunities for F-1

---

[3] This was the very first regulation to claim alien employment could be authorized either by statute or by regulation.

Nonimmigrant Students With STEM Degrees and
Cap-Gap Relief for All Eligible F-1 Students, 81 Fed.
Reg. 13,040 (Mar. 11, 2016); International Entrepreneur Rule, 82 Fed. Reg. 5,238, 5,239 (Jan. 17, 2017).
The Optional Practical Training program, created entirely through regulation, is now the largest guestworker program in the entire immigration system
measured by the number of aliens entering the workforce each year. Neil G. Ruiz and Abby Budiman, *Number of Foreign College Students Staying and Working
in the U.S. After Graduation Surges*, Pew Research
Center, May 10, 2018[4] at 4 (stating the number of approvals for Optional Practical Training exceed initial
approvals for H-1B).

### C.   Even if Congress had attempted to confer on DHS the power to define classes of aliens eligible for employment, such a delegation of power would be unconstitutional.

Defining classes of aliens who are eligible for employment is a basic lawmaking function in the field of
immigration, and Congress has defined such classes of
aliens in every major immigration act. *E.g.*, INA, § 101,
66 Stat. at 166–69; Immigration and Nationality Act
of 1965, Pub. L. No. 89-236, § 9, 79 Stat. 911, 917; Immigration Act of 1990, Pub. L. No. 101-649, §§ 204–21,
104 Stat. 4978, 5019–28. If one makes the baseless

---

[4] Available at https://assets.pewresearch.org/wp-content/
uploads/sites/2/2018/05/10110621/Pew-Research-Center_Foreign-Student-Graduate-Workers-on-OPT_2018.05.10.pdf

12

assumption that Congress intended to confer on DHS (in either § 1103 or § 1324a) the alien employment authority necessary for DACA, Congress would have created a system that runs afoul of the Constitution. America would have a dual system of immigration lawmaking in which Congress (by statute) and DHS (by regulation) can independently define classes of aliens eligible for employment to cross-purposes. In fact, because any subsequent restriction Congress may enact to restrict this otherwise unlimited power conferred on DHS is subject to a veto (as are Congress's own employment authorizations), the executive's power to define alien employment in the immigration system would be greater than that of Congress. U.S. Const., Art. I, § 7. Such a system of dual lawmaking authority would be unconstitutional. "The lawmaking function belongs to Congress, U.S. Const., Art. I, § 1, and may not be conveyed to another branch or entity." *Loving* v. *United States*, 517 U.S. 748, 758 (1996); *see also Clinton* v. *City of N.Y.*, 524 U.S. 417, 481 (1998) (holding the statutory creation of a line-item veto was an unconstitutional delegation of power to the executive branch).

Such an arrangement also runs headlong into the non-delegation doctrine. "[The Supreme Court] repeatedly [has] said that when Congress confers decisionmaking authority upon agencies Congress must 'lay down by legislative act an intelligible principle to which the person or body authorized to act' is directed to conform." *Whitman* v. *Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (quoting *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U.S. 394, 409 (1928).

13

Assuming that Congress implicitly intended to confer on the executive "dual authority" to define classes of aliens eligible for employment in 1952 in § 1103 or in 1990 in § 1324a(h)(3), it was not through a legislative act that provides an "intelligible principle" to which the executive must conform. Section 1103 makes no mention of alien employment at all and § 1324a(h)(3) is a term definition that does not direct DHS to do anything. Neither provision includes any parameters whatsoever on how the claimed delegated authority is supposed to be used. *Id.* Thus, making the completely unsupported assumption that Congress intended to confer on DHS authority to define classes of aliens eligible for employment results in an unconstitutional reading of these provisions. *Whitman* v. *Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). Because another, constitutionally compliant reading—namely, that Congress conferred no general power to authorize employment in these provisions—is possible, and indeed far preferable, the doctrine of constitutional avoidance requires that it be adopted. *Arizona* v. *Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247, 2258–59 (2013) (explaining that this Court must adopt a fairly possible interpretation of a statute if doing so is necessary to avoid an interpretation that would make that statute unconstitutional).

AR4533

14

## II. Whether § 1324a(h)(3) confers on DHS co-equal authority with Congress to authorize any class of aliens it chooses to work will have major implications throughout the immigration system and is not an issue to be lightly considered.

Should this Court adopt DHS's novel interpretation that the definition of the term *unauthorized alien* in § 1324a(h)(3) (and limited in scope to that section) is a legislative grant to the agency of co-equal authority with Congress to permit any alien it chooses to work in the United States, the decision would have widespread ramifications throughout the immigration system. To affirm the courts below would be an affirmation that DHS has unlimited authority to define classes of aliens, because the lawfulness of this authority is a prerequisite for DACA's substantive lawfulness. *See*, § I, *supra*. An affirmation by this Court of such sweeping authority would enable DHS, through regulation, to continue to dismantle administratively the protections for American workers that Congress has enacted in the INA since 1952.

Such concern is not based on mere speculation or unsubstantiated fears. History demonstrates that *Amici*'s concerns are well founded. DHS's predecessor has previously attempted to subvert Congress's intricate statutory protections for American workers. *See*, *e.g.*, *Int'l Union of Bricklayers & Allied Craftsmen* v. *Meese*, 761 F.2d 798 (D.C. Cir. 1985); *Int'l Longshoremen's & Warehousemen's Union* v. *Meese*, 891 F.2d 1374 (9th Cir. 1989). When challenges could be mounted

**AR4534**

15

against such agency abuse, the courts could be counted on to intervene. *Id*.

This Court should take note of the facts of *Washington Alliance of Technology Workers* to better understand the consequences for American workers, including *Amici*, should this Court adopt the lower courts' overbroad gloss on § 1324a(h)(3). The H-1B visa program is routinely used to replace American workers in technology fields with lower-paid foreign workers. *E.g.*, Julia Preston, *Pink Slips at Disney. But First, Training Foreign Replacements*, New York Times, June 3, 2015. To protect American workers, Congress has put in place limits on the number of H-1B visas that in turn limit the number of Americans that can be replaced by such workers. § 1184(g).

In 2007 Microsoft Corporation concocted a scheme to get around the H-1B quota by using student visas as a substitute. Extending Period of Optional Practical Training by 17 Months for F-1 Nonimmigrant Students With STEM Degrees and Expanding Cap-Gap Relief for All F-1 Students, 73 Fed. Reg. 18,944 (Apr. 8, 2008), Administrative Record (A.R.) at 120–23. Microsoft proposed that DHS allow aliens to work on student visas for 29 months after graduation. *Id*. Microsoft presented its proposal to the DHS secretary at a dinner party. *Id*. DHS then worked in secret with industry lobbyists to prepare regulations implementing Microsoft's scheme. A.R. 124–27, 130–34. The first notice to the public that such regulations were even being considered was when DHS put them in place as a *fait*

AR4535

16

*accompli*, without notice and comment. 73 Fed. Reg. 18,950.

The nondelegation doctrine is supposed to ensure "that important choices of social policy are made by Congress, the branch of our Government most responsive to the popular will." *Indus. Union Dep't, AFL-CIO* v. *Am. Petroleum Inst.*, 448 U.S. 607, 685 (1980) (Rehnquist, J., concurring). Affirming the holdings of the courts below that DACA is substantively lawful would keep open the door to the creation of guest-worker programs by Washington insiders at dinner parties, and their enactment in secret rulemaking processes from which the public is excluded. As *Amici*'s cases demonstrate, this dark scenario is fact, not hyperbole.

————◆————

## CONCLUSION

For the foregoing reasons, this Court should rule in favor of petitioners, and hold that DACA is unlawful because DHS has no general authority to define classes of aliens eligible for employment.

Respectfully submitted,

JOHN M. MIANO
*Counsel of Record*
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave., NW, Suite 315
Washington DC 20001
(202) 232-5590
miano@colosseumbuilders.com

Nos. 18-587, 18-588, and 18-589

In The

# Supreme Court of the United States

——————— ◆ ———————

DEPARTMENT OF
HOMELAND SECURITY, et al.,

*Petitioners,*

v.

REGENTS OF THE
UNIVERSITY OF CALIFORNIA, et al.,

*Respondents.*

——————— ◆ ———————

**On Writ Of Certiorari To The
United States Court Of Appeals
For The Ninth Circuit**

——————— ◆ ———————

**BRIEF OF AMICUS CURIAE
SOUTHEASTERN LEGAL FOUNDATION
IN SUPPORT OF PETITIONERS**

——————— ◆ ———————

KIMBERLY S. HERMANN
SOUTHEASTERN LEGAL
  FOUNDATION
560 W. Crossville Rd.,
  Ste. 104
Roswell, GA 30075

KURT R. HILBERT
  *Counsel of Record*
KELLY H. BROLLY
THE HILBERT
  LAW FIRM, LLC
205 Norcross St.
Roswell, GA 30075
(770) 551-9310
khilbert@hilbertlaw.com

August 26, 2019

*Counsel for Amicus Curiae*

[Additional Captions Listed On Inside Cover]

**AR4537**

DONALD J. TRUMP,
President of the United States, et al.,

*Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, et al.,

*Respondents.*

——————◆——————

**On Writ Of Certiorari Before Judgment
To The United States Court Of Appeals
For The District Of Columbia Circuit**

——————◆——————

KEVIN K. McALEENAN,
Acting Secretary of Homeland Security, et al.,

*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, et al.,

*Respondents.*

——————◆——————

**On Writ Of Certiorari Before Judgment
To The United States Court Of Appeals
For The Second Circuit**

**AR4538**

i

## QUESTIONS PRESENTED

This dispute concerns the policy of immigration enforcement discretion known as Deferred Action for Childhood Arrivals (DACA). In 2016, this Court affirmed, by an equally divided vote, a decision of the Fifth Circuit holding that two related Department of Homeland Security (DHS) discretionary enforcement policies, including an expansion of the DACA policy, were likely unlawful and should be enjoined. *See United States* v. *Texas*, 136 S. Ct. 2271 (per curiam). In September 2017, DHS determined that the original DACA policy was unlawful and would likely be struck down by the courts on the same grounds as the related policies. DHS thus instituted an orderly wind-down of the DACA policy. The questions presented are as follows:

    1.   Whether DHS's decision to wind down the DACA policy is judicially reviewable.

    2.   Whether DHS's decision to wind down the DACA policy is lawful.

AR4539

ii

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................. iii

INTEREST OF AMICUS CURIAE ...................... 1

SUMMARY OF ARGUMENT ............................ 1

ARGUMENT ...................................................... 3

   I.  DACA's rescission was not arbitrary and capricious because DACA is unlawful ....... 3

      A.  DACA violates the APA because it did not go through notice-and-comment .... 7

      B.  DACA violates the INA, the Constitution, and international treaty law ....... 12

   II.  Courts cannot unilaterally expand the APA's standard of review ..................................... 17

CONCLUSION .................................................... 20

AR4540

iii

TABLE OF AUTHORITIES

Page

CASES

*Arizona v. United States*, 567 U.S. 387 (2012) .............2

*Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984)....................................................................19

*Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) .......................16

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ..........7, 9

*City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863 (2013)................................................................1, 7

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)....................................................................16

*Dickinson v. Zurko*, 527 U.S. 150 (1999)....................18

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)..........................................................6, 8, 18

*Finley v. United States*, 490 U.S. 545 (1989) ...............4

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138 (2010) .............................1

*Hearst Radio v. FCC*, 167 F.2d 225 (D.C. Cir. 1948)....................................................................19

*Heckler v. Chaney*, 470 U.S. 821 (1985).....................17

*Hines v. Davidowitz*, 312 U.S. 52 (1941).......................2

*Morton v. Ruiz*, 415 U.S. 199 (1974) .......................9, 11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...............16, 17, 19

AR4541

iv

## TABLE OF AUTHORITIES—Continued

Page

*Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015) ..................................................................6, 18

*Plyler v. Doe*, 457 U.S. 202 (1982) .................................2

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018) ...................18

*Safe Extensions, Inc. v. FAA*, 509 F.3d 593 (D.C. Cir. 2007) ................................................................16

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ......................................................... 4, 7, 12, 13, 14

*Texas v. United States*, 328 F. Supp. 3d 662 (S.D. Tex. 2018) ...............................................................15

*United States v. Mead*, 533 U.S. 218 (2001) ..............14

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .......................................................................16

Constitutional Provisions

U.S. Const. art. I, § 8, cl. 4 ...........................................2

U.S. Const. art. II, § 3 ..................................................2

U.S. Const. art. IV, § 2, cl. 1 .......................................13

U.S. Const. art. VI, cl. 2...............................................15

Statutes

5 U.S.C. § 551(4)..........................................................11

5 U.S.C. § 551(5)............................................................9

5 U.S.C. § 551(13).........................................................19

**AR4542**

v

TABLE OF AUTHORITIES—Continued

Page

5 U.S.C. § 553(b) .....................................................7, 8

5 U.S.C. § 553(c) .....................................................7, 8

5 U.S.C. § 706 .............................................................18

5 U.S.C. § 706(2)(A) ................................ 4, 5, 12, 16, 18

5 U.S.C. § 706(2)(D) .............................................4, 5, 18

5 U.S.C. § 706(2)(E) ....................................................16

8 U.S.C. § 1101 *et seq.* ...............................................12

8 U.S.C. § 1201 *et seq.* ...............................................13

REGULATIONS

60 Fed. Reg. 13,023 (Mar. 10, 1995) ...........................15

RULES

Sup. Ct. R. 37.3(a) .......................................................1

Sup. Ct. R. 37.6 ...........................................................1

OTHER AUTHORITIES

Extradition Treaty, Mexico-U.S., Jan. 25, 1980,
    31 U.S.T. 5059 .........................................................15

Memorandum from Elaine C. Duke, Acting Sec'y
    on Rescission of Deferred Action For Child-
    hood Arrivals (DACA) (Sept. 5, 2017) ....................13

Memorandum from Sec'y Kirstjen M. Nielsen
    (June 22, 2018) .......................................................13

AR4543

vi

TABLE OF AUTHORITIES—Continued

Page

Oliver Wendell Holmes, *The Theory of Legal In-
terpretation*, 12 Harv. L. Rev. 417 (1899) ................5

Richard B. Stewart & Cass R. Sunstein, *Public
Programs and Private Rights*, 95 Harv. L. Rev.
1193 (1982) ...............................................................8

S. Doc. No. 77-8, Final Report of the Attorney
General's Committee on Administrative Pro-
cedure in Government Agencies (1941) ...................8

The Federalist No. 45 (James Madison) (Clinton
Rossiter ed., Signet Classics 2003) ..........................2

Thomas J. Miles & Cass R. Sunstein, *The Real
World of Arbitrariness Review*, 75 U. Chi. L.
Rev. 761 (2008) ......................................................17

AR4544

1

## INTEREST OF AMICUS CURIAE[1]

Amicus Southeastern Legal Foundation (SLF), founded in 1976, is a national nonprofit, public interest law firm and policy center that advocates for constitutional individual liberties, limited government, and free enterprise. SLF drafts legislative models, educates the public on key policy issues, and litigates often before both state and federal courts. As an organization interested in federalism, agency powers, and separation of powers, SLF has a particular interest in sweeping non-statutory imposition of policies and programs that violate agency procedure, conflict with existing federal laws, and improperly seek to expand laws absent congressional or constitutional authority.

———————◆———————

## SUMMARY OF ARGUMENT

It is no secret that "[t]he administrative state 'wields vast power and touches almost every aspect of daily life.'" *City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1878 (2013) (Roberts, C.J., dissenting) (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3156 (2010)). "[T]he authority administrative agencies now hold over our economic, social, and political activities[,]" *id.*, contradicts the government of enumerated powers the Framers envisioned.

---

[1] Rule 37 statement: Amicus notified the parties to the filing of this brief and parties have consented by blanket consent on file with the Court. *See* Sup. Ct. R. 37.3(a). No party's counsel authored any of this brief; amicus alone funded its preparation and submission. *See* Sup. Ct. R. 37.6.

2

Our Founding Fathers sought to create a limited government structure. Addressing concerns that the proposed national government would usurp the people's power to govern themselves, James Madison explained: "The powers delegated by the proposed Constitution to the federal government are few and defined . . . [and] will be exercised principally on external objects, as war, peace, negotiation, and foreign commerce. . . ." The Federalist No. 45, at 292 (James Madison) (Clinton Rossiter ed., Signet Classics 2003).

Despite the dangers posed by the growing administrative state, it is within the province of the federal government to oversee immigration and to implement congressional purposes and objectives. *See* U.S. Const. art. I, § 8, cl. 4; U.S. Const. art. II, § 3; *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also Arizona v. United States*, 567 U.S. 387, 394 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."); *Plyler v. Doe*, 457 U.S. 202, 225 (1982) (the Constitution commits the power to classify aliens to the political branches of government). But that power is not without limits—both procedural and substantive.

The Department of Homeland Security's (DHS) decision to wind down and ultimately rescind the Deferred Action for Childhood Arrivals program (DACA) is lawful because DACA is both procedurally and substantively unlawful. Procedurally, DACA violates the Administrative Procedure Act (APA) because the public received neither notice nor a chance to comment

AR4546

3

prior to the substantive rule's announcement and enforcement. And substantively, DACA conflicts with federal law, the U.S. Constitution, and international treaty law. Because DACA is unlawful, no further judicial inquiry should be required, and thus its rescission is not arbitrary and capricious.

Amicus writes to discuss not only the unlawfulness of DACA, but to highlight confusion in the lower courts about when they should use the APA arbitrary and capricious standard and the tests about discretion. Amicus suggests that a bright line rule could clarify that if an agency's discretionary enforcement policy is unlawful, then no secondary inquiry is needed to determine whether that agency's discretionary decision to rescind is arbitrary and capricious. Alternatively, if a reviewing court finds such a challenged policy lawful in the first instance, then it should apply the arbitrary and capricious standard to determine whether rescission was proper and otherwise lawful.

————————◆————————

## ARGUMENT

## I.   DACA's rescission was not arbitrary and capricious because DACA is unlawful.

Amicus agrees with Petitioners that the lower courts erred in finding that rescission was arbitrary and capricious. Pet'r. Br. at 32-57. An agency's rescission of a prior administration's discretionary enforcement policy is not an arbitrary and capricious decision when, like here: 1) the policy violated the notice-and-comment

4

requirements of the APA, and 2) the policy is not required by existing law, conflicts with both the Constitution and federal laws, and is a counterpart to a law already found to be unconstitutional (i.e., Deferred Action for Parents of Americans (DAPA)).[2] The APA provides that courts may "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or *otherwise not in accordance with law . . .* or *without observance of procedure required by law*." 5 U.S.C. §§ 706(2)(A), (D) (emphasis added). These standards are disjunctive and not mutually exclusive.

From its inception, DACA was unlawful. And because DACA is unlawful, DHS's discretionary agency decision to rescind it was not arbitrary and capricious. Declaring DACA's rescission arbitrary and capricious is illogical, cuts against the plain meaning of the APA and this Court's precedent, and undermines the foundational pillars of our system of justice. Just as a binding contract that is illegal at inception is judicially unenforceable, a court must find an unlawful policy invalid and void.

This Court has opined that it is imperative "that Congress be able to legislate against a background of clear interpretive rules, so that it may know the effect of the language it adopts." *Finley v. United States*, 490 U.S. 545, 556 (1989). Justice Oliver Wendell Holmes in

---

[2] *Texas v. United States*, 809 F.3d 134, 184-86 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam) (*Texas I*) (holding DAPA unlawful and unconstitutional).

5

an oft-quoted aphorism stated as well: "We do not in-
quire what the legislature meant; we ask only what the
statute means." Oliver Wendell Holmes, *The Theory of
Legal Interpretation*, 12 Harv. L. Rev. 417, 419 (1899).
For these reasons, 5 U.S.C. §§ 706(2)(A) and (D) set
forth separate and distinct legal standards, any one of
which can declare the policy at issue void. The lower
courts here wrongfully focused on and errantly inter-
preted the arbitrary and capricious standard while giv-
ing no moment to the fundamental concern of whether
DACA was lawful at inception. Although this issue
may be a matter of first impression in the context of
rescission of a prior administration's discretionary en-
forcement policy in the immigration context, Amicus
urges the Court to consider all standards, the entirety
of the APA, and other applicable laws.

It may also be helpful for this Court to clarify that
when reviewing rescission of an agency's discretionary
enforcement policy, courts should use a two-step pro-
cess: first considering the policy's lawfulness and then
scrutinizing the discretionary rescission. This would
protect agency action from the improper imposition of
both a higher standard and different levels of judicial
scrutiny. A threshold analysis of whether the policy is
lawful in the first instance would also be in the inter-
ests of judicial economy and would preserve a true
notion of constitutional separation of powers. This
analysis is particularly important when an agency de-
cision concerns an agency policy that not only directly
violates the APA, but also conflicts with an existing

**AR4549**

6

comprehensive congressionally approved statutory scheme, as well as other laws.

When an agency concludes, based on the evidence before it that one of its discretionary policies is likely unlawful, it is improper for lower courts to impose a heightened standard to determine whether rescission of that policy was arbitrary and capricious. *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1207 (2015) (finding courts have no authority to impose procedural requirements beyond those stated in the APA). And it is certainly judicial overreach to create new standards such as policy differences or reliance interests that have no foundation in the APA. *Id.* at 1209. Indeed, this Court already foreclosed applying such a heightened searching review standard to rescission. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (holding there is "no basis . . . for a requirement that all agency change for a new policy be subjected to more searching review").

That said, if this Court finds that its prior opinions leave room for policy difference and reliance interests as a higher level of scrutiny of agency discretion, Amicus urges the Court to provide clarity on when courts should employ these added tests. In any case, the lower courts here avoid any real analysis of the question of lawfulness in the first instance, and fail to follow this Court's precedent and limited judicial review standards.

7

### A. DACA violates the APA because it did not go through notice-and-comment.

Congress and the people are entitled to the benefits of the APA notice-and-comment procedures. The APA requires both notice and a chance to comment before enforcement of any substantive rule or regulation. 5 U.S.C. §§ 553(b)-(c); *see Chrysler Corp. v. Brown*, 441 U.S. 281 (1979). In passing the APA, Congress recognized the hazards that agencies pose to the democratic process, separation of powers, and liberty. The APA requires that agencies issue substantive rules through the notice-and-comment procedure, while "general statement[s] of policy" do not. *Texas I*, 809 F.3d at 214. Ignoring these requirements, in 2012 DHS wrote and implemented DACA, a substantive rule, without giving the public notice or a chance to comment on the substantive rule. This disregard of the APA's requirements led to the very abuse of power and usurpation of congressional authority that Congress sought to curtail with the APA.

As this Court is aware, federal agencies issue, interpret, and enforce rules that govern our lives. "[A]s a practical matter they exercise legislative power, by promulgating regulations with the force of law; executive power, by policing compliance with those regulations; and judicial power, by adjudicating enforcement actions and imposing sanctions on those found to have violated their rules." *City of Arlington*, 133 S. Ct. at 1877-78 (Roberts, C.J., dissenting).

**AR4551**

8

The APA's chief procedural safeguard, Section 553, requires administrative agencies to provide "notice of proposed rulemaking" and "give interested persons an opportunity to participate in the rule making through submission of written verified data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. §§ 553(b)-(c). Congress understood that if agencies were going to wield quasi-legislative power, their procedures must "giv[e] adequate opportunity to all persons affected to present their views, the facts within their knowledge, and the dangers and benefits of alternative courses." S. Doc. No. 77-8, Final Report of the Attorney General's Committee on Administrative Procedure in Government Agencies, at 102 (1941). Public notice-and-comment is "essential in order to permit administrative agencies to inform themselves and to afford adequate safeguards in private interests." *Id.* at 103.

The APA must remain "a 'working compromise, in which broad delegations of discretion were tolerated as long as they were checked by extensive procedural safeguards.'" *Fox Television Stations, Inc.*, 556 U.S. at 537 (Kennedy, J., concurring in part and concurring in the judgment) (quoting Richard B. Stewart & Cass R. Sunstein, *Public Programs and Private Rights*, 95 Harv. L. Rev. 1193, 1248 (1982)). The authority agencies have accumulated is startling. They have combined the once inviolate and separate characteristics of legislative, executive, and judicial powers. If courts do not uphold and enforce required procedures such as APA notice-and-comment, bureaucracy as an independent force

9

will swallow the very framework and intent of checks and balances enshrined in our Constitution.

Against this backdrop, neither agencies nor courts can ignore the APA's notice-and-comment. Politics can shape policy, but politics must not overrun law and when it does, it is not harmless error. DACA can, has, and will continue to profoundly affect our nation's immigration landscape. Interested persons on both sides of the issue should have had a chance to present written verified data, differing views, and the dangers and benefits of alternative courses before DHS instituted DACA. Both the APA and our nation's democratic process require that DACA, as a substantive rule for APA purposes, be subjected to notice-and-comment. 5 U.S.C. § 551(5); *Chrysler Corp.*, 441 U.S. at 302 (substantive rules can be legally binding, policy statements cannot); *Morton v. Ruiz*, 415 U.S. 199, 232 (1974) (finding a substantive rule exists where benefits eligibility merely "affect[ed] individual rights and obligations"). This is especially true given the legally binding impact the policy will have on immigration law.

DACA, as pleaded by plaintiffs in the consolidated and other related cases, provides that the grantees are granted substantive benefits. The *California* Plaintiffs have pleaded, among other things, that they are "granted the right not to be arrested or detained based solely on their immigration status"; "granted eligibility to receive employment authorization"; "allow[ed] travel"; "not disqualified on the basis of their immigration status from receiving certain public benefits . . . includ[ing] federal Social Security, retirement,

10

and disability benefits"; and "other benefits and opportunities." Compl. at 17-18 ¶¶ 82-86, *California v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05235-WHA (N.D. Cal. Sept. 11, 2017), ECF No. 1 (citations omitted). The *Garcia* Plaintiffs have also pleaded that "DACA confers numerous important benefits on those who apply for and are granted DACA status." Compl. at 9 ¶ 27, *Garcia v. United States*, No. 3:17-cv-5380-WHA (N.D. Cal. Sept. 18, 2017), ECF No. 1.

Likewise, the plaintiffs in the Second and D.C. Circuits challenging the memorandum winding-down DACA pleaded in substance that DACA conferred substantive rights but was wound-down without following the notice-and-comment procedures of the APA. Compl., *NAACP v. Trump*, No. 1:17-cv-1907-CRC (D.D.C. Sept. 18, 2017), ECF No. 1; 3d Am. Compl., *Batalla Vidal v. Nielsen*, No. 1:16-cv-4756-NGG-JO (E.D.N.Y. Dec. 11, 2017), ECF No. 113. And the *New York* Plaintiffs pleaded: "DACA confers numerous benefits on DACA grantees"; "DACA grantees are granted the right not to be arrested or detained based solely on their immigration status"; and "DACA grantees are eligible to receive certain public benefits . . . includ[ing] Social Security, retirement, and disability benefits, and, in certain states, benefits such as driver's licenses or unemployment insurance." Compl. at 41 ¶¶ 218, 220, *New York v. Trump*, No. 1:17-cv-5228-NGG-JO (E.D.N.Y. Sept. 6, 2017), ECF No. 1. The *New York* Plaintiffs further stated:

In implementing the DHS Memorandum, federal agencies have changed the substantive

11

> criteria by which individual DACA grantees
> work, live, attend school, obtain credit, and
> travel in the United States. Federal agencies
> did not follow the procedures required by the
> APA before taking action impacting these *sub-
> stantive rights*.

*Id.* at 54 ¶ 289 (emphasis added). Thus, to the extent
that DACA's rescission "affect[ed] substantial individ-
ual rights and obligations" as a substantive rule, then
DACA's creation must also have "affect[ed] individual
rights and obligations[.]" *Ruiz*, 415 U.S. at 232. For
these reasons, notice-and-comment was required at
DACA's inception.

While the lower court decisions here confront the
consolidated DACA cases from different procedural
angles, one must return to the nub of the case—the
threshold question of the legality of DACA as a sub-
stantive rule at inception. If unlawful at inception, this
finding is dispositive, and rescission was not arbitrary
and capricious.

However, in general, the lower courts wrongly
overlooked the central issue of whether DACA is sub-
ject to the APA's notice-and-comment requirement as
a substantive rule. For example, the Ninth Circuit's reli-
ance on policy ignored the APA's definition of "rule" as
"an agency statement of general or particular applica-
bility and future effect designed to implement, inter-
pret, or prescribe law or policy or describing the
organization, procedure, or practice requirements of an
agency. . . ." 5 U.S.C. § 551(4). Further, even if a court

12

found that DACA contains mere policy language, such a finding would not preclude categorizing DACA as a substantive rule under the APA definition requiring notice-and-comment. Any reliance on the purported discretion in DACA is more theoretical than based in reality. If statistics are to govern, there is a slippery slope that emerges. How is a court to draw any conceivable or meaningful line to preserve the voice of Congress and the people, against a president imposing legally binding "policy" rules through an unchecked fourth branch of government?

### B. DACA violates the INA, the Constitution, and international treaty law.

On top of its procedural flaws, DACA violates the APA because it violates the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, the Constitution, and international treaty law. *See* 5 U.S.C. § 706(2)(A) (agency action must be "otherwise not in accordance with law").

Before DACA's announcement in 2012, Congress enacted a comprehensive legal scheme under the INA which neither requires DACA, contemplates DACA, nor gives DHS the authority to implement DACA or any other deferred action plan. DACA, like DAPA, is "foreclosed by Congress's careful plan." *Texas I*, 809 F.3d at 186. It violates the congressionally approved immigration scheme because it is a discretionary enforcement policy at its core, not part of any existing law. Thus, it involves agency decision, discretion, and

**AR4556**

13

action to make substantive judgments about non-enforcement of a comprehensive congressional scheme already mandated by the INA to require deportation of illegal aliens. *Id*. at 186 n.202. In *Texas I*, the Fifth Circuit held that similar DAPA and expanded DACA policies were "manifestly contrary" to the INA. *Id*. at 186.

As the DHS Secretaries concluded after considerable analysis and reliance on well-reasoned decisions involving DAPA including analysis from the Attorney General, they lacked "sufficient confidence in the DACA policy's legality to continue this non-enforcement policy, whether the courts would ultimately uphold it or not." Memorandum from Elaine C. Duke, Acting Sec'y on Rescission of Deferred Action For Childhood Arrivals (DACA) (Sept. 5, 2017); *see also* Memorandum from Sec'y Kirstjen M. Nielsen (June 22, 2018). The Duke and Nielsen Memorandums further provided multiple reasons of "enforcement policy" to rescind DACA, including that Congress has "repeatedly considered but declined to protect" illegal aliens.[3] *Id*. The analysis, before rescission, was enough to satisfy the APA.

Their analysis shows that the INA does not give DHS the authority to implement or to enact DACA. This is because Congress did not give DHS authority to grant, through executive policy, lawful presence to large classes of people outside the INA (including visa requirements under 8 U.S.C. § 1201 *et seq*.), the

---

[3] A reason may also exist in the Privileges and Immunities Clause which only identifies "citizens" as having a right to such privileges and immunities as opposed to illegal aliens. U.S. Const. art. IV, § 2, cl. 1.

14

Constitution, or applicable international treaty law. As the Fifth Circuit held in *Texas I*: "In specific and detailed provisions, the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present." 809 F.3d at 179. The INA also specifies classes of aliens eligible and ineligible for work authorization and visa issuance, requiring extensive inquiry and satisfaction of mandatory requirements. *Id.* at 180-81. Because the congressional scheme is comprehensive, DHS should not be allowed to sidestep or undermine it through unchecked policies.

The INA is also silent about the group of around 4.3 million aliens identified under DACA and makes no mention or reference regarding deferred action with respect to this large group of otherwise removable aliens. Deferred action under DACA amounts to much more than a mere decision not to pursue removal of an alien. Indeed, it is equivalent to declaring and conferring extra-constitutional and extra-statutory rights of lawful presence. The INA statutorily mandates bars for reentry based on unlawful presence, eligibility for advance parole, and eligibility for federal benefits. DACA disregards the statutory scheme. An agency cannot be left to legislate or create categories not contemplated by the legislation, especially when it fails to adhere to the required notice-and-comment procedures. *United States v. Mead*, 533 U.S. 218, 230 (2001) ("Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure. . . .").

15

Our Constitution also requires adherence to international treaties and congressional approval of same as the "supreme Law of the Land." U.S. Const. art. VI, cl. 2. DACA provides a clear mechanism to circumvent, obstruct, or inhibit removal and extradition under applicable international treaties.[4] DACA gives lawful status to illegal aliens and thus impedes statutorily mandated removal, extradition, and deportation. As found by the Fifth Circuit, "DACA prevents removal of its recipients—whom Congress has deemed removable." *Texas v. United States*, 328 F. Supp. 3d 662, 714 (*Texas II*).

Although not involving the APA, there is at least one example of a court invalidating an executive policy that conflicted with an existing comprehensive federal legal scheme. In 1995, President Bill Clinton issued Executive Order 12954 which prohibited the federal government from contracting with organizations that had strike-breakers on the payroll. 60 Fed. Reg. 13,023 (Mar. 10, 1995). But because the policy conflicted with the express provisions of the National Labor Relations Act, the reviewing court invalidated the policy.

--------

[4] *See, e.g.*, Extradition Treaty, Mexico-U.S., Jan. 25, 1980, 31 U.S.T. 5059, art. 2; art. 9; art. 13 ("Extradition shall take place, subject to this Treaty, for willful acts which fall within any of the clauses of the Appendix and are punishable in accordance with the laws of both Contracting Parties. . . . Neither Contracting Party shall be bound to deliver up its own nationals, but the executive authority of the requested Party shall, if not prevented by the laws of that Party, have the power to deliver them up if, in its discretion, it be deemed proper to do so. . . . The request for extradition shall be processed in accordance with the legislation of the requested Party. . . .").

16

*Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996). Similarly, DACA's rescission is proper because DACA conflicts with the INA, the Constitution, and treaty law.

Of course, if the agency discretionary action is "otherwise not in accordance with law" in the first instance, the rational test and so-called agency discretion inquiry should be unnecessary. 5 U.S.C. § 706(2)(A). Courts typically review agency actions and factual findings made during formal proceedings under a substantial evidence test, 5 U.S.C. § 706(2)(E), and uphold the agency's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In formal proceedings, the agency must support its action with evidence in the record. But in informal proceedings, the agency can point to any evidence it possessed when it made its determination. *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007). In *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), the Court clarified that an agency decision may be unlawful

> [i]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could

**AR4560**

17

not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43.[5] Here, however, in rescinding DACA, DHS considered exactly what Congress intended it to consider.

## II.   Courts cannot unilaterally expand the APA's standard of review.

Judicial review of discretionary enforcement policies should not expand procedurally beyond the standard set forth in the APA or substantively beyond constitutional muster. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (finding that when an agency acts, the action itself provides a focus for judicial review to determine whether the agency exceeded its statutory powers). Here, the inquiry should be narrowly constrained to the threshold issue of whether DHS's discretionary enforcement policy—DACA—is unlawful. If so, then, DHS's rescission based, in part, on such rational inquiry into the lawfulness of DACA cannot be arbitrary and capricious.

Here, for example, the Ninth Circuit de-emphasizes the unlawfulness of DACA in the first instance and

---

[5] Thomas J. Miles & Cass R. Sunstein, *The Real World of Arbitrariness Review*, 75 U. Chi. L. Rev. 761, 763 (2008) ("In its seminal decision in *Motor Vehicle Manufacturers Association v. State Farm Auto Mutual Insurance Co.*, the Court entrenched hard look review and clarified its foundations.").

AR4561

18

instead focuses on the degree of inquiry to be applied to an agency decision. *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018). Focus on enlarging the APA review standards ignores this Court's explanation that the arbitrary and capricious standard becomes neither heightened nor more stringent just because an agency's action alters or changes its prior policy. *Fox Television Stations, Inc.*, 556 U.S. 502. Indeed, there is a complete lack of precedent supporting application of a different heightened standard to review of a rescission of a discretionary enforcement policy than to review of the original policy. Yet at least one of the lower courts imposes an improper heightened substantial evidence standard, and likewise a heightened judicial scrutiny including factors far beyond the plain language of the APA—so-called policy differences or reliance interests. *Perez*, 135 S. Ct. at 1209.

The APA establishes plain language standards governing judicial review of decisions and actions made by federal administrative agencies. *Dickinson v. Zurko*, 527 U.S. 150, 152 (1999). The APA's discretion standard is limited and, regarding the agency action here, does not permit courts to engage in heightened searching review. The APA instructs reviewing courts to decide "all relevant questions of law . . . and determine the meaning or applicability of the terms of an agency action . . . and set aside agency action . . . found to be . . . arbitrary, capricious, or . . . without observance of procedure required by law. . . ." 5 U.S.C. §§ 706, 706(2)(A), (D). Agency "action" is defined as "the whole or a part

19

of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id*. at § 551(13); *Hearst Radio v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948) (APA covers only those activities included within the statutory definition of "agency action"). Judicial review may also be limited because it would contravene congressional intent, such as disrupting or impeding the intended and prompt implementation of complex congressionally approved regulatory frameworks. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). Thus, a reasoned and rational explanation to justify the agency's change in course related to a discretionary enforcement policy is found sufficient. *Id.* Reasons for a change in a discretionary enforcement policy do not require justification exceeding the reasons to adopt the rulemaking policy in the first instance. *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 29. Interpretation should be logical from a commonsense reading. If an agency action from inception is otherwise not in accordance with law, the threshold judicial inquiry should end there. Whether the agency action met the evidentiary standards applicable to the arbitrary and capricious standard should be a secondary analysis.

————◆————

20

## CONCLUSION

The judgments of the Ninth Circuit and the District Court for the District of Columbia, as well as the orders of the Eastern District of New York, should be reversed.

Respectfully submitted,

KIMBERLY S. HERMANN
SOUTHEASTERN LEGAL
 FOUNDATION
560 W. Crossville Rd.,
 Ste. 104
Roswell, GA 30075

KURT R. HILBERT
 *Counsel of Record*
KELLY H. BROLLY
THE HILBERT
 LAW FIRM, LLC
205 Norcross St.
Roswell, GA 30075
(770) 551-9310
khilbert@hilbertlaw.com

August 26, 2019

*Counsel for Amicus Curiae*

Nos. 18-587, 18-588, 18-589

# In the Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, *et al.*, *Petitioners,*
v.
REGENTS OF THE UNIVERSITY OF CALIFORNIA, *et al.*, *Respondents.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, *et al.*, *Petitioners,*
v.
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*, *Respondents*

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, *et al.*, *Petitioners,*
v.
MARTIN JONATHAN BATALLA VIDAL, *et al.*, *Respondents.*

**On Writs of Certiorari to the United States Courts of Appeals for the Ninth, District of Columbia, and Second Circuits**

**BRIEF FOR *AMICUS CURIAE* IMMIGRATION REFORM LAW INSTITUTE IN SUPPORT OF THE PETITIONERS**

CHRISTOPHER J. HAJEC*
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave., NW, Suite 335
Washington, DC  20001
(202) 232-5590
chajec@irli.org
*Counsel of Record

August 26, 2019    *Counsel for Amicus Curiae*

Becker Gallagher  ·  Cincinnati, OH  ·  Washington, D.C.  ·  800.890.5001

**AR4565**

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . ii

INTEREST OF *AMICUS CURIAE* . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Because DACA Was Invalid, The Courts Below Could Not Reinstate It, And Respondents Lack Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. DACA Is Invalid . . . . . . . . . . . . . . . . . . . . . . . . 4

   A. The Immigration and Nationality Act does not authorize DACA . . . . . . . . . . . . . . . . . . . 4

   B. The DACA program is a substantive rule that did not go through the procedural requirements of 5 U.S.C. § 553 . . . . . . . . . . . 11

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**AR4566**

ii

## TABLE OF AUTHORITIES

**CASES**

*Action on Smoking & Health v. Civil*
    *Aeronautics Bd.*,
    713 F.2d 795 (D.C. Cir. 1983) . . . . . . . . . . . . . . . 3

*Arizona Dream Act Coal. v. Brewer*,
    818 F.3d 101 (9th Cir. 2016) . . . . . . . . . . . . . . . . 1

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
    133 S. Ct. 2247 (2013) . . . . . . . . . . . . . . . . . . . . 11

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) . . . . . . . . . . . . . . . . . . . . . . . 5

*City of Los Angeles v. Adams*,
    556 F.2d 40 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . 7

*Crowell v. Benson*,
    285 U.S. 22 (1932) . . . . . . . . . . . . . . . . . . . . . . . 11

*Guevara v. Holder*,
    649 F.3d 1086 (9th Cir. 2011) . . . . . . . . . . . . . . . 9

*Kamen v. Kemper Fin. Servs.*,
    500 U.S. 90 (1991) . . . . . . . . . . . . . . . . . . . . . . . 4

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . 3

*Mada-Luna v. Fitzpatrick*,
    813 F.2d 1006 (9th Cir. 1987) . . . . . . . . . . . 12, 13

*Manhattan Gen. Equip. Co. v. Comm'r of*
    *Internal Revenue*, 297 U.S. 129 (1936) . . . . . . . . 5

AR4567

iii

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) . . . . . . . . . . . . . . . . . . . . . . . 5

*Matter of C-T-L-,*
  25 I. & N. Dec. 341 (B.I.A. 2010) . . . . . . . . . . . . 1

*Matter of Silva-Trevino,*
  26 I. & N. Dec. 826 (B.I.A. 2016) . . . . . . . . . . . . 1

*Mistretta v. United States,*
  488 U.S. 361 (1989) . . . . . . . . . . . . . . . . . . . . . . 10

*NRDC v. United States Forest Serv.,*
  421 F.3d 797 (9th Cir. 2005) . . . . . . . . . . . . . . . 11

*Nat'l Ass'n of Mfrs. v. United States Dep't of Labor,*
  no. 95-0715, 1996 U.S. Dist. LEXIS 10478
  (D.D.C. July 22, 1996) . . . . . . . . . . . . . . . . . . . . 11

*Pacific Gas & Electric Co. v. Federal Power Com.,*
  506 F.2d 33 (D.C. Cir. 1974) . . . . . . . . . . . . . . . 12

*Paulsen v. Daniels,*
  413 F.3d 999 (9th Cir. 2005) . . . . . . . . . . . . . . . 3

*Save Jobs USA v. U.S. Dep't of Homeland Sec.,*
  No. 16-5287 (D.C. Cir., filed Sept. 28, 2016) . . . . 1

*Succar v. Ashcroft,*
  394 F.3d 8 (1st Cir. 2005) . . . . . . . . . . . . . . . . . 5

*Sure-Tan, Inc. v. Nat'l Labor Relations Bd.,*
  467 U.S. 883 (1984) . . . . . . . . . . . . . . . . . . . . . . 10

*Texas v. United States,*
  86 F. Supp. 3d 591 (S.D. Tex. 2015) . . . . . . . . . . 8

AR4568

iv

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015). . . . . . . . . . . 8, 9, 14

*Transohio Sav. Bank v. Dir., Office of Thrift
   Supervision*, 967 F.2d 598 (D.C. Cir. 1992) . . . . . 3

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018). . . . . . . . . . . . . . . . . . . . 1

*United States v. Hays*,
   515 U.S. 737 (1995). . . . . . . . . . . . . . . . . . . . . 4

*United States v. Texas*,
   136 S. Ct. 2271 (2016). . . . . . . . . . . . . . . . . . . . 1

*Univ. of the D.C. Faculty Ass'n/NEA v. D.C. Fin.
   Responsibility & Mgmt. Assistance Auth.*,
   163 F.3d 616 (D.C. Cir. 1998). . . . . . . . . . . . . . . 5

*Washington All. of Tech. Workers v. U.S. Dep't
   of Homeland Sec.*,
   74 F. Supp. 3d (D.D.C. 2014) . . . . . . . . . . . . . . . 1

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001). . . . . . . . . . . . . . . . . . . . . 10

*Woodall v. Commissioner*,
   964 F.2d 361 (5th Cir. 1992). . . . . . . . . . . . . . . 8

## STATUTES

5 U.S.C. § 553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . 2

5 U.S.C. § 706(2)(C) . . . . . . . . . . . . . . . . . . . . . . . 2

6 U.S.C. § 202(5). . . . . . . . . . . . . . . . . . . . . . . . . . 6

**AR4569**

v

8 U.S.C. § 1103(a)(3) . . . . . . . . . . . . . . . . . . . . . . . 6, 11

8 U.S.C. § 1158(d)(5) . . . . . . . . . . . . . . . . . . . . . . . 6

8 U.S.C. § 1182(n). . . . . . . . . . . . . . . . . . . . . . . . . 10

8 U.S.C. § 1184(g). . . . . . . . . . . . . . . . . . . . . . . . . 10

8 U.S.C. § 1188 . . . . . . . . . . . . . . . . . . . . . . . . . . 10

8 U.S.C. § 1225(a)(1) . . . . . . . . . . . . . . . . . . . . . . . 5

8 U.S.C. § 1225(b)(2)(A) . . . . . . . . . . . . . . . . . . . . . 5

8 U.S.C. § 1228(a)(3) . . . . . . . . . . . . . . . . . . . . . . . 6

8 U.S.C. § 1229a . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

8 U.S.C. § 1324a . . . . . . . . . . . . . . . . . . . . . . . . . 9

8 U.S.C. § 1324a(h)(3) . . . . . . . . . . . . . . . . . . 9, 10, 11

8 U.S.C. § 1324a(h)(3)(B) . . . . . . . . . . . . . . . . . . . . . 10

**RULE**

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . 3

**OTHER AUTHORITIES**

80 Fed. Reg. at 10,294 . . . . . . . . . . . . . . . . . . . . . . 10

H.R. Rep. No. 99-682 (1986) . . . . . . . . . . . . . . . . . . . 9

H.R. Rep. No. 104-725 (1996) (Conf. Rep.) . . . . . . . . 8

Michael X. Marinelli, *INS Enforcement of the Immigration Reform and Control Act of 1986: Employer Sanctions During the Citation Period*, 37 Cath. U. L.R. 829 (1988) . . . . . . . . . . . . . . . . 8

AR4570

vi

Memorandum from Jeh Charles Johnson, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who are Parents of U.S. Citizens or Permanent Residents* (Nov. 20, 2014) . . . . . . . . 7

Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 13

**AR4571**

1

## INTEREST OF *AMICUS CURIAE*[1]

The Immigration Reform Law Institute ("IRLI") is a not for profit 501(c)(3) public interest law firm incorporated in the District of Columbia. IRLI is dedicated to litigating immigration-related cases on behalf of United States citizens, as well as organizations and communities seeking to control illegal immigration and reduce lawful immigration to sustainable levels. IRLI has litigated or filed *amicus curiae* briefs in many immigration-related cases before federal courts (including this Court) and administrative bodies, including *Trump v. Hawaii*, 138 S. Ct. 2392 (2018); *United States v. Texas*, 136 S. Ct. 2271 (2016); *Arizona Dream Act Coal. v. Brewer*, 818 F.3d 101 (9th Cir. 2016); *Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 74 F. Supp. 3d 247 (D.D.C. 2014); *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, No. 16-5287 (D.C. Cir., filed Sept. 28, 2016); *Matter of Silva-Trevino*, 26 I. & N. Dec. 826 (B.I.A. 2016); and *Matter of C-T-L-*, 25 I. & N. Dec. 341 (B.I.A. 2010).

## SUMMARY OF THE ARGUMENT

The decisions of the courts below depended on the assumption that the program known as Deferred Action for Childhood Arrivals ("DACA") both is substantively lawful and was implemented in a

---

[1] The parties have given blanket consent to the filing of *amicus curiae* briefs in this case. No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae,* its members, or its counsel made a monetary contribution to its preparation or submission.

2

procedurally lawful manner. If either assumption is untrue, an injunction of DACA's rescission should restore not DACA, but the last lawful regulatory state of affairs—to wit, the *status quo* pre-DACA.

In fact, neither of the above assumptions is true: DACA is both substantively and procedurally invalid. It is substantively invalid because it exceeds agency authority. It is procedurally invalid because it restricts agency discretion but did not go through the requisite notice and comment process. Thus, Respondents' requested relief should only result in the restoration of the *status quo* pre-DACA. Since the *status quo* pre-DACA would not benefit Respondents, their claims cannot be redressed by an injunction of DACA's rescission. Accordingly, Respondents lack standing to maintain these actions, and the federal courts lack jurisdiction to hear them.

This Court has an obligation to assure itself of its own jurisdiction, and that of lower courts. In fulfilling this obligation, this Court should find DACA both substantively and procedurally invalid, and dismiss these cases for lack of jurisdiction.

## ARGUMENT

### I. Because DACA Was Invalid, The Courts Below Could Not Reinstate It, And Respondents Lack Standing.

As explained below, the DACA program is invalid. Courts must hold unlawful, rather than give effect to, invalid regulations. 5 U.S.C. § 706(2)(A), (C) ("The reviewing courts shall . . . hold unlawful and set aside agency action, findings and conclusions found to be . . .

**AR4573**

3

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law . . . [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . "); *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992) ("Agency actions beyond delegated authority are *ultra vires,* and courts must invalidate them.") (internal citation and quotation marks omitted).

The effect of the invalidation of the rescission of DACA would be to reinstate the rule previously in force—but only if that previous rule were valid. *See, e.g., Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983) (holding that the effect of invalidating an agency rule is to reinstate the rule previously in force); *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) (refusing to reinstate a previous rule under that standard because it was itself invalid). Thus, because DACA is invalid, the invalidation of its rescission cannot revive it.

Indeed, because DACA is invalid, and because the effect of invalidating its rescission would be to reinstate the last lawful state of applicable regulations, Respondents' requested remedy would only result in the restoration of the *status quo* pre-DACA. For this reason, at the minimum, Respondents' claimed injuries are non-redressable, and their claims should be dismissed for lack of standing under Federal Rule of Civil Procedure 12(b)(1). *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

AR4574

4

As this Court has explained:

> The question of standing is not subject to waiver . . . We are required to address the issue even if the courts below have not passed on it, and even if the parties fail to raise the issue before us. The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines.

*United States v. Hays*, 515 U.S. 737, 742 (1995) (internal quotation marks, citations, and brackets omitted). Thus, courts' hesitation to consider arguments raised solely by an *amicus curiae* does not apply to jurisdictional arguments. *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 97 n.4 (1991).

This Court, in the course of assuring itself of its jurisdiction, should examine both the substantive and procedural lawfulness of DACA, and, finding it unlawful, hold that Respondents' claims should be dismissed for lack of standing.

## II. DACA Is Invalid.

DACA is invalid both because it was *ultra vires* and because the Department of Homeland Security ("DHS") failed to follow the notice and comment requirement of the Administrative Procedure Act.

### A. The Immigration and Nationality Act does not authorize DACA.

In reviewing an *ultra vires* claim, courts examine statutory language to determine whether Congress

**AR4575**

5

intended the agency to have the power that it exercised when it acted. *Univ. of the D.C. Faculty Ass'n / NEA v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 163 F.3d 616, 620 (D.C. Cir. 1998). A reviewing court must reasonably be able to conclude that the regulations issued were contemplated in Congress's grant of authority. *Chrysler Corp. v. Brown*, 441 U.S. 281, 308 (1979).

Analyzing DACA by this standard reveals that it has no statutory foundation, and therefore is *ultra vires* and a nullity. *See Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134 (1936) ("A regulation which . . . operates to create a rule out of harmony with the statute[] is a mere nullity").

First, the Immigration and Nationality Act ("INA") does not provide a statutory foundation for the DACA program. Quite to the contrary: DACA is a programmatic refusal by DHS to enforce Congress's clear statutory mandate. Under the INA, any alien who entered the country illegally is an applicant for admission. 8 U.S.C. § 1225(a)(1). And 8 U.S.C. § 1225(b)(2)(A) mandates that if an applicant for admission "is not clearly and beyond a doubt entitled to be admitted, the alien *shall* be detained" for removal proceedings under 8 U.S.C. § 1229a (emphasis added). "Congress did not place the decision as to which applicants for admission are placed in removal proceedings into the discretion of the Attorney General, but created mandatory criteria." *Succar v. Ashcroft*, 394 F.3d 8, 10 (1st Cir. 2005). "[W]hile the President has broad authority in foreign affairs, that authority does not extend to the refusal to execute domestic laws." *Massachusetts v. EPA*, 549 U.S. 497, 534 (2007).

**AR4576**

6

True, two provisions of the INA provide broad, general grants of authority to DHS: 8 U.S.C. § 1103(a)(3) ("[The Secretary] . . . shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter."); and 6 U.S.C. § 202(5) ("The Secretary . . . shall be responsible for . . . [e]stablishing national immigration enforcement policies and priorities."). The first of these, 8 U.S.C. § 1103(a)(3), clearly fails to authorize DACA, which is not "necessary for carrying out" any part of the INA. In any event, only if the authority of DHS to "deem[]" that an action is so "necessary" were unlimited and unreviewable could these provisions grant authority for DACA, but in that case, they would grant DHS a limitless authority over how it carries out its duties, making the innumerable other provisions of the INA that detail how DHS is to carry out its duties meaningless. *See, e.g.*, 8 U.S.C. §§ 1158(d)(5) (providing requirements for asylum procedure), 1228(a)(3) (providing that expedited proceedings "shall be" initiated for aliens incarcerated for aggravated felonies), 1229a (providing procedural requirements for removal proceedings).

Title 6 U.S.C. § 202(5)'s grant of authority to "[e]stablish[] national immigration enforcement policies and priorities" also fails to authorize DACA. Its authorization to DHS to set "priorities" does not authorize DACA, which, as explained below, goes far beyond making removable aliens that meet its criteria low priorities for removal. Thus, this provision could only authorize DACA based on its apparently open-

7

ended authorization to DHS to establish enforcement "policies." But if the meaning of this language were as open-ended as that, it would allow DHS to establish a policy, for example, of removing only removable aliens who were violent felons, or only those who had been in the country less than two months, or only those who lacked a high school education—and it would be patently unreasonable to suppose that Congress intended DHS to have authority to set policies so at odds with the INA.

Second, DACA is not a valid form of "deferred action." True, faced with limited resources, an agency has discretion to implement the mandate of Congress as best it can, by setting priorities for action. *See City of Los Angeles v. Adams*, 556 F.2d 40, 50 (D.C. Cir. 1977) (holding that when a statutory mandate is not fully funded, "the agency administering the statute is required to effectuate the original statutory scheme as much as possible, within the limits of the added constraint.").

With DACA, however, DHS did not "effectuate the original statutory scheme as much as possible" within the limits set by underfunding. DACA was not created because of lack of resources; the aliens protected by it were already rarely removed. Memorandum from Jeh Charles Johnson, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who are Parents of U.S. Citizens or Permanent Residents* 3 (Nov. 20, 2014) (explaining that DACA applies to individuals who "are extremely unlikely to be deported given [the] Department's

8

limited enforcement resources").[2] Rather, the program reflects a policy judgment that these aliens should be free to live and work in the United States without fear of deportation. Far from "effectuat[ing] the original statutory scheme as much as possible," this policy judgment is at odds with the INA and congressional intent. Not only has Congress rejected a legislative version of DACA repeatedly, it has found that "immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and illegal aliens do not have the right to remain in the United States undetected and unapprehended." H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.). Congress has also passed laws designed to reduce the incentives for illegal entry, and to incentivize self-deportation where enforcement is lacking. *Texas v. United States*, 86 F. Supp. 3d 591, 634-35 (S.D. Tex. 2015), *aff'd Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) (arguing that the Deferred Action for Parents of Americans program ("DAPA") would disincentivize illegal aliens from self-deporting); Michael X. Marinelli, *INS Enforcement of the Immigration Reform and Control Act of 1986: Employer Sanctions During the Citation Period*, 37 Cath. U. L.R. 829, 833-34 (1988) ("Congress

---

[2] This statement is scarcely consistent with Secretary Napolitano's bald assertion that "additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities." Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 1 (June 15, 2012) ("DACA Memo"). Admissions against interest are admissible evidence, but self-serving statements are not. *Woodall v. Commissioner*, 964 F.2d 361, 364-65 (5th Cir. 1992).

9

postulated that unauthorized aliens currently in the United States would be encouraged to depart") (citing H.R. Rep. No. 99-682, at 46 (1986)).

In any event, the deferred-action justification, even if accepted initially for a portion of DACA, cannot help Respondents. DACA is not *only* deferred action; as an integral part of the DACA program, DHS has granted work authorization to its beneficiaries. DACA Memo 3. No provision of the INA grants DHS such wide-ranging power to authorize aliens to work.

8 U.S.C. § 1324a(h)(3) (defining an "unauthorized alien," that is, an alien ineligible for employment, as an "alien [that] is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this Act or by the Attorney General") certainly does not grant DHS the needed authority. That provision, which does not address deferred action at all, is an "exceedingly unlikely" grant of power from Congress to authorize work, because what the provision does address is the *unlawful* employment of aliens. *Texas v. United States,* 809 F.3d 134, 172-73 (5th Cir. 2015). Indeed, as the U.S. Court of Appeals for the Ninth Circuit has held, "[8 U.S.C. § 1324a] merely allows an employer to legally hire an alien (whether admitted or not) while his application [for adjustment of status] is pending." *Guevara v. Holder*, 649 F.3d 1086, 1095 (9th Cir. 2011). And if § 1324a(h)(3) permitted DHS to give work authorization to DACA beneficiaries, it could only be because that provision allowed DHS to authorize work for any class of alien it chose; the provision contains no limiting language. If Congress had granted the

**AR4580**

10

executive branch such vast discretion, it would have done so clearly, not through "vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 468 (2001). It is not reasonable to suppose that Congress, without any clear statement that it was doing so, granted to DHS the unrestricted power to overthrow Congress's own grants of employment protection to American workers. *See, e.g.,* 8 U.S.C. §§ 1182(n), 1184(g), 1188 (protecting American workers from competition from aliens); *Sure-Tan, Inc. v. Nat'l Labor Relations Bd.,* 467 U.S. 883, 893 (1984) ("A primary purpose in restricting immigration is to preserve jobs for American workers.").

Indeed, any interpretation of § 1324a(h)(3) that is broad enough to permit DACA's work authorizations makes § 1324a(h)(3) a glaring violation of the nondelegation doctrine. That doctrine requires "an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). No principle governing the grant of work authorizations by the Attorney General or his successor DHS can be discerned in § 1324a(h)(3); rather, as DHS appears to acknowledge, if § 1324a(h)(3) gives DHS the authority to authorize work for aliens in the DACA program, that is because it gives DHS general authority to authorize work for any alien, or class of aliens, as it sees fit. *See, e.g.,* 80 Fed. Reg. at 10,294 ("8 U.S.C. 1324a(h)(3)(B)[] recognizes that employment may be authorized by statute or by the Secretary"). Such an interpretation makes § 1324a(h)(3) unconstitutional, and for that

**AR4581**

11

reason should be avoided. *Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."), *quoted in Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247, 2259 (2013).

Nor is there a constitutional delegation of power to DHS in 8 U.S.C. § 1103(a)(3) to issue DACA's work authorizations. If DHS's power to issue regulations "deem[ed] necessary for carrying out [its] authority under the provisions of this chapter" is broad enough to cover the wholesale work authorizations in DACA, then it is broad enough to give DHS limitless power to authorize work for aliens.

### B. The DACA program is a substantive rule that did not go through the procedural requirements of 5 U.S.C. § 553.

Even if this Court determines that DACA is not *ultra vires* on its face, it did not go through the proper procedural requirements for enacting a substantive rule. Substantive rules issued by an agency that did not go through the notice and comment process are invalid. *NRDC v. United States Forest Serv.*, 421 F.3d 797, 810 n.27 (9th Cir. 2005); *Nat'l Ass'n of Mfrs. v. United States Dep't of Labor*, no. 95-0715, 1996 U.S. Dist. LEXIS 10478, *55 (D.D.C. July 22, 1996) ("Under section 706(2), this court must hold unlawful and set aside regulations promulgated without adequate notice

AR4582

12

and comment.") (citation and internal quotation marks omitted).

As the U.S. Court of Appeals for the District of Columbia Circuit has explained:

> The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings. A properly adopted substantive rule establishes a standard of conduct that has the force of law. In subsequent administrative proceedings involving a substantive rule, the issues are whether the adjudicated facts conform to the rule and whether the rule should be waived or applied in that particular instance. The underlying policy embodied in the rule is not generally subject to challenge before the agency.

*Pacific Gas & Electric Co. v. Federal Power Com.*, 506 F.2d 33, 38 (D.C. Cir. 1974) (internal citation omitted). Thus, "[t]he critical factor to determine whether a directive announcing a new policy constitutes a rule . . . is the extent to which the challenged directive leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the announced policy in an individual case." *Mada-Luna v. Fitzpatrick,* 813 F.2d 1006, 1013 (9th Cir. 1987) (internal citations and quotation marks omitted) (emphasis in original) (finding that an agency directive concerning the application of a deferred action policy in the immigration context left ample discretion to agency officials and thus did not constitute a substantive rule).

13

By this standard, DACA is clearly a substantive rule. The DACA Memo directs U.S. Immigration and Customs Enforcement agents to "exercise prosecutorial discretion, on an individual basis," to grant deferred action for two years, subject to renewal, to aliens who meet the criteria set forth therein, for the purpose of "preventing low priority individuals from being placed into removal proceedings or removed from the United States," and to accept work authorization applications from those granted deferred action. DACA Memo 2, 3. It is difficult to see how any agent so charged would feel free *not* to grant deferred action in any given case, especially since the only purpose the agents are supposed to be fulfilling in implementing the DACA Memo is to prevent the removal of those meeting the criteria. *Compare Mada-Luna,* 813 F.2d at 1017 (finding discretion where officials were permitted to grant deferred action based on "appealing humanitarian factors"). Thus, though couched in terms of agents' discretion, the DACA Memo actually removes that discretion. Indeed, the form of words chosen verges on the comical; to order agents to "exercise their discretion" *only in a particular way,* as the DACA Memo does, is to deny them the very discretion the order presupposes.

Indeed, based on a thorough evidentiary hearing, the U.S. Court of Appeals for the Fifth Circuit held that DACA was a substantive rule because it withdrew discretion from agents:

> [T]he DACA Memo instructed agencies to review applications on a case-by-case basis and exercise discretion, but the district court found that those

AR4584

14

statements were "merely pretext" because only about 5% of the 723,000 applications accepted for evaluation had been denied, and "[d]espite a request by the [district] [c]ourt, the [g]overnment's counsel did not provide the number, if any, of requests that were denied [for discretionary reasons] even though the applicant met the DACA criteria . . . ." The finding of pretext was also based on a declaration by Kenneth Palinkas, the president of the union representing the USCIS employees processing the DACA applications, that "DHS management has taken multiple steps to ensure that DACA applications are simply rubberstamped if the applicants meet the necessary criteria"; [and on] DACA's Operating Procedures, which "contain[] nearly 150 pages of specific instructions for granting or denying deferred action . . . ."

*Texas v. United States,* 809 F.3d at 172-73. Surveying the above and other evidence relied on by the district court in that case, the Fifth Circuit roundly held that the district court's finding that DACA "severely restricts" agency discretion, "[f]ar from being clear error, . . . was no error whatsoever." *Id.* at n.133 (internal quotation marks and brackets omitted).

As a substantive rule, DACA was required to go through notice and comment; it never did. It therefore is an invalid rule; at most, a court, exercising its equitable powers, could allow it to remain in effect while notice and comment was accomplished. But DACA will not, now, go through the notice and

15

comment process, so there would be no occasion for a court to allow it to remain in effect for that purpose.

\*   \*   \*

Because DACA is invalid, an injunction of its rescission can avail Respondents nothing. Respondents' claimed injuries, therefore, are not redressable, and these cases should be dismissed for lack of jurisdiction.

## CONCLUSION

For the foregoing reasons, the judgments of the courts below should be reversed.

Respectfully submitted,

CHRISTOPHER J. HAJEC*
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
(202) 232-5590
chajec@irli.org
*Counsel of Record

*Counsel for Amicus Curiae*

AR4586

Nos. 18-587, 18-588, 18-589

# In the Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, *et al.*, *Petitioners,*
v.
REGENTS OF THE UNIVERSITY OF CALIFORNIA, *et al.*,
*Respondents.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, *et al.*, *Petitioners,*
v.
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*, *Respondents*

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, *et al.*, *Petitioners,*
v.
MARTIN JONATHAN BATALLA VIDAL, *et al.*, *Respondents.*

**On Writs of Certiorari to the United States Courts of Appeals for the Ninth, District of Columbia, and Second Circuits**

**BRIEF *AMICUS CURIAE* OF CITIZENS UNITED, CITIZENS UNITED FOUNDATION, AND THE PRESIDENTIAL COALITION, LLC IN SUPPORT OF PETITIONERS**

ROBERT J. OLSON*
JEREMIAH L. MORGAN
HERBERT W. TITUS
WILLIAM J. OLSON
WILLIAM J. OLSON, P.C.
370 Maple Ave. W., Ste. 4
Vienna, VA  22180
(703) 356-5070
wjo@mindspring.com
*Counsel of Record
Attorneys for Amici Curiae

August 26, 2019

**AR4587**

ii

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . .  iv

INTEREST OF THE *AMICI CURIAE* . . . . . . . . . . . . . . .  1

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . .  6

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . .  7

ARGUMENT

I.   DHS' DECISION TO END DACA AND ENFORCE
     IMMIGRATION LAW IS NOT JUDICIALLY
     REVIEWABLE . . . . . . . . . . . . . . . . . . . . . . . . . .  9

     A.   Revising Reviewability Precedents:
          From "No Opinion" to "May Be" to "Is"  . .  10

     B.   The Decision to End DACA Is Not a
          "Nonenforcement Decision" . . . . . . . . . .  13

II.  DHS' DECISION TO END DACA WAS LAWFUL
     UNDER <u>SEC</u> V. <u>CHENERY</u> . . . . . . . . . . . . . . . . .  16

III. DACA HAS BEEN UNLAWFUL SINCE ITS
     INCEPTION, BUT EVEN IF FOUND LAWFUL, WAS
     LAWFULLY RESCINDED . . . . . . . . . . . . . . . . . . .  18

**AR4588**

iii

A.   The Ninth Circuit Clearly Erred by Failing to Consider the Constitutionality of DACA . . . . . . . . . . . . . . . . . . . . . . . . . .   18

B.   DACA Is an Unconstitutional Exercise of Legislative Power . . . . . . . . . . . . . . . . . . .   20

C.   DACA Violates Separation of Powers Principles . . . . . . . . . . . . . . . . . . . . . . . . . .   22

D.   DACA Violates the Take Care Clause . . .   24

E.   Even if DACA Was Lawful, It Can Be Lawfully Rescinded . . . . . . . . . . . . . . . . . .   26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

AR4589

iv

## TABLE OF AUTHORITIES

Page

HOLY BIBLE
*Exodus* 18:16 . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

U.S. CONSTITUTION
Art. I, Sect. 1. . . . . . . . . . . . . . . . . . . . . . . . . . . .  23, 26
Art. I, Sect. 7. . . . . . . . . . . . . . . . . . . . . . . . . . . .  23
Art. II, Sect. 1, Cl. 8 . . . . . . . . . . . . . . . . . . . . . .  24
Art. II, Sect. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

STATUTES
5 U.S.C. § 701, *et seq.*. . . . . . . . . . . . . . . . . . . . .  6, 16
Immigration and Nationality Act . . . . . . . . 6, *passim*

CASES
Arizona v. United States, 567 U.S. 387
    (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 5, 21
City of Arlington v. FCC, 569 U.S. 290
    (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 13
Clinton v. New York, 524 U.S. 417 (1998) . . . . . .  25
Cooper v. Aaron, 358 U.S. 1 (1958). . . . . . . . . . . .  27
Dept. of Transportation v. Ass'n of American
    R.R., 135 S. Ct. 1225 (2015). . . . . . . . . . . .  23, 26
District of Columbia v. Heller, 554 U.S. 570
    (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
Franklin v. Massachusetts, 505 U.S. 768 (1992). .  9
Harper v. Va. Dep't of Taxation, 509 U.S. 86
    (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
Heckler v. Chaney, 470 U.S. 821 (1985) . .  10, 11, 13
IRAP v. Trump, 857 F.3d 554 (4th Cir. 2017). . . .  10
Marbury v. Madison, 5 U.S. 137 (1803) . . . . . .  7, 28

v

Montana Air Chapter No. 29 v. Federal Labor
    Relations Authority, 898 F.2d 753
    (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . 11, 12
SEC v. Chenery Corp., 318 U.S. 80 (1943)   16, 17, 18
Texas v. United States, 86 F. Supp. 3d 591
    (S.D. Tex. 2015) . . . . . . . . . . . . . . . . . . . . . . . .  6
Texas v. United States, 809 F.3d 134 (5th Cir.
    2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
United States v. Texas, 136 S.Ct. 2271 (2016) . . . .  6
Youngstown Sheet & Tube Co. v. Sawyer, 343
    U.S. 579 (1952). . . . . . . . . . . . . . . . . . . . . 14, 22

MISCELLANEOUS
50 Core American Documents (C. Burkett, ed.:
    Ashbrook Press: 2016) . . . . . . . . . . . . . . . . . .  29
B. Adams, "Late to the party: CNN and
    MSNBC anchors discover there's a crisis
    at the border," *Washington Examiner*
    (June 26, 2019). . . . . . . . . . . . . . . . . . . . . . . . .  4
W. Blackstone, Commentaries on the Laws
    of England (Univ. Chi. Facsimile ed.:
    1765) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27
G. Carey & J. McClellan, The Federalist
    (Liberty Fund:  2001). . . . . . . . . . . . . . . . . 14, 29
E. Chemerinsky, In Defense of Judicial
    Supremacy, 58 WM. & MARY L. REV.
    1459 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
Customs and Border Protection, Southwest
    Border Migration FY 2019 . . . . . . . . . . . . . . .  5
S.A. Camarota and K. Zeigler, "63% of
    Non-Citizen Households Access Welfare
    Programs," *Center for Immigration Studies*
    (Nov. 20, 2018) . . . . . . . . . . . . . . . . . . . . . . . .  3

**AR4591**

vi

R. Delahunty & J. Yoo, "Dream On:  The Obama Administration's Nonenforcement of Immigration Laws, the DREAM Act, and the Take Care Clause," 91 TEX. L. REV. 781 (2013) . . . . . . . . . . . . . . . . . . . . . . .   26

P. Kurland & R. Lerner, <u>The Founders' Constitution</u> (Univ. of Chicago Press: 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

Letter from Thomas Jefferson to William Charles Jarvis (Sept. 28, 1820) . . . . . . . .   29, 30

K. Pavlich, "His Own Words: Obama Said He Doesn't Have Authority For Executive Amnesty 22 Times," TownHall.com (Nov. 19, 2014) . . . . . . . . . . . . . . . . . . . . . . . .   22

K.R. Thompson, "The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others," U.S. Department of Justice, Office of Legal Counsel (Nov. 19, 2014) . . . . . . . . . .   21

U.S. Citizenship and Immigration Services, Approximate Active DACA Recipients: Country of Birth (July 31, 2018) . . . . . . . . . . .   21

AR4592

## INTEREST OF THE *AMICI CURIAE*[1]

Citizens United is a nonprofit social welfare organization exempt from federal income tax under Internal Revenue Code ("IRC") section 501(c)(4). Citizens United Foundation is a nonprofit educational and legal organization exempt from federal income tax under IRC section 501(c)(3). These organizations were established, *inter alia*, for purposes related to participation in the public policy process, including conducting research, and informing and educating the public on the proper construction of state and federal constitutions, as well as statutes related to the rights of citizens, and questions related to human and civil rights secured by law.

The Presidential Coalition, LLC is an IRC section 527 political organization that was founded to educate the American public on the value of having principled conservative Republican leadership at all levels of government, and to support the election of conservative candidates to state and local government and the appointment of conservatives to leadership positions at the federal and state level in order to advance conservative public policy initiatives.

These *amici*, along with several others, filed three *amicus* briefs in two of these consolidated cases last year:

---

[1] It is hereby certified that counsel for the parties have consented to the filing of this brief; that no counsel for a party authored this brief in whole or in part; and that no person other than these *amici curiae*, their members, or their counsel made a monetary contribution to its preparation or submission.

AR4593

2

- U.S. Department of Homeland Security v. Regents of the University of California, Brief *Amicus Curiae* of Citizens United, *et al.,* U.S. Supreme Court, on petition for certiorari before judgment (Feb. 2, 2018);

- Vidal v. Nielsen, Brief *Amicus Curiae* of Citizens United, *et al.*, U.S. Court of Appeals for the Second Circuit (Mar. 14, 2018); and

- U.S. Department of Homeland Security v. Regents of the University of California, Brief *Amicus Curiae* of Citizens United, *et al.*, U.S. Supreme Court, on petition for certiorari (Dec. 6, 2018).

## STATEMENT

The Brief for the Petitioners ("Pet. Br.") addresses the need for a rescission of the Deferred Action for Childhood Arrivals ("DACA") policy based on the findings made by Secretary Nielsen in her statement of July 22, 2018. Pet. Br. at 10, 40-41. These findings supplemented the reasons given by Acting Secretary Elaine C. Duke in her September 5, 2017 memorandum determining that DACA was unlawful and would be wound down. In addition to agreeing that DACA was contrary to law, Secretary Nielsen asserted that "'tens of thousands of minor aliens' ... have made the dangerous trek — with or without their families — to and across our southern border without legitimate claims to lawfully enter the country." *Id*. at 40. Secretary Nielsen determined it necessary "that DHS should send a strong message that children who

**AR4594**

3

are sent or taken on this perilous and illegal journey will not be accorded preferential treatment." *Id*. at 41.

The lack of enforcement of our nation's immigration laws mandated by the courts below sends exactly the wrong signal — that the United States Government has lost the will to enforce its borders, and that anyone who enters the country illegally stands an excellent chance of being rewarded with permanent status as a lawful resident, and likely citizenship as well.

Multiple nationwide federal court injunctions that have been in place for nearly two years send the message that federal judges are in charge of our borders — not Congress or the President of the United States — and judges are welcoming of illegal immigrants. Indeed, the Ninth Circuit did not try to hide its policy preferences, praising DACA as a response to "the cruelty and wastefulness of deporting productive young people to countries with which they have no ties." <u>Regents of the Univ. of Cal.</u> v. <u>U.S. Dep't of Homeland Security</u>, 908 F.3d 476, 486 (9th Cir. 2018) ("<u>Regents</u>").[2]

In their briefs urging that the injunctions be maintained, Respondents are unlikely to concede that

---

[2] Pairing lax and deferred enforcement with the range of welfare-type benefits, the lower court injunctions have exacerbated the current crisis at the border. Almost two-thirds of illegal aliens reportedly are receiving welfare benefits. *See* S.A. Camarota and K. Zeigler, "<u>63% of Non-Citizen Households Access Welfare Programs</u>," *Center for Immigration Studies* (Nov. 20, 2018).

4

there is a crisis at the border as Secretary Nielsen contended — although the mainstream media, which has supported Respondents' litigation throughout, has changed its collective view on that point. On February 14, 2019, CNN Anchor Don Lemon opposed President Trump's attempt to declare a national emergency to secure border funding:

> Here is a really, really disgraceful thing. OK? You listening? All of this, this whole mess, is manufactured. It's a manufactured crisis. A noncrisis at the border that's really not fooling anybody. People go, 'Oh, it's a crisis, it's a crisis.' They know it's not a crisis. That's all for political expediency. [B. Adams, "Late to the party: CNN and MSNBC anchors discover there's a crisis at the border," *Washington Examiner* (June 26, 2019).]

More recently, Lemon reversed ground, stating:

> "For anybody who doesn't think that immigration is a crisis, a deadly serious crisis, a humanitarian crisis...." [*Id.*]

CNN's Chris Cuomo and MSNBC's Brian Williams showed the same pattern and have agreed there is a crisis at the border. *See id.*

Some years ago, this Court recognized the scope of the problems that border states face as a result of illegal immigration. In Arizona v. United States, 567 U.S. 387 (2012), the Court noted that, in 2010, the federal government "apprehended almost half a

**AR4596**

5

million" unlawful aliens.  <u>Arizona</u> at 397.  The Court
added that "[s]tatistics alone do not capture the full
extent of Arizona's concerns" about illegal
immigration, adding that the record in that case
demonstrates "an 'epidemic of crime, safety risks,
serious property damage, and environmental problems'
associated with the influx of illegal migration across
private land near the Mexican border."  *Id*. at 398.
Since last addressed by this Court, conditions have
only worsened, and the nation's border remains in
crisis.  Each year, from FY 2014 through FY 2018,
Customs and Border Patrol has continued to
apprehend an average of over half a million
"inadmissibles."

Broad deferred enforcement programs such as
DACA and Deferred Action for Parents of Americas
("DAPA") create an incentive for migrants to enter the
United States illegally, not waiting for proper
immigration processes.  This year has seen an
explosion of illegal border crossings and
apprehensions, with over 144,000 apprehensions in
May 2019 alone.[3]  Through the first 10 months of FY
2019, there have been 862,785 apprehensions on the
Southwest border, but this number does not include
illegal crossings, making it impossible to know how
many total illegal immigrants are entering the United
States each month.  The Constitution did not invest in
the federal judiciary the authority to protect the
nation's borders, and it should not continue to impede

---

[3]  *See* Customs and Border Protection, Southwest Border
Migration  FY  2019,  https://www.cbp.gov/newsroom/
stats/sw-border-migration.

6

the President of the United States in his effort to do just that.

It is in this context — the existence of a true crisis at the border — a border that the President of the United States has the duty to protect — that these cases come to this Court.

## STATEMENT OF THE CASE

The original DACA policy, implemented by the Obama Administration in 2012, was a decision not to enforce existing law against a broad class of persons. The later and lawfully indistinguishable DAPA policy, which also expanded DACA, was determined to violate the notice-and-comment provision of the Administrative Procedure Act ("APA") (5 U.S.C. § 701, *et seq.*) by the U.S. District Court for the Southern District of Texas. Texas v. United States, 86 F. Supp. 3d 591 (S.D. Tex. 2015). That decision was affirmed by the U.S. Court of Appeals for the Fifth Circuit. The Fifth Circuit took the position that DAPA (and its expansion of DACA) judgment likely violated both the APA and the Immigration and Nationality Act. Texas v. United States, 809 F.3d 134, 136, 170-196 (5th Cir. 2015). Lastly, the judgment of the Fifth Circuit was affirmed by this Court on an equally divided vote. United States v. Texas, 136 S.Ct. 2271, 2272 (2016) (*per curiam*).

Once the Trump Administration's Department of Homeland Security announced its decision to rescind the DACA policy on September 5, 2017, it was subjected to multiple challenges: (i) in the U.S.

**AR4598**

7

District Court for the Northern District of California (by the Regents of the University of California, *et al.*); (ii) in the District of Columbia (by the National Association for the Advancement of Colored People, *et al.*); and (iii) in the Eastern District of New York (by Batalla Vidal). These three cases led to the issuance of three nationwide injunctions against DHS that remain in effect to this day, nearly two years later.

## SUMMARY OF ARGUMENT

The Trump Administration's decision to end the DACA non-enforcement policy — which has applied to a broad class of persons illegally in the United States — merely returns to the Department of Homeland Security ("DHS") the ability to begin to enforce immigration law as it had been enforced prior to 2012. The decision to end DACA and begin enforcement itself did not constitute an adverse action against any person illegally in the country, and therefore, no one should have had standing even to challenge its rescission.

The decision to end DACA was not a non-enforcement decision and should not have been evaluated as such. Rather, it was the opposite — a decision to revoke a non-enforcement policy. That decision to begin enforcement was unreviewable by the judiciary because it could have been made by DHS for any policy reason whatsoever. This Court's decision in SEC v. Chenery presents no bar to rescission of the DACA non-enforcement decision. The decision to enforce the law was not just presumptively

**AR4599**

8

unreviewable by federal courts, it was also completely unreviewable.

The courts below have made the legality and constitutionality of DACA an issue in this case. The justification for the injunctions against the rescission of DACA was that it was predicated, in part, on an opinion by the Attorney General and Secretary of DHS that DACA was unlawful. Because the judges involved disagreed, believing that DACA was lawful, the courts felt empowered to enjoin DACA's rescission on the theory that the government had made a mistake of law in viewing DACA to be unlawful, thereby rendering the rescission illegitimate.

Actually, the courts had no basis to enjoin DHS, irrespective of whether DACA was lawful or unlawful. First, the judges were wrong in concluding that the original DACA policy was lawful, and if the Court agrees, the injunctions must be dissolved. However, even if this Court were to believe that the original DACA policy was lawful, the injunctions should still be dissolved. This case does not present a situation where there is a dispute of law between an agency and the courts, and the court must have the final say. There is no doctrine of judicial supremacy which requires the Executive to consult with and then bow to the opinion of the courts before determining and carrying out its executive functions. Nor are the Petitioners asking the courts to stand down from any role in reviewing individual immigration decisions. Rather, the courts have no role **at this time** in mandating what the nation's immigration policies will be.

9

## ARGUMENT

## I. DHS' DECISION TO END DACA AND ENFORCE IMMIGRATION LAW IS NOT JUDICIALLY REVIEWABLE.

Former Attorney General Sessions and the Secretary of the Department of Homeland Security determined that DACA should be phased out, *inter alia*, because "the Department lacked statutory authority to have created DACA in the first place," having been "'an unconstitutional exercise of authority'" with "the same legal and constitutional defects that the courts recognized as to DAPA."[4] Regents at 491-92.[5]  The Ninth Circuit did not dispute — and indeed no one appears to have disputed — that the Trump Administration has the absolute discretion to end the DACA program based on a change in policy.[6] *See* Pet. Br. at 19-20; *see also* Regents at 510.  And no one in this case has alleged that the executive branch has improperly enforced any immigration law that Congress enacted.  *See* Pet. Br. at 19.  Indeed,

---

[4]  The legality of the DACA program is discussed in Section III, *infra*.

[5]  The government argues that it also had provided additional reasons for reversing the DACA program, and that those reasons independently support its decision.  Pet. Br. at 37.

[6]  Presumably, President Trump could simply declare "I have chosen to end DACA because I believe it necessary to protect the border," and that would moot this case, as APA does not apply to the President, absent express statement by Congress.  *See* Franklin v. Massachusetts, 505 U.S. 768, 801 (1992).

10

revocation of DACA only signals an **intent to enforce** federal immigration law as it was enforced prior to 2012. The only sticking point for the courts has been the reasons given for the decision to end DACA and to begin to enforce immigration law. In other words, DHS made a permissible decision for an impermissible reason.[7] Due to this perceived error in reasoning (but not in judgment), the Ninth Circuit panel below claimed that the decision to end DACA is judicially reviewable.

### A. Revising Reviewability Precedents: From "No Opinion" to "May Be" to "Is."

On its way to determining that the DHS decision to revoke DACA was judicially reviewable, the panel below first cited <u>Heckler</u> v. <u>Chaney</u>, 470 U.S. 821, 832 (1985), where this Court held that nonenforcement

---

[7] This is not the first time that the lower courts have invalidated this President's policy agenda based on allegations of improper reasons for otherwise legitimate decisions. *See, e.g.,* <u>IRAP</u> v. <u>Trump</u>, 857 F.3d 554, 572 (4th Cir. 2017) (claiming President Trump's order "drips with religious intolerance, animus, and discrimination"). The lower courts have repeated these *ad hominem* attacks *ad nauseam*, claiming that hidden, secret motivations override the legality of otherwise perfectly acceptable policy choices with which federal judges personally disagree. In this case, the judges of the Ninth Circuit have made no secret of how they wanted the case to turn out. Claiming that President Obama's policies "[r]ecogniz[ed] the cruelty and wastefulness of deporting productive young people," the allegedly neutral and detached magistrates below decried the current administration's decision to end this so-called "'commendable exercise'" and to disappoint DACA recipients who were "trusting the government to honor its promises." <u>Regents</u> at 486-87.

11

decisions by the executive branch are presumed to be nonreviewable by the judiciary. <u>Regents</u> at 495. However, as the Ninth Circuit noted, this Court had "express[ed] no opinion" as to whether an agency's nonenforcement decision is judicially reviewable if based upon the belief that the agency lacked jurisdiction to institute proceedings. <u>Chaney</u> at 833 n.4.[8]

Undeterred, the Ninth Circuit filled in the alleged gap in <u>Chaney</u> with its own prior opinion in <u>Montana Air Chapter No. 29</u> v. <u>Federal Labor Relations Authority</u>, 898 F.2d 753, 754 (9th Cir. 1990), finding that "the Supreme Court had nevertheless 'suggested that'" such decisions "'may be reviewable.'" <u>Regents</u> at 496. Thus, the Ninth Circuit understood <u>Montana Air</u> as having established that the "presumption of nonreviewability '**may be** overcome if the refusal is based solely on the erroneous belief that the agency lacks jurisdiction.'" *Id.* (emphasis added).

A page later, however, the Ninth Circuit took yet another leap, converting <u>Montana Air</u>'s "may be overcome" language into a hard-and-fast rule that "a nonenforcement decision **is reviewable** ... if the decision was based solely on the agency's belief that it lacked jurisdiction to act." <u>Regents</u> at 497 (emphasis

---

[8]   This Court also discussed a situation where "the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion'" (*id.*), but that situation is not present here.

12

added).[9]   Of course, by the Ninth Circuit's own admission, this Court has never reached that conclusion and neither had the Ninth Circuit — until its decision in this case.

Then, as the icing on its cake, the Ninth Circuit relied on City of Arlington v. FCC, 569 U.S. 290 (2013), for the proposition that "there is no difference between an agency that lacks jurisdiction to take a certain action, and one that is barred by the substantive law from doing the same...." *Id.* at 497.  But the facts in this case have nothing to do with the City of Arlington distinction between an agency "**exceeding** the scope of its authority ... and its **exceeding** authorized application of authority that it unquestionably has,"[10] or between agencies which "'act **improperly**'" versus ones that act "'**beyond** their jurisdiction.'"  Regents at 496 (emphasis added).  Rather, in this case, DHS clearly has **not** acted in **excess** of or **beyond** its jurisdiction — but rather, it is the Ninth Circuit's opinion that, in implementing DACA, the agency has acted well **within** any limit on its authority.  Here, the Ninth Circuit takes the position that DHS has far more authority than the agency itself believes it has.  City of Arlington has no application here.

_____

[9] In Montana Air, the Ninth Circuit separately concluded that an agency's nonenforcement decision might be reviewable if based "upon adoption of a general policy so extreme as to amount to an abdication of the agency's statutory responsibilities."  *Id.* at 754.  Unsurprisingly, the Ninth Circuit never mentioned this rule when it opined that the original DACA program — adopting a general policy not to enforce the law — was lawful.

[10]   City of Arlington at 299 (emphasis added).

13

## B. The Decision to End DACA Is Not a "Nonenforcement Decision."

As discussed above, neither this Court's decisions nor the Ninth Circuit's own precedents support its conclusion that the decision to end DACA is judicially reviewable. But there is an even more fundamental weakness in the Ninth Circuit's decision. The decision to revoke DACA is not a "nonenforcement decision." Regents at 497. Rather, it is the opposite — **an enforcement decision** — a "decision to rescind a nonenforcement policy...." Pet. Br. at 21. Therefore, this is not a case like Chaney where an agency decides not to enforce because it does not have the jurisdiction **to bring** enforcement proceedings. Rather, here an agency is deciding to enforce the statute as it is written, based on the court below's theory that it does not have the authority **to abdicate** its responsibility to enforce the law.

This means that none of the factors weighing in favor of judicial reviewability of nonenforcement decisions is applicable here. *See* Pet. Br. at 31-32. Certainly when, as here, an agency states its intent to enforce the law, there is no "danger that [the] agenc[y] may not carry out [its] delegated powers with sufficient vigor...." Chaney at 834. Indeed, unlike actual nonenforcement decisions, an enforcement decision presents no conflict between the legislature and the Executive. Rather, with the DHS decision to revoke DACA and enforce immigration law, Congress and the executive branch are once again in lockstep. Congress has determined that certain persons are unlawfully present in the United States, and the

**AR4605**

14

Trump Administration has announced its intent to
enforce that law. It is only the lower federal courts —
part of the allegedly "weakest of the three departments
of power"[11] — which have stood in the way, forcing
both other branches of government to bend to the
judiciary's will through the liberal application of
nationwide injunctions.[12]

Both Respondents and the courts below try to give
the impression that the revocation of DACA will end
all exercises of prosecutorial discretion, and that all
DACA recipients immediately will be deported. On the
contrary, there is no indication that the executive
branch now will move generally to deport persons who
are part of the DACA program. With DACA repealed,
enforcement will simply revert to the way it was before
— with real prosecutorial discretion being applied
based on the facts and circumstances of actual
individual cases. True prosecutorial discretion will
replace the policy discretion, on a categorical basis,
engaged in by the prior administration.

---

[11]  A. Hamilton, Federalist No. 78, reprinted in G. Carey & J.
McClellan, The Federalist at 402 (Liberty Fund: 2001).

[12]  This Court has held that when the Executive and Congress act
arm-in-arm on a matter, the President's authority is at its
maximum. Thus, a decision to enforce federal law, when
"executed by the President pursuant to an Act of Congress would
be supported by the strongest of presumptions and the widest
latitude of judicial interpretation, and the burden of persuasion
would rest heavily upon any who might attack it." Youngstown
Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637 (1952).

15

Respondents here are attempting to convince this Court to do on a wholesale level what instead should be done at the retail level. But as Petitioners note, "an alien subjected to removal proceedings may challenge the substantive validity of an adverse final order, but he may not raise a procedural claim that the government was arbitrary and capricious for commencing enforcement." Pet. Br. at 23.

In upholding the district court's issuance of a nationwide injunction, the Ninth Circuit has declared that a duly enacted statute may not be enforced by the Executive.[13] In other words, the judiciary has created a requirement that the federal government must continue to permit our immigration laws to be broken by hundreds of thousands of persons for a period now going on two years — unless permitted to do otherwise by the judicial branch. *See* Pet. Br. at 16. The injunction below was not issued because the decision to revoke DACA is unconstitutional, or because it conflicts with a statute or an international agreement

---

[13]   The Ninth Circuit credits itself with "empowering the Executive" in this case by informing DHS that it has greater authority than it believes. Regents at 490. Of course, this is just whitewash, as the Ninth Circuit's opinion upheld the district court's injunction preventing the administration from implementing its policy agenda and forcing the DACA program on the American people for nearly an additional two years. Later, the Ninth Circuit outrageously claims that its opinion in this case "prevents [an] anti-democratic and untoward outcome," allegedly because an accurate description of the law permits voters to properly allocate blame. Regents at 499. Of course, there is nothing democratic about four unelected and unaccountable judges below, all appointed by Democratic presidents, unilaterally impeding the political agenda of an elected Republican president.

16

or treaty. Rather, it was issued solely because an executive branch agency has taken the position that a law Congress enacted should be enforced, and that the prior administration's political abdication of its responsibility to enforce the law was wrong.

## II. DHS' DECISION TO END DACA WAS LAWFUL UNDER SEC V. CHENERY.

Having determined that neither the APA nor the Immigration and Nationality Act imposes any bar to judicial review of the rescission of DACA, the Ninth Circuit examined the merits of the decision to end DACA, based on the "likelihood of success on the merits" prong of the preliminary injunction standard. Regents at 505, *et seq.*

The court below relied on this Court's decision in SEC v. Chenery Corp., 318 U.S. 80 (1943). There, the Court determined that it could not uphold an "order" by the Securities and Exchange Commission based on the record before the Court. The Court likened review of agency action to appellate review of lower court decisions: if a lower court reaches the right result but for the wrong reason, the appellate court nevertheless can sustain the decision if there is an alternative ground on which the lower court could have relied. However, in cases where a required showing, or factual or jury determination, was not made, the appellate court must remand the case to make that determination. Chenery at 88.

In rejecting the Commission's order in Chenery, the Court likened that case to the latter scenario — a

**AR4608**

17

situation where "[t]he record is utterly barren of any such showing," and where "findings might have been made and considerations disclosed which would justify its order," but were not. *Id.* at 93-94. Specifically, the Court noted that the Commission had applied the wrong standard to the case but that, since "the Commission is not bound by settled judicial precedents," it was impossible for the Court to weigh in on the issue, and thus remanded the case for further findings. *Id.* at 89, 95.

This case involves precisely the opposite situation, and implicates the first scenario from <u>Chenery</u> — where a decision "must be affirmed if the result is correct 'although the lower court relied upon a wrong ground or gave a wrong reason.'" *Id.* at 88. Here, the decision to end DACA was said to have been made because the program was believed to have been unlawful and unconstitutional at its inception. And even if the Ninth Circuit is correct that such a justification was incorrect, the court admits that the decision to end DACA may have been justified for any number of other reasons, presumably including one as simple as "because we can." Unlike in <u>Chenery</u>, there is no need to send the decision back to DHS for additional fact finding or required showings, since the agency was not required to find any facts or make any showing before ending an entirely discretionary program.

In <u>Chenery</u>, the Commission's decision could have been justified **only** by a determination that was not made. Here, however, the decision to end DACA presumably could have been justified by just about

AR4609

18

**any** reason, allegedly except the one that was given. Thus, like the other cases relied on by the panel below, <u>Chenery</u> provides no support for the Ninth Circuit's decision, but actually demonstrates that the DHS decision to end DACA should have been upheld.

### III. DACA HAS BEEN UNLAWFUL SINCE ITS INCEPTION, BUT EVEN IF FOUND LAWFUL, WAS LAWFULLY RESCINDED.

#### A. The Ninth Circuit Clearly Erred by Failing to Consider the Constitutionality of DACA.

Although the questions presented to this Court do not directly raise the legality or constitutionality of DACA, that question is subsumed in the second question presented — whether the Trump Administration's decision to wind down the Obama Administration's DACA policy is lawful. Indeed, these *amici* argued at the petition stage that, in order to evaluate properly the rescission of DACA, it would be essential to evaluate the legality and constitutionality of the original policy. *See* Brief *Amicus Curiae* of Citizens United, *et al.* (Dec. 6, 2018) at 14.[14]

---

[14] The government's brief on the merits extensively addresses the legality of the original DACA policy. *See* Pet. Br. at 43-52. So too did the Ninth Circuit's opinion below, as the legality of DACA was necessary for the courts below to conclude as to the illegality of the decision to end DACA. <u>Regents</u> at 506-510. *See also* <u>Vidal</u> v. <u>Nielsen</u>, 279 F. Supp. 3d 401, 420-27 (E.D. NY 2018). Thus, the lawfulness of the original DACA policy is before the Court, should the Court first find the rescission of DACA to be judicially reviewable. If this Court finds that DACA was unlawful to begin

19

Interestingly enough, the Ninth Circuit acknowledged that the Attorney General's (and DHS's) decision to end DACA was based in part on its perceived unconstitutionality. <u>Regents</u> at 492, 506. Yet, even though it purportedly rejected that argument, the Ninth Circuit actually did not address it. Rather, the court washed its hands of any constitutional strictures on the theory that "no court has ever held that DAPA is unconstitutional" and "the government makes no attempt in this appeal to defend the Attorney General's assertion that the DACA program is unconstitutional." *Id.* at 506.

That is quite an interesting conclusion. Certainly, it is axiomatic that, in a typical case, a criminal defendant can waive many constitutional challenges.[15] And an individual plaintiff certainly can waive constitutional claims, such as in Section 1983 litigation. But this is anything but a typical case. Here, with the Sessions[16] and Duke memoranda, it was **the government** arguing that **its own** ongoing action is unconstitutional.

In the typical cases discussed above, a waiver of constitutional claims or arguments means only that a court must **overlook past** possible constitutional

---

with, then the nationwide injunctions against the Trump Administration's rescission of the program are even more clearly unlawful.

[15] *See* Criminal Resource Manual 626: <u>Plea Agreements and Sentencing Appeal Waivers — Discussion of the Law</u>.

[16] *See* Joint Appendix 877-878.

20

violations. Here, however, multiple federal courts, including the Ninth Circuit, **mandated future** government action, yet the Ninth Circuit expressly refused to analyze whether that action is constitutional or not. It was error for the court below to fail to consider DACA's constitutionality before ordering that the program continue unabated.

In fact, once the district courts issued their injunctions, DACA which originated as an executive action, became DACA perpetuated by judicial action. And it seems evident that courts have an obligation to *sua sponte* consider the constitutionality of their own orders. Indeed, had the Ninth Circuit examined the issue, it would have found that the DACA policy violated several constitutional provisions.

## B. DACA Is an Unconstitutional Exercise of Legislative Power.

The Immigration and Nationality Act did not delegate to the Executive the power to invalidate immigration laws, either permanently or temporarily. Although the DACA policy advised beneficiaries that their status (or lack thereof) could be revoked at any time, DACA nevertheless granted a renewable two-year deferred action status, and the benefits that go with that status, to more than 700,000 aliens who are present in the United States in defiance of the immigration laws enacted by Congress.[17] DACA thus changed the nation's immigration law in a

---

[17] *See* U.S. Citizenship and Immigration Services, <u>Approximate Active DACA Recipients: Country of Birth</u> (July 31, 2018).

**AR4612**

21

fundamental way — a change that began in 2012 and continues to this day.

Any notion that the Obama Administration implemented DACA pursuant to congressional authority is not plausible.    President Obama repeatedly failed to persuade Congress to enact the Development, Relief, and Education for Alien Minors Act ("DREAM") Act, which would have gone a long way towards eviscerating many of the nation's immigration laws.  Thrice, Congress has made known its position with respect to the provisions of DACA.    First, Congress explicitly legislated with regard to the legality of aliens' presence and the grounds for their removal.  *See* Arizona v. United States, 567 U.S. 387, 396-97 (2012).  As the U.S. Department of Justice Office of Legal Counsel's own Memorandum ("OLC Memo") notes, "[i]n the INA, Congress established a comprehensive scheme governing immigration and naturalization." *Id.* at 3.[18] Second, Congress implicitly rejected President Obama's DACA scheme, in refusing to take any steps toward enacting the DREAM Act and thus ratifying the program. Third, the President has only narrow, statutorily defined circumstances whereby he may grant deferred-action status for certain specified illegal aliens.

---

[18] *See* K.R. Thompson, "The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others," U.S. Department of Justice, Office of Legal Counsel (Nov. 19, 2014).

**AR4613**

22

Even the Ninth Circuit admits that "[u]nlike most other forms of relief from deportation, deferred action is not expressly grounded in statute." Regents at 487. In fact, President Obama publicly announced that he did not believe he had the power to implement a DACA-type policy.[19]  Nevertheless, he implemented DACA anyway.  President Obama's assumption of a broad general power (a power he acknowledged he did not have) to waive the nation's immigration laws for large numbers of persons is simply incompatible with the narrow and detailed statutory scheme.  With DACA, President Obama not only established new national immigration policy outside of the legislative process, but also he acted contrary to Congress' clear desires, where his power is clearly "at its lowest ebb"[20] and, indeed, its exercise is unconstitutional.

**C. DACA Violates Separation of Powers Principles.**

The Ninth Circuit, as well as the parties before it, acknowledged that "DACA's *adoption* was a general statement of policy." Regents at 513.  But such a policy is not the equivalent of legislation adopted pursuant to the bicameral approval and presentment process in Article I, Section 7 that govern the exercise of legislative power.  *See* Dept. of Transportation v.

---

[19]  K. Pavlich, "His Own Words: Obama Said He Doesn't Have Authority For Executive Amnesty 22 Times," TownHall.com (Nov. 19, 2014).

[20]  Youngstown Sheet & Tube Co. at 637 (Jackson, J., concurring). *See* discussion in Section II.B, *infra*.

23

Ass'n. of American R.R., 135 S. Ct. 1225, 1237 (2015) ("DOT") (Thomas, J., concurring).

Legislative power is vested by Article I, Section 1 of the Constitution in Congress alone, and Congress "cannot delegate its 'exclusively legislative' authority at all." *Id.* The question, then, is whether DACA is an exercise of legislative power to create immigration policy or, as the Ninth Circuit alleges, stems from "the Executive's inherent authority to allocate resources and prioritize cases." Regents at 487.[21]

Although DACA is a rule governing the Secretary and DHS agents in the administration and enforcement of INA, it is also a rule governing private conduct. First, DACA requires an alien to apply for lawful presence status. Second, DACA requires the alien to affirmatively demonstrate that he is entitled to the deferred action status including, but not limited to, "not fall[ing] within the Secretary's enforcement priorities."[22] And third, presumably if an applicant

---

[21] The Ninth Circuit initially claims that DACA involves a system whereby "each application is ... evaluated for approval by DHS personnel on a case-by-case basis." Regents at 490. Later, however, the court lets the truth slip, acknowledging that this alleged "case-by-case" review involves no "prosecutorial discretion," but rather that "DACA obviously allows (and indeed requires) DHS officials to exercise discretion in making deferred action decisions as to individual cases...." *Id.* at 507. In other words, DACA allows/requires voluntary/mandatory "decisions" by DHS rubber stampers. The Ninth Circuit's statements are doublespeak.

[22] "Frequently Asked Questions: Rescission of Memorandum Providing for Deferred Action for Parents of Americans and

24

fails to stay outside of those enforcement priorities, he would be outside of the DACA qualifications, and subject to priority removal.  In sum, DACA established a law — a generally applicable rule of private conduct that applies generally to all aliens, but benefits only certain of those aliens who "have no lawful immigration status on th[e] date" of application.  *Id.* That action violated the separation of powers.

## D.  DACA Violates the Take Care Clause.

After a bill becomes law, other constitutional provisions govern.  The Take Care Clause of Article II, Section 3 requires the President to "take Care that the Laws be faithfully executed," and the President's Oath of Office requires him to "preserve, protect and defend the Constitution of the United States."  So long as a law was duly enacted, and so long as it comports with the Constitution, the President has a duty to implement or enforce the law.[23]  The reason that all persons illegally in the United States are not deported immediately is regularly described as being due to inadequate enforcement resources — not due to a decision by the President that the law was unworthy of being enforced.  *See* Pet. Br. at 4.

---

Lawful Permanent Residents ("DAPA")," Department of Homeland Security (June 15, 2017).

[23]  On the other hand, if a law was not duly enacted, or if it is "repugnant" to the Constitution, then the President could argue that he is duty-bound by his oath **not** to implement and enforce it.  *See* Article II, Section 1, Clause 8.  However, the Obama Administration never made such claims about the INA.

25

This Court has noted that, "[a]lthough the Constitution expressly authorizes the President to play a role in the process of enacting statutes, it is silent on the subject of unilateral Presidential action that either repeals or amends parts of duly enacted statutes." Clinton v. New York, 524 U.S. 417, 439 (1998). However, the Court did not view this silence as authorizing executive action, but rather viewed it as "equivalent to an express prohibition" on the post-enactment executive meddling with enacted statutes. *Id.* Whenever a President acts to "effect the repeal of laws ... without observing the procedures set out in Article I, § 7 ... he is rejecting the policy judgment made by Congress and relying on his own policy judgment." *Id.* at 444-45.

Indeed, in the debates on the Constitution, Hamilton and other advocates of a strong executive proposed that "[t]he Executive ought to have an absolute negative" over laws passed by Congress. Records of the Federal Convention, June 4, 1787, reprinted in P. Kurland & R. Lerner, The Founders' Constitution ("Founders") (Univ. of Chicago Press: 1987), vol. 2, p. 389. However, other delegates thought that "[t]his was a mischievous sort of check," that "[t]o give such a prerogative would certainly be obnoxious to the temper of this country," and the proposal was unanimously rejected by a vote of the state delegations. *Id.* at 390. Since the framers specifically rejected the idea that the President should have an absolute veto, it certainly could not be argued that they would have favored absolute executive power to dispense with a law for policy reasons after it has been enacted.  This "threat of nonenforcement gives the

26

President improper leverage over Congress by providing a second, postenactment veto." R. Delahunty & J. Yoo, "Dream On: The Obama Administration's Nonenforcement of Immigration Laws, the DREAM Act, and the Take Care Clause," 91 TEX. L. REV. 781, 795 (2013).

Because DACA is a "'law' in the Blackstonian sense of [a] generally applicable rule[] of private conduct" (*see* Dep't of Transportation v. Ass'n of American R.R., 135 S.Ct. 1225, 1245 (2015), it is outside the authority of the DHS, because Article I, Section 1 vests legislative power exclusively in Congress. *Id.*

> The [Constitution] itself and the writings surrounding it reflect a conviction that the power to make the law and the power to enforce it must be kept separate, particularly with respect to the regulation of private conduct. [*Id.* at 1244.]

Thus, contrary to the lower courts' conclusions that DACA was a lawful exercise of authority under the INA, for the reasons set forth above, and for the reasons set forth by Petitioners, DACA was an unlawful and unconstitutional action, and it was appropriate for the Secretary to rescind it.

### E. Even if DACA Was Lawful, It Can Be Lawfully Rescinded.

Although these *amici* contend that DACA was unlawful when implemented, the case does not turn on

27

that issue.  If DACA was lawful when implemented, as the courts below have contended, it nevertheless was certainly possible for the Secretary of DHS and the Attorney General to have a different view, and take action based on that view, without first seeking judicial approval.    Indeed, judges have no constitutional authority to decide constitutional issues not properly before them.  Any belief that no President may have a view of the Constitution at odds with a judge is an extreme and unsupportable view of judicial supremacy.

Legal scholars may differ as to whether Congress and the President have a role to play in interpreting the law and the Constitution, or whether the Supreme Court's decisions become part of the supreme law of the land.  That is an extreme view — advanced only on one known occasion by this Court in Cooper v. Aaron, 358 U.S. 1, 18 (1958), but at odds with a great deal of history.  Famously, William Blackstone wrote that a judge's "opinion" represents merely "evidence" of what the law is.  W. Blackstone, I Commentaries on the Laws of England (Univ. Chi. Facsimile ed.: 1765) at ¶ 71.  In Marbury v. Madison, this Court likewise held that it is the role of judges "to say what the law is."  5 U.S. 137, 177 (1803).  And just as "a legislative act contrary to the constitution is not law," (*id.*), a judicial opinion that "is manifestly absurd or unjust" is not simply "bad law" but rather "not law" at all.  Blackstone at ¶ 70; *see also* Harper v. Va. Dep't of Taxation, 509 U.S. 86, 107 (1993) (Scalia, J., concurring).  It does not matter which branch of government is responsible for the act, action, or

28

opinion — if it violates the law or the Constitution, all are equally "not law."

Indeed, although Marbury established judicial review, it did not adopt judicial supremacy, "the idea that the Supreme Court should be viewed as the authoritative interpreter of the Constitution and that we should deem its decisions as binding on the other branches and levels of government...." E. Chemerinsky, In Defense of Judicial Supremacy, 58 WM. & MARY L. REV. 1459 (2017). The natural corollary to this view is that **any** opinion from **any** judge in **any** court in the country issued on **any** topic is the supreme law of the land, at least until overruled by a higher court.

Although judicial supremacy is viewed by some as "desirable because we want to have an authoritative interpreter of the Constitution,"[24] it has no basis in the structure of the Constitution, which divides federal power — including the power to opine on the law — among the branches. Chemerinsky at 1459. And, as *amici* argued in their brief at the petition stage, officers of the executive and judicial branches are "each independently bound by oath to support the Constitution in the exercise of [their] respective

---

[24] This school of thought would require that, if this Court in District of Columbia v. Heller, 554 U.S. 570 (2008) had determined that "the right of the people" only referred to a right of the states to maintain the National Guard, overriding the Second Amendment's clear text, the Court's edict must be followed nationwide. History, however, teaches us that even this Court is not infallible.

29

powers." Brief *Amicus Curiae* of Citizens United, *et al.* in Support of Petitioners (Dec. 6, 2018) at 8. These oaths are to follow the Constitution and the law as the oath taker understands it to be, not as the Ninth Circuit would advise it should be. This understanding stands in contrast to the Ninth Circuit's view of "the judiciary [being] the branch ultimately responsible for interpreting the law...." Regents at 499.

President Andrew Jackson, in vetoing the national bank bill enacted by Congress, wrote that "[t]he Congress, the Executive, and the Court must each for itself be guided by its own opinion of the Constitution.... The opinion of the judges has no more authority over Congress than the opinion of Congress has over the judges, and on that point the President is independent of both." Veto Message of the Bill on the Bank of the United States, reprinted in 50 Core American Documents at 166-67 (C. Burkett, ed.: Ashbrook Press: 2016). Likewise, in Federalist 49, Madison wrote that "[t]he several departments being perfectly co-ordinate by the terms of their common commission, neither of them, it is evident, can pretend to an exclusive or superior right of settling the boundaries between their respective powers...."[25] Finally, Thomas Jefferson wrote that "to consider the judges as the ultimate arbiters of all constitutional questions" is "a very dangerous doctrine indeed and one which would place us under the despotism of an

---

[25]  J. Madison, Federalist No. 49, reprinted in The Federalist.

30

Oligarchy."[26]  Petitioners agree, arguing that "as a coordinate Branch, the Executive has an independent duty to determine whether it lacks authority to act." Pet. Br. at 50.

Thankfully, this Court need not resolve any such thorny and enduring constitutional disputes in this case.  This case does not involve a disagreement between the branches as to what the law or Constitution **requires** the President to do (or not to do), but what the law **permits** him to do.  As the Ninth Circuit has admitted, this case is not a situation where the agency has actually done anything unlawful or unconstitutional.  Rather, this case involves a matter of executive discretion.

In forming the nation's immigration policy, former Attorney General Sessions and DHS officials have relied upon their own opinions as to what the law and Constitution requires of them.  They may be right, or they may be wrong, but it is not within the purview of the courts to weigh in every time another branch of government takes a position on a law or the Constitution, and then acts on that position.

The Ninth Circuit disagreed, claiming that "[t]he government may not simultaneously both assert that its actions are legally compelled, based on its interpretation of the law, and avoid review of that assertion by the judicial branch...." Regents at 486. But courts are not roving tribunals open to anyone

---

[26] Letter from Thomas Jefferson to William Charles Jarvis (Sept. 28, 1820).

AR4622

31

who might dispute the legality of government action or inaction. *See Exodus* 18:16. As Petitioners note, "the Executive is entitled to act on its view of the bounds of its enforcement discretion even if the courts might disagree." Pet. Br. at 50-51.

Ironically, the Ninth Circuit does not accuse DHS officials of taking too expansive a view of the scope of executive authority, but rather too narrow a view. The Ninth Circuit may disagree with the assessment that DACA was wrongly implemented, but that does not consequently give rise to a power to have its say on the matter to set the record straight. In a case such as this, it is perfectly acceptable for President Trump and the Ninth Circuit to have different interpretations of the law. And, unlike many other times in our history, no constitutional crisis is created by DHS's decision to end DACA contrary to the wishes of the Ninth Circuit.

## CONCLUSION

For the foregoing reasons, the decisions issued by the U.S. Court of Appeals for the Ninth Circuit and the U.S. District Court for the District of Columbia, and the order issued by the U.S. District Court for the Eastern District of New York granting an injunction, should be reversed.

**AR4623**

32

Respectfully submitted,

ROBERT J. OLSON*
JEREMIAH L. MORGAN
HERBERT W. TITUS
WILLIAM J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Ave. W., Ste. 4
  Vienna, VA  22180
  (703) 356-5070
  wjo@mindspring.com
Attorneys for *Amici Curiae*

August 26, 2019                    *Counsel of Record*

AR4624

**Nos. 18-587, 18-588, & 18-589**

# In the Supreme Court of the United States

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, ET AL., PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

*ON WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE NINTH CIRCUIT*

DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL., PETITIONERS

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL.

*ON WRIT OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURT OF APPEALS
FOR THE D.C. CIRCUIT*

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOME-
LAND SECURITY, ET AL., PETITIONERS

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

*ON WRIT OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

**BRIEF FOR THE STATES OF TEXAS, ALABAMA,
ALASKA, ARIZONA, ARKANSAS, FLORIDA,
KANSAS, LOUISIANA, NEBRASKA, SOUTH
CAROLINA, SOUTH DAKOTA AND WEST
VIRGINIA, AND GOVERNOR PHIL BRYANT OF
MISSISSIPPI AS AMICI CURIAE IN SUPPORT OF
PETITIONERS**

*Counsel Listed on Inside Cover*

**AR4625**

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant
  Attorney General

KYLE D. HAWKINS
Solicitor General
  *Counsel of Record*

MATTHEW H. FREDERICK
 Deputy Solicitor General

ARI CUENIN
LANORA C. PETTIT
Assistant Solicitors General

OFFICE OF THE
  ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
kyle.hawkins@oag.texas.gov
(512) 936-1700

**AR4626**

## QUESTIONS PRESENTED

1.   Whether the Department of Homeland Security (DHS)'s decision to wind down the DACA policy is judicially reviewable.

2.   Whether the DHS's decision to wind down the DACA policy is lawful.

(I)

AR4627

III

## TABLE OF CONTENTS

Page

Questions Presented ............................................... I

Table of Contents ................................................. III

Table of Authorities .............................................. IV

Interest of Amici Curiae ......................................... 1

Summary of Argument ........................................... 2

Argument ............................................................ 6

I.   DACA Is Unlawful. ......................................... 6

    A.   DACA contravenes Congress's extensive immigration-enforcement scheme ....................... 8

    B.   DACA is procedurally unlawful because it was promulgated contrary to the APA's requirements ....................................... 21

II.  The Executive's Decisions Both to Create and to Rescind DACA Are Subject to Judicial Review ...... 30

III. The Executive's Rescission of DACA Was Neither Arbitrary Nor Capricious ............................... 32

Conclusion ......................................................... 36

AR4628

IV

## TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Am. Bus. Ass'n v. United States,*
    627 F.2d 525 (D.C. Cir. 1980) ..................................22, 25

*Am. Mining Cong. v. Mine Safety & Health Admin.,*
    995 F.2d 1106 (D.C. Cir. 1993) ................................24-25

*Ariz. Christian Sch. Tuition Org. v. Winn,*
    563 U.S. 125 (2011) ....................................................35

*Arizona v. United States,*
    567 U.S. 387 (2012) .............................................. *passim*

*Azar v. Alina Health Servs.,*
    139 S. Ct. 1804 (2019) ...............................................28

*Bd. of Trs. of Leland Stanford Jr. Univ. v.*
    *Roche Molecular Sys., Inc.,*
    563 U.S. 776 (2011) ....................................................17

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
    419 U.S. 281 (1974) ....................................................34

*Burlington Truck Lines v. United States,*
    371 U.S. 156 (1962) ....................................................32

*CASA de Md. v. U.S. Dep't of Homeland Sec.,*
    924 F.3d 684 (4th Cir. 2019) ...........................3, 5, 32, 34
    284 F. Supp. 3d 758 (D. Md. 2018) .......................31, 32

*Chevron, U.S.A., Inc. v. NRDC,*
    467 U.S. 837 (1984) ......................................................8

*Chrysler Corp. v. Brown,*
    441 U.S. 281 (1979) .......................................4, 22, 24, 28

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ....................................................34

**AR4629**

v

*Guardian Fed. Sav. & Loan Ass'n v. Fed.*
  *Sav. & Loan Ins. Corp.*,
  589 F.2d 658 (D.C. Cir. 1978) ......................................29

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ........................................................31

*Hoffman Plastic Compounds, Inc. v. NLRB*,
  535 U.S. 137 (2002) ........................................................15

*In re Aiken Cty.*,
  725 F.3d 255 (D.C. Cir. 2013) ......................................35

*Iowa League of Cities v. EPA*,
  711 F.3d 844 (8th Cir. 2013) .........................................29

*Kendall v. United States*,
  37 U.S. 524 (1838) ...........................................................9

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ........................................................31

*McLouth Steel Prods. Corp. v. Thomas*,
  838 F.2d 1317 (D.C. Cir. 1988)....................................30

*Medellin v. Texas*,
  552 U.S. 491 (2008) ........................................................18

*Morgan Stanley Capital Grp. Inc. v. Pub. Util.*
  *Dist. No. 1 of Snohomish Cty.*,
  554 U.S. 527 (2008) ........................................................34

*Morton v. Ruiz*,
  415 U.S. 199 (1974) ..............................................*passim*

*Motor Vehicles Mfrs. Ass'n v. State Farm*
  *Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...........................................32, 33, 34

*NAACP v. Trump*,
  298 F. Supp. 3d 209 (D.D.C. 2018) ..............................34

AR4630

VI

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014)...........................22, 23, 24

*Nat. Res. Def. Council v. EPA*,
    643 F.3d 311 (D.C. Cir. 2011)......................................25

*Perez v. Mortg. Bankers Ass'n*,
    135 S. Ct. 1199 (2015).............................................22, 29

*Phillips Petro. Co. v. Johnson*,
    22 F.3d 616 (5th Cir. 1994) ..........................................29

*Prof'ls & Patients for Customized Care v. Shalala*,
    56 F.3d 592 (5th Cir. 1995) ..........................................28

*Regents of the Univ. of Cal. v. U.S. Dep't of
    Homeland Sec.*,
    908 F.3d 476 (9th Cir. 2018) ...............................*passim*

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) .................................................10, 31

*Shalala v. Guernsey Mem'l Hosp.*,
    514 U.S. 87 (1995) ....................................................23, 25

*Texas v. United States (Texas I)*,
    136 S. Ct. 2271 (2016) .................................................1
    809 F.3d 134 (5th Cir. 2015) ...............................*passim*
    86 F. Supp. 3d 591 (S.D. Tex. 2015) ............................20

*Texas v. United States (Texas II)*,
    328 F. Supp. 3d 662 (S.D. Tex. 2018) .................*passim*

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) .........................................................8

*Util. Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014) .................................................21, 23

*Weyerhaeuser Co. v U.S. Fish & Wildlife Serv.*,
    139 S. Ct. 361 (2018) .................................................30, 31

**AR4631**

VII

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const.:

art. I, § 8, cl. 4 ....................................................... 9

art. II, § 3 .................................................. 6, 9, 35

8 U.S.C. § 1611(b)(2)-(4) ...................................... 13

42 U.S.C.:

§ 402(a)-(h) ......................................................... 18

§ 405(c)(2)(B)(i)(I) ........................................... 18

§ 414(a) ................................................................ 18

Administrative Procedure Act, 5 U.S.C.:

§ 551(4) ................................................................ 21

§ 553(b) ................................................................ 22

§ 553(d)(2) ........................................................... 28

§ 701(a)(1) ........................................................... 31

§ 701(a)(2) ........................................................... 31

Haitian Refugee Immigration Fairness Act of 1998,
Pub. L. No. 105-277, div. A, § 101(h), tit. IX,
112 Stat. 2681-538 .......................................... 16

Immigration Act of 1990, Pub. L. No. 101-649,
104 Stat. 4978 ................................................... 16

Immigration and Nationality Act, 8 U.S.C.:

§ 1101(a)(15)(A)-(V) ....................................... 10

§ 1101(a)(15)(H) ............................................... 15

§ 1101(a)(15)(P) ............................................... 15

§ 1101(a)(20) ..................................................... 10

§ 1105a(a) ........................................................... 16

AR4632

VIII

§ 1151 ................................................................................. 10
§ 1153 ................................................................................. 10
§ 1154(a)(1)(D)(i)(II) ......................................................... 17
§ 1154(a)(1)(D)(i)(IV) ........................................................ 17
§ 1154(a)(1)(K) .................................................................. 17
§ 1157 ................................................................................. 10
§ 1158 ................................................................................. 10
§ 1158(c)(1)(B) .................................................................. 15
§ 1158(d)(2) ....................................................................... 16
§ 1159 ................................................................................. 10
§ 1160(d)(3)(A) .................................................................. 16
§ 1181 ................................................................................. 10
§ 1182(a)(6)(A)(i) ............................................................... 11
§ 1182(a)(9)(B) ................................................................... 12
§ 1182(a)(9)(B)(i) ............................................................... 11
§ 1182(a)(9)(B)(ii) ........................................................ 10, 12
§ 1182(a)(9)(B)(iv) ............................................................. 15
§ 1182(d)(5)(A) ........................................................ 10, 12, 19
§ 1182(d)(5)(A) (1952) ...................................................... 19
§ 1184(p)(6) ....................................................................... 16
§ 1227(a)(1)(B) ................................................................... 11
§ 1227(d)(1)-(2) ................................................................. 16
§ 1229b .............................................................................. 10
§ 1229c(a)(2)(A) ................................................................ 19
§ 1231(b)(3) ....................................................................... 10
§ 1252(b) (1988) ................................................................ 19
§ 1252(g) ............................................................................ 32
§ 1254(e) (1988) ................................................................ 19
§ 1254a(a)(1)(B) ................................................................ 16
§ 1255(a) ............................................................................ 12
§ 1255(c)(2) ....................................................................... 15
§ 1255a(b)(3) ..................................................................... 16
§ 1255a(e)(1)-(2) ............................................................... 16

AR4633

IX

§ 1255a note ..................................................... 16

§ 1324a(a) ......................................................... 15

§ 1324a(f) .......................................................... 15

§ 1324a(h)(3) .................................................... 20

§ 1324a(h)(3)(B) .............................................. 15

Immigration Reform and Control Act of 1986,
    Pub. L. No. 99-603, 101 Stat. 3359 .................... *passim*

Internal Revenue Code, 26 U.S.C.:

§ 32(c)(1)(E) ..................................................... 18

§ 32(m) ............................................................. 18

National Defense Authorization Act for Fiscal
    Year 2004, Pub. L. No. 108-136,
    117 Stat. 1392 ................................................. 17

Nicaraguan Adjustment and Central American
    Relief Act, Pub. L. No. 105-100, tit. II,
    111 Stat. 2160, 2193 (1997) ........................... 16

REAL ID Act of 2005, Pub. L. No. 109-13, div. B
    119 Stat. 231, 302 .......................................... 14

USA PATRIOT Act of 2001, Pub. L. No. 107-56, 115
    Stat. 272 ..................................................... 16-17

8 C.F.R.:

§ 1.3(a)(4)(vi) .................................................. 14

§ 274a.12(a) ...................................................... 20

§ 274a.12(c)(9)-(10) ......................................... 20

§ 274a.12(c)(14) ......................................... 17, 20

§ 274a.12(c)(16) ............................................... 20

20 C.F.R. § 422.104(a)(2) .................................. 18

45 C.F.R. § 152.2(4)(vi) .................................... 14

Tex. Lab. Code § 207.043(a)(3) ......................... 14

Tex. Transp. Code § 521.142(a) ......................... 14

AR4634

X

Sup. Ct. R. 37 ........................................................................ 1

**Other Authorities:**

3d Am. Compl., *Vidal v. Nielsen*,
No. 1:16-cv-4756 (E.D.N.Y. Dec. 11, 2017),
ECF No. 113 ................................................... 27

52 Fed. Reg. 46,092 (Dec. 4, 1987) .................................... 20

Br. for State Respondents, *United States v.
Texas*, 136 S. Ct. 2271 (2016) (No. 15-674),
2016 WL 1213267 ..................................................... 7, 21

Br. for the States of Texas et al., *Brewer v. Ariz.
Dream Act Coal.*, No. 16-1180, 2017 WL
1629324 (U.S. May 1, 2017) ........................................ 7

Complaint, *Regents of Univ. of Cal. v. U.S. Dep't
of Homeland Sec.*, No. 3:17-cv-5211-WHA
(N.D. Cal. Sept. 8, 2017), ECF No. 1 .......................... 26

Complaint, *California v. U.S. Dep't of
Homeland Sec.*, No. 3:17-cv-5235 (N.D.
Cal. Sept. 11, 2017), ECF No. 1 .................................... 26

Complaint, *Garcia v. United States*, No.
3:17-cv-5380 (N.D. Cal. Sept. 18, 2017),
ECF No. 1 ..................................................................... 26

Complaint, *NAACP v. Trump*, No. 1:17-cv-
1907 (D.D.C. Sept. 18, 2017), ECF No. 1 .................. 27

Complaint, *New York v. Trump*, No. 1:17-cv-
5228 (E.D.N.Y. Sept. 6, 2017), ECF No. 1 ................ 27

Complaint, *Trs. of Princeton Univ. v. United
States*, No. 1:17-cv-2325 (D.D.C. Nov. 3, 2017),
ECF No. 1 ..................................................................... 22

**AR4635**

XI

David Hancock, *Few Immigrants Use Family Aid Program*, Miami Herald, Oct. 1, 1990 .............. 19

Deferred Action for Childhood Arrivals (DACA) Toolkit, *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015) (No. 1:14-cv-254), ECF No. 38-6 .................................................................. 12

H.R. Rep. No. 99-682(I) (1986), reprinted in 1986 U.S.C.C.A.N. 5649 .................... 17, 20

H.R. Rep. No. 104-725 (1996) (Conf. Rep.), reprinted in 1996 U.S.C.C.A.N. 2649 ......................... 14

Josh Blackman, *The Constitutionality of DAPA Part I: Congressional Acquiescence to Deferred Action*, 103 Geo. L.J. Online 96 (2015) .................................. 21

Letter from León Rodríguez, Dir., USCIS, to Sen. Grassley (June 29, 2016) .................................... 12

Letter from León Rodríguez, Dir., USCIS, to Sen. Grassley (Oct. 9, 2014) ..................................... 12

Motion for Preliminary Injunction, App. 12, *Texas v. United States* (S.D. Tex. May 2, 2018) (1:14-cv-68), ECF No. 6, Exh. 3 .................................................. 13

Pet. Br., *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 836758 ......................... 11

Pls.' Stip. of Voluntary Dismissal, *Texas v. United States*, No. 1:14-cv-254 (S.D. Tex. Sept. 12, 2017), ECF No. 473 .................................................................... 2

Principal and Response Brief of Appellees the Regents of the University of California, Janet Napolitano, and City San Jose, *Regents*, 908 F.3d 476 (9th Cir. 2018) (No. 18-15068), 2018 WL 1414352 .................... 18

AR4636

XII

U.S. Br. as Amicus Curiae in Opp. to Reh'g En Banc,
*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053
(9th Cir. 2014) (No. 13-16248) ........................................ 9

U.S. Dep't of Homeland Sec., DACA Nat'l
Standard Operating Procedures (2013) .................... 13

USCIS, Frequently Asked Questions,
https://www.uscis.gov/humanitarian/consideration
-deferred-action-childhood-arrivals-
process/frequently-asked-questions ...................... 9, 26

USCIS, How Do I Change to Another
Nonimmigrant Status? (Jan. 2016),
https://www.uscis.gov/sites/default/files/USCIS/
Resources/C2en.pdf ...................................................... 15

Zachary Price, *Enforcement Discretion and Executive
Duty*, 67 VAND. L. REV. 671 (2014) ............................... 9

AR4637

### INTEREST OF AMICI CURIAE

Amici curiae are the States of Texas, Alabama, Alaska, Arizona, Arkansas, Florida, Kansas, Louisiana, Nebraska, South Carolina, South Dakota, and West Virginia, and Governor Phil Bryant of Mississippi.[1]

The present lawsuits have forced the Executive to retain an unlawful "deferred action" program known as DACA. The administration is correct that DACA is unlawful: DACA operates contrary to substantive immigration law by affirmatively conferring "lawful presence" status and work-authorization eligibility on over 1.7 million unlawfully present aliens. DACA is thus materially identical to two programs (Expanded DACA and DAPA, *see infra* n.5) that were invalidated by the Fifth Circuit in a ruling affirmed by an equally divided vote of this Court. *See Texas v. United States*, 809 F.3d 134, 172, 184-86 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam) (*Texas I*).

DACA, like the programs held unlawful in *Texas I*, inflicts ongoing irreparable harm on the States. For example, amici "bear the costs of providing . . . social services required by federal law," including healthcare, education, and law-enforcement. *Texas v. United States*, 328 F. Supp. 3d 662, 700 (S.D. Tex. 2018) (*Texas II*). "[B]ecause DACA increases the total number of aliens in

---

[1] Pursuant to Supreme Court Rule 37.6, amici state that no counsel for any party authored this brief, in whole or in part, and no person or entity other than amici contributed monetarily to its preparation or submission. The parties consent to the filing of this brief.

AR4638

the States by disincentivizing those already present from leaving, the States must provide more . . . social services, which cost more." *Id.* According to an expert retained by DACA's defenders in *Texas II*, Texas alone "incurs more than $250,000,000 in total direct costs from DACA recipients per year." *Id.* at 700-01.

To seek redress for these injuries, a group of States, led by Texas, notified the federal government that it would challenge DACA on the same bases that succeeded as to DAPA and Expanded DACA unless the federal government rescinded DACA. AR 238-40.[2] In response, the Executive issued the September 2017 memorandum at issue here announcing DACA's rescission. Based on the memorandum, Texas and the other States agreed to dismiss their pending lawsuit. Pls.' Stip. of Voluntary Dismissal at 1, *Texas v. United States*, No. 1:14-cv-254 (S.D. Tex. Sept. 12, 2017), ECF No. 473. But DACA was not wound down. DACA's rescission was enjoined, and the Texas-led coalition ultimately filed suit seeking a declaration that DACA was unlawful. *Texas II*, 328 F. Supp. 3d 662.

This case thus directly implicates the States' effort to bring about an orderly end to DACA and threatens to continue the numerous harms inflicted on the States by this lawless program.

### SUMMARY OF ARGUMENT

I.   The courts below erred by concluding that DACA was lawful. The Executive decided to wind down

---

[2] AR cites the Administrative Record, filed as Notice of Filing Administrative Record, *Regents of the University of California v. United States Department of Homeland Security*, No. 3:17-cv-5211-WHA (N.D. Cal. Oct. 6, 2017), ECF No. 64-1.

3

DACA after a new administration concluded that DACA was unlawful for the reasons affirmed by the Court in *Texas I*, or at least that DACA would likely be held unlawful, creating significant litigation risk if the program continued. Pet. App. 114a-18a.[3]

Respondents in these consolidated cases argue that rescinding DACA was arbitrary and capricious because the Executive's conclusion that DACA was unlawful was incorrect or insufficiently explained. The courts below and the Fourth Circuit have agreed. *E.g.*, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 494-504 (9th Cir. 2018) (*Regents*); *CASA de Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 697-701 (4th Cir. 2019).[4] As the multistate coalition litigating *Texas II* has demonstrated, the Executive was correct for several reasons. Amici will focus on two that demonstrate the fundamental misunderstandings of law underlying the decisions under review.

A. DACA is substantively unlawful because it exceeds the scope of authority delegated to the Executive by the INA. As the Court has repeatedly recognized, the power to establish when aliens are lawfully present is "entrusted exclusively to Congress," which has enacted "extensive and complex" statutes governing (among other things) lawful presence. *Arizona v. United States*, 567 U.S. 387, 395, 409 (2012) (quotation

---

[3] Pet. App. cites the Appendix to the Petition for a Writ of Certiorari Before Judgment in *United States Department of Homeland Security v. Regents of the University of California*, No. 18-587 (S. Ct. filed Nov. 5, 2018).

[4] Although *CASA de Maryland* has not been consolidated with this case, it presents the same threshold legal issues.

4

marks omitted). Congress delegated limited rule-making authority to the Executive, which DACA exceeds.

Congress has never given the Executive *carte blanche* to grant lawful presence to any alien it chooses not to remove, let alone benefits including work authorization, health care, unemployment, and a pathway to citizenship. To the contrary, Congress enacted the Immigration Reform and Control Act (IRCA) in 1986 "as a comprehensive framework for combating the employment of illegal aliens." *Id.* at 404 (quotation marks omitted). Congress has defined numerous categories of aliens entitled to or eligible for work authorization. Entirely absent are the aliens covered by DACA. DACA contradicts those mandates and would render Congress's detailed provisions surplusage.

B. Even if the Court were to conclude that DACA is substantively lawful, DACA is procedurally invalid because it seeks to change this nation's immigration law without following the APA's notice-and-comment procedure. For forty years, this Court has held that any "substantive" agency rule that "affect[s] individual rights and obligations" must go through the notice-and-comment procedures established by the APA. *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979). DACA falls within this category of "substantive" rules because it sets criteria by which more than a million unlawfully present aliens may seek access to numerous benefits. *Morton v. Ruiz*, 415 U.S. 199, 231 (1974). Moreover, DACA imposes extensive obligations on States to provide social services to an entire class of people. Assuming such changes could be adopted without congressional action, they could not be adopted without APA notice and comment.

**AR4641**

5

Plaintiffs cannot avoid this commonsense conclusion by asserting that DACA is merely a "general policy statement," which leaves signficant discretion to the Executive. As the Fifth Circuit noted in *Texas I*, DACA and its Operating Procedures "contain nearly 150 pages of specific instructions for granting or denying deferred action." 809 F.3d at 173 (alterations omitted). Such a system affords line-level employees at the Department of Homeland Security (DHS) little practical discretion, belying the notion that DACA is a "general policy statement" without binding effect.

II. Three circuit courts have now examined the sweeping changes to American immigration law effected by the creation of DACA (or the closely related Expanded DACA and DAPA programs[5]), and two of them have considered DACA's rescission. *Texas I*, 809 F.3d at 163-70; *Regents*, 908 F.3d at 494-504; *CASA de Md.*, 924 F.3d at 697-701. These courts agree that these Executive actions were rules subject to judicial review. This conclusion follows the text of the Immigration and Nationality Act (INA), the Administrative Procedure Act (APA), and this Court's precedent.

III. Because DACA exceeded DHS's authority under the INA and was promulgated without notice and comment, it was never a valid legislative rule. It cannot

---

[5] DHS announced DACA in 2012 to grant lawful presence to aliens who arrived in this country as children. In 2014, DHS expanded DACA to cover additional aliens and lengthen the lawful-presence period for aliens awarded relief. At the same time, DHS created the DAPA program to provide lawful presence for unlawfully present aliens with children who were either U.S. citizens or lawful permanent residents. *See Texas I*, 809 F.3d at 147-49.

AR4642

6

be arbitrary or capricious for the Executive to rescind a program that was both substantively and procedurally unlawful. Indeed, such a rule is incompatible with our constitutional system, which imposes on the President an obligation "that the Laws be faithfully executed." U.S. Const. art. II, § 3.

## ARGUMENT

### I.   DACA Is Unlawful.

DACA effected one of the largest shifts in immigration policy in American history, granting "lawful presence" to hundreds of thousands of unlawfully present aliens. That policy shift occurred without public input because the Executive bypassed APA notice-and-comment procedures. And it violated substantive immigration laws duly enacted by Congress.

On June 29, 2017, an 11-state coalition, led by Texas, sent a letter to the federal government proposing a DACA wind-down to end the *Texas I* litigation challenging the Executive's ability to unilaterally confer lawful presence and work authorization. AR 238-40. At that time, *Texas I* challenged only DAPA and Expanded DACA, but the coalition informed the Attorney General that it would expand the case if DACA were not wound down. AR 239-40. This letter explained how the legal arguments that the Fifth Circuit, and ultimately this Court, sustained against DAPA applied equally to DACA. AR 238-39.[6]

---

[6] Also available to the Attorney General was an amicus brief filed before this Court, Br. for the States of Texas et al., *Brewer v. Ariz. Dream Act Coal.*, No. 16-1180, 2017 WL 1629324 (U.S. May 1, 2017), which explained that DACA was unlawful for the same substantive and procedural infirmities

7

The letter persuaded DHS that DACA is unlawful. DHS effectively acceded to Texas's request "after consulting with the Attorney General, and considering the likelihood of success on the merits of the ongoing litigation." AR 254. On September 5, 2017, Acting DHS Secretary Elaine C. Duke issued a memorandum stating that the "DACA program should be terminated" in light of the "rulings in the ongoing litigation." AR 255. In particular, Secretary Duke invoked the Fifth Circuit's decision in *Texas I*, which concluded that DAPA "conflicted with the discretion authorized by Congress" because the INA "'flatly does not permit the reclassification of millions of illegal aliens as lawfully present,'" and that "implementation of the program did not comply with the [APA] because the Department did not implement it through notice-and-comment rulemaking." AR 253-54 (quoting *Texas I*, 809 F.3d at 184). Secretary Kristjen M. Nielsen issued a separate memorandum on June 22, 2018 further explaining the Agency's conclusion that DACA was unlawful and should be discontinued for policy reasons. Pet. App. 120a-126a.

DHS's conclusion was correct. For the reasons Texas presented in the letter and successfully litigated in the Southern District of Texas, DACA is substantively and procedurally unlawful.

---

found in *Texas I* regarding Expanded DACA and DAPA, *see* Br. for State Respondents at 44-70, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 1213267.

**AR4644**

8

### A. DACA contravenes Congress's extensive immigration-enforcement scheme.

DACA is substantively unlawful for the same reasons the Fifth Circuit held Expanded DACA and DAPA unlawful. The Fifth Circuit assumed without deciding that the standard set forth in *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), controlled the review of DAPA. *Texas I*, 809 F.3d at 178-79 & n.159. Under *Chevron*'s familiar two-part test, a court must defer to an agency's interpretation of its own statute if the text of the statute is ambiguous and the agency's interpretation is reasonable. *Chevron*, 467 U.S. at 844. DACA, like DAPA, fails *Chevron* at either step: Congress has unambiguously spoken to the precise questions at issue, *id.* at 842-43; *Texas I*, 809 F.3d at 185-86. And a program that is "manifestly contrary" to Congress's statutory scheme is necessarily unreasonable. *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001); *Texas I*, 809 F.3d at 186.

### 1. DACA contravenes Congress's extensive statutory framework for lawful presence.

DACA violates Congress's extensive statutory framework defining when aliens are lawfully present in the country. Beneficiaries under DACA receive so-called "[d]eferred action," which in this context "means that, for a specified period of time, an individual is permitted to be *lawfully present* in the United States." *Texas I*, 809 F.3d at 168 & n.107 (quoting executive memo extending DACA's deferred-action period from two to three years).[7]

---

[7] The Executive has repeatedly explained that under DACA, "while [an applicant's] deferred action is in effect," the alien is

9

DACA's purported grant of lawful presence violates the INA. As the Fifth Circuit explained in *Texas I*, the "INA flatly does not permit the [Executive to deem] aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits." 809 F.3d at 184. The Executive has no power to unilaterally create immigration classifications that authorize aliens' presence in this country because "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present." *Id.* at 179.[8]

a. "Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress"—not the Executive. *Arizona*, 567 U.S. at 409; *see* U.S. Const. art. I, § 8, cl. 4. Congress has accordingly enacted "extensive and complex" statutory provisions governing when aliens may be lawfully present in the country. *Arizona*, 567 U.S. at 395; *accord Texas I*, 809 F.3d at 179.

Congress has delineated over 40 classes of lawfully present aliens. *See Texas I*, 809 F.3d at 179. The INA

---

"considered to be lawfully present in the United States." USCIS, Frequently Asked Questions, https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last visited July 20, 2019). The Executive has even described DACA recipients as having "lawful status." U.S. Br. as Amicus Curiae in Opp. to Reh'g En Banc 16, *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) (No. 13-16248).

[8] DACA also violates the Take Care Clause, U.S. Const. art. II, § 3, because DACA "dispens[es]" with certain immigration statutes. *Kendall v. United States*, 37 U.S. 524, 613 (1838); *See* Zachary Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671, 676, 690-91 (2014).

10

creates two primary categories of aliens permitted to be present in the country:

- Aliens admitted as "nonimmigrant" aliens, who receive temporary permission to be lawfully present according to one of several visa categories, 8 U.S.C. § 1101(a)(15)(A)-(V); and

- Aliens admitted under "immigrant" visas, who have lawful permanent residence (LPR) status, commonly known as possessing "green cards," *id.* §§ 1101(a)(20), 1151, 1153, 1181.

Congress also created other avenues to lawful presence, such as admission as a refugee, *id.* §§ 1157, 1159, asylum, *id.* § 1158, and humanitarian "parole" into the country, *id.* § 1182(d)(5)(A).

By contrast, "unlawful presence" is defined as an alien's presence in the United States "after the expiration of the period of stay authorized by the [Executive] or presen[ce] in the United States *without being admitted or paroled*." *Id.* § 1182(a)(9)(B)(ii) (emphasis added). Of course, an alien's unlawful presence does not automatically mean that he will be removed. Congress has imposed several statutory limitations on removal. *E.g.*, *id.* §§ 1229b (cancellation of removal), 1231(b)(3) (withholding of removal). And, due to limited enforcement resources, the Executive generally has "discretion to abandon" removal proceedings on a "case-by-case basis"—forbearance rooted in prosecutorial discretion and traditionally called "deferred action." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 & n.8 (1999) (*AADC*). But this traditional conception of deferred action is far removed from "deferred-action status" as DACA defines it: granting lawful presence on a

11

systematic basis to potentially over one million otherwise unlawfully present aliens.

To be sure, there are four narrow contexts in which Congress has decided to grant lawful presence to certain categories of unlawfully present aliens. These include (1) certain aliens seeking relief under the Violence Against Women Act, (2) immediate family members of LPRs killed by terrorism or (3) in combat, and (4) applicants for T- and U- visas denied an administrative stay. *See Texas II*, 328 F. Supp.3d at 717 n.78 (collecting statutes). But no such legislation covers unlawfully present aliens who entered the country as minors. Indeed, as discussed further below (at 25 & n.17), such legislation has been repeatedly proposed and rejected.

b. DACA also flouts four statutory mechanisms that Congress enacted to discourage aliens from being unlawfully present in the country.

*First*, the lawful presence granted by DACA negates Congress's determination that an alien is removable as either "present in the United States in violation of [federal law]," 8 U.S.C. § 1227(a)(1)(B); or present "without being admitted or paroled," *id.* § 1182(a)(6)(A)(i). That is because once an alien has enrolled in the DACA program, the Executive treats him as though he were not "present in the United States without being admitted or paroled." *See* Pet. Br. at 9 n.3, *Texas*, 136 S. Ct. 2271 (No. 15-674), 2016 WL 836758.

*Second*, DACA vitiates the INA's reentry bar. Congress directed that, depending on the total time that an alien is "unlawfully present" in the country, an alien may not reenter the country legally for three or ten years after departure. 8 U.S.C. § 1182(a)(9)(B)(i). But DACA stops the reentry-bar clock by granting lawful presence

12

to unlawfully present aliens. *Texas I*, 809 F.3d at 166 n.99.

Ordinarily the reentry-bar clock starts when an alien crosses the border "without being admitted or paroled." 8 U.S.C. § 1182(a)(9)(B)(ii). The INA allows the President to stop that clock by granting humanitarian "parole," but only in very limited circumstances. *Id.* § 1182(d)(5)(A). The INA does *not* authorize the Executive to stop this clock for any alien of its choosing based on the Executive's priorities for removal proceedings—yet that is what DACA seeks to effect.

*Third*, DACA gives unlawfully-present aliens a pathway to citizenship that Congress has disallowed. For an alien to be eligible to adjust to permanent-resident status (and ultimately citizenship), the alien must be lawfully "admitted or paroled into the United States." *Id.* § 1255(a). Unlawfully present aliens who depart the country, however, are generally inadmissible upon return. *See id.* § 1182(a)(9)(B).

DACA status gives aliens access to "advance parole," an Executive practice that allows them to leave and reenter the country lawfully.[9] *Cf. id.* § 1182(d)(5)(A). Advanced parole allows an otherwise inadmissible alien to be "admitted" into the country, removing a significant

---

[9] *See* Letter from León Rodríguez, Dir., USCIS, to Sen. Grassley 1 (June 29, 2016), available at https://www.judiciary.senate.gov/imo/media/doc/2016-06-29 USCIS to CEG - DACA Advance Parole Program.pdf; Deferred Action for Childhood Arrivals (DACA) Toolkit 23-24, *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015) (No. 1:14-cv-254), ECF No. 38-6; Letter from León Rodríguez, Dir., USCIS, to Sen. Grassley 3-4 (Oct. 9, 2014), *Texas*, 86 F. Supp. 3d 591 (No. 1:14-cv-254), ECF No. 64-48.

AR4649

13

barrier to seeking LPR status. DACA thereby "enable[s] certain individuals to change their inadmissible status (due to unlawful entry) into an admitted/paroled category." *Texas I*, 809 F.3d at 720. Having been paroled into the country, the alien can seek LPR status.[10]

As of August 2017, approximately 1,056 DACA recipients had been given citizenship and approximately 39,514 DACA recipients had been given green cards, the first step on the pathway to citizenship. *See* Motion for Preliminary Injunction, App. 12, *Texas v. United States* (S.D. Tex. May 2, 2018) (1:18-cv-68), ECF No. 6, Exh. 3. DACA thus "directly undermines the intent and deterrent effect intended by Congress, and contradicts the express wording of the DACA program's instituting memorandum." *Texas II*, 328 F. Supp. 3d at 720.

*Fourth*, DACA makes otherwise unlawfully present aliens eligible for Social Security, Medicare, and the Earned Income Tax Credit. But in 1996, Congress eliminated most federal benefits for unlawfully present aliens. As part of welfare-reform legislation, Congress declared that only those with "lawful presence" are eligible for specified benefits. As relevant here, Congress required aliens to be "lawfully present in the United

---

[10] Under DACA's detailed procedures, officials were to interpret access to this benefit very broadly. *See* U.S. Dep't of Homeland Sec., DACA Nat'l Standard Operating Procedures 139-42 (2013). Under these procedures, work-related conferences, semester-abroad programs and job interviews would all count as "urgent humanitarian" reasons to travel abroad, which would provide "significant public benefit." *Id.* at 135.

14

States" to obtain Social Security, Medicare, and another retirement benefit. 8 U.S.C. § 1611(b)(2)-(4).[11]

DACA purports to re-enable access to those benefits. *See* 8 C.F.R. § 1.3(a)(4)(vi); 45 C.F.R. § 152.2(4)(vi).[12] Yet extensive statutory criteria define when an alien's presence is lawful, and these provisions do not mention discretion to deem any alien in the country lawfully present. *See supra* pp. 8-11. DACA thus does what Congress prohibited in 1996: It authorizes benefits for aliens, not because their presence is authorized by Congress, but simply because the Executive is forbearing from removal.

**2. DACA contravenes statutes defining which aliens are authorized to work in this country.**

Likewise, DACA's conferral of work authorization violates substantive immigration law.

---

[11] The legislative history confirms that those whom the Executive granted deferred removal, previously eligible for such benefits as "[p]ersons residing under color of law," would no longer be eligible for those benefits because they were to "be considered to be aliens unlawfully present in the United States." H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.), reprinted in 1996 U.S.C.C.A.N. 2649, 2771. Congress recognized "approved deferred action status," *i.e.*, the four programs that it had approved, as a lawful status when it passed the Real ID Act of 2005 without returning to the *status quo ante*. *See* Pub. L. No. 109-13 § 202(c)(2)(B)(viii), 119 Stat. 231, 313.

[12] In addition to these federal benefits, lawful presence under DACA also makes aliens eligible under some state laws for benefits, such as driver's licenses, *e.g.*, Tex. Transp. Code § 521.142(a), and unemployment insurance, *e.g.*, Tex. Lab. Code § 207.043(a)(3).

15

a. Congress has imposed numerous restrictions to discourage the employment of unauthorized aliens. In 1986, IRCA created "a comprehensive framework for 'combating the employment of illegal aliens.'" *Arizona*, 567 U.S. at 404 (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002)). Breaking with previous law, Congress created penalties for employers who hire "unauthorized aliens."[13] 8 U.S.C. § 1324a(a), (f); *see Texas I*, 809 F.3d at 181 & n.174. Unauthorized employment also generally makes aliens ineligible to adjust to LPR status, 8 U.S.C. § 1255(c)(2), or to toll the unlawful-presence clock under the INA's reentry bar, *id.* § 1182(a)(9)(B)(iv).

b. As with lawful presence, Congress has not given the Executive free rein to grant work authorization. Instead, Congress has intricately defined which aliens are authorized for employment in the country.

In particular, Congress has chosen to authorize employment as to about 20 nonimmigrant-visa categories. *E.g.*, *id.* § 1101(a)(15)(H) (temporary employment for defined specialty occupations), (P) (entertainment work).[14]

---

[13] The INA defines "unauthorized alien" to include aliens who are neither LPRs nor "authorized to be so employed by [the INA] or by the [Executive]." 8 U.S.C. § 1324a(h)(3)(B). The section does not address the scope of the Executive's delegated work-authorization power. *Texas I*, 809 F.3d at 183 & n.185. It merely tells employers that they can rely on work authorization conferred by statute or by the Executive without fear of liability for hiring "unauthorized aliens." 8 U.S.C. § 1324a(a).

[14] *See also* USCIS, How Do I Change to Another Nonimmigrant Status? 2 (Jan. 2016), https://www.uscis.gov/sites/default/files/USCIS/Resources/C2en.pdf.

16

In addition, Congress has required the Executive to authorize employment of other categories of aliens, including:

- Asylum holders, *id.* § 1158(c)(1)(B);
- Aliens granted temporary protected status, *id.* § 1254a(a)(1)(B);
- Aliens granted and applying for relief under IRCA, *id.* § 1255a(b)(3), (e)(1)-(2);
- Aliens granted "Family Unity" under the Immigration Act of 1990, Pub. L. No. 101-649, tit. III, § 301, 104 Stat. 4978, 5029 (codified as amended at 8 U.S.C. § 1255a note).

Congress has further provided that aliens in certain categories are "eligible" for or "may" receive work authorization from the Executive. Those categories include:

- Asylum applicants, 8 U.S.C. § 1158(d)(2);
- Certain battered spouses of nonimmigrants, *id.* § 1105a(a);
- Certain agricultural worker preliminary applicants, *id.* § 1160(d)(3)(A);
- Certain nationals applying for status adjustment, Haitian Refugee Immigration Fairness Act of 1998, Pub. L. No. 105-277, div. A, § 101(h), tit. IX, § 902(c)(3), 112 Stat. 2681-538, 2681-539; Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, § 202(c)(3), 111 Stat. 2160, 2193, 2195 (1997);
- Deferred-action U-visa applicants, 8 U.S.C. § 1184(p)(6); *id.* § 1227(d)(1)-(2);
- Deferred-action family members of LPRs killed on September 11, 2001, USA PATRIOT Act of

17

2001, Pub. L. No. 107-56, tit. IV, § 423(b)(1)-(2), 115 Stat. 272, 361;

- Deferred-action family members of U.S. citizens killed in combat, National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, tit. XVII, § 1703(c)(2), 117 Stat. 1392, 1694-95; and

- Deferred-action Violence Against Women Act self-petitioners and family members, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV), (a)(1)(K).

Congress, in short, has carefully set out which aliens are eligible to work. And it has likewise prohibited employment of aliens who "either entered the country illegally, or are in an immigration status which does not permit employment." H.R. Rep. No. 99-682(I), at 46, 51-52 (1986), reprinted in 1986 U.S.C.C.A.N. 5649, 5650, 5655-56.[15]

Except as set out above, Congress has not granted the Executive the power to unilaterally grant work authorization. And in light of Congress's "comprehensive framework," *Arizona*, 567 U.S. at 404, there is no basis to infer such a grant of power to the Executive. If there were, then Congress's detailed work-authorization provisions would be surplusage. *See Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 788 (2011).

---

[15] A regulation, 8 C.F.R. § 274a.12(c)(14), makes work authorization available on a case-by-case basis to aliens granted "deferred action" who "establish[] an economic necessity." To the extent this provision would cover aliens outside the four categories of deferred-action recipients that Congress made eligible for work authorization, it too is invalid.

18

It makes good sense that Congress would keep tight control over alien work authorization, because work authorization brings a host of other benefits. For example, aliens' receipt of work authorization connotes that their "status is so changed as to make it lawful for them to engage in such employment," thus allowing a Social Security number to issue. 42 U.S.C. § 405(c)(2)(B)(i)(I); *accord* 20 C.F.R. § 422.104(a)(2). And with a Social Security number comes eligibility for Social Security benefits and the valuable Earned Income Tax Credit. *Texas I*, 809 F.3d at 149 & n.18; *see* 26 U.S.C. § 32(c)(1)(E), (m); 42 U.S.C. §§ 402(a)-(h), 414(a). IRCA made clear that these generous benefits should be available only to a discrete category of aliens. In overriding that determination, DACA grants those benefits far more broadly than Congress permitted.

### 3. Neither historical practice nor other Executive programs can cure DACA's unlawfulness.

Unable to point to any statutory language or legislative history authorizing DACA, its defenders try to justify the program based on past executive actions. In particular, they point to opinion letters and legal briefs asserting the legality of classic deferred action, Principal and Response Brief of Appellees the Regents of the University of California, Janet Napolitano, and City San Jose at 46-47, *Regents*, 908 F.3d 476 (9th Cir. 2018) (No. 18-15068), 2018 WL 1414352, and instances when the "executive branch has provided blanket or categorical deferrals of deportation." *Regents*, 908 F.3d at 488 (quotation marks omitted). The Court should reject that argument for four reasons.

**AR4655**

19

*First*, "historical practice . . . 'does not, by itself, create power.'" *Texas I*, 809 F.3d at 184 & n.193 (quoting *Medellin v. Texas*, 552 U.S. 491, 532 (2008)). This alone forecloses any attempt to justify DACA based on past practice.

*Second*, the leading historical example on which the Ninth Circuit relied, the 1990 Family Fairness program, is inapposite. *Regents*, 908 F.3d at 489. That program offered "extended voluntary departure," *see* 8 U.S.C. §§ 1252(b), 1254(e) (1988), to about 1% of the country's unlawfully present aliens (about 47,000 people), David Hancock, *Few Immigrants Use Family Aid Program*, MIAMI HERALD, Oct. 1, 1990, at 1B. But it did so through a form of Executive forbearance specifically authorized by Congress at the time, which the Executive interpreted to allow it to grant removable aliens an indefinite period to "depart voluntarily" from the United States. Congress took that power away in 1996. 8 U.S.C. § 1229c(a)(2)(A).

Likewise, other historical programs preceding DACA where the Executive forbore from removing classes of aliens were supported by statutory authorization that Congress has either curtailed or declined to extend to DACA recipients. These include forms of "parole," which previously had been left to the "discretion" of the Executive. *Id.* § 1182(d)(5)(A) (1952). Congress limited the Executive's statutory parole authority in 1996 to humanitarian parole, which may be granted only "on a case-by-case basis," and only "for urgent humanitarian reasons or significant public benefit." *See id.* § 1182(d)(5)(A).

*Third*, no relevant historical practice supports DACA's work authorization. No practice preceding

**AR4656**

20

IRCA in 1986 is relevant because there was no general federal ban on hiring unauthorized aliens.

Post-1986, Congress has never amended IRCA's definition of "unauthorized alien" in 8 U.S.C. § 1324a(h)(3). Congress has thus consistently maintained its general prohibition against "employment of aliens" who "entered the country illegally." H.R. Rep. No. 99-682(I), at 46, 1986 U.S.C.C.A.N. at 5650. Congress reinforced that position in 1996 by eliminating the basis for work authorization provided under programs like the 1990 Family Fairness program.

The Executive did promulgate a post-IRCA work-authorization regulation that covered a few categories of aliens. *E.g.*, 8 C.F.R. § 274a.12(c)(9)-(10), (c)(14), (c)(16). But most aliens who received work authorization under that regulation already had lawfully present status via, for example, a nonimmigrant visa. *E.g.*, *id.* § 274a.12(a). While the regulation did grant work-authorization eligibility to some deferred-action recipients who fell outside the four narrow contexts in which IRCA deemed deferred-action recipients eligible for work authorization, *see supra* p. 11, that eligibility applied to an exceedingly small number of aliens. *See* 52 Fed. Reg. 46,092, 46,092-93 (Dec. 4, 1987) (number of aliens covered was so small as "to be not worth recording statistically" and "the impact on the labor market is minimal"); *see also Texas*, 86 F. Supp. 3d 591, 639 n.46 (only 500-1,000 aliens received deferred action annually from 2005-2010, before DACA). The amici States doubt the validity of that action, but even if it were lawful, it cannot show congressional acquiescence to a massive new program like DACA.

*Fourth*, previous grants of deferred action outside the categories authorized by Congress "are not

21

analogous to [DACA]." *Texas I*, 809 F.3d at 184. In particular, "many of the previous programs were bridges from one legal status to another, whereas [DACA] awards lawful presence to persons who have never had a legal status and may never receive one." *Id.* (footnotes omitted); *see* Josh Blackman, *The Constitutionality of DAPA Part I: Congressional Acquiescence to Deferred Action*, 103 GEO. L.J. ONLINE 96, 119-25 (2015) (historical overview); *see also* Pet. Br. at 46-49 (discussing prior executive actions). Unlike earlier stop-gap measures designed to facilitate congressional policies *see Texas I*, 809 F.3d at 184-85 & nn.195, 197, DACA flouts Congress's scheme for conferring lawful presence. *See* Br. for State Respondents at 59 n.47, *Texas*, *supra* (listing lawful-status paths for past deferred-action programs).[16]

## B. DACA is procedurally unlawful because it was promulgated contrary to the APA's requirements.

Even if DACA were consistent with the INA, it would still be invalid because it was promulgated without notice-and-comment rulemaking. DACA is indisputably a "rule" for APA purposes. 5 U.S.C. § 551(4). If DACA created a "substantive" or "legislative" rule, it had to go

---

[16] The courts below have also upheld DACA on the grounds that (1) DACA affects fewer people than DAPA, and (2) DACA creates a pathway to citizenship rather than simply making it easier as DAPA did. *E.g.*, *Regents*, 908 F.3d at 507-09. This too was in error. *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 325-28 (2014) (holding that limitations on unlawful regulatory overreach cannot be justified as interpretive rules); *see also* Pet. Br. at 35-37 (explaining why those distinctions do not support DACA's legality).

22

through the notice-and-comment procedure unless it was subject to an exception. *Id.* § 553(b); *Texas I*, 809 F.3d at 171. DACA's defenders have argued that DACA is exempt from notice-and-comment rule making because DACA is a "general policy statement" rather than a "substantive rule." But settled law confirms the opposite.

A rule is "substantive" if it *either* (1) "affect[s] individual rights and obligations," *Morton*, 415 U.S. at 232; or (2) does not "genuinely leave[] the agency and its decisionmakers free to exercise discretion," *Am. Bus. Ass'n v. United States*, 627 F.2d 525, 529 (D.C. Cir. 1980). Based on "the language of the purported statement and the circumstances of its promulgation," *id.* at 530, both tests confirm that DACA is a substantive rule, not a general policy statement.

    **1.   DACA required notice and comment because it affected the substantive rights of individuals and obligations of States.**

DACA is a substantive rule, not—as respondents imagine—a mere policy statement. Courts have routinely held that an "important touchstone for distinguishing" substantive rules from policy statements is that "a substantive rule . . . [i]s one 'affecting individual rights and obligations.'" *Chrysler*, 441 U.S. at 302 (quoting *Morton*, 415 U.S. at 232); *see also, e.g.*, *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014) (Kavanaugh, J.) (describing impact on private parties as "most important factor" in determining substantive rule). Policy statements and interpretive rules, by contrast, do "'not have the force and effect of law and are not accorded that weight in the adjudicatory process.'" *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015)

AR4659

23

(quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)).

Amici do not challenge the Executive's well-established authority to defer removal action on a case-by-case basis. Deferred action under DACA, however, "is far from any program conducted in the past." *Texas II*, 328 F. Supp. 3d at 721. DACA is "not just an announcement of [DHS's] refusal to enforce the statutory . . . requirements; it purports to *alter* those requirements" for over a million unlawfully present aliens. *Util. Air Regulatory Grp.*, 573 U.S. at 326. In so doing, DACA both alters individual rights and imposes obligations on States. It therefore is procedurally unlawful because it never underwent the mandatory notice-and-comment process. *Nat'l Mining Ass'n*, 758 F.3d at 251-52 (summarizing the law).

a. The plain language of the memorandum creating DACA has a significant impact on individual rights. As discussed above, when a DHS field office grants a DACA permit, that act changes the immigrant's status to "lawful presence," which triggers numerous benefits, including creating a defense to removability, allowing the alien to work in the United States, tolling the reentry bar, and making the alien eligible for numerous social services at the state and federal levels. *See supra* pp. 8-14.

This Court has required notice-and-comment procedures for far less significant administrative acts. In *Morton v. Ruiz*, for example, the Court examined whether notice-and-comment rulemaking was required before the Bureau of Indian Affairs could exclude "full-blooded, unassimilated Indians living in an Indian community near their native reservation," 415 U.S. at 211, from benefits provided by Congress to Indians living "on a

24

reservation," *id.* at 208. The Court concluded that such a regulation was "substantive" because it "affect[ed] individual rights and obligations." *Id.* at 231-37. DACA, of course, does that and far more. *See supra* pp. 11-14. There is no serious argument that DACA does not "affect individual rights and obligations." *See Morton*, 415 U.S. at 232.

b. As the Fifth Circuit recognized in *Texas I*, DACA also obligates individual States to increase their spending on various social services. 809 F.3d at 155-56 (discussing impact on Texas). These services include healthcare, education, and law-enforcement, as well as social services required by federal law. *Texas II*, 328 F. Supp. 3d at 700-04. According to an expert retained by DACA's defenders, Texas alone "incurs more than $250,000,000 in total direct costs from DACA recipients per year." *Id.* at 700-701. If the administrative state wishes to impose that significant burden on States, it must at a minimum initiate notice-and-comment review. *Nat'l Mining Ass'n*, 758 F.3d at 252 (finding rule to be interpretive where "State permitting authorities 'are free to ignore it'"); *cf. Chrysler*, 441 U.S. at 302.

This Court should reject any argument that a DACA permit merely triggers benefits that flow from other regulations. As discussed above (at 13-14), DACA recipients would be ineligible for these benefits under existing statutes. But DACA makes eligible those whom Congress has deemed ineligible. It thus must be considered a substantive rule because "in the absence of the rule there would not be an adequate legislative basis" for DHS either "to confer benefits" relating to lawful status on this class of individuals or impose the accompanying obligations on States. *Am. Mining Cong. v. Mine Safety &*

25

*Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993); *cf. Shalala*, 514 U.S. at 99-100 (holding policy manual was interpretive rule because it was consistent with regulations).

c. The "circumstances of its promulgation" further confirm that DACA creates substantive rights. *Am. Bus. Ass'n*, 627 F.2d at 530. After all, DACA arose as President Obama's attempted workaround to Congress's failure to pass the Development, Relief, and Education for Alien Minors (DREAM) Act.[17] The DREAM Act, if adopted, would have shared many features with DACA, including allowing unlawfully present aliens who arrived before they were 16 to apply for lawful presence.

But the DREAM Act never reached President Obama's desk. When the DREAM Act failed in Congress for the third time, the President set out to do what Congress refused to do: confer lawful presence, and associated benefits, on hundreds of thousands of aliens. The President did so even though "nothing in the statute, prior regulations, or case law" authorized the benefits in question. *Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 320-21 (D.C. Cir. 2011). That effort to "change[] the law" cannot be described as anything other than substantive. *Id.*; *see also Texas I*, 809 F.3d at 176-78.

d. Respondents' own pleadings further confirm that DACA was a "substantive rule" requiring notice and comment.

The University of California respondents contend that the DACA-wind-down memorandum "constitutes a

---

[17] *See also* Pet. Br. at 5 & n.2 (discussing failed history of DREAM Act); *id.* at 38 (quoting concessions of need for Congressional action to provide this relief).

26

substantive rule subject to APA's notice-and-comment requirements." Complaint at 14 ¶ 61, *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-5211-WHA (N.D. Cal. Sept. 8, 2017), ECF No. 1. In support of this legal conclusion, respondents allege that DACA purports to unilaterally confer lawful presence. *Id.* at 8 ¶ 31 ("Individuals with DACA status were 'not considered to be unlawfully present during the period in which deferred action [was] in effect.'" (alteration in original) (citing USCIS FAQs)). Furthermore, these respondents admit that aliens with DACA status would not have been able—but for DACA—lawfully to "obtain jobs and access to certain Social Security and Medicare benefits." *Id.* at 2 ¶ 3.

The State of California respondents likewise plead that DACA's attributes meet the test for a substantive rule requiring APA notice-and-comment procedure. For instance, these respondents plead that "**DACA Provides Numerous Benefits**," including (1) "the right not to be arrested or detained based solely on their immigration status," (2) "eligibility to receive employment authorization," (3) the ability to "travel," specifically the ability "to briefly depart the U.S. and legally return," (4) eligibility for "federal Social Security, retirement, and disability benefits" not available to other undocumented immigrants, and (5) "equal access to other benefits and opportunities" with other individuals who are lawfully present in this country. Complaint at 17-18 ¶¶ 82-86, *California v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-5235 (N.D. Cal. Sept. 11, 2017), ECF No.1.

Indeed, DACA's defenders insist over and over again that "DACA *confers* numerous important *benefits* on those who apply for and are granted DACA status."

**AR4663**

27

Complaint at 9 ¶ 27, *Garcia v. United States*, No. 3:17-cv-5380 (N.D. Cal. Sept. 18, 2017), ECF No. 1 (emphases added). They have done so in multiple courts. *See, e.g.*, Complaint, *Trs. of Princeton Univ. v. United States*, No. 1:17-cv-2325 (D.D.C. Nov. 3, 2017), ECF No. 1; Complaint, *NAACP v. Trump*, No. 1:17-cv-1907 (D.D.C. Sept. 18, 2017), ECF No. 1; 3d Am. Complaint, *Vidal v. Nielsen*, No. 1:16-cv-4756 (E.D.N.Y. Dec. 11, 2017), ECF No. 113; Complaint, *New York v. Trump*, No. 1:17-cv-5228 (E.D.N.Y. Sept. 6, 2017), ECF No. 1.

Respondents list these benefits to support their assertion that by rescinding DACA "federal agencies have changed the substantive criteria by which individual[] DACA grantees" are permitted to "work, live, attend school, obtain credit, and travel in the United States." Complaint at 54 ¶ 289, *New York v. Trump*, No. 1:17-cv-5228 (E.D.N.Y. Sept. 6, 2017), ECF No. 1. But that could be true only if DACA's creation was itself a substantive rule—one "affect[ing] individual rights and obligations." *Morton*, 415 U.S. at 232. If DACA did not create substantive criteria by which these immigrants gained the benefits listed in their complaints, *id.*, winding down this program could not have changed any substantive criteria.

The necessary implication of these allegations is that DACA was a substantive rule that was never validly implemented. If DACA's rescission "affect[ed] individual rights and obligations," *id.* at 232, so too did DACA's creation.

AR4664

28

**2. DACA, as implemented, did not leave immigration officials with discretion to deny relief.**

Unable to deny that DACA altered substantive rights, its defenders claim that notice-and-comment rulemaking was unnecessary because it is worded as a "general policy statement" regarding how DHS will exercise prosecutorial discretion. While the APA exempts policy statements from notice and comment, *see* 5 U.S.C. § 553(d)(2), that exemption has no application here for at least two independent reasons.

*First*, "a general statement of policy" is a statement that, by definition, does not alter statutory law or existing regulation. Stated differently, in contrast to a "substantive rule," a "general policy statement," *cannot* "impose any rights and obligations." *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995). Such a statement may only lay out the factors that the agency may consider in applying discretion going forward. *Id.*; *accord Azar v. Alina Health Servs.*, 139 S. Ct. 1804, 1811-12 (2019) (distinguishing "policy statements" under Medicare, which can create "substantive rules," from "policy statements" under APA, which cannot). Because DACA "affect[s] individual rights and obligations," it is a "legislative" rule whose promulgation "must conform with any procedural requirements imposed by Congress." *Chrysler Corp.*, 441 U.S. at 302-03. There is no support in either the APA or this Court's precedent for the notion that an agency action that changes substantive immigration law may be adopted without notice-and-comment rulemaking merely because it provides the agency with some level of discretion in its

29

application. Nor would such a rule be consistent with the purpose of notice-and-comment rulemaking, which is to ensure that those agencies making binding rules do so in a way that is open, fair, and accountable. *Cf. Perez*, 135 S. Ct. at 1206.

*Second*, DACA does not genuinely give DHS officials discretion; it removes discretion where it previously existed. While DHS's label of this policy as "discretionary" is relevant, the true test is how the program is actually administered. *Azar*, 139 S. Ct. at 1812 ("Agencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements.") (citing *inter alia Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666-67 (D.C. Cir. 1978)). When a rule purports to allow discretion "is in purpose or likely effect . . . a binding rule of substantive law," courts uniformly look past the label and take the rule "for what it is." *Guardian*, 589 F.2d at 666-67; *see also, e.g.*, *Iowa League of Cities v. EPA*, 711 F.3d 844, 862-63 (8th Cir. 2013); *Phillips Petro. Co. v. Johnson*, 22 F.3d 616, 619-20 (5th Cir. 1994).

In *Texas I*, the Fifth Circuit acknowledged that (like DAPA) the language in the original memo creating DACA purported to "instruct[] agencies to review applications on a case-by-case basis and exercise discretion." 809 F.3d at 172. But, the court correctly gave more weight to three facts in the record: (1) DACA is implemented through a 150-page manual of associated operating procedures that leaves little actual discretion, (2) of the 723,000 applications accepted for evaluation under DACA, only 5% had been rejected, and (3) "[d]espite a request by the [district c]ourt, the Government's counsel did not provide the number, if any, of requests that were

30

denied" for discretionary reasons once the agency concluded that "the applicant met the DACA criteria." *Id.* at 172-73 (cleaned up). In the presence of those circumstances, the Fifth Circuit concluded that regulatory reality trumps labels in the original DACA memo. *Id.*

Despite extensive discovery in *Texas II*, DACA's defenders still have not established that DHS field offices exercise meaningful discretion in implementing DACA. To the contrary, one reason the Executive decided to rescind DACA was that it could not find a single individual who qualified for DACA but was nonetheless denied relief for discretionary reasons. Pet. App. 112a-13a n.1; *see also* Pet. Br. at 39 & n.7 (explaining less than 10% of applications were denied, most of were denied because applicants were ineligible). Even if some de minimis number of applications were denied for discretionary reasons, the Court should still consider the policy binding and subject to the notice-and-comment rulemaking procedures established by Congress. *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988) (where model was used to resolve 96 out of 100 applications it was a substantive rule).

## II. The Executive's Decisions Both to Create and to Rescind DACA Are Subject to Judicial Review.

DACA is substantively and procedurally unlawful— and the federal courts are empowered to say so. The Executive's decisions to create and, later, to wind down DACA are reviewable agency actions under the APA. Courts have "long applied a strong presumption favoring judicial review of administrative action." *Weyerhaeuser Co. v U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). This presumption can be rebutted in only two

31

ways: (1) if the challenged action is "committed to agency discretion by law," or (2) if the relevant statute "preclude[s] review." 5 U.S.C. §§ 701(a)(1), (a)(2). These "very narrow" exceptions, *Heckler v. Chaney*, 470 U.S. 821, 830 (1985), do not apply here.

*First*, DACA cannot be considered an "agency action committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception is limited to "certain categories" that have been "traditionally committed to agency discretion," including "a decision not to institute enforcement proceedings" or allocation of lump-sum appropriations. *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993); *see also Weyerhaeuser Co.*, 139 S. Ct. at 370. Rulemaking is *not* an area left to agency discretion.

DACA cannot be defended as simply an announcement of enforcement priorities or an exercise of prosecutorial discretion. DACA, like DAPA and Expanded DACA, "is much more than nonenforcement" because it "affirmatively confer[s] 'lawful presence' and associated benefits on a class of unlawfully present aliens." *Texas I*, 809 F.3d at 166. That plainly distinguishes DACA from the form of immigration-enforcement forbearance known as "deferred action." *AADC*, 525 U.S. at 482-84. DACA also creates a massive bureaucracy to grant applicants that status. As every court to consider the question has concluded, the creation and subsequent dismantling of such a bureaucracy is not a question committed to one branch of government's unilateral discretion. *E.g.*, *CASA de Md. v. U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 765 (D. Md. 2018) ("[J]udicial decisions throughout the DAPA litigation illustrate" that "challenges to DAPA or analogous immigration programs

**AR4668**

32

promulgated by DHS without approval by Congress are justiciable."), *aff'd*, 924 F.3d 684, 698-700 (4th Cir. 2019).

*Second*, no INA provision precludes judicial review of the Executive's decision to grant lawful presence to entire classes of aliens. DACA's rescission is not made unreviewable by 8 U.S.C. § 1252(g), which shields final deportation orders from review, because DACA reflects no claim "by or on behalf of any alien" challenging removal-proceeding determinations. Indeed, the idea that section 1252(g) "precludes judicial review has been rejected repeatedly." *CASA de Md.*, 284 F. Supp. 3d at 769.

## III. The Executive's Rescission of DACA Was Neither Arbitrary Nor Capricious.

The arguments against DACA's rescission are premised on the notion (rebutted above) that DACA was lawful. They also reflect a fundamental misunderstanding of the scope of arbitrary-and-capricious review under the APA. Tellingly, no court has found that rescinding an unlawful executive policy is arbitrary and capricious. Instead, respondents maintain that a court may block an agency from rescinding its own policy merely because the court disagrees with the agency that the policy is unlawful. That is not the law.

The standard of review under the APA is "narrow." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As this Court has repeatedly stated, a court may only look to whether the Executive examined "the relevant data" and articulated "a satisfactory explanation for its action including a 'rational connection between the facts found and the choice

made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).[18]

The Executive here did precisely that. Secretary Duke's memorandum winding down DACA summarized DHS's conclusion that DACA was illegal "after consulting with the Attorney General and considering the likelihood of success on the merits of the ongoing litigation" in *Texas I*. Specifically, the memo recited the Attorney General's "legal determination[s]" that (1) "DACA 'was effectuated by the previous administration through executive action, without proper statutory authority," (2) "[s]uch an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch," and (3) "because DACA has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Pet. App. 116a (quotation marks omitted); *see also id.* 122a-23a (explaining how Secretary Nielsen reached similar conclusion).

As discussed above, the Executive's conclusion that DACA is illegal was correct. But, at the very least, it met this Court's requirement that "the [Executive] examine the relevant data,'"—here, the legal opinions of the Fifth Circuit as affirmed by this Court and the highest-ranking lawyer in the United States—and explained why she

---

[18] As Amici have previously explained, this standard does not change simply because the new administration has different policy goals or reaches a different conclusion about the legality of DACA. *See* Brief for the States of Texas, et al., as Amici Curiae in Support of Petitioners, *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. 18-587, at 5-8 (U.S. Dec. 6, 2018).

34

thought the program was unlawful. *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43 (quotation marks omitted). That is all the APA requires.

The courts below held to the contrary only by imposing additional standards not required by the APA. Each court to consider the question has recognized that "DACA was rescinded based on [DHS'] view that the policy was unlawful." *CASA de Md.*, 924 F.3d at 704; *see also Regents*, 908 F.3d at 500; *NAACP v. Trump*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018). The courts concluded that the Executive action was nonetheless arbitrary because they disagreed with either the Fifth Circuit analysis the Executive invoked or its applicability to DACA. *See Regents*, 908 F.3d at 508-10; *CASA de Md.*, 924 F.3d at 705; *NAACP*, 298 F. Supp. 3d at 239-40. For example, the Ninth Circuit concluded that Secretary Duke erred in deciding that DACA was illegal under the Fifth Circuit's opinion in *Texas I* because she failed to expressly address the differences in size between the DACA and DAPA populations. *Regents*, 908 F.3d at 509 ("As the district court laconically put it, 'there is a difference between 4.3 million and 689,800.'").

That is not arbitrary-and-capricious review. An agency is not required to explain the reasons behind its policy changes in minute detail. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009). Moreover, courts are to "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *see also, e.g., Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 544-45 (2008) (upholding action that was legally required even if agency cited

35

different rationale for decision). There is no basis in this Court's jurisprudence to require an agency to anticipate and discuss every legal distinction that a district court might later deem relevant. Such searching review is the definition of substituting the judgment of judges for that of the Executive, which the APA and this Court's precedent foreclose.

Applying the APA otherwise would intrude on the President's Article II obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The "executive department[] of the Federal Government, no less than the judicial department, ha[s] a duty to defend the Constitution." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011). Absent a ruling by this Court, "subordinate executive agencies supervised and directed by the President" may "decline to follow [even a] statutory mandate" that the President concludes is unconstitutional. *In re Aiken Cty.*, 725 F.3d 255, 261 (D.C. Cir. 2013) (Kavanaugh, J.). This Court should hold that it is not arbitrary and capricious for the Executive to discontinue a prior unilateral executive action that it determines is unlawful.

36

## CONCLUSION

The decisions enjoining the Executive's rescission of DACA should be reversed.

STEVE MARSHALL
Attorney General of
Alabama

KEVIN G. CLARKSON
Attorney General of
Alaska

MARK BRNOVICH
Attorney General of
Arizona

LESLIE RUTLEDGE
Attorney General of
Arkansas

ASHLEY MOODY
Attorney General of
Florida

DEREK SCHMIDT
Attorney General of
Kansas

JEFF LANDRY
Attorney General of
Louisiana

Respectfully submitted.

KEN PAXTON
Attorney General of
Texas

JEFFREY C. MATEER
First Assistant
Attorney General

KYLE D. HAWKINS
Solicitor General
*Counsel of Record*

MATTHEW H. FREDERICK
Deputy Solicitor General

ARI CUENIN
LANORA C. PETTIT
Assistant Solicitors General

OFFICE OF THE
ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
kyle.hawkins@oag.texas.gov
(512) 936-1700

**AR4673**

37

PHIL BRYANT
Governor of
 Mississippi

DOUG PETERSON
Attorney General of
 Nebraska

ALAN WILSON
Attorney General of
 South Carolina

JASON R. RAVNSBORG
Attorney General of
 South Dakota

PATRICK MORRISEY
Attorney General of
 West Virginia

AUGUST 2019

AR4674

Nos. 18-587, 18-588, 18-589

# In the Supreme Court of the United States

---

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

---

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET
AL., PETITIONERS

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, ET AL.

---

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, ET AL., PETITIONERS

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

---

*ON WRITS OF CERTIORARI TO THE UNITED STATES COURTS OF
APPEALS FOR THE D.C., NINTH, AND SECOND CIRCUITS*

---

**BRIEF FOR *TEXAS V. UNITED STATES*
DEFENDANT-INTERVENORS DACA RECIPIENTS AND STATE
OF
NEW JERSEY IN SUPPORT OF RESPONDENTS**

---

GURBIR S. GREWAL
ATTORNEY GENERAL
STATE OF NEW JERSEY

JEREMY M. FEIGENBAUM
ASST. ATTORNEY GENERAL
25 Market Street
Trenton, NJ 08625

*Counsel for New Jersey*

NINA PERALES
  *Counsel of Record*
MEXICAN AMERICAN LEGAL
  DEFENSE AND
  EDUCATIONAL FUND
110 Broadway, Ste. 3000
San Antonio, TX 78205
(210) 224-5476
*nperales@MALDEF.org*

DOUGLAS HALLWARD-DRIEMEIER
ROPES & GRAY LLP
2099 Pennsylvania Avenue NW
Washington, DC 20006

*Counsel for DACA Recipients*

---

*Additional counsel on inside cover*

**AR4675**

GLENN J. MORAMARCO
ASST. ATTORNEY GENERAL
25 Market Street
Trenton, NJ 08625

*Counsel for New Jersey*

EMERSON SIEGLE
RAISHAY LIN
PAUL BENNETCH
ROPES & GRAY LLP
2099 Pennsylvania Avenue NW
Washington, DC 20006

MARK CIANCI
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199

PHILIP EHRLICH
ROPES & GRAY LLP
191 North Wacker Drive
Chicago, IL 60606

*Counsel for DACA Recipients*

**AR4676**

# TABLE OF CONTENTS

Page

Interest of amici curiae..........................................................1

Summary of the argument ...................................................3

Argument:

DACA, as written and implemented, requires the exercise of prosecutorial discretion, and is thus entirely lawful ...................................................................6

    A.   The DACA Memorandum itself makes clear that USCIS adjudicators should exercise case-by-case discretion when deciding whether to grant deferred action ....................................................................6

    B.   Evidence developed in the *Texas* DACA litigation confirms that DACA adjudicators are informed of, and exercise, their discretion .................................9

        1.   DHS materials and internal communications consistently describe DACA as setting forth discretionary criteria for individualized, rather than class-wide, grants of deferred action...........10

        2.   USCIS adjudicators exercise individualized discretion by interpreting and sometimes deviating from the criteria set forth in the DACA Memorandum ...............12

        3.   The significant and increasing denial rate for deferred action likewise confirms this use of case-by-case, individualized discretion......16

(I)

**AR4677**

II

Table of Contents—Continued:                    Page

    4.    Testimonial evidence further confirms that USCIS adjudicators understand DACA to empower them to make discretionary decisions ................................. 19

C.    Evidence from the *Texas* DACA litigation thoroughly discredits petitioners' reliance on the Fifth Circuit's conclusions regarding discretion in the DAPA litigation ................ 22

Conclusion ........................................................................ 25

Appendix A—List of Individual Defendant-Intervenors ............................................. 1a

AR4678

III

# TABLE OF AUTHORITIES

Page(s)

Cases:

*Crane* v. *Johnson*, 783 F.3d 244 (5th Cir. 2015) ........ 9

*Reno* v. *Am.-Arab Anti-Discrimination
    Comm.*, 525 U.S. 471 (1999).................................... 9

*Texas* v. *United States*, 328 F. Supp.
    3d 662 (S.D. Tex. 2018)............................ 4, 6, 13, 24

*Texas* v. *United States*, 809 F.3d 134 (5th
    Cir. 2015), aff'd by an equally divided
    court, 136 S. Ct. 2271 (2016) ....................... *passim*

*Texas* v. *United States*, 86 F. Supp. 3d
    591 (S.D. Tex. 2015)........................................... 1, 22

Miscellaneous:

The Department of Homeland Security's
    Authority to Prioritize Removal of Certain
    Aliens Unlawfully Present in the United
    States and to Defer Removal of Others, 38 Op.
    O.L.C. 1 (2014)............................................................ 3

AR4679

## INTEREST OF AMICI CURIAE[1]

Amici are defendant-intervenors in *Texas* v. *United States*, No. 1:18-cv-00068, a case in the United States District Court for the Southern District of Texas, in which several States brought direct challenges to the legality of the Deferred Action for Childhood Arrivals (DACA) memorandum (*Texas* DACA litigation).[2]  Because the Department of Homeland Security (DHS) declined to defend DACA in the *Texas* litigation, amici stepped in to defend DACA.[3]  The question of DACA's lawfulness is also a central issue, albeit indirectly and in

---

[1] All parties have provided blanket consent to the filing of amicus curiae briefs.  No counsel for any party authored this brief in whole or in part, and no person or entity, other than amici curiae or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

[2] The *Texas* DACA litigation is distinct from *Texas* v. *United States*, 809 F.3d 134 (5th Cir. 2015), aff'd by an equally divided court, 136 S. Ct. 2271 (2016) (per curiam), an earlier case that concerned the legality of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) (*Texas* DAPA litigation).  Notably, in the earlier *Texas* DAPA litigation, the government "did not seek an evidentiary hearing," 809 F.3d at 175-176, and the evidentiary record was underdeveloped, *Texas* v. *United States*, 86 F. Supp. 3d 591, 677 (S.D. Tex. 2015).  The DHS rescission of DACA at issue in this case mistakenly equated DAPA and DACA, and assumed that certain findings in the *Texas* DAPA litigation meant that DACA itself was unlawful.  This brief explains the key factual errors underlying that assumption.

[3] Twenty-two individual DACA recipients intervened to defend DACA's lawfulness.  These individual defendant-intervenors are listed in Appendix A hereto.  The State of New Jersey also intervened to defend DACA in light of the many benefits the State has enjoyed on account of DACA, including through the many contributions within New Jersey that have been made by DACA recipients.

(1)

AR4680

2

a different procedural posture, in the present consolidated cases concerning the purported rescission of DACA.

While the present consolidated cases and the *Texas* DACA litigation concern certain overlapping issues, the *Texas* DACA litigation, unlike the cases at bar, has involved discovery at both the preliminary injunction and merits phases.  Through this ongoing discovery, amici have compiled a substantial evidentiary record demonstrating that immigration officers' evaluation of DACA applications involves considerable discretion on the part of the officers.  The discovery that amici have compiled to date—including official governmental documents, such as DHS internal guidelines and leadership correspondence regarding the decision to defer action for certain childhood arrivals, which are subject to judicial notice by this Court—is directly relevant to the questions before the Court in these consolidated proceedings.  As the DHS materials show—and as testimonial evidence from depositions and declarations filed in the *Texas* DACA litigation confirms—the DACA Memorandum, as applied, leaves United States Citizenship and Immigration Services (USCIS) officers free to exercise discretion when deciding whether to defer action in the case of a particular DACA applicant.

Amici respectfully submit that the evidence developed through discovery in the *Texas* DACA litigation shows that the reasoning in the DHS memorandum rescinding DACA (the Rescission Memorandum)—to the effect that the initial issuance of the DACA Memorandum was unlawful because the operation of DACA was categorical, rather than on an individualized basis—was

3

based on a flawed premise, as the decisions below correctly recognized.

## SUMMARY OF THE ARGUMENT

A key issue in this case is whether DACA "grant[s] deferred action * * * on a class-wide basis" or as a matter of individualized discretion.  Pet. Br. 11; *Texas* v. *United States*, 809 F.3d 134, 184 n.197 (5th Cir. 2015), aff'd by an equally divided court, 136 S. Ct. 2271 (2016) (per curiam) (*Texas* DAPA litigation) (quoting 38 Op. O.L.C. at 18 n.8 (Nov. 19, 2014)[4]); Dkt. 9,[5] Ex. 19 at App. 1192 n.8 (OLC Memorandum Opinion, Nov. 19, 2014), (contrasting forms of deferred action that are "automatic[]" and "class-wide" with those that "evaluate each application * * * on a case-by-case basis").

But in rescinding DACA, DHS did not actually consider any evidence regarding whether, and to what extent, officers are making discretionary decisions, as opposed to merely implementing a class-wide rule, when they evaluate DACA applications.  To the contrary, DHS simply assumed that the Fifth Circuit's holding and rationale regarding Deferred Action for Parents of Americans (DAPA) in *Texas*, 809 F.3d 134, applied equally to the original DACA Memorandum.[6]

---

[4] The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. 1 (2014).

[5] App. in Supp. of Pls.' Mot. for Prelim. Inj. (Pls.' PI App.) Vol. 4 (May 2, 2018).  Throughout this brief, references to the docket or citations to "Dkt." refer to the docket in amici's case, *Texas* v. *United States*, No. 1:18-cv-00068 (S.D. Tex. May 1, 2018).

[6] See Pet. Br. 52 ("DHS made clear that it agrees with the robust analysis in the Fifth Circuit's [DAPA] decision and that it sees

**AR4682**

4

Subsequent discovery in the *Texas* DACA litigation has demonstrated plainly that this premise underlying DHS's reliance on the Fifth Circuit's decision in the earlier DAPA litigation and its characterization of the extent of officers' discretion in considering DACA applications was in error. Indeed, the very district court that previously enjoined DAPA has found—based on evidence developed through discovery with respect to DACA—that the record in fact may be "indicative of a discretionary standard" and that the States challenging DACA "have not made a 'clear showing' that those processing DACA applications are not free to exercise discretion." *Texas* v. *United States*, 328 F. Supp. 3d 662, 733-734 (S.D. Tex. 2018).

There were good reasons for that conclusion. In the *Texas* DACA litigation, amici have compiled substantial evidence demonstrating that DACA is, and has always been, administered as an exercise of prosecutorial discretion by immigration officers, and that the final decision on whether to defer action continues to involve the application of discretion by individual adjudicators, on a case-by-case basis. Of course, it is no surprise that the evidence would confirm the exercise of discretion by immigration officers in individual cases. On its face, the memorandum in which then-Secretary of DHS Janet Napolitano explained DACA (the DACA Memorandum)

---

no meaningful distinctions between the lawfulness of those policies and the lawfulness of the original DACA policy."); *id.* at 56 ("the Attorney General informed the Acting Secretary that he had concluded that the policy was unlawful based in significant part on the Texas litigation invalidating the DAPA and expanded DACA policies").

AR4683

5

*requires* USCIS adjudicators to exercise discretion when evaluating DACA applications.

Further official documentation confirms that individual officers were informed of their continued authority and discretion. DHS's own training materials, guidance documents, operating procedures, and internal communications produced in discovery in the *Texas* DACA litigation consistently describe DACA as setting forth discretionary criteria for a favorable exercise of discretion through deferred action, rather than establishing any binding standards or conferring any substantive rights.

Discovery in the *Texas* DACA litigation also shows that USCIS adjudicators actually *exercise* the discretion required by the DACA Memorandum. During the first two quarters of fiscal year 2018, adjudicators denied about 20% of requests for initial grants of deferred action under DACA, including denying applications where the criteria indicative of a favorable exercise of discretion were satisfied. Moreover, testimonial evidence from the *Texas* litigation confirms that USCIS adjudicators understand that the DACA guidelines empower them to make discretionary, case-by-case decisions that are informed, but not *bound*, by the stated DACA criteria.

Accordingly, the premise underlying the Rescission Memorandum is belied by the evidence—evidence available to DHS, but that it did not consider. This Court should thus reject the premise of petitioners' challenge—that DACA unlawfully established a categorical rule.

**AR4684**

6

## ARGUMENT

### DACA, As Written And Implemented, Requires The Exercise Of Prosecutorial Discretion, And Is Thus Entirely Lawful

Contrary to petitioners' argument that DHS correctly concluded DACA is unlawful, Pet. Br. 43-50, DACA is not a class-wide grant of deferred action and in fact requires DACA adjudicators to exercise individualized discretion. Discovery from the *Texas* DACA litigation shows both that DHS materials, like the DACA Memorandum itself, require USCIS adjudicators to exercise discretion and that adjudicators in practice actually do engage in discretionary, case-by-case review when deciding whether to defer action with respect to individual requestors. The same district court that previously enjoined DAPA, when reviewing this evidence in the *Texas* DACA litigation, concluded it may be "indicative of a discretionary standard" and that the States challenging DACA "have not made a 'clear showing' that those processing DACA applications are not free to exercise discretion." *Texas* v. *United States*, 328 F. Supp. 3d 662, 733-734 (S.D. Tex. 2018).

### A. The DACA Memorandum Itself Makes Clear That USCIS Adjudicators Should Exercise Case-By-Case Discretion When Deciding Whether To Grant Deferred Action

The DACA Memorandum, by its plain language, disclaims any intent to bind DHS. The memorandum requires adjudicators considering whether to grant deferred action to exercise discretion on an individualized

**AR4685**

7

basis for requestors who meet certain preliminary crite-
ria. Dkt. 6,[7] Ex. 1 at App. 0002-0004. The memorandum
makes clear that the specified criteria "should be satis-
fied *before an individual is considered* for an exercise of
prosecutorial discretion pursuant to this memorandum."
*Id.* at App. 0002 (emphasis added). In other words, the
criteria do not *preclude* discretion, but instead *precede*
the exercise of discretion. The criteria listed are:

- came to the United States under the
  age of sixteen;
- has continuously resided in the United
  States for [at] least five years preced-
  ing the date of this memorandum and is
  present in the United States on the
  date of this memorandum;
- is currently in school, has graduated
  from high school, has obtained a gen-
  eral education development certificate,
  or is an honorably discharged veteran
  of the Coast Guard or Armed Forces of
  the United States;
- has not been convicted of a felony of-
  fense, a significant misdemeanor of-
  fense, multiple misdemeanor offenses,
  or otherwise poses a threat to national
  security or public safety; and
- is not above the age of thirty.

*Ibid.*

In addition to the discretion to be applied after as-
certaining that the criteria have been satisfied, deciding

---

[7] Pls.' PI App. Vol. 1 (May 2, 2018).

8

whether certain of the above criteria are met inherently *requires* the adjudicator to exercise individual discretion. For example, determining whether a person "*otherwise* poses a threat to national security," or whether a prior misdemeanor conviction is a "significant" one, involves the exercise of discretionary judgment by individual USCIS adjudicators. See Dkt. 6, Ex. 7 at App. 0586-0587 (emphasis added). Furthermore, the DACA Memorandum requires that, even once these criteria are satisfied, requestors must undergo a complete background check and, in some cases, a personal interview. *Id.*, Ex. 1 at App. 0003; *id.*, Ex. 7 at App. 0585, App. 0589. As a result, adjudicators have a substantial body of information upon which to base their individualized decision whether to defer action in a particular case.

The DACA Memorandum further emphasizes that "requests for relief pursuant to this memorandum are to be decided on a case by case basis," Dkt. 6, Ex. 1 at App. 0003, and concludes:

> This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, *to set forth policy for the exercise of discretion* within the framework of the existing law. I have done so here.

*Id.* at App. 0004 (emphasis added).

As a result, no person has any substantive entitlement to have action deferred under the DACA Memo-

9

randum, and the Executive retains discretion to terminate deferred action at any time. See *Texas* v. *United States*, 809 F.3d 134, 148 (5th Cir. 2015) (recognizing that "'[l]awful presence' is not an enforceable right to remain in the United States and can be revoked at any time"). Indeed, despite historical efforts by applicants to sue after being denied deferred action under prior frameworks, this Court recognized that Congress sought to limit "judicial constraints upon [this] prosecutorial discretion." *Reno* v. *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 & n.9 (1999).

The DACA Memorandum therefore both clarifies how an agency vested with discretion plans to use that power and confirms that agents still have the authority to decide each case on an individual basis. The DACA Memorandum sets forth relevant criteria and considerations, and adjudicators consider these criteria and more, on an individualized basis, when rendering a decision to grant or deny deferred action. See also *Crane* v. *Johnson*, 783 F.3d 244, 254-255 (5th Cir. 2015) ("The [DACA Memorandum] makes it clear that the Agents shall exercise their discretion in deciding to grant deferred action, and this judgment should be exercised on a case-by-case basis.").

## B. Evidence Developed In The *Texas* DACA Litigation Confirms That DACA Adjudicators Are Informed Of, And Exercise, Their Discretion

In contrast to the cases presently before the Court, the *Texas* DACA litigation is developing a full record regarding the legality of DACA. Cf. Regents Br. in Opp. 18 ("[M]ultiple courts have held that the administrative

**AR4688**

10

record is likely incomplete."). The record developed thus far in the *Texas* litigation—largely comprised of DHS's internal materials and communications—includes ample evidence demonstrating that adjudicators, in practice, exercise the discretion required by the DACA Memorandum. Testimonial evidence from the *Texas* litigation provides further confirmation of individual officers' exercise of discretion. Together, this new evidence undercuts the assumptions regarding discretion upon which petitioners now rely (and which were the basis of the Fifth Circuit ruling upon the legality of DAPA). See note 6, *supra*.

> 1. *DHS materials and internal communications consistently describe DACA as setting forth discretionary criteria for individualized, rather than class-wide, grants of deferred action*

Internal DHS documents produced by the United States in the *Texas* DACA litigation confirm that DACA does not confer any class-wide deferred action but rather provides for temporary deferral of action against individual undocumented immigrants. DHS's national standard operating procedures (SOPs) have consistently stated that DACA "does not confer any lawful status." See Dkt. 225-6,[8] Ex. 153 at 8 (2013 DACA Nat'l SOP); see also Dkt. 226-2,[9] Ex. 183 at 6 (2012 DACA Training Presentation) ("[DACA] does not *confer* any status," nor does it "*lead* to any status"; it "simply means that action

---

[8] App. in Supp. of Def.-Ints.' Opp. to Pls.' Mot. for Prelim. Inj. (Def.-Ints.' PI App.) Vol. 7 (July 21, 2018).

[9] Def.-Ints.' PI App. Vol. 9 (July 22, 2018).

11

to remove someone is deferred until a certain date and that the decision to pursue removal may be revisited at some point in the future").

DHS guidance documents require USCIS adjudicators to exercise discretion and do not bind adjudicators to defer action in the case of any given DACA application. See, *e.g.*, Dkt. 226-1,[10] Ex. 167 at 4 (USCIS Field Manual) ("As in all deferred action determinations, USCIS will make case-by-case, discretionary judgments based on the totality of the evidence. In doing so, USCIS will weigh and balance all relevant considerations, both positive and negative.").

Adjudicators' trainings, including refresher training, also emphasize the need to exercise discretion when reviewing DACA applications:

> As we prepare to attend DACA refresher training on Thursday, I just want to be sure everyone is clear on a couple things. First, *DACA can be denied if we determine that the person doesn't merit a favorable exercise of discretion.* One of the reasons we would determine that they don't merit a favorable exercise of discretion is based on possible public safety concerns *or the totality of the circumstances.*

Dkt. 215-1,[11] Ex. 38 at NJAPP0401 (DACA Email Guidance, Apr. 7, 2015) (emphasis added).

---

[10] Def.-Ints.' PI App. Vol. 8 (July 22, 2018).

[11] App. to N.J. Br. in Opp. to Pls.' Mot. for Prelim. Inj. (N.J. PI App.) (July 21, 2018).

12

Other internal documents similarly indicate that USCIS supervisors require adjudicators to evaluate DACA applications on a case-by-case basis. For example, in USCIS DACA team meetings, officers were encouraged to "[t]ake the time and adjudicate *correctly*" and prioritize "quality over quantity." Dkt. 226-2, Ex. 194 at DEF00000228 (DACA Meeting Minutes, June 1, 2015); *id.*, Ex. 195 at DEF00000476 (DACA Meeting Minutes, June 30, 2015); see also Dkt. 227-1,[12] Ex. 234 at DEF00001730 (DACA Email Guidance, June 28, 2013) ("Every case has a different set of facts involved and all of the facts must be considered.").

Evidence produced in the *Texas* DACA litigation thus amply demonstrates that DHS training materials and internal guidance documents consistently and repeatedly urge USCIS adjudicators to exercise individualized, case-by-case discretionary judgment when considering whether to grant deferred action.

    2.   *USCIS adjudicators exercise individualized discretion by interpreting and sometimes deviating from the criteria set forth in the DACA Memorandum*

USCIS adjudicators in practice exercise discretion in interpreting the meaning of the criteria set forth in the DACA Memorandum. Adjudicators exercise particularly broad discretion in determining whether a requestor represents a threat to "public safety" or "national security." See Dkt. 225-6, Ex. 153 at 82, 90 (2013 DACA Nat'l SOP); see also Dkt. 215-1, Ex. 38 at NJAPP0401 (DACA Email Guidance, Apr. 7, 2015) ("[S]omeone could

---

[12] Def.-Ints.' PI App. Vol. 11 (July 22, 2018).

13

not meet the definition of [Egregious Public Safety] for a referral to ICE but still be considered a public safety concern for DACA."). Broadly, as one officer put it, when determining whether a requestor represents a threat to public safety, "[the] standard is whether or not you would want to live next door to the person." Dkt. 227-1, Ex. 233 at 1 (DACA Email Guidance, June 2, 2015). Of note, the district court presiding over the *Texas* litigation—which is the same court that previously concluded, in connection with DAPA, that USCIS officers did not genuinely exercise discretion—recognized that this guideline "would certainly be indicative of a discretionary standard" in the application of DACA. See *Texas*, 328 F. Supp. 3d at 733.[13]

Similarly, although the SOPs provide that requestors with a history of "significant misdemeanors" do not merit consideration for deferred action, the SOPs do not exhaustively define which misdemeanors qualify as "significant," requiring adjudicators to exercise discretion in determining whether applicants have committed a significant crime (and, therefore, do not merit a favorable exercise of discretion). See, *e.g.*, Dkt. 225-6, Ex. 154 at DEF00001779-DEF00001780 (2012 DACA FAQs) ("[T]he absence of the criminal history outlined above, or

---

[13] The district court in the *Texas* litigation observed: "Defendant-Intervenors produced a post-*Texas I* email from one instructor that, while talking about the established criteria, said that she liked to 'jokingly say our standard is whether or not you would want to live next door to the person.' While this Court will not opine on whether the 'neighbor' standard is one capable of refined precision or even whether it would be legally enforceable, if it were routinely being used, it would certainly be indicative of a discretionary standard." *Texas*, 328 F. Supp. 3d at 733 (citation omitted).

14

its presence, is not necessarily determinative, but is a factor to be considered in the unreviewable exercise of discretion.").[14]  Officers thus determine, using their discretion, whether, *inter alia*, minor traffic violations, multiple non-significant misdemeanors, juvenile convictions, marriage fraud, expunged convictions, or deferred prosecution indicate that a requestor does not merit discretionary relief based on the totality of the evidence.  See *id.*, Ex. 153 at 83-85 (2013 DACA Nat'l SOP).[15]  In other cases, officers are required to go beyond the information conveyed by a RAP sheet or criminal record to exercise their discretion.  See *id.* at 89.[16]

---

[14] See also Dkt. 226-2, Ex. 198 (DHS Email Chain – "204(c) and DACA," Aug. 19, 2015); Dkt. 226-3, Def.-Ints.' PI App. Vol. 10 (July 22, 2018), Ex. 208 (Meeting Minutes – "DACA Roundtable Notes," Sept. 9, 2015); *id.*, Ex. 220 (Meeting Minutes – "Rap Session Notes," Feb. 27 & 28, 2013); Dkt. 227-1, Exs. 231-235 (DACA Email Guidance); *id.*, Dkt. 227-3, Def.-Ints.' PI App. Vol. 13 (July 22, 2018), Ex. 252 (2015 Training Presentation – "How to Deconflict DACA").

[15] See also Dkt. 227-1, Ex. 236 at 4-5 (DACA BCU Picnic Rap Session Agenda and Notes, May 16, 2018); *id.*, Ex. 242 (DACA Email Guidance – "Guidance on legal terminology," May 4, 2017); Dkt. 225-6, Ex. 153 at 90 (2013 DACA Nat'l SOP) (providing examples of types of conduct that might rise to a public safety threat without resulting in a criminal conviction).

[16] See also Dkt. 227-1, Ex. 236 at 2 (DACA BCU Picnic Rap Session Agenda and Notes, May 16, 2018); Dkt. 227-2, Def.-Ints.' PI App. Vol. 12 (July 22, 2018), Ex. 244 (DACA Email Guidance – "Domestic Violence for DACA Purposes," Sept. 15, 2014); Dkt. 225-6, Ex. 155 at DEF00003638 (DACA Internal Adjudicator FAQs); Dkt. 227-1, Ex. 241 at 1 (Internal FAQ – "Wobbler Offenses"); Dkt. 227-3, Ex. 262 at DEF00004597 (Newsletter – "DACA Matters").

15

Even where there is no conviction, an officer may still consider the underlying factors of the criminal activity when determining whether favorable discretion is warranted. See Dkt. 227-1, Ex. 239 at 30 (DACA BCU Criminality Training, Feb. 2017) ("DACA is a discretionary program and does not necessarily require a conviction for the adjudicator to consider the underlying factors of the criminal activity when determining whether or not favorable discretion is warranted.").

Additionally, in looking at the totality of the circumstances, USCIS adjudicators can deny DACA applications not only based on the conduct of the applicant, but also because of the applicant's questionable affiliations. See, *e.g.*, Dkt. 215-1, Ex. 37 at NJAPP0398 (DACA Email Guidance, Mar. 12, 2015) (Background Check Unit denies DACA requests "as a matter of discretion using the discretionary checkbox" when there are concerns of possible drug cartel affiliation).

As in the public safety context, USCIS adjudicators also exercise broad discretion in determining whether an applicant has met DACA's educational criteria, based on inquiries such as the following:

(i) Whether an applicant has graduated from or is enrolled in an educational establishment, Dkt. 225-6, Ex. 153 at 60-70 (2013 DACA Nat'l SOP);

(ii) Whether an applicant's privately funded training or vocational programs have been sufficient, *id.* at 66; and

16

(iii) Whether submitted institutions, homeschooling programs, or other programs are "diploma mills" or otherwise "suspect," see Dkt. 226-3,[17] Ex. 214 at DEF00000405-DEF00000408 (DACA Guidance on Diploma Mills); Dkt. 225-6, Ex. 153 at 60-70 (2013 DACA Nat'l SOP); Dkt. 226-3, Exs. 212-213 at DEF00000198-DEF00000199 (DACA Guidance – "Homeschooling").

Finally, USCIS adjudicators have the discretion to deny applications notwithstanding the applicants' meeting the criteria set forth in the DACA Memorandum. For instance, DHS's SOPs on DACA state clearly that "*[n]otwithstanding* whether [an applicant's] offense is categorized as a significant or non-significant misdemeanor, the decision whether to defer action in a particular case is an individualized, discretionary one that is made taking into account the totality of the circumstances." Dkt. 225-6, Ex. 153 at 83-84 (2013 DACA Nat'l SOP) (emphasis added).  As such, USCIS adjudicators can and do grant or deny deferred action to applicants regardless of whether they have or have not strictly satisfied the criteria in the DACA Memorandum.

3. *The significant and increasing denial rate for deferred action likewise confirms this use of case-by-case, individualized discretion*

Through the first two quarters of fiscal year 2018, USCIS adjudicators denied about 20% of requests for initial grants of deferred action under DACA.  Dkt. 224-

---

[17] Def.-Ints.' PI App. Vol. 10 (July 22, 2018).

17

2,[18] Ex. 25 at 1 (USCIS Data on Number of Form I-821D, Consideration of DACA). This denial rate is "consistent with other discretionary applications such as adjustment of status," and a high acceptance rate is based on "the high caliber of the DACA applications submitted to USCIS." Dkt. 225-3,[19] Ex. 69 at 7 (Decl. of Barbara Hines). Moreover, USCIS management has emphasized that discretionary denials are increasing, and even DACA renewals should not be automatic:

> I wanted to be sure to reiterate what I previously stated which is that *TSC now denies significantly more DACA cases based on our view of discretionary denials* shifting to be more in line with HQ. * * * *Every case is different* so we have to review the totality of the circumstances of each case. * * * If we wouldn't approve it now as an initial, we shouldn't approve it now just because it's a renewal.

Dkt. 215-1, Ex. 38 at NJAPP0400 (DACA Email Guidance, June 2, 2015) (emphasis added).

Lower initial rates of DACA rejections and denials[20] were not indicative of a lack of adjudicator discretion,

---

[18] Def.-Ints.' PI App. Vol. 1 (July 21, 2018).

[19] Def.-Ints.' PI App. Vol. 4 (July 21, 2018).

[20] Rejections and denials are distinct. Rejections occur when it appears on the face of the application that the applicant is not eligible for the discretionary initiative (*e.g.*, she does not meet the age requirement), or when the application is missing required materials (*e.g.*, the required fee, component forms, or a signature). Denials occur when an application is sent to an adjudicator, and the adjudicator exercises his or her discretion not to grant deferred action to

18

but were instead indicative of the quality of the applicants. As the Fifth Circuit recognized in the DAPA litigation, even where adjudicators are exercising discretion, a low initial denial rate for DACA would not be surprising because (1) "DACA involved issuing benefits to self-selecting applicants, and persons who expected to be denied relief would seem unlikely to apply," and (2) "[e]ligibility for DACA was restricted to a younger and less numerous population, which suggests that DACA applicants are less likely to have backgrounds that would warrant a discretionary denial." *Texas*, 809 F.3d at 173-174 (footnote omitted).

Additionally, early DACA applications had a better chance of being approved, because "[w]hen DACA was announced, non-profit organizations, immigration clinics, immigrant advocacy organizations and private attorneys mobilized to provide free or low cost legal advice to DACA eligible individuals, using workshops and clinic models," and "[t]hese efforts screened out individuals whose applications were likely to be denied by USCIS if they had applied." Dkt. 225-3, Ex. 69 at 6 (Decl. of Barbara Hines).

Denial rates have since consistently risen, and were at approximately 13.4% in 2014, 17.4% in 2015, 17.8% in 2016, 16.4% in 2017, and 20.1% through the first two quarters of fiscal year 2018 for initial applications.[21]

---

the applicant. Dkt. 6, Ex. 7 at App. 0586 (Decl. of Donald W. Neufeld).

[21] The percentages are based on USCIS data for fiscal years 2012-2018. See Dkt. 224-2, Ex. 25 at 1 (USCIS Data on Number of Form I-821D, Consideration of DACA). These calculations are based on applications that were either approved or denied in the

19

These denial rates simply do not support any contention that DACA applications have been "rubberstamped."

In sum, the evidence adduced in the *Texas* DACA litigation demonstrates that USCIS adjudicators exercise individualized discretion when determining whether to grant deferred action. This evidence demonstrates the use of individualized, case-by-case discretion and proves inaccurate the presumption in the Rescission Memorandum that DACA conferred a class-wide grant of deferred action and eliminated officers' discretion in individual cases.

4. *Testimonial evidence further confirms that USCIS adjudicators understand DACA to empower them to make discretionary decisions*

Testimonial evidence from the *Texas* DACA litigation—and the predecessor DAPA case—confirms that USCIS adjudicators consider themselves to be exercising discretion when deciding whether to grant or deny applications for deferred action.

---

given year, and do not include requests that were rejected *ab initio*. Nor do they include requests that were submitted but were still awaiting decision at the end of the given year (labelled as "pending" on the chart). For 2014, there were 20,987 denials and 136,101 approvals. For 2015, there were 19,070 denials and 90,629 approvals. For 2016, there were 11,396 denials and 52,708 approvals. For 2017, there were 9,250 denials and 47,298 approvals. And through the first two quarters of fiscal year 2018, there were 3,839 denials and 15,294 approvals. The percentage of denials noted above was calculated by dividing the number of denials by the total of approvals plus denials.

20

In particular, Donald Neufeld, the Associate Director for USCIS Service Center Operations, testified that USCIS officers adjudicate DACA applications using their discretion, on a case-by-case basis, informed—but not bound—by the stated DACA eligibility criteria. Neufeld was personally in charge of all four USCIS Service Centers that adjudicated DACA requests, which encompassed responsibility for all policy, planning, management, and execution at the Service Centers. Dkt. 6, Ex. 7 at App. 0578-0595 (Decl. of Donald W. Neufeld). Neufeld stated that requestors who meet the guidelines in the DACA Memorandum "are not automatically granted deferred action under DACA. Rather, each initial DACA request is individually considered, wherein an adjudicator must determine whether a requestor meets the guidelines and whether there are other factors that might adversely impact the favorable exercise of discretion." *Id.* at App. 0584-0585. Requestors must pay for and submit to a background check, and "[i]nformation discovered in the background check process is also considered in the overall discretionary analysis." *Id*. at App. 0585. Adjudicators also may submit a "Request for Evidence" seeking additional information from an applicant, as well as contacting employers, educational institutions, or other government agencies to verify information submitted on an application. *Id.* at App. 0588-0589. Likewise, in-person interviews are sometimes scheduled for the requestor. *Ibid.* Due to the breadth of information available for consideration, adjudicators exercise discretion in determining what information to credit and prioritize.

Adjudicators deny requests not only when the guidelines are not met, but also when the adjudicator

21

herself determines that deferred action is not appropriate for other reasons. Dkt. 6, Ex. 7 at App. 0586-0591 (Decl. of Donald W. Neufeld). These discretionary denials have been made "on the basis that deferred action was not appropriate for other reasons not expressly set forth in [the] 2012 DACA Memorandum." *Id.* at App. 0591. Neufeld provided examples of denials of deferred action under DACA "even when all the DACA guidelines, including public safety considerations, have been met." *Id.* at App. 0587. For example, USCIS has denied deferred action when a requestor is suspected of gang affiliation. *Id.* at App. 0591. Discretionary denials have also been made for requestors who submitted false statements as part of the application process, even though the requestors actually satisfied all of the guidelines, including public safety considerations. *Id.* at App. 0587. Likewise, USCIS issued a discretionary denial when a requestor had prior removals and had previously falsely claimed to be a United States citizen. *Id.* at App. 0587-0588.

Deposition testimony from former USCIS union president Michael Knowles further confirms that USCIS adjudicators perceive themselves to be engaging in a highly discretionary analysis when handling DACA applications. Knowles testified that USCIS adjudicators "bristled at the thought" that anyone would think they "rubber-stamped" DACA requests. See Dkt. 291-1,[22] Ex. 151 at 24:19-21, 25:24-26:3 (Tr. of Depo. of Michael Knowles); see also *id.* at 23:9-24, 24:9-26:10, 32:11-25,

---

[22] Def.-Ints.' Supp. App. in Supp. of Opp. to Pls.' Mot. for Prelim. Inj. (Aug. 4, 2018).

22

67:10-68:24. Indeed, USCIS adjudicators use their discretion to assess fraud, continuous presence, educational qualifications, and criminal records. *Id.* at 26:11-27:16, 79:4-79:22. Per one USCIS adjudicator, of all the requests he had processed at Service Centers, DACA was "the one that required the most discretion." *Id.* at 25:24-26:3.

## C. Evidence From The *Texas* DACA Litigation Thoroughly Discredits Petitioners' Reliance On The Fifth Circuit's Conclusions Regarding Discretion In The DAPA Litigation

Although a district court years ago concluded, in the context of ruling on DAPA—a separate initiative from DACA—that the DACA Memorandum's promise of discretion was "mere[] pretext," *Texas* v. *United States*, 86 F. Supp. 3d 591, 669 n.101 (S.D. Tex. 2015), and the Fifth Circuit found no clear error therewith, *Texas*, 809 F.3d at 172-176, that conclusion is no longer tenable in light of subsequent factual development and discovery described above. Contra Pet. C.A. Br. 29-30, *Regents of the Univ. of Cal.* v. *U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018) (No. 18-15068).

At the time of the DAPA litigation, the district court relied on (i) the "declaration by Kenneth Palinkas, the president of the union representing the USCIS employees processing the DACA applications, that * * * DACA applications are simply rubberstamped"; (ii) the volume of DACA guidelines; and (iii) the denial rate of accepted DACA applications at the time. See *Texas*, 809 F.3d at 172-173 (summarizing district court findings) (internal quotations omitted). However, as detailed above, DHS's

23

own materials overwhelmingly point to case-by-case adjudicator discretion in connection with DACA applications, and the Fifth Circuit itself discussed reasons independent of discretion why DACA denial rates—now at much higher levels—might initially have been lower. *Id.* at 174.

Moreover, Palinkas's declaration has been shown by his recent testimony in the current *Texas* DACA litigation to have been unreliable, biased, and wrong. In the earlier DAPA litigation, Palinkas submitted a declaration stating that DACA applications were "rubberstamped." *Texas*, 809 F.3d at 172-173. In Palinkas's more recent deposition in the *Texas* DACA litigation, however, it became apparent that Palinkas did not have any firsthand knowledge of how DACA requests are adjudicated. Palinkas did not know anything about the training USCIS adjudicators receive or the procedures USCIS adjudicators follow. Dkt. 215-1, Ex. 16 at 88:4-16 (Tr. of Depo. of Kenneth Palinkas), ("I have no idea about a lot of details pertaining to it"); *id.* at 58-59 (no knowledge of the time required for continuous presence); *id.* at 60:7-13 (no knowledge about the use of biometrics); *id.* at 91-92 (no knowledge regarding detection of fraud in applications). Indeed, on the crucial question of whether adjudicators exercise discretion on a case-by-case basis, Palinkas flatly admitted that he was "not aware of the extent to which discretion is exercised." *Id.* at 95:3-9.

The deposition revealed not only that Palinkas lacked essential knowledge about how DACA applications are adjudicated, but also that he was extremely hostile to DACA. He repeatedly emphasized his belief that DACA applicants had broken the law and that they

24

should not receive a "reward" for their purportedly illegal conduct.  See, *e.g.*, Dkt. 215-1, Ex. 16 at 43:20-21 ("DACA applicants broke the law."); *id.* at 51:14-16 ("I don't think that anybody should be given any preferential treatment after breaking the law. I have an inherent problem [with] that * * * ."); *id.* at 53:4-6 ("I don't think it's equitable to have them demand and be entitled to a path to citizenship * * * ."); *id.* at 55:20-24 ("DACA, it appears to me that, you know, it's a reward system for doing something you shouldn't have done. I mean, when are the parents going to take the responsibility for their children?").

In the *Texas* DACA litigation, the district court, in denying the motion for preliminary injunction, declined to rely on Palinkas's declaration and testimony, even though the same district court relied on Palinkas's testimony in the DAPA litigation.  This time, the district court noted that Palinkas has never processed a DACA application, and that his declaration and testimony was either opinion or based upon hearsay.  See 328 F. Supp. 3d at 733 n.105.  The district court concluded that Texas had not demonstrated that adjudicators fail to use case-by-case prosecutorial discretion when deciding whether to grant or deny deferred action.  See *id.* at 734.

That is plainly correct in light of the newly developed record, which shows, to the contrary, that USCIS adjudicators exercise case-by-case discretion when determining whether to grant or deny individual DACA applications.  As such, DACA is lawful agency guidance regarding individualized, rather than class-wide, discretionary grants of deferred action.  The Rescission Memorandum's reliance on a contrary conclusion was erroneous, and this Court should reject petitioners' invitation

25

to rule on the basis of a finding that is directly contrary to the available evidence.

## CONCLUSION

For the foregoing reasons, the judgments of the United States District Court for the District of Columbia and the Court of Appeals for the Ninth Circuit, as well as the orders of the United States District Court for the Eastern District of New York, should be affirmed.

Respectfully submitted,

NINA PERALES
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND

DOUGLAS HALLWARD-DRIEMEIER
MARK CIANCI
EMERSON SIEGLE
RAISHAY LIN
PAUL BENNETCH
PHILIP EHRLICH
ROPES & GRAY LLP

*COUNSEL FOR DACA RECIPIENTS*

GURBIR S. GREWAL
ATTORNEY GENERAL
STATE OF NEW JERSEY

JEREMY M. FEIGENBAUM
GLENN J. MORAMARCO
ASST. ATTORNEYS GENERAL

*COUNSEL FOR NEW JERSEY*

SEPTEMBER 2019

**AR4704**

1a

# APPENDIX A

## LIST OF INDIVIDUAL DEFENDANT-INTERVENORS

Karla Perez

Maria Rocha

Jose Magaña-Salgado

Nanci J. Palacios Godinez

Elly Marisol Estrada

Karina Ruiz De Diaz

Carlos Aguilar Gonzalez

Karla Lopez

Luis A. Rafael

Darwin Velasquez

Jin Park

Oscar Alvarez

Nancy Adossi

Denise Romero

Pratishtha Khanna

**AR4705**

2a

Jung Woo Kim

Angel Silva

Moses Kamau Chege

Hyo-Won Jeon

Elizabeth Diaz

Maria Diaz

Blanca Gonzalez

Nos. 18-587, 18-588, 18-589

═══════════

In The

# Supreme Court of the United States

────────

DEPARTMENT OF HOMELAND SECURITY, *et al.*, *Petitioners*,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, *Respondents*.

────────

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, *et al.*,
*Petitioners*,

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, *et al.*, *Respondents*.

────────

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, *et al.*, *Petitioners*,

v.

MARTIN JONATHAN BATALLA VIDAL, *et al.*, *Respondents*.

────────

**On Writs of Certiorari to the
United States Courts of Appeals for the
Ninth, District of Columbia, and Second Circuits**

────────

**BRIEF OF THE NATIONAL QUEER ASIAN
PACIFIC ISLANDER ALLIANCE AND
OTHERS AS *AMICI CURIAE*
IN SUPPORT OF RESPONDENTS**

────────

GLENN D. MAGPANTAY
   *Executive Director
   and Counsel*
NATIONAL QUEER ASIAN
   PACIFIC ISLANDER
   ALLIANCE, INC.
P.O. Box 1277
Old Chelsea Station
New York, NY 10113

217 West 18th Street, #1277
New York, NY 10011
(917) 439-3158

SUSAN M. FINEGAN
   *Counsel of Record*
MEREDITH M. LEARY
KAITLYN A. CROWE
ANGEL FENG
GEOFFREY A. FRIEDMAN
RITHIKA KULATHILA
MARGUERITE MCCONIHE
MINTZ, LEVIN, COHN,
   FERRIS, GLOVSKY
   AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000
SMFinegan@Mintz.com

*Counsel for Amici Curiae*

WILSON-EPES PRINTING CO., INC.  –  (202) 789-0096  –  WASHINGTON, D. C. 20002

**AR4707**

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES................................. ii

INTEREST OF *AMICI CURIAE* ........................ 1

SUMMARY OF ARGUMENT ............................. 3

ARGUMENT......................................................... 5

   I.   LGBTQ API DACA recipients will face criminal penalties, imprisonment, discrimination, and violence (including death) if they are removed to their countries of birth.................................................................. 5

  II.  The tens of thousands of LGBTQ DACA recipients, especially those who publically identified themselves as such, will be at increased risk for discrimination and mistreatment if DACA is rescinded... 20

CONCLUSION ................................................... 30

APPENDIX

   List of *Amici Curiae* ......................................... 1a

(i)

AR4708

ii

## TABLE OF AUTHORITIES

**CASES**          Page(s)

*Hively v. Ivy Tech Cmty.*
*College of Ind.*,
853 F.3d 339 (7th Cir. 2017)..................... 22

*Lawrence v. Texas*,
539 U.S. 558 (2003).............................. 7, 11, 22

*Li v. Ashcroft*,
356 F.3d 1153 (9th Cir. 2004)................... 28

*Nelson v. INS*,
232 F.3d 258 (1st Cir. 2000) .................... 28

*Obergefell v. Hodges*,
135 S. Ct. 2584 (2015)............................*passim*

*Regents of the Univ. of Calif. v.*
*U.S. Dep't Homeland Sec.*,
908 F.3d 476 (9th Cir. 2018).................... 29

*Zarda v. Altitude Express, Inc.*,
855 F.3d 76 (2d Cir. 2017) ...................... 22

**STATUTES AND REGULATIONS**

8 U.S.C. § 101 ............................................... 28

8 U.S.C. § 1158 ............................................. 5

18 U.S.C. § 249 *et seq.* .................................. 22

Executive Order No. 13087, 63 Fed. Reg.
30097 (May 28, 1998)................................ 22

Cal Health & Saf Code Div. 104, Pt. 5,
Art. 5 (2016) ............................................. 22

N.J. Stat. § 18A:35-4.36 (2019).................... 22

N.Y. Exec. Law § 296 (Consol. 2019).......... 22

**AR4709**

iii

## TABLE OF AUTHORITIES—Continued

FOREIGN STATUTES                              Page(s)

BANGL. PENAL CODE, Act No. XLV of 1860,
    § 377 (Oct. 6, 1860) ................................... 7

BHUTAN PENAL CODE, Act of 2004,
    §§ 213–14.................................................... 9

BRUNEI PENAL CODE, Ch. 22 of 1951, § 377
    (Revised Ed. 2001) ................................... 9

BRUNEI SYARIAH PENAL CODE ORDER,
    Part IV, Ch. 1 §§ 69, 82 (2013) ................ 9

MALAYSIA PENAL CODE, Act No. 574,
    § 377A of 2015 ........................................... 8

MALAYSIA PENAL CODE, Act No. 574,
    § 377B of 2015 ........................................... 8

MALDIVES PENAL CODE, Law No. 6/2014,
    §411 .......................................................... 9

MILITARY CRIMINAL ACT (SOUTH KOREA),
    Article 92-6................................................ 28

MYANMAR PENAL CODE, Act 45/1850,
    Revised Edition, § 377 .............................. 9

PAKISTAN PENAL CODE, Act No. XLV of
    1860, § 294 (Oct. 6, 1860) ........................ 7

PAKISTAN PENAL CODE, Act No. XLV of
    1860, § 377 (Oct. 6, 1860) ........................ 7

SINGAPORE PENAL CODE, No. 2 of 2008
    (Revised Ed.), § 295 (Jan. 28, 2008)......... 9

SINGAPORE PENAL CODE, No. 2 of 2008
    (Revised Ed.), § 354 (Jan. 28, 2008)......... 9

AR4710

iv

TABLE OF AUTHORITIES—Continued

Page(s)

SINGAPORE PENAL CODE, No. 2 of 2008
(Revised Ed.), § 377a (Jan. 28, 2008) ....... 9

SRI LANKA PENAL CODE, Act No. 22 of
1995, § 365 ................................................ 9

SRI LANKA PENAL CODE, Act No. 22 of
1995, § 365A .............................................. 9

OTHER AUTHORITIES

#*Outlawed the Love That Dare Not Speak
its Name*, HUMAN RIGHTS WATCH, http://
internap.hrw.org/features/features/lgbt_
laws/ (last visited Sept. 24, 2019)............. 6

*A Survey of LGBT Americans*, PEW RES.
CTR. SOC. & DEMOGRAPHIC TRENDS (June
13, 2013), https://www.pewsocialtrends.org/
2013/06/13/a-survey-of-lgbt-americans/ ... 25

Aengus Carroll & Lucas Ramón Mendos,
*State-Sponsored Homophobia: A world
survey of sexual orientation laws: crimi-
nalization, protection and recognition*,
INTERNATIONAL LESBIAN, GAY, BISEXUAL,
TRANS AND INTERSEX ASSOCIATION (ILGA)
(May 2017), https://ilga.org/downloads/
2017/ILGA_State_Sponsored_Homophob
ia_2017_WEB.pdf............................. 7, 8, 17, 19

Anamika Singh, *More LGBT people are
expressing their love openly, however they
are also being targeted*, FIJIVILLAGE
(Nov. 20, 2017), https://fijivillage.com/ne
ws-feature/More-LGBT-people-are-expre
ssing-their-love-openly-however-they-are-
also-being-targeted-k9s25r/...................... 14

**AR4711**

v

TABLE OF AUTHORITIES—Continued

Page(s)

Annie Banerji, *Mind your own business: Small firms opt out as India Inc races to be LGBT-friendly*, REUTERS (Feb. 12, 2019, 5:16 AM), https://www.reuters.com/article/us-india-lgbt-business/mind-your-own-business-small-firms-opt-out-as-india-inc-races-to-be-lgbt-friendly-idUSKCN 1Q113D ..................................................... 12

Ben Bavinton et al., *Secret Lives, Other Voices: A community-based study exploring male-to-male sex, gender identity and HIV transmission risk in Fiji*, AIDS TASK FORCE OF FIJI (2011), https://www.aidsdatahub.org/sites/default/files/documents/secret_lives_other_voices_research-report33.pdf ..................................................... 13

Cai Wilkinson et al., *LGBT Rights in Southeast Asia: One Step Forward, Two Steps Back?*, IAFOR J. OF ASIAN STUD. (2017) ........................................................ 16, 19

Chris Horton, *After a Long Fight, Taiwan's Same-Sex Couples Celebrate New Marriages*, N.Y. TIMES, May 25, 2019 ............. 18

*DACA Stories, Bupendra (Bupen) Ram*, SAALT, http://saalt.org/policy-change/immigrant-rights/daca-stories/bupendra-bupen-ram/ (last visited Sept. 27, 2019) ...... 24

Feifei Sun, *Behind the Cover: America's Undocumented Immigrants*, TIME (June 14, 2012) ..................................................... 23

vi

TABLE OF AUTHORITIES—Continued

Page(s)

*Fiji PM's gay marriage comments shock*,
RNZ (Jan. 6, 2016, 7:31 PM), https://www.
rnz.co.nz/international/pacific-news/293
597/fiji-pm's-gay-marriage-comments-sh
ock ............................................................. 28

Gustavo López & Jens Krogstad, *Key facts
about unauthorized immigrants enrolled
in DACA*, PEW RES. CTR. (Sep. 25, 2017),
http://www.pewresearch.org/fact-tank/20
17/09/25/key-facts-about-unauthorized-im
migrants-enrolled-in-daca/ ....................... 24

*Halt the Hate*, AMNESTY INTERNATIONAL
INDIA (Mar. 5 2019, 10:49 AM), https://
amnesty.org.in/news-update/over-200-all
eged-hate-crimes-in-2018-reveals-halt-the-
hate-website/ ............................................. 13

*Indonesia's Aceh Resumes Public Caning
Despite Pledge to Curb Access*, REUTERS
(July 13, 2018, 7:58 AM), https://www.
reuters.com/article/us-indonesia-aceh-ca
ning/indonesias-aceh-resumes-public-ca
ning-despite-pledge-to-curb-access-idUS
KBN1K31N1 ............................................. 10

*Indonesia: Draft Criminal Code Disastrous
for Rights*, HUMAN RIGHTS WATCH (Sept.
18, 2019), https://www.hrw.org/news/20
19/09/18/indonesia-draft-criminal-code-dis
astrous-rights ............................................ 9

Jeffrey Gettleman et al., *India Gay Sex Ban
Is Struck Down. 'Indefensible,' Court
Says*, N.Y. TIMES, Sept. 7, 2018 ................ 12

**AR4713**

vii

TABLE OF AUTHORITIES—Continued

Page(s)

Jon Emont, *2 Men in Indonesia Sentenced to Caning for Having Gay Sex*, N.Y. TIMES, May 18, 2018 ..................................   10

Jon Emont, *Indonesia Police Arrest 141 Men Accused of Having Gay Sex Party*, N.Y. TIMES, May 23, 2017 ........................   10

Kerith Conron & Taylor N.T. Brown, *There are Over 75,000 LGBT DREAMers; 36,000 Have Participated in DACA*, THE WILLIAMS INST., UCLA School of Law, n.3 (Feb. 2017), https://williamsinstitute.law. ucla.edu/wp-content/uploads/LGBT-DRE AMers-and-DACA-February-2017.pdf. ....   20

Kyle Knight, *Indonesia's anti-LGBT drive should concern all Asia*, HUMAN RIGHTS WATCH (Feb. 20, 2018, 1:42 PM), https:// www.hrw.org/news/2018/02/20/indonesia s-anti-lgbt-drive-should-concern-all-asia ...   17

Kyle Knight, *Indonesian Militant Islamists, Police Raid Gay Gathering*, HUMAN RIGHTS WATCH (Nov. 29, 2016), https://www. hrw.org/news/2016/11/29/indonesian-mil itant-islamists-police-raid-gay-gathering...   10

*Kwentong Bebot: Lived Experiences of Lesbians, Bisexual and Transgender Women in the Philippines*, RAINBOW RIGHTS PROJECT (2013), https://www. outrightinternational.org/sites/default/fil es/phillipinescc.pdf ...................................   15

AR4714

viii

TABLE OF AUTHORITIES—Continued

Page(s)

*LGBTI Rights*, AMNESTY INTERNATIONAL, https://www.amnesty.org/en/what-we-do/discrimination/lgbt-rights/ (last visited Sept. 24, 2019)............................................ 7

Liam Fox, *Murdered on International day against Transphobia: fears Fiji killing is a hate crime*, ABC NEWS (July 23, 2018, 5:06 AM), https://www.abc.net.au/news/2018-07-23/trans-woman-murdered-in-fiji-in-suspect ed-hate-crime/10026188.......... 14

*Lim Meng Suang et al. v. Attorney General*, Court of Appeal of Republic of Singapore (October 29, 2014), https://www.supreme court.gov.sg/docs/default-source/ module-document/judgement/-2014-sgca-53-pdf. pdf................................................ 17

Lucas Ramón Mendos, *State-Sponsored Homophobia 2019*, INTERNATIONAL LESBIAN, GAY, BISEXUAL, TRANS AND INTERSEX ASSOCIATION (ILGA) (March 2019), https://ilga.org/downloads/ILGA_State_Sponsored_Homophobia_2019. pdf...........................................*passim*

*Malaysia: Two Women Face Caning for Same-Sex Conduct*, HUMAN RIGHTS WATCH (Aug. 21, 2018), https://www.hrw.org/news/2018/08/21/malaysia-two-women-fa ce-caning-same-sex-conduct ..................... 8

M.V. Lee Badgett et al., *LGBT Exclusion in Indonesia and Its Economic Effects*, THE WILLIAMS INSTITUTE (2017) ............ 9, 12, 17, 19

ix

TABLE OF AUTHORITIES—Continued

Page(s)

Neela Ghosal & Thilaga Sulathireh, *"The Deceased Can't Speak for Herself:" Violence Against LGBT People in Malaysia*, GEO. J. OF INT'L AFF. (2019) .......................... 15

Nicole Svajlenka & Audrey Singer, *Immigration Facts: Deferred Action for Childhood Arrivals (DACA)*, BROOKINGS METRO. POL'Y PROGRAM (Aug. 14, 2013) https://www.brookings.edu/research/immigration-facts-deferred-action-for-childhood-arrivals-daca/...................................... 21

Brunei Prime Minister's Office, Press Statement (March 30, 2019)...................... 9

Sam Hananel, *Release: LGBT Immigrants in Detention Centers at Severe Risk of Sexual Abuse, CAP Analysis Says*, CTR. FOR AMERICAN PROGRESS (May 30, 2018), https://www.americanprogress.org/press/release/2018/05/30/451380/release-lgbt-immigrants-detention-centers-severe-risk-sexual-abuse-cap-analysis-says/............... 27

Sharita Gruberg, *ICE's Rejection of Its Own Rules Is Placing LGBT Immigrants at Severe Risk of Sexual Abuse*, CTR. FOR AMERICAN PROGRESS (May 30, 2018, 12:00 PM), https://www.americanprogress.org/issues/lgbt/news/2018/05/30/451294/ices-rejection-rules-placing-lgbt-immigrants-severe-risk-sexual-abuse/ ........................ 26

AR4716

x

TABLE OF AUTHORITIES—Continued

Page(s)

Sharita Gruberg, *What Ending DACA Means for LGBTQ Dreamers*, CTR. FOR AMERICAN PROGRESS (Oct. 11, 2017, 11:08 AM), https://www.americanprogress.org/issues/lgbt/news/2017/10/11/440450/ending-daca-means-lgbtq-dreamers/ ............... 21

*Social Media Fact Sheet*, PEW RES. CTR., INTERNET & TECH., (June 12, 2019), https://www.pewinternet.org/fact-sheet/social-media/ ................................................ 25

*South Korea: Military 'Sodomy' Law Violates Rights*, Human Rights Watch (March 7, 2019, 1:00 AM), https://www.hrw.org/news/2019/03/07/south-korea-military-sodomy-law-violates-rights ............ 13

Sushmita Pathak & Furkan Latif Khan, *India's Anti-Gay Law Is History. Next Challenge: Treat LGBTQ Patients with Respect*, NPR (Sept. 17, 2018, 1:26 PM), https://www.npr.org/sections/goatsandsoda/2018/09/17/645279722/indias-anti-gay-law-is-history-next-challenge-treat-lgbtq-patients-with-respect ................................ 12

Suva Shahani Mala, *Attack On Gay Men Condemned*, FIJI SUN (Feb. 7, 2017), http://fijisun.com.fj/2017/02/07/attack-on-gay-men-condemned/ ................................ 14

AR4717

xi

TABLE OF AUTHORITIES—Continued

Page(s)

Timothy Rich & Isabel Eliassen, *What's Behind South Korea's Persistent LGBT Intolerance?*, THE DIPLOMAT (March 19, 2019), https://thediplomat.com/2019/03/whats-behind-south-koreas-persistent-lgbt-intolerance/.................................................. 13

Tokada Rainima, *No arrest yet on Vesida murder*, FBC NEWS (Oct. 12, 2017, 1:20 AM), https://www.fbcnews.com.fj/news/no-arrests-yet-on-vesida-murder/ (last visited Sept. 24, 2019)............................................ 14

Tom K. Wong et al., 2017 *National DACA Study* (Nov. 2, 2017), https://cdn.americanprogress.org/content/uploads/2017/11/02125251/2017_DACA_study_economic_report_updated.pdf.................................. 21

Tom K. Wong et al., *2019 National DACA Study* (Sept. 19, 2019), https://cdn.americanprogress.org/content/uploads/2019/09/18122133/New-DACA-Survey-2019-Final-1.pdf......................................... 6, 21

*Uncovering Our Stories: Bupendra Ram*, National Queer Asian Pacific Islander Alliance (Aug. 24, 2013), https://www.nqapia.org/wpp/uncovering-our-stories-bupendra/ .......................................... 24

*Uncovering Our Stories: Tony Choi*, National Queer Asian Pacific Islander Alliance (Oct. 11, 2013), https://www.nqapia.org/wpp/uncovering-our-stories-tony-choi/ ....... 22

AR4718

xii

TABLE OF AUTHORITIES—Continued

Page(s)

U.N. Dev. Programme & U.S. Agency Int'l Dev., *Being LGBT in Asia: Cambodia Country Report* (2014) .............................   8

U.N. Dev. Programme & U.S. Agency Int'l Dev., *Being LGBT in Asia: China Country Report* (2014) .............................   12

U.N. Dev. Programme & U.S. Agency Int'l Dev., *Being LGBT in Asia: Indonesia Country Report* (2014) .............................   10

U.N. Dev. Programme & U.S. Agency Int'l Dev., *Being LGBT in Asia: The Philippines Country Report* (2014) .............................   15

U.N. Dev. Programme & U.S. Agency Int'l Dev., *Being LGBT in Asia: Thailand Country Report* (2014) .............................   17

U.S. Citizenship & Immigration Servs., *Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction* (July 17, 2019) .......................   5

U.S. Citizenship & Immigration Servs., *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake and Case Status Fiscal Year 2012-2019* (June 30, 2019) ....................................   20

U.S. Dep't of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 12, 2012) ..........   21

AR4719

xiii

TABLE OF AUTHORITIES—Continued

Page(s)

U.S. DEP'T OF STATE, BUREAU OF DEMOC-
RACY, H.R. AND LAB., *Malaysia 2018
Human Rights Report* (2018)...................   8

U.S. DEP'T OF STATE, BUREAU OF
DEMOCRACY, H.R. AND LAB., *Laos 2018
Human Rights Report* (2018)...................   16

U.S. DEP'T OF STATE, BUREAU OF
DEMOCRACY, H.R. AND LAB., *Maldives
2018 Human Rights Report* (2018)...........   16

*What is LGBTQ?*, THE LESBIAN, GAY,
BISEXUAL & TRANSGENDER COMMUNITY
CENTER, https://gaycenter.org/about/lgbtq/
#queer (last visited Sept. 24, 2019) ...........   1, 23

Yvette Tan, *Brunei implements stoning to
death under anti-LGBT laws*, BBC (Apr.
3, 2019), https://www.bbc.com/news/wo
rld-asia-47769964 .....................................   9

Zenén Jaimes Pérez, *A Portrait of Deferred
Action for Childhood Arrivals Recipients:
Challenges and Opportunities Three-Years
Later*, UNITED WE DREAM (Oct. 2015),
https://unitedwedream.org/wp-content/up
loads/2015/10/DACA-report-final-1.pdf. ..   20

AR4720

### INTEREST OF *AMICI CURIAE*[1]

The National Queer Asian Pacific Islander Alliance ("NQAPIA") is a federation of lesbian, gay, bisexual, transgender and queer or questioning ("LGBTQ")[2] Asian and Pacific Islander ("API") organizations. NQAPIA unites local groups, develops leadership, promotes visibility, educates the community, invigorates grassroots organizing, encourages collaboration, and challenges anti-LGBTQ bias and racism. NQAPIA spearheads educational and advocacy campaigns in support of LGBTQ immigrants' rights.

NQAPIA member groups and ally LGBTQ organizations are deeply troubled by the Trump Administration's attempt to rescind DACA and the significant risk that LGBTQ undocumented immigrants will face removal to countries that criminalize homosexuality, discriminate and marginalize LGBTQ individuals, and put them at undue risk of violence because of their LGBTQ status.

The following NQAPIA member groups and ally LGBTQ organizations join this brief as *amici curiae* and a statement of interest from each organization is attached as an Appendix to this brief:

---

[1] Pursuant to Supreme Court Rule 37.6, counsel for *amici* certify that they authored this brief in its entirety and that no party or its counsel, nor any other person or entity other than *amici* or their counsel, made a monetary contribution to this brief's preparation or submission. The parties have consented to the filing of this brief.

[2] "LGBTQ is an acronym for lesbian, gay, bisexual, transgender and queer or questioning. These terms are used to describe a person's sexual orientation or gender identity." *What is LGBTQ?*, THE LESBIAN, GAY, BISEXUAL & TRANSGENDER COMMUNITY CENTER, https://gaycenter.org/about/lgbtq/#queer (last visited Sept. 24, 2019).

AR4721

2

- API Equality – Northern California (APIENC);

- API Rainbow Parents of PFLAG NYC;

- APICHA Community Health Center – New York City;

- Asian and Pacific Islander Queers United for Action (AQUA);

- Asian Pacific American Labor Alliance (AFL-CIO);

- Asian Pacific Islander Queer Women and Transgender Community – San Francisco;

- ATL Q+A – Atlanta;

- Equality Federation;

- Gay Asian and Pacific Islander Men of New York (GAPIMNY);

- Gay Asian Pacific Alliance (GAPA) – San Francisco;

- GLBT Fund of America, Philadelphia;

- GLBTQ Legal Advocates & Defenders (GLAD);

- Immigration Equality;

- Invisible to Invincible Asian Pacific Pride of Chicago (i2i);

- KhushATX;

- Korean American Rainbow Parents (KARP) – Washington D.C.;

- Korean Queer and Transgender Organization of Washington D.C.;

- Lambda Legal Defense and Education Fund;

- Los Angeles LGBT Center;

AR4722

3

- National Black Justice Coalition;

- National LGBTQ Task Force;

- Our Space LGBT Youth Center;

- OutRight Action International;

- Philadelphia Asian & Queer (PAQ);

- PFLAG;

- PFLAG – San Gabriel Valley Chapter Asian Pacific Islander;

- Queer South Asian Collective Community – Boston;

- Q-WAVE;

- SAGE NYC;

- SALGA NYC;

- San Francisco LGBT Center;

- Satrang Los Angeles;

- Transgender Legal Defense and Education Fund;

- Trikone; and

- UTOPIA Seattle.

## SUMMARY OF ARGUMENT

There are tens of thousands of individuals who identify as LGBTQ and received protection under the Deferred Action for Childhood arrivals ("DACA") policy, many of whom were born in API nations. Without the protection afforded by DACA, those children, many of whom have now grown to be young adults who have only ever known the United States as home, will be subject to removal proceedings to their countries of birth. These children often have no memory of their

**AR4723**

4

birth countries nor have they visited their countries of birth since they arrived in the United States in their infancy or young childhood.  Many have no connections to their country of birth; indeed they may not know anyone there.  Should they be removed, it is likely that they would have no shelter, no resources, no ability to earn income, nor even an ability to speak the local language.  In sum, should DACA be rescinded, these children and young adults will be unceremoniously dispatched with no safety net to a country wholly unknown to them.

Moreover, if DACA is rescinded, many LGBTQ API DACA recipients are almost certain to face harassment, discrimination, criminal prosecution, violence and even death by virtue of their sexual orientation and/or gender identity.  LGBTQ API DACA recipients from these nations will also lose substantial civil protections afforded them in the United States, including the right to marry, the ability to seek medical care, and/or the ability to earn a living without discrimination.

Many LGBTQ DACA recipients have been open and transparent about their sexual orientation and/or gender identity while living in the United States, have engaged in LGBTQ activism, and have publicly disclosed their LGBTQ status in their communities, through their online identities and otherwise.  In this digital age, if these openly LGBTQ DACA recipients are removed, there is no realistic way to put this "genie back in the bottle."  The rescission of DACA will unavoidably put these individuals in danger of criminal prosecution, discrimination, violence and even death in their country of birth because of their sexual orientation and/or gender identity.  The great promise of DACA was the freedom from fear of removal, and the liberating sense of security that permitted DACA re-

AR4724

5

cipients to build their lives in America authentically, including being open about their sexual orientation and/or gender identity, without shame of being "undocumented." Rescinding DACA not only revokes that promise but, even more cruelly, puts some of the most vulnerable DACA recipients in even greater danger than they may have been in had DACA never been in place.

## ARGUMENT

### I. LGBTQ API DACA recipients will face criminal penalties, imprisonment, discrimination, and violence (including death) if they are removed to their countries of birth

For LGBTQ children and young adults who (1) have been prevented from applying for DACA as a result of the government halting the policy, or (2) are current DACA recipients who may lose their ability to renew their status if the policy is ended, the rescission of DACA means the risk of immediate removal to a detention facility followed by removal to their country of birth.[3]

Many undocumented immigrants who qualify for or have received DACA share a tangible, and realistic, fear of what being removed to their birth countries—countries that their families fled for fear of persecution, poverty, and/or violence—would mean. In a recent survey of DACA recipients, approximately 80% of surveyed respondents indicated concern for their physical safety, and the physical safety of their

---

[3] *See* U.S. CITIZENSHIP & IMMIGRATION SERVS., *Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction* (July 17, 2019).  Further, many of these individuals have been in the United States for over 1 year, making them ineligible for asylum protections.  8 U.S.C. § 1158 (2)(B).

6

families, if they were to return to their countries of birth.[4]

For LGBTQ DACA recipients, that concern is even more acute. Approximately seventy countries worldwide still criminalize and punish same-sex relationships and same-sex sexual activity and impose extensive penalties, including life in prison.[5] Numerous countries sentence people engaged in consensual same-sex relationships to death as punishment.[6] Further, and as discussed below, the circumstances can be dire even in the absence of the criminalization of sexual orientation and/or gender identity due to rampant discrimination, bias, and significantly increased rates of violence by private actors against LGBTQ individuals. In such countries, rescinding DACA can be tantamount to a death sentence.

The cruelty of reversing DACA for this vulnerable population is evident from the laws and customs in the API nations where DACA recipients may be forced to return if the rescission of DACA is upheld.

---

[4] Tom K. Wong et al., *2019 National DACA Study*, at 7 (Sept. 19, 2019), https://cdn.americanprogress.org/content/uploads/2019/09/18122133/New-DACA-Survey-2019-Final-1.pdf [hereinafter Wong et al.].

[5] Lucas Ramón Mendos, *State-Sponsored Homophobia 2019*, INTERNATIONAL LESBIAN, GAY, BISEXUAL, TRANS AND INTERSEX ASSOCIATION (ILGA), at 15 (March 2019), https://ilga.org/downloads/ILGA_State_Sponsored_Homophobia_2019.pdf [hereinafter *State-Sponsored Homophobia* (2019)]; #*Outlawed the Love That Dare Not Speak its Name*, HUMAN RIGHTS WATCH, http://internap.hrw.org/features/ features/lgbt_laws/.

[6] *State-Sponsored Homophobia* (2019), *supra* note 5, at 15-16; #*Outlawed the Love That Dare Not Speak its Name*, Human Rights Watch, http://internap.hrw.org/features/features/lgbt_laws/.

7

**Criminal Prohibitions and the Death Penalty:**

Many API countries still criminalize same-sex sexual activity and relationships, posing a grave threat to the LGBTQ DACA recipients from these countries if they are forced to return, especially where they are not closeted. The mere fact that such laws exist significantly impairs the liberty and "autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct" for LGBTQ individuals in these countries. *Lawrence v. Texas*, 539 U.S. 558, 562 (2003).

For example, Bangladesh—a country of over 150 million people—criminalizes all sexual activity between men, with a punishment of ten years and up to life in prison.[7] Pakistan criminalizes a broadly-worded category of "obscene acts" and same-sex activity.[8] Punishment is severe: two to ten years imprisonment[9] and possible penalty by death.[10] In Afghanistan, United

---

[7] Bangl. Penal Code, Act No. XLV of 1860, § 377 (Oct. 6, 1860).

[8] Pakistan Penal Code, Act No. XLV of 1860, § 294 (Oct. 6, 1860); *see also* Aengus Carroll & Lucas Ramón Mendos, *State-Sponsored Homophobia: A world survey of sexual orientation laws: criminalization, protection and recognition,* International Lesbian, Gay, Bisexual, Trans and Intersex Association (ILGA), at 133 (May 2017), https://ilga.org/downloads/2017/ILGA _State_Sponsored _Homophobia_2017_WEB.pdf [hereinafter *State-Sponsored Homophobia* (2017)].

[9] Pakistan Penal Code, Act No. XLV of 1860, §§ 294, 377 (Oct. 6, 1860).

[10] *Id.*; *State-Sponsored Homophobia* (2019), *supra* note 5, at 15–16; *LGBTI Rights*, Amnesty International, https://www.amnesty.org/en/what-we-do/discrimination/lgbt-rights/ (last visited Sept. 24, 2019).

8

Arab Emirates, Yemen, Iran, Brunei, and Saudi Arabia, homosexuality is also punishable by death.[11]

Malaysia criminalizes certain same-sex sexual activity with punishment of up to twenty years in prison, and punishes consensual same-sex intercourse with lashings.[12] In September of 2018, two women were sentenced to caning in Malaysia after allegedly attempting to engage in same-sex relations.[13] There are also many reports of state-sanctioned violence and discrimination against LGBTQ individuals who are found to violate Malaysian law. The 2018 U.S. State Department *Malaysia 2018 Human Rights Report* includes reports from local advocates stating that "imprisoned transgender women served their sentences in prisons designated for men and that police and inmates often abused them verbally and sexually."[14] LGBTQ Cambodians also face documented discrimination as a result of laws giving police broad authority to enforce security and public order.[15]

Bhutan criminalizes same-sex sexual activity as "unnatural" and punishes by imprisonment, as does

---

[11] *State-Sponsored Homophobia* (2019), *supra* note 5, at 15–16; *see also* BRUNEI SYARIAH PENAL CODE ORDER, Part IV, Ch. 1 §§ 69, 82 (2013).

[12] MALAYSIA PENAL CODE, Act No. 574, §§ 377A, 377B (2015).

[13] *State-Sponsored Homophobia* (2017), *supra* note 8, at 131; *Malaysia: Two Women Face Caning for Same-Sex Conduct,* HUMAN RIGHTS WATCH (Aug. 21, 2018), https://www.hrw.org/new s/2018/08/21/malaysia-two-women-face-caning-same-sex-conduct.

[14] U.S. DEP'T OF STATE, BUREAU OF DEMOCRACY, H.R. AND LAB., *Malaysia 2018 Human Rights Report*, at 29 (2018).

[15] U.N. DEV. PROGRAMME & U.S. AGENCY FOR INT'L DEV., *Being LGBT in Asia: Cambodia Country Report*, at 8, 21, 31-32 (2014).

9

Singapore and the Maldives.[16]   Myanmar punishes same-sex relations with imprisonment for up to ten years, as does Sri Lanka.[17]   Brunei's penal code also provides for imprisonment for up to ten years.[18] Moreover, in April 2019, the government of Brunei fully implemented the Syariah Penal Code.[19]   Now, individuals in Brunei may also face death by stoning and/or whipping.[20]

In Indonesia, recent changes to national law appeared to ostensibly protect the rights of LGBTQ individuals at the national level, but the 2019 proposed revisions to the Indonesian criminal code include a number of changes that, if passed, could be used to violate the rights of LGBTQ individuals.[21]   Indonesia also has local provinces and cities that already criminalize homosexuality.[22]   In one such province in May

---

[16] BHUTAN PENAL CODE, Act of 2004, §§ 213–14; SINGAPORE PENAL CODE, No. 2 of 2008 (Revised Ed.), §§ 295, 354, 377a (Jan. 28, 2008); MALDIVES PENAL CODE, Law No. 6/2014, § 411.

[17] MYANMAR PENAL CODE, Act 45/1850, Revised Edition, § 377; *State-Sponsored Homophobia* (2019), at 531–32; SRI LANKA PENAL CODE, Act No. 22 of 1995, §§ 365, 365A.

[18] BRUNEI PENAL CODE, Ch. 22 of 1951 (Revised Ed. 2001), § 377 (Oct. 1, 2001).

[19] Brunei Prime Minister's Office, Press Statement (March 30, 2019).

[20] BRUNEI SYARIAH PENAL CODE ORDER, Part IV, Ch. 1, §§ 69, 82 (2013); Yvette Tan, *Brunei implements stoning to death under anti-LGBT laws,* BBC (Apr. 3, 2019), https://www.bbc.com/news/world-asia-47769964.

[21] *Indonesia: Draft Criminal Code Disastrous for Rights,* HUMAN RIGHTS WATCH (Sept. 18, 2019), https://www.hrw.org/news/2019/09/18/indonesia-draft-criminal-code-disastrous-rights.

[22] M.V. Lee Badgett et al., *LGBT Exclusion in Indonesia and Its Economic Effects,* THE WILLIAMS INSTITUTE, at 5 (2017).

AR4729

10

2017, two men were sentenced to eighty-five lashes in a public caning after being accused of having sex with each other.[23]  State-sanctioned discrimination and violence against LGBTQ individuals in Indonesia is also prevalent.  According to a 2014 report, police often fail to protect or intervene on behalf of LGBTQ individuals and commonplace police roundups often target, and potentially abuse, the population.[24]  Law enforcement and militant groups in the country sometimes even work together to achieve these ends.  For example, in late 2016, the Indonesian militant group Islamic Defenders Front, tipped off local police about an alleged sex party at a private home in Jakarta. Police on the scene detained the individuals who were present.[25]  Just a few months later in May 2017, a similar raid also took place in Jakarta and almost 150 men were arrested.[26]

Criminalizing same-sex relations effectively makes it illegal to be LGBTQ in these countries.  Unlike in the United States, these countries can and do "demea[n] the lives of homosexual persons" and "demean their

---

[23] Jon Emont, *2 Men in Indonesia Sentenced to Caning for Having Gay Sex,* N.Y. TIMES, May 18, 2018, § A at 7; *Indonesia's Aceh Resumes Public Caning Despite Pledge to Curb Access,* REUTERS (July 13, 2018, 7:58 AM), https://www.reuters.com/article/us-indonesia-aceh-caning/indonesias-aceh-resumes-public-caning-despite-pledge-to-curb-access-idUSKBN1K31N1.

[24] U.N. DEV. PROGRAMME & U.S. AGENCY FOR INT'L DEV., *Being LGBT in Asia: Indonesia Country Report,* at 8, 10, 27 (2014).

[25] Kyle Knight, *Indonesian Militant Islamists, Police Raid Gay Gathering,* HUMAN RIGHTS WATCH (Nov. 29, 2016), https://www.hrw.org/news/2016/11/29/indonesian-militant-islamists-police-raid-gay-gathering.

[26] Jon Emont, *Indonesia Police Arrest 141 Men Accused of Having Gay Sex Party,* N.Y. TIMES, May 23, 2017, § A at 7.

AR4730

11

existence or control their destiny by making their private sexual conduct a crime." *Lawrence*, 539 U.S. at 575, 578.[27]   Beyond the significant threat of criminal detention or even death, such laws have a dramatic chilling effect on the "autonomy of self" to which all individuals should be entitled in a free society; as the Court has recognized, the "stigma" of such criminal statutes is "not trivial." *Lawrence*, 539 U.S. at 575.

## **Discrimination and Hate Crimes:**

Discrimination against LGBTQ individuals in API nations is deeply-rooted and pervasive, and there can be no question that LGBTQ API DACA recipients would face discrimination in their personal and professional lives if they were expelled from this country. Just as was the case in America for many years, LGBTQ persons in many API countries are "barred from military service, excluded under immigration laws, targeted by police, and burdened in their rights to associate." *Obergefell,* 135 S. Ct. at 2596.  Rampant discrimination in these countries denies LGBTQ individuals "dignity in their own distinct identity." *Id*.  It remains true in many countries that "the argument that gays and lesbians [have] a just claim to dignity [is] in conflict with both law and widespread social conventions." *Id*.

In country after country outside of the United States, LGBTQ API individuals are marginalized or repressed. In China, LGBTQ discrimination and stigma is omni-

---

[27] This Court has recognized how in this country as well, "[u]ntil the mid-20th century, same-sex intimacy long had been condemned as immoral by the state itself . . ., a belief often embodied in the criminal law." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2596 (2015).

12

present, including from one's family and friends.[28]  In a 2012 poll of residents of the Beijing, Shanghai, and Guangzhou provinces, only 31% of participants said they accepted people who identify as gay, and only 27% said that there should be legal protections for sexual minorities.[29]  Likewise, in India, there remains immense cultural prejudice against LGBTQ individuals, and not surprisingly so, given that the Supreme Court of India only recently decriminalized same-sex sexual activities.[30]

In Indonesia, public acceptance of LGBTQ individuals remains very low and has changed little over the past decade; media coverage remains generally negative.[31]  LGBTQ individuals are denied educational opportunities,[32] employment opportunities,[33] and face physical, psychological, cultural and sexual violence.[34]

---

[28] U.N. DEV. PROGRAMME & U.S. AGENCY FOR INT'L DEV., *Being LGBT in Asia: China Country Report*, at 27 (2014).

[29] *Id.*

[30] Jeffrey Gettleman et al., *India Gay Sex Ban Is Struck Down. 'Indefensible,' Court Says,* N.Y. TIMES, Sept. 7, 2018, § A at 1; *see also* Sushmita Pathak & Furkan Latif Khan, *India's Anti-Gay Law Is History. Next Challenge: Treat LGBTQ Patients with Respect,* NPR (Sept. 17, 2018, 1:26 PM), https://www.npr.org/ sections/goatsandsoda/2018/09/17/645279722/indias-anti-gay-law-is-history-next-challenge-treat-lgbtq-patients-with-respect; Annie Banerji, *Mind your own business: Small firms opt out as India Inc races to be LGBT-friendly*, REUTERS (Feb. 12, 2019, 5:16 AM), https://www.reuters.com/article/us-india-lgbt-business/mind-you r-own-business-small-firms-opt-out-as-india-inc-races-to-be-lgbt-friendly-idUSKCN1Q113D.

[31] Badgett et al., *supra* note 22, at 5-7.

[32] *Id.*, at 8–12.

[33] *Id.*, at 13–16.

[34] *Id.*, at 16–22.

13

Even in an advanced democracy like South Korea, there are no antidiscrimination laws in place to protect LGBTQ individuals, and efforts to implement such protections have repeatedly failed.[35]

As a result of discrimination and marginalization, numerous API nations report increased rates of hate crimes and/or interpersonal violence against individuals identifying as LGBTQ—even where the government decriminalized same-sex relationships or sexual activity. In 2018, when India decriminalized same-sex sexual activity, the country reported 218 hate crimes, with eight attacks on individuals identifying as transgender, and the majority of attacks on women of marginalized groups (sexual orientation was not specified).[36] In Fiji, a 2011 community-based survey funded by the United Nations Development Programme and conducted by the AIDS Task Force of Fiji found that LGBTQ individuals experience high rates of discrimination and violence. Over 65% individuals surveyed reported feeling unsafe expressing their sexuality, 30.3% of respondents reported being physically hurt in the prior six months, and 26.8% of respondents reported being sexually abused or assaulted.[37] These

---

[35] Timothy Rich & Isabel Eliassen, *What's Behind South Korea's Persistent LGBT Intolerance?*, THE DIPLOMAT (March 19, 2019), https://thediplomat.com/2019/03/whats-behind-south-koreas-persistent-lgbt-intolerance/; *South Korea: Military 'Sodomy' Law Violates Rights,* HUMAN RIGHTS WATCH (March 7, 2019, 1:00 AM), https://www.hrw.org/news/2019/03/07/south-korea-military-sodomy-law-violates-rights.

[36] *Halt the Hate,* AMNESTY INTERNATIONAL INDIA (Mar. 5 2019, 10:49 AM), https://amnesty.org.in/news-update/over-200-alleged-hate-crimes-in-2018-reveals-halt-the-hate-website/.

[37] Ben Bavinton et al., *Secret Lives, Other Voices: A community-based study exploring male-to-male sex, gender identity and HIV transmission risk in Fiji,* AIDS TASK FORCE OF FIJI, at 9 (2011),

14

statistics are corroborated by media reports of LGBTQ individuals in Fiji who have been victims of physical violence on the island.  In 2017 and 2018, there were a number of violent murders of LGBTQ individuals that were classified as hate crimes.[38]  Activist groups in Fiji consistently report high levels of violence and discrimination against members of the LGBTQ community.[39]  In 2017, two gay men were physically assaulted in Fiji by teenagers, but did not report the assault to the police because they had "fear of reprisals from the people who allegedly attacked them."[40]  The two men also refused to reveal their identities to the media because "they feared for their lives."[41]  Similar

---

https://www.aidsdatahub.org/sites/default/files/documents/secret _lives_other_voices_research-report33.pdf.

[38] *State-Sponsored Homophobia* (2019), *supra* note 5, at 168-169; *see also, e.g.,* Liam Fox, *Murdered on International day against Transphobia: fears Fiji killing is a hate crime,* ABC NEWS (July 23, 2018, 5:06 AM), https://www.abc.net.au/news/2018-07-23/trans-woman-murdered-in-fiji-in-suspected-hate-crime/10026 188 (murder by blunt force trauma of individual identifying as transgender); Tokada Rainima, *No arrest yet on Vesida murder,* FBC NEWS (Oct. 12, 2017, 1:20 AM), https://www.fbcnews.com.fj/ news/no-arrests-yet-on-vesida-murder/ (mutilation and murder of student who identified as gay).

[39] Anamika Singh, *More LGBT people are expressing their love openly, however they are also being targeted,* FIJIVILLAGE (Nov. 20, 2017), https://fijivillage.com/news-feature/More-LGBT-people-are-expressing-their-love-openly-however-they-are-also-being-tar geted-k9s25r/.

[40] Suva Shahani Mala, *Attack On Gay Men Condemned,* FIJI SUN (Feb. 7, 2017), http://fijisun.com.fj/2017/02/07/attack-on-gay-men-condemned/.

[41] *Id.*

AR4734

15

hate crimes have been reported against individuals identifying as transgender in Malaysia as well.[42]

In the Philippines, in the first half of 2011 alone, at least twenty-eight people were killed on the basis of identifying as LGBTQ.[43]  Moreover, LGBTQ individuals in the Philippines report physical violence within their own family.  A 2012 report highlighting different manifestations of violence against women in the LGBTQ community in the Philippines points to family-based violence as a form of physical abuse against this community:

> Most of those interviewed said family members within a nuclear family unit, predominantly male members of family or clan, including fathers, brothers, uncles and stepfathers, had inflicted most of the physical violence.  Most incidents of violence occurred immediately after a person voluntarily disclosed her sexual orientation and/or gender identity, was "outed" (a person's sexual orientation or gender identity is revealed without the person's knowledge or permission), or was suspected of being non-heteronormative.[44]

The reported acts of violence in these API nations are not isolated incidents, and violence against

---

[42] Neela Ghosal & Thilaga Sulathireh, *"The Deceased Can't Speak for Herself:" Violence Against LGBT People in Malaysia,* GEO. J. OF INT'L AFF. (2019).

[43] U.N. DEV. PROGRAMME & U.S. AGENCY INT'L DEV., *Being LGBT in Asia: The Philippines Country Report*, at 8 (2014).

[44] *Kwentong Bebot: Lived Experiences of Lesbians, Bisexual and Transgender Women in the Philippines*, RAINBOW RIGHTS PROJECT, at 14 (2013), https://www.outrightinternational.org/sites/default/files/phillipinescc.pdf.

16

LGBTQ individuals remains a real risk across API nations. The serious repercussions also decrease reporting—suggesting even higher rates of such violence actually occur.[45] The situation is exacerbated by the fact that only two out of over forty API nations (East Timor and Mongolia) have enacted legislation aimed at curbing violence motivated by sexual orientation.[46]

Despite what appears to be some modest increase in legal protections in some API nations, scholars have noted that the continued "discrimination, marginalisation and violence experienced by LGBTQ people in the countries of Southeast Asia, point to the reality that, in practice, recognition of LGBTQ people's human rights is uneven, incomplete and frequently contradictory and arbitrary, reflecting national, regional and international politics, as well as multiple intersecting dynamics of privilege and marginalisation."[47]

---

[45] U.S. State Department reports on human rights in Laos and the Maldives both highlight the fact that even where "there were no reports of discrimination . . . observers believed societal stigma and concern about repercussions led some to withhold reporting incidents of abuse." U.S. DEP'T OF STATE, BUREAU OF DEMOCRACY, H.R. AND LAB., *Laos 2018 Human Rights Report*, at § 6 (2018); U.S. DEP'T OF STATE, BUREAU OF DEMOCRACY, H.R. AND LAB., *Maldives 2018 Human Rights Report*, at § 6 (2018) ("There were no reports of officials complicit in abuses against LGBTI persons, although societal stigma likely discouraged individuals from reporting such problems. Local citizens who expressed support for LGBTI rights on social media reportedly were targeted for online harassment . . .")

[46] *State-Sponsored Homophobia* (2019), *supra* note 5, at 257–59.

[47] Cai Wilkinson et al., *LGBT Rights in Southeast Asia: One Step Forward, Two Steps Back?*, IAFOR J. OF ASIAN STUD, at 7 (2017).

AR4736

17

And, as was formerly the case in the United States, homosexuality is still "treated as an illness" in many API countries. *Obergefell,* 135 S. Ct. at 2596. While psychiatrists and others in the United States now recognize that "sexual orientation is both a normal expression of human sexuality and immutable," *id.*, the governments of many API nations do not. In Indonesia, for example, Government Regulation 61/2014 on Reproductive Health defines a healthy sexual life as free from "sexual orientation dysfunction or deviance."[48] The country has become increasingly intolerant in the last several years, with increasing prosecutions of LGBTQ people under its Pornography Law, which refers to same-sex conduct as "deviant behavior."[49] In Thailand, until 2011, LGBTQ individuals were banned from serving in the military, branded as individuals of "permanent mental disorder."[50] The Supreme Court in Singapore has declared that there is "no definitive conclusion" on the "supposed immutability" of homosexuality and upheld antiquated, discriminatory laws from legal challenge.[51] For LGBTQ DACA recipients, a return to the numerous API countries that embrace these harmful and hurtful ideologies would deny them the "lawful realm, to

---

[48] *State-Sponsored Homophobia* (2017), *supra* note 8, at 125.

[49] Kyle Knight, *Indonesia's anti-LGBT drive should concern all Asia,* HUMAN RIGHTS WATCH (Feb. 20, 2018, 1:42 PM), https://www.hrw.org/news/2018/02/20/indonesias-anti-lgbt-drive-should-concern-all-asia; Badgett et al., *supra* note 22, at 5.

[50] U.N. DEV. PROGRAMME & U.S. AGENCY INT'L DEV., *Being LGBT in Asia: Thailand Country Report*, at 23 (2014).

[51] *Lim Meng Suang et al. v. Attorney General*, Court of Appeal of Republic of Singapore (decided October 29, 2014), https://www.supremecourt.gov.sg/docs/default-source/module-document/judgement/-2014-sgca-53-pdf.pdf

18

define and express their identity" that they enjoy in this country. *Obergefell*, 135 S. Ct. at 2593.

### The Fundamental Right to Marry:

Unlike in the United States, same-sex individuals have little to no access to the fundamental right to marry in nearly every API country. Thus, despite the "utmost importance" of the "fundamental right" to marry, LGBTQ API DACA recipients would be denied this right entirely if forced to return to their country of birth. *Obergefell,* 135 S. Ct. at 2589, 2605. Only in May of this year did Taiwan become the very first—and only—country in Asia to recognize same-sex marriage.[52] Thus, countries that collectively have billions of citizens deny this fundamental right to same-sex couples, including China, India, Indonesia and South Korea. In all of the many countries that do not recognize same-sex marriage, DACA recipients would be "demean[ed] or stigmatize[ed]" by laws that would, if they are removed to one of these many countries, "disparage their choices and diminish their personhood." *Obergefell,* 135 S.Ct. at 2602. Marriages recognized in the United States would not be recognized in their countries of birth, a pernicious and cruel result and insult to personhood.

### Public Expression and Freedom of Association:

In addition to criminalization and discrimination in society at large, the right to free expression and association is severely reduced in many API countries. In Indonesia, for example, broadcasting standards limit LGBTQ expression on TV, with the logic of

---

[52] Chris Horton, *After a Long Fight, Taiwan's Same-Sex Couples Celebrate New Marriages,* N.Y. Times, May 25, 2019, § A at 7; *State-Sponsored Homophobia* (2019), *supra* note 5, at 27.

19

protecting children, and factions in the country are seeking bans on LGBTQ-focused apps and websites.[53] In Pakistan, the media has depicted an admitted serial killer of gay men as the "epitome of righteousness."[54] In the countries that still criminalize same-sex sexual activities, freedom of expression and association for LGBTQ individuals is often curtailed, if not eliminated altogether. Social scientists have described how actors in various Southeast Asian countries have used "political homophobia"—that is, "overt claims to political legitimacy through homophobia"—to advance their political goals in culturally and religiously-conservative countries.[55] For LGBTQ people, such political opportunism has, as its devastating side-effect, "the perpetuation of a 'chilly' socio-political climate in which there is little or no protection from scapegoating, exclusion, marginalisation, discrimination and violence, even in the absence of criminalization."[56]

In short, LGBTQ individuals would be denied basic freedoms that they have obtained and relied on in America if the rescission of DACA is upheld and LGBTQ API DACA recipients are forced to return to their countries of birth. Worse, they would be subject to physical, psychological, cultural and sexual violence simply for being who they are, and living authentically in the United States.

---

[53] *State-Sponsored Homophobia* (2017), *supra* note 8, at 41; Badgett et al., *supra* note 22, at 8.

[54] *State-Sponsored Homophobia* (2017), *supra* note 8, at 134.

[55] Wilkinson, *supra* note 47, at 13 (internal quotations omitted).

[56] *Id.*, at 14.

20

## II. The tens of thousands of LGBTQ DACA recipients, especially those who publically identified themselves as such, will be at increased risk for discrimination and mistreatment if DACA is rescinded

Over 800,000 young people have received protection from removal through DACA since the policy's inception.[57]  The Williams Institute at the UCLA School of Law estimates that, as of March 2016, "over 36,000" of these recipients identify as LGBTQ "including 24,000 who renewed" based on a "conservative estimate of the percentage of LGBTQ individuals among 15 to 34 year olds eligible for or participating in DACA."[58]  Surveys of LGBTQ DACA recipients indicate the rates of self-identification as LGBTQ are actually higher than the national average.  In a 2015 survey conducted by United We Dream, 8.6% of respondents "identified as LGBTQ, a rate higher than the national average and higher for the 18 to 29 age group."[59]  Similarly, the authors of a 2017 survey of DACA recipients reported that up to 10 percent of all DACA recipients who

---

[57] U.S. CITIZENSHIP & IMMIGRATION SERVS., *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake and Case Status Fiscal Year 2012-2019* (June 30, 2019).

[58] Kerith Conron & Taylor N.T. Brown, *There are Over 75,000 LGBT DREAMers; 36,000 Have Participated in DACA*, THE WILLIAMS INST., UCLA School of Law, at n.3 (Feb. 2017), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT -DREAMers-and-DACA-February-2017.pdf.

[59] Zenén Jaimes Pérez, *A Portrait of Deferred Action for Childhood Arrivals Recipients: Challenges and Opportunities Three-Years Later*, UNITED WE DREAM, at 7 (Oct. 2015), https:// unitedwedream.org/wp-content/uploads/2015/10/DACA-report-final-1.pdf.

AR4740

21

participated in the survey identified as LGBTQ.[60] In the 2019 update, 6.3% of respondents identified as gay or lesbian, 7.6% identified as bisexual, and 0.3% identified as transgender or gender non-conforming—indicating the rate of DACA recipients who identify as LGBTQ may be substantially higher than in the general population, and amount to over 100,000 individuals.[61]

In order to be eligible for DACA, an undocumented immigrant must have entered the United States before turning sixteen years old.[62] Many DACA recipients arrived in the United States at very young ages, and have spent their formative years here. Surveys of DACA recipients have suggested that the average age of entry to this country is just six years old.[63] Importantly, LGBTQ DACA recipients have grown up in a country that provides significant rights

---

[60] Sharita Gruberg, *What Ending DACA Means for LGBTQ Dreamers,* CTR. FOR AMERICAN PROGRESS (Oct. 11, 2017 11:08 AM), https://www.americanprogress.org/issues/lgbt/news/2017/10/11/440450/ending-daca-means-lgbtq-dreamers/.

[61] Wong et al., *supra* note 4, at 16.

[62] U.S. DEP'T OF HOMELAND SECURITY, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*, at 1 (June 12, 2012).

[63] Tom K. Wong et al., *2017 National DACA Study*, at 13 (Nov. 2, 2017), https://cdn.americanprogress.org/content/uploads/2017/11/02125251/2017_DACA_study_economic_report_updated.pdf; Wong et al., *supra* note 4, at 15; *see also* Nicole Svajlenka & Audrey Singer, *Immigration Facts: Deferred Action for Childhood Arrivals (DACA),* BROOKINGS METRO. POL'Y PROGRAM (Aug. 14, 2013), https://www.brookings.edu/research/immigration-facts-deferred-action-for-childhood-arrivals-daca/ ("The most common age at arrival was eight, however almost one-third (31 percent) were five or younger and more than two-thirds (69 percent) were 10 or younger when they arrived.").

AR4741

22

and protections to LGBTQ individuals and where opportunities for LGBTQ activism and community are ample.[64]   In building their lives here, especially in reliance on the expectation of DACA continuing, LGBTQ DACA recipients have often elected to live publicly "out" lives on social media and otherwise. Those expressions of identity, made in reliance on the continued expectation of DACA, cannot be undone and could result in serious repercussions in their countries of birth, as outlined *infra*, Section I.

Tony Choi is one such individual.  Mr. Choi is a twenty-eight year old DACA recipient who lives in Bergen County, New Jersey.  Tony was born in Korea, but his family moved to the United States after the Asian financial crisis in 1996 when he was eight years old.[65]   Tony identifies as gay, and has become an

---

[64] *See, e.g., Obergefell v. Hodges,* 135 S. Ct. 2584 (2015) (recognizing same-sex marriage); *Lawrence v. Texas*, 539 U.S. 558 (2003) (decriminalizing sodomy); *Hively* v. *Ivy Tech Cmty. College of Ind.*, 853 F.3d 339 (7th Cir. 2017) (extending the protections of Title VII of the Civil Rights Act of 1964 to discrimination based on sexual orientation); *Zarda v. Altitude Express, Inc.*, 855 F.3d 76 (2d Cir. 2017) (same); *see also* 18 U.S.C. § 249 *et seq.* (criminalizing hate crimes on the basis of actual or perceived sexual orientation); Executive Order No. 13087, 63 Fed. Reg. 30097 (May 28, 1998) (prohibiting discrimination in the federal government on the basis of sexual orientation); N.Y. Exec. Law § 296 (Consol. 2019) (prohibiting discrimination on the basis of sexual orientation in many forums in New York); N.J. Stat. § 18A:35-4.36 (2019) (requiring New Jersey public schools to teach LGBTQ-inclusive materials); Cal Health & Saf Code Div. 104, Pt. 5, Art. 5 (2016) (requiring that single-occupancy restrooms in California businesses, government buildings, and places of public accommodation be universally accessible to all genders).

[65] *Uncovering Our Stories: Tony Choi,* National Queer Asian Pacific Islander Alliance (Oct. 11, 2013), https://www.nqapia.org/wpp/uncovering-our-stories-tony-choi/.

23

outspoken advocate for undocumented and LGBTQ individuals.  In Mr. Choi's own words:

> In 2010, after the failure of the DREAM Act and my mother's cancer diagnosis, I had lost hope.  The choices ahead of me were to live a closeted life taking care of my mother or to return to Korea where my LGBTQ identity would subject me to harsh hazing for two years in the mandatory military service in an unfamiliar cultural environment echoes away from my home here in New Jersey.  Instead, I chose to speak out and find my community.  Finding my voice in advocating for, and then in receiving, DACA protection has given me the ability to live a fuller life out of the closet, and allowed me to find a community both online and in New Jersey.

Mr. Choi has a prominent online presence as an LGBTQ activist and organizer.  In 2012, Mr. Choi appeared on the cover of TIME Magazine alongside Jose Antonio Vargas, a nationally recognized immigrant rights activist and journalist who is undocumented.[66]

Bupendra Ram is another such individual.  Mr. Ram is a thirty-two year old DACA recipient who lives and works in Los Angeles, California, and identifies as queer.[67]  He was born in Fiji, but is ethnically Indian, and came to the United States when he was two years

---

[66] Feifei Sun, *Behind the Cover: America's Undocumented Immigrants*, TIME (June 14, 2012).

[67] "Queer" is typically used to denote "people, particularly younger people, whose sexual orientation is not exclusively heterosexual."  *What is LGBTQ?, supra* note 2.

24

old.[68]   His family fled Fiji as a result of a political coup.[69]  While his family was granted political asylum in the United States, Mr. Ram's name was never included on the application through an error of the family's counsel.   As a result, he remains undocumented.   In recent years, Mr. Ram has been "'out' on social media and online."  He has "become more public about his identity" as a queer, undocumented South Asian immigrant, more involved in activism, and more involved in the LGBTQ community.   Mr. Ram is a vocal advocate for immigration reform.[70]   In short, DACA has allowed Mr. Ram to be more open about his identity as both undocumented and queer.

Like Mr. Ram and Mr. Choi, many young people who identify as LGBTQ are open about their sexual orientation and/or gender identity in ways that are publicly accessible, such as through activism and social media.  On average, DACA recipients are 24 years old, 29% of recipients are between the ages of 16 and 20 years old, and 37% are between the ages of 21 and 25 years old.[71]   Social media use is almost ubiquitous within this age group: 90% of people between the ages of 18 and 29 years old report they use at least one

---

[68] *Uncovering Our Stories: Bupendra Ram,* National Queer Asian Pacific Islander Alliance (Aug. 24, 2013), https://www.nqapia.org/wpp/uncovering-our-stories-bupendra/.

[69] *DACA Stories, Bupendra (Bupen) Ram*, SAALT, http://saalt.org/policy-change/immigrant-rights/daca-stories/bupendra-bupen-ram/ (last visited Sept. 27, 2019).

[70] *Id.*

[71] Gustavo López & Jens Krogstad, *Key facts about unauthorized immigrants enrolled in DACA*, PEW RES. CTR. (Sep. 25, 2017), http://www.pewresearch.org/fact-tank/2017/09/25/key-facts-about-unauthorized-immigrants-enrolled-in-daca/.

25

social media platform.[72]  These social media platforms are widely used amongst young people who identify as LGBTQ to convey their unique stories and to build community.  In a survey of LGBTQ adults, 55% say they "have met new LGBTQ friends online" and 43% "have revealed their sexual and/or gender identity on a social networking site."[73]  Both Mr. Ram and Mr. Choi use social media in order to convey their stories about being undocumented and identifying as LGBTQ. They also use social media to connect with similarly situated individuals and organizations like NQAPIA, and to provide support to other undocumented Asians who self-identify as LGBTQ.

This use of social media, or more generally being identified as "out" online, is significant.  It means that information regarding DACA recipients' sexual orientation and/or gender identity is publically and readily available.  This information is not limited to individuals residing in the United States but is readily available to both governmental and private actors here ***and abroad***, putting LGBTQ DACA recipients at ***increased*** risk for discrimination and mistreatment, for the reasons set forth *supra*.  Even without social media, it is not unreasonable to expect that the news of being "out," especially in countries that criminalize sexual orientation and/or gender identity, will follow DACA recipients to their countries of birth.

---

[72] *Social Media Fact Sheet,* PEW RES. CTR., INTERNET & TECH., (June 12, 2019), https://www.pewinternet.org/fact-sheet/social-media/.

[73] *A Survey of LGBT Americans*, PEW RES. CTR. SOC. & DEMOGRAPHIC TRENDS (June 13, 2013), https://www.pewsocial trends.org/2013/06/13/a-survey-of-lgbt-americans/.

26

There is no question that many LGBTQ API DACA recipients will face harassment, persecution, violence and possible criminal prosecution by virtue of their sexual orientation and/or gender identity if DACA is rescinded and they are removed to their country of birth. This risk is compounded to the extent that among the tens of thousands of LGBTQ DACA recipients, there are individuals who are "out"—a decision undoubtedly guided and informed in reliance on the continued expectation of DACA and the protections of this country—who will be at higher risk of danger if and when removed to their countries of birth. This creates a serious risk for Mr. Choi, Mr. Ram and those similarly situated if detained and/or removed.

If DACA is terminated, many LGBTQ undocumented immigrants would be subject to removal proceedings under United States immigration law. Unless individuals are able to apply for another type of protection, or agree to voluntarily return to their country of birth, such undocumented immigrants could be sent to an immigration detention center for days or even months during these proceedings. For LGBTQ undocumented immigrants, immigration detention centers in the United States are particularly violent. According to an analysis by the Center for American Progress, the Immigration, Customs and Enforcement ("ICE") sexual assault reporting data released pursuant to the Prison Rape Elimination Act demonstrates that, in 2017, "although LGBT people were 0.14 percent of the people ICE detained in FY2017, they accounted for 12 percent of victims of sexual abuse and assault in ICE detention that year."[74] This means that

---

[74] Sharita Gruberg, *ICE's Rejection of Its Own Rules Is Placing LGBT Immigrants at Severe Risk of Sexual Abuse,* CTR. FOR AMERICAN PROGRESS (May 30, 2018, 12:00 PM), https://www.

27

"assuming each report of sexual violence is substantiated and involves a separate victim, LGBTQ people in ICE custody are 97 times more likely to be sexually victimized than non-LGBTQ people in detention."[75] Further, the "ICE data show[s] that 1 in 8 transgender people detained in FY 2017 were placed in solitary confinement" which is "considered a form of torture by the United Nations."[76]

The risks and violence continue if an individual is removed. As Mr. Choi has stated:

> For many of us, going back to our home countries is a scary proposition because of our queerness. I worry about my safety, and the safety of my fellow undocumented DACA recipients. I have serious concerns about being forced to return to Korea as a gay man, including forced conscription to a military that openly criminalizes, and punishes, homosexual acts. Further, I am deeply concerned that I will be unable to adjust to an unfamiliar culture after two decades of life here in the United States.

As Mr. Choi has recognized, removal to Korea would have a severe impact on his life. Korea's mandatory conscription mandates that he serve in a military

---

americanprogress.org/issues/lgbt/news/2018/05/30/451294/ices-rejection-rules-placing-lgbt-immigrants-severe-risk-sexual-abuse/.

[75] *Id.*

[76] Sam Hananel, *Release: LGBT Immigrants in Detention Centers at Severe Risk of Sexual Abuse, CAP Analysis Says,* CTR. FOR AMERICAN PROGRESS (May 30, 2018), https://www.americanprogress.org/press/release/2018/05/30/451380/release-lgbt-immigrants-detention-centers-severe-risk-sexual-abuse-cap-analysis-says/.

28

which outlaws and could prosecute him for "sodomy or other disgraceful conduct"[77] (a provision that was upheld as constitutional as recently as July 2016).[78]

Mr. Ram would also be put at risk for societal discrimination and violence on the basis of his sexual orientation.[79]  In fact, he reports hearing even "close family members make anti-LGBTQ comments about how they would hurt members of my community." Further, Mr. Ram's family left Fiji because of the political climate, which was severe enough and dangerous enough for his family members as ethnic Indians to be granted asylum in the United States.[80] That danger and discrimination would be compounded by his LGBTQ status.

Both men would lose these civil protections afforded to them in the United States, including the fundamental right to marry.[81]  Neither man could engage in any

---

[77] MILITARY CRIMINAL ACT (SOUTH KOREA) Article 92-6.

[78] *State-Sponsored Homophobia* (2019), *supra* note 5, at 132.

[79] *See supra* text accompanying note 38.

[80] To be eligible for asylum in the U.S., Mr. Ram's family must have faced demonstrated "persecution" in Fiji.  *See* 8 U.S.C. § 101(a)(42).  "[P]ersecution must rise above unpleasantness, harassment and even basic suffering." *Nelson v. INS*, 232 F.3d 258, 263 (1st Cir. 2000).  Rather, persecution in asylum jurisprudence is "an extreme concept", marked by "the infliction of suffering or harm . . . in a way regarded as offensive." *Li v. Ashcroft*, 356 F.3d 1153, 1158 (9th Cir. 2004) (*quoting Ghaly v INS*, 58 F.3d 1481 (9th Cir. 1995)).

[81] In fact, in Fiji, the prime minister has explicitly stated that his government would "never" allow same-sex marriage in his lifetime, and called same-sex marriage "rubbish." *Fiji PM's gay marriage comments shock,* RNZ (Jan. 6, 2016, 7:31 PM), https://www.rnz.co.nz/international/pacific-news/293597/fiji-pm's-gay-marriage-comments-shock.

29

LGBTQ advocacy without real risk of repercussions and possible violence.[82]

LGBTQ API DACA recipients who have built their lives in this country should not be arbitrarily forced to return to face near-certain discrimination and mistreatment in countries that for many recipients, will be entirely foreign.  As Mr. Ram stated:

> Receiving DACA allowed me for the first time to breathe easier.  I can live, I can take care of myself, and I have some stability.  Removal would take all that I have worked for away, and place me without any support in a country I do not even remember.  I would also be separated from my family and friends who live in America.

Rescinding DACA for Mr. Choi, Mr. Ram and other LGBTQ recipients would be the perfect embodiment of what the Court of Appeals deemed "the cruelty and wastefulness of deporting productive young people to countries with which they have no ties." *Regents of the Univ. of Calif. v. U.S. Dep't Homeland Sec.*, 908 F.3d 476, 486 (9th Cir. 2018).  Removal to countries of birth is exceptionally cruel for LGBTQ API DACA recipients, who not only have no ties to their countries of birth, but would also face discrimination, criminal prosecution violence upon their return.

---

[82] Further, both Mr. Ram and Mr. Choi are very active in the Asian LGBTQ community, and if DACA is rescinded, their removal will be an irreparable loss to the community and NQAPIA.

30

## CONCLUSION

For the foregoing reasons and those in the briefs of Respondents and other *amici curiae* supporting them, the National Queer Asian Pacific Islander Alliance, Inc., and the other *amici curiae* on this brief urge the Court to affirm the judgments of the Court of Appeals for the Ninth Circuit and the United States District Court for the District of Columbia, as well as the orders of the United States District Court for the Eastern District of New York.

Respectfully submitted,

GLENN D. MAGPANTAY
*Executive Director
and Counsel*
NATIONAL QUEER ASIAN
PACIFIC ISLANDER
ALLIANCE, INC.
P.O. Box 1277
Old Chelsea Station
New York, NY 10113

217 West 18th Street, #1277
New York, NY 10011
(917) 439-3158

SUSAN M. FINEGAN
*Counsel of Record*
MEREDITH M. LEARY
KAITLYN A. CROWE
ANGEL FENG
GEOFFREY A. FRIEDMAN
RITHIKA KULATHILA
MARGUERITE MCCONIHE
MINTZ, LEVIN, COHN,
FERRIS, GLOVSKY AND
POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000
SMFinegan@Mintz.com

*Counsel for Amici Curiae*

September 30, 2019

**AR4750**

**APPENDIX**

1a

# APPENDIX

## List of *Amici Curiae*

**API Equality – Northern California (APIENC)** builds queer and transgender Asian and Pacific Islander power to amplify their voices and increase the visibility of their communities. Through organizing, the organization inspires and trains leaders, establishes intergenerational connections, and documents and disseminates queer and transgender Asian and Pacific Islander histories.

**API Rainbow Parents of PFLAG NYC** provides information and support to Asian Pacific Islander families with LGBTQ family members.

The mission of the **APICHA Community Health Center – New York City** is to improve the health of the community and to increase access to comprehensive primary care, preventive health services, mental health, and supportive services for underserved and vulnerable people, especially Asians and Pacific Islanders, the LGBT Community and individuals living with and affected by HIV/AIDS.

**Asian and Pacific Islander Queers United for Action (AQUA)** promotes the positive identity and general welfare of the LGBTQ+ members of the Asian and Pacific Islander communities in the DC metro area, through advocacy, coalition building, education, networking, outreach, and support.

Founded in 1992, **Asian Pacific American Labor Alliance (AFL-CIO)**, is the first and only national organization of Asian American and Pacific Islander (AAPI) workers, most of who are union members, and allies advancing worker, immigrant and civil rights.

AR4752

2a

The **Asian Pacific Islander Queer Women and Transgender Community – San Francisco** is a fun, welcoming, multi-generational group of Asian & Pacific islander queer women and transgender people in the Bay Area, who are building community together. It is the legacy of queer A&PI activism, stemming from earlier-founded organizations going back to 1987.  It is a wholly volunteer-based organization.

**ATL Q+A – Atlanta** supports and respects Queer/Trans Asian folx living in the Atlanta area.

**Equality Federation** is the movement builder and strategic partner to state-based organizations advocating for LGBTQ people.

The **Gay Asian and Pacific Islander Men of New York ("GAPIMNY")** was founded on 1990 and is an all-volunteer, membership-based community organization that provides a range of political, social, educational, and cultural programming.  GAPIMNY works in coalition with other community organizations to help educate its communities on issues of race, sexuality, gender, and health.  Its mission is to empower LGBT Asian and Pacific Islander people to create positive change.

The **Gay Asian Pacific Alliance (GAPA)** in San Francisco Bay Area is an organization dedicated to furthering the interests of LGBT Asian and Pacific Islanders by creating awareness, developing a positive collective identity, and establishing a supportive community.  GAPA envisions a powerful Queer Trans Asian and Pacific Islander community that is seen, heard, and celebrated.

The **GLBT Fund of America, Philadelphia** was established in 2007 to support its community in the areas of social justice, health needs and civil rights.

**AR4753**

3a

Through strategic litigation, public policy advocacy, and education, **GLBTQ Legal Advocates & Defenders (GLAD)** works in New England and nationally to create a just society free of discrimination based on gender identity and expression, HIV status, and sexual orientation. GLAD has litigated widely in both state and federal courts in all areas of the law in order to protect and advance the rights of lesbians, gay men, bisexuals, transgender individuals and people living with HIV and AIDS. GLAD has an enduring interest in affirming the right of all LGBTQ individuals to live in a free and just society.

**Immigration Equality** is a leading national non-profit organization that provides legal services and advocacy for lesbian, gay, bisexual, transgender, queer ("LGBTQ") and HIV-positive immigrants.

**Invisible to Invincible Asian Pacific Pride of Chicago (i2i)** is a community-based organization that celebrates and affirms Asians & Pacific Islanders who identify as Lesbian, Gay, Bisexual, Transgender, Questioning, and Queer in the Chicago area.

**KhushATX,** is an active South Asian gay, lesbian, bisexual, and transgender group based in Austin, Texas.

**Korean American Rainbow Parents (KARP) – Washington D.C.**, aims to build compassion on queer issues within the Korean American community, on behalf of LBGTQ loved ones.

**Korean Queer and Transgender Organization of Washington, DC** is comprised of LGBTQ individuals, parents, and allies of Korean descent committed to promote a welcoming space and advocating for LGBTQ rights.

**AR4754**

4a

**Lambda Legal Defense and Education Fund, Inc.** is the nation's oldest and largest non-profit legal organization committed to achieving full recognition of the civil rights of lesbians, gay men, bisexuals, transgender, and queer ("LGBTQ") people and everyone living with HIV through impact litigation, education, and public policy work. Lambda Legal's advocacy on behalf of youth and adult immigrants includes, in addition to direct representation to secure legal protections, educating the public and courts regarding the emotional and physical harm and state-sponsored, government-sanctioned discrimination faced by LGBTQ people and people living with HIV, or those perceived to be, in countries around the world and the life or death consequences if forced to return to their home countries.

Since 1969, the **Los Angeles LGBT Center** has cared for, championed, and celebrated LGBT individuals and families in Los Angeles and around the world. Today, the organization's nearly 750 employees provide services for more LGBT people than any other organization in the world, offering programs, services, and global advocacy that span four broad categories: health, social services and housing, culture and education, and leadership and advocacy.

**National Black Justice Coalition** is a civil rights organization dedicated to empowering Black lesbian, gay, bisexual, and transgender people.

Founded in 1973, the **National LGBTQ Task Force** is a progressive social justice organization that works to build power, take action, and create change to achieve freedom and justice for LGBTQ people and their families. The Task Force works toward a society that values and respects the diversity of human expression and identity and achieves equity for all.

**AR4755**

5a

**Our Space LGBT Youth Center** is a vibrant safe space for LGBTQ youth ages 11-23 in Alameda County which served over 500 queer and trans youth each year.  LGBTQ young people experience significantly higher rates of harassment and abuse—as well as poverty, homelessness, and involvement in the child welfare and juvenile justice systems—than their straight peers.  Our Space provides the much-needed safe space where LGBTQ youth can express their authentic selves and feel seen, accepted, and celebrated. Comprehensive services for youth include: peer support groups in schools, community-based mental health and case management, intergenerational community building activities, paid youth leadership opportunities, as well as a community center with drop-in hours and a gender affirming clothing closet and food pantry. Our Space also offers specialized support services for adult caregivers and families, as well as trainings for staff from schools, clinics, and other service providers working with LGBTQ youth.  At its heart, Our Space is working to create a world where LGBTQ youth are empowered to show fierce love for themselves and their community.

**OutRight Action International** seeks to advance human rights and opportunities for LGBTIQ people around the world by developing partnerships at global, regional, and national levels to build capacity, document human rights violations, advocate for inclusion and equality, and hold leaders accountable for protecting the rights of LGBTIQ people.

**Philadelphia Asian & Queer (PAQ)** is a volunteer, social organization that strives to engage queer (LGBTQIA+), Asian Pacific Islander (API) folx within the greater Philadelphia area.  Through a range of advocacy, social and supportive programming, PAQ

**AR4756**

6a

commits to building and uniting the collective voices of the queer, API community.

**PFLAG** is the first and largest organization for lesbian, gay, bisexual, transgender, and queer (LGBTQ+) people, their parents and families, and allies. With over 400 chapters and 200,000 members and supporters crossing multiple generations of families in major urban centers, small cities, and rural areas across America, PFLAG is committed to creating a world where diversity is celebrated and all people are respected, valued, and affirmed. PFLAG's mission is to build on a foundation of loving families united with LGBTQ people and allies who support one another, and to educate ourselves and our communities to speak up as advocates until all hearts and minds respect, value and affirm LGBTQ people.

The **PFLAG – San Gabriel Valley Asian Pacific Islander** accomplishes the vision and mission of PFLAG National in promoting the health and well-being of LGBT individuals, their families, and friends through: support, education and advocacy. The organization addresses the culture-specific needs of the Asian-American, Pacific-Islander, East Asian, and South Asian people and fosters inter-generational dialogue.

**Queer South Asian Collective Community – Boston** is a collective community of LGBTQIA folx, residing in the Greater Boston Area of API descent.

**Q-WAVE** is a community organization based in New York City, founded in 2004. It is dedicated to strengthening the voices of lesbian / bisexual / queer women and transgender / gender variant people of Asian & Pacific Islander descent.

**SAGE NYC** leads in addressing issues related to lesbian, gay, bisexual and transgender (LGBT) aging.

AR4757

7a

In partnership with its constituents and allies, SAGE works to achieve a high quality of life for LGBT older people, supports and advocates for their rights, fosters a greater understanding of aging in all communities, and promotes positive images of LGBT life in later years.

**SALGA NYC** serves to promote awareness, acceptance, empowerment, and safe inclusive spaces for people of all sexual orientation and/or gender identity, who trace their heritage to South Asia or who identify as South Asian. SALGA-NYC is a not-for-profit, all-volunteer organization, serving the South Asian LGBT community. Its mission is to enable community members to establish cultural visibility and take a stand against oppression and discrimination in all its forms.

**San Francisco LGBT Center** is San Francisco's only organization serving the full spectrum of LGBT communities. The Center innovates powerful human service programs to meet changing community needs, to address problems that have been neglected, and to shine light on LGBT culture and community in new ways. The Center's major program areas are economic development, youth programming, community programming and building services.

**Satrang Los Angeles**, serves the South Asian LGBTQ community by promoting awareness, acceptance, and empowerment through social, educational, and advocacy-related events. It envisions and works towards an inclusive and visible community in which South Asian LGBTQ-identified people feel whole and heard.

**Transgender Legal Defense and Education Fund** is an American civil rights organization that

8a

focuses on transgender equality through impact litigation and public policy work.

**Trikone** offers a supportive, empowering and non-judgmental environment where LGBTQ South Asians and their allies can meet, make connections, and proudly promote awareness and acceptance of their sexual identity.

**UTOPIA Seattle's** mission is to provide sacred spaces to strengthen the minds and bodies of QTPIs (Queer and Trans Pacific Islanders) through community organizing, community care, civic engagement, and cultural stewardship.

**AR4759**

Nos. 18-587, 18-588, and 18-589

IN THE

# Supreme Court of the United States

DEPARTMENT OF
HOMELAND SECURITY, ET AL.,    *Petitioners*,
*v.*
REGENTS OF THE UNIVERSITY
OF CALIFORNIA, ET AL.,    *Respondents*.

DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL.,    *Petitioners*,
*v.*
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL.,    *Respondents*.

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, ET AL.,    *Petitioners*,
*v.*
MARTIN JONATHAN BATALLA VIDAL, ET AL.,    *Respondents*.

ON WRITS OF CERTIORARI TO THE
UNITED STATES COURTS OF APPEALS FOR THE
NINTH, D.C., AND SECOND CIRCUITS

**BRIEF OF TIM COOK, DEIRDRE O'BRIEN, AND
APPLE AS AMICI CURIAE
IN SUPPORT OF RESPONDENTS**

Mark S. Davies
Thomas M. Bondy
Jeremy R. Peterman
Upnit K. Bhatti
Aaron Brecher
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, D.C. 20005

E. Joshua Rosenkranz
   *Counsel of Record*
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000
jrosenkranz@orrick.com

*Counsel for Amici Curiae*

AR4760

i

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................... ii

INTEREST OF AMICI CURIAE ............................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................................... 2

ARGUMENT ............................................................. 4

CONCLUSION ....................................................... 16

**AR4761**

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*NLRB v. Bell Aerospace Co.*,
  416 U.S. 267 (1974) .............................................. 15

*Perez v. Mortg. Bankers Ass'n*,
  135 S. Ct. 1199 (2015) ......................................... 15

*Smiley v. Citibank (S.D.), N.A.*,
  517 U.S. 735 (1996) .............................................. 15

*United States v. Penn. Indus. Chem. Corp.*,
  411 U.S. 655 (1973) .............................................. 15

**Other Authorities**

Tim Cook & Charles Koch, *Congress must act
  on the 'dreamers'*, Wash. Post (Dec. 14,
  2017), https://tinyurl.com/y4rkuzdl ..................... 13

Letter from Tim Cook et al. to Donald J.
  Trump, Paul Ryan, Nancy Pelosi, Mitch
  McConnell, and Charles Schumer (Aug. 31,
  2017), https://tinyurl.com/y6byjda9 ..................... 14

*Global Diversity & Inclusion: Fostering
  Innovation Through a Diverse Workforce*,
  Forbes Insights (July 2011),
  https://tinyurl.com/y7plo7qh ............................... 14

AR4762

iii

Sylvia Ann Hewlett et al., *How Diversity Can Drive Innovation*, Harv. Bus. Rev. (Dec. 2013), https://tinyurl.com/j8nyu8k ...................... 13

Anna Powers, *A Study Finds That Diverse Companies Produce 19% More Revenue*, Forbes (June 27, 2018), https://tinyurl.com/y5tk7lsn ............................... 13

Ellyn Shook & Julie Sweet, *Getting to Equal 2019: Creating a Culture That Drives Innovation*, Accenture (2019), https://tinyurl.com/y6alhclq ................................ 13

AR4763

### INTEREST OF AMICI CURIAE[1]

Apple is a company rooted in innovation that aims to make the world a better place. Tim Cook is its CEO, and Deirdre O'Brien is its Senior Vice President of Retail and People. Mr. Cook joined Apple in 1998, and Ms. O'Brien in 1988. In this submission, Mr. Cook and Ms. O'Brien speak for Apple and, importantly, for themselves. Apple has filed numerous briefs before this Court, but this is the first time we lend our own names as well. We do so here to stress that not only does Apple care as a company, but we care as leaders, colleagues, and human beings. This is an issue we feel to our core.

Since 1976, Apple has made its name by designing, developing, selling, and maintaining cutting-edge consumer electronics including mobile communications devices, personal computers, and related software and services. Apple's success stems from its people. They shape and embody Apple's culture of innovation. Apple employs a diverse workforce of over 90,000 employees in the United States alone.

Among those people are hundreds of DACA recipients who had no say in the decision to travel to this country and have known no other home. Apple employs DACA recipients who embody Apple's commitment to innovation in a wide variety of positions. As

---

[1] The parties have consented to the filing of this brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than amici and their counsel made a monetary contribution intended to fund the preparation or submission of the brief.

**AR4764**

2

we explain below, they, and immigrants like them, are vital to Apple's success. They spark creativity and help drive innovation. They are among our most driven and selfless colleagues.

Our interest in this case is simple: We are distressed at the prospect of ripping our DACA colleagues from the fabric of our company. This issue is a moral one: Our country made a deal with a highly vulnerable population interested in a bright future, and we should keep that deal.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

We are often asked, "How does Apple do it?" How has Apple devised a parade of revolutionary new products and services that no one ever imagined? How has Apple achieved one technological breakthrough after another? How has Apple made its products so consistently innovative and appealing that people all across the world, from all walks of life, enjoy them?

The answer is our people. Our recipe for success is simple: Hire the best people, from the most diverse backgrounds. They will solve the most challenging technological problems. They will find new ways to connect to the broadest population and new ways to provide the best customer experience. This is Apple's innovation strategy. It is all about the people—and their rich diversity.

After the DACA program was created, Apple eagerly sought out and hired Dreamers—relying on the commitment our government made to them. Today,

**AR4765**

3

Apple employs 443 Dreamers who come from more than 25 different countries on four continents. We did not hire them out of kindness or charity. We did it because Dreamers embody Apple's innovation strategy. They come from diverse backgrounds and display a wide range of skills and experiences that equip them to tackle problems from different perspectives. Because they thrived in the face of adversity, they often exhibit extraordinary levels of grit and drive.

We can say from experience that DACA promotes innovation—for us at Apple and for companies all across the United States. This brief features the stories of five of our DACA colleagues who play vital roles throughout Apple. They help shape our culture. Their personal stories, work ethic, and success inspire us. Apple and companies like it would be weaker and less competitive without these extraordinary individuals in our workforce. They have earned the right to continue to contribute to our company and to our society.

Which brings us to a broader—and more fundamental—point. One of Apple's core values is the belief that equal opportunities should be available for all, regardless of background. The United States is at its best when all people are free to pursue their dreams. Our country has enjoyed unparalleled success by welcoming people from around the world who seek to make a better life for themselves and their families, no matter their backgrounds.

DACA is an embodiment of those ideals. The Dreamers were brought to this country at a young age, typically through no choice of their own. When

**AR4766**

4

they were old enough to make their own choices, our country offered them a deal, which they accepted at great personal peril. They fulfilled their end of the bargain. They have done everything right. In their patriotism, dedication to their families and communities, and commitment to making their country a better place, they are as American as any of us. They simply want the opportunity to continue to work, meet their obligations to society, raise and support their families, and pursue the American dream. We collectively have a moral obligation to uphold our end of the bargain. When we do, our country will be richer for it.

## ARGUMENT

**1.** Apple did not become one of the most successful companies in the history of the world by doing things conventionally. Apple's success story is a story of innovation. We have succeeded by disrupting the marketplace with revolutionary products, novel strategies to engage the public, and new approaches to customer interactions. None of this would have happened without our diverse workforce.

For Apple, diversity is a technological and business imperative. Suppose you need to solve a complicated, multifaceted problem. It could be a technological problem that no one else has ever figured out, such as how to make a transparent touchscreen that can respond to multiple touches; how to make a watch provide life-saving assistance; or how to fulfill the promise of augmented reality. It could be a customer-relations challenge, such as how

**AR4767**

5

to teach the latest technology to someone who is buying her first smartphone; or how to ensure Apple customers receive the very best service when they are ready to purchase a new device. It could be a problem across hundreds of dimensions.

One approach is to gather a group of problem solvers with the same upbringing, experiences, and educations. That is a recipe for group think. Apple strives to gather together a diverse group, with wildly different perspectives, educations, and life experiences. When you do that magical things happen. You find better solutions. You intuit things about customers who are not the same as you. That is how you innovate.

**2.** It is this culture of innovation—this technological imperative—that first attracted us to Dreamers. Apple's investment in Dreamers has paid huge dividends. Dreamers fuel creativity, broaden knowledge, and help drive innovation. They inspire all of us. They make Apple better. They make our country better.

Apple employs Dreamers across 36 states and in all regions of the country. Dreamers at Apple run the gamut of roles within the company. They are Hardware Development Engineers, Software Engineers and Technicians, Retail Store Geniuses, and Support and Operations Specialists. With their diverse experiences and educational backgrounds, they bring different technological solutions to the table. Speaking numerous languages, they also educate customers on the latest technology and help repair broken devices in Apple's stores. Having grown up in families from

AR4768

6

different cultures, they display different sensibilities about customer interactions.

Each brings his or her own story of adversity, achievement, and commitment to excellence. Each contributes to Apple's success in his or her own way—and in ways that would not be replicated by plugging just any cog into the wheel. As a group, they tend to display levels of determination and resolve that would be the pride of any business. We could tell you 443 stories to illustrate these attributes. Instead, we will focus on an illustrative five.[2]

D.O. came from Mexico as an eight-year-old when his mother sacrificed everything to reunite with her family in the United States. He saw his mother struggle to find a steady job and then ultimately "work in the fields. It [wa]s really hard, manual labor. It is so tough on her body and I see how it wears her out. So seeing my mom have to work like that, I knew I needed to do everything I could, work as hard as I could, to get a job that would allow her to stop working in the fields. You know, working in the fields, you don't get benefits, you don't get a retirement plan. I'm my mom's retirement plan." Growing up, D.O.'s main goal was to own a computer. "I always had to work just to get my hands on a device." He focused his interest and passion for computers toward helping his community. He helped students learn how to code and worked as a program coordinator, teaching students

---

[2] All Dreamers are highly vulnerable and fear retribution. The Dreamers in the stories below have authorized us to use their initials, except for "A.B.," who requested complete anonymity.

7

the skills they needed to succeed in software engineering. "These jobs focused on giving back to my community, and the reason why I give back is because I've seen what can happen to kids like me if they don't get opportunities to be on a laptop and get their hands on the programs that they want to write. Due to the way I grew up and what I wanted to do, it was hard to get the opportunities that I had."

D.O. explains how his background affects his professional endeavors. "I think the adversity I faced led me to develop a really strong work ethic that allowed me to succeed. I attended a college program where you could graduate with your bachelor's in three years instead of four—but that meant no breaks, no summers off. All school all the time. It was an intense schedule but because of my drive to get my mom out of her manual labor job, I was able to stay committed to the program."

That drive has contributed to D.O.'s success at Apple, which hired him out of college as a software development engineer in Sunnyvale, California. Recognizing his work ethic and skills, D.O.'s supervisors have commented, "He was learning so fast that we couldn't even keep up with him!" D.O. was hired about four weeks ago and is already known for his research skills and for his ability "to come up with his own ideas." It was an "easy decision to hire him. He was as brilliant as anybody we could get. He is of the highest caliber for any new college hire." Given his "determination, ability to learn, and keenness to provide new ideas, he [has become a] well-respected team member."

AR4770

8

\* \* \*

W.V.'s father faced struggles in Peru and moved to the United States, leaving his family behind for several years. W.V. was eight years old when his father brought him here. W.V. says he is motivated by "the sacrifices my mom and dad made. My dad never saw his family again." At first, he says, "I didn't have a drive. Because there was no DACA back then, I knew I wouldn't be able to get a job so I didn't have the drive to do well. But when my dad passed away, I knew I had to work hard." He simply had to support his mother and sister. The obstacles W.V. faced helped him learn how to think outside the box. "I've been in some [difficult situations]. But just like my dad, I'm going to go with it. Just going with the flow and finding the best solution that I can find."

Apple originally hired W.V. as a contractor. But managers quickly noticed his unique abilities and he was offered a full-time position as a Maps Analyst. His supervisor emphasizes that W.V. has always been "a top performer and takes initiative and runs with anything we give him." He is "one of the best people I've had working for me. He's become an indispensable part of my group." If W.V. had to leave the country, his supervisor worries, "I don't know if his replacement would be able to do what he can do."

\* \* \*

A.B. was born and raised in a small town in Mexico. She was brought to the United States at the age of eight. Her sister was born in the United States. Growing up, she says, "I knew I would not have the

**AR4771**

9

same opportunity to continue my education after high school or even have a standard career like my sister due to my legal status." So she "had to get creative and find a different path to success." A.B. gets her motivation from her mother who cleans houses for a living. She says, "Her work ethic drives me. I learned to give it 110% because of her." A.B. started working at a very young age. She explains, "I had to make sure what my family went through wasn't for nothing." DACA gave her hope and opportunity. She made it to Apple, where she now works in an Apple store in Louisville. She explains how her background prepared her for her current job at Apple. "I'm not above anything. My mom is a cleaning lady. I can do anything. I can tackle anything. She doesn't even know the language, but she's out there. So what's stopping me?" Her struggles have taught her to "be more patient and put my energy in my work, even if it's the energy that's fueled by people hating on me or misunderstanding me."

A.B.'s supervisor also describes her as "a superstar!" "She's one of the most positive team members that I'm lucky enough to lead." A.B. started out as a part-time employee, but "I sat her down and asked her to come on full-time because she was so positive. She offers to stay late or work in another area of the store every day just to support the store." She recounts that "we just recognized her two days ago. I talked to my leaders about how great she is. She's quick, accurate, and knows how to engage with customers. She's very personable. She's one of my favorites!"

\* \* \*

**AR4772**

10

K.G.'s parents arranged for him to come to the United States from Mexico when he was eight years old to join his father, who had moved earlier. "Living without my dad for a good long time was difficult," he recounts. "Financially, we were not very stable. For us to come here to the U.S., mom had to sell her car. We had to travel from Central Mexico." K.G.'s empathy and work ethic were driven by tough circumstances that have fostered a sense of gratitude for his chances here. He explains, "These tough circumstances changed how I see things in life. I matured faster because of that. Changed [because of] my having to learn a whole new language." Because of these hardships, "I've been able to push myself more to look for the things that I want and work harder." Within a year of coming to the United States, "I was already speaking English fairly fluently. I now speak three languages."

K.G. now works as a part of our AppleCare team in Austin. Though he's been with Apple less than a year, he is already impressing supervisors with his ability to pick up details of Apple's procedures. He explains what drives him: "I want to be more successful than what my parents were able to be. They brought me here to become a better person and have better luck than they had. [So] I appreciate every opportunity I'm presented, and I always try to do my best."

\* \* \*

L.D. was five when she moved to the United States from Brazil with her parents. At such a young age, she didn't realize how her life would change and what obstacles she would face, but growing up she

11

learned this fact very quickly. "I saw how difficult it was for my parents and how it may be for me and my sister. We couldn't visit our family. When my grand-parents passed away, my parents couldn't go back. People always judge us and ask why we're here. It's uncomfortable because we can't share our story because we don't know how someone will take it." But "DACA helped me and my sister not feel different from everyone else."

L.D. is now working as a Retail Specialist at Apple. Her supervisors have asked her to train new employees even though that function was not initially part of her official job description. She attributes her success to her ability to "educat[e herself] about everything that's going on." She's also "able to relate with everyone and care about everyone. Even if I don't speak their language, I'm able to relate and be patient with them because I saw that with my parents who didn't speak English."

Her supervisors "appreciate [her] diversity and [her] customer focus, and [she] gets opportunities others don't" because of her unique skills. "We can lean on her for a lot of things," her supervisors stress. "One thing that sticks out is her ability to connect with people and embody our values." L.D. is "one out of 2 among 100 of our employees who has been chosen to train new employees on Apple's values, products, and how to connect with our customers." We "want her to be the first impression [our new employees] have with Apple." "Others can also speak multiple languages, but they cannot relate to customers like her." Coming from another country, "she can connect with customers in a unique way—other employees can't provide

**AR4774**

12

that exceptional experience." In our customer reviews, she is rated "one of the highest consistently."

\* \* \*

As different as these stories are, they all have a few things in common. First, they display how unique backgrounds have translated into tangible skills and capabilities that set Apple apart in every arena. Second, they display the grit that inevitably translates into personal and collective success.

Third, they inspire us—all of us, at every level of the company. Apple would quite literally not exist without a brilliant and driven population of immigrants. Apple founder Steve Jobs's father immigrated from Syria. Dreamers form a pipeline from which future managers and leaders will be drawn. Each is an innovator with promotion potential, and we would be thrilled if they spent their careers at Apple. Infusions of talent like the Dreamers from around the globe sustain and help drive Apple's ability to thrive. Every one of these talented Dreamers should have the same opportunities as Steve did to create, work hard, and help change the world for the better.

Fourth, these are all quintessentially *American* stories—stories about the American Dream: Come from nothing, follow the rules, work hard, contribute, and then prosper and make us all more prosperous.

**3.** Apple is not the only company that subscribes to the view that diversity drives innovation—and that has found huge value in hiring DACA recipients. This Court will hear from many tech companies—run by

13

executives across the ideological spectrum—who will confirm that they subscribe to the same philosophy.[3] That is why we say (as we have published with Charles Koch): "For our nation to maximize progress and prosperity, we need more, not fewer, talented people at the table."[4] The path to our country's continued success is to bring in the best and most diverse team of problem-solvers.

Several studies have shown that organizations with diverse employees are significantly more likely to experience growth and success.[5] For example, a study based on "a nationally representative survey of 1,800 professionals, 40 case studies, and numerous focus groups and interviews" found that companies with managers who have diverse traits and varied life experiences "are 45% likelier to report a growth in market share over the previous year and 70% likelier to report that the firm captured a new market."[6] Another study by the Boston Consulting Group found

---

[3] Apple fully endorses the Coalition for the American Dream's amicus brief.

[4] Tim Cook & Charles Koch, *Congress must act on the 'dreamers'*, Wash. Post (Dec. 14, 2017), https://tinyurl.com/y4rkuzdl.

[5] Sylvia Ann Hewlett et al., *How Diversity Can Drive Innovation*, Harv. Bus. Rev. (Dec. 2013), https://tinyurl.com/j8nyu8k; *see also* Ellyn Shook & Julie Sweet, *Getting to Equal 2019: Creating a Culture That Drives Innovation*, Accenture (2019), https://tinyurl.com/y6alhclq.

[6] Hewlett et al., *supra*.

14

that "diversity increases the bottom line for companies."[7]

Companies have recognized how diversity fuels success.[8] That is why hundreds of America's most important business leaders wrote to the Administration emphasizing DACA's benefits and urging it to preserve the program, explaining that "Dreamers are vital to the future of our companies and our economy" and part of America's "global competitive advantage."[9]

**4.** Most of the Dreamers had no say in the decision to travel to this country and have known no other home. By adopting the DACA program, this country

---

[7] Anna Powers, *A Study Finds That Diverse Companies Produce 19% More Revenue*, Forbes (June 27, 2018), https://tinyurl.com/y5tk7lsn.

[8] *See generally Global Diversity & Inclusion: Fostering Innovation Through a Diverse Workforce*, Forbes Insights (July 2011), https://tinyurl.com/y7plo7qh ("Diversity fosters creativity. We need to generate the best ideas from our people in all levels of the company and incorporate them into our business practices." –Frédéric Rozé, President and CEO, L'Oréal USA); *id.* ("We are in 75 countries and we want to hire the best talent in each locale. Diverse teams and companies make better decisions." –Eileen Taylor, global head of diversity until 2013, Deutsche Bank); *id.* ("We couldn't have gone through all of the mergers and acquisitions and continue to be successful without having a diverse workforce. It's important to our business strategy and it makes us more innovative and competitive." –Debbie Storey, senior vice president of talent development and chief diversity officer until 2015, AT&T).

[9] Letter from Tim Cook et al. to Donald J. Trump, Paul Ryan, Nancy Pelosi, Mitch McConnell, and Charles Schumer (Aug. 31, 2017), https://tinyurl.com/y6byjda9.

15

acknowledged their sacrifice and offered them a path to continuing the lives they loved and formalizing their contributions to American society. With the promise of deferred action and permission to seek work and stay long term, 800,000 young people stepped forward, shared highly sensitive personal information, passed a background check, and played by the rules. Their decision to do so was quite literally life-altering, and irreversible. DACA status affected Dreamers' decisions about whether and where to apply to college, seek jobs, and travel. The Dreamers took us at our word. They held up their end of the bargain. They have worked hard, paid taxes, and contributed to our society and to their communities.

This Court has recognized that "serious reliance interests" like these carry significant legal weight. *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015); *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996); *see also NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 295 (1974) (warning against agency actions "impos[ing]" "new liability … on individuals for past actions which were taken in good-faith reliance on [agency] pronouncements"); *United States v. Penn. Indus. Chem. Corp.*, 411 U.S. 655, 670-75 (1973) (requiring consideration of reliance interests).

This is an issue where one's head and heart lead to the same conclusion. We collectively owe it to the Dreamers to hold up our end of the bargain. It is not just a legal requirement. It is the moral thing to do. Who are we as a country if we renege? What does it say about us as a people to turn our backs on the Dreamers now?

16

## CONCLUSION

This Court should affirm the judgments below.

Respectfully submitted,

Mark S. Davies
Thomas M. Bondy
Jeremy R. Peterman
Upnit K. Bhatti
Aaron Brecher
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, D.C. 20005

E. Joshua Rosenkranz
    *Counsel of Record*
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000
jrosenkranz@orrick.com

October 2, 2019

**AR4779**

Nos. 18-587, 18-588, and 18-589

# In the Supreme Court of the United States

———————

DEPARTMENT OF HOMELAND SECURITY, et al.,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al.,

*Respondents.*

———————

On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit

———————

**BRIEF OF UNITED WE DREAM AND 50 ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS**

———————

GEOFFREY BROUNELL
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
21st Floor
New York, N.Y. 10020
Tel. (212) 489-8230
geoffreybrounell@dwt.com

PETER KARANJIA*
MELISSA L. TURCIOS
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, D.C. 20004
Tel. (202) 799-4000
peter.karanjia@dlapiper.com
*Counsel of Record*

*Counsel for Amici Curiae*

October 2, 2019

Additional Captions Listed on Inside Cover

AR4780

DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, et al.,

*Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, et al.,

*Respondents.*

————————

On Writ of Certiorari to the United States Court of
Appeals for the District of Columbia Circuit

————————

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, et al.,

*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, et al.,

*Respondents.*

————————

On Writ of Certiorari to the United States Court of
Appeals for the Second Circuit

**AR4781**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................... i

INTEREST OF *AMICI CURIAE* ............................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 3

ARGUMENT ........................................... 5

    The Stories of a Cross-Section of DACA Recipients Illustrate the Program's Critical Role in Improving the Lives of Promising Young Individuals, Their Families, Local Communities, and the Nation ............................................ 5

    A.    DACA Has Allowed Recipients to Maximize Their Potential, While Enriching American Schools and Universities.......................................... 9

    B.    DACA Has Empowered Recipients to Found Start-Up Businesses, Create Jobs, and Otherwise Realize Their Career Potential ........ 16

        1.    *DACA Increases Job Opportunity and Earning Power* ........................................ 16

        2.    *DACA Has Jump-Started a Wave of Entrepreneurialism* ................. 19

    C.    DACA Has Enabled Recipients to Support Their Families and Social Networks, Which Include Many United States Citizens...................... 22

AR4782

**TABLE OF CONTENTS—Cont'd**

**Page(s)**

D. DACA Has Made It Possible for Recipients to Obtain Careers That Serve the American Public ................ 25

E. DACA Has Enabled Recipients to Serve Their Communities as Volunteers and Organizers ............... 29

F. DACA Has Empowered Many Young Immigrants to Live Their Lives in the Open Without Fear of Persecution or Harassment ............... 33

CONCLUSION ....................................................... 37

APPENDIX ............................................................ 1A

AR4783

(i)

# TABLE OF AUTHORITIES

**Page(s)**

**Case**

*CASA de Maryland* v. *United States Department of Homeland Security*, 924 F.3d 684 (4th Cir. 2019), *petition for cert. pending*, No. 18-1469 (filed May 24, 2019) ...................2, 35

**Statutes and Regulations**

Act of May 24, 2013, ch. 99, 2013 Minn. Laws 752 ............................................................................ 10

Ala. Code § 31-13-8 (2019) ..................................... 10

Cal. Educ. Code § 66021.6 (West 2013)................. 11

N.J. Stat. Ann. 18A:3B-79 (West 2019)................. 10

N.Y. Educ. Law:

    § 355(8) (McKinney 2019)................................. 10

    § 6206(7)(a) (McKinney 2019) .......................... 10

Or. Rev. Stat. § 352.287 (2009)............................. 10

S.C. Code Ann. § 59-101-430 (2008) ..................... 10

Tex. Educ. Code Ann. §§ 54.051-.057 (West 2005) 10

**AR4784**

(ii)

**Page(s)**

### Other Authorities

Catalina Amuedo-Dorantes &
 Francisca Antman, *Can Authorization
 Reduce Poverty among Undocumented
 Immigrants? Evidence from the Deferred
 Action for Childhood Arrivals Program*,
 147 Econ. Letters (2016).................................. 22

Associated Press, *'Dreamer,' Rhodes scholar
 Jin Park to attend State of the Union*,
 NBC News (Jan. 31, 2019),
 https://nbcnews.to/2Bkbzvg............................. 14

Ike Brannon & Logan Albright, *The Economic
 and Fiscal Impact of Repealing DACA*,
 Cato Inst. (Jan. 18, 2017), https://bit.ly/2k1hn1R
 ........................................................................... 8

Alexandra A. Chaidez & Sanjana L. Narayanan,
 *Harvard Senior Becomes First DACA Recipient
 to Win Rhodes Scholarship*, Harv. Crimson
 (Nov. 19, 2018), https://bit.ly/2QTJz7H ........... 12

City of Orlando, Exec. & Admin. Offices,
 Fair Treatment of All (Trust Act Policy)
 § 100.3 (adopted July 23, 2018),
 https://bit.ly/2p05O2N ...................................... 28

Democrats of the Comm. on Small Bus.,
 *Report: Economic Impact of DACA:
 Spotlight on Small Business* (Feb. 2018),
 https://bit.ly/2JQKpRZ........................................ 8

**AR4785**

(iii)

**Page(s)**

Exec. Order No. 13,768, 82 Fed. Reg. 8800
(Jan. 25, 2017) ..................................................... 5

Roberto G. Gonzales & Angie M.
Bautista-Chavez, *Two Years and
Counting: Assessing the Growing Power
of DACA*, Am. Immigration Council
(June 2014), https://bit.ly/2mTP5xe ................. 16

H.B. 2691, § 15(a), 101st Gen. Assem.,
Reg. Sess. (Ill. 2019) (Pub. Act No.
101-0021), https://bit.ly/2mFIQ08 ................... 10

Misha E. Hill & Meg Wiehe, Inst. Tax'n &
Econ. Pol'y, *State & Local Tax Contributions
of Young Undocumented Immigrants*
(Apr. 2018), https://bit.ly/2mWzYTL ............... 17

Sari Pekkala Kerr & William R. Kerr,
*Immigrants Play a Disproportionate
Role in American Entrepreneurship*,
Harv. Bus. Rev. (Oct. 3, 2016) ......................... 19

Elira Kuka et al., *Do Human Capital
Decisions Respond to the Returns to
Education? Evidence from DACA*, Nat'l
Bureau of Econ. Research (Feb. 2018),
https://bit.ly/2mTVOY7 ............................. 11, 12

Jose Magaña-Salgado & Tom K. Wong,
*Draining the Trust Funds: Ending DACA
and the Consequences to Social Security
and Medicare*, Immigrant Legal Res. Ctr.
(Oct. 2017), https://bit.ly/2mTN9F7 .................. 8

**AR4786**

(iv)

**Page(s)**

Memorandum from Sec'y of U.S. Dep't
    Homeland Sec. to Kevin McAleenan et al.,
    *Enforcement of the Immigration Laws to
    Serve the National Interest* (Feb. 20, 2017),
    https://bit.ly/2miirQd .......................................... 5

Jin Park, *Opinion: I'm a Dreamer and
    Rhodes Scholar. Where Do I Belong?,*
    N.Y. Times (Jan. 11, 2009),
    https://nyti.ms/2FuPTiW ................................... 12

Caitlin Patler & Jorje A. Cabrera, *From
    Undocumented to DACAmented: Impacts of the
    Deferred Action for Childhood Arrivals (DACA)
    Program Three Years Following its
    Announcement* (June 2015),
    http://bit.ly/1R7Sz1c ................................... 10, 22

Zenén Jaimes Pérez, *A Portrait of Deferred
    Action for Childhood Arrivals Recipients:
    Challenges and Opportunities Three-Years Later*
    21, United We Dream (Oct. 2015),
    https://bit.ly/2osP9Vl ........................................ 11

Zenén Jaimes Pérez, *How DACA Has
    Improved the Lives of Undocumented
    Young People*, Ctr. for Am. Progress (Nov. 19,
    2014), http://ampr.gs/1O7iTHA........................ 11

Press Release, U.S. Census Bureau, *Highest
    Educational Levels Reached by Adults in the
    U.S. Since 1940* (Mar. 2017),
    https://bit.ly/2nFBkSb ...................................... 12

**AR4787**

(v)

Page(s)

*Protecting Dreamers and TPS Recipients: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. (2019), https://bit.ly/2mWoIGZ .............................. 13, 18

Sofar Sounds, *Mannywellz - Alright Rendition | Sofar NYC*, YouTube (Jan. 23, 2017), https://bit.ly/2man6ct........................................ 20

Nicole Prchal Svajlenka et al., *A New Threat to DACA Could Cost States Billions of Dollars*, Ctr. for Am. Progress (July 21, 2017), https://ampr.gs/2uI9Deh.................................... 8

Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States,* Ctr. for Am. Progress (Sep. 5, 2019), https://ampr.gs/2kvp0DE....................7, 8, 22, 24

Univ. Leaders for Educ. Access & Diversity Network*, Policy Environment—Select a State to See the Policies*, https://bit.ly/2ocRK5q ............ 11

Tom K. Wong et al., *DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November*, Ctr. for Am. Progress (Sept. 19, 2019), https://ampr.gs/2mnO8N6. ............................... 7

Tom K. Wong et al., *Findings from 2019 National Survey of DACA Recipients* (Sept. 2019) (forthcoming, Suppl. to *2019 National DACA Study*) ...................................... 32

**AR4788**

(vi)

**Page(s)**

Tom K. Wong et al., *Results from 2019 National DACA Study* (Sept. 2019), https://ampr.gs/2noR7pv................5, 7, 12, 17, 22

Kimberly Yam, *NYC Celebrated First Undocumented Rhodes Scholar With 'Jin Park Day'*, Huffington Post (Apr. 17, 2019), https://bit.ly/2nNpUfO ........... 14

**AR4789**

1

## INTEREST OF *AMICI CURIAE*[1]

*Amicus curiae* United We Dream ("UWD") is the largest immigrant youth-led community in the United States. UWD is a national non-profit, non-partisan, membership-based organization comprising more than 500,000 immigrant youth and their allies, with more than 100 affiliate organizations located in 28 States. UWD's primary purpose is to advocate for the dignity and fair treatment of immigrant youth and their families, regardless of their immigration status. Among UWD's members are recipients of deferred action under the Deferred Action for Childhood Arrivals ("DACA") initiative announced on June 15, 2012. Because the government action in this case seeks to undo DACA's protections—protections that have formed the basis for the most consequential life decisions of hundreds of thousands of immigrant youth—UWD has a substantial interest in the proper resolution of the issues presented in this case.

UWD is joined by fifty organizations, including social service and advocacy organizations that work with DACA applicants and beneficiaries, across the United States. A full listing of *amici*—

---

[1] The parties have consented to the filing of this brief, and their letters of consent have been filed with the Clerk. Pursuant to Supreme Court Rule 37.6, *amici* state that no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amici* or their counsel made a monetary contribution to its preparation or submission.

2

including the organizational plaintiffs in *CASA de Maryland* v. *U.S. Dep't of Homeland Security*, 924 F.3d 684 (4th Cir. 2019) (concluding that the government's decision to rescind the DACA program was arbitrary and capricious)—appears in the Appendix.

AR4791

3

## INTRODUCTION AND SUMMARY OF ARGUMENT

In this brief, United We Dream and fifty other organizations offer a glimpse into the lives of the more than 825,000 young people who have placed their trust in, and organized their lives around, the government's promise in the DACA program.

DACA has accomplished far more than affording deferred prosecutorial action. It has created life-changing opportunities for hundreds of thousands of promising young people. DACA has allowed them to lead fuller and more vibrant lives, including by seizing opportunities to advance their education, furthering their careers, providing critical help to their families, and giving back to their communities. Able to make use of the basic building blocks of a productive life—a Social Security number, work authorization, or driver's license, for example—DACA recipients have thrived. They are students, teachers, health care workers, first responders, community leaders, and small business owners. They are also spouses, neighbors, classmates, friends, and co-workers. Collectively, they are parents of over a quarter-million U.S. citizens, and 70% of DACA recipients have an immediate family member who is a U.S. citizen. They pay taxes, contribute to their local economies in myriad ways, and spur a virtuous cycle of further opportunity for many Americans.

The sample stories below include, among many others, an Oregon schoolteacher and community volunteer from Mexico; a Rhodes scholar from South Korea with a bright future in health science; the first

AR4792

4

transgender immigrant appointed as a Commissioner for the Mayor's Office of Latino Affairs in the District of Columbia; a Maryland small-business owner and musician, born in Nigeria; a critically-acclaimed, Mexican chef in Missouri; a Michigan-based community organizer from Poland; and an entrepreneur and mother of five who, after serving at the Chamber of Commerce, launched her own translation and interpreter business in Oklahoma. *Amici* hope to illustrate how, from their diverse backgrounds spanning the globe, DACA recipients are now fully part of their communities and the broader fabric of America.

Their stories of resilience, generosity, and accomplishment epitomize the American dream. Yet, the government's effort to rescind DACA, which has given hope to so many, would put these young people in grave danger of deportation and threatens to cause massive disruption to their lives, tearing apart families and uprooting productive members of society from the networks that rely on them. If allowed to stand, the cancellation of DACA will have devastating ripple effects that extend well beyond the DACA recipients into every community in the United States.

AR4793

5

## ARGUMENT

**The Stories of a Cross-Section of DACA Recipients Illustrate the Program's Critical Role in Improving the Lives of Promising Young Individuals, Their Families, Local Communities, and the Nation**

DACA has enabled hundreds of thousands of young individuals to live their lives in the open, fully realizing their potential and contributing to their local communities. Most DACA recipients arrived in the United States when they were just six years old or younger—indeed, nearly a quarter of DACA recipients were under the age of three—and two-thirds of DACA recipients no longer have any close family members in the country of their birth. Tom K. Wong et al., *Results from 2019 National DACA Study* 7, 15 (Sept. 2019), https://ampr.gs/2noR7pv ("Wong et al."). For these promising young people, the United States is the only home they have ever known. They've grown up here, gone to school here, played sports here, and built families here. They play critical roles in their communities—as entrepreneurs who create jobs, as family members who support hundreds of thousands of U.S. citizens, as public servants who teach our children and care for us, and as volunteers who improve their communities. In short, they have become fully integrated into the fabric of American society.

Despite these deep and longstanding ties to the United States, before DACA, many of these young immigrants who arrived in the country as children struggled to survive due to their undocumented

**AR4794**

6

status—often living in constant fear of deportation.[2] DACA was life-changing. For the first time, these individuals could obtain work authorizations, healthcare, a Social Security number, a driver's license, and, in many States, in-state tuition, scholarships, and financial aid. DACA recipients can also board planes, open bank accounts, apply for credit for their businesses, and access other resources so that they can support their families, communities, and local economies. As ***Lidia D.***, a 23-year-old Dreamer, explains, "DACA gave me a sense of liberty." Thanks to her deferred action, Lidia was able to relocate from her home in Nebraska to accept job opportunities in California and Nevada—opportunities that would have been out-of-reach for her without a four-year college degree, a work authorization, or the ability to board a plane.

With these essential keys to survival and success, DACA recipients have drawn on their remarkable

---

[2] Deportation orders have been entered against DACA recipients who arrived in the country as babies and toddlers, and these young people—many of whom only later discovered their immigration status—have good reason to fear they will be first in line for deportation if the government's attempted rescission stands. Under a 2017 Executive Order, anyone who is subject to a final order of removal is an enforcement priority. *See* Exec. Order No. 13,768, 82 Fed. Reg. 8800 (Jan. 25, 2017); Memorandum from Sec'y of U.S. Dep't Homeland Sec. to Kevin McAleenan et al., *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017), https://bit.ly/2miirQd ("DHS Memorandum") (providing limited discretion to make exceptions to enforcement priorities). Although a subsequent DHS Memorandum guidance excepted DACA recipients, DACA's rescission removes these protections.

**AR4795**

talents, ingenuity, and dedication to make ever greater contributions to this nation. According to one survey, after receiving deferred action, nearly 60% of DACA recipients—approximately 400,000 individuals—entered the American workforce for the first time. Wong et al., *supra*, at 2. And about 71% of DACA recipients also pursued educational opportunities previously foreclosed to them. *Id.* at 5. Altogether, 96% of DACA recipients are employed or enrolled in an educational program. Tom K. Wong et al., *DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November*, Ctr. for Am. Progress (Sept. 19, 2019), https://ampr.gs/2mnO8N6.

Their greater educational attainment and better jobs have translated into increased financial independence—which has been crucial not only for supporting their families and social networks, but also for contributing to broader economic growth. One 2019 study found that DACA recipients and their households hold a combined annual spending power of $24.1 billion. Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States*, Ctr. for Am. Progress (Sep. 5, 2019), https://ampr.gs/2kvp0DE ("CAP Report"). Seventy-nine percent reported that their increased earnings have helped them become financially independent. Wong et al., *supra*, at 2. Approximately 60% of DACA recipients bought a car. *Id.* at 3. Almost 14% became homeowners. *Id.* Collectively, DACA recipients own 59,000 homes and make $613.8 million in annual mortgage payments. CAP Report, *supra*. Two-thirds of DACA recipients have applied for and received

8

their first credit card, while more than half have opened a bank account. Wong et al., *supra*, at 3. In short, DACA has opened a world of financial independence and opportunity that was once inaccessible.

These higher wages also increase tax revenues at all levels of government. Employers automatically deduct payroll taxes from DACA recipients' paychecks—even though those individuals are ineligible for many of the social programs supported by these taxes. One report estimated that DACA recipients and their households pay a combined $8.8 billion in federal, state, and local taxes annually. CAP Report, *supra*; *see also* Democrats of the Comm. on Small Bus., *Report: Economic Impact of DACA: Spotlight on Small Business* 5 (Feb. 2018), https://bit.ly/2JQKpRZ ("House Report") (estimating $5.87 billion in taxes from DACA-eligible individuals). Another study estimates that tax revenue for Social Security and Medicare alone would decrease by $39.3 billion over a decade if the contributions of DACA-eligible individuals were lost. Jose Magaña-Salgado & Tom K. Wong, *Draining the Trust Funds: Ending DACA and the Consequences to Social Security and Medicare*, Immigrant Legal Res. Ctr. (Oct. 2017), https://bit.ly/2mTN9F7. And, even under a conservative estimate, the combined economic costs and fiscal impact of deporting DACA recipients amount to an eye-popping $283 billion over a decade. Ike Brannon & Logan Albright, *The Economic and Fiscal Impact of Repealing DACA*, Cato Inst. (Jan. 18, 2017), https://bit.ly/2k1hn1R. Other estimates are even higher. *See, e.g.*, Nicole Prchal

**AR4797**

9

Svajlenka et al., *A New Threat to DACA Could Cost States Billions of Dollars*, Ctr. for Am. Progress (July 21, 2017), https://ampr.gs/2uI9Deh (estimating $460.3 billion impact). This substantial body of empirical data is borne out by the representative stories of the DACA recipients described below. Not only would the rescission of DACA be devastating for the program's recipients and their families, it would also have negative repercussions for our nation's economy, and the impacts on some local economies could be severe.

DACA was a promise made by our government to eligible young people. The realization of that promise unleashed tremendous personal, social, and economic opportunities for DACA recipients, and it established a foundation upon which many American communities now rely. The government's efforts to break faith with those young individuals now would destroy a program that works for millions of people—DACA recipients and U.S. citizens alike—and deal a staggering blow to American progress.

## A. DACA Has Allowed Recipients to Maximize Their Potential, While Enriching American Schools and Universities

By design, DACA opens a world of educational opportunities for young immigrants. A key prerequisite for obtaining DACA's protection is that the applicant is pursuing a high school diploma or GED certificate, or is enrolled in a qualifying educational program. *See* JA-387. As a result, many

10

undocumented young people who may otherwise have dropped out are motivated to stay in school.

Moreover, DACA makes it easier for young immigrants to invest in their education. *First*, many undocumented students are forced to drop out because they are unable to both work to cover tuition fees and study at the same time, but DACA allows its recipients to obtain better-paying jobs, so they can more easily bear the costs of school. Caitlin Patler & Jorje A. Cabrera, *From Undocumented to DACAmented: Impacts of the Deferred Action for Childhood Arrivals (DACA) Program Three Years Following its Announcement* 18 (June 2015), http://bit.ly/1R7Sz1c ("Patler Report"). Indeed, 80% of DACA recipients say they are better able to fund their educations by earning more. Wong et al., *supra*, at 2; *accord* Patler Report, *supra*, at 5. As a result, young immigrants are better equipped to maximize their career potential, and their investments in education have helped many DACA recipients serve as role models for their families and communities.

*Second*, DACA offers a pathway to higher education. DACA recipients can enroll in public colleges and universities in States (such as Alabama and South Carolina) where undocumented students are otherwise barred from attending. *See* Ala. Code § 31-13-8; S.C. Code Ann. § 59-101-430. A number of States—including Texas, Oregon, New Jersey, and New York—allow DACA recipients to attend public colleges and universities at in-state or reduced tuition rates, just like their U.S. citizen peers. *See* Tex. Educ.

**AR4799**

11

Code Ann. §§ 54.051-057; Or. Rev. Stat. § 352.287; N.J. Stat. Ann. 18A:3B-79; N.Y. Educ. Law §§ 355(8), 6206(7)(a). Other States, like California, Illinois, and Minnesota, even allow certain DACA recipients to receive state and institutional financial assistance. *See* Cal. Educ. Code § 66021.6; H.B. 2691, § 15(a), 101st Gen. Assem., Reg. Sess. (Ill. 2019) (Pub. Act No. 101-0021), https://bit.ly/2mFIQ08; 2013 Minn. Laws 31, https://bit.ly/2noUYCQ; *see also* Univ. Leaders for Educ. Access & Diversity Network, *Policy Environment—Select a State to See the Policies*, https://bit.ly/2ocRK5q. Despite being ineligible for all federal and most state financial aid programs, DACA recipients can fill out the Free Application for Federal Student Aid form, which helps schools determine students' financial need and eligibility for scholarships and institutional financial aid. Zenén Jaimes Pérez, *How DACA Has Improved the Lives of Undocumented Young People*, Ctr. for Am. Progress 5 (Nov. 19, 2014), http://ampr.gs/1O7iTHA. As a result of these enhanced opportunities, 31% of respondents in one survey by *amicus* United We Dream reported that they had qualified for additional financial aid. Zenén Jaimes Pérez, *A Portrait of Deferred Action for Childhood Arrivals Recipients: Challenges and Opportunities Three-Years Later* 21, UWD (Oct. 2015), https://bit.ly/2osP9Vl ("UWD Survey").

With barriers to opportunity removed, it is not surprising that thousands of DACA recipients have pursued greater educational opportunities. In 2018, the National Bureau of Economic Research ("NBER") found that DACA eligibility correlated with greater

**AR4800**

12

high school attainment and college attendance. Elira Kuka et al., *Do Human Capital Decisions Respond to the Returns to Education? Evidence from DACA*, NBER (Feb. 2018), https://bit.ly/2mTVOY7. In United We Dream's survey, 30% of respondents credited DACA for bringing them back into the classroom. UWD Survey, *supra*, at 25. Of the nearly two-thirds of survey respondents currently in school, 83% were pursuing a bachelor's degree or higher. *Id.* Over half of DACA recipients twenty-five or older have completed a bachelor's degree or higher, compared to just one-third of Americans in the same age bracket. *Compare* Wong et al., *supra*, at 7, *with* Press Release, U.S. Census Bureau, *Highest Educational Levels Reached by Adults in the U.S. Since 1940* (Mar. 2017), https://bit.ly/2nFBkSb.

Many young immigrants have seized the opportunity to further their education and pursue advanced degrees. For example, right after receiving DACA's protection, **Luke H.** submitted his applications for doctoral programs in chemistry. Now in his sixth year at the University of Chicago, he worries that—if allowed to stand—DACA's rescission could prevent him from completing his dissertation, jeopardizing years of hard work, and leaving his future uncertain.

Like hundreds of thousands of other immigrant youth, ***Jin Park*** used DACA as a springboard to greater educational opportunities. The first DACA recipient to receive the prestigious Rhodes Scholarship, Jin arrived in New York from South

13

Korea when he was just seven years old.[3] For years, his father worked in restaurants and his mother worked in beauty salons to build a life for their family in Flushing, Queens. A brilliant student, Jin nonetheless applied to 34 colleges, out of fear that his immigration status would limit his opportunities. He took his insights into the college admissions process to found Higher Dreams, a non-profit that partners with the Boston Public School system to help undocumented students gain access to higher education. He volunteered with a Boston non-profit to provide naturalization assistance, and currently serves as a chapter leader for Define American (a non-profit media and culture organization that advocates for fair representation of immigrants in the media). Jin has even testified before Congress about how DACA has fundamentally changed his life.[4]

Now a 23-year-old Harvard graduate with degrees in Molecular and Cellular Biology, Jin hopes to pursue master's degrees at the University of Oxford in Global Health Science and Epidemiology, as well as Migration Studies. With this foundation, Jin is

---

[3] Jin Park, *Opinion: I'm a Dreamer and Rhodes Scholar. Where Do I Belong?*, N.Y. Times (Jan. 11, 2009), https://nyti.ms/2FuPTiW;  *see also* Alexandra A. Chaidez & Sanjana L. Narayanan, *Harvard Senior Becomes First DACA Recipient to Win Rhodes Scholarship*, Harv. Crimson (Nov. 19, 2018), https://bit.ly/2QTJz7H.

[4] *Protecting Dreamers and TPS Recipients: Hearing Before the Committee on the Judiciary of the House of Representatives*, 116 Cong. 5 (Mar. 6, 2019) (statement of Jin K. Park), https://bit.ly/2mWoIGZ.

AR4802

14

interested in working on improving health policy for immigrants and underserved communities. Although his family and community have celebrated his accomplishments—New York City declared April 16th "Jin Park Day"[5]—obtaining the Rhodes Scholarship has been bittersweet. If Jin leaves the country to continue his graduate studies abroad, he risks being barred from returning to his family and the only home he has ever known: "No matter how hard I work or what I achieve, I will never know if I have a place in America, my home."[6]

Just seven years old when she arrived in the United States in 2002, **Monica C.**—who was born in Mexico—obtained DACA's protection in 2013. Currently, Monica works full-time as a paraeducator at William Paca Elementary School in Baltimore, Maryland, while she also studies for her associate's degree at Baltimore City Community College. As she focuses on the next generation—teaching students whose native language is not English—Monica knows that becoming a classroom instructor is her true calling: "Every day I see the light in the eyes of my students, the excitement it gives them to learn English and dream about their futures." Yet, DACA's rescission is never far from her mind: "It would break

---

[5] Kimberly Yam, *NYC Celebrated First Undocumented Rhodes Scholar With 'Jin Park Day'*, Huffington Post (Apr. 17, 2019), https://bit.ly/2nNpUfO. *See also* Associated Press, *'Dreamer,' Rhodes scholar Jin Park to attend State of the Union*, NBC News (Jan. 31, 2019), https://nbcnews.to/2Bkbzvg.

[6] Statement of Jin K. Park 11.

15

my heart if I wasn't able to be there for them in the classroom."

**Yazmin I.**'s mother left behind a career as a physician in Mexico to give her three daughters better opportunities in the United States. An excellent student who dreamed of following in her mother's footsteps, Yazmin discovered at sixteen that she was undocumented when she tried to find work to support her family following her mother's stroke. Her status as an undocumented immigrant in Arizona (and later New Mexico) was a serious obstacle to continuing her education and accessing scholarships and financial aid. Thanks to DACA, Yazmin is now a fourth-year student at the University of New Mexico School of Medicine. She recently finished her sub-internship in surgical oncology and is currently completing a trauma-surgery and critical-care rotation as a visiting student at Washington University in St. Louis. Yazmin is also proud to give back to her community. She mentors young people through the New Mexico Dream Team and provides free health check-ups for immigrant families released from border detention facilities. But Yazmin needs a Social Security number to continue towards her residency, and her professional aspirations depend on DACA's continuation.

By authorizing undocumented individuals to work, DACA has broadened the diversity and skill set of our nation's workforce. Deferred action is thus especially important when it comes to the education, science, technology, engineering, mathematics, and

16

healthcare sectors, where maintaining U.S. leadership in an increasingly global economy is critical. As the stories of young men and women like Jin Park (Rhodes Scholar studying global health science and epidemiology), Monica C. (paraeducator), Yazmin I. (medical student applying to general surgery residency), and Luke H. (sixth-year University of Chicago Ph.D. candidate in chemistry) demonstrate, undocumented immigrants represent a pool of highly skilled talent that is in fierce demand.

Despite their hard work and accomplishments, the futures of Jin, Monica, Yazmin, and Luke are precarious. Forcing these exceptional young people—with a wealth of opportunities ahead of them—to live in fear of deportation would not only destroy their educational and professional prospects, but also deprive their communities and the nation of their current and future economic and societal contributions.

**B. DACA Has Empowered Recipients to Found Start-up Businesses, Create Jobs, and Otherwise Realize Their Career Potential**

*1. DACA Increases Job Opportunity and Earning Power*

Before DACA, even highly educated and skilled undocumented immigrants often had no option but to accept very low-paying jobs with bleak prospects for advancement. Without a Social Security number, driver's license, and work authorization, jobs better suited to their talents were simply unobtainable. DACA, however, suddenly enabled these young

17

people to obtain work authorizations for the first time. As a result, just sixteen months into the program, 59% of respondents in one survey reported having found a new or different job. Roberto G. Gonzales & Angie M. Bautista-Chavez, *Two Years and Counting: Assessing the Growing Power of DACA*, Am. Immigration Council (June 2014), https://bit.ly/2mTP5xe ("Gonzales & Bautista-Chavez"). In another survey—conducted from August to September 2019—two-thirds of respondents over twenty-five reported that DACA had allowed them to get a job that either made the best use of their qualifications or paid better. And for DACA recipients who pursued higher education, the opportunities for professional development are particularly striking. While employment rates increased by 114% for DACA recipients across the board (from 42% of respondents employed to 90%), those who obtained degrees from four-year colleges were more than *1.5 times* as likely to obtain new jobs and increase their earnings as DACA beneficiaries who never went to college. *See* Wong et al., *supra*, at 2-3.

DACA's benefits are also mutually reinforcing. When freed from the fear of looming deportation and able to work legally, DACA recipients work harder, are more productive, and earn more. *See* Misha E. Hill & Meg Wiehe, Inst. Tax'n & Econ. Pol'y, *State & Local Tax Contributions of Young Undocumented Immigrants* (Apr. 2018), https://bit.ly/2mWzYTL; Wong et al., *supra*, at 3. Overall, DACA recipients' salaries doubled on average—from an annual salary of $21,012 (pre-DACA) to $42,132 (post-DACA). Wong et al., *supra*, at 4. For DACA beneficiaries who

18

completed licensing programs—in fields such as nursing, dentistry, and construction—the earnings boost is even more profound. Gonzales & Bautista-Chavez, *supra*, at 4. For 68% of individuals in these programs, their salaries more than doubled from as little as $5 to more than $14 an hour. *Id.* As a result, one of the most dramatic effects of DACA is to catapult low-income individuals with great potential into higher-skilled, higher-earning jobs. In short, DACA facilitates the American Dream.

**Chirayu P.** is particularly emblematic of this path to increased opportunity. Despite graduating in 2006 from the University of Illinois with degrees in Economics and Political Science, Chirayu was "just barely surviving" before DACA. Chirayu and his family had attempted to adjust their status when they arrived in the United States from India in 1994, but they later discovered that an unscrupulous middleman had taken their savings and left them with nothing. Now, thanks to DACA, Chirayu makes enough money as an Asset Manager for a real estate company in Chicago, that he is able to support his family while he studies to be a Certified Public Accountant.

**Sana A.**—born in Pakistan and raised in Saudi Arabia—used her DACA protections to become a Lead Innovation Designer at a major multinational company. Now working at the cutting edge of technology and design, Sana explains, "I make more money than my parents have ever made in their life."

But she is acutely aware of how vulnerable her situation is. After a problem with her DACA

**AR4807**

19

paperwork caused Sana to temporarily lose her deferred-action status, her company was forced to place her on a three-month leave of absence and, then, let her go. The instant her status was restored, she was re-hired. (Sana shares her story in a video available at: http://www.uwdamicusbrief.com.) As Sana's story illustrates, rescinding DACA not only hurts its recipients, it also hurts U.S. employers, who will lose an estimated $6 billion in worker turnover costs (including hiring and training) if talented young people, like Sana, are forced out of the country's workforce. House Report 8.

### 2. DACA Has Jump-Started a Wave of Entrepreneurialism

Immigrants are among our nation's most prolific small business originators and entrepreneurs, and DACA recipients are no exception. *See, e.g.*, Sari Pekkala Kerr & William R. Kerr, *Immigrants Play a Disproportionate Role in American Entrepreneurship*, Harv. Bus. Rev. (Oct. 3, 2016) (reporting that 40% of startup firms are affiliated with an immigrant). Indeed, 6% of DACA recipients have started their own business—double the rate of entrepreneurship for native-born Americans. *See* Wong et al., *supra*, at 2, 4. This is the equivalent of approximately 41,000 new businesses in total. *See id.* Nearly half of those businesses report hiring employees, each providing jobs to an average of four to five employees, amounting to some 86,000 employees who work for DACA recipient-owned firms. *Id.* Again, the benefits of DACA have extended far beyond DACA recipients themselves.

AR4808

20

***Darit A.*** was limited to a low-wage job at a travel agency before DACA. Under recent revisions to New Jersey law, Darit's DACA protection enables her to attend community college at in-county reduced tuition rates, and she is currently completing a program on small business management. Darit and her partner now run a landscaping company in New Jersey with several employees. The company's success has enabled Darit to purchase vehicles and equipment to serve her growing client base and members of the elder community to whom she provides free lawn care services as her way of giving back. As Darit works to expand her business and support her growing family under the cloud of DACA's potential repeal, she has to live with the fear that she could someday be detained—and worse—face deportation, losing everything she has worked so hard for.

***Emmanuel A.*** is another example of the inspiring entrepreneurialism of DACA recipients. Now twenty-five years old, Emmanuel was only nine years old when his family migrated from Nigeria and settled in Maryland. Although he was a talented athlete, his undocumented status made him ineligible for many college scholarships, and Emmanuel was forced to leave college because his family could not afford his tuition. Now, as a full-time musician, producer, and small business owner, Emmanuel enjoys a substantial national and international following—videos of his performances on YouTube

21

have received hundreds of thousands of views.[7] DACA allows him the freedom to travel to perform for his fans in concerts across the nation. Ever-grateful for the opportunities DACA has given him, Emmanuel is proud to give back: Proceeds from his merchandise sales go to support other DACA recipients, and he mentors youth through his church to spread words of love and acceptance. His single, "American Dream," has become a major success, and he aims to deliver a message of hope to all people that they too can thrive amidst adversity. (Emmanuel shares his story in the video available at: http://www.uwdamicusbrief.com.)

**Maricruz A.** immigrated from Mexico in 2002 at the age of fifteen to reunite with her mother. For years, Maricruz worked odd jobs to make ends meet and support her family—including a thirteen-year-old son and twin five-year-old daughters, all U.S. citizens. When Maricruz received DACA protection in 2016, her life drastically changed. She was able to study at Baltimore City Community College, where she founded the first Latinx affinity organization and was the first Latina in history to be appointed to the Baltimore City Community College Board of Trustees. Now, Maricruz owns a business buying and selling used cars, and she and her partner run an auto repair shop with two employees. While managing two businesses, Maricruz is pursuing a bachelor's degree in Philosophy, Law, and Ethics at the University of Baltimore, and she hopes to become an attorney. For

---

[7] *See, e.g.*, Sofar Sounds, *Mannywellz - Alright Rendition | Sofar NYC*, YouTube (Jan. 23, 2017), https://bit.ly/2man6ct.

22

Maricruz, "DACA is not just a legal status, it's an opportunity for this country."

***Zaid C.*** is another young immigrant who seized this opportunity. One of four children raised by a single mother, Zaid is the co-founder and executive chef of a critically-acclaimed restaurant in Missouri. The recipient of numerous local and national culinary accolades, he actively promotes healthy and sustainable eating through his plant-based restaurant and by spearheading community education initiatives in partnership with the Kansas-Missouri Dream Act Alliance.

As the businesses of these talented young individuals continue to grow and prosper, their successes and impact on the community will be closely entwined with the continuation of DACA.

### C. DACA Has Enabled Recipients to Support Their Families and Social Networks, Which Include Many United States Citizens

With the greater job, salary, and financial-planning opportunities that come with work authorizations and Social Security numbers, DACA recipients are better able to support themselves and their families. A 2016 study found that DACA-eligible households were 38% less likely than non-eligible undocumented immigrant households to live in poverty. Catalina Amuedo-Dorantes & Francisca Antman, *Can Authorization Reduce Poverty among Undocumented Immigrants? Evidence from the Deferred Action for Childhood Arrivals Program*, 147 Econ. Letters 1-4 (2016). Nearly 80% of surveyed

23

DACA recipients reported that they could make enough money to financially support their family. Wong et al., *supra*, at 2. And many family members of DACA recipients are U.S. citizens. Nearly 1.5 million Americans live with someone who is a DACA recipient. CAP Report, *supra*. Seventy percent of individuals granted deferred action under DACA have an immediate family member who is a U.S. citizen. Wong et al., *supra*, at 9; Patler Report, *supra*, at 26. According to another survey, 13% have a U.S. citizen spouse, and 19% have a U.S. citizen child. Wong et al., *supra*, at 9. Altogether, 256,000 U.S. citizen children have a parent who is a DACA recipient. *Id.*

As the mother of five children—all U.S. citizens—**Angelica V.** worked long hours at a fast food restaurant to help support her family. A work authorization she obtained through DACA provided tremendous opportunity, allowing Angelica to accept a higher-paying position at the Chamber of Commerce as a program coordinator for disabled persons in Oklahoma. This, in turn, helped her realize her dreams as an entrepreneur and become the owner of a successful and growing translation and interpretation business. Angelica also volunteers to support entrepreneurs in the area and empower the local immigrant community.

In addition, DACA has helped Angelica become more engaged in her children's extra-curricular activities. She is now able to coach her children's soccer teams—which required Angelica to have a Social Security number as part of a routine background check. The prospect of DACA's rescission

24

has left her deeply fearful for her family, however. Preparing her young children for the worst has been a traumatic and painful process, and Angelica worries daily about how they will cope if she or her husband, also a DACA recipient, is deported. (Angelica shares her story in a video available at: http://www.uwdamicusbrief.com.)

For **Ritu P.**, a 25-year-old native of India, DACA gave her "a purpose to live." One of the program's first applicants, Ritu knew that DACA would open doors to her. It allowed her to apply to college and, later, land her "dream job" as a manager at MAC Cosmetics in Tampa Bay, Florida. Ritu is now deeply invested in using that experience to build her own business as a make-up artist and beauty influencer with a growing online following. The stakes are also high for Ritu, her partner, and their families. As the only adult in the household with a work authorization, Ritu is the primary breadwinner: "If I'm not employed, I don't get paid, and there's no one to take care of the bills."

For families like Angelica's and Ritu's, DACA has been a critical lifeline. DACA recipients have been able to secure better jobs that take full advantage of their skills, translating into greater pay and financial support for their loved ones. Without DACA, many of these families would become more isolated and less secure—and would face the devastating possibility of separation due to deportation. In these and other ways, DACA strengthens the families of undocumented immigrants and U.S. citizens alike.

AR4813

25

### D. DACA Has Made It Possible for Recipients to Obtain Careers that Serve the American Public

DACA recipients also dedicate their lives to public service—further enriching their local communities and the country in a manner that will no longer be possible if DACA is unwound. Some 25,000 DACA recipients work for nonprofit organizations, while 22,000 work in the public sector. CAP Report, *supra*. Moreover, 16,000 DACA recipients (including many of the above) are educators and 27,000 are healthcare professionals. *Id.*

***Maricruz R.*** is just one example. At just seven years old, Maricruz, along with her mother and siblings, escaped an abusive father in Mexico to build a life in the United States. Before DACA, Maricruz's life was difficult: She cycled through jobs at a fast food restaurant, a fishery, and a waste disposal facility, struggling to earn a living to support herself and her family. As an undocumented immigrant, finding consistent work was impossible, and—lacking a driver's license—it was often difficult to get to interviews with potential employers and, even if lucky to find a job, commute to work. With DACA's protection, Maricruz was able to go back to school and obtain an associate's degree in Early Childhood Education and, later, a bachelor's degree.

Now a schoolteacher in Salem, Oregon, Maricruz has taught children ranging from pre-kindergarten to elementary school. She is able to drive to work, build a credit history, and support her family. As a member of the Oregon DACA Coalition, she has been a

26

powerful voice for immigrants' rights. She finds deep fulfillment in her teaching and volunteering: "I want to be able to give back. We are part of this community." (Maricruz shares her story in a video available at:  http://www.uwdamicusbrief.com.)

Like Maricruz, many other DACA recipients have devoted themselves to teaching. ***Itzel A.***, for example, came to the United States from Mexico when she was nine years old and grew up on a dairy farm, where her mother worked. She worked hard in school, and eventually obtained a degree in education from Western Michigan University. Unable to work legally in the United States, however, Itzel had little choice but to return to the dairy farm where she grew up. It was only after Itzel was granted DACA protection in 2012 that she was able to get a job as a full-time Spanish teacher at Kalamazoo Central High School.

Other DACA recipients help meet the urgent health-care needs of their communities. For instance, ***Luis A.***, who came to the United States from Mexico at the age of seven, has been working as an intensive care nurse since receiving DACA's protection in 2013. In 2010, Arkansas passed a law prohibiting anyone without a Social Security card from obtaining a nursing license. Luis, then a nursing student, was devastated. But, through DACA, Luis was able to get a Social Security number, obtain his nursing license, and begin work as a nurse in a cardiovascular Intensive Care Unit ("ICU"). He has since been certified to work in the Neuroscience, Trauma, and Surgical ICUs. Luis also fills a critical need during the country's current shortage of qualified nurses. As a

**AR4815**

27

travel nurse, Luis frequently relocates to hospitals that are understaffed or lack staff with appropriate training to meet the health needs of their local communities.

Unable to volunteer at his local hospital, work, or drive without lawful immigration status, **Daniel C.**— an undocumented native of South Korea who arrived in the United States as a child—wrestled with clinical depression before DACA: "I felt like I was in a prison without bars," but DACA "gave me a new beginning." Now thirty-one, Daniel works as a registered nurse in New Jersey, while he attends graduate school at William Patterson University to become a nurse practitioner. If DACA continues, Daniel hopes to obtain his doctoral degree and become an educator to help address the nationwide shortage in qualified nurses—particularly for nursing faculty. Daniel is grateful for the enormous opportunities DACA has brought him, and he is committed to helping underserved communities.

DACA recipients who have devoted their careers to serving the public are not only teachers and nurses. **Juan S.** left Oaxaca, Mexico as an eleven-year-old boy to pick grapes in the Central Valley of California. Arriving with only a third-grade education and unable to speak English, Juan was a diligent student. In May 2015, he became the first in his family to obtain a four-year college degree.

Once Juan received DACA protection and his work authorization—and while still in college—he began serving federal and state courts as the nation's only court interpreter for his native tongue, Zapotec,

**AR4816**

28

an indigenous dialect of Oaxaca. Juan was also able to pursue a competitive internship opportunity at the U.S. Congress. Advance parole (another benefit that DACA recipients could apply for before the government's attempt to rescind the program) enabled Juan to travel abroad to present his research findings about the civic engagement of indigenous young people in the San Joaquin Valley. At the invitation of the University of California, he also participated in seminars in his native Oaxaca regarding migrant education.

Now thirty years old, Juan operates an interpreting company, while working full-time as a business development specialist for a regional non-profit. As a Zapotec-speaking court interpreter, Juan travels across the U.S. southwest border region to help immigrants understand the proceedings they are involved in. As a business development specialist, Juan assists farmers and entrepreneurs in the food industry in underserved and low-resourced rural communities. In addition to allocating micro-loans on behalf of a regional non-profit, Juan provides local business owners with technical assistance, business development, and connections with resources and markets. Juan feels empowered by DACA and the knowledge that his actions have had a positive impact on his community in California's Central Valley—but he still worries daily that, with DACA's fate in peril, all of his hard work could be undone in an instant.

29

### E. DACA Has Enabled Recipients to Serve Their Communities as Volunteers and Organizers

Many DACA recipients understand deeply the challenges faced by those who lack resources and opportunities, and they aspire to serve their local and national communities as a result. Deferred action under DACA has helped to make those ideals a reality.

On the day that the DACA program was announced, **Karen C.** came home from high school to find her mother crying tears of happiness. DACA gave Karen new hope, motivating her to pursue a degree in Political Science at the University of Central Florida ("UCF"). While at UCF, she has worked with local organizations to persuade Florida to pass the Orlando Trust Act, a resolution that prohibits the city of Orlando from discriminating against people based on their immigration status. *See* City of Orlando, Exec. & Admin. Offices, Fair Treatment of All (Trust Act Policy) § 100.3 (adopted July 23, 2018), https://bit.ly/2p05O2N. A community organizer with a passion for environmental justice and immigrant rights, Karen hopes to eventually seek political office. Her writing was recently published in a collection of essays from young and established public figures regarding the importance of civic participation in making a better world.

**Tasneem A.**, now twenty, learned that he was undocumented at the age of fifteen, when his parents decided that his performing at Carnegie Hall would put him in too much danger of being deported. Born

**AR4818**

30

with a weak immune system, Tasneem was brought to the United States from Bangladesh when he was just nine months old. While a full-time student at University of Oklahoma, Tasneem works tirelessly to financially support his family. He founded a business that provides fundraising, communications, and graphic design for local, state, and federal campaigns, and he works part-time for a community education non-profit. DACA has given Tasneem a voice: As an activist, he has helped to elect his town mayor; as a professional community organizer, he has mobilized survivors of violence; and as a performer, he has empowered others to express themselves through the arts. (Tasneem shares his story in a video available at: http://www.uwdamicusbrief.com.)

*Bartosz K.* immigrated to the United States from Poland when he was ten years old. After receiving DACA protection in 2012, he completed undergraduate studies in Michigan before getting his juris doctor from Wayne State University Law School. Along the way, Bartosz became a professional organizer. He has been involved in electoral campaigns at all levels—from door-knocker to campaign manager—and believes that his work strengthens American political discourse. Now, Bartosz works as the political director of an advocacy group, Michigan United, using his talents to help make life better for his community. "For me," Bartosz explains, "the U.S. has always felt like home, but prior to DACA I worried every day about what would happen to me. . . . Ultimately, I would like to become a U.S. citizen, so that I can vote and maybe run for office one day."

**AR4819**

31

*Ju H.* is an active volunteer and organizer on behalf of immigrants and refugees in California. A graduate of University of California, Berkeley, Ju serves on the board of a local organization that supports immigrant families. He also regularly devotes his time to the National Korean American Service & Education Consortium, a national non-profit that strives for social, economic, and racial justice for Asian Americans. But Ju suffers from Crohn's Disease, a chronic inflammation of the gastrointestinal system that, if untreated, could lead to colon cancer. Although DACA recipients are excluded from federal insurance programs (such as the Patient Protection and Affordable Care Act), DACA allows Ju to access private insurance to receive the treatment he needs to manage his condition. For Ju, "DACA is literally a matter of life and death."

*Cinthia P.* was only one year old when her family entered the United States. Experiencing her father's traumatic detention and deportation—coupled with the anxiety of living as an undocumented immigrant in Louisiana—led Cinthia into a downward spiral of depression and even thoughts of suicide. Despite her 4.0 GPA, Cinthia's undergraduate options were limited due to her undocumented status: She was excluded from most scholarships, and her parents had to work multiple full-time jobs to pay for college. DACA, however, allowed her to take a summer job as a law clerk for a nonprofit legal-services organization. This job, in turn, helped Cinthia afford to pursue a law degree at the Loyola University New Orleans College of Law. "[W]ith DACA," she says, "I was somebody. . . . I existed." After graduating, Cinthia

32

hopes to become a criminal defense attorney or a staff attorney for an immigrants' and workers' rights group.

Growing up in Macon, Georgia, **Raymond P.**, twenty-six, knew no other undocumented children. Always conscious of his "outsider" status, Raymond struggled with depression and even attempted suicide in 2009. A Filipino immigrant who came to the United States as a one-year-old infant, Raymond lived in the United States for almost his entire life, but it was only after receiving DACA's protection that Raymond was able to accept an exciting opportunity with a non-profit group assisting Asian immigrants and refugees. Deferred action also made it possible for Raymond to travel freely within the United States, and even board a plane to attend the G92 Fellowship for Christian Leaders in 2014. Since graduating *summa cum laude* from Mercer University, Raymond works as a political consultant and paralegal, spending his free time volunteering with Freedom University, an organization that helps undocumented students in Georgia. Without DACA, Raymond's ability to openly involve himself in his community would be dramatically limited. Raymond knows his educational future is uncertain as the DACA program is threatened, but he dreams of one day going to law school.

AR4821

33

## F. DACA Has Empowered Many Young Immigrants to Live their Lives in the Open Without Fear of Persecution or Harassment

For undocumented youth of all backgrounds, deferred action can be a source of enormous psychological and emotional relief. For undocumented youth who have reason to fear persecution or harassment in their countries of origin—for example, based on their race, religion, or sexual orientation or identity—that effect can be particularly profound.

*Amicus* United We Dream has extensive experience helping LGBTQ communities who have enormously benefited from DACA, and the examples below illustrate DACA's broader impact in empowering various marginalized communities to live their lives in the open.

***Catalina V.*** is a thirty-one-year-old transgender woman and Ph.D. student at the University of Washington, where she teaches undergraduates. Catalina's family came to the United States to escape political persecution in their native Colombia, and she fears further persecution on the basis of her gender identity if she is deported.[8] A graduate of the Georgetown University School of Foreign Service,

---

[8] This is unfortunately common. According to a recent survey, almost 80% of LGBT DACA recipients expressed concern about their physical safety if they were deported as a result of the government's attempt to rescind the program. Tom K. Wong et al., *Findings from 2019 National Survey of DACA Recipients* (Sept. 2019) (forthcoming, Suppl. to *2019 National DACA Study*).

34

Catalina serves as a Partner and Senior Adviser for Megaphone Strategies, a strategic communication non-profit organization.

A trailblazer and inspiration to many around her, Catalina is a 2007 recipient of the President's Volunteer Award from the President's Council on Service and Civic Participation. In 2008, she was named an Ambassador for Peace by the Universal Peace Federation and the Inter-religious and International Federation for World Peace. Catalina was also the first transgender immigrant Latina appointed as a Commissioner for the D.C. Office of Latino Affairs (from December 2013 to June 2017). Recently, Catalina was named one of *Rolling Stone* magazine's "16 Young Americans Shaping the 2016 Election" and one of Mitu's "Young Latinos that are Leaving a Footprint in Politics."

***Luis G.***, thirty, has lived over half of his life in the United States. During his teen years, Luis learned that he was undocumented around the same time as he first understood his sexual orientation. Luis's newfound identities as a gay man and an undocumented immigrant were destabilizing, and made him deeply fearful of deportation to Mexico (where he feared persecution for his sexual orientation). Obstacles continued to mount when Luis was forced to drop out of college because it was unaffordable.

But DACA offered Luis new hope. It enabled him to apply for state and institutional financial aid, allowing Luis leave his low-paying jobs and return to school. After making the Dean's List every quarter,

**AR4823**

35

Luis graduated from the University of California, Irvine in June 2015. For the last several years, Luis has worked as an immigration resource specialist at a non-profit organization. At the LGBT Center of Orange County, Luis supervises a team that conducts advocacy and provides immigration resources to local LGBTQ individuals (including, for example, citizenship classes, immigration consultation services, and detention visitation programs).

*Moises R.*, now twenty-two, was just five years old when his family left Mexico and relocated to Tennessee in search of a better life. Before DACA, "every single day was a gamble" and Moises reports that "we had to plan our entire day around checkpoints." With the assistance of a non-profit to help pay for his initial $465 DACA application fee, DACA was a worthwhile investment that has already unlocked tremendous opportunities for Moises. The proud recipient of a $500,000 scholarship, Moises currently attends the University of Chicago, with dreams of going to law school and becoming the first gay, Mexican U.S. Senator for Tennessee. "[A]fter I got DACA," he observed, "I was able to . . . start living."

For now, Moises has taken advantage of internship opportunities with UWD and other immigrant rights organizations. As a co-founder of Tennessee United and various other organizations, Moises works to support the rights of immigrant, LGBTQ, and homeless populations in his hometown of Chattanooga. He has mobilized hundreds of community members.

AR4824

36

The experience of undocumented youth in this country is undeniably difficult, and those difficulties compound for LGBTQ individuals. As Moises R. observed, "[t]he pressure of being in two closets can be too much." Despite this, many undocumented LGBTQ individuals have been able to turn their struggles into remarkable strengths, as they emerge as strong voices at the local and national levels.

\* \* \*

As the stories discussed above illustrate, DACA has had a profound and positive impact on the lives of hundreds of thousands of young individuals with deep ties to this country—and for the even larger numbers of family members, friends, classmates, colleagues, neighbors, and community members whose lives are enriched by their contributions and fellowship. By any measure, DACA has been an unqualified success. The lives of both DACA recipients and American citizens are inextricably interwoven.

DACA's beneficiaries have come from all over the world and live across every State in the nation. They have brought with them their exceptional talents, drive, entrepreneurial spirit, and commitment to their local communities and the country. They call the United States their home—and, for the countless DACA recipients who arrived as babies or young children, it is the only country they know. "[P]articularly given the significant reliance interests involved," *CASA de Maryland* v. *U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 704 (4th Cir. 2019), this Court should not allow the government to renege on the promise it made to these inspiring young people

**AR4825**

37

when granting them deferred action. Doing so would not only upend their lives—as well as the lives of their friends, families, and communities, all of whom have relied on DACA's promise—but also diminish the United States and harm the broader social fabric and economy.

## CONCLUSION

For the foregoing reasons, this Court should affirm (1) the judgments of the Court of Appeals for the Ninth Circuit and the District Court for the District of Columbia, and (2) the orders of the District Court for the Eastern District of New York.

Respectfully submitted,

GEOFFREY BROUNELL
DAVIS WRIGHT TREMAINE
  LLP
1251 Avenue of the Americas
21st Floor
New York, N.Y. 10020
Tel. (212) 489-8230
geoffreybrounell@dwt.com

PETER KARANJIA*
MELISSA L. TURCIOS
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, D.C. 20004
Tel. (202) 799-4000
peter.karanjia@dlapiper.com
*Counsel of Record

*Counsel for Amici Curiae*

October 2, 2019

**AR4826**

1A

**APPENDIX:**

LIST OF *AMICI*

1.   Alabama Coalition for Immigrant Justice

2.   Alliance San Diego

3.   Arkansas United Community Coalition

4.   Arizona Dream Act Coalition

5.   Asian Americans Advancing Justice | AAJC

6.   Asian Americans Advancing Justice – Los Angeles

7.   Asian Law Alliance

8.   Asian Pacific American Labor Alliance, AFL-CIO

9.   Association of Farmworker Opportunity Programs

10.  Casa de Maryland

11.  CARECEN SF

12.  Caring Across Generations

13.  Center for American Progress

14.  The Coalition for Humane Immigrant Rights

**AR4827**

2A

15.  Connecticut Students for a Dream

16.  Fair Immigration Reform Movement

17.  FWD.us

18.  HOLA Ohio

19.  ImmSchools

20.  Junta for Progressive Action, Inc.

21.  Latin America Working Group

22.  Make the Road Pennsylvania

23.  Michigan United

24.  Migrant and Immigrant Community Action Project

25.  Migrant Justice

26.  National Domestic Workers Alliance

27.  National Equality Action Team

28.  National Korean American Service & Education Consortium

29.  National Partnership for New Americans

30.  Next Up

31.  Next100

32.  One America

AR4828

3A

33. Opening Doors International Services

34. Pennsylvania Immigration and Citizenship Coalition

35. Project South

36. Promise Arizona

37. UFW Foundation

38. United Farm Workers of America

39. UPLIFT

40. The Resurrection Project

41. The Revolutionary Love Project

42. The Rhode Island Bible Society

43. The Rhode Island State Council of Churches

44. Rio Grande Valley Equal Voice Network

45. South Asian Americans Leading Together

46. South Carolina Appleseed Legal Justice Center

47. Southeast Asia Resource Action Center

48. Tennessee Immigrant and Refugee Rights Coalition

49. US Fund for UNICEF

**AR4829**

4A

50.   Young Center for Immigrant Children's Rights

AR4830

Nos. 18-587, 18-588, 18-589

# In the Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, et al.,
*Petitioners,*
*v.*
REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al.,
*Respondents.*

DONALD J. TRUMP, President of the United States, et al.,
*Petitioners,*
*v.*
NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, et al.,
*Respondents.*

KEVIN K. MCALEENAN,
Acting Secretary of Homeland Security, et al.,
*Petitioners,*
*v.*
MARTIN JONATHAN BATALLA VIDAL, et al.,
*Respondents.*

On Writs of Certiorari to the United States Courts of Appeals
for the Ninth, District of Columbia, and Second Circuits

**BRIEF OF AMICI CURIAE CURRENT AND FORMER
PROSECUTORS AND LAW ENFORCEMENT LEADERS IN
SUPPORT OF RESPONDENTS**

MATTHEW J. PIERS
CHIRAG G. BADLANI
CARYN C. LEDERER
HUGHES SOCOL PIERS
RESNICK & DYM, LTD.
70 West Madison St.
Suite 4000
Chicago, IL 60602
(312) 580-0100

MARY B. MCCORD
   *Counsel of Record*
JOSHUA A. GELTZER
ANNIE L. OWENS
DANIEL B. RICE
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
GEORGETOWN UNIVERSITY
LAW CENTER
600 New Jersey Ave., NW
Washington, DC 20001
(202) 661-6607
mbm7@georgetown.edu

**AR4831**

i

# TABLE OF CONTENTS

Page

INTEREST OF AMICI CURIAE ......................... 1

SUMMARY OF ARGUMENT .............................. 3

ARGUMENT ................................................. 5

    I.  DACA Fosters Effective Law Enforcement............................................ 5

        A.  "Community Policing" Is Essential To Effective Law Enforcement....................................... 5

        B.  Trust And Respect Between Communities And Law Enforcement Officials Are Thwarted When Individuals Fear Removal Consequences Of Cooperation ....................................... 6

        C.  DACA Promotes Cooperation With Law Enforcement ................... 13

        D.  DACA Aids Law Enforcement By Facilitating Access To Identification.................................... 16

    II.  DACA Helps Law Enforcement Protect Vulnerable Individuals From Crime And Exploitation ............. 18

CONCLUSION .................................................. 23

APPENDIX: LIST OF AMICI CURIAE ...........A-1

AR4832

ii

# TABLE OF AUTHORITIES

Page(s)

CASES

*City of Philadelphia* v. *Sessions*,
    309 F. Supp. 3d 289 (E.D. Pa. 2018) .................. 10

STATUTES

8 C.F.R. § 274a.12(c)(14) .......................................... 17

8 U.S.C. § 1324a(h)(3) .............................................. 17

Violence Against Women Act, Pub. L. No. 106-
    386, 114 Stat. 1491 (2000) .................................. 14

EXECUTIVE AND CONGRESSIONAL
MATERIALS

*Hearing Before the S. Comm. on the Judiciary*,
    114th Cong. 2 (2015) (statement of Tom
    Manger, Chief, Montgomery Cty., Md.,
    Police Dep't & President, Major Cities
    Chiefs Ass'n),
    https://perma.cc/SKM2-QKV9 ....................... 5, 19

Office of Cmty. Oriented Policing Servs., U.S.
    Dep't of Justice, *Enhancing Community
    Policing with Immigrant Populations:
    Recommendations from a Roundtable
    Meeting of Immigrant Advocates and Law
    Enforcement Leaders* (2010),
    https://perma.cc/62JX-99KK ............................. 18

AR4833

iii

TABLE OF AUTHORITIES—Continued

Page(s)

Soc. Sec. Admin., SSA Publ'n No. 05-10096, Social Security Numbers for Noncitizens (2017), https://perma.cc/9RGJ-X8Y2 ................. 17

U.S. Citizenship & Immigration Servs., U.S. Dep't of Homeland Sec., OMB No. 1615-0040, Instructions for I-765 Application for Employment Authorization (last updated May 31, 2018), https://perma.cc/JW66-XQCG ........................... 17

*Victims of Criminal Activity: U Nonimmigrant Status*, U.S. Citizenship & Immigr. Servs. (last updated June 12, 2018), https://perma.cc/P3AC-XTHG ........................... 14

OTHER AUTHORITIES

Angelica S. Reina et al., *"He Said They'd Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593, (2014) ........... 21

Anita Khashu, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties*, Police Found. (2009), https://perma.cc/KL5A-EQWR ................... 5, 8, 20

AR4834

iv

TABLE OF AUTHORITIES—Continued

Page(s)

Bret Hauff, *ICE Targets Immigrants at La Plata County Courthouse*, Durango Herald (Mar. 23, 2019), https://perma.cc/8RFS-3YMW ............................ 10

Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation.*, N.Y. Times (June 3, 2018), https://perma.cc/Q4HN-N5BX .................. 9

Elizabeth Fussell, *The Deportation Threat Dynamic and Victimization of Latino Migrants: Wage Theft and Robbery*, 52 Soc. Q. 593 (2011) ............................. 19, 20, 22

Emma Whitford, *Courthouse ICE Arrests Are Making Immigrants 'Sitting Ducks,' Lawyers Warn*, Gothamist (June 22, 2017), https://perma.cc/XJT4-YQ4D............................. 12

Hannah Rappleye et al., *Immigration Crackdown Makes Women Afraid to Testify Against Abusers, Experts Warn*, NBC News (Sept. 22, 2018), https://perma.cc/UB6S-RTE7 ................. 10, 12, 13

Hans Johnson & Sergio Sanchez, Immigrants in California, Public Policy Institute of California (2019), https://perma.cc/W5RL-7ZZA ............................... 2

**AR4835**

v

TABLE OF AUTHORITIES—Continued

Page(s)

Jacob Bucher et al., *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159 (2010) ......................... 19

James Fanelli, *Father of Two Who Testified in Brooklyn Homicide Cases and Is Married to a U.S. Citizen Detained by ICE*, N.Y. Daily News (Aug. 2, 2017), https://perma.cc/SBH8-BUGH ......................... 11

James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017), https://perma.cc/QR2S-FKX7 ............... 9

Jessica Lipscomb, *Miami Crime Victim Detained by ICE Warns Others About Calling Police for Help*, Miami New Times (Apr. 23, 2019), https://perma.cc/9GG5-BKQQ ......................... 11

Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328 (2015) ........... 8, 20

Katie Mettler, *'This Is Really Unprecedented': ICE Detains Woman Seeking Domestic Abuse Protection at Texas Courthouse*, Wash. Post (Feb. 16, 2017), https://perma.cc/33UE-WC85 ........................... 10

**AR4836**

vi

TABLE OF AUTHORITIES—Continued

Page(s)

Leslye Orloff et al., Nat'l Immigrant Women's Advocacy Project, *U-Visa Victims and Lawful Permanent Residency* (2012), https://perma.cc/53NZ-LCPF ............................. 15

Letter from Mary E. Fairhurst, Chief Justice of the Supreme Court of Washington, to John F. Kelly, Sec'y of Dep't of Homeland Sec. (Mar. 22, 2017), https://perma.cc/6358-7Z3H .............................. 13

Letter from Seventy-Five Former State and Federal Judges to Ronald D. Vitiello, Acting Director of ICE (Dec. 12, 2018), https://perma.cc/LJE2-94P7 .............................. 13

Letter from Stuart Rabner, Chief Justice of the Supreme Court of New Jersey, to John F. Kelly, Sec'y of Dep't of Homeland Sec. (Apr. 19, 2017), https://perma.cc/M2QA-FJYD ........... 13

Letter from Tani G. Cantil-Sakauye, Chief Justice of California, to Jeff Sessions, Att'y Gen. of the U.S., and John F. Kelly, Sec'y of Dep't of Homeland Sec. (Mar. 16, 2017), https://perma.cc/9C8T-QVET ............................. 12

Maria Cramer, *ICE Courthouse Arrests Worry Attorneys, Prosecutors*, Boston Globe (June 16, 2017), https://perma.cc/VZZ9-J7WE ............ 13

**AR4837**

vii

TABLE OF AUTHORITIES—Continued

Page(s)

Mark Hugo Lopez et al., *More Latinos Have Serious Concerns About Their Place in America Under Trump*, Pew Res. Ctr.: Hispanic Trends (Oct. 25, 2018), https://perma.cc/R3TE-DMAD ............................ 6

Matthew Haag, *Texas Deputy Accused of Molesting 4-Year-Old and Threatening to Deport Her Mother*, N.Y. Times (June 18, 2018), https://perma.cc/682K-2ZR3 ................... 19

Michael Corkery & Jessica Silver-Greenberg, *Banks Reject New York City IDs, Leaving 'Unbanked' on Sidelines*, N.Y. Times (Dec. 23, 2015), https://perma.cc/A5B7-X32D ............ 16

Michael Morris & Lauren Renee Sepulveda, *A New ICE Age*, Texas Dist. & Cty. Attorneys Ass'n, *The Texas Prosecutor*, Vol. 47, No. 4 (July/Aug. 2017), https://perma.cc/J2QH-AWV7 .............................. 9

Min Xie & Eric P. Baumer, *Neighborhood Immigrant Concentration and Violent Crime Reporting to the Police: A Multilevel Analysis of Data from the National Crime Victimization Survey*, 57 Criminology 237 (2019), https://perma.cc/QS5R-K867 ................... 7

**AR4838**

viii

TABLE OF AUTHORITIES—Continued

Page(s)

Nat'l Immigrant Women's Advocacy Project,
*Promoting Access to Justice for Immigrant
and Limited English Proficient Crime
Victims in an Age of Increased Immigration
Enforcement: Initial Report from a 2017
National Survey* (2018),
https://perma.cc/52MV-X8TG ..................... 8, 9, 21

Natalia Lee et al., Nat'l Immigrant Women's
Advocacy Project, *National Survey of
Service Providers on Police Response to
Immigrant Crime Victims, U Visa
Certification and Language Access* (2013),
https://perma.cc/5SR9-VTWA ............................ 16

Nawal H. Ammar et al., *Calls to Police and
Police Response: A Case Study of Latina
Immigrant Women in the USA*,
7 Int'l J. Police Sci. & Mgmt. 230 (2005) ........... 21

Nik Theodore, *Insecure Communities: Latino
Perceptions of Police Involvement in
Immigration Enforcement* (2013),
https://perma.cc/XEE8-P42V ............................... 7

Philip Jankowski, *Deportation Fears Keep
Victim from Cooperating in Domestic
Violence Case, Travis DA Says*, Statesman
(Austin) (Mar. 8, 2017),
https://perma.cc/9AYX-5FQP ............................ 11

**AR4839**

ix

TABLE OF AUTHORITIES—Continued

Page(s)

Police Exec. Research Forum, *Voices from Across the Country: Local Law Enforcement Officials Discuss the Challenges of Immigration Enforcement* (2012), https://perma.cc/QKN8-QFJK ..................... 16, 17

Roberto G. Gonzales & Angie M. Bautista-Chavez, Am. Immigration Council, *Two Years and Counting: Assessing the Growing Power of DACA* (June 16, 2014), https://perma.cc/6UBE-Z9AK ............................ 14

Roberto G. Gonzales, *Here's How DACA Changed the Lives of Young Immigrants, According to Research*, Vox Media (Feb. 16, 2018), https://perma.cc/PB6B-9S9L .................. 14

S. Poverty Law Ctr., *Under Siege: Life for Low-Income Latinos in the South* (2009), https://perma.cc/7GCY-V25L................. 19, 20, 22

S.P. Sullivan, *Advocates Say ICE Courthouse Arrests in N.J. Are Hurting Immigrant Crime Victims*, NJ (June 5, 2017), https://perma.cc/8VQW-TYD7 ........................... 12

Sarah Stillman, *When Deportation Is a Death Sentence*, New Yorker (Jan. 15, 2018), https://perma.cc/TK4U-FKMY ........................... 12

Steve Coll, *When a Day in Court Is a Trap for Immigrants*, New Yorker (Nov. 8, 2017), https://perma.cc/VMT5-75M5............................ 11

x

TABLE OF AUTHORITIES—Continued

Page(s)

Tom K. Wong, *Sanctuary Cities Don't 'Breed Crime.' They Encourage People to Report Crime.*, Wash. Post (Apr. 24, 2018), https://perma.cc/EDW3-9SEQ ............................. 7

Zenén Jaimes Pérez, United We Dream, *A Portrait of Deferred Action for Childhood Arrivals Recipients: Challenges and Opportunities Three-Years Later* (2015), https://perma.cc/AGE7-X5UH ...................... 14, 18

AR4841

1

## INTEREST OF AMICI CURIAE[1]

Amici are current and former prosecutors and law enforcement leaders who have extensive expertise in law enforcement, prosecution, and cooperative federal-state law enforcement activities. They are intimately familiar with the challenges of performing critical law enforcement and governance functions in communities where immigrants fear the police and are vulnerable to exploitation and crime. Amici represent jurisdictions from across the country that understand the challenges of protecting local community needs and public safety.

Amici's experience in keeping their communities safe has underscored the critical importance of bringing immigrants and their families "out of the shadows." Community trust and cooperation are essential to public safety, and sound police work as well as successful prosecutorial efforts are undermined when undocumented immigrants and their communities fear interacting with law enforcement and the justice system. This dynamic leaves undocumented immigrants more vulnerable to crime and exploitation—and undocumented immigrant victims less likely to come forward or cooperate with investigations and prosecutions—leading to more violence in the communities

---

[1] Pursuant to Supreme Court Rule 37.6, counsel for amici certifies that no counsel for a party authored this brief in whole or in part and that no person or entity, other than amici and their counsel, made a monetary contribution intended to fund this brief's preparation or submission. Counsel of record for all parties received timely notice of the filing of this brief and consented to its filing.

2

amici are and have been charged with protecting. In the State of California, where more than a quarter of the population are immigrants,[2] these problems have a particularly profound impact.

The Deferred Action for Childhood Arrivals ("DACA") program has protected from removal nearly 800,000 individuals brought to this country as children. Under DACA, these individuals—who have undergone background checks and lived continuously in the United States since 2007—have been permitted to live, work, and study in this country without fear of removal. Amici are aware that the DACA program has helped law enforcement officers and prosecutors keep their communities safe by reducing the fear of removal for these nearly 800,000 individuals who are active members of their communities.

---

[2] Hans Johnson & Sergio Sanchez, Immigrants in California, Public Policy Institute of California, 1 (2019), https://perma.cc/W5RL-7ZZA (in 2017, immigrants constituted 27 percent of California's population).

AR4843

3

## SUMMARY OF ARGUMENT

The lessons amici have learned in protecting their communities shed important light on the issues raised in this case. When community residents live in constant fear that interactions with local law enforcement officials could result in removal, that fundamental breakdown in trust threatens public safety and impedes justice system leaders from doing their jobs. Extensive evidence shows that, in such circumstances, undocumented immigrants—and their lawfully present family and neighbors—fear that turning to the police and cooperating with prosecutors could bring adverse immigration consequences. As a result, immigrant communities are less willing to report crimes and cooperate with criminal investigations and prosecutions. This dynamic poses a major challenge to the investigation and prosecution of individual crimes and to the proper allocation of public safety resources.

DACA ameliorates these problems by addressing an important reason that many individuals fear cooperating with law enforcement. As experience with DACA has shown, when immigrants are permitted to step out of the shadows, they are much more willing to work cooperatively with police and prosecutors. As explained below, nearly two-thirds of DACA recipients reported being less afraid of law enforcement, and 59 percent indicated that they were more likely to report crimes after having entered the program. DACA further aids law enforcement by facilitating access to identification, such as federal employment authorization documents. Lack of identification in immigrant communities often leads to undue burdens on

4

police, potentially turning a simple traffic stop into an hours-long detour to fingerprint someone at the police station. When police are able to identify victims, witnesses, and potential suspects without those sorts of delays, valuable law enforcement resources are spared. Knowing the identity of individuals with whom law enforcement officers come into contact aids in the safety of law enforcement officers as well.

DACA also promotes public safety by helping law enforcement to protect a population uniquely vulnerable to exploitation and violent crime. Numerous studies have shown that undocumented individuals' fear of interacting with law enforcement makes them attractive targets for many forms of crime and abuse. With limited access to bank accounts (in substantial part because of their lack of identification), they have been dubbed "walking ATMs" and are frequent targets for robbery. Undocumented individuals are also especially vulnerable to domestic abuse because they often fear turning to law enforcement for help. And they face increased wage theft and other forms of exploitation in the workplace.

By eliminating an important reason to fear law enforcement, enabling access to work authorization and to identification, and building trust between law enforcement and immigrants with longstanding ties to the United States, DACA aids community policing and makes recipients less vulnerable to crime and exploitation. In doing so, DACA provides vital support to police and prosecutors charged with protecting all members of their communities.

**AR4845**

5

## ARGUMENT

### I. DACA Fosters Effective Law Enforcement

#### A. "Community Policing" Is Essential To Effective Law Enforcement

The experience of policing cities across the country has taught law enforcement officers that doing their jobs well requires "the trust and respect of the communities [they] serve." *Hearing Before the S. Comm. on the Judiciary*, 114th Cong. 2 (2015) (statement of Tom Manger, Chief, Montgomery Cty., Md., Police Dep't & President, Major Cities Chiefs Ass'n), https://perma.cc/SKM2-QKV9 [hereinafter Statement of Tom Manger]. To combat crime, police officers "need the full cooperation of victims and witnesses." *Id.* This common-sense philosophy is sometimes called "community policing"—an approach to policing whereby local law enforcement organizations partner with communities to reduce crime and promote public safety. *See* Anita Khashu, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties*, Police Found. (2009), https://perma.cc/KL5A-EQWR.

Community policing requires police to interact with neighborhood residents in a manner that builds trust and encourages cooperation. *Id.* at xiii. When that trust is missing—as it is when people believe that contacting police or cooperating with prosecutors could lead to removal for themselves or others—community policing breaks down and the entire community suffers.

6

### B. Trust And Respect Between Communities And Law Enforcement Officials Are Thwarted When Individuals Fear Removal Consequences Of Cooperation

The reality of everyday life for millions of undocumented immigrants living in the United States poses significant challenges to effective community policing. According to a recent Pew survey, 66 percent of Hispanic immigrants and 43 percent of all Hispanic adults in the United States worry about removal—of themselves, family members, or close friends. Mark Hugo Lopez et al., *More Latinos Have Serious Concerns About Their Place in America Under Trump*, Pew Res. Ctr.: Hispanic Trends (Oct. 25, 2018), https://perma.cc/R3TE-DMAD. This fear predictably hinders cooperation and communication with police and prosecutors. Immigrants often assume that interaction with law enforcement officials could have adverse consequences for themselves or a loved one.

As a result, immigrant communities—and undocumented immigrants in particular—are less likely to trust and cooperate with local police and prosecutors. One recent study found that individuals living in communities of recent immigrants are less likely to report violent crime: in neighborhoods where 65 percent of residents are immigrants, there is only a 5-percent chance that a victim will report a violent crime, compared with a 48-percent chance in a neighborhood where only 10 percent of residents are born outside the United States. Min Xie & Eric P. Baumer, *Neighborhood Immigrant Concentration and Violent Crime Reporting to the Police: A Multilevel Analysis of Data from the National Crime Victimization Survey*, 57

7

Criminology 237, 249 (2019), https://perma.cc/QS5R-K867.  The authors of the study specifically noted that "the development of trusting relationships between citizens and the police is often challenged by the presence and application of local and federal immigration enforcement programs . . . that may dissuade residents from calling on the police to help address crime problems."  *Id.* at 254.

In addition, one survey of Latinos in four major cities found that 70 percent of undocumented immigrants and 44 percent of all Latinos would be less likely to contact law enforcement authorities if they were victims of a crime for fear that the police would ask them or people they know about their immigration status; and 67 percent of undocumented immigrants and 45 percent of all Latinos would be less likely to provide information about, or report, crimes because of the same fear.  Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 5-6 (2013), https://perma.cc/XEE8-P42V; *see also id.* at 1 ("Survey results indicate that increased involvement of police in immigration enforcement has significantly heightened the fears many Latinos have of the police, . . . exacerbating their mistrust of law enforcement authorities.").  And a recent survey of undocumented individuals in San Diego County found that if local law enforcement officials were working together with ICE, 60 percent of survey respondents would be less likely to report a crime they witnessed, while 43 percent would be less likely to report being a victim of a crime.  Tom K. Wong, *Sanctuary Cities Don't 'Breed Crime.' They Encourage People to Report Crime.*, Wash. Post (Apr. 24, 2018), https://perma.cc/EDW3-

AR4848

8

9SEQ.  These studies (among others) highlight that fears of immigration enforcement result in damage to law enforcement cooperation from not only undocumented community members, but also individuals with citizenship or lawful status, particularly in "mixed-status" households.[3]

This problematic atmosphere of mistrust poses a fundamental challenge for community policing.  Police cannot prevent or solve crimes if victims or witnesses are unwilling to talk to them or prosecutors because of concerns that they, their loved ones, or their neighbors will face adverse immigration consequences.  Law enforcement officers participating in one recent national survey reported seeing an across-the-board decline in immigrant communities' willingness to cooperate with law enforcement.  Nat'l Immigrant Women's Advocacy Project, *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey* 101 (2018), https://perma.cc/52MV-X8TG [hereinafter *NIWAP Report*].  Roughly one-fifth of police officers surveyed reported that, in 2017, immigrants were less willing than they were in 2016 to make police reports, less likely to help police when

---

[3] An estimated 85 percent of immigrants live in mixed-status families.  *See* Khashu, *supra*, at 24; *see also* Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328, 334 (2015) ("The results indicate that for each 1-point increase in fear of deportation [e.g., from 'not much' to 'some' worry, or from 'some' to 'a lot'], Latina participants were [15 percent] less willing to report being [a] victim of a violent crime to police.").

9

they arrived at the scene of the crime, less likely to assist with subsequent investigations, and less willing to work with prosecutors. *Id.* at 42. As a result, more than half of the law enforcement officials surveyed reported that crimes such as domestic violence, human trafficking, and sexual assault became more difficult to investigate. *Id.* at 51.

These trends have continued to worsen in recent years. *See* Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation.*, N.Y. Times (June 3, 2018), https://perma.cc/Q4HN-N5BX. According to the Houston Police Department, rape reporting by members of the Hispanic community fell over 40 percent from the first quarter of 2016 to the same period in 2017, despite an overall increase in city-wide crime reports. Michael Morris & Lauren Renee Sepulveda, *A New ICE Age*, Texas Dist. & Cty. Attorneys Ass'n, *The Texas Prosecutor*, Vol. 47, No. 4 (July/Aug. 2017), https://perma.cc/J2QH-AWV7. Los Angeles, San Francisco, and San Diego also witnessed lagging sexual assault and domestic violence reporting by Latino persons—but not other ethnic groups—in the first half of 2017. James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017), https://perma.cc/QR2S-FKX7. According to Los Angeles County Sheriff's Deputy Marino Gonzalez, "[t]hey're afraid of us. And the reason they're afraid of us is because they think we're going to deport them." *Id.*; *see also NIWAP Report*, *supra*, at 99 (finding that, in 2016 and 2017, fear of removal was the principal reason that immigrant victims did not call the police for help or file or follow through with a court

10

case).  Law enforcement officials across the country have echoed that sentiment.  *See, e.g.*, Hannah Rappleye et al., *Immigration Crackdown Makes Women Afraid to Testify Against Abusers, Experts Warn*, NBC News (Sept. 22, 2018), https://perma.cc/UB6S-RTE7 ("'We rely very heavily at the local level on cooperation from our witnesses and from our victims to ensure that cases can be prosecuted,' said Denver City Attorney Kristin Bronson.  'What we've found in Denver is people are not showing up because they're afraid that they might get apprehended in the hallways.'"); *see also City of* Philadelphia v. *Sessions*, 309 F. Supp. 3d 289, 341 (E.D. Pa. 2018) ("[Philadelphia] Police Commissioner Ross reiterated his earlier testimony that the City's ability to fight crime is impaired when victims and witnesses are afraid to report crimes for fear of immigration consequences."); Bret Hauff, *ICE Targets Immigrants at La Plata County Courthouse*, Durango Herald (Mar. 23, 2019), https://perma.cc/8RFS-3YMW (explaining that the tactic of courthouse arrests "deters people from making reports; it deters people from coming in" (quoting Colorado 6th Judicial District Chief Judge Jeffery Wilson)).

Immigrants' fear of interacting with law enforcement and prosecutors in light of potential removal consequences is not merely theoretical.  In February 2017, for example, an immigrant woman living in Texas arrived at a courthouse seeking a protective order against her abusive boyfriend, only to leave under arrest—likely due to a tip from her abuser.  Katie Mettler, *'This Is Really Unprecedented': ICE Detains Woman Seeking Domestic Abuse Protection at Texas Courthouse*, Wash. Post (Feb. 16, 2017),

11

https://perma.cc/33UE-WC85. In August 2017, federal agents detained an undocumented immigrant who had provided key testimony in two homicide cases. James Fanelli, *Father of Two Who Testified in Brooklyn Homicide Cases and Is Married to a U.S. Citizen Detained by ICE*, N.Y. Daily News (Aug. 2, 2017), https://perma.cc/SBH8-BUGH. Weeks later, ICE agents arrested a victim of domestic violence as he left a county courthouse. Steve Coll, *When a Day in Court Is a Trap for Immigrants*, New Yorker (Nov. 8, 2017), https://perma.cc/VMT5-75M5. And in February 2019, ICE detained a 38-year-old mother of three who was cooperating with police in an open investigation—and almost removed her to her native Nicaragua. Asked upon her release if she would think twice before interacting with law enforcement in the future, she answered without hesitation: "Sí." Jessica Lipscomb, *Miami Crime Victim Detained by ICE Warns Others About Calling Police for Help*, Miami New Times (Apr. 23, 2019), https://perma.cc/9GG5-BKQQ.

The underreporting of crimes by recent immigrants is a problem for the entire criminal justice system. Precisely because victims and witnesses fear removal, violent crimes have gone unreported, and pending prosecutions have disappeared from courts' dockets. For example, a Texas district attorney confirmed that a victim of domestic violence had become uncooperative because she feared removal. Philip Jankowski, *Deportation Fears Keep Victim from Cooperating in Domestic Violence Case, Travis DA Says*, Statesman (Austin) (Mar. 8, 2017), https://perma.cc/9AYX-5FQP. Denver prosecutors have been forced to drop 30 domestic violence cases

for similar reasons, Rappleye et al., *supra*, and in 2017, more than a dozen Latina women in Denver dropped their own civil cases against domestic abusers, citing fear of removal. Sarah Stillman, *When Deportation Is a Death Sentence*, New Yorker (Jan. 15, 2018), https://perma.cc/TK4U-FKMY. An immigrant mother in New Jersey, fearing that interaction with the court system could trigger removal, declined to report that her son had been assaulted on his way to school. S.P. Sullivan, *Advocates Say ICE Courthouse Arrests in N.J. Are Hurting Immigrant Crime Victims*, NJ (June 5, 2017), https://perma.cc/8VQW-TYD7. And a victim of domestic violence in New York City "did not think it was in her best interest" to pursue a protective order. Emma Whitford, *Courthouse ICE Arrests Are Making Immigrants 'Sitting Ducks,' Lawyers Warn*, Gothamist (June 22, 2017), https://perma.cc/XJT4-YQ4D. In addition to their particular removal concerns, undocumented immigrant victims and witnesses may understandably recoil more generally from a system that allows participants to walk into a courthouse to fulfill a civic responsibility to testify, only to be detained by immigration authorities and prevented from walking freely out of that same courthouse.

In response to these types of incidents, the chief justices of three state supreme courts—including the Supreme Court of California—wrote to federal authorities to emphasize that preserving trust with immigrant communities is essential to the administration of justice. Letter from Tani G. Cantil-Sakauye, Chief Justice of California, to Jeff Sessions, Att'y Gen. of the U.S., and John F. Kelly, Sec'y of Dep't of Homeland Sec. (Mar. 16, 2017), https://perma.cc/9C8T-

13

QVET; Letter from Mary E. Fairhurst, Chief Justice of the Supreme Court of Washington, to John F. Kelly, Sec'y of Dep't of Homeland Sec. (Mar. 22, 2017), https://perma.cc/6358-7Z3H; Letter from Stuart Rabner, Chief Justice of the Supreme Court of New Jersey, to John F. Kelly, Sec'y of Dep't of Homeland Sec. (Apr. 19, 2017), https://perma.cc/M2QA-FJYD.  In addition, 75 former state and federal judges wrote to ICE's Acting Director to explain that "our justice system cannot function effectively . . . if victims, defendants, witnesses, and family members do not feel secure in accessing the courthouse."  Letter from Seventy-Five Former State and Federal Judges to Ronald D. Vitiello, Acting Director of ICE (Dec. 12, 2018), https://perma.cc/LJE2-94P7.  Three district attorneys in New York asked ICE to stop making courthouse arrests because of the "chilling effect" this practice has on witnesses.  Rappleye et al., *supra*.  And other leaders around the country have asserted that using local court systems as levers for federal immigration enforcement "undercuts local law enforcement's ability to develop the critical trust needed to keep communities safe."  Maria Cramer, *ICE Courthouse Arrests Worry Attorneys, Prosecutors*, Boston Globe (June 16, 2017), https://perma.cc/VZZ9-J7WE (quoting Massachusetts Attorney General Maura Healey).

## C. DACA Promotes Cooperation With Law Enforcement

DACA has improved public safety by helping to build trust between immigrant communities and law enforcement.  Nearly eight in ten recipients of DACA relief reported that they are now less afraid of re-

**AR4854**

14

moval, Zenén Jaimes Pérez, United We Dream*, A Portrait of Deferred Action for Childhood Arrivals Recipients: Challenges and Opportunities Three-Years Later* 23 (2015), https://perma.cc/AGE7-X5UH. Two-thirds reported being less afraid of law enforcement, and 59 percent said that they would report a crime now in a situation in which they would not have reported it before. Roberto G. Gonzales & Angie M. Bautista-Chavez, Am. Immigration Council, *Two Years and Counting: Assessing the Growing Power of DACA* 9 (June 16, 2014), https://perma.cc/6UBE-Z9AK; Roberto G. Gonzales, *Here's How DACA Changed the Lives of Young Immigrants, According to Research*, Vox Media (Feb. 16, 2018 ), https://perma.cc/PB6B-9S9L. If the DACA program continues, those who qualify for the program would not need to fear ordinary encounters with law enforcement. Instead, they would retain greater freedom to cooperate for the protection of their communities—and indeed all communities—without worrying that their good deed might be punished with separation from their family members, siblings, or loved ones.

Lessons learned from the implementation of the Violence Against Women Act, Pub. L. No. 106-386, 114 Stat. 1491 (2000), are instructive. With that Act, Congress created the U visa to provide immigration relief to undocumented victims of certain crimes. *See Victims of Criminal Activity: U Nonimmigrant Status*, U.S. Citizenship & Immigr. Servs., https://perma.cc/P3AC-XTHG (last updated June 12, 2018). A U visa allows recipients to identify themselves, receive temporary relief from removal, and obtain verified government identification. *See id.* The benefits for law enforcement have been striking. A

15

recent study indicated that U visa applicants and recipients, freed of the need to remain in the shadows, became far more likely to cooperate with law enforcement in the detection, investigation, and prosecution of crimes. *See* Leslye Orloff et al., Nat'l Immigrant Women's Advocacy Project, *U-Visa Victims and Lawful Permanent Residency* 5-6 (2012), https://perma.cc/53NZ-LCPF. Indeed, more than 99 percent stated that they were willing to cooperate with the police, and 70 percent were in fact asked to—and did—provide assistance related to crimes committed against them. *See id.* That U visa holders who seek lawful permanent residency are expected to provide "reasonably requested information and assistance" to law enforcement in connection with the crimes that qualify them for immigration relief undoubtedly helps to explain the especially high level of cooperation. *Id.* at 5 (internal quotation marks omitted) (quoting New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status; Interim Rule, 72 Fed. Reg. 53,014 (Sept. 17, 2007) (to be codified in scattered sections of 8 C.F.R.)). But it is the protection offered by the U visa that enables that cooperation in the first place.[4] *See id.* Another study revealed that three-quarters of law enforcement officers view U visas as beneficial in encouraging victims to come forward and report crimes. Natalia Lee et al., Nat'l Immigrant Women's Advocacy Project, *National*

---

[4] As set forth *supra*, the DACA program has yielded similar results, despite entailing no explicit expectation of law enforcement cooperation.

16

*Survey of Service Providers on Police Response to Immigrant Crime Victims, U Visa Certification and Language Access* 21 (2013), https://perma.cc/5SR9-VTWA.

### D. DACA Aids Law Enforcement By Facilitating Access To Identification

DACA further benefits effective policing because it provides an easy method of identification for DACA recipients. Because most states do not issue driver's licenses or other identification to undocumented immigrants, law enforcement officials often face serious difficulties in reliably identifying undocumented community members. Ready access to identification aids law enforcement in the most basic of ways: if the police cannot verify who someone is, it becomes much harder to identify witnesses and victims, investigate potential suspects, and perform critical tasks like searching for a criminal history, investigating outstanding warrants, and determining whether someone poses a threat. *See, e.g.*, Police Exec. Research Forum, *Voices from Across the Country: Local Law Enforcement Officials Discuss the Challenges of Immigration Enforcement* 15 (2012), https://perma.cc/QKN8-QFJK; *see also* Michael Corkery & Jessica Silver-Greenberg, *Banks Reject New York City IDs, Leaving 'Unbanked' on Sidelines*, N.Y. Times (Dec. 23, 2015), https://perma.cc/A5B7-X32D (describing municipal identification and stating, "The mayor emphasized that the cards were developed with input from the New York City Police Department and said the department had been one of the biggest backers of the program. 'They want every New Yorker on the street to have an ID card; it greatly improves the work of the NYPD,' Mr. de Blasio said.").

**AR4857**

17

Even the simplest traffic stop can lead to an unnecessary waste of valuable law enforcement resources if an individual cannot be identified. Police Exec. Research Forum, *supra*, at 15-16. As one police chief has explained, "[w]hen we stop cars and the driver doesn't have a driver's license, there are very few options for the officers and troopers." *Id.* at 16 (quoting Chief Harry Dolan, N.C. Police). The only reliable method of identification—fingerprinting—requires a detour to "jail so we can find out who they are." *Id.* (same). Another former police chief lamented the "manpower" required and time lost—"up to two to three hours to determine who an arrestee is"—which could be devoted to more-pressing law enforcement concerns. *Id.* at 15 (quoting Art Venegas, Founder, Law Enf't Engagement Initiative).

Recipients of DACA are eligible to apply for a federal employment authorization document ("EAD"). The EAD comes in the form of a card issued by U.S. Citizenship and Immigration Services, and includes the recipient's photograph. *See* 8 U.S.C. § 1324a(h)(3); 8 C.F.R. § 274a.12(c)(14); *see also* U.S. Citizenship & Immigration Servs., U.S. Dep't of Homeland Sec., OMB No. 1615-0040, Instructions for I-765 Application for Employment Authorization (last updated May 31, 2018) (describing EAD as a "card" and requiring two passport-style photos) https://perma.cc/JW66-XQCG . Individuals who receive employment authorization also are eligible to obtain a Social Security number and card. *See* Soc. Sec. Admin., SSA Publ'n No. 05-10096, Social Security Numbers for Noncitizens (2017), https://perma.cc/9RGJ-X8Y2. Because DACA has ex-

**AR4858**

18

panded the availability of identification, it has en-
hanced law enforcement officers' ability to identify
those whom they encounter. More than 90 percent of
recipients of relief under DACA report that they have
acquired a driver's license or other identification. Pé-
rez, *supra*, at 20. Freed from time-consuming, waste-
ful, and potentially antagonistic encounters with in-
dividuals who pose no public safety concern, police
have more time to focus on higher priorities in keep-
ing their communities safe.

## II. DACA HELPS LAW ENFORCEMENT PROTECT VUL-NERABLE INDIVIDUALS FROM CRIME AND EXPLOI-TATION

DACA has yielded another vital public safety ben-
efit: protecting individuals who are particularly vul-
nerable to crime and thus attractive targets for crim-
inals.

As discussed above, undocumented immigrants
and their families are reluctant to report crimes for
fear of removal. Predators who seek to take ad-
vantage of the vulnerabilities of immigrant communi-
ties also know this. These communities face a range
of unlawful conduct, including domestic and gang vi-
olence, as well as abuse by unscrupulous employers.
*See* Office of Cmty. Oriented Policing Servs., U.S.
Dep't of Justice, *Enhancing Community Policing with
Immigrant Populations: Recommendations from a
Roundtable Meeting of Immigrant Advocates and Law
Enforcement Leaders* 16 (2010),
https://perma.cc/62JX-99KK.

When immigrants distrust their local police, "it
creates conditions that encourage criminals to prey
upon victims and witnesses alike." Statement of Tom

**AR4859**

19

Manger, *supra*, at 2. This phenomenon has been termed the "deportation threat dynamic," whereby individuals who fear removal from the United States do not report the crimes they suffer. Elizabeth Fussell, *The Deportation Threat Dynamic and Victimization of Latino Migrants: Wage Theft and Robbery*, 52 Soc. Q. 593, 610 (2011). Nearly two-thirds of undocumented migrant workers participating in a study in Memphis, Tennessee, reported being the victim of at least one crime, with the most common being theft and robbery. Jacob Bucher et al., *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159, 164, 166 tbl.2 (2010). Respondents indicated that fewer than a quarter of these crimes were reported to the police, and only one was reported by the victim himself. *Id.* at 165. In one especially horrific incident, a four-year-old girl in Texas suffered repeated sexual abuse at the hands of someone who threatened to cause her mother to be removed if the mother reported her daughter's exploitation. *See* Matthew Haag, *Texas Deputy Accused of Molesting 4-Year-Old and Threatening to Deport Her Mother*, N.Y. Times (June 18, 2018), https://perma.cc/682K-2ZR3.

Robbery and similar crimes pose a particular threat to undocumented individuals, who often do not have bank accounts, in part because of their inability to obtain government-issued identification. Fussell, *supra*, at 604 & tbl.2, 605; S. Poverty Law Ctr., *Under Siege: Life for Low-Income Latinos in the South* 6, 25 (2009), https://perma.cc/7GCY-V25L. In addition, many of these immigrants live in group apartments and are unable to store valuables in a safe place at

20

home.  Khashu, *supra*, at 25.  As a result, undocumented immigrants are known to carry large amounts of cash, making them especially vulnerable to robbery.  The risk to the perpetrators, meanwhile, is minimal because the victims are often too afraid of adverse immigration consequences to report the crimes to the police.

The targeting of undocumented immigrants for robbery has become so widespread that these individuals have been labeled "walking ATMs"—or the subjects of "amigo shopping."  *See* Fussell, *supra*, at 604-05 (internal quotation marks omitted); S. Poverty Law Ctr., *supra*, at 25 (same); Khashu, *supra*, at 25. In a study of largely undocumented immigrants helping to rebuild New Orleans in the wake of Hurricane Katrina, the immigrants reported robbery and physical assault at more than ten times the rate experienced by the general population.  *See* Fussell, *supra*, at 604 & tbl.2, 605.  In another survey, 53 percent of law enforcement officers held the view that undocumented immigrants were especially likely to be victims of robbery and theft.  *See* Khashu, *supra*, at 25.

Undocumented immigrants also are particularly vulnerable to domestic violence.  Numerous studies have shown that abusive partners may exploit the threat of removal to maintain power and control.  *See, e.g.*, Messing et al., *supra*, at 330 (citing several studies); Angelica S. Reina et al., *"He Said They'd Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J.

21

Interpersonal Violence 593, 601 (2014).[5] Financial dependence on an abusive partner with stable immigration status may facilitate violence in this way. *See, e.g.*, Messing et al., *supra*, at 330. Seventy percent of participants in one study of domestic violence victims said that immigration status was a major factor keeping them from seeking help or reporting their abuse to the authorities—thereby permitting the violence to continue. Reina et al., *supra*, at 600. In another study, immigration status was identified as the single largest factor independently affecting the rate at which battered Latina immigrants called the police. Nawal H. Ammar et al., *Calls to Police and Police Response: A Case Study of Latina Immigrant Women in the USA*, 7 Int'l J. Police Sci. & Mgmt. 230, 237 (2005).

Undocumented immigrants are vulnerable in the workplace, as well. In a number of studies, between 40 and 80 percent of mostly undocumented immigrants reported being victims of wage theft. *See* Fussell, *supra*, at 604 & tbl.2 (finding that 40 percent of respondents reported wage theft since arriving in New Orleans); *id.* (citing Nik Theodore, Abel Valenzuela, Jr. & Edwin Meléndez, *La Esquina (The Corner): Day Laborers on the Margins of New York's Formal Economy*, 9 WorkingUSA: J. Lab. & Soc'y 407

---

[5] One study cited a participant who explained that a partner "beat me up and I could have called the police because that was what I thought to do . . . but he threatened me . . . . [H]e told me that if I called the police I was going to lose out . . . because [police officers] would . . . take me, because I didn't have legal documents." Reina et al., *supra*, at 601; *see also NIWAP Report*, *supra*, at 103 (noting that 69 percent of law enforcement officers surveyed had observed a decrease in domestic violence reporting).

22

(2006) (finding a wage theft rate of approximately 50 percent in New York)); S. Poverty Law Ctr., *supra*, at 6 (finding that 41 percent of those surveyed across the South and 80 percent surveyed in New Orleans had experienced wage theft). Many immigrants also reported other types of worksite abuse. Fussell, *supra*, at 604 & tbl.2. In one study, 32 percent of respondents said that they had suffered on-the-job injuries—and most of these individuals, after being injured, were either fired, not paid lost wages, or denied medical care by their employers. S. Poverty Law Ctr., *supra*, at 6. The "deportation threat dynamic" fuels not only workplace exploitation but also outright violence. An advocate reported that, when one worker attempted to collect wages his employer owed him, "[t]he contractor raised his shirt and showed he had a gun—and that was enough . . . . He didn't have to say any more. The worker left." *Id.* at 7 (internal quotation marks omitted).

Unlike undocumented immigrants, DACA recipients are currently eligible to apply to receive work authorization. Many are currently working or pursuing higher educational opportunities. Should they lose their work authorization and once again fear removal from the United States, exploitative employers and criminals alike would be emboldened, thus diminishing the safety of entire communities. By permitting these young individuals to live and work openly, DACA eliminates a significant barrier to developing trusting relationships with law enforcement that are essential to public safety. Continuing the DACA program will enable police and prosecutors to fight crime more effectively and to serve all of those whom they are charged with protecting.

**AR4863**

23

## CONCLUSION

For the foregoing reasons, the judgments of the United States District Court for the District of Columbia and the Court of Appeals for the Ninth Circuit, as well as the orders of the United States District Court for the Eastern District of New York, should be affirmed.

Respectfully submitted.

MARY B. MCCORD
JOSHUA A. GELTZER
ANNIE L. OWENS
DANIEL B. RICE
INSTITUTE FOR
CONSTITUTIONAL ADVOCACY
AND PROTECTION
GEORGETOWN UNIVERSITY
LAW CENTER
600 New Jersey Ave., NW
Washington, DC 20001
(202) 661-6607
mbm7@georgetown.edu

MATTHEW J. PIERS
CHIRAG G. BADLANI
CARYN C. LEDERER
HUGHES SOCOL PIERS
RESNICK & DYM, LTD.
70 West Madison St.
Suite 4000
Chicago, IL 60602
(312) 580-0100

OCTOBER 2019

**AR4864**

A-1

## APPENDIX: LIST OF AMICI CURIAE

**Art Acevedo**, Chief, Houston Police Department, Texas.

**Roy L. Austin, Jr.**, former Deputy Assistant to the President for the Office of Urban Affairs, Justice, and Opportunity; former Deputy Assistant Attorney General for the Civil Rights Division; former Assistant U.S. Attorney, U.S. Attorney's Office for the District of Columbia.

**Chiraag Bains**, former Senior Counsel to the Assistant Attorney General, Civil Rights Division, U.S. Department of Justice; former Trial Attorney, Civil Rights Division, Criminal Section, U.S. Department of Justice.

**Ramon Batista**, Chief, Mesa Police Department, Arizona.

**Diana Becton**, District Attorney, Contra Costa County, California.

**Wesley Bell**, Prosecuting Attorney, St. Louis County, Missouri.

**Thomas Berg**, former U.S. Attorney for the District of Minnesota.

**Carmen Best**, Chief, Seattle Police Department, Washington.

**Christopher C. Blue**, Chief, Chapel Hill Police Department, North Carolina.

AR4865

A-2

**William Bones**, Chief, Boise Police Department, Idaho.

**Mike Brown**, Chief, Salt Lake City Police Department, Utah.

**Chris Burbank**, former Chief, Salt Lake City Police Department, Utah.

**A. Bates Butler III**, former U.S. Attorney for the District of Arizona.

**John Choi**, County Attorney, Ramsey County, Minnesota.

**Jerry L. Clayton**, Sheriff, Washtenaw County, Michigan.

**Jorge Colina**, Chief, Miami Police Department, Florida.

**Brendan Cox**, former Chief, Albany Police Department, New York.

**John Creuzot,** District Attorney, Dallas County, Texas.

**Satana Deberry**, District Attorney, Durham County, North Carolina.

**Maggie Deboard**, Chief, Herndon Police Department, Virginia.

**Michael Dougherty**, District Attorney, 20th Judicial District (Boulder County), Colorado.

**Mark Dupree**, District Attorney, Wyandotte County, Kansas.

A-3

**Jenny Durkan**, former U.S. Attorney for the Western District of Washington.

**Tony Estrada**, Sheriff, Santa Cruz County, Arizona.

**Paul H. Fitzgerald**, Sheriff, Story County, Iowa.

**Kim Gardner,** Circuit Attorney, City of St. Louis, Missouri.

**George Gascón**, District Attorney, City and County of San Francisco, California.

**Sarah F. George**, State's Attorney, Chittenden County, Vermont.

**Sim Gill**, District Attorney, Salt Lake County, Utah.

**Joe Gonzales**, District Attorney, Bexar County, Texas.

**Eric Gonzalez**, District Attorney, Kings County, New York.

**Mark Gonzalez**, District Attorney, Nueces County, Texas.

**Ronald Haddad**, Chief, Dearborn Police Department, Michigan.

**Andrea Harrington**, District Attorney, Berkshire County, Massachusetts.

**Michael S. Harrison**, Commissioner, Baltimore Police Department, Maryland.

**Andy Harvey**, Chief, Palestine Police Department, Texas.

**AR4867**

A-4

**Dwight Henninger**, Chief, Vail Police Department, Colorado.

**Sally Hernandez**, Sheriff, Travis County, Texas.

**Peter Holmes**, City Attorney, Seattle, Washington.

**John Hummel**, District Attorney, Deschutes County, Oregon.

**Wayne Jerman**, Chief, Cedar Rapids Police Department, Iowa.

**Mitzi G. Johanknecht**, Sheriff, King County, Washington.

**Craig S. Kingsbury**, Chief, Twin Falls Police Department, Idaho.

**Michael C. Koval**, former Chief, Madison Police Department, Wisconsin.

**Lawrence S. Krasner**, District Attorney, Philadelphia, Pennsylvania.

**Miriam Aroni Krinsky**, former Chief, Criminal Appeals Section, U.S. Attorney's Office for the Central District of California; former Assistant U.S. Attorney, U.S. Attorney's Office for the Central District of California; former Chair, Solicitor General's Advisory Group on Appellate Issues.

**Brian Kyes**, Chief, Chelsea Police Department, Massachusetts.

**AR4868**

A-5

**William Lansdowne**, former Chief, San Diego Police Department, California; former Chief, San Jose Police Department, California; former Chief, Richmond Police Department, California.

**Chris Magnus**, Chief, Tucson Police Department, Arizona.

**David Mahoney**, Sheriff, Dane County, Wisconsin.

**Beth McCann**, District Attorney, 2nd Judicial District (City and County of Denver), Colorado.

**Mary B. McCord**, former Acting Assistant Attorney General and Principal Deputy Assistant Attorney General for National Security, U.S. Department of Justice; former Assistant U.S. Attorney and Chief, Criminal Division, U.S. Attorney's Office for the District of Columbia.

**Brian M. Middleton**, District Attorney, Fort Bend County, Texas.

**Kenneth Mighell**, Former U.S. Attorney for the Northern District of Texas.

**Sylvia Moir**, Chief, Tempe Police Department, Arizona.

**Marilyn Mosby**, State's Attorney, Baltimore City, Maryland.

**Peter Newsham**, Chief, Metropolitan Police Department of Washington, D.C.

**Andy Norris**, former Lieutenant, Tuscaloosa County Sheriff's Office, Alabama.

A-6

**Steven M. Pare**, Commissioner of Public Safety, Providence, Rhode Island.

**Joseph Pelle**, Sheriff, Boulder County, Colorado.

**Joseph Platania**, Commonwealth's Attorney, City of Charlottesville, Virginia.

**Abdul Pridgen,** Chief, Seaside Police Department, California.

**Mark Prosser**, Director, Department of Public Safety, Storm Lake, Iowa.

**Lonny Pulkrabek**, Sheriff, Johnson County, Iowa.

**Ira Reiner**, former District Attorney, Los Angeles County, California; former City Attorney, Los Angeles, California.

**Rachael Rollins**, District Attorney, Suffolk County, Massachusetts.

**Orlando Rolón**, Chief, Orlando Police Department, Florida.

**Marian Ryan,** District Attorney, Middlesex County, Massachusetts.

**Daniel Satterberg**, Prosecuting Attorney, King County, Washington.

**Carol A. Siemon**, Prosecuting Attorney, Ingham County, Michigan.

**Steve Stahl**, Chief, Maricopa Police Department, Arizona.

A-7

**Norm Stamper**, former Chief, Seattle Police Department, Washington.

**David E. Sullivan**, District Attorney, Northwestern District, Massachusetts.

**Thomas P. Sullivan**, former U.S. Attorney for the Northern District of Illinois.

**Raúl Torrez**, District Attorney, Bernalillo County, New Mexico.

**Michael Tupper**, Chief, Marshalltown Police Department, Iowa.

**Cyrus R. Vance**, District Attorney, New York County, New York.

**John Walsh**, former U.S. Attorney for the District of Colorado.

**Andrew H. Warren**, State Attorney, Thirteenth Judicial Circuit (Tampa), Florida.

**William D. Wilmoth**, former U.S. Attorney for the Northern District of West Virginia.

NO. 18-587, 18-588, 18-589

# In the
# Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, ET. AL.,
Petitioners,

—v—

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,
Respondents.

---

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,
Petitioners,

—v—

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, ET AL., Respondents.

---

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND
SECURITY, ET AL., Petitioners,

—v—

MARTIN JONATHAN BATALLA VIDAL, ET AL.,
Respondents.

---

**On Writs of Certiorari to the United States Court of Appeals
for District of Columbia, Ninth and Second Circuits**

---

## BRIEF OF AMICUS CURIAE
## GOVERNMENT OF THE UNITED MEXICAN STATES
## IN SUPPORT OF RESPONDENTS

---

ADELA ELVIA RUTH MCCHESNEY
 *COUNSEL OF RECORD*
FAYE MAGDALENA KOLLY
DE MOTT, MCCHESNEY, CURTRIGHT & ARMENDARIZ, LLP
8023 VANTAGE DRIVE, SUITE 800
SAN ANTONIO, TX 78230
(210) 590-1844
RUTH@DMCAUSA.COM

OCTOBER 3, 2019                                  *COUNSEL FOR AMICUS CURIAE*

**AR4872**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................ii

INTEREST OF AMICUS CURIAE ........................... 1

ARGUMENT ........................................................... 4

    I.   PROTECTION OF DACA RECIPIENTS' WELL-BEING IS AN INTEGRAL PART OF MEXICO'S FOREIGN POLICY................................................. 4

    II.  BENEFICIARIES OF THE DEFERRED ACTION FOR CHILDHOOD ARRIVALS PROGRAM CONTRIBUTE SIGNIFICANTLY TO THE U.S. ECONOMY ......................................................... 7

    III. MILLIONS OF UNITED STATES CITIZENS AND LAWFUL PERMANENT RESIDENTS ARE POSITIVELY IMPACTED BY DACA...................... 14

        A.  The DACA Program Strengthens Cultural Ties between Mexico and the United States ........................................... 18

        B.  The DACA Program Strengthens Educational Ties between Mexico and the United States.................................... 21

    IV. DACA HAS STRENGTHENED CROSS BORDER EXCHANGES IN MULTIPLE AREAS ................... 24

    V.  THE U.S. HAS UNDERTAKEN TO PROTECT DACA RECIPIENTS AS PART OF ITS INTERNATIONAL OBLIGATIONS UNDER THE ICCPR........................................................... 26

CONCLUSION....................................................... 32

AR4873

ii

# TABLE OF AUTHORITIES

Page

## CASES

*Arizona v. United States*,
  567 U.S. 387 (2012) ............................................. 2

*Casa de Maryland v. U.S. Dep't of Homeland
  Sec.*, No. 18-1521 (4th Cir. 2019)
  *cert granted*, No. 18-589
  (docketed Nov. 5, 2019) ...................................... 1

*Dep't of Homeland Security v. Regents of the
  U. of Cal.*, Sup. Ct. Nos. 18-587, 18-588,
  and 18-589 ......................................................... 7

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) .............................................. 2

*McAleenan v. Batalla Vidal*,
  No. 18-589 (consolidated with 18-587,
  18-588) (docketed Nov. 5, 2019) ......................... 4

*Medellin v. Texas*,
  552 U.S. 491 (2008), ........................................... 2

*Morrison v. Nat'l Austl. Bank*,
  561 U.S. 247 (2010) ............................................ 2

*Regents of the University of California
  v. U.S. Dep't of Homeland Sec.*,
  No. 18-15068 (9th Cir. 2018), *cert granted*,
  No. 18-589 (docketed Nov. 5, 2019) .................... 1

**AR4874**

## TABLE OF AUTHORITIES—Continued

Page

### STATUTES

INA § 212(a)(9)(B) ..................................................... 24

NAFTA Implementation Act,
    Pub. L No: 103-182 (1993) ................................. 26

### REGULATIONS

8 C.F.R. § 214(b) ................................................. 24, 25

8 C.F.R. § 274a.12(c)(14) .......................................... 29

### MEXICAN GOVERNMENT DOCUMENTS

Press Release, Embassy of Mexico in the
    United States, *Impact of the DACA*
    *Rescission Among the Mexican*
    *Community in the United States of*
    *America* (Sept. 27, 2019) available at
    https://embamex.sre.gob.mx/eua/index.
    php/en/press-releases/61-press-releases-
    2019 .............................................................. 5, 6

Secretaría de Relaciones Exteriores,
    *Canciller Ruiz Massieu Se Reúne con*
    *Jóvenes Dreamers*, GOBIERNO DE MEXICO
    (JULY 4, 2016) AVAILABLE AT
    https://www.gob.mx/sre/prensa/canciller-
    ruiz-massieu-se-reune-con-jovenes-
    dreamers. ....................................................... 25

AR4875

TABLE OF AUTHORITIES—Continued

Page

Secretaría de Relaciones Exteriores, *El Gobierno de México Lamenta Profundamente la Cancelación del Programa de Acción Diferida para los Llegados en la Infancia (DACA)*, GOBIERNO DE MÉXICO (Sept. 5, 2017) available at https://www.gob.mx/sre/prensa/el-gobierno-de-mexico-lamenta-profundamente-la-cancelacion-del-programa-de-accion-diferida-para-los-llegados-en-la-infancia-daca ...................................................... 6

Secretaría de Relaciones Exteriores, *El gobierno de México lamenta profundamente la cancelación del Programa de Acción Diferida para los Llegados en la Infancia (DACA)*, GOBIERNO DE MÉXICO (Sept. 5, 2017) available at https://www.gob.mx/sre/prensa/el-gobierno-de-mexico-lamenta-profundamente-la-cancelacion-del-programa-de-accion-diferida-para-los-llegados-en-la-infancia-daca. ...................................................... 6

AR4876

v

## TABLE OF AUTHORITIES—Continued

Page

### INTERNATIONAL LAW AND U.N. DOCUMENTS

North American Free Trade Agreement, Can.–Mex.–U.S., Dec. 17, 1992, 32 I.L.M. 289. ........... 3

Rep. of the United States of Amer. Submitted to the U.N. in Accordance with paragraph 5 of the Annex to the Human Rights Council Resolution 16/21, 22nd Sess., Feb. 13, 2015, UN Doc. A/HRC/WG.6/22/USA/1 (4–15 May 2015) ................................................. 30

UN General Assembly, International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171 ................ 26, 28

Universal Declaration of Human Rights, Dec. 10, 1948, G.A. Res. 217A, 3 U.N. GAOR, U.N. Doc. A/810. ................................................ 26

VCCR, art. 5, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 ........................... 1

**AR4877**

vi

## TABLE OF AUTHORITIES—Continued

Page

**U.S. GOVERNMENT DOCUMENTS**

138 Cong. Rec. S4784
(daily ed. Apr. 2, 1992) ...................................... 27

Ben Harrington, *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others*, CONG. RESEARCH SERV. REP. No. 7-5700 (Apr. 10, 2018).............. 28

Janet Napolitano, David Aguilar and John Morton, *Memorandum from Sec'y of Homeland Sec., Janet Napolitano to Acting Commissioner, U.S. Customs and Boarder Protection, David V. Aguilar, Director of U.S. Citizenship and Immigration Services, and Director of U.S. Immigration and Customs Enforcement, John Morton* (June 15, 2012) ............................................. 7, 28

President Barack Obama, Press Release, *Remarks from the President on Immigration* (June 15, 2012)....... 24

**AR4878**

vii

## TABLE OF AUTHORITIES—Continued

Page

U.S. Dep't of State,
*U.S. Relations with Mexico* (Apr. 1, 2019)
available at https://www.state.gov/u-s-
relations-with-mexico /........................................ 3

U.S. Senator Martin Heinrich,
*Ending DACA Means Widespread
Economic Harm,* JOINT ECON. COMM.
DEMOCRATS (Sept. 6, 2017) available at
https://www.jec.senate.gov/public/index.
cfm/democrats/2017/9/ending-daca-means-
widespread-economic-harm. ............................ 13

United States Citizenship and Immigration
Services, *Data Set: Form I-821D Deferred
Action for Childhood Arrivals* (June 30,
2019) https://www.uscis.gov/sites/default/
files/USCIS/Resources/Reports%20and%
20Studies/Immigration%20Forms%20Data/
Static_files/DACA_Population_Receipts_
since_Injunction_Jun_30_2019.pdf (last
visited Sept. 25, 2019) ........................................ 2

AR4879

viii

## TABLE OF AUTHORITIES—Continued

Page

### OTHER AUTHORITIES

Aliyya Swaby,
  *Texas School Districts Struggle to Recruit
  Bilingual Certified Teachers*,
  THE TEXAS TRIBUNE, (Feb. 21, 2017),
  https://www.texastribune.org/2017/02/21/
  texas-school-districts-struggle-bilingual-
  certified-teachers/.............................................. 23

Amy Hsin & Francesc Ortega, IZA Institute of
  Labor Econ., *The Effects of Deferred
  Acton for Childhood Arrivals on the
  Educational Outcomes of Undocumented
  Students* (Oct. 2017).......................................... 16

Ann M. Simmons,
  *The End of DACA Would Be 'a Big Win
  for Mexico,' Foreign Secretary Says*, L.A.
  TIMES (Sept. 14, 2017, 11:15 AM)
  available at https://www.latimes.com/
  world/mexico-americas/la-fg-global-
  mexico-foreign-secy-qa-20170909-story.
  html.................................................................. 6

Caitlin Patler & Whitney Laster Pirtle,
  *From Undocumented to Lawfully Present:
  Do Changes to Legal Status Impact
  Psychological Well being Among Latino
  Immigrant Young Adults?*,
  199 SOC. SCI. & MED. (Feb. 2018)....................... 18

Fernanda Uriegas,
  *Undocumented Entrepreneurs Rise
  Above Policy Making*,

**AR4880**

TABLE OF AUTHORITIES—Continued

Page

Forbes (May 12, 2018, 2:31 PM) available at https://www.forbes.com/sites/ fernandafabian/2018/05/12 /undocumented-entrepreneurs-rise-above- policy-making/#49389b4b4ee4 .......................... 11

*Financial Implications for the Social Security Trust Funds of the President's Executive Actions on Immigration, Announced November 20, 2014:* Hearing before S. Comm on Homeland Sec. and Gov. Affairs, (Feb. 4, 2015) ........................ 10

Gardenia Mendoza,
    *22 "Dreamers," Invitados de Honor en México*, THE CALIFORNIA-MEXICO STUDIES CENTER, INC. (July 16, 2015, 5:10 PM) available at https://www.california- mexicocenter.org/22-dreamers-invitados- de-honor-en-mexico/ ........................................... 25

Grace Tatter,
    *Why DACA Works*, Harvard Ed. (Winter 2019), available at https://www.gse.harvard.edu/news/ed/19/ 01/why-daca-works. ........................................... 19

Greg Toppo,
    *20,000 DACA Teachers at Risk—and Your Kids Could Feel the Fallout, Too*, USA TODAY, (Oct. 11, 2017), https://www. usatoday.com/story/news/2017/10/11/ thousands-daca-teachers-risk/752082001/ ....... 23

**AR4881**

x

## TABLE OF AUTHORITIES—Continued

Page

Jens Hainmueller et al.,
  *Protecting Unauthorized Immigrant
  Mothers Improves Their Children's
  Mental Health*, 357 SCIENCE 955, 1043
  (Sept. 8, 2017)..................................................... 15

Jie Zong, Ariel G. Ruiz Soto, Jeanne Batalova,
  Julia Gelatt, Randy Capps, *A Profile of
  Current DACA Recipients by Education,
  Industry, and Occupation,* MIGRATION
  POLICY INSTITUTE, (Nov. 2017),
  https://www.migrationpolicy.org/research/
  profile-current-daca-recipients-education-
  industry-and-occupation ........................ 8, 16, 23

Johns Hopkins,
  *WIC Participation Better Among
  Vulnerable, U.S. Citizen Children Whose
  Mothers are Eligible for DACA*,
  (May 29, 2018) .................................................. 17

Jose Magaña-Salgado & Tom K. Wong,
  *Draining the Trust Funds: Ending DACA
  and the Consequences to Social Security
  and Medicare*, IMMIGRANT LEGAL
  RESOURCE CTR., at 9 (Oct. 2017),
  https://www.ilrc.org/sites/default/files/
  resources/2017-09-29_draining_the_trust_
  funds_final.pdf.................................................. 10

Joseph Hincks,
  *CEOs From More Than 400 Leading U.S.
  Companies Urge Trump to Keep DACA*,

**AR4882**

### TABLE OF AUTHORITIES—Continued

Page

(Sep. 5, 2017), https://fortune.com/2017/09/
05/daca-trump-dreamers-business-leaders / ...... 13

Julia Cusick,
*New Data Highlight DACA Recipients'
Contributions to Families and
Communities*, CTR. FOR AMER. PROGRESS
(Sept. 5, 2019) available at https://www.
americanprogress.org/press/release/2019/
09/05/474185/release-new-data-highlight-
daca-recipients-contributions-families-
communities/ .................................................... 14

Julia Horowitz,
*These Dreamers Started Businesses. Will
They Have to Leave Them Behind?*, CNN
(Oct. 5, 2017, 12:07 PM) available at
https://money.cnn.com/2017/10/04/news/
daca-dreamers-entrepreneurs/index.html........ 11

Mary Ellen Flannery,
*Fear and Longing: Life for Students with
Undocumented Parents*, NAT'L EDUC.
ASS'N (July 10, 2017) available at http://
neatoday.org/2017/07/10/students-with-
undocumented-parents / ................................... 15

Michel Martin,
*DACA, A Student's Story: 'They Are The
Types Of Immigrants You Want In Your
Country'* (Sep. 16, 2017 7:44 PM)
available at https://www.npr.org/2017/09/
16/551544757/daca-a-students-story-they-

xii

## TABLE OF AUTHORITIES—Continued

Page

are-the-types-of-immigrants-you-want-in-
your-country. ..................................................... 20

Nat'l Immigration Forum,
*Deferred Action Basics* (Apr. 15, 2016)
available at https://immigrationforum.org/
article/deferred-action-basics / .......................... 29

Nat'l Immigration Law Center,
*Frequently Asked Questions* (Dec. 2014)
available at https://www.nilc.org/issues/
health-care/aca_mixedstatusfams/ ................... 14

New Economy America,
*California Student Uses DACA Status to
Start a Business* (Sept. 17, 2017) ....................... 9

Nicole Prchal Svajlenka,
*What We Know About DACA Recipients
in the United States*, CTR. FOR AMER.
PROGRESS (Sept. 5, 2019, 9:00 AM)
available at https://www.
americanprogress.org/issues/immigration/
news/2019/09/05/474177/know-daca-
recipients-united-states / ...........................passim

Omolara T. Uwemedimo,
Ana C. Monterrey, Julie M. Linton,
*A Dream Deferred: Ending DACA
Threatens Children, Families, and
Communities*, 140 AM. ACAD. OF
PEDIATRICS, No. 6 (Dec. 2017), available at
https://pediatrics.aappublications.org/cont
ent/140/6/e20173089........................................... 15

**AR4884**

TABLE OF AUTHORITIES—Continued

Page

Patrick Oakford,
  *Administrative Action on Immigration
  Reform, The Fiscal Benefits of Temporary
  Work Permits*, CTR. FOR AMER. PROGRESS
  at 6 (2014) https://ampr.gs/1vw27HZ ................. 8

Rebecka Rosenquist,
  *The 'Warming Effect' of DACA on
  American Children*, PENN LEONARD DAVIS
  INSTITUTE OF HEALTH ECONOMICS
  (June 4, 2018) ................................................... 17

Rep. of the United States of Amer. Submitted to
  the U.N. in Accordance with paragraph 5 of
  the Annex to the Human Rights Council
  Resolution 16/21, 22nd Sess., Feb. 13, 2015,
  UN Doc. A/HRC/WG.6/22/USA/1 (4–15 May
  2015) ................................................................. 31

Report submitted by the United States of
  America under art. 40 of the ICCPR,
  U.N. Doc. CCPR/C/81/Add 4(1994), ................. 27

Roberto G. Gonzales,
  *Investing in the American Dream*,
  IMMIGRATION POL'Y CTR. (Dec. 2010)
  https://exchange.
  americanimmigrationcouncil.org/sites/
  default/files/research/Gonzales_-_
  Investing_in_the_American_DREAM_
  120210.pdf .................................................. 20, 21

Rodrigo Dominguez-Villegas,
  *Protection and Reintegration: Mexico
  Reforms Migration Agenda in an*

**AR4885**

TABLE OF AUTHORITIES—Continued

Page

*Increasingly Complex Era*, MIGRATION POLICY INSTITUTE (Mar. 7, 2019) available at https://www.migrationpolicy.org/article/ protection-and-reintegration-mexico-reforms-migration-agenda. ............................. 4, 5

Tom K. Wong, Greisa Martinez Rosas, Adam Luna, Henry Manning, Adrian Reyna, Patrick O'Shea, Tom Jawetz, and Philip E. Wolgin, *DACA Recipients' Economic and Educational Gains Continue to Grow*, CTR. FOR AMER. PROGRESS, (Aug. 28, 2017, 9:01 AM) available at https://www.americanprogress.org/ issues/immigration/news/2017/08/28/ 437956/daca-recipients-economic-educational-gains-continue-grow /.......... 9, 11, 12

Tom K. Wong, Sanaa Abrar, Claudia Flores, Tom Jawetz, Ignacia Rodriguez Kmec, Greisa Martinez Rosas, Holly Straut-Eppsteiner, and Philip E. Wolgin, *DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November*, CTR. FOR AMER. PROGRESS (Sept. 19, 2019, 5:00 AM) available at https://www.americanprogress.org/issues/ immigration/news/2019/09/19/474636/ daca-recipients-livelihoods-families-sense-security-stake-november/.................................. 22

U.S. Dep't of Educ., RESOURCE GUIDE: SUPPORTING

AR4886

xv

## TABLE OF AUTHORITIES—Continued

Page

UNDOCUMENTED YOUTH
(Oct. 20, 2015)...................................................... 7

*U.S.-Mexico Higher Education Engagement:*
*Current Activities, Future Directions*,
CIGE INSIGHTS: AMERICAN COUNCIL ON
EDUCATION, 5 (2017) available at https://
www.acenet.edu/Documents/US-Mexico-
Higher-Education-Engagement.pdf) ................ 21

AR4887



## INTEREST OF AMICUS CURIAE[1]

The Government of the United Mexican States ("Mexico") has a vital interest in the treatment of its nationals by other countries and is entitled to protect their rights in foreign states within the limits of international law and under the Vienna Convention on Consular Relations ("VCCR"), to which both Mexico and the United States are signatories. VCCR, art. 5, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.

Mexico acknowledges the sovereign right of the United States to decide on the public policies that should apply in its territory. However, Mexico is gravely concerned that, as the lower courts have ruled in these cases, the decision to rescind the DACA program was "arbitrary and capricious,"[2] as it did not take into account the well-being and contributions of DACA recipients and their families to the U.S. Mexico is equally concerned that if DACA is ultimately rescinded, the resources of Mexico's consular network in the U.S. will be strained due to the projected increased demand for consular services. At 80 percent,

---

[1] It is hereby certified that counsel for the parties have consented to the filing of this brief; that no counsel for a party authored this brief in whole or in part; and that no person other than this amicus curiae, their members, or their counsel made a monetary contribution to its preparation.

[2] *See Regents of the University of California v. U.S. Dep't of Homeland Sec.*, No. 18-15068 (9th Cir. 2018), *cert granted*, No. 18-589 (docketed Nov. 5, 2019); *Casa de Maryland v. U.S. Dep't of Homeland Sec.*, No. 18-1521 (4th Cir. 2019) *cert granted*, No. 18-589 (docketed Nov. 5, 2019).

AR4888

Mexico has the largest population of active DACA recipients.[3] In that regard, Mexico respectfully asserts its legitimate, substantial and compelling interest to protect the rights of its citizens. Mexican nationals have relied upon the commitments made by the U.S. government in relationship to DACA for work and travel authorization, and relief from deportation. DACA recipients would be forced to return to the shadows and subjected to increased vulnerability as a result of the termination of a program that allows them to live, work, contribute and thrive in a country they have known since their young age.

This Court has routinely considered the interests of foreign governments as amici curiae to protect the rights of their citizens. *E.g.*, *Morrison v. Nat'l Austl. Bank*, 561 U.S. 247, 267–271 (2010); *Medellin v. Texas*, 552 U.S. 491 (2008), and has reaffirmed that "[o]ne of the most important and delicate of all international relationships . . . has to do with the protection of the just rights of a country's own nationals when those nationals are in another country." *Arizona v. United States*, 567 U.S. 387, 395 (2012) citing *Hines v. Davidowitz*, 312 U.S. 52, 64 (1941).

The economic, cultural and political ties between Mexico and the United States are deeply rooted in

---

[3] *See* United States Citizenship and Immigration Services, *Data Set: Form I-821D Deferred Action for Childhood Arrivals* (June 30, 2019) https://www.uscis.gov/sites/default/files/USCIS/ Resources/Reports%20and%20Studies/Immigration%20Forms% 20Data/Static_files/DACA_Population_Receipts_since_Injunction_ Jun_30_2019.pdf (last visited Sept. 25, 2019) (Approximate Active DACA Recipients chart reflects that as of June 30, 2019, those with an approved DACA application, 529,760 of the total 660,880 DACA recipients are nationals of Mexico)

**AR4889**

3

the proximity of the two nations and the sharing of a common border. Immigration is a priority for both countries, but it is by no means the only critical foreign policy concern. The roots of cooperation between Mexico and the United States run deep, and manifest in multiple areas including economic trade, tourism, law enforcement and security, use of natural resources, emergency management, and global and regional issues.[4] This productive relationship between Mexico and the U.S. has flourished throughout many decades and has covered matters of national and international interests, including treatment of nationals residing in each other's respective countries.[5]

In that regard, the fate of the DACA program is no exception. DACA has had a wide range of positive direct impacts, not only for its recipients and their families, but it has also benefited the U.S. economy and society, which in turn strengthens the economic, educational, security, and cultural ties between our two countries. Allowing DACA to continue will serve our mutual national interests.[6]

---

[4] U.S. Dep't of State, *U.S. Relations with Mexico* (Apr. 1, 2019) https://www.state.gov/u-s-relations-with-mexico/.

[5] *See e.g.,* UN General Assembly, International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171 (ratified by the United States on 8 June 1992 with entry into force 8 September 1992); *see also* North American Free Trade Agreement, Can.–Mex.–U.S., Dec. 17, 1992, 32 I.L.M. 289.

[6] Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States*, CTR. FOR AMER. PROGRESS (Sept. 5, 2019, 9:00 AM) available at https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states/ (discussing the positive impact the social and economic contributions of DACA recipients on their own lives as well

**AR4890**

The Government of Mexico has submitted a prior amicus curiae in the consolidated case of *McAleenan v. Batalla Vidal*, No. 18-589.[7]



## ARGUMENT

### I. PROTECTION OF DACA RECIPIENTS' WELL-BEING IS AN INTEGRAL PART OF MEXICO'S FOREIGN POLICY

The protection of the rights of Mexican nationals abroad has been one of the core principles of Mexico's foreign policy and an essential part of the work its consulates perform. That is reflected in the largest consular network any country has in the U.S., with 50 consulates located across the continental U.S. and its territories.[8] As a result, Mexico is committed to a focused policy, which includes the interests of Mexican nationals living in the United States and, indeed, the well-being of DACA recipients, of which an approximate 80% were born in Mexico.[9] In fact,

_____

as the country).

[7] *McAleenan v. Batalla Vidal*, No. 18-589 (consolidated with 18-587, 18-588) (docketed Nov. 5, 2019).

[8] Rodrigo Dominguez-Villegas, *Protection and Reintegration: Mexico Reforms Migration Agenda in an Increasingly Complex Era*, MIGRATION POLICY INSTITUTE (Mar. 7, 2019) available at https://www.migrationpolicy.org/article/protection-and-reintegration-mexico-reforms-migration-agenda.

[9] *See* U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *Data Set: Form I-821D Deferred Action for Childhood Arrivals* (June 30, 2019) https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/

the current President of Mexico has called on Mexican consulates to strengthen their efforts by referring to the consulates as "migrant legal defense agencies" (*procuradurias de defensa para los migrantes*).[10] It is the position of the Mexican government that DACA recipients embody bicultural, bilingual and binational values our countries share. Mexico continued protection of DACA beneficiaries will elevate the mutual understanding between our countries and benefit our shared economic prosperity.

To this end, Mexico's government has supported DACA beneficiaries and Mexican nationals living in the United States by holding clinics, providing funding and access to competent legal counsel in connection to the application process under DACA.[11] Since the program's inception Mexico has held 17,978 informative workshops and benefited 1,035,890 people.[12] Among the attendees of workshops, the consular network has identified 28,526 cases meriting consular protection, for which the consulates have assisted in obtaining the necessary documents and, in some cases, providing

---

Static_files/DACA_Population_Receipts_since_Injunction_Jun_30_2019.pdf) (last visited Sept. 25, 2019) (providing statistics indicating approximately 80% of DACA recipients are nationals of Mexico).

[10] Dominguez-Villegas, *supra* note 8.

[11] *See* Press Release, Embassy of Mexico in the United States, *Impact of the DACA Rescission Among the Mexican Community in the United States of America* (Sept. 27, 2019) available at https://embamex.sre.gob.mx/eua/index.php/en/press-releases/61-press-releases-2019 (describing Mexico's allocation of "significant financial and human resources in helping Dreamers").

[12] *Id.*

AR4892

economic assistance to apply for DACA.[13] From June 2012 to August 2019, the Government of Mexico has invested $2.175 million dollars for Mexican DACA recipients.[14]

When the cancellation of the program was announced in 2017, the Government of Mexico increased its consular services and reinforced its commitment to provide information and assistance to DACA recipients. Additionally, the Government of Mexico displayed important diplomatic efforts to convey to members of Congress the value and contributions of Mexican DACA beneficiaries to the U.S., stressing the importance of a permanent solution that provides legal certainty.[15] The interest of the Government of Mexico in providing this assistance is to better protect the rights of a young population whose nationality is Mexican, but who were raised and live in the U.S.[16] Mexico has invested in supporting the continued

---

[13] *Id.*

[14] *Id.*

[15] *See* Secretaría de Relaciones Exteriores, *El Gobierno de México Lamenta Profundamente la Cancelación del Programa de Acción Diferida para los Llegados en la Infancia (DACA)*, GOBIERNO DE MÉXICO (Sept. 5, 2017) available at https://www.gob.mx/sre/prensa/el-gobierno-de-mexico-lamenta-profundamente-la-cancelacion-del-programa-de-accion-diferida-para-los-llegados-en-la-infancia-daca. (stating Mexico's continued support for the DACA program and recognizing the positive social, economic, and cultural impact of Dreamers).

[16] Ann M. Simmons, *the End of DACA Would Be 'A Big Win for Mexico,' Foreign Secretary Says*, L.A. TIMES (Sept. 14, 2017, 11:15 AM) available at https://www.latimes.com/world/mexico-americas/la-fg-global-mexico-foreign-secy-qa-20170909-story.html.

positive and impactful contributions that this same group makes to the U.S. economy, education and culture.

## II. BENEFICIARIES OF THE DEFERRED ACTION FOR CHILDHOOD ARRIVALS PROGRAM CONTRIBUTE SIGNIFICANTLY TO THE U.S. ECONOMY

Individuals eligible under the DACA program are temporarily allowed to stay in the United States and receive employment authorization for a period commensurate with their DACA grant, which is typically two years. It should be noted that DACA does not permanently protect a beneficiary from the possibility of removal. Rather, as a matter of prosecutorial discretion, it merely temporarily defers deportation for any DACA recipient who has been vetted by the government and met its strict requirements.[17] As a direct consequence of the DACA program and the government's pointed efforts,[18] recipients are thoroughly vetted and documented. The process effectively

---

[17] *See* 2 J.A., *Dep't of Homeland Security v. Regents of the U. of Cal.*, Nos. 18-587, 18-588, and 18-589 at 594–596 (detailing the inspection process for the government before an individual may become a DACA recipient); *See also* Memorandum from Sec'y of Homeland Sec., Janet Napolitano to Acting Commissioner, U.S. Customs and Border Protection, David V. Aguilar, Director of U.S. Citizenship and Immigration Services, and Director of U.S. Immigration and Customs Enforcement, John Morton (June 15, 2012) (establishing the eligibility criteria and discretionary guidelines for DACA).

[18] *See, e.g.,* U.S. Dep't of Educ., RESOURCE GUIDE: SUPPORTING UNDOCUMENTED YOUTH (Oct. 20, 2015) ("[DACA] allows youth who were brought to the United States as children and who meet certain criteria to requires consideration for deferred action, which constitutes a case-by-case determination by DHS.").

brought DACA recipients out of the shadows of the U.S. society, allowing them to fully participate and contribute to the country's communities, educational system and the economy.[19]

Under the DACA program, nearly 800,000 eligible individuals have applied for and been granted work authorization since the program was announced in 2012.[20] From those, currently 660,880 youth have an active DACA status.[21] An estimated 55% of DACA recipients are currently employed.[22] As a result of the ability of DACA recipients to work with authorization in the United States, the beneficiaries have been able

---

[19] *See* Patrick Oakford, *Administrative Action on Immigration Reform, The Fiscal Benefits of Temporary Work Permits*, CTR. FOR AMER. PROGRESS at 6 (2014) available at https://ampr.gs/1vw27HZ (exploring the fiscal benefits of allowing "low-priority individuals" to contribute to the economy through educational and professional opportunity).

[20] Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States,* CTR. FOR AMER. PROGRESS (Sept. 5, 2019, 9:00 AM), https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states/.

[21] United States Citizenship and Immigration Services, *Data Set: Form I-821D Deferred Action for Childhood Arrivals* (June 30, 2019) available at https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/Static_files/DACA_Population_Receipts_since_Injunction_Jun_30_2019.pdf. (last visited Sept. 25, 2019)

[22] Jie Zong, Ariel G. Ruiz Soto, Jeanne Batalova, Julia Gelatt, Randy Capps, *A Profile of Current DACA Recipients by Education, Industry, and Occupation,* MIGRATION POLICY INSTITUTE, Nov. 2017, https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation.

AR4895

to make positive and significant contributions to the U.S. economy through the ability to earn wages and pay taxes.[23] DACA recipients pay state and local taxes, are able to purchase homes, cars, and be employed in some of the most successful businesses in the United States. DACA recipient, Ovier Alvarez explained that after he was able to receive DACA, acquire a social security number, obtain a driver's license, and open a bank account he started a sole proprietorship as a professional photographer.[24] "Now I'm able to do business and pay business taxes to the state." DACA recipients are entrepreneurs and create businesses that employ U.S. citizens.[25] Combined, 97% of DACA recipients are currently employed or attending high school or higher levels of education.[26]

It is estimated that DACA recipients make major financial contributions to the U.S. economy via payment of $5.7 billion in federal taxes and $3.1 billion in state and local taxes annually. Additionally, DACA recipients pay into Social Security and Medicare through payroll taxes. These young immigrants and

---

[23] Svajlenka, *supra* note 20.

[24] New Economy America, *California Student Uses DACA Status to Start a Business* (Sept. 17, 2017).

[25] *Id.*

[26] Tom K. Wong, Greisa Martinez Rosas, Adam Luna, Henry Manning, Adrian Reyna, Patrick O'Shea, Tom Jawetz, and Philip E. Wolgin, *DACA Recipients' Economic and Educational Gains Continue to Grow*, Ctr. for Amer. Progress (Aug. 28, 2017, 9:01 AM) available at https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

their households have a combined $24.1 billion of income remaining after taxes.[27]

The Chief Actuary of the Social Security Administration (SSA), Stephen C. Goss, has testified as to the positive impact the DACA program will have on the SSA Trust Funds. He reported to the Senate Committee on Homeland Security and Governmental Affairs that as the U.S. population ages combined with lower birth rates, immigration in general has a net positive impact on funds set for the retirement of millions of individuals.[28] It is estimated that eliminating DACA will reduce funding for Social Security and Medicare by $39.3 billion over a ten-year period.[29]

---

[27] Svajlenka, *supra* note 20.

[28] *See Financial Implications for the Social Security Trust Funds of the President's Executive Actions on Immigration, Announced November 20, 2014: Hearing Before S. Comm on Homeland Sec. and Gov. Affairs*, Feb. 4, 2015 (testimony of Stephen C. Goss, Chief Actuary, SSA) ("Immigration has played a fundamental role in the growth and evolution of the U.S. population and will continue to do so in the future . . . . Without . . . net immigration, the effects of the drop in birth rates after 1965 would be much more severe for the finances of Social Security, Medicare, and for retirement plans in general. Because immigrants into the U.S. are generally young, they increase the ration of working age population to retirement age population in much the same way as do births.").

[29] *See* Jose Magaña-Salgado & Tom K. Wong, *Draining the Trust Funds: Ending DACA and the Consequences to Social Security and Medicare*, Immigrant Legal Resource Ctr., at 9 (Oct. 2017) available at https://www.ilrc.org/sites/default/files/resources/2017-09-29_draining_the_trust_funds_final.pdf. (last visited Sept. 27, 2019)

DACA recipients outpace the population of native-born Americans in terms of starting their own businesses. DACA has allowed the entrepreneurial drive of the recipients to add to the local economies through job creation and revenue building.[30] Recipients are able to pursue the education and professional experiences necessary to fulfill not only their own entrepreneurial potential but provide opportunities for others to join the entrepreneurial community as well. For example, Dr. Iliana G. Perez—a Mexican DACA recipient, author, and academic who was able to conduct research as she completed her Ph.D.—ultimately published a comprehensive guide to entrepreneurship for immigrants, supporting further economic achievement within the immigrant community.[31] Dr. Perez's story is one of many. Another Mexican Dreamer, Juan Martinez, he is building an artificial intelligence company.[32] "In the tech space,

---

[30] Wong et. al., *supra* note 26.

[31] Fernanda Uriegas, *Undocumented Entrepreneurs Rise Above Policy Making*, Forbes (May 12, 2018, 2:31 PM) available at https://www.forbes.com/sites/fernandafabian/2018/05/12/undocumented-entrepreneurs-rise-above-policy-making/#49389b4b4ee4. This article also details the story of Cris Mercado, who migrated from the Philippines and became a social entrepreneur. After high school, Cris was unable to accept NYU's offer to join its engineering program when he was unable to receive sufficient financial aid due to his undocumented status. After having an offer to complete a Ph.D. fellowship revoked due to his undocumented status, Cris started his own business that "focuses on college and scholarship access and careers." *Id.*

[32] Julia Horowitz, *These Dreamers Started Businesses. Will They Have to Leave Them Behind?*, CNN (Oct. 5, 2017, 12:07 PM) available at https://money.cnn.com/2017/10/04/news/daca-dreamers-entrepreneurs/index.html.

AR4898

[the resources DACA provides, like the ability to get a social security number] is a must." Without his status as a DACA recipient, he will not be able to fund his developing company.

In addition to the economic entrepreneurial contributions that DACA recipients make to the U.S. economy, entry to the authorized workforce into the United States has allowed recipients to obtain jobs with better pay with long term career possibilities across various labor sectors. After receiving DACA, many recipients moved to a job with better working conditions and aligned with their education and career goals.[33] The professional growth allowed through DACA is not only beneficial for the recipient, but also for the community. Plaintiff Saul Jimenez Suarez is a DACA recipient who was raised in the United States and eventually earned his college degree at Oklahoma Panhandle State University where he played football.[34] After college he took low-paying jobs to support his parents and himself. Once DACA became available, Mr. Jimenez was able to apply and receive DACA benefits. Like many DACA recipients, he was able to use his degree to obtain a professional position. He has embraced his newfound career as a special education teacher, coach and mentor, and has positively affected the lives of young people and the community in which he lives.

U.S. business owners and other employees have benefited greatly from hiring young immigrants who

---

[33] Wong, et. al., *supra* note 26.

[34] 2 J.A., *Dep't of Homeland Security v. Regents of the U. of Cal.,* Nos. 18-587, 18-588, and 18-589 at 447–449.

AR4899

have benefited under DACA. Apple CEO Tim Cook joined over 400 leading U.S. companies to write a letter to Congress explaining that DACA recipients are "vital" to their businesses and "are part of why we will continue to have a global competitive advantage."[35] The repeal of the DACA program would result in a hardship to employers and the local and national economy. An end to the DACA program would result in an estimated loss of $60.3 billion from the national GDP of the United States over the next decade. Additionally, an estimated 685,000 workers would be removed from the formal economy of the United States. It is expected to cost employers upwards of $3.4 billion in turnover costs.[36]

DACA recipients stimulate the U.S. economy through the direct provision of labor, payment of taxes, creation of jobs for U.S. workers, and participation as consumers of goods and services. If DACA were rescinded or struck down, the economic contributions of its recipients to the United States would cease or be greatly diminished.

---

[35] Joseph Hincks, *CEOs From More Than 400 Leading U.S. Companies Urge Trump to Keep DACA*, Sep. 5, 2017, https://fortune.com/2017/09/05/daca-trump-dreamers-business-leaders/.

[36] U.S. Senator Martin Heinrich, *Ending DACA Means Widespread Economic Harm,* JOINT ECON. COMM. DEMOCRATS (Sept. 6, 2017) available at https://www.jec.senate.gov/public/index.cfm/democrats/2017/9/ending-daca-means-widespread-economic-harm.

III. MILLIONS OF UNITED STATES CITIZENS AND LAWFUL PERMANENT RESIDENTS ARE POSITIVELY IMPACTED BY DACA

It is estimated that over a quarter of a million U.S. citizen children have at least one parent that is part of the DACA program.[37] Across the country, 1.5 million individuals live with a person who is a DACA recipient.[38] These individuals include parents, siblings, spouses, and children living in mixed status households.[39] It is important to consider the broader impact of DACA recipients in their communities.

Dr. Omolara T. Uwemedimo and her colleagues found that, "[i]mmigration status, including DACA, is a social determinant of health that intersects with other determinants, including access to care, mental health, educational attainment, and poverty."[40] The

_____

[37] Julia Cusick, *New Data Highlight DACA Recipients' Contributions to Families and Communities*, CTR. FOR AMER. PROGRESS (Sept. 5, 2019) available at https://www.americanprogress.org/press/release/2019/09/05/474185/release-new-data-highlight-daca-recipients-contributions-families-communities/.

[38] Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States*, CTR. FOR AMER. PROGRESS (Sept. 5, 2019, 9:00 AM) available at https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states/.

[39] *See* Nat'l Immigration Law Center, *Frequently Asked Questions* (Dec. 2014) available at https://www.nilc.org/issues/health-care/aca_mixedstatusfams/ ("A 'mixed-status family' is a family whose members include people with different citizenship or immigration statuses.").

[40] Omolara T. Uwemedimo, Ana C. Monterrey, Julie M. Linton, *A Dream Deferred: Ending DACA Threatens Children, Families, and Communities*, 140 AM. ACAD. OF PEDIATRICS, No. 6 (Dec.

AR4901

lack of legal status of parents in the United States impacts the physical and mental health of young children.[41] Educators provide insight into the trauma of even their youngest students. Amie Baca-Oehlert, Colorado Education Association Vice President, recounted the devastating example of one kinder-gartener who, when asked why he was bringing a suitcase to school, responded, "I want to make sure I have my special things when they come to get me."[42] The DACA program has provided the ability for its recipients to become economically stable and contribute to their families' well-being. The economic stability and deferment from deportation decreases familial stress, which in turn lessens the chances of impairment due to early childhood adversity that is present for many children of undocumented parents.

In a study published by Science Magazine, researchers found adverse consequences to U.S. citizen children whose parent(s) may be stripped of DACA benefits as: one that goes beyond the impacts for recipients alone and takes into account the inter-generational consequences of deferred action for the health of unauthorized immigrants' children, most of whom are U.S. citizens. Early childhood exposure to

---

2017), available at https://pediatrics.aappublications.org/content/140/6/e20173089.

[41] Jens Hainmueller et al., *Protecting Unauthorized Immigrant Mothers Improves Their Children's Mental Health*, 357 SCIENCE 955, 1043 (Sept. 8, 2017).

[42] Mary Ellen Flannery, *Fear and Longing: Life for Students with Undocumented Parents*, NAT'L EDUC. ASS'N (July 10, 2017) available at http://neatoday.org/2017/07/10/students-with-undocumented-parents/.

stress and adversity does not only cause poor health and impaired development in the short term; the issues can also persist into adulthood. Anxiety and psychosocial stress are identified as risk factors for depression, substance abuse, cardiovascular diseases, and obesity.[43]

It is estimated that the nearly 382,000 beneficiaries of DACA who are currently employed and contributing to the U.S. workforce and providing for the livelihood of their families would be stripped of their ability to work lawfully in the U.S. should the program be terminated.[44] The ability of DACA recipients to work and complete their secondary education and higher education has been demonstrated to have a positive impact on first generation U.S. citizen children.[45] Parents who are DACA recipients are more willing to access critical social services to which their U.S. citizen children are entitled by law. They are also more likely to live in more stable circumstances diminishing the external stresses caused by the uncertainty related to lack of immigration status and an unstable income and private health insurance.[46] For example,

---

[43] Hainmueller, *supra* note 41.

[44] Jie Zong, Ariel G. Ruiz Soto, Jeanne Batalova, Julia Gelatt, Randy Capps, *A Profile of Current DACA Recipients by Education, Industry, and Occupation,* MIGRATION POLICY INSTITUTE, Nov. 2017, https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation.

[45] Amy Hsin & Francesc Ortega, IZA Institute of Labor Econ., *The Effects of Deferred Action for Childhood Arrivals on the Educational Outcomes of Undocumented Students* (Oct. 2017).

[46] Rebecka Rosenquist, *The 'Warming Effect' of DACA on American Children*, PENN LEONARD DAVIS INSTITUTE OF HEALTH

AR4903

it is important to note that DACA recipients are over 12% more likely to ensure that their U.S. citizen children access resources to which U.S. citizens are entitled, such as the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC), than parents without DACA protections.[47] WIC is considered one of the most successful anti-poverty programs for children in the United States.[48] Treatment of the mental disorders caused by the external stressors of having an undocumented parent result in high health care expenditures and long-term outcomes including diminished school performance and welfare reliance.[49] In the long run these issues can continue into adulthood.[50] Ultimately, the DACA program has been associated with the mental health and well-being of its recipients and has ultimately acted as a

---

ECONOMICS (June 4, 2018) (quoting study author Atheendar Venkataramani who stated, "Our findings demonstrate that favorable immigration policies can have a 'warming effect' on vulnerable children's access of critical social services. The results suggest that rolling back DACA or instituting policies which raise the threat of deportation could result in a 'chilling effect' that could adversely affect child health.").

[47] Johns Hopkins, *WIC Participation Better Among Vulnerable, U.S. Citizen Children Whose Mothers are Eligible for DACA* (May 29, 2018).

[48] Rosenquist, *supra*, note 46.

[49] Jens Hainmueller et al., *Protecting Unauthorized Immigrant Mothers Improves Their Children's Mental Health*, 357 SCIENCE 955, 1043 (Sept. 8, 2017).

[50] *Id.*

AR4904

"multiplier" improving the educational and health future of their U.S. citizen children and families.[51]

In a study conducted on the impact of people with protection under DACA and those immigrants without the same benefits, the researchers concluded, "We know that a lack of legal status impacts multiple aspects of immigrants' lives, including health and well-being, and we also know that communities do not benefit when individuals are unhealthy. We have shown that changes to immigrant legal status can directly improve psychological well-being."[52] The individual well-being of DACA recipients is linked to increased community health and the lack of any immigration status is linked to poorer outcomes for individual immigrants reflecting on a decrease of health within communities. The preservation of DACA for its recipients will lead to more positive outcomes for families and communities within the U.S., including increased prosperity of U.S. citizen children and a decrease in the costs associated with the adverse physical repercussions of living a life as an immigrant without protected status.

## A. The DACA Program Strengthens Cultural Ties between Mexico and the United States

Beneficiaries of DACA, while citizens of other countries, including Mexico, are in effect vital members

---

[51] *Id.*

[52] Caitlin Patler & Whitney Laster Pirtle, *From Undocumented to Lawfully Present: Do Changes to Legal Status Impact Psychological Well being Among Latino Immigrant Young Adults?*, 199 SOC. SCI. & MED. at 39-48 (Feb. 2018).

of U.S. society. The average age that most DACA recipients arrived in the U.S. is seven years old.[53] These young people have attended elementary and secondary schools in the United States. They work and contribute to the U.S. economy and their communities. DACA has allowed its beneficiaries to be lawfully employed, obtain driver's licenses, open bank accounts, purchase homes and vehicles, and ultimately integrate their lives into the U.S. society.[54] DACA recipients comprise an important part of the population, with eighty-six metropolitan areas home to at least 1,000 DACA recipients.[55]

The citizenship of Mexican DACA recipients often belies their cultural identity as Mexican and American as they have been educated and raised in the United States. The uncertainties that possible rescission has created for DACA recipients puts the cultural, educational, and entrepreneurial gains of these young immigrants at a crossroads. The ending of the program will lead to a lack of incentive and disenfranchisement from the gained economic and

---

[53] Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States*, CTR. FOR AMER. PROGRESS (Sept. 5, 2019, 9:00 AM) available at https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states/.

[54] Grace Tatter, *Why DACA Works*, Harvard Ed. (Winter 2019), available at https://www.gse.harvard.edu/news/ed/19/01/why-daca-works.

[55] Nicole Prchal Svajlenka, *What We Know About DACA Recipients, by Metropolitan Area*, CTR. FOR AMER. PROGRESS (Sept. 23, 2019, 9:00 AM), https://www.americanprogress.org/issues/immigration/news/2019/09/23/474653/know-daca-recipients-metropolitan-area/.

cultural ties, with which DACA recipients identify. This will adversely affect the continued productivity, education and entrepreneurship of DACA recipients.[56] As one DACA student at American University explained, "[I]t's like feeling that perpetual falling feeling. I just want to be able to know if I'm going to be able to keep what I built here."[57] Continuance of the DACA program will more permanently align the values of DACA recipients to the culture and society with which they most closely identify.

DACA recipients have had a unique opportunity to contribute their bi-cultural and multilingual abilities in order to bridge the shared cultures and strengthen cultural ties between Mexico and the United States and the many countries from which DACA recipients hail.[58] The failure to extend the program will deprive

---

[56] *See generally* Roberto G. Gonzales, *Investing in the American Dream*, IMMIGRATION POL'Y CTR. (Dec. 2010) available at https://exchange.americanimmigrationcouncil.org/sites/default/files/research/Gonzales_-_Investing_in_the_American_DREAM_120210.pdf (discussing the professional potential of DACA recipients who have been educated in the U.S. and now seek to continue into higher education and the American labor market) (last visited Sept. 25, 2019).

[57] Michel Martin, *DACA, A Student's Story: 'They Are the Types of Immigrants You Want in Your* Country' (Sep. 16, 2017 7:44 PM) available at https://www.npr.org/2017/09/16/551544757/daca-a-students-story-they-are-the-types-of-immigrants-you-want-in-your-country.

[58] *See* United States Citizenship and Immigration Services, *Data Set: Form I-821D Deferred Action for Childhood Arrivals* (June 30, 2019) available at https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/Static_files/DACA_Population_Receipts_since_Injunction_Jun_30_2019.pdf (providing the birth countries of

a population of immigrant youth the ability to contribute and fully participate in a society that has given them an opportunity to demonstrate their intrinsic value as members of U.S. society.[59]

### B. The DACA Program Strengthens Educational Ties between Mexico and the United States

Academic ties and exchanges have been an important part of U.S.-Mexico diplomatic relations.[60] There have been several policies and initiatives in order to focus resources and collaborations to enhance cross-border educational engagement.[61] A concerted and bi-national effort has been made via the *100,000 Strong in the Americas* supported by the U.S. government and *Proyecta 100,000* with the aim of having 100,000 students from each country studying in each respective country. These projects have established relationships between government entities, institutions of higher learning, industry and non-profit organizations.[62] As part of the concerted bi-national effort, U.S. and Mexican Universities have administered the Dreamers Without Borders program, which brings

---

DACA recipients and approximate number of recipients from each) (last visited Sept. 25, 2019).

[59] Gonzales, *supra* note 56.

[60] *U.S.-Mexico Higher Education Engagement: Current Activities, Future Directions*, CIGE INSIGHTS: AMERICAN COUNCIL ON EDUCATION, 5 (2017) available at https://www.acenet.edu/Documents/US-Mexico-Higher-Education-Engagement.pdf (last visited Sept. 25, 2019).

[61] *Id.* at 7.

[62] *Id.*

**AR4908**

groups of Deferred Action for Childhood Arrivals (DACA) recipients living in the U.S. to Mexico for short-term study and networking visits.[63] Continuation of the DACA program is an important facet to preserve the bilateral educational collaboration established between our two countries, both through established programs and the continued effort to educate youth in Mexico and the United States.

The DACA program has also served to buttress the U.S. education system. Over 40 percent of current DACA recipients are enrolled in school with 83% pursuing a bachelor's degree or higher.[64] "The majors and specializations that respondents report include accounting, biochemistry, business administration, chemical engineering, civil engineering, computer science, early childhood education, economics, environmental science, history, law, mathematics, mechanical

---

[63] *Id.* at 34 ("USMF is partnering with UCLA, Tec de Monterrey, Instituto de los Mexicanos en el Exterior (IME), and the governments of a number of Mexican states to administer the Dreamers Without Borders program, which brings groups of Deferred Action for Childhood Arrivals (DACA) recipients living in the U.S. to Mexico for short-term study and networking visits.")

[64] Tom K. Wong, Sanaa Abrar, Claudia Flores, Tom Jawetz, Ignacia Rodriguez Kmec, Greisa Martinez Rosas, Holly Straut-Eppsteiner, and Philip E. Wolgin, *DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November*, CTR. FOR AMER. PROGRESS (Sept. 19, 2019, 5:00 AM) available at https://www.americanprogress.org/issues/immigration/news/2019/09/19/474636/daca-recipients-livelihoods-families-sense-security-stake-november/.

engineering, neuroscience, physics, psychology, and social work, to name a few."[65]

A sizeable number of DACA recipients have dedicated themselves to the profession of teaching. Nationwide there are an estimated 20,000 teachers who are work-authorized under the DACA program.[66] Many of these teachers possess the ability to speak a foreign language and the bi-cultural skills that are in high demand within their profession.[67] The removal of teachers from the classroom who are DACA recipients would undercut the bi-cultural diversity that DACA teachers bring to their schools and lead to a further shortage of teachers.[68]

---

[65] Tom K. Wong, Greisa Martinez Rosas, Adam Luna, Henry Manning, Adrian Reyna, Patrick O'Shea, Tom Jawetz, and Philip E. Wolgin, *DACA Recipients' Economic and Educational Gains Continue to Grow*, CTR. FOR AMER. PROGRESS (Aug. 28, 2017, 9:01 AM) available at https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[66] Greg Toppo, *20,000 DACA Teachers at Risk—and Your Kids Could Feel the Fallout, Too*, USA TODAY, Oct. 11, 2017, https://www.usatoday.com/story/news/2017/10/11/thousands-daca-teachers-risk/752082001/.

[67] *See* Aliyya Swaby, *Texas School Districts Struggle to Recruit Bilingual Certified Teachers*, THE TEXAS TRIBUNE, Feb. 21, 2017, https://www.texastribune.org/2017/02/21/texas-school-districts-struggle-bilingual-certified-teachers/ (reporting on Texas school districts that are struggling to recruit bilingual educators).

[68] *See* Jie Zong, Ariel G. Ruiz Soto, Jeanne Batalova, Julia Gelatt, Randy Capps, *A Profile of Current DACA Recipients by Education, Industry, and Occupation,* MIGRATION POLICY INSTITUTE, Nov. 2017, https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation

AR4910

## IV. DACA HAS STRENGTHENED CROSS BORDER EXCHANGES IN MULTIPLE AREAS

The U.S. and Mexico have historically engaged in reciprocal and beneficial treaties that strengthen cross border exchanges. These agreements have promoted increased investment, trade and the ability of well-trained and educated foreign nationals to contribute talent, skills and education to the economies of both countries.[69] DACA recipients possess many of the same talents, skills, education and experience that these treaties promote and envision.

Through no fault of their own, DACA recipients are generally barred under U.S. immigration law from either changing status to a nonimmigrant visa or adjusting status to that of a lawful permanent resident of the United States.[70] Many have accumulated over 1 year of unlawful presence, and are subject to a "10 year bar of inadmissibility".[71] They cannot obtain a visa or return to the U.S. for a 10 year period or otherwise meet the non-immigrant intent requirements.[72] These visa requirements render DACA recipients ineligible to obtain a student visa or

---

("There are about 9,000 DACA recipients employed as teachers or similar education professionals [in the United States] . . . .").

[69] *See e.g.,* North American Free Trade Agreement, Can.-Mex.-U.S., Dec. 17, 1992, 32 I.L.M. 289.

[70] Press Release, President Barack Obama, Remarks from the President on Immigration (June 15, 2012) ("This is not a path to citizenship. It's not a permanent fix. This is a temporary stopgap measure . . . .").

[71] INA Sec. 212(a)(9)(B).

[72] 8 C.F.R. § 214(b)

AR4911

other temporary work visa in order to attend school, work, and lawfully reside in the United States.[73] For this otherwise vulnerable group, DACA has provided an avenue of relief, albeit temporarily, from this situation. Like their foreign national counterparts who obtain visas, DACA recipients are able to fulfill the promise of international agreements and are able to invest, study, and contribute their expertise to the U.S. economy.

In furtherance of our bi-lateral effort, many Mexican DACA holders were permitted to attend academic and cultural exchange programs in Mexico.[74] In partnership with prestigious Mexican academic and cultural institutions, the Government of Mexico has supported these exchanges as part of its foreign policy priorities to engage Mexicans abroad.[75] These cross border exchanges have forged bicultural leaders for both Mexico and the U.S.

While DACA recipients are not eligible for temporary work visas as a matter of law, their ability to

---

[73] *Id.* Based on the discussed requirements, DACA recipients are ineligible because they do not maintain a residence in their "home country" and do not commit to return there.

[74] *See e.g.,* Gardenia Mendoza, *22 "Dreamers," Invitados de Honor en México*, THE CALIFORNIA-MEXICO STUDIES CENTER, INC. (July 16, 2015, 5:10 PM), https://www.california-mexicocenter.org/22-dreamers-invitados-de-honor-en-mexico/ (describing exchange program hosted in Mexico emphasizing and cultivating the strength and achievements of Dreamers).

[75] Secretaría de Relaciones Exteriores, *Canciller Ruiz Massieu Se Reúne con Jóvenes Dreamers*, GOBIERNO DE MEXICO (JULY 4, 2016), https://www.gob.mx/sre/prensa/canciller-ruiz-massieu-se-reune-con-jovenes-dreamers.

work in the United States strengthens the binational and multinational commitment to foster stronger economic ties, ensure border security and protect employment and labor standards in conformity with our bi-lateral and international agreements.[76]

## V. THE U.S. HAS UNDERTAKEN TO PROTECT DACA RECIPIENTS AS PART OF ITS INTERNATIONAL OBLIGATIONS UNDER THE ICCPR

Central to the modern human rights framework is the International Covenant on Civil and Political rights ("ICCPR").[77] This treaty embodies the fundamental civil and political rights contained in the Universal Declaration of Human Rights ("Universal Declaration"),[78] agreed upon at the United Nations General Assembly on December 10, 1948. With over 150 State Parties, the ICCPR is the most widely accepted human rights treaty in existence. Among other protections, the ICCPR guarantees that family is "entitled to protection by society and the State (art. 23)."[79] The United States ratified the ICCPR on September 8, 1992 and is therefore bound by its terms.

---

[76] NAFTA Implementation Act, Pub. L No: 103-182 (1993).

[77] UN General Assembly, International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171 ("The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.")

[78] Universal Declaration of Human Rights, Dec. 10, 1948, G.A. Res. 217A, 3 U.N. GAOR, U.N. Doc. A/810.

[79] UN General Assembly, International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171 ("The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.")

27

When ratifying the ICCPR, the United States appended a "declaration" to the effect that the operative provisions of the Covenant are "not self-executing".[80] The basis for this declaration (the effect of which is that the ICCPR does not, of itself, create private rights directly enforceable in U.S. courts) was that "the fundamental rights and freedoms protected by the Covenant are already *guaranteed as a matter of U.S. law*, either by virtue of constitutional protections or enacted statutes, and can be effectively asserted and enforced by individuals in the judicial system on those bases."[81]

This declaration does not relieve the United States of its obligations on the international legal plane. Rather, it operates as a representation to the international community that the United States' international legal obligation to confer the fundamental rights and protections enshrined in the ICCPR will be discharged through the medium of U.S. domestic law, including the U.S. Constitution, because individuals whose human rights may be infringed are entitled to effective equivalent remedies under that law. The declaration amounts to an undertaking to the other States Parties to the ICCPR that the United States will secure the protections set forth in the ICCPR through domestic law as applicable to "all individuals within its territory and subject to its jurisdiction".[82]

---

[80] 138 Cong. Rec. S4784 (daily ed. Apr. 2, 1992).

[81] Report submitted by the United States of America under art. 40 of the ICCPR, U.N. Doc. CCPR/C/81/Add 4(1994), at 8 (emphasis added).

[82] *See* UN General Assembly, International Covenant on Civil

**AR4914**

The enactment of DACA by the U.S. government is a discretionary and unique protection made available to immigrant youth who are undocumented in the United States. The protection from deportation and the ability of DACA recipients to work and care for their families comports with the U.S. government's obligations under the ICCPR. The Department of Homeland Security (DHS) Secretary has announced that DACA participants will not be a deportation priority unless they commit crimes.[83] This directive along with the protections afforded by DACA would ensure that the international obligations that the United States has committed to with regard to the preservation of the family unit are not undermined.

The United States has a long history of granting deferred action or relief from deportation to vulnerable populations of immigrants which include recipients of Temporary Protected Status (TPS),[84] Deferred

---

and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171 art. 2(1).

[83] *See* 2 J.A., Dep't of Homeland Security v. Regents of the U. of Cal. Nos. 18-587, 18-588, and 18-589 at 594–596 (discussing inspection and vetting process for the government before an individual may become a DACA recipient)*; See also* Memorandum from Sec'y of Homeland Sec., Janet Napolitano to Acting Commissioner, U.S. Customs and Border Protection, David V. Aguilar, Director of U.S. Citizenship and Immigration Services, and Director of U.S. Immigration and Customs Enforcement, John Morton (June 15, 2012) (establishing the limitations and standards for the exercise of discretion).

[84] *See* Ben Harrington, *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others*, CONG. RESEARCH SERV. REP. No. 7-5700 (Apr. 10, 2018) (reviewing discretionary temporary reprieves from removal granted by the U.S. in the last half century).

Enforced Departure (DED),[85] Parole,[86] Administrative Closure in removal proceedings,[87] Voluntary Departure,[88] Stays of Removal,[89] self-petitioners under the Violence Against Women Act (VAWA),[90] student visa holders who due to natural disasters were unable to return home,[91] Widows and widowers of U.S. Citizens,[92] Victims of Trafficking,[93] and victims of serious crimes.[94] Current regulations permit an individual beneficiary of deferred action to obtain employment authorization due to economic necessity.[95] These deferred action programs, like DACA, recognize the unique circumstances of vulnerable immigrants and give priority to ensure basic protections for vetted individuals.

---

[85] DED includes cases for humanitarian basis including serious mental or physical illness, primary caretaker of minor or elderly person, primary caretaker of ill person, present in the U.S. since childhood. Nat'l Immigration forum, *Deferred Action Basics* (Apr. 15, 2016) available at https://immigrationforum.org/article/deferred-action-basics/.

[86] *Id.*

[87] Harrington, *supra* note 84 at 18.

[88] *Id.* at 19.

[89] *Id.*

[90] Nat'l Immigration Forum*, supra* note 85.

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] 8 C.F.R. § 274a.12(c)(14).

AR4916

In their 2015 report to the Human Rights Council for the United Nations, the United States reiterated their commitment to human rights,

> Human rights are embedded in our Constitution, laws, and policies at every level, and governmental action is subject to review by an independent judiciary and debated by a free press and engaged civil society. Not only do individuals within the United States have effective legal means to seek policy, administrative, and judicial remedies for human violations and abuses, the government itself pursues extensive and comprehensive enforcement actions to create systematic reform. Our federal system enables our nation to test new methods and strategies for promoting human rights at the state and local levels. While recognizing that there is more work to be done, we are constantly striving to create a fairer and more just society, as reflected in the programs and policies discussed in this report.[96]

Further showing their commitment to the ICCPR, the United States specifically addressed immigration policies in this report and specifically mentioned DACA as an indicator of compliance.[97] The report reiterates their enforcement policy that indicates

---

[96] Rep. of the United States of Amer. Submitted to the U.N. in Accordance with paragraph 5 of the Annex to the Human Rights Council Resolution 16/21, 22nd Sess., Feb. 13, 2015, UN Doc. A/HRC/WG.6/22/USA/1 (4–15 May 2015).

[97] *Id.* Sec. E. at 12–14.

AR4917

DACA recipients are not an enforcement priority.[98] DACA recipients have grown up in this country—their families, friends, communities are in the United States, so it is highly improbable they would depart the country on their own if DACA was terminated. DACA recipients would return to living under the radar in a vulnerable state. In effect, they would be at risk and unable or unwilling to seek the legal protections from predatory or criminal practices, rendering the United States' human rights protections ineffective for the very populations they seek to protect.[99]

---

[98] *Id.* at 12 ("Consistent with these actions, we are implementing a new enforcement and removal policy that continues to place top priority on threats to national security, public safety, and border security.").

[99] *Id.*

AR4918



## CONCLUSION

It is undisputed that the decision to rescind DACA by the Federal Government has placed an extraordinary level of uncertainty and anxiety on young DACA beneficiaries who greatly contribute to the prosperity and well-being of a country they embrace, respect, and honor.

If DACA protections are rescinded, this young bicultural generation will be forced to live without certain rights and protections, substantially increasing their vulnerability and hampering the opportunities to continue contributing as vital members of U.S. society. The rescission of DACA will augment uncertainty in the workplace, at school, and the daily lives for recipients, their families and the community as a whole, potentially leading to the separation of family members.

For the foregoing reasons, the Government of Mexico submits the present amicus curiae, acting under international law, to protect the interests and rights of its nationals in potentially vulnerable situations, and respectfully requests that this Court affirm the injunctions ordered by the courts below.

Respectfully submitted,

ADELA ELVIA RUTH MCCHESNEY
    *COUNSEL OF RECORD*
FAYE MAGDALENA KOLLY
DE MOTT, MCCHESNEY,
CURTRIGHT & ARMENDARIZ, LLP
8023 VANTAGE DRIVE, SUITE 800
SAN ANTONIO, TX 78230
(210) 590-1844
RUTH@DMCAUSA.COM

*COUNSEL FOR AMICUS CURIAE*

OCTOBER 3, 2019

AR4920

Nos. 18-587, 18-588, and 18-589

In The

# Supreme Court of the United States

---

Department of Homeland Security, et al.,
*Petitioners*,

v.

Regents of the University of California, et al.,
*Respondents.*

---

**On Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit**

---

**BRIEF FOR *AMICI CURIAE* NINETEEN
COLLEGES AND UNIVERSITIES
IN SUPPORT OF RESPONDENTS**

---

Anton Metlitsky
  (*Counsel of Record*)
Jennifer B. Sokoler
Charles J. Mahoney
David Z. Cohen
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, N.Y. 10036
(212) 326-2000
ametlitsky@omm.com

---

Additional Captions Listed on Inside Cover

**AR4921**

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

*Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.,

*Respondents.*

_____

**On Writ of Certiorari Before Judgment to the United States Court of Appeals for the District of Columbia Circuit**

_____

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOME-LAND SECURITY, ET AL.,

*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL.,

*Respondents.*

_____

**On Writ of Certiorari Before Judgment to the United States Court of Appeals for the Second Circuit**

_____

AR4922

i
# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI* ............................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .................................................. 2

ARGUMENT ................................................................. 5

I.  DACA Students Enrolled at *Amici* Institutions Are Some of the Most Gifted and Motivated Young People in the World ......... 5

II. Rescinding DACA Would Harm *Amici*'s Students and Alumni, and Deprive Both *Amici* Institutions and the Country of Their Promise ........................................... 12

    A. Ending DACA Would Have a Devastating Impact on DACA Students ...... 12

    B. Rescinding DACA Would Prevent Undocumented Students From Fully Benefitting From and Contributing To *Amici*'s Institutions ......................................... 15

    C. Rescinding DACA Would Deprive the Nation of Invaluable Resources .................... 19

CONCLUSION .......................................................... 22

AR4923

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Batalla Vidal v. Nielsen,*
　279 F. Supp. 3d 401 (E.D.N.Y. 2018) ............... 14

*Nat'l Ass'n for the Advancement of Colored People v. Trump,*
　298 F. Supp. 3d 209 (D.D.C. 2018) ................... 13

*Plyler v. Doe,*
　457 U.S. 202 (1982) ........................................... 14

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.,*
　279 F. Supp. 3d 1011 (N.D. Cal. 2018) ............. 14

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.,*
　908 F.3d 476 (9th Cir. 2018) ............................. 13

*Sweezy v. New Hampshire,*
　354 U.S. 234 (1957) ............................................. 6

**Other Authorities**

Amanda Mott, *Inaugural President's Innovation Prize Winners Announced at Penn*, PENNNEWS (Apr. 20, 2016) ............... 20

*Brown President Urges Trump to Continue DACA*, BROWN UNIV. NEWS (Aug. 30, 2017) .... 22

Brown University, *Undergraduate Admission* ....... 6

Columbia Undergraduate Admissions, *Undocumented Students and DACA* .................. 7

Cornell University, *University Mission* ................... 5

**AR4924**

iii

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Dartmouth College, *Dartmouth College Mission Statement* .............................................................. 5

Duke University, *Indenture of James B. Duke Establishing the Duke Endowment* (1924)......... 5

*Durbin: Let's Show The American Dream Is Still Alive By Passing The Dream Act* (Sept. 12, 2017) ................................................. 20

Emory University, *Study Abroad at Emory* .......... 15

Gabe Ortiz, *Luke: DACA "Gave Me a New Faith, and Brought Out a New Me to Reject Fear"*, AMERICA'S VOICE (Dec. 9, 2016) ......................... 9

George Washington University, *Apply to GW* ......... 7

Greg Lee, *Undocumented Santa Ana Scholar Accepted to Harvard Medical School*, ABC NEWS (June 16, 2016) .............................. 21

Harvard College Admissions, *What We Look For* ... 6

Harvard College Financial Aid Office, *How Aid Works* ................................................................. 7

Harvard University, *The Charter of the President and Fellows of Harvard College, Under the Seal of the Colony of Massachusetts Bay, and Bearing the Date May 31st A.D. 1650* ............................................ 5

Institute for Immigration, Globalization, & Education, *In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration*

**AR4925**

iv

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*Reform* (2015) ..................................................... 10

Jake Miller, *White Coats for DACA*, HARVARD
MED. SCH. NEWS (Sept. 14, 2017) .................... 22

Jin Park, *I'm a Dreamer and a Rhodes
Scholar. Where Do I Belong?*, THE N.Y. TIMES
(Jan. 11, 2019) .................................................. 11

L. Rafael Reif, President of MIT, *Trump
Should Not Repeal DACA*, BOSTON GLOBE
(Aug. 31, 2017) ............................................. 4, 19

Laura Anthony, *Two Years Later, Tania
Chairez Still 'Undocumented and
Unapologetic'*, DAILY PENNSYLVANIAN
(Apr. 17, 2014) .................................................. 18

Letter from Caltech President Thomas F.
Rosenbaum to The Caltech Community
(Sept. 5, 2017) ..................................................... 3

Letter from Cornell University President
Martha E. Pollack to President Donald J.
Trump (Aug. 31, 2017) ........................................ 3

Letter from Harvard University President
Drew Gilpin Faust to President Donald
J. Trump Regarding DACA
(Aug. 28, 2017) ............................................. 3, 22

Letter from Washington University in St. Louis
Chancellor Mark S. Wrighton to President
Donald J. Trump (Sept. 1, 2017) ....................... 3

**AR4926**

v

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Liz Mineo, *Ask the Undocumented*, HARVARD GAZETTE (May 4, 2017) ..................................... 11

MIT Student Financial Services, *Making MIT Affordable* ............................................................. 7

MIT, *MIT Mission* .................................................. 6

New York University Admission, *Undocumented Students* ............................................................... 7

Northwestern University, *About the Global Learning Office* ................................................ 15

Penn for Immigrant Rights, *Founders Statement* ............................................................. 18

Roberto Torres, *These 3 Companies Are Coming to the Pennovation Center*, TECHNICAL.LY (June 30, 2016)................................................... 21

Santiago Tobar Potes, *DACA Student: Deporting Me and 800,000 Dreamers Is a Man-Made Disaster That Will Be Terrible for US*, FOX NEWS (Sept. 5, 2017)................................... 8

Stanford University, *The Founding Grant with Amendments, Legislation, and Court Decrees* (1885)................................................................. 5

Stephanie Leutert, *Undocumented in the Ivy League*, AM. Q. (May 5, 2015) .......................... 10

Teach for America, *DACA Recipients* .................... 20

**AR4927**

vi
## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Troy Parks, *Med Student 'Dreamers' Speak
  Out on Maintaining DACA Protections*,
  AMA WIRE (Feb. 13, 2017)................................ 21

Vanderbilt University, *About the Global
  Education Office*............................................... 15

Yale Admissions, *What Yale Looks For*.................. 6

AR4928

1

## INTEREST OF *AMICI*[1]

*Amici* are nineteen distinguished American institutions of higher education.[2]  Though important differences exist among them, *amici* share a common mission to educate the next generation of leaders with the talent, creativity and drive to solve society's most pressing problems.  In furtherance of that objective, *amici* have admitted undocumented students who benefitted from the protections and opportunities provided by the Deferred Action for Childhood Arrival ("DACA") program.  Like their classmates, the DACA students on *amici's* campuses make enormous contributions to our educational institutions and our country.

The colleges and universities that are signatories to this brief have an interest in each of their undocumented students' welfare and ability to obtain a full and complete higher education.  *Amici* also have an

---

[1]  Pursuant to Supreme Court Rule 37.6, counsel for *amici* state that no counsel for a party authored this brief in whole or in part, and no person other than *amici* or their counsel made any monetary contribution intended to fund the preparation or submission of this brief. Pursuant to Supreme Court Rule 37.3(a), all parties have provided blanket consent to the filing of *amicus curiae* briefs.

[2] They include Brown University, California Institute of Technology ("Caltech"), Columbia University, Cornell University, Dartmouth College, Duke University, Emory University, Georgetown University, George Washington University, Harvard University, Massachusetts Institute of Technology ("MIT"), New York University, Northwestern University, Stanford University, the University of Chicago, the University of Pennsylvania, Vanderbilt University, Washington University in St. Louis, and Yale University.

2

interest in ensuring that when these students graduate, they are able to put their education to its highest use. The Department of Homeland Security's September 5, 2017 Memorandum jeopardizes *amici's* interests by harming their students.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici* institutions have educated and helped launch the careers of many celebrated leaders and innovators in all fields, including more than 200 Nobel Prize recipients, half of the astronauts who have walked on the moon, dozens of Fortune 500 CEOs, and numerous Academy Award and Pulitzer Prize-winning artists and authors. Every day, *amici's* alumni can be found teaching in our schools, performing cutting-edge research, discovering ground-breaking technology, healing patients in our hospitals, starting businesses, leading our armed forces, and reporting on current events for local and global news outlets. This is no coincidence, but a reflection of *amici's* principal objective: To improve the human condition by educating the next generation of people with the talent, drive, and heart needed to identify and solve society's most pressing problems.

To further this mission, all *amici* institutions have admitted students who have applied for and been granted relief from removal under the DACA program. "[L]ike their peers," the DACA students on *amici's* campuses "are extraordinarily talented young people who . . . aspire to be leaders in public service, science, business, medicine, and the arts. They embody the drive and determination that has made the United States the most prosperous and innovative

**AR4930**

3

country in the world."[3]  And by virtue of DACA—which protects certain undocumented immigrants from near-term deportation, allows them to work lawfully, and enables them to travel abroad—these students have been able for the first time to access educational and life opportunities on nearly equal terms with their peers.

If permitted to enter into effect, the memorandum rescinding the DACA program will preclude the remarkable students enrolled at *amici* institutions from obtaining the full benefit of their time on our campuses.  It would also undermine *amici*'s educational missions by threatening their ability to attract and educate the most talented young people.[4]  Indeed, ending DACA would force future scholars, innovators,

---

[3] Letter from Harvard University President Drew Gilpin Faust to President Donald J. Trump Regarding DACA (Aug. 28, 2017), https://www.harvard.edu/president/news/2017/letter-to-president-trump-regarding-daca.  *See also, e.g.*, Letter from Cornell University President Martha E. Pollack to President Donald J. Trump (Aug. 31, 2017), https://tinyurl.com/y4ufuhod ("I believe that our DACA students are 'incredible kids.' . . . It would be more than a shame if you . . . extinguish so many bright and productive futures just as they are getting started."); Letter from Washington University in St. Louis Chancellor Mark S. Wrighton to President Donald J. Trump (Sept. 1, 2017), https://tinyurl.com/y48e7tof ("I believe that abandoning DACA would not be in our national interest.").

[4] Letter from Caltech President Thomas F. Rosenbaum to The Caltech Community (Sept. 5, 2017), https://tinyurl.com/y3u5meyq (ending DACA "cuts to the core of what we stand for as an educational institution:  to identify, attract, and support talented individuals, and to create a community where students, staff, and faculty alike can learn from each other and thrive").

AR4931

4

and leaders to choose between withdrawing to the margins of our society and national economy or returning to countries that they have never called home.  Whatever they choose, their gifts and education will be lost to this nation.  *Amici* therefore urge this Court to affirm the decisions below.

*Amici* submit this brief to inform the Court about their experiences with the DACA students on their campuses and to warn of the consequences—to the students, *amici*, and the country—of rescinding DACA.  At this time of profound challenges—from global pandemics and insoluble conflicts, to climate change and income inequality—the importance of *amici*'s shared mission of advancing and improving the human condition through teaching and research comes into sharper focus.  To achieve their ambitious goals of advancing knowledge and improving our society, schools must be able to identify and educate the very best students, and those students must be able to work after graduation.  Ending DACA would unjustly sideline a discrete group of students.  As one of *amici*'s Presidents put it, no student—*amici*'s or otherwise—should be forced to live in constant fear of "losing the opportunities they earned, the communities they think of as home, and the nation they love."[5] Nor should the nation lose the benefits of any student's full participation in our society.

---

[5] L. Rafael Reif, President of MIT, *Trump Should Not Repeal DACA*, BOSTON GLOBE (Aug. 31, 2017), https://tinyurl.com/y6wyq239.

5

**ARGUMENT**

## I.  DACA STUDENTS ENROLLED AT *AMICI* INSTITUTIONS ARE SOME OF THE MOST GIFTED AND MOTIVATED YOUNG PEOPLE IN THE WORLD

*Amici* are united in a core mission:  to educate extraordinary students from diverse backgrounds and prepare them for leadership, active citizenship, and achievement in every field of human endeavor.  Each of *amici*'s schools, to borrow from one, "educates the most promising students and prepares them for a lifetime of learning and of responsible leadership." [6] From their founding charters [7] to their current websites,[8] these clearly stated educational objectives govern how *amici* "determine for [themselves]

---

[6] Dartmouth College, *Dartmouth College Mission Statement*, https://tinyurl.com/y5mku5ul (last visited Oct. 1, 2019).

[7] *See, e.g.*, Duke University, *Indenture of James B. Duke Establishing the Duke Endowment*, at 24 (1924), https://tinyurl.com/y4dzoeq2 (calling for courses of instruction in areas that "can do most to uplift mankind" and "help to develop our resources, increase our wisdom and promote human happiness"); Stanford University, *The Founding Grant with Amendments, Legislation, and Court Decrees,* at 24 (1885), https://tinyurl.com/y69s9ph7 (Stanford University's "chief object is the instruction of students with a view to producing leaders and educators in every field of science and industry"); Harvard University, *The Charter of the President and Fellows of Harvard College, Under the Seal of the Colony of Massachusetts Bay, and Bearing the Date May 31st A.D. 1650*, https://tinyurl.com/yxduz56t (Harvard's mission includes "the advancement of all good literature arts and sciences").

[8] *See, e.g.*, Cornell University, *University Mission*, https://tinyurl.com/yymdtgxk (last visited Oct. 1, 2019) (Cornell University's "mission is to discover, preserve and disseminate

AR4933

6

on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring) (quotation omitted).

To fulfill their missions, *amici* devote substantial resources to identifying, recruiting, and retaining exceptional young people from around the globe. Of course, *amici* seek students with the scholarship record to excel in their classrooms, but given the great number of applications that *amici* receive—well in excess of the number of students they can admit—academic merit alone is insufficient for admission. *Amici* therefore undertake an intensive application review process to identify those students "who w[ill] make the most of the extraordinary resources" they have to offer, "those with a zest to stretch the limits of their talents, and those with an outstanding public motivation—in other words, applicants with a concern for something larger than themselves."[9] Additionally,

---

knowledge, to educate the next generation of global citizens, and to promote a culture of broad inquiry throughout and beyond the Cornell community"); MIT, *MIT Mission*, https://tinyurl.com/yglcbj (last visited Oct. 1, 2019) (MIT's goal "is to advance knowledge and educate students in science, technology, and other areas of scholarship that will best serve the nation and the world in the 21st century").

[9] Yale Admissions, *What Yale Looks For*, https://tinyurl.com/y2cxrqht (last visited Oct. 1, 2019); *see also* Harvard College Admissions, *What We Look For*, https://tinyurl.com/y86n5rv7 (last visited Oct. 1, 2019) ("We seek to identify students who will be the best educators of one another and their professors—individuals who will inspire those around them during their College years and beyond."); Brown University, *Undergraduate Admission*, https://tinyurl.com/y7syjs2m

7

*amici* have worked to ensure that the most qualified students can enroll in their institutions, irrespective of their socioeconomic and immigration status.[10]

The DACA students at *amici* institutions were selected because they are outstanding students. Like their classmates, these young people were valedictorians, student government leaders, varsity athletes, inventors, academic award winners, accomplished

---

(last visited Oct. 1, 2019) ("We will consider how your unique talents, accomplishments, energy, curiosity, perspective and identity might weave into the ever-changing tapestry that is Brown University."); George Washington University, *Apply to GW*, https://tinyurl.com/y53qu2cn (last visited Oct. 1, 2019) ("We are looking to enroll a bright, talented and diverse body of students who will take advantage of the many unique opportunities that the university and Washington, D.C., have to offer.").

[10] Indeed, many of *amici* provide at least their undergraduate students complete, need-based financial aid. *See, e.g.*, Harvard College Financial Aid Office, *How Aid Works*, https://tinyurl.com/y3zylrq5 (last visited Oct. 1, 2019) (Harvard "meet[s] 100 percent of [the] students' demonstrated financial need" of undergraduate education irrespective of citizenship status); MIT Student Financial Services, *Making MIT Affordable*, https://tinyurl.com/y523kn2e (last visited Oct. 1, 2019) (MIT promises its undergraduate applicants that once they are admitted, the university is "committed to meeting 100% of demonstrated financial need with our aid."); Columbia Undergraduate Admissions, *Undocumented Students and DACA*, https://tinyurl.com/yyf2p7e5 (last visited Oct. 1, 2019) (Columbia is "committed to meeting 100% of the demonstrated financial need of all students admitted as first-years or transfer students pursuing their first degree, regardless of citizenship status"); New York University Admissions, *Undocumented Students*, https://tinyurl.com/y3v8zmg3 (last visited Oct. 1, 2019) ("NYU will not draw a distinction between applicants who are US citizens, and those who maintain DACA status—or are otherwise undocumented—while determining institutional scholarship awards.").

8

artists, and role models for younger children in their communities.  And like many of their classmates, they are the pride of the neighborhoods in which they grew up—"local kids who made good."  To take just a few examples:

- Santiago Tobar Potes, a rising senior at Columbia University, was a straight-A student in high school, scored at the highest levels on state and national academic tests, speaks six languages and is an accomplished violinist who gave free lessons to impoverished youth in his hometown of Miami, Florida.[11]  While at Columbia, Santiago has been on the Dean's List every semester.  Also, because of DACA, Santiago has been able to work as a research assistant in a neuroscience lab and intern for a New York State Supreme Court Justice.

- Anahi Figueroa-Flores is a rising junior majoring in Computer Science at Georgetown.  While in high school in Colorado, Anahi was a member of the Marine Corps ROTC and served as Executive Battalion Commander her senior year.  When she graduates, Anahi "want[s] to pursue a career in software engineering and advocacy," but her "goals remain uncertain as they depend on what happens with DACA."[12]

---

[11] Santiago Tobar Potes, *DACA Student: Deporting Me and 800,000 Dreamers Is a Man-Made Disaster That Will Be Terrible for US*, Fox News (Sept. 5, 2017), https://tinyurl.com/y6sdxvsr.

[12] This anecdote, along with those discussed *infra* about Johan Villanueva, Barbara Olachea Lopez Portillo, Jose Martinez

**AR4936**

9

- Luke Hwang, a current PhD candidate in chemistry at the University of Chicago, graduated from a competitive math and sciences magnet high school in Bergen County, New Jersey, where he won a number of awards at regional science fairs and volunteered as an Emergency Medical Technician in his local ambulance corps.  Luke was next accepted as a University Scholar in the Macaulay Honors College at the City College of New York, from which he received a Bachelor's of Science in Chemistry.  In addition to graduating *summa cum laude*, Luke received an award for obtaining the highest grade point average of any chemistry major.[13]

- Johan Villanueva, a rising senior at MIT majoring in chemical engineering, graduated second in his class from the largest public high school in Chicago.  In addition to being the co-captain of his high school's Math Team, Johan was involved in Homeland Helpers, a student group dedicated to assisting the city's homeless population, the Environmental Club, and the National Honor Society.

DACA students' presence on *amici*'s campuses is all the more notable given the enormous challenges that undocumented youth face in order to obtain a

---

Guevara, Paul Gastello, Dalia Larios, and Stella Linardi, were provided by *amici* for this brief.

[13] Gabe Ortiz, *Luke: DACA "Gave Me a New Faith, and Brought Out a New Me to Reject Fear"*, AMERICA'S VOICE (Dec. 9, 2016), https://tinyurl.com/y57e944q.

10

higher education.  To start, the vast majority of these students have grown up in households that survive on incomes far below the federal poverty line, and most are the first persons in their families to attend college.[14]  Additionally, these students often cope with family instability and anxiety relating to their undocumented status.[15]  As one DACA student at Yale explained:

> [The] challenges . . . start in high school—when many undocumented students, seeing no way out of their limbo status, lose motivation.  Others pick up jobs on the side to financially help their families, slowly drifting away from their classwork.  Even for those who remain dedicated to their classes, studies show a lack of information regarding university options and an inability to obtain financial aid obstructs the path to higher education.[16]

Given the significant adversity that DACA students have surmounted prior to even applying to *amici* institutions, it is no surprise that they have also

---

[14] *See* Institute for Immigration, Globalization, & Education, *In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration Reform* 7 (2015), https://tinyurl.com/y6kvtafm (reporting on a survey of undocumented students that found "61.3% . . . had an annual household income below $30,000" and 67.6% were first-generation college students).

[15] *Id.* at 2 ("[Undocumented youth] are disproportionately more likely to grow up in poverty, crowded housing, lacking health care, and residing in households where families have trouble paying rent and affording food.").

[16] Stephanie Leutert, *Undocumented in the Ivy League*, AM. Q. (May 5, 2015), https://tinyurl.com/y36yanvr.

11

excelled on *amici*'s campuses.  Jin Park was born in South Korea and came to New York City at age 7.[17] Growing up, Park understood that his family was different:  "I knew that my family couldn't get a car, that we didn't have health care, and that we should avoid busy streets, where immigration raids often take place[,] . . . but I didn't quite understand it."[18]  In high school, a Manhattan hospital rejected him from an internship program on that basis.  Jin credits DACA with giving him the confidence to apply to college to pursue his dream of becoming a "doctor to work on policies to help the most vulnerable."[19]  Indeed, his professional goals are an outgrowth of his experience growing up undocumented:  "When I was 11, I had to search online how to treat a burn at home because my father had been burned at work and couldn't go to the hospital."[20]  A 2018 Harvard graduate and Class Day speaker, Jin is the first DACA recipient of a Rhodes Scholarship.[21]  Without DACA, Jin will not be able to travel to the United Kingdom to participate in this prestigious program.

---

[17] Jin Park is a signatory on the *amicus* brief "*Texas V. United States Defendant-Intervenors DACA Recipients And State Of New Jersey,*" submitted in support of respondents.

[18] Liz Mineo, *Ask the Undocumented*, HARVARD GAZETTE (May 4, 2017), https://tinyurl.com/y5ufmbms.

[19] *Id.*

[20] *Id.*

[21] Jin Park, *I'm a Dreamer and a Rhodes Scholar. Where Do I Belong?*, THE N.Y. TIMES (Jan. 11, 2019), https://tinyurl.com/y76482pd.

12

## II. RESCINDING DACA WOULD HARM *AMICI'S* STUDENTS AND ALUMNI, AND DEPRIVE BOTH *AMICI* INSTITUTIONS AND THE COUNTRY OF THEIR PROMISE

### A. Ending DACA Would Have a Devastating Impact on DACA Students

DACA students are American in everything except immigration status. They came of age in this country, excelling in our elementary, middle and high schools. Still more, an amazing number of these young people have demonstrated their dedication to this country's ideals by actively engaging in its civic life to the full extent permitted by law. Even before their arrival on our campuses, many of *amici*'s students and alumni led voter registration drives, carried petitions, testified before state and federal legislative bodies, wrote letters to the editor, and participated in documentary film projects. And they continue to do so today—despite the potential consequences for themselves, their friends, and their loved ones. In short, many of these young people have engaged in precisely the kind of courageous civic activities that are crucial to the continued vitality of our democracy.

While DACA does not provide our students and alumni a path to citizenship, it does offer them a measure of security and access to opportunities for educational and professional development. As Juan Jose Martinez Guevara, a rising senior at Georgetown, whose goal is someday to "work for the government—to help achieve what is best for America in the world and to help make the world a safer place"—put it:

**AR4940**

13

> Thanks to DACA, I now have a part-time job on campus and can help ease the cost of college on my parents.  Thanks to DACA I can feel safe and confident while traveling, whether it be to attend school or to visit my family.  Thanks to DACA I can focus on my studies without worrying that it may all be taken away from me at any second.  I have always *thought* of myself as an American, but it is thanks to DACA that I can begin to truly *feel* like one, too.

The same goes for Barbara Olachea Lopez Portillo, who graduated last spring from Dartmouth, where she double-majored in film and media studies and sociology.  Barbara was the valedictorian of her high school class in Phoenix, Arizona, the secretary of her school's student government, and an active participant in various other extracurricular activities, including Inspire Arizona, an organization that promotes civic engagement.  Relying on her DACA status, Barbara is now pursuing a career in documentary filmmaking in Los Angeles.

Rescinding DACA would wrest from Juan, Barbara, and hundreds of thousands of strivers like them the sense of safety and possibility that they deserve and have come to rely on.  *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 486 (9th Cir. 2018) ("DACA also allows recipients to apply for authorization to work in this country legally, paying taxes and operating in the above-ground economy. ... [H]undreds of thousands of ... young people, trusting the government to honor its promises, leapt at the opportunity."); *Nat'l Ass'n for the Advancement of Colored People v. Trump*, 298 F. Supp. 3d 209, 240 (D.D.C. 2018) ("Because DHS failed to even

14

acknowledge how heavily DACA beneficiaries had come to rely on the expectation that they would be able to renew their DACA benefits, its barebones legal interpretation was doubly insufficient and cannot support DACA's rescission."); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 431 (E.D.N.Y. 2018) ("[E]ducational institutions have enrolled DACA recipients who, if they lose their DACA benefits, may be forced to leave the United States or may see little need to continue pursuing educational opportunities."); *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1046 (N.D. Cal. 2018) ("DACA recipients, their employers, their colleges, and their communities all developed expectations based on the possibility that DACA recipients could renew their deferred action and work authorizations for additional two-year periods."). Through no fault of their own, these young people would face the terrifying prospect of having to return to a life in which they have little chance of making the best use of their hard-earned skills and knowledge, or, worse still, being removed altogether and forced to make their way in a country that is wholly foreign to them.

Ending the DACA program also would send a clear message to the more than one million undocumented children in the United States that the trails *amici*'s students and alumni have blazed lead nowhere and are not worth following. That message is antithetical to the commitment to equal opportunity on which this country was founded, raising "the specter of a permanent caste of undocumented [immigrants] . . . denied the benefits that our society makes available to citizens and lawful residents." *Plyler v. Doe*, 457 U.S.

15

202, 218–19 (1982). Rather than serving our country's interests, rescinding DACA will deprive our society of the many contributions these young people are prepared and eager to make.

## B. Rescinding DACA Would Prevent Undocumented Students From Fully Benefitting From and Contributing To *Amici*'s Institutions

Consistent with their missions, *amici* are committed to providing a full and complete education to all of their enrolled students—anything less is insufficient to prepare them to identify and solve the consequential problems that *amici* expect their alumni to address over the course of their careers. DACA helps *amici* achieve this objective by making it possible for undocumented students to participate fully in educational work opportunities, such as off-campus internships and on-campus research with university faculty. It also allows them to conduct field work outside of the United States and participate in *amici*'s varied study abroad programs.[22] By participating in these experiences, students generate questions for further

---

[22] Indeed, *amici* have emphasized the importance of study abroad programs to better prepare students to build "global competence" and navigate careers in an interconnected world. *See, e.g.*, Northwestern University, *About the Global Learning Office*, https://tinyurl.com/y335nlrj (last visited Oct. 1, 2019); Vanderbilt University, *About the Global Education Office*, https://tinyurl.com/yyyzxvf3 (last visited Oct. 1, 2019) (Vanderbilt "is committed to preparing global citizens. . . ."); Emory University, *Study Abroad at Emory*, https://tinyurl.com/y5xm7uod (last visited Oct. 1, 2019) ("Education abroad experiences are essential to the development and preparation of students for future scholarship and careers.").

16

exploration during their time on campus and begin to chart their course for after graduation.

For instance, during his time at MIT, Jose Gomez, who came to the United States from northern Mexico when he was five years old, participated in MIT's Undergraduate Research Opportunity Program at the MIT Space Systems Laboratory, where, among other things, he participated as a flyer in a NASA reduced gravity flight. This work in turn resulted in Jose co-authoring a paper that was presented at an international conference in Vienna, Austria. Separately, due to DACA, Jose was eligible to participate in an externship at a startup company that develops robots to improve the efficiency of e-commerce order fulfillment. During this externship, Jose led the development of a tactile sensor kit for a robotic hand and designed and prototyped robotic finger mechanical components using 3D printed parts and rubber casting. Given this achievement, it is no surprise that the startup asked Jose to return as an applications engineer after he graduated with a Bachelor's of Aerospace Engineering in June 2017. Jose is now the primary software engineer for that company on a new barcode scanning technology that is being used by a large American retailer. His work is also integrated into products used by customers in North America, Europe, and Japan. Without DACA, Jose's story would not have been possible.

Paul Gastello has a similar story. Paul grew up in New York and was the first person in his family to go to college. He studied government at Dartmouth, but was unable to find a job through the on-campus re-

17

cruiting process his senior year because of his immigration status. For Paul, DACA changed everything. When DACA was announced, Paul decided to take a year off from college to gain the work experience that he needed to pursue a career in finance. During that year, Paul interned with a private investment management company and subsequently accepted an offer to return as a full-time employee after he graduated in 2014. Paul stayed with that company for four years before taking a job analyzing strategic financing opportunities for a startup company that operates an online marketplace for the sale of new and used clothing. Last spring, Paul was promoted to the position of strategic finance manager. Looking to the future, Paul's primary goal is to take care of his aging parents, who endured many hardships to give him access to freedom and economic security. DACA is vital to his ability to do so.

Dr. Dalia Larios was the first DACA recipient accepted to Harvard Medical School, where she pursued her passion: curing cancer. Indeed, remained in medical school for an extra year to study novel therapies for mesothelioma and lung cancer and has presented her research at numerous conferences and published several manuscripts. Today, Dr. Larios is a practicing physician at both Brigham and Women's Hospital and Massachusetts General Hospital, where she is completing a medical residency specializing in radiation oncology. Without DACA, Dalia would not be able to complete her training as a physician or treat the many patients who rely on her.

In addition to unlocking the full array of enriching

**AR4945**

18

activities that comprise a world-class higher education, deferred action under DACA empowers undocumented students to talk about their lived experiences without fear of retribution, adding meaningfully to the robust exchange of ideas that *amici* seek to cultivate on their campuses.  For instance, while attending the University of Pennsylvania's Wharton School of Business, class of 2014 graduate and DACA recipient Tania Chairez founded Penn for Immigrant Rights ("PIR"), an organization intended to "debunk misconceptions and connect immigration to current events."[23]  Under her leadership, PIR conducted "undocu-trainings . . . [to] mak[e] sure as many student leaders as possible know what it even means to be an undocumented person."[24]

True, numerous DACA students have continued to speak publicly about their immigration status despite the rescission memorandum—including the many students who agreed to the use of their name in this brief.  But the policy reversal places these students, and the many more whom these threats to DACA have silenced, in a position wholly at odds with the principles of academic freedom to which *amici* are fervently committed.  These students should not have to risk their own physical liberty—and that of their families—in order to tell their stories.

---

[23] Penn for Immigrant Rights, *Founders Statement*, https://tinyurl.com/y3gltspb (last visited Oct. 1, 2019).

[24] Laura Anthony, *Two Years Later, Tania Chairez Still 'Undocumented and Unapologetic'*, DAILY PENNSYLVANIAN (Apr. 17, 2014), https://tinyurl.com/y46uchbl.

19

## C. Rescinding DACA Would Deprive the Nation of Invaluable Resources

The DACA students at *amici* institutions—and the many thousands more enrolled at other colleges and universities—are by definition the product of this nation's education system and the communities that support it. Through the opportunities provided by American institutions of higher education all over this country, including *amici*'s, these young people now have the skills to give back—in ways big and small—to the country that raised them. And they want nothing more than the opportunity to do so. "[D]riving them out" now "would be throwing away a tremendous national investment" for no discernible benefit.[25]

Take Cristina Velasquez, whose mother brought her to Madison, Wisconsin, when she was six years old. In a letter to Senator Richard Durbin of Illinois, Cristina wrote that her values and attitude were shaped by the people surrounding her during her childhood, especially their "compassion, patience and hard work." During middle school, Cristina's family relocated to Florida, where she went on to graduate from high school with impeccable grades and a track record of community engagement, but she could not afford to attend college. After taking a gap year to focus on saving money, Cristina enrolled at Miami-Dade Community College before transferring to the Georgetown School of Foreign Service from which she graduated in 2017. While at Georgetown, Cristina

---

[25] Reif, *supra,* note 5.

20

spent both of her summers working with high-achieving, low-income middle school students, and received several awards for her academic achievement and commitment to public service. After graduation, Cristina returned to the classroom, where she is currently one of 240 DACA recipients teaching some of our nation's most marginalized and vulnerable youth through Teach for America.[26]

Consider, too, Alfredo Muniz, who arrived with his parents in Houston, Texas when he was only a year old and went on to earn a full scholarship to attend the University of Pennsylvania, from which he graduated in 2016 with undergraduate and graduate degrees in mechanical engineering and robotics. [27] While at Penn, Alfredo and a classmate developed XEED, a sensor-based system that collects and transmits data about limb movement in individuals with Parkinson's disease.[28] Healthcare professionals and patients can use this information to better assess the disease's progress and the effectiveness of treatment. The project, which has the potential to help hundreds of thousands of patients around the world, was awarded the 2016 University of Pennsylvania President's Innovation Prize, which was accompanied by

---

[26] *Durbin: Let's Show The American Dream Is Still Alive By Passing The Dream Act* (Sept. 12, 2017), https://tinyurl.com/y69m6nmd; Teach for America, *DACA Recipients*, https://tinyurl.com/yxkxbq75 (last visited Oct. 1, 2019).

[27] Amanda Mott, *Inaugural President's Innovation Prize Winners Announced at Penn*, PENNNEWS (Apr. 20, 2016), https://tinyurl.com/y5juheqm.

[28] *Id.*

21

$100,000 to support its further development.[29]

Stella Linardi is a rising sophomore at Cornell University, where she is majoring in industrial and labor relations. Because of DACA, Stella was able to intern for the California Labor Commissioner. This semester, she is putting that real-world experience to work while serving as a research assistant to a professor studying the gig-economy and digital hiring platforms. She aspires to someday become a lawyer.

And as a final example, take Blanca Morales. Blanca arrived in the United States when she was five years old. She "believed [her] teachers when they said that if [she] just worked hard enough, [she] could achieve great things."[30] Heeding their advice, Blanca graduated as the valedictorian of her community college class and with Latin honors from the University of California, Irvine, before receiving a full scholarship to attend Harvard Medical School.[31] Blanca's ultimate goal is to return to Santa Ana, California, the town where she grew up, to give back to its current residents the "opportunities" and "encouragement" that they gave her.[32] Without DACA, Blanca would

---

[29] Roberto Torres, *These 3 Companies Are Coming to the Pennovation Center*, TECHNICAL.LY (June 30, 2016), https://tinyurl.com/y2sa6sl6.

[30] Troy Parks, *Med Student 'Dreamers' Speak Out on Maintaining DACA Protections*, AMA WIRE (Feb. 13, 2017), https://tinyurl.com/zg8p8vd.

[31] *Id.*

[32] Greg Lee, *Undocumented Santa Ana Scholar Accepted to Harvard Medical School*, ABC NEWS (June 16, 2016), https://tinyurl.com/y5lcbqj7.

22

be "left to wonder if [she] will be deported" before she has the opportunity to do so.[33]  "When I received this white coat, I took an oath to act whenever there are injustices and to embrace my duty to advocate for patients," Blanca said.  "The end of DACA is an injustice to my future patients, because it threatens my ability to treat diabetes, to perform heart surgery or perhaps even cure cancer as a future physician."[34]

Cristina, Alfredo, Stella, Blanca, and countless others like them have "bound" themselves to this nation through their "hard work, perseverance, grit and determination to succeed."[35]  And this nation, in turn, has bound itself to them.  The United States now stands to benefit greatly by permitting the young people that it has raised "to put their skills to their highest use."[36]  "[F]orcing them to return to the shadows of our society" by ending the DACA program would be a tragic mistake.[37]

## CONCLUSION

For the foregoing reasons, rescinding the DACA program would impede *amici*'s ability to advance their missions, impose a direct harm on their current students and alumni, and deprive the United States of the benefit of DACA students' considerable

---

[33] Jake Miller, *White Coats for DACA*, HARVARD MED. SCH. NEWS (Sept. 14, 2017), https://tinyurl.com/y6rudqxv.

[34] *Id.*

[35] *Brown President Urges Trump to Continue DACA*, BROWN UNIV. NEWS (Aug. 30, 2017), https://tinyurl.com/yxcceope.

[36] Faust, *supra,* note 3.

[37] *Id.*

23

talents.  Accordingly, the Court should affirm the decisions below.

Respectfully submitted,

ANTON METLITSKY
 (*Counsel of Record*)
JENNIFER B. SOKOLER
CHARLES J. MAHONEY
DAVID Z. COHEN
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, N.Y. 10036
(212) 326-2000
ametlitsky@omm.com

October 3, 2019

AR4951

Nos. 18-587, 18-588, and 18-589

# In the Supreme Court of the United States

———————

DEPARTMENT OF HOMELAND SECURITY, ET AL.,

*Petitioners*,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,

*Respondents.*

———————

**On Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit**

**BRIEF OF 143 U.S. BUSINESS
ASSOCIATIONS AND COMPANIES
AS *AMICI CURIAE*
IN SUPPORT OF RESPONDENTS**

———————

ANDREW J. PINCUS
  *Counsel of Record*
  *Mayer Brown LLP*
  *1999 K Street, NW*
  *Washington, DC 20006*
  *(202) 263-3000*
  *apincus@mayerbrown.com*

KAREN W. LIN
  *Mayer Brown LLP*
  *1221 Avenue of the*
   *Americas*
  *New York, NY 10020*
  *(212) 506-2500*

*Counsel for* Amici Curiae

*Additional Captions Listed On Inside Cover*

**AR4952**

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

*Petitioners*,

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.,

*Respondents.*

_____

**On Writ of Certiorari to the
United States Court of Appeals
for the District of Columbia Circuit**

_____

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOME-LAND SECURITY, ET AL.,

*Petitioners*,

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL.,

*Respondents.*

_____

**On Writ of Certiorari to the
United States Court of Appeals
for the Second Circuit**

_____

**AR4953**

i

## TABLE OF CONTENTS

**Page**

INTEREST OF THE *AMICI CURIAE* ......................1

INTRODUCTION AND  SUMMARY OF ARGUMENT ............................................................2

ARGUMENT ............................................................3

I.  RESCINDING DACA WILL HARM U.S. COMPANIES AND THE ENTIRE ECONOMY....................................................3

    A.  Dreamers Contribute To The Success Of U.S. Companies And The Economy As A Whole..................................................5

    B.  Dreamers Help Grow The Economy By Filling Jobs That Otherwise Would Remain Vacant Due To An Insufficient Supply Of Workers. ..........................9

    C.  Rescinding DACA Will Inflict Enormous Harm On Individuals, Companies, And The Economy....................................15

II.  THE DACA RECISSION IS INVALID. ..............20

    A.  The Rescission Decision Is Subject To Judicial Review Under The APA. ..................21

    B.  The Rescission Decision Must Be Set Aside................................................26

CONCLUSION ........................................................31

AR4954

ii

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Arizona* v. *United States*,
  567 U.S. 387 (2012) .............................................28

*Barahona-Gomez* v. *Reno*,
  236 F.3d 1115 (9th Cir. 2001) .............................25

*Bonilla* v. *Lynch*,
  840 F.3d 575 (9th Cir. 2016) ...............................22

*Bowrin* v. *INS*,
  194 F.3d 483 (4th Cir. 1999) ...............................25

*Edison Elec. Inst.* v. *EPA*,
  996 F.2d 326 (D.C. Cir. 1993) .............................23

*Encino Motorcars, LLC* v. *Navarro*,
  136 S. Ct. 2117 (2016) .........................................26

*Epic Sys. Corp.* v. *Lewis*,
  138 S. Ct. 1612 (2018) .........................................22

*Fornalik* v. *Perryman*,
  223 F.3d 523 (7th Cir. 2000) ...............................25

*Heckler* v. *Chaney*,
  470 U.S. 821 (1985) .......................................21, 23

*Hotel & Rest. Emps. Union, Local 25* v. *Smith*,
  846 F.2d 1499 (D.C. Cir. 1988) (en banc) ....................................................................29

**AR4955**

iii

## TABLE OF AUTHORITIES—continued

**Page(s)**

*I.C.C.* v. *Brotherhood of Locomotive Engineers,*
  482 U.S. 270 (1987).........................................23, 24

*INS* v. *St. Cyr,*
  533 U.S. 289 ........................................................25

*Jennings* v. *Rodriguez,*
  138 S. Ct. 830 (2018)...........................................25

*Kenney* v. *Glickman,*
  96 F.3d 1118 (8th Cir. 1996)...............................23

*Kucana* v. *Holder,*
  558 U.S. 233 (2010)..............................................26

*Mach Mining, LLC* v. *EEOC,*
  135 S. Ct. 1645 (2015)..........................................26

*Marbury* v. *Madison,*
  5 U.S. 137 (1803).................................................22

*Montana Air Chapter No. 29* v. *Fed. Labor Relations Auth.,*
  898 F.2d 753 (9th Cir. 1990)...............................23

*Nat'l Wildlife Fed'n* v. *EPA,*
  980 F.2d 765 (D.C. Cir. 1992).............................23

*Reno* v. *American Arab Anti-Discrimination Committee,*
  525 U.S. 471 (1999).........................................25, 30

AR4956

iv

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Safe Air For Everyone* v. *EPA*,
   488 F.3d 1088 (9th Cir. 2007) .............................26

*SEC* v. *Chenery Corp.*,
   318 U.S. 80 (1943) ................................................26

*Sharkey* v. *Quarantillo*,
   541 F.3d 75 (2d Cir. 2008) ...................................23

*Texas* v. *United States*,
   809 F.3d 134 (5th Cir. 2015) ................................25

*Transitional Hosps. Corp. of La.* v.
   *Shalala*,
   222 F.3d 1019 (D.C. Cir. 2000) ...........................26

*Yale-New Haven Hosp.* v. *Leavitt*,
   470 F.3d 71 (2d Cir. 2006) ...................................26

## STATUTES, RULES AND REGULATIONS

5 U.S.C. § 701 ...........................................................21

6 U.S.C. § 202 ...........................................................27

8 U.S.C. § 1103 .........................................................28

8 U.S.C. § 1252 .........................................................24

8 U.S.C. § 1324a .......................................................31

49 U.S.C. § 30301 note ..............................................30

**AR4957**

v

## TABLE OF AUTHORITIES—continued

**Page(s)**

8 C.F.R. § 274a.12 ....................................................30

### MISCELLANEOUS

44 Fed. Reg. 43,480 ..................................................31

51 Fed. Reg. 39,385 ..................................................31

Alan Nelson, *Legalization and Family Fairness: An Analysis* 64 No. 41 Interpreter Releases 1191 (Oct. 21, 1987) ................................................29

American Immigration Council, *Executive Grants of Temporary Immigration Relief, 1956-Present* (Oct. 2014), https://goo.gl/Q87gqn ......................29

Andorra Bruno et al., CRS, *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* App'x (July 13, 2012), https://goo.gl/deiGYz ...........................................29

Ben Gitis & Jacqueline Varas, Am. Action Forum, *The Labor and Output Declines From Removing All Undocumented Immigrants* (May 5, 2016), https://goo.gl/UAt3dJ ................................19

**AR4958**

vi

**TABLE OF AUTHORITIES—continued**

**Page(s)**

Bob Davis, *The Thorny Economics of
    Illegal Immigration*, Wall St. J. (Feb.
    9, 2016) ................................................................ 18

Buttonwood, *Keep on Trucking*, The
    Economist (Feb. 11, 2012) ..................................... 10

Ctr. for Am. Progress, *Results of Tom K.
    Wong, United We Dream, National
    Immigration Law Center, and Center
    for American Progress National
    Survey* (2016), https://goo.gl/pe2i17 .................... 13

Dan Kosten, Nat'l Immigration Forum,
    *Immigrants as Economic
    Contributors: Immigrant Tax
    Contributions and Spending Power*
    (Sept. 6, 2018),
    https://tinyurl.com/ycohpups ................................. 4

David Bier, Cato Inst., *Ending DACA
    Will Impose Billions in Employer
    Compliance Costs* (Sept. 1, 2017),
    https://goo.gl/1FMidk ........................................... 17

David Bier, Cato Inst., *Five Myths
    About DACA* (Sept. 7, 2017),
    https://tinyurl.com/ydy2qx3q .............................. 10

**AR4959**

vii

**TABLE OF AUTHORITIES—continued**

**Page(s)**

David Dyssegaard Kalick, Americas
Soc'y/Council of the Americas,
*Bringing Vitality to Main Street:
How Immigrant Small Businesses
Help Local Economies Grow* (Jan.
2015) https://tinyurl.com/lzuglue .........................7

David Kenny, *Kenny: One Dreamer,
Weathering Two Storms*, Houston
Chronicle (Dec. 3, 2017),
https://goo.gl/562Pme...........................................14

Deloitte, *Waiter, Is That Inclusion in
My Soup? A New Recipe to Improve
Business Performance* (2013),
https://tinyurl.com/jnnszk4...................................6

*Economics A-Z Terms Beginning with L*,
The Economist,
https://goo.gl/BvRwKU........................................10

Francesc Ortega et al., *The Economic
Effects of Providing Legal Status to
DREAMers*, IZA Discussion Paper
No. 11281 (Jan. 2018),
https://tinyurl.com/y9kx52bz........................11, 17

Giovanni Peri, *The Effect of Immigrants
on U.S. Employment and
Productivity*, Fed. Reserve Bank of
San Francisco Econ. Letter (Aug. 30,
2010), https://goo.gl/jK17fc ...........................10, 15

**AR4960**

viii

## TABLE OF AUTHORITIES—continued

**Page(s)**

Gretchen Frazee, *4 Myths About How
Immigrants Affect the U.S. Economy,*
PBS NewsHour (Nov. 2, 2018),
https://tinyurl.com/yxlwzkth ...............................11

H.R. Rep. No. 111-157 (2009)....................................28

Heather Boushey & Sarah Jane Glynn,
Ctr. for Am. Progress, *There Are
Significant Business Costs to
Replacing Employees* (Nov. 16,
2012), https://goo.gl/ZSmRLq ..............................18

Ike Brannon & Logan Albright, The
Cato Inst., *The Economic and Fiscal
Impact of Repealing DACA* 1 (Jan.
18, 2017), https://goo.gl/jFXw4g ..........................16

*Interim Relief for Certain Foreign
Academic Students Adversely
Affected by Hurricane Katrina:
Frequently Asked Questions (FAQ)*
(Nov. 25, 2005),
https://tinyurl.com/y68s86cy................................30

Jacqueline Varas, Am. Action Forum,
*How Immigration Helps U.S.
Workers and the Economy* (Mar. 20,
2017), https://goo.gl/ovHQEh;.............................11

AR4961

ix

**TABLE OF AUTHORITIES—continued**

**Page(s)**

Jacqueline Varas, Am. Action Forum,
    *The Fiscal Implications of the DACA
    Program* (Jan. 18, 2018), https://ti-
    nyurl.com/y36tlgh9 ..............................................16

Jose Magaña-Salgado, Immigrant Legal
    Res. Ctr., *Money on the Table: The
    Economic Cost of Ending DACA* 4
    (2016), https://goo.gl/3ZwGVJ ......................16, 17

Jose Magaña-Salgado & Tom K. Wong,
    Immigration Legal Res. Cntr.,
    *Draining the Trust Funds* (Oct.
    2017), https://tinyurl.com/y6y65jvy....................16

Julia Gelatt, Migration Pol'y Inst., *All
    Eyes Turn to Congress, Following
    Trump Decision to Terminate DACA
    Program* (Sept. 2017),
    https://tinyurl.com/yyv89mjb..............................22

Katherine W. Phillips, *How Diversity
    Makes Us Smarter*, Scientific
    American (Oct. 1, 2014)
    https://tinyurl.com/zo3asdr ...................................6

Kenneth Megan, Bipartisan Policy Ctr.,
    *Immigration and the Labor Force*
    (Aug. 25, 2015),
    https://goo.gl/8p3SP8 ..........................................10

**AR4962**

x

**TABLE OF AUTHORITIES—continued**

**Page(s)**

ManpowerGroup, *2018 Talent Shortage Survey: Solving the Talent Shortage* (ManpowerGroup 2018), https://tinyurl.com/y8vxvvf7 ..............................12

Maria E. Enchautegui, *Immigrant and Native Workers Compete for Different Low-Skilled Jobs*, The Urban Institute: Urban Wire (Oct. 13, 2015), https://tinyurl.com/ycayp6ky ...................11

Martin Crutsinger, *Thanks to Consumers, the US Economy Is Still Rising Steadily,* USA Today (Aug. 29, 2019), https://ti-nyurl.com/y2ngbkch ...............................................8

Matthew Denhart, George W. Bush Institute, *America's Advantage: A Handbook on Immigration and Economic Growth* (3d ed., Sept. 2017), https://tinyurl.com/y4ykokn9 .........4, 11, 12

Mem. from Donald Neufeld, USCIS, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* (June 15, 2009), https://goo.gl/SHaCVZ.........................................30

AR4963

xi

**TABLE OF AUTHORITIES—continued**

**Page(s)**

Mem. from Elaine C. Duke, "Exercising
  Prosecutorial Discretion With
  Respect to Individuals Who Came to
  the United States as Children"
  (Sept. 5, 2017) .................................................... 20

Mem. from Gene McNary, Comm'r, INS,
  to Reg'l Comm'rs, *Family Fairness:
  Guidelines for Voluntary Departure
  under 8 CFR 242.5 for the Ineligible
  Spouses and Children of Legalized
  Aliens* (Feb. 2, 1990), 67 No. 6
  Interpreter Releases 153, app. I
  (Feb. 5, 1990) ..................................................... 29

Mem. from Janet Napolitano to David
  V. Aguilar (June 15, 2012),
  https://tinyurl.com/zzxfoue ................................... 2

Mem. from Michael D. Croning, INS, for
  Michael A. Perason, INS, *VTVPA
  Policy Memorandum #2—"T" and
  "U" Nonimmigrant Visas* (Aug. 30,
  2001), https://tinyurl.com/yxpztydf ................... 30

Mem. from Paul Virtue, INS, *Supple-
  mental Guidance on Battered Alien
  Self-Petitioning Process and Related
  Issues* (May 6, 1997), 74 No. 41 In-
  terpreter Releases 962 ........................................ 30

**AR4964**

xii

**TABLE OF AUTHORITIES—continued**

**Page(s)**

Michael A. Clemens, *Does Kicking Out Mexicans Create Jobs?*, Politico Magazine (Feb. 15, 2017), https://goo.gl/XwLj1x ..........................................19

Nat'l Fed'n of Indep. Bus., *Small Business Jobs Report: Small Business Owners' Difficulty Finding Qualified Workers Reaches Survey High in August* (Aug. 2019), https://tinyurl.com/y4l4kn9w ........................12, 15

Nat'l Fedn. Of Indep. Bus., *Small Business Optimism Index* (Aug. 2019), https://tinyurl.com/y72v3t69 ...................12

New Am. Economy, *Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis* (Mar. 29, 2017), https://tinyurl.com/y6275mgb.............................13

New Am. Economy, *Spotlight on the DACA-Eligible Population* (Feb. 8, 2018), https://tinyurl.com/y2fyhf9a .............5, 7, 15

Nicole Prchal Svajlenka et al., *A New Threat to DACA Could Cost States Billions of Dollars*, Ctr. for Am. Progress (July 21, 2017), https://goo.gl/7udtFu ...........................................16

**AR4965**

xiii

### TABLE OF AUTHORITIES—continued

**Page(s)**

Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States*, Ctr. for Am. Progress (Sept. 5, 2019), https://tinyurl.com/y4xc6sf4 ................8, 9, 13, 15

Nicole Prchal Svajlenka, *What We Know About DACA Recipients, By State*, Ctr. for Am. Progress (Sept. 12, 2019), https://tinyurl.com/yxttwcm9 ....................9

Nicole Prchal Svajlenka, *Without Action, More Dreamers Than Ever Before Could See Their DACA Expire in October*, Ctr. for Am. Progress, Aug. 15, 2019, https://tinyurl.com/y38uvt4s.................................4

*I Felt Like a Normal American Kid . . . Then Everything Changed*, THINKPolicy Blog (Oct. 9, 2017), https://goo.gl/oV9P7h ...........................................14

*My American Dream, Minus the Paperwork*, THINKPolicy Blog (Oct. 3, 2017), https://goo.gl/876JDm ..............................14

P'ship for a New Am. Econ., *Open for Business: How Immigrants Are Driving Business Creation in the United States* 12 (Aug. 2012), https://goo.gl/3mFkVz ...........................................4

**AR4966**

xiv

## TABLE OF AUTHORITIES—continued

**Page(s)**

Paul Krugman, Opinion, *Lumps of Labor*, N.Y. Times (Oct. 7, 2003), https://goo.gl/GyYTG5 ..........................................10

President's Council of Advisors on Science and Technology, *Report to the President: Engage to Excel: Producing One Million Additional College Graduates with Degrees in Science, Technology, Engineering, and Mathematics* (Feb. 2012), https://goo.gl/v2YRVD ..........................................13

President Dwight Eisenhower, *Statement Concerning the Entry Into the United States of Adopted Foreign-Born Orphans* (Oct. 26, 1956), https://goo.gl/BkztnZ ..............................29

Rachel Unruh & Amanda Bergson-Shilcock, Nat'l Skills Coalition, *Missing in Action* (Feb. 2015), https://goo.gl/gokfJW ..........................................12

Ryan Nunn, et al., *A Dozen Facts about Immigration*, Brookings, Inst. (Oct. 2018), https://tinyurl.com/y5ra3r8l .....................15

**AR4967**

xv

**TABLE OF AUTHORITIES—continued**

**Page(s)**

Sara McElmurry, Ctr. for Am. Progress,
*Proactive and Patient: Managing
Immigration and Demographic
Change in 2 Rural Nebraska
Communities*, Nov. 14, 2018,
https://tinyurl.com/y4lu3etx ..................................7

Sarah Bohn et al.*, Do E-Verify
Mandates Improve Labor Market
Outcomes of Low-Skilled Native and
Legal Immigrant Workers?* (May
2014), https://goo.gl/7UihSE ................................18

Sarah Elizabeth Richards, *How Fear of
Deportation Puts Stress on Families*,
The Atlantic (Mar. 22, 2017),
https://goo.gl/qDgeRf............................................17

Tiziana Rinaldi & Angilee Shah, *Immi-
gration Limbo Is a 'Tug of Emotions.'
It's Also a Mental Health Issue*,
*Mental Health Issue*, PRI's The
World (Aug. 22, 2017),
https://goo.gl/WLXMZ4; .......................................17

Tom K. Wong et al., Ctr. for Am.
Progress, *DACA Recipients'
Economic and Educational Gains
Continue to Grow* (Aug. 28, 2017),
https://tinyurl.com/y7dqgwd4 ................................5

**AR4968**

xvi

**TABLE OF AUTHORITIES—continued**

**Page(s)**

Tom K. Wong, et al., Ctr. for Am. Pro-
    gress, *DACA Recipients' Livelihoods,*
    *Families, and Sense of Security Are*
    *at Stake This November*, (Sept. 19,
    2019), https://tinyurl.com/y3c742re.......6, 8, 13, 14

Tom K. Wong et al., United We Dream,
    *Ending DACA Would Have Wide-*
    *Ranging Effects but Immigrant*
    *Youth are Fired Up and Politically*
    *Engaged* (Aug. 23, 2018),
    https://tinyurl.com/y49stg87...............................17

Tony Romm, *IBM CEO Ginni Rometty*
    *Is in D.C. Urging Congress to Save*
    *DACA* (Sept. 19, 2017),
    https://goo.gl/NQeJUc ..........................................14

U.S. Chamber of Commerce,
    *Immigration Myths and Facts*
    (Apr. 14, 2016),
    https://tinyurl.com/yay4xjm9...............................11

U.S. Citizenship & Immigration Serv.,
    Number of Form I-821D, Considera-
    tion of Deferred Action for Childhood
    Arrivals by Fiscal Year, Quarter, In-
    take and Case Status Fiscal Year
    2012-2019 (June 30, 2019), https://ti-
    nyurl.com/y5j36gyj..................................................2

**AR4969**

xvii

**TABLE OF AUTHORITIES—continued**

**Page(s)**

U.S. Dep't of Labor, Bureau of Labor
    Statistics, Employment Projections,
    https://tinyurl.com/y4lzn72u .............................15

U.S. Dep't of Labor, Bureau of Labor
    Statistics, *Labor Force Statistics
    from the Current Population Survey,*
    https://tinyurl.com/zyq5xlx (last
    visited Oct. 2, 2019) ..............................................11

U.S. Dep't of Labor, Bureau of Labor
    Statistics, *Job Openings and Labor
    Turnover Survey* (Sept. 10, 2019)
    https://tinyurl.com/y57pxqrb ........................11, 12

UndocuScholars Project, *In the
    Shadows of the Ivory Tower:
    Undocumented Undergraduates and
    the Liminal State of Immigration
    Reform* (2015),
    https://tinyurl.com/y7svqsxr ...............................14

World Health Org. & Int'l Labour Org.,
    *Mental Health And Work: Impact,
    Issues and Good Practices* (2000),
    https://goo.gl/ecH1Ut ...........................................17

**AR4970**

### INTEREST OF THE *AMICI CURIAE*[1]

*Amici* include 143 individual companies that collectively contribute trillions of dollars in annual revenue to the American economy and have millions of employees.

Some *amici* are business associations that together represent millions of companies that fuel the American economy—including the National Association of Manufacturers, the National Retail Federation, the Chamber of Commerce of the United States of America, the Retail Industry Leaders Association, the American Hotel & Lodging Association, BSA | The Software Alliance, the Information Technology Industry Council, TechNet, the National Association of State Latino Chambers of Commerce, the Software & Information Industry Association, the Semiconductor Industry Association, and the HR Policy Association.

The list of the *amici* is set forth in Appendix A.

Many *amici* and their members employ individuals who participate in the Deferred Action for Childhood Arrivals (DACA) program—young people who are now able to live and work in the country that has been their home for most of their lives. In addition, *amici*'s customers and end users are DACA recipients; and *amici*'s businesses benefit from DACA recipients' contributions to the overall economy through their tax payments, spending, and investments. Accordingly,

---

[1] No party or counsel for a party authored this brief in whole or in part, and no one other than *amici*, their members, or their counsel funded the preparation or submission of this brief. See Sup. Ct. R. 37.6. Counsel for petitioners and respondents have filed blanket consents to the filing of *amicus* briefs.

2

*amici* have a strong interest in DACA recipients' continued ability to work and participate in our country's economy and in our society generally.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Since its inception, DACA has had an enormous impact on the lives of over 825,000 young people who "were brought to this country as children and know only this country as home."[2] DACA enabled those young individuals to participate fully for the first time in all aspects of our society without the constant and crippling fear of deportation.[3] And, based on longstanding federal regulations ratified by Congress, the deferral of removal granted to DACA recipients made them eligible to apply for work authorization, thereby enabling them to obtain jobs commensurate with their skills and education.

But the beneficial effects of DACA have not been limited to those individuals. By expanding the opportunities available to DACA recipients, this program has benefitted America's companies, our Nation's economy, and all Americans. Indeed, employment of DACA recipients expands work opportunities for everyone, because employment is not a zero-sum game. DACA recipients are filling vacancies at companies that otherwise would not be able to attract workers for

---

[2] Mem. from Janet Napolitano to David V. Aguilar (June 15, 2012), https://tinyurl.com/zzxfoue; U.S. Citizenship & Immigration Serv., Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake and Case Status Fiscal Year 2012-2019 (June 30, 2019), https://tinyurl.com/y5j36gyj.

[3] Mem. from Janet Napolitano, *supra* n.2.

3

open positions. They are creating businesses that employ other Americans. And their increased wages lead to higher tax revenues and expansion of our national GDP—producing new jobs and benefits for all Americans.

Eliminating DACA will inflict serious harm on U.S. companies, all workers, and the American economy as a whole. Companies will lose valued employees. Workers will lose employers and co-workers. Our national GDP will lose up to $460.3 billion, and tax revenues will be reduced by approximately $90 billion, over the next decade.

Those harms should not occur, however, because the rescission of DACA must be set aside under the Administrative Procedure Act (APA). The Department of Homeland Security (DHS) rescinded DACA based entirely on its legal conclusion that DACA exceeds the agency's authority. That legal determination is subject to judicial review. Courts consistently review agencies' broadly-applicable policies that rest on such legal determinations.

And DHS's legal determination is wrong. DACA closely resembles deferred action programs adopted in the past, and—given Congress's express recognition of this deferred action authority and the Executive Branch's substantial authority with respect to immigration matters—it does not exceed the Department's statutory authority.

## ARGUMENT

## I. RESCINDING DACA WILL HARM U.S. COMPANIES AND THE ENTIRE ECONOMY.

Immigrants have long been essential to our Nation's growth and prosperity. They have contributed

**AR4973**

4

to important breakthroughs in science and innovation[4]; they have created businesses—including many Fortune 500 companies—that generate over $775 billion in sales and provide numerous jobs to others[5]; and they pay over $300 billion in yearly state, local, and federal taxes.[6]

Even though DACA is relatively new, DACA recipients—often referred to as "Dreamers"—have contributed significantly to America's prosperity.

DACA enabled more than 825,000 individuals[7] to come out of the shadows, participate in the economy, and contribute to U.S. companies and the economy, which benefits us all. Rescinding DACA will harm not only individual recipients and their families, friends, and co-workers, but also the many U.S. businesses

---

[4] Matthew Denhart, George W. Bush Institute, *America's Advantage: A Handbook on Immigration and Economic Growth* 70, 76 (3d ed., Sept. 2017), https://tinyurl.com/y4ykokn9.

[5] P'ship for a New Am. Econ., *Open for Business: How Immigrants Are Driving Business Creation in the United States* 12, 14 (Aug. 2012), https://goo.gl/3mFkVz; Denhart, *supra* n.4, at 84-100.

[6] Dan Kosten, Nat'l Immigration Forum, *Immigrants as Economic Contributors: Immigrant Tax Contributions and Spending Power* (Sept. 6, 2018), https://tinyurl.com/ycohpups.

[7] The number of DACA recipients has declined from over 800,000 in 2017 to approximately 661,000 today because eligible individuals who never had DACA are no longer able to apply for it, and many of those who did have it have either adjusted to permanent resident status or another status or did not renew or otherwise lost their DACA status. Nicole Prchal Svajlenka, *Without Action, More Dreamers Than Ever Before Could See Their DACA Expire in October*, Ctr. for Am. Progress, Aug. 15, 2019, https://tinyurl.com/y38uvt4s.

5

that count on them to help fuel continued innovation and economic growth.

### A. Dreamers Contribute To The Success Of U.S. Companies And The Economy As A Whole.

Dreamers have become essential contributors to American companies and the American economy. Prior to DACA, these young people—who have obtained at least a high school degree and, in many cases, have finished college and graduate school—would have been unable to obtain work authorization, and therefore unable to put their education and skills to productive use.

DACA changed that and, as a result, over 90 percent of Dreamers are employed in virtually every sector of the economy—from construction workers to nurses to cooks to computer scientists.[8] Their employment supports the growth of U.S. companies and the economy in a number of ways.

#### 1. *Dreamers Are Valued Employees.*

*First*, Dreamers contribute directly to the success of U.S. companies, including many *amici*. At least 72 percent of the top 25 Fortune 500 companies employ DACA recipients—including IBM, Walmart, Apple, General Motors, Amazon, JPMorgan Chase, Home Depot, and Wells Fargo, among others—as do many others, including Uber and Lyft.[9] Those companies

---

[8] New Am. Economy, *Spotlight on the DACA-Eligible Population* (Feb. 8, 2018), https://tinyurl.com/y2fyhf9a.

[9] Tom K. Wong et al., Ctr. for Am. Progress, *DACA Recipients' Economic and Educational Gains Continue to Grow* (Aug. 28, 2017), https://tinyurl.com/y7dqgwd4.

AR4975

6

represent every major sector of the U.S. economy and generate almost $3 trillion in annual revenue.

Dreamers' contributions are not limited to their work product alone. Immigrants like Dreamers bring diverse backgrounds and experiences to their workplaces, which bolster their colleagues' creativity and innovation.[10] People with different backgrounds offer different perspectives when confronted with a problem, and their different opinions and perspectives enable colleagues to anticipate alternative possibilities and work harder to evaluate those possibilities.[11]

### 2.   *Dreamers Are Business Owners.*

*Second*, many Dreamers are entrepreneurs, who have created companies themselves. Six percent of Dreamers (and nearly nine percent of Dreamers 25 years and older) started their own businesses after receiving DACA.[12] Those businesses create jobs for other U.S. residents: Each DACA business owner with full-time employees employs on average 4.5 other workers.[13] That is nearly 86,000 additional jobs that otherwise would not exist.

---

[10]   See Katherine W. Phillips, *How Diversity Makes Us Smarter*, Scientific American, Oct. 1, 2014, https://tinyurl.com/y4vrn8q2.

[11]   *Ibid.*; see also Deloitte, *Waiter, Is That Inclusion in My Soup? A New Recipe to Improve Business Performance* 8 (2013), https://tinyurl.com/jnnszk4.

[12]   Tom K. Wong, et al., Ctr. for Am. Progress, *DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November* (Sept. 19, 2019), https://tinyurl.com/y3c742re; *see also* New Am. Economy, *Spotlight, supra* n.8 (4.5 percent of DACA-eligible individuals are entrepreneurs).

[13]   Wong, *Livelihoods, supra* n.12.

7

The businesses started by Dreamers also generate revenue: In 2015, DACA-eligible entrepreneurs had a total business income of $658.7 million.[14] Those funds are spent on wages, or goods and services from other companies, or reinvested, producing more overall growth.

This entrepreneurial activity is particularly focused on the local, small business level. Immigrants make up an outsized proportion of Main Street business owners.[15] Those businesses attract others in the community, which often helps to revitalize declining neighborhoods and reverse declining population trends.[16] Immigrant-owned businesses have revived communities from Philadelphia to Lexington, Nebraska to Minneapolis-St. Paul to Nashville.[17]

### 3.   *Dreamers Are Consumers.*

*Third*, Dreamers also consume the goods produced and services provided by U.S. companies—contributing to the growth of those companies and the economy as a whole.

Not surprisingly, receiving a grant of deferred action under DACA—and the resulting eligibility to ap-

---

[14] New Am. Economy, *Spotlight, supra* n. 8.

[15] David Dyssegaard Kalick, Americas Soc'y/Council of the Americas, *Bringing Vitality to Main Street: How Immigrant Small Businesses Help Local Economies Grow* at 2, 5, 8-9, Jan. 2015, https://tinyurl.com/lzuglue.

[16] *Id.* at 12.

[17] *Id.* at 14-34; Sara McElmurry, Ctr. for Am. Progress, *Proactive and Patient: Managing Immigration and Demographic Change in 2 Rural Nebraska Communities*, Nov. 14, 2018, https://tinyurl.com/y4lu3etx.

AR4977

8

ply for work authorization—increases Dreamers' incomes. Fifty-eight percent of recently-surveyed Dreamers were able to obtain better-paying jobs; 53 percent were able to move to a job that "better fits [their] education and training."[18] That, in turn, resulted in average wage increases for Dreamers of 86 percent—128 percent for those 25 years and older—after receiving DACA.[19] In total, Dreamers and their households exercise $24.1 billion in spending power (income remaining after paying taxes) each year.[20]

This increased purchasing power—combined with the increased stability and security resulting from receiving a grant of deferred action—has enabled Dreamers to make purchases and investments that grow our Nation's economy.

Consumer spending accounts for nearly 70 percent of all economic growth.[21] Sixty percent of Dreamers reported buying their first car after receiving DACA; fourteen percent reported purchasing their first home.[22] Dreamers are responsible for $613.8 million in annual mortgage payments, on top of $2.3 billion in rental payments to landlords.[23]

---

[18] Wong, *Livelihoods*, *supra* n.12.

[19] *Id.*

[20] Nicole Prchal Svajlenka, Ctr. for Am. Progress, *What We Know About DACA Recipients in the United States (*Sept. 5, 2019*)*, https://tinyurl.com/y4xc6sf4.

[21] Martin Crutsinger, *Thanks to Consumers, the US Economy Is Still Rising Steadily,* USA Today (Aug. 29, 2019), https://tinyurl.com/y2ngbkch.

[22] Wong, *Livelihoods*, *supra* n.12.

[23] Svajlenka, *supra* n.20.

AR4978

9

Dreamers' higher wages also result in increased fiscal contributions in the form of taxes. Dreamers and their households pay $5.7 billion in federal taxes and $3.1 billion in state and local taxes annually.[24] In 41 states and the District of Columbia, the state and local tax contributions of Dreamers' households total more than $1 million annually; in 35 states, their contributions are more than $10 million; and in 12 states, they are more than $50 million.[25] These taxes support American communities and the people and companies in those communities—funding local schools, infrastructure investments, and services and programs like police, fire protection, and economic development. DACA recipients' payroll taxes also support Social Security and Medicare.

Through these myriad contributions, Dreamers post-DACA have supported the growth and success of the U.S. economy.

## B. Dreamers Help Grow The Economy By Filling Jobs That Otherwise Would Remain Vacant Due To An Insufficient Supply Of Workers.

These benefits to the U.S. economy do not come at the expense of U.S.-born workers. Studies have consistently found that immigrants do not displace U.S.-born workers. They instead help grow the economy and create more opportunities for U.S.-born workers by filling positions that otherwise would remain vacant because of a shortage of qualified workers.

---

[24] Svajlenka, *supra* n.20.

[25] Nicole Prchal Svajlenka, Ctr. for Am. Progress, *What We Know About DACA Recipients, By State* (Sept. 12, 2019), https://tinyurl.com/yxttwcm9.

10

1. *DACA Recipients' Participation In The Workforce Expands The Number Of Jobs Available To Everyone.*

"[O]ne of the best-known fallacies in economics" is the "lump of labor fallacy."[26] Economists from across the policy and political spectrum have discredited the notion that "there is a fixed amount of work to be done—a lump of labour"—such that an increase in the number of workers reduces the number of available jobs.[27] Rather, the indisputable reality is that jobs beget more jobs. "When people work for a living, they earn money. They spend that money on goods and services that are produced by other people."[28] That greater demand for goods and services in turn creates more jobs.

That has long been America's experience. "From 1970 to 2017, the U.S. labor force doubled. Rather than ending up with a 50 percent unemployment rate, U.S. employment doubled."[29] Studies demonstrate

---

[26] *Economics A-Z Terms Beginning with L*, The Economist, https://goo.gl/BvRwKU.

[27] *Id.*; *see also* Paul Krugman, Opinion, *Lumps of Labor*, N.Y. Times (Oct. 7, 2003), https://goo.gl/GyYTG5.

[28] Buttonwood, *Keep on Trucking*, The Economist (Feb. 11, 2012), https://goo.gl/x8vqaL; *see also* Kenneth Megan, Bipartisan Policy Ctr., *Immigration and the Labor Force* (Aug. 25, 2015), https://goo.gl/8p3SP8 ("[A] breadth of research indicates that immigration can be complementary to native born employment, as it spurs demand for goods and services"); Giovanni Peri, *The Effect of Immigrants on U.S. Employment and Productivity*, Fed. Reserve Bank of San Francisco Econ. Letter (Aug. 30, 2010), https://goo.gl/jK17fc.

[29] David Bier, Cato Inst., *Five Myths About DACA* (Sept. 7, 2017), https://tinyurl.com/ydy2qx3q.

11

that increased immigration levels into the U.S. have had largely *positive* impacts on the employment levels and incomes of U.S.-born workers.[30]

These findings hold true today. The unemployment rate has more than halved since 2012, when DACA was first implemented.[31] The number of total job openings has increased.[32] And studies have found that DACA has not had any significant effect on the wages of U.S.-born workers.[33]

### 2.   *Dreamers Fill Critical Labor Shortages.*

Studies repeatedly show that immigrants complement, rather than compete with, U.S.-born workers in the workforce.[34] The same holds true for Dreamers,

---

[30] *See* Jacqueline Varas, Am. Action Forum, *How Immigration Helps U.S. Workers and the Economy* (Mar. 20, 2017), https://goo.gl/ovHQEh; U.S. Chamber of Commerce, *Immigration Myths and Facts* (Apr. 14, 2016), https://tinyurl.com/yay4xjm9.

[31] U.S. Dep't of Labor, Bureau of Labor Statistics, *Labor Force Statistics from the Current Population Survey,* https://tinyurl.com/zyq5xlx (last visited Oct. 2, 2019).

[32] U.S. Dep't of Labor, Bureau of Labor Statistics, *Job Openings and Labor Turnover Survey* (Sept. 10, 2019) https://tinyurl.com/y57pxqrb.

[33] Francesc Ortega et al., *The Economic Effects of Providing Legal Status to DREAMers* 18, IZA Discussion Paper No. 11281 (Jan. 2018), https://tinyurl.com/y9kx52bz.

[34] Denhart, supra n.4, at 118; Gretchen Frazee, *4 Myths About How Immigrants Affect the U.S. Economy,* PBS NewsHour (Nov. 2, 2018), https://tinyurl.com/yxlwzkth; Maria E. Enchautegui, *Immigrant and Native Workers Compete for Different Low-Skilled Jobs*, The Urban Institute: Urban Wire (Oct. 13, 2015), https://tinyurl.com/ycayp6ky; U.S. Chamber of Commerce, *supra* n.30.

12

who are helping to fill holes in the workforce that are *not* being filled by U.S.-born workers.

U.S. job creation has been outpacing supply. As a result, the U.S. unemployment rate is currently quite low, and the number of job openings is high. In June 2019, the U.S. had 7.4 million job openings, but only 6 million people looking for work.[35] Sixty-four percent of small business owners reported hiring or trying to hire workers, but of those, 89 percent reported having "few or no 'qualified' applicants."[36] This gap in demand and supply has led commentators to state that "[i]f the widely discussed slowdown occurs, a significant contributor will be the unavailability of labor."[37] Moreover, that gap is likely to be exacerbated as the "baby boom" generation retires.[38]

U.S. employers have reported particular difficulty filling skilled labor positions, such as teachers, accounting and finance staff, nurses, and engineers.[39]

---

[35] U.S. Dep't of Labor, *supra* n.32..

[36] Nat'l Fed'n of Indep. Bus., *Small Business Optimism Index* (Aug. 2019), https://tinyurl.com/y72v3t69.

[37] Nat'l Fed'n of Indep. Bus., *supra* n.36.

[38] Denhart, *supra* n.4, at 60.

[39] Nat'l Fed'n of Indep. Bus., *Small Business Jobs Report: Small Business Owners' Difficulty Finding Qualified Workers Reaches Survey High in August* (Aug. 2019), https://tinyurl.com/y4l4kn9w (Thirty-three percent of small business owners have job openings for skilled workers); *See* ManpowerGroup, *2018 Talent Shortage Survey: Solving the Talent Shortage* (ManpowerGroup 2018), https://tinyurl.com/y8vxvvf7; see also Rachel Unruh & Amanda Bergson-Shilcock, Nat'l Skills Coalition, *Missing in Action* 3-4 (Feb. 2015), https://goo.gl/gokfJW.

AR4982

13

And the U.S. faces a shortfall of *millions* of professionals in the science, technology, engineering, and mathematics (STEM) fields in the next few years.[40]

Dreamers help to fill these unfilled positions. Dreamers have at least a high school degree or equivalent—and 46 percent have obtained a bachelor's degree or higher.[41] Twenty percent have received professional licenses since receiving DACA.[42] In other words, they are qualified for the skilled labor jobs for which there is a severe shortage of workers.

Reality reflects Dreamers' paper qualifications. A significant number of Dreamers are employed in the education and health services industries, as well as in management and business occupations.[43] Many others work in technology, science, and finance.[44]

*Amici*'s experiences are illustrative. For example, IBM has at least 31 Dreamers within the company who work in areas such as software development and

---

[40] New Am. Economy, *Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis* (Mar. 29, 2017), https://tinyurl.com/y6275mgb; see also President's Council of Advisors on Science and Technology, *Report to the President: Engage to Excel: Producing One Million Additional College Graduates with Degrees in Science, Technology, Engineering, and Mathematics* 1 (Feb. 2012), https://goo.gl/v2YRVD.

[41] Wong, *Livelihoods*, *supra* n.12.

[42] Wong, *Livelihoods*, *supra* n.12.

[43] Svajlenka, *supra* n.20; Ctr. for Am. Progress, *Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey* 4 (2016), https://goo.gl/pe2i17.

[44] Ctr. for Am. Progress, *Results, supra* n.43.

14

client support.[45] One IBM Dreamer provided critical remote technical support to ensure continuity of IBM's Cloud services when Hurricane Harvey flooded Houston.[46] Lyft employs at least one Dreamer as a software engineer, who serves as one of the tech leads of the team driving critical data projects.[47]

And Dreamers' contributions to these fields will likely only increase. By making it possible for Dreamers to apply for work authorization, DACA has made pursuing higher education both possible and worthwhile for Dreamers. Forty percent are currently in school—almost all of whom are working toward a bachelor's or post-graduate degree.[48] And a substantial portion of those individuals are pursuing studies in STEM fields—acquiring the knowledge and skills that U.S. companies so desperately need to continue to innovate and stay competitive.[49]

Dreamers in occupations that do not require advanced degrees are similarly filling under-met labor needs. Sixty-eight percent of small business owners

---

[45] *See* Tony Romm, *IBM CEO Ginni Rometty Is in D.C. Urging Congress to Save DACA*, Recode.net (Sept. 19, 2017), https://goo.gl/NQeJUc; *My American Dream, Minus the Paperwork*, THINKPolicy Blog (Oct. 3, 2017), https://goo.gl/876JDm; *I Felt Like a Normal American Kid . . . Then Everything Changed*, THINKPolicy Blog (Oct. 9, 2017), https://goo.gl/oV9P7h.

[46] See David Kenny, *Kenny: One Dreamer, Weathering Two Storms*, Houston Chronicle (Dec. 3, 2017), https://goo.gl/562Pme.

[47] *See* Decl. of Emily Nishi ¶ 4, JA1099, Doc. 54, *Batalla Vidal v. Nielsen*, No. 18-485 (2d Cir. Mar. 7, 2018).

[48] Wong, *Livelihoods*, *supra* n.12.

[49] The UndocuScholars Project, *In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration Reform* 8 (2015), https://tinyurl.com/y7svqsxr.

15

reported having "few or no qualified applicants" for construction jobs.[50] Construction, meanwhile, is the second largest industry employing DACA-eligible individuals.[51] Additionally, there are significant labor shortages in food preparation and serving-related occupations and personal care and services occupations.[52] But "[a]mong less-educated workers, those born in the United States tend to have jobs in manufacturing or mining, while immigrants tend to have jobs in personal services and agriculture."[53] And a substantial proportion of Dreamers have jobs in food preparation.[54]

In sum, DACA has enabled thousands of young people who grew up in the United States to obtain jobs that fill critical gaps in the economy and that produce benefits for United States' workers, companies, and economy.

## C. Rescinding DACA Will Inflict Enormous Harm On Individuals, Companies, And The Economy.

All of the above benefits—and more—will be lost if DACA's rescission is permitted to stand. Over the next decade, our country's GDP would lose between $215 and $460.3 billion; and federal tax revenue will

---

[50] Nat'l Fed'n of Indep. Bus., *supra* n.39.

[51] New Am. Economy, *Spotlight, supra* n.8; *cf.* Ryan Nunn, et al., *A Dozen Facts about Immigration* (Oct. 2018), https://tinyurl.com/y5ra3r8l.

[52] U.S. Dep't of Labor, Bureau of Labor Statistics, Employment Projections, https://tinyurl.com/y4lzn72u.

[53] Peri, *supra* n.28.

[54] Svajlenka, *supra* n.20.

16

drop by approximately \$60 to 90 billion.[55] Texas alone would lose \$6.3 billion in GDP; California would experience a \$11.6 billion decline in GDP.[56] And Social Security and Medicare contributions would lose out on \$40.9 billion over 10 years.[57]

This economic contraction would result directly from Dreamers' loss of work authorization. Under federal law, employers are prohibited from employing individuals who do not have a valid work authorization document. Accordingly, all of the hundreds of thousands of employed Dreamers would lose their jobs. In addition to the obvious harm to Dreamers themselves, the loss of so many workers will have severe repercussions for U.S. companies and workers.

Already, the possibility that DACA's rescission might go into effect is impacting Dreamers and, by extension, the companies for which they work. Dream-

---

[55] See Decl. of Ike Brannon & Logan Albright ¶ 11, Doc. 45-3 at 359, *Regents of the Univ. of Calif.* v. *U.S. Dep't of Homeland Sec'y*, No. 18-18056 (9th Cir. Mar. 13, 2018); Nicole Prchal Svajlenka et al., Ctr. for Am. Progress, *A New Threat to DACA Could Cost States Billions of Dollars* (July 21, 2017), https://goo.gl/7udtFu; Jose Magaña-Salgado, Immigrant Legal Res. Ctr., *Money on the Table: The Economic Cost of Ending DACA* 4, 6-7 (2016), https://goo.gl/3ZwGVJ; see also Ike Brannon & Logan Albright, The Cato Inst., *The Economic and Fiscal Impact of Repealing DACA* 1 (Jan. 18, 2017), https://goo.gl/jFXw4g; Jacqueline Varas, Am. Action Forum, *The Fiscal Implications of the DACA Program* (Jan. 18, 2018), https://tinyurl.com/y36tlgh9.

[56] Svajlenka et al., *supra* n.55.

[57] Jose Magaña-Salgado & Tom K. Wong, Immigration Legal Res. Cntr., *Draining the Trust Funds* (Oct. 2017), https://tinyurl.com/y6y65jvy.

17

ers now live with the constant threat of job loss, withdrawal from society, and forced removal from the only country they have ever known.

Seventy-six percent of Dreamers reported living with the daily worry of being separated from their children.[58] The fear for the future that is now a daily part of life for Dreamers and their families affects both physical and mental health.[59] That, in turn, negatively affects employee productivity and performance, illness and absenteeism, accidents, and turnover.[60]

If this Court permits the DACA rescission to take effect and thereby end Dreamers' work authorization, companies will face an estimated $6.3 billion in costs to replace Dreamers—if they can even find new employees to fill the empty positions.[61] Companies will forfeit the funds invested in training Dreamers, and will incur costs recruiting and training new employees, who will be less experienced and therefore less

---

[58] Tom K. Wong et al., United We Dream, *Ending DACA Would Have Wide-Ranging Effects but Immigrant Youth are Fired Up and Politically Engaged* (Aus. 23, 2018), https://tinyurl.com/y49stg87.

[59] See Tiziana Rinaldi & Angilee Shah, *Immigration Limbo Is a 'Tug of Emotions.' It's Also a Mental Health Issue*, PRI's The World (Aug. 22, 2017), https://goo.gl/WLXMZ4; Sarah Elizabeth Richards, *How Fear of Deportation Puts Stress on Families*, The Atlantic (Mar. 22, 2017), https://goo.gl/qDgeRf.

[60] See World Health Org. & Int'l Labour Org., *Mental Health And Work: Impact, Issues and Good Practices* 1 (2000), https://goo.gl/ecH1Ut; Ortega, *supra* n.33, at 9-10.

[61] See David Bier, *Ending DACA Will Impose Billions in Employer Compliance Costs*, Cato Institute (Sept. 1, 2017), https://goo.gl/1FMidk; *see also* Magaña-Salgado, *supra* n.55, at 4.

18

productive.[62] These costs are particularly burdensome for small businesses.

But numbers alone do not come close to capturing Dreamers' contributions and the tremendous harm that will result from their loss. People are the heart of every business; and every company's goal is to create teams that work seamlessly together—teams in which colleagues support one another both within and outside the workplace. Ripping Dreamers out of their jobs hurts not only Dreamers, but other employees who lose friends and colleagues, and companies that lose trusted members of their teams.

History confirms that forcing Dreamers out of the workforce will reduce job growth and harm the U.S. economy. After Arizona passed the Legal Arizona Workers Act (LAWA) in 2007, which targeted the use of unauthorized workers, economic growth fell, reducing job opportunities. The State's total employment was 2.5 percent less than what it would have been without the law, and its GDP was reduced by an average of 2 percent a year between 2008 and 2015.[63]

Similarly, in 1964, the U.S. expelled Mexican *braceros*, who were previously permitted to work temporarily in the U.S., mostly on farms. One study revealed that excluding the Mexican *braceros* "did not

---

[62] Heather Boushey & Sarah Jane Glynn, Ctr. for Am. Progress, *There Are Significant Business Costs to Replacing Employees* (Nov. 16, 2012), https://goo.gl/ZSmRLq.

[63] See Bob Davis, *The Thorny Economics of Illegal Immigration*, Wall St. J. (Feb. 9, 2016), https://goo.gl/j4dd7J; see also Sarah Bohn et al*., Do E-Verify Mandates Improve Labor Market Outcomes of Low-Skilled Native and Legal Immigrant Workers?* 17-18, 21, 24-25 (May 2014), https://goo.gl/7UihSE (finding that employment rates of U.S.-born men dropped post-LAWA).

AR4988

19

affect the wages or employment of U.S. farmworkers."[64] Instead, farms responded by *eliminating* the jobs—often by moving production abroad or going out of business.[65]

Removing Dreamers from the workforce is likely to have the very same negative effect on U.S. employment. As documented above, companies are already struggling to fill job openings; additional labor shortages will further hamper productivity and growth. The resulting drag on the economy will be exacerbated as Dreamers are forced to shutter businesses—putting the jobs of nearly 86,000 other U.S. workers at risk—and companies lose the income from Dreamers and Dreamers' employees that has helped drive demand and production of goods and services provided by U.S.-born workers.[66]

More fundamentally, just as DACA sent a powerful message of inclusion, its rescission tells the immigrants who have been integral to the growth and development of our society and economy for decades that they are no longer welcome here. As a result, DACA's

---

[64] Michael A. Clemens, *Does Kicking Out Mexicans Create Jobs?*, Politico Magazine (Feb. 15, 2017), https://goo.gl/XwLj1x.

[65] *Id.*

[66] Cf. Ben Gitis & Jacqueline Varas, Am. Action Forum, *The Labor and Output Declines From Removing All Undocumented Immigrants* (May 5, 2016), https://goo.gl/UAt3dJ (concluding that removing undocumented immigrants from the workforce would cause private sector employment to decline by 4 to 6.8 million workers, would reduce real private sector output by $381.5 to $623.2 billion, and would have further negative economic impacts through the loss of consumption, investments, and entrepreneurship).

20

rescission will reduce the future ability of U.S. companies to attract individuals from around the world to support America's continued economic growth and prosperity.

## II.  THE DACA RECISSION IS INVALID.

DHS's decision to rescind DACA did not rest on a change in immigration enforcement priorities, or a reassessment of the policy's costs and benefits, or the financial cost to the federal government of administering DACA. Rather, as the Ninth Circuit and the District Courts for the District of Columbia and Eastern District of New York correctly recognized,[67] DHS rested its decision on the legal conclusion that DACA "was effectuated * * * without proper statutory authority" and therefore "was an unconstitutional exercise of authority by the Executive Branch."[68]

Because of the across-the-board nature of the rescission determination and the particular justification given by DHS, that decision is subject to judicial review. And because of the Executive Branch's broad authority with respect to the relevant immigration matters, the long history of administrative grants of deferred action and work authorization, and Congress's

---

[67] 18-587 Pet. Supp. Br. App. 35a-43a; 18-588 Pet. App. 39a-42a, 97a; 18-589 Pet. App. 26a-27a, 94a.

[68] Mem. from Elaine C. Duke, Acting Secretary, Dep't of Homeland Security, on Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017).

21

express recognition of that authority, the agency's rescission decision must be vacated.[69]

## A.  The Rescission Decision Is Subject To Judicial Review Under The APA.

The rescission of DACA—like all agency action—is subject to review under the APA unless it falls within one of two narrow exceptions: "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."  5 U.S.C. § 701(a).

Pointing to this Court's decision in *Heckler* v. *Chaney*, 470 U.S. 821 (1985), the government argues that its rescission of DACA is a "decision not to prosecute or enforce" that is "generally committed to an agency's absolute discretion" and "unsuitab[le] for judicial review." U.S. Br. at 18 (quoting *Chaney*, 470 U.S. at 831).

*Chaney* stated that an agency's decision not to enforce the law is "generally" unreviewable, but carefully refrained from holding that *all* refusals to enforce are unreviewable. And the Court expressly *declined* to hold unreviewable a refusal to enforce based on the belief that the agency lacked jurisdiction, observing that such decisions might not be "committed to agency discretion." 470 U.S. at 833 n.4.

Judicial review is available here, because three aspects of the agency decision combine to render the general *Chaney* rule inapplicable.

---

[69] For the reasons explained by Judge Bates (see 18-588 Pet. App. 103a-108a), the June 2018 memorandum issued by Secretary of Homeland Security Nielsen did not provide a justification for the rescission decision other than that set forth in the initial rescission memorandum—that the DACA program is unlawful because it exceeds the Department's authority.

22

*First*, the decision to rescind DACA is a broad policy determination, not an individualized exercise of enforcement discretion. And that policy determination directly affects the lives of close to two million people—current DACA recipients and individuals who would be entitled to apply for DACA status.[70] It is therefore fundamentally different from the archetypal decision not to prosecute an individual or not to enforce a statute with respect to a particular set of facts.

*Second*, the rescission decision rested on a purely legal determination. There accordingly is no risk that judicial review would require assessment of the policy considerations or fact-based exercises of discretion that frequently underlie such decisions.

Courts are fully qualified to review an agency's interpretation of a statute or the Constitution. See, *e.g, Epic Sys. Corp.* v. *Lewis*, 138 S. Ct. 1612, 1629-30 (2018). Indeed, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury* v. *Madison*, 5 U.S. 137, 177 (1803).

A long line of lower court decisions apply this principle, holding that agency actions that are generally unreviewable—if based on the agency's evaluation of factual and policy factors—nonetheless are reviewable when based on a legal interpretation, including a legal determination regarding the agency's jurisdiction or authority.[71]

---

[70] See Julia Gelatt, Migration Pol'y Inst., *All Eyes Turn to Congress, Following Trump Decision to Terminate DACA Program* (Sept. 2017), https://tinyurl.com/yyv89mjb.

[71] See, *e.g.*, *Bonilla* v. *Lynch*, 840 F.3d 575, 587 (9th Cir. 2016) (holding reviewable BIA's decision not to exercise its sua sponte

AR4992

23

The government is wrong in asserting (U.S. Br. 23-25) that *I.C.C.* v. *Brotherhood of Locomotive Engineers*, 482 U.S. 270 (1987), supports its contention that the DACA rescission is not reviewable. That case involved a decision *not to reconsider* a prior decision interpreting a statute. The legal question resolved in the initial determination "could have been brought [before the court] by appeal from the original order." *Id.* at 279. In that very different context, the fact that the Commission based its refusal to reconsider the un-

---

authority to open the petitioner's motion to reopen his order of removal where the BIA did not deny the motion "as an exercise of discretion," but rather based on the "conclu[sion] that it lacked the authority to reopen"); *Montana Air Chapter No. 29* v. *Fed. Labor Relations Auth.*, 898 F.2d 753, 756 (9th Cir. 1990) (holding that *Chaney* does not apply to decisions "based on a belief that the agency lacks jurisdiction" or "an agency's statutory interpretations made in the course of nonenforcement decisions"); *Sharkey* v. *Quarantillo*, 541 F.3d 75, 85, 91 (2d Cir. 2008) (holding reviewable USCIS's rescission of plaintiffs' lawful permanent resident (LPR) status where decision was based on agency's "*nondiscretionary decision*[]" that plaintiff did not have LPR status within meaning of rescission statute and regulation); *Edison Elec. Inst.* v. *EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993) ("[I]nterpretation [of] the substantive requirements of the law * * * is not the type of discretionary judgment concerning the allocation of enforcement resources that [*Chaney*] shields from review."); *Nat'l Wildlife Fed'n* v. *EPA*, 980 F.2d 765, 773 (D.C. Cir. 1992) (holding reviewable EPA's nonenforcement decision where plaintiff challenged agency's "statutory interpretation embodied in [the regulation], * * * and does not contest a particular enforcement decision"); see also *Chaney*, 470 U.S. at 833 n.4 (suggesting exception would not apply if case involved "a refusal by the agency to institute proceedings based solely on the belief that it lacks jurisdiction"); *Kenney* v. *Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996) (interpreting *Chaney* as applying "to individual, case-by-case determinations of when to enforce existing regulations rather than permanent policies or standards").

24

derlying order on a legal interpretation did not provide a cogent reason for making the refusal to reconsider reviewable. *Ibid.*

Judicial review of agency decisions based entirely on legal determinations also serves the important purpose of promoting accountability. When an agency rests a broad non-enforcement decision on policy-based discretion, citizens who support or oppose the decision know that the agency bears responsibility for the determination. That makes clear that any efforts to either overturn or support the decision should be directed to agency decisionmakers.

Allowing an agency to rest its decision on purely legal grounds and yet avoid judicial review has the opposite effect: insulating the agency decisionmaker from accountability—and responsibility. Even if the agency's legal justification is patently incorrect, the agency would be able to shift responsibility to Congress by asserting a lack of legal authority. And citizens who oppose the decision would blame Congress for failing to act rather than the agency decisionmakers.

*Third*, a statute relating to judicial review in the immigration context provides additional support for this conclusion.

That provision, 8 U.S.C. § 1252(g), states that, subject to certain exceptions, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

The government contended below that Section 1252(g) precluded judicial review here—but it has

**AR4994**

25

abandoned that argument. U.S. Br. 20. In fact, the provision bolsters the argument in favor of judicial review.

This Court explained in *Reno* v. *American Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) *(AAADC)*, that Section 1252(g) "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Id.* at 482; see also *id.* at 485 (stating that § 1252(g) was "designed to give some measure of protection to 'no deferred action' decisions *and similar discretionary determinations*" (emphasis added)); *Jennings* v. *Rodriguez*, 138 S. Ct. 830, 841 (2018) (plurality op.).

Section 1252(g) thus reflects the distinction between fact-specific exercises of discretion in the context of an individual proceeding and other types of decisions, as this Court and the lower courts have recognized.[72] Congress focused specifically on enforcement-related exercises of discretion in the immigration context and specifically did not exclude from judicial review broad policy pronouncements based entirely on

---

[72] See, *e.g.*, *INS* v. *St. Cyr*, 533 U.S. 289, 293 & 311 n.34 (2001) (§ 1252(g) did not apply to challenge to "Attorney General['s] interpret[ation]" of statutes); *Texas* v. *United States*, 809 F.3d 134, 165 (5th Cir. 2015) (§ 1252(g) did not apply to challenge to DAPA); *Barahona-Gomez* v. *Reno*, 236 F.3d 1115, 1118-19 (9th Cir. 2001) (§ 1252(g) did not apply to challenge to directives issued by the BIA Chairman and the Chief Immigration Judge that were based on legal interpretations); *Bowrin* v. *INS*, 194 F.3d 483, 488 (4th Cir. 1999) ("§ 1252(g) does not apply to agency interpretations of statutes"); *Fornalik* v. *Perryman*, 223 F.3d 523, 532 (7th Cir. 2000) (habeas petition filed before INS filed initial filing in removal case was not request for "relief from a decision to commence proceedings").

26

an agency's legal determination. That congressional determination supports review here.

In sum, the particular characteristics of this decision combine to place it clearly within the category of agency actions subject to judicial review.

In this unusual context, there is no basis for disregarding the "strong" and "well-settled" presumption favoring review of executive determinations. *Mach Mining, LLC* v. *EEOC*, 135 S. Ct. 1645, 1651 (2015); *Kucana* v. *Holder*, 558 U.S. 233, 241 (2010).

## B. The Rescission Decision Must Be Set Aside.

The decision to rescind DACA rested on a legal determination: DHS's conclusion that the program exceeded the agency's statutory authority. Because that conclusion constituted a change in position—the government had previously stated that DACA was lawful—DHS was required to provide "a reasoned explanation for the change" in position. *Encino Motorcars, LLC* v. *Navarro*, 136 S. Ct. 2117, 2125 (2016). Failure to explain a change in agency policy "'is a reason for holding an interpretation to be an arbitrary and capricious change.'" *Id*. at 2126 (citation omitted).

Even if the explanation were adequate, the rescission must be set aside if the agency's legal analysis is wrong. *SEC* v. *Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[I]f the [agency] action is based upon a determination of law * * *, an order may not stand if the agency has misconceived the law."); *Yale-New Haven Hosp.* v. *Leavitt*, 470 F.3d 71, 86 (2d Cir. 2006); *Safe Air For Everyone* v. *EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007); *Transitional Hosps. Corp. of La.* v. *Shalala*, 222 F.3d 1019, 1029 (D.C. Cir. 2000).

27

The rescission decision must be vacated for both reasons: DHS failed to provide an adequate explanation for its change in policy and it erred in determining that DACA is beyond the Executive Branch's legal authority.

To begin with, as Judge Bates explained in detail in two opinions (see 18-588 Pet. App 1a-74a & 80a-109a), the "scant legal reasoning" set forth by DHS "was insufficient to satisfy the Department's obligation to explain its departure from its prior stated view that DACA was lawful." *Id.* at 51a.

Moreover, "[t]he Department's failure to give an adequate explanation * * * was particularly egregious here in light of the reliance interests involved"—because the program had been in place for five years "and had engendered the reliance of hundreds of thousands of beneficiaries, many of whom had structured their education, employment, and other life activities on the assumption that they would be able to renew their DACA benefits." *Id.* at 54a. Citing *Encino Motorcars*, Judge Bates stated that "[t]he Supreme Court has set aside changes in agency policy for failure to consider reliance interests that pale in comparison to the ones at stake here." *Id.* at 54a-55a.

Even if DHS's explanation could be deemed adequate, the Department's legal analysis is wrong: the DACA program falls well within the Executive Branch's particular legal authority with respect to immigration for several related reasons.

*First*, Congress has broadly authorized the Department of Homeland Security to exercise discretion, including to "[e]stablish[] national immigration enforcement policies and priorities"—which is precisely what the DACA program does. 6 U.S.C. § 202(5); see

28

also 8 U.S.C. § 1103(a)(1) (charging the Secretary with the "administration and enforcement" of the immigration laws); *id.* § 1103(a)(3) (authority to "perform such other acts as he deems necessary for carrying out his authority" under the immigration laws); H.R. Rep. No. 111-157, at 8 (2009) ("rather than simply rounding up as many illegal immigrants as possible, which is sometimes achieved by targeting the easiest and least threatening among the undocumented population, DHS must ensure that the government's huge investments in immigration enforcement are producing the maximum return in actually making our country safer").

*Second*, granting "deferred action" is a long-established administrative practice expressly recognized by this Court and by Congress.

The government recognizes that "[a]s a practical matter, * * * the Executive Branch lacks the resources to remove every removable alien," and "[f]or any alien subject to removal, DHS officials must first 'decide whether it makes sense to pursue removal at all.'" U.S. Br. 4 (quoting *Arizona* v. *United States*, 567 U.S. 387, 396 (2012)). For that reason, Presidents since 1956 have implemented formal programs deferring government action to remove individuals present in the United States—thereby enabling over two million otherwise-removable aliens to remain temporarily in the country.

In the 1950s, President Eisenhower authorized the admission of ("paroled") almost 1,000 foreign-born children into the United States; and he and Presi-

29

dents Kennedy, Johnson, and Nixon later paroled an-
other 600,000 Cubans.[73] In the 1970s and 1980s, the
Ford and Carter Administrations granted "extended
voluntary departure," which "temporarily sus-
pend[ed] enforcement" of deportation, to "particular
group[s]" of immigrants.[74]

The Reagan Administration introduced the "Fam-
ily Fairness" program, which deferred removal actions
against minor children whose parents were in the pro-
cess of obtaining legal status but who did not them-
selves qualify for legal status.[75] President George
H.W. Bush then extended the program in 1990 to
cover qualified spouses.[76] And on at least four addi-
tional occasions, immigration officials have extended
deferred action to specified classes of individuals.[77]

---

[73] See President Dwight Eisenhower, *Statement Concerning the
Entry Into the United States of Adopted Foreign-Born Orphans*
(Oct. 26, 1956), https://goo.gl/BkztnZ; American Immigration
Council, *Executive Grants of Temporary Immigration Relief,
1956-Present* (Oct. 2014), https://goo.gl/Q87gqn.

[74] *Hotel & Rest. Emps. Union, Local 25* v. *Smith*, 846 F.2d 1499,
1510 (D.C. Cir. 1988) (en banc); Andorra Bruno et al., CRS, *Anal-
ysis of June 15, 2012 DHS Memorandum, Exercising Prosecuto-
rial Discretion with Respect to Individuals Who Came to the
United States as Children* App'x (July 13, 2012),
https://goo.gl/deiGYz.

[75] Alan Nelson, *Legalization and Family Fairness: An Analysis*
(Oct. 21, 1987), *in* 64 No. 41 Interpreter Releases 1191 app. I.

[76] Mem. from Gene McNary, Comm'r, INS, to Reg'l Comm'rs,
*Family Fairness: Guidelines for Voluntary Departure under 8
CFR 242.5 for the Ineligible Spouses and Children of Legalized
Aliens* (Feb. 2, 1990), *in* 67 No. 6 Interpreter Releases 153, app.
I, at 164-65 (Feb. 5, 1990).

[77] See, *e.g.*, Mem. from Paul Virtue, INS, *Supplemental Guidance
on Battered Alien Self-Petitioning Process and Related Issues* at

30

In view of that long history, it is not surprising that this Court itself has recognized the "regular practice" of "deferred action." *AAADC*, 525 U.S. at 483-85.

Most importantly, Congress has enacted statutes expressly recognizing that authority. As the government itself recognizes (U.S. Br. 43), Congress has on several occasions recognized the legal authority to grant deferred action by expressly expanding deferred action to certain categories of individuals and by authorizing States to issue driver's licenses to immigrants with "approved deferred action status." 49 U.S.C. § 30301 note.

Given this long historical practice and express congressional recognition, it is plain that the Executive Branch has broad authority to grant deferred action.

*Third*, permitting deferred action recipients to obtain work authorization has a similarly lengthy pedigree.

A regulation promulgated in the 1980s provides that individuals who receive deferred action are eligible to apply for work authorization. See 8 C.F.R. § 274a.12(c)(14). That regulation codified the already-

---

3 (May 6, 1997), 74 No. 41 Interpreter Releases 962 app. I; U.S. Citizenship & Immigration Servs. (USCIS), *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)* 1, 7 (Nov. 25, 2005), https://tinyurl.com/y68s86cy; Mem. from Michael D. Croning, INS, for Michael A. Pearson, INS, *VTVPA Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* (Aug. 30, 2001), https://tinyurl.com/yxpztydf; Mem. from Donald Neufeld, USCIS, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* (June 15, 2009), https://goo.gl/SHaCVZ.

31

existing practice and procedure of granting employ-ment authorization to such individuals. See Proposed Rules for Employment Authorization for Certain Aliens, 44 Fed. Reg. 43,480 (July 25, 1979). And in the almost forty years since, Congress has declined to limit this practice in any way.

To the contrary, in the face of a challenge to the Attorney General's authority to grant work authoriza-tions to individuals who have been granted deferred action (see Employment Authorization, 51 Fed. Reg. 39,385 (Oct. 28, 1986)), Congress ratified the Attorney General's authority, enacting a law prohibiting em-ployers from hiring unauthorized aliens, but expressly excluded from that category individuals "authorized to be so employed by * * * the Attorney General." 8 U.S.C. § 1324a(h)(3).

In sum, the broad discretionary authority con-ferred on the Executive Branch in this immigration context, the long history of administrative grants of both deferred action and work authorization, and Congress's express recognition of that practice estab-lish that DACA falls within the legal authority avail-able to the Executive Branch.

## CONCLUSION

The judgments of the Court of Appeals for the Ninth Circuit and the District Court for the District of

32

Columbia, and orders of the District Court for the Eastern District of New York should be affirmed.

Respectfully submitted.

ANDREW J. PINCUS
*Counsel of Record*
*Mayer Brown LLP*
*1999 K Street, NW*
*Washington, DC 20006*
*(202) 263-3000*
*apincus@mayerbrown.com*

KAREN W. LIN
*Mayer Brown LLP*
*1221 Avenue of the Americas*
*New York, NY 10020*
*(212) 506-2500*

*Counsel for* Amici Curiae

OCTOBER 2019

AR5002

1a

**APPENDIX A**

**LIST OF *AMICI CURIAE***

## Business Associations

1.    American Hotel & Lodging Association

2.    BSA | The Software Alliance

3.    Chamber of Commerce of the United

    States of America

4.    HR Policy Association

5.    Information Technology Industry

    Council

6.    National Association of Manufacturers

7.    National Association of State Latino

    Chambers of Commerce

8.    National Retail Federation

9.    North Texas Commission

10.   Philadelphia Area Cooperative Alliance

**AR5003**

2a

11.   Retail Industry Leaders Association

12.   Semiconductor Industry Association

13.   Software and Information Industry Association

14.   Sustainable Business Network of Greater Philadelphia

15.   Tech:NYC

16.   TechNet

17.   Texas Association of Business

18.   Vail Valley Partnership

3a

## Individual Companies

1.   A Medium Corporation

2.   Adobe Systems Incorporated

3.   Affirm, Inc.

4.   Airbnb, Inc.

5.   Akamai Technologies, Inc.

6.   Amazon.com, Inc.

7.   Ampush LLC

8.   Asana, Inc.

9.   Aspen Skiing Company, LLC

10.   Atlassian Corp. Plc

11.   Autodesk, Inc.

12.   Azavea Inc.

13.   Ben & Jerry's Homemade, Inc.

14.   Berry Appleman & Leiden LLP

4a

15.   Best Buy, Inc.

16.   Box, Inc.

17.   Braze, Inc.

18.   Brightcove Inc.

19.   CareZone Inc.

20.   Checkr, Inc.

21.   Chegg, Inc.

22.   Chobani, LLC

23.   Cisco Systems Inc.

24.   Citrix Systems, Inc.

25.   Civis Analytics, Inc.

26.   Cloudera, Inc.

27.   Cloudflare, Inc.

28.   Codecademy

29.   Color Genomics, Inc.

**AR5006**

5a

30. Columbia Group LLP

31. Cummins Inc.

32. DoorDash

33. Driscoll's

34. Dropbox, Inc.

35. eBay Inc.

36. Ernst & Young LLP

37. Exelon Corp.

38. Facebook, Inc.

39. Fastly, Inc.

40. Foossa

41. Foursquare Labs, Inc.

42. Gap Inc.

43. General Assembly Space, Inc. DBA

    General Assembly

6a

44.  Golden Door Scholars

45.  Google LLC

46.  Graham Holdings Company

47.  Greenough Consulting Group

48.  Hewlett Packard Enterprise

49.  Hilton Worldwide Holdings Inc.

50.  HMS Holdings Corp.

51.  Host Hotels and Resorts, Inc.

52.  HP Inc.

53.  IBC Bank

54.  IBM Corporation

55.  IKEA North American Services, LLC

56.  Imgur, Inc.

57.  Indiegogo, Inc.

58.  Intel Corporation

7a

59.   JAND, Inc. d/b/a Warby Parker

60.   Kickstarter, PBC

61.   Knotel

62.   Lam Research Corporation

63.   Levi Strauss & Co.

64.   Linden Research, Inc. d/b/a Linden Lab

65.   Lydecker Diaz

66.   Lyft, Inc.

67.   Mapbox

68.   Marriott International, Inc.

69.   Medidata Solutions, Inc.

70.   Molecule Software, Inc.

71.   MongoDB, Inc.

72.   MPOWERD Inc.

73.   Netflix, Inc.

8a

74. NETGEAR, Inc.

75. NewsCred, Inc.

76. Niskanen Center

77. Okta, Inc.

78. OpenAI, LLC

79. Patreon, Inc.

80. PayPal Holdings, Inc.

81. Pinterest, Inc.

82. Planet Labs Inc.

83. Postmates

84. RealNetworks, Inc.

85. Red Ventures

86. Rippling

87. Salesforce.com, Inc.

88. Scopely, Inc.

9a

89.  ServiceNow

90.  Shutterstock, Inc.

91.  Space Exploration Technologies Corp.

92.  Spokeo, Inc.

93.  SpotHero, Inc.

94.  Spotify USA Inc.

95.  Square, Inc.

96.  Squarespace, Inc.

97.  Starbucks Coffee Company

98.  Strava, Inc.

99.  SurveyMonkey Inc.

100. Tampa Bay Tech

101. Target

102. TaskRabbit, Inc.

103. Tesla, Inc.

10a

104. The Nielsen Company

105. Thumbtack, Inc.

106. TNTP, Inc.

107. TPG Capital

108. TransferWise Inc.

109. TripAdvisor LLC

110. Turner Morris, Inc.

111. Turo Inc.

112. Twitter Inc.

113. Uber Technologies, Inc.

114. Univision Communications Inc.

115. Upwork Inc.

116. Verizon Communications Inc.

117. Via Transportation, Inc.

118. Western Union

**AR5012**

11a

119.  Work & Co.

120.  Workday, Inc.

121.  Y Combinator Management, LLC

122.  Year Up

123.  Yelp Inc.

124.  Zendesk, Inc.

125.  ZenPayroll, Inc. d/b/a Gusto

AR5013

Nos. 18-587, 18-588, and 18-589

In The

## Supreme Court of the United States

———

DEPARTMENT OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,

*Respondents.*

———

On Writ of Certiorari to the United States
Court of Appeals for the Ninth Circuit

———

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

*Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.,

*Respondents.*

———

On Writ of Certiorari Before Judgment to the United States
Court of Appeals for the District of Columbia Circuit

———

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL.,

*Respondents.*

———

On Writ of Certiorari Before Judgment to the United States
Court of Appeals for the Second Circuit

———

**BRIEF OF CURRENT MEMBERS OF CONGRESS AND BIPARTISAN FORMER MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS**

ELIZABETH B. WYDRA
BRIANNE J. GOROD*
BRIAN R. FRAZELLE
DAYNA J. ZOLLE**
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1200 18th Street NW
  Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

October 4, 2019        * Counsel of Record
                       ** Not admitted in D.C.; supervised by principals of the firm

## TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF AUTHORITIES | ii |
| INTEREST OF *AMICI CURIAE* | 1 |
| INTRODUCTION AND SUMMARY OF ARGUMENT | 2 |
| ARGUMENT | 5 |
| DACA WAS A LAWFUL EXERCISE OF EXECUTIVE DISCRETION, AND ITS RESCISSION ON THE GROUND THAT IT WAS UNLAWFUL THEREFORE VIOLATED THE APA | 5 |
| I. DACA WAS A VALID EXERCISE OF EXECUTIVE AUTHORITY | 5 |
| A. Congress Has Long Conferred Significant Discretion on the Executive Branch | 5 |
| B. The Executive Branch Has Long Exercised This Broad Discretion with Congress's Affirmative Approval | 11 |
| C. DACA Was a Valid Exercise of Executive Discretion | 17 |
| II. THE TERMINATION OF DACA ON THE GROUND THAT IT WAS UNLAWFUL VIOLATED THE APA | 23 |
| CONCLUSION | 29 |
| APPENDIX | 1A |

AR5015

ii

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Apex Hosiery Co. v. Leader,*
310 U.S. 469 (1940) .............................. 14

*Arizona v. United States,*
567 U.S. 387 (2012) .............................. *passim*

*Barnhart v. Peabody Coal Co.,*
537 U.S. 149 (2003) .............................. 28

*Bob Jones Univ. v. United States,*
461 U.S. 574 (1983) .............................. 17

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962) .............................. 24

*Dames & Moore v. Regan,*
453 U.S. 654 (1981) .............................. 13

*Harisiades v. Shaughnessy,*
342 U.S. 580 (1952) .............................. 5

*Heckler v. Chaney,*
470 U.S. 821 (1985) .............................. 6, 10

*INS v. Chadha,*
462 U.S. 919 (1983) .............................. 6

*Jama v. ICE,*
543 U.S. 335 (2005) .............................. 8

*Lichter v. United States,*
334 U.S. 742 (1948) .............................. 10

*Marx v. Gen. Revenue Corp.,*
568 U.S. 371 (2013) .............................. 27

iii

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Mathews v. Diaz,*
   426 U.S. 67 (1976) .................................. 8

*Medellin v. Texas,*
   554 U.S. 759 (2008) ............................... 6, 21

*Mistretta v. United States,*
   488 U.S. 361 (1989) ............................... 9

*Motor Vehicle Mfrs. Ass'n v. State Farm*
   *Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) .................................. 24

*Reno v. Am.-Arab Anti-Discrimination*
   *Comm.,*
   525 U.S. 471 (1999) ...................... 2, 7, 8, 11, 17

*Scripps-Howard Radio v. F.C.C.,*
   316 U.S. 4 (1942) .................................... 22

*SEC v. Chenery Corp.,*
   332 U.S. 194 (1947) ............................... 24

*Tex. Dep't of Hous. & Cmty. Affairs v.*
   *Inclusive Cmtys. Project, Inc.,*
   135 S. Ct. 2507 (2015) ............................ 14

*Texas v. United States,*
   136 S. Ct. 2271 (2016) ............................ 5

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) .......... 5, 25, 26, 27

*United States ex rel. Knauff v.*
   *Shaughnessy,*
   338 U.S. 537 (1950) ............................... 10

**AR5017**

iv

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*United States v. Craft,*
535 U.S. 274 (2002) ............................... 21

*United States v. Rutherford,*
442 U.S. 544 (1979) ............................... 14

*United States v. Vonn,*
535 U.S. 55 (2002) ................................. 28

Constitutional Provisions and Legislative Materials

5 U.S.C. § 551 *et seq.* ................................. 2

5 U.S.C. § 706(2)(A) ................................. 4, 25

6 U.S.C. § 202(5) ........................................ *passim*

8 C.F.R. § 109.1(b)(7) (1984) .................... 11

8 C.F.R. § 245a.2(a)(2)(iv)(5) (1989) ........ 12

8 C.F.R. § 274a.12(c)(14) (1989)............... 11, 16

8 U.S.C. § 1101 *et seq.* .............................. 1

8 U.S.C. § 1103(a)(1) ................................ 7

8 U.S.C. § 1103(a)(3) ........................... 3, 7, 18, 19

8 U.S.C. § 1151(b)(2)(A)(i) ....................... 25

8 U.S.C. § 1154(a)(1)(D)(i)(II) .................. 15, 16

8 U.S.C. § 1154(a)(1)(D)(i)(IV) ................. 15, 16

8 U.S.C. § 1182(a)(9)(B) .......................... 26

**AR5018**

v

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

8 U.S.C. § 1182(a)(9)(B)(i)(II).....................  25

8 U.S.C. § 1201(a).......................................  25

8 U.S.C. § 1227(d)(1) .................................  14

8 U.S.C. § 1227(d)(2) .................................  14

8 U.S.C. § 1255 ..........................................  25

8 U.S.C. § 1324a(h)(3) ...............................  9

49 U.S.C. § 30301 note ..............................  15

52 F.R. 16222 (1987) .................................  11

158 Cong. Rec. (daily ed. July 19, 2012)...  21, 23

*Battered Immigrant Women Protection Act of 1999: Hearing on H.R. 3083 Before the Subcomm. on Immigration & Claims of the H. Comm. on the Judiciary*, 106th Cong. (2000).............................................  15

Department of Homeland Security Appropriations Act, Pub. L. No. 114-4, 129 Stat. 39 (2015) .......................................  10

Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, Pub. L. No. 109-13, 119 Stat. 231 (2005) .........................  15

H.R. 5160, 113th Cong. (2014)...................  22

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 .......................................................  9

**AR5019**

vi

## TABLE OF AUTHORITIES – cont'd

Page(s)

National Defense Authorization Act for
  Fiscal Year 2004, Pub. L. No. 108-136,
  117 Stat. 1392 (2003) ............................ 16

S. 1615, 115th Cong. (2017) ...................... 22

S. 2631, 113th Cong. (2014) ...................... 22

Subcomm. on Immigration, Citizenship,
  Refugees, Border Security, & Int'l L., H.
  Comm. on the Judiciary, 111th Cong.,
  *Rules of Procedure and Statement of
  Policy for Private Immigration Bills* ..... 16

Uniting and Strengthening America by
  Providing Appropriate Tools Required to
  Intercept and Obstruct Terrorism Act of
  2001 (USA PATRIOT Act), Pub. L. No.
  107-56, 115 Stat. 272 ............................ 16

Victims of Trafficking and Violence Protec-
  tion Act of 2000, Pub. L. No. 106-386, 114
  Stat. 1464 ............................................... 15

Books, Articles, and Other Authorities

64 No. 41 Interpreter Releases 1191, app. I,
  (Oct. 26, 1987) ........................................ 12

67 No. 6 Interpreter Releases 153, app. I,
  (Feb. 5, 1990) .......................................... 13

76 Interpreter Releases, app. I (Dec. 3,
  1999) ........................................................ 20

**AR5020**

vii

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Am. Immigration Council, *Executive Grants of Temporary Immigration Relief, 1956-Present* (Oct. 2014), https://www.americanimmigrationcouncil.org/sites/default/files/research/executive_grants_of_temporary_immigration_relief_1956- present_final_0.pdf ............ 12

Andorra Bruno et al., Cong. Research Serv., *Analysis of June 15, 2012 DHS Memorandum,* Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (July 13, 2012) ............................. 6, 11, 12

Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458 (2009) ............................... 7, 8

Charles Gordon & Harry N. Rosenfield, *Immigration Law and Procedure* (1959).... 6

Ben Harrington, Cong. Research Serv., R45158, *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others* (Apr. 10, 2018) ........................................................ 11

*ICYMI: Speaker Ryan, Senator Hatch Urge Trump to Keep DACA*, fwd.us (Sept. 1, 2017), https://www.fwd.us/news/speaker-ryan-senator-hatch-urge-trump-keep-daca/....................................................... 23

**AR5021**

viii

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Letter from Rep. Lamar Smith et al., to
Hon. Janet Reno, Att'y Gen., DOJ, and
Hon. Doris M. Meissner, Comm'r, INS
(Nov. 4, 1999) ......................................... 20

Bernadette Maguire, *Immigration: Public
Legislation and Private Bills* (1997) ...... 16

Doris Meissner & Julia Gelatt, Migration
Policy Inst., *Eight Key U.S. Immigration
Policy Issues: State of Play and Unan-
swered Questions* (May 2019) ................ 9

Memorandum from Gene McNary, Comm'r,
INS, to Reg'l Comm'rs, *Family Fairness:
Guidelines for Voluntary Departure Un-
der 8 C.F.R. 242.5 for the Ineligible
Spouses and Children of Legalized Aliens*
(Feb. 2, 1990) ......................................... 12, 13

Memorandum from John Morton, Dir., Im-
migration & Customs Enforcement, to
All ICE Employees, *Civil Immigration
Enforcement: Priorities for the Apprehen-
sion, Detention, and Removal of Aliens*
(Mar. 2, 2011) ....................................... 8, 18, 19

Memorandum from John P. Torres, Acting
Dir., ICE Office of Detention & Removal
Operations, to Field Office Dirs., *Deten-
tion and Deportation Officer's Field Man-
ual Update* (Mar. 27, 2006), https://
www.ice.gov/doclib/foia/dro_pol-
icy_memos/09684drofieldpolicyman-
ual.pdf .................................................... 13

**AR5022**

ix

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Alan C. Nelson, Comm'r, INS, *Legalization and Family Fairness—An Analysis* (Oct. 21, 1987) ................................................. 12

Pres. Barack Obama, Remarks by the President on Immigration (June 15, 2012)... 22

Press Release, *Durbin, Lugar Ask Secretary Napolitano to Stop Deportations of Dream Act Students* (Apr. 21, 2010), https://www.durbin.senate.gov/news-room/press-releases/durbin-lugar-ask-secretary-napolitano-to-stop-deporta-tions-of-dream-act-students................... 20

U.S. Citizenship and Immigration Services, *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals* (Nov. 30, 2018), https://www.uscis.gov/ sites/default/files/USCIS/Resources/Re-ports%20and%20Studies/Immigra-tion%20Forms%20Data/All%20Form%20 Types/DACA/DACA_FY19_Q1_Data .pdf ......................................................... 26

**AR5023**

1

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are a bipartisan group of current and former members of the U.S. Senate and House of Representatives, many of whom served when key components of the nation's immigration laws, including provisions pertinent to these cases, were drafted, debated, and passed. Based on their experience serving in Congress, *amici* understand that the nation's immigration laws, including the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, delegate significant discretion to the executive branch to interpret and administer those laws, including by setting rational enforcement priorities and providing guidance to field officials to implement those priorities. Moreover, *amici* know that administrations of both major political parties have for decades exercised that discretion to grant undocumented immigrants deferred action, on both an *ad hoc* basis and by establishing categorical threshold criteria for deferral, and Congress has consistently approved of these exercises of executive discretion. Where Congress has chosen to vest the executive with authority to determine how a law should be enforced, and the executive has acted pursuant to that authority—as was the case with the Deferred Action for Childhood Arrivals (DACA) policy—*amici* have an interest in ensuring that courts honor Congress's deliberate choice. *Amici* therefore have a substantial interest in ensuring that this Court

---

[1] The parties have consented to the filing of this brief, and their letters of consent have been filed with the Clerk. Under Rule 37.6 of the Rules of this Court, *amici* state that no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amici* or their counsel made a monetary contribution to its preparation or submission.

2

recognize that DACA was a permissible exercise of the broad discretion that Congress has accorded the executive branch, and that the rescission of DACA on the ground that it was unlawful therefore violated the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

Because immigration is a complex and dynamic field, Congress has long conferred significant discretion on the executive branch to implement the nation's immigration laws. Effectuating that discretion, administrations of both major political parties have for decades granted undocumented immigrants deferred action, both on an *ad hoc* basis and by establishing categorical threshold criteria for deferral. This Court has recognized that such grants of deferred action are "a regular practice" that the executive branch engages in "for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999) (*AADC*). Moreover, Congress has repeatedly taken affirmative steps that demonstrate its ratification of, and reliance on, these exercises of executive discretion, including passing legislation that presumes that the executive will continue to grant deferred action or that expressly directs the executive to continue doing so.

Consistent with these past exercises of discretion, the Department of Homeland Security in 2012 established DACA, which authorized the temporary deferred removal of "certain young people who were brought to this country as children and know only this

**AR5025**

3

country as home." Pet. App. 97a-98a.[2]  In 2017, the current Administration ended DACA, citing its supposed "legal and constitutional defects."  J.A. 878.

Contrary to the Administration's contentions when it rescinded the policy, DACA was a permissible exercise of the broad discretion that Congress conferred on the executive branch to implement the federal immigration laws.  *See, e.g.*, 8 U.S.C. § 1103(a)(3) (authorizing the Secretary of Homeland Security to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under the INA); 6 U.S.C. § 202(5) (directing the Secretary to "[e]stablish[] national immigration enforcement policies and priorities").  DACA was also consistent with the immigration enforcement priorities that the executive branch had established, and the Department of Justice's Office of Legal Counsel (OLC) advised before DACA's implementation that it would be lawful, provided that it required review on a case-by-case basis, J.A. 827 n.8—which it expressly did, Pet. App. 99a.

DACA was also a sensible response to the imperatives and realities of law enforcement: the immigration laws make a substantial number of noncitizens removable, but Congress has not provided sufficient resources to effectuate the removal of more than a small fraction of the nation's undocumented immigrants.  Instead, Congress has reasonably permitted the executive branch to determine the nation's immigration enforcement priorities.

Indeed, many members of Congress specifically

---

[2] "Pet. App." and "Supp. Pet. App." refer to the appendices accompanying the original and supplemental petitions for certiorari, respectively, in *DHS v. Regents of the University of California*, No. 18-587.

4

called for the executive to exercise discretion regarding certain young people who were brought to the United States as children, and many members of Congress subsequently praised DACA's implementation.  And although bipartisan efforts to enact new legislation extending broader rights and protections to certain immigrants who were brought to the United States as children have thus far failed, *see* Pet'rs Br. 5 & n.2, as have numerous congressional efforts to defund or terminate DACA, these facts have no bearing on the legality of DACA itself.  The legislative proposals that Congress has considered were not remotely coextensive with DACA:  Under DACA, grants of deferred action may be terminated at any time and confer no substantive rights or immigration status, J.A. 827, whereas the legislative proposals that Congress has considered would have provided more permanent and wide-ranging protections and benefits, and they would have extended these protections to a broader class of individuals.  DACA was a valid exercise of the broad discretion that Congress has delegated to the executive branch, regardless of whether Congress chooses to provide greater long-term protections for DACA recipients (or others) through new legislation.

Accordingly, the Administration's decision to rescind DACA on the ground that it was unlawful was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA.  5 U.S.C. § 706(2)(A).  Although Petitioners now offer multiple explanations for DACA's rescission, *see, e.g.*, Pet'rs Br. 15, those *post hoc* explanations are irrelevant.  At the time that it terminated DACA, the Administration made clear that it was doing so because it had concluded that the policy was unlawful.  *See* J.A. 877.  The Administration also asserted that, if challenged in court, DACA would meet the same fate

5

as the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy, which the Fifth Circuit enjoined in a decision this Court affirmed by an equally divided vote. *Id.* at 878; *see Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) (per curiam). The Administration reached this conclusion even though DACA is materially distinguishable from DAPA. Accordingly, this Court should hold that the decision to terminate DACA—a policy that lawfully and laudably deferred removal on a case-by-case basis of certain persons who were brought to the United States as children and who met other qualifications— on the ground that this effort was unlawful and contravened the APA.

## ARGUMENT

## DACA WAS A LAWFUL EXERCISE OF EXECUTIVE DISCRETION, AND ITS RESCISSION ON THE GROUND THAT IT WAS UNLAWFUL THEREFORE VIOLATED THE APA.

## I.   DACA WAS A VALID EXERCISE OF EXECUTIVE AUTHORITY.

### A. Congress Has Long Conferred Significant Discretion on the Executive Branch.

As *amici* know from their time serving in Congress, it is impossible for Congress to anticipate every situation to which legislation must apply. This fact is particularly true in a complex and dynamic context like immigration, as demographic, social, and political changes at home and abroad can cause abrupt and substantial changes in immigration patterns. This Court has recognized that the field of immigration is "vitally and intricately interwoven with . . . the conduct of foreign relations," *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952), a sphere that falls largely

**AR5028**

6

within the executive branch's purview. *See INS v. Chadha*, 462 U.S. 919, 954 (1983); *Arizona v. United States*, 567 U.S. 387, 394-95 (2012) (noting that the federal government's authority over immigration "rests, in part, on the National Government's . . . inherent power as sovereign to control and conduct relations with foreign nations"); *Medellin v. Texas*, 554 U.S. 759, 765 (2008) (Breyer, J., dissenting) (acknowledging the "President's responsibility for foreign affairs").

Reflecting these considerations, Congress has long recognized that the executive branch must have discretion to determine how best to enforce the nation's immigration laws by "balancing . . . factors which are peculiarly within its expertise," *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), including foreign relations, humanitarian considerations, and national security concerns. Accordingly, Congress has repeatedly conferred authority on executive branch officials to exercise discretion in enforcing the federal immigration laws. *See* Pet'rs Br. 16 ("Decisions about how the government will exercise enforcement discretion within the bounds of the law are uniquely entrusted to the Executive Branch."). Indeed, as far back as 1959, a key immigration law textbook reported that "Congress traditionally has entrusted the enforcement of its deportation policies to executive officers, and this arrangement has been approved by the courts." Charles Gordon & Harry N. Rosenfield, *Immigration Law and Procedure* 406 (1959); *see* Andorra Bruno et al., Cong. Research Serv., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 5 & n.18 (July 13, 2012) [hereinafter *CRS Analysis of DHS Memorandum*].

AR5029

7

In particular, Congress has, for more than sixty years, authorized the Secretary of Homeland Security (previously the Attorney General) to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under the INA, 8 U.S.C. § 1103(a)(3), which charges him "with the administration and enforcement" of the nation's immigration laws, *id.* § 1103(a)(1). Moreover, in recognizing a growing gap between the size of the unauthorized immigrant population and the resources reasonably available for enforcement, Congress directed the Secretary of Homeland Security in the Homeland Security Act of 2002 to "[e]stablish[] national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). These and other provisions in our federal immigration laws "delegat[e] tremendous authority to the President to set immigration screening policy." Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458, 463 (2009). At a minimum, these provisions of federal immigration law authorize the executive to define enforcement and removal priorities. *See* J.A. 831 ("The practice of granting deferred action, like the practice of setting enforcement priorities, is an exercise of enforcement discretion rooted in DHS's authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed.").

Indeed, this Court has repeatedly recognized that Congress has conferred broad discretion on the executive branch in the immigration context, observing that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials" and that "[f]ederal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396; *see AADC*, 525 U.S. at

**AR5030**

8

483 ("At each stage" of removal, "the Executive has discretion to abandon the endeavor."). This Court has also recognized that the executive branch's broad discretion allows its officers to consider many factors in deciding when removal is appropriate, including both "immediate human concerns" and "foreign policy" matters. *Arizona*, 567 U.S. at 396-97; *Jama v. ICE*, 543 U.S. 335, 348 (2005) ("Removal decisions . . . 'may implicate our relations with foreign powers' and require consideration of 'changing political and economic circumstances.'" (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976))). And this Court has noted that executive grants of deferred action in particular have become "a regular practice" and a "commendable exercise in administrative discretion." *AADC*, 525 U.S. at 483-84 (citation and internal quotation marks omitted).

Congress's delegation of this discretion to the executive branch is, in fact, essential: while the immigration laws make a substantial number of noncitizens removable, Congress has not appropriated the funds necessary to effectuate such a mass removal—indeed, it has never come close to providing such vast resources. *See* Cox & Rodríguez, *supra*, at 463 (explaining that Congress has made a "huge fraction of noncitizens deportable at the option of the Executive"); Memorandum from John Morton, Dir., Immigration & Customs Enforcement (ICE), to All ICE Employees, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* 1 (Mar. 2, 2011) [hereinafter *Morton Prioritization Memorandum*] (estimating that ICE has enough resources to deport less than 4 percent of the undocumented-immigrant population each year). In other words, given the large population of undocumented immigrants in the United States and the limited resources available to enforce the nation's immigration laws—

**AR5031**

9

even as appropriations for enforcement have reached particularly high levels, *see* Doris Meissner & Julia Gelatt, Migration Policy Inst., *Eight Key U.S. Immigration Policy Issues: State of Play and Unanswered Questions* 1 (May 2019) ("[T]he United States is spending 34 percent more on immigration enforcement than on all other principal federal criminal law enforcement agencies combined.")—the government cannot possibly remove everyone who is eligible for removal.

Accordingly, the executive branch necessarily must exercise substantial discretion in determining who should be removed consistent with the nation's "immigration enforcement policies and priorities." 6 U.S.C. § 202(5); *see Mistretta v. United States*, 488 U.S. 361, 372 (1989) ("[I]n our increasingly complex society, . . . Congress simply cannot do its job absent an ability to delegate power under broad general directives."). Even Petitioners recognize that, "[a]s a practical matter, . . . the Executive Branch lacks the resources to remove every removable alien, and a 'principal feature of the removal system is the broad discretion exercised by immigration officials.'" Pet'rs Br. 4 (quoting *Arizona*, 567 U.S. at 396).

Moreover, the discretion Congress has conferred on the executive branch to implement the immigration laws is not limited to decisions related to removal. To the contrary, Congress has also specifically given the executive branch significant authority over which persons are entitled to work in the United States. For example, the Immigration Reform and Control Act of 1986 (IRCA) defines an "unauthorized alien" not entitled to work in the United States as an alien who is neither a lawful permanent resident nor "authorized to be . . . employed by [the INA] *or by the Attorney General* [now the Secretary of Homeland Security]." 8 U.S.C. § 1324a(h)(3) (emphasis added); *see* Pub. L. No.

**AR5032**

10

99-603, 100 Stat. 3359, 3368 (1986).  Thus, whether deferred action recipients can apply for work authorization "depend[s] on independent and more specific statutory authority rooted in the text of the INA," J.A. 833, and falls within the executive's discretion.

To be sure, executive discretion in the immigration context is not unlimited, and Congress remains free to "limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Chaney*, 470 U.S. at 833.  Congress has, for instance, directed the Secretary of Homeland Security to "prioritize the identification and removal of aliens convicted of a crime by the severity of that crime."  Department of Homeland Security Appropriations Act, Pub. L. No. 114-4, 129 Stat. 39, 43 (2015).  But Congress has never sought to define enforcement priorities in such detail that the executive could not exercise its own judgment at all, nor has it sought to enumerate all the circumstances in which a noncitizen may receive a given accommodation.  Accordingly, this Court has observed that, when it comes to immigration, "[i]t is not necessary that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program."  *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (quoting *Lichter v. United States*, 334 U.S. 742, 785 (1948)).

In short, through the INA and other legislation, Congress has intentionally given the executive branch broad discretion to rationally decide how best to implement the nation's immigration laws.  *See* Supp. Pet. App. 8a-9a.

AR5033

11

### B. The Executive Branch Has Long Exercised This Broad Discretion with Congress's Affirmative Approval.

The executive has long exercised its broad discretion in the immigration context by implementing policies involving deferred action and similar forms of discretionary relief, and Congress has affirmatively approved of, and relied on, those practices. "Since at least the 1970s, immigration authorities in the United States have sometimes exercised their discretion to grant temporary reprieves from removal to non-U.S. nationals . . . ." Ben Harrington, Cong. Research Serv., R45158, *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others*, at i (Apr. 10, 2018) [hereinafter *CRS Overview*]. As this Court has recognized, "[t]his commendable exercise in administrative discretion, developed without express statutory authorization, originally was known as nonpriority and is now designated as deferred action." *AADC*, 525 U.S. at 484 (citation and internal quotation marks omitted); *see CRS Overview* at 15 (noting that "[p]rior to 1975, immigration authorities used the term 'nonpriority status' to describe the type of reprieve now labeled deferred action"); Supp. Pet. App. 10a (tracing the practice of granting "nonpriority status" to at least the 1950s).

In 1975, the Immigration and Naturalization Service (INS) issued its first formal guidance on deferred action. *CRS Analysis of DHS Memorandum* at 8. Federal agencies have also promulgated regulations recognizing deferred action since the 1980s. *E.g.*, 8 C.F.R. § 109.1(b)(7) (1984) (providing that recipients of deferred action are eligible to apply for work authorization) (reserved by 52 F.R. 16222 (1987)); *id.* § 274a.12(c)(14) (1989) (describing deferred action as "an act of administrative convenience to the

12

government which gives some cases lower priority"); *id.* § 245a.2(a)(2)(iv)(5) (1989) (providing that immigrants granted deferred action before January 1, 1982, and meeting other criteria could apply for adjustment to temporary residence status).

Thus, for decades, administrations of both major political parties have granted discretionary relief from removal, both on an *ad hoc* basis and by establishing categorical threshold criteria for deferral. *See CRS Analysis of DHS Memorandum* at 20-23; Am. Immigration Council, *Executive Grants of Temporary Immigration Relief, 1956-Present*, at 1 (Oct. 2014), https://www.americanimmigrationcouncil.org/sites/default/files/research/executive_grants_of_temporary_immigration_relief_1956-present_final_0.pdf ("Since at least 1956, every U.S. president has granted temporary immigration relief to one or more groups in need of assistance."); *id.* at 3-10 (collecting 39 examples). In 1987, for instance, after IRCA gave lawful status to some undocumented immigrants, the Reagan Administration created the Family Fairness Program, which allowed INS district directors to choose not to remove some children and spouses of immigrants whose status had recently changed under the Act. The program provided that those district directors could "exercise the Attorney General's authority to indefinitely defer deportation of anyone for specific humanitarian reasons." Alan C. Nelson, Comm'r, INS, *Legalization and Family Fairness—An Analysis* (Oct. 21, 1987), *in* 64 No. 41 Interpreter Releases 1191, app. I, at 1203 (Oct. 26, 1987).

That program was then expanded in 1990 under President George H.W. Bush to allow more people to qualify for deferral of deportation and also to receive work authorization. Memorandum from Gene McNary, Comm'r, INS, to Reg'l Comm'rs, *Family*

13

*Fairness: Guidelines for Voluntary Departure Under 8 C.F.R. 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990), *in* 67 No. 6 Interpreter Releases 153, app. I, at 164-65 (Feb. 5, 1990). The INS published guidelines "to assure uniformity in the granting of voluntary departure and work authorization for the ineligible spouses and children of legalized aliens." *Id.* at 164.

And in 2006, during the administration of President George W. Bush, ICE published a field manual that included guidelines for when deferred action could be granted. Memorandum from John P. Torres, Acting Dir., ICE Office of Detention & Removal Operations, to Field Office Dirs., *Detention and Deportation Officer's Field Manual Update* (Mar. 27, 2006), https://www.ice.gov/doclib/foia/dro_policy_memos/ 09684drofieldpolicymanual.pdf. As was the case with DACA, the manual specified that "deferred action is not an immigration status," and it enumerated "[f]actors to be [c]onsidered . . . as part of a deferred action determination." *Id.* § 20.8(a)-(b). The manual explained that, although deferred action "may, on [its] face look like a benefit grant," it "really [is] just [a] mechanism[] for formalizing an exercise of prosecutorial discretion." *Id.* § 20.9(a).

Congress has consistently affirmatively approved of these exercises of executive discretion. As OLC has recognized, "Congress has long been aware of the practice of granting deferred action, including in its categorical variety, and of its salient features," and yet instead of acting "to disapprove or limit the practice," Congress "has enacted several pieces of legislation that have either assumed that deferred action would be available in certain circumstances, or expressly directed that deferred action be extended to certain categories of aliens." J.A. 828-29; *cf. Dames & Moore v.*

**AR5036**

14

*Regan*, 453 U.S. 654, 680, 686 (1981) (holding that the president had authority to settle international claims by executive agreement and explaining that "crucial to [this] decision" was the fact that Congress had "placed its stamp of approval on such agreements" by passing legislation "creating a procedure to implement future settlement agreements"); *United States v. Rutherford*, 442 U.S. 544, 554 n.10 (1979) ("[O]nce an agency's statutory construction has been 'fully brought to the attention of the public and the Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." (quoting *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 489 (1940))); *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2519-20 (2015) (similar). In this manner, Congress has repeatedly ratified the executive branch's interpretation of the federal immigration laws as authorizing the executive to grant discretionary relief from removal.

For example, in making certain victims of trafficking and abuse eligible for immigration-status adjustments, Congress authorized the Secretary of Homeland Security to stay final orders of removal while applications for such adjustments are pending. 8 U.S.C. § 1227(d)(1). In so doing, Congress took care to ensure that this new authority would not impair the forms of relief already available under existing law—including deferred action—by clarifying that the denial of an administrative stay under the new provision "shall not preclude the alien from applying for a stay of removal, *deferred action*, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws." *Id.* § 1227(d)(2) (emphasis added). This provision is a clear indication that Congress understood deferred action as a preexisting and

**AR5037**

15

permissible form of relief available under the immigration laws. *See, e.g.*, Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, Pub. L. No. 109-13, § 202(c)(2)(B)(viii), 119 Stat. 231, 313 (2005) (codified at 49 U.S.C. § 30301 note) (listing "approved deferred action status" as a basis for issuing driver's licenses).

In addition to endorsing the executive's use of deferred action as a general matter, Congress has at times required the executive to consider whether individuals who satisfy certain categorical threshold criteria should be granted deferred action. For instance, Congress has provided that certain victims of domestic violence with pending petitions for preference status are "eligible for deferred action and work authorization." 8 U.S.C. § 1154(a)(1)(D)(i)(II) & (IV). As legislators considered reauthorizing the Violence Against Women Act (VAWA) in 2000, INS officials testified that "[a]pproved [VAWA] self-petitioners are placed in deferred action status," with the result that "[n]o battered alien who has filed a[n approved] self petition . . . has been deported." J.A. 829 (alterations in original) (quoting *Battered Immigrant Women Protection Act of 1999: Hearing on H.R. 3083 Before the Subcomm. on Immigration & Claims of the H. Comm. on the Judiciary*, 106th Cong. 43 (2000) (statement of Barbara Strack, Acting Exec. Assoc. Comm'r for Pol'y & Planning, INS)). In response to this testimony, Congress "not only acknowledg[ed] but also expand[ed] the deferred action program in the 2000 VAWA reauthorization legislation, providing that children who could no longer self-petition under VAWA because they were over the age of 21 would nonetheless be 'eligible for deferred action and work authorization.'" *Id.* (quoting Victims of Trafficking and Violence Protection Act of

16

2000, Pub. L. No. 106-386, § 1503(d)(2), 114 Stat. 1464, 1522 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV))).

Congress has similarly ensured that eligibility for both deferred action and work authorization remains available to people affected by other prominent tragedies or hardships. *See, e.g.*, Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), Pub. L. No. 107-56, § 423(b)(1)-(2), 115 Stat. 272, 361 (specifying that certain relatives of individuals killed in the September 11 terrorist attacks with pending petitions for preference status "may be eligible for deferred action and work authorization"); National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)-(d), 117 Stat. 1392, 1694-95 (2003) (specifying that certain relatives of individuals killed in combat with pending petitions for classification "shall be eligible for deferred action, advance parole, and work authorization").

Congress has also demonstrated its reliance on the executive's practice of granting deferred action in other ways. For decades, the congressional committees that are responsible for immigration have routinely asked the executive to grant unauthorized immigrants deferred action or stays of removal while the committees considered private bills for relief from enforcement of the immigration laws. *See, e.g.*, Bernadette Maguire, *Immigration: Public Legislation and Private Bills* 23-25, 253-55 (1997); Subcomm. on Immigration, Citizenship, Refugees, Border Security, & Int'l L., H. Comm. on the Judiciary, 111th Cong., *Rules of Procedure and Statement of Policy for Private Immigration Bills*, R. 5 ("In the past, the Department of Homeland Security has honored requests for departmental reports by staying deportation until final action is taken on the private bill."); *see also* 8 C.F.R.

17

§ 274a.12(c)(14) (allowing recipients of deferred action to apply for work authorization).

In sum, Congress has not simply declined to amend the law after the executive has announced certain grants of deferred action, but rather it has "affirmatively manifested its acquiescence" in that practice. *Bob Jones Univ. v. United States*, 461 U.S. 574, 601 (1983). As OLC has explained, "[t]he history of immigration policy illustrates" that "[w]hen Congress has been dissatisfied with Executive action, it has responded . . . by enacting legislation to limit the Executive's discretion in enforcing the immigration laws." J.A. 806. With respect to executive grants of deferred action, however, Congress has repeatedly enacted legislation affirming the executive branch's broad authority to grant this relief and relying on the continuation of this practice. There can therefore be no doubt that deferred action is a valid form of discretionary forbearance available to the Secretary of Homeland Security in cases or classes of cases that he rationally deems appropriate.

## C. DACA Was a Valid Exercise of Executive Discretion.

The Secretary's establishment of DACA fell well within the broad discretion that Congress has long conferred on the executive and repeatedly reaffirmed. Although deferred action policies originated "without express statutory authorization," *AADC*, 525 U.S. at 484 (citation and internal quotation marks omitted), they are now "a regular practice," *id.* at 483-84, and are part and parcel of the Secretary's congressionally conferred authority both to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority"

AR5040

18

under the INA, 8 U.S.C. § 1103(a)(3). DACA was no exception to this rule.

DACA enabled "certain young people who were brought to this country as children and know only this country as home" to apply for deferred action from removal. Pet. App. 97a-98a. Those whose applications were approved were protected from removal for renewable two-year periods and were eligible for work authorization. *Id.* at 11a-12a. The executive memorandum announcing DACA recognized that "[o]ur Nation's immigration laws must be enforced in a strong and sensible manner" and that these laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language." *Id.* at 98a-99a. The memorandum also established specific eligibility criteria and provided that qualified applicants must pass a background check and undergo a case-by-case review process to receive the requested deferral from removal. *Id.* Moreover, the memorandum emphasized that DACA was an exercise of "[p]rosecutorial discretion, which is used in so many other areas, [and] is especially justified here." *Id.* at 99a.

DACA was also fully consistent with the reasonable immigration enforcement priorities that the executive branch had announced pursuant to 6 U.S.C. § 202(5), which authorizes the executive to "[e]stablish[] national immigration enforcement policies and priorities." In a 2011 memorandum, the director of ICE declared that "[a]liens who pose a danger to national security or a risk to public safety" were the highest priority for civil immigration enforcement. *Morton Prioritization Memorandum* at 1. The director deemed other undocumented immigrants, including "[r]ecent illegal entrants" and "[a]liens who are fugitives or otherwise obstruct immigration controls" to be lower

19

enforcement priorities. *Id.* at 2. The director explained that "[t]he rapidly increasing number of criminal aliens who may come to ICE's attention heightens the need for ICE employees to exercise sound judgment and discretion consistent with these priorities when conducting enforcement operations." *Id.* at 4. He also noted that "[p]articular care should be given when dealing with . . . juveniles." *Id.* By establishing DACA to advance these carefully constructed priorities, the Secretary acted within his congressionally conferred discretion to, among other things, "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under the INA, 8 U.S.C. § 1103(a)(3).

OLC's 2014 memorandum further confirms DACA's validity. The memorandum noted that prior to DACA's implementation, OLC had concluded that a deferred action policy like DACA "would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis." J.A. 827 n.8. Significantly, DACA expressly guarantees that "requests for relief . . . are to be decided on a case by case basis. DHS cannot provide assurance that relief will be granted in all cases." Pet. App. 99a. OLC also observed that "the concerns animating [DACA] were consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion." *Id.* at 42a. Thus, OLC recognized that DACA would be a lawful exercise of the executive's discretionary authority in immigration enforcement.

Moreover, in addition to Congress's longstanding general practice of sanctioning executive grants of deferred action, members of Congress affirmatively called for the executive to exercise discretion regarding

**AR5042**

20

certain individuals who were brought to the country as children.  In a 1999 letter to the attorney general and the INS commissioner, 28 bipartisan members of Congress noted the "well-grounded" principle that the "INS has prosecutorial discretion in the initiation or termination of removal proceedings" and specifically called on the executive to issue written guidelines and "exercise . . . such discretion" in "[t]rue hardship cases," including those involving people "who came to the United States when they were very young."  Letter from Rep. Lamar Smith et al., to Hon. Janet Reno, Att'y Gen., DOJ, and Hon. Doris M. Meissner, Comm'r, INS (Nov. 4, 1999), *in* 76 Interpreter Releases, app. I, at 1730-32 (Dec. 3, 1999).  In sending this letter, members of Congress on both sides of the aisle recognized that Congress had deliberately given the executive broad discretion to grant deferred action, and this bipartisan group expressly encouraged the executive to exercise that discretion with respect to the category of individuals later covered by DACA.

In the period surrounding DACA's establishment, members of Congress on a bipartisan basis continued to recognize the executive's prerogative to establish eligibility criteria for deferred action.  In 2010, Senator Richard J. Durbin, then Assistant Majority Leader of the Senate, and then-Senator Richard G. Lugar, Ranking Member of the Senate Foreign Relations Committee, wrote to the executive branch requesting deferred action for young immigrants known as Dreamers.  *See* Press Release, *Durbin, Lugar Ask Secretary Napolitano to Stop Deportations of Dream Act Students* (Apr. 21, 2010), https://www.durbin.senate.gov/newsroom/press-releases/durbin-lugar-ask-secretary-napolitano-to-stop-deportations-of-dream-act-students.  Shortly after the 2012 memorandum implementing DACA was released, a group of 104 members of

**AR5043**

21

Congress sent a follow-up letter to President Obama praising the use of prosecutorial discretion in DACA, which they noted deferred the removal of certain "outstanding young Americans." 158 Cong. Rec. 11764 (daily ed. July 19, 2012) (statement of Rep. Gutiérrez). These members of Congress emphasized that the "consensus legal opinion among experts" was that DACA rested "on solid moral and legal ground," and they vowed to defend "the authority that [President Obama], like past Presidents, can exercise to set [immigration] enforcement priorities and better protect our neighborhoods and our nation." *Id.*

Although bipartisan efforts to provide broader and more permanent protections to Dreamers through new legislation have thus far failed, *see* Pet'rs Br. 5 & n.2, that fact has no bearing on DACA's legality as an exercise of the discretion Congress has already conferred on the executive in existing legislation. *See United States v. Craft*, 535 U.S. 274, 287 (2002) ("[C]ongressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." (citation and internal quotation marks omitted)). As this Court's precedents confirm, and as Congress has consistently reaffirmed through the legislation it *has* passed, the executive branch's authority to set rational immigration enforcement priorities is well established. *See Arizona*, 567 U.S. at 394-95 (noting that the federal government's authority over immigration "rests, in part, on the National Government's . . . inherent power as sovereign to control and conduct relations with foreign nations"); *Medellín*, 554 U.S. at 765 (Breyer, J., dissenting) (acknowledging the "President's responsibility for foreign affairs"); 6 U.S.C. § 202(5) (authorizing the executive to "[e]stablish[]

22

national immigration enforcement policies and priorities").

As noted, moreover, the proposals for new legislation that Congress has considered would provide more permanent and wide-ranging protections for Dreamers than DACA afforded its recipients, and they would have extended these protections to a broader class of Dreamers. *See, e.g.*, S. 1615, 115th Cong. (2017). The fact that these proposals are not coextensive with DACA further underscores why Congress's failure to pass them has no bearing on DACA's legality. Indeed, even if congressional inaction were a permissible consideration when assessing the legality of executive policies, no inference could be drawn here in either direction, given that Congress has also repeatedly rejected efforts to terminate or defund DACA, *see, e.g.*, H.R. 5160, 113th Cong. (2014); S. 2631, 113th Cong. (2014). In short, Congress's decision not to pass new legislation that might affect DACA recipients (and others) is irrelevant to the legality of DACA itself. "The search for significance in the silence of Congress is too often the pursuit of a mirage." *Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4, 11 (1942).

Likewise, even though President Obama stated that he intended for DACA to be a short-term measure until Congress passed legislation to more fully protect DACA recipients, *see* Pet'rs Br. 38; Pres. Barack Obama, Remarks by the President on Immigration (June 15, 2012) ("This is not a path to citizenship. It's not a permanent fix. This is a temporary stopgap measure . . . ."), this subjective expectation did not alter the legal authority underpinning DACA, much less set an expiration date on that legal authority. President Obama merely recognized that DACA did not confer a legal immigration status on recipients—an action that would have fallen within Congress's domain, *see*

23

Pet. App. 101a—and he encouraged Congress to legislate to more completely protect DACA recipients from removal, even as the executive was providing available legal protections through DACA in the meantime. *Cf. ICYMI: Speaker Ryan, Senator Hatch Urge Trump to Keep DACA*, fwd.us (Sept. 1, 2017), https://www.fwd.us/news/speaker-ryan-senator-hatch -urge-trump-keep-daca/ (quoting statement by then-Senator Orrin Hatch that he has "urged [President Trump] not to rescind DACA" while recognizing that "we also need a workable, permanent solution for individuals who entered our country unlawfully as children through no fault of their own" and that "that solution must come from Congress").

DACA therefore did what Congress legally authorized the executive to do: grant deferred action to certain qualified and "outstanding young Americans," 158 Cong. Rec. 11764 (daily ed. July 19, 2012), so that immigration officers could instead focus their enforcement efforts and limited resources on higher priority cases. *See* Supp. Pet. App. 56a ("In a world where the government can remove only a small percentage of the undocumented noncitizens present in this country in any year, deferred action programs like DACA enable DHS to devote much-needed resources to enforcement priorities such as threats to national security, rather than blameless and economically productive young people with clean criminal records."). Accordingly, DACA was a lawful exercise of executive discretion.

## II. THE TERMINATION OF DACA ON THE GROUND THAT IT WAS UNLAWFUL VIOLATED THE APA.

Despite the many explanations that Petitioners now offer for DACA's rescission, *see, e.g.*, Pet'rs Br. 15, what matters is the explanation the executive branch offered at the time it terminated DACA—namely, that

24

it had concluded that DACA was unlawful, J.A. 877. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; [*SEC v. Chenery Corp.*, 332 U.S. 194 (1947),] requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself."); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (same). In his September 2017 letter advising then–Acting Secretary of Homeland Security Elaine C. Duke to end DACA, then–Attorney General Jefferson B. Sessions, III, asserted that "DACA was effectuated . . . without proper statutory authority" and that "[s]uch an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." J.A. 877. He also referenced the DAPA policy, which the Fifth Circuit had concluded was unlawful in a decision this Court affirmed by an equally divided vote, and suggested that "it is likely that potentially imminent litigation would yield similar results with respect to DACA." *Id.* at 878. Acting Secretary Duke's memorandum formally rescinding DACA the next day echoed and incorporated these reasons for the rescission. *See* Pet. App. 112a. It stated, "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing [DAPA] litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." *Id.* at 117a. Thus, the Administration ended DACA because it concluded that it was unlawful and would likely be enjoined if challenged in court.

For the reasons discussed above, however, DACA was fully consistent with the nation's immigration laws and was a permissible—and, indeed, sensible—

25

exercise of the discretion Congress conferred on the executive to implement those laws. Accordingly, the decision to terminate DACA on the ground that it was unlawful was itself "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA. 5 U.S.C. § 706(2)(A).

Contrary to the executive officials' assertions, DACA is also materially distinguishable from DAPA, which the Fifth Circuit addressed in *Texas v. United States*, 809 F.3d 134. The Fifth Circuit there upheld a preliminary injunction against DAPA on the ground that DHS likely lacked the authority to implement it, and the Department therefore likely violated the APA in doing so. *See id.* at 146, 178-86. Although the Fifth Circuit noted in its decision some "important similarities" between DACA and DAPA, it also emphasized that "DACA and DAPA are not identical," *id.* at 174, and that "any extrapolation from DACA must be done carefully," *id.* at 173.

Illustrating one such distinction, the Fifth Circuit based its DAPA decision in part on its determination that "Congress has enacted an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status." *Id.* at 179; *see id.* at 180 n.167 (citing 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255). The Fifth Circuit noted with disapproval that "DAPA would allow illegal aliens to receive the benefits of lawful presence solely on account of their children's immigration status without complying with any of the [enumerated] requirements . . . that Congress has deliberately imposed." *Id.* at 180. This analysis of DAPA

26

was flawed,[3] but it is also inapposite here because DACA is markedly different from DAPA in this regard. No legislation provides a framework for young people who were brought to the United States as children without documentation to receive lawful status *or* to be considered lawfully present in the country, and therefore DACA does not even plausibly circumvent any established legislative scheme.

Another important difference the court identified between the policies was that "[e]ligibility for DACA was restricted to a younger and less numerous population" than was the case for DAPA. *Id.* at 174. According to the Fifth Circuit, approximately "1.2 million persons qualif[ied] for DACA" and only "approximately 636,000 applications were approved through 2014." *Id.* at 147; *see id.* at 174 n.138. By 2018, that number was still only 823,815. *See* U.S. Citizenship and Immigration Services, *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals*, at 1

---

[3] The Fifth Circuit erred by conflating two distinct concepts: "lawful immigration classification" and "lawful presence." *Texas*, 809 F.3d at 179-80. While the former confers significant rights and benefits, the latter simply means that one's physical presence no longer exposes him or her to immigration enforcement consequences that escalate over time. *See, e.g.*, 8 U.S.C. § 1182(a)(9)(B) (making admissibility determinations depend on how long an alien has been unlawfully present in the United States). Although the Fifth Circuit acknowledged the existence of this distinction, *Texas*, 809 F.3d at 180 ("DAPA does not confer the full panoply of benefits that a visa gives . . . ."); *id.* ("LPR status is more substantial than is lawful presence . . . ."); *id.* at 184 ("DAPA awards lawful presence to persons who have never had a legal status and may never receive one." (footnote omitted)), it nevertheless brushed it aside—declaring with little explanation that Congress's decision to make lawful immigration classifications available in certain defined situations precluded the executive from allowing other individuals to be lawfully present through a grant of deferred action, *see id.* at 179-82, 186.

27

(Nov. 30, 2018), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_FY19_Q1_Data.pdf. By contrast, "4.3 million [persons] would [have] be[en] eligible for lawful presence pursuant to DAPA." *Texas*, 809 F.3d at 148; *see id.* at 174 n.138.

Regardless, the Fifth Circuit's conclusion about DAPA's legality was wrong, undermining any persuasive value the decision might have in assessing the legality of DACA (and the attendant illegality of its rescission). Although the court purported to disclaim reliance on the *expressio unius est exclusio alterius* canon of statutory construction, *id.* at 182, it reasoned that congressional acknowledgment of deferred action's appropriateness in some circumstances precludes the executive branch from granting deferred action in other circumstances, as it did in DAPA, *see id.* at 179-81. *See generally Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 392 (2013) (explaining that the *expressio unius* canon "instructs that when Congress includes one possibility in a statute, it excludes another by implication"). In other words, the court reasoned that because "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present and confers eligibility for 'discretionary relief allowing [aliens in deportation proceedings] to remain in the country,'" the INA deliberately does not authorize grants of deferred action to others, including those eligible for DAPA. *Texas*, 809 F.3d at 179 (alterations in original) (quoting *Arizona*, 567 U.S. at 396); *see id.* ("Entirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA were it not enjoined.").

28

This Court, however, has repeatedly held that "the canon *expressio unius est exclusio alterius* does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002)). As the court of appeals explained in one of the decisions below, the INA provisions allowing for deferred action were not collectively included in the original statute. *See* Supp. Pet. App. 53a. Rather, Congress has added them piecemeal over time in separate amendments to the INA as different situations arose. *See id.* Accordingly, as many *amici* well know from serving in Congress while those amendments were drafted, debated, and passed, Congress did not intend to preclude the executive from granting deferred action in other situations besides those expressly mentioned in the amendments. And, as explained above, the fact that Congress has not yet enacted such an amendment permanently protecting DACA recipients and others from removal does not alter the fact that Congress has given the executive broad discretion to provide some relief in the meantime.

In short, because DACA was a lawful exercise of executive discretion, the decision to terminate it on the ground that it was unlawful was itself in violation of the APA.

29

## CONCLUSION

For the foregoing reasons, the judgments of the Ninth Circuit and the District Court for the District of Columbia, as well as the orders of the Eastern District of New York, should be affirmed.

Respectfully submitted,

ELIZABETH B. WYDRA
BRIANNE J. GOROD*
BRIAN R. FRAZELLE
DAYNA J. ZOLLE**
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1200 18th Street NW
  Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

October 4, 2019

* Counsel of Record
** Not admitted in D.C.; supervised by principals of the firm

**AR5052**

1A

APPENDIX:
LIST OF *AMICI*

**U.S. Senate**

Durbin, Richard J.
  Senator of Illinois

Schumer, Charles E.
  Senator of New York

Leahy, Patrick J.
  Senator of Vermont

Feinstein, Dianne
  Senator of California

Murray, Patty
  Senator of Washington

Wyden, Ron
  Senator of Oregon

Reed, Jack
  Senator of Rhode Island

Carper, Thomas R.
  Senator of Delaware

Stabenow, Debbie
  Senator of Michigan

Cantwell, Maria
  Senator of Washington

2A

LIST OF *AMICI* - cont'd

Menendez, Robert
  Senator of New Jersey

Cardin, Benjamin L.
  Senator of Maryland

Sanders, Bernard
  Senator of Vermont

Brown, Sherrod
  Senator of Ohio

Casey, Robert P., Jr.
  Senator of Pennsylvania

Klobuchar, Amy
  Senator of Minnesota

Whitehouse, Sheldon
  Senator of Rhode Island

Tester, Jon
  Senator of Montana

Udall, Tom
  Senator of New Mexico

Shaheen, Jeanne
  Senator of New Hampshire

Warner, Mark R.
  Senator of Virginia

3A

LIST OF *AMICI* - cont'd

Merkley, Jeff
  Senator of Oregon

Bennet, Michael F.
  Senator of Colorado

Gillibrand, Kirsten E.
  Senator of New York

Manchin, Joe, III
  Senator of West Virginia

Coons, Christopher A.
  Senator of Delaware

Blumenthal, Richard
  Senator of Connecticut

Schatz, Brian
  Senator of Hawai'i

Baldwin, Tammy
  Senator of Wisconsin

Murphy, Christopher
  Senator of Connecticut

Hirono, Mazie K.
  Senator of Hawai'i

Heinrich, Martin
  Senator of New Mexico

AR5055

4A

LIST OF *AMICI* - cont'd

King, Angus S., Jr.
  Senator of Maine

Kaine, Tim
  Senator of Virginia

Warren, Elizabeth
  Senator of Massachusetts

Markey, Edward J.
  Senator of Massachusetts

Booker, Cory A.
  Senator of New Jersey

Peters, Gary C.
  Senator of Michigan

Van Hollen, Chris
  Senator of Maryland

Duckworth, Tammy
  Senator of Illinois

Hassan, Margaret Wood
  Senator of New Hampshire

Harris, Kamala D.
  Senator of California

Cortez Masto, Catherine
  Senator of Nevada

AR5056

5A

LIST OF *AMICI* - cont'd

Smith, Tina
  Senator of Minnesota

Rosen, Jacky
  Senator of Nevada

Hart, Gary
  Former Senator of Colorado

Levin, Carl
  Former Senator of Michigan

Reid, Harry
  Former Senator of Nevada

Udall, Mark
  Former Senator of Colorado

**U.S. House of Representatives**

Lofgren, Zoe
  Representative of California

Nadler, Jerrold
  Representative of New York

Castro, Joaquin
  Representative of Texas

Pelosi, Nancy
  Representative of California

Hoyer, Steny H.
  Representative of Maryland

**AR5057**

6A

LIST OF *AMICI* - cont'd

Clyburn, James E.
  Representative of South Carolina

Aguilar, Pete
  Representative of California

Allred, Colin Z.
  Representative of Texas

Barragán, Nanette Diaz
  Representative of California

Bass, Karen
  Representative of California

Beyer, Donald S., Jr.
  Representative of Virginia

Blumenauer, Earl
  Representative of Oregon

Brown, Anthony
  Representative of Maryland

Brownley, Julia
  Representative of California

Carbajal, Salud O.
  Representative of California

Cárdenas, Tony
  Representative of California

7A

LIST OF *AMICI* - cont'd

Carson, André
  Representative of Indiana

Casten, Sean
  Representative of Illinois

Castor, Kathy
  Representative of Florida

Chu, Judy
  Representative of California

Cicilline, David N.
  Representative of Rhode Island

Cisneros, Gilbert R., Jr.
  Representative of California

Clarke, Yvette D.
  Representative of New York

Cohen, Steve
  Representative of Tennessee

Correa, J. Luis
  Representative of California

Costa, Jim
  Representative of California

Cox, TJ
  Representative of California

8A

LIST OF *AMICI* - cont'd

Crow, Jason
   Representative of Colorado

Cummings, Elijah E.
   Representative of Maryland

Davis, Danny K.
   Representative of Illinois

Davis, Susan A.
   Representative of California

DeFazio, Peter A.
   Representative of Oregon

DeGette, Diana
   Representative of Colorado

DeLauro, Rosa L.
   Representative of Connecticut

DelBene, Suzan K.
   Representative of Washington

Demings, Val Butler
   Representative of Florida

DeSaulnier, Mark
   Representative of California

Deutch, Theodore E.
   Representative of Florida

**AR5060**

9A

LIST OF *AMICI* - cont'd

Engel, Eliot L.
  Representative of New York

Escobar, Veronica
  Representative of Texas

Eshoo, Anna G.
  Representative of California

Espaillat, Adriano
  Representative of New York

Evans, Dwight
  Representative of Pennsylvania

Foster, Bill
  Representative of Illinois

Gabbard, Tulsi
  Representative of Hawaiʻi

Gallego, Ruben
  Representative of Arizona

Garamendi, John
  Representative of California

García, Jesús G. "Chuy"
  Representative of Illinois

Garcia, Sylvia R.
  Representative of Texas

10A

LIST OF *AMICI* - cont'd

Gomez, Jimmy
  Representative of California

Green, Al
  Representative of Texas

Grijalva, Raúl M.
  Representative of Arizona

Haaland, Debra A.
  Representative of New Mexico

Harder, Josh
  Representative of California

Hayes, Jahana
  Representative of Connecticut

Hill, Katie
  Representative of California

Huffman, Jared
  Representative of California

Jackson Lee, Sheila
  Representative of Texas

Jayapal, Pramila
  Representative of Washington

Jeffries, Hakeem
  Representative of New York

11A

LIST OF *AMICI* - cont'd

Johnson, Henry C. "Hank," Jr.
  Representative of Georgia

Keating, William R.
  Representative of Massachusetts

Khanna, Ro
  Representative of California

Kildee, Daniel T.
  Representative of Michigan

Lawrence, Brenda L.
  Representative of Michigan

Lee, Barbara
  Representative of California

Levin, Andy
  Representative of Michigan

Lewis, John
  Representative of Georgia

Lieu, Ted W.
  Representative of California

Lowenthal, Alan S.
  Representative of California

Lowey, Nita M.
  Representative of New York

**AR5063**

12A

LIST OF *AMICI* - cont'd

Matsui, Doris O.
  Representative of California

McCollum, Betty
  Representative of Minnesota

McEachin, A. Donald
  Representative of Virginia

McGovern, James P.
  Representative of Massachusetts

McNerney, Jerry
  Representative of California

Meeks, Gregory W.
  Representative of New York

Meng, Grace
  Representative of New York

Moore, Gwen
  Representative of Wisconsin

Napolitano, Grace F.
  Representative of California

Neguse, Joe
  Representative of Colorado

Norton, Eleanor Holmes
  Delegate of District of Columbia

AR5064

13A

LIST OF *AMICI* - cont'd

Ocasio-Cortez, Alexandria
  Representative of New York

Panetta, Jimmy
  Representative of California

Peters, Scott H.
  Representative of California

Pocan, Mark
  Representative of Wisconsin

Porter, Katie
  Representative of California

Pressley, Ayanna
  Representative of Massachusetts

Quigley, Mike
  Representative of Illinois

Raskin, Jamie
  Representative of Maryland

Rice, Kathleen M.
  Representative of New York

Richmond, Cedric L.
  Representative of Louisiana

Rouda, Harley
  Representative of California

AR5065

14A

LIST OF *AMICI* - cont'd

Roybal-Allard, Lucille
  Representative of California

Rush, Bobby L.
  Representative of Illinois

Sánchez, Linda T.
  Representative of California

Schakowsky, Janice D.
  Representative of Illinois

Schiff, Adam B.
  Representative of California

Schneider, Bradley Scott
  Representative of Illinois

Serrano, José E.
  Representative of New York

Sires, Albio
  Representative of New Jersey

Smith, Adam
  Representative of Washington

Soto, Darren
  Representative of Florida

Stanton, Greg
  Representative of Arizona

AR5066

15A

LIST OF *AMICI* - cont'd

Swalwell, Eric
  Representative of California

Takano, Mark
  Representative of California

Thompson, Bennie G.
  Representative of Mississippi

Titus, Dina
  Representative of Nevada

Tlaib, Rashida
  Representative of Michigan

Torres, Norma J.
  Representative of California

Vargas, Juan
  Representative of California

Vela, Filemon
  Representative of Texas

Velázquez, Nydia M.
  Representative of New York

Welch, Peter
  Representative of Vermont

Yarmuth, John A.
  Representative of Kentucky

AR5067

16A

LIST OF *AMICI* - cont'd

Gonzalez, Charles
  Former Representative of Texas

Holtzman, Elizabeth
  Former Representative of New York

LaHood, Ray
  Former Representative of Illinois

Morella, Constance
  Former Representative of Maryland

Schneider, Claudine
  Former Representative of Rhode Island

Skaggs, David E.
  Former Representative of Colorado

Smith, Peter
  Former Representative of Vermont

Waxman, Henry A.
  Former Representative of California

Nos. 18-587, 18-588 and 18-589

IN THE

# Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Petitioners,*

*v.*

REGENTS OF THE UNIVERSITY
OF CALIFORNIA, *et al.*,

*Respondents.*

DONALD J. TRUMP, PRESIDENT
OF THE UNITED STATES, *et al.*,

*Petitioners,*

*v.*

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, *et al.*,

*Respondents.*

*(For Continuation of Caption See Inside Cover)*

ON WRITS OF CERTIORARI TO THE UNITED STATES COURTS
OF APPEAL FOR THE NINTH, DC AND SECOND CIRCUITS

**BRIEF OF FORMER HOMELAND SECURITY
AND IMMIGRATION OFFICIALS AS *AMICI CURIAE*
IN SUPPORT OF RESPONDENTS**

JEH C. JOHNSON
LIZA M. VELAZQUEZ
DAVID C. KIMBALL-STANLEY
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

MASHA G. HANSFORD
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300

KAREN L. DUNN
JOSHUA RILEY
MENNO GOEDMAN
ANDREA R. FLORES
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
(202) 237-2727

ALBERT GIANG
 *Counsel of Record*
BOIES SCHILLER FLEXNER LLP
725 South Figueroa Street
Los Angeles, CA 90017
(213) 629-9040
agiang@bsfllp.com

*Counsel for Amici Curiae*

291551

**AR5069**

KEVIN K. MCALEENAN, ACTING SECRETARY
OF HOMELAND SECURITY, *et al.,*

                                        *Petitioners,*

*v.*

MARTIN JONATHAN BATALLA VIDAL, *et al.,*

                                        *Respondents.*

*i*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................i

TABLE OF AUTHORITIES .........................................ii

INTEREST OF *AMICI CURIAE* ...............................1

SUMMARY OF ARGUMENT ....................................6

STATEMENT OF THE CASE....................................7

ARGUMENT ..........................................................12

   I.  Deferred Action Is Firmly Rooted in Historical Practice ...........................................12

  II.  Allowing Deferred Action Recipients to Apply for Work Authorization Is Consistent With Historical Practice and Benefits the United States ...........................25

     A.  Work authorization is permitted under federal law ................................................26

     B.  Work authorization is consistent with historical practice .....................................27

CONCLUSION .......................................................34

**AR5071**

*ii*

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Arizona v. United States,*
    567 U.S. 387 (2012)................................................10

*Hotel & Rest. Emps. Union, Local 25 v. Smith,*
    846 F.2d 1499 (D.C. Cir. 1988)............................16

*United States v. Texas,*
    136 S. Ct. 2271 (2016)..........................................26


**Statutes:**

6 U.S.C. § 202(5).........................................................13

8 U.S.C. § 1103............................................................29

8 U.S.C. § 1182(a)(4)..................................................26

8 U.S.C. § 1231(a)(7)..................................................32

8 U.S.C. § 1324a(a)(1)...............................................29

8 U.S.C. § 1324a(h)(3)...................................27, 29, 31

Pub. L. No. 82-414, 66 Stat. 163..............................14

Pub. L. No. 93-518, 88 Stat. 1652............................28

Pub. L. No. 97-113, 95 Stat. 1519............................17

Pub. L. No. 99-603, 100 Stat. 3359....................17, 29

Pub. L. No. 101-649, 104 Stat. 4978.........................22

Pub. L. No. 104-208, 110 Stat. 3009-546.................32

**AR5072**

*iii*

Pub. L. No. 106-386, 114 Stat. 1464 .........................33

**Regulations:**

8 C.F.R. § 109.1(b)(6) ...................................29

8 C.F.R. § 214.2(c) ....................................28

8 C.F.R. § 214.14(d)(3) ...............................24

8 C.F.R. § 274a.12(c)(11) ............................33

8 C.F.R. § 274a.12(c)(14) ........................13, 17, 26, 33

Sup. Ct. R. 37.3(a) ......................................1

**Other Authorities:**

17 Fed. Reg. 11,488 (Dec. 19, 1952) .........................27

46 Fed. Reg. 25,079 (May 5, 1981) ...........................17

46 Fed. Reg. 25,080 (May 5, 1981) ...........................29

46 Fed. Reg. 25,081 (May 5, 1981) .....................17, 29

51 Fed. Reg. 39,385 (Oct. 28, 1986) .........................30

51 Fed. Reg. 39,386 (Oct. 28, 1986) .........................30

52 Fed. Reg. 46,092 (Dec. 4, 1987) .....................30, 31

52 Fed. Reg. 46,093 (Dec. 4, 1987) .....................30, 31

72 Fed. Reg. 53,014 (Sept. 17, 2007) ........................24

Alan   C.   Nelson,   *Legalization   and   Family Fairness: An Analysis* (Oct. 21, 1987) ................18

**AR5073**

*iv*

Camilo Montoya-Galvez, *Trump Administration to Process Some Deferred Deportation Requests from Sick Immigrants*, CBS News (Sept. 2, 2019) ....................................................25

*Executive Grants of Temporary Immigration Relief, 1956-Present*, Am. Immigr. Counsel (Oct. 2014) ...........................................................14

Gene McNary, INS Comm'r, to INS Reg'l Comm'rs, *Family Fairness: Guidelines for Voluntary Departure Under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990)............................19

*Hearing Before the H. Comm. on the Judiciary*, 114th Cong. (Feb. 25, 2015)....................................8

*Immigration Act of 1989 (Part 2): Hearing before the Subcomm. on Immigration, Refugees, and International Law of the H. Comm. on the Judiciary* at 56, 101st Cong. (Feb. 21, 1990) ......20

*Immigration Reform and Control Act of 1983: Hearings before the Subcomm. on Immigration, Refugees, and Int'l Law of the H. Comm. on the Judiciary*, 98th Cong. 1441 (1983)....................................................................30

Jeffrey S. Passel et al., *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled*, Pew Res. Ctr. (Sept. 3, 2014) ....................................................................20

**AR5074**

*v*

Jens Manuel Krogstad et al., *5 Facts About Illegal Immigration in the U.S.*, Pew Res. Ctr. (June 12, 2019) ................................................. 7

Jie Zong et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation*, Migration Pol'y Inst. (Nov. 2017) .... 11

Kathryn Watson, *Pentagon Says DACA Recipients in Military Number Fewer than 900*, CBS News (Sept. 6, 2017) ............................ 11

Letter from Robert McConnell, Dep't of Justice, to Rep. Romano Mazzoli (Apr. 4, 1983) ............... 30

Memorandum from Andorra Bruno et al., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* Cong. Res. Serv. (July 13, 2012) ..................................... 13

Memorandum from Janet Napolitano to David V. Aguilar et al., Sec'y of Homeland Sec., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) .... 9, 10

Memorandum from Michael D. Cronin, Acting Exec. Assoc. Comm'r, INS, to Michael A. Pearson, Exec. Assoc. Comm'r, Off. of Programs, INS, *VTVPA of 2000 Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* (Aug. 30, 2001) .................. 33

**AR5075**

*vi*

Memorandum from Paul W. Virtue, *Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* (May 6, 1997)........................................................22

President Dwight D. Eisenhower, *Statement by the President Concerning the Entry into the United States of Adopted Foreign-Born Orphans* (Oct. 26, 1956)................................13, 14

President George H.W. Bush, *Statement on Signing the Immigration Act of 1990* (Nov. 29, 1990) ................................................................21

President William J. Clinton, *Memorandum for the Attorney General: Measures Regarding Certain Liberians in the United States* (Sept. 27, 1999) .................................................22, 23, 32

President William J. Clinton, *Memorandum on Deferred Enforced Departure for Haitians* (Dec. 23, 1997)..............................................32, 33

Raquel Muñiz et al., *DACAmented Law Students and Lawyers in the Trump Era*, Ctr. Am. Progress (June 7, 2018) .......................11

*Recent Developments,* 67 No. 6 Interpreter Releases (Feb. 5, 1990) ..................................18, 20

*Revision of Immigration, Naturalization, and Nationality Laws: Joint Hearing Before the S. & H.R. Subcomms. on the Judiciary*, 82d Cong. 713 (1951)..................................................14

**AR5076**

*vii*

Roberto G. Gonzalez et al., *Taking Giant Leaps Forward: Experiences of a Range of DACA Beneficiaries at the 5-Year Mark*, Ctr. Am. Progress (June 22, 2017) ....................................11

Sam Bernsen, *Lawful Work for Nonimmigrants*, 48 No. 21 Interpreter Releases (June 21, 1971) ....................................................................28

Sam Bernsen, *Leave to Labor*, 52 No. 35 Interpreter Releases (Sept. 2, 1975)...................28

*Statement from Dean Manning on the End of the DACA Program*, Harv. L. Sch. (Sept. 5, 2017)....11

Steven Kopits, *Apprehensions, Illegal Entries Forecast for 2019 (August)*, Princeton Pol'y Advisors (Sept. 10, 2019) ......................................7

Ted Hesson, *DHS Walks Back Decision to Halt Medical Deportation Relief*, Politico (Sept. 19, 2019) ................................................................25

Tom Wong et al., *Results from 2019 National DACA Study*, Ctr. Am. Progress (2019) .............11

U.S. Customs & Border Patrol, *United States Border Patrol Nationwide Illegal Alien Apprehensions Fiscal Years 1925 – 2018* ..............7

U.S. Customs & Border Protection, *CBP Enforcement Statistics FY 2019* ...........................7

U.S. Immigr. & Customs Enforcement, *Fiscal Year 2018 ICE Enforcement and Removal Operations Report* ..................................................8

AR5077

*viii*

USCIS Policy Manual § 38.2 ..................................... 15

USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina, Frequently Asked Questions* (Nov. 25, 2005) .................................... 23

USCIS, *Liberia Temporary Protected Status (TPS) Questions and Answers* (Sept. 27, 2002) ................................. 23

USCIS, Press Release, USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina (Nov. 25, 2005) ................................................... 33

AR5078

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are former leaders of the U.S. Department of Homeland Security ("DHS") and its component or predecessor agencies. *Amici* had direct involvement in the creation and administration of Deferred Action for Childhood Arrivals ("DACA") specifically and/or responsibility for administering and enforcing our nation's immigrations laws generally.

Jeh C. Johnson served as Secretary of DHS from December 2013 to January 2017, where he was responsible for enforcement and administration of the nation's immigration laws. Previously, Secretary Johnson served as General Counsel of the U.S. Department of Defense (2009–2012), General Counsel of the U.S. Air Force (1998–2001), and as an Assistant U.S. Attorney in the Southern District of New York (1989–1991).

Alejandro Mayorkas served as Deputy Secretary of DHS from December 2013 to October 2016. Prior to that, Deputy Secretary Mayorkas was Director of U.S. Citizenship and Immigration Services ("USCIS") from August 2009 to December 2013; in

---

[1] The parties have consented to the filing of this brief. Pursuant to Rule 37.3(a), written consents to the filing of this brief are on file with the Clerk of the Court. No counsel for a party authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than the *amici curiae*, or their counsel, made a monetary contribution to the preparation or submission of this brief.

2

that role, he was directly responsible for the launch, implementation, and subsequent administration of DACA. Earlier in his career, Deputy Secretary Mayorkas was United States Attorney for the Central District of California (1998–2001).

Leon Rodriguez served as Director of USCIS from 2014 to 2017, where he was also directly responsible for the administration of DACA. From 2007 to 2011, Mr. Rodriguez served in leadership positions at the Department of Health and Human Services and the Department of Justice.

Gil Kerlikowske served as Commissioner of U.S. Customs and Border Protection from March 2014 to January 2017. Previously, Commissioner Kerlikowske was Director of the Office of National Drug Control Policy (2009–2014) and served as the Commissioner or Chief of Police in four different cities, including an eight-year term in Seattle, Washington (2001–2009).

John T. Morton served as Director of Immigration and Customs Enforcement ("ICE") from May 2009 to August 2013. Previously, Mr. Morton served in leadership positions at the Department of Justice and was an Assistant U.S. Attorney in the Eastern District of Virginia (1999–2006).

Stevan E. Bunnell served as General Counsel of DHS from December 2013 to January 2017. Prior to that, he held various positions in law enforcement,

**AR5080**

3

including Chief of the Criminal Division in the U.S. Attorney's Office for the District of Columbia.

Russell C. Deyo served as Acting Deputy Secretary of DHS from November 2016 to January 2017. Previously, Mr. Deyo served as Under Secretary for Management at DHS from May 2015 to November 2016. He also served as an Assistant U.S. Attorney for the District of New Jersey (1978–1985).

Bo Cooper served as General Counsel of the Immigration and Naturalization Service ("INS") from 1999 until 2003.[2]

T. Alexander Aleinikoff served as General Counsel and then as Executive Associate Commissioner for Programs of the INS from 1994 to 1997.

Roxana Bacon served as Chief Counsel of USCIS from 2009 to 2011.

Seth Grossman served as Chief of Staff to the General Counsel of DHS from 2010 to 2011, Deputy General Counsel of DHS from 2011 to 2013, and as Counselor to the Secretary at the same agency in 2013.

Stephen H. Legomsky served as Chief Counsel of

---

[2] The INS is the predecessor agency to the federal offices within DHS that now have responsibility for enforcing the nation's immigration laws.

AR5081

4

USCIS from 2011 to 2013 and as Senior Counselor to the Secretary of DHS on immigration from July to October 2015.

Jonathan E. Meyer served as Deputy General Counsel of DHS from 2014 to 2016 and as Senior Counselor to the General Counsel from 2011 to 2014. Previously, he served as Deputy Assistant Attorney General at the Department of Justice (2000–2001, 2009–2011).

John R. Sandweg served as Acting Director of ICE from 2013 to 2014, as Acting General Counsel of DHS from 2012 to 2013, as Senior Counselor to the Secretary of DHS from 2010 to 2012, and as Chief of Staff to the General Counsel of the same agency from 2009 to 2010.

David A. Martin served as Principal Deputy General Counsel of DHS from January 2009 through December 2010 (including four months as Acting General Counsel) and as General Counsel of the INS from August 1995 to January 1998.

Paul Virtue served as General Counsel of the INS from 1998 to 1999. He also served as Executive Associate Commissioner of the INS from 1997 to 1998 and as Deputy General Counsel from 1988 to 1997.

Paul M. Rosen served as Chief of Staff to the Secretary of DHS from 2015 to 2017. Previously, Mr. Rosen served in various positions at DHS from 2013 to 2015. Earlier in his career, Mr. Rosen served at

**AR5082**

5

the U.S. Department of Justice (2009–2013) and as Counsel to the U.S. Senate Judiciary Committee for then-Senator Joseph R. Biden, Jr. (2006–2009).

*Amici* submit this brief to offer their first-hand perspective on the virtue, historical pedigree, and lawfulness of deferred action in the enforcement of federal immigration law and to provide context as to why a decision to rescind DACA as unlawful cannot and should not stand.

AR5083

## SUMMARY OF ARGUMENT

DACA is not government benevolence, inaction, or—as some have derisively labeled it—"amnesty." Rather, as the *amici* can personally attest, DACA is sound, smart policy given the inherent limitations of government resources. It confers no legal status and it serves important government interests (including public safety and national security) by encouraging young people who are the lowest priorities for removal, but who live in the shadows of American life, to come forward, engage in their communities, and contribute to the economy.

Discretionary relief policies have existed within the landscape of executive branch authority for decades and have been used by administrations of both political parties. DACA is thus neither novel nor unprecedented. The authority to adopt DACA and the accompanying authority to issue work authorization both derive from the prosecutorial discretion routinely exercised by the executive branch and from Congress' broad delegations of authority in the immigration context. Further statutory authority expressly endorsing the manner in which that prosecutorial discretion is exercised is not necessary.

7

## STATEMENT OF THE CASE

There are an estimated 11 million people present in this country without documentation. Another 300,000 to 450,000 immigrants are apprehended trying to enter the country illegally each year. This year, the figure likely will approach 850,000—the highest in over a decade.[3]

Historically, the executive branch has lacked the resources required to take action against every person residing in the United States who may be removable. The institutions and personnel of immigration enforcement—including immigration courts, judges, federal attorneys, asylum officers, and DHS enforcement and removal personnel—can remove only a small fraction of those who are removable. Re-

---

[3] Jens Manuel Krogstad et al., *5 Facts About Illegal Immigration in the U.S.*, Pew Res. Ctr. (June 12, 2019), https://pewrsr.ch/2lpzIfn; U.S. Customs & Border Protection, *CBP Enforcement Statistics FY 2019*, http://bit.ly/2lhBbo7; Steven Kopits, *Apprehensions, Illegal Entries Forecast for 2019 (August)*, Princeton Pol'y Advisors (Sept. 10, 2019), http://bit.ly/2mqdY36; U.S. Customs & Border Patrol, *United States Border Patrol Nationwide Illegal Alien Apprehensions Fiscal Years 1925 – 2018*, http://bit.ly/2mQqMzV.

8

cently, the government has removed 220,000 to 260,000 people per year from the country's interior.[4]

Inevitably, then, choices must be made. Priorities for removal must be developed. Prosecutorial discretion must be exercised.

For more than fifty years, presidents and their administrations have done just that: exercising prosecutorial discretion to prioritize enforcement against those individuals who pose threats to public safety or national security, while deferring action against and authorizing the right to work (where economically necessary) for those who do not.

The Obama Administration was no exception. Just as seven of his predecessors had done, including nearly every president since Eisenhower, President Obama implemented deferred action, whereby immigration officials exercised discretion to defer the removal of young people who otherwise were in the United States unlawfully. *See generally Hearing Before the H. Comm. on the Judiciary*, 114th Cong. (Feb. 25, 2015) (Written Testimony of Stephen H. Legomsky at 2–26), http://bit.ly/2lFGM7I (explaining the legality of such policies, including DACA).

---

[4] U.S. Immigr. & Customs Enforcement, *Fiscal Year 2018 ICE Enforcement and Removal Operations Report* 10, http://bit.ly/2mwAVl3.

**AR5086**

9

Established on June 15, 2012, DACA authorizes the deferral of removal and other proceedings on a case-by-case basis for young people who were under the age of sixteen when they entered the United States, under the age of thirty-one as of June 15, 2012, and who meet specific educational and public-safety criteria. *See* Memorandum from Janet Napolitano to David V. Aguilar et al., Sec'y of Homeland Sec., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 1–2 (June 15, 2012), http://bit.ly/2mVOUkJ ("Napolitano Memorandum"). Importantly, however, satisfying these criteria is a necessary, but not sufficient, condition to receiving deferred action under DACA; immigration officials retain authority to deny deferred action even to those individuals who satisfy these criteria. *See* Br. for Amici DACA Recipients & State of New Jersey at 9–25.

Deferred action for DACA recipients is "especially justified," because they "were brought to this country as children" and many "know only this country as home." Napolitano Memorandum at 1–2. President Obama recognized that it would cause irreparable harm to remove these individuals to countries where they lacked familial or economic ties. There is thus a compelling humanitarian interest in affording DACA recipients some explicit protection against removal.

10

Like deferred action and similar policies before it, DACA is not available to anyone who has been convicted of certain offenses or to anyone who poses a threat to national security. *Id.* at 1. DACA's emphasis on public safety and national security is consistent with historical practice—immigration enforcement generally has prioritized dangerous criminals and those apprehended at the border. *See generally Arizona v. United States*, 567 U.S. 387, 396–97 (2012).

DACA's authorizing memorandum provides that USCIS "shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action." Napolitano Memorandum at 3. Significantly, however, the authorizing memorandum confers neither a right to work nor a right to petition DHS for approval to work. Rather, a DACA recipient is eligible to apply for work authorization under a federal regulation that predates DACA and has been available for decades to qualifying recipients of discretionary relief.

Since its adoption, DACA has been an overwhelming success. As of 2017, before the Trump Administration attempted to rescind DACA on the incorrect assertion that its hands were tied legally, nearly fifty-five percent of DACA recipients were employed, while sixty-two percent of those not in the

11

labor force were enrolled in school.[5] The DACA population includes students, teachers,[6] licensed physicians,[7] members of the U.S. military,[8] students at top law schools,[9] and those admitted to practice law in various states.[10] In short, today's DACA population is by-and-large either full-time employed or otherwise in school. In the course of their duties, *amici*

---

[5] Jie Zong et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation*, Migration Pol'y Inst. (Nov. 2017), http://bit.ly/2lrezS1; *see also* Tom Wong et al., *Results from 2019 National DACA Study*, Ctr. Am. Progress 2, 6 (2019), https://ampr.gs/2lWJyWp (explaining that, since their applications were approved, seventy percent of DACA recipients have enrolled in educational programs that were previously unavailable to them and almost sixty percent became employed for the first time).

[6] *See* Roberto G. Gonzalez et al., *Taking Giant Leaps Forward: Experiences of a Range of DACA Beneficiaries at the 5-Year Mark*, Ctr. Am. Progress 5 (June 22, 2017), https://ampr.gs/2lu5tDU.

[7] *Ibid.*

[8] Kathryn Watson, *Pentagon Says DACA Recipients in Military Number Fewer than 900*, CBS News (Sept. 6, 2017), https://cbsn.ws/2kTFlSR.

[9] *Statement from Dean Manning on the End of the DACA Program*, Harv. L. Sch. (Sept. 5, 2017), http://bit.ly/2kWugjZ.

[10] Raquel Muñiz et al., *DACAmented Law Students and Lawyers in the Trump Era*, Ctr. Am. Progress (June 7, 2018), https://ampr.gs/2lrqFKM.

AR5089

12

personally met a number of these outstanding young people who, after years of living in this country, have become *de facto* Americans.

*Amici* know from personal experience that DACA is sound, smart policy, and firmly rooted in precedent. Now, after more than seven years, rescinding DACA is neither compelled by law nor warranted in fact. President Trump himself has observed that DACA recipients should "rest easy" because the "policy of [his] administration [is] to allow the dreamers to stay." J.A. 435. The human cost of now rescinding DACA on the erroneous assertion that the law compels it would be enormous; it is no overstatement to say that if DACA perishes, many of the 700,000 young people who placed their faith in the U.S. government would be gravely harmed.

## ARGUMENT

### I. Deferred Action Is Firmly Rooted in Historical Practice.

Deferred action, including discretionary, systematic relief granted on a case-by-case basis to large numbers of people otherwise removable, has in various forms occupied the landscape of executive au-

13

thority for decades.[11] Federal law long has recognized this reality, codifying and sanctioning deferred action as "an act of administrative convenience to the government which gives some cases lower priority." 8 C.F.R. § 274a.12(c)(14) (2019); *see also* 6 U.S.C. § 202(5) (2018) (making the Secretary of Homeland Security "responsible" for "establishing national immigration enforcement policies and priorities").

Below are a handful of salient examples, all of which involve executive action that occurred absent, or in excess of, statutory authority granted by Congress.

***Eisenhower Administration.*** In 1956, President Eisenhower "paroled" approximately one thousand foreign-born children who had been adopted by American citizens overseas but who were barred entry into the United States by statutory quotas. President Dwight D. Eisenhower, *Statement by the President Concerning the Entry into the United States of Adopted Foreign-Born Orphans* (Oct. 26, 1956),

---

[11] *See, e.g.*, Memorandum from Andorra Bruno et al., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 20–23, Cong. Res. Serv. (July 13, 2012), http://bit.ly/2liwPNz ("CRS Analysis").

14

http://bit.ly/2mtocQe ("Eisenhower Statement").[12] With this authority, President Eisenhower was empowered to permit the physical presence in the country of individuals who otherwise were inadmissible under the governing statutes.[13] The President explained that he had been "particularly concerned over the hardship" the quotas imposed, especially on members of the Armed Forces who were "forced to leave their adopted children behind" after completing tours of duty. Eisenhower Statement at 1. The President adopted the parole policy in the face of Congressional inaction. *Ibid.*

As the Cold War entered its second decade, the Eisenhower Administration began to use the parole power as an instrument of foreign policy.[14] For example, President Eisenhower ordered the parole of

---

[12] *See Executive Grants of Temporary Immigration Relief, 1956–Present*, Am. Immigr. Counsel 3 (Oct. 2014), http://bit.ly/2lstw6k ("AIC Report").

[13] *See* Immigration and Nationality Act, Pub. L. No. 82-414, § 212(d)(5), 66 Stat. 163, 188 (1952); *see also Revision of Immigration, Naturalization, and Nationality Laws: Joint Hearing Before the S. & H. Subcomms. on the Judiciary*, 82d Cong. 713 (1951) (Statement of Peyton Ford, Deputy Att'y Gen.) (recognizing a long history of executive parole "under emergent and humanitarian circumstances" absent any authorizing "provision in existing law" before 1952).

[14] *See* AIC Report at 3.

**AR5092**

15

Cubans fleeing their country's oppressive communist regime.[15] The Kennedy, Johnson, and Nixon Administrations continued this parole program, which ultimately allowed over 600,000 otherwise inadmissible persons to enter the United States.[16]

***Ford & Carter Administrations.*** The Ford and Carter Administrations each granted "Extended Voluntary Departure"[17] to certain classes of immigrants, many of whom came from war-torn or communist countries, including individuals of Lebanese and

---

[15] *Ibid.*

[16] *Ibid.*

[17] Since 1990 and continuing through today, Extended Voluntary Departure has been known as Deferred Enforced Departure. USCIS Policy Manual § 38.2, https://bit.ly/2mnY09H. These terms refer to "a temporary, discretionary, administrative stay of removal granted to aliens from designated countries." *Ibid.*

16

Ethiopian descent.[18] Under these deferred action policies, immigration officials "temporarily suspend[ed] enforcement" of the immigration laws for "particular group[s] of aliens." *Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1510 (D.C. Cir. 1988) (en banc) (per curiam) (separate opinion of Mikva, J.).[19]

***Reagan Administration.*** The Reagan Administration made two significant contributions to the history of deferred action. First, it continued and broadened the use of deferred action, in particular by implementing the Family Fairness Program.[20] Second, and of equal importance, President Reagan's INS promulgated a regulation enabling deferred ac-

---

[18] *See* AIC Report at 4. Petitioners suggest that this policy "had a plausible basis" in the Immigration and Nationality Act. Pet. Br. at 49. But as the United States previously recognized, Extended Voluntary Departure was distinct from the statutorily authorized policy. *See id.* at 49 n.10; *see also Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1519 (D.C. Cir. 1988) (en banc) (per curiam) (separate opinion of Silberman, J.) (affirming Extended Voluntary Departure as the President's "extrastatutory decision to withhold enforcement"). In our view, informed by decades of collective work administering our nation's immigration laws, Extended Voluntary Departure was clearly distinct from the policy authorized by statute. Because it did not in fact have express statutory authorization, the policy is indistinguishable from DACA.

[19] *See also* AIC Report at 3–5; CRS Analysis at 20–21.

[20] CRS Analysis at 21–22.

17

tion recipients to apply for work authorization. *See* 46 Fed. Reg. 25,079, 25,081 (May 5, 1981). This regulation remains in effect and applies to present-day deferred action recipients, including those covered by DACA. 8 C.F.R. § 274a.12(c)(14).

At the start of President Reagan's term, Congress expressly approved the Administration's continued use of Extended Voluntary Departure as a means of prosecutorial discretion for certain citizens of El Salvador who claimed a risk of persecution in their homeland. *See* International Security and Development Cooperation Act of 1981, Pub. L. No. 97-113, § 731, 95 Stat. 1519, 1557 ("It is the sense of the Congress that the administration should continue to review, on a case-by-case basis, petitions for extended voluntary departure made by citizens of El Salvador who claim that they are subject to persecution in their homeland, and should take full account of the civil strife in El Salvador in making decisions on such petitions.").

Later, following passage of the Immigration Reform and Control Act of 1986 ("IRCA"), President Reagan's Administration established the Family Fairness Program. *See* Pub. L. No. 99-603, § 201, 100 Stat. 3359, 3394. At the time, IRCA provided a pathway to lawful status for certain people who otherwise were present illegally in the United States. *See ibid.* But the statute said nothing about the relatives of people who might qualify for lawful status

18

under IRCA. "What to do when some but not all members of an alien family qualify for legalization" thus became "a controversial issue." *See Recent Developments,* 67 No. 6 Interpreter Releases 153, 153 (Feb. 5, 1990), http://bit.ly/2mtPlmh.

Confronted with that issue, INS Commissioner Alan Nelson acknowledged that there was "nothing in [IRCA or the legislative history] that would indicate Congress wanted to provide immigration benefits to others who didn't meet the basic criteria, including the families of legalized aliens." Alan C. Nelson, *Legalization and Family Fairness: An Analysis* (Oct. 21, 1987), *reprinted in* 64 No. 41 Interpreter Releases 1191 app. I, at 1201. The INS therefore lacked express statutory authority to grant lawful permanent resident status to anyone who did not qualify for it on their own merits. *Ibid.* That situation was indistinguishable from the one addressed by DACA.

The Reagan Administration, however, knew that the INS was not legally required to *remove* all such persons, even if the INS was prohibited from granting them legal status. That is, the Reagan Administration recognized the distinction between: (a) granting individuals lawful permanent resident status, which the Attorney General could not do without express statutory authorization, and (b) merely deferring removal actions against certain persons unlawfully present, which the Attorney General was

19

empowered to do by law. *See ibid.*

As Commissioner Nelson stated: "INS is exercising the Attorney General's discretion by allowing minor children to remain in the United States even though they do not qualify on their own, but whose parents (or single parent in the case of divorce or death of spouse) have qualified under the provisions of IRCA. The same discretion is to be exercised as well in other cases which have specific humanitarian considerations." *Ibid.*

***G.H.W. Bush Administration.*** President George H.W. Bush's Administration then expanded the Family Fairness Program. In 1990, INS Commissioner Gene McNary instructed that "[v]oluntary departure will be granted to the spouse and to unmarried children under 18 years of age, living with the legalized alien" so long as those individuals can establish that they meet certain criteria, including residence in the United States for a specified period of time and the lack of a felony conviction. Gene McNary, INS Comm'r, to INS Reg'l Comm'rs, *Family Fairness: Guidelines for Voluntary Departure Under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* 1 (Feb. 2, 1990), *reprinted in* 67 No. 6 Interpreter Releases 153 app. I, at 164–65 (Feb. 5, 1990) ("McNary Memorandum"). The McNary Memorandum also made clear that anyone who qualified under the Family Fairness Program was eligible to work. *Ibid.* Contemporaneous government estimates

20

indicated that as many as 1.5 million people would be eligible under the expanded program.[21] *See Immigration Act of 1989 (Part 2): Hearing before the Subcomm. on Immigration, Refugees, and International Law of the H. Comm. on the Judiciary* at 56, 101st Cong. (Feb. 21, 1990) (testimony of INS Commissioner Gary McNary); *see also id.* at 49. It is estimated that this figure amounted to approximately forty percent of immigrants without documentation in the United States at the time.[22]

---

[21] We dispute Petitioners' claim that the Family Fairness Program served only an estimated 100,000 individuals. Pet. Br. at 49. As Petitioners themselves note, this is inconsistent with contemporaneous accounts by the head of the INS, which estimated as many as 1.5 million recipients. *Ibid.* Moreover, the authority relied upon by Petitioners in support of the lower estimate appears to be three newspaper articles, which cannot overcome the authoritative estimate proffered by the INS. *See ibid.* (citing *Recent Developments*, 67 No. 6 Interpreter Releases 153, 153 (Feb. 5, 1990), which itself relies on articles in the *Los Angeles Times*, the *New York Times*, and the *Washington Post* as authority for the 100,000 figure). But regardless of the exact numbers, the point remains: a ruling that DACA is unlawful would mean that this program and others like it were illegal and should have been struck down by the courts.

[22] *See* Jeffrey S. Passel et al., *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled*, Pew Res. Ctr. 4, 7 (Sept. 3, 2014), https://pewrsr.ch/2m4CK8F (estimating the unauthorized-immigrant population in 1990 to be 3.5 million people).

**AR5098**

21

President Bush later reaffirmed the executive branch's inherent authority to implement policies like deferred action in a signing statement accompanying his approval of the Immigration Act of 1990. The Act authorized the Attorney General to grant Temporary Protected Status ("TPS") to allow otherwise removable persons to remain in the United States "because of their particular nationality or region of foreign state of nationality." Pub. L. No. 101-649, § 302, 104 Stat. 4978, 5035 (1990). President Bush objected to language purporting to make this the "exclusive" avenue for providing such relief, stating: "I do not interpret this provision as detracting from any authority of the executive branch to exercise prosecutorial discretion in suitable immigration cases. Any attempt to do so would raise serious constitutional questions." *See* President George H.W. Bush, *Statement on Signing the Immigration Act of 1990* (Nov. 29, 1990), http://bit.ly/2mWGaL7.

Enactment of the Immigration Act of 1990 was significant for an additional reason: it conveyed and confirmed Congress' express approval of the Family Fairness Program as it had been implemented to that point. Specifically, while the Act codified a temporary stay of removal and work authorization for certain eligible immigrants to preserve "family unity," Congress made clear that this provision would not become effective until the following year—and that administration of the Family Fairness Program

**AR5099**

22

should not be modified in any manner before such date. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 301(g), 104 Stat. 4978, 5030 ("[T]he delay in effectiveness of this section shall not be construed as reflecting a Congressional belief that the existing family fairness program should be modified in any way before such date.")

***Clinton Administration.*** President Clinton provided deferred action for individuals without documentation who might later prove eligible for relief under the Violence Against Women Act. *See* Memorandum from Paul W. Virtue, *Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* 3 (May 6, 1997), http://bit.ly/2mXIcuw (noting that "[b]y their nature, VAWA cases generally possess factors that warrant consideration for deferred action"). And later, following the end of the Liberian civil war and ahead of the looming expiration of TPS protections for Liberian refugees in 1999, President Clinton invoked his "constitutional authority to conduct the foreign relations of the United States" to grant Deferred Enforced Departure ("DED") of Liberian nationals who were present in the United States when their TPS expired. *See* President William J. Clinton, *Memorandum for the Attorney General: Measures Regarding Certain Liberians in the United States* (Sept. 27, 1999),

**AR5100**

23

http://bit.ly/2kUd8ew ("Clinton Memorandum").[23] President Clinton also authorized employment for Liberians receiving discretionary relief under this policy. *See ibid.*

**G.W. Bush Administration.** At the start of his administration in 2001, President Bush extended President Clinton's DED policy for certain Liberian nationals.[24] Later, in 2007, the Bush Administration granted DED for Liberian nationals a second time, again permitting deferred action following expiration of TPS (which had been reinstated following a change of country conditions in Liberia in 2002). *See* 72 Fed. Reg. 53,596 (Sept. 19, 2007).

President Bush also granted deferred action to foreign students affected by Hurricane Katrina who otherwise were removable because of their failure to fulfill the requisite F-1 visa full-time student requirement.[25] This included an express grant of eligi-

---

[23] *See also* CRS Analysis at 23.

[24] *See* USCIS, *Liberia Temporary Protected Status (TPS) Questions and Answers* 2 (Sept. 27, 2002), http://bit.ly/2mXOgmM (explaining DED availability).

[25] USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina, Frequently Asked Questions* 1 (Nov. 25, 2005), http://bit.ly/2mARJr9.

24

bility to apply for work authorization, provided that the students could demonstrate economic necessity.[26]

Finally, the George W. Bush Administration enacted regulations that deferred action for individuals petitioning for U nonimmigrant status—a classification available to victims of criminal activity who assist the government's investigation and prosecution of that activity. 72 Fed. Reg. 53,014, 53,027 (Sept. 17, 2007). The rules allowed these petitioners, like DACA recipients, to apply for employment authorization and excluded the period during which their petitions were pending from counting towards the accrual of unlawful presence. *Ibid.*; *see* 8 C.F.R. § 214.14(d)(3).

***Trump Administration.*** President Trump's Administration, like at least eight administrations before it, also engaged in deferred action—contradicting its own stated position that any form of deferred action not expressly authorized by statute is illegal. *See* Pet. Br. at 11. For example, from at least January 2017 through September 2019, USCIS continued to process deferred action renewal requests

---

[26] *Ibid.*

25

from individuals who themselves or whose family faced life-threatening health crises.[27]

## II. Allowing Deferred Action Recipients to Apply for Work Authorization Is Consistent With Historical Practice and Benefits the United States.

The Executive's core authority to prioritize the removal of certain individuals above others—whether for public safety, national security, or humanitarian reasons—gives rise to a closely related consideration: how to structure discretionary relief policies to best serve the American economy.

Administration after administration has answered this question by authorizing recipients of deferred action to petition the federal government for work authorization if the recipients can prove economic necessity. That solution is sensible, as it increases social security and tax revenues, boosts our country's GDP, and provides better access to work protections for discretionary relief recipients. *See*

---

[27] *See* Camilo Montoya-Galvez, *Trump Administration to Process Some Deferred Deportation Requests from Sick Immigrants*, CBS News (Sept. 2, 2019), https://cbsn.ws/2lt1ash; *see also* Ted Hesson, *DHS Walks Back Decision to Halt Medical Deportation Relief*, Politico (Sept. 19, 2019), https://politi.co/2myWK3s (quoting USCIS spokesperson that "USCIS is resuming its consideration of non-military deferred action requests on a discretionary, case-by-case basis").

26

*generally* Brief for Professional Economists and Scholars in Related Fields as Amici Curiae in Support of Petitioners, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674). It also reduces the likelihood that a recipient of deferred action will become a public charge, thereby furthering the purpose of federal immigration law. Immigration Act of 1990 § 212(a)(4), 8 U.S.C 1182(a)(4) (2018) (aliens are inadmissible if they are likely to become a public charge).

Granting work authorization to recipients of deferred action is expressly permitted by regulation and is a necessary practice for the coherent administration of federal immigration law. *See* 8 C.F.R. § 274a.12(c)(14). Ending this policy would present not only an unprecedented disruption of the federal immigration system, it would upend an employment practice upon which the American economy and immigration system have relied for nearly half a century.

## A. Work authorization is permitted under federal law.

It is undisputed that federal law permits all recipients of deferred action to request work authorization based upon a showing of "economic necessity." 8 C.F.R. § 274a.12(c)(14); *see* Pet. Br. at 44–45. Critically, federal law does not permit *all* recipients of deferred action to receive work authorization.

27

Rather, work authorization is available only to those deferred action recipients who can demonstrate that they are unable to support themselves economically without entering the formal economy.

Contrary to Petitioners' claim, Pet. Br. at 44–45, this limited right is not a reason to reject DACA's lawfulness. To begin, work authorization is not unique to DACA. Rather, it is a product of federal regulations that predate DACA by decades, that have been invoked by administrations of both parties since the 1970s, and that Congress has approved since 1986. *See* 8 U.S.C. § 1324a(h)(3) (recognizing executive authority to grant work authorization). *See generally* J.A. 833–35 & n.11 (OLC opinion explaining the history of this authority). Further, the accompanying effect is modest and beneficial to this country. Finally, it also is smart policy: if these individuals are to remain in the United States, even for short periods of time, immigration officials recognize that it is in the national interest to ensure that they can be economically self-sufficient.

## B. Work authorization is consistent with historical practice.

Like deferred action, the grant of work authorization is a long-standing practice of the executive branch. DHS and its predecessor agencies have granted work authorization to certain immigrants since at least 1952. *See, e.g.*, 17 Fed. Reg. 11,488,

**AR5105**

28

11,489 (Dec. 19, 1952) (codified at 8 C.F.R. § 214.2(c) (1952)) (prohibiting some aliens from working in the United States "unless such employment or activity has first been authorized by the district director").

The policy of granting work authorization to recipients of deferred action began in the early 1970s and continues today. Congress has endorsed the practice throughout this period. *See* Sam Bernsen, *Lawful Work for Nonimmigrants*, 48 No. 21 Interpreter Releases 168, 315 (June 21, 1971).

*1970s.* In 1975, the INS's General Counsel explained that the INS authorized certain aliens to work in cases "when we do not intend or are unable to enforce the alien's departure," even though such work authorization "doesn't make his illegal stay here any less illegal." Sam Bernsen, *Leave to Labor*, 52 No. 35 Interpreter Releases 291, 294–95 (Sept. 2, 1975). As under DACA, such grants of work authorization were not given "automatically," but rather required a "request" by the individual. *Id.* at 295. Earlier, Congress had recognized and approved this practice in the Farm Labor Contractor Registration Act Amendments of 1974, Pub. L. No. 93-518, § 7(5), 88 Stat. 1652, 1655, which made it unlawful for farm labor contractors knowingly to employ any "alien not lawfully admitted for permanent residence *or who has not been authorized by the Attorney General to accept employment*" (emphasis added).

**AR5106**

29

***1980s.*** In 1981, President Reagan's INS codified "the procedures and criteria for the grant of employment authorization to aliens in the United States." *See* 46 Fed. Reg. 25,080–25,081 (May 5, 1981). The Reagan Administration stipulated that the Attorney General could grant work authorization to certain deferred action recipients, as well as other categories of individuals who lacked specific statutory authorization for employment. *Id.* at 25,081 (codified at 8 C.F.R. § 109.1(b)(6) (1982) (citing 8 U.S.C. § 1103)). Granting deferred action recipients the right to seek approval to work was necessary, the INS emphasized, "because humanitarian or economic needs warrant administrative action." *Ibid.*

Five years later, Congress endorsed President Reagan's codification of work authorization. *See* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359. By enacting IRCA, Congress made it unlawful for an employer to hire "an unauthorized alien (as defined in subsection (h)(3) of this section) with respect to such employment." 8 U.S.C. § 1324a(a)(1). In defining "unauthorized alien," however, Congress *excluded* individuals who had been "authorized to be so employed by [the INA] or *by the Attorney General*." 8 U.S.C. § 1324a(h)(3) (emphasis added). This language reaffirmed both the Attorney General's authority to grant work authori-

**AR5107**

30

zations *and* the manner in which the INS had been exercising that authority.[28]

The following year, the INS reaffirmed the work authorization rule (after extensive notice and comment) and reiterated the important policy goals that supported its adoption. In 1987, the Reagan Administration denied a petition for rulemaking that sought to rescind the rule on grounds that it was "inconsistent" with IRCA's alleged purpose of protecting the "American labor force." 51 Fed. Reg. 39,385–39,386 (Oct. 28, 1986); 52 Fed. Reg. 46,092–46,093 (Dec. 4, 1987) (denying the petition). In rejecting the petition, the INS explained that the work authorization rule relates to and supports a variety of IRCA's policy objectives, including because it furthers international exchange, encourages family reunion, protects those who fear persecution, facilitates diplomatic relations, fulfills international treaty require-

---

[28] At the time Congress enacted IRCA, it was aware that the INS had promulgated work authorization regulations: the INS sent a letter to Congress asserting its claimed authority to grant work authorization, and Congress included this letter in IRCA's legislative history. *See* Letter from Robert McConnell, Dep't of Justice, to Rep. Romano Mazzoli (Apr. 4, 1983), *included in Immigration Reform and Control Act of 1983: Hearings before the Subcomm. on Immigration, Refugees, and Int'l Law of the H. Comm. on the Judiciary*, 98th Cong. 1441, 1450 (1983) ("INS currently has authority to define classes of aliens who may be employed in the U.S. . . . .").

31

ments, provides due process for removable individuals, and affords some humanitarian assistance in meritorious cases. 52 Fed. Reg. at 46,092. The INS further explained that "the only logical way to interpret" Section 1324a(h)(3)'s definition of "unauthorized alien" is to recognize that Congress was fully aware of the Attorney General's practice and wanted to exclude *both* "aliens who have been authorized employment by the Attorney General through the regulatory process" *and* "those who are authorized employment by statute." *Id.* at 46,093. Congress has not interfered with or sought to end this process in the years since.

***1990s.*** The George H.W. Bush and Clinton Administrations granted discretionary relief and work authorization in support of their humanitarian and foreign policy objectives.

In 1991, the George H.W. Bush Administration granted voluntary departure to the "ineligible spouses and children of legalized aliens" who did not qualify for statutory protection under IRCA. McNary Memorandum at 165. The Administration also granted work authorization to these individuals, recognizing that family members of newly legalized individuals required both protection from removal *and* the means to economically support themselves. *Ibid.*

In 1996, Congress again preserved the Attorney General's authority to grant work authorization,

32

even as it imposed new limits on the Attorney General's ability to do so. For example, Congress provided that "[n]o alien ordered removed shall be eligible to receive authorization to be employed in the United States unless the Attorney General makes a specific finding . . . that the alien cannot be removed" or that "the removal of the alien is otherwise impracticable or contrary to the public interest." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 305(a)(3), 110 Stat. 3009-546, 3009-600 (codified as amended at 8 U.S.C. § 1231(a)(7)).

In late 1997, President Clinton ordered the Attorney General to provide certain Haitian nationals with DED. *See* President William J. Clinton, *Memorandum on Deferred Enforced Departure for Haitians* (Dec. 23, 1997), http://bit.ly/2nemnqS. President Clinton also granted these Haitian nationals "authorization for employment," pursuant to which they could seek approval to work. *Ibid.* Like DACA recipients, these Haitian nationals were eligible for deferred action and employment authorization so long as they had been continuously present in the United States for a specified period of time. *Ibid.*

Finally, as discussed *supra* p. 22-23, President Clinton in 1999 extended DED to certain Liberian nationals based upon "compelling foreign policy reasons[.]" Clinton Memorandum at 1. President Clinton supported his foreign policy rationale with an

**AR5110**

33

economic one, making work authorization available to Liberians who received discretionary relief. *Ibid.*

***2000s.*** During the second Bush Administration, the INS continued to grant work authorization to aliens who might qualify as potential trafficking or crime victims under the Victims of Trafficking and Violence Protection Act of 2000 (VTVPA), Pub. L. No. 106-386, 114 Stat. 1464. *See* Memorandum from Michael D. Cronin, Acting Exec. Assoc. Comm'r, INS, to Michael A. Pearson, Exec. Assoc. Comm'r, Off. of Programs, INS, *VTVPA of 2000 Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* 4 (Aug. 30, 2001), http://bit.ly/2mEG5vA (discussing how potential applicants of new VAWA categories could be eligible for work authorization under 8 C.F.R. § 274a.12(c)(11), (c)(14)). After Hurricane Katrina, work authorization was similarly extended to students newly eligible for deferred action.[29]

As this history suggests, Congress and the executive repeatedly have granted work authorization to recipients of deferred action. They have done so because economic and humanitarian needs compel it. DACA is no different.

_____

[29] *See* USCIS, Press Release, USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina 1 (Nov. 25, 2005), http://bit.ly/2lHjWfZ.

34

## CONCLUSION

DACA is a lawful and prudent response to challenges inherent in the enforcement of our nation's immigration laws. It also is entirely consistent with the practice of prior administrations dating back to the 1950s. And while DACA does not create any specific right for young people to work, existing federal law does, and the practice has been accepted by the executive and legislative branches since the 1970s. For these reasons, the judgment of the courts below should be affirmed.

Respectfully submitted,

JEH C. JOHNSON
LIZA M. VELAZQUEZ
DAVID C. KIMBALL-STANLEY
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

KAREN L. DUNN
JOSHUA RILEY
MENNO GOEDMAN
ANDREA R. FLORES
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
(202) 237-2727

MASHA G. HANSFORD
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300

ALBERT GIANG
*Counsel of Record*
BOIES SCHILLER FLEXNER LLP
725 South Figueroa Street
Los Angeles, CA 90017
(213) 629-9040
agiang@bsfllp.com

*Counsel for Amici Curiae*

October 4, 2019

**AR5112**

Nos. 18-587, 18-588, 18-589

# In the Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, *et al.*, *Petitioners,*
v.
REGENTS OF THE UNIVERSITY OF CALIFORNIA, *et al.*,
*Respondents.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, *et al.*, *Petitioners*,
v.
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*, *Respondents*

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, *et al.*, *Petitioners*,
v.
MARTIN JONATHAN BATALLA VIDAL, *et al.*, *Respondents.*

**On Writs of Certiorari to the United States Courts of Appeals for the Ninth, District of Columbia, and Second Circuits**

**Brief for *Amici Curiae* Institutions of Higher Education in Support of Respondents**

Bruce V. Spiva
*Counsel of Record*
Amanda R. Callais
Rebecca K. Mears
PERKINS COIE LLP
700 13th Street, NW, Suite 600
Washington, D.C. 20005
(202) 654-6203
bspiva@perkinscoie.com

*Attorneys for Amici Curiae*

AR5113

i

## LIST OF *AMICI CURIAE*

This brief is filed on behalf of the following 165 institutions of higher education located in 32 states and the District of Columbia:

Adler University
Agnes Scott College
Alamo Community College District
American University
Amherst College
Arizona State University
Augustana College
Austin Community College District
Barnard College
Beloit College
Benedictine University - Mesa
Berklee College of Music
Boston University
Bowdoin College
Brandeis University
Bryn Mawr College
Bucknell University
California Community Colleges Board of Governors
Carleton College
Carnegie Mellon University
Case Western Reserve University
Christian Brothers University
Claremont Graduate University
Claremont McKenna College
Colby College
Colorado Mountain College

**AR5114**

ii

Colorado State University System
    Colorado State University
    Colorado State University-Global
    Colorado State University-Pueblo
Columbia College
Connecticut College
Connecticut State Colleges & Universities
    Asnuntuck Community College
    Capital Community College
    Central Connecticut State University
    Charter Oak State College
    Eastern Connecticut State University
    Gateway Community College
    Housatonic Community College
    Manchester Community College
    Middlesex Community College
    Naugatuck Valley Community College
    Northwestern Community College
    Norwalk Community College
    Quinebaug Valley Community College
    Southern Connecticut State University
    Three Rivers Community College
    Tunxis Community College
    Western Connecticut State University
Contra Costa Community College District
Cornell College
Dominican University
Elon University
Emerson College
Foothill-De Anza Community College District
Fort Lewis College
Franklin & Marshall College
Gettysburg College
Goucher College

**AR5115**

iii

Grand View University
Grinnell College
Guilford College
Hamilton College
Haverford College
Illinois Institute of Technology
Indiana University
Ithaca College
Kalamazoo College
Knox College
Lafayette College
Lawrence University
Lewis and Clark College
Los Angeles Community College District
Loyola University of Chicago
Macalester College
Maricopa County Community College District
Marietta College
Maryland Institute College of Art
Marymount University
Massachusetts College of Liberal Arts
MassBay Community College
Menlo College
Metropolitan State University of Denver
Middlebury College
Minnesota State Colleges and Universities
Moravian College
Mount Holyoke College
National Louis University
Nevada System of Higher Education
    College of Southern Nevada
    Desert Research Institute
    Great Basin College
    Nevada State College

iv

Truckee Meadows Community College
University of Nevada, Las Vegas
University of Nevada, Reno
Western Nevada College
Northampton Community College
Northeastern University
Northern Essex Community College
Northwestern Community College
Oberlin College
Oglethorpe University
Oregon State University
Passaic County Community College
Pima County Community College District
Pomona College
Quinsigamond Community College
Reed College
Rhode Island School of Design
Rhodes College
Rice University
Riverside Community College District
Rochester Institute of Technology
Roosevelt University
Rutgers University-Camden
Rutgers University-Newark
Salisbury University
San Bernardino Community College District
Sarah Lawrence College
School of the Art Institute of Chicago
Seattle Pacific University
Seattle University
Simmons University
Smith College
Southeastern University
Southern New Hampshire University

**AR5117**

v

St. Edward's University
State Center Community College District
Swarthmore College
TCS Education System
    Pacific Oaks College & Children's School
    Saybrook University
    The Chicago School of Professional Psychology
    The Santa Barbara & Ventura Colleges of Law
The College of Wooster
The New School
The Trustees of the California State University
Trinity Washington University
Tufts University
University of Arkansas
University of Colorado
University of Connecticut
University of Denver
University of Illinois System
University of Maryland Baltimore
University of Maryland College Park
University of Michigan
University of New England
University of Northern Colorado
University of Puget Sound
University of San Diego
University of Utah
Vassar College
Virginia Wesleyan University
Wayne State University
Weber State University
Wellesley College
Wesleyan University
Western Oregon University
Western Washington University

**AR5118**

vi

Westminster College
Whitman College
Williams College

AR5119

vii

# TABLE OF CONTENTS

LIST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . .  viii

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . .  1

INTRODUCTION AND
    SUMMARY OF ARGUMENT . . . . . . . . . . . . . . .  2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

I.    DACA HAS ALLOWED TENS OF THOUSANDS OF PREVIOUSLY UNDOCUMENTED YOUTH TO PURSUE HIGHER EDUCATION. . . . . . . . . . . . . . . . .  5

II.    DACA STUDENTS CONTRIBUTE IMMEASURABLY TO OUR CAMPUSES. .  11

    A. DACA Students Have Had Great Academic and Co-Curricular Success at Our Schools. . . . . . . . . . . . . . . . . . . . . . . . .  13

    B. DACA Students Contribute to Campus Diversity, A Key Component of the Educational Experience. . . . . . . . . . . . .  23

III.    THE RESCISSION OF DACA WILL HARM AMERICAN COLLEGES AND UNIVERSITIES. . . . . . . . . . . . . . . . . . . . . . .  26

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

**AR5120**

viii

## TABLE OF AUTHORITIES

### Cases

*Batalla Vidal v. Nielsen*,
    279 F. Supp. 3d 401 (E.D.N.Y. 2018) . . . . . . . . . . 4

*Fisher v. University of Texas at Austin* (*Fisher I*),
    570 U.S. 297 (2013) . . . . . . . . . . . . . . . . . . . . . . 23

*Fisher v. Univ. of Texas at Austin* (*Fisher II*),
    136 S. Ct. 2198 (2016) . . . . . . . . . . . . . . . . . 23, 24

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) . . . . . . . . . . . . . . . . . . . . 23, 24

*NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C. 2018) . . . . . . . . . . . 4

*Regents of Univ. of Cal. v. DHS*,
    279 F. Supp. 3d 1011 (N.D. Cal. 2018) . . . . . . . . 4

### Statutes

Ala. Code § 31-13-8 . . . . . . . . . . . . . . . . . . . . . . . . . 8

S.C. Code Ann. § 59-101-430 . . . . . . . . . . . . . . . . . . 8

### Other Authorities

*About the Team: Reyna Montoya*, ALIENTO,
    h t t p s : / / w w w . a l i e n t o a z . o r g / t h e -
    team/xiln91utxdyjpwkt94p3h0icez84l9 . . . . . . . 16

America's Voice (Oct. 3, 2017),
    https://americasvoice.org/blog/name-denisse-
    r o j a s - m a r q u e z - 2 8 - y e a r s - o l d - o l d - p r o u d -
    undocumented-american-soon-doctor/ . . 14, 15, 30

**AR5121**

ix

*American Dreamers: Alfredo Avila*, N.Y. Times, https://www.nytimes.com/interactive/projects/ storywall/american-dreamers/stories/alfredo-avila . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*American Dreamers: Anayancy Ramos*, N.Y. Times, https://www.nytimes.com/interactive/projects/ storywall/american-dreamers/stories/anayancy-ramos . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

*American Dreamers: Belsy Garcia*, N.Y. Times, https://www.nytimes.com/interactive/projects/ storywall/american-dreamers/stories/belsy-garcia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*American Dreamers: Brisa E. Ramirez*, N.Y. Times, https://www.nytimes.com/interactive/projects/ storywall/american-dreamers/stories/brisae-ramirez . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*American Dreamers: Carlos Adolfo Gonzalez Sierra*, N.Y. Times, https://www.nytimes.com/ interactive/projects/storywall/american-dreamers/ stories/carlos-adolfo-gonzalez-sierra . . . . . . . 14, 17

*American Dreamers: Denisse Rojas Marquez*, 2016, N.Y. Times, https://www.pdsoros.org/meet-the-fellows/denisse-rojas-marquez . . . . . . . . . . . . . 14

*American Dreamers: Eduardo Solis*, N.Y. Times, https://www.nytimes.com/interactive/projects/ storywall/american-dreamers/stories/eduardo-solis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*American Dreamers: Gargi Y. Purohit*, N.Y. Times, https://www.nytimes.com/interactive/projects/ storywall/american-dreamers/stories/gargiy-purohit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*American Dreamers: Isabelle Muhlbauer*, N.Y. Times, https://www.nytimes.com/interactive/ projects/storywall/american-dreamers/stories/isabelle-muhlbauer. . . . . . . . . 30

*American Dreamers: Jin Park*, N.Y. Times, https://www.nytimes.com/interactive/projects/ storywall/american-dreamers/stories/jin-park . 15

*American Dreamers: Julia Verzbickis*, N.Y. Times, https://www.nytimes.com/interactive/projects/ storywall/american-dreamers/stories/julia-verzbickis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*American Dreamers: Kok-Leong Seow*, N.Y. Times, https://www.nytimes.com/interactive/projects/ storywall/american-dreamers/stories/kok-leong-seow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*American Dreamers: Nancy A.*, N.Y. Times, https://www.nytimes.com/interactive/projects/ storywall/american-dreamers/stories/nancy-a. . 18

Arizona State Univ., *DREAMzone – DACA Alumni Success Stories*, https://eoss.asu.edu/access/ dreamzone. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

AR5123

xi

Ass'n of Vermont Indep. Colls., *Statement on the Revocation of the Deferred Action for Childhood Arrivals (DACA) Program*, http://www.vermont-icolleges.org/Documents/DACAFinal2017.pdf. . 13

*Basic Facts about In-State Tuition for Undocumented Immigrant Students*, NAT'L IMMIGRATION LAW CTR. (June 21, 2019), https://www.nilc.org/wp-content/uploads/2017/11/instate-tuition-basicfacts.pdf . . . . . . . . . 8

Brandeis Univ., *Mission & Diversity Statements*, http://www.brandeis.edu/about/mission.html . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Caitlin Patler & Jorge A. Cabrera, *From Undocumented to DACAmented: Impacts of the Deferred Action for Childhood Arrivals (DACA) Program Three Years Following its Announcement* 15 (June 2015), http://www.chicano.ucla.edu/files/Patler_DACA_Report_061515.pdf . . . . . . . . . . . . . . . . . 6, 8, 11

*California Community Colleges Chancellor Eloy Ortiz Oakley's Statement on the Trump Administration's Action to End DACA for Dreamers* (Sept. 5, 2017), https://www.ccco.edu/About-Us/News-and-Media/Press-Releases/Statement-Ending-DACA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**AR5124**

xii

*DACA Population Data*, USCIS (Apr. 30, 2019), https://www.uscis.gov/sites/default/files/USCIS /Resources/Reports%20and%20Studies/Immigr ation%20Forms%20Data/All%20Form%20Types/ DACA/Approximate_Active_DACA_Recipients _Demographics_-_Apr_30_2019.pdf . . . . . . . . . . 25

*Deferred Action for Childhood Arrivals (DACA) Data Tools*, MIGRATION POLICY INST., https://www.migrationpolicy.org/programs/data- hub/deferred-action-childhood-arrivals-daca- profiles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Eleanor J. Bader, *As End of DACA Looms, Colleges and Organizers Ramp Up Efforts to Protect Undocumented Students*, NACLA (Jan. 27, 2017), https://nacla.org/news/2017/01/27/end- daca-looms-colleges-and-organizers-ramp- efforts-protect-undocumented-students . . . . . . . 28

Folsom Lake Coll., *Strategic Plan 2017-2020*, https://losrios.edu/docs/lrccd/board/2017/enc/20 170614-flc-strat-plan.pdf . . . . . . . . . . . . . . . . . 24

Interview by TheDream.US with Erik (Sept. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Interview by TheDream.US with Isabel (alias) (Sept. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Interview by TheDream.US with Uzair (Sept. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

AR5125

xiii

Jie Zong et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation*, MIGRATION POLICY INST. (Nov. 2017), https://www.migrationpolicy.org/research/ profile-current-daca-recipients-education-industry-and-occupation . . . . . . . . . . . 4, 7, 10, 25

Jie Zong & Jeanne Batalova, *How Many Unauthorized Immigrants Graduate form U.S. High Schools Annually?*, MIGRATION POLICY INST. (Apr. 2019), https://www.migrationpolicy. org/research/unauthorized-immigrants-graduate-us-high-schools . . . . . . . . . . . . . . . . . 26

Jose Herrera, *DACA Student Leads by Example*, Los Angeles Pierce College Roundup (Sept. 13, 2017), http://theroundupnews.com/2017/09/13/ daca-student-leads-example/ . . . . . . . . . . . . . . . 13

Letter from Adam Falk, President, Williams College, to the Williams Community (Nov. 17, 2016), https://president.williams.edu/writings/ caring-for-our-undocumented-students/ . . . . . . 12

Letter from Andrew D. Hamilton, President New York University to Donald J. Trump, President (Sept. 1, 2017), http://www.nyu.edu/content/dam/ nyu/president/documents/09-01-17-daca-letter.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Letter from Biddy Martin, President, Amherst College to Donald J. Trump, President (Aug. 30, 2017), https://www.amherst.edu/amherst-story/president/statements/node/689036 . . . . . . 11

**AR5126**

xiv

Letter from David W. Leebron, President, Rice University (Sept. 5, 2017), https://president.rice.edu/daca-announcement . . . . . . . . . . . . . . . . . . 13

Letter from Drew Gilpin Faust, President, Harvard University, to Donald J. Trump, President (Aug. 28, 2017), https://www.harvard.edu/president/news/2017/letter-to-president-trump-regarding-daca . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Letter from Kathleen McCartney, President, Smith College, to Students, Staff and Faculty (Sept. 5, 2017), https://smith.edu/president-kathleen-mccartney/letters/2017-18/responding-to-daca-decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Letter from Lee Pelton, President, Emerson College, to Emerson Community (Sept. 6, 2017), http://www.emerson.edu/news-events/emerson-college-today/pelton-reaffirms-support-emerson-daca-students#.We5Ui2you70 . . . . . . . . . . . . . . 12

Letter from Ron Liebowitz, President, Brandeis University, to Donald J. Trump, President (Sept. 5, 2017), http://www.brandeis.edu/president/letters/2017-09-05.html . . . . . . . . . . . . . . . . . . . 12

Letter from Vincent E. Price, President Duke University, to Donald J. Trump, President (Aug. 30, 2017), https://today.duke.edu/2017/08/duke-university-letter-support-daca . . . . . . . . . . . . . . 12

AR5127

xv

Letter of Joseph E. Aoun, President, Northeastern University, to all members of the Northeastern Community (Sept. 4, 2017), http://www.northeastern.edu/president/2017/09/04/turning-ideals-into-action/ . . . . . . . . . . . . 13

Marcelo Suárez-Orozco et al., Inst. for Immigration, Globalization, & Educ., *In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration Reform* 1 (2015), https://escholarship.org/uc/item/2hq679z4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

Middlebury Coll., *Diversity and Inclusion*, http://www.middlebury.edu/student-life/community-living/diversity-inclusivity . . . . 24

Monica Scott, *Undocumented: One immigrant's story of life under DACA*, MLive (Aug. 29, 2017), http://www.mlive.com/news/grand-rapids/index.ssf/2017/08/one_daca_students_story_about.html . . . . . . . . . . . . . . . . . . . . . . . 13

Nicole Prchal Svajlenka, *What We Know about DACA Recipients in the United States*, CTR. FOR AMERICAN PROGRESS (Sept. 5, 2019), https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states/ . . . . . . . . . . . . . . 29, 30

Penny Schwartz, *A Jewish 'Dreamer' is scared, but refuses to despair*, Jewish Telegraphic Agency (Sept. 6, 2017), https://www.jta.org/2017/09/06/news-opinion/united-states/a-jewish-dreamer-is-scared-but-refuses-to-despair . . . . . . . . . . . 15, 16

AR5128

xvi

Pomona Coll., *Statement in Support of the Deferred Action for Childhood Arrivals (DACA) Program and Our Undocumented Students*, https://www.pomona.edu/news/2016/11/21-college-university-presidents-call-us-uphold-and-continue-daca . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Resolution of the Board of Governors, California Community Colleges, No. 2017-01 (Jan. 18, 2017) https://www.ccleague.org/sites/default/files/federal_advocacy/BOG_Election_REVISED-Resolution%20%281%29.pdf . . . . . . . . . . . 12, 13

Rice Univ., *Statement of Office of Diversity and Inclusion*, https://www.rice.edu/mission-values . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Statement of Susan Herbst, President, University of Connecticut, to the University of Connecticut Community (Sept. 5, 2017), https://today.uconn.edu/2017/09/president-herbst-responds-daca-decision/ . . . . . . . . . . . . . . . . . . . . . . . . . . 13

TheDream.US, *2018-2019 Scholar Survey* (Aug. 2019) (on file with author) . . . . . . . . . . . . . *passim*

Tom K. Wong et al., *DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November*, CTR. FOR AMERICAN PROGRESS (Sept. 19, 2019), https://www.americanprogress.org/issues/immigration/news/2019/09/19/474636/daca-recipients-livelihoods-families-sense-security-stake-November/. . . . . . . . . . . . . . *passim*

AR5129

xvii

Univ. of Michigan, *Statement on DACA from President Mark Schlissel* (Sept. 3, 2017), https://president.umich.edu/news-communications/statements/ statement-on-daca-from-president-mark-schlissel/. . . . . . . . . . . . . 12

Zenen Jaimes Pérez, *How DACA Has Improved the Lives of Undocumented Young People*, CTR. FOR AMERICAN PROGRESS 5 (Nov. 19, 2014), https://cdn.americanprogress.org/wp-content/uploads/2014/11/BenefitsOfDACABrief2.pdf. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

AR5130

1

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are 165 institutions of higher education located in 32 states and the District of Columbia. *Amici* include large public universities, private research universities, liberal arts colleges, community colleges, and faith-based institutions. We are located in urban centers and rural farm areas throughout states that span the political spectrum. Collectively, *amici* have taught and employed millions of people.

*Amici* have seen firsthand the positive effects of Deferred Action for Childhood Arrivals ("DACA") on their campuses. DACA has facilitated the pursuit of higher education by undocumented youth in unprecedented numbers, ensuring that once enrolled, these students are positioned to succeed. As a result of DACA, thousands of talented and hard-working young people have made significant and wide-ranging contributions to *amici's* campuses. They form a key part of our campus life and as institutions we benefit

---

[1] The parties have given blanket consent to the filing of *amicus curiae* briefs in this case. Pursuant to Supreme Court Rule 37.6, counsel for *amici* state that no counsel for a party authored this brief in whole or in part, and no person other than *amici*, their members, or their counsel made any monetary contribution intended to fund the preparation or submission of this brief. Out of an abundance of caution, counsel notes that Jenner & Block LLP, counsel for Respondents the Trustees of Princeton University, Microsoft Corporation, Maria De La Cruz Perales Sanchez, represented some of *amici* in the Second and Ninth Circuits and filed a brief similar in some respects to this one. However, Jenner & Block played no role in authoring this brief beyond the work it had already done in connection with the Second and Ninth Circuit briefs.

**AR5131**

2

greatly from the energy and academic excellence they bring. *Amici* have also made substantial investments in the education of undocumented youth in reliance on DACA. Although these students unquestionably benefit from being able to attend our institutions—and this is something DACA certainly facilitates—we as institutions also benefit significantly from the many contributions, discussed herein, this remarkable group of young people make to our schools and communities.

We believe the perspective we bring as institutions is relevant to this case because it will demonstrate to the Court that another group—beyond DACA recipients themselves—will be harmed by the Petitioners' actions. *Amici* Institutions of Higher Education share the Respondents' interest in a diverse student body, and this brief demonstrates that Petitioners' arbitrary and capricious actions will impact institutions of all sizes throughout the nation.

## INTRODUCTION AND SUMMARY OF ARGUMENT

American institutions of higher education benefit profoundly from the presence of immigrant students on our campuses. Whether they attend large public universities, private research universities, liberal arts colleges, or community colleges, these students contribute a perspective and experience that is unique and important. That is especially true of Dreamers—that is, undocumented young people who were brought to the United States as children.

Through no choice of their own, Dreamers were raised and educated in this country as Americans. They

3

have worked and studied in American schools; have prepared and trained for all manner of careers; and have strived to innovate, achieve, and serve their communities. Yet, until DACA was announced in 2012, they lived under the threat that the government might one day come calling and remove them from the country that has become their home. Though they might have dreamed of bright futures, for many their undocumented status stood as an impenetrable roadblock to one of the most fundamental tools for a successful future: College.

DACA changed this and has provided up to 1.3 million Dreamers with an opportunity to apply for temporary protection from removal, to pursue their education, and to work legally in the United States.[2] To qualify for DACA, Dreamers are required to meet strict conditions, including, completing high school, obtaining a GED, or being currently enrolled in school in the United States. In addition, Dreamers are required to pay a significant application fee and provide detailed personal information to the government—a significant request given the hesitancy of undocumented persons to have any interaction with the government whatsoever. But the students who have signed up and placed their trust in the government received in exchange the opportunity to pursue higher education. And they have done so in unprecedented numbers. Indeed, in fall 2017, estimates show that of the close to

---

[2] *Deferred Action for Childhood Arrivals (DACA) Data Tools*, MIGRATION POLICY INST., https://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles (last visited Sept. 27, 2019).

4

700,000 then-active DACA recipients, over 120,000 were in post-secondary education.[3]

On September 5, 2017, Petitioners announced they were rescinding DACA. This misguided, arbitrary and capricious decision will harm the thousands of remarkable young people who are already DACA recipients and millions more who would seek to take advantage of the opportunities that DACA provides. But, critically, it will also harm the country, which will be deprived of the many contributions Dreamers would otherwise be able to make.

Challenges to DACA's rescission were filed in the United States District Court for the Northern District of California, *Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018), the District of Columbia, *NAACP v. Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018), and the Eastern District of New York, *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018). These cases were each appealed to their respective circuit courts before the Court granted certiorari. The cases were consolidated and are now before the Court. In all three cases, lower courts either

---

[3] Jie Zong et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation*, MIGRATION POLICY INST. (Nov. 2017), https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation (follow "DACA Recipients by State" hyperlink to excel document) (The data provided comes from a Migration Policy Institute analysis of U.S. Census Bureau data from the pooled 2010-2014 American Community Surveys and 2008 Survey of Income and Program Participation, with legal status assignments by James Bachmeier of Temple University and Jennifer Van Hook of the Pennsylvania State University, Population Research Institute.).

5

enjoined or vacated Petitioners' decision to rescind DACA.

*Amici* collectively have educated thousands of DACA beneficiaries, and we have benefited from their talents and the passion they bring to our campuses. Even those *amici* who have no DACA beneficiaries currently on campus view DACA as core to their educational missions. In this brief, *amici* explain how we will be harmed if DACA is rescinded. For that reason, *amici* support Respondents and respectfully urge the Court to affirm the judgments of the courts below.

## ARGUMENT

## I.   DACA HAS ALLOWED TENS OF THOUSANDS OF PREVIOUSLY UNDOCUMENTED YOUTH TO PURSUE HIGHER EDUCATION.

DACA has enabled previously undocumented students to pursue higher education in several important ways that benefit the *amici* institutions through heightened interest in enrollment, financial support, improved diversity, and myriad contributions to campus life.

*First*, to qualify for deferred action under DACA, an applicant must generally obtain a high school diploma, GED certificate, or be enrolled in school. The possibility of securing deferred action provides a powerful incentive for students to stay in school, increasing the likelihood that they will pursue postsecondary education and become taxpayers and significant contributors to our society.

6

*Second*, prior to DACA, undocumented students felt the need to hide their status from others, which constrained their access to academic resources and their ability to apply to college.[4] Not surprisingly, undocumented students who felt the need to hide their status from school personnel or peers during high school are significantly less likely even to think college is a possibility.[5] DACA provides hard-working and passionate young individuals with the assurance that they can attend higher education without fear of deportation. In a 2019 survey of more than 1,100 DACA recipients by the Center for American Progress (the "2019 CAP survey"), 93 percent of those enrolled in school stated that DACA allowed them to pursue educational opportunities that they previously could not.[6] In fact, those who receive DACA are almost as likely as U.S. citizens of the same age group to be enrolled in college; an analysis of U.S. Census data and data from the United States Citizenship and Immigration Services ("USCIS") on DACA recipients

---

[4] Caitlin Patler & Jorge A. Cabrera, *From Undocumented to DACAmented: Impacts of the Deferred Action for Childhood Arrivals (DACA) Program Three Years Following its Announcement* 15 (June 2015), http://www.chicano.ucla.edu/files/Patler_DACA_Report_061515.pdf.

[5] *Id.* at 16.

[6] Tom K. Wong et al., *DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November*, CTR. FOR AMERICAN PROGRESS (Sept. 19, 2019), https://www.americanprogress.org/issues/immigration/news/2019/09/19/474636/daca-recipients-livelihoods-families-sense-security-stake-November/ (This study included 1,105 DACA recipients in 40 states as well as the District of Columbia.).

7

from 2010-2014 indicates that 18 percent of DACA recipients were enrolled in college versus 20 percent of U.S. citizens of the same age group.[7] The 2019 CAP survey found that over 53 percent of all respondents over the age of 25 reported obtaining a bachelor's degree or higher.[8]

*Third*, DACA enables students to secure social security numbers and photo identification. Something as simple as flying on an airplane was previously all but impossible for undocumented youth. With DACA, they can fly across the country to visit campuses, attend school and academic conferences, and even obtain authorization to study abroad. Likewise, with a social security number, they can apply for financial aid and fee waivers that were previously unobtainable and secure credit to fund other education-related expenses. Given that DACA students come from families whose parents lack legal status—and thus frequently are unable to secure high-paying jobs—the availability of financial aid is all the more crucial to their ability to attend college or university.

*Fourth*, DACA enables students to apply for work authorization. With the ability to work part-time jobs and participate in work-study programs, undocumented students can better afford school—something previously made difficult or impossible by

---

[7] Zong et al., *supra* note 3.

[8] Wong et al., *supra* note 6.

8

the inability to work lawfully.[9] Likewise, the ability to secure a legitimate job following graduation from college provides a powerful incentive to pursue a college education; and the inability to secure such a job likewise dissuades promising students from pursuing higher education. DACA thus increases the value of higher education itself for undocumented students.

*Fifth*, DACA has enabled students to overcome state laws that impede their ability to pursue higher education. For example, DACA recipients may enroll in public colleges and universities in states where they would otherwise be barred from attending,[10] and may apply for in-state tuition in others, making it far easier for them to afford a college education.[11] Over 20 states provide access to in-state tuition (at the state, institutional, or system level) to undocumented students who meet residency requirements.[12] The continued existence of DACA is essential to allow students in these states to utilize these opportunities without fear of deportation.

---

[9] *See* Zenen J. Pérez, *How DACA Has Improved the Lives of Undocumented Young People*, CTR. FOR AMERICAN PROGRESS 5 (Nov. 19, 2014), https://cdn.americanprogress.org/wp-content/uploads/2014/11/BenefitsOfDACABrief2.pdf; Patler & Cabrera, *supra* note 4, at 18.

[10] *See, e.g.*, Ala. Code § 31-13-8; S.C. Code Ann. § 59-101-430.

[11] *See* Pérez, *supra* note 9, at 4.

[12] *Basic Facts about In-State Tuition for Undocumented Immigrant Students*, NAT'L IMMIGRATION LAW CTR. (June 21, 2019), https://www.nilc.org/wp-content/uploads/2017/11/instate-tuition-basicfacts.pdf.

9

*Sixth*, DACA enables students to envision a future for themselves in this country, providing the incentive to pursue a degree, develop skills and expertise, and invest in their future here. In an August 2019 survey by TheDream.US of over 1,800 of their Dreamer scholars ("TheDream.US 2019 survey"), 84 percent indicated they intended to complete a master's, doctoral, or professional degree after college; 57 percent indicated that they were pursuing a degree that required occupational licensing.[13] Likewise, DACA also enables Dreamers to major in high demand and technical career fields. In the 2019 CAP survey, 24 percent of respondents indicated that they were majoring in STEM-related fields, including biology, engineering, and computer and information science. Similarly, 15 percent of respondents indicated they were majoring in health fields, including nursing, public health, and biomedical sciences.[14] Even more telling is that 94 percent of DACA recipients indicated that they had at least some concern that being undocumented poses a barrier to achieving long-term

---

[13]   TheDream.US, *2018-2019 Scholar Survey* (Aug. 2019) [hereinafter "TheDream.US Survey"] (on file with author). TheDream.US is a national college access program that awards scholarships to Dreamers to attend college and university. They partner with over 70 colleges and universities nation-wide. Ninety-three percent of their 3,000 scholars are DACA recipients, accordingly, data regarding these scholars is highly informative regarding DACA's higher educational benefits. In August 2019, TheDream.US conducted an updated survey of its scholars and received over 1,800 responses.

[14] Wong et al., *supra* note 6.

10

career goals, a concern that would likely bear out if DACA is rescinded.[15]

*Finally*, because of DACA, *amici* have made extensive investments in the education of DACA beneficiaries, facilitating their access to higher education like never before. Among other things, *amici* have provided DACA students with financial aid, housing benefits, counseling, faculty time and attention, and graduate and research assistant positions, all in reliance on DACA. Some *amici* even provide legal services. *Amici* made these investments with the expectation that those students would be able to pursue their education and career in this country, in furtherance of *amici's* educational missions, and the public interest.

DACA has accomplished what it was intended to do: In a 2017 estimate of DACA recipients, the Migration Policy Institute estimated that over 120,000 DACA recipients were enrolled in post-secondary education.[16] Likewise, the 2019 CAP survey found that 40 percent are currently in school.[17] Among those who are in school, 93 percent said that, because of DACA, they "pursued educational opportunities that [they]

---

[15] Zong et al., *supra* note 3.

[16] *Id.*

[17] Wong et al., *supra* note 6. Another 56 percent of respondents are currently employed, meaning in all, 96 percent of respondents are currently employed or enrolled in school.

AR5140

11

previously could not."[18] In a different study, nearly four-fifths of DACA recipients (78%) reported that DACA made it easier to pay for school.[19] Three-quarters of current students said DACA made it easier to attend school and to stay in school.[20] These studies and *amici's* experience confirm the obvious: Once young people are able to come out of the shadows and avail themselves of programs available to countless other American youth, they seize and benefit from the opportunity.

## II.   DACA STUDENTS CONTRIBUTE IMMEASURABLY TO OUR CAMPUSES.

American colleges and universities have benefited immeasurably from DACA. As *amicus* Amherst's President, Biddy Martin, wrote in a letter to the President of the United States, "[o]ur classrooms at Amherst are enriched by the academic talent, hard work, and perspectives of DACA students who go on to become doctors, teachers, engineers, and artists."[21] And President Martin is far from alone. Hundreds of other university presidents have echoed those sentiments, issuing public statements on DACA's importance to

---

[18] *Id.*

[19] Patler & Cabrera, *supra* note 4, at 5, 18.

[20] *Id.* at 18.

[21] Letter from Biddy Martin, President, Amherst College, to Donald J. Trump, President (Aug. 30, 2017), https://www.amherst.edu/amherst-story/president/statements/node/689036.

AR5141

12

American colleges and universities, including many whose institutions have signed this brief as *amici*.[22]

---

[22] *See, e.g.*, Pomona Coll., *Statement in Support of the Deferred Action for Childhood Arrivals (DACA) Program and Our Undocumented Students*, https://www.pomona.edu/news/2016/11/21-college-university-presidents-call-us-uphold-and-continue-daca (last visited Sept. 27, 2019) (letter opposing the nonrenewal of DACA signed by over 700 university and college presidents and chancellors); *see also, e.g.*, *California Community Colleges Chancellor Eloy Ortiz Oakley's Statement on the Trump Administration's Action to End DACA for Dreamers* (Sept. 5, 2017), https://www.cccco.edu/About-Us/News-and-Media/Press-Releases/Statement-Ending-DACA; Letter from Andrew D. Hamilton, President, New York University to Donald J. Trump, President (Sept. 1, 2017), http://www.nyu.edu/content/dam/nyu/president/documents/09-01-17-daca-letter.pdf; Letter from Vincent E. Price, President, Duke University, to Donald J. Trump, President (Aug. 30, 2017), https://today.duke.edu/2017/08/duke-university-letter-support-daca; Letter from Drew Gilpin Faust, President, Harvard University, to Donald J. Trump, President (Aug. 28, 2017), https://www.harvard.edu/president/news/2017/letter-to-president-trump-regarding-daca; Letter from Ron Liebowitz, President, Brandeis University, to Donald J. Trump, President (Sept. 5, 2017), http://www.brandeis.edu/president/letters/2017-09-05.html; Univ. of Michigan, *Statement on DACA from President Mark Schlissel* (Sept. 3, 2017), https://president.umich.edu/news-communications/statements/statement-on-daca-from-president-mark-schlissel/; Letter from Adam Falk, President, Williams College, to the Williams Community (Nov. 17, 2016), https://president.williams.edu/writings/caring-for-our-undocumented-students/; Letter from Kathleen McCartney, President, Smith College, to Students, Staff and Faculty (Sept. 5, 2017), https://smith.edu/president-kathleen-mccartney/letters/2017-18/responding-to-daca-decision; Letter from Lee Pelton, President, Emerson College, to Emerson Community (Sept. 6, 2017) http://www.emerson.edu/news-events/emerson-college-today/pelton-reaffirms-support-emerson-daca-students#.We5Ui2you70; Resolution of the Board of Governors,

13

## A. DACA Students Have Had Great Academic and Co-Curricular Success at Our Schools.

Dreamers are invaluable members of our academic communities. In TheDream.US 2019 survey, 52 percent of respondents indicated that they had an on- or off-campus leadership role.[23] DACA recipients serve as the presidents and vice-presidents of student governments,[24] publish research in top academic

California Community Colleges, No. 2017-01, https://www.ccleague.org/sites/default/files/federal_advocacy/BOG_Election_REVISED-Resolution%20%281%29.pdf (last visited Sept. 27, 2019); Statement of Susan Herbst, President, University of Connecticut, to the University of Connecticut Community (Sept. 5, 2017), https://today.uconn.edu/2017/09/president-herbst-responds-daca-decision/; Letter from David W. Leebron, President, Rice University (Sept. 5, 2017), https://president.rice.edu/daca-announcement; Letter of Joseph E. Aoun, President, Northeastern University, to all members of the Northeastern Community (Sept. 4, 2017), http://www.northeastern.edu/president/2017/09/04/turning-ideals-into-action/; Ass'n of Vermont Indep. Colls.*, Statement on the Revocation of the Deferred Action for Childhood Arrivals (DACA) Program*, http://www.vermont-icolleges.org/Documents/DACAFinal2017.pdf (last visited Sept. 27, 2019).

[23] TheDream.US Survey, *supra* note 13.

[24] *See* Jose Herrera, *DACA Student Leads by Example*, Los Angeles Pierce College Roundup (Sept. 13, 2017), http://theroundupnews.com/2017/09/13/daca-student-leads-example/ (discussing experience as student body president); Monica Scott, *Undocumented: One immigrant's story of life under DACA*, MLive (Aug. 29, 2017), https://www.mlive.com/news/grand-rapids/2017/08/one_daca_students_story_about.html (discussing experience as vice-president of student body).

14

journals,[25] innovate and apply for patents,[26] earn inclusion on the Dean's List,[27] graduate *summa cum laude*,[28] and serve as tutors and research assistants.[29] They have won Soros Fellowships and been named Gates Cambridge Scholars and Schwarzman Scholars.[30] They take on extra learning opportunities beyond their classes as they prepare for their futures—74 percent participated in internships.[31] They have gone on to serve others in the Teach For America and AmeriCorps

[25] America's Voice (Oct. 3, 2017), https://americasvoice.org/blog/name-denisse-rojas-marquez-28-years-old-old-proud-undocumented-american-soon-doctor/.

[26] *American Dreamers: Kok-Leong Seow*, N.Y. Times, https://www.nytimes.com/interactive/projects/storywall/american-dreamers/stories/kok-leong-seow (last visited Sept. 27, 2019).

[27] *E.g.*, *American Dreamers: Anayancy Ramos*, N.Y. Times, https://www.nytimes.com/interactive/projects/storywall/american-dreamers/stories/anayancy-ramos (last visited Sept. 27, 2019).

[28] *American Dreamers: Carlos Adolfo Gonzalez Sierra*, N.Y. Times, https://www.nytimes.com/interactive/projects/storywall/american-dreamers/stories/carlos-adolfo-gonzalez-sierra (last visited Sept. 27, 2019).

[29] *E.g.*, *American Dreamers: Gargi Y. Purohit*, N.Y. Times, https://www.nytimes.com/interactive/projects/storywall/american-dreamers/stories/gargiy-purohit (last visited Sept. 27, 2019).

[30] *American Dreamers: Denisse Rojas Marquez*, 2016, N.Y. Times, (2016) https://www.pdsoros.org/meet-the-fellows/denisse-rojas-marquez (last visited Sept. 27, 2019) (discussing selection as Soros Fellow); *American Dreamers: Carlos Adolfo Gonzalez Sierra*, *supra* note 28 (discussing selection as Gates and Schwarzman Scholars).

[31] TheDream.US Survey, *supra* note 13.

AR5144

15

VISTA programs.[32] They have founded national organizations to assist other undocumented youth.[33]

The following are but a few examples of current and past DACA students at *amici* and other institutions of higher education who are brave enough to share their stories, and whose remarkable achievements serve as a reminder of why DACA benefits students, the institutions lucky enough to have them, and the country:

- Reyna Montoya was born in Tijuana, Mexico and migrated to Arizona in 2003 while fleeing violence in Mexico. She holds bachelor degrees in Political Science and Transborder Studies from Arizona State University where she also minored in Dance. Reyna also obtained a Masters of Education in Secondary Education

---

[32] *American Dreamers: Julia Verzbickis*, N.Y. Times, https://www.nytimes.com/interactive/projects/storywall/american-dreamers/stories/julia-verzbickis (last visited Sept. 27, 2019) (discussing selection for Teach for America); *American Dreamers: Brisa E. Ramirez*, N.Y. Times, https://www.nytimes.com/interactive/projects/storywall/american-dreamers/stories/brisae-ramirez (last visited Sept. 27, 2019) (discussing selection for VISTA program).

[33] America's Voice (Oct. 3, 2017), https://americasvoice.org/blog/name-denisse-rojas-marquez-28-years-old-old-proud-undocumented-american-soon-doctor; *see also American Dreamers: Jin Park*, N.Y. Times, https://www.nytimes.com/interactive/projects/storywall/american-dreamers/stories/jin-park (last visited Sept. 27, 2019); Penny Schwartz, *A Jewish 'Dreamer' is Scared, but Refuses to Despair*, Jewish Telegraphic Agency (Sept. 6, 2017), https://www.jta.org/2017/09/06/news-opinion/united-states/a-jewish-dreamer-is-scared-but-refuses-to-despair.

16

from Grand Canyon University. She has engaged in local, statewide, and national platforms to advance justice for immigrant communities. Reyna is a 2016 Soros Justice Fellow, a 2017 Echoing Green Fellow, and a Forbes: 30 Under 30 Social Entrepreneur. She is also a founding member of the first Teach For America DACA Advisory Board.[34]

- Elias Rosenfeld is currently a junior at Brandeis University. Elias was brought to the United States at age six from Venezuela by his mother who was a media executive and came on an L1 visa. His mother died when he was in fifth grade, and it was only in high school when he tried to apply for a driver's license that he learned he was undocumented because his mother's death voided her (and his) visas. Elias excelled in high school, completing 13 AP classes, and ranked in the top 10 percent of his class. At Brandeis he studies political science, sociology, and law. When asked what America means to him, he responded: "It means my country. It's my home. There's a connection. I want to contribute."[35]

---

[34] *About the Team: Reyna Montoya*, ALIENTO, https://www.alientoaz.org/the-team/xiln91utxdyjpwkt94p3h0icez84l9 (last visited Sept. 27, 2019).

[35] *See* Schwartz, *supra* note 33.

17

- Anayancy Ramos attended Eastern Connecticut State University with a double major in Biology and Computer Science and a minor in Bioinformatics. Before matriculating at ECSU, she attended a community college where she was a Dean's List scholar, was inducted into the Phi Theta Kappa honor society, was the president of the Alpha Beta Gamma chapter, and worked full time at an animal hospital. She notes that through DACA she's been able to achieve an education and a future she never thought possible, but that those dreams will die if DACA forces her to retreat once more into the shadows.[36]

- Carlos Adolfo Gonzalez Sierra came to the United States from the Dominican Republic when he was eleven. Carlos graduated *summa cum laude* from Amherst and studied as a Gates Scholar at Cambridge University and a Schwarzman Scholar in China. Carlos emphasizes that his desire to stay in the United States is not economic: "The United States is my home. It is where I feel the most comfortable." Moreover, given the education he's received, he expresses an "inconsolable desire to contribute to the country that has given me so much."[37]

---

[36] *See American Dreamers: Anayancy Ramos*, *supra* note 27. *Amicus* Eastern Connecticut State University has provided updated details about Ramos's course of study, with her consent.

[37] *See American Dreamers: Carlos Adolfo Gonzalez Sierra*, *supra* note 28.

AR5147

18

- Eduardo Solis was brought to the United States from Mexico when he was one month old. At the age of eleven he founded a blog to help fellow children deal with bullying. He has gained over 30,000 followers from all over the world and has won awards recognizing his role as a teen activist. He attends UCLA, aspiring to major in either psychology or sociology. Although worried about the end of DACA, Eduardo says that "[f]or now, I will continue on pledging allegiance to the only flag I know and love; the American Flag."[38]

- Nancy A. was brought to the United States from Togo as a child. When she entered high school at age thirteen, she realized she was undocumented and, shortly thereafter, both she and her parents were put in deportation proceedings. Despite being in these proceedings, she graduated as the valedictorian of her high school class and then became the youngest graduate of her masters' programs. She is currently due to graduate with her Doctorate at age 27 and is a professor of Political Science and Education at a university and community college. She describes receiving DACA at age 23 as being "finally forgiven for a sin I had no control over when I was a child."[39]

---

[38] *See American Dreamers: Eduardo Solis*, N.Y. Times, https://www.nytimes.com/interactive/projects/storywall/american-dreamers/stories/eduardo-solis (last visited Sept. 27, 2019).

[39] *See American Dreamers: Nancy A.*, N.Y. Times, https://www.nytimes.com/interactive/projects/storywall/american-dreamers/stories/nancy-a (last visited Sept. 27, 2019).

19

- Alfredo Avila was brought to the United States when he was just a child, and despite neither of his parents being able to speak English, they managed to send Alfredo and his siblings to school where they all learned English. Despite having to move around several times out of a fear of deportation, Alfredo excelled in school and attended the Honors College at the University of Texas at San Antonio, where he majored in Electrical Engineering. Alfredo worked part-time as a math and science tutor and was involved with many student organizations, including serving as the President of the professional engineering student organization. His dream is to one day build and manage his own technology company that thrives off diversity and inclusion.[40]

- Dalia Larios is an Arizona State University alum who was born in Mexico and raised in the United States. In high school, Dalia graduated within the top 1 percent of her class. Despite her desire to use her studies to help communities in need, her longing to earn a college degree was threatened by her status as an undocumented immigrant. Nonetheless, she remained determined and graduated from Arizona State University with a major in Biological Sciences (Genetics, Cell and Developmental Biology) and a 4.0 GPA. Dalia recently graduated Harvard

---

[40] *See American Dreamers: Alfredo Avila*, N.Y. Times, https://www.nytimes.com/interactive/projects/storywall/american-dreamers/stories/alfredo-avila (last visited Sept. 27, 2019).

AR5149

20

Medical School where she continued to advocate for equitable access to education and healthcare in vulnerable populations.[41]

- Isabel (alias) was able to return to school as an adult and finish her Business Management degree at National Louis University upon receiving DACA. She graduated college with a 4.0 GPA and is currently working as a technical support specialist for a top financial tech company. Isabel hopes to one day become a successful entrepreneur and to own her own restaurant group. DACA changed her life, allowing her to obtain a state ID, apply for better jobs, and help her family. But, most importantly, it made her feel like a human.[42]

- Erik graduated *summa cum laude* from Rutgers University - Newark with a bachelor's degree in Public Administration and Nonprofit Management. He was a member of the Pi Alpha Alpha Honors Society for public administration, and also interned for a member of Congress, a local Assemblyman, and a non-profit. After obtaining his degree, he continued his Rutgers education with a Master's in Public Administration, concentrating in Public and Nonprofit Performance Management. Erik dreams of going to law school and then working

---

[41] *See* Arizona State Univ., *DREAMzone – DACA Alumni Success Stories*, https://eoss.asu.edu/access/dreamzone (last visited Sept. 27, 2019).

[42] Interview by TheDream.US with Isabel (alias) (Sept. 2019).

21

for the government, and possibly even running for office one day. None of which would be possible without DACA.[43]

- Uzair was brought to the United States from Pakistan at just five months old. He received DACA five years ago and is now a student at the University of Houston as well as an aspiring nurse. Uzair wants to become a nurse because he has witnessed firsthand his parents' struggle to pay astronomical medical bills, resulting from a lack of health benefits due to his and his parents' undocumented status. Likewise, throughout high school he volunteered with the Red Cross and developed a passion for caring for others and the community. Uzair will be the first in his family to graduate from college, and he is grateful that his status will allow him the opportunity to provide for his parents and give back to his community. [44]

The success of DACA students in college and university should come as no surprise. These students have overcome innumerable hardships simply to be able to apply and enroll in an institution of higher education. For many of our students (whether U.S. citizens or from other countries), matriculation in college or university is a natural progression after attending high school and taking standardized tests. But this is not the case for DACA students. Those

---

[43] Interview by TheDream.US with Erik (Sept. 2019).

[44] Interview by TheDream.US with Uzair (Sept. 2019).

22

students must perform well in school and on tests while at the same time living under the constant threat that they and their families may be deported.[45] Moreover, until DACA, these students could not apply for work authorization, and most of their parents still cannot.[46] Thus, DACA students frequently have had to work multiple, poorly-paid jobs to help put food on the table while at the same time trying to maintain their focus and performance in school and apply to college. The sacrifices these students and their families have had to make simply to enroll as students at our institutions are legion, and their commitment to bettering themselves and getting the most out of their education is unwavering. These extraordinary young people should be cherished and celebrated, so that they can achieve their dreams and contribute to the fullest for our country. Banishing them once more to immigration limbo—a predicament they had no part in creating—is not merely cruel, but irrational. DACA students are the ideal candidates for prosecutorial

---

[45] TheDream.US Survey, *supra* note 13 (In TheDream.US 2019 survey 94 percent of scholars indicated that they experience anxiety due to their legal status and the potential to lose that status, anxiety likely fueled by the administration's rescission of DACA and ongoing litigation.).

[46] Most DACA students are raised in households with incomes well below the federal poverty line. *See* Marcelo Suárez-Orozco et al., Inst. for Immigration, Globalization, & Educ., *In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration Reform* 1 (2015), https://escholarship.org/uc/item/2hq679z4 (In a survey of undocumented students, 61.3% had annual household incomes below $30,000 and 29% had annual household incomes between $30,000 and $50,000).

23

discretion, which the government formerly recognized and exercised for those who applied and were accepted to DACA. DACA's rescission is not based on any different conclusion about those eligible; rather, it appears to reflect an arbitrary and capricious policy shift for which talented young people will bear the brunt of the harm. If such an unlawful decision is allowed to stand—and these young people take their tremendous talent, enthusiasm, and skills elsewhere—*we* (both *amici* and the country as a whole) will be the losers.

### B. DACA Students Contribute to Campus Diversity, A Key Component of the Educational Experience.

The Supreme Court has time and again noted the myriad benefits that a diverse student body yields for institutions of higher education. *First*, the Court has recognized "the educational benefits that flow from student body diversity," *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 310 (2013) (*Fisher I*) (quotation marks omitted), namely the deeper understanding students and professors achieve when an issue or problem is analyzed by individuals who bring differing perspectives and backgrounds to the question. *See also Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) (noting that the "educational benefits that diversity is designed to produce . . . [are] substantial."). *Second*, "enrolling a diverse student body 'promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races.'" *Fisher v. Univ. of Texas at Austin* (*Fisher II*), 136 S. Ct. 2198, 2210 (2016) (quoting

24

*Grutter*, 539 U.S. at 328, 330). While this obviously has a direct benefit to students, it also is a key component in creating a dynamic and integrated campus environment. *Third*, and "[e]qually important, student body diversity promotes learning outcomes, and better prepares students for an increasingly diverse workforce and society." *Fisher II*, 136 S. Ct. at 2210 (internal quotation marks omitted).

Diversity on campus is amongst the highest priorities for *amici*, and we have seen the benefits in practice that the Supreme Court has highlighted in its opinions. For example, *amicus* Rice University's mission statement notes that it seeks to fulfill its mission "by cultivating a diverse community of learning and discovery that produces leaders across the spectrum of human endeavor."[47] Likewise, *amicus* Middlebury College explains its commitment to "full and equal participation for all individuals and groups" by noting evidence that "groups of people from a variety of backgrounds and with differing viewpoints are often more resilient and adaptive in solving problems and reaching complex goals than more homogenous groups."[48] These are but two examples of many.[49]

---

[47] Rice Univ., *Statement of Office of Diversity and Inclusion*, https://www.rice.edu/mission-values (last visited Sept. 27, 2019).

[48] Middlebury Coll., *Diversity and Inclusion*, http://www.middlebury.edu/student-life/community-living/diversity-inclusivity (last visited Sept. 27, 2019).

[49] *See, e.g.*, Folsom Lake Coll., *Strategic Plan 2017-2020*, https://losrios.edu/docs/lrccd/board/2017/enc/20170614-flc-strat-plan.pdf (last visited Sept. 27, 2019); Brandeis Univ., *Mission &*

25

The DACA students attending our schools play a significant role in fostering the inclusive and diverse on-campus atmosphere we strive to create. As reported by USCIS, as of April 30, 2019, the 669,080 active DACA recipients come from over 150 countries, spanning every continent except Antarctica.[50] DACA recipients are also often the first in their family to have the opportunity to attend college. In TheDream.US 2019 survey, 81 percent of Dreamer scholars identified as first-generation college students.[51] And as discussed *supra*, DACA recipients often come from households with incomes well below the federal poverty line.[52]

This diversity of backgrounds and ethnicities is reflected in the thousands of DACA recipients, and undocumented students, who study on our campuses.[53]

---

*Diversity Statements*, http://www.brandeis.edu/about/mission.html (last visited Sept. 27, 2019).

[50] *See DACA Population Data*, USCIS (Apr. 30, 2019), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/Approximate_Active_DACA_Recipients_Demographics_-_Apr_30_2019.pdf.

[51] TheDream.US Survey, *supra* note 13.

[52] *See* Suárez-Orozco et al., *supra* note 46.

[53] Zong et al., *supra* note 3 (In fall 2017, it was estimated that of the close to 700,000 then active DACA recipients, over 120,000 were currently in post-secondary education, and over 137,000 were in secondary school.); *see also* TheDream.US Survey, *supra* note 13 (TheDream.US scholars represent 94 countries across the world, demonstrating the link between DACA and increasing diversity at college and universities.).

26

In addition to their compelling life stories, they bring a wealth of different perspectives to our schools.

## III.  THE RESCISSION OF DACA WILL HARM AMERICAN COLLEGES AND UNIVERSITIES.

If DACA's rescission is allowed to stand, the greatest harm will of course be suffered by DACA recipients and their families. But American colleges and universities will be harmed as well.

*First*, and foremost, we will lose important members of our academic communities. The few examples cited above are not anomalous; rather, they exemplify the talent and accomplishment of the thousands of DACA students we have on our campuses. As many students may be forced to withdraw, *amici* will be deprived of some of our most accomplished students. Additionally, a spring 2019 analysis of U.S. Census Bureau data indicates that 98,000 Dreamers graduate from high school annually in the United States.[54] Without DACA many of these students will be unable to pursue college, depriving *amici* of thousands of hard-working students each year. These students contribute not only to the diversity of perspectives in our classrooms but also to the student leadership of social action initiatives

---

[54] Jie Zong & Jeanne Batalova, *How Many Unauthorized Immigrants Graduate form U.S. High Schools Annually?*, MIGRATION POLICY INST. (Apr. 2019), https://www.migrationpolicy.org/research/unauthorized-immigrants-graduate-us-high-schools.

27

in our communities.[55] Our campuses will be noticeably poorer places without those substantial contributions.

*Second*, the education we provide our students is a valuable commodity, and we have finite resources to provide it. If DACA students lose their status and, with it, the ability to pay for tuition or living expenses, they may not be able to continue with their education. And, even for those students who have saved enough money to continue, the value of an education may decrease if they are unable to secure lawful employment upon graduation. As a result, *amici* will almost certainly lose students mid-way through their degree programs, and the retention rate for this population will drop dramatically and beyond what institutions are prepared to accommodate through normal attrition cycles. *Amici* have devoted valuable, and in many cases limited, enrollment spaces to this student population that will not be able to continue in their education and cannot be replaced during a mid-point of their progression in their degree program.

*Third*, some of our DACA students work in a variety of positions on campus, and many are already trained for these positions and performing well.[56] With the loss of the ability of DACA students to apply for work authorization, *amici* will lose these valuable contributions. The cost of refilling and retraining for these roles, if we can even find adequate replacements,

---

[55] TheDream.US Survey, *supra* note 13.

[56] *Id.* (TheDream.US survey indicates that 89 percent of scholars worked at least 10 hours a week, with 57 percent working at least 21 hours.).

28

represents measurable harm to the institutions. More broadly, the loss of the ability to apply for work authorization will also mean that our DACA students will be unable to secure stable jobs upon graduation.[57] While of course this is primarily a harm to them, given that our DACA students are among the most committed of our alumni, we too will lose an important source of support (both financial and otherwise).

*Fourth*, DACA's rescission has already required *amici* to dedicate valuable resources to counsel students who are negatively impacted by rescission. Many of these students have required mental health counseling to deal with the stress and anxiety induced by the government's sudden shift in position, as well as legal assistance to determine their range of possibilities.[58] As institutions of higher education, we believe we should be spending our resources on educating our students for the bright futures they will have, not defending and counseling them against unfair and adverse actions by their government for a situation in which they have no blame whatsoever.

---

[57] *Id.* (TheDream.US scholars indicated that their greatest concern is an inability to work.).

[58] *See, e.g.*, Eleanor J. Bader, *As End of DACA Looms, Colleges and Organizers Ramp Up Efforts to Protect Undocumented Students*, NACLA (Jan. 27, 2017), https://nacla.org/news/2017/01/27/end-daca-looms-colleges-and-organizers-ramp-efforts-protect-undocumented-students; *see also* TheDream.US Survey, *supra* note 45 and accompanying text.

AR5158

29

*Fifth*, the investments *amici* have made in DACA students and the investments DACA students have made in their own education allow these students to use college as a pathway out of poverty and into careers. DACA alumni enter a variety of careers where they give back to *amici* and the country as a whole; these career opportunities would be inaccessible to these talented hardworking individuals without DACA. As detailed *supra*,[59] DACA alumni work in a variety of fields giving back to the country.

In the 2019 CAP survey, 89 percent of all respondents noted that they were currently employed, and 91 percent of respondents age 25 and older were employed.[60] That same study reports that DACA recipients work in a variety of fields—28,000 DACA recipients are employed in management and business occupations, over 6,000 DACA recipients are self-employed in an incorporated business,[61] 25,000 work in nonprofit organizations, and 22,000 in the public sector.[62] Furthermore, approximately 27,000 DACA recipients work as health care practitioners and

---

[59] *See* discussion *supra* Part II.A.

[60] Wong et al., *supra* note 6.

[61] Nicole Prchal Svajlenka, *What We Know about DACA Recipients in the United States*, CTR. FOR AMERICAN PROGRESS (Sept. 5, 2019), https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states/.

[62] *Id.*

30

supporting occupations.[63] If DACA is rescinded, *amici* stand to lose the return on their investments in these students, and the country as a whole stands to lose these students' long-term contributions to the American economy.[64]

*Finally*, even for those schools without many or even any DACA students, supporting DACA is central to our mission as educators. *Amici* are devoted to the education of people to help them realize their ambitions and potential, and to contribute to their communities, to this country, and to the world. We pursue that mission on behalf of our students, regardless of national origin. Indeed, core to that mission is our commitment to equal opportunity. The rescission of

---

[63] *Id.*; *see also* America's Voice (Oct. 3, 2017), https://americasvoice.org/blog/name-denisse-rojas-marquez-28-years-old-old-proud-undocumented-american-soon-doctor/; *American Dreamers: Belsy Garcia*, N.Y. Times, https://www.nytimes.com/interactive/projects/storywall/american-dreamers/stories/belsy-garcia (last visited Sept. 27, 2019); *American Dreamers: Isabelle Muhlbauer*, N.Y. Times, https://www.nytimes.com/interactive/projects/storywall/american-dreamers/stories/isabelle-muhlbauer (last visited Sept. 27, 2019).

[64] DACA participants have a large impact on the economy given their work in a variety of fields, their purchasing power, and the fact that they increase state and federal tax bases. According to the Center for American Progress's analysis of ACS microdata, "DACA recipients and their households pay $5.7 billion in federal taxes and $3.1 billion in state and local taxes annually. In addition to this, DACA recipients boost Social Security and Medicare through payroll taxes. DACA recipients and their households hold a combined $24.1 billion in spending power—or income remaining after paying taxes—each year." Svajlenka, *supra* note 61.

31

DACA devalues that mission without any rational basis. In that respect, it harms all *amici.*

## CONCLUSION

DACA is enlightened and humane; it represents the very best of America. It provides legal certainty for a generation of hard-working, high-achieving, and determined young people who love this country and were raised here. Once at college or university, DACA recipients are among the most engaged students both academically and otherwise. They work hard in the classroom and become deeply engaged in co-curricular activities, supporting communities on and off campus. Moreover, our DACA students are deeply committed to giving back to their communities and, more broadly, the country they love. We should not be pushing them out of the country or returning them to a life in the shadows. As institutions of higher education, we see every day the achievement and potential of these young people, and we think it imperative for both us and them that they be allowed to remain here and live out their dreams. Indeed, it defies rationality to prevent the government from utilizing its discretion to protect this set of young people from removal. For these reasons, we urge the Court to affirm the decisions enjoining the rescission of DACA.

32

Respectfully submitted,

Bruce V. Spiva
   *Counsel of Record*
Amanda R. Callais
Rebecca K. Mears
PERKINS COIE LLP
700 13th Street, NW
Suite 600
Washington, D.C. 20005
(202) 654-6203
bspiva@perkinscoie.com

*Attorneys for Amici Curiae*

Dated: October 4, 2019

Nos. 18-587, 18-588, and 18-589

In The

# Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, ET AL.,

*Petitioners*,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,

*Respondents.*

On Writ of Certiorari
to the United States Court of Appeals
for the Ninth Circuit

**BRIEF OF AMICI CURIAE ADMINISTRATIVE
LAW PRACTITIONERS IN SUPPORT OF
RESPONDENTS**

Kevin K. Russell
 *Counsel of Record*
Daniel Woofter
Charles H. Davis
Erica Oleszczuk Evans
GOLDSTEIN &
 RUSSELL, P.C.
7475 Wisconsin Ave.
Suite 850
Bethesda, MD 20814
(202) 362-0636
*kr@goldsteinrussell.com*

Additional Captions Listed on Inside Cover

**AR5163**

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

*Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.,

*Respondents.*

————

On Writ of Certiorari Before Judgment
to the United States Court of Appeals
for the District of Columbia Circuit

————

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL.,

*Respondents.*

————

On Writ of Certiorari Before Judgment
to the United States Court of Appeals
for the Second Circuit

————

AR5164

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .........................................ii

INTEREST OF AMICI CURIAE.................................1

SUMMARY OF ARGUMENT ....................................1

ARGUMENT ...............................................................5

I.   The Nielsen Memo Should Not Be Considered In Assessing The Lawfulness Of DACA's Repeal... ..................................................................5

   A.   Post-Hoc Agency Explanations Like The Nielsen Memo Cannot Be Considered In Reviewing An Agency Action Under The APA .................................................................6

   B.   Even When Post-Hoc Explanations Are Allowed, They May Not Extend Beyond The Original Rationale Offered For An Agency Decision...........................................12

II.   The Reasons Given In The Nielsen Memo Are Arbitrary And Capricious ....................................18

   A.   Secretary Nielsen's New Policy Reasons Are Each Arbitrary and Capricious............18

   B.   If Any Of The Nielsen Memo Justifications Is Arbitrary And Capricious, The Agency Action Must Be Vacated And Remanded For Reconsideration ..........................................30

CONCLUSION .......................................................32

**AR5165**

ii

## TABLE OF AUTHORITIES

### Cases

*Burlington Truck Lines, Inc. v. United States,*
   371 U.S. 156 (1962)....................................................6

*Califano v. Sanders,*
   430 U.S. 99 (1977).....................................................7

*Camp v. Pitts,*
   411 U.S. 138 (1973).......................................... *passim*

*Carnegie Nat. Gas Co. v. FERC,*
   968 F.2d 1291 (D.C. Cir. 1992).............................. 30

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971).......................................... 6, 9, 13

*Comcast Corp. v. FCC,*
   579 F.3d 1 (D.C. Cir. 2009) ............................. 11, 12

*Cotton Petroleum Corp. v. U.S. Dep't of Interior,*
   870 F.2d 1515 (10th Cir. 1989)............................... 14

*Council Tree Commc'ns, Inc. v. FCC,*
   619 F.3d 235 (3d Cir. 2010) ................................... 12

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019)....................................... *passim*

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016)....................................... 20, 25

*Envtl. Def. Fund, Inc v. Costle,*
   657 F.2d 275 (D.C. Cir. 1981) ............................... 14

*Fla. Power & Light Co. v. Lorion,*
   470 U.S. 729 (1985)............................................ 6, 15

*Fogo De Chao (Holdings) Inc. v. DHS,*
   769 F.3d 1127 (D.C. Cir. 2014) ............................. 30

*Forest Guardians v. Babbitt,*
   174 F.3d 1178 (10th Cir. 1999).............................. 12

**AR5166**

iii

*Idaho Farm Bureau Fed'n v. Babbitt,*
   58 F.3d 1392 (9th Cir. 1995) .................................. 12

*Indus. Union Dep't, AFL-CIO v.*
   *Am. Petroleum Inst.,*
   448 U.S. 607 (1980) .............................................. 24

*Limnia, Inc. v. U.S. Dep't of Energy,*
   857 F.3d 379 (D.C. Cir. 2017) ............................... 10

*Martin v. OSHRC,*
   499 U.S. 144 (1991) ........................................... 9, 10

*Michigan v. EPA,*
   135 S. Ct. 2699 (2015) ..................................... 28, 29

*Milk Train, Inc. v. Veneman,*
   310 F.3d 747 (D.C. Cir. 2002) ............................... 12

*Mingo Logan Coal Co. v. EPA,*
   829 F.3d 710 (D.C. Cir. 2016) ......................... 28, 29

*Mo. Pub. Serv. Comm'n v. FERC,*
   337 F.3d 1066 (D.C. Cir. 2003) ............................... 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*
   *State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) .................................. 3, 21, 23, 24

*Nat'l Cable & Telecomms. Ass'n v.*
   *Brand X Internet Servs.,*
   545 U.S. 967 (2005) .............................................. 20

*PBGC v. LTV Corp.,*
   496 U.S. 633 (1990) .............................................. 15

*Perez v. Mortg. Bankers Ass'n,*
   135 S. Ct. 1199 (2015) ......................................... 25

*SEC v. Chenery Corp.,*
   318 U.S. 80 (1943) .............................................. 6, 7

*Sierra Club v. Marsh,*
   976 F.2d 763 (1st Cir. 1992) ................................. 14

**AR5167**

iv

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) .................................. 15

*Yakima Valley Cablevision, Inc. v. FCC*,
  794 F.2d 737 (D.C. Cir. 1986) ............................... 23

**Statutes**

Administrative Procedure Act,
  5 U.S.C. §§ 551-559, 701-706 ........................ *passim*

Victims of Trafficking and Violence Protection
  Act of 2000, Pub. L. No. 106-386, 114 Stat.
  1464 ...................................................................... 21

William Wilberforce Trafficking Victims
  Protection Reauthorization Act of 2008, Pub.
  L. No. 110-457, 122 Stat. 5044 ............................ 21

5 U.S.C. § 553 .............................................................. 8

5 U.S.C. § 554 .............................................................. 8

5 U.S.C. § 556 .............................................................. 8

5 U.S.C. § 706 ............................................................ 12

5 U.S.C. § 706(2) .......................................................... 6

6 U.S.C. § 202(5) .................................................. 2, 19

8 U.S.C. § 1154(a)(1)(D)(i)(II) ................................. 21

8 U.S.C. § 1154(a)(1)(D)(i)(IV) ................................ 21

8 U.S.C. § 1227(d)(2) ................................................ 21

**AR5168**

v

## Other Authorities

Russell Berman, *Trump Reverses His Stand on DACA*, The Atlantic (Sept. 14, 2017), https://www.theatlantic.com/politics/archive/2017/09/daca-deal-or-no-deal-trump-democrats-dreamers/539784/ ................................ 27

*The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op. O.L.C. __ (Nov. 19, 2014), 2014 WL 10788677 ......................... 21

Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 Duke L.J. 291 (2003) ...... 11

Nolan D. McCaskill, *Trump Says He Will Treat Dreamers 'with Heart'*, Politico (Feb. 16, 2017, 2:37PM), https://www.politico.com/story/2017/02/trump-press-conference-dreamers-heart-235103 .................................................. 27

Memorandum from Michael D. Cronin, Acting Exec. Assoc. Comm'r, Office of Programs, INS, to Michael A. Pearson, Exec. Assoc. Comm'r, Office of Field Operations, INS, *Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2 – "T" and "U" Nonimmigrant Visas* (Aug. 30, 2001) ...... 19

AR5169

vi

Memorandum from Janet Napolitano, Sec'y,
   DHS, to David V. Aguilar, Acting Comm'r,
   CBP, et al., *Exercising Prosecutorial
   Discretion with Respect to Individuals Who
   Came to the United States as Children*
   (June 15, 2012), https://www.dhs.gov/xlibrary/
   assets/s1-exercising-prosecutorial-discretion-
   individuals-who-came-to-us-as-children.pdf ......... 22

Memorandum from Donald Neufeld, Acting
   Assoc. Dir., Office of Domestic Operations,
   USCIS, to Field Leadership, *Guidance
   Regarding Surviving Spouses of Deceased U.S.
   Citizens and Their Children* (Sept. 4, 2009) ......... 19

Memorandum from Paul W. Virtue, Acting Exec.
   Assoc. Comm'r, INS, to Reg'l Dirs. et al., INS,
   *Supplemental Guidance on Battered Alien
   Self-Petitioning Process and Related Issues*
   (May 6, 1997) ........................................................ 19

USCIS, *Battered Spouse, Children & Parents*,
   https://www.uscis.gov/humanitarian/battered-
   spouse-children-parents (last updated Feb. 16,
   2016) ..................................................................... 20

USCIS, *Deferred Action for Childhood Arrivals
   (DACA) Toolkit: Resources for Community
   Partners*, https://www.uscis.gov/sites/default/
   files/USCIS/Humanitarian/Deferred%20
   Action%20for%20Childhood%20Arrivals/
   DACA_Toolkit_CP_072914.pdf (last visited
   Oct. 3, 2019) .................................................. 22, 23

**AR5170**

vii

USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)* (Nov. 25, 2005), https://www.uscis.gov/sites/default/files/archive/faq-interim-student-relief-hurricane-katrina.pdf.................................... 19

USCIS, *Victims of Criminal Activity: U Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-status/victims-criminal-activity-u-nonimmigrant-status (last updated June 12, 2018) ..................... 20

The White House, President Barack Obama, *Remarks by the President on Immigration* (June 15, 2012), https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration ........................................................ 26

AR5171

1

### INTEREST OF AMICI CURIAE[1]

Amici are practitioners with decades of experience litigating cases in this Court and in the lower courts addressing questions of administrative law. Alan B. Morrison is the Lerner Family Associate Dean for Public Interest and Public Service Law at The George Washington University Law School. Brian Wolfman is Associate Professor of Law at Georgetown University Law Center and Director of Georgetown Law's Appellate Courts Immersion Clinic.

### SUMMARY OF ARGUMENT

I. The supplementary memorandum of former Department of Homeland Security (DHS) Secretary Kirstjen Nielsen is not properly before the Court and should not be considered in assessing the lawfulness of the repeal of the Deferred Action for Childhood Arrivals (DACA) program.

A. It is settled law that "in reviewing agency action, a court is ordinarily limited to evaluating the agency's *contemporaneous explanation* in light of the existing administrative record." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) (emphasis added) (collecting authorities). Any other rule would be unadministrable, making the subject of review a moving target for litigants and the courts. Moreover, upholding agency decisions on the basis of new reasons developed during litigation would undermine

---

[1]  No counsel for any party authored this brief in whole or in part, and no person or entity, other than amici curiae, their members, or their counsel contributed money to fund the brief's preparation or submission. All parties lodged letters of blanket consent to the filing of amicus briefs.

2

public confidence in the administrative process, suggesting to the public that the agency deliberative process was a sham and that the agency's initial explanation was pretextual.

The Nielsen memo is the kind of post-hoc explanation that is generally prohibited—issued months after the initial decision and self-consciously designed to add reasons that were never mentioned in the original agency explanation.

B. The Court has created a narrow exception to the contemporaneous explanation rule, for cases in which an agency's original rationale is so unclear as to prevent judicial review. *See Camp v. Pitts*, 411 U.S. 138 (1973) (per curiam). But even in that context, the Court has prohibited the agency from adding new rationales in the guise of clarifying the original basis for its decision. *See id*. at 143. Accordingly, if the Court *were* to consider the Nielsen memo, it should at a minimum, consistent with *Camp*, refuse to consider the memo's attempt to add new "policy" reasons for DACA's withdrawal.

II. In any event, even if the Court were to consider Secretary Nielsen's memo, the additional reasons it gives are arbitrary and capricious.

A. Secretary Nielsen asserts that Congress, rather than DHS, should enact programs like DACA. But she recognizes that in 6 U.S.C. § 202(5) Congress has given DHS the power to establish broad enforcement policies and priorities, and ignores the Government's repeated use of that power over the decades to create programs like DACA through the categorical use of prosecutorial discretion, some of which DHS continues to administer to this day. Nor

**AR5173**

3

does Secretary Nielsen acknowledge that Congress has effectively ratified the use of deferred action to create protections for categories of individuals.

In the same vein, Secretary Nielsen's explanation that deferral discretion should be exercised only on an individualized, case-by-case basis is arbitrary. That reasoning ignores that DACA already requires a substantial degree of individualized consideration. Moreover, the Secretary failed to consider obvious and less drastic alternatives to full rescission, such as simply directing her employees to implement DACA with a greater degree of case-by-case consideration. The failure to consider obvious, less-drastic alternatives is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46-48 (1983).

Secretary Nielsen also claims that repealing DACA is necessary to deter the flow of illegal immigration by migrant teens. But she fails to acknowledge that DACA is available only to individuals who have lived in the United States since 2007. The Government's lawyers attempt to provide the missing reasoning, arguing that retaining DACA would give immigrants hope for other amnesty programs in the future. But that explanation is an impermissible post-hoc invention of appellate counsel. And, in any event, counsel does not explain why an immigrant who is willing to come to this country based on nothing more than the hope of a future amnesty program would be deterred by the repeal of DACA when the Secretary herself insists that all comers are still entitled to seek deferred status on a case-by-case basis and when subsequent administrations and

AR5174

4

Congress remain free to reinstate or create similar programs in the future.

The Secretary's conclusory statement that the "asserted reliance interests [do not] outweigh the questionable legality of the DACA policy and other reasons for ending the policy," *Regents* Pet. App. 125a, is wholly inadequate as well. That boilerplate assertion is not the kind of consideration of reliance interests this Court's decisions require. That failure is not saved by the Secretary's assertion that DACA recipients could still apply for deferred action on a case-by-case basis. The memo does not explain what the replacement system will entail nor assess whether that system will offer a real chance for relief to any meaningful number of those presently relying on DACA.

Finally, having justified her decision on the basis of a cost-benefit analysis, the Secretary was obligated to engage in a rational weighing of the competing interests, which she failed to do. As noted, the memo's assessment of the purported benefits (*e.g.*, deterring future unlawful immigration) is irrational. Its consideration of the human and other costs of deporting tens of thousands of individuals from the only country they've ever known is nonexistent.

B. If any of Secretary Nielsen's justifications are arbitrary and capricious, the agency's rescission of DACA must be vacated and the matter remanded for reconsideration. Although the memo contains boilerplate language asserting that each of the reasons set forth is "independently sufficient," that claim is belied by the substance of the memo itself, which weighs the costs and benefits of repeal collectively.

**AR5175**

5

**ARGUMENT**

In September 2017, then-Acting DHS Secretary Elaine Duke issued a memorandum ordering an end to the DACA program.  As respondents and others explain, the reasons given in that contemporaneous memo are arbitrary and capricious.  Perhaps aware of the weakness of the original rationale, the Government also relies in this Court on a post-hoc memo from Acting Secretary Duke's successor, Kirstjen Nielsen, purporting to provide additional support for her predecessor's decision.  That memo is not properly before the Court and should not be considered.  Even if the Court were to consider the memo, however, the additional reasons it gives are no less arbitrary or capricious than the agency's original explanation.

**I.    The Nielsen Memo Should Not Be Considered In Assessing The Lawfulness Of DACA's Repeal.**

It is settled that judicial review of agency action ordinarily must be based on the explanation the agency provided at the time of its decision.  The Nielsen memo may not be considered in reviewing the legality of DACA's repeal under that principle and does not fall under any recognized exception to the basic rule.  If the Court nonetheless considers the memo, it should confine its review to Secretary Nielsen's elaboration of the reasons originally given in support of DACA's repeal and disregard the new "policy" reasons given as additional support.

**AR5176**

6

### A. Post-Hoc Agency Explanations Like The Nielsen Memo Cannot Be Considered In Reviewing An Agency Action Under The APA.

1. It is a "settled proposition[]" of administrative law that "in reviewing agency action, a court is ordinarily limited to evaluating the agency's *contemporaneous explanation* in light of the existing administrative record." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) (emphasis added) (collecting authorities). If the court determines that the agency action is arbitrary or capricious based on that contemporaneous explanation, it "shall . . . set aside" the agency action. 5 U.S.C. § 706(2). Ordinarily, the matter is then remanded to the agency, which may elect to reopen the administrative record and take a new administrative action on the basis of new evidence or rationales. *See, e.g.*, *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Sometimes, the agency will reach the same decision as it did before. In that case, its renewed action is subject to judicial review under the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559, 701-706, on the basis of the new administrative record and the agency's revised rationale. *See, e.g.*, *Mo. Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1068 (D.C. Cir. 2003).

Under this established regime, a court generally may not consider additional reasons proffered after the fact in defense of the original decision. *See Dep't of Commerce*, 139 S. Ct. at 2573; *see also, e.g.*, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962); *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943), and explaining

**AR5177**

7

that affidavits presented in litigation that purported to explain basis for agency decision were "merely '*post hoc*' rationalizations, which have traditionally been found to be an inadequate basis for review"), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

There are sound reasons for this standard practice. To start, constraining judicial review to the "grounds upon which the administrative agency acted [and] clearly disclosed" is necessary to preserve the "orderly functioning of the process of review." *Chenery*, 318 U.S. at 94. Otherwise, the subject of review could become a moving target, with the agency constantly changing its justifications as the weakness of the initial rationale becomes apparent when tested in litigation. It is in neither the interest of the public nor the courts for APA review to become a game of whack-a-mole.

Moreover, allowing the Government to develop new rationales for its actions during litigation could reduce agencies' incentive to think through their actions thoroughly in the first instance. Indeed, it could even encourage agencies to engage in gamesmanship by issuing vague explanations of their actions, believing they can develop the rationale further during litigation, tailored to the challengers' specific objections.

But perhaps most importantly, upholding an agency decision on the basis of new reasons developed during litigation would undermine public confidence in the administrative process. "The reasoned explanation requirement of administrative law," the Court recently explained, "is meant to ensure that agencies offer genuine justifications for important

8

decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce*, 139 S. Ct at 2575-76. Allowing an agency to develop new reasons for its actions during litigation suggests to the public that the agency deliberative process was a sham and that the public explanation at the time of the decision was just a pretext. Perhaps courts could guard against this prospect by inquiring into whether the new rationale is genuinely held. But that alternative has its own undesirable effects, as "judicial inquiry into 'executive motivation' represents a 'substantial intrusion' into the workings of another branch of Government and should normally be avoided." *Id.* at 2573 (citation omitted).

Beyond facilitating public oversight, the APA also seeks to further public participation in administrative policymaking (*e.g.*, by requiring public notice of certain kinds of proposed administrative action and requiring the agency to accept and take into account public comment). *See, e.g.*, 5 U.S.C. § 553; *see also id.* §§ 554, 556. It would make a mockery of that system to allow an agency to jettison the rationale emerging from that public process in favor of a new explanation developed behind closed doors in response to litigation.

It is thus far more orderly, more conducive to public confidence and participation in the Government, and more in line with the Constitution's separation of powers for a court to review the agency justifications as given when a decision was made and, if the record or rationale is found wanting, vacate the order and allow the agency a chance to revise its decision, the record, or its explanation on remand.

2. The Nielsen memo is the kind of post-hoc explanation that is generally prohibited. It was issued

**AR5179**

9

more than nine months after the initial decision, directly in response to litigation. And it was self-consciously designed to add reasons that were never mentioned in the original agency explanation. *See Regents* Pet. App. 120a-125a.

The Solicitor General insists that the rule against post-hoc justification applies only to rationalizations of appellate counsel in litigation, not the agency itself. *See* U.S. Br. 29. When the explanation is given by the relevant agency official rather than her lawyers, the United States argues, the reasoning "*is* agency action, not a *post hoc* rationalization of it." *Id.* (quoting *Martin v. OSHRC*, 499 U.S. 144, 157 (1991)).

This Court's precedents hold otherwise. In *Citizens to Preserve Overton Park*, for example, the Government submitted affidavits representing the position of the Secretary of Transportation. *See* 401 U.S. at 409. The Court nonetheless rejected them as "merely '*post hoc*' rationalizations" that provided "an inadequate basis for review," *id.* at 419. Likewise, in *Camp v. Pitts*, 411 U.S. 138 (1973) (per curiam), discussed in greater detail below, the Court made a limited exception to permit an agency to better explain the basis of a prior decision, but forbade the agency from adding to the rationale originally given. *See id.* at 143. That limitation would make no sense if the Court viewed a subsequent explanation by an agency (as opposed to its lawyers) as constituting the relevant agency action, as the Government now contends.[2]

---

[2] The only authority the Government cites, *Martin v. OSHRC*, is inapposite. There, the Court deferred to an agency's interpretation of a regulation developed during agency

10

The situation would be different if Secretary Nielsen had revoked the prior order and issued a new one, as the District Court for the District of Columbia had urged. After finding the repeal arbitrary and capricious based on the reasoning in the Duke memo, that court "vacate[d] DACA's rescission but stay[ed] its order of vacatur for 90 days." *NAACP* Pet. App. 66a. The point of the delay was to allow the agency to "cure the defects that the court has identified," *id*. at 62a, by "reissu[ing] a memorandum rescinding DACA, this time providing a fuller explanation," *id*. at 66a. Had Secretary Nielsen done so, her renewed order would be the relevant agency action, and the present challenges to the old order would likely be moot. But here Secretary Nielsen made the strategic decision *not* to replace the original order precisely to *avoid* mooting the litigation challenging the old one. *See Regents* Pet. App. 121a. The Administration may have had legal or political reasons for making that choice. But it was a strategic decision that has consequences under established law.

DHS also could have asked the reviewing courts for a voluntary remand for further proceedings to supplement the administrative record. *See generally Limnia, Inc. v. U.S. Dep't of Energy*, 857 F.3d 379, 386-88 (D.C. Cir. 2017). Doing so would have allowed the agency to provide additional support for its decision while maintaining the orderliness of APA review. It also would have preserved public confidence that any

---

enforcement proceedings. *Martin*, 499 U.S. at 156-57. There is a world of difference between deferring to an agency's interpretation of the legal *meaning* of its prior regulation and accepting a new post-hoc, supposedly fact-based policy *rationale* for the issuance of that regulation in the first place.

11

revision in the Administration's position was the result of a genuine, deliberative process. But DHS passed up that opportunity as well.

Finally, some courts have held that when an agency action is arbitrary or capricious on the contemporaneous administrative record, but it appears likely that the agency will be able to justify its existing decision on remand, the court can remand without vacating. *See, e.g.*, *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009); *see generally* Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 Duke L.J. 291 (2003). But that did not happen here either. In the District of Columbia litigation, the Government argued that the district court's stay of its vacatur order amounted to a remand without vacatur. 17-cv-02325 Doc. 76, at 1-3 (D.D.C. July 27, 2018). But the court corrected that misimpression, *NAACP* Pet. App. 90a-91a, and the Government does not challenge that explanation here. Instead, on the basis of the Nielsen memo, DHS asked the district court to "revise its Order to reject Plaintiffs' challenges" to the original decision to rescind DACA. 17-cv-02325 Doc. 74, at 1 (D.D.C. July 11, 2018). Likewise, in this Court, the Solicitor General does not claim that the Nielsen memo created a new agency action in response to a remand order, but instead argues that the Nielsen memo shows that the district court *erred* in ordering a remand in the first place. As discussed, that position

AR5182

12

runs     aground     on     this     Court's     established
contemporaneous explanation rule.[3]

### B. Even When Post-Hoc Explanations Are Allowed, They May Not Extend Beyond The Original Rationale Offered For An Agency Decision.

This Court has permitted agencies to provide post-hoc explanations for their decisions in certain rare circumstances. But even then, the agency is limited to elucidating its original rationale and may not provide new reasons, as the Nielsen memo attempts to do.

1. The controlling authority here is *Camp v. Pitts*. There, the Comptroller of the Currency denied the respondent a banking charter. In a brief letter, the Comptroller explained that he was "unable to reach a favorable conclusion as to the need factor," referring to

---

[3] The questionable lawfulness of the remand-without-vacatur procedure provides additional reason for this Court not to treat the Nielsen memo as the product of such a remand. The circuits are divided over whether that remedy is appropriate in light of the APA's plain language, which provides that upon finding an agency action arbitrary, capricious, or contrary to law, the court "*shall* . . . set aside [the] agency action." 5 U.S.C. § 706 (emphasis added); *compare Council Tree Commc'ns, Inc. v. FCC*, 619 F.3d 235, 257-58 (3d Cir. 2010) (remand without vacatur permitted), *Comcast*, 579 F.3d at 8 (same), *and Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995) (same), *with Forest Guardians v. Babbitt*, 174 F.3d 1178, 1191 (10th Cir. 1999) (rejecting remand without vacatur doctrine), *Comcast*, 579 F.3d at 10 (Randolph, J., concurring) ("'Set aside' means vacate, according to the dictionaries and the common understanding of judges, to whom the provision is addressed. And 'shall' means 'must.' I see no play in the joints."), *and Milk Train, Inc. v. Veneman*, 310 F.3d 747, 757-58 (D.C. Cir. 2002) (Sentelle, J., dissenting) (same).

13

one of the statutory criteria for obtaining a federal bank charter.  411 U.S. at 139.  The court of appeals concluded that the basis of the denial was not spelled out with sufficiently clarity to permit judicial review.  *Id.* at 140.  It therefore ordered the trial court to hold a de novo hearing on the respondent's eligibility.  *Id*.  This Court reversed.  The Court explained that "the focal point for judicial review should be the administrative record already in existence."  *Id.* at 142.  For that reason, the court of appeals had erred in ordering the district court to decide the case on the basis of a record to be developed for the first time in court.  *Id*.  Instead, this Court held that if

> there was such failure to explain administrative action as to frustrate effective judicial review, the remedy was not to hold a *de novo* hearing but, as contemplated by *Overton Park*, to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary.

*Id.* at 142-43.

The Court then added a critical "caveat."  411 U.S. at 143.  It explained that although the original decision "may have been curt," it nonetheless "indicated the determinative reason for the final action taken," (i.e., failure to satisfy the "needs" requirement under the statute).  *Id*.  In that circumstance, the Court held, the "validity of the Comptroller's action must, therefore, stand or fall on the propriety of that finding, judged, of course, by the appropriate standard of review."  *Id*.  In other words, any new materials must "be explanatory of the decisionmakers' action at the time it occurred.  No new

14

rationalizations for the agency's decision should be included, and if included should be disregarded." *Sierra Club v. Marsh*, 976 F.2d 763, 772-73 (1st Cir. 1992) (collecting citations); *see also, e.g.*, *Envtl. Def. Fund, Inc v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981) ("The new materials should be merely explanatory of the original record and should contain no new rationalizations.").

2. The Government does not claim that the Nielsen memo is properly considered under *Camp*, and for good reason. None of the courts below invoked *Camp* or otherwise ordered DHS to submit affidavits clarifying the reasoning of the Duke memo. While the District Court for the District of Columbia attempted to provide DHS an opportunity to cure the defects in the original order and memo, it did not do so by invoking the *Camp* procedure, but instead by staying its judgment to allow DHS to issue a new order (an invitation the agency rejected). *See supra* at 10.

In any event, the extraordinary procedures allowed by *Camp* are permitted only when the agency's original rationale is *unclear*, not when it is clear but unconvincing. *See Camp*, 411 U.S. at 142-43; *Cotton Petroleum Corp. v. U.S. Dep't of Interior*, 870 F.2d 1515, 1528 n.5 (10th Cir. 1989). Here, there's no question what the original order's rationale was— DHS thought DACA was likely illegal. Nielsen did not issue her memo to clarify that point, but instead to add "policy" reasons why the agency would take the same action even if it was wrong in its views of DACA's

15

lawfulness.  *See Regents* Pet. App. 123a-125a.  That is exactly what *Camp* forbids.[4]

3.  Accordingly, the Court should not consider the Nielsen memo at all.  But if the Court does consider the memo, it should at least, consistent with *Camp*, refuse to consider the memo's attempt to add new reasons for the agency action.

a. The supplementary affidavit procedure contemplated by *Camp* is, and should be, rarely invoked.  In fact, "[s]ubsequent cases have made clear that remanding to the agency in fact is the preferred course." *PBGC v. LTV Corp.*, 496 U.S. 633, 654 (1990); *see also Lorion*, 470 U.S. at 744 ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").  And, as discussed, in the rare instance in which *Camp* permits an exception to the general contemporaneous explanation rule, the agency is still prohibited from advancing new reasons for its original

_____

[4]  Indeed, Secretary Nielsen was in an especially poor position to offer any insight into the reasons motivating the original withdrawal.  For one thing, she was not the author of the original memo.  In addition, her predecessor was not, in fact, the principal source of the reasoning behind DACA's withdrawal—the Duke memo makes clear that DHS was simply complying with a one-page letter then-Attorney General Jefferson B. Sessions III had sent the day before, suggesting that DACA be withdrawn in light of this Court's non-precedential summary affirmance of the Fifth Circuit's decision in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd*, 136 S. Ct. 2271 (2016) (per curiam).  *See Regents* Pet. App. 117a.

16

decision.  It would be remarkable if an agency could avoid that restriction simply by beating a reviewing court to the punch, issuing a revised set of rationales for its actions before a court orders production of a *Camp* affidavit.[5]

Allowing agencies to issue new explanations for their decisions once challenged in litigation would have significant practical consequences for courts and the administrative process.  There should be little doubt that if this Court authorizes agencies to supplement their reasoning whenever their original rationale proves vulnerable in court, agencies will take advantage of that rule in many, many cases.  And doing so will create all of the costs and hazards the contemporaneous explanation rule is designed to prevent.

The effect that would have on public confidence in the administrative system should give the Court particular pause.  Allowing an agency to freely jump from one justification to the next in response to legal challenges strongly conveys to the public that the agency's deliberative process and the resulting initial explanation were shams.  Moreover, permitting that

---

[5]  The Government has not cited any case in which an agency has been permitted to provide a supplementary explanation without being ordered to do so by the reviewing court.  In *Department of Commerce*, the agency was permitted to voluntarily supplement the administrative record not with an additional explanation of the decision, but with underlying documentation relating to the explanation the Department had publicly given in the first place.  *See* 139 S. Ct. at 2564.  When that documentation proved that the original explanation was pretextual, the district court vacated the agency action and remanded, *id.* at 2564, a ruling this Court affirmed, *id.* at 2576.

17

tactic would lend the courts' credibility to the enterprise, resulting in judicial affirmance of agency decisions on the basis of reasoning that the public will (often rightly) perceive as something other than the Government's genuine reasons. *Cf. Dep't of Commerce*, 139 S. Ct. at 2575-76 (refusing to uphold agency decision based upon alleged rationale that "ordinary citizens" would deem pretextual).

b. If the *Camp* rule were applied here, it would require this Court to ignore the Nielsen memo altogether.

To the extent the Nielsen memo addresses the grounds advanced in the Duke memo, it adds nothing to them. The original memo gave a single reason for repealing DACA—its alleged unlawfulness. *Regents* Pet. App. 112a-119a. The Nielsen memo simply summarizes that reason and agrees with it. *Id.* at 122a-123a.

The remainder of the Nielsen memo must be ignored under *Camp*. After rehashing the prior memo's consideration of DACA's legality, the Nielsen memo moves on to additional "reasons of enforcement policy" in support of repeal, reasons found nowhere in the original memo. *Regents* Pet. App. 123a-125a. The Solicitor General acknowledges as much, separately addressing the Duke memo's concerns about DACA's legality and Secretary Nielsen's "*additional* policy concerns." *Compare* U.S. Br. § II(A) (entitled "The Rescission Is Reasonable In Light Of DHS's Serious Doubts About DACA's Lawfulness"), *and id.* § II(C) (entitled "The Rescission Is Reasonable In Light Of DHS's Conclusion That DACA Is Unlawful"), *with id.* § II(B) (entitled "The Rescission Is Reasonable In Light Of DHS's *Additional* Policy Concerns")

18

(emphasis added).  In addressing the "policy concerns," the Government cites the Nielsen memo, not Duke's. *See id.* at 37-43.  At the same time, the Solicitor General directly rejects the conclusion of the District of Columbia District Court that the new policy arguments simply rehashed the prior memo's legality concerns.  *See id.* at 29.  Instead, the Government insists that "Secretary Nielsen could not have been clearer that the policy reasons she offered . . . were independent from her legal concerns." *Id.*

## II.  The Reasons Given In The Nielsen Memo Are Arbitrary And Capricious.

Were the Court to consider the substance of the Nielsen memo, it should conclude that the supplemental rationales are no less arbitrary and capricious than the agency's original explanation.

### A.  Secretary Nielsen's New Policy Reasons Are Each Arbitrary and Capricious.

1. *Preference for Congressional Action.*  The Nielsen memo first asserts that DHS "should not adopt public policies of non-enforcement . . . for broad classes and categories of aliens" because acting on such categorical bases should be left to Congress, which can create a deferral program with the "permanence and detail of statutory law," which a program like DACA lacks. *Regents* Pet. App. 123a-124a.  But the memo fails to acknowledge that Congress expressly delegated authority to DHS to develop programmatic enforcement policies, that DHS has long created enforcement policies on a categorical basis, that DHS continues to apply its enforcement discretion on a categorical basis in other areas, and

**AR5189**

19

that Congress has ratified those categorical practices, including deferred action programs.

The Secretary herself recognizes that Congress has given her the power to "[e]stablish[] national immigration enforcement policies and priorities." *Regents* Pet. App. 121a (quoting 6 U.S.C. § 202(5)) (alterations in original). She fails to acknowledge, moreover, that this authority has been used for over 50 years to exercise prosecutorial discretion on a categorical basis, including in programs the Administration has retained to this day. For example, the agency has made deferred action available to victims of human trafficking and domestic violence and to surviving spouses of U.S. citizens.[6]  Moreover,

---

[6] *See* Memorandum from Donald Neufeld, Acting Assoc. Dir., Office of Domestic Operations, USCIS, to Field Leadership, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* (Sept. 4, 2009) (deferred action for widows and widowers of U.S. citizens); USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)* (Nov. 25, 2005), https://www.uscis.gov/sites/default/files/archive/faq-interim-student-relief-hurricane-katrina.pdf (deferred action for foreign students affected by Hurricane Katrina); Memorandum from Michael D. Cronin, Acting Exec. Assoc. Comm'r, Office of Programs, INS, to Michael A. Pearson, Exec. Assoc. Comm'r, Office of Field Operations, INS, *Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2 – "T" and "U" Nonimmigrant Visas* (Aug. 30, 2001) (deferred action for certain victims of human trafficking and their family members, and victims of certain other crimes and their family members); Memorandum from Paul W. Virtue, Acting Exec. Assoc. Comm'r, INS, to Reg'l Dirs. et al., INS, *Supplemental Guidance on Battered Alien Self-Petitioning Process and Related*

20

while the Solicitor General implies that the Administration has ended all categorical deferred action programs, U.S. Br. 56, this is not, in fact, the case.[7]  And Secretary Nielsen did not explain why she believes the programs she has retained are appropriate despite Congress's failure to enact legislation permanently enshrining them, while DACA is not.  Such an "'[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'"  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

Nor did the memo even acknowledge that Congress has effectively ratified the use of deferred action to create protections for certain categories of individuals as an exercise of prosecutorial discretion.  As discussed, that practice has been open and longstanding for decades and across administrations.  Far from disapproving or limiting it, Congress has

---

*Issues* (May 6, 1997) (deferred action for battered aliens under the Violence Against Women Act).

[7]  *See, e.g.*, USCIS, *Battered Spouse, Children & Parents*, https://www.uscis.gov/humanitarian/battered-spouse-children-parents (last updated Feb. 16, 2016) (deferred action program for victims of domestic abuse still in place); USCIS, *Victims of Criminal Activity: U Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-status/victims-criminal-activity-u-nonimmigrant-status (last updated June 12, 2018) (deferred action program for victims of certain crimes still in place).

21

enacted several pieces of legislation that have assumed that deferred action would be available to classes of immigrants in certain circumstances.[8] The memo's failure to address this history is all the more inexcusable because the Office of Legal Counsel had explored it in detail in an opinion addressing deferred action programs prior to Secretary Nielsen's decision. *See The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op. O.L.C. __ (Nov. 19, 2014), 2014 WL 10788677, at *14.[9] This failure to consider "an important aspect of the problem" renders the Secretary's decision arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

2. *Preference for Case-by-Case Consideration.* Relatedly, the Nielsen memo asserts that deferral discretion should be exercised only on "a truly individualized, case-by-case basis." *Regents* Pet. App. 124a. In contrast, the memo insists, DACA has "the

---

[8]  Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 1503(d)(2), 114 Stat. 1464, 1522 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) ) (expanding the agency's deferred action program in the 2000 Violence Against Women Act reauthorization legislation); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 204, 122 Stat. 5044, 5060 (codified at 8 U.S.C. § 1227(d)(2)) (clarifying that denial of request for administrative stay of removal under new authority "shall not preclude the alien from applying for . . . deferred action").

[9]  The care exhibited in the prior Office of Legal Counsel memorandum stands in sharp contrast with the one-page legal analysis from Attorney General Sessions that prompted Acting Secretary Duke to repeal DACA. J.A. 877-78.

22

practical effect of inhibiting assessments of whether deferred action is appropriate" in light of "individual considerations." *Id*. Repealing DACA, the memo continues, will ensure that deferral remains available "in individual cases if circumstances warrant." *Id.* at 125a. The memo again fails the test of reasoned decisionmaking.

To start, as just discussed, the memo fails to acknowledge that DHS has long and routinely created enforcement policies that provide deferral eligibility to categories of individuals.

Further, the memo ignores that DACA *does* require a substantial degree of individualized consideration. Memorandum from Janet Napolitano, Sec'y, DHS, to David V. Aguilar, Acting Comm'r, CBP, et al., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 2 (June 15, 2012)[10] (requiring that "[a]s part of this exercise of prosecutorial discretion, the [DACA eligibility] criteria are to be *considered*" and that "requests for relief pursuant to this memorandum are to be decided on a case by case basis") (emphasis added); *see also* USCIS, *Deferred Action for Childhood Arrivals (DACA) Toolkit: Resources for Community Partners* 7, 12 (noting that "[e]ach request for consideration of deferred action for childhood arrivals

---

[10] https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

23

will be reviewed on an individual, case-by-case basis").[11]

The memo suggests that the Secretary believes that a greater degree of individualized assessment would be more appropriate. *Regents* Pet. App. 124a. But it fails to consider whether that concern could be addressed through modifications to the program short of complete repeal. As the federal district court in D.C. put it, "if Secretary Nielsen believes that DACA is not being implemented as written, she can simply direct her employees to implement it properly." *NAACP* Pet. App. 100a. The failure even to consider any "obvious and less drastic alternatives" is arbitrary and capricious. *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 & n.36 (D.C. Cir. 1986) (the "failure of an agency to consider obvious alternatives has led uniformly to reversal") (collecting cases); *see, e.g.*, *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 48 (failure to "even consider the possibility" of "alternative way of achieving the objectives of the Act" was arbitrary and capricious).

3. *Avoiding Incentives for Future Unlawful Immigration.* The Nielsen memo further claims that repealing DACA is necessary to deter the flow of "tens of thousands of minor aliens [who] have illegally crossed or been smuggled across our border in recent years and then have been released into the country owing to loopholes in our laws." *Regents* Pet. App. 124a. According to the memo, this "pattern continues to occur at unacceptably high levels," and therefore it

---

[11] https://www.uscis.gov/sites/default/files/USCIS/ Humanitarian/Deferred%20Action%20for%20Childhood%20 Arrivals/DACA_Toolkit_CP_072914.pdf (last visited Oct. 3, 2019).

24

is "critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws against all classes and categories of aliens." *Id.* That justification is arbitrary and capricious for several reasons.

First, the memo fails to acknowledge that DACA is only available to individuals who have lived in the United States since 2007. *NAACP* Pet. App. 102a. The memo is silent on how a program that is no longer open to new immigrants could create an incentive for new immigration. That silence is fatal, for the APA requires the Secretary to "articulate" a "rational connection between the facts found and the choice made." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (internal quotation marks omitted).

The Solicitor General attempts to supply the missing analysis, claiming that retaining DACA would give future immigrants hope that another, later "amnesty" program would apply to them. U.S. Br. 41. But the memo says nothing like that, and even the Solicitor General acknowledges that the agency's lawyers cannot supplement the agency's reasoning after the fact. *See id.* at 29; *supra* at 9. Nor did the memo make the predicate factual finding that significant numbers of immigrants would, in fact, come to this country with the hope that the Trump Administration will create a new program that is even more generous than DACA, based on their knowledge of an existing program for which they do not qualify. *See Regents* Pet. App. 124a-125a; *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 659 (1980) (plurality opinion) ("The [agency action] must, of course, be supported by findings actually made by

25

the Secretary, not merely by findings that we believe he might have made.").  The closest the memo comes is to claim that "tens of thousands of minor aliens" have been "released into the country owing to loopholes in our laws," and that this "pattern continues to occur at unacceptably high levels." *Regents* Pet. App. 124a.  But those statements say nothing about what drew the immigrants to the United States in the first place, much less that they were aware of DACA and hoped for its expansion.

Nor does the Solicitor General (let alone the Nielsen memo) explain why an immigrant who is willing to come to this country based on nothing more than the hope of a future amnesty program would be deterred by the repeal of DACA when the Secretary herself insists that all comers are still entitled to seek deferred status on a case-by-case basis.  *Regents* Pet. App. 125a.  And, of course, to the extent people fleeing violence and deprivation in their home countries actually think about such things, they would understand that the repeal of DACA does nothing to prevent another administration, or Congress, from reinstating DACA or another program that would allow them legal status.

4.  *Reliance Interests.*  When an agency repeals an existing program, the APA compels the agency to take adequate account of reliance interests.  *See, e.g.*, *Encino Motorcars*, 136 S. Ct. at 2126; *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015).  Enforcing that requirement is all the more important when, as here, the liberty and safety of tens of thousands of people is at stake.

The Nielsen memo's discussion of reliance falls short.  The memo states that the Secretary is "keenly

26

aware that DACA recipients have availed themselves of the policy in continuing their presence in this country and pursuing their lives." *Regents* Pet. App. 125a. Regardless, the memo concludes that these "asserted reliance interests [do not] outweigh the questionable legality of the DACA policy and other reasons for ending the policy" presented in the memo. *Id.*

That discussion is wholly inadequate. A rational agency head cannot just refer to balancing; she must actually conduct the balancing in a reasonable, reality-based way. Here, although the Secretary purported to take reliance interests into account, in her next breath she disavowed that responsibility, stating that "issues of reliance would best be considered by Congress." *Regents* Pet. App. 125a. Perhaps for that reason, the memo's only other mention of reliance is to suggest (but not explain) that DACA recipients have no reasonable reliance interests because of the assertedly "temporary" nature of the program. *Id.* But that characterization fails to account for the fact that DACA was intended to be "temporary" only in the sense that it was expected that Congress would provide a permanent solution in the near future;[12] the memo points to no evidence that it was intended to be repealed if Congress failed to act. *Id.* Accordingly, recipients could reasonably expect that their status was subject to renewal until a

---

[12] The White House, President Barack Obama, *Remarks by the President on Immigration* (June 15, 2012), https://obama-whitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration.

27

permanent solution was reached. Indeed, the current Administration shared that expectation when it first took office.[13]

The memo also suggests that the harm to reliance interests is diminished by the fact that DACA recipients can still apply for "deferred action in individual cases if circumstances warrant." *Regents* Pet. App. 125a. But the memo utterly fails to describe how that alternative program will function. The memo does not say, for example, whether the factors that make individuals presumptively eligible for deferred action under DACA will regularly, sometimes, or rarely make them serious candidates for deferred action after DACA is repealed. If the Secretary believes that many of those eligible for relief under DACA will be entitled to deferral after its repeal, she does not square that with other statements in the memo—*e.g.*, that only Congress should be making such broad determinations and that there is a need to deter unlawful immigration by repealing programs that could be perceived as a broad amnesty. *Regents* Pet. App. 125a. On the other hand, if the Secretary believes that deferral should be rare and for idiosyncratic reasons, the memo does not say so

---

[13] Nolan D. McCaskill, *Trump Says He Will Treat Dreamers 'with Heart'*, Politico (Feb. 16, 2017, 2:37 PM), https://www.politico.com/story/2017/02/trump-press-conference-dreamers-heart-235103; Russell Berman, *Trump Reverses His Stand on DACA*, The Atlantic (Sept. 14, 2017), https://www.theatlantic.com/politics/archive/2017/09/daca-deal-or-no-deal-trump-democrats-dreamers/539784/ (noting deal Trump tentatively reached with Democrats in House and Senate to protect Dreamers).

28

explicitly or defend that position.[14]  And if that were the Secretary's belief, her assertion that the harm to reliance interests is mitigated by the possibility of individualized deferrals would be arbitrary and pretextual, flaws that warrant vacatur and remand. *See Dep't of Commerce*, 139 S. Ct. at 2575-76.

5. *Overall Weighing of Costs and Benefits.*  Going beyond reliance interests, the memo announces that neither reliance interests "nor the sympathetic circumstances of DACA recipients as a class overcomes the legal and institutional concerns" identified in the memo.  *Regents* Pet. App. 125a. Having justified her decision on the basis of a cost-benefit analysis, the Secretary was compelled to engage in a rational weighing of the competing interests. *Michigan v. EPA*, 135 S. Ct. 2699, 2706-08 (2015).[15]  But her brief analysis fails that requirement.

As discussed, the memo's assessment of the purported benefits of repeal suffers from multiple

---

[14] Here, once again, the Government's lawyers try to fill the gap, arguing that Secretary Nielsen preferred a "presumption" that DACA recipients "should be removed," and a "truly individualized" approach to deferred action "seeks to identify, on a case-by-case basis, individuals who should be excused from that presumption."  U.S. Br. 40.  Whatever the merits of this preference, it comes post hoc, not from the Secretary.  In any event, it fails to address its inconsistency with other policies or the costs/benefits of switching to such a system.

[15] *See also, e.g.*, *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 732-33 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) ("[A]bsent a congressional directive to disregard costs," which no one argues is the case here, "common administrative practice and common sense require an agency to consider the costs and benefits of its proposed actions, and to reasonably decide and explain whether the benefits outweigh the costs.").

29

flaws, such as its failure to assess in any meaningful way whether, and to what extent, repeal will actually affect the inflow of migrants. *See supra* at 23-25. To the extent the Secretary views avoidance of litigation as a benefit of repeal, *see Regents* Pet. App. 123a, the memo makes no effort to determine whether the repeal created more litigation costs than it avoided.

Nor does the memo adequately account for the costs. Indeed, beyond suggesting that DACA recipients have no reasonable reliance interests, the memo's only acknowledgement of the costs of the decision is to refer to the recipients' "sympathetic circumstances." *Regents* Pet. App. 125a. It makes no effort to assess the real-world consequences of deporting thousands of people from the only country they've ever known. Respondents and others fully detail the human cost of that decision on DACA recipients, their families, and their communities. The memo neither acknowledges nor denies these consequences. And having failed to identify the nature or extent of the costs of her decision, the Secretary failed to rationally weigh those unidentified costs against any benefit from DACA's repeal. *See, e.g.*, *Michigan v. EPA*, 135 S. Ct. at 2706 (requiring consideration of all "relevant factors"); *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 732-33 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) (discussing importance that agency consider all costs in balancing).

**AR5200**

30

**B. If Any Of The Nielsen Memo Justifications Is Arbitrary And Capricious, The Agency Action Must Be Vacated And Remanded For Reconsideration.**

If *any* of the Nielsen memo's justifications are found to be arbitrary and capricious, the Court should remand for DHS to consider whether the remaining justifications are themselves sufficient to uphold DACA's rescission.

In general, when "an agency has set out multiple *independent* grounds for a decision, [a reviewing court] will affirm the agency so long as any one of the grounds is valid." *Fogo De Chao (Holdings) Inc. v. DHS*, 769 F.3d 1127, 1149 (D.C. Cir. 2014) (emphasis added) (internal quotation marks omitted). "Where the agency has not afforded individual weight to the alternative grounds, however, the court may uphold the decision *only* as long as one ground is valid *and* the agency would *clearly* have acted on that ground even if the other were unavailable." *Id.* (emphasis added) (internal quotation marks and brackets omitted). Thus, an agency action should not be upheld when "there is reason to believe the combined force of these otherwise independent grounds influenced the outcome." *Carnegie Nat. Gas Co. v. FERC*, 968 F.2d 1291, 1294-95 (D.C. Cir. 1992).

The memo's boilerplate statement that each of the reasons for repeal are "independently sufficient," *Regents* Pet. App. 122a, is clearly belied by the substance of the memo. For example, the memo balances the cost of repeal against the *cumulative* benefits arising from *all* of the purported

**AR5201**

31

justifications, instead of determining whether the benefits of each allegedly independent justification outweigh the reliance interest of DACA recipients and the other costs of repeal. *See id.* at 125a ("I do not believe that the asserted reliance interests outweigh the questionable legality of the DACA policy *and* other reasons for ending the policy discussed above.") (emphasis added); *id.* at 124a-125a ("*All of those considerations* lead me to conclude that [the] decision to rescind the DACA policy was, and remains, sound[.]") (emphasis added). The memo does not claim, for instance, that the harm to people who arrived in this country as children would be justified if the only benefit was to save the Government the cost of defending DACA in court. Further, the Secretary does not claim that total rescission of DACA would be appropriate if the only non-arbitrary justification was a lack of individualized consideration. Indeed, if the Secretary *had* reached such a conclusion, the decision would be arbitrary and capricious.

Because the Secretary failed to provide independent weight to each of her justifications, and did not conduct a separate balancing of the costs and benefits based on each supporting consideration, her decisions must be vacated if any of her justifications is found arbitrary or capricious.

32

## CONCLUSION

For the foregoing reasons, the decisions below should be affirmed.

Respectfully submitted,

Kevin K. Russell
  *Counsel of Record*
Daniel Woofter
Charles H. Davis
Erica Oleszczuk Evans
GOLDSTEIN &
  RUSSELL, P.C.
7475 Wisconsin Ave.
Suite 850
Bethesda, MD 20814
(202) 362-0636
*kr@goldsteinrussell.com*

October 4, 2019

AR5203

Nos. 18-587, 18-588, 18-589

# In the Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL., RESPONDENTS.

————

*ON WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE NINTH CIRCUIT*

————

DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL., PETITIONERS,

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL., RESPONDENTS.

————

*ON WRIT OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT*

————

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, ET AL., PETITIONERS,

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL., RESPONDENTS.

————

*ON WRIT OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

————

## BRIEF OF *AMICI CURIAE*
## FORMER NATIONAL SECURITY OFFICIALS
## IN SUPPORT OF RESPONDENTS

————

PHILLIP SPECTOR
MESSING & SPECTOR LLP
1200 Steuart Street
#2112
Baltimore, MD 21230
(202) 277-8173

HAROLD HONGJU KOH
 *Counsel of Record*
HOPE R. METCALF
PETER GRUBER RULE OF LAW CLINIC
YALE LAW SCHOOL
127 Wall Street
P.O. Box 208215
New Haven, CT 06520
(203) 432-4932
harold.koh@ylsclinics.org

 *Counsel for Amici Curiae*

October 4, 2019

**AR5204**

i

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................ii

STATEMENT OF INTEREST ................................. 1

SUMMARY OF ARGUMENT................................. 1

ARGUMENT.............................................................. 3

I.  Petitioners' Rescission of DACA Does Not Serve a "Cause and Deter" Rationale, and in Fact Would Do Serious Harm to U.S. National Security and Foreign Policy Interests ................. 3

    A.  Rescission does not serve a "cause and deter" rationale. ................................ 3

    B.  Rescission would do serious harm to U.S. security and foreign policy interests ............... 8

II.  Petitioners' Unsupported Claims Do Not Warrant National Security Deference ............... 13

CONCLUSION ........................................................ 18

APPENDIX:  List of *Amici Curiae* ........................ A-1

**AR5205**

ii

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ACLU* v. *U.S. Dep't of Def.*, 901 F.3d 125
(2d Cir. 2018) ........................................................ 14

*Doe 2* v. *Shanahan*, 917 F.3d 694 (D.C.
Cir. 2019) ................................................. 13, 14, 15

*Encino Motorcars, LLC* v. *Navarro*,
136 S. Ct. 2117 (2016) ....................................... 4, 8

*FCC* v. *Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........................................... 3, 8

*Goldman* v. *Weinberger*, 475 U.S. 503 (1986) .... 13, 15

*Holder* v. *Humanitarian Law Project*,
561 U.S. 1 (2010) .................................................. 14

*Michigan* v. *EPA*, 135 S. Ct. 2699 (2015) .............. 3, 7

*Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut.
Auto. Ins. Co.*, 463 U.S. 29 (1983) ..................... 3, 7

*NAACP* v. *Trump*, 298 F. Supp. 3d 209
(D.D.C. 2018) ......................................................... 5

*Rostker* v. *Goldberg*, 453 U.S. 57 (1981) ............ 14, 15

*Trump* v. *Hawaii*, 138 S. Ct. 2392 (2018) ............... 13

*Thomasson* v. *Perry*, 80 F.3d 915 (4th Cir.
1996) .................................................................... 13

*Vill. Of Arlington Heights* v. *Metro. Hous. Dev.
Corp.*, 429 U.S. 252 (1977) .................................. 17

*Winter* v. *Nat. Res. Def. Council*,
555 U.S. 7 (2008) ................................................. 13

**AR5206**

iii

## OTHER AUTHORITIES

Alan Gomez, *Who are the DACA DREAMers and how many are here?*, USA Today (Feb. 13, 2018)............................................................8

Alex Horton, *How the Pentagon Ending Its Deal with* Immigrant *Recruits Could Hurt the Military*, Wash. Post (July 18, 2017) .................11

Alicia Parlapiano & Karen Yourish, *A Typical 'Dreamer' Lives in Los Angeles, Is From Mexico and Came to the U.S. at 6 Years Old*, N.Y. Times (Jan. 23, 2018)............................................8

*Approximate Active DACA Recipients: Country of Birth as of July 31, 2018*, U.S. Citizenship & Immigration Servs ..................................................9

Arnoldo Lopez Marmolejo & Marta Ruiz Arranz, *The Economic Landscape in Central America and the Dominican Republic: External Challenges and Internal Strengths* 15 (2019).....10

Ben Gitis, *The Budgetary and Economic Costs of Ending DACA*, American Action Forum (Sept. 7, 2017) ....................................................12

Brief for Current and Former Prosecutors and Law Enforcement as Amicus Curiae, *Regents of the University of California v. Department of Homeland Security*, 908 F.3d 476 (9th Cir. 2018) ....................................................11

Catalina Amuedo-Dorantes & Thitima Puttitanun, *DACA and the Surge in Unaccompanied Minors at the US-Mexico Border*, 54 Int'l Migration 102 (2016). ...........................................6

Catalina Amuedo-Dorantes & Thitima Puttitanun, *Was DACA Responsible for the Surge in Unaccompanied Minors on the Southern Border?*, 55 Int'l Migration 12 (2017) ..................6

**AR5207**

iv

David Bier, *DACA Definitely Did Not Cause
the Child Migrant Crisis*, Cato Inst.
(Jan. 9, 2017) ........................................................7

Geneva Sands, *ICE Director: If You Entered the US
Illegally, You 'Should be Concerned'*, ABC News
(June 16, 2017) .....................................................8

Gregory Korte *et al.*, *Trump administration
struggles with fate of 900 DREAMers serving
in the military*, USA Today (Sept. 7, 2017) ........10

Ike Brannon & Logan Albright, *The Economic and
Fiscal Impact of Repealing DACA*, Cato Inst.
(Jan. 18, 2017) ....................................................12

Jacqueline Varas & Usama Zafar, *Estimating the
Economic Contributions of DACA Recipients*,
Am. Action F. (Dec. 21, 2017) ............................12

John Grady, *Panel Says U.S. Military Recruitment
Pool Must Broaden*, U.S.N.I. News (June 17,
2019) ...................................................................11

Kevin Sieff, *Mexico's Migration Crackdown
Overwhelms its Shelters, Antagonizes its
Neighbors,* Wash. Post (July 1, 2019) ..................9

Kirk Semple, *Overflowing Toilets, Bedbugs and
High Heat: Inside Mexico's Migrant Detention
Centers*, N.Y. Times (Aug. 3, 2019). ....................9

Manuel Orozco, *Fact Sheet: Family Remittances to
Latin America and the Caribbean in 2018*,
The Dialogue: Leadership for the Americas
(Feb. 8, 2019) ......................................................10

Meghann Myers, *After 2018's Recruiting Shortfall,
It Will Take A Lot Longer to Build the Army to
500K*, Army Times (Mar. 14, 2019) ....................11

AR5208

v

Memorandum from Elaine C. Duke, Acting Sec'y of Homeland Sec. to James W. McCament, Acting Dir. of U.S. Citizenship and Immigration Servs., *et al.* (Sept. 5, 2017) ............4

Memorandum from John Kelly, Sec'y of Homeland Sec. to Kevin McAleenan, Acting Comm'r of U.S. Customs & Border Prot., *et al.* (Feb. 20, 2017) .......................................................................8

Memorandum from Kirstjen M. Nielsen, Sec'y of Homeland Sec. (June 22, 2018) ..................5, 17

Nicole Prchal Svajlenka, *Amid Court Challenges, Here's What Will Happen if DACA Ends*, Center for American Progress (Aug. 15, 2018)...12

Protecting Dreamers and TPS Recipients: Hearing Before the H. Comm. on the Judiciary, 116th Cong. 2015 (2019) (statement of the American Friends Service Committee)...............................10

Robert M. Gates, *Robert Gates: Ending DACA Will Hurt Immigrant Troops*, N.Y. Times (Nov. 8, 2017) .......................................................................11

Roberto G. Gonzales, *Here's How DACA Changed the Lives of Young Immigrants, According to Research*, Vox (Feb. 16, 2018)..................................11

Stephen Dinan, *No Apologies: ICE Chief Says Illegal Immigrants Should Live in Fear of Deportation*, Wash. Times (June 13, 2017)...........9

U.S. Dep't of State, *Country Reports on Human Rights Practices for 2018: Mexico* (2019) .............9

World Bank, *Poverty & Equity Brief: Mexico* (Oct. 2019) ............................................................9

World Bank, *Poverty & Equity Brief: Honduras* (Oct. 2019) ..........................................................10

World Bank, *Poverty & Equity Brief: Guatemala* (Oct. 2019) ............................................................9

**AR5209**

1

## STATEMENT OF INTEREST[1]

Amici curiae are former national security, foreign policy, homeland security, intelligence, and other public officials who have worked on security matters at the senior-most levels of the U.S. government.[2] Amici have held the highest security clearances in the U.S. government and have served in leadership roles in presidential administrations of both major political parties. Amici have collectively devoted their careers to combatting the security threats that the United States faces in an interconnected and dynamic world. A number of amici were serving in the U.S. government in June 2012, when the now-rescinded Deferred Action for Childhood Arrivals ("DACA") program was created. Amici write respectfully to offer the Court their perspective on the national security and foreign policy issues implicated by this case.

## SUMMARY OF ARGUMENT

Petitioners' original September 2017 decision to rescind DACA did not include a policy rationale based on immigration enforcement priorities, or foreign policy or national security objectives. Not until nine months later, far into the present litigation, did Petitioners offer such a rationale, in a single sentence near the end of then-Secretary Nielsen's June 2018

---

[1] No counsel for a party to this case authored this brief in whole or in part, and no such counsel or party contributed monetarily to the preparation or submission of any portion of this brief. Yale Law School's Peter Gruber Rule of Law Clinic operates as a public interest law firm separate and independent from the school's Jerome N. Frank Legal Services Organization, one of the counsel for Respondents in one of the consolidated matters in this case. Petitioners and Respondents provided blanket consent to file *amicus curiae* briefs.

[2] A complete list of signatories can be found in the Appendix.

2

memorandum ("Nielsen Memo"). That sentence suggested a "cause and deter" explanation for the rescission: DACA *causes* illegal border crossings, so DACA rescission is needed to *deter* such crossings. The Nielsen Memo offered this *post hoc* rationale in passing, without citations or factual support. Petitioners' brief to this Court now tries to breathe life into this empty rationale.

The "cause and deter" rationale bears no connection to the facts, record, or stated motivation for the decision under review. This rationale not only lacks an evidentiary basis, but is at odds with the overwhelming weight of available evidence. It also fails to account for the many ways in which—in amici's experience—DACA rescission would harm the national security and foreign policy interests of the United States. Accordingly, this Court owes this unsupported policy claim no "national security" deference. In amici's judgment, this claim and the defective process that gave rise to it bear no resemblance to the considered and reasoned professional judgments in which amici participated, and that have supported bona fide claims to national security deference in the past.

3

**ARGUMENT**

I. **Petitioners' Rescission of DACA Does Not Serve a "Cause and Deter" Rationale, and in Fact Would Do Serious Harm to U.S. National Security and Foreign Policy Interests.**

Many months after their decision to rescind DACA, Petitioners introduced, in passing and without evidence, an unsubstantiated *post hoc* rationale: that because DACA causes illegal border crossings, rescission of DACA is needed to deter such crossings. This unsupported claim does not approach the reasoned evaluation of the facts that this Court has required to uphold agency action. It ignores the many ways in which DACA rescission in fact would do grave harm to U.S. security and foreign policy concerns.

A. **Rescission does not serve a "cause and deter" rationale.**

Under section 706(2)(a) of the Administrative Procedure Act ("APA"), a reviewing court must set aside agency actions, findings, or conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." The court must assess whether the agency policy resulted from "reasoned decisionmaking"[3] and whether, at the time "it took the action,"[4] the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[5] When an agency

---

[3] *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 520 (2009).

[4] A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan* v. *EPA*, 135 S. Ct. 2699, 2710 (2015).

[5] *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

4

reverses an earlier position, it must "provide a rea-soned explanation for the change."[6] These principles apply with special force when, as here, hundreds of thousands have come to rely on the policy to conduct their daily lives.[7] In such cases, an agency must iden-tify, with more than mere "conclusory statements," the "facts and circumstances that underlay or were engendered by the prior policy."[8]

The "cause and deter" rationale for Petitioners' de-cision to rescind DACA falls well short of this stand-ard.

Petitioners' original decision to rescind DACA made no mention of an immigration enforcement ra-tionale or any security or foreign policy need for the change. In her September 5, 2017 memorandum re-scinding DACA ("Duke Memo"), then-Acting Secre-tary of Homeland Security Elaine Duke did not sug-gest that DACA rescission was necessary to deter mi-grants, to address a security risk, or to protect the homeland in any respect. The sole reason she articu-lated for the decision concerned the legality of DACA.[9]

More than nine months later—after the U.S. Dis-trict Court for the District of Columbia rejected the

---

[6] *Encino Motorcars, LLC* v. *Navarro*, 136 S. Ct. 2117, 2125 (2016).

[7] Petitioners do not dispute that hundreds of thousands of DACA recipients have come to rely on DACA for the stability of their continued presence in this country, the only home that most re-cipients have ever known. Pet. Br. at 42-43.

[8] *Encino Motorcars,* 136 S. Ct. at 2126 (internal quotation marks omitted).

[9] Memorandum from Elaine C. Duke, Acting Sec'y of Homeland Sec. to James W. McCament, Acting Dir. of U.S. Citizenship and Immigration Servs., *et al.* (Sept. 5, 2017).

5

Duke Memo[10]—then-Secretary of Homeland Security Kirstjen Nielsen abruptly introduced a "cause and deter" explanation for the rescission of DACA, in a single sentence near the end of a three-page memorandum.[11] The sentence suggests that, "considering the fact that tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years," and that this "pattern continues to occur at unacceptably high levels to the detriment of the immigration system," it is "critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, transparent enforcement of the immigration laws against all classes and categories of aliens."[12] The Nielsen Memo does not cite any evidence either that DACA caused the migration of minors, or that rescinding DACA would deter such migration.

Petitioners' brief to this Court now expands this rationale, asserting that DACA rescission is needed to "discourage illegal immigration," and to prevent the "illegal border crossings" of children "with or without their families."[13] Petitioners further insist that "[a]mnesty-like policies" such as DACA "encourage further illegal conduct" by "creating an expectation of future amnesties."[14] As support, Petitioners cite only a single law review article from fifteen years ago,

---

[10] *NAACP* v. *Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018).

[11] Memorandum from Kirstjen M. Nielsen, Sec'y of Homeland Sec. (June 22, 2018) [hereinafter Nielsen Memo].

[12] *Id.* at 3.

[13] Pet. Br. at 11, 40.

[14] *Id.* at 41 (citing Pia Orrenius & Madeline Zavodny, *What Are the Consequences of an Amnesty for Undocumented Immigrants?*, 9 Geo. Pub. Pol'y Rev. 21, 31 (2004)).

6

which itself cites no evidence for this claim.[15] Later in their brief, Petitioners opaquely refer to unspecified "foreign-policy considerations" as justifying the policy change in this case.[16]

Petitioners' "cause and deter" rationale has no basis in the evidence or record. Even now, nearly two years after the original decision to rescind DACA, and more than a year after the Nielsen Memo introduced the rationale, Petitioners cannot offer a single piece of evidence to support this rationale. They do not point to any information in the administrative record. Indeed, they produced no administrative record for the Nielsen Memo at all. They do not claim to be in possession of supporting classified or sensitive information that they are unable to disclose. They do not offer the declaration of a single national security official who is willing to speak to the process or the facts that yielded this rationale. Their *post hoc* rationale is not just late, but entirely unmoored from fact.

In fact, the overwhelming evidence is to the contrary. Years of data now illuminate the actual impact that DACA has had on migrant flows into the United States. That data confirms that, as the authors of one comprehensive study put it, "DACA did not significantly contribute to the observed increase in unaccompanied minors" apprehended along the U.S.-Mexico border.[17] A separate analysis found that the Border

---

[15] *Ibid.*

[16] *Id.* at 53.

[17] Catalina Amuedo-Dorantes & Thitima Puttitanun, *Was DACA Responsible for the Surge in Unaccompanied Minors on the Southern Border?*, 55 Int'l Migration 12, 12 (2017); see also Catalina Amuedo-Dorantes & Thitima Puttitanun, *DACA and the Surge in Unaccompanied Minors at the US-Mexico Border*, 54 Int'l Migration 102 (2016).

7

Patrol's own figures "show[] unequivocally that all of the increase in children coming to the border in 2012 began *before* the DACA announcement," and that "UAC [unaccompanied alien children] arrivals have fluctuated month-to-month and year-to-year totally without regard to the number of new DACA applications."[18] These results accord not only with amici's experience, but also with the fact that DACA offers no benefits to those migrating today, because its protections are only available to people who entered the United States on or before June 15, 2007, an eligibility that expired more than a decade ago. This robust body of evidence does not support, but rather undermines, Petitioners' "cause and deter" rationale.

The policy rationale for DACA rescission that Petitioners now offer arose at least nine months after the actual rescission decision, cites no evidence, relies on no evidence of which we are aware, and runs counter to the available empirical evidence. This passing justification was not made at the time the agency "took the action."[19] And it reflected no examination of "relevant data," offered no "connection" between the facts and the choices made, and gave no explanation of any "facts and circumstances" that might be engendered by the rescinded policy.[20] Petitioners' "cause and deter" rationale represents the antithesis of the "reasoned decisionmaking" that the law requires, and instead resembles the kind of "conclusory statement"

---

[18] David Bier, *DACA Definitely Did Not Cause the Child Migrant Crisis*, Cato Inst. (Jan. 9, 2017) (emphasis added).

[19] *Michigan*, 135 S. Ct. at 2710 (2015).

[20] *Michigan*, 135 S. Ct. at 2710; *State Farm*, 463 U.S. at 43.

8

that has been held insufficient under this Court's precedent.[21]

## B. Rescission would do serious harm to U.S. security and foreign policy interests.

Petitioners' "cause and deter" rationale not only is unsupported by the available evidence, but also fails to account for the many ways in which—in amici's experience—the rescission of DACA would do grave harm to the security and foreign policy interests of the United States.

*First*, rescission would have a devastating humanitarian impact on DACA recipients and their families and communities. On average, DACA recipients arrived in the United States at the age of six.[22] Deporting them to places that are unsafe, unfamiliar, and unable to support them would gravely harm these individuals and signal a deep contempt for human rights.[23] In amici's experience, this move would

---

[21] See *Fox Television*, 556 U.S. at 520; *Encino Motorcars*, 136 S. Ct. at 2127.

[22] Alan Gomez, *Who are the DACA DREAMers and how many are here?*, USA Today (Feb. 13, 2018); Alicia Parlapiano & Karen Yourish, *A Typical 'Dreamer' Lives in Los Angeles, Is From Mexico and Came to the U.S. at 6 Years Old*, N.Y. Times (Jan. 23, 2018).

[23] Rescission would place DACA recipients at a genuine risk of deportation from the only home that they have known. The Administration's stated enforcement policy has sharply narrowed discretion to exempt any removable aliens from enforcement. See Memorandum from John Kelly, Sec'y of Homeland Sec. to Kevin McAleenan, Acting Comm'r of U.S. Customs & Border Prot., *et al.* (Feb. 20, 2017). Administration officials have declared that those without legal status "should be concerned" and "need to be worried." Geneva Sands, *ICE Director: If You Entered the US Illegally, You 'Should be Concerned'*, ABC News (June 16, 2017);

9

embolden other countries to mistreat their own migrants. And it would deeply tarnish our image throughout the world as a country of promise and tolerance, threatening our influence as a global leader on human rights issues, and eroding our capacity to hold other governments accountable to their human rights obligations.

*Second*, rescission would have a damaging impact on the stability of our hemisphere. The countries to which DACA recipients would be deported are already struggling with deep poverty, crime, and overwhelmed and under-resourced social services. The countries of the Northern Triangle lack the capacity or services to absorb the potential inflow of tens of thousands of young people in need of jobs and schooling and lacking familiarity with the region. Even Mexico, larger and at least somewhat more prosperous, would have enormous capacity issues were it to receive so many individuals.[24] In addition, rescission

---

Stephen Dinan, *No Apologies: ICE Chief Says Illegal Immigrants Should Live in Fear of Deportation*, Wash. Times (June 13, 2017).

[24] The majority of the roughly 700,000 DACA recipients are from Mexico (561,420 recipients); the next most common countries of origin are El Salvador (26,630), Guatemala (18,220), and Honduras (16,730). *Approximate Active DACA Recipients: Country of Birth as of July 31, 2018*, U.S. Citizenship & Immigration Servs. Over forty percent of the population of Mexico lives in poverty, the nation is grappling with widespread crime and corruption, and its infrastructure is already overwhelmed by the tens of thousands of migrants from other countries who are newly in the country due to the Trump Administration's Migrant Protection Protocols and related policies. See World Bank, *Poverty & Equity Brief: Mexico* (Oct. 2019); U.S. Dep't of State, *Country Reports on Human Rights Practices for 2018: Mexico* (2019); Kevin Sieff, *Mexico's Migration Crackdown Overwhelms its Shelters, Antagonizes its Neighbors,* Wash. Post (July 1, 2019); Kirk Semple, *Overflowing Toilets, Bedbugs and High Heat: Inside Mexico's*

10

would narrow the flow of remittances into these countries, which are critical to many Central American economies.[25] Depletion of these sources of revenue would only further destabilize countries already straining to produce enough tax revenues to fund security, governance, and anti-poverty programs.

*Third*, the rescission of DACA will undercut our military readiness. Hundreds of DACA recipients are currently serving in the U.S. Armed Forces through the Military Accession Vital to National Interest ("MAVNI") program, which recruits immigrants with special, mission-critical skills such as language proficiency and medical expertise that are urgently needed by the military.[26] MAVNI recruits have been especially valuable to Special Operations Forces, who rely heavily on language and cultural competencies to

---

*Migrant Detention Centers*, N.Y. Times (Aug. 3, 2019). Other countries that would receive DACA recipients are struggling with similar issues. The poverty rate in both Guatemala and Honduras, for example, is around sixty percent. See *Poverty & Equity Brief Guatemala* (Oct. 2019); *Poverty & Equity Brief Honduras* (Oct. 2019).

[25] See Protecting Dreamers and TPS Recipients: Hearing Before the H. Comm. on the Judiciary, 116th Cong. 2015 (2019) (statement of the American Friends Service Committee); Arnoldo Lopez Marmolejo & Marta Ruiz Arranz, *The Economic Landscape in Central America and the Dominican Republic: External Challenges and Internal Strengths* 15 (2019). In 2018, remittances constituted 22 percent of El Salvador's GDP, 20 percent of Honduras', and 16 percent of Jamaica's. See Manuel Orozco, *Fact Sheet: Family Remittances to Latin America and the Caribbean in 2018*, The Dialogue: Leadership for the Americas (Feb. 8, 2019).

[26] See Gregory Korte *et al.*, *Trump administration struggles with fate of 900 DREAMers serving in the military*, USA Today (Sept. 7, 2017).

**AR5219**

11

perform their sensitive missions.[27] The United States faces security challenges throughout the globe that require a military force with specialized and diverse skills. The rescission of DACA will harm our military effectiveness at a moment when our Armed Forces are already struggling to attract enough recruits.[28]

*Fourth*, rescinding DACA will make it more difficult for our law enforcement officials to combat crime at home and across the region. Law enforcement and homeland security professionals agree that DACA vastly improved the safety of American cities by decreasing fear of police officers in immigrant communities and encouraging immigrants to cooperate with law enforcement efforts.[29] Nearly sixty percent of DACA recipients have stated that they would be willing to report a crime that they would not have reported before receiving protected status.[30] By removing protection against deportation, young DACA recipients will be unable to obtain work, hold driver's licenses, or participate in many other aspects of

---

[27] See Alex Horton, *How the Pentagon Ending Its Deal with* Immigrant *Recruits Could Hurt the Military*, Wash. Post (July 18, 2017).

[28] See Robert M. Gates, *Robert Gates: Ending DACA Will Hurt Immigrant Troops*, N.Y. Times (Nov. 8, 2017); John Grady, *Panel Says U.S. Military Recruitment Pool Must Broaden*, U.S.N.I. News (June 17, 2019); Meghann Myers, *After 2018's Recruiting Shortfall, It Will Take A Lot Longer to Build the Army to 500K*, Army Times (Mar. 14, 2019).

[29] Brief for Current and Former Prosecutors and Law Enforcement as Amicus Curiae, *Regents of the University of California v. Department of Homeland Security*, 908 F.3d 476 (9th Cir. 2018); see also Roberto G. Gonzales, *Here's How DACA Changed the Lives of Young Immigrants, According to Research*, Vox (Feb. 16, 2018).

[30] Gonzales, *supra* note 29.

12

American society,[31] pushing immigrants into the shadows and eroding trust in law enforcement. Without the cooperation of immigrant communities, the ability of law enforcement to prevent and disrupt crime will be significantly hampered, threatening local, national, and cross-border security.

*Finally*, the expense of DACA rescission would divert significant funds from real and urgent national security needs. The cost of deporting all DACA recipients is estimated to be $7.5 billion.[32] This money is urgently needed for other priorities: to combat cross-border and international crime, prevent terrorist attacks, and address other emergent security threats. Redirecting such a substantial sum of money toward the deportation of DACA recipients would undermine these legitimate national security initiatives. Further, by one estimate, DACA recipients contribute nearly $42 billion to the nation's economy each year, money that can directly and indirectly contribute to initiatives to bolster homeland security.[33] Scarce resources should not be diverted toward tearing immigrants away from their families and livelihoods at the

---

[31] Nicole Prchal Svajlenka, *Amid Court Challenges, Here's What Will Happen if DACA Ends*, Center for American Progress (Aug. 15, 2018).

[32] See Ike Brannon & Logan Albright, *The Economic and Fiscal Impact of Repealing DACA*, Cato Inst. (Jan. 18, 2017); see also Ben Gitis, *The Budgetary and Economic Costs of Ending DACA*, American Action Forum (Sept. 7, 2017).

[33] Jacqueline Varas & Usama Zafar, *Estimating the Economic Contributions of DACA Recipients*, Am. Action F. (Dec. 21, 2017); see also Brannon & Albright, *supra* note 32 (estimating the total economic and fiscal cost of immediately eliminating the DACA program and deporting its participants to be $283 billion over 10 years).

AR5221

13

expense of critical efforts to address the very real security threats that we face.

## II. Petitioners' Unsupported Claims Do Not Warrant National Security Deference.

Before this Court, Petitioners make the passing claim that "courts are also 'ill equipped' to consider the authenticity or the adequacy of the foreign-policy considerations" raised by cases such as this.[34] If this is a veiled request for national security deference, it is unjustified here.

This Court has underscored that national security deference is owed to the "*considered professional judgment*" of national security officials.[35] As the Second Circuit has explained, "[d]eference to the executive's national security and military judgments is

---

[34] Pet. Br. at 53.

[35] *Goldman* v. *Weinberger*, 475 U.S. 503, 508-509 (1986) (emphasis added); see also *Winter* v. *Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008) (affording "great deference to the professional judgment of military authorities" (quoting *Goldman*, 475 U.S. at 507)). Last Term, this Court afforded deference to the judgment of national security officials, but only after finding that "the agencies weighed various indicators of national security risk" and "had collected and evaluated data regarding all foreign governments" for the specific order the Court considered. *Trump* v. *Hawaii*, 138 S. Ct. 2392, 2404-2405 (2018). See *Doe 2* v. *Shanahan*, 917 F.3d 694, 703 (D.C. Cir. 2019) (Wilkins, J., concurring) (mem.) ("Even when dealing with facially neutral policies, Congress and the Executive receive deference only where military policies are based upon the 'considered professional judgment' of 'appropriate military officials' and only after finding that the policies 'reasonably and evenhandedly regulate' the matter at issue." (quoting *Goldman*, 475 U.S. at 509-510)); *Thomasson* v. *Perry*, 80 F.3d 915, 921-923 (4th Cir. 1996) (deferring to the "considered judgment" of coordinate branches of government after an "exhaustive review" by the Department of Defense).

14

appropriate only where [courts] have sufficient information to evaluate whether those judgments were logical and plausible."[36] Or as another court recently put it after reviewing this Court's jurisprudence on deference, "in the Supreme Court's opinions granting military and national security deference, a precursor to that grant of deference was the finding that *reasoned decision-making* had taken place" and there had been a "*reasonable evaluation*" of the evidence by responsible officials.[37]

The Nielsen Memo's *post hoc* allusion to the "cause and deter" rationale bears no resemblance to the sort of "considered" judgment or "reasonable evaluation" of the evidence that have supported claims to national security deference in the past.

*First*, as discussed *supra*, Petitioners do not rest their "cause and deter" rationale on any evidence at all. The Nielsen Memo cites no evidence for the rationale. Petitioners have placed no evidence for the rationale in the record. Nor do they point to any actual evidence outside the record. And the overwhelming evidence in fact contradicts the purported rationale. In short, any claim they might make to a security or foreign policy imperative bears no connection to the evidence, or to any "reasonable evaluation" thereof.[38]

---

[36] *ACLU* v. *U.S. Dep't of Def.*, 901 F.3d 125, 134 (2d Cir. 2018).

[37] *Doe 2* v. *Esper*, 2019 WL 4394842, at *3 (D.D.C. Sept. 13, 2019) (emphasis added) (internal quotation marks omitted); see also *id.* at *2, *9.

[38] See *Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 34-36 (2010) (basing the decision to defer to the executive branch's national security claims on "persuasive evidence" and "adequat[e] substantiat[ion]" of those claims); *Rostker* v. *Goldberg*, 453 U.S. 57, 66-68 (1981) (deferring to "reasonable evaluation" of the national security evidence by the legislative branch).

AR5223

15

*Second*, Petitioners first submitted the "cause and deter" rationale more than nine months *after* the decision to rescind. DACA rescission had already gone into effect; had been challenged in multiple courts; had been fully briefed and decided in multiple dispositive motions; and had been enjoined by two courts and vacated by a third—all before Secretary Nielsen first suggested the "cause and deter" rationale for the rescission in her memorandum. An explanation for a policy decision cannot fairly be said to reflect the "considered professional judgment" of national security professionals, without evidence that it was ever "considered" until months after the policy decision in question.[39]

*Third*, Petitioners did not weigh the security costs against the perceived benefits of their decision. As detailed *supra*, the DACA rescission would do considerable injury to multiple security and foreign policy interests of the United States.[40] Petitioners cannot claim to have undertaken a "considered" exercise of judgment or "reasonable evaluation" of the national security and foreign policy equities, while entirely failing to mention—much less consider—these serious national security and foreign policy considerations.[41]

*Fourth*, there is no indication that former Secretary Nielsen undertook a considered policy-making

---

[39] *Goldman*, 475 U.S. at 508; see *Doe 2*, 917 F.3d at 703-704 (Wilkins, J., concurring) (decision to afford the government deference depends on whether its policy action "was a product of" considered national security judgment, or was "based upon" that judgment).

[40] See *supra* at text accompanying notes 22-33.

[41] *Goldman*, 475 U.S. at 508; *Rostker*, 453 U.S. at 68.

AR5224

16

process before concluding that DACA rescission was needed.

Every recent administration to consider an important change to security policy has followed an interagency review process, in which many of the amici have participated. That process allows experienced national security professionals to ensure that all relevant uncertainties are addressed by policy and legal experts, appropriate preparations are made for implementation, and any potential risks are effectively identified and mitigated. Before recommendations are submitted to the President, the National Security Council oversees a policy and legal process that typically includes: a review by the career professionals in those institutions of the U.S. government charged with implementing an order; a review by the career lawyers in those institutions to ensure legality and consistency in interpretation; and a policy review among senior leadership across all relevant agencies, including Deputies and Principals at the cabinet level.

If national security or foreign policy considerations were serious factors motivating a major policy decision affecting more than 700,000 individuals, one would expect to see at least a semblance of such a process. But there is not even a hint of it in this record. To the contrary, all that is known about the decision points in the opposite direction. The earlier memorandum of then-DHS Secretary John Kelly rescinding the Deferred Action for Parents of Americans ("DAPA") program claimed that he made his decision "after consulting with" at least one other agency. But when DACA was later rescinded, the Nielsen Memo simply omitted this claim. Instead, Secretary Nielsen took pains to convey that the decision was hers alone, and that it was based not on an assessment of security facts, but on a consideration of the earlier Duke

17

Memo, the administrative record for the Duke Memo, and the various other documents that had been submitted to the U.S. District Court for the District of Columbia.[42]

This Court has noted that "[d]epartures from the normal procedural sequence might afford evidence that improper purposes are playing a role" in government action.[43] The process Petitioners followed to conclude that the rescission of DACA was needed to deter migration was such a departure from the norm as to be unrecognizable as a security process. The process followed does not reflect the sort of "considered" homeland security judgment in which amici participated, that is a necessary prerequisite for national security deference.

*Finally*, Petitioners should not receive national security deference for the simple reason that they have not articulated any national security need for the rescission. To be sure, concerns about immigration enforcement often are connected to national security imperatives. But Secretary Nielsen's stated concerns manifestly were not. While expressing a desire to deter "minor aliens" from crossing the border, at no point does her memorandum cite any security consequence of these child crossings, or claim that DACA or failure to rescind DACA would present any identifiable

---

[42] Nielsen Memo, *supra* note 11, at 1 ("Having considered the Duke memorandum and Acting Secretary Duke's accompanying statement, the administrative record for the Duke memorandum that was produced in litigation, and the judicial opinions reviewing the Duke memorandum, I decline to disturb * * *").

[43] *Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).

18

national security or foreign policy risk.[44] Petitioners can make no tenable claim to national security deference when they are unable to articulate any actual national security basis for their change in DACA policy.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgments of the U.S. Court of Appeals for the Ninth Circuit and the U.S. District Court for the District of Columbia, and the orders of the U.S. District Court for the Eastern District of New York.

Respectfully submitted,

| | |
|---|---|
| PHILLIP SPECTOR | HAROLD HONGJU KOH |
| *Messing & Spector LLP* | *Counsel of Record* |
| *1200 Steuart Street* | HOPE R. METCALF |
| *#2112* | *Peter Gruber Rule of Law* |
| *Baltimore, MD 21230* | *  Clinic* |
| *(202) 277-8173* | *Yale Law School* |
| | *127 Wall Street* |
| | *P.O. Box 208215* |
| | *New Haven, CT 06520* |
| | *(203) 432-4932* |
| | *harold.koh@ylsclinics.org* |

---

[44] Long after the fact, Petitioners' Brief wrests from the single sentence in the Nielsen Memo an alleged concern about the crossings of the "families" of these children that appears nowhere in the Memo itself. See *supra* text accompanying notes 13-14. But even then, Petitioners do not identify a concrete security or foreign policy harm that would plausibly flow from a court order blocking the rescission of DACA. See *supra* text accompanying note 15.

**APPENDIX**

AR5228

A-1

# APPENDIX

## List of *Amici Curiae*

1. Madeleine K. Albright served as Secretary of State from 1997 to 2001. A refugee and naturalized American citizen, she served as U.S. Permanent Representative to the United Nations from 1993 to 1997. She has also been a member of the Central Intelligence Agency External Advisory Board since 2009 and of the Defense Policy Board since 2011, in which capacities she has received assessments of threats facing the United States.

2. Rand Beers served as Deputy Homeland Security Advisor to the President of the United States from 2014 to 2015.

3. John B. Bellinger III served as the Legal Adviser for the U.S. Department of State from 2005 to 2009. He previously served as Senior Associate Counsel to the President and Legal Adviser to the National Security Council from 2001 to 2005.

4. Jarrett Blanc served as State Department Coordinator for Iran Nuclear Implementation from 2015 to 2017. He previously served as Principal Deputy Special Representative for Afghanistan and Pakistan from 2014 to 2015.

5. Antony Blinken served as Deputy Secretary of State from 2015 to 2017. He previously served as Deputy National Security Advisor to the President from 2013 to 2015.

A-2

6.　　John O. Brennan served as Director of the Central Intelligence Agency from 2013 to 2017. He previously served as Deputy National Security Advisor for Homeland Security and Counterterrorism and Assistant to the President from 2009 to 2013.

7.　　William J. Burns served as Deputy Secretary of State from 2011 to 2014. He previously served as Under Secretary of State for Political Affairs from 2008 to 2011, as U.S. Ambassador to Russia from 2005 to 2008, as Assistant Secretary of State for Near Eastern Affairs from 2001 to 2005, and as U.S. Ambassador to Jordan from 1998 to 2001.

8.　　Derek Chollet served as Assistant Secretary of Defense for International Security Affairs from 2012 to 2015.

9.　　James Clapper served as Director of National Intelligence from 2010 to 2017.

10.　　Bathsheba N. Crocker served as Assistant Secretary of State for International Organization Affairs from 2014 to 2017.

11.　　Rudy DeLeon served as Deputy Secretary of Defense from 2000 to 2001.

12.　　Nancy Ely-Raphel served as Senior Adviser to the Secretary of State and Director of the Office to Monitor and Combat Trafficking in Persons from 2001 to 2003. She previously served as U.S. Ambassador to Slovenia from 1998 to 2001.

**AR5230**

A-3

13.     John D. Feeley served as U.S. Ambassador to Panama from 2015 to 2018. He previously served as Principal Deputy Assistant Secretary for Western Hemisphere Affairs at the U.S. Department of State from 2012 to 2015.

14.     Daniel F. Feldman served as U.S. Special Representative for Afghanistan and Pakistan from 2014 to 2015, Deputy U.S. Special Representative for Afghanistan and Pakistan from 2009 to 2014, and previously Director for Multilateral and Humanitarian Affairs at the National Security Council.

15.     Jonathan Finer served as Chief of Staff to the Secretary of State from 2015 to 2017, and Director of the Policy Planning Staff at the U.S. Department of State from 2016 to 2017.

16.     Lucas Guttentag served as Senior Counselor to the Secretary of Homeland Security and previously as Senior Counselor to the Director of U.S. Citizenship and Immigration Services from 2014 to 2016.

17.     Chuck Hagel served as Secretary of Defense from 2013 to 2015, and previously served as Co-Chair of the President's Intelligence Advisory Board. From 1997 to 2009, he served as U.S. Senator for Nebraska, and as a senior member of the Senate Foreign Relations and Intelligence Committees.

A-4

18.     Avril D. Haines served as Deputy National Security Advisor to the President of the United States from 2015 to 2017. From 2013 to 2015, she served as Deputy Director of the Central Intelligence Agency.

19.     General (ret.) Michael V. Hayden, USAF, served as Director of the Central Intelligence Agency from 2006 to 2009. From 1995 to 2005, he served as Director of the National Security Agency.

20.     Kathleen H. Hicks served as Principal Deputy Under Secretary of Defense for Policy from 2012 to 2013, and as Deputy Under Secretary of Defense for Strategy, Plans, and Forces from 2009 to 2012.

21.     Roberta Jacobson served as U.S. Ambassador to Mexico from 2016 to 2018. She previously served as Assistant Secretary of State for Western Hemisphere Affairs from 2011 to 2016.

22.     Nate Jones served as Director of Counterterrorism at the National Security Council from 2009 to 2012.

23.     Colin H. Kahl served as Deputy Assistant to the President and National Security Advisor to the Vice President from 2014 to 2017. He previously served as Deputy Assistant Secretary of Defense for the Middle East from 2009 to 2011.

24.     John F. Kerry served as Secretary of State from 2013 to 2017.

AR5232

A-5

25.     Lawrence J. Korb served as Assistant Secretary of Defense (manpower, reserve affairs, installations, and logistics) from 1981 to 1985.

26.     Prem Kumar served as Senior Director for the Middle East and North Africa at the National Security Council from 2013 to 2015.

27.     Kelly E. Magsamen served as Principal Deputy Assistant Secretary of Defense for Asian and Pacific Security Affairs from 2014 to 2017.

28.     David A. Martin served as Principal Deputy General Counsel of the U.S. Department of Homeland Security from 2009 through 2010, including four months as Acting General Counsel, and as General Counsel of the Immigration and Naturalization Service from 1995 to 1998.

29.     Denis McDonough served as the Chief of Staff to the President from 2013 to 2017. He previously served as Deputy National Security Advisor to the President from 2010 to 2013.

30.     Nancy McEldowney served as Principal Deputy Assistant Secretary of State for European Affairs from 2009 to 2011. She previously served as U.S. Ambassador to Bulgaria from 2008 to 2009.

A-6

31.     Brett H. McGurk served as Special Presidential Envoy for the Global Coalition to Counter the Islamic State of Iraq and the Levant from 2015 to 2018. Previously, he served as the Deputy Assistant Secretary of State for Near Eastern Affairs from 2013 to 2015, and as Special Assistant to the President and Senior Director for Iraq and Afghanistan from 2007 to 2009.

32.     Cecilia Muñoz served as Director of the White House Domestic Policy Council from 2012 to 2017, and as the White House Director of Intergovernmental Affairs from 2009 to 2012.

33.     James C. O'Brien served as Special Presidential Envoy for Hostage Affairs from 2015 to 2017. He served in the U.S. Department of State from 1989 to 2001, including as Principal Deputy Director of Policy Planning and as Special Presidential Envoy for the Balkans.

34.     Matthew G. Olsen served as Director of the National Counterterrorism Center from 2011 to 2014.

35.     Leon E. Panetta served as Secretary of Defense from 2011 to 2013. From 2009 to 2011, he served as Director of the Central Intelligence Agency.

A-7

36.     Anne W. Patterson served as Assistant Secretary of State for Near Eastern Affairs from 2013 to 2017. She previously served as U.S. Ambassador to Egypt from 2011 to 2013, U.S. Ambassador to Pakistan from 2007 to 2010, U.S. Ambassador to Colombia from 2000 to 2003, and U.S. Ambassador to El Salvador from 1997 to 2000.

37.     Thomas R. Pickering served as Under Secretary of State for Political Affairs from 1997 to 2000. He previously served as U.S. Ambassador to El Salvador from 1983 to 1985, and U.S. Permanent Representative to the United Nations from 1989 to 1992.

38.     Samantha J. Power served as U.S. Permanent Representative to the United Nations from 2013 to 2017. From 2009 to 2013, she served as Senior Director for Multilateral Affairs and Human Rights at the National Security Council.

39.     Jeffrey Prescott served as Deputy National Security Advisor to the Vice President from 2013 to 2015, and as Special Assistant to the President and Senior Director for Iran, Iraq, Syria and the Gulf States from 2015 to 2017.

40.     Ned Price served as Special Assistant to President for National Security Affairs from 2016 to 2017 and as the National Security Council Spokesperson from 2015 to 2017.

A-8

41.     Susan E. Rice served as U.S. Permanent Representative to the United Nations from 2009 to 2013 and as National Security Advisor to the President from 2013 to 2017.

42.     Eric P. Schwartz served as Assistant Secretary of State for Population, Refugees, and Migration from 2009 to 2011. From 1993 to 2001, he was responsible for refugee and humanitarian issues at the National Security Council, ultimately serving as Special Assistant to the President for National Security Affairs and Senior Director for Multilateral and Humanitarian Affairs.

43.     Nick Shapiro served as Deputy Chief of Staff and Senior Advisor to the Director of the Central Intelligence Agency from 2013 to 2015. He previously served as a senior White House counterterrorism and homeland security aide to the President of the United States from 2009 to 2013.

44.     Wendy R. Sherman served as Under Secretary of State for Political Affairs from 2011 to 2015.

45.     Anne-Marie Slaughter served as the Director of Policy Planning at the U.S. Department of State from 2009 to 2011.

46.     Dana Shell Smith served as U.S. Ambassador to Qatar from 2014 to 2017. She previously served as Principal Deputy Assistant Secretary of Public Affairs.

A-9

47.     Jake Sullivan served as National Security Advisor to the Vice President from 2013 to 2014. He previously served as Director of Policy Planning at the U.S. Department of State from 2011 to 2013.

48.     Strobe Talbott served as Deputy Secretary of State from 1994 to 2001.

49.     Arturo A. Valenzuela served as Assistant Secretary of State for Western Hemisphere Affairs from 2009 to 2011. He previously served as Special Assistant to the President and Senior Director for Inter-American Affairs at the National Security Council from 1999 to 2000, and as Deputy Assistant Secretary of State for Mexican Affairs from 1994 to 1996.

50.     Douglas Wilson served as Assistant Secretary of Defense for Public Affairs from 2010 to 2012.

51.     Samuel M. Witten served as Principal Deputy Assistant Secretary of State for Population, Refugees, and Migration from 2010 to 2017. He previously served as Deputy Legal Adviser of the U.S. Department of State from 2001 to 2007.

Nos. 18-587, 18-588 and 18-589

In the

# Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Petitioners,*

*v.*

REGENTS OF THE UNIVERSITY
OF CALIFORNIA, *et al.*,

*Respondents.*

*(For Continuation of Caption See Inside Cover)*

On Writ of Certiorari to the United States
Court of Appeals for the Ninth Circuit

## BRIEF *AMICI CURIAE* OF THE NATIONAL EDUCATION ASSOCIATION AND NATIONAL PTA IN SUPPORT OF RESPONDENTS

Alice O'Brien
 *Counsel of Record*
Emma Leheny
Lubna A. Alam
Rebecca Yates
National Education Association
1201 16th Street, NW
Washington, DC 20036
(202) 822-7048
aobrien@nea.org

October 4, 2019          *Counsel for Amici Curiae*

291673



COUNSEL PRESS

(800) 274-3321 • (800) 359-6859

**AR5238**

DONALD J. TRUMP, PRESIDENT OF
THE UNITED STATES, *et al.*,

*Petitioners,*

*v.*

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, *et al.*,

*Respondents.*

———————————

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE
UNITED STATES COURT OF APPEALS FOR THE DISTRICT
OF COLUMBIA CIRCUIT

———————————

KEVIN K. MCALEENAN, ACTING SECRETARY
OF HOMELAND SECURITY, *et al.*,

*Petitioners,*

*v.*

MARTIN JONATHAN BATALLA VIDAL, *et al.*,

*Respondents.*

———————————

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**AR5239**

*i*

## QUESTION PRESENTED

This brief addresses the second question accepted for review by the Court:

Whether the Department of Homeland Security's decision to terminate the Deferred Action for Childhood Arrivals ("DACA") policy was arbitrary and capricious.

**AR5240**

*ii*

## TABLE OF CONTENTS

*Page*

QUESTION PRESENTED . . . . . . . . . . . . . . . . . . . . . . .i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CITED AUTHORITIES . . . . . . . . . . . . . .iv

INTEREST OF *AMICI* . . . . . . . . . . . . . . . . . . . . . . . .1

INTRODUCTION AND SUMMARY OF
    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    A.  DHS Failed to Provide a Reasoned
        Explanation for the Policy Change,
        Including a Consideration of Reliance
        Interests, as Required by the APA. . . . . . . . . . .5

    B.  In Reliance on DACA, Students
        Pursued Higher Education and Careers
        in Public Service . . . . . . . . . . . . . . . . . . . . . . . . .8

    C.  DHS Failed to Consider the Reliance
        Interests DACA Engendered in This
        Country's Public Schools . . . . . . . . . . . . . . . . . .15

        i.  Without DACA, Thousands of
            Educators Would Abruptly Leave Their
            Students . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

**AR5241**

*iii*

*Table of Contents*

|  |  | Page |
|---|---|---|
| ii. | Educational Institutions Rely on Thousands of DACA Educators to Offset the Nationwide Teacher Shortage | 18 |
| iii. | Educational Institutions Rely on DACA to Provide Essential Diversity in the Teaching Profession | 20 |
| iv. | DHS Failed to Consider How DACA Rescission Would Undermine Student Learning for All Students | 25 |
| CONCLUSION | | 29 |

**AR5242**

*iv*

## TABLE OF CITED AUTHORITIES

*Page*

**Cases**

*Batalla Vidal v. Nielsen,*
279 F. Supp. 3d 401 (E.D.N.Y. 2018) . . . . . . . . . . . . . .4

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

*Camp v. Pitts,*
411 U.S. 138 (1973) (per curiam) . . . . . . . . . . . . . . . .7

*Casa De Md. v. U.S. Dep't of Homeland Sec.,*
284 F. Supp. 3d 758 (D. Md. 2018) . . . . . . . . . . . . . . .3

*Casa De Md. v. U.S. Dep't of Homeland Sec.,*
924 F.3d 684 (4th Cir. 2019) . . . . . . . . . . . . . . . . . . . . .3

*Encino Motorcars, LLC v. Navarro,*
__ U.S. __, 136 S. Ct. 2117 (2016) . . . . . . . . . . . . . . . .5

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . .5, 8

*NAACP v. Trump,*
315 F. Supp. 3d 457 (D.D.C. 2018) *cert. granted sub nom. Trump v. NAACP,*
139 S. Ct. 2779 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . .4

*Nat'l Cable & Telecomm. Ass'n. v.*
*Brand X Internet Servs.,*
545 U.S. 967 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

**AR5243**

*v*

*Cited Authorities*

*Page*

*Regents of Univ. of Cal. v.*
    *U.S. Dep't of Homeland Sec.,*
    279 F. Supp. 3d 1011 (N.D. Cal. 2018) . . . . . . . . . . . .3

*Regents of Univ. of Cal. v.*
    *U.S. Dep't of Homeland Sec.,*
    908 F.3d 476 (9th Cir. 2018), *cert. granted sub*
    *nom. U.S. Dep't of Homeland Sec. v. Regents of*
    *Univ. of Cal.,* 139 S. Ct. 2779 (2019). . . . . . . . . . . . .3-4

*U.S. Dep't of Commerce v. New York,*
    __ U.S. __, 139 S. Ct. 2551 (2019) . . . . . . . . . . . . . .5, 7

*Vermont Yankee Nuclear Power Corp. v.*
    *Nat. Res. Defense Council, Inc.,*
    435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . .7

**Statutes**

Administrative Procedure Act, 5 U.S.C. § 706(2)(A) .4, 5

**Other Authorities**

Alexia Fernández Campbell, *DACA Immigrants*
    *Are Teaching American Children. What*
    *Happens After They're Gone?*, Vox (Sept.
    15, 2017), https://www.vox.com/policy-
    and-politics/2017/9/15/16306972/daca-
    teachers-dreamers. . . . . . . . . . . . . . . . . . . . . . . . . .22

**AR5244**

*vi*

*Cited Authorities*

*Page*

Corey Mitchell, *Wanted: Teachers as Diverse as Their Students*, Educ. Wk. (Sept. 17, 2019), https://www.edweek.org/ew/ articles/2019/09/18/wanted-teachers- as-diverse-as-their-students.html . . . . . . . . . . . . . . .19

Dan Goldhaber et al., Univ. of Wash. Bothell, *The Theoretical and Empirical Arguments for Diversifying the Teacher Workforce: A Review of the Evidence* (Ctr. for Educ. Data & Res., Working Paper No. 2015-9) . . . . . .20-21

Dianne Solis & James Barragan, *U.S. Could Lose an Estimated 20,000 Teachers, Many Bilingual, as DACA is Phased Out*, The Dallas Morning News (Oct. 5, 2017), https://www. dallasnews.com/news/immigration/2017/10/05/ u-s-could-lose-an-estimated-20000-teachers- many-bilingual-as-daca-is-phased-out/ . . . . . . . . . .22

Erica L. Green, *With DACA in Limbo, Teachers Protected by the Program Gird for the Worst*, N.Y. Times (Feb. 1, 2018), https://www.nytimes.com/2018/02/01/US/ politics/daca-teachers-trump.html . . . . . . . . . . . . . . .17

Ginette Magaña, *DACAmented Teachers: Educating and Enriching Their Communities*, Obama White House: Blog (Aug. 4, 2015), https://obamawhitehouse.archives.gov/ blog/2015/08/04/dacamented-teachers- educating-and-enriching-their-communities . . . . . .24

**AR5245**

*vii*

*Cited Authorities*

*Page*

Jason A. Grissom et al., *Teacher and Principal Diversity and the Representation of Students of Color in Gifted Programs*, 117 Elementary Sch. J. 396 (2017) . . . . . . . . . . . . . . .21

Jason T. Downer et al., *Teacher-Child/Racial/ Ethnic Match Within Pre-Kindergarten Classrooms and Children's Early School Adjustment*, 36 Early Childhood Res. Q. 26 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

Jie Zong et al., Migration Pol'y Inst., *A Profile of Current DACA Recipients by Education, Industry, and Occupation* (2017) . . . . . . . . . . . . .9, 16

Leib Sutcher et al., Learning Pol'y Inst., *A Coming Crisis in Teaching? Teacher Supply, Demand, and Shortages in the U.S.* (2016), https://learningpolicyinstitute.org/ sites/default/files/product-files/A_Coming_ Crisis_in_Teaching_REPORT.pdf . . . . . . . . . . . . .17

Matthew Ronfeldt et al., *How Teacher Turnover Harms Student Achievement*, 50 Am. Educ. Res. J. 4 (2013) . . . . . . . . . . . . . . . . . .17

Memorandum from Elaine C. Duke, Acting Sec'y of DHS, to James W. McCament, Acting Dir., USCIS, et al., *Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA)* (Sept. 5, 2017), https:// www.dhs.gov/news/2017/09/05/memorandum- rescission-daca . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 7

**AR5246**

*viii*

*Cited Authorities*

*Page*

Memorandum from Janet Napolitano, Sec'y, DHS to David V. Aguilar, Acting Comm'r, CBP, et al., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf . . . . . . 6

Memorandum from John F. Kelly, Sec'y, DHS to Kevin K. McAleenan, Acting Comm'r, CBP, et al., *Memorandum on Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017) . . . . . . . . . . . . . . . . 6

Memorandum from John F. Kelly, Sec'y, DHS to Kevin K. McAleenan, Acting Comm'r, CBP, et al., *Memorandum on Rescission Providing for Deferred Action for Parents of Americans ["DAPA"] and Lawful Permanent Residents* (June 15, 2017) . . . . . . . . . . . . 6

Nat'l Sci. Council on the Developing Child, *Persistent Fear and Anxiety Can Affect Young Children's Learning and Development* (Harv. Univ. Ctr. on the Developing Child, Working Paper No. 9, 2010), http://developingchild.harvard.edu/wp-content/uploads/2010/05/Persistent-Fear-and-Anxiety-Can-Affect-Young-Childrens-Learning-and-Development.pdf . . . . . . . 27

**AR5247**

*ix*

*Cited Authorities*

*Page*

Nat'l Sci. Council on the Developing Child,
  *Young Children Develop in an Environment
  of Relationships* (Harv. Univ. Ctr. on the
  Developing Child, Working Paper No. 1,
  2004), https://developingchild.harvard.
  edu/wp-content/uploads/2004/04/Young-
  Children-Develop-in-an-Environment-
  of-Relationships.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

NEA, *The National Education Association
  Vision, Mission and Values*, 2019
  Handbook, http://www.nea.org/assets/
  docs/2019_NEA_Handbook.pdf . . . . . . . . . . . . . . . . . .1

Off. of Plan., Evaluation & Pol'y Dev., U.S. Dep't
  of Educ., *The State of Racial Diversity in
  the Educator Workforce* (July 2016), https://
  www2.ed.gov/rschstat/eval/highered/racial-
  diversity/state-racial-diversity-workforce.pdf . .20, 21

Off. of Postsecondary Educ., U.S. Dep't of Educ.,
  *Teacher Shortage Areas Nationwide Listing
  1990-1991 through 2017-2018* (June 2017),
  https://www2.ed.gov/about/offices/list/ope/pol/
  ateachershortageareasreport2017-18.pdf . . . . . . . .18

Randy Capps et al., Migration Pol'y Inst.,
  *Implications of Immigration
  Enforcement Activities for the Well-Being
  of Children in Immigrant Families:
  A Review of the Literature* (2015) . . . . . . . . . . . . . .26

**AR5248**

*x*

*Cited Authorities*

*Page*

Roberto G. Gonzales et al., Ctr. for Am. Progress, *Taking Giant Leaps Forward: Experiences of a Range of DACA Beneficiaries at the 5-Year Mark* (2017) . . . . . .8, 9, 15

Tatyana Kleyn et al., *Learning from Undocumented Students: Testimonios for Strategies to Support and Resist*, 14 The New Educator 24 (2018) . . . . . . . . . . . . . . . .14

Teach For Am., *DACA Recipients*, (last visited Oct. 3, 2019), https://www.teachforamerica. org/how-to-join/eligibility/daca. . . . . . . . . . . . . . . . .22

Tom K. Wong et al., *2019 National DACA Survey,* https://cdn.americanprogress.org/ content/uploads/2019/09/18122133/New-DACA-Survey-2019-Final-1.pdf . . . . . . . . . . .9, 15, 28

U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Sec., *Approximate Active DACA Recipients: Country of Birth* (Sept. 4, 2017), https://www.uscis.go v/sites/default/files/USCIS/Resources/Re ports%20and%20Studies/Immigration%20 Forms%20Data/All%20Form%20Types/ DACA/daca_population_data.pdf . . . . . . . . . . . . . .22

**AR5249**

*xi*

*Cited Authorities*

*Page*

Valerie Strauss, *Teacher Shortages Affecting
Every State as 2017-18 School Year Begins*,
Wash. Post (Aug. 28, 2017), https://www.
washingtonpost.com/news/answer-
sheet/wp/2017/08/28/teacher-shortages-
affecting-every-state-as-2017-18-school-
year-begins/?utm_term=.0583fbf55b17 . . . . . . . . . .18

**AR5250**

1

## INTEREST OF *AMICI*[1]

**National Education Association ("NEA")** is the largest and oldest educational association in the United States. Founded in 1857, NEA now represents three million teachers, counselors, nurses, and education support professionals throughout the country, including many DACA educators. Among the millions of public school students NEA members serve are hundreds of thousands of DACA recipients. DACA has provided a foundation for those students' success both by granting them the certainty as to their legal status needed to pursue their educational aspirations and by granting that same certainty to their teachers who hold DACA status. As such, DACA meaningfully advances NEA's core mission, which is to fulfill the promise of public education for every student. NEA, *The National Education Association Vision, Mission and Values*, 2019 Handbook 7, http://www.nea.org/assets/docs/2019_NEA_Handbook.pdf. A rescission of DACA will do real and lasting harm to those students and teachers, as well as to the entire project of public education.

**National PTA ("PTA")** is a nationwide network of nearly 3.5 million families, students, teachers,

---

[1] No counsel for a party authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief.  No person other than *amici curiae*, their members, or their counsel made a monetary contribution to its preparation or submission. Pursuant to Rule 37.3(a), counsel for *amici* also represent that all parties have consented to the filing of this brief; letters reflecting their blanket consent to the filing of *amicus* briefs are on file with the Clerk.

**AR5251**

2

administrators, and business and community leaders devoted to making a difference for the education, health, safety and wellbeing of every child and making every child's potential a reality. National PTA is comprised of 54 state congresses, encompassing all 50 states, the District of Columbia, U.S. Virgin Islands, Puerto Rico and the Department of Defense Schools in Europe. Additionally, there are more than 24,000 local PTA units nationwide. PTA serves 16.5 million students across the country.

The overall purpose of PTA is to bring together families, educators and business and community leaders to solve the toughest challenges facing schools and communities and engage and empower families and communities to speak up and take action for every child. For more than 100 years, PTA has been a powerful voice for all children, a relevant resource for families and communities, and a strong advocate for public education.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Since its inception in 2012, the Deferred Action for Childhood Arrivals ("DACA") program has yielded immeasurable benefits for our nation's students and educators. For young people who, prior to DACA, had only a limited pathway to college and almost no realistic expectation of long-term employment, the program created new hope and a reason to strive for academic excellence. Since DACA began over seven years ago, many DACA recipients, in reliance on the program, have completed high school, entered four-year colleges and universities, and graduated to embark on careers in public service. And school districts, also relying on DACA, have hired thousands of DACA recipients. DACA

**AR5252**

3

recipients have helped alleviate the nationwide shortage of qualified educators, particularly in high needs schools and communities, and they serve as role models for the next generation of increasingly diverse students.

Following the September 5, 2017 decision by the Trump administration to rescind DACA, the Department of Homeland Security ("DHS") immediately stopped accepting DACA applications and attempted to cut off renewal applications 30 days later. Memorandum from Elaine C. Duke, Acting Sec'y, DHS, to James W. McCament, Acting Dir., USCIS, et al., *Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA)* (Sept. 5, 2017), https://www.dhs. gov/news/2017/09/05/memorandum-rescission-daca ("Rescission Memo"). Lawsuits challenging the rescission quickly followed, including the three now before the Court.[2] In these cases, the district courts either vacated or enjoined in large part DHS's rescission on a nationwide basis. *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1049 (N.D. Cal. 2018) (issuing a nationwide injunction requiring DHS to continue accepting DACA renewals); *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 512 (9th Cir. 2018) (upholding injunction), *cert. granted sub nom. U.S. Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 139 S.

---

[2]    In a fourth case, not currently before this Court, a Maryland District Court held that the decision to rescind DACA was not arbitrary and capricious. *Casa De Md. v. U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 772 (D. Md. 2018). The Fourth Circuit reversed in relevant part. *Casa De Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684 (4th Cir. 2019). DHS has petitioned for a writ of certiorari in that case, which was distributed for the Court's October 1, 2019 conference.

4

Ct. 2779 (2019); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 437 (E.D.N.Y. 2018) (issuing a nationwide injunction requiring DHS to continue accepting DACA renewals) *cert. granted sub nom. McAleenan v. Vidal*, 139 S. Ct. 2779 (2019); *NAACP v. Trump*, 315 F. Supp. 3d 457, 473 (D.D.C. 2018) (vacating Rescission Memo), *cert. granted sub nom. Trump v. NAACP.*, 139 S. Ct. 2779 (2019).

DHS violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), when it purported to rescind DACA without providing a reasoned explanation for its decision. The Rescission Memo fails to acknowledge that the elimination of DACA is a drastic change in policy and does not attempt to address the factual record that underlay the creation of DACA, nor the serious reliance interests the policy has created over the past seven years. These shortcomings render the agency's action arbitrary and capricious.

Allowing this unlawful agency action to eliminate DACA would erase the educational and professional gains made by DACA recipients in reliance on DACA and cause lasting harm to the education communities that have invested in and have come to rely on DACA holders. Young children will suffer the abrupt departure of trusted teachers, teacher shortages will worsen as thousands of DACA educators lose their status, immigrant students will lose a lifeline to education mentors, and student learning will be harmed in both the short- and long-term.

Therefore, on behalf of millions of education stakeholders, *amici* urge the Court to affirm the judgments below as the Rescission Memo was an arbitrary and capricious agency action.

**AR5254**

5

## ARGUMENT

### A.  DHS Failed to Provide a Reasoned Explanation for the Policy Change, Including a Consideration of Reliance Interests, as Required by the APA

The APA instructs courts to hold as unlawful and set aside agency action that is arbitrary or capricious. 5 U.S.C. § 706(2)(A). "In order to permit meaningful judicial review, an agency must 'disclose the basis' of its action." *U.S. Dep't of Commerce v. New York*, __ U.S. __, 139 S. Ct. 2551, 2573 (2019) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–69 (1962)). That is, the agency needs to provide a "reasoned explanation" for its decision. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). When the agency is changing its policy, rather than writing on a blank slate, that reasoned explanation must demonstrate that the agency is aware that it is changing position and that there are good reasons for the new policy. *Encino Motorcars, LLC v. Navarro*, __ U.S. __, 136 S. Ct. 2117, 2125 (2016). When the new policy "rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests," the agency must provide a "more detailed justification." *Fox Television Stations*, 556 U.S. at 515. Ignoring these requirements constitutes "arbitrary [and] capricious" action. *Id.*; *see also Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005) (holding that the failure of an agency to explain a change in its policy is a "reason for holding an interpretation to be [] arbitrary and capricious").

DHS's decision to rescind DACA represents an enormous shift in policy. When then-Secretary Janet

6

Napolitano announced the creation of DACA in 2012, she found that DHS needed the policy to "ensure that [its] enforcement resources [were] not expended on these low priority cases." Memorandum from Janet Napolitano, Sec'y, DHS to David V. Aguilar, Acting Comm'r, CBP, et al., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*, 1-2 (June 15, 2012), https://www.dhs.gov/xlibrary/assets/ s1-exercising-prosecutorial-discretion-individuals-who- came-to-us-as-children.pdf ("2012 DACA Memo"). She found that, as a group, DACA-eligible individuals "lacked the intent to violate the law," and were "productive young people," many of whom had "already contributed to our country in significant ways." *Id.*

As late as June 2017, DHS had explicitly preserved DACA, even as it dismantled other programs that provided immigrants with relief. Memorandum from John F. Kelly, Sec'y, DHS to Kevin K. McAleenan, Acting Comm'r, CBP, et al., *Memorandum on Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017), Joint Appendix ("J.A.") at 858; Memorandum from John F. Kelly, Sec'y, DHS to Kevin K. McAleenan, Acting Comm'r, CBP, et al., *Memorandum on Rescission Providing for Deferred Action for Parents of Americans ["DAPA"] and Lawful Permanent Residents* (June 15, 2017), J.A. at 870-71. At that time, DHS emphasized that it would prioritize enforcement of immigration laws against undocumented immigrants who had criminal backgrounds. J.A. at 859-63. When DHS did announce the rescission of DACA on September 5, 2017, the only basis it provided for its decision was its belief that DACA was unlawful, based on a ruling by the Fifth Circuit that DAPA conflicted with the discretion granted to DHS by the Immigration

7

and Nationality Act and a letter by the Attorney General opining that DACA was unconstitutional. Rescission Memo at 3-4.[3]

The Rescission Memo did not mention the findings provided in the 2012 DACA Memo nor did it discuss the serious reliance interests created by the program over the past several years, thus providing no reasoned explanation for why DHS rescinded the policy. As the interviews[4] for this brief amply demonstrate, the explanation given for the policy in 2012 – that DACA-eligible individuals are productive young people who contribute to our country in significant ways – has only grown stronger. And, when serious reliance interests are at stake such as here, agencies must provide an explanation that is not

---

[3]  On June 22, 2018, after the D.C. District Court vacated the Rescission Memo and remanded the case to DHS, then-Secretary Kirstjen Nielsen issued a memorandum attempting to offer some explanation for DHS's decision. The Court should not consider this memorandum because its review is limited to the agency's contemporaneous explanation, not its post-hoc rationalization. *See U.S. Dep't of Commerce v. New York*, __ U.S. __, 139 S. Ct. 2551, 2573 (2019); *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978); *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973) (per curiam). In any event, then-Secretary Nielsen's cursory consideration of the reliance interests cannot satisfy the APA's reasoned decision-making requirement.

[4]  To provide the Court with an expanded understanding of how DACA has impacted public education, *amici* have interviewed numerous students, graduates, educators, and school administrators. Where names are used, it is with interviewees' permission. Others asked not to be named or identifiably described because of the uncertainty of their DACA status or concern for their DACA students.

8

just reasoned, but "more detailed" than one for other types of agency action. *See Fox Television Stations*, 556 U.S. at 515. In reliance on the DACA program, DACA holders furthered their education and began careers as educators. In turn, school districts and communities relied on the many benefits provided by these DACA holders. But DHS failed to consider any of these serious reliance interests. That failure renders DHS's action arbitrary and capricious, and accordingly unlawful. The Court should therefore affirm the judgments below.

## B.  In Reliance on DACA, Students Pursued Higher Education and Careers in Public Service

DACA has motivated countless young people to stay in school and further their education. Without DACA,

> most unauthorized immigrant youth end their schooling before entering college . . . . [T]he majority of unauthorized students pursuing higher education attend community colleges and struggle to persist and graduate. With access to legal employment and diminished fear of possible deportation [because of DACA], many of the study's respondents described their newfound motivation and interest in school.

Roberto G. Gonzales et al., Ctr. for Am. Progress, *Taking Giant Leaps Forward: Experiences of a Range of DACA Beneficiaries at the 5-Year Mark* 2 (2017). "DACA has been the impetus for many young people . . . to return to school . . . . Dozens of the respondents who had previously not finished high school told the authors that DACA was an important impetus to re-enroll in school . . . ."

9

*Id.* at 3. Forty percent of respondents in a nationwide survey of 1,105 DACA recipients reported that they were currently in school. Tom K. Wong et al., *2019 National DACA Survey*, https://cdn.americanprogress.org/content/uploads/2019/09/18122133/New-DACA-Survey-2019-Final-1.pdf. Of those respondents, 83% were already pursuing a bachelor's degree or higher, and 93% reported that DACA allowed them to pursue education opportunities that had not previously been available. *Id.* And upon graduating from high school, many DACA holders pursue higher education so as to devote their careers to public service. Some 9,000 DACA holders are now working in education according to one 2017 estimate by the Migration Policy Institute. Jie Zong et al., Migration Pol'y Inst., *A Profile of Current DACA Recipients by Education, Industry, and Occupation* 7-8 (2017).

DACA holders invested in their education in reliance on the government's promise in DACA that they would be able to pursue educational and job opportunities, and that those opportunities would not be taken away without due consideration. However, DHS failed to consider these serious reliance interests and the massive and irreparable harm rescinding DACA would have on the hundreds of thousands of DACA holders, their families, their students, and their communities. The interviews that follow speak powerfully to the very issues DHS should have considered.

**"I could finally serve my community."** This was the reaction of Angelica Reyes upon learning of DACA. As a public school student in Los Angeles, Reyes dreamed of becoming an educator, but felt that advanced academic and professional opportunities were out of reach. During that time Reyes recalls, "I had done more than 1,000

10

hours of community service. It was heartbreaking that I
couldn't be part of the system I had tried to enrich." With
DACA, "it felt like an opportunity. I could finally serve
my community. And I could be an educator. DACA gave
me a clear path to obtain the career I had been working
towards." While earning her teaching credential at the
University of California at Los Angeles, Reyes also
worked for several non-profit advocacy organizations that
assist K-12 students with college preparedness, financial
aid, health and nutrition, and recovery from domestic
violence. Reyes is now a valued member of the teaching
corps in the district where she herself was a student. A
former Advanced Placement U.S. History teacher, Reyes
now teaches World History and Ethnic Studies. Next,
Reyes is hoping to pursue a doctorate in education.

**"Helping everyday citizens."** A senior at the
University of Texas at Austin, Vanessa Rodriguez Minero
majors in government. She volunteers in a program that
brings college students to underserved high schools to
advise on how to pursue higher education. For two years,
Rodriguez Minero served as the constituent liaison for
an Austin City Councilmember. She enjoyed "helping
everyday citizens" navigate through government services
to resolve their issues. Her goal is to use her education
to give back to her community. In thinking about the
potential end of DACA, Rodriguez Minero is concerned
about "professional development, what happens after
college, what happens with my degree, will I be able to
work in a field that I'm very passionate about?"

**"My dream of working in education."** A graduate
of the University of California, DACA-holder Vicente
Rodriguez teaches in the San Bernardino City Unified

**AR5260**

11

School District. This year, Rodriguez works one-on-one with a student receiving special education services. Last year, he served as the school's resident substitute, an assignment that included three months as a teacher providing bilingual education to second-graders. The former Director of Social Services at an after-school program providing academic support for school-aged children, Rodriguez has just this month applied for a master's program in education. His career goal is to teach high school students in the areas of English and Ethnic Studies, his majors in college, but he now feels that "my dream of working in education is slowly slipping away despite how far I have come."

**"DACA gave me access to education."** A Duke University senior, Axel Herrera is pursuing a double major in economics and sociology. Herrera has interned in the U.S. Congress and is applying to work at advocacy organizations after his graduation from Duke. Herrera presently volunteers for a STEM program where he has mentored a group of students since they were in sixth grade. Herrera receives mentorship, funding toward tuition, and career placement support through the Golden Door Scholarship program, which was established to advance the economic mobility of DACA recipients. "DACA gave me access to education," says Herrera, who sees the termination of DACA as an "extreme disruption," not just on a personal level but to schools and employers.

**"I wanted to do something more."** A bilingual teaching fellow in a school district outside of Seattle, A.M.P. is pursuing her teaching certification. Before DACA, she had always been a strong student, but she felt she had no clear pathway to college. When she received

**AR5261**

12

DACA, she "wanted to do something more." Working with a mentor teacher, A.M.P. now teaches third grade at the elementary school she attended as a child. Next year, she will have her own classroom and she intends to stay in her home district, but "I know there are a lot of [educators] who are wondering how they'll be able to renew their DACA" and continue their teaching careers.

**"The basic sense of human dignity."** Kateri Simpson teaches at a high school in Oakland, California. Simpson has seen first-hand how DACA has motivated students to fully engage in school and work toward graduation because higher education opportunities were now within reach. The students "all of a sudden . . . had agency and advocacy . . . . They were able to work for themselves and that was such a powerful thing." Her students could afford to stay in school and, with DACA work authorization, hold jobs to support themselves in college. As Simpson says, "the basic sense of human dignity to be able to work for what you want—I don't think can be underestimated."

**"It affects every aspect of my being."** Anayeli Marcos is in her last year of study for a dual master's degree in social work and science at the University of Texas at Austin. Marcos aims to join a non-profit organization as a counselor or therapist and use her Spanish-language skills to help underserved clients. In addition to her studies, Marcos works 20 hours per week, helping to provide for her three U.S. citizen siblings. When an agency error caused a temporary break in Marcos's DACA status, she says it "turned my world upside down." She had to withdraw from UT-Austin for a semester, move back in with her parents, and cease work until the mistake could be corrected. "It affects every aspect of my being. It

13

not only affects me financially, it also affects my mental health."

**"Only take things day by day."** H.A. is an education support professional at an Arizona high school where he works as a lab technician and volunteers in the counseling department, supporting immigrant students and their parents. He previously assisted students with the college application process. He himself was accepted to state university with a scholarship but, lacking DACA at the time, enrolled in community college, where it took him seven years to complete his degree while working. H.A. is witnessing students at his school feel "confusion and panic" about DACA and related immigration issues, so he has started an immigrant student support group. He remains dedicated to his students but due to the uncertainty around DACA, he can "only take things day by day."

**"A vehicle to better opportunities."** As a public school student in Texas, Roberto Valadez dreamed of becoming an academic, but his immigration status made him feel that "no matter how hard I try, I can never go to college." By high school, Valadez had begun to miss classes and struggle academically. But when DACA was announced, Valadez immediately recognized it as "a vehicle to better opportunities" and applied. He improved his schoolwork and recently graduated from the University of Texas at El Paso. He is currently working toward his Masters degree in Sociology and hopes to someday direct a non-profit organization and contribute to his community. Valadez states that "I feel like a new person after DACA." While DACA has allowed Valadez to work for a decent wage and put himself through college, "without DACA, it's game over."

AR5263

14

**"A new sense of confidence."** Areli Morales attended public schools in New York City where, she states, "I felt voiceless for many years . . . I remember wanting to be invisible . . . ."[5] DACA gave Morales "a new sense of confidence to move forward with [her] studies." She was able to obtain work authorization, a Social Security number, and attend college. Morales graduated from Brooklyn College in 2018. She is currently working as a substitute teacher while pursuing her teaching license. If Morales can renew her DACA status, she declares, "I plan to use my experiences of being undocumented to be an empathic teacher . . . . I hope to create a positive classroom environment that fosters acceptance, understanding, and empowerment to educate future generations of children, so they can strive to reach their greatest potential." Having relied on DACA and devoted years to her goal of becoming a teacher, the idea that she would not be able to teach, have her own classroom, and prepare her own lesson plans is "devastating."

**"DACA was a motivator."** Prior to receiving DACA, recent college graduate Joseph Ramirez would question the need to excel in school because he did not think he could go to college: "What am I going to do with that degree without a Social Security number?" During his senior year of high school, he received DACA. "DACA was a motivator," Ramirez says. Without it, "I would not have pushed my limits." Ramirez is the first in his family to graduate from college. "Losing DACA would be devastating" for Ramirez, who is helping his parents open a daycare for children in their community.

---

[5]   Based on a personal interview conducted by *amici* and excerpts from Tatyana Kleyn et al., *Learning from Undocumented Students: Testimonios for Strategies to Support and Resist*, 14 The New Educator 24, 29 (2018).

15

**"What will they have to go through?"** Jose Garibay recently graduated from St. Edwards College with a degree in political science. While in college, he volunteered for a college preparedness program for students from low-income communities. DACA meant Garibay was no longer afraid to be open and involved in community service. He hopes to go to law school or pursue a graduate degree in public policy. Garibay worries about his own career, but more than that, he worries about how DACA's rescission will affect his younger brother, who just started college. And he is anxious about what college will look like for the young people he has helped through the college preparedness program. "What will they have to go through?"

These are just a few of the thousands of student and educator stories around the country. *See* Gonzales, *supra*, at 2; Wong, *supra*. By opening the door to higher education and meaningful work in fields of public service, DACA has provided young people with a powerful reason to engage and succeed in their K-12 studies and beyond. If they lose their DACA status, the achievements that they have worked so hard to attain will be cut short. The nation's investment in educating and training DACA holders will be lost. And for DACA recipients still in high school, the DACA opportunities that motivated young people—and improved high school matriculation rates—will summarily vanish.

**C. DHS Failed to Consider the Reliance Interests DACA Engendered in This Country's Public Schools**

The harm caused by the loss of DACA would not be borne by its recipients alone. Without DACA renewals, the

16

status of thousands of educators will expire on different dates throughout the school year. Teachers and staff will abruptly disappear from classrooms to the distress of their students and to the measurable detriment of educational outcomes. In addition, educational institutions across the country rely on thousands of DACA educators to help remedy significant teacher shortages, provide mentorship and role models to students, and diversify the teaching corps.

### i.   Without DACA, Thousands of Educators Would Abruptly Leave Their Students

The loss of DACA would mean that our nation's schools would lose thousands of valued education employees. Zong, *supra*, at 7-8. Given the individual DACA expiration dates of these educators, no district, school, or classroom can adequately prepare students for the staggered departure of beloved teachers. Departures that occur mid-year or at critical points of educational mastery would irreversibly harm children and their educational outcomes. Teacher Karina Alvarez in San Antonio, Texas experienced this first-hand. While awaiting the delayed renewal of her DACA work permit, Alvarez was forced to temporarily resign from her second grade class. Seven-year-olds cannot comprehend the reasons for such a loss, but research abundantly shows that such abrupt changes can have disruptive impacts on young children. *See, e.g.*, Nat'l Sci. Council on the Developing Child, *Young Children Develop in an Environment of Relationships* (Harv. Univ. Ctr. on the Developing Child, Working Paper No. 1, 2004), https://developingchild.harvard.edu/wp-content/uploads/2004/04/Young-Children-Develop-in-an-Environment-of-Relationships.pdf. During Alvarez's absence, her second-graders lost their relationship with

**AR5266**

17

a trusted teacher and their academic progress lagged. This would occur on a much larger scale if thousands of teachers lose the ability to renew their DACA status.

Teacher turnover has long been shown to harm student academic achievement. Matthew Ronfeldt et al., *How Teacher Turnover Harms Student Achievement*, 50 Am. Educ. Res. J. 4, 31 (2013). Not only would the students of lost DACA teachers perform worse academically, all students would be negatively impacted. *Id.* Turnover causes a decline in student achievement school-wide because it damages faculty morale, increases the workload of remaining teachers, and diverts district funds away from student programs to training new hires. *Id.* at 8, 32. Moreover, the loss of DACA would cause greater harm in subjects and at schools most likely to already suffer from high turnover. The subject with the highest rate of teacher turnover is English Language Learning ("ELL"). Leib Sutcher et al., Learning Pol'y Inst., *A Coming Crisis in Teaching? Teacher Supply, Demand, and Shortages in the U.S.* 46, Fig. 24 (2016), https://learningpolicyinstitute. org/sites/default/files/product-files/A_Coming_Crisis_in_ Teaching_REPORT.pdf. Turnover rates are also higher at schools with a greater percentage of students of color. *Id.* These are schools and subjects in which DACA educators are particularly impactful.

Karen Reyes teaches hearing-impaired toddlers.[6] When she took a class in this specialized area, she felt it was the illuminating "light at the end of the tunnel" of

---

[6] Based on a personal interview conducted by *amici* and excerpts from Erica L. Green, *With DACA in Limbo, Teachers Protected by Program Gird for the Worst*, N.Y. Times (Feb. 1, 2018), https://www.nytimes.com/2018/02/01/us/politics/daca-teachers-trump.html.

18

her own education. From that class, she knew she wanted to dedicate her life to teaching children with limited communication abilities. Reyes tries to explain the risk that she will be removed from her students' classroom using pictures and sign language. "They understand when I go on an airplane. Maybe they'll just think I'm on a never-ending flight." Reyes's area of specialization suffers from a teacher shortage. It often takes more than a year to fill a vacancy in her specialty. Were DACA terminated, her students would be left, likely for a long period of time, without an educator adequately trained to teach them. If DACA continues, however, Reyes will not only continue teaching but plans to further her career by acquiring a doctorate with the eventual goal of becoming a school audiologist.

### ii. Educational Institutions Rely on Thousands of DACA Educators to Offset the Nationwide Teacher Shortage

Throughout the country, states face a critical shortage of teachers. The U.S. Department of Education found that every state was "dealing with shortages of teachers in key subject areas" in the 2017-18 school year. Valerie Strauss, *Teacher Shortages Affecting Every State as 2017-18 School Year Begins*, Wash. Post (Aug. 28, 2017), https://www.washingtonpost.com/news/answer-sheet/wp/2017/08/28/teacher-shortages-affecting-every-state-as-2017-18-school-year-begins/?utm_term%20.0583fbf55b17; *see also* Off. of Postsecondary Educ., U.S. Dep't of Educ., *Teacher Shortage Areas Nationwide Listing 1990-1991 through 2017-2018* (June 2017), https://www2.ed.gov/about/offices/list/ope/pol/ateachershortageareasreport2017-18.pdf. For the 2018-19 school year, thirty states and the

**AR5268**

19

District of Columbia had shortages of bilingual and ELL teachers. Corey Mitchell, *Wanted: Teachers as Diverse as Their Students*, Educ. Wk., (Sept. 17, 2019), https://www.edweek.org/ew/articles/2019/09/18/wanted-teachers-as-diverse-as-their-students.html. DACA helps districts ease these shortages. A rescission of DACA would leave tens of thousands of students in the breach, many of them in the most underserved schools.

School administrators shore up this data with first-hand experience. Heidi Sipe, the superintendent of the Umatilla School District in eastern Oregon, notes that her district posts positions for three to six months without receiving a single application. And Superintendent Matt Utterback, of the North Clackamas School District in the suburbs of Portland, Oregon, states that his district has not been fully staffed for years. In Sacramento, Superintendent Jorge Aguilar of the Sacramento City Unified School District reports that his district is heavily impacted by the teacher shortage that is felt throughout California. He fears that the end of DACA would exacerbate the district's already-critical need for qualified staff.

Mike Walsh, Immediate Past President of the California School Boards Association and a Trustee of the Butte County Office of Education, observes that the California Mini-Corps, which provides tutoring services to K-12 youth in migrant communities, stands to lose numerous college-student tutors who hold DACA status. Walsh notes, "About eighty percent of tutors go on to obtain a teaching credential or permit to continue to be involved in education." The Mini-Corps tutors are "in the pipeline to become teachers, administrators, [and]

20

superintendents." If these young people are no longer able to work as tutors, Mini-Corps will lose hard-to-replace staff and the state will lose committed educators. The state's investment in this training and development pipeline will be lost.

Public schools have invested in the K-12 and higher education of these motivated young people whose professional aim is to give back, to educate students like themselves. And in reliance on DACA, educational institutions have hired thousands of DACA educators to fill much needed positions. The termination of DACA would bar these qualified educators from the classrooms that so urgently need them.

### iii. Educational Institutions Rely on DACA to Provide Essential Diversity in the Teaching Profession

Numerous studies have shown that students benefit from teachers who are ethnically and culturally diverse. "Teachers of color are positive role models for all students in breaking down negative stereotypes and preparing students to live and work in a multiracial society." Off. of Plan., Evaluation & Pol'y Dev., U.S. Dep't of Educ., *The State of Racial Diversity in the Educator Workforce* 1 (July 2016), https://www2.ed.gov/rschstat/eval/highered/ racial-diversity/state-racial-diversity-workforce.pdf.

There are "meaningful 'role model effects' when minority students are taught by teachers of the same race." Dan Goldhaber et al., Univ. of Wash. Bothell, *The Theoretical and Empirical Arguments for Diversifying the Teacher Workforce: A Review of the Evidence* 6 (Ctr.

21

for Educ. Data & Res., Working Paper No. 2015-9). These effects are not subjective, but are quantifiable in making a "meaningful impact on student test scores." *Id.* at 3. For example, "a larger presence of black and Hispanic teachers [is linked] to improved treatment or outcomes for black and Hispanic students along a variety of dimensions, including lower rates of exclusionary discipline, lower likelihood of placement in special education, and higher pass rates on standardized tests." Jason A. Grissom et al., *Teacher and Principal Diversity and the Representation of Students of Color in Gifted Programs*, 117 Elementary Sch. J. 396, 400 (2017) (internal citations omitted). Similarly, "non-English proficient Latino children revealed greater gains on a direct assessment of literacy . . . if their teacher was also Latino rather than Caucasian." Jason T. Downer et al., *Teacher-Child Racial/Ethnic Match Within Pre-Kindergarten Classrooms and Children's Early School Adjustment*, 36 Early Childhood Res. Q. 26, 38 (2016).

It is therefore critical for schools to hire teachers whose backgrounds mirror those of an increasingly diverse student population. Yet districts have had difficulty doing so. Between 2003 and 2012, "the increase in the percentage of Hispanic students [in the U.S.] far outpaced the modest increase in the percentage of Hispanic teachers." Goldhaber et al., *supra*, at 1. In the 2011-12 school year, 24% of students were Hispanic, while only 8% of teachers were Hispanic. Off. of Plan., Evaluation & Pol'y Dev., *supra*, at 6. This disparity is only expected to grow: "students of color are expected to make up 56 percent of the student population by 2024." *Id.* at 1.

School districts thus have a pressing need to hire an increasing number of Latino educators to serve the needs

**AR5271**

22

of their changing student populations. DACA teachers have helped to meet this growing need; over 93% of DACA recipients were born in Latin American countries. U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Sec., *Approximate Active DACA Recipients: Country of Birth* 1 (Sept. 4, 2017), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf. Indeed, some districts have specifically recruited DACA recipients for this reason. Tom Boasberg, Superintendent of Denver Public Schools, has advocated for DACA because it "allowed him to find talented bilingual teachers who can connect with his students." Alexia Fernández Campbell, *DACA Immigrants Are Teaching American Children. What Happens After They're Gone?*, Vox (Sept. 15, 2017), https://www.vox.com/policy-and-politics/2017/9/15/16306972/daca-teachers-dreamers. Dallas Independent School District Superintendent Michael Hinojosa spoke highly of the DACA teachers, who "grew up in [the Dallas] community" and spoke both English and Spanish well. Dianne Solis & James Barragan, *U.S. Could Lose an Estimated 20,000 Teachers, Many Bilingual, as DACA is Phased Out*, The Dallas Morning News (Oct. 5, 2017), https://www.dallasnews.com/news/immigration/2017/10/05/u-s-could-lose-an-estimated-20000-teachers-many-bilingual-as-daca-is-phased-out/. Hinojosa said the district employs 68 DACA recipients, "including three dozen teachers." *Id.* Teach for America actively recruits DACA recipients for its corps, noting that these individuals know "first-hand the concerns that undocumented kids face." Teach For Am., *DACA Recipients*, (last visited Oct. 3, 2019), https://www.teachforamerica.org/how-to-join/eligibility/daca.

**AR5272**

23

**"Schools need to reflect our community."**
Administrators recognize the need for a diverse teaching
staff. Matt Charlton, the superintendent of the Manson
School District in Washington State, said that "students
benefit when they have role models and people teaching
them who come from their background." As a result, his
district is trying to promote Latino para-professionals
to teaching positions because "schools need to reflect our
community." Thomas Ahart, the superintendent of the
Des Moines School District in Iowa, has witnessed the
importance of a "diversity of points of view and different
perspectives informing what happens in our classrooms,"
and that having diverse educators is important so that "all
students see models of success and leadership that look
like them, so they start imagining different possibilities
for themselves."

**"It is so important for students to see themselves
in their educators."** Superintendent Utterback observes
that "students can go thirteen years without experiencing
teachers who look like them." This harms white students
as well, observes Superintendent Utterback since "white
students never experience seeing a person of color in a
professional role." Superintendent Sipe also emphasizes
the importance of having teachers who reflect the student
body. "It is so important for students to see themselves in
their educators . . . so they can see pathways and futures
they did not see before." She reports that the student body
in her district is over 70% Latino, but it does not have
enough Latino educators, although the district actively
pursues Latino candidates. Superintendent Theron
Schutte, of the Marshalltown Community School District
in Iowa, notes that his district is majority minority but the
teaching staff is still predominately white. He explains

AR5273

24

that his district has "great difficulty in hiring high-quality educators who mirror student demographics."

**"Just one less child who felt isolated."** Many DACA educators acknowledge that their background makes them especially important to students, and that they have been drawn to teaching because of their desire to act as role models. Jaime Ballesteros, a California educator with DACA, said that he became a teacher because he knew he could reach immigrant students: "I wanted to amplify the voices of students and families who shared both my story and values. I wanted to ensure that there would be even just one less child who felt isolated and helpless because of his or her immigration status." Ginette Magaña, *DACAmented Teachers: Educating and Enriching Their Communities*, Obama White House: Blog (Aug. 4, 2015), https://obamawhitehouse.archives.gov/blog/2015/08/04/dacamented-teachers-educating-and-enriching-their-communities.

**"A role model who has walked in their shoes."** DACA recipient Karina Alvarez speaks to her students, many of whom are Latino immigrants, about her own experience. Alvarez believes that her students "need to have a role model who has walked in their shoes . . . they need to see that college is in their reach, that it is possible for them to be a teacher or whatever they want to be." A.M.P., from Washington State, also understands the importance of sharing her experience with her students. She teaches in a district where 37.9% of the student body – but only 8.2% of the teaching staff – is Latino. She explains: "something that has always driven me was to be the person you needed growing up." Her school had an assembly where she and other immigrant educators talked to students about how they were able to go to college. She noted that

**AR5274**

25

it was "heartwarming" and the children responded "really positively." Angelica Reyes in Los Angeles relates that as an immigrant herself, she is able to "connect very well with students because of experiences in common, something many other teachers lack." This connection supports students' ability to focus on learning rather than becoming distracted and intimidated by public discourse that is "scary, it's in our faces, it's destructive to our families."

### iv.   DHS Failed to Consider How DACA Rescission Would Undermine Student Learning for All Students

Public school administrators report that the rescission of DACA has created an atmosphere of anxiety that makes it more difficult for students to focus on their studies. This anxiety is not limited to students with DACA or those taught by DACA educators.

**"Every single student is affected."** Cindy Marten is the Superintendent of San Diego Unified School District, in which Latino students make up about 45 percent of the student body. The September 5, 2017 announcement of DACA rescission caused great anxiety among San Diego students. "Kids are worried about what's going to happen to them," says Superintendent Marten. While non-immigrant students are, in Superintendent Marten's words, "not afraid of being deported, they're afraid about their best friend or their best friend's mother. Every single student is affected." And for younger children, who often misunderstand their family's status or believe that "immigrant" is synonymous with unauthorized presence in the U.S., the anxiety and fear that they or their authorized relatives are in danger of being deported escalates their anxiety—and that of the classmates

**AR5275**

26

around them. Randy Capps et al., Migration Pol'y Inst., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature* 6 (2015). Starting with the Rescission Memo and increasing through the present day, uncertainty about DACA has undermined students' ability to learn, regardless of their immigration status. These significant negative impacts of DACA rescission were neither considered nor analyzed by DHS.

**"DACA being rescinded takes away the hope from our students."** Superintendent Utterback says "stress has an impact on academics and behavior," and children's ability to "concentrate, their ability to excel is being hampered because they are worried about their safety and future and that of their family members." The same is true in the Highline Public Schools in Washington State, according to Superintendent Susan Enfield. Maile Valu, a counselor in her district, reports that the "constant uncertainty that our DACA students and our students [and] families without legal status face has caused fear, stress, anxiety, [and] hopelessness." Daniela Laureano Francisco, a family liaison in Highline reports, "DACA being rescinded takes away the hope from our students." Superintendent Schutte has also seen first-hand the effects of increased immigration-related anxiety on children, including a "lack of ability to focus, more frequent absenteeism, and lesser achievement with coursework and on test performance."

The experiences of these administrators are confirmed by academic research. A working paper by the Harvard University Center on the Developing Child found that persistent anxiety can change a child's brain and negatively affect their physical, cognitive, and emotional

**AR5276**

27

development, which in turn impacts their ability to learn effectively in school. Nat'l Sci. Council on the Developing Child, *Persistent Fear and Anxiety Can Affect Young Children's Learning and Development* 5 (Harv. Univ. Ctr. on the Developing Child, Working Paper No. 9, 2010), http://developingchild.harvard.edu/wp-content/uploads/2010/05/Persistent-Fear-and-Anxiety-Can-Affect-Young-Childrens-Learning-and-Development.pdf. The anxiety and stress caused by the threatened termination of DACA impacts students' academic success, professional prospects, and personal well-being.

**"We cannot tell them that everything will be okay."** A superintendent in Long Island, New York notes that since the rescission announcement, he can "definitely sense an increase in anxiety and stress, both for the student who fears that the end of DACA means they have to go back to a country they have not lived in since the age of two; and for documented students, the worry is in wondering if their friend will need to go and leave the U.S." Superintendent Sipe, whose school district is in a rural area and serves primarily Latino students, says "the fear is very real in young students all the way up to high schoolers." Sipe observes that the anxiety "puts educators in a really uncomfortable role because we cannot tell them that everything will be okay because we cannot make promises about things that are out of our control."

**"Students are unable to focus."** Superintendent Aguilar also reports that the Rescission Memo has caused considerable student anxiety. Aguilar observes that this anxiety is "taking a toll on our ability to be able to provide the academic intervention necessary. Students are unable to focus on their academic achievement when they are

28

experiencing the kind of trauma, anxiety, and anguish that comes as a result of the ending of DACA." Indeed, more than half of DACA recipients surveyed report thinking about being deported at least once a day and almost 45% think about being detained in an immigration detention facility at least once a day. Wong, *supra* at 10. The repetition of such stark fears, articulated or not, deeply disturbs student learning and family support. Superintendent Charlton notes that in his rural, majority-Latino district, threats to DACA result in a persistent "feeling of angst . . . that translates from families down to the kids . . . which impacts the classroom" and harms children's ability to learn. Superintendent Marten, from San Diego, observes that "as soon as you destabilize your school, you're not delivering the quality of education that children deserve." She emphasized that "the educational outcomes for our students are going to be compromised."

**No "light at the end of the tunnel for these kids."** The Rescission Memo has caused many students to abandon their academic and professional goals as they see carefully crafted plans unravel. Arianna Martinez, an Associate Professor at LaGuardia Community College in New York, teaches many DACA recipients. Those college students' "entire relationship to education and their future" has changed as the students now feel there is no point in obtaining a degree. Through her own academic research, Martinez has found that DACA recipients enrolled in continuing education classes to prepare for college are struggling to envision a way forward. Superintendent Sipe speaks emotionally of a brilliant student who dreams of becoming a pediatrician but may no longer even consider college. She also describes a student with DACA who dropped out of college because of their

**AR5278**

29

disappointment and feeling of "why bother investing [in their education] if it does not do any good." Superintendent Charlton speaks of how DACA gave students "that hope and inspiration to reach higher; to rescind that now is not fair" to his students. Superintendent Schutte expresses his concern that the termination of DACA will lead to a "greater challenge to encourage kids to finish school, a greater challenge to reduce the achievement gap and drop-out rate . . . there is not a light at the end of the tunnel for these kids."

**Kids who "have done everything asked of them."** In Superintendent Utterback's district, "high school counselors and administrators are having conversations with kids who thought they had an avenue for post-secondary education" and now do not know how to plan for the future. "These are really bright kids who have been in the school system for 13 years and have done everything asked of them and now they do not have the same opportunities as their classmates." The DHS decision took none of these reliance interests into account. Hundreds of thousands of "productive young people" who have "contributed to our country in significant ways" see nowhere to go from here.

## CONCLUSION

DHS swept away DACA, together with its recipients' dreams and their communities' needs, in one curt memorandum that failed to provide a reasoned explanation for the agency's drastic change of course. DACA educators, students, and administrators can – and do, here in this brief – attest to the serious reliance interests engendered by DACA, as well as the disastrous results that will

AR5279

30

ensue if the program is terminated. DACA rescission will deprive schools of qualified teachers and mentors, diminish diversity in the teaching corps, and destabilize school environments. By taking away the prospect of advanced learning and gainful employment, hundreds of thousands of young people will have the foundation that DACA provided shattered, and lose the basis on which they and their communities have made so much progress for the last seven years. The result will be damage to them, their families, their communities, and their students, as well as to the public schools in which they now serve. By failing to consider any of these significant reliance interests and impacts, DHS's decision to rescind DACA was arbitrary and capricious. Accordingly, *amici* urge the Court to affirm the judgments below.

Respectfully submitted,

ALICE O'BRIEN
   *Counsel of Record*
EMMA LEHENY
LUBNA A. ALAM
REBECCA YATES
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, NW
Washington, DC 20036
(202) 822-7048
aobrien@nea.org

*Counsel for Amici Curiae*

**AR5280**

Nos. 18-587, 18-588, 18-589

# In the Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, *et al.*, *Petitioners,*
v.
REGENTS OF THE UNIVERSITY OF CALIFORNIA, *et al.*,
*Respondents.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, *et al.*, *Petitioners,*
v.
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*, *Respondents*

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, *et al.*, *Petitioners*,
v.
MARTIN JONATHAN BATALLA VIDAL, *et al.*, *Respondents.*

**On Writs of Certiorari to the United States Courts of Appeals for the Ninth, District of Columbia, and Second Circuits**

**Brief for the States of Nevada, Michigan, Wisconsin, Governor Laura Kelly of Kansas, and Governor Steve Bullock of Montana as Amici Curiae in Support of Respondents**

| | |
|---|---|
| DANA NESSEL | AARON D. FORD |
| *Michigan Attorney General* | *Attorney General of Nevada* |
| ERIC J. WILSON | HEIDI PARRY STERN\* |
| *Deputy Attorney General* | *Solicitor General* |
| *State of Wisconsin* | CRAIG A. NEWBY |
| LAURA KELLY | *Deputy Solicitor General* |
| *Governor of Kansas* | 100 North Carson Street |
| STEVE BULLOCK | Carson City, NV 89701 |
| *Governor of Montana* | (775) 684-1100 |
| *Counsel for Amici Curiae* | HStern@ag.nv.gov |
| | \* *Counsel of Record* |

Becker Gallagher · Cincinnati, OH · Washington, D.C. · 800.890.5001

AR5281

i

## QUESTIONS PRESENTED

1.  Whether the Department of Homeland Security (DHS)'s decision to wind down the DACA policy is judicially reviewable.

2.  Whether the DHS's decision to wind down the DACA policy is lawful.

**AR5282**

ii

# TABLE OF CONTENTS

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . .  iii

INTEREST OF AMICI CURIAE . . . . . . . . . . . . . . .  1

INTRODUCTION AND
   SUMMARY OF ARGUMENT . . . . . . . . . . . . . . .  1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

A. The States' Economies Benefit From DACA . . . .  4

B. DACA Aids the States in Providing Social
   Services to Residents . . . . . . . . . . . . . . . . . . . . . .  9

C. Public Colleges and Universities Benefit From
   DACA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

D. DACA Grantees are Valued State Employees . .  16

E. DACA Contributes to Public Safety . . . . . . . . . .  16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

**AR5283**

iii

# TABLE OF AUTHORITIES

## CASES

*Texas v. United States*,
    328 F. Supp. 3d 662 (S.D. Tex. 2018) . . . . . . . . . . 4

## OTHER AUTHORITIES

*Approximate Active DACA Recipients: As of April 30, 2019*, U.S. CITIZENSHIP AND IMM. SVC., https://www.uscis.gov/sites/default/files/USCIS /Resources/Reports%20and%20Studies/Immigr ation%20Forms%20Data/All%20Form%20Type s/DACA/Approximate_Active_DACA_Recipient s_-_Apr_30_2019.pdf . . . . . . . . . . . . . . . . . . . . . . 3

Ike Brannon, *The Economic and Budgetary Cost of Repealing DACA at the State Level*, THE CATO INSTITUTE (Aug. 31, 2017), https://www.cato.org/ blog/economic-budgetary-cost-repealing-daca- state-level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Jill Casner-Lotto, *Dreaming Big: What Community Colleges Can Do to Help Undocumented Immigrant Youth Achieve Their Potential*, COMMUNITY COLLEGE CONSORTIUM FOR IMMIGRANT EDUCATION (Sept. 1, 2012), https://www.cccie.org/wp-content/uploads/ 2010/06/DREAMING_BIG_CCCIE_Report_9- 2012_final_version.pdf . . . . . . . . . . . . . . . . . 12, 13

AR5284

iv

Misha Hill & Meg Wiehe, *State & Local Tax Contributions of Young Undocumented Immigrants*, INSTITUTE ON TAXATION & ECONOMIC POLICY, Apr. 2018, https://itep.org/wp-content/uploads/2018DACA.pdf . . . . . . . . . . . 7

Tom Jawetz & Nicole Prchal Svajlenka, *Thousands of DACA Recipients Are Already Losing their Protection from Deportation,* CENTER FOR AMERICAN PROGRESS (Nov. 9, 2017), https://www.americanprogress.org/issues/immigration/news/2017/11/09/442502/thousands-daca-recipients-already-losing-protection-deportation/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Kansas Labor Market Report* (Aug. 2019), https://klic.dol.ks.gov/gsipub/index.asp?docid=472 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Dara Lind, *9 facts that explain DACA, the immigration program Trump is ending*, VOX.COM (Jan. 30, 2018), https://www.vox.com/policy-and-politics/2017/8/31/16226934/daca-trump-dreamers-immigration . . . . . . . . . . . . . . . 9

Lisa Mascaro, *Pen Pal Inspires Sen. Harry Reid on Immigration Reform*, L.A. TIMES, July 12, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Silva Mathema, *What DACA Recipients Stand to Lose - And What States Can Do About It*, CENTER FOR AMERICAN PROGRESS (Sept. 13, 2018), https://www.americanprogress.org/issues/immigration/reports/2018/09/13/458008/daca-recipients-stand-lose-states-can/ . . . . . . . . 14

AR5285

v

MIT News Office, *President Reif writes to support preservation of DACA* (Aug. 31, 2017), http://news.mit.edu/2017/president-reif-writes-support-preservation-daca-0831. . . . . . . . . . 13, 14

NATIONAL CONFERENCE OF STATE LEGISLATURES, *Deferred Action for Childhood Arrivals / Federal Policy and Examples of State Actions* (Apr. 25, 2018), http://www.ncsl.org/research/immigration/deferred-action.aspx . . . . . . . . . . . 15

NEW AMERICAN ECONOMY RESEARCH FUND, *The Contributions of New Americans in Montana* (Aug. 2016), http://research.newamericaneconomy.org/wp-content/uploads/2017/02/nae-mt-report.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

NEW AMERICAN ECONOMY RESEARCH FUND, *Examining the Contributions of the DACA-Eligible Population in Key States*, (Nov. 6, 2017), https://research.newamericaneconomy.org/report/examining-the-contributions-of-the-daca-eligible-population-in-key-states/. . . . . . . . . . 5, 6

NEW AMERICAN ECONOMY RESEARCH FUND, *Overcoming The Odds: The Contributions of DACA-Eligible Immigrants and TPS Holders to the U.S. Economy*, (June 3, 2019), https://research.newamericaneconomy.org/report/overcoming-the-odds-the-contributions-of-daca-eligible-immigrants-and-tps-holders-to-the-u-s-economy/ . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

AR5286

vi

Ed O'Keefe and David Nakamura, *Trump, top Democrats agree to work on deal to save 'dreamers' from deportation*, THE WASHINGTON POST (Sept. 14, 2017) . . . . . . . . . . . . . . . . . . . . . . 2

*Statement in Support of the Deferred Action for Childhood Arrivals (DACA) Program and our Undocumented Immigrant Students* (Nov. 21, 2016), https://www.pomona.edu/support-daca. . 12

Nicole Prchal Svajlenka, *What We Know About DACA Recipients, by State*, (Sept. 12, 2019), CENTER FOR AMERICAN PROGRESS, https://www.americanprogress.org/issues/immigration/news/2019/09/12/474422/know-daca-recipients-state/. . . . . . . . . . . . . . . . . . . . 5, 6, 10

Nicole Prchal Svajlenka, et al., *A New Threat to DACA Could Cost States Billions of Dollars*, CENTER FOR AMERICAN PROGRESS, (July 21, 2017), https://www.americanprogress.org/issues/immigration/news/2017/07/21/436419/new-threat-daca-cost-states-billions-dollars/. . . . . . 8, 9

John Trent, NEVADA TODAY (Sept. 1, 2017), https://www.unr.edu/nevada-today/news/2017/president-johnson-daca-statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*U.S. Census Figures*, 2013–2017. https://www.census.gov/quickfacts/fact/table/MI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

AR5287

vii

U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *Approximate Active DACA Recipients – State or Territory of Residence as of August 31, 2018*, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_August_31_2018.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

UNIVERSITY OF WISCONSIN-MADISON, *Statement from Chancellor Blank on Executive Order on Immigration* (Jan. 30, 2017), https://news.wisc.edu/statement-from-chancellor-blank-on-executive-order-on-immigration/ . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Tom K. Wong, et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, CENTER FOR AMERICAN PROGRESS, (Aug. 28, 2017), https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Jie Zong, et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation,* MIGRATION POLICY INST. (Nov. 2017), https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation . . . . . . . . . . . . . . . . . . 4, 5

AR5288

1

## INTEREST OF AMICI CURIAE[1]

Amici curiae are the States of Nevada, Michigan, and Wisconsin, Laura Kelly, Governor of Kansas, and Steve Bullock, Governor of Montana ("the States"). The interest of amici here lies in the positive impact DACA and its recipients have had on the States and the country as a whole. Rescinding DACA would accordingly harm the States and the country as a whole.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

The Deferred Action for Childhood Arrivals program (DACA) has provided the States (and the country) significant, calculable benefits. As detailed below, these include significant economic contributions, improved public health, better public education, contribution as employees for the States, and overall public safety. Because these calculable benefits are at risk, the States join Respondents' position that DACA's rescission is subject to judicial review and was, in this instance, unlawfully rescinded.

The categories listed above quantify the significance that rescinding DACA would have on the States. The deepest injury, however, would be the human toll on DACA recipients themselves, which are not so easily calculable, yet nonetheless real.

---

[1]   Rule 37 statement: All parties issued blanket consents to the filing of amicus briefs. No one but amici and their counsel authored any of this brief or funded its preparation and submission.

2

For instance, Nevada is home to numerous DACA recipients. Astrid Silva is one such recipient. At the age of four, Ms. Silva was pulled across the Rio Grande River with her mother, carrying a Ken doll.[2] Once top-of-her-class in her magnet high school, she feared deportation if she applied to a university to pursue her dream of being an architect.[3] Instead of giving up, she wrote and delivered letters to then-Senator Harry Reid.[4]

After President Obama implemented DACA, Ms. Silva wrote the following to Senator Reid:

> I sit today holding my work permit and studying for my drivers permit. I turned 25 on March 11 and I can tell you that I feel like my life has finally begun. I have so many ideas and dreams to accomplish.... I feel like I am one step closer to being part of this, my country.[5]

As the current President of the United States has tweeted, "Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!"[6]   The

---

[2]   Lisa Mascaro, *Pen Pal Inspires Sen. Harry Reid on Immigration Reform*, L.A. TIMES, July 12, 2013.

[3]   *Id.*

[4]   *Id.*

[5]   *Id.*

[6]   *See* Ed O'Keefe and David Nakamura, *Trump, top Democrats agree to work on deal to save 'dreamers' from deportation*, THE WASHINGTON POST (Sept. 14, 2017).

AR5290

3

accomplishment of goals and dreams by DACA recipients like Ms. Silva benefit the States and the country, and are among the most important intangible benefits of DACA.

DACA should not be rescinded without judicial review and proper legal justification.

## ARGUMENT

Currently, more than 669,000 DACA recipients throughout the United States are able to go to work or school and live without fear of deportation while pursuing their dreams.[7]  They are students and teachers, military service members, law enforcement officers, fire fighters, health care workers, child and elder care workers, and treasured friends and neighbors.  Allowing these individuals to participate in American society generates significant positive impacts for the States and the country as a whole.  We recognize not only the economic value of these individuals, but also the myriad social benefits that result from permitting them to participate fully in our communities.  As detailed below, in addition to contributing sorely needed tax revenue, their participation in DACA enriches our colleges and universities, reduces the burden on our public health

---

[7]  *Approximate Active DACA Recipients: As of April 30, 2019*, U.S. CITIZENSHIP AND IMM. SVC., https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/Approximate_Active_DACA_Recipients_-_Apr_30_2019.pdf.

AR5291

4

and social safety net systems, and enhances public safety.

## A. The States' Economies Benefit From DACA.

DACA provides recipients with the ability to apply for work authorizations, which allow them to work legally in the United States. With work authorization, many DACA recipients have obtained new or higher-paying jobs, allowing them to be productive members of our communities. The rescission of DACA nationwide could lead to the loss of work authorization for 915 DACA recipients every day from the time it goes into effect.[8]  Businesses will face an estimated $6.3 billion in costs to replace employees if DACA is rescinded.[9]

Businesses throughout the States will face a loss of demand for goods and services from the diminished purchasing power of the Dreamers and their families, while the state and local governments will see reduced tax revenues. For instance, DACA recipients in Nevada exercised an estimated $261.8 million in spending power in 2015, and paid an estimated $19.9 million in

---

[8]    Jie Zong, et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation,* MIGRATION POLICY INST. (Nov.   2017),   https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation.

[9]    *See Texas v. United States*, 328 F. Supp. 3d 662, 695 (S.D. Tex. 2018).

AR5292

5

state and local taxes.[10]   Approximately 1,500 DACA
recipients own homes in Nevada.[11]

Wisconsin had 6,720 DACA recipients as of 2017.[12]
More than 90 percent of Wisconsin's DACA recipients
worked, unless currently in school or the military.[13]
Wisconsin's DACA recipients exercised an estimated
spending power of $110.7 million in 2015, paying a
total of $17.6 million in taxes (of which $10.1 million
were state and local taxes).[14]   Wisconsin's DACA
recipients paid $26.5 million in rent in Wisconsin in
2017.[15]

In Michigan, according to the Migration Policy
Institution, there are 13,000 Michigan residents who
are eligible for deferred action under DACA, and 5,610
are participating (44%) as of August 2018.[16] Consistent

---

[10]   NEW AMERICAN ECONOMY RESEARCH FUND, *Examining the
Contributions of the DACA-Eligible Population in Key States*, (Nov. 6,
2017), https://research.newamericaneconomy.org/report/examining-
the-contributions-of-the-daca-eligible-population-in-key-states/.

[11]   Nicole Prchal Svajlenka, *What We Know About DACA Recipients,
by State*, (Sept. 12, 2019), CENTER FOR AMERICAN PROGRESS,
https://www.americanprogress.org/issues/immigration/news/2019/0
9/12/474422/know-daca-recipients-state/.

[12]   *Id.*

[13]   NEW AMERICAN ECONOMY RESEARCH FUND, *supra* note 10.

[14]   *Id.*

[15]   Svajlenka, *supra* note 11.

[16]   Zong, et al., *supra* note 9.

6

with other states, Michigan's DACA recipients are active in the work force. By one metric, more than 90% of Michigan's DACA-eligible population were employed.[17] In contrast, only 61.2% of the state's population over the age of 16 was in the work force.[18]

For 2015, the New American Economy Research Fund determined that Michigan's DACA-eligible residents earned $182 million in income and paid $13.6 million in state and local taxes, for a total of $27 million in taxes generally.[19] A September 2019 report marked tax payments at $23.3 million in state and local taxes for DACA-eligible residents, and a total of $42 million in taxes.[20] For Michigan, one of only two states in the country to lose population in the 2010 census, the role these residents play in the Michigan economy and workforce is vital. Michigan losing these hard-working and productive residents would have a significant, adverse effect on the Michigan economy.

---

[17] From 2015, the figure was 92.5%, where the state with the lowest percentage was still 86%. *See* NEW AMERICAN ECONOMY RESEARCH FUND, *supra* note 10.

[18] *See U.S. Census Figures, 2013–2017.* https://www.census.gov/quickfacts/fact/table/MI .

[19] NEW AMERICAN ECONOMY RESEARCH FUND, *supra* note 10.

[20] Svajlenka, *supra* note 11.

7

In Kansas, nearly 6,000 DACA recipients[21] generate $111 million in annual spending power[22] and pay $12.6 million annually in state and local taxes.[23] The Cato Institute conservatively estimates that rescinding DACA will cost the Kansas economy $1.76 billion over the next decade,[24] while the Center for American Progress estimates that the Kansas economy would

---

[21] U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *Approximate Active DACA Recipients – State or Territory of Residence as of August 31, 2018*, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_August_31_2018.pdf.

[22] NEW AMERICAN ECONOMY RESEARCH FUND, *Overcoming The Odds: The Contributions of DACA-Eligible Immigrants and TPS Holders to the U.S. Economy*, (June 3, 2019), https://research.newamericaneconomy.org/report/overcoming-the-odds-the-contributions-of-daca-eligible-immigrants-and-tps-holders-to-the-u-s-economy/.

[23] Misha Hill & Meg Wiehe, *State & Local Tax Contributions of Young Undocumented Immigrants*, INSTITUTE ON TAXATION & ECONOMIC POLICY, Apr. 2018, https://itep.org/wp-content/uploads/2018DACA.pdf.

[24] Ike Brannon, *The Economic and Budgetary Cost of Repealing DACA at the State Level*, THE CATO INSTITUTE (Aug. 31, 2017), https://www.cato.org/blog/economic-budgetary-cost-repealing-daca-state-level.

8

lose $335 million in annual gross domestic product.[25] This is contrary to claims that the presence of DACA recipients imposes significant costs to state budgets and social services resources.

Kansas is experiencing its lowest unemployment rate in 20 years, with only 3.2% of Kansans looking for work.[26]  In this low-unemployment economy, Kansas relies on its DACA recipients to fill both high- and low-skilled jobs that it could not otherwise fill.  For Kansas, terminating DACA will prevent it from realizing the benefits of its investments in DACA recipients, significantly weakening Kansas's economy.

Montana is one of several states in the country that, while not boasting a large foreign-born population, is increasingly drawing more immigrants.  Among them are DACA recipients.  In 2010, the state was home to less than 20,000 foreign-born residents.[27]  Between 2010 and 2014, that number grew by 19.1 percent—or more than three times as fast as the number of foreign-

---

[25]  Nicole Prchal Svajlenka, et al., *A New Threat to DACA Could Cost States Billions of Dollars*, CENTER FOR AMERICAN PROGRESS, (July 21, 2017), https://www.americanprogress.org/issues/immigration/news/2017/07/21/436419/new-threat-daca-cost-states-billions-dollars/.

[26]  *Kansas Labor Market Report* (Aug. 2019), https://klic.dol.ks.gov/gsipub/index.asp?docid=472.

[27]  *See* NEW AMERICAN ECONOMY RESEARCH FUND, *The Contributions of New Americans in Montana* (Aug. 2016), http://research.newamericaneconomy.org/wp-content/uploads/2017/02/nae-mt-report.pdf.

9

born residents increased in the country as a whole.[28] Only three other states had higher rates of growth during that period. [29] Today, Montana is home to almost 24,000 individuals who were born in another country.[30] Montana's immigrants are playing a valuable role in helping Montana meet its healthcare workforce needs, both now and in the future.[31] Should DACA be rescinded, Montana would suffer a minimum of $3,507,840 in economic loss.[32]

In total, DACA recipients are an overwhelmingly beneficial—even essential—part of state economies.

## B. DACA Aids the States in Providing Social Services to Residents.

Rescinding DACA would affect the financial security and welfare of families that today are supported by DACA grantees. Nationwide, 73 percent of DACA grantees live with an American citizen spouse, child, or sibling.[33] In Nevada, 27,600 individuals live in mixed-status households with an estimated 4,600 United

---

[28]   *Id.*

[29]   *Id.*

[30]   *Id.*

[31]   *See* NEW AMERICAN ECONOMY RESEARCH FUND. *supra* note 27.

[32]   Svajlenka, et al., *supra* note 25.

[33]   Dara Lind, *9 facts that explain DACA, the immigration program Trump is ending*, VOX.COM (Jan. 30, 2018), https://www.vox.com/policy-and-politics/2017/8/31/16226934/daca-trump-dreamers-immigration.

AR5297

10

States-born children of DACA recipients.[34]   Losing DACA status threatens to throw families into financial chaos, because many depend on the incomes and health insurance of the DACA recipients in their families.  It also threatens to tear families apart, as native-born children of DACA recipients could be separated from their parents if removal proceedings are instituted against them.

DACA grantees' loss of income and health insurance will place increased burdens on the States' public health and social safety net programs. Undocumented immigrants are more hesitant to seek out and use health services and medical treatment.[35] Respondents in this case have described how they and other undocumented immigrants are hesitant to seek healthcare treatment when they need it.[36] In addition, recipients were able to obtain health insurance because of DACA, often through their new employers.  They will likely lose this health insurance because of the rescission, leading to worse health outcomes[37] and greater strain on public health resources from treating uninsured patients at state facilities.[38]

---

[34]   Svajlenka, *supra* note 11.

[35]   Wong Decl., SER 1159

[36]   J.A. 934, 962.

[37]   McLeod Decl., SER 759-760.

[38]   Lorenz Decl., SER 715.

AR5298

11

## C. Public Colleges and Universities Benefit From DACA.

Public colleges and universities in the States benefit tremendously from the participation of DACA grantees, who as both students and valued employees, contribute tuition revenue, skills, and knowledge, while enhancing diversity for all students. For example, University of Nevada, Reno President Marc Johnson wrote in a September 1, 2017 statement to faculty, staff and students:

> Since the Deferred Action for Childhood Arrivals (DACA) program was started in 2012, we have witnessed the critical benefits of this program for our students, and the highly positive impacts on our institution and community. . . We will continue to embrace our mission and support the members of our diverse groups, who are a valued and critical part of our campus community.[39]

In this case, several DACA recipient respondents have attested to how DACA enabled them to attend universities. Many are exemplary students with great academic success.[40]

---

[39] John Trent, NEVADA TODAY (Sept. 1, 2017), https://www.unr.edu/nevada-today/news/2017/president-johnson-daca-statement.

[40] *See* J.A. 921-923, 926-929 (UC Berkeley graduate, USCF med student); J.A. 937-938 (UCSD graduate); J.A. 957-960 (UC Berkeley graduate, Harvard Law School student); J.A. 967, 969-67, 973-74 (attended Maryland community college, U.C. Berkeley PhD student); SER 543-544 (high school valedictorian, UCLA student); SER 556 (UCLA law student); SER 618-619 (high school

12

Recognizing these successes, leaders of over 600 colleges and universities, including Nevada State College, five University of Wisconsin campuses (specifically including the University of Wisconsin-Madison flagship campus), Kansas State University, Northern Michigan University, and numerous other public universities, four-year colleges and community colleges from amici joined in a statement describing the "critical benefits" of DACA to their educational communities. Describing the continuation of DACA as a "moral imperative and a national necessity," they wrote: "America needs talent – and these students, who have been raised and educated in the United States, are already part of our national communities and economies."[41]

Public colleges and universities provide needed educational services to DACA students, who often cannot afford the tuition and costs of private universities, and choose schools close to their home communities. Community colleges in particular have traditionally served immigrant students, including DACA students, as a gateway into higher education.[42]

_____

valedictorian, UCSD graduate, UCLA medical school student); SER 1112-1113 (UC Irvine PhD student and Ford Fellowship recipient).

[41] *Statement in Support of the Deferred Action for Childhood Arrivals (DACA) Program and our Undocumented Immigrant Students* (Nov. 21, 2016), https://www.pomona.edu/support-daca.

[42] Jill Casner-Lotto, *Dreaming Big: What Community Colleges Can Do to Help Undocumented Immigrant Youth Achieve Their Potential*, COMMUNITY COLLEGE CONSORTIUM FOR IMMIGRANT

AR5300

13

Nationwide, 94 percent of DACA grantees currently in school report that the grant of deferred action has allowed them to pursue education opportunities they otherwise would not have been able to pursue.[43] According to one nationwide study, 45% of DACA recipients were currently in school, and of that group, more than 70% were pursuing a bachelor's degree or higher.[44]   As a result, the rescission of DACA would result in the loss of large sums in tuition revenue.

If DACA is rescinded, many of these students, who work and support themselves while in school, will be forced to drop out before finishing their degrees.  In addition, because these students have been educated in our public primary and secondary schools, our public educational system, and our nation as a whole, loses its investment in these talented students, "without any discernable benefit."[45]  As noted by MIT President L.

---

EDUCATION (Sept. 1, 2012) at p.1, https://www.cccie.org/wp-content/uploads/2010/06/DREAMING_BIG_CCCIE_Report_9-2012_final_version.pdf.

[43]   Tom K. Wong, et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, CENTER FOR AMERICAN PROGRESS, (Aug. 28, 2017), https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[44]   *Id.*

[45]   MIT News Office, *President Reif writes to support preservation of DACA* (Aug. 31, 2017), http://news.mit.edu/2017/president-reif-writes-support-preservation-daca-0831.

14

Rafael Reif, "We should treat these educated, English-speaking strivers not as a burden, but as a resource."[46]

Because some states provide in-state tuition rates at public colleges and universities to DACA students, but require other immigrants to pay full tuition, many of these students will find it unaffordable to continue with any form of higher education if DACA is rescinded. Likewise, DACA students will lose the ability to pay in-state tuition at public colleges and universities in at least three states: Virginia, Massachusetts, and Ohio. Among the nearly 20,600 people with DACA status, students in those states are at risk of losing their access to public colleges and universities because of the prohibitive difference between in-state and out-of-state tuition.[47]

At Virginia Commonwealth University, for example, out-of-state tuition costs $35,798 per year—$20,000 more than in-state tuition and fees.[48] In addition, in February 2017, Angel Cabrera, president of Virginia's George Mason University, estimated that without

---

[46]   *Id.*

[47]   Silva Mathema, *What DACA Recipients Stand to Lose - And What States Can Do About It*, CENTER FOR AMERICAN PROGRESS (Sept. 13, 2018), https://www.americanprogress.org/issues/immigration/reports/2018/09/13/458008/daca-recipients-stand-lose-states-can/.

[48]   *Id.*

15

DACA, between 150 and 300 students might have to leave the university due to unaffordable tuition.[49]

For another set of states, losing DACA status will bar students from attending public colleges and universities altogether.  Currently, Alabama and South Carolina bar unauthorized immigrants from enrolling in their public institutions.  Certain universities in Georgia also deny enrollment to undocumented students.[50]

Even for those students who find a way to remain in school, as well as DACA recipients who serve as faculty and staff, their experience as part of the educational community will be curtailed without DACA.  For example, without advance parole, DACA recipients will not be able to travel abroad for studies or educational meetings, and the colleges and universities will lose the ability to select the best candidates to represent the institution in these programs and forums.[51]

---

[49]   Tom Jawetz & Nicole Prchal Svajlenka, *Thousands of DACA Recipients Are Already Losing their Protection from Deportation,* CENTER FOR AMERICAN PROGRESS (Nov. 9, 2017), https://www.americanprogress.org/issues/immigration/news/2017/11/09/442502/thousands-daca-recipients-already-losing-protection-deportation/.

[50]   NATIONAL CONFERENCE OF STATE LEGISLATURES, *Deferred Action for Childhood Arrivals/Federal Policy and Examples of State Actions* (Apr. 25, 2018), http://www.ncsl.org/research/immigration/deferred-action.aspx.

[51]   *See, e.g.*, UNIVERSITY OF WISCONSIN-MADISON, *Statement from Chancellor Blank on Executive Order on Immigration* (Jan. 30, 2017), https://news.wisc.edu/statement-from-chancellor-blank-on-executive-order-on-immigration/.

16

**D. DACA Grantees are Valued State Employees.**

DACA grantees serve the States not only in our colleges and universities, but also throughout state and local government, often serving in roles that make use of their unique skills and life experiences. Record evidence shows that DACA recipients perform jobs for which it can be hard to find a replacement hire, such as serving as interpreters at the County of Santa Clara's hospitals.[52] Because of their own background and ability to speak Spanish, DACA employees are uniquely able to connect with and understand the struggles these hospital clients face.

DACA grantees have also been employed throughout state and local government agencies, often interacting and serving the communities where they themselves live. They are law enforcement officers, nurses, fire fighters, special needs teachers, home health care workers, and more. If DACA is rescinded the States would lose many highly valued, passionate, and productive employees, whose skill sets and experience would be costly for the States to replace.

**E. DACA Contributes to Public Safety.**

Many of the undersigned serve as chief law enforcement officials in our states, and we recognize the important public safety benefits that flow from DACA. Residents who live in fear of deportation are less likely to report crimes committed against them, and less likely to serve as witnesses to crimes they

---

[52]   Marquez Decl., SER 744-745; Mendez Decl., SER 781; Duenas Decl., SER 424; Melvoin Decl., SER 768-769.

17

encounter, choosing to remain in the shadows.  As just one of many examples, a DACA respondent stated that she did not report when she was robbed at gunpoint prior to DACA because of fear she would be deported.[53]

Record evidence in this case supports her statement.  For instance, in a survey of over 3,000 DACA recipients, 53% said after the rescission they would be less likely to report a crime, 46% said they would be less likely to report a crime even if they were the victim, and 60% said they would be less likely to report wage theft.[54]  In another survey of DACA recipients, 59% said they would report a crime after receiving DACA status but would not have before.[55]

Effective law enforcement requires cooperation between residents and law enforcement officers.  That cooperation is lacking when residents live in fear of deportation.  Indeed, unscrupulous criminals often target undocumented residents because they understand the particular vulnerability of this population.  As a result, granting deferred action to young community members who themselves pose no threat to public safety enhances the safety of the entire community.  Local prosecutors have observed this firsthand in the communities they serve and protect.[56]

---

[53] J.A. 923.

[54] *See* Wong Decl., SER 1159.

[55] *See* Gonzalez Decl., SER 534.

[56] Gascon Decl., SER 504-505; O'Malley Decl., SER 883.

18

## CONCLUSION

DACA grantees, having emerged from the shadows into public life, have enriched the Amici States. Forcing these productive and industrious young residents out of their places in our communities would impose significant economic and social costs on our States and the country as a whole.

For these reasons, the Amici States submit that the rescission of DACA is subject to judicial review and that the efforts to rescind DACA in this instance are unlawful, as adjudicated by the lower courts.

Respectfully submitted,

DANA NESSEL
*Michigan Attorney General*

ERIC J. WILSON
*Deputy Attorney General*
*State of Wisconsin*

LAURA KELLY
*Governor of Kansas*

STEVE BULLOCK
*Governor of Montana*

AARON D. FORD
*Attorney General of Nevada*
HEIDI PARRY STERN\*
*Solicitor General*
CRAIG A. NEWBY
*Deputy Solicitor General*
100 North Carson Street
Carson City, NV 89701
(775) 684-1100
HStern@ag.nv.gov
*\* Counsel of Record*

*Counsel for Amici Curiae*

OCTOBER 4, 2019

**AR5306**

**Nos. 18-587, 18-588, 18-589**

# In the Supreme Court of the United States
——————————

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,
*Respondents.*
——————————

*On Writ of Certiorari to the United States
Court of Appeals for the Ninth Circuit*
——————————

## BRIEF OF AMICI CURIAE SERVICE EMPLOYEES INTERNATIONAL UNION, AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, AND AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES IN SUPPORT OF RESPONDENTS
——————————

NICOLE G. BERNER
CLAIRE PRESTEL
JOHN M. D'ELIA
SERVICE EMPLOYEES
INTERNATIONAL UNION
1800 Massachusetts Ave., NW
Washington, D.C. 20036
(202) 730-7466

*Counsel for Amicus Curiae
SEIU*

DEEPAK GUPTA
  *Counsel of Record*
LARK TURNER
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

*Counsel for Amici Curiae*

*(additional captions and Counsel listed on inside cover)*

October 4, 2019

Mosaic - (301) 927-3800 - Cheverly, MD



**AR5307**

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

*Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.,

*Respondents.*

———————

*On Writ of Certiorari Before Judgment to the United States Court of Appeals for the District of Columbia Circuit*

———————

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL.,

*Respondents.*

———————

*On Writ of Certiorari Before Judgment to the United States Court of Appeals for the Second Circuit*

———————

HAROLD C. BECKER
MATTHEW J. GINSBURG
AMERICAN FEDERATION OF
LABOR AND CONGRESS OF
INDUSTRIAL ORGANIZATIONS
815 Sixteenth Street., NW
Washington, D.C. 20006
*cbecker@aflcio.org*

*Counsel for Amicus Curiae
AFL-CIO*

JUDITH RIVLIN
AMERICAN FEDERATION
OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES
1625 L Street, NW
Washington, DC 20036
*JRivlin@afscme.org*

*Counsel for Amicus Curiae
AFSCME*

**AR5308**

-i-

## TABLE OF CONTENTS

Table of contents .................................................. i

Table of authorities ............................................. ii

Introduction and summary of argument...........................1

Interest of amici curiae.......................................2

Argument ........................................................4

I.  Union members and their families have become
    vital parts of American society as a direct result
    ofthe opportunities provided to them by the
    DACA program..............................................4

    M.R.:  Homecare worker for the elderly by day,
           tutor to his American siblings by night. .........4

    P.V.:  A dedicated public servant prosecuting
           crime for Travis County, Texas. ......................6

    T.W.:  From NFL athlete to Harvard-trained
           orthopedic surgeon...........................................7

    E.M.:  A father supporting his family.........................9

    O.S.:  23 and "able to do normal things" like
           attend college. ...................................................10

    F.G.:  Living without fear of being deported
           from his American wife...................................11

    C.F.:  Living the American dream until 17,
           regaining it through DACA. .........................13

    V.S.:  Public servant, psychology graduate, and
           the caretaker of her American siblings. .......14

    I.T.:  Surgical technician
           uncertain of her future....................................15

II.  Rescinding DACA will adversely impact
     America's workplaces, communities,
     and national economy...............................................17

III. Terminating the DACA program inflicts
     irreparable harm on DACA recipients and their
     families, including American-citizen children..........19

Conclusion.......................................................22

AR5309

-ii-

# TABLE OF AUTHORITIES

**Articles and Reports**

Catalina Amuedo-Dorantes & Francisca Antman,
*Can authorization reduce poverty among
undocumented immigrants?* Evidence from
the Deferred Action for Childhood Arrivals
program, Elsevier, 147 Econ. Lett. 1 (2016)........19, 20

Ike Brannon & Logan Albright,
*The Economic and Fiscal Impact of
Repealing DACA*, Cato Institute
(Jan. 18, 2017), https://perma.cc/ZH57-8D98. .......2, 18

Center for American Progress & FWD.us,
*Study: The Impact of Deferred Action for
Childhood Arrivals (DACA) Program
Repeal on Jobs,* FWD.us (Aug. 23, 2017),
https://perma.cc/3X8Q-ZJSM................................17, 20

Edward Graham,
*Trump's DACA Move Comes as
Most Voters Back Citizenship for 'Dreamer*s,'
Morning Consult (Sept. 5, 2017),
https://perma.cc/6BX9-J6K5. ......................................19

Roberto G. Gonzales et al.,
*Becoming DACAmented: Assessing the
Short-Term Benefits of Deferred Action for
Childhood Arrivals (DACA)*,
58 Am. Behav. Sci. 1852 (2014). .............................19, 20

Jens Hainmueller et al.,
*Protecting unauthorized immigrant
mothersimproves their children's mental
health*, 357 Science 1041 (2017). ..................................21

**AR5310**

-iii-

Jens Manuel Krogstad,
  *DACA has shielded nearly 790,000 young
  unauthorized immigrants from deportation*,
  Pew Research Center (Sept. 1, 2017),
  https://perma.cc/ A5NW-HKYD. ................................21

Jens Manuel Krogstad, Jeffrey S. Passel & D'Vera
  Cohn, *5 facts about illegal immigration in the
  U.S.*, Pew Research Center (Apr. 27, 2017),
  https://perma.cc/ FYM8-GAEA. .................................18

Jose Magaña-Salgado,
  *Money on the Table: The Economic Cost of
  Ending DACA*, Immigrant Legal Resource
  Center (Dec. 2016), https://perma.cc/S4NY-V33Z....18

Milenko Martinovich,
  *Rescinding DACA protections on immigrant
  mothers could have negative health impacts on
  their children, Stanford study finds,* Stanford
  News (Sept. 7, 2017), https://perma.cc/ZMT5-
  K2MB............................................................................21

**AR5311**

AR5312

-1-

## INTRODUCTION AND
## SUMMARY OF ARGUMENT[1]

Through the Deferred Action for Childhood Arrivals program, law-abiding undocumented young people in the United States have been able to achieve a longstanding dream: to become vital, productive, and successful members of the society in which they were raised. In just five years, DACA recipients have made invaluable contributions to the American labor force as doctors, lawyers, teachers, community health workers, janitors, homecare providers, and more. They are the working parents and siblings of 200,000 adolescent American citizens,[2] providing what is often their family's sole source of income.

The question before this Court is whether the Trump Administration's abrupt termination of this program was lawful. Amici submit this brief to demonstrate—through individual stories of DACA recipients and social-science data—how rescinding DACA would harm working

---

[1] This brief was not authored in whole or in part by counsel for a party and no one other than amici curiae and their counsel made a monetary contribution to the preparation or submission of this brief. SEIU Local 521 and the American Federation of Teachers, parties to this case, are independent organizations affiliated with SEIU and the AFL-CIO respectively. SEIU and the AFL-CIO are independent legal entities, separate and distinct from the many local, regional, and national labor organizations with which they are affiliated. Counsel for SEIU are employed solely by SEIU and do not represent SEIU Local 521. Likewise, the counsel for the AFL-CIO are employed solely by the AFL-CIO and do not represent the American Federation of Teachers. All parties have consented to the filing of this brief; letters of consent have been lodged with the Clerk.

[2] Priscilla Alvarez, *Will DACA Parents Be Forced to Leave Their U.S.-Citizen Children Behind?*, The Atlantic, Oct. 21, 2017, https://perma.cc/XD7H-282Q.

**AR5313**

-2-

people, their families, and the country in general, while doing little to address the need to reform our broken immigration system. It is conservatively estimated that DACA recipients would increase the gross domestic product of the United States economy by $215 billion and U.S. tax revenues by $60 billion over the next decade.[3] Terminating DACA eliminates these gains. It also denies DACA recipients the security and confidence in knowing that they will return home safely to their families every day. That fear is only amplified now that the government has gained sensitive information about them through the program. Terminating DACA also severely limits their educational and employment opportunities. Multiple studies establish the obvious and acute negative consequences of living in such uncertain conditions and how DACA has already provided observable relief from those consequences. The experiences of individual union members and their relatives shared below illustrate this research, demonstrating the real human toll that rescinding DACA will inflict on undocumented young adults, their families, their communities, their workplaces, and the nation.

### INTEREST OF AMICI CURIAE

*Amici* are two of the nation's largest labor unions and the nation's largest labor federation: Service Employees International Union, the American Federation of Labor and Congress of Industrial Organizations, and the American Federation of State, County and Municipal Employees.

---

[3] Ike Brannon & Logan Albright, *The Economic and Fiscal Impact of Repealing DACA*, Cato Institute (Jan. 18, 2017), https://perma.cc/ZH57-8D98.

**AR5314**

-3-

**Service Employees International Union (SEIU)** is a labor organization of approximately two million working men and women in the United States and Canada. SEIU's members include foreign-born U.S. citizens, lawful permanent residents, and undocumented immigrants authorized to work in the United States. Many of SEIU's members have mixed-status families. As described below, SEIU members will be directly affected by the termination of DACA.

**The American Federation of Labor and Congress of Industrial Organizations (AFL-CIO)** is a federation of 55 national and international labor organizations with a total membership of more than 12 million working men and women. The AFL-CIO's affiliated unions represent workers of all citizenship and immigration statuses. This includes many union members who, as a result of DACA, are themselves permitted to remain in the United States and work to support their families and communities, as well as many additional union members whose children, grandchildren, or other family members benefit from DACA. The termination of DACA would directly harm these union members and their families, as well as negatively impact the employers, community institutions, and local unions that depend on these union members' hard work and volunteer commitment.

**American Federation of State, County and Municipal Employees, AFL-CIO (AFSCME)** is a union of 1.4 million members in the United States and Puerto Rico, both in the public and private sectors, who share a commitment to service. AFSCME is participating in this case to advance its mission of helping all working people, including immigrants and people of color, achieve the American dream regardless of their identity. AFSCME is

**AR5315**

-4-

proud to represent members who came to the United States as children and who are contributing to our communities, states, and country. The public servants of AFSCME, and indeed all Americans, deserve better.

**ARGUMENT**

**I. Union members and their families have become vital parts of American society as a direct result of the opportunities provided to them by the DACA program.**

Millions of workers nationwide are united in the amici labor organizations, and many union members and their families will be harmed by a repeal of DACA. The experiences of individual union members and their family members confirm and illustrate the successes of DACA for American society and, in turn, the gains that will be lost if DACA is terminated.[4]

### M.R.: *Homecare worker for the elderly by day, tutor to his American siblings by night.*

M.R. is a 24-year-old member of SEIU 2015 who came to the United States from El Salvador at age eight. He lives in San Jose, California with his family, including his three U.S.-citizen siblings, aged nineteen, thirteen, and nine. M.R. is a homecare worker and has recently enrolled in a medical assistant training program at Silicon Valley Career Technical Education (SVCTE).

M.R. enrolled in DACA in 2013. "My parents raised me with the idea that I should make something of myself and contribute to the community. With DACA I was able

---

[4] The individuals whose stories are told here all consented to having their experiences recounted in this brief. Participants chose to maintain a measure of anonymity by using initials only.

**AR5316**

-5-

to work at a job that allowed me to make a difference in the life of a very ill, elderly patient. I'm a homecare worker and I care for an elderly man who is blind, diabetic, has kidney failure, a pacemaker, and is on dialysis. DACA made this meaningful job possible for me."

M.R. attended school in California, graduating high school from Gunderson High School in 2014. During his high school years, M.R. received an honor roll award, played varsity soccer and volleyball, and participated in the multicultural club and the boxing club.

M.R. is a conscientious and responsible member of his family, his workplace, and his community. He picks up his siblings from school, helps them with their homework, and does chores around his house. He attends church regularly and is involved in a leadership development program with his co-workers. "I believe that I am responsible for more than myself alone. I think that in a democratic society we must care for the needs of our neighbors, friends, and co-workers—not just ourselves and our families. These are the values that I learned from my parents—you have to work hard for what you want, but you must respect others and treat them the way that you want to be treated."

As a child in El Salvador, M.R. faced danger and uncertainty. His earliest memories are of hearing warnings to avoid the gang members who moved freely through his neighborhood. M.R.'s family rushed him out of the country before the gangs could recruit him. "The gangs search for young boys to become members at an early age. I was lucky to escape before I was forcibly recruited. DACA has allowed me to live in safety and security in the U.S."

**AR5317**

-6-

### P.V.: *A dedicated public servant prosecuting crime for Travis County, Texas.*

P.V. is an Assistant County Attorney for Travis County, Texas, where Austin is located. As a dedicated public servant and an AFSCME Local 1624 member, P.V. spends his workdays as a criminal prosecutor protecting public safety by handling all sorts of traffic-related criminal cases from running red lights to DWIs.

P.V. came to the United States from Mexico when he was three years old. He and his family settled in the Houston area, but his living situation was difficult when he first arrived. His father found work as a dishwasher and his mother as a busser, and the family lived with various relatives while they got their footing. His father is now a bartender and his mother a licensed massage therapist. After 19 years, his parents became legal permanent residents. P.V., however, remains without permanent legal status because he aged out of his parents' application during the 19-year wait.

P.V. knew from a young age that he wanted to create a path to success in the United States, and he studied hard to make that dream a reality. He graduated from high school in 2009 and went on to study sports management at the University of Texas at Austin, where he graduated with high honors. At first, P.V. thought he wanted to pursue a career as a sports agent, "like Jerry Maguire," but decided he enjoyed public service and chose to attend The University of Texas School of Law. He graduated from law school in 2016 and soon after passed the Texas Bar.

P.V. is a DACA recipient and that status is what allows him to be a dedicated public servant and prosecut-

**AR5318**

-7-

ing attorney today. Without DACA, he would not be eligible to do the work he does every day for Travis County. P.V. is the first member of his family to go to college and graduate school, and the first member of his family to work as a professional. Without DACA, he would be "unemployable" in most workplaces. With it, P.V. can do the job he loves, and contribute to the economy and his community by supporting himself, paying taxes, and contributing to the county retirement plan.

He also knows that without DACA his community would suffer dire consequences. P.V.'s experience as a prosecutor has taught him that without legal status, many immigrants, fearing deportation, refuse to report crimes or avoid testifying when they are victims of assaults and other crimes for fear of deportation. As an immigrant himself, he knows that many immigrant families' conduit to law enforcement and their broader community is through their DACA recipient children who serve as their "ambassadors."

P.V. wants to continue to be a "positive agent of change in the criminal justice system," but he knows he cannot do so without DACA. The ability to achieve work status through DACA is what gave him the confidence to go to law school in the first place, and make his family and community so proud.

### T.W.: *From NFL athlete to Harvard-trained orthopedic surgeon.*

Dr. T.W. is a practicing orthopedic surgeon in Atlanta, Georgia who recently completed a five-year medical residency in Harvard's orthopedic surgery department and a one-year fellowship in orthopedic sports medicine at Stanford University. Dr. T.W. is a former National Football League (NFL) athlete who

**AR5319**

-8-

participated in DACA for about four years. His wife, a U.S. citizen, is an alumnus member of SEIU's Committee of Interns and Residents (CIR).

Dr. T.W. came to the United States at age three. His family settled in California after fleeing political unrest in Nigeria. Dr. T.W.'s only memories are of life in the United States, and he grew up believing that with hard work and commitment, he could do anything. "I saw only the American Dream and truly believed if I put forth effort and determination, there was nothing I could not do." A brilliant student and a track, wrestling, and football star in high school and at Stanford University, Dr. T.W. graduated and spent several years playing football on NFL teams.

Throughout his childhood and early adult years, Dr. T.W. believed he was American. It was only when he needed his passport to travel to Canada for a position with the Canadian Football League that he learned that he was not a U.S. citizen. "In some ways, the fact that I didn't know my true immigration status freed me from the stress and obstacles imposed by undocumented status and allowed me to imagine limitless possibilities in my life."

As Dr. T.W.'s football career ended, he turned to his other passion: medicine. He excelled in his studies at Northwestern University's Feinberg School of Medicine, but recognized that his undocumented status would prevent his acceptance to a medical residency program in the United States. "DACA saved me. It rescued me and allowed me to pursue my medical residency at the Harvard Combined Orthopedic Residency Program at Massachusetts General Hospital. Thank God for DACA."

**AR5320**

-9-

A six-week lapse of Dr. T.W.'s DACA status served as a reminder of the critical importance of DACA to his medical career. Dr. T.W. had to stop working for 6 weeks during his intern year while he waited for the extension of his DACA work authorization card. "The orthopedic surgery intern functions as a crucial member of a team, and when I wasn't able to work, I let my team down. My program could not fill the void, and I was sleepless with anxiety. All of a sudden it didn't matter that I was a doctor. Without DACA I was thrust back into the status of an unwelcome, alien intruder."

Dr. T.W. completed his training last year and now works in an orthopedic surgery practice. He intends to continue serving the community and treating muscular injuries, broken bones, and a wide range of other conditions.[5]

### E.M.: *A father supporting his family.*

E.M. is a 33-year-old alumnus member of SEIU 32BJ who has lived in Washington, D.C. since he came to the United States from Mexico in 1999. He is a husband, a father of two U.S. citizen children aged nine and six, an active member of his community, and a DACA recipient. E.M. has held DACA status for about six years. He worked on a janitorial crew represented by SEIU 32BJ and is now a supervisor responsible for leading a crew.

E.M. attended Francis Junior High School and graduated from Roosevelt Senior High School in Washington, D.C.

---

[5] In June of 2017, Dr. T.W.'s application for legal residency was approved. Although he no longer relies on DACA, he values the program that was vital to his medical career and his life.

**AR5321**

-10-

With DACA he has been able to "step out of the shadows," participate in the community, and not be afraid of arrest and deportation. "I can't stand the thought of being deported and leaving my kids alone."

E.M. wants "to be able to afford a house so that my kids can play in our own backyard." E.M.'s kids are the world to him. "I want my kids to grow up to be someone— I want them to go to college, have a good future, and be better than I am. My nine-year-old son says he wants to be a doctor and he wants to buy me a big house. My kids are my motivation, they are my anchor, and they keep me fighting for a better future."

Since E.M. left his hometown of Puebla, Mexico in 1999, gangs and cartels there have grown dramatically. E.M. remembers his sister, his only close family member still in Mexico, warning him: "Don't you ever come back here. It's too dangerous."

After 20 years of living in the U.S. and contributing to his community through his work and union activities, E.M. feels that everything most important to him is in the U.S. "I'm not here to hurt anyone—I'm here to work hard and make a better life for me and my family. I don't want to go back to living in the shadows."

**O.S.:** *23 and "able to do normal things" like attend college.*

O.S. is a 23-year old citizen of Colombia, the nephew of an SEIU 1199 member, and a former DACA recipient who is now a legal resident of the United States. He resides in Queens, New York and works as a server at the Standard Hotel in Manhattan.

O.S. has lived in New York City since he arrived in the United States with his family at age 8 more than 15 years ago. He always knew that he was undocumented, and as

**AR5322**

soon as the DACA program was created, O.S. applied for and was granted DACA. "Having DACA meant that I was able to do normal things that other people my age were doing. I was a sophomore in high school and with DACA, I qualified to get my first job through the city Summer Youth Employment Program. DACA allowed me to feel more confident and more comfortable. I didn't feel ashamed and alien."

After O.S. graduated from high school in Queens, he enrolled in a bachelor's degree program at a campus of the City College of New York. O.S. hopes to complete his bachelor's degree and work in the marketing and communications field.

O.S. renewed DACA twice and remained in DACA until he obtained legal residency in 2017.

"Although I have a green card now, I'll never forget how much it meant to me to receive DACA. It came at just the right time in my life and helped put me on the path to college and a better future."

### F.G.: *Living without fear of being deported from his American wife.*

F.G., a citizen of Mexico who came to the United States 24 years ago at age four, received DACA status in 2014. He is a member of SEIU 32BJ and resides in New York City with his U.S. citizen wife.

DACA allowed F.G. to live, work, and participate in civic life without worrying that he would be deported. Fear of deportation shaped F.G.'s life for years. F.G. learned that he was undocumented when he was in high school and did everything he could to keep his undocumented status hidden. "It's hard to describe the level of fear that affects immigrant communities. My own loving parents were so frightened that they might be deported,

-12-

leaving my brother alone, that they gave up their parental rights in order to allow my U.S. citizen aunt to adopt us. That is the level of fear I lived with until 2014 when I was granted DACA. With DACA I could breathe freely for the first time."

F.G. spent his childhood and teenage years in Fayetteville, a small college town in northwest Arkansas. He attended Catholic school and excelled in literature, art, and football. He worked on the art magazine in high school and acted as a stage manager for high school theatre productions. "Despite my fear of deportation, I was resolved to continue my education. After I graduated from high school in 2010, I attended the University of Arkansas for several years with the goal of becoming an architect. But without work authorization, I felt that I could never get a good job. I left the University discouraged and without a degree."

F.G. met his wife at the University of Arkansas and lived in Fayetteville until his wife graduated from the University. "We moved to Atlanta for a short time while my wife worked for CNN, and then to New York City where my wife found a job working as a photo editor for a national magazine. By the time we moved to New York, I had DACA and was able to get a good job."

F.G. applied for legal residency in the United States and finally received his green card in early 2019. "Now my wife and I are making plans to open a business, and for my return to college. We are able to take advantage of the benefits of living in New York and often go to New York's museums . . . I'll always be grateful to DACA for giving me a sense of confidence, allowing me to work, and giving me the belief that I could live my life fully without the trauma of possible deportation. After receiving DACA I felt that I could finally relax." F.G. and his wife have now

-13-

started a family; she recently gave birth to their first child.

**C.F.:** *Living the American dream until 17, regaining it through DACA.*

C.F. is a member of SEIU 32BJ who was brought to the United States from Mexico when he was a one-year-old child. He worked as a custodian and is now in training to become a maintenance technician. C.F. lives in Baltimore with his parents and his three U.S.-citizen brothers.

C.F. attended school in Baltimore, completing his studies and graduating from Lansdowne High School. His favorite subject was math and he participated in the chess team in high school. C.F. learned for the first time that he was undocumented at age 17, when he sought to apply for a Social Security card.

"I felt like I was as American as anyone else and finding out that I was undocumented was terrible for me. It changed my outlook and undermined my confidence." C.S. felt that he didn't belong, that he was different, even in his own family. "I'm really close to my three U.S. citizen brothers. But finding out about my immigration situation made me feel like an outsider, different and alone."

C.F. also worried that he couldn't invest in his future. He feared he could be deported without warning. "My hopes for living the American dream—going to college, studying marketing, buying a home someday—the belief that I could succeed and build a good life suddenly seemed impossible."

But shortly after C.F. graduated high school, he heard about and applied for the DACA program. "DACA gave me permission to work, and with that permission I was able to get a steady job and join the union. DACA gave me

**AR5325**

-14-

a chance and the hope for a better future." With DACA, C.F.'s self-assurance returned. He began participating in activities to help his community and in activities supporting his co-workers. "There are many people like me who just want a chance to work hard and be part of the American dream. DACA gave me that chance."

### V.S.: *Public servant, psychology graduate, and the caretaker of her American siblings.*

V.S. was born in Mexico City and has resided in the United States since infancy. She is the daughter of an SEIU 1021 member. Educated entirely in the United States, from elementary school through the University of California, Santa Cruz, she was granted DACA in 2012. V.S. now works in her county's District Attorney's office, where she provides outreach and support services to Spanish-speaking survivors of domestic violence and sexual assault.

"DACA was a game changer for me. It gave me hope and allowed me to believe that I always could be a little more: that I could graduate from the University of California, Santa Cruz, be on the dean's list, and pursue a career in public service. When my parents were forced to depart the U.S. and I became the head of my family, DACA kept my spirits up and helped me to trust that I would be able to support and care for my three younger U.S. citizen brother and sisters."

V.S. grew up with faith in the power of education and the value of community service. In high school she maintained a 4.0 average; organized a schoolwide activities committee; worked on the yearbook; and volunteered at a nursing home, running activities, music lessons, exercise sessions, and movie events for the elderly. During her years at U.C. Santa Cruz, she studied psychology

**AR5326**

-15-

while working as a research assistant in a child development lab, tutoring over 40 students, and interning in a special program to advance and support diversity at the University. V.S. graduated in 2016 with a B.A. in psychology.

"My mother is a nurse and I watched her care for her patients with compassion and diligence. She inspired me to care for others who are facing trauma. But while she was forced to remain outside of the U.S., I carried the responsibility for my younger U.S. citizen siblings. I had to make sure everything went smoothly."

During her mother's absence, V.S. attended her brother and sisters' parent-teacher conferences and open house nights, oversaw their homework, and made sure that they got to school on time. She took her brother and sister to the doctor, did the family grocery shopping and cooking, and handled finances for her siblings and her parents. "We're a close-knit family, and I can sense if my brother and sisters are upset. I know they're going through a lot and I want to be there for them. Our community, my mother's union, and our church have been great to us."

"I've always felt that I was an American," she says. "But DACA has made me feel like my dreams could come true and I could have a career that will allow me to give something back to my community and my country."

### I.T.: A *surgical technician uncertain of her future.*

I.T. is a surgical technician at the University Medical Center in El Paso, Texas. When President Obama first announced the creation of DACA, I.T. began gathering her documents to apply. As a child, I.T.'s mother told her about her legal status and the limitations that came from

**AR5327**

-16-

not being a citizen. As she began to approach her senior year in high school, I.T. knew she did not have the other opportunities that her classmates had. She was often envious of her classmates who lived with the freedom to take drivers' education courses and work part-time jobs in high school.

Before I.T. became eligible to apply for DACA, she couldn't go to the doctor for annual checkups. Because of their immigration status, I.T.'s family didn't participate in many things that other high school students took for granted, like going to the dentist or eye doctor. She thought she would never be able to get a driver's license, go to college, or get a job. But that all changed in October 2012 when she applied for and enrolled in DACA.

Shortly after she received her DACA enrollment letter, she began applying for jobs. She applied everywhere that was hiring, from retail to fast food to entry-level office work. Finally, she landed a job at a small law firm as a bilingual receptionist. She was soon promoted to a legal assistant position. She learned quickly in her new role. Newly employed, I.T. looked forward to paying taxes. "I feel like I'm contributing to society every time I pay taxes."

Being a DACA recipient meant that I.T. could continue her studies. She began taking courses at the local college in El Paso. While in school, she worked full-time and paid for her education. It took her several years to finish but in 2015, I.T. became the first person in her family to graduate from college. DACA provided her with opportunities she thought she would never have. Now she's married and working in the same field she studied in college. While DACA has provided her with many opportunities, she lives in fear of it being rescinded. "I have to renew my DACA status every two years. I can't

**AR5328**

-17-

make a five-year plan because I'm unsure of how long I can live in this country." She cannot plan for children because she is uncertain of how to support them if DACA were rescinded. The loss of DACA would place a huge financial burden on her husband, because he would become the sole monetary provider of the family. She would live in fear of deportation to a country she has never known. Even now, I.T. lives with constant worries about the future. Being a DACA recipient has brought her pride in contributing to American society. She cannot bear the thought of losing that status.

## II. Rescinding DACA will adversely impact America's workplaces, communities, and national economy.

Rescinding DACA subjects 800,000 young people to the threat of removal while reducing local, state, and federal revenues and forcing employers to expend significant resources to hire and train new employees.

The most immediate costs are those imposed on the American workplace. One study estimates that for "every business day DACA renewals are halted, over 1,400 jobs [will be] lost" in the next two years.[6] This places a substantial burden on employers and employees, considering how even a short-term loss of DACA work authorization can seriously hinder a workplace. Take, for example, the story of Dr. T.W. in Part I of this brief. Dr. T.W. is a retired NFL athlete and practicing orthopedic surgeon in Atlanta. During his intern year, he was forced to abruptly stop working for a period of six weeks while waiting for the extension of his DACA authorization. This created a critical void that threw his surgery team into disarray

---

[6] Center for American Progress & FWD.us, *Study: The Impact of Deferred Action for Childhood Arrivals (DACA) Program Repeal on Jobs,* FWD.us, 4 (Aug. 23, 2017), https://perma.cc/3X8Q-ZJSM.

**AR5329**

-18-

because his role could not be temporarily filled. In this way, rescinding DACA will cause employers to grapple with the loss of staff in whom they have invested while also forcing them to absorb unnecessary turnover expenses— a cost that is projected to total $3.4 billion for the wholesale replacement of employed DACA recipients.[7]

Terminating DACA will also mean that $24.6 billion worth of Medicare and Social Security contributions will be lost over the next ten years, as well as most of the federal and tax revenues generated from the 91% gainfully employed DACA recipients.[8] These effects will be particularly burdensome for the six states that are home to 59% of the undocumented immigrant population in the U.S.: California, Texas, Florida, New York, New Jersey, and Illinois.[9] By contrast, DACA implementation has entailed almost no direct cost to taxpayers because the program's overhead is covered by the $495 fee paid by each applicant.

In addition, the federal government's threat to deport DACA recipients would lead to a staggering result: a burden of $7.5 billion[10] on American taxpayers. The public opinion evidence suggests that the American people may at some level understand this stark

---

[7] Jose Magaña-Salgado, *Money on the Table: The Economic Cost of Ending DACA*, Immigrant Legal Resource Center (Dec. 2016), https://perma.cc/S4NY-V33Z.

[8] *Id.*

[9] Jens Manuel Krogstad, Jeffrey S. Passel & D'Vera Cohn, *5 facts about illegal immigration in the U.S.*, Pew Research Center (Apr. 27, 2017), https://perma.cc/ FYM8-GAEA.

[10] Brannon & Albright, *The Economic and Fiscal Impact of Repealing DACA.*

-19-

cost-benefit calculus: 69% of Republicans, 84% of Democrats, and 74% of Independents think that DACA recipients should be able to stay in the country, whether through citizenship or other means.[11] Costly, ineffective, and unpopular, the deportation of these American-raised young adults would not repair our broken immigration system in any real way.

## III. Terminating the DACA program inflicts irreparable harm on DACA recipients and their families, including American-citizen children.

Undocumented immigrants face a mountain of hardships. They suffer poverty rates nearly twice that of American citizens and have a harder time escaping those conditions because of their status.[12] Employment opportunities are generally limited to low-wage jobs, but even those can be difficult to access without a driver's license. Most undocumented immigrants also lack a bank account since "financial institutions often request U.S. identification and a Social Security number." Instead, they carry cash, making them targets for robbery.[13]

---

[11] Edward Graham, *Trump's DACA Move Comes as Most Voters Back Citizenship for 'Dreamers'*, Morning Consult (Sept. 5, 2017), https://perma.cc/6BX9-J6K5. The statistics given here are calculated from the "allow them to become citizens" and "allow them to stay" categories of the graph from Morning Consult.

[12] Catalina Amuedo-Dorantes & Francisca Antman, *Can authorization reduce poverty among undocumented immigrants?* Evidence from the Deferred Action for Childhood Arrivals program, Elsevier, 147 Econ. Lett. 1, 1 (2016).

[13] Roberto G. Gonzales, et al., *Becoming DACAmented: Assessing the Short-Term Benefits of Deferred Action for Childhood Arrivals (DACA)*, 58 Am. Behav. Sci. 1852, 1855 (2014).

**AR5331**

-20-

Undocumented youth encounter additional hurdles in their education because of their ineligibility for federal and state financial aid, paid internships, and study opportunities that require identification. On top of all these challenges is the constant fear of being deported that wreaks havoc on mental health, causing many undocumented immigrants to suffer from anxiety, depression, and suicidal thoughts.

What makes DACA so significant is that, in just five years, it has led to improved socioeconomic and health outcomes—including for American-citizen children. Researchers have found that the odds of life in poverty in households headed by DACA recipients fell by 38%.[14]

The story of M.R., presented in Part I above, illustrates this finding. M.R. has three U.S.-citizen siblings. DACA helped him obtain a driver's license and secure employment as a homecare worker so that he can help his parents financially support their family and also pick up his siblings from school. DACA has produced these kinds of tangible gains for the majority of its recipients. According to one survey, the program has led to new employment for 59% of recipients, 45% of whom also experienced salary growth.[15] 55% of recipients were also able to purchase a vehicle while more than 10% purchased their first home.[16]

Looking at improved health outcomes, a study from Stanford University found that since 2012, the diagnoses

---

[14] Amuedo-Dorantes & Antman, *Can authorization reduce poverty*, at 1.

[15] Gonzales et al., *Becoming DACAmented*, at 1863.

[16] Center for American Progress & FWD.us, *Study: The Impact of DACA Program Repeal on Jobs*, at 5.

-21-

of adjustment and anxiety disorders for the American children of DACA-eligible parents fell by an astounding 50%.[17] Such "immediate and sizable improvements in the mental health of their U.S. citizen children . . . suggests that parents' unauthorized status is a substantial stressor that stymies normal child development and . . . transfer[s] parental [health] disadvantages to children."[18]

These improvements are likely only preliminary, due to DACA's short existence, and the program can reasonably be expected to create more observable gains in the long term if it continues. As Stanford researcher Jens Hainmueller noted, "It's not every day that public policy has such an immediate effect."[19]

But nothing more clearly illustrates the value of DACA to its recipients than the fact that 78% of the law-abiding, American-raised young people eligible for the program have applied[20]—in spite of its hefty $495 fee and two-year limit. Ending DACA threatens all these advances, the improvements to come, and the hopes of young people like the union members and families described above.

---

[17] Jens Hainmueller et al., *Protecting unauthorized immigrant mothers improves their children's mental health*, 357 Science 1041, 1043 (2017).

[18] *Id.*

[19] Milenko Martinovich, *Rescinding DACA protections on immigrant mothers could have negative health impacts on their children, Stanford study finds*, Stanford News (Sept. 7, 2017), https://perma.cc/ZMT5-K2MB.

[20] Jens Manuel Krogstad, *DACA has shielded nearly 790,000 young unauthorized immigrants from deportation*, Pew Research Center (Sept. 1, 2017), https://perma.cc/ A5NW-HKYD.

-22-

## CONCLUSION

The judgment below should be affirmed.

Respectfully submitted,

DEEPAK GUPTA
  *Counsel of Record*
LARK TURNER
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

*Counsel for Amici Curiae*

NICOLE G. BERNER
CLAIRE PRESTEL
JOHN M. D'ELIA
SERVICE EMPLOYEES
INTERNATIONAL UNION
1800 Massachusetts Avenue, NW
Washington, DC 20036
(202) 730-7466

*Counsel for Amicus Curiae*
*SEIU*

**AR5334**

-23-

HAROLD C. BECKER
MATTHEW J. GINSBURG
AMERICAN FEDERATION OF
LABOR AND CONGRESS OF
INDUSTRIAL ORGANIZATIONS
815 Sixteenth Street., NW
Washington, D.C. 20006
cbecker@aflcio.org

*Counsel for Amicus Curiae*
*AFL-CIO*

JUDITH RIVLIN
AMERICAN FEDERATION
OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES
1625 L Street, NW
Washington, DC 20036
*JRivlin@afscme.org*

*Counsel for Amicus Curiae*
*AFSCME*

October 4, 2019

**AR5335**

**AR5336**

**AR5337**

**AR5338**

Nos.18-587, 18-588, AND 18-589

In The

# Supreme Court of the United States

Department of Homeland Security, et al.

*Petitioners,*

v.

Regents of the university of California, et al.

*Respondents.*

_____

## On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit

_____

## BRIEF OF *AMICUS CURIAE* NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., AND LATINOJUSTICE PRLDEF IN SUPPORT OF RESPONDENTS

_____

Sherrilyn A. Ifill
    *Director-Counsel*
Janai S. Nelson
Samuel Spital
Natasha Merle*
Raymond Audain
Cara McClellan
NAACP Legal Defense &
    Educational Fund, Inc.
40 Rector St., 5th Floor
New York, NY 10006
(212) 965-2200
nmerle@naacpldf.org

*Counsel of Record

Daniel Harawa
    *Of Counsel*
NAACP Legal Defense &
Educational Fund, Inc.
700 14th St, NW Suite 600
Washington, DC 20005

*Counsel for Amicus Curiae
NAACP Legal Defense &
Educational Fund, Inc*

October 4, 2019

AR5339

i

## TABLE OF CONTENTS

<u>**PAGE**</u>

TABLE OF AUTHORITIES ....................................... ii

INTERESTS OF *AMICUS CURIAE* ..........................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT ..............................................................7

I.  Respondents' Intentional Racial Discrimination Claim is Cognizable. ...................7

    A.  Respondents' Equal Protection Claim Challenges a General Policy Decision, Which Should be Reviewed Under the *Arlington Heights* Framework. ......................9

    B.  Respondents' Claim of Intentional Racial Discrimination Meets the "Outrageous" Requirement of *AADC*...........13

II.  The Lower Courts Correctly Concluded that Respondents Plausibly Alleged an Equal Protection Claim Under *Arlington Heights*. ................................................17

    A.  The Factors Supporting an Inference of Discrimination...............................................18

    B.  The Government Cannot Rely on *Ipse Dixit* to Defeat an Inference of Discrimination. ...........................................23

**AR5340**

ii

CONCLUSION..........................................................31

**AR5341**

iii

# TABLE OF AUTHORITIES

<u>**PAGE(S)**</u>

<u>**CASES**</u>

*Batalla Vidal v. Nielsen,*
   279 F. Supp. 3d 401 (E.D.N.Y. 2018) ...................4

*Batalla Vidal v. Nielsen,*
   291 F. Supp. 3d 260 (E.D.N.Y. 2018) ..........*passim*

*Bolling v. Sharpe,*
   347 U.S. 497 (1955).............................................14

*Brown v. Board of Education,*
   347 U.S. 483 (1954)...............................................1

*Buck v. Davis,*
   137 S. Ct. 759 (2017).............................................1

*CASA de Maryland, Inc. v. Trump,*
   355 F. Supp. 3d 307 (D. Md. 2018)......................21

*CASA de Maryland v. U.S. Dep't of
   Homeland Sec.,*
   284 F. Supp. 3d 758 (D. Md. 2018)......................12

*Centro Presente v. U.S. Dep't of Homeland
   Sec.,*
   332 F. Supp. 3d 393 (D. Mass. 2018) .................21

*Chae Chan Ping v. United States,*
   130 U.S. 581 (1889).............................................16

*City of Greenwood v. Peacock,*
   384 U.S. 808 (1966).............................................14

**AR5342**

iv

## TABLE OF AUTHORITIES
### (CONTINUED)

<u>**PAGE(S)**</u>

<u>**CASES**</u>

*City of Richmond v. J.A. Croson Co.*
  488 U.S. 469 (1989)..................................................8

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019)....................................29, 30

*Dep't of Homeland Security v. Regents of the*
  *Univ. of Calif.*
  (2019) (Nos. 18-587, 18-588, and 18-589) .............5

*Erickson v. Pardus,*
  551 U.S. 89 (2007)..................................................27

*Humphrey's Executor v. United States,*
  295 U.S. 602 (1935)...............................................26

*Korematsu v. United States*
  323 U.S. 214 (1944)..................................................8

*McCreary County v. ACLU of Ky.,*
  545 U.S. 844 (2005)...............................................27

*Miller-El v. Dretke,*
  545 U.S. 231 ........................................................15

*Nat'l Ass'n for the Advancement of Colored*
  *People v. U.S. Dep't of Homeland Sec.,*
  364 F. Supp. 3d 568 (D. Md. 2019)......................21

**AR5343**

v

**TABLE OF AUTHORITIES**
(CONTINUED)

**PAGE(S)**

**CASES**

*Nino v. Johhnson,*
  No. 16-CV-2876, 2016 WL 6995563
  (N.D. Ill. Nov. 30, 2016) ........................................17

*U.S. ex rel Parco v. Morris,*
  426 F. Supp. 976 (E.D. Pa 1977) .........................11

*Peña-Rodriguez v. Colorado,*
  137 S. Ct. 855 (2017) .............................................1

*Plessy v. Ferguson,*
  163 U.S. 537 (1896) ..........................................1, 15

*Ragbir v. Homan,*
  923 F.3d 53 (2d Cir. 2019) ...................................16

*Rajah v. Mukasey,*
  544 F.3d 427 (2d Cir. 2008) .................................13

*Ramos v. Nielsen,*
  336 F. Supp. 3d 1075 (N.D. Cal. 2018) ...............21

*Regents of Univ. of Calif. v. U.S. Dep't of
  Homeland Sec.,*
  279 F. Supp. 3d 1011 (N.D. Cal. 2018) .................4

*Regents of Univ. of Calif. v. U.S. Dep't of
  Homeland Sec.,*
  298 F. Supp. 3d 1304 (N.D. Cal. 2018) ........*passim*

**AR5344**

vi

**TABLE OF AUTHORITIES**
(CONTINUED)

<u>**PAGE(S)**</u>

<u>**CASES**</u>

*Regents of the Univ. of Calif. v. U.S. Dep't of*
    *Homeland Sec.,*
    908 F.3d 476 (9th Cir. 2018)........................*passim*

*Reno v. American-Arab Anti-Discrimination*
    *Committee,*
    525 U.S. 471, 488-91 (1999)......................9, 10, 13

*Rose v. Mitchell,*
    443 U.S. 545 (1979)..........................................8, 14

*Saget v. Trump,*
    345 F. Supp. 3d 287 (E.D.N.Y. 2018) .................21

*Saget v. Trump,*
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ............22, 26

*Texas v. United States,*
    96 F. Supp. 3d 591 (S.D. Tex.), *aff'd,* 809
    F.3d 134 (5th Cir. 2015), *aff'd,* 136 S. Ct.
    2271 (2016)........................................................28

*Trump v. NAACP,*
    298 F. Supp. 3d 209 (D.D.C. 2018).......................4

*United States v. Armstrong,*
    517 U.S. 456 (1996).............................................13

**AR5345**

vii

**TABLE OF AUTHORITIES**
(CONTINUED)

**PAGE(S)**

**CASES**

*United States v. Locke*,
   471 U.S. 84 (1985)...................................................5

*Vill. of Arlington Heights v. Metro. Hous.
   Dev. Corp.*,
   429 U.S. 252 (1977)...............................................18

*Washington v. Davis*,
   426 U.S. 229 (1976)...............................................24

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886)................................................8

**STATUTES**

Act of July 14, 1870, ch. 254, §7, 16 Stat.
   254.......................................................................15

Act of Mar. 26, 1790, ch. 3, § 1, 1 Stat. 103..............15

Act of May 6, 1882 (Chinese Exclusion Act),
   ch. 126, 22 Stat. 58. ............................................16

Administrative Procedure Act, 5 U.S.C. §
   551 et seq. .............................................................4

Immigration Act of 1917, ch. 29, § 3, 39
   Stat. 874.................................................................16

**AR5346**

viii

**TABLE OF AUTHORITIES**
(CONTINUED)

<u>**PAGE(S)**</u>

<u>**STATUTES**</u>

Immigration Act of 1924, ch. 190, § 11(a),
   43 Stat. 153. ..........................................................19

<u>**OTHER AUTHORITIES**</u>

A. Warner Parker, The Quota Provisions of
   the Immigration Act of 1924, 18 AM. J.
   INT'L L. 737 (1924)...............................................19

Bianca Quilantan & David Cohen, *Trump
   tells Dem congresswomen: Go back
   where you came from*, POLITICO (July
   14, 2019),
   https://www.politico.com/story/2019/07/1
   4/trump-congress-go-back-where-they-
   came-from-1415692. ...........................................20

Brief of Amicus Curiae NAACP Legal
   Defense and Educational Fund, Inc. In
   Support of Petitioners*, Jean v. Nelson*,
   472 U.S. 846 (1985) (No.84-5240), 1985
   WL 670075. ..........................................................2

**AR5347**

ix

**TABLE OF AUTHORITIES**
(CONTINUED)

<u>PAGE(S)</u>

## <u>OTHER AUTHORITIES</u>

Christopher Flavelle, Lisa Friedman, and
    Peter Baker, *Commerce Chief
    Threatened Firings at NOAA after
    Trump's Dorian Tweets, Sources Say*,
    NY Times,
    https://www.nytimes.com/2019/09/09/cli
    mate/hurricane-dorian-trump-
    tweet.html (last updated Sept. 10, 2019)............27

David Sherfinski, *Donald Trump: Protesters
    outside rally 'thugs who were flying the
    Mexican flag,'* Wash. Times (May 25,
    2016).....................................................19

Def.'s Suppl. Submission and Further Resp.
    to Pl.'s Post-Briefing Notices, *James
    Madison Project v. Dep't of Justice*, No.
    1:17-cv-00144-APM, (D.D.C. Nov. 13,
    2017) ...................................................25

Elizabeth Landers, *White House: Trump's
    Tweets are 'Official Statements'*, CNN
    (June 6, 2017),
    https://www.cnn.com/2017/06/06/politics/
    trump-tweets-official-
    statements/index.html.......................................25

**AR5348**

x

## TABLE OF AUTHORITIES
(CONTINUED)

<u>**PAGE(S)**</u>

### **OTHER AUTHORITIES**

Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.b56f11cc896f...........................................................20

Jugal K. Patel, *Trump Wants Big Changes to Legal Immigration, Too — How Big?*, NY Times (Oct. 18, 2016), https://www.nytimes.com/interactive/2016/10/18/us/politics/trump-legal-immigration.html.................................................19

Karen Tumulty, *President Trump isn't a fan of dissent—inside or outside the government*, Wash. Post (Feb. 1, 2017), https://www.washingtonpost.com/politics/president-trump-seeks-to-quash-dissent-inside-the-government/2017/02/01/788bdefa-e7ed-11e6-b82f-687d6e6a3e7c_story.html...................27

**AR5349**

xi

## TABLE OF AUTHORITIES
(CONTINUED)

**PAGE(S)**

## OTHER AUTHORITIES

Madeline Joung, *What Is Happening at
Migrant Detention Centers? Here's What
to Know*, TIME,
https://time.com/5623148/migrant-
detention-centers-conditions/ (last
updated July 12, 2019). ......................................22

Mallory Shelbourne, *Trump to Congress:
'Get ready to do your job" on DACA*, The
Hill (Sept. 5, 2017),
https://thehill.com/homenews/administr
ation/349173-trump-to-congress-get-
ready-to-do-your-job-on-daca...............................26

Memorandum For Federal Prosecutors
Along the Southwest Border from the
Att'y Gen. Sessions to Fed. Prosecutors
Along the Sw. Border (Apr. 6, 2018)
(https://perma.cc/H5JB-LFG9) ...........................23

Memorandum from Att'y Gen. Sessions to
Acting DHS Sec'y Duke (Sept. 5, 2017)
(https://www.dhs.gov/sites/default/files/p
ublications/17_0904_DOJ_AG-letter-
DACA.pdf) .......................................................4, 26

**AR5350**

xii

## TABLE OF AUTHORITIES
(CONTINUED)

**PAGE(S)**

## OTHER AUTHORITIES

Memorandum from Janet Napolitano, Sec'y
   of Homeland Sec. to David V. Aguilar et
   al. (June 15, 2012)
   https://www.dhs.gov/sites/default/files/p
   ublications/s1-exercising-prosecutorial-
   discretion-individuals-who-came-to-us-
   as-children.pdf ........................................................3

Michael Shear, *Stoking Fears, Trump
   Defied Bureaucracy to Advance
   Immigration Agenda*, NY Times (Dec.
   23, 2017),
   https://www.nytimes.com/2017/12/23/us/
   politics/trump-immigration.html. .......................20

Sophie Tatum, *Trump: I'll 'revisit' DACA if
   Congress can't fix in 6 months*, CNN,
   https://www.cnn.com/2017/09/05/politics/
   donald-trump-revisit-daca/index.html
   (last updated Sept. 6, 2017)................................26

Stephen Collinson, *The law or the
   President: The Trump appointees'
   dilemma*, CNN (Apr. 9, 2019),
   https://www.cnn.com/2019/04/09/politics/
   donald-trump-kirstjen-nielsen-
   immigration/index.html......................................27

**AR5351**

xiii

## TABLE OF AUTHORITIES
### (CONTINUED)

<u>**PAGE(S)**</u>

## <u>OTHER AUTHORITIES</u>

U.S. Dep't of Justice, Office of Pub. Affairs,
*Attorney General Sessions Delivers
Remarks on DACA* (Sept. 5, 2017),
https://www.justice.gov/opa/speech/attor
ney-general-sessions-delivers-remarks-
daca. ....................................................................28

Z. Byron Wolf, *The kiss of death in Trump's
cabinet is disagreeing with the boss*,
CNN,
https://www.cnn.com/2018/04/03/politics/
trump-cabinet-kiss-of-death/index.html
(last updated Apr. 3, 2018) .................................27

Z. Byron Wolf, *Trump's attacks on Judge
Curiel are still jarring to read*, CNN
(Feb. 27, 2017),
https://www.cnn.com/2018/02/27/politics/
judge-curiel-trump-border-
wall/index.html ..................................................19

**AR5352**

xiv

## TABLE OF AUTHORITIES
### (CONTINUED)

**PAGE(S)**

### OTHER AUTHORITIES

Zack Budryk, *Trump's renewed push for family separations led to Nielsen's ouster: report*, The Hill (Apr. 8, 2019), https://thehill.com/latino/437830-trump-has-pushed-to-resume-child-separations-for-months-report.................................................26

**AR5353**

## INTERESTS OF *AMICUS CURIAE*[1]

Amicus **NAACP Legal Defense and Educational Fund, Inc. ("LDF")** is a non-profit, non-partisan law organization established under the laws of New York to assist Black people and other people of color in the full, fair, and free exercise of their constitutional rights. Founded in 1940 under the leadership of Thurgood Marshall, LDF focuses on eliminating racial discrimination in education, economic justice, criminal justice, and political participation. For nearly eighty years, LDF has fought to enforce the constitutional guarantee of equal protection for all persons. LDF represented Black parents and their children in *Brown v. Board of Education*, 347 U.S. 483 (1954), the historic case that dismantled the "separate but equal" doctrine established under *Plessy v. Ferguson*, 163 U.S. 537 (1896), which relegated Black people, by law, to a position inferior to white citizens. Today, LDF continues to work to combat discrimination and pernicious racial stereotyping against people of all backgrounds. In 2016, LDF argued *Buck v. Davis*, 137 S. Ct. 759, 778 (2017), in which this Court condemned defense counsel's introduction of the "toxin" of racial bias into Mr. Buck's capital sentencing hearing. That same year, LDF also filed an amicus brief in *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 868, 870 (2017),

---

[1] Pursuant to Supreme Court Rule 37.6, counsel for *amicus curiae* state that no counsel for a party authored this brief in whole or in part and that no person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief. Pursuant to Supreme Court Rule 37.3, counsel for *amicus curiae* state that both parties have filed blanket consent to the filing of *amicus briefs*.

**AR5354**

2

in which this Court recognized that a juror's statements assigning pernicious racial stereotypes to a Mexican American defendant could, if left unchecked, result in the wrongful exercise of power by the State.

Consistent with amicus curiae's opposition to all forms of discrimination, LDF has a strong interest in ensuring that the federal government abides by fundamental equal protection principles in its policies related to immigrants. LDF filed an amicus brief in *Jean v. Nelson*, 472 U.S. 846 (1985), explaining that the Court of Appeals had misapplied this Court's precedent in concluding that a federal immigration policy tainted by racial discrimination was not subject to judicial review.[2] Most recently, in January 2018, LDF filed *NAACP v. United States Department of Homeland Security*, on behalf of organizational plaintiffs challenging on equal protection grounds the Department of Homeland Security's decision to rescind Temporary Protected Status ("TPS") for Haitians in the United States. No. 1:18-cv-00239-DKC (D. Md. Jan. 24, 2018).

Amicus **LatinoJustice PRLDEF**, founded in 1972 as the Puerto Rican Legal Defense & Education Fund, is a national not-for-profit civil rights legal defense fund that has advocated for and defended the constitutional rights and the equal protection of all Latinos under the law. LatinoJustice champions an equitable society through advancing Latinx civil engagement, cultivating leadership, and protecting civil rights and equality in the areas of criminal

---

[2] *See* Brief of Amicus Curiae NAACP Legal Defense and Educational Fund, Inc. In Support of Petitioners, *Jean v. Nelson*, 472 U.S. 846 (1985) (No.84-5240), 1985 WL 670075 at *4.

3

justice, education, employment, fair housing, immigrants' rights, language rights, redistricting and voting rights. LatinoJustice vehemently opposes the Petitioner's unlawful actions to rescind the Deferred Action for Childhood Arrivals ("DACA") program, which has provided deferred status for thousands of Latinx students and DREAMers across the country. Thus, LDF and LatinoJustice have the experience and expertise to assist the Court in its review of this important case.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

On June 15, 2012, then-Secretary of Homeland Security ("DHS") Janet Napolitano issued a memorandum establishing the DACA program.[3] Under DACA, individuals who were brought to the United States as children and meet specific criteria may request deferred action for a period of two years, subject to renewal. DACA designees must undergo rigorous screening, including biometric screening and criminal background checks, in order to be eligible for the program. In establishing DACA, DHS recognized that there are "certain young people who were brought to this country as children and know only this country as home[,]" and that federal immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language." DACA Memo. at 1-2. The

---

[3] Memorandum from Janet Napolitano, Sec'y of Homeland Sec. to David V. Aguilar et al. (June 15, 2012) https://www.dhs.gov/sites/default/files/publications/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf [hereinafter DACA Memo].

AR5356

4

program has allowed nearly 700,000 young people, mostly Latinos and persons of Mexican heritage, to come out of the shadows, study and work without fear of removal.

On September 5, 2017, DHS abruptly rescinded DACA by announcing that it would cease to accept new applications. It also announced it would only issue renewals for grantees whose deferrals expire before March 5, 2018, and only if they applied for renewal within one month of DHS's announcement.[4] Respondents challenged the rescission of DACA under the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq., and on constitutional grounds. The district courts for the Northern District of California and Eastern District of New York denied in relevant part the Government's motion to dismiss Respondents' APA and constitutional claims, and those courts granted Respondents' motions for a preliminary injunction based on their APA claims.[5] In addition, the District of Columbia district court denied in relevant part the Government's motion for summary judgment and vacated the rescission of DACA.[6]

---

[4] *See* Memorandum from Att'y Gen. Sessions to Acting DHS Sec'y Duke (Sept. 5, 2017) (https://www.dhs.gov/sites/default/files/publications/17_0904_D OJ_AG-letter-DACA.pdf) [hereinafter DACA Rescission Memo].

[5] *See Regents of Univ. of Calif. v. U.S. Dep't of Homeland Sec.*, 298 F. Supp. 3d 1304 (N.D. Cal. 2018); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260 (E.D.N.Y. 2018); *Regents of Univ. of Calif. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018).

[6] *See Trump v. NAACP*, 298 F. Supp. 3d 209 (D.D.C. 2018).

**AR5357**

5

Subsequently, the Ninth Circuit affirmed the California district court's decision on the motion to dismiss and the preliminary injunction on APA grounds. *Regents of the Univ. of Calif. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018). In a concurrence, Judge Owens explained that he would have held the APA claim to be not judicially reviewable, but that he would have remanded for consideration of whether the Plaintiffs' equal protection claim would support a preliminary injunction, noting that the claim appeared "promising" based on the Plaintiffs' allegations. *Id.* at 523-24 (Owens, J., concurring).

This Court granted certiorari on the questions of: (1) whether the DHS's decision to terminate DACA is judicially reviewable; and if so (2) whether the decision to terminate DACA is lawful. *Dep't of Homeland Security v. Regents of the Univ. of Calif.* (2019) (Nos. 18-587, 18-588, and 18-589).

For the reasons stated by Respondents, the district courts correctly granted preliminary injunctions under the APA. Because those injunctions are supported by statutory grounds, this Court need not reach Respondents' constitutional claims. *See, e.g., United States v. Locke*, 471 U.S. 84, 92 (1985). Nevertheless, because the Government has sought to limit judicial review of its racially discriminatory treatment of non-citizen U.S. residents, a response from amici is in order.

The Government contends this case involves a "discriminatory-enforcement claim," which it claims is "not cognizable in the immigration context." Pet'rs' Aug. 19, 2019 Br. at 53 [hereinafter Pet'rs' Br.]. Thus, according to the Government, the Administration's

**AR5358**

6

decision to rescind a program that protects from removal 700,000 persons brought to the United States as children is not subject to judicial scrutiny even if the rescission was motivated by racial animus. That is a breathtaking argument. It would mean the Article III courts could not review DACA's rescission even if the Administration formally stated that the rescission was motivated by a desire to remove as many Latinos as possible from our country. Nor could the courts review an official federal policy to deport only non-citizens of color.

That is not, and cannot be, the law. The Fifth Amendment protects all persons living in the United States. If the equal protection component of that Amendment means anything, it means that racial discrimination must not infect federal policy judgments about whether to deport hundreds of thousands of individuals who came to the United States as children. And, as LDF pointed out over 30 years ago in *Jean*, and as this Court has recognized in other contexts, the harms from state-sponsored racial discrimination "extend[] beyond the direct victims" of the discrimination.[7] Such discrimination "corrupt[s] our governmental institutions, stigmatize[s] all members of the disfavored group and incite[s] further discrimination." *Id*. If unchecked by the courts, such discrimination will also undermine public confidence in the courts as neutral arbiters of the rule of law.

The Government insists that, even if this claim is reviewable, Respondents have not stated an equal protection claim. In the Government's view, this Court should ignore the facts that over ninety percent

---

[7] *See* Brief of Amicus Curiae NAACP Legal Defense and Educational Fund, Inc., *supra* note 2, at *9.

7

of DACA's beneficiaries are Latino—the vast majority of whom are of Mexican heritage—and that the President has repeatedly made statements evincing his animus against Mexican and Latino immigrants. But this Court's precedent does not authorize the Government to disregard facts because they are detrimental. Instead, the President's alarming statements evincing animus against Latino immigrants and other immigrants of color; the influence he exerts over the members in his cabinet; the fact that the vast majority of DACA's beneficiaries are Latino; and the unusual procedures employed by the Administration in rescinding DACA, all support an inference that the Administration's rescission of DACA was motivated, at least in part, by racial discrimination. Therefore, to the degree this Court reaches the issue, it should recognize that Respondents' equal protection claims are "promising," as Judge Owens recognized. They are certainly plausible claims, the assertion of which was sufficient to defeat the Government's motion to dismiss.

## ARGUMENT

### I. Respondents' Intentional Racial Discrimination Claim is Cognizable.

The United States has taken the position that Respondents' equal protection challenge to the rescission of DACA is "not cognizable."[8] In essence, the Government argues that the Administration's policy change, the impact of which falls almost completely on Latinos and individuals of Mexican heritage, cannot be reviewed by the judiciary for

---

[8] Pet'rs' Br. at 53.

8

discriminatory intent. That argument runs contrary to our most fundamental constitutional principles and to the rule of law itself. No principle is more sacred to our democracy than the prohibition on racial discrimination in federal government policy. *See City of Richmond v. J.A. Croson Co.* 488 U.S. 469, 501 (1989) (citation omitted). The courts are tasked with ensuring that state-sponsored discriminatory policies are not allowed to stand.

The Government attempts to create a category of cases that would be immune from equal protection review by courts: challenges to immigration policies. This has never been true. It is well established that equal protection "provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." *Yick Wo v. Hopkins,* 118 U.S. 356, 369 (1886). The country's extensive history of racial classifications suggests that judicial deference to executive policies is not compatible with the constitutional promise of equal protection. *See Korematsu v. United States* 323 U.S. 214, 235-40 (1944) (Murphy, J., dissenting).

Though the executive has broad discretion in implementing immigration policy, that discretion is not so broad to allow the executive to engage in that which is "odious in all aspects," *Rose v. Mitchell*, 443 U.S. 545, 555 (1979), i.e., government-sponsored racial discrimination.

9

## A. Respondents' Equal Protection Claim Challenges a General Policy Decision, Which Should Be Reviewed Under the *Arlington Heights* Framework.

The Government argues that Respondents' equal protection challenge is, in actuality, a selective-prosecution claim, and the race discrimination alleged by Respondents is not sufficiently "outrageous" to warrant review under the selective-prosecution standard. *See* Pet'rs' Br. at 54. As each lower court to address the issue found, this argument is without merit. *First*, Respondents do not raise a selective-enforcement claim subject to a higher pleading standard, but instead raise an equal protection challenge to the executive's policy judgment about how to apply the nation's immigration laws, which should be analyzed under the *Arlington Heights* framework. *Second*, even if this were a selective-prosecution challenge, discrimination on the basis of race is the epitome of "outrageous" government conduct that presents a judicially cognizable claim.

The Government's argument relies on *Reno v. American-Arab Anti-Discrimination Committee*, in which this Court stated that selective-enforcement claims are rarely viable in the deportation context. 525 U.S. 471, 488–91 (1999) [hereinafter *AADC*]. In that case, non-citizens claimed that, although they had violated the immigration laws, the Government had impermissibly targeted and chosen them for deportation because of their affiliation with an alleged terrorist group. The Court rejected their claims, noting that selective-enforcement defenses to

**AR5362**

10

deportation proceedings are ill-suited for judicial review. *See id.* at 490–91.

Respondents' challenge to the DACA rescission, however, is not raised "as a defense against [ ] deportation" and is not a claim of "selective enforcement." *Id.* Further, as Respondents note, some of the plaintiffs in this case are states, and their claims plainly do not implicate selective enforcement principles. Br. of New York, et al. at 56. Therefore, the necessary predicate for the application of *AADC*'s heightened standard is not applicable, and its concerns about "invad[ing] a special province of the Executive" do not apply. *Id.* at 489.

Respondent's equal protection allegation is a freestanding claim that the Administration, motivated by race discrimination, made a sweeping policy decision to rescind protections to all approximately 700,000 immigrants brought here as children. It is not a challenge to a case-by-case decision made by DHS as to which immigrants should have their cases prosecuted and which should not, but a challenge that the Government has made a fundamental policy judgment about how to apply our nation's immigration laws in a manner infected by racial discrimination. In short, the "substantial concerns that make the courts properly hesitant to examine" individual prosecutorial decisions do not obtain here. *Id.* at 490 (quoting *Wayte v. United States*, 470 U.S. 598, 607-08 (1985)).

Indeed, key factors the *AADC* Court identified as making courts hesitant to review selective-prosecution claims have no application when, as here, the challenge is to a categorical (and public) government policy decision as to how to apply our

**AR5363**

11

immigration laws. *See id.* (referring to the "strength of the case," the "prosecution's general deterrence value," potentially "revealing the Government's enforcement policy," and the risk of chilling law enforcement by subjecting a prosecutor's motives to outside inquiry, as reasons why courts should be hesitant in reviewing selective-enforcement claims).

The Government's argument that this is a case of prosecutorial "discretion" fails on the plain meaning of that word. Under the DACA policy "'discretion' was exercised favorably in all cases of a certain kind and then, after repeal of the regulation, unfavorably in each such case." *U.S. ex rel Parco v. Morris*, 426 F. Supp. 976, 984 (E.D. Pa 1977). This is not discretion; it is a policy concerning a category of people. The DACA rescission may eventually lead to the prosecution and removal of undocumented immigrants, who may challenge the decision to prosecute their case in lieu of others, but that day is not today. Today, Respondents are challenging whether the Administration's categorical decision to end a nationwide immigration program was motivated by race discrimination.

The Government also makes the half-hearted suggestion that judicial review of the Administration's discriminatory rescission of DACA would "'[impact] foreign relations.'" Pet'rs' Br. at 54 (citation omitted). But the Government has never explained what "foreign relations" interest is implicated by judicial review of Respondents' claim that the rescission of DACA was motivated by racial discrimination. In rescinding DACA, the Administration made no mention of foreign relations as a basis for its decision. Notably, this case does not

12

involve decisions about foreign nationals entering the United States; indeed, the only beneficiaries of DACA are longstanding residents of this country who have a Fifth Amendment right not to be subject to racial discrimination by the federal government.

Each lower court correctly rejected the Government's attempt to import *AADC*'s heightened selective prosecution standard to the DACA rescission.[9] As one court explained, "Plaintiffs' claims cannot fairly be characterized as selective-prosecution claims because they do not 'implicate the Attorney General's prosecutorial discretion—that is, in this context, his discretion to choose to deport one person rather than another among those who are illegally in this country.'" *Regents of the Univ. of Calif. v. U.S. Dep't of Homeland Sec.*, 298 F. Supp. 3d 1304, 1314 n.3 (N.D. Cal. 2018) (quoting *Kwai Fun Wong v. United States*, 373 F.3d 952, 970 (9th Cir. 2004)). Rather, Respondents "allege[d] that the agency's decision to end a nationwide deferred action program was motivated by racial animus towards a protected class[,]" an allegation subject to review under the traditional *Arlington Heights* framework.  *Id.*

## B. Respondents' Claim of Intentional Racial Discrimination Meets the "Outrageous" Requirement of *AADC*.

Even if this were a selective prosecution case (and it is not), that would not end the Court's inquiry.

---

[9] *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260 (E.D.N.Y. 2018); *CASA de Maryland v. U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758 (D. Md. 2018); and *Regents of the Univ. of Calif. v. U.S. Dep't of Homeland Sec.*, 298 F. Supp. 3d 1304 (N.D. Cal. 2018).

13

*AADC* does not support the Government's broad assertion that Respondents' claims are "not cognizable" if they are deemed a selective-enforcement challenge. Pet'rs' Br. at 53.

The Court in *AADC* stated that in many cases "deportation is sought simply because the time of permitted residence in this country has expired . . ." and held that the government "does not offend the Constitution by deporting [a non-citizen] for the additional reason that it believes him to be a member of an organization that supports terrorist activity." *AADC*, 525 U.S. at 491-92. Yet, the Court left open "the possibility of a rare case in which the alleged basis of discrimination is so outrageous" that a selective-enforcement claim could be maintained. *Id.* at 491.

In addressing the selective-enforcement claim in *AADC*, this Court drew heavily on its prior case law analyzing selective-prosecution claims in the criminal law context. And, in that context, this Court has expressly recognized that a "prosecutor's discretion is subject to constitutional constraints." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal quotation marks omitted). A prosecutor's discretion may not be "based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* (internal quotation marks omitted); *see also Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008) (stating if immigration laws were selectively enforced against petitioners because of their religion, ethnicity, gender, and race, "selective prosecution based on an animus of that kind would call for some remedy") (internal citation removed).

14

Racial animus represents the paradigmatic example of "outrageous" discrimination that requires judicial review even under *AADC*. Indeed, this Court has used that very term to describe racially motivated prosecutions. *See City of Greenwood v. Peacock*, 384 U.S. 808, 828 (1966) ("If, as they allege, [petitioners] are being prosecuted on baseless charges solely because of their race, then there has been an outrageous denial of their federal rights, and the federal courts are far from powerless to redress the wrongs done to them."). As this Court has long recognized, "[d]iscrimination on the basis of race [is] odious in all aspects," and "was the primary evil" at which the Reconstruction Amendments, including the Equal Protection Clause, "were aimed." *Rose*, 443 U.S. at 554, 555. The Fifth Amendment's due process clause means the same principles prohibiting racial discrimination by state officials apply to the federal government. *Bolling v. Sharpe*, 347 U.S. 497, 499-50 (1955). Indeed, "it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government" not to engage in racial discrimination. *Id*. at 500.

Further, as LDF pointed out in *Jean v. Nelson*, the harms from official acts of racial discrimination extend beyond the direct victims of that discrimination. State-sponsored discrimination on the basis of race or ethnicity "corrupt[s] our governmental institutions, stigmatize[s] all members of the disfavored group and incite[s] further discrimination."[10] As Justice Harlan recognized long ago, racially discriminatory government policies send

---

[10] *See* Brief of Amicus Curiae NAACP Legal Defense and Educational Fund, Inc., *supra* note 2, at *9.

15

a message that people of color "are . . . inferior and degraded" so as to justify the discrimination. *Plessy v. Ferguson*, 163 U.S. at 560 (Harlan, J., dissenting). If left unchecked by the courts, such discriminatory policies consign people of color to an inferior status and reinforce racist ideas about them. *See also Miller-El v. Dretke*, 545 U.S. 231, 237-8  (recognizing that, when a prosecutor discriminates against prospective jurors on the basis of race, the harm is not only to the excluded juror or the defendant; rather, people of color "are harmed more generally, for prosecutors drawing racial lines in picking juries establish 'state-sponsored group stereotypes rooted in, and reflective of, historical prejudice[.]'") (citation omitted).  Thus, when the Government is motivated by racial discrimination in publicly canceling a program that protects hundreds of thousands of people from removal, it sends an unmistakable message of racial hierarchy to society as a whole.

That message of racial hierarchy has particular resonance given the overt racism that has long plagued our nation's immigration and naturalization laws. In 1790, the country's first immigration law restricted the ability to become naturalized citizens to "free white person[s]."[11] It was not until 1870 that Black people were permitted to naturalize as citizens, despite having been brought to the United States as slaves beginning in 1619.[12] The notorious Chinese Exclusion Act of 1882 forbade people of Chinese

---

[11] Act of Mar. 26, 1790, ch. 3, § 1, 1 Stat. 103, 103 (repealed by act of Jan. 29, 1795, ch. 20; however, this act also limited the ability to be naturalized as a citizen to "free white person[s]).
[12] Act of July 14, 1870, ch. 254, §7, 16 Stat. 254, 256.

**AR5368**

16

heritage from entering the country entirely,[13] and the Immigration Act of 1917 expanded that prohibition to encompass immigrants from most of Asia.[14] In the notorious *Chinese Exclusion Cases*, this Court sanctioned such blatant discrimination, holding that no court could review the federal government's determinations that "foreigners of a different race in this country" were "dangerous" and would not "assimilate with us" (the "us" clearly referring to white Americans).[15]

Plaintiffs allege the rescission of DACA is grounded in the same kind of bigotry that long characterized our immigration and naturalization laws. Such allegations are entitled to judicial review. This is particularly true here, because DACA recipients have a substantial interest in not being deported and maintaining their DACA protections, and because the Government's interests are "less pronounced than in *AADC*," given it has not alleged any threat to safety and security considerations. *See Ragbir v. Homan*, 923 F.3d 53, 73 (2d Cir. 2019) (noting factors that support a claim of "outrageous" discrimination).

By contrast, the Government's sweeping interpretation of *AADC* would prohibit a court from reviewing an executive branch decision relating to immigration, even if that decision displayed blatant race discrimination. For example, under the Government's view, even if the Administration were to create a policy prioritizing the deportation of Black

---

[13] Act of May 6, 1882 (Chinese Exclusion Act), ch. 126, 22 Stat. 58.

[14] Ch. 29, § 3, 39 Stat. 874, 875-76 (repealed 1952).

[15] *See Chae Chan Ping v. United States*, 130 U.S. 581, 606 (1889).

17

non-citizens based solely on their race, that decision would not be reviewable by any court. *But cf. Nino v. Johhnson*, No. 16-CV-2876, 2016 WL 6995563, at *5 (N.D. Ill. Nov. 30, 2016) (citing *LaGuerre v. Reno*, 164 F.3d 1035, 1040 (7th Cir. 1998) ("Suppose the [Board of Immigration Appeals] ordered an alien deported on the basis of a criminal conviction that it knew had been vacated, but it didn't care because the alien was black. We have expressed doubt that Congress intended to forbid such orders to be challenged in court")).

The Government's position is at war with the plain text of the Fifth Amendment, and the basic principles of the rule of law that underlie our constitutional democracy. It must be rejected, and forcefully so.

## II.  The Lower Courts Correctly Concluded that Respondents Plausibly Alleged an Equal Protection Claim Under *Arlington Heights*.

The lower courts correctly held that Respondents plausibly alleged that the rescission of DACA violated the equal protection component of the Fifth Amendment's Due Process Clause. *See Regents of the Univ. of Calif. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018); *Regents of Univ. of Calif. v. U.S. Dep't of Homeland Sec.*, 298 F. Supp. 3d 1304 (N.D. Cal. 2018); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260 (E.D.N.Y. 2018). In the Ninth Circuit decision, Judge Owens wrote a concurrence recognizing that Respondents' allegations of unconstitutional race discrimination were "promising" and would likely succeed on remand if the Government failed to rebut the presumption of

18

unconstitutional animus. *Regents*, 908 at 523-24 (Owens, J., concurring). The Ninth Circuit majority noted that it "[did] not disagree" with this assessment, stating Respondents' equal protection claim was an alternative ground for affirming the injunction. *Id.* at 520, n.31.

In holding Respondents plausibly alleged equal protection claims, these courts, applying the *Arlington Heights*[16] framework, relied on three key factors. Those factors strongly support an inference that the rescission of DACA was motivated, at least in part, by racial discrimination.

## A. The Factors Supporting an Inference of Discrimination.

First, the lower courts emphasized that rescission of DACA would disproportionately impact Latinos and individuals of Mexican heritage. *See Regents*, 908 F.3d at 518-19; *Regents*, 298 F. Supp. 3d at 1314; *Batalla*, 291 F. Supp. 3d at 274-75. Indeed, Latinos account for at least 93 percent of DACA recipients. *Regents*, 908 F.3d at 518.

Second, the courts highlighted Respondents' allegations that before and after the election, the President made statements evincing animus towards Latinos and persons of Mexican ancestry. *See Regents*, 908 F.3d at 518-19; *Regents*, 298 F. Supp. 3d at 1314; *Batalla*, 291 F. Supp. 3d at 276. For example, the President called Mexican immigrants "criminals, drug dealers, and rapists"; the President derided people who protested at one of his rallies as "thugs

---

[16] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

19

who were flying the Mexican flag";[17] the President stated a federal judge of Mexican descent could not fairly preside over a lawsuit in which he was a party because "[h]e's a Mexican" despite the fact that the judge is American[18]; and the President has repeatedly labeled Latino immigrants "criminals, 'animals,' and 'bad hombres.'" *Batalla*, 291 F. Supp. 3d at 276 (citation omitted).

Indeed, beyond these examples, President Trump has repeatedly stated a preference for white immigrants over immigrants of color. In August 2016, then-candidate Trump expressed his desire to return to the 1924 quota system to maintain "historical norms."[19] The 1924 system was, in the words of its proponent, then-Senator Reed of Pennsylvania, "a scientific plan for keeping America American,"[20] by sharply limiting non-white immigration.[21] As

---

[17] David Sherfinski, *Donald Trump: Protesters outside rally 'thugs who were flying the Mexican flag,'* Wash. Times (May 25, 2016)*,* https://www.washingtontimes.com/news/2016/may/25/trump-protesters-rally-thugs-waving-mexican-flag/.

[18] *See* Z. Byron Wolf, *Trump's attacks on Judge Curiel are still jarring to read*, CNN (Feb. 27, 2017), https://www.cnn.com/2018/02/27/politics/judge-curiel-trump-border-wall/index.html (providing an excerpt of the President's interview during which he made the remark).

[19] *See, e.g.,* Jugal K. Patel, *Trump Wants Big Changes to Legal Immigration, Too — How Big?*, NY Times (Oct. 18, 2016), https://www.nytimes.com/interactive/2016/10/18/us/politics/trump-legal-immigration.html.

[20] A. Warner Parker, The Quota Provisions of the Immigration Act of 1924, 18 AM. J. INT'L L. 737, 740 (1924).

[21] *See* Immigration Act of 1924, ch. 190, § 11(a), 43 Stat. 153, 159 (repealed 1952) (tying immigration quotas to the total number of people of each nationality in the United States as of the 1890

20

President, upon learning that 15,000 Haitians and 40,000 Nigerians had received visas to enter the United States, Mr. Trump reportedly exclaimed that Haitians "all have AIDS," and that, upon seeing the United States, Nigerians would never return to their "huts" in Africa.[22] Then, during a meeting with several U.S. Senators, the President disparaged a draft immigration plan that protected people from Haiti, El Salvador, and some African countries, asking, "Why are we having all these people from shithole countries come here?"[23] At the same meeting, President Trump expressed his preference for more immigrants from places like Norway.[24] The President has even gone so far as to suggest that members of Congress who are women of color are not real Americans. In August of 2019, at a public rally, President Trump said that four United States congresswomen of color could "go back" to the countries "from which they came," despite the fact that all four women are (of course) U.S. citizens.[25]

---

census, thereby sharply limiting quotas for non-white immigrants).

[22] Michael Shear, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, NY Times (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html.

[23] Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.b56f11cc896f.

[24] *Id.*

[25] Bianca Quilantan & David Cohen, *Trump tells Dem congresswomen: Go back where you came from*, POLITICO (July

21

The Trump Administration's policies are consistent with the President's persistent rhetoric employing odious stereotypes to describe immigrants of color, and the countries from which they emigrated, and questioning the citizenship of non-white public officials. In addition to rescinding DACA, the Administration rescinded Temporary Protected Status ("TPS")—which provides legal status for nationals from other countries to remain in the United States as a result of natural disasters, war, or other extraordinary conditions in their home countries—for nationals of El Salvador, Haiti, Nicaragua, Sudan, Nepal and Honduras. As several courts have recognized, plaintiffs challenging these TPS rescissions have plausibly alleged that the Administration was motivated by racial discrimination.[26]  In one of those cases, after a 4-day bench trial, the district court granted a preliminary injunction and observed the following with respect to the rescission of Haitian TPS:

> As President John Adams once observed, "Facts are stubborn things; and

---

14, 2019, 09:15 AM), https://www.politico.com/story/2019/07/14/trump-congress-go-back-where-they-came-from-1415692.

[26] *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1098 (N.D. Cal. 2018) (TPS plaintiffs plausibly stated claim that terminations were motivated by racial animus); *Saget v. Trump*, 345 F. Supp. 3d 287, 303 (E.D.N.Y. 2018) (same); *Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 413 (D. Mass. 2018) (same); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 326 (D. Md. 2018) (same); *Nat'l Ass'n for the Advancement of Colored People v. U.S. Dep't of Homeland Sec.*, 364 F. Supp. 3d 568, 578 (D. Md. 2019) (same).

22

> whatever may be our wishes, our inclinations, or the dictates of our passion, they cannot alter the state of facts and evidence." Based on the facts on this record, and under the factors prescribed by *Arlington Heights*, there is both direct and circumstantial evidence [that] a discriminatory purpose of removing non-white immigrants from the United States was a motivating factor behind the decision to terminate TPS for Haiti.

*Saget v. Trump*, 375 F. Supp. 3d 280, 374 (E.D.N.Y. 2019).

The Administration has also implemented widely condemned family separation policies that resulted in thousands of children of tender age—many of them babies and toddlers—being forcibly removed from their parents and held in detention centers, where conditions have been described by official observers as "unsanitary" and "dangerous[ly] overcrowd[ed]."[27] The immigrants affected by these policies are overwhelmingly from Mexico and Central American countries, and the Administration has unapologetically admitted that these policies were designed to deter these families from seeking refuge

---

[27] Madeline Joung, *What Is Happening at Migrant Detention Centers? Here's What to Know*, TIME, https://time.com/5623148/migrant-detention-centers-conditions/ (last updated July 12, 2019).

**AR5375**

23

in the United States.[28] In sum, the statements pointed to by the courts below represent only a portion of the President's statements expressing animus against immigrants of color, and his Administration has implemented a variety of policies reflecting that animus.

Third, the lower courts pointed to the "unusual history" leading up to the Government's decision to rescind DACA. *See Regents*, 908 F.3d at 519; *Regents*, 298 F. Supp. 3d at 1315. Namely, "DACA received reaffirmation by [the Department of Homeland Security] as recently as three months before the rescission, only to be hurriedly cast aside on what seems to have been a contrived excuse (its purported illegality)." *Regents*, 908 F.3d at 519 (quotation marks omitted).

These facts together strongly support an inference that the Trump Administration's rescission of DACA violated the Fifth Amendment because it was motivated, at least in part, by racial discrimination against non-white immigrants.

## B. The Government Cannot Rely on *Ipse Dixit* to Defeat an Inference of Discrimination.

The Government challenges the lower courts' rulings on three grounds. *See* Pet'rs' Br. at 52-57. First, it tries to diminish the import of the disparate impact that the rescission of DACA has on Latinos and persons of Mexican heritage by arguing that

---

[28] *See* Memo. for Federal Prosecutors Along the Southwest Border from the Att'y Gen. Sessions to Fed. Prosecutors Along the Sw. Border (Apr. 6, 2018) (https://perma.cc/H5JB-LFG9).

24

"given the United States' natural immigration patterns, the disparate impact of the rescission of DACA is neither surprising nor illuminating of the agency's motives." *Id.* at 54-55.

This argument defies both logic and precedent. Disparities do not become less significant because they mostly affect minorities. On the contrary, "particularly . . . in the case of governmental action," gross disparities such as those here are powerful evidence of discrimination because "normally [an] actor is presumed to have intended the natural consequences of his deeds." *Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring). That the Government could predict the rescission of DACA would overwhelmingly impact Latinos and persons of Mexican heritage bolsters the plausibility of Respondents' intentional discrimination claims—there was no question about which groups of immigrants the Government's actions would affect.

Next, the Government avers that the President's discriminatory "statements are equally irrelevant." Pet'rs' Br. at 55. This is so, claims the Government, because "the relevant decisionmakers were Duke and Nielsen [Secretaries of Homeland Security]." *Id.* It goes on to assert that the President's statements do not "even address[] DACA recipients," save for one that "reveals nothing more than the obvious fact that DACA has been an important part of legislative negotiations on immigration reform"—the President's tweet that "[t]he Democrats have been told, and fully understand, that there can be no DACA without the desperately needed WALL at the Southern Border." *Id.* The Government then suggests that the President's statements of animus against

**AR5377**

25

immigrants of color do not matter because he "has repeatedly praised DACA recipients and urged Congress to 'legalize' their protection." *Id.* (citation omitted).

The Government's arguments collapse in on themselves. The Government in one breath says that the President was not the "relevant decisionmaker," and then in the next admits that he was leveraging the rescission of DACA as "part of legislative negotiations." The President has been very clear that he would end DACA if Congress did not accede to his demand to build a wall on the Southern Border, tweeting: "The Democrats have been told, and fully understand, that there can be no DACA without the desperately needed WALL at the Southern Border . . . ." *Regents*, 908 F.3d at 519 n.30. And in the face of evidence that the President was using DACA as a bargaining chip, it is certainly plausible that the President *was* the relevant decisionmaker.

In fact, the President's tweets, which are his official statements,[29] alleviate any doubt. On the morning of September 5, 2017, the very same day

---

[29] *See, e.g.*, Def.'s Suppl. Submission and Further Resp. to Pl.'s Post-Briefing Notices, *James Madison Project v. Dep't of Justice*, No. 1:17-cv-00144-APM, (D.D.C. Nov. 13, 2017) (DOJ noting that the Government is treating the President's tweets "as official statements of the President of the United States"); Elizabeth Landers, *White House: Trump's Tweets are 'Official Statements'*, CNN (June 6, 2017), https://www.cnn.com/2017/06/06/politics/trump-tweets-official-statements/index.html (recounting the White House Press Secretary's announcing during a press briefing that the President's tweets are "considered official statements by the President of the United States").

26

DHS released its memorandum rescinding DACA,[30] the President tweeted: "Congress, get ready to do your job – DACA!"[31] And the next day, after the Administration announced that it was rescinding DACA, the President tweeted he would "revisit this issue" if Congress did not act to legalize DACA within six months.[32] These tweets reveal that the President was a driving force behind the rescission decision.

More generally, a president has immense influence over his cabinet. *See Humphrey's Executor v. United States*, 295 U.S. 602 (1935). And this President is widely known to wield particularly great influence over his cabinet.[33] Thus, President Trump's

---

[30] DACA Rescission Memo.

[31] Mallory Shelbourne, *Trump to Congress: 'Get ready to do your job" on DACA*, The Hill (Sept. 5, 2017), https://thehill.com/homenews/administration/349173-trump-to-congress-get-ready-to-do-your-job-on-daca.

[32] Sophie Tatum, *Trump: I'll 'revisit' DACA if Congress can't fix in 6 months*, CNN, https://www.cnn.com/2017/09/05/politics/donald-trump-revisit-daca/index.html (last updated Sept. 6, 2017).

[33] For example, in *Saget*, the court found the President "exerted significant influence over [the Secretary of Homeland Security's] TPS decision." 375 F. Supp. 3d at 360. It is reported that the President also influenced the Department of Homeland Security's decision to implement a family separation policy. *See* Zack Budryk, *Trump's renewed push for family separations led to Nielsen's ouster: report*, The Hill (Apr. 8, 2019), https://thehill.com/latino/437830-trump-has-pushed-to-resume-child-separations-for-months-report. And a more recent example, after the National Weather Service contradicted the President's statement about Hurricane Dorian, the Secretary of Commerce reportedly threatened to fire the heads of the National Oceanic and Atmospheric Administration (NOAA), which led NOAA to disavow the earlier statement. *See*

27

stated animus towards Latinos and Mexican nationals is highly relevant and supports Respondents' intentional discrimination claims. *See generally McCreary County v. ACLU of Ky.*, 545 U.S. 844, 846 (2005) (a court cannot "turn a blind eye to the context in which [a] policy arose") (internal quotation marks and citation omitted).

In any event, the Government's argument that the President was not the "relevant decisionmaker" is premature, given Respondents' allegations that the President himself ordered the rescission of DACA. *See Regents*, 298 F. Supp. 3d at 1315; *Batalla*, 291 F. Supp. 3d at 277. At this stage of the proceedings, this Court must accept those allegations as true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.").

---

Christopher Flavelle, Lisa Friedman, and Peter Baker, *Commerce Chief Threatened Firings at NOAA after Trump's Dorian Tweets, Sources Say*, NY Times, https://www.nytimes.com/2019/09/09/climate/hurricane-dorian-trump-tweet.html (last updated Sept. 10, 2019). *See also* Karen Tumulty, *President Trump isn't a fan of dissent—inside or outside the government*, Wash. Post (Feb. 1, 2017), https://www.washingtonpost.com/politics/president-trump-seeks-to-quash-dissent-inside-the-government/2017/02/01/788bdefa-e7ed-11e6-b82f-687d6e6a3e7c_story.html; Z. Byron Wolf, *The kiss of death in Trump's cabinet is disagreeing with the boss*, CNN, https://www.cnn.com/2018/04/03/politics/trump-cabinet-kiss-of-death/index.html (last updated Apr. 3, 2018); Stephen Collinson, *The law or the President: The Trump appointees' dilemma*, CNN (Apr. 9, 2019), https://www.cnn.com/2019/04/09/politics/donald-trump-kirstjen-nielsen-immigration/index.html.

AR5380

28

The Government's assertion that the President's remarks "praising" DACA recipients somehow neuters his numerous statements evincing animus against immigrants of color must be rejected. The President only made those "praising" statements while asserting the United States needs to build a wall across the Southern border to keep people from Central America out of the country. And racist remarks cannot be cured by feel-good bromides. The President cannot meaningfully say he "loves those kids," referring to DACA recipients (when most of them are adults), and then label people from the same countries the vast majority of DACA recipients come from as animals, drug dealers, rapists, and murderers. Simply, Respondents' allegations of the President's animus support the plausibility of their intentional discrimination claims.

Finally, the Government claims there was "nothing remotely 'unusual' about the history of the rescission" because shortly after DHS reaffirmed DACA, "the *Texas*[34] plaintiffs indicated their intent to challenge [DACA], and the Attorney General informed the Acting Secretary that he had concluded that the policy was unlawful . . ." Pet'r's Br. at 56.[35] The Government claims that these two "facts provide

---

[34] *Texas v. United States*, 96 F. Supp. 3d 591 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd*, 136 S. Ct. 2271 (2016).

[35] Attorney General Sessions also said in his remarks announcing that the Administration's stance that DACA was illegal that DACA "denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." U.S. Dep't of Justice, Office of Pub. Affairs, *Attorney General Sessions Delivers Remarks on DACA* (Sept. 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca.

29

ample explanation for the policy change and its timing." *Id.* at 57.

However, the fact that the Government can give reasons for its decision to rescind DACA does not mean that the process leading up to that decision was not unusual. As the district court reasoned in *Regents*, the speed at which the Government rescinded DACA makes these purported justifications appear "contrived": the "strange about-face, done at lightning speed, suggests that the normal care and considerations within the agency was bypassed." *Regents*, 298 F. Supp. 3d at 1315. And the speed of this decision is extra curious given just how momentous it was. *Regents*, 908 F.3d at 493. The Government does not dispute Respondents' allegations that the decision to rescind DACA was abrupt, and the Government's justifications for that abruptness do not undercut the inference of discrimination at the pleadings stage.

The Census case recently decided by this Court exemplifies why Respondents' Equal Protection Clause claims cannot be dismissed at the pleadings stage. In that case, the Secretary of Commerce asserted that the Government was seeking to add a citizenship question to the census to better enforce the Voting Rights Act (VRA). *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019). However, the evidence told a "story that did not match the explanation the Secretary gave for his decision." *Id.* The evidence revealed that the VRA explanation was "contrived" and "pretextual," because "the Secretary began taking steps to reinstate a citizenship question about a week into his tenure" with "no hint that he

**AR5382**

30

was considering VRA enforcement in connection with that project." *Id.*

Respondents have plausibly alleged the Government's purported rationales for rescinding DACA—its illegality and potential litigation—are similarly "contrived" and "pretextual." *Id.* This likelihood is increased when considering the disparate impact the rescission had on Latinos and individuals of Mexican ancestry, which are groups the President has persistently evinced animus towards, and the unusual history behind DACA's rescission. Although the validity of Respondents' allegations must ultimately be tested at trial after they have an opportunity for discovery, they have easily met their burden at the pleading stage. Indeed, as Judge Owens recognized, their allegations that the Government's decision to rescind DACA was motivated by racial discrimination are "promising," and suggest an alternative basis to uphold the district courts' preliminary injunctions.

AR5383

31

## CONCLUSION

This Court should affirm the lower courts' decisions preliminarily enjoining the rescission of DACA. If the Court reaches Respondents' constitutional claims, it should hold that those claims

Respectfully submitted,

SHERRILYN A. IFILL
*Director-Counsel*
JANAI S. NELSON
SAMUEL SPITAL
NATASHA MERLE*
RAYMOND AUDAIN
CARA MCCLELLAN
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector St., 5th Floor
New York, NY 10006
(212) 965-2200
nmerle@naacpldf.org

*Counsel of Record*

DANIEL HARAWA
*Of Counsel*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th St, NW Suite 600
Washington, DC 20005

*Counsel for Amicus Curiae
NAACP Legal Defense &
Educational Fund, Inc*

October 4, 2019

Nos. 18-587, 18-588, 18-589

# In The
# Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, ET AL., *Petitioners*,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA,
ET AL., *Respondents*,

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE NINTH CIRCUIT*

**AMICI CURIAE BRIEF OF AMERICAN
HISTORICAL ASSOCIATION, ORGANIZATION OF
AMERICAN HISTORIANS, 42 HISTORIANS, AND
THE FRED T. KOREMATSU CENTER FOR LAW
AND EQUALITY IN SUPPORT OF RESPONDENTS**

Robert S. Chang
Lorraine K. Bannai
Melissa Lee
Jessica Levin
FRED T. KOREMATSU CENTER
  FOR LAW AND EQUALITY
RONALD A. PETERSON LAW
  CLINIC
SEATTLE UNIVERSITY SCHOOL
  OF LAW
1112 East Columbia Street
Seattle, WA 98122
(206) 398-4025

Pratik A. Shah
  *Counsel of Record*
Z.W. Julius Chen
AKIN GUMP STRAUSS HAUER &
  FELD LLP
2001 K Street, NW
Washington, DC 20006
(202) 887-4000
pshah@akingump.com

Jessica Weisel
AKIN GUMP STRAUSS HAUER &
  FELD LLP
1999 Avenue of the Stars
Suite 600
Los Angeles, CA 90067
(310) 229-1000

*Counsel for Amici Curiae*

Additional Captions Listed on Inside Cover

**AR5385**

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., *Petitioners*,

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL., *Respondents*,

————————

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT*

————————

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, ET AL., *Petitioners*,

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL., *Respondents*,

————————

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT*

————————

**AR5386**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.........................................ii

INTEREST OF *AMICI CURIAE* ...............................1

INTRODUCTION AND SUMMARY OF
    ARGUMENT .........................................................4

ARGUMENT.............................................................7

  I.  HISTORY SHOWS A TRANSITION
     FROM RACIALLY EXPLICIT
     ATTACKS TO CODED LANGUAGE
     FOR DISCRIMINATION AGAINST
     IMMIGRANT GROUPS...................................7

  II.  CODE WORD ANALYSIS IS A WIDELY
     ACCEPTED METHODOLOGY
     EMPLOYED BY HISTORIANS AND
     RELIED UPON BY COURTS .......................16

  III. THE HISTORY, CONTEXT, AND
     CONTEMPORANEOUS STATEMENTS
     ABOUT DACA REVEAL THE USE OF
     CODE WORDS THAT REFLECT ANTI-
     MEXICAN AND ANTI-LATINO
     SENTIMENT .................................................21

  IV. THE TRUMP ADMINISTRATION'S
     USE OF CODED LANGUAGE IN
     DISCUSSING DACA UNDERSCORES
     THE MISMATCH BETWEEN THE
     PROFFERED REASONS AND DACA'S
     RESCISSION .................................................26

CONCLUSION .......................................................29

APPENDIX ............................................................1a

(i)

AR5387

ii

# TABLE OF AUTHORITIES

<u>CASES</u>:

*Aman v. Cort Furniture Rental Corp.*,
    85 F.3d 1074 (3d Cir. 1996) ........................... 17, 18

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015) ................................ 17

*Arnold v. United States Postal Serv.*,
    863 F.2d 994 (D.C. Cir. 1988) ............................. 20

*Avenue 6E Invs., LLC v. City of Yuma*,
    818 F.3d 493 (9th Cir. 2016) ........................ 19, 26

*Cerros v. Steel Techs., Inc.*,
    398 F.3d 944 (7th Cir. 2005) ................................ 12

*Department of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ........................... 4, 5, 27, 28

*E.E.O.C. v. Board of Regents of Univ. of Wis. Sys.*,
    288 F.3d 296 (7th Cir. 2002) ................................ 19

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ............................................. 27

*González v. Douglas*,
    269 F. Supp. 3d 948 (D. Ariz. 2017) ...................... 3

*Jenkins v. Methodist Hosps. of Dall., Inc.*,
    478 F.3d 255 (5th Cir. 2007) ................................ 19

**AR5388**

iii

*Korematsu v. United States*,
  323 U.S. 214 (1944) .............................................. 5

*MHANY Mgmt., Inc. v. County of Nassau*,
  819 F.3d 581 (2d Cir. 2016)..................... 18, 26, 27

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015) ........................................... 2

*Ortiz v. School Bd. of Broward Cty.*,
  No. 18-15305, 2019 U.S. App. LEXIS
  20554 (11th Cir. July 11, 2019) .......................... 12

*Smith v. Fairview Ridges Hosp.*,
  625 F.3d 1076 (8th Cir. 2010) ............................. 19

*Smith v. Town of Clarkton*,
  682 F.2d 1055 (4th Cir. 1982) ............................. 18

*Soto v. Flores*,
  103 F.3d 1056 (1st Cir. 1997)............................... 18

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ........................................... 5

*Underwood v. Hunter*,
  730 F.2d 614 (11th Cir. 1984) ............................. 20

*United States v. City of Birmingham*,
  727 F.2d 560 (6th Cir. 1984) ............................... 19

*Vigil v. City of Las Cruces*,
  119 F.3d 871 (10th Cir. 1997) ............................. 12

AR5389

iv

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*
429 U.S. 252 (1977) ........................................ 20, 21

*Villanueva v. Carere,*
85 F.3d 481 (10th Cir. 1996) ................................ 20

**OTHER AUTHORITIES:**

*150,000 "Wetbacks" Taken in Round-Up,*
N.Y. TIMES, July 29, 1954 .................................... 11

*Brownell Maps Trip for "Wetback" Study,*
N.Y. TIMES, Aug. 7, 1953 ..................................... 13

CALAVITA, KITTY, INSIDE THE STATE: THE BRACERO PROGRAM, IMMIGRATION, AND THE I.N.S. (1992) .................................... 13

*Fifteen News Questions*, N.Y. TIMES, Apr. 2, 1950 ........................................................ 12

GARCÍA, JUAN RAMON, OPERATION WETBACK: THE MASS DEPORTATION OF MEXICAN UNDOCUMENTED WORKERS IN 1954 (1980) .... 11, 13

Herbert, Bob, *Righting Reagan's Wrongs?,*
N.Y. TIMES, Nov. 13, 2007 .................................... 15

HIGHAM, JOHN, STRANGERS IN THE LAND: PATTERNS OF AMERICAN NATIVISM, 1860-1925 (rev. ed. 2002) ......................................... 9, 10

**AR5390**

v

Kneeland, Douglas E., *Reagan Campaigns at Mississippi Fair:  Nominee Tells Crowd of 10,000 He Is Backing States' Rights—Attacks Inflation Policy*, N.Y. TIMES, Aug. 3, 1980 ............................................. 15

LÓPEZ, IAN HANEY, DOG WHISTLE POLITICS: HOW CODED RACIAL APPEALS HAVE REINVENTED RACISM AND WRECKED THE MIDDLE CLASS (2014) ................................ 14, 15, 16

MENDELBERG, TALI, THE RACE CARD: CAMPAIGN STRATEGY, IMPLICIT MESSAGES, AND THE NORM OF EQUALITY (2001) .................................................................... 14

NGAI, MAE M., IMPOSSIBLE SUBJECTS: ILLEGAL ALIENS AND THE MAKING OF MODERN AMERICA (2004) .......................... 10, 11, 13

THE OXFORD ENGLISH DICTIONARY (2d ed. 1989) .................................................................... 12

Perlstein, Rick, *Exclusive:  Lee Atwater's Infamous 1981 Interview on the Southern Strategy*, THE NATION, Nov. 13, 2012 ................... 6

The President's News Conference, July 14, 1954 .................................................................... 12

The President's News Conference, July 21, 1954 .................................................................... 12

S. CT. R. 37.6 .............................................................. 1

AR5391

vi

SALYER, LUCY, LAWS HARSH AS TIGERS: CHINESE IMMIGRANTS AND THE SHAPING OF MODERN IMMIGRATION LAW (1995) ................ 8, 9

SÁNCHEZ, GEORGE J., BECOMING MEXICAN AMERICAN: ETHNICITY, CULTURE AND IDENTITY IN CHICANO LOS ANGELES, 1900-1945 (1993) .......................................................... 11

SANTA ANA, OTTO, DOCUMENTING THE PRESIDENT'S VERBAL ANIMUS AGAINST IMMIGRANTS TO DEFEND DACA GRANTEES: FINAL REPORT OF THE UCLA DACA DEFENSE GROUP (Jan. 2019) ............... 21, 24

STAMPP, KENNETH M., THE PECULIAR INSTITUTION: SLAVERY IN THE ANTE-BELLUM SOUTH (1956) ........................................... 2

Statement from President Donald J. Trump (Sept. 5, 2017) ................................................. 23, 25

*Transcript: Republican Presidential Debate,* N.Y. TIMES, Nov. 11, 2015 .................................... 25

Trump, Donald J., Remarks at 2015 Sunshine Summit (Nov. 13, 2015) ...................... 22

Trump, Donald J., Remarks at the Charlotte Convention Center in Charlotte, North Carolina (Aug. 18, 2016) ..................................... 22

Trump, Donald J., Remarks at the Mississippi Coliseum in Jackson, Mississippi (Aug. 24, 2016) .................................. 22

AR5392

vii

Trump, Donald J., Remarks on Signing a
    Proclamation on the National Day of
    Prayer for the Victims of Hurricane
    Harvey and for Our National Response
    and Recovery Efforts and an Exchange
    with Reporters (Sept. 1, 2017) ............................ 23

Ware, Leland & David C. Wilson, *Jim Crow
    on the "Down Low": Subtle Racial
    Appeals in Presidential Campaigns*, 24
    ST. JOHN'S J.L. COMM. 299 (2009) ........... 14, 15, 16

AR5393

## INTEREST OF *AMICI CURIAE*[1]

The American Historical Association ("AHA") is the largest professional organization in the United States devoted to the study and promotion of history and historical thinking.  It is a non-profit membership organization, founded in 1884 and incorporated by Congress in 1889 for the promotion of historical studies.  The AHA provides leadership to the discipline on such issues as professional standards, academic freedom, access to archives, history education, and the centrality of history to public culture.  In situations involving the rights and careers of individual historians, historical practice in diverse venues, or the role of history in public culture, the AHA has the responsibility to take public stands—including participation in relevant legal proceedings.  Everything has a history; in this particular case, the AHA considers it imperative for the Court to be aware of the historical context of current efforts to vilify an entire racial group.

Founded in 1907, the Organization of American Historians ("OAH") is the largest professional society dedicated to the teaching and study of American history.  Its distinguished *Journal of American History*, annual meetings, and public service activities aim to promote excellence in scholarship, teaching, and presentation of American history.  The OAH is an

---

[1] Pursuant to Supreme Court Rule 37.6, *amici* state that no counsel for any party authored this brief, in whole or in part, and no person or entity other than *amici* contributed monetarily to its preparation or submission.  The parties consent to the filing of this brief.

(1)

2

international, non-profit membership organization, whose approximately 7,000 historian members include university and college professors in the United States and abroad, as well as individuals employed in a variety of scholarly and institutional settings, such as libraries, museums, and historical societies.

The late Kenneth M. Stampp, historian and past president of OAH, wrote: "With the historian it is an article of faith that knowledge of the past is a key to understanding the present."[2] The OAH adheres to this principle, and has an interest—not as an advocate of a particular legal standard, but as a steward of history—in ensuring that the Court is presented with an accurate description of the way that discrimination against immigrant groups initially relied upon racially explicit attacks, but has more recently relied upon coded language. The OAH occasionally submits *amicus* briefs that discuss the history of discrimination against certain groups. *See, e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2596 (2015) (citing Br. for Org. of Am. Historians as *Amicus Curiae* 5-28).

The 42 individual *amici* are academics trained in the field of history who study, teach, and write about United States history.[3]

The Fred T. Korematsu Center for Law and Equality ("Korematsu Center") is a non-profit organization, based at the Seattle University School of

---

[2] KENNETH M. STAMPP, THE PECULIAR INSTITUTION: SLAVERY IN THE ANTE-BELLUM SOUTH vii (1956).

[3] Their names, titles, and institutional affiliations appear in the appendix, *infra*.

3

Law, that works to advance justice through research, advocacy, and education. Inspired by the legacy of Fred Korematsu, who defied military orders during World War II that ultimately led to the unlawful incarceration of 120,000 Japanese Americans, the Korematsu Center has a special interest in addressing government action targeted at classes of persons based on race, nationality, or religion. The Korematsu Center has developed familiarity with code word analysis from its role as co-counsel to high school students who successfully challenged a facially neutral Arizona statute enacted and enforced to terminate a Mexican American Studies Program. *González v. Douglas*, 269 F. Supp. 3d 948 (D. Ariz. 2017). In addition, the Korematsu Center is keenly aware of the use of racially coded (and more explicit) language to justify past discriminatory treatment of Japanese Americans.

In proceedings in the United States District Court for the Eastern District of New York, *New York v. Trump*, No. 1:17-cv-5228, an expert report and declaration by historian Dr. Stephen Pitti explained the historical context and use of racially coded expressions or "code words" on the part of President Trump and other Administration officials in connection with the rescission of the Deferred Action for Childhood Arrivals program ("DACA"). *Id.*, ECF No. 97-2, Ex. 38 (Dec. 15, 2017) ("Pitti Decl."). All *amici* submit that Dr. Pitti's research methods are widely accepted as valid in the field of history, and agree with his summative opinion:

> When properly understood within the context of the history and contemporary discrimination directed against Mexicans,

**AR5396**

4

> Mexican Americans, and Latinos, ***
> President Trump and others who worked for
> his campaign and in his Administration
> have long expressed animus towards ethnic
> Mexicans and other Latinos. President
> Trump and others associated with his
> presidential campaign and Administration
> have drawn upon and used racial code
> words, and have benefitted from racism
> against Latinos. Racial animus against
> ethnic Mexicans shaped their decision to
> terminate DACA.

Pitti Decl. ¶ 17.

Drawing on their collective experience and expertise, *amici* seek to ensure that this Court understands the ways in which racially coded language has been used by government actors, both past and present, to mask illicit discriminatory motives—particularly in the immigration context, including the rescission of DACA.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

Just last Term, this Court held the Department of Commerce's addition of a citizenship question to the decennial census lacked the sort of genuine reasoned explanation that the Administrative Procedure Act ("APA") demands. *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019). The Court so held even though (i) the reason the agency offered was facially neutral; and (ii) the agency's decision was within the substantive scope of its authority. The Court relied on evidence showing that the agency's proffered explanation was "incongruent with what the record

5

reveals about the agency's priorities and decision-making process." *Id.* at 2575.

The Department of Homeland Security's decision to rescind DACA suffers from a similar incongruity. The proffered reasons, largely *post hoc*, are likewise facially neutral. But as Respondents catalog, there is already evidence in the administrative record that those reasons were pretextual. *See* Br. of Univ. of Cal. Resp'ts 56-58 (citing Attorney General Sessions's statements, upon announcing rescission, that DACA denies Americans jobs and contributes to crime). *Amici* here seek to underscore that accepting the Administration's justifications for rescinding DACA requires turning a blind eye not only to that evidence, but also to the history and context of the rescission decision—including the repeated use of "code words" designed to advance political objectives by appealing to racist and nativist sentiment.

We ought not be surprised that proffered reasons for government actions sometimes mask improper discrimination. Race-neutral reasons have been offered throughout our country's history to justify all manner of discriminatory actions that were, in fact, the product of deliberate action and animus. *See, e.g., Korematsu v. United States*, 323 U.S. 214 (1944), *abrogated by Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) ("*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—'has no place in law under the Constitution.'"). That has been particularly true with respect to anti-immigrant measures targeted at disfavored minority groups.

6

The practice of using race-neutral justifications has become more prevalent as overtly racist language has become less accepted over time.  But racism has hardly disappeared.  In place of overt expressions of animus, politicians have resorted to using code words to convey racial and political messages to appeal to their constituents.  This phenomenon is well described in a surprisingly candid confession by Republican political strategist Lee Atwater in 1981:

> You start out in 1954 by saying, "N****r, n****r, n****r."  By 1968 you can't say "n****r"—that hurts you, backfires.  So you say stuff like *** forced busing, states' rights, and all that stuff, and you're getting abstract.  Now, you're talking about cutting taxes, and all these things you're talking about are totally economic things and a byproduct of them is, blacks get hurt worse than whites *** .  "We want to cut this," is much more abstract than even the busing thing *** and a hell of a lot more abstract than "N****r, n****r."[4]

To assist the Court in evaluating Respondents' claims that DACA rescission violates the APA and the Equal Protection Clause, *amici* explain that racial animus can be discerned by code word analysis, and that such analysis is a widely accepted methodology in the field of history and is increasingly relied upon by

---

[4] Rick Perlstein, *Exclusive:  Lee Atwater's Infamous 1981 Interview on the Southern Strategy*, THE NATION, Nov. 13, 2012 (sixth ellipsis in original), https://www.thenation.com/article/exclusive-lee-atwaters-infamous-1981-interview-southern-strategy/.

7

courts. *Amici* then analyze the history, context, and contemporaneous statements by President Trump that reflect anti-Mexican and anti-Latino sentiment behind the decision to rescind DACA. Those statements are consistent with racially coded language he used throughout his campaign and presidency, and reveal that the Government's explanation for rescinding DACA is pretextual.

## ARGUMENT

I. **HISTORY SHOWS A TRANSITION FROM RACIALLY EXPLICIT ATTACKS TO CODED LANGUAGE FOR DISCRIMINATION AGAINST IMMIGRANT GROUPS**

**1.** The use of race-based language to advance anti-immigration measures is nothing new. For most of this Nation's history, populist leaders, politicians, and others did not shy away from overt racial attacks to justify and advance discrimination against a particular immigrant group. The following describes a few notable historical examples that show how racial nativism was exploited explicitly to scapegoat outsider immigrant communities.

**a.** In the 1870s, a major depression in the United States caused widespread unemployment. Labor groups in the western United States blamed their problems on the growing Chinese immigrant population. Stereotypes about Chinese workers were used to justify anti-Chinese actions. A widespread belief that Chinese immigrants had been brought to the country involuntarily fueled the notion that they were willing to tolerate terrible working conditions because they had no choice. Newspapers such as the

AR5400

8

*San Francisco Chronicle* propagated the claim that Chinese immigrants were "as rigidly under the control of the contractor who brought him as ever an African slave was under his master."[5]

Nativist politicians also raised alarms about Chinese immigrants' strong work ethic. Senator John F. Miller, a leading advocate of restricting Chinese immigration, alleged that due to overpopulation in China, Chinese laborers had become "by long training and *** heredity *** automatic engines of flesh and blood," and white laborers could not compete with such "machines."[6] White Americans thus had to be protected from admission of Chinese "servile labor."[7]

Opponents of Chinese immigration also seized on racial and cultural theories in support of their arguments against Chinese immigration. Chinese immigrants were supposedly biologically incapable of assimilation.[8] According to Senator Miller, Chinese immigrants could never become American because American and Asian civilizations were "of diverse elements and character, both the result of evolution under different conditions, radically antagonistic," and this meant that Americans and Chinese were like "oil and water" and would never mix.[9] Other restrictionists warned that Chinese immigrants were "utterly unfit for and incapable of free or self-

---

[5] LUCY SALYER, LAWS HARSH AS TIGERS: CHINESE IMMIGRANTS AND THE SHAPING OF MODERN IMMIGRATION LAW 9-10 (1995).

[6] *Id.* at 15 (ellipses in original).

[7] *Id.*

[8] *Id.* at 11.

[9] *Id.* at 15-16.

9

government" because Chinese immigrants had emigrated from a despotic government.[10]

The restrictionists' view eventually carried the day as Congress passed the Chinese Exclusion Act of 1882, and the United States adopted a policy of excluding immigrants on the basis of race and nationality for the first time in its history.[11]

**b.** Congress next drastically restricted immigration in the 1920s to preserve a supposedly past ideal of America from a perceived threat of mass immigration. Strains of anti-Semitism and racial animus were present from the beginning of these efforts.

The House Committee on Immigration appended to its 1921 report in favor of suspending immigration a blatantly anti-Semitic screed that America faced an inundation of "abnormally twisted" and "unassimilable" Jews—"filthy, un-American, and often dangerous in their habits."[12] The rise of eugenics in America aided this racial push to restrict immigration based on national origin.[13] The House Committee appointed an "expert eugenics agent," who testified on the bad breeding state of immigrants who were entering America and spoiling its inborn national qualities. [14] Future-President Coolidge similarly

---

[10] *Id.* at 16.

[11] *Id.* at 17.

[12] JOHN HIGHAM, STRANGERS IN THE LAND: PATTERNS OF AMERICAN NATIVISM, 1860-1925, at 309 (rev. ed. 2002).

[13] *Id.* at 314.

[14] *Id.*

10

warned of deterioration when immigrants intermarried with white Americans.[15]

These sentiments prompted Congress to pass the Immigration Act of 1924, in order to preserve a "distinct American type" and prevent the "Nordic" race in America from being overrun by immigrants from other parts of the globe.[16]

**c.** Concerns about the emerging "Mexican problem" soon followed.[17] An editorial in the *Saturday Evening Post* in 1928 heralded these fears:

> Mexican laborers often have nine children, or even more. At the nine-child rate, any of these Mexicans who are coming in by the trainload might be expected to average 729 great grandchildren. *** No temporary considerations of expediency should carry the smallest weight in preventing the proper economic protection of our own flesh and blood.[18]

Anti-Mexican rhetoric often focused on allegations of ignorance, filth, indolence, and criminality.[19]

The Great Depression served only to increase this racial hostility. [20] Federal and local governments began to pressure Mexican immigrants to return to

_____

[15] *Id.* at 318.

[16] *Id.* at 321.

[17] MAE M. NGAI, IMPOSSIBLE SUBJECTS: ILLEGAL ALIENS AND THE MAKING OF MODERN AMERICA 52 (2004).

[18] *Id.* at 52-53.

[19] *Id.*

[20] *Id.* at 71.

AR5403

11

Mexico. [21] The Immigration Service created an atmosphere of fear through public round-ups and deportation drives.[22] Local governments and private charitable organizations placed additional pressure on Mexicans and Mexican-Americans to repatriate voluntarily by denying or discriminating against them with regard to governmental relief.[23] Over 400,000 people from Mexico, including American citizens of Mexican descent, were repatriated from the United States to Mexico during the 1930s.[24] It is estimated that 60% were children or American citizens by native birth.[25]

**d.** Mexican migrants again became the target of nativist sentiment in the 1950s, when a program officially known as "Operation Wetback" began forcibly repatriating hundreds of thousands of them in 1954.[26] As a Sunday edition of the *New York Times* then explained, "[t]he term 'wetback' was originally applied to Mexicans who entered the U.S. farther east

---

[21] *Id.* at 73.

[22] *Id.*

[23] GEORGE J. SÁNCHEZ, BECOMING MEXICAN AMERICAN: ETHNICITY, CULTURE AND IDENTITY IN CHICANO LOS ANGELES, 1900-1945, at 211-212 (1993).

[24] NGAI, *supra* note 17, at 72.

[25] *Id.*

[26] *See* JUAN RAMON GARCÍA, OPERATION WETBACK: THE MASS DEPORTATION OF MEXICAN UNDOCUMENTED WORKERS IN 1954, at 228 (1980); *see also 150,000 "Wetbacks" Taken in Round-Up*, N.Y. TIMES, July 29, 1954, at 7 (reporting numbers apprehended approximately two months after the beginning of Operation Wetback), https://timesmachine.nytimes.com/timesmachine/1954/07/30/84128756.html?pageNumber=7.

12

by swimming the Rio Grande,"[27] and dates back to the Great Depression.[28]

Over time, "wetback" became a metonym for all unauthorized Mexican migrants, and today there is little doubt of its status as an epithet or slur.[29] For present purposes, the historical record makes clear that, at least as far back as Operation Wetback, the term was used in connection with anti-immigration sentiment. President Eisenhower, for example, affirmed his support of legislation intended to address what was characterized as the "wetback problem."[30]

---

[27] *Fifteen News Questions*, N.Y. TIMES, Apr. 2, 1950, at E2, E9, https://timesmachine.nytimes.com/timesmachine/1950/04/02/96214886.html?pageNumber=142; https://timesmachine.nytimes.com/timesmachine/1950/04/02/96214988.html?pageNumber=149.

[28] *Wetback*, 20 THE OXFORD ENGLISH DICTIONARY 173 (2d ed. 1989).

[29] *See, e.g.*, *Ortiz v. School Bd. of Broward Cty.*, No. 18-15305, 2019 U.S. App. LEXIS 20554, at *12 (11th Cir. July 11, 2019) ("ethnic slurs like 'spic' and 'wetback'" evidence "severe" harassment); *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 950-951 (7th Cir. 2005) (stating that it was "difficult to imagine epithets more offensive to someone of Hispanic descent" than "spic" and "wetback"); *Vigil v. City of Las Cruces*, 119 F.3d 871, 871-874 (10th Cir. 1997) (Lucero, J., dissenting) (comparing the term to other racial epithets).

[30] *See* The President's News Conference, July 14, 1954, https://www.presidency.ucsb.edu/documents/the-presidents-news-conference-458 (question by Sarah McClendon, *El Paso Times*, about two Senate bills "designed to curb the hundreds of thousands of wetbacks coming into this country"); The President's News Conference, July 21, 1954, https://www.presidency.ucsb.edu/documents/the-presidents-news-conference-461 (question by John Herling, *Editors Syndicate*, asking about "the wetback legislation prepared by Attorney General Brownell").

13

Attorney General Herbert Brownell, Jr. similarly announced in the lead-up to Operation Wetback that he "would go to California next week to study the 'wetback' problem."[31]  And most pointedly, General Joseph Swing, upon assuming the post of Commissioner of Immigration and Naturalization, announced that he would "stop this horde of invaders."[32]

As the architect of Operation Wetback, General Swing made good on his promise.  The massive scope of the program and lack of procedural safeguards resulted in many American citizens of Mexican descent being swept up in its dragnet and removed to remote areas of Mexico.[33]  One of the ships used to transport such persons was the subject of a congressional investigation, during which the vessel was "likened *** to an 'eighteenth century slave ship' and a 'penal hell ship.'"[34]  Immigration officials also deployed calculated publicity campaigns meant to drum up fear and scare thousands of Mexican migrants into leaving the United States.[35]

**2.**  Over time, the nature of the public discourse underlying measures enacted to further discrimination has changed.  As the use of explicit racial epithets (like "wetback") has become less

---

[31] *Brownell Maps Trip for "Wetback" Study*, N.Y. TIMES, Aug. 7, 1953, at 13, https://timesmachine.nytimes.com/timesmachine/1953/08/08/84417640.html?pageNumber=13.

[32] KITTY CALAVITA, INSIDE THE STATE:  THE BRACERO PROGRAM, IMMIGRATION, AND THE I.N.S. 51 (1992).

[33] GARCÍA, *supra* note 26, at 228.

[34] NGAI, *supra* note 17, at 156.

[35] GARCÍA, *supra* note 26, at 227-229.

14

acceptable, racially coded expressions have taken their place.

The civil rights movement provides a lesson in how code words can replace overtly racist statements in political appeals. As reflected in the quotation from Lee Atwater noted above (p. 6, *supra*), common racial slurs used in and before the 1960s became politically toxic. In their stead, politicians began using code words that implicitly appealed to certain voters.

Beginning with the presidential campaigns of George Wallace and Barry Goldwater, opponents of integration discovered they could win the support of white middle class voters who resented gains by African-Americans.[36] They used terms like "States' rights," which were "code words for resistance to the federal government's efforts to desegregate schools and Civil Rights laws that protected the rights of African Americans."[37]

To fend off Wallace's third-party campaign, Richard Nixon's 1968 presidential campaign adopted similar code words. In addition to appeals to "states' rights," Nixon championed "law and order" and urged

---

[36] Ian Haney López, Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism and Wrecked the Middle Class 6-7, 13-22 (2014); Tali Mendelberg, The Race Card: Campaign Strategy, Implicit Messages, and the Norm of Equality 7 (2001).

[37] Leland Ware & David C. Wilson, *Jim Crow on the "Down Low": Subtle Racial Appeals in Presidential Campaigns*, 24 St. John's J.L. Comm. 299, 309 (2009); *see also* López, *supra* note 36, at 16; Mendelberg, *supra* note 36, at 72-73.

AR5407

15

"less government interference."[38] These terms played on targeted white voters' concerns about racial desegregation and urban civil unrest, and cast African-Americans as criminals.[39]

Ronald Reagan echoed the "states' rights" mantra in his first major public appearance after becoming the Republican Party presidential nominee.[40] Reagan announced, "I believe in states' rights," and promised to "restore to states and local governments the power that properly belongs to them."[41] The setting for the speech—a nearly all-white crowd of 10,000 at a county fair in Neshoba County, Mississippi, where no presidential candidate had previously spoken—itself had historical resonance that dovetailed with Reagan's message: Neshoba County is where three civil rights workers (James Cheney, Andrew Goodman, and Michael Schwerner) were murdered in 1964.[42]

Similarly, in attacking the welfare system throughout his campaign, President Reagan used code

---

[38] Ware & Wilson, *supra* note 37, at 300; *see* LÓPEZ, *supra* note 36, at 23-24.

[39] LÓPEZ, *supra* note 36, at 23-24.

[40] Douglas E. Kneeland, *Reagan Campaigns at Mississippi Fair:  Nominee Tells Crowd of 10,000 He Is Backing States' Rights—Attacks Inflation Policy*, N.Y. TIMES, Aug. 3, 1980, at 11, https://timesmachine.nytimes.com/timesmachine/1980/08/04/111 268554.html?pageNumber=11.

[41] *Id.*

[42] Ware & Wilson, *supra* note 37, at 310-311; Bob Herbert, *Righting Reagan's Wrongs?*, N.Y. TIMES, Nov. 13, 2007, at A29, https://www.nytimes.com/2007/11/13/opinion/13herbert.html?se archResultPosition=1.

16

words that relied on the public's impression that most welfare recipients were dishonest African-Americans.[43] He repeatedly invoked the image of a "Chicago welfare queen" with "eighty names, thirty addresses, [and] twelve Social Security cards [who] is collecting veteran's benefits on four non-existing deceased husbands. She's got Medicaid, getting food stamps, and she is collecting welfare under each of her names. Her tax-free cash income is over $150,000."[44] He similarly described a "strapping young buck" who used food stamps to buy steak while "you were waiting in line to buy hamburger."[45] These code words not only relied on stereotypes that African-Americans were lazy and cheating the system, but also cast whites as hard-working taxpayers—all without expressly saying so.

## II. CODE WORD ANALYSIS IS A WIDELY ACCEPTED METHODOLOGY EMPLOYED BY HISTORIANS AND RELIED UPON BY COURTS

Code word analysis has become increasingly important as politicians and others have developed code words whose racial character is less overt but nonetheless perceptible to desired constituencies. The analysis employs a specific interpretive methodology that looks at public discourse to discern the use of racially coded expressions by government officials, politicians, and members of the public to advance political objectives targeting immigrant or other

---

[43] Ware & Wilson, *supra* note 37, at 311-312.

[44] LÓPEZ, *supra* note 36, at 58.

[45] *Id.* at 59.

17

minority communities.  As Dr. Pitti explains in his declaration:

> Historians and other academic experts recognize that animus does not require explicit, public declarations of racial ideology that racism has persisted across the centuries.  An attention to history and careful analysis of the use of coded racial appeals in contemporary political discourse provide the keys to understanding the links between racial animus and politics in the twenty-first century.

Pitti Decl. ¶ 20.

Courts rely on such code word analysis as evidence in determining whether alleged discriminatory acts are racially motivated.  Unlike times past, people today are rarely explicit about their intent or motivation in expressing or acting on racial bias.  Because "officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority," it is necessary to determine "whether they have 'camouflaged' their intent." *Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015); *see also Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081-1082 (3d Cir. 1996) ("Anti-discrimination laws and lawsuits have 'educated' would-be violators such that extreme manifestations of discrimination are thankfully rare," but "[d]iscrimination continues to pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms.").  Coded language therefore makes it "easier to coat various

18

forms of discrimination with the appearance of propriety." *Aman*, 85 F.3d at 1082.

Today, every federal court of appeals has recognized, in a variety of contexts ranging from employment discrimination to legislative action, that code words or camouflaged expressions can evidence discriminatory intent:

**First Circuit**: *Soto v. Flores*, 103 F.3d 1056, 1067 n.12 (1st Cir. 1997) ("It is rare that discrimination wears its garb openly and it more often comes 'masked in subtle forms.' Triers of fact may recognize those more subtle forms for what they are and coded comments may raise inferences of discrimination.");

**Second Circuit**: *MHANY Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 608-612 (2d Cir. 2016) (upholding district court's finding that opponents used racially charged code words to communicate animus and that city officials acquiesced to this animus in its shift in zoning);

**Third Circuit**: *Aman*, 85 F.3d at 1082-1083 (holding that use of "inherently racist" code words can constitute evidence of a hostile work environment and an intent to discriminate);

**Fourth Circuit**: *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982) (evincing concern about the influx of "undesirables" and dilution of public schools and threat to public safety constituted "evidence *** which in a different context might not illustrate racial bigotry, but, against the background of the housing project in Clarkton and the considerable opposition to it,

19

were interpreted by the trial court as 'camouflaged' racial expressions");

**Fifth Circuit**: *Jenkins v. Methodist Hosps. of Dall., Inc.*, 478 F.3d 255, 265 (5th Cir. 2007) (recognizing that code words may provide basis of discriminatory intent);

**Sixth Circuit**: *United States v. City of Birmingham*, 727 F.2d 560, 563 (6th Cir. 1984) (affirming injunctive relief on a Fair Housing Act claim based in part on statements that proposed housing would introduce "harmful elements" and bring "those people" to Birmingham, which led trial court to specifically conclude the language was in reference to "black people");

**Seventh Circuit**: *E.E.O.C. v. Board of Regents of Univ. of Wis. Sys.*, 288 F.3d 296, 303 (7th Cir. 2002) (holding that reasonable jury could find use of code words such as "'pre-electronic' era and that he would have to be brought 'up to speed' on 'new trends of advertising via electronic means'" to be reflection of age bias);

**Eighth Circuit**: *Smith v. Fairview Ridges Hosp.,* 625 F.3d 1076, 1085-1086 (8th Cir. 2010) (finding reference to the "ghetto," among other things, to "carry some inferences that they were racially motivated," and discussing variety of instances in which code words may serve as evidence of racial animus);

**Ninth Circuit**: *Avenue 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 506-507 (9th Cir. 2016) (finding that use of code words consisting of stereotypes of Latinos, along with other evidence,

20

"provide plausible circumstantial evidence that community opposition to Developers' proposed development was motivated in part by animus, and that the City Council was fully aware of these concerns" when it voted against the zoning commission's recommendations);

**Tenth Circuit**: *Villanueva v. Carere*, 85 F.3d 481, 488 (10th Cir. 1996) (sharing concern over use of "culture" in response to argument that use of term is a code word for "ethnic minority");

**Eleventh Circuit**: *Underwood v. Hunter*, 730 F.2d 614, 621 (11th Cir. 1984) (holding that a provision of the Alabama constitution disenfranchised voters in violation of the Fourteenth Amendment, noting that "the avowed objective of the suffrage committee was to deny the vote to *the corrupt and the ignorant*," which defendant's expert admitted "referred specifically to blacks and lower-class whites") (emphasis added); and

**D.C. Circuit:** *Arnold v. United States Postal Serv.*, 863 F.2d 994, 1000 (D.C. Cir. 1988) ("There may well be cases in which seniority is simply a code word for age discrimination.").

Broad recognition of the role that code word analysis may play in ferreting out discriminatory intent in government decisionmaking is hardly surprising. Indeed, in light of its oft hidden nature, this Court has long recognized that courts must make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.* 429 U.S. 252, 266 (1977). Among the relevant factors

**AR5413**

21

is "[t]he historical background of the decision." *Id.* at 267-268.

This established understanding of the operation of code words is precisely the reason that expert analysis of historians examining current events can be helpful to the Court.

## III. THE HISTORY, CONTEXT, AND CONTEMPORANEOUS STATEMENTS ABOUT DACA REVEAL THE USE OF CODE WORDS THAT REFLECT ANTI-MEXICAN AND ANTI-LATINO SENTIMENT

Dr. Pitti's declaration, in conjunction with his 96-page expert report, comprehensively documents and analyzes President Trump's statements (as candidate and in office), as well as statements made by key advisers and administration officials (including Attorney General Sessions and policy adviser Stephen Miller). Pitti Decl., Ex. B 35-85. Dr. Pitti's findings— including that President Trump used code words that simultaneously convey and mask anti-immigrant sentiment—are independently corroborated by linguistics expert Dr. Otto Santa Ana, whose team of researchers analyzed 347 of President Trump's speeches and 6,963 tweets.[46]

In particular, the manner in which President Trump talks about DACA recipients and the way he subverts the name by which they are commonly

---

[46] *See* OTTO SANTA ANA ET AL., DOCUMENTING THE PRESIDENT'S VERBAL ANIMUS AGAINST IMMIGRANTS TO DEFEND DACA GRANTEES: FINAL REPORT OF THE UCLA DACA DEFENSE GROUP 9-11 (Jan. 2019) https://www.thepresidentsintent.com/issue-final-report ("FINAL REPORT").

22

referred—"dreamers"—cannot be ignored. During a campaign forum called the Sunshine Summit, hosted by the Republican Party of Florida, Trump stated:

> We are going to hire Americans first. We're going to take care of our workers. Did you ever hear of the Dream Act? The Dream Act isn't for our children. The Dream Act is for other children that come into the country. I want the Dream Act to be for our children.[47]

Later in the campaign, Trump juxtaposed American children and DACA recipients:

> Where is the sanctuary city for American children? Where is that sanctuary? The dreamers we never talk about are the young Americans. Why aren't young Americans dreamers also? I want my dreamers to be young Americans.[48]

In another general campaign speech, he implored, "[l]et our children be dreamers too."[49]

Once in office, when asked by reporters whether "dreamers" should be worried, President Trump responded: "We love the DREAMers. *** We think the

---

[47] Donald J. Trump, Remarks at 2015 Sunshine Summit at 17:28-17:43 (Nov. 13, 2015), https://www.c-span.org/video/?400325-10/donald-trump-remarks-2015-sunshine-summit.

[48] Donald J. Trump, Remarks at the Mississippi Coliseum in Jackson, Mississippi (Aug. 24, 2016), http://www.presidency.ucsb.edu/ws/index.php?pid=123198.

[49] Donald J. Trump, Remarks at the Charlotte Convention Center in Charlotte, North Carolina (Aug. 18, 2016), http://www.presidency.ucsb.edu/ws/index.php?pid=119175.

23

DREAMers are terrific."[50]  Mere days later, the Trump Administration ended DACA.  In doing so, President Trump repeated, "[a]bove all else, we must remember that young Americans have dreams too. *** Our first and highest priority *** must be to improve jobs, wages and security for American workers and their families."[51]

As explained by Dr. Santa Ana's declaration, President Trump has co-opted the term "dreamer" and uses it to paint DACA recipients as interlopers whose unlawful presence threatens the rightful economic opportunities of "American" children.  "Dreamer" itself becomes a code word that is intended to inflame and exploit negative sentiment based on people's economic and cultural anxieties.  *See Regents of the Univ. of Cal. v. United States Dep't of Homeland Sec.*, Nos. 18-15068 et al. (9th Cir. Mar. 19, 2018), ECF No. 56-3, Ex. 2 ¶ 50 ("Santa Ana Decl.").

That is consistent with President Trump's characterization of Latinos and immigrants generally, conveyed often through (among more explicit references) racially coded expressions and code words. *See* Pitti Decl. ¶¶ 18-148; Santa Ana Decl. ¶¶ 23-53.

---

[50] Donald J. Trump, Remarks on Signing a Proclamation on the National Day of Prayer for the Victims of Hurricane Harvey and for Our National Response and Recovery Efforts and an Exchange with Reporters (Sept. 1, 2017), https://www.presidency.ucsb.edu/documents/remarks-signing-proclamation-the-national-day-prayer-for-the-victims-hurricane-harvey-and.

[51] Statement from President Donald J. Trump (Sept. 5, 2017), https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-7/ ("DACA Statement").

24

Expert analysis demonstrates that President Trump's assertions about Latinos and immigrants employ a steady narrative, portraying a "calculating enemy who dispatches inhuman forces; colluding agents who have betrayed their country; vulnerable citizens who are preyed upon by the invaders; and the one stalwart leader who can defeat the invaders by deploying the nation's human and material resources."[52]   The United States is depicted as a "besieged fortress" at war with an "enemy"—Mexico—that "'push[es]' [its] 'worst' people onto the United States; 'murderers, drug dealers, and gang members.'"[53] A wall is necessary to protect U.S. citizens from this "flood" of criminality.[54]

Similarly, President Trump's narrative casts Latino immigrants as invaders who drive down wages and steal "the few opportunities that remain[] for longtime residents." Pitti Decl. ¶ 72. He also has repeatedly suggested that immigrants are drains on the welfare state, abuse the system, and "put great burdens on local schools and hospitals." *Id.* ¶¶ 89-92. These statements are inextricably intertwined with his support for immigration reform that would "preven[t] new migrants and new immigrants from collecting welfare and protect[] U.S. workers from being displaced," *id.* (first alteration in original), by low-skilled immigrants from Mexico and Central America, *id.* ¶¶ 104-107. Significantly, during the presidential campaign, Trump promised a "deportation force" based on President Eisenhower's

---

[52] Santa Ana, Final Report, *supra* note 46, at 11.

[53] *Id.* at 12-13.

[54] *Id.* at 13-14.

25

enforcement of the border—hearkening back to Operation Wetback (*see* pp. 11-13, *supra*), which Trump lauded for "[m]ov[ing] them way south" so "[t]hey never came back."[55]

These narratives are reflected in President Trump's statement rescinding DACA.  He described a "massive surge of accompanied minors" that "in some cases" would "become members of violent gangs throughout our country, such as MS-13."[56]  He also described existing immigration policy as having "predictable and tragic consequences:  lower wages and higher unemployment for American workers, substantial burdens on local schools and hospitals, the illicit entry of dangerous drugs and criminal cartels, and many billions of dollars a year in costs paid for by U.S. taxpayers."[57]

Attorney General Sessions, announcing the reasons, echoed those sentiments that same day.  In particular, he stated that DACA "denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens," and the program's "wind down" would "strengthen[] *** the rule of law in America," "save[] lives, protect[] communities and taxpayers," and avoid "put[ting] our nation at risk of crime, violence and even terrorism."  SER1354-1355, Nos. 18-15068 et al. (9th Cir. Mar. 13, 2018), ECF No. 45-6; *see also* Br. of Univ. of Cal. Resp'ts 56-58.

---

[55] *Transcript:  Republican Presidential Debate*, N.Y. TIMES, Nov. 11, 2015, https://www.nytimes.com/2015/11/11/us/politics/transcript-republican-presidential-debate.html.

[56] DACA Statement, *supra* note 51.

[57] *Id.*

26

At bottom, the Trump Administration's coded statements—targeting both Latino migrants generally and DACA recipients specifically—amply connect anti-immigrant sentiment to the rescission of DACA.

## IV. THE TRUMP ADMINISTRATION'S USE OF CODED LANGUAGE IN DISCUSSING DACA UNDERSCORES THE MISMATCH BETWEEN THE PROFFERED REASONS AND DACA'S RESCISSION

Pretext is a simple concept. If the reasons offered to justify a government action turn out not to square with the record or underlying facts, then a court need not accept those reasons and may set aside the action. Applying the code word analysis discussed in the prior sections reveals the pretextual nature of the reasons the Administration offered (mostly *post hoc*) for the rescission of DACA.

The Government contends that the President's narrative surrounding DACA is irrelevant in the absence of evidence that Secretaries Duke and Nielsen harbored similar views. But courts have long recognized that decisions made in response to coded expressions of racial animus "can support a finding of discriminatory motives by government officials, even if the officials do not personally hold such views." *Avenue 6E Invs.*, 818 F.3d at 504. Stated differently, courts recognize that discrimination can occur when government officials acquiesce to constituents motivated by animus. *See MHANY*, 819 F.3d at 610-611 & n.5 (city's decision to reject building permit "in the face of vocal citizen opposition to changing the character of Garden City represented acquiescence to race-based animus"). As the Second Circuit explained,

**AR5419**

27

"[t]he notion of a code word implies that it will be understood by another" and permits courts to consider the "relevance of code words in the context of legislators acting responsively to citizen animus." *Id.* at 609 n.5.

If acquiescence *to constituents* is enough, then acquiescence *to superiors* must be too. Like the decisionmakers in *Avenue 6E Investments* and *MHANY*, it is not necessary for Secretaries Duke and Nielsen to have expressed or harbored racial animus for the DACA rescission to have been so tainted. Just as local officials may make discriminatory decisions in response to pressure from their constituents, the Secretaries serve at the pleasure of the President, whose statements naturally influence agency decisionmaking. *See Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 496-497 (2010) (recognizing "basic principle" that Article II "makes a single President responsible for the actions of the Executive Branch"). This Court should not adhere to the fiction that the decision to rescind DACA was made in a vacuum, for courts "are not required to exhibit a naiveté from which ordinary citizens are free." *Department of Commerce*, 139 S. Ct. at 2575 (citation and internal quotation marks omitted).

The Government further contends that the (suspect) admiration expressed by the President for DACA recipients somehow forecloses the possibility that illicit motives played a part in the DACA decision. As discussed above, however, the President has co-opted language about "dreamers" to exploit anti-immigrant sentiment. President Trump's statements, as candidate and in office, reveal his overriding message—playing to his constituencies—that the

28

American Dream is not for the "dreamers" but for our "American children." *See* pp. 21-26, *supra*.

The Government also tries to dismiss the President's statements as suggesting "nothing more than the obvious fact that DACA has been an important part of legislative negotiations on immigration reform." Br. of Pet'rs 55. But DACA's use as a political bargaining chip appears nowhere in either Secretary Duke's or Secretary Nielson's explanations. And the Government's gloss is belied by the historical and other context from which those statements cannot be separated. *See Department of Commerce*, 139 S. Ct. at 2575-2576 (refusing to accept "contrived reasons" for an agency decision because the APA's "reasoned explanation requirement *** is meant to ensure that agencies offer genuine justifications for important decisions"). Ample record and public evidence, similar to the evidence that came to light in the census case and buttressed by code word analysis, shows that the Government's proffered reasons were pretextual.

29

## CONCLUSION

This Court should affirm the decisions below.

Respectfully submitted.

| | |
|---|---|
| Robert S. Chang | Pratik A. Shah |
| Lorraine K. Bannai | *Counsel of Record* |
| Melissa Lee | Z.W. Julius Chen |
| Lessica Levin | Jessica Weisel |
| FRED T. KOREMATSU | AKIN GUMP STRAUSS |
|   CENTER FOR LAW AND |   HAUER & FELD LLP |
|   EQUALITY | |
| RONALD A. PETERSON | |
|   LAW CLINIC | |
| SEATTLE UNIVERSITY | |
|   SCHOOL OF LAW | |

*Counsel for Amici Curiae*

October 4, 2019

AR5422

1a

**APPENDIX**

List of Individual *Amici Curiae* with Title and
Institutional Affiliation for Identification Purposes[1]

| Name | Title | Institutional Affiliation |
|------|-------|---------------------------|
| Lauren Araiza | Associate Professor and Chair, Department of History | Denison University |
| Rick Baldoz | Associate Professor and Chair of Sociology | Oberlin College |
| Carlos Kevin Blanton | Professor and Head, Department of History | Texas A&M University, College Station |
| Laura Briggs | Professor, Women, Gender, Sexuality Studies | University of Massachusetts Amherst |
| Geraldo L. Cadava | Associate Professor of History & Latina/o Studies | Northwestern University |

[1] None of the individual *amici* speak for or represent the official views of their respective institutions or departments.

**AR5423**

2a

| Maria Raquel Casas | Associate Professor, Department of History | University of Nevada, Las Vegas |
|---|---|---|
| Lori Flores | Associate Professor, Department of History | Stony Brook University (SUNY) |
| Glenda Elizabeth Gilmore | Peter V. and C. Vann Woodward Professor of History Emeritus | Yale University |
| Ariela Gross | John B. & Alice R. Sharp Professor of Law & History | University of Southern California |
| Thomas Guglielmo | Associate Professor of American Studies | George Washington University |
| Joshua B. Guild | Associate Professor of History and African American Studies | Princeton University |
| Matthew Pratt Guterl | Professor of Africana Studies and American Studies | Brown University |

AR5424

3a

| Leslie M. Harris | Professor, History and African American Studies | Northwestern University |
|---|---|---|
| Kelly Lytle Hernandez | Professor, Departments of History and African-American Studies, The Thomas E. Lifka Endowed Chair of History, and Director, Ralph J. Bunche Center for African American Studies | University of California, Los Angeles |
| Daniel HoSang | Associate Professor of Ethnicity, Race & Migration and American Studies | Yale University |
| Madeline Y. Hsu | Professor, Department of History and Center for Asian American Studies | The University of Texas at Austin |

AR5425

4a

| Michael D. Innis-Jiménez | Associate Professor of American Studies and Director of Graduate Studies | University of Alabama |
|---|---|---|
| Matthew Frye Jacobson | William Robertson Coe Professor of American Studies and History | Yale University |
| Karl Jacoby | Allan Nevins Professor of History | Columbia University |
| Ari Kelman | Chancellor's Leadership Professor of History | The University of California, Davis |
| Erika Lee | Regents Professor of History and Asian American Studies and The Rudolph J. Vecoli Chair in Immigration History | University of Minnesota |

AR5426

5a

| | | |
|---|---|---|
| Shelley S. Lee | Associate Professor of History and Comparative American Studies | Oberlin College |
| Mary Ting Yi Lui | Professor of American Studies and History | Yale University |
| Joseph Lowndes | Associate Professor, Political Science Department | University of Oregon |
| Nancy MacLean | William H. Chafe Professor of History and Public Policy | Duke University |
| Kate Masur | Associate Professor of History | Northwestern University |
| John Mckiernan-Gonzalez | Associate Professor of History | Texas State University |
| Ronald L. Mize | Associate Professor of Language, Culture and Society | Oregon State University |

AR5427

6a

| | | |
|---|---|---|
| Natalia Molina | Professor of American Studies & Ethnicity | University of Southern California |
| Gary Y. Okihiro | Professor Emeritus of International and Public Affairs, and Visiting Professor of American Studies | Columbia University, Yale University |
| Lorena Oropeza | Professor, History Department | University of California, Davis |
| Leigh Raiford | Associate Professor, African American Studies | University of California, Berkeley |
| David Roediger | Foundation Professor of American Studies | University of Kansas |

AR5428

7a

| | | |
|---|---|---|
| Renee C. Romano | Robert S. Danforth Professor of Humanities; Chair, Department of History; and Professor of Comparative American Studies and Africana Studies | Oberlin College |
| Vicki L. Ruiz | Distinguished Professor Emerita, History and Chicano/Latino Studies | University of California, Irvine |
| Rachel St. John | Associate Professor, Department of History | University of California, Davis |
| Virginia J. Scharff | Distinguished Professor of History and Director, Center for the Southwest | University of New Mexico |

8a

| | | |
|---|---|---|
| Alexandra Minna Stern | Chair and Professor, Department of American Culture and History | University of Michigan |
| Timothy Stewart-Winter | Associate Professor of History | Rutgers University—Newark |
| Penny Von Eschen | William R. Kennan, Jr. Professor of American Studies and Professor of History | University of Virginia |
| Julie M. Weise | Associate Professor of History | University of Oregon |
| Judy Tzu-Chun Wu | Director of the Humanities Center; Professor of Asian American Studies; Chancellor's Fellow | University of California, Irvine |

AR5430

Nos. 18-587, 18-588, and 18-589

IN THE

# Supreme Court of the United States

————

DEPARTMENT OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,

*Respondents.*

————

**On Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit**

————

**BRIEF FOR AMICI CURIAE
ASSOCIATION OF AMERICAN
MEDICAL COLLEGES, ET AL.,
IN SUPPORT OF RESPONDENTS**

————

HEATHER J. ALARCON
FRANK R. TRINITY
ASSOCIATION OF
 AMERICAN MEDICAL
 COLLEGES
655 K Street N.W.
Suite 100
Washington, D.C 20001
(202) 478-9939

JONATHAN S. FRANKLIN
 *Counsel of Record*
DAVID KEARNS
NORTON ROSE FULBRIGHT US LLP
799 Ninth Street, N.W.
Washington, D.C. 20001
(202) 662-4663
jonathan.franklin@
  nortonrosefulbright.com

*Counsel for Amici Curiae*

Additional Captions Listed on Inside Cover

**AR5431**

DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL.,

*Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL.,

*Respondents.*

————

**On Writ of Certiorari Before Judgment
to the United States Court of Appeals
for the District of Columbia Circuit**

————

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL.,

*Respondents.*

————

**On Writ of Certiorari Before Judgment
to the United States Court of Appeals
for the Second Circuit**

————

**AR5432**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.....................................iii

INTEREST OF AMICI CURIAE ..............................1

SUMMARY OF THE ARGUMENT ..........................2

ARGUMENT ............................................................6

I.  AGENCIES CANNOT CHANGE POLICIES WITHOUT FAIRLY ADDRESSING RELIANCE INTERESTS.....................................................6

II. LOSS OF DACA STATUS FOR HEALTH CARE TRAINEES AND PROFESSIONALS WOULD NULLIFY SUBSTANTIAL INVESTMENTS MADE BY SCHOOLS, OTHER INSTITUTIONS, AND RECIPIENTS, TO THE PUBLIC'S SIGNIFICANT DETRIMENT.....................................8

    A.  Recipients Depend On DACA For Their Work Eligibility............................8

    B.  Medical Schools, Teaching Hospitals, And Other Educational And Health Care Institutions Expended Vast Amounts Of Time, Money, And Other Resources In Reliance On DACA..............................10

    C.  DACA Recipients Relied On Their Eligibility To Work When They Decided To Invest Their Own Time, Effort, And Resources In A Health Care Career ...................14

**AR5433**

ii

TABLE OF CONTENTS—Continued

Page

D.   Rescinding DACA Will Nullify
These Investments And Worsen
A Shortage Of Health Care
Professionals In The United
States.....................................................16

III. THE GOVERNMENT ACTED
ARBITRARILY AND CAPRICIOUSLY
IN FAILING TO TAKE ACCOUNT OF
ANY OF THESE AND OTHER
SERIOUS RELIANCE INTERESTS...........24

CONCLUSION ......................................................27

AR5434

iii

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Encino Motorcars, LLC* v. *Navarro*, 136 S. Ct. 2117 (2016).....................................7, 25, 26

*FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502 (2009)......................................................7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)......................................................6

*NAACP* v. *Trump*, 315 F. Supp. 3d 457 (D.D.C. 2018)................................................8, 25

*Nat'l Lifeline Ass'n* v. *FCC*, 921 F.3d 1102 (D.C. Cir. 2019) ....................................7, 26

*Plyler* v. *Doe*, 457 U.S. 202 (1982)......................10

STATUTES AND REGULATIONS:

5 U.S.C. § 706(2)(A) ...............................................6

8 U.S.C. § 1324a ...................................................9

8 C.F.R. § 274a.12................................................9

LEGISLATIVE AND EXECUTIVE MATERIALS:

A.B. 275, 80th Sess. (Nev. 2019) .........................21

H.B. 1552, 92d Gen. Assemb., Reg. Sess., (Ark. 2019) ......................................................21

Ill. Fin. Auth., Board Book (July 9, 2013), https://tinyurl.com/yxqa2cjw ...............22

Ill. Fin. Auth., Resolution 2013-0709-AD05 (July 9, 2013), https://tinyurl.com/y6o23j96 ........................................22

L.B. 947 (Neb. 2016)............................................22

AR5435

iv

TABLE OF AUTHORITIES—Continued

Page(s)

S.E.A. 419, 120th Gen. Assemb., 2d Reg.
Sess. (Ind. 2018) ................................................. 21

**OTHER AUTHORITIES:**

Amy E. Thompson, MD, *A Physician's
Education*, J. Am. Med. Assoc. (Dec.
10, 2014), https://jamanetwork.com
/journals/jama/fullarticle/2020375 .................. 15

Am. Med. Ass'n, *2018 American Medical
Association Economic Impact Study*,
(last visited Sept. 24, 2019), https://
www.physicianseconomicimpact.org/ ............... 24

Andrea N. Garcia et al., *Factors
Associated with Medical School
Graduates' Intention to Work with
Underserved Populations: Policy
Implications for Advancing Workforce
Diversity*, Acad. Med. (Sept. 2017),
https://www.ncbi.nlm.nih.gov/
pmc/articles/PMC5743635/ .............................. 19

Angela Chen, PhD et al., *PreHealth
Dreamers: Breaking More Barriers
Survey Report* (Sept. 2019),
https://tinyurl.com/y436och3 ....................... 5, 19

Ass'n of Am. Med. Colls., *The
Complexities of Physician Supply &
Demand: Projections from 2017 to 2032*
(Apr. 2019), https://tinyurl.com/
yxbh2nhv ....................................................... 5, 17

Atheendar S. Venkataramani, M.D.,
Ph.D. & Alexander C. Tsai, M.D.,
Ph.D., *Dreams Deferred—The Public*

**AR5436**

v

TABLE OF AUTHORITIES—Continued

Page(s)

*Health Consequences of Rescinding DACA*, 377 New Eng. J. Med. 1707 (Nov 2, 2017) .................................................... 23

Bureau of Labor Stat., U.S. Dep't of Labor, *Occupational Outlook Handbook: Healthcare Occupations* (September 4, 2019), https://www.bls.gov/ooh/healthcare/home.htm ........... 17

Ctr. For Health Workforce Studies, SUNY-Albany Sch. of Pub Health, *Health Care Employment Projections, 2016-2026: An Analysis of Bureau of Labor Statistics Projections by Setting and by Occupation* (Feb. 2018), https://tinyurl.com/y58hfz6x ........................... 17

Evelyn Valdez-Ward, *The End of DACA Would Be a Blow to Science*, Sci. Am. Blog Network (Dec. 12, 2018), https://blogs.scientificamerican.com/voices/the-end-of-daca-would-be-a-blow-to-science/ ............................................................ 14

Fed. Student Aid, U.S. Dep't of Educ., *Who Gets Aid: Non-U.S. Citizens* (last visited Sept. 24, 2019), https://studentaid.ed.gov/sa/eligibility/non-us-citizens ............................................................ 15

Gabrielle Redford, *DACA Students Risk Everything to Become Doctors* (Sept. 17, 2018), https://www.aamc.org/news-insights/daca-students-risk-everything-become-doctors ........................................... 20, 21

AR5437

vi

TABLE OF AUTHORITIES—Continued

Page(s)

Health Res. & Servs. Admin., U.S. Dep't
of Health & Human Servs., *Cost
Estimates for Training Residents in a
Teaching Health Center*, (last visited
Sept. 24, 2019) https://bhw.hrsa.gov/
sites/default/files/bhw /grants/thc-
costing-fact-sheet.pdf......................................... 12

Health Res. & Servs. Admin., U.S. Dep't
of Health & Human Servs., *Health
Professional Shortage Areas* (last
visited Sept. 4, 2019), https://bhw.
hrsa.gov/shortage-designation/hpsas............... 18

Health Res. & Servs. Admin., U.S. Dep't
of Health & Human Servs., *Map Tool—
Shortage Areas*, (last visited Sept. 24,
2019), https://data.hrsa.gov/hdw/tools/
MapTool.aspx ..................................................... 19

Henry J. Kaiser Fam. Found., *Dental
Care Health Professional Shortage
Areas (HPSAs)* (last visited September
24, 2019),  https://tinyurl.com/
yye44kpy ...................................................... 5, 18

Henry J. Kaiser Fam. Found., *Mental
Health Care Health Professional
Shortage Areas (HPSAs)* (last visited
September 24, 2019), https://
tinyurl.com/y9u2g69b ................................... 5, 18

Interview by Julie Pace with Donald
Trump, Associated Press (Apr. 23,
2017), https://tinyurl.com/lr7z7ye ................... 26

Mark Murray et al., *Panel Size: How
Many Patients Can One Doctor*

AR5438

vii

TABLE OF AUTHORITIES—Continued

Page(s)

*Manage?,* Family Practice Mgmt. (April
2007), https://www.aafp.org/fpm/
2007/0400/p44.pdf ................................................ 3

Nat'l Ctr. For Health Workforce
Analysis, U.S. Dep't of Health &
Human Servs., *State-Level Projections
of Supply and Demand for Primary
Care Practitioners: 2013-2025* (Nov.
2016), https://bhw.hrsa.gov/sites/
default/files/bhw/health-workforce-
analysis/research/projections/primary-
care-state-projections2013-2025.pdf ............... 18

Nat'l Ctr. For Health Workforce
Analysis, U.S. Dep't of Health &
Human Servs., *Supply and Demand
Projections of the Nursing Workforce:
2014-2030* (July 21, 2017), https://
bhw.hrsa.gov/sites/default/files/bhw/nc
hwa/projections/NCHWA_HRSA_Nursi
ng_Report.pdf ................................................... 18

Nat'l Ctr. For Health Workforce
Analysis, U.S. Dep't of Health &
Human Servs., *National and Regional
Projections of Supply and Demand for
Internal Medicine Subspecialty
Practitioners: 2013-2025* (Dec. 2016),
https://bhw.hrsa.gov/sites/default/files/
bhw/health-workforce-analysis/
research/ projections/internal-
medicine-subspecialty-report.pdf .................... 18

Nat'l Ctr. for Health Stat., Ctr. for
Disease Control, *National Ambulatory*

**AR5439**

viii

TABLE OF AUTHORITIES—Continued

Page(s)

*Medical Care Survey: 2016 National Summary Tables* (2016), https://www.cdc.gov/nchs/data/ahcd/namcs_summary/2016_namcs_web_tables.pdf .................. 3

Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States*, Ctr. for Am. Progress (Sept. 5, 2019), https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states/ .................................... 3

Office of the Assistant Sec'y for Preparedness and Response, Dep't of Health and Human Servs., *National Health Security Strategy 2019-2002* (last visited Sept. 24, 2019), https://www.phe.gov/Preparedness/planning/authority/nhss/Documents/NHSS-Strategy-508.pdf .................................................. 5

Osea Giuntella & Jakub Lonsky, *The Effect of DACA on Health Insurance, Access to Care, and Health Outcomes*, IZA Inst. Labor Econ. Discussion Paper Series (Apr. 2018) ............................................. 23

The Physicians Found., *2018 Survey of America's Physicians* (2018), https://physiciansfoundation.org/wp-content/uploads/2018/09/physicians-survey-results-final-2018.pdf .......................................... 3

Pre-Health Dreamers, *Frequently Asked Questions & Answers about Medical School for Pre-med Undocumented*

AR5440

ix

TABLE OF AUTHORITIES—Continued

Page(s)

*Students Across the Nation*, (last visited Sept. 24, 2019), https://tinyurl.com/yyhcsqkt ........................................ 15

Sarah Conway & Alex V. Hernandez, *Loyola's DACA Medical Students, Largest Group in the Country, Plagued with Uncertainty*, Chicago Trib. (Sept. 13, 2017), https://tinyurl.com/y485wmxu ........................................ 11

Shoba Sivaprasad Wadhia, *Demystifying Employment Authorization & Prosecutorial Discretion in Immigration Cases*, 6 Colum. J. Race & L. 1 (2016) ............................................. 9

Hector Sanchez Perez, *Student Blog: I'm a Mailman Dreamer* (Feb 20, 2018), https://www.mailman.columbia.edu/public-health-now/news/student-blog-im-mailman-dreamer ............................................. 20

U.S. Census Bureau, *Older People Projected to Outnumber Children for First Time in U.S. History* (Sept. 6, 2018) ................................................. 17

Wullianallur Raghupathi & Viju Raghupathi, *An Empirical Study of Chronic Diseases in the United States: A Visual Analytics Approach to Public Health*, 15 Int'l J. Envtl. Res. & Pub. Health 431 (Mar. 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5876976/ ........................................ 17

AR5441

## INTEREST OF AMICI CURIAE

The **Association of American Medical Colleges** ("AAMC") is a non-profit educational association whose members include all 154 accredited U.S. medical schools, nearly 400 major teaching hospitals and health systems, and 80 academic and scientific societies.[1]  Through these institutions and organizations, the AAMC represents 173,000 faculty members, 89,000 medical students, and 129,000 resident physicians.  Founded in 1876, the AAMC, through its many programs and services, strengthens the world's most advanced medical care by supporting the entire spectrum of education, research, and patient care activities conducted by its member institutions.

The AAMC is joined in this brief by thirty-two organizations whose members include schools, residency programs, and other institutions involved in educating and training health care providers and administrators:

**America's Essential Hospitals, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American Association of Colleges of Nursing, American Association of Colleges of Pharmacy, American College of Healthcare Executives, American College of Obstetricians and Gynecologists, American College of Physicians, American College of Preventive Medicine, American Dental Education Association,**

---

[1] No counsel to a party authored this brief in whole or in part, no such counsel or a party made a monetary contribution intended to fund the preparation or submission of the brief, and no person other than the amici curiae made such a monetary contribution.  The parties have consented to the filing of this brief.

**AR5442**

2

**American Medical Association, American Medical Student Association, American Nurses Association, American Psychiatric Association, American Public Health Association, American Society of Hematology, American Society of Nephrology, American Thoracic Society, Association of Academic Health Centers, Association of American Indian Physicians, Association of Schools and Programs of Public Health, Association of Schools of Allied Health Professions, Association of University Programs in Health Administration, California Medical Association, Council on Social Work Education, Greater New York Hospital Association, National Council of Asian Pacific Islander Physicians**, **National Hispanic Medical Association, National Medical Association, Physician Assistant Education Association, Pre-Health Dreamers, and Society of General Internal Medicine.** Additional information regarding these organizations is provided in the Addendum to this brief.

## SUMMARY OF THE ARGUMENT

The law is clear that the government cannot rescind a longstanding policy without, at a minimum, seriously considering the reliance interests that would be disrupted by such a change in course. Yet in this case, the government failed to make any serious effort to consider any of the substantial reliance interests affected by the rescission of the Deferred Action for Childhood Arrivals ("DACA") program.

This is particularly true with respect to the health care sector, for which the avoidance of unnecessary harm is a guiding principle. At this moment, an estimated 27,000 health care workers and support

**AR5443**

3

staff depend on DACA for their authorization to work in the United States.[2]   Among those 27,000 are nurses, dentists, pharmacists, physician assistants, home health aides, technicians, and others.  *Id.*

The number also includes nearly 200 medical students, medical residents, and physicians who depend on DACA for their eligibility to practice medicine.  If those trainees and physicians retain their work eligibility, each will care for an average of between 1,533 and 4,600 patients a year.[3]  Together, over the course of their careers, they will touch the lives of 1.7 to 5.1 million U.S. patients.[4]

---

[2] Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States*, Ctr. for Am. Progress (Sept. 5, 2019), https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states/ (estimates based upon occupations under health care practitioners and technical occupations and health care support from the University of Minnesota's Integrated Public Use Microdata Series (IPUMS) USA 2017 American Community Survey occupational classification data).

[3] The Physicians Found., *2018 Survey of America's Physicians* at 57 (2018), https://physiciansfoundation.org/wp-content/uploads/2018/09/physicians-survey-results-final-2018.pdf (data indicating physicians see 20 patients per day on average, and work 230 days per year); Mark Murray et al., *Panel Size: How Many Patients Can One Doctor Manage?*, Family Practice Mgmt. at 47 (April 2007), https://www.aafp.org/fpm/2007/0400/p44.pdf (data indicates each patient is seen by their doctor one to three times a year).

[4] This calculation is based on 14.3% of patients being new patients during any given year, *see* Nat'l Ctr. for Health Stat., Ctr. for Disease Control, *National Ambulatory Medical Care Survey: 2016 National Summary Tables* (2016), https://www.cdc.gov/nchs/data/ahcd/namcs_summary/2016_namcs_web_tables.pdf, and an average career length of 35 years,

AR5444

4

If DACA is rescinded, however, almost none of these people will be able to serve the American public in their chosen fields. This action would therefore nullify the substantial and long-term investments that DACA recipients, educational institutions, and the public have made in educating and training those recipients to provide needed health care services to the Nation. Their loss will have potentially devastating effects. It can take a decade or more to educate and train a new physician. As health care professional institutions and organizations, *amici* know that the resources to competently train capable physicians, nurses, and other medical and public health professionals are subject to substantial limitations. Each year and each dollar that a school spends to train one future physician or other health care worker is a year or dollar not spent training another. The decision to expend vast amounts of time, money, and effort in educating and training DACA recipients in the health care sector was thus made in reliance on the expectation that such individuals would be able to serve the public once educated and trained. Rescinding the program negates all of that substantial time, money, and effort spent.

Nor is the country prepared to fill the loss that would result if DACA recipients were excluded from the health care workforce. The number of physicians in the United States has not kept pace with our growing and aging population and a commensurate increase in patients needing care for a variety of chronic health conditions. It is estimated that in the next eleven years, the country will have between

---

using data from the AAMC's 2019 National Sample Survey of Physicians, (publication forthcoming; data on file with AAMC).

5

46,900 and 121,900 fewer primary and specialty care physicians than it needs.[5]  Shortages in other health professions, such as mental health, dentistry, and nursing, are worsening as well.[6]  These shortages will be felt most keenly in medically underserved areas, such as rural settings and poor neighborhoods—precisely the areas in which DACA recipients are likeliest to work.[7]

The risk of a pandemic also continues to grow, since infectious diseases can spread around the globe in a matter of days due to increased urbanization and international travel.[8]  These conditions pose a threat to America's health security—its preparedness for and ability to withstand incidents with public-health consequences.  To ensure health security, the country needs a robust health workforce.  Rescinding DACA, however, would deprive the public of domestically educated, well-trained, and otherwise qualified health

---

[5]  Ass'n of Am. Med. Colls., *The Complexities of Physician Supply & Demand: Projections from 2017 to 2032* at 2 (Apr. 2019), https://tinyurl.com/yxbh2nhv.

[6]  *See* Henry J. Kaiser Fam. Found., *Mental Health Care Health Professional Shortage Areas (HPSAs)* (last visited September 24, 2019), https://tinyurl.com/y9u2g69b; Henry J. Kaiser Fam. Found., *Dental Care Health Professional Shortage Areas (HPSAs)* (last visited September 24, 2019), https://tinyurl.com/yye44kpy.

[7]  Angela Chen, PhD et al., *PreHealth Dreamers: Breaking More Barriers Survey Report* at 27 (Sept. 2019), https://tinyurl.com/y436och3.

[8]  Office of the Assistant Sec'y for Preparedness and Response, Dep't of Health and Human Servs., *National Health Security Strategy 2019-2002* at 5-6, (last visited Sept. 24, 2019), https://www.phe.gov/Preparedness/planning/authority/nhss/Documents/NHSS-Strategy-508.pdf.

6

care professionals who have been provided education in reliance on their ability to continue to work in the United States as health care professionals.

As the courts below correctly recognized, the government failed to seriously consider these or any of the other substantial reliance interests engendered by DACA.  By rescinding DACA on the basis of a cursory and conclusory analysis that failed to consider real-world effects, the government ignored the significant reliance interests of U.S. health professional schools, hospitals, other institutions, and U.S. patients, as well as those of DACA recipients themselves.  The rescission was therefore arbitrary and capricious, and the decisions below should be affirmed.

## ARGUMENT

### I. AGENCIES CANNOT CHANGE POLICIES WITHOUT FAIRLY ADDRESSING RELIANCE INTERESTS.

Under the Administrative Procedure Act ("APA"), courts must set aside agency actions that are "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).  That standard requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency acts arbitrarily or capriciously if it "fail[s] to consider an important aspect of the problem" it is addressing.  *Id.*

Where—as here—an agency considers reversing or rescinding an existing policy, one "important aspect of the problem," *State Farm*, 463 U.S. at 43, is the possibility that segments of the public may have ordered their affairs in reliance on existing rules.  This Court has made clear that in such circumstances,

**AR5447**

7

an agency must—at the very least—"display awareness that it is changing position" and "take[] into account" any "serious reliance interests" fostered by the prior policy. *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The agency cannot act in spite of those interests without providing a "reasoned explanation * * * for disregarding facts and circumstances that * * * were engendered by the prior policy." *Id.* at 516. To "ignore such matters" violates the APA. *Id.* at 515.

This Court has applied the *Fox* standard to informal policy statements. In *Encino Motorcars, LLC* v. *Navarro*, 136 S. Ct. 2117 (2016), the Court invalidated a regulation that classified certain employees as subject to federal wage-and-hour laws. *Id.* at 2123, 2126. Because that regulation contravened a prior, informal policy statement excluding those same employees, the Court held that the agency needed to provide more than a "summary discussion" before issuing it. *Id.* at 2126. Indeed, in light of the "serious reliance interests * * * at stake," any "reasoned explanation" had to justify not only the rule the agency adopted, but also the "decision to depart from its existing enforcement policy." *Id.* at 2126-27 (agency had "duty to explain why it deemed it necessary to overrule its previous position"). What might "suffice in other circumstances"—*i.e.*, where an agency is writing on a blank slate—is inadequate where an agency decision reflects a departure from prior enforcement policy. *Id.* at 2126; *see also, e.g.*, *Nat'l Lifeline Ass'n* v. *FCC*, 921 F.3d 1102, 1114 (D.C. Cir. 2019) (agency action "was arbitrary and capricious" in "departing from" a prior non-enforcement policy while "failing to consider * * * the reliance interests" of regulated parties and others).

8

As the courts below recognized, the government's decision to end DACA "demonstrates no true cognizance of the serious reliance interests at issue." *NAACP* v. *Trump*, 315 F. Supp. 3d 457, 473 (D.D.C. 2018). Respondents have raised this issue in broad terms. *See* Br. for Regents of Univ. of Cal., at 40-43. As further shown below, the issue is substantial and far-reaching: health professional schools, hospitals, and other institutions have made significant, long-term investments of time and money in the training of DACA recipients wholly in reliance on these individuals' continued work authorization under DACA. These investments were made amidst severe shortages of trained health care workers, where the nation needs every single one available. Nothing in the record shows that the government considered these or any other disruptions of significant reliance interests at all, much less gave them the serious consideration that the law requires. And because the courts below correctly found that the government did not, this Court should affirm the judgments and hold that DACA's rescission was arbitrary and capricious.

## II. LOSS OF DACA STATUS FOR HEALTH CARE TRAINEES AND PROFESSIONALS WOULD NULLIFY SUBSTANTIAL INVESTMENTS MADE BY SCHOOLS, OTHER INSTITUTIONS, AND RECIPIENTS, TO THE PUBLIC'S SIGNIFICANT DETRIMENT.

### A. Recipients Depend On DACA For Their Work Eligibility.

The reliance interests in this case arise because DACA is the sole source of work authorization for

9

most of its recipients.[9]  Such authorization is critical to anyone seeking to practice medicine or otherwise work in the health care sector in the United States. Federal law prohibits anyone from hiring or from continuing to employ any person who is not authorized by the federal government to work.  *See* 8 U.S.C. §§ 1324a(a)(1)-(2), (h)(3).

As relevant here, only three classes of noncitizens are eligible for work authorization:  those who are lawfully admitted to the United States, those who have visas, and those eligible to apply for work authorization owing to specific circumstances.  *See* 8 C.F.R. § 274a.12.  By definition, DACA recipients have entered the country without legal authorization, and thus are only eligible—if at all—for work authorization under the third category.

DACA thus provides its recipients with a way to be self-sufficient and contribute to the U.S. workforce and economy.  Any noncitizen "who has been granted deferred action" may apply for and receive authorization so long as "the alien establishes an economic necessity for employment."  8 C.F.R. § 274a.12(c)(14).

---

9 *See* Shoba Sivaprasad Wadhia, *Demystifying Employment Authorization & Prosecutorial Discretion in Immigration Cases*, 6 Colum. J. Race & L. 1, 3 (2016) (DACA provides a route to work authorization that the "vast majority" of its recipients would otherwise lack).

10

### B. Medical Schools, Teaching Hospitals, And Other Educational And Health Care Institutions Expended Vast Amounts Of Time, Money, And Other Resources In Reliance On DACA.

Medical schools, teaching hospitals, and other health care institutions have invested heavily in DACA recipients, in reliance on the premise that they would be legally authorized to perform the jobs for which they have been, or are being, trained. Those investments, moreover, were made to serve the public interest, as the country faces an ever-increasing shortage in the number of health care professionals.

Since 1982, students who arrived in the United States without legal authorization as children have been able to benefit from public K-12 education. *Plyler* v. *Doe,* 457 U.S. 202, 223 (1982). Some of these children have found ways to pay for college educations. However, prior to DACA, medical school was not a realistic option for undocumented immigrants who were brought to the U.S. as children. Without formal recognition of deferred action status from the government, undocumented immigrants were legally foreclosed from working as licensed physicians and thus could not meet the technical standards for admission into most medical schools. There are a limited number of seats in medical schools, and each medical school takes seriously its responsibility to the public to use every available seat to produce a physician capable of contributing to the health care workforce. Consequently, before 2013 no medical school had any published policy allowing undocumented immigrants to be accepted into their programs.

11

DACA changed this calculus. As related by one department chair, DACA provided the "missing link" for medical schools to accept qualified noncitizens because it offered a route to work permits for recipients.[10]  In the autumn of 2013, the first DACA recipients entered medical school, and in the ensuing years the number of DACA applicants and matriculants steadily grew. As of the 2019 application cycle, 65 medical schools across the country have reported admissions policies that include DACA recipients. Those schools include Alpert Medical School at Brown University, Georgetown University School of Medicine, Harvard Medical School, Stritch School of Medicine at Loyola University ("Stritch"), Michigan State University College of Human Medicine, University of Minnesota Medical School, University of Nevada Reno School of Medicine, Medical College of Wisconsin, Yale School of Medicine, and others. According to AAMC data, nearly 200 DACA recipients have matriculated into medical school, and many of them have graduated and entered or completed their medical residencies.

It was DACA that allowed medical schools to accept and train nearly all of these students. For example, Rosa Aramburo graduated college with degrees in biology and literature. *Id*. One of her college advisors wrote to the department chair of medical education at Stritch that "one of the brightest students he had ever encountered was about to slip through the cracks because of her undocumented status." *Id*.

---

[10] Sarah Conway & Alex V. Hernandez, *Loyola's DACA Medical Students, Largest Group in the Country, Plagued with Uncertainty*, Chicago Trib. (Sept. 13, 2017), https://tinyurl.com/y485wmxu.

12

Dr. Aramburo's talent and drive, along with DACA's extension of work authorization, inspired Stritch to admit her. She has since earned her M.D. and is now in the first year of her Obstetrics and Gynecology residency.

More broadly, DACA recipients, like their citizen counterparts, were selected for admission to medical school because of their academic and personal achievements. Many were high school valedictorians. Most have undergraduate degrees in complex sciences, such as integrative biology, neurology, physics, and molecular and cellular biology. Many have impressive volunteer and leadership experiences. All scored competitively on the Medical College Admission Test. Moreover, the very fact of their having met the rigorous qualifications for admission to medical school is a testament to their determination and fortitude—precisely the attributes one looks for in a physician.

Teaching hospitals have also invested substantial time and money in training residents with DACA-dependent work authorization. There are currently an estimated 41 medical residents with DACA status, including many whose residencies are nearly complete. The direct training costs for these residents has been estimated at $157,602 per resident, per year.[11] Based upon available data, the AAMC

---

[11] Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Cost Estimates for Training Residents in a Teaching Health Center* at 2 (last visited Sept. 24, 2019), https://bhw.hrsa.gov/sites/default/files/bhw/grants/thc-costing-fact-sheet.pdf. This number does not include indirect costs or those associated with the physical space and equipment retrofitting required to host and train medical residents.

13

estimates that, as of February 2019, hospitals in the U.S. have invested approximately $5 million training medical residents with DACA status.[12] Accompanying this significant financial investment is an investment of tens of thousands of hours in supervision, training, and administration. As with all physicians' residency training, enormous resources have been expended with the expectation of a return on that investment in the form of highly-trained professionals able to serve the public by practicing medicine independently. These investments would not have been made but for reliance on DACA recipients' continued eligibility to work in the U.S.

Other health professional schools have invested in the training of DACA recipients for the health care workforce. DACA recipients are also pursuing or have obtained graduate degrees in medical sciences. With the support of privately funded fellowships or in collaboration with universities, these individuals are researching radiation sensors, the role of cholesterol regulation in breast cancer cells, the formation of genetic abnormalities associated with cancer, changes in the structure and function of proteins that may result in autoimmune disorders, and cognitive

---

[12] According to available self-reported AAMC data, most recently updated in February 2019, there was one DACA resident in 2016-2017, eight DACA residents in 2017-2018, and twenty DACA residents in 2018-2019. Because the AAMC has not collected data on DACA status consistently across programs, these numbers are not comprehensive. The five million dollar figure quoted above does not include costs associated with an additional 20 or more DACA residents who began residencies in 2019. (Data on file with AAMC).

14

neuroscience, among other things.[13] As with other health care professionals, these researchers' ability to continue their work in their fields is contingent upon work authorization.

All of these institutions have invested money, time, and other resources into DACA recipients' training and development because of the promise presented by these bright learners, eager to contribute their talents to the health care workforce. Institutions would not have made these investments but for their reliance on the continued work authorization afforded by the DACA program.

## C. DACA Recipients Relied On Their Eligibility To Work When They Decided To Invest Their Own Time, Effort, And Resources In A Health Care Career.

Thousands of DACA recipients have also invested vast amounts of their own time, effort, and resources to be able to serve the United States health care system. Health professional education is expensive, and financing that education presents even greater challenges for most DACA recipients than it does for citizens.

The necessary financial investments only increase with medical school. Many DACA recipients patch together tuition with merit-based scholarships and private loans, all provided and accepted with the expectation that they will be eligible for future employment in the field in which they are being

---

[13] Evelyn Valdez-Ward, *The End of DACA Would Be a Blow to Science*, Sci. Am. Blog Network (Dec. 12, 2018), https://blogs.scientificamerican.com/voices/the-end-of-daca-would-be-a-blow-to-science/.

15

trained.[14]   Because most DACA students are not eligible for federal loans,[15] most finance their education through the private sector.   Their only realistic route to repay those loans turns on their ability to practice medicine after residency, which in turn is dependent on their continued work authorization through DACA.

Even apart from financial investments, DACA recipients have made substantial investments of both time and effort in the reasonable expectation that they will practice in their chosen field.  Physicians, for example, between post-graduate preparatory courses, four years of medical school, and three to nine years in internships, residencies, and fellowships, may spend more than half of their lives in training before being able to independently practice.[16]   Like others pursuing a career in medicine, DACA recipients who are or will become physicians have delayed making an income for four or more years after graduating college, and may have instead accrued debt, so that they could acquire the skills they will need to treat patients. Other health care workers make similar sacrifices.

---

[14] Pre-Health Dreamers, *Frequently Asked Questions & Answers about Medical School for Pre-med Undocumented Students Across the Nation* at 11-14 (last visited Sept. 24, 2019), https://tinyurl.com/yyhcsqkt.

[15] *See* Fed. Student Aid, U.S. Dep't of Educ., *Who Gets Aid: Non-U.S. Citizens* (last visited Sept. 24, 2019), https://studentaid.ed.gov/sa/eligibility/non-us-citizens ("Undocumented students, including DACA recipients, are not eligible for federal student aid.").

[16] Amy E. Thompson, MD, *A Physician's Education*, J. Am. Med. Assoc. (Dec. 10, 2014), https://jamanetwork.com/journals/jama/fullarticle/2020375.

16

### D. Rescinding DACA Will Nullify These Investments And Worsen A Shortage Of Health Care Professionals In The United States.

Each DACA recipient in the health care sector embodies a substantial, irreplaceable investment of time and resources made with the reasonable expectation that that recipient would be eligible to put his or her education and training into practice. Every dollar or hour invested in a DACA recipient's education and training during the past seven years is a dollar or hour not invested in someone else's.

For that reason, the resources expended on DACA recipients' educations cannot ever be recouped. If those individuals are prevented from working in the U.S., their abrupt absence will leave a critical gap in the health professional workforce. While the medical field has worked to expand its training capacity, it cannot backfill such a significant number of trainees. Even if new resources were suddenly found to educate and train replacement physicians, it would be ten years before any of those physicians had the training and preparation to practice medicine independently. Because of these limitations, medical schools and teaching hospitals strive not to lose a single medical student or resident. The loss of all DACA medical students and residents if DACA is rescinded would mark a concrete and enduring loss to medical schools, teaching hospitals, and the U.S. public at large.

In addition to the harm to educational institutions, rescinding DACA also threatens to exacerbate a broader threat facing the country. Over the next decade, the United States will face increased health care challenges arising from its aging population. By 2050, adults over the age of 65 will make up 20% of

17

the population, outnumbering children for the first time in U.S. history.[17]  Almost half of the population is expected to have at least one chronic disease by 2020, and as the population ages this number will increase.[18]  Due in large part to the aging population, the growth in demand for health care services workers in the next decade is projected to outstrip that of any other occupational group.[19]

This increase in demand will be met by a projected decrease in supply.  More than a third of all currently active physicians will be 65 or older within the next decade, and will retire at a rate faster than new graduates can replace them.[20]  The AAMC's workforce studies have projected a future shortfall of between 46,900 to 121,900 primary and specialty care physicians by 2032.[21]   Shortages  are and will continue to be experienced in other health care professions as well.[22]

---

[17]  U.S. Census Bureau, *Older People Projected to Outnumber Children for First Time in U.S. History* (Sept. 6, 2018).

[18] Wullianallur Raghupathi & Viju Raghupathi, *An Empirical Study of Chronic Diseases in the United States: A Visual Analytics Approach to Public Health*, 15 Int'l J. Envtl. Res. & Pub. Health 431, 431 (Mar. 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5876976/.

[19] Bureau of Labor Stat., U.S. Dep't of Labor, *Occupational Outlook Handbook: Healthcare Occupations* (September 4, 2019), https://www.bls.gov/ooh/healthcare/home.htm.

[20] Ass'n of Am. Med. Colls., *supra* note 5, at x, 4.

[21] *Id.* at 1-2.

[22] Ctr. For Health Workforce Studies, SUNY-Albany Sch. of Pub Health, *Health Care Employment Projections, 2016-2026: An Analysis of Bureau of Labor Statistics Projections by Setting and by Occupation* at 3 (Feb. 2018), https://tinyurl.com/y58hfz6x

18

These shortages are nationwide.  Texas, for example, has nearly 1,200 health professional shortage areas (HPSAs) that have been designated by the Health Resources and Services Administration (HRSA).[23]   Nationwide, there are 6,782 dental HPSAs, with 56 million affected people, requiring 9,951 additional practitioners to fill the gaps.  Over the next decade, thirty-seven states will have a shortage of primary care physicians, seven will face a shortage of nurses, and there will be shortages among cardiologists, gastroenterologists, hematologists, oncologists, and pulmonologists.[24]  Across the nation,

---

(projecting annual need of 37,000 new physicians, nurse practitioners, and physician assistants).  The Henry J. Kaiser Family Foundation similarly estimates a nationwide shortage of 6,894 mental-health professionals and 10,635 dental health professionals.  Henry J. Kaiser Fam. Found., *supra* note 6.

[23] *See generally* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Health Professional Shortage Areas* (last visited Sept. 24, 2019), https://bhw.hrsa.gov/shortage-designation/hpsas.

[24] Nat'l Ctr. For Health Workforce Analysis, U.S. Dep't of Health & Human Servs., *State-Level Projections of Supply and Demand for Primary Care Practitioners: 2013-2025*, at 5 (Nov. 2016), https://bhw.hrsa.gov/sites/default/files/bhw/health-workforce-analysis/research/projections/primary-care-state-projections2013-2025.pdf; Nat'l Ctr. For Health Workforce Analysis, U.S. Dep't of Health & Human Servs., *Supply and Demand Projections of the Nursing Workforce: 2014-2030* (July 21, 2017), https://bhw.hrsa.gov/sites/default/files/bhw/nchwa/projections/NCHWA_HRSA_Nursing_Report.pdf (identifying shortages of RNs in 7 states and shortages of LPNs in 33 states); Nat'l Ctr. For Health Workforce Analysis, U.S. Dep't of Health & Human Servs., *National and Regional Projections of Supply and Demand for Internal Medicine Subspecialty Practitioners: 2013-2025*, at 4 (Dec. 2016), https://bhw.hrsa.gov/sites/default/files/bhw/health-workforce-

19

HRSA has identified more than 5,000 areas in the U.S. with a shortage of mental-health professionals, which means that less than half of this nation's need for mental health treatment is being addressed.[25]  By removing current and expected health professionals from practice, rescinding DACA will only worsen these shortages.

   DACA health care workers are an important part of the nation's response to health care shortages in regions and communities with insufficient access to health care or culturally responsive care, as these are the communities where DACA recipients have shown a propensity to work.  According to a survey of undocumented youth interested in health careers conducted in 2016, 97% expressed plans to ultimately work in the neighborhoods in which they grew up, or other underserved areas.[26] That number is consistent with other studies demonstrating that individuals who are under-represented in medicine are twice as likely to pursue careers working with underserved populations.[27]

---

analysis/research/projections/internal-medicine-subspecialty-report.pdf.

   [25] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Map Tool—Shortage Areas*, (last visited Sept. 24, 2019),  https://data.hrsa.gov/hdw/tools/MapTool.aspx  (showing mental health shortage areas).

   [26] Chen, *supra* note 7, at 27 .

   [27] Andrea N. Garcia et al., *Factors Associated with Medical School Graduates' Intention to Work with Underserved Populations: Policy Implications for Advancing Workforce Diversity*, Acad. Med. (Sept. 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5743635/.

20

DACA recipients currently in health professional schools have discussed painful childhood experiences that motivated them to pursue careers in the medical profession: family members unnecessarily suffering— and even dying—from treatable conditions like diabetes, breast cancer, stroke, heart conditions, prostate cancer, and anemia due to a lack of access to care. "The older I got," says Ali Torabi, a medical student at Stritch, "the more I recognized the disparities between my community and the communities that had access to health care. I've had injuries where I've avoided going to the hospital * * * because broken bones are expensive."[28] Blanca Morales, a fourth-year medical student at Harvard, recalls how some of her family members with diabetes went without medical support. "I remember thinking that we have all this new technology and these new advances in managing diabetes, but we can't access them." *Id.* For these young people, becoming a physician for the underserved is not just a profession but a calling. As Hector Perez, a public health graduate student at Columbia, puts it: "my passion for public health arose from my undocumented immigrant identity."[29] "Seeing * * * all the extra hurdles you have to go through when you are underprivileged," says Sharjeel

---

[28] Gabrielle Redford, DACA Students Risk Everything to Become Doctors (Sept. 17, 2018), https://www.aamc.org/news-insights/daca-students-risk-everything-become-doctors.

[29] Hector Sanchez Perez, *Student Blog: I'm a Mailman Dreamer* (Feb 20, 2018), https://www.mailman.columbia.edu/public-health-now/news/student-blog-im-mailman-dreamer.

21

Syed, a medical student at Stanford, "makes me want to * * * create solutions."[30]

States have recognized the criticality of DACA recipients to health care in rural and underserved areas. After the Arkansas Board of Nursing announced in 2017 that it would no longer license DACA recipients to practice, the state legislature quickly reversed course in light of the impact of the loss of these trained nurses. The legislature instead recognized that Arkansas was "suffering from a nursing shortage across the state," such that it was "in the best interest of the State of Arkansas to make full use of the skills and talents in the state by ensuring that an individual who is work-authorized under the [DACA] policy is able to obtain an occupational or professional license and practice his or her occupation or profession."[31] Similar bills have been passed in other states with health care shortages, such as Nebraska, Indiana, and Nevada.[32]

---

[30] Redford, *supra* note 30.

[31] H.B. 1552, 92d Gen. Assemb., Reg. Sess., § 1(a)(6) (Ark. 2019), http://www.arkleg.state.ar.us/assembly/2019/2019R/Bills/HB1552.pdf.

[32] A.B. 275, 80th Sess., § 2 (Nev. 2019), https://legiscan.com/NV/text/AB275/id/2030359/Nevada-2019-AB275-Enrolled.pdf ("The Legislature hereby finds and declares that * * * It is in the best interests of this State to make full use of the skills and talents of every resident of this State [and] it is the public policy of this State that each resident of this State, regardless of his or her immigration status, is eligible to receive the benefit of applying for a license, certificate or permit pursuant to 8 U.S.C. 1621(d)."); S.E.A. 419, 120th Gen. Assemb., 2d Reg. Sess., § 1(C) (Ind. 2018), http://iga.in.gov/static-documents/3/5/f/f/35ff8b3b/SB0419.05.ENRH.pdf (expands eligibility for professional licensure to individuals who have been "authorized by the federal

AR5462

22

Illinois has also applied DACA recipients' willingness to work in underserved communities as part of its strategy to address state health care shortages. In 2013, Illinois provided financial resources to enable DACA medical and dental students in the State with education and training in order to serve underserved communities in the State.[33] Under that program, loan recipients agree to a yearly service obligation that requires them to work in a primary-care specialty in one of several types of underserved areas in the state of Illinois. For each year of funding recipients receive from Illinois, they agree to spend a year serving a population in need. *Id.* Loan recipients under this program who have graduated medical school are currently in medical residencies and have not yet begun their service obligations. To date, Illinois has invested millions in these students to address its underserved populations. If the administration is permitted to rescind DACA, Illinois will lose not only the money it has already invested (which would otherwise be recouped through loan repayment funded by recipients' earnings as physicians) but also the promise of needed care in shortage areas.

---

government to work in the United States"); L.B. 947, § 3(a) (Neb. 2016), https://nebraskalegislature.gov/FloorDocs/104/PDF/Slip/LB947.pdf ("The Legislature finds that it is in the best interest of the State of Nebraska to make full use of the skills and talents in the state by ensuring that a person who is work-authorized is able to obtain a professional or commercial license and practice his or her profession.").

[33] *See* Ill. Fin. Auth., Board Book, at 53 (July 9, 2013), https://tinyurl.com/yxqa2cjw (describing program); Ill. Fin. Auth., Resolution 2013-0709-AD05 (July 9, 2013), https://tinyurl.com/y6o23j96 (approving program).

AR5463

23

These states' investments into DACA health care professionals was made in the context of what was known and projected about shortages. However, if DACA is rescinded, these projections will change, and our nation's health needs will deepen. A rescission of DACA is a threat to public health: the sudden loss of employment by roughly a million people will likely result in a concomitant reduction in their living conditions, their mental health, and their ability to seek preventative health care.[34] The impact will not be contained to the undocumented immigrant community, and will put additional pressure on the nation's health care infrastructure,[35] as the need for health care professionals increases at the same time that tens of thousands of health care professionals are excluded from the workforce.

In addition to providing much-needed health care, physicians also contribute to the economies of the communities in which they work. A 2018 study by the American Medical Association showed that, on average, every physician supports the employment of over seventeen other people, generates $3.2 million dollars of economic activity, contributes $1.4 million to workers' wages and benefits, and generates $126,129

---

[34] Atheendar S. Venkataramani, M.D., Ph.D. & Alexander C. Tsai, M.D., Ph.D., *Dreams Deferred—The Public Health Consequences of Rescinding DACA*, 377 New Eng. J. Med. 1707, 1708 (Nov 2, 2017).

[35] Osea Giuntella & Jakub Lonsky, *The Effect of DACA on Health Insurance, Access to Care, and Health Outcomes*, at 14, IZA Inst. of Labor Econ. Discussion Paper Series (Apr. 2018) (Concluding that a rescission of DACA could have detrimental effects on DACA recipients, health care providers, and public health officials).

24

in state and local tax revenue.[36] Physicians also act as financial multipliers in the communities they serve by providing cost-efficient preventative care and adding jobs to the local economy. For every DACA student or physician who loses work authorization, cities, states, and the country will lose these significant benefits.

The effects of rescinding DACA will extend far beyond the impact on DACA recipients themselves. For years, health professional schools, hospitals, and even states themselves have invested substantially in educating and training DACA recipients under the expectation that they would be able to return that investment with a lifetime of practice that benefits the public in ways that will be crucial over the next decades. These serious reliance interests warranted consideration before the government decided to rescind DACA.

### III. THE GOVERNMENT ACTED ARBITRARILY AND CAPRICIOUSLY IN FAILING TO TAKE ACCOUNT OF ANY OF THESE AND OTHER SERIOUS RELIANCE INTERESTS.

Nothing in the government's effort to justify its change in position even attempts to take account of the weighty reliance interests set forth above. To the contrary, the government provided only a brief statement that to the extent reliance interests exist, they

---

36 Am. Med. Ass'n, *2018 American Medical Association Economic Impact Study*, (last visited Sept. 24, 2019), https://www.physicianseconomicimpact.org/.

25

are less important than DACA's supposedly "question-able legality," along with unspecified "other reasons for ending" it. *NAACP*, 315 F. Supp. 3d at 473.

Even now, the government all but dismisses reliance interests. In barely more than a page of its brief, the government argues that DACA could not have engendered any reliance interests because it was not intended to confer any "substantive right," and that whatever reliance interests may have arisen were overcome by the "legal and institutional concerns" arising from DACA itself. *See* Pet. Br. 42-43; *Regents* Pet. App. 101a, 125a.

Neither of these arguments justifies the government's failure to consider reliance interests. By definition, where an agency has the ability to reverse an existing regulatory program, that program will not confer permanently vested rights. This Court has made clear, however, that in these circumstances, the agency must still give serious consideration to reliance interests that would be disrupted by that action. This Court has further held that even informal policy statements issued through an opinion letter may suffice to engender serious reliance interests. *See, e.g., Encino Motorcars*, 136 S. Ct. at 2123, 2126. Likewise here, the government's reliance on a single, boilerplate statement at the end of a memorandum that accompanied DACA's issuance, *see Regents* Pet. App. 101a, does not address any of the practical effects that DACA has had on the medical profession and others over the years since DACA was put in place.

Nor has the government adequately addressed reliance issues through its assertion that its "legal and institutional concerns" outweighed those reliance interests. *See* Pet. Br. 42-43. That argument is no better than the reasoning this Court found

AR5466

26

insufficient in *Encino Motorcars*. *Compare Regents* Pet. App. 125a, *with Encino Motorcars*, 136 S. Ct. at 2126-27.

In any event, to the extent the government acknowledged reliance interests, its consideration was limited to the reliance interests of DACA recipients themselves. *See Regents* Pet. App. 125a (noting that "neither any individual's reliance * * * nor the sympathetic circumstances of DACA recipients as a class" sufficed to avoid rescinding DACA). It did not consider the reliance interests of any other group, such as the effects rescinding DACA would have on American health care. This includes the effects on our health professions and educational communities, like the ones *amici* represent, who have already invested substantial and irreplaceable resources educating and training DACA recipients to care for the American public.[37] The government's analysis therefore does not comport with the requirement to consider reliance interests beyond parties directly subject to a regulatory change. *See, e.g.*, *Nat'l Lifeline Ass'n*, 921 F.3d at 1114-15.

In sum, the government's analysis and stated rationale are plainly deficient. Accordingly, the lower courts were correct that rescinding DACA without

---

[37] The institutional expenditures set forth above reflected entirely reasonable reliance on DACA's continuing viability. As late as April 23, 2017—just months before the current administration attempted to rescind the program—President Trump assured the country that "the dreamers should rest easy," because he was only "after the criminals." Interview by Julie Pace with Donald Trump, Associated Press (Apr. 23, 2017), https://tinyurl.com/lr7z7ye.

AR5467

27

considering weighty, unaddressed reliance interests was arbitrary and capricious.

## CONCLUSION

For the foregoing reasons and those in the respondent's brief, the judgment should be affirmed.

Respectfully submitted,

HEATHER J. ALARCON
FRANK R. TRINITY
ASSOCIATION OF
  AMERICAN MEDICAL
  COLLEGES
655 K Street N.W.
Suite 100
Washington, D.C 20001
(202) 478-9939

JONATHAN S. FRANKLIN
  *Counsel of Record*
DAVID KEARNS
NORTON ROSE FULBRIGHT US LLP
799 Ninth Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 662-4663

October 2019

*Counsel for Amici Curiae*

AR5468

**ADDENDUM**

AR5469

1a

## AMICI CURIAE

**America's Essential Hospitals**—an association of more than 300 hospitals and health systems dedicated to high-quality care for all, including the most vulnerable, and that provide specialized, lifesaving services, train the health care workforce, advance public health and health equity, and coordinate care.

**American Academy of Child and Adolescent Psychiatry**—a medical membership association established by child and adolescent psychiatrists in 1953. With over 9,500 members strong, AACAP is the leading national medical association dedicated to treating and improving the quality of life for the estimated 7-15 million American youth under 18 years of age who are affected by emotional, behavioral, developmental and mental disorders.

**American Academy of Family Physicians**—represents 134,600 family physicians, family-medicine residents, and medical students from all fifty states, the District of Columbia, Guam, Puerto Rico, the Virgin Islands, and the Uniformed Services of the United States.

**American Association of Colleges of Nursing**—is the national voice for academic nursing. Representing over 825 member schools offering baccalaureate and graduate programs in nursing at public and private universities nationwide, AACN works to establish quality standards for nursing education; assists schools in implementing those standards; influences the nursing profession to improve health care; and promotes public support for professional nursing education, research, and practice.

**AR5470**

2a

**American Association of Colleges of Pharmacy**—represents pharmacy education in the United States to advance pharmacy education, research, scholarship, practice, and service in partnership with members and stakeholders, to improve health for all.

**American College of Healthcare Executives**—an international professional society of more than 48,000 healthcare executives who lead hospitals, healthcare systems, and other healthcare organizations.

**American College of Obstetricians and Gynecologists**—is a not-for-profit educational and professional organization with more than 58,000 members dedicated to the healthcare of women.

**American College of Physicians**—represents 159,000 internal-medicine physicians (internists), related subspecialists, and medical students.

**American College of Preventive Medicine**—a professional medical society of more than 2,700 preventive medicine and public health physicians who manage, research, and influence population health.

**American Dental Education Association**—the "Voice of Dental Education," with members that include all 68 U.S. dental schools, over 1,000 allied and advanced dental-education programs, 60 corporations, and more than 20,000 individuals.

**American Medical Association**—the largest professional association of physicians, residents, and medical students in the United States. The AMA appears on its own behalf and as a representative of the Litigation Center of the American Medical Association and the State Medical Societies.

AR5471

3a

**American Medical Student Association**—represents the concerns of more than 30,000 physicians-in-training in the United States.

**American Nurses Association**—represents the interests of the nation's approximately 4 million registered nurses. ANA's membership consists of both individual members and organizational members, which include over 35 affiliate member specialty nursing organizations and 50 state or constituent nursing associations. Together, ANA and its members work to find solutions to issues that face the nursing profession.

**American Psychiatric Association**—represents more than 38,500 medical doctors involved in clinical psychiatric practice, research, academia, and education of psychiatrists needed to prevent, diagnose, and treat mental health and substance use disorders. Its membership represents the diversity of the patients for whom they care.

**American Public Health Association**— an organization of nearly 25,000 public health professionals, champions the health of all people and all communities, strengthens the profession of public health, shares the latest research and information, promotes best practices, and advocates for public-health issues and policies grounded in research.

**American Society of Hematology**—the world's largest professional society of hematologists, including clinicians and researchers, who are dedicated to furthering the understanding, diagnosis, treatment, and prevention of disorders affecting the blood.

**AR5472**

4a

**American Society of Nephrology**—Since 1966, ASN has been leading the fight to prevent, treat, and cure kidney diseases throughout the world by educating health professionals and scientists, advancing research and innovation, communicating new knowledge, and advocating for the highest quality care for patients. ASN has more than 20,000 members representing 131 countries.

**American Thoracic Society**—a medical professional organization of over 16,000 members dedicated to the prevention, detection, treatment, and cure of pulmonary disease, critical care illness and sleep disordered breathing through research, education, clinical care, and advocacy.

**Association of Academic Health Centers**—a not-for-profit association dedicated to advancing the nation's health and well-being through the vigorous leadership of academic health centers.

**Association of American Indian Physicians**—more than 412 American Indian/Alaskan Native residents, licensed or retired Allopathic or Osteopathic physicians, committed to pursuing excellence in Native American health care by promoting education in the medical disciplines, honoring traditional healing principles and restoring the balance of mind, body, and spirit.

**Association of American Medical Colleges**—represents all 154 accredited U.S. medical schools; nearly 400 major teaching hospitals and health systems, and 80 academic societies.

**Association of Schools and Programs of Public Health**—represents more than 120 schools and

AR5473

5a

programs accredited by the Council on Education for Public Health.

**Association of Schools of Allied Health Professions**—a national association comprised of 127 not-for-profit universities focused on issues impacting allied health education.

**Association of University Programs in Health Administration**—a global network of colleges, universities, faculty, individuals, and organizations dedicated to the improvement of health and healthcare delivery through excellence in healthcare management and policy education and scholarship, by promoting the value of university-based management education for leadership roles in the health sector.

**California Medical Association**—a nonprofit, incorporated professional association for physicians with approximately 45,000 members throughout the state of California. For more than 150 years, CMA has promoted the science and art of medicine, the care and well-being of patients, the protection of public health, and the betterment of the medical profession. CMA's physician members practice medicine in all specialties and settings, and is dedicated to the health of all patients in California.

**Council on Social Work Education**—represents over 800 accredited baccalaureate and master's degree social work programs, as well as individual social work educators, practitioners, and agencies dedicated to advancing quality social work education.

**Greater New York Hospital Association**—represents more than 160 hospitals and health systems located throughout New York, New Jersey, Connecticut, Pennsylvania, and Rhode Island. All of

6a

GNYHA's members are either not-for-profit entities, charitable organizations, or publicly sponsored institutions that provide services that range from state-of-the-art, acute tertiary services to basic primary care, and, with their related medical schools, provide medical education and training and undertake cutting-edge medical research.

**National Council of Asian Pacific Islander Physicians**—represents Asian American, Native Hawaiian, and Pacific Islander physicians committed to the advancement of the health and well-being of their patients and communities, and supports the professional development of Asian American and Pacific Islander medical students and residents.

**National Hispanic Medical Association**—represents the interests and concerns of 50,000 licensed physicians committed to the mission to improve the health of Hispanic populations with affiliated Hispanic medical societies, resident and medical-student organizations, and other public and private partners.

**National Medical Association**—the largest and oldest national organization representing the interests of more than 30,000 African-American physicians and the patients they serve.

**Physician Assistant Education Association**—represents over 240 physician assistant programs across the nation.

**Pre-Health Dreamers**—a network and community of over 800 health career bound undocumented students across 42 different states.

**Society of General Internal Medicine**—represents more than 3,300 of the world's leading

AR5475

7a

academic general internists, who are dedicated to improving access to care for vulnerable populations, eliminating healthcare disparities, and enhancing medical education.

AR5476

Nos. 18-587, 18-588, 18-589

In the

# Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, ET AL.,

*Petitioners*,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL,

*Respondents.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

*Petitioners*,

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.,

*Respondents.*

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, ET AL.,

*Petitioners*,

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL,

*Respondents.*

On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit and Writs of Certiorari Before Judgment to the United States Courts of Appeal for the District of Columbia and Second Circuits

## BRIEF OF NATIONAL SCHOOL BOARDS ASSOCIATION ET AL. AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS

FRANCISCO M. NEGRÓN, JR.
Chief Legal Officer
NATIONAL SCHOOL BOARDS
  ASSOCIATION
1680 Duke St., FL 2
Alexandria, VA 22314
(703) 838-6722

RICHARD P. BRESS
*Counsel of Record*
SAMIR DEGER-SEN
JESSICA SABA
LATHAM & WATKINS LLP
555 11th St., NW, Ste. 1000
Washington, DC 20004
(202) 637-2200
richard.bress@lw.com

*Counsel for Amici Curiae*

**AR5477**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................... iii

INTERESTS OF *AMICI CURIAE* ............................1

SUMMARY OF ARGUMENT.....................................4

ARGUMENT .............................................................7

I.   THE RESCISSION OF DACA MUST SATISFY NORMAL APA STANDARDS.............7

    A.   Reasoned decision-making requires that an agency's rationale be adequately explained, that any change in policy be acknowledged, and that reliance interests are accounted for.............................8

    B.   The requirements of reasoned decision-making are fully applicable when an agency's stated basis for its decision is a change in its interpretation of the law........10

    C.   A court's independent assessment of whether an agency's policy is unlawful is inappropriate................................................12

II.   THE DECISION TO RESCIND DACA WAS ARBITRARY AND CAPRICIOUS ....................15

    A.   DHS failed to adequately explain why it believes DACA is unlawful. .........................16

        1.   DHS failed to explain why there was no "statutory authority" for DACA. ......19

**AR5478**

ii

## TABLE OF CONTENTS—Continued

**Page**

2. DHS failed to acknowledge or account for the differences between DACA and DAPA. ...................................20

3. DHS's citation to the Fifth Circuit's DAPA ruling is inadequate to justify its decision to rescind DACA. ................21

4. The Supreme Court's affirmance of the Fifth Circuit's DAPA ruling has no precedential value. ...........................23

5. DHS fails to identify any constitutional defect of DACA. ..............24

B. DHS's post-hoc explanations should be disregarded and, in any event, do not meet the requirements for reasoned decision-making. ...........................24

C. DHS failed to acknowledge its changed policy position or provide reasons for that change. ...................................31

D. DHS did not adequately take into account reliance interests. ...........................32

CONCLUSION .......................................................37

iii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Administration,*
429 F.3d 1136 (D.C. Cir. 2005) .............................7

*Alpharma, Inc. v. Leavitt,*
460 F.3d 1 (D.C. Cir. 2006) .................................25

*Altera Corp. & Subsidiaries v. Commissioner,*
926 F.3d 1061 (9th Cir. 2019) .............................33

*Amerijet International, Inc. v. Pistole,*
753 F.3d 1343 (D.C. Cir. 2014) ..........................16

*Animal Legal Defense Fund, Inc. v. Perdue,*
872 F.3d 602 (D.C. Cir. 2017) .............................12

*Arizona Dream Act Coalition v. Brewer,*
855 F.3d 957 (9th Cir. 2017), *cert. denied,* 138 S. Ct. 1279 (2018) ...........................19

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,*
419 U.S. 281 (1974) ...............................6, 9, 18, 23

*Catholic Healthcare West v. Sebelius,*
748 F.3d 351 (D.C. Cir. 2014) .......................12, 13

**AR5480**

iv

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Checkosky v. SEC,*
    23 F.3d 452 (D.C. Cir. 1994)................................30

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971)..........................................7, 25

*East Texas Medical Center-Athens v. Azar,*
    337 F. Supp. 3d 1 (D.D.C. 2018).........................11

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016).................................*passim*

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009).........................5, 9, 10, 31, 33

*Food Marketing Institute v. ICC,*
    587 F.2d 1285 (D.C. Cir. 1978).....................26, 31

*Hispanic Affairs Project v. Acosta,*
    263 F. Supp. 3d 160 (D.D.C. 2017), *aff'd
    in part, rev'd in part*, 901 F.3d 378 (D.C.
    Cir. 2018).............................................................32

*International Union, United Mine Workers
    of America v. United States DOL,*
    358 F.3d 40 (D.C. Cir. 2004)...............................22

*Interstate Natural Gas Association of
    America v. FERC,*
    617 F.3d 504 (D.C. Cir. 2010)................................5

**AR5481**

v

## TABLE OF AUTHORITIES—Continued

Page(s)

*Jicarilla Apache Nation v. United States DOI,*
613 F.3d 1112 (D.C. Cir. 2010)............................32

*Judulang v. Holder,*
565 U.S. 42 (2011)................................................12

*Kimble v. Marvel Entertainment, LLC,*
135 S. Ct. 2401 (2015)...........................................8

*LePage's 2000, Inc. v. Postal Regulatory Commission,*
642 F.3d 225 (D.C. Cir. 2011).............................32

*Manin v. NTSB,*
627 F.3d 1239 (D.C. Cir. 2011)...........................31

*Michigan v. EPA,*
135 S. Ct. 2699 (2015)....................................5, 27

*Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.,*
463 U.S. 29 (1983)........................9, 10, 24, 27, 31

*National Cable & Telecommunications Association v. Brand X Internet Services,*
545 U.S. 967 (2005)................................................9

*Neil v. Biggers,*
409 U.S. 188 (1972).............................................23

*Occidental Petroleum Corp. v. SEC,*
873 F.2d 325 (D.C. Cir. 1989)...............................9

**AR5482**

vi

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Organized Vill. of Kake v. U.S. DOA,*
    795 F.3d 956 (9th Cir. 2015)................................27

*Pension Benefit Guaranty Corp. v. LTV Corp.,*
    496 U.S. 633 (1990)................................25

*Perez v. Mortgage Bankers Association,*
    135 S. Ct. 1199 (2015)................................10

*Ramaprakash v. FAA,*
    346 F.3d 1121 (D.C. Cir. 2003)................................32

*Regents of the University of California v. U.S. DHS,*
    908 F.3d 476 (9th Cir. 2018)................................21

*Reno v. American-Arab Anti-Discrimination Committee,*
    525 U.S. 471 (1999)................................28

*Republic Airline Inc. v. United States DOT*
    669 F.3d 296 (D.C. Cir. 2012)................................9

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947)................................12, 13, 14

*Select Specialty Hospital-Bloomington, Inc. v. Burwell,*
    757 F.3d 308 (D.C. Cir. 2014)................5, 20, 28, 30

*Smiley v. Citibank (South Dakota), N.A.,*
    517 U.S. 735 (1996)................................36

**AR5483**

vii

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015), *aff'd*, 136
  S. Ct. 2271 (2016)...............................17, 20, 21, 24

*Tourus Records, Inc. v. Drug Enforcement
  Administration*,
  259 F.3d 731 (D.C. Cir. 2001)........................11, 19

*Transcon. Gas Pipe Line Corp. v. FERC*,
  54 F.3d 893 (D.C. Cir. 1995)................................15

*Trump v. International Refugee Assistance
  Project*,
  137 S. Ct. 2080 (2017)...........................................24

*United Airlines, Inc. v. FERC*,
  827 F.3d 122 (D.C. Cir. 2016)................................6

*Water Quality Insurance Syndicate v.
  United States*,
  225 F. Supp. 3d 41 (D.D.C. 2016).......................12

**STATUTES**

5 U.S.C. § 706(2)(A)....................................................7

6 U.S.C. § 202(5)..................................................19, 29

8 U.S.C. § 1103(a)....................................................19

Pub. L. No. 106-386, § 1503(d)(2), 114 Stat.
  1464, 1522 (codified at 8 U.S.C. §
  1154(a)(1)(D)(i)(II), (IV))......................................30

**AR5484**

viii

## TABLE OF AUTHORITIES—Continued

**Page(s)**

Pub. L. No. 107-296, § 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. § 202(5)) ...........28

Pub. L. No. 110-457, § 204, 122 Stat. 5044, 5060 (codified at 8 U.S.C. § 1227(d)(1)) ..............30

## OTHER AUTHORITIES

Moriah Balingit, *As DACA winds down, 20,000 educators are in limbo*, Wash. Post (Oct. 25, 2017), https://www.washingtonpost.com/local/education/as-daca-winds-down-20000-educators-are-in-limbo/2017/10/25/4cd36de4-b9b3-11e7-a908-a3470754bbb9_story.html .........................35

Jill Barshay, *Counting DACA students*, Hechinger Report (Sept. 11, 2017), https://hechingerreport.org/counting-daca-students/.....................................................35

David Bier, *Rescinding DACA, The Dream Act, Would Impose Massive Costs on Employers*, Newsweek.com (Sept. 5, 2017) https://www.newsweek.com/rescinding-dreamers-act-would-impose-massive-costs-employers-659813 ......................................34

**AR5485**

ix

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

The Department of Homeland Security's
    Authority to Prioritize Removal of
    Certain Aliens Unlawfully Present in
    the United States and to Defer Removal
    of Others (Nov. 19, 2014),
    https://www.justice.gov/file/179206/
    download ..................................................19, 28, 31

Roberto G. Gonzales et al., Center for
    American Progress, *Taking Giant Leaps
    Forward: Experiences of a Range of
    DACA Beneficiaries at the 5-Year Mark*
    (June 22, 2017),
    https://cdn.americanprogress.org/content
    / uploads/2017/06/21142115/DACAat5-
    brief2.pdf .......................................................33, 34

Letter from Jefferson B. Sessions III, U.S.
    Attorney General, to Acting Secretary
    Elaine Duke (Sept. 4, 2017),
    https://www.dhs.gov/sites/default/files/p
    ublications/17_0904_DOJ_AG-letter-
    DACA.pdf .....................................17, 18, 19, 20, 24

Memorandum from DHS Secretary Kirstjen
    M. Nielsen (June 22, 2018),
    https://www.dhs.gov/sites/default/
    files/publications/18_0622_S1_Memoran
    dum_DACA.pd ............................25, 26, 27, 28, 29

AR5486

x

## TABLE OF AUTHORITIES—Continued

**Page(s)**

Memorandum from Elaine Duke, Acting
Secretary, DHS, Rescission of the June
15, 2012 Memorandum Entitled
"Exercising Prosecutorial Discretion
with Respect to Individuals who Came
to the United States as Children" (Sept.
5, 2017), https://www.dhs.gov/news/
2017/09/05/memorandum-rescission-
daca ...............................................16, 17, 21, 23, 24

Memorandum from Janet Napolitano,
Secretary of Homeland Security,
Exercising Prosecutorial Discretion with
Respect to Individuals Who Came to the
United States as Children (June 15,
2012), https://www.dhs.gov/sites/default/
files/publications/s1-exercising-
prosecutorial-discretion-individuals-
who-came-to-us-as-children.pdf .........................29

David Nakamura, *How many people will
Trump's DACA rollback affect? About
100,000 fewer than initially reported*,
Wash. Post (Sept. 7, 2017),
https://www.washingtonpost.com/news/p
ost-politics/wp/2017/09/07/how-many-
people-will-trumps-daca-rollback-affect-
about-100000-fewer-than-initially-
reported/ ............................................................35

AR5487

Case 1:17-cv-05228-NGG-VMS   Document 282-10   Filed 09/04/20   Page 1089 of 1805 PageID #: 13827

xi

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

U.S. Citizenship & Immigration Services,
Number of Form I-821D, Consideration
of Deferred Action for Childhood
Arrivals, by Fiscal Year, Quarter,
Intake, Biometrics and Case Status
Fiscal Year 2012–2019 (Nov. 30, 2018),
https://www.uscis.gov/sites/default/files/
USCIS/Resources/Reports%20and%20
Studies/Immigration%20Forms%20Data/
All%20Form%20Types/DACA/DACA_
FY19_Q1_Data.pdf .............................................29

*Updating Regulations Issued Under the
Fair Labor Standards Act,* 76 Fed. Reg.
18,832-01 (Apr. 5, 2011) ......................................11

Jie Zong et al., Migration Policy Inst., *A
Profile of Current DACA Recipients by
Education, Industry, and Occupation*
(2017), https://www.migrationpolicy.org/
research/profile-current-daca-recipients-
education-industry-and-occupation ...................35

AR5488

## INTERESTS OF *AMICI CURIAE*[1]

*Amici curiae* are educational organizations deeply concerned about the significant consequences that state and local government agencies will suffer if this Court does not apply its usual standards of judicial review under the Administrative Procedure Act ("APA") to hold that the actions of the Department of Homeland Security ("DHS") are arbitrary and capricious. As entities involved in the provision of public education, amici's members are impacted by complex federal agency regulations and actions. Amici thus have a strong interest in ensuring that federal agencies respect statutory and regulatory limitations and engage in reasoned decision-making, so as not to issue regulations or take actions that unnecessarily harm state and local educational interests. Judicial review ensures that agencies provide transparency to and allow for meaningful participation by organizations such as amici.

Amici have grave concerns about DHS's decision to rescind Deferred Action for Childhood Arrivals ("DACA"). This decision would have severe ramifications and devastating costs for public education and the students it serves—impacting thousands of school districts and their communities. The following education associations respectfully submit this *amici curiae* brief in support of respondents:

---

[1] The parties filed blanket consents to the filing of briefs *amici curiae*. No counsel for a party authored this brief in whole or part; and no such counsel, party, or other person or entity—other than amici and their counsel—made a monetary contribution intended to fund the preparation or submission of this brief.

**AR5489**

2

**The National School Boards Association** ("NSBA"), founded in 1940, is a non-profit organization representing state associations of school boards across the country. Through its member state associations, NSBA represents over 90,000 school board members who govern approximately 13,800 local school districts serving nearly 50 million public school students. NSBA regularly represents its members' interests before Congress and federal and state courts and has participated as amicus curiae in numerous cases before this Court. NSBA's mission is to promote equity and excellence in public education through school board leadership. NSBA is particularly concerned about the ramifications for public education and the students it serves that will result from the rescission of DACA.

**The School Superintendents Association** ("AASA") represents over 13,000 school system leaders and advocates. For over 150 years, AASA has advocated for the highest quality public education for all students, and provided programming to develop and support school system leaders nationwide. The Nation's superintendents and the districts and students they represent would be harmed by the rescission of DACA. As the largest employer in many communities, school districts will be impacted by the cost of this reversal and it will hinder their ability to provide high quality educational opportunities to children they educate.

**The National Association of Secondary School Principals** ("NASSP") is the leading organization of and voice for principals and other school leaders across the Nation. NASSP seeks to transform education through school leadership, recognizing that the fulfillment of each student's

3

potential relies on great leaders in every school committed to the success of each student. NASSP believes that each child is entitled to an excellent public school education, regardless of their immigration status.

**The American School Counselor Association** ("ASCA") represents more than 36,000 school counseling professionals. School counselors promote equal opportunity, a safe and nurturing environment, and respect for all individuals regardless of citizenship status, including undocumented students and students with undocumented family members, understanding that this population faces unique stressors. School counselors work to eliminate barriers impeding student development and achievement, and help today's students become tomorrow's productive members of society.

4

## SUMMARY OF ARGUMENT

For the past half century, as the administrative state has grown more complex and increasingly pervasive, Congress and this Court have cabined the vast power of executive agencies with one fundamental check: that an agency must adequately explain its actions. The government's position in this case is a frontal attack on that basic requirement.

Since DACA was established in 2012, the policy has been relied upon by hundreds of thousands of residents who entered the United States as children, have no criminal records, and meet various educational or military service requirements, to apply for two-year renewable periods of deferred action. On September 5, 2017, DHS rescinded DACA on the ground that the agency believed the policy was unlawful. But the entirety of the agency's explanation for that decision was a cross-reference to a threadbare, single-paragraph statement by the Attorney General, which did not cite any statutory or constitutional provision, did not acknowledge the government's change in position, and did not even mention the reliance interests engendered by the prior policy.

Under the ordinary rules governing agency decision-making, that explanation was manifestly deficient. This case can and should be resolved on that ground, without any need for this Court to address either the agency's substantive discretion to revoke DACA or the legality of the DACA program itself.

As this Court has recognized time and again, the APA requires that "[n]ot only must an agency's decreed result be within the scope of its lawful

5

authority, but the *process* by which it reaches that result must be logical and rational." *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) (emphasis added) (citation omitted). Even when a court has "no reason to doubt" an agency's authority to take a challenged action, the action must be vacated if the court "cannot discern" *why* the agency made the decision it did. *Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d 308, 314 (D.C. Cir. 2014). Furthermore, when an agency *changes* position, it must "display awareness" of that change and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And when the agency's prior position has "engendered serious reliance interests," those interests "*must* be taken into account." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (emphasis added) (citation omitted). Here, the whiplash from this dramatic shift in executive branch policy will, as amici can attest, have a devastating impact not only on the young people who have come to rely on DACA, but on schools, school communities and countless other educational and social institutions that depended on the stability of the agency's interpretation.

The APA's procedural requirements stand apart from whether the agency's decision was substantively reasonable or even correct. A court assessing a FERC ratemaking decision, for example, evaluates not only whether the particular rate is reasonable, but also the quality of the agency's explanation for why it approved the particular rate. *Interstate Nat. Gas Ass'n of Am. v. FERC*, 617 F.3d 504, 508 (D.C. Cir. 2010). Even if the figure approved is reasonable, that does *not* immunize the agency's decision from legal

**AR5493**

6

challenge if its explanation is inadequate. *See United Airlines, Inc. v. FERC*, 827 F.3d 122, 131 (D.C. Cir. 2016).

The subject matter is different but the same rules apply where, as here, an agency purports to act based on its belief that a particular course of action is unlawful. *Encino Motorcars*, 136 S. Ct. at 2125. The question for a reviewing court is not whether the agency's view of the law is *in fact* correct; rather, it is whether the agency has explained its view of the law with sufficient clarity so the "path" to its conclusion may reasonably be "discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). Irrespective of the ultimate correctness of an agency's legal view, if the proffered explanation is inadequate, its decision must be vacated. *Encino Motorcars*, 136 S. Ct. at 2127; *United Airlines, Inc.*, 827 F.3d at 131.

Accordingly, this case provides no occasion to assess the ultimate legality of DACA. Rather, this Court can and should hold that DACA's rescission was invalid because DHS plainly failed to adequately explain its legal position. To hold otherwise would be to fashion a dramatically lower standard of judicial review for agencies when they invoke putative legal rationales for their decisions than when they invoke other rationales. And that, in turn, would create incentives for agencies to invoke the law as a mask for their policy preferences, shirk responsibility for the impact of their decisions, and ultimately shift public accountability onto the federal courts. That result would be inconsistent with the proper division of responsibility in our constitutional order and with core separation of powers principles. The decision of DHS should be vacated.

AR5494

7

**ARGUMENT**

## I. THE RESCISSION OF DACA MUST SATISFY NORMAL APA STANDARDS

Under the APA, a reviewing court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In determining whether an agency decision is lawful, a court must engage in a "searching and careful" inquiry of whether the agency considered the relevant factors and whether a clear error of judgment was made. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). "[U]nsupported agency action normally warrants vacatur . . . ." *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005).

The APA's requirement of reasoned decision-making imposes three core requirements on an agency that are relevant here. *First*, agency action must be adequately explained, such that the agency's path to its decision can be reasonably discerned. *Second*, an agency must display awareness of any change from its prior position, and explain the basis of that change. *Third,* the agency must take account of the reliance interests created by an existing policy. A failure to meet any of these three requirements justifies a finding that the agency's decision is arbitrary and capricious.

These principles apply with full force when an agency's purported explanation is that it is compelled to act by law. In such circumstances, an agency must explain its view of the law in sufficient detail to provide assurance that the result was the product of

**AR5495**

8

reasoned decision-making.  And it must account for any prior conflicting legal interpretations, and any reliance interests created by those interpretations. Indeed, because stability of interpretation is expected in the law, it is especially important in the legal context that changes in interpretation are explained and reliance interests accounted for.  *See Encino Motorcars, LLC v. Navarro,* 136 S. Ct. 2117, 2127 (2016); *cf. Kimble v. Marvel Entm't, LLC,* 135 S. Ct. 2401, 2409 (2015) (noting the importance of "evenhanded, predictable, and consistent development" of legal interpretations because of the "reliance" they engender (citation omitted)).

Finally, regardless of the nature of an agency's rationale—whether it be driven by policy, technical factors, or law—a reviewing court may not substitute its own alternative explanation for the one actually proffered by the agency itself.  Thus, even if a court is inclined to think that an agency's legal conclusion was correct, it cannot affirm the agency's action if the agency's own explanation is deficient.  Instead, the court must remand for the agency to explain its reasoning.  In that posture, the ultimate legality of the policy would be beyond the scope of the court's review.

### A.  Reasoned decision-making requires that an agency's rationale be adequately explained, that any change in policy be acknowledged, and that reliance interests are accounted for.

The most basic procedural requirement of administrative rulemaking is that an agency "give adequate reasons for its decisions."  *Encino Motorcars*, 136 S. Ct. at 2125.  This means that an

9

agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).  An agency rule is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Id.*   On the other hand, an agency satisfactorily explains a decision when its decision-making "path may reasonably be discerned" from the explanation provided.  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974); *see also Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 344 (D.C. Cir. 1989) (an agency must  provide "a decision that permits the reviewing court to trace the path of the agency's decisionmaking process").

Agencies must also provide a reasoned explanation for any *change* in policy, including a change based on a purely legal rationale.  *Encino Motorcars,* 136 S. Ct. at 2125-26.  Specifically, an agency must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Republic Airline Inc. v. U.S. DOT*, 669 F.3d 296, 299 (D.C. Cir. 2012) ("One of the core tenets of reasoned decision-making is that 'an agency [when] changing its course . . . is obligated to supply a reasoned analysis for the change.'" (alterations in original) (citation omitted)).   The failure of an agency to explain a change in its policy is "reason for holding [the agency's decision] to be an arbitrary and capricious." *Nat'l Cable & Telecomms.*

10

*Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

Finally, "[i]n explaining its changed position, an agency must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars,* 136 S. Ct. at 2126 (quoting *Fox Television Stations*, 556 U.S. at 515). An agency's disregard for such reliance interests is likewise arbitrary and capricious. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) ("[T]he APA requires an agency to provide more substantial justification . . . 'when its prior policy has engendered serious reliance interests that must be taken into account.'" (citation omitted)). Agency action that does not meet each of these three criteria is arbitrary and capricious within the meaning of the APA and must be vacated. *See id.*, *Encino Motorcars,* 136 S. Ct. at 2125-26; *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 42-43.

**B. The requirements of reasoned decision-making are fully applicable when an agency's stated basis for its decision is a change in its interpretation of the law.**

The procedural requirements of the APA apply with full force where, as here, an agency asserts that it was legally compelled to act. Just as with other motivations for agency action, the question for purposes of APA review is not only the substantive reasonableness of the agency's decision—*i.e.*, whether its view of the law is *correct*—but also whether the agency "articulate[d] a satisfactory explanation" justifying its legal rationale, *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43, taking into account its prior positions and any reliance interests.

**AR5498**

11

For example, in *Encino Motorcars*, this Court invalidated a 2011 decision of the Department of Labor ("DOL") interpreting the Fair Labor Standards Act ("FLSA") to require overtime payments to certain automobile service providers, after decades of treating these employees as exempt. The DOL had interpreted the statutory language of the FLSA permitting an "exemption from [the statute's] overtime compensation requirement" for "'any salesman . . . engaged in selling or servicing [vehicles]'" to exclude "service advisors," who are employees that "sell[] repair and maintenance services but *not* the vehicle itself." *Encino Motorcars*, 136 S. Ct at 2122 (emphasis added) (citation omitted).

The DOL explained that, in its view, "the statute does not include such position[s]." *Id.* at 2127 (citation omitted); *see also Updating Regulations Issued Under the Fair Labor Standards Act,* 76 Fed. Reg. 18,832-01 (Apr. 5, 2011). This Court held that this conclusory assessment amounted to "no reason[] at all," because "the Department did not analyze or explain why the statute should be interpreted" to support the agency's reading. 136 S. Ct. at 2127. Accordingly, this Court vacated the agency's decision without deciding whether the agency's statutory interpretation was in fact correct. *Id.*

Lower courts have similarly applied the APA's requirement of reasoned decision-making in analyzing agency actions based on purely legal rationales. *See*, *e.g.*, *Tourus Records, Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001) (agency action was not "the product of reasoned decisionmaking" where it was justified by statement of legal "conclusion" as opposed to a "statement of reasoning"); *E. Tex. Med. Ctr.-Athens v. Azar*, 337 F.

12

Supp. 3d 1, 19 (D.D.C. 2018) (agency decision violated APA where the "Secretary has failed to adequately explain his interpretation and application of the [relevant statute] and implementing regulation . . . or the final rules predating it" (citation omitted)); *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 71-72, 76 (D.D.C. 2016) (setting aside agency decision based on "the insufficiency of its legal analysis" and noting that agency's "gap in legal analysis" rendered its legal conclusions "shaky at best").

These cases confirm that no special rule applies when an agency anchors its decision in an interpretation of law.  A reviewing court must still "examin[e] the reasons for [the agency's] decisions— or, as the case may be, the absence of such reasons." *Judulang v. Holder*, 565 U.S. 42, 53 (2011).  And, just as when an agency justifies its decision on non-legal grounds, the lawfulness of agency action depends "on the agency's ability to demonstrate that it engaged in reasoned decisionmaking."  *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 619 (D.C. Cir. 2017).

## C.  A court's independent assessment of whether an agency's policy is unlawful is inappropriate.

Finally, as with other types of agency explanation, if an agency's legal explanation is "inadequate or improper, [a] court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper [legal] basis."  *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *see also Catholic Healthcare W. v. Sebelius*, 748 F.3d 351, 354 (D.C. Cir. 2014).  Accordingly, even if a reviewing court is inclined to believe the agency

**AR5500**

13

came to the right legal *result*, it must nonetheless vacate the agency action if its explanation for reaching that result is inadequate. Indeed, to permit a court to supply a different legal rationale through *de novo* review of a policy's underlying legality would be to violate the cardinal principle of administrative law that judicial review is limited "solely [to] the grounds invoked by the agency." *See Chenery Corp.*, 332 U.S. at 196.

An explanation proffered at a high level of generality is not an invitation for a court to fill out that explanation with more precise rationales. A court cannot "affirm agency decisions on a legal *analysis* other than that expressed by the agency" itself—even if that analysis broadly accords with the agency's proffered explanation. *Catholic Healthcare*, 748 F.3d at 354 (emphasis added).

DHS's assertion that this decision was driven by its view of the law, rather than technical or policy concerns, should make no difference. Regardless of whether the putative rationale is legal, technical, or policy-laden, it will virtually always be the case that a court could convert an agency's vague assertions into a more sophisticated rationale; but to do so would undercut the core function of APA review, which is to provide a meaningful check on the agency's *own* decision-making process. The fact that a court may be able to formulate a reasoned justification for action says nothing about whether the agency itself engaged in reasoned decision-making and provides no check on arbitrary agency action.

For this reason, when an agency asserts a legal justification for its action and fails to provide a reasoned basis for its legal conclusion, a court cannot uphold the agency's action based on its own resolution

14

of the underlying legal issue. Because the APA imposes distinct procedural requirements that stand apart from the substantive correctness of the agency's ultimate decision, even if a court believes the agency's decision correct, it still *must* vacate the decision when the agency's explanation is inadequate. And because the absence of reasoned decision-making means the agency's action *must be vacated in any event*, any judicial opinion on a policy's underlying legality would be purely advisory. Worse still, it would be an advisory opinion that violates *Chenery* by functionally affirming the agency on the basis of a different rationale than the one it proffered.

It may appear counter-intuitive for a court to vacate an agency action that the agency claims was required by law, when the court believes the agency's legal conclusion is correct. But that is the inescapable result of Congress's decision to impose independent procedural constraints on an agency's decision-making. Those procedural constraints are much more than empty formalism. Administrative agencies wield enormous power, pervasively impact citizens' lives, and largely operate outside the glare of public scrutiny. In enacting the APA, Congress recognized that, regardless of the substantive reasonableness of agencies' decisions, that they must also reach those decisions in a way that is transparent, publicly justifiable, and democratically accountable.

Those principles have equal—indeed special—force when an agency asserts that its decision was driven by legal concerns, because these circumstances implicate additional separation of powers concerns. Enforcing a lesser degree of scrutiny for agency actions justified by legal rationales would create powerful incentives for agencies to advance

15

purportedly legal grounds for their actions, shifting accountability for an agency's most controversial decisions to the federal courts. Making an unelected branch of government the public face of unpopular decisions both undercuts democratic accountability and endangers the public legitimacy of the judiciary. By compelling agencies to publicly explain and justify their decisions, the APA forbids precisely such a maneuver.

Applying these principles, this Court should not assess the ultimate legality of DACA unless it first deems DHS's articulated legal reasoning to be adequate. If that reasoning is inadequate, the agency's decision should be vacated without any further advisory opinion regarding the scope of the executive branch's statutory or constitutional power to implement DACA. Here, as in any other context, "[i]t is not the role of the courts to speculate on reasons that might have supported an agency's decision." *Encino Motorcars*, 136 S. Ct. at 2127.

## II. THE DECISION TO RESCIND DACA WAS ARBITRARY AND CAPRICIOUS

DHS's decision to rescind DACA was based *solely* on the agency's view that the policy was unlawful. It now seeks to defend that decision by effectively asking this Court to weigh in on DACA's underlying legality. But, despite three opportunities to do so, DHS provided virtually none of the "reasoning that underlies its conclusion," as the APA requires. *See Transcon. Gas Pipe Line Corp. v. FERC*, 54 F.3d 893, 898 (D.C. Cir. 1995). To the contrary, even a cursory review of the DHS memorandum rescinding DACA reveals that the rescission "was issued without the reasoned explanation that was required in light of the

16

Department's change in position and the significant reliance interests involved." *See Encino Motorcars,* 136 S. Ct. at 2126.

DHS's explanation is inadequate for three reasons under settled principles of administrative law. *First*, DHS failed to adequately explain the reasoning that led it to conclude DACA was legally deficient. *Second*, DHS neglected to acknowledge or explain the change from its prior policy of enforcing DACA. *Third,* DHS did not take into account the serious reliance interests impacted by the rescission of DACA. Under a neutral application of these settled principles, the agency's decision must be vacated. This case provides no occasion for this Court to decide the substantive question of DACA's legality.

### A.   DHS failed to adequately explain why it believes DACA is unlawful.

DHS stated its rationale for rescinding DACA in a *single sentence*, which cross-referenced a letter by the Attorney General, which itself contained only a single paragraph of reasoning. Under settled APA precedent, these "conclusory statements will not do." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).

Recognizing the facial deficiency of these reasons, DHS issued a new memorandum well after this litigation began. A reviewing court may not consider those post-hoc assertions. But even if it could, that memorandum—though more fulsome in its analysis—still fails to satisfy the APA's requirements for reasoned decision-making.

1. On September 5, 2017, then-Acting Secretary of Homeland Security Elaine Duke issued a memorandum rescinding DACA ("Duke

**AR5504**

17

memorandum"[2]).  The Duke memorandum contains background information regarding DACA, DAPA, and the litigation in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).  However, the only relevant part of the memo, the legal analysis justifying the rescission of DACA, is one sentence long:  "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017, letter from the Attorney General, it is clear that the June 15, 2012, DACA program should be terminated."  Duke memorandum.

The Duke memorandum therefore contained no reasoning of its own, and instead rested on the reasoning of three other sources: (1) the Fifth Circuit's opinion in *Texas v. United States*, which struck down the related, but different, DAPA policy, (2) the Supreme Court's 4-4 affirmance of that decision, and (3) the September 4, 2017, letter from Attorney General Sessions ("Attorney General's letter"[3]).  The Attorney General's letter, in turn, contained only one paragraph justifying the rescission of DACA:

> DACA was effectuated by the previous administration through executive action, without proper statutory authority and

---

[2]   Memorandum from Elaine Duke, Acting Secretary, DHS, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals who Came to the United States as Children" (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

[3]   Letter from Jefferson B. Sessions III, U.S. Attorney General, to Acting Secretary Elaine Duke (Sept. 4, 2017), https://www.dhs.gov/sites/default/files/publications/17_0904_DOJ_AG-letter-DACA.pdf

18

> with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related [DAPA] policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. . . . Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

Attorney General's letter.

The Duke memorandum and the Attorney General's letter, which together constitute DHS's entire contemporaneous explanation for the rescission of DACA, fail to provide a "path" from which the agency's decision "may reasonably be discerned." *See Bowman*, 419 U.S. at 285-86. Instead, the Duke memorandum and the Attorney General's letter offer five conclusory assertions devoid of "even [a] minimal level of analysis." *See Encino Motorcars*, 136 S. Ct. at 2125. These assertions are: (1) DACA was enacted without statutory authority, (2) DACA suffers from the same legal defects as DAPA, (3) DACA is unlawful based on the Fifth Circuit's ruling with respect to DAPA, (4) this Court affirmed the Fifth Circuit, and (5) DACA is unconstitutional. As explained below, these five

**AR5506**

19

explanations are not "statement[s] of reasoning, but of conclusion," and thus they "do[] not meet the APA standard" for reasoned decision-making. *Tourus Records*, 259 F.3d at 737.

### 1. DHS failed to explain why there was no "statutory authority" for DACA.

The Attorney General's letter summarily asserts that DACA was enacted "without proper statutory authority." But that assertion is hardly self-explanatory. The Immigration and Nationality Act ("INA") broadly delegates to the executive branch the power to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and to carry out the "administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. § 1103(a). "Since the INA was enacted, the Executive Branch has on numerous occasions exercised discretion to extend various forms of immigration relief to categories of aliens for humanitarian, foreign policy, and other reasons." Office of Legal Counsel ("OLC") Opinion[4] at 6. As part of the authority provided by the INA, "it is well settled that the Secretary can exercise deferred action, a form of prosecutorial discretion whereby the Department of Homeland Security declines to pursue the removal of a person unlawfully present in the United States." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 967 (9th Cir. 2017).

---

[4] The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others (Nov. 19, 2014), https://www.justice.gov/file/179206/download ("OLC Opinion").

20

The Attorney General's letter does not discuss, or even display awareness of those statutory provisions, the history of numerous administrations exercising deferred action, or precedent affirming such authority. Simply asserting that the policy "lacks statutory authority," without more, is no different from describing a policy as "unlawful" without providing any explanation for why that is so. In both situations, there is a "failure to connect the dots" between the conclusion and its underlying reasoning. *See Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312-13 (D.C. Cir. 2014). And, as this Court recognized in *Encino Motorcars*, the unadorned conclusion that a particular approach is "unlawful" or not authorized is an inadequate basis for agency action. *See* 136 S. Ct. at 2127.

### 2. DHS failed to acknowledge or account for the differences between DACA and DAPA.

The Attorney General's letter asserts that "the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA." That explanation is facially inadequate because it fails to identify *what* "defects" the agency had in mind, and instead tacitly assumes that DACA and DAPA are identical in scope and legal foundation. But that is not so. Indeed, the Fifth Circuit's opinion in *Texas v. United States* itself notes that "DACA and DAPA are not identical" and that "any extrapolation from DACA must be done carefully." *Texas*, 809 F.3d at 174, 173. Far from extrapolating "carefully," DHS extrapolated completely—and without any explanation at all.

As the Fifth Circuit recognized, DACA impacts "a younger and less numerous population" than DAPA,

**AR5508**

21

"which suggests that DACA applicants are less likely to have backgrounds that would warrant a discretionary denial." *Id.* at 174. And, importantly, a critical reason why the Fifth Circuit held DAPA unlawful was that the INA already prescribed "an intricate process" for undocumented parents "to derive a lawful immigration classification from their children's immigration status." *Id.* at 179. There is, however, "no analogous provision in the INA defining how immigration status may be derived by undocumented persons who arrived in the United States as children." *Regents of the Univ. of Cal. v. U.S. DHS*, 908 F.3d 476, 508 (9th Cir. 2018).

Because some of the grounds for invalidating DAPA do not apply to DACA, it is inadequate for the agency to assert that the policies suffer from the "same" "defects." Instead, it is incumbent on the agency to explain *which* of DACA's "defects" it believes apply to DACA, and provide at least some explanation of why those "defects" alone are sufficient to render DACA illegal. A generalized reliance on problems that certain courts have identified with a materially different policy cannot constitute a reasoned basis for discontinuing a policy on the ground of illegality.

### 3. DHS's citation to the Fifth Circuit's DAPA ruling is inadequate to justify its decision to rescind DACA.

Next, the agency attempts to remedy its own lack of reasoning by seeking to incorporate the Fifth Circuit's ruling regarding DAPA. Duke memorandum. That asserted incorporation is inadequate for substantially the same reasons as the agency's contention that DAPA and DACA have the

22

"same defects." The Fifth Circuit did not strike down DACA and expressly recognized that its reasoning did not necessarily apply to DACA. Furthermore, DHS failed to "explain what (if anything) it found persuasive" in that opinion. *See Encino Motorcars,* 136 S. Ct. at 2127. An unexplained citation to a single case by a court of appeals (regarding a materially different policy) is clearly not enough to alone justify an agency decision.

For example, in *International Union, United Mine Workers of America v. United States DOL,* 358 F.3d 40 (D.C. Cir. 2004), the United Mine Workers of America challenged the decision of the Mine Safety and Health Administration ("MSHA") to withdraw a proposed Air Quality rule. MSHA stated that the withdrawal was based, in part, on a decision by the Eleventh Circuit to invalidate a similar, earlier air quality rule. *Id.* at 42. The agency claimed that, in light of this decision, its proposed rule was not "'a viable means' of addressing the health risks it had sought to remedy with the proposed Air Quality rule." *Id.* at 44 (citation omitted). The D.C. Circuit acknowledged that the Eleventh Circuit opinion was "indeed a caution for an agency embarking upon . . . regulation" in the area. *Id.* But, the court concluded, MSHA's decision to withdraw the proposed rule was nonetheless arbitrary and capricious because the agency "did not explain why it came to deem the Eleventh Circuit decision fatal to [its] effort." *Id.* Simply citing a court of appeals decision invalidating a similar or related rule does not, the court recognized, satisfy the APA's requirement of reasoned decision-making.

DHS likewise cannot rescind DACA simply by referring to the Fifth Circuit's holding in *Texas v. United States*. Instead, DHS must, at the very least,

23

explain what it was about the decision that would be "fatal" to DACA. The Fifth Circuit invalidated DAPA on multiple alternative grounds, and simply citing to the decision leaves it entirely indeterminate which of those grounds the agency had in mind, making it impossible to the "discern[]" the "path" to the agency's conclusion. *Bowman*, 419 U.S. at 286. Moreover, as discussed above, the Fifth Circuit itself recognized the substantive differences between DAPA and DACA and disclaimed any holding as to the latter. Under the circumstances, a simple citation to the Fifth Circuit's decision cannot alone satisfy the APA's requirements.

### 4. The Supreme Court's affirmance of the Fifth Circuit's DAPA ruling has no precedential value.

DHS also invokes the Supreme Court's "affirm[ance of] the Fifth Circuit's ruling" to justify its actions rescinding DACA. Duke memorandum. But that affirmance was by an equally-divided court and therefore is not "entitled to precedential weight." *Neil v. Biggers*, 409 U.S. 188, 192 (1972). Reference to this Court's affirmance also draws the improper inference that the "equally divided vote," Duke memorandum, was based on the ultimate *illegality* of DAPA. But the Court's affirmance could have been rendered on a host of other bases, such as the threshold ground of reviewability. This observation is all the more true where, as here, the Supreme Court affirms the grant of a preliminary injunction motion, which itself is "an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *See Trump*

24

*v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).

### 5. DHS fails to identify any constitutional defect of DACA.

Finally, DHS claims that DACA suffers from "constitutional defects." Duke memorandum (citation omitted). But, yet again, DHS fails to explain this assertion or even identify which provision of the Constitution is violated by the continued enforcement of DACA—let alone "cogently explain" any constitutional theory. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 48.

And the Attorney General's letter asserts only that the policy suffers "the same . . . constitutional defects" as DAPA. But no court has identified any "constitutional defects" with DAPA. Indeed, the Fifth Circuit's *Texas* decision, which again is the only source of legal reasoning to which the Duke memorandum cites, explicitly *declined* to address the constitutionality of that policy. *See Texas*, 809 F.3d at 154 ("We decide this appeal . . . without resolving the constitutional claim."). As with its bare assertion that DACA is "without statutory authority," the agency's contention that the policy is "unconstitutional" does not constitute an adequate explanation. Those are conclusions, not reasons, and cannot alone satisfy the APA's requirements.

### B. DHS's post-hoc explanations should be disregarded and, in any event, do not meet the requirements for reasoned decision-making.

In the course of the litigation in the D.C. Circuit, DHS attempted to bolster its bare-bones explanations

25

for the rescission of DACA by issuing yet another memorandum, this time by Secretary of Homeland Security Kirstejen M. Nielsen (the "Nielsen memorandum"[5]). Because it is well settled that an agency cannot supply additional post-hoc explanations for its actions during litigation, the Nielsen memorandum should not be considered by this Court. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990) (agency's explanation must "enable the court to evaluate the agency's rationale at the time of decision"); *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) ("*[P]ost hoc* rationalizations 'have traditionally been found to be an inadequate basis for review' of agency decisions." (quoting *Citizens to Preserve Overton Park,* 401 U.S. at 419). Since review of agency action is limited to the agency's "rationale at the time of decision," the Nielsen memorandum is irrelevant.   *See Pension Benefit Guar. Corp*, 496 U.S. at 654.

But, even if this Court were to consider the Nielsen memorandum, it adds nothing to DHS's reasoning. Instead of engaging in "any genuine reconsideration of the issues," the Nielsen memorandum is no more than "a barren exercise of supplying reasons to support a pre-ordained result," and should accordingly be rejected. *Food Mktg. Inst. v. ICC*, 587 F.2d 1285, 1290 (D.C. Cir. 1978).

The Nielsen memorandum begins by reiterating that "the Duke memorandum . . . remains . . . sound," and that DACA is "contrary to law." Nielsen memorandum at 1-2. It then goes on to list a number

---

[5]   Memorandum from DHS Secretary Kirstjen M. Nielsen (June 22, 2018), https://www.dhs.gov/sites/default/files/publications/18_0622_S1_Memorandum_DACA.pdf.

26

of purportedly "separate and independently sufficient reasons" justifying the rescission of DACA. *Id.* These reasons are: (1) there are risks associated with the enforcement of a "legally questionable" policy, (2) policies like DACA "should be enacted legislatively," and (3) deferred action should be implemented on a "truly individualized, case-by-case basis." *Id.* at 2-3. None of these explanations survive even minimal scrutiny.

*First,* the Nielsen memorandum points to purported harms stemming from DHS's "doubts" regarding DACA's legality. These include a "risk that [DACA] may undermine public confidence in and reliance on the agency and the rule of law, and the threat of burdensome litigation that distracts from the agency's work." *Id.* at 2. But in order to invoke litigation risks associated with the enforcement of a "legally questionable" policy, *see id.*, DHS was required to seriously *evaluate* those risks. That evaluation necessarily involves articulating a plausible basis to believe DACA is unlawful, such that there is a meaningful "risk" of it being struck down. But that is the very thing the agency failed to adequately explain in the first place. As discussed above, the agency failed to provide any reasoned explanation for why DACA is unlawful—and the Nielsen memorandum does not itself even try to provide any additional reasoning on that score. Without properly explaining why DACA is unlawful, the agency, *a fortiori*, cannot have provided a reasoned basis for why there was a litigation "risk" associated with its continuation.

Moreover, when an agency invokes "risk" as a basis for action, it typically must conduct an analysis weighing that risk against the policy's benefits

**AR5514**

27

(including, here, the protection of substantial reliance interests)—which DHS clearly did not do. *See Michigan v. EPA*, 135 S. Ct. 2699, 2711 (2015) (an agency did not engage in reasoned decision-making where it "plainly did not" consider relevant benefits); *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 52, 54 ("reasoned decisionmaking" requires agencies to "look at the costs as well as the benefits"). The mere assertion that a particular course of action involves "risk"—without any assessment of the magnitude of that risk, the action's putative benefits, or the associated costs of discontinuation—cannot constitute reasoned decision-making.

Finally, as the various challenges to the rescission itself demonstrate, "litigation" and "public confidence" "risks" were inevitable whichever option the agency chose. To provide an adequate explanation, DHS therefore had to explain why there was *more* risk in enforcing DACA than in rescinding it—a dubious proposition when either action would "predictably le[ad] to [a] lawsuit." *See Organized Vill. of Kake v. U.S. DOA*, 795 F.3d 956, 970 (9th Cir. 2015) (invocation of litigation as a rationale for agency decision was inadequate because "[a]t most, the Department deliberately traded one lawsuit for another").

*Second,* the Nielsen memorandum asserts that DACA "should be enacted legislatively." Nielsen memorandum at 3. But that normative conclusion is wholly unexplained. When Congress created DHS, it expressly vested the agency with responsibility for "[e]stablishing national immigration enforcement policies and priorities." Homeland Security Act of 2002, Pub. L. No. 107-296, § 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. § 202(5)); *see also Reno v.*

**AR5515**

28

*Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999) (observing the "regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience"). Congress therefore contemplated that at least some forms of deferred action would *not* be enacted legislatively. The agency's explanation critically fails to explain why *this* instance of deferred action "should" have been "enacted legislatively" when others, presumably, "should not." *See Burwell*, 757 F.3d at 312-13 (agency's "failure to connect the dots" was not reasoned decision-making).

The Nielsen memorandum states only that DACA "lack[s] the permanence and detail of statutory law." Nielsen memorandum at 2. But that statement provides no basis to *rescind* the policy; at most, it explains why a legislative solution for DACA recipients would be *better* than deferred action alone. But that is not a reasoned basis for rescinding deferred action without any such legislative solution.

Moreover, it is ultimately Congress, not the agency, that determines which forms of deferred action "should be enacted legislatively." If Congress had agreed with the agency, it could have responded "by enacting legislation to limit the Executive's discretion in enforcing the immigration laws," OLC Opinion at 6, which it did not do. The agency's substitution of its own judgment for Congress's as to what policies "should" be enacted legislatively is not a reasoned basis to act.

*Third,* DHS asserts that the agency "should only exercise its prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-case basis." Nielsen memorandum at 3. But the

**AR5516**

29

Nielsen memorandum does not define "truly individualized, case-by-case" adjudication or explain why the agency believes DACA falls short of that goal. It is well understood that the federal government cannot deport the over ten million undocumented persons within the United States. Accordingly. the INA mandates that the executive branch "shall" establish "immigration enforcement priorities and policies" to guide individualized discretion. 6 U.S.C. § 202(5). As with any such policy, DACA guides—but does not remove—the discretion of individual immigration officers. Memorandum from Janet Napolitano, Secretary of Homeland Security, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children at 1 (June 15, 2012), https://www.dhs.gov/sites/default/files/publications/s1 -exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf ("[A]dditional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities."). Indeed, DHS statistics reveal that 17.8% of the DACA initial applications acted upon in 2016 were denied, 16.3% were denied in 2017, and 24.8% were denied in 2018. U.S. Citizenship & Immigration Services, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012–2019 (Nov. 30, 2018), https://www.uscis.gov/sites/default/ files/USCIS/Resources/Reports%20and%20Studies/ Immigration%20Forms%20Data/All%20Form%20Ty pes/DACA/DACA_FY19_Q1_Data.pdf.

30

In calling for "truly individualized, case-by-case" assessment, the Nielsen memorandum might be advocating entirely *unguided* discretion, which would itself be in stark tension with the INA's requirements. In addition, the memorandum fails to provide any reasoned explanation why it would be superior to let individual officers make entirely discretionary decisions, rather than setting broad policies to guide that discretion. *See Burwell,* 757 F.3d at 312 (noting that when "an agency's failure to state its reasoning or to adopt an intelligible decisional standard is . . . glaring . . . we can declare with confidence that the agency action was arbitrary and capricious" (quoting *Checkosky v. SEC*, 23 F.3d 452, 463 (D.C. Cir. 1994)).[6]

In short, the Nielsen memorandum fails to explain what "truly case-by-case" discretion means, how it differs from DACA, or why, if it means wholly unguided discretion, it is superior to the guided discretion that has long been a hallmark of immigration law and policy.   The Nielsen memorandum thus fails to provide any reasoned basis to explain DACA's rescission.

---

[6]   This failure is particularly telling in the immigration context, where policies and statutes commonly prescribe guided discretion.   *See, e.g.*, Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 1503(d)(2), 114 Stat. 1464, 1522 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV)); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 204, 122 Stat. 5044, 5060 (codified at 8 U.S.C. § 1227(d)(1)).

31

## C. DHS failed to acknowledge its changed policy position or provide reasons for that change.

In addition, none of the proffered explanations discussed above even mention*s*—let alone provides a "reasoned explanation" for—the Department's *change* in policy. *See Encino Motorcars,* 136 S. Ct. at 2127. An agency is not permitted to "depart from a prior policy *sub silentio*." *Fox Television Stations*, 556 U.S. at 515; *see also Manin v. NTSB*, 627 F.3d 1239, 1243 (D.C. Cir. 2011) ("When an agency departs from its prior precedent without explanation, . . . its judgment cannot be upheld."). Instead, it was "incumbent" upon DHS to "carefully to spell out the bases of its decision when departing from prior norms." *See Food Mktg. Inst. v. ICC*, 587 F.2d at, 1290; *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 42 ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance.").

These principles have special force where, as here, the OLC has weighed in on the issue. In 2014, the OLC prepared a detailed 33-page opinion, carefully explaining why DACA and DAPA are lawful. *See, e.g.,* OLC Opinion at 18 n.8 (noting OLC determination that DACA was "legally permissible"). The Attorney General's letter, Duke memorandum, and Nielsen memorandum all "completely ignore" the OLC Opinion—and the government's prior position—and wholly fail to acknowledge the dramatic shift in legal assessment. This flaw is alone fatal. Both this Court and the D.C. Circuit have "*never* approved an agency's decision to completely ignore relevant precedent." *See*

32

*Jicarilla Apache Nation v. U.S. DOI*, 613 F.3d 1112, 1120 (D.C. Cir. 2010) (emphasis added); *Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003) (an agency is required to "come to grips with conflicting precedent").

The fact that OLC opinions constitute binding law within the executive branch provides all the more reason to vacate the agency's decision, because "[a] contrary result would permit agencies to toss aside OLC memoranda that contain legal conclusions contrary to the agency's preferred policy choices." *See Hispanic Affairs Project v. Acosta*, 263 F. Supp. 3d 160, 178 (D.D.C. 2017), *aff'd in part, rev'd in part*, 901 F.3d 378 (D.C. Cir. 2018). And it is, in the very least, highly suspect that DHS made a decision of enormous national importance—based *solely* on a legal rationale—without even consulting the office within the Department of Justice charged with determining the legality of executive branch practices. Had DHS truly believed that DACA was unlawful, the agency could have asked OLC to directly address the issue— as it had in 2014. DHS's failure to do so further underscores the shaky foundation of its legal rationale for rescinding DACA.

DHS's departure from "established precedent" without "a reasoned explanation" cannot be upheld. *LePage's 2000, Inc. v. Postal Regulatory Comm'n*, 642 F.3d 225, 233 (D.C. Cir. 2011) (citation omitted).

### D. DHS did not adequately take into account reliance interests.

Finally, DHS's decision contravened the APA because the agency did not take into account the considerable reliance interests of the parties impacted by DACA's rescission, including critical

33

stakeholders like children, public schools, and the affected communities. *See Encino Motorcars,* 136 S. Ct. at 2126-27. As this Court has emphasized, agency action "engender[s] serious reliance interests" amongst regulated parties who depend on the stability and predictability of agency guidance. *Id.* at 2126 (citation omitted). These reliance interests must be taken into account, even where an agency believes that the policy change is legally mandated. *See id.* at 2125-27 (considering reliance interests where change in agency position was based upon interpretation of governing statute). And "an agency may need to 'provide a more detailed justification than what would suffice for a new policy created on a blank slate . . . when, for example, . . . its prior policy has engendered serious reliance interests.'" *Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1100 (9th Cir. 2019) (alterations in original) (quoting *Fox*, 556 U.S. at 515).

The rescission of DACA will undoubtedly implicate serious reliance interests of regulated parties. For instance, many young people who were forced to prematurely exit the school system because of barriers related to their immigration status have, for years, relied upon DACA in order to maintain a livelihood. The policy's work authorization has enabled these young people to take jobs commensurate with their education, and has incentivized investments in such programs. Roberto G. Gonzales et al., Center for American Progress, *Taking Giant Leaps Forward: Experiences of a Range of DACA Beneficiaries at the 5-Year Mark* (June 22, 2017), https://cdn.americanprogress.org/content/uploads/2017/06/21142115/DACAat5-brief2.pdf.

34

Because of the program, DACA beneficiaries have experienced immediate and continued job mobility. *Id.* at 4-5.  Indeed, many DACA beneficiaries have obtained significant job training and are using these new opportunities as building blocks to careers.  The magnitude of DACA's impact has been most felt by these young people.  And the personal success of these DACA beneficiaries has in turn provided them with more purchasing power, allowing them to invest in the United States at the local and state levels.  *Id.* at 6.

Individual DACA recipients are not the only group with significant reliance interests on the continued viability of the policy.  Requiring institutions "to adapt to the Department's new position could necessitate systemic, significant changes."  *Encino Motorcars,* 136 S. Ct. at 2126.  For example, DACA rescission will cost employers $6.3 billion in employee turnover costs, including recruiting, hiring, and training 720,000 new employees.  David Bier, *Rescinding DACA, The Dream Act, Would Impose Massive Costs on Employers*, Newsweek.com (Sept. 5, 2017), https://www.newsweek.com/rescinding-dreamers-act-would-impose-massive-costs-employers-659813.  If the rescission is allowed to stand, U.S. employers will have to terminate 6,914 employees currently participating in DACA every week for the next two years, at a weekly cost of $61 million.  *Id*.

Pertinent to amici, public school districts are collectively the largest employer in the country and will be sharply affected by these costs.  Specifically, public elementary schools, high schools, and universities stand to lose thousands of employees.  According to one estimate, DACA protects close to 9,000 education employees from deportation.  Jie

35

Zong et al., Migration Policy Inst., *A Profile of Current DACA Recipients by Education, Industry, and Occupation* (2017), https://www.migrationpolicy.org/ research/profile-current-daca-recipients-education-industry-and-occupation (download fact sheet).  The Migration Policy Institute estimates that there are 20,000 immigrants with DACA-protected status working as educators, including 5,000 in California and 2,000 each in New York and Texas.  Moriah Balingit, *As DACA winds down, 20,000 educators are in limbo*, Wash. Post (Oct. 25, 2017), https://www.washingtonpost.com/local/education/as -daca-winds-down-20000-educators-are-in-limbo/2017/ 10/25/4cd36de4-b9b3-11e7-a908-a3470754bbb9_ story.html.  Many of these educators have helped to alleviate the shortage of qualified teachers, particularly in high-needs schools and communities.

The rescission of DACA will also have a devastating impact on schools and school communities.  An estimated 365,000 high school students are eligible for DACA status, and another 241,000 of DACA-eligible students are in college. Together, that number accounts for 51% of the nearly 1.2 million DACA-eligible population.  Jill Barshay, *Counting DACA students*, Hechinger Report (Sept. 11, 2017), https://hechingerreport.org/counting-daca-students/ (figures from the Migration Policy Institute based on 2014 census data).  Overall, about 690,000 immigrants are enrolled in DACA and could face deportation if and when their work permits expire. David Nakamura, *How many people will Trump's DACA rollback affect? About 100,000 fewer than initially reported*, Wash. Post (Sept. 7, 2017), https://www.washingtonpost.com/news/post-politics/ wp/2017/09/07/how-many-people-will-trumps-daca-

36

rollback-affect-about-100000-fewer-than-initially-reported/. These people are parents, neighbors, teachers, custodians, administrators, and students in public schools. If they are forced to leave the only country they call home, the communities in which schools do their crucial work will be devastated.

In short, DACA has entrenched enormous reliance interests in its seven years of operation and its removal threatens to destabilize virtually every sector of the Nation's economy and society. Yet, not only did DHS fail to discuss these potential impacts of DACA's rescission, it failed to even acknowledge *any* reliance interests at all. DHS's failure to even mention—let alone account for—the interests created by the prior policy is flatly inconsistent with this Court's holding in *Encino Motorcars*. *See also Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996*)* (agency decision that "does not take account of legitimate reliance on prior interpretation" may be arbitrary and capricious). Indeed, the principles espoused in *Encino* and this Court's other precedent would be a virtual dead letter if an agency were permitted to rescind a policy upon which so many people rely without even one word acknowledging that reliance.

\*\*\*\*\*

If this Court's administrative law principles are to mean anything, they must be applied neutrally and impartially in even the most challenging cases. This Court's most fundamental check on unfettered agency discretion—the requirement of reasoned explanation—would mean nothing if the threadbare explanation here were deemed adequate to invalidate a policy of unquestioned national importance. DHS's decision to rescind DACA must be vacated.

37

## CONCLUSION

For the foregoing reasons, the Court should vacate the decision of DHS.

Respectfully submitted,

FRANCISCO M. NEGRÓN, JR.
Chief Legal Officer
NATIONAL SCHOOL BOARDS
  ASSOCIATION
1680 Duke Street, FL 2
Alexandria, VA 22314
(703) 838-6722

RICHARD P. BRESS
  *Counsel of Record*
SAMIR DEGER-SEN
JESSICA SABA
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
richard.bress@lw.com

*Counsel for Amici Curiae*

October 4, 2019

AR5525

Nos. 18-587, 18-588, and 18-589

In The
# Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, et al.,

*Petitioners,*

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al.,

*Respondents.*

DONALD J. TRUMP, President of the United States, et al.,

*Petitioners,*

*v.*

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, et al.,

*Respondents.*

KEVIN K. MCALEENAN,
Acting Secretary of Homeland Security, et al.,

*Petitioners,*

*v.*

MARTIN JONATHAN BATALLA VIDAL, et al.,

*Respondents.*

On Writs Of Certiorari To The
United States Courts Of Appeals For The
Ninth, District Of Columbia, and Second Circuits

**BRIEF OF ALIANZA AMERICAS AND 10 OTHER
IMMIGRATION RIGHTS ORGANIZATIONS AS
*AMICI CURIAE* IN SUPPORT OF RESPONDENTS**

NEIL V. MCKITTRICK
*Counsel of Record*
LORENZO R. CABANTOG
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
(617) 994-5726
neil.mckittrick@ogletree.com
*Counsel for Amici Curiae*

COCKLE LEGAL BRIEFS (800) 225-6964
WWW.COCKLELEGALBRIEFS.COM

**AR5526**

i

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ......................................... i

TABLE OF AUTHORITIES .................................... ii

INTEREST OF THE *AMICI CURIAE* .................. 1

SUMMARY OF ARGUMENT ............................... 1

ARGUMENT ............................................................ 4

   I.   DHS FAILED TO CONSIDER THE SIGNIF-
ICANT RELIANCE INTERESTS CREATED
BY THE DACA PROGRAM BEFORE IT
DECIDED TO RESCIND DACA ................ 4

      A.   THE 2017 DUKE MEMORANDUM DID
NOT CONSIDER AT ALL THE RELI-
ANCE INTERESTS AT STAKE .......... 5

      B.   THE JUNE 2018 NIELSON MEMO-
RANDUM WAS A POST HOC RATION-
ALIZATION THAT IS NOT PROPERLY
PART OF THE ADMINISTRATIVE REC-
ORD AND WHICH ALSO FAILED TO
CONSIDER ADEQUATELY THE SUB-
STANTIAL RELIANCE INTERESTS
INVOLVED ............................................ 9

  II.   THE RELIANCE INTERESTS INVOLVE
SIGNIFICANT SOCIAL AND ECONOMIC
BENEFITS TO DACA RECIPIENTS AND
THE COMMUNITY AT LARGE ................ 13

 III.   RESCINDING DACA WOULD POTEN-
TIALLY RESULT IN THE ENTRAPMENT
OF RECIPIENTS ......................................... 17

CONCLUSION .................................................... 20

APPENDIX A—LIST OF *AMICI* ..............................1a

ii

# TABLE OF AUTHORITIES

Page

CASES

*Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490 (1981) .......................................................................9

*Camp v. Pitts*, 411 U.S. 138 (1973) ............................10

*Cox v. Louisiana*, 379 U.S. 559 (1965) ......................18

*Encino Motorcars LLC v. Navarro*, 136 S. Ct. 2117 (2016) ........................................... 4, 6, 7, 11, 12

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........................................................ 4, 7, 11, 12

*Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144 (1991) ..................................12

*Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889 (5th Cir. 1993)............................................................9

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S. Ct. 2856 (1983) ......................................................9

*NAACP v. Trump*, 298 F. Supp. 3d 209 (D.D.C.), *denied on reconsideration*, 315 F. Supp. 3d 457 (D.D.C. 2018) ............................................................5

*Raley v. Ohio*, 360 U.S. 423, 79 S. Ct. 1257 (1959)........ 18

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018)...............................................................*passim*

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018)...................10

**AR5528**

iii

## TABLE OF AUTHORITIES – Continued

Page

*Sec. and Exchange Comm'n v. Chenery Corp.*,
    332 U.S. 194 (1947) ...................................................9

*Vargas v. I.N.S.*, 938 F.2d 358 (2d Cir. 1991)................9


RULES

S. Ct. R. 37.2(a) .............................................................1

S. Ct. R. 37.6..................................................................1


OTHER AUTHORITIES

Alex Horton, *The military looked to 'dreamers' to
    use their vital skills. Now the U.S. might deport
    them.* (Sept. 7, 2017) (available at https://www.
    washingtonpost.com/news/checkpoint/wp/2017/
    09/07/the-military-looked-to-dreamers-to-use-
    their-vital-skills-now-the-u-s-might-deport-them/).......17

Alexander Casey, *An Estimated 123,000 "Dream-
    ers" Own Homes and Pay $380M in Property
    Taxes*, Zillow (Sept. 20, 2017) (available at https://
    www.zillow.com/research/daca-homeowners-380M-
    taxes-16629) ............................................................15

Blake Emerson, *The Claims of Official Reason:
    Administrative Guidance on Social Inclusion*,
    128 Yale L.J. 2122 (2019) ....................................8, 17

**AR5529**

iv

TABLE OF AUTHORITIES – Continued

Page

Elaine C. Duke, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," U.S. Dep't Homeland Security (Sept. 5, 2017) (available at https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca)......................2

Form I-765, Application for Employment Authorization, Eligibility Category and Filing Type, fiscal years 2003-2018, available at https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/Employment-based/I-765_RAD_FY03-18.pdf............................................................14

Kirstjen M. Nielsen, Memorandum from Secretary Kirstjen M. Nielsen on the Rescission of Deferred Action for Childhood Arrivals (DACA) (June 22, 2018) (available at https://www.dhs.gov/sites/default/files/publications/18_0622_S1_Memorandum_DACA.pdf) .......................2

*Remarks by the President on Immigration*, June 15, 2012 (available at https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration)...........................................19

Roberto G. Gonzales et al., *Becoming DACA-mented: Assessing the Short-Term Benefits of Deferred Action for Childhood Arrivals (DACA)*, 58 Am. Behav. Scientist 1852 (2014) .....................15

United States Citizenship and Immigration Services Form I-821D ...................................................13

AR5530

v

TABLE OF AUTHORITIES – Continued

Page

Zachary S. Price, *Reliance on Nonenforcement*,
  58 Wm. & Mary L. Rev. 937 (2017)..................18, 19

**AR5531**

1

### INTEREST OF THE *AMICI CURIAE*[1]

This case involves an enforcement program decision by the Department of Homeland Security (DHS) that will potentially impact hundreds of thousands of immigrants in this country. *Amici* are organizations that advocate on behalf of various immigrant populations, including persons enrolled in the Deferred Action for Childhood Arrivals (DACA) program. *Amici* have among their members and the populations for which they advocate DACA recipients and their families. As a result of their work with, and advocacy for, immigrant populations, *Amici* have a breadth of understanding of the significant reliance interests of these populations on DACA, which DHS failed to consider when deciding to rescind DACA. (A description of each of the *Amici* appears in Appendix A.)

———————◆———————

### SUMMARY OF ARGUMENT

DHS's decision to rescind DACA was arbitrary and capricious because it failed to consider the significant reliance interests engendered by DACA. DACA recipients have relied on the program to make major, life-altering decisions. They have obtained Social Security numbers, advanced their education and signed

———————

[1] All parties issued blanket consents to the filing of *amicus* briefs in this matter. *See* S. Ct. R. 37.2(a). Pursuant to S. Ct. R. 37.6, no one other than *Amici* and their counsel have authored any part of this brief or funded its preparation and submission.

2

school loans, gained employment, undertaken military service, purchased homes and entered into mortgages, and become fully integrated into society. Yet, these facts and data were conspicuously ignored by DHS in its decision to rescind DACA.

In two separate attempts to justify its rescission of DACA, DHS failed to consider in any meaningful way the reliance interests DACA had engendered. In 2017, DHS Acting Secretary Elaine Duke issued a memorandum eliminating DACA. *See* Elaine C. Duke, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," U.S. Dep't Homeland Security (Sept. 5, 2017) (available at https:// www.dhs.gov/news/2017/09/05/memorandum-rescission-daca) (the "Duke Memorandum"). The Duke Memorandum ignored the extent to which DACA recipients relied on the program to make major life, educational, financial and employment decisions. The Duke Memorandum's failure to analyze, or even consider, the significant reliance interests violated Supreme Court precedent and a basic tenet of administrative law.

In June 2018, DHS Secretary Kirstjen Nielsen issued a second memorandum attempting to justify her predecessor's rescission of DACA. *See* Kirstjen M. Nielsen, Memorandum from Secretary Kirstjen M. Nielsen on the Rescission of Deferred Action for Childhood Arrivals (DACA) (June 22, 2018) (available at https:// www.dhs.gov/sites/default/files/publications/18_0622_S1_ Memorandum_DACA.pdf) (the "Nielsen Memorandum"). The Nielsen Memorandum, published five months

**AR5533**

3

following the decision by the District Court for the Northern District of California to enjoin the rescission of DACA and while the case was pending before the Ninth Circuit, was a post hoc rationalization of the DACA rescission, intended to address the administrative decision-making deficiencies identified by the District Court. Indeed, it is not supported by its own administrative record; instead, it relied on the same record that was before Acting Secretary Duke. Although the Nielsen Memorandum mentioned the reliance interest in a conclusory manner, it did not contain any analysis of those interests.

DACA's rescission also potentially represents a form of entrapment. In exchange for deferred action and suspension of removal proceedings, DACA recipients were required to submit personal biographical information, including date and location of entry into the United States and all previous and current residential addresses, along with fingerprints and photographs. Undocumented immigrants provided this information on the condition of confidentiality and that DHS would not share the information with Immigration and Customs Enforcement in connection with removal proceedings. With DACA eliminated, nothing prevents DHS from delivering the information to initiate immigrants' removal.

————◆————

4

## ARGUMENT

## I. DHS FAILED TO CONSIDER THE SIGNIFI-CANT RELIANCE INTERESTS CREATED BY THE DACA PROGRAM BEFORE IT DE-CIDED TO RESCIND DACA.

A basic procedural requirement of administrative rulemaking is that an agency must provide adequate reasons for its decisions. *See Encino Motorcars LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016). If the agency fails to provide at least a minimal level of analysis, its action will be found to be arbitrary and capricious. *See id.* In cases involving a rescission or reversal of policy, an agency must provide "a more detailed justification" in certain circumstances, especially "when its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *accord Encino*, 136 S. Ct. at 2125-26 (2016). It would be arbitrary and capricious to ignore such reliance interests. *See Fox*, 556 U.S. at 515.

In its two separate attempts to justify its rescission of DACA, DHS failed to meet this reasoned decision-making standard. Initially, the 2017 memorandum issued by DHS Acting Secretary Duke wholly ignored the fact that DACA recipients relied on the deferred action program to make major life, educational, financial and employment decisions. DHS's subsequent attempt to rectify the deficiencies of the Duke Memorandum by issuing a memorandum in June 2018 by Secretary Nielsen was merely a post hoc rationalization unsupported by an administrative record. This second

5

attempt at establishing a reasoned rationale baldly asserted, without any factual analysis, that Secretary Nielsen considered the reliance interests of DACA recipients. Neither attempted justification was sufficient to satisfy the reasoned analysis decision-making standard.

### A.  THE 2017 DUKE MEMORANDUM DID NOT CONSIDER AT ALL THE RELIANCE INTERESTS AT STAKE.

As the U.S. District Court for the District of Columbia held in *NAACP v. Trump*, DHS's rescission of DACA was "particularly egregious . . . in light of the reliance interests involved." 298 F. Supp. 3d 209, 240 (D.D.C.), *denied on reconsideration*, 315 F. Supp. 3d 457 (D.D.C. 2018). As the Court noted, these reliance interests include: the participation by DACA recipients in international postgraduate research; their application for, and receipt of, student loans; employment opportunities they obtained by virtue of availing themselves of DACA; and educational opportunities such as the pursuit of advanced degrees. *Id.* at 240 n.24. Although "hundreds of thousands" of DACA recipients had "structured their education, employment, and other life activities on the assumption that they would be able to renew their DACA benefits," the 2017 Duke Memorandum made no effort to weigh such interests in the agency's decision-making process. *Id.* at 240.

In *Regents v. DHS*, the U.S. District Court for the Northern District of California likewise held that

**AR5536**

6

Acting Secretary Duke did not weigh the reliance interests of DACA recipients in deciding to rescind DACA. Relying on this Court's decisions in *Encino* and *Fox*, the court found that the abandonment of DACA was arbitrary and capricious because "the administrative record includes no consideration to the disruption a rescission would have on the lives of DACA recipients, let alone their families, employers and employees, schools and communities." *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1045-46 (N.D. Cal. 2018).

As this Court explained in *Fox*, an agency changing course on policy "must" account for serious reliance interests engendered by the previous policy. 556 U.S. at 515. The agency's failure to consider such interests renders its decision arbitrary and capricious. *Id.*

*Fox* involved a Federal Communications Commission ("FCC") enforcement policy to refrain from prosecuting broadcasters for "fleeting expletives," but instead only bring enforcement actions against the "deliberate and repetitive use" of expletives. *Id.* at 506-08. Justice Scalia, writing for the Court, initially observed that an agency is generally not required to provide a more substantial explanation when it changes a previous policy. *Id.* at 514. However, Justice Scalia subsequently explained that "a more detailed justification" is required "when its prior policy has engendered serious reliance interests that must be taken into account." *Id.* at 515.

*Encino* also emphasized that an agency changing course must consider "reliance interests" that developed

7

under the previous policy. That case involved the De-
partment of Labor's about-face on its interpretation of
a Fair Labor Standards Act regulation concerning the
application of minimum wage and overtime provisions
to certain car dealership employees. *Encino*, 136 S. Ct.
at 2121. The Court held:

> In explaining its changed position, an agency
> must also be cognizant that longstanding pol-
> icies may have "engendered serious reliance
> interests that must be taken into account . . .
> In such cases, it is not that further justifica-
> tion is demanded by the mere fact of policy
> change; but that a reasoned explanation is
> needed for disregarding facts and circum-
> stances that underlay or were engendered by
> the prior policy." *Fox*, 556 U.S. at 515-16. . . . It
> follows that an "unexplained inconsistency" in
> agency policy is "a reason for holding an inter-
> pretation to be an arbitrary and capricious
> change from agency practice." *National Cable
> & Telecommunication Assn. v. Brand X Inter-
> net Services*, 545 U.S. 967, 981 (2005).

*Id.* at 2126 (other internal citations omitted).

The reliance interests of the DACA recipients are
even more significant than the business interests at is-
sue in *Fox* and *Encino*. The interests at stake here in-
clude major life decisions by approximately 700,000
people, each of whom provided considerable personal
information to the government in reliance on the ex-
pected protections of the DACA program. DHS strayed
from this Court's precedent in *Fox* and *Encino* when it
failed to consider these "serious reliance interests." The

8

rationale of the Duke Memorandum, which eliminated
DACA, came down to one sentence: "Taking into con-
sideration the Supreme Court's and the Fifth Circuit's
rulings in the ongoing litigation, and the September 4,
2017 letter from the Attorney General, it is clear that
the June 15, 2012 DACA program should be termi-
nated." Duke Memorandum at 3.

Missing from the Duke Memorandum was any
mention or consideration of the significant educa-
tional, employment, and financial decisions made by
DACA recipients in reliance on the DACA program.
Also absent was the consideration of, or even any ref-
erence to, the significant reliance interests of third
parties—including schools and universities, employers
and businesses, families and communities—that will
be affected by the government's abrupt policy change.
"[T]he interests and investments thereby created de-
serve at least some minimal protection." Blake Emer-
son, *The Claims of Official Reason: Administrative
Guidance on Social Inclusion*, 128 Yale L.J. 2122, 2205
(2019). By protecting these expectations, "people and
institutions [can] make plans against a relatively sta-
ble background of rules and official practices." *Id.* The
Duke Memorandum considered none of these issues.

**AR5539**

9

## B. THE JUNE 2018 NIELSON MEMORAN- DUM WAS A POST HOC RATIONALIZA- TION THAT IS NOT PROPERLY PART OF THE ADMINISTRATIVE RECORD AND WHICH ALSO FAILED TO CONSIDER ADEQUATELY THE SUBSTANTIAL RE- LIANCE INTERESTS INVOLVED.

This Court has repeatedly held that after-the-fact attempts by agencies to justify their actions "cannot serve as a sufficient predicate for agency action." *Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 539 (1981); *accord Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 49, 103 S. Ct. 2856, 2870 (1983). Indeed, agency actions are judged "solely by the grounds invoked by the agency" *at the time* the decision is made. *Sec. and Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

Courts have been loathe to accept after-the-fact explanations to justify agency action. *See, e.g.*, *Vargas v. I.N.S.*, 938 F.2d 358, 363 (2d Cir. 1991) ("Post hoc explanations—especially those offered by appellate counsel—are simply an inadequate basis for the exer- cise of substantive review of an administrative deci- sion."); *Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 905 (5th Cir. 1993) ("We will not accept the [agency's] post-hoc rationalizations in justification of its decision, nor will we attempt to supply a basis for its decision that is not supported by the administrative record."). While these cases typically critique arguments made by agency counsel on appeal, the principle applies with equal force to any after-the-fact explanation offered by

10

an agency that attempts to defend a challenged decision. Moreover, the timing and circumstances surrounding the publication of the Nielsen Memorandum demonstrate that it is not itself *agency action*. *See* Petitioner's Brief ("Pet. Br.") at 29. Indeed, DHS counsel submitted a letter concerning the Nielsen Memorandum to the Ninth Circuit *five months after* the Northern District of California's decision in *Regents* and while the case was *pending* on appeal. *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 510 n.24 (9th Cir. 2018).

The focal point for judicial review is the administrative record in existence when the agency made the decision, not the response provided by an agency after a court rules on that agency decision. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973). DHS made the decision to rescind DACA in 2017, and it provided the Duke Memorandum to justify that decision. There is nothing in the Duke Memorandum to suggest that the Department ever considered the significant reliance interests involved at that time.

If the Nielsen Memorandum was in fact a standalone policy, it would be supported by its own administrative record. It is not. The entire administrative record consisted of 256 pages that were submitted to the district court before DHS issued the Nielsen Memorandum. *Regents*, 279 F. Supp. 3d at 1028. Nothing in the 256-page record indicated that either Acting Secretary Duke or Secretary Nielsen considered, in any

11

meaningful way, the reliance interests of DACA recipients.[2]

The circumstances of the Nielsen Memorandum suggest that it was created to address the deficiencies of the Duke Memorandum, as identified by the district court. Although Secretary Nielsen's Memorandum asserted that she was "keenly aware" of the reliance interests, that she "does not believe that the asserted reliance interests outweigh the questionable legality of the DACA policy," and that she "did not come to these conclusions lightly," Nielsen Memorandum at 3, it does not mean that such interests were actually considered. Recitation of such buzzwords, absent evidence of actual consideration in the administrative decision, is insufficient to satisfy the standard established by *Fox* and *Encino*. As the Court explained in *Encino*, "the agency 'must examine the *relevant data* and articulate a satisfactory explanation for its action including a rational connection between the *facts* found and the choice made.'" *Encino*, 136 S. Ct. at 2125 (quoting *State Farm*, 463 U.S. at 43) (emphasis added). The Nielsen Memorandum contains no data or analysis of facts related to the reliance interests at issue. Instead, it contains only conclusory statements unsupported by

---

[2] The administrative record contains three letters from members of Congress, one to Acting Secretary Duke and two to the President, about DACA recipients, but as noted above, Acting Secretary Duke did not mention any reliance interests at all, and Secretary Nielsen merely referred to reliance in a conclusory manner, without any analysis, or specific discussion of any particular aspect of reliance and/or the weight, if any, to be accorded such reliance.

12

the record. This Court's holding in *Encino* applies
equally well here: "In light of the serious reliance in-
terest at stake, the Department's conclusory state-
ments do not suffice to explain its decision." *Encino*,
136 S. Ct. at 2127 (citing *Fox*, 556 U.S. at 515-16).

DHS's reliance on *Martin v. Occupational Safety
& Health Review Comm'n*, 499 U.S. 144 (1991), for the
proposition that the Nielsen Memorandum, "*is* agency
action," is misplaced for two reasons. First, *Martin* did
not involve a rescission of policy. As this Court has held
in *Fox* and *Encino*, an agency "must" provide a rea-
soned analysis where a previous policy has engendered
serious reliance interests. Second, the agency action at
issue in *Martin* was the Secretary of Labor's first-time
interpretation of a safety regulation during an adjudi-
cation before the Occupational Safety and Health Re-
view Commission. In contrast, Secretary Nielsen's
Memorandum was DHS's second bite at the apple, an
attempt to salvage her predecessor's rule-making deci-
sion by claiming that she had considered the relevant
reliance interests.

Neither the 2017 Duke Memorandum nor the
2018 Nielsen Memorandum adequately considered
the significant reliance interests involved. Accordingly,
DHS failed to satisfy the fundamental principle of *Fox*
and *Encino* to evaluate the reliance interests impacted
by the reversal of agency policy.

13

## II.  THE RELIANCE INTERESTS INVOLVE SIG-NIFICANT SOCIAL AND ECONOMIC BEN-EFITS TO DACA RECIPIENTS AND THE COMMUNITY AT LARGE.

DACA recipients relied on the deferred action pro-gram to their detriment. To be eligible for the program, individuals underwent an extensive background check and completed USCIS Form I-821D, which requested personal data, including biographical information, date and point of entry into the country, immigration status (or lack thereof), educational history, and all previous residential addresses since entering the United States. *See Regents*, 279 F. Supp. 3d at 1022. Applicants pro-vided documented proof of identity and continuous res-idence in the United States, as well as photographs, fingerprints and signatures.

As the Northern District of California recognized in *Regents*, DACA conferred significant protections in exchange for an applicant's enrolling in the program and providing significant personal information:

> *First*, under pre-existing regulations, DACA recipients became eligible to receive employ-ment authorization for the period of deferred action, thereby allowing them to obtain social security numbers and to become legitimate taxpayers and contributing members of our open economy. 8 C.F.R. § 274a.12(c)(14). *Sec-ond*, deferred action provided a measure of safety for a period of two years from detention and removal, albeit always subject to termina-tion at any time in any individual case. *Third*, DACA recipients could apply for "advance

14

> parole" to obtain permission to travel overseas
> and be paroled back into the United States.
> 8 C.F.R. § 212.5(f). *Fourth*, also pursuant to
> pre-existing regulations, DACA recipients
> avoided accrual of time for "unlawful pres-
> ence" under the INA's bar on re-entry. 8 U.S.C.
> § 1182(a)(9)(B)–(C) (establishing three-year,
> ten-year, and permanent bars on the admis-
> sion of aliens after specified periods of "unlaw-
> ful presence").

*Id.* at 1023.

In addition to the submission of substantial per-
sonal identifying information to the government,
DACA recipients paid significant fees and planned
their lives in reliance on the government's promises to
provide tangible protections pursuant to DACA. Argu-
ably, the most significant and tangible promises to
DACA recipients included the ability to obtain a tem-
porary Social Security number and a two-year renew-
able employment authorization.[3] These protections
increase an immigrant's potential to improve his or her
incorporation into society and mobility trajectory. *See*

---

[3] The government has only rarely denied a renewal applica-
tion for work authorization. In 2017, for example, the government
received approximately 431,197 renewal applications. It denied
only 3,352, for a renewal rate of approximately 99.3%. *See* Form
I-765, Application for Employment Authorization, Eligibility Cat-
egory and Filing Type, fiscal years 2003-2018, available at https://
www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and
%20Studies/Immigration%20Forms%20Data/Employment-based/
I-765_RAD_FY03-18.pdf. Therefore, DACA recipients could rea-
sonably rely on the near-certain expectation that their work au-
thorizations would be renewed.

15

Roberto G. Gonzales et al., *Becoming DACAmented: Assessing the Short-Term Benefits of Deferred Action for Childhood Arrivals (DACA)*, 58 Am. Behav. Scientist 1852, 1853 (2014). Sixteen months after DACA was implemented, recipients experienced greater access to education, employment, and societal opportunities. *Id.* at 1866. Many attend universities and have started internships which provided them with the opportunity to be in a "better position to leverage their education to pursue better jobs with higher earnings." *Id.* at 1857. Without DACA, however, undocumented youth could not obtain greater access to educational opportunities. *Id.* at 1855. Accordingly, they would be "excluded from work, study opportunities, and paid internships." *Id.* at 1854. Indeed, some internships require Social Security numbers to process background checks, thus "excluding undocumented youth from gaining applied skills and expanding professional networks." *Id.*

In addition to vastly improved educational opportunities, DACA confers significant financial and employment opportunities. Social Security numbers allow DACA recipients to open bank accounts and obtain credit cards, thereby improving their financial stability. *See id.* at 1863.[4] DACA recipients are more likely than undocumented immigrants to obtain drivers'

---

[4] An on-line real estate database company estimated that, as of 2017, 123,000 DACA enrollees were homeowners, paying an estimated $380 million per year in property taxes. Alexander Casey, *An Estimated 123,000 "Dreamers" Own Homes and Pay $380M in Property Taxes*, Zillow (Sept. 20, 2017) (available at https://www.zillow.com/research/daca-homeowners-380M-taxes-16629).

16

licenses, which lead to greater educational and employment opportunities for young immigrants. *See id.*

The significant reliance interests also implicate the interests of DACA recipients' families, employers, schools, and communities. As DACA recipients receive Social Security numbers and obtain employment authorizations, they are deeply integrated into society through employment and educational opportunities. This not only benefits DACA recipients but also impacts educational institutions, employers and communities at large. As the Regents of the University of California explained, they have "invested considerable resources in recruiting students and staff who are DACA recipients," and the University will "lose significant intellectual capital and productivity" as a result of the rescission. *Regents*, 279 F. Supp. 3d at 1026. In addition, DACA recipients will lose their work authorizations, and the various states and counties that employ them will lose the time and resources in training these employees. *Id.* at 1027. Rescission of DACA also will cause harm to the county and state economies by decreasing tax revenue and will result in immigrants' increased dependency on subsidized health care. *Id.* at 1027, 1034.

Schools, employers, and the community at-large have thus relied on the continuation of DACA. A sudden about-face will have a significant impact on the entities that employ and educate DACA recipients. In light of the significant economic reliance interests at stake, "review of the bases for the rescission should be

**AR5547**

17

relatively intense." *Emerson, Official Reason*, 128 Yale L.J. at 2205.

DACA recipients have come to rely on DACA's benefits to obtain undergraduate and postgraduate education, private and public employment, and social and economic integration.[5] Thus, a searching review for the agency's reasons for rescission of the program is required.

## III. RESCINDING DACA WOULD POTENTIALLY RESULT IN THE ENTRAPMENT OF RECIPIENTS.

DACA recipients detrimentally relied on the representation that information submitted to DHS would be confidential and would not be used for removal purposes. *Regents*, 279 F. Supp. 3d at 1022 (citing United States Citizenship and Immigration Services Form I-821D). If DACA were rescinded, however, the protection against the use of incriminating information would cease to exist. As one legal scholar observed pre-rescission, "Were the government to change course and

---

[5] The Defense Department estimates that, as of 2017, approximately 900 DACA recipients were serving in the military or had signed contracts to serve through the Military Accessions Vital to the National Interest (MAVNI) program which offered a promise of fast-track review of citizenship application for enrollees. In rescinding DACA, DHS did not even mention MAVNI enrollees. *See* Alex Horton, *The military looked to 'dreamers' to use their vital skills. Now the U.S. might deport them.* (Sept. 7, 2017) (available at https://www.washingtonpost.com/news/checkpoint/wp/2017/09/07/the-military-looked-to-dreamers-to-use-their-vital-skills-now-the-u-s-might-deport-them/).

18

resume enforcement, then these applications could amount to neatly packaging the immigrants' information on a platter for law enforcement officials." Zachary S. Price, *Reliance on Nonenforcement*, 58 Wm. & Mary L. Rev. 937, 1002 (2017) (quotations omitted). The result of DACA's rescission would be the unsuspecting cooperation of DACA recipients by providing the government with information that would be used against them.

When the government obtains information by assuring nonenforcement, "due process principles of fair notice should limit the government's use of that information in future enforcement efforts." *Id.* at 1001. In *Cox v. Louisiana*, 379 U.S. 559 (1965), this Court overturned a conviction for picketing where city officials instructed the defendant to picket. Although the defendant did as instructed, he still was charged and convicted. In overturning the conviction on due process grounds, this Court explained:

> Under all the circumstances of this case, after the public officials acted as they did, to sustain appellant's later conviction for demonstrating where they told him he could "would be to sanction an indefensible sort of entrapment by the State convicting a citizen for exercising a privilege which the State had clearly told him was available to him."

*Id.* at 571, 85 S. Ct. at 484 (quoting *Raley v. Ohio*, 360 U.S. 423, 426, 79 S. Ct. 1257, 1260 (1959)).

**AR5549**

19

The reversal of DACA would likewise involve an "indefensible sort of entrapment." As noted above, DACA required applicants to provide extensive personal information, with the understanding that such information would not be used against them. If the government now uses that information to initiate removal proceedings against DACA recipients, it would amount to entrapping those persons who "exercis[ed] a privilege which the [government] has clearly told them was available." *Id.* at 571.

The promise that information would not be provided to Immigration and Customs Enforcement likely led to deferred action recipients to "live more openly in reliance on the government's promise." Price, *Reliance on Nonenforcement*, 58 Wm. & Mary L. Rev. at 959. As one legal scholar observed, "[I]t seems doubtful that immigrants would have taken this risk without the perceived assurance that doing so would place them at reduced, rather than increased, risk of future enforcement." *Id.* at 960.

DHS argues that DACA recipients could not reasonably rely on the promise of DACA because President Obama, in remarks announcing DACA, stated that it was merely a "temporary stop gap measure" and not a "permanent fix." However, in those same remarks, President Obama also said that DACA "is taking steps to lift the shadow of deportation from these young people." By lifting the shadow of deportation, DACA "giv[es] a degree of relief and hope to talented, driven, patriotic young people." *Remarks by the President on Immigration*, June 15, 2012 (available at

20

https://obamawhitehouse.archives.gov/the-press-office/
2012/06/15/remarks-president-immigration). President
Obama further explained that "it makes no sense to
expel talented young people, who, for all intents and
purposes are Americans . . . to expel these young peo-
ple who want to staff our labs, or start new businesses,
or defend our country." *Id.* As the Northern District of
California observed in *Regents*, "689,800 young people
. . . had come to rely on DACA to live and to work in
this country." 279 F. Supp. 3d at 1045.

———————◆———————

**CONCLUSION**

This Court should affirm the judgments of the U.S.
Court of Appeals for the Ninth Circuit, the U.S. District
Court for the District of Columbia, and the orders of
the U.S. District Court for the Eastern District of New
York.

Respectfully submitted,

NEIL V. McKITTRICK
    *Counsel of Record*
LORENZO R. CABANTOG
OGLETREE, DEAKINS, NASH,
    SMOAK & STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
(617) 994-5726
neil.mckittrick@ogletree.com

Dated: October 4, 2019

AR5551

Nos. 18-587, 18-588, 18-589

# In the Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
PETITIONERS,
v.
REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,
RESPONDENTS.

DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL., PETITIONERS,
v.
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL., RESPONDENTS.

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, ET AL., PETITIONERS,
v.
MARTIN JONATHAN BATALLA VIDAL, ET AL., RESPONDENTS.

On Writs of Certiorari to the United States Courts of
Appeals for the Ninth, D.C., and Second Circuits

**BRIEF OF AMICI CURIAE PUBLIC CITIZEN, NATURAL
RESOURCES DEFENSE COUNCIL, AND AMERICAN CIVIL
LIBERTIES UNION IN SUPPORT OF RESPONDENTS**

SCOTT L. NELSON
*Counsel of Record*
ALLISON M. ZIEVE
PUBLIC CITIZEN
  LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
snelson@citizen.org

*Attorneys for Amici Curiae*

October 2019

**AR5552**

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................ii

INTEREST OF AMICI CURIAE............................... 1

SUMMARY OF ARGUMENT ................................... 2

ARGUMENT ............................................................. 5

I.   This Court's decisions, including *Chaney*, have narrowly construed the APA's exceptions to judicial review. ...................................................... 5

II.  *Chaney*'s holding is limited to agency decisions not to initiate enforcement proceedings............. 7

III. Consistent with *Chaney*, lower federal courts have held that agency actions promulgating general enforcement-related policies are reviewable. ......................................................... 11

IV.  The government's arguments for extending *Chaney* are unconvincing.................................. 16

CONCLUSION......................................................... 21

**AR5553**

ii

# TABLE OF AUTHORITIES

**Cases:**                                          **Page(s)**

*Air Courier Conf. of Am. v. Am.*
*Postal Workers Union,*
498 U.S. 517 (1991) ............................................. 21

*Bowen v. Mich. Acad. of Family Physicians,*
476 U.S. 667 (1986) ........................................ 6, 21

*Center for Auto Safety, Inc. v. NHTSA,*
342 F. Supp. 2d 1 (D.D.C. 2004),
*aff'd,* 452 F.3d 798 (D.C. Cir. 2006) ............. 14, 15

*Chiang v. Kempthorne,*
503 F. Supp. 2d 343 (D.D.C. 2007) .................... 14

*Crowley Caribbean Transport, Inc. v. Peña,*
37 F.3d 671 (D.C. Cir. 1994) .......................*passim*

*Dep't of Commerce v. New York,*
139 S. Ct. 2551 (2019) .................................. 5, 7, 9

*Edison Elec. Inst. v. EPA,*
996 F.2d 326 (D.C. Cir. 1993) ............................ 11

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ............................................ 20

*FEC v. Akins,*
524 U.S. 11 (1998) ........................................ 10, 21

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ............................................ 10

*Gulf Restoration Network v. McCarthy,*
783 F.3d 227 (5th Cir. 2015) .............................. 13

*Heckler v. Chaney,*
470 U.S. 821 (1985) .....................................*passim*

**AR5554**

*ICC v. B'hood of Locomotive Eng'rs,*
    482 U.S. 270 (1987) ............................................. 18

*INS v. St. Cyr,*
    533 U.S. 289 (2001) ............................................. 20

*Kenney v. Glickman,*
    96 F.3d 1118 (8th Cir. 1996) ........................ 13, 16

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ........................................ 7, 9

*Mach Mining, LLC v. EEOC,*
    135 S. Ct. 1645 (2015) ...................................... 6, 7

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ..................................... 7, 9, 10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*
    *State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ............................................. 20

*Nat'l Wildlife Fed'n v. EPA,*
    980 F.2d 765 (D.C. Cir. 1992) ............................ 11

*OSG Bulk Ships, Inc. v. United States,*
    132 F.3d 808 (D.C. Cir. 1998) ...................... 12, 13

*Ringo v. Lombardi,*
    706 F. Supp. 2d 952 (W.D. Mo. 2010) ................ 15

*Riverkeeper, Inc. v. Collins,*
    359 F.3d 156 (2d Cir. 2004).......................... 13, 14

*Roane v. Holder,*
    607 F. Supp. 2d 216 (D.D.C. 2009) .................... 15

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015), *aff'd by equally*
    *divided Court,* 136 S. Ct. 2271 (2016)................ 13

*Webster v. Doe,*
    486 U.S. 592 (1988) ...................................... 10, 20

**AR5555**

iv

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
  139 S. Ct. 361 (2019) ........................................ 6, 7

*WildEarth Guardians v. DOJ*,
  752 F. Appx. 421 (9th Cir. 2018) ........................ 14

*WildEarth Guardians v. DOJ*,
  181 F. Supp. 3d 651 (D. Ariz. 2015) .................... 14

**Constitutional Provisions, Statutes, and Rules:**

5 U.S.C. §§ 701–706 ................................................... 5

5 U.S.C. § 701(a) ................................................... 3, 5

5 U.S.C. § 701(a)(1) ................................................... 6

5 U.S.C. § 701(a)(2) .............................. 2, 6, 7, 8, 9, 16

5 U.S.C. § 704 ........................................................... 5

5 U.S.C. § 706(2)(A) ...................................... 3, 6, 7, 10

**Other:**

Office of Legal Counsel, U.S. Department of Justice,
  *The Department of Homeland Security's Authority
  to Prioritize Removal of Certain Aliens
  Unlawfully Present in the United States and to
  Defer Removal of Others* (Nov. 19, 2014),
  2014 WL 10788677 ........................................ 15, 16

**AR5556**

## INTEREST OF AMICI CURIAE[1]

Amicus Curiae Public Citizen, Inc., is a nonprofit advocacy organization founded in 1971. Public Citizen appears on behalf of its nationwide membership before Congress, administrative agencies, and courts on a range of issues, including protection of consumers and workers and fostering open and fair governmental processes.

Amicus curiae Natural Resources Defense Council, Inc., (NRDC) is a nonprofit advocacy group that works to protect health and the environment. Since its founding in 1970, NRDC has pursued this goal through science, policy analysis, advocacy before agencies and legislatures, and litigation to enforce environmental laws.

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan organization with nearly 2 million members and supporters dedicated to the principles of liberty and equality embodied in our nation's Constitution and civil rights laws. The ACLU, through its Immigrants' Rights Project and state affiliates, engages in a nationwide program of litigation, advocacy, and public education to enforce and protect the constitutional and civil rights of noncitizens.

Amici have litigated hundreds of cases seeking judicial review of government actions under the Administrative Procedure Act (APA), special review provisions applicable to particular statutes, and nonstatutory mechanisms for review of unlawful government

---

[1] This brief was not authored in whole or part by counsel for a party. No one other than amici curiae made a monetary contribution to preparation or submission of the brief. Counsel for all parties have filed blanket consents to the filing of amicus briefs.

2

action. It is critical to the mission of these organizations that courts adhere to the principle that agency action is presumptively subject to judicial review, with exceptions to reviewability narrowly construed. In their own litigation, amici confront arguments by governmental defendants that agency actions reflect unreviewable exercises of enforcement discretion or are otherwise committed to agency discretion by law. Amici therefore have a strong interest in confining to their proper sphere these exceptions to the availability of judicial review.

In this case, the government petitioners argue that their decision to rescind the Deferred Action for Childhood Arrivals (DACA) program was an exercise of enforcement discretion that is unreviewable under *Heckler v. Chaney*, 470 U.S. 821 (1985). For a generation since *Chaney*, however, courts have recognized that that decision bars review of discretionary decisions not to commence particular enforcement actions, not of agencies' adoption of general policies affecting enforcement decisions. The government's brief, however, does not address this body of law. Amici therefore submit this brief to provide a more complete account of the boundaries of *Chaney*'s exception to the general presumption favoring judicial review.

## SUMMARY OF ARGUMENT

The government's principal submission in this case is that its decision to rescind DACA "is a quintessential exercise of enforcement discretion" that is unreviewable under the APA because it is "'committed to agency discretion by law.'" U.S. Br. 17 (quoting 5 U.S.C. § 701(a)(2)). Invoking *Heckler v. Chaney*'s holding that section 701(a)(2) "precludes review … of an agency's decision not to institute enforcement

3

actions," *id.* (citing 470 U.S. at 831), the government contends that that holding also extends to agency actions adopting or rescinding a "policy of nonenforcement," *id.* at 17, 19. As respondents explain, section 701(a)(2) cannot apply here because, in rescinding DACA, the Secretary of Homeland Security did not purport to exercise any enforcement discretion, but instead bowed to the Attorney General's determination that DACA was unlawful. *See*, *e.g.*, D.C. Resp. Br. 22–30. Even leaving that point aside, however, the government's argument depends entirely on its assertion that *Heckler v. Chaney* is applicable to "a broad and categorical decision to rescind a nonenforcement policy." *Id.* at 21. The government's position that *Chaney* applies to actions promulgating enforcement policies is contrary to decades of case law in the federal courts recognizing that *Chaney*'s reasoning does not extend to such agency actions.

The APA embodies a broad presumption in favor of judicial review of agency action. Persons aggrieved by final agency action may generally obtain review in the courts unless the action falls within two narrow exceptions applicable when (1) other statutes "preclude judicial review," or (2) the action is "committed to agency discretion by law." 5 U.S.C. § 701(a). The second exception, at issue here, does not apply broadly to all exercises of agency discretion; indeed, the APA elsewhere explicitly provides for review of discretionary agency actions. *See* 5 U.S.C. § 706(2)(A). As this Court has repeatedly held, the "committed to agency discretion by law" exception applies only to narrow categories of agency actions that have traditionally been excluded from the scope of judicial review because courts have no meaningful standards against which to review them.

AR5559

4

The kind of action that was the subject of *Heckler v. Chaney*—an agency decision not to initiate an enforcement proceeding—is one of the few examples of agency action that this Court has determined falls within that exception. *Chaney*, however, does not broadly immunize from review all agency actions that arguably implicate an agency's enforcement discretion. *Chaney* focused narrowly on the longstanding judicial tradition of declining review of agency decisions not to undertake enforcement actions, and on reasons for denying review that are specific to such decisions and inapplicable when an agency adopts a general policy that governs its enforcement decisions. This Court has, therefore, consistently described *Chaney* as limited to agency decisions not to initiate enforcement proceedings.

Based on the limits of *Chaney*'s holding and reasoning, the lower federal courts, in the decades since that decision, have elaborated a workable and principled distinction between unreviewable actions declining to initiate particular enforcement proceedings, and reviewable actions promulgating general rules or policies affecting agency enforcement. This case law respects the judicial tradition of noninterference with agency nonenforcement decisions that lies at the heart of *Chaney*. At the same time, the courts have properly subjected agency actions that fall outside that tradition to review for conformity with law and the APA's prohibition of arbitrary and capricious agency action. As this body of case law reflects, the promulgation of general policies affecting agency enforcement is well-suited to such judicial review.

The government's arguments for expanding *Chaney*'s preclusion of review to encompass generally applicable agency policies are unconvincing. The

government points to no tradition against review of agency policies comparable to the one *Chaney* identified with respect to decisions not to initiate enforcement proceedings. And contrary to the government's characterization, *Chaney* did not purport to address general, "programmatic" actions. The nonenforcement decision in *Chaney* may have reflected the agency's general policy views, but the Court rejected review because of the *form* the agency's action took—a decision not to initiate enforcement proceedings—not because enforcement-related policies are inherently unreviewable. General rules or policies are amenable to review not only for conformity to statutory mandates, but also for their adherence to norms of reasoned explanation applicable to agency action generally. Far from infringing on separation-of-powers principles, as the government suggests, such review is a proper and important exercise of the courts' power to confine the executive branch to the lawful exercise of authority delegated by Congress.

## ARGUMENT

### I.  This Court's decisions, including *Chaney*, have narrowly construed the APA's exceptions to judicial review.

The starting-point for consideration of the government's argument against judicial review is the long-established principle that the APA's provisions for judicial review, set forth at 5 U.S.C. §§ 701–706, "embod[y] a 'basic presumption of judicial review.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019) (citation omitted). That presumption is set forth in section 704, which generally makes "final agency action … subject to judicial review," and section 701(a), which creates narrow exceptions to the availability of

6

review only "to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."

As this Court has repeatedly emphasized, these provisions reflect that "Congress rarely intends to prevent courts from enforcing its directives to federal agencies." *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015). The APA's language and structure manifest Congress's choice to provide remedies for the "legal lapses and violations" that are especially likely to occur "when they have no consequence." *Id.* at 1652–53. "For that reason, this Court applies a 'strong presumption' favoring judicial review of administrative action." *Id.* at 1651 (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)). Consistent with that strong presumption, the Court has read the APA's exceptions to judicial review narrowly and imposed on agencies "a 'heavy burden' in attempting to show that Congress 'prohibit[ed] all judicial review'" of their actions. *Id.* (citation omitted).

In this case, the government suggests only glancingly that applicable statutes "preclude judicial review" within the meaning of section 701(a)(1), *see* U.S. Br. 20–21; it relies principally on section 701(a)(2)'s exception for "agency action … committed to agency discretion by law." This Court has explained, however, that section 701(a)(2) does not preclude review of all discretionary agency actions: If it did, it would contradict "the command in § 706(2)(A) that courts set aside any agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2019). "A court could never determine that an agency abused its discretion if all matters committed to agency discretion were

**AR5562**

7

unreviewable." *Id*. Thus, "[t]o give effect to § 706(2)(A) and to honor the presumption of review, we have read the exception in § 701(a)(2) quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Id*. (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *accord, Dep't of Commerce*, 139 S. Ct. at 2568.

In keeping with this narrow reading of section 706(a)(2), the Court has restricted it to the types of decisions that courts "traditionally" recognized as unreviewable under the "common law" of judicial review that preceded the APA's enactment. *Chaney*, 470 U.S. at 832. Thus, "[t]he few cases in which [this Court] ha[s] applied the § 701(a)(2) exception involved agency decisions that courts have traditionally regarded as unreviewable," not types of actions "that federal courts regularly review." *Weyerhaeuser*, 139 S. Ct. at 370. *Chaney* is one of the rare instances in which the Court identified a narrow type of action—"a decision not to institute enforcement proceedings"—that is "traditionally committed to agency discretion." *Dep't of Commerce*, 139 S. Ct. at 2568. This Court has consistently refused to give *Chaney* a more expansive reading, *see, e.g., id.*; *Weyerhaeuser*, 139 S. Ct. at 370; *Mach Mining*, 135 S. Ct. at 1652; *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007).

## II. *Chaney*'s holding is limited to agency decisions not to initiate enforcement proceedings.

*Chaney* involved a challenge to the failure of the Food and Drug Administration (FDA) to take enforcement action against the use of unapproved drugs for

8

execution of prisoners facing death sentences. This Court framed the issue before it in accordingly narrow terms as one involving "the extent to which determinations by the FDA *not to exercise* its enforcement authority over the use of drugs in interstate commerce may be judicially reviewed." 470 U.S. at 828. While emphasizing the breadth of the presumption in favor of judicial review under the APA and the narrowness of the exception for actions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), the Court held that the presumption was inapplicable to "an agency's decision not to undertake certain enforcement actions," 470 U.S. at 831, because of the "general unsuitability for judicial review" of such decisions, *id*. The Court went on to explain that "general unsuitability" in terms that made plain that the decisions it deemed unsuitable for judicial review were decisions to forbear from taking particular enforcement actions:

> [A]n agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether *a violation* has occurred, but whether agency resources are best spent on *this violation* or another, whether the agency is likely to succeed if it acts, whether *the particular enforcement action requested* best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake *the action* at all. An agency generally cannot act against *each technical violation* of the statute it is charged with enforcing.

*Id*. at 831–32 (emphasis added).

The Court accordingly held "agency refusals to institute investigative or enforcement proceedings" to be

9

presumptively unreviewable. *Id*. at 838. Justice Brennan, concurring, agreed that "[t]his general presumption is based on the view that, in the normal course of events, Congress intends to allow broad discretion for its administrative agencies to make particular enforcement decisions, and there often may not exist readily discernible 'law to apply' for courts to conduct judicial review of nonenforcement decisions." *Id*. at 838 (Brennan, J., concurring). The Court recognized, moreover, that situations in which an agency "consciously and expressly adopted a general policy" inconsistent with statutory responsibilities were not controlled by its holding. *Id*. at 833 n.4 (majority). Justice Brennan likewise distinguished such policies from the "[i]ndividual, isolated nonenforcement decisions" that the Court's holding addressed. *Id*. at 839 (Brennan, J., concurring).

Thus, this Court's subsequent decisions have consistently characterized *Chaney*'s holding as narrowly applicable to decisions to forgo enforcement actions, not as establishing a broad exemption from the APA for all agency actions that touch in any way on how an agency exercises enforcement authority. Last Term, for example, the Court described *Chaney* as making "a decision not to institute enforcement proceedings" presumptively unreviewable. *Dep't of Commerce*, 139 S. Ct. at 2568. Likewise, in *Massachusetts v. EPA*, the Court noted *Chaney*'s holding "that an agency's refusal to initiate enforcement proceedings is not ordinarily subject to judicial review." 549 U.S. at 527. The Court's decision in *Lincoln v. Vigil* used an almost identical characterization: "In *Heckler* itself, we held an agency's decision not to institute enforcement proceedings to be presumptively unreviewable under § 701(a)(2)." 508 U.S. at 191. Every other case in

which the Court has described *Chaney*'s holding uses equivalent terms. *See, e.g.*, *FEC v. Akins*, 524 U.S. 11, 26 (1998); *Franklin v. Massachusetts*, 505 U.S. 788, 818 (1992); *Webster v. Doe*, 486 U.S. 592, 599 (1988).

Both in promulgating DACA, and in rescinding it, the government adopted policies concerning criteria determining whether a noncitizen will be permitted to remain in the United States. Those actions were not decisions to forgo specific enforcement actions. Neither *Chaney* nor any of this Court's decisions following it has held that the APA precludes review of actions promulgating general policies such as DACA's rescission. Indeed, as noted above, *Chaney* itself distinguished the adoption of general policies from decisions not to institute enforcement proceedings. Likewise, *Massachusetts v. EPA* explained why similar actions—denials of rulemaking petitions involving whether or not to promulgate policies governing an agency's enforcement of the statutes it administers—do not fall within *Chaney*'s ambit: Unlike "an agency's decision not to initiate an enforcement action," such actions "are less frequent, more apt to involve legal as opposed to factual analysis," and involve "a public explanation" of the agency's action. 549 U.S. at 527 (citation omitted). Those features enhance the amenability of such actions to review aimed at determining whether they are "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

11

### III. Consistent with *Chaney*, lower federal courts have held that agency actions promulgating general enforcement-related policies are reviewable.

In accordance with the limits on this Court's rationale in *Chaney*, the lower courts have for decades developed a workable distinction between discretionary decisions declining to initiate enforcement proceedings, which are presumptively unreviewable under *Chaney*, and actions promulgating policies that guide an agency's enforcement or nonenforcement determinations, which fall outside *Chaney*'s narrow scope. This line of precedent fully respects exercises of discretion not to take enforcement action that are traditionally not subject to judicial review. Where that tradition is inapplicable, however, courts have given effect to the APA's broad presumption favoring review by allowing agency actions to be tested for abuse of discretion and compliance with law when meaningful standards for review are available.

Given its significant role in developing and applying principles of administrative law, the D.C. Circuit has played an active part in fleshing out this distinction. That court has repeatedly held that an agency's adoption of rules or general policies establishing criteria for enforcement *is* reviewable. *See, e.g., Edison Elec. Inst. v. EPA*, 996 F.2d 326 (D.C. Cir. 1993); *Nat'l Wildlife Fed'n v. EPA*, 980 F.2d 765 (D.C. Cir. 1992). In *Crowley Caribbean Transport, Inc. v. Peña*, 37 F.3d 671 (1994), for example, the D.C. Circuit explained that, under *Chaney*, "an agency's statement of a *general enforcement policy* may be reviewable for legal sufficiency where the agency has expressed the policy as a formal regulation after the full rulemaking

12

process … or has otherwise articulated it in some form of universal policy statement." *Id*. at 676.

*Crowley* identified three reasons why *Chaney*'s presumption that a decision to forgo initiating an enforcement proceeding is unreviewable does not apply to an agency's promulgation of a general enforcement (or nonenforcement) policy. First, because enforcement policies are not tied to the particular facts of an individual enforcement action, "they are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion." *Id*. at 677. Second, an agency's statement of a policy regarding enforcement "poses special risks" that the agency "has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities," *id.* (quoting *Chaney,* 470 U.S. at 833 n.4), rendering a presumption of nonreviewability "inappropriate." *Id.* "Finally, an agency will generally present a clearer (and more easily reviewable) statement of its reasons for acting when formally articulating a broadly applicable enforcement policy, whereas such statements in the context of individual decisions to forego enforcement tend to be cursory, ad hoc, or post hoc." *Id.*

Based on these considerations, *Crowley* articulated, and the D.C. Circuit has subsequently followed, a generally applicable corollary to *Chaney*: While "agencies' nonenforcement decisions are generally unreviewable under the Administrative Procedure Act, … an agency's adoption of a general enforcement policy is subject to review." *OSG Bulk Ships, Inc. v.*

AR5568

13

*United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) (holding that courts could review the federal Maritime Administration's policy of not enforcing restrictions on use of ships constructed with federal subsidies).

Other circuits have similarly held that *Chaney* does not extend to "permanent policies or standards." *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996) (rejecting Secretary of Agriculture's contention that a policy of not enforcing a zero-tolerance standard for contaminated poultry was unreviewable under *Chaney*); *see also Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 236 (5th Cir. 2015) (citing *Crowley* and holding that EPA's determination whether to promulgate a "broadly applicable … policy" was not an exercise of unreviewable enforcement discretion under *Chaney*); *cf. Texas v. United States*, 809 F.3d 134, 168 (5th Cir. 2015) (finding DHS's action creating the Deferred Action for Parents of Americans and Lawful Permanent Residents program to be reviewable under *Chaney*), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016).

The Second Circuit, in *Riverkeeper, Inc. v. Collins*, 359 F.3d 156, 167 (2004), also approvingly cited the distinction drawn by *Crowley* between reviewable enforcement policies and unreviewable individual non-enforcement decisions. *Riverkeeper* was a challenge to the failure of the Nuclear Regulatory Commission (NRC) to require certain security measures as conditions on its licensing of a nuclear power plant. The challenger argued that the NRC's inaction was reviewable because it reflected a general policy of failing to enforce adequate security requirements. The court endorsed *Crowley*'s explanation of why *Chaney* does not preclude review of an agency's explicit adoption of an enforcement policy, *see id.* (quoting *Crowley*, 37

14

F.3d at 677), but found that the NRC had not explicitly "express[ed]" a "broad enforcement polic[y]," *id.* The court then examined the record to see if it could discern a reviewable "policy not to protect adequately public health and safety with respect to nuclear plants," *id.* at 168, and, finding no such policy, held that *Chaney* precluded review of the agency's failure to take enforcement action in the case before it, *id.* at 170. *Riverkeeper* thus illustrates that the permissible review of general policies that guide enforcement does not encroach on the space occupied by *Chaney*.

Applying these principles, district courts, in the nearly quarter-century since *Crowley*, have reviewed agencies' adoption of express enforcement policies in the relatively infrequent cases where agencies take such actions and face APA challenges. For example, in *WildEarth Guardians v. DOJ*, 181 F. Supp. 3d 651, 665 (D. Ariz. 2015), the court cited *Crowley* in support of its holding that *Chaney* did not bar review of the Department of Justice's formally expressed "McKittrick policy" authorizing prosecutors to request specific intent rather than general intent instructions in certain cases.[2] In *Chiang v. Kempthorne*, 503 F. Supp. 2d 343, 351 (D.D.C. 2007), the court held that guidelines limiting the time periods for which the government could seek to recover royalties from mineral lessees constituted a reviewable general enforcement policy rather than an unreviewable decision not to take enforcement action under *Chaney*. And in *Center for Auto Safety, Inc. v. NHTSA*, 342 F. Supp. 2d 1

---

[2] The Ninth Circuit ultimately vacated the district court's later decision granting summary judgment to the plaintiffs, for lack of standing. *WildEarth Guardians v. DOJ*, 752 F. Appx. 421 (9th Cir. 2018). The court of appeals did not address *Chaney*.

(D.D.C. 2004), *aff'd on other grounds*, 452 F.3d 798 (D.C. Cir. 2006), the court held that *Chaney* was inapplicable to a challenge to an agency's practice of enforcing auto recalls on a regional but not national basis because it was not a "single-shot non-enforcement decision." *Id*. at 12 (quoting *Crowley*, 37 F.3d at 676). *See also*, *e.g.*, *Ringo v. Lombardi*, 706 F. Supp. 2d 952 (W.D. Mo. 2010) (holding that *Chaney* does not preclude review of a general policy of nonenforcement of the Controlled Substances Act with respect to lethal-injection drugs); *Roane v. Holder*, 607 F. Supp. 2d 216, 226–27 (D.D.C. 2009) (same). The cases illustrate that the appellate decisions have set forth a workable standard and that application of that standard has neither displaced *Chaney* from its proper sphere nor resulted in torrents of litigation.

The Department of Justice has also recognized the well-established distinction between exercises of discretion to forgo an enforcement action and general enforcement policies that fall outside *Chaney*'s holding. In its formal opinion concerning the lawfulness of deferred action programs for noncitizens unlawfully present in the United States, the Department's Office of Legal Counsel (OLC) extensively discussed *Chaney* and the limitations of its holding. *See* OLC, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* (Nov. 19, 2014), 2014 WL 10788677.

OLC's opinion stressed two points significant here. First, OLC stated that agencies "ordinarily" may not "'consciously and expressly adopt[] a general policy'" that abdicates statutory responsibilities. *Id*., 2014 WL 10788677, at *6 (quoting *Chaney*, 470 U.S. at 833 n.4). Second, OLC recognized that "lower courts, following

16

*Chaney*, have indicated that non-enforcement decisions are most comfortably characterized as judicially unreviewable exercises of enforcement discretion when they are made on a case-by-case basis." *Id.* OLC cited both *Crowley* and *Kenney* for this proposition and endorsed *Crowley*'s distinction between unreviewable "single-shot non-enforcement decisions," *id.* (quoting *Crowley*, 37 F.3d at 676), and "general policies" that pose risks that the agency "has exceeded the bounds of its enforcement discretion," *id.*

The government's brief does not acknowledge the extensive body of lower-court case law fleshing out *Chaney*'s boundaries, or its own prior statements distinguishing reviewable general policies from unreviewable individual exercises of discretion not to take enforcement action. Adopting the government's current litigation position that its action rescinding DACA falls within the scope of *Chaney*'s preclusion of review of decisions not to initiate enforcement proceedings would eliminate this distinction, long recognized by courts and by the Justice Department itself.

## IV. The government's arguments for extending *Chaney* are unconvincing.

The government's justification for disregarding the longstanding judicial view that *Chaney* does not extend to actions of the type at issue here rests largely on an *ipse dixit*: The government asserts that "DHS's decision to discontinue the DACA policy is exactly the type of agency decision that traditionally has been understood as unsuitable for judicial review and therefore 'committed to agency discretion' under Section 701(a)(2)." U.S. Br. 18–19. But the government cites absolutely nothing to support its assertion that there is a tradition that actions adopting general

**AR5572**

17

enforcement policies are unreviewable. Neither *Chaney* nor any of this Court's other decisions invokes such a tradition, and the government offers no examples from other courts and no citations to other authorities suggesting that the "common law" of judicial review at the time of the APA's enactment embodied such a tradition. Instead, the government backs up its statement only with the observation that if "the decision to *adopt* a policy of nonenforcement" is unreviewable, "the decision whether to *retain* such a policy" should also be unreviewable. *Id*. at 19. That might be so; but because the premise that decisions to adopt nonenforcement policies are traditionally unreviewable is unsupported, the government's syllogism does nothing to advance its argument.

The government also insists that "*Chaney* itself concerned the programmatic determination whether to enforce the FDCA with respect to drugs used to administer the death penalty, not the particular circumstances of any individual case." U.S. Br. 21–22. That assertion, however, picks a quarrel with this Court's own description of the issue and holding in *Chaney* itself and in later opinions. As this Court explained in *Chaney*, the case arose from a request by individuals under sentences of death that the FDA initiate enforcement proceedings aimed at the manufacturers and end users of the specific drugs to be used in their executions. Those individuals then sought APA review of the agency's refusal to initiate the requested enforcement actions. *See* 470 U.S. at 823–25. Thus, the Court did not treat the case as involving reviewability of a general or "programmatic" action (a term not found in the opinion), but considered instead whether "an agency's decision not to prosecute or enforce," *id*. at 831, is committed to agency discretion under the

AR5573

APA. And, as explained above, *see supra* pp. 9–10, the Court has consistently described *Chaney* as addressing decisions declining to initiate specific enforcement proceedings, not as applying to actions adopting policies concerning enforcement.

To be sure, the agency's decision in *Chaney* undoubtedly reflected broader legal and policy views, *see id*. at 824—views that might have served as the basis for a different type of action that would have been reviewable. But *Chaney* found that there were "good reasons" why one type of action—a decision not to initiate an enforcement proceeding—was presumptively unsuitable for review, *id*. at 832, even if that action rested in part on legal or policy grounds that could be reviewed in the context of a different type of action. As the government itself points out, this Court has "held that agency actions falling within a tradition of non-reviewability do not become reviewable just because the agency gives a reviewable reason" for those actions. U.S. Br. 23 (internal quotation marks and brackets omitted; citing *ICC v. B'hood of Locomotive Eng'rs*, 482 U.S. 270, 282–83 (1987)). By the same token, reviewable action, such as the promulgation of a generally applicable policy, does not become unreviewable merely because an individual decision to forgo enforcement might also be based on the same "programmatic" reasons.

The government's observations that enforcement priorities "are, if anything, more susceptible to implementation though broad guidance than through case-by-case enforcement decisions," and that such guidance helps "avoid arbitrariness and ensure consistency," U.S. Br. 22 (citations omitted), do nothing to support its contention that *Chaney* should be extended to shield such actions from review. That there are

19

advantages for agencies to proceeding through general policies rather than case-by-case decisionmaking is hardly a reason to forgo review of the lawfulness and rationality of such policies. Indeed, the very features of general enforcement policies that render them effective as a means of ordering agency priorities and conforming them to statutory commands and purposes also make them suitable for judicial review, which in turn serves to further the desired goal of avoiding arbitrary agency action.

The government suggests that review is unwarranted here because actions promulgating general enforcement policies can only be reviewable if they involve a specific "statutory directive" that circumscribes agency enforcement discretion, U.S. Br. 19, or an "interpretation of particular substantive provisions" of a statute, *id*. at 25. As explained above, this argument is unsupported by the Court's opinion in *Chaney*. Moreover, questions of statutory authorization *are* directly implicated by the action rescinding DACA, which is based on the assertion that DACA violated substantive commands of federal immigration statutes. Indeed, the government's current claim that its action was justified by a litigation risk that DACA could be held unlawful as a violation of statutory commands assumes that the promulgation of DACA was a reviewable action rather than an unreviewable exercise of discretion not to initiate a particular enforcement proceeding. If that is so, DACA's rescission is likewise reviewable.

In addition, as the D.C. Circuit explained in *Crowley*, the fact that actions promulgating general enforcement policies often involve direct interpretations of statutes is only one of the reasons that such actions are reviewable. Thus, *Crowley* observed that actions

**AR5575**

promulgating enforcement policies are "more likely" than individual enforcement decisions to involve interpretation of express statutory commands, not that they *necessarily* involve such interpretation. 37 F.3d at 676–77. Such a statement about the generic characteristics of general policies that help make them suitable for review by no means suggests that a policy must share each such characteristic to render it reviewable.

*Crowley* also pointed to other features of general policies that distinguish them from decisions not to initiate specific enforcement actions and make them suitable for judicial review—in particular, that the promulgation of general rules and policies, unlike an individual nonenforcement decision, typically involves formal explanation of the agency's reasons for acting. *Crowley*, 37 F.3d at 677. That consideration is present here and confirms the reviewability of the action rescinding DACA against the standards of reasoned explanation that apply under the APA when an agency abruptly changes its course. *See, e.g., Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

Finally, the government's passing suggestion that APA review of actions promulgating enforcement policies implicates separation-of-powers concerns, U.S. Br. 19, is baseless. Exempting an agency's exercise of authority delegated by Congress from judicial review is not a matter of constitutional imperative, but of congressional choice—which is itself constrained by constitutional principles that in some cases *require* review. *See Webster*, 486 U.S. at 603; *INS v. St. Cyr*, 533 U.S. 289, 308–08 (2001). Thus, *Chaney* recognized that even the actions it found to be presumptively

21

unreviewable—agency decisions not to initiate enforcement actions—are reviewable when Congress so commands. 470 U.S. at 832–33. "Congress may limit an agency's exercise of enforcement power if it wishes." *Id.* at 833. Likewise, in *FEC v. Akins*, this Court brushed aside any suggestion that agency enforcement discretion must remain unreviewable even when Congress has authorized review. *See* 524 U.S. at 26. Indeed, statutorily authorized judicial review of the lawfulness of agency action serves rather than undermines separation-of-powers values. *See Bowen*, 476 U.S. at 670. Here, where the action at issue falls outside the APA's limited exception to the presumptive availability of review, separation-of-powers concerns provide no basis for denying review.[3]

In sum, accepting the government's view that its adoption or rescission of broad policies governing its administration of the immigration laws is unreviewable would substantially expand the reach of *Chaney*, conflict with its reasoning and that of other decisions of this Court, and upend decades of case law applying *Chaney*. The Court accordingly should reject the government's contention that its rescission of DACA is unreviewable.

## CONCLUSION

This Court should affirm the decisions of the courts below.

---

[3] The government's suggestions in the lower courts (not repeated in its brief in this Court) that its *Chaney* arguments are about "justiciability" are also baseless. Section 702(a)(1)'s preclusion of review of actions "committed to agency discretion by law" is a limit on the APA right of action, not on the jurisdiction of the federal courts. *See Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523 n.3 (1991).

AR5577

22

Respectfully submitted,

SCOTT L. NELSON
  *Counsel of Record*
ALLISON M. ZIEVE
PUBLIC CITIZEN LITIGATION
  GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
snelson@citizen.org

*Attorneys for Amici Curiae*

October 2019

AR5578

Nos. 18-587, 18-588, and 18-589

In The
# Supreme Court of the United States

◆

DEPARTMENT OF HOMELAND SECURITY, et al.,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al.,

*Respondents.*

———◆———

DONALD J. TRUMP, President of the United States, et al.,

*Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, et al.,

*Respondents.*

———◆———

KEVIN K. MCALEENAN,
Acting Secretary of Homeland Security, et al.,

*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, et al.,

*Respondents.*

———◆———

**On Writs Of Certiorari To The
United States Courts Of Appeals For The Ninth,
District Of Columbia, And Second Circuits**

———◆———

**BRIEF OF TEACH FOR AMERICA, INC.
AS *AMICUS CURIAE* IN SUPPORT OF
RESPONDENTS AND AFFIRMANCE**

———◆———

HARVEY L. ROCHMAN
ESRA A. HUDSON
MICHAEL E. OLSEN
MARIO CARDONA
MANATT, PHELPS
  & PHILLIPS, LLP
11355 W. Olympic Blvd.
Los Angeles, CA 90064

RONALD G. BLUM
  *Counsel of Record*
JULIAN POLARIS
MANATT, PHELPS
  & PHILLIPS, LLP
7 Times Square
New York, NY 10036
(212) 830-7186
rblum@manatt.com

COCKLE LEGAL BRIEFS (800) 225-6964
WWW.COCKLELEGALBRIEFS.COM

AR5579

i

## TABLE OF CONTENTS

Page

INTEREST OF *AMICUS CURIAE* ........................ 1

INTRODUCTION AND SUMMARY OF ARGU-
MENT ................................................................. 2

ARGUMENT ........................................................... 6

I. THE APA REQUIRES AN AGENCY TO
CONSIDER "SERIOUS RELIANCE IN-
TERESTS" WHEN IMPLEMENTING A
POLICY CHANGE ..................................... 6

II. DACA HAS ENGENDERED SERIOUS RE-
LIANCE INTERESTS IN TEACH FOR
AMERICA, TEACHERS, SCHOOLS, AND
STUDENTS ................................................. 7

A. DACA Freed Undocumented Young Peo-
ple to Pursue Productive Lives ............ 7

1. Alejandro Fuentes Mena ................. 9

2. Marissa Molina ................................ 10

3. Vanessa Luna .................................. 10

4. Erik Kwak ....................................... 11

5. Denise Panaligan ............................ 12

6. Miriam Gonzalez Avila .................... 13

B. DACA Teachers Provide Special Value to
Students, Schools, and Communities ..... 14

1. Teacher Diversity Redresses Achieve-
ment Gaps and Promotes Positive Stu-
dent Outcomes .................................. 15

**AR5580**

ii

TABLE OF CONTENTS – Continued

Page

    2. Excellent Teachers Offer Great Value,
       Especially in Teacher Shortage Ar-
       eas ....................................................   17

  C. Teach For America Has Expended Con-
     siderable Resources Recruiting and Sup-
     porting Talented DACA Teachers .........   19

III. THE DEPARTMENT ACTED ARBITRAR-
    ILY AND CAPRICIOUSLY BY RESCIND-
    ING DACA WITHOUT CONSIDERING
    SERIOUS RELIANCE INTERESTS ..........   22

CONCLUSION ....................................................   25

AR5581

iii

## TABLE OF AUTHORITIES

Page

CASES

*Bd. of Educ., Island Trees Union*
   *Free Sch. Dist. No. 26 v. Pico,*
   457 U.S. 853 (1982) ................................................. 24

*Brown v. Bd. of Ed. of Topeka,*
   347 U.S. 483 (1954) ................................................. 24

*Delgadillo v. Carmichael,*
   332 U.S. 388 (1947) ................................................. 8

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016) ........................................ 6, 23

*F.C.C. v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ................................................. 6

*Garcia v. United States,*
   No. 3:17-cv-5380 (N.D. Cal.) ............................... 1, 13

*Grutter v. Bollinger,*
   539 U.S. 306 (2003) ................................................. 24

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ................................................. 5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*
   *State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................. 6, 23

*Ng Fung Ho v. White,*
   259 U.S. 276 (1922) ................................................. 8

*Padilla v. Kentucky,*
   559 U.S. 356 (2010) ................................................. 8

*Plyler v. Doe,*
   457 U.S. 202 (1982) ..................................... 2, 3, 4, 24

**AR5582**

iv

TABLE OF AUTHORITIES – Continued

Page

*Regents of the Univ. of Cal. v.*
*U.S. Dep't of Homeland Sec.*,
908 F.3d 476 (9th Cir. 2018).....................................8

*W. Virginia State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) .................................................24

STATUTES

6 U.S.C. § 202(5).........................................................6

Administrative Procedure Act............................5, 6, 25

OTHER AUTHORITIES

*AmeriCorps*, Teach For America, https://www.
teachforamerica.org/life-in-the-corps/salary-
and-benefits/americorps (last accessed Sept.
29, 2019) ...............................................................20

Anna J. Egalite & Brian Kisida, *The Effects of
Teacher Match on Students' Academic Percep-
tions and Attitudes. Educational Evaluation
and Policy Analysis*, 40 Rev. Res. Educ. 59
(2018)....................................................................15

Anna J. Egalite et al., *Representation in the
Classroom: The Effect of Own-Race Teachers
on Student Achievement*, Econ. Educ. Rev., Vol.
45, Issue C, at 44 (2015)..........................................16

**AR5583**

v

TABLE OF AUTHORITIES – Continued

Page

Arne Duncan et al., Bipartisan Letter to Congress
from Former Education Secretaries, https://www.
politico.com/f/?id=0000015e-5b9c-db52-a75e-dffd
ed380001 (last accessed Sept. 29, 2019) ................14

*Champions of Change: Dacamented Teachers*,
The White House, https://obamawhitehouse.
archives.gov/champions/dacamented-teachers
(last accessed Sept. 29, 2019) ..................................17

Constance A. Lindsay & Cassandra M. D. Hart,
*Exposure to Same-Race Teachers and Student
Disciplinary Outcomes for Black Students in
North Carolina*, 39 Rev. Res. Educ. 485 (2018) .......16

*DACA Recipients*, Teach For America, https://
www.teachforamerica.org/how-to-join/eligibility/
daca (last accessed Sept. 29, 2019) .............16, 20, 21

Jie Zong et al., *A Profile of Current DACA Recipients
by Education, Industry, and Occupation*, Mi-
gration Pol'y Inst. 2 (Nov. 2017), https://www.
migrationpolicy.org/research/profile-current-daca-
recipients-education-industry-and-occupation .......18

Leib Sutcher et al., *A Coming Crisis in Teaching?
Teacher Supply, Demand, and Shortages in
the U.S.*, Learning Pol'y Inst. 1 (2016), https://
learningpolicyinstitute.org/sites/default/files/
product-files/A_Coming_Crisis_in_Teaching_
REPORT.pdf ...........................................................18

AR5584

vi

TABLE OF AUTHORITIES – Continued

Page

Memorandum on Rescission of Deferred Action for Childhood Arrivals (Sept. 5, 2017), available at Pet. App. 101a, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. 18-587 ...............4

*Remarks by the President on Immigration*, The White House (June 15, 2012), https://obama whitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration .....................3

*The State of Racial Diversity in the Educator Workforce 2016*, U.S. Dep't Educ. (July 2016), https://eric.ed.gov/?id=ED571989 .....................15, 16

*Status and Trends in the Education of Racial and Ethnic Groups 2017*, Nat'l Ctr. Educ. Statistics, U.S. Dep't Educ. (July 2017), https://nces.ed.gov/pubs2017/2017051.pdf .............15

Stephen B. Holt & Nicholas W. Papageorge, *Who Believes in Me? The Effect of Student–Teacher Demographic Match on Teacher Expectations*, Econ. Educ. Rev., Vol. 52, Issue C, at 209 (2016) .......16

Teach For America, *What We Do*, https://www.teachforamerica.org/what-we-do (last accessed Sept. 29, 2019) .........................................................14

*Teacher Shortage Areas*, U.S. Dep't of Educ., https://tsa.ed.gov ....................................................18

U.S. Dep't of Educ. Fed. Student Aid, *Financial Aid and Undocumented Students*, https://student aid.ed.gov/sa/sites/default/files/financial-aid-and-undocumented-students.pdf (last accessed Sept. 29, 2019) ................................................................20

AR5585

vii

TABLE OF AUTHORITIES – Continued

Page

*Undocumented Student Tuition: Overview*, Nat'l Conf. St. Legislatures (Sept. 29, 2019), http:// www.ncsl.org/research/education/undocumented-student-tuition-overview.aspx ...............................20

Viridiana Carrizales, *Why TFA Supports DACA and Undocumented Students*, Teach For America (Feb. 28, 2017), https://www.teach foramerica.org/stories/why-tfa-supports-daca-and-undocumented-students ...................................21

Zenen Jaimes Pérez, *Removing Barriers to Higher Education for Undocumented Students*, Ctr. Am. Progress 8 (Dec. 2014), https://cdn.american progress.org/wp-content/uploads/2014/12/Undoc HigherEd-report2.pdf .................................. 15, 16, 20

AR5586

1

## INTEREST OF *AMICUS CURIAE*[1]

For almost three decades, Teach For America, Inc. has recruited top college graduates and professionals who commit to teach for at least two years in low-income communities. More than 6,500 Teach For America corps members currently teach in 2,500 public schools across the country. Many Teach For America alumni become lifelong leaders in the effort to end educational inequity. They win recognition as teachers, school principals, and leaders in school systems and departments of education. Our 62,000 corps members and alumni include 20,000 teachers working in classrooms; nearly 3,000 principals, assistant principals, and deans; more than 550 system leaders; and over 100 school board members. Eight alumni currently lead statewide school systems, serving as state education commissioners, state education secretaries, or state superintendents. Others work outside the education system, advocating for policy reforms or pioneering new approaches for meeting the needs of low-income children.

Teach For America counts almost 250 Deferred Action for Childhood Arrivals ("DACA") recipients among its corps members and alumni, including Respondent Miriam Gonzalez Avila, who was a corps member when she became a party in *Garcia v. United States*, No. 3:17-cv-5380 (N.D. Cal.). The organization witnesses

---

[1] All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part. No one but *amicus curiae* and its counsel made monetary contribution to its preparation or submission.

2

firsthand the leadership, passion, and empathy these incredible individuals bring to serving their students, schools, and communities. An end to DACA would end their ability to work and put them at risk of deportation—a far cry from the pathway to citizenship these young people deserve. Ending DACA would undermine Teach For America's effort to increase academic success among all students, and would severely impact undocumented students, for whom DACA teachers are particularly powerful role models. Teach For America thus has an interest in the continued vitality of DACA, and seeks to ensure that the program is not unlawfully rescinded.

————————◆————————

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

Almost four decades ago, this Court confirmed that undocumented children enjoy a constitutional right to free public education, "the primary vehicle for transmitting the values on which our society rests." *Plyler v. Doe*, 457 U.S. 202, 221 (1982) (internal quotation marks omitted). "By denying these children a basic education," the Court explained, "we deny them the ability to live within the structure of our civic institutions, and foreclose any realistic possibility that they will contribute in even the smallest way to the progress of our Nation." *Id*. at 223. Especially because undocumented children may "remain in this country indefinitely," the cost of public education is "wholly

AR5588

3

insubstantial" when compared against the benefit "to these children, the State, and the Nation." *Id*. at 230.

On *Plyler*'s thirtieth anniversary, President Obama announced a policy of temporary relief from deportation for "talented young people, who, for all intents and purposes, are Americans." In a tacit acknowledgement of *Plyler*'s legacy, President Obama identified DACA's beneficiaries as "young people who study in our schools," who have "been raised as Americans," and who "understand themselves to be part of this country."[2]

Over the next five years, hundreds of thousands of people successfully applied to the United States Department of Homeland Security for temporary deportation relief and work authorization under DACA. They graduated from high school, pursued higher education, served in the military, and worked in their communities.

Presented with the full range of job opportunities, many chose to give back to their communities. In particular, approximately 250 helped educate a new generation of students by serving as Teach For America corps members, often working in schools with large populations of undocumented children who, to this day, benefit from *Plyler*'s promise of free public education. These teachers typically held leadership positions in their colleges, and are often open about their status as DACA recipients. They deconstruct stereotypes and

---

[2] *Remarks by the President on Immigration*, The White House (June 15, 2012), https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration.

4

operate as role models of achievement, possibility, and service. Their presence is especially valuable for undocumented students, a vulnerable group that benefits substantially from having authority figures with whom they can identify.

Because of DACA, these Teach For America corps members have a better chance than ever before to live out the simple truth, recognized by this Court, that "education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all." *Plyler*, 457 U.S. at 221.

That chance was abruptly curtailed, however, when the Department rescinded DACA on September 5, 2017. Acting Secretary Elaine Duke's memorandum (the "Duke Memorandum") articulated unsubstantiated concerns about the legal basis for the DACA policy, then announced that the Department would "wind it down in an efficient and orderly fashion."[3]

Without DACA, undocumented youth—including thousands of schoolchildren—lack a clear path to higher education, economic mobility, and high-quality jobs. They risk deportation to countries they do not know. Even if they avoid removal, they are hampered in their ability to "lead economically productive lives." Without DACA, Teach For America, school districts, and other organizations lose the investment they have

---

[3] Memorandum on Rescission of Deferred Action for Childhood Arrivals (Sept. 5, 2017), available at Pet. App. 101a, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. 18-587 ("*Regents*").

5

made in recruiting and training talented workers, and our communities lose teachers, caregivers, healthcare professionals, and members of the military, all of whom seek to advance our nation's ideals.

In light of the enormous reliance interests at stake, the Department errs in arguing that this Court may not review the rescission of DACA even under an "arbitrary and capricious" standard. The Department asks this Court to tell DACA recipients, the nation, and the world that judicial review does not apply to a government decision depriving 700,000 young people of basic protections for personal safety and the ability to continue the only life they have ever known. No legal basis supports the Department's decision, which would hobble our moral standing and undermine American values. *See Heckler v. Chaney*, 470 U.S. 821, 832 (1985).

The Duke Memorandum makes no mention of DACA's profound impact on hundreds of thousands of young people, or on the communities where they live, learn, teach and work. For these reasons, Teach For America urges this Court to affirm the unanimous opinions and orders from the lower courts setting aside the Department's rescission of DACA as arbitrary and capricious under the Administrative Procedure Act ("APA").

———————◆———————

AR5591

6

## ARGUMENT

## I.   THE APA REQUIRES AN AGENCY TO CONSIDER "SERIOUS RELIANCE INTERESTS" WHEN IMPLEMENTING A POLICY CHANGE

Congress vested the Department with authority to implement the DACA policy, and also to amend or rescind that policy. 6 U.S.C. § 202(5). Although agencies are "free to change their existing policies," they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). In particular, the agency must acknowledge cases in which the "prior policy has engendered serious reliance interests." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "[I]t is not that further justification is demanded by the mere fact of policy change," but the agency must offer "a reasoned explanation" for "disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16.

Courts reviewing agency action under the APA must ensure that an agency's "decision was based on a consideration of the relevant factors." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court should set aside an action as arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." *Ibid.* Where "serious reliance interests [are] at stake," the agency may not rely on "conclusory statements" to justify its change in position, and must provide a "reasoned explanation" for reversing course. *Encino Motorcars*, 136 S. Ct. at 2127.

**AR5592**

7

Teach For America's experience demonstrates that the Department violated these well-settled principles when it rescinded DACA.

## II. DACA HAS ENGENDERED SERIOUS RELIANCE INTERESTS IN TEACH FOR AMERICA, TEACHERS, SCHOOLS, AND STUDENTS

In 2013, Teach For America was among the first organizations to recruit DACA-eligible college students. Starting with two DACA teachers in Denver, Teach For America's DACA cohort has grown to 89 current members and more than 150 alumni, many of whom remain active in the education community.

Teach For America has expended considerable resources to recruit and support these talented young people on their journey to becoming teachers and leaders in communities nationwide. Their lived experience as undocumented immigrants enhances their ability to guide students and spearhead transformative change in the classroom and beyond, and so advances Teach For America's pedagogical mission. Because of these unique benefits, an end to DACA harms not only DACA recipients, but also the organizations that recruited and trained them, the students who depend on them daily, and the communities they serve.

### A. DACA Freed Undocumented Young People to Pursue Productive Lives

Commentary on DACA's impact has generally— and rightly—focused on the 700,000 individuals who

8

hold temporary relief and work authorization. *See, e.g.*, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 520 (9th Cir. 2018) (Because of DACA, Respondent "Dulce Garcia and the hundreds of thousands of other young dreamers like her may continue to live productively in the only country they have ever known.").

DACA allows undocumented youth to live without fear of deportation. One cannot overstate the benefits of dispelling that ever-present specter. As this Court has long recognized, involuntary removal may cause "loss of both property and life, or of all that makes life worth living." *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922). For a young person who thinks of America as home and has never known any other, deportation means "banishment or exile." *Delgadillo v. Carmichael*, 332 U.S. 388, 391 (1947); *see also Padilla v. Kentucky*, 559 U.S. 356, 373 (2010) (recognizing the "severity of deportation").

In addition to providing peace of mind, DACA opened up opportunities that U.S. citizens take for granted, like applying for a driver's license or a job. Almost 250 of these accomplished young leaders chose to participate in the Teach For America program to help remedy educational inequity and become lifelong leaders who impact societal change. The six described below embody DACA's benefits and the reliance interests at stake in this case.

9

### 1. Alejandro Fuentes Mena

At age four, Alejandro Fuentes Mena came to San Diego from Valparaiso, Chile. His undocumented parents found work, but their low-wage jobs could not prevent periods of homelessness during Fuentes's childhood. He entered his teenage years with near-failing grades, but encouragement from a dedicated teacher helped him raise his GPA high enough to earn a full scholarship at Whitman College in Washington. As college graduation approached, however, he began to feel hopeless about his future, fearing that his lack of documentation would force him into the same low-wage, under-the-table jobs as his parents.

DACA changed everything, enabling Fuentes to join Teach For America as one of the first undocumented corps members. He wanted to become a teacher because he'd seen an educator turn around a child's life. Fuentes finished his two-year commitment with Teach For America in 2015 and continues to serve students in Denver, where he began his seventh year as a middle school math teacher this fall. After participating in Moonshot, a school incubator fellowship, Fuentes now seeks to start his own school with a focus on arts integration. He aims to help students develop their talents alongside their academics. Fuentes also continues to humanize the undocumented community, seeking to share his narrative in the podcast Shoebox Stories to contribute to nationwide exposure around the immigration crisis.

10

### 2.  Marissa Molina

Marissa Molina came from Mexico when she was nine and grew up in Glenwood Springs, Colorado. Before her first day of school, she practiced saying, "I don't speak English." Even after learning English, she spent high school ashamed and isolated by her undocumented status, which her family instructed her to keep secret. She revealed her status to an empathetic college counselor, who helped Molina become the first member of her family to attend college. Paying tuition was a struggle, however, even though Molina worked alongside her mother cleaning houses. She considered dropping out. Without the ability to work legally, she thought, a college degree was little more than a piece of paper.

Then DACA opened new opportunities. Molina graduated from college and joined Teach For America in 2014. The following year, the White House honored her as a "Champion of Change" for developing a culturally responsive curriculum tailored to native Spanish speakers. In March 2019, Colorado Governor Jared Polis appointed Molina to the Board of Trustees for the Metropolitan State University of Denver, acknowledging her ability to advocate for expanding educational opportunity.

### 3.  Vanessa Luna

Vanessa Luna emigrated from Lima, Peru at age ten. Like Molina, she grew up fearing social rejection and removal orders, then became the first of her family

11

to graduate from college. She taught in Los Angeles as a Teach For America corps member and served as a founding member of the organization's DACA Advisory Board.

After her time in the classroom, Luna drew on her experiences as an undocumented student and teacher to found ImmSchools, a non-profit organization that helps educators create safe and welcoming spaces for undocumented students and their families. She created programming materials that have trained almost 1,000 educators, and devised workshops to help nearly 1,000 immigrant families learn about legal and educational services. This year, the Forbes "30 Under 30" list honored Luna for her ongoing impact.

### 4. Erik Kwak

Eric Kwak came to the United States from South Korea when he was eight and grew up in Koreatown, Los Angeles. Kwak's mother faced dim prospects in South Korea as the fourth daughter in a patriarchal society, and moved to America hoping to give her family a chance at a better life. She was determined to escape poverty and impressed upon her son the value of education as a tool for upward social mobility.

Kwak graduated as the valedictorian of his high school class and went on to the University of California, Berkeley. He then joined Teach For America as a Head Start teacher in West Garfield Park, Chicago. He is now pursuing a career in education policy, hoping to address inequities in our education system. This past

12

year, he worked as a Public Policy Fellow at the Alameda County Office of Education to organize and advocate for a bill increasing funding for public schools in California. DACA gave him the opportunity to make his mother's dream come true.

### 5. Denise Panaligan

Denise Panaligan was born in Mandaluyong in the Philippines. She came to the United States when she was nine and, like Kwak, grew up in Koreatown. She too spent much of her life ashamed and fearful of her undocumented status, until a resourceful counselor told her about a conference that connected undocumented students with resources in higher education. With support from her community, Panaligan graduated from UCLA with a dual degree in Economics and Asian American Studies, then earned a master's degree in urban education from Loyola Marymount University.

After joining Teach For America, she was honored as the Urban Educator of the Year for her work with English Learners and students with disabilities. Panaligan began her fourth year of teaching this fall as a history teacher, and will be assisting with Teach For America trainings around diversity, equity, and inclusion. She believes teachers should help break down systemic injustices and develop equitable policies for new generations of students. Panaligan is also an active member of UPLIFT, a community organization that advances Asian American and Pacific Islander

AR5598

13

representation in the narrative around immigration in order to highlight important histories, cultures, and social justice issues.

### 6. Miriam Gonzalez Avila

Miriam Gonzalez Avila arrived in Los Angeles at age six. In high school, a formerly undocumented Latina teacher became her role model and inspired her to believe that she could "make it," even without a formal immigration status. After graduating with Dean's Honors from UCLA, Gonzalez joined Teach For America, hoping that she too could become a role model. She recalls a student confessing his undocumented status to her, a secret he had not told any other teacher. After hearing his family's story, including their reluctance to ask for help for fear of being discovered, she organized a "know your rights" workshop for local immigrant families.

Gonzalez was in the middle of teaching a class in her hometown when the Department announced its rescission of DACA. Her students knew that she was a DACA recipient. They asked what would happen to her, and whether she would have to leave. She decided to join the complaint in *Garcia v. United States* to show her students the importance of fighting for one's beliefs. She believes, as Teach For America believes, that to rescind DACA so abruptly, when so many have relied on it to better themselves and their country, is unlawful and wrong.

\*      \*      \*

14

Dedicated educators inspired these young people to pursue higher education. Yet their limited post-college prospects nearly stifled that inspiration. DACA brought hope and created a legal path to previously unattainable goals. Their government offered an opportunity and they made the most of it, hoping to give back to the nation that had given them so much. As five former Secretaries of Education explained, rescinding DACA would "violate a promise our nation made to these earnest young people."[4]

## B.  DACA Teachers Provide Special Value to Students, Schools, and Communities

Fuentes, Molina, Luna, Kwak, Panaligan, and Gonzalez exemplify the "outstanding and diverse leaders" that Teach For America places in low-income communities, where they "confront both the challenges and joys of expanding opportunities for kids."[5] Teach For America requires strong academic records and leadership skills, attributes often found in DACA students who engage in advocacy and awareness campaigns around immigration issues on campus, in the public square, and in the halls of government. Moreover,

---

[4] Arne Duncan et al., Bipartisan Letter to Congress from Former Education Secretaries at 2, https://www.politico.com/f/?id= 0000015e-5b9c-db52-a75e-dffded380001 (last accessed Sept. 29, 2019); *see also ibid.* ("We must not, we cannot, let these children down. The stakes are too high for them and for the future of our country.").

[5] Teach For America, *What We Do*, https://www.teachforamerica. org/what-we-do (last accessed Sept. 29, 2019).

15

DACA enables Teach For America to recruit and part-
ner with teachers who reflect the diverse demographics
in school systems across the country, thereby advanc-
ing Teach For America's mission in unique and power-
ful ways.

1.  **Teacher Diversity Redresses Achieve-
ment Gaps and Promotes Positive Stu-
dent Outcomes**

Undocumented youth are a vulnerable group: com-
pared to their U.S.-born peers, they are five times less
likely to finish high school, and those who enroll in col-
lege are far less likely to graduate.[6] Black and Hispanic
students, too, continue to lag behind on standardized
test scores, discipline records, and high school gradua-
tion rates.[7]

A growing body of research shows that diversity
among educators plays a powerful role in closing these
achievement gaps, in addition to "providing social ad-
vantages for all students."[8] Diverse teachers "break[]

---

[6] Zenen Jaimes Pérez, *Removing Barriers to Higher Educa-
tion for Undocumented Students*, Ctr. Am. Progress 8–9 (Dec. 2014),
https://cdn.americanprogress.org/wp-content/uploads/2014/12/Undoc
HigherEd-report2.pdf.

[7] *Status and Trends in the Education of Racial and Ethnic
Groups 2017*, Nat'l Ctr. Educ. Statistics, U.S. Dep't Educ., at iii–v
(July 2017), https://nces.ed.gov/pubs2017/2017051.pdf.

[8] *The State of Racial Diversity in the Educator Workforce
2016*, U.S. Dep't Educ., at 2 (July 2016), https://eric.ed.gov/
?id=ED571989; *see also* Anna J. Egalite & Brian Kisida, *The Ef-
fects of Teacher Match on Students' Academic Perceptions and At-
titudes. Educational Evaluation and Policy Analysis*, 40 Rev. Res.

16

down negative stereotypes" and serve as "positive role models" in different ways to different students.[9] Teachers who share demographic traits with their students help upend the tyranny of low expectations, diffuse conflicts that can lead to disciplinary action, and inspire students to be their best selves.

DACA teachers add to the diversity of Teach For America's corps in many ways, including language fluency, national origin, socioeconomic status, race, and ethnicity. Their lived experience as undocumented immigrants is uniquely valuable to the 80,000 DACA-eligible undocumented children who turn 18 each year.[10] A "teacher is often the first adult an undocumented student will ask for help" in overcoming obstacles and planning their future, as the experiences of Fuentes, Molina, Luna, Kwak, Panaligan, and Gonzalez demonstrate.[11] DACA teachers "know first-hand the concerns that undocumented kids face."[12]

---

Educ. 59 (2018); Constance A. Lindsay & Cassandra M. D. Hart, *Exposure to Same-Race Teachers and Student Disciplinary Outcomes for Black Students in North Carolina*, 39 Rev. Res. Educ. 485 (2018); Stephen B. Holt & Nicholas W. Papageorge, *Who Believes in Me? The Effect of Student–Teacher Demographic Match on Teacher Expectations*, Econ. Educ. Rev., Vol. 52, Issue C, at 209 (2016); Anna J. Egalite et al., *Representation in the Classroom: The Effect of Own-Race Teachers on Student Achievement*, Econ. Educ. Rev., Vol. 45, Issue C, at 44 (2015).

[9] *The State of Racial Diversity*, *supra* n.8, at 1.

[10] Jaimes, *supra* n.6, at 8.

[11] *DACA Recipients*, Teach For America, https://www.teachforamerica.org/how-to-join/eligibility/daca (last accessed Sept. 29, 2019).

[12] *Ibid.*

17

DACA teachers' impact does not stop at the door to the classroom, however; they also pass their specialized knowledge to their peers. Teach For America's DACA Advisory Board encouraged the organization to prepare *all* corps members for the unique needs of undocumented students. With the organization's support and coordination, undocumented corps members and alumni worked to develop and implement a training program for the more than 3,000 teachers who join Teach For America each year.

## 2. Excellent Teachers Offer Great Value, Especially in Teacher Shortage Areas

Teach For America's commitment to excellence in hiring supports educational equality for all students. DACA teachers' backgrounds and skills, enhanced with two years of training and experience as Teach For America corps members, lay the foundation for a lifetime commitment to education and advocacy. The White House's "Champions of Change" series, for example, recognized nine "DACAmented teachers" as "extraordinary educators"; five of the nine were Teach For America corps members or alumni.[13]

These wonderful teachers are especially valuable in the growing number of school districts that face teacher shortages. A 2016 study found a nationwide deficit of approximately 64,000 teachers, and predicted

---

[13] *Champions of Change: Dacamented Teachers*, The White House, https://obamawhitehouse.archives.gov/champions/dacamented-teachers (last accessed Sept. 29, 2019).

18

an annual teacher shortage of 112,000 in 2018.[14] Those shortages will only increase if America loses the estimated 9,000 education professionals who currently benefit from DACA's protection.[15]

Teach For America recruits corps members to serve in high-need, hard-to-staff schools with high concentrations of low-income students. The DACA corps members are no different, and help to fill crucial needs in these communities. Since 2014, for example, Teach For America has placed more than a quarter of its DACA corps members into science, technology, engineering, and math ("STEM") subjects that represent teacher shortage areas in almost every state in the country.[16] Most states also report shortages of bilingual teachers, or specialists in teaching English Learners or teaching other languages.[17] DACA teachers fill those needs, too, by virtue of their native language

---

[14] Leib Sutcher et al., *A Coming Crisis in Teaching? Teacher Supply, Demand, and Shortages in the U.S.*, Learning Pol'y Inst. 1 (2016), https://learningpolicyinstitute.org/sites/default/files/product-files/A_Coming_Crisis_in_Teaching_REPORT.pdf.

[15] Jie Zong et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation*, Migration Pol'y Inst. 2 (Nov. 2017), https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation.

[16] All states other than Kansas and Ohio identified a STEM subject as a teacher shortage area. *See Teacher Shortage Areas*, U.S. Dep't of Educ., https://tsa.ed.gov; *see also* Sutcher et al., *supra* n.14, at 10–11 (discussing STEM teacher shortages in prior school years).

[17] *See Teacher Shortage Areas*, *supra* n.16; Sutcher et al., *supra* n.14, at 11.

19

proficiencies and their experiences learning English as an additional language.

Teachers are the lifeblood of a well-functioning school system. Districts around the country rely on Teach For America corps members, and the members' commitment to teach at least two years. That reliance is especially pronounced in hard-to-staff schools and subject areas, where each additional loss worsens a growing crisis.

### C. Teach For America Has Expended Considerable Resources Recruiting and Supporting Talented DACA Teachers

When President Obama announced DACA in 2012, Teach For America immediately recognized the policy's potential to promote the organization's mission of advancing educational equality. Teach For America hired staff, built administrative infrastructure, and raised funds to recruit DACA recipients and support them during their two years of service and beyond.

One prominent example is the financial award available to Teach For America corps members who complete their two-year commitment. Most corps members are eligible for federal education awards to pay down student debt or pursue additional education.[18]

---

[18] Teach For America is the largest grantee of the Corporation for National and Community Service, which administers the AmeriCorps program. Like all AmeriCorps volunteers, Teach For America corps members who serve a two-year term are eligible for a Segal AmeriCorps Education Award to pay for student loans

20

DACA recipients, however, are ineligible for federal financial aid.[19] Undocumented students often struggle to pay for school, given their generally low socioeconomic status, their lack of access to federal aid, and their ineligibility in most states for discounted in-state tuition rates.[20] To mitigate those imbalances, Teach For America has done extensive fundraising and designed administrative systems to provide DACA teachers "with the same opportunities for an education award as all other corps members."[21]

Teach For America also provides financial resources and free legal assistance to corps members when they re-apply for DACA status. These services cost almost $1,500 per renewal application, which requires Teach For America to raise significant funding from private sources.

In addition, the organization hired a full-time staff member dedicated to recruiting and supporting DACA

---

or further higher education. *See AmeriCorps*, Teach For America, https://www.teachforamerica.org/life-in-the-corps/salary-and-benefits/americorps (last accessed Sept. 29, 2019).

[19] *See* U.S. Dep't of Educ. Fed. Student Aid, *Financial Aid and Undocumented Students*, https://studentaid.ed.gov/sa/sites/default/files/financial-aid-and-undocumented-students.pdf (last accessed Sept. 29, 2019).

[20] *See* Jaimes, *supra* n.6, at 9; *Undocumented Student Tuition: Overview*, Nat'l Conf. St. Legislatures (Sept. 29, 2019), http://www.ncsl.org/research/education/undocumented-student-tuition-overview.aspx.

[21] *DACA Recipients*, *supra* n.11.

21

corps members.[22] And each year, Teach For America hosts a "convening" of DACAmented corps members and alumni. Participants have commented on how meaningful it is to be surrounded by talented, high-achieving people who are committed to educational excellence and equity. They bond over shared experiences, and discover how their lives have differed because of local demographics or state policies. This knowledge and these connections fuel their efficacy as educators and advocates.

Teach For America offers these benefits to reward DACA corps members' commitment to service. These extraordinary young people choose to dedicate at least two years—the same period as their renewable DACA relief—to serve children and schools in low-income communities. Teach For America is unreservedly confident in placing these wonderful teachers in parts of the country where students need them most. That is why the organization makes such efforts to recruit and support DACA recipients, efforts that have purpose only as long as DACA survives.

---

[22] *DACA Recipients*, *supra* n.11; *see also* Viridiana Carrizales, *Why TFA Supports DACA and Undocumented Students*, Teach For America (Feb. 28, 2017), https://www.teachforamerica.org/stories/why-tfa-supports-daca-and-undocumented-students (statement from Teach For America's former "Managing Director of DACA Corps Member Support").

22

### III.  THE DEPARTMENT ACTED ARBITRARILY AND CAPRICIOUSLY BY RESCINDING DACA WITHOUT CONSIDERING SERIOUS RELIANCE INTERESTS

DACA profoundly altered the lives of 700,000 young people, allowing them to join organizations like Teach For America for the betterment of communities nationwide. Most critically, DACA lifted the looming shadow of deportation and vastly expanded the universe of potential jobs. Teach For America was among the first organizations to recruit motivated individuals from this newly available pool of talent. The organization sought, trained, and financially supported high-achieving DACA recipients in furtherance of its mission to equalize educational opportunity.

Like all good teachers, Teach For America's DACA corps members educate, inspire, and guide their students. Many provide vital assistance to school districts suffering shortages of high-quality teachers in hard-to-staff subjects. Over and above those crucial benefits, Teach For America recognized the special value that DACA recipients offer students and communities by virtue of their lived experience as undocumented immigrants.

Acting Secretary Duke rescinded DACA without acknowledging, must less weighing, the rich and variegated reliance interests engendered over DACA's first five years. The Duke Memorandum's abrupt rescission of DACA "entirely failed to consider" these "important aspect[s] of the problem" DACA sought to address.

23

*State Farm*, 463 U.S. at 43. The "significant reliance interests involved" compel the Department to offer "a more reasoned explanation for its decision to depart from its existing enforcement policy." *Encino Motorcars*, 136 S. Ct. at 2127. The agency's failure to do so, together with the flaws of law and logic discussed in Respondents' briefs, demonstrate that the agency's decision to "depart from its existing enforcement policy" was arbitrary and capricious. *Id*. at 2126. The lower courts recognized these flaws and properly set aside the agency action rescinding DACA.[23]

There are perhaps no greater examples of DACA's importance, and the consequences of its rescission, than the students and teachers who have relied upon its relief. Beyond serving as critical role models for undocumented students, DACA educators benefit *all* students in their schools. Their American story deepens all students' understanding of the richness of the diversity of our country. This Court has long extolled the virtues of education, recognizing public schools as "a principal instrument in awakening the child to cultural values" and laying the foundation for "later

---

[23] Homeland Security Secretary Kirstjen Nielsen offered a post hoc rationalization in her 2018 memorandum, commenting in passing that "DACA recipients have availed themselves of the policy in continuing their presence in this country and pursuing their lives." *Regents* Pet. App. 125a. Even if the Court considers these perfunctory post hoc statements, the Nielsen memorandum falls woefully short of acknowledging the profound ways DACA transformed the lives of undocumented young people. The memorandum also ignores the reliance interests that DACA has engendered in organizations like Teach For America.

24

professional training." *Brown v. Bd. of Ed. of Topeka*, 347 U.S. 483, 493 (1954); *see also Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 864 (1982) (describing public schools as "vehicles for inculcating fundamental values necessary to the maintenance of a democratic political system." (internal quotation marks omitted)); *Plyler*, 457 U.S. at 221 (collecting cases). Education at all levels—from pre-K to post-doctorate—is "pivotal to sustaining our political and cultural heritage" and occupies a "fundamental role in maintaining the fabric of society." *Grutter v. Bollinger*, 539 U.S. 306, 331 (2003) (internal quotation marks omitted).

The pivotal role schools play in shaping our youth makes all the more important the courts' role in safeguarding the rights of those who sit at desks or stand at the head of classrooms. "[E]ducation prepares individuals to be self-reliant and self-sufficient participants in society," the *Plyler* Court wrote, decrying "governmental barriers" that present "unreasonable obstacles to advancement on the basis of individual merit." 457 U.S. at 222. Even before that, the Court emphasized the need for "scrupulous protection" of rights in the schoolhouse "if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943).

These admonitions apply with equal force today. What will impressionable children think upon learning that their teacher has been sent far away without the government even having to establish that its

25

actions were rational? What lessons will children learn about faith in their government, trust in social institutions, and the rule of law? How will we instill American values—the importance of keeping promises, the rewards that flow from talent and hard work—when the Department seeks to upend hundreds of thousands of lives without considering the depth of their loss or the immediacy of their suffering?

———————◆———————

## CONCLUSION

Under the Administrative Procedure Act, the Department may rescind DACA only if it offers a sufficiently reasoned explanation, which it did not do. In light of the serious reliance interests at stake for DACA recipients, the organizations they work with, and the communities they serve, the Department's conclusory statements do not suffice to explain its abrupt rescission. Teach For America urges the Court to affirm the lower courts' unanimous judgments and orders in these consolidated appeals.

Respectfully submitted,

RONALD G. BLUM
  *Counsel of Record*
JULIAN POLARIS
MANATT, PHELPS
  & PHILLIPS, LLP
7 Times Square
New York, NY 10036
(212) 830-7186
rblum@manatt.com

**AR5611**

26

HARVEY L. ROCHMAN
ESRA A. HUDSON
MICHAEL E. OLSEN
MARIO CARDONA
MANATT, PHELPS
  & PHILLIPS, LLP
11355 W. Olympic Blvd.
Los Angeles, CA 90064
*Counsel for Amicus Curiae*
  *Teach For America, Inc.*

October 4, 2019

**Nos. 18-587, 18-588, and 18-589**

IN THE

# Supreme Court of the United States

———————

DEPARTMENT OF HOMELAND SECURITY, et al.,

*Petitioners*,

v.

REGENTS OF THE
UNIVERSITY OF CALIFORNIA, et al.

*Respondents.*

———————

**On Writ of Certiorari
to the United States Court of Appeals
for the Ninth Circuit**

———————

**BRIEF OF *AMICI CURIAE*
THE NATIONAL ASSOCIATION OF HOME
BUILDERS, THE REAL ESTATE ROUNDTABLE,
AND THE ESSENTIAL WORKER IMMIGRATION
COALITION IN SUPPORT OF RESPONDENTS**

———————

Gavin R. Villareal
*Counsel of Record*
BAKER BOTTS L.L.P.
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
(512) 322-2500
gavin.villareal@bakerbotts.com

*Counsel for Amici Curiae*
[Additional Captions Listed on Inside Cover]

WILSON-EPES PRINTING CO., INC. – (202) 789-0096 – WASHINGTON, D.C. 20002

**AR5613**

DONALD J. TRUMP,
President of the United States, et al.

*Petitioners*,

v.

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, et al.

*Respondents.*

—————

**On Writ of Certiorari Before Judgment
to the United States Court of Appeals
for the District of Columbia Circuit**

—————

KEVIN K. MCALEENAN,
Acting Secretary of Homeland Security, et al.

*Petitioners*,

v.

MARTIN JONATHAN BATALLA VIDAL, et al.

*Respondents.*

—————

**On Writ of Certiorari Before Judgment
to the United States Court of Appeals
for the Second Circuit**

—————

**AR5614**

# TABLE OF CONTENTS

Table of Authorities ............................................................. iii

Interest of *Amici Curiae* .................................................... 1

Introduction ...................................................................... 2

Argument .......................................................................... 3

    I.   DACA Provides Necessary Workers for the Struggling U.S. Construction Workforce ............ 3

        A.   DACA recipients and other immigrants are a valuable part of the U.S. labor workforce. ....................................... 3

        B.   Threats to the immigrant workforce are threats to the U.S. economy, particularly the construction industry. .............................. 7

        C.   Labor shortages hurt homebuilders and related service industries, and burden the availability of affordable housing ............ 8

    II.  The Decision to Terminate DACA is Subject to Judicial Review ................................. 11

        A.   Reviewability under the APA ...................... 11

        B.   The DACA termination decision is reviewable. ..................................... 16

            1.   *Chaney's* presumption does not extend to programmatic rescissions such as occurred here. ........................... 17

            2.   Agency decisions not to act based on supposed lack of legal authority are subject to judicial review ....................... 18

            3.   Actions committed to agency discretion remain subject to constitutionality review. ......................... 21

**AR5615**

ii

Conclusion ........................................................................ 21

AR5616

# TABLE OF AUTHORITIES

Page(s)

CASES

*Abbott Laboratories* v. *Gardner*,
387 U.S. 136 (1967), abrogated on other grounds by *Califano* v. *Sanders*, 430 U.S. 99 (1977) .................................................................. 12

*Bowen* v. *Michigan Academy of Family Physicians*,
476 U.S. 667 (1986) ..................................................... 12

*Casa de Maryland* v. *U.S. Department of Homeland Security*,
284 F. Supp. 3d 758 (D. Md. 2018) .........................11, 19

*Citizens to Preserve Overton Park, Inc.* v. *Volpe*,
401 U.S. 402 (1971), abrogated on other grounds by *Califano* v. *Sanders*, 430 U.S. 99 (1977).............................................................12, 13, 14

*City of Arlington* v. *Federal Communications Commission*,
569 U.S. 290 (2013) ................................................15, 16

*Crowley Caribbean Transport, Inc.* v. *Pena*,
37 F.3d 671 (D.C. Cir. 1994) ..................................17, 18

*Heckler* v. *Chaney*,
470 U.S. 821 (1985) ............................................... passim

*ICC v. Brotherhood of Locomotive Engineers*,
482 U.S. 270 (1987) ................................................20, 21

*International Longshoremen's Association, AFL-CIO* v. *National Mediation Board*,
785 F.2d 1098 (D.C. Cir. 1986) .................................... 20

(iii)

AR5617

iv

*Kenney* v. *Glickman,*
   96 F.3d 1118 (8th Cir. 1996)..........................17

*Lincoln* v. *Vigil,*
   508 U.S. 182 (1993) .....................................12

*Mach Mining, LLC* v. *Equal Employment*
   *Opportunity Commission,*
   135 S. Ct. 1645 (2015) ..................................12

*Montana Air Chapter No. 29* v. *Federal Labor*
   *Relations Authority,*
   898 F.2d 753 (9th Cir. 1990)............................14, 15, 20

*National Treasury Employees Union* v.
   *Horner,*
   854 F.2d 490 (D.C. Cir. 1988) .......................17

*OSG Bulk Ships, Inc.* v. *United States,*
   132 F.3d 808 (D.C. Cir. 1998) .......................17

*Robbins* v. *Reagan,*
   780 F.2d 37 (D.C. Cir. 1985) ........................18

*Texas* v. *United States,*
   809 F.3d 134, 163-170 (5th Cir. 2015), cert.
   granted, 136 S. Ct. 906, and aff'd by an
   equally divided court, 136 S. Ct. 2271 (2016)
   (per curiam)...............................................11, 19

*Webster* v. *Doe,*
   486 U.S. 592 (1988) .....................................21

*Weyerhauser Co.* v. *U.S. Fish & Wildlife*
   *Service,*
   139 S. Ct. 361 (2018) ...................................12

**STATUTES**

5 U.S.C. § 701 .................................................11

5 U.S.C. § 701(a)(2)....................................... passim

**AR5618**

v

5 U.S.C. § 702 .................................................................... 11

5 U.S.C. § 703 .................................................................... 11

5 U.S.C. § 704 .................................................................... 11

5 U.S.C. § 705 .................................................................... 11

5 U.S.C. § 706 .................................................................... 11

OTHER AUTHORITIES

Ashok Chaluvadi, *Top Challenges for Builders: Materials in 2018, Labor in 2019*, NAHB: Eye on Housing (Mar. 18, 2019), http://eyeonhousing.org/2019/03/top-challenges-for-builders-materials-in-2018-labor-in-2019/ .................................................................... 7

Deloitte, *2019 US Travel and Hospitality Outlook*, https://www2.deloitte.com/content/dam/Deloitte/us/Documents/consumer-business/us-consumer-2019-us-travel-and-hospitality-outlook.pdf .................................................................... 5

Exec. Order No. 13,878, 84 Fed. Reg. 30,853 (June 25, 2019) .................................................................... 10

Freddie Mac, *The Major Challenge of Inadequate U.S. Housing Supply* 1 (Dec. 2018), http://www.freddiemac.com/fmac-resources/research/pdf/201811-Insight-06.pdf ....... 9, 10

Jie Zong, et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation*, Migration Policy Inst.: Fact Sheet 7 (Nov. 2017), https://www.migrationpolicy.org/sites/default/files/publications/DACA-Recipients-Work-Education-Nov2017-FS-FINAL.pdf .................... 3, 6, 7

AR5619

vi

Jie Zong, et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation*, Migration Policy Inst.:  Fact Sheet 7 (Nov. 2017), https://www.migrationpolicy.org/sites/default/ files/publications/DACA-Recipients-Work-Education-Nov2017-FS-FINAL.pdf ........................... 6

NAHB, *Housing Market Index: Special Questions on Labor and Subcontractors' Availability* 16 (July 2019), http://eyeonhousing.org/wp-content/uploads/2019/08/July2019-SplQ-REPORT-EXTERNAL.pdf ........................................ 8

NAHB, *Housing Market Index: Special Questions on Significant Problems Builders Faced in 2018 and Expect to face in 2019* (Jan. 2019), http://eyeonhousing.org/wp-content/uploads/2019/03/HMI-Jan-2019-SplQ-REPORTEXTERNALFINAL.pdf ................... 8

Natalia Siniavskaia, *Immigrant Workers in the Construction Labor Force*, NAHB (Jan. 2, 2018), https://www.nahbclassic.org/generic.aspx?s ectionID=734&genericContentID=260375 ............3, 4

New Am. Econ., *Spotlight on the DACA-Eligible Population* (Feb. 8, 2018), https://research.newamericaneconomy.org/r eport/spotlight-on-the-daca-eligible-population/ ...................................................... 6

AR5620

vii

Paul Emrath, *Labor and Subcontractor Costs Outpacing Inflation, Raising Home Prices*, NAHB: Eye on Housing (Sept. 10, 2018), http://eyeonhousing.org/2018/09/labor-and-subcontractor-costs-outpacing-inflation-raising-home-prices/.......................................................... 9

Paul Emrath, *Labor Shortages Still Hurting Affordability*, NAHB: Eye on Housing (Aug. 5, 2019), http://eyeonhousing.org/2019/08/labor-shortages-still-hurting-affordability/ .......................... 8

PHI, *U.S. Nursing Assistants Employed in Nursing Homes: Key Facts* 3 (2019), https://phinational.org/wp-content/uploads/2019/08/US-Nursing-Assistants-2019-PHI.pdf ............................................4, 5

PHI, *Understanding the Direct Care Workforce: Key Facts & FAQ*, https://phinational.org/policy-research/key-facts-faq/ (last visited Oct. 3, 2019)............................. 5

Robert Dietz, *Construction Job Openings Up in July*, NAHB: Eye on Housing (Sept. 10, 2019), https://eyeonhousing.org/2019/09/construction-job-openings-up-in-july/ .......................................... 6

Robert Dietz, *Job Openings Slow, Still Higher Year-over-Year*, NAHB: Eye on Housing (Aug. 6, 2019), http://eyeonhousing.org/2019/08/job-openings-slow-still-higher-year-over-year/ ................ 7

**AR5621**

viii

Robert Espinoza, *Immigrants and the Direct Care Workforce*, PHI Research Br. (June 2017), https://phinational.org/wp-content/uploads/2017/06/Immigrants-and-the-Direct-Care-Workforce-PHI-June-2017.pdf............................................................ 4

Rose Quint, *Housing Affordability Holds Steady at a 10-Year Low in the Fourth Quarter*, NAHB: Eye on Housing (Feb. 14, 2019), http://eyeonhousing.org/2019/02/housing-affordability-holds-steady-at-a-10-year-low-in-the-fourth-quarter/ ................................ 10

U.S. Travel Assocoation, *U.S. Travel Answer Sheet*, https://www.ustravel.org/answersheet (last visited Oct. 3, 2019)........................................ 5

AR5622

_____

## INTEREST OF *AMICI CURIAE*[1]

The National Association of Home Builders (NAHB) is a trade federation of more than 700 state and local associations whose mission is to enhance the climate for housing and the building industry.  Chief among NAHB's goals is providing and expanding opportunities for all people to have safe, decent, and affordable housing.  About one-third of NAHB's approximately 140,000 members are home builders or remodelers.  NAHB members provide 80% of all homes constructed in the United States.

The Real Estate Roundtable (the Roundtable) brings together leaders of the nation's top publicly-held and privately-owned real estate ownership, development, lending, and management firms with the leaders of major national real estate trade associations to jointly address key national policy issues relating to real estate and the overall economy.  By identifying, analyzing, and coordinating policy positions, the Roundtable's business and trade association leaders seek to ensure a cohesive industry voice is heard by government officials and the public about real estate and its important role in the global economy.  Collectively, the Roundtable members' portfolios contain over 12 billion square feet of office, retail, and industrial properties valued at more than $3 trillion; over two million apartment units; and more than three million hotel rooms.  Participating trade associations represent more than two million people involved in virtually every aspect of the real estate business.

_____

[1]   No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amici curiae*, their members, and their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.  The parties have consented to the filing of this brief by blanket consent on file with the Court.

(1)

**AR5623**

2

The Essential Worker Immigration Coalition (EWIC) is a coalition of businesses, trade associations, and other organizations from across the industry spectrum concerned with the shortage of both lesser skilled and unskilled labor. EWIC supports policies that facilitate the employment of essential workers by U.S. companies and organizations, as well as reform of U.S. immigration policy to facilitate a sustainable workforce for the American economy while ensuring our national security and prosperity.

In addition to their respective interests in ensuring the vitality of the nation's construction workforce, the availability of affordable housing, and the existence of equal employment opportunities, *amici* each have a particular interest in ensuring appropriate judicial review of state and federal government decisions and actions.

## INTRODUCTION

The U.S. construction industry, and the industries that provide related services to the real estate sector, are suffering from a prolonged labor shortage. Among other consequences, the labor shortage is increasingly hampering the construction and affordability of new homes. The country is not building enough new homes to keep pace with demand and maintain a healthy housing stock. Builders nationwide recognize the problem and report that the labor shortages are getting worse, creating a cascading impact on the pace of home construction and the price of new homes. The labor shortage is having similar negative effects in multiple support service industries, such as food preparation and serving, hotel and hospitality, health and elder care, and building and grounds cleaning and maintenance.

It is undisputed that immigrants provide a valuable source of construction labor and play a significant role in the workforce that services buildings once constructed.

**AR5624**

3

Taken together, about 41% of DACA recipients work in industries represented by *amici*.[2]  The decision to rescind the Deferred Action for Childhood Arrivals (DACA) policy threatens to further exacerbate the ongoing labor shortage and harm the U.S. economy, and make the American dream of homeownership harder than ever to achieve.

Courts can and should play a role in such agency decisions, as every court below in these consolidated cases appropriately concluded (and as many of the *amici* States otherwise supporting respondents agree).  The Court's decision in *Heckler* v. *Chaney*, 470 U.S. 821 (1985), which established a presumption of nonreviewability of certain agency decisions, does not apply to the DACA rescission decision.  To the contrary, that decision, based upon an agency's presumption that it lacked legal authority to act otherwise, is precisely the type of agency determination that courts are well equipped to review.

## ARGUMENT

### I. DACA PROVIDES NECESSARY WORKERS FOR THE STRUGGLING U.S. CONSTRUCTION WORKFORCE

#### A. DACA recipients and other immigrants are a valuable part of the U.S. labor workforce.

Immigrants comprise an essential part of the U.S. labor workforce.  For example, immigrant workers now account for close to one in four workers in the construction industry, a percentage that has been rising since the Great Recession.[3]  The share of immigrants is even higher in

---

[2]   Jie Zong, et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation*, Migration Policy Inst.: Fact Sheet 7 (Nov. 2017), https://www.migrationpolicy.org/sites/default/files/publications/DACA-Recipients-Work-Education-Nov2017-FS-FINAL.pdf.

[3]   Natalia Siniavskaia, *Immigrant Workers in the Construction Labor Force*, NAHB (Jan. 2, 2018), https://www.nahbclassic.org/generic.aspx?sectionID=734&genericContentID=260375.

**AR5625**

4

construction trades, reaching 30%, and is particularly high in some of the trades needed to build a home and that consistently register high labor shortages, such as carpenters, painters, drywall/ceiling tile installers, brick masons, and construction laborers.[4]

Reliance on foreign-born workers is pronounced in some states. In 2018, immigrants comprised almost 42% of the construction workforce in California; 41% in Texas; 37% in New York and Nevada; and 35% in Florida.[5]

The importance of immigrant laborers extends throughout the national workforce. The role of immigrants in providing direct health care and working as nursing assistants, who work in our nation's hospitals, elder care facilities, and other health care properties, is illustrative. In 2017, one in four workers providing hands-on care to older people and people with disabilities nationwide was an immigrant, and that number continues to grow.[6] Including independent providers, about one million immigrants work in direct health care services.[7] Similarly, 21% of nursing assistants were born outside of the United States, compared to 17% of all U.S. workers.[8] The need for such health care workers is growing dramatically. From 2015 to 2050, the population of adults aged 65 and over will almost double, from 47.8 million to 88 million, and the number of adults over 85 will more than triple over the

---

[4]   *Ibid.*

[5]   *Ibid.*

[6]   Robert Espinoza, *Immigrants and the Direct Care Workforce*, PHI Research Br. (June 2017), https://phinational.org/wp-content/uploads/2017/06/Immigrants-and-the-Direct-Care-Workforce-PHI-June-2017.pdf.

[7]   *Ibid.*

[8]   PHI, *U.S. Nursing Assistants Employed in Nursing Homes: Key Facts* 3 (2019), https://phinational.org/wp-content/uploads/2019/08/US-Nursing-Assistants-2019-PHI.pdf.

5

same time period, from 6.3 million to 19 million.[9]  As a result, nursing homes will have to fill nearly 680,000 nursing assistant job openings by 2026, primarily as workers leave the field.[10]  The elder care industry will continue to rely on immigrants to fill that need.

Likewise, the sustainability and growth of the U.S. travel industry—estimated to generate $2.5 trillion in economic output, supporting a total of 15.7 million American jobs, and generating $170.9 billion in tax revenue to support infrastructure and other critical government services[11]—depends on the availability of foreign-born talent at all skill levels.  Hotel and other lodging real estate assets confront serious workforce shortages.[12]  "Even though immigrants comprise only 13 percent of the US population—they account for 31 percent of the workforce in the hotel and lodging industry and 22 percent in restaurants."[13]

DACA-eligible immigrants are a crucial component of the workforce in *amici*'s industries.  Among the top ten industries employing DACA recipients, construction

---

[9]   PHI, *Understanding the Direct Care Workforce:  Key Facts & FAQ*, https://phinational.org/policy-research/key-facts-faq/ (last visited Oct. 3, 2019).

[10]   PHI, *U.S. Nursing Assistants Employed in Nursing Homes: Key Facts* 2 (2019), https://phinational.org/wp-content/uploads/2019/08/US-Nursing-Assistants-2019-PHI.pdf.

[11]   U.S. Travel Ass'n, *U.S. Travel Answer Sheet*, https://www.ustravel.org/answersheet (last visited Oct. 3, 2019).

[12]   Deloitte, *2019 US Travel and Hospitality Outlook*, https://www2.deloitte.com/content/dam/Deloitte/us/Documents/consumer-business/us-consumer-2019-us-travel-and-hospitality-outlook.pdf.  "In 2009, the US Bureau of Labor Statistics estimated 353,000 job openings across the leisure and hospitality sector.  As of 2018, * * * that number swelled to 1,139,000." *Id.* at 3 (footnote omitted).

[13]   *Id.* at 11.

6

ranks second, employing more than 84,000.[14]   Of that group, more than 27,000 identify as construction laborers.[15]  A loss of these 84,000 workers amounts to more than 20% of the July 2019 job openings in construction.[16]

DACA recipients also account for material percentages of workers in a broad range of professions critical to serve the nation's building infrastructure, where Americans live, work, shop, recreate, and heal.  In a 2017 study, a combined 41% of the DACA recipients worked as laborers in construction, food preparation and serving, office and administrative support, building grounds cleaning and maintenance, and transportation and material moving.[17] The study estimates that 23% of DACA recipients serve the "arts, entertainment, recreation, accommodations and food services" industries, and 14% are in the "retail trade,"[18] including personnel who work in malls and brick-and-mortar stores—key sectors that are essential to a thriving U.S. real estate industry.

According to one past estimate, if the DACA rescission proceeds, an average of 915 DACA recipients each day will lose their work authorization and protection from

---

[14]  New Am. Econ., *Spotlight on the DACA-Eligible Population* (Feb. 8, 2018), https://research.newamericaneconomy.org/report/spotlight-on-the-daca-eligible-population/.

[15]  *Ibid.*

[16]  Robert Dietz, *Construction Job Openings Up in July*, NAHB: Eye on Housing (Sept. 10, 2019), https://eyeonhousing.org/2019/09/construction-job-openings-up-in-july/.

[17]  Jie Zong, et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation*, Migration Policy Inst.: Fact Sheet 7 (Nov. 2017), https://www.migrationpolicy.org/sites/default/files/publications/DACA-Recipients-Work-Education-Nov2017-FS-FINAL.pdf.

[18]  *Id.* at 6.

AR5628

7

deportation.[19]  Such losses will degrade an already strug-
gling U.S. labor market.

**B.  Threats to the immigrant workforce are threats
to the U.S. economy, particularly the construc-
tion industry.**

The labor shortages in industries in which immigrants
and DACA recipients are a material percentage of the
workforce represent a substantial threat to the nation's
economy.  While such shortages are troubling for many in-
dustries, the lack of available workers is reaching crisis
levels for the U.S. construction industry in particular.  The
number of open construction jobs nationwide has been in-
creasing since the end of the Great Recession and reached
post-Great Recession highs in 2019.[20]  The overall trend in
this metric signals the ongoing need for additional work-
ers in the construction industry.[21]

Given the industry's labor shortage, it is unsurprising
that cost and availability of labor has risen dramatically as
an area of significant concern among builders over the
past eight years.  In 2011, for instance, only 13% of resi-
dential builders reported labor as a significant problem
that they were currently facing.[22]  That percentage in-
creased in every subsequent year:  to 30% in 2012; 53% in
2013; 61% in 2014; 71% in 2015; 78% in 2016; 82% in both
2017 and 2018.[23]  In a January 2019 survey, 82% of

---

[19]  *Id.* at 3.

[20]  Robert Dietz, *Job Openings Slow, Still Higher Year-over-Year*,
NAHB: Eye on Housing (Aug. 6, 2019), http://eyeonhous-
ing.org/2019/08/job-openings-slow-still-higher-year-over-year/.

[21]  *Ibid.*

[22]  Ashok Chaluvadi, *Top Challenges for Builders: Materials in 2018,
Labor in 2019*, NAHB: Eye on Housing (Mar. 18, 2019), http://eyeon-
housing.org/2019/03/top-challenges-for-builders-materials-in-2018-
labor-in-2019/.

[23]  *Ibid.*

**AR5629**

8

NAHB's builder members identified cost and availability of labor as an area of expected significant concern for 2019, making it the number one such concern for builders.[24]

In a recent survey of home builders, shortages of labor directly employed by builders were widespread.[25] Many of the shortage percentages were little changed from where they were as of the same time in 2018.[26] Averaged across nine labor occupations that NAHB has been consistently covering since the 1990s, the incidence of labor shortages reached 69% in 2019—the highest number on record.[27]

### C. Labor shortages hurt homebuilders and related service industries, and burden the availability of affordable housing.

The ongoing and worsening labor and subcontractor shortages continue to impact the homebuilding industry in a number of ways, including placing additional upward pressure on new home prices. In July 2019, more than 87% of builders reported the need to pay higher wages and higher subcontractor bids as a result of labor issues, 81% reported that issues with available labor made it difficult to complete projects on time, and 75% reported having to raise home prices as a result.[28] Since 2015, rising labor

---

[24] NAHB, *Housing Market Index: Special Questions on Significant Problems Builders Faced in 2018 and Expect to face in 2019*, at 2 (Jan. 2019), http://eyeonhousing.org/wp-content/uploads/2019/03/HMI-Jan-2019-SplQ-REPORTEXTERNALFINAL.pdf.

[25] Paul Emrath, *Labor Shortages Still Hurting Affordability*, NAHB: Eye on Housing (Aug. 5, 2019), http://eyeonhousing.org/2019/08/labor-shortages-still-hurting-affordability/.

[26] *Ibid.*

[27] *Ibid.*

[28] NAHB, *Housing Market Index: Special Questions on Labor and Subcontractors' Availability* 16 (July 2019), http://eyeonhousing.org/wp-content/uploads/2019/08/July2019-SplQ-REPORT-

9

costs have outpaced inflationary effects.  In 2018, for example, overall inflation was 2.9%, but labor costs increased by 5.2% over the same period.[29]

Other effects of labor shortages are less common but nevertheless also on the rise.  For example, the share of builders indicating that labor shortages have slowed the rate at which they accept incoming orders doubled between 2015 and 2018 (from 16% to 32%).[30]  Even the least common of the effects—lost or cancelled sales—was up to 26% in 2018, suggesting that the shortages are having a significant impact on production levels.[31]

The labor shortages further complicate the unfortunate reality that the United States is not building enough housing to meet the country's needs.  According to a study by Freddie Mac, between 2011 and 2018, residential housing construction has increased, but only gradually—and not enough to meet demand.[32]  Freddie Mac estimated that the annual rate of construction as of the end of 2018 was about 370,000 units below the level required by long-term housing demand.[33]  After years of low levels of building, a significant shortfall had developed, with between 0.9 and 4.0 million too few housing units to accommodate long-term housing demand.[34]  Freddie Mac predicted that until

---

EXTERNAL.pdf.

[29] Paul Emrath, *Labor and Subcontractor Costs Outpacing Inflation, Raising Home Prices*, NAHB: Eye on Housing (Sept. 10, 2018), http://eyeonhousing.org/2018/09/labor-and-subcontractor-costs-outpacing-inflation-raising-home-prices/.

[30] *Ibid.*

[31] *Ibid.*

[32] Freddie Mac, *The Major Challenge of Inadequate U.S. Housing Supply* 1 (Dec. 2018), http://www.freddiemac.com/fmac-resources/research/pdf/201811-Insight-06.pdf.

[33] *Id.* at 8.

[34] *Id.* at 2.

10

construction ramped up, housing costs would likely continue rising above income, constricting household formation and preventing homeownership for millions of potential households.[35] Indeed, housing affordability hovered at a ten-year low as of the end of 2018.[36] In all, only 56.6% of new and existing homes sold in the last quarter of 2018 were affordable to families earning the U.S. median income of $71,900.[37]

The current administration has expressed concern regarding the issue of housing affordability. In establishing a White House Council on eliminating regulatory barriers to affordable housing, President Trump noted that "[f]or many Americans, access to affordable housing is becoming far too difficult." Exec. Order No. 13,878, 84 Fed. Reg. 30,853 (June 25, 2019). "Rising housing costs are forcing families to dedicate larger shares of their monthly incomes to housing. * * * These rising costs are leaving families with fewer resources for necessities such as food, healthcare, clothing, education, and transportation, negatively affecting their quality of life and hindering their access to economic opportunity." *Ibid.*

\*\*\*

The ongoing labor shortages in construction and related services are negatively affecting the U.S. economy, causing among other problems a decrease in available affordable housing. Policy decisions that threaten the availability of immigrant labor, such as the decision to rescind

---

[35] *Id.* at 8.

[36] Rose Quint, *Housing Affordability Holds Steady at a 10-Year Low in the Fourth Quarter*, NAHB: Eye on Housing (Feb. 14, 2019), http://eyeonhousing.org/2019/02/housing-affordability-holds-steady-at-a-10-year-low-in-the-fourth-quarter/.

[37] *Ibid.*

AR5632

11

DACA, are likely to further exacerbate the labor short-ages and the negative consequences those shortages are already causing.

## II. THE DECISION TO TERMINATE DACA IS SUBJECT TO JUDICIAL REVIEW

In each of the consolidated cases, petitioners contended below and reiterate in this Court that the decision to terminate DACA is not subject to judicial review, in part based on the "committed to agency discretion" exemption under Section 701(a)(2) of the Administrative Procedure Act (APA).  5 U.S.C. § 701(a)(2).  Five federal courts, including the Ninth Circuit, have now rejected that argument, albeit for slightly different reasons.  18-587 Gov't Supp. Br. App. 23a-45a (9th Cir.); 18-587 Pet. App. 26a-33a (N.D. Cal.); 18-589 Pet. App. 24a-39a (E.D.N.Y); 18-588 Pet. App. 19a-21a, 25a-43a (D.D.C.); *Casa de Md.* v. *U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 769-770 (D. Md. 2018); cf. *Texas* v. *United States*, 809 F.3d 134, 163-170 (5th Cir. 2015), cert. granted, 136 S. Ct. 906, and aff'd by an equally divided court, 136 S. Ct. 2271 (2016) (per curiam).  In addition, although supporting petitioners on the merits of rescinding DACA, *amici* the States of Texas, Alabama, Alaska, Arizona, Arkansas, Florida, Kansas, Louisiana, Nebraska, South Carolina, South Dakota, and West Virginia, and Mississippi Governor Phil Bryant, all agree with respondents that the decision to terminate the DACA program is subject to judicial review.  States of Texas et al. Amicus Br. 30-32.  That is indeed the correct conclusion.

### A.  Reviewability under the APA

The APA provides for judicial review of "agency action."  5 U.S.C. §§ 701-706.  Any person "adversely affected or aggrieved" by agency action, including a "fail[ure] to act," is entitled to "judicial review thereof," as long as the action is a "final agency action for which there is no other adequate remedy in a court."  *Id.* §§ 702, 704.

**AR5633**

12

This Court has consistently articulated "a 'strong presumption' favoring judicial review of administrative action." *Mach Mining, LLC* v. *EEOC*, 135 S. Ct. 1645, 1651 (2015) (quoting *Bowen* v. *Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)); see also, *e.g.*, *Weyerhauser Co.* v. *U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (noting that this Court has "long applied a strong presumption favoring judicial review of an administrative action" (quoting *Mach Mining*, 135 S. Ct. at 1653)); *Lincoln* v. *Vigil*, 508 U.S. 182, 190 (1993) ("[W]e have read the APA as embodying a 'basic presumption of judicial review.'" (quoting *Abbott Labs.* v. *Gardner*, 387 U.S. 136, 140 (1967), abrogated on other grounds by *Califano* v. *Sanders*, 430 U.S. 99 (1977))). This Court has indicated that the APA's review provisions are "generous" and that courts "must" give them "a hospitable interpretation." *Abbott Labs.*, 387 U.S. at 140-141 (citations omitted). The government carries a "heavy burden" to overcome the presumption of judicial review. *Mach Mining*, 135 S. Ct. at 1651.

Section 701(a)(2) of the APA provides an exception to judicial review when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This Court has instructed that this "is a very narrow exception." *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U.S. 402, 410 (1971), abrogated on other grounds by *Califano* v. *Sanders*, 430 U.S. 99 (1977); see also *Weyerhaeuser*, 139 S. Ct. at 370 (noting that the Court has "read the exception in § 701(a)(2) quite narrowly" in light of the "strong presumption favoring judicial review" (quoting *Mach Mining*, 135 S. Ct. at 1653)).

As this Court has explained, Section 701(a)(2) "is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Overton Park*, 401 U.S. at 410 (citation omitted); see also *Chaney*, 470 U.S. at 830 ("[R]eview is not to be had if the statute is drawn so that a court would have no

meaningful standard against which to judge the agency's exercise of discretion.").

In *Chaney*, this Court interpreted the scope of Section 701(a)(2) in considering "the extent to which a decision of an administrative agency to exercise its 'discretion' not to undertake certain enforcement actions is subject to judicial review under the [APA]." 470 U.S. at 823. The case involved a challenge by several death-row inmates to the decision by the Commissioner of the U.S. Food & Drug Administration to exercise discretion not to consider the inmates' request for an investigation into the safety and effectiveness of lethal injection drugs. *Id.* at 823-825. The D.C. district court dismissed the lawsuit for lack of jurisdiction, holding that "decisions of executive departments and agencies to *refrain* from instituting investigative and enforcement proceedings are essentially unreviewable by the courts." *Id.* at 825 (citation omitted).

A divided panel of the D.C. Circuit reversed. Relying in part on this Court's decision in *Overton Park*, the D.C. Circuit began with the presumption that Section 701(a)(2) should be narrowly construed and invoked only where the substantive statute left the courts with "no law to apply." *Id.* at 826 (citing *Overton Park*, 401 U.S. at 410). The court determined, however, that judicial review of the FDA Commissioner's nonenforcement decision was not foreclosed because of an FDA policy statement indicating that the agency was "obligated" to investigate certain unapproved drug uses. *Ibid.* Having concluded that the policy statement provided sufficient "law to apply," and in light of the strong presumption that all agency action is subject to review, the court proceeded to review the decision, concluding it was irrational. *Id.* at 826-827.

This Court reversed. *Id.* at 838. The Court reiterated that Section 701(a)(2) is a "narrow" exemption, *ibid.*, and that it precludes review of agency action "if the statute is

14

drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 830. But the Court took issue with the D.C. Circuit's interpretation of *Overton Park*: "*Overton Park* did not involve an agency's refusal to take requested enforcement action. It involved an affirmative act of approval under a statute that set clear guidelines for determining when such approval should be given." *Id.* at 831. After discussing several relevant factors why nonenforcement decisions are inapt for judicial review, *id.* at 831-832, the Court concluded that Section 701(a)(2) encompasses and excludes judicial review of "agency refusals to institute investigative or enforcement proceedings, unless Congress has indicated otherwise." *Id.* at 838.

In reaching that conclusion, however, the Court in a footnote expressly disclaimed any opinion as to the reviewability of an agency's decision *not* to act because of the agency's belief that it lacked jurisdiction to act. *Id.* at 833 n.4 ("We do not have in this case a refusal by the agency to institute proceedings based solely on the belief that it lacks jurisdiction," and expressing no opinion as to "whether such decisions would be unreviewable under § 701(a)(2)").

Following *Chaney*, both the Ninth and D.C. Circuits concluded that judicial review was appropriate in the situation that the Court reserved in *Chaney*'s footnote. In *Montana Air Chapter No. 29* v. *Federal Labor Relations Authority*, 898 F.2d 753 (9th Cir. 1990), a union representing civilian technicians employed by the Montana Air National Guard sued to challenge a decision of the Federal Labor Relations Authority's General Counsel not to issue an unfair labor practice complaint. *Id.* at 755. The district court granted FLRA summary judgment on the basis that the court lacked jurisdiction to review the agency's decision. *Id.* at 756.

15

The Ninth Circuit reversed, citing to *Chaney*'s footnote and concluding that *Chaney*'s presumption of nonreviewability "may be overcome if the refusal is based solely on the erroneous belief that the agency lacks jurisdiction." *Id.* at 754-756 (citing *Chaney*, 470 U.S. at 833 n.4). The court noted that had the FLRA's General Counsel indicated a discretionary refusal to act, the court "would be compelled to deny review." *Id.* at 757. But the General Counsel's communications "strongly indicate[d] a belief that the General Counsel lacked jurisdiction" to consider the alleged unfair labor practice. *Ibid.* That question of statutory interpretation was subject to review. *Id.* at 762-763 (agreeing that the decision not to issue an unfair labor practice complaint was presumptively unreviewable, but the mistaken basis for that decision—a lack of jurisdiction to act—was subject to review).

The Ninth Circuit noted support from the D.C. Circuit for this conclusion. *Id.* at 756. ("[T]he D.C. Circuit has recognized two exceptions to the general rule of unreviewability of agency nonenforcement decisions: 1) agency nonenforcement decisions are reviewable when they are based on a belief that the agency lacks jurisdiction; and 2) an agency's statutory interpretations made in the course of nonenforcement decisions are reviewable.") (internal citations omitted).[38]

Relatedly, this Court in *City of Arlington* v. *FCC*, 569 U.S. 290 (2013), has explained that the question of agency jurisdiction to act is inseparable from the question of agency authority to act. *City of Arlington* involved whether an agency's determination of its own jurisdiction is entitled to *Chevron* deference. The Court concluded

---

[38] The D.C. district court below noted some inconsistency in the D.C. Circuit rulings on the issue of *Chaney*'s applicability to agency decisions based on presumed lack of jurisdiction. See 18-588 Pet. App. 28a (D.D.C.).

16

that "[t]he reality, laid bare, is that there is *no difference*, insofar as the validity of agency action is concerned, between an agency's exceeding the scope of its authority (its 'jurisdiction') and its exceeding authorized application of authority that it unquestionably has." *Id.* at 299. As the Ninth Circuit below elucidated, "*City of Arlington* teaches that there is no difference between an agency that lacks jurisdiction to take a certain action, and one that is barred by the substantive law from doing the same; the question 'is always, simply, whether the agency has stayed within the bounds of its statutory authority.'" 18-587 Gov't Supp. Br. App. 29a (9th Cir.) (citing *City of Arlington*, 569 U.S. at 297).

A cogent analytical structure emerges from these decisions. Under *Chaney*, an agency's refusal to enforce the substantive law is presumptively unreviewable because that discretionary nonenforcement function is "committed to agency discretion" within the meaning of the APA. 470 U.S. at 828-830. But a nonenforcement decision should be reviewable notwithstanding *Chaney* if the agency based its decision on its belief that it lacked jurisdiction to act— the issue the Court expressly reserved in *Chaney*. See *id.* at 833 n.4. Thus, an agency's nonenforcement decision is outside the scope of the *Chaney* presumption—and is therefore presumptively reviewable—if it is based on a belief that the agency lacked the lawful authority to do otherwise. That is, where the agency's decision is based not on an exercise of discretion, but instead on a belief that any alternative choice was foreclosed by law, the APA's "committed to agency discretion" bar to reviewability, 5 U.S.C. § 701(a)(2), does not apply.

**B. The DACA termination decision is reviewable.**

Petitioners contend that DHS's decision to terminate the DACA program "is a quintessential exercise of enforcement discretion" that is exempted from judicial

17

review under Section 701(a)(2). 18-587 Gov't Br. 17. Under the analytical framework described above, petitioners are incorrect.

> 1. *Chaney's presumption does not extend to programmatic rescissions such as occurred here.*

Petitioners substantially rely on *Chaney* as being dispositive of the reviewability question here. 18-587 Gov't Br. 17-26. By its terms, however, *Chaney* involved and applies to agency decisions "not to take enforcement action." 470 U.S. at 832. It strains logic to describe the rescission of an entire policy as an agency decision not to undertake an individual enforcement action. To the contrary, programmatic rescission is fundamentally different than one-off agency enforcement decisions.

Several circuits agree, appropriately distinguishing between individualized nonenforcement decisions, which are unreviewable under *Chaney*, and agency adoptions of general enforcement policies, which *are* subject to judicial review. See *OSG Bulk Ships, Inc.* v. *United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) (citing *Crowley Caribbean Transp., Inc.* v. *Pena*, 37 F.3d 671, 674-675 (D.C. Cir. 1994)); see also *Kenney* v. *Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996); *Nat'l Treasury Emps. Union* v. *Horner*, 854 F.2d 490, 496-497 (D.C. Cir. 1988). Two of the district courts below noted this substantial distinction in rejecting the applicability of *Chaney*'s presumption to DACA's rescission. 18-589 Pet. App. 28a-31a (E.D.N.Y) ("The decision to rescind DACA is unlike the nonenforcement decision at issue in *Chaney*."); 18-587 Gov't Pet. App. 26a-30a (N.D. Cal.) (noting that the DACA termination "is different from *Chaney*[, in which] the agency simply refused to initiate an enforcement proceeding"). The D.C. Circuit has noted that broad policy changes "are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of

18

fact, policy, and law that drive an individual enforcement decision." *Crowley*, 37 F.3d at 677.

The Court in *Chaney* noted several policy considerations supporting its conclusion about the nonreviewability of nonenforcement decisions, including that such decisions require balancing factors peculiarly within the agency's expertise, and that such decisions are akin to the exercise of prosecutorial discretion that is typically the province of the Executive Branch. *Chaney*, 470 U.S. at 831-832. Such considerations may apply to individual nonenforcement decisions; they do not apply to a broad policy change affecting hundreds of thousands of DACA enrollees. The Court noted in *Chaney* that in making a nonenforcement decision, an agency "does not exercise its *coercive* power over an individual's liberty" and thus "does not infringe upon areas that courts often are called upon to protect." *Id.* at 832. That rationale *supports* reviewability here, given that the DACA rescission amounts to the rescission of a nonenforcement commitment made to DACA holders. See 18-587 Gov't Pet. App. 29(a) (N.D. Cal.) ("In contrast to nonenforcement decisions, 'rescissions of commitments, whether or not they technically implicate liberty and property interests as defined under the fifth and fourteenth amendments, exert much more direct influence on the individuals or entities to whom the repudiated commitments were made.'" (quoting *Robbins* v. *Reagan*, 780 F.2d 37, 47 (D.C. Cir. 1985))).

Because the decision to rescind DACA dramatically extends beyond individualized nonenforcement decisions, *Chaney*'s presumption of nonreviewability simply does not apply.

> 2. *Agency decisions not to act based on supposed lack of legal authority are subject to judicial review.*

In any event, as the record demonstrates and the

**AR5640**

19

Ninth Circuit below thoroughly explained, DHS did not base its DACA rescission decision on the type of policy rationales the Court discussed in *Chaney*, but did so rather on the forthright and solitary position that the DACA program was unlawful. 18-587 Gov't Supp. Br. App. 34a-42a (9th Cir.) (noting that Attorney General Sessions advised the DHS Acting Secretary to rescind the program because "DACA was effectuated . . . without proper statutory authority," and that DACA "was an unconstitutional exercise of authority by the Executive Branch"); 18-587 Pet. App. 30a (N.D. Cal.) ("The main, if not exclusive, rationale for ending DACA was its supposed illegality.").

That reason for agency decisionmaking—when an agency bases its decision not on an exercise of discretion but rather on its belief that the law forecloses any other alternative—is plainly analogous to the type of situation that the Court explicitly left undecided in *Chaney*. 470 U.S. at 833 n.4 (noting that "[w]e do not have in this case a refusal by the agency to institute proceedings based solely on the belief that it lacks jurisdiction," and expressing no opinion as to "whether such decisions would be unreviewable under § 701(a)(2)"). Each of the courts below rejected the *Chaney* presumption of nonreviewability in such circumstances. 18-587 Gov't Supp. Br. App. 23a-45a (9th Cir.); 18-587 Pet. App. 26a-33a (N.D. Cal.); 18-589 Pet. App. 24a-39a (E.D.N.Y); 18-588 Pet. App. 19a-21a, 25a-43a (D.D.C.); *Casa de Md.*, 284 F. Supp. at 769-770; cf. *Texas* v. *United States*, 809 F.3d at 163-170. As one of the district courts below stated, "an official cannot claim that the law ties her hands while at the same time denying the courts' power to unbind her. She may escape political accountability or judicial review, but not both." 18-588 Pet. App. 73a (D.D.C.).

That outcome is in line with Ninth Circuit and D.C. Circuit precedent holding that agency inaction caused by an agency's determination that it lacks jurisdiction to act

20

is appropriately reviewable by the courts. *Montana Air*, 898 F.2d at 754 (concluding that *Chaney*'s presumption of nonreviewability "may be overcome if the refusal is based solely upon the erroneous belief that the agency lacks jurisdiction"); *Int'l Longshoremen's Ass'n, AFL-CIO* v. *Nat'l Mediation Bd.*, 785 F.2d 1098, 1100 (D.C. Cir. 1986) (noting that federal courts are empowered to review National Mediation Board decisions disclaiming jurisdiction).

And subjecting such a decision to judicial review accords with this Court's guidance in *Chaney*. Section 701(a)(2) excludes from review only decisions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). DHS's decision to terminate DACA, however, was fundamentally based upon its determination that the program was unlawful, and that the agency *had no discretion but to act as it did*. Such a conclusion—that an agency *lacks* any discretion to act—is a legal interpretation that is subject to "judicially manageable standards" of review. *Chaney*, 470 U.S. at 830. Judicial review in such circumstances does not tread on the agency's discretion; rather, judicial review appropriately determines whether an agency has correctly interpreted the scope of its own legal authority. That is well within the courts' wheelhouse. 18-587 Pet. App. 30a (N.D. Cal.) (rejecting the presumption of nonreviewability when an agency bases its decision on lack of legal authority to act, because "determining illegality is a quintessential role of the courts").

The Court's decision in *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 283 (1987) (*BLE*) does not lead to a different conclusion. *BLE* concerned the reviewability of the Interstate Commerce Commission's denial of a motion to reopen proceedings on grounds of material error. *Id.* at 280. The Court concluded such agency action was presumptively unreviewable based upon "a similar tradition of nonreviewability" to nonenforcement decisions as arose in *Chaney*. *Id.* at 282. The Court thus

**AR5642**

21

rejected the proposition that "if the agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." *Id.* at 283.

*BLE* has no applicability here. In *Chaney*, the Court left open the question of reviewability of agency decisions not to act when the agency based that decision on a lack of legal authority to act. *Chaney*, 470 U.S. at 833 n.4. For the reasons described above, such decisions are appropriately subject to judicial review. Accordingly, *BLE*'s guidance regarding an unreviewable decision is irrelevant here.

> ### 3. Actions committed to agency discretion remain subject to constitutionality review.

"It is well-established that 'even where agency action is "committed to agency discretion by law," review is still available to determine if the Constitution has been violated.'" 18-589 Pet. App. 31a (E.D.N.Y) (citing cases). In *Webster* v. *Doe*, 486 U.S. 592 (1988), this Court held that Section 701(a)(2) did not preclude judicial review of constitutional claims by a former CIA employee. 486 U.S. at 603-604 (rejecting the Government's arguments that constitutional claims were unreviewable under Section 701(a)(2) because the National Security Act vested the CIA director with termination decisions, because the Act did not expressly preclude review of such claims). The same result is merited here.

## CONCLUSION

The judgments of the Ninth Circuit and the District Court for the District of Columbia, as well as the orders of the Eastern District of New York, should be affirmed as to their respective determinations that the termination of the DACA program is subject to judicial review under the APA.

22

Respectfully submitted.

Gavin R. Villareal
    *Counsel of Record*
BAKER BOTTS L.L.P.
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
(512) 322-2500
gavin.villareal@bakerbotts.com


*Counsel for Amici Curiae*

October 2019

AR5644

Nos. 18-587, 18-588, 18-589

IN THE

# Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, *et al.*,
*Petitioners*,

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, *et al.*,
*Respondents.*

DONALD J. TRUMP, PRESIDENT
OF THE UNITED STATES, *et al.*,
*Petitioners*,

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, *et al.*,
*Respondents.*

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, *et al.*,
*Petitioners*,

*v.*

MARTIN JONATHAN BATALLA VIDAL, *et al.*,
*Respondents.*

ON WRITS OF CERTIORARI TO THE UNITED STATES
COURTS OF APPEALS FOR THE NINTH,
DISTRICT OF COLUMBIA, AND SECOND CIRCUITS

BRIEF FOR ADMINISTRATIVE LAW SCHOLARS
AS AMICI CURIAE IN SUPPORT OF RESPONDENTS

ALAN E. SCHOENFELD
MARGUERITE COLSON
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 937-7518

SETH P. WAXMAN
    *Counsel of Record*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC  20006
(202) 663-6800
seth.waxman@wilmerhale.com

AR5645

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................ii

INTEREST OF AMICI CURIAE .........................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................................1

ARGUMENT .........................................................................2

I. COURTS MAY REVIEW AN AGENCY'S LEGAL DETERMINATION THAT IT LACKS ENFORCEMENT DISCRETION .....................................2

   A. Judicial Review Is Presumptively Available For Agency Actions ..........................3

   B. An Enforcement Decision That Rests On An Agency's Legal Conclusion That It Lacks Authority To Act Is Reviewable ....................................................5

   C. Judicial Review Of Agency Decisions That Rest On Legal Conclusions Is Necessary To Ensure Accountability And The Separation Of Powers .........................8

II. THE DECISION TO RESCIND DACA IS REVIEWABLE BECAUSE IT RESTS ON A NON-DISCRETIONARY BELIEF ABOUT WHAT THE LAW REQUIRES .....................................10

   A. The Department Concluded That The Law Required It To Rescind DACA ...............11

   B. This Court Can And Should Review The Department's Conclusion That DACA Violates The Law ...................................14

CONCLUSION ..................................................................16

APPENDIX A: List of Amici .................................................1a

**AR5646**

ii

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Bowen* v. *Michigan Academy of Family Physicians*, 476 U.S. 667 (1986) ................................ 3

*Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U.S. 402 (1971) ............................ 3

*City of Arlington* v. *FCC*, 569 U.S. 290 (2013) ...... 6, 7, 10

*Crowley Caribbean Transport, Inc.* v. *Pena*, 37 F.3d 671 (D.C. Cir. 1994) ........................................ 6, 14

*Edison Electric Institute* v. *EPA*, 996 F.2d 326 (D.C. Cir. 1993) ................................................ 6

*Heckler* v. *Chaney*, 470 U.S. 821 (1985) ... 3, 4, 5, 6, 11, 14, 15

*Kenney* v. *Glickman*, 96 F.3d 1118 (8th Cir. 1996) ................................................................ 7

*Lincoln* v. *Vigil*, 508 U.S. 182 (1993) ................................ 5

*Mach Mining, LLC* v. *EEOC*, 135 S. Ct. 1645 (2015) ................................................................ 3

*Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137 (1803) ................................................................ 5

*Massachusetts* v. *EPA*, 549 U.S. 497 (2007) .................... 6

*Montana Air Chapter No. 29, Ass'n of Civilian Technicians, Inc.* v. *Federal Labor Relations Authority*, 898 F.2d 753 (9th Cir. 1990) ........................................................ 7

*NAACP* v. *Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018) ................................................................ 10, 12

*NAACP* v. *Trump*, 315 F. Supp. 3d 457 (D.D.C. 2018) ................................................................ 12, 14

**AR5647**

iii

## TABLE OF AUTHORITIES—Continued

Page(s)

*OSG Bulk Ships, Inc.* v. *United States*, 132 F.3d 808 (D.C. Cir. 1998) .............................................. 6

*Regents of the University of California* v. *U.S. Department of Homeland Security*, 908 F.3d 476 (9th Cir. 2018) ........................................... 8, 9

*Robbins* v. *Reagan*, 780 F.2d 37 (D.C. Cir. 1985) .......... 14

*Weyerhaeuser Co.* v. *U.S. Fish & Wildlife Service*, 139 S. Ct. 361 (2018) ........................................... 3

## STATUTORY PROVISIONS

5 U.S.C.
    § 701 .................................................................. 3, 4, 5, 10
    § 702 .................................................................. 3

## OTHER AUTHORITIES

Donald Trump (@realDonaldTrump), Twitter (Sept. 14, 2017, 5:28 AM), https://tinyurl.com/y378dsy9 ................................................. 15

Donald Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 PM), https://tinyurl.com/y2auprfo ...................................................... 15

Kagan, Elena, *Presidential Administration*, 114 Harv. L. Rev. 2245 (2001) ..................................... 9

**AR5648**

## INTEREST OF AMICI CURIAE[1]

Amici are professors of administrative law and related public law subjects at institutions across the United States.  In their scholarship and their teaching, they have carefully considered the legal doctrines implicated by this case.  They submit this brief to address arguments and precedent that are relevant to a central question presented by this appeal: whether the Department of Homeland Security's decision to rescind the Deferred Action for Childhood Arrivals (DACA) policy is judicially reviewable.  Amici join this brief solely on their own behalf and not as representatives of their universities.  A full list of amici appears in Appendix A.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

Under basic precepts of administrative law, the decision to rescind DACA is reviewable.  Congress drafted the Administrative Procedure Act intending that, subject to narrow exceptions, agency actions would be judicially reviewable.  Among the narrow exceptions carved out from that presumption are enforcement decisions that rest on an agency's exercise of discretion. As this Court has explained, discretionary enforcement decisions typically reflect a complex balancing of factors that lie within the agency's expertise.  As such, courts lack any meaningful standards to review them.

---

[1] No party authored this brief in whole or in part, and no one other than amici, their members, and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.  The parties have consented to the filing of this brief.

**AR5649**

2

By contrast, enforcement decisions that rely on an agency's view that the law compels a certain course are not insulated from judicial review. They do not rely on the sort of discretionary reasoning that judges are unable to assess. Indeed, they proclaim to be entirely *non-discretionary*. Moreover, the law they construe provides a meaningful standard by which courts may evaluate them.

It is not only permissible under the APA for courts to review agency actions that are purportedly compelled by law. It is imperative. Courts abdicate their constitutional duty when they allow the Executive Branch to have the last word on what the law requires. Judicial review of such actions promotes electoral accountability—a fundamental principle of administrative of law—and safeguards the separation of powers.

In September 2017, the Department of Homeland Security rescinded DACA based on its view that the law left it no other choice. The Department did not reach that view as an exercise of its discretion and none of the belated justifications put forward by the Department alters the fact that the agency's decision was based on its view that DACA was illegal. In keeping with the basic tenets of administrative law, this Court may review the Department's legal conclusion.

## ARGUMENT

### I. COURTS MAY REVIEW AN AGENCY'S LEGAL DETERMINATION THAT IT LACKS ENFORCEMENT DISCRETION

Administrative actions are presumptively reviewable. The exceptions to this rule are narrow and include enforcement decisions that reflect the exercise of agency discretion. Enforcement decisions that rest on an agency's interpretation of the law, by contrast, are sub-

3

ject to judicial review. And for good reason. As a practical matter, the final word on what the law says should go to legal experts. More important, judicial review of such actions is vital to preserve principles of constitutional and administrative law.

## A. Judicial Review Is Presumptively Available For Agency Actions

The Administrative Procedure Act entitles those aggrieved by agency action to judicial review. 5 U.S.C. § 702. "From the beginning," this Court has found in the APA a "strong presumption that Congress intends judicial review of administrative action." *Bowen* v. *Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986); *see also Weyerhaeuser Co.* v. *U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018); *Mach Mining LLC* v. *EEOC*, 135 S. Ct. 1645, 1651 (2015) ("Congress rarely intends to prevent courts from enforcing its directives to federal agencies."). The bedrock presumption of reviewability permits few exceptions, and it places the burden on the government to demonstrate that a particular agency action qualifies.

Relevant here, the APA draws an exception for an administrative action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). As this Court has explained, that exception is "very narrow" and pertains only "in those rare instances where … there is no 'law to apply.'" *Citizens to Pres. Overton Park, Inc.* v. *Volpe*, 401 U.S. 402, 410 (1971), *abrogated on other grounds by Califano* v. *Sanders*, 430 U.S. 99 (1977). Stated differently, Section 701(a)(2) precludes judicial review of an administrative action when a court has "no meaningful standard against which to judge the agency's exercise of discretion." *Heckler* v. *Chaney*, 470 U.S. 821, 830 (1985).

AR5651

4

Included in that narrow exception is the "decision of an administrative agency to exercise its 'discretion' not to undertake certain enforcement actions." *Chaney*, 470 U.S. at 823. In *Chaney*, inmates sentenced to die by lethal injection petitioned the FDA. They maintained that the use of lethal injection drugs for their executions violated the Federal Food, Drug, and Cosmetic Act, and they asked the agency to initiate enforcement actions to prevent the alleged statutory violations that would follow from their executions. *Id.* The FDA Commissioner declined, noting that he was unsure of the agency's jurisdiction under the Act. *Id.* at 824. But even were the agency to have jurisdiction, the Commissioner concluded, the FDA would refuse to initiate enforcement proceedings under its "'inherent discretion to decline to pursue certain enforcement matters.'" *Id.*

The Court held that under Section 701(a)(2) of the APA, an agency's discretionary decision not to initiate an enforcement action was not reviewable. Emphasizing that such decisions had "traditionally been 'committed to agency discretion,'" 470 U.S. at 832, the Court likened the FDA's decision to that of a prosecutor not to indict, an action "long [] regarded as the special province of the Executive Branch." *Id.* Apart from tradition, the Court went on to list other considerations that made discretionary enforcement decisions unsuitable for judicial review. *Id.* Typically, the Court explained, in a decision not to enforce, the agency's exercise of discretion reflects "a complicated balancing of a number of factors which are peculiarly within its expertise." *Id.* at 831. Those factors include how best to allocate the agency's resources and where the requested enforcement action lies on the agency's list of priorities. *Id.* at 831-832. Hesitant to involve itself in such "administra-

**AR5652**

5

tive concerns" outside its expertise, the Court observed that decisions not to enforce also generally do not entail an exercise of "*coercive* power over an individual's liberty or property rights," areas that courts frequently are "called upon to protect." *Id.* at 832.

*Chaney* considered Section 701(a)(2) in the cabined context of an enforcement decision resting on the exercise of an agency's discretion. At the same time, the Court left undisturbed the "strong presumption" of judicial review for agency actions that do not reflect an exercise of administrative discretion or a tradition of non-reviewability. Indeed, *Chaney* expressly stated that the case did not present a situation where an agency had refused to act based only on a non-discretionary *legal* determination "that it lacks jurisdiction." 470 U.S. at 833 n.4. Since *Chaney*, the Court has made clear that the "strong presumption" of judicial review endures, narrowly circumscribing the category of non-reviewable actions to those that have historically been entrusted to an agency's discretion or involve sensitive areas in which courts are loath to intrude. *Lincoln* v. *Vigil*, 508 U.S. 182, 191-192 (1993).

## B. An Enforcement Decision That Rests On An Agency's Legal Conclusion That It Lacks Authority To Act Is Reviewable

Where an enforcement decision reflects a legal determination that the law affords the agency no discretion, judicial review is available. In that instance, the deference to agency discretion that counseled against review in *Chaney* does not pertain for the simple reason that the agency has not exercised *any discretion at all.* Rather, it has said what the law is, and that is the province and the duty of the judiciary. *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). "The rise of

**AR5653**

6

the modern administrative state has not changed that duty." *City of Arlington* v. *FCC*, 569 U.S. 290, 316 (2013) (Roberts, C.J., dissenting).

Unlike the discretionary enforcement decision in *Chaney*, enforcement decisions based on an agency's view of what the law compels are "less frequent" and "more apt to involve legal as opposed to factual analysis." *Massachusetts* v. *EPA*, 549 U.S. 497, 527 (2007). They are "more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments" of discretionary factors that are, "as *Chaney* recognizes, peculiarly within the agency's expertise and discretion." *Crowley Caribbean Transp., Inc.* v. *Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994). Grounded in an analysis of the statute (or some other source of law), these policy-type pronouncements "delineat[e] the boundary between enforcement and non-enforcement," *id.* at 676-677, and provide a clear and "meaningful standard" against which a court may evaluate the agency's action, *Chaney*, 470 U.S. at 830. All those characteristics are present in this case.

Lower courts, too, have long recognized the distinction between legal decisions that an agency lacks authority to enforce and those that reflect the exercise of its enforcement discretion. Where an agency's "interpretation has to do with the substantive requirements of the law," the D.C. Circuit has said, "it is not the type of discretionary judgment concerning the allocation of enforcement resources that *Heckler* shields from judicial review." *Edison Elec. Inst.* v. *EPA*, 996 F.2d 326, 333 (D.C.Cir.1993); *see also Crowley Caribbean Transp.*, 37 F.3d at 676-677; *OSG Bulk Ships, Inc.* v. *United States*, 132 F.3d 808, 812 (D.C. Cir. 1998).

7

Similarly, the Eighth Circuit held reviewable certain poultry processing standards by the Department of Agriculture that were "express general policies" based on the Secretary's interpretation of the relevant statute. *Kenney* v. *Glickman*, 96 F.3d 1118, 1122, 1123 n.4 (8th Cir. 1996). And the Ninth Circuit has concluded that "agency nonenforcement decisions are reviewable when they are based on a belief that the agency lacks jurisdiction." *Montana Air Chapter No. 29, Ass'n of Civilian Technicians, Inc.* v. *Federal Labor Relations Auth.*, 898 F.2d 753, 756 (9th Cir. 1990).

It makes no difference whether an agency's decision reflects a legal determination about the scope of authority that a statute unquestionably permits (*Kenney*) or a determination that the law strips the agency of any authority to act (*Montana Air*). As this Court has explained, "the distinction between 'jurisdictional' and 'nonjurisdictional' interpretations is a mirage." *City of Arlington*, 569 U.S. at 297. In either event, the agency has made a legal evaluation as to whether it "*has stayed within the bounds of its statutory authority*," *id.*, and that sort of evaluation falls squarely within the expertise of the judiciary.[2]

---

[2] *City of Arlington* considered whether *Chevron* deference applied to an agency's interpretation of a statutory ambiguity that pertained to "the scope of its regulatory authority (that is, its jurisdiction)." 569 U.S. at 293. Here, the government does not argue that its legal interpretation of a particular statute is entitled to *Chevron* deference. Nor would that argument shield its decision from scrutiny, because judicial review is twice baked into *Chevron* deference. As the Court explained in *City of Arlington*, *a court* awards *Chevron* deference only after (1) *a court* asks whether the intent of Congress is clear in the statute and, if not, (2) after *a court* determines that the agency's construction of an ambiguous statute is permissible. *Id; see also id.* at 318-319 (Roberts, C.J.,

8

### C. Judicial Review Of Agency Decisions That Rest On Legal Conclusions Is Necessary To Ensure Accountability And The Separation Of Powers

It is common that courts review administrative policy decisions that rest on an agency's interpretation of what the law commands or forbids. And that makes good sense: Experts in the law, judges—not administrators—are best suited to say what, if anything, the law commands or forbids. But judicial review is more than a matter of common sense in this circumstance. It is more than a matter of protecting the province of the judiciary. It is a matter of this Court fulfilling its obligation to ensure that the other branches of government are confined to their correct constitutional roles and held accountable to the people.

Far from limiting the executive's discretion, judicial review promotes it. Consider an agency decision that does not reflect discretion but instead the agency's mistaken view that the law denies it any discretion to act. In reviewing the relevant law, a court may correct that misimpression and thereby empower the agency to exercise its discretion to reach an outcome it had previously thought unavailable. *See Regents of the Univ. of Cal.* v. *U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 498

---

dissenting) ("We have never faltered in our understanding of this straightforward principle, that whether a particular agency interpretation warrants *Chevron* deference turns on the *court's* determination whether Congress has delegated to the agency the authority to interpret the statutory ambiguity at issue." (emphasis added)). If the Court does not take an agency's word that *Chevron* deference applies to an ambiguous statute, even less should it take an agency's word that the law—whether the Constitution or a statute—requires a certain outcome.

AR5656

9

(9th Cir. 2018) ("If an agency head is mistaken in her assessment that the law precludes one course of action, allowing the courts to disabuse her of that incorrect view of the law does not constrain discretion, but rather opens new vistas within which discretion can operate."), *cert. granted sub nom. Department of Homeland Sec.* v. *Regents of the Univ. of Cal.*, 139 S. Ct. 2779 (2019).

Judicial review is also crucial to promote democratic accountability. A "principal value" of administrative law, the concept of accountability contemplates that voters may hold the President responsible for an unpopular agency action. Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2251-2252 (2001). That concept, however, is undermined where an agency claims it was legally required to take that unpopular action and the judiciary is precluded from saying otherwise. As the Ninth Circuit succinctly explained below, where an agency states that a law deprives it of any discretion to act, it "shifts responsibility for the outcome from the Executive Branch to Congress (for making the law in question) or the courts (for construing it)." 908 F.3d at 499. If the Executive Branch is mistaken in its interpretation of the law and also able to preclude a court from correcting that interpretation, then the agency will have escaped electoral recourse for an unpopular "choice that was the agency's to make all along." *Id.*

Judicial review also promotes congressional accountability. When Congress has in fact made a decision to impose a legal constraint on an agency, judicial review enforces and safeguards that decision, making clear that Congress—and not the Executive—is responsible for it. No matter where the Court lands on

**AR5657**

10

the correct interpretation of the law, judicial review thus increases transparency and accountability.

To force instead the judicial and legislative branches to reap what the executive branch has sown strikes at the heart of democratic accountability and the separation of powers.  And yet that is precisely what an administrative official does when she "claim[s] that the law ties her hands while at the same time denying the courts' power to unbind her." *NAACP* v. *Trump*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018), *cert. before judgment granted*, 139 S. Ct. 2779 (No. 18-588).  A critical duty of the judiciary is to ensure that the increasing power of the administrative state does not go unchecked.  Fulfilling that duty means courts cannot "leave it to the agency to decide when it is in charge." *City of Arlington*, 569 U.S. at 327 (Roberts, C.J., dissenting).

## II.  THE DECISION TO RESCIND DACA IS REVIEWABLE BECAUSE IT RESTS ON A NON-DISCRETIONARY BELIEF ABOUT WHAT THE LAW REQUIRES

The decision to universally end deferred status for 800,000 people is based on the Department's view that the law required that result.  It does not reflect an exercise of discretion but a legal judgment, which this Court may evaluate by reference to meaningful standards.  Even if this Court were to consider the Secretary's supplemental justifications for rescinding DACA, they are not the sort of discretionary justifications that *Chaney* suggested would be unreviewable.  Rather, they stem from (and ratify) the Department's ultimate legal conclusion.  To find that legal conclusion unreviewable would represent a dramatic expansion of Section 701(a)(2).

11

### A. The Department Concluded That The Law Required It To Rescind DACA

In her memorandum of September 5, 2017, then-acting Secretary of Homeland Security Elaine C. Duke explained that the law required her to rescind DACA. Taking into consideration rulings from the Supreme Court and the Fifth Circuit "in the ongoing litigation," she wrote, and "the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." *Regents*, Pet. App. 117a (Duke memorandum). The letter of the Attorney General itself had been crystal-clear that DACA was illegal: "DACA was effectuated … without proper statutory authority." It was "an open-ended circumvention of immigration laws" and an "unconstitutional exercise of authority by the Executive Branch." JA 877 (Sessions letter).

What the government calls "litigation risk" cannot serve as the sort of discretionary consideration that precludes judicial review. Pet. Br. 27. As an initial matter, it is unclear what role—if any—"litigation risk" played in the decision to rescind DACA. To be sure, the Sessions letter noted that DAPA had been enjoined nationwide and that DACA would likely face a similar result. JA 877-878. Yet the Duke memorandum, while noting the Attorney General's prediction, did not expressly include it as a "consideration" driving the Secretary's decision.

In any event, the "litigation risk" alluded to in the Duke memorandum is not the type of discretionary consideration discussed in *Chaney* (*i.e.*, one that takes into account a "complicated balancing of a number of factors … peculiarly within [the Department's] expertise."). *Chaney*, 470 U.S. at 831. Instead, the Duke

12

memorandum tied the threat of litigation to the conclusion that DACA suffered the same legal infirmities as DAPA and so would be enjoined.  *See NAACP*, 298 F. Supp. 3d at 234, *adhered to on denial of recons.*, 315 F. Supp. 3d 457 (D.D.C. 2018) ("[T]he Department's conclusion that the Fifth Circuit's decision to uphold a preliminary injunction of DAPA suggests that a court would likely also impose a preliminary injunction of DACA necessarily relies on the Department's legal analysis of the similarities between the two policies—which, like the Department's view of DACA's legality itself, does not qualify for *Chaney's* presumption of unreviewability.").  While acting on the consideration of litigation risk could conceivably be a discretionary decision in another context, here the alleged "litigation risk" is no more than an outgrowth of the agency's legal conclusion about the illegality of DACA.  Where that is the case, judicial review is proper.[3]

Even assuming the Court sees fit to consider the belated justifications in then-Secretary Nielsen's memorandum of June 22, 2018, none of her reasons insulates the decision to rescind DACA from judicial review.  At the outset, the Nielsen memorandum ratifies the reasoning given in the Duke memorandum.  It "decline[s] to disturb the Duke memorandum," and notes that the decision of then-acting Secretary Duke to rescind DACA "was, and remains, sound."  *Regents*, Pet. App. 121a.  The Nielsen memorandum then goes on to detail

---

[3] To hold otherwise would insulate from judicial review any agency action based on a legal conclusion, provided the action also includes "as an additional, 'discretionary' justification the assertion that a court would likely agree with the agency's interpretation."  *NAACP*, 298 F. Supp. 3d at 233.

AR5660

13

several justifications for rescinding DACA, which do nothing to convert the rescission of DACA from a legal decision to a discretionary one.

First, the Nielsen memorandum considers (again) and finds convincing the Attorney General's conclusion that DACA was contrary to law. *Regents*, Pet. App. at 122a. Second, the memorandum cites "serious doubts about" the legality of DACA, noting that there are "sound reasons" for an agency not to pursue a legally questionable policy. *Id.* at 123a. But the stated reasons—maintaining public confidence in the rule of law, the "threat of burdensome litigation"—are plainly tethered to the legal conclusion about the questionable legality of the DACA policy. *Id.* Indeed, the "threat of burdensome litigation" is no different than the "potentially imminent litigation" cited in the Duke memorandum. *Regents*, Pet. App. at 116a.

Finally, the Nielsen memorandum includes several "reasons of enforcement policy" that counsel in favor of ending DACA. By and large, these alleged policy reasons relate back to the conclusion that DACA is unlawful. The first policy rationale—that DHS should not adopt DACA until that policy is permitted by statute—of course rests on the premise that DACA is *not* permitted by statute. The second stated policy reason—that deferral should be granted only on an individual basis—was discussed in the Duke memorandum as indicia of the policy's unlawfulness. *Regents*, Pet. App. 112a. Leaving no doubt as to the basis for that justification, the Nielsen memorandum is express that DACA's blanket deferral approach is not "consistent with the INA." *Id.* at 124a.

The final stated policy reason in the Nielsen memorandum—the importance of messaging that the immi-

**AR5661**

14

gration laws will be enforced against "all classes and categories of aliens"—is an impermissible post-hoc justification that this Court should not consider. *Regents*, Pet. App. 124a. It cannot be traced to any stated rationale in the Duke memorandum or the Sessions letter. But even were it not offered too late, the "solitary sentence" about messaging cannot "wholly transmute[] the explanation for DACA's rescission from an issue of law into an issue of policy." *NAACP*, 315 F. Supp. 3d at 471.

### B.  This Court Can And Should Review The Department's Conclusion That DACA Violates The Law

Guided by the INA, the Executive's historic discretion over immigration, and its own precedent on deferred action, this Court has clear standards by which to evaluate the legal conclusion that DACA must be terminated. This is not a "*single-shot* non-enforcement decision." *Crowley Caribbean Transp.*, 37 F.3d at 676. It is a sweeping enforcement policy that "purport[s] to speak to a broad class of parties." *Id.* at 677. Indeed, it does more than purport to speak; it invokes the coercive power of the government against hundreds of thousands of individuals who now stand to lose their deferred action status and its attendant benefits. *Chaney*, 470 U.S. at 832. "[R]escissions of commitments, whether or not they technically implicate liberty and property interests as defined under the fifth and fourteenth amendments, exert much more direct influence on the individuals or entities to whom the repudiated commitments were made." *Robbins* v. *Reagan*, 780 F.2d 37, 47 (D.C. Cir. 1985).

Judicial review is not simply appropriate in this case. It is urgent. Agency decisions about enforcement

15

typically do not leave aggrieved parties seeking the court's protection from the coercive power of the government. For that reason, they may be understood not to require judicial review. *Chaney*, 470 U.S. at 832. This case presents precisely the opposite situation. Claiming the law left no choice, the Executive Branch ended a program that granted deferred status to nearly 800,000 people brought to the United States as children, making Dreamers subject to a coercive power from which they were previously exempt absent special individual circumstances. The President himself expressed support for DACA, calling on Congress to legalize the program and insisting that blame for the Secretary's unpopular action lay with the Legislature. Donald Trump (@realDonaldTrump), Twitter (Sept. 14, 2017, 5:28 AM) ("Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!"), https://preview.tinyurl.com/y378dsy9; Donald Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 PM) ("Congress now has 6 months to legalize DACA"), https://tinyurl.com/y2auprfo.

The Executive may not declare that the law requires an unpopular outcome, lament that outcome, and then proclaim that outcome to be insulated from judicial review. That sort of buck passing is an affront to our constitutional system.

AR5663

16

## CONCLUSION

The Court should affirm the reviewability of petitioners' decision to rescind DACA.

Respectfully submitted.

ALAN E. SCHOENFELD  
MARGUERITE COLSON  
WILMER CUTLER PICKERING  
   HALE AND DORR LLP  
7 World Trade Center  
250 Greenwich Street  
New York, NY 10007  
(212) 937-7518  

SETH P. WAXMAN  
   *Counsel of Record*  
WILMER CUTLER PICKERING  
   HALE AND DORR LLP  
1875 Pennsylvania Ave., NW  
Washington, DC 20006  
(202) 663-6800  
seth.waxman@wilmerhale.com  

OCTOBER 2019

AR5664

1a

# APPENDIX A

## List of Amici Curiae

**Ash Bhagwat**
Martin Luther King, Jr. Professor of Law and
Boochever and Bird Endowed Chair for the Study
and Teaching of Freedom and Equality
UC Davis School of Law

**William W. Buzbee**
Professor of Law
Georgetown University Law Center

**Cary Coglianese**
Edward B. Shils Professor of Law
University of Pennsylvania Law School

**Michael C. Dorf**
Robert S. Stevens Professor of Law
Cornell Law School

**Cynthia R. Farina**
William G. McRoberts Research Professor in
Administrative Law, Emerita
Cornell Law School

**William Funk**
Lewis & Clark Distinguished Professor of Law
Emeritus
Lewis & Clark Law School

**Michael Herz**
Arthur Kaplan Professor of Law
Benjamin N. Cardozo School of Law

**Ronald M. Levin**
William R. Orthwein Distinguished Professor of Law
Washington University School of Law

**AR5665**

2a

**Jerry L. Mashaw**
Sterling Professor Emeritus of Law and Professorial Lecturer
Yale Law School

**Thomas O. McGarity**
Joe R. and Teresa Lozano Long Endowed Chair in Administrative Law
University of Texas School of Law

**Nina Mendelson**
Joseph L. Sax Collegiate Professor of Law
University of Michigan Law School

**Jon Michaels**
Professor of Law
UCLA School of Law

**Richard J. Pierce, Jr.**
Lyle T. Alverson Professor of Law
George Washington University School of Law

**Arden Rowell**
Professor of Law
University of Illinois College of Law

**Joshua D. Sarnoff**
Professor of Law
DePaul University College of Law

**Mark Seidenfeld**
Patricia A. Dore Professor of Administrative Law
The Florida State University College of Law

**Peter M. Shane**
Jacob E. Davis and Jacob E. Davis II Chair in Law
The Ohio State University Moritz College of Law

**Peter L. Strauss**
Betts Professor of Law Emeritus
Columbia Law School

**AR5666**

3a

**Wendy Wagner**
Richard Dale Endowed Chair
University of Texas School of Law

**AR5667**

Nos. 18-587, 18-588, and 18-589

# In the Supreme Court of the United States

———————

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
*PETITIONERS*,

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,
*RESPONDENTS*

———————

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE NINTH CIRCUIT*

———————

**BRIEF OF FORMER SERVICE SECRETARIES, MODERN MILITARY ASSOCIATION OF AMER- ICA, AND MILITARY AND VETERAN ADVO- CACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS**

———————

PETER E. PERKOWSKI
Modern Military
  Association of America
P.O. Box. 65301
Washington, DC  20035
(202) 328-3244
peter@modernmilitary.org

*Counsel for* Amicus Curiae
*Modern Military Association
of America*

CHARLES B. KLEIN
  *Counsel of Record*
CLAIRE A. FUNDAKOWSKI
Winston & Strawn LLP
1700 K Street, N.W.
Washington, DC  20006
(202) 282-5000
cklein@winston.com

*Counsel for* Amici Curiae

Additional Captions and Counsel
Listed on Inside Cover

**AR5668**

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., *PETITIONERS*,

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, ET AL., *RESPONDENTS.*

————————

*ON WRIT OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT*

————————

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, ET AL., *PETITIONERS*,

*v.*

MARTÍN JONATHAN BATALLA VIDAL, ET AL.,
*RESPONDENTS.*

————————

*ON WRIT OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

————————

HARVEY WEINER
Peabody & Arnold LLP
600 Atlantic Avenue
Boston, MA 02210
hweiner@peabodyarnold.com

Counsel for *Amicus Curiae*
Jewish War Veterans of the USA

**AR5669**

# <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

INTERESTS OF *AMICI CURIAE* ............................. 1

STATEMENT ................................................. 5

SUMMARY OF ARGUMENT ..................................... 8

ARGUMENT ................................................. 9

I.  The Government Must Consider Serious Reliance Interests When Changing Existing Policy ........................................ 9

II.  DACA Engendered Serious Reliance Interests on the Part of Non-Citizens Enlisted in the Military, Their Families, and the American People ............................. 11

    A.  Foreign-Born Recruits Are Integral to the U.S. Military and Vital to Its Mission ................................. 11

    B.  Enlistees Rely on DACA for Eligibility to be Employed by the Military and for a Path to Citizenship ............................. 14

    C.  Enlistees' Families Rely on DACA for the Possibility of Parole in Place or Deferred Action ............................. 18

    D.  The U.S. Military Relies on Non-Citizens, Including DACA

**AR5670**

ii

Recipients, to Protect the American
People.....................................................20

III.    The Government Violated the APA When
It Rescinded DACA Without Considering
Serious Reliance Interests.............................29

CONCLUSION .........................................................31

AR5671

iii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Burlington Truck Lines, Inc. v. United*
    *States,*
    371 U.S. 156 (1962) ............................................... 30

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) ................................. 9, 10, 31

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ............................................. 10

*Motor Vehicle Mfrs. Ass'n v. State Farm*
    *Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................ 9

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) ............................................ 30

**Statutes**

5 U.S.C. § 706(2)(A) ..................................................... 9

8 U.S.C. § 1439.......................................................... 15

8 U.S.C. § 1439(a) ...................................................... 15

8 U.S.C. § 1439(f) ...................................................... 15

8 U.S.C. § 1440.......................................................... 15

8 U.S.C. § 1440(a) ...................................................... 15

8 U.S.C. § 1440(c)....................................................... 15

**AR5672**

iv

10 U.S.C. § 504(b)(2) ........................................... *passim*

10 U.S.C. § 513(b)(1)-(3) ........................................... 17

38 U.S.C. §§ 3311 ........................................... 16

38 U.S.C. § 3702 ........................................... 16

**Regulations**

8 C.F.R. § 274a.12(c)(14) ........................................... 6

32 C.F.R. § 199.3 ........................................... 16

**Other Authorities**

Air Force News, *The U.S. Military Helps Naturalize Non-Citizens* (2019), https://www.military.com/join-armed-forces/eligibility-requirements/the-us-military-helps-naturlize-non-citizens.html ........................ 23

Baldor, Lolita, *Problems for Pentagon's immigrant recruit program*, AP NEWS (Sept. 30, 2018), https://www.apnews.com/84530d3799 004a0a8c15b3d11058e030 ................................... 22

Bennett, Jonah, *Pentagon: Fewer Than 900 DACA Recipients Are Currently Serving In The Military* (Sept. 6, 2017), https://stream.org/pentagon-fewer-than-900-daca-recipients-are-currently-serving-in-the-military/ ....................... 13

**AR5673**

v

Bowman, Tom, *Citizenship For Military Service Program Under Fire*, NPR (July 11, 2017), https://www.npr.org/2017/07/11/53663 0223/citizenship-for-military-service-program-under-fire ................................................ 16

Exec. Order 13,269, 67 Fed. Reg. 45287 (July 3, 2002) ................................................. 13, 15

Chief of Naval Personnel Public Affairs, SECNAV Releases Updated Diversity, Inclusion Policy Statement (Feb. 25, 2016), *available at* https://www.navy.mil/submit/display. asp?story_id=93282 ........................................ 23, 28

Chishti, Muzaffar, et al., *Immigrants in the Military: Evolving Recruitment Needs Can Accommodate National Security Concerns* (May 2019), https://www.migrationpolicy.org/sites/ default/files/publications/MPI-Noncitizens-Military-Final.pdf ............................ 24

Courtney, Paul Vincent, *Prohibiting Sexual Orientation Discrimination in Public Accommodations: A Common Law Approach*, 163 U. Pa. L. Rev. 1497 (2014-2015) ................................................. 26

Dep't of Def., Defense Language Transformation Roadmap 3 (Jan. 2005) http://www.defense.gov/news /mar2005/d20050330roadmap.pdf ....................... 27

**AR5674**

vi

Dep't of Def., *DoD Announces Policy Changes to Lawful Permanent Residents and the Military Accessions Vital to the National Interest (MAVNI) Pilot Program* (Oct. 13, 2017), https://www.defense.gov /Newsroom/Releases/Release/Article/1 342317/dod-announces-policy-changes-to-lawful-permanent-residents-and-the-military-acc/ ..................... 15, 16

Dep't of Def., MAVNI Fact Sheet, https://dod.defense.gov/news/mavni-fact-sheet.pdf ......................................... 14

Dep't of Def., *Population Representation in the Military Services: Fiscal Year 2010 Summary Report, available at* https://www.cna.org/pop-rep/2010 /summary/PopRep10summ.pdf ........................... 12

Dep't of Def., *Population Representation in the Military Services: Fiscal Year 2016 Summary Report, available at* https://www.cna.org/pop-rep/2016 /summary/summary.pdf. ................... 12, 14, 21, 24

Dep't of Def., *Remarks by Secretary Hagel at the Lesbian, Gay, Bisexual, Transgender Pride Month Event in the Pentagon Auditorium* (June 25, 2013), http://archive.defense.gov /transcripts/transcript.aspx?transcrip tid=5262 ............................................................ 27

**AR5675**

vii

Dep't of Homeland Security, *MAVNI Program Status for Fiscal Year 2017* (Dec. 2, 2016), https://www.ice.gov /doclib/sevis/pdf/bcm-1612-02.pdf ........................ 14

Eric Fanning, *Immigration reform: An Army recruitment opportunity* (Jan. 8, 2018), https://thehill.com/opinion/national-security/367839-immigration-reform-an-army-recruitment-opportunity. ........................ 21, 22, 23

Eric Fanning, *Secretary of the Army: America's Diversity is Our Army's Strength*, Ass'n of the U.S. Army (Oct. 1, 2016), *available at* https://www.ausa.org/articles/secretary-army-america%E2%80%99s-diversity-our-army%E2%80%99s-strength .............................. 28

Gates, Gary J., The Williams Inst., *Effects of "Don't Ask, Don't Tell" on Retention Among Lesbian, Gay and Bisexual Military Personnel* (2007), *available at* https://williamsinstitute.law.ucla.edu/ wp-content/uploads/Gates-EffectsOfDontAskDontTellOnRetenti on-Mar-2007.pdf .................................................. 26

AR5676

viii

Horton, Alex, *Foreign-born recruits, promised citizenship by the Pentagon, flee the country to avoid deportation*, Washington Post (July 17, 2017), https://www.washingtonpost.com/news/checkpoint/wp/2017/07/17/foreign-born-recruits-promised-citizenship-by-the-pentagon-flee-the-country-to-avoid-deportation/ ................................................ 18

Horton, Alex, *The military looked to 'dreamers' to use their vital skills. Now the U.S. might deport them.*, Washington Post (Sept. 7, 2017), https://www.washingtonpost.com/news/checkpoint/wp/2017/09/07/the-military-looked-to-dreamers-to-use-their-vital-skills-now-the-u-s-might-deport-them ........................................... 17

Memorandum from Deborah Lee James, Secretary of the Air Force, Air Force Diversity & Inclusion (Mar. 4, 2015), *available at* https://www.af.mil/Portals/1/documents/SECAF/FINALDiversity_Inclusion_Memo1.pdf ...................................................... 22, 28

McIntosh, Molly F., et al., *Non-Citizens in the Enlisted U.S. Military* (Nov. 2011), *available at* https://www.cna.org/CNA_files/PDF/D0025768.A2.pdf ......................................... 22, 23, 29

AR5677

ix

Military Leadership Diversity
    Commission, *From Representation to*
    *Inclusion: Diversity Leadership for the*
    *21st-Century Military, Final Report xvi*
    (2011), https://www.hsdl.org
    /?view&did=11390 ................................................ 27

National Immigration Forum, *For Love of Country:*
    *New Americans Serving in our Armed Forces:*
    *Executive Summary* (Nov. 7, 2017),
    https://immigrationforum.org/article/love-country-
    new-americans-serving-armed-forces-2/.............. 29

New American Economy, *Outside the*
    *Wire: How Barring the DACA-Eligible*
    *Population from Enlisting Weakens*
    *our Military* (Nov. 8, 2017),
    https://research.newamericaneconomy
    .org/report/outside-the-wire-how-
    barring-the-daca-eligible-population-
    from-enlisting-weakens-our-military/ ..... 14, 24, 25

U.S. Citizenship and Immigration Servs.,
    *Adjudicator's Field Manual*, ch.
    21.1(c)........................................................ 18, 19, 20

U.S. Citizenship and Immigration Servs.,
    *Military Naturalization Statistics*,
    https://www.uscis.gov/military/militar
    y-naturalization-statistics (last
    updated Dec. 6, 2018)..................................... 13, 15

**AR5678**

x

U.S. Citizenship and Immigration Servs.,
*USCIS Facilities Dedicated to the*
*Memory of Immigrant Medal of Honor*
*Recipients*, https://www.uscis.gov
/about-us/find-uscis-office/uscis-
facilities-dedicated-memory-
immigrant-medal-honor-recipients
(last updated Jan. 24, 2014).................................. 12

U.S. Gov't Accountability Office,
*Immigration Enforcement: Actions*
*Needed to Better Handle, Identify, and*
*Track Cases Involving Veterans* 7
(2019) ........................................................ 14, 17, 18

Memorandum from Jessica Wright,
Undersecretary of Defense for
Personnel and Readiness, Military
Accessions Vital to the National
Interest Program Changes (Sept. 25,
2014) .................................................................... 13

Jie Zong & Jeanne Batalova, *Immigrant*
*Veterans in the United States* (May
16, 2019),
https://www.migrationpolicy.org/articl
e/immigrant-veterans-united-states............. 12, 29

**AR5679**

1

## INTERESTS OF *AMICI CURIAE*[1]

The *amici curiae* are Secretary Eric Fanning, Secretary Deborah Lee James, Secretary Ray Mabus, the Modern Military Association of America (MMAA), the National Veterans Legal Services Program (NVLSP), Jewish War Veterans of the USA (JWV), Blue Star Families, Minority Veterans of America (MVA), and Swords to Plowshares.  *Amici* share a common interest in policies that enhance the U.S. military's readiness and protect the interests of service members and their families.

Secretary Eric K. Fanning served as the 22nd U.S. Secretary of the Army.  As Secretary, he had statutory responsibility for all matters related in the United States Army, including manpower, personnel, and reserve affairs.  Previously, he served as Chief of Staff to the Secretary of Defense, as Acting Secretary of the Air Force, as Under Secretary of the Air Force, and as Deputy Under Secretary of the Navy/Deputy Chief Management Officer.  He is the only person to have held senior appointments in all three military departments and the Office of the Secretary of Defense.

Secretary Deborah Lee James served as the 25th U.S. Secretary of the Air Force.  Previously, she served in the Pentagon as the Assistant Secretary of Defense for Reserve Affairs, where she was the Secretary of Defense's Senior Advisor on National Guard

---

[1] This brief is filed with the consent of the parties pursuant to Supreme Court Rule 37.3(a).  In accordance with Supreme Court Rule 37.6, counsel for *amici curiae* states that no counsel for any party authored this brief in whole or in part, and no person other than *amici curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

2

and Reserve personnel.  As a professional staff member on the House Armed Services Committee, she served as Senior Advisor to the Military Personnel and Compensation Subcommittee, the NATO Burden Sharing Panel, and the Chairman's Member Services team.

Secretary Ray Mabus served as the 75th U.S. Secretary of the Navy from 2009 to 2017, the longest to serve as leader of the Navy and Marine Corps since World War I.  Throughout his tenure, he focused on four key priorities—People, Platforms, Power, and Partnerships—that enabled the Navy and Marine Corps' unique ability to maintain the global presence that reassures our allies and deters our adversaries. Among his achievements, he spearheaded the "21st Century Sailor and Marine" initiative, which was designed to build and maintain the most resilient and ready force possible and to prepare service members and their families for the high-tempo operations of today's military.

MMAA is one of the country's largest non-profit, non-partisan legal services, policy, and watchdog organizations serving lesbian, gay, bisexual, transgender, and queer (LGBTQ) military personnel, veterans, military spouses, family members, and allies, as well as individuals living with HIV.  MMAA was formed through the merger of the American Military Partner Association and OutServe-SLDN, Inc., and it has over 75,000 members and supporters. MMAA has a unique understanding of the challenges faced by the populations it serves.  Since 1993, MMAA and its predecessor entities have assisted over 12,500 clients.

**AR5681**

3

MMAA regularly engages in high-profile litigation and participates as *amicus curiae* to challenge policies that target, stigmatize, or otherwise negatively affect service members and their families—reducing morale and diminishing military readiness by inhibiting the military's efforts at recruiting and retention. For example, MMAA has filed lawsuits challenging laws and regulations that discriminate against and stigmatize LGBTQ service members, including: the former "Don't Ask, Don't Tell" law requiring that lesbian, gay, and bisexual service members conceal their sexual orientation; regulations prohibiting same-sex military spouses from receiving spousal benefits; the current ban on openly transgender people serving in the U.S. military; and regulations negatively affecting service members with HIV. MMAA has a strong interest in advocating for its members who may be affected by DACA's rescission as well as an interest in advocating for a ruling in this case that would affirm the need for government agencies to consider how their policy choices would harm the military by stigmatizing and otherwise negatively affecting service members and their families.

NVLSP is an independent nonprofit organization that has worked since 1981 to ensure that our nation's 22 million veterans and active duty personnel receive the federal benefits they have earned through service to our nation. NVLSP advocates before federal agencies, courts, and Congress to protect service members and veterans irrespective of whether they joined the military as citizens or non-citizens. NVLSP has represented thousands of individual service members and veterans, served as counsel for certified classes of veteran-plaintiffs, and participated as

**AR5682**

4

*amicus curiae* in support of service members and veterans in numerous agency and court actions.

JWV, organized in 1986 by Jewish veterans of the Civil War, is the oldest active national veterans' service organization in America. Incorporated in 1924, and chartered by an act of Congress in 1983, *see* 36 U.S.C. § 110103, JWV's objectives include to "encourage the doctrine of universal liberty, equal rights, and full justice to all men," *id* § 110103(5), "combat the powers of bigotry and darkness wherever originating and whatever the target", *id* § 110103(6), and "preserve the spirit of comradeship by mutual helpfulness to comrades and their families," *id* § 110103(7).

JWV has long taken an interest in the right to serve in the military. Jewish immigrants and refugees have fought and died for America, particularly in World War II against the Nazis. Over one third of the Jews awarded the Congressional Medal of Honor were born in a foreign country.

Blue Star Families is a national, nonprofit organization that exists to support active-duty members, veterans, and their families from all ranks and services—including National Guard and Reserve. BSF strengthens military families and connects America to the Armed Forces through a robust array of morale, empowerment, education and employment programs. Additionally, BSF's annual Military Family Lifestyle Survey creates opportunities to support the health and sustainability of our all-volunteer Force by increasing dialogue and understanding between the military community and broader American society.

Blue Star Families exists to support military families, regardless of their documented legal status. We,

**AR5683**

5

therefore, join with the MMAA in advocating for a ruling that would affirm the need for government agencies to consider how their policy choices would harm the military by stigmatizing and otherwise negatively affecting service members and their families.

MVA is a nonprofit organization dedicated to creating community belonging and advancing equality for minority veterans, including veterans of color, women veterans, LGBTQ veterans, and (non)religious minority veterans. MVA is built on four fundamental values: inclusivity, advocacy, allyship, and education. By advocating for the needs of veteran communities without a majority voice, MVA strives to improve the lives of veterans who may otherwise be forgotten.

Swords to Plowshares is a community-based not-for-profit organization that provides needs assessment and case management, employment and training, housing, and legal assistance to veterans in the San Francisco Bay Area. Swords to Plowshares promotes and protects the rights of veterans through advocacy, public education, and partnerships with local, state, and national entities.

## STATEMENT

On September 5, 2017, the Government issued a brief memorandum rescinding the Deferred Action for Childhood Arrivals program (DACA). Since 2012, DACA, implemented by the Department of Homeland Security (DHS), has conferred life-changing benefits to nearly 800,000 non-citizens. In addition to DACA's promise of a reduced likelihood of removal, these benefits include numerous advantages under existing policies, such as the ability to obtain employment

6

lawfully. *See* 8 C.F.R. § 274a.12(c)(14). DACA has permitted its recipients to remain in the United States with their families and obtain a 91% employment rate, benefitting not only DACA recipients, but also strengthening and maintaining their families.

The American people also rely on DACA to enhance U.S. national security through military readiness. As of September 2017, when the Government rescinded DACA, over 800 DACA recipients were actively serving in the U.S. military under the Military Accessions Vital to the National Interest program (MAVNI). That program allows the military to recruit non-citizens who have skills "vital to the national interest," including health care professionals and individuals with specific language and cultural skills. *See* 10 U.S.C. § 504(b)(2). The U.S. military has relied on the efforts of these non-citizens, including DACA recipients, to further such vital national interests that promote national security and protect Americans.

The Government overlooked such reliance interests when rescinding DACA. The rescission memorandum contains just one sentence explaining the Government's rationale for changing its existing policy: "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017, letter from the Attorney General, it is clear that the June 15, 2012, DACA program should be terminated." *Regents* Pet. App. 117a.

Numerous parties brought actions alleging that the Government's decision to rescind DACA was unlawful on several grounds, including that the rescission was arbitrary and capricious under the Adminis-

**AR5685**

7

trative Procedure Act (APA). Three of these cases are now before the Court: *Department of Homeland Security v. Regents of the University of California*, No. 18-587 (*Regents*), in the Ninth Circuit; *McAleenan v. Batalla Vidal*, No. 18-589 (*Batalla Vidal*), in the Eastern District of New York; and *Trump v. NAACP*, No. 18-588 (*NAACP*), in the District Court for the District of Columbia. The courts below have uniformly agreed to enjoin or vacate the Government's decision to rescind DACA.

In *Regents*, the Ninth Circuit affirmed a preliminary injunction requiring, among other things, that the Government "allow[] DACA enrollees to renew their enrollments." *Regents* Pet. App. 66a; *Regents* Pet. Supp. App. 45a-46a. The Eastern District of New York preliminarily enjoined the rescission of DACA on similar terms. *Batalla Vidal* Pet. App. 126-128a. Both courts concluded that the Government's rescission of DACA was likely arbitrary and capricious, determining that the Government's sole rationale for rescinding DACA relied on a legally erroneous premise. *Regents* Pet. App. 42a; *Batalla Vidal* Pet. App. 91a. In *Batalla Vidal*, the court further explained that the Government "acted arbitrarily and capriciously by ending [the DACA] program without taking any account of reliance interests that program has engendered." *Batalla Vidal* Pet. App. 113-117a.

In *NAACP*, the District Court for the District of Columbia granted partial summary judgment against the Government and vacated the rescission of DACA, holding that it violated the APA's substantive requirements. The court emphasized that the "Department's failure to give an adequate explanation of its legal judgment was particularly egregious here in light of the reliance interests involved," which "en-

AR5686

8

gendered the reliance of hundreds of thousands of beneficiaries, many of whom had structured their education, employment, and other life activities on the assumption that they would be able to renew their DACA benefits." *NAACP* Pet. App. 54a. The court stayed its mandate for ninety days "to allow the agency an opportunity to better explain its rescission decision." *Id.* at 3a.

In response, on June 22, 2018, DHS Secretary Kirstjen M. Nielsen issued a second memorandum "declin[ing] to disturb the Duke memorandum's rescission of the DACA policy." *Regents* Pet. App. 121a. The Nielsen memorandum stated, "I am keenly aware that DACA recipients have availed themselves of the policy in continuing their presence in this country and pursuing their lives," but concluded "I do not believe that the asserted reliance interests outweigh the questionable legality of the DACA policy and the other reasons for ending the policy discussed above." *Id.* at 125a. Secretary Nielsen's memorandum did not mention, much less address, the reliance interests of DACA family members, or how the U.S. military relies on DACA to advance national security, which in turn serves the interests of the American people.

On August 3, 2018, the *NAACP* court concluded the Nielsen memorandum did not alter the court's earlier conclusions. *NAACP* Pet. App. 80a-109a. The Government petitioned for writs of certiorari in all three cases. The Court granted certiorari and consolidated the cases for briefing and oral argument.

## SUMMARY OF ARGUMENT

This Court should affirm the decisions below, which correctly enjoined or vacated the Government's decision to rescind DACA on the basis of arbitrary

9

and capricious agency action in violation of the APA. The Government provided a legally deficient rescission rationale because, among other reasons, it failed to address how "longstanding [DACA] policies may have engendered serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). For example, the Government did not adequately consider the "serious reliance interests" of DACA beneficiaries who have enlisted in the military and are pursuing a path to citizenship, the interests of military family members who are direct or indirect beneficiaries of DACA, and the interests of the American people, who rely on a military that has been significantly strengthened by the DACA program.

## ARGUMENT

The courts below have uniformly—and correctly—preliminarily or permanently set aside the Government's rescission of DACA on the basis of arbitrary and capricious agency action. This Court should affirm.

## I. The Government Must Consider Serious Reliance Interests When Changing Existing Policy.

The APA directs that arbitrary and capricious Government actions be set aside as unlawful. 5 U.S.C. § 706(2)(A). While "[a]gencies are free to change their existing policies," they must "provide a reasoned explanation for the change." *Encino*, 136 S. Ct. at 2125. If the explanation for the policy change "entirely fail[s] to consider an important aspect of the problem," it will not survive arbitrary-and-capricious review. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

10

To survive such review, the Government must demonstrate it is "cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Encino*, 136 S. Ct. at 2126. The Government also must explain its reason "for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

In *Encino*, this Court set aside a policy change for failure to consider serious reliance interests. There, the Court recognized that the retail automobile and truck industry had "significant reliance interests" in an agency's prior position that service advisors were exempt from certain overtime pay provisions. 136 S. Ct. at 2126. These significant reliance interests included the compensation plans negotiated between dealerships and service advisors, which the Court recognized "could necessitate systemic, significant changes" under the agency's revised policy. *Ibid.* The Court also observed that dealerships who failed to compensate their service advisors under the revised policy could face significant liability. *Ibid.*

Where, as in *Encino*, significant reliance interests are present, the agency must provide "a more reasoned explanation for its decision to depart from its existing enforcement policy." *Ibid.* And where an agency's proffered rationale "f[a]ll[s] short of the agency's duty to explain why it deemed it necessary to overrule its previous position," the agency's change in position is arbitrary and capricious and therefore unlawful under the APA. *Id.* at 2126-27.

AR5689

11

## II. DACA Engendered Serious Reliance Interests on the Part of Non-Citizens Enlisted in the Military, Their Families, and the American People.

DACA offers more than deferred removal, and the program affects more than its direct beneficiaries. DACA recipients and their families benefit from numerous pre-exiting policies, which they would not have access to but for DACA. DACA recipients are eligible for employment authorization documents, commonly known as work permits, and recipients with specialized medical or linguistic and cultural skills are eligible to enlist through MAVNI. For those who have enlisted, the military offers the opportunity to serve their adopted country and a path to citizenship. This policy keeps families with non-citizens together and, as explained in depth below, offers the possibility of deferred action or parole in place regardless of DACA eligibility.

For the American people, DACA has facilitated the military readiness on which the country depends, such as enabling the military to approach its recruiting and retention goals by leveraging immigrant and minority communities with unique skills vital to the national interest. DACA has promoted these expectations for more than five years.

### A. Foreign-Born Recruits Are Integral to the U.S. Military and Vital to Its Mission.

The United States has long relied on foreign-born recruits to protect our country. From the Revolutionary War through the 1840s, half of the U.S. military's

**AR5690**

12

recruits were foreign born.[2]  During the Civil War, approximately 300,000 foreign-born members of the military served in the Union Army.  *Ibid.*  These and other foreign-born recruits account for half a million of our country's veterans, more than 700 of whom have received Medals of Honor.  *Ibid.*[3]

Our country's reliance on foreign-born recruits—and specifically, non-citizens—has persisted in recent decades.  Between 1999 and 2010, "some 80,000 non-citizens enlisted across all four services, accounting for 4 percent of all accessions" among the Army, Navy, Air Force, and Marine Corps.[4]  As of June 2010 alone, approximately 16,500 non-citizens were actively serving in the military.  *Id.* at 39.  Another 5,255 non-citizens first enlisted in the military in 2016.[5]

In light of our military's seasoned reliance on the foreign born, it is not surprising that our Government has repeatedly recognized the importance of non-citizen recruits to the U.S. military.  Nearly two dec-

---

[2] Jie Zong & Jeanne Batalova, *Immigrant Veterans in the United States* (May 16, 2019), https://www.migrationpolicy.org/article/immigrant-veterans-united-states.

[3] *See also* U.S. Citizenship and Immigration Servs., *USCIS Facilities Dedicated to the Memory of Immigrant Medal of Honor Recipients*, https://www.uscis.gov/about-us/find-uscis-office/uscis

-facilities-dedicated-memory-immigrant-medal-honor-recipients (last updated Jan. 24, 2014).

[4] Dep't of Def., *Population Representation in the Military Services: Fiscal Year 2010 Summary Report*, at 41, *available at* https://www.cna.org/pop-rep/2010/summary/PopRep10summ.pdf.

[5] Dep't of Def., *Population Representation in the Military Services: Fiscal Year 2016 Summary Report*, at 41, *available at* https://www.cna.org/pop-rep/2016/summary/summary.pdf.

13

ades ago, President George W. Bush issued an Executive Order creating an incentive for non-citizens to serve in the military in exchange for expedited naturalization. Exec. Order 13,269, 67 Fed. Reg. 45287 (July 3, 2002). Under this program, as of 2018, the U.S. Citizenship and Immigration Services (USCIS) reports that "[s]ince Oct. 1, 2001, USCIS has naturalized 129,587 members of the military."[6] In 2008, the Secretary of Defense authorized the MAVNI program, designed to recruit non-citizens who have skills that are "vital to the national interest," including health care professionals and individuals with specific language and cultural skills. *See* 10 U.S.C. § 504(b)(2).

Most recently, in 2014, the Department of Defense provided a pathway for DACA recipients to enlist in the military under MAVNI.[7] As of September 2017, more than 800 highly skilled DACA recipients were serving in the U.S. military through MAVNI.[8] Many more await final background checks so that they too can begin serving. These DACA recipients, along with other MAVNI service members, possess "critical skills" and are "vital" to protecting the American people.

---

[6] U.S. Citizenship and Immigration Servs., *Military Naturalization Statistics*, https://www.uscis.gov/military/military-naturalization-statistics (last updated Dec. 6, 2018).

[7] Memorandum from Jessica Wright, Undersecretary of Defense for Personnel and Readiness, *Military Accessions Vital to the National Interest Program Changes* (Sept. 25, 2014).

[8] Jonah Bennett, *Pentagon: Fewer Than 900 DACA Recipients Are Currently Serving In The Military* (Sept. 6, 2017), https://stream.org/pentagon-fewer-than-900-daca-recipients-are-currently-serving-in-the-military/.

14

### B. Enlistees Rely on DACA for Eligibility to be Employed by the Military and for a Path to Citizenship.

DACA opened a path for certain non-citizens to obtain work permits and to serve in the military if they possess a "critical skill or expertise" that is both "vital to the national interest" and useful to the armed forces on a daily basis. *See* 10 U.S.C. § 504(b)(2). For example, the military's MAVNI recruiting program targets immigrants with critical medical skills or expertise in certain foreign languages and cultures.[9] The program has recruited 10,400 immigrants from 2008 to 2016.[10,11] In 2016 alone, 359 MAVNI recruits were talented immigrants who could not have participated in the program without DACA.[12]

---

[9] Dep't of Def., MAVNI Fact Sheet, 1, https://dod.defense.gov/news/mavni-fact-sheet.pdf.

[10] U.S. Gov't Accountability Office, *Immigration Enforcement: Actions Needed to Better Handle, Identify, and Track Cases Involving Veterans* 7 (2019).

[11] MAVNI recruiting was indefinitely suspended at the end of fiscal year 2016 pending the implementation of increased security protocols. *See* Dep't of Homeland Security, *MAVNI Program Status for Fiscal Year 2017* (Dec. 2, 2016), https://www.ice.gov/doclib/sevis/pdf/bcm-1612-02.pdf. As discussed below, many MAVNI recruits still await the completion of their background checks so that they can begin serving.

[12] New American Economy, *Outside the Wire: How Barring the DACA-Eligible Population from Enlisting Weakens our Military* (Nov. 8, 2017), https://research.newamericaneconomy.org/report/outside-the-wire-how-barring-the-daca-eligible-population-from-enlisting-weakens-our-military/; *see also* Dep't of Def., MAVNI Fact Sheet, 1.

**AR5693**

15

DACA beneficiaries rely on military service to provide a path to citizenship. The United States has long granted citizenship to non-citizens in exchange for their military service. *See* Exec. Order 13,269, 67 Fed. Reg. 45287 (July 3, 2002). By permitting DACA beneficiaries to enlist in the military, the Government has provided them the opportunity to earn citizenship by serving honorably for one year under 8 U.S.C. § 1439(a), or by serving honorably on active duty for a shorter period under 8 U.S.C. § 1440(a).[13] More than 129,000 immigrants earned their citizenship through military service between the attacks on September 11, 2001, and the end of last year. U.S. Citizenship and Immigration Servs., *Military Naturalization Statistics*.

DACA also enables its beneficiaries who have skills vital to the national interest an opportunity to serve in the U.S. military and to become lawful citizens of the country in which they were raised. Beneficiaries wanting to serve and undertake the benefits and responsibilities of citizenship enlisted. After enlisting, they organized their lives around the com-

---

[13] On October 13, 2017, the Department of Defense announced that instead of requiring a single day of active-duty service it would require 180 days before certifying honorable service under 8 U.S.C. § 1440(a). Dep't of Def., *DoD Announces Policy Changes to Lawful Permanent Residents and the Military Accessions Vital to the National Interest (MAVNI) Pilot Program* (Oct. 13, 2017), https://www.defense.gov/Newsroom/Releases/Release/Article/1342317/dod-announces-policy-changes-to-lawful-permanent-residents-and-the-military-acc/. Citizenship granted under either 8 U.S.C. § 1439 or 8 U.S.C. § 1440 could be revoked if the soldier was "separated from the Armed Forces under other than honorable conditions before the person ha[d] served honorably for a period or periods aggregating five years." 8 U.S.C. §§ 1439(f), 1440(c).

16

mitment to hold themselves constantly ready to serve as soon as their background investigations finished.

Rescinding DACA undermines the reliance interests inherent in the life-changing demands of military service, as well as the path to citizenship offered through the MAVNI program. Like all non-citizens—including otherwise lawful permanent residents—DACA beneficiaries who enlisted are unable to begin basic training until their background investigations are completed.[14] Less than two months before DACA's rescission, NPR reported that more than 4,000 MAVNI recruits were awaiting basic training.[15] Without DACA's protection, DACA recruits awaiting training or who have not served long enough to apply for citizenship will lose their eligibility to participate in MAVNI. They also risk losing their work permits and a range of military employment benefits, including health care, home loans, and educational funds, that generally vest only after a recruit begins or completes a specified term of active-duty service. *See* 38 U.S.C. §§ 3311, 3702; 32 C.F.R. § 199.3. In addition to threatening enlistees' ability to access these benefits, DACA's rescission even threatens enlistees with the prospect of being deported.

This threat was not eliminated by the grandfathering provisions in the DACA rescission memorandum. DHS announced that it would not terminate previously issued deferred action determinations or

---

[14] *See* Dep't of Def., *DoD Announces Policy Changes to Lawful Permanent Residents and the Military Accessions Vital to the National Interest (MAVNI) Pilot Program* (Oct. 13, 2017).

[15] Tom Bowman, *Citizenship For Military Service Program Under Fire*, NPR (July 11, 2017), https://www.npr.org/2017/07/11/536630223/citizenship-for-military-service-program-under-fire.

AR5695

17

work permits based on the rescission. *Regents* Pet. App. 118a. It also announced that, if requested within 30 days, it would consider a one-time renewal of DACA benefits for individuals whose periods of deferred action were set to expire within 180 days. *Ibid.* But DACA benefits last only two years. *Regents* Pet. App. 99-100a. Military background checks take up to three. *See* 10 U.S.C. § 513(b)(1)-(3). This means that DACA beneficiaries face a very real prospect that they will lose their DACA benefits before obtaining background clearance, getting scheduled for training, and freeing themselves of the need for DACA by completing the term of service necessary to obtain citizenship.[16]

This fear of deportation after DACA's rescission is not merely hypothetical. A recent report by the Government Accountability Office states that DHS has a system of policies in place for deporting veterans—and that the protections the system offers are not consistently observed. U.S. Gov't Accountability Office, *Immigration Enforcement*, 10-12. Although the data is incomplete, available records show that "approximately 250 veterans were placed in removal proceedings or removed from the United States from fiscal years 2013 through 2018." *Id.* at 16. At the

---

[16] *See, e.g.*, Alex Horton, *The military looked to 'dreamers' to use their vital skills. Now the U.S. might deport them.*, Washington Post (Sept. 7, 2017), https://www.washingtonpost.com/news/checkpoint/wp/2017/09/07/the-military-looked-to-dreamers-to-use-their-vital-skills-now-the-u-s-might-deport-them/ (reporting on plight of recruits like Zion Dirgantara, a MAVNI recruit awaiting the completion of his background check who came to the United States at the age of 12, did not know he lacked lawful status until he applied for a driver's license, and now finds himself alongside "hundreds of others in a race against time to avoid deportation back to now unfamiliar nations").

18

time of the study, about 115 of them had been ordered removed and only 25 had been granted relief or protection from removal. *Ibid.* Recruits who have not served are likely to receive less favorable treatment. Some have already fled the country to avoid deportation to countries where they believe their lives would be in danger.[17]

### C. Enlistees' Families Rely on DACA for the Possibility of Parole in Place or Deferred Action.

Enlistees' families also have relied on DACA. In addition to families' general interest in policies that protect their relatives from deportation—and consequently keep families together—DACA grants family members access to additional benefits as well.

USCIS offers consideration for parole in place or deferred action to the families of service men and women, with the goal of "[f]acilitating military morale and readiness and supporting DoD recruitment policies." U.S. Citizenship and Immigration Services, *Adjudicator's Field Manual*, Chapter 21.1(c). Parole in place is a one-year period of authorization to stay in the United States, subject to extensions as appropriate. *Id.* at Chapter 21.1(c)(1).

---

[17] Alex Horton, *Foreign-born recruits, promised citizenship by the Pentagon, flee the country to avoid deportation*, Washington Post (July 17, 2017), https://www.washingtonpost.com/news/checkpoint/wp/2017/07/17/foreign-born-recruits-promised-citizenship-by-the-pentagon-flee-the-country-to-avoid-deportation/ (telling story of Ranj Rafeeq, an Iraqi Kurd who translated for the U.S. military in 2005 and came to the United States in 2012 hoping to join the Army after earning a graduate degree in civil engineering but who fled to Canada in fear that his path to citizenship would fail and that he would become a target of the Islamic State if deported to Iraq).

19

Although a grant of parole in place is discretionary, the fact that an immediate family member serves in the U.S. military "ordinarily weighs heavily in favor of parole in place," so that a grant of parole in place is generally appropriate absent a criminal conviction or other serious adverse factors. *Ibid.* Parole in place is available only to individuals who are not lawfully admitted to the United States. *Ibid.* Parolees are eligible to apply for work permits during the period of their parole. *Ibid.*

Deferred action for family members of service members is similar to parole in place, but it is available only to individuals who have been lawfully admitted to the United States and have overstayed their authorized period of admission. *Id.* at Chapter 21.1(c)(2)(A). Deferred action is available in two-year increments and, like parole in place, makes the recipient eligible to apply for work permits. *Id.* at Chapter 21.1(c)(2)(C). Deferred action determinations are "case-by-case, discretionary judgments based on the totality of the evidence." *Id.* at Chapter 21.1(c)(2)(A).

Although being an immediate family member of a MAVNI recruit or other enlistee awaiting basic training is no guarantee of deferred action, it is considered a strong positive factor. *Ibid.* On the other hand, USCIS may terminate any period of deferred action awarded to the family members of an enlistee awaiting basic training who later becomes disqualified from military service. *Ibid.*

As explained above, DACA's rescission placed enlistees at risk of becoming disqualified for employment and for participation in MAVNI. In so doing, it also placed family members of enlistees at risk of losing their work permits and even of being deported.

AR5698

20

This is true not only of family members who are direct beneficiaries of DACA, but also of family members who are beneficiaries of parole in place or of deferred action for families of service men and women. As the USCIS Adjudicator's Field Manual notes, "the family members of such recruits often lose their lawful statuses because their statuses depend on those of the recruits." *Ibid.*

Immigrant families have sacrificed for the United States by supporting their relatives in enlisting for military service. They have counted on staying together and earning a living while their relatives were on duty. Whether directly or indirectly, they relied on DACA—and their reliance interests are serious.

### D. The U.S. Military Relies on Non-Citizens, Including DACA Recipients, to Protect the American People.

The serious consequences of DACA's rescission extend to the American people, who rely on having a strong, ready military to promote and defend U.S. national interests. Unraveling DACA will negatively affect the military's ability to recruit and retain highly qualified service members, which in turn jeopardizes the protection of the American people.

1. The American people rely on a strong, ready U.S. military to promote and defend U.S. national interests. One critical component of a strong military is ensuring that the military is able to recruit and retain enough soldiers, sailors, airmen, Marines, and coast guardsmen to meet the myriad of challenges these men and women are asked to tackle every day. As a result, meeting annual accession goals is a critical component of ensuring military readiness.

**AR5699**

21

In recent years, the U.S. military, and by extension its largest branch, the U.S. Army, has "struggl[ed] to find candidates who meet [its] requirements."[18]   Because only 30% of potential recruits qualify to join the military, in 2017, the U.S. Army Recruiting Command was "forced to lower its recruiting standards in hopes of reaching its goal of 80,000 new soldiers." *Ibid.*   In 2016, 1.6% of Army recruits placed in the bottom third of military exams, *ibid.*—scores that typically lead the Army to deny enlistment—  and only 56% of Army recruits were deemed "high-quality personnel."  Dep't of Def., *Population Representation in the Military Services: Fiscal Year 2016 Summary Report*, at 3, 17.  Yet as difficulties with military recruitment have risen, Congress has directed the Army to increase its number of active-duty soldiers.  Fanning, *Immigration reform: An Army recruitment opportunity* (Jan. 8, 2018).

DACA recipients do not just add necessary numbers to the U.S. military; they also bring necessary skills.  As a statutory prerequisite to enlistment as non-citizens without green cards, each of the hundreds of DACA recipients enlisted in the military must possess "critical skill[s] . . . vital to the national interest."  10 U.S.C. § 504(b)(2).  These and other MAVNI recruits serve an important role in the military's ability to protect the American people.  As explained by Air Force Maj. Carla Gleason, a Pentagon spokeswoman, "the unique skill sets these individuals bring is one of the reasons the U.S. military is the

---

[18] Eric Fanning, *Immigration reform: An Army recruitment opportunity* (Jan. 8, 2018), https://thehill.com/opinion/national-security/367839-immigration-reform-an-army-recruitment-opportunity.

22

world's premier fighting force."[19]  Former Secretary of the Army Eric Fanning has likewise explained that MAVNI recipients serve an important role in forming "a skilled, diverse military force with high levels of integrity that can adapt to today's emerging threats." Fanning, *Immigration reform: An Army recruitment opportunity* (Jan. 8, 2018).  Removing protections for these vital service members and subjecting such service members to discharge runs counter to American interests in protecting our country.

Research and practice have confirmed that noncitizen service members, such as DACA recipients, meet critical needs for the military.  As the Center for Naval Analyses (CNA) observed, "noncitizens are [] an attractive recruiting resource" because "a substantial share of the recruitable U.S. non-citizen population comes from diverse backgrounds and potentially possesses language and cultural skills that are of strategic interest to the U.S. military."[20]  Recognizing the importance of such language and cultural skills, Former Secretary of the Air Force Deborah Lee James emphasized, "diversity of background, experience, demographics, perspective, thought and even organization are essential to our ultimate success."[21] Former Secretary of the Navy Ray Mabus echoed this

---

[19] Lolita Baldor, *Problems for Pentagon's immigrant recruit program*, AP NEWS (Sept. 30, 2018), https://www.apnews.com/84530d3799004a0a8c15b3d11058e030.

[20] Molly F. McIntosh et al., *Non-Citizens in the Enlisted U.S. Military*, at 57 (Nov. 2011), *available at* https://www.cna.org/CNA_files/PDF/D0025768.A2.pdf.

[21] Memorandum from Deborah Lee James, Secretary of the Air Force, Air Force Diversity & Inclusion (Mar. 4, 2015), *available at* https://www.af.mil/Portals/1/documents/SECAF/FINALDiversity_Inclusion_Memo1.pdf.

23

sentiment, explaining "[a] more diverse force is a stronger force."[22]  As succinctly stated by Secretary Fanning, "[o]ur nation's military is stronger when it reflects the diversity it aims to defend."  Fanning, *Immigration reform: An Army recruitment opportunity* (Jan. 8, 2018).  Today, the military continues to target recruits who are "more diverse linguistically and culturally than citizen recruits . . . [because they are] particularly valuable as the U.S. faces the challenges of the Global War on Terrorism."[23]

CNA projects that non-citizens likely will play a crucial role in meeting recruitment goals in coming years, and thus recommends that "the services should develop strategies to recruit non-citizens more effectively."  McIntosh et al., *Non-Citizens in the Enlisted U.S. Military*, at 2 (Nov. 2011).  Notably, "non-citizen recruits are significantly and substantially less likely than citizen recruits to attrite in the first term."  *Ibid.*  After three years, "attrition rates for non-citizens are between nine and 20 percentage points lower than those for white citizens, the largest demographic group in the military."  Air Force News, *The U.S. Military Helps Naturalize Non-Citizens* (2019).  Other analysts have similarly estimated that the attrition rate for non-citizens is more than 10% lower than for

---

[22] Chief of Naval Personnel Public Affairs, SECNAV Releases Updated Diversity, Inclusion Policy Statement (Feb. 25, 2016), *available at* https://www.navy.mil/submit/display.asp?story_id =93282.

[23] Air Force News, *The U.S. Military Helps Naturalize Non-Citizens* (2019), https://www.military.com/join-armed-forces/eligibility-requirements/the-us-military-helps-naturlize-non-citizens.html.

24

citizens, "meaning that noncitizens are more likely to serve in the military for extended periods of time."[24]

The Department of Defense's data has reinforced the significance of the American people's interest in the military's ability to recruit and retain non-citizens, including DACA recipients. In 2016, the Department of Defense reported that "the majority of non-citizen [non-prior service] accessions are high-quality recruits, with Tier 1 education credentials and an [Armed Forces Qualification Test] score in the top 50 percentiles." Dep't of Def., *Population Representation in the Military Services: Fiscal Year 2016 Summary Report*, at 42. In the Army, the Department of Defense observed that 4.8% of accessions in 2016 were non-citizens, and "[a] higher percentage of non-citizen accessions in the Army were high quality compared to citizen accessions (66 percent versus 54 percent)." *Id.* at 41-42. That same year, hundreds of DACA recipients newly enlisted in the Army. New American Economy, *Outside the Wire: How Barring the DACA-Eligible Population from Enlisting Weakens our Military* (Nov. 8, 2017).

The military's reliance on programs such as DACA to protect the American people is not limited to those DACA recipients who currently serve in the military. Analysts have estimated that the military could target many more DACA recipients to improve military readiness. Of the 45 languages the military has deemed "vital to military success," the New American Economy estimated that "[m]ore than 169,000 mem-

---

[24] Muzaffar Chishti, et al., *Immigrants in the Military: Evolving Recruitment Needs Can Accommodate National Security Concerns* (May 2019), https://www.migrationpolicy.org/sites/default/files/publications/MPI-Noncitizens-Military-Final.pdf.

25

bers of the DACA-eligible population—or more than one in seven of them—speak one of these languages at home." *Ibid.* This organization further concluded that "a substantial portion of the DACA-eligible population has language or workforce training that could help address the military's recruitment challenges." *Ibid.* The authors thus concluded that "[t]here is a strategic advantage to having [DACA recipients] serve in the military, as they will have cultural and linguistic expertise which could be of critical importance." *Ibid.*

Unraveling of DACA protections will likely dissuade these many qualified recipients from enlisting in the military due to the lengthy delays in accession and uncertainty surrounding shipment dates, making it difficult for the military to meet its recruiting goals. Upon rescission of DACA, the military is likely to find that a large number of potential high-quality recruits are ineligible for accession or have left the United States. Thus, a policy with the stated goal of improving the country's national security is likely to undermine that goal by impairing military readiness.

2. In addition to recruitment and retention, another key component of a strong military is morale. As precedent has shown in other contexts, however, ignoring the reliance interests of DACA recipients could significantly damage the relationship of currently serving DACA recipients to the military, undermining their morale and negatively impacting unit cohesion, thus curbing the military's ability to recruit and retain additional non-citizens and immigrants unaffected by DACA.

For example, history has shown that discriminatory policies such as Don't Ask Don't Tell (DADT)—

**AR5704**

26

which prohibited military service by openly lesbian, gay, and bisexual people—diminished morale among active and prospective LGB service members. One analysis studying the negative effects of DADT estimated that in 2004 alone, "nearly 1,000 active duty LGB soldiers would have been retained if they had been able to serve and be open about their sexual orientation."[25] Even more would have joined but for DADT. *See ibid.* And evidence suggests that discriminatory policies like DADT affected morale and recruitment and retention even among those who were not directly subject to it, such as service members or prospective service members with LGB relatives.[26] Repeal of DADT corrected this: As explained by then-Secretary of Defense Chuck Hagel upon DADT's repeal, permitting service members to "serve openly, with full honor, integrity, and respect . . . makes our military and our nation stronger."[27]

A discriminatory policy like DACA rescission here would likely have the same detrimental effects on

---

[25] *See, e.g.,* Gary J. Gates, The Williams Inst., *Effects of "Don't Ask, Don't Tell" on Retention Among Lesbian, Gay and Bisexual Military Personnel* (2007), *available at* https://williamsinstitute.law.ucla.edu/wp-content/uploads/Gates-EffectsOfDontAskDontTellOnRetention-Mar-2007.pdf; *accord*

[26] *See* Paul Vincent Courtney, *Prohibiting Sexual Orientation Discrimination in Public Accommodations: A Common Law Approach*, 163 U. Pa. L. Rev. 1497, 1534 (2014-2015) ("[D]iscrimination harms not only the dignity of the immediate victim of the discriminatory act but also the dignity and autonomy of those who, fearing such discrimination, feel forced to comply with heterosexual norms.").

[27] Dep't of Def., *Remarks by Secretary Hagel at the Lesbian, Gay, Bisexual, Transgender Pride Month Event in the Pentagon Auditorium* (June 25, 2013), http://archive.defense.gov/transcripts/transcript.aspx?transcriptid=5262.

AR5705

27

military morale as DADT did. The negative effects of rescission would spread to a broader population of non-citizens, immigrants, and others who simply seek to serve their Nation with honor and dignity, volunteering to face extreme hardships, endure lengthy deployments and separation from family and friends, and to willingly make the ultimate sacrifice of their lives.

Another insidious effect of declining morale and reduced recruitment and retention of non-citizens will be that fewer foreign-born service members will advance to senior-enlisted positions, resulting in a less diverse military leadership to the military's detriment. Ongoing concern over diversity in the military's leadership recently prompted Congress to establish what became the Military Leadership Diversity Commission (MLDC), an independent body comprised of current and former military officers, senior enlisted personnel, and civilians.[28] As the MLDC reported, "[i]ncluding a broad range of men and women from different backgrounds can increase the likelihood that the U.S. military 'knows the enemy' and is better able to work with international partners by adding to the cultural and linguistic knowledge base from which U.S. forces may draw." *Id.* at 17.[29]

---

[28] *From Representation to Inclusion: Diversity Leadership for the 21st-Century Military, Final Report xvi* (2011), https://www.hsdl.org/?view&did=11390.

[29] *See also* Dep't of Def., Defense Language Transformation Roadmap 3 (Jan. 2005) https://apps.dtic.mil/dtic/tr/fulltext/u2/b313370.pdf (describing the need for expertise on "less-commonly-taught languages" in order to sustain coalitions, pursue regional stability, and conduct multi-national missions.).

28

The U.S. military has shared MLDC's concerns over the importance of diversity to national security. In describing strategies imperative to military readiness, Secretary Mabus observed that "[o]rganizations that embrace myriad backgrounds and perspectives will attract the best talent and remain ready" to protect the American people.  Chief of Naval Personnel, *SECNAV Releases Updated Diversity, Inclusion Policy Statement* (Feb. 25, 2016).  Secretary Fanning likewise observed that "most importantly, [the U.S. military] need[s] teams of people who think differently from one another and yet are joined together in common cause."[30]  He therefore advised that "we must harness the power of diverse teams and draw further from one of America's greatest advantages: our diverse population."  *Ibid.*  As Secretary James emphasized, "diversity and inclusion are not programs or initiatives; they are national security imperatives and critical force multipliers."  Secretary James Memorandum (Mar. 4, 2015).

A reduction in the number of leaders acting as prominent immigrant role models in the military would create a negative feedback loop, further inhibiting the military's ability to recruit and retain future generations of foreign-born service members.  But this population is critical for the future health of the U.S. military:  Analysts have observed that immigrants are an important population to recruit in the military because "immigration is projected to be the only source of net growth in the U.S. population

---

[30] Eric Fanning, Secretary of the Army: America's Diversity is Our Army's Strength (Oct. 1, 2016), *available at* https://www.ausa.org/articles/secretary-army-america%E2%80%99s-diversity-our-army%E2%80%99s-strength.

29

among 18- to 24-year-olds in the coming decades." McIntosh et al., *Non-Citizens in the Enlisted U.S. Military*, at 57. The number of potential recruits multiplies when considering children of immigrants. Nearly 1.9 million veterans are children of immigrants, accounting for 10% of all veterans. Zong & Batalova, *Immigrant Veterans in the United States*. Thus in coming years, "the segment of the population most likely to enlist[] will come entirely from immigrants and the children of immigration."[31]

Rescinding policies such as DACA—which relinquish the protections of active and prospective service members based on their country of origin—will impede the military's ability to retain quality service members for years to come. The immediate and future harms to the composition of the U.S. military adversely affects military readiness and frustrates it from reaching its goals, contrary to the interests of the American people.

## III. The Government Violated the APA When It Rescinded DACA Without Considering Serious Reliance Interests.

Despite the breadth of reliance by DACA recipients, their families, and the military itself, the Duke memorandum contained a single sentence purportedly explaining the Government's rationale for changing its existing policy: "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017, letter from the Attorney General, it is clear that the June

---

[31] National Immigration Forum, *For Love of Country: New Americans Serving in our Armed Forces: Executive Summary* (Nov. 7, 2017), https://immigrationforum.org/article/love-country-new-americans-serving-armed-forces-2/.

30

15, 2012, DACA program should be terminated." *Regents* Pet. App. 117a. No other analysis regarding the interests of those relying on the DACA program were provided. In short, the Government did not consider any reliance interests at all.

Secretary Nielsen's memorandum, published more than nine months after the rescission, merely consists of post-hoc rationalizations that cannot overcome the inadequacies of the original rescission memorandum. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) (agency action may be "upheld, if at all, on the same basis articulated in the order by the agency itself") (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Even if the Nielsen memorandum were given weight, the D.C. District Court correctly noted that it failed to offer meaningful consideration of "DACA's benefits to DACA recipients and to society at large." *NAACP* Pet. App. 107a. The memorandum conveys only a blanket recognition "that DACA recipients have availed themselves of the policy in continuing their presence in this country and pursuing their lives." *Regents* Pet. App. 125a. Nowhere does it consider the indirect beneficiaries of DACA, the sacrifice and service of currently enlisted DACA recipients and their families, or the serious risks posed to the American public if the military lost access to a significant number of non-citizen recruits.

DACA has engendered serious reliance interests for each of these stakeholders. Their interests deserved due consideration by the Government before deciding to rescind that policy.

The Government's bases for rescinding DACA fall far short of the reasoned explanation the APA re-

**AR5709**

31

quires.  As in *Encino*, "[w]hatever potential reasons the Department might have given, the agency in fact gave almost no reasons at all" for rescinding DACA. 136 S. Ct. at 2127.  "In light of the serious reliance interests at stake, the [Government's] conclusory statements do not suffice to explain its decision." *Ibid.*  The Government's decision to rescind DACA is entitled to no deference and should be held unlawful under the APA.

## CONCLUSION

For the foregoing reasons, the Supreme Court should affirm the judgments and orders below.

Respectfully submitted.

PETER E. PERKOWSKI
Modern Military
  Association of America
P.O. Box. 65301
Washington, DC  20035
peter@modermilitary.org

Counsel for *Amicus Curiae* Modern Military Association of America

CHARLES B. KLEIN
*Counsel of Record*
CLAIRE A. FUNDAKOWSKI
Winston & Strawn LLP
1700 K Street, N.W.
Washington, DC  20006
(202) 282-5000
cklein@winston.com

Counsel for *Amici Curiae*

HARVEY WEINER
Peabody & Arnold LLP
600 Atlantic Avenue
Boston, MA 02210
hweiner@peabodyarnold.com

Counsel for *Amicus Curiae* Jewish War Veterans of the USA

OCTOBER 2019

Nos. 18-587, 18-588, and 18-589

# In the Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

*V.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,

*Respondents.*

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE NINTH CIRCUIT*

**BRIEF OF THE UNITED STATES CONFERENCE OF CATHOLIC BISHOPS AND OTHER CHRISTIAN ORGANIZATIONS IN SUPPORT OF RESPONDENTS**

CHRISTOPHER J. WRIGHT
STEPHEN W. MILLER
  *Counsel of Record*
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street NW, Fl. 8
Washington, DC 20036
(202) 730-1300
smiller@hwglaw.com

October 4, 2019       *Counsel for Amici Curiae*

Additional Captions Listed on Inside Cover

**AR5711**

---

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

*Petitioners,*

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.,

*Respondents.*

---

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT*

---

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.,

*Respondents.*

---

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT*

---

**AR5712**

i

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES........................................ ii

STATEMENT OF INTEREST .................................... 1

SUMMARY OF ARGUMENT.................................... 4

ARGUMENT ............................................................. 5

I.   The Decision to Rescind DACA is Arbitrary
     and Capricious Because DHS Failed to
     Consider the Severe Individual and Social
     Harm of Family Separation................................... 7

II.  Disturbing the Preliminary Injunction Before
     the Completion of Litigation Would Inequitably
     Cause Irreparable Harm to DACA Recipients
     and Their Families and Harm the Public
     Interest. ............................................................. 13

CONCLUSION ....................................................... 17

LIST OF *AMICI CURIAE* ........................................ 1a

AR5713

ii

# TABLE OF AUTHORITIES

**Cases**                                        **Page(s)**

*Amoco Production Co. v. Village of Gambell,*
    480 U.S. 531 (1987)...............................................13

*Ashcroft v. American Civil Liberties Union,*
    542 U.S. 656 (2004)...............................................15

*Department of Homeland Security v. Regents*
    *of the University of California,*
    139 S. Ct. 2779 (2019)..........................................14

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016)........................................7, 9

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009).......................................7–9, 14

*National Cable & Telecommunications Ass'n v.*
    *Brand X Internet Services,*
    545 U.S. 967 (2005).................................................7

*Railroad Commission of Texas v. Pullman Co.,*
    312 U.S. 496 (1941)...............................................14

*Regents of the University of California v. United*
    *States Department of Homeland Security,*
    908 F.3d 476 (9th Cir. 2018)...............................14

*Securities and Exchange Commission v. Chenery*
    *Corp.,* 332 U.S. 194 (1947)....................................7

**AR5714**

iii

**TABLE OF AUTHORITIES**—Continued

*Stanley v. Illinois,*
    405 U.S. 645 (1972) ................................................9

*Upper Skagit Indian Tribe v. Lundgren,*
    138 S. Ct. 1649 (2018) ........................................14

*Weinberger v. Romero–Barcelo,*
    456 U.S. 305 (1982) ............................................14

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) ................................................13

**Statutes and Legislative Material**

5 U.S.C. §§ 551–559... .................................................7

5 U.S.C. § 706 .............................................................7

29 U.S.C. § 2601 .........................................................9

H.R. Rep. No. 101-723(I) (1990), *reprinted in*
    1990 U.S.C.C.A.N. 6710....................................10

S. Rep. No. 89-748 (1965), *reprinted in*
    1965 U.S.C.C.A.N. 3328....................................10

**AR5715**

iv

**TABLE OF AUTHORITIES**—Continued

## Other Authorities

Ashley Feasley et al., *Serving Separated and Reunited Families: Lessons Learned and the Way Forward to Promote Family Unity*, United states Conference of Catholic Bishops/Migration and Refugee Services and Lutheran Immigration and Refugee Service (Oct. 2018), https://justiceforimmigrants.org/wp-content/uploads/2018/10/Serving-Separated-and-Reunited-Families_Final-Report-10.16.18-updated-2.pdf uploads/2018/10/Serving-Separated-and-Reunited-Families_Final-Report-10.16.18-updated-2.pdf ........................................12

Carol Zimmermann, *Catholic College Presidents Pledge Support for Students with DACA Status*, Nat'l Catholic Reporter (Dec. 1, 2016), https://www.ncronline.org/news/politics/catholic-college-presidents-pledge-support-students-daca-status ...........................................................2

*Catholic Social Teaching on Immigration and the Movement of Peoples*, UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, http://www.usccb.org/issues-and-action/human-life-and-dignity/immigration/catholic-teaching-on-immigration-and-the-movement-of-peoples.cfm ...........................................................5a

**AR5716**

v

**TABLE OF AUTHORITIES**—Continued

Colleen Kraft, *AAP Statement Opposing Separation of Children and Parents at the Border*, American Academy of Pediatrics (May 8, 2018), https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/StatementOpposingSeparationof ChildrenandParents.aspx .................................... 13

*Deferred Action for Childhood Arrivals (DACA) Data Tools*, Migration Policy Institute (Aug. 31, 2018), https://www.migrationpolicy.org/programs/data-hub/deferred-action-child hood-arrivals-daca-profiles ................................... 5

Irma Becerra, *Note to Congress — it's time to step up and protect DREAMers*, Washington Business Journal (Sept. 6, 2019), https://www.bizjournals.com/washington/news/2019/09/06/viewpoint-note-to-congress-it-s-time-to-step-up.html .................................................. 1

John DeFrain et al., *Why are Families So Important?*, NebGuide (Sept. 23, 2008), http://extensionpubs.unl.edu/publication/9000016366318/creating-a-strong-family/ ............ 9

Julie Zauzmer, *'If They Come for You, They Come For Me,'* The Washington Post (Jan. 19, 2018), https://www.washingtonpost.com/news/acts-of-faith/wp/2018/01/19/if-they-come-for-you-they-come-for-me-if-congress-fails-to-save-daca-this-priest-could-be-deported/ ...................................... 3

**AR5717**

vi

**TABLE OF AUTHORITIES**—Continued

Msgr. Agostino Marchetto, *Address in Brussels, Belgium,* The Holy See (July 10, 2007), http://www.vatican.va/roman_curia/ secretariat_state/2007/documents/rc_ seg-st_20070710_migrazione-sviluppo_ en.html. ............................................................10

Omolara T. Uwemedimo et al., *A Dream Deferred: Ending DACA Threatens Children, Families, and Communities*, 140 Pediatrics 1 (Dec. 2017), https://pediatrics.aappublications.org/content/ pediatrics/140/6/e20173089.full.pdf. .............10, 11

*Overcoming the Odds: The Contributions of DACA-Eligible Immigrants and TPS Holders to the U.S. Economy*, New American Economy, (June 3,2019),https://www.newamerican economy.org/wp-content/uploads/2019/05/ DACA-TPS_Brief.pdf .............................................5

Pope John Paul II, *Familiaris Consortio* 42 (1981) ...................................................................9

Samantha Artiga and Barbara Lyons, *Family Consequences of Detention / Deportation: Effects on Finances, Health, and Well-Being*, Kaiser Family Foundation, 1–2 (Sept. 18, 2018), https://www.kff.org/disparities-policy/issue- brief/family-consequences-of-detention- deportation-effects-on-finances-health-and- well-being/ .....................................................11, 12

**AR5718**

vii

**TABLE OF AUTHORITIES**—Continued

Seth Freed Wessler, *Shattered Families: The
    Perilous Intersection of Immigration
    Enforcement and the Child Welfare System*,
    Applied Research Center (Nov. 2, 2011),
    https://www.raceforward.org/research/
    reports/shattered-families?arc=1. ......................10

Shruti Simha, *The Impact of Family Separation
    on Immigrant and Refugee Families* 80 North
    Carolina Medical Journal 95 (2019), http://
    www.ncmedicaljournal.com/content/80/2/95
    .full...............................................................11, 12

*Statement from USCCB President Cardinal
    Daniel N. DiNardo of Galveston-Houston*,
    United States Conference of Catholic
    Bishops (Sept. 5, 2017), http://www.usccb.
    org/news/2017/17-157.cfm...................................16

*Quotes from Church Teachings on the Rights of
    Migrants and Refugees*, United States
    Conference of Catholic Bishops, http://
    www.usccb.org/issues-and-action/human
    -life-and-dignity/migrants-refugees-and-
    travelers/quotes-rights-migrants-refugees.
    cfm ...................................................................17

**AR5719**

viii

**TABLE OF AUTHORITIES**—Continued

United States Citizenship and Immigration
    Services, Approximate DACA Receipts as of
    June 30, 2019 (2019), https://www.uscis.gov/
    sites/default/files/USCIS/Resources/Reports
    %20and%20Studies/Immigration%20Forms
    %20Data/Static_files/DACA_Population_
    Receipts_since_Injunction_Jun_30_2019.
    pdf.................................................................5, 10

**AR5720**

1

### STATEMENT OF INTEREST[1]

*Amici cvriae* are the Association of Catholic Colleges and Universities (ACCU), Catholic Charities USA (CCUSA), Catholic Health Association (CHA), Catholic Legal Immigration Network, Inc. (CLINIC), the Center for Migration Studies (CMS), the Council for Christian Colleges and Universities (CCCU), the United States Conference of Catholic Bishops (USCCB), and World Relief. A full statement of interest for each organization is provided as an Appendix to this brief.

*Amici* have long watched with pride and admiration as recipients of Deferred Action for Childhood Arrivals (DACA) live out their daily lives with hope and a determination to flourish and contribute to society: continuing to work and provide for their families, serve in the military, and receive an education.[2] *Amici* have long supported and defended DACA recipients, a position grounded in its interest in promoting the defense of human dignity in the country's immigration laws, particularly as applied to youth and families. And this interest is not abstract; indeed, the most recent data from the Catholic Legal

---

[1] All parties have provided blanket consent to the filing of *amicus curiae* briefs. No counsel for any party authored this brief in whole or in part, and no person or entity, other than *amici* or their counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

[2] *See* Irma Becerra, *Note to Congress — it's time to step up and protect DREAMers*, Wash. Bus. J. (Sept. 6, 2019), https://www.bizjournals.com/washington/news/2019/09/06/viewpoint-note-to-congress-it-s-time-to-step-up.html. Dr. Becerra is the president of Marymount University, a member of ACCU.

AR5721

2

Immigration Network Surveys indicates that over the last five years:

- 85–90% of Catholic and community immigration legal programs ("Programs") offered legal services for DACA renewals or applications, accounting for 7,000–14,000 such submissions per year;

- 41% of Programs conducted at least one DACA renewal info session as community outreach in the last year;

- DACA applications made up 18–20% of the total caseload for the Programs.

*Amici* are mindful of the effect DACA's rescission would have on religious education. For example, over seventy leaders of Catholic educational institutions have explained that their schools share a long history of welcoming students from diverse backgrounds and stressed their hope that "the students in our communities who have qualified for DACA are able to continue their studies without interruption and that many more students in their situation will be welcome to contribute their talents to our campuses."[3]

Rescinding DACA will also have a significant effect on health care provision in this country. For instance, Catholic health care provides more than 15 percent of hospital services in America. As employers of millions of dedicated health care professionals, Catholic health care has seen firsthand how DACA recipients have

---

[3] Carol Zimmermann, *Catholic College Presidents Pledge Support for Students with DACA Status*, Nat'l Catholic Reporter (Dec. 1, 2016), https://www.ncronline.org/news/politics/catholic-college-presidents-pledge-support-students-daca-status.

3

benefitted its organizations and patients as nurses, physicians, aides, dietary workers and facility professionals, and know how much they contribute to their communities and to the economy. An estimated 27,000 health care workers and support staff depend on DACA for their authorization to work in the United States. Rescinding DACA will cause them to lose their authorization to work. This will further contribute to the growing shortage of health care professionals in the United States, thereby reducing access to care across the country and the ability of hospitals and other health care facilities to maintain critical staffing levels.

*Amici* are also familiar with and thankful for the contributions that DACA recipients have made to the pastoral mission of the Catholic Church in the United States. Take, for instance, the story of Father Pineda. Fr. Pineda is a DACA recipient from Mexico who has been living in the United States since he was only two years old. While Fr. Pineda was initially told that he could not be ordained due to his unlawful status in the country, creation of the DACA program provided him with both protection and a path to fulfill his calling. Termination would harm Fr. Pineda and other DACA recipients serving our Church and faith. It would also mean parishes and communities across the country would be at risk of losing their trusted spiritual leaders.[4]

---

[4] Julie Zauzmer, *'If They Come for You, They Come for Me,'* Wash. Post (Jan. 19, 2018), https://www.washingtonpost.com/news/acts-of-faith/wp/2018/01/19/if-they-come-for-you-they-come-for-me-if-congress-fails-to-save-daca-this-priest-could-be-deported/.

AR5723

4

## SUMMARY OF ARGUMENT

This brief addresses the second question presented: whether the rescission of DACA was lawful. It concludes that rescinding DACA without considering crucial facts underlying the program—chief among them that rescinding the program would irreparably harm hundreds of thousands of families by placing them at imminent risk of separation—violates the Administrative Procedure Act (APA) and is thus unlawful.

Relatedly, this brief also addresses the preliminary injunction affirmed by the Ninth Circuit. Respondents have brought claims, including one grounded in the Equal Protection clause, that have survived motions to dismiss but have not yet been developed. Should the Court decide that the Department of Homeland Security's (DHS) decision to rescind DACA did not run afoul of the APA, the cases should return to the lower courts for factual development and trial on the merits of the constitutional claims. In the interim, the preliminary injunction currently in place should continue. While this brief does not address the likelihood of success of the Equal Protection argument, the severe and irreparable personal and social harms of family separation weigh heavily in favor of retaining that injunction.

AR5724

## ARGUMENT[5]

This case has a direct impact on the nearly 700,000 current DACA recipients,[6] as well as their families and communities. These individuals, who arrived in this country unlawfully through no fault of their own, contribute significantly to the country's culture and economy.[7] The fundamental promise of DACA is that, for individuals like these, the United States Government will deprioritize prying apart their families and forcing them to leave the only country

---

[5] To aid the Court's assessment of the issues presented here, *amici* limit their arguments to areas in which they have particular knowledge, interest, and expertise. They express no opinion as to, among other arguments, the reviewability question, nor the likelihood of success of the Equal Protection claim.

[6] U.S. Citizenship and Immigration Services, Approximate DACA Receipts as of June 30, 2019 (2019), https://www. uscis.gov/sites/default/files/USCIS/Resources/Reports%20and% 20Studies/Immigration%20Forms%20Data/Static_files/DACA_ Population_Receipts_since_Injunction_Jun_30_2019.pdf; *see also Deferred Action for Childhood Arrivals (DACA) Data Tools*, Migration Policy Inst. (Aug. 31, 2018), https://www.migration policy.org/programs/data-hub/deferred-action-childhood-arrivals -daca-profiles.

[7] *Overcoming the Odds: The Contributions of DACA-Eligible Immigrants and TPS Holders to the U.S. Economy*, New Am. Econ., (June 3, 2019), https://www.newamericaneconomy. org/wp -content/uploads/2019/05/DACA-TPS_Brief.pdf. ("Our analysis of the most recent data finds that the DACA-eligible population earned $23.4 billion in 2017 alone, up from almost $19.9 billion in 2015. And despite rhetoric claiming they are a drain on the economy, 93.3 percent of DACA-eligible individuals were actively employed in 2017 . . . . In 2017, we estimate that DACA-eligible individuals paid more than $2.2 billion in federal taxes, contributions that helped sustain troubled entitlement programs like Social Security and Medicare.").

6

they have known so long as they contribute and follow the rules.

As a product of agency action, of course, DACA is subject to being changed by subsequent agency action. But any change, up to and including rescission, must be accomplished lawfully. The APA requires an agency to engage in reasoned decisionmaking, consider the consequences of a change in policy, and explain its decision in a manner that appropriately accounts for the costs as compared to the benefits of the new policy. Here, the only justification provided for rescinding DACA was a new belief that the program was unlawful. DHS failed utterly to consider and address the drastic consequences of rescission— among them the mass-scale separation of families. This failure to consider the facts underlaying the program violates the APA, and therefore the rescission is unlawful.

Should the Court agree with Petitioners and find that the rescission did not violate the APA, Respondents have brought various other claims regarding the illegality of rescission. Due to the accelerated nature of this case before the Court, however, the lower courts have not had the opportunity to develop these claims, including a constitutional challenge. The Court should not disturb the preliminary injunction while these claims remain outstanding. Permitting families to be torn apart while these claims progress through the lower courts is precisely the kind of irreparable harm a preliminary injunction is designed to prevent. Moreover, a future victory by Respondents would be pyrrhic if any of the DACA recipients would have by then been deported and separated from their families.

7

Maintaining the status quo is in the public interest and works no harm to Petitioners who, under the injunction, remain free to make individualized enforcement decisions against recipients.

## I. THE DECISION TO RESCIND DACA IS ARBITRARY AND CAPRICIOUS BECAUSE DHS FAILED TO CONSIDER THE SEVERE INDIVIDUAL AND SOCIAL HARM OF FAMILY SEPARATION.

To comply with the Administrative Procedure Act, 5 U.S.C. §§ 551–559, before taking action an agency must first "examine the relevant data and articulate a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation omitted); 5 U.S.C. § 706(2)(A) (courts "shall" set aside agency action that is "not in accordance with law"). The basis for its action must be "set forth with such clarity as to be understandable." *Sec. and Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947). The standard is the same for "blank slate" agency action as it is for changes in prior policy. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("For if the agency adequately explains the reasons for a reversal of policy, change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." (internal quotation marks and citation omitted)).

**AR5727**

8

Importantly, however, when an agency changes a prior policy, particularly one that has "engendered serious reliance interests," *Fox Television Stations,* 556 U.S. at 515 (citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)), "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy," *id.* at 516. Agency action without adequate explanation is arbitrary and capricious, and therefore unlawful.

The agency explanation for DACA's rescission is exceptionally brief and bare. The reasoning section in the September 5, 2017 memorandum from Acting Secretary of the Department of Homeland Security, Elaine Duke, supplying the justification for rescinding DACA, states:

> Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities . . . I hereby rescind the June 15, 2012 memorandum. *Regents* Pet. App. 116a–117a.

Thus, the reason actually given for ending the program was DACA's purported illegality. The memorandum did not acknowledge, let alone weigh, the profound reliance interests and the devastating consequences of the rescission on hundreds of thousands of DACA recipients and the countless other stakeholders who have come to rely on the program.

AR5728

9

This fundamental failure by DHS to engage in reasoned decisionmaking, and the paucity of its explanation for its change of position, run afoul of the APA. Similar to *Encino Motorcars*, here, DHS "gave almost no reasons at all" for its decision. 136 S. Ct. at 2127. The Court there continued, holding that given "the serious reliance interests at stake, the Department's conclusory statements do not suffice to explain its decision. This lack of reasoned explication for a regulation that is inconsistent with the Department's longstanding earlier position results in a rule that cannot carry the force of law." *Id.* (citing *Fox Television Stations*, 556 U.S. at 515–516). The same is true here.

Making the failure more egregious is the substantial body of ignored and widely available evidence dealing with the serious harms of rescission to DACA recipients, their families, and their communities. Families are the building blocks of American society,[8] and the "integrity of the family unit has found protection in" our founding document, the Constitution itself. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). Federal legislation, such as the Family and Medical Leave Act, designed to promote "the stability and economic security of families," 29 U.S.C. § 2601(b)(1), underscores this reality. And federal immigration law has long underscored the

---

[8] *See, e.g.*, John DeFrain et al., *Why are Families So Important?*, NebGuide (Sept. 23, 2008), http://extensionpubs.unl.edu/publication/9000016366318/creating-a-strong-family/ ("Families, in all the diverse patterns, sizes, creeds, and colors they come in, are, indeed, the heart and soul of human society."); Pope John Paul II, *Familiaris Consortio* 42 (1981) ("The family has vital organic links with society, since it is its foundation and nourishes it continually.").

**AR5729**

10

"intention . . . regarding the preservation of the family unit." H.R. Rep. No. 101-723(I), at 40 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6710, 6717 (referring to "family reunification" as "the cornerstone of U.S. immigration policy"); S. Rep. No. 89-748, at 13 (1965), *reprinted in* 1965 U.S.C.C.A.N. 3328, 3332 (describing "[r]eunification of families" as "the foremost consideration").[9] Inflicting harm on families ripples out to all areas of society, as explained below.

The devastating impacts on families of harsh immigration enforcement have been documented by the Applied Research Center in its report, *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System*.[10] Most DACA recipients have a mixed-status family situation, where the loss of deferred action threatens to tear families apart. Studies show that 20% of DACA recipients are married,[11] 25% are parents of US-citizen children, [12] and 70% have family members who

---

[9] *See also* Msgr. Agostino Marchetto, *Address in Brussels, Belgium,* The Holy See (July 10, 2007), http://www. vatican. va/ roman_curia/secretariat_state/2007/documents/rc_seg-st_20070 710_migrazione-sviluppo_en.html. (immigrants "are even more in need of their own family, since for those who are far from home family support is indispensable").

[10] Seth Freed Wessler, *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System*, Applied Research Ctr. (Nov. 2, 2011), https:// www. race forward.org/research/reports/shattered-families?arc=1.

[11] U.S. Citizenship and Immigration Services, *supra* note 6.

[12] Omolara T. Uwemedimo et al., *A Dream Deferred: Ending DACA Threatens Children, Families, and Communities,* 140 Pediatrics 1 (Dec. 2017), https://pediatrics.aappublications.org/ content/pediatrics/140/6/e20173089.full.pdf.

11

are US citizens.[13] A 2018 report from the Kaiser Family Foundation, which interviewed families "that recently [i.e., since the beginning of 2017] had a family member detained or deported," along with legal service providers, found that "nearly all respondents appeared to be experiencing symptoms of depression, with the majority having a positive score on the clinical depression-screening tool. . . . Several said that chronic conditions like diabetes and hypertension have gotten worse . . . ."[14] And while perhaps obvious, these studies also show that "parents' unauthorized status creates stress for children that can threaten their health, development, and general well-being."[15]

Indeed, there is significant literature dealing with the unique and trying experiences and needs of separated children and their families. One study from the Center on the Developing Child at Harvard University shows that "persistent stress can change the brain architecture by damaging neurons in the prefrontal cortex and hippo-campus. These are centers of executive function and short-term memory and regulate thoughts, emotions, and actions."[16] Another recent study shows that children separated

---

[13] *Id.*

[14] Samantha Artiga and Barbara Lyons, *Family Consequences of Detention/Deportation: Effects on Finances, Health, and Well-Being*, Kaiser Family Found., 1–2 (Sept. 18, 2018), https:// www. kff.org/disparities-policy/issue-brief/family-consequences-of-detention-deportation-effects-on-finances-health-and-well-being/.

[15] Uwemedimo, *supra* note 12, at 2.

[16] *See* Shruti Simha, *The Impact of Family Separation on Immigrant and Refugee Families* 80 N.C. MEDICAL J. 95 (2019), http:// www. ncmedicaljournal.com/content/80/2/95.full.

12

from family members following immigration enforcement had "increased mental health issues and behavioral changes that . . . will have long-term negative impacts on their health."[17]

The trauma of separation has both short- and long-term consequences. In the short term, children experiencing trauma often have problems dealing with such basic functions as sleeping, toileting, and eating.[18] They also often have issues with "temper tantrums, detachment, anxiety, aggression, or heightened response to situations."[19] In the long-term, trauma affects "development and learning in young children, cause[s] limitations of working memory, disrupt[s] organizational skills, and affect[s] IQ."[20] "Children exposed to toxic stress have higher chances of adopting health risk behaviors in the future, leading to disease, disability, and social problems."[21] And the impact of trauma can be "compounded and that children can experience the effects of trauma long-term, across various domains in their lives (education, physical health, mental health, relationally, etc.)."[22]

---

[17] Artiga and Lyons, *supra* note 14, at 2.

[18] *Id.*

[19] Simha, *supra* note 16.

[20] *Id.*

[21] *Id.*

[22] Ashley Feasley et al., *Serving Separated and Reunited Families: Lessons Learned and the Way Forward to Promote Family Unity*, U.S. Conference of Catholic Bishops/Migration and Refugee Services and Lutheran Immigration and Refugee Serv., (Oct. 2018), https://justiceforimmigrants.org/wp-content/uploads/2018/10/Serving-Separated-and-Reunited-Families_

13

By ignoring these harms when changing its policy, DHS's action was arbitrary and capricious in violation of the APA. DACA's rescission is unlawful.

## II. DISTURBING THE PRELIMINARY INJUNCTION BEFORE THE COMPLETION OF LITIGATION WOULD INEQUITABLY CAUSE IRREPARABLE HARM TO DACA RECIPIENTS AND THEIR FAMILIES AND HARM THE PUBLIC INTEREST.

To obtain a preliminary injunction, a court must find that the plaintiff "is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). In "exercising their sound discretion, courts of equity should pay

---

Final-Report-10.16.18-updated-2.pdf   uploads/2018/10/Serving-Separated-and-Reunited-Families_Final-Report-10.16.18-updated-2.pdf; *see also* Colleen Kraft, *AAP Statement Opposing Separation of Children and Parents at the Border*, Am. Acad. of Pediatrics (May 8, 2018), https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/StatementOpposingSeparationof ChildrenandParents.aspx ("Separating children from their parents contradicts everything we stand for as pediatricians – protecting and promoting children's health. In fact, highly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short- and long-term health. This type of prolonged exposure to serious stress - known as toxic stress - can carry lifelong consequences for children.").

**AR5733**

14

particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982); *see also R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941). And the Court may affirm a preliminary injunction on any basis supported by the record. *See, e.g.*, *Upper Skagit Indian Tribe v. Lundgren*, 138 S. Ct. 1649, 1654 (2018) ("[W]e have discretion to affirm on any ground supported by the law and the record that will not expand the relief granted below . . . .").

Here, the Ninth Circuit affirmed the nationwide preliminary injunction temporarily halting the rescission of DACA that the district court entered upon finding Respondents were likely to succeed on their APA argument.[23] The Court here, presumably, will rule that DACA was unlawfully rescinded on APA grounds, that the rescission is not reviewable under the APA, or that DHS complied with the APA. Under either of the latter two scenarios, however, Respondents' non-APA claims should survive, as they are distinct from the present case. *See Fox Television Stations*, 556 U.S. at 516 ("If the Commission's action here was not arbitrary or capricious in the ordinary sense, it satisfies the Administrative Procedure Act's 'arbitrary [or] capricious' standard; its lawfulness under the Constitution is a separate question to be

---

[23] The Ninth Circuit panel separately noted that Respondents' "likelihood of success on [their] equal protection claim is a second, alternative ground for affirming the entry of the injunction." *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 520 n. 31 (9th Cir. 2018), *cert. granted sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 139 S. Ct. 2779 (2019).

15

addressed in a constitutional challenge." (footnote omitted)).

While *amici* do not address at this time the likelihood of success of Respondents' Equal Protection argument, the remaining factors weigh sufficiently in Respondents' favor that the Court should continue the preliminary injunction during the pendency of the outstanding constitutional claims. Indeed, in the lower courts the Government did not dispute that the likelihood of irreparable harm, the balance of hardships, and the public interest weigh in favor of Respondents. In light of the irreparable harms described above that will result from DACA's rescission, *see supra* pp. 9–13, the public interest in maintaining the status quo while the remaining claims are litigated is high, and the Government has not taken the position that its interests will be harmed in any meaningful way. Indeed, the injunction affirmed by the Ninth Circuit does not limit the Government's ability to remove a DACA participant who "poses a risk to national security or public safety, or otherwise deserves, in its judgment, to be removed." *Regents* Pet. App. 67a.

As the Court has observed, "[i]f the underlying constitutional question is close, therefore, we should uphold the injunction and remand for trial on the merits." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 664–65 (2004). That should be the result here if Petitioners succeed on the merits of their APA argument.

16

\*   \*   \*

The Court should not countenance DHS's disregard for the harm to DACA recipients and their families,[24] which renders the rescission of DACA arbitrary and capricious and therefore unlawful. The Court should be mindful now—as DHS failed to be when it rescinded the program—of the harm threatened and on whom it will be inflicted: individuals who faultlessly arrived in this country as children, came forward voluntarily, paid a fee, submitted to a rigorous application process, bettered themselves through education or military service, and worked and paid taxes on any wages they earned; the families from which they will be separated; and the social fabric into which those families are deeply woven. Disregarding so grave a harm would be, in

---

[24] *Statement from USCCB President Cardinal Daniel N. DiNardo of Galveston-Houston, along with USCCB Vice President, Archbishop José H. Gomez of Los Angeles, Bishop Joe S. Vásquez of Austin, chairman, Committee on Migration, and Bishop Joseph J. Tyson of Yakima, chairman of the Subcommittee on Pastoral Care of Migrants, Refugees, and Travelers,* U.S. Conference of Catholic Bishops (Sept. 5, 2017), http://www.usccb.org/news/2017/17-157.cfm ("The cancellation of the DACA program is reprehensible. It causes unnecessary fear for DACA youth and their families. . . . The Church has recognized and proclaimed the need to welcome young people: 'Whoever welcomes one of these children in my name welcomes me; and whoever welcomes me does not welcome me but the one who sent me' (Mark 9:37). Today, our nation has done the opposite of how Scripture calls us to respond. It is a step back from the progress that we need to make as a country. Today's actions represent a heartbreaking moment in our history that shows the absence of mercy and good will, and a short-sighted vision for the future. DACA youth are woven into the fabric of our country and of our Church, and are, by every social and human measure, American youth.").

17

*amici*'s estimation, not only unlawful, but inhumane, inequitable, and contrary to the dignity of the human person and to the common good.[25]

## CONCLUSION

The judgments of the Ninth Circuit and the District Court for the District of Columbia, as well as the orders of the Eastern District of New York, should be affirmed.

Respectfully submitted,

Christopher J. Wright
Stephen W. Miller
  *Counsel of Record*
HARRIS, WILTSHIRE &
GRANNIS LLP
1919 M Street NW, Fl. 8
Washington, DC 20036
(202) 730-1300
smiller@hwglaw.com

*Counsel for Amici Curiae*

---

[25] *Quotes from Church Teachings on the Rights of Migrants and Refugees*, U.S. Conference of Catholic Bishops, http:// www. usccb.org/issues-and-action/human-life-and-dignity/migrants-refugees-and-travelers/quotes-rights-migrants-refugees.cfm ("The reality is that our current system is immoral. While many may condemn the presence of the undocumented in our land, we willingly accept their hard labor, their contributions to our economy, and their cultural and religious spirit which enriches our local communities. While we accept these contributions, we do so at the expense of the human beings who come here not to harm us but to help us. They are often ridiculed, exploited, and abused. This must stop, and this immoral system must be changed.").

AR5737

1a

## LIST OF *AMICI CURIAE*

The **Association of Catholic Colleges and Universities (ACCU)**, founded in 1899, serves as the collective voice of U.S. Catholic higher education. Through programs and services, the association strengthens and promotes the Catholic identity and mission of its member institutions so that all associated with Catholic higher education can contribute to the greater good of the world and the Church.

**Catholic Charities USA (CCUSA)** is a national membership organization representing more than 167 diocesan Catholic Charities member agencies. These member agencies operate more than 2,600 service locations across the 50 states, the District of Columbia, and five U.S. territories. Their diverse array of social services reached more than 10 million individuals in need last year. These services include immigration and refugee services. In 2017, nearly 100 Catholic Charities agencies served over 25,000 immigrants and refugees through 217 programs. Our Catholic heritage includes a scriptural call to provide hospitality to newcomers as if welcoming Christ Himself. The Catholic Church, like our nation as a whole, finds its identity and roots in various immigrant communities. We affirm the inherent dignity bestowed by God on every human person, including immigrants and refugees, no matter the circumstances that compel a person to begin a new life in our community.

The **Catholic Health Association of the United States (CHA)** is the national leadership organization of the Catholic health ministry, representing the largest not-for-profit provider of health care services

**AR5738**

2a

in the nation.  The Catholic health ministry includes more than 2,300 hospitals, nursing homes, long-term care facilities, health care systems, sponsors, and related organizations serving the full continuum of health care across our nation. CHA's *Vision for U.S. Health Care* calls for health care to be available, affordable and accessible to everyone, regardless of immigration status and paying special attention to poor and vulnerable individuals. CHA works to advance the Catholic ministry's commitment to a just, compassionate health care system that protects life from conception to natural death.

As an organization guided by the social teachings of the Catholic Church, CHA affirms that each person is created in the image of God, and that each human life is sacred and possesses inalienable worth. While we call on our fellow Americans to respect that dignity within every single immigrant, we also should be particularly mindful of those who were brought to this country as children and have known no other home. They have become a part of the fabric of our nation, and deserve our support and respect.

The **Catholic Legal Immigration Network, Inc. ("CLINIC")**, a national religious organization created in 1988 by the United States Conference of Catholic Bishops, embraces the Gospel value of welcoming the stranger and promotes the dignity and protects the rights of immigrants in partnership with a dedicated network of Catholic and community legal immigration programs. CLINIC's network includes over 380 faith and community-based immigration legal programs in more than 400 cities, and employs over 2,300 legal representatives, including attorneys, Department of Justice-accredited representatives and

**AR5739**

3a

paralegals who serve hundreds of thousands of citizens and immigrants each year. CLINIC has a substantial interest in the Court's resolution of this case because the issues this Court will decide have a direct impact on the work of CLINIC's network and the immigrants it serves. Within CLINIC's network, the majority of legal immigration programs provide DACA and related immigration services and have seen the positive benefits of this program on their clients. Further, for many of the programs, DACA services represent a significant amount of program revenue. Consequently, CLINIC has a substantial interest in ensuring that DACA recipients are able to safely remain with their families, in their schools and communities, and employed.

The **Center for Migration Studies of New York (CMS)** is a think tank and an educational institute devoted to the study of international migration, to the promotion of understanding between immigrants and receiving communities, and to public policies that safeguard the dignity and rights of migrants, refugees and newcomers. CMS was established in 1964 by the Congregation of the Missionaries of St. Charles, Scalabrinians, a community of Catholic priests, nuns and lay people dedicated to serving migrants and refugees throughout the world. CMS produces rigorous, evidence-based research and public policy ideas. CMS conducted a nationwide study on implementation of the Deferred Action for Childhood Arrivals (DACA) program, produced an extensive profile and estimates of those eligible for DACA, and has offered technical support to organizations seeking to serve DACA beneficiaries. CMS's study on DACA's implementation found that community-based and

AR5740

4a

non-governmental organizations successfully expanded their capacity to meet the increased demand for their services by DACA applicants. CMS's estimates show that the DACA-eligible population has deep and longstanding ties the United States. CMS estimates indicate that 85 percent of the DACA-eligible have lived in the country for 10 years or more, 89 percent of those in the labor force are employed, 93 percent have at least a high school degree, and 91 percent speak English well, very well, or exclusively. Other studies have shown that DACA allowed thousands of undocumented immigrants to pursue higher education, better-paying jobs, careers on par with their fields of study, and homeownership.

CMS's research points to individuals who are American in every aspect, except on paper. It believes that DACA recipients have become part of the American fabric, and that allowing them to remain in status will significantly benefit our nation.

The **Council for Christian Colleges & Universities (CCCU)** is a higher education association of more than 180 Christian institutions around the world, including more than 150 in the U.S. and Canada and more than 30 from an additional 18 countries. The CCCU's mission is to advance the cause of Christ-centered higher education and to help our institutions transform lives by faithfully relating scholarship and service to biblical truth.

The **United States Conference of Catholic Bishops (USCCB)** is a nonprofit corporation, the members of which are the active Catholic Bishops in the United States. The Conference advocates and promotes the pastoral teachings of the U.S. Catholic Bishops in such diverse areas of the nation's life as the

**AR5741**

5a

free expression of ideas, the rights of religious organizations and their adherents, fair employment and equal opportunity for the underprivileged, protection of the rights of parents and children, the value of human life from conception to natural death, and care for immigrants and refugees. It is the position of the Catholic Church that pastoral, educational, medical, and social services provided by the Church are never conditioned on legal status—all persons are invited to participate in our parishes, attend our schools, and receive other services offered by our institutions and programs.[26] When lawsuits have touched upon central Roman Catholic tenets like these, the Conference has filed *amicus curiae* briefs to make its view clear, particularly in this Court.

**World Relief** is the international relief and development arm of the National Association of Evangelicals. Based in Baltimore, Maryland World Relief stands with the vulnerable and partners with local churches to end the cycle of suffering, transform lives and build sustainable communities. With over 70 years of experience, World Relief works in 20 countries worldwide through disaster response, health and child development, economic development and peacebuilding and has 23 offices in the United States that specialize in refugee and immigration services. In 15 offices across the country World Relief provides immigration legal services, including representation to asylum seekers, and technical legal

---

[26] *Catholic Social Teaching on Immigration and the Movement of Peoples*, U.S. Conference of Catholic Bishops, http:// www. usccb .org/issues-and-action/human-life-and-dignity/immigration /catholic-teaching-on-immigration-and-the-movement-of-peoples.cfm.

6a

support to more than 40 churches recognized by the
Department of Justice.

AR5743

Nos. 18-587, 18-588, 18-589

IN THE

# Supreme Court of the United States

————————

DEPARTMENT OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,

*Respondents.*

————————

## On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit

————————

## BRIEF OF *AMICI CURIAE* 109 CITIES, COUNTIES, MUNICIPALITIES, AND LOCAL GOVERNMENT ADVOCACY ORGANIZATIONS IN SUPPORT OF RESPONDENTS

————————

MICHAEL N. FEUER
  *City Attorney*
JAMES P. CLARK
VALERIE L. FLORES
DANIELLE GOLDSTEIN
MICHAEL DUNDAS
  *Counsel of Record*
200 N. Main Street
Los Angeles, CA  90012
(213) 978-8100
mike.dundas@lacity.org

MARGARET L. CARTER
DANIEL R. SUVOR
DIMITRI D. PORTNOI
DANIEL J. TULLY
O'MELVENY & MYERS LLP
400 South Hope Street
18th Floor
Los Angeles, CA 90071
(213) 430-6000

*Counsel for* Amicus Curiae
*City of Los Angeles, Calif.*

*Counsel for* Amicus Curiae
*County of Los Angeles, Calif.*

[Additional Captions Listed On Inside Cover]

**AR5744**

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

*Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.,

*Respondents.*

———————————

**On Writ of Certiorari Before Judgment to the United States Court of Appeals for the District of Columbia Circuit**

———————————

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL.,

*Respondents.*

———————————

**On Writ of Certiorari Before Judgment to the United States Court of Appeals for the Second Circuit**

———————————

**AR5745**

i

## QUESTIONS PRESENTED

In 2012, the Secretary of Homeland Security announced a policy that would provide a temporary forbearance of removal for certain undocumented immigrants who unwittingly entered the United States as children. Known as Deferred Action for Childhood Arrivals (DACA), the program allows such noncitizens to receive a renewable two-year term of deferred action—a form of prosecutorial discretion whereby the government declines to pursue removal—if they have no criminal record and satisfy various educational or military service requirements. Under longstanding federal regulations, any person subject to deferred action, including DACA recipients, may apply for government work authorization. In the seven years since DACA was implemented, more than 800,000 young people throughout the country have applied for and received deferred action. In September 2017, the Department of Homeland Security (DHS) announced that it would rescind DACA because it believed the program was unlawful and would likely be struck down by the courts.

The questions presented are:

1.  Whether DHS's decision to rescind DACA is judicially reviewable.

2.  Whether DHS's decision to rescind DACA is unlawful.

ii

# TABLE OF CONTENTS

**Page(s)**

STATEMENT OF INTEREST .................................. 1

INTRODUCTION ..................................................... 4

ARGUMENT ........................................................... 6

I.    DACA Recipients Represent the Best of *Amici*'s Communities. ............. 6

II.   Rescinding DACA Harms *Amici*'s Young People and Communities. ...... 10

A.    Rescinding DACA Will Harm the Economy. ............................................ 11

B.    Rescinding DACA Will Undermine *Amici*'s Public Safety Priorities. ........................................... 14

III.  Petitioners' Purported Rescission of DACA is Unlawful. ....................... 16

A.    Petitioners Did Not Adequately Consider the Harm of Repealing DACA. ................................................ 18

B.    Post-Hoc Rationalizations Do Not Insulate Petitioners' Decision From Review or Render it Lawful. ............................................... 26

CONCLUSION ....................................................... 38

APPENDIX .......................................................... 1a

**AR5747**

iii

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) ............................................ 33

*Bowen v. Mich. Acad. of Family Physicians*,
  476 U.S. 667 (1986) ............................................ 28

*Camp v. Pitts*,
  411 U.S. 138 (1973) ................................33, 35, 37

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ...........................24, 28, 32, 35

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) ...................................passim

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ...........................18, 20, 22, 25

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ............................................ 36

*Food Mktg. Inst. v. ICC*,
  587 F.2d 1285 (D.C. Cir. 1978) ....................34, 37

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ............................................ 33

*Heckler v. Chaney*,
  470 U.S. 821 (1985) .....................................28, 29

*Hilton v. S.C. Pub. Rys. Comm'n*,
  502 U.S. 197 (1991) ............................................ 25

*ICC v. Bhd. of Locomotive Eng'rs*,
  482 U.S. 270 (1987) ............................................ 31

*Judulang v. Holder*,
  565 U.S. 42 (2011) .......................................18, 27

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) ............................................ 25

**AR5748**

iv

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Michigan v. EPA,*
   135 S. Ct. 2699 (2015)...................................18, 27

*Mont. Air Chapter No. 29 v. Fed. Labor
   Relations Auth.,*
   898 F.2d 753 (9th Cir. 1990)............................. 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.
   State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983)....................................18, 20, 35

*Nat'l Lifeline Ass'n v. FCC,*
   921 F.3d 1102 (D.C. Cir. 2019)......................... 25

*OSG Bulk Ships, Inc. v. United States,*
   132 F.3d 808 (D.C. Cir. 1998)........................... 30

*Pension Benefit Guar. Corp. v. LTV Corp.,*
   496 U.S. 633 (1990)..................................32, 34, 35

*Perez v. Mortg. Bankers Ass'n,*
   135 S. Ct. 1199 (2015)..................................22, 24

*SEC v. Chenery Corp.,*
   318 U.S. 80 (1943)...........................27, 33, 34, 37

*Smiley v. Citibank (S.D.), N.A.,*
   517 U.S. 735 (1996)........................................... 25

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015)............................. 19

*Util. Air Regulatory Grp. v. EPA,*
   573 U.S. 302 (2014)........................................... 36

### STATUTES

5 U.S.C. § 601 ...................................................... 22

5 U.S.C. § 603 ...................................................... 22

5 U.S.C. § 604 ...................................................... 22

5 U.S.C. § 701 ...................................................... 28

**AR5749**

v

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

8 U.S.C. § 1324a ...................................................... 37

### REGULATIONS

8 C.F.R. § 274.12 .................................................... 37

### RULES

Sup. Ct. R. 37.3(a) .................................................. 1

Sup. Ct. R. 37.6 ...................................................... 1

### OTHER AUTHORITIES

Alex Nowrasteh, *Don't End DACA: The Immigration Program Trump Must Save*, N.Y. Post (Aug. 31, 2017)........................ 11

Barry Moreno, Children of Ellis Island (2005).................................................... 4

George White, *Teachers Who Are DACA Recipients Help Ease Anxiety of Undocumented Students,* EdSource (Sept. 15, 2017) .................................. 9

Gregory Korte, *et al.*, *Trump Administration Struggles with Fate of 900 DREAMers Serving in the Military*, USA Today (Sept. 7, 2017)................. 8

John Burnett, *New Immigration Crackdowns Creating 'Chilling Effect' on Crime Reporting*, Nat'l Pub. Radio (May 25, 2017) ................................ 14

Julia Wick, *L.A.-Area DACA Recipients Contribute Approximately $5.5 Billion Annually to Economy, Chamber Estimates*, LAist (Sept. 21, 2017)...................... 11

**AR5750**

vi

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*L.A. County Sheriff Jim McDonnell's Statement About Senate Bill 54 Regarding Immigration*, The Signal (Sept. 16, 2017) .................................................. 15

Michelangelo Landgrave & Alex Nowrasteh, *The DREAMer Incarceration Rate*, Cato Institute (Aug. 30, 2017) ...................................... 15

Nik Theodore, Dep't of Urban Planning & Policy, Univ. of Ill. at Chi., Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement (2013) .......................................... 15

Office of the Press Sec'y, Remarks by the President on Immigration (June 15, 2012) .................................................... 21

Randy Capps et al., Migration Policy Inst., Delegation and Divergence: A Study of 287(g) State and Local Immigration Enforcement (2011) ..................... 15

Roberto G. Gonzales & Angie M. Bautista-Chavez, Am. Immigration Council, Two Years and Counting: Assessing the Growing Power of DACA (June 2014) ........................................... 10

Samantha Schmidt, *A 'Dreamer' Dies Trying to Save Harvey Victims, Days Before Trump Plans to End DACA*, Wash. Post (Sept. 5, 2017) ................................ 10

**AR5751**

vii

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Scott R. Baker, *Effects of Immigrant Legalization on Crime: The 1986 Immigration Reform and Control Act*, Stanford Law and Econ. Olin Working Paper (July 28, 2014) .......................... 14

Silva Mathema, *Ending DACA Will Cost States Billions of Dollars*, Ctr. for Am. Progress (Jan. 9, 2017) ......................... 12

*State & Local Tax Contributions of Young Undocumented Immigrants,* Inst. on Taxation & Econ. Policy (Apr. 30, 2018) ................................. 11

Tom K. Wong et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, Ctr. for Am. Progress (Aug. 28, 2017) ............................... 2, 12

Tom K. Wong et al., Results from Tom K. Wong et al., 2017 National DACA Study (2017) .................................... 7, 10

U.S. Dep't of Homeland Sec., Letter by Secretary Jeh Johnson to U.S. Representative Judy Chu (Dec. 30, 2016) .................................... 21

U.S. Dep't of Homeland Sec., Memorandum from Secretary Janet Napolitano on Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012) ............................................ 21

AR5752

viii

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

U.S. Dep't of Homeland Sec., Secretary
Napolitano Announces Deferred
Action Process for Young People
Who Are Low Enforcement
Priorities (June 15, 2012) .................................... 7

U.S. Dep't of Justice, Attorney General
Sessions Delivers Remarks on
DACA (Sept. 5, 2017) ........................................ 14

**AR5753**

## STATEMENT OF INTEREST[1]

*Amici Curiae* are 109 cities, towns, counties, and municipal organizations.[2]  *Amici* come from every corner of the country:  from rural farming communities to industrial cities to large, urban metropolises.  *Amici* represent a broad, bi-partisan cross-section of American cities and counties with a wide spectrum of economic, political, and cultural perspectives.  They include the most populous and diverse cities and counties in the United States, as well as jurisdictions of more modest size.  Individuals of every race, ethnicity, culture, and creed call *amici* home.

---

[1] The parties have consented in writing to the filing of this brief, and their letters of consent have been filed with the Clerk.  *See* Sup. Ct. R. 37.3(a).  No party's counsel authored this brief in whole or in part, and no person or entity other than *amici* or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.  *See* Sup. Ct. R. 37.6.

[2] A complete list of *amici* is provided as **Appendix A**.  *Amici* include four non-partisan advocacy organizations charged with representing the interests of the nation's cities, towns, and villages.  The National League of Cities advocates for 19,000 cities, towns, and villages, representing more than 218 million Americans.  The United States Conference of Mayors represents the country's 1,408 cities with populations of over 30,000.  The International Municipal Lawyers Association is a professional organization consisting of more than 2,500 local government member entities represented by their chief legal officers, state municipal leagues, and individual attorneys.  The International City/County Management Association is an association of 12,000 city, town, and county managers who oversee the daily operations of the local governments they serve.

2

Though important differences exist between them, *amici* share a common interest in building communities where all residents, regardless of immigration status, feel safe and empowered to participate in civic life. At their core, local governments exist to provide for the health (*e.g.*, public hospitals), safety (*e.g.*, police departments and county sheriffs), and welfare (*e.g.*, social services agencies) of their residents. The Deferred Action for Childhood Arrivals (DACA) program directly benefits the health, safety and welfare of all of our residents, by encouraging DACA recipients to openly participate in their communities and interact with local government without fear.

Before the program was instituted, many DACA recipients feared the basic tasks of everyday life, like going to work, attending school and church, or simply buying groceries. Many recipients with American citizen children[3] stuck Post-it notes to their refrigerators before they left for the day, instructing their children whom to call in case "Mom and Dad" did not come home. These fears are precisely why DACA was created: to both focus limited immigration enforcement resources on the removal of serious criminals and to enable young people to contribute to their communities.

---

[3] A 2017 study by the Center for American Progress found that 25% of DACA recipients have at least one child who is an American citizen. Tom K. Wong et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, Ctr. for Am. Progress (Aug. 28, 2017), https://perma.cc/JT3D-6TVR.

3

*Amici* will suffer substantial harm if DACA is terminated.  More than 12% of all active DACA recipients live in the Los Angeles metro area alone.[4] Another 22% reside in the New York, Dallas, Chicago, or Houston metro regions, while 10% of recipients currently make their homes in Phoenix, Atlanta, the San Francisco Bay area, San Diego, or Denver.[5]  All told, 60% of current DACA recipients— nearly 400,000 individuals—live in *amici*'s communities.[6]

These individuals—most of whom arrived in the United States as children—are no different than the tens of millions of people who live and work alongside them in *amici*'s cities and counties.  DACA recipients have made enormous contributions to our communities and to our country.  They attend our local schools where they study to become our newest doctors, nurses, and lawyers.  As entrepreneurs, they build businesses that revitalize local economies. As teachers, they shape the next generation of leaders.  As civil servants, they assist and transform the communities that they call home.  Without deferred action, none of these contributions would be possible.

---

[4] Figures are based on recipients' residency in a Core Based Statistical Area, as defined by the U.S. Office of Management and Budget, at the time of their most recent DACA application. *See Regents of the Univ. of Cal. v. Dep't of Homeland Sec.*, No. 3:17-cv-05211-WHA, Dkt. 292-2, U.S. Citizenship and Immigration Services DACA Data as of September 30, 2019 (N.D. Cal. Oct. 1, 2019).

[5] *Id.*

[6] *Id.*

*Amici* are stronger and safer because of the DACA program.

As history teaches, our collective success depends on the contributions of *all* members of society. Our nation's and *amici*'s civic, cultural, and economic prosperity in the 20th Century was aided in no small part by the contributions of immigrants, many of whom arrived in the United States as children.[7] And our future progress is tied to the full participation of such individuals, including the 800,000 young people who have received deferred action under the DACA program. The rescission of DACA jeopardizes *amici*'s interests by harming tens of thousands of DACA recipients in *amici*'s communities.

## INTRODUCTION

Each day, more than 650,000 DACA recipients work to make the world a better place. They are educators, administrators, social workers, firefighters, police officers, soldiers, scientists, engineers, entrepreneurs, artists, journalists, service workers, and civic leaders. They make their communities—our communities—safe and prosperous.

Since its inception, DACA has allowed more than 800,000 hardworking individuals to reach their full potential. The program, which reduces recipients' fear of removal and allows them the opportunity to work for renewable two-year terms, has empowered recipients to participate fully in their communities. These individuals are as much part of the American

---

[7] *See* Barry Moreno, Children of Ellis Island (2005).

5

fabric that binds us together as are their neighbors with lawful immigration status.

The rescission of DACA in the Department of Homeland Security's (DHS) September 5, 2017 Memorandum (September Memorandum) tears at that fabric. Petitioners' decision to rescind DACA is a violation of trust that forces hundreds of thousands of participants back into lives of fear. Keeping talented young people at the margins threatens to rob *amici* and the nation of their promise. It is anathema to *amici*, as it undermines their shared interest in empowering all residents to participate in public life. *Amici* therefore request that the Court affirm the judgments of the Ninth Circuit and the District Court for the District of Columbia, and the orders of the Eastern District of New York.

*Amici* submit this brief to inform the Court of the profound impact that DACA recipients have had on *amici* and to highlight the consequences that rescission of DACA will have on *amici*, our communities, and our residents. *Amici* also write to address two discrete legal issues—Petitioners' failure to adequately consider reliance interests in the September Memorandum, and Petitioners' attempted post-hoc rationalization of their decision to rescind DACA. Given the significant harm to *amici* and their residents from the rescission, Petitioners' failure to analyze participants' reliance interests and the harm to society at large is alarmingly inadequate. Their attempt to use after-the-fact explanations to prevent the courts from redressing these harms is equally deficient, and was correctly rejected by the courts below.

AR5758

6

As all *amici* recognize, our shared future is brighter when opportunities for success are available to all people, regardless of their race, ethnicity, gender, or immigration status. DACA recipients have used these opportunities for seven years to strengthen *amici*'s communities, and should not now have those opportunities taken from them. And their neighbors, coworkers, employers, and local governments should not be denied the countless contributions that DACA recipients have made and will continue to make to our country.

## ARGUMENT

### I. DACA Recipients Represent the Best of *Amici*'s Communities.

When DACA was first announced, then-DHS Secretary Janet Napolitano and current President of Respondent University of California, explained:

> Our nation's immigration laws must be enforced in a firm and sensible manner. But they are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Discretion, which is used in so

AR5759

7

many other areas, is especially justified here.[8]

*Amici* agree:  our best interests are advanced by educating and empowering our next generation of leaders, not by tearing students out of their schools and uprooting industrious individuals from their communities.  For the last seven years, DACA has advanced our best interests, and *amici* have witnessed hundreds of thousands of young people emerge from the margins to lead productive, exemplary lives.

DACA has allowed recipients to pursue higher education, enhancing their economic productivity and enriching their lives and futures.[9]

For example, Jin Kyu Park arrived in New York City at the age of seven from South Korea.  He excelled in his studies and matriculated at Harvard. As an undergraduate in Cambridge, Jin Kyu worked as a research assistant at the Koch Institute for Integrative Cancer Research at MIT, served as the managing editor of the Harvard Undergraduate Research Journal, directed the Phillips Brooks House Association's Chinatown Citizenship program, and founded a nonprofit to help other undocumented

---

[8] Dep't of Homeland Sec., Secretary Napolitano Announces Deferred Action Process for Young People Who Are Low Enforcement Priorities (June 15, 2012), https://perma.cc/94JC-2293.

[9] Tom K. Wong et al., Results from Tom K. Wong et al., 2017 National DACA Study 3 (2017), https://perma.cc/R2J8-D57W.

8

students.  Last November, he became the first DACA recipient ever to become a Rhodes Scholar.  After completing his studies at Oxford, Jin Kyu plans to become a doctor so that he can serve immigrant communities like the one where he grew up in Queens.

Many recipients share similar stories.  DACA allowed Nelson Magdaleno, who was brought to the United States from Venezuela as a child, to attend Georgia Tech University, one of the nation's top engineering schools.  Nelson graduated with honors and has been working in Dallas as an engineer at Texas Instruments since his graduation.  Herta Llusho arrived in Detroit from Albania at the age of eleven.  She worked tirelessly through high school and college, ultimately receiving a Master's Degree in robotics and automation engineering.  Herta now works as a supervising engineer at Ford Motor Company, and regularly volunteers at her church and in her community.

Armed with their high school degrees, college degrees, and the other building blocks of modern life, recipients have gone on to strengthen their communities by dedicating themselves to them.  Hundreds have protected our country by serving in the military as part of a Pentagon pilot program.[10]  Thousands of recipients, like Chicagoan Cynthia Sanchez and Aus-

---

[10] Gregory Korte, *et al.*, *Trump Administration Struggles with Fate of 900 DREAMers Serving in the Military*, USA Today (Sept. 7, 2017), https://perma.cc/EH4W-2DSL.

9

tinite Karen Reyes, have taken up teaching, often in underserved communities of color.[11]

Others have made lasting impacts in the arts. Yehimi Cambrón, an art teacher and artist from Atlanta, paints murals with imagery that evoke survival, opportunity, and other common themes of the immigrant experience.  In the classroom, she teaches her high school students how to find expression and empowerment in art.  Last year, the Atlanta Superbowl LIII Host Committee commissioned Yehimi to create three murals that highlight Atlanta's civil rights and social justice journey, a commission that would not have been possible without DACA.

Bambadjan Bamba grew up in the South Bronx, worked to put himself through drama school, and now is a successful actor, appearing on NBC's *The Good Place*, and in Disney's *Black Panther*.  Daniela Pierre-Bravo arrived in the United States from Chile at age 11.  Today, she is a news producer for MSNBC and NBCUniversal in New York City and recently released a non-fiction motivational book with bestselling author Mika Brzezinski.

Still others have made their mark through selfless sacrifice.  In times of need or sorrow, congre-

---

[11] *See* George White, *Teachers Who Are DACA Recipients Help Ease Anxiety of Undocumented Students*, EdSource (Sept. 15, 2017), https://perma.cc/PPJ2-KR3P. Although the exact number of DACA recipients employed as teachers is unknown, the Migration Policy Institute estimates that 20,000 "DACA-eligible" individuals are teachers, although some may have attained lawful status by other means.  *Id*.

10

gants turn to the guidance of DACA-recipient Father Rey Pineda, a Catholic priest at Atlanta's Cathedral of Christ the King. When emergencies have threatened families, friends, and neighbors, DACA recipients have been among the first to answer the call. During Hurricane Harvey, Houston-area paramedic Jesus Contreras worked six straight days to rescue people from the storm. One DACA recipient, Alonso Guillén, was killed while trying to save fellow Texans from perishing in rising floodwaters.[12]

These stories and countless others highlight the lasting impact that the DACA program has had on recipients and on society at large. As *amici* look to the future, we cannot afford to let some of our best and brightest go.

## II. Rescinding DACA Harms *Amici*'s Young People and Communities.

DACA has allowed recipients to live without fear and to better contribute to *amici*'s communities. It has drastically improved recipients' lives, allowing them to obtain better jobs, more education, and improved access to vital services—like healthcare and driver's licenses[13]—which allow them to better contribute to society. Petitioners' decision to rescind

---

[12] Samantha Schmidt, *A 'Dreamer' Dies Trying to Save Harvey Victims, Days Before Trump Plans to End DACA*, Wash. Post (Sept. 5, 2017), https://perma.cc/YT2Q-9H7P.

[13] Roberto G. Gonzales & Angie M. Bautista-Chavez, Am. Immigration Council, Two Years and Counting: Assessing the Growing Power of DACA 9 (June 2014), https://perma.cc/K4RB-327Q; Wong, *supra* note 9.

11

DACA wrests from these young people the protections that have allowed them to better their communities. It will also directly harm *amici*, particularly their economies and public safety programs, which benefit from the open participation of nearly 400,000 resident recipients.

## A. Rescinding DACA Will Harm the Economy.

DACA recipients help drive *amici*'s economies. In Los Angeles alone, they are responsible for approximately $5.5 billion of the annual GDP.[14] Nationally, DACA recipients pay an estimated $1.7 billion in state and local taxes every year that go to fund critical programs administered by *amici*.[15]

DACA's nationwide impact has been substantial. Adding DACA recipients to the workforce has generated roughly $30 billion in new earnings, which, according to an op-ed from an analyst at the Cato Institute, "ha[d] a job-creating ripple effect on the economy."[16] Recipients have made profound economic gains because of the DACA program. They have entered the work force, purchased their first homes,

---

[14] Julia Wick, *L.A.-Area DACA Recipients Contribute Approximately $5.5 Billion Annually to Economy, Chamber Estimates*, LAist (Sept. 21, 2017), https://perma.cc/9VDJ-HEDB.

[15] *State & Local Tax Contributions of Young Undocumented Immigrants*, Inst. on Taxation & Econ. Policy (Apr. 30, 2018), https://perma.cc/WKL6-U2HJ.

[16] Alex Nowrasteh, *Don't End DACA: The Immigration Program Trump Must Save*, N.Y. Post (Aug. 31, 2017), https://perma.cc/9LYT-8895.

12

and built businesses that have revitalized their communities. According to one representative survey, 69% of employed DACA recipients moved to a higher-paying job while receiving deferred action, and 5% of recipients started a new business, a rate of entrepreneurship greater than among the general public.[17]   The same survey indicated that 50% of surveyed DACA recipients reported that they have bought a car since receiving deferred action and 12% have bought their first home, both of which are major economic drivers.[18]   Over the next decade, these workers and business owners are estimated to contribute more than $433 billion to the national GDP.[19]

DHS's decision to rescind DACA will thus have a clear deleterious effect on *amici* and the nation as a whole.   One story illustrates what is at stake for DACA recipients and *amici*.

Angelica Hernandez came to the United States at the age of nine with her mother.   Growing up in Phoenix, she fell in love with robotics.   While attending Carl Hayden High School, Angelica was a member of a team of undocumented students that won a national underwater robotics competition, besting teams from other high schools and from elite engineering universities like MIT.   Angelica's passion for robotics led her to Arizona State University, where

---

[17] Wong, *supra* note 3.

[18] *Id.*

[19] Silva Mathema, *Ending DACA Will Cost States Billions of Dollars*, Ctr. for Am. Progress (Jan. 9, 2017), https://perma.cc/7NSZ-Y2L7.

13

she graduated *summa cum laude*, and then to Stanford, where she received a Master's Degree in Civil and Environmental Engineering. Today she works as an engineer on clean energy and energy efficiency programs at Nexant, an energy company in the Phoenix area.

Because of DACA, Angelica was able to discover a passion and pursue her dream career. But Angelica's other teammates were each too old to qualify for DACA. Of the Carl Hayden students, only Angelica works as an engineer. Contrast their story with those of the members of the MIT student team they defeated in competition. A decade after the competition, three of the four MIT team members had gone onto successful careers in underwater robotics, with one working on a project in Antarctica, while the fourth MIT team member was working in product design for Apple, Inc.

At a time when our country is facing a shortage of professionals in science, technology, engineering, and mathematics (STEM) fields, programs like DACA give certainty to young people who should not be enforcement priorities, enabling more of them to pursue passions that leave *amici* and the nation stronger. Petitioners' rescission of DACA denies hundreds of thousands of recipients the opportunity to pursue their dreams and deprives *amici* of these young people's promise.

14

## B. Rescinding DACA Will Undermine *Amici*'s Public Safety Priorities.

DACA has helped make *amici*'s communities safer because recipients are able to cooperate more freely and effectively with law enforcement.

When undocumented individuals fear interacting with law enforcement, it makes communities less safe and officers' jobs more difficult. Law enforcement agencies report that, as immigration enforcement and the threat of deportation increase, undocumented immigrants are substantially less likely to report crimes, including violent crimes.[20]  One study estimates that granting legal status to 1% of undocumented immigrants in a county can lower crime rates there by 2 to 6%.[21]  Although then-Attorney General Sessions insinuated that DACA had "put our nation at risk of crime, violence and even terrorism,"[22] the facts show just the opposite.[23]

---

[20] John Burnett, *New Immigration Crackdowns Creating 'Chilling Effect' on Crime Reporting*, Nat'l Pub. Radio (May 25, 2017), https://perma.cc/3VJ3-Q8NK.

[21] Scott R. Baker, *Effects of Immigrant Legalization on Crime: The 1986 Immigration Reform and Control Act*, Stanford Law and Econ. Olin Working Paper, at 25 (July 28, 2014), https://perma.cc/G5WH-4EX3.

[22] U.S. Dep't of Justice, Attorney General Sessions Delivers Remarks on DACA (Sept. 5, 2017), https://perma.cc/482G-5JEA.

[23] One study by the Cato Institute reported that only 0.25% of DACA recipients have been expelled from the program for criminal activity and that DACA recipients' native-born counterparts were 14% more likely to be incarcerated.  *See* Michel-

15

Community policing strategies in *amici* cities and counties call for trust and engagement between law enforcement and the people they protect. As Los Angeles County's then-Sheriff put it shortly after Petitioners announced the September Memorandum, "Public safety is our mission. This requires that people come forward if they are a crime victim or be willing to come forth as a witness to a crime without fear of being deported. When I say that public trust is our currency, I mean it."[24]

*Amici* have prudently considered and created data-driven law enforcement policies to enhance trust with immigrant communities. That trust is undermined when residents fear interaction with the police, and law enforcement suffers as a result. Extensive evidence shows that undocumented immigrants—and their lawfully present family and neighbors—fear that turning to the police will bring adverse immigration consequences, and thus are less likely to report crimes.[25] DACA has promoted com-

---

angelo Landgrave & Alex Nowrasteh, *The DREAMer Incarceration Rate*, Cato Institute (Aug. 30, 2017), https://perma.cc/HJA9-L6LP.

[24] *L.A. County Sheriff Jim McDonnell's Statement About Senate Bill 54 Regarding Immigration*, The Signal (Sept. 16, 2017), https://perma.cc/XF4Y-DJXT.

[25] *See, e.g.*, Nik Theodore, Dep't of Urban Planning & Policy, Univ. of Ill. at Chi., Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement 5–6 (2013), https://perma.cc/4B5R-7JL4 (finding that 67% of undocumented individuals are less likely to offer information to law enforcement as a witness and 70% are less likely to contact law enforcement even if they were victims of a crime); Randy Capps

16

munity policing and furthered *amici*'s efforts to ensure that deferred action recipients and their families and neighbors are less vulnerable to crime and exploitation.  The rescission of DACA will undermine these crucial efforts, making *amici*'s communities less safe for their tens of millions of residents.

### III. Petitioners' Purported Rescission of DACA is Unlawful.

Petitioners' decision to rescind DACA was both a grave policy error and unambiguously unlawful.  As each of the courts below correctly concluded, Petitioners acted arbitrarily and capriciously in violation of the Administrative Procedure Act (APA) when they abruptly ended DACA based on a cursory, dubious analysis of the program's legality.  *See Regents* Pet. Supp. App. 1a–87a; *NAACP* Pet. App. 1a–74a; *Batalla Vidal* Pet. App. 62a–129a.  Respondents deftly address Petitioners' arguments in their briefs, *see* Regents Resp. Br. 30–55; DACA Recipient Resp. Br. 29–59; State of Cal. Resp. Br. 23–55; State of N.Y. Resp. Br. 30–53; D.C. Resp. Br. 34–61, and *amici* will not repeat them here.

---

et al., Migration Policy Inst., Delegation and Divergence: A Study of 287(g) State and Local Immigration Enforcement 43 (2011), https://perma.cc/T3PR-X4LG  (finding in multiple counties that increased local-federal law enforcement cooperation meant "community respondents were likely to report that immigrants were venturing into public places with less frequency, failing to report crimes or interact with police, interacting less with schools and other institutions, patronizing local businesses less often, and changing their driving patterns").

17

*Amici* instead address two discrete legal issues that are of particular significance to them because of the substantial effects that the rescission of DACA will have on *amici* and their millions of residents.

*First*, when they decided to rescind DACA, Petitioners did not adequately consider the effects of rescission or the legitimate reliance interests engendered by the DACA program, as they were required to do under the Court's precedent. DACA recipients irrevocably rearranged their lives in reliance on deferred action, funding college educations, signing mortgages, enrolling in the military, and starting families. These acts were not just the foreseeable effects of DACA; they were exactly what the program was designed to induce. Petitioners also failed to consider that the hasty decision to rescind DACA will have consequences that reach far beyond DACA recipients to harm *amici*'s economies and communities.

*Second*, the courts below properly rejected Petitioners' post-hoc attempt in the June 22, 2018 memorandum from then-Secretary Kirstjen M. Nielsen (Nielsen Memorandum) to save the arbitrary and capricious decision announced in the September Memorandum. Although courts have, in limited circumstances, permitted an agency to provide a fuller explanation of the agency's stated rationale after the fact, an agency may not offer new and shifting rationales. The Court should not countenance Petitioners' effort to avoid judicial review and accountability by manufacturing new reasons for the rescission that were not stated in the September Memorandum.

18

### A. Petitioners Did Not Adequately Consider the Harm of Repealing DACA.

"Federal administrative agencies are required to engage in 'reasoned decisionmaking.'" *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) (quotation omitted). An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted).[26] When an agency seeks to depart from prior policy, it must "demonstrate that the new policy rests upon principles that are rational, neutral, and in accord with the agency's proper understanding of its authority." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 536 (2009) (Kennedy, J., concurring in part). "In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *Fox Television*, 556 U.S. at 515). Petitioners' explanation for rescinding DACA fails to meet these standards.

On September 5, 2017, then-Acting Secretary of Homeland Security Elaine C. Duke issued a memo-

---

[26] *Cf. Judulang v. Holder*, 565 U.S. 42, 53 (2011) ("When reviewing an agency action, we must assess, among other matters, 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'") (quotation omitted).

19

randum rescinding DACA. *Regents* Pet. App. 111a–119a. In the five-page memorandum, Acting Secretary Duke summarized the procedural history of litigation filed by Texas and a coalition of states challenging a separate deferred-action program called Deferred Action for Parents of Americans (DAPA). *Id.* at 112a–116a. *See also Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) (per curiam). The memorandum also incorporated by reference a one-page letter from then-Attorney General Sessions, in which the Attorney General instructed Acting Secretary Duke to rescind DACA because the program's enactment was purportedly unlawful (Sessions Letter). *Regents* Pet. App. 116a; *see also* J.A. 877–78 (letter noting that DACA had been "effectuated by the previous administration through executive action [and] without proper statutory authority," and concluding that "[s]uch an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch.").

Based on the outcome of the DAPA litigation and the Sessions Letter, the September Memorandum concluded that "it is clear that the June 15, 2012 DACA program should be terminated." *Regents* Pet. App. 117a. Although it acknowledges DHS's departure from existing policy, the September Memorandum does not discuss the effects of the rescission, save for a passing reference to unexplained "complexities associated with winding down the program." *Id.* The memorandum makes no mention at all of any reliance interests likely to be harmed by

**AR5772**

20

the change in policy.  Such cursory treatment of the
wide-reaching impacts of rescission does not comply
with the APA.

Although a decision enacting a *new* policy gener-
ally need not provide more than a "rational connec-
tion between the facts found and the choice made,"
*State Farm*, 463 U.S. at 43 (quotation omitted), Act-
ing Secretary Duke was not working "on a blank
slate" when she issued the September Memorandum:
the DACA program had been in place for over half a
decade and offered protections and opportunities
that have benefited not just individual applicants
but also state and local governments and the public
at large.  *See supra* Section II.  Under these circum-
stances, "a more detailed justification" for the policy
reversal is required.  *Fox Television*, 556 U.S. at 515
(holding that agency must "provide a more detailed
justification than what would suffice for a new policy
created on a blank slate" when its "prior policy has
engendered serious reliance interests that must be
taken into account") (quotation omitted); *accord En-
cino Motorcars*, 136 S. Ct. 2125–26.

Here, the reliance interests are fundamental.  As
a result of the DACA program, nearly a million indi-
viduals, many from *amici*'s communities, have
stepped out of the shadow of fear and begun to lead
open and productive lives.  Beneficiaries structured
their education, employment, housing, and other life
activities on the reliance that they would be protect-
ed by deferred action and employable because of
their work authorization if they continued to satisfy
eligibility criteria.  J.A. 879–980.  DACA has given
recipients of deferred action the encouragement and

21

comfort to openly enter the work force, take on student loans, sign mortgages, and even start new businesses.

DACA applicants shared intimate details and biometric data with DHS for the opportunity to participate in the program. Plainly, they would not have provided this information without being able to rely upon the positive impacts of the program. That reliance was not merely foreseeable, it was expected by DHS.[27] Petitioners' decision to rescind DACA upsets these interests: it would upend the enriching lives that DACA recipients have built and drive thousands of productive members of our communities to the margins of society.

The DACA program has also created reliance interests beyond individual recipients. When DACA was announced, DHS found that by granting young, long-term immigrants deferred action and offering the opportunity to apply for work authorization, the program would benefit not only the recipients, but society as a whole.[28] That is precisely what hap-

---

[27] *See* U.S. Dep't of Homeland Sec., Letter by Secretary Jeh Johnson to U.S. Representative Judy Chu (Dec. 30, 2016), https://perma.cc/3MVA-6EU5 ("We believe these representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored.").

[28] U.S. Dep't of Homeland Sec., Memorandum from Secretary Janet Napolitano on Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), https://perma.cc/B2CW-SPRR; Office of the Press Sec'y, Remarks by the President on Immigration (June 15, 2012), https://perma.cc/H9YP-8869.

22

pened. As detailed above, the DACA program has made our communities more economically robust and discernibly safer. *See supra* Section II. Rescission will not only deal *amici* the staggering loss of hundreds of thousands of individual economic contributors and cause fear that undermines public health and safety, but it will also force *amici* to operate and fund the social safety net that will be needed to catch recipients' families when jobs are lost, health insurance plans are discontinued, college educations are forfeited, homes fall into foreclosure, and families are forced apart by low-priority removals. Although they may be different in kind from recipients' interests, *amici*'s interests are no less relevant.[29]   *See Encino Motorcars*, 136 S. Ct. at 2126 (holding that industry reliance on prior policy should be considered by agency).

The September Memorandum inexplicably contains no mention of these obvious reliance interests. Its passing reference to certain unidentified "complexities" associated with rescission, *Regents* Pet. App. 117a, falls far short of Petitioners' obligation to provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television*, 556 U.S. at 515–16; *see also Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) ("[T]he APA requires an agency to provide more substantial justifi-

---

[29] Indeed, Congress has also directed that when agencies consider policy changes of this magnitude, they consider impact on small businesses and localities. *See* Regulatory Flexibility Act, 5 U.S.C. §§ 601, 603–04.

23

cation . . . when its prior policy has engendered serious reliance interests that must be taken into account.") (quotation omitted).

Petitioners now assert that "the Secretary sufficiently considered the reliance interests of DACA recipients" as required by the APA.[30]  Pet. Br. 42.  But Petitioners point to nowhere in the September Memorandum where Acting Secretary Duke considered any reliance interests.  Instead, they rely exclusively on the Nielsen Memorandum.  Pet. Br. 42; *see Regents* Pet. App. 120a–126a.  As discussed below, the Nielsen Memorandum's *post-hoc* explanations cannot permissibly be considered in assessing the legality of Petitioners' decision to rescind DACA.  *See infra* Section III.B.2.

Even if the memorandum could be considered, Secretary Nielsen's after-the-fact explanation does not satisfy Petitioners' burden.  The Nielsen Memorandum states only that the Secretary did not come to her "conclusions lightly," and was "keenly aware that DACA recipients have availed themselves of the

---

[30] In passing, Petitioners appear to suggest that they were not required to consider reliance interests based on the presence of certain disclaimers in the policy memorandum.  *See* Pet. Br. 42 ("By its own terms, the policy 'confer[red] no substantive right' or lawful 'immigration status.'").  Whether DACA recipients had a constitutionally protected liberty or property interest in the existence of the DACA program is wholly different than whether the recipients had *reliance interests* that Petitioners were required to consider.  *Batalla Vidal* Pet. App. 115a–116a; *cf. Encino Motorcars*, 136 S. Ct. at 2126–27 (holding that agency required to consider automobile industry's reliance interests in prior interpretation of Fair Labor Standards Act).

24

policy in continuing their presence in this country and pursuing their lives." *Regents* Pet. App. 125a. But that was the extent of the discussion,[31] and, in the very next sentence, those reliance interests were found to be outweighed by the "questionable legality" of the DACA program and "other reasons for ending the policy." *Id.*

Such a "summary discussion . . . f[alls] short of the agency's duty to explain why it deemed it necessary to overrule its previous position." *Encino Motorcars*, 136 S. Ct. at 2126–27 (where agency stated that "it had carefully considered all of the comments, analyses, and arguments made for and against the proposed changes," concluding that "[i]n light of the serious reliance interests at stake, the Department's conclusory statements do not suffice to explain its decision") (quotation omitted); *accord Perez*, 135 S. Ct. at 1209 (agency must provide "more substantial justification" for departure from past practice).

Vacatur is therefore required.  Compliance with the APA's requirements is not a mere formality. *Cf. Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (review of agency action under APA is to be "thorough, probing, [and] in-depth"). An agency's duty to consider reliance interests and competing concerns is a bulwark against arbitrary administrative action.  Here, as elsewhere, the law

---

[31] In fact, Secretary Nielsen went so far as to disavow any substantive discussion of reliance interests, stating, instead, that "issues of reliance would best be considered by Congress." *Id.*

25

seeks to protect settled expectations. *Cf. Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) ("[S]ettled expectations should not be lightly disrupted."); *Hilton v. S.C. Pub. Rys. Comm'n*, 502 U.S. 197, 202 (1991) ("*Stare decisis* has added force when the legislature, in the public sphere, and citizens, in the private realm, have acted in reliance on a previous decision, for in this instance overruling the decision would dislodge settled rights and expectations . . . .").

This case demonstrates precisely why the law imposes such a requirement. Because Petitioners wholly failed to meet it, their decision to rescind DACA is unlawful. *See Encino Motorcars*, 136 S. Ct. at 2126–27 (agency policy change was unlawful where the agency did not sufficiently address reliance interests); *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1114–15 (D.C. Cir. 2019) (departure from prior forbearance policy was arbitrary and capricious where commission failed to consider the primary effects of change, including the interests of providers who "had crafted business models and invested significant resources" in reliance on the prior policy).[32]

---

[32] *Accord Fox Television*, 556 U.S. at 515 ("It would be arbitrary or capricious to ignore such matters."); *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996) ("[C]hange that does not take account of legitimate reliance on prior interpretation . . . may be 'arbitrary, capricious [or] an abuse of discretion.'") (quotations omitted).

26

## B. Post-Hoc Rationalizations Do Not Insulate Petitioners' Decision From Review or Render it Lawful.

On June 22, 2018, in response to the District of Columbia district court's order vacating the September Memorandum,[33] then-Secretary Nielsen issued a memorandum further addressing DHS's decision to rescind the DACA program. *Regents* Pet. App. 120a–126a. The Nielsen Memorandum did not purport to rescind DACA anew. *Id.* at 121a ("Having considered the Duke memorandum and Acting Secretary Duke's accompanying statement, the administrative record for the Duke memorandum that was produced in litigation, and the judicial opinions reviewing the Duke memorandum, I decline to disturb the Duke memorandum's rescission of the DACA policy . . . ."). Instead, it attempted to elucidate "why the decision to rescind the DACA policy was, and remains, sound." *Id.* In explaining her "understanding of the Duke memorandum," Secretary Nielsen offered additional detail supporting Acting Secretary Duke's conclusion that DACA was unlawful. *Id.* at 121a–123a. She also set forth new policy rationales not reflected in the September Memorandum that

---

[33] The district court concluded that "DACA's rescission was unlawful and must be set aside" because it was predicated on a judgment of the DACA program's lawfulness that "was virtually unexplained" and thus arbitrary and capricious. *NAACP* Pet. App. 73a–74a. The court, however, stayed its order of vacatur for ninety days "to afford DHS an opportunity to better explain its view that DACA is unlawful." *Id.*

27

are independent of whether DACA is "illegal or legally questionable." *Id.* at 123a–125a.

Petitioners heavily rely on the Secretary's new explanations to argue that the September Memorandum is unreviewable by this Court, *see* Pet. Br. 26–32, and in an attempt to bolster the legally flawed and inadequate decision-making that infects the September Memorandum, *see* Pet. Br. 37–43, but the Nielsen Memorandum cannot carry either point. "A court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan*, 135 S. Ct. at 2710 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). Accordingly, Secretary Nielsen's new, after-the-fact explanations provide no basis to disturb the lower courts' decisions.

1. *The Nielsen Memorandum Does Not Alter the Reviewability Determination Made by the Courts Below.*

Each of the courts below concluded that Petitioners' decision to rescind the DACA program is reviewable under the APA. *Regents* Pet. Supp. App. 23a–45a; *NAACP* Pet. App. 25a–43a, 95a–103a; *Batalla Vidal* Pet. App. 1a–58a. These decisions are correct, *see* Regents Resp. Br. 17–30; DACA Recipient Resp. Br. 17–29; State of Cal. Resp. Br. 13–23; State of N.Y. Resp. Br. 16–30; D.C. Resp. Br. 21–34, 49–61, and the Nielsen Memorandum provides no basis for disturbing them.

"[C]ourts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang*, 565 U.S. at 53. Although

AR5780

28

there is a "strong presumption" in favor of judicial review of agency action, *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986), the APA bars judicial review of agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "This is a very narrow exception" applicable only "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Overton Park*, 401 U.S. at 410.

Petitioners argue that the rescission of DACA is the type of enforcement decision that is presumptively unreviewable under the APA. *See* Pet. Br. 17–21. In support of this position, they rely on the Court's decision in *Heckler v. Chaney*, 470 U.S. 821 (1985). There, the Food and Drug Administration declined to take enforcement action against prison officials for using certain drugs in human executions when they had not been approved for that purpose. *Id.* at 823–24. In response to a petition from a group of death row inmates, the agency questioned whether it had jurisdiction to prohibit the use of drugs in executions, but concluded that assuming it did have jurisdiction, it would "decline to exercise it under [the agency's] inherent discretion." *Id.* at 824. The Court held that the agency's discretionary decision not to enforce was unreviewable under the APA, concluding that "agency refusals to institute investigative or enforcement proceedings" fall within the narrow general exception to reviewability. *Id.* at 837–38. The Court, however, expressly did not reach the question of whether "a refusal by the agency to institute proceedings based solely on the belief that it

**AR5781**

29

lacks jurisdiction" might nonetheless be reviewable. *Id.* at 833 n.4.

Each of the courts below rejected Petitioners' argument that the rescission of DACA is the type of discretionary decision that enjoys a *Chaney*-presumption of nonreviewability.

The Eastern District of New York rejected Petitioners' assertion that "the decision to rescind the DACA program constitutes 'an exercise of enforcement discretion' that is 'entrusted to the agency alone' and immune from judicial review." *Batalla Vidal* Pet. App. 28a. Judge Garaufis reasoned that the "decision to rescind DACA is unlike the non-enforcement decision at issue in *Chaney*" because the rescission was actually an enforcement decision, not a non-enforcement decision. *Id.* at 28a–31a. As the court noted, Respondents did not challenge DHS's refusal to prosecute certain alleged violations of law or individual non-enforcement decisions, because DHS's rescission of DACA was a commitment to take enforcement action. *Id.* The court also reasoned that Petitioners' decision to rescind DACA was not motivated by a "complicated balancing of . . . factors" within their expertise, as was the case in *Chaney*, but instead was based on their understanding that the program was unlawful. *Id.*

The Ninth Circuit similarly concluded that Acting Secretary Duke's decision was reviewable under the APA. While acknowledging that Petitioners' decision falls outside the bounds of *Chaney* because it implicated *enforcement* action (not nonenforcement action), *Regents* Pet. Supp. App. 34a–35a, n.13, the court based its conclusion on circuit precedent that

30

"directly addressed the question" left open by *Chaney*'s footnote four. *Id.* at 26a. The court followed *Montana Air Chapter No. 29 v. Federal Labor Relations Authority*, 898 F.2d 753 (9th Cir. 1990), which held that a nonenforcement decision is presumptively reviewable "if it is based solely on a belief that the agency lacked the lawful authority to do otherwise," and concluded that it could review Petitioners' decision because it was based on Petitioners' belief that DACA was unlawful. *Id.* at 23a–42a.

Finally, the District Court for the District of Columbia also concluded that DHS's decision was reviewable under the APA. *NAACP* Pet. App. 42a–43a. The court concluded that Petitioners' decision did not reflect a "discretionary enforcement policy," but instead represented a "legal interpretation[ ] couched as [a] broad enforcement polic[y]," which fell outside of *Chaney* and was reviewable. *Id.* at 34a–35a (citing *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808 (D.C. Cir. 1998)); *id.* at 31a–43a.

Although the courts below employed slightly different reasoning, their reviewability analysis shares a common thread—an enforcement decision, particularly one based on the agency's interpretation of the scope of its legal authority, is not a presumptively unreviewable exercise of discretion under Section 701. *Regents* Pet. Supp. App. 29a ("[W]here the agency's decision is based not on an exercise of discretion, but instead on a belief that any alternative choice was foreclosed by law, the APA's 'committed to agency discretion' bar to reviewability [ ] does not apply."); *NAACP* Pet. App. 42a–43a (rescission solely

31

supported by "a legal determination which, when made in the context of a general enforcement policy, is not subject to *Chaney*'s presumption of unreviewability"); *Batalla Vidal* Pet. App. 30a–31a ("Defendants stated that they were required to rescind the DACA program because it was unlawful, which suggests both that Defendants did not believe that they were exercising discretion when rescinding the program and that their reasons for doing so are within the competence of this court to review."). Because the only reasons for rescission in the September Memorandum were Acting Secretary Duke's and Attorney General Sessions's conclusions that DACA was unlawful, that decision was reviewable under the APA. *Regents* Pet. Supp. App. 34a–42a; *NAACP* Pet. App. 41a–43a; *Batalla Vidal* Pet. App. 28a–31a.

Against this backdrop,[34] the irrelevance of the Nielsen Memorandum is clear. Insofar as the memorandum offered additional explanation regarding the program's purported unlawfulness, *Regents* Pet. App. 122a–123a (discussing Attorney General's conclusion that DACA "was contrary to law" and other "serious doubts about its legality"), it did not change the fact that the Acting Secretary's decision to re-

---

[34] As discussed at length by Respondents, the conclusion reached by the courts below is consistent with the Court's precedent, including its decision in *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270 (1987), and most closely adheres to the concerns animating the *Chaney* presumption. Regents Resp. Br. 18–25; DACA Recipient Resp. Br. 21–24 ; State of Cal. Resp. Br. 15–21; State of N.Y. Resp. Br. 23–29; D.C. Resp. Br. 26–30.

32

scind DACA was based on the belief that the pro-
gram was unlawful.  Such a decision is reviewable,
whether supported only by the September Memo-
randum's bare analysis or Secretary Nielsen's addi-
tional explanation.

To the extent the Nielsen Memorandum offered
rationales separate and distinct from the sole reason
provided in the September Memorandum, *id.* at
123a–125a (discussing "sound reasons of enforce-
ment policy to rescind the DACA policy"), those af-
ter-the-fact explanations cannot insulate the Acting
Secretary's decision from review.[35]   Although the
Court has permitted limited remand to an agency for
further explanation of previously articulated reason-
ing, *see Overton Park*, 401 U.S. at 420, such a re-
mand is "for a fuller explanation of the agency's rea-
soning *at the time of the agency action*," *Pension Ben-
efit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654
(1990) (emphasis added).  New rationales advanced

---

[35] The Ninth Circuit refused to consider the Nielsen Memo-
randum because it was not part of the administrative record,
but also noted that it constituted an impermissible "post-hoc
rationalization" of the decision to rescind DACA.  *Regents* Pet.
Supp. App. 57a–58a, n.24.  The District Court for the District of
Columbia considered the Nielsen Memorandum, but concluded
that certain rationales were new post-hoc rationalizations
whereas others built upon Acting Secretary Duke's reviewable
legal conclusion.  *NAACP* Pet. App. 88a–95a.  However you
slice it, the Nielsen Memorandum does not provide a basis for
altering the lower courts' reviewability determinations:  any
further legal analysis does not change the fact that DHS's legal
conclusion is reviewable, and any new rationales should be dis-
regarded.

33

after the fact must be disregarded. *Cf. Chenery*, 318 U.S. at 88 (APA review is based solely on "the grounds upon which the [agency] itself based its action").

This rule makes perfect sense. The APA is meant to promote accountability of federal agencies to the public. *Cf. Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992) ("The APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts."); *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 348–49 (1984) (discussing presumption in favor of judicial review of agency action). If agencies were permitted to go back to the drawing board and manufacture new rationales for challenged decisions in order to short-circuit judicial review, the APA would be rendered impotent. But that is exactly what Petitioners seek to do here.

Petitioners argue that the Court need only disregard post-hoc explanations offered by *counsel*. Pet. Br. 29 ("[C]ourts may not accept *appellate counsel's* post hoc rationalizations for agency action.") (quotation omitted). This rejoinder misses the mark. The crucial issue is not *who* provides the subsequent reasoning, but *what* that after-the-fact reasoning is (i.e., whether it provides further explanation of prior stated reasons or supplies new rationales altogether).

The post-hoc rationalization rule aims to ensure that an agency action is upheld only on the basis of the grounds *that were provided at the time the challenged action was taken. See Camp v. Pitts*, 411 U.S. 138, 143 (1973) (agency action must "stand or fall" based on "determinative reason" identified in the

AR5786

34

agency's "contemporaneous explanation") (citing *Chenery*, 318 U.S. at 80); *Food Mktg. Inst. v. ICC*, 587 F.2d 1285, 1290 (D.C. Cir. 1978) ("*Post-hoc* rationalizations by the agency on remand are no more permissible than are such arguments when raised by appellate counsel during judicial review."); *cf. Pension Benefit Guar. Corp.*, 496 U.S. at 654 (remand was limited to explanation of "agency's reasoning at the time of the agency action").

An agency may of course take *new* action in response to a legal challenge. For example, DHS could have rescinded the September Memorandum and issued a new decision. Secretary Nielsen could have then contemporaneously "explain[ed] *her* reasons" for rescinding the DACA program. Pet Br. 29. Petitioners expressly refused to do so.

Notwithstanding their assertions that the Nielsen Memorandum "is agency action, not a post hoc rationalization of it," Pet. Br. 29 (quotation omitted), the memorandum plainly shows that Petitioners *expressly* refused to take new action. *Regents* Pet. App. 121a ("I decline to disturb the Duke memorandum's rescission of the DACA policy."). Whatever Petitioners' reasons were for that decision, it came with consequences, one of which was that Secretary Nielsen could not offer *new rationales* for rescission not included in the September Memorandum. Because the Nielsen Memorandum offered either further reasoning of DHS's reviewable legal conclusion or new explanations that must be disregarded, it provides no basis to alter the lower courts' conclusions that Petitioners' rescission of DACA is reviewable under the APA.

35

2. *The Nielsen Memorandum Does Not Save Petitioners' Decision to Rescind DACA From Being Arbitrary and Capricious.*

Petitioners also assert that the Nielsen Memorandum establishes that the rescission of DACA was lawful. Pet. Br. 37–43. But as with the reviewability analysis, the memorandum cannot shore up Petitioners' inadequate decision-making.

Giving "adequate reasons" for an agency's decision is "[o]ne of the basic procedural requirements of administrative rulemaking." *Encino Motorcars*, 136 S. Ct. at 2125. In an APA challenge, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50. As with reviewability, post-hoc rationalizations that do not build on the agency's contemporaneous explanation but instead provide new reasons for the decision cannot be considered in an arbitrary-and-capricious review of the agency action. *See Pension Benefit Guar. Corp.*, 496 U.S. at 654; *Camp*, 411 U.S. at 143; *Overton Park*, 401 U.S. at 419.

Either the statements set forth in the Nielsen Memorandum are enlarging on Petitioners' *old* legal rationale about DACA's legality or they are *new* policy reasons for rescission. But either way, Petitioners' decision is arbitrary and capricious.

Certain reasons provided in the Nielsen Memorandum are in the former category: they simply enlarge upon the erroneous conclusion in the September Memorandum that DACA was unlawful. Secretary Nielsen's reaffirmation of Acting Secretary Duke's and Attorney General Sessions's conclusions,

**AR5788**

36

*Regents* Pet. App. 122a–123a (noting the Attorney General's conclusion that "the DACA policy was contrary to law" and that she was "bound by" that determination), and discussion of reasons "to avoid discretionary policies that are legally questionable," *id.* at 123a, mirror the legal rationale provided in the September Memorandum, *id.* at 112a–116a, and should be rejected for the same reasons. *NAACP* Pet. App. 103a–109a (district court considering above-referenced policy rationales from Nielsen Memorandum and finding no basis to alter conclusion that rescission was arbitrary and capricious).

That legal conclusion was erroneous when Petitioners issued the September Memorandum, *see* Regents Resp. Br. 44–55; DACA Recipient Resp. Br. 37–48; State of Cal. Resp. Br. 25–41; State of N.Y. Resp. Br. 43–51; D.C. Resp. Br. 34–49, and remains so even with Secretary Nielsen's additional analysis.[36] Because the decision to rescind DACA was

---

[36] Petitioners contend that DHS correctly concluded that DACA was unlawful in part because the DACA program is not an "interstitial matter" of immigration enforcement over which the agency retains authority. Pet. Br. 44 (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). Instead, they assert it is an "agency decision[ ] of vast 'economic and political significance,'" pointing to work authorization, which Petitioners claim "aid [DACA recipients] in their continuing unlawful presence." Pet. Br. 44–45 (citing *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Petitioners' argument is meritless, *see, e.g.*, Regents Resp. Br. 49–53; DACA Recipient Resp. Br. 37–40; State of Cal. Resp. Br. 27–34, and relies on an incorrect premise. The availability of work authorization is not grounded in the DACA program. Instead, it flows from the Secretary of Homeland Security's express authority to

37

based on a faulty legal conclusion, it must be set aside. *See Chenery*, 318 U.S. at 94 ("[I]f the action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law.").

The other reasons stated in the Nielsen Memorandum are new and were never previously considered by Acting Secretary Duke. Such after-the-fact justifications are irrelevant to the Court's arbitrary-and-capricious analysis. *See Camp*, 411 U.S. at 143; *Food Mktg. Inst.*, 587 F.2d at 1290.

Secretary Nielsen discussed various "policy reasons of enforcement policy" supporting the rescission, including her belief that DHS should not adopt broad policies of non-enforcement when they were not authorized by Congress, should only exercise its discretion on a case-by-case basis, and should project a clear message about "enforcement of the immigration laws." *Regents* Pet. App. 123a–124a. But the five-page September Memorandum did not discuss these reasons for rescission.[37] *Id.* at 111a–119a.

_____

"authorize" various immigrants for employment who have shown "economic necessity to work." 8 U.S.C. § 1324a(h)(3); 8 C.F.R. § 274.12(c)(14). The Secretary has for decades granted work authorization to certain qualified immigrants and exercised her discretion to do so for DACA recipients when the program was instituted in 2012.

[37] Petitioners note that the District Court for the District of Columbia concluded that certain of these policy reasons were not "post-hoc rationalizations." Pet. Br. 29. Even if the policy considerations are viewed as an elaboration of the September

38

The Nielsen Memorandum's cursory discussion of recipients' reliance interests, *id.* at 125a, likewise had no root in the September Memorandum, *id.* at 111a–119a, and should be rejected for this reason alone. *See Encino Motorcars*, 136 S. Ct. at 2126.

\* \* \*

Petitioners lean heavily on the Nielsen Memorandum to support their assertions that the decision to rescind the DACA program is not subject to judicial review and is substantively valid. *See* Pet. Br. 26–32, 37–43, 50–52. But the three-page Nielsen Memorandum cannot shore up the faulty decision-making in the September Memorandum because it merely restates erroneous legal conclusions or offers new, post-hoc policy rationalizations that cannot be considered. Under this Court's precedent, such explanations provide no basis to disturb the lower courts' reviewability and merits determinations.

## CONCLUSION

For the foregoing reasons, the September Memorandum undermines *amici*'s interests in fostering safe, prosperous communities where all individuals—including the hundreds of thousands of residents receiving deferred action under DACA—are given an opportunity to participate and grow. The courts below correctly decided that Petitioners' deci-

---

Memorandum, they are based on Acting Secretary Duke's original legal conclusion, and as explained in the preceding paragraph, do not change the fact that Petitioners' decision was arbitrary and capricious.

39

sion to rescind DACA is reviewable and unlawful. Accordingly, the Court should affirm the judgments of the Ninth Circuit and the District Court for the District of Columbia, and the orders of the Eastern District of New York.

Respectfully submitted,

MICHAEL N. FEUER
  *City Attorney*
JAMES P. CLARK
VALERIE L. FLORES
DANIELLE GOLDSTEIN
MICHAEL DUNDAS
  *Counsel of Record*
200 N. Main Street
Los Angeles, CA 90012
(213) 978-8100
mike.dundas@lacity.org

MARGARET L. CARTER
DANIEL R. SUVOR
DIMITRI D. PORTNOI
DANIEL J. TULLY
O'MELVENY & MYERS LLP
400 South Hope Street
18th Floor
Los Angeles, CA 90071
(213) 430-6000

*Counsel for* Amicus Curiae
*City of Los Angeles, Calif.*

*Counsel for* Amicus Curiae
*County of Los Angeles, Calif.*

October 4, 2019

**AR5792**

1a

## APPENDIX A

### LIST OF *AMICI CURIAE*

MICHAEL N. FEUER
  *City Attorney*
JAMES P. CLARK
VALERIE L. FLORES
DANIELLE GOLDSTEIN
MICHAEL DUNDAS
200 N. Main Street
Los Angeles, CA 90012

*Counsel for* Amicus Curiae
*City of Los Angeles, California*

MARGARET L. CARTER
DANIEL R. SUVOR
DIMITRI D. PORTNOI
DANIEL J. TULLY
O'MELVENY & MYERS LLP
400 South Hope Street
18th Floor
Los Angeles, CA 90071

*Counsel for* Amicus Curiae
*County of Los Angeles, California*

EVE V. BELFANCE
  *Director of Law*
161 S. High Street,
Suite 202
Akron, OH 44308

*Counsel for* Amicus Curiae
*City of Akron, Ohio*

DONNA R. ZIEGLER
  *County Counsel*
1221 Oak Street, Suite 450
Oakland, CA 94612

*Counsel for* Amicus Curiae
*County of Alameda, California*

CRAIG LABADIE
  *City Attorney*
1000 San Pablo Avenue
Albany, CA 94706

*Counsel for* Amicus Curiae
*City of Albany, California*

WILLIAM G. KELLY, JR.
  *Corporation Counsel*
24 Eagle Street
Albany, NY 12207

*Counsel for* Amicus Curiae
*City of Albany, New York*

AR5793

2a

ESTEBAN A. AGUILAR, JR.
 *City Attorney*
P.O. Box 2248
Albuquerque, NM 87103

*Counsel for* Amicus Curiae
*City of Albuquerque, New Mexico*

GREGORY J. SWAIN
 *County Attorney*
2660 Riva Road,
4th Floor
Annapolis, MD 21401

*Counsel for* Amicus Curiae
*Anne Arundel County, Maryland*

SHANNON CHAFFIN
 *City Attorney*
Aleshire & Wynder, LLP
2440 Tulare Street,
Suite 410
Fresno, CA 93721

*Counsel for* Amicus Curiae
*City of Arvin, California*

JOANNA C. ANDERSON
 *City Attorney*
301 King Street, Suite 1300
Alexandria, VA 22314

*Counsel for* Amicus Curiae
*City of Alexandria, Virginia*

STEPHEN A. MACISAAC
 *County Attorney*
2100 Clarendon Boulevard,
Suite 403
Arlington, VA 22201

*Counsel for* Amicus Curiae
*County of Arlington, Virginia*

NINA R. HICKSON
 *City Attorney*
55 Trinity Avenue,
Suite 5000
Atlanta, GA 30303

*Counsel for* Amicus Curiae
*City of Atlanta, Georgia*

**AR5794**

3a

ANNE L. MORGAN
  *City Attorney*
PO Box 1546
Austin, TX 78767

*Counsel for* Amicus Curiae
*City of Austin, Texas*

FARIMAH F. BROWN
  *City Attorney*
2180 Milvia Street,
4th Floor
Berkeley, CA 94704

*Counsel for* Amicus Curiae
*City of Berkeley, California*

EUGENE O'FLAHERTY
  *Corporation Counsel*
One City Hall Square,
Room 615
Boston, MA 02201

*Counsel for* Amicus Curiae
*City of Boston, Massachu-
setts*

ANDRE M. DAVIS
  *City Solicitor*
100 N. Holliday Street,
Suite 101
Baltimore, MD 21146

*Counsel for* Amicus Curiae
*City of Baltimore, Maryland*

JAYME B. SULLIVAN
  *City Attorney*
150 N. Capitol Boulevard
Boise, ID 83701

*Counsel for* Amicus Curiae
*City of Boise, Idaho*

THOMAS A. CARR
  *City Attorney*
1777 Broadway
P.O. Box 791
Boulder, CO 80302

*Counsel for* Amicus Curiae
*City of Boulder, Colorado*

AR5795

4a

BEN PEARLMAN
 *County Attorney*
P.O. Box 471
Boulder, CO 80306

*Counsel for* Amicus Curiae
*County of Boulder, Colo-rado*

NANCY E. GLOWA
 *City Solicitor*
795 Massachusetts
Avenue
Cambridge, MA  02139

*Counsel for* Amicus Curiae
*City of Cambridge, Massa-chusetts*

RALPH KARPINOS
 *Town Attorney*
405 Martin Luther King
Jr. Boulevard
Chapel Hill, NC 27514

*Counsel for* Amicus Curiae
*Town of Chapel Hill, North Carolina*

EILEEN BLACKWOOD
 *City Attorney*
City Hall
149 Church Street
Burlington, VT 05401

*Counsel for* Amicus Curiae
*City of Burlington, Vermont*

JUAN A. GONZALEZ
 *Chief Counsel*
1100 East Monroe Street
Brownsville, Texas 78520

*Counsel for* Amicus Curiae
*County of Cameron, Texas*

CHERYL WATSON FISHER
 *City Solicitor*
500 Broadway,
Room 307
Chelsea, MA 02150

*Counsel for* Amicus Curiae
*City of Chelsea, Massachu-setts*

AR5796

5a

MARK A. FLESSNER
 *Corporation Counsel*
30 N. LaSalle Street,
Suite 800
Chicago, IL 60602

*Counsel for* Amicus Curiae
*City of Chicago, Illinois*

WILLIAM R. HANNA
 *Director of Law*
40 Severance Circle
Cleveland Heights, OH
20740

*Counsel for* Amicus Curiae
*City of Cleveland Heights,
Ohio*

ZACH KLEIN
 *City Attorney*
77 N. Front Street,
4th Floor
Columbus, OH 43214

*Counsel for* Amicus Curiae
*City of Columbus, Ohio*

STEPHEN G. QUINN
 *City Attorney*
1055 Rowland Street
Clarkston, GA 30021

*Counsel for* Amicus Curiae
*City of Clarkston, Georgia*

SUELLEN FERGUSON
 *City Attorney*
4500 Knox Road
College Park, MD 20740

*Counsel for* Amicus Curiae
*City of College Park, Mary-
land*

SHARON L. ANDERSON
 *County Counsel*
651 Pine Street,
9th Floor
Martinez, CA 94553

*Counsel for* Amicus Curiae
*County of Contra Costa, Cali-
fornia*

**AR5797**

6a

KIMBERLY M. FOXX
 *States Attorney*
69 W. Washington,
32nd Floor
Chicago, IL 60602

*Counsel for* Amicus Curiae
*Cook County, Illinois*

HEATHER M. MINNER
 *City Attorney*
10300 Torre Avenue
Cupertino, CA 95014

*Counsel for* Amicus Curiae
*City of Cupertino, California*

JOHN BUTRUS
 *Federal Practices Division Chief*
133 N. Riverfront
Boulevard, LB 19
Dallas, TX 75207

*Counsel for* Amicus Curiae
*County of Dallas, Texas*

CAROL A. SCHWAB
 *City Attorney*
9770 Culver Boulevard
Culver City, CA 90232

*Counsel for* Amicus Curiae
*City of Culver City, California*

CHRISTOPHER J. CASO
 *Interim City Attorney*
1500 Marilla Street,
Room 7DN
Dallas, Texas 75201

*Counsel for* Amicus Curiae
*City of Dallas, Texas*

INDER KHALSA
 *City Attorney*
Richards Watson &
Gershon
44 Montgomery Street,
Suite 3800
San Francisco, CA 94104

*Counsel for* Amicus Curiae
*City of Davis, California*

AR5798

7a

BARBARA J. DOSECK
 *City Attorney*
101 West Third Street
P.O. Box 22
Dayton, OH 45401

*Counsel for* Amicus Curiae
*City of Dayton, Ohio*

KRISTIN M. BRONSON
 *City Attorney*
1437 Bannock St.,
Room 353
Denver, CO 80202

*Counsel for* Amicus Curiae
*City and County of Denver, Colorado*

LAWRENCE GARCIA
 *Corporation Counsel*
2 Woodward Avenue
Detroit, MI 48226

*Counsel for* Amicus Curiae
*City of Detroit, Michigan*

KIMBERLY M. REHBERG
 *City Attorney*
101 City Hall Plaza
Durham, NC 27701

*Counsel for* Amicus Curiae
*City of Durham, North Carolina*

ANGELA WHEELER
 *City Attorney*
1101 S. Saginaw Street
Flint, MI 48502

*Counsel for* Amicus Curiae
*City of Flint, Michigan*

DOUGLAS T. SLOAN
 *City Attorney*
2600 Fresno Street
Fresno, CA 93721

*Counsel for* Amicus Curiae
*City of Fresno, California*

**AR5799**

8a

N. LYNN BOARD
 *City Attorney*
31 S. Summit Avenue
Gaithersburg, MD 20877

*Counsel for* Amicus Curiae
*City of Gaithersburg, Maryland*

Howard G. Rifkin
 *Corporation Counsel*
550 Main Street, Room 210
Hartford, CT 06103

*Counsel for* Amicus Curiae
*City of Hartford, Connecticut*

MICHAEL O. FREEMAN
 *County Attorney*
C-2000 Government Center
300 S. Sixth Street
Minneapolis, MN 55487

*Counsel for* Amicus Curiae
*County of Hennepin, Minnesota*

KATHERINE B. RILEY
 *Board Attorney*
Barrett Law Group, P.A.
P.O. Box 927
Lexington, MS 39095

*Counsel for* Amicus Curiae
*County of Holmes, Mississippi*

CRYSTAL BARNES
 *Acting City Solicitor*
20 Korean Veterans Plaza, # 204
Holyoke, MA 01040

*Counsel for* Amicus Curiae
*City of Holyoke, Massachusetts*

PAUL S. AOKI
 *Acting Corporation Counsel*
530 S. King St., Room 110
Honolulu, HI 96813

*Counsel for* Amicus Curiae
*City and County of Honolulu, Hawaii*

AR5800

9a

RONALD C. LEWIS
 *City Attorney*
900 Bagby, 4th Floor
Houston, Texas 77002

*Counsel for* Amicus Curiae
*City of Houston, Texas*

ELEANOR M. DILKES
 *City Attorney*
410 East Washington
Street
Iowa City, IA 52240

*Counsel for* Amicus Curiae
*City of Iowa City, Iowa*

DANIEL T. SATTERBERG
 *Prosecuting Attorney*
516 Fourth Avenue,
W400
Seattle, WA 98104

*Counsel for* Amicus Curiae
*King County, Washington*

E.I. CORNBROOKS, IV
 *City Attorney*
Karpinski, Colaresi &
Karp, P.A.
120 East Baltimore Street
Baltimore, MD 21202

*Counsel for* Amicus Curiae
*City of Hyattsville, Maryland*

CLYDE J. ROBINSON
 *City Attorney*
241 West South Street
Kalamazoo, MI 49007

*Counsel for* Amicus Curiae
*City of Kalamazoo, Michigan*

CHARLES W. SWANSON
 *City Law Director*
400 Main Street, Room 699
Knoxville, TN 37901

*Counsel for* Amicus Curiae
*City of Knoxville, Tennessee*

**AR5801**

10a

JIM SMIERTKA
 *City Attorney*
124 W. Michigan Avenue
Lansing, MI 48933

*Counsel for* Amicus Curiae
*City of Lansing, Michigan*

JENNIFER VEGA-BROWN
 *City Attorney*
700 North Main
Las Cruces, NM 88001

*Counsel for* Amicus Curiae
*City of Las Cruces, New Mexico*

RAQUEL RUANO
 *City Attorney*
City Hall – Room 306
200 Common Street
Lawrence, MA 01840

*Counsel for* Amicus Curiae
*City of Lawrence, Massachusetts*

CHARLES PARKIN
 *City Attorney*
411 W. Ocean Boulevard,
9th Floor
Long Beach, CA 90802

*Counsel for* Amicus Curiae
*City of Long Beach, California*

MICHAEL P. MAY
 *City Attorney*
210 Martin Luther King
Jr. Boulevard, Room 401
Madison, WI 53703

*Counsel for* Amicus Curiae
*City of Madison, Wisconsin*

BRIAN E. WASHINGTON
 *County Counsel*
3501 Civic Center Drive,
Suite 275
San Rafael, CA 94903

*Counsel for* Amicus Curiae
*County of Marin, California*

AR5802

11a

RAUL J. AGUILA
 *City Attorney*
1700 Convention Center Drive
Miami Beach, FL 33139

*Counsel for* Amicus Curiae
*City of Miami Beach, Florida*

SUSAN SEGAL
 *City Attorney*
350 S. Fifth Street, Room #210
Minneapolis, MN 55415

*Counsel for* Amicus Curiae
*City of Minneapolis, Minnesota*

LESLIE J. GIRARD
 *Acting County Counsel*
168 West Alisal Street, 3rd Floor
Salinas, CA 93901

*Counsel for* Amicus Curiae
*County of Monterey, California*

MARC P. HANSEN
 *County Attorney*
101 Monroe Street
Rockville, MD 20850

*Counsel for* Amicus Curiae
*Montgomery County, Maryland*

DONALD A. LARKIN
 *City Attorney*
17575 Peak Avenue
Morgan Hill, CA 95307

*Counsel for* Amicus Curiae
*City of Morgan Hill, California*

KRISHAN CHOPRA
 *City Attorney*
500 Castro Street
Mountain View, CA 94041

*Counsel for* Amicus Curiae
*City of Mountain View, California*

AR5803

12a

JOHN ROSE, JR.
 *Corporation Counsel*
165 Church Street, # 441
New Haven, CT 06510

*Counsel for* Amicus Curiae
*City of New Haven, Connecticut*

GEORGIA M. PESTANA
 *Acting Corporation Counsel*
100 Church Street
New York, NY 10007

*Counsel for* Amicus Curiae
*City of New York, New York*

BARBARA J. PARKER
 *City Attorney*
One Frank H. Ogawa
Plaza, 6th Floor
Oakland, CA 94612

*Counsel for* Amicus Curiae
*City of Oakland, California*

KATHLEEN E. GILL
 *Corporation Counsel*
515 North Avenue
New Rochelle, NY 10801

*Counsel for* Amicus Curiae
*City of New Rochelle, New York*

JEFF P. H. CAZEAU
 *City Attorney*
776 NE 125 Street
North Miami, FL 33161

*Counsel for* Amicus Curiae
*City of North Miami, Florida*

WM. MATTHEW DITZHAZY
 *City Attorney*
38300 Sierra Highway
Palmdale, CA 93550

*Counsel for* Amicus Curiae
*City of Palmdale, California*

**AR5804**

13a

JEFFREY S. BALLINGER
 *City Attorney*
3200 E. Tahquitz Canyon
Way
Palm Springs, CA 92262

*Counsel for* Amicus Curiae
*City of Palm Springs, California*

SAMUEL S. GOREN
 *City Attorney*
Goren Cherof Doody &
Ezrol, P.A.
3099 East Commercial
Boulevard, Suite 200
Fort Lauderdale, FL 33308

*Counsel for* Amicus Curiae
*City of Pembroke Pines, Florida*

YVONNE HILTON
 *City Solicitor*
313 City-County Building
414 Grant Street
Pittsburgh, PA 15219

*Counsel for* Amicus Curiae
*City of Pittsburgh, Pennsylvania*

MARCEL S. PRATT
 *City Solicitor*
1515 Arch Street,
17th Floor
Philadelphia, PA 19102

*Counsel for* Amicus Curiae
*City of Philadelphia, Pennsylvania*

CRIS MEYER
 *City Attorney*
200 W. Washington
Street, 13th Floor
Phoenix, AZ 85003

*Counsel for* Amicus Curiae
*City of Phoenix, Arizona*

DAVID MINCHELLO
 *Corporation Counsel*
515 Watchung Avenue
Plainfield, NJ 07061

*Counsel for* Amicus Curiae
*City of Plainfield, New Jersey*

**AR5805**

14a

TRACY P. REEVE
 *City Attorney*
1221 SW Fourth Avenue,
Suite 430
Portland, OR 97240

*Counsel for* Amicus Curiae
*City of Portland, Oregon*


JEFFREY DANA
 *City Solicitor*
444 Westminster Street,
Suite 220
Providence, RI 02903

*Counsel for* Amicus Curiae
*City of Providence, Rhode
Island*


JASON LOOS
 *City Attorney*
201 4th Street SE
Rochester, MN 55904

*Counsel for* Amicus Curiae
*City of Rochester, Minne-
sota*


TRISHA WATERBURY CECIL
 *Municipal Attorney*
Mason, Griffin & Pierson,
P.C.
101 Poor Farm Road
Princeton, NJ 08540

*Counsel for* Amicus Curiae
*Municipality of Princeton,
New Jersey*


BRUCE GOODMILLER
 *City Attorney*
450 Civic Center Plaza
Richmond, CA 94804

*Counsel for* Amicus Curiae
*City of Richmond, California*


TIMOTHY R. CURTIN
 *Corporation Counsel*
30 Church Street,
Room 400A
Rochester, NY 14614

*Counsel for* Amicus Curiae
*City of Rochester, New York*

**AR5806**

15a

SUSANA ALCALA WOOD
 *City Attorney*
915 I Street, Fourth Floor
Sacramento, CA 95814

*Counsel for* Amicus Curiae
*City of Sacramento, California*

CHRISTOPHER A.
CALLIHAN
 *City Attorney*
200 Lincoln Avenue
Salinas, CA 93901

*Counsel for* Amicus Curiae
*City of Salinas, California*

MARA W. ELLIOTT
 *City Attorney*
1200 Third Avenue,
Suite 1620
San Diego, CA 92101

*Counsel for* Amicus Curiae
*City of San Diego, California*

LYNDSEY M. OLSON
 *City Attorney*
15 West Kellogg Boulevard,
Suite 400
Saint Paul, MN 55102

*Counsel for* Amicus Curiae
*City of Saint Paul, Minnesota*

ANDY SEGOVIA
 *City Attorney*
100 Military Plaza
3rd Floor City Hall
San Antonio, TX 78201

*Counsel for* Amicus Curiae
*City of San Antonio, Texas*

DENNIS J. HERRERA
 *City Attorney*
City Hall Room 234
One Dr. Carlton B.
Goodlett Place
San Francisco, CA 94102

*Counsel for* Amicus Curiae
*City and County of San Francisco, California*

16a

JOHN C. BEIERS
 *County Counsel*
Hall of Justice and
Records
400 County Center,
6th Floor
Redwood City, CA 94063

*Counsel for* Amicus Curiae
*County of San Mateo, California*

DANA MCRAE
 *County Counsel*
701 Ocean Street,
Room 505
Santa Cruz, CA 95060

*Counsel for* Amicus Curiae
*County of Santa Cruz, California*

ERIN K. MCSHERRY
 *City Attorney*
200 Lincoln Avenue
Santa Fe, NM 98501

*Counsel for* Amicus Curiae
*City of Santa Fe, New Mexico*

LANE DILG
 *City Attorney*
1685 Main Street
Santa Monica, CA 90401

*Counsel for* Amicus Curiae
*City of Santa Monica, California*

PETER S. HOLMES
 *City Attorney*
701 Fifth Avenue,
Suite 2050
Seattle, WA 98104

*Counsel for* Amicus Curiae
*City of Seattle, Washington*

FRANCIS X. WRIGHT, JR.
 *City Solicitor*
93 Highland Avenue
Somerville, MA 02143

*Counsel for* Amicus Curiae
*City of Somerville, Massachusetts*

AR5808

17a

STEPHANIE STEELE
 *Corporation Counsel*
227 W. Jefferson Boulevard, Suite 1200S
South Bend, IN 46601

*Counsel for* Amicus Curiae
*City of South Bend, Indiana*

JOHN M. LUEBBERKE
 *City Attorney*
425 N. El Dorado Street
Stockton, CA 95202

*Counsel for* Amicus Curiae
*City of Stockton, California*

DAVID A. ESCAMILLA
 *County Attorney*
P.O. Box 1748
Austin, TX 78767

*Counsel for* Amicus Curiae
*Travis County, Texas*

MIKE RANKIN
 *City Attorney*
P.O. Box 27210
Tucson, AZ 85726

*Counsel for* Amicus Curiae
*City of Tucson, Arizona*

KATHRYN EMMETT
 *Corporation Counsel*
888 Washington Boulevard
Stamford, CT 06904

*Counsel for* Amicus Curiae
*City of Stamford, Connecticut*

WILLIAM FOSBRE
 *City Attorney*
747 Market Street,
Room 1120
Tacoma, WA 98402

*Counsel for* Amicus Curiae
*City of Tacoma, Washington*

RACHEL B. TURPIN
 *City Attorney*
6200 Southcenter Boulevard
Tukwila, WA 98188

*Counsel for* Amicus Curiae
*City of Tukwila, Washington*

ANGELO AUTERI
 *Corporation Counsel*
1100 Valley Brook Avenue
Lyndhurst, NJ 07071

*Counsel for* Amicus Curiae
*City of Union City, New Jersey*

**AR5809**

18a

MICHAEL JENKINS
 *City Attorney*
Best Best & Krieger LLP
1230 Rosecrans Avenue,
Suite 110
Manhattan Beach, CA
90266


*Counsel for* Amicus Curiae
*City of West Hollywood,
California*


CHUCK THOMPSON
 *General Counsel*
International Municipal
Lawyers Association
51 Monroe Street,
Suite 404
Rockville, MD 20850


*Counsel for* Amicus Curiae
*International Municipal
Lawyers Association*


National League of Cities
660 North Capitol Street
NW
Washington, DC 20001

JOHN DANIEL REAVES
 *General Counsel*
U.S. Conference of Mayors
1200 New Hampshire Ave-
nue NW, Suite 800
Washington, DC 20036


*Counsel for* Amicus Curiae
*U.S. Conference of Mayors*


International City/County
Management Association
770 North Capitol Street
NE,
Suite 500
Washington, DC 20002

AR5810

No. 18-587

IN THE

# Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
*Petitioners,*

—v.—

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,
*Respondents.*

ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

BRIEF FOR AMICUS CURIAE
IMMIGRATION LAW SCHOLARS
IN SUPPORT OF THE RESPONDENTS

Harry Lee
*Counsel of Record*
Johanna Dennehy
STEPTOE & JOHNSON LLP
1330 Connecticut Ave. NW
Washington, D.C. 20036
hlee@steptoe.com
(202) 429 8112

Additional Captions Listed on Inside Cover

**AR5811**

DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL.,
*Petitioners,*

—v.—

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL.,
*Respondents.*

————————

ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, ET AL.,
*Petitioners,*

—v.—

MARTIN JONATHAN BATALLA VIDAL, ET AL.,
*Respondents.*

————————

ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

**AR5812**

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................ii

INTEREST OF AMICI CURIAE.......................1

SUMMARY OF ARGUMENT............................1

ARGUMENT.......................................................3

I. THE EXECUTIVE BRANCH HAS LONG USED PROSECUTORIAL DISCRETION AND CATEGORY-BASED DEFERRED ACTION INITIATIVES IN SETTING PRIORITIES FOR IMMIGRATION ENFORCEMENT..........................................3

II. THE DACA INITIATIVE FITS SQUARELY INTO THE EXECUTIVE BRANCH'S LONGSTANDING USE OF CATEGORY-BASED DEFERRED ACTION INITIATIVES................................................16

III. THE DACA INITIATIVE IS A LAWFUL EXERCISE OF DISCRETION IN IMMIGRATION ENFORCEMENT ...........18

CONCLUSION ..................................................37

APPENDIX .......................................................1a

**AR5813**

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. United States,*
    567 U.S. 387 (2012) ......................................... 5, 16

*Arpaio v. Obama,*
    27 F. Supp. 3d 185 (D.D.C. 2014) ................ 21, 35

*Crane v. Johnson,*
    783 F.3d 244 (5th Cir. 2015) ............................. 21

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ............................................ 16

*Hotel & Rest. Emps. Union, Local 25 v.
Smith,*
    846 F.2d 1499 (D.C. Cir. 1988) .......................... 29

*Regents v. U.S. Dep't of Homeland Sec.,*
    908 F.3d 476 (9th Cir. 2018) ............................... 8

*Reno v. American-Arab Anti-Discrimination
Committee,*
    525 U.S. 471 (1999) ............................................ 16

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) ............................................ 20

*Texas v. United States,*
    86 F. Supp. 3d 591 (S.D. Tex. 2015) .................. 18

**AR5814**

iii

*Texas v. United States*,
   328 F. Supp. 3d 662 (S.D. Tex. 2018)................. 18

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) .............................. 20

*United States v. Texas*,
   136 S. Ct. 2271 (2016) ........................................ 18

**Constitutions**

U.S. CONST. art. II, § 3 .............................................. 21

**Statutes**

6 U.S.C. § 202(5) ...................................................... 14

8 U.S.C. § 1103(a) .............................................. 14, 30

8 U.S.C. § 1182(a)(9)(B)(ii) ............................... 30, 32

8 U.S.C. § 1229b........................................................ 24

8 U.S.C. § 1324a(h)(3)............................................. 31

Immigration and Nationality Act § 237(d)(2)
   (codified at 8 U.S.C. § 1227(d)(2)) ...................... 14

Victims of Trafficking and Violence
   Protection Act of 2000, Pub. L. No. 106-
   386, 114 Stat. 1464............................................. 14

**Regulations**

8 C.F.R. § 214.14(d)(3) ........................................ 30, 32

8 C.F.R. § 274a.12(c)(14)................................. 8, 24, 30

**AR5815**

iv

28 C.F.R. § 1100.35(b)(2) .................................... 30, 32

**Other Authorities**

64 No. 41 Interpreter Releases 1191 (Oct. 26, 1987)................................................. 10

67 No. 6 Interpreter Releases 153 (Feb. 5, 1990)...................................................... 10

67 No. 8 Interpreter Releases 204 (Feb. 26, 1990)...................................................... 10

Am. Imm. Council, *Reagan-Bush Family Fairness: A Chronological History* 1-2 (Dec. 2014) ......................................... 10

American Progress, *What We Know About DACA Recipients in the United States* (Sept. 5, 2019) .................................... 28

Memorandum from Sam Bernsen, Gen. Counsel of INS, Legal Opinion Regarding Service Exercise of Prosecutorial Discretion (July 15, 1976) ............. 7

Jennifer M. Chacón, *Producing Liminal Legality*, 92 DENVER L. R. 709 (2015)................. 34

Elise Foley, *Officials Refuse to Budge on Deportation of Students, Families*, THE HUFFINGTON POST (updated June 1, 2011).................................................... 34

AR5816

v

Statement of Karen T. Grisez on behalf of the American Bar Association to the U.S. Senate Committee on the Judiciary (May 18, 2011)................................................................ 13

Marvine Howe, *New Policy Aids Families of Aliens*, N.Y. TIMES at B3 (Mar. 5, 1990) ............. 10

INS Operations Instructions, O.I. § 242.10(a)(6)(i) (1956) ...................................... 6, 9

Memorandum from Jeh Charles Johnson, Sec'y of Homeland Security, Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants (Nov. 20, 2014)................................................... 4, 8

Stephen H. Legomsky & Cristina M. Rodriguez, IMMIGRATION AND REFUGEE LAW AND POLICY 1115 (5th ed. 2009) ................... 9

Written Testimony of Stephen H. Legomsky, The John S. Lehmann University Professor at the Washington University School of Law, *in Unconstitutionality of Obama's Executive Actions on Immigration: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 61-90 (2015)........................................*passim*

Letter from Members of Congress to Janet Reno, Attorney General, Department of Justice, Guidelines for Use of Prosecutorial Discretion in Removal Proceedings (Nov. 4, 1999) .................................. 15

AR5817

vi

Kate Manuel & Tom Garvey, Congressional Research Service, *Prosecutorial Discretion in Immigration Enforcement* (Dec. 27, 2013) .................................................... 22

Memorandum from Gene McNary, Comm'r of INS, Family Fairness:  Guidelines for Voluntary Departure Under 8 C.F.R. 242.5 for Ineligible Spouses and Children of Legalized Aliens (Feb. 2, 1990)............................................................. 10, 28

Memorandum from Doris Meissner, Comm'r of INS, Exercising Prosecutorial Discretion (Nov. 17, 2000).............................. 7, 13

Memorandum from John Morton, Dir., U.S. Immigration & Customs Enforcement, Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens (Mar. 2, 2011)................................................................. 4

Memorandum from John Morton, Dir., U.S. Immigration & Customs Enforcement, Policy No. 10075.1, Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens (June 17, 2011) ...................................... 7

AR5818

vii

Hiroshi Motomura, *The President's Dilemma: Executive Authority, Enforcement, and the Rule of Law in Immigration Law*, 55 WASHBURN L.J. 1, 28 (2015). ........................................................ 22

Decl. of Donald W. Neufeld, *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015) (No. B-14-254), ECF No. 130 att. 11 ....................................................................... 35

Memorandum from Donald Neufeld, Acting Assoc. Dir. of USCIS, Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children (Sept. 4, 2009) ..................................... 12

Office of Legal Counsel, U.S. Dept. of Justice, The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others (Nov. 19, 2014). .......... 14

Press Release, USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina (Nov. 25, 2005) .............................................................. 11

David Reimers, STILL THE GOLDEN DOOR: THE THIRD WORLD COMES TO AMERICA (1986) ................................................................... 9

AR5819

viii

Nicole Prchal Svajlenka, Center for American Progress, *What We Know About DACA Recipients in the United States* (Sept. 5, 2019) .......................................... 27

Paul W. Virtue, Acting Exec. Assoc. Comm'r of INS, Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues (May 6, 1997) ...................... 11

Shoba S. Wadhia, Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases (2015) .................................................... 5, 9, 13, 22

Shoba S. Wadhia, *In Defense of DACA, Deferred Action, and the DREAM Act*, 91 Tex. L.R. 59 (2013) .............................................. 22

Shoba Sivaprasad Wadhia, *Demystifying Employment Authorization and Prosecutorial Discretion in Immigration Cases*, 6 Colum. J. Race & Law 1 (2016) ........... 31

Shoba Sivaprasad Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 Conn. Pub. Int'l L.J. 243 (2010) .............. 5

U.S.C.I.S. Adjudicator's Field Manual 38.2(a)(2007) ......................................... 8

U.S.C.I.S., *Deferred Enforced Departure – Liberia* (last updated Apr. 4, 2019) .................... 12

U.S. Citizenship & Imm. Servs., DHS DACA FAQs Q1 ................................................. 32

**AR5820**

ix

Memorandum from Johnny N. Williams,
Exec. Assoc. Comm'r, Off. of Field Ops.,
INS, Family Unity Benefits and
Unlawful Presence (Jan. 27, 2003) .................... 13

Memorandum from William R. Yates, Assoc.
Dir. of Ops., U.S.C.I.S., Centralization of
Interim Relief for U Nonimmigrant
Status Applicants (Oct. 8, 2003) ........................ 11

Memorandum from William R. Yates, Assoc.
Dir. of Ops., U.S.C.I.S., Assessment of
Deferred Action Requests for Interim
Relief from U Nonimmigrant Status
Aliens in Removal Proceedings (May 6,
2004).................................................................... 11

AR5821

**1**

## INTEREST OF AMICI CURIAE[1]

*Amici* are 124 scholars of immigration law who have testified, lectured, researched, written, and advocated at length on immigration issues, including the principal subject of this appeal:  The power of the Executive Branch to craft and deploy immigration-related deferred action policies. This brief reflects *amici's* long-standing interest in and knowledge regarding the historical use of deferred-action initiatives in immigration enforcement, as well as the legal doctrines and precedent supporting such use.

A complete list of *amici* is set forth in Appendix A.

## SUMMARY OF ARGUMENT

In September 2017, the Department of Homeland Security (DHS) rescinded the agency's Deferred Action for Childhood Arrivals ("DACA") policy, purportedly on the basis that the policy was unconstitutional and otherwise unlawful. After unsuccessfully defending that position in court, DHS

---

[1]   Pursuant to Supreme Court Rule 37.6, *amici curiae* affirm that no counsel for a party authored this brief in whole or in part; that no party or counsel for a party made a monetary contribution toward the preparation or submission of this brief; and that no person other than the amici curiae or their counsels made a monetary contribution to its preparation or submission. Pursuant to Supreme Court Rule 37.3, each party has consented to the filing of this brief, and copies of the consents are on file with the Clerk of the Court.

2

issued a second, *post-hoc* memoranda that offered additional reasons for rescinding DACA, including the assertion that the current administration prefers to determine eligibility for deferred action on an *ad hoc*, case-by-case basis rather than a policy by which immigrants who meet certain threshold criteria may obtain deferred action after the exercise of case-by-case review by immigration officials.

While the parties debate in their briefs DHS's ability to rely on *post-hoc* rationalizations for agency decisions, *amici* respectfully submit this brief for the purpose of demonstrating to the Court that DHS's *originally stated* basis for rescission—the purported unconstitutionality and/or illegality of DACA—is not supported by legal precedent or historical practice. *Amici* can state this conclusion with confidence because they have devoted their careers to studying and researching immigration law, including the means by which the Executive Branch has exercised its discretion to identify which cases present a high priority for removal, and which low-priority immigrants may appropriately be placed at the 'end of the line.'

By submitting this brief, *amici* seek to provide the Court with the benefit of their expertise and knowledge regarding the long-standing use of deferred action and other forms of prosecutorial discretion in immigration enforcement. Specifically, a*mici* catalogue the numerous instances in which the Executive Branch has exercised its discretion to provide temporary relief to categories of immigrants

**AR5823**

**3**

who it determines, in its discretion, merit temporary relief from removal. These historical examples reveal that the exercise of discretion in immigration enforcement has long been driven by humanitarian considerations. *Amici* also identify the legal sources of prosecutorial discretion, and explain the ways in which Congress and the courts have supported and affirmed the validity of the exercise of discretion in setting priorities for immigration enforcement. And in an effort to be as helpful as possible, *amici* respond to the grounds on which DHS initially relied to rescind DACA, as well as the new arguments DHS has advanced in litigation, and explain why both fail to establish that DACA marks an unlawful departure from historical practice and precedent.

## ARGUMENT

## I.   THE EXECUTIVE BRANCH HAS LONG USED PROSECUTORIAL DISCRETION AND CATEGORY-BASED DEFERRED ACTION INITIATIVES IN SETTING PRIORITIES FOR IMMIGRATION ENFORCEMENT

The DACA initiative is a form of prosecutorial discretion, a long-established and well-accepted practice in nearly every area of civil and criminal law enforcement. As a general matter, prosecutorial discretion in immigration enforcement provides a temporary reprieve from removal. But the use of prosecutorial discretion, while broad, has its limits: The Executive Branch does not have the discretion to grant permanent residency or eligibility to naturalize in the United States. Such powers are reserved to

**AR5824**

**4**

Congress.

Where Congress appropriates fewer resources than will permit full enforcement, the use of prosecutorial discretion is unavoidable. DHS does not dispute that it cannot remove every undocumented immigrant who enters the country without authorization or enters under a valid visa that expires. When DACA was first announced, there were approximately 11 million undocumented immigrants living in the United States, yet Congress appropriated funds that allowed executive agencies to remove only 400,000 per year—less than 4% of that population.[2] DHS spends all of the money appropriated to it each year to remove this small percentage, and thus it must decide, within its broad discretion, those who are the highest removal priorities, and those who are not.[3] *See*

---

[2]  *See* Memorandum from John Morton, Dir., U.S. Immigration & Customs Enforcement, Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens at 1 (Mar. 2, 2011), http://www.ice.gov/doclib/news/releases/2011/110302washingtondc.pdf, superseded by Memorandum from Jeh Charles Johnson, Sec'y of Homeland Security, Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants (Nov. 20, 2014), https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.

[3]  *See Unconstitutionality of Obama's Executive Actions on Immigration: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 61-90 (2015) (written testimony of Stephen H. Legomsky, The John S. Lehmann University Professor at the Washington University School of Law) (hereinafter "Legomsky Written Testimony"); Shoba Sivaprasad Wadhia, *The Role of*

**5**

*Arizona v. United States*, 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials.").

### A.

Given that the resources appropriated to immigration enforcement permit removal of only a small fraction of undocumented immigrants, the Executive Branch has long exercised prosecutorial discretion in setting immigration enforcement priorities, including through the use of deferred action.

Prosecutorial discretion played a role in immigration enforcement long before the Executive Branch began its current practice of issuing and publicizing formal memoranda and guidance, such as the 2012 DACA Memorandum. In the 1970s, attorney Leon Wildes learned through his representation of John Lennon and Yoko Ono that the INS had for many years granted "nonpriority status" to prevent the deportation of immigrants who presented "sympathetic" cases for non-enforcement.[4] Shortly

---

*Prosecutorial Discretion in Immigration Law*, 9 CONN. PUB. INT'L L.J. 243, 268 (2010) (explaining that a just response to limited federal resources for immigration enforcement is to prioritize the removal of bad actors and, conversely, shift removal of noncitizens with desirable qualities to a lower priority).

[4] Shoba S. Wadhia, BEYOND DEPORTATION: THE ROLE OF PROSECUTORIAL DISCRETION IN IMMIGRATION CASES 14-17 (2015).

**AR5826**

**6**

after Wildes made this discovery, INS published its first formal, public deferred-action guidance in the form of "Operations Instructions," which required agents to consider deferred action "[i]n every case where the district director determines that adverse action would be unconscionable because of the existence of appealing humanitarian factors."[5] The instructions identified factors for INS agents and officers to use in determining whether to refer a removal or deportation case for deferred action. These factors included (i) an immigrant's age; (ii) the number of years he or she had been present in the United States; (iii) whether any health condition required care in the United States; (iv) how removal of the immigrant would affect family remaining in the United States; and (v) the extent to which the immigrant had engaged in criminal or other disfavored conduct.[6]

Long before the Department of Justice's Office of Legal Counsel issued its 2014 opinion concerning the legality of DACA, extended DACA, and DAPA (Pet'n App. 102a-110a), federal immigration officials issued guidance documents that affirmed the legal basis for using prosecutorial discretion in immigration enforcement and directed officers to exercise discretion judiciously at every stage of enforcement. One of the first publicly available memoranda

---

[5]   *Id.* at 17 (citing INS Operations Instructions, O.I. § 103.1(a)(1)(ii) (1975)).

[6]   *Id.* at 187 n.8(ii) (citing INS Operations Instructions, O.I. § 103.1(a)(1)(ii) (1975)).

**7**

promulgated by a federal official was authored in 1976 by then-INS General Counsel Sam Bernsen.[7] The Bernsen Memorandum explained that prosecutorial discretion is rooted in the common law, and identified the "Take Care" clause of the United States Constitution as a source of authority to exercise prosecutorial discretion over immigration matters.[8] In 2000, INS Commissioner Doris Meissner expanded upon the Bernsen Memorandum and provided additional guidance regarding the use of prosecutorial discretion in immigration enforcement.[9] During the last administration, additional memoranda setting out policies to govern the exercise of prosecutorial discretion were issued by the Director of U.S. Immigration and Customs Enforcement and, later, by the Secretary of DHS.[10] Deferred action was

---

[7]      Memorandum from Sam Bernsen, Gen. Counsel of INS, Legal Opinion Regarding Service Exercise of Prosecutorial Discretion (July 15, 1976), https://www.ice.gov/doclib/foia/prosecutorial-discretion/service-exercise-pd.pdf.

[8]      *Id.*

[9]      Memorandum from Doris Meissner, Comm'r of INS, Exercising Prosecutorial Discretion (Nov. 17, 2000), http://library.niwap.org/wp-content/uploads/2015/IMM-Memo-ProsDiscretion.pdf.

[10]      Memorandum from John Morton, Dir., U.S. Immigration & Customs Enforcement, Policy No. 10075.1, Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens (June 17, 2011), https://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf; Memorandum from Jeh Charles Johnson, Sec'y of DHS,

8

mentioned specifically in nearly every one of the aforementioned guidance documents. Moreover, a federal immigration regulation in place since 1981 recognizes deferred action as "an act of administrative convenience to the government which gives some cases lower priority." 8 C.F.R. § 274a.12(c)(14).

Since 1960, the INS and its successor, DHS, have adopted at least 20 policies reflecting the use of prosecutorial discretion with respect to large, defined categories of undocumented immigrants.[11] Many of these policies included the use of "extended voluntary departure" (now known as "deferred enforced departure"), under which the President may temporarily delay removal of certain classes of individuals.[12] Historical policies that applied such prosecutorial discretion to categories of immigrants include:

- In 1956, Present Dwight D. Eisenhower used prosecutorial discretion in grants of

---

on Policies for the Apprehension, Detention and Removal of Undocumented Immigrants (Nov. 20, 2014), https://www.dhs.gov/sites/default/files/publications/14_1 120_memo_prosecutorial_discretion.pdf.

[11]  *See Regents v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 488 (9th Cir. 2018) (citing Andorra Bruno et al., Cong. Research Serv., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (July 13, 2012)).

[12]  *See* U.S.C.I.S. Adjudicator's Field Manual 38.2(a)(2007), https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0 -0-0-1/0-0-0-16606/0-0-0-16764.html#0-0-0-591.

AR5829

**9**

"parole" to authorize thousands of Hungarian "Freedom Fighters" (who had been fighting against Soviet incursions) to enter the United States.[13]

- In the same year, the Eisenhower Administration implemented an extended voluntary departure program for certain beneficiaries of a program for skilled or other workers.[14]

- In 1981, President Ronald Reagan issued temporary relief from deportation through extended voluntary departure to thousands of Polish nationals who were residing in the United States when Poland declared martial law.[15]

- In 1987, the Reagan Administration announced the "Family Fairness" executive action to defer deportations of children whose parents were eligible for permanent residency under the newly enacted Immigration Reform and

---

[13]   *See* Wadhia, BEYOND DEPORTATION at 29-30.

[14]   *See* INS Operations Instructions, O.I. § 242.10(a)(6)(i) (1956).

[15]   *See* Stephen H. Legomsky & Cristina M. Rodriguez, IMMIGRATION AND REFUGEE LAW AND POLICY 1115-17 (5th ed. 2009); David Reimers, STILL THE GOLDEN DOOR: THE THIRD WORLD COMES TO AMERICA 202 (1986).

**10**

Control Act of 1986 (IRCA).[16] Under President George H.W. Bush, the Family Fairness policy was expanded to defer deportations of the spouses and children of immigrants who qualified for permanent residence under the same statute.[17] The Bush Administration predicted that the policy would affect 1.5 million non-citizen spouses and children of immigrants (expected at the time to affect 40% of the undocumented immigrant population).[18]

• Under President William Jefferson Clinton, the INS established a deferred action initiative for survivors of abuse by

---

[16]   *See* 64 No. 41 Interpreter Releases 1191 (Oct. 26, 1987); *see also* Am. Imm. Council, *Reagan-Bush Family Fairness: A Chronological History* 1-2 (Dec. 2014), https://www.americanimmigrationcouncil.org/sites/default/files/research/reagan_bush_family_fairness_final_0.pdf.

[17]   Marvine Howe, *New Policy Aids Families of Aliens*, N.Y. TIMES at B3 (Mar. 5, 1990), https://www.nytimes.com/1990/03/05/nyregion/new-policy-aids-families-of-aliens.html; 67 No. 8 Interpreter Releases 204 (Feb. 26, 1990); 67 No. 6 Interpreter Releases 153 (Feb. 5, 1990).

[18]   *See* Memorandum from Gene McNary, Comm'r of INS, Family Fairness: Guidelines for Voluntary Departure Under 8 C.F.R. 242.5 for Ineligible Spouses and Children of Legalized Aliens at 1-2 (Feb. 2, 1990); *see also* Legomsky Written Testimony at 83–85.

11

U.S.-citizen spouses.[19]

- In 2003, then-INS Director of Operations William Yates published memoranda that directed INS officers to use prosecutorial discretion (including deferred action) to protect victims who were eligible for statutory protections such as an "U" visa.[20]

- In 2005, President George W. Bush's administration instituted a deferred-action policy for foreign students affected by Hurricane Katrina.[21]

---

[19]  Paul W. Virtue, Acting Exec. Assoc. Comm'r of INS, Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues (May 6, 1997).

[20]  Memorandum from William R. Yates, Assoc. Dir. of Ops., U.S.C.I.S., Centralization of Interim Relief for U Nonimmigrant Status Applicants (Oct. 8, 2003), http:///www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/Archives%201998-2008/2003/ucntrl100803.pdf; Memorandum from William R. Yates, Assoc. Dir. of Ops., U.S.C.I.S., Assessment of Deferred Action Requests for Interim Relief from U Nonimmigrant Status Aliens in Removal Proceedings (May 6, 2004), https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/Archives%201998-2008/2004/uprcd050604.pdf.

[21]  Press Release, USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina (Nov. 25, 2005),

12

- Two years later, President Bush's administration announced a policy of deferred enforced departure applicable to certain Liberians, in recognition of the ongoing Liberian armed conflict. The policy has been extended for periods of twelve to eighteen months at a time, most recently by President Donald J. Trump in March 2019.[22]

- And in 2009, President Barack Obama implemented deferred action for widows and widowers whose visa applications had not been adjudicated when their U.S.-citizen spouses died.[23]

As a general matter, agency officials have recognized that prosecutorial discretion should be informed by humanitarian considerations, and have regularly reminded agents to take humanitarian factors into account when deciding which cases may be eligible for

---

https://www.uscis.gov/sites/default/files/files/pressreleas e/F1Student_11_25_05_PR.pdf.

[22] U.S.C.I.S., *Deferred Enforced Departure – Liberia*, https://www.uscis.gov/humanitarian/deferred-enforced-departure/ded-granted-country-liberia/ded-granted-country-liberia (last updated Apr. 4, 2019).

[23] Memorandum from Donald Neufeld, Acting Assoc. Dir. of USCIS, Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children (Sept. 4, 2009), https://www.uscis.gov/sites/default/files/USCIS/ Laws/Memoranda/2009/June%202009/surviving-spouses-deferred-action-guidance.pdf.

**13**

deferred action.[24] Thus, in addition to adopting policies directed at categories of immigrants who may warrant relief based on the same humanitarian considerations, INS and DHS have exercised discretion on a case-by-case basis to grant deferred action to people with serious medical conditions, those who entered the country at a young age, those who have strong family ties to citizens, and those with lengthy terms of residence in the United States.[25]

B.

Congress has effectively delegated to DHS (and INS before) the power and authority to make prosecutorial discretion decisions. It has explicitly charged the Secretary of Homeland Security with the "administration and enforcement of . . . all . . . laws

---

[24] *See, e.g.*, Memorandum from Doris Meissner, Comm'r of INS, Exercising Prosecutorial Discretion (Nov. 17, 2000), http://library.niwap.org/wp-content/uploads/2015/IMM-Memo-ProsDiscretion.pdf; *see also* Memorandum from Johnny N. Williams, Exec. Assoc. Comm'r, Off. of Field Ops., INS, Family Unity Benefits and Unlawful Presence (Jan. 27, 2003) (reminding regional directors that they have authority to refrain from bringing charges on the basis of unlawful presence and may rely on humanitarian factors to make this assessment); *see generally* Wadhia, BEYOND DEPORTATION at 27-28 (collecting examples).

[25] *See* Statement of Karen T. Grisez on behalf of the American Bar Association to the U.S. Senate Committee on the Judiciary at 7 (May 18, 2011), *available at* http:///www.americanbar.org/content/dam/aba/uncatego rized/2011/2011may18_grisezs_t.authcheckdam.pdf.

**AR5834**

14

relating to . . . immigration and naturalization . . . ," 8 U.S.C. § 1103(a)(1), and has made the Secretary "responsible" for "[e]stablishing national immigration enforcement policies and priorities," 6 U.S.C. § 202(5).

Congress has also enacted numerous pieces of immigration legislation that assume that the Executive Branch has the power to grant deferred action to certain classes or categories of otherwise removable immigrants. As the Office of Legal Counsel recognized in 2014, "Congress has long been aware of the practice of granting deferred action, including in its categorical variety" and "has enacted several pieces of legislation that have either assumed that deferred action would be available in certain circumstances, or expressly directed that deferred action be extended to certain categories of aliens."[26] For instance, in Section 237(d)(2) of the Immigration and Nationality Act (codified at 8 U.S.C. § 1227(d)(2)), Congress specified that the denial of a request for an administrative stay of an order of removal "shall not preclude the alien from applying for . . . deferred action." Similarly, Section 1503(d)(3) of the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464, 1522 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV)), makes certain covered immigrants "eligible for deferred action and work authorization."

---

[26]   Office of Legal Counsel, U.S. Dept. of Justice, The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others at 18 (Nov. 19, 2014).

**15**

Moreover, members of Congress from both major political parties have urged the Executive Branch to de-prioritize specific categories of removal cases on humanitarian grounds. For instance, after Congress amended the INA in 1996 to mandate that INS detain "arriving aliens" (including asylum seekers) and limit the discretion of immigration judges to release detainees on bond, a bi-partisan group of twenty-eight members of Congress (including some co-sponsors of the 1996 amendments) urged the INS Commissioner to issue guidelines on prosecutorial discretion based on the concern that INS was pursuing the deportation of productive and sympathetic non-citizens "when so many other more serious cases existed."[27]

In fact, Congress has never curtailed the Executive Branch's use of deferred action over the almost 50 years such initiatives have been employed, despite amending the INA on numerous occasions and passing annual agency appropriation bills. To the contrary, Congress has made the Executive Branch's use of deferred action and other forms of prosecutorial discretion unavoidable, by consistently appropriating far less than DHS needs to remove every person eligible for removal.

C.

Finally, this Court has repeatedly confirmed

---

[27] *See* Letter from Members of Congress to Janet Reno, Attorney General, Department of Justice, Guidelines for Use of Prosecutorial Discretion in Removal Proceedings (Nov. 4, 1999), http://www.ice.gov/doclib/foia/ \ prosecutorial-discretion/991104congress-letter.pdf.

16

the Executive Branch's lawful right and need to employ prosecutorial discretion policies in various contexts, including immigration. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials"); *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion"). Indeed, in *Reno v. American-Arab Anti-Discrimination Committee*, Justice Scalia, writing for an eight-Justice majority, confirmed that deferred action constituted a "regular practice" by which the INS exercised prosecutorial discretion "for humanitarian reasons or simply for its own convenience." 525 U.S. 471, 483-84 (1999).

## II. THE DACA INITIATIVE FITS SQUARELY INTO THE EXECUTIVE BRANCH'S LONGSTANDING USE OF CATEGORY-BASED DEFERRED ACTION INITIATIVES

DACA fits squarely within the legal, historical practice of identifying categories of immigrants for whom removal is not a high priority, such that "enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities." 2012 DACA Memorandum at 98a. The policy sets out criteria that must be satisfied before an individual is "considered for an exercise of prosecutorial discretion," which include age (eligibility is limited to

**AR5837**

**17**

those thirty years old or under); dates of entry, and, to the extent applicable, re-entry into the United States (the applicant must have first arrived in the United States when he or she was under sixteen years old, must have resided in the United States on a continuous basis for the past five years, and must have been present in the United States as of the date the DACA policy was first promulgated); education (the applicant must be in school, have graduated from high school or have a GED, or have been honorably discharged from the armed services); and threat to public safety (the applicant must not have been convicted of a felony, a significant misdemeanor or multiple misdemeanors, or otherwise pose a threat to national security or public safety). *Id.* Applicants must also pass a background check. *Id.* at 99a.

The memorandum announcing the DACA initiative specified that satisfying the above criteria would not guarantee relief from removal. Rather, "requests for relief pursuant to this memorandum are to be decided on a case-by-case basis." *Id.* at 99a. Then-Secretary Napolitano also confirmed that the memorandum "confers no substantive right, immigration status or pathway to citizenship," but rather "set[s] forth policy for the exercise of discretion within the framework of the existing law." *Id.* at 101a.

To date, every court to substantively address DACA has found it to be a lawful exercise of Executive

18

Branch discretion.[28]

## III.   THE DACA INITIATIVE IS A LAWFUL EXERCISE OF DISCRETION IN IMMIGRATION ENFORCEMENT

DHS's stated reasons for declaring DACA unconstitutional or otherwise unlawful cannot be squared with the broad discretion the Executive Branch has historically exercised over matters of immigration enforcement. DHS acknowledges—as it must—that both Congress and this Court have recognized and affirmed the use of prosecutorial discretion and deferred action as integral to

---

[28]   The only instance in which a deferred action policy has been found unlawful did not involve a full hearing on the merits. In *Texas v. United States*, a district court in Brownsville, Texas granted a request by the attorneys general of several states to enjoin the implementation of DAPA and "extended DACA"—deferred-action initiatives that applied to much larger groups of immigrants than DACA—after finding that the states were likely to prevail on the merits of their claims that DHS violated the procedural requirements of the Administrative Procedure Act by adopting these policies. 86 F. Supp. 3d 591, 671-72 (S.D. Tex. 2015). The U.S. Court of Appeals for the Fifth Circuit affirmed, and an equally divided Court allowed the ruling to stand. *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam). In 2018, the same district court determined that a group of states were likely to prevail on claims that DACA violated the APA, but declined to enjoin the program on the ground that the plaintiff states had not demonstrated that they would suffer irreparable harm if the program were allowed to remain in place for the pendency of the litigation. *Texas v. United States*, 328 F. Supp. 3d 662, 712-42 (S.D. Tex. 2018). The Texas court's limited-record rulings have no bearing on DACA's viability.

**19**

enforcement of the immigration laws. In addition, DHS acknowledges that, because it lacks the resources to remove the entire population eligible for removal at any given time (and, in fact, has the funds to remove only a small fraction of those immigrants), DHS *must* exercise discretion in deciding who to prioritize for removal. Despite these concessions, DHS has taken the position that the exercise of deferred action embodied by DACA is somehow patently improper. *Amici* respectfully submit that DHS's reasons have no support in the historical facts or jurisprudential underpinnings of Executive Branch discretion in the field of immigration enforcement.

A.

In announcing and attempting to justify its decision to rescind DACA, DHS relied in significant part on its conclusion that the policy is "unconstitutional." On September 4, 2017, then-Attorney General Sessions wrote to Acting DHS Secretary Elaine Duke to "advise" that DHS rescind the June 2012 DACA Memorandum. Sessions described DACA as an "unconstitutional exercise of authority by the Executive Branch" based on his conclusion that the policy constituted an "open-ended circumvention of immigration laws." JA 877. Acting Secretary Duke quoted this portion of the letter in her September 5, 2017 Rescission Memorandum (*see* Duke Mem. 116a), and concluded, "it is clear that the June 15, 2012 DACA program should be terminated" based on Sessions's legal analysis as well as the factual findings in a lawsuit in which "the original DACA policy was not challenged." Duke Mem. 114a &

20

117a.[29]

DHS has not explained why Acting Secretary Duke concluded that DACA was unconstitutional, either in the appellate courts below or in its merits brief here. Neither Attorney General Sessions nor Acting Secretary Duke pointed to a specific supporting law or doctrine. In fact, the lone case on which the Acting Secretary relied to find DACA unconstitutional did not address DACA's lawfulness at all, much less the constitutionality of exercising prosecutorial discretion. *Texas v. United States*, 809 F.3d 134, 178-86 (5th Cir. 2015), *aff'd per curiam by an equally divided panel*, *United States v. Texas*, 136 S. Ct. 2271 (2016).

Prior to the attempt to rescind DACA, those who challenged the constitutionality of the policy generally grounded their objections on the President's obligation to "take Care that the Laws be faithfully

[29] Although this brief focuses on whether DACA is a legal exercise of prosecutorial discretion, and leaves it to others to address the extent to which DHS's rescission of the policy comported with the Administrative Procedure Act, *amici* note that a court's review of agency action is generally limited to the record before the agency at the time it made the decision under review, rather than an agency's *post-hoc* rationalizations developed for the purpose of litigation. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Here, Attorney General Sessions and Acting Secretary Duke both adopted the view that DACA was unconstitutional at the time of their decision. As a result, although DHS does not attempt to defend its original justification for its action, *amici* will briefly address the extent to which DACA is a constitutional exercise of discretion by the Executive Branch.

AR5841

21

executed." U.S. CONST. art. II, § 3. Certain commentators argued that the President's willingness to temporarily defer pursuit and deportation of successful DACA applicants constitutes a failure to "execute" the immigration laws. But, as the Congressional Research Service observed in 2013, "no court appears to have invalidated a policy of non-enforcement founded upon prosecutorial discretion on the grounds that the policy violated the Take Care Clause." Kate Manuel & Tom Garvey, Congressional Research Service, *Prosecutorial Discretion in Immigration Enforcement* at 17 (Dec. 27, 2013). This unbroken pattern has held among the lower courts that have since considered challenges to DACA. *See Arpaio v. Obama*, 27 F. Supp. 3d 185, 209-10 (D.D.C. 2014), *aff'd on other grounds*, 797 F.3d 11 (D.C. Cir. 2015) (rejecting constitutional attack on DACA); *Crane v. Johnson*, 783 F.3d 244, 251-55 (5th Cir. 2015) (dismissing on standing grounds plaintiff's claim that DACA is unconstitutional).

The exercise of prosecutorial discretion to prioritize which immigrants to remove from the United States is, if anything, a *necessary* component of the President's obligation to "take care" to execute faithfully all immigration laws, not an abdication of that responsibility. The law requires the President, as "prosecutor-in-chief" for the immigration enforcement system, to make the hard choices necessary to properly "administer systematic enforcement in the huge gap between the unauthorized population of over eleven million and the annual enforcement capacity of

AR5842

22

[a small percentage] of that figure."[30] The President's "faithful execution of the immigration laws" therefore "includes prioritizing the deportable population in a cost-effective and conscientious manner and providing benefits to deportable noncitizens when they qualify" under other laws.[31]

In any event, DHS long ago abandoned its argument that DACA constitutes a violation of the President's Article II obligations under the "Take Care" clause. And DHS does not identify any other constitutional provision that prohibits it from engaging in its long-standing practice of using deferred action to carry out its enforcement priorities.[32] As a result, any challenge to DACA's lawfulness must be based on the notion that this exercise of discretion is inconsistent with federal

---

[30]  Hiroshi Motomura, *The President's Dilemma: Executive Authority, Enforcement, and the Rule of Law in Immigration Law*, 55 WASHBURN L.J. 1, 28 (2015).

[31]  Wadhia, BEYOND DEPORTATION at 107; *see also* Shoba S. Wadhia, *In Defense of DACA, Deferred Action, and the DREAM Act*, 91 TEX. L.R. 59, 62-63 (2013).

[32]  An *amicus* brief filed by the Cato Institute and Professor Jeremy Rabkin "supporting DACA as a matter of policy but petitioners as a matter of law" argues that Attorney General Sessions's and Acting Secretary Duke's objections to the constitutionality of the policy can be understood as an application of this Court's non-delegation or "major questions" precedent. Although a full rebuttal of this argument is outside of the scope of this brief, *amici* are unaware of any historical or legal precedent that would support curtailing the exercise of a power that is unique to the executive—prosecutorial discretion—on grounds that it constituted an exercise of Congress's power to legislate.

**23**

immigration law.

B.

DHS's remaining reasons for contending that the DACA policy is unlawful are impossible to square with the legal and historical precedent supporting the broad use of prosecutorial discretion in immigration enforcement.

1.

First, DHS appears to take the position that DACA impinges on Congress's authority to legislate the terms under which an otherwise removable immigrant may be permitted to remain in the United States. To this end, DHS points to various provisions of the INA that, in its view, form a "comprehensive, detailed scheme for affording certain aliens relief or reprieve from removal." DHS Br. at 44. It then suggests that, although DHS retains authority to address "interstitial matters of immigration enforcement," the INA does not permit the agency to pursue this particular form of deferred action. *Id.*

This argument simply ignores the differences between the limited grounds for relief or reprieve from removal afforded by the INA and the Executive Branch's right, as reflected in DACA, to make decisions about which cases to prioritize for removal. Statutory provisions that offer durable relief from removal (including the adjustment of status to lawful permanent residency) are fundamentally different from deferred action. Deferred action is an "act of administrative convenience to the government which

**AR5844**

24

gives some cases lower priority." 8 C.F.R. § 274a.12(c)(14). It is a policy of temporary, time-limited non-enforcement. *See* DHS Br. at 46; JA 799 (2014 OLC Memorandum) ("Deferred action does not confer any lawful immigration status, nor does it provide a path to obtaining permanent residence or citizenship. Grants of deferred action under the proposed programs would, rather, represent DHS's decision not to seek an alien's removal for a prescribed period of time.").

There is no indication that, in providing statutory remedies for certain immigrants who might otherwise be removable, Congress intended to prevent the Executive Branch from exercising discretion to set enforcement priorities with respect to removable immigrants who do not qualify for asylum or other forms of statutory relief. To the contrary, Congress has repeatedly recognized that the agencies that enforce immigration laws may exercise prosecutorial discretion (including deferred action) in prioritizing cases for removal, and has noted, for example, the possibility of such temporary relief in the same statutes that contain provisions affording relief to asylum seekers, immigrants eligible for "T" or "U" visas. The provisions DHS identifies as forming a "comprehensive and detailed scheme" do not provide remedies for every immigrant who may warrant relief from removal on humanitarian grounds.[33] Indeed, each of the deferred action initiatives identified in

---

[33]     *See, e.g.,* 8 U.S.C. § 1229b (capping the Attorney General's authority to adjust the status of immigrants who are eligible for an adjustment under the provision to 4,000 immigrants in any fiscal year);

**25**

Section I, *infra*, was pursued at a time when the operative immigration laws included provisions that provided relief or reprieve from removability.

Meanwhile, Congress has repeatedly chosen not to provide sufficient funding for DHS to initiate removal proceedings against every immigrant subject to removal. Thus, the temporal order of removal is hardly an area in which Congress intended to occupy the field and leave the agency room only to pursue "interstitial" or "gap-filling" measures. DHS Br. at 44. Instead, it is an area—like many other areas—in which Congress and this Court have recognized the power of the executive branch to decide how to best use the limited resources allocated for enforcement of federal law.

Nor does Congress's failure to legislate a permanent pathway to citizenship for DACA recipients (via so-called DREAM Acts) foreclose DHS from making DACA recipients a lower removal priority. Surely, DHS does not mean to indicate that, in failing to overcome legislative gridlock on possible pathways to permanent citizenship, Congress affirmatively signaled *affirmative opposition* to placing at the back of the removal line children who were brought to the United States as minors, who obtained an education and/or served in the armed forces, and who do not present a risk to national security or public safety. In any event, regardless of what inferences one might attempt to draw from Congress's failure to fully pass DREAM Act legislation, DHS, not Congress, is responsible for strategically employing limited resources to enforce the immigration laws.

**AR5846**

26

2.

DHS concedes that it has limited resources to devote to removal, and therefore must make choices regarding which immigrants to prioritize in its enforcement efforts. It argues, however, that its discretion is limited to "strategically directing the agency's resources to the highest priority violators." DHS Br. at 45. It then contends that DACA goes too far by "informing roughly 1.7 million aliens that they may continue violating federal law without fear of enforcement—while establishing a procedure to make them eligible for additional benefits." *Id.* Elsewhere, DHS describes DACA as "affirmatively assisting lower-priority offenders to persist in ongoing illegal activity." *Id.* at 46.

This argument rests on false premises that find no support in the law governing deferred action or the historical circumstances in which the practice has been used. Indeed, accepting several of DHS's pronouncements as true would cast doubt on the validity of *every* past or future use of deferred action— notwithstanding the fact that both Congress and this Court have for decades acknowledged and approved of prosecutorial discretion in enforcing the immigration laws (including through deferred action).

a.

Because DHS recognizes that deferred action has been used by previous administrations and appears to concede this use was lawful (or at least does not challenge these previous uses), it must establish here that DACA is fundamentally different from those previous policies and that any such

**AR5847**

27

differences are doctrinally significant. DHS fails on both counts—nearly all of the differences to which it draws the Court's attention are not supported by the record, and any factually supportable differences do not justify the conclusion that DACA is unlawful.

In referring repeatedly to the number of potential DACA beneficiaries (1.7 million) and implicitly comparing the smaller populations that were the subject of certain prior deferred action initiatives, DHS appears to assume that the INA somehow caps the number of immigrants who may be identified as lower priority for removal in an exercise of prosecutorial discretion. There is no legal basis for holding that DHS may only enact policies that apply to a small class of otherwise removable immigrants. Although category-based deferred action has typically been used for groups comprised of fewer immigrants than the 1.7 million who were estimated to meet DACA's threshold eligibility requirements, this does not mean that DHS acted unlawfully in promulgating a policy that temporarily defers removal of a larger class of immigrants who are each deemed worthy recipients of prosecutorial discretion.[34] DHS does not

---

[34]   Although there is no legal or historical support for DHS's argument that it may not exercise discretion with respect to a group that exceeds a certain number of immigrants, *amici* note that the actual number of immigrants granted deferred action under DACA is far less than 1.7 million. As of June 2019, the Center for American Progress estimated that there are 660,880 DACA recipients living in the United States. *See* Nicole Prchal Svajlenka, Center for American Progress, *What We Know About DACA*

28

dispute that its resources historically permit removal of only about 400,000 immigrants per year. Thus, even if immigrants who meet the criteria for DACA (1.7 million) were taken out of the pool of immigrants eligible for removal (historically about 11 million), the number of removable immigrants still vastly exceeds those DHS could realistically remove at current and historic funding levels.

Moreover, in terms of overall anticipated effect, DACA was slated to impact a smaller proportion of removable immigrants than original estimates for the Family Fairness policy in effect during the administrations of Presidents Ronald Reagan and George H.W. Bush. The Family Fairness policy was expected to defer the deportations of approximately 1.5 million non-citizen spouses and children of immigrants—i.e., about forty percent of the removable population at the time.[35] Although there is some evidence that INS's estimates regarding program participation exceeded the number of immigrants who ultimately took part in Family Fairness, the fact remains that there were no challenges to the legality of using prosecutorial discretion to afford temporary relief from deportation to a significant portion of the

_____

*Recipients in the United States* (Sept. 5, 2019), https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states/ (summarizing data filed in this litigation).

[35]   *See* Memorandum from Gene McNary, Comm'r of INS, Family Fairness: Guidelines for Voluntary Departure Under 8 C.F.R. 242.5 for Ineligible Spouses and Children of Legalized Aliens at 1-2 (Feb. 2, 1990); *see also* Legomsky Written Testimony at 83-85.

29

removable population.

DHS is also incorrect when arguing that the Family Fairness program had a "plausible basis in the INA" because it used the mechanism of extended voluntary departure as opposed to deferred action. DHS Br. at 48-49. The power to grant or deny extended voluntary departure finds its basis in the same sources as the power to grant deferred action— the Attorney General's "broad latitude" in enforcing the immigration laws implicit in statutes such as 8 U.S.C. § 1103(a), as well as the President's general obligations to "take Care" that the laws be faithfully executed. *See Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1510, 1519 (D.C. Cir. 1988) (en banc) (per curiam) (Mem.) (opinions of Mikva, J. and Silberman, J.).

In addition to arguing that the number of recipients somehow renders DACA unlawful, DHS attempts to distinguish DACA from instances in which previous administrations have used deferred action, noting that many of the previous uses were stop-gap measures to forestall deportation while the immigrants pursued statutory remedies. DHS also argues that many initiatives singled out groups who are afforded "special solicitude" by the INA. DHS Br. at 46-48.[36] To the extent this is a correct description of

---

[36]   Although the INA does not currently afford special treatment to DACA recipients, there is broad-based, bi-partisan public support for passing some version of the DREAM Act.  Moreover, Congress's repeated (albeit unsuccessful) attempts to provide a legislative remedy is,

**30**

at least some of the previous exercises of deferred action, neither DHS, Congress, nor this Court has ever indicated that DHS lacks discretion to de-prioritize the removal of groups who do not meet either criteria.

b.

It is highly misleading for DHS to suggest that DACA is somehow "different" from prior policies because it "affirmatively assist[s] lower-priority offenders to persist in ongoing illegal activity." DHS Br. at 46. In making this statement, DHS is presumably referencing the fact that DACA recipients are temporarily treated as "lawfully present" and are eligible to apply for work authorization upon a showing of economic need, which, if granted, will lead to the issuance of a Social Security card. But this would be the case for *any* recipient of deferred action—it is not unique to DACA. Under 8 U.S.C. § 1182(a)(9)(B)(ii) and related regulations, DHS treats recipients of deferred action as "lawfully present" during the temporary "period of stay" in which their status is in effect.[37] Further, as DHS itself admits, immigrants who are granted deferred action *on any basis* may be authorized to work if they establish economic necessity. *See* DHS Br. at 5. The regulation governing work authorization for recipients of deferred action (8 C.F.R. § 274a.12(c)(14)) has been in

_____

at the very least, evidence of Congress's concern for children and young adults who were brought to the United States as children and who are productive members of their communities.

[37]   *See* 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2).

31

place since 1981, and implements a similar statutory directive. *See* 8 U.S.C. § 1324a(h)(3) (noting that a person is 'authoriz[ed] to work in this country if he or she is permitted to work "by [the INA] or by the Attorney General"). Thousands of deferred action recipients have applied for and received employment authorization pursuant to this regulation.[38] Moreover, obtaining work authorization permits recipients of deferred action to obtain temporary social security cards under Section 205(c)(2)(B)(ii)(I) of the Social Security Act, not under the INA.[39] DHS fails to explain how the application of these statutes and regulations renders DACA unlawful while other deferred action policies are allowed to proceed.

Moreover, DHS's references to the receipt of "benefits," the "deploy[ment] [of] limited resources in a manner that *facilitates* ongoing violation of federal law," and "affirmative[] assist[ance]" are themselves misleading, to the extent that this rhetoric suggests DACA impermissibly directs scarce enforcement resources directly into the pockets of recipients. Work authorization is not a "benefit" as that term is typically understood under public law—although it permits recipients to earn money, the wages are paid by an employer rather than the taxpayer, and the recipient in turn pays taxes to the United States. To

---

[38]    *See, e.g.*, Legomsky Written Testimony at 76-78; Shoba Sivaprasad Wadhia, *Demystifying Employment Authorization and Prosecutorial Discretion in Immigration Cases*, 6 COLUM. J. RACE & LAW 1 (2016).

[39]    *See* Legomsky Written Testimony at 67.

32

the extent DHS intended to refer here to the costs of administering DACA, there is no evidence of these costs in the record, much less evidence that DHS relied on the initiative's costs as a ground to rescind. To the contrary, there is forceful evidence that DACA recipients, on a net basis, contribute healthily to (rather than burden) the federal tax base.[40]

DHS's references to DACA recipients' "ongoing violation" of federal law are similarly misleading. Although prosecutorial discretion cannot be used to grant "lawful status," recipients of deferred action are treated as "lawfully present" while deferred action is in effect,[41] and, thus, cannot be said to be violating statutes governing removal on an "ongoing" basis. Again, lawful presence is the result of a generally applicable statute, rather than a feature of DACA in particular. Moreover, it cannot be the case that DHS believes rationally that DACA recipients are violating the law in other ways, given that immigrants who have committed felonies, "significant" misdemeanors,

---

[40]    *See* Nicole Prchal Svajlenka, Center for American Progress, *What We Know About DACA Recipients in the United States* (Sept. 5, 2019), https://www.americanprogress.org/issues/immigration/n ews/2019/09/05/474177/know-daca-recipients-united-states/ (summarizing evidence of financial contributions of DACA recipients based on 2017 1-year American Community Survey microdata).

[41]    *See* U.S. Citizenship & Imm. Servs., DHS DACA FAQs Q1 ("An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect."); *see also* 8 U.S.C. § 1182(a)(9)(B)(ii); 8 C.F.R. § 214.14(d)(3); 28 C.F.R. 1100.35(b)(2).

33

or multiple misdemeanors are categorically ineligible for DACA. The DACA policy also requires recipients to apply for renewal every two years, thereby assuring that criminal activity, if any, can be taken into account.

c.

Finally, to the extent DHS believes DACA is unlawful on grounds that it is a "categorical deferred-action policy" (DHS Br. at 43), this broad objection does not align with the long-standing practice of adopting prosecutorial discretion strategies that identify categories of immigrants who may warrant temporary relief rather than exercising discretion on a purely case-by-case basis.

Indeed, DHS does not raise a meaningful challenge to its own ability to identify a category of immigrants eligible to receive individualized consideration for deferred action. Instead, DHS posits that DACA's high acceptance rate "plainly creates an implicit presumption that requestors who meet its eligibility criteria will be granted deferred action," and then offers the previously unstated view that the current administration prefers to exercise its discretion to grant requests for deferred action only on a "truly individualized, case-by-case basis. DHS Br. at 39. While DHS's ability to rely on *post-hoc* policy preferences is beyond the scope of this brief, *amici* seek to clarify the extent to which DACA already requires case-by-case enforcement.

DACA expressly mandates that DHS make individualized, case-by-case, discretionary evaluations as to applicants who meet the threshold

34

criteria for eligibility. Then-Secretary Napolitano drafted the DACA policy to explicitly require DHS adjudicators to exercise individualized discretion consistent with the administration's stated view that there were not "whole categories that we will, by executive fiat, exempt from the current immigration system, as sympathetic as we feel towards them."[42] Under DACA, if young people meet certain criteria relating to their residence in the United States, such as age at arrival, education, and good behavior, they are eligible for an individualized assessment, but the discretionary grant of temporary relief is only a *possible* outcome—it is not guaranteed.[43]

DACA's initial eligibility criteria also explicitly preclude approval of applicants who pose a threat to national security or public safety, which itself requires an exercise of individualized discretion. Whether an applicant endangers the public safety is not simply a box-checking exercise. Assessing the extent to which an individual may pose a threat to national security or public safety requires officials to exercise subjective judgment.

The record developed in *Texas II*—the only case DHS emphasized in its revocation decision—reflects

---

[42]   *See* Elise Foley, *Officials Refuse to Budge on Deportation of Students, Families*, THE HUFFINGTON POST (updated June 1, 2011), http://www.huffingtonpost.com\2011\04\01\obama–administration–refu_1_in_843729.html.

[43]   *See* Jennifer M. Chacón, *Producing Liminal Legality*, 92 DENVER L. R. 709, 727 (2015).

35

that the agency in fact exercises its discretion when reviewing DACA applications.[44] The evidence established that as of December 5, 2014, 36,860 requests for deferred action under DACA had been denied on the merits (in addition to those that were rejected for other reasons, such as lack of the required fee and failure to sign the application).[45] Moreover, the government provided a number of examples of applications denied on discretionary grounds, even though the applicants met all of the threshold criteria. These examples were in addition to denials based on the discretion inherent in some of the threshold criteria themselves, such as not posing a threat to public safety.[46]

The U.S. District Court for the District of Columbia specifically considered and rejected the current administration's claim that DHS personnel are not evaluating the facts of each individual case when applying DACA. *See Arpaio*, 27 F. Supp. 3d 185. After considerable factual analysis, the court found not only that DACA "retain[s] provisions for meaningful case-by-case review," but also that "[s]tatistics provided by the defendants reflect that such case-by-case review is in operation." *Id.* at 209. The court specifically noted the unrebutted fact that

---

[44]  For a thorough discussion of the evidence developed in *Texas II*, *see* Brief for Texas v. United States Defendant-Intervenors DACA Recipients and State of New Jersey in Support of Respondents (filed Sept. 26, 2019).

[45]  *See* Decl. of Donald W. Neufeld ¶ 23, *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015) (No. B-14-254), ECF No. 130 att. 11.

[46]  *Id.* ¶ 18.

36

through 2014, more than 38,000 DACA applications had been denied on the merits as the result of case-by-case decision making. *See id.* at 209 n.13.

The fact that DACA has a relatively high rate of acceptance—91%, according to DHS's brief, which is down from the 95% rate that pertained at the time of *Texas II*—does not mean that agents are "rubber-stamping" applications. To the contrary, a high acceptance rate is the natural result of self-selected candidates—young people willing to spend the time needed to complete the detailed application, gather the necessary documentation, and pay the relatively high application fee ($495) because, based on the published eligibility criteria and discretionary factors, they could judge before-hand whether they were likely to be approved. *See* JA 713-14.

The published eligibility criteria also caused potential applicants not to file an application at all, because they knew ahead of time that their less-than-perfect backgrounds might diminish their chances, whether fairly or unfairly. Among their reasons for not applying was the risk—despite contrary representations by DHS—that if their applications were rejected, they would be immediately detained and removed because they would have disclosed all of their personal information during the application process. As a result of these candidates absenting themselves from the application process altogether (even though they might have been successful), the group of well-informed children and young adults who elected to submit applications was comprised of individuals who, on the whole, presented strong cases for temporary relief from removal. As one immigration

**37**

scholar succinctly concludes: "A denial rate of 5%, therefore, provides no legitimate basis for the belief that DACA requests are being rubber-stamped; to the contrary, it shows that thousands of denials occur even among this highly self-selected group."[47]

## CONCLUSION

DACA is a lawful exercise of prosecutorial discretion in a field in which the Executive Branch is granted broad latitude to set and carry out removal priorities. Although the current administration may now seek to offer after-the-fact reasons to exercise its discretion differently, there is no legal or historical basis for its officially-stated conclusion that DACA is unconstitutional or otherwise unlawful. *Amici* respectfully urge the Court to affirm the judgments below.

---

[47]     Legomsky Written Testimony at 72 n.10.

38

Respectfully submitted,

/s/ _____

Harry Lee
*Counsel of Record*
Johanna Dennehy
STEPTOE & JOHNSON LLP
1330 Connecticut Ave. NW
Washington, D.C.  20036
hlee@steptoe.com
(202) 429 8112

*Counsel for Amici Curiae*
*Immigration Law Scholars*

AR5859

**1a**

**APPENDIX**

LIST OF *AMICI* CURIAE

Evangeline G. Abriel
Clinical Professor of Law
Santa Clara University School of Law

Saba N. Ahmed
Visiting Assistant Professor of Law
CUNY School of Law

Raquel E. Aldana
Associate Vice Chancellor for Academic Diversity
and Professor of Law
UC Davis School of Law

Sabrineh Ardalan
Assistant Clinical Professor and Assistant Director,
Harvard Immigration and Refugee Clinic
Harvard Law School

Lauren R. Aronson
Associate Clinical Professor
Immigration Law Clinic Director
University of Illinois College of Law

David C. Baluarte
Associate Dean for Academic Affairs and Associate
Clinical Professor of Law
Washington and Lee School of Law

AR5860

**2a**

Caitlin Barry
Associate Professor of Law
Director, Farmworker Legal Aid Clinic
Villanova University Charles Widger School of Law

Jon Bauer
Clinical Professor of Law and Richard D. Tulisano
'69 Scholar in Human Rights
University of Connecticut School of Law

Lenni B. Benson
Professor of Law and Founder and Senior Advisor,
Safe Passage Project
New York Law School

Linda S. Bosniak
Distinguished Professor of Law
Rutgers Law School

Jason A. Cade
J. Alton Hosch Associate Professor of Law
University of Georgia School of Law

Janet M. Calvo
Professor
CUNY School of Law

Kristina M. Campbell
Jack & Lovell Olendor Professor of Law and Co-
Director, Immigration and Human Rights Clinic
University of the District of Columbia David A.
Clarke School of Law

AR5861

**3a**

Stacy Caplow
Associate Dean of Experiential Education &
Professor of Law
Brooklyn Law School

Jennifer M. Chacón
Professor of Law
University of California-Los Angeles

Howard F. Chang
Earle Hepburn Professor of Law
University of Pennsylvania Law School

Stewart Chang
Professor of Law
UNLV William S. Boyd School of Law

Violeta Chapin
Associate Clinical Professor of Law
University of Colorado Law School

Ming H. Chen
Associate Professor of Law
Faculty-Director, Immigration and Citizenship Law
Program
University of Colorado Law School

Gabriel J. Chin
Edward L. Barrett Jr. Chair of Law, Martin Luther
King Jr. Professor of Law, Director of Clinical Legal
Education
UC Davis School of Law

AR5862

**4a**

Michael J. Churgin
Raybourne Thompson Centennial Professor in Law
The University of Texas at Austin School of Law

Marisa S. Cianciarulo
Professor
Doy & Dee Henley Chair in Law
Associate Dean for Academic Affairs
Chapman University Dale E. Fowler School of Law

Fernando Colon-Navarro
Professor of Law and Director of LL.M &
Immigration Development
Texas Southern University Thurgood Marshall
School of Law

Jenny-Brooke Condon
Professor of Law
Seton Hall University School of Law

Erin B. Corcoran
Executive Director, Kroc Institute of International
Peace Studies and Concurrent Faculty at the Keough
School of Global Affairs
University of Notre Dame

Susan Coutin
Professor of Criminology, Law and Society and
Anthropology and Associate Dean for Academic
Programs
University of California, Irvine School of Social
Ecology

AR5863

**5a**

Evelyn H. Cruz
Clinical Law Professor and Director, Immigration
Law and Policy Clinic
Arizona State University Sandra Day O'Connor
College of Law

Rose Cuison-Villazor
Vice Dean, Professor of Law, Chancellor's Social
Justice Scholar
Rutgers Law School

Julie A. Dahlstrom
Clinical Associate Professor and Director,
Immigrants' Rights & Human Trafficking Program
Boston University School of Law

Alina Das
Professor of Clinical Law and Co-Director,
Immigrant Rights Clinic
New York University School of Law

Kate Evans
Clinical Professor of Law and Director, Immigrant
Rights Clinic
Duke Law School

Jill E. Family
Commonwealth Professor of Law and Government
and Director, Law and Government Institute
Widener University Commonwealth Law School

**6a**

Richard H. Frankel
Associate Professor of Law and Director, Federal
Litigation and Appeals Clinic
Drexel University Thomas R. Kline School of Law

Denise L. Gilman
Clinical Professor and Co-Director, Immigration
Clinic
The University of Texas at Austin School of Law

Joanne Gottesman
Clinical Professor of Law, Director of the Immigrant
Justice Clinic, and Chair for Clinical Programs
Rutgers Law School

Anjum Gupta
Professor of Law and Director of the Immigration
Rights Clinic
Rutgers Law School

Jean Han
Director and Practitioner-in-Residence
American University Washington College of Law

Lindsay M. Harris
Assistant Professor of Law and Co-Director of the
Immigration and Human Rights Clinic
University of the District of Columbia David A.
Clarke School of Law

Kayleen R. Hartman
Supervising Attorney/Clinical Teaching Fellow
Loyola Marymount University Law School

AR5865

7a

Sheila N. Hayre
Visiting Associate Professor of Law, Carmen and
Waring Partridge Faculty Fellow
Quinnipiac University School of Law

Susan Hazeldean
Associate Professor of Law
Brooklyn Law School

Laura A. Hernández
Associate Professor of Law
Baylor University Sheila & Walter Umphrey Law
Center

Julia Hernandez
Assistant Professor of Law
CUNY School of Law

Laila L. Hlass
Professor of Practice
Tulane University Law School

Geoffrey A. Hoffman
Clinical Professor of Law and Director, Immigration
Clinic
University of Houston Law Center

Mary Holper
Associate Clinical Professor and Director,
Immigration Clinic
Boston College Law School

8a

Alan Hyde
Distinguished Professor of Law and Sidney Reitman
Scholar
Rutgers Law School

Erin Jacobsen
Assistant Professor of Law
University of Vermont Law School

Eisha Jain
Assistant Professor of Law
University of North Carolina School of Law

Kevin R. Johnson
Dean and Mabie-Apallas Professor of Public Interest
Law and Chicana/o Studies
UC Davis School of Law

Anil Kalhan
Professor of Law
Drexel University Thomas R. Kline School of Law

Katherine Kaufka Walts
Director, Center for the Human Rights of Children
Loyola University Chicago

Elizabeth Keyes
Associate Professor of Law and Director, Immigrant
Rights Clinic
University of Baltimore School of Law

Kathleen C. Kim
Professor of Law
Loyola University Law School

AR5867

9a

Jennifer Lee Koh
Visiting Professor of Law
University of California, Irvine School of Law

Daniel M. Kowalski
Managing Partner of Ware | Immigration
Centennial, Colorado

Krista Kshatriya
Lecturer – International Studies Program
School of Global Policy and Strategy at University of
California San Diego

Hiroko Kusuda
Clinic Professor and Director of Immigration Law
Section
Loyola University New Orleans College of Law,
Stuart H. Smith Law Clinic and Center for Social
Justice

Christopher N. Lasch
Professor of Law
University of Denver Sturm College of Law

Jennifer J. Lee
Associate Clinical Professor of Law and Director,
Social Justice Lawyering Clinic at the Sheller Center
for Social Justice
Temple University Beasley School of Law

Stephen H. Legomsky
John S. Lehman University Professor Emeritus
Washington University in St. Louis School of Law

AR5868

10a

Theo Liebmann
Clinical Professor of Law and Director of Clinical Programs
Hofstra University Maurice A. Deane School of Law

Beth Lyon
Clinical Professor of Law and Founder of Farmworker's Legal Assistance Clinic
Cornell Law School

Randi Mandelbaum
Distinguished Clinical Professor of Law, Annamay Sheppard Scholar, and Founding Director of the Child Advocacy Clinic
Rutgers Law School

Lynn Marcus
Clinical Professor of Law and Co-Director, Immigrant Justice Clinic
University of Arizona James E. Rogers College of Law

Dr. Susan Martin
Donald G. Herzberg Professor Emerita of International Migration
Georgetown University

Miriam H. Marton
Director, Tulsa Immigrant Resource Network
University of Tulsa College of Law

**AR5869**

11a

Amelia S. McGowan
Adjunct Professor and Clinical Supervising Attorney
of the Immigration Clinic
Mississippi College School of Law

M. Isabel Medina
Ferris Family Distinguished Professor of Law
Loyola University New Orleans College of Law

Vanessa H. Merton
Professor of Law and Director of Immigration Justice
Clinic
Pace University School of Law

Richard T. Middleton IV
Associate Professor of Political Science
University of Missouri – St. Louis
Adjunct Assistant Professor of Law
St. Louis University School of Law

Donald Mooers
Lecturer
The Catholic University of America Columbus School
of Law

Jennifer Moore
Professor of Law
University of New Mexico School of Law

Andrew F. Moore
Professor of Law
University of Detroit Mercy School of Law

AR5870

12a

Nancy Morawetz
Professor of Clinical Law
New York University School of Law

Hiroshi Motomura
Susan Westerberg Prager Distinguished Professor of
Law
University of California Los Angeles School of Law

Rev. Craig B. Mousin
Adjunct Faculty
DePaul University College of Law

Elora Mukherjee
Jerome L. Greene Clinical Professor of Law
Director, Immigrants' Rights Clinic
Columbia Law School

Raquel Muñiz, J.D., Ph.D.
Assistant Professor and Liaison to the Law School
Boston College Lynch School of Education and
Human Development

Karen Musalo
Professor and Chair in International Law
University of California Hastings College of the Law

Lindsay Nash
Clinical Assistant Professor of Law
Co-Director, Kathryn O. Greenberg Immigration
Justice Clinic
Yeshiva University Benjamin N. Cardozo School of
Law

**AR5871**

13a

Lori A. Nessel
Professor of Law and Director of Center for Social
Justice
Seton Hall University School of Law

Mariela Olivares
Professor of Law
Howard University School of Law

Michael Olivas
William B. Bates Distinguished Chair in Law
Director, Institute for Higher Education Law &
Governance
University of Houston Law Center

María Mercedes Pabón
Professor of Law
Loyola University New Orleans College of Law

Sarah H. Paoletti
Practice Professor of Law
Director, Transnational Legal Clinic
University of Pennsylvania Law School

Helen Parsonage
Adjunct Professor of Law
Wake Forest University School of Law

Talia Peleg
Associate Professor of Law, Immigrant and Non-
Citizen Rights Clinic
CUNY School of Law

**AR5872**

**14a**

Huyen Pham
Professor of Law
Texas A&M University School of Law

Polly J. Price
Asa Griggs Candler Professor of Law
Emory University School of Law

Anam Rahman
Adjunct Professor at Law
Georgetown University Law Center

Andrea Ramos
Clinical Professor of Law and Director of the
Immigration Law Clinic
Southwestern Law School

Shruti Rana
Professor of International Law Practice
Indiana University Bloomington Hamilton Lugar
School of Global and International Studies

Renee C. Redman
Adjunct Professor of Law
University of Connecticut School of Law

Victor C. Romero
Professor of Law & Maureen B. Cavanaugh
Distinguished Faculty Scholar
Penn State Law

Carrie Rosenbaum
Adjunct Professor
Golden Gate University School of Law

AR5873

15a

Rachel E. Rosenbloom
Professor of Law and Co-Director, Immigration
Justice Clinic
Northeastern University School of Law

Rubén G. Rumbaut
Distinguished Professor of Sociology
University of California Irvine School of Social
Sciences

Irene Scharf
Professor of Law
Director, Immigration Law Clinic
University of Massachusetts School of Law

Andrew I. Schoenholtz
Professor from Practice
Director, Human Rights Institute
Drictor, Center for Applied Legal Studies
Georgetown Law

Erica B. Schommer
Clinical Associate Professor of Law
St. Mary's School of Law

Philip G. Schrag
Delaney Family Professor of Public Interest Law
Director, Center for Applied Legal Studies
Georgetown Law

Ragini Shah
Clinical Professor of Law
Suffolk University Law School

AR5874

16a

Rebecca Sharpless
Professor of Law and Director, Immigration Clinic
University of Miami School of Law

Sarah R. Sherman-Stokes
Associate Director, Immigrants' Rights and Human
Trafficking Program
Boston University School of Law

Gemma Solimene
Clinical Associate Professor of Law
Fordham University School of Law

Elissa C. Steglich
Clinical Professor
The University of Texas at Austin School of Law

Juliet P. Stumpf
Robert E. Jones Professor of Advocacy and Ethics
Lewis & Clark Law School

Maureen A. Sweeney
Professor of Law and Director of Immigration Clinic
University of Maryland Carey School of Law

Margaret H. Taylor
Professor of Law
Wake Forest University School of Law

Claire R. Thomas
Director, Asylum Clinic
New York Law School

AR5875

17a

Veronica T. Thronson
Clinical Professor of Law
Michigan State University College of Law

David B. Thronson
Alan S. Zekelman Professor of International Human
Rights Law and Director, Talsky Center for Human
Rights of Women and Children
Michigan State University College of Law

Scott C. Titshaw
Associate Professor of Law
Mercer University School of Law

Enid Trucios-Haynes
Professor of Law
University of Louisville Louis D. Brandeis School of
Law

Diane Uchimiya
Professor of Law
Director, Justice and Immigration Clinic
University of La Verne College of Law

Julia Vázquez
Associate Clinical Professor of Law
Southwestern Law School

Alexander Vernon
Assistant Professor of Law
Director, Immigration Law Clinic
University of Detroit Mercy School of Law

AR5876

18a

Susannah Volpe
Visiting Assistant Clinical Professor
Seton Hall University School of Law

Leti Volpp
Robert D. and Leslie Kay Raven Professor of Law in Access to Justice
University of California Berkeley School of Law

Shoba Sivaprasad Wadhia
Samuel Weiss Faculty Scholar
Clinical Professor of Law
Director, Center for Immigrants' Rights Clinic
Penn State Law

Jonathan Weinberg
Associate Dean for Research & Faculty Development and Professor of Law
Wayne State University Law School

Lauris Wren
Clinical Professor of Law and Founder, Political Asylum Clinic
Hofstra University Maurice A. Deane School of Law

Stephen Yale-Loehr
Professor of Immigration Law Practice
Cornell Law School

AR5877

Nos. 18-587, 18-588, 18-589

# In the Supreme Court of the United States

---

DEPARTMENT OF HOMELAND SECURITY, *et al.*, *Petitioners,*
v.
REGENTS OF THE UNIVERSITY OF CALIFORNIA, *et al.*,
*Respondents.*

---

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
*et al.*, *Petitioners,*
v.
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, *et al.*, *Respondents*

---

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND
SECURITY, *et al.*, *Petitioners,*
v.
MARTIN JONATHAN BATALLA VIDAL, *et al.*, *Respondents.*

---

**On Writs of Certiorari to the United States Courts of Appeals
for the Ninth, District of Columbia, and Second Circuits**

---

**BRIEF OF *AMICI CURIAE* PUBLIC INTEREST LAW CENTER,
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS
AND URBAN AFFAIRS,  AND THE MISSISSIPPI CENTER
FOR JUSTICE IN SUPPORT OF RESPONDENTS**

---

THOMAS W. HAZLETT
   *Counsel of Record*
STEPHEN J. KASTENBERG
JULIANA B. CARTER
MANSI G. SHAH
BALLARD SPAHR LLP
1735 Market St., 51st Fl.
Philadelphia, PA 19103
(215) 665-8500
HazlettT@ballardspahr.com

WILLIAM ALDEN MCDANIEL, JR.
BALLARD SPAHR LLP
300 East Lombard Street
18th Floor
Baltimore, MD 21202
(410) 528-5600

*Counsel for Amici Curiae*

---

Becker Gallagher  ·  Cincinnati, OH  ·  Washington, D.C.  ·  800.890.5001

**AR5878**

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . iii

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . 1

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . 3

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.  FEDERAL COURTS HAVE AUTHORITY TO GRANT EQUITABLE RELIEF THAT APPLIES NATIONWIDE, TO PARTIES BEYOND THOSE BEFORE THE COURT. . . . . . . . . . . . . . . . . . . . . 3

    A. "Principles, Rules, and Usages" of English Equity Before 1789 Included Granting Injunctions that Extended Beyond the Parties Before the Court . . . . . . . . . . . . . . . . 6

        1.  English equity decisions before 1789  . . . . 7

        2.  Calvert's treatise also demonstrates that equitable relief applied broadly under English law. . . . . . . . . . . . . . . . . . . . . . . . 10

    B. Early American Equity Practice Granted Relief that Applied Beyond the Parties to a Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.  STORY'S EQUITY PLEADINGS establishes that equitable relief in United States courts never was limited to the parties before the court  . . . . . . . . . . . . . . . . . . . . . 12

AR5879

ii

2. Early federal and state decisions in equity granted relief that applied beyond the parties to the litigation . . . . . . . . . . . . . 15

3. Pomeroy's TREATISE UPON EQUITY JURISPRUDENCE and additional early American decisions . . . . . . . . . . . . . . . . 18

C. The Civil Rights Era Provided Widespread Injunctive Relief to Address Harm to Broad Populations . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

AR5880

iii

## TABLE OF AUTHORITIES

### CASES

*Atlas Life Ins. Co. v. W. I. Southern, Inc.*,
   306 U.S. 563 (1939) . . . . . . . . . . . . . . . . . . . . . . 6

*Bailey v. Patterson*,
   323 F.2d 201 (5th Cir. 1963) . . . . . . . . . . . . 22, 23

*Bailey v. Tillinghast*,
   99 F. 801 (6th Cir. 1900) . . . . . . . . . . . . . . . . . 20

*Blagrave v. Blagrave*,
   1 De Gex & Smale 252, 63 E.R. 1056 (1847) . . . . 9

*Boyle v. Zacharie*,
   32 U.S. (6 Pet.) 648 (1832) . . . . . . . . . . . . . . . . 4

*Brinkerhoff v. Brown*,
   6 Johns. Ch. 139 (N.Y. Ch. 1822) . . . . . . . . . . . 20

*Brown v. Vermuden*,
   1 Ch. Cas. 272, 22 E.R. 796 (1676) . . . . . . . 7, 8, 10

*Carlton v. Newman*,
   1 A. 194 (Me. 1885) . . . . . . . . . . . . . . . . . . . . . 20

*Cherokee Nation v. Georgia*,
   30 U.S. 1 (1831) . . . . . . . . . . . . . . . . . . . . . 17, 18

*City of London v. Perkins*,
   3 Bro. P. C. 602,
   1 E.R. 1524 (1734) . . . . . . . . . . . . . 8, 9, 13, 14, 20

*Dilly v. Doig*,
   2 Ves. junr. 486, 30 E.R. 738 (1794) . . . . . . . . . 10

**AR5881**

iv

*Elmendorf v. Taylor*,
    25 U.S. (10 Wheat.) 152 (1825). . . . . . . . . . 16, 17

*Ewelme Hospital v. Andover*,
    1 Vern. 266, 23 E.R. 460 (1684) . . . . . . . . 8, 9, 10

*Fitton v. Macclesfield*,
    1 Vern. 287, 23 E.R. 474 (1684) . . . . . . . . . . . . . 8

*Grupo Mexicano de Desarrollo, S.A. v. Alliance
    Bond Fund, Inc.*, 527 U.S. 308 (1999) . . . . . 4, 6, 9

*How v. Tenants of Bromsgrove*,
    1 Vern. 22, 23 E.R. 277 (1681) . . . . . . . . . . . . . . 8

*Knight v. Carrollton R. Co.*,
    9 La. Ann. 284 (1854) . . . . . . . . . . . . . . . . . . . . . 6

*Knight v. Knight*,
    3 P. Wms. 331, 24 E.R. 1088 (1734) . . . . . . . . . 12

*Lord Tenham v. Herbert*,
    2 Atk. 483, 26 E.R. 692 (1742) . . . . . . . . . 9, 10, 20

*Mayor of York v. Pilkington*,
    1 Atk. 282, 26 E.R. 180 (1737) . . . . . . 9, 13, 14, 20

*McTwiggan v. Hunter*,
    30 A. 962 (R.I. 1895) . . . . . . . . . . . . . . . . . . . 20, 21

*Trump v. Hawaii*,
    585 U.S. ___, 138 S. Ct. 2392 (2018) . . . . . . . . 2, 5

*United States v. W. T. Grant Co.*,
    345 U.S. 629 (1953). . . . . . . . . . . . . . . . . . . . . . 23

*Vattier v. Hinde*,
    33 U.S. (7 Pet.) 252 (1833) . . . . . . . . . . . . . 4, 9, 17

**AR5882**

v

*Vulcan Soc'y of N.Y.C. Fire Dept., Inc. v. Civil Service Com.*,
  360 F. Supp. 1265 (S.D.N.Y. 1973),
  *aff'd*, 490 F.2d 387 (2d Cir. 1973) . . . . . . . . . 23, 24

*West v. Randall*,
  2 Mason 181, 29 F. Cases 718
  (C. Ct. D.R.I. 1820) . . . . . . . . . . . . . . . . . . . . 15, 16

## CONSTITUTION

U.S. CONST., ART. III, SEC. 2 . . . . . . . . . . . . . . . . . . 4

## OTHER AUTHORITIES

J. Altman, *Implementing a Civil Rights Injunction: A Case Study of NAACP v. Brennan*, 78 COLUM. L. REV. 739 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . 22

S. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 417 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

F. Calvert, A TREATISE UPON THE LAW RESPECTING PARTIES TO SUITS IN EQUITY (2d ed. 1847) . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12

A. Dobie, HANDBOOK OF FEDERAL JURISDICTION AND PROCEDURE (1928) . . . . . . . . . . . . . . . . . . . . . . . . . 4

J. Pomeroy, A TREATISE UPON EQUITY JURISPRUDENCE AS ADMINISTERED IN THE UNITED STATES OF AMERICA, VOL. I (3rd ed. 1905) . . . . . . . . . . . . . . . . . . . . . . 13, 18, 19, 20, 21

AR5883

vi

J. Story, COMMENTARIES ON EQUITY PLEADINGS, AND THE INCIDENTS THEREOF, ACCORDING TO THE PRACTICE OF THE COURTS OF EQUITY, OF ENGLAND AND AMERICA (3d. 1844) . . . . . . . *passim*

AR5884

1

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are The Public Interest Law Center of Philadelphia, Pennsylvania, The Washington Lawyers' Committee for Civil Rights and Urban Affairs of Washington, D.C., and The Mississippi Center for Justice, all nonpartisan, nonprofit organizations whose shared roots date to 1963, when President John F. Kennedy enlisted the private bar's leadership and resources in combating racial discrimination, and the resulting inequality of opportunity, through creation of The Lawyers' Committee for Civil Rights Under Law. These independently funded and governed organizations battle injustice in its many forms and create systemic reform.

*Amici* work on some of the most important national issues of our times, including voting rights; employment discrimination; healthcare; fair housing and community development; environmental health and justice; educational opportunity; rights of persons with disabilities; and immigration. Together these *amici* are part of the largest network of private lawyers in America focused primarily on civil rights issues.

One of the underlying issues in the cases on appeal is a federal court's ability to issue a nationwide

---

[1] The parties submitted blanket consents to submissions of *amicus curiae* briefs in this case, and, pursuant to this Court's Rule 37.3(a), *amici* are filing this brief based on such consents. In accordance with Rule 37.6, *amici* affirm that no counsel for any party authored this brief, and no person other than *amici*, their members, or their counsel made a monetary contribution to the preparation or submission of this brief.

2

injunction. For the most vulnerable communities represented by *amici*, including the poor, and historically disenfranchised people of color, nationwide injunctions are often critical for achieving justice. Nationwide injunctions are vital tools in advancing the cause of equal justice under law in a wide range of litigation. Their legality directly affects the mission and work of *amici curiae*.

## INTRODUCTION

*Amici* submit this brief to address the legality of nationwide injunctions, should that become a matter under consideration by the Court in this instance.

As do the district court decisions in the cases under review here, the Court's recent decision in *Trump v. Hawaii*, 585 U.S. ___, 138 S. Ct. 2392 (2018), involved appeals from two federal district courts that "entered nationwide preliminary injunctions barring enforcement of the" federal government's conduct. *Id.* at 2404. The injunctions there were "nationwide" in that they "barred the Government from enforcing the President's Proclamation against anyone, not just the plaintiffs." *Id.* at 2424 (Thomas, J., concurring). The Court vacated the two injunctions, but did so without addressing the propriety in that case—or in general—of injunctions with a national scope. Because *amici* believe national injunctions are not only a lawful form of equitable relief, but also serve a vital role in the enforcement of justice, we submit this *amicus* brief directed to the issue of nationwide injunctions.

**AR5886**

3

## SUMMARY OF ARGUMENT

Contrary to recent suggestions that so-called nationwide injunctions are a recent phenomenon, that go beyond the traditional powers of equity invested in the courts of the United States, courts of equity in England before the founding of the United States, and in state and federal courts in the early days of the Republic, frequently granted relief that extended well beyond the parties before the court. These decisions support the granting of injunctive relief with nationwide application.  This brief provides the Court with the historical record that demonstrates nationwide injunctions are well within the scope of the traditional equity powers of the United States courts, and therefore a Constitutional form of relief.

## ARGUMENT

## I.  FEDERAL COURTS HAVE AUTHORITY TO GRANT EQUITABLE RELIEF THAT APPLIES NATIONWIDE, TO PARTIES BEYOND THOSE BEFORE THE COURT

When government acts wrongfully, the impact can be felt throughout the community, the state, or the country.  Providing effective remedies to cure serious, wide-reaching wrongs is not only a well-settled use of the judicial power, it also may be the only remedy available to courts to redress adequately the threat of immediate, irreparable harm.  Arguments that nationwide injunctions are a "modern" invention, calling into question whether such a form of equitable relief is consistent with historical practice and the Constitution, are based on an incorrect premise.

**AR5887**

4

ARTICLE III of the Constitution provides that "[t]he judicial Power" of the federal courts "shall extend to all Cases, in Law and Equity, arising under this Constitution [and] the Laws of the United States[.]" U.S. CONST., ART. III, SEC. 2.  As to such "judicial Power" in equity cases, "settled doctrine . . . is, that the *remedies in equity are to be administered* . . . according to the *practice of courts of equity in the parent country* . . . ; subject, of course, . . . to such alterations and rules as . . . the courts of the United States may, from time to time, prescribe."  *Boyle v. Zacharie*, 32 U.S. (6 Pet.) 648, 658 (1832) (Story, J.) (emphasis added); *see also Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) ("authority to administer" equity suits consistent with "principles of the system of judicial remedies . . . devised and . . . administered by the English Court of Chancery at the time of the separation of the two countries"); *Vattier v. Hinde*, 33 U.S. (7 Pet.) 252 (1833) (Marshall, C.J.) (equitable powers of federal courts "generally understood to adopt the principles, rules and usages of the court of chancery of England"); A. Dobie, HANDBOOK OF FEDERAL JURISDICTION AND PROCEDURE, at 660 (1928) ("equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act").

Nationwide injunctions—that is, injunctions issued by federal courts enjoining a party's conduct, and protecting parties and non-parties affected throughout the United States—are entirely consistent with historical practice in English courts before the adoption

of the Constitution, and with early precedents in the United States, and thus are within the "judicial Power" granted by the Constitution.

Justice Thomas's recent concurrence in *Trump v. Hawaii* expressed skepticism to whether courts have authority to impose "universal injunctions." *Trump*, 138 S. Ct. at 2425 (Thomas, J. concurring). Relying on one law review article, Justice Thomas wrote that nationwide injunctions against the government do not comport with historic English equity practice in two ways: first, the English courts of equity "had no authority to enjoin" the King, *id.* at 2427 (citing S. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 417 (2017)); and second, "as a general rule, American courts of equity did not provide relief beyond the parties to the case." *Id.* In his article, Bray argues that, while English courts in equity did sometimes protect the rights of persons not before the court, they did not afford relief as broad as a national injunction in modern America. *See* Bray, 131 HARV. L. REV. at 426.

But there can be no dispute: long-standing English and early American precedents establish that, as of the time of the Constitution's adoption, courts of equity could issue broad injunctions that affected the rights or duties of parties not before the court. The exercise of this authority by English courts of equity had been settled by at least the 17th Century, and American courts frequently exercised this authority from 1789, and thereafter through today (including in cases against federal, state, or local governments). These courts did so, as one American state supreme court put

6

it in 1854, to prevent "irreparable mischief, or such multiplied vexations, and such constantly recurring causes of litigation" as would arise if courts were limited to issuing decrees that bound only the parties before them. *Knight v. Carrollton R. Co.*, 9 La. Ann. 284, 286 (1854). That court further identified the reason English and American courts of equity imposed broad-reaching relief: "If indeed courts of equity did not interfere in such like cases, the justice of the country would be very lame and inadequate." *Id*.

English practice during the pre-Constitution era, and United States courts thereafter, consistently exercised equity jurisdiction whenever a party's wrongful conduct would do harm to others, and, where necessary, extended that jurisdiction well beyond the parties.

### A. "Principles, Rules, and Usages" of English Equity Before 1789 Included Granting Injunctions that Extended Beyond the Parties Before the Court.

A federal court's authority to provide equitable relief, including an injunction with nationwide scope, accords with "the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." *Atlas Life Ins. Co. v. W. I. Southern, Inc.*, 306 U.S. 563, 568 (1939); *see also, e.g., Grupo Mexicano de Desarrollo, S.A.*, 527 U.S. at 319. Justice Thomas's concurrence and Bray's article address English equity precedents in cursory fashion, but at the time of the adoption of the Constitution, English decisions had long recognized

**AR5890**

7

that the decrees of an equity court could broadly bind non-parties. American courts have followed this precedent from the earliest days of the country.

### 1. English equity decisions before 1789.

English practice on these issues had been well-established by the 1676 decision in *Brown v. Vermuden*, 1 Ch. Cas. 272 & 283, 22 E.R. 796 & 802 (1676).[2]   Brown sued to enforce a decree "against certain Persons Workers and Owners of Lead Mines in Derbyshire" requiring defendants to pay a certain amount based on the quantity of lead ore mined. *Id*. at 283, 22 E.R. at 802.   The original suit proceeded against four defendants, but the Chancellor entered a judgment in favor of Brown's predecessor, and his successors, "whereby a certain manner of tithing of Lead [Ore] was decreed, not only against the particular Persons named Defendants, but all other Owners and Workers." *Id*. at 272, 283, 22 E.R. at 797, 802.

Brown's predecessor served the decree on Vermuden, "who owned and wrought a Mine there." *Id*. at 273, 22 E.R. at 797.  Vermuden "insisted that he [was] not bound by the Decree, for that he was not Party to" the original suit, and was not in privity with a party.  *Id*. Vermuden argued that he "could have no Bill of Review of [the decree] if it be erroneous, and therefore ought not to be bound" by its terms.  *Id*.; *see also id*. at 283, 22 E.R. at 802 ("Vermuden pleaded . . . That he was a Stranger").

---

[2] The Chancellor issued two decisions in *Brown v. Vermuden*; both addressed whether an equitable decree applied to non-parties.

8

The Lord Chancellor overruled Vermuden's plea, holding, the "Decree passed against the four" defendants in the original case brought by Brown's predecessor required not just "that the Defendants," but that "all the Miners should pay." *Id*. at 273, 22 E.R. at 797. "If [Vermuden] should not be bound, *Suits of this Nature . . . would be infinite, and impossible to be ended*." *Id*. (emphasis added). The Chancellor thus enforced the decree against Vermuden, though he had not been a party to the original action, or in privity with the parties. *Id*. at 273, 22 E.R. at 797; *id*. at 283, 22 E.R. at 802. Numerous other courts of equity in early England reached the same result. *See*, *e.g.*, *Ewelme Hospital v. Andover*, 1 Vern. 266, 267, 23 E.R. 460, 461 (1684) (allowing action in equity to proceed without all parties in interest); *Fitton v. Macclesfield*, 1 Vern. 287, 292-93, 23 E.R. 474, 476 (1684) (denying "bill of review" and finding court had equitable jurisdiction over prior matter despite failure to have before it all parties in interest); *How v. Tenants of Bromsgrove*, 1 Vern. 22, 23 E.R. 277 (1681) (concluding "Bills of peace" applicable to non-parties "are proper in equity" "to prevent multiplicity of suits").

The House of Lords, in *City of London v. Perkins*, 3 Bro. P. C. 602, 1 E.R. 1524 (1734), discussed the rationale for the broad reach of this practice. *Perkins* involved serial disputes over the right of London to collect a duty, to be "applied to the use of the lord mayor for the time being, for supporting the dignity of his office." *Id*. at 603, 1 E.R. at 1524. In a later dispute, London instituted an equity action in the Court of Exchequer, pleading the prior decrees as grounds to require payment of the duties. On appeal,

**AR5892**

9

the House of Lords recognized that "the duty in question was a demand against the *common rights and freedom of every subject of England*." *Id.* at 606, 1 E.R. at 1527 (emphasis added). The Lords, on this ground, enforced the earlier decrees against defendants, none of whom had been parties in those earlier cases. Thus, equity jurisdiction extended in England to cases involving matters of broad public importance, where the decree would bind many members of the public not before the court as parties. *See also Blagrave v. Blagrave*, 1 De Gex & Smale 252, 258, 63 E.R. 1056, 1058 (1847) (clarifying that issue in *Perkins* was equitable relief applying to "the public"); *Mayor of York v. Pilkington*, 1 Atk. 282, 26 E.R. 180 (1737) ("all the king's subjects" could be bound by decree in equity in a case, even where only few subjects were parties).

These cases, among others, establish that "the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries," *Grupo Mexicano de Desarrollo, S.A.*, 527 U.S. at 318, and the "principles, rules and usages of the court of chancery of England" at that time, *Vattier*, 33 U.S. (7 Pet.) at 274, included broad authority to issue decrees that bound parties not before the Chancellor. This authority applied where the dispute involved "a general exclusive right," *Lord Tenham v. Herbert*, 2 Atk. 483, 484, 26 E.R. 692, 692 (1742); where "all the king's subjects may be concerned in this right," *Pilkington*, 1 Atk. at 284, 26 E.R. at 181; where the suit was between government and "the public," *Blagrave*, 1 De Gex & Smale at 258, 63 E.R. at 1058; "to prevent multiplicity of suits," *Ewelme Hospital*, 1 Vern. at 267,

**AR5893**

10

23 E.R. at 461; where "one general right was liable to invasion by all the world," *Dilly v. Doig*, 2 Ves. junr. 486, 487, 30 E.R. 738, 738 (1794), or where individual suits "would be infinite, and impossible to be ended," *Brown*, 1 Ct. Ch. at 274, 22 E.R. at 797. In short, whenever parties otherwise "must [go] all round the compass to" settle the issues in dispute. *Lord Tenham*, 2 Atk. at 484, 26 E.R. at 692.

### 2. Calvert's treatise also demonstrates that equitable relief applied broadly under English law.

The leading English treatise addressing the scope of equity practice prior to the establishment of the Constitution is A TREATISE UPON THE LAW RESPECTING PARTIES TO SUITS IN EQUITY (2d ed. 1847), by Frederic Calvert ("PARTIES IN EQUITY").[3] Calvert began by stating the general rule regarding parties to equitable actions: "whether the relief sought in the bill, in other words, the equity of the bill touches any particular person, so as to obtain from him a benefit, or to fasten upon him a duty," such a person is a "necessary party." PARTIES IN EQUITY at 16, 21. But he noted that, this rule "is founded upon general convenience," and is subject to numerous "occasions for the relaxation of the rule." *Id*. at 21. Calvert explained that "relaxation" is necessary in equity because:

---

[3] Justice Joseph Story wrote that no "comprehensive and accurate" treatment of this subject existed before PARTIES IN EQUITY. *See* J. Story, COMMENTARIES ON EQUITY PLEADINGS, AND THE INCIDENTS THEREOF, ACCORDING TO THE PRACTICE OF THE COURTS OF EQUITY, OF ENGLAND AND AMERICA (3d. 1844) ("STORY'S EQUITY PLEADINGS") at xi.

**AR5894**

11

> The complication of human affairs has, however, become such, that it is impossible always to act strictly on this general rule. Cases arise, in which if you hold it necessary to bring before the court every person having an interest in the question, the suit could never be brought to a conclusion. The consequence would be that *if the court adhered to the strict rule, there would in many cases be a denial of justice.*

*Id.* at 21-22 (emphasis added; internal quotation, citation omitted). Calvert discussed over a dozen "instances of relaxation" for various circumstances, *id.* at 22-54, each of which Calvert supported by citations to numerous cases decided before the establishment of the United States. All of the "relaxations" of the general rule, and the English cases cited in support of them, illustrate the great flexibility the English equity courts had before 1789 to permit bills that affected the rights of persons or entities not before the court as parties.

Calvert rooted the "relaxations" of the general rule regarding parties in fundamental principles of the courts of equity in England: "A Court of Law decides some one individual question, which is brought before it," whereas "a *Court of Equity* not merely makes a decision to that extent but also *arranges all the rights*, which the decision immediately affects." *Id.* at 3 (emphasis added). Calvert added that a "'*Court of Equity, in all cases, delights to do complete justice, and not by halves*'; to put an end to litigation, and to give decrees of such a nature, that the performance of them may be perfectly safe to all who obey them: *interest*

**AR5895**

12

*reipublicae ut sit finis litium* [it is in the interest of the public that litigation come to an end]."  *Id.* (emphasis added; translated from Latin; quoting *Knight v. Knight*, 3 P. Wms. 331, 333, 24 E.R. 1088, 1089 (1734)).

Calvert's analysis in PARTIES IN EQUITY supports the conclusion that English courts possessed the equitable authority to bind persons who were not parties to the action, notably in cases involving general interests, and the rights of the public.  English equity practice as of 1789 fully supports the use of equitable power by federal courts in this country to issue injunctions with nationwide scope.

## B. Early American Equity Practice Granted Relief that Applied Beyond the Parties to a Litigation

These principles of English practice carried over to early American equity courts, as demonstrated by both the leading 19th and 20th Century treatises on the subject, and federal and state equity decisions.

### 1. STORY'S EQUITY PLEADINGS establishes that equitable relief in United States courts never was limited to the parties before the court.

The leading American treatise on equity in the 19th Century was STORY'S EQUITY PLEADINGS, by Justice Joseph Story.  Justice Story analyzed at length the usages, rules, and practices that the English cases established in equity before 1789, and illustrated how American courts had adopted and applied these principles in the early days of the United States. Justice Story wrote that he aimed his book especially

AR5896

13

to address "the principles, which govern . . . the subject of the proper and necessary Parties to Bills." STORY'S EQUITY PLEADINGS at xi; *see also* J. Pomeroy, A TREATISE UPON EQUITY JURISPRUDENCE AS ADMINISTERED IN THE UNITED STATES OF AMERICA, VOL. I (3rd ed. 1905) ("POMEROY") §§ 243-275, at pp. 356-458 (state and federal cases applied approaches of cases such as *Perkins*, *Pilkington*, and other English decisions regarding scope of equitable relief).

Justice Story's work tracked Calvert's research and conclusions: after stating the general rule that all persons materially interested in the subject matter of a suit in equity should be made parties to it, STORY'S EQUITY PLEADINGS § 72, at p. 83, the Justice recognized an "exception to the general rule[.]" *Id*. § 94, at pp. 114-15. Where such persons "are exceedingly numerous, and it would be impracticable to join them without almost interminable delays and other inconveniences, which would obstruct, and probably defeat the purposes of justice," they need not be parties to the case, even though the decree would be binding upon them. *Id*. He observed, "the doctrine above stated as to the necessity of all persons being made actual parties" was riddled with so "many qualifications" that it was questionable whether it was "maintainable at all in its general signification." *Id*. § 94, at p. 116.

The exceptions derive from the fact that "*there always exists a common interest, or a common right*, which the Bill seeks to establish and enforce, or a general claim or privilege, which it seeks to establish, or to narrow, or take away." *Id*. § 120, at p. 146

**AR5897**

14

(emphasis added). "It is obvious," he stated, "that, under such circumstances, the interest of persons, not actual parties to the suit, may be in some measure affected by the decree; but the suit is nevertheless permitted to proceed without them, in order *to prevent a total failure of justice.*" *Id.* (emphasis added). Justice Story cited English cases that antedated the Constitution, including *Pilkington* and *Perkins*. *Id.* § 120, at p. 146, nn. 1-4.

Justice Story cited *Perkins* as an example of a case allowing a bill in equity "where there has been a general right claimed by the plaintiff," *id.* § 124, at p. 150, emphasizing that, in *Perkins*, the Chancery Court had allowed the bill to go forward "notwithstanding the objection, that *all the subjects of the realm might be concerned* in the right." *Id.* § 124, at pp. 149-50 (emphasis added). This was because, "[i]n such a case, a great number of actions might otherwise be brought, and *almost interminable litigation would ensue*; and, therefore, the Court suffered the Bill to proceed, although the defendants might make distinct defences, and although there was no privity between them and the city." *Id.* § 124, at p. 150 (emphasis added).

Justice Story also analyzed *Pilkington*. He wrote that the Chancellor had sustained the action because "such a Bill, under the circumstances, . . . furnish[ed] a ground *to quiet the general right*, not only as to the persons before the Court, but as to all others in the same predicament." *Id.* § 125, at p. 150 (emphasis added); *see also*, *e.g.*, *id.* § 125, at pp. 150-51, n.3. Justice Story summarized the law on this point:

15

In all these classes of cases, *it is apparent, that all the parties* stand, or are supposed to stand, in the same situation, and *have one common right*, or one common interest, *the operation and protection of which will be for the common benefit of all*[.]

*Id.* § 126, at pp. 151-52 (emphasis added).

> ## 2. Early federal and state decisions in equity granted relief that applied beyond the parties to the litigation.

Justice Story also addressed equity practice as to absent parties as Circuit Justice in *West v. Randall*, 2 Mason 181, 29 F. Cases 718 (C. Ct. D.R.I. 1820). In *West*, plaintiff instituted in federal court "a bill [in equity] against the defendants, as survivors of four trustees, for a discovery and account of certain real and personal estate, alleged to have been conveyed to them by one William West[.]" 2 Mason at 189, 29 F. Cases at 721. West had died, and plaintiff was one of his heirs. Plaintiff did not name as parties West's other heirs or West's personal representative, and one defendant sought dismissal for failure to name them. *Id.* at 189-90, 29 F. Cases at 721.

Justice Story began by acknowledging the "general rule in equity that all persons materially interested, either as plaintiffs or defendants in the subject matter of the bill ought to be made parties to the suit, however numerous they may be." *Id.* at 190, 29 F. Cases at 721. But this "being a general rule, established for the convenient administration of justice," Justice Story said, "it must not be adhered to in cases, to which

AR5899

16

consistently with practical convenience it is incapable of application." *Id.* at 193, 29 F. Cases at 722.

Justice Story gave two illustrations when the exception comes into play: "where the parties are very numerous, and the court perceives, that it will be almost impossible to bring them all before the court; or where the question is of general interest, and *a few may sue for the benefit of the whole*." *Id.* (emphasis added). Accordingly, "[i]n these and analogous cases of general right," a court of equity will:

> dispense with having all the parties, who claim the same right, before it, from the manifest inconvenience, if not impossibility of doing it, and is satisfied with *bringing so many before it, as may be considered as fairly representing that right, and honestly contesting in behalf of the whole*, and therefore binding, in a sense, that right.

*Id.* at 195, 29 F. Cases at 723 (emphasis added).

In *Elmendorf v. Taylor*, 25 U.S. (10 Wheat.) 152 (1825), Chief Justice Marshall, writing for a unanimous Court, recognized the flexibility that federal courts of equity have in administering the rules as to parties in equity actions before them. In that case, defendants argued that plaintiff in the equitable action was "a tenant in common with others, and ought not to be permitted to sue in equity, without making his co-tenants parties to the suit," which he had not done. *Id.* at 166. The Court noted that "[t]his objection *does not affect the jurisdiction*" of the federal court, "but addresses itself to the policy of the Court" to the effect

17

that in an action in equity, "all parties concerned shall be brought before them, that the matter in controversy may be finally settled." *Id*. (emphasis added).

But "[t]his equitable rule," the Court said, "is framed by the Court itself, and is subject to its discretion." *Id*. at 166-67. The rule is not "inflexible," such that "a failure to observe [it] turns the party out of Court, because it has no jurisdiction over his cause." *Id*. at 167. "[B]eing introduced by the Court itself, for the purposes of justice," the Court held, the rule "is susceptible of modification for the promotion of those purposes." *Id*. The Court observed that "it may be proper to say, that the rule which requires that all persons concerned in interest, however remotely, should be made parties to the suit, though applicable to most cases in the Courts of the United States, is not applicable to all," and that the federal courts had discretion to apply, or not apply, the rule depending on the circumstances of the case. *Id*.; *see also Vattier*, 33 U.S. (7 Pet.) at 265 ("a general rule, established for the convenient administration of justice," "is subject to some exceptions, introduced from necessity, or with *a view to practical convenience*") (emphasis added).

In *Cherokee Nation v. Georgia*, 30 U.S. 1 (1831), the Court again considered a request for injunctive relief that extended beyond the actual parties to the case, and, in fact, applied to the entire state government. Although the Court found that it did not have jurisdiction over the Cherokee Nation's request to prevent enforcement of Georgia state law within the Nation's territory, *Cherokee Nation*, 30 U.S. at 19-20, a dissent authored by Justice Thompson, and joined by

18

Justice Story, concluded that, as a matter of equity, it was within the courts' powers to grant the requested injunction.  *Id*. at 77-80.

These decisions illustrate Justice Story's statement that "Courts of Equity do not require, that all persons, having an interest in the subject-matter, should, under all circumstances, be before the Court as parties." STORY'S EQUITY PLEADINGS § 142, at p. 176.  "On the contrary," both English and American equity decisions established that "there are cases, in which certain parties before the Court are entitled to be deemed the *full representatives of all other persons*, or at least so far as to bind their interests under the decree, although they are not, or cannot be made parties."  *Id*. at 177 (emphasis added).

### 3.  Pomeroy's TREATISE UPON EQUITY JURISPRUDENCE and additional early American decisions.

The leading 20th Century treatise on equity rules, POMEROY, concluded that the possibility of a multiplicity of suits alone "shows that the legal remedies are inadequate, and *cannot meet the ends of justice*, and therefore a court of equity interferes" on that ground to provide "some specific equitable remedy, which gives, perhaps in one proceeding, more substantial relief than could be obtained in numerous actions at law."  POMEROY § 244, at p. 358 (emphasis added).

POMEROY identified several "classes" of cases in which English and American courts of equity had exercised jurisdiction for the purpose of avoiding a

**AR5902**

19

multiplicity of actions.  *Id.* § 245, at pp. 359-61.  These cases included "[w]here a number of persons have separate and individual claims and rights of action against the same party," all of which "*arise from some common cause*, are governed by the same legal rule, and involve similar facts, *and the whole matter might be settled in a single suit* brought by all these persons uniting as co-plaintiffs, or one of the persons suing on behalf of the others, or *even by one person suing for himself alone*."  *Id.* § 245, at p. 360 (emphasis added); *see also id.* § 255, at p. 390 (common interests "may perhaps be enforced by one equitable suit" alone).

POMEROY listed "the equitable relief which might be obtained by the single plaintiff in the one case, or by all the plaintiffs united in the other" as including "*a perpetual injunction . . . or the declaration and establishment of some common right* or duty affecting all the parties."  *Id.* § 250, at p. 367 (emphasis added).  The treatise noted that "[t]he decisions are full of examples illustrating this most important feature of the doctrine."  *Id.*

Finally, POMEROY cited "the very numerous recent cases illustrating" equitable relief being granted to avoid repetitious litigation.  *Id.* § 261, at 411, n.(b).  These included cases where the court enjoined:  a defendant from bringing actions at law against numerous parties; "the enforcement of an invalid municipal ordinance affecting many persons"; wrongful acts affecting numerous persons; a defendant from breaching a contract where many other parties had a right to enforce it; enforcing promissory notes made by numerous persons;  and a defendant to provide

**AR5903**

20

pecuniary relief to many people.  *See id.* § 261, at pp. 414-15, n.(b).

The cases POMEROY cited illustrate that English precedents such as *Perkins* and *Pilkington*, recognizing the authority of a court of equity to bind persons not before it to the requirements of its decree, maintained their vitality in America into the 20th Century.  For example, in *Bailey v. Tillinghast*, 99 F. 801 (6th Cir. 1900), the court of appeals held that "to bring a case within the jurisdiction" of a federal court of equity involving the rights of parties not before the court, all that was necessary was that there existed a common interest among the persons not before the court and the parties to the action regarding "the question involved and the kind of relief sought."  99 F. at 806 (citing *Perkins*, *Pilkington*, and *Lord Tenham*).

In a decision by a leading state court judge in the early years of the Republic, *Brinkerhoff v. Brown*, 6 Johns. Ch. 139 (N.Y. Ch. 1822) (Kent, Ch.), the court found it well settled that, when general rights are at issue, a court of equity would exercise jurisdiction "for the sake of peace, and to prevent a multiplicity of suits."  *Id.* at 155 (citing *Pilkington*).  The court explained "[t]he rules of pleading in chancery are not so precise and strict as at law," but "are more flexible in their modification, and *can more readily be made to suit the equity of the case* and the policy of the court."  *Id.* at 157 (emphasis added).

The principle of equity applying beyond the parties to a case also is seen in numerous cases regarding tax disputes in the 1800s.  *See, e.g.*, *Carlton v. Newman*, 1 A. 194 (Me. 1885); *McTwiggan v. Hunter*, 30 A. 962

**AR5904**

21

(R.I. 1895); *see also* POMEROY § 260, at pp. 391-410 (equity suits by one taxpayer could enjoin enforcement of tax against all). In these cases, courts found that the taxes to be imposed were improper, and enjoined the government from collecting them from plaintiffs, *and others* subject to the taxes.

As POMEROY found, "[u]nder the greatest diversity of circumstances, and the greatest variety of claims arising from unauthorized public acts, private tortious acts, invasion of property rights, [and] violation of contract obligations," the "weight" of American "authority is simply overwhelming that" the authority of a court of equity:

> may and *should be exercised*, either *on behalf of a numerous body of separate claimants against a single party*, or on behalf of a single party against a numerous body . . . where there is and because there is merely a community of interest among them in *the questions of law and fact involved in the general controversy*, or in the kind and form of relief demanded and obtained[.]

POMEROY § 269, at p. 445 (emphasis added).

Early American equity decisions were thus entirely consistent with "the principles, rules and usages which belonged to'" the "court of Chancery England" in 1789. American courts (both state and federal) have always had the ability to issue equitable decrees binding persons not before them as parties to the litigation, so as to ensure that American justice is not "lame and inadequate." In cases involving the general interest, the public's rights, or the prospect of a multiplicity of

AR5905

22

lawsuits, courts of equity in England had enjoyed that authority since at least the 17th century. Federal (and state) courts of equity in the new United States recognized that authority from the start of the new nation in 1789, and well into the 20th Century.

### C. The Civil Rights Era Provided Widespread Injunctive Relief to Address Harm to Broad Populations.

During the period from Reconstruction through (and after) passage of the Civil Rights Act of 1968, civil rights plaintiffs asked courts to apply their equitable authority broadly to end unconstitutionally discriminatory practices and policies. In these cases, plaintiffs needed both a declaration of illegality, and a vehicle to provide a basis for strong enforcement— injunctions applied broadly to parties and non-parties alike. *See* J. Altman, *Implementing a Civil Rights Injunction: A Case Study of NAACP v. Brennan*, 78 COLUM. L. REV. 739, 739-40 (1978) (summarizing use of injunctions to address civil rights violations in variety of settings).

For example, plaintiffs in *Bailey v. Patterson*, 323 F.2d 201 (5th Cir. 1963), alleged that Mississippi unlawfully discriminated against African Americans by enacting and enforcing state and local statutes and ordinances mandating racial segregation in public accommodations. Several transportation carriers— including local, interstate, and international carriers— also allegedly discriminated against African Americans by requiring racial segregation in their facilities. *Id.* at 203, n.2. Residents of Jackson, Mississippi sought a declaratory judgment that the statutes and ordinances

23

violated the United States Constitution and the Interstate Commerce Act, and sought an order enjoining the carriers from continuing their unlawful segregation. *Id*. at 203.

The district court granted declaratory relief, but declined to issue an injunction, reasoning that, because the suit was not a class action, no relief could be granted beyond that which each named plaintiff was specifically entitled. *Id*. at 202, 204. On appeal, the Fifth Circuit itself enjoined the City of Jackson and its officials from "seeking to enforce or encouraging" racial segregation in the transportation facilities, and granted injunctions against the transportation carrier defendants. *Id*. at 202, 204, 207-08. Importantly, the Fifth Circuit declined to limit relief simply because the case was not a class action:

> Appellants . . . seek the right to use facilities which have been desegregated, that is, which are open to all persons, appellants and others, without regard to race. *The very nature of the rights appellants seek to vindicate requires that the decree run to the benefit not only of appellants but also for all persons similarly situated.*

*Id*. at 205-06 (emphasis added). The court further held that denying the injunction was improper given the "threat of continued or resumed violations of appellant's federally protected rights remains actual." *Id*. (citing *United States v. W. T. Grant Co.*, 345 U.S. 629 (1953)); *see also Vulcan Soc'y of N.Y.C. Fire Dept., Inc. v. Civil Service Com.*, 360 F. Supp. 1265, 1278, n.8 (S.D.N.Y. 1973) (granting injunction, and holding "any

**AR5907**

24

equitable relief . . . should take the form of an injunction prohibiting further use of those procedures determined to be unconstitutional, which would automatically benefit all individuals similarly situated"), *aff'd*, 490 F.2d 387 (2d Cir. 1973).

These are but exemplars of the many cases in more recent times granting injunctions as a remedy that applied to parties and non-parties; nationwide injunctions are one variety of such equitable relief. These remedies are well established as appropriate and available.

*   *   *

The power to grant equitable relief that applies beyond the parties before the court, through local, regional, or, indeed, national injunctions, is consistent with the scope of equitable powers recognized by English courts, American courts, and respected authorities, and is necessary to afford complete justice as a matter of equity. This Court should affirm the injunctive relief granted by the district courts in these cases on this basis.

25

## CONCLUSION

The power to grant broad equitable relief, including relief that will apply to parties beyond those before the courts, is well-within the traditional powers of courts of equity. The district courts' entries of nationwide injunctions were appropriate forms of relief.

Respectfully submitted,

THOMAS W. HAZLETT
   *Counsel of Record*
STEPHEN J. KASTENBERG
JULIANA B. CARTER
MANSI G. SHAH
BALLARD SPAHR LLP
1735 Market Street
51st Floor
Philadelphia, PA 19103
(215) 665-8500
hazlettt@ballardspahr.com

WILLIAM ALDEN MCDANIEL, JR.
BALLARD SPAHR LLP
300 East Lombard Street
18th Floor
Baltimore, MD 21202
(410) 528-5600

*Counsel for Amici Curiae The Public Interest Law Center, The Washington Lawyers' Committee for Civil Rights and Urban Affairs, and The Mississippi Center for Justice*

OCTOBER 4, 2019

**AR5909**

Nos. 18-587, 18-588, and 18-589

================================

In The

# Supreme Court of the United States

————◆————

DEPARTMENT OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF
CALIFORNIA, ET AL.,

*Respondents.*

————◆————

DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL.,

*Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, ET AL.,

*Respondents.*

————◆————

KEVIN K. McALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL.,

*Respondents.*

————◆————

**On Writs Of Certiorari To The
United States Courts Of Appeals For The Ninth,
District Of Columbia, And Second Circuits**

————◆————

***AMICI CURIAE* BRIEF OF EMPIRICAL
SCHOLARS IN SUPPORT OF RESPONDENTS**

————◆————

OSSAI MIAZAD
MICHAEL N. LITROWNIK
CHAUNIQUA D. YOUNG
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017

RACHEL WILLIAMS DEMPSEY
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111

NIKOLAS BOWIE
*Counsel of Record*
OREN NIMNI
IVAN ESPINOZA-MADRIGAL
OREN SELLSTROM
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street,
  5th Floor
Boston, MA 02110
(617) 988-0606
nbowie@law.harvard.edu

================================

**AR5910**

i

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ..................................... i

TABLE OF AUTHORITIES ................................ ii

INTEREST OF *AMICI CURIAE* ......................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT................................................... 7

ARGUMENT ....................................................... 9

I. Immigrant legal status and work authorization have a critical impact on the lives of individuals and their children and families ................................................... 9

    A. Overview of DACA and DACA recipients ................................................ 9

    B. Effect of obtaining legal status and work authorization ............................. 11

II. DACA has positive effects on the lives of its recipients and their families, including U.S.-citizen children ................................. 18

III. DACA protects against the harms experienced by U.S.-citizen children when a parent or relative is undocumented or removed ................................................ 26

CONCLUSION.................................................. 33

**AR5911**

ii

## TABLE OF AUTHORITIES

Page

CASES

*Atkins v. Virginia*, 536 U.S. 304 (2002).........................1

*Hall v. Florida*, 134 S. Ct. 1986 (2014).........................1

*Roper v. Simmons*, 543 U.S. 551 (2005).........................1

RULES AND REGULATIONS

Sup. Ct. R. 37 ...............................................1

OTHER AUTHORITIES

Ajay Chaudry et al., *Facing Our Future: Children in the Aftermath of Immigration Enforcement*, Urb. Inst. (2010), https://www.urban.org/sites/default/files/publication/28331/412020-Facing-Our-Future.PDF...................29, 30

Alexander Ortega, Sarah Horwitz, Hai Fang, Alice Kuo, Steven Wallace & Moira Inkela, *Documentation Status and Parental Concerns About Development in Young U.S. Children of Mexican Origin*, 9 Acad. Pediatrics 278 (2009)...................................................25

Amada Armenta, *Protect, Serve, and Deport: The Rise of Policing as Immigration Enforcement* (2017)....................................................14

Amy Hsin & Francesc Ortega, *The Effects of Deferred Action for Childhood Arrivals on Educational Outcomes of Undocumented Students*, 55 Demography 1487 (2018) .......................19

**AR5912**

iii

TABLE OF AUTHORITIES—Continued

Page

Atheedar Venkataramani et al., *Health Conse-quences of the U.S. Deferred Action for Child-hood Arrivals (DACA) Immigration Programme: A Quasi-Experimental Study*, 2 Lancet Pub. Health e175 (2017), https://www.thelancet.com/journals/lanpub/article/PIIS2468-2667(17) 30047-6/fulltext ........................................................30

Brian Allen, Erica Cisneros & Alexandra Tellez, *The Children Left Behind: The Impact of Pa-rental Deportation on Mental Health*, 24 J. Child & Fam. Stud. 386 (2013) ...............................30

Caitlin Patler & Whitney Laster Pirtle, *From Undocumented To Lawfully Present: Do Changes In Legal Status Impact Psychological Wellbeing Among Latino Immigrant Young Adults?*, Soc. Sci. & Med. (2017), www.science direct.com/science/article/pii/S0277953617301 48X?np=y&npKey=cd0a5382554ee22e26ffd1a ccf5c9a82cdd84c6a794d2bab0323cb930f5281 07 .......................................................... 14, 15, 23, 31

Caitlin Patler et al., *From Undocumented to DACAmented: Impacts of the Deferred Action for Childhood Arrivals (DACA) Program*, Inst. for Research Lab. & Emp. 6 (2015), https:// escholarship.org/uc/item/3060d4z3 ............ 18, 20, 24

Caitlin Patler et al., *Uncertainty About DACA May Undermine Its Positive Impact on Health for Recipients and Their Children*, 38 Health Affairs 738 (2019)........................................26, 31, 33

AR5913

iv

TABLE OF AUTHORITIES—Continued

Page

Cecilia Menjívar & Andrea Gómez Cervantes,
    Am. Psychol. Ass'n, *The Effects of Parental
    Undocumented Status on Families and Chil-
    dren: Influence of Parental Undocumented
    Status on the Development of U.S.-Born Chil-
    dren in Mixed-Status Families* (2016), https://
    www.apa.org/pi/families/resources/newsletter/
    2016/11/undocumented-status.........................30, 31

Cecilia Menjívar & Daniel Kanstroom, *Con-
    structing Immigrant "Illegality": Critiques,
    Experiences, and Responses* (2014).........................13

Cecilia Menjívar, *Liminal Legality: Salvadoran
    and Guatemalan Immigrants' Lives in the
    United States*, 111 Am. J. Soc. 999 (2006) ..............12

Cecilia Menjívar, *The Power of the Law: Central
    Americans' Legality and Everyday Life in
    Phoenix, Arizona*, 9 Latino Stud. 377 (2011)..........32

Edward Vargas & Vickie Ybarra, *U.S.-Citizen
    Children of Undocumented Parents: The Link
    Between State Immigration Policy and the
    Health of Latino Children*, 19 J. Immigrant &
    Minority Health 913 (2017), https://www.ncbi.
    nlm.nih.gov/pmc/articles/PMC5236009 .................24

Elira Kuka et al., *Do Human Capital Decisions
    Respond to the Returns to Education? Evi-
    dence from DACA* (2018), https://www.nber.org/
    papers/w24315.pdf ...........................................19, 21

**AR5914**

v

TABLE OF AUTHORITIES—Continued

Page

Elizabeth Aranda & Elizabeth Vaquera, *Immigrant Family Separation, Fear, and the U.S. Deportation Regime*, 5 Monitoring Pub. Opinion: Econ. & Soc. Changes 204 (2018) .....................31

Elizabeth Aranda et al., *Personal and Cultural Trauma and the Ambivalent National Identities of Undocumented Young Adults in the U.S.*, 36 J. Intercultural Stud. 600 (2015) .............12

Elizabeth Vaquera, Elizabeth Aranda & Isabel Sousa-Rodriguez, *Emotional Challenges of Undocumented Young Adults: Ontological Security, Emotional Capital, and Well-Being*, 64 Social Problems 298 (2017).....................................23

Emily Greenman & Matthew Hall, *Legal Status and Educational Transitions for Mexican and Central American Immigrant Youth*, 91 Social Forces 1475 (2013) ..................................16

Francesc Ortega et al., *The Economic Effects of Providing Legal Status to DREAMers* (2018), http://ftp.iza.org/dp11281.pdf ..........................19, 20

Frank D. Bean et al., *Parents Without Papers: The Progress and Pitfalls of Mexican American Integration* (2015).......................................12, 13

Gustavo López & Jens Manuel Krogstad, *Key Facts About Unauthorized Immigrants Enrolled in DACA* (2017), https://www.pewresearch.org/fact-tank/2017/09/25/key-facts-about-unauthorized-immigrants-enrolled-in-daca.........................................................10

AR5915

vi

TABLE OF AUTHORITIES—Continued

Page

Hirokazu Yoshikawa & Ariel Kalil, *The Effects of Parental Undocumented Status on the Developmental Contexts of Young Children in Immigrant Families*, 5 Child Development Perspectives 291 (2011) ..........................................31

Hirokazu Yoshikawa et al., *Unauthorized Status and Youth Development in the United States: Consensus Statement of the Society for Research on Adolescence*, 27 J. Res. Adolescence 4 (2016)....................................................................31

Hirokazu Yoshikawa, Carola Suárez-Orozco & Roberto Gonzales, *Unauthorized Status and Youth Development in the United States: Consensus Statement of the Society for Research on Adolescence*, 27 J. Res. Adolescence 4 (2016)....................................................................14

Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Children* (2011) ........................................................31, 32

Jefferey Passel & D'vera Cohn, *A Portrait of Unauthorized Immigrants in the United States* (2009), https://www.pewresearch.org/hispanic/2009/04/14/a-portrait-of-unauthorized-immigrants-in-the-united-states...........................16

Jens Hainmueller et al., *Protecting Unauthorized Immigrant Mothers Improves Their Children's Mental Health*, 357 Science 1041 (2017), https://science.sciencemag.org/content/357/6355/1041.long ..........................................25, 31

**AR5916**

vii

TABLE OF AUTHORITIES—Continued

Page

Jie Zong, Ariel Ruiz Soto, Jeanne Batalova, Julia Gelatta & Randy Capps, *A Profile of Current DACA Recipients by Education, Industry, and Occupation* (2017), https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation ......................................................... 11

Joanna Dreby, *Everyday Illegal* (2015) ................ 12, 32

Jorge Delva et al., *Mental Health Problems of Children of Undocumented Parents in the United States: A Hidden Crisis*, 13 J. Community Positive Prac. 25 (2013) ................................... 30

Kalina Brabeck, Erin Sibley & M. Brinton Lykes, *Authorized and Unauthorized Immigrant Parents: The Impact of Legal Vulnerability on Family Contexts*, 38 Hisp. J. Behav. Sci. 3 (2015) ................................................................. 32

Krista M. Perreira, Andrew Fuligni & Stephanie Potochnick, *Fitting In: The Roles of Social Acceptance and Discrimination in Shaping the Academic Motivations of Latino Youth in the U.S. Southeast*, 66 J. Soc. Issues 173 (2010) ........... 13

Laura Enriquez, *Multigenerational Punishment: Shared Experiences of Undocumented Immigration Status Within Mixed-Status Families*, 77 J. Marriage & Fam. 939 (2015) .......... 25

**AR5917**

viii

TABLE OF AUTHORITIES—Continued

Page

Leisy Abrego, *Renewed Optimism and Spatial Mobility: Legal Consciousness of Latino Deferred Action for Childhood Arrivals Recipients and their Families in Los Angeles*, *Ethnicities*, 18 Ethnicities 192 (2018) ........ 15, 24, 31

Lisseth Rojas-Flores, Mari Clements, J. Hwang Koo & Judy London, *Trauma and Psychological Distress in Latino Citizen Children Following Parental Detention and Deportation*, 9 Psychol. Trauma 352 (2016), https://www.researchgate.net/profile/Lisseth_Rojas-Flores/publication/306025305_Trauma_and_Psychological_Distress_in_Latino_Citizen_Children_Following_Parental_Detention_and_Deportation/links/599483b7458515c0ce65300a/Trauma-and-Psychological-Distress-in-Latino-Citizen-Children-Following-Parental-Detention-and-Deportation.pdf ............................................................29

Luis Zayas, Sergio Aguilar-Gaxiola, Hyunwoo Yoon & Guillermina Natera Rey, *The Distress of Citizen-Children with Detained and Deported Parents*, 24 J. Child & Fam. Stud. 3213 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4667551 ............................................................30

Manuel Pastor, Jared Sanchez & Vanessa Carter, *The Kids Aren't Alright—But They Could Be* (2015), https://dornsife.usc.edu/csii/dapa-impacts-children ............................................27

AR5918

ix

TABLE OF AUTHORITIES—Continued

Page

María Enchautegui & Cecilia Menjívar, *Para-doxes of Family Immigration Policy: Separa-tion, Reorganization, and Reunification of Families under Current Immigration Laws*, 37 Law & Pol'y 32 (2015) ........................................30

Marie Mallet & Lisa García Bedolla, *Transi-tory Legality: The Health Implication of Ending DACA*, 11 Cal. J. Pol. & Pol'y (2019), https://escholarship.org/uc/item/84f6g2qj ..............33

Nancy Landale, Jessica Hardie, R.S. Oropesa & Marrianne Hillemeier, *Behavioral Function-ing Among Mexican-Origin Children: Does Pa-rental Legal Status Matter?*, 56 J. Health & Soc. Behav. 2 (2015).................................................24

Nat'l Acads. of Scis., Eng'g & Med., Comm. on Population, Div. of Behavioral & Soc. Sci. & Educ., *The Integration of Immigrants into American Society* 10 (Mary C. Waters & Marisa Gerstein Pineau eds., 2015, www.nap.edu/catalog/21746/the-integration-of-immigrants-into-american-society ....................27

Nolan G. Pope, *The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants*, 143 J. Pub. Econ. 98 (2016)........................................18, 20

Philip Kasinitz, John H. Mollenkopf, Mary C. Waters & Jennifer Holdaway, *Inheriting the City: The Children of Immigrants Come of Age* (2009).....................................................................16

**AR5919**

x

TABLE OF AUTHORITIES—Continued

Page

Press Release, The White House, Office of the Press Sec'y, Remarks by the President on Immigration (June 15, 2012), https://obama whitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration .................... 9

R.S. Oropesa et al., *How Does Legal Status Matter for Oral Health Care Among Mexican-Origin Children in California?* 3 SSM Population Health 730 (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5607870 ..................................... 25

R.S. Oropesa, Nancy Landale & Marianne Hillemeier, *Family Legal Status and Health: Measurement Dilemmas in Studies of Mexican-Origin Children*, 138 Soc. Sci. Med. 57 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4498967 .......................................... 25

R.S. Oropesa, Nancy Landale & Marianne Hillemeier, *Legal Status and Health Care: Mexican-Origin Children in California, 2001–2014*, 35 Population Res. & Pol'y Rev. 651 (2016) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5114005 .......................................... 25

Randy Capps et al., *A Profile of U.S. Children with Unauthorized Immigrant Parents* (2016), https://www.migrationpolicy.org/research/profile-us-children-unauthorized-immigrant-parents ....... 17

AR5920

xi

TABLE OF AUTHORITIES—Continued

Page

Randy Capps, Michael Fix & Jie Zong, *A Profile of U.S. Children with Unauthorized Immigrant Parents*, Migration Policy Inst. 1 (2016) https://www.migrationpolicy.org/research/profile-us-children-unauthorized-immigrant-parents.......28

Robert Courtney Smith, *Horatio Alger Lives in Brooklyn, But Check His Papers, Published Materials*, https://www.baruch.cuny.edu/mspia/faculty-and-staff/full-time-faculty/amicusbrief.html ...................................................... 13, 15, 20, 23

Robert Courtney Smith, *Horatio Alger Lives in Brooklyn: Extra-Family Support, Intra-Family Dynamics, and Socially Neutral Operating Identities in Exceptional Mobility Among Children of Mexican Immigrants*, 620 Annals of Am. Acad. of Pol. & Soc. Sci. 270 (2008) .............15

Robert Courtney Smith, *Mexican New York* (2006).........................................................................1

Roberto G. Gonzales et al., *(Un)Authorized Transitions: Illegality, DACA, and the Life Course*, 15 Res. Hum. Dev. 345 (2018) ...................21

Roberto G. Gonzales et al., *Becoming DACA-mented: Assessing the Short-Term Benefits of Deferred Action for Childhood Arrivals (DACA)*, 58 Am. Behav. Scientist 1852 (2014) .. 10, 17, 19, 20, 23

Roberto G. Gonzales, *Learning to be Illegal: Undocumented Youth and Shifting Legal Contexts in the Transition to Adulthood*, 76 Am. Soc. Rev. 602 (2011).................................................13

AR5921

xii

TABLE OF AUTHORITIES—Continued

Page

Roberto G. Gonzales, *Lives in Limbo: Undocumented and Coming of Age in America* (2016) ........................................................ 12, 14, 15

Shawn Malia Kanaiaupuni, Child Well-Being and the Intergenerational Effects of Undocumented Immigrant Status, Presentation at the USDA Economic Research Service Small Grants Program Conference (Oct. 14–15, 1999), https://www.academia.edu/5923999/Child_Well-Being_and_the_Intergenerational_Effects_of_Undocumented_Immigrant_Status ........................ 32

Silva Mathema, *Keeping Families Together: Why All Americans Should Care What Happens to Unauthorized Immigrants, Center for American Progress* (2017), https://www.americanprogress.org/issues/immigration/reports/2017/03/16/428335/keeping-families-together/ ........................ 27

Susan Mapp & Emily Hornung, *Irregular Immigration Status Impacts for Children in the USA*, 1 J. Hum. Rights & Soc. Work 61 (2016) https://link.springer.com/content/pdf/10.1007%2Fs41134-016-0012-1.pdf ........................ 25

U.S. Citizenship & Immigration Servs. (USCIS), DACA Population Data (Aug. 31, 2018), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_August_31_2018.pdf ....... 10

AR5922

xiii

TABLE OF AUTHORITIES—Continued

Page

U.S. Citizenship & Immigration Servs., Approx-
    imate Active DACA Recipients Demographics—
    Apr. 30, 2019 (2019), https://www.uscis.gov/
    sites/default/files/USCIS/Resources/Reports%
    20and%20Studies/Immigration%20Forms%20
    Data/All%20Form%20Types/DACA/Approximate_
    Active_DACA_Recipients_Demographics_-_
    Apr_30_2019.pdf .....................................................11

Zhihuan Jennifer Huang, Stella Yu & Rebecca
    Ledsky, *Health Status and Health Service Ac-
    cess and Use Among Children in U.S. Immi-
    grant Families*, 96 Am. J. Pub. Health 634
    (2006), https://ajph.aphapublications.org/doi/
    full/10.2105/AJPH.2004.049791 ............................32

AR5923

1

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are fourteen academic social scientists who have conducted significant research on immigration, specifically the Deferred Action for Childhood Arrivals ("DACA") population and the long-term effects of formal legal status and deferred action on the lives of immigrants and their families, including their children and grandchildren.[2] *Amici curiae* are affiliated with leading universities across the country and their research has been funded by major foundations, including the National Science Foundation, and published in respected journals.

**Robert Courtney Smith** is Professor in the Austin W. Marxe School of Public and International Affairs, Baruch College, and Sociology Department, Graduate Center, CUNY. He authored *Mexican New York: Transnational Worlds of New Immigrants* (California, 2006), and *Horatio Alger Lives in Brooklyn, But Check His Papers* (under contract, University of California press), which analyze how immigration status and other factors affect intergenerational individual and family mobility. His current project, the DACA Access Project, studies the long-term effects of having,

---

[1] Rule 37 statement: All parties issued blanket consents to the filing of amicus briefs. Nobody but *amici* and their counsel authored any portion of this brief or funded its preparation and submission.

[2] This Court has often relied on social science research to inform its decisions. *See, e.g., Hall v. Florida*, 134 S. Ct. 1986, 1993 (2014); *Roper v. Simmons*, 543 U.S. 551, 569–70 (2005); *Atkins v. Virginia*, 536 U.S. 304, 318 (2002).

AR5924

2

lacking, gaining, or losing formal immigration status or deferred action, especially DACA.

**Caitlin Patler** is Assistant Professor of Sociology at the University of California, Davis, where her research analyzes the origins and reproduction of inequality in the United States, with a special focus on how laws, legal statuses, and law enforcement institutions drive socioeconomic and health disparities. Dr. Patler is the Principal Investigator of the DACA Longitudinal Study, an original survey and in-depth interview study that follows 502 DACA recipients and undocumented non-recipients in California over time.

**Cecilia Menjívar** holds the Dorothy L. Meier Chair in Social Equities and is Professor of Sociology at the University of California, Los Angeles. Her research on immigration examines the effects of immigration laws and policies on various aspects of immigrants' lives, especially family dynamics, access to institutions, and citizenship and belonging.

**Douglas S. Massey** is the Henry G. Bryant Professor of Sociology and Public Affairs at Princeton University, where he also directs the Office of Population Research. He is the Co-Director of the Mexican Migration Project, which annually since 1987 has gathered data from representative community samples on documented and undocumented migrants to the United States. Since 1998 he has also Co-Directed the Latin American Migration Project, which uses the same methodology to gather data on documented and

AR5925

3

undocumented migrants from other nations in Latin America and the Caribbean.

**James D. Bachmeier** is Associate Professor of Sociology at Temple University and a non-resident Fellow at the Migration Policy Institute. His research is focused on immigration and the integration of immigrants in the United States. He co-authored, with Frank D. Bean and Susan K. Brown, *Parents without Papers: The Progress and Pitfalls of Mexican American Integration* (2015, Russell Sage), and has published his research in *Social Forces, Demography, International Migration Review*, and *the ANNALS of the American Academy of Political and Social Science.*

**Elizabeth Aranda** is Professor of Sociology at the University of South Florida. Her work has been supported by the National Science Foundation. Her primary field of interest is immigrant emotional well-being. She has conducted influential research on issues of immigrant integration, such as psychological well-being and emotional adaptation, contributing to the improvement of our understanding of the subjective experience of migration and settlement in a new country. She is co-author on several articles and books on immigrant youth and young adults (with and without DACA) and their subjective well-being.

**Mary C. Waters** is the PVK Professor of Arts and Sciences and the John Loeb Professor of Sociology at Harvard University. A demographer and sociologist, Waters is an expert on the assimilation of immigrants, specializing in the socioeconomic outcomes of young

**AR5926**

4

adults whose parents are immigrants. A member of the National Academy of Sciences, Waters chaired the interdisciplinary NAS Committee of 17 immigration experts who produced the 2015 report on *The Integration of Immigrants into American Society* (National Academies Press).

**Frank D. Bean** is Distinguished Professor of Sociology (and Education and Economics) at the University of California, Irvine. A demographer who is a leading senior researcher on the estimation of unauthorized and legal status from survey data and on the assessment of the educational effects of migration status on the descendants of immigrants, he both co-directed the Urban Institute/RAND national evaluation of the 1986 IRCA's effects and the large-scale 2004 IIMMLA survey of second-generation immigrant integration in Los Angeles.

**Susan K. Brown** is Professor of Sociology at the University of California, Irvine. Her work examines immigrant integration, population distribution, and educational inequalities. She is co-author of *Parents Without Papers: The Progress and Pitfalls of Mexican American Integration*, winner of an outstanding scholarship award. She is a co-investigator of "Immigration and Intergenerational Mobility in Metropolitan Los Angeles," a survey in 2004 of the immigrant second generation.

**Catalina Amuedo-Dorantes** is Professor of Economics at University of California, Merced, a Research Fellow at CReAM, FEDEA and IZA, an Advisory

**AR5927**

5

committee member of the Americas Center Advisory Council at the Federal Reserve Bank of Atlanta, and the Western Representative in the Committee for the Status of Women in the Economics Professions (CSWEP) since 2015. Her areas of interest include labor economics, international migration and remittances. She has published scholarship on contingent work contracts, the informal work sector, international remittances, as well as on immigrant savings, health care and labor market outcomes. Her current research broadly focuses on immigration policy and its consequences.

**Leisy J. Abrego** is Professor in the Chicana and Chicano Studies Department at the University of California, Los Angeles. Over two decades, she has researched how local, state, and federal U.S. immigration policies and practices have affected the day-to-day lives of migrants and their families. Her research analyzes how young people—undocumented and 1.5 generation immigrants, and DACA recipients—internalize and respond to immigration policies and practices. In her current project, she interviews DACA recipients and their relatives to analyze the family-level consequences of DACA.

**Joanna Dreby** is Associate Professor of Sociology at the University at Albany—SUNY. A leading qualitative methodologist, Dr. Dreby is an expert on the impacts of migration, family separation, and immigration enforcement on children and gender and generational relationships in families. She is author of two award-winning books, *Divided by Borders: Mexican Migrants*

**AR5928**

6

*and their Children* (University of California Press 2010) and *Everyday Illegal: When Policies Undermine Immigrant Families* (University of California Press 2015).

**Francesc Ortega** is the Dina A. Perry Professor in Economics at the Queens College of the City University of New York. Dr. Ortega's main area of research is the analysis of the economic effects of immigration, with a focus on labor market and macroeconomic outcomes. Much of his recent work has been devoted to quantifying the economic contribution of unauthorized workers to the U.S. economy and to the evaluation of the potential impact of policy proposals aimed at providing legal status.

**Amy Hsin** is Associate Professor of Sociology at Queens College, City University of New York (CUNY), and faculty affiliate at CUNY Institute of Demographic Research. She has researched the determinants of Asian American achievement in education, and the effect of aggressive policing on the educational performance of immigrant youth and Black/Latino youth. She is a principal investigator on a large study of DACA funded by the W.T. Grant Foundation, which analyzes DACA's effects on college attendance and work, and analyzes DACA recipients' strong academic trajectories.

As scholars who conduct empirical research on the DACA population, *amici* have a substantial interest in this matter. In this brief, they present social science research relevant to the legal questions before this

AR5929

Court, including research concerning: the demographic and socioeconomic characteristics of the DACA population; how those individuals benefit from DACA; how their United States citizen relatives, including children, benefit from having parents or family members with DACA; and how DACA recipients and their United States citizen relatives would be harmed if DACA were ended.

————◆————

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Research on DACA, as well as more general scholarship on the effects of having, gaining, lacking, and losing deferred action or legal status in the United States, shows unequivocally the strong reliance interests in DACA, both on the part of DACA recipients and on the part of their U.S.-citizen children and families. Rescinding DACA would cause harm to a particularly hardworking and high-achieving segment of U.S. society, and its effects would reverberate through generations.

Social science research on the DACA population reveals that DACA recipients are successful, long-term residents of the United States who are deeply embedded in American life, and who, in the seven years since DACA's inception, have come to rely on its promises of increased stability and economic security for themselves and their relatives. Most DACA recipients have attended and graduated from American schools and

AR5930

8

many live with U.S.-citizen children or immediate family members. DACA protects its recipients in a number of important ways, including by increasing their earnings and labor market participation, improving their ability to continue their education, and facilitating their ability to function without fear in daily life, such as by enabling them to get drivers' licenses to drive to work or to pick up their children. DACA also decreases the harms attached to undocumented status, including heightened anxiety and stress, or fear of separation from children or family.

U.S.-citizen children and immediate family members of DACA recipients also benefit significantly from DACA, because of DACA recipients' increased incomes, ability to continue their education and training, increased ability to function without fear, and decreased risk of harm due to undocumented status. For example, U.S.-citizen children whose parents received deferred action experienced reduced rates of adjustment and anxiety disorders, compared to children whose parents did not. DACA further protects U.S.-citizen children and other immediate family members from substantial harms that result from having a family member, especially the primary breadwinner, removed or living under the constant threat of removal.

In sum, seven years of research into the DACA population, as well as studies of other populations that have gained and lost legal status or deferred action in the United States, show that DACA recipients and their family members strongly rely on the protections

9

of DACA, the loss of which could ripple deeply outward.



**ARGUMENT**

**I.    Immigrant legal status and work authorization have a critical impact on the lives of individuals and their children and families.**

### A.    Overview of DACA and DACA Recipients.

DACA was initiated to address the legal and social limbo in which its recipients found themselves: On one hand, they had grown up in the United States and saw this country as home, attended U.S. schools, and contributed to the country with their taxes. On the other hand, they were often prevented from continuing their education due to eligibility and tuition-related barriers and were unable to find legal employment. In then President Obama's words, DACA was created to help the young people who "want to staff our labs, or start new businesses, or defend our country." He observed that DACA recipients were "Americans in their heart, in their minds, in every single way but one: on paper." Press Release, The White House, Office of the Press Sec'y, *Remarks by the President on Immigration* (June 15, 2012), https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration.

As would be expected given the DACA initiative's central mission, the DACA population is young, and deeply settled in the U.S. Two-thirds were under age 25 in 2017, when the average age was 24; only 24%

10

were ages 26–30, and only 11% were 31–36. U.S. Citizenship and Immigration Services (USCIS) data from 2017 showed that 20% of DACA recipients were still in high school. Some 83% of DACA recipients were unmarried when applying, and only 15% were married. *See* Gustavo López & Jens Manuel Krogstad, *Key Facts About Unauthorized Immigrants Enrolled in DACA* (2017), https://www.pewresearch.org/fact-tank/2017/09/25/key-facts-about-unauthorized-immigrants-enrolled-in-daca; *see also* Roberto G. Gonzales et al., *Becoming DACAmented: Assessing the Short-Term Benefits of Deferred Action for Childhood Arrivals (DACA)*, 58 Am. Behavioral Scientist 1852, 1862 (2014) (reporting the average age of DACA recipients in study sample was 22.6 years in 2014). All DACA recipients have been in the U.S. at least 12 years (since June 15, 2007, to qualify for DACA), but many have been here longer—16 years on average according to one field-based study.[3] *See* Robert Courtney Smith, DACA Access Project (in field study of 1,707 interviews of DACA recipients in New York state, finding average age of arrival of 6.8 years old).

As a group, DACA recipients are high achievers. Due to the initiative's educational requirements, DACA recipients generally have at least a high school

---

[3] U.S. Citizenship & Immigration Servs. (USCIS) reported the average age of DACA recipients as 24.2 years in August 2018, which yields an average stay of 16–18 years. *See* U.S. Citizenship and immigration services (USCIS), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_August_31_2018.pdf.

11

diploma, a GED, or are pursuing adult education. As of 2014, DACA recipients were enrolled in college at nearly the same rate as all Americans (18% for DACA versus 20% for the overall U.S. population). Jie Zong, Ariel Ruiz Soto, Jeanne Batalova, Julia Gelatta, & Randy Capps, *A Profile of Current DACA Recipients by Education, Industry, and Occupation.* (2017), https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation. Another 15% of DACA recipients had completed some college, and 4% had earned a bachelor's degree or higher. *Id*. In total, some 37% had attended at least some college, and those numbers have undoubtedly risen in the last five years, as DACA recipients have relied on deferred action to access higher education. *Id*. Moreover, DACA recipients have become more deeply settled in the U.S., increasingly forming their own families. USCIS data from April 30, 2019 show that 20.6% of DACA recipients are now married (up from 15% on initial application). U.S. Citizenship and Immigration Servs., Approximate Active DACA Recipients Demographics—Apr. 30, 2019 (2019), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/Approximate_Active_DACA_Recipients_Demographics_-_Apr_30_2019.pdf.

## B. Effect of obtaining legal status and work authorization.

The impact of attaining legal status or work authorization is broad and far-reaching, has dramatic

12

effects on entire families, and extends through multiple generations.

Immigrant legal status is a central axis of stratification in contemporary U.S. society and is linked to a range of inequities for youth. Joanna Dreby, *Everyday Illegal*, (2015); Roberto G. Gonzales, *Lives in Limbo: Undocumented and Coming of Age in America* (2016); Elizabeth Aranda et al., *Personal and Cultural Trauma and the Ambivalent National Identities of Undocumented Young Adults in the U.S.*, 36 J. Intercultural Stud. 600, 603–04 (2015); Cecilia Menjívar, *Liminal Legality: Salvadoran and Guatemalan Immigrants' Lives in the United States*, 111 Am. J. Soc. 999, 1000 (2006). Undocumented status promotes "membership exclusion" and inhibits integration by, for example, preventing access to key American institutions, such as schools, jobs, healthcare, and childcare institutions. Frank D. Bean et al., *Parents Without Papers: The Progress and Pitfalls of Mexican American Integration*, 6–9 (2015) A key example of how these effects are transmitted through a generation is that having undocumented parents decreases second-generation children's educational attainment by 1.24 years, compared to those whose parents were citizens or entered the U.S. with authorization. *Id.* at 86. Having parents who came to the U.S. without authorization but later obtained permanent legal status did *not* have the same negative effect as having parents who remained undocumented. Rather, children whose parents obtained permanent legal status displayed educational outcomes similar to their counterparts whose parents had

13

always had legal status. Similarly, second-generation adult male children of unauthorized parents had decreased earnings compared to those whose parents had always had legal status. *Id*. at 108–119.

Membership exclusion becomes particularly acute in adolescence, when undocumented youth start to become excluded from key institutions, rituals, and identity documents—for example, getting a driver's license or an internship, attending school trips, or obtaining financial aid for college. Simultaneously, many increasingly feel a duty to help their parents financially and begin to work in the informal economy. Roberto G. Gonzales, *Learning to be Illegal: Undocumented Youth and Shifting Legal Contexts in the Transition to Adulthood*, 76 Am. Soc. Rev. 602, 612–13 (2011); Cecilia Menjívar & Daniel Kanstroom, *Constructing Immigrant "Illegality": Critiques, Experiences, and Responses* (2014); Robert Courtney Smith, *Horatio Alger Lives in Brooklyn, But Check His Papers*, Published Materials, https://www.baruch.cuny.edu/mspia/faculty-and-staff/full-time-faculty/amicusbrief.html. The end result is that college and the better life prospects it leads to become false promises. This pushes many, as early adults, to relinquish their dreams of college and accept a life where they work for low wages, in hard jobs with little chance for advancement, where injury and wage theft are common. *Id*. Later, as early adults, undocumented people feel they must conceal the shameful secret of their lack of legal status from others. Gonzales, *Learning to be Illegal*, *supra*, at 610–11; *see also* Perreira, K. M., Fuligni, A., & Potochnick, S., *Fitting In: The Roles of Social Acceptance and Discrimination in Shaping the Academic*

14

*Motivations of Latino Youth in the U.S. Southeast*, 66 J. Soc. Issues 173, 185–188 (2010). They fear the police, as a routine traffic stop could lead to removal. Amada Armenta, *Protect, Serve, and Deport: The Rise of Policing as Immigration Enforcement* (2017). As a result, many experience depression and anxiety. *See* Gonzales, *Learning to be Illegal*, *supra*, at 610–15; Hirokazu Yoshikawa et al., *Unauthorized Status and Youth Development in the United States: Consensus Statement of the Society for Research on Adolescence*, 27 J. Res. Adolescence 4 (2016); Hirokazu Yoshikawa, Carola Suárez-Orozco & Roberto Gonzales, *Unauthorized Status and Youth Development in the United States: Consensus Statement of the Society for Research on Adolescence*, 27 J. Res. Adolescence 4 (2016); Caitlin Patler & Whitney Laster Pirtle, *From undocumented to lawfully present: Do changes in legal status impact psychological wellbeing among Latino immigrant young adults?*, Soc. Sci. & Med. (2017), www.sciencedirect.com/science/article/pii/S027795361730148X?np=y&npKey=cd0a5382554ee2 2e26ffd1accf5c9a82cdd84c6a794d2bab0323cb930f528 107.

Even high-achieving undocumented youth face these negative effects. By their early twenties, the lives of these high achievers (in terms of jobs, income, and opportunity) converge with similarly situated youth who dropped out of high school. Gonzales, *Lives in Limbo, supra*. While their U.S.-citizen peers can get driver's licenses, jobs, internships, or student loans to help them go to college, undocumented status becomes a "master status" that excludes even the most

AR5937

15

academically successful undocumented youth from pursuing educational and professional opportunities. *Id*.; Leisy Abrego, *Renewed Optimism and Spatial Mobility: Legal Consciousness of Latino Deferred Action for Childhood Arrivals Recipients and their Families in Los Angeles*, *Ethnicities*, 18 Ethnicities 192–207 (2018); *cf*. Patler & Pirtle, *supra*, at 39–48, www.sciencedirect.com/science/article/pii/S027795361730148X?np=y&npKey=cd0a5382554ee22e26ffd1accf5c9a82cdd84c6a794d2bab0323cb930f528107. The end result is that the opportunities these youth have are greatly limited, even if they are able to attend college despite their status. *Id*.

Perhaps unsurprisingly given this research, having or gaining legal status and work authorization has a strong positive effect on intra-family mechanisms that promote upward mobility among immigrant families. For example, one study followed a set of children of Mexican immigrants for over a decade as they moved from later adolescence into early adulthood (ages 18–25) and middle adulthood (late-20s to mid-30s) found that families who had or obtained legal immigration status achieved higher levels of yearly income compared to families who did not. Robert Courtney Smith, *Horatio Alger Lives in Brooklyn, But Check His Papers, Published Materials*, https://www.baruch.cuny.edu/mspia/faculty-and-staff/full-time-faculty/amicusbrief.html; *see also* Robert Courtney Smith, *Horatio Alger Lives in Brooklyn: Extra-Family Support, Intra-Family Dynamics, and Socially Neutral Operating Identities in Exceptional Mobility Among Children of Mexican Immigrants*, 620 Annals of Am. Acad. of Pol.

16

& Soc. Sci. 270 (2008); Philip Kasinitz, John H. Mollen-kopf, Mary C. Waters, Jennifer Holdaway, *Inheriting the City: The Children of Immigrants Come of Age* (2009). For "always documented families" (where parents and older children always had formal legal immigration status or were U.S. citizens) and "legal status category changer" families (where parents or older children had been undocumented, but later gained formal status), family income rose more as the older children began to work than it did in "always undocumented" families (where parents and older children remained undocumented). This difference was dramatic: at the start of the study, the difference in yearly income between "always undocumented" families and the other families was less than $4,000 per person, but this number rose to $15,000–20,000 per person by the time the study was complete.

These exclusions have large, negative, intergenerational consequences on the children of immigrants (including U.S.-citizen children). Due to these membership exclusions, the poverty rate of children with undocumented parents is twice the rate of children of U.S.-born parents, and undocumented youth are far less likely to graduate high school and attend college than documented immigrants and native-born youth. Emily Greenman & Matthew Hall, *Legal Status and Educational Transitions for Mexican and Central American Immigrant Youth*, 91 Social Forces 1475, 1475–98, 1486 (2013). Jefferey Passel & D'vera Cohn, *A Portrait of Unauthorized Immigrants in the United States* (2009), https://www.pewresearch.org/hispanic/

17

2009/04/14/a-portrait-of-unauthorized-immigrants-in-the-united-states; *see also* Randy Capps et al., *A Profile of U.S. Children with Unauthorized Immigrant Parents*, Migration Policy Inst., at 2 (2016), https://www.migrationpolicy.org/research/profile-us-children-unauthorized-immigrant-parents. Although poverty levels decreased for all children in older age groups within the U.S. population, they decreased less for those with undocumented parents. Capps et al., *supra*, at 6. Thus, children of undocumented parents are more likely to grow up in poverty, and suffer its ill effects.

While DACA, as deferred action, only gives temporary access to work authorization and reprieve from removal, and to work authorization enables recipients to convert educational effort into better future life chances for oneself and one's family. It also gives access to "gateway identity documents" such as a driver's license. Gonzales et al., *supra*, at 612–13. Hence, while DACA does not confer the full protections of institutional inclusion that permanent legal immigration status does, individuals' ability under DACA to obtain temporary reprieve from removal, access to the labor market, and documents, such as a driver's license, promote financially stronger families that would facilitate intergenerational upward mobility in ways that ending DACA would inhibit. Moreover, DACA also helps its recipients and their families by decreasing other negative effects of lacking legal status, such as children's increased anxiety due to the fear their parents will be removed.

18

## II. DACA has positive effects on the lives of its recipients and their families, including U.S.-citizen children.

DACA has improved the lives of recipients and their families, including their U.S.-citizen children and family members, in various ways. These improvements include increased earnings and better jobs, increased motivation in school and ability to attend college, and decreased anxiety and related mental health problems for themselves and their U.S.-citizen children.

Various studies find that DACA is associated with improved socioeconomic outcomes. Analyses of data from the federal American Community Survey using advanced regression techniques show that DACA increased the probability of being employed and being in the labor force, reduced the likelihood of unemployment, and increased the hours worked per week for likely-eligible noncitizens, compared to noncitizens ineligible for DACA. Nolan G. Pope, *The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants*, 143 J. Pub. Econ. 98, 99 (2016). These findings are supported and developed by studies that have directly surveyed DACA recipients. For example, one study found that 84% of DACA recipients were working, versus 68% of undocumented respondents, that 79% of DACA recipients reported getting a better job, and 64% reported earning more money. Caitlin Patler et al., *From Undocumented to DACAmented: Impacts of the Deferred Action for Childhood Arrivals (DACA) Program*, Inst. for Research Lab. & Emp. 6, 19, 20 (2015),

**AR5941**

19

https://escholarship.org/uc/item/3060d4z3. Some 77% of DACA recipients reported it was easier to cover bills after obtaining DACA, while 78% reported it was easier to contribute to household expenses. *Id.* at 6. Another study found that 59% of DACA recipients had obtained a new job, 21% had obtained internships, 57% had obtained driver's licenses, and 45% had increased their earnings after gaining DACA. Gonzales et al., *Becoming DACAmented*, *supra*, at 1861. These higher earnings increase DACA recipients' incomes and, in turn, their families' incomes, helping their siblings, especially younger siblings, many of whom are likely to be U.S.-citizens. Such increased earnings also help the American economy. Professors Francesc Ortega, Ryan Edwards, and Amy Hsin estimate that DACA increased GDP by about $3.5 billion, or $7,454 per legalized worker. Francesc Ortega et al., *The Economic Effects of Providing Legal Status to DREAMers* 2–3 (2018), http://ftp.iza.org/dp11281.pdf.

In addition to its financial effects, DACA positively affected educational attainment for many recipients. Some scholars have found that obtaining DACA was linked to increases in high school attendance and graduation; Elira Kuka et al., *Do Human Capital Decisions Respond to the Returns to Education? Evidence from DACA*, (2018), https://www.nber.org/papers/w24315.pdf. Others found it increased the number of Latinos taking the GED (General Educational Development certificate; Pope, *supra*, at 99; or that it made it easier to attend college. Patler et al., *supra*. Some research detects a drop in college attendance. Amy Hsin &

AR5942

20

Francesc Ortega, *The Effects of Deferred Action for Childhood Arrivals on Educational Outcomes of Undocumented Students*, 55 Demography 1487, 1487–1506 (2018). But Hsin and Ortega do not posit a general tendency towards dropping out of college permanently, but rather theorize there may be a more zero-sum trade-off between going to four-year college and working. *Id.* Once DACA recipients acquire work permits, they are able to work legally and earn more money, making work more attractive than school. That same study's finding that those who remain enrolled in four-year colleges continue to attend full time is consistent with the more positive reports of the survey- and case-based research. *See, e.g.*, Patler et al., *supra*. Similarly, the lack of an increase in dropout rates for community college students, but a decrease in full-time enrollment, likely reflects an increase in the number of hours these DACA recipients in community college worked. *Id*. at 8. This would signal more of a "stop-out" (leaving school to work, when earnings are higher) than a drop out (leaving school permanently.). This is true for at least two reasons. One, DACA permits recipients to benefit from their current hard work in school with better jobs in the formal economy in the future (which would be harder to get without work authorization). Gonzales et al., *Becoming DACAmented*, *supra*, at 1867; Smith, *supra* note 14; Patler et al., *supra*, at 20. Moreover, the potential to earn more money makes it easier for some students to stay in college. Ortega et al., *supra*; *see also* Patler et al., *supra*, at 5. For example, one study found that DACA increased high school attendance and graduation rates and closed the

**AR5943**

21

citizen/noncitizen graduation gap by 40%. Elira Kuka et al., *Do Human Capital Decisions Respond to the Returns to Education? Evidence from DACA* (2018), https://www.nber.org/papers/w24315.pdf. That DACA encourages school persistence in high school is especially important because high school is a life turning point—dropping out of high school closes many educational and professional doors, while graduating keeps them open. This is consistent with research finding that obtaining deferred action at a younger age promotes stronger educational engagement and continuation. Roberto G. Gonzales et al., *(Un)Authorized Transitions: Illegality, DACA, and the Life Course*, 15 Res. Hum. Dev. 345, 346–58 (2018).

Case-oriented research further shows that the earnings of many DACA recipients increased substantially within a few years after obtaining work authorization through DACA. This improvement occurs along two separate paths: those who began working without work authorization had access to better paying jobs, and those who obtained their first job after receiving a work authorization entered the workforce with higher starting incomes.

For example, an ongoing study conducted by Professor Robert Courtney Smith tracks students like the following, all of whom illustrate the many ways in which recipients have relied on DACA to shape their life paths:

22

- Lionel[4] had been working as a self-employed consultant after getting his B.A. since his lack of work authorization made it harder to get work in larger organizations with more institutionalized hiring processes. After getting DACA, he applied for jobs at larger organizations, and landed one making $60,000/year, up from the $24,000 he had made before. Within a few years, he was asked to apply for, and received, a job with more leadership opportunities and a salary of $77,000 at another organization that liked his work.

- Laxmi, a college student, was able to get her first full-time job working in youth services making $46,000/year at a nonprofit, rather than working in a restaurant or other job where work authorization would less likely be an issue. This meant she could pay for her tuition for college, which her parents would have found difficult.

- Orestes had started cutting high school, and was in danger of failing, when his mother brought him to get DACA. After getting DACA, he made up the credits he had missed the prior year, and graduated from high school, and was working and planned to attend community college. DACA dramatically increased his effort at school, because he saw the chance to get a better job and go to college.

---

[4] Names have been changed for confidentiality.

AR5945

23

- Magda had been a high-performing, undocumented high school student, but feared that she would not be able to go to college. Getting DACA made it possible for her to go to college, after which she wants to become a pediatric nurse.

- Armando enrolled in and then took a break from college because his work authorization enabled him to work more, for better pay. Getting DACA, Armando reported, enabled him to make concrete plans about his future, and act on them, and to help his family.

Robert Courtney Smith, *Horatio Alger Lives in Brooklyn, But Check His Papers, Published Materials*, https://www.baruch.cuny.edu/mspia/faculty-and-staff/full-time-faculty/amicusbrief.html.

For young people like Lionel, Laxmi, Orestes, Magda, and Armando, getting DACA and employment authorization brought their earnings more in line with where we would otherwise expect them to be.

DACA also decreases psychological stress on its recipients. *Id.*; *see also* Patler & Pirtle, *supra*, at 42–46. The stressors that DACA may lessen include removal fear, lack of ontological security (i.e., one's sense of reliance on material surroundings and trust of what one knows to be true), and economic precariousness. Patler & Pirtle, *supra*, at 42–46. Elizabeth Vaquera, Elizabeth Aranda & Isabel Sousa-Rodriguez, *Emotional Challenges of Undocumented Young Adults: Ontological Security, Emotional Capital, and Well-Being*, 64 Social Problems 298–314 (2017). Gonzales, et al., *Becoming*

24

*DACAmented, supra*, at 1852–1872; Patler, et al., *From Undocumented to DACAmented, supra*. For example, undocumented respondents are four times more likely to fear removal than DACA recipients (40% versus 9%). *Id.*; *see also* Patler & Pirtle *From Undocumented to Lawfully Present, supra* at 44 ("Receiving DACA reduced the odds of distress, negative emotions, and worry about self-deportation by 76–87%, compared to respondents without DACA."). Drawing from 100 in-depth interviews with DACA recipients and their family members in Los Angeles, a 2018 study found that DACA led to many more opportunities for entire families to "achieve their goals [and] experience spatial mobility," and "shifted entire families' legal consciousness toward a stronger sense of pride and belonging in the United States." Abrego, *supra*, at 192–207.

Beyond the positive effects of DACA on recipients themselves, the children of DACA recipients (many of whom are U.S. citizens) have a strong reliance interest in their parents retaining DACA. Children's health and well-being are sensitive to family stress, and prior studies have shown that children are aware of and affected by removal threats their parents face. Landale, et al., *Behavioral Functioning Among Mexican-Origin Children: Does Parental Legal Status Matter?*, 56 J. Health & Soc. Behav. 2, 2–18 (2015); Edward Vargas & Vickie Ybarra, *U.S.-Citizen Children of Undocumented Parents: the Link Between State Immigration Policy and the Health of Latino Children*, 19 J. Immigrant & Minority Health 913, 918–20 (2017) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5236009;

25

Mapp & Hornung, *Irregular Immigration Status Impacts for Children in the USA*, 1 J. Hum. Rights & Soc. Work 61, 61–70 (2016) https://link.springer.com/content/pdf/10.1007%2Fs41134-016-0012-1.pdf; Alexander Ortega, Sarah Horwitz, Hai Fang, Alice Kuo, Stevan Wallace & Maira Inkela, *Documentation Status and Parental Concerns About Development in Young U.S. Children of Mexican Origin*, 9 Acad. Pediatrics 278–82 (2009); R.S. Oropesa, et al., *Family Legal Status and Health: Measurement Dilemmas in Studies of Mexican-Origin Children*, 138 Soc. Sci. Med. 57, 57–67 (2015) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4498967; Enriquez, *Multigenerational Punishment: Shared Experiences of Undocumented Immigration Status Within Mixed-Status Families*, 77 J. Marriage & Fam. 939–53 (2015); R.S. Oropesa, et al., *How Does Legal Status Matter for Oral Health Care Among Mexican-Origin Children in California?* 3 SSM Population Health 730, 730–39 (2017) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5607870; R.S. Oropesa, et al., *Legal Status and Health Care: Mexican-Origin Children in California, 2001–2014*, 35 Population Research & Policy Rev. 651, 651–84 (2016) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5114005. One study of Medicaid data in Oregon, published in *Science* in 2017, showed that, among children of DACA-eligible parents, diagnoses of adjustment and anxiety disorders decreased significantly after 2012 compared with the ten-year period before the initiative was put in place. Jens Hainmueller et al., *Protecting Unauthorized Immigrant Mothers Improves Their Children's Mental Health*, 357 Science 1041, 1041–44 (2017) https://science.sciencemag.org/

26

content/357/6355/1041. Another study that drew from representative statewide survey data from the California Health Interview Survey found that mothers' DACA eligibility significantly increased reports of "good," "great," or "excellent" health among children, compared to reports of "fair" or "poor" health. Caitlin Patler et al., *Uncertainty About DACA May Undermine Its Positive Impact on Health for Recipients and Their Children*, 38 Health Affairs 738, 738–45 (2019) https://www.healthaffairs.org/doi/full/10.1377/hlthaff. 2018.05495. While 79% of children of DACA-eligible mothers were reported to have good health during the period prior to DACA, this percentage rose to 99% from 2012–15. *Id*. The average age of the affected children in the California study was 4.9 years old. *Id*.

### III. DACA protects against the harms experienced by U.S.-citizen children when a parent or relative is undocumented or removed.

While DACA promotes *positive* outcomes for its recipients, such as helping their U.S.-citizen children or siblings have better life chances, it also protects against the *negative* effects of having a parent (or sibling, or other immediate family member) who is undocumented, or has been removed. This is because:

> Policies designed to block the integration of undocumented immigrants or individuals with a temporary status can have the unintended effect of halting or hindering the integration of U.S. citizens and lawful permanent residents in mixed status families. Laws are

**AR5949**

27

often designed to apply to individuals, but their effects ripple through households, families, and communities, with measurable long-term, negative impacts on children who are lawful U.S.-citizens. Nat'l Acads. of Scis., Eng'g & Med., Comm. on Population, Div. of Behavioral & Soc. Sci. & Educ., *The Integration of Immigrants into American Society* 10 (Mary C. Waters & Marisha Gerstein Pineau eds., 2015), www.nap.edu/catalog/21746/the-integration-of-immigrants-into-american-society).

The family members of DACA recipients therefore have a strong reliance interest in the continuation of DACA.

The numbers of U.S. citizens and legal permanent residents potentially affected by ending DACA are enormous. As of 2017, there were 5.8 million U.S.-born children who lived with an undocumented family member in the same household, including 1 million in Texas alone.[5] Silva Mathema, *Keeping Families Together: Why All Americans Should Care What Happens to Unauthorized Immigrants, Center for American Progress* (2017), https://www.americanprogress.org/issues/immigration/reports/2017/03/16/428335/keeping-families-together/; Manuel Pastor, Jared Sanchez & Vanessa Carter, *The Kids Aren't Alright – But They Could Be* (2015), https://dornsife.usc.edu/csii/dapa-impacts-children. In 2013, there were about 4.1 million children living with an undocumented parent, an estimated 4% of whom had parents who would have immediately

---

[5] Mathema, *supra*, at Table 3.

28

qualified for DACA in 2013, including 9% of 0–2 year old children and 7% of 3–4 year old children. Randy Capps, Michael Fix, & Jie Zong, *A Profile of U.S. Children with Unauthorized Immigrant Parents*, Migration Policy Inst. 1 (2016) https://www.migrationpolicy.org/research/profile-us-children-unauthorized-immigrant-parents (hereinafter Capps, Fix & Zong). This yields some 202,000 children whose parents were immediately eligible for DACA. *Id*. at 10. This number will have increased since 2013 because DACA recipients, who were of or entering childbearing age when DACA began, are now all six years older. One study found that 44% of DACA-eligible people reported having children; 95% of these children were U.S. citizens, while only 3.7% were undocumented. Of 1,707 screened persons in *amicus curiae* Professor Robert Smith's DACA Access Project, some 367 persons met the conditions required for DACA. Of these 367 persons, 161 (44%) told us they had children. The study has formal immigrant status data on 135 of those children. Of these 135, 128 (95%) were U.S.-citizens; 2 (1.5%) had other immigration status (e.g. TPS); and 5 (3.7%) were undocumented. Some 126 of these children were born in the United States, while 7 were born in Mexico, and 1 was born in Guatemala.

The potential negative impacts of DACA rescission upon U.S.-citizen or lawful permanent resident family members may occur along several dimensions. First, because DACA offers protection against removal, it also protects the U.S.-citizen children of DACA recipient parents from the loss in family income that

29

removal causes. Several studies of families of people in removal proceedings or who have been removed report extremely negative effects. For example, families where a father is removed experienced a dramatic drop in family income—an average of 70% in one study of 85 families with a parent in immigration detention or removal proceedings. Ajay Chaudry et al., *Facing Our Future: Children in the Aftermath of Immigration Enforcement*, Urb. Inst. (2010), https://www.urban.org/sites/default/files/publication/28331/412020-Facing-Our-Future.PDF.

Second, DACA protects the U.S.-citizen children of DACA recipients from the emotional impact caused by the removal or possible removal of an undocumented parent. Children with undocumented parents live in constant fear that their parents will be removed, and they will be permanently separated, with negative educational and psychological consequences. Children whose parents are in removal proceedings or have been removed experience similarly profound harms. These include trauma, post-traumatic stress syndrome; self-harm; and difficulty forming strong emotional attachments, and adapting to significant changes in family structure, (reporting a case of a family where the main breadwinner had an immediate order of removal that resulted in his daughter harming herself by cutting her hands). Lisseth Rojas-Flores, Mari Clements, J. Hwang Koo & Judy London, *Trauma and Psychological Distress in Latino Citizen Children Following Parental Detention and Deportation*, 9 Psychol. Trauma 352, 352–361 (2016), https://www.researchgate.net/

30

profile/Lisseth_Rojas-Flores/publication/306025305_ Trauma_and_Psychological_Distress_in_Latino_Citizen_ Children_Following_Parental_Detention_and_Deportation/ links/599483b7458515c0ce65300a/Trauma-and-Psychological-Distress-in-Latino-Citizen-Children-Following-Parental-Detention-and-Deportation.pdf; Jorge Delva, et al., *Mental Health Problems of Children of Undocumented Parents in the United States: A Hidden Crisis*, 13 J. Community Positive Prac. 25, 25–35; Luis Zayas, Sergio Aguilar-Gaxiola, Hyunwoo Yoon & Guillermina Natera Rey, *The Distress of Citizen-Children with Detained and Deported Parents*, 24 J. Child & Fam. Stud. 3213, 3213–3223 (2015), https://www.ncbi.nlm.nih.gov/ pmc/articles/PMC4667551; Chaudry et al., *supra*, at 71; Enchautegui & Cecilia Menjívar, *Paradoxes of Family Immigration Policy: Separation, Reorganization, and Reunification of Families under Current Immigration Laws*, 37 Law & Pol'y 32–60 (2015); Cecilia Menjívar & Andrea Gómez Cervantes, Am. Psychol. Ass'n. *The Effects of Parental Undocumented Status on Families and Children: Influence of Parental Undocumented Status on the Development of U.S.-Born Children in Mixed-Status Families* (2016), https://www.apa.org/ pi/families/resources/newsletter/2016/11/undocumented-status; Brian Allen, Erica Cisneros & Alexandra Tellez, *The Children Left Behind: The Impact of Parental Deportation on Mental Health*, 24 J. Child & Fam. Stud. 386, 386–392 (2013); *see also* Venkataramani et al., *Health Consequences of the US Deferred Action for Childhood Arrivals (DACA) Immigration Programme: A Quasi-Experimental Study*, 2 Lancet Pub. Health 175 (2017), https://www.thelancet.com/journals/lanpub/

31

article/PIIS2468-2667(17)30047-6/fulltext. Elizabeth Aranda & Elizabeth Vaquera, *Immigrant Family Separation, Fear, and the U.S. Deportation Regime*, 5 Monitoring Pub. Opinion: Econ. & Soc. Changes 204–212 (2018).

Finally, "[p]arents' unauthorized status is . . . a substantial barrier to normal child development and perpetuates health inequalities through the intergenerational transmission of disadvantage." Jens Hainmueller et al., *Protecting Unauthorized Immigrant Mothers Improves Their Children's Mental Health*, 357:6355 Science 1041–1044 (Sept. 8, 2017), https://science.sciencemag.org/content/357/6355/1041.long; *see* Patler & Pirtle, *supra*, at 39–48. Abrego, *supra*, at 192–207; Patler et al., *Uncertainty About DACA, supra*, at 738–45. DACA allows the children of DACA recipients to take advantage of education and health programs that will affect their well-being. Undocumented parents are less likely to make use of services or institutions for which their U.S.-citizen children are eligible, because they fear exposing themselves as undocumented persons, which might impair their chances to legalize their status in the future. Hirokazu Yoshikawa & Ariel Kalil, *The Effects of Parental Undocumented Status on the Developmental Contexts of Young Children in Immigrant Families*, Child Development Perspectives 291–297 (2011); Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Children* (2011); Menjívar & Cervantes, Am. Psychol. Ass'n, *The Effects of Parental Undocumented Status on Families and Children: Influence of Parental*

32

*Undocumented Status on the Development of U.S.-Born Children in Mixed-Status Families* (2016), https://www.apa.org/pi/families/resources/newsletter/2016/11/undocumented-status; Cecilia Menjívar, *The Power of the Law: Central Americans' Legality and Everyday Life in Phoenix, Arizona*, 9 Latino Stud. 377–395 (2011). Children with undocumented parents are less likely to see the doctor or dentist, or be enrolled in pre-school, Head Start programs, or other child nutritional programs. Kalina Brabeck, Erin Sibley, M. Brinton Lykes, *Authorized and Unauthorized Immigrant Parents: The Impact of Legal Vulnerability on Family Contexts*, Hisp. J. Behav. Sci. 3–30 (2015); Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Children* (2011); Hirokazu Yoshikawa et al., *Unauthorized Status and Youth Development in the United States: Consensus Statement of the Society for Research on Adolescence*, 27 J. Res. Adolesc. 4–19 (2016); Menjívar, *The Power of the Law, supra*; Huang Yu & Ledsky, 2006; Zhihuan Jennifer Zhihuan, Stella Yu & Rebecca Ledsky, *Health Status and Health Service Access and Use Among Children in U.S. Immigrant Families*, 96(4) Am. J. Pub. Health 634–640 (2006), https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2004.049791; Joanna Dreby, *Everyday Illegal* (University of California Press 2015); Shawn Malia Kanaiaupuni, *Child Well-Being and the Intergenerational Effects of Undocumented Immigrant Status*, USDA Economic Research Service Small Grants Program Conference (Oct. 14–15, 1999), https://www.academia.edu/5923999/Child_Well-Being_and_the_Intergenerational_Effects_of_Undocumented_Immigrant_Status.

33

In fact, the negative effects of a potential rescission are already being felt. One recent study found that improvements to health during the first three years of DACA disappeared for both DACA-eligible immigrants and the children of DACA-eligible mothers after the first formal threats were made to the initiative during the lead-up to the 2016 election. Patler et al., *Uncertainty About Daca May Undermine Its Positive Impact on Health for Recipients and Their Children*, 38(5) Health Affairs 738–45, 743. This study posited that "the observed declines in health after mid-2015 were a response to the stressful and painful experiences of fearing the termination of DACA, not knowing what the future held, and imagining a return to undocumented status." *Id*. Other studies have drawn similar conclusions, finding that the September 2017 attempt to rescind DACA may have led to worsening health outcomes for DACA recipients. Marie Mallet and Lisa García Bedolla, *Transitory Legality: The Health Implication of Ending DACA*, 11(2) Cal. J. Pol. & Pol'y, https://escholarship.org/uc/item/84f6g2qj. These studies suggest that revoking DACA will likely be linked with severe threats to the health of both DACA recipients and their family members.

————◆————

## CONCLUSION

Empirical research demonstrates that DACA has had very positive effects on the lives both of its recipients, and, intergenerationally, on the lives of their U.S.-citizen children and family members. DACA helps its

34

recipients earn more money and continue their educations, it also helps reduce anxiety and other mental health challenges for its recipients, their children, and their family members, including U.S.-citizen family members. DACA also protects both its recipients and their U.S.-citizen children and family members from the dramatic and negative consequences of having a family member, especially a parent, removed. Our research shows that such benefits can have long lasting, intergenerational effects. For these reasons, the judgments below should be affirmed.

Respectfully submitted,

OSSAI MIAZAD
MICHAEL N. LITROWNIK
CHAUNIQUA D. YOUNG
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017

RACHEL WILLIAMS DEMPSEY
OUTTEN & GOLDEN LLP
One California Street,
   12th Floor
San Francisco, CA 94111

NIKOLAS BOWIE
*Counsel of Record*
OREN NIMNI
IVAN ESPINOZA-MADRIGAL
OREN SELLSTROM
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street,
5th Floor
Boston, MA 02110

**AR5957**

Nos. 18-587, 18-588, 18-589

IN THE

# Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
*Petitioners*,

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,
*Respondents.*

ON WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE NINTH CIRCUIT

[Caption Continued on Following Page]

**BRIEF FOR THE AMERICAN PROFESSIONAL
SOCIETY ON THE ABUSE OF CHILDREN,
THE AMERICAN ACADEMY OF PEDIATRICS,
THE CENTER FOR LAW AND SOCIAL
POLICY, AND 33 CHILD ADVOCACY
ORGANIZATIONS, MEDICAL
PROFESSIONALS, AND CHILD
DEVELOPMENT EXPERTS AS AMICI CURIAE
IN SUPPORT OF RESPONDENTS**

Kelsi Brown Corkran
Melanie R. Hallums
ORRICK, HERRINGTON
& SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, DC 20005
(202) 339-8400

Mary Kelly Persyn
*Counsel of Record*
PERSYN LAW & POLICY
912 Cole Street
San Francisco, CA 94117
(628) 400-1254
marykelly@persynlaw.com

*Counsel for Amici Curiae*

**AR5958**

---

DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL.,

*Petitioners*,

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL.,

*Respondents.*

---

ON WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE D.C. CIRCUIT

---

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, ET AL.,

*Petitioners*,

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.,

*Respondents.*

---

ON WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE SECOND CIRCUIT

---

**AR5959**

i

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................... iii

INTRODUCTION AND INTEREST OF
   AMICI CURIAE................................................. 1

SUMMARY OF ARGUMENT................................. 12

ARGUMENT .......................................................... 15

I.   Rescinding DACA Places Children At Risk
     Of Immediate Harm. ........................................ 15

II.  Ending DACA Protection Will Likely
     Damage Children's Mental And Physical
     Health. ............................................................ 19

     A.  Even the threat of detention and
         deportation can cause children to
         suffer symptoms of traumatic stress
         and post-traumatic stress disorder and
         impacts birth outcomes............................. 19

     B.  DACA rescission will likely cause
         income and food insecurity. ....................... 24

     C.  DACA rescission threatens to cut off
         access to reliable health care..................... 25

     D.  DACA rescission puts children at risk
         of parental separation and reduced
         access to educational opportunities............ 29

     E.  DACA rescission puts children at risk
         of traumatic stress, causing immediate
         and long-term damage. ............................... 32

**AR5960**

ii

F.  DACA protection benefits children's health.......................................................... 34

III. It Is In Society's Interest To Protect Children From Harm. ...................................... 36

CONCLUSION........................................................ 39

**AR5961**

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown v. Board of Educ. of Topeka,*
  *Shawnee Cty., Kan.,*
  347 U.S. 483 (1954)..............................36

*Brown v. Entm't Merchants Ass'n,*
  564 U.S. 786 (2011)..............................36

*Ginsberg v. New York,*
  390 U.S. 629 (1968)..............................36

*Moore v. East Cleveland,*
  431 U.S. 494 (1977)..............................37

*Prince v. Massachusetts,*
  321 U.S. 158 (1944)..............................36

*Regents of the Univ. of Cal. v. U.S. Dep't*
  *of Homeland Sec.,*
  279 F. Supp. 3d 1011 (N.D. Cal. 2018)...............13

**Other Authorities**

164 Cong. Rec. S1731 (daily ed. Mar.
  14, 2018) (statement of Sen. Wyden) .................38

Am. Academy of Pediatrics, *AAP*
  *Statement on Protecting Immigrant*
  *Children* (Jan. 25, 2017),
  https://tinyurl.com/y526he2n .............................33

AR5962

iv

Jeff Amy & Rogelio V. Solis,
    *Immigration raids to have long-term
    effects on poultry towns*, Journal
    Gazette (Aug. 9, 2019),
    https://tinyurl.com/yx9x4gjl................................30

Carlos Ballesteros, *She's a DACA
    recipient. ICE agents still arrested
    her. Then they went after her
    parents*, Chicago Sun Times (May 21,
    2019), https://tinyurl.com/y2x3x7cd...................16

Edward R. Berchick et al., *Health
    Insurance Coverage in the United
    States: 2018*,
    U.S. Census Bureau (Sept. 2019),
    https://tinyurl.com/y53cpsvt................................27

Hamutal Bernstein et al., *One in Seven
    Adults in Immigrant Families
    Reported Avoiding Public Benefit
    Programs in 2018*, Urban Inst. (May
    2019), https://tinyurl.com/y2fhwgg3 ...................26

Sharon H. Bzostek & Audry N. Beck,
    *Familial instability and young
    children's physical health*, 73 Soc.
    Sci. & Med. 282 (July 2011) ...............................22

Lauren Camera, *ICE Raids Send
    Schools Scrambling*, U.S. News &
    World Report (Aug. 8, 2019),
    https://tinyurl.com/yymuf33f.........................18, 30

**AR5963**

v

Guillermo Cantor et al., *Changing Patterns of Interior Immigration Enf't in the United States, 2016-2018*, Am. Immigration Council (July 1, 2019), https://tinyurl.com/y6ccpqwk ........................17, 18

Randy Capps et al., *Implications of Immigration Enf't Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature*, Migration Policy Inst. (Sept. 2015), https://tinyurl.com/ybm62mqa ...........................20

Andrea Castillo, *Immigrant arrested by ICE after dropping daughter off at school, sending shockwaves through neighborhood*, L.A. Times (Mar. 3, 2017), https://tinyurl.com/j26wswx .....................31

Center on the Developing Child at Harvard University, *InBrief: The Impact of Early Adversity on Children's Development*, https://tinyurl.com/yyjxt72b ...............................33

Center on the Developing Child at Harvard University, *InBrief: The Science of Early Childhood Development*, https://tinyurl.com/y6n3g894 .............................33

Centers for Disease Control & Prevention, *Adverse Childhood Experiences*, https://tinyurl.com/y8fc6qok................................32

AR5964

vi

Wendy Cervantes et al., *Our Children's Fear: Immigration Policy's Effects on Young Children*, CLASP (Mar. 2018), https://tinyurl.com/yas57ql2.....................21

Ajay Chaudry et al., *Facing Our Future: Children in the Aftermath of Immigration Enf't*, Urban Inst. (Feb. 2010), https://tinyurl.com/y2vv8aro ........20, 31, 32

The Children's P'ship, *California Children in Immigrant Families: The Health Provider Perspective* (2018), https://tinyurl.com/y2rdf4fp ...................27

Isha Marina Di Bartolo, *Immigration, DACA, and Health Care*, 21 AMA J. of Ethics 1 (Jan. 2019), https://tinyurl.com/y394f85p ..............................28

Caitlin Dickerson & Zolan Kanno-Youngs, *Thousands Are Targeted as ICE Prepares to Raid Undocumented Migrant Families*, N.Y. Times (July 11, 2019), https://tinyurl.com/y5nggr9p..............................18

Exec. Order No. 13768, *Enhancing Public Safety in the Interior of the United States*, 82 Fed. Reg. 8799 (Jan. 30, 2017)......................................................17

Maureen Hack et al., *Long-Term Developmental Outcomes of Low Birth Weight Infants*, 5 The Future of Children 176 (1995) .........................................23

AR5965

vii

Jens Hainmueller et al., *Protecting unauthorized immigrant mothers improves their children's mental health*, 357 Science 1041 (2017), https://tinyurl.com/y46cf7be .............13, 14, 35, 36

Julie L. Hudson & Asako S. Moriya, *Medicaid Expansion For Adults Had Measurable 'Welcome Mat' Effects On their Children*, 36 Health Affairs 1643 (Sept. 2017) .................................................28

Kaiser Family Found., *Key Facts on Individuals Eligible for the Deferred Action for Childhood Arrivals (DACA) Program* (Feb. 2018), https://tinyurl.com/yxtnmxwr ......................25, 26

Michael Karpman & Genevieve M. Kenney, *Health Ins. Coverage for Children and Parents: Changes Between 2013 and 2017*, Urban Inst. (Sept. 7, 2017), https://tinyurl.com/yy2xn87s...............................28

Gary Klein, *Marin man arrested in ICE bust while dropping off child at school*, Marin Indep. J. (Mar. 15, 2018), https://tinyurl.com/y38xje2n ...................31

Nancy Krieger et al., *Severe sociopolitical stressors and preterm births in New York City: 1 September 2015 to 31 August 2017*, 72 J. Epidemiology & Cmty. Health 1147 (2018), https://tinyurl.com/y5gv7mxk .................23

AR5966

viii

Julie M. Linton et al., *Providing Care for Children in Immigrant Families*, 144 Pediatrics 1 (Sept. 2019), https://tinyurl.com/y6ghwfkr ..................15, 26, 35

John Minchillo & Elliot Spagat, *Immigration agents arrest 114 at Ohio landscaper*, AP (June 5, 2018), https://tinyurl.com/y5pwduhb ......................19, 30

Nat'l Acad. of Scis., Eng'g, & Med., *A Roadmap to Reducing Child Poverty* 20 (Greg Duncan & Suzanne Le Menestrel eds.), Nat'l Acads. Press 2019, https://tinyurl.com/yyvwcu9z ...................24

Nat'l Child Traumatic Stress Network, *Children with Traumatic Separation: Information for Professionals* (2016), https://tinyurl.com/y2k2sqg7 ...............................29

Nat'l Research Council & Inst. of Med., *From Neurons to Neighborhoods: The Science of Early Childhood Dev.* (Jack P. Shonkoff & Deborah A. Phillips eds., Nat'l Acad. Press 2000) ................23

Nat'l Sci. Council on the Developing Child, *Persistent Fear and Anxiety Can Affect Young Children's Learning and Dev.* (Feb. 2010), https://tinyurl.com/y2lw82qa...............................22

AR5967

ix

Nat'l Sci. Council on the Developing
    Child, *The Science of Early
    Childhood Dev.: Closing the Gap
    Between What We Know and What
    We Do* (Jan. 2007),
    https://tinyurl.com/y3x43yvr ..............................22

Nicole L. Novak et al., *Change in birth
    outcomes among infants born to
    Latina mothers after a major
    immigration raid*, 46 Int'l J.
    Epidemiology 839 (2017),
    https://tinyurl.com/y5ehbjs7..........................14, 23

Caitlin Patler & Whitney Laster Pirtle,
    *From undocumented to lawfully
    present: Do changes to legal status
    impact psychological wellbeing
    among latino immigrant young
    adults?*, 199 Soc. Sci. & Med. 39
    (2017), https://tinyurl.com/y6f85wdm ................34

Caroline Ratcliffe & Signe-Mary
    McKernan, *Child Poverty and Its
    Lasting Consequence*, Urban Inst. (Sept.
    2012), https://tinyurl.com/y254aa6x ..................24

Nicole Rodriguez, *Trump Admin. Has Illegally
    Attempted to Deport DACA Recipients,
    Advocates Say*, Newsweek (Dec. 2, 2017),
    https://tinyurl.com/y69w92ya..............................17

**AR5968**

x

Vanessa Romo, *Trump Admin. Moves To Speed Up Deportations With Expedited Removal Expansion*, NPR (July 22, 2019), https://tinyurl.com/y4lrblfm ...................18

Rebecka Rosenquist, *The 'Warming Effect' of DACA on American Children*, Penn LDI, Leonard Davis Inst. of Health Econ. (June 4, 2018), https://tinyurl.com/yys7sbj7 ..............................36

Sara Satinsky et al., *Family Unity, Family Health: How Family-Focused Immigration Reform Will Mean Better Health for Children and Families* (2013), https://tinyurl.com/y437qu3s.............21, 25, 30, 31

Alan Shapiro, *Immigration: deporting parents negatively affects kids' health*, The Hill (May 13, 2016), https://tinyurl.com/y5np9s83..............................33

Jack P. Shonkoff & Andrew S. Garner et al., *The Lifelong Effects of Early Childhood Adversity and Toxic Stress*, 129 Pediatrics e232 (Jan. 2012), https://tinyurl.com/y38kyr9y.............21, 22

Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States*, Ctr. for Am. Progress (Sept. 5, 2019), https://tinyurl.com/y4xc6sf4 ...................15

xi

Reis Thebault, *How a flight attendant from Texas ended up in an ICE detention center for six weeks*, Washington Post (Mar. 23, 2019), https://tinyurl.com/yxar27pu ............................ 16

U.S. Dep't of Health and Human Servs., *Reasonable Efforts to Preserve or Reunify Families and Achieve Permanency for Children* (Mar. 2016), https://tinyurl.com/y4xgdygj .................... 37

U.S. Dep't of Homeland Security, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals (DACA)*, https://tinyurl.com/y9ptpepg (last visited Oct. 2, 2019) ........................... 16

U.S. Imm. & Customs Enf't, *FAQ on Sensitive Locations and Courthouse Arrests*, https://tinyurl.com/y9ul6mfo (last visited Oct. 2, 2019) ........................... 31

United Nations, *What is the difference between signing, ratification and accession of UN treaties?*, https://tinyurl.com/y3j2c84l ............................... 38

AR5970

xii

Atheendar S. Venkataramani et al.,
*Health consequences of the US De-
ferred Action for Childhood Arrivals
(DACA) immigration programme: a
quasi-experimental study*, 2 Lancet
Public Health e175 (Apr. 2017),
https://tinyurl.com/yyj5nhgk .............................35

Maya Venkataramani et al., *Spillover
Effects of Adult Medicaid Expan-
sions on Children's Use of Preventive
Services*, 140 Pediatrics 1 (Dec.
2017), https://tinyurl.com/yxwv5v2x ..................29

Amy B. Wang, *US immigration
authorities arrest chemistry
professor after he finishes getting his
children ready for school*, The
Independent (Feb. 5, 2018),
https://tinyurl.com/y38dzfeu...............................31

Hirokazu Yoshikawa, *Immigrants
Raising Citizens: Undocumented
Parents and Their Young Children*
(Russell Sage Found. 2011) .................................25

Leah Zallman et al., *Implications of
Changing Public Charge
Immigration Rules for Children Who
Need Medical Care*, 173 JAMA
Pediatrics E4 (July 1, 2019) ................................28

**AR5971**

xiii

Lisa Zamosky, *Health care options for undocumented immigrants*, L.A. Times (Apr. 27, 2014), https://tinyurl.com/huvcplj ...............................................27

Luis H. Zayas & Laurie Cook Heffron, *Disrupting young lives: How detention and deportation affect US-born children of immigrants*, Am. Psych. Ass'n (Nov. 2016), https://tinyurl.com/l6ro2ql.....14, 19, 20, 21, 24, 26

AR5972

1

## INTRODUCTION AND
## INTEREST OF AMICI CURIAE[1]

The government's decision to end the Deferred Action for Childhood Arrivals (DACA) policy has endangered the mental and physical health of hundreds of thousands of children—mostly U.S. citizens—whose parents are DACA recipients. As organizations dedicated to supporting children and promoting their well-being, amici are deeply concerned about the immediate and long-term effects of ending the DACA policy on this population. Since the Trump Administration announced the rescission of DACA, children of DACA recipients live with the fear that their parents will be taken away, and that fear negatively impacts all aspects of their lives, including their health, education, and overall family stability.

The American Professional Society on the Abuse of Children (APSAC) is the leading national organization for professionals serving children and families affected by child maltreatment. A multidisciplinary group, APSAC achieves its mission through expert training and educational activities, policy leadership and collaboration, and consultation emphasizing theoretically sound, evidence-based principles. For 30 years, APSAC has played a central role in developing guidelines that address child maltreatment. It is qualified to inform the Court about the damage that

---

[1] The parties have consented to the filing of this amicus brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than amici and their counsel made a monetary contribution intended to fund the preparation or submission of the brief.

AR5973

2

maltreatment can inflict on children's brain development and cognitive ability. APSAC submits this brief to assist the Court in understanding the impact of parental detention and deportation on children's physical, emotional, and mental development.

The American Academy of Pediatrics (AAP) is a non-profit professional membership organization of 67,000 primary care pediatricians and pediatric medical subspecialists, and pediatric surgical specialists dedicated to the health and well-being of infants, children, adolescents, and young adults. AAP believes that the future prosperity and well-being of the United States depends on the health and vitality of all of its children, without exception. Pediatricians have seen the negative effects that family separation and the threat of deportation have on child health. As such, AAP is uniquely positioned to understand the impact of the rescission of the DACA policy on the health of children.

The Center for Law and Social Policy (CLASP) is a national, nonpartisan anti-poverty nonprofit organization advancing policy solutions for low-income people in the United States. CLASP develops practical yet visionary strategies for reducing poverty, promoting economic opportunity, and addressing barriers faced by people of color. CLASP has expertise in early care and education, early childhood development, child welfare, mental health, and immigration policy. CLASP recognizes the important role DACA has played in strengthening families and communities, and we are deeply concerned with the harmful impact that rescinding DACA will have on thousands of

**AR5974**

3

young children with DACA parents, including possible separation from parents, weakened economic security, and poor developmental outcomes. CLASP strongly urges the Court to consider the long-term implications for children's health and well-being and uphold DACA protections.

The Academy on Violence and Abuse is a national organization of health care professionals whose mission is to advance health education and research on the recognition, treatment, and prevention of the health effects of violence and abuse across the lifespan.

Advocates for Children of New Jersey (ACNJ) is the independent, trusted voice for children in New Jersey, including the estimated 16,830 DACA recipients brought to New Jersey as young children, and their 5,200 U.S. born children.

The American Academy of Child and Adolescent Psychiatry (AACAP) is the leading national medical association dedicated to treating and improving the quality of life for the estimated 7-15 million American youth under 18 years of age who are affected by emotional, behavioral, developmental and mental disorders.

The American Academy of Pediatrics, California is a nonprofit association committed to promoting and protecting the health and well-being of children in California, including more than 188,000 DACA recipients and more than 72,600 US-born children with a DACA parent in California.

AR5975

4

The American Nurses Association (ANA), representing the interests of the nation's approximately 4 million registered nurses, has unique interest and expertise in patient-centered and holistic health care.

The Arizona Chapter of the American Academy of Pediatrics (AzAAP), representing approximately 1,100 Arizona pediatricians and other child health specialists, is committed to improving the health and wellness of all Arizona children, including 24,700 DACA recipients and 12,200 US citizen children of DACA recipients residing in Arizona.

Warren Binford is an internationally recognized children's rights scholar, author, and advocate both nationally and internationally. Professor Binford has served as a licensed foster parent, Court Appointed Special Advocate for abused and neglected children, and inner city teacher.

The Center for Youth Wellness is a pediatric health care and advocacy organization dedicated to improving the health of children and adolescents exposed to early adversity and toxic stress by advancing public awareness of, medical research on, and treatment practices for Adverse Childhood Experiences, or ACEs.

Dr. Priscilla Chan, Co-Founder and Board Chair of The Primary School and co-founder of the Chan Zuckerberg Initiative, is a pediatrician and an education entrepreneur who designs and implements interventions addressing adverse childhood experiences.

5

The Child Welfare League of America (CWLA), a coalition of hundreds of private and public agencies that has worked to serve children and families since 1920, opposes the repeal of DACA because it will harm countless families and children, running counter to our practices and standards.

Children Now is a nonpartisan whole-child research, policy development, communications, and advocacy organization working on all key kids' issues, and is dedicated to promoting children's health, education and well-being in California.

Children's Action Alliance (CAA), an independent voice for Arizona children, including the children of 24,700 DACA recipients living in our state, urges the court to uphold the DACA injunction.

The Children's Defense Fund is a national non-profit child advocacy organization that has worked relentlessly for more than 40 years to ensure a level playing field for all children and champions policies that lift children out of poverty, protect them from abuse and neglect, and ensure their access to health care, quality education, and a moral and spiritual foundation.

Children's Defense Fund–Texas, working diligently for more than 20 years to ensure that all the children of Texas have a good start in life and a successful passage to adulthood with the help of caring families and communities, supports upholding protections for DACA recipients and their children (of whom there are 46,700 living in Texas).

AR5977

6

Children's Institute, a statewide, non-profit, early childhood advocacy and policy organization that supports cost-effective investments in health, education, and social services for babies and children to eight years old, supports Oregon's 9,910 DACA recipients and 5,500 U.S. born children of DACA recipients.

Colorado Children's Campaign, the leading voice for Colorado's children, supports ensuring the continuation of the protection that DACA has provided to nearly 15,000 fellow Coloradoans who, on average, have lived in our state for over 20 years.

First Focus on Children, a bipartisan advocacy organization dedicated to making children and families the priority in federal policy and budget decisions, believes the decision to rescind the DACA program continues to cause trauma and stress for both DACA recipients and their children who rightfully fear their parents may be deported in the near future.

The Florida Chapter of the American Academy of Pediatrics (FCAAP) represents more than 2,600 pediatricians in the State of Florida and is committed to promoting the health and welfare of Florida's children, no matter where they or their parents were born. We oppose elimination of DACA protection because it would directly and negatively impact the lives of 25,500 Florida DACA recipients and would put their 7,200 Florida US citizen children in severe jeopardy.

Lisa R. Fortuna, MD, MPH, M.Div., is the Director of Child and Adolescent Psychiatry at Boston Medical Center, Boston University School of Medicine. A

**AR5978**

7

co-founder of the Refugee and Immigrant Assistance Center Community Counseling program, she currently serves as a member of the American Academy of Child and Adolescent Psychiatry Resource Group on Youth at the Border and has been a member of the Physicians for Human Rights Asylum Network since 2007.

For 50 years, Illinois Action for Children has championed the cause of high-quality, accessible early care and education in Illinois. Ending—or even threatening to end—DACA adds uncertainty to the lives of 85,000 people in Illinois living in DACA households, including 15,200 U.S.-born children, placing children's growth, health, and educational development at risk.

The Illinois Chapter, American Academy of Pediatrics (ICAAP), recognizes the approximately 72,600 U.S. born children of DACA recipients living in Illinois. ICAAP supports upholding protections for DACA recipients and their children, recognizing that serious health consequences they currently suffer would only worsen if DACA were rescinded.

March of Dimes is a nonprofit organization that leads the fight for the health of all mothers and babies. As the leader in ensuring the health of all moms and babies, we recognize the irreparable harm to the health and well-being of children and families that would result from rescinding DACA, and we stand firm on keeping moms and babies heathy and safe — regardless of their citizenship status.

8

The National Association of Hispanic Nurses (NAHN) is a non-profit professional membership organization of 2,500 nurses and affiliated nursing specialists dedicated to advancing the health in Hispanic communities and to lead, promote and advocate the educational, professional, and leadership opportunities for Hispanic nurses. As the only national organization representing Hispanic nurses who provide bilingual and culturally competent care, we are troubled by the mental and physical health effects that ending the policy has on children of DACA recipients. NAHN calls for the continuation of the DACA policy.

The National Association of Social Workers (NASW) is the largest association of professional social workers in the United States, with over 110,000 members in 55 chapters that represent regions with over 250,000 US-born children of DACA recipients.

NC Child is a non-profit organization whose mission is to build a strong North Carolina by advancing policies to ensure that all children — regardless of race, ethnicity, or place of birth — have the opportunity to thrive. NC Child strongly supports upholding protections for DACA recipients and their children, including more than 50,000 in North Carolina.

New York State American Academy of Pediatrics represents more than 5,500 pediatricians across New York State. NYSAAP is committed to supporting and enhancing the health, safety, and well-being of all infants, children, adolescents, and young adults in New York State, no matter where they or their parents were born. We oppose the proposed elimination of

Case 1:17-cv-05228-NGG-VMS   Document 282-10   Filed 09/04/20   Page 1582 of 1805 PageID #: 14320

DACA protection, which would directly and negatively impact the lives of 29,390 New York State DACA recipients and would put 6,900 New York US citizen children, whose parents are currently DACA recipients, in severe jeopardy.

The Ounce of Prevention is committed to giving children in poverty the best chance for success in school and in life by advocating for and providing the highest quality care and education for children from birth to age five, including attention to the comprehensive development and well-being of young children. The harmful effects of the trauma imposed on children as a result of separation from their family members will have a lasting impact throughout their lifetime.

The Partnership for America's Children's mission is to support its network of 52 state and community child advocacy organizations in 41 states that advocate to improve policies for children at the state, local and federal level. Members have long been leaders in efforts to secure access to essential benefits and services for children in immigrant families.

Jack P. Shonkoff, M.D., is the Julius B. Richmond FAMRI Professor of Child Health and Development at the Harvard T.H. Chan School of Public Health and Harvard Graduate School of Education; Professor of Pediatrics at Harvard Medical School and Boston Children's Hospital; and Director of the university-wide Center on the Developing Child at Harvard. He currently chairs the National Scientific Council on the Developing Child, whose mission is to bring credible science to bear on public policy affecting children and

10

families, and The JPB Research Network on Toxic Stress, which is developing new measures of stress effects and resilience in young children.

The Society for Research in Child Development (SRCD) is a professional research organization established in 1933 by the National Research Council of the National Academy of Sciences. SRCD concurs with the compelling evidence that termination of DACA poses risks to the health and development of children whose parents are DACA recipients and other immigrant communities, with negative and long lasting effects on future generations of Americans, particularly children.

The Texas Pediatric Society (TPS), the Texas Chapter of the American Academy of Pediatrics (AAP), represents over 4,200 primary care pediatricians, pediatric medical subspecialists, surgical specialists, and medical students who believe that the most important resource of the State of Texas is its children, and pledges its efforts to promote their health and welfare. TPS has consistently and firmly stated that children who are citizens should not be subjected to the separation, or fear of separation from non-citizen parents or their caregivers.

The Children's Partnership (TCP) is a California-based children's advocacy organization committed to improving the lives of underserved children where they live, learn, and play with breakthrough solutions at the intersection of research, policy, and community engagement. TCP believes programs like DACA will help ensure the healthy development of thousands of

11

California children and ensure a stronger future for the entire state.

ZERO TO THREE (ZTT) is a national nonprofit, nonpartisan organization founded over 40 years ago to promote the well-being of all infants and toddlers, translating the science of early childhood development for policymakers, practitioners, and parents. ZERO TO THREE is concerned that separating young adults covered by DACA from the young families they have now formed, or increasing the families' stress levels through the fear of separation and deportation, will inflict immense trauma on the young children as well as their parents.

Amici submit this brief to assist the Court in its review by providing key facts about how DACA status and its rescission might impact the children of DACA recipients. The rescission of DACA plunges recipients into immediate uncertainty and stress. Recipients are at risk of immediate detention and deportation when their current protection expires. Even the threat of separation from their parents can cause children to suffer significant physiological stress that threatens their mental and physical health and their overall development, not to mention the harm to them caused by the actual detention and deportation of their parents.

The Executive Branch's long-standing recognition of its legal and moral responsibility to avoid inflicting harm on children is nowhere apparent in its arbitrary and capricious decision to end DACA. In explaining the Department of Homeland Security's decision to rescind DACA, then-Secretary Nielsen stated that

**AR5983**

12

"neither any individual's reliance on the expected continuation of the DACA policy nor the sympathetic circumstances of DACA recipients as a class" outweigh the reasons to end the policy. *Regents* Pet. App. 125a. Amici disagree.

The DACA policy was created to protect young people brought to this country as children. Rescinding the policy will harm not only those whom DACA initially sought to help, but also will harm hundreds of thousands of their U.S. citizen children by triggering short- and long-term health impacts during their critically important developmental years. This human toll must be considered.

## SUMMARY OF ARGUMENT

The September 2017 Memorandum on Rescission of Deferred Action for Childhood Arrivals (Rescission Memo) issued by the Department of Homeland Security (DHS) arbitrarily and capriciously ignores the human impact of ending DACA protections. The Rescission Memo does not even consider the detrimental impact this action will have both on DACA recipients and their children. *See* Pet. Br. 7-8, citing *Regents* Pet. App. 111a-119a. In listing the factors underlying its decision to rescind the policy, DHS considered only the relevant litigation, not the immense personal impact on hundreds of thousands of people. The district court noted this failure in finding the rescission arbitrary and capricious:

In terminating DACA, the administrative record failed to address the 689,800 young people who had come to rely on DACA to live and to

**AR5984**

13

work in this country. These individuals had submitted substantial personal identifying information to the government, paid hefty fees, and planned their lives according to the dictates of DACA. The administrative record includes no consideration to the disruption a rescission would have on the lives of DACA recipients, let alone their families, employers and employees, schools and communities.

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1045 (N.D. Cal. 2018).

Amici focus here on the most vulnerable class of affected persons disregarded by the Rescission Memo: the hundreds of thousands of children of DACA recipients. Because DACA recipients are at immediate risk of detention and deportation if DACA is rescinded, the danger to their children also is immediate.

Indeed, these children are endangered not only by the actual detention and deportation of their parents, but also the looming fear of deportation. The imminent threat of losing DACA protection places children at risk of losing parental nurturance, as well losing income, food security, housing, access to health care, educational opportunities, and the sense of safety and security that is the foundation of healthy child development.

The mental health benefits to children whose mothers are protected by DACA, and therefore protected from the fear of deportation, are large and clinically significant. Jens Hainmueller et al., *Protecting*

14

*unauthorized immigrant mothers improves their children's mental health*, 357 Science 1041-44 (2017), https://tinyurl.com/y46cf7be. Children who did not live in fear that their parent might be detained and deported saw significantly decreased adjustment and anxiety disorder diagnoses. *Id.* Conversely, exposure to immigration enforcement actions, such as raids, negatively impacts birth outcomes. Infants born to Latina mothers had a 24% greater risk of low birthweight after an immigration raid when compared with the same period one year earlier. Nicole L. Novak et al., *Change in birth outcomes among infants born to Latina mothers after a major immigration raid*, 46 Int'l J. Epidemiology 839 (2017), https://tinyurl.com/y5ehbjs7.

In addition to the children of DACA recipients, children of other immigrant parents and in affected school communities also suffer increased stress. DACA recipients live in households with an average of four members, often of different immigration statuses, and within larger communities. The effects of deportation touch neighbors, friends, and family. Children who witness arrests often share their stories with friends and classmates. "[F]or every two adults deported, one citizen-child is directly affected." Luis H. Zayas & Laurie Cook Heffron, *Disrupting young lives: How detention and deportation affect US-born children of immigrants*, Am. Psych. Ass'n (Nov. 2016), https://tinyurl.com/l6ro2ql.

As the American Academy of Pediatrics recently explained, "[t]he immigration status of children and their parents relates directly to their subsequent access to and use of health care, perceived health status,

15

and health outcomes. Family immigration status is intertwined with other social determinants of health, including poverty, food insecurity, housing instability, discrimination, and health literacy." Julie M. Linton et al., *Providing Care for Children in Immigrant Families*, 144 Pediatrics 1, 4 (Sept. 2019), https://tinyurl.com/y6ghwfkr.

## ARGUMENT

## I.  Rescinding DACA Places Children At Risk Of Immediate Harm.

The Rescission Memo reaches far into the homes, schools, churches, and communities of hundreds of thousands of children across the country. Although the nearly 700,000 DACA recipients arrived in the United States as children, many of them are now adults and have children of their own. According to recent estimates, more than 250,000 U.S.-born children have at least one parent who is a DACA recipient, and about 1.5 million people in the United States live with a DACA recipient. Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States*, Ctr. for Am. Progress (Sept. 5, 2019), https://tinyurl.com/y4xc6sf4.

Once DACA protections are rescinded, these children's parents will be eligible for detention and deportation, and they will also be forced out of the lawful labor market. DHS's position is clear: "Recipients of DACA are currently unlawfully present in the U.S. with their removal deferred. When their period of deferred action expires or is terminated, their removal will no longer be deferred and they will no longer be

**AR5987**

16

eligible for lawful employment." U.S. Dep't of Home-land Security, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals (DACA)*, https://tinyurl.com/y9ptpepg (last visited Oct. 2, 2019).

In its opening brief, the government states that "a decision to abandon an existing nonenforcement pol-icy will not, by itself, bring to bear the agency's coer-cive power over any individual; that will occur only if any resulting enforcement proceeding leads to a final adverse order." Pet. Br. 19. This is an empty assur-ance for DACA recipients and their children, for sev-eral reasons.

To begin, DHS holds extensive identifying infor-mation for every DACA recipient. While DHS states that for the time being it will not "proactively" use this information for deportation purposes, U.S. Dep't of Homeland Security, *Frequently Asked Questions*, *su-pra*, reports of recent detentions suggest otherwise. *See, e.g.*, Carlos Ballesteros, *She's a DACA recipient. ICE agents still arrested her. Then they went after her parents*, Chicago Sun Times (May 21, 2019), https://ti-nyurl.com/y2x3x7cd; Reis Thebault, *How a flight at-tendant from Texas ended up in an ICE detention center for six weeks*, Washington Post (Mar. 23, 2019), https://tinyurl.com/yxar27pu.

Moreover, although DHS does not keep robust data on DACA revocations and does not track DACA detentions, advocates report that numerous DACA re-cipients have been detained and issued Notices to Ap-pear. DHS officials have then asserted that these Notices to Appear automatically cancel DACA status,

17

even though advocates argue that this contradicts the government's own rules. Rep. Marc Veasey (D-Texas), who has called for an investigation of the Administration's enforcement actions against DACA recipients, reported that post-rescission, many of his DACA constituents began living in fear and had been held at border checkpoints for prolonged periods. Nicole Rodriguez, *Trump Administration Has Illegally Attempted to Deport DACA Recipients, Advocates Say*, Newsweek (Dec. 2, 2017), https://tinyurl.com/y69w92ya.

Given the Administration's current immigration priorities, it appears likely these detention and deportation efforts will intensify. On January 25, 2017, President Trump issued an Executive Order expanding the priority list of noncitizens subject to deportation to anyone charged with even minor criminal offenses and to anyone who may have misrepresented their status to obtain work. Exec. Order No. 13768, *Enhancing Public Safety in the Interior of the United States*, 82 Fed. Reg. 8799 (Jan. 30, 2017). A July 2019 analysis of Immigration and Customs Enforcement (ICE) data by the American Immigration Council shows that ICE has cast a wider deportation net under the current administration than under previous administrations. Rather than prioritizing individuals who may present a threat to public safety, "the administration has issued policies that treat all infractions of the law as equally deserving of enforcement action." Guillermo Cantor et al., *Changing Patterns of Interior Immigration Enforcement in the United States, 2016-2018*, Am. Immigration Council (July 1, 2019), https://tinyurl.com/y6ccpqwk. As a result, "[i]ncreasingly, individuals with no criminal records

**AR5989**

18

have been apprehended, regardless of their social and economic ties to U.S. families, communities, and employers." *Id.*

The Administration is also taking steps to deport unauthorized immigrants faster, stoking widespread fear in immigrant communities. In July 2019, it announced that it would expedite the removal of undocumented immigrants who cannot prove that they have been in the United States continuously for two years or more. "The change dramatically expands the ability of the Department of Homeland Security to quickly deport certain immigrants without any of the due-process protections granted to most other people, including the right to an attorney and to a hearing before a judge … and is the latest escalation of the Trump administration's immigration crackdown." Vanessa Romo, *Trump Administration Moves To Speed Up Deportations With Expedited Removal Expansion*, NPR (July 22, 2019), https://tinyurl.com/y4lrblfm.

The Administration has also increased the number of major raids targeting undocumented immigrants. In July 2019, for example, immigration officials targeted more than 2,000 people who were in the United States illegally in widely publicized raids (called Operation Border Resolve) that took place in over a dozen U.S. cities. Caitlin Dickerson & Zolan Kanno-Youngs, *Thousands Are Targeted as ICE Prepares to Raid Undocumented Migrant Families*, N.Y. Times (July 11, 2019), https://tinyurl.com/y5nggr9p. And in August 2019, more than 600 Latino workers were detained at poultry plants in Mississippi. Lauren Camera, *ICE Raids Send Schools Scrambling*,

19

U.S. News & World Report (Aug. 8, 2019), https://tinyurl.com/yymuf33f. This raid followed other large-scale immigration raids that took place last year in Ohio and Tennessee. John Minchillo & Elliot Spagat, *Immigration agents arrest 114 at Ohio landscaper*, AP (June 5, 2018), https://tinyurl.com/y5pwduhb.

In sum, whether DACA recipients are detained immediately, sometime in the future, or not at all, the Rescission Memo inflicts fear and anxiety not only on the recipients, but also their children, at significant cost to their long-term health and well-being. Loss of DACA protection also subjects recipients to immediate job loss and the risk factors associated with unauthorized status, potentially impacting parents' ability to provide and care for their children.

## II.   Ending DACA Protection Will Likely Damage Children's Mental And Physical Health.

### A. Even the threat of detention and deportation can cause children to suffer symptoms of traumatic stress and post-traumatic stress disorder and impacts birth outcomes.

The deportation of a parent is devastating for a child and can cause severe trauma. As a result, children may experience anxiety, depression, and insomnia, and exhibit signs of fear. They also may suffer from social isolation, self-stigma, and aggression, and may experience separation anxiety, attachment disorders, and post-traumatic stress disorders. Zayas &

**AR5991**

20

Heffron, *supra*, at 3. For young children, these impacts are even greater because they are more physically and emotionally dependent on their caregivers and because they are at a crucial developmental stage where interactions with their primary caregiver provide the framework for health and well-being. *See* Ajay Chaudry et al., *Facing Our Future: Children in the Aftermath of Immigration Enforcement*, Urban Inst. (Feb. 2010), https://tinyurl.com/y2vv8aro; Randy Capps et al., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature*, Migration Policy Inst. (Sept. 2015), https://tinyurl.com/ybm62mqa.

"[T]he children of the unauthorized live under constant threat that their parents might be arrested and deported, leaving them vulnerable to family separation, instability, economic hardship, dramatic changes in their life courses, and potentially severe psychological and behavioral impacts." Chaudry, *supra*, at 1. The arrest, detention, and deportation of a parent often accumulates on top of children's other stress and can "detrimentally impact their mental health." Zayas & Heffron, *supra*, at 1. And these children will likely suffer from depression, negative self-esteem, and anxiety, whether they accompany their parents out of the country or stay behind in the United States. *Id.* at 3.

Moreover, research shows that this trauma is not limited to children whose parents are ultimately deported. Even the *threat* of deportation is highly traumatic for children. "As parents' risk of deportation

21

rises, so too does the stress of their children. The lingering possibility of deportation of parents leaves children with constant anxiety and vigilance about the potential becoming real." *Id.* at 2 (citations omitted). A 2013 study of family unity and health among mixed-status families (families with at least one undocumented parent and at least one U.S.-citizen child) found that almost 75% of undocumented parents reported signs of PTSD in their children, compared with 40% of documented parents. Sara Satinsky et al., *Family Unity, Family Health: How Family-Focused Immigration Reform Will Mean Better Health for Children and Families* 2, 8 (2013), https://tinyurl.com/y437qu3s. A 2017 study across six states found that children as young as three years old are expressing fear about losing a parent to deportation and demonstrating those fears through words and troubling behaviors. Wendy Cervantes et al., *Our Children's Fear: Immigration Policy's Effects on Young Children*, CLASP 8 (Mar. 2018), https://tinyurl.com/yas57ql2.

High levels of anxiety and stress experienced by young children during the early formative years can have serious and lasting effects on their physical and emotional development. Persistent and substantial exposure to fear and anxiety—sometimes called "toxic stress"—can do immense damage to children's health. This level of stress can interfere with young children's physical brain development, altering how they learn and their ability to manage their emotions. It can also lead to physical and mental health problems that last into adulthood. *See* Jack P. Shonkoff & Andrew S. Garner et al., *The Lifelong Effects of Early Childhood Adversity and Toxic Stress*, 129 Pediatrics e232-46

22

(Jan. 2012), https://tinyurl.com/y38kyr9y; Nat'l Sci. Council on the Developing Child, *Persistent Fear and Anxiety Can Affect Young Children's Learning and Development* (Feb. 2010), https://tinyurl.com/y2lw82qa.

A child's earliest years are a critical period for influencing their healthy development, with implications for lifelong physical and emotional well-being. Experiences during a child's earliest years affect the development of their brain—including the cognitive, linguistic, social, and emotional abilities—and build a healthy foundation for life. The well-being of the parents has an important impact on children's social-emotional, physical, and economic well-being. *See* Shonkoff & Garner, *supra*; Nat'l Sci. Council on the Developing Child, *The Science of Early Childhood Development: Closing the Gap Between What We Know and What We Do* (Jan. 2007), https://tinyurl.com/y3x43yvr.

A key reason why even the threat of rescission damages child health is because family instability and parental stress can undermine parent-child attachment and child well-being. Further, if families experience increased housing and economic instability due to avoidance of immigration enforcement actions, children can suffer great harm to their developing minds and bodies. Sharon H. Bzostek & Audry N. Beck, *Familial instability and young children's physical health*, 73 Soc. Sci. & Med. 282-92 (July 2011). Children's mental health and social-emotional development is inextricably linked to that of their parents and caregivers, and their parents' stress has a collateral impact on them. There is "strong consensus on

23

the central importance of child-caregiver relation-ships," and "[e]motional problems such as depression, economic stress, and marital conflict can interfere with sensitive and responsive parenting, be disruptive of secure attachments, and constitute a significant source of instability over time in attachment security." Nat'l Research Council & Inst. of Med., *From Neurons to Neighborhoods: The Science of Early Childhood Development* 234, 353 (Jack P. Shonkoff & Deborah A. Phillips eds., Nat'l Acad. Press 2000).

The fear of deportation and exposure to immigration raids negatively impacts birth outcomes, putting babies at risk for adverse health outcomes. In one study, infants born to Latina mothers had a 24 percent greater risk of low birthweight after an immigration raid when compared with the same period one year earlier, Novak, *supra*, increasing the risk for subnormal growth, illnesses, and neurodevelopmental problems. Maureen Hack et al., *Long-Term Developmental Outcomes of Low Birth Weight Infants*, 5 The Future of Children 176-96 (1995). In another study of women in New York City pre- and post-inauguration in 2017, the relative risk of preterm birth among Hispanic women increased 1.15% due to severe sociopolitical stressors such as heightened fear of deportation. Nancy Krieger et al., *Severe sociopolitical stressors and preterm births in New York City: 1 September 2015 to 31 August 2017*, 72 J. Epidemiology & Cmty. Health 1147 (2018), https://tinyurl.com/y5gv7mxk.

24

## B. DACA rescission will likely cause income and food insecurity.

Without DACA protection, recipients will lose their work authorizations, which means that they will no longer be able to work legally and likely will lose income from employment. As a result, their children and families will face poverty and food insecurity.

Poverty has a significantly corrosive impact on child development and well-being. It causes negative outcomes across numerous health, mental health, and other indicators during childhood, as well as lower educational attainment and earnings into adulthood. Nat'l Acad. of Scis., Eng'g, & Med., *A Roadmap to Reducing Child Poverty* 20 (Greg Duncan & Suzanne Le Menestrel eds.), Nat'l Acads. Press 2019, https://tinyurl.com/yyvwcu9z. Poverty also affects children by stressing their parents, which impairs their ability to effectively parent their children. Caroline Ratcliffe & Signe-Mary McKernan, *Child Poverty and Its Lasting Consequence*, Urban Inst. (Sept. 2012), https://tinyurl.com/y254aa6x.

"Regardless of legal status, children of undocumented immigrants more often suffer from food insecurity than children of US citizens." Zayas & Heffron, *supra*, at 2. Unauthorized immigrant parents "also may not use social services and public programs such as food stamps and child care subsidies, for which their citizen-children are eligible." *Id.* Moreover, the actual detention of a family member can leave a household without enough food. According to one study, more than 80% of households ran out of food six months after the detention of a family member

25

and did not have the money to get more. Satinsky, *supra*, at 32-33.

Unauthorized parents often experience poor or exploitative work conditions, such as extended work hours without overtime pay, pay below the minimum wage, and little-to-no benefits, such as paid sick leave—all conditions that could negatively impact their children's lives. Research has found that the above conditions result in high levels of parental stress and increased economic insecurity. Children living in households under these stresses often experience poor cognitive development, which can be seen as early as age two. Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Young Children* (Russell Sage Found. 2011).

## C. DACA rescission threatens to cut off access to reliable health care.

Access to reliable health care is critical to child health and development. Although unauthorized immigrants, including DACA recipients, are not eligible for Affordable Care Act coverage, many DACA recipients have obtained health insurance through their employers or through college or university health plans. One survey found that about 60% of individuals eligible for DACA had health insurance, mostly through their employers. Kaiser Family Found., *Key Facts on Individuals Eligible for the Deferred Action for Childhood Arrivals (DACA) Program* 2 (Feb. 2018), https://tinyurl.com/yxtnmxwr. Rescinding DACA will cut off much of this access to health insurance—former recipients will no longer be authorized to work, and their access to higher education will be

26

significantly reduced. "Employers would likely terminate individuals as they lose work authorization, leading to job loss along with loss of health coverage. Job losses may also result in coverage losses for their children, who are often U.S.-born citizens." *Id.* at 3.

In addition to losing health insurance coverage, parents no longer protected by DACA may be too fearful of deportation to seek medical care for their children. "In spite of the fact that citizen-children have the right to health care, their parents may avoid encounters with providers for fear of discovery." Zayas & Heffron, *supra*, at 2. As a result, "undocumented immigrants make fewer visits to health care providers than citizens with authorized immigrant status." *Id.* "Increased fears about the use of public programs and immigration status has deterred immigrants from accessing programs regardless of eligibility. In addition, immigration enforcement activities that occur at or near sensitive locations, such as hospitals, may prevent families from accessing needed medical care." Linton, *supra*, at 8. Indeed, one study found that one-seventh of all adults in immigrant families reported avoiding non-cash public benefits during the past year because of fear that their legal immigration status would be harmed. Hamutal Bernstein et al., *One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018*, Urban Inst. 2 (May 2019), https://tinyurl.com/y2fhwgg3. Low-income members of immigrant families reported even higher rates of avoidance. *Id.* Of this group that avoided benefits, 46% avoided nutrition benefits (SNAP), 42% avoided medical benefits (Medicaid and CHIP), and 33% avoided public housing subsidies. *Id.* at 8.

27

Even though doctors and health care providers are required by law to protect patient information, many people in immigrant communities avoid visiting clinics or hospitals for fear of being reported to immigration officials. In a 2018 survey of health care providers in California, for example, 67% noted an increase in parents' concerns about enrolling their children in public health and nutritional programs, and 42% reported an increase in skipped scheduled health care appointments. The Children's P'ship, *California Children in Immigrant Families: The Health Provider Perspective* (2018), https://tinyurl.com/y2rdf4fp. As one policy analyst explained, "[m]any undocumented immigrants 'say fear of deportation for themselves or family members is a barrier in terms of signing up for coverage and accessing healthcare services.'" Lisa Zamosky, *Health care options for undocumented immigrants*, L.A. Times (Apr. 27, 2014), https://tinyurl.com/huvcplj.

In fact, the number of children without health insurance increased to 5.5% in 2018, an increase of 0.6% from the previous year, largely because of a decline in children's Medicaid and CHIP coverage rates. Edward R. Berchick et al., *Health Insurance Coverage in the United States: 2018*, U.S. Census Bureau 2-3 (Sept. 2019), https://tinyurl.com/y53cpsvt. "Hispanic children were more likely to be uninsured than children from other races and non-Hispanic origin groups," and "the uninsured rate increased 1.0 percentage point for Hispanic children" between 2017 and 2018. *Id.* at 9.

In addition, "a political climate that tolerates migration criminalization rhetoric has served to create

28

what's been called a *chilling effect*—reduction, due to fear rather than eligibility changes, in the number of undocumented immigrants willing to interact with staff at public agencies or enroll themselves or their children in health plans or other benefits." Isha Marina Di Bartolo, *Immigration, DACA, and Health Care*, 21 AMA J. of Ethics 1, E4 (Jan. 2019), https://tinyurl.com/y394f85p.

Children will lose health coverage—whether due to chilling effects or their households being directly affected by the rescission of DACA—to potentially disastrous effects. Michael Karpman & Genevieve M. Kenney, *Health Insurance Coverage for Children and Parents: Changes Between 2013 and 2017*, Urban Inst. (Sept. 7, 2017), https://tinyurl.com/yy2xn87s. One study found that disenrollment of children in need of medical care would likely contribute to child deaths and future disability. Leah Zallman et al., *Implications of Changing Public Charge Immigration Rules for Children Who Need Medical Care*, 173 JAMA Pediatrics E4-E5 (July 1, 2019). Foregoing regular treatment for such children will likely lead to increased health care costs and disastrous outcomes. *See id.* For these vulnerable children, the loss of health coverage would be catastrophic.

While the loss of health coverage by parents has a significant negative impact on their children's health coverage, the converse is also true. When parents gain access to health coverage, their children also gain access to health coverage. Julie L. Hudson & Asako S. Moriya, *Medicaid Expansion For Adults Had Measurable 'Welcome Mat' Effects On their Children*, 36 Health Affairs 1643-51 (Sept. 2017). When

**AR6000**

29

parents have health insurance coverage, children are more likely to access routine and preventative health care. Maya Venkataramani et al., *Spillover Effects of Adult Medicaid Expansions on Children's Use of Preventive Services*, 140 Pediatrics 1, 6 (Dec. 2017), https://tinyurl.com/yxwv5v2x.

### D. DACA rescission puts children at risk of parental separation and reduced access to educational opportunities.

Of course, parental separation itself causes significant psychological and emotional harm to children. Separations are especially difficult for children when they do not know where their parents are, whether they are safe, or when they will return. "Chronic separation from a caregiver can be extremely overwhelming to a child. Depending on the circumstances and their significance, the child can experience these separations as traumatic. They may be sudden, unexpected, and prolonged, and can be accompanied by additional cumulative stressful events." Nat'l Child Traumatic Stress Network, *Children with Traumatic Separation: Information for Professionals* 1 (2016), https://tinyurl.com/y2k2sqg7.

With DACA rescinded, the children of recipients will also face more barriers to educational opportunities as the result of prolonged exposure to highly stressful situations without the buffering support of a parent, also known as toxic stress. The anxiety, depression, and other symptoms that children will experience interfere with cognitive ability and focus, and behavioral issues like aggression that results from experiencing trauma can interfere with concentration

**AR6001**

30

and attendance. "Children in families under the threat of detention or deportation will achieve *fewer years of education* than children of citizens, and they face challenges in focusing on schoolwork, potentially translating into less income as adults." Satinsky, *supra*, at 17.

Finally, children face additional risks from the revived practice of large-scale immigration raids, including worksite raids. In August 2019, on the first day of school for children in Mississippi's Scott County, U.S. immigration officials raided seven Mississippi chicken processing plants and arrested 680 workers. Camera, *supra*. The superintendent for the Scott County School District said that some longtime teachers told him that the raid in their community "was by far the worst day they have ever spent as educators." Jeff Amy & Rogelio V. Solis, *Immigration raids to have long-term effects on poultry towns*, Journal Gazette (Aug. 9, 2019), https://tinyurl.com/yx9x4gjl. The raids affected 15 families and about 30 to 35 students in Scott County. "[T]he overall chilling effect of the event meant 150 students were absent from school" the next day. Camera, *supra*; *see also*, *e.g.*, Minchillo & Spagat, *supra* (immigration raid of a landscaping company in northern Ohio and a meatpacking plant in eastern Tennessee).

These immigration raids have an effect throughout communities, including on children's education. "Immigration policies create a climate of fear that affects children's academic performance, even if their family is not directly impacted by detention and deportation." Satinsky, *supra*, at 16. One study of immigration raids in six different locations found that

**AR6002**

31

about 20% of children had difficulty keeping up in school after the raids. *Id.*

Moreover, although ICE currently maintains a policy of avoiding enforcement actions at "sensitive locations," such as schools, churches, and hospitals, *see* U.S. Imm. & Customs Enforcement, *FAQ on Sensitive Locations and Courthouse Arrests*, https://tinyurl.com/y9ul6mfo (last visited Oct. 2, 2019), parents have been arrested while taking their children to school. *See, e.g.*, Gary Klein, *Marin man arrested in ICE bust while dropping off child at school*, Marin Indep. J. (Mar. 15, 2018), https://tinyurl.com/y38xje2n; Amy B. Wang, *US immigration authorities arrest chemistry professor after he finishes getting his children ready for school*, The Independent (Feb. 5, 2018), https://tinyurl.com/y38dzfeu; Andrea Castillo, *Immigrant arrested by ICE after dropping daughter off at school, sending shockwaves through neighborhood*, L.A. Times (Mar. 3, 2017), https://tinyurl.com/j26wswx.

In a 2010 study of immigration-related parental arrests, researchers found that "[i]n the short term, six months or less after a raid or other arrest, about two-thirds of children experienced changes in eating and sleeping habits." Chaudry, *supra*, at ix. "More than half of children in our study cried more often and were more afraid, and more than a third were more anxious, withdrawn, clingy, angry, or aggressive. A majority of children experienced four or more of these behavior changes." *Id.* "Younger children experienced greater difficulties eating and sleeping, excessive crying, and clinging to parents, while aggressive and

32

withdrawn behavior was more common among the older children." *Id.*

### E. DACA rescission puts children at risk of traumatic stress, causing immediate and long-term damage.

As described above, the risk of parental detention and deportation puts children at serious risk of harm, including increased risk to their mental and physical health, income and food security, and separation from their parents. Each of these experiences contributes to the development of child traumatic stress. Beginning with a landmark study published by Kaiser Permanente and the Centers for Disease Control and Prevention in 1998, numerous studies have confirmed that "adverse childhood experiences" can significantly impact physical and mental health well into the adult years, especially when the stress is chronic. *See* Centers for Disease Control & Prevention, *Adverse Childhood Experiences*, https://tinyurl.com/y8fc6qok.

As the American Academy of Pediatrics explained in response to executive orders calling for tougher immigration enforcement:

> Far too many children in this country already live in constant fear that their parents will be taken into custody or deported, and the message these children received today from the highest levels of our federal government exacerbates that fear and anxiety. No child should ever live in fear. When children are scared, it can impact their health and development. Indeed, fear and stress, particularly prolonged

**AR6004**

33

> exposure to serious stress—known as toxic stress—can harm the developing brain and negatively impact short- and long-term health.

Am. Academy of Pediatrics, *AAP Statement on Protecting Immigrant Children* (Jan. 25, 2017), https://tinyurl.com/y526he2n.

Without a network of supportive relationships, toxic stress can disrupt normal development and negatively affect the immune system and other biological functions in children—potentially for life. Pediatrician Alan Shapiro notes the amplified effect of toxic stress for children with unauthorized immigrant parents: "In this bio-ecological framework, parental deportation becomes a double whammy for children, compounding the negative effect on a child's health and well-being by increasing their risk for exposure to stressors and removing a key buffer to that stress, their parent." Alan Shapiro, *Immigration: deporting parents negatively affects kids' health*, The Hill (May 13, 2016), https://tinyurl.com/y5np9s83.

The long-term, disruptive effects of toxic stress on the developing brains of children are particularly concerning. "Toxic stress damages developing brain architecture, which can lead to life-long problems in learning, behavior, and physical and mental health." Center on the Developing Child at Harvard University, *InBrief: The Science of Early Childhood Development*, https://tinyurl.com/y6n3g894. The stress is cumulative, such that "[t]he more adverse experiences in childhood, the greater the likelihood of developmental delays and other problems." Center on the

34

Developing Child at Harvard University, *InBrief: The Impact of Early Adversity on Children's Development*, https://tinyurl.com/yyjxt72b.

Children who experience toxic stress are at significant risk for negative consequences that can last a lifetime. Rescinding DACA will cause the children of recipients unrelenting fear of losing either their country or their parents and will also create additional hardships for their economic and social well-being. And the cumulative effect of that fear and additional hardships can lead to worse health outcomes, lower productivity, and less quality of life for hundreds of thousands of American children.

## F. DACA protection benefits children's health.

While DACA rescission has devastating consequences for children, DACA protection affirmatively helps them. Recent evidence demonstrates the health-promoting effects of DACA protection. For example, a 2016 survey of immigrant young adults showed that DACA status predicted psychological wellness. Caitlin Patler & Whitney Laster Pirtle, *From undocumented to lawfully present: Do changes to legal status impact psychological wellbeing among latino immigrant young adults?*, 199 Soc. Sci. & Med. 39 (2017), https://tinyurl.com/y6f85wdm. DACA lowered the likelihood of psychological distress, and recipients reported "better health" and "reduced fear." *Id.* at 44. Specifically, "[r]eceiving DACA reduced the odds of distress, negative emotions, and worry about self-deportation by 76-87%, compared to respondents without DACA." *Id.*

**AR6006**

35

Likewise, a 2017 study found significant mental health benefits among DACA-eligible individuals. Atheendar S. Venkataramani et al., *Health consequences of the US Deferred Action for Childhood Arrivals (DACA) immigration programme: a quasi-experimental study*, 2 Lancet Public Health e175 (Apr. 2017), https://tinyurl.com/yyj5nhgk. Researchers found that the "effects on mental health were large and clinically significant, with the DACA programme significantly reducing the odds of individuals reporting moderate or worse psychological distress." *Id.* at e179. The authors further noted that these results should be expected, given other studies that show an increase in anxiety and depression symptoms when immigration policies raise the risk of deportation. *Id.* The American Academy of Pediatrics agrees: "Policies that offer protection from deportation, such as DACA, may confer large mental health benefits for youth and for the children of parenting youth." Linton, *supra*, at 8.

Another recent study showed that the DACA eligibility of mothers had a positive impact on the physical and mental health of their children. By evaluating their health information, researchers found that adjustment and anxiety disorders were significantly reduced among the children of DACA-eligible mothers. Hainmueller, *supra*, at 1041. The authors chose to study mental health disorders because the effects were immediately observable after DACA was established. "Moreover, examining mental health disorders that originate in childhood is important because they are associated with long-term health issues, low education, and welfare dependence,

AR6007

36

which generate considerable private and social costs." *Id.* at 1042.

In sum, "favorable immigration policies can have a 'warming effect' on vulnerable children's access of critical social services," and "rolling back DACA or instituting policies which raise the threat of deportation could result in a 'chilling effect' that could adversely affect child health." Rebecka Rosenquist, *The 'Warming Effect' of DACA on American Children*, Penn LDI, Leonard Davis Inst. of Health Econ. 2 (June 4, 2018), https://tinyurl.com/yys7sbj7.

## III. It Is In Society's Interest To Protect Children From Harm.

As the Court has recognized, it is in "the interests of society to protect the welfare of children." *Prince v. Massachusetts*, 321 U.S. 158, 165 (1944). "It is the interest of youth itself, and of the whole community, that children be both safeguarded from abuses and given opportunities for growth into free and independent well-developed men and citizens." *Id.*; *see generally Brown v. Board of Educ. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483, 494 (1954) (holding that racial segregation in schools deprived children of equal educational opportunities); *Ginsberg v. New York*, 390 U.S. 629, 640 (1968) ("The State also has an independent interest in the well-being of its youth."); *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 794 (2011) (recognizing that a state "possesses legitimate power to protect children from harm").

The Court has also recognized the importance of family. "Our decisions establish that the Constitution

37

protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural." *Moore v. East Cleveland*, 431 U.S. 494, 503-04 (1977).

Indeed, these principles of family unity and child protection have animated laws across the United States that make family preservation a priority of child welfare agencies. The U.S. Department of Health and Human Services notes that laws in all states "require that child welfare agencies make reasonable efforts to provide services that will help families remedy the conditions that brought the child and family into the child welfare system ... [such as] accessible, available, and culturally appropriate services that are designed to improve the capacity of families to provide safe and stable homes for their children." U.S. Dep't of Health and Human Servs., *Reasonable Efforts to Preserve or Reunify Families and Achieve Permanency for Children* 1 (Mar. 2016), https://tinyurl.com/y4xgdygj.

Acknowledging the vital importance of family unity, on February 9, 2018, President Trump signed into law the Family First Prevention Services Act, as part of Division E in the Bipartisan Budget Act of 2018. P.L. 115-123 (H.R. 1892). This law makes comprehensive changes to child welfare laws in an effort to keep families together: "The purpose of this subtitle is to enable States to use Federal funds … to provide enhanced support to children and families and prevent foster care placements through the provision of mental health and substance abuse prevention and

**AR6009**

38

treatment services, in-home parent skill-based programs, and kinship navigator services." P.L. 115-123. As one of cosponsors of the legislation explained, "this new law has the power to better the lives of hundreds of thousands of children and their families. It will for the first time allow States to invest Federal foster care dollars in evidence-based services, like substance use treatment and mental health and parenting programs, to prevent the need for foster care by keeping families safely together." 164 Cong. Rec. S1731 (daily ed. Mar. 14, 2018) (statement of Sen. Wyden). Family First represents an intentional shift to a more upstream system that can prevent unnecessary foster care through services for vulnerable families. The strain on child welfare systems resulting from DACA rescission will come at a time when those systems are moving toward an evidence-based model even more incongruous with addressing the needs of children of DACA recipients.

The United States is also a signatory to the United Nations Convention on the Rights of the Child. Although the United States has not ratified the Convention, its signature "creates an obligation to refrain, in good faith, from acts that would defeat the object and the purpose of the treaty." United Nations, *What is the difference between signing, ratification and accession of UN treaties?* (citing Arts. 10 and 18, Vienna Convention on the Law of Treaties 1969), https://tinyurl.com/y3j2c84l. The Convention emphasizes the importance of protecting child safety and family unity and establishes that a child has "the right to know and be cared for by his or her parents." Convention on the Rights of the Child, Arts. 7, 18. It also requires parties to "ensure that a child shall not

39

be separated from his or her parents against their will." *Id.*, Art. 9.

The well-being of children and the importance of family preservation are fundamental values in our society. DACA recipients were brought here as children and given no other choice of home. Many of these recipients are now parents of U.S.-born children. Rescinding DACA puts these children at immediate risk and threatens their families with forced separation, in direct contravention of our nation's core commitment to protect children. At a minimum, the government should weigh these concerns carefully in considering whether to rescind DACA.

## CONCLUSION

For the foregoing reasons, the Court should affirm the orders and judgments of the Ninth Circuit and the District Courts for the District of Columbia and the Eastern District of New York.

Respectfully submitted,

Kelsi Brown Corkran
Melanie R. Hallums
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, DC 20005
(202) 339-8400

Mary Kelly Persyn
   *Counsel of Record*
PERSYN LAW & POLICY
912 Cole Street
San Francisco, CA 94117
(628) 400-1254
marykelly@persynlaw.com

October 9, 2019

**AR6011**

Nos. 18-587, 18-588, 18-589

# In the Supreme Court of the United States

————

DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL., RESPONDENTS.

————

*ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT*

————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS,

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL., RESPONDENTS.

————

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT*

————

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS,

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL., RESPONDENTS.

————

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT*

————

**BRIEF FOR LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, THE ANTI-DEFAMATION LEAGUE, THE LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS, AND 42 OTHER SOCIAL JUSTICE ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS**

————

KRISTEN CLARKE
JON GREENBAUM
DARIELY RODRIGUEZ
DORIAN SPENCE
PHYLICIA H. HILL
MARYUM JORDAN
LAWYERS' COMMITTEE FOR
  CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600
October 4, 2019

WILLIAM D. COSTON
  *Counsel of Record*
MARTIN L. SAAD
SAMEER P. SHEIKH
VENABLE LLP
600 Massachusetts Ave NW
Washington, DC 20001
(202) 344-4813
wdcoston@venable.com

*Counsel for Amici Curiae*

WILSON-EPES PRINTING CO., INC.   –   (202) 789-0096   –   WASHINGTON, D. C. 20002

**AR6012**

## QUESTIONS PRESENTED

1. Whether DHS's decision to wind down the DACA policy is judicially reviewable.

2. Whether DHS's decision to wind down the DACA policy is lawful.

(i)

AR6013

TABLE OF CONTENTS

Page

QUESTIONS PRESENTED ............................... i

TABLE OF AUTHORITIES................................ iv

INTEREST OF *AMICI CURIAE* ........................ 1

INTRODUCTION ................................................ 3

ARGUMENT........................................................... 5

  I.  THE GOVERNMENT WAS REQUIRED TO CONSIDER RELIANCE INTERESTS PRIOR TO TERMINATING DACA ......... 5

 II.  DACA ENGENDERED SERIOUS RELIANCE INTERESTS THAT THE GOVERNMENT FAILED TO CONSIDER...... 11

    A.  Reliance Interests of DACA Students, Educators and Educational Institutions....................................................... 13

    B.  DACA Enrollees Purchased Homes and Lending Institutions Extended Loans in Reliance on DACA................ 17

    C.  Promises of "Expedited Citizenship" for DACA Enrollees Serving Vital Military Interests ................................. 19

CONCLUSION .................................................... 22

APPENDIX

    APPENDIX: LIST OF *AMICI CURIAE* ........ 1a

**AR6014**

iv

## TABLE OF AUTHORITIES

CASES                                                      Page(s)

*City of Arlington v. FCC,*
    569 U.S. 290 (2013)..................................   5

*Encino Motor Cars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016)...................... 6, 7, 11, 13

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009)..................................   10

*Jimenez–Cedillo v. Sessions,*
    885 F.3d 292 (4th Cir. 2018)....................   11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*
    *State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)...................................   5

*NAACP v. Trump,*
    298 F. Supp. 3d 209 (D.D.C. 2018)...........   5

*Perez v. Mortgage Bankers Association,*
    135 S. Ct. 1199 (2015)..............................   6-7

*Plyler v. Doe,*
    457 U.S. 202 (1982)................................. 13, 17

*Regents of Univ. of Cal. v. DHS,*
    908 F.3d 476 (9th Cir. 2018)....................   5

*Smiley v. Citibank (South Dakota), NA,*
    517 U.S. 735 (U.S. 1996)..........................   7

*Texas v. United States,*
    328 F. Supp. 3d 662 (S.D. Tex. 2018).......   8

*U.S. v. Penn. Indus. Chem. Corp.,*
    411 U.S. 655 (1973)..................................   11-12

STATUTES

5 U.S.C. § 706(2)(A)......................................   5

v

TABLE OF AUTHORITIES—Continued

OTHER AUTHORITIES                    Page(s)

A.W. Geiger, *America's Public School Teachers Are Far Less Racially And Ethnically Diverse Than Their Students*, Pew Research Center. (Aug. 27, 2018), https://www.pewresearch.org/fact-tank/2018/08/27/americas-public-school-teachers-are-far-less-racially-and-ethnically-diverse-than-their-students/ ............................. 15

Alex Horton, *The Military Looked to 'Dreamers' to Use Their Vital Skills. Now the U.S. Might DePort Them.* Wash. Post (Sept. 7, 2017), *available at* https://www.washingtonpost.com/news/checkpoint/wp/2017/09/07/the-military-looked-to-dreamers-to-use-their-vital-skills-now-the-u-s-might-deport-them/ ................................ 20, 21

Alexander Casey, *An Estimated 123,000 'Dreamers' Own Homes and Pay $380M in Property Taxes*, Zillow (Sept. 20, 2017), https://www.zillow.com/research/daca-homeowners-380m-taxes-16629/ .................. 18

Alice Yin, *Education by the Numbers*, N.Y. Times (Sept. 8, 2017), *available at* https://www.nytimes.com/2017/09/08/magazine/education-by-the-numbers.html ............... 15

Annie Karni and Sheryl Gay Stolberg, *Trump Offers Temporary Protections for 'Dreamers' in Exchange for Wall Funding*, N.Y. Times (Jan. 9, 2019), *available at* https://www.nytimes.com/2019/01/19/us/politics/trump-proposal-daca-wall.html ... 11

AR6016

vi

TABLE OF AUTHORITIES—Continued

Page(s)

Anti-Defamation League (ADL), *Creating an Anti-Bias Learning Environment*, https://www.adl.org/education/resources/tools-and-strategies/creating-an-anti-bias-learning-environment (last visited Oct. 2, 2019)............................................................ 16

Dep't of Justice Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op. O.L.C. (2014). ...................................... 8

Elise Gould, *Local Public Education Employment May Have Weathered Recent Storms, But Schools Are Still Short 327,000 Public Educators*, Econ. Pol'y. Inst. (Oct. 6, 2017), *available at* http://www.epi.org/publication/teacher-employment-may-have-weathered-storms-but-schools-are-still-short-327000-public-educators/................ 14

Greg Toppo, *20,000 DACA Teachers At Risk — and Your Kids Could Feel the Fallout, too*, USA Today (Oct. 11, 2017), *available at* https://www.usatoday.com/story/news/2017/10/11/thousands-daca-teachers-risk/7520820 01/ ............................................... 14, 16

AR6017

vii

TABLE OF AUTHORITIES—Continued

Page(s)

Lisette Partelow, *America Needs More Teachers of Color*, Ctr. for Amer. Progress (Sept. 14, 2017,), https://www.american progress.org/issues/education-k-12/repor ts/2017/09/14/437667/america-needs-tea chers-color-selective-teaching-profession/ ...   15

Liz Robbins, *For Teachers Working Through DACA, a Bittersweet Start to the School Year*, N.Y. Times (Sept. 7, 2017), *available at* https://www.nytimes.com/20 17/09/07/nyregion/daca-teachers.html .....   16

Memorandum from Janet Napolitano, Sec'y of Homeland Sec., Exercising Prosecuto-rial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), *available at* https://www.dhs.gov/xlibrary/assets/s1-ex ercising-prosecutorial-discretion-individ uals-who-came-to-us-as-children.pdf .......   12

Moriah Balingit, *As DACA Winds Down, 20,000 Educators Are in Limbo*, Wash. Post (Oct. 25, 2017), *available at* https:// www.washingtonpost.com/local/education/ as-daca-winds-down-20000-educators-are- in-limbo/2017/10/25/4cd36de4-b9b3-11e7- a908-a3470754bbb9_story.html ...............   14

AR6018

viii

TABLE OF AUTHORITIES—Continued

Page(s)

New American Economy, *Overcoming the Odds: The Contributions of DACA-Eligible Immigrants and TPS Holders to the U.S. Economy* (May 2019), *available at* https://www.newamericaneconomy.org/wp-content/uploads/2019/05/DACA-TPS_Brief.pdf...   12

Nicole Svjlenka, *What We Know About DACA Recipients in the United States*, Ctr. for Amer. Progress (Sept. 5, 2019), https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states/...............   13

Statement of Nancy E. Weaver, Department of Defense Senior Language Authority, Before the House Armed Services Committee Subcommittee on Oversight and Investigations, (June 29, 2010) *available at* http://prhome.defense.gov/Portals/52/Documents/RFM/Readiness/DLNSEO/docs/Weaver%20Testimony%20062910.pdf.................................   20

Tom K. Wong et al., *DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November*, Ctr. For Am. Progress (Sept. 19, 2019), https://www.americanprogress.org/issues/immigration/news/2019/09/19/474636/daca-recipients-livelihoods-families-sense-security-stake-november/.............................   18

AR6019

ix

TABLE OF AUTHORITIES—Continued

Page(s)

U.S. Census Bureau, Quarterly Residential
Vacancies And Homeownership, Fourth
Quarter 2017 (Jan. 30, 2018 10:00 AM),
https://www.census.gov/housing/hvs/files
/currenthvspress.pdf ................................. 19

U.S. Dep't of Def., Military Accessions Vital
to National Interest (MAVNI) Recruitment
Pilot Program, *available at* https://www.
defense.gov/news/MAVNI-Fact-Sheet.pdf... 20

U.S. Dep't of Housing and Urb. Dev.,
*The National Homeownership Strategy:
Partners in the American Dream* (1995).. 17

Yukiko Furuya et al., *A Portrait of Foreign-
Born Teachers In The United States,*
George Mason University, Institute for
Immigration Research, January 2019,
*available at* https://www.immigrationres
earch.org/system/files/Teacher_Paper.pdf... 15

**AR6020**

## INTEREST OF *AMICI CURIAE*[1]

*Amici*, the Lawyers' Committee for Civil Rights Under Law, the Anti-Defamation League, the Leadership Conference on Civil and Human Rights, and 42 other social justice organizations,[2] are national and regional civil rights groups and equal justice organizations, each committed to the promotion of civil liberties throughout the country and the elimination of discrimination in any form.

The Lawyers' Committee for Civil Rights Under Law ("Lawyers' Committee") is a nonpartisan, non-profit civil rights organization formed in 1963, at the request of President John F. Kennedy, to enlist the American bar's leadership and resources in defending the civil rights of racial and ethnic minorities. Through the Lawyers' Committee, attorneys have represented thousands of clients in civil rights cases across the country challenging discrimination in virtually all aspects of American life.  In furtherance of its commitment to challenge policies that discriminate against immigrants and refugees, the Lawyers'

---

[1] Pursuant to Supreme Court Rule 37.6, counsel for *amici* represent that they authored this brief in its entirety and that none of the parties or their counsel, nor any other person or entity other than *amici* or their counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

Pursuant to Rule 37.3(a), counsel for *amici* also represent that all parties have consented to the filing of this brief; letters reflecting their blanket consent to the filing of *amicus* briefs are on file with the Clerk.

[2] A list of the 42 other social justice organizations as *amici curiae* is set forth below in the Appendix at 1a.

2

Committee has filed numerous lawsuits and submitted six *amicus* briefs in in support of challenges to DACA's rescission, including in all three cases currently before the Court.

Anti-Defamation League ("ADL"), founded in 1913, is an anti-hate organization that seeks to stop the defamation of the Jewish people, and secure justice and fair treatment to all. Its 25 regional offices further this mission with programmatic support to promote civil rights and combat all forms of bigotry. ADL is rooted in a community that has experienced the plight of living as refugees throughout its history. ADL has advocated for fair and humane immigration policy since its founding and has been a leader in exposing anti-immigrant and anti-refugee fervor that has poisoned our nation's debate. Consistent with its principles and values, ADL joins this brief.

The Leadership Conference on Civil and Human Rights ("The Leadership Conference") is a diverse coalition of more than 200 national organizations charged with promoting and protecting the civil and human rights of all persons in the United States, including immigrants. It is the nation's largest and most diverse civil and human rights coalition. For more than half a century, The Leadership Conference, based in Washington, D.C., has led the fight for civil and human rights by advocating for federal legislation and policy, securing passage of every major civil rights statute since the Civil Rights Act of 1957. The Leadership Conference works to build an America that is inclusive and as good as its ideals.

*Amici* are particularly well suited to offer assistance to the Court based on their experience working with and in immigrant communities of color including those affected by the rescission of DACA. *Amici* have

**AR6022**

3

observed firsthand the ways in which DACA has improved the lives of undocumented young people and enabled them to make significant social and economic contributions that have made our country greater.

## INTRODUCTION

The Department of Homeland Security ("DHS" or the "Department") failed to consider serious reliance interests engendered by the Deferred Action for Childhood Arrivals ("DACA") program prior to termination, in violation of the Administrative Procedures Act ("APA"). In this brief, *amici* seek to highlight some of the significant commitments in education, investments in home ownership, and service to our military program that participants have made in reliance on DACA.

The DACA program, announced on June 15, 2012, provided eligible undocumented immigrants protection from deportation and made them eligible for work authorization subject to approval of an initial application and renewal every two years thereafter. The policy's coverage was limited in scope to individuals under the age of thirty-one present in the country on or after June 12, 2012 who arrived in the United States before the age of sixteen. Thus, while the DACA program was available to only eligible individuals in the United States prior to June 2012, foreign-born persons who entered after this time are ineligible.

Imbued with the spirit of the American dream, and in reliance on the DACA program, enrollees have made substantial investments in themselves, their families, and their communities. Contrary to the government's assertion in its brief to this Court (*e.g.*, Pet. Br. 46), the DACA enrollees are *not* engaged in

**AR6023**

4

"ongoing illegal activity" or "ongoing violation of federal law." To the contrary, under DACA and with the government's permission, enrollees are *legally* engaged in educational, tax-paying, teaching, and military activities. *See, e.g.,* Case No. 18-589 Pet. App. 115a ("[H]undreds of thousands of DACA recipients and those close to them planned their lives around the program.").

Without any consideration for these substantial reliance interests engendered by DACA over the last several years, the Department abruptly terminated the program. In doing so, the government upended the lives of nearly 700,000 productive young adults, their families, and their communities. These DACA recipients, in an effort to play by the rules, came out of the shadows to enroll in the program.

The APA's requirements are designed to protect against arbitrary and capricious reversals or terminations of policies and programs that induce serious reliance interests of the type found here. With the government's encouragement, DACA enrollees invested in job-specific training programs, enrolled in universities, obtained jobs as educators, purchased homes, and enlisted in the military in service of our country. In turn, educational institutions, local communities, and employers invested in and have come to rely on the substantial benefits provided by DACA enrollees. Yet the administrative record is void of any mention, let alone consideration of these interests.

The government's complete failure to consider such serious reliance interests before abruptly rescinding DACA is the hallmark of arbitrary and capricious conduct.

**AR6024**

5

## ARGUMENT

### I. THE GOVERNMENT WAS REQUIRED TO CONSIDER RELIANCE INTERESTS PRIOR TO TERMINATING DACA

In its opening brief, the government argues that the decision to rescind DACA is an unreviewable discretionary act, even though the justification offered was that the program lacked proper statutory authority and was therefore illegal.  This argument is unavailing.  "[A]n official cannot claim that the law ties her hands while at the same time denying the courts' power to unbind her." *NAACP v. Trump*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018).  Indeed, Acting Secretary of Homeland Security Duke's proffered rationale for the rescission of DACA – that DHS did not have the authority to institute DACA in the first place – placed its decision squarely within the bounds of an "agency action" reviewable under the APA. *Regents of Univ. of Cal. v. DHS*, 908 F.3d 476, 494-498 (9th Cir. 2018) (citing *City of Arlington v. FCC,* 569 U.S. 290 (2013)).

Under Section 706(2)(A) of the APA, federal courts may review and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Here, DHS violated core principles governing its actions under the APA.  The Department abused its discretion because it "entirely failed to consider an important aspect of the problem," namely the impact of its policy change on the hundreds of thousands of DACA enrollees who would be directly affected by the decision. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**AR6025**

6

Although agencies are free to change their existing policies, they must provide a reasoned explanation for a policy change, where that change implicates serious reliance interests:

> *In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken in account.* In such cases it is not that further justification is demanded by the mere fact of policy change; but that *a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy*. It follows that an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.

*Encino Motor Cars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-2126 (2016) (emphasis added).

This Court's opinion in *Perez v. Mortgage Bankers Association* is also instructive on the importance of reliance in APA cases:

> The APA contains a variety of constraints on agency decision making—the arbitrary and capricious standard being among the most notable. . . . *[T]he APA requires an agency to provide more substantial justification* when 'its new policy rests upon factual findings that contradict those which underlay its prior policy; or *when prior policy has engendered serious reliance interests that must be taken into account. It would be arbitrary and*

7

*capricious to ignore such matters* (citations omitted).

135 S. Ct. 1199, 1209 (2015) (emphasis added). *See also Smiley v. Citibank (South Dakota), NA*, 517 U.S. 735, 742 (U.S. 1996) (citations and quotations omitted) ("Sudden and unexplained change or change that does not take account of legitimate reliance on prior interpretation may be arbitrary, capricious or an abuse of discretion.").

Here, as the lower courts repeatedly found, DHS failed entirely to consider the reliance interests of the DACA enrollees, their employers, and their communities. *See* Case No. 18-587, Pet. App. 60a ("As [in *Encino*], the administrative record here includes no analysis of the 'significant reliance issues involved.'. . . The administrative record includes no consideration to the disruption a rescission would have on the lives of DACA recipients, let alone their families, employers and employees, schools and communities.") (Alsup, J.); Case No. 18-588, Pet. App. 54a ("The Rescission Memo made no mention of the fact that DACA had been in place for five years and had engendered the reliance of hundreds of thousands of beneficiaries, many of whom had structured their education, employment, and other life activities on the assumption that they would be able to renew their DACA benefits.") (Bates, J.); Case No. 18-589, Pet. App. 114a ("The record does not indicate that Defendants acknowledged, let alone considered, these or any other reliance interests engendered by the DACA program.   That alone is sufficient to render their supposedly discretionary

8

decision to end the DACA program arbitrary and capricious.") (Garaufis, J.).[3]

The reliance by DACA enrollees was certainly reasonable.  DACA did not guarantee a "substantive right, immigration status or pathway to citizenship" as the government emphasizes.  Pet. Br. 5. But deferred action enabled and incentivized individuals to pursue schooling, jobs, investments, tax-payment, military service, and home ownership.  These are not "ongoing illegal activit[ies]," Pet. Br. 46, but rather the activities that DACA enrollees have earned under the program. No court has determined that the reliance under DACA to do these things was unreasonable. Indeed, as Judge Nicholas Garaufis of the U.S. District Court for the Eastern District of New York found, "it is obvious that hundreds of thousands of DACA recipients and those close to them planned their lives around the program." Case No. 18-589, Pet. App. 115a.

The original DACA policy: (i) was not challenged in the DAPA litigation before this divided Court; (ii) was supported by an opinion of the Office of Legal Counsel[4]; and (iii) has not been found to violate the Constitution.

---

[3] The Texas court, which previously ruled that DAPA was illegal, concluded that reliance interests were so significant that a preliminary injunction should not issue against DACA. *Texas v. United States*, 328 F. Supp. 3d 662, 742 (S.D. Tex. 2018) ("[T]he reality of the situation is that [DACA] conferred lawful presence and numerous other benefits, and many DACA recipients and others nationwide have relied upon it for the last six years.").  The court specifically noted (a) DACA recipients' loss of benefits that flow from lawful presence, and (b) loss of employees to various schools, states, municipalities, employers and industries. *Id.*

[4] *See* Dep't of Justice Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op. O.L.C. (2014).

9

These observations further support the recipients' reasonable reliance on the program to build successful lives in this country.

In its opening brief, the government argues that DHS "sufficiently considered the reliance interests of DACA recipients" in rescinding the program. Pet. Br. 42. Specifically, it points to the wind-down period set out in the Duke Memorandum, which permitted existing DACA grants "to expire according to their stated two-year terms" and purportedly "allow[ed] a limited window for additional renewals." *Id.* But neither those provisions of the Duke Memorandum nor any others reference the serious reliance interests engendered by DACA. *See* Case No. 18-587, Pet. App. 117a-118a. Indeed, *nowhere in the administrative record* are the reliance interests of the nearly 700,000 DACA enrollees mentioned. There are no studies, calculations, or analyses. And in fact, the "wind-down" period appears to have been designed to benefit the Department, not DACA enrollees, whose interests are not mentioned *anywhere* in the Duke Memorandum. *See* Joint App. 878 (Sessions Memorandum recommending a wind-down to address the "costs and burdens *that will be imposed on DHS* associated with rescinding this [DACA] policy.") (Emphasis added); *see also* Case No. 18-589, Pet. App. 117a ("While the Acting Secretary stated that she '[r]ecogniz[ed] the complexities associated with winding down the program,' the Sessions Letter makes clear that these complexities referred to the burdens on DHS of winding down the DACA program.").

The government also points to Secretary Nielsen's subsequent memorandum in which she stated that she did not take the DACA rescission "lightly" and referenced "sympathetic circumstances" of DACA

10

recipients. Pet. Br. 42. But lip service in a *post-hoc* rationalization does not provide the reasoned analysis of the serious reliance interests engendered by the DACA program, as required by the APA. *See* Case No. 18-587, Pet. App. 125a; *see also, e.g., FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) ((("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay . . . the prior policy.").

As Judge Bates explained astutely:

> [T]he Nielsen Memo—like the Duke Memo before it—fails to engage meaningfully with the reliance interests and other countervailing factors that weigh against ending the program . . . .

> Although this time around the Nielsen Memo at least "acknowledge[s] how heavily DACA beneficiaries had come to rely on" the program, id., it does little more than that. Instead of considering DACA's benefits to DACA recipients and to society at large, Secretary Nielsen simply states that "the asserted reliance interests" are outweighed by DACA's "questionable legality . . . and the other reasons for ending the policy," and then goes on to suggest that she should not even have to consider those interests . . . .

> Like the Duke Memo, the Nielsen Memo demonstrates no true cognizance of the serious reliance interests at issue here—indeed, it does not even identify what those interests are.

Case No. 18-588, Pet. App. 106a-107a. Such "[a]n 'unexplained inconsistency' in agency policy indicates that the agency's action is arbitrary and

**AR6030**

11

capricious, and therefore unlawful." *Jimenez–Cedillo v. Sessions,* 885 F.3d 292, 298 (4th Cir. 2018) (quoting *Encino Motor Cars*, 136 S. Ct. at 2125).

The following section sets forth several serious reliance interests engendered by DACA enrollees that the government was required to consider prior to rescinding the DACA policy, but instead ignored.

## II. DACA ENGENDERED SERIOUS RELIANCE INTERESTS THAT THE GOVERNMENT FAILED TO CONSIDER

Since its inception, nearly 800,000 DACA enrollees invested in their education and job training, purchased homes, and enlisted in the military in reliance on the understanding that their right to remain in the United States would not be rescinded without proper consideration of the consequences of rescission – or used solely as a political bargaining chip.[5]  *See* Pet. App. 12a–13a (793,026 enrollees, with 689,800 active as of September 2017).

The Department is the responsible agency for adjudicating the rights of persons to remain on American soil, and "the rulings, interpretations and opinions of the responsible agency, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which litigants may properly resort for guidance."  *U.S. v.*

---

[5]  Annie Karni and Sheryl Gay Stolberg, *Trump Offers Temporary Protections for 'Dreamers' in Exchange for Wall Funding*, N.Y. Times (Jan. 9, 2019), https://www.nytimes.com/2019/01/19/us/politics/trump-proposal-daca-wall.html. The government's brief to this Court acknowledges that DACA is a possible tradeoff in a deal with Congress (*see* Pet. Br. 32 and 39), although the Administration has hardly exercised "executive restraint" on many matters pertaining to immigration.

12

*Penn. Indus. Chem. Corp.*, 411 U.S. 655 (1973) (quotations omitted).  It was around this guidance that the DACA recipients planned their lives moving forward in the United States.

By explicitly targeting "productive young people,"[6] the federal government plainly contemplated that DACA enrollees would be contributing members of our society and that the nation would benefit from their social and economic efforts.  With the opportunity to advance their lives through education, employment, and homeownership, DACA enrollees have been induced by the promise of being able to achieve financial security for themselves and their families – and to be part of the fabric of America.  And it is on the basis of this promise that childhood arrivals revealed themselves to the government and submitted to a rigorous application and background check process, the cost of which was borne by the applicant. Indeed, there were individuals who opted not to apply to the DACA program on the basis that they could not afford the significant application fee or because of the program requirement to provide personal and private information to the federal government.[7]

The states and the federal government, in turn, would benefit from an increased population of productive, legally employable workers, who pay taxes and

---

[6] *See* Memorandum from Janet Napolitano, Sec'y of Homeland Sec., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[7] *See* New American Economy, Overcoming the Odds: The Contributions of DACA-Eligible Immigrants and TPS Holders to the U.S. Economy (May 2019), https://www.newamericaneconomy.org/wp-content/uploads/2019/05/DACA-TPS_Brief.pdf.

13

make significant contributions to the economy. And, indeed, they have. "DACA enrollees and their households pay $5.7 billion in federal taxes and $3.1 billion in state and local taxes annually."[8] The termination of DACA will only place further strain on states and local communities that were already under economic pressure.

The Department's failure to consider such reliance interests, let alone provide an "analysis" of its action "is arbitrary and capricious and so cannot carry the force of law." *Encino Motor Cars*, 136 S. Ct. at 2125.

## A. Reliance Interests of DACA Students, Educators and Educational Institutions

It is indisputable that access to education is vitally important to all persons in the United States—whether citizens, lawful resident aliens, or undocumented persons. *See Plyler v. Doe*, 457 U.S. 202, 226 (1982). In *Plyler*, this Court ruled that undocumented school age children had a constitutional right to a free public education. *Id.* ("Education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all . . . "[e]ducation has a fundamental role in maintaining the fabric of our society." Because of *Plyler*, generations of undocumented persons have succeeded in school and integrated into the American culture.

The DACA program has had the practical effect of extending the rationale of *Plyler* to post-secondary education. By relying on the rights granted by DACA, tens of thousands of undocumented persons have

---

[8] Nicole Svjlenka, *What We Know About DACA Recipients in the United States*, Ctr. for Amer. Progress, (Sept. 5, 2019), https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states/.

14

gained access to and invested substantial time and money in a college education. And many of those persons, once educated, have entered the workforce as teachers, giving back to their communities.

DACA teachers, in particular, are a significant asset to our nation's public schools, especially in cities with large, immigrant student populations. An estimated 20,000 DACA recipients are employed as educators throughout the U.S., and many of them possess in-demand bilingual language skills.[9] There is currently a severe shortage nationally of teachers in the public education sector, estimated to be as high as 327,000.[10] The consequences of a shortage in public educators are well known: larger class sizes, fewer teacher aides, fewer guidance counselors, and fewer extra-curricular activities.

Further, in the past few decades, the racial makeup of the country's student population has drastically shifted, but the overwhelming majority of public school teachers continue to be white.[11] Public schools have

---

[9] Moriah Balingit, *As DACA Winds Down, 20,000 Educators Are in Limbo*, Wash. Post (Oct. 25, 2017), https://www.washingtonpost.com/local/education/as-daca-winds-down-20000-educators-are-in-limbo/2017/10/25/4cd36de4-b9b3-11e7-a908-a3470754bbb9_story.html (citing data provided by the Migration Policy Institute); *see also* Greg Toppo, *20,000 DACA Teachers At Risk — and Your Kids Could Feel the Fallout, Too*, USA Today (Oct. 11, 2017,), https://www.usatoday.com/story/news/2017/10/11/thousands-daca-teachers-risk/752082001/.

[10] Elise Gould, *Local Public Education Employment May Have Weathered Recent Storms, But Schools Are Still Short 327,000 Public Educators*, Econ. Pol'y. Inst. (Oct. 6, 2017), http://www.epi.org/publication/teacher-employment-may-have-weathered-storms-but-schools-are-still-short-327000-public-educators/.

[11] "Racial and ethnic minorities accounted for 20% of all public elementary and secondary school teachers in the United States

15

seen increased enrollment by students of color, especially by Latinos.[12] By 2025, it is expected that a majority of high school graduates will be students of color.[13] DACA has allowed schools to recruit qualified teachers serving students of diverse backgrounds.

DACA teachers do much more than just fill available positions; they also serve as mentors and role models. For many communities, DACA teachers mirror the experiences of their immigrant students, which informs their teaching with cultural competence, helps develop positive relationships with students, and creates more welcoming school environments.[14] "Foreign-born teachers not only educate Americans, but also serve as cultural ambassadors for immigrant students who may not be as familiar with American traditions, customs, and social norms."[15]

---

during the 2015-16 school year." A.W. Geiger, *America's Public School Teachers Are Far Less Racially And Ethnically Diverse Than Their Students*, Pew Research Center (Aug. 27, 2018), https://www.pewresearch.org/fact-tank/2018/08/27/americas-public-school-teachers-are-far-less-racially-and-ethnically-diverse-than-their-students/.

[12] Alice Yin, *Education by the Numbers*, N.Y. Times (Sept. 8, 2017), https://www.nytimes.com/2017/09/08/magazine/education-by-the-numbers.html.

[13] *Id.*

[14] Lisette Partelow, *America Needs More Teachers of Color*, Ctr. for Amer. Progress (Sept. 14, 2017), https://www.americanprogress.org/issues/education-k-12/reports/2017/09/14/437667/america-needs-teachers-color-selective-teaching-profession/.

[15] Yukiko Furuya et al., *A Portrait of Foreign-Born Teachers In The United States,* George Mason University, Institute for Immigration Research (Jan. 2019), https://www.immigrationresearch.org/system/files/Teacher_Paper.pdf.

16

Viridiana Carrizales, who led the DACA Initiative at Teach or America, aptly noted that "[w]e cannot afford to lose so many teachers and impact so many students . . . [e]very time a student loses a teacher, that is a disruption in the student's learning."[16] As Vanessa Luna, a DACA recipient who taught as a Teach for America teacher and now serves as the Co-Founder and Chief Programming Officer at ImmSchools, explains: "We're going to lose leaders and lose teachers – it's not only their presence, but having a teacher that can share the same experiences that you possibly had growing up. . . . Their advocacy, their leadership, their resilience is extraordinary because of their own personal journey."[17]

School environments with DACA educators help reflect the diversity of communities, the country, and the world, which, in turn, helps open students' minds to new perspectives and actively engage them in learning. Prejudice and bias are countered in schools and communities when respect for diversity is taught, modeled, and experienced firsthand by children.[18] The loss of 20,000 DACA teachers will cause severe and lasting harm to students and their educational trajectories, and more broadly our country, which depends on the great talent of future generations.

---

[16] *See* Toppo, *supra* n.9.

[17] Liz Robbins, *For Teachers Working Through DACA, a Bittersweet Start to the School Year*, N.Y. Times (Sept. 7, 2017), https://www.nytimes.com/2017/09/07/nyregion/daca-teachers.html.

[18] Anti-Defamation League (ADL), *Creating an Anti-Bias Learning Environment*, https://www.adl.org/education/resources/tools-and-strategies/creating-an-anti-bias-learning-environment.

17

In *Plyler*, the Court made an observation that is apt for the present DACA revocation:

> In determining the rationality of § 21.031 [denying access to school to undocumented persons], we may appropriately take into account its costs to the Nation and to the innocent children who are its victims. In light of these countervailing costs, the discrimination contained in §21.031 can hardly be considered rational unless it furthers some substantive goal of the State.

Here, as in *Plyler*, the federal government failed to consider the profound reliance interests and costs to DACA recipients and their educational communities around the nation resulting from the rescission of DACA.

### B. DACA Enrollees Purchased Homes and Lending Institutions Extended Loans in Reliance on DACA

Homeownership has long been recognized as an integral part of the American dream. Indeed, the federal government and its agencies have developed programs and marketing around that well-accepted precept.[19] DACA put that dream within reach for enrollees and provided them an opportunity to achieve financial security for themselves and their families and contribute to the economic stability of their communities through homeownership. They made these significant and life changing investments in reliance on DACA.

---

[19] *See, e.g.*, U.S. Dep't of Housing and Urb. Dev., *The National Homeownership Strategy: Partners in the American Dream* (1995).

18

The online real estate database company Zillow estimates that 123,000 DACA enrollees are home-owners and, indeed, purchased their homes *after* their DACA applications had been approved.[20]  Similarly, a survey of DACA recipients conducted by the Center for American Progress found that 19 percent of respond-ents age 25 and older purchased their first home after being granted DACA.[21]

DACA made it possible for these individuals to establish roots and purchase homes thanks to access to credit, which was previously unavailable to them. Lending institutions extended this credit and offered mortgages to enrollees in complete reliance on DACA. In relying on the same, DACA participants make $613.8 million in annual mortgage payments.  These transactions and their underlying commitments were based on the fundamental understanding that the government would not, without due consideration, terminate the program and upend the lives of tens of thousands of individuals.

Further, through homeownership, DACA recipients "pay an estimated $380 million a year in property taxes to their communities."[22]  As tenants, DACA

---

[20] Alexander Casey, *An Estimated 123,000 'Dreamers' Own Homes and Pay $380M in Property Taxes*, Zillow (Sept. 20, 2017), https://www.zillow.com/research/daca-homeowners-380m-taxes-16629/.

[21] Tom K. Wong et al.**,** *DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November***,** Ctr. For Am. Progress (Sept. 19, 2019), https://www.americanprogress.org/iss ues/immigration/news/2019/09/19/474636/daca-recipients-livelih oods-families-sense-security-stake-november/.

[22] *See* Casey, *supra* n.20.

**AR6038**

19

enrollees contribute $2.3 billion in rental payments annually. Communities that benefit, even depend, on the property tax revenues from these DACA recipient homeowners will, in turn, be financially upended.

Creating a pathway to homeownership is particularly important for communities of color that continue to suffer as a result of the widening racial and ethnic wealth gap in this country. Owning a home is often the largest investment families make. Yet, only 47 percent of Hispanics own a home compared to 73 percent of whites.[23] DACA allowed undocumented immigrants who had previously faced barriers to homeownership because of their status to accumulate long-term wealth and security in reliance on the government's representations and DACA's promulgation. The government's decision to rescind DACA threatens to strip these individuals of their most valuable investments without any consideration of their reliance interests.

### C. Promises of "Expedited Citizenship" for DACA Enrollees Serving Vital Military Interests

DACA enrollees have also relied on a military program established in 2008 that provides the promise of "expedited citizenship" opportunities in exchange for service vital to the national interest. The Military Accessions Vital to the National Interest ("MAVNI") program offers fast-tracked citizenship review for enrollees, "whose skills are considered to be vital to the national interest," such as "physicians, nurses, and

---

[23] U.S. Census Bureau, *Quarterly Residential Vacancies And Homeownership, Fourth Quarter 2017* (Jan. 30, 2018), https://www.census.gov/housing/hvs/files/currenthvspress.pdf.

AR6039

20

certain experts in language with associated cultural backgrounds."[24]

The Defense Department's MAVNI materials entice recruits with the "opportunity of early citizenship" to "recognize their contribution and sacrifice." *Id.* at 2. According to a Defense Department MAVNI fact sheet, "[t]he Law ensures" that such contribution and sacrifice be recognized. *Id.* In testimony to Congress, the Defense Department made clear the benefit from service in the MAVNI program: "This program recruits legal non-citizens with critical foreign language and cultural skills, as well as licensed healthcare professionals, *and as an additional incentive*, they receive expedited U.S. citizenship processing in return for their service."[25]

Beginning in 2014, the Defense Department granted DACA enrollees eligibility to apply for the MAVNI program.[26]   At the time of rescission, the Defense Department estimated that up to 900 DACA recipients were either serving or had signed contracts to serve through MAVNI.[27]

---

[24] *See* Dep't of Def., Military Accessions Vital to National Interest (MAVNI) Recruitment Pilot Program, https://www.defense.gov/news/MAVNI-Fact-Sheet.pdf.

[25] Statement of Nancy E. Weaver, Department of Defense Senior Language Authority, Before the House Armed Services Committee Subcommittee on Oversight and Investigations, June 29, 2010, http://prhome.defense.gov/Portals/52/Documents/RFM/Readiness/DLNSEO/docs/Weaver%20Testimony%20062910.pdf (emphasis added).

[26] *See* MAVNI Fact Sheet, *supra* n. 24.

[27] Alex Horton, *The Military Looked to 'Dreamers' to Use Their Vital Skills. Now the U.S. Might Deport Them.* Wash. Post (Sept. 7, 2017), https://www.washingtonpost.com/news/checkpoint/wp/

21

DACA enlistees in the MAVNI program have been left in limbo by the government's decision to rescind DACA, not knowing whether they will be permitted to carry out their service or be deported, let alone receive early citizenship review as promised.   Moreover, DACA enlistees in MAVNI have provided extensive information to the federal government through the enrollment process and are in constant contact with the military (or are already in service), making them particularly vulnerable to deportation proceedings. Worse still, deportation could result in enrollees facing the most serious of consequences, including "harsh treatment or interrogation" by foreign adversaries.[28]

The administrative record is devoid of any consideration whatsoever of the military's promises and the reliance thereon by DACA enrollees in the MAVNI program.   Termination of the DACA program without consideration of these serious reliance interests and those described above is arbitrary and capricious under the APA.

---

2017/09/07/the-military-looked-to-dreamers-to-use-their-vital-skills-now-the-u-s-might-deport-them/.

[28] *See id.*

22

**CONCLUSION**

For the foregoing reasons, *amici* urge this Court to affirm the decisions of the lower courts to enjoin the rescission of DACA.

Respectfully Submitted,

| | |
|---|---|
| KRISTEN CLARKE | WILLIAM D. COSTON |
| JON GREENBAUM | *Counsel of Record* |
| DARIELY RODRIGUEZ | MARTIN L. SAAD |
| DORIAN SPENCE | SAMEER P. SHEIKH |
| PHYLICIA H. HILL | VENABLE LLP |
| MARYUM JORDAN | 600 Massachusetts Ave NW |
| LAWYERS' COMMITTEE FOR | Washington, DC 20001 |
|   CIVIL RIGHTS UNDER LAW | (202) 344-4813 |
| 1500 K Street NW, Suite 900 | wdcoston@venable.com |
| Washington, DC 20005 | |
| (202) 662-8600 | |

*Counsel for Amici Curiae*

October 4, 2019

**AR6042**

**APPENDIX**

AR6043

1a

**APPENDIX: LIST OF *AMICI CURIAE***

**42 Other Social Justice Organizations**

1. Advocates for Youth

2. Andrew Goodman Foundation

3. Arab American Institute

4. Asian & Pacific Islander American Health Forum

5. The Asian American Legal Defense and Education Fund

6. Bend the Arc: A Jewish Partnership for Justice

7. Center for Responsible Lending

8. Center for the Study of Hate & Extremism

9. Coalition for Disability Health Equity

10. Disability Rights Education & Defense Fund

11. Equal Justice Society

12. Equality California

13. Farmworker Justice

14. Hispanic National Bar Association

15. Human Rights Campaign

16. In Our Own Voice: National Black Women's Reproductive Justice Agenda

17. Jewish Council for Public Affairs

18. Juvenile Law Center

19. League of Women Voters of the United States

20. Legal Aid at Work

21. Matthew Shepard Foundation

22. The Mississippi Center for Justice

**AR6044**

2a

23. National Association of Human Rights Workers

24. National Center for Lesbian Rights

25. National Coalition for Asian Pacific American Community Development

26. National Council on Independent Living

27. National Employment Law Project

28. National Employment Lawyers Association

29. National Heath Law Program

30. National Hispanic Media Coalition

31. National Partnership for Women & Families

32. National Women's Law Center

33. OCA - Asian Pacific American Advocates

34. People For the American Way Foundation

35. Self-Help Federal Credit Union

36. Silver State Equality-Nevada

37. The Southern Poverty Law Center

38. The Employee Rights Advocacy Institute for Law & Policy

39. The Sikh Coalition

40. UnidosUS

41. Voto Latino

42. Young Women's Christian Association USA

AR6045

Nos. 18-587, 18-588, 18-589

IN THE

# Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Petitioners*,

—v.—

REGENTS OF THE UNIVERSITY OF CALIFORNIA, *et al.*,

*Respondents*.

(*Caption continued on inside cover*)

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT
OF APPEALS FOR THE NINTH, DISTRICT OF COLUMBIA AND SECOND CIRCUITS

## BRIEF OF *AMICI CURIAE* 127 RELIGIOUS ORGANIZATIONS IN SUPPORT OF RESPONDENTS

STEVEN A. ZALESIN
  *Counsel of Record*
ADEEL A. MANGI
MICHAEL N. FRESCO
MOHAMMED A. BADAT
PATTERSON BELKNAP WEBB
  & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
sazalesin@pbwt.com

FARHANA KHERA
JUVARIA KHAN
MUSLIM ADVOCATES
P.O. Box 34440
Washington, DC 20043
(202) 897-2622

*Attorneys for Amici Curiae*

AR6046

———————————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, *et al.*,

—v.—

*Petitioners,*

NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

———————————

*Respondents.*

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, *et al.*,

*Petitioners,*

—v.—

MARTIN JONATHAN BATALLA VIDAL, *et al.*,

*Respondents.*

**AR6047**

i

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES..........................................ii

INTERESTS OF AMICI CURIAE ............................1

SUMMARY OF THE ARGUMENT ...........................5

ARGUMENT   .............................................................7

I.   RELIGIOUS ORGANIZATIONS SUPPORT DACA AS A JUST RESPONSE TO A HUMANITARIAN CRISIS ...............................................................7

II.   TERMINATION OF DACA WILL CAUSE AMICI, THEIR CONGREGATIONS, AND THEIR COMMUNITIES IRREPARABLE HARM AND POSES A GRAVE THREAT TO PUBLIC WELFARE............................. 12

    A.   Direct Harm to Amici and Their Congregants ......................................... 13

    B.   Impairment of Amici's Ability to Carry out Their Missions.................... 19

    C.   As Sensitive Locations for Immigration Enforcement Purposes, Some Amici Will Be Called upon to Provide Sanctuary While at the Same Time Risking Being Targeted for Immigration Raids.................................................... 20

CONCLUSION ....................................................... 25

AR6048

ii

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Hawaii v. Trump,*
859 F.3d 741 (9th Cir.), vacated on
other grounds by *Trump v. Hawaii,*
138 S. Ct. 377 (2017)............................................19

*Kalaw v. Ferro,*
651 F. Supp. 1163 (W.D.N.Y. 1987) ...................17

*Nunez v. Boldin,*
537 F. Supp. 578 (S.D. Tex. 1982) ......................16

*Valle Del Sol Inc. v. Whiting,*
732 F.3d 1006 (9th Cir. 2013).............................19

**Statutes**

Administrative Procedure Act ...................................7

**Other Authorities**

Alex Emmons, The Intercept, *Targeting
a Sanctuary: After ICE Stakes Out a
Church Homeless Shelter, Charities
Worry Immigrants Will Fear Getting
Help,*
https://theintercept.com/2017/02/27/a
fter-ice-stakes-out-a-church-
homeless-shelter-charities-worry-
immigrants-will-fear-getting-help/
(Feb. 27, 2017)....................................................23

**AR6049**

iii

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

American-Islamic Relations, *CAIR Condemns Trump's Termination of DACA Program as 'Pandering to Anti-Immigrant Extremists'*, https://www.cair.com/press-center/press-releases/14582-cair-condemns-trump-s-termination-of-daca-program-as-pandering-to-anti-immigrant-extremists.html (Sept. 5, 2017) ....................................................10

CBS News, *Undocumented immigrant, father of leukemia patient, takes refuge in Phoenix church*, https://www.cbsnews.com/news/undocumented-immigrant-father-of-leukemia-patient-takes-refuge-in-phoenix-church/ (Feb. 12, 2018, 7:20 AM) ..............................................22

95.1 Chicago, *Amid Deportation Push, Suburban Church Grapples with Loss*, https://www.wbez.org/shows/wbez-news/amid-deportation-push-suburban-church-grapples-with-loss/3d269fc3-04e7-4604-bae4-a376a37410c9 (Feb. 15, 2016) ...........................24

AR6050

iv

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

U.S. Immigration and Customs
   Enforcement, FAQ on Sensitive
   Locations and Courthouse Arrests:
   Does ICE's policy sensitive locations
   policy remain in effect?,
   https://www.ice.gov/ero/enforcement/
   sensitive-loc ........................................................21

Julie Carey, NBC Washington, *ICE*
   *Agents Arrest Men Leaving Fairfax*
   *County Church Shelter*,
   https://www.nbcwashington.com/new
   s/local/ICE-Agents-Arrest-Men-
   Leaving-Alexandria-Church-Shelter-
   413889013.html (Feb. 15, 2017) ..........................23

KVIA, *Which places are considered*
   *'sensitive locations'?*,
   http://www.kvia.com/crime/which-
   places-are-considered-sensitive-
   locations/338319025 (Feb. 16, 2017) ..................25

Memorandum from John Morton,
   Director, U.S. Immigration and
   Customs Enforcement to Field Office
   Directors, Special Agents in Charge,
   and Chief Counsel (Oct. 24, 2011),
   https://www.ice.gov/doclib/ero-
   outreach/pdf/10029.2-policy.pdf...........................20

**AR6051**

v

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>Page(s)</u>

Qué Pasa Mi Gente, *Arrestos de ICE
cerca de escuela elemental de
mayoría hispana*,
https://charlotte.quepasanoticias.com
/noticias/ciudad/local/arrestos-de-ice-
cerca-de-escuela-elemental-de-
mayoria-hispana (Feb. 9, 2017)...........................24

Religious Action Center of Reform
Judaism, *Reform Jewish Movement
Assails White House Targeting of
Immigrant Youth*,
https://rac.org/reform-jewish-
movement-assails-white-house-
targeting-immigrant-youth
(Sept. 5, 2017) .....................................................10

Sanctuary Movement,
http://www.sanctuarynotdeportation.
org/.......................................................................11

Sup. Ct. R. 37.6.............................................................1

**AR6052**

vi

## TABLE OF AUTHORITIES
### (continued)

Page(s)

Tina Vasquez, Rewire, *Have Trump's Mass Deportations Begun? Immigration Arrests Reported Around the Country*, https://rewire.news/article/2017/02/10/trumps-mass-deportations-begin-immigration-arrests-reported-around-country/ (Feb. 10, 2017) ..........................24

U.S. Dep't of Homeland Security, Statement by Secretary Jeh C. Johnson on Southwest Border Security, https://www.dhs.gov/news/2016/02/02/statement-secretary-jeh-c-johnson-southwest-border-security (Feb. 2, 2016) ....................................................................21

*USCCB President, Vice President and Committee Chairmen Denounce Administration's Decision to End DACA and Strongly Urge Congress to Find Legislative Solution*, http://www.usccb.org/news/2017/17-157.cfm (Sept. 5, 2017)..........................................9

AR6053

## INTERESTS OF *AMICI CURIAE*[1]

Led by the Muslim Bar Association of New York, *amici* are more than 100 U.S. religious or religiously-affiliated organizations who represent a wide array of faiths and denominations. *Amici* include congregations and houses of worship as well as professional, civil liberties, and immigrant rights groups who work with or represent faith communities ("Religious Organizations"). *Amici* have long supported Deferred Action for Childhood Arrivals ("DACA") as a compassionate and appropriate response to the humanitarian crisis posed by the hundreds of thousands of undocumented people brought to this country as children, before they could make choices of their own. *Amici* believe that the arbitrary rescission of DACA will indelibly harm the vitality of their spiritual communities, including by forcing committed members of their congregations and organizations to leave the country or return to the shadows. Indeed, certain *amici* have committed to providing sanctuary to those targeted for deportation.

*Amici* are: Albuquerque Mennonite Church; Albuquerque Monthly Meeting of the Religious Society of Friends (Quakers); The American Association of Jewish Lawyers and Jurists; American

---

[1] Pursuant to Sup. Ct. R. 37.6, counsel for *amici curiae* represent that they have authored the entirety of this brief, and that no person other than the *amici curiae* or their counsel has made a monetary contribution to the preparation or submission of this brief. All parties in each of the three cases have provided consent for *amici curiae* to file this brief.

**AR6054**

2

Baptist Church of the Rochester/Genesee Region; American Baptist Churches of Metropolitan New York; American Friends Service Committee; Ansche Chesed, New York City; American Jewish Committee; Arch Street United Methodist Church; Association of Muslim American Lawyers; Cabrini Immigrant Services of NYC; Campus Ministry of Roman Catholic Archdiocese of New York at Hostos and Bronx Community College of City University of New York; Capital Area Muslim Bar Association; Catholic Charities Community Services of the Archdiocese of New York; Catholic Charities, Trenton, NJ; Catholic Legal Services, Archdiocese of Miami, Inc.; Central Conference of American Rabbis; Church Council of Greater Seattle; Church of Our Redeemer in Lexington, Massachusetts; Church of Our Saviour/La Iglesia de Nuestro Salvador (Cincinnati, Ohio); Congregation Action Network; Congregation B'nai Jeshurun (New York City); Congregation Beit Simchat Torah; Congregation Shaarei Shamayim (Madison, Wisconsin); Congregation of Our Lady of Charity of the Good Shepherd, US Provinces; Council of Churches of the City of New York; Council on American-Islamic Relations (National); Council on American-Islamic Relations – California Chapter; Council on American-Islamic Relations – Michigan Chapter; Council of American-Islamic Relations – New Jersey Chapter; Council of American-Islamic Relations – New York Chapter; Council on American-Islamic Relations – Oklahoma Chapter; Cuba Presbyterian Church (Presbyterian Church, USA), Cuba, New Mexico; Daughters of Charity of St. Vincent de Paul; Degrees of Change; Dominican Development Center; East End Temple (New York City); El Paso Monthly

3

Meeting of the Religious Society of Friends; Emgage; Episcopal City Mission; Episcopal Diocese of Long Island; Episcopal Diocese of Massachusetts; Episcopal Diocese of New York; Episcopal Diocese of Rochester; Episcopal Dioceses of Western Massachusetts; Episcopal Society of Christ Church/The Christ Church Cathedral, Cincinnati, Ohio; Faith in New Jersey; First Congregational Church of Kalamazoo; First Congregational United Church of Christ (Albuquerque, New Mexico); First Unitarian Church of Portland, Oregon; First Unitarian Congregational Society in Brooklyn; New Mexico; Franciscan Friars of the Province of St. Barbara; Global Justice Institute; Ignatian Solidarity Network; Hawaii Conference of the United Church of Christ; Hyattsville Mennonite Church; ICNA Council for Social Justice; Interfaith Alliance of Iowa; Iowa Conference of the United Church of Christ; Islamic Circle of North America; Islamic Society of Central Jersey; Jewish Center for Justice; Keshet; Lab/Shul; Leadership Conference of Women Religious; Legal Advocacy Project of Unitarian Universalist FaithAction of New Jersey; Living Interfaith Church of Lynnwood, WA; Lutheran Immigration and Refugees Service; Maryknoll Office for Global Concerns; Metropolitan New York Synod of the Evangelical Lutheran Church in America; Men of Reform Judaism; Muslim Advocates; Muslim Bar Association of New York; Muslim Public Affairs Council; Muslim Urban Professionals (Muppies); Muslims for Progressive Values; National Advocacy Center of the Sisters of the Good Shepherd; National Council of Jewish Women; NETWORK Lobby for Catholic Social Justice; New Mexico Faith Coalition for Immigrant Justice; New Sanctuary Coalition;

4

New York Annual Conference Immigration Task Force of the United Methodist Church; New York Board of Rabbis; New York Conference United Church of Christ; New York State Council of Churches; New York Yearly Meeting, the Religious Society of Friends (Quakers); Northern California Nevada Conference of the United Church of Christ; Oregon Interfaith Movement for Immigrant Justice; Pacific Northwest Conference of the United Church of Christ; Pax Christi Metro New York; Pax Christi, USA; Presbyterian Church (U.S.A.); Presentation Sisters at Caminando Juntos; Province of St. Mary of the Capuchin Order; Queens Federation of Churches; The Rabbinic Call for Human Rights; The Reform Temple of Forest Hills; Religious Institute; Romemu; San Bernardino Community Service Center, Inc.; Santa Fe Monthly Meeting of the Religious Society of Friends (Quakers); Sisterhood of Salaam Shalom, Society for the Advancement of Judaism; Southwest Conference of the United Church of Christ; St. Andrew Presbyterian Church in Albuquerque, New Mexico; St. Francis Community Services / Catholic Legal Assistance Ministry; St. Luke's Episcopal Church in Long Beach; St. Peter's Church, Evangelical Lutheran Church in America; St. Stephen's Episcopal Church in Boston; Stephen Wise Free Synagogue; Synod of the Northeast PCUSA; T'ruah: Temple Israel of Hollywood (CA); Temple Ner Tamid of Bloomfield, New Jersey; Temple Sinai (Washington, DC); Town and Village Synagogue, New York, New York; Trinity Church Wall Street; Union for Reform Judaism, including Reform Jewish Voice of New York State; Unitarian Universalist Mass Action Network; Unitarian Universalist Service Committee; Unitarian Universalists for

5

Social Justice; United Methodist Women; University Christian Ministry at Northwestern University; Visitation BVM Church in Philadelphia, Pennsylvania; West End Synagogue (New York City); Westminster Presbyterian Church of Santa Fe; Women of Reform Judaism; and The Workmen's Circle.

## SUMMARY OF THE ARGUMENT

Since DACA's inception in 2012, American religious communities of many faiths have supported the program as a just and compassionate response to a moral and humanitarian crisis. The children and young adults eligible for and currently receiving the benefits of DACA status (often referred to as "Dreamers") were, in most cases, brought to this country as children by their parents. They have lived most of their lives in the United States, typically with no memory of any other home. Only young people who have pursued education or served in our military, and have no significant criminal record, are eligible for DACA status. Yet they now face deportation to often dangerous and unfamiliar places, or a life in the undocumented shadows.

*Amici* believe, on the basis of faith and morality, that these children and young adults must be protected. *Amici* therefore offer this brief in support of Respondents in order to address how, in their view, the Government's proposed termination of DACA (the "Termination Memo") would cause irreparable harm and constitute a severe detriment to the public. *Amici* have firsthand knowledge of the valuable contributions to faith and community made

6

by DACA recipients and understand all too well the harm that the termination of DACA would cause. For example, ending DACA would put Nancy, an Associate Rector at *amicus* St. Luke's Episcopal Church in Long Beach, California, who came to the United States from Mexico at age seven, at risk of deportation. *Amici* detail the stories of Nancy and others like her in Section II(A) below to provide the Court with a sample of the lives that are at risk of being upended. *Amici* also know, because of their religious and charitable work in Latin America and other regions, the challenges and dangers these young people face if they are deported.

*Amici* also have a direct stake in these issues beyond their religious concerns and the protection of their congregants. First, *amici* stand to lose the substantial benefits they currently enjoy as a result of the varied contributions that DACA recipients make to their congregations and institutions.

*Second*, if the Termination Memo is carried out and DACA recipients and DACA-eligible individuals are forced into hiding, *amici* will suffer an impairment of their ability to carry out their core mission to provide spiritual guidance and general assistance to people of all backgrounds and faiths.

*Third*, many *amici* have and will continue to offer sanctuary to those facing deportation. *Amici's* churches, mosques, and synagogues are ostensibly designated by U.S. Immigration and Customs Enforcement ("ICE") as sensitive locations to be avoided by enforcement officials, but ICE has shown a growing willingness to target and exploit, rather than

**AR6059**

7

avoid, sensitive locations. *Amici* will be on the front line of this conflict if DACA is rescinded: honoring their convictions to protect DACA recipients will risk ICE raids on or around their houses of worship.

For the reasons set forth herein and in Respondents' and other *amici*'s briefs, *amici* urge the Court to affirm the lower courts' decisions enjoining the implementation of the Termination Memo and holding that it was unlawful.

## ARGUMENT

The lower courts prohibited the Government from proceeding with its planned termination of DACA. In Case Nos. 18-587 and 18-589, the lower courts found that Respondents demonstrated (1) a likelihood of success on the merits of their claims under the Administrative Procedure Act, (2) irreparable harm, and (3) that the balance of equities and the public interest favored injunctive relief. In Case No. 18-588, the lower court vacated the Termination Memo, finding that it was arbitrary and capricious. *Amici* endorse the lower courts' holdings and the arguments set forth by Respondents, and submit this brief to further illustrate the irreparable harm that implementation of the Termination Memo would cause.

## I. RELIGIOUS ORGANIZATIONS SUPPORT DACA AS A JUST RESPONSE TO A HUMANITARIAN CRISIS

*Amici* object to the Government's arbitrary and ill-reasoned decision to rescind DACA on moral, spiritual, and religious grounds. Although they

8

represent different faiths and denominations, *amici* are in unequivocal agreement that DACA is a force for good in our society that should be protected. As *amicus* Catholic Charities Community Services of the Archdiocese of New York explains, "DACA is an important first step to acknowledging and growing the human and social contributions and needs of young immigrants and of our own communities."[2] Those who are eligible for DACA or who already benefit from it "were brought to the United States" by their parents, "now have established roots, have built families, have contributed to their communities of faith, work, and family," and their "energy, spirit, life, and heart are part of this nation, which can only benefit from their continued participation."

For many *amici*, these convictions are deeply rooted in their faith and moral principles. Temple Sinai of Washington D.C., for example, believes that "as a Jewish institution, Biblical texts and our Jewish history inform our position on modern day immigration policy. Leviticus 19 explicitly says, 'When a stranger sojourns with you in your land, you shall do him no wrong.'" St. Luke's Episcopal Church in Long Beach, California, similarly states that "for us, this is a biblical rather than a political issue." And as the Catholic mission Maryknoll attests, "recognizing the hardships and struggles of immigrant families, and the tremendous economic

---

[2] Quotes from *amici* herein are drawn from interviews conducted by counsel in November and December 2017 to provide the Court with a fuller understanding of how DACA has impacted American religious communities.

AR6061

9

and social contributions Dreamers make to the United States, we feel it is unethical to send Dreamers back to countries they hardly know, as well as a senseless loss to our nation."

For others still, supporting DACA is part of their social justice mission. Christ Church Cathedral in Cincinnati has, in light of the Government's immigration policy priorities, "focused its social justice concerns on matters of immigration and the impact that deportations or the repeal of DACA will have on God's children."

*Amici* and groups like them have, accordingly, objected vocally to the arbitrary repeal of the DACA program. On September 5, 2017, when the Government announced its decision to terminate DACA, countless religious groups and leaders released statements of condemnation. The United States Conference of Catholic Bishops publicly called the decision "reprehensible," "unacceptable," and "a heartbreaking moment in our history that shows the absence of mercy and good will."[3] *Amicus* Council on American-Islamic Relations described the move as a "heartless action [that] will only serve to create fear and anxiety for the Dreamers and their loved ones, and will force them back to living in the shadows, rendering them unable to contribute to our nation's

---

[3] United States Conference of Catholic Bishops, *USCCB President, Vice President and Committee Chairmen Denounce Administration's Decision to End DACA and Strongly Urge Congress to Find Legislative Solution*, http://www.usccb.org/news/2017/17-157.cfm (Sept. 5, 2017).

economy."[4]   And *amici* Union for Reform Judaism and Central Conference of American Rabbis declared it "morally misguided and poor public policy," noting that "Judaism demands that we welcome the stranger and compels us to work for a just immigration system."[5]

*Amici* agree wholeheartedly with these statements. Rev. Robin Hynicka of *amicus* Arch Street United Methodist Church ("UMC") in Philadelphia, for example, describes the "mythology surrounding why people migrate" as a campaign to "criminalize immigration" and to paint all immigrants as "bad," when in fact the "the real reasons for these migrations are not listened to, considered, or understood." He explains: "From a faith perspective, we take a baptismal vow that states we will resist evil, injustice, and oppression in any form in which it presents itself. The current immigration system and the move to end DACA create unjust circumstances, made manifest in human suffering. The attempt to crack down on Dreamers is a serious, cynical, evil action that has

---

[4] Council on American-Islamic Relations, *CAIR Condemns Trump's Termination of DACA Program as 'Pandering to Anti-Immigrant Extremists'*, https://www.cair.com/press-center/press-releases/14582-cair-condemns-trump-s-termination-of-daca-program-as-pandering-to-anti-immigrant-extremists.html (Sept. 5, 2017).

[5] Religious Action Center of Reform Judaism, *Reform Jewish Movement Assails White House Targeting of Immigrant Youth*, https://rac.org/reform-jewish-movement-assails-white-house-targeting-immigrant-youth (Sept. 5, 2017).

11

nothing to do with safety or justice. We have a theological and moral obligation to oppose these forces."

*Amici* include entities that have taken active steps to protect Dreamers. A nation-wide, interfaith network of communities and congregations known as the New Sanctuary Movement, of which many *amici* are a part, have pledged to stand in solidarity with immigrants facing deportation.[6] These groups provide preparedness training and legal counseling and referrals; accompany individuals to immigration hearings; run awareness programs and panel discussions; and conduct advocacy aimed at supporting immigrant communities through the lens of faith. *Amicus* New Mexico Faith Coalition for Immigrant Justice, for example, provides these services "in order to create better immigration laws and a more just system that supports the well-being of all," and employs two DACA recipients in their three-person office. Similarly, *amicus* New Sanctuary Coalition is an interfaith network working "to reform immigration enforcement practices and policies, both locally and nationally, with a special focus on preserving family unity." As explained below, many *amici* and congregations like them have offered themselves as places of sanctuary, providing shelter to those targeted for deportation actions.

*Amici* thus oppose with deep conviction the Government's arbitrary decision to terminate DACA.

---

[6] *See* Sanctuary Movement, http://www.sanctuarynotdeportation.org/.

**AR6064**

12

As institutions of faith with a special interest in serving vulnerable immigrant populations, *amici* have direct knowledge of the harm that the Government's actions will cause to them and the people with whom they live, work, and worship.

## II. TERMINATION OF DACA WILL CAUSE *AMICI*, THEIR CONGREGATIONS, AND THEIR COMMUNITIES IRREPARABLE HARM AND POSES A GRAVE THREAT TO PUBLIC WELFARE

The arbitrary termination of DACA will not only imperil Respondents, it will directly harm *amici* and their congregants, clergy members, staff, clients, and communities.   In the words of *amicus* Church Council of Greater Seattle, "DACA-recipients are our brothers and sisters, relatives, service-providers, congregational members, initiators of small business, and protectors of our communities and nation," and the Government's actions would "deprive hopeful and patriotic men and women of the opportunity to exercise their hopes and dreams, to the detriment of the common good."  Like our society at large, faith communities, according to the Albuquerque Monthly Meeting of the Religious Society of Friends (Quakers), "stand to lose the tremendous investment made over many years to bring DACA recipients into adulthood with skills and multicultural perspectives that are sorely needed by the larger community and the nation."

The Government's planned actions would cause harm on various levels.  First, DACA recipients are vital members of *amici*'s congregations and

13

workforces whose loss of status will not only disrupt their lives, but harm *amici* who benefit from their participation.   Second, termination of the DACA program will impair the ability of *amici* and other religiously-affiliated organizations to carry out their missions to help people of all backgrounds and faiths. Third, as institutions of faith and sensitive locations for immigration enforcement purposes, many *amici* face the grim prospect that following their spiritual calling to provide sanctuary for targeted Dreamers will result in the religious entities themselves being targeted by immigration enforcement authorities, a concern that would increase dramatically with the termination of DACA.

## A. Direct Harm to *Amici* and Their Congregants

To illustrate the irreparable harm at issue in this case, *amici* provide the Court with the following examples of individual DACA recipients brought to this country as children who have enriched their communities, organizations and congregations.

**Nancy**.[7]   Nancy, Associate Rector at *amicus* St. Luke's Episcopal Church in Long Beach, California, came to the United States from Mexico at age seven. Like many Dreamers, Nancy did not know she was undocumented until her junior year of high school, when she applied to college and learned what a social

---

[7] Declarations from the individual DACA recipients attesting to the information presented here are on file with counsel.  The last names of these individuals have been withheld here to protect their privacy.

**AR6066**

14

security number was—and that she did not have one. Nancy describes her life after learning her immigration status as "in the shadows"; she could not get a driver's license, and could not drive a car for fear of getting pulled over and risking deportation.  For a teenager in Los Angeles, this was no idle fear.

Nonetheless, Nancy was active in her community. The Episcopal Church served as an extended family during her childhood, and by the time she turned 17 Nancy led the largest youth group in the Episcopal Diocese of Los Angeles.  So great was her dedication that the Church paid for her tuition to college and seminary school, where she obtained a Master's of Divinity degree.   After obtaining DACA status, Nancy was able to fulfill her dream of becoming an ordained Episcopal minister.  Today, Nancy is the associate rector at *amicus* St. Luke's Episcopal Church, and the Diocese of Los Angeles's first Latina leader to have grown up in a Spanish-speaking Episcopal Church and gone on to pursue ordination. At St. Luke's, she is actively involved in immigrants' rights activism and education initiatives.

For Nancy, the Government's announcement on September 5, 2017 was "a moment of complete fear and hopelessness."  She and others like her have "made a life here, trusted the system and tried to do things the right way," but now "run the risk that we will be hunted down and sent to a country that we do not know."

**Rafael**.  Brought to Los Angeles at three years old, Rafael, an office assistant with *amicus* New

**AR6067**

15

Mexico Faith Coalition for Immigrant Justice, was born in Guanajuato, Mexico. Rafael's parents, having risked everything to bring him to the United States, sought to instill in him the values of hard work and education. They succeeded. Rafael completed a Bachelor's Degree with a double major in History and Chicano Studies from California State University Dominguez Hills while working full time to pay his tuition and support himself. After obtaining DACA status, Rafael went on to obtain a Master's Degree in American Studies at the University of New Mexico, where he is now a Ph.D. candidate and an instructor.

Rafael's parents also instilled in him the values of Catholicism. He believes that faith-based organizations "fill the gaps of social justice and service that many times nation-states do not offer." As such, he works for *amicus* New Mexico Faith Coalition for Immigrant Justice as an office assistant. Rafael is proud to contribute to their work, which he sees as fulfilling community needs and a natural expression of his Catholic faith.

For Rafael, the end of DACA represents drastic and dangerous change. It spells the end of access to the work that he loves and a halt to his career after graduation. Moreover, it means "going back to living in the reality of survival mode," forever uncertain of his place and permanence in his own home, and without opportunity to flourish and grow.

**Andrea**. Andrea is a legal assistant at *amicus* American Friends Service Committee. Andrea was born and baptized in Ecuador, but brought to New

**AR6068**

16

Jersey by her parents when she was a year and a half old. Andrea grew up in the Catholic Church. She went to Sunday school, took First Communion, and received Confirmation at her church in the Newark area, where she continues to volunteer in youth groups and for fundraising activities.

Andrea's parents, like many parents of Dreamers, prioritized her education. Knowing she could not obtain financial aid, Andrea's parents, both union members, carefully saved. After Andrea earned a paralegal degree from community college, her parents put her through Rutgers University's undergraduate program. Nonetheless, until DACA, Andrea's life was one of fear and constraint. She kept her undocumented status secret, and had to refrain from the normal day-to-day activities and jobs that her friends freely engaged in.

Andrea graduated from Rutgers summa cum laude. After she obtained DACA status, she was hired as a paralegal at a law firm, and was proud to have a job and a salary. Andrea's dream is to go to law school in the United States. For her, the end of DACA puts her dream in doubt and threatens to send her to Ecuador, a place in which she has never set foot since she was an infant. In the face of this peril, Andrea maintains, "I love this country and I can't imagine living elsewhere."

\* \* \*

The harm that these individuals would suffer as a result of their loss of DACA status is readily apparent. *See Nunez v. Boldin*, 537 F. Supp. 578,

17

587 (S.D. Tex. 1982) ("Deportation to a country where one's life would be threatened obviously would result in irreparable injury."); *Kalaw v. Ferro*, 651 F. Supp. 1163, 1167 (W.D.N.Y. 1987) (enjoining deportation proceeding and finding irreparable harm because "petitioner's deportation would make her ineligible for any subsequent application for legalization"). *Amici* would be harmed as well; not only do people like Nancy, Rafael, and Andrea contribute richly to religious and faith-based organizations through their own individual efforts, they serve as mentors and inspire others to give back to institutions from which they have benefitted. If the Termination Memo goes into effect, nearly 800,000 Dreamers—many with stories similar to the three detailed above—will be forced out of the country or into hiding. *Amici* will suffer incalculable harm if they are deprived of the contributions and talents of these young congregants and community members.

Moreover, as *amici* know from their work in other parts of the world, Dreamers deported would face tremendous challenges and even physical danger. For example, Gerry Lee and others from *amicus* Maryknoll Office for Global Concerns have lived and worked with impoverished families in Mexico, El Salvador, Guatemala, and other countries to which DACA recipients face deportation. In Haiti, for example, "Maryknoll Sisters have witnessed the bare struggle for post-disaster survival in the massive slums of Cite Soleil, where they help residents subsist from gardens grown in discarded tires on turf fought over by rival gangs." In El Salvador, a Maryknoll Lay Missioner witnessed "the anger and

**AR6070**

18

pain that pervades communities preyed upon by powerful gangs, where immediate survival forces youth to face grim choices between lives of drugs and guns—or escape." In Guatemala, a Maryknoll Father reports on the "rising rates of femicide" and sums up what motivates millions of rural migrants in a single word: "desperation." And along the U.S.-Mexico border, Maryknoll Missioners hear daily the "stories of desperation from the countries to which many Dreamers might be returned," namely, that "poverty, starvation, extortion, sexual assault, gang violence, and political oppression are among the conditions cited as triggers to leave." In one such encounter in Nogales, Sonora, "a man travelling north with his son from Honduras merely pointed south and said, 'There is no life there anymore.'" Children raised in America knowing no other country should not have to face deportation into such conditions.

As the D.C. District Court concluded, in rescinding DACA, the Government failed to consider the important reliance interests of Dreamers. Dreamers have relied on the protected status afforded by DACA to build their futures in the United States, make meaningful contributions to their communities, and develop important, lifelong relationships with others in this country. The Government broke its end of the bargain it struck with Dreamers by abruptly rescinding DACA. The accounts detailed above highlight how Dreamers have relied on DACA and the profoundly disruptive impact that rescission would have on Dreamers' lives. The Termination Memo and the administrative record are devoid of any consideration

**AR6071**

19

of these facts.  For this reason, and the reasons set forth in Respondents' brief, the Government's rescission of DACA is arbitrary and capricious.

## B.  Impairment of *Amici*'s Ability to Carry out Their Missions

It goes without saying that religious and faith-affiliated organizations such as *amici* play a vital role in society.  Countless lives have been uplifted and enriched by the spiritual guidance as well as the material and legal assistance these institutions provide.  Immigrants and their families—including children brought to this country at a young age—are among the groups that have benefitted most from the support furnished by *amici* and similar organizations.  By aiding such vulnerable individuals, faith-based organizations including *amici* have helped to make their entire communities more prosperous, united, and civically engaged than they otherwise would be.

Implementation of the Termination Memo would undermine these efforts by making it virtually impossible for *amici* to continue their outreach to Dreamers and their families, causing *amici* irreparable harm.  *See Hawaii v. Trump*, 859 F.3d 741, 782-83 (finding the "State's inability to assist in refugee resettlement" to be irreparable harm) (9th Cir.), vacated on other grounds by *Trump v. Hawaii*, 138 S. Ct. 377 (2017); V*alle Del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (finding irreparable harm where "organizational plaintiffs have shown ongoing harms to their organizational missions").

20

*Amici* cannot reach people in need if those people are hiding in the shadows or have been deported.  If the Termination Memo is implemented, *amici* and similarly-situated organizations will lose their ability carry out their core mission to assist those in the greatest need of help.  This will result in the needless suffering not only of at-risk individuals, but of their communities as a whole.

## C. As Sensitive Locations for Immigration Enforcement Purposes, Some *Amici* Will Be Called upon to Provide Sanctuary While at the Same Time Risking Being Targeted for Immigration Raids

Finally, religiously-affiliated organizations like *amici* occupy a unique position in matters of immigration enforcement, particularly with respect to DACA.  Pursuant to an October 2011 memorandum by then-ICE Director John Morton, ICE is not to engage in immigration enforcement actions such as arrests, interviews, searches, or surveillance at churches, synagogues, mosques, or other houses of worship, unless exigent circumstances or other law enforcement purposes exist, or if prior approval is obtained (the "ICE sensitive locations policy").[8]  In 2016, while the prior administration was still in office, then-Secretary of

---

[8] Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement to Field Office Directors, Special Agents in Charge, and Chief Counsel (Oct. 24, 2011), https://www.ice.gov/doclib/ero-outreach/pdf/10029.2-policy.pdf. The sensitive locations policy puts the same restrictions on raids at schools, hospitals, and other public settings.

21

Homeland Security Jeh C. Johnson publicly reiterated that "when enforcing the immigration laws, our personnel will not, except in emergency circumstances, apprehend an individual at a place of worship, a school, a hospital or doctor's office or other sensitive location."[9]   The ICE sensitive locations policy remains in effect today, at least as an official matter.[10]

The ICE sensitive locations policy recognizes that houses of worship are sacred spaces of sanctuary and peace, where community members can go and be without fear of harassment or arrest.  Many *amici* and others like them proudly fulfill that role and have pledged to offer their churches, synagogues, and mosques as sanctuaries to those at risk of deportation.   Temple Sinai DC, Christ Church Cathedral in Cincinnati, St. Luke's in Long Beach, Arch Street UMC in Philadelphia, Albuquerque Friends Meeting, the many members of *amici* New Mexico Faith Coalition for Immigrant Justice and New Sanctuary Coalition, and others have publicly declared their status as sanctuary congregations. These organizations maintain dedicated, furnished

---

[9] U.S. Dep't of Homeland Security, Statement by Secretary Jeh C. Johnson on Southwest Border Security, https://www.dhs.gov/news/2016/02/02/statement-secretary-jeh-c-johnson-southwest-border-security (Feb. 2, 2016).

[10] *See* U.S. Immigration and Customs Enforcement, FAQ on Sensitive Locations and Courthouse Arrests: Does ICE's policy sensitive locations policy remain in effect?, https://www.ice.gov/ero/enforcement/sensitive-loc.

**AR6074**

22

space for visitors who need protection, and rely on their congregants for support in doing so.

In each case, the decision to become a sanctuary congregation is made after careful discussion among congregations and communities, and reflects broad religious consensus on this issue. The Albuquerque Friends Meeting, for example, when called upon to respond to an urgent need for sanctuary by a community member, convened their members and attenders. "Through a process of deep discernment together—and in commitment to our Quaker values of Equality and Community—we were led to a profound sense of Spiritual Unity, meaning we were 'One in the Spirit,'" and the Meeting collectively committed to providing sanctuary. Many *amici* reported that these decisions, while weighty, were not difficult to make. When Arch Street UMC was called upon to house a man in danger of immigration detention, "the conversation among the congregation wasn't 'will we do this,' but how?" They provided sanctuary to the man in question for 11 months. In Phoenix, Shadow Rock United Church of Christ provided sanctuary to a man facing deportation whose wife was pregnant and young son was in the midst of leukemia treatment. The church's reverend stated in a public interview that the man "shouldn't be prosecuted," but rather "lifted up, used as an example of what it means to be a father."[11]

---

[11] CBS News, *Undocumented immigrant, father of leukemia patient, takes refuge in Phoenix church*, https://www.cbsnews.com/news/undocumented-immigrant-

(<i>footnote continued …</i>)

23

Under the current administration, however, the parameters and application of the ICE sensitive locations policy are increasingly in doubt.  ICE has already begun to target areas adjacent to places of worship for enforcement actions, to worrisome effect. For example, in 2017, on a freezing cold morning in Alexandria, Virginia, a dozen ICE agents surrounded a group of Latino men as they emerged from a church hypothermia shelter where they had spent the night.  Six men were arrested and taken away in vans.[12]   After church leaders demanded and were refused the names and locations of the men taken, Governor Terry McAuliffe and Senator Tim Kaine both sent letters to ICE inquiring about the raid and their enforcement policies near churches.    ICE responded to neither.[13]   In suburban Illinois, ICE agents tricked a worshiper into leaving a church service—by texting him from his cousin's cell phone about a fictional car accident—and arrested him at a neighboring McDonald's.  They arrived in unmarked

father-of-leukemia-patient-takes-refuge-in-phoenix-church/ (Feb. 12, 2018, 7:20 AM).

[12] Julie Carey, NBC Washington, *ICE Agents Arrest Men Leaving      Fairfax      County      Church      Shelter*, https://www.nbcwashington.com/news/local/ICE-Agents-Arrest-Men-Leaving-Alexandria-Church-Shelter-413889013.html (Feb. 15, 2017).

[13] Alex Emmons, The Intercept, *Targeting a Sanctuary: After ICE Stakes Out a Church Homeless Shelter, Charities Worry Immigrants      Will      Fear      Getting      Help*, https://theintercept.com/2017/02/27/after-ice-stakes-out-a-church-homeless-shelter-charities-worry-immigrants-will-fear-getting-help/ (Feb. 27, 2017).

AR6076

24

cars and wore vests that said "Police."  A retired ICE supervisor, interviewed after the fact, praised this strategy as "actually . . . quite creative."[14]

ICE has shown a propensity to target sensitive or controversial locations other than religious institutions as well.  In Charlotte, North Carolina, ICE conducted raids and arrests within two miles of a predominantly Latino elementary school.[15] Students witnessed the arrests as they passed by in school busses.[16]  In El Paso, Texas, a Latina woman was taken into custody by ICE agents dressed in plain clothes after she left a courtroom in a county courthouse.  The criminal complaint filed against her

[14] Odette Yousef, WBEZ 95.1 Chicago, *Amid Deportation Push, Suburban Church Grapples with Loss*, https://www.wbez.org/shows/wbez-news/amid-deportation-push-suburban-church-grapples-with-loss/3d269fc3-04e7-4604-bae4-a376a37410c9 (Feb. 15, 2016).

[15] Tina Vasquez, Rewire, *Have Trump's Mass Deportations Begun? Immigration Arrests Reported Around the Country*, https://rewire.news/article/2017/02/10/trumps-mass-deportations-begin-immigration-arrests-reported-around-country/ (Feb. 10, 2017).

[16] Qué Pasa Mi Gente, *Arrestos de ICE cerca de escuela elemental de mayoría hispana*, https://charlotte.quepasanoticias.com/noticias/ciudad/local/arrestos-de-ice-cerca-de-escuela-elemental-de-mayoria-hispana (Feb. 9, 2017), *translation available at* https://translate.google.com/translate?hl=en&sl=es&tl=en&u=https%3A%2F%2Fcharlotte.quepasanoticias.com%2Fnoticias%2Fciudad%2Flocal%2Farrestos-de-ice-cerca-de-escuela-elemental-de-mayoria-hispana.

25

indicates that ICE knew she was living at a domestic and sexual abuse resource center.[17]

These incidents indicate that instead of abiding by the spirit of the sensitive-locations memorandum—that is, to avoid immigration enforcement at sensitive locations—ICE is using houses of worship and other locations as lures for easy, unsuspected surveillance and arrest. This puts *amici* in the untenable and unacceptable position of at once heeding their faith-based calling to provide sanctuary while at the same time attracting the attention of those who would do harm to the people *amici* seek to protect. This crisis of conscience has sewn fear and anxiety among *amici* and their congregants and supporters. These concerns will be greatly exacerbated if the Termination Memo goes into effect and the DACA program is terminated.

## CONCLUSION

For the reasons set forth above, the Court should affirm the judgments of the United States District Court for the District of Columbia and the Court of Appeals for the Ninth Circuit and the orders of the Eastern District of New York.

---

[17] ABC-7 KVIA, *Which places are considered 'sensitive locations'?*, http://www.kvia.com/crime/which-places-are-considered-sensitive-locations/338319025 (Feb. 16, 2017).

**AR6078**

26

October 4, 2019      Respectfully submitted,

STEVEN A. ZALESIN
   *Counsel of Record*
ADEEL A. MANGI
MICHAEL N. FRESCO
MOHAMMED A. BADAT
PATTERSON BELKNAP
WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
sazalesin@pbwt.com

FARHANA KHERA
JUVARIA KHAN
MUSLIM ADVOCATES
P.O. BOX 34440
WASHINGTON, DC 20043
(202) 897-2622

*Attorneys for Amici Curiae*

**AR6079**

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to Rule 33.1(g), that the attached brief is proportionally spaced; uses a typeface (Century Schoolbook) of 12 points; and contains 5,682 words, as counted by Microsoft Office Word 2010, which was used to produce this brief.

Dated:     New York, New York
           October 4, 2019

<u>/s/  Steven A. Zalesin</u>

Steven A. Zalesin

Patterson Belknap Webb &
  Tyler LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Amici Curiae*

**AR6080**

Nos. 18-587, 18-588, 18-589

IN THE

# Supreme Court of the United States

_____

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
*Petitioners*,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,
*Respondents*.

_____

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,
*Petitioners*,

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL.,
*Respondents*.

_____

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND
SECURITY, ET AL.,
*Petitioners*,

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL.,
*Respondents*.

_____

**On Writs of Certiorari to the
United States Courts of Appeals for the Ninth,
District of Columbia, and Second Circuits**

_____

**BRIEF OF AMERICAN COUNCIL ON EDUCATION AND
43 OTHER HIGHER EDUCATION ASSOCIATIONS AS
*AMICI CURIAE* IN SUPPORT OF RESPONDENTS**

_____

NEAL K. KATYAL
 *Counsel of Record*
JESSICA L. ELLSWORTH
STEPHANIE J. GOLD
MITCHELL P. REICH
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Amici Curiae American Council on Educa-
tion and 43 Other Higher Education Associations*

**AR6081**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES......................................iii

STATEMENT OF INTEREST ....................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.................................................2

ARGUMENT .............................................................5

I. THE RESCISSION OF DACA WILL INFLICT PROFOUND HARMS ON COLLEGES AND UNIVERSITIES, THEIR STUDENTS, AND THE COUNTRY AS A WHOLE ..................................5

   A. America's Colleges and Universities Thrive on a Diverse Student Body and a Reputation for Inclusiveness..............5

   B. Prior to DACA, Many of the Nation's Most Promising Students Faced Severe Challenges to Enrollment in or Completion of Undergraduate and Graduate Programs ................8

   C. DACA Has Made It Substantially Easier for Dreamers to Enroll in Postsecondary Institutions and Has Carried Enormous Benefits for Colleges, Universities, and the Country...........16

   D. The Rescission of DACA Would Reverse the Gains the Program Has Enabled........................................................24

II. THE RESCISSION IS REVIEWABLE ...........28

   A. The APA Does Not Make the Rescission Unreviewable ..................................29

(i)

AR6082

ii

**TABLE OF CONTENTS—Continued**

<u>Page</u>

B. The INA Does Not Withdraw Juris-
diction to Consider the Rescission..............33

CONCLUSION .........................................................37

ADDENDUM—LIST OF *AMICI CURIAE*..............1a

**AR6083**

iii

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Arizona* v. *United States*,
567 U.S. 387 (2012)................................................6

*Citizens to Preserve Overton Park, Inc.* v.
*Volpe*,
401 U.S. 402 (1971)..............................................29

*Dep't of Commerce* v. *New York*,
139 S. Ct. 2551 (2019)....................................29, 30

*Fisher* v. *Univ. of Texas at Austin*,
570 U.S. 297 (2013)................................................7

*Gill* v. *Paige*,
226 F. Supp. 2d 366 (E.D.N.Y. 2002) .................28

*Grutter* v. *Bollinger*,
539 U.S. 306 (2003)................................................7

*Heckler* v. *Chaney*,
470 U.S. 821 (1985)............................30, 31, 32, 33

*ICC* v. *Bhd. of Locomotive Eng'rs*,
482 U.S. 270 (1987)..............................................32

*Jennings* v. *Rodriguez*,
138 S. Ct. 830 (2018)......................................34, 35

*Mach Mining, LLC* v. *EEOC*,
135 S. Ct. 1645 (2015)..........................................36

*Massachusetts* v. *EPA*,
549 U.S. 498 (2007)..............................................33

*Michigan* v. *Bay Mills Indian Cmty.*,
572 U.S. 782 (2014)..............................................35

*Nielsen* v. *Preap*,
139 S. Ct. 954 (2019)............................................34

**AR6084**

iv

## TABLE OF AUTHORITIES—Continued

<u>Page(s)</u>

*Reno* v. *Am.-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999) ............................ 33, 34, 35, 36

*Texas* v. *United States*,
809 F.3d 134 (5th Cir. 2015) ......................... 31, 32

*United States* v. *Texas*,
136 S. Ct. 2271 (2016) .................................... 30, 32

*United Student Aid Funds, Inc.* v. *DeVos*,
237 F. Supp. 3d 1 (D.D.C. 2017) ......................... 28

*Weyerhauser Co.* v. *U.S. Fish & Wildlife Serv.*,
139 S. Ct. 361 (2018) ........................................... 29

*Zivotofsky ex rel. Zivotofsky* v. *Clinton*,
566 U.S. 189 (2012) .............................................. 29

### STATUTES:

5 U.S.C. § 701(a)(2) .................................................. 29

8 U.S.C. § 1252(b)(9) .............................. 5, 33, 34, 35

8 U.S.C. § 1252(g) ................................... 5, 33, 34, 36

Administrative Procedure Act .................... 28, 29, 30

Immigration and Nationality Act ................... 28, 33

### OTHER AUTHORITIES:

Leisy Janet Abrego, *"I Can't Go to College Because I Don't Have Papers": Incorporation Patterns of Latino Undocumented Youth*, 4 Latino Stud. 212 (2006),
https://www.academia.edu/3684916/Abrego_Leisy._2006._I_can_t_go_to_college_because_I_don_t_have_papers_Incorporation_Pat-

**AR6085**

v

## TABLE OF AUTHORITIES—Continued

Page(s)

terns_of_Latino_Undocumented_Youth._Latino_Studies_4_3_212-231 ................................ 15

Am. Council on Educ., *Immigration Post-Election Q&A: DACA Students, "Sanctuary Campuses," and Institutional or Community Assistance* (Dec. 2016), https://www.acenet.edu/Documents/ACE-Issue-Brief-Immigration-DACA-Sanctuary-Campus.pdf ........................................ 19

Am. Council on Educ., *Protect Dreamers Higher Education Coalition: Who Are the Dreamers?*, https://www.acenet.edu/Policy-Advocacy/Pages/Immigration/Protect-Dreamers-Higher-Education-Coalition.aspx ...................................................... 20

Jeanne Batalova et al., Migration Policy Inst., *DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action* (Aug. 2014), https://www.migrationpolicy.org/research/daca-two-year-mark-national-and-state-profile-youth-eligible-and-applying-deferred-action ...................................... 15

Ike Brannon & Logan Albright*, The Economic and Fiscal Impact of Repealing DACA*, Cato Inst.: Cato At Liberty (Jan. 18, 2017), https://www.cato.org/blog/economic-fiscal-impact-repealing-daca ......... 24, 27

Alexandra A. Chaidez & Sanjana L. Narayana, *Harvard Senior Becomes First*

**AR6086**

vi

## TABLE OF AUTHORITIES—Continued

Page(s)

*DACA Recipient to Win Rhodes Scholar-
ship*, Harvard Crimson (Nov. 19, 2018)..............21

John Coyle, *The Legality of Banking the
Undocumented*, 22 Geo. Immigr. L.J. 21
(2007)......................................................................11

*Deferred Action for Childhood Arrivals
(DACA) Data Tools*, Migration Policy Inst.,
https://www.migrationpolicy.org/programs
/data-hub/deferred-action-childhood-
arrivals-daca-profiles...........................................9

Economic News Release, Bureau of Labor
Statistics, U.S. Dep't of Labor, *College En-
rollment and Work Activity of Recent High
School and College Graduates Summary*
(Apr. 25, 2019), https://www.bls.gov/news.
release/hsgec.nr0.htm........................................14

*Enrollment Trends*, Inst. for Int'l Educ.
(2018), https://www.iie.org/Research-and-
Insights/Open-Doors/Data/International-
Students/Enrollment ...........................................6

Roberto G. Gonzales & Angie M. Bautista-
Chavez, Am. Immigration Council, *Two
Years and Counting: Assessing the Grow-
ing Power of DACA* (June 2014),
http://www.immigrationpolicy.org/sites/def
ault/files/research/two_years_and_countin
g_assessing_the_growing_power_of_daca_f
inal.pdf ........................................................14, 17

Roberto G. Gonzales & Leo R. Chavez,
*"Awakening to a Nightmare": Abjectivity
and Illegality in the Lives of Undocumented*

AR6087

vii

## TABLE OF AUTHORITIES—Continued

Page(s)

*1.5-Generation Latino Immigrants in the United States*, 53 Current Anthropology 255 (2012), https://pdfs.semanticscholar.org /4515/9747881c9cd7961b282a9066c3e7f4b1 a93a.pdf ............................................................... 16

Roberto G. Gonzales et al., *Becoming DACAmented: Assessing the Short-Term Benefits of Deferred Action for Childhood Arrivals (DACA)*, 58 Am. Behavioral Scientist 1852 (Nov. 2014) ............................... *passim*

Emily Greenman & Matthew Hall, *Legal Status and Educational Transitions for Mexican and Central American Immigrant Youth*, 91 Social Forces 1475 (2013), https://www.ncbi.nlm.nih.gov/pmc/articles/ PMC3816545/pdf/sot040.pdf .............................. 14

Neeta Kantamneni et al., *Academic and Career Development of Undocumented College Students: The American Dream?*, 64 Career Development Quarterly 318 (2016) ............................................................. 10, 13

Neeta Kantamneni et al., *DREAMing Big: Understanding the Current Context of Academic and Career Decision-Making for Undocumented Students*, 43 J. Career Dev. 483 (2016) ........................................ 12, 13, 17

Letter from More than 800 Colleges and Universities to Speaker Ryan et al. (Oct. 19, 2017), https://www.acenet.edu/ Documents/Letter-to-Congress-on-DACA-Oct-2017.pdf ........................................................ 21

**AR6088**

viii

## TABLE OF AUTHORITIES—Continued

Page(s)

Letter from President Eisgruber and Microsoft President Smith to Congress Regarding the Deferred Action for Childhood Arrivals (DACA) Program (Jan. 11, 2018), https://president.princeton.edu/blogs/letter-president-eisgruber-and-microsoft-president-smith-congress-regarding-deferred-action .................................................... 21

Silva Mathema, *What DACA Recipients Stand to Lose—and What States Can Do About It*, Ctr. for Am. Progress (Sept. 13, 2018), https://www.americanprogress.org/issues/immigration/reports/2018/09/13/458008/daca-recipients-stand-lose-states-can/ ................................................ 19, 25, 26

Gilbert Mendoza & Chesterfield Polkey, *States Offering Driver's Licenses to Immigrants*, Nat'l Conference of State Legislatures (July 25, 2019), http://www.ncsl.org/research/immigration/states-offering-driver-s-licenses-to-immigrants.aspx .................. 26

NAFSA: Ass'n of Int'l Educators, *Restoring U.S. Competitiveness for International Students and Scholars* (June 2006), https://www.nafsa.org/sites/default/files/ektron/uploadedFiles/NAFSA_Home/Resource_Library_Assets/Public_Policy/restoring_u.s.pdf .................................................................... 7

*NAFSA International Student Economic Value Tool*, NAFSA, https://www.nafsa.org/policy-and-

**AR6089**

ix

## TABLE OF AUTHORITIES—Continued

Page(s)

advocacy/policy-resources/nafsa-
international-student-economic-value-tool ........... 8

Nat'l Immigration Law Ctr., *Access to Driv-*
*er's Licenses for Immigrant Youth Granted*
*DACA*, https://www.nilc.org/issues/drivers-
licenses/daca-and-drivers-licenses/ (last
updated May 31, 2015) ........................................ 16

Nat'l Immigration Law Ctr., *Stories in De-*
*fense of Deferred Action for Childhood Ar-*
*rivals*, https://www.nilc.org/issues/
daca/daca-fifth-anniversary-stories/ ............. 22, 23

Zenen Jaimes Pérez, Ctr. for Am. Progress,
*Removing Barriers to Higher Education*
*for Undocumented Students* (Dec. 2014),
https://www.luminafoundation.org/files/re
sources/removing-barriers-for-
undocumented-students.pdf ........................ *passim*

*Protect Dreamers Higher Education Coali-*
*tion: Faces of Dreamers*, Am. Council on
Educ.: Higher Educ. Today (Oct. 5, 2017),
https://www.higheredtoday.org/2017/10/05
/protect-dreamers-higher-education-
coalition-faces-dreamers/ .................................... 22

REAL ID *Frequently Asked Questions*, Dep't
of Homeland Sec., https://www.dhs.gov/
real-id-frequently-asked-questions (last
updated Aug. 14, 2018) ........................................ 26

Alene Russell, Am. Ass'n of State Colls. and
Univs., *State Policies Regarding Undocu-*
*mented College Students: A Narrative of*
*Unresolved Issues, Ongoing Debate and*

**AR6090**

x

## TABLE OF AUTHORITIES—Continued

Page(s)

*Missed Opportunities* (Mar. 2011), https://www.aascu.org/uploadedFiles/AASCU/Content/Root/PolicyAndAdvocacy/PolicyPublications/PM_UndocumentedStudents-March2011.pdf ............ 11

TheDream.US, *2018 Progress Report* (2018), https://www.thedream.us/impact/ourdata/ ... 21, 23

TheDream.US, *Featured Scholar Stories*, https://www.thedream.us/impact/our-scholar-stories-2/ .................................................. 22

TheDream.US, *In Their Own Words: Higher Education, DACA, and TPS* (Oct. 2018), https://www.thedream.us/wp-content/uploads/2018/10/TheDream.US-In-Their-Own-Words-Report-Oct-2018-1-2.pdf .............................................................. 26, 27

The UndocuScholars Project, Inst. for Immigration, Globalization, & Educ., Univ. of California, Los Angeles, *In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration Reform* (2015), https://www.luminafoundation.org/files/resources/in-the-shadows.pdf ........................... 17, 19

United We Dream, *A Portrait of Deferred Action for Childhood Arrivals Recipients: Challenges and Opportunities Three-Years Later* (Oct. 2015), https://unitedwedream.org/wp-content/uploads/2015/10/DACA-report-final-1.pdf .................................................. 18

AR6091

xi

## TABLE OF AUTHORITIES—Continued

Page(s)

Evelyn Valdez-Ward, *The End of DACA Would Be a Blow to Science*, Sci. Am.: Voices (Dec. 12, 2018), https://blogs.scientificamerican.com/voices/the-end-of-daca-would-be-a-blow-to-science/ ............................................................... 22

Tom K. Wong et al., *2019 National DACA Study* (Sept. 2019), https://cdn.americanprogress.org/content/uploads/2019/09/18122133/New-DACA-Survey-2019-Final-1.pdf ................... 17, 20, 21, 24

*World University Rankings 2020*, Times Higher Educ., https://www.timeshighereducation.com/world-university-rankings/2020/world-ranking#!/page/0/length/25/sort_by/rank/sort_order/asc/cols/stats ................................ 5

Xueying Han & Richard P. Applebaum, Ewing Marion Kauffman Found., *Will They Stay or Will They Go?  International STEM Students Are Up for Grabs* (July 2016), https://files.eric.ed.gov/fulltext/ED570660.pdf ........................................ 8

Jie Zong et al., Migration Policy Inst., *A Profile of Current DACA Recipients by Education, Industry, and Occupation* (Nov. 2017), https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation ........................................................... 24

AR6092

xii

**TABLE OF AUTHORITIES—Continued**

<u>Page(s)</u>

Sejal Zota, *Unauthorized Immigrants' Access to Higher Education: Fifty States, Different Directions*, 79 Popular Gov't 46 (2009)..................................................10

**AR6093**

## STATEMENT OF INTEREST

*Amici* are 44 associations of colleges, universities, educators, trustees, and other representatives of several thousand institutions of higher education in the United States. *Amici* represent public, independent, large, small, urban, rural, denominational, non-denominational, graduate, and undergraduate institutions and faculty. Each *amicus* is deeply concerned about the harms that the rescission of the Deferred Action for Childhood Arrivals ("DACA") policy will inflict on America's institutions of higher education, their students, and the global standing and reputation of the country's colleges and universities.

*Amicus* American Council on Education ("ACE") is the major coordinating body for American higher education. Its more than 1,700 members reflect the extraordinary breadth and contributions of four-year, two-year, public and private colleges and universities. ACE members educate two out of every three students in accredited, degree-granting U.S. institutions. ACE participates as *amicus curiae* on occasions such as this where a case presents issues of substantial importance to higher education in the United States.

The Addendum contains information on the other *amici* on this brief.[1]

---

[1] No party or counsel for a party authored this brief in whole or in part. No party, counsel for party, or person other than *amici curiae* or counsel made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

AR6094

2

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

America's colleges and universities are among the finest in the world. They help preserve our country's democratic values; ensure its economic strength; and contribute to our Nation's influence and global standing. One of the central reasons for the excellence of our postsecondary schools is their ability to attract and enroll talented, motivated, and curious students, regardless of their circumstances, whether born in this country or born abroad.

Yet, prior to DACA, colleges and universities were effectively unable to enroll hundreds of thousands of the most deserving and meritorious students in the United States. The "Dreamers"—undocumented immigrants brought here as children, through no fault of their own, who attended high school or served in the military and have amassed no serious criminal record—faced a battery of severe impediments to attending or completing college or graduate school. Unable to receive federal loans, work legally, or qualify for most state tuition benefits, Dreamers were foreclosed from nearly every avenue for financing their education. Without driver's licenses or work permits, Dreamers could not easily commute to school or complete many courses of study. Forced to live in the shadows, they often had to bear the serious emotional strains and anxiety of their undocumented status alone.

DACA has not removed all of these barriers, but it has made it newly possible for countless Dreamers to get a postsecondary education and unlock the potential such an education affords. Dreamers can now qualify for many work-study programs, take on high-

**AR6095**

3

quality jobs, receive a range of state tuition benefits, and otherwise find the means to pay for tuition. They can drive to work, school, and internships. When they graduate, they can qualify for occupational licenses and work legally in high-quality sectors.  In short, while policymakers and politicians remain unwilling or unable to address their predicament legislatively, DACA has offered Dreamers cautious hope that they can live the American Dream, and become part of this country's ever-evolving story of innovators, inventors, entrepreneurs, and leaders.

The statistics bear out the profound difference DACA has made for its recipients, for U.S. colleges and universities, and for the country as a whole. College enrollment rates have increased dramatically for DACA-eligible individuals, and completion rates have skyrocketed.  *Amici* have seen up-close the tremendous contributions these individuals have made to our campuses as they prepare for and live lives of impact across America.

Dreamers are Rhodes Scholars, scientists, and campus leaders; they are sources of inspiration and insight for their peers; and they are unparalleled ambassadors for our schools abroad.  In the words of one college president: "Dreamers set the bar very high academically, inspiring other students to reach higher as well."  Dreamers are also highly productive members of the Nation's economy, contributing over a quarter of a trillion dollars in economic growth, thanks in large part to their ability to earn an advanced education.

The rescission of DACA would reverse all of these gains.  In an instant, it would send a message of

**AR6096**

4

exclusion that would irreparably harm our institutions' ability to recruit and retain foreign-born students. It would tear at the fabric of our campus communities. Most importantly, it would pull the rug out from under the Dreamers themselves, who have upended their lives—taking out loans, earning degrees, and taking the risk of revealing their undocumented status—in reliance on DACA. As one DACA recipient stated, rescission would mean that "all the hard work I have put into my goals would be for nothing, and I would be back to the bottom where I started."

There are many problems with the government's legal defense of this harsh and destructive policy. But the higher education community is particularly troubled by the government's threshold claim that its decision is wholly exempt from judicial review. Sanctioning that remarkable argument would threaten to immunize from legal scrutiny numerous other major decisions disguised as "enforcement policies" that impact our higher education system.

The government's nonreviewability argument is untenable. The narrow "tradition of nonreviewability" for civil non-enforcement actions does not extend to the rescission of DACA, which (1) is not an individual non-enforcement action (or a non-enforcement action at all); (2) rests on a legal conclusion amenable to judicial review; and (3) will result in the revocation of tangible benefits, such as work authorization. Indeed, it is logically incoherent for the government to claim that *DACA itself was reviewable*— and to endorse the Fifth Circuit's holding to that effect—but that DACA's *rescission* is somehow exempt from judicial scrutiny. The government's

AR6097

attempt to cram its rescission action into the narrow limitations on judicial review embodied in 8 U.S.C. § 1252(b)(9) and (g) is equally unavailing:  Its argument is flatly irreconcilable with those provisions' text and ignores the limited construction this Court has given both statutes.

The Court should not write the Administration a blank check to make this monumental policy choice without even a patina of judicial review.  DACA has been an unmitigated good for this country, its higher education system, and the young persons whom it has benefited.  The lower courts' judgments should be affirmed.

## ARGUMENT

### I. THE RESCISSION OF DACA WILL INFLICT PROFOUND HARMS ON COLLEGES AND UNIVERSITIES, THEIR STUDENTS, AND THE COUNTRY AS A WHOLE.

#### A. America's Colleges and Universities Thrive on a Diverse Student Body and a Reputation for Inclusiveness.

America's higher education system is one of the crown jewels of our democracy.  The country's colleges and universities regularly rank among the finest in the world.  *See World University Rankings 2020*, Times Higher Educ.[2]  Americans of every background have gained enrichment, social mobility, and eco-

---

[2]   https://www.timeshighereducation.com/world-university-rankings/2020/world-ranking#!/page/0/length/25/sort_by/rank/sort_order/asc/cols/stats (all websites last visited Oct. 3, 2019).

6

nomic advancement by attending our postsecondary schools. And, for decades now, the world's leaders in the sciences, humanities, arts, and politics have come to the United States to be educated, work, and contribute to our country's progress.

One central ingredient in the success of our higher education system is its historic openness and diversity. That openness is nowhere more evident than in our tradition of enrolling and educating persons born outside the United States. "The history of the United States is in part made of the stories, talents, and lasting contributions of those who crossed oceans and deserts to come here." *Arizona* v. *United States*, 567 U.S. 387, 416 (2012). Many of the leading graduates of our country's colleges and universities were born abroad. And today, more than 1 million enrollees in our colleges and universities are international students. *Enrollment Trends*, Inst. for Int'l Educ. (2018).[3]

Admitting and enrolling students born outside the United States benefits colleges, universities, and the country at large in numerous ways. For one, it ensures that our colleges and universities enroll the best, brightest, most motivated and curious undergraduate and graduate students. Schools can build the strongest possible student body when they close their doors to no one, and can select from the country (and the world) as a whole, rather than being limited to a subset of the population.

---

[3]   https://www.iie.org/Research-and-Insights/Open-Doors/Data/International-Students/Enrollment.

7

Furthermore, enrolling a diverse class helps colleges and universities provide a better education to all of their students. This Court has repeatedly recognized the "educational benefits that flow from a diverse student body." *Fisher* v. *Univ. of Texas at Austin*, 570 U.S. 297, 308 (2013). Campus diversity helps to create and maintain an "atmosphere which is most conducive to speculation, experiment, and creation." *Id.* (internal quotation marks omitted). It opens up students to new ideas and perspectives, and breaks down "isolation and stereotypes." *Id.* In practical terms, it helps give students "the skills needed in today's increasingly global marketplace," which "major American businesses have made clear * * * can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints." *Grutter* v. *Bollinger*, 539 U.S. 306, 330 (2003).

Enrolling foreign-born students is also critical in enabling American schools to compete in the "global competition" for international students and scholars. NAFSA: Ass'n of Int'l Educators, *Restoring U.S. Competitiveness for International Students and Scholars* 1 (June 2006).[4] The finest international students and scholars are most interested in coming to a country when its schools are perceived as welcoming and open-minded. *See id.* at 5. For that reason, other countries have made a concerted effort in recent decades to attract the leading minds from around the world into their universities. *Id.* at 4.

---

[4] https://www.nafsa.org/sites/default/files/ektron/uploadedFiles/ NAFSA_Home/Resource_Library_Assets/Public_Policy/restorin g_u.s.pdf.

8

Policies that welcome the immigrants who reside within our borders are critical to preserving our higher education system's reputation for openness and inclusion.

Moreover, attracting and enrolling foreign-born students is greatly in the interest of the country at large. Foreign-born students contribute tens of billions of dollars to the U.S. economy and support hundreds of thousands of jobs each year. *NAFSA International Student Economic Value Tool*, NAFSA (estimating that foreign-born students contributed $39 billion and supported 455,000 jobs during the 2017-2018 academic year).[5] Many of these international students remain in our country to live, work, and found businesses. *See* Xueying Han & Richard P. Applebaum, Ewing Marion Kauffman Found., *Will They Stay or Will They Go? International STEM Students Are Up for Grabs* (July 2016).[6] Others return home inculcated with American values of democracy, tolerance, education, and the rule of law, helping spread American ideals and strengthening our country's influence and national security.

**B. Prior to DACA, Many of the Nation's Most Promising Students Faced Severe Challenges to Enrollment in or Completion of Undergraduate and Graduate Programs.**

For many years, American colleges and universities faced a severe gap in their ability to include the more than one million foreign-born "Dreamers" in their

---

[5]   https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool.

[6] https://files.eric.ed.gov/fulltext/ED570660.pdf.

9

student bodies and communities. Dreamers are individuals who were brought to the United States as children, resided here continuously, and attended high school or served in the armed forces without committing any serious crime. No. 18-587 Pet. App. 97a-98a; *see Deferred Action for Childhood Arrivals (DACA) Data Tools*, Migration Policy Inst.[7] These individuals include countless students whose enrollment would markedly enrich college and university campuses: high school valedictorians; promising STEM candidates, leaders, or artists; and persons who "embod[y] the American dream." No. 18-587 Supp. Br. App. 5a.

Like "[m]ost young adults in the United States," Dreamers typically "aspire to some type of postsecondary education." Roberto G. Gonzales et al., *Becoming DACAmented: Assessing the Short-Term Benefits of Deferred Action for Childhood Arrivals (DACA)*, 58 Am. Behavioral Scientist 1852, 1854 (Nov. 2014) [hereinafter, "*Becoming DACAmented*"]. But prior to DACA, severe structural barriers made it punishingly difficult for many Dreamers to afford, enroll in, or successfully complete college or graduate school.

The most daunting impediment many Dreamers faced was financial. The vast majority of high school graduates—and nearly every undocumented immigrant—cannot afford college without some form of tuition assistance, financial aid, or part-time em-

---

[7] https://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles.

10

ployment.  But prior to DACA, each of those avenues was largely foreclosed to Dreamers.

Dreamers were largely barred from the most straightforward path to college affordability: enrolling in a public college or university and paying the lower rate charged for in-state residents.  More than 30 States categorically prohibited undocumented immigrants from qualifying as residents for in-state tuition purposes.  Zenen Jaimes Pérez, Ctr. for Am. Progress, *Removing Barriers to Higher Education for Undocumented Students* 5-6 (Dec. 2014) [hereinafter, "*Removing Barriers*"].[8]  While a minority of States permitted undocumented students to qualify for the in-state rate, Dreamers often could not establish their eligibility without providing their Social Security numbers or disclosing information that risked revealing their undocumented status.  *Id.* at 19, 24.  In practice, many undocumented immigrants were thus compelled to pay the out-of-state rate at state schools, which is on average 61% higher, and sometimes seven times as high, as the rate charged for in-state residents.  *Id.* at 5; *see* Neeta Kantamneni et al., *Academic and Career Development of Undocumented College Students: The American Dream?*, 64 Career Development Quarterly 318, 319 (2016) [hereinafter, "*Academic and Career Development*"].[9]

---

[8]   https://www.luminafoundation.org/files/resources/removing-barriers-for-undocumented-students.pdf.

[9] In two states, even that higher rate was not an option: South Carolina and Alabama banned undocumented students from attending many public colleges altogether.  *See* Sejal Zota, *Unauthorized Immigrants' Access to Higher Education: Fifty States, Different Directions*, 79 Popular Gov't 46, 50 (2009).

11

Nor could Dreamers qualify for federal or state financial aid to fill the gap.  Undocumented students are "ineligible for all forms of federal financial aid, including Pell Grants, the Federal Work-Study Program, and federal loans." *Removing Barriers* at 20.  And nearly every State makes undocumented immigrants ineligible for state education grants, too. *Id.* at 6; *see* Alene Russell, Am. Ass'n of State Colls. and Univs., *State Policies Regarding Undocumented College Students: A Narrative of Unresolved Issues, Ongoing Debate and Missed Opportunities* 4 (Mar. 2011).[10]

Private banks presented no better an option for most undocumented students.  Before DACA, few financial institutions were willing to extend loans to undocumented students and their parents.  *Removing Barriers* at 21.  And those that were would often impose difficult-to-meet conditions, such as finding a co-signer who was a U.S. citizen or lawful permanent resident, and charging interest rates in excess of twice the rate for federal student loans.  *Id.*; *see* John Coyle, *The Legality of Banking the Undocumented*, 22 Geo. Immigr. L.J. 21, 23 (2007) ("[U]ndocumented immigrants * * * pay disproportionately more to access basic financial services.").

That left working part-time as the only realistic way for most Dreamers to finance their education. But before DACA, Dreamers could not legally work in the United States.  *See Becoming DACAmented* at

---

[10]      https://www.aascu.org/uploadedFiles/AASCU/Content/Root/PolicyAndAdvocacy/PolicyPublications/PM_Undocumented Students-March2011.pdf.

12

1854. They were thus "generally limited to low-wage jobs," where they were afforded minimal legal protections and few opportunities for advancement. *Id.*; *see* Neeta Kantamneni et al., *DREAMing Big: Understanding the Current Context of Academic and Career Decision-Making for Undocumented Students*, 43 J. Career Dev. 483, 489 (2016) [hereinafter, "*DREAMing Big*"]. Getting to and from these jobs also was not easy: Dreamers could not qualify for driver's licenses, and so, for many, a daily commute meant exposing oneself to the risk of arrest, apprehension, and deportation. *Becoming DACAmented* at 1855.

Moreover, even when Dreamers did have some narrow pathway to college affordability open to them, students often lacked the information and institutional support necessary to capitalize on it. Undocumented immigrants generally do not have the "social networks [that] play an all-important role in relaying key information" about schools, tuition assistance, and work-study jobs. *Id.* As aspiring "first-generation college students," they usually cannot rely on members of their immediate family to provide such information. *Removing Barriers* at 19. Moreover, high school college and career counselors often "lack the training to navigate the specific barriers faced by undocumented students," and, prior to DACA, most Dreamers were reluctant to share with their counselors that they were undocumented in the first place. *Id.* at 17-18, 23-24; *see DREAMing Big* at 489-490.

Those Dreamers who could finance a postsecondary education continued to face serious and unique challenges upon arriving on campus. *Removing Barriers* at 24-25. Many undocumented students

13

were told that they needed a second form of identification to acquire a student ID, and had their admissions revoked when they were unable to provide one. *See DREAMing Big* at 488. Without driver's licenses, Dreamers could not easily travel to and from school, or take advantage of off-campus academic and career opportunities. *Id.* at 489. When the financial support they had relied on to enroll in school dried up, many Dreamers found that they needed to take semesters off to earn or save money to finance more of their education. *Removing Barriers* at 25.

Dreamers' academic options were also constrained. Many majors and fields of study "require hands-on participation outside the classroom." *Becoming DACAmented* at 1854. But, because of their undocumented status, Dreamers were excluded from many study opportunities and nearly all paid internships. *Id.* Some Dreamers reported changing majors because they found that background checks were needed to gain practical training necessary to succeed in their chosen field of study. *Academic and Career Development* at 323-324.

Dreamers also had to contend with the psychological and emotional toll of attending school in the shadows. *Id.* at 324-325. Many Dreamers experienced deep anxiety or fear while grappling with the financial, practical, and academic challenges of attending school as an undocumented immigrant. But many such students feared sharing their status with peers or school administrators, and few institutional programs were in place to provide them support. *Id.*

**AR6106**

14

The effects of these impediments were severe. Before DACA, out of approximately 65,000 undocumented immigrants who graduated from high school each year, only 7,000 to 13,000 individuals—or less than 20%—enrolled in college. *Id.* at 319. That rate was less than *one-third* the rate of college enrollment among the general population of high school graduates. *See* Economic News Release, Bureau of Labor Statistics, U.S. Dep't of Labor, *College Enrollment and Work Activity of Recent High School and College Graduates Summary* (Apr. 25, 2019).[11] One study found that the likelihood of a high school graduate from Mexico or Central America enrolling in college was nearly four times higher if the graduate was a documented rather than undocumented immigrant. Emily Greenman & Matthew Hall, *Legal Status and Educational Transitions for Mexican and Central American Immigrant Youth*, 91 Social Forces 1475, 1490-92 (2013).[12]

Furthermore, those undocumented students who did enroll in college had markedly worse outcomes than their peers. Undocumented students were more than three times as likely as their peers to "stop out" of school (*i.e.*, temporarily leave college with the intention of returning). Roberto G. Gonzales & Angie M. Bautista-Chavez, Am. Immigration Council, *Two Years and Counting: Assessing the Growing Power of DACA* 7-8 (June 2014) [hereinafter, "*Two*

---

[11] https://www.bls.gov/news.release/hsgec.nr0.htm.

[12] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3816545/pdf/sot040.pdf.

15

*Years and Counting*"].[13]  And at the time DACA was announced in 2012, only 8% of Dreamers had completed a postsecondary education and received an associate's, bachelor's, or advanced degree.  *See* Jeanne Batalova et al., Migration Policy Inst., *DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action* 16 (Aug. 2014).[14]

These grim prospects had profoundly negative consequences on Dreamers beginning as early as high school.  Many Dreamers spent their childhoods believing themselves to be largely or fully American.  *See Becoming DACAmented* at 1855.  But upon learning of the web of legal and practical snares that would flow from their "illegality"—or witnessing siblings and peers trying and failing to attend or complete college—many Dreamers lost the motivation to learn.  Leisy Janet Abrego, *"I Can't Go to College Because I Don't Have Papers": Incorporation Patterns of Latino Undocumented Youth*, 4 Latino Stud. 212, 220-224 (2006) [hereinafter *"Incorporation Patterns"*].[15]

---

[13]  http://www.immigrationpolicy.org/sites/default/files/research/two_years_and_counting_assessing_the_growing_power_of_daca_final.pdf.

[14]  https://www.migrationpolicy.org/research/daca-two-year-mark-national-and-state-profile-youth-eligible-and-applying-deferred-action.

[15]  https://www.academia.edu/3684916/Abrego_Leisy._2006._I_can_t_go_to_college_because_I_don_t_have_papers_Incorporation_Patterns_of_Latino_Undocumented_Youth._Latino_Studies_4_3_212-231.

AR6108

16

For some, the experience of "discover[ing]" their illegality was akin to "awakening to a nightmare." Roberto G. Gonzales & Leo R. Chavez, *"Awakening to a Nightmare": Abjectivity and Illegality in the Lives of Undocumented 1.5-Generation Latino Immigrants in the United States*, 53 Current Anthropology 255, 262 (2012).[16]  It meant realizing that they, unlike the peers with whom they spent their childhoods, would be barred from unlocking the opportunities that only a college education can afford, and living as full and productive members of American society. *Id.*

## C. DACA Has Made It Substantially Easier for Dreamers to Enroll in Postsecondary Institutions and Has Carried Enormous Benefits for Colleges, Universities, and the Country.

DACA has not removed every impediment that previously stood in the way of Dreamers, but it has dramatically improved the educational outcomes for DACA students, and it has carried enormous benefits for colleges, universities, and the country as a whole.

DACA has made it newly possible for many Dreamers to afford, attend, and complete college and graduate school.  DACA makes it possible for recipients to apply for work authorization and apply for a Social Security card.  In all 50 States and the District of Columbia, it also enables recipients to apply for driver's licenses. *See* Nat'l Immigration Law Ctr., *Access to Driver's Licenses for Immigrant Youth*

---

[16]  https://pdfs.semanticscholar.org/4515/9747881c9cd7961b282 a9066c3e7f4b1a93a.pdf.

17

*Granted DACA*.[17] And it allows Dreamers to come out of the shadows and reveal their undocumented status without immediate fear of deportation. *Id.*

Together, these benefits have opened up vital new avenues for Dreamers to fund their education. Most significantly, DACA has enabled Dreamers to pay for their tuition with earnings from part-time employment, institutional work-study jobs, or paid internships. *DREAMing Big* at 486. Having a driver's license also means that DACA recipients can commute to work and school and select from a wider range of job prospects. *Two Years and Counting* at 3. Taken together, these tools have had a dramatic effect on Dreamers' ability to pay for college: 80% of DACA recipients report that DACA enabled them to earn more money to help pay for their tuition, Tom K. Wong et al., *2019 National DACA Study*, at 2 (Sept. 2019),[18] and 72.3% of DACA recipients enrolled in college now report that they have paid work experience, as compared with 28% of undocumented college students who are not DACA recipients, The UndocuScholars Project, Inst. for Immigration, Globalization, & Educ., Univ. of California, Los Angeles, *In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of*

---

[17] https://www.nilc.org/issues/drivers-licenses/daca-and-drivers-licenses/ (last updated May 31, 2015).

[18] https://cdn.americanprogress.org/content/uploads/2019/09/18122133/New-DACA-Survey-2019-Final-1.pdf.

18

*Immigration Reform* 9 (2015) [hereinafter, "*In the Shadows of the Ivory Tower*"].[19]

DACA has also improved Dreamers' financial aid options. Although DACA recipients remain ineligible for federal student financial aid, they can now fill out the Free Application for Federal Student Aid and receive a calculation of their Estimated Family Contribution, which enables students to apply for need-based institutional aid that was previously unavailable. *Removing Barriers* at 12. Some States have changed their residency requirements to permit all undocumented students, or all DACA recipients, to qualify for in-state tuition or education grants. *Id.* In addition, some scholarship organizations have expanded their eligibility criteria to include DACA recipients. United We Dream, *A Portrait of Deferred Action for Childhood Arrivals Recipients: Challenges and Opportunities Three-Years Later* 22 (Oct. 2015) [hereinafter, "*Portrait of DACA Recipients*"].[20] This too has made an appreciable difference: Over 31% of DACA recipients have reported that DACA enabled them to qualify for education support, scholarships, and financial aid. *Id.* at 21.

DACA has also made private education loans a more viable option. Banks are far more willing to open bank accounts for individuals with a Social Security number. *Becoming DACAmented* at 1863.

---

[19]     https://www.luminafoundation.org/files/resources/in-the-shadows.pdf.

[20]     https://unitedwedream.org/wp-content/uploads/2015/10/DACA-report-final-1.pdf.

19

And almost half of DACA recipients have obtained their first bank account since receiving DACA.  *Id.*

DACA has improved Dreamers' opportunities while in college, as well.  Because DACA recipients can legally work and drive, it is possible for them to pursue internships and other hands-on programs critical for academic success.  Over 40% of DACA recipients have obtained internships, as compared to 16% of the non-DACA undocumented population.  *In the Shadows of the Ivory Tower* at 10; *see also Becoming DACAmented* at 1863.  In addition, most DACA recipients are now able to obtain driver's licenses and safely drive to and from campus, shortening their weekly commutes by an average of two hours.  *In the Shadows of the Ivory Tower* at 10-11.  DACA recipients can also study abroad without fear that on return to the United States they will be denied entry.  *See* Am. Council on Educ., *Immigration Post-Election Q&A: DACA Students, "Sanctuary Campuses," and Institutional or Community Assistance* 4 (Dec. 2016).[21]

DACA has reduced the emotional toll of college enrollment for Dreamers, too.  For the first time, many Dreamers can speak openly about their undocumented status, increasing their sense of belonging, and reducing the pressures and anxieties previously endemic to enrollment in college without legal status.  *In the Shadows of the Ivory Tower* at 11; *Becoming DACAmented* at 1866.

---

[21]    https://www.acenet.edu/Documents/ACE-Issue-Brief-Immigration-DACA-Sanctuary-Campus.pdf.

20

Finally, DACA has improved Dreamers' job prospects upon graduation. It has made it newly possible for Dreamers to receive occupational licensing. In many States, DACA recipients are now eligible to become members of the legal bar, to be certified as teachers, and to be licensed as physicians—all avenues previously closed to them. *See* Silva Mathema, *What DACA Recipients Stand to Lose—and What States Can Do About It*, Ctr. for Am. Progress (Sept. 13, 2018) [hereinafter, "*What DACA Recipients Stand to Lose*"].[22] And, of course, Dreamers can now work legally when they graduate postsecondary school, enabling them to take full advantage of their degrees and move upward on the social and economic ladder.

The bottom-line effect of these improvements has been dramatic. The percentage of DACA recipients enrolled in postsecondary school is reportedly almost 40%, up from approximately 20% of DACA-eligible students at the time the policy was announced. *See 2019 National DACA Study* at 5; Am. Council on Educ., *Protect Dreamers Higher Education Coalition: Who Are the Dreamers?*.[23] The percentage of DACA recipients with associate's, bachelor's, or master's degrees has also markedly increased, with one study reporting that as many as 60% of DACA recipients have postsecondary degrees, as compared to 8% of the DACA-eligible population in 2012. *2019 National DACA Study* at 6. Indeed, a staggering *95%* of

---

[22] https://www.americanprogress.org/issues/immigration/reports/2018/09/13/458008/daca-recipients-stand-lose-states-can/.

[23] https://www.acenet.edu/Policy-Advocacy/Pages/Immigration/Protect-Dreamers-Higher-Education-Coalition.aspx.

21

DACA recipients report that they intend to pursue more education because of DACA, or have already done so. *Id.* at 5.

Colleges and universities have reaped innumerable benefits from the markedly increased presence of Dreamers on their campuses. As Princeton President Christopher Eisgruber has explained, "DACA recipients are among our most accomplished and respected students." Letter from President Eisgruber and Microsoft President Smith to Congress Regarding the Deferred Action for Childhood Arrivals (DACA) Program (Jan. 11, 2018).[24] "Colleges and universities have seen these remarkable people up close, in our classrooms and as our colleagues and friends. Despite the challenges they face, they have made incredible contributions to our country and its economy and security." Letter from More than 800 Colleges and Universities to Speaker Ryan et al., at 1 (Oct. 19, 2017).[25]

Countless stories bear out that statement. Sheila, a DACA recipient, graduated *summa cum laude* and at the top of her class at Rutgers, and went on to work as a digital strategist at IBM. TheDream.US, *2018 Progress Report*, at 3 (2018).[26] Jin Park, a Harvard senior with a concentration in molecular biology, became the first DACA recipient to win a

---

[24]     https://president.princeton.edu/blogs/letter-president-eisgruber-and-microsoft-president-smith-congress-regarding-deferred-action.

[25]     https://www.acenet.edu/Documents/Letter-to-Congress-on-DACA-Oct-2017.pdf.

[26] https://www.thedream.us/impact/ourdata/.

22

Rhodes Scholarship. Alexandra A. Chaidez & Sanjana L. Narayana, *Harvard Senior Becomes First DACA Recipient to Win Rhodes Scholarship*, Harvard Crimson (Nov. 19, 2018). Carlos Mendez-Dorantes, who was brought to the United States from Mexico when he was ten years old, is a PhD student and Ford Foundation Fellow studying cancer treatments at the City of Hope Comprehensive Cancer Center in Duarte, California. Evelyn Valdez-Ward, *The End of DACA Would Be a Blow to Science*, Sci. Am.: Voices (Dec. 12, 2018).[27]

These stories could easily be multiplied. *See Protect Dreamers Higher Education Coalition: Faces of Dreamers*, Am. Council on Educ.: Higher Educ. Today (Oct. 5, 2017) (collecting stories of Dreamers and their accomplishments)[28]; TheDream.US, *Featured Scholar Stories* (collecting stories of DACA recipients who have received academic scholarships)[29]; Nat'l Immigration Law Ctr., *Stories in Defense of Deferred Action for Childhood Arrivals* [hereinafter, "*Stories in Defense of DACA*"] (collecting additional stories of DACA recipients).[30] President Pat McGuire of Trinity Washington University—a school at which 70% of Dreamers have Latin honors, and where Dreamers make up more than half of the

---

[27]    https://blogs.scientificamerican.com/voices/the-end-of-daca-would-be-a-blow-to-science/.

[28]    https://www.higheredtoday.org/2017/10/05/protect-dreamers-higher-education-coalition-faces-dreamers/.

[29] https://www.thedream.us/impact/our-scholar-stories-2/.

[30]    https://www.nilc.org/issues/daca/daca-fifth-anniversary-stories/.

AR6115

23

Phi Beta Kappa class—put the point succinctly: "Dreamers set the bar very high academically, inspiring other students to reach higher as well." *2018 Progress Report* at 10.

Attending school alongside Dreamers improves the education of their classmates in numerous ways. Dreamers invariably overcame daunting obstacles to reach campus: Their families fled poverty, violence, or persecution; they often grew up in households that spoke little English; they struggled with the legal and practical impediments endemic to life as an undocumented immigrant; and they had the courage to disclose their status in order to achieve their ambitions and attain a better life. Attending school with these remarkable individuals exposes other students to global challenges of which they may have been unaware, supplies them perspectives they never before encountered, and helps imbue in them values of tolerance, respect, and compassion. One Georgetown University student wrote:

> I never interacted much with undocumented immigrants growing up, but since college I have. Several of my good friends at Georgetown University are undocumented, and I can never imagine all the fear and hurt their families have been through because of their status. * * * I can't imagine what Georgetown would be like without them. Certainly a worse place to go to school.

*Stories in Defense of DACA.*

Finally, increasing enrollment of DACA recipients in colleges and universities has had positive effects for the U.S. economy at large. DACA recipients with postsecondary degrees have greater purchasing power: They are able to buy cars, take out mortgag-

24

es, and invest in the economy.  *See 2019 National DACA Study* at 2.  They are also more productive members of the U.S. workforce, filling better and higher-paying jobs.  *See* Jie Zong et al., Migration Policy Inst., *A Profile of Current DACA Recipients by Education, Industry, and Occupation*, at 8 (Nov. 2017) (comparing job profiles of DACA recipients and other similarly aged undocumented immigrants).[31] In total, the Cato Institute has estimated that DACA will add $60 billion in tax revenue and $280 billion in economic growth over the next decade, in large part because it has enabled DACA recipients to build skills through college and graduate school.   Ike Brannon & Logan Albright, *The Economic and Fiscal Impact of Repealing DACA*, Cato Inst.: Cato At Liberty (Jan. 18, 2017).[32]

### D. The Rescission of DACA Would Reverse the Gains the Program Has Enabled.

If the rescission of DACA is permitted to go into effect, these gains would be reversed almost immediately, and our colleges and universities, their students, and the country at large would severely suffer.

First, DACA's rescission would irreparably damage the reputation of America's higher education system in the eyes of the world.  DACA has been a symbol of tolerance and openness of our university campuses. It has shown other foreign-born students that they are welcome on our campuses, and that our colleges

---

[31]     https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation.

[32]   https://www.cato.org/blog/economic-fiscal-impact-repealing-daca.

25

and universities value and celebrate the contributions of those individuals who overcome adversity to come to this country. The rescission of DACA would serve as a profound symbol of exclusion, sending a message that the United States does not value even the most deserving and sympathetic foreign-born individuals within its own borders.

Rescinding DACA would also upset the lives of tens of thousands of DACA recipients who have relied on this program. DACA recipients reordered their lives with the legitimate expectation that they would be able to live and work in this country legally. These young people came out of the shadows, enrolled in school, took out private student loans, worked hard to earn advanced degrees, started jobs, started families, and made countless other life decisions of tremendous import, all in reliance on DACA. The rescission would subvert all of that. Many Dreamers would once again be rendered unable to pay for their education or pay off the private loans they have taken out. DACA recipients would immediately be disqualified from employment, the principal means by which most DACA recipients have paid tuition. DACA recipients would lose their access to in-state tuition rates in at least three States—Virginia, Massachusetts, and Ohio—and become categorically barred from attending public college in South Carolina and Alabama. *See What DACA Recipients Stand to Lose*.

Rescission would also result in the revocation of many Dreamers' driver's licenses. Only 13 States and the District of Columbia make driver's licenses available to undocumented immigrants who are not beneficiaries of some form of relief from deportation.

**AR6118**

26

*See* Gilbert Mendoza & Chesterfield Polkey, *States Offering Driver's Licenses to Immigrants*, Nat'l Conference of State Legislatures (July 25, 2019).[33] Those driver's licenses cannot qualify as REAL IDs under federal law, and so are of limited use; starting in October 2020, for example, they will not permit recipients to board commercial airlines. *See REAL ID Frequently Asked Questions*, Dep't of Homeland Sec.[34] With limited geographic mobility, many DACA recipients would once again be unable to complete school, continue their jobs, or fulfill many day-to-day tasks.

Rescission would also dramatically devalue the education Dreamers have worked diligently to attain. Dreamers with advanced degrees—doctors, lawyers, scientists, engineers, MBAs, teachers, and more—would be unable to work legally in this country and unable to qualify for occupational licenses in most States. *See What DACA Recipients Stand to Lose*. Years of education would be squandered. Many Dreamers would once again be forced to return to low-paying, low-quality jobs, often in service industries or jobs requiring manual labor. *See Becoming DACAmented* at 1854, 1863.

One DACA recipient wrote that, if DACA is revoked, "all the hard work I have put into my goals would be for nothing, and I would be back to the bottom where I started." TheDream.US, *In Their*

---

[33]    http://www.ncsl.org/research/immigration/states-offering-driver-s-licenses-to-immigrants.aspx.

[34] https://www.dhs.gov/real-id-frequently-asked-questions (last updated Aug. 14, 2018).

**AR6119**

27

*Own Words: Higher Education, DACA, and TPS*, at 8 (Oct. 2018).[35]  Said another: "I will have to go back to hiding in the shadows.  I will not be able to work, drive, or go to school.  I will not be able to feed myself.  I will not be able to continue my pursuit of happiness, essentially, I will not have [a] part in the American Dream."  *Id.* at 13.

Rescission would also tear at the fabric of our academic communities.  Many students would understandably be demoralized if their peers were forced to leave campus, or faced the risk of being apprehended and deported at any moment.  Individuals who have become leaders on campus—student body presidents, Rhodes Scholars, political activists—would immediately face the Hobson's choice of returning to the shadows or exposing themselves to the threat of removal from the only country they have ever known.

Rescission would radiate negative consequences throughout the U.S. economy, as well.  The wholesale revocation of employment authorization for nearly 700,000 individuals, many of them now highly educated and highly sought-after by their employers, would cause industries to suffer economic and fiscal shocks.  *Id.* at 5.  And the country as a whole would lose approximately a quarter of a trillion dollars in economic growth and tens of billions of dollars in tax revenue over the next decade.  *The Economic and Fiscal Impact of Repealing DACA.*

---

[35]         https://www.thedream.us/wp-content/uploads/2018/10/TheDream.US-In-Their-Own-Words-Report-Oct-2018-1-2.pdf.

**AR6120**

28

## II.   THE RESCISSION IS REVIEWABLE.

In light of the profound harms that DACA's rescission would inflict, it is critical that the Court subject that decision to full judicial scrutiny.  Yet the Government has advanced the remarkable proposition that the decision is entirely unreviewable.

This claim is particularly concerning to the higher education community for reasons that extend beyond this litigation.  Administrations often attempt to enact sweeping policies of great significance to colleges and universities through documents denominated as enforcement decisions.  For instance, both the current Administration and prior administrations have issued "Dear Colleague" letters that effectively state the government's legal position on a question of education policy, backed by the threat of legal sanctions or funding revocations.  Courts have regularly reviewed these policies.  *See, e.g.*, *United Student Aid Funds, Inc.* v. *DeVos*, 237 F. Supp. 3d 1 (D.D.C. 2017); *Gill* v. *Paige*, 226 F. Supp. 2d 366 (E.D.N.Y. 2002).  It is vital that the Court not immunize actions of this nature from judicial scrutiny.

Fortunately, the law does not support the government's claim that its decision is exempt from judicial review.  The Administrative Procedure Act ("APA") does not revoke judicial authority to scrutinize the rescission's compliance with the law.  And the government's suggestion that the Immigration and Nationality Act ("INA") withdraws jurisdiction to consider such claims is baseless.

29

## A. The APA Does Not Make the Rescission Unreviewable.

The government claims that the decision to rescind DACA is unreviewable under 5 U.S.C. § 701(a)(2) because it is "committed to agency discretion by law." U.S. Br. 17. This Court has "read the § 701(a)(2) exception for action committed to agency discretion 'quite narrowly,'" so as to "to give effect to the command that courts set aside agency action that is an abuse of discretion, and to honor the presumption of judicial review." *Dep't of Commerce* v. *New York*, 139 S. Ct. 2551, 2567-69 (2019) (citation omitted). Review is unavailable under this provision, the Court has held, only where there is "no law to apply" and "no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 2568-69 (quoting *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U.S. 402, 410 (1971); *Weyerhauser Co.* v. *U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018)).

Here, there plainly is "law to apply." Plaintiffs argue that the government's decision to rescind DACA is arbitrary and capricious because it rests on the erroneous conclusion that DACA is unlawful. The prohibition on arbitrary and capricious decisionmaking is a foundational principle of administrative law. And determining whether DACA exceeds the scope of DHS's statutory authority is a "familiar judicial exercise" well within this Court's cognizance. *Zivotofsky ex rel. Zivotofsky* v. *Clinton*, 566 U.S. 189, 196 (2012). Resolving plaintiffs' claims would thus involve reviewing a decision "for compliance with *** provisions of the [Immigration and Nationality] Act, according to the general requirements of rea-

**AR6122**

30

soned agency decisionmaking." *Dep't of Commerce*, 139 S. Ct. at 2569. That is a decision "subject to judicial review." *Id.* Indeed, this Court granted certiorari, received briefing, and heard argument on the legality of another broad deferred action policy four Terms ago. *See United States* v. *Texas*, 136 S. Ct. 2271 (2016) (mem.) (per curiam).

The government nonetheless claims that review is unavailable on the strength of *Heckler* v. *Chaney*, 470 U.S. 821 (1985). In that case, this Court held that the "decision not to take enforcement action * * * has traditionally been 'committed to agency discretion,'" and that "the Congress enacting the APA did not intend to alter that tradition." *Id.* at 832-833. In the government's view, DACA is akin to a decision "not to institute enforcement actions," the decision to issue that policy was thus unreviewable, and the decision to *revoke* that policy is therefore also an enforcement decision immune from judicial scrutiny. U.S. Br. 17. Each step of that analysis is faulty.

*First*, the *Chaney* Court identified a "tradition" of exempting *individual* non-enforcement decisions from judicial review. 470 U.S. at 832. It identified no comparable tradition of exempting *policies* of non-enforcement like DACA from judicial scrutiny; on the contrary, the Court suggested that "general polic[ies]" of non-enforcement are reviewable, at least where it is contended that those policies are an "abdication of [the agency's] statutory responsibilities." *Id.* at 833 n.4 (internal quotation marks omitted).[36] It was in part for this reason that the Fifth

---

[36] The government suggests that the plaintiffs in *Chaney* challenged a "programmatic determination" not to enforce a

31

Circuit held—in a decision affirmed 4-4 by this Court—that a policy of granting deferred action was reviewable. *Texas* v. *United States*, 809 F.3d 134, 165-168 (5th Cir. 2015). If that reviewability holding was correct—and the government has said that it "agrees with the robust analysis in the Fifth Circuit's * * * decision," U.S. Br. 52—then neither DACA nor its revocation is exempt from judicial review either.

*Second*, the logic and holding of *Chaney* have no purchase where, as here, an agency rests its decision on the view that it lacks legal authority. *Chaney* explained that "an agency decision not to enforce" is unreviewable principally because it "involves a complicated balancing of a number of factors which are peculiarly within its expertise." 470 U.S. at 831. The Court reasoned that "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831-832. But evaluating an agency's *legal conclusion* that it lacks authority to retain a deferred action policy does not involve "balancing * * * factors" or "ordering * * * priorities." It entails a straightforward judicial task. Likely for that reason, *Chaney* itself indicated that its holding would not extend to "a refusal by the agency to institute proceedings based solely on the belief that it lacks jurisdiction." *Id.* at 833 n.4; *see id.* at 839 (Brennan,

---

statute. U.S. Br. 21. That is simply incorrect. In *Chaney*, the petitioners "requested the FDA to take various investigatory and enforcement actions" against the States of Oklahoma and Texas; when the FDA refused, they asked the courts for an order requiring FDA "to take the same enforcement actions requested in the prior petition." 470 U.S. at 824-825.

**AR6124**

32

J., concurring); *id.* at 841 n.1 (Marshall, J., concurring in judgment).

*Third*, the fact that a non-enforcement decision is unreviewable does not necessarily (or even usually) imply that the revocation of that decision is unreviewable, as well. In the ordinary course, decisions to enforce and not to enforce differ in the most fundamental respect—most notably, the enforcement of a statute entails the bringing to bear of the government's coercive power. *See id.* at 832 ("when an agency does act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner"). An enforcement decision may involve other intrusions on an individual's liberty. Here, for instance, the revocation will have the consequence of withdrawing tangible benefits, including work authorization, from hundreds of thousands of undocumented immigrants, and disrupting the affairs of a wide swathe of American society. The government has identified no "tradition" of exempting decisions of this nature from judicial review.

The government invokes the principle that an otherwise unreviewable action does not "become[ ] reviewable" merely because the agency "gives a 'reviewable' reason" for its decision. U.S. Br. 23 (quoting *ICC* v. *Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987)). But that argument assumes as its starting premise that the decision to issue or retain a sweeping deferred action policy falls within the "tradition of nonreviewability" as described in *Chaney*. *See Locomotive Eng'rs*, 482 U.S. at 282. As the Fifth Circuit and at least four Justices evidently concluded in *Texas*, it does not. Furthermore,

33

*Chaney* itself made clear that the tradition of nonreviewability applicable to civil non-enforcement decisions does not extend to cases in which an agency's "refusal * * * to institute proceedings [is] based solely on the belief that it lacks jurisdiction." 470 F.3d at 833 n.4. Far from retreating from that statement, subsequent decisions of this Court have reviewed the legal basis for agencies' refusal to act. *See, e.g.*, *Massachusetts* v. *EPA*, 549 U.S. 498, 527-528 (2007).

## B. The INA Does Not Withdraw Jurisdiction to Consider the Rescission.

The government also suggests that principles of nonreviewability "apply with particular force" to this case because it involves "enforcement of the immigration laws." U.S. Br. 20. That is incorrect. The only statutory provisions the government cites to support this statement are 8 U.S.C. § 1252(g) and (b)(9), and both are plainly inapplicable here.

Section 1252(g) channels jurisdiction over "any cause or claim by or on behalf of any alien arising from the decision or action * * * to commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g). This provision is expressly limited to claims "by or on behalf of any alien." *Id.* It is therefore inapplicable to claims brought by universities and States to vindicate their own interests. Moreover, the Court has held that Section 1252(g) "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno* v. *Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 482 (1999) (emphases in original). The revocation of a

**AR6126**

34

broad policy of granting deferred action is plainly not one of the "three discrete actions" listed in *AADC*. Indeed, it is farther removed from the three listed actions than the examples the Court gave of decisions *not* covered by Section 1252(g), such as "open[ing] an investigation" and "surveil[ing] the suspected violator." *Id.*

Section 1252(b)(9) is similarly irrelevant. That provision states that "[j]udicial review of all questions of law and fact * * * arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." 8 U.S.C. § 1252(b)(9). In two recent cases, the Court has rejected "expansive interpretation[s]" of this provision that would have "cramm[ed] judicial review" of any removal-related actions "into the review of final removal orders." *Jennings* v. *Rodriguez*, 138 S. Ct. 830, 840 (2018); *see Nielsen* v. *Preap*, 139 S. Ct. 954, 962 (2019). The Court clarified that this provision is inapplicable at least where aliens "are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not even challenging any part of the process by which their removability will be determined." *Jennings*, 138 S. Ct. at 841; *Nielsen*, 139 S. Ct. at 962.

Respondents' challenge to the DACA rescission falls into none of those buckets. They are not challenging an "order of removal." They are not challenging a "decision to detain them * * * or to seek removal." And the DACA rescission is not "even * * * part of the process by which their removability will

35

be determined"; it is a deferred action policy that has no bearing on "removability" at all, but rather addresses whom the government may *seek* to remove. Indeed, it is difficult to comprehend how the rescission policy could "aris[e] from any action * * * to remove an alien," given that it *precedes* the initiation of any removal action against a DACA recipient.[37]

Perhaps recognizing that its textual argument is meritless, the government quickly pivots to purpose: "[E]ven if those provisions do not directly preclude review here," it writes, they "confirm[] the importance Congress placed on shielding DHS's discretion decisions from review." U.S. Br. 21. It scarcely needs repeating, however, that this Court does not "disregard clear language simply on the view that * * * Congress 'must have intended' something broader." *Michigan* v. *Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014). That admonition applies with heightened force when it comes to limiting the courts' authority to review agency action or to exercise jurisdiction. Limitations on judicial review must

---

[37] Contrary to the government's suggestion (at 21), the rescission also falls outside the construction of Section 1252(b)(9) espoused by Justice Thomas in his *Jennings* concurrence. Justice Thomas argued that Section 1252(b)(9) "must at least cover congressionally authorized portions of the deportation process that necessarily serve the purpose of ensuring an alien's removal." 138 S. Ct. at 854 (Thomas, J., concurring). The rescission of DACA, however, does not "necessarily serve the purpose of ensuring an alien's removal"; on the contrary, it is undisputed that many former DACA recipients will *not* be removed or placed into removal proceedings. Nor is the rescission of DACA a "portion[] of the deportation process," given that it precedes even "the decision[] to open an investigation" into an alien's removability. *AADC*, 525 U.S. at 482.

36

be clearly expressed, not implied. *Mach Mining, LLC* v. *EEOC*, 135 S. Ct. 1645, 1651 (2015) (describing the "'strong presumption' favoring judicial review of administrative action"). And as Justice Scalia wrote when rejecting a previous effort to strain Section 1252(g) beyond its textual limits: "It is implausible that [this provision] was a shorthand way of referring to all claims arising from deportation proceedings. Not because Congress is too unpoetic to use synecdoche, but because that literary device is incompatible with the need for precision in legislative drafting." *AADC*, 525 U.S. at 482.

So too here, had Congress truly placed "importance * * * on shielding" policies like this one from judicial review, it would have enacted a statute that accomplished that objective. It did not, and this Court should not shield this consequential and profoundly harmful policy decision from review based on vague inferences of congressional purpose.

AR6129

37

## CONCLUSION

For the foregoing reasons, the judgments in Nos. 18-587, 18-588, and 18-589 should be affirmed.

Respectfully submitted,

NEAL K. KATYAL
   *Counsel of Record*
JESSICA L. ELLSWORTH
STEPHANIE J. GOLD
MITCHELL P. REICH
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Amici Curiae American Council on Education and 43 Other Higher Education Associations*

OCTOBER 2019

**ADDENDUM**

AR6131

## ADDENDUM—LIST OF *AMICI CURIAE*

American Council on Education

The Accreditation Council for Pharmacy Education

Accrediting Commission for Community and Junior Colleges

ACT

American Association of Community Colleges

American Association of Colleges of Nursing

American Association of State Colleges and Universities

American Association of University Professors

American Indian Higher Education Consortium

American Speech-Language-Hearing Association

Association of American Colleges and Universities

Association of American Universities

Association of Community College Trustees

Association of Governing Boards of Universities and Colleges

Association of Jesuit Colleges and Universities

Association of Public and Land-grant Universities

Coalition of Urban and Metropolitan Universities

College and University Professional Association for Human Resources

College Board

Consortium of Universities of the Washington Metropolitan Area

Council for Advancement and Support of Education

Council for Christian Colleges & Universities

Council for Opportunity in Education

1a

Council of Graduate Schools

Council of Independent Colleges

Council on Social Work Education

Educational Testing Service

EDUCAUSE

Higher Learning Commission

Hispanic Association of Colleges and Universities

Middle States Commission on Higher Education

National Association for College Admission Counseling

NAFSA: Association of International Educators

National Association of College and University Business Officers

National Association of Diversity Officers in Higher Education

National Association of Independent Colleges and Universities

National Association of Student Financial Aid Administrators

National Collegiate Athletic Association

New England Commission of Higher Education

Northwest Commission on Colleges and Universities

Phi Beta Kappa

Student Affairs Administrators in Higher Education

The University Risk Management & Insurance Association

WASC Senior College and University Commission

2a

**AR6133**

Nos. 18-587, 18-588, & 18-589

### In The
# Supreme Court of the United States

————◆————

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

————◆————

DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL.,

*Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, ET AL.

————◆————

KEVIN K. MCALEENAN, ACTING SECRETARY
OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL.

————◆————

**On Writs Of Certiorari To The
United States Courts Of Appeals
For The Ninth, D.C., And Second Circuits**

————◆————

**BRIEF OF NONPROFIT LEGAL SERVICES
ORGANIZATIONS AS *AMICI CURIAE*
IN SUPPORT OF RESPONDENTS**

————◆————

JONATHAN S. KOLODNER
JESSA DEGROOTE
DAVID Z. SCHWARTZ
ABBEY GAUGER
CLEARY GOTTLIEB STEEN
  & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000

MAUREEN P. ALGER
  *Counsel of Record*
MONIQUE R. SHERMAN
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000
malger@cooley.com

*Counsel for Amici Curiae*

[Additional Counsel Listed On Inside Cover]

**AR6134**

MARY KATHRYN KELLEY
COOLEY LLP
4401 Eastgate Mall
San Diego, CA 92121

KYLE C. WONG
COOLEY LLP
101 California Street
5th Floor
San Francisco, CA 94111

**AR6135**

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................. iii

INTEREST OF *AMICI CURIAE* ......................... 1

SUMMARY OF ARGUMENT ............................. 2

ARGUMENT ....................................... 5

   I.  The Government Completely Failed to Consider How Rescinding DACA Would Affect Those Who Reasonably Relied on DACA and, as a Result, the Rescission Is Arbitrary and Capricious .......................... 5

      A.  The Government Induced DACA Recipients to Rely on DACA and Then Ignored Their Reliance Interests, in Violation of the APA .......................... 6

      B.  DACA Recipients' Reliance Interests Are Significant Because Most Do Not Qualify for Other Forms of Immigration Relief ............................ 12

      C.  Most DACA Recipients Will Lose the Ability to Work, Drive, Pay for College, and Plan for Their Lives if DACA Is Rescinded............................ 15

      D.  Rescinding DACA Will Also Harm Organizations that Represent DACA-Eligible Individuals ............................ 20

  II.  The Government's Justifications for Rescinding DACA Are Belied by the Nature of Its Implementation................................ 27

AR6136

ii

TABLE OF CONTENTS—Continued

Page

A. The Government's Justification for Rescission that DACA Was Illegal Was Inconsistent With Allowing Some DACA Recipients to Renew .................  29

B. The Chaotic Nature of the Rescission's Implementation Refutes the Government's Purported Desire for an "Orderly Wind-Down" of DACA................  31

CONCLUSION....................................................  34

APPENDIX .................................................................1a

**AR6137**

iii

## TABLE OF AUTHORITIES

Page

CASES

*Arpaio* v. *Obama*,
797 F.3d 11 (D.C. Cir. 2015) ......................................6

*Crane* v. *Johnson*,
783 F.3d 244 (5th Cir. 2015)......................................6

*Encino Motorcars, LLC* v. *Navarro*,
136 S. Ct. 2117 (2016) ...................................7, 10, 30

*FCC* v. *Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .............................................7, 27

*Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State
Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .............................................30, 34

*Nat'l Ass'n for the Advancement of Colored
People* v. *Trump*,
Civ. Action No. 17-1907 (JDB) (D.D.C.
Apr. 24, 2018) (slip op.) ......................................9, 30

*New Hampshire* v. *Maine*,
532 U.S. 742 (2001) ................................................10

*New York* v. *Trump*,
17-CV-5228 (NGG) (JO) (E.D.N.Y. Feb. 13,
2018) (slip op.).............................................8, 10, 30

*Perez* v. *Mortg. Bankers Ass'n*,
135 S. Ct. 1199 (2015) ............................................34

*Regents of Univ. of California* v. *United States
Dep't of Homeland Security*,
279 F. Supp. 3d 1011 (N.D. Cal. 2018)...............8, 30

**AR6138**

iv

TABLE OF AUTHORITIES—Continued

Page

STATUTES

8 U.S.C.

   § 1101(a)(15)(T) ........................................................13

   § 1101(a)(15)(U) .......................................................13

   § 1101(a)(27) ............................................................13

   § 1101(a)(51) ............................................................13

   § 1158 ......................................................................13

   § 1182(a)(9)(B) ........................................................14

   § 1182(a)(9)(C) ........................................................14


OTHER AUTHORITIES

18 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 4477 (1981) ....................10

Caitlin Dickerson, *For DACA Recipients, Losing Protection and Work Permits Is Just the Start*, The New York Times (Sept. 7, 2017) .........16, 17, 18

*Forum: Monday Political News Roundup*, KQED (Feb. 26, 2018) ........................................................19

Jessica Ferger, *Rescinding DACA Could Spur a Public Health Crisis, from Lost Services to Higher Rates of Depression, Substance Abuse*, Newsweek (Sept. 6, 2017) ...................................16, 17

Jose Magaña-Salgado & Tom K. Wong, *Draining the Trust Funds: Ending DACA and the Consequences to Social Security and Medicare*, Immigrant Legal Resource Center (Oct. 2017)............16

**AR6139**

v

TABLE OF AUTHORITIES—Continued

Page

Julia Carrie Wong, *Fear and Uncertainty for Dreamers as DACA Ends: 'Where am I going to go?'*, The Guardian (Sept. 5, 2017)......................19

Letter from Members of Congress to Elaine C. Duke, Acting Sec'y, Dep't Homeland Security (Sept. 26, 2017)........................................................32

Maria Sacchetti, Patricia Sullivan and Ed O'Keefe, *DACA Injunction Adds to Limbo for "Dreamers" as Trump Crackdown, Hill Talks Continue*, The Washington Post (Jan. 10, 2018) ........................................................................17

Memorandum from Acting Secretary Elaine C. Duke on Rescission of Deferred Action for Childhood Arrivals (DACA) (Sept. 5, 2017)........8, 30

Memorandum from Janet Napolitano, Sec'y of Homeland Security, U.S. Dep't of Homeland Security, to David V. Aguilar, Acting Comm'r, U.S. Customs and Border Prot., *et al.* (June 15, 2012) ......................................................................28

Memorandum from Secretary Kirstjen M. Nielsen on the Rescission of Deferred Action for Childhood Arrivals (DACA) (June 22, 2018)......9, 11

Michelle Hackman, *U.S. Immigration Courts' Backlog Exceeds One Million Cases*, The Wall Street Journal (Sept. 18, 2019)................................25

Parija Davilanz, *For Dreamers, DACA's End Could Mean Losing Their Homes*, CNN (Jan. 24, 2018) ................................................................18

**AR6140**

vi

TABLE OF AUTHORITIES—Continued

Page

President Barack Obama, Remarks by the Pres-
ident on Immigration (June 15, 2012)....................28

Press Release, Congressional Hispanic Caucus,
CHC Request Reset of DACA Renewal Dead-
line (Oct. 3, 2017) .....................................32

Press Release, Congressman Gutiérrez, Reps.
Roybal-Allard, Lujan Grisham, Gutiérrez
Statement on October 5th DACA Deadline
(Sept. 28, 2017).......................................32

Priscilla Alvarez, *Will DACA Parents Be Forced
to Leave Their U.S.-Citizen Children Behind?*,
The Atlantic (Oct. 21, 2017)..............................18, 19

Sheryl Gay Stolberg and Yamiche Alcindor,
*Trump's Support for Law to Protect 'Dreamers'
Lifts Its Chances*, The New York Times (Sept.
14, 2017) ..............................................29

Sophie Tatum, *Trump: I'll 'Revisit' DACA if Con-
gress Can't Fix In 6 Months*, CNN (Sept. 6,
2017) ..................................................29

Tom K. Wong, *et al*., *2017 National DACA Study*,
Ctr. for Am. Progress (Aug. 28, 2017) .....................14

Tom K. Wong, *et al*., *Paths to Lawful Immigra-
tion Status: Results and Implications from the
PERSON Survey*, 2 J. Migration and Hum. Se-
curity 4 (2014) ........................................13

**AR6141**

1

### INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are nonprofit legal services organizations that provide legal assistance on immigration issues to low-income immigrants. *Amici* include 47 organizations, listed and described in the Appendix. Many of *amici*'s clients are eligible for Deferred Action for Childhood Arrivals ("DACA"). Cumulatively, *amici* helped thousands of young people apply for DACA between 2012 and 2017 and have provided legal counseling to many of these same youth in an effort to help them understand their immigration options since the Department of Homeland Security ("DHS") decided to rescind DACA in September 2017. When DHS rescinded DACA, eligible recipients initially had only four weeks to apply for renewal. As a result, *amici* scrambled to help their clients meet the new deadline and to consider whether there were any newly-available options to gain immigration status.[2] Staff at many of the *amici* organizations worked around the clock to

---

[1] All parties have filed blanket consents to the filing of amicus briefs. Blanket Consents filed by Petitioner and Respondents, *Dep't of Homeland Security* v. *Regents of the Univ. of California* (No. 18-587) (July 10, 2019, July 17, 2019, July 23, 2019, July 29, 2019, July 30, 2019, July 31, 2019, and Aug. 1, 2019). Pursuant to Supreme Court Rule 37.6, counsel for *amici* represent that this brief was not authored in whole or in part by counsel for a party and that none of the parties or their counsel, nor any other person or entity other than *amici*, their members, or their counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

[2] *Amici* regularly screened clients for eligibility for forms of immigration relief that would lead to permanent immigration status before assisting clients with applications for DACA.

2

contact and counsel as many clients subject to the new
deadline  as possible and to quickly organize legal clin-
ics to meet their clients' legal needs. *Amici* have ob-
served firsthand the profound negative effects the
Government's decision to rescind DACA has had on
their clients and the uncertainty their clients now face
in every aspect of their lives. As a result of their work
with undocumented immigrants generally, and DACA-
eligible individuals in particular, *amici* are well-posi-
tioned to articulate the nature of the reliance interests
engendered by DACA, the legal framework DACA-eli-
gible individuals must navigate if DACA is rescinded,
and the effects rescission would have on their clients,
their organizations, and the communities they serve.[3]

———————◆———————

## SUMMARY OF ARGUMENT

In applying for DACA, hundreds of thousands of
brave young people raised their hands and announced
their presence in the United States, encouraged by the
federal government's assurances that they would be
considered for protection from immigration enforce-
ment action. Relying on these assurances, DACA recip-
ients applied for work authorization, pursued their
educations, planned for their families' futures, and im-
proved their lives in ways they had dreamed of for

---

[3] Counsel for *amici* have interviewed and/or received infor-
mation from the legal services organizations that are filing this
brief. Information throughout the brief that relates to these or-
ganizations' clients was obtained through these interviews and/or
related requests for information.

**AR6143**

years. Then, on September 5, 2017, DHS abruptly rescinded DACA, causing immediate chaos, uncertainty, and fear. If the judgments below are reversed and the rescission of DACA is reinstated, hundreds of thousands of young people will face a frightening and uncertain future, despite assurances from the Government that enticed them to come forward in the first place. Nearly all DACA recipients will lose the ability to apply for work authorization (likely leading them to lose their jobs and health insurance) and countless other resources they have worked hard to acquire. Losing DACA will leave most DACA recipients without any protection from deportation and force them either to leave the only country they have known since early childhood or to live in constant fear of removal. The rescission of DACA would also harm many family members of DACA recipients, including U.S.-citizen children, who rely on them for support.

If DACA is rescinded, *amici*—legal services organizations that serve these young people and other vulnerable immigrant populations—would also be harmed. They would struggle to meet the needs of an enormous population of immigrants suddenly in need of immediate legal advice and assistance. *Amici* already experienced this situation once, when they were thrown into chaos after the Government issued its decision to rescind DACA in September 2017, during the one-month window originally imposed for filing renewal applications. At the same time that demands on their time would greatly increase, *amici* would also lose valuable

4

DACA-recipient staff, whom *amici* hired and trained in reliance on DACA.

Despite all this, DHS did not consider, let alone address, the dire consequences its decision would have. Not only is it reckless for an administrative agency to play fast and loose with people's lives in this way, it is also unlawful. This Court has made clear that, under the Administrative Procedure Act ("APA"), when an administrative agency changes policy it *must* consider, among other things, the reliance interests engendered by the previous policy. It must also provide an explanation for the change that is cogent and consistent. Where, as here, an agency neither considers reliance interests nor provides a cogent and consistent explanation for its decision, that decision is arbitrary and capricious. The reliance interests at stake here are substantial because hundreds of thousands of DACA recipients have no choice other than to rely upon the continuation of DACA. The rescission of DACA would inflict very real, tangible damage on hundreds of thousands of people who came forward to be counted and to contribute to this nation, on their dependents, and on the legal services organizations that work tirelessly to serve this community. The Government's failure to even consider these foreseeable and significant consequences of its change in policy renders the rescission unlawful.

—————◆—————

5

## ARGUMENT

**I.**    **The Government Completely Failed to Consider How Rescinding DACA Would Affect Those Who Reasonably Relied on DACA and, as a Result, the Rescission Is Arbitrary and Capricious.**

If the Government's decision to rescind DACA is upheld, the effects on DACA recipients will be severe. Most have no other available path to obtain work authorization, earn a living, or pursue an education, and will find themselves in legal uncertainty and without the means to support themselves and their families. The organizations that support them will lose the significant investments they have made in hiring and training their DACA-recipient employees and in developing DACA-related programs. At the same time, these organizations will likely be overwhelmed with thousands of new requests for assistance as DACA recipients struggle to find ways to protect what they have achieved since 2012. The Government's decision to rescind DACA without considering any of these harms to the individuals' and organizations' reliance interests was arbitrary and capricious.

6

### A. The Government Induced DACA Recipients to Rely on DACA and Then Ignored Their Reliance Interests, in Violation of the APA.

The abrupt announcement that DHS was terminating DACA upended the lives of hundreds of thousands of DACA recipients, yet the agency had not even considered the effects its decision would have on their reliance interests. Through the implementation and continuation of DACA, the Government induced young undocumented immigrants brought to the United States as children to rely on DACA. Through DACA, they had new opportunities to obtain students loans to attend college, apply for work authorization so that they could work for living wages, obtain driver's licenses, and otherwise fully participate in society without fear of removal. During this period, DACA recipients have become even more integral to their communities, to which they have been making significant, positive contributions for years. Their reliance on DACA only increased over the five years that DACA remained in existence without adverse action by the Administration or the courts.[4]

Despite the enormous reliance interests created by the incentives and opportunities the Government presented to recipients of DACA, upon which the Government knew DACA recipients extensively relied, the Government nevertheless failed to consider these

---

[4] See, e.g., *Crane* v. *Johnson*, 783 F.3d 244, 255 (5th Cir. 2015); *Arpaio* v. *Obama*, 797 F.3d 11, 25 (D.C. Cir. 2015).

7

reliance interests when it rescinded DACA, plunging hundreds of thousands of young people into legal, educational, financial, and familial uncertainty. Rescinding DACA would strip recipients of the ability to plan for their futures in the only country they have known since early childhood and eliminate their ability to support themselves and those who rely on them—including their parents, spouses, and U.S.-citizen children. Instead of considering these interests—or even acknowledging them—DHS moved ahead with an ill-conceived policy change affecting hundreds of thousands of young people, overnight. That is not only bad policy, it is also unlawful because it renders the decision arbitrary and capricious under the APA.

When an agency has not engaged in a reasoned decision-making process, which, among other things, must include consideration of "serious reliance interests" engendered by the previous policy, the agency's decision is arbitrary and capricious and will not be upheld. *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009); see also *Encino Motorcars, LLC* v. *Navarro*, 136 S. Ct. 2117, 2125–27 (2016). This is so even if the parties have no constitutionally-protected liberty or property interests in the continuation of the previous policy. The agency cannot simply disregard reliance interests when changing policy. See *Encino Motorcars*, 136 S. Ct., at 2126 (explaining that an agency must articulate a reason for a changed position and take into account that "longstanding policies may have engendered serious reliance interests").

8

The record establishes that DHS paid no attention to the reliance interests of DACA recipients or others affected by its decision until months after the decision was made. DHS only acknowledged these interests at all after courts began holding that the agency was required to consider such reliance interests. Indeed, the Duke Memorandum rescinding DACA made no reference whatsoever to the rescission's effect on DACA recipients. Memorandum from Acting Secretary Elaine C. Duke on Rescission of Deferred Action for Childhood Arrivals (DACA) (Sept. 5, 2017), available at https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca (hereinafter the "Duke Memorandum"). Four months later, in January 2018, the U.S. District Court for the Northern District of California noted that the Secretary should have weighed "DACA's programmatic objectives as well as the reliance interests of DACA recipients," but failed to do so. *Regents of Univ. of California* v. *United States Dep't of Homeland Security*, 279 F. Supp. 3d 1011, 1044 (N.D. Cal. 2018). Similarly, in February 2018, when the U.S. District Court for the Eastern District of New York enjoined the Government from rescinding DACA, it determined that there was no evidence whatsoever in the record that DHS had considered how rescission would affect DACA recipients. *New York* v. *Trump*, 17-CV-5228 (NGG) (JO) (E.D.N.Y. Feb. 13, 2018) (slip op., at 43) ("The record does not indicate that Defendants acknowledged, let alone considered, these *or any other reliance interests* engendered by the DACA program." (emphasis added)).

9

A few months later, in April 2018, the U.S. District Court for the District of Columbia "vacated" the Duke Memorandum but stayed its decision to allow the Government an opportunity to more fully explain its decision. Order, *Nat'l Ass'n for the Advancement of Colored People* v. *Trump*, Civ. Action No. 17-1907 (JDB) (D.D.C. Apr. 24, 2018) (hereinafter the "D.D.C. Order") ("Because DHS failed to even acknowledge how heavily DACA beneficiaries had come to rely on the expectation that they would be able to renew their DACA benefits, its barebones legal interpretation was doubly insufficient and cannot support DACA's rescission.").

It was not until June 2018, nine months after the Duke Memorandum, and six months after the Northern District of California enjoined the DACA rescission, that DHS paid lip-service to the idea of considering DACA recipients' reliance interests in a memorandum issued in response to an order from the D.C. District Court. See Memorandum from Secretary Kirstjen M. Nielsen on the Rescission of Deferred Action for Childhood Arrivals (DACA) at 3 (June 22, 2018) (hereinafter the "Nielsen Memorandum"). Even then, the Secretary merely asserted, without providing any reasoning, analysis, or explanation, that any reliance interests that existed were outweighed by the allegedly questionable legality of DACA and "other reasons for ending the policy." *Id*. This perfunctory nod to reliance interests is insufficient, especially in light of DHS's earlier contention in the litigation that any reliance

10

interests were not longstanding or serious enough to even require consideration. See Memorandum of Law in Opp'n Pl.'s Mots. Prelim. Injunction, *New York* v. *Trump*, 1:17-CV-5228 (NGG) (JO) (E.D.N.Y. Jan. 13, 2018) at 16–17. "[A]bsent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *New Hampshire* v. *Maine*, 532 U.S. 742, 749 (2001) (citing 18 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 4477 at 782 (1981)).

In its opening brief, the Government does not even meaningfully contest its failure to consider reliance interests. Pet. Br. at 42–43. Instead, it argues that Secretary Nielsen need not have considered any reliance interests held by stakeholders because DACA was a "temporary stop-gap measure" that "confer[red] no substantive right." *Id*. But, merely asserting that DACA was not intended to create reliance interests does not demonstrate that those interests did not exist, let alone that the agency may ignore such interests. See *Encino Motorcars*, 136 S. Ct. at 2126. The Eastern District of New York noted as much when it correctly dismissed DHS's argument, explaining that a substantive right need not exist for the agency to be required to consider reliance interests engendered by a policy the agency seeks to change. *New York* v. *Trump*, 17-CV-5228 (NGG) (JO) (slip op., at 4) (citing *Encino Motorcars*, 136 S. Ct., at 2124–26); see also D.D.C. Order ("Because DHS failed to even acknowledge how heavily DACA beneficiaries had come to rely on the expectation that

11

they would be able to renew their DACA benefits, its
barebones legal interpretation was doubly insufficient
and cannot support DACA's rescission."). Even Secre-
tary Nielsen explicitly acknowledged that "recipients
have availed themselves of [DACA] in continuing their
presence in this country and pursuing their lives."
Nielsen Memorandum at 3.

The Government also failed to consider any other
reliance interests, including those of *amici*, who have
worked tirelessly to assist DACA recipients and have
built extensive programs and infrastructure within
their organizations in reliance on DACA. They have
also hired and trained DACA recipients in reliance on
DACA. Even if the Secretary's statements constituted
adequate consideration of the reliance interests of
DACA recipients—and they do not—there is nothing
in the record that indicates the Government gave *any*
consideration to reliance interests of *amici* or the harm
they would suffer upon DACA's rescission.

The rescission of DACA and its effects on both re-
cipients and the organizations who serve and employ
them would mean that hundreds of thousands of peo-
ple may suddenly face the complicated immigration re-
moval system alone and without legal assistance,
given the serious limitations on resources many *amici*
(and other organizations like them) will face, described
*infra*. Given the enormity of the interests at stake and
the profound reliance interests generated over the
course of years, DHS's failure to consider these inter-
ests when it rescinded DACA renders that decision ar-
bitrary and capricious.

12

### B. DACA Recipients' Reliance Interests Are Significant Because Most Do Not Qualify for Other Forms of Immigration Relief.

*Amici* routinely screened DACA-eligible immigrants to determine whether they qualified for immigration relief under any available program. The vast majority of their DACA-eligible clients do not qualify for permanent immigration status or any other form of protection from removal from the United States.[5] Moreover, contrary to popular perception, there is no provision that protects DACA recipients from removal based on how long they have lived in the United States, even if they have been here nearly all their lives, contributed positively to their communities, and excelled academically. Additionally, despite arguments made in other contexts, such as the ongoing litigation in the U.S. District Court for the Southern District of Texas, DACA did not create a "loophole" by which DACA recipients could "cut in line" to obtain immigration relief or citizenship ahead of those applicants who applied from their home countries. See, e.g., Pl.'s Mot. Prelim. Injunction and Memorandum in Support, *Texas* v. *United States*, 1:18-cv-68 (S.D. Tex. 2018) at 3. Rather,

---

[5] As Respondents note, DACA is consistent with various Acts of Congress that view undocumented immigrants who came here as children or have been in the United States for a long time as low enforcement priorities. See Brief of Respondents the States of California, et al. at 32 n. 11, *Dep't of Homeland Security* v. *Regents of the Univ. of California*, Nos. 18-587, 18-588, 18-589 (U.S. Sept. 27, 2019). As set forth in the Office of Legal Counsel opinion cited therein, DACA is consistent with this legislation. *Id.* at 4, 43; J.A. 827 n. 8.

AR6153

13

DACA provided young people who had no choice whether to immigrate to the United States with a path to obtain immigration relief that is entirely distinct from DHS's visa-granting programs. The tiny fraction of DACA recipients who have obtained lawful immigration status were eligible for such status independently of DACA.

*Amici*'s experience, based upon years of screening and advising DACA-eligible clients, is that most have not suffered the requisite harm to be eligible for humanitarian forms of immigration relief, and do not have qualifying relatives through whom they can apply for family-based relief. Academic research confirms *amici*'s experience. See, e.g., Tom K. Wong, *et al.*, *Paths to Lawful Immigration Status: Results and Implications from the PERSON Survey*, 2 J. Migration and Hum. Security 4, 287–304 (2014). The rescission of DACA therefore would leave the vast majority of DACA recipients without any protection from deportation.

Humanitarian-based immigration options, such as asylum, Special Immigrant Juvenile Status ("SIJS"), and U and T visas, are narrowly-tailored forms of relief that typically require applicants to have survived persecution; parental neglect, abandonment, or abuse; a serious crime; or a severe form of human trafficking.[6]

---

[6] See 8 U.S.C. § 1158 (asylum) (based on past persecution or a well-founded fear for future persecution); 8 U.S.C. § 1101(a)(27)(SIJS); 8 U.S.C. § 1101(a)(15)(U) (U visas); 8 U.S.C. § 1101(a)(15)(T) (T visas); 8 U.S.C. § 1101(a)(51) (VAWA).

14

Most DACA recipients have not experienced these hardships and do not qualify for these forms of relief.

Most DACA recipients are also not eligible for family-based immigration relief because they do not have a qualifying relative. Even those very few DACA recipients who might have a qualifying relative would typically have to leave the country to apply for a family-based visa at a U.S. consulate abroad. Moreover, most would face strict bars to re-entry because their original entry (even though they were children at the time) was unlawful, resulting in the accrual of "unlawful presence" between the age of 18 and receipt of DACA.[7] 8 U.S.C. § 1182(a)(9)(B)–(C). The average DACA recipient who applied in 2012 was 20 years old and thus had already accrued two years of unlawful presence before receiving DACA, which results in a ten-year bar to re-entering the United States. See Tom K. Wong, *et al.*, *2017 National DACA Study*, Ctr. for Am. Progress (Aug. 28, 2017) at 12 (hereinafter the "2017 National DACA Study"); 8 U.S.C. § 1182(a)(9)(B)(i)(II). DACA recipients would have to abandon their families, jobs, and schools, and leave the only country most of them have ever known since early childhood, to wait out this ten-year period in their country of birth. Although unlawful presence may be waived, the standards are so difficult to meet that few DACA recipients

---

[7] DACA recipients who have accrued unlawful presence and depart the United States are barred from re-entry for varying lengths of time, depending on their length of unlawful presence and number of entries. 8 U.S.C. §§ 1182(a)(9)(B)(i)(I)–(II); 1182(a)(9)(C).

AR6155

15

are likely to qualify. In practice, then, these time bars act as complete barriers to relief.

Given how few DACA recipients qualify for immigration status or relief from removal, and the legal and practical hurdles they face even if they do qualify, the reality is that rescinding DACA would strip most recipients of the ability to work legally and obtain protection from deportation—and therefore will inevitably result in real and profound damage to the reliance interests that DACA recipients have nurtured since DACA's inception.

### C. Most DACA Recipients Will Lose the Ability to Work, Drive, Pay for College, and Plan for Their Lives if DACA Is Rescinded.

The reliance interests that DHS so blithely ignored in deciding to rescind DACA involve matters that are fundamental to DACA recipients' lives—indeed, they are matters fundamental to nearly all Americans. Because the vast majority of DACA recipients are not eligible for most other forms of immigration relief, they rely on DACA for their educational, professional, financial, and familial stability. Without DACA, families, workplaces, and communities will be disrupted and torn apart.

The revocation of DACA would strip its recipients of the ability to live and work legally in this country and would remove any protection from deportation. But the elimination of DACA would strike at

16

opportunities that "reverberate far beyond th[e] privileges" of legally living and working in the United States. Caitlin Dickerson, *For DACA Recipients, Losing Protection and Work Permits Is Just the Start*, The New York Times (Sept. 7, 2017), https://www.nytimes.com/2017/09/07/us/daca-losses-immigration.html (hereinafter "*Losing Protection*"). DACA recipients have been able to participate fully in economic life and pursue higher educational opportunities more readily. For example, DACA recipients who are now able to work legally have been paying Social Security taxes with the expectation that they will be eligible for Social Security benefits upon retirement, which they will lose if DACA is rescinded.[8] And 69% of DACA recipients "earn[ed] more money [after qualifying for DACA], which . . . helped [them] become financially independent." 2017 National DACA Study at 3. As a result of their employment, many DACA recipients also obtained employer-based health insurance. See Jessica Ferger, *Rescinding DACA Could Spur a Public Health Crisis, from Lost Services to Higher Rates of Depression, Substance Abuse*, Newsweek (Sept. 6, 2017), https://www.newsweek.com/daca-immigration-heath-care-access-mental-health-660539. After the implementation of DACA, approximately 80% of DACA recipients

---

[8] Soc. Sec. Admin., Social Sec. No. and Card-Deferred Action for Childhood Arrivals, https://www.ssa.gov/pubs/deferred_action.pdf (last visited Sept. 25, 2019); Jose Magaña-Salgado & Tom K. Wong, *Draining the Trust Funds: Ending DACA and the Consequences to Social Security and Medicare*, Immigrant Legal Resource Center (Oct. 2017), https://www.ilrc.org/sites/default/files/resources/2017-09-28_draining_the_trust_funds.pdf.

17

obtained driver's licenses for the first time and approximately 65% of recipients pursued educational opportunities they previously could not pursue. 2017 National DACA Study at 7, 9.

DACA recipients not only benefitted from opportunities newly available to them, but undertook obligations in reliance on DACA as well. They made "life decisions such as buying homes, pursuing graduate degrees, and starting families. Those decisions came with major obligations that may be unmanageable without a steady job or benefits, but that cannot be canceled or renegotiated." Dickerson, *Losing Protection*. If DACA is rescinded, investments in student loans, business start-up costs, employment opportunities, cars, and homes will lose most—if not all—of their value. Countless DACA recipients, heeding advice that education is the key to advancement, undertook significant student loan debt to earn degrees they trusted would lead to better, high-paying jobs, but which, without DACA, are worthless. For example, one DACA recipient who took out $100,000 in student loans to get through college, reported that, without work authorization, she will likely not even "be able to renew her apartment lease," let alone "fulfill her dreams of attending law school." See Maria Sacchetti, Patricia Sullivan and Ed O'Keefe, *DACA Injunction Adds to Limbo for "Dreamers" as Trump Crackdown, Hill Talks Continue*, The Washington Post (Jan. 10, 2018). And another DACA recipient, who in 2017 had already borrowed approximately $40,000 to cover her law school expenses—and expected to borrow at least $20,000 more to complete her degree—feared that, without DACA, she would be

AR6158

18

unable to practice law and would have to rely on much lower-paying jobs to make ends meet. Dickerson, *Losing Protection*. Many of *amici*'s clients are students with similar experiences, having taken out loans and worked hard to put themselves through school to become police officers, psychologists, and dentists. Others, who were finally able to apply for mortgages and buy homes—"the pinnacle of the American Dream"—feared they would be unable to pay for the homes they had purchased when they were able to work legally. See Parija Davilanz, *For Dreamers, DACA's End Could Mean Losing Their Homes*, CNN (Jan. 24, 2018), https://money.cnn.com/2018/01/24/news/economy/daca-dreamers-homeowners/index.html.

Moreover, DACA recipients made life-altering decisions about their family lives in reliance on DACA. These choices will be upended if DACA is rescinded; the effects will be terribly disruptive and will deeply impact U.S. citizens as well. Many DACA recipients will be forced to make heart-breaking decisions about the future of their families, and in particular about the future of their U.S.-citizen children. DACA recipients who are parents will have to decide whether to take their U.S.-citizen children with them if they leave or are deported (separating their children from the communities they know and significantly disrupting their lives) or face long-term and possibly permanent separation from their children. Priscilla Alvarez, *Will DACA Parents Be Forced to Leave Their U.S.-Citizen Children Behind?*, The Atlantic (Oct. 21, 2017), https://

AR6159

19

www.theatlantic.com/politics/archive/2017/10/donald-
trump-daca/543519/ (explaining that, because of the
rescission of DACA, an estimated 200,000 U.S.-citizen
children are at risk of being separated from their
DACA-recipient parents). As of 2017, approximately
25% of DACA recipients had a child who is a U.S. citi-
zen. *Id*. If these DACA recipients decide to leave their
U.S.-citizen children in the United States, they will
need to make legal, practical, and financial arrange-
ments for the care and custody of those children.

These harms are not speculative. One study pro-
filed a DACA recipient who "was born in Mexico, but
came to the United States at the age of nine. She re-
ceived DACA when she was studying for a master's de-
gree at Stanford. She bought a house, married another
DACA recipient, and has two children who are U.S. cit-
izens." Julia Carrie Wong, *Fear and Uncertainty for
Dreamers as DACA Ends: 'Where am I going to go?'*,
The Guardian (Sept. 5, 2017), https://www.theguardian.
com/us-news/2017/sep/05/dreamers-daca-trump-ends-
program-fears-for-future. This DACA recipient is not
eligible for other immigration relief, so she and her
partner must consider options "to protect [their]
daughters in case [they] are deported." *Id. Amici* are
aware of countless similar situations among their cli-
ents, which cause their clients a significant amount of
stress and anxiety. See generally *Forum: Monday Po-
litical News Roundup*, KQED (Feb. 26, 2018), https://
www.kqed.org/forum/2010101864021/monday-political-
news-roundup (discussing "state of limbo" faced by
DACA recipients).

20

The reliance interests of DACA recipients in DACA's continuation implicate every facet of their lives and their communities. These interests are substantial, and the consequences of rescinding DACA would be dire for DACA recipients and their families. Nonetheless, the record indicates the Government ignored these interests, and went so far as to claim they were too insubstantial to warrant consideration, despite the Government's obligation to consider reliance interests as part of its reasoned decision-making. The decision to rescind the policy without even acknowledging these interests was thus arbitrary and capricious.

### D. Rescinding DACA Will Also Harm Organizations that Represent DACA-Eligible Individuals.

Given *amici*'s role in providing services to their DACA-recipient clients, *amici* understand that the primary harm that would occur if DACA were rescinded would be to DACA recipients. However, DACA's rescission would also have countless ripple effects in myriad communities throughout the country. The harm caused to *amici* represents just one, albeit grave, example of these harms. If DACA is rescinded, *amici* and similar organizations will lose the benefit of the significant investment of time and resources that have been expended in reliance on DACA's existence. They will be overwhelmed with client needs resulting from the rescission and face those needs with depleted staff as their DACA-recipient employees become ineligible for work permits. Many *amici* are leanly staffed and

21

funded and will not have the resources needed to meet the emergent legal needs of thousands of new and existing clients who will be plunged into crisis if DACA is rescinded. This effect on the legal services organizations will in turn cause additional harm to DACA recipients, as they try to find legal assistance in a community of overwhelmed legal services providers.

The rescission of DACA would upend the programs and resources crafted by *amici* in reliance on the guidelines, and it would render moot *amici*'s investment of substantial time and funding in the years following announcement of the guidelines. *Amici*'s reliance on DACA increased as the eligible population became more comfortable coming forward. As hundreds of thousands successfully received deferred action and the few legal challenges that were brought failed without this Court granting further review, *amici* organizations shifted and increased programming to meet community needs. Since DACA's inception in 2012, *amici* and similar organizations have played a critical role in counseling candidates eligible for DACA and ensuring they receive the step-by-step legal assistance they need to apply for DACA. Many organizations spent significant resources educating the community about DACA after it was first announced. When the guidelines were initially implemented, eligible immigrants were hesitant to apply out of fear the Government would use their application information to remove them from the United States. For instance, staff at Church World Service ("CWS") recall that fear was so rampant that, initially, no participants would

**AR6162**

22

show up to DACA informational sessions or clinics. CWS and other *amici* expended considerable time and effort to assuage these fears and help clients build the courage to apply for DACA, which eventually came to be understood as a reliable and safe path for young adults brought here as children to obtain deferred action and work authorization.

As those education efforts succeeded, the organizations shifted to providing large-scale legal assistance. *Amici* and similar organizations screened candidates for eligibility for DACA as well as for more permanent forms of immigration relief. They helped those who were eligible for DACA apply in the first instance and later helped DACA recipients apply to renew. *Amici*'s role has included: (i) screening interested candidates for DACA eligibility criteria, including taking account of each applicant's unique circumstances; (ii) assisting eligible candidates to complete and file DACA applications—a complicated process that U.S. Citizenship and Immigration Services ("USCIS") itself has recognized often requires legal assistance;[9] (iii) assisting with follow-up, including responding to USCIS requests for evidence; (iv) handling renewal applications, including giving additional legal advice resulting from a change in an applicant's circumstances; and (v) aiding DACA applicants and recipients in applying for

---

[9] See *Find Legal Services*, USCIS, https://www.uscis.gov/ avoid-scams/find-legal-services (last visited Sept. 26, 2019) ("If [applicants] are not sure . . . which USCIS forms to submit, then [they] may need immigration legal advice from an authorized service provider.").

23

employment authorization, which involves filing a seven-page application and analyzing over twenty-five pages of instructions.[10]

To keep up with demand, *amici* gradually increased DACA-related programs, trainings, and staff positions. For example, the Legal Aid Society in New York City (the "Society") handles several hundred DACA cases per year. The Society works on individual DACA renewals on an ongoing basis, and holds group application assistance clinics at *pro bono* law firms where they can counsel numerous applicants in a single day. In order to keep up with demand, paralegal staff became Department of Justice-accredited representatives so that they could assist with DACA renewals, as well as with other immigration matters. As a part of their training, the Society began providing paralegal case managers with DACA-specific training because, given the volume of its DACA practice, nearly all case managers were working on DACA cases. All of these shifts required investments of time and money. For the Society and many other *amici*, the rescission of DACA means that the resources invested in providing DACA-specific training to case managers and developing application assistance clinics over the past seven years will all be lost.

Since 2012, *amici* have also been committed to outreach activities aimed at ensuring that information about DACA reaches its intended beneficiaries. *Amici*

---

[10] See *I-765, Application for Employment Authorization*, USCIS, https://www.uscis.gov/i-765 (last visited Sept. 26, 2019).

24

have devoted substantial time and resources to providing young immigrants with accessible and reliable information about DACA by, for example, creating know-your-rights pamphlets, hosting clinics and information sessions, promoting information through social media, and counseling members of their communities. Many organizations have dedicated significant resources toward this effort, and have been forced to devote even more since September 2017 to keep their clients well-informed.

Rescission of DACA would also cause legal services organizations to be inundated with calls from new and prospective clients with questions and concerns about their immigration status. *Amici* would be forced to divert their already-strained resources to triage this influx of need, much like they experienced during the one-month renewal period following issuance of the Duke Memo. See *infra* Section II.B. Many *amici* would also be faced with the difficult process of re-screening almost all of their DACA-eligible clients, and likely others who did not come forward for legal assistance when they initially applied for DACA, to identify any forms of relief that may now be available to them. Many *amici* have served hundreds and even *thousands* of DACA clients and will be overwhelmed with the increased need. For example, the Society has assisted thousands of DACA recipients over the last seven years. When initial applications began in August 2012, the demand for services far outpaced the agency's ability to meet the need, with the result that desperate young would-be applicants spent the night camped

25

outside its Brooklyn office in the hopes of being among the people served the next morning. Should DACA be rescinded, similar demands are anticipated.[11] If in the end there is no alternative form of relief available to specific DACA recipients, it will be impossible for *amici* to represent them all in removal proceedings given that there are nearly 700,000 potentially affected individuals.[12] This will leave DACA-recipient clients, who will have significant legal needs, with very limited options.

Finally, rescission of DACA would prevent DACA recipients from renewing employment authorization, so *amici* may lose valuable employees who rely on DACA. Staff of *amici* who are DACA recipients have desirable language skills and cultural competency to work with immigrant communities. Their experiences, knowledge, existing networks, and trust within their communities render them uniquely suited to meet the needs of such communities. The loss of these staff would not only disrupt *amici*'s ability to provide

---

[11] Volunteers of Legal Service ("VOLS"), for example, which has only three full-time immigration staff, would need to re-screen the more than 600 DACA recipients they served.

[12] Beyond the burden placed on *amici* and their clients if removal proceedings were initiated against 700,000 individuals, immigration courts would also be tremendously burdened by adding this number of removal proceedings to the over 1 million proceedings that are currently backlogged. See Michelle Hackman, *U.S. Immigration Courts' Backlog Exceeds One Million Cases*, The Wall Street Journal (Sept. 18, 2019), https://www.wsj.com/articles/u-s-immigration-courts-backlog-exceeds-one-million-cases-11568845885.

26

compassionate, informed services, but also could inca-
pacitate some *amici* through the sudden loss of these
employees. The individual clients of DACA-recipient
employees will lose their advocates, and this work will
be difficult for *amici* to transition to others in their or-
ganizations, given that most *amici* are leanly staffed.
The loss of staff at exactly the same time when demand
for their services increases substantially would be dev-
astating to *amici* and all of their clients.

*Amicus* organization Immigrant Justice Corps
("IJC"), for example, employs DACA recipients as part
of its fellowship program, the mission of which is to re-
cruit, train, and populate the immigration field with
high-quality legal advocates. Attorneys and non-attor-
neys (who become Department of Justice-accredited
representatives) represent immigrants before DHS
and in court through the fellowship program in a vari-
ety of immigration matters, including DACA applica-
tions. These fellows, including DACA recipients, have
served more than 60,000 clients since the fellowship
program's inception in 2014. The DACA-recipient fel-
lows, as individuals directly affected by immigration
policies, bring a unique and invaluable perspective on
the immigration system and its impact on individuals
and families. The loss of these fellows would substan-
tially harm both the program and the clients the pro-
gram serves.

Given *amici*'s reliance interests, even were DHS's
statements to constitute evidence of adequate consid-
eration of the reliance interests of the DACA recipi-
ents—and they do not—there is nothing in the record

27

that indicates the Government gave *any* consideration
to reliance interests of *amici* that provide services and
employment to DACA recipients or the harm they
would face from rescission. See *Fox Television Stations*,
556 U.S. at 515–16 (explaining that when a "prior pol-
icy has engendered serious reliance interests . . . [i]t
would be arbitrary or capricious to ignore such mat-
ters," and an agency seeking to change the policy must
provide a "reasoned explanation for disregarding facts
and circumstances that underlay or were engendered
by the prior policy"). The Government's complete fail-
ure to consider or acknowledge *any* of these important
reliance interests renders the decision to rescind
DACA arbitrary and capricious.

## II. The Government's Justifications for Re-
scinding DACA Are Belied by the Nature of
Its Implementation.

The Government's decision to rescind DACA was
internally inconsistent because allowing some DACA
recipients to renew, but requiring them to do so on an
arbitrarily short timeline, runs counter to the Govern-
ment's stated justifications for rescission and its own
policy statements. First, despite its arguments in this
litigation that DACA was unlawful, the Government
implemented a narrow exception when it rescinded
DACA, allowing a small number of DACA recipients to
renew during a short window. If DHS believed that
DACA was unlawful, it should not have allowed renew-
als at all. Second, when it rescinded DACA, DHS im-
posed a one-month window for applying for renewal,

28

while also declaring that its goal was an "orderly" end to DACA. If DHS truly intended an orderly wind-down of DACA, it would not have imposed an arbitrary and unreasonably short deadline on the complicated renewal process, and the chaos that ensued proves this point.

When DACA was adopted in 2012, young undocumented immigrants brought to the United States as children were told by DHS that they could apply to remain and work lawfully in the United States. See Memorandum from Janet Napolitano, Sec'y of Homeland Security, U.S. Dep't of Homeland Security, to David V. Aguilar, Acting Comm'r, U.S. Customs and Border Prot., *et al.*, at 2–3 (June 15, 2012). The policy's intent was to avoid "expel[ling] talented young people, who, for all intents and purposes, are Americans." President Barack Obama, Remarks by the President on Immigration (June 15, 2012), https://obamawhitehouse.archives. gov/the-press-office/2012/06/15/remarks-president-immigration. Even after DHS rescinded DACA, President Trump referenced allowing DACA recipients to be able to remain safely in the country:

> We're looking at allowing people to stay here. We're working with everybody. . . . Everybody is on board. . . . We're not talking about amnesty. We're talking about . . . taking care of people, people that were brought here, people that have done a good job, and were not brought here of their own volition.

AR6169

29

Sheryl Gay Stolberg and Yamiche Alcindor, *Trump's Support for Law to Protect 'Dreamers' Lifts Its Chances*, The New York Times (Sept. 14, 2017), https://www.nytimes.com/2017/09/14/us/politics/trump-daca-dreamers.html. President Trump also indicated that he would revisit the continuation of DACA if a deal did not pass Congress within six months. Sophie Tatum, *Trump: I'll 'Revisit' DACA if Congress Can't Fix In 6 Months*, CNN (Sept. 6, 2017), https://www.cnn.com/2017/09/05/politics/donald-trump-revisit-daca/index.html. The rescission of DACA and the rescission's devastating effects were not consistent with these kinds of statements.

### A. The Government's Justification for Rescission that DACA Was Illegal Was Inconsistent With Allowing Some DACA Recipients to Renew.

Although the Duke Memorandum claimed that DACA contained "legal and constitutional defects," it provided an exception to total rescission for a limited set of DACA recipients. This opportunity was limited to individuals whose status was expiring between September 5, 2017 and March 5, 2018, despite USCIS's past practice of allowing a one-year renewal grace period (which in many cases was utilized because candidates were unable to afford the $495 filing fee given the financial strains experienced by many DACA recipients).[13] Any renewals filed subject to the exception

---

[13] Prior to the announcement of the exception to the rescission, USCIS had in its written guidance that DACA provided a one-year grace period for DACA recipients to renew their status

30

were required to be physically received by USCIS on or before October 5, 2017. Duke Memorandum. Individuals eligible for this exception could renew their work authorization for an additional two years, assuming they could quickly file before the renewal window closed on October 5, 2017.

The Government's decision to allow for renewal of DACA status without explaining how, if DACA were truly unlawful, it could continue to violate the law, is itself arbitrary and capricious. See *Encino Motorcars*, 136 S. Ct. at 2126 ("[A]n 'unexplained inconsistency' in agency policy 'is a reason for holding an interpretation to be an arbitrary and capricious change. . . .'" (internal citation omitted)). The lower courts correctly recognized this. See D.D.C. Order, Civ. Action No. 17-1907 (JDB) (slip op., at 41–45); *Regents*, 279 F. Supp. 3d, 1011 at 1045–46; *New York* v. *Trump*, 17-CV-5228 (NGG) (JO) (slip op., at 37–39).

Without any statements from the Government in the record on this point, there is no basis on which to come to any other conclusion. See also *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983) (explaining that this Court

---

after it expired. See https://www.uscis.gov/archive/frequently-asked-questions ("If you file after your most recent DACA period expired, but within one year of its expiration, you may submit a request to renew your DACA."). The Government failed to account for the fact that certain individuals were within that one-year grace period and waiting to renew in reliance on the USCIS guidance. Based on the way the exception was implemented, these individuals could not reapply.

31

has "frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner" in order to pass arbitrary and capricious review). Ultimately, the Government articulated no good reasons whatsoever for how it handled this important decision, which negatively affected so many people and organizations. As a result, the Government's actions were arbitrary and capricious.

## B.  The Chaotic Nature of the Rescission's Implementation Refutes the Government's Purported Desire for an "Orderly Wind-Down" of DACA.

The Government argues that it rescinded DACA in order to bring about an "orderly wind-down" of DACA rather than having DACA ended through litigation. Pet. Br. at 34–35. However, the way in which the Government implemented the rescission supports the findings of every lower court decision before the Court that the rescission was arbitrary and capricious. Once the rescission was announced, USCIS set an unprecedented and arbitrary one-month window—from September 5, 2017 to October 5, 2017—for eligible individuals, subject to the exception discussed above, to renew DACA. The chaos this would cause was clear from the beginning—when the rescission was announced, members of Congress repeatedly warned USCIS that a one-month window for renewals was unrealistic, particularly given the economic realities for

**AR6172**

32

many DACA recipients and the logistics of processing a large volume of applications by mail.[14]

This manner of implementing the alleged "careful" and "gradual[]" rescission, Pet. Br. at 56, did, in fact, result in chaos for *amici* and their clients. The termination of DACA and the arbitrary one-month window for renewal applications forced *amici*—who serve as a critical bridge in communicating information from USCIS to thousands of intended beneficiaries—to scramble. *Amici* had less than one month to both develop and implement a comprehensive response, including engaging in extensive community outreach

---

[14] On September 26, 2017, ninety-two members of Congress wrote a letter to Secretary Duke stating that "the decision to require all DACA recipients whose permits expire in the next six months to have their renewal submitted by October 5th is a deadline that is arbitrary and puts an undue financial burden on many law-abiding people within the program." Letter from Members of Congress to Elaine C. Duke, Acting Sec'y, Dep't Homeland Security (Sept. 26, 2017), https://newhouse.house.gov/sites/newhouse.house.gov/files/DACA%20Deadline%20Extension%20Letter_0.pdf.

The Congressional Hispanic Caucus, on September 28, asked the administration to "exercise common sense" and extend the deadline. Press Release, Congressman Gutiérrez, Reps. Roybal-Allard, Lujan Grisham, Gutiérrez Statement on October 5th DACA Deadline (Sept. 28, 2017), https://roybal-allard.house.gov/news/documentsingle.aspx?DocumentID=398344.

The Caucus wrote a final letter, on October 3, stating that 50,000 recipients—nearly one third of those eligible—had not submitted their applications due to tight timeframes and the substantial application fee. It again urged an extension. Press Release, Congressional Hispanic Caucus, CHC Request Reset of DACA Renewal Deadline (Oct. 3, 2017), https://congressionalhispaniccaucus-castro.house.gov/media-center/press-releases/chc-requests-reset-of-daca-renewal-deadline.

33

and counseling candidates who were immediately and adversely impacted by the rescission. This included an emergency outreach process, wherein lawyers and staff made efforts to identify and contact previous DACA clients to notify them of the upcoming renewal deadline. For many clients this required individualized outreach by telephone and other means, which consumed considerable resources and required the diversion of staff and other resources from other important programs.

The sudden and unanticipated rescission also generated fear and mistrust, which compounded the difficulties *amici* experienced conducting outreach. Otherwise eligible individuals became reluctant to access legal services or provide information to USCIS. In some instances, guidance counselors and social workers called *amici* on behalf of DACA applicants fearful of meeting with lawyers and staff. This need to liaise with intermediaries before being able to reach affected individuals further complicated the outreach process and forced *amici* to expend even more resources. For instance, *amici* were forced to postpone other client appointments in an attempt to triage among DACA renewal clients and other immigration cases, deferring work on other cases until after the renewal deadline.

In light of these harms, the Government's assertion that it was trying to accomplish an "orderly winddown" of DACA strains credulity. Pet. Br. at 34–35. The predictable scramble and the harm caused by implementation of the renewal window showed that the Government's decision was not "the product of reasoned

**AR6174**

34

decisionmaking." See *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43, 52. Instead, the implementation is indicative of the haphazard and thoughtless way in which the Government handled the rescission as a whole. The Government has not provided any evidence to support its decision to rescind DACA, especially on such an expedited timeline. See *Perez* v. *Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) ("[T]he APA *requires* an agency to provide more substantial justification when . . . its prior policy has engendered serious reliance interests that must be taken into account." (emphasis added) (internal citations and quotations omitted)). The Government's decision to give applicants and the organizations that serve them only one month to conduct thousands of attorney-client consultations and prepare tens of thousands of applications provides insight into the capricious nature of the decision-making process that went into the decision to rescind DACA, and it therefore cannot be upheld.

———————◆———————

## CONCLUSION

DACA recipients relied on DACA to develop their family, educational, financial, and professional lives, and they stand to lose all they have invested in this process if DACA is rescinded. *Amici* organizations have worked tirelessly to serve these deserving youth, but will be stretched far beyond capacity if DACA is, in fact, rescinded. They will lose staff and resources and their clients will suffer. The Government failed to consider the profound effects rescinding DACA would

**AR6175**

35

have on the reliance interests of those who had relied
on DACA, and this failure renders the rescission arbi-
trary and capricious. For all of these reasons, the judg-
ments of the U.S. Court of Appeals for the Ninth
Circuit, the U.S. District Court for the Eastern District
of New York, and the U.S. District Court for the District
of Columbia should be affirmed.

Respectfully submitted,

JONATHAN S. KOLODNER          MAUREEN P. ALGER
JESSA DEGROOTE                    *Counsel of Record*
DAVID Z. SCHWARTZ             MONIQUE R. SHERMAN
ABBEY GAUGER                 COOLEY LLP
CLEARY GOTTLIEB STEEN         3175 Hanover Street
   & HAMILTON LLP          Palo Alto, CA 94304
One Liberty Plaza            (650) 843-5000
New York, NY 10006           malger@cooley.com
(212) 225-2000
                             MARY KATHRYN KELLEY
                             COOLEY LLP
                             4401 Eastgate Mall
                             San Diego, CA 92121

                             KYLE C. WONG
                             COOLEY LLP
                             101 California Street
                             5th Floor
                             San Francisco, CA 94111

                             *Counsel for Amici Curiae*

**AR6176**

1a

**APPENDIX**

*Amici* include the following legal services organizations:

1. African Services Committee
2. American Gateways
3. Asian Law Alliance
4. Brooklyn Defender Services
5. Canal Alliance
6. Catholic Charities of Southern New Mexico
7. Central American Resource Center of California
8. Central West Justice Center
9. Centro Legal de la Raza
10. Children's Law Center of Massachusetts
11. Church World Service
12. Community Legal Center
13. Community Legal Services in East Palo Alto
14. Diocesan Migrant & Refugee Services, Inc.
15. Dolores Street Community Services
16. East Bay Sanctuary Covenant
17. Empire Justice Center
18. Equal Justice Center
19. Heartland Alliance's National Immigrant Justice Center
20. Hebrew Immigrant Aid Society (HIAS) Pennsylvania

AR6177

2a

21. Immigrant Justice Corps

22. Immigrant Law Center of Minnesota

23. Immigrant Legal Advocacy Project

24. Immigrant Legal Center

25. Immigrant Legal Resource Center

26. Just Neighbors

27. Justice Center of Southeast Massachusetts

28. The Latin American Association

29. La Union del Pueblo Entero

30. Legal Aid Justice Center

31. The Legal Aid Society in New York City

32. Legal Aid Society of San Mateo County

33. Legal Services for Children

34. Massachusetts Law Reform Institute

35. MinKwon Center for Community Action

36. National Justice for Our Neighbors

37. New Mexico Immigrant Law Center

38. New York Legal Assistance Group

39. Northern Manhattan Improvement Corporation

40. Northwest Immigrant Rights Project

41. OneJustice

42. Refugee and Immigrant Center for Education and Legal Services

43. Rocky Mountain Immigrant Advocacy Network

AR6178

3a

44. Safe Horizon

45. Services, Immigrant Rights, and Education Network

46. UnLocal, Inc.

47. Volunteers of Legal Service

AR6179

# Congress of the United States
## Washington, DC 20515

June 22, 2020

President Donald Trump
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C.  20500

Dear President Trump:

Following the Supreme Court's landmark decision rejecting your repeal of Deferred Action for Childhood Arrivals (DACA), we strongly urge you to change course and use your executive authority to protect, not deport, the young immigrants who are eligible for DACA.

Eight years ago, following bipartisan requests from Congress, President Obama used his legal authority to establish DACA.  DACA provides temporary protection from deportation on an individualized basis to immigrants who arrived in the United States as children if they register with the government, pay a fee, and pass criminal and national security background checks.  The young people who are eligible for DACA, known as Dreamers, are American in every way except for their immigration status.  More than 800,000 Dreamers have come forward and received DACA.  DACA has unleashed the full potential of Dreamers, who are contributing to our country as soldiers, nurses, teachers, and small business owners, and in many other ways.

In the midst of the COVID-19 pandemic, more than 200,000 DACA recipients are working in occupational areas that your Administration's Department of Homeland Security (DHS) identifies as part of the "essential critical infrastructure workforce."  This includes an estimated 41,700 DACA recipients working in the health care industry, including physicians and physicians in training, intensive care nurses, paramedics, respiratory therapists, nursing assistants, and health technicians.  It makes no sense to continue your efforts to deport these essential workers to countries they barely remember even as our nation grapples with the COVID-19 pandemic.

When you announced your repeal of DACA, you called on Congress to "legalize DACA," but since then, you have rejected numerous bipartisan deals to protect Dreamers. For example, on January 11, 2018, in a meeting in the Oval Office, you profanely rejected a bipartisan immigration agreement that included protection for Dreamers and a large down payment on your beloved border wall.  On February 15, 2018, the Senate considered a bipartisan amendment offered by Senators Mike Rounds (R-SD) and Angus King (I-ME) which included a path to citizenship for Dreamers.  A bipartisan majority supported the amendment, but it failed to reach the 60 votes needed to pass because your Administration issued a strident statement of opposition.  On the same day, the Senate rejected your hardline immigration proposal by a bipartisan supermajority of 39-60.

**AR6180**

On June 4, 2019, the House of Representatives passed H.R. 6, the American Dream and Promise Act, legislation that would give Dreamers a path to citizenship, on a strong bipartisan vote of 237-187.  The American Dream and Promise Act has now been pending in the Senate for more than a year.  Without your support, it is unlikely that Senate Republican Leader Mitch McConnell will schedule it for a vote.

Mr. President, it is not too late for you to do the right thing.  Specifically, we call on you to immediately:

1.  Publicly announce that you will not make another attempt to repeal DACA;

2.  Comply with the Supreme Court's decision by directing DHS to follow the June 15, 2012, memo issued by then-Secretary of Homeland Security Janet Napolitano called, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*; and

3.  Endorse the American Dream and Promise Act, which would pass the Senate on a strong bipartisan vote if you simply called on Leader McConnell to bring it to a vote.

As the Supreme Court has recognized, our nation can continue to protect Dreamers.  By contrast, your Administration's efforts to deport DACA recipients are needlessly cruel and would weaken our nation's essential workforce.  While only Congress can provide a pathway to citizenship for Dreamers, it is up to you whether that process is done as smoothly and as harmlessly as possible so that these young immigrants who have benefitted from America in countless ways can also continue contributing to our nation.

It would be an American tragedy to deport DACA recipients who are saving lives in the midst of this pandemic.  We must ensure these talented young immigrants are not forced to stop working when the need for their public service has never been greater.  And we must give them the chance they deserve to become American citizens.

We, and hundreds of thousands of Dreamers, await your response.

Sincerely,

| | | |
|---|---|---|
| Joaquin Castro<br>Member of Congress | | Lucille Roybal-Allard<br>Member of Congress |
| A. Donald McEachin<br>Member of Congress | Adam B. Schiff<br>Member of Congress | Adam Smith<br>Membr of Congress |
| Adriano Espaillat<br>Member of Congress | Al Green<br>Member of Congress | Alan Lowenthal<br>Member of Congress |
| Albio Sires<br>Member of Congress | Alcee L. Hastings<br>Member of Congress | Alexandria Ocasio-Cortez<br>Member of Congress |
| Alma S. Adams, Ph.D.<br>Member of Congress | Ami Bera, M.D.<br>Member of Congress | André Carson<br>Member of Congress |

2

**AR6181**

| | | |
|---|---|---|
| Andy Kim<br>Member of Congress | Ann Kirkpatrick<br>Member of Congress | Anna G. Eshoo<br>Member of Congress |
| Antonio Delgado<br>Member of Congress | Ayanna Pressley<br>Member of Congress | Barbara Lee<br>Member of Congress |
| Ben Ray Luján<br>Member of Congress | Bennie G. Thompson<br>Member of Congress | Betty McCollum<br>Member of Congress |
| Bill Foster<br>Member of Congress | Bobby L. Rush<br>Member of Congress | Bonnie Watson Coleman<br>Member of Congress |
| Brenda L. Lawrence<br>Member of Congress | Carolyn B. Maloney<br>Member of Congress | Cedric L. Richmond<br>Member of Congress |
| Donald M. Payne, Jr.<br>Member of Congress | Danny K. Davis<br>Member of Congress | Darren Soto<br>Member of Congress |
| David E. Price<br>Member of Congress | David N. Cicilline<br>Member of Congress | David Scott<br>Member of Congress |
| Deb Haaland<br>Member of Congress | Debbie Dingell<br>Member of Congress | Debbie Mucarsel-Powell<br>Member of Congress |
| Dina Titus<br>Member of Congress | Doris Matsui<br>Member of Congress | Earl Blumenauer<br>Member of Congress |
| Eleanor Holmes Norton<br>Member of Congress | Eliot L. Engel<br>Member of Congress | Emanuel Cleaver, II<br>Member of Congress |
| Filemon Vela<br>Member of Congress | Frank Pallone, Jr.<br>Member of Congress | Frederica S. Wilson<br>Member of Congress |
| G. K. Butterfield<br>Member of Congress | Gerald E. Connolly<br>Member of Congress | Gilbert R. Cisneros, Jr.<br>Member of Congress |
| Grace F. Napolitano<br>Member of Congress | Grace Meng<br>Member of Congress | Greg Stanton<br>Member of Congress |
| Gregory W. Meeks<br>Member of Congress | Gwen Moore<br>Member of Congress | Hakeem Jeffries<br>Member of Congress |
| Henry C. "Hank" Johnson, Jr.<br>Member of Congress | J. Luis Correa<br>Member of Congress | Jackie Speier<br>Member of Congress |
| Jahana Hayes<br>Member of Congress | James P. McGovern<br>Member of Congress | James R. Langevin<br>Member of Congress |
| Jamie Raskin<br>Member of Congress | Jan Schakowsky<br>Member of Congress | Jared Huffman<br>Member of Congress |

**AR6182**

| | | |
|---|---|---|
| Jason Crow<br>Member of Congress | Jerrold Nadler<br>Member of Congress | Jesús G. "Chuy" García<br>Member of Congress |
| Jim Costa<br>Member of Congress | Jimmy Panetta<br>Member of Congress | Joe Neguse<br>Member of Congress |
| John Garamendi<br>Member of Congress | José E. Serrano<br>Member of Congress | Joseph P. Kennedy, III<br>Member of Congress |
| Juan Vargas<br>Member of Congress | Judy Chu<br>Member of Congress | Julia Brownley<br>Member of Congress |
| Karen Bass<br>Member of Congress | Katherine Clark<br>Member of Congress | Linda T. Sánchez<br>Member of Congress |
| Lisa Blunt Rochester<br>Member of Congress | Lloyd Doggett<br>Member of Congress | Lori Trahan<br>Member of Congress |
| Madeleine Dean<br>Member of Congress | Marc Veasey<br>Member of Congress | Marcy Kaptur<br>Member of Congress |
| Mark Pocan<br>Member of Congress | Mark Takano<br>Member of Congress | Nanette Diaz Barragán<br>Member of Congress |
| Norma J. Torres<br>Member of Congress | Nydia M. Velázquez<br>Member of Congress | Paul D. Tonko<br>Member of Congress |
| Pete Aguilar<br>Member of Congress | Peter A. DeFazio<br>Member of Congress | Pramila Jayapal<br>Member of Congress |
| Raja Krishnamoorthi<br>Member of Congress | Rashida Tlaib<br>Member of Congress | Raúl Grijalva<br>Member of Congress |
| Ro Khanna<br>Member of Congress | Rosa L. DeLauro<br>Member of Congress | Ruben Gallego<br>Member of Congress |
| Salud O. Carbajal<br>Member of Congress | Sanford D. Bishop, Jr.<br>Member of Congress | Scott H. Peters<br>Member of Congress |
| Steven Horsford<br>Member of Congress | Susan A. Davis<br>Member of Congress | Suzanne Bonamici<br>Member of Congress |
| Sylvia R. Garcia<br>Member of Congress | Ted W. Lieu<br>Member of Congress | TJ Cox<br>Member of Congress |
| Tony Cárdenas<br>Member of Congress | Val B. Demings<br>Member of Congress | Veronica Escobar<br>Member of Congress |
| Vicente Gonzalez<br>Member of Congress | Yvette D. Clarke<br>Member of Congress | Zoe Lofgren<br>Member of Congress |
| Joyce Beatty<br>Member of Congress | Raul Ruiz, M.D.<br>Member of Congress | Sheila Jackson Lee<br>Member of Congress |

**AR6183**

# Congress of the United States
## Washington, DC 20515

July 1, 2020

Kenneth T. Cuccinelli
Senior Official Performer Duties of the Director
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security
20 Massachusetts Avenue NW M.S. 2090
Washington, D.C. 20529

Dear Mr. Cuccinelli,

We are writing to urge U.S. Citizenship and Immigration Services (USCIS) to immediately begin accepting new applications for the Deferred Action for Childhood Arrivals (DACA) program.

On June 18, 2020, in an opinion authored by Chief Justice Roberts, the Supreme Court ruled that the Trump administration's attempted rescission of DACA was arbitrary and capricious, in violation of the Administrative Procedure Act.  This conclusion rests on the well-settled principle of administrative law that "[a]n agency must defend its actions based on the reasons it gave when it acted," a principle that the Department of Homeland Security violated in its haste to deport hundreds of thousands of Dreamers.[1]

We were disturbed to see that the USCIS website includes a statement that the recent U.S. Supreme Court decision "has no basis in law."[2]  As noted above, the Court correctly held that the Trump administration violated fundamental tenets of administrative law in its eagerness to end DACA.  We should not need to tell you that under our Constitution, the U.S. Supreme Court, not the Administration, determines whether the rescission of DACA was lawful.[3]  USCIS and the Administration must faithfully administer our nation's immigration laws by providing clear guidance implementing the Court's order.

The Supreme Court's decision was also a moral victory for the hundreds of thousands of Dreamers across our country, for their families and communities, and for our core values as a nation of immigrants.  We were extremely disappointed to see Administration officials ignore their mandate and use USCIS's public platform to make a political attack undermining the rule of law and Dreamers.

---

[1] Department of Homeland Security v. Regents of the University of California, 2020 WL 321746 at * 14 , 17 (June 18, 2020) (noting that the Department had "entirely failed" to consider obvious alternatives to complete rescission od DACA and had refused to consider the important reliance interests that DACA had engendered)( quoting *Motor Vehicle Mfrs. Ass'n of US., Inc. v. State Farm Mut. Auto. Ins. Co.* 463 U.S. 29, 43 (1983)).

[2] USCIS STATEMENT ON SUPREME COURT'S DACA DECISION, USCIS, June 19, 2020, available at https://www.uscis.gov/news/news-releases/uscis-statement-supreme-courts-daca-decision

[3] *See* U.S. CONST., art. VI, § 2 *and* Marbury v. Madison, 5 U.S. 137, 175–78 (1803).

1

We ask that you not only remove the statement, but also provide clear guidance to the public and USCIS employees that you will immediately begin accepting new DACA applications, and will resume accepting and adjudicating applications for advance parole for DACA recipients.

Sincerely,

| | | |
|---|---|---|
| Joaquin Castro<br>Member of Congress | Lucille Roybal-Allard<br>Member of Congress | Jerrold Nadler<br>Member of Congress |
| | Zoe Lofgren<br>Member of Congress | |
| Adam B. Schiff<br>Member of Congress | Adam Smith<br>Membr of Congress | Adriano Espaillat<br>Member of Congress |
| Al Green<br>Member of Congress | Alan Lowenthal<br>Member of Congress | Albio Sires<br>Member of Congress |
| Alexandria Ocasio-Cortez<br>Member of Congress | Alma S. Adams, Ph.D.<br>Member of Congress | Ami Bera, M.D.<br>Member of Congress |
| André Carson<br>Member of Congress | Ann Kirkpatrick<br>Member of Congress | Anna G. Eshoo<br>Member of Congress |
| Anthony G. Brown<br>Member of Congress | Ayanna Pressley<br>Member of Congress | Barbara Lee<br>Member of Congress |
| Ben Ray Luján<br>Member of Congress | Bennie G. Thompson<br>Member of Congress | Bobby L. Rush<br>Member of Congress |
| Bonnie Watson Coleman<br>Member of Congress | Brenda L. Lawrence<br>Member of Congress | Carolyn B. Maloney<br>Member of Congress |
| Cedric L. Richmond<br>Member of Congress | Danny K. Davis<br>Member of Congress | Darren Soto<br>Member of Congress |
| David N. Cicilline<br>Member of Congress | David Scott<br>Member of Congress | David Trone<br>Member of Congress |
| Deb Haaland<br>Member of Congress | Debbie Mucarsel-Powell<br>Member of Congress | Diana DeGette<br>Member of Congress |
| Dina Titus<br>Member of Congress | Donald M. Payne, Jr.<br>Member of Congress | Doris Matsui<br>Member of Congress |
| Dwight Evans<br>Member of Congress | Earl Blumenauer<br>Member of Congress | Eleanor Holmes Norton<br>Member of Congress |
| Eliot L. Engel<br>Member of Congress | Emanuel Cleaver, II<br>Member of Congress | Filemon Vela<br>Member of Congress |
| Frank Pallone, Jr.<br>Member of Congress | Gerald E. Connolly<br>Member of Congress | Gilbert R. Cisneros, Jr.<br>Member of Congress |

**AR6185**

| | | |
|---|---|---|
| Grace F. Napolitano<br>Member of Congress | Grace Meng<br>Member of Congress | Greg Stanton<br>Member of Congress |
| Gregory W. Meeks<br>Member of Congress | Gwen Moore<br>Member of Congress | Hakeem Jeffries<br>Member of Congress |
| Henry C. "Hank" Johnson, Jr.<br>Member of Congress | Ilhan Omar<br>Member of Congress | J. Luis Correa<br>Member of Congress |
| Jackie Speier<br>Member of Congress | Jahana Hayes<br>Member of Congress | James P. McGovern<br>Member of Congress |
| James R. Langevin<br>Member of Congress | Jamie Raskin<br>Member of Congress | Jan Schakowsky<br>Member of Congress |
| Jared Huffman<br>Member of Congress | Jason Crow<br>Member of Congress | Jennifer Wexton<br>Member of Congress |
| Jesús G. "Chuy" García<br>Member of Congress | Jimmy Gomez<br>Member of Congress | Jimmy Panetta<br>Member of Congress |
| Joe Neguse<br>Member of Congress | José E. Serrano<br>Member of Congress | Joseph P. Kennedy, III<br>Member of Congress |
| Juan Vargas<br>Member of Congress | Judy Chu<br>Member of Congress | Julia Brownley<br>Member of Congress |
| Karen Bass<br>Member of Congress | Katherine M. Clark<br>Member of Congress | Kathleen M. Rice<br>Member of Congress |
| Linda T. Sánchez<br>Member of Congress | Lisa Blunt Rochester<br>Member of Congress | Lloyd Doggett<br>Member of Congress |
| Lori Trahan<br>Member of Congress | Madeleine Dean<br>Member of Congress | Marc Veasey<br>Member of Congress |
| Mark Pocan<br>Member of Congress | Mark Takano<br>Member of Congress | Nanette Diaz Barragán<br>Member of Congress |
| Nita Lowey<br>Member of Congress | Norma J. Torres<br>Member of Congress | Nydia M. Velázquez<br>Member of Congress |
| Pete Aguilar<br>Member of Congress | Peter A. DeFazio<br>Member of Congress | Pramila Jayapal<br>Member of Congress |
| Raja Krishnamoorthi<br>Member of Congress | Rashida Tlaib<br>Member of Congress | Raúl M. Grijalva<br>Member of Congress |
| Raul Ruiz, M.D.<br>Member of Congress | Rosa L. DeLauro<br>Member of Congress | Ruben Gallego<br>Member of Congress |
| Salud O. Carbajal<br>Member of Congress | Scott H. Peters<br>Member of Congress | Steven Horsford<br>Member of Congress |

3

**AR6186**

Susan A. Davis
Member of Congress

Suzanne Bonamici
Member of Congress

Sylvia R. Garcia
Member of Congress

Ted W. Lieu
Member of Congress

Terri A. Sewell
Member of Congress

TJ Cox
Member of Congress

Tony Cárdenas
Member of Congress

Veronica Escobar
Member of Congress

Vicente Gonzalez
Member of Congress

Yvette D. Clarke
Member of Congress

4

**AR6187**



# STATE OF WASHINGTON

July 1, 2020

The Honorable Donald J. Trump
President of the United States
The White House
1600 Pennsylvania Avenue NW
Washington, D.C. 20500

Dear Mr. President:

As elected officials from across the state of Washington, we write to you united in our support for the more than 16,000 young people covered by the Deferred Action for Childhood Arrival (DACA) program who call our state home.

These aspiring Washingtonians who contribute to our state and economy have built their lives here and are part of the fabric of our communities. They are students, teachers, doctors, and small-business professionals who are working, studying, and raising families. Their great courage, grit, and determination embody the American Dream. We are proud that they have given Washington the honor of being their home.

We are heartened by the Supreme Court's June 18 decision ensuring that DACA recipients can continue to live their lives free from the fear and uncertainty they have shouldered since your decision to terminate the program in 2017. Particularly at a time when immigrant communities are facing disproportionate health and economic impacts from the COVID-19 pandemic, this new measure of security is sorely needed.

However, in their ruling, the Court remanded the issue back to the U.S. Department of Homeland Security (DHS) and left open the possibility that your administration may continue to pursue termination of the DACA program. If you were to proceed down that path, we are confident that you would cause staggering costs to our economy and substantial injury to employers across our state. More importantly, it would carry a devastating human toll for the thousands of DACA recipients we represent. These young people know no other place as their home and would be torn apart from their lives, their families, their jobs, and their communities. We hope you recognize that these costs are far too great to pursue further action on this issue.

**AR6188**

The Honorable Donald J. Trump
July 1, 2020
Page 2

We strongly encourage you to abandon any efforts to terminate a program that directly benefits thousands of Washingtonians who we are proud to serve. Instead, it is our fervent hope that you choose the path of empathy and reason by ensuring that these young people remain here at home, in America, where they belong.

Very truly yours,

Jay Inslee
Governor

Speaker Laurie Jinkins
Washington State House of Representatives

Senator Andy Billig
Majority Leader, Wasington State Senate

Senator Marko Liias
Washington State Senate

Representative Alex Ramel
Washington State House of Representatives

Representative Frank Chopp
Washington State House of Representatives

Senator Jamie Pedersen
Washington State Senate

Senator Lisa Wellman
Washington State Senate

Representative My-Linh Thai
Washington State House of Representatives

Representative Strom Peterson
Washington State House of Representatives

Senator Karen Keiser
Washington State Senate

Senator Joe Nguyen
Washington State Senate

**AR6189**

The Honorable Donald J. Trump
July 1, 2020
Page 3

Senator Dean Takko
Washington State Senate

Representative Mike Sells
Washington State House of Representatives

Representative Tana Senn
Washington State House of Representatives

Representative Jake Fey
Washington State House of Representatives

Senator Liz Lovelett
Washington State Senate

Senator Claire Wilson
Washington State Senate

Representative Christine Kilduff
Washington State House of Representatives

Senator Reuven Carlyle
Washington State Senate

Representative Mia Gregerson
Washington State House of Representatives

Representative Vandana Slatter
Washington State House of Representatives

Representative Gerry Pollet
Washington State House of Representatives

Representative Timm Ormsby
Washington State House of Representatives

Representative Mari Leavitt
Washington State House of Representatives

Representative Steve Tharinger
Washington State House of Representatives

**AR6190**

The Honorable Donald J. Trump
July 1, 2020
Page 4

Representative Amy Walen
Washington State House of Representatives

Representative Lisa Callan
Washington State House of Representatives

Representative Dave Paul
Washington State House of Representatives

Senator Derek Stanford
Washington State Senate

Representative Joe Fitzgibbon
Washington State House of Representatives

Representative Eileen Cody
Washington State House of Representatives

Representative Cindy Ryu
Washington State House of Representatives

Representative Roger Goodman
Washington State House of Representatives



Representative Sharon Tomiko Santos
Washington State House of Representatives

Senator Patty Kuderer
Washington State Senate

Senator Mona Das
Washington State Senate

Senator Steve Conway
Washington State Senate

Representative Sharon Wylie
Washington State House of Representatives

Representative Debra Lekanoff
Washington State House of Representatives

**AR6191**

The Honorable Donald J. Trump
July 1, 2020
Page 5

Representative Sharon Shewmake
Washington State House of Representatives

Representative Mike Chapman
Washington State House of Representatives

Senator Sam Hunt
Washington State Senate

Senator Rebecca Saldaña
Washington State Senate

Representative Lauren Davis
Washington State House of Representatives

Representative Pat Sullivan
Washington State House of Representatives

Representative Tina Orwall
Washington State House of Representatives

Representative Marcus Riccelli
Washington House of Representatives

Senator David Frockt
Washington State Senate

Representative Javier Valdez
Washington State House of Representatives

Senator Emily Randall
Washington State Senate

Representative Davina Duerr
Washington State House of Representatives

Representative Nicole Macri
Washington State House of Representatives

Representative Jesse Johnson
Washington State House of Representatives

**AR6192**

The Honorable Donald J. Trump
July 1, 2020
Page 6

Representative Beth Doglio
Washington State House of Representatives

Representative John Lovick
Washington State House of Representatives

Representative Steve Kirby
Washington State House of Representatives

Representative Brian Blake
Washington State House of Representative

Senator June Robinson
Washington State Senate

Senator Manka Dhingra
Washington State Senate

Senator Bob Hasegawa
Washington State Senate

Representative Lillian Ortiz-Self
Washington State House of Representatives

Senator Annette Cleveland
Washington State Senate

Representative Zack Hudgins
Washington State House of Representatives

Representative Eric Pettigrew
Washington State House of Representatives

Representative Bill Ramos
Washington State House of Representatives

Senator Steve Hobbs
Washington State Senate

Senator Christine Rolfes
Washington State Senate

**AR6193**

The Honorable Donald J. Trump
July 1, 2020
Page 7

Representative Sherry Appleton
Washington State House of Representatives

Represenative Monica Jurado Stonier
Washington State House of Representatives

Represenatative Melanie Morgan
Washington State House of Represenatives

Represenative Debra Entenman
Washington State House of Representatives

Representative Noel Frame
Washington State House of Representatives

Representative Laurie Dolan
Washington State House of Representatives

Representative Shelley Kloba
Washington State House of Representatives

Representative Mike Pellicciotti
Washington State House of Representatives

Representative Gael Tarleton
Washington State House of Representatives

Representative Emily Wicks
Washington State House of Representastives

Representative Jared Mead
Washington State House of Representatives

Senator Jeannie Darneille
Washington State Senate

Senator Jesse Salomon
Washington State Senate

Representative Larry Springer
Washington State House of Representatives

**AR6194**

The Honorable Donald J. Trump
July 1, 2020
Page 8

Senator Kevin Van De Wege
Washington State Senate

Senator Mark Mullet
Washington State Senate

Representative Steve Berquist
Washington State House of Representatives

Representative Drew Hansen
Washington State House of Representatives

Representative Brian Blake
Washington State House of Representatives

**AR6195**



**Bitta Mostofi**
Commissioner

253 Broadway
14th Floor
New York, NY 10007

212-788-7654 tel
212-788-9389 fax

www.nyc.gov/immigrants

July 6, 2020

**RECEIVED**
**By ESEC External at 11:42 am, Jul 07, 2020**

Chad F. Wolf
Acting Secretary
U.S. Department of Homeland Security
245 Murray Lane, S.W.
Washington, D.C. 20528

Joseph Edlow
Deputy Director for Policy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Avenue, N.W.
Washington, D.C. 20529

Dear Acting Secretary Wolf and Deputy Director Edlow,

As the Commissioner of the New York City Mayor's Office of Immigrant Affairs, I write today to urge the U.S. Department of Homeland Security ("DHS") and U.S. Citizenship and Immigration Services ("USCIS") to honor the Supreme Court's June 18, 2020, decision in *Department of Homeland Security et al. v. Regents of the University of California et al* and restore the Deferred Action for Childhood Arrivals ("DACA") program to how it was being administered before DHS's 2017 decision to terminate the program.

New York City has long supported the DACA program, as DACA recipients and DACA eligible individuals are integral to our communities and have significantly contributed to our City's culture and economy. In our City alone, there are approximately 30,000 young immigrants who have benefited from the program as well as an additional 45,000 who could become eligible to apply. The City has had the privilege of witnessing firsthand the enormous contributions of DACA recipients and eligible individuals—including as our public school teachers, nurses at our hospitals, business owners, and as City government employees.

The Supreme Court recognized in its decision that not only have individual DACA recipients relied on the program—but further, this reliance has "radiate[d] outward" to encompass families, schools, businesses, and cities like ours. *DHS v. Regents of the University of California*, 591 U.S. ___, *24 (2020). The decision rightfully restores the DACA program to its original state in 2012. DHS and USCIS must abide by this decision and immediately reinstate the DACA program by accepting and processing initial applications as well as advance parole applications.

**AR6196**



As part of the reinstatement, USCIS must immediately issue clear guidance and accompanying instructions on how it plans to accept and process initial DACA and advance parole applications. USCIS must also conduct extensive outreach and education about its plans to current DACA recipients, DACA eligible individuals, and others impacted by this decision such as local governments, educational institutions, and employers. Such outreach efforts should include mechanisms for addressing feedback like stakeholder calls and a stakeholder roundtable with legal services providers and members of the impacted community.

The Supreme Court's decision leaves no room for doubt that the DACA program must be reinstated fully and entirely to its original condition. DHS and USCIS must commit to following and implementing this clear decision immediately not only because the rule of law demands it, but also because the DACA program is an incredibly successful policy that improves the lives of young immigrants and benefits employers, communities, and cities across the nation.

Sincerely,

Bitta Mostofi
Commissioner, Mayor's Office of Immigrant Affairs

AR6197

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC 20529-2000



**U.S. Citizenship
and Immigration
Services**

July 10, 2020

Ms. Bitta Mostofi
Commissioner
Office of Immigrant Affairs
253 Broadway
14th Floor
New York, NY 10007

Dear Ms. Mostofi:

Thank you for your suggestions and comments in your July 6, 2020 letter related to the Department of Homeland Security's (DHS) implementation of the Supreme Court's ruling in *Department of Homeland Security v. Regents of the University of California* regarding the Deferred Action for Childhood Arrivals (DACA) program. Acting Secretary Wolf asked that I respond on his behalf.

Reaffirming Acting Secretary Wolf's statement on the Supreme Court's decision, DACA recipients deserve closure and finality surrounding their status here in the United States. U.S. Citizenship and Immigration Services will work with DHS on next steps regarding the Court's decision and will consider your views during this process.

Thank you again for your letter and interest in this important matter.

Sincerely,

Joseph Edlow
Deputy Director for Policy

# EVANGELICAL IMMIGRATION table.

Bethany Christian Services

Council for Christian Colleges and Universities

Ethics and Religious Liberty Commission of the Southern Baptist Convention

Faith and Community Empowerment

National Association of Evangelicals

National Latino Evangelical Coalition

World Relief

July 8, 2020

Dear President Trump,

Last month, while the U.S. Supreme Court ruled on the Deferred Action for Childhood Arrival (DACA) case in such a way that maintains it for the moment, the Court also affirmed the authority of your administration to terminate DACA via a different process. We are writing to urge you, consistent with the request of Evangelical Immigration Table leaders in August 2017, to leave DACA in place until such time as Congress has passed legislation to permanently protect Dreamers, and to encourage you to sign such legislation into law.

As we have communicated to our congressional leaders, we continue to believe that this situation merits a permanent, legislative solution for these young immigrants who consider America their home and are contributing to our communities in so many ways, including in the response to and recovery from the COVID-19 pandemic. As president, you have an important role to play – not only in signing legislation that reaches your desk, but in signaling your support and urging Congress to act.

We ask you to publicly and consistently urge congressional leaders to urgently pass legislation to create a pathway for those who arrived in the U.S. as children and who meet other necessary and appropriate qualifications to earn permanent legal status and, eventually, citizenship. Polls show such pathway legislation is supported by the majority of evangelical Christians as well as the majority of those who voted for you in 2016. Permanence for Dreamers has robust support among all Americans.

Consistent with your past comments affirming your concern and "great love" for this population, we plead with you to work toward good faith compromise that would both be compassionate to immigrants and respect the rule of law. As always, we are committed to praying for you and your administration, as well as for the immigrant individuals and families whose lives and livelihoods are directly affected by your deliberations.

Sincerely,

The Evangelical Immigration Table
www.EvangelicalImmigrationTable.com

**AR6199**



Scott Arbeiter, President, World Relief

Shirley Hoogstra, President, Council for Christian Colleges and Universities

Hyepin Im, President & CEO, Faith and Community Empowerment

Walter Kim, President, National Association of Evangelicals

Russell Moore, President, Ethics & Religious Liberty Commission of the Southern Baptist Convention

Chris Palusky, President & CEO, Bethany Christian Services

Gabriel Salguero, President, National Latino Evangelical Coalition

**AR6200**



# THE UNITED STATES CONFERENCE OF MAYORS

1620 EYE STREET, NORTHWEST
WASHINGTON, D.C. 20006
TELEPHONE (202) 293-7330
FAX (202) 293-2352
TDD (202) 293-9445
URL: www.usmayors.org/uscm

July 9, 2020

**An Open Letter to the President and Congress on Dreamers from America's Mayors**

Dear Mr. President and Members of the U.S. House of Representatives and the U.S. Senate:

We write on behalf of the nation's mayors to urge that the Administration fully maintain the Deferred Action for Childhood Arrivals (DACA) program until Congress passes legislation that would enable Dreamers – people who have lived in America since they were children and built their lives here – to earn lawful permanent residence and eventually American citizenship, if they meet certain criteria.  And we urge Congress to seize the moment and pass this legislation as quickly as possible.  We pledge to work with you in this effort and do whatever we can to assist you in seeing this important legislation enacted into law this year.

The United States Conference of Mayors has had strong policy supporting permanent legal status for Dreamers and extension of the DACA program for many years, and our bipartisan organization has adopted this policy because it is the right thing to do – for Dreamers, for our communities and for our country.  The cultural, economic, and social contributions of the 800,000 DACA recipients and their families to their communities cannot be overstated, particularly during a global pandemic where over 200,000 DACA recipients are working in essential roles, including 27,000 in health care positions.

The decision by the U.S. Supreme Court to uphold the DACA program provided a reprieve to DACA recipients.  It delivered a powerful message to Dreamers: this country belongs to you today and will remain your home tomorrow. Dreamers are our neighbors, colleagues, essential workers, entrepreneurs, students, and soldiers. For hundreds of thousands nationwide, this ruling was life-changing — a source of relief and a reason for celebration.

For these young people and every immigrant who strengthens America's economy, communities, and future, Congress must deliver on the promise of a long-term and humane legislative solution, so nobody's status hangs in the balance of uncertainty again.  And, until it does so, the Administration must maintain the DACA program and continue to accept new applicants as they become eligible for it.

It is incumbent upon you to remove Dreamers' fears of deportation and allow them to contribute even more to the country they love, which for many is the only country they have known.  They would be able to reach their full potential in many ways, including serving in the military.  The U.S. Conference of Mayors pledges to work with you to make this happen.

**AR6201**

Sincerely,

Greg Fischer
Mayor of Louisville
President

Nan Whaley
Mayor of Dayton
Vice President

Francis X. Suarez
Mayor of Miami
Second Vice President

Bryan K. Barnett
Mayor of Rochester Hills, MI
Past President

Stephen Benjamin
Mayor of Columbia, SC
Past President

Elizabeth B. Kautz
Mayor of Burnsville
Past President

Eric Garcetti
Mayor of Los Angeles
Chair, USCM Latino Alliance

John Giles
Mayor of Mesa
Co-chair, Immigration
Reform Task Force

Jorge Elorza
Mayor of Providence
Co-Chair, Immigration
Reform Task Force

Lori E. Lightfoot
Mayor of Chicago
Chair, Criminal and Social Justice
Committee

Dee Margo
Mayor of El Paso
Vice Chair for Border Policy
Criminal and Social Justice
Committee

Tom Cochran
CEO and Executive Director

**AR6202**

**COALITION** *for the*
**AMERICAN DREAM**

July 11, 2020

President Donald J. Trump
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20050

Dear Mr. President:

The Coalition for the American Dream is an organization of business leaders supporting Deferred Action for Childhood Arrivals (DACA) recipients and pursuing a bipartisan, permanent legislative solution for Dreamers. Our membership includes more than 140 employers and trade associations spanning a variety of U.S. industries, from retail to manufacturing to tech, that represent more than half of American private sector workers.

As large American employers and employer organizations, we strongly urge you to leave the DACA program in place.  DACA recipients have been critical members of our workforce, industries, and communities for years now, and they have abided by the laws and regulations of our country in order to maintain their DACA status.  Their work and commitment to our companies, their families and communities are critical to our nation's strength, especially since there are tens of thousands of DACA recipients working as front line doctors and nurses and in other critical industries fighting COVID-19.  Moreover, poll after poll has shown that the overwhelming majority of Americans of all political backgrounds agree that we should protect DACA recipients from deportation.

This is no time to disrupt the economic recovery of our companies and communities, nor time to jeopardize the health and safety of these vulnerable individuals.  We ask that you leave DACA in place and refrain from taking any additional administrative actions that would negatively impact the DACA program.

Respectfully,
The Coalition for the American Dream




















**AR6203**





WARBY PARKER



RETAIL INDUSTRY LEADERS ASSOCIATION




EY















































































AR6204